**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) | MDL NO 2924 |
| PRODUCTS LIABILITY | 20-MD-2924 |
| LITIGATION | |
| | JUDGE ROBIN L ROSENBERG |
| | MAGISTRATE JUDGE BRUCE REINHART |

_____/

**THIS DOCUMENT RELATES TO:  ALL CASES**

**<u>MASTER PERSONAL INJURY COMPLAINT</u>**

Pursuant to Pretrial Order ("PTO") No. 31, Plaintiffs file this Master Personal Injury Complaint ("MPIC") against Defendants identified below.  Plaintiffs bring this MPIC because Plaintiffs developed cancers from taking medication that Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold.

For decades Defendants widely promoted and/or sold Zantac and/or its generic forms of ranitidine as being safe and effective for use against heartburn, making it the first pharmaceutical drug to reach $1 billion in sales.  But Defendants concealed from the public a devastating secret that once revealed resulted in voluntary recalls by manufacturers and retailers.  The U.S. Food and Drug Administration ("FDA") ultimately removed all ranitidine-containing products from shelves nationwide.  The secret: Zantac and its generic forms inherently harbor a well-known cancer-causing compound, N-Nitrosodimethylamine ("NDMA").   For decades, Defendants sold ranitidine-containing products, reaping substantial profits.  Now, Plaintiffs across the country seek to hold Defendants accountable for causing hundreds of thousands of people to develop cancer.

This MPIC sets forth allegations of fact and law common to the personal-injury claims within this multidistrict litigation ("MDL").  Each Plaintiff individually seeks compensatory and punitive damages (where available), restitution, and all other available remedies as a result of

injuries caused by Defendants' defective pharmaceutical products.  The MPIC is intended to plead all causes of action in the broadest sense and pursuant to all applicable laws and choice-of-law principles, including the statutory and common law of each Plaintiff's state.

This MPIC does not necessarily include all claims asserted in all of the transferred actions to this Court, and it is not intended to consolidate for any purpose the separate claims of the individual Plaintiffs in this MDL.  Each Plaintiff in this MDL will adopt this MPIC and the causes of action alleged herein against specific Defendants through a separate Short Form Complaint ("SFC"), attached hereto as Exhibit A.  Any individual facts, jurisdictional allegations, additional legal claims, and/or requests for relief of an individual Plaintiff may be set forth as necessary in the SFC filed by the respective Plaintiff.  This MPIC does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions, and no Plaintiff relinquishes the right to amend his or her individual claims to include additional claims as discovery proceeds and facts and other circumstances may warrant pursuant to PTO No. 31 or the appropriate Federal Rules of Civil Procedure.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................................ i

INTRODUCTION ................................................................................................................... 1

PARTIES ................................................................................................................................ 5

    I.    Plaintiffs ....................................................................................................................... 5

    II.    Defendants ................................................................................................................... 6

        A.    Brand-Name Manufacturer Defendants ........................................................ 6

        B.    Generic Manufacturer Defendants ................................................................. 9

        C.    Distributor Defendants ................................................................................ 26

        D.    Retailer Defendants ..................................................................................... 28

        E.    Repackager Defendants ............................................................................... 37

JURISDICTION & VENUE .................................................................................................. 38

FACTUAL ALLEGATIONS ................................................................................................ 39

    I.    The Creation of Ranitidine-Containing Products and Their Introduction to the Market .................................................................................................................. 39

        A.    GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers .................................................................................................. 39

        B.    Patents Expire, Allowing Generics to Enter the Market ............................... 43

    II.    Ndma Is a Probable Carcinogen Whose Dangerous Properties Are Well Established ................................................................................................................ 48

    III.    NDMA Is Discovered in Ranitidine-Containing Products, Leading to Market Withdrawl ................................................................................................................ 54

    IV.    How Ranitidine Transforms Into NDMA ................................................................. 60

            Figure 1 – Diagram of Ranitidine & NDMA Molecules ................................ 61

        A.    Formation of NDMA in the Environment of the Human Stomach .................. 61

            Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol .......................................................................................... 67

            Table 2 – Valisure Biologically Relevant Tests for NDMA Formation .......... 68

        B.    Formation of NDMA in Other Organs of the Human Body ........................... 69

            Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme .................................................................................................. 71

            Figure 3 – Expression levels of DDAH-1 enzyme by Organ ......................... 72

        C.    Formation of NDMA by Exposure to Heat and/or Time ................................ 73

       Figure 4 – Rate of Development of NDMA when Exposed to Heat ............... 74

    D.    Formation of NDMA in the Manufacturing Process...................................... 75

  V.    Evidence Directly Links Ranitidine Exposure to Cancer ........................... 76

  VI.    Defendants Knew or Should Have Known of the NDMA Risk .............................. 78

THE FEDERAL REGULATORY LANDSCAPE ...................................................... 80

  I.    Brand-Name and Generic Manufacturer Defendants Made False Statements in the Labeling of Ranitidine-Containing Products .............................................. 80

  II.    Generic Drug Manufacturer Requirements .............................................. 85

  III.    Federal Law Required the Manufacturer Defendants to Notify the FDA About the Presence of NDMA in Ranitidine-Containing Products...................................... 87

  IV.    Current Good Manufacturing Practices ...................................................... 88

  V.    The Repackager and Distributor Defendants also Had a Duty to Implement Proper Storage, Handling, and Shipping Conditions ........................................... 90

  VI.    Ranitidine-Containing Products Are Misbranded and Adulterated Because They Contain Dangerous and Biologically Relevant Levels of NDMA .......................... 92

DEFENDANTS' WARRANTIES TO PLAINTIFFS .................................................. 94

  I.    Warranties Common to Manufacturer and Repackager Defendants. ....................... 94

  II.    Warranties Common to All Non-Manufacturing Defendants ................................. 96

PLAINTIFFS' USE OF RANITIDINE-CONTAINING PRODUCTS ........................................ 96

TOLLING / FRAUDULENT CONCEALMENT ...................................................... 98

EXEMPLARY / PUNITIVE DAMAGES ALLEGATIONS ........................................... 99

CAUSES OF ACTION ............................................................................ 100

  Count I:  Strict Products Liability—Failure to Warn ...................................... 100

  Count II:  Strict Products Liability—Design Defect ....................................... 104

  Count III:  Strict Products Liability—Manufacturing Defect ............................. 108

  Count IV:  Negligence—Failure to Warn ................................................... 110

  Count V:  Negligent Product Design......................................................... 114

  Count VI:  Negligent Manufacturing ....................................................... 117

  Count VII:  General Negligence.............................................................. 119

  Count VIII:  Negligent Misrepresentation ................................................. 124

  Count IX:  Breach of Express Warranties .................................................. 127

  Count X:  Breach of Implied Warranties ................................................... 131

  Count XI:  Violation of Consumer Protection and Deceptive Trade Practices Laws ....... 132

  Count XII:  Unjust Enrichment .............................................................. 138

Count XIII:  Loss of Consortium .................................................................................... 140

Count XIV:  Survival Actions ......................................................................................... 141

Count XV:  Wrongful Death .......................................................................................... 142

JURY TRIAL DEMAND ..................................................................................................... 143

PRAYER FOR RELIEF ....................................................................................................... 143

## INTRODUCTION

1.      Zantac is the branded name for ranitidine, a "blockbuster" drug that was sold as a safe and effective antacid.  But ranitidine is anything but safe.  It is an unstable molecule that breaks down under normal conditions into high levels of NDMA, a carcinogen that is as potent as it is dangerous.  After almost four decades and billions of dollars of sales, ranitidine consumption has caused hundreds of thousands of consumers to develop cancer.  Plaintiffs bring these actions for personal injuries and/or death as a result of Defendants' design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of brand-name and generic ranitidine-containing products.

2.      Until its recent recall by the FDA, ranitidine was a popular antacid drug consumed by millions of people every day.  Recent scientific studies, however, confirm what drug companies knew or should have known decades earlier: ingesting ranitidine exposes the consumer to staggering amounts of NDMA.

3.       NDMA is a potent human carcinogen.  It was first discovered in the early 1900s as a byproduct of manufacturing rocket fuel.  Today, its only use is to induce tumors in animals as part of laboratory experiments.  Its only function is to cause cancer.  It has no medicinal purpose whatsoever.

4.      NDMA is not akin to other compounds that have a salutary effect at low levels and a negative effect with greater exposure.  There is no recommended daily dose of NDMA.  The ideal level of exposure is zero.  Nonetheless, the FDA previously set an allowable daily limit of NDMA of 96 nanograms (ng) to minimize the risks posed by this dangerous molecule.  Yet a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher than the allowable limit.

5.      Those recent revelations by the scientific community have caused widespread recalls of ranitidine both domestically and internationally.   In fact, after numerous voluntary recalls, on April 1, 2020, the FDA ordered the immediate withdrawal of all ranitidine-containing products sold in the United States, citing unacceptable and unpreventable levels of NDMA accumulation.

6.      The high levels of NDMA observed in ranitidine-containing products is a function of the drug's unstable nature.   Ranitidine-containing products generate NDMA as the ranitidine molecule (1) breaks down in the human digestive system; (2) interacts with various enzymes in the human body; (3) reacts over time under normal storage conditions and which increases significantly when exposed to heat; and/or (4) during the manufacturing process.   In aggregate, ranitidine-containing products were akin to billions of Trojan horses that smuggled dangerously high levels of NDMA into the bodies of millions of consumers.

7.      Zantac wreaked such widespread harm in large part because Glaxo—the inventor of ranitidine—succumbed to a temptation that is all too familiar to pharmaceutical innovators: maximizing the profits of an incredibly lucrative, government-conferred monopoly.

8.      To encourage pharmaceutical companies to invest in research and development ("R&D"), the U.S. legal and regulatory system offers drug companies who invent "new chemical entities" two powerful inducements.   First, innovators obtain patent protection for their pharmaceutical compounds.   Second, approved new drugs enjoy FDA exclusivity, irrespective of whether the molecule is protected by one or more issued patents.   Taken together, these policies assure that a pharmaceutical innovator will receive the exclusive right, for a limited period of time, to sell its drug to the American public.

9.      The argument for monopoly pharmaceutical franchises rests on the profit-

2

motive. R&D is time consuming and expensive, and not all drug-development efforts will succeed. Once a drug is approved, some period of monopoly profits is necessary to allow innovators to recoup their sunk R&D costs in both successful and unsuccessful pursuits.

10. In some ways, the system works as intended. Pharmaceutical companies do invent new and useful medicines that—absent high profit potential—might not otherwise come to market. But once an innovator possesses a blockbuster monopoly franchise, it has a virtual license to mint money. Most pharmaceutical ingredients are cheap commodities, which branded manufacturers then resell at a monopoly markup. During the exclusivity period, brand-name drugs routinely enjoy gross profit margins of 70, 80, or even 90+ percent. No other industry comes close to matching this profit-generating potential.

11. As a result of these economic realities, branded drug manufacturers have a strong— and too often perverse—incentive to sell as much product as they can during their exclusivity window. That is why branded manufacturers spend billions of dollars per year in sales and marketing efforts to push incremental sales of a brand-name drug. Where every $1 in new sales can produce upwards of $.90 in gross profit, staggering sales and marketing budgets are a very profitable investment. But while it makes sense for branded manufacturers to spend vast sums of money to develop and promote FDA approved drugs, they have no equivalent economic or regulatory incentive to uncover and investigate developing risks posed by their products.

12. That problem is especially acute for bestselling, blockbuster drugs. And Zantac is the brand that gave meaning to a blockbuster pharmaceutical product, becoming the first drug ever to generate over $1 billion in annual sales. Zantac's success catapulted Glaxo ahead of its previously larger rivals, fueling the market capitalization and corporate combinations that gave the company its current name: GlaxoSmithKline. It is little wonder Glaxo spared no expense to both

3

get Zantac to market and to aggressively promote it to millions of consumers.  Yet Glaxo did not

part with a comparative pittance to investigate the obvious cancer risk posed by

ranitidine.  Turning a blind eye was far more profitable.

13.     Generic ranitidine manufacturers share culpability for Plaintiffs' cancers, but for

different and equally perverse reasons.  To reduce the costs of medicine, Congress sought to ensure

extensive competition once the exclusivity period for a brand-name drug expires.  At that point,

generic manufacturers may rapidly enter the market.  They undergo a streamlined FDA approval

process—through an Abbreviated New Drug Application ("ANDA")—without the need to

replicate the expensive clinical trials to prove that the drug is safe and effective.

14.     With a drug as popular as Zantac, generic competition is extensive and

fierce.  Without the benefit of a lawful monopoly or a strong brand name, generics are forced to

compete on price, which dramatically undercuts the lucrative margins enjoyed by branded

manufacturers.  The FDA estimates that when a single generic enters the market, the average price

of the drug falls by 39% compared to the branded-only monopoly.  Once four generics enter the

market, the average price falls by 79%.  It takes only six generic competitors to reduce the price

by more than 95%.  But over the years, there were 75 FDA-approved ANDAs for generic ranitidine

held by a multitude of generic manufacturers.

15.     With razor thin margins and robust competition, a generic manufacturer faces its

own economic temptation to cut corners, source ingredients as inexpensively as possible, and

underinvest in quality control.  And having already enjoyed a free ride on the brand's development

of the drug, generic manufacturers also hope to free ride on some other company's investment in

monitoring and analyzing emerging dangers posed by the products they are selling into the

marketplace.  But the generic manufacturers listed in this MPIC are responsible for their own

products.  Thin margins and robust competition are not legally valid excuses for selling drugs that cause cancer.

16.     Ultimately, the law holds every corporate entity in the supply chain of ranitidine responsible for the personal injuries and death caused by such an unsafe product.  And the civil justice system is the first, last, and only line of defense against the unchecked avarice that is a byproduct of a regulatory regime with the well-intentioned aim of bringing safe and effective medicines to market.  Plaintiffs seek redress both to compensate them for the horrific losses they have suffered in the past and to strongly deter in the future the type of misconduct that gave rise to their injuries.

## PARTIES

### I.  PLAINTIFFS

17.     Pursuant to PTO # 31, this MPIC is filed on behalf of all individually injured Plaintiffs and, if applicable, Plaintiffs' spouses, children, parents, decedents, heirs, estates, wards, guardians or other legally appointed representatives who file a SFC.

18.     Plaintiffs in these individual actions are citizens and/or residents of the United States who have suffered personal injuries and/or death as a result of using Defendants' dangerously defective ranitidine-containing products.

19.     Plaintiffs were diagnosed with various cancers and their sequelae, which were directly and proximately caused by their use of ranitidine-containing products.  These injuries include, but are not limited to, the following types of cancer:  bladder, brain, breast, colorectal, esophageal or throat, intestinal, kidney, liver, lung, ovarian, pancreatic, prostate, stomach, testicular, thyroid, and uterine.

## II.  DEFENDANTS

20.     Defendants are collectively composed of entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine.

### A.  Brand-Name Manufacturer Defendants

### Boehringer Ingelheim (BI)[1]

21.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a citizen of Delaware and Connecticut.

22.     Defendant Boehringer Ingelheim Corporation is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Corporation is a citizen of Nevada and Connecticut.

23.     Defendant Boehringer Ingelheim USA Corporation is a Delaware corporation with its principal place of business located at 900 Ridgebury Rd., Ridgebury, Connecticut 06877. Boehringer Ingelheim USA Corporation is a citizen of Delaware and Connecticut.

24.     Defendant Boehringer Ingelheim International GmbH is a limited liability company formed and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim AM Rhein, Rheinland-Phalz, Germany.  Boehringer Ingelheim International GmbH is a citizen of Germany.

25.     Boehringer Ingelheim Pharmaceuticals, Inc. is a direct or indirect subsidiary of Boehringer Ingelheim Corporation and Boehringer Ingelheim USA Corporation, which are

---

[1] Defendant Boehringer Ingelheim also manufactured generic ranitidine under ANDA 074662, as well as through its former subsidiary Ben Venue Laboratories Inc. d/b/a Bedford Laboratories (ANDA 074764).  Ben Venue Laboratories Inc. is no longer in operation.

themselves wholly owned, directly or indirectly, by Boehringer Ingelheim International GmbH. Collectively, these entities shall be referred to as "Boehringer Ingelheim" or "BI."

26.    Defendant Boehringer Ingelheim Promeco, S.A. de C.V. is a foreign corporation organized and existing under the laws of Mexico with its principal place of business located at Maiz No. 49, Barrio Xaltocan, Xochimilco, Ciudad de Mexico, 16090 Mexico. Boehringer Ingelheim Promeco, S.A. de C.V. is a citizen of Mexico.

### GlaxoSmithKline (GSK)

27.    Defendant GlaxoSmithKline LLC is a Delaware limited liability company with its principal place of business located at Five Crescent Drive, Philadelphia, Pennsylvania, 19112. GlaxoSmithKline LLC's sole member is GlaxoSmithKline (America) Inc., a Delaware corporation with its principal place of business in that state.  GlaxoSmithKline LLC is a citizen of Delaware.

28.    Defendant GlaxoSmithKline (America) Inc. is a Delaware corporation with its principal place of business located at 1105 N. Market Street, Suite 622, Wilmington, Delaware 19801.  Defendant GlaxoSmithKline (America) Inc. is a citizen of Delaware.

29.    Defendant GlaxoSmithKline plc is a public limited company formed and existing under the laws of the United Kingdom, having a principal place of business at 980 Great West Road, Brentford Middlesex XO, TW8 9GS, United Kingdom.  GlaxoSmithKline plc is a citizen of the United Kingdom.

30.    GlaxoSmithKline LLC and GlaxoSmithKline (America) Inc. are subsidiaries of GlaxoSmithKline plc.  Collectively, these entities shall be referred to as "GSK."

**Pfizer**

31.     Defendant Pfizer Inc.  ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.  Pfizer Inc. is a citizen of Delaware and New York.

**Sanofi**

32.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi-Aventis U.S. LLC's sole member is Sanofi U.S. Services, Inc., a Delaware corporation with its principal place of business in New Jersey.  Sanofi-Aventis U.S. LLC is a citizen of Delaware and New Jersey.

33.     Defendant Sanofi US Services Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi US Services Inc. is a citizen of Delaware and New Jersey.

34.     Defendant Sanofi S.A. is a corporation formed and existing under the laws of France, having a principal place of business at 54 Rue La Boetie, 8th Arrondissement, Paris, France 75008.  Sanofi S.A. is a citizen of France.

35.     Defendant Patheon Manufacturing Services LLC is a Delaware limited liability company with its principal place of business located at 5900 Martin Luther King Jr. Hwy, Greenville, North Carolina 27834.  Thermo Fisher Scientific, Inc. is the sole member of Patheon Manufacturing Services LLC.  Thermo Fisher Scientific, Inc. is a Delaware corporation with its principal place of business in Massachusetts.  Patheon Manufacturing Services LLC is a citizen of Delaware and Massachusetts.

36.     Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. are subsidiaries of Sanofi S.A.  Patheon Manufacturing Services LLC and Boehringer Ingelheim Promeco, S.A. de C.V. packaged and manufactured the finished Zantac product for Sanofi.  Collectively, these entities shall be referred to as "Sanofi."

*          *          *

37.     Defendants BI, GSK, Pfizer, and Sanofi, shall be referred to collectively as the "Brand-Name Manufacturer Defendants."  At all relevant times, the Brand-Name Manufacturer Defendants have conducted business and derived substantial revenue from their design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of Zantac within each of the States and Territories of the United States, and the District of Columbia.[2]

## B.  Generic Manufacturer Defendants

### Acic Pharmaceuticals

38.     Defendant Methapharm, Inc. is a Delaware corporation with its principal place of business located at 11772 W. Sample Road, Ste. 103, Coral Springs, FL 33065.  Methapharm, Inc. is a citizen of Delaware and Florida.

39.     Defendant Acic Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Canada with its principal place of business located at 81 Sinclair Boulevard, Brandtford, Ontario N3S 7X6.  Acic Pharmaceuticals, Inc. is a citizen of Canada.

40.     Methapharm, Inc. is a subsidiary of Acic Pharmaceuticals, Inc.  Collectively, these entities shall be referred to as "Acic Pharmaceuticals."

---

[2] All references to "States" include the District of Columbia.

**Ajanta**

41.     Defendant Ajanta Pharma USA Inc. is a New Jersey corporation with its principal place of business located at 440 U.S. Highway 22, Ste. 150, Bridgewater, NJ 08807.  Ajanta Pharma USA Inc. is a citizen of New Jersey.

42.     Defendant Ajanta Pharma Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at 9 Ajanta House Charkop, Kandivili (West), Mumbai, Maharashtra, India.  Ajanta Pharma Ltd is a citizen of India.

43.     Ajanta Pharma USA Inc. is a subsidiary of Ajanta Pharma Ltd.  Collectively, these entities shall be referred to as "Ajanta."

44.     Defendant Ajanta purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Ajanta.

**AmerisourceBergen**

45.     Defendant Amerisource Health Services, LLC d/b/a American Health Packaging, is a Delaware limited liability company with its principal place of business located at 2550 John Glenn Ave., Suite A, Columbus, Ohio 43217.  Amerisource Health Services, LLC's sole member is AmerisourceBergen Corporation, a Delaware corporation with its principal place of business in Pennsylvania.  Amerisource Health Services, LLC is a citizen of Delaware and Pennsylvania.

46.     Defendant AmerisourceBergen Corporation is a Delaware corporation with its principal place of business located at 1300 Morris Drive, Chesterbrook, Pennsylvania 19087.  AmerisourceBergen Corporation is a citizen of Delaware and Pennsylvania.[3]

---

[3] Defendant AmerisourceBergen Corporation is also a "Distributor Defendant" and is listed again under that heading below.

47.     Amerisource Health Services, LLC is a subsidiary of AmerisourceBergen Corporation.  Collectively, these entities shall be referred to as "Amerisource."

**Amneal**

48.     Defendant Amneal Pharmaceuticals LLC is a Delaware limited liability company with its principal place of business located at 400 Crossing Blvd., Bridgewater, New Jersey 08807. The sole member of Amneal Pharmaceuticals LLC is Amneal Pharmaceuticals, Inc., a Delaware corporation with its principal place of business in New Jersey.  Amneal Pharmaceuticals LLC is a citizen of Delaware and New Jersey.

49.     Defendant Amneal Pharmaceuticals of New York, LLC is a Delaware limited liability company with its principal place of business located at 50 Horseblock Road, Brookhaven, New York 11719.  The membership interest of Amneal Pharmaceuticals of New York, LLC is owned by Amneal Pharmaceuticals, Inc., through an intervening limited liability company. Amneal Pharmaceuticals of New York, LLC is a citizen of Delaware and New Jersey.

50.     Defendant Amneal Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 400 Crossing Blvd., Bridgewater, New Jersey 08807. Defendant Amneal Pharmaceuticals, Inc. is a citizen of Delaware and New Jersey.

51.     Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals of New York, LLC are subsidiaries of Amneal Pharmaceuticals, Inc.  Collectively, these entities shall be referred to as "Amneal."

52.     Defendant Amneal purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Amneal.

**ANDA Repository**

53.     Defendant ANDA Repository, LLC is a Delaware limited liability company with its principal place of business located at 3477 Corporate Pkwy, Ste. 100, Center Valley, Pennsylvania 18034.  Upon information and belief, the member(s) of ANDA Repository, LLC and the company itself are citizens of Pennsylvania

**Ani Pharmaceuticals**

54.     Defendant Ani Pharmaceuticals Inc. is a Delaware corporation with its principal place of business located at 210 Main Street West, Baudette, Minnesota 56623.  Defendant Ani Pharmaceuticals Inc. is a citizen of Delaware and Minnesota.

**Apotex**

55.     Defendant Apotex Corporation is a Delaware corporation with its principal place of business located at 2400 N. Commerce Parkway, Suite 400, Weston, Florida 33326.  Apotex Corporation is a citizen of Delaware and Florida.

56.     Defendant Apotex Inc. is a corporation organized and existing under the laws of Canada with its principal place of business located at 150 Signet Drive, Toronto, Ontario, M9L 1T9 Canada.  Apotex Inc. is a citizen of Canada.

57.     Apotex Corporation is a subsidiary of Apotex Inc.  Collectively, these entities shall be referred to as "Apotex."

58.     Defendant Apotex purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Apotex.

**Appco**

59.     Defendant Appco Pharma LLC ("Appco") is a New Jersey limited liability company with its principal place of business located at 120 Belmont Drive, Somerset, New Jersey

08873.  Upon information and belief, the member(s) of Appco and the company itself are citizens of New Jersey.

**Aurobindo**

60.    Defendant Auro Health LLC is a New Jersey limited liability company with is principal place of business located at 2572 U.S. Highway 1, Lawrenceville, New Jersey 08648. The sole member of Auro Health LLC is Aurobindo Pharma USA, Inc., a Delaware corporation with its principal place of business located in New Jersey.  Auro Health LLC is a citizen of Delaware and New Jersey.

61.    Aurobindo Pharma USA, Inc. is a Delaware corporation with its principal place of business located at 279 Princeton Highstown Road, East Windsor, New Jersey 08520.  Aurobindo Pharma USA, Inc. is a citizen of Delaware and New Jersey.

62.    Defendant Aurobindo Pharma, Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Plot No. 2, Maitrivihar, Ameerpet, Hyderabad-500038, Telangana, India.  Aurobindo Pharma, Ltd. is a citizen of India.

63.    Auro Health LLC and Aurobindo Pharma USA, Inc. are subsidiaries of Aurobindo Pharma, Ltd.  Collectively, these entities shall be referred to as "Aurobindo."

64.    Defendant Aurobindo purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Aurobindo.

**Contract Pharmacal**

65.    Defendant Contract Pharmacal Corp. is a New York corporation with its principal place of business located at 135 Adams Avenue, Hauppauge, New York 11788.  Contract Pharmacal Corp. is a citizen of New York.

13

**Dr. Reddy's**

66.     Defendant Dr. Reddy's Laboratories Inc. is a New Jersey corporation with its principal place of business located at 107 College Rd. E, Princeton, New Jersey 08540.  Dr. Reddy's Laboratories Inc. is a citizen of New Jersey.

67.     Defendant Dr. Reddy's Laboratories, Ltd. is corporation organized and existing under the laws of India with its principal place of business located at 8-2-337, Road No. 3, Banjara Hills, Hyderabad Telangana 500 034, India.  Dr. Reddy's Laboratories, Ltd. is a citizen of India.

68.     Defendant Dr. Reddy's Laboratories SA is a corporation organized and existing under the laws of Switzerland with its principal place of business located at Elisabethenanlage, 11, Basel, 4051 Switzerland.  Dr. Reddy's Laboratories SA is a citizen of Switzerland.

69.     Dr. Reddy's Laboratories Inc. and Dr. Reddy's Laboratories, Ltd. are subsidiaries of Dr. Reddy's Laboratories SA.  Collectively, these entities shall be referred to as "Dr. Reddy's."

70.     Defendant Dr. Reddy's purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Dr. Reddy's.

**Geri-Care**

71.     Defendant Geri-Care Pharmaceuticals, Corp. ("Geri-Care") is a New York corporation with its principal place of business located at 1650 63rd Street, Brooklyn, New York 11204.  Geri-Care is a citizen of New York.

72.     Defendant Geri-Care purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Geri-Care.

**Glenmark**

73.    Defendant Glenmark Pharmaceuticals, Inc., USA is a Delaware corporation with its principal place of business located at 750 Corporate Drive, Mahwah, New Jersey 07430. Glenmark Pharmaceuticals, Inc., USA is a citizen of Delaware and New Jersey

74.    Defendant Glenmark Generics Ltd is a corporation organized and existing under the laws of India with its principal place of business located at Glenmark House, B.D. Sawant Marg., Chakala, Western Express Highway, Andheri (E), Mumbai 400 099, India.  Glenmark Generics Ltd is a citizen of India.

75.    Defendant Glenmark Pharmaceuticals Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Glenmark House, B.D. Sawant Marg., Chakala, Western Express Highway, Andheri (E), Mumbai 400 099, India. Glenmark Pharmaceuticals Ltd. is a citizen of India.

76.    Glenmark Pharmaceuticals, Inc., USA and Glenmark Generics Ltd are subsidiaries of Glenmark Pharmaceuticals Ltd.  Collectively, these entities shall be referred to as "Glenmark."

77.    Defendant Glenmark purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Glenmark.

**Granules**

78.    Defendant Granules USA, Inc. is a Delaware corporation with its principal place of business located at 35 Waterview Blvd., Parsippany, New Jersey 07054.  Granules USA, Inc. is a citizen of Delaware and New Jersey.

79.     Defendant Granules India, Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at 2nd Floor, 3rd Block, My Home Hub, Madhapur, Hyderabad – 500 081 (TG), India.  Granules India, Ltd. is a citizen of India.

80.     Granules USA, Inc. is a subsidiary of Granules India, Ltd.  Collectively, these entities shall be referred to as "Granules."

81.     Defendant Granules purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Granules.

### Heritage

82.     Defendant Heritage Pharma Labs Inc. is a New Jersey corporation with its principal place of business located at 21 Cotters Ln Ste B, East Brunswick, New Jersey, 08816-2050. Heritage Pharma Labs Inc. is a citizen of New Jersey.

83.     Defendant Heritage Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located at 21 Cotters Ln Ste B, East Brunswick, New Jersey, 08816-2050.  Heritage Pharmaceuticals, Inc. is a citizen of Delaware and New Jersey

84.     Defendant Emcure Pharmaceuticals Ltd. is corporation organized and existing under the laws of India with its principal place of business located at Emcure House T 184, MIDC Bhosari Pune, 411 026 India.  Emcure Pharmaceuticals Ltd. is a citizen of India.

85.     Heritage Pharma Labs Inc. and Heritage Pharmaceuticals, Inc. are subsidiaries of Emcure Pharmaceuticals Ltd.  Collectively, these entities shall be referred to as "Heritage."

### Hikma

86.     Defendant Hikma Pharmaceuticals USA, Inc. f/k/a West-Ward Pharmaceuticals Corp. is a Delaware corporation with its principal place of business located at 246 Industrial Way

West, Eatontown, New Jersey, 07724.  Hikma Pharmaceuticals USA, Inc. is a citizen of Delaware and New Jersey.

87.     Defendant Hikma Pharmaceuticals International, Ltd. f/k/a West-Ward Pharmaceuticals International, Ltd. is a corporation organized and existing under the laws of the United Kingdom with its principal place of business located at 1 New Burlington Place, London, England W1S 2HR.  Hikma Pharmaceuticals International Ltd. is a citizen of the United Kingdom.

88.     Hikma Pharmaceuticals USA, Inc. and Hikma Pharmaceuticals International Ltd. are subsidiaries of Hikma Pharmaceuticals, PLC.  Collectively, these entities shall be referred to as "Hikma."

### Hi-Tech

89.     Defendant Hi-Tech Pharmacal Co., Inc. is a Delaware corporation with its principal place of business located at 369 Bayview Avenue, Amityville, New York 11701.  Hi-Tech Pharmacal Co., Inc. is a citizen of Delaware and New York.

### JB Chemicals

90.     Defendant Unique Pharmaceutical Laboratories, Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Neelam Centre, B'Wing, 4th Floor, Hund-Cycle Road, Worli, Mumbai – 400025, Maharashtra, India.  Unique Pharmaceutical Laboratories, Ltd. is a citizen of India.

91.     J B Chemicals and Pharmaceuticals Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Cnergy IT Park, Unit 2A, 3rd Floor & Unit A, 8th Floor, App Saheb Marathe Marg, Prabhadevi, Mumbai, 400 025, India.  J B Chemicals and Pharmaceuticals Ltd. is a citizen of India.

92.     Unique Pharmaceutical Laboratories, Ltd. is a subsidiary of J B Chemicals and Pharmaceuticals Ltd.  Collectively, these entities shall be referred to as "JB Chemicals."

## Lannett

93.     Defendant Lannett Co., Inc. ("Lannett") is a Delaware corporation with its principal place of business located at 9000 State Road, Philadelphia, Pennsylvania 19136.  Lannett is a citizen of Delaware and Pennsylvania.

94.     Defendant Lannett purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Lannett.

## Mylan

95.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business located at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  Mylan Pharmaceuticals, Inc. is a citizen of West Virginia.

96.     Defendant Mylan Institutional LLC is a Delaware limited liability company with its principal place of business located at 1718 Northrock Court, Rockford, Illinois 61103.  The sole member of Mylan Institutional LLC is Mylan, Inc., a Pennsylvania corporation with is principal place of business in that state.  Mylan Institutional LLC is a citizen of Pennsylvania.

97.     Defendant Mylan, Inc. is a Pennsylvania corporation with its principal place of business located at 1000 Mylan Blvd., Canonsburg, Pennsylvania 15317.  Mylan, Inc. is a citizen of Pennsylvania.

98.     Defendant Mylan Laboratories Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Plot No. 564/A/22, Road No. 92, Jubilee Hills 500 034, Hyderabad, India.  Mylan Laboratories Ltd. is a citizen of India.

18

99.     Mylan Pharmaceuticals, Inc., Mylan Institutional LLC, Mylan Laboratories Ltd., and Mylan, Inc. are subsidiaries of Mylan N.V.  Collectively, these entities shall be referred to as "Mylan."

100.     Defendant Mylan purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Mylan.

**Nostrum**

101.     Defendant Nostrum Laboratories Inc. ("Nostrum") is a New Jersey corporation with its principal place of business located at 1370 Hamilton Street, Summerset, New Jersey 08873.  Nostrum Laboratories Inc. is a citizen of New Jersey.

102.     Defendant Nostrum purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Nostrum.

**Novitium**

103.     Defendant Novitium Pharma LLC ("Novitium") is a Delaware limited liability company with its principal place of business located at 70 Lake Drive, East Windsor, New Jersey 08520.  Upon information and belief, the member(s) of Novitium and the company itself are citizens of New Jersey.

104.     Defendant Novitium purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Novitium.

**PAI**

105.    Defendant PAI Holdings, LLC f/k/a Pharmaceutical Associates, Inc., is a South Carolina limited liability company with its principal place of business located at 1700 Perimeter Road, Greenville, South Carolina 29605.  Upon information and belief, the member(s) of PAI Holdings, LLC and the company itself are citizens of South Carolina.

**Par Pharmaceutical**

106.    Defendant Par Pharmaceutical Inc. is a New York corporation with its principal place of business located at 6 Ram Ridge Road, Chestnut Ridge, New York, 10977.  Par Pharmaceutical Inc. is a citizen of New York.

**Perrigo**

107.    Defendant L. Perrigo Co. is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010.  L. Perrigo Co. is a citizen of Michigan.

108.    Defendant Perrigo Company is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010.  Perrigo Company is a citizen of Michigan.

109.    Defendant Perrigo Research & Development Company is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010.  Perrigo Research & Development Company is a citizen of Michigan.

110.    Defendant Perrigo Company, plc is a corporation organized and existing under the laws of Ireland with its principal place of business located at Treasury Building, Lower Grand Canal Street, Dublin, 2 Ireland.  Perrigo Company, plc is a citizen of Ireland.

111.    L. Perrigo Co., Perrigo Company, and Perrigo Research & Development Company are subsidiaries of Perrigo Company, plc.  Collectively, these entities shall be referred to as "Perrigo."

112.    Defendant Perrigo purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Perrigo.

### Sandoz

113.    Defendant Sandoz Inc. ("Sandoz") is a Colorado corporation with its principal place of business located at 100 College Road West, Princeton, New Jersey 08540.  Sandoz Inc. is a citizen of Colorado and New Jersey.

### Strides

114.    Defendant Strides Pharma, Inc. is a New Jersey corporation with its principal place of business located at 2 Tower Center Blvd., Suite 1102, East Brunswick, New Jersey 08816. Strides Pharma, Inc. is a citizen of New Jersey.

115.    Defendant Strides Pharma Global Pte. Ltd. is a corporation organized and existing under the laws of Singapore with its principal place of business located at 8 Eu Tong Sen Street, #15-93, The Central, Singapore 059818.  Strides Pharma Global Pte. Ltd. is a citizen of Singapore.

116.    Defendant Strides Pharma Science Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Strides House, Bilekahalli, Bannerghatta Road, Bangalore 560 076, India.  Strides Pharma Science Ltd. is a citizen of India.

117.    Strides Pharma, Inc., Strides Pharma Global Pte. Ltd, and Strides Pharma Science Ltd. are subsidiaries of Strides Arcolab International Ltd.  Collectively, these entities shall be referred to as "Strides."

118.    Defendant Strides purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Strides.

**Taro**

119.    Defendant Taro Pharmaceuticals U.S.A., Inc. is a New York corporation with its principal place of business located at Three Skyline Drive, Hawthorne, New York 10532.  Taro Pharmaceuticals U.S.A., Inc. is a citizen of New York.

120.    Defendant Ranbaxy Inc. is a Texas corporation with its principal place of business located at 2 Independence Way, Princeton, New Jersey 08540.  Ranbaxy Inc. is a citizen of Texas and New Jersey.

121.    Defendant Sun Pharmaceutical Industries, Inc., f/k/a Ranbaxy Pharmaceuticals Inc., is a Delaware corporation with is principal place of business located at 2 Independence Way, Princeton, New Jersey 08540.  Sun Pharmaceutical Industries, Inc. is a citizen of Delaware and New Jersey.

122.    Defendant Sun Pharmaceutical Industries Ltd. is corporation organized and existing under the laws of India with its principal place of business located at Western Express Highway Sun House, CTS No 201 B/1 Goregaon East, Mumbai, 400 063 India.  Sun Pharmaceutical Industries Ltd. is a citizen of India.

123.    Defendant Taro Pharmaceutical Industries Ltd. is a corporation organized and existing under the laws of Israel with its principal place of business located at 14 Hakitor Street, Haifa Bay 2624761, Israel.  Taro Pharmaceutical Industries Ltd. is a citizen of Israel.

124.    Taro Pharmaceuticals U.S.A., Inc., Ranbaxy Inc., Sun Pharmaceutical Industries, Inc. (f/k/a Ranbaxy Pharmaceuticals Inc.), and Sun Pharmaceutical Industries Ltd. are subsidiaries

of Taro Pharmaceutical Industries Ltd.  Collectively, these entities shall be referred to as "Taro Pharmaceutical."

**Teva**

125.    Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business located at 1877 Kawai Rd., Lincolnton, North Carolina 28092.  The membership interest of Actavis Mid Atlantic LLC is owned by Teva Pharmaceuticals U.S.A., Inc., either directly or through an intervening limited liability company.  Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business in Pennsylvania.  Actavis Mid Atlantic LLC is a citizen of Delaware and Pennsylvania.

126.    Defendant Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business located at 400 1090 Horsham Road North Wales, Pennsylvania 19454.  Teva Pharmaceuticals U.S.A., Inc. is a citizen of Delaware and Pennsylvania.

127.    Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business located at 400 Interpace Parkway, Bldg. A., Parsippany, New Jersey, 07054.  Watson Laboratories, Inc. is a citizen of Nevada and New Jersey.

128.     Defendant Teva Pharmaceutical Industries Ltd. is a corporation organized and existing under the laws of Israel with its principal place of business located at 5 Basel Street, Petach Tikva, Israel, 4951033.  Teva Pharmaceutical Industries Ltd. is a citizen of Israel.

129.    Actavis Mid Atlantic LLC, Teva Pharmaceuticals U.S.A., Inc., and Watson Laboratories, Inc. are subsidiaries of Teva Pharmaceutical Industries Ltd.  Collectively, these entities shall be referred to as "Teva."

**Torrent**

130.    Defendant Torrent Pharma Inc. is a Delaware corporation with its principal place of business located at 150 Allen Road, Suite 102, Basking Ridge, New Jersey 07920.  Torrent Pharma Inc. is a citizen of Delaware and New Jersey.

**VKT**

131.    VKT Pharma Inc. is a Delaware corporation with its principal place of business located at 8 The Green, Suite A, Dover, Delaware 19901.  VKT Pharma Inc. is a citizen of Delaware.

132.    Defendant VKT Pharma Private Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Plot No. 72, H.No. 8-2-334/ 3 & 4, 4th Floor, Road No. 05, Opp SBI Executive Enclave, Banjara Hills, Hyderabad, 500 034, Telangana, India.  VKT Pharma Private Ltd. is a citizen of India.

133.    VKT Pharma Inc. is a subsidiary of VKT Pharma Private Ltd.  Collectively, these entities shall be referred to as "VKT."

134.    Defendant VKT purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant VKT.

**Wockhardt**

135.    Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business located at 20 Waterview Blvd., Parsippany, New Jersey 07054.  Upon information and belief, the sole member of Wockhardt USA LLC is Wockhardt USA, Inc., a Delaware corporation with its principal place of business in New Jersey.  Wockhardt USA LLC is a citizen of Delaware and New Jersey.

136.     Wockhardt USA, Inc. is a Delaware corporation with its principal place of business located at 135 Route 202/206, Bedminster, New Jersey 07921.  Wockhardt USA, Inc. is a citizen of Delaware and New Jersey.

137.     Defendant Wockhardt, Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Wockhardt Towers, Bandra Kurla Complex, Bandra (East), Mumbai 400051, Maharashtra, India.  Wockhardt, Ltd. is a citizen of India.

138.     Wockhardt USA LLC and Wockhardt USA, Inc. are subsidiaries of Wockhardt, Ltd.  Collectively, these entities shall be referred to as "Wockhardt."

139.     Defendant Wockhardt purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Wockhardt.

### Zydus-Cadila

140.     Defendant Zydus Pharmaceuticals (USA) Inc. is a New Jersey corporation with its principal place of business located at 73 Route 31 N., Pennington, New Jersey 08534.  Zydus Pharmaceuticals (USA) Inc. is a citizen of New Jersey.

141.     Cadila Healthcare Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Zydus Tower, Satellite Cross Roads, Sarkhej-Gandhinagar Highway, Amedabad 380 015, India.  Cadila Healthcare Ltd. is a citizen of India.

142.     Zydus Pharmaceuticals (USA) Inc. is a subsidiary of Cadila Healthcare Ltd.  These entities operate under the trade name of, and shall be referred to as, "Zydus-Cadila."

143.     Defendant Zydus-Cadila purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Zydus-Cadila.

* * *

144.    Defendants identified in paragraphs 38 to 143 above shall be referred to collectively as the "Generic Manufacturer Defendants." At all relevant times, the Generic Manufacturer Defendants have conducted business and derived substantial revenue from their design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products within each of the States and Territories of the United States.

**C.  Distributor Defendants**

145.    Distributors purchase bulk ranitidine-containing products from the Brand-Name Manufacturer Defendants and Generic Manufacturer Defendants and then sell to the Retailer Defendants.  The distributor market is extremely concentrated, with three entities controlling approximately 92% of the volume:  Defendants Amerisource Bergen Corporation; Cardinal Health, Inc.; and McKesson Corporation.

**Amerisource Bergen**

146.    Defendant AmerisourceBergen Corporation is a Delaware corporation with its principal place of business located at 1300 Morris Drive, Chesterbrook, Pennsylvania 19087. AmerisourceBergen Corp. is a citizen of Delaware and Pennsylvania.[4]

147.    Defendant AmerisourceBergen Corporation purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant AmerisourceBergen Corporation.

---

[4] Defendant AmerisourceBergen Corporation is also a "Generic Manufacturer Defendant" and is listed again under that heading above.

## Cardinal Health

148.    Defendant Cardinal Health, Inc. ("Cardinal Health") is an Ohio corporation with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017.  Cardinal Health is a citizen of Ohio.

149.    Defendant Cardinal Health purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Cardinal Health.

## Chattem

150.    Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th Street Chattanooga, Tennessee 37409.  Chattem is a citizen of Tennessee.  Chattem is a wholly owned subsidiary of Sanofi S.A., a French corporation otherwise described above.

151.    Defendant Chattem purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Chattem.

## McKesson

152.    Defendant McKesson Corporation is a Delaware corporation with its principal place of business located at 6555 State Highway 161, Irving, TX 94104.  McKesson Corporation is a citizen of Delaware and Texas.

153.    Defendant McKesson Corporation purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant McKesson Corporation.

*    *    *

154.    Defendants AmerisourceBergen Corporation, Cardinal Health, Chattem, and McKesson Corporation, shall be referred to collectively as the "Distributor Defendants."  At all relevant times, the Distributor Defendants have conducted business and derived substantial revenue from their testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products within each of the States and Territories of the United States.

**D.  Retailer Defendants**

155.    Retailers derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products within each of the States and Territories of the United States.  As described below, many retailers also used their own brand names on relabeled ranitidine-containing products.

<b>Albertson's</b>

156.    Defendant Albertson's Companies, Inc. is a Delaware corporation with a its principal place of business located at 132 E. Lake Street, McCall, Idaho 83638.  Albertson's Companies, Inc. is a citizen of Delaware and Idaho.

157.    Defendant Safeway, Inc. is a Delaware corporation with its principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California 94588.  Safeway, Inc. is a citizen of Delaware and California.

158.    Defendant Safeway, Inc. purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Safeway, Inc.

159.    Safeway, Inc. is a subsidiary of Albertson's Companies, Inc.  Collectively, these entities shall be referred to as "Albertson's."

**Amazon**

160.    Defendant Amazon.com, Inc. is Delaware corporation with its principal place of business located at 410 Terry Avenue North, Seattle, Washington 98109.  Amazon.com, Inc. is a citizen of Delaware and Washington.

**BJ's**

161.    Defendant BJ's Wholesale Club Holdings, Inc. is a Delaware corporation with its principal place of business located at 25 Research Drive, Westborough, Massachusetts 01581. BJ's Wholesale Club Holdings, Inc. is a citizen of Delaware and Massachusetts.

**Costco**

162.    Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal place of business located at 999 Lake Drive, Issaquah, Washington 98027. Costco is a citizen of Washington.

163.    Defendant Costco purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Costco.

**CVS**

164.    Defendant CVS Pharmacy, Inc. ("CVS") is a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island 02895. Defendant CVS is a citizen of Delaware and Rhode Island.

165.    Defendant CVS purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant CVS.

166.     CVS is the largest pharmacy healthcare provider in the United States.  In 2015, CVS Health Corporation acquired Target Corporation's pharmacies and clinics.  CVS defined herein includes any current or former Target pharmacy.

## Dollar General

167.     Defendant Dolgencorp, LLC ("Dollar General") is a Kentucky limited liability company with its principal place of business located at 100 Mission Rdg., Goodlettsville, Tennessee 37072.  Dollar General Corporation is the sole member of Dolgencorp, LLC.  Dollar General Corporation is a Tennessee corporation with its principal place of business in Tennessee. Dollar General is a citizen of Tennessee.

168.     Defendant Dollar General purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Dollar General.

## Dollar Tree

169.     Defendant Family Dollar, Inc. is a North Carolina corporation with its principal place of business located at 500 Volvo Parkway, Chesapeake, Virginia 23320.  Family Dollar, Inc. is a citizen of North Carolina and Virginia.

170.     Defendant Family Dollar, Inc. purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Family Dollar, Inc.

171.     Defendant Dollar Tree Stores, Inc. is a Virginia corporation with its principal place of business located at 500 Volvo Parkway, Chesapeake, Virginia 23320.  Dollar Tree Stores, Inc. is a citizen of Virginia.

172.    Family Dollar, Inc. is a subsidiary of Dollar Tree Stores, Inc.  Collectively, these entities shall be referred to as "Dollar Tree."

## Express Scripts

173.    Defendant Express Scripts, Inc. is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri 63121.  Defendant Express Scripts, Inc. is a citizen of Delaware and Missouri.

## Giant Eagle

174.    Defendant Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business located at 101 Kappa Drive, Pittsburgh, Pennsylvania 15238.  Defendant Giant Eagle, Inc. is a citizen of Pennsylvania.

## HEB

175.    Defendant H-E-B LP f/k/a HEB Grocery Company ("HEB") is a Texas limited partnership with its principal place of business located at 646 South Main Avenue, San Antonio, Texas 78204.  Upon information and belief, the partners of H-E-B LP are citizens of Texas and, thus, H-E-B LP is a citizen of Texas.

176.    Defendant HEB purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant HEB.

## Humana

177.    Defendant Humana Pharmacy Solutions, Inc. is a Kentucky corporation with its principal place of business located at 500 West Main Street, Louisville, Kentucky 40202.  Humana Pharmacy Solutions, Inc. is a citizen of Kentucky.

**Hy-Vee**

178.     Defendant Hy-Vee, Inc. is an Iowa corporation with its principal place of business located at 5820 Westown Parkway, West Des Moines, Iowa 50266.  Hy-Vee, Inc. is a citizen of Iowa.

**Kaiser Permanente**

179.     Defendant Kaiser Permanente International is a California corporation with its principal place of business located at One Kaiser Place, Oakland, California 94612.  Kaiser Permanente International is a citizen of California.

**Kmart**

180.     Defendant Kmart Corporation is a Michigan corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, IL 60179.  Kmart Corporation is a citizen of Michigan and Illinois.

**Kroger**

181.     Defendant The Kroger Co. is an Ohio corporation with its principal place of business located at 1014 Vine Street, Cincinnati, Ohio 45202.  The Kroger Co. is a citizen of Ohio.

182.     Defendant The Kroger Co. purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant The Kroger Co.

183.     Defendant Smith's Food and Drug Centers, Inc. is an Ohio corporation with its principal place of business located at 1014 Vine Street, Cincinnati, Ohio 45202.  Smith's Food and Drug Centers, Inc. is a citizen of Ohio.

184.    Defendant Fred Meyer Stores, Inc. is an Ohio corporation with its principal place of business located at 3800 SE 22nd Avenue, Portland, Oregon 97202.  Fred Meyer Stores, Inc. is a citizen of Ohio and Oregon.

185.    Smith's Food and Drug Centers, Inc. and Fred Meyer Stores, Inc. are subsidiaries of The Kroger Co.  Collectively, these entities shall be referred to as "Kroger."

## Medicine Shoppe

186.    The Medicine Shoppe International, Inc. is a Delaware corporation with its principal place of business located at 1100 N.  Lindbergh Boulevard, St. Louis, Missouri 63132. The Medicine Shoppe International, Inc. is a citizen of Delaware and Missouri.

187.    The Medicine Shoppe International, Inc. is a subsidiary of Cardinal Health.[5] and shall be referred to as the "Medicine Shoppe."

## Price Chopper

188.    Defendant Price Chopper Operating Co., Inc. is a New York corporation with its principal place of business located at 461 Nott St., Schenectady, New York 12308.  Price Chopper Operating Co., Inc. is a citizen of New York.

## Publix

189.    Defendant Publix Supermarkets, Inc. ("Publix") is a Florida corporation with its principal place of business located at 3300 Publix Corporate Parkway, Lakeland, Florida 33811. Publix is a citizen of Florida.

190.    Defendant Publix purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Publix.

---

[5] Cardinal Health is also a "Distributor Defendant" and is listed again under that heading above.

**Rite Aid**

191.    Defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with its principal place of business located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011.  Rite Aid is a citizen of Delaware and Pennsylvania.

192.    Defendant Rite Aid purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Rite Aid.

**Shop-Rite**

193.    Defendant Shop-Rite Supermarkets, Inc. is a New Jersey corporation with its principal place of business located at 5000 Riverside Drive, Keasbey, New Jersey 08332. Defendant Shop-Rite Supermarkets, Inc. is citizen of New Jersey.

194.    Defendant Wakefern Food Corporation is a New Jersey corporation with its principal place of business located at 5000 Riverside Drive, Keasbey, New Jersey 08332. Defendant Wakefern Food Corporation is citizen of New Jersey.

195.    Shop-Rite Supermarkets, Inc. is a subsidiary of Wakefern Food Corporation. Collectively, these entities shall be referred to as "Shop-Rite."

**UnitedHealth (OptumRx)**

196.    Defendant OptumRx, Inc. is a California corporation with its principal place of business located at 2300 Main Street, MS CA134-501, Irvine, California 92614.  Optum Rx, Inc. is a citizen of California.

**Vitamin Shoppe**

197.    Defendant Vitamin Shoppe Industries, LLC f/k/a Vitamin Shoppe Industries, Inc. "Vitamin Shoppe" is a New York limited liability company with its principal place of business

located at 300 Harmon Meadow Boulevard, Secaucus, New Jersey 07094.  Franchise Group, Inc. is the sole member of Vitamin Shoppe.  Franchise Group, Inc. is a Delaware corporation with its principal place of business in Virginia.  Vitamin Shoppe is a citizen of Delaware and Virginia

## Walgreens

198.    Defendant Walgreen Co. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015.  Walgreen Co. is a citizen of Delaware and Illinois.

199.    Defendant Duane Reade, Inc. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015.  Duane Reade, Inc. is a citizen of Delaware and Illinois.

200.    Defendant Walgreens Boot Alliance, Inc. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015.  Walgreens Boot Alliance, Inc. is a citizen of Delaware and Illinois.

201.    Defendant Walgreens Boot Alliance, Inc. purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Walgreens Boot Alliance, Inc.

202.    Walgreen Co. and Duane Reade, Inc. are subsidiaries of Walgreens Boots Alliance, Inc.  Collectively, these entities shall be referred to as "Walgreens."

## Walmart

203.    Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 72716.  Walmart Inc. is a citizen of Delaware and Arkansas.

204.    Defendant Sam's West, Inc. is an Arkansas corporation with its principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 72716.  Sam's West, Inc. is a citizen of Arkansas.

205.    Sam's West, Inc. is a subsidiary of Walmart, Inc.  Collectively, these entities shall be referred to as "Walmart."

206.    Defendant Walmart purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.  Therefore, all allegations referring to the "Repackager Defendants" apply to Defendant Walmart.

**Winn Dixie**

207.    Defendant Winn Dixie Stores, Inc. is a Florida corporation with its principal place of business located 8928 Prominence Parkway #200, Jacksonville, Florida 32256.  Winn Dixie Stores, Inc. is a citizen of Florida.

208.    Defendant Southeastern Grocers, Inc. f/k/a Southeastern Grocers, LLC is a Delaware corporation with its principal place of business located at 8928 Prominence Parkway #200, Jacksonville, Florida 32256.  Southeastern Grocers, Inc. is a citizen of Delaware and Florida.

209.    Winn Dixie Stores, Inc. is a subsidiary of Southeastern Grocers, Inc.  These entities shall be referred to as "Winn Dixie."

*    *    *

210.    Defendants identified in paragraphs 156 to 209 above shall be referred to collectively as the "Retailer Defendants."  At all relevant times, the Retailer Defendants have conducted business and derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products within each of the States and Territories of the United States.

### E.  Repackager Defendants

211.    Repackagers take a finished or unfinished drug product and repackage that product into a different container without manipulating, changing, or affecting the composition or formulation of the drug.  Relabelers change the content on an original manufacture's label to note the drug is distributed or sold under the relabeler's own name.  Repackagers and relabelers, together, will be referred to as "Repackager Defendants," and will include Generic Manufacturer, Distributor, and Retailer Defendants above who are also relabelers and/or repackagers.

### Denton Pharma

212.    Defendant Denton Pharma Inc. d/b/a Northwind Pharmaceuticals ("Denton Pharma") is a New York corporation with its principal place of business located at 119 Creamery Road, North Blenheim, New York 12131.  Denton Pharma is a citizen of New York.

### GSMS

213.    Defendant Golden State Medical Supply, Inc. ("GSMS") is a California corporation with its principal place of business located at 5187 Camino Ruiz, Camarillo, California 93012. Golden State Medical Supply is a citizen of California.

### Precision Dose

214.    Defendant Precision Dose Inc. ("Precision Dose") is an Illinois corporation with its principal place of business located at 722 Progressive Lane S, Beloit, Illinois 61080.  Precision Dose is a citizen of Illinois.

* * *

215.    Defendants identified in paragraphs 212 to 214 above, combined with those Generic Manufacturer, Distributor, and Retailer Defendants above who are also relabelers and/or repackagers, shall be referred to collectively as the "Repackager Defendants."  At all relevant

times, the Repackager Defendants have conducted business and derived substantial revenue from testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products within each of the States and Territories of the United States.

## JURISDICTION & VENUE

216.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  In each of the actions there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

217.    A substantial part of the events, actions, or omissions giving rise to Plaintiffs' causes of action occurred in the federal judicial district identified in each SFC.

218.    Venue is proper in each of those districts under 28 U.S.C. § 1391(a).

219.    Pursuant to the Transfer Orders of the Judicial Panel on Multidistrict Litigation, venue in actions sharing common questions with the initially transferred actions is proper in this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

220.    Defendants have significant contacts with the federal judicial district identified in each Plaintiff's SFC such that they are subject to the personal jurisdiction of the courts in each of those districts.

221.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products within the judicial district listed in the SFCs and targeted the consumer market within those districts.

222.    At all times alleged herein, Defendants were authorized to conduct or engage in business within each of the States and Territories of the United States and supplied ranitidine-containing products within each of the States and Territories of the United States.  Defendants received financial benefit and profits as a result of designing, manufacturing, testing, marketing,

labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products within each of the States and Territories of the United States

223.    Defendants each have significant contacts in each of the States and Territories of the United States, such that personal jurisdiction would be proper in any of them.  Defendants have derived revenue from the sale of their ranitidine-containing products in each of the States and Territories of the United States.

224.    Venue is proper for pretrial purposes in the Southern District of Florida, pursuant to this Court's PTO No. 11 Setting Forth Procedures for Direct Filed Personal Injury Cases.  Prior to trial, Plaintiffs may seek remand and/or transfer of their actions to the federal district of their choice, provided venue would have been proper if filed in the first instance, as specified in the SFC and PTO No. 11.

## FACTUAL ALLEGATIONS

### I.  THE CREATION OF RANITIDINE-CONTAINING PRODUCTS AND THEIR INTRODUCTION TO THE MARKET

225.    Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine under the brand name Zantac or a generic equivalent by either prescription or over the counter ("OTC").  Defendants sold or otherwise made available ranitidine in the following forms: injection, syrup, granules, tablets and/or capsules.

### A.  GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers

226.    Ranitidine belongs to a class of medications called histamine $H_2$-receptor antagonists (or $H_2$ blockers), which decrease the amount of acid produced by cells in the lining of the stomach.  Other drugs within this class include cimetidine (branded Tagamet), famotidine (Pepcid), and nizatidine (Tazac).

227.    GSK-predecessor Smith, Kline & French discovered and developed Tagamet, the

first $H_2$ blocker and the prototypical histamine $H_2$ receptor antagonist from which the later members of the class were developed.

228.    GSK[6] developed Zantac specifically in response to the success of cimetidine. Recognizing the extraordinary potential of having its own $H_2$ blocker in the burgeoning anti-ulcer market, GSK was all too willing to ensure its drug succeeded at all costs.

229.    In 1976, scientist John Bradshaw, on behalf of GSK-predecessor Allen & Hanburys Ltd. synthesized and discovered ranitidine.

230.    Allen & Hanburys Ltd., a then-subsidiary of Glaxo Laboratories Ltd., is credited with developing ranitidine and was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule.

231.    In 1983, the FDA granted approval to Glaxo to sell Zantac, pursuant to the New Drug Application ("NDA") No. 18-703 and it quickly became GSK's most successful product—a "blockbuster."  Indeed, ranitidine became the first prescription drug in history to reach $1 billion in sales.

232.    To accomplish this feat, GSK entered into a joint promotion agreement with Hoffmann-LaRoche, Inc., increasing Zantac's U.S. sales force from 400 people to approximately 1,200.  More salespersons drove more sales and blockbuster profits for GSK.

233.    In 1993, GSK (through Glaxo Wellcome plc) entered into a joint venture with Pfizer-predecessor company Warner-Lambert Co. to develop an OTC version of Zantac.  In 1995, the FDA approved OTC Zantac 75 mg tablets through NDA 20-520.  In 1998, the FDA approved

---

[6] GSK, as it's known today, was created through a series of mergers and acquisitions:  In 1989, Smith, Kline & French merged with the Beecham Group to form SmithKline Beecham plc.  In 1995, Glaxo merged with the Wellcome Foundation to become Glaxo Wellcome plc.  In 2000, Glaxo Wellcome plc merged with SmithKline Beecham plc to form GlaxoSmithKline plc and GlaxoSmithKline LLC.

OTC Zantac 75 mg effervescent tablets through NDA 20-745.

234.    In 1998, GSK (Glaxo Wellcome plc) and Warner-Lambert Co. ended their joint venture.  As part of the separation, Warner-Lambert Co. retained control over the OTC NDA for Zantac and the Zantac trademark in the United States and Canada but was required to obtain approval from GSK prior to making any product or trademark improvements or changes.  GSK regained rights to sell OTC Zantac outside of the United States and Canada,[7] and retained control over the Zantac trademark internationally.

235.    In 2000, Pfizer acquired Warner-Lambert Co.  Pfizer controlled the Zantac OTC NDAs until December 2006.

236.    In October 2000, GSK sold to Pfizer the full rights to OTC Zantac in the United States and Canada pursuant to a divestiture and transfer agreement.  As part of that agreement, GSK divested all domestic Zantac OTC assets to Pfizer, including all trademark rights.  The agreement removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac.  GSK retained the right to exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

237.    In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg.  The FDA approved NDA 21-698 on August 31, 2004.

238.    Throughout the time that Pfizer owned the rights to OTC Zantac, GSK continued to manufacture the product.

239.    In 2006, pursuant to a Stock and Asset Purchase Agreement, Pfizer sold and divested its entire consumer health division (including employees and documents) to Johnson & Johnson ("J&J").  Because of antitrust issues, however, Zantac was transferred to Boehringer

---

[7] GSK also still held the right to sell prescription Zantac in the United States.

Ingelheim.

240.   Pfizer, through a divestiture agreement, transferred all assets pertaining to its Zantac OTC line of products, including the rights to sell and market all formulations of OTC Zantac in the United States and Canada, as well as all intellectual property, R&D, and customer and supply contracts to Boehringer Ingelheim.  As part of that deal, Boehringer Ingelheim obtained control and responsibility over all of the Zantac OTC NDAs.

241.   GSK continued marketing prescription Zantac in the United States until 2017 and still holds the NDAs for several prescription formulations of Zantac.  GSK continued to maintain manufacturing and supply agreements relating to various formulations of both prescription and OTC Zantac.  According to its recent annual report, GSK claims to have "discontinued making and selling prescription Zantac tablets in 2017 . . . in the U.S."[8]

242.   Boehringer Ingelheim owned and controlled the NDA for OTC Zantac between December 2006 and January 2017, and manufactured, marketed, and distributed the drug in the United States during that period.[9]

243.   In 2017, Boehringer Ingelheim sold the rights of OTC Zantac to Sanofi pursuant to an asset swap agreement.  As part of that deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac NDAs.  As part of this agreement, Boehringer Ingelheim and Sanofi entered into a manufacturing agreement wherein Boehringer continued to manufacture OTC Zantac for Sanofi.

244.   Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a recall and ceased

---

[8] GlaxoSmithKline, plc, *Annual Report* 37 (2019), https://www.gsk.com/media/5894/annual-report.pdf.
[9] Boehringer Ingelheim also owned and controlled ANDA 074662.

marketing, selling, and distributing OTC Zantac.

245. Throughout the time that Sanofi controlled the OTC Zantac NDAs, Boehringer Ingelheim Promeco, S.A. de C.V. and Patheon Manufacturing Services LLC manufactured the finished drug product.

246. Sanofi voluntarily recalled all brand-name OTC Zantac on October 18, 2019.

247. Pfizer and Boehringer Ingelheim have made demands for indemnification per the Stock and Asset Purchase Agreement against J&J for legal claims related to OTC Zantac products.

248. Sanofi has made a demand for indemnification against J&J pursuant to a 2016 Asset Purchase Agreement between J&J and Sanofi.

**B.  Patents Expire, Allowing Generics to Enter the Market**

249. In 1997, GSK's patent on the original prescription Zantac product expired, allowing generic manufacturers to sell prescription ranitidine.

250. When GSK and Pfizer's patent on the original OTC Zantac product expired, generic manufacturers were allowed to sell OTC ranitidine.

251. The FDA approved numerous generic manufacturers for the sale of prescription and OTC ranitidine through the ANDA process.  Those generic manufacturers are:

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|---|---|---|---|---|---|
| 203694 | Acic Pharmaceuticals, Inc | EQ 150 & 300 mg Base | Tablet; Oral | 11/30/17 | Rx |
| 76124 | Actavis Mid Atlantic LLC | EQ 15 mg Base/ml | Syrup; Oral | 2/21/07 | Discontinued |
| 209859 | Ajanta Pharma Ltd. | EQ 150 & 300 mg Base | Capsule; Oral | 9/27/18 | Rx |
| 77824 | Amneal Pharmaceuticals of New York, LLC | EQ 150 & 300 mg Base | Tablet; Oral | 10/13/06 | Discontinued |

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|---|---|---|---|---|---|
| 78312 | Amneal Pharmaceuticals | EQ 150 & 300 mg Base | Syrup; Oral | 9/2/08 | Rx |
| 90054 | ANDA Repository LLC | EQ 15 mg Base/ml | Syrup; Oral | 11/15/10 | Rx |
| 74488 | Ani Pharmaceuticals Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 7/31/97 | Discontinued |
| 75212 | Ani Pharmaceuticals Inc. | EQ 75 mg Base | Tablet; Oral | 1/14/00 | Discontinued |
| 75296 | Ani Pharmaceuticals Inc. | EQ 75 mg Base | Tablet; Oral | 1/14/00 | Discontinued |
| 77426 | Ani Pharmaceuticals Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 12/19/05 | Discontinued |
| 200172 | Apotex Inc. | EQ 150 mg Base | Tablet; Oral | 5/31/12 | OTC |
| 74680 | Apotex Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 9/12/97 | Rx |
| 75167 | Apotex Inc. | EQ 75 mg Base | Tablet; Oral | 5/4/00 | OTC |
| 77602 | Apotex Inc. | EQ 15 mg Base/ml | Syrup; Oral | 9/17/07 | Discontinued |
| 211893 | Appco Pharma LLC | EQ 150 & 300 mg Base | Capsule; Oral | 4/5/19 | Rx |
| 207578 | Aurobindo Pharma, Ltd. | EQ 150 mg Base | Tablet; Oral | 11/13/17 | OTC |
| 207579 | Aurobindo Pharma, Ltd. | EQ 150 mg Base | Tablet; Oral | 11/13/17 | OTC |
| 90623 | Aurobindo Pharma, Ltd. | EQ 15 mg Base/ml | Syrup; Oral | 7/28/10 | Rx |
| 211058 | Aurobindo Pharma, Ltd. | EQ 150 & 300 mg Base | Capsule; Oral | 7/16/18 | Rx |
| 74764 | Ben Venue Laboratories Inc. d/b/a Bedford Laboratories | EQ 25 mg Base/ ml | Injectable; Injection | 11/19/04 | Discontinued |
| 74662 | Boehringer Ingelheim | EQ 150 & 300 mg Base | Tablet; Oral | 8/29/97 | Discontinued |

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|---|---|---|---|---|---|
| 78684 | Breckenridge Pharmaceutical Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 8/27/09 | Rx |
| 75094 | Contract Pharmacal Corp. | EQ 75 mg Base | Tablet; Oral | 6/21/99 | Discontinued |
| 75294 | Dr Reddy's Laboratories, Ltd. | EQ 75 mg Base | Tablet; Oral | 3/28/00 | OTC |
| 75742 | Dr Reddy's Laboratories, Ltd. | EQ 150 & 300 mg Base | Capsule; Oral | 11/29/00 | Rx |
| 76705 | Dr Reddy's Laboratories Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 7/27/05 | Rx |
| 78192 | Dr Reddy's Laboratories, Ltd. | EQ 150 mg Base | Tablet; Oral | 8/31/07 | OTC |
| 78542 | Glenmark Pharmaceuticals, Inc., USA | EQ 150 & 300 mg Base | Tablet; Oral | 11/19/08 | Rx |
| 210243 | Granules India, Ltd. | EQ 150 mg Base | Tablet; Oral | 8/20/18 | OTC |
| 75165 | Heritage Pharma Labs Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 9/30/98 | Rx |
| 91078 | Hi Tech Pharmacal Co. Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 3/22/11 | Rx |
| 78890 | Lannett Co., Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 7/1/10 | Rx |
| 91288 | Lannett Co., Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 12/9/10 | Rx |
| 74023 | Mylan Pharmaceuticals, Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 8/22/97 | Discontinued |
| 74552 | Mylan Pharmaceuticals. Inc, | EQ 150 & 300 mg Base | Tablet; Oral | 7/30/98 | Discontinued |
| 75497 | Mylan Pharmaceuticals. Inc, | EQ 75 mg Base | Tablet; Oral | 1/14/00 | Discontinued |
| 75564 | Mylan Pharmaceuticals. Inc, | EQ 150 & 300 mg Base | Capsule; Oral | 10/27/00 | Discontinued |
| 79076 | Mylan Laboratories Ltd. | EQ 25 mg Base/ ml | Injectable; Injection | 6/9/16 | Rx |
| 91091 | Nostrum Laboratories Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 9/20/11 | Rx |

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|--------|-------------|----------|--------------------|--------------|--------|
| 210681 | Novitium Pharma LLC | EQ 150 & 300 mg Base | Capsule; Oral | 11/23/18 | Rx |
| 75180 | Par Pharmaceutical Inc. | EQ 300 mg Base | Tablet; Oral | 1/28/99 | Rx |
| 76195 | L. Perrigo Co. | EQ 75 mg Base | Tablet; Oral | 8/30/02 | OTC |
| 91429 | Perrigo Research & Development Company | EQ 150 mg Base | Tablet; Oral | 5/11/11 | OTC |
| 77405 | Pharmaceutical Associates Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 9/21/07 | Rx |
| 75000 | Ranbaxy Pharmaceuticals Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 1/30/98 | Discontinued |
| 75254 | Ranbaxy Pharmaceuticals Inc. | EQ 75mg Base | Tablet; Oral | 1/14/00 | Discontinued |
| 78448 | Ranbaxy Inc. | EQ 15 mg Base/ ml | Syrup; Oral | 12/13/07 | Discontinued |
| 74467 | Sandoz Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 8/29/97 | Rx |
| 74655 | Sandoz Inc. | EQ 150 & 300 mg Base | Capsule; Oral | 10/22/97 | Rx |
| 75519 | Sandoz Inc. | EQ 75 mg Base | Tablet; Oral | 9/26/02 | Discontinued |
| 200536 | Strides Pharma Global Pte Ltd | EQ 150 mg Base | Tablet; Oral | 6/28/11 | OTC |
| 201745 | Strides Pharma Global Pte. Ltd. | EQ 75 mg Base | Tablet; Oral | 2/29/12 | OTC |
| 205512 | Strides Pharma Global Pte. Ltd. | EQ 150 & 300 mg Base | Tablet; Oral | 8/22/16 | Rx |
| 209160 | Strides Pharma Global Pte. Ltd. | EQ 75 mg Base | Tablet; Oral | 3/5/18 | OTC |
| 209161 | Strides Pharma Global Pte. Ltd. | EQ 150 mg Base | Tablet; Oral | 2/22/18 | OTC |
| 210010 | Strides Pharma Global Pte Ltd | EQ 150 & 300 mg Base | Tablet; Oral | 8/1/18 | Rx |
| 75132 | Sun Pharmaceutical Industries Ltd. | EQ 75 mg Base | Tablet; Oral | 1/14/00 | Discontinued |

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|---|---|---|---|---|---|
| 75439 | Sun Pharmaceutical Industries Ltd. | EQ 150 & 300 mg Base | Tablet; Oral | 4/19/00 | Discontinued |
| 77476 | Taro Pharmaceuticals U.S.A., Inc | EQ 15 mg Base/ ml | Syrup; Oral | 6/13/11 | Rx |
| 75557 | Teva Pharmaceuticals U.S.A., Inc. | EQ 150 & 300 mg Base | Capsule; Oral | 10/31/03 | Discontinued |
| 90102 | Torrent Pharma Inc, | EQ 15 mg Base/ ml | Syrup; Oral | 5/26/09 | Discontinued |
| 210228 | Unique Pharmaceutical Laboratories | EQ 150 mg Base | Tablet; Oral | 8/30/19 | OTC |
| 210250 | Unique Pharmaceutical Laboratories | EQ 75 mg Base | Tablet; Oral | 8/30/19 | OTC |
| 211289 | Vkt Pharma Private Ltd. | EQ 150 & 300 mg Base | Tablet; Oral | 1/31/19 | Rx |
| 74864 | Watson Laboratories, Inc. | EQ 150 & 300 mg Base | Tablet; Oral | 10/20/97 | Discontinued |
| 74777 | West-Ward Pharmaceuticals International Ltd. | EQ 25 mg Base/ ml | Injectable; Injection | 3/2/05 | Rx |
| 77458 | West-Ward Pharmaceuticals International Ltd. | EQ 25 mg Base/ ml | Injectable; Injection | 2/16/05 | Rx |
| 76760 | Wockhardt, Ltd. | EQ 75 mg Base | Tablet; Oral | 2/24/06 | OTC |
| 78653 | Wockhardt, Ltd. | EQ 150 & 300 mg Base | Tablet; Oral | 11/26/07 | Discontinued |
| 78701 | Wockhardt, Ltd. | EQ 150 mg Base | Tablet; Oral | 11/12/09 | Discontinued |
| 78884 | Wockhardt, Ltd. | EQ 75 mg Base | Tablet; Oral | 7/31/08 | Discontinued |
| 79211 | Wockhardt, Ltd. | EQ 15 mg Base/ ml | Syrup; Oral | 5/26/09 | Discontinued |
| 79212 | Wockhardt, Ltd. | EQ 15 mg Base/ ml | Syrup; Oral | 2/23/09 | Discontinued |
| 75208 | Wockhardt, Ltd. | EQ 150 & 300 mg Base | Tablet; Oral | 12/17/98 | Rx |

| ANDA # | ANDA Holder | Strength | Dosage Form/ Route | Date Approved | OTC/RX |
|---|---|---|---|---|---|
| 91534 | Zydus Pharmaceuticals (USA) Inc. | EQ 25 mg Base/ ml | Injectable; Injection | 2/23/13 | Rx |

252.    Despite generic entry, Brand-Name Manufacturer Defendants continued to sell prescription and OTC Zantac.  Although sales of Zantac declined as a result of generic competition, ranitidine sales remained strong over time.  As recently as 2018, Zantac was one of the top 10 antacid tablets in the United States, with sales of OTC Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

## II.  NDMA IS A PROBABLE CARCINOGEN WHOSE DANGEROUS PROPERTIES ARE WELL ESTABLISHED

253.    According to the Environmental Protection Agency ("EPA"), "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes."[10]  It is one of the simplest members of a class of N-nitrosamines, a family of potent carcinogens.  Scientists have long recognized the dangers that NDMA poses to human health.  A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[11]  NDMA is no longer produced or commercially used in the United States except for research.  Its only use today is to cause cancer in laboratory animals.

---

[10] U.S. Environmental Protection Agency, *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)* (Nov. 2017), https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[11] Jane Brody, *Bottoms Up: Alcohol in Moderation Can Extend Life*, The Globe & Mail (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger Grows as Officials Unable to Trace Poison in Reserve's Water*, The Globe & Mail (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA Adducts in Humans After Exposure to Methylating Agents*, 405 Mut. Res. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

254. Both the EPA and the International Agency for Research on Cancer ("IARC") classify NDMA as a probable human carcinogen.[12]

255. The IARC classification is based upon data that demonstrates NDMA "is carcinogenic in all animal species tested: mice, rats, Syrian gold, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frog. It induces benign and malignant tumors following its administration by various routes, including ingestion and inhalation, in various organs in various species." Further, in 1978, IARC stated that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans."[13]

256. The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[14]

257. The Department of Health and Human Services ("DHHS") states that NDMA is reasonably anticipated to be a human carcinogen.[15] This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[16]

258. The FDA considers NDMA a chemical that "could cause cancer" in humans.[17]

---

[12] *See* EPA Technical Fact Sheet, *supra* note 10; Int'l Agency for Research on Cancer (IARC), *Summaries & Evaluations, N-NITROSODIMETHYLAMINE* (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html.

[13] 17 Int'l Agency for Research on Cancer, *IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, Some N-Nitroso Compounds* 151–52 (May 1978).

[14] *See* EPA Technical Fact Sheet, *supra* note 10.

[15] *Id.* at 3.

[16] *Id.*

[17] FDA Statement, Janet Woodcock, Director – Ctr. for Drug Evaluation & Research, *Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

49

259.    The World Health Organization states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[18]

260.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

261.    Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—Valsartan, Losartan, and Irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.

262.    The no-observed-adverse-effect level ("NOAEL") is the level of exposure at which there is no biologically significant increase in the frequency or severity of any adverse effects of the chemical.  Due to NDMA's ability to affect DNA at a microscopic level, there is no NOAEL for NDMA. This means any amount of NDMA exposure increases risk.

263.    The FDA has set an acceptable daily intake ("ADI") level for NDMA at 96 ng. That means that consumption of 96 ng of NDMA a day would increase the risk of developing cancer by 0.001% over the course of a lifetime.  That risk increases as the level of NDMA exposure increases.  However, any level above 96 ng is considered unacceptable.[19]  Tobacco smoke also contains NDMA, with one filtered cigarette containing between 5 to 43 ng.

264.    In studies examining carcinogenicity through oral administration, mice exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.  In comparable rat studies, cancers

---

[18] World Health Org., *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3d ed. 2008), https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

[19] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)* (Feb. 28, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

were observed in the liver, kidney, pancreas, and lung. In comparable hamster studies, cancers were observed in the liver, pancreas, and stomach. In comparable guinea-pig studies, cancers were observed in the liver and lung. In comparable rabbit studies, cancers were observed in the liver and lung.

265.    In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

266.    Prior to the withdrawal of ranitidine, the FDA considered the drug as category B for birth defects, meaning it was considered safe to take during pregnancy. Yet animals exposed to NDMA during pregnancy birthed offspring with elevated rates of cancer in the liver and kidneys.

267.    NDMA is a very small molecule. That allows it to freely pass through all areas of the body, including the blood-brain and placental barrier. This is particularly concerning as ranitidine has been marketed for pregnant women and young children for years.

268.    In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer. In animal studies, derivatives of NDMA induced cancer in the stomach and intestine (including colon).

269.    Research shows that lower levels of NDMA, *e.g.*, 40 ng, are fully metabolized in the liver, but high doses enter the body's general circulation.

270.    Exposure to high levels of NDMA has been linked to liver damage in humans.[20]

271.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

272.    Overall, the animal data demonstrates that NDMA is carcinogenic in all animal

---

[20] *See* EPA Technical Fact Sheet, *supra* note 10.

species tested: mice; rats; Syrian golden, Chinese and European hamsters; guinea pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

273.    The EPA classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species exposed to NDMA by various routes."[21]

274.    Pursuant to EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."[22]

275.    In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  And, while these studies consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction of the exposures noted in a single ranitidine capsule.

276.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day.[23]

277.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[24]

278.    In another 1995 epidemiological case-control study looking at, in part, the effects

---

[21] *Id.*

[22] *See* U.S. Envtl. Protection Agency, Risk Assessment Forum, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf.

[23] Pobel et al., *Nitrosamine, Nitrate and Nitrite in Relation to Gastric Cancer: A Case-control Study in Marseille, France*, 11 Eur. J. Epidemiol. 67–73 (1995).

[24] La Vecchia, *et al.*, *Nitrosamine Intake & Gastric Cancer Risk*, 4 Eur. J. Cancer. Prev. 469–74 (1995).

of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[25]

279.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[26]

280.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[27]

281.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[28]

282.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[29]

283.    In addition to studies demonstrating that NDMA directly causes cancer, research

---

[25] Rogers et al., *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cance*r, 5 Cancer Epidemiol. Biomarkers Prev. 29–36 (1995).

[26] Knekt et al., *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 Int. J. Cancer 852–56 (1999)

[27] Straif et al., *Exposure to High Concentrations of Nitrosamines and Cancer Mortality Among a Cohort of Rubber Workers*, 57 Occup. Envtl. Med 180–87 (2000).

[28] Loh et al., *N-nitroso Compounds and Cancer Incidence: The European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 Am. J. Clinical Nutrition 1053–61 (2011).

[29] Zhu et al., *Dietary N-nitroso Compounds and Risk of Colorectal Cancer: A Case-control Study in Newfoundland and Labrador and Ontario, Canada*, 111 Brit. J. Nutrition 6, 1109–17 (2014).

shows that exposure to NDMA (1) can exacerbate existing but dormant (*i.e.* not malignant) cancers, (2) promote otherwise "initiated cancer cells" to develop into cancerous tumors; and (3) reduce the ability of the body to combat cancer.  Thus, in addition to NDMA being a direct cause of cancer itself, NDMA can also be a contributing factor to a cancer injury caused by some other source.

284.    NDMA is also known to be genotoxic—meaning, it can cause DNA damage in human cells.  Indeed, multiple studies demonstrate that NDMA is genotoxic both *in vivo* and *in vitro*.  However, recent studies have shown that the ability of NDMA to cause mutations in cells is affected by the presence of enzymes typically found in living humans, suggesting that "humans may be especially sensitive to the carcinogenicity of NDMA."[30]

### III. NDMA IS DISCOVERED IN RANITIDINE-CONTAINING PRODUCTS, LEADING TO MARKET WITHDRAWL

285.    On September 9, 2019, pharmacy and testing laboratory Valisure LLC and ValisureRX LLC (collectively, "Valisure") filed a Citizen Petition calling for the recall of all ranitidine-containing products due to exceedingly high levels of NDMA found in ranitidine pills. FDA and European regulators started reviewing the safety of ranitidine with specific focus on the presence of NDMA.[31]  This set off a cascade of recalls by the Brand-Name Manufacturer, Generic Manufacturer, Retailer, and Repackager Defendants.

286.    On September 13, 2019, the FDA's Director for Drug Evaluation and Research, Dr. Janet Woodcock, issued a statement warning that some ranitidine medicines may contain

---

[30] World Health Org., *supra* note 18.
[31] FDA Statement, Woodcock, *supra* note 17; Press Release, European Medicines Agency, *EMA to Review Ranitidine Medicines Following Detection of NDMA* (Sept. 13, 2019), https://www.ema.europa.eu/en/news/ema-review-ranitidine-medicines-following-detection-ndma.

NDMA.[32]

287.    On September 24, 2019, Generic Manufacturer Defendant Sandoz voluntarily recalled all of its ranitidine-containing products due to concerns of a "nitrosamine impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled medicine."[33]

288.    On September 26, 2019, Generic Manufacturer Apotex and Retailer Defendants Walgreens, Walmart, and Rite Aid voluntarily recalled all ranitidine products and removed them from shelves.[34]   Apotex issued a statement, noting that "Apotex has learned from the U.S. Food and Drug Administration and other Global regulators that some ranitidine medicines including brand and generic formulations of ranitidine regardless of the manufacturer, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA)."[35]

289.    On September 28, 2019, Retailer Defendant CVS stated that it would stop selling Zantac and its CVS-repackaged ranitidine out of concern that it might contain a carcinogen.

290.    On October 2, 2019, the FDA ordered manufacturers of ranitidine to test their products and recommended using a liquid chromatography with high resolution mass spectrometer

---

[32] FDA Statement, Woodcock, *supra* note 17.

[33] FDA News Release, U.S. Food & Drug Admin., *FDA Announces Voluntary Recall of Sandoz Ranitidine Capsules Following Detection of an Impurity* (Sept. 24, 2019), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-sandoz-ranitidine-capsules-following-detection-impurity.

[34] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Sept. 26, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[35] Company Announcement, U.S. Food & Drug Admin., *Apotex Corp. Issues Voluntary Nationwide Recall of Ranitidine Tablets 75mg and 150mg (All Pack Sizes and Formats) Due to the Potential for Detection of an Amount of Unexpected Impurity, N-nitrosodimethylamine (NDMA) Impurity in the Product* (Sept. 25, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/apotex-corp-issues-voluntary-nationwide-recall-ranitidine-tablets-75mg-and-150mg-all-pack-sizes-and.

("LC-HRMS") testing protocol, which "does not use elevated temperature."[36]

291.    On October 8, 2019, Brand-Name Manufacturer Defendant GSK voluntarily recalled all ranitidine-containing products internationally.[37]  As part of the recall, GSK publicly acknowledged that unacceptable levels of NDMA were discovered in Zantac and noted that "GSK is continuing with investigations into the potential source of the NDMA."[38]

292.    On October 18 and 23, 2019, Brand-Name Manufacturer Defendant Sanofi and Generic Manufacturer and Repackager Defendant Dr. Reddy's voluntarily recalled all of their ranitidine-containing products.[39]

293.    On October 28, 2019, Generic Manufacturer Defendants Perrigo, Novitium, and Lannett voluntarily recalled all their ranitidine-containing products.[40]

294.    In its recall notice, Generic Manufacturer Defendant Perrigo stated, "[a]fter regulatory bodies announced that ranitidine may potentially contain NDMA, Perrigo promptly began testing of its externally sourced ranitidine API (active pharmaceutical ingredient) and ranitidine-based products.  On October 8, 2019, Perrigo halted shipments of the product based upon preliminary results.  Based on the totality of data gathered to date, Perrigo has made the

---

[36] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[37] Press Release, Gov. UK, *Zantac – MHRA Drug Alert Issued as GlaxoSmithKline Recalls All Unexpired Stock* (Oct. 8, 2019), https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock.

[38] Justin George Varghese, *GSK Recalls Popular Heartburn Drug Zantac Globally After Cancer Scare*, Reuters (Oct. 8, 2019), https://www.reuters.com/article/us-gsk-heartburn-zantac/gsk-recalls-popular-heartburn-drug-zantac-globally-after-cancer-scare-idUSKBN1WN1SL.

[39] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[40] *Id.*

56

decision to conduct this voluntary recall."[41]

295.    Generic Manufacturer Defendant Lannett also acknowledged the presence of NDMA in the active pharmaceutical ingredient ("API") and/or drug product in its recall notice: "Lannett was notified by FDA of the potential presence of NDMA on September 17, 2019 and immediately commenced testing of the Active Pharmaceutical Ingredient (API) and drug product. The analysis confirmed the presence of NDMA."[42]

296.    On November 1, 2019, the FDA announced the results of recent testing, finding "unacceptable levels" of NDMA in ranitidine-containing products, and requested that drug makers begin to voluntarily recall their ranitidine-containing products if the FDA or manufacturers discovered NDMA levels above the acceptable limits.[43]

297.    On December 4, 2019, the FDA issued a statement notifying consumers who wished to continue taking ranitidine to consider limiting their intake of nitrite-containing foods, *e.g.*, processed meats and preservatives like sodium nitrite.[44]  This advice ***mirrored*** an admonition issued by Italian scientists in 1981 after finding that ranitidine reacted with nitrites *in vitro* to form toxic and mutagenic effects in bacteria.  The prudent advice of Dr. de Flora published in October

---

[41] Company Announcement, U.S. Food & Drug Admin., *Perrigo Company plc Issues Voluntary Worldwide Recall of Ranitidine Due to Possible Presence of Impurity, N-nitrosodimethylamine (NDMA) Impurity in the Product* (Oct. 23, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/perrigo-company-plc-issues-voluntary-worldwide-recall-ranitidine-due-possible-presence-impurity-n.

[42] Company Announcement, U.S. Food & Drug Admin., *Lannett Issues Voluntary Nationwide Recall of Ranitidine Syrup (Ranitidine Oral Solution, USP), 15mg/ml Due to an Elevated Level of the Unexpected Impurity, N-nitrosodimethylamine (NDMA)* (Oct. 25, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/lannett-issues-voluntary-nationwide-recall-ranitidine-syrup-ranitidine-oral-solution-usp-15mgml-due.

[43] U.S. Food & Drug Admin., Laboratory Tests | Ranitidine, https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine (content current as of Nov. 1, 2019).

[44] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Dec. 4, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

1981 in *The Lancet* was to "avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals or by giving inhibitors of nitrosation such as ascorbic acid."[45]  If GSK had only heeded Dr. de Flora's advice in 1981, millions of people might have avoided exposure to a known carcinogen and increased risk of developing cancer from ingesting ranitidine.

298.    Between November 1, 2019 and February 27, 2020, the following Generic Manufacturer and Repackager Defendants recalled their products from the market, citing NDMA concerns:  Aurobindo, Amneal, American Health Packaging, GSMS, Precision Dose, Glenmark, Appco, and Denton Pharma.[46]

299.    On January 2, 2020, research laboratory, Emery Pharma, submitted a Citizen Petition to the FDA, showing that NDMA accumulates in ranitidine at unsafe rates when exposed to label-compliant temperature ranges that would occur during normal transport and storage conditions.

300.    Emery's Citizen Petition outlined its substantial concern that ranitidine is a time- and temperature-sensitive pharmaceutical product that develops NDMA when exposed to heat, a common occurrence during shipping, handling, and storage.  In addition to warning about this condition, Emery requested agency directives to manufacturers and distributors to ship ranitidine in temperature-controlled vehicles.

---

[45] Silvio de Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, The Lancet, Oct. 31, 1981, at 993–94.
[46] *See generally* U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (content current as of Apr. 16, 2020).

301.    In response,[47] on April 1, 2020, the FDA recounted that a recall is an "effective methods [sic.] of removing or correcting defective FDA-regulated products . . . particularly when those products present a danger to health."[48]    The FDA sought the voluntary consent of manufacturers to accept the recall "to protect the public health from products that present a risk of injury."[49]  The FDA found that the recall of all ranitidine-containing products and a public warning of the recall was necessary because the "product being recalled presents a serious health risk."[50] The FDA therefore sent Information Requests to all applicants and pending applicants of ranitidine-containing products "requesting a market withdrawal."[51]

302.    The FDA found its stability testing raised concerns that NDMA levels in some ranitidine-containing products stored at room temperature can increase with time to unacceptable levels.   In the same vein, FDA testing revealed NDMA levels were higher as the products approached their expiration dates.  The FDA's testing eroded the agency's confidence that any ranitidine-containing product could remain stable through its labeled expiration date. Consequently, the FDA withdrew the products from the market.  The FDA's decision to withdraw the drug rendered moot Emery's request for temperature-controlled shipping conditions.

303.    The FDA's reaction was consistent with comparable regulatory action throughout the world.  Before the FDA acted, over 43 different countries and jurisdictions restricted or banned ranitidine-containing products.[52]

---

[47] Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No. FDA-2020-P-0042 (Apr. 1, 2020), *available at* https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.
[48] *Id.* at 5 (*citing* 21 CFR 7.40(a)).
[49] *Id.*
[50] *Id.* at 7.
[51] *Id.* at 10 n.43.
[52] Margaret Newkirk & Susan Berfield, *FDA Recalls Are Always Voluntary and Sometimes Haphazard—and The Agency Doesn't Want More Authority to Protect Consumers*, Bloomberg

304.    The European Medicines Agency ("EMA"), the European Union's equivalent to the FDA, through an Article 31 Referral, determined the sale of all ranitidine-containing products should be suspended on September 19, 2019.  On April 30, 2020, the Human Medicines Committee of the EMA "has recommended the suspension of all ranitidine medicines in the EU due to the presence of low levels of an impurity called N-nitrosodimethylamine (NDMA)."  The EMA recognizes NDMA as a probable human carcinogen and issued a "precautionary suspension of these medicines in the EU" because "NDMA has been found in several ranitidine medicines above levels considered acceptable, and there are unresolved questions about the source of the impurities."[53]

## IV. HOW RANITIDINE TRANSFORMS INTO NDMA

305.    The ranitidine molecule itself contains the constituent molecules to form NDMA. *See* Figure 1.

306.    Specifically, the O=N (Nitroso) on one side of the ranitidine molecule can combine with the $H_3C$-N-$CH_3$ (DMA) on the other side to form NDMA.

---

Businessweek (Dec. 3, 2019), https://www.bloomberg.com/graphics/2019-voluntary-drug-recalls-zantac/.

[53] Eur. Med. Agency, *Suspension of Ranitidine Medicines in the EU* (Apr. 30, 2020), https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-suspension-ranitidine-medicines-eu_en.pdf.

Figure 1 – Diagram of Ranitidine & NDMA Molecules

Ranitidine Molecule                          NDMA Molecule

307.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the U.S. water supply.[54]  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater-treatment plants was specifically linked to the presence of ranitidine.[55]

308.    Ranitidine leads to NDMA exposure in four ways: (1) formation of NDMA in the human digestive system; (2) formation of NDMA due to an enzymatic reaction throughout the human body; (3) formation of NDMA over time under normal storage conditions and which increases significantly when exposed to heat; and (4) formation of NDMA during the manufacturing process.

**A.  Formation of NDMA in the Environment of the Human Stomach**

309.    When the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing

---

[54] Ogawa et al., *Purification and Properties of a New Enzyme, NG, NG-dimethylarginine Dimethylaminohydrolase, from Rat Kidney*, 264 J. Bio. Chem. 17, 10205–209 (1989).

[55] Mitch et al., *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 Env. Eng. Sci. 5, 389–404 (2003).

foods), the Nitroso molecule (0=N) and the DMA molecule ($H_3C$-N-$CH_3$) break off and reform as NDMA.

310.    In 1981, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, published the results of experiments he conducted on ranitidine in the well-known journal, *The Lancet*.  When ranitidine was exposed to human gastric fluid in combination with nitrites, his experiment showed "toxic and mutagenic effects."[56]  Dr. de Flora hypothesized that these mutagenic effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions."  *Id.*  Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to … suggest[] a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals."[57]  *Id.*

311.    GSK knew of Dr. de Flora's publication because, two weeks later, GSK responded in *The Lancet*, claiming that the levels of nitrite needed to induce the production of nitroso derivatives (*i.e.*, NDMA) were not likely to be experienced by people in the real world.[58]

312.    This response reflects GSK's reputation for "adopting the most combative, scorched-earth positions in defense of its brands."[59]  The company has no compunctions against distorting objective science to maintain its lucrative monopoly franchises, and its egregious conduct surrounding Zantac is not some isolated incident.

---

[56] De Flora, *supra* note 45.

[57] This admonition came two years before the FDA approved Zantac in 1983.  Notwithstanding, in 1998 GSK applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal."  *See* Ctr. for Drug Eval. & Research, *Approval Package* (June 8, 1998), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20520s1_Zantac.pdf.  So GSK specifically invited patients to take Zantac shortly before eating heartburn-inducing food.

[58] R. T., Brittain et al., *Safety of Ranitidine*, *The Lancet* 1119 (Nov. 14, 1981).

[59] Jim Edwards, *GSK's Alleged Coverup of Bad Avandia Data: A Snapshot of Its Poisonous Corporate Culture*, Moneywatch (July 13, 2010) https://www.cbsnews.com/news/gsks-alleged-coverup-of-bad-avandia-data-a-snapshot-of-its-poisonous-corporate-culture/.

313.    GSK endangered patient health while reaping billions of dollars in profits from Paxil, Wellbutrin, and Avandia.  As we now know, the company was involved in covering up scientific data, offering illegal kickbacks to prescribing physicians, intimidating witnesses, and defrauding Medicare to profit from these medicines.  In the wake of Congressional hearings into the company's outrageous misbehavior,[60] GSK's actions resulted in a criminal investigation and the then-largest guilty plea by a pharmaceutical company for fraud and failure to report safety data in the country's history.[61]

314.    In its submission to the FDA, GSK explained that the level of nitrite present would be unrealistic and, thus, these results had no "practical clinical significance"[62]:

> Although N-nitroso-nitrolic acid was a potent mutagen, it is not likely to be formed in the stomach of a patient ingesting ranitidine, as an unrealistically large amount of nitrite needs to be present to form and maintain the nitrosamine.  For this reason, and also because ranitidine was not carcinogenic in life-span studies in rodents, the in vitro nitrosation of ranitidine to a mutagenic nitrosamine does not seem to have practical clinical significance.

315.    Around this same time—before Zantac was approved by the FDA—GSK conducted another study to examine, among other things, how long-term use of ranitidine could affect the levels of nitrite in the human stomach.[63]  Remarkably, in the study that was presented to

---

[60] *Staff Report on GlaxoSmithKline and the Diabetes Drug Avandia*, Senate Comm. on Finance, 111th Cong.2d Sess. 1 (Comm. Print Jan. 2010).

[61] U.S. Dep't of Justice, *GlaxoSmithKline to Please Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data* (July 2, 2012), https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-and-pay-3-billion-resolve-fraud-allegations-and-failure-report.

[62] Excerpted from the Summary Basis of Approval submitted to the FDA to obtain approval of Zantac in the early 1980s.  This document was obtained through a Freedom of Information Act request to the FDA.

[63] The results of this study are discussed in the Summary Basis of Approval, obtained from the FDA.

the FDA, GSK admitted that ranitidine use caused the proliferation of bacteria in the human stomach that are known to convert nitrates to nitrites, which leads to elevated levels of nitrite in the stomach environment.  GSK acknowledged this could increase the risk of developing NDMA and, in turn, cancer, but then dismissed this risk because people were allegedly only expected to use ranitidine-containing products for a short-term period:

> The importance of this finding is not clear.  High levels of nitrite could react with certain organic compounds to form nitrosamines, which are known carcinogens.  To date, however, neither ranitidine nor cimetidine have been carcinogenic in rodents, so the level of human risk cannot be estimated from animal studies.  Ranitidine is recommended only for short-term use and carcinogenic risk, if any, should thus be minimized.

316.    GSK knew—and indeed specifically admitted—that ranitidine could react with nitrite in the human stomach to form NDMA and, at the same time, that long-term use of ranitidine could lead to elevated levels of nitrite in the human stomach.

317.    In response to Dr. de Flora's findings, in 1982, GSK conducted a clinical study specifically investigating gastric contents in human patients.[64]  The study, in part, specifically measured the levels of N-Nitroso compounds in human gastric fluid.  GSK indicated that there were no elevated levels, and even published the results of this study five years later, in 1987.  The study, however, was rigged.  It did not use gold-standard mass spectrometry to test for NDMA, but instead, used a process that could not measure N-nitrosamines efficiently.  And worse, in the testing it did do, GSK refused to test gastric samples that contained ranitidine in them out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."[65]  In other words, GSK intentionally rigged the study to exclude the very samples

---

[64] Thomas et al., *Effects of One Year's Treatment with Ranitidine and of Truncal Vagotomy on Gastric Contents*, 6 Gut. Vol. 28, 726–38 (1987).
[65] *Id.*

most likely to contain a dangerous carcinogen.

318.    In 1983, the same year Zantac obtained approval from the FDA, seven researchers from the University of Genoa published a study discussing ranitidine and its genotoxic effects (ability to harm DNA).[66]  The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells."  *Id.*

319.    Then, again in 1983, Dr. de Flora, along with four other researchers, published their complete findings.[67]  The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine."  Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals."  This admonition carries weight considering GSK's studies indicate that long-term ranitidine consumption, itself, leads to elevated levels of nitrites in the human gut.

320.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[68]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water-treatment plants that supply many U.S. cities with water.

321.    In 2016, researchers at Stanford University conducted an experiment on healthy

---

[66] Maura et al., *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 Tox. Lttrs. 97–102 (1983).
[67] De Flora et al., *Genotoxicity of Nitrosated Ranitidine*, 4 Carcinogenesis 3, 255–60 (1983).
[68] Le Roux et al., *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Envtl. Sci. Tech. 20, 11095–103 (2012).

volunteers.[69]  They measured the NDMA in urine of healthy individuals over the course of 24 hours, administered one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for another 24 hours.  On average, the level of NDMA increased by 400 times, to approximately 47,000 ng.  The only change during that 24-hour period was the consumption of ranitidine.  This study directly demonstrates that unsafe levels of NDMA are formed in the human body as a result of ranitidine ingestion.  The scientists further explained that previous studies have indicated a high metabolic conversion rate of NDMA, meaning it will be processed by the human body.  As such the observed 47,000 ng likely only captured 1/100 of the actual NDMA levels in the human body.

322.    These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule. Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

323.    Valisure is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO")—an accreditation recognizing the laboratories technical competence for regulatory purposes.  Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

---

[69] Zeng et al., *Oral intake of Ranitidine Increases Urinary Excretion of N-nitrosodimethylamine*, 37 Carcinogenesis 625–34 (2016).

324.    In its September 9, 2019 Citizen's Petition to the FDA, [70] Valisure disclosed as part of its testing of ranitidine-containing products that in every lot tested there were exceedingly high levels of NDMA.  Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA for the determination of NDMA levels.  As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[71]  The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

325.    Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg ranitidine tablet.  This testing demonstrates the instability of the ranitidine molecule and its propensity to break down under higher temperatures and in a high nitrite environment, such as in

---

[70] Valisure, *Citizen Petition on Ranitidine* (Sept. 9, 2019), *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf

[71] U.S. Food & Drug Admin., *Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, FY19-005-DPA-S* (Jan. 28, 2019).

the human stomach.

326.    Valisure was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol.  So Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

327.    Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach.  Industry standard "Simulated Gastric Fluid" ("SGF": 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF": 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.  The inclusion of nitrite in gastric fluid testing is commonplace and helps simulate the environment of a human stomach.

328.    Indeed, ranitidine-containing products were specifically advertised to be used when consuming foods containing high levels of nitrates, such as tacos or pizza.[72]

329.    The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2 – Valisure Biologically Relevant Tests for NDMA Formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |

---

[72] *See, e.g* Zantac television commercial, *Family Taco Night*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; Zantac television commercial, *Spicy*, https://youtu.be/jzS2kuB5_wg; Zantac television commercial, *Heartburn,* https://youtu.be/Z3QMwkSUlEg; Zantac television commercial, *Zantac Heartburn Challenge*, https://youtu.be/qvh9gyWqQns.

| Tablet without Solvent | Not Detected | Not Detected |
|---|---|---|
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid ("SIF") | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

330.    Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg ranitidine, ranging between 245 and 3,100 times above the FDA-allowable limit.  One would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg ranitidine at the 25 nanogram level (over 7,000 for the 50 nanogram level).

331.    Following the release of Valisure Citizen's Petition, the FDA conducted additional laboratory tests, which showed NDMA levels in all ranitidine samples it tested, including API and the finished drug, both tablets and syrup.  The FDA developed simulated gastric fluid ("SGF") and simulated intestinal fluid ("SIF") models to use with the LC-MS testing method to estimate the biological significance of *in vitro* findings.  These models are intended to detect the formation of NDMA in systems that approximate the stomach and intestine.  The testing showed unacceptable levels of NDMA.

332.    When the scientific data is assessed overall, the literature demonstrates that the ingestion of ranitidine in the presence of human-relevant levels of nitrite in the stomach—a substance that is commonly found in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule breaks down into levels of NDMA that would dramatically increase a person's risk of developing cancer.

**B.  Formation of NDMA in Other Organs of the Human Body**

69

333.    In addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

334.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder.  The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[73]

---

[73] Ogawa, *et al*., *supra* note 54.

335.    In Figure 2, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).



**Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**

| | Predicted Affinity (kcal/mol) |
|---|---|
| ADMA | -5.9 ± 0.2 |
| Ranitidine | -6.1 ± 0.1 |

336.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

71

337.     Figure 3 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.



338.     DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the brain, colon, liver, small intestine, stomach, bladder, and prostate.  This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs.

339.     The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body.  Indeed, ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours.  When ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA.  This observation is validated by the Stanford study, discussed above.

### C.  Formation of NDMA by Exposure to Heat and/or Time

340.    The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented.  Early studies, including the one conducted by GSK in the early 1980s, demonstrated that NDMA formed when ranitidine was exposed to heat.  This point was underscored in the Valisure petition, which initially used a high-heat testing method but also specifically developed a detection protocol that did not use heat.

341.    In response to Valisure, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

342.    On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine.  The researchers exposed ranitidine to 70 ˚C for varying periods of time.  The results showed that increasing levels of NDMA formed based on exposure to heat.  The following diagram reveals how NDMA accumulates over time when exposed to 70 ˚C:



343.    The researchers cautioned:

NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage.   More importantly, these conditions occur post-lot release by the manufacturer.   Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.[74]

344.    The results of this data demonstrate that in normal transport and storage, and especially when exposed to heat, the ranitidine molecule systematically breaks down into NDMA, accumulating over time in the finished product.   Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA prior to consumption is very real—a point underscored by the FDA's swift removal of the product from the market.

345.    In fact, the FDA acknowledged that testing revealed that NDMA levels in ranitidine

---

[74]   Emery Pharma, *Emery Pharma Ranitidine: FDA Citizen Petition* (Jan. 7, 2020), *available at* https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

products stored at room temperature can increase with time to unacceptable levels and elevated levels of NDMA were measured in *all products after 2 weeks*.[75]

### D. Formation of NDMA in the Manufacturing Process

346.    Recent testing conducted under the auspices of the FDA involving a number of drugs within the last two years also demonstrates that NDMA can form during the manufacturing process.

347.    On July 13, 2018, the FDA announced the first of what would be many recalls of Valsartan and other angiotensin receptor blocker ("ARB") drugs used to treat high blood pressure, such as losartan and irbesartan.[76]

348.    Specifically, the recalls were due to NDMA and other nitrosamines being present in the APIs manufactured by four API manufacturers located in China and India.

349.    According to the Council on Foreign Relations, "approximately 80% of the active pharmaceutical ingredients (APIs) used to make drugs in the United States are said to come from China and other countries like India."[77]

350.    As the FDA's investigation into the ARB contamination continued, it became clear that NDMA had made its way into the API through the use of recovered solvents or as a result of using less expensive solvents during the manufacturing process.[78]

---

[75] Woodcock Letter, *supra* note 47.

[76] FDA News Release, U.S. Food & Drug Admin., *FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity U.S. Food and Drug Administration* (July 13, 2018), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

[77] Yanzhong Huang, *U.S. Dependence on Pharmaceutical Products from China* (Aug. 14, 2019), https://www.cfr.org/blog/us-dependence-pharmaceutical-products-china.

[78] Press Announcements, U.S. Food & Drug Admin*., FDA Updates & Press on ARB Recalls: Valsartan, Losartan and Irbesartan U.S. Food and Drug Administration* (Nov. 13, 2019),

351.     Similarly, API was noted as a possible source of NDMA in ranitidine-containing drugs: "Lannett was notified by FDA of the potential presence of NDMA on September 17, 2019 and immediately commenced testing of the Active Pharmaceutical Ingredient (API) and drug product.  The analysis confirmed the presence of NDMA."[79]

352.     FDA's early testing of ranitidine was conducted without utilizing heat and without subjecting the pills to gastric conditions.  This testing nonetheless revealed unacceptable levels of NDMA.[80]

## V.  EVIDENCE DIRECTLY LINKS RANITIDINE EXPOSURE TO CANCER

353.     In addition to numerous epidemiology studies examining how NDMA causes cancer in humans, researchers have also specifically looked at ranitidine and found an association with cancer.

354.     One epidemiology study, published in 2004, showed that men taking either ranitidine or cimetidine (Tagamet) had increased risks of bladder cancer.[81]

355.     In one epidemiology study specifically designed to look at breast cancer, ranitidine was shown to more than double the risk, an effect that was even more pronounced in those with specific gene mutations.[82]

356.     In another comprehensive epidemiological study looking at various cancer risks

---

https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

[79] Company Announcement, Lannett, *supra* note 42.

[80] Press Announcements, U.S. Food & Drug Admin., *NDMA in Zantac (ranitidine)* (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[81] D. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 Cancer Epi. Biomarkers & Prevention 250–54 (Feb. 2004).

[82] Robert W. Mathes et al., *Relationship Between Histamine2-receptor Antagonist Medications and Risk of Invasive Breast Cancer*, 17 Cancer Epi. Biomarkers & Prevention 1, 67–72 (2008).

and histamine H$_2$-receptor antagonists (or H$_2$ blockers), including ranitidine, the data showed that ranitidine consumption increased the risk of prostate, lung, esophageal, pancreatic, and kidney cancer.[83] Of particular note, the study indicated that people under the age of 60 who took ranitidine were five times more likely to develop prostate cancer.  In addition, there was more than a doubling the risk of pancreatic cancer with ranitidine use.

357.    A study published in 2018, demonstrated an increased risk of liver cancer associated with use of ranitidine in comparison with other H$_2$ blockers in the class.  The purpose of the study was to determine whether there was an increased risk of liver cancer associated with proton pump inhibitors, a different class of medications indicated for the treatment of GERD.  This finding is particularly notable as the authors adjusted for variables.[84]

358.    In 2018, a study found an increased risk in hepatocellular carcinoma associated with use of H$_2$ blockers.[85]  The authors were evaluating the risk of cancer in association with proton pump inhibitors and looked at H$_2$ blockers as a confounder.  The study only considered use of H$_2$ blockers within one year of cancer diagnosis and still found an increased odds ratio associated with use of H$_2$ blockers and hepatocellular carcinoma, a type of liver cancer.

359.    A number of other studies have been published over the years showing an increased risk of various cancers associated with use of ranitidine and/or H$_2$ blockers.[86]  These cancers

---

[83] Laurel A Habel et al., *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, 9 Pharmacoepidemiology & Drug Safety 149–55 (2000).

[84] Kim Tu Tran et al., *Proton Pump Inhibitor and Histamine-2 receptor Antagonist Use and Risk of Liver Cancer in Two Population-based Studies*, 48 Alimentary Pharmacology & Therapeutics 1, 55–64 (2018).

[85] Y-H J Shao et al., *Association Between Proton Pump Inhibitors and the Risk of Hepatocellular Carcinoma*, 48 Alimentary Pharmacology & Therapeutics 4, 460–68 (2018).

[86] Mathes et al., *supra* note 82; *see also* Jeong Soo Ahn et al., *Acid Suppressive Drugs and Gastric Cancer: A Meta-analysis of Observational Studies*, 19 World J. Gastroenterology 16, 2560 (2013); Shih-Wei Lai et al., *Use of Proton Pump Inhibitors Correlates with Increased Risk of Pancreatic Cancer: A Case-control Study in Taiwan*, 46 Kuwait Med J. 1, 44–48 (2014); Poulsen

include breast, gastric, pancreatic, and stomach cancer. Additional research reports that ranitidine use was associated with a significant increase in the risk of breast, testicular, thyroid, and kidney cancer.[87]

## VI. DEFENDANTS KNEW OR SHOULD HAVE KNOWN OF THE NDMA RISK

360.    As early as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.[88] This was known or should have been known by the Brand-Name Manufacturer, Generic Manufacturer, Distributor, and Repackager Defendants ("Knowledge Defendants") or any other manufacturer or distributor of ranitidine-containing products as the information was available in medical literature. Such literature should have been accessed by all companies in the chain of distribution of ranitidine, even if it would have been difficult to locate for a regular consumer.

361.    In 1981, GSK, the originator of the ranitidine molecule, published a study focusing on the metabolites of ranitidine in urine using liquid chromatography.[89] Many metabolites were listed, though there is no indication that the study looked for NDMA.

362.    Indeed, in that same year, Dr. de Flora published a note discussing the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites—a substance commonly

---

et al., *Proton Pump Inhibitors and Risk of Gastric Cancer – A Population Based Cohort Study*, 100 Brit. J. Cancer 1503–07 (2009); E Wennerström, *Acid-suppressing Therapies and Subsite-specific Risk of Stomach Cancer*, 116 Brit. J. Cancer 9, 1234–38 (2017).

[87] Richard H. Adamson & Bruce A. Chabne, *The Finding of N-Nitrosodimethylamine in Common Medicines,* The Oncologist, June 2020; 25(6): 460–62, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7288647/.

[88] *See supra* ¶ 311 (discussing de Flora research).

[89] Carey et al., *Determination of Ranitidine and Its Metabolites in Human Urine by Reversed-phase Ion-pair High-performance Liquid Chromatography*, 255 J. Chromatography B: Biomedical Sci. & Appl. 1, 161–68 (1981).

found in food and in the body.[90]  GSK was aware of this study because GSK specifically responded to the note and attempted to discredit it.  Knowledge Defendants knew or should have known about this scientific exchange as it was published in a popular scientific journal.  Knowledge Defendants were obligated to investigate this issue properly.  None did.

363.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously in Factual Allegations, Section IV), GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[91]  That study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one).  But the study was rigged.  It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines.  Not only is that approach not accurate, but GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."  Without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed.  The inadequacy of that test was knowable in light of its scientific publication in 1987.  All Defendants either knew or should have known about the inadequacy of that study and should have investigated the issue properly and/or took action to protect consumers from the NDMA risks in their products.  None did.

364.     In fact, upon information and belief, no Defendant ever used a mass spectrometry assay to test for the presence of nitrosamines in any of the studies and trials they did in connection

---

[90] De Flora, *supra* note 45.
[91] Thomas et al., *supra* note 61.

with their trials associated with the ranitidine NDA.  That is because mass spectrometry requires heating of up to 130 degrees Celsius, which can result in the formation of excessive amounts of nitrosamines.  Had the Brand-Name Manufacturer and Generic Manufacturer Defendants used a mass spectrometry assay, it would have revealed large amounts of NDMA.

365.    There are multiple alternatives to ranitidine that do not cause cancer, and the benefits of using ranitidine were always outweighed by the risk-adjusted costs.

## THE FEDERAL REGULATORY LANDSCAPE

366.    Plaintiffs reference federal law herein not in any attempt to enforce it, but only to demonstrate that their state-law tort claims do not impose any additional obligations on Defendants, beyond what is already required of them under federal law.

## I.   BRAND-NAME AND GENERIC MANUFACTURER DEFENDANTS MADE FALSE STATEMENTS IN THE LABELING OF RANITIDINE-CONTAINING PRODUCTS

367.    A manufacturer is required to give adequate directions for the use of a pharmaceutical drug such that a "layman can use a drug safely and for the purposes for which it is intended,"[92] and conform to requirements governing the appearance of the label.[93]

368.     "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[94]  and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

369.    "Most, if not all, labeling is advertising.  The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude

---

[92] 21 C.F.R. § 201.5.
[93] Id. § 201.15.
[94] Id.; 65 Fed. Reg. 14286 (Mar. 16, 2000).

from the definition printed matter which constitutes advertising."[95]

370.    All drug manufacturers (brand and generic) are also responsible for conducting stability testing, which must be "designed to assess the stability characteristics of drug products."[96] Manufacturers must adopt a written testing program that includes: "(1) Sample size and test intervals based on statistical criteria for each attribute examined to assure valid estimates of stability; (2) Storage conditions for samples retained for testing; (3) Reliable, meaningful, and specific test methods; (4) Testing of the drug product in the same container-closure system as that in which the drug product is marketed; (5) Testing of drug products for reconstitution at the time of dispensing (as directed in the labeling) as well as after they are reconstituted."[97]

371.    The purpose of stability testing is, in part, to determine "the appropriate storage conditions and expiration dates."[98]  And expiration dates, in turn, must be set to "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use."[99]  An expiration date is "related to any storage conditions stated on the labeling, as determined by stability studies listed in § 211.166."[100]

372.    The FDA made clear when it first adopted the expiration-date provision that the regulation means what it says.  The purpose of the expiration date is not merely to consider the "stability of a specific active ingredient."  Instead, a compliant expiration date must account for multiple factors, including "the stability of the inactive ingredients, the interaction of active and inactive ingredients, the manufacturing process, the dosage form, the container closure system, the

---

[95] *United States v. Research Labs.*, 126 F.2d 42, 45 (9th Cir. 1942).
[96] 21 C.F.R. § 211.166(a).
[97] *Id.*
[98] *Id.*
[99] *Id.* § 211.137(a).
[100] *Id.* § 211.137(b).

conditions under which the drug product is shipped, stored, and handled by wholesalers and retailers, and the length of time between initial manufacture and final use."[101]

373.    The FDA expressly recognizes that an initial expiration date may not be the final expiration date: "Where data from accelerated studies are used to project a tentative expiration date that is beyond a date supported by actual shelf life studies, there must be stability studies conducted . . . until the tentative expiration date is verified or the appropriate expiration date determined."[102]

374.    After a drug is approved, a manufacturer (brand or generic) can make changes to its drug application.  To do so, manufacturers must comply with the requirements of §§ 314.70 and 314.71.[103]

375.    Some of the requirements in those regulations require a brand or generic manufacturer of an approved drug to obtain FDA approval before implementing a label change.[104]

376.    But the FDA has long recognized a "changes being effected" ("CBE") supplement that permits a manufacturer to make immediate changes, subject to FDA's post-change review.[105]

377.    A manufacturer of an approved drug can use the CBE supplement to immediately make an "[a]ddition to a specification or changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength quality, purity, or potency that it purports or is represented to possess."[106]  "A specification is defined as a list of tests, references to analytical procedures, and appropriate acceptance criteria

---

[101] 43 Fed. Reg. 45059 (Sept. 29, 1978).
[102] 21 C.F.R. § 211.166(b).
[103] *See id.* §§ 314.70, 314.97(a) (requiring generics to comply).
[104] *Id.* § 314.70(b).
[105] *Id.* § 314.70(c)(3), (c)(6).
[106] *Id.* § 314.70(c)(6)(i).

that are numerical limits, ranges, or other criteria for the tests described."[107]

378.    A manufacturer, therefore, need not seek FDA pre-approval to make changes to its stability studies to identify the appropriate expiration date—which must "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use"[108]—or to ensure that the drug is shipped and stored under appropriate conditions.

379.    A manufacturer of an approved drug can also use the CBE supplement to make changes "in the labeling to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter"; "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product"; and "delete false, misleading, or unsupported indications for use or claims for effectiveness."[109]

380.    A manufacturer of an approved drug may make minor changes to a label with no approval or notice, so long as that change is described in an annual report.  The illustrative but non-exhaustive list of minor changes includes "[a] change in the labeling concerning the description of the drug product or in the information about how the drug product is supplied, that does not involve a change in the dosage strength or dosage form."[110]

381.    A "minor change" further includes "[a]n extension of an expiration dating period based upon full shelf life data on production batches obtained from a protocol approved in the NDA."[111]

---

[107] 65 Fed. Reg. 83042 (Dec. 29, 2000).
[108] 21 C.F.R. § 211.137(a).
[109] Id. § 314.70(c)(6)(iii)(A), (C), (D).
[110] Id. § 314.70 (d)(2)(ix).
[111] Id. § 314.70 (d)(2)(vi).

382.     At no time did any Brand-Name Manufacturer or Generic Manufacturer Defendant ("Manufacturer Defendants") attempt to include a warning about NDMA levels in ranitidine and its association with cancer, and the FDA never rejected such a warning.  Manufacturer Defendants holding the NDAs had the ability to unilaterally add an NDMA and/or cancer warning to the labels of ranitidine-containing products (for both prescription and OTC) without prior FDA approval pursuant to the CBE regulation.  Had any such Manufacturer Defendant attempted to add an NDMA warning to the label of its ranitidine-containing products (either for prescription or OTC), the FDA would not have rejected it.

383.     At no time did any Manufacturer Defendant attempt to change its label to delete a false or misleading expiration date, to delete false or misleading shipping and storage conditions, to add a proper expiration date, or to add proper shipping and storage conditions, to ensure that ranitidine-containing products would not break down into NDMA prior to human consumption.

384.     Based on the public scientific information available starting in 1983 (or earlier), the Manufacturer Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat and/or over time in storage.

385.     At no time did any Manufacturer Defendant change its label to shorten the expiration date or alter the safe shipping and storage conditions of its ranitidine-containing product, and the FDA never rejected such changes.  Manufacturer Defendants had the ability to unilaterally make such label changes (for both prescription and OTC) without prior FDA approval pursuant to the CBE regulation.  Had any Manufacturer Defendant attempted such label changes, the FDA would not have rejected them.

386.     Because they failed to warn that ranitidine-containing products contained NDMA, Manufacturer Defendants made false statements in the labeling of their products.

387.    Because they failed to include appropriate expiration dates on their products, Manufacturer Defendants made false statements in the labeling of their products.

388.    Because they failed to include proper storage instructions on their products, Manufacturer Defendants made false statements in the labeling of their products.

## II.  GENERIC DRUG MANUFACTURER REQUIREMENTS

389.    According to FDA, "[a] generic drug is a medication created to be the same as an already marketed brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use.  These similarities help to demonstrate bioequivalence, which means that a generic medicine works in the same way and provides the same clinical benefit as its brand-name version.  In other words, you can take a generic medicine as an equal substitute for its brand-name counterpart."[112]

390.    While brand-name medications undergo a more rigorous review before being approved, generic manufacturers are permitted to submit an ANDA.  As the first "A" in ANDA denotes, the generic approval process is "abbreviated" to serve Congress's intent to expeditiously offer consumers lower-cost, previously approved medicines.  But the abbreviated NDA process does not absolve generic manufacturers of their obligations to ensure that their drugs are safe and effective.  To obtain FDA approval, an ANDA applicant must demonstrate that the generic medicine is the same as the brand-name version in the following ways:

   a.  The active ingredient in the generic medicine is the same as in the brand-name drug/innovator drug.

---

[112] U.S. Food & Drug Admin., *Generic Drugs: Questions & Answers U.S. Food and Drug Administration*, https://www.fda.gov/drugs/questions-answers/generic-drugs-questions-answers (current as of June 1, 2018)

b. The generic medicine has the same strength, use indications, form (such as a tablet or an injectable), and route of administration (such as oral or topical).

c. The inactive ingredients of the generic medicine are acceptable.

d. The generic medicine is manufactured under the same strict standards as the brand-name medicine.

e. The container in which the medicine will be shipped and sold is appropriate.[113]

391.    Because the branded manufacturer previously demonstrated clinical safety and efficacy when the NDA was approved, an ANDA applicant does not need to do so if it can show bioequivalence to the branded, reference listed drug ("RLD").  Bioequivalence is the "absence of significant difference" in the pharmacokinetic profiles of two pharmaceutical products.[114]

392.    Though an ANDA applicant's drug must be bioequivalent to the RLD, no two manufacturers' drugs will be exactly the same.  For that reason, generic manufacturers are responsible for conducting their *own, independent* stability testing, which must be "designed to assess the stability characteristics of drug products."[115]

393.    Because a generic manufacturer's drug must be bioequivalent to the RLD, a compliant generic label should be "the same as the labeling of the reference listed drug" in many respects.[116]  But because a generic drug may not be exactly the same as the RLD, the generic label "may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance."[117]

---

[113] U.S. Food & Drug Admin., *Generic Drug Facts*, https://www.fda.gov/drugs/generic-drugs/generic-drug-facts (current as of June 1, 2018).
[114] 21 C.F.R. §§ 320.1(e) & 314.3(b).
[115] *Id.* § 211.166(a).
[116] *Id.* § 314.94(a)(8)(iii).
[117] *Id.* § 314.94(a)(8)(iv).

394.    Pursuant to this regulation, it is common for a generic drug's label to differ from the RLD by setting a different expiration date, requiring the drug to be shipped and stored under different temperature conditions, and/or requiring the drug to receive different (or no) exposure to light.  Several of the Generic Manufacturer Defendants relied on 21 C.F.R. § 314.94(a)(8)(iv) and their independent stability studies to sell approved, generic ranitidine with labels that differed from the RLD label.

### III. FEDERAL LAW REQUIRED THE MANUFACTURER DEFENDANTS TO NOTIFY THE FDA ABOUT THE PRESENCE OF NDMA IN RANITIDINE-CONTAINING PRODUCTS

395.    During the time that Manufacturer Defendants manufactured and sold ranitidine-containing products in the United States, the weight of scientific evidence showed that ranitidine exposed users to unsafe levels of NDMA.  Manufacturer Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and they failed to report these risks to the FDA.

396.    Manufacturer Defendants concealed the ranitidine–NDMA link from ordinary consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like ranitidine to the agency's attention.

397.    Manufacturers (brand and generic) of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product.  The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

398.    21 C.F.R. § 314.81(b)(2)(v) provides:

The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (*e.g.*, mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

399.    Manufacturer Defendants ignored these regulations and, disregarding the scientific evidence available to them regarding the presence of NDMA in their products and the risks associated with NDMA, did not report to the FDA significant new information affecting the safety or labeling of ranitidine-containing products.

400.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the publicly available scientific literature such that any manufacturer or distributor, consistent with their heightened obligations to ensure the safety of their products, also should have known about the potential NDMA risks associated with ranitidine consumption.

401.    Manufacturer Defendants never conducted or provided the relevant studies to the FDA, nor did they present the FDA with a proposed disclosure noting the link between ranitidine and NDMA.  Accordingly, because Manufacturer Defendants never properly disclosed the risk to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this risk.  Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

402.    When the FDA eventually learned about the NDMA risks posed by ranitidine-containing products, it ordered manufacturers to voluntarily remove the products from the market. Thus, had any Manufacturer Defendant alerted the FDA to the risks of NDMA, the FDA would have required the manufacturers to remove ranitidine-containing products from the market.

## IV. CURRENT GOOD MANUFACTURING PRACTICES

403.    Under federal law, a manufacturer must manufacture, store, warehouse, and

distribute pharmaceutical drugs in accordance with "Current Good Manufacturing Practices" ("CGMPs") to ensure they meet safety, quality, purity, identity, and strength standards.[118]

404.    21 C.F.R. § 210.1(a) states that the CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."  Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

405.    Pursuant to 21 C.F.R. § 211.142(b), the warehousing of drug products shall provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected."  In other words, Defendants had a duty and were obligated to properly store, handle, and warehouse ranitidine.

406.    Any drug not manufactured in accordance with CGMPs is deemed "adulterated and/or misbranded" and may not be distributed or sold in the United States.[119]  State common law and statutory law mirror these federal standards.

407.    Testing conducted by the FDA confirms that improper storage of ranitidine has resulted in extremely high levels of NDMA.[120]  FDA has also concluded that NDMA can increase in ranitidine even under storage conditions allowed by the labels, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during normal distribution and handling.  FDA's testing also showed that the

---

[118] 21 U.S.C. § 351(a)(2)(B).
[119] *Id.* §§ 331(a), 351(a)(2)(B).
[120] Woodcock Letter, *supra* note 47.

level of NDMA in ranitidine-containing products increases with time.  And while Emery's Citizen Petition sought to obtain a directive regarding temperature-controlled shipping of ranitidine, which was necessary given the time and temperature sensitivity of the drug, that request was deemed moot by the FDA because the agency sought to withdraw ranitidine-containing products altogether.

408.     Nothing prevented any Defendant from, on their own, taking actions to prevent accumulation of NDMA in ranitidine-containing products by ensuring cooled storage and transport.  Such actions would not have required FDA approval, nor would they have violated any regulatory decisions or laws.

## V.  THE REPACKAGER AND DISTRIBUTOR DEFENDANTS ALSO HAD A DUTY TO IMPLEMENT PROPER STORAGE, HANDLING, AND SHIPPING CONDITIONS

409.     During the time that the Repackager and Distributor Defendants repackaged, distributed, and sold ranitidine-containing products in the United States, the weight of scientific evidence showed that ranitidine exposed users to unsafe levels of NDMA.

410.     The Repackager and Distributor Defendants failed to disclose that risk to consumers on the drug's label—or through any other means—and they failed to report those risks to the FDA.

411.     The U.S. Pharmacopeia Convention (hereinafter "USP") sets forth industry standards applicable—in relevant part—to repackagers and distributors.  Chapter 1079, entitled "Good Storage and Shipping Practices," specifies that

> Good storage and distribution practices apply to all organizations and individuals
>
> involved in any aspect of the storage and distribution of all drug products, including but
>
> not limited to the following: . . .
>
> • Repackaging operations in which the drug product may be owned by an

organization other than the primary manufacturer

Pharmacies including but not limited to retail, compounding, specialty, mail order, hospital, and nursing home pharmacies. . .

- Wholesale distributors; distribution companies involved in automobile, rail, sea, and air services.

412.    USP 1079 further states that the

drug product manufacturer (in the case of many OTSs, where there is no application) and the repackager bear primary responsibility and accountability including but not limited to the following: . . .

- Determining proper storage and handling practices

- Communicating storage and distribution practices through the supply chain

- Drug product stability profiles or the associated stability information from the holder, inclusive of distribution conditions and excursion that may be allowable should they occur.  These stability profiles include the approved storage conditions for the shelf life of the drug product and, where applicable, supporting data for the distribution conditions, if they differ from the storage conditions.

413.    USP 1079 continues: "However, all organizations along the supply chain bear responsibility for ensuring that they handle drug products within adequate storage and distribution parameters that will not affect the drug product identity, strength, quality, purity, or safety."

414.    The Repackager and Distributor Defendants, as well as the Manufacturer Defendants, breached their duty to provide proper storage, shipping, and temperature specifications in all of the ways previously mentioned in the preceding paragraphs.

## VI. RANITIDINE-CONTAINING PRODUCTS ARE MISBRANDED AND ADULTERATED BECAUSE THEY CONTAIN DANGEROUS AND BIOLOGICALLY RELEVANT LEVELS OF NDMA

415.    The manufacture of any misbranded or adulterated drug is prohibited under federal law.[121]

416.    The introduction into commerce of any misbranded or adulterated drug is similarly prohibited.[122]

417.    Similarly, the receipt in interstate commerce of any adulterated or misbranded drug is also unlawful.[123]

418.    Among the ways a drug may be adulterated and/or misbranded are:

    a.    "If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[124]

    b.    "If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and . . . its quality or purity falls below, the standard set forth in such compendium. . . ."[125]

    c.    "If it is a drug and any substance has been (1) mixed or packed therewith so as to reduce its quality or strength or (2) substituted wholly or in part therefor."[126]

419.    A drug is misbranded:

---

[121] 21 U.S.C. § 331(g).
[122] *Id.* § 331(a).
[123] *Id.* § 331(c).
[124] *Id.* § 351(a)(2)(B).
[125] *Id.* § 351(b).
[126] *Id.* § 351(d).

    a.   "If its labeling is false or misleading in any particular."[127]

    b.   "If any word, statement, or other information required . . . to appear on the label or labeling is not prominently placed thereon . . . in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."[128]

    c.   If the labeling does not contain, among other things, "the proportion of each active ingredient . . ."[129]

    d.   "Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings . . . against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ."[130]

    e.   "If it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged and labeled as prescribed therein."[131]

    f.   "If it is an imitation of another drug."[132]

    g.   "If it is offered for sale under the name of another drug."[133]

    h.   "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[134]

---

[127] *Id.* § 352(a)(1).
[128] *Id.* § 352(c).
[129] *Id.* § 352(e)(1)(A)(ii).
[130] *Id.* § 352(f).
[131] *Id.* § 352(g).
[132] 21 U.S.C. § 352(i)(2).
[133] *Id.* § 352(i)(3).
[134] *Id.* § 352(j).

     i.   If the drug is advertised incorrectly in any manner.[135]

     j.   If the drug's "packaging or labeling is in violation of an applicable regulation."[136]

420.    If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[137]

421.    Because Defendants did not disclose NDMA as an ingredient in ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded.

422.    Because Defendants did not disclose the proper directions for storage of the ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded.

423.    Because Defendants did not disclose the proper directions for expiration of the ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded

424.    It is unlawful to introduce a misbranded drug into interstate commerce.[138]  Thus, the ranitidine ingested by Plaintiffs was unlawfully distributed and sold.

## DEFENDANTS' WARRANTIES TO PLAINTIFFS

### I.  WARRANTIES COMMON TO MANUFACTURER AND REPACKAGER DEFENDANTS.

425.    Each Manufacturer and Repackager Defendant's ranitidine-containing product is accompanied by an FDA-approved label.  By presenting consumers with an FDA-approved label, Manufacturer and Repackager Defendants made representations and express or implied warranties to consumers like Plaintiffs that their products were consistent with the safety, quality, purity, identity, and strength characteristics reflected in the FDA-approved labels and/or were not

---

[135] *Id.* § 352(n).
[136] *Id.* § 352(p).
[137] *Id.* § 201.6, 201.10.
[138] *Id.* § 331(a).

adulterated and/or misbranded.

426.    In addition, each Manufacturer and Repackager Defendant affirmatively misrepresented and warranted to physicians and patients like Plaintiffs through their websites, brochures, and other marketing or informational materials that their ranitidine-containing products complied with CGMPs and did not contain (or were not likely to contain) any ingredients besides those identified on the products' FDA-approved labels.

427.    The presence of NDMA in Manufacturer and Repackager Defendants' ranitidine-containing products resulted in Manufacturer and Repackager Defendants' ranitidine-containing products containing an ingredient that is not also listed on each Defendant's FDA-approved label, breaching warranties listed on each Defendant's FDA-approved label and Defendants' express warranty of compliance.  Each Manufacturer and Repackager Defendant willfully, recklessly, or negligently failed to ensure their products' labels and other advertising or marketing statements accurately conveyed information about their products.

428.    At all relevant times, Manufacturer and Repackager Defendants have also impliedly warranted that their ranitidine-containing products were merchantable and fit for their ordinary purposes.

429.    Due to its status as a probable human carcinogen as listed by both the IARC and the EPA, NDMA is not an FDA-approved ingredient.  The presence of NDMA in Manufacturer and Repackager Defendants' ranitidine-containing products means that Manufacturer and Repackager Defendants violated implied warranties to Plaintiffs.  The presence of NDMA in Manufacturer and Repackager Defendants' products results in their being non-merchantable and not fit for their ordinary purposes, breaching Manufacturer and Repackager Defendants' implied warranty of merchantability and/or fitness for ordinary purposes.

430.    For these and other reasons, Manufacturer and Repackager Defendants' ranitidine-containing products are adulterated and/or misbranded, and it was illegal for Brand-Name Manufacturer and Generic Manufacturer Defendants to have introduced such ranitidine into commerce in the United States.[139]

## II. WARRANTIES COMMON TO ALL NON-MANUFACTURING DEFENDANTS

431.    By selling drugs in the stream of commerce, each Distributor and Retailer Defendant warranted to consumers that the ranitidine-containing products they sold were safe and effective.

## PLAINTIFFS' USE OF RANITIDINE-CONTAINING PRODUCTS

432.    Plaintiffs were prescribed and/or ingested ranitidine at various times as part of their treatment for gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.

433.    Plaintiffs used ranitidine-containing products designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants.  Those products, unbeknownst to Plaintiffs, contained dangerous levels of NDMA.

434.    Plaintiffs developed cancer, serious and/or permanent injuries, adverse effects, and/or death as set forth in the individual SFCs or any other responsive discovery adduced in the respective constituent actions.

435.    Plaintiffs suffered significant bodily injuries, pain and suffering, mental anguish, disfigurement, embarrassment, inconvenience, loss of earnings and earning capacity and have and will incur past and future medical expenses as set forth in the individual SFCs or any other responsive discovery adduced in the respective constituent actions.

---

[139] *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B), 331(g).

436.    Based on prevailing scientific evidence, exposure to ranitidine (and the attendant NDMA) causes cancer in humans.

437.    At all relevant times, Knowledge Defendants knew or should have known that there was a significant increased risk of cancer associated with ranitidine, and death related to those diseases.  Knowledge Defendants continued to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell and profit from sales of ranitidine until it was withdrawn from the market.

438.    Knowledge Defendants knowingly, purposely, and deliberately failed to warn Plaintiffs, patients, consumers, medical providers, the FDA, and the public of the increased risk of serious injury associated with using ranitidine, and death related to those events.

439.    Plaintiffs' prescribing physicians would not have prescribed ranitidine to Plaintiffs, would have changed the way in which they treated Plaintiffs' relevant conditions, changed the way they warned Plaintiffs about the signs and symptoms of serious adverse effects of ranitidine, and discussed with Plaintiffs the true risks of cancer, had Knowledge Defendants provided said physicians with an appropriate and adequate warning regarding the risks associated with the use of ranitidine-containing products.

440.    Upon information and belief, Plaintiffs' physicians were unaware of the increased risk of multiple types of cancer associated with the use of ranitidine and, if they had been informed, would have used and prescribed alternative therapies to Plaintiffs.

441.    Plaintiffs would not have taken ranitidine had Plaintiffs known of or been fully and adequately informed by Defendants of the true increased risks and serious dangers of taking the drugs.

442.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered serious

and/or permanent injuries, adverse effects, and/or death as set forth in the individual SFCs or any other responsive discovery adduced in the respective constituent actions, which resulted in damages to Plaintiffs in sums in excess of the jurisdictional limits of the Court.

443.    Defendants' conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish and deter similar conduct in the future.

## TOLLING / FRAUDULENT CONCEALMENT

444.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

445.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

446.    The nature of Plaintiffs' injuries, damages, or their causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiffs' claims.

447.    Plaintiffs bring this MPIC within the applicable statute of limitations.  Specifically, Plaintiffs bring this action within the prescribed time limits following Plaintiffs' injuries and/or death and Plaintiffs' knowledge of the wrongful cause.  Prior to such time, Plaintiffs did not know and had no reason to know of their injuries and/or the wrongful cause of those injuries.

448.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiffs and defects associated with ranitidine-containing products including the severity, duration, and frequency of risks and complications.  Defendants affirmatively withheld and/or misrepresented facts concerning the safety of ranitidine.  As a result of Defendants' misrepresentations and concealment, Plaintiffs and Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Plaintiffs had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

449.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which Defendants had exclusive control—and because Plaintiffs could not reasonably have known that Defendants' ranitidine-containing products were and are defective, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## **EXEMPLARY / PUNITIVE DAMAGES ALLEGATIONS**

450.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of ranitidine, particularly the carcinogenic potential of ranitidine as it transforms into NDMA within the chemical environment of the human body and/or during transport and/or storage.  Nonetheless, Defendants deliberately crafted their label and marketing to mislead consumers.

451.    This was not done by accident or through some justifiable negligence.  Rather,

Defendants knew they could profit by convincing consumers that ranitidine was harmless to humans, and that full disclosure of the true risks of ranitidine would limit the amount of money Defendants would make selling the drugs. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase and use ranitidine-containing products, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

452. Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Plaintiffs.

## CAUSES OF ACTION

### COUNT I:  STRICT PRODUCTS LIABILITY—FAILURE TO WARN
(Against All Defendants)

453. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

454. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

455. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, and/or otherwise released into the stream of commerce their ranitidine-containing products, and in the course of same, directly marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the

use of ranitidine.

456. At all relevant times, Defendants had a duty to properly design, manufacture, test, market, label, package, handle, distribute, store, sell, provide proper warnings, and/or take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiffs of dangers associated with ranitidine.  Defendants, as a manufacturer, seller, distributor, or repackager of pharmaceutical medication, are held to the knowledge of an expert in the field.

457. Defendants had a continuing duty to provide appropriate and accurate instructions regarding the proper expiration and retest dates, as well as the packaging, storage, and handling of ranitidine.

458. At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

459. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

460. Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products.  The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and

testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

461.    Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, *i.e.*, the reasonably foreseeable users, and physicians of the risks of exposure to ranitidine-containing products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

462.    At all relevant times, Defendants' ranitidine-containing products were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by the Brand-Name Manufacturer, Generic Manufacturer, Distributor, and Repackager Defendants.

463.    Plaintiffs were exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

464.    At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

465.    Plaintiffs could not have reasonably discovered the defects and risks associated with ranitidine-containing products prior to or at the time Plaintiffs consumed the drugs.  Plaintiffs and their physicians relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

466.    Defendants knew or should have known that the minimal warnings disseminated

with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

467.    The information that Defendants did provide or communicate failed to contain relevant warnings, expiration dates, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the drug.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

468.    This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling.  Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with ranitidine through other non-labeling mediums, *e.g.*, promotion, advertisements, public service announcements, and/or public information sources.  But Defendants did not disclose these known risks through any medium.

469.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their

ranitidine-containing products, Plaintiffs could not have averted their injuries.

470.   Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

471.   Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Plaintiffs' injuries.

472.   As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT PRODUCTS LIABILITY—DESIGN DEFECT
### (Against All Defendants)

473.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

474.   At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing ranitidine-containing products into the stream of commerce.  These actions were under the ultimate

control and supervision of these Defendants.

475.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the ranitidine-containing products used by Plaintiffs, as described herein.

476.    At all relevant times, Defendants' ranitidine-containing products were designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public.

477.    At all relevant times, the medication ingested by Plaintiffs were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by the Brand-Name Manufacturer, Generic Manufacturer, Distributor, and Repackager Defendants.

478.    Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation in that, when they left Defendants' control, they were unreasonably dangerous, and dangerous to an extent beyond that which an ordinary consumer would contemplate because of their inherent susceptibility to form NDMA.

479.    Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

480.    At all relevant times, Defendants knew or had reason to know that ranitidine-containing products were defective and were inherently dangerous and unsafe when used in the

manner instructed and provided by Defendants.

481. Therefore, at all relevant times, Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation, in one or more of the following ways:

    a.  Defendants' ranitidine-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer when used in a reasonably anticipated manner;

    b.  Defendants' ranitidine-containing products were not reasonably safe when used in a reasonably anticipated or intended manner;

    c.  Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the ability for ranitidine to transform into the carcinogenic compound NDMA within the human body;

    d.  Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the stability of ranitidine and the ability for ranitidine-containing products to develop increasing levels of NDMA over time under anticipated and expected storage and handling conditions;

    e.  Defendants failed to provide accurate expiration dates on the product label;

    f.  Defendants failed to package their ranitidine-containing products in a manner which would have preserved the safety, efficacy, quality, and purity of the product;

    g.  Defendants failed to provide accurate instructions concerning the stability of the drug, including failing to provide accurate information about proper temperature and light conditions for storage of the drug;

    h.  Defendants knew or should have known at the time of marketing ranitidine-containing products that exposure to ranitidine could result in cancer and other severe illnesses and injuries;

    i.  Defendants did not conduct adequate post-marketing surveillance of their ranitidine-containing products;

    j.  Defendants did not conduct adequate stability testing of their product to ascertain shelf life, expiration, and proper storage, heat, and light specifications; and

    k.  Defendants could have employed safer alternative designs and formulations.

482.     Plaintiffs used and were exposed to Defendants' ranitidine-containing products without knowledge of ranitidine's dangerous characteristics.

483.     At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' ranitidine-containing products in an intended or reasonably foreseeable manner without knowledge of ranitidine's dangerous characteristics.

484.     Plaintiffs could not reasonably have discovered the defects and risks associated with ranitidine-containing products before or at the time of exposure due to Defendants' suppression or obfuscation of scientific information linking ranitidine to cancer.

485.     Exposure to ranitidine presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug.  The harm caused by Defendants' ranitidine-containing products far outweighed their benefit, rendering each Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendants' ranitidine-containing products were and are more dangerous than alternative products, and Defendants could have designed ranitidine-containing products to make them less dangerous.  Indeed, at the time Defendants designed ranitidine-containing products and their labels, the state of the industry's scientific knowledge was such that a safer, less risky design or formulation and label was attainable.

486.     At the time ranitidine-containing products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' ranitidine-containing products.  For example, Defendants could have provided proper warnings, expiration dates, stability information, and associated information.

487.     Defendants' defective design of ranitidine-containing products was willful, wanton,

malicious, and conducted with reckless disregard for the health and safety of users of ranitidine-containing products, including Plaintiffs.

488.    The defects in Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

489.    As a direct and proximate result of Defendants' defective design of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT
### (Against Brand-Name Manufacturer and Generic Manufacturer Defendants)

490.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

491.    At all times herein mentioned, the Manufacturer Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the ranitidine-containing products ingested by Plaintiffs.

492.    At all relevant times, the medication ingested by Plaintiffs were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by the Manufacturer Defendants.

493.    At all relevant times, the medications ingested by Plaintiffs were used in a manner that was foreseeable and intended by the Manufacturer Defendants.

494.     The ranitidine ingested by Plaintiffs were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that the Manufacturer Defendants deviated materially from their design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale specifications and/or such design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale posed an unreasonable risk of harm to Plaintiffs.

495.     The Manufacturer Defendants' ranitidine-containing products are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their healthcare providers.

496.     The ranitidine-containing products create risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and treatments available to treat the corresponding medical conditions, and which far outweigh the utility of ranitidine-containing products because of the Manufacturer Defendants' manufacturing defects, which include but are not limited to:

a.     Failure to follow CGMPs;

b.     Upon information and belief, failure to adequately clean and test recovered and/or recycled solvents;

c.     Failure to adequately inspect and/or test the drugs during the manufacturing process;

d.     Failure to implement procedures that would reduce or eliminate NDMA levels in ranitidine-containing products;

e.     Failure to implement appropriate handling instructions and storage conditions for the API and the finished drug.

497.     The Manufacturer Defendants have intentionally and recklessly manufactured ranitidine-containing products with wanton and willful disregard for the rights and health of Plaintiffs, and with malice, placing their economic interests above the health and safety of

109

Plaintiffs.

498.    The manufacturing defects in the Manufacturer Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

499.    As a direct and proximate result of Defendants' defective manufacture of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  NEGLIGENCE—FAILURE TO WARN
### (Against All Defendants)

500.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

501.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products. Defendants knew or by the exercise of reasonable care should have known that their ranitidine-containing products were not accompanied by adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.  These actions were under the ultimate control and supervision of Defendants.

502.    Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, and otherwise released into the stream of commerce their ranitidine-containing products, and in the course of same, directly marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks

associated with the use of ranitidine-containing products.

503.    At all relevant times, Defendants had a duty to properly design, manufacture, test, market, label, package, handle, distribute, store, and sell, provide proper warnings, and take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiffs of dangers associated with ranitidine.  Defendants, as manufacturer, seller, distributor, or repackager of pharmaceutical medication, are held to the knowledge of an expert in the field.

504.    Defendants had a continuing duty to provide appropriate and accurate warnings and instructions regarding the identity, strength, stability, expiry, quality and purity at the time of use of their products and how to properly store and handle their ranitidine-containing products.

505.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known use of ranitidine-containing products was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner.

506.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

507.    Defendants knew or should have known that ranitidine-containing products posed a grave risk of harm but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products.  The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine, as described above, were known to Defendants, or scientifically knowable to

Defendants through appropriate research and testing by known methods, at the time they designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the product, and were not known to end users and consumers, such as Plaintiffs.

508.    Defendants further breached their duty by failing to use reasonable care to adequately warn or instruct consumers (*i.e.*, the reasonably foreseeable users), such as Plaintiffs, of the risks of exposure to their products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in their ranitidine-containing products and the potential for ingested ranitidine to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of ranitidine-containing products.

509.    At all relevant times, Plaintiffs used and/or were exposed to excessive levels of nitrosamines through the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

510.    Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and identity, strength, quality and purity at the time of use of their products, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

511.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the product.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative

severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine and ranitidine-containing products; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine-containing products.

512.    A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of ranitidine-containing products.

513.    This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling.  Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with ranitidine-containing products through other non-labeling mediums, *e.g.*, promotion, advertisements, public service announcements, and/or public information sources.  But Defendants did not disclose these known risks through any medium.

514.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Plaintiffs could not have averted their injuries.

515.    Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, warn or inform the

unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

516.    Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Plaintiffs' injuries.

517.    As a direct and proximate result of Defendants' failure to provide an adequate warning  of the risks of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  NEGLIGENT PRODUCT DESIGN
### (Against Brand-Name Manufacturer, Generic Manufacturer, and Repackager Defendants)

518.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

519.    Manufacturer and Repackager Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of ranitidine-containing products.

520.    Manufacturer and Repackager Defendants owed a duty to all reasonably foreseeable users to design a safe product and to provide a label that rendered the product safe and effective.

521.    Manufacturer and Repackager Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products because the drug exposed users to unsafe levels of the carcinogen NDMA.

522.    Manufacturer and Repackager Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products by negligently designing the drug with an inherent susceptibility to form NDMA.

523.    Manufacturer and Repackager Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products in one or more of the following ways:

    a.  When placed in the stream of commerce, Manufacturer and Repackager Defendants' ranitidine-containing products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.  When placed in the stream of commerce, Manufacturer and Repackager Defendants' ranitidine-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.  When placed in the stream of commerce, Manufacturer and Repackager Defendants' ranitidine-containing products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.  Manufacturer and Repackager Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the ability for ranitidine to transform into the carcinogenic compound NDMA within the human body;

    e.  Manufacturer and Repackager Defendants did not sufficiently test, investigate, or study their ranitidine-containing products identity, strength, quality and purity at the time of use of their products and, specifically, the ability for ranitidine-containing products to develop increasing levels of NDMA under anticipated and expected packaging, storage, and handling conditions;

    f.  Manufacturer and Repackager Defendants did not sufficiently test, investigate, or study their ranitidine-containing products identity, strength, quality and purity at the time of use of their products and, specifically, the ability for ranitidine-containing products to develop increasing levels of NDMA over time;

    g.  Manufacturer and Repackager Defendants failed to conduct proper stability testing and/or to set accurate recall dates for the drugs, which resulted in the formation of excess amounts of NDMA in ranitidine-containing products;

h.  Manufacturer and Repackager Defendants knew or should have known at the time of marketing ranitidine-containing products that exposure to ranitidine could result in cancer and other severe illnesses and injuries;

i.  Manufacturer and Repackager Defendants did not conduct adequate post-marketing surveillance of their ranitidine-containing products; and

j.  Manufacturer and Repackager Defendants could have employed safer alternative designs and formulations.

524.  Exposure to ranitidine presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug.

525.  Manufacturer and Repackager Defendants breached their duty to exercise reasonable care by failing to use cost effective, reasonably feasible alternative designs.  There was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Manufacturer and Repackager Defendants' ranitidine-containing products.

526.  A reasonable company under the same or similar circumstances would have designed a safer product.

527.  Plaintiffs were harmed directly and proximately by Manufacturer and Repackager Defendants' failure to use reasonable care in the design of their ranitidine-containing products. Such harm includes significant exposure to a known carcinogen, NDMA, which can cause or contribute the development of cancers.

528.  Manufacturer and Repackager Defendants' defective design of ranitidine-containing products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of ranitidine-containing products, including Plaintiffs.

529.  The defects in Manufacturer and Repackager Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

530.  As a direct and proximate result of Manufacturer and Repackager Defendants'

defective design of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI:  NEGLIGENT MANUFACTURING
### (Against Brand-Name Manufacturer and Generic Manufacturer Defendants)

531.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

532.    At all relevant times, the Manufacturer Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the ranitidine-containing products that Plaintiffs consumed.

533.    Manufacturer Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products.

534.    Manufacturer Defendants knew or, by the exercise of reasonable care, should have known that use of ranitidine-containing products that were carelessly manufactured or packaged was dangerous, harmful, and injurious when used by Plaintiffs in a reasonably foreseeable manner.

535.    Manufacturer Defendants knew or, by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of ranitidine-containing products improperly designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold.

536.     Without limitation, examples of the manner in which the Manufacturer Defendants breached their duty to exercise reasonable care in manufacturing ranitidine-containing products included

     a.  Failure to follow CGMPs;

     b.  Failure to adequately inspect and/or test the drugs during and after the manufacturing process to ensure identity, strength, quality and purity at the time of use of their products;

     c.  Failure to implement procedures that would reduce or eliminate NDMA levels in ranitidine-containing products;

     d.  Failure to conduct proper stability testing and/or to set accurate recall dates for the drugs, which resulted in the formation of excess amounts of NDMA in ranitidine-containing products; and

     e.  Failure to implement appropriate handling instructions and storage conditions for the drug.

537.     A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality and safety of their product.

538.     Plaintiffs were harmed directly and proximately by the Manufacturer Defendants' failure to use reasonable care in the manufacture of their ranitidine-containing products.  Such harm includes significant exposure to a known carcinogen, NDMA, which can cause or contribute to the development of cancers.

539.     Manufacturer Defendants' improper manufacturing of ranitidine-containing products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of ranitidine-containing products, including Plaintiffs.

540.     The defects in the Manufacturer Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

541.     As a direct and proximate result of the Manufacturer Defendants' improper design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT VII:  GENERAL NEGLIGENCE
### (Against All Defendants)

542.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

543.     Defendants, directly or indirectly, designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products that were used by Plaintiffs.

544.     At all relevant times, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, including the duty to take all reasonable steps necessary to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

545.     At all relevant times, Defendants had a duty to exercise reasonable care in the marketing and sale of ranitidine-containing products.  Defendants' owed to consumers and the general public a duty of care that included providing accurate, true, and correct information concerning the risks of using ranitidine-containing products and appropriate, complete, and

accurate warnings concerning the potential adverse effects of ranitidine and, in particular, its ability to transform into the carcinogenic compound NDMA.

546.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of ranitidine and, specifically, the carcinogenic properties of NDMA when ranitidine-containing products are ingested and/or the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored.

547.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that their ranitidine-containing products were highly unstable and that ranitidine-containing products were not safe for human consumption for as long as the labeling suggested.

548.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that their ranitidine-containing products were likely to break down in the absence of sufficient packaging which would have protected the pills from heat and/or light exposure.

549.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of ranitidine-containing products could cause or be associated with Plaintiffs' injuries, and thus create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

550.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of ranitidine-containing products were unaware of the risks and the magnitude of the risks associated with use of ranitidine-containing products.

551.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, in that Defendants manufactured and produced defective ranitidine-containing products, which carries the potential

to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in their products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.  Indeed, Defendants deliberately refused to test ranitidine-containing products for NDMA levels because they knew that the chemical posed serious health risks to humans.

552.    Defendants further failed to conduct stability and light sensitivity studies at all levels of the distribution and storage chain to enable them to set accurate expiration dates for their ranitidine-containing products.  As such, Defendants failed to provide physicians and patients, such as Plaintiffs, with accurate warnings related to their products.

553.    Defendants were negligent in their marketing of ranitidine-containing products, outside of the labeling context, by failing to disclose material-risk information as part of their marketing of ranitidine-containing products, including the internet, television, and print advertisements.  Nothing prevented Defendants from being honest in their promotional activities to doctors, as well as to co-Defendants further down the distribution chain, including generic manufacturers, distributors, repackagers, relabelers, and retailers, among others, and, in fact, Defendants had a duty to disclose the truth about the risks associated with ranitidine in their promotional efforts, outside of the context of labeling.

554.    Defendants— designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine—were in a superior position to understand the risk of NDMA being present in and/or forming in ranitidine-containing products and had a duty to warn of these dangers.

555.    Despite their ability and means to investigate, study, and test the products and to

provide adequate warnings, Defendants failed to do so. Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of ranitidine-containing products.

556. Defendants' negligence included

a. Designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products without thorough and adequate pre- and post-market testing;

b. Designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of ranitidine and the carcinogenic potential of NDMA as a result of ingesting ranitidine, and, consequently, the risk of serious harm associated with human use of ranitidine-containing products;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not ranitidine-containing products were safe for their intended consumer use;

d. Failing to use reasonable and prudent care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products so as to avoid the risk of serious harm associated with the prevalent use of ranitidine-containing products;

e. Failing to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell ranitidine-containing products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f. Failing to undertake to provide adequate instructions, guidelines, and safety precautions regarding identity, strength, quality and purity at the time of use of their products to those persons Defendants could reasonably foresee would use ranitidine-containing products;

g. Failing to conduct proper studies at every level of the distribution chain regarding stability, as well as proper packaging and storage conditions, particularly relating to heat and light;

h. Failing to comply with CGMPs or conduct testing and due diligence in sourcing ingredients and solvents used to manufacture ranitidine-containing products;

i.   Failing to comply with CGMPs or conduct testing and due diligence before designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products, specifically as it relates to proper storage and transport of the drugs, and subsequently failing to provide proper warnings to patients and physicians concerning the same;

j.   Failing to conduct proper post-market surveillance relating to the presence of NDMA in Defendants' ranitidine-containing products;

k.   Failing to conduct proper post-market surveillance relating to the stability (or lack thereof) of Defendants' ranitidine-containing products;

l.   Failing to report adverse events, specifically cases of cancer in patients who took ranitidine-containing products to the FDA, despite being aware of these adverse events;

m.   Failing to undertake to disclose to Plaintiffs, users/consumers, and the general public that use of ranitidine-containing products presented severe risks of cancer;

n.   Failing to warn Plaintiffs, consumers, and the general public that ranitidine-containing products' risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiffs and other consumers;

o.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of ranitidine-containing products;

p.   Representing that their ranitidine-containing products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

q.   Declining to make or propose any changes to ranitidine-containing products' labeling or other promotional materials that would alert consumers and the general public of the risks of ranitidine-containing products;

r.   Advertising, marketing, and recommending the use of ranitidine-containing products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to ranitidine-containing products;

s.   Continuing to disseminate information to consumers, including Plaintiffs, that indicate or imply that Defendants' ranitidine-containing products are not unsafe for regular consumer use; and

t.   Continuing to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell ranitidine-containing products with the knowledge that the products were unreasonably unsafe and dangerous.

123

557.     Defendants knew or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products.

558.     Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

559.     Defendants' negligence was a substantial factor in causing Plaintiffs' injuries.

560.     Defendants' conduct, as described above, was reckless.  Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, about those dangers. Defendants' reckless conduct therefore warrants an award of punitive damages.

561.     As a direct and proximate result of Defendants' failure to undertake to provide an adequate warning  of the risks of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VIII:  NEGLIGENT MISREPRESENTATION
### (Against Brand-Name Manufacturer, Generic Manufacturer, and Repackager Defendants)

562.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

as if fully stated herein.

563.    At all relevant times, Manufacturer and Repackager Defendants designed, manufactured, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, stored, handled, warehoused, distributed, sold and/or otherwise placed ranitidine-containing products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to consumers of ranitidine-containing products, including Plaintiffs.

564.    Manufacturer and Repackager Defendants were negligent, reckless, and careless and owed a duty to Plaintiffs to make accurate and truthful representations regarding ranitidine-containing products, and Manufacturer and Repackager Defendants breached their duty, thereby causing Plaintiffs to suffer harm.

565.    Manufacturer and Repackager Defendants represented to Plaintiffs via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that

   a.  ranitidine-containing products were both safe and effective for the lifetime of the product, when in fact, the drug contains unsafe levels of NDMA far in excess of the 96 ng limit that increases at various points during the shipping, handling, storage, and consumption phases and as the product ages;

   b.  consumption of ranitidine-containing products would not result in excessive amounts of NDMA being formed in their bodies; and

   c.  the levels of NDMA in ranitidine-containing products have no practical clinical significance; and

   d.  ranitidine-containing products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose.

566.    These representations were false.  Because of the unsafe levels of NDMA in ranitidine-containing products, the drug presented an unacceptable risk of causing cancer. Ranitidine-containing products are so unsafe that the FDA was compelled to order the immediate

withdrawal of all ranitidine-containing products on April 1, 2020.

567.    Manufacturer and Repackager Defendants knew or should have known these representations were false and negligently made them without regard for their truth.

568.    Manufacturer and Repackager Defendants had a duty to accurately provide this information to Plaintiffs.  In concealing this information from Plaintiffs, Manufacturer and Repackager Defendants breached their duty.  Manufacturer and Repackager Defendants also gained financially from, and as a result of their breach.

569.    Manufacturer and Repackager Defendants intended for Plaintiffs and/or their physicians to rely on these representations.

570.    Each of these misrepresentations were material at the time they were made.  In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume ranitidine-containing products.

571.    Plaintiffs reasonably relied on these representations and were harmed as described herein.  Plaintiffs' reliance on Manufacturer and Repackager Defendants' representations was a substantial factor in causing Plaintiffs' harms.  Had Manufacturer and Repackager Defendants told Plaintiffs the truth about the safety and composition of ranitidine-containing products, Plaintiffs would not have consumed or purchased them.

572.    Manufacturer and Repackager Defendants' acts and omissions as described herein were committed in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich Defendants.

573.    As a direct and proximate result of the Manufacturer and Repackager Defendants' negligent misrepresentations concerning their ranitidine-containing products, Plaintiffs have been

injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IX:  BREACH OF EXPRESS WARRANTIES
### (Against All Defendants)

574.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

575.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

576.    Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, including a duty to:

    a.  ensure that their products did not cause the user unreasonably dangerous side effects;

    b.  warn of dangerous and potentially fatal side effects; and

    c.  disclose adverse material facts, such as the true risks associated with the use of and exposure to ranitidine-containing products, when making representations to consumers and the general public, including Plaintiffs.

577.    As alleged throughout this pleading, the ability of Defendants to properly disclose

those risks associated with ranitidine-containing products is not limited to representations made on the labeling.

578.   At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that ranitidine-containing products were safe to human health and the environment, effective, fit, and proper for their intended use.  Defendants advertised, labeled, marketed, and promoted ranitidine-containing products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that ranitidine-containing products would conform to the representations.

579.   These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to ranitidine-containing products.  Defendants knew and/or should have known that the risks expressly included in ranitidine-containing products warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that ranitidine-containing products were safe and effective, that they were safe and effective for use by individuals such as Plaintiffs, and/or that they were safe and effective as consumer medication.

580.   The representations about ranitidine-containing products, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

581.   Defendants placed ranitidine-containing products into the stream of commerce for

sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of ranitidine-containing products.

582.    Defendants breached these warranties because, among other things, ranitidine-containing products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendants breached the warranties in the following ways:

    a.  Defendants represented through their labeling, advertising, and marketing materials that ranitidine-containing products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of ranitidine-containing products and by expressly limiting the risks associated with use within their warnings and labels;

    b.  Defendants represented that the expiry dates on their products were accurate and that their ranitidine-containing products were safe for consumption throughout the end of the expiry period;

    c.  Defendants represented that their ranitidine-containing products were safe for human consumption without disclosing the risks of NDMA in the pills, the risk that NDMA might form over time and/or increase dramatically as a result of exposure to heat and/or light, and the risk that NDMA might form during the digestion process; and

    d.  Defendants represented that ranitidine-containing products were safe for use and intentionally concealed information that demonstrated that they had carcinogenic properties, and that ranitidine-containing products, therefore, were not safer than alternatives available on the market.

583.    Plaintiffs detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of ranitidine-containing products in deciding to purchase the product.  Plaintiffs reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of ranitidine.  Physicians would not have prescribed, and Plaintiffs would not have purchased or used ranitidine-containing products had Defendants properly disclosed the risks associated with ranitidine, either through advertising, labeling, or any other

form of disclosure.

584.    Defendants had sole access to material facts concerning the nature of the risks associated with their ranitidine-containing products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in ranitidine-containing products' warnings and labels were inadequate and inaccurate.

585.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning ranitidine-containing products.

586.    Plaintiffs used and/or were exposed to ranitidine-containing products as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, or otherwise released into the stream of commerce by Defendants.

587.    Had the warnings, labels, advertisements, or promotional material for ranitidine-containing products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

588.    Defendants' breach of these express warranties were a substantial factor in causing Plaintiffs' harm.

589.    As a direct and proximate result of Defendants' breach of these warranties, as alleged herein, Plaintiffs sustained an economic loss and other injuries.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT X:  BREACH OF IMPLIED WARRANTIES
### (Against All Defendants)

590.    Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

591.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing ranitidine-containing products into the stream of commerce.

592.    Before the time Plaintiffs used ranitidine-containing products, Defendants impliedly warranted to their consumers, including Plaintiffs, that ranitidine-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

593.    But Defendants failed to disclose that ranitidine-containing products had dangerous propensities when used as intended and that use of ranitidine-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

594.    Plaintiffs were an intended beneficiary of the implied warranties made by Defendants to purchasers of their ranitidine-containing products.

595.    At all relevant times, Defendants were aware that consumers and users of their products, including Plaintiffs, would use ranitidine-containing products as marketed by Defendants, which is to say that Plaintiffs were a foreseeable user of ranitidine-containing products.

596.    Defendants intended that ranitidine-containing products be used in the manner in which Plaintiffs, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though ranitidine-containing products were

not adequately tested or researched.

597.    In reliance upon Defendants' implied warranty, Plaintiffs used ranitidine-containing products as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

598.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with ranitidine-containing products.

599.    Defendants breached their implied warranty to Plaintiffs in that ranitidine-containing products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.   Ranitidine-containing products have dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

600.    The harm caused by Defendants' ranitidine-containing products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

601.    Defendants' breach of these implied warranties was a substantial factor is causing Plaintiffs' harm.

602.    As a direct and proximate result of Defendants' breach of implied warranties, as alleged herein, Plaintiffs sustained a loss an economic loss and other injuries.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT XI:  VIOLATION OF CONSUMER PROTECTION AND DECEPTIVE TRADE PRACTICES LAWS (Against All Defendants)

603.    Plaintiffs incorporate by reference every allegation set forth in preceding

paragraphs as if fully stated herein.

604.     Certain Plaintiffs herein bring a cause of action for deceptive trade practices and or violation of applicable state consumer protection laws.

605.     Plaintiffs used Defendants' ranitidine-containing products and suffered ascertainable losses as a result of Defendants' actions in violation of consumer protection laws.

606.     Had Defendants not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased ranitidine-containing products, and would not have incurred related medical costs and injuries.

607.     Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiffs for ranitidine-containing products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

608.     Unfair methods of competition or deceptive acts or practices that were proscribed by law include

>    a.  Representing that goods or services have characteristics, ingredients, uses benefits or qualities they do not have;
>
>    b.  Representing that ranitidine-containing products are of a particular standard, quality, and grade when they are not.
>
>    c.  Advertising goods or services with the intent not to sell them as advertised;
>
>    d.  Over-promotion of the product with respect to, inter alia, its safety and efficacy; and
>
>    e.  Engaging in fraudulent and deceptive conduct that creates a likelihood of confusion or misunderstanding.

609.     Plaintiffs were injured by the cumulative and indivisible nature of Defendants' conduct, which created demand for ranitidine-containing products.  Each aspect of Defendants' conduct combined to artificially create sales for ranitidine-containing products.

610.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products.

611.    Had Defendants not engaged in the deceptive conduct described above, Plaintiffs would not have purchased and/or paid for ranitidine-containing products and would not have incurred related medical costs.

612.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to Plaintiffs constituted unfair and deceptive acts and trade practices in violation of state consumer protection statutes.

613.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

614.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the following consumer protection laws:

> a. Ariz. Rev. Stat. Ann. §§ 44-1521, et seq.;
>
> b. Ark. Code Ann. §§ 4-88-101, et seq.;
>
> c. Cal Bus & Prof Code §§ 1750, et seq.;
>
> d. Colo. Rev. Stat. §§ 6-1-101, et seq.;
>
> e. Del. Code Ann. tit. 6, §§ 2511, et seq. and §§ 2531, et seq.
>
> f. D.C. Code Ann. §§ 28-3901, et seq.;
>
> g. Ga. Code Ann. §§ 10-1-390, et seq.;
>
> h. Id. Code Ann. §§ 48-601, et seq.;

i. 815 Ill. Comp. Stat. 505/1, et seq.;

j. Ind. Code Ann. §§ 24-5-0.5-1, et seq.;

k. Kan. Stat. Ann. §§ 50-623, et seq.;

l. Ky. Rev. Stat. Ann. §§ 367.110, et seq.;

m. Me. Rev. Stat. Ann. tit. 5, §§ 205-A, et seq.;

n. Md. Code Ann., Com. Law §§ 13-101, et seq.;

o. Mass. Gen. Laws Ann. Ch. 93A, et seq.;

p. Mich. Comp. Laws §§ 445.901, et seq.;

q. Minn. Stat. §§ 325F.68, et seq.;

r. Mo. Ann. Stat. §§ 407.010, et seq.;

s. Mon. Code Ann. §§ 30-14-101, et seq.;

t. Neb. Rev. Stat. §§ 59-1601, et seq.;

u. Nev. Rev. Stat. Ann. §§ 598.0903, et seq.;

v. N.H. Rev. Stat. Ann. §§ 358-A:1, et seq.;

w. N.M. Stat. Ann. §§ 57-12-1, et seq.;

x. N.Y. Gen. Bus. Law §§ 349, et seq. and §§ 350, et seq.;

y. N.C. Gen. Stat. §§ 75-1.1, et seq.;

z. N.D. Cent. Code §§ 51-15-01, et seq.;

aa. Okla. Stat. tit. 15 §§ 751, et seq.;

bb. S.C. Code Ann. §§ 39-5-10, et seq.;

cc. S.D. Codified Laws §§ 37-24-1, et seq.;

dd. Tenn. Code Ann. §§ 47-18-101, et seq.;

ee. Utah Code Ann. §§ 13-11a-1.;

ff. Vt. Stat. Ann. tit. 9, §§ 2451, et seq.;

gg. Va. Code Ann. §§ 59.1-196, et seq.;

hh. W. Va. Code §§ 46A-1-101, et seq.;

ii. Wis. Stat. §§ 100.18, et seq.; and

jj. Wyo. Stat. §§ 40-12-101, et seq.

615.    Under the statutes listed above to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers and sellers who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

616.    Plaintiffs are the type of consumers, as defined in these statutes, that these statutes were designed to protect.

617.    Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that ranitidine-containing products were fit to be used for the purpose for which they were intended, when in fact ranitidine-containing products were defective and dangerous, and by other acts alleged herein.  These representations were made in promotional materials.

618.    The actions and omissions of Defendants as alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. Defendants were provided notice of the issues raised in this count and this MPIC by the FDA, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of ranitidine-containing products' defects

became public.

619.    Defendants had actual knowledge of the defective and dangerous condition of ranitidine-containing products and failed to take any action to cure such defective and dangerous conditions.

620.    Plaintiffs and the medical community relied upon Defendants' misrepresentations and omissions.   Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiffs, about the inherently defective and unreasonably dangerous nature of ranitidine-containing products.

621.    Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under these statutes in the course of their business.   Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the dangers of ranitidine-containing products because they possessed exclusive knowledge, they intentionally concealed the dangers of ranitidine from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

622.    The facts regarding ranitidine that Defendants knowingly and intentionally misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiffs, who consider such facts to be important to their purchase decisions with respect to ranitidine-containing products.

623.    Plaintiffs purchased ranitidine-containing products in reliance on Defendants' misrepresentations, omissions, concealments, and failures to disclose material facts regarding ranitidine-containing products.   Had Defendants not engaged in the deceptive acts and practices

alleged herein, Plaintiffs would not have purchased the drug and would not have been injured.

624.    Defendants' deceptive, fraudulent and unconscionable representations to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and practices.

625.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

626.    Defendants' unlawful acts and practices complained of herein affect the public interest, as the violations regarding a widely sold drug were harmful to the general public.

627.    Defendants' actions and omissions as identified in this MPIC show that Defendants acted willfully, maliciously and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages, or other applicable statutory damages including double or treble damages where available.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, statutory damages where applicable, including double and treble damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT XII:  UNJUST ENRICHMENT
### (Against All Defendants)

628.    Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

629.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, or otherwise released ranitidine-containing products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, including Plaintiffs.

630.    Defendants knew that ranitidine-containing products posed a grave risk of harm but

failed to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the carcinogenic characteristics of NDMA were well known to Defendants.

631.    Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions, and advertisements that omitted disclosure that the products presented an unreasonable risk of substantial bodily injury resulting from their use.

632.    Defendants requested and received a measurable benefit at the expense of Plaintiffs in the form of payment for their ranitidine-containing products.

633.    Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at Plaintiffs' detriment. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of Plaintiffs.

634.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

635.    Defendants wrongfully obfuscated the harm caused by their ranitidine-containing products. Thus, Plaintiffs, who mistakenly enriched Defendants by relying on Defendants' misrepresentations of product safety, could not and did not know the effect that using ranitidine-containing products would have on Plaintiffs' health.

636.    Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendants. Due to their wrongful conduct and the FDA action recalling ranitidine-containing products in the form of a market withdrawal, Defendants are reasonably notified that

Plaintiffs would expect compensation from Defendants' unjust enrichment stemming from their
wrongful actions.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor
for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'
fees and all such other and further relief as this Court deems just and proper.

### COUNT XIII:  LOSS OF CONSORTIUM
### (Against All Defendants)

637.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs
as if fully stated herein.

638.    As a direct and proximate result of Defendants' conduct as detailed above,
Plaintiffs' spouses and/or family members, as specified in the SFC, have suffered and will continue
to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

639.    Plaintiffs' spouses and/or family member have necessarily paid and have become
liable to pay for medical aid, treatment and for medications, and will necessarily incur further
expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

640.    Plaintiffs' spouses allege that their marital relationship has been impaired and
depreciated, and the marital association has been altered.

641.    Plaintiffs' spouses and/or family members have suffered great emotional pain and
mental anguish.

642.    Plaintiffs' spouses and/or family members have sustained and will continue to
sustain several physical injuries, severe emotional distress, economic losses, and other damages
for which they are entitled to compensatory damages.

643.    Defendants' actions and omissions as identified in this MPIC show that Defendants
acted maliciously and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition

of punitive damages.

### COUNT XIV:  SURVIVAL ACTIONS
### (Against All Defendants)

644.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

645.    As a direct and proximate result of the conduct of Defendants, Decedents, prior to their deaths, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by their estates.  As a direct and proximate cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earnings and earning capacity.  Plaintiffs' spouses, as Administrators of the Estates of Decedents, beneficiaries and/or lawful representatives bring this claim on behalf of the estates for damages under any and all applicable statute or common law.

646.    As a direct and proximate result of the conduct of Defendants, Decedents, and their spouses, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.  This claim is brought on behalf of the Estates of the Decedents pursuant to any and all applicable statutes or common law.

647.    As a direct and proximate result of the conduct of Defendants and including the observances of the suffering of the Decedents, until the date of their deaths, Plaintiffs suffered permanent and ongoing psychological damage.

648.    As a direct and proximate result of the aforesaid and including the observance of the suffering and physical deterioration of Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future

psychological and medical treatment.  Plaintiffs' spouses, as Administrators of the Estates of the Decedents, beneficiaries and/or lawful representatives bring the claims on behalf of the Estates for damages any and all applicable statutes or common law and in their own right.

649.    Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiffs and the public.

650.    As a result of Defendants' conduct, Plaintiffs suffered the injuries and damages specified herein.

651.    Defendants' actions and omissions as identified in this MPIC show that Defendants acted maliciously and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT XV:  WRONGFUL DEATH
### (Against All Defendants)

652.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein

653.    Plaintiffs Decedents' spouses, beneficiaries, and/or lawful representatives of Decedents' Estates bring this claim on behalf of themselves and as the Decedents' lawful beneficiaries.

654.    As a direct and proximate result of the conduct of Defendants and the defective nature of ranitidine-containing products as outlined above, Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

655.    As a direct and proximate cause of the conduct of Defendants, Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration

expenses as a result of Decedents' deaths.

656.    Defendants' actions and omissions as identified in this MPIC show that Defendants acted maliciously and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## JURY TRIAL DEMAND

657.    Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiffs hereby demand a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and against Defendants for:

a.      actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.      exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

c.      pre-judgment and post-judgment interest;

d.      reasonable attorneys' fees as provided by law;

e.      costs and expenses of these actions;

f.      statutory damages, treble damages and other relief permitted by the laws of the states that will govern these actions; and

g.      any other relief the Court may deem just and proper.

DATED: June 22, 2020.

Respectfully submitted,

/s/ Tracy A. Finken
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: /s/ Robert C. Gilbert
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

/s/ Michael L. McGlamry
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

/s/ Adam Pulaski
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogden
Email:  Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1222 Troy-Schenectady Road
Niskayuna, NY 12309
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerlenkner.com
KELLER | LENKNER
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Tel: (312) 741-5222

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
9 Evelyn Road
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Francisco R. Maderal, FBN 0041481
Email: frank@colson.com
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Tel: (305) 476-7400

Lauren S. Miller
Email: lmiller@corywatson.com
CORY WATSON, P.C.
2131 Magnolia Ave S
Birmingham, AL 35205
Tel: (205) 271-7168

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX 78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Tel: (305) 330-5512

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

*Plaintiffs' Steering Committee*
*Plaintiffs' Law and Briefing Committee Co-Chairs*
*Plaintiffs' Liaison Counsel*

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
2579 N. Avalon Avenue
Orange, CA 92867
Tel: (202) 506-3591

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

/s/ <i>Robert C. Gilbert</i>
Robert C. Gilbert
