**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                        MDL No. 2924
PRODUCTS LIABILITY                                      20-MD-2924
LITIGATION

                                                  **JUDGE ROBIN L. ROSENBERG**
             **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**


**BRANDED DEFENDANTS' RULE 12 PARTIAL MOTION TO DISMISS**
**PLAINTIFFS' THREE COMPLAINTS AS PREEMPTED BY FEDERAL LAW**
**AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

INTRODUCTION .........................................................................................................................1

BACKGROUND .........................................................................................................................3

    A.    The FDCA Framework and FDA Regulation of Safety and Efficacy of
Pharmaceutical Products.............................................................................................3

    B.    Zantac's FDA Regulatory History .............................................................................5

    C.    Overview of the Litigation and Filing of the Complaints.........................................7

ARGUMENT AND CITATION OF AUTHORITY .....................................................................9

I.      FEDERAL LAW EXPRESSLY PREEMPTS PLAINTIFFS' STATE LAW
CLAIMS FOR REFUND OF THE PURCHASE PRICE FROM
MANUFACTURERS OR SELLERS OF BRANDED OTC ZANTAC. .........................11

    A.    Plaintiffs' State Law Counts Seek to Impose "Requirements" that Are
"Different from or in Addition to, or Otherwise Not Identical with"
Requirements Under the FDCA. ...............................................................................11

    B.    Plaintiffs' Claims Are Not Saved By Section 379r(e). ...........................................15

II.    CONFLICT PREEMPTION BARS PLAINTIFFS' DESIGN DEFECT CLAIMS
IN ALL COMPLAINTS, AS TO BOTH OTC AND PRESCRIPTION ZANTAC..........17

CONCLUSION..........................................................................................................................22

APPENDIX A ......................................................................................................................... A-1

# TABLE OF AUTHORITIES

**Cases**                        **Page(s)**

*Barcal v. EMD Serono, Inc.*,
   No. 14-CV-01709, 2016 WL 1086028 (N.D. Ala. March 21, 2016)..................................20, 21

*Batoh v. McNeil-PPC, Inc.*,
   167 F. Supp. 3d 296 (D. Conn. 2016)..............................................................................20, 21

*Berenguer v. Warner–Lambert Co.*,
   No. 02-05242, 2003 WL 24299241 (Fla. Cir. Ct. July 31, 2003)...........................................12

*Bimont v. Unilever U.S., Inc.*,
   No. 14-CV-7749, 2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015)............................................15

*Brazil v. Janssen Research & Dev. LLC*,
   196 F. Supp. 3d 1351 (N.D. Ga. 2016)..................................................................................21

*Carter v. Novartis Consumer Health, Inc.*,
   582 F. Supp. 2d 1271 (C.D. Cal. 2008) ........................................................................ *passim*

*Cavalieri v. Avior Airlines C.A.*,
   Case No. 17-22010-CIV, 2019 WL 1099860 (S.D. Fla. Mar. 8, 2019)....................................9

*Cipollone v. Liggett Group, Inc.*,
   505 U.S. 504 (1992)...............................................................................................................9

*E. River S.S. Corp. v. Transam. Delaval, Inc.*,
   476 U.S. 858 (1986).............................................................................................................16

*Eckler v. Neutrogena Corp.*,
   238 Cal. App. 4th 433 (Cal. App. Ct. 2015) .....................................................................12, 15

*Epstein v. Gilead Scis., Inc.*,
   No. 19-81474-CIV, 2020 WL 4333011 (S.D. Fla. July 27, 2020) .....................................3, 20

*Faustino v. Alcon Labs.*,
   No. 15-CV-04145, 2015 WL 12839161 (C.D. Cal. Sept. 22, 2015), *aff'd on other grounds*, 692 F. App'x 819 (9th Cir. 2017)....................................................................15

*Fleming v. Janssen Pharm., Inc.*,
   186 F. Supp. 3d 826 (W.D. Tenn. 2016)...............................................................................20

*FMC Corp. v. Holliday*,
   498 U.S. 52 (1990).................................................................................................................9

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
    898 F.3d 1110 (11th Cir. 2018) ...........................................................................................16

*Gustavsen v. Alcon Labs., Inc.*,
    272 F. Supp. 3d 241 (D. Mass. 2017), *aff'd,* 903 F.3d 1 (1st Cir. 2018)................................21

*Gustavsen v. Alcon Labs., Inc.*,
    903 F.3d 1 (1st Cir. 2018)....................................................................................................18

*Home Warranty Corp. v. Caldwell*,
    777 F.2d 1455 (11th Cir. 1985) ...........................................................................................16

*Kanter v. Warner-Lambert Co.*,
    99 Cal. App. 4th 780 (2002) ..............................................................................12, 13, 14, 17

*Mills v. Warner-Lambert Co.*,
    581 F. Supp. 2d 772 (E.D. Tex. 2008).......................................................................2, 12, 17

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013).............................................................................................18, 19, 21, 22

*O'Connor v. Henkel Corp.*,
    No. 14-CV-5547 ARR MDG, 2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015).......................15

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)...............................................................................................3, 10, 18, 21

*Rheinfrank v. Abbott Labs., Inc.*,
    137 F. Supp. 3d 1035 (S.D. Ohio 2015) ...............................................................................20

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008)..............................................................................................................12

*Robinson ex rel. T.R. v. Eli Lilly & Co.*,
    No. 17-CV-338, 2018 WL 4039703 (E.D. Ky. Aug. 23, 2018) .............................................20

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. Dec. 23, 2016) ....................................................................20

*Wyeth v. Levine*,
    555 U.S. at 555 (2009)..........................................................................................................21

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ................................................................................3, 18, 20, 21

## Statutes and Regulations

21 U.S.C. § 314.70(c)(6)(iii)(A) .....................................................................................................5

21 U.S.C. § 321(p) ...............................................................................................................3

21 U.S.C. § 352.................................................................................................................3, 5

21 U.S.C. § 353(b)(3) .........................................................................................................4

21 U.S.C. § 355.................................................................................................................3, 4

21 U.S.C. § 379r ......................................................................................................... *passim*

21 U.S.C. § 393(b)(2)(B) ....................................................................................................3

21 C.F.R. § 310.200(b) .......................................................................................................4

21 C.F.R. §§ 314.1–314.3 ..................................................................................................4

21 C.F.R. § 314.50..............................................................................................................4

21 C.F.R. § 314.70........................................................................................................4, 5, 19

21 C.F.R. § 314.71..............................................................................................................5

21 C.F.R. § 314.105(b) .......................................................................................................4

21 C.F.R. § 330.1............................................................................................................3, 4

21 C.F.R. § 330.10..........................................................................................................3, 4

26 C.F.R. § 1.172-13(b)(2)(i).............................................................................................16

## Other Authorities

James T. O'Reilly and Katharine A. Van Tassel, *Prescription Drug to OTC Drug
    Switches*, Food and Drug Admin. § 13:37 (4th ed. 2020)..........................................4

Restatement (Third) of Torts: Prod. Liab. § 21 (1998)..................................................16

U.S. Const. art. VI, cl. 2....................................................................................................9

## INTRODUCTION

Zantac (ranitidine) is a medication that, for nearly four decades, had been approved by the Food and Drug Administration ("FDA") and widely used in prescription and over-the-counter ("OTC") form to treat stomach ulcers, gastroesophageal reflux disease, heartburn, indigestion, and other conditions of the stomach and esophagus. *See, e.g.*, Dkt. 889 at ¶¶ 2, 23, 29, 188, 209, 249. FDA has exhaustively and repeatedly reviewed the safety and efficacy of Zantac throughout its lifecycle, and closely regulates the Branded Defendants' involvement in the product. Despite the lack of any real-world evidence that Zantac use increases the risk of cancer, Plaintiffs brought this litigation after a private laboratory's test results allegedly detected the presence of N-Nitrosodimethylamine ("NDMA") in certain ranitidine products.

Plaintiffs' sprawling Complaints assert hundreds of broadly framed state law causes of action against manufacturers or sellers of Zantac (the "Branded Defendants"),[1] which defy the limitations federal law imposes on the use of the state tort system as an alternative means of regulating pharmaceutical products. The Supremacy Clause of the U.S. Constitution does not allow Plaintiffs to assert state law claims that the Federal Food, Drug, and Cosmetic Act ("FDCA") either expressly or impliedly preempts as incompatible with its comprehensive federal regulatory regime. Here, on the face of the Complaints now before the Court, bedrock preemption principles require dismissal of two significant categories of Plaintiffs' sweeping state law claims against the Branded Defendants.

---

[1] The term "Branded Defendants" includes Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Ingelheim"); Chattem, Inc., Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC (collectively, "Sanofi"); Patheon Manufacturing Services, LLC; Pfizer Inc. ("Pfizer"); and GlaxoSmithKline LLC ("GSK").

*First*, the FDCA expressly preempts each of the state law claims in the Complaints that seek economic damages arising out of the use and purchase of OTC formulations of Zantac.  *See* Consumer Complaint, Counts 2 and 4 through 314, Dkt. 889, ¶¶ 794–802, 822–5899; Personal Injury Complaint, Count 12, Dkt. 887, ¶¶ 628–636; TPP Complaint, Counts 2, 3, and 5 through 9, Dkt. 888, ¶¶ 564–77, 578–87, 606–77.  Under the plain language of the FDCA, consumers may not bring state law claims for economic harms relating to OTC product regulation that are "different from," "in addition to," or "otherwise not identical with" a federal requirement under the FDCA.  21 U.S.C. § 379r(a).  That broad provision expressly preempts Plaintiffs' state law claims for purported monetary harms—whether they are brought pursuant to state consumer protection and other state statutes, strict liability, or state common law—which assert the Branded Defendants should have used a different design, different labeling (including different marketing or advertising materials), or different manufacturing processes than that required by federal law.

Those claims are not "saved" from preemption by the limited exclusion that applies to claims brought "under the product liability law of any State," because Plaintiffs' claims seek reimbursement for the cost of the medication, not personal injuries.  *See* 21 U.S.C. § 379r(e).  Courts have dismissed such monetary claims in consumer class actions involving OTC medications, and this Court should do the same.  *See, e.g.*, *Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1290 (C.D. Cal. 2008); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 793 (E.D. Tex. 2008).

*Second*, Plaintiffs' design defect claims in the Personal Injury and Consumer Class Action Complaints are impliedly preempted as to both OTC and prescription formulations because it is impossible for the Branded Defendants to simultaneously comply with those state tort-law obligations and FDA regulations.  The heart of Plaintiffs' design defect claims is the assertion that

the Branded Defendants should have designed Zantac or ranitidine in a different and safer manner. *See* Personal Injury Complaint Count 2 and 5; 47 counts of the Consumer Complaint listed in Appendix A. But FDA regulations ***prohibit*** Defendants from making any "major changes" to prescription or OTC products—including any changes to the formulation of the medication (Zantac) or to its active ingredient (ranitidine)—without FDA's express prior approval. Because the Branded Defendants cannot satisfy the state law duties Plaintiffs seek to impose without FDA's advance permission, Plaintiffs' design defect claims are plainly preempted. *See, e.g.*, *PLIVA*, *Inc. v. Mensing*, 564 U.S. 604, 623–24 (2011) ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."); *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (applying impossibility preemption to bar design defect claims against branded manufacturers); *Epstein v. Gilead Scis., Inc.*, No. 19-81474-CIV, 2020 WL 4333011, at *2 (S.D. Fla. July 27, 2020) (same).

## BACKGROUND

### A. The FDCA Framework and FDA Regulation of Safety and Efficacy of Pharmaceutical Products

Under the FDCA, before a manufacturer may introduce any new medication into the market, whether prescription or OTC, FDA must evaluate the medication through a rigorous process of scientific review and approve it as both safe and effective for its intended use (also known as an "indication"). 21 U.S.C. §§ 355(a), 393(b)(2)(B). Zantac started as a prescription medication, and thus, it followed the new drug application ("NDA") process. *See* 21 U.S.C. §§ 321(p), 352, 355(a); 21 C.F.R. §§ 330.1, 330.10. When FDA approved certain dosages of

3

branded Zantac for OTC use, it did so only after manufacturers submitted a new NDA and FDA conducted its own scientific review.[2]

A manufacturer seeking approval of a new medication through the NDA process must submit a detailed application that includes "substantial evidence" affirmatively demonstrating the medication's safety and efficacy.  21 U.S.C. §§ 355(a), (b)(1); 21 C.F.R. §§ 314.1–314.3, 314.50.[3] If FDA determines after its independent review that the medication is safe and effective for the indication specified in the proposed label, it approves the NDA.  *See* 21 U.S.C. § 355; 21 C.F.R. § 314.105(b).  A manufacturer that wishes to get approval for an additional indication, new dosage, or different formulation must submit a Supplemental NDA, which again must undergo independent FDA scientific review.  21 C.F.R. § 314.70.

When a manufacturer seeks approval for an OTC version of a prescription medication, the related NDA must include data showing FDA that the medication is appropriate for self-administration.  *See* 21 C.F.R. § 310.200(b); *see also* 21 U.S.C. §§ 353(b)(3), 355(c)–(d).  This may include studies showing that the product's labeling can be read, understood, and followed by the consumer without the guidance of a health care provider.  *See* James T. O'Reilly and Katharine A. Van Tassel, *Prescription Drug to OTC Drug Switches*, Food and Drug Admin. § 13:37 (4th ed.

---

[2] An OTC drug product may be marketed in the United States in compliance with an OTC drug monograph, or under the authority of an approved product-specific NDA, or an abbreviated new drug application ("ANDA").  *See* 21 U.S.C. § 355(b)(1)-(2); § 355(j); 21 C.F.R. Part 300.  Through the monograph process, FDA reviews the active ingredients and the labeling of certain groups of medications based on the therapeutic class of drugs instead of evaluating individual medications. *See* 21 C.F.R. §§ 330.1, 330.10.  None of the medications at issue in this litigation were approved pursuant to a monograph.

[3] Once medications with approved NDAs are outside of any patent protection, generic manufacturers may seek approval for their own version of the original medication through the abbreviated NDA ("ANDA") process, which allows the generic manufacturers to piggy-back on the scientific work previously performed.  *See* 21 U.S.C. § 355(j)(2)(A).

2020).  FDA reviews the new data, along with any information known about the medication from its history of prescription use.  *Id.*

All NDAs are approved subject to the condition that the exact language provided in the FDA's approval appear on the labeling (which includes packaging).  21 C.F.R. §§ 314.70(b), (c), 314.71.  Most revisions to drug labeling require FDA's prior approval.  *See id.* § 314.70(b) (describing "prior approval supplement[s]").  A brand name manufacturer of an NDA product may change the label without FDA pre-approval only to address "newly acquired information" of drug risks and only if those changes fit special criteria.  *See, e.g., id.* § 314.70(c)(6)(iii)(A) (describing "Changes Being Effected" process).  Advertising of an NDA-approved medication must remain consistent with the labeling.  *See* 21 U.S.C. § 352(f)(1).

FDA also closely regulates changes to the ingredients or composition of drug products.  Absent FDA's express prior approval, manufacturers may not make any changes to the "qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application."  21 C.F.R. § 314.70(b)(2)(i).  Further, a manufacturer may not make any change to the active ingredient in an FDA-approved medication without undertaking an entirely new drug application process.  *Id.* § 314.70(h).

**B.** **Zantac's FDA Regulatory History**

Based on extensive scientific testing, FDA first approved ranitidine hydrochloride (the active ingredient in Zantac) for prescription use in 1983.  *See* Dkt. 889, ¶¶ 421–27 (citing NDA No. 18-703).  The medication has been used in the decades since to treat stomach ulcers, gastroesophageal reflux disease, heartburn, indigestion, and other conditions of the stomach and esophagus.  *See, e.g.*, *id.* ¶¶ 2, 23, 29, 188, 209, 249.

FDA has reviewed the safety and efficacy of ranitidine many times, approving additional indications for the medication over the years, and also approving different dosages and formulations.  In 1995, FDA approved Zantac for OTC sale at a dosage of 75 mg after review of an NDA that detailed, among other things, extensive clinical investigations by experts qualified in the field demonstrating the medication was safe and effective for treatment of heartburn and indigestion.  *See* Dkt. 889, ¶ 429 (citing NDA 20-520); *see also id.* at ¶¶ 2, 570–91.  In 1998, FDA-approved Zantac OTC 75 mg in effervescent tablets, also through an NDA.  *See id.* at ¶ 429 (citing NDA 20-745).  And in 2004, FDA approved through an NDA OTC Zantac in an increased dosage of 150 mg.  *See id.* at ¶ 433 (citing NDA 21-698).

Over Zantac's long history in the United States, marketing authorization has been transferred a number of times to different companies.  GSK developed the medication and initially marketed it in both prescription and OTC form.  *Id.* at ¶¶ 427–29.  In 1998, Warner-Lambert assumed legal rights to market OTC Zantac in the U.S.  *Id.* at ¶ 430.  Pfizer continued to market OTC Zantac in the U.S. when it acquired Warner-Lambert in 2000.  *Id.* at ¶¶ 431–34.  In 2006, Boehringer Ingelheim acquired the U.S. marketing rights for OTC Zantac as part of a three-way transaction involving Pfizer and Johnson & Johnson.  *Id.* at ¶¶ 435–36, 438.  Finally, Sanofi acquired U.S. OTC Zantac marketing rights in 2017 from Boehringer Ingelheim.  *Id.* at ¶ 439.  While the U.S. rights to OTC Zantac have transferred several times, GSK has and continues to retain the rights to the prescription version of Zantac.  *Id.* at ¶¶ 427, 437.

From the time prescription and OTC Zantac first received FDA approval until its voluntary recall in response to FDA's investigation in late 2019, Zantac was FDA-approved as safe and effective for the treatment of heartburn and other related conditions.  *See id.* at ¶¶ 427–440, 448.

### C.     Overview of the Litigation and Filing of the Complaints

On September 19, 2019, an online pharmacy, Valisure, filed a citizen petition with FDA reporting that its testing of certain ranitidine products revealed high levels of the chemical NDMA, which Plaintiffs allege is a human carcinogen.  FDA conducted its own testing, which identified levels of NDMA much lower than Valisure's but still above conservative regulatory limits in some ranitidine products.  As a result, in April 2020—after Sanofi and GSK had already voluntarily recalled Zantac—FDA asked all ranitidine manufacturers to withdraw the product from the market.

FDA has made clear that the presence of NDMA at the low levels identified does not translate to any significant real-world cancer risk.  FDA's regulatory limits on NDMA levels are based on an assumption that *1 in 100,000* people potentially could develop cancer if more than that amount is ingested *every day for 70 years*.[4]  FDA has further explained that "[a]lthough NDMA may cause harm in large amounts, the levels FDA is finding in ranitidine from preliminary tests barely exceed amounts you might expect to find in common foods."[5]  And subsequent FDA tests showed that levels of NDMA in some ranitidine products, while in excess of FDA's daily

---

[4] U.S. Food & Drug Admin., Information about Nitrosamine Impurities in Medications, https://www.fda.gov/drugs/drug-safety-and-availability/information-about-nitrosamine-impurities-medications#:~:text=Nitrosamine%20impurities%20may%20increase%20the,an%20increased%20risk%20of%20cancer (last visited Aug. 23, 2020) ("[A] person taking a drug that contains nitrosamines at-or-below the acceptable daily intake limits *every day for 70 years* is not expected to have an increased risk of cancer" (emphasis added)).

[5] U.S. Food & Drug Admin., Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine (Sept. 13, 2019), *available at* https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine (last visited Aug. 23, 2020).

acceptable limits, were also "similar to the levels [one] would expect to be exposed to if [one] ate common foods like grilled or smoked meats."[6]

Despite FDA's continuing investigation and the lack of scientific evidence connecting Zantac to any real-world cancer risk, Plaintiffs have initiated nationwide litigation alleging that ranitidine use causes any type of cancer diagnosed in the decades that Zantac has been on the market.  To date, more than 400 actions have been transferred to or filed in this Zantac MDL.

In June 2020, Plaintiffs filed three Complaints meant to replace those filed by the various individual plaintiffs: (1) a personal injury complaint bringing 15 causes of action against the Branded Defendants, as well as other companies allegedly involved in some aspect of the manufacture, distribution, or sale of Zantac or generic ranitidine, on behalf of persons who claim they would not have purchased or used Zantac/ranitidine had they known of the alleged health risks, Dkt. 887 (the "Personal Injury Complaint" or "PI Complaint"); (2) a class action complaint bringing nine causes of action against the Branded Defendants, and others, on behalf of third party payors who allege they would not have reimbursed for prescription Zantac or prescription generic ranitidine had they known of the alleged health risks, Dkt. 888 (the "TPP Complaint"); and (3) a class action complaint bringing 314 causes of action against the Branded Defendants and others on behalf of consumers who claim they would not have purchased Zantac or generic ranitidine had they known of the alleged health risks, Dkt. 889 (the "Consumer Complaint") (collectively, the "Complaints").

---

[6] U.S. Food & Drug Admin., Statement on New Testing Results, Including Low Levels of Impurities in Ranitidine Drugs (Nov. 1, 2019), *available at* https://www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs (last visited Aug. 23, 2020).

Together, the Complaints bring claims under federal law and the laws of each of the 50 states, the District of Columbia, and Puerto Rico, and are based on theories of liability that include strict liability, negligence, unjust enrichment, violations of the Magnuson-Moss Warranty Act, violations of the Racketeer Influenced and Corrupt Organizations Act, violations of various state law consumer protection and deceptive trade practices statutes, common law fraud, breach of express and implied warranties, battery, and medical monitoring. These claims include frontal assaults on FDA-approved design, formulation, and labeling of Zantac and ranitidine products and seek economic damages notwithstanding the FDCA's express preemption of claims that seek to impose state law obligations that differ from federal requirements governing OTC products.

## ARGUMENT AND CITATION OF AUTHORITY

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the Supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under this provision, "state law that conflicts with federal law is without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Where state law claims are preempted by federal law, dismissal with prejudice is appropriate because any amendment would be futile. *Cavalieri v. Avior Airlines C.A.*, Case No. 17-22010-CIV, 2019 WL 1099860, at *2 (S.D. Fla. Mar. 8, 2019).

Preemption of state law "may be [] express" where Congress explicitly states such intention in the language of a statute. *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990). The FDCA contains an express preemption provision relating to OTC medications. Under the heading "National uniformity for nonprescription drugs," Section 379r mandates that "no State or political subdivision of a State may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription] drug . . . ; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under [the FDCA]." 21 U.S.C. § 379r(a). Section

9

379r has a "savings clause" that excludes from this provision only claims brought "under the *product liability* law of any State." 21 U.S.C. § 379r(e) (emphasis added).

Preemption may also be implied. Implied preemption occurs when "state and federal law conflict" such that it is "impossible for a private party to comply with both state and federal requirements." *PLIVA*, 564 U.S. at 618. In the pharmaceutical arena, such implied "conflict" preemption bars state law claims "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency," because "that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623–24.

Here, as explained below, both express and conflict preemption bar substantial portions of Plaintiffs' Complaints on the face of those pleadings, including (1) Plaintiffs' state law claims for reimbursement of the purchase price of OTC Zantac, and (2) Plaintiffs' design defect claims challenging FDA-approved formulation and design of the product, which the Branded Defendants could not independently modify without FDA approval.[7]

---

[7] In addition to this motion, Defendants have contemporaneously filed motions to dismiss the Complaints in their entirety on the basis of shotgun pleading. Those motions explain that the Complaints' failure to distinguish between individual Defendants frustrates the Branded Defendants' ability to raise certain preemption defenses. *See* Defendants' Motion to Dismiss Plaintiffs' Master Personal Injury Complaint on the Grounds of Shotgun Pleading, at Section I.A.1. If Plaintiffs are required to replead any of their Complaints, the Branded Defendants reserve the right to raise preemption arguments not addressed in this motion that may be appropriate based on the repleaded allegations.

I. **Federal Law Expressly Preempts Plaintiffs' State Law Claims For Refund of the Purchase Price From Manufacturers or Sellers of Branded OTC Zantac.**

A. **Plaintiffs' State Law Counts Seek to Impose "Requirements" that Are "Different from or in Addition to, or Otherwise Not Identical with" Requirements Under the FDCA.**

Express preemption bars the 320 state law claims in the Plaintiffs' Complaints that seek to recover for purported monetary losses allegedly caused by the purchase, use or reimbursement of OTC ranitidine medicines. *See* Consumer Complaint, Counts 2 and 4 through 314, Dkt. 889, ¶¶ 794–802, 822–5899; Personal Injury Complaint, Count 12, Dkt. 887, ¶¶ 628–636; TPP Complaint, Counts 2, 3, and 5 through 9, Dkt. 888, ¶¶ 564–77, 578–87, 606–77. [8]

Finding that the interest in national uniformity and federal oversight of pharmaceutical products is paramount, Congress has explicitly mandated that federal law preempts nearly all state law claims relating to OTC medications. *See* 21 U.S.C. § 379r(a). Specifically, consumers may not bring any state law claims that would impose duties on companies marketing OTC products

---

[8]  The individual Branded Defendants, Pfizer, Boehringer Ingelheim, Patheon Manufacturing Services, LLC, and Sanofi have manufactured or sold *only* the OTC version of Zantac in the U.S., not prescription versions. State law monetary damage claims against them in the Consumer Complaint are therefore preempted in their entirety. Defendant GSK manufactured OTC Zantac from 1995 to 2006, and prescription Zantac from 1983 to 2017. *See* Dkt. 889, ¶¶ 429–30, 434, 437. State law claims against GSK in the Consumer Complaint are preempted to the extent they seek to recover for monetary injuries allegedly caused by use, purchase, or reimbursement of OTC Zantac manufactured by GSK. Plaintiffs' state law counts in the TPP Complaint name only Defendant GSK and manufacturers of generic prescription Zantac. Thus, preemption-based arguments to dismiss state law counts in the TPP Complaint are made on behalf of only GSK and only to the extent the counts relate to OTC Zantac rather than prescription Zantac.

This Motion addresses only branded OTC Zantac manufactured, distributed, and/or sold by the Branded Defendants. However, preemption under Section 379r applies equally to *any* form of OTC ranitidine, including generic OTC ranitidine medicines. Accordingly, the Branded Defendants anticipate that other defendants who manufactured, distributed, or sold OTC Zantac, OTC generic ranitidine, or both may incorporate the 379r preemption argument in this section in their own respective preemption motions.

11

that are "different from," "in addition to," or "otherwise not identical with" a federal requirement under the FDCA.  21 U.S.C. § 379r(a).

Section 379r's preemption mandate is broad: it preempts *any* state law requirement related to an OTC medication that is ***not identical*** to federal requirements.  The FDCA, the federal regulations governing OTC Zantac, and the NDA for OTC Zantac all constitute federal "requirements" for purposes of Section 379r preemption.  *See Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 793–95 (2002) (an NDA and a final monograph regulating OTC head lice products establish federal "requirements"); *accord Berenguer v. Warner–Lambert Co.*, No. 02-05242, 2003 WL 24299241, at *4 (Fla. Cir. Ct. July 31, 2003); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 785–87 (E.D. Tex. 2008).

Section 379r preempts not only state legislation and regulations, but also common-law duties imposed through civil damages, which differ from or add to federal requirements.  *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324–25 (2008); *Mills*, 581 F. Supp. 2d at 789.  In addition, Congress provided in Section 379r(c)(2) that "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug" shall be deemed a state "requirement" that satisfies §379r(a). "A reasonable reading of §379r(c)(2) is that it expands the universe of potentially preempted state law claims to include those that require additional warnings in the advertising for nonprescription drugs, and not only on the labeling." *Carter*, 582 F. Supp. 2d at 1282; *Eckler v. Neutrogena Corp.*, 238 Cal. App. 4th 433, 453, 458 (Cal. App. Ct. 2015) (same).  In other words, Plaintiffs' common-law and statutory claims for alleged monetary losses—***including*** purported state law claims premised on statements (or omissions of statements) allegedly made in advertising, marketing, or website-based communications— are preempted "state requirements," "regardless of the . . . theory under which

[the claim] is brought." *Carter*, 582 F. Supp. 2d at 1280–82; *see also Kanter*, 99 Cal. App. 4th at 792 ("state 'requirement' within the meaning of the provision could encompass state common law actions as well as causes of action based on state statutes.").

Although the legal theories vary, Plaintiffs' claims which seek monetary losses hinge on their assertion that OTC Zantac is not safe and effective or that OTC Zantac should have included a warning about the presence of NDMA or the risk of cancer.[9]  These claims are expressly preempted because they seek to impose state law obligations that are different from, in addition to, or not identical with FDA regulations governing the manufacture, labeling, marketing, and sale of OTC Zantac.

Plaintiffs' claims directly contravene the judgment of FDA that OTC Zantac was safe and effective as labeled for use.  Since FDA first approved 75 mg OTC Zantac in 1995, FDA has reviewed and reaffirmed that OTC Zantac was safe and effective as labeled on multiple occasions and through multiple NDAs.  *See* discussion *supra* at 5–6.  Plaintiffs' claims challenging the safety and efficacy of Zantac would require exactly the opposite determination: that Zantac was ***not*** safe as marketed under the FDA-approved labels and other conditions of FDA-approved NDAs.  This outcome is not simply "at variance with FDA regulations," it completely obliterates them.  *Carter*, 582 F. Supp. 2d at 1283.

---

[9] For instance, the Consumer Class Plaintiffs allege that the Branded Defendants sold products that were "defective and unreasonably dangerous to consumers . . . because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Ranitidine-Containing Products and NDMA," Dkt. 889, ¶ 1142; and that the Branded Defendants "knowingly and intentionally misrepresent[ed], omit[ed], conceal[ed], and fail[ed] to disclose material facts regarding Ranitidine-Containing Products, including that such drugs were inherently defective[ and] unreasonably dangerous," *id.* at ¶ 4122.  *See also* allegations discussed in Section II, *supra*.

Courts therefore have repeatedly found Section 379r preempts analogous claims grounded in the allegation that an OTC medication was not safe and effective. *See e.g.*, *Carter*, 582 F. Supp. 2d 1271; *Kanter*, 99 Cal. App. 4th 780.  In *Carter v. Novartis*, consumers filed class actions against manufacturers of OTC cough and cold medicines, claiming the manufacturers knew or should have known that their medications were unsafe or ineffective for children under the age of six.  582 F. Supp. 2d at 1276–77.  The consumers brought causes of action that included violation of the New Jersey Consumer Fraud Act, unjust enrichment, false and misleading advertising, fraudulent concealment, unfair and deceptive business practices, and breach of express and implied warranties.  *Id.* at 1277.  The court dismissed "all claims pursuant to express preemption under [Section] 379r" as each "merely restate[d] what [was] alleged in [the] other causes of action: that [the defendants'] statements [were] false and misleading in light of the fact that OTC cough and cold medicines d[id] not work and [were] dangerous to young children."  *Id.* at 1290, 1284.

Likewise, in *Kanter v. Warner-Lambert, Co.*, consumers brought a class action against three manufactures of OTC head lice medication under several distinct causes of action—"breach of express warranty, fraud and deceit, false advertising, unfair competition, and violations of the Consumer Legal Remedies Act."  99 Cal. App. 4th at 796.  The California state court found each cause of action preempted by Section 379r because, although "the legal theories underlying these causes of action . . . differ[ed], each [was] bottomed on the assertion that th[e] approved label [was] no longer accurate or adequate and that the label should be changed or the product banned."  *Id.* at 796.

Other courts have similarly found that federal law preempts state law claims for false advertising, negligent misrepresentation, breach of warranties, or consumer protection that challenge an OTC manufacturer's assertion that the product was "safe and effective" or

14

merchantable for sale—the same determinations reached by FDA before it approved OTC Zantac for sale. *See, e.g.*, *Faustino v. Alcon Labs.*, No. 15-CV-04145, 2015 WL 12839161, at \*2–\*3 (C.D. Cal. Sept. 22, 2015) (finding negligent misrepresentation claim preempted where it was premised on the assertion that, through "its labels, advertisements, or other communications, [the manufacturer] misrepresented the safety of the eye drops and failed to warn of possible risks"), *aff'd on other grounds*, 692 F. App'x 819 (9th Cir. 2017); *O'Connor v. Henkel Corp.*, No. 14-CV-5547 ARR MDG, 2015 WL 5922183, at \*3 (E.D.N.Y. Sept. 22, 2015) (holding Section 379r bars "state law establishing or continuing any requirement for labeling or packaging 'that is different from or in addition to, or that is otherwise not identical with' a requirement of the FDCA or enumerated federal statutes" (quoting 21 U.S.C. § 379r)); *Bimont v. Unilever U.S., Inc.*, No. 14-CV-7749, 2015 WL 5256988, at \*6 (S.D.N.Y. Sept. 9, 2015) ("Under a strict approach to FDCA preemption, this is sufficient to bar Plaintiffs' claims: A state rule forbidding non-functional slack-fill in drugs and cosmetics would impose a requirement that is in addition to or not identical with federal law, and it would do so on a subject matter that clearly could be regulated by FDA."); *Eckler*, 238 Cal. App. 4th 433, 459 (holding that claims were preempted where they alleged that sunscreen products were misleadingly labeled and marketed in violation of consumer protection statutes).

These cases demonstrate that Section 379r expressly preempts Plaintiffs' state law claims for refund of the cost of OTC Zantac and other alleged monetary harms

### B.     Plaintiffs' Claims Are Not Saved By Section 379r(e).

Section 379r exempts one discrete category of claims—those brought "under the product liability law of any State"—from its express preemption mandate. 21 U.S.C. § 379r(e). Because the Branded Defendants have "met their initial burden of demonstrating that the express

preemption clause applies, the onus shifts to Plaintiffs to prove that their state law claims satisfy the savings clause." *Carter*, 582 F. Supp. 2d at 1287–88. They will be unable to do so.

Plaintiffs cannot avail themselves of this exemption because their state law refund claims do not constitute "product liability" claims. Although Congress did not expressly define "product liability" in Section 379r, the term has a settled meaning under the common law, which we "must presume Congress meant to import." *See Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1118 (11th Cir. 2018) ("where a federal statute contains a term with settled meaning under the common law, courts must presume Congress meant to import that meaning unless the statute says otherwise"). Federal common law has defined "product liability" to refer to alleged physical and property harms derived from operation of the product, not claims for refund of the purchase price. *See Home Warranty Corp. v. Caldwell*, 777 F.2d 1455, 1457–62, 1486 (11th Cir. 1985) (canvassing the history of "products liability" law and explaining "[i]t is a traditional concept of products liability law that the products liability risk does not include the loss of or damage to the product itself."); 26 C.F.R. § 1.172-13(b)(2)(i) (federal regulation defining "product liability" to "mean[ ] the liability . . . for damages resulting from physical injury or emotional harm to individuals, or damage to or loss of the use of property). This accords with the widely accepted meaning of the term under State law as well. *See E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 868-69 (1986) (explaining that the majority of states preclude tort liability for pure economic loss); *Carter*, 582 F. Supp. 2d at 1288 ("In fact, Plaintiffs have not demonstrated that product liability law in *any* state omits a requirement for injury to one's person or property." (emphasis in original)); Restatement (Third) of Torts: Prod. Liab. § 21 (1998) (providing that the only economic losses recoverable in product liability are those involving personal injury or property damage other than damage to the defective product itself).

Plaintiffs' state-law causes of action addressed in this motion seek refund of the purchase price of OTC Zantac, not damages from personal injury or property damage. As they allege, but for the Branded Defendants' conduct, Plaintiffs would not have purchased, paid for, and/or reimbursed for Ranitidine-Containing Products and would not have incurred related costs. *See* Dkts. 887, 888, 889, *passim*. Because Plaintiffs do not bring plausible claims for personal injury or property damage, the "product liability" exception does not remove their state-law claims from the scope of Section 379r's express preemption mandate. *See Mills*, 581 F. Supp. 2d at 793 (finding that plaintiffs' claims for economic damages "are not products liability actions under Texas law" and so "not 'saved' from preemption"); *Kanter*, 99 Cal. App. 4th at 790–91 (holding that the "product liability" savings clause to Section 379r did not apply because the plaintiffs alleged no personal injury or property damage: "Liability may be imposed either for personal injury or for physical damage to property, but if the damage consists solely of economic losses, recovery on a products liability theory is unavailable").

For all of these reasons, Counts 2 and 4 through 314 of the Consumer Complaint, Count 12 of the Personal Injury Complaint, and Counts 2, 3, and 5 through 9 of the TPP Complaint should be dismissed with prejudice to the extent they relate to OTC products.

## II.   Conflict Preemption Bars Plaintiffs' Design Defect Claims In All Complaints, As To Both OTC and Prescription Zantac.

Plaintiffs' design defect claims are impliedly preempted by federal law. Plaintiffs challenge the design of ranitidine products in Counts 2 and 5 of the Personal Injury Complaint and in 47 counts of the Consumer Complaint (*see* Appendix A). These claims are premised on the contention that the Branded Defendants' ranitidine-containing products should have been designed differently. Yet federal law prohibits the Branded Defendants from changing the design of FDA-

approved pharmaceuticals without FDA's prior approval.  Because the Branded Defendants could not unilaterally change their products' design, Plaintiffs' claims are preempted.

Under the Supremacy Clause, conflict preemption exists if "it is impossible for a private party to comply with both state and federal requirements."  *PLIVA*, 564 U.S. at 618 (internal quotation marks and citation omitted).  The Supreme Court has explained that, in the pharmaceutical context, the touchstone of impossibility preemption is whether the defendant can ***unilaterally*** take action to satisfy state law duties without the prior approval of FDA:  "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."  *Id.* at 623–24.

The Supreme Court has specifically applied this principle to bar a design defect claim against a pharmaceutical company.  In *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 490 (2013), the Court held that "state-law design-defect claims . . . that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition…."  Although *Bartlett* involved a generic manufacturer, its holding and rationale applies equally to branded manufacturers.  These companies likewise are prohibited from changing an FDA-approved product's design without obtaining FDA's prior approval.  *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (holding plaintiff's design defect claim against brand manufacturer was preempted); *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 10 (1st Cir. 2018) (holding plaintiffs' state law claims were preempted because changing the product bottle to dispense a different amount of medication was a major change that required FDA pre-approval).  As the Court in *Bartlett* explained: "Once a drug—whether generic ***or brand-name***—

18

is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" 570 U.S. at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added).

Plaintiffs' design defect claims would require major changes to the Zantac product. Section 314.70(b)(1) defines major changes to include a broad array of modifications including "any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product." Section 314.70(b)(2) also lists a separate category of specific changes that the FDA has pre-determined are "major changes." Among these enumerated major changes are any changes to the "formulation of the drug product, including inactive ingredients." *Id.* § 314.70(b)(2)(i). Moreover, a manufacturer may not make any change to the active ingredient in an FDA-approved medication without participating in a full NDA process. 21 C.F.R. § 314.70(h).

Notwithstanding these federal regulations prohibiting design changes without prior FDA approval, Plaintiffs' Personal Injury Complaint asserts that ranitidine products are "defective in design and formulation" and that Defendants should have "designed ranitidine-containing products to make them less dangerous." Dkt. 887, Count II at ¶¶ 478, 485. Plaintiffs claim Defendants should be held liable for alleged failure to use a "less risky design or formulation" (*id.*, Count II at ¶ 485), for failure to utilize unspecified "alternative designs," and for otherwise "negligently designing the drug with an inherent susceptibility to form NDMA" (*id.*, Count V at ¶¶ 522, 523(j), 525). The Consumer Complaint lodges essentially the same claims to challenge ranitidine's design and formulation within 47 state law design defect counts. *See* Appendix A. All of these claims,

19

at bottom, allege that the design of the ranitidine molecule was defective because it resulted in the formation of NDMA.  These design defect claims run squarely into FDA regulations prohibiting manufacturers from unilaterally changing the design, formulation or chemical composition of an approved medication without FDA approval.

Because a manufacturer cannot unilaterally make such major changes to an FDA-approved medication, courts around the country have agreed that state law design defect claims like those here are preempted.  *See, e.g.*, *Yates*, 808 F.3d at 300 (holding plaintiff's design defect claims against a branded manufacturer were preempted by federal law); *Robinson ex rel. T.R. v. Eli Lilly & Co.*, No. 17-CV-338, 2018 WL 4039703, at *6 (E.D. Ky. Aug. 23, 2018) (explaining that preemption applied where plaintiff alleged that branded manufacturer should have changed the composition of the drug, but that change was rendered impossible because there was no way to "independently [make] such fundamental changes to [the drug's] formula"); *Epstein v. Gilead Scis., Inc.*, No. 19-81474-CIV, 2020 WL 4333011, at *2 (S.D. Fla. July 27, 2020) (holding plaintiff's design defect claim against branded manufacturer was preempted because "the FDA approved [the medication's] formula and any changes would have required further approval");  *see also Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185–87 (S.D.N.Y. Dec. 23, 2016); *Brazil v. Janssen Research & Dev. LLC,* 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016); *Fleming v. Janssen Pharm., Inc.*, 186 F. Supp. 3d 826, 832–34 (W.D. Tenn. 2016); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 320–22 (D. Conn. 2016); *Barcal v. EMD Serono, Inc.*, No. 14-CV-01709, 2016 WL 1086028, at *4 (N.D. Ala. March 21, 2016); *Rheinfrank v. Abbott Labs., Inc.*, 137 F. Supp. 3d 1035, 1040–41 (S.D. Ohio 2015).

For example, in *Barcal*, the plaintiff claimed that tort design defect claims under Alabama law would require the defendant-manufacturer to redesign its medication.  2016 WL 1086028, at

\*4. The district court found these design defect claims preempted, reasoning that redesigning a pharmaceutical product was "precisely the kind of impossibility in which the Supreme Court has found preemption." *Id.* (citing *Bartlett*, 570 U.S. at 490). A plaintiff's speculative assertion "that the FDA may approve an alteration does not negate the present impossibility." *Id.* (citing *PLIVA*, 564 U.S. at 624). The district court further explained that, whether branded or generic, a manufacturer has no federal regulatory mechanism to alter the medication's chemical composition without approval from FDA. *Id.* (distinguishing *Wyeth v. Levine*, 555 U.S. 555 (2009)).

Likewise, in *Batoh*, the court explained that "changing [a medication's] active ingredient from ibuprofen to dexibuprofen qualifies as a 'major change' requiring prior approval from the FDA." 167 F. Supp. 3d at 322. In that case, the decedent had developed a rare and painful skin condition after taking one dose of OTC Motrin, and a year later, he committed suicide allegedly due to his pain and suffering. *Id.* at 300. The court agreed with the branded manufacturer that the plaintiff's design defect claim was preempted because her claim was "based on the chemical composition of Motrin." *Id.* at 315. The court reasoned, "it would have been impossible for Defendants to comply both with any state law duty to substitute dexibuprofen for ibuprofen and with federal requirements." *Id.* at 322.

Plaintiffs cannot end-run preemption by arguing that a defendant should have formulated the product differently at the outset. As the Sixth Circuit has explained, this theory results in the same problem—the company would have needed FDA approval for a different design. *Yates*, 808 F.3d at 300 ("Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking FDA's approval prior to marketing [the product], and certainly prior to [the plaintiff's] use of the drug."); *Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 255 (D. Mass. 2017) ("It is irrelevant that the defendants could have designed an entirely different product

before they sought approval, which may have never been granted."), *aff'd,* 903 F.3d 1 (1st Cir. 2018).  Such a theory essentially argues that the defendant should never have sold the medication in question.   The Supreme Court has wholly rejected such a "stop-selling" rationale as "incompatible" with its "pre-emption jurisprudence."  *Bartlett*, 570 U.S. at 488.

Because the Branded Defendants could not unilaterally change the design of ranitidine or Zantac without FDA approval, Plaintiffs' design defect claims including Counts 2 and 5 of the Personal Injury Complaint and the 47 counts of the Consumer Complaint listed in Appendix A, are preempted by federal law and accordingly should be dismissed with prejudice.[10]

## CONCLUSION

For the foregoing reasons, the Branded Defendants respectfully request the Court dismiss as preempted by federal law (a) all state law claims that seek economic damages arising out of the use and purchase of OTC Zantac (Counts 2 and 4 through 314 of the Consumer Complaint, Count 12 of the Personal Injury Complaint, and Counts 2, 3, and 5 through 9 of the TPP Complaint); and (b) all design defect claims (Counts 2 and 5 of the Personal Injury Complaint and the 47 counts listed in Appendix A of the Consumer Complaint).

---

[10] The Plaintiffs also broadly include allegations that Defendants failed to study or test, or appropriately package, or appropriately label with expiration dates or storage instructions in their design defect claims. *See* Dkt. 887, Count II at ¶ 481 (alleging failure to study or test, appropriately package, or appropriately label with expiration dates or storage instructions).  Whether these allegations are properly cast as design defect claims or are simply improper redundancies  of other counts in the Complaints, Plaintiffs cannot avoid preemption of their "pure" design defect claims (*i.e.,* claims which go to the composition of the product itself) by muddling their design defect counts with such duplicative or extraneous allegations.

Dated:  August 24, 2020               Respectfully submitted,

By:    */s/  Anand Agneshwar*
Anand Agneshwar
**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

Daniel S. Pariser
Paige H. Sharpe
601 Massachusetts Avenue, NW
Washington, DC  20001
Tel: (202) 942-5000
Fax: (202) 942-5999
daniel.pariser@arnoldporter.com
paige.sharpe@arnoldporter.com

Loren Brown
**DLA PIPER LLP**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 884-8543
loren.brown@us.dlapiper.com

Ilana H. Eisenstein
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Ilana.eisenstein@dlapiper.com

Matthew A. Holian
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Tel: (617) 406-6009
Fax: (617) 406-6109

matt.holian@us.dlapiper.com

*Attorneys for Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
Robert B. Friedman
Julia Zousmer
Mark Sentenac
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Tel: (404) 572-3583
Fax: (404) 572-5100
abayman@kslaw.com
rfriedman@kslaw.com
jzousmer@kslaw.com
msentenac@kslaw.com

*Attorneys for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

*/s/ Mark Cheffo*
Mark Cheffo
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10019
Tel: (212) 689-3500
Fax: (212) 689-3590
mark.cheffo@dechert.com

Judy Leone
Will Sachse
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
judy.leone@dechert.com

2

will.sachse@dechert.com

*Attorneys for GlaxoSmithKline*
*LLC*

*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
M. Elaine Horn
Jessica B. Rydstrom
Michelle L. Hood
**WILLIAMS & CONNOLLY**
**LLP**
725 12th Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com
ehorn@wc.com
jrydstrom@wc.com
mhood@wc.com

*Attorneys for Defendant Pfizer*
*Inc.*

*/s/  Christopher R. Carton*
Christopher R. Carton, Esq.
Erica S. Mekles, Esq.
**BOWMAN AND BROOKE LLP**
317 George Street, Suite 320
New Brunswick, NJ 08901
Tel: (201) 577-5176
christopher.carton@bowmanandbrooke.com
erica.mekles@bowmanandbrooke.com

*Attorneys for Defendant Patheon Manufacturing*
*Services LLC*

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 24 day of August, 2020, the foregoing Branded Defendants'
Rule 12 Partial Motion To Dismiss Plaintiffs' Three Complaints As Preempted By Federal Law
And Incorporated Memorandum Of Law was filed electronically through the Court's CM/ECF
system, which will send notice of filing to all CM/ECF participants.

*/s/  Anand Agneshwar*
Anand Agneshwar

4

## **APPENDIX A**

Alabama
Count 12 – Strict Products Liability/Design Defect (Against All Defendants)

Alaska
Count 18 – Strict Products Liability/Design Defect (Against All Defendants)

Arizona
Count 24 – Strict Products Liability/Design Defect (Against All Defendants)

Arkansas
Count 30 – Strict Products Liability/Design Defect Arkansas Product Liability Act of 1979
(Against All Defendants)

California
Count 38 – Strict Products Liability/Design Defect

Colorado
Count 44 – Strict Products Liability/Design Defect (Against All Defendants)

Connecticut
Count 51 – Strict Products Liability/Design Defect (Against All Defendants)

District of Columbia
Count 60 – Strict Products Liability/Design Defect (Against All Defendants)

Florida
Count 66 – Strict Products Liability/Design Defect (Against All Defendants)

Georgia
Count 74 – Strict Products Liability/Design Defect (Against All Defendants)

Hawaii
Count 80 – Strict Products Liability/Design Defect (Against All Defendants)

Idaho
Count 86 – Strict Products Liability/Design Defect (Against All Defendants)

Illinois
Count 93 – Strict Products Liability/Design Defect (Against All Defendants)

Indiana
Count 99 – Products Liability/Design Defect Indiana Product Liability Act (Against All Defendants)

Iowa
Count 105 – Strict Products Liability/Design Defect (Against All Defendants)

Kansas
Count 111 – Products Liability/Design Defect (Against All Defendants)

Kentucky
Count 117 – Strict Products Liability/Design Defect (Against All Defendants)

Louisiana
Count 123 – Products Liability/Design Defect Louisiana Product Liability Act (Against All Defendants)

Maine
Count 129 – Strict Products Liability/Design Defect (Me. Rev. Stat. Ann. tit. 14, §221) (Against All Defendants)

Maryland
Count 135 – Strict Products Liability/Design Defect (Against All Defendants)

Minnesota
Count 149 – Strict Products Liability/Design Defect (Against All Defendants)

Mississippi
Count 154 – Products Liability/Design Defect (Miss. Code Ann. §11-1-63) (Against All Defendants)

Missouri
Count 160 – Strict Products Liability/Design Defect (Against All Defendants)

Montana
Count 166 – Strict Products Liability/Design Defect (Against All Defendants)

Nebraska
Count 173 – Strict Products Liability/Design Defect (Against All Defendants)

Nevada
Count 179 – Strict Products Liability/Design Defect (Against All Defendants)

New Hampshire
Count 185 – Strict Products Liability/Design Defect (Against All Defendants)

New Jersey
Count 191 – Products Liability/Design Defect New Jersey Products Liability Act (Against All Defendants)

New Mexico
Count 197 – Strict Products Liability/Design Defect (Against All Defendants)

New York
Count 204 – Strict Products Liability/Design Defect (Against All Defendants)

North Dakota
Count 214 – Strict Products Liability/Design Defect (Against All Defendants)

Ohio
Count 219 – Strict Products Liability/Design Defect Ohio Product Liability Act (Against All Defendants)

Oklahoma
Count 225 – Manufacturer's Products Liability/Design Defect (Against All Defendants)

Oregon
Count 231 – Strict Products Liability/Design Defect (Or. Rev. Stat. Ann. §30.920) (Against All Defendants)

Pennsylvania
Count 237 – Strict Products Liability/Design Defect

Puerto Rico
Count 243 – Strict Products Liability/Design Defect (Against All Defendants)

Rhode Island
Count 248 – Strict Products Liability/Design Defect (Against All Defendants)

South Carolina
Count 254 – Strict Products Liability/Design Defect (S.C. Code Ann. §15-73-10) (Against All Defendants)

South Dakota
Count 260 – Strict Products Liability/Design Defect (Against All Defendants)

Tennessee
Count 266 – Products Liability/Design Defect Tennessee Products Liability Act of 197 [sic] (Against All Defendants)

Texas
Count 272 – Products Liability/Design Defect (Against All Defendants)

Utah
Count 279 – Strict Products Liability/Design Defect

Vermont
Count 286 – Strict Products Liability/Design Defect (Against All Defendants)

Washington
Count 295 – Strict Products Liability/Design Defect Washington Product Liability Act (Against All Defendants)

West Virginia
Count 301 – Strict Products Liability/Design Defect (Against All Defendants)

Wisconsin
Count 308 – Strict Products Liability/Design Defect (Against All Defendants)

Wyoming
Count 314 – Strict Products Liability/Design Defect (Against All Defendants)