# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)     MDL NO. 2924
PRODUCTS LIABILITY       20-MD-2924
LITIGATION

            JUDGE ROBIN L. ROSENBERG
       MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO ALL CASES**

---

## THE GENERIC MANUFACTURERS' AND REPACKAGERS' RULE 12 MOTION TO DISMISS ON THE GROUND OF PREEMPTION AND INCORPORATED MEMORANDUM OF LAW

---

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ......................................................................................................... 1

II.   ALLEGATIONS AGAINST THE GENERIC MANUFACTURERS AND
      REPACKAGERS IN THE COMPLAINTS ................................................................. 3

   A.   The Three Complaints And The Causes Of Action Asserted Therein .............................. 3

   B.   The Three Complaints Are Premised On The Theory That NDMA Is Intrinsic To
        Ranitidine Products, Rendering Them Inherently Defective. ........................................... 6

III.  LEGAL STANDARDS AND PREEMPTION FRAMEWORK ............................................. 9

   A.   Federal Regulation Of Generic Drug Products And Drug Repackagers ........................... 9

      1.   The Hatch-Waxman Amendments Govern The Manufacture And Sale Of Generic
           Drugs. ................................................................................................................. 9

      2.   Federal Law Mandates That A Generic Drug Manufacturer Show Its Product Is "The
           Same" As The Branded Equivalent. ..................................................................... 10

      3.   Repackagers, Like Generic Manufacturers, Cannot Make Unilateral Changes To A
           Drug's Design Or Labeling. ................................................................................. 11

      4.   Generic Manufacturers And Repackagers Cannot Employ The Changes Being
           Effected ("CBE") Process To Make Unilateral Labeling Changes. ........................... 12

   B.   The Preemption Of State Tort Law Claims Regarding Generic Drugs And Repackaged
        Drugs ............................................................................................................... 12

      1.   The *Mensing* And *Bartlett* Decisions ................................................................. 12

      2.   Courts Applying *Mensing* And *Bartlett* Reject Attempts To Creatively Plead Around
           Preemption. ....................................................................................................... 15

IV.   LEGAL ARGUMENT ............................................................................................. 20

   A.   Plaintiffs' Claims Against The Generic Manufacturers In The Personal Injury Complaint
        Are All Preempted Under *Mensing* and *Bartlett*. ................................................... 20

      1.   Counts I, II, IV, V, And VII - XII Of Plaintiffs' Personal Injury Complaint Are
           Premised On Failure To Warn And Design Defect And Are Preempted. ................... 20

      2.   Plaintiffs' Contention That The Generic Manufacturers Could Unilaterally Change The
           Label Is Wrong. ................................................................................................. 21

      3.   Plaintiffs' "Manufacturing Defect" Claims In Counts III And VI Are Preempted
           Design Defect Claims. ........................................................................................ 23

      4.   Plaintiffs' "Manufacturing Defect" Claims Are Also Preempted Because They Are
           Based On Allegations That Are Otherwise Preempted. ......................................... 26

i

      a.   *The Specific Allegations In Counts III And VI Are Preempted Because The Actions They Call For Are "Major Changes" Requiring FDA Approval.* ........................... 26

      b.   *Federal Law Also Preempts The Specific Allegations In Counts III And VI.* ........... 28

    5.   Counts XIII, XIV, And XV Of Plaintiffs' Personal Injury Complaint And Their Punitive Damages Allegations Are Derivative Claims That Are Also Preempted Under *Mensing* and *Bartlett* .................................................................................................. 30

  B.   Plaintiffs' Claims Against The Generic Manufacturers In The Class Action Complaints Are Likewise Preempted Under *Mensing* and *Bartlett.* ................................................... 31

    1.   Plaintiffs' State-Law Claims In The Class Action Complaints Are Substantively Similar To The State-Law Claims In The Personal Injury Complaint And Are Preempted For The Same Reasons ................................................................................. 31

    2.   Claims Raised Against The Generic Manufacturers As To The Manufacture Or Sale Of OTC Generic Ranitidine Medications Are Preempted Pursuant To 21 U.S.C. § 379r .................................................................................................................................. 31

    3.   Plaintiffs' Magnuson-Moss Warranty Act Claim Against The Generic Manufacturers Should Be Dismissed As Preempted And Because The Act Does Not Apply To FDA-Regulated Product Labeling. ........................................................................................ 32

  C.   Plaintiffs' Claims Against The Repackagers Are Preempted Under *Mensing* And *Bartlett* And Must Be Dismissed. ..................................................................................................... 33

V.   CONCLUSION ..................................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Page(s)**

*Acevedo v. Johnson & Johnson*,
　No. 16-CV-11977-DLC, 2018 WL 4693958 (D. Mass. Sept. 30, 2018)................................24

*Allbright v. Teva Pharm. USA, Inc.*,
　290 F. Supp. 3d 1321 (S.D. Fla. 2017) ...................................................................................16

*Barker v. Lull Eng'g Co.*,
　573 P.2d 443 (Cal. 1978) ........................................................................................................23

*Booker v. Johnson & Johnson*,
　54 F. Supp. 3d 868 (N.D. Ohio 2014)......................................................................................24

*Brinkley v. Pfizer, Inc.*,
　772 F.3d 1133 (8th Cir. 2014) ...........................................................................................15, 17

*Buckman Co. v. Plaintiffs' Legal Committee*,
　531 U.S. 341 (2001)..............................................................................................19, 29, 30

*Burkett v. Smith & Nephew Gmbh*,
　No. CV 12-4895 LDW ARL, 2014 WL 1315315 (E.D.N.Y. Mar. 31, 2014) ........................30

*Cardenas v. Toyota Motor Corp.*,
　418 F. Supp. 3d 1090 (S.D. Fla. 2019) ...................................................................................32

*In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,
　756 F.3d 917 (6th Cir. 2014) .......................................................................11, 15, 17, 31

*Demahy v. Schwarz Pharma, Inc.*,
　702 F.3d 177 (5th Cir. 2012) ...................................................................................................15

*Dietrich v. Wyeth, Inc.*,
　No. 502009CA021586XXXXMB, 2012 WL 12314992 (Fla. Cir. Ct. Nov. 12,
　2012) (Rosenberg, J.), *aff'd sub. nom, Dietrich v. Actavis, Inc.*, 138 So. 3d
　1163 (Fla. Ct. App. 2014) (per curiam) ..............................................................................16, 18

*Drager v. PLIVA USA, Inc.*,
　741 F.3d 470 (4th Cir. 2014) .............................................................................................15, 18

*Eckhardt v. Qualitest Pharm., Inc.*,
　751 F.3d 674 (5th Cir. 2014) ...................................................................................................15

*In re Fosamax (Alendronate Sodium) Prod. Liab. Litig. (No. II)*,
　751 F.3d 150 (3d Cir. 2014)...............................................................................................12, 15

*Frere v. Medtronic, Inc.*,
No. EDCV1502338BRODTBX, 2016 WL 1533524 (C.D. Cal. Apr. 6, 2016) .....................29

*Greager v. McNeil-PPC, Inc.*,
414 F. Supp. 3d 1137 (N.D. Ill. 2019) ..............................................................................12, 16

*Gross v. Pfizer, Inc.*,
825 F. Supp. 2d 654 (D. Md. 2011) ........................................................................................19

*Guariglia v. Procter & Gamble Co.*,
No. 215CV04307ADSSIL, 2018 WL 1335356 (E.D.N.Y. Mar. 14, 2018) ...........................24

*Guarino v. Wyeth, LLC*,
719 F.3d 1245 (11th Cir. 2013) ........................................................................................15, 17

*Gustavsen v. Alcon Labs., Inc.*,
903 F.3d 1 (1st Cir. 2018) ............................................................................................... *passim*

*Hernandez v. Johnson & Johnson Consumer, Inc.*,
No. 3:19-cv-15679-BRM-TJB, 2020 U.S. Dist. LEXIS 87654 (D.N.J. May 19,
2020) .......................................................................................................................................33

*Houston v. United States*,
638 F. App'x 508 (7th Cir. 2016) ...........................................................................................15

*Johnson v. Teva Pharm. USA, Inc.*,
758 F.3d 605 (5th Cir. 2014) ...........................................................................................15, 17

*Kious v. Teva Pharm. USA, Inc.*,
CIV-16-990-R, 2016 WL 9559038 (W.D. Okla. Dec. 8, 2016) .............................................24

*Lashley v. Pfizer, Inc.*,
750 F.3d 470 (5th Cir. 2014) ...........................................................................................15, 17

*Lewis v. Am. Hoist & Derrick Co.*,
97 Cal. Rptr. 798 (Ct. App. 1971) ..........................................................................................23

*Loo v. Toyota Motor Sales, USA, Inc.*,
No. 819CV00750VAPADSX, 2019 WL 7753448 (C.D. Cal. Dec. 20, 2019).......................24

*May v. Ethicon, Inc.*,
No. 1:20-CV-322-TWT, 2020 WL 674357 (N.D. Ga. Feb. 11, 2020)....................................23

*McDaniel v. Upsher-Smith Labs., Inc.*,
893 F.3d 941 (6th Cir. 2018) ..................................................................................................17

*Morris v. PLIVA, Inc.*,
713 F.3d 774 (5th Cir. 2013) ...........................................................................................17, 18

*Mut. Pharm. Co. v Bartlett,*
    570 U.S. 472 (2013)................................................................................................ *passim*

*Phelps v. Wyeth, Inc.,*
    857 F. Supp. 2d 1114 (D. Or. 2012) .............................................................................18

*PLIVA, Inc. v. Mensing,*
    564 U.S. 604 (2011)................................................................................................ *passim*

*Schrock v. Wyeth, Inc.,*
    727 F.3d 1273 (10th Cir. 2013) .....................................................................................17

*Smith v. Teva Pharm. USA, Inc.,*
    437 F. Supp. 3d 1159 (S.D. Fla. 2020) .............................................................11, 16, 33

*Strayhorn v. Wyeth Pharm., Inc.,*
    737 F.3d 378 (6th Cir. 2013) .................................................................................10, 17

*Trabakoolas v. Watts Water Techs., Inc.,*
    No. 12-CV-01172-YGR, 2012 WL 2792441 (N.D. Cal. July 9, 2012)..................................26

*In re Trasylol Prods. Liab. Litig.,*
    763 F. Supp. 2d 1312 (S.D. Fla. 2010) ..........................................................................19

*Tsavaris v. Pfizer, Inc.,*
    154 F. Supp. 3d 1327 (S.D. Fla. 2016) ..........................................................................15

*Tsavaris v. Pfizer, Inc.,*
    717 Fed. App'x 874 (11th Cir. 2017) ............................................................................19

*Vazquez v. Gen. Motors, LLC,*
    No. 17-22209-CIV, 2018 WL 447644 (S.D. Fla. Jan. 16, 2018)..........................................32

*Wyeth v. Levine,*
    555 U.S. 555 (2009)...................................................................................................12

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.,*
    808 F.3d 281 (6th Cir. 2015) ..........................................................................14, 15, 17

*Yosowitz v. Covidien LP,*
    182 F. Supp. 3d 683 (S.D. Tex. 2016) ...........................................................................29

## Constitution and Statutes

U.S. Const., Art. VI, cl. 2...................................................................................................12

15 U.S.C. § 2301................................................................................................................6, 32

15 U.S.C. § 2311(d)............................................................................................................32, 33

21 U.S.C. § 301 ..................................................................................................................2, 9

21 U.S.C. § 321(m) ...............................................................................................................10

21 U.S.C. § 337(a) ...........................................................................................................19, 29

21 U.S.C. § 355(a) .................................................................................................................9

21 U.S.C. § 355(b)(1) ...........................................................................................................10

21 U.S.C. § 355(b)(d) ...........................................................................................................10

21 U.S.C. § 355(j)(2)(A) ...............................................................................................2, 10, 11

21 U.S.C. § 355(j)(4)(G) ...............................................................................................2, 11

21 U.S.C. § 356a(c) ...............................................................................................................16

21 U.S.C. § 356a(c)(2) ...........................................................................................................17

21 U.S.C. § 379r ..........................................................................................................31, 32, 34

**Regulations**

21 C.F.R. § 1.3 .....................................................................................................................11

21 C.F.R. § 202.1(l)(2) ..........................................................................................................11

21 C.F.R. § 207 .....................................................................................................................4

21 C.F.R. § 314.70(b) ...............................................................................................16, 17, 26

21 C.F.R. § 314.70(b)(2) ........................................................................................................27

21 C.F.R. § 314.70(b)(2)(i) .....................................................................................................14

21 C.F.R. § 314.70(b)(2)(iv) ...............................................................................................27, 28

21 C.F.R. § 314.70(b)(2)(vi) ...............................................................................................27, 28

21 C.F.R. § 314.70(c)(6)(iii) ...................................................................................................12

21 C.F.R. § 314.94(a) .............................................................................................................22

21 C.F.R. § 314.127(a) ...........................................................................................................22

**Other Authorities**

Am. L. Prod. Liab. 3d § 17:3 .................................................................................................23

Pursuant to this Court's Pretrial Orders #30, 31, and 36, the Generic Manufacturer Defendants ("Generic Manufacturers") and the Repackager Defendants ("Repackagers") (as those entities are identified in the Complaints)[1], hereby submit this Rule 12 motion to dismiss the three Complaints on the ground of preemption and incorporated memorandum of law in support.

## I.  __INTRODUCTION__

The U.S. Supreme Court's decisions in *Mensing* and *Bartlett* require dismissal of all Plaintiffs' claims against the Generic Manufacturers and the Repackagers.[2] Across three sprawling Complaints, Plaintiffs assert hundreds of state- and federal-law claims seeking damages associated with the design, manufacture, distribution, and sale of ranitidine-containing products. But these claims *all* turn on only two factors: (1) the alleged danger inherent in the design of every ranitidine-containing medicine approved for sale by the U.S. Food and Drug Administration ("FDA") or (2) the adequacy of those medicines' labeling. At their core, therefore, the claims are *all* design or labeling defect claims, preempted under *Mensing* and *Bartlett*.

In those cases, the Supreme Court explained that the relevant question to determine if a claim against a drug manufacturer is preempted is whether the manufacturer "could independently do under federal law what state law requires of it," without "the Federal Government's special permission and assistance. . . ." *Mensing*, 564 U.S. at 620-24. If the answer to that question is no, *i.e.*, if federal law prohibits the manufacturer from making the change without the FDA's prior approval, or if the only way to comply with both the asserted state-law duty and federal law is to stop selling the drug altogether, then the state-law claims are preempted, no matter how they are

---

[1] This Motion is brought on behalf of all defendants that are characterized as Generic Manufacturers and Repackagers in the Complaints.  Each Generic Manufacturer and Repackager reserves the right to more accurately describe its business if necessary following the ruling on this motion.

[2] *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mut. Pharm. Co. v Bartlett*, 570 U.S. 472 (2013).

styled. Applying that principle to federal law governing *generic* drugs, the Supreme Court held that all state-law claims premised on a generic medication's design or labeling are preempted because the federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*., and its implementing regulations prohibit a generic drug manufacturer from unilaterally changing the FDA-approved design of a generic medication or its labeling. Instead, a generic medication's design and labeling must remain identical to those of the equivalent brand-name medication. *See Mensing*, 564 at 618; *Bartlett*, 570 U.S. at 483-84; 21 U.S.C. § 355(j)(2)(A), (4)(G).

Here, Plaintiffs assert various causes of action against the Generic Manufacturers, including claims for design defect, failure to warn, manufacturing defect, negligence, breach of warranty (including the Magnuson-Moss Warranty Act), and fraud.[3] Plaintiffs assert the same claims against the Repackagers, with the exception of the purported "manufacturing defect" claims pled in Counts III and VI. The gravamen of *all* Plaintiffs' claims against *all* defendants is that a probable carcinogen, N-Nitrosodimethylamine ("NDMA"), develops in every unit of ranitidine sold in the United States when stored under normal conditions or when used as directed. Plaintiffs assert that NDMA is intrinsic to ranitidine—regardless of how the product is stored or ingested—because the molecule itself contains all the structural components necessary to create NDMA. Plaintiffs further allege that the Generic Manufacturers and the Repackagers were aware of that intrinsic risk and are liable for not adjusting the design and not adding warnings about NDMA and a risk of cancer to the ranitidine label.

Based on Plaintiffs' allegations, this is not a case where particular batches of ranitidine made by certain defendants may have contained NDMA due to some error in the manufacturing process that caused those batches to depart from the intended design. To the contrary, Plaintiffs

---

[3] *See*, *e.g.*, PI Compl. ¶¶ 38-215.

allege that an inherent flaw in the design of the ranitidine molecule itself created conditions ripe for NDMA formation in *every* unit of ranitidine made by *every* branded manufacturer and *every* generic manufacturer over the last *thirty years*.

Taking all Plaintiffs' allegations to be true, the Generic Manufacturers and the Repackagers could have avoided liability under the asserted state-law duties only by changing the design of the ranitidine molecule itself, changing the labeling of generic ranitidine medicines based on the alleged NDMA risk, or removing the product from the market entirely. But this they could not do: federal law prohibited the Generic Manufacturers from re-designing ranitidine or changing its label without prior FDA approval. And entities like the Repackagers that do not submit applications to FDA for drug approval are likewise barred by federal law from unilaterally altering a drug's design or labeling. Thus, it was impossible for the Generic Manufacturers and Repackagers to unilaterally satisfy Plaintiffs' purported state-law duties while also complying with federal law, which means that all Plaintiffs' state-law claims as to those Defendants are preempted under *Mensing* and *Bartlett*. Plaintiffs' Magnuson-Moss Warranty Act claim likewise cannot proceed, as the state law warranty claims on which it relies are preempted, and the Act does not apply to product labeling exclusively regulated by FDA.

For these reasons, and those set forth below, all Plaintiffs' claims against the Generic Manufacturers and the Repackagers must be dismissed with prejudice.

## II.   ALLEGATIONS AGAINST THE GENERIC MANUFACTURERS AND REPACKAGERS IN THE COMPLAINTS

### A.  The Three Complaints And The Causes Of Action Asserted Therein

Plaintiffs filed three complaints in this action: a Master Personal Injury Complaint (Dkt. 887, the "Personal Injury Complaint" or "PI Complaint"), a "Consolidated Consumer Class Action Complaint" (Dkt. 889, the "Consumer Complaint") and a "Consolidated Third Party Payor Class

Complaint" (Dkt. 888, the "TPP Complaint") (collectively, the "Complaints"). In the Complaints, Plaintiffs assert claims against the Generic Manufacturers that allegedly designed, manufactured, tested, marketed, labeled, packaged, repackaged, handled, distributed, stored, and/or sold generic prescription and/or over-the-counter ("OTC") ranitidine medications in states and territories in the United States at various times from 1997 to April 1, 2020 pursuant to FDA-approved Abbreviated New Drug Applications ("ANDAs").[4] *See, e.g.*, PI Compl. ¶ 13, ¶¶ 33-144, ¶ 251, ¶ 301. Plaintiffs also bring claims against Defendants who are described as "Repackagers," which Plaintiffs define as entities that either "repackage [a drug] product into a different container without manipulating, changing, or affecting the composition or formulation of the drug," or relabel the product to "note the drug is distributed or sold under the relabeler's own name." PI Compl. ¶ 211; *see also* 21 C.F.R. § 207 (defining Repackagers as companies that do not manipulate, change, or affect the composition or formulation of the drug).[5]

Despite the length of the Complaints, Plaintiffs' claims against the Defendants, including the Generic Manufacturers and the Repackagers, are grounded on the same straightforward factual allegations: that all ranitidine medications (branded and generic) are "unstable" and "inherently harbor" and/or have an "inherent susceptibility" to form NDMA, alleged to be a "well known cancer-causing compound." *See* PI Compl. ¶¶ 1, 478, 522; TPP Compl. ¶¶ 4, 8. More specifically, Plaintiffs allege that NDMA develops in ranitidine because the "ranitidine molecule itself contains

---

[4] As Plaintiffs acknowledge, some Generic Manufacturers did not gain FDA approval until as late as August 2019, while others no longer held ranitidine applications or otherwise discontinued manufacture and sale of their ranitidine medications before April 1, 2020 (in some instances, years before). *See* PI Compl. ¶ 251. Some Generic Defendants *never* commercialized the product. Regardless, the arguments in this brief apply equally to all Generic Manufacturers.

[5] Three Defendants are defined only as "Repackagers" (Denton Pharma, GSMS, and Precision Dose). *See* PI Compl. ¶¶ 212-14. Many of the Generic Manufacturers, Retailer and Pharmacy Defendants, and Distributor Defendants also are alleged to have acted as Repackagers. *See id*. at ¶¶ 38-215.

the constituent molecules to form NDMA." PI Compl. ¶ 305. Indeed, according to Plaintiffs, "the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself." *Id.* at ¶ 322.

Plaintiffs' claims rely heavily on scientific studies that allegedly show that (1) NDMA is formed in ranitidine medications when stored at normal temperatures and in normal bodily conditions; and (2) consumption of ranitidine increases the risk of cancer. *See*, *e.g.*, *id.* at ¶ 321 (alleging "unsafe levels of NDMA are formed in the human body as a result of ranitidine ingestion"); *id.* at ¶¶ 329-331 (alleging "significant NDMA formation under simulated gastric conditions"); *id.* at ¶ 352 (testing "conducted without utilizing heat and without subjecting the pills to gastric conditions" allegedly "nonetheless revealed unacceptable levels of NDMA"); *id.* at ¶¶ 352-58 (citing various studies that allegedly show that ranitidine use leads to an increased risk of cancer). In Plaintiffs' estimation, "the weight of scientific evidence showed that ranitidine exposed users to unsafe levels of NDMA." *Id.* at ¶ 395.

Plaintiffs rely on those factual allegations and the fundamental theory of an inherent defect to raise both state- and federal-law claims against the Defendants, including the Generic Manufacturers and Repackagers. In the PI Complaint, Plaintiffs assert fifteen state-law claims against the Generic Manufacturers, all premised on allegations that the Generic Manufacturers owed a state-law duty of care to consumers of ranitidine, breached that duty, and caused injuries to Plaintiffs by (i) failing to properly design the ranitidine molecule or develop the manufacturing, storage, and handling processes for the drug in a way that would avoid the formation of NDMA; (ii) failing to warn of the alleged inherent presence of NDMA in ranitidine and the alleged associated risk of cancer; and (iii) failing to include certain storage and expiration date information on the labeling relating to the alleged NDMA risk. *See id.* ¶¶ 453-656.

Likewise, although the Consumer Complaint and TPP Complaint (together, the "Class Action Complaints") contain hundreds of claims (due to the assertion of claims under the laws of all 50 states and the laws of the District of Columbia and Puerto Rico), the state-law claims and theories raised in the Class Action Complaints nonetheless closely track those in the Personal Injury Complaint and are similarly grounded in design defect and/or failure to warn theories. *See* Consumer Compl. ¶¶ 838-5902; TPP Compl. ¶¶ 564-87, 606-77. In both Class Action Complaints, Plaintiffs also assert that the Generic Manufacturers violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, by warranting to the public that the ranitidine-containing products were safe when, allegedly, they were not. Consumer Compl. ¶¶ 803-21; TTP Compl. ¶¶ 588-605.

All but two causes of action asserted against the Generic Manufacturers in the Complaints are also brought against the Repackagers. Plaintiffs do not assert the manufacturing defect and negligent manufacturing counts against the Repackagers. *See*, *e.g.*, PI Compl. ¶¶ 490-99 (Count 490), ¶¶ 531-541 (Count VI).

### B. The Three Complaints Are Premised On The Theory That NDMA Is Intrinsic To Ranitidine Products, Rendering Them Inherently Defective.

The language Plaintiffs chose to articulate their claims reveals Plaintiffs' theory of liability. They claim each and every unit of ranitidine suffers from the same inherent defect and the only way to avoid Plaintiffs' injuries would be to change the formulation or include a different warning on the labeling. On those points, Plaintiffs' phrasing is unequivocal, and they expressly assert an inherent defect in the formulation/design of ranitidine or a failure to warn consumers about that alleged inherent danger in each claim of their Complaints directed to the Generic Manufacturers and Repackagers. For example, in the PI Complaint, Plaintiffs allege:

- **Count I: Strict Products Liability – Failure to Warn**: Defendants' ranitidine-containing products are defective and unreasonably dangerous "because they do not contain adequate warnings or instructions." PI Compl. ¶ 454.

- **Count II: Strict Products Liability – Design Defect**: Defendants' ranitidine-containing products "were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design" and were "defective in design and formulation . . . because of their inherent susceptibility to form NDMA." *Id.* at ¶¶ 477-478.

- **Count III: Strict Products Liability – Manufacturing Defect**: "[T]he medication[s] ingested by Plaintiffs were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design" and "are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses. . . ." *Id.* at ¶¶ 492, 495.

- **Count IV: Negligence – Failure to Warn**: "As a direct and proximate result of Defendants' failure to provide an adequate warning of the risk of ranitidine products, Plaintiffs have been injured. . . ." *Id.* at ¶ 517.

- **Count V: Negligent Product Design**: "As a direct and proximate result of Manufacturer and Repackager Defendants' defective design of ranitidine containing products, Plaintiffs have been injured. . . ." *Id.* at ¶ 530.

- **Count VI: Negligent Manufacturing**: Manufacturer Defendants[6] failed to take reasonable care in manufacturing ranitidine-containing products by failing to follow federal regulations, failing to test, and failing to adopt procedures to reduce or eliminate NDMA. *Id.* at ¶ 536.

- **Count VII: General Negligence**: Defendants "made conscious decisions not to redesign, re-label, warn, or inform" about the danger of ranitidine and as "a direct and proximate result of Defendants' failure to undertake to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs have been injured. . . ." *Id.* at ¶¶ 560-61.

- **Count VIII: Negligent Misrepresentation**: Manufacturer and Repackager defendants misrepresented to plaintiffs via packaging that ranitidine products were safe and effective and would not lead to excessive levels of NDMA being formed but "had a duty to accurately provide this information to Plaintiffs. . . ." *Id.* at ¶¶ 565-68.

- **Count IX: Breach of Express Warranties**: "Had the warnings, labels, advertisements, or promotional material for ranitidine accurately and adequately set forth the true risks associated with the use of such products, Plaintiffs could have avoided the injuries complained of herein." *Id.* at ¶ 587.

- **Count X: Breach of Implied Warranties**: Defendants impliedly warranted that the ranitidine-containing products were safe, but they "have dangerous propensities when used as intended. . . ." *Id.* at ¶¶ 592-599.

---

[6] In recognition that the Repackagers have no role in manufacturing, Plaintiffs do not assert the manufacturing defect and negligent manufacturing counts against the Repackagers. *See, e.g.*, PI Compl. ¶¶ 490-99, ¶¶ 531-541.

- **Count XI: Violation of Consumer Protection and Deceptive Trade Practices Laws**: Defendants engaged in unfair competition/deceptive acts by representing that the ranitidine-containing products were safe when they were not. *Id.* at ¶ 608.

- **Count XII: Unjust Enrichment**: "Defendants knew that ranitidine-containing products posed a grave risk of harm but failed to warn of the dangerous risks. . . ." *Id.* at ¶ 630.[7]

The factual allegations in the body of the Complaints follow suit. In the PI Complaint, Plaintiffs assert that all Defendants, including the Generic Manufacturers and the Repackagers, have been keeping a "secret" from the public: that "Zantac and its generic forms inherently harbor a well-known cancer-causing compound, N-Nitrosodimethylamine ("NDMA")." *Id.*, p. 1. They declare that "ranitidine is anything but safe. It is an unstable molecule that breaks down under ***normal*** conditions into high levels of NDMA, a carcinogen that is as potent as it is dangerous," that ingesting ranitidine exposes the consumer to "staggering amounts of NDMA," and that NDMA is generated when the ranitidine molecule breaks down in normal conditions of the human digestive system and under normal storage conditions. *Id.* at ¶¶ 1, 6 (emphasis added).

Likewise, in the TPP Complaint, Plaintiffs allege that "ranitidine is a dangerous chemical that is unsafe and unfit for human consumption" and the "molecule itself is unstable and has a propensity to degrade into high levels of [NDMA]." TPP Compl. ¶ 4. Indeed, Plaintiffs characterize their conclusion that "ranitidine breaks down into carcinogenic NDMA when used in the manner Defendants directed" as "undeniable." *Id.* ¶ 8. In the Consumer Complaint, Plaintiffs allege that all Defendants engaged in a scheme "designed to conceal the inherent dangers and risks associated with ranitidine use" and underscore that the "ranitidine molecule itself is unstable and

---

[7] The remaining claims, for Loss of Consortium (Count XIII), Survival Actions (Count XIV) and Wrongful Death (Count XV) are derivative of the substantive claims and cannot survive if those claims fail.

– under **normal** conditions – degrades into high levels of [NDMA]." *See* Consumer Compl. ¶¶ 3-4 (emphasis in original).

Ultimately, Plaintiffs contend that the Generic Manufacturers and the Repackagers are responsible for the Plaintiffs' alleged harm. Yet, as set forth in more detail below, the only way the Generic Manufacturers and the Repackagers could have avoided that alleged harm would have been to change the design of the ranitidine molecule itself (which is both scientifically and legally impossible) or to change the labeling to include warnings about NDMA and cancer (which is legally impossible). Because the Generic Manufacturers were unable to unilaterally take those actions under federal law, and because federal law likewise barred the Repackagers from unilaterally changing the design or label of ranitidine-containing medications, Plaintiffs' claims are preempted pursuant to *Mensing* and *Bartlett* and must be dismissed.

## III.   LEGAL STANDARDS AND PREEMPTION FRAMEWORK

### A. Federal Regulation Of Generic Drug Products And Drug Repackagers

#### 1. The Hatch-Waxman Amendments Govern The Manufacture And Sale Of Generic Drugs.

Human drug products, both prescription and OTC, are regulated under the FDCA, which is implemented and enforced by FDA. *See* 21 U.S.C. §§ 301 *et seq*.; *id*., §§ 371, 393. A drug may not be marketed in interstate commerce unless FDA has approved an application for its manufacture, distribution, and sale. *See* 21 U.S.C. § 355(a).

In 1984, Congress amended the FDCA to expand access to affordable generic drugs by reducing barriers to generic market entry. Those amendments—commonly known as the Hatch-Waxman Amendments—gave birth to the modern generic drug industry. *See Mensing*, 564 U.S. at 626 ("Indeed, it is the special, and different, regulation of generic drugs that allowed the generic drug market to expand, bringing more drugs more quickly and cheaply to the public."). Before

Hatch-Waxman, virtually all companies were required to file a new drug application ("NDA") to receive FDA approval to market a new drug. As part of that process, NDA applicants must conduct extensive and costly clinical trials to prove the safety and efficacy of a proposed new drug. *Mensing*, 564 U.S. at 612. Hatch-Waxman, however, drew sharp distinctions between branded and generic drug applicants. While brand companies seeking to market a novel drug product must submit NDAs (based on multi-phase clinical trial programs), *id.* (citing 21 U.S.C. § 355(b)(1), (d)), drug companies seeking to market generic versions of previously-approved drugs may file an ANDA that demonstrates the product's chemical and biological equivalence to a previously-approved drug product (known as the "reference listed drug" or "RLD"). *Id.* (citing 21 U.S.C. § 355(j)(2)(A)).

### 2. Federal Law Mandates That A Generic Drug Manufacturer Show Its Product Is "The Same" As The Branded Equivalent.

The FDCA requires ANDA applicants to show that their generic drugs contain *the same* active ingredients, employ *the same* route of administration (*e.g.*, oral or injected), are in *the same* dosage form and *the same* strength, and "have *the same* therapeutic effect" as the branded equivalent on which their ANDA is based. 21 U.S.C. § 355(j)(2)(A)(i)-(iv) (emphasis added). Because this "sameness" requirement is the touchstone for generic drug approval, "labeling" for generic drugs—which under federal law is defined expansively to include warnings and other information on the drug's packaging, physically accompanying the drug (*e.g.*, a package insert), or in any respect supplementing and explaining the drug product (even if not physically accompanying it)[8]—must be "the same as the labeling approved for the [brand-name] drug."

---

[8] The FDCA defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). Courts have long interpreted this statute to give the broadest possible meaning to the term "labeling." *See, e.g., Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 394 (6th Cir. 2013); *see also*

*Mensing*, 564 U.S. at 612-13 (quoting 21 U.S.C. § 355(j)(2)(A)(v) and citing *id.* at § 355(j)(4)(G) (alteration in original)). "As a result, brand-name and generic drug manufacturers have different federal drug labeling duties. A brand name manufacturer seeking new drug approval is responsible for the accuracy and adequacy of its label. A manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label *is the same as the brand name's*." *Id.* (emphasis added, internal citations omitted). As Plaintiffs acknowledge, a generic manufacturer also must demonstrate that "the generic medicine is manufactured under the same strict standards as the brand name medicine." PI Compl., ¶ 390(e). Those federal duties of sameness —which continue while the generic product is on the market—are not academic. If a generic manufacturer makes unilateral changes to a drug's design, manufacturing process, or label, FDA could withdraw its approval. *See Bartlett*, 570 U.S. at 477; *Mensing*, 564 U.S. at 618.

### 3. Repackagers, Like Generic Manufacturers, Cannot Make Unilateral Changes To A Drug's Design Or Labeling.

Repackagers, who distribute drug products but do not hold an NDA or ANDA themselves, are similarly powerless to make changes to the design or label of a drug. Recently, this Court held in *Smith v. Teva Pharm. USA, Inc.*, 437 F. Supp. 3d 1159 (S.D. Fla. 2020) that claims against a distributor must be dismissed as preempted based on "the wealth of authority clearly stating that a company that does not hold an NDA, regardless of its connection to the NDA holder, is powerless to submit label changes to the FDA." *Id.* at 1166.[9] Other courts similarly have dismissed on

---

21 C.F.R. § 1.3 (defining "label" and "labeling"); 21 C.F.R. § 202.1(l)(2) (including other forms of communication in the definition of labeling). Plaintiffs acknowledge this well-settled law in their pleadings ("'Labeling' encompasses all written, printed or graphic material accompanying the drug or device, and therefore broadly encompasses nearly every form of promotional activity, including not only 'package inserts' but also advertising.") PI Compl. at ¶ 368 (footnote omitted).

[9] This Court relied on other federal cases, including two pharmaceutical MDLs, to conclude that that a defendant that does not hold an NDA has no power to alter drug labeling. *See Smith*, 437 F. Supp. 3d at 1166 (citing, *inter alia*, *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,

preemption grounds state-law claims against entities in the supply chain that do not hold an ANDA. *See*, *e.g.*, *Greager v. McNeil-PPC, Inc.*, 414 F. Supp. 3d 1137 (N.D. Ill. 2019) (dismissing as preempted claims against retailer of a generic OTC medication).[10]

### 4. Generic Manufacturers And Repackagers Cannot Employ The Changes Being Effected ("CBE") Process To Make Unilateral Labeling Changes.

Federal regulations include a CBE procedure that permits a brand manufacturer, in certain limited circumstances, to revise its labeling before obtaining FDA approval to add or strengthen a "contraindication, warning, [or] precaution."  *See* 21 C.F.R. § 314.70(c)(6)(iii); *see also Mensing*, 564 U.S. at 624 ("the CBE regulation . . . permit[s] a brand-name drug manufacturer . . . to 'unilaterally strengthen its warning' without prior FDA approval") (quoting *Wyeth v. Levine*, 555 U.S. 555, 573 (2009)). In contrast, generic manufacturers may use the CBE regulation to change their labeling *only* in certain narrow instances: "to match an updated brand-name label or to follow the FDA's instructions." *Mensing*, 564 U.S. at 614. Outside those circumstances, "CBE changes unilaterally made to strengthen a generic drug's warning label would violate the statutes and regulations requiring a generic drug's label to match its brand-name counterpart's." *Id*.

## B. The Preemption Of State Tort Law Claims Regarding Generic Drugs And Repackaged Drugs

### 1. The *Mensing* And *Bartlett* Decisions

The foundation of every preemption analysis is the Supremacy Clause, which establishes that federal law "shall be the supreme Law of the Land. . . ." U.S. Const., Art. VI, cl. 2. Thus, when

---

756 F.3d 917, 940 (6th Cir. 2014) and *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.* (No. II), No. MDL 2243 JAP-LHG, 2012 WL 181411, at *3 (D.N.J. 2012)).

[10] This reasoning applies equally to those Generic Manufacturers also alleged to have acted, at times, as Repackagers with respect to any ranitidine medication that those Generic Manufacturers merely repackaged, as opposed to manufactured. This reasoning also applies to any Generic Manufacturer that no longer held an ANDA during the time that Plaintiffs allege changes should have been made to the labeling of a particular generic medication.

state and federal law directly conflict such that it is impossible for a private party to comply with both state and federal requirements, "state law must give way." *Mensing*, 564 U.S. at 617.

In *Mensing,* the Supreme Court set a bright-line rule that federal law preempts state-law failure-to-warn claims against generic-drug manufacturers. *See* 564 U.S. at 608-609. Like Plaintiffs here, the *Mensing* plaintiffs alleged that the label of a generic drug did not warn adequately of the drug's alleged risk. *Id*. at 610. The Supreme Court recognized that the state-law duty—if not preempted—could require manufacturers to alter their drug's label. *Id*. at 611-12. But the Court also recognized that federal law required generic drug manufacturers to create and maintain labels identical to the brand-name drug's label. *Id*. at 613. Accordingly, if the generic drug manufacturers were required to make a labeling change to comply with state law, they would be violating their federal duty of "sameness." *Id.* at 613-15. The Court acknowledged this tension between state and federal law, and determined that the Supremacy Clause operated to preempt the plaintiffs' state-tort-law failure-to-warn claims because "it was impossible for the Manufacturers to comply with both their [purported] state-law duty to change the label and their federal law duty to keep the label the same[.]"*Id*. at 618.

Importantly, the *Mensing* Court explained that the inquiry as to whether state-law claims directly conflict with federal law and, therefore, are preempted, focuses exclusively on actions that a manufacturer can take "unilaterally" or "independently" under federal law, without prior FDA approval. The sole "question for 'impossibility' [preemption] is whether the private party could *independently* do under federal law what state law requires of it[.]" *Id.* at 620 (emphasis added). If the answer to that question is no, the claims are preempted and must be dismissed. Thus, arguments that a generic drug manufacturer could have or should have gone to the FDA for help are irrelevant to the preemption analysis. As the *Mensing* Court held, "when a party cannot satisfy its state duties

13

without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24.

Just two years later, the Supreme Court extended *Mensing*'s bright-line rule, holding that federal law *also* preempts state-law *design*-defect claims against generic drug manufacturers. *Bartlett*, 570 U.S. 475-76. The *Bartlett* Court explained that the duty of sameness extends to design as well as labeling, as "the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based." *Id.* at 483-84. And, once FDA approves a generic drug's design, the manufacturer is prohibited from making changes to the "qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application" unless it first seeks and obtains FDA approval for the change. *Id.* at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)). Moreover, because the active ingredient in the drug at issue in *Bartlett* was a single molecule (like ranitidine), it was "chemically incapable of being redesigned." *Id.* at 484.

The *Bartlett* Court also squarely rejected what it referred to as a "stop-selling" argument: that a manufacturer could satisfy both its state- and federal- law duties by choosing not to make the FDA-approved medicine at all. *Id.* at 488-90. The Court explained that its preemption jurisprudence "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.*[11]

---

[11] Courts also have relied on *Bartlett* to dismiss as preempted claims that a manufacturer could have chosen not to market a drug in the first instance. *See Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (rejecting plaintiff's "never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale").

In sum, under *Mensing, Bartlett* and their progeny, any cause of action that would require a generic manufacturer or a repackager to change the chemical makeup of a generic drug, change the labeling of the drug, take any other unilateral action without FDA approval, or stop selling its product are preempted and must be dismissed. *Id.* at 486.

### 2. Courts Applying *Mensing* And *Bartlett* Reject Attempts To Creatively Plead Around Preemption.

Since *Mensing* and *Bartlett*, dozens of courts nationwide—including the Eleventh Circuit Court of Appeals, district courts in the Southern District of Florida, and Florida state trial and appellate courts—have applied *Mensing* and *Bartlett's* bright-line preemption rules to dismiss state-law claims against generic drug manufacturers and others in the supply chain, no matter how styled, including claims substantively identical to those asserted by Plaintiffs here:

- *Guarino v. Wyeth, LLC*, 719 F.3d 1245 (11th Cir. 2013) (affirming dismissal of claims for negligence, strict liability, breach of warranty, misrepresentation and fraud, and negligence *per se* asserted against manufacturer of generic metoclopramide);

- *Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th Cir. 2014) (affirming dismissal of negligence, breach of warranty, fraud and misrepresentation, strict liability, and failure to warn claims asserted against manufacturer of generic metoclopramide);

- *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig*, 756 F.3d 917 (6th Cir. 2014) (affirming dismissal of wrongful marketing, failure-to-warn, design defect, breach of express and implied warranty, fraud, misrepresentation, breach of consumer protection statutes, wrongful death, survivorship, unjust enrichment, loss of consortium, and punitive damage claims against manufacturers of generic propoxyphene);[12]

- *Tsavaris v. Pfizer, Inc.*, 154 F. Supp. 3d 1327 (S.D. Fla. 2016) (granting judgment on the pleadings as to strict liability, negligence, and negligent misrepresentation claims in favor of generic manufacturer/distributor of generic hormone replacement therapy drugs);

---

[12] *See also Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355 (7th Cir. 2016); *Houston v. United States*, 638 F. App'x 508 (7th Cir. 2016); *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015); *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig. (No. II)*, 751 F.3d 150 (3d Cir. 2014); *Eckhardt v. Qualitest Pharm., Inc.*, 751 F.3d 674 (5th Cir. 2014); *Lashley v. Pfizer, Inc.*, 750 F.3d 470 (5th Cir. 2014); *Johnson v. Teva Pharm. USA, Inc.*, 758 F.3d 605 (5th Cir. 2014); *Brinkley v. Pfizer, Inc.*, 772 F.3d 1133 (8th Cir. 2014); *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177 (5th Cir. 2012).

- *Allbright v. Teva Pharm. USA, Inc.*, 290 F. Supp. 3d 1321 (S.D. Fla. 2017) (granting motion to dismiss as to strict liability failure to warn, strict liability design defect, and negligence claims raised against generic manufacturer of osteoporosis medication);

- *Smith v. Teva Pharm. USA, Inc.*, 437 F. Supp. 3d 1159 (S.D. Fla. 2020) (granting summary judgment as to strict liability and negligence claims in favor of generic manufacturer of contraceptive medications and finding claims against distributor that did not hold NDA or ANDA preempted);

- *Greager v. McNeil-PPC, Inc.*, 414 F. Supp. 3d 1137 (N.D. Ill. 2019) (dismissing claims of defective design, failure to warn, negligence, consumer fraud, breach of implied warranty of merchantability, and willful and wanton misconduct asserted against manufacturer and retailer of generic OTC medications);

- *Dietrich v. Wyeth, Inc.*, No. 502009CA021586XXXXMB, 2012 WL 12314992 (Fla. Cir. Ct. Nov. 12, 2012) (Rosenberg, J.) (dismissing claims of negligence, strict liability, breach of warranties, misrepresentation and fraud, and negligence *per se* against manufacturer of generic metoclopramide), *aff'd sub. nom*, *Dietrich v. Actavis, Inc.*, 138 So. 3d 1163 (Fla. Ct. App. 2014) (per curiam).

Despite the well-defined holdings of *Mensing* and *Bartlett,* plaintiffs have tried to creatively plead around those decisions to avoid dismissal. But courts repeatedly have applied the fundamental principle of *Mensing* and *Bartlett*—that claims are preempted when there is a direct conflict between a state-law claim and federal law that a manufacturer cannot avoid without first securing FDA approval—to reject those novel theories of liability, as follows:

*Major Changes Are Preempted.* If a plaintiff's theory would require the defendant to make a change to the product that is classified as a "major change" requiring FDA approval before implementation, it is preempted. *See* 21 U.S.C. § 356a(c);[13] 21 C.F.R. § 314.70(b); *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 9-14 (1st Cir. 2018) (state law unjust enrichment claims against eye drop manufacturers preempted by federal law because changing the drug delivery system design

---

[13] 21 U.S.C. § 356a(c) provides that ". . . a drug made with a major manufacturing change may be distributed only if, before the distribution of the drug as so made, the holder involved submits to the Secretary [of the Department of Health & Human Services] a supplemental application for such change and the Secretary approves the application. . . ."

as sought by plaintiffs was a "major change"); *see also Yates*, 808 F.3d at 298 (state law design defect claim preempted by federal law where it was impossible to alter the dosages to comply with state law without violating FDA regulations and where the alteration constituted a "major change"). A "major change" is defined in 21 U.S.C. § 356a(c)(2) and 21 C.F.R. § 314.70(b) as "a manufacturing change that is determined . . . to have substantial potential to adversely affect the identity, strength, quality, purity, or potency of the drug as they may relate to the safety or effectiveness of a drug." In sections (b)(2)(i)-(vii) of the regulation, the FDA has enumerated specific changes to drug products which automatically constitute "major changes." The "major changes" in those subsections that are pertinent to the preemption of Plaintiffs' claims against the Generic Manufacturers and Repackagers are addressed in Part IV.A.4.a of the Memorandum, *infra*.

*"Failure to Communicate" Theories Are Preempted.* Every federal Circuit Court to consider this theory has held that state-law claims that would require generic manufacturers to communicate information to physicians or consumers in some fashion other than or different from the FDA-approved prescribing information or patient labeling are impliedly preempted because, in so doing, the generic manufacturer would violate the federal "duty of sameness" in labeling. *See*, *e.g.*, *Strayhorn*, 737 F.3d at 394 (6th Cir. 2014); *Guarino*, 719 F.3d at 1249 (11th Cir. 2013) (generic manufacturers are "'dependent on brand-names taking the lead'" in communications to "consumers, doctors, or pharmacists" and accordingly rejecting the failure-to-communicate theory of liability as to generic manufacturers as "preempted by federal law") (citing *Morris v. PLIVA, Inc.*, 713 F.3d 774, 777 (5th Cir. 2013));[14] *see also Mensing*, 564 U.S. at 615 ("Dear Doctor" letters

---

[14] *See also McDaniel v. Upsher-Smith Labs., Inc.*, 893 F.3d 941, 945-47 (6th Cir. 2018); *Brinkley*, 772 F.3d at 1139; *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d at 932-33; *Johnson*, 758 F.3d at 612; *Lashley*, 750 F.3d at 475; *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1286 (10th Cir. 2013).

sent to physicians qualify as labeling under the FDCA); *Dietrich v. Wyeth, Inc.*, No. 502009CA021586XXXXMB, 2012 WL 12314992, *2 (plaintiffs' suggested "failure to communicate" theory "amount[s] to a general 'failure to warn' claim, which is preempted under *Mensing*") (Fla. Cir. Ct. Nov. 12, 2012) (Rosenberg, J.).

> *"Failure to Test" And "Failure to Report" Theories Are Preempted.* Re-framing design defect or failure-to-warn claims to focus on allegations of failure to test, failure to conduct post-market surveillance, or failure to report adverse events to the FDA cannot save claims from preemption under *Mensing*, *Bartlett,* and other federal law. That is so because, even assuming that additional or different testing, surveillance, or reporting would have discovered a purported defect in a generic drug product (such as Plaintiffs allege here), the generic drug manufacturer or repackager still would have to take *additional* action to meet any state tort law duty by redesigning the molecule, changing the labeling, or by ceasing sales of the product. Because all the possible actions a generic manufacturer or repackager could take are preempted or cannot forestall preemption under *Mensing* and *Bartlett*, the failure to test, failure to report, and failure to conduct post-market surveillance allegations cannot serve as a basis for liability. *Drager*, 741 F.3d at 477 ("If we assume that under Maryland law there is a general duty to protect consumers from injury based on the negligent marketing and sale of a product, it is clear that a generic drug manufacturer whose product is unreasonably dangerous as sold could not satisfy that duty without changing its warnings, changing its formulation, exiting the market, or accepting tort liability. Therefore, [plaintiff's] negligence claims are preempted by impossibility."); *Morris*, 713 F.3d at 778 (failure to test and inspect allegations are "yet another attempt to circumvent disfavored failure-to-warn claims" but also fail under *Mensing* principles); *Phelps v. Wyeth, Inc.*, 857 F. Supp. 2d 1114, 1126 (D. Or. 2012) ("[P]laintiffs' failure to conduct post-marketing activities and failure-to-test claims

cannot be stand-alone causes of action. Rather, they are a part of the failure to warn claim[,]" and are preempted along with that claim); *Gross v. Pfizer, Inc.*, 825 F. Supp. 2d 654, 659 (D. Md. 2011) (failure-to-test allegations that were "but a piece of [p]laintiff's larger failure to warn claims" were preempted).

Additionally, the failure to report adverse events theory is separately preempted pursuant to *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In *Buckman*, the Supreme Court held that a plaintiff's state-law claims based on alleged fraudulent representations made by a manufacturer to obtain approval for orthopedic bone screws were preempted by federal law that empowered the FDA to punish and deter fraud perpetrated against it. *Id.* at 347-52. The *Buckman* Court recognized "[t]he FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with FDCA provisions. *Id.* at 349 n.4 (citing 21 U.S.C. § 337(a)). The Eleventh Circuit and this Court have held that *Buckman* preempts any claim to the extent it is premised on a theory of failure to report adverse events to FDA. *See Tsavaris v. Pfizer, Inc.*, 717 Fed. App'x 874, 877 (11th Cir. 2017) (plaintiff could not state a claim in a products liability suit against generic drug manufacturer under a theory that manufacturer had failed to report studies to FDA); *In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1329-30 (S.D. Fla. 2010) (granting motion in *limine* to preclude all evidence regarding drug manufacturer's failure to adequately or timely provide adverse event information to FDA because such evidence was relevant only to "a fraud-on-the-FDA claim that is preempted by *Buckman*").

When Plaintiffs' state law claims are viewed in light of controlling federal law, application of preemption is clear and all Plaintiffs' claims against the Generic Defendants and the Repackagers must be dismissed.

## IV.   LEGAL ARGUMENT

### A. Plaintiffs' Claims Against The Generic Manufacturers In The Personal Injury Complaint Are All Preempted Under *Mensing* and *Bartlett*.

#### 1. Counts I, II, IV, V, And VII - XII Of Plaintiffs' Personal Injury Complaint Are Premised On Failure To Warn And Design Defect And Are Preempted.

In ten of the twelve substantive state-law claims[15] in Plaintiffs' PI Complaint, Plaintiffs

assert that the Generic Manufacturers are liable under one or more of the following theories:

- Failing to warn of the alleged "dangerous characteristics of ranitidine and NDMA" by not changing the warnings on the labels affixed to the generic ranitidine medications, issuing other warning-related promotional or advertising communications, or proposing warning-related label/communications changes to FDA;[16]

- Making statements in the labeling of their generic ranitidine medications or in other communications that were allegedly false or misleading in that they did not include information about the alleged dangers posed by NDMA in ranitidine;[17]

- Failing to provide other non-warning product information, such as different expiration dates or storage and stability instructions, either by not changing the labels affixed to the generic ranitidine medications or failing to issue other communications;[18]

- Failing to report alleged adverse events from use of the generic ranitidine medications;[19]

- Failing to "employ[ ] safer alternative designs and formulations" for the generic ranitidine medications;[20]

---

[15] Strict Products Liability - Failure to Warn and Design Defect (Counts I and II); Negligent Failure to Warn and Negligent Product Design (Counts IV and V), General Negligence (Count VII), Negligent Misrepresentation (Count VIII), Breach of Express and Implied Warranties (Counts IX and X), Violation of Consumer Protection and Deceptive Trade Practices Laws (Count XI), and Unjust Enrichment (Count XII).

[16] *See* PI Compl. ¶¶ 453-73, 486, 500-17, 520 551-53, 556(b), (d), (e), (m), (n), (q), 574-602, 628-36.

[17] *Id.* at ¶¶ 461, ¶ 467, 508, 511, 555, 556(b), (p), (r), (s), (t), 562-73, 603-27.

[18] *Id.* at ¶¶ 457-58, 481(e), (g), 523(g), 536(b), (d), 556(f).

[19] *Id.* at ¶ 556(l).

[20] *Id.* at ¶¶ 473-89, 481(k), ¶¶ 518-30, ¶ 523(j), ¶ 556(d)-(e).

- Failing to adequately test, investigate, or study the generic ranitidine medications;[21] and/or,

- Failing to conduct "adequate post-marketing surveillance" of the generic ranitidine medications.[22]

These claims contemplate that the Generic Manufacturers should have: (1) reformulated the product, included different information on the labeling, or communicated a warning through other means, (2) reported adverse events or other information to FDA, or (3) taken other unilateral steps that courts have held cannot serve as an independent basis for liability (including different testing and post-market surveillance). As outlined in Section III.B., *supra*, all those theories and the claims premised on them are preempted under *Mensing* and *Bartlett*, even when not specifically called "Design Defect" or "Failure to Warn."

### 2. Plaintiffs' Contention That The Generic Manufacturers Could Unilaterally Change the Label Is Wrong.

In an effort to avoid the bright-line rule preempting failure-to-warn claims, Plaintiffs contend that federal law permits generic manufacturers to make or propose certain types of labeling changes unilaterally. *See* PI Compl. ¶¶ 379-80. Plaintiffs are incorrect.

First, Plaintiffs acknowledge that only manufacturers "holding the NDAs" for ranitidine products can unilaterally make labeling changes "without prior FDA approval" using the CBE process. *See id.* at ¶ 382. Yet Plaintiffs do not allege that Generic Manufacturers hold NDAs; to the contrary, Plaintiffs concede that the Generic Manufacturers hold only ANDAs. *Id.* at ¶ 251. Therefore, Plaintiffs' suggestion that Generic Manufacturers make unilateral changes would place the Generic Manufacturers in direct breach of federal law from the moment the change was implemented. Indeed, the Supreme Court directly rejected this argument in *Mensing* as

---

[21] *Id.* at ¶¶ 459, 481(c)-(d), (j), 505, 523(d)-(g),552, 556(a), (c), (g), (h), (i).

[22] *Id.* at ¶¶ 481(i), 523(i), 556(j), (k).

incompatible with the continuing duty of sameness in labeling. 564 U.S. at 618, 624-25. Accordingly, the Generic Manufacturers could not unilaterally change their product labels and Plaintiffs' claims are preempted.

Second, Plaintiffs posit that the Generic Manufacturers could have "proposed" different "labeling or storage / transportation guidelines" to FDA, which might have led FDA to order the brand name manufacturer of Zantac to implement the revised labeling. PI Compl. ¶¶ 401-02. That argument was also addressed and rejected in *Mensing*. The Supreme Court acknowledged that while generic drug manufacturers "could have asked the FDA for help" to change a label, that is *irrelevant* to the preemption inquiry and therefore cannot forestall preemption because the theory depends on the FDA's discretion and action. *Mensing*, 564 U.S. at 619-20, 623-24 (preemption inquiry considers only what generic manufacturer "could independently do under federal law . . . without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency"); *see also Gustavsen*, 903 F. 3d. at 9 ("If a private party . . . cannot comply with state law without first obtaining the approval of a federal regulatory agency, then the application of that law to that private party is preempted.").

Third, the regulations on which Plaintiffs rely do not apply to *post-approval* labeling changes. PI Compl. ¶¶ 393-94. Rather, they describe information that an ANDA applicant submits as part of its *initial application* to gain approval to market a generic drug product, and the review that the FDA thereafter conducts. *See* 21 C.F.R. § 314.94(a). In that instance, the FDA is the final arbiter of whether the labeling information submitted with the ANDA will be accepted. 21 C.F.R. § 314.127(a), (a)(7). Because those labeling submissions are subject to FDA pre-approval and, once approved, must be kept the same as the brand labeling, the Generic Manufacturers could not have independently made changes. Consequently, Plaintiffs cannot avoid the preemption of their

labeling-based claims against the Generic Manufacturers under this theory, either. *See Mensing*, 564 U.S. at 623-24.

Accordingly, Counts I, II, IV, V, and VII through XII of the PI Complaint must be dismissed as to the Generic Manufacturers.

> ### 3. Plaintiffs' "Manufacturing Defect" Claims In Counts III And VI Are Preempted Design Defect Claims.

In yet another effort to circumvent preemption, Plaintiffs attempt to frame two of their counts in the Personal Injury Complaint as "manufacturing defect" claims—Strict Products Liability - Manufacturing Defect (Count III) and Negligent Manufacturing (Count VI). But those "manufacturing defect" claims must be dismissed with prejudice because they are not manufacturing defect claims, but rather preempted design defect claims. And in light of Plaintiffs' emphasis on the alleged inherent danger of NDMA in the entire ranitidine product line, these claims cannot plausibly be re-pleaded to become a manufacturing defect claim.

"In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker v. Lull Eng'g Co*., 573 P.2d 443, 454 (Cal. 1978) (citing *Lewis v. Am. Hoist & Derrick Co*., 97 Cal. Rptr. 798, 804 (Ct. App. 1971)). "A manufacturing defect refers to individual products *within a product line* that are improperly constructed" while "design defects concern a defect in the design of the *entire product line*. . . ." Am. L. Prod. Liab. 3d § 17:3 (emphasis added). Indeed, the dichotomy between manufacturing defect claims (which focus on certain products with purported errors) and design defect claims (which allege the same defect across an entire product line) is a fundamental feature of product liability law, regardless of the type of product alleged to be defective. *See*, *e.g.*, *May v. Ethicon, Inc.,* No. 1:20-CV-322-TWT, 2020 WL 674357, at *3 (N.D. Ga. Feb. 11, 2020) (when plaintiff

claimed to be injured from an adverse reaction to a material inherent in a medical device product's design, it was properly construed as a design defect, not a manufacturing defect); *Loo v. Toyota Motor Sales, USA, Inc.,* No. 819CV00750VAPADSX, 2019 WL 7753448, at *6-7 (C.D. Cal. Dec. 20, 2019) (when plaintiffs alleged that cars "suffered from an inherent defect" and defined their putative class as "all purchasers," the "case is about a design defect not a manufacturing one"); *Guariglia v. Procter & Gamble Co.,* No. 215CV04307ADSSIL, 2018 WL 1335356, at *5 (E.D.N.Y. Mar. 14, 2018) (when plaintiffs alleged that all units of the product were defective, a manufacturing defect claim could not be plausibly pled).

Applying these fundamental tenets to cases involving pharmaceutical products, courts have held that "when a plaintiff calls into question the entire product line, it is properly construed as a design defect claim, not a manufacturing defect claim." *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 876 (N.D. Ohio 2014); *see also Acevedo v. Johnson & Johnson,* No. 16-CV-11977-DLC, 2018 WL 4693958, at *5 (D. Mass. Sept. 30, 2018). Therefore, purported "manufacturing defect" claims against a generic drug manufacturer that are actually premised on an inherent danger are preempted design defect claims that must be dismissed:

> Although Plaintiff contends [that] he has pled a claim based on an alleged manufacturing defect, the Court concludes that Plaintiff's Amended Petition fails to state any such claim. Plaintiff does not allege therein that the azithromycin was not manufactured as would be anticipated. ***Rather, Plaintiff's claims stem from the alleged failure to warn of the dangerous risks posed by the prescription and the inherent danger of the medicine***. Under Oklahoma law, [a] product is defective in manufacture if it deviates in some material way from its design or performance standards. . . . Plaintiff makes no allegations that would give rise to such a claim, ***rather he contends that every dose of azithromycin was defective because of its design and/or lack of adequate warnings. As such, Defendant is entitled to dismissal of Plaintiff's manufacturing defect claim.***

*Kious v. Teva Pharm. USA, Inc.*, CIV-16-990-R, 2016 WL 9559038, at *2 (W.D. Okla. Dec. 8, 2016) (internal citations and quotation marks omitted) (emphasis added).

24

Here, each count in Plaintiffs' Complaints is based on the theory that ranitidine—in all its forms—is an inherently dangerous molecule that contains the very components of NDMA and can cause cancer even when taken as directed. In making these allegations, Plaintiffs call into question each and every unit of ranitidine. Tellingly, Plaintiffs do not shy away from their fundamental theory in their manufacturing counts. In Count III, Plaintiffs assert that ***all*** ranitidine products are "***inherently dangerous and defective***, unfit and unsafe for their intended and reasonably foreseeable uses." *See* PI Compl. ¶ 494 (emphasis added). Plaintiffs further allege that the ranitidine medications they purchased and took "were expected to and did reach Plaintiffs ***without a substantial change in their anticipated or expected design***." *Id.* at ¶ 492 (emphasis added). In the Class Complaints, Plaintiffs define the putative classes to include *all purchasers* of ranitidine, further illustrating their theory that the defect applies across the product line. Consumer Compl. ¶¶ 734; 737; TPP Compl. ¶¶ 506; 508. These allegations show that Plaintiffs' claims are ***not*** based on a claim that certain batches made by certain defendants potentially contain NDMA because of an error in the manufacturing process.[23] Instead, Plaintiffs are attacking the entire product line, alleging that *every* branded manufacturer and *every* generic manufacturer made the same mistake in the production of *every* unit of ranitidine made over the last *thirty years.* As a result, their purported "manufacturing defect" claims are design defect claims that walk straight into the Supreme Court's preclusive preemption jurisprudence and must be dismissed for all the reasons set forth in Sections III.B and IV.A.1.[24]

---

[23] Plaintiffs' attempt to concoct a manufacturing defect is itself half-hearted. The few substantive purported "manufacturing defect" allegations included in Counts III and VI are merely abbreviated versions of the *same* allegations that Plaintiffs use to support their design defect claims.

[24] Rule 8(d), which allows pleading of alternative claims, cannot save Counts III and VI. "This is not an instance of pleading alternative statements *of a claim* under Rule 8(d). Plaintiffs attempt to plead two alternative claims with one set of facts, but, in this case, the facts are sufficient to allege

**4. Plaintiffs' "Manufacturing Defect" Claims Are Also Preempted Because They Are Based On Allegations That Are Otherwise Preempted.**

Setting aside that the purported "manufacturing defect" claims are, in reality, preempted design defect claims, the specific allegations raised in Counts III and VI are also otherwise preempted under *Mensing* or other federal law. They must therefore be dismissed for these additional reasons.[25]

a. *The Specific Allegations In Counts III And VI Are Preempted Because The Actions They Call For Are "Major Changes" Requiring FDA Approval.*

The allegations in Counts III and VI (and Count VII, to the extent it is based on similar allegations) still should be dismissed as preempted under *Mensing* because they would require the Generic Manufacturers to take actions that need FDA pre-approval. As noted, when a tort plaintiff claims that state law requires a change in a drug product's design, and under federal law the change is a "major change" that would require FDA review and approval, the state-law claim is preempted. *See*, *e.g.*, *Gustavsen*, 903 F.3d at 9-10. The implementing regulation for the statutory "major change" requirement, 21 C.F.R. § 314.70(b), has a two-part structure:

First, the regulation provides in section (b)(1) that changes that have "a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product" are "major changes" requiring FDA approval.

But second, the regulation ***also*** provides in section (b)(2) "a host of ensuing categories of changes to drug products, listed at sections (b)(2)(i) through (viii)," all of which FDA has ***pre-***

---

only design defect, not manufacturing defect." *Trabakoolas v. Watts Water Techs., Inc.*, No. 12-CV-01172-YGR, 2012 WL 2792441, at *4 n.6 (N.D. Cal. July 9, 2012) (emphasis in original).

[25] Count VII of Plaintiffs' PI Complaint contains some allegations similar to those in Counts III and VI. For instance, all three counts allege liability on the basis of alleged violations of CGMPs. Those allegations in Count VII are preempted for the same reasons given in this Part, *infra*.

*determined* are "major changes." *Gustavsen*, 903 F.3d at 10. Thus, for the changes listed in section (b)(2), there is no requirement that a defendant must prove that those changes have a "substantial potential to have an adverse effect" on identity, strength, quality, purity or potency in order to qualify as "major." *See Gustavsen*, 903 F.3d at 10-11 (concluding that "if a change fits under any of the categories listed in section (b)(2), that change necessarily constitutes a 'major' change requiring FDA pre-approval").

Specifically, in 21 C.F.R. § 314.70(b)(2), FDA states that "major changes" include (among others):

- "Changes in the synthesis or manufacture of the drug substance that may affect the *impurity profile* and/or the *physical, chemical, or biological properties* of the drug substance." 21 C.F.R. § 314.70(b)(2)(iv) (emphasis added); and,

- "Changes . . . in the type . . . or composition . . . of a packaging component that may affect *the impurity profile* of the drug product." 21 C.F.R. § 314.70(b)(2)(vi) (emphasis added).

FDA defines "impurity profile" as "[a] description of the identified and unidentified impurities present in a drug substance." *See* U.S. Dep't of Health and Human Servs., Food and Drug Admin., Guidance for Industry—ANDAs: Impurities in Drug Substances 14 (Nov. 1999). An "impurity" is "[a]ny component of the drug substance that is not the chemical entity defined as the drug substance." *Id.* Impurities can include "organic impurities," *e.g.*, organic compounds other than the drug substance that "may arise during the manufacturing process and/or storage of the drug substance[,]" as well as "residual solvents" that may be used during the manufacturing process. *Id.* at 2-3.

Here, Plaintiffs' fundamental theory of liability is that ranitidine is inherently susceptible to forming an organic impurity,[26] NDMA, and that the Generic Manufacturers (and other

---

[26] Multiple FDA documents cited and incorporated by reference in the PI Complaint refer to NDMA in ranitidine as an "impurity." *See*, *e.g.*, PI Compl. ¶ 258 n.17 (FDA Statement, Janet

Defendants) breached a duty of care by failing to change the design of ranitidine, warn, or otherwise address the alleged impurity. All the factual allegations in Counts III and VI, such as that the Generic Manufacturers should have implemented "procedures that would reduce or eliminate NDMA levels in ranitidine-containing products," or changed procedures involving the solvents allegedly used during the manufacture of generic ranitidine medications,[27] are changes that "may affect the impurity profile" of the generic ranitidine medications and therefore are "major changes" that require FDA pre-approval under 21 C.F.R. § 314.70(b)(2)(iv) and (vi). All of Plaintiffs' proposed changes are also major changes under 21 C.F.R. § 314.70(b)(2)(iv) because they are aimed at addressing an alleged "physical, chemical, or biological propert[y]" of ranitidine, namely, that it allegedly contains the constituent nitroso components necessary to form NDMA. *See* PI Compl. ¶ 305. Accordingly, Counts III and VI are preempted and must be dismissed. *See Gustavsen*, 903 F.3d at 9-11.

b.   *Federal Law Also Preempts The Specific Allegations In Counts III And VI.*

The specific allegations raised in Counts III and VI (and Count VII, to the extent it is based on the allegations set forth below) are also all preempted under *Mensing* or other federal law for the following reasons:

---

Woodcock, Director – Ctr. for Drug Evaluation & Research, *Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alertingpatients-and-health-care-professionals-ndma-found-samples-ranitidine); *id.* at ¶ 287 n.33 (FDA News Release, U.S. Food & Drug Admin., FDA Announces Voluntary Recall of Sandoz Ranitidine Capsules Following Detection of an Impurity (Sept. 24, 2019), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recallsandoz-ranitidine-capsules-following-detection-impurity).

[27] *See, e.g.*, PI Compl. ¶¶ 496(d), 536(c).

*Cooled Storage and Transport.* Plaintiffs contend that the Generic Manufacturers committed a manufacturing defect by failing to implement "appropriate" storage and handling conditions for the ingredients and finished drug products of their generic ranitidine medications. *See* PI Compl. ¶¶ 496(e), 536(e), 408. By this, Plaintiffs mean that the Generic Manufacturers should have implemented "cooled storage and transport," which allegedly would have "prevent[ed] accumulation of NDMA in ranitidine-containing products[.]" *Id.* at ¶ 408. However, the label of the brand-name Zantac medication contains precise temperature storage information, *e.g.*, that ranitidine should be "store[d] at 20º-25ºC (68º-77ºF)."[28] As discussed above, federal law obligated the Generic Manufacturers to place that temperature storage information word-for-word on the labels of their own generic ranitidine medications. Thus, Plaintiffs' claim regarding storage conditions is *directly contrary to the storage conditions federal law required Generic Manufacturers to use and place on the products' labels.* The Generic Manufacturers were powerless to unilaterally change those labeled storage conditions, and doing so would have put the Generic Manufacturers in direct breach of federal law. Therefore, Counts III and VI are preempted to the extent they rely on this cooled storage theory.

*Failure to Follow Current Good Manufacturing Practices ("CGMPs").* Plaintiffs allege that "failure to follow CGMPs" is a manufacturing defect. *See* PI Compl. ¶ 496(a), ¶ 536(a). But the federal government alone is empowered to enforce alleged violations of CGMPs, and a private cause of action based on failure to follow CGMPs is preempted under *Buckman*.[29] The theory is

---

[28] *See*, *e.g.*, Zantac 150® mg label (Sept. 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/021698s022lbl.pdf (last accessed Aug. 23, 2020).

[29] *See Yosowitz v. Covidien LP,* 182 F. Supp. 3d 683, 698 (S.D. Tex. 2016) ("21 U.S.C. § 337(a) does not permit freestanding federal causes of action based on violation of the FDA's regulations, and there is no private cause of action for duties independently created by FDA regulations.") (internal citations and quotation marks omitted); *Frere v. Medtronic, Inc.*, No. EDCV1502338BRODTBX, 2016 WL 1533524, at *7 (C.D. Cal. 2016) ("Plaintiff[']s

also implausible given Plaintiffs' position that the nitroso needed to form NDMA likely comes from no other source than the ranitidine molecule itself. *See* PI Compl. ¶ 322.

*Procedures to Reduce or Eliminate NDMA.* Plaintiffs allege that failure to implement procedures to reduce or eliminate NDMA levels in ranitidine products is a manufacturing defect, including procedure changes regarding solvents used in the manufacturing process. *See id.* at ¶¶ 496(b), (d), 536(c). But according to Plaintiffs' own factual allegations, that would have been impossible without a complete redesign of the ranitidine molecule because, according to Plaintiffs, it contains all the pieces necessary to create NDMA under normal conditions and when taken as directed. *See id.* at ¶¶ 305, 322. Such allegations, however styled, conflict with the duty of sameness in formulation and are chemically impossible for single-molecule ranitidine, and are therefore preempted. *Bartlett*, 570 U.S. at 583-84.

*Failure to Adequately Test or Inspect.* Lastly, Plaintiffs allege that a failure to inspect and test the drugs during the manufacturing process is a manufacturing defect. *See* PI Compl. ¶¶ 496(c), 536(b), (d). But as set forth in Section III.B.2, such claims have been consistently held to be preempted.

5. **Counts XIII, XIV, And XV Of Plaintiffs' Personal Injury Complaint And Their Punitive Damages Allegations Are Derivative Claims That Are Also Preempted Under *Mensing* and *Bartlett***

The remaining counts in the Personal Injury Complaint are for Loss of Consortium (Count XIII), Survival Actions (Count XIV), Wrongful Death (Count XV) and allegations of Punitive Damages. *See* PI Compl. ¶¶ 637-56, 450-52. Those are derivative claims that rely on Plaintiffs'

---

manufacturing defect claim is impliedly preempted under *Buckman*, because Plaintiff's entire claim rests on conduct Plaintiff claim [sic] that Defendants violated the FDA's CGMPs."); *Burkett v. Smith & Nephew Gmbh*, No. CV 12-4895 LDW ARL, 2014 WL 1315315, at *5 (E.D.N.Y. 2014) ("Because Burkett's manufacturing defect claim is based on violation of generally applicable CGMPs, as opposed to federal requirements specific to the R3 liner, preemption bars the claim.").

other substantive state-law claims and therefore are preempted. *See In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d at 936 ("derivative claims for wrongful death, survivorship, . . . loss of consortium, and punitive damages stand or fall with the underlying claims on which they rest" and are properly dismissed when underlying claims are preempted).

**B. Plaintiffs' Claims Against The Generic Manufacturers In The Class Action Complaints Are Likewise Preempted Under *Mensing* and *Bartlett*.**

**1. Plaintiffs' State-Law Claims In The Class Action Complaints Are Substantively Similar To The State-Law Claims In The Personal Injury Complaint And Are Preempted For The Same Reasons**

Plaintiffs' state-law claims in the Class Action Complaints are substantively similar to and rely on the same underlying alleged facts as in the Personal Injury Complaint, *i.e.*, that the presence of NDMA is inherent to the ranitidine molecule and the Generic Manufacturers therefore had a duty to alter the drug's design or labeling to counter that risk. *See* Consumer Compl. ¶¶ 838-5902; TPP Compl. ¶¶ 564-87, 606-77. Thus, all the Class Action Complaints' state-law claims would likewise require the Generic Manufacturers to take actions that would conflict with their federal law duty of sameness in labeling and design and/or would require FDA pre-approval, and are preempted under *Mensing* and *Bartlett* for the same reasons previously discussed.

**2. Claims Raised Against The Generic Manufacturers As To The Manufacture Or Sale Of OTC Generic Ranitidine Medications Are Preempted Pursuant To 21 U.S.C. § 379r**

As a further independent basis for dismissal, the Generic Manufacturers adopt and incorporate the arguments and authorities in the Preemption Brief of the Brand Name Manufacturers regarding express preemption under 21 U.S.C. § 379r for all state-law claims based

on the manufacture or sale of OTC ranitidine medications. Those arguments apply equally to those Generic Manufacturers who manufactured and/or sold generic OTC ranitidine medications.[30]

### 3. Plaintiffs' Magnuson-Moss Warranty Act Claim Against The Generic Manufacturers Should Be Dismissed As Preempted And Because The Act Does Not Apply To FDA-Regulated Product Labeling.

Plaintiffs also claim in the Class Action Complaints that the Generic Manufacturers violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, a federal statute governing warranties on consumer products. Consumer Compl. ¶¶ 803-21; TPP Compl. ¶¶ 588-605. This claim must be dismissed for two additional reasons.

First, to state a claim under the MMWA, a plaintiff must also state a valid state law breach of warranty claim. *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1110-11 (S.D. Fla. 2019); *Vazquez v. Gen. Motors, LLC*, No. 17-22209-CIV, 2018 WL 447644, *4 (S.D. Fla. Jan. 16, 2018). As discussed in detail above, Plaintiffs' state-law breach of warranty claims are preempted under *Mensing* and *Bartlett*. Without state-law breach of warranty claims as an anchor, Plaintiffs cannot state a valid MMWA claim, and the MMWA claim must be dismissed.

Second, the MMWA claim must be dismissed because the Act cannot be used to challenge the adequacy of FDA-regulated product labeling. The MMWA's express terms make it "inapplicable to any written warranty the making or content of which is otherwise governed by Federal law." 15 U.S.C. § 2311(d). Applying the statute's plain meaning, courts regularly dismiss MMWA claims involving FDA-regulated product labeling. For example, a New Jersey federal court recently dismissed MMWA claims regarding Tylenol gelcaps, recognizing that the

---

[30] Certain Generic Manufacturers held ANDAs only for OTC ranitidine medications (as opposed to those who held ANDAs only for prescription ranitidine or both OTC and prescription ranitidine). If the Court dismisses Plaintiffs' state-law claims in the Class Action Complaints based on 21 U.S.C. § 379r preemption, the Court should dismiss those OTC-only defendants.

"'majority of courts that have considered whether § 2311(d) bars an MMWA claim founded on the labels of products governed by the FDCA have concluded that [the] MMWA claim is barred.'" *Hernandez v. Johnson & Johnson Consumer, Inc.*, No. 3:19-cv-15679-BRM-TJB, 2020 U.S. Dist. LEXIS 87654, at *12-14 (D.N.J. May 19, 2020) (quoting *Reid v. GMC Skin Care USA Inc.*, No. 8:15-CV-277, 2016 U.S. Dist. LEXIS 14001, at *38 (N.D.N.Y. Jan. 15, 2016)). The court emphasized the broad scope of the FDCA, explaining that through "the FDCA, the FDA extensively regulates the labeling, marketing, and sale of all over-the-counter medications," just as it does for prescription medications. *See id.* at *13. Those same principles require dismissal of the Class Action Complaints' MMWA claims here.

### C. Plaintiffs' Claims Against The Repackagers Are Preempted Under *Mensing* And *Bartlett* And Must Be Dismissed.

Plaintiffs have not asserted Counts III and VI of the PI Complaint (the "manufacturing defect" claims) against the Repackagers. As set forth above in Section IV.A.1, the remaining substantive claims that are asserted against the Repackagers are based on design defect or failure to warn. They are therefore all preempted under the principles of *Mensing* and *Bartlett* for the reasons set forth in Sections III.A.3 and III.B. Because the Repackagers do not hold the NDAs or ANDAs for the ranitidine-containing medications that they repackaged, federal law barred the them from making any unilateral design or labeling changes to those medications, or even submitting *requests* for labeling changes to FDA. *See Smith v. Teva Pharm. USA, Inc.*, 437 F. Supp. 3d 1159, 1164-65 (S.D. Fla. 2020). This same reasoning also applies to those Generic Manufacturers alleged to have acted as Repackagers.[31]

---

[31] Thus, for those Generic Manufacturers who are alleged to have also acted as Repackagers, claims against them in the PI Complaint for the products they *manufactured* are preempted and must be dismissed for the reasons given in Parts IV.A, *supra*, and claims against them for the

Because the claims in the Class Action Complaints against the Repackagers (including those Generic Manufacturers alleged to have acted as Repackagers) closely follow the claims in the Personal Injury Complaint, they should be preempted for the same reasons. The Repackagers further adopt and incorporate the Generic Manufacturers' arguments set forth in Sections IV.A and IV.B, as those Sections apply equally to the Repackagers.[32]

The Repackagers (including those Generic Manufacturers alleged to have acted as Repackagers) also adopt and incorporate the arguments and authorities in the Preemption Brief of the Brand Name Manufacturers regarding express preemption under 21 U.S.C. § 379r for all state-law claims based on the manufacture or sale of OTC ranitidine medications, which apply equally to those Repackagers who repackaged and/or sold generic OTC ranitidine medications.

The Repackagers (including those Generic Manufacturers alleged to have acted as Repackagers) also adopt and incorporate the Generic Manufacturers' argument as to express preemption for the MMWA claim in Section IV.B.3, which applies equally to the Repackagers.

## V.    **CONCLUSION**

All Plaintiffs' state-law claims in the Personal Injury Complaint, Consumer Complaint, and TPP Complaint are preempted under *Mensing* and *Bartlett* as to the Generic Manufacturers and the Repackagers. And the Magnuson-Moss Warranty Act does not apply to product labeling

---

products they *repackaged* are preempted and must be dismissed under the logic of *Smith* and cases cited therein.

[32] Count VII—alleging general negligence—includes vaguely pleaded allegations of failure to follow CGMPs, failures in manufacturing, and failures in storage and handling. Although Count VII is pleaded against all Defendants, Plaintiffs have failed to plead any factual allegations that the Repackagers violated any CGMP regulations or were involved in the manufacture of ranitidine and therefore those portions of Count VII do not apply to the Repackagers. To the extent Plaintiffs have alleged that the Repackagers had a legal to duty to follow certain alleged industry standards regarding storage and handling of the ranitidine medications, PI Compl. ¶¶ 409-414, the Repackagers adopt the arguments set forth in Sections IV.A.3-4 regarding alleged deficiencies in storage and handling.

regulated by FDA. Accordingly, all claims asserted against the Generic Manufacturers and Repackagers in Plaintiffs' Complaints must be dismissed, with prejudice.

Dated:  August 24, 2020                      Respectfully submitted,

*Generic Defendants' Co-Liaison Counsel:*

/s/ Richard M. Barnes
Richard M. Barnes
Kamil Ismail
Sean Gugerty
**Goodell, DeVries, Leech & Dann, LLP**
One South Street, 20th Floor
Baltimore, Maryland 21202
Tel: (410)783-4000
rmb@gdldlaw.com
kxi@gdldlaw.com
sgugerty@gdldlaw.com

*Attorneys for Defendant*
*L. Perrigo Company*

/s/ Thomas J. Yoo
Thomas J. Yoo
**HOLLAND & KNIGHT LLP**
400 South Hope Street, 8th Floor
Los Angeles, CA  90071
T: 213.896.2400
F: 213.896.2450
Thomas.Yoo@hklaw.com

Philip E. Rothschild
Fla. Bar No.: [0088536]
515 East Las Olas Boulevard, Ste  1200
Fort Lauderdale, Florida 33301
T: 954.525.1000
F: 954.463.2030
Phil.Rothschild@hklaw.com

Daniel Mateo
Amy McVeigh
Cira Centre, Suite 800
2929 Arch Street
Philadelphia, PA  19104
T: 215.252.9600
F: 215.867.6070
Daniel.Mateo@hklaw.com
Amy.McVeigh@hklaw.com

Daniel Winters
31 West 52nd Street, 12th Floor
New York, NY  10019
T: 212.513.3200
F: 212.385.9010
Daniel.Winters@hklaw.com

*Attorneys for Glenmark Pharmaceuticals Inc.,*
*USA, f/k/a Glenmark Generics Inc., USA and*
*Glenmark  Pharmaceuticals  Ltd.  (f/k/a*
*Glenmark Generics Ltd.)*

*Counsel for Generic Manufacturer and Repackager Defendants:*

**As to ACIC Pharmaceuticals Inc. and
Methapharm, Inc.:**

*/s/  Frederick J. Fein*
Frederick J. Fein (Fla. Bar No. 813699)
fred.fein@clydeco.us
Stephanie G. Kolman (Fla. Bar. No. 958130)
stephanie.kolman@clydeco.us
CLYDE & CO US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Telephone: (305) 446-2646

*Attorneys for Defendants
ACIC Pharmaceuticals Inc. and
Methapharm, Inc*

**As to Amerisource Health Services LLC:**

*/s/ Larry R. Wood, Jr.*
Larry R. Wood, Jr.
Lauren E. O'Donnell
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Tel: 215-569-5735
LWood@BlankRome.com
ODonnell@BlankRome.com

*Attorneys for Defendant
Amerisource Health Services LLC*

**As to Ajanta Pharma Ltd., Ajanta Pharma
USA Inc., and Torrent Pharma Inc.:**

*/s/ Neal Seth*
Neal Seth
Corey Weinstein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel:  202.719.4179
nseth@wiley.law
cweinstein@wiley.law

*Counsel for Ajanta Pharma Ltd.,
Ajanta Pharma USA Inc., and
Torrent Pharma Inc.*

**As to Amneal Pharmaceuticals LLC,
Amneal Pharmaceuticals of New York,
LLC,  and Amneal Pharmaceuticals, Inc.:**

*/s/ Paul J. Cosgrove*
Paul J. Cosgrove
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-698-5104
pcosgrove@ulmer.com

Georgia Hatzis
Ulmer & Berne LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113
Tel: 216-583-7000
ghatzis@ulmer.com

*Attorneys for Defendants
Amneal Pharmaceuticals LLC,
Amneal Pharmaceuticals of New York, LLC,
and Amneal Pharmaceuticals, Inc.*

**As to ANDA Repository, LLC:**

*/s/ Bruno Reategui*
Bruno Reategui, FL Bar No. 1013936
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard, Suite 5300
Miami, FL 33131-2339
Telephone: (305) 415-3000
Facsimile: (305) 415-3001
bruno.reategui@morganlewis.com

Jeffrey R. Gargano
Gregory T. Fouts
Morgan, Lewis & Bockius LLP
77 West Wacker Dr.
Chicago, IL 60601-5094
Telephone: (312) 324-1000
Facsimile: (312) 324-1001
jeffrey.gargano@morganlewis.com
gregory.fouts@morganlewis.com

*Counsel for Defendant*
*ANDA Repository, LLC*

**As to ANI Pharmaceuticals, Inc.:**

*/s/ Elyse D. Echtman*
Elyse D. Echtman
ORRICK, HERRINGTON
& SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel:  (212) 506-3753
Fax:   (212) 506-5151
eechtman@orrick.com

*Attorneys for Defendant*
*ANI Pharmaceuticals, Inc.*

**As to Apotex Corp. and Apotex Inc.:**

*/s/ Terry M. Henry*
Terry M. Henry
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA  19103
Tel: (215) 569-5644
THenry@BlankRome.com

Jane Thomas
**BLANK ROME LLP**
1825 Eye Street NW
Washington, D.C. 20006
Tel: (202) 420-2577
JThomas@BlankRome.com

*Attorneys for Defendants*
*Apotex Corp. and Apotex Inc.*

**As to APPCO Pharma LLC:**

*/s/ Jordan S. Cohen*
Jordan S. Cohen
Florida Bar No. 551872
WICKER SMITH O'HARA MCCOY &
FORD, P.A.
515 E. Las Olas Boulevard
SunTrust Center, Suite 1400
Ft. Lauderdale, FL 33301
Tel: (954) 847-4800
jcohen@wickersmith.com

*Attorneys for Defendant*
*APPCO Pharma LLC*

**As to Aurobindo Pharma USA, Inc. and Auro Health LLC:**

*/s/ Joshua A. Klarfeld*
Joshua A. Klarfeld
Ulmer & Berne LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113
Tel: 216-583-7000
jklarfeld@ulmer.com

*Attorney for Defendants*
*Aurobindo Pharma USA, Inc., and Auro*
*Health LLC*

**As to Denton Pharma Inc., d/b/a Northwind Pharmaceuticals:**

*/s/ Barry J. Koopmann*
Barry J. Koopmann
Bowman and Brooke LLP
150 South Fifth Street, Suite 3000
Minneapolis, MN 55402
Tel: 612-339-8682
barry.koopmann@bowmanandbrooke.com

Daniel A. Rock (FL Bar No. 119365)
Bowman and Brooke LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel: 305-995-56000
daniel.rock@bowmanandbrooke.com

*Attorneys for Defendant*
*Denton Pharma Inc., d/b/a*
*Northwind Pharmaceuticals*

**As to Contract Pharmacal Corporation:**

*/s/ Joseph Mamounas*
Joseph Mamounas
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone 305.789.7491
Fax 305.789.7799
Email: joseph.mamounas@hklaw.com

*Counsel for Defendant*
*Contract Pharmacal Corporation*

**As to Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories Limited, and Dr. Reddy's Laboratories, S.A.**

*/s/ John R. Ipsaro*
John R. Ipsaro
Megan B. Gramke
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-698-5104
jipsaro@ulmer.com
mgramke@ulmer.com

*Attorneys for Defendants*
*Dr. Reddy's Laboratories, Inc., Dr. Reddy's*
*Laboratories Limited, and Dr. Reddy's*
*Laboratories, S.A.*

**As to Geri-Care Pharmaceuticals Corp.:**

*/s/ Julie B. Glassman*
Julie Bork Glassman
Florida Bar No. 014104
Eduardo Cosio
Florida Bar No. 714331
COSIO LAW GROUP
1430 S. Dixie Hwy., Suite 202
Coral Gables, FL 33146
Tel: 305-567-0503
j.glassman@cosiolaw.com
ecosio@cosiolaw.com

*Attorneys for Defendant*
*Geri-Care Pharmaceuticals Corp.*

**As to Granules USA, Inc.**

*/s/ Walter H. Swayze, III*
Walter H. Swayze, III
Lewis Brisbois Bisgaard & Smith, LLP
550 E. Swedesford Road
Suite 270
Wayne, PA 19087
Tel: 215-977-4100
Pete.Swayze@lewisbrisbois.com

*Attorney for Defendant*
*Granules USA, Inc.*

**As to Golden State Medical Supply, Inc.**

*/s/ Richards H. Ford*
Richards H. Ford
Florida Bar No. 0288391
WICKER SMITH O'HARA MCCOY &
FORD, P.A.
390 N. Orange Ave., Suite 1000
Orlando, FL 32801
Tel: (407) 843-3939
ORLcrtpleadings@wickersmith.com
rford@wickersmith.com

*Attorneys for Defendant*
*Golden State Medical Supply, Inc.*

**As to Heritage Pharmaceuticals Inc. and
Heritage Pharma Labs Inc.:**

*/s/ Cristina Cárdenas*
M. Cristina Cárdenas
Sujey Herrera
FBN: 0672491
Reed Smith, LLP
Tel: 786-747-0204
ccardenas@reedsmith.com
sherrera@reedsmith.com

*Attorneys for Defendants*
*Heritage Pharmaceuticals Inc. and*
*Heritage Pharma Labs Inc.*

39

**As to Hikma Pharmaceuticals International Limited and Hikma Pharmaceuticals USA Inc.:**

*/s/ Peter C. Kim*
Peter C. Kim
Litchfield Cavo LLP
303 W. Madison Street, Suite 300
Chicago, IL 60606
Tel: 312-781-6601
KimP@LitchfieldCavo.com

*Attorneys for Defendants*
*Hikma Pharmaceuticals International Limited*
*and Hikma Pharmaceuticals USA Inc.*

**As to Lannett Co., Inc.:**

*/s/ Eileen Oakes Muskett*
Eileen Oakes Muskett
FOX ROTHSCHILD LLP
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, NJ
Tel: (609) 572-2355
emuskett@foxrothschild.com

*/s/ Maura L. Burke*
Maura L. Burke, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 299-2000
mburke@foxrothschild.com

*/s/ Susanne M. Calabrese*
Susanne M. Calabrese
Fla Bar No: 89512
FOX ROTHSCHILD LLP
One Biscayne Tower, Suite 2750
2 South Biscayne Blvd.
Miami, FL 33131
Tel: (305) 442-6547
SCalabrese@FoxRothschild.com

*/s/ Allison L. Hollows*
Allison L. Hollows
FOX ROTHSCHILD LLP
101 Park Ave, Suite 1700
New York, NY 10017
Tel: (212) 878-7900
AHollows@FoxRothschild.com

*Attorneys for Defendant*
*Lannett Co., Inc.*

**As to Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Institutional LLC:**

*/s/ Jason M. Reefer*
Jason M. Reefer
Clem C. Trischler
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel: 412-263-2000
jmr@pietragallo.com
cct@pietragallo.com

*Attorneys for Defendants*
*Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Institutional LLC*

**As to Novitium Pharma:**

*/s/ Amy L. Baker*
Amy L. Baker
Florida Bar No. 86912
Wilson Elser
111 N Orange Ave., Ste. 1200
Orlando, FL 32801
Tel: 407-203-7599
amy.baker@wilsonelser.com

*Attorneys for Defendant*
*Novitium Pharma*

**As to Nostrum Laboratories Inc.:**

*/s/ Jonathan C. Abel*
Jonathan C. Abel
Florida Bar No. 370721
Drew M. Levin
Florida Bar No. 0048419
Conroy Simberg
3440 Hollywood Boulevard, Second Floor
Hollywood, FL 33021
Tel: 954-961-1400
eservicehwd@conroysimberg.com
jabel@conroysimberg.com

*Attorneys for Defendant*
*Nostrum Laboratories Inc.*

**As to PAI Holdings, LLC:**

*/s/ Jennifer Snyder Heis*
Jennifer Snyder Heis
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-698-5058
jheis@ulmer.com

*Attorneys for Defendant*
*PAI Holdings, LLC*

**As to Par Pharmaceuticals, Inc.:**

*/s/ Lisa M. Baird*
Edward M. Mullins
Florida Bar:  863920
Lisa M. Baird
Florida Bar:  961191
lbaird@reedsmith.com
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
Tel: 786-747-0200
emullins@reedsmith.com
lbaird@reedsmith.com

*Attorneys for Defendant*
*Par Pharmaceuticals, Inc.*

**As to Precision Dose, Inc.:**

*/s/ Tracy Zurzolo Quinn*
Tracy Zurzolo Quinn
Holland & Knight LLP
2929 Arch Street, Suite 800
Philadelphia, PA  19104
Tel:  215.252.9522
Fax:  215.867.6070
tracy.quinn@hklaw.com

*Attorneys for Defendant*
*Precision Dose, Inc.*

**As to Sandoz Inc.**

*/s/ Donald R. McMinn*
Donald R. McMinn
Heather A. Pigman
Florida Bar No. 0119938
Hollingsworth LLP
1350 I Street, NW
Washington, DC  20005
Tel:  (202) 898-5800
dmcminn@hollingsworthllp.com
hpigman@hollingsworthllp.com

*Attorneys for Defendant Sandoz Inc.*

**As to Strides Pharma, Inc.:**

*/s/ Douglas Tween*
Douglas Tween
John Eichlin
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
Tel: 212-903-9000
douglas.tween@linklaters.com
john.eichlin@linklaters.com

*Attorneys for Defendant*
*Strides Pharma, Inc.*

**As to Sun Pharmaceutical Industries, Inc. f/k/a Ranbaxy Pharmaceuticals Inc., Ranbaxy Inc., and Taro Pharmaceuticals U.S.A., Inc.:**

*/s/ Anthony R. McClure*
Anthony R. McClure
Florida Bar No. 102753
Sara K. White
Florida Bar No. 0086014
Porter Wright Morris & Arthur, LLP
9132 Strada Place, Third Floor
Naples, Florida 34108
Tel: 239-593-2900
amcclure@porterwright.com
swhite@porterwright.com

*Attorneys for Defendants Sun Pharmaceutical Industries, Inc. f/k/a Ranbaxy Pharmaceuticals Inc., Ranbaxy Inc., and Taro Pharmaceuticals U.S.A., Inc.*

**As to Wockhardt USA LLC (f/k/a Wockhardt USA Inc.) and Wockhardt Ltd.:**

*/s/ Neil Merkl*
Neil Merkl
Clifford E. Katz
Sojin Yoon
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Tel: 212-808-7811
nmerkl@kelleydrye.com
ckatz@kelleydrye.com
syoon@kelleydrye.com

*Attorneys for Defendants Wockhardt USA LLC (f/k/a Wockhardt USA Inc.) and Wockhardt Ltd.*

**As to Teva  Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and  Actavis Mid Atlantic, LLC**

*/s/ Lori G. Cohen*
Lori G. Cohen, Esq.
cohenl@gtlaw.com
Sara K. Thompson, Esq.
thompsons@gtlaw.com
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Tel: (678) 553-2100
Fax: (678) 553-2212

*Counsel for Defendants Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., and Actavis Mid Atlantic, LLC*

**As to Zydus Pharmaceuticals (USA) Inc.:**

*/s/ Arthur J. Liederman*
Arthur J. Liederman
Nicole Battisti
Morrison Mahoney LLP
88 Pine Street
Suite 1900
New York, NY  10005
Tel: 212- 825-1212
aliederman@morrisonmahoney.com
nbattisti@morrisonmahoney.com

Nichole M. Mooney
Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A.
Florida Bar No. 057908
Post Office Box 2346
Orlando, Florida 32802-2346
Tel: 407-841-1200
nmooney@deanmead.com

*Attorneys for Defendant Zydus Pharmaceuticals (USA) Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 24, 2020, I electronically filed the foregoing **GENERIC MANUFACTURERS' AND REPACKAGERS' RULE 12 MOTION TO DISMISS ON THE GROUND OF PREEMPTION AND INCORPORATED MEMORANDUM OF LAW** with the Clerk of Court using the CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Thomas J. Yoo*
Thomas J. Yoo

44