## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)             **MDL NO. 2924**
PRODUCTS LIABILITY             **20-MD-2924**
LITIGATION

                          **JUDGE ROBIN L. ROSENBERG**
              **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS AND/OR STRIKE CONSOLIDATED CONSUMER AND THIRD PARTY PAYOR CLASS ACTION COMPLAINTS ON GROUNDS OF IMPERMISSIBLE SHOGUN PLEADINGS AND LACK OF ARTICLE III STANDING

DATED:  October 1, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ............................................................................................1

BACKGROUND .............................................................................................3

    A. Litigation History ................................................................................3

    B. The Class Complaints.............................................................................4

    C. The Geographic Scope of the Class Complaints ....................................................9

ARGUMENT ................................................................................................10

I. Plaintiffs Plausibly Plead Article III Standing ................................................................10

    A. Standing Focuses on Injury in Fact, Which Plaintiffs Have Alleged ........................10

    B. Plaintiffs Adequately Allege Which Defendant Caused Their Injury........................11

        1. Plaintiffs need not allege with certainty which Defendant harmed them ..............12

        2. Standing does not require class representative plaintiffs to suffer injuries
            sufficient to underlie claims by unnamed putative class members ......................14

        3. The Class Complaints' allegations that each Defendant sold
            ranitidine to at least one class representative Plaintiff are plausible ...................17

    C. Named Plaintiffs Do Not Lose Article III Standing for the Claims
       Brought in Their Respective States, Merely By Alleging Claims in Their
       Representative Capacity for Putative Class Members Residing in Other States .......17

II. The Class Complaints, Meant to Consolidate Claims Within This MDL,
    Should Not Be Dismissed on the Grounds of Shotgun Pleading....................................21

    A. The Purpose of the Shotgun Pleading Doctrine Is to Give Defendants
       Fair Notice of What Claims Are Being Brought Against Them................................22

    B. The Class Complaints Appropriately Navigate the Shotgun Pleading Standards
       in the Context of Presenting Consolidated Class Claims in an MDL........................23

1. Plaintiffs do not adopt by reference allegations in successive counts .................23

2. Plaintiffs do not associate non-specific factual allegations with specific claims.................................................................................................23

3. Plaintiffs carefully articulate claims into discrete count......................................24

4. Plaintiffs link their claims to Defendants with the requisite specificity to put Defendants on notice ...................................................................................24

C.  Defendants' Shotgun Pleading Objections Do Not Warrant Dismissal...................24

III.  The Class Complaints As Pleaded Present a Manageable Path Forward ......................26

CONCLUSION.................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*,
   77 F.3d 364 (11th Cir. 1996) ................................................................... 26

*Armstrong v. Martin Marietta Corp.*,
   138 F.3d 1374 (11th Cir. 1998) ................................................................ 16

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................................. 10

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ................................................................................. 15

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ................................................................... 28

*City of Miami Gardens v. Wells Fargo & Co.*,
   931 F.3d 1274 (11th Cir. 2019) ................................................................ 12

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
   704 F.3d 413 (5th Cir. 2013) ................................................................... 27

*DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ...................................................... 20

*Doremus v. Bd. of Ed. of Hawthorne*,
   342 U.S. 429 (1952) ........................................................................... 11, 18

*Fallik v. Nationwide Mut. Ins. Co.*,
   162 F.3d 410 (6th Cir. 1998) ................................................................... 21

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
   344 F.3d 1263 (11th Cir. 2003) ................................................................ 13

*Fox v. Ritz-Carlton Hotel Co., L.L.C.*,
   No. 19-10361, 2020 WL 5784768 (11th Cir. Sept. 29, 2020) ......................... *passim*

*Freeman v. Wyeth*,
   764 F.3d 806 (8th Cir. 2014) ................................................................... 27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................. 11, 12

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ........................................................................ 15

*Glover v. District Board of Trustees of Palm Beach State College*,
    2019 WL 6340087 (S.D. Fla. Nov. 27, 2019) ....................................22

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) .............................................................. 21

*In re Asbestos Prods. Liab. Litig.*,
    718 F.3d 236 (3d Cir. 2013) ............................................................. 27

*In re Checking Account Overdraft Litig.*,
    275 F.R.D. 666 (S.D. Fla. 2011) ...................................................... 21

*In re Checking Account Overdraft Litig.*,
    No 1:09-MD-02036, 2016 WL 5848730 (S.D. Fla. July 5, 2016) ............. 20

*In re Ford Tailgate Litig.*,
    No. 11-CV-02953, 2015 WL 751772 (N.D. Cal. Nov. 25, 2015) .............. 27

*In re Grand Theft Auto Video Game Consumer Litig. (No. II)*,
    No. 06MD1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) ................. 20

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    No. 1:08-WP-65000, 2010 WL 2756947 (N.D. Ohio July 12, 2010) ........ 28

*Isaias v. Martin Cty.*,
    No. 2:18-CV-14171, 2018 WL 8660342 (S.D. Fla. July 17, 2018) ...........22

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ........................................................ 20

*La Mar v. H & B Novelty & Loan Co.*,
    489 F.2d 461 (9th Cir. 1973) ............................................................ 16

*Langan v. Johnson & Johnson Consumer Cos.*,
    897 F.3d 88 (2d Cir. 2018) ................................................... 18, 19, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................................ 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 11, 12, 18

*Mills v. Foremost Ins. Co.*,
  511 F.3d 1300 (11th Cir. 2008) ................................................................................. 15

*Moore v. Comfed Sav. Bank*,
  908 F.2d 834 (11th Cir. 1990) .................................................................................. 16

*Morrison v. YTB Int'l, Inc.*,
  649 F.3d 533 (7th Cir. 2011) ............................................................................... 18, 19

*Payton v. Cty. of Kane*,
  308 F.3d 673 (7th Cir. 2002) .................................................................................... 16

*Philips v. Ford Motor Co.*,
  No. 14-CV-02989, 2015 WL 4111448 (N.D. Cal. July 7, 2015) ................................. 27

*Prado-Steiman v. Bush*,
  221 F.3d 1266 (11th Cir. 2000) ......................................................................... 13, 15, 26

*Resnick v. AvMed, Inc.*,
  693 F.3d 1317 (11th Cir. 2012) ............................................................................... 11

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................. 18

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................. 16, 18

*Summers v. Tice*,
  199 P.2d 1 (Cal. 1948) ............................................................................................ 13

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................................ 11

*Thole v. U. S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ............................................................................................ 18

*United Techs. Corp. v. Mazer*,
  556 F.3d 1260 (11th Cir. 2009) ................................................................................ 12

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ................................................................................................ 18

*Watts v. City of Port St. Lucie,*,
    No. 2:15-CV-14192, 2015 WL 7736532 (S.D. Fla. Nov. 30, 2015) ........................................ 22

*Weiland v. Palm Beach Cty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ........................................................................... passim

*Wilson v. Everbank, N.A.*,
    77 F. Supp. 3d 1202 (S.D. Fla. 2015) ............................................................... 20, 21

Statutes

28 U.S.C. § 1332(d)(2)(A) ................................................................................................ 20

28 U.S.C. § 1332(d)(4) .................................................................................................... 19

Other Authorities

1 *Newberg on Class Actions* § 2:3 (5th ed. 2020) ........................................................ 16

Plaintiffs submit the following memorandum of law in opposition to Defendants' Amended Motion to dismiss and/or strike consolidated consumer and third party payor class action complaints on grounds of impermissible shotgun pleadings and lack of Article III standing. *See* D.E. 1630 (Standing Mot.).

## INTRODUCTION

Article III standing requires a plaintiff to show injury in fact, fairly traceable to wrongful conduct, that is redressable by the court. To have standing as a "class representative," an individual "must also 'be part of the class and possess the same interest and suffer the same injury as the class members.'" *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, No. 19-10361, 2020 WL 5784768, at *4 (11th Cir. Sept. 29, 2020) (citations omitted). Plaintiffs easily surmount this threshold jurisdictional hurdle. Plaintiffs have alleged injury from purchasing and ingesting ranitidine, just like the absent class members they seek to represent. They have alleged these injuries are traceable to Defendants' wrongful manufacture, distribution, or sale of ranitidine. They seek money damages and the creation of a medical monitoring program as redress. Ergo, Plaintiffs have standing.

To put standing in dispute, Defendants take the true principle that standing must be assessed claim-by-claim, and transmogrify it into the requirement that a class representative's standing be assessed *both* defendant-by-defendant and state-by-state. Neither requirement is sound, and both "mix up the class representative standing inquiry. They conflate the requirements of individual standing with those for a class representative." *Id.* at *5.

First, 115 Consumer Plaintiffs alleged they purchased branded Zantac, and thus have standing against GlaxoSmithKline (GSK). Another 140 Consumer Plaintiffs alleged they purchased OTC Zantac and the time periods of their purchases; thus their injury is traceable to each OTC Brand Defendant based on their date(s) of purchase. Approximately 180 Consumer Plaintiffs require discovery, however, to determine which specific Generic and Distributor Defendants manufactured and delivered the specific drugs they purchased. But even if these 180 Consumer Plaintiffs were sure, so long as "the named plaintiff and class members have the same interest and suffer the 'same injury,'" *id.*, class representatives need not allege they purchased from the same defendant as everyone in the class. It is enough for Article III that the class representative has standing for his claim and the putative class member has standing for her claim. Whether the former may represent the latter turns on Rule 23, not standing, and thus is premature at this juncture.

1

Second, a state-by-state assessment makes no sense because the substantive law underlying an absent class member's claim has no bearing on whether named plaintiffs adequately alleged standing *for themselves*.   Standing looks at "the *nature* of the injury," *id.* (emphasis added), not substantive law; and because plaintiffs in different states can suffer the "same injury," they also can be in the same class.   *Id.*   If the law of different states were sharply different—which Defendants have not raised—Rule 23 may require sub-classes; but Article III jurisdiction must be decided before considering what law applies, let alone how the choice of law bears on the requirements of Rule 23.   Here, as in *Fox*, "[b]ecause [Plaintiffs] ha[ve] the same interest and suffered the same injury as the class members, [they] ha[ve] class representative standing to bring the claims [they] alleged."   *Id.*

Unable to defeat jurisdiction, Defendants attack the pleadings. But Defendants' shotgun pleading argument ignores the purposes and limits of that doctrine in the Eleventh Circuit.   The essential "characteristic of all types of shotgun pleadings is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).   As their extensive arguments across multiple motions showcase, Defendants are not confounded by the allegations in any of the Complaints.   They merely disagree with the allegations, or believe they fail to state a claim.   The proper course is for Defendants to answer and deny the allegations under Rule 7, or move to dismiss for failure to state a claim under Rule 12(b)(6).   Shotgun pleading exists only for the rare occasion when the pleadings lack sufficient clarity for either of those responses.   Ignoring those avenues, Defendants seek the extreme remedies of striking or dismissing the pleadings, which the Eleventh Circuit has countenanced only "[w]here a plaintiff fails to make meaningful modifications to her complaint," after a court requests repleading.   *Id.* at 1321 n.10.   Dismissing on those grounds requires finding "a clear pattern of delay or willful contempt" and "that lesser sanctions would not suffice."   *Id.* (quotation omitted).   No such pattern exists (nor has it even been suggested).   Defendants' motion should be denied.

## BACKGROUND

In November 2019 the U.S. Food & Drug Administration (FDA) confirmed that Zantac and its generic equivalents produce unacceptable levels of NDMA, a probable carcinogen. Consumer Class Action Complaint (CCAC), D.E. 889 ¶¶ 11, 706. All ranitidine-containing products (ranitidine) were pulled from shelves nationwide. *Id.* ¶¶ 707–14. For decades, those products had been sold to consumers who were kept in the dark of the latent risks they posed. *Id.* ¶¶ 8–12, 449–58, 496–505. Consumers and third-party payors (TPPs) spent billions on these injurious products. *Id.* ¶¶ 1–2, 427, 499, 756–57. *See also* Consolidated Third Party Payor Class Complaint (TPPCAC), D.E. 888, ¶¶ 495, 522,562, 577, 586, 818, 675.

### A. Litigation History

After learning the truth about ranitidine, Plaintiffs began filing lawsuits around the country. The Consumer Plaintiffs here seek damages for purchasing a worthless product and the medical expenses necessary to monitor for cancer. The TPP Plaintiffs seek recovery for the out-of-pocket losses of paying for a malignant drug.

This Court ordered Plaintiffs' leadership to file Master Class Complaints. To implement this directive, the Consumer Plaintiffs and TPP Plaintiffs pleaded federal and state claims on behalf of consumers and TPPs nationwide. The pleaded claims are similar, but ranitidine itself was sold for many years and by many Defendants. While Plaintiffs' leadership interviewed all Consumer Plaintiffs to vet their claims, Plaintiffs' leadership did not have the benefit of discovery, including such fundamental matters as when and precisely which Defendants sold which ranitidine. Plaintiffs' leadership nonetheless compiled detailed information on the Defendants from public sources. This included the time periods over which the Brand-Name Manufacturer Defendants each marketed and sold OTC Zantac (only GSK marketed and sold prescription Zantac), TPPCAC ¶¶ 29–45; CCAC ¶¶ 260–76, as well as when the Generic Manufacturer Defendants entered the ranitidine market by filing Abbreviated New Drug Applications (ANDAs), CCAC 889 ¶¶ 445–48. The Consumer Plaintiffs sued four distributors, three of which processed 92% of the ranitidine sold nationwide, CCAC ¶ 358 as well as 19 families of retailers with a substantial market share of ranitidine sales. *Id.* ¶¶ 368–414. Plaintiffs' leadership then overlaid that information on the Consumer Plaintiffs' purchases, including (a) the type of ranitidine (i.e., branded OTC, branded prescription, generic OTC, and/or generic prescription) purchased or used; (b) the time period over

3

which each Consumer Plaintiff made purchases; (c) which retailers the Consumer Plaintiffs purchased from; and (d) in which states the purchases were made.

**B.    The Class Complaints**

Consumer Plaintiffs and TPP Plaintiffs both allege economic injury resulting from the purchase of a worthless, dangerous drug.  Consumer Plaintiffs also allege an additional form of injury: the future costs of medical monitoring due to their increased risk of a cancer diagnosis. Below is a table summarizing the causes of action asserted in the CCAC:

| Cause of Action | Brands | Generics | Repackagers | Distributors | Retailers | Description |
|---|---|---|---|---|---|---|
| RICO | ● | | | | | Count 1: Nationwide class |
| Unjust Enrichment | ● | ● | ● | ● | ● | Count 2: Nationwide class or alternative state law classes |
| Magnuson-Moss | ● | ● | ● | ● | ● | Count 3: Federal cause of action incorporating state law |
| Common Law Fraud | ● | ● | ● | | | Count 4: Nationwide class or alternative state law classes |
| Negligence (per se) | ● | ● | ● | ● | ● | Count 5: State law classes |
| Battery | ● | ● | ● | ● | ● | Count 6: State law classes |
| Breach of Express Warranties | ● | ● | ● | ● | ● | Multiple counts: State law classes |
| Breach of Implied Warranties | ● | ● | ● | | | Multiple counts: State law classes |
| Products Liability Failure to Warn | ● | ● | ● | ● | ● | Multiple counts: State law classes |
| Products Liability Manufacturing Defect | ● | ● | ● | ● | ● | Multiple counts: State law classes |
| Products Liability Design Defect | ● | ● | ● | ● | ● | Multiple counts: State law classes |
| UDAP | ● | ● | ● | ● | ● | Mutliple counts: State law classes |
| Medical Monitoring (Remedy) | ● | ● | ● | ● | ● | Multiple counts: Nationwide class and state law classes |

Figure 1: Summary of causes of action brought in Consolidated Consumer Class Action Complaint (D.E. 889)

And this table summarizes the causes of action asserted in the TPPCAC:

| Cause of Action | Brands | Generics | Repackagers | Distributors | Retailers | Description |
|---|---|---|---|---|---|---|
| RICO | ● | | | | | Count 1: Nationwide class |
| Breach of Express Warranties | GSK | ● | | | | Count 2: Nationwide class or alternative state law classes |
| Breach of Implied Warranties | GSK | ● | | | | Count 3: Nationwide class or alternative state law classes |
| Magnuson-Moss | GSK | ● | | | | Count 4: Federal cause of action incorporating state law |
| Fraud | GSK | ● | | | | Count 5: Nationwide class or alternative state law classes |
| Negligent Misrepresenation | GSK | ● | | | | Count 6: Nationwide class or alternative state law classes |
| UDAP | GSK | ● | | | | Count 7: State law classes |
| Unjust Enrichment | GSK | ● | | | | Count 8: Nationwide class or alternative state law classes |
| Negligence | GSK | ● | | | | Count 9: Nationwide class or alternative state law classes |

Figure 2: Summary of causes of action brought in Consolidated Third Party Payor Class Complaint (D.E. 888)

For branded prescription Zantac, all of those losses are traceable to Defendant GSK. *See* TPPCAC ¶¶ 190–99; CCAC ¶¶ 427–437. Each TPP Plaintiff asserted such claims. *See* TPPCAC ¶¶ 22, 25, 28, 216. The CCAC identifies 115 Consumer Plaintiffs who purchased and used branded prescription Zantac:

| Defendant | Consumer Plaintiffs |
|---|---|
| GSK | ¶¶ 21, 23-25, 27, 29-30, 32, 34, 37-39, 42-46, 57, 65-68, 74-76, 80-82, 84-85, 89-90, 94, 96-98, 100-01, 103-07, 109, 112, 115, 117-18, 120, 127, 129-32, 137, 141-43, 148, 150, 153, 155-56, 158-60, 162, 164-65, 170, 172-73, 175-76, 181, 183, 185-89, 192-95, 199, 201-02, 206, 208, 211-12, 216-17, 220, 222, 225-30, 232-35, 238, 244-45, 250-51, 254, 256-58 |

Figure 3: Consumer Plaintiffs who purchased prescription branded Zantac with reference to D.E. 889 at ¶ no.

Consumer Plaintiffs brought claims for branded OTC Zantac (the TPP Plaintiffs bring no such claims as they only reimbursed for prescriptions). The right to manufacture and sell branded OTC Zantac shifted over its 25 years on the market. The CCAC identifies which Consumer Plaintiffs purchased OTC Zantac and the time periods of their use of Zantac / Ranitidine. *See, e.g.*, CCAC ¶ 21 ("Plaintiff purchased and used Ranitidine-Containing Products, including prescription and OTC Zantac and ranitidine syrup and Zantac tablets and capsules, from approximately 2013 to 2020 . . . ."). No fewer than 33 Consumer Plaintiffs purchased Zantac / Ranitidine in some form during *each of the time periods* that a Brand-Name Defendant sold Zantac:



Consumer Plaintiffs who purchased OTC Zantac (number of plaintiffs alleging Zantac / Ranitidine usage in each year)

Plaintiffs have similarly robust coverage for the Generic Defendants. The CCAC provides charts reflecting the earliest dates each filed ANDAs. *See* CCAC ¶ 447.[1] Unlike the Brands, the Generics did not have exclusive rights to sell ranitidine. Consequently, the CCAC alleges when each Generic Defendant entered the market, making a distinction between Apotex, for example, which entered the market in 1997 and Ajanta, which did so in 2018. *See id.* For that reason, any of the Consumer Plaintiffs who purchased generic ranitidine between 1997 to 2020 may have

---

[1] The exception is Geri-Care that, as a Repackager, would not have operated under its own ANDA.

purchased and/or consumed ranitidine manufactured by Apotex.  On the other hand, only the Consumer Plaintiffs who purchased generic ranitidine between 2018 and 2020 may have purchased or consumed Ajanta's ranitidine.



Figure 5: Consumer Plaintiffs who purchased generic Ranitidine (number of plaintiffs alleging Zantac / Ranitidine usage in each year)

Without discovery, it is effectively impossible for Consumer Plaintiffs to identify which of the Generics manufactured the specific drugs they purchased.  Still, the above chart shows that as many as 180 Consumer Plaintiffs purchased and consumed ranitidine during the time when the 22 Generic Defendants were making it.  Similarly, the TPP Plaintiffs allege they issued reimbursements for prescription ranitidine during the entire time at issue.  TPPCAC ¶¶ 218–20.

In addition to the claims against the Brand-Name and Generic Manufacturer Defendants, the Consumer Plaintiffs (but not the TPP Plaintiffs) bring claims against distributors and retailers. The CCAC alleges that three Distributor Defendants accounted for 92% of the distribution chain.

*See* CCAC ¶ 358. As for the retailers, the Consumer Plaintiffs identify where they purchased ranitidine.  Under several of the Consumer Plaintiffs' product liability theories, the ultimate seller of a defective product is liable for the harm caused, even when that harm is the result of the wrongful acts of an "upstream" Defendant.  *See* Plaintiffs' Opp. to Generic and Repackager Defendants' motion to dismiss on preemption grounds § I.B.  Not all such retail outlets would be appropriately managed in a class action.  But for each Retailer Defendant named in the CCAC, there is at least one Consumer Plaintiff (and typically many more) that allege he or she purchased from that Defendant as shown by the following chart:

| Defendant | Consumer Plaintiffs |
|---|---|
| Albertson's \| Safeway | ¶¶ 29, 31, 33, 37, 44, 194, 228, 250-52, 254 |
| Amazon | ¶ 126 |
| Costco | ¶¶ 36, 86, 206, 228, 252-54 |
| CVS | ¶¶ 21, 24, 32, 38, 40-42, 45, 51-56, 58-63, 65, 68, 71, 74-75, 78, 81, 83, 87, 89-90, 97-98, 100, 103, 109, 112, 114, 116-18, 123, 125-26, 146, 150, 154-55, 158, 160, 170-71, 173, 177, 179-80, 187, 190-91, 193, 197, 201-02, 204, 207-08, 212, 216-18, 223, 225, 228-29, 231, 233, 235, 241-43, 245, 255-56, 258 |
| Dollar General | ¶¶ 23, 25, 28, 72, 88, 94, 101, 160, 193, 209, 212, 236 |
| Dollar Tree \| Family Dollar | ¶¶ 23, 81, 88, 94, 172, 212, 233, 236 |
| Giant Eagle | ¶ 199 |
| H-E-B | ¶¶ 227-28, 233-34 |
| Hy-Vee | ¶ 101 |
| Kmart | ¶ 104, 150, 209, 252 |
| Kroger \| Fred Meyer \| Smith Fooods | ¶¶ 81, 85-86, 94, 105, 118, 153, 168, 190, 192-93, 209, 212, 228, 239, 250 |
| Medicine Shoppe | ¶ 145 |
| Price Chopper | ¶ 149 |
| Publix | ¶¶ 24, 53, 60, 73, 75, 77, 79 |
| Rite Aid | ¶¶ 23, 39-40, 44, 47, 103-04, 109, 115-16, 123, 136, 162, 171, 173-74, 178, 187, 200-01, 247-49, 254 |
| Shop-Rite | ¶ 247 |
| Walgreens | ¶¶24, 26, 33-35, 37-38, 44, 50, 53-54, 57-58, 60, 62-63, 65, 68, 71, 74-75, 77, 80, 86-90, 92-93, 99, 101-03, 109, 112-13, 115, 120-21, 126, 128-30, 134-36, 138, 143, 148, 150, 159, 161-62, 164, 166, 172, 179, 181-83, 189-90, 192, 195-96, 203, 205-06, 208, 210, 216-18, 225, 227, 230-31, 235, 239, 241-43, 248-50, 252, 257 |
| Walmart \| Sam's Club | ¶¶ 22, 25, 27-29, 31, 33-35, 42-44, 47, 60, 66-67, 69-70, 72-73, 80, 82, 84, 86, 92-93, 95-96, 99-100, 103, 105-07, 111, 116, 120-21, 127-28, 130, 133, 135, 137, 139, 141-42, 147-49, 151-52, 157, 161, 164-65, 167, 180, 185, 188, 191, 194, 202, 206, 208-09, 211, 213, 215, 220-22, 224, 226-27, 232-37, 240, 244, 247, 252, 254-55 |
| Winn-Dixie | ¶ 23 |

Figure 6: Consumer Plaintiffs who purchased from specific retailers with reference to D.E. 889 at ¶ no.

### C.      The Geographic Scope of the Class Complaints

Both the CCAC and TPPCAC assert nationwide claims as well as claims under the laws of the 50 states, the District of Columbia, and Puerto Rico.  Consumer Plaintiffs hail from across the nation, and allege that they are citizens of 41 states, the District of Columbia and Puerto Rico.  CCAC ¶¶ 21–258.  Those Consumer Plaintiffs allege purchases in 45 states, the District of Columbia, and Puerto Rico.  Even distinguishing between generic ranitidine and Zantac, the number of states in which the Consumer Plaintiffs reside is robust as shown below:



Figure 7: Consumer Plaintiffs who purchased brand name Zantac -by state of residence-

Figure 8: Consumer Plaintiffs who purchased generic Ranitidine -by state of residence-

The TPP Plaintiffs are citizens of three different states and allege reimbursements for prescription Zantac / generic ranitidine in 31 states.  TPPCAC ¶¶ 22, 25, 28.  The TPP Plaintiffs thus were injured in those 31 states (which is the only question at this stage), and have alleged claims on behalf of putative class members in the remainder of the states in their representative capacity.

Plaintiffs recognize that the Class Complaints—particularly the CCAC—are lengthy.  This is a complex case.  While Plaintiffs claim no perfect recipe for pleading the claims necessary to account for the vast harm at issue in this MDL, the approach they took was in service of consolidating all justiciable claims before this Court and putting Defendants on notice of all claims.  As set forth below, Defendants' position would introduce far greater complexity, requiring many more named Plaintiffs and thousands of additional pages of pleading.  Nothing in the Constitution requires such an approach.

# ARGUMENT

## I.   Plaintiffs Plausibly Plead Article III Standing

Article III, Section 2 of the Constitution extends the judicial power to "Cases" or "Controversies."  Since the dawn of the Republic, certain sorts of disputes—such as ones lacking disagreement between the parties or involving purely psychic injury—did not meet the case-or-controversy definition, depriving litigants of "standing" to obtain a binding judgment from a federal tribunal.  None of the concerns animating standing doctrine are applicable here.  Each Plaintiff—Consumers and TPPs—seek economic damages from Defendants who vigorously contest their culpability.  That is the archetypal dispute that federal courts have jurisdiction to resolve.  Defendants' true complaint has nothing to do with constitutional limits on the judicial power.  It is instead that the Plaintiffs in the Class Complaints have justiciable claims that are *insufficiently similar* to the ones held by putative, absent class members.  At bottom, Defendants contend that the Plaintiffs can only represent a narrower subset of the injured population.  Though some precedent admittedly (and sloppily) analyzes Defendants' argument under the doctrine of "standing," that is a category error, as the Eleventh Circuit emphasized just *two days ago*.  Once a named plaintiff establishes his or her own case or controversy, the ability to vindicate the rights of putative class members turns exclusively on interpreting and applying Rule 23.  The question of representative capacity should not be addressed as a threshold question of jurisdiction.  It should await briefing and argument on class certification.

### A.   Standing Focuses on Injury in Fact, Which Plaintiffs Have Alleged

To police the boundary of standing, the Supreme Court has held that no case or controversy exists if a plaintiff lacks "a personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 205 (1962).  The "irreducible constitutional minimum of standing" requires three elements:

> [1] an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]
>
> [2] a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[; and]

> [3] it must be likely, as opposed to merely speculative, that the injury
> will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations, citations, and alterations removed).

Plaintiffs easily meet this constitutional minimum, and Defendants do not claim otherwise. The financial harm of buying a defective product is a classic "direct dollars-and-cents injury" that is the hallmark of standing. *Doremus v. Bd. of Ed. of Hawthorne*, 342 U.S. 429, 434 (1952). And the Consumer Plaintiffs' medical monitoring claims are also sufficient because "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (individuals who refrained from visiting a river for fear illegal discharges rendered it polluted had standing because fear of harm was not "improbable"). The injuries, in short, are concrete, particularized, and actual or imminent. And this Court can fashion a simple remedy when it finds liability: ordering Defendants to create a fund to pay for medical monitoring and to reimburse Plaintiffs' for their ranitidine purchases. *Cf. Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (finding standing for persons alleging actual identity theft resulting from data breach whose injuries could be redressed through compensation). *See* TPPCAC ¶¶ 715–24; CCAC ¶¶ 491–95. That should be the beginning and the end of the jurisdictional analysis.

Indeed, Defendants implicitly concede that Plaintiffs have suffered constitutionally sufficient injuries for themselves, Standing Mot. at 17–18, confirming that Plaintiffs are *not* trying to bootstrap jurisdiction through the injuries of putative class members. But in a move that would scupper *all* class actions if taken to its logical conclusion, Defendants variously argue that a named Plaintiff: (1) cannot sue *all* Defendants who caused the same sorts of injuries to absent class members, *id.* at 17–25; and (2) cannot bring claims for out-of-state absent class members, *id.* at 25–29. Both arguments fail.

### B.    Plaintiffs Adequately Allege Which Defendant Caused Their Injuries

Defendants' first argument could be taken in two senses. Either (a) Plaintiffs who were harmed by ranitidine lack standing because they are unsure which precise Defendant harmed them, or (b) Plaintiffs who were harmed by ranitidine have standing to sue *only* the Defendants who made, distributed, or sold *their* specific version of the drug; they cannot bring claims by *others*

who were harmed by ranitidine in the same way by a different set of Defendants. This argument is spurious in either form. The first ignores the procedural posture, leaping to summary judgment, when it is black-letter law that standing is evaluated more leniently on the pleadings. The second argument sounds the death of Rule 23. No named plaintiff actually suffers the injury associated with *each* alleged claim. The putative class member suffers her own injury and has her own cause of action. If Defendants' position were taken literally, the class-action device would be unconstitutional in all of its applications.

> 1.    *Plaintiffs need not allege with certainty which Defendant harmed them*

If a plaintiff alleged only an individual claim against ranitidine manufacturers, but was not sure which entity manufactured the generic ranitidine she purchased, would she lack standing? The answer is no. Any manufacturer could plausibly have caused her injury. No constitutional problem exists. Depending on substantive state law, such a claim might be dismissed under Rule 12(b)(6)—on duty, causation, or another element—but Article III does not require a plaintiff to plead precisely who among plausible tortfeasors caused her injury. Any alternative rule would risk "rais[ing] the standing hurdle higher than the necessary showing for success on the merits." *Friends of the Earth*, 528 U.S. at 181.

First, standing doctrine tracks the procedural posture of the case. Where a reasonable investigation under the circumstances points to multiple possible tortfeasors, a plaintiff has a good-faith basis to sue each one in the alternative. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273–74 (11th Cir. 2009) ("Rule 8(d) . . . expressly permits the pleading of both alternative and inconsistent claims. Thus, [a] complaint is not subject to dismissal simply because it alleges that both [defendant A], individually, and [defendant B] committed the tortious conduct, even if it would be impossible for both to be simultaneously liable . . . ." (footnote omitted)). There is no "standing" problem with this approach, as the Court must accept the pleadings as true to ascertain if there is injury, traceability, and redressability. *Lujan*, 504 U.S. at 560–61 (elements of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").

After discovery, the evidentiary demands on a plaintiff go up, and the Court may insist that a litigant train its sights on the discrete defendants responsible for her injuries. *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1283 (11th Cir. 2019) ("At the summary-judgment stage, the burden to establish standing is satisfied only if affidavits or other submissions indicate

that a genuine issue of material fact exists concerning standing." (quotation omitted)).  That heightened burden is grounded in procedure and common sense, not the constitutional limits of Article III's vesting clause.  The detail Defendants demand (based on information in their control) is simply not required at the pleading stage.  *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("Importantly, in evaluating Article III's causation (or traceability) requirement, we are concerned with something less than the concept of proximate cause." (quotation marks omitted)); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000) ("[T]he factual record is not fully developed—making resolution of individual standing claims impossible.").

Second, quite apart from the pleading standard, standing cannot require certainty regarding which defendant caused an injury because not even common law claims always require that. Consider the classic case of *Summers v. Tice*, 199 P.2d 1 (Cal. 1948) (in banc).  During an ill-fated quail hunt, two hunters (Tice and Simonson) simultaneously fired their shotguns, and a third (Summers) suffered a wound to his eye.  *Id.* at 2.  Who shot his eye, Tice or Simonson?  Summers did not know.  The California Supreme Court relaxed the causation standard for negligence, noting that "the innocent wronged party should not be deprived of his right to redress.  The wrongdoers should be left to work out between themselves any apportionment."  *Id.* at 5.  *Summers* evolved from concerted action cases but held that "the difficulty of proof is the reason . . . not merely [that] they acted in conscious concert."  *Id.* at 4.

On Defendants' argument, deciding this common law claim would have been outside a federal court's judicial power and *unconstitutional*.  The injury-in-fact to Summers' eye, traceable to the shots, and redressable by damages, would be insufficient because he could not demonstrate standing for "*each* claim asserted against *each* Defendant," Standing Mot. at 17.  Such a result would do nothing to preserve separation of powers, ensure adverse litigation, or any other purpose of standing.  It is not the law.  The point of this example is not to argue that Plaintiffs' claims are just like Summers'—though there are similarities.  The point is that the longstanding existence of such common-law claims shows that certainty with respect to which defendants' wrongful conduct caused injury is not hardwired into the case-or-controversy requirement.

>    2.    *Standing does not require class representative plaintiffs to suffer injuries sufficient to underlie claims by unnamed putative class members*

No class action could survive Defendants' confected demand that "the named Plaintiffs must independently meet the[] requirements [of standing] as to *each claim asserted . . . .*" Standing Mot. at 17 (emphasis added). That is because a class representative plaintiff is bringing both her *own* claims in her own right, and the claims of *others* in her representative capacity. By definition, then, no class representative plaintiff has an injury in fact that could ground the claims she brings on others' behalf. The same is true when parents sue for their children, executors for an estate, or officers for a corporation. The law recognizes in each case that a plaintiff has standing so long as an injury underlies the claim. *Who* can assert claims for a child, estate, or corporation is not a standing question at all, but turns on family law, the law of estates, or corporate law. Who can represent a *class* turns on Rule 23.

The Eleventh Circuit recently reaffirmed this foundational principle in *Fox,* 2020 WL 5784768. There, Fox dined at three restaurants at the Ritz-Carlton Key Biscayne hotel over a two-day period and noticed that an automatic gratuity was added. *Id.* at *1. Fox sued on behalf of a putative class who paid the automatic gratuity at all 49 Ritz-Carlton restaurants in Florida and alleged that Ritz Carlton had a pattern of deceptive practices across *all* of its Florida restaurants. *Id.* The district court dismissed the case. *Id.* In relevant part, the court ruled that Fox did not suffer an injury-in-fact as to the other 46 Ritz-Carlton restaurants because he did not eat there. *Id.* The court also ruled that Fox did not even have standing to represent putative class members who ate at the same three restaurants on different days than he did because Ritz-Carlton's policies could have changed throughout the four-year class period. *Id.*

Defendants here make the same flawed argument: they claim that because Plaintiffs purchased ranitidine from certain manufacturers over certain time periods, Plaintiffs cannot assert claims on behalf of those who bought from different manufacturers over different time periods. The Eleventh Circuit reversed the dismissal of Fox's complaint and rejected this argument because it "conflate[s] the requirements of individual standing with those for a class representative." *Id.* at *4–5. While "Fox surely would not have *individual standing* to assert claims concerning Ritz-Carlton restaurants where he did not dine because he suffered no injury fairly traceable to those restaurants," "[b]ecause Fox has the same interest and suffered the same injury as the class

members, he has class representative standing to bring the claims he alleged." *Id.* at *5 (emphasis added).

To have the "same injury," plaintiffs need not have sustained injury at the same time or place or by the same actor; what matters is the *nature* of the injury (a cancer-causing drug, for example, or an illegal automatic gratuity). *Id.* The Eleventh Circuit found that its earlier decision in *Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008), "did not require purported class members to have suffered the same kind of property damage on the same day in the same part of Florida from the same hurricane. Rather, we looked to the nature of the injury." *Fox*, 2020 WL 5784768, at *5. Thus, the Court concluded that "Fox and the class members have suffered the same economic injury from Ritz-Carlton's gratuity and sales tax practices across its properties in Florida. While those injuries may have occurred on different days at different restaurants, those facts do not change what injuries Fox alleged those class members suffered." *Id.*

Here, like Fox, each named Plaintiff alleges that she or he purchased Zantac from one or more Defendants based, *inter alia*, on Defendants' wrongful conduct in manufacturing, marketing, and selling a defective drug throughout the proposed class period. Each named Plaintiff therefore has standing to assert her or his own claims, as well as claims on behalf of putative class members who also purchased Zantac from one or more of the Defendants at any time during the class period. Put simply, based on *Fox* and *Mills*, the named Plaintiffs' standing to assert these claims is beyond legitimate dispute.

Defendants' cited authority does not require otherwise. Their principal case, *Prado-Steiman*, was decided in a Rule 23(f) interlocutory appeal posture, and focuses on whether the named plaintiff's *injury* is typical: "Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." 221 F.3d at 1279. The case emphasized that the Supreme Court "repeatedly held that a class representative must be part of the class and possess *the same interest and suffer the same injury* as the class members." *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)) (emphasis added). Again: "a plaintiff who has been subject to injurious conduct *of one kind* [does not] possess by virtue of that injury the necessary stake in litigating conduct *of another kind*, although similar, to which he has not been subject." *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)) (emphasis added).

Defendants' true complaint, then, is not Plaintiffs' standing, but the procedural question of what claims a given injury empowers a class representative plaintiff to bring on behalf of putative class members. That question should be addressed as a "class certification decision[]" which is "left to the sound discretion of the district court," *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998), as opposed to a constitutional holding restricted to consideration of "constitutional reasons, not 'prudential' ones," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014). Plaintiffs recognize that some courts have blurred the line between constitutional standing and the requirements of Rule 23. *Cf.* Standing Mot. at 23 n.6 (collecting cases). Those decisions merely reflect the prescience of the Supreme Court's admonition that "jurisdiction . . . is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quotation omitted). Defendants' cases are what animated the Eleventh Circuit to admonish district courts not to "mix up" and "conflate the requirements of individual standing with those for a class representative." *Fox*, 2020 WL 5784768 at *5. The better reasoned—and binding—approach cabins jurisdiction to its proper sphere and recognizes that, when Rule 23 is satisfied, plaintiffs with sufficiently similar injuries may sue defendants who harmed only putative class members.

If "[a]t least one class representative [has] standing to pursue her own claims individually . . . she has all the standing she needs to pursue a class action, as well." 1 *Newberg on Class Actions* § 2:3 (5th ed. 2020). In fact, courts have applied the principles of *Tice* to identify a juridical link allowing a plaintiff with his own injury (*i.e.*, standing) to sue on behalf of others with the same injury against *all* culpable defendants. *See La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973) (allowing claims by plaintiffs who suffered identical injury where defendants were "juridically related in a manner that suggests a single resolution of the dispute would be expeditious"); *see also Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838 (11th Cir. 1990) ("in the event there is a juridical link, it is appropriate to join as a defendant a party with whom the named class representative did not have a direct contact"); *Payton v. Cty. of Kane*, 308 F.3d 673, 681–82 (7th Cir. 2002) (recognizing juridical link doctrine). Defendants argue these cases are not about standing, Standing Mot. at 19–25, but a court cannot approve certification under Rule 23—or joinder under Rule 20—if plaintiffs lack standing. To side with Defendants, this Court would need to conclude that all juridical link cases are *ultra vires*.

> 3. *The Class Complaints' allegations that each Defendant sold ranitidine to at least one class representative Plaintiff are plausible*

Defendants' argument is not only mistaken, it is largely academic as applied to the CCAC. Even if the 238 Consumer Plaintiffs cannot *each* sue *every* Defendant, *among them* they plausibly suffered harm at the hands of *all* Defendants.  In other words, not a single party will be dismissed from the CCAC as a result of Defendants' "privity theory" of standing.  Manipulating the limits of Article III for Defendants is all in service of some hoped-for Pyrrhic victory.

The charts above illustrate this.  GSK manufactured prescription Zantac, which no fewer than 115 Consumer Plaintiffs alleged they purchased.  Various Defendants manufactured OTC Zantac over time, but no fewer than 33 putative Consumer Plaintiffs purchased OTC Zantac and alleged taking Zantac / Ranitidine in some form during each of the time periods that a Brand-Name Defendant was making it.  Similarly, as many as 180 Consumer Plaintiffs purchased and consumed ranitidine when the 22 Generic Defendants were selling it.  As for the Distributor Defendants, because the CCAC alleges that three Distributors occupied 92% of the market, it is plausible that at least one of 238 Consumer Plaintiffs purchased a drug distributed by each.  The CCAC alleges at least one Consumer Plaintiff (and typically many) made a purchase from each Retailer Defendant.  Again, discovery will reveal how each Defendant linked into the chain of commerce starting from a manufacturer to the consumer, but at this stage, given the scope of the claims, Consumer Plaintiffs have plausibly asserted traceable harm to each Defendant.

The TPP Complaint, which asserts claims only against Brand-Name and Generic Manufacturer Defendants, is similarly comprehensive.  The TPP Plaintiffs allege exemplar reimbursements for prescription Zantac and generic ranitidine over a period of 10 years from 2010 to 2019, during which GSK and each Generic Manufacturer Defendant named in the TPP Complaint manufactured prescription Zantac or ranitidine.  Discovery will bear out further details, but at this early stage, the TPP Plaintiffs have plausibly alleged economic loss traceable to the Defendants they named.

**C.**     **Named Plaintiffs Do Not Lose Article III Standing for the Claims Brought in Their Respective States, Merely By Alleging Claims in Their Representative Capacity for Putative Class Members Residing in Other States**

Defendants next argue that even Plaintiffs with the *same* injury against the *same* Defendants lack standing to bring claims for putative class members in a different state.  *See, e.g.*, D.E. 1630 at 1, 8–12.  But Plaintiffs do not claim to step into the shoes of putative class members

for Article III standing; instead, they allege that they will demonstrate they have the capacity to represent putative class members under Rule 23 at that procedural stage.[2]

Defendants' argument rests on the premise that a class representative plaintiff lacks standing to assert a putative class member's claim unless both invoke the same state's substantive law, but this is wrong because "there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right." *Lujan*, 504 U.S. at 576; *see also Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) ("[T]he cause of action does not affect the Article III standing analysis."). Standing doctrine does not depend on substantive law; it turns instead on the *nature* of the injury alleged. *Fox*, 2020 WL 5784768 at *5. Purely psychic harms, such as disappointment that the law is not being enforced, do not confer standing. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing . . . ."). Economic harm, such as spending money on a worthless product, is the quintessential injury in fact. *Doremus*, 342 U.S. at 434. It does not matter in the first hypothetical if the executive is *improperly* refusing to enforce the law; nor does it matter in the second hypothetical if the defendant has an ironclad defense that will result in a take-nothing judgment. Those are *merits* questions under substantive law that a federal court may only reach if it first finds that a litigant has standing. *Steel Co.*, 523 U.S. at 94. Said differently, substantive law cannot create or take away an injury in fact—standing and the validity of claims are distinct inquiries. The Supreme Court deems it "settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quotation omitted) (citing cases). And on the other side of the coin, standing is not defeated "by the possibility that the averments might fail to state a cause of action on which [plaintiffs] could actually recover." *Steel Co.*, 523 U.S. at 89 (quotation omitted).

Two cases are instructive on the distinction between standing and representative capacity: *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533 (7th Cir. 2011), and *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88 (2d Cir. 2018). In *Morrison*, an Illinois class representative asserted

---

[2] Thus, while Defendants make a generic argument that differences in state law may prevent certification under Rule 23, they have not properly raised or attempted to demonstrate material differences among state laws at this stage.

a claim on behalf of a nationwide class against an Illinois defendant for violating state consumer fraud law. The district court dismissed the non-Illinois class members (purportedly on standing grounds), then declined to exercise jurisdiction over the case under 28 U.S.C. § 1332(d)(4) (because, post-dismissal, the suit presented an intra-state controversy). *Morrison*, 649 F.3d at 535. The Seventh Circuit reversed. *Id.* at 536–39. Judge Easterbrook explained that the word "standing" "is not an accurate description" because the case had "no problem with standing." *Id.* at 535–36.

> Plaintiffs have standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision. Plaintiffs allege that they are victims of a pyramid scheme that saddled them with financial loss, which YTB caused. The judiciary can redress that injury by ordering YTB to pay money to the victims. <u>Nothing more is required for standing</u>.

*Id.* at 536 (citation omitted) (emphasis added). Judge Easterbrook explained that only merits and Rule 23 questions were at issue. The merits question was whether the Illinois consumer fraud law or a similar law applied; and the Rule 23 question was whether "a class action arising under the consumer-fraud laws of [multiple states would] be manageable." *Id.* The same is true here.

*Langan* involved a Connecticut plaintiff who brought class claims under the consumer protection laws of 20 other states. 897 F.3d at 91. The Second Circuit's statement of the question and answer is crisp and correct:

> The only point of contention is whether Langan has standing to bring a class action on behalf of unnamed, yet-to-be-identified class members from other states under those states' consumer protection laws. . . . [A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of "adjudicatory competence" under Article III.

*Id.* at 92–93 (citations and quotation omitted). The court reversed and remanded with instructions for the district court to consider whether the laws of other states were sufficiently similar to allow certification of the class. *Id.* at 96–99.

*Morrison* and *Langan* correctly explicate the fundamental distinctions between standing, the merits, and Rule 23, and the Defendants can only prevail by confusing them. On Defendants' reasoning, the Constitution blocks any federal court from adjudicating nationwide class actions

19

involving violations of the laws of different states (even if those laws are identical).  That would be a surprise to the drafters of the Class Action Fairness Act, who modified diversity requirements to expand federal jurisdiction over class claims with no federal question.  *See* 28 U.S.C. § 1332(d)(2)(A) (allowing for minimal diversity where the amount in controversy exceeds $5,000,000).  Defendants' position also contradicts precedent.

District courts in the Eleventh Circuit routinely allow class representative plaintiffs to assert claims on behalf of out-of-state putative class members where the suit relates to common law causes of action.  *See In re Checking Account Overdraft Litig.*, No 1:09-MD-02036, 2016 WL 5848730, at *2–3 (S.D. Fla. July 5, 2016) (citing cases).  The court explained:

> Where a named plaintiff has established individual standing to bring specific claims against a defendant in his or her own right, but asserts parallel common law claims arising under different states' laws on behalf of a putative class, the plaintiff is not "attempting to piggy-back on the injuries of the unnamed class members."

*Id.* (quoting *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06MD1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006)).  As Plaintiffs have argued, "the issue is not whether the named plaintiff has standing to sue the defendant" but whether the named plaintiff's injuries "are sufficiently similar to those of the purported class to justify the prosecution of a nationwide class action."  *Id.* (quoting *DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 214 (S.D.N.Y. 2012)).

The Eleventh Circuit has agreed: "if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004).  Following Defendants' argument, what *Klay* meant to say is that such a class, though realistically possible, would be beyond the jurisdiction of a federal court.  But, alas, applying *Klay*, the Southern District has held that named plaintiffs—residents of Florida, New York, and Illinois—had standing to assert common-law unjust enrichment and tortious interference claims on behalf of a nationwide class.  *Wilson v. Everbank, N.A.*, 77 F. Supp. 3d 1202, 1230–31 (S.D. Fla. 2015).  The court explained that "dismissal of the putative nationwide class claims prior to the [c]ourt's consideration of class certification . . . would in effect impose a requirement that, in a multistate class action involving state common law claims, *there be a named plaintiff from every state*."  *Id.* at 1231 (emphasis added).  "Not only is that contrary to established practice and highly inefficient, but it conflates the issue of whether the named Plaintiffs have

standing to bring their individual claims with the secondary issue of whether they can meet the requirements to certify a class." *Id.* (quotation and alteration omitted). *See also In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674, 680 (S.D. Fla. 2011) (certifying nationwide class with named plaintiffs from subset of states finding "[p]laintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent class members").

Defendants provide no circuit court authority for their argument. Indeed, every circuit court opinion Plaintiffs could locate agrees that there is no Article III problem with a class representative plaintiff seeking to assert claims on behalf of putative class members from other states. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) ("[T]he claims of the named plaintiffs" need not "in all respects be identical to the claims of each class member."); *Fallik v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421 (6th Cir. 1998) (requiring that the claims of the class representative be in all respects identical to those of each class member in order to establish standing would "confuse[] the requirements of Article III and Rule 23"); *Langan*, 897 F.3d at 93 (2018) ("[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claim subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of 'adjudicatory competence' under Article III . . . .") (citations and quotation omitted)).

Plaintiffs assert claims based on broadly similar state laws premised on the same course of conduct by the Defendants. Plaintiffs will demonstrate at the class certification stage that states with similar laws may be grouped such that common questions will predominate, which Defendants are welcome to challenge. The Court has jurisdiction to reach those arguments at the appropriate time.

## II. The Class Complaints, Meant to Consolidate Claims Within This MDL, Should Not Be Dismissed on the Grounds of Shotgun Pleading

Defendants argue the Class Complaints violate shotgun pleading standards and, consequently, the Court should dismiss or strike them and order re-pleading. As Plaintiffs argue in their Opposition to Defendants' Motion to Dismiss Master Personal Injury Complaint on shotgun pleading grounds § I, dismissing or striking the complaint would be procedurally improper for shotgun pleading—the only remedy is a motion for a more definite statement. That aside, Defendants have not demonstrated—or even clearly argued—that they have been deprived of notice of the claims asserted against them. To the contrary, Defendants present detailed arguments

going to the merits of Plaintiffs' claims, which is only possible because Plaintiffs put them on *clear* notice of those claims.

> **A.     The Purpose of the Shotgun Pleading Doctrine Is to Give Defendants Fair Notice of What Claims Are Being Brought Against Them**

"The unifying characteristic of all types of shotgun pleadings is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.  This Court's rulings in prior cases illustrates that the proper inquiry for shotgun pleading is the notice given to the defendants.  For instance, in *Glover v. District Board of Trustees of Palm Beach State College*, the plaintiff alleged a violation of Title VII because he applied for 79 jobs for which he was qualified but was denied for alleged racially discriminatory reasons. *See* No. 9:19-CV-80968, 2019 WL 6340087, at *2 (S.D. Fla. Nov. 27, 2019) (Rosenberg, J.).  The plaintiff commingled all these alleged Title VII violations in his Count I. *Id.* at *3.  The Court found that it was necessary for plaintiff to plead the facts underlying each distinct Title VII claim separately and granted leave to amend and plead any plausible claims. *Id.* By contrast, in *Watts v. City of Port St. Lucie*, the defendants argued the plaintiff's complaint impermissibly incorporated paragraphs from previous counts by reference. *See* No. 2:15-CV-14192, 2015 WL 7736532, at *5 (S.D. Fla. Nov. 30, 2015) (Rosenberg, J.).  The Court rejected this argument because the incorporation was "only for convenience" and the Court was "able to ascertain which paragraphs [were] relevant to each of the claims." *Id.*  Similarly, in *Isaias v. Martin County*, the defendant complained of the incorporation of 28 background paragraphs that were not directly tied to any counts. *See* No. 2:18-CV-14171, 2018 WL 8660342, at *3 (S.D. Fla. July 17, 2018) (Rosenberg, J.).  The Court rejected this shotgun pleading argument, remarking that a complaint "need not be perfect but rather sufficient," because the complaint gave the defendant "sufficient notice of the claims against it." *Id.*

Bearing in mind the overarching consideration is one of notice, the Eleventh Circuit has summarized the four drafting "sins" that can be considered "shotgun pleading" and, thus, require the plaintiff clarify the allegations:

> (1) adopting by reference allegations in successive counts;

> (2) associating non-specific factual allegations with a cause of action;

> (3) failing to carefully articulate claims into discrete counts; and

(4) failing to link particular claims to specific defendants in multiparty complaints.

*Weiland*, 792 F.3d at 1319–20.

Except in trivial ways that have not prejudiced Defendants, Plaintiffs' Class Complaints do not commit any of these sins.

**B.     The Class Complaints Appropriately Navigate the Shotgun Pleading Standards in the Context of Presenting Consolidated Class Claims in an MDL**

This MDL presents challenges as it involves a ubiquitous drug that—despite its harmful effects—was widely manufactured, distributed, marketed, and sold by scores of companies.  Few MDLs have involved claims against as many defendants as this one. The Class Complaints had to consolidate the claims accounting for the various categories of Defendants, as well as the claims asserted against them. When bearing in mind the needs of this case, the Class Complaints provide Defendants with notice and, while not beyond all reproach, are not so "sinful" as to constitute a shotgun pleading under *Weiland*.

### 1.     *Plaintiffs do not adopt by reference allegations in successive counts*

Though they obfuscate this point, Defendants do not argue that Plaintiffs commit *Weiland*'s first "sin" as it is plainly not applicable.  Standing Mot. at 7 (listing "as relevant here" only two of the four "sins").  Plaintiffs do not re-allege and incorporate all the preceding paragraphs in each successive count.  The Class Complaints incorporate the paragraphs preceding the first count, but that is not what *Weiland* condemns.

### 2.     *Plaintiffs do not associate non-specific factual allegations with specific claims*

The second shotgun pleading "sin" is also not applicable because the factual allegations do not consist of "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322.  The background paragraphs in the Class Complaints are specific and materially related to Plaintiffs' theory of the case—put simply, that ranitidine causes cancer and Defendants knew of and concealed this risk.  Beyond that, the factual allegations themselves are organized under headers making clear to which categories of Defendants certain allegations are addressed.  *See, e.g.*, CCAC at 211 ("Brand-Name Manufacturer Defendants' and Generic Manufacturer Defendants' Labels Were Misleading and Omitted Material Information and Warnings that Should Have Been Apparent to Them through Stability Testing"), at 252

("Retailer Defendants Breached Warranties to Plaintiffs and Class Members"), and at 258 ("Repackager Defendants and Distributor Defendants Also Failed in Their Duty to Implement Proper Storage, Handling, and Shipping Conditions"), among many others.

### 3.  *Plaintiffs carefully articulate claims into discrete counts*

The third *Weiland* standard is plainly not applicable because the Class Complaints are divided into separate counts.  Defendants do not assert otherwise.  Standing Mot. at 7.

### 4.  *Plaintiffs link their claims to Defendants with the requisite specificity to put Defendants on notice*

Finally, the fourth *Weiland* standard is not applicable because the claims set forth in Class Complaints are organized according to the "geographic and temporal realities" of Defendants' conduct.  *Contra Weiland*, 792 F.3d at 1323 n.14 (quotation omitted).  Where appropriate, Plaintiffs have separated counts according to certain geographic jurisdictions.  The Class Complaints are clear against whom certain claims are asserted—for certain causes of action against all Defendants, and for others, against subsets thereof.  The Class Complaints also articulate, to the extent possible, how the Consumer Plaintiffs and TPP Plaintiffs, respectively, relate to the individual Defendants by explaining what products were purchased (*i.e.*, OTC Zantac, generic prescription ranitidine, etc.), when it was purchased, and where it was purchased (both geographically, and in the case of the consumer plaintiffs, through what retail outlet).  Defendants' arguments are not—and cannot be—that Plaintiffs' allegations are ambiguous.  Indeed, as demonstrated below, Defendants' own arguments are that certain Defendants could not be liable for certain conduct because of corporate family structure, the time periods at issue, the business operations of certain Defendants, etc.—*i.e.*, arguments on the merits, not pleading deficiencies.

### C.  **Defendants' Shotgun Pleading Objections Do Not Warrant Dismissal**

What Defendants' motion to dismiss reveals is that their issue with the Class Complaints is not a lack of notice, but a defense on the merits.  Shotgun pleading exists only for the rare occasion when the pleadings lack sufficient clarity for either an answer or motion to dismiss under Rule 12.  Regarding the CCAC, Defendants wrongly argue, *inter alia*:

▪   Each Brand-Name Manufacturer Defendant manufactured, advertised, and sold their products at different times, yet Plaintiffs assert claims universally against them without regard to when the Defendant entered the supply chain.  Standing Mot. at 10. (Notwithstanding that, the complaints state when each plaintiff purchased ranitidine and

when each Manufacturer Defendant entered the market.  CCAC ¶¶ 21–258; TPPCAC ¶¶ 216–20.)

- Plaintiffs who do not allege ever to have purchased generic ranitidine products purported to sue generic manufacturers.  Standing Mot. at 11.  (Yet the consumer class complaint does identify those putative class members who purchased generic ranitidine, and those who do not.  D.E. 889 ¶¶ 21–258.)

- Individual plaintiffs allege purchasing products from only a few retailers, yet purport to assert claims against all Retail Defendants.  Standing Mot. at 11.  (Again, the complaints are clear which putative class representatives purchased from which retailers.  CCAC ¶¶ 21–258; TPPCAC ¶¶ 216–20.  The extent to which a class representative can pursue claims on behalf of class members who purchased from other retailers is at most a class certification question.)

- Plaintiffs attribute to all Defendants knowledge of some scientific studies that were not published until after Defendants stopped selling or manufacturing ranitidine.  Standing Mot. at 12.  (Defendants are free to deny allegations in the Complaints.)

- Plaintiffs allege all Defendants misleadingly advertised their products when the Generic Manufacturer and Distributor Defendants do not advertise and include design and manufacturing claims against Distributor and Retailor Defendants who do not design or manufacture ranitidine-containing products.  Standing Mot. at 12.  (Again, to the extent that certain theories of recovery are premised on facts that the Defendants deny, the remedy is to assert as much in an answer, assuming claims cannot be resolved—as many already have—through the meet-and-confer process.)

Similarly, regarding the TPPCAC, Defendants wrongly argue, *inter alia*:

- The three TPP Plaintiffs do not purchase prescription medications but asserted claims against entities that manufactured and sold exclusively OTC Zantac.  Standing Mot. at 13.  (The only Defendants named by the TPPs that exclusively sold OTC Zantac were BI, GSK, and Sanofi.  Those Defendants are included only in the RICO count under that law's enterprise theory, which the TPPCAC makes clear.)

- The TPP Plaintiffs allege they automatically covered generic versions of drugs, yet were induced by Defendants to provide such coverage. Standing Mot. at 13–14. (This is at best a merits argument. That Defendants raise this point shows they have notice.)

- The TPP Plaintiffs assert nationwide claims, yet each TPP Plaintiff did not reimburse purchases in all 50 states. Standing Mot. at 14. (As explained above, this is not necessary in a class action. Even if it were, that would not be a shotgun pleading problem; Defendants appear to have notice of and understand Plaintiffs' theory.)

None of these issues concerns the notice given to Defendants. They are merits issues—*i.e.*, whether Defendants are liable for the conduct as Plaintiffs allege—and should not be resolved on the basis of shotgun pleading standards. Even though Defendants recite the "sins" of shotgun pleadings, they do not explain how they are unable to answer the Class Complaints. Instead, they argue why the Plaintiffs cannot recover.

In a similar vein, the authorities relied upon by Defendants do not sweep as broadly as they contend. If anything, Defendants' cases support the proposition that the shotgun pleading standards inquiry comes down to notice. *See, e.g.*, *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (shotgun pleading makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief"). And none of the cases cited by Defendants involves an MDL where the policies supporting consolidation weigh in favor of consolidated Class Complaints that necessarily combine disparate claims.

Even if this Court agreed with Defendants' arguments, Plaintiffs are entitled to leave to amend their Class Complaints. As is the case with "venial sin[s]," Plaintiffs have faith theirs may be absolved. *See Weiland*, 792 F.3d at 1322.

## III.    The Class Complaints As Pleaded Present a Manageable Path Forward

In the real world, Defendants' argument would induce far longer pleadings, far more named Plaintiffs, and parallel litigation. This is decidedly not a situation where, if Defendants prevailed, "at worst several new named representatives would have to be added to the class or several of the class subclaims would have to be amended or dropped." *Prado-Steiman*, 221 F.3d at 1278. On Defendants' misguided view, the Class Complaints would require at least one Plaintiff in privity with *each* Defendant in *all* 50 states, Puerto Rico, and the District of Columbia. That would result in more than 5,000 named Consumer Plaintiffs, each pleading separate allegations against each

Defendant.  If Defendants believe the current pleadings are too long, they should be careful what they wish for.

As an alternative to repleading exponentially longer Class Complaints in federal court, Defendants' broadest standing arguments could, if successful, induce Plaintiffs to file their claims in state courts, which do not have Article III limits imposed on their jurisdiction.  Defendants would be unable to remove, having secured dismissal on the ground that federal jurisdiction is lacking, creating inefficient state-court proceedings away from this MDL.  Of course, the interests of efficiency and judicial economy cannot confer jurisdiction.  Where a federal court lacks standing, it must dismiss the suit, irrespective of the consequences.  But Defendants' jurisdictional arguments are plainly wrong, and the practical consequences of embracing them reveals that they have dressed up Rule 23 arguments in constitutional clothing.

The Class Complaints are long, but in light of the complexity of the case, they are easily the most efficient manner of resolving these disputes.  Rather than force refiling elsewhere or repleading with far more class representative plaintiffs, the better course is to address Defendants' practical concerns with pragmatic solutions of the sort MDL courts have discretion to fashion.  *See, e.g.*, *In re Asbestos Prods. Liab. Litig.*, 718 F.3d 236, 246–49 (3d Cir. 2013) (stressing the discretion an MDL court possesses due to the complexity and potential burdens involved in administering massive litigation); *Freeman v. Wyeth*, 764 F.3d 806, 809 (8th Cir. 2014) ("MDL courts must be given greater discretion to organize, coordinate and adjudicate [their] proceedings" (quotation omitted)); *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 431–32 (5th Cir. 2013) (MDL court managing "exceedingly complex" Deep Water Horizon matter had a "broad grant of authority" to manage the "daunting litigation" and was "well within" its discretion when it decided to set up pleading bundles and separate out certain claims (quotation omitted)).

The Court could, for example, employ a bellwether approach to class certification and related briefing and discovery.  After bellwether determinations on the law of a select number of states, briefing could focus on material differences in state law or facts, greatly improving efficiency.  Courts have used this method before to conserve judicial resources.  *See, e.g.*, *In re Ford Tailgate Litig.*, No. 11-CV-02953, 2015 WL 751772 (N.D. Cal. Nov. 25, 2015) (class certification and summary judgment with respect to three states obviated the need to address twenty-one other states); *Philips v. Ford Motor Co.*, No. 14-CV-02989, 2015 WL 4111448, at *1 n.1 (N.D. Cal. July

7, 2015) ("the Court decided to proceed by addressing the California claims first" for purposes of motion-to-dismiss and class certification briefing); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2010 WL 2756947, at *4 (N.D. Ohio July 12, 2010) (limiting class certification decision to one bellwether state). The Court has wide discretion to fashion workable procedures under Rule 23 as well. *E.g.*, *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (endorsing bifurcation employed by the district court).

Ultimately, Defendants do not pose questions of standing or lack of notice that require dismissal. They simply highlight the need for collaboration and a workable case management plan, which the Court and parties have already begun to craft and employ on multiple fronts.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that Defendants' Motion be denied.

DATED: October 1, 2020                              Respectfully submitted,


<u>/s/ Tracy A. Finken</u>                          By: <u>/s/ Robert C. Gilbert</u>
Tracy A. Finken                                     Robert C. Gilbert, FBN 561861
Email: tfinken@anapolweiss.com                      Email: gilbert@kolawyers.com
ANAPOL WEISS                                        KOPELOWITZ OSTROW FERGUSON
One Logan Square                                    WEISELBERG GILBERT
130 North 18th Street, Suite 1600                   2800 Ponce de Leon Boulevard, Suite 1100
Philadelphia, PA 19103                              Coral Gables, FL 33134
Tel: (215) 735-1130                                 Tel: (305) 384-7270


<u>/s/ Michael L. McGlamry</u>                       <u>/s/ Adam Pulaski</u>
Michael L. McGlamry                                 Adam Pulaski
Email: efile@pmkm.com                               Email: adam@pulaskilawfirm.com
POPE McGLAMRY, P.C.                                 PULASKI KHERKHER, PLLC
3391 Peachtree Road NE, Suite 300                   2925 Richmond Avenue, Suite 1725
Atlanta, GA 30326                                   Houston, TX 77098
Tel: (404) 523-7706                                 Tel: (713) 664-4555


*Plaintiffs' Co-Lead Counsel*

28

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1222 Troy-Schenectady Road
Niskayuna, NY 12309
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerlenkner.com
KELLER | LENKNER
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Francisco R. Maderal, FBN 0041481
Email: frank@colson.com
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Tel: (305) 476-7400

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Lauren S. Miller
Email: lmiller@corywatson.com
CORY WATSON, P.C.
2131 Magnolia Ave S
Birmingham, AL 35205
Tel: (205) 271-7168

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
9 Evelyn Road
Port Washington, NY 11050
Tel: (516) 723-4629

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Tel: (305) 330-5512

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

*Plaintiffs' Steering Committee*
*Plaintiffs' Law and Briefing Committee Co-Chairs*
*Plaintiffs' Liaison Counsel*

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King, Jr. Avenue
S.E., 3rd Floor,
Washington, DC 20032
Tel: (202) 918-1824

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2020, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF and that the foregoing document is being served on

all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert