## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | **MDL NO. 2924** <br> **20-MD-2924** |
| RICARDO BENEDICTO, | **JUDGE ROBIN L. ROSENBERG** <br> **MAGISTRATE JUDGE BRUCE E. REINHART** |
| Plaintiff, | COMPLAINT [ & JURY DEMAND] |
| v. | **Case No.:** |
| SANOFI S.A., SANOFI-AVENTIS US LLC, SANOFI US SERVICES INC, CHATTEM, INC., BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., and GLAXOSMITHKLINE, LLC, | |
| Defendants. | |
| _____/ | |

**THIS DOCUMENT RELATES TO:** *Ricardo Benedicto v. Sanofi S.A., et al.*

## COMPLAINT

Plaintiff, by and through undersigned counsel, bring this Complaint for Damages against Defendants, Sanofi S.A., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Chattem Inc. (collectively, "Sanofi"), Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"), and GlaxoSmithKline, LLC ("GSK") (collectively, "Defendants")[1] and alleges the following:

## PARTIES

1.     Plaintiff, Ricardo Benedicto, is a citizen of Florida and resides in Miami-Dade County, Florida.

---

[1] Pursuant to Pretrial Order #11 [ECF No. 422], Plaintiff files this Complaint directly in MDL No. 2924.

MASE MEBANE

2.      Defendant, Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly owned subsidiary of the French company Sanofi S.A.

3.      Defendant, Sanofi US Services Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly owned subsidiary of the French company Sanofi S.A.

4.      Defendant, Chattem, Inc. is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. It is a wholly owned subsidiary of the French company Sanofi S.A.

5.      Defendants, Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively "Sanofi") controlled the U.S. rights and NDA to over-the-counter (OTC) Zantac from 2017 to the present. During that period, Sanofi manufactured and distributed the drug in the United States.

6.      Defendant, GlaxoSmithKline LLC is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania, and Research Triangle, North Carolina. GSK is a wholly owned subsidiary of GlaxoSmithKline PLC, a British limited company that is registered to do business in the United States. GlaxoSmithKline PLC was the first company to apply for and receive approval for prescription brand Zantac. GSK, until recently, sold over the counter versions of Zantac.

7.      Defendant, Pfizer, Inc. is a Delaware corporation with its principal place of business in New York, New York. Until 2006, Pfizer held the U.S. Right & New Drug Application ("NDA") for manufacturing, marketing, and selling over the counter Zantac.

8.      Defendant, Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Ridgefield, Connecticut. Boehringer is a subsidiary of the German company Boehringer Ingelheim Corporation. From 2006 to 2017, Boehringer owned the U.S. rights to over the counter Zantac. During that time Boehringer manufactured and distributed the drug in the United States.

## JURISDICTION AND VENUE[2]

9.      Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interests and costs, and because Plaintiff is a citizen of a state different from any Defendant.

10.      Pursuant to 20 U.S.C. § 1367, this Court has jurisdiction over supplemental state law claims.

11.      This Court has personal jurisdiction over Plaintiff. Plaintiff is a citizen of Florida and resides in Miami, Florida.

12.      This Court has personal jurisdiction over Defendants because (1) they conducted substantial business in this District; (2) Plaintiff's claims arise out of Defendants, directly or by an agent, operating, conducting, engaging in, or carrying on a business in this state or having an office or agency in this state, committing a tortious act in this state; and (3) Defendants were engaged in solicitation or service activities within the state which were used or consumed within the state in the ordinary course of commerce, trade, or use. This Court also has personal jurisdiction over the Defendants because they have consented to jurisdiction by registering to do business in Florida.

---

[2] All Defendants stipulate and agree that they will not assert any objection of improper venue pursuant to Fed. R. Civ. P. 12(b) as to any ranitidine-related cases filed directly in the Southern District of Florida that emanate from districts outside the Southern District of Florida and that are filed in this multidistrict litigation for pretrial proceedings. [*See* ECF No. 11].

MASE MEBANE

13.    Venue properly lies in the District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, Defendants' actions caused harm to Plaintiff who resides in this District, and Defendants regularly conduct business in the District.

## FACTUAL ALLEGATIONS

### A. Zantac (Background)

14.    Zantac is used to treat ulcers of the stomach and intestines, and other stomach and esophagus issues, including erosive esophagitis, gastroesophageal reflux disease-GERD, and Zollinger-Ellison syndrome.[3] It is also intended to relieve heartburn.[4]

15.    Zantac's main active ingredient is ranitidine.[5]  Ranitidine is a histamine 2 blocker, also known as a histamine H2 antagonist.[6]  Histamine 2 blockers prevent or relieve heartburn and other stomach issues by reducing the amount of acid produced by the stomach.[7]

### B. History of Zantac

16.    Ranitidine was developed by GSK.  It was introduced into the market in 1981. It was the world's biggest-selling prescription drug by 1988.

17.    In 1996, it became available over-the-counter (OTC) and was marketed under several trade names, including Zantac, by GSK and many other companies.[8]

18.    OTC Zantac was available in 75 mg and 150 mg tablets.[9]

---

[3]  Zantac Tablet, WebMD.   https://www.webmd.com/drugs/2/drug-4090-7033/zantac-oral/ranitidine-tablet-oral/details attached as Exhibit 1.
[4] Frequently Asked Questions, Zantac. https://www.zantacotc.com/zantac-FAQ.html attached as Exhibit 2.
[5] *Id.*
[6]  *Id.*; Histamine H2 Antagonist (Oral Route, Injection Route, Intravenous Route), Descriptions. https://www.mayoclinic.org/drugs-supplements/histamine-h2-antagonist-oral-route-injection-route-intravenous-route/description/drg-20068584 attached as Exhibit 3.
[7] *Id.*
[8] *Id.*
[9] https://www.zantacotc.com/zantac-FAQ.html attached as Exhibit 2.

MASE MEBANE

19.    GSK was the original inventor of Zantac. GSK had the prescription rights to Zantac from 1983 to 2009, and a patent for ranitidine that expired in 1997.  After GSK's patent expired, many competitors launched generic alternatives to OTC Zantac.

20.    At all relevant times, Defendants aggressively advertised and pushed sales of Zantac.  Therefore, sales soared throughout the years since its introduction to the market.

21.    In 2018, Sanofi reported that Zantac brought in 127 million euros in net sales around the world, with sales in the United States constituting 113 million euros of total sales.[10]

22.    Throughout all relevant times, Zantac was marketed as a safe and effective drug for infants, children, and adults.

## C. NDMA – A Known Carcinogen

23.    There is conclusive evidence that NDMA is a potent carcinogen.

24.    Several organizations, including the Food and Drug Administration ("FDA"), U.S. Environmental Protection Agency ("EPA"), the International Agency for Research on Cancer ("IARC"), and Word Health Organization ("WHO"), have classified NDMA as a probable human carcinogen.[11] NDMA acts as a carcinogen because it modifies DNA.[12]

25.    Since the 1980's, the FDA has directed manufacturers to recall products containing unsafe levels of NDMA. The FDA recalls drugs containing NDMA exceeding the acceptable intake limits because they pose an unacceptable safety risk to patients.

26.    The NDMA found in Zantac is due to the inherent molecular structure of ranitidine.

---

[10] Sanofi, Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act or 1934 for the Fiscal Year ended December 31, 2018. 2018 Consumer Healthcare net sales by geographical region, at 97. https://www.sanofi.com/-/media/Project/One-Sanofi-Web/Websites/Global/Sanofi-COM/Home/common/docs/investors/Sanofi-20-F-2018-EN-PDF-e-accessible_01.pdf attached as Exhibit 4.
[11] Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA), Environmental Protection Agency (Nov. 2017). https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf attached as Exhibit 5.
[12] Id.

27.     Every dose of Zantac or its genetic alternative exposes users to high and unsafe levels of the carcinogen NDMA.

**D.  Defendants Concealed the Risks of NDMA Exposure from Zantac**

28.     Defendants knew or should have known that Zantac exposes users to unsafe levels of NDMA.

29.     None of the Defendants disclosed this information and the associated health risks to consumers, either by reporting it to the FDA or by warning consumers on the drug label.

30.     A study published in 1983 found that ranitidine tends to form compounds, such as NDMA.[13] This reaction occurs when it is combined with nitrite, which is naturally produced by bacteria in the stomach. The study concluded that oral administration in rats of high doses of ranitidine and nitride can produce DNA fragmentation either in the liver or in gastric mucosa.[14]

31.     In 1987, after several studies were published concerning ranitidine and NDMA, Defendant GSK published a clinical study that determined ranitidine was not associated with NDMA.

32.     However, GSK's published study had significant weaknesses. GSK used a less accurate and less specific definition method than industry standard chromatography, a method that necessitates discarding gastric samples that contained ranitidine. Without ranitidine being present in the samples taken, the relationship between ranitidine and NDMA could not be assessed or detected. This was an obvious attempt of GSK to cover up the link between ranitidine and NDMA in order to avoid Zantac from being recalled and taken off the market.

---

[13] Annalisa Maura, et. al., DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells, 18 Toxicology Letters 97 (August 1983) attached as Exhibit 6. https://www.sciencedirect.com/science/article/abs/pii/0378427483900772?via%3Dihub attached as Exhibit 6.
[14] Brambilla, G. et al. Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite. Carcinogenesis v. 4,10 1281-1285 (1983) https://academic.oup.com/carcin/article-abstract/4/10/1281/2391364 attached as Exhibit 7.

MASE MEBANE

33.     In 2003, a study proposed that "elevated levels of NDMA in drinking water produced by American wastewater treatment plans may be associated with the drug ranitidine."[15]

34.     Since then, multiple scientific groups and researchers have described "the breakdown of ranitidine to form NDMA..."[16]

35.     A 2004 study examined and followed up with 414 patients who had peptic ulcers over a period of 14 years. The study found that "those who were taking either Zantac or another antacid, Tagamet (cimetidine) had a heightened risk of bladder cancer."[17] The authors of the study also noted that "N-Nitrosamines are known carcinogens, and that nitrate ingestion has been related to bladder cancer risk."[18]  NDMA is a type of N-Nitrosamine.

36.     In 2007, the Fred Hutchinson Cancer Research Center, a cancer institute established in 1972, conducted a peer-review study titled "Relationship between histamine2-receptor antagonist medications and risk of invasive breast cancer."[19] The study assessed the relationship between use of H(2) blockers – namely cimetidine, ranitidine, nizatidine, and famotidine and their relationship to breast cancer. While the other H2 blockers did not have a link to breast cancer, ranitidine was linked with a 2.4-fold increased risk of hormone receptor-positive ductal carcinoma.[20]

---

[15] Light, David; Kucera, Kaury, Valisure Citizen Petition on Ranitidine. September 9, 2019. https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf; *See* Mitch, W.a., Sharp, J.O., Trussell, R.R., Valentine, R.L., Alvarez-Cohen, L. and Sedlak, D.L. (2003) N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review. Environmental Engineering Science. Vol 20, 5 https://superfund.berkeley.edu/pdf/231/pdf attached as Exhibit 8.

[16] *Id*. at 5.

[17] Tanya Lewis, What we know about the possible carcinogen found in Zantac, Scientific American (Oct. 28, 2019), https://www.scientificamerican.com/article/what-we-know-about-the-possible-carcinogen-found-in-zantac/     citing Michaud DS, et. al., Peptic Ulcer disease and the risk of bladder cancer in a prospective study of male health professionals, 13 Cancer Epidemiology Biomarkers & Prevention 250 (February 2004), https://www.ncbi.nlm.nih.gov/pubmed/14973090 attached as Exhibit 9.

[18] *Id.*

[19] Robert W. Mathes, et. al., Relationship between Histamine2- receptor antagonist medications and risk of invasive breast cancer, 17 Cancer Epidemiology Biomarkers & Prevention 67 https://www.ncbi.nlm.nih.gov/pubmed/18199712 attached as Exhibit 10.

[20] *Id.*

37.     A 2011 study that examined ranitidine in water supply found that "ranitidine, a histamine antagonist widely used for peptic ulcer treatment was found to be an important NDMA precursor."[21]

38.     A 2016 study conducted at Stanford University gave 10 volunteers 150 mg tablet of Zantac and discovered that the subsequent NDMA levels in their urine exceeded 47,000 nanograms. The researchers wrote that as most of the NDMA would have been metabolized prior to reaching the urine, the amount of NDMA in the body could have actually been much higher.[22]

39.     In September 2019, Valisure, a pharmaceutical company, submitted a Citizen's Petition on Ranitidine requesting the Commissioner of Food and Drugs to issue a regulation, revise industry guidance, and request a recall and suspend sales of ranitidine.[23] This was prompted after Valisure conducted tests that showed the link between ranitidine and NDMA formation.[24]

40.     In its Citizen Petition, Valisure stated that "an epidemiological study ha[d] implicated ranitidine's drug class as being correlated to cancer."[25]

41.     Valisure also tested ranitidine tablets in conditions that stimulate the human stomach.[26] The study revealed significant NDMA formation under simulated gastric conditions with [sodium] nitrite present."[27]

42.     In 2019, FDA testing and evaluation confirmed that NDMA levels increased in ranitidine, the active ingredient in Zantac, even under normal storage conditions. The testing also

---

[21] Julien Le Roux, Hervé Gallard, Jean-Philippe Croué. Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation. 45 Water Research 3164 (Mar. 26, 2011) attached as Exhibit 11.
[22] https://www.scientificamerican.com/article/what-we-know-about-the-possible-carcinogen-found-in-zantac/.
[23] *Id.*
[24] *See* Valisure Citizen Petition.
[25] *Id.* at 4.
[26] *Id.* at 6.
[27] *Id.* at 7.

showed that the older the ranitidine product is, or the longer the length of time since it was manufactured, the greater the level of NDMA.

43.     Manufacturers of an approved drug are required by law to submit an annual report to the FDA that contains a "brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product."[28]

44.     Despite these several scientific studies and knowing that Zantac exposes users to unsafe levels of NDMA, Defendants did not notify or alert the FDA.

45.     Defendants placed the importance of sales and profits over the health and safety of its consumers.

**E.  Plaintiff-Specific Allegations**

46.     Plaintiff began taking Zantac in approximately 2012 and used it through 2019 in order to treat heart burn and stomach ulcers.

47.     In July of 2019, Plaintiff was diagnosed with urothelial carcinoma, also known as bladder cancer.

48.     Based on prevailing scientific evidence, exposure to Zantac (and the carcinogen found in the drug, NDMA) can cause bladder cancer in humans.

49.     Plaintiff's bladder cancer was caused by him taking Zantac.

50.     Had any Defendant warned Plaintiff that Zantac could lead to exposure to NDMA or, in turn, cancer, through a warning label or otherwise, Plaintiff would not have taken Zantac.

---

[28] 21 C.F.R. §314.81(b)(2).

## COUNT I
## STRICT LIABILITY – DESIGN DEFECT

51.     Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

52.     At all relevant times, Defendants designed, manufactured, marketed, promoted, sold, supplied and/or distributed Zantac.

53.     In Florida, Defendants have the duty to use reasonable care to design a product that is reasonably safe for its intended use in order to prevent defects that create a substantial risk of foreseeable injury to consumers.

54.     Defendants breached their duty to use care in designing Zantac because it is unreasonably dangerous for its normal intended use.

55.     Defendants also breached their duty of care by failing to disclose the design defect to Plaintiff, consumers, and the general public, through a warning label or otherwise.

56.     Zantac is inherently dangerous and defective because of users' heightened exposure to NDMA when using it. The main active ingredient in Zantac, ranitidine, can produce NDMA by reacting with itself. NDMA can lead to the development of cancer. Therefore, as formulated and designed, the foreseeable risks of taking Zantac exceed the benefit.  Defendants failed to warn Plaintiff and other consumers of the foreseeable risks. Therefore, Zantac is more dangerous than an ordinary consumer would expect.

57.     The design defect in Zantac existed at the time the products left Defendant's possession. There was no substantial change in the condition in which Zantac was manufactured and produced, to the time it reached consumers.

58.     Plaintiff used Zantac in as recommended, to treat heartburn and stomach ulcers, and in a reasonably foreseeable manner.

MASE MEBANE

59. Defendant's actions set forth herein directly and proximately caused Plaintiff injury, including developing bladder cancer.

60. Defendants are strictly liable for Plaintiff's injuries resulting from his Zantac use because Defendants designed, researched, manufactured, tested, marketed, sold, and distributed the defective Zantac product.

61. Defendants acted willfully, wantonly, and/or recklessly by failing to warn Plaintiff about Zantac's associated health risks and by failing to design it in a reasonably safe manner.

62. As a direct and proximate result of Plaintiff's ordinary and foreseeable use of Zantac, he developed bladder cancer, and has experienced permanent injury and damages, including pain and suffering and economic damages.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

## <u>COUNT II</u>
## <u>STRICT LIABILITY – FAILURE TO WARN</u>

63. Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

64. At all relevant times, Defendants designed, manufactured, marketed, promoted, sold, supplied and/or distributed Zantac.

65. Defendants owed Plaintiff a duty to properly design, manufacture, test, inspect, label, market, examine, and provide proper and adequate warnings about the associated safety risks of using Zantac.

66. Based on the scientific research and studies conducted over the years, Defendants knew or should have known that Zantac was defective and unsafe for consumers.

11

67.     At all relevant times, Defendants knew or should have known that Zantac creates serious health risks, including cancer, and could have avoided the risk or reduced the foreseeable risks of harm by providing reasonable instructions or warnings.

68.     Defendants failed to exercise reasonable care to warn consumers by failing to inform/warn them of the health risks associated with using Zantac. Defendants did not include proper warning or instruction labels to advise users of the risk of cancer from using Zantac. Zantac is defective because of the inadequate warning and instruction.

69.      The failure to warn defect in Zantac existed at the time the products left Defendant's possession. There was no substantial change in the condition in which Zantac was manufactured and produced, to the time it reached consumers.

70.     Plaintiff used Zantac in as recommended, to treat heartburn and stomach ulcers, and in a reasonably foreseeable manner.

71.     Defendant's actions set forth herein directly and proximately caused Plaintiff injury, including developing bladder cancer.

72.     Defendants are strictly liable for Plaintiff's injuries resulting from his Zantac use because Defendants designed, researched, manufactured, tested, marketed, sold, and distributed the defective Zantac product, and failed to warn Plaintiff, consumers, and the general public of the known associated health risks from Zantac's use, including cancer.

73.     Defendants acted willfully, wantonly, and/or recklessly by failing to warn Plaintiff about Zantac's associated health risks and by failing to design it in a reasonably safe manner.

74.     As a direct and proximate result of Plaintiff's ordinary and foreseeable use of Zantac, he developed bladder cancer, and has experienced permanent injury and damages, including pain and suffering and economic damages.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

### COUNT III
### NEGLIGENCE

75.     Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

76.     During all relevant times, Defendants owed Plaintiff the duty to exercise reasonable care in the designing, developing, manufacturing, testing, inspecting, distributing, labeling, and/or sale of Zantac.

77.     Defendants breached their duty to exercise reasonable care by negligently designing, developing, manufacturing, testing, inspecting, distributing, labeling, and/or selling Zantac.

78.     At all relevant times, Defendants breached their duty to exercise reasonable care through the following acts and/or omissions:

    a.  Negligence in the design, develop, research, manufacture, testing, packaging, marketing, sale and/or distribution of Zantac;

    b.  Failing to adequately warn Plaintiff, consumer, physicians, healthcare professionals, the public, and the FDA of the known foreseeable health risks of using Zantac;

    c.  Failing to use reasonable care in the design, development, administration, and/or monitoring of the clinical trials of Zantac;

    d.  Failing to use reasonable care in utilizing a reasonably safe design and formula for manufacturing Zantac;

MASE MEBANE

e.   Failing to adequately test and/or adequately monitor test and test results of Zantac before and after its introduction into the market;

f.   Falsely representing that Zantac was safe for its intended purpose when Defendant knew the product was unsafe and posed seriously health risks;

g.   Failing to warn the general public of the presence of NDMA in Zantac and the risk of developing cancer from its use;

h.   Failing to warn physicians, pharmacists, and other healthcare providers of the known and foreseeable risks of using Zantac;

i.   Failing to warn the public, health care providers, the general public , and the FDA, with post-market warnings and instructions.

79.   At all relevant times, Defendants knew or should have known consumers of Zantac would foreseeably be exposed to health risks and suffer severe health injuries, including but not limited to, bladder cancer.

80.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering. As a result of Defendants' acts and omissions, Plaintiff believed that Zantac was safe, and therefore purchased and ingested Zantac for its intended use, causing Plaintiff to develop cancer. Plaintiff requires and will continue to require medical care and treatment, causing Plaintiff emotional pain and suffering and ongoing medical expenses.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

14

## <u>COUNT IV</u>
## <u>BREACH OF EXPRESS WARRANTY</u>

81.     Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

82.     At all relevant times, Defendants are and/or were the manufacturers, distributors, marketers, and sellers of Zantac and knew or had reason to know of the specific intended use of the drug.

83.     Defendants, through their public announcements, press releases, public statements, the labelling on Zantac products, and promotional materials expressly warranted that Zantac was safe for its intended use of preventing and relieving heartburn, ulcers, and other stomach issues.

84.     Zantac does not conform to the Defendants' warranties because it is unreasonably dangerous, defective in design and/or formulation, provides inadequate warnings of the adverse health risks associated with using Zantac, and is not fit for the ordinary purpose for which it was intended.

85.     Zantac has numerous side effects that were not disclosed by Defendants, such as causing cancer.

86.     Defendants knew or should have known that their representations and warranties about the safety of Zantac were false and misleading.

87.     Physicians, healthcare professionals, and consumers, including Plaintiff, relied on Defendants' express warranties.

88.     As a result of Defendants' acts and omissions, Plaintiff reasonably believed that Zantac was safe.

89.     As a direct and proximate cause of Defendants' breach of their express warranties, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate

<u>COUNT V</u>
<u>BREACH OF IMPLIED WARRANTY</u>

90.     Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

91.     At all relevant times, Defendants are and/or were the manufacturers, distributors, marketers, and sellers of Zantac and knew or had reason to know of the specific intended use of the drug.

92.     At all relevant times, Defendants are and were merchants and sellers of goods.

93.     Plaintiff was a foreseeable user of Zantac because he suffered from heartburn and stomach ulcers, which is what Zantac was advertised and intended to treat.

94.     Defendants implicitly warranted that Zantac was in merchantable condition and fit for the ordinary purpose for which the drug is used.

95.     Defendants designed, manufactured, sold, and at all times thereafter, Zantac was not in merchantable condition and was not fit for its ordinary purpose as it was defective and unreasonably dangerous to users.

96.     Defendants are not able to disclaim their implied warranty of merchantability as they knowingly sold an inherently defective and unreasonably dangerous drug.

97.     As a result of Defendants' acts and omissions, Plaintiff reasonably believed that Zantac was safe.

98.     As a direct and proximate cause of Defendants' breach of their implied warranties, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate

## COUNT VI
## FRAUD OR FRAUDULENT CONCEALMENT

99.     Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

100.     Defendants intentionally and knowingly misrepresented, concealed, suppressed, and/or omitted material facts regarding the defectiveness and inherent dangerousness of Zantac, which were proven in several scientific studies.

101.     Defendants misrepresented to physicians, healthcare professionals, and the general public and consumers, including Plaintiff, through their advertisements and drug packaging that Zantac was safe to use and did not have significant defects.

102.     When making these misrepresentations, Defendants knew that Zantac exposes users to unsafe levels of NDMA and heightened risks of cancer and chose to conceal it.  In fact, Defendants touted the benefits of using Zantac to the general public. Defendants knew or should have known that they should have disclosed the dangers associated with Zantac.

103.    Defendants knew and intended that consumers, including Plaintiff, would reply on their representations and omissions and that their concealment of failure to disclose the dangers associated with consuming Zantac would cause Plaintiff to use Zantac.

104.    Defendants knew that their concealment and suppression of the dangers of Zantac would allow them to continue selling the product, increasing revenue and profits.

105.    By not disclosing the fact that Zantac exposes consumers to high levels of NDMA or increases their risk of cancer, Defendants were able to keep users from switching to other widely available medications to treat their symptoms. Defendants acted maliciously, oppressively, and with intent to defraud.

106.    Defendants had a duty to disclose the inherent defects of Zantac as the information was material to Plaintiff since it concerned his safety and wellbeing and Defendants knew that Plaintiff could not reasonably discover this information on his own.

107.    Plaintiff detrimentally relied on Defendants' knowing, affirmative and active false representations, concealment, and omissions. Plaintiff could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading.

108.    As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

## COUNT VII
## FRAUDULENT MISREPRESENTATION

109.    Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

110.    Defendants falsely and fraudulently represented to Plaintiffs, consumers, healthcare professionals, the public, and/or the FDA that based on test results, Zantac products were safe for consumption and were effective in relieving symptoms of acid reflux, heartburn, and other similar conditions.

111.    Defendants' representations were false and fraudulent.

112.    At all relevant times, Defendants knew that their representations about Zantac's safety was false and fraudulent because of the several studies showing Zantac's relationship with NDMA, a human carcinogen.

113.    Defendants intended that Plaintiff would rely on such misrepresentations and omissions. Defendants made the representations with the intent of defrauding Plaintiff, consumers, healthcare professionals, and the public into believing that Zantac was safe and therefore inducing them to recommend or use Zantac.

114.    Plaintiff detrimentally relied on Defendants' fraudulent misrepresentations and omissions. Plaintiffs could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading.

115.    Defendants knew or should have known that ranitidine was an unstable molecule that could react with itself to form unsafe levels of NDMA, which could lead to severe medical conditions such as cancer. Defendants deliberately turned a blind eye to the scientific research and studies that were available and minimized and concealed the inherently dangerous nature of Zantac

from Plaintiff, consumers, healthcare professionals, and the public by making fraudulent misrepresentations about the safety and benefits of the drug.

116.    As a direct and proximate cause of Defendants' fraudulent misrepresentation, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

**COUNT VIII**
**NEGLIGENT MISREPRESENTATION**

117.    Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

118.    Defendants owed a duty to disclose the adverse side effects of using Zantac, such as the link between ranitidine and NDMA, the harmful effects of NDMA, and the potential of NDMA causing cancer, to Plaintiff, consumers, physicians, healthcare professionals, the public, and the FDA as Defendants had superior knowledge concerning the dangerous side effects of Zantac.

119.    Defendants breached this duty of care by failing to disclose the material fact that Zantac was unreasonably dangerous.

120.    Defendants negligently misrepresented, concealed, suppressed, and/or omitted material facts regarding the safety of Zantac to Plaintiff, consumers, physicians, healthcare professionals, and the public.

121.    Defendants intended that Plaintiff would rely on such misrepresentations and omissions.

122.    Defendants, in the absence of due care, made misrepresentations and concealed the dangers of Zantac. Defendants knew and intended that Plaintiff would rely on such misrepresentations and omissions.

123.    Plaintiff detrimentally relied on Defendants' negligent misrepresentations and omissions. Plaintiff could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading.

124.    As a direct and proximate cause of Defendants' negligent misrepresentation, Plaintiff has suffered severe injury, including but not limited to developing cancer in the bladder, loss of enjoyment of life, economic damages, and continuous pain and suffering.

Wherefore, Plaintiff seeks trial by jury and all damages available to him under the law, including but not limited to, pain and suffering, damages for his injuries, economic damages, and other damages the Court deems appropriate.

## COUNT IX
## CLAIM FOR PUNITIVE DAMAGES

125.    Plaintiff incorporates and re-alleges all prior paragraphs of this Complaint as if fully set forth herein.

126.    At all relevant times, Defendants had actual knowledge of the illegality and wrongfulness of their actions and/or omissions.

127.    Defendants were required to submit an annual report to the FDA regarding Zantac's safety, effectiveness, and labeling.

128.    Defendants knew that using Zantac could lead to cancer and other serious health risks, but intentionally did not disclose the information to the FDA, healthcare providers, and the public, including Plaintiff.

129.    Defendants were aware of the several scientific studies and evidence showing Zantac's link to NDMA and cancer in humans. However, Defendants put sales and profits above the health and safety of consumers and purposely concealed this information.

130.    Defendants knew that by misrepresenting, concealing, suppressing, and/or omitting the dangerous side effects of using Zantac, users, like Plaintiff, could likely develop severe medical conditions, such as cancer.  Despite this knowledge, Defendants willfully, wantonly, and recklessly continued to proceed with their conduct.

131.    Defendants conduct shows their reckless disregard and indifference for the safety of Plaintiffs and their consumers.

132.    Defendants willful, wanton, and/or reckless conduct includes, but is not limited to, Defendants' lack of disclosure and warnings of the link between ranitidine and NDMA and their failure to protect and take all reasonable measures to make sure that consumers such as Plaintiff were using defective medication that could cause cancer.

## **Prayer for Relief**

Wherefore, Plaintiff respectfully requests this Court enter judgment against Defendants, and award the following relief:

a)  An order awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering, health care costs, and medical monitoring;

b)  An order requiring Defendants to pay both pre- and post-judgment interest on any amount awarded;

c)  Restitution for all purchases of Zantac by Plaintiff, in an amount to be determined at trial;

d)  An order awarding actual, general, special, incidental, punitive, and consequential damages to which Plaintiff is entitled;

e)  An award of costs, expenses, and attorneys' fees as permitted by law; and

    f)  Such other relief this Court deems appropriate.

**<u>Demand for Jury Trial</u>**

Pursuant to Fed. R. Civ. P. §38(b), Plaintiff demands a trial by jury as to all triable claims in this action.

Dated: October 15, 2020

Respectfully submitted,

MASE MEBANE, P.A.
2601 S. Bayshore Drive, Suite 800
Miami, Florida 33133
Telephone:  (305) 377-3770
Facsimile: (305) 377-0080

By:    */s/ Curtis J. Mase*
        CURTIS J. MASE
        Florida Bar No. 663034
        cmase@maselaw.com
        LAUREN A. LEVITT
        Florida Bar No.: 1011030
        llevitt@maselaw.com
