## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                              MDL NO 2924
PRODUCTS LIABILITY                                      20-MD-2924
LITIGATION

                                                JUDGE ROBIN L ROSENBERG
                                        MAGISTRATE JUDGE BRUCE REINHART

_____/

## ORDER GRANTING DEFENDANTS' MOTION
## TO DISMISSAND/OR STRIKE MASTER PERSONAL INJURY COMPLAINT
## ON GROUNDS OF IMPERMISSIBLE SHOTGUN PLEADING; GRANTING
## IN PART AND DENYING IN PART DEFENDANTS' AMENDED MOTION
## TO DISMISS AND/OR STRIKE CONSOLIDATED CONSUMER AND THIRD
## PARTY CLASS ACTION COMPLAINTS ON GROUNDS OF IMPERMISSIBLE
## SHOTGUN PLEADING AND LACK OF ARTICLE III STANDING; AND
## DENYING GENERIC MANUFACTURERS' AND REPACKAGERS' RULE 12 MOTION
## TO DISMISS CONSOLIDATED CONSUMER AND THIRD-PARTY PAYOR CLASS
## ACTION COMPLAINTS ON THE GROUND OF FAILURE TO ALLEGE AN INJURY

This matter is before the Court upon three motions: (1) Defendants' Motion to Dismiss and/or Strike Master Personal Injury Complaint on Grounds of Impermissible Shotgun Pleading and Incorporated Memorandum of Law [DE 1588] (the "MPIC Shotgun Motion"); (2) Defendants' Amended Motion to Dismiss and/or Strike Consolidated Consumer and Third Party Payor Class Action Complaints on Grounds of Impermissible Shotgun Pleading and Lack of Article III Standing and Incorporated Memorandum of Law [DE 1630] (the "Shotgun/Standing Motion"); and (3) Generic Manufacturers' and Repackagers' Rule 12 Motion to Dismiss Consolidated Consumer and Third-Party Payor Class Action Complaints on the Ground of Failure to Allege an Injury and Incorporated Memorandum of Law [DE 2037] (the "Injury Motion"). All "Defendants" named in the Master Personal Injury Complaint ("MPIC") bring the MPIC Shotgun Motion (the "MPIC Shotgun Defendants"). All "Defendants" named in the Consolidated Consumer Class Action Complaint ("CCCAC") and the Consolidated Third Party Payor Class Complaint

("CTPPCC") bring the Shotgun/Standing Motion (collectively, the "Shotgun/Standing Defendants").[1]  The "Generic Manufacturer Defendants" and "Repackager Defendants," as those groups are defined in the CCCAC and CTPPCC, bring the Injury Motion (the "Injury Defendants").[2]

On December 14, 2020, the Court held a hearing on the MPIC Shotgun Motion, the Shotgun/Standing Motion, and the Injury Motion (the "Hearing"). The Court has carefully considered: (1) the MPIC Shotgun Motion and the parties' briefing [DE 1974; DE 2130]; (2) the Shotgun/Standing Motion and the parties' briefing [DE 1980; DE 2129]; and (3) the Injury Motion and the parties' briefing [DE 2242; DE 2321], including the briefing on the Brand-Name Manufacturer Defendants' joinder in the Injury Motion [DE 2157; DE 2300; DE 2333].  For the reasons set forth below, the MPIC Shotgun Motion is **GRANTED**, the Shotgun/Standing Motion is **GRANTED IN PART AND DENIED IN PART**, and the Injury Motion is **DENIED**.

## I.  Factual Background[3]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980's, first by prescription and later as an over-the-counter medication ("OTC").  In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. MPIC ¶¶ 226, 231, 432.  GlaxoSmithKline ("GSK") first developed

---

[1] The CCCAC and CTPPCC are collectively referred to herein as the "Class Complaints."

[2] On October 8, 2020, the Retailer, Pharmacy, and Distributor Defendants joined the Injury Motion. DE 2044 at 12 n.2; DE 2045 at 14.  On October 26, 2020, the Brand-Name Manufacturer Defendants joined the Injury Motion. DE 2157.

[3] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." (quotation marks omitted)).  Plaintiffs have set forth their factual allegations in three "master" complaints: the MPIC, the CCCAC, and the CTPPCC (collectively "Master Complaints"). DE 887, 888, 889.

and patented Zantac. *Id.* ¶ 230. Zantac was a blockbuster – the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 231.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233. Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237. The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 234. Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 235. The right to sell OTC Zantac in the United States later passed to Boehringer Ingelheim Pharmaceuticals and then to Sanofi. *Id.* ¶¶ 239-40, 242-44. When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 249-51.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 253, 321, 324, 331. Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 253, 264-72. The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 254, 258. The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 4, 263.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 285. The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 286. On November 1, the FDA announced

that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 296.  The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.*  Six months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 301.

## II.  Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products.  On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1.  Since that time, hundreds of plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the Southern District of Florida.  In addition, this Court has created a Census Registry where thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed three Master Complaints on June 22, 2020. DE 887, 888, 889.  They contend that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. MPIC ¶¶ 1, 6, 19.  They allege that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4.  They are pursuing federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* CCCAC.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 30, the Court set a case management schedule that is intended to prepare the

MDL for the filing of *Daubert* motions on general causation and class certification motions in December 2021. DE 875; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In Pretrial Order # 36, the Court set a schedule for the filing and briefing of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346. Pursuant to that schedule, the various defendants filed the motions to dismiss discussed herein.

## III. The Master Complaints

### A. Master Personal Injury Complaint

All individuals who file a Short Form Complaint (collectively, the "MPIC Plaintiffs") adopt the MPIC. MPIC at 2.[4] The MPIC Plaintiffs allege that they developed cancers from taking the MPIC Shotgun Defendants' ranitidine products. *Id.* at 1. The MPIC "sets forth allegations of fact and law common to the personal-injury claims" within the MDL. *Id.* at 1. Each MPIC Plaintiff individually seeks compensatory damages, punitive damages, restitution, and all other available remedies. *Id.* at 1-2.

The MPIC Shotgun Defendants are entities that "designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine." *Id.* ¶ 20. They are categorized by the MPIC Plaintiffs into five groups: (1) Brand-Name Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; (4) Retailer Defendants; and (5) Repackager Defendants. Some MPIC Shotgun Defendants belong to multiple categories.[5] Within each category, the MPIC combines distinct corporate entities, including parents,

---

[4] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.
[5] For example, AmerisourceBergen is named as both a Generic Manufacturer Defendant and a Distributor Defendant. MPIC at 15 n.3.

subsidiaries, and affiliates, into single named MPIC Shotgun Defendants.[6]   Certain allegations apply to MPIC Shotgun Defendants across multiple groups.[7]

The MPIC contains 15 counts: Strict Products Liability—Failure to Warn (Count I), Strict Products Liability—Design Defect (Count II), Strict Products Liability—Manufacturing Defect (Count III), Negligence—Failure to Warn (Count IV), Negligence Product Design (Count V), Negligent Manufacturing (Count VI), General Negligence (Count VII), Negligent Misrepresentation (Count VIII), Breach of Express Warranties (Count IX), Breach of Implied Warranties (Count X), Violation of Consumer Protection and Deceptive Trade Practices Laws (Count XI), Unjust Enrichment (Count XII), Loss of Consortium (Count XIII), Survival Actions (Count XIV), and Wrongful Death (Count XV).   Counts I, II, IV, VII, IX, X, XI, XII, XIII, XIV and XV are brought against every MPIC Shotgun Defendant.   Counts V and VIII are brought against every Brand-Name Manufacturer, Generic Manufacturer and Repackager Defendant. Counts III and VI are brought against every Brand-Name Manufacturer and Generic Manufacturer Defendant.

**B.  Consolidated Consumer Class Action Complaint**

One hundred and eighty-three named individuals (collectively, the "CCCAC Plaintiffs") bring the CCCAC on behalf of themselves and all others similarly situated.[8]   The CCCAC Plaintiffs are citizens of nearly every state, the District of Columbia, and Puerto Rico.   There are no CCCAC Plaintiffs who reside in or purchased ranitidine products from Delaware, Hawaii,

---

[6] For example, CCCAC Defendant "Sanofi" refers to five entities: Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Sanofi S.A., Patheon Manufacturing Services LLC, and Boehringer Ingelheim Promeco, S.A. de C.V. MPIC ¶ 36.

[7] *See*, *e.g.*, MPIC ¶ 44 (allegations referring to Repackager Defendants apply to Ajanta, a Generic Manufacturer Defendant).

[8] The CCCAC originally had 238 named plaintiffs, but 55 were subsequently dismissed without prejudice. *See* Order Granting Plaintiffs' Unopposed Motion to Drop Certain Plaintiffs from Consolidated Consumer Class Action Complaint, DE 2241.

Kansas, Maine, North Dakota, Rhode Island, or South Dakota. Each CCCAC Plaintiff asserts that he or she purchased and/or used a ranitidine product during an approximate timeframe.

The CCCAC Plaintiffs bring the action in their individual capacities and on behalf of numerous classes pursuant to Rule 23. Among the various classes are two nationwide classes: (1) the "RICO Class," comprised of "[a]ll residents of the United States or its territories who purchased for personal, family, or household use any of Brand-Name Manufacturer Defendants' Ranitidine-Containing Products in the United States or its territories"; and (2) the "Nationwide Class," comprised of "[a]ll residents of the United States or its territories who purchased and/or used for personal, family, or household use, any of the Defendants' Ranitidine-Containing Products in the United States or its territories." CCCAC ¶ 734. The CCCAC alleges that as an alternative, and/or in addition to, the Nationwide Class, the CCCAC Plaintiffs bring the action in their individual capacities and on behalf of "State Classes" for all fifty states, the District of Columbia, and Puerto Rico. *Id.* ¶ 737. Each State Class is comprised of "[a]ll residents of [State or Territory] who purchased and/or used for personal, family, or household use, any of the Defendants' Ranitidine-Containing Products in the United States or its territories." *Id.*

The defendants named in the CCCAC are entities that "invented, manufactured, distributed, labeled, marketed, advertised, . . . stored, and sold ranitidine." *Id.* ¶ 259. They are categorized by the CCCAC Plaintiffs into five groups: (1) Brand-Name Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; (4) Retailer Defendants; and (5) Repackager Defendants (collectively, the "CCCAC Defendants"). Some CCCAC Defendants belong to multiple categories. Within each category, the CCCAC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named CCCAC Defendants. Certain allegations apply to CCCAC Defendants across multiple groups.

The CCCAC alleges 314 counts against the CCCAC Defendants.  The CCCAC Plaintiffs allege Count 1 (RICO) on behalf of the RICO Class against the Brand-Name Manufacturer Defendants. *Id.* ¶ 750.  The CCCAC Plaintiffs allege Count 2 (unjust enrichment) and Count 3 (Magnuson-Moss Warranty Act) on behalf of the Nationwide Class against all CCCAC Defendants. *Id.* ¶¶ 795, 804.  Alternatively, they bring Count 2 "on behalf of themselves under the laws of the state in which each [CCCAC] Plaintiff resides and/or purchased Ranitidine-Containing Products, and on behalf of a Class comprised of members from each [CCCAC] Plaintiff's respective state." *Id.* ¶ 795.  The CCCAC Plaintiffs allege Count 4 (fraud) on behalf of the Nationwide Class against the Brand-Name Manufacturer Defendants, the Generic Manufacturer Defendants, and the Repackager Defendants. *Id.* ¶ 823.  Alternatively, they bring Count 4 "on behalf of themselves under the laws of the state in which each [CCCAC] Plaintiff resides and/or purchased Ranitidine-Containing Products, and on behalf of each State Class." *Id.*  The CCCAC Plaintiffs allege Count 5 (negligence) and Count 6 (battery) on behalf of numerous State Classes against all CCCAC Defendants. *Id.* ¶¶ 839, 886.  Finally, the CCCAC Plaintiffs allege Counts 7 through 314 (including breach of express and implied warranties; failure to warn; manufacturing defects; design defects; state consumer protection violations; deceptive trade practices; and medical monitoring) on behalf of the various State Classes against some or all of the CCCAC Defendants. *Id.* ¶¶ 906-5899.

**C.  Consolidated Third-Party Payor Class Complaint**

The NECA-IBEW Welfare Trust Fund, the Plumbers & Pipefitters Local Union 630, and the Indiana Laborers Welfare Fund (collectively, the "CTPPCC Plaintiffs") bring the CTPPCC on behalf of themselves and all others similarly situated. CTPPCC at 8.  The CTPPCC Plaintiffs are entities that provide eligible members with health and welfare benefits, such as paying and

reimbursing for prescription drugs on behalf of their members and dependents. Each CTPPCC Plaintiff's members have filled prescriptions requiring reimbursement for ranitidine products in several states.

The CTPPCC Plaintiffs bring the action on behalf of a "Nationwide TPP Class" comprised of:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third party payors and any other health benefit provider, in the United States of America and its territories, which paid or incurred costs for prescription Zantac or the Generic Manufacturer Defendants' Ranitidine-Containing Products for purposes other than resale since their respective approval dates.

*Id.* ¶ 506. As an alternative and/or in addition to the Nationwide TPP Class, the CTPPCC Plaintiffs bring the action in their individual capacities and on behalf of state classes for all fifty states, the District of Columbia, and Puerto Rico ("State CTPPCC Classes"). *Id.* ¶ 508. Each State CTPPCC Class is comprised of:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third party payors and any other health benefit provider, in the United States of America and its territories, which paid or incurred costs for prescription Zantac or the Generic Manufacturer Defendants' Ranitidine-Containing Products for purposes other than resale since their respective approval dates.

*Id.* The Nationwide TPP Class and the State CTPPCC Classes are collectively referred to in the CTPPCC as the "TPP Class" or "Classes." *Id.* ¶ 511.

The defendants named in the CTPPCC are companies that "invented, made, distributed, labeled, marketed, advertised, . . . stored, and sold ranitidine." *Id.* ¶ 29. They are categorized by the CTPPCC Plaintiffs into two groups: (1) Brand-Name Manufacturer Defendants, and (2) Generic Manufacturer Defendants (collectively, the "CTPPCC Defendants"). Within each

category, the CTPPCC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named CTPPCC Defendants.

The CTPPCC Plaintiffs allege nine counts against the CTPPCC Defendants: Count 1 (RICO); Count 2 (breach of express warranties); Count 3 (breach of implied warranties); Count 4 (Magnuson-Moss Warranty Act); Count 5 (fraud); Count 6 (negligent misrepresentation and omission); Count 7 (violations of state consumer protection laws); Count 8 (unjust enrichment); and Count 9 (negligence). The CTPPCC Plaintiffs allege Count 1 on behalf of the TPP Class against the Brand-Name Manufacturer Defendants. The CTPPCC Plaintiffs allege Counts 2-9 on behalf of the TPP Class against GSK and the Generic Manufacturer Defendants.

## IV. Summary of the Parties' Arguments

### A.  MPIC Shotgun Motion

The MPIC Shotgun Defendants seek to dismiss and/or strike the MPIC. They argue that the MPIC fails in two primary respects. First, it indiscriminately lumps the MPIC Shotgun Defendants' conduct together—including distinct corporate entities—and "utterly fails to distinguish the alleged liability-creating conduct of one [MPIC Shotgun] Defendant from another." DE 1588 at 6. Second, each MPIC count adopts the allegations of all preceding counts. In doing so, the MPIC violates Rules 8 and 9(b) and frustrates the purpose of an MDL.

In response, the MPIC Plaintiffs argue that the MPIC Shotgun Defendants have not identified a shotgun pleading problem based on Eleventh Circuit caselaw. The MPIC Shotgun Defendants' targeted motions to dismiss are proof that they received adequate notice of the claims against them. Moreover, the manner in which the MPIC Shotgun Defendants are grouped is consistent with Rule 8 and appropriate for an MDL of this complexity. Nor is Rule 9(b) violated, since the MPIC provides notice of each MPIC Shotgun Defendant's specific misrepresentations.

Further, grouping corporate entities is permissible, particularly when the MPIC Plaintiffs can only learn of the divisions between entities through discovery.  Finally, each MPIC claim is clear as to which MPIC Shotgun Defendants it applies.

## B. Shotgun/Standing Motion

The Shotgun/Standing Defendants ask the Court to dismiss and/or strike the Class Complaints and order the CCCAC Plaintiffs and CTPPCC Plaintiffs (collectively, when discussing the Shotgun/Standing Motion, the "Shotgun/Standing Plaintiffs") to replead in compliance with Rules 8 and 9, Article III, and the Eleventh Circuit's prohibitions against shotgun pleading.  They argue that the Class Complaints should be dismissed or stricken as impermissible shotgun pleadings, since they fail to provide a short and plain statement of claims as required by Rule 8, and thus fail to provide adequate notice of the claims against each Shotgun/Standing Defendant and the grounds upon which each claim rests.

The Shotgun/Standing Defendants further argue that the Class Complaints should also be dismissed or stricken for lack of Article III standing.  Each named Shotgun/Standing Plaintiff must, but cannot, independently meet the requirements for Article III standing—injury in fact, traceability, and redressability—as to each claim asserted against each Shotgun/Standing Defendant.  Each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named Shotgun/Standing Plaintiff has suffered the injury giving rise to the claim.  The Shotgun/Standing Plaintiffs have ignored the traceability requirement for Article III standing and thus failed to plausibly allege that each named Shotgun/Standing Plaintiff has standing to sue each Shotgun/Standing Defendant.  Nor are the Shotgun/Standing Plaintiffs saved by the juridical link doctrine,[9] since the doctrine neither confers Article III standing nor applies

---

[9] The juridical link doctrine is discussed in detail below. *See* discussion *infra* Section VIII.B.3.

here.  Finally, the Shotgun/Standing Plaintiffs lack standing to assert claims on behalf of putative class members whose claims arise under other states' laws.

In response, the Shotgun/Standing Plaintiffs argue that the Shotgun/Standing Defendants fail to show that they are deprived of the requisite notice.  Despite the challenges posed by this MDL, the Class Complaints do not meaningfully commit any of the "sins" recognized by the Eleventh Circuit as indicia of shotgun pleadings, and instead provide the Shotgun/Standing Defendants adequate notice of the claims against them.  Moreover, the Shotgun/Standing Plaintiffs have plausibly pled Article III standing and thus made the requisite showing at this stage of the litigation.  Through the juridical link doctrine, the Shotgun/Standing Plaintiffs can allege claims on behalf of others with the same injury against every culpable defendant.  And at this stage, they need not allege with certainty which Shotgun/Standing Defendant harmed them.

## C.  Injury Motion

The Injury Defendants argue that the Class Complaints must be dismissed in their entirety for failure to allege a cognizable injury.  Instead of alleging a personal injury or another legally cognizable injury, the Class Complaints affirm ranitidine's efficacy, for it "did exactly what it was supposed to do without physically injuring any Class Plaintiffs," and thus the CCCAC Plaintiffs and CTPPCC Plaintiffs (collectively, when discussing the Injury Motion, the "Injury Plaintiffs") received the benefit of their bargain. DE 2037 at 6.  Even if the Injury Plaintiffs could allege personal injuries, those claims must be placed in the MPIC rather than the CCCAC.  Moreover, the tort-based claims in the CTPPCC must be dismissed pursuant to the economic loss doctrine, which forecloses such claims for purely economic losses relating to the product, absent personal injury or damage to other property.  Lastly, the Court should dismiss the CCCAC Plaintiffs'

requests for injunctive relief, namely those for medical monitoring and the removal of ranitidine from the market, since the former is actually a monetary remedy and the latter is already complete.

The Injury Plaintiffs respond by noting that they assert multiple theories for injury in fact. They state that they suffered an economic injury, (*i.e.*, a "pocketbook injury") by paying for misbranded and/or adulterated ranitidine products that should not have been available for sale, and which were economically worthless. Further, they plausibly allege other forms of cognizable injuries, including economic losses due to ongoing medical monitoring, and physical injuries including cellular damage, subcellular damage, and increased risk of developing cancer. Those claims need not be repled in the MPIC, since they are class claims and moving them would not streamline the MDL. Regarding the economic loss doctrine, the Injury Defendants fail to explain which states apply the version of the rule they argue for, and under what circumstances. Lastly, the Injury Plaintiffs have properly pled available remedies, and the Injury Defendants' attempt to dismiss the CCCAC claims for injunctive relief is not actually an attempt to dismiss anything, but rather a preview of their Rule 23 arguments. Finally, the request for the Injury Defendants to cease marketing and selling ranitidine is not moot.

## V.  Summary of the Court's Rulings

The Court concludes that the MPIC is an impermissible shotgun pleading. The Court grants the MPIC Shotgun Motion, and the MPIC is dismissed without prejudice and with leave to amend.

The Court concludes that the Class Complaints are both impermissible shotgun pleadings. The Court grants the Shotgun/Standing Motion in part, and the Class Complaints are dismissed without prejudice and with leave to amend. Because the current Class Complaints are shotgun pleadings and the Shotgun/Standing Plaintiffs are given leave to amend, the Court cannot

undertake a full Article III standing analysis and thus denies the Shotgun/Standing Motion in part, but can reach conclusions as to certain issues raised by the parties.

The Court denies the Injury Motion.  The Court concludes that the Injury Plaintiffs have plausibly alleged an injury in fact as to their "Medical Monitoring" claims by alleging economic losses and expenses due to ongoing medical monitoring.  However, given the allegations of personal injuries, the Court concludes that these claims do not belong in the CCCAC.  All claims and allegations of physical injury and medical monitoring, including Counts 45, 67, 139, 167, 238, 280 and 302, are thus stricken without prejudice from the CCCAC.[10]  The Injury Plaintiffs may seek leave of Court for an alternative pleading to allege their class physical injury and/or medical monitoring claims.  The Court declines to reach conclusions as to the Injury Plaintiffs' other theories of injury at this juncture.  Finally, Court denies the Injury Defendants' request to dismiss the injunctions sought for medical monitoring and ceasing sales and marketing of ranitidine products.

## VI. Standards of Review

### A.  Rule 12(b)(1)

Federal courts are courts of limited jurisdiction.  "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that

---

[10] *See, e.g.*, CCCAC ¶ 723 ("[A]s a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class members who ingested Defendants' Ranitidine-Containing Products have suffered physical damages in the form of cellular, sub-cellular, and or/genetic injuries that significantly increased their risk of developing various types of serious and potentially deadly cancers."); CCCAC ¶ 834 ("Defendants' fraudulent conduct directly and proximately caused Plaintiffs and the Class to: (a) be subjected to the accumulation of NDMA in their bodies, including the resulting cellular damage, subcellular damage, and related symptoms; and (b) sustain a significantly increased risk of developing various types of serious and potentially deadly cancers."); CCCAC ¶ 1524 ("As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and the members of the Class have suffered physical injury, have a significantly increased risk of developing serious and potentially deadly cancers, and have suffered and will suffer economic losses and expenses associated with ongoing medical monitoring."); CCCAC ¶ 1527 ("Plaintiffs' exposure to Ranitidine-Containing Products has significantly increased their risk of developing various types of serious and potentially deadly cancers and caused them bodily injury in the form of cellular, sub-cellular, and/or genetic injuries.").

jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

## B.  Rule 12(b)(6)

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).  But the court need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1273 (11th Cir. 2019).  "Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).

## VII.    Analysis of MPIC Shotgun Motion

## A.  Arguments and Allegations

The MPIC Shotgun Defendants argue that the MPIC violates Rule 8 by indiscriminately lumping all MPIC Shotgun Defendants together. DE 1588 at 10.  They note that 11 of the 15 counts are brought against every MPIC Shotgun Defendant, while the other 4 counts are against broad subgroups, namely the Brand-Name Manufacturer Defendants, the Generic Manufacturer Defendants, and the Repackager Defendants. *Id.*  They provide examples of how the MPIC does not explain how certain categories of MPIC Shotgun Defendants can be responsible for conduct that is attributed to every MPIC Shotgun Defendant. *Id.* at 11-14.  Separately, the MPIC violates Rule 9(b) by lumping Shotgun/Standing Defendants together.  The MPIC claims sounding in fraud are subject to Rule 9(b)'s heightened pleading standard, and the MPIC Plaintiffs fall short by

failing to describe specific misrepresentations or omissions by individual MPIC Shotgun Defendants. *Id.* at 15. Finally, the MPIC further constitutes shotgun pleading because it fails to differentiate between distinct corporate entities, and incorporates every count into every other count. *Id.* at 15-16. Given the foregoing deficiencies, the MPIC frustrates the purpose of an MDL, including by forcing the Court to sift out irrelevancies and impeding the MPIC Shotgun Defendants' ability to mount certain defenses. *Id.* at 16-19.

The MPIC Plaintiffs argue that the MPIC Shotgun Defendants' requested relief is improper, for they should have instead moved for a more definite statement pursuant to Rule 12(e). DE 1974 at 8. Still, the MPIC is not a shotgun pleading, since it is apparent that the MPIC Shotgun Defendants have notice of the claims against them. The way in which the MPIC Shotgun Defendants are grouped does not violate Rule 8 given the complexity of the MDL, and because the MPIC specifies which groups of MPIC Shotgun Defendants each count applies to. *Id.* at 12. The examples provided by the MPIC Shotgun Defendants also misstate the law and/or the MPIC's allegations. *Id.* at 14-17. Further, not all of the fraud-based claims are subject to heightened pleading standards of Rule 9, and even if they are, the MPIC contains detailed factual allegations that provide adequate notice of specific misrepresentations made by each MPIC Shotgun Defendant. *Id.* at 17-18. And despite the MPIC's lumping of corporate entities, the MPIC Shotgun Defendants' contentions are merely denials of the MPIC's factual assertions; the MPIC Shotgun Defendants should thus answer the MPIC. *Id.* at 19. Finally, even if prior allegations are incorporated by reference into each MPIC count, the MPIC is clear as to which MPIC Shotgun Defendant each count applies. *Id.* at 20. The MPIC Plaintiffs acknowledged this final issue at the Hearing and took no issue with amending the MPIC. DE 2498 at 84:24-85:7 ("I do want to start by being honest with the Court, our complaint does have a paragraph at the beginning of each

count that incorporates the previous allegations into the first one.  If the Court wants us to, we will be happy to amend our complaints . . . .").

## B.  Law on Shotgun Pleading

Rule 8(a) requires that any claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A shotgun pleading fails "to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claims rests." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).  There are roughly four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1321-23 (footnotes omitted).

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), a complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002).

## C. Analysis and Conclusion

The MPIC Shotgun Defendants' failure to bring their motion as a motion for a more definite statement pursuant to Rule 12(e) is not fatal. Even if a defendant fails to move pursuant to Rule 12(e), a "district court ought to take the initiative to dismiss or strike a shotgun pleading and give the plaintiff an opportunity to replead." *Weiland*, 792 F.3d at 1321 n.10; *see Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006) ("Given the district court's proper conclusions that the complaint was a shotgun pleading and that plaintiffs' [sic] failed to connect their causes of action to the facts alleged, the proper remedy was to order repleading *sua sponte*.").

The Court concludes that the MPIC constitutes a shotgun pleading. As the MPIC Shotgun Defendants note, each of the MPIC's 15 counts adopts by reference or incorporates by reference every prior allegation. In this way, the MPIC commits the most common type of shotgun pleading recognized in *Weiland*. Contrary to the MPIC Plaintiffs' suggestion, the MPIC would not be saved merely by amending select paragraphs, such that each count incorporated only the first 452 paragraphs, for doing so would still "lead[] to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) (amended complaints deemed "quintessential" shotgun pleadings). Indeed, that version of the MPIC would still "leav[e] the reader to wonder which prior paragraphs support the elements of" each claim. *Wagner,* 464 F.3d at 1279; *see Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018) (amended complaint deemed "an incomprehensible shotgun pleading" where it "incorporate[d] by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the

Court to determine with any certainty which factual allegations give rise to which claims for relief").

The MPIC also lumps the MPIC Shotgun Defendants together in a manner that violates Rule 8.  The MPIC Plaintiffs bring 11 of the 15 counts against every MPIC Shotgun Defendant; the other 4 are each brought against multiple categories of MPIC Shotgun Defendants.  As this Court has noted, "lumping all the defendants together in each claim and provid[ing] no factual basis to distinguish their conduct" does not satisfy Rule 8. *Lane v. Cap. Acquisitions & Mgmt. Co.*, No. 04-60602, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006); *see also Petrovic v. Princess Cruise Lines, Ltd.*, No. 12-21588-CIV, 2012 WL 3026368, at *3 (S.D. Fla. July 20, 2012) (same); *Chiron Recovery Ctr., LLC v. United Healthcare Servs., Inc.*, No. 9:18-CV-81761, 2020 WL 3547047, at *5 (S.D. Fla. June 30, 2020) (Rosenberg, J.) ("Shotgun pleading exists when multiple parties or multiple claims for relief are merged into a single count."); *Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1249 (S.D. Fla. 2018) ("When a complaint indiscriminately lumps all defendants together, it fails to comply with Rule 8.").

The Court is particularly concerned by the way in which the MPIC lumps MPIC Shotgun Defendants across entire groups (*e.g.,* Retailers grouped with Distributors, Brands grouped with Repackagers).  The Court understands certain groups to conduct fundamentally different activities than others, such that grouping them together throughout the MPIC might create confusion. Indeed, this pleading strategy has led to allegations that the Court has had difficulty understanding with sufficient clarity, including some of the inconsistencies highlighted by the MPIC Shotgun Defendants. *See* DE 1588 at 11-14.  Through the discovery and Registry process conducted since the MPIC was filed in June, the Court understands that the MPIC Plaintiffs know much more about individual MPIC Shotgun Defendants' conduct than they did six months ago.  This fact was

highlighted both at the Hearing and at the Case Management Conference conducted on December 18, 2020.  The Court expects that the newly acquired information will allow the MPIC Plaintiffs to more precisely tailor their allegations to the proper categories of MPIC Shotgun Defendants.

The Court acknowledges the complexity of this MDL.[11]  But "[e]xperience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Kareem v. Ocwen Loan Servicing, LLC*, No. 9:15-CV-80638, 2015 WL 7272765, at *5 (S.D. Fla. Nov. 18, 2015) (Rosenberg, J.) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366-67 (11th Cir. 1996)).[12]

The MPIC Shotgun Motion is granted, and the MPIC Plaintiffs' claims are dismissed without prejudice and with leave to amend the MPIC.

## VIII.   Analysis of Shotgun/Standing Motion

The Court addresses the issue of shotgun pleading first, as it overlaps with the issues discussed above regarding the MPIC Shotgun Motion.  The Court then turns to issues of Article III standing raised in the briefing, including whether to analyze standing at the pleading stage or after class certification; how to analyze standing at the pleading stage; the juridical link doctrine; and whether the Shotgun/Standing Plaintiffs may assert claims under the laws of states where no named Shotgun/Standing Plaintiffs reside, purchased, and/or reimbursed for ranitidine products. For each issue, the Court reviews the arguments of the parties, any relevant allegations in the Class

---

[11] Because of this, the Court is less concerned by the way in which related corporate entities are consolidated. Moreover, requiring delineation on this level would likely induce a significantly longer version of the MPIC.

[12] In concluding that lumping the MPIC Shotgun Defendants together violates Rule 8, the Court declines to decide whether doing so also violates Rule 9(b).  Should the amended MPIC still contain the alleged Rule 9(b) infirmity, the MPIC Shotgun Defendants may re-raise the issue in the next round of Rule 12 motions.

Complaints, and any additional, issue-specific law before providing the Court's analysis and conclusion on the issue.

## A. Shotgun Pleading

### 1. Arguments and Allegations

The Shotgun/Standing Defendants argue that the Class Complaints commit two of the four sins recognized by the Eleventh Circuit in *Weiland*.  First, the Class Complaints assert multiple claims against multiple defendants without specifying which defendants are responsible for which acts and omissions. DE 1630 at 16.  Second, the Class Complaints are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* (quotation marks omitted).  The Shotgun/Standing Defendants provide several examples from the Class Complaints to illustrate how they "defy reason and reality." *Id.* at 19-23.

The Shotgun/Standing Plaintiffs respond by emphasizing that whether a complaint is a shotgun pleading depends principally on whether a defendant receives adequate notice. DE 1980 at 29.  They state that the Shotgun/Standing Defendants received adequate notice, and that the Class Complaints, "while not beyond all reproach, are not so 'sinful' as to constitute a shotgun pleading under *Weiland*." *Id.* at 30.  They refute certain of the Shotgun/Standing Defendants' examples by stating that adequate notice is provided, that many arguments raised in the Shotgun/Standing Motion improperly go to the merits, and that the proper solution to many of the Shotgun/Standing Defendants' complaints is to simply deny various allegations when answering the Class Complaints. *Id.* at 9.

### 2. Law on Shotgun Pleading

The Court addressed the relevant law on shotgun pleading above. *See* discussion *supra* Section VII.B.  That same discussion applies here.

21

### 3.  Analysis and Conclusion

The Class Complaints combine related and unrelated defendants together.  In the CCCAC, the CCCAC Plaintiffs categorize 82 individual entities across five groups: Brand-Name Manufacturer Defendants, Generic Manufacturer Defendants, Distributor Defendants, Retailer Defendants, and Repackager Defendants.  In the CTPPCC, 67 individual entities are categorized across two groups—Brand-Name Manufacturer Defendants and Generic Manufacturer Defendants.  While the Court appreciates the Shotgun/Standing Plaintiffs' attempt to efficiently navigate the pleading challenges posed by this MDL, the decision to lump Shotgun/Standing Defendants together has created some degree of confusion for the Shotgun/Standing Defendants and the Court.  The Shotgun/Standing Defendants' examples are illustrative. *See* DE 1630 at 19-23.  These examples highlight that certain allegations are not consistent with geographic and temporal realities.  The ways in which individual Shotgun/Standing Defendants are categorized and consolidated support the arguments that the Class Complaints fail to provide a factual basis to distinguish individual Shotgun/Standing Defendants' conduct.

Both Class Complaints also incorporate hundreds of allegations into every count.  The CCCAC incorporates the first 748 paragraphs into each of the 314 counts, including more than 300 paragraphs designated as "Factual Allegations," while the CTPPCC incorporates 519 paragraphs into all nine counts, including nearly 400 paragraphs under the "Factual Allegations" heading.  In doing so, the Shotgun/Standing Plaintiffs "leav[e] the reader to wonder which prior paragraphs support the elements of" each claim. *Wagner*, 464 F.3d at 1279.  They likewise force the Shotgun/Standing Defendants and the Court to sift out irrelevancies—an especially onerous task given the size and scope of the Class Complaints.  The Eleventh Circuit has declared shorter complaints with fewer factual allegations and defendants to be shotgun pleadings. *See Chudasama*

*v. Mazda Motor Corp.*, 123 F.3d 1353, 1359 n.9 (11th Cir. 1997) (complaint containing four counts and 43 numbered paragraphs deemed "an all-too-typical shotgun pleading," where "[e]ach count has two numbered paragraphs, the first of which incorporates by reference all forty-three paragraphs of factual allegations," despite "[m]any of the factual allegations appear[ing] to relate to only one or two counts, or to none of the counts at all."); *see also Wagner*, 464 F.3d at 1279-80 (shotgun pleading where "the factual particularity of the first 175 paragraphs [was] not connected to the otherwise generally pled claim in any meaningful way"); *Magluta*, 256 F.3d at 1284 ("quintessential" shotgun pleading where complaint was 58 pages long, contained 146 paragraphs under a section titled "General Factual Allegations," and was "replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged").  Because hundreds of allegations are incorporated into every count, "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson*, 77 F.3d at 366.  The Shotgun/Standing Defendants cannot be expected to frame responsive pleadings given the current Class Complaints.

The Court recognizes that its decision may lead to longer Class Complaints.  But it cannot permit pleadings that fail Rule 8, provide inadequate notice, and unduly burden parties to discern relevant and irrelevant parties and claims.  Given the size of the Class Complaints and the number of parties, classes, and claims involved, it is especially critical that the Shotgun/Standing Plaintiffs plead with precision.  With the benefit of discovery since filing the Class Complaints, coupled with the Court's rulings, the Court is confident that the Shotgun/Standing Plaintiffs can do so.

**B.  Article III Standing**

Because the Class Complaints are impermissible shotgun pleadings, the Court struggles to analyze certain issues of Article III standing raised in the Shotgun/Standing Motion.  When faced

with a shotgun pleading, a court may reserve judgment on standing issues until receiving an amended pleading. *See Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1222 (S.D. Fla. 2020) ("[B]ecause of the shotgun nature of the Complaint, the Court cannot readily decipher who is seeking what relief. Because Plaintiffs are given leave to amend certain claims, the Court will address any standing and statute of limitations arguments that Defendants may raise in response to an amended complaint."). Here, the Court concludes that evaluating certain issues of Article III standing will be far more manageable and effective after the Shotgun/Standing Plaintiffs file amended Class Complaints. This is particularly true given the Court's Orders on the other Rule 12 motions, through which it has dismissed various claims.

That decision notwithstanding, the Court reaches conclusions as to certain Article III standing issues. In the interest of narrowing the issues that might be argued in subsequent Rule 12 motions, the Court addresses those issues below.

### 1. Timing

Before evaluating the issues in the Shotgun/Standing Motion concerning Article III standing, the Court must determine whether they should be decided before or after issues of class certification under Rule 23. The parties seem to agree that the Court should analyze issues of Article III standing now, rather than waiting until briefing on class certification. *See* DE 1630 at 37 ("Eleventh Circuit precedents wholly reject *Langan* to the extent that case holds that (i) the court's assessment of a named plaintiff's standing to pursue a particular claim may be deferred until after the Rule 23 analysis . . . ."); DE 2498 at 49:4-6 ("I think that we agree with the general principle that standing of each Plaintiff against at least one Defendant must be determined at the Rule 12 stage.").

Consistent with the parties' positions, the caselaw appears clear that courts should evaluate Article III standing before those of class certification. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that Article III standing elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case"); *see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) ("It is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.") (quotation marks omitted).   And indeed, "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994).  The Court is thus satisfied that Article III standing can and should be evaluated at this stage of the litigation, and should not be deferred until the class certification stage.

### 2. Article III Standing Analysis at the Pleading Stage

#### a.      Arguments and Allegations

Although the parties appear to agree on when to evaluate Article III standing, they disagree on what the appropriate Article III standing analysis looks like at this stage.  Citing *Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000), the Shotgun/Standing Defendants argue that "the named Plaintiffs must independently meet" the minimum requirements of Article III standing—injury in fact, traceability and redressability—"as to *each* claim asserted against each Defendant," and that "it is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert." DE 1630 at 26 (quotation marks omitted).  They further contend that "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff

has suffered the injury that gives rise to that claim." *Id.* (quotation marks omitted).  With those principles in mind, they note that the CCCAC asserts claims on behalf of all named CCCAC Plaintiffs against all CCCAC Defendants, despite it making clear that not all 82 CCCAC Defendants could have possibly harmed any one of the named CCCAC Plaintiffs, let alone all of them. *Id.*  They make a similar argument regarding the CTPPCC. *See id.* at 27 (noting that no named CTPPCC Plaintiff purchased or reimbursed for OTC products, and further, that "*none of* the named [CTPPCC] Plaintiffs alleges that it reimbursed products from—or had any relationship whatsoever with—certain Generic Manufacturer Defendants, including but not limited to Ajanta, Aurobindo, Geri-Care, Torrent and Zydus-Cadila").

The Shotgun/Standing Plaintiffs argue that they comfortably meet the *Lujan* elements, calling this a "classic 'direct dollars-and-cents injury' that is the hallmark of standing." DE 1980 at 18.  At the pleading stage, they need not allege with certainty which defendant harmed them if "a reasonable investigation under the circumstances points to multiple possible tortfeasors." *Id.* at 19.  Further, standing does not require class representative plaintiffs to suffer injuries that support unnamed class members' claims. *Id.* at 21.  Given the Eleventh Circuit's decision in *Fox v. Ritz-Carlton Hotel Company, L.L.C.*, 977 F.3d 1039 (11th Cir. 2020), a representative need only have the same interest and suffer the same injury as the class members to have class representative standing to bring his claims. *Id.* at 21-22.  Further, the Shotgun/Standing Defendants' reliance on *Prado* is misplaced given that case's procedural posture (*i.e.*, a Rule 23(f) interlocutory appeal) and its focus on "typicality" under Rule 23. *Id.* at 22.  The Shotgun/Standing Defendants' complaints are thus matters of Rule 23 representative capacity rather than Article III standing.

###### b.     Law on Article III Standing at the Pleading Stage

"Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). That a case or controversy exists is a bedrock requirement, and courts cannot exercise judicial power without it. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). "Standing, ripeness and mootness are three traditional doctrines governing whether a case or controversy exists." *Id.* Standing—"perhaps the most important of the jurisdictional doctrines"— is the only one of these doctrines raised in the Shotgun/Standing Motion. *Id.* (quotation marks omitted). The "irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (quotation marks, footnotes and citations omitted). Stated more plainly, a plaintiff must show that the defendant(s) harmed her, and that a court decision can eliminate or compensate for it. *Godiva*, 979 F.3d at 924. That standard applies equally to class actions. *Id.*; *see Cordoba*, 942 F.3d at 1273 ("[T]hat a suit may be a class action adds nothing to the question of standing.") (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016)). Further, "standing is not dismissed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733-34 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Rather, a plaintiff must demonstrate standing for each claim she pursues and each form of relief sought. *Id.*; *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017). The same is true in cases with multiple plaintiffs, and at least

one plaintiff must have standing to seek each form of relief sought. *Town of Chester*, 137 S. Ct. at 1651.

The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 561. The *Lujan* elements are "an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (quotation marks omitted). That said, when "a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each [*Lujan*] element." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks omitted). If a plaintiff fails to plead facts sufficient to show Article III standing, the Court "lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005); *see also Godiva*, 979 F.3d at 925 ("We will not imagine or piece together an injury sufficient to give [a] plaintiff standing when it has demonstrated none.") (quotation marks omitted).

c.     **Analysis and Conclusion**

The Court concludes that at the pleading stage, a proper standing analysis involves an evaluation on a claim-by-claim basis, consistent with the standard set forth in *Prado*. *Prado* states that as to standing, "[i]t is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert," and further, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that

claim." 221 F.3d at 1280; *see also Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).

Further, *Prado* and *Griffin* instruct the Court to determine the issues for which plaintiffs have

standing before considering questions of representative capacity. *Prado*, 221 F.3d at 1280 (quoting

*Griffin*, 823 F.2d at 1483).   Despite the procedural difference between *Prado* and this litigation,

courts in this District have acknowledged the principles in *Prado* when reviewing motions to

dismiss. *See, e.g.*, *Sanchez-Knutson v. Ford Motor Co.*, No. 14-61344-CIV, 2015 WL 11197772

(S.D. Fla. July 22, 2015); *see also Holliday v. Albion Lab'ys, Inc.*, No. 9:14-cv-81294, 2015 WL

10857479 (S.D. Fla. June 9, 2015); *Barron v. Snyder's-Lance, Inc.*, No. 13-62496-CIV, 2015 WL

11182066 (S.D. Fla. Mar. 20, 2015).   Although the *Lujan* elements are less demanding at the

pleading stage than at later stages of litigation, a court must still evaluate standing on a claim-by-

claim basis.

   *Fox v. Ritz-Carlton* is inapposite.   In *Fox*, one restaurant customer filed a putative class

action against Ritz-Carlton for charging an automatic gratuity in violation of Florida law.   While

that lone named plaintiff had dined at just three Ritz-Carlton restaurants, the Eleventh Circuit

allowed him to assert claims on behalf of unnamed plaintiffs who dined at 46 other Ritz-Carlton

restaurants, since the plaintiff had "the same interest and suffered the same injury as the class

members." 977 F.3d at 1047.   Yet as the Shotgun/Standing Defendants note, *Fox* involved just one

named plaintiff suing one defendant under one state's law.   That is markedly different than the

Class Complaints: the CCCAC contains 183 named Plaintiffs, 314 counts, claims arising under

the laws of all 50 states (and the District of Columbia and Puerto Rico), and 82 individual

defendants.   Although the CTPPCC contains three named Plaintiffs and nine counts, they allege

claims arising under the laws of all 50 states (plus the District of Columbia and Puerto Rico) and

against 67 individual defendants.

### 3.  Juridical Link Doctrine

#### a.      Arguments and Allegations

The Shotgun/Standing Defendants assert that the Shotgun/Standing Plaintiffs cannot rely on the juridical link doctrine, which the Shotgun/Standing Plaintiffs claim allows them to sue every culpable defendant on behalf of others with the same injury.  The doctrine cannot confer Article III standing and the Shotgun/Standing Plaintiffs' position counters binding precedent that rejected the concept of class standing. DE 1630 at 28-29.  The Shotgun/Standing Defendants distinguish three cases that apply and/or discuss the doctrine. *See id.* at 29-31 (distinguishing *Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002), *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973); and *Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990)).  Additionally, they cite several cases to support their view that the doctrine cannot confer standing. *Id.* at 31-34.  Even if the doctrine *could* confer standing, it is still inapplicable to this case, since the Eleventh Circuit in *Moore* clarified that it only applies to cases where there is either a contractual obligation among all defendants or a state or local statute requiring common action. *Id.* at 34.

The Shotgun/Standing Plaintiffs argue that the juridical link doctrine applies and rely principally on *Payton* and *Moore*.  At the Hearing, counsel for the Shotgun/Standing Plaintiffs clarified that because every Shotgun/Standing Defendant participates in a scheme regulated by the FDA, they are juridically linked. *See* DE 2498 at 32:5-8 ("[N]one of these Plaintiffs could have ever purchased this defective drug but for the FDA's authorization to these Defendants to manufacture, distribute, and sell it.  That is a juridical link.").[13]

---

[13] During the Hearing, the Shotgun/Standing Plaintiffs admitted that they did not include this argument in their briefing. DE 2498 at 66:3-5.

### b.      Law on Juridical Link Doctrine

The juridical link doctrine is an exception to the general rule that a plaintiff cannot bring a class action against parties that did not injure her.  The juridical link doctrine was first announced in *La Mar*.  In *La Mar*, the Ninth Circuit reviewed two class actions: one action by a single named plaintiff against all Oregon-licensed pawnbrokers for violations of the Truth-in-Lending Act, and one by a named plaintiff against eight named aviation companies for violations of the Federal Aviation Act.  On appeal in the pawnbroker case was the district court's determination that the lawsuit was a proper class action.  On appeal in the airline case was the district court's dismissal of six appellee-aviation companies that argued that they neither dealt with nor caused injury to the named plaintiff.

The Ninth Circuit declined to decide issues of standing, as it found that under Rule 23, the named plaintiffs were "not entitled to bring a class action against defendants with whom they had no dealing." *La Mar*, 489 F.2d at 464.  The court stated further:

> [W]e assert that a plaintiff who has no cause of action against the defendant can not 'fairly and adequately protect the interests' of those who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant and even though his attorney is excellent in every material respect. *Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury.  Nor is it intended to apply to instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious.*

*Id.* at 466 (emphasis added) (footnotes omitted).

The Seventh Circuit recognized the juridical link doctrine in *Payton*, where former arrestees who were released on bail from Illinois county jails filed a putative class action challenging several counties' practice of charging bail fees as conditions for release.  The named plaintiffs were confined to jails in just 2 Illinois counties, yet moved to certify a class consisting

of persons affected by the bail practice in 19 Illinois counties.  All 19 counties followed the same Illinois bail statute.  The defendants moved to dismiss the case, and the district court granted the motion based on its conclusion that the named plaintiffs lacked standing to pursue the entire lawsuit.  The district court also denied the plaintiffs' motion for class certification as moot.  On appeal, however, the Seventh Circuit reversed the district court, found the juridical link doctrine applicable, and concluded that because all 19 counties imposed bond fees pursuant to the same Illinois statute, it was reasonable for the class to try to hold every county accountable in one suit. *Payton*, 308 F.3d at 677-82.

The Eleventh Circuit has discussed the juridical link doctrine in only one case.  In *Moore*, individuals borrowed money from Land Bank Equity Corporation, which provided mortgages on Georgia real estate.  Land Bank sold those mortgages on the secondary market to various financial institutions.  The borrowers subsequently brought a class action against the institutions that purchased Land Bank's loan paper, alleging usury.  In response to a motion by the borrowers seeking to certify a class of defendant-institutions, the district court entered an order *sua sponte* joining, as named defendants, all other institutions that held Land Bank loans secured by real property in Georgia.  The district court joined seven institutions that argued that doing so was improper, since they did not hold paper signed by any named plaintiff-borrower.  Those institutions appealed the district court's decision.

On appeal, the borrowers argued that the juridical link doctrine allowed the court to join the seven institutions.  The Eleventh Circuit acknowledged *La Mar* and several district court cases recognizing the doctrine.  Yet it ultimately found the doctrine inapplicable, stating that each case cited by the borrowers "presents a situation in which there was either a contractual obligation among all defendant or a state or local statute requiring common action by the defendants." *Moore*,

32

908 F.2d at 838.  It instead found that under Rule 20, which concerns permissive joinder, the trial court correctly concluded that certain institutions were properly joined as defendants. *Id.* at 839. That was so because every transaction at issue arose out of transactions or occurrences initiated by Land Bank, and every claim involved the same question of law and fact. *Id.*

       **c.**      **Analysis and Conclusion**

The Court concludes that the juridical link doctrine does not apply to this litigation, insofar as the Shotgun/Standing Plaintiffs cannot rely on the doctrine to sue on behalf of others with the same injury against every culpable defendant.  Nor does the doctrine confer Article III standing. *Payton* is not binding on the Court and is factually distinct from this case, since there, the 19 Illinois counties all imposed bail bond fees pursuant to the same Illinois statute.  Every county thus "took part in a similar scheme that was . . . mandated by a uniform state rule." *Payton*, 308 F.3d at 679.  That is not true here.

*Moore* is also inapplicable.  First, the Eleventh Circuit did not discuss Article III standing anywhere in its opinion.  Second, every loan transaction at issue in *Moore* arose out of a series of transactions initiated by a single bank, and every claim involved the same question of law in fact. On that basis, the court concluded that permissive joinder under Rule 20 was proper.  Third, the court in *Moore* noted that the cases cited by the plaintiffs supporting the juridical link doctrine presented situations "in which there was either a contractual obligation among all defendants or a state or local statute requiring common action by the defendants." 908 F.2d at 838.  Neither condition is present in this litigation.

The Shotgun/Standing Plaintiffs ask this Court to find the doctrine applicable because the FDA's regulatory framework ties every Shotgun/Standing Defendant together. DE 2498 at 31:23-32:8.  By that logic, countless entities subject to the FDA's regulatory framework would also be

juridically linked here.  The Court declines to apply the doctrine so broadly.  Moreover, even if the doctrine applied, the Eleventh Circuit has never held that it can serve to confer or substitute for Article III standing.

### 4.  States Without Named Plaintiffs

#### a.    Arguments and Allegations

The Shotgun/Standing Defendants argue that the Shotgun/Standing Plaintiffs lack standing to assert claims on behalf of class members whose claims arise under the laws of the states in which no named Shotgun/Standing Plaintiffs reside or purchased ranitidine products. DE 1630 at 34-38.  Regarding the CCCAC, the parties disagree on whether the named CCCAC Plaintiffs have standing to assert claims on behalf of putative class members whose claims arise under other states' laws.  The Shotgun/Standing Defendants note that no named CCCAC Plaintiff alleges that he or she resides or purchased ranitidine in Hawaii, Kansas, North Dakota, Rhode Island, or South Dakota. *Id.* at 35.  As to the CTPPCC, they note that no CTPPCC Plaintiff reimbursed purchases for ranitidine products in Alaska, Arkansas, California, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Kansas, Massachusetts, New Hampshire, New York, North Dakota, Oklahoma, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, or any U.S. territory. *Id.* at 23.  They cite several cases from the Eleventh Circuit and this District to argue that named Plaintiffs' standing to pursue claims under the laws of their home states does not in turn allow them to pursue claims under other jurisdictions for putative class members. *See id.* at 35-37.  They also attack Plaintiffs' reliance on *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88 (2d Cir. 2018) and *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533 (7th Cir. 2011).  *Id.* at 35-36; DE 2129 at 11-12.

The Shotgun/Standing Plaintiffs argue that they do not lose Article III standing by alleging claims for putative class members residing in other states. DE 1980 at 24. They characterize this issue as one of representative capacity under Rule 23, rather than Article III standing, and argue that standing does not turn on substantive law. *Id.* at 25. They discuss *Langan* and *Morrison* in detail to illustrate the distinctions between standing, Rule 23, and merits issues, and further, the errors in Shotgun/Standing Defendants' reasoning. *Id.* at 25-27. The Shotgun/Standing Plaintiffs suggest that this issue is better reviewed at the class certification stage than at the motion to dismiss stage.

### b.      Law on States Without Named Plaintiffs

As noted above:

> It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.

*Feldman v. BRP US, Inc.*, No. 17-CIV-61150, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018) (quoting *Prado*, 221 F.3d at 1280). "In accordance with this principle, named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises." *Id.* (collecting cases); *see Barron*, 2015 WL 11182066 (S.D. Fla. Mar. 20, 2015).[14]

---

[14] In *Barron*, purchasers of food products marketed by the defendant alleged that the defendant deceptively and misleadingly marketed certain products as "All Natural." 2015 WL 11182066, at *1. The plaintiffs filed a 30-count complaint under the laws of 10 states, in 9 of which the named plaintiffs had purchased the defendant's products. Yet after some of the named plaintiffs were voluntarily dismissed, those remaining had not purchased the defendant's products in six of the nine states. The Court dismissed the plaintiff's claims for those six jurisdictions. *Id.* at *2.

### c.    Analysis and Conclusion

The Shotgun/Standing Plaintiffs do not refute that no named CCCAC Plaintiff resides or purchased ranitidine in Hawaii, Kansas, North Dakota, Rhode Island or South Dakota.  The Court notes that following the dismissal of 55 named CCCAC Plaintiffs [DE 2241], the same is true of Delaware and Maine.  Nor do the Shotgun/Standing Plaintiffs refute that no named CTPPCC Plaintiff reimbursed for ranitidine products in Alaska, Arkansas, California, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Kansas, Massachusetts, New Hampshire, New York, North Dakota, Oklahoma, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, or West Virginia.

The Court concludes that a named plaintiff lacks standing to assert claims on behalf of putative class members whose claims arise under other states' laws.  Cases within this District are clear on this point. *See Feldman*, 2018 WL 8300534, at *6 ("[N]amed plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises.")*; see also In re Takata Airbag Prods. Liab. Litig.,* MDL No. 2599, 2016 WL 1266609, at *4 (S.D. Fla. Mar. 11, 2016) ("A named plaintiff lacks standing to assert legal claims on behalf of a putative class pursuant to state law under which the named plaintiff's own claims do not arise."); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) ("[T]he named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief.  Class allegations that others suffered injuries giving rise to claims add nothing to the question of standing.") (quotation marks omitted).

The Shotgun/Standing Plaintiffs' reliance on *Langan* is unpersuasive.  *Langan* is not binding on the Court and involved just one named plaintiff and one defendant and the parties agreed that the plaintiff had standing to sue under Connecticut's consumer protection statute.  The

Shotgun/Standing Plaintiffs' reliance on *Morrison* is similarly unconvincing given it, too, is not binding on the Court and concerned whether plaintiffs residing in Illinois could sue for violations of Illinois law on behalf of non-Illinois putative class members.  That is different than this case, where the Shotgun/Standing Plaintiffs bring claims under the laws of several states in which they neither reside, purchased, nor reimbursed for ranitidine.

Nor is the Shotgun/Standing Plaintiffs' reliance on *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202 (S.D. Fla 2015), and *In re Checking Acct. Overdraft Litig.*, MDL No. 2036, 2016 WL 5848730 (S.D. Fla. July 5, 2016) dispositive.  While evaluating a nearly identical question in *Takata Airbag*, the Court distinguished those cases:

> In *Wilson*, the court departed from this District's precedent and held that the named plaintiffs had standing to assert state law claims for unjust enrichment and tortious interference where the laws of states where they did not reside and where they did not claim to have been injured. The court in *Wilson* relied on three cases binding on the Court, along with out of Circuit cases. The court in *Wilson* first cited to *Klay,* in which the Eleventh Circuit stated class certification in multi-state class actions is "a realistic possibility." However, the Eleventh Circuit made that statement responding to arguments related to Rule 23(b)(3)'s predominance requirement, not to standing arguments. Moreover, the Eleventh Circuit expressly stated that, on appeal "the defendants do not challenge the standing of the named plaintiffs." The court in *Wilson* also relied on *In re Checking Account* because that court certified a nationwide class with common law claims represented by Plaintiffs from New York, California, and Washington. However, the court in *In re Checking Account* . . . certified the class only after it had dismissed various state law claims because the named plaintiffs lacked standing.

2016 WL 1266609, at *5 (quotation marks and citations omitted).  The Court follows this District's precedent.

In the CCCAC, Counts 52-60, 75-80, 106-11, 124-29, 209-14, 244-48, and 255-60 are dismissed without prejudice.  CCCAC Counts 2, 4, 5, and 6 are also dismissed without prejudice, to the extent they are brought under the laws of Delaware, Hawaii, Kansas, Maine, North Dakota,

Rhode Island and South Dakota.  In the CTPPCC, Counts 2, 3, and 5-9 are dismissed without prejudice, to the extent that they are brought under the laws of Alaska, Arkansas, California, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Kansas, Massachusetts, New Hampshire, New York, North Dakota, Oklahoma, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, or West Virginia.

## IX. Analysis of Injury Motion

The Court's inability to properly analyze Article III standing issues because the Class Complaints are impermissible shotgun pleadings, *see* discussion *supra* Section VIII.A.3, applies equally to the Injury Motion.  The Court nonetheless reaches conclusions as to some issues, and does so below in the interest of narrowing the issues that might be argued in subsequent Rule 12 motions.

The Court first discusses whether to analyze the Injury Motion under Rule 12(b)(1), Rule 12(b)(6), or both.  It then addresses each of the Injury Plaintiffs' theories for injury in fact, including pocketbook injury, economic loss due to medical monitoring, and physical injury.  The Court ends by discussing the economic loss doctrine, as well as the Injury Plaintiffs' requests for injunctive relief.  For each issue, the Court reviews the arguments of the parties, any relevant allegations in the Class Complaints, and any additional, issue-specific law before providing the Court's analysis and conclusion on the issue.

### A.  Rule 12(b)(1) and Rule 12(b)(6)

The Injury Defendants argue that courts frequently dismiss no-injury cases like the Injury Plaintiffs' for lack of Article III standing under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). DE 2037 at 9.  They state that they are able to bring the Injury Motion under both

rules. DE 2321 at 5 n.1.  The parties disagree, however, on whether a Rule 12(b)(6) motion requires

any state-specific analysis.  Plaintiffs argue:

> For a Rule 12 motion to succeed on a particular state law claim under *Iqbal*, it
> would be 'necessary first to discuss the [substantive legal] principles implicated' to
> identify the claim's elements—which would require an *Erie* prediction—and next
> to identify an essential element of the claim that was not pleaded in the complaint.

DE 2242 at 11 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  Conversely, neither the

Injury Motion nor the reply in support of the Injury Motion contain any such discussion.

The Injury Plaintiffs state that "[i]n the absence of any particular 12(b)(6) argument to

refute, Plaintiffs will focus on standing." DE 2242 at 13.  Because the Injury Plaintiffs have not

responded to the Injury Motion on Rule 12(b)(6) grounds, and because the Injury Defendants have

not undertaken the state-specific analysis that the Injury Plaintiffs believe is warranted, the Court

will evaluate the Injury Motion solely on Rule 12(b)(1) grounds.

## B.  Injury in Fact

### 1.  Economic ("Pocketbook") Injury

#### a.      Arguments and Allegations

The Injury Defendants argue that the Class Complaints constitute "no-injury" class actions,

in part because the Injury Plaintiffs received exactly what they paid for—a heartburn medication—

and did not experience any demonstrable physical injury or argue that the medication was

ineffective.  They note that courts routinely reject class actions based on theories of economic loss

where a drug at issue was effective for its approved indication and benefitted class members. DE

2037 at 12.

The Injury Plaintiffs respond that they plausibly allege an economic (*i.e.,* pocketbook)

injury through purchasing and reimbursing for a drug that has long been misbranded and/or

adulterated, and thus illegal to sell and economically worthless. DE 2242 at 16.  The Class

Complaints, they claim, contain detailed and plausible allegations that ranitidine is, and has been, misbranded and adulterated. *Id.* (citing, as examples, CTPPCC ¶¶ 335-41 and CCCAC ¶¶ 595-604).[15]  They state that ranitidine was unlawfully sold "at least as soon as Defendants knew or should have known that the molecule breaks down into NDMA." *Id.* at 19.  To establish economic injury, the Injury Plaintiffs rely upon the intersection of the foregoing allegations and the case of *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019).  *Debernardis* is therefore the focus of the parties' arguments, with the Injury Plaintiffs arguing the case is highly instructive and analogous to the instant case, and the Injury Defendants arguing that *Debernardis* is a distinguishable case involving a statutory framework with no application to the Class Complaints.

    **b.**    **Law on Economic ("Pocketbook") Injury**

To establish an injury in fact for Article III standing, a plaintiff must allege that she suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quotation marks omitted). For an injury to be particularized, it must affect the plaintiff in a personal and individual way. *Id.* "A concrete injury must be *de facto*; that is, it must actually exist" and be real, rather than abstract. *Id.* (quotation marks omitted).  "[S]tatutory violations do not—cannot—give [courts] permission to offer plaintiffs a wink and a nod on concreteness.  Plaintiffs must show, and the courts must ensure, that an alleged injury is concrete." *Godiva*, 979 F.3d at 925.

In *Godiva*, the Eleventh Circuit stated: "[A] direct harm is the most straightforward way to show a concrete injury—in fact, it's probably what most people think of naturally. . . . Tangible harms are the most obvious and easiest to understand; physical injury or *financial loss* come to

---

[15]  In these paragraphs, the Injury Plaintiffs allege that ranitidine products were misbranded because the Injury Defendants "did not disclose NDMA as an ingredient" in the products, "did not disclose the proper directions for storage" of the products, and "did not disclose the proper directions for expiration" of the products. CTPPCC ¶¶ 338-40; CCCAC ¶¶ 601-03.

mind as examples." *Id.* at 926 (emphasis added).  To establish financial loss, the Injury Plaintiffs rely significantly on *Debernardis*.

In *Debernardis*, purchasers of dietary supplements sued the product's manufacturer and its exclusive distributor pursuant to Illinois, Florida, and New York law, and also alleged claims for common law fraud and unjust enrichment.  According to the plaintiffs' complaint, the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), prohibited selling the supplements because they were presumptively "adulterated" under the FDCA.  Specifically, one ingredient in the supplements qualified as a "new dietary ingredient," in turn creating the presumption under the FDCA that the supplements were adulterated.  Additionally, the plaintiffs alleged facts indicating that, before they purchased the supplements, the FDA sent letters to 14 companies that sold supplements containing the "new dietary ingredient," and warned each that the supplements were adulterated.

On appeal, the Eleventh Circuit concluded that the plaintiffs plausibly alleged that the supplements they purchased were adulterated.  The court found that the complaint plausibly alleged that the supplements contained a "new dietary ingredient," in part because of the FDA's warning letters stating that the supplements were adulterated, which were sent before the plaintiffs purchased the supplements. *Debernardis,* 942 F.3d at 1085 n.6.  While the plaintiffs did not allege that the supplements failed to perform as advertised, the court stated that such allegations were sufficient but not necessary to establish standing. *Id.* at 1086.

The Eleventh Circuit concluded that "[b]ecause the plaintiffs were deprived of the entire benefit of their bargain . . . they adequately alleged that they experienced economic loss." *Id.* at 1088.  Yet it also stated:

> [W]e are not deciding today whether a consumer who alleges he purchased a product that could not legally be sold under a different statutory scheme acquired a

41

worthless product. *We caution that our decision is limited to the specific facts alleged in this case*—that the plaintiffs purchased dietary supplements that Congress, through the FDCA and the DSHEA [Dietary Supplement Health and Education Act], had banned from sale with the purpose of preventing consumers from ingesting an unsafe product.

*Id.* (emphasis added).  The court further cautioned that it was not "addressing whether a plaintiff would have standing if she allegedly purchased a product that lawfully could be sold but came with inadequate warnings . . . or a product that was lawfully sold at the time of purchase but whose sale later was prohibited." *Id.* at 1088 n.8

      **c.**      **Analysis and Conclusion**

There are differences between *Debernardis* and this case.  *Debernardis* involved supplements regulated in part by DSHEA, unlike ranitidine, and which were *presumptively* adulterated pursuant to the FDCA.  The FDA's warning letters expressly acknowledged this presumption that the products were adulterated.  Those warning letters were delivered *before* the plaintiffs in the case purchased the supplements.  The plaintiffs' complaint contained each of these allegations.

*Debernardis* "accept[ed], at least at the motion to dismiss stage, that a dietary supplement that is *deemed* adulterated and cannot lawfully be sold has no value." *Id.* at 1085 (emphasis added). In *Debernardis*, the FDA expressly deemed the supplements adulterated.  Although *Debernardis* does not say *who* must deem a product adulterated before a court accepts such allegations as true, the Court believes that the FDA's express declaration is significant, particularly when a plaintiff does not have a private cause of action to enforce the adulteration and misbranding statute. *See* 21 U.S.C. § 337(a) (providing that "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States"); *Ellis v. C.R. Bard, Inc.*, 311 F.3d

1272, 1284 n.10 (11th Cir. 2002) (explaining that "no private right of action exists for a violation of the FDCA").

The Court views *Debernardis* narrowly because the text of *Debernardis* compels the Court to do so. 942 F.3d at 1088 ("We caution that our decision is limited to the specific facts alleged in this case."). The specific facts alleged in *Debernardis* are not the specific facts alleged in the instant case. Thus, the Injury Plaintiffs cannot rely on *Debernardis* to establish financial loss—to establish an economic injury.

The Court will not determine, at this juncture, whether the Injury Plaintiffs have plausibly alleged a financial loss outside of *Debernardis*. That matter is better reserved for when the Injury Plaintiffs file amended Class Complaints and correct the shotgun pleading issues addressed in this Order. The Court's decision to reserve is reinforced by its decisions in other Orders pertaining to related motions to dismiss. If, on amendment, it is still the Injury Plaintiffs' theory that ranitidine was adulterated or misbranded and, as a result, illegal to sell, the Injury Plaintiffs must explain how that is so and plausibly allege facts in support of the same (in light of the Court's other rulings). Relatedly, if it is the Injury Plaintiffs' theory that a drug may be misbranded if it is created exactly in the manner in which the FDA approved it, this is a theory that must be clearly pled and adequately briefed for the Court's consideration.

## 2. Medical Monitoring; Physical Injury

### a. Arguments and Allegations

The Injury Defendants assert that the Injury Plaintiffs fail to allege actual physical or emotional injury due to ingesting ranitidine. DE 2037 at 16. No Injury Plaintiff alleges being diagnosed with cancer or any other disease in connection with purchasing ranitidine, and further, speculative physical injuries like cellular and subcellular damage are not legally cognizable

injuries. *Id.* at 16-17.  Even if the Injury Plaintiffs could allege such injuries, they must all be alleged in the MPIC. *Id.* at 18.

The Injury Plaintiffs argue that they plausibly allege an injury in fact by stating that they have suffered and will suffer economic losses and expenses due to the need for ongoing medical monitoring. DE 2242 at 22.  *Bouldry v. C.R. Bard, Inc.*, 909 F. Supp. 2d 1371 (S.D. Fla. 2012), supports the notion that an alleged increased risk of future harm satisfies the injury in fact requirement for Article III standing. *Id.*  At the Hearing, counsel for the Injury Plaintiffs argued that this theory of injury in fact pertains to those State Class-specific claims in the CCCAC titled "Medical Monitoring," namely Counts 45, 67, 139, 167, 238, 280 and 302. DE 2498 at 142:14-22. The Injury Plaintiffs also state that they plausibly alleged an injury in fact by alleging accumulation of NDMA in their bodies, cellular damage, subcellular damage and related symptoms, and a significantly increased risk of developing various types of cancers. *Id.* at 23.  They argue that the Court's Pretrial Orders do not require them to replead those allegations in the MPIC.

> **b.      Law on Medical Monitoring**

Parties pursuing medical monitoring claims seek to recover "the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure." *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 259-60 (D. Minn. 2018) (quotation marks omitted).  Medical monitoring claims evolved from "the realization that widely recognized tort law concepts premised upon a present physical injury are ill-equipped to deal with cases involving latent injury." *Id.* at 260 (quotation marks omitted).  Medical monitoring claims are considered non-traditional tort claims. *Id.*  To prevail on a medical monitoring claim, some states require manifest, cellular, or subcellular harm. *See Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 901-02 (Mass. 2009) (requiring at least "subcellular

changes that substantially increased the risk of serious disease, illness or injury" to recover costs of medical monitoring in Massachusetts).  Other states do not impose that requirement. *See In re Nat'l Hockey League*, 327 F.R.D. at 261-62 (noting that Florida recognizes medical monitoring "as an independent cause of action that does not require proof of present injury or cellular or subcellular harm").  This Court and others have held that in the context of medical monitoring, an alleged increased risk of future harm constitutes an injury in fact. *Bouldry*, 909 F. Supp. 2d at 1375; *see also In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 861 (3d Cir.1990) (holding that persons exposed to poly-chlorinated biphenyls, a toxic substance, could sue for medical monitoring expenses because "regardless of whether all plaintiffs alleged demonstrable physical injury, they all clearly alleged monetary injury"), *cert. denied*, 499 U.S. 961 (1991); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 574-75 (6th Cir. 2005) (concluding that standing was present where a defective medical implement presented an increased risk of future health problems).

   **c.**  **Analysis and Conclusion**

   The Court finds the Injury Plaintiffs' reliance on *Bouldry* persuasive and concludes that as to CCAC Counts 45, 67, 139, 167, 238, 280 and 302, the Injury Plaintiffs have plausibly alleged injury in fact by alleging economic losses and expenses due to medical monitoring.  The Court declines to conclude whether the Injury Plaintiffs have plausibly alleged injury in fact for any other CCCAC counts; this is because the Court cannot discern whether the Injury Plaintiffs argue that their alleged physical injuries constitute injury in fact for any other counts other than the medical monitoring counts.

During the Hearing, counsel for the Injury Plaintiffs indicated that their alleged physical injuries[16] constitute injury in fact for every CCCAC claim for those individuals who actually ingested ranitidine:

> THE COURT:   Regarding Plaintiffs' NDMA accumulation, cellular damage, subcellular damage, and increased risk of cancers, are Plaintiffs alleging that these injuries constitute injury in fact for every claim in the consumer complaint?
>
> MR. HEINZ:  It would probably as to the people that ingested Ranitidine.  For the class of people that would include people who purchased it, but didn't ingest it, then it likely would not.

DE 2498 at 142:23-143:5.   Yet at another point, counsel suggested that the Injury Plaintiffs' physical injuries were relevant only to their claims for medical monitoring:

> THE COURT:   What would be the impact if the Court ordered that all of the personal injury claims are to be asserted in the MPIC?  Question for the Plaintiffs. . . .
>
> MR. KELLER:  The medical monitoring claimants are proceeding in a putative class action, so obviously *they have their own personal injuries*, but they are proceeding in a representative capacity on behalf of others.
>             So, our understanding of the order was that you didn't mean for the master personal injury complaint to include class allegations, but obviously it would be a housekeeping matter, and if you prefer us to move *medical monitoring* claims over to the [MPIC], we could amend and do that and accommodate whatever your Honor thinks is the most efficient way to proceed.

*Id.* at 161:4-162:12 (emphasis added).  But in the CCCAC, physical injuries are alleged in more than just those counts titled "Medical Monitoring." *See, e.g.*, CCCAC ¶ 834 (physical injury alleged as part of Count 4 (Common Law Fraud)) ("Defendants' fraudulent conduct directly and proximately caused Plaintiffs and the Class to: (a) be subjected to the accumulation of NDMA in their bodies, including the resulting cellular damage, subcellular damage, and related symptoms; and (b) sustain a significantly increased risk of developing various types of serious and potentially

---

[16] The Court interprets any mention of physical injury in the CCCAC to mean cellular, sub-cellular, and/or genetic injuries that significantly increased the Injury Plaintiffs' risk of developing various types of serious and potentially deadly cancers. *E.g.*, CCCAC ¶ 723.  Indeed, those are the only physical injuries alleged in the CCCAC.

deadly cancers."); *see also* CCCAC ¶ 1081 (physical injury alleged as part of Count 17 (Strict Product Liability/Manufacturing Defect)) ("Plaintiffs and members of the Class would not have: (a) been subjected to the accumulation of NDMA in their bodies, including the resulting cellular damage, subcellular damage, and related symptoms; and (b) sustained a significantly increased risk of developing various types of serious and potentially deadly cancers."). Creating even further uncertainty, each of the CCCAC's 314 counts incorporates *every* factual allegation, including paragraph 722, which alleges that the Injury Plaintiffs sustained out-of-pocket losses and did not receive the benefit of their bargain, *and* paragraph 723, which alleges that due to the Injury Defendants' conduct, the Injury Plaintiffs allegedly suffered physical damages including cellular, sub-cellular, and/or genetic injuries leading to a significantly increased risk of developing certain cancers.

Thus, the Court is unclear as to the Injury Plaintiffs' position, namely whether their alleged physical injuries constitute injury in fact only for those counts titled "Medical Monitoring," or for other counts in the CCCAC as well. Regardless, the Court concludes that *any and all* allegations of physical and/or personal injury do not belong in the CCCAC and, as such, are stricken from the CCCAC. This includes, but is not limited to, those allegations of physical injury in the medical monitoring counts and strict liability counts. Amended Pretrial Order # 31 sets forth a clear procedure for parties asserting personal injury claims in this MDL. The Order specifically explains that "Plaintiffs shall file a Master Personal Injury Complaint on behalf of all Plaintiffs asserting personal injury claims in MDL No. 2924." DE 1496 at 2. At the Hearing, counsel for the Injury Plaintiffs confirmed that the Injury Plaintiffs have personal injuries. DE 2498 at 162:4-5.

This Court acknowledges that other courts, including those managing large MDLs, have addressed the procedural mechanism for filing personal injury and medical monitoring class

allegations differently.  For example, the plaintiffs in *In re National Hockey League* did not file their personal injury and medical monitoring class claims in separate complaints, even though the plaintiffs sought various forms of relief in one complaint, namely declaratory relief, medical monitoring, and compensatory damages. Plaintiffs' Second Amended Consolidated Class Action Complaint at 114-15, 327 F.R.D. 245 (D. Minn 2018) (MDL No. 14-2551).  But this case has in place a structure, set forth in Amended Pretrial Order # 31, that requires the filing of personal injury claims in the MPIC and not in the Class Complaints.  Moreover, the CCCAC is larger and more complex than the complaint in *In re National Hockey League*: it contains over three hundred more counts (314 counts in this case as compared to the six counts alleged in *In re National Hockey League*), over fifty more proposed classes, and over 170 more named plaintiffs.  A case of this size demands the utmost organization, that which was contemplated by the parties and the Court in the entry of Amended Pretrial Order # 31.

The Court recognizes that although Amended Pretrial Order # 31 provides for all personal injury claims to be filed in the MPIC, that complaint is not a class complaint.  Thus, the Injury Plaintiffs, without any prejudice to their substantive claims, may seek leave of Court for an alternative pleading to allege their class physical injury and/or medical monitoring claims.  This approach is implicitly recognized as appropriate by the parties, insofar as the Injury Defendants have argued that these allegations do not belong in the CCCAC and the Injury Plaintiffs, at the Hearing, conceded that they would not be prejudiced by moving the allegations from the CCCAC to another pleading.

### C.  Economic Loss Doctrine

#### 1.  Arguments and Allegations

The Injury Defendants seek to dismiss CTPPCC Counts 5 (fraud), 6 (negligent misrepresentation and omission), 7 (consumer protection laws), and 9 (negligence) by relying on the economic loss doctrine, and argue that because the CTPPCC Plaintiffs are sophisticated commercial entities that allege purely economic losses, they cannot pursue tort law claims. DE 2037 at 18.  The Injury Defendants cite *East River Steamship Corp. v. Transamerica Delaval*, *Inc.*, 476 U.S. 858 (1986), which "upheld the overwhelming 'majority' approach of the States," namely "that preserving a proper role for the law of warranty precludes imposing tort liability if a defective product causes purely monetary harm." *Id.* at 19 (quoting *East River*, 476 U.S. at 868).  They state that they argue only one version of the economic loss doctrine: that "between commercial parties, claims for injury to the product itself without personal injury or other-property damage are contractual and not tort claims." *Id.* at 20 n.9.  The Injury Defendants argue that every state recognizes this "most basic iteration." *See* DE 2498 at 153:7-13.

The Injury Defendants' reply brief includes cases reviewing certain states' laws and holding that the economic loss doctrine bars commercial plaintiffs from bringing tort claims for purely economic losses. DE 2321 at 11-12.  They also note that the Injury Plaintiffs provide no caselaw to refute the doctrine's application, and that "Plaintiffs' lack of substantive support . . . is not a failure of diligence, but futility because no jurisdictions would permit commercial entities in contract to recover tort damages for economic loss alone." *Id.* at 12.

The Injury Plaintiffs respond that *East River* is inapposite because it is a 1986 case that dealt with admiralty law. DE 2242 at 25.  They argue that even if *East River* did, in fact, recognize a majority approach, the Injury Defendants did not identify which jurisdictions apply it. *Id.*

Further, they assert that general allegations that the Injury Plaintiffs' state law claims fail is inadequate, because doing so does not help the Court evaluate the issue. *Id.* The Injury Defendants have the initial burden to demonstrate why the CTPPCC's allegations fail under state law, which the Injury Plaintiffs can then refute. DE 2498 at 158:8-13. The Injury Plaintiffs claim that they "have responses on the merits and stand ready to brief the issue at a later stage." DE 2242 at 26.

### 2. Law on the Economic Loss Doctrine

The economic loss doctrine is a judicially created rule establishing when a tort action is barred if a party only suffers economic losses. *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1030 (11th Cir. 2017). "The rule was designed to prevent the application of tort remedies to traditional contract law damages." *Id.*

The economic loss doctrine is not applied identically across jurisdictions. *East River* recognizes a majority approach, a minority approach, and "[b]etween the two poles . . . a number of cases that would permit a products-liability action under certain circumstances." 476 U.S. at 868-69; *see* Garret W. Hunkins, *The Current State of the Economic Loss Doctrine As Applied to Intentional and Negligent Misrepresentation Claims: A Comparative Analysis*, 84 UMKC L. REV. 1085, 1092 (2016) ("The majority view of the economic loss doctrine is contrasted by a minority view, which prohibits applying the economic loss doctrine to commercial transactions."); *see also* Jeffrey L. Goodman, Daniel R. Peacock & Kevin J. Rutan, *A Guide to Understanding the Economic Loss Doctrine*, 67 DRAKE L. REV. 1, 16-35 (2019) (recognizing 28 states following the "majority rule," 17 states following the "intermediate rule," and the remaining states following the "minority rule").

There is some question as to whether every state recognizes the economic loss doctrine. *See* Ralph C. Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine*,

90 MARQ. L. REV. 921, 925 n.23 (2007) (noting that Arkansas and Montana have rejected the economic loss doctrine).  Yet under at least the majority view, which approximately 28 states follow, "a plaintiff may only recovery under a tort theory when there is a personal injury or damage to other property," and "[i]f the plaintiff suffers purely economic loss, the plaintiff's only avenue of recovery is through contract." Goodman, 67 DRAKE L. REV. at 16-17.

### 3.   Analysis and Conclusion

The Court declines to reach a conclusion on this issue based on the parties' current briefing. The Court's research reveals that many jurisdictions follow the version of the economic loss doctrine that the Injury Defendants argue.  Yet CTPPCC Counts 5, 6, 7, and 9 are alleged under most or all states' laws.

The Injury Plaintiffs did not attempt to justify their pleading strategy, arguing that it is not their burden to indicate which states allow their tort claims.  But they are now on notice of the Injury Defendants' arguments, and Rule 11(b)(2) requires them to bring claims that "are warranted by existing law." Fed. R. Civ. P. 11(b)(2).  If they choose to replead any of those claims, they should only do so for the jurisdictions that permit the claims notwithstanding applicable states' economic loss rules.  If the Injury Defendants still object to any tort claims brought in the amended CTPPCC, they have reserved their right to re-raise this issue in later Rule 12 briefing.

## D.  Injunctive Relief in CCCAC

### 1.   Medical Monitoring as Injunctive Relief

The Injury Defendants argue that the request in the CCCAC for a medical monitoring injunction is improper because the sought-after medical monitoring is actually a request for monetary damages. DE 2037 at 21.  The Injury Plaintiffs respond that this argument is procedurally improper. DE 2242 at 26.  They assert that Rule 12 does not permit the Injury Defendants to ask

the Court to label the request as something other than "injunctive" relief, and point out that, by the Injury Defendants' own admission, they only move "as to the request for an injunction and reserve the arguments that the Consumer Plaintiffs failed to state claims for medical monitoring under applicable states' laws." *Id.* (quoting DE 2037 at 21 n.10).  The Injury Plaintiffs suggest that this is a Rule 23 matter.

Rule 8(a)(3) requires that a pleading contain "a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3).  The Injury Plaintiffs have done so in the CCCAC.  Notwithstanding their request for a fund to pay for medical monitoring, the Court concludes this issue is more appropriate for briefing at the class certification stage.  As the Injury Plaintiffs note, none of cases that the Injury Defendants cite for support were decided on a Rule 12 motion, and nearly all of them were adjudicated at the Rule 23 stage. *See, e.g.*, *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001); *see also Barraza v. C.R. Bard Inc.*, 322 F.R.D. 369 (D. Ariz. 2017).  Reserving the issue until class certification will enable the Injury Plaintiffs to more precisely determine the nature of the medical monitoring sought.  That will in turn aid the Court, for with greater precision, it can more effectively evaluate and determine the nature of the request.

### 2.  Ceasing Marketing and Selling Ranitidine

The Injury Defendants also argue that the request to cease marketing and selling ranitidine is moot. DE 2037 at 23.  They state that they have ceased selling ranitidine, that the Court cannot enjoin conduct that is not happening, and that before future sales could resume, "one must assume (1) that the medications will have been shown to be safe and effective and (2) that [the] FDA will have approved the medications for sale." DE 2321 at 15-16.  The Injury Plaintiffs state that that is not the standard for mootness. DE 2242 at 28.  They argue that because the Injury Defendants

engaged in a decades-long conspiracy, withdrew ranitidine merely because of anticipated litigation, and have not acknowledged liability, the request is not moot. *Id.* at 28-30.

Article III of the Constitution limits federal courts to adjudicating live cases or controversies. *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000). That requirement "subsists through all stages of federal judicial proceedings, trial and appellate." *Id.* "A claim for injunctive relief may be moot if: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety & Health Rev. Comm'n*, 102 F.3d 1200, 1201 (11th Cir. 1997) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). When a court considers whether it lacks jurisdiction due to mootness, it looks at the events at the present time, rather than when the complaint was filed. *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1254 (11th Cir. 2001).

The Court concludes that the Injury Plaintiffs' request is not moot. Given that all ranitidine products were voluntarily recalled, it cannot be said with assurance that there is no reasonable expectation that the Injury Defendants will resume selling ranitidine. The first prong of *Reich* is thus not satisfied. Nor have the Injury Defendants set forth any reasons why the second prong is satisfied.

## X. Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss and/or Strike Master Personal Injury Complaint on Grounds of Impermissible Shotgun Pleading and Incorporated Memorandum of Law is **GRANTED**; Defendants' Amended Motion to Dismiss and/or Strike Consolidated Consumer and Third Party Payor Class Action Complaints on Grounds of Impermissible Shotgun Pleading and Lack of Article III Standing and Incorporated

Memorandum of Law is **GRANTED IN PART AND DENIED IN PART**; and The Generic Manufacturers' and Repackagers' Rule 12 Motion to Dismiss Consolidated Consumer and Third-Party Payor Class Action Complaints on the Ground of Failure to Allege an Injury and Incorporated Memorandum of Law is **DENIED**.

1. The Master Personal Injury Complaint, Consolidated Consumer Class Action Complaint, and Consolidated Third Party Payor Class Complaint are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** consistent with this Order.

2. All claims and allegations of physical injury and medical monitoring in the CCCAC, including Counts 45, 67, 139, 167, 238, 280 and 302, are **STRICKEN WITHOUT PREJUDICE**.  The Injury Plaintiffs may seek leave of Court for an alternative pleading to allege their class physical injury and/or medical monitoring claims.

3. Under Pretrial Order # 36, the repled Master Complaints are due 30 days after the Court issues its Order on Article III standing. DE 1346 at 4.  The Court **AMENDS** that requirement in Pretrial Order # 36.  The repled Master Complaints are due 30 days after the Court issues its forthcoming Order on Branded Defendants' Rule 12 Partial Motion to Dismiss Plaintiffs' Three Complaints as Preempted by Federal Law. DE 1580.  All other requirements in Pretrial Order # 36 remain in place.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 31st day of December, 2020.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE