**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                    MDL NO. 2924
PRODUCTS LIABILITY                                              20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**ORDER GRANTING BRANDED DEFENDANTS' RULE 12 PARTIAL MOTION TO
DISMISS PLAINTIFFS' THREE COMPLAINTS AS PREEMPTED BY FEDERAL LAW**

This matter is before the Court on the Branded Defendants' ("Defendants") Rule 12 Partial

Motion to Dismiss Plaintiffs' Three Complaints as Preempted by Federal Law ("Motion to

Dismiss"). DE 1580.  The Court held a hearing on the Motion to Dismiss on December 15, 2020

("the Hearing"). *See* DE 2499. The Court has carefully considered the Motion to Dismiss, the

Plaintiffs' Response [1976], the Defendants' Reply [DE 2134], the Plaintiffs' Notice of

Supplemental Authority [DE 2159], the arguments that the parties made during the Hearing, and

the record and is otherwise fully advised in the premises.  For the reasons set forth below, the

Motion to Dismiss is **GRANTED**.

**I.   Factual Background**[1]

This case concerns the pharmaceutical product Zantac and its generic forms, which are

widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the

active ingredient in both Zantac and its generic forms.

---

[1] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." (quotation marks omitted)).  Plaintiffs have set forth their factual allegations in three "master" complaints: the Master Personal Injury Complaint ("MPIC"), the Consolidated Consumer Class Action Complaint ("CCCAC"), and the Consolidated Third Party Payor Class Complaint ("CTPPCC") (collectively "Master Complaints"). DE 887, 888, 889.

Zantac has been sold since the early 1980's, first by prescription and later as an over-the-counter ("OTC") medication. In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. MPIC ¶¶ 226, 231, 432. GlaxoSmithKline ("GSK") first developed and patented Zantac. *Id.* ¶ 230. Zantac was a blockbuster – the first prescription drug in history to reach $1 billion in sales. ¶ 231.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233. Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237. The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 234. Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 235. The right to sell OTC Zantac in the United States later passed to Boehringer Ingelheim Pharmaceuticals and then to Sanofi. *Id.* ¶¶ 239-40, 242-44. When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 249-51.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 253, 321, 324, 331. Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 253, 264-72. The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 254, 258. The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 4, 263.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 285.  The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 286.  On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 296.  The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.*  Six months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 301.

## II.  Procedural Background

After the discovery that ranitidine products may contain NDMA, Plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products.  On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1.  Since that time, hundreds of Plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the Southern District of Florida.  In addition, this Court has created a Census Registry where thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed three Master Complaints on June 22, 2020. DE 887, 888, 889. Plaintiffs contend that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. MPIC ¶¶ 1, 6, 19.  Plaintiffs allege that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4. Plaintiffs are pursuing federal

3

claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* CCCAC.  The entities named as defendants are alleged to have designed, manufactured, tested, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine products. MPIC ¶¶ 20, 225.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 30, the Court set a case management schedule that is intended to prepare the MDL for the filing of *Daubert* motions on general causation and class certification motions in December 2021. DE 875; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  In Pretrial Order # 36, the Court set a schedule for the filing and briefing of motions to dismiss under Federal Rule of Civil Procedure 12 directed to the Master Complaints. DE 1346. Defendants filed the instant Motion to Dismiss pursuant to that schedule.

### III.  The Master Complaints

#### A.  Master Personal Injury Complaint

All individuals who file a Short Form Complaint (collectively, the "MPIC Plaintiffs") adopt the MPIC. MPIC at 2.[2]  The MPIC Plaintiffs allege that they developed cancers from taking ranitidine products. *Id.* at 1.  The MPIC "sets forth allegations of fact and law common to the personal-injury claims" within the MDL. *Id.* at 1.  Each MPIC Plaintiff individually seeks compensatory damages, punitive damages, restitution, and all other available remedies. *Id.* at 1-2.

The defendants named in the MPIC (collectively, the "MPIC Defendants") are entities that "designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine." *Id.* ¶ 20.  They are categorized by the MPIC Plaintiffs into five groups: (1) Brand-Name Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; (4)

---

[2] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.

4

Retailer Defendants; and (5) Repackager Defendants.  Some MPIC Defendants belong to multiple categories.[3]  Within each category, the MPIC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named MPIC Defendants.[4]  Certain allegations apply to MPIC Defendants across multiple groups.[5]

The MPIC contains 15 counts: Strict Products Liability—Failure to Warn (Count I), Strict Products Liability—Design Defect (Count II), Strict Products Liability—Manufacturing Defect (Count III), Negligence—Failure to Warn (Count IV), Negligence Product Design (Count V), Negligent Manufacturing (Count VI), General Negligence (Count VII), Negligent Misrepresentation (Count VIII), Breach of Express Warranties (Count IX), Breach of Implied Warranties (Count X), Violation of Consumer Protection and Deceptive Trade Practices Laws (Count XI), Unjust Enrichment (Count XII), Loss of Consortium (Count XIII), Survival Actions (Count XIV), and Wrongful Death (Count XV).  Counts I, II, IV, VII, IX, X, XI, XII, XIII, XIV and XV are brought against every MPIC Defendant.  Counts V and VIII are brought against every Brand-Name Manufacturer, Generic Manufacturer and Repackager Defendant.  Counts III and VI are brought against every Brand-Name Manufacturer and Generic Manufacturer Defendant.

## B.  Consolidated Consumer Class Action Complaint

One hundred and eighty-three named individuals (collectively, the "CCCAC Plaintiffs") bring the CCCAC on behalf of themselves and all others similarly situated.[6]  The CCCAC Plaintiffs are citizens of nearly every state, the District of Columbia, and Puerto Rico.  There are

---

[3] For example, AmerisourceBergen is named as both a Generic Manufacturer Defendant and a Distributor Defendant. MPIC at 15 n.3.
[4] For example, CCCAC Defendant "Sanofi" refers to five entities: Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Sanofi S.A., Patheon Manufacturing Services LLC, and Boehringer Ingelheim Promeco, S.A. de C.V. MPIC ¶ 36.
[5] See, e.g., MPIC ¶ 44 (allegations referring to Repackager Defendants apply to Ajanta, a Generic Manufacturer Defendant).
[6] The CCCAC originally had 238 named plaintiffs, but 55 were subsequently dismissed without prejudice. See Order Granting Plaintiffs' Unopposed Motion to Drop Certain Plaintiffs from Consolidated Consumer Class Action Complaint, DE 2241.

no CCCAC Plaintiffs who reside in or purchased ranitidine products from Delaware, Hawaii, Kansas, Maine, North Dakota, Rhode Island, or South Dakota.  Each CCCAC Plaintiff asserts that he or she purchased and/or used a ranitidine product during an approximate timeframe.

The CCCAC Plaintiffs bring the action in their individual capacities and on behalf of numerous classes pursuant to Rule 23.  Among the various classes are two nationwide classes: (1) the "RICO Class," comprised of "[a]ll residents of the United States or its territories who purchased for personal, family, or household use any of Brand-Name Manufacturer Defendants' Ranitidine-Containing Products in the United States or its territories"; and (2) the "Nationwide Class," comprised of "[a]ll residents of the United States or its territories who purchased and/or used for personal, family, or household use, any of the Defendants' Ranitidine-Containing Products in the United States or its territories." CCCAC ¶ 734.  The CCCAC alleges that as an alternative, and/or in addition to, the Nationwide Class, the CCCAC Plaintiffs bring the action in their individual capacities and on behalf of "State Classes" for all fifty states, the District of Columbia, and Puerto Rico. *Id.* ¶ 737.  Each State Class is comprised of "[a]ll residents of [State or Territory] who purchased and/or used for personal, family, or household use, any of the Defendants' Ranitidine-Containing Products in the United States or its territories." *Id.*

The defendants named in the CCCAC are entities that "invented, manufactured, distributed, labeled, marketed, advertised, . . . stored, and sold ranitidine." *Id.* ¶ 259.  They are categorized by the CCCAC Plaintiffs into five groups: (1) Brand-Name Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; (4) Retailer Defendants; and (5) Repackager Defendants (collectively, the "CCCAC Defendants").  Some CCCAC Defendants belong to multiple categories.  Within each category, the CCCAC combines distinct corporate

entities, including parents, subsidiaries, and affiliates, into single named CCCAC Defendants. Certain allegations apply to CCCAC Defendants across multiple groups.

The CCCAC alleges 314 counts against the CCCAC Defendants.  The CCCAC Plaintiffs allege Count 1 (RICO) on behalf of the RICO Class against the Brand-Name Manufacturer Defendants. *Id.* ¶ 750.  The CCCAC Plaintiffs allege Count 2 (unjust enrichment) and Count 3 (Magnuson-Moss Warranty Act) on behalf of the Nationwide Class against all CCCAC Defendants. *Id.* ¶¶ 795, 804.  Alternatively, they bring Count 2 "on behalf of themselves under the laws of the state in which each [CCCAC] Plaintiff resides and/or purchased Ranitidine-Containing Products, and on behalf of a Class comprised of members from each [CCCAC] Plaintiff's respective state." *Id.* ¶ 795.  The CCCAC Plaintiffs allege Count 4 (fraud) on behalf of the Nationwide Class against the Brand-Name Manufacturer Defendants, the Generic Manufacturer Defendants, and the Repackager Defendants. *Id.* ¶ 823.  Alternatively, they bring Count 4 "on behalf of themselves under the laws of the state in which each [CCCAC] Plaintiff resides and/or purchased Ranitidine-Containing Products, and on behalf of each State Class." *Id.*  The CCCAC Plaintiffs allege Count 5 (negligence) and Count 6 (battery) on behalf of numerous State Classes against all CCCAC Defendants. *Id.* ¶¶ 839, 886.  Finally, the CCCAC Plaintiffs allege Counts 7 through 314 (including breach of express and implied warranties; failure to warn; manufacturing defects; design defects; state consumer protection violations; deceptive trade practices; and medical monitoring) on behalf of the various State Classes against some or all of the CCCAC Defendants. *Id.* ¶¶ 906-5899.

## C.  Consolidated Third-Party Payor Class Complaint

The NECA-IBEW Welfare Trust Fund, the Plumbers & Pipefitters Local Union 630, and the Indiana Laborers Welfare Fund (collectively, the "CTPPCC Plaintiffs") bring the CTPPCC on

behalf of themselves and all others similarly situated. CTPPCC at 8.  The CTPPCC Plaintiffs are entities that provide eligible members with health and welfare benefits, such as paying and reimbursing for prescription drugs on behalf of their members and dependents.  Each CTPPCC Plaintiff's members have filled prescriptions requiring reimbursement for ranitidine products in several states.

The CTPPCC Plaintiffs bring the action on behalf of a "Nationwide TPP Class" comprised of:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third party payors and any other health benefit provider, in the United States of America and its territories, which paid or incurred costs for prescription Zantac or the Generic Manufacturer Defendants' Ranitidine-Containing Products for purposes other than resale since their respective approval dates.

*Id.* ¶ 506.  As an alternative and/or in addition to the Nationwide TPP Class, the CTPPCC Plaintiffs bring the action in their individual capacities and on behalf of state classes for all fifty states, the District of Columbia, and Puerto Rico ("State CTPPCC Classes"). *Id.* ¶ 508.  Each State CTPPCC Class is comprised of:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third party payors and any other health benefit provider, in the United States of America and its territories, which paid or incurred costs for prescription Zantac or the Generic Manufacturer Defendants' Ranitidine-Containing Products for purposes other than resale since their respective approval dates.

*Id.*  The Nationwide TPP Class and the State CTPPCC Classes are collectively referred to in the CTPPCC as the "TPP Class" or "Classes." *Id.* ¶ 511.

The defendants named in the CTPPCC are companies that "invented, made, distributed, labeled, marketed, advertised, . . . stored, and sold ranitidine." *Id.* ¶ 29.  They are categorized by the CTPPCC Plaintiffs into two groups: (1) Brand-Name Manufacturer Defendants, and

(2) Generic Manufacturer Defendants (collectively, the "CTPPCC Defendants").  Within each category, the CTPPCC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named CTPPCC Defendants.

The CTPPCC Plaintiffs allege nine counts against the CTPPCC Defendants: Count 1 (RICO); Count 2 (breach of express warranties); Count 3 (breach of implied warranties); Count 4 (Magnuson-Moss Warranty Act); Count 5 (fraud); Count 6 (negligent misrepresentation and omission); Count 7 (violations of state consumer protection laws); Count 8 (unjust enrichment); and Count 9 (negligence).  The CTPPCC Plaintiffs allege Count 1 on behalf of the TPP Class against the Brand-Name Manufacturer Defendants.  The CTPPCC Plaintiffs allege Counts 2-9 on behalf of the TPP Class against GSK and the Generic Manufacturer Defendants.[7]

## IV.   Summary of the Parties' Arguments

The Defendants contend in the Motion to Dismiss that the design-defect claims against them are pre-empted because they could not change the design of ranitidine products without FDA approval while remaining in compliance with federal law.   And, 21 U.S.C. § 379r expressly pre-empts the Plaintiffs' claims that seek to recover refunds for the purchase of OTC ranitidine products.

The Plaintiffs respond that none of their claims against the Defendants are pre-empted. Their design-defect claims are not pre-empted because the claims are based on ranitidine products that were misbranded when sold, on labeling defects that the Defendants could have remedied without FDA approval, and on GSK's failure to propose a different drug formulation and/or different labeling to the FDA when seeking the initial approval to market ranitidine products.

---

[7] The Generic Manufacturer, Repackager, Retailer, and Distributor Defendants also brought motions to dismiss based on pre-emption that the Court has ruled upon by separate Orders. *See* DE 2512; DE 2513.  The Court refers to all defendants named in this MDL collectively as "named defendants."

Section 379r does not expressly pre-empt the Plaintiffs' claims that seek to recover refunds for the purchase of OTC ranitidine products.

## V.  Summary of the Court's Rulings

Design-defect claims based on the FDA-approved formulation of ranitidine products are pre-empted, regardless of the Plaintiffs' allegations that the products were misbranded.  The Plaintiffs' claims against Defendants based on allegations of failure to make changes to the FDA-approved design that the Defendants could not have made independently while remaining in compliance with federal law are dismissed with prejudice as pre-empted.  Because all of the design-defect counts in the Master Complaints incorporate such allegations, all of the design-defect counts against the Defendants are dismissed.  The Court grants the Plaintiffs leave to replead design-defect claims that are based on labeling defects and to plead pre-approval design-defect claims.  The Plaintiffs' claims that seek a refund and are not premised upon a personal injury to a plaintiff's person or property are not saved from express pre-emption under 21 U.S.C. § 379r(e).

## VI.  Standard of Review

Defendants move to dismiss some of the claims against them under Federal Rule of Civil Procedure 12(b)(6) based on the affirmative defense of federal pre-emption. *See* DE 1580 at 1; DE 2499 at 145; *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 619 (2011) (describing federal pre-emption as a drug manufacturer's affirmative defense).  A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).  But the court need not accept legal conclusions couched as factual allegations.

*Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019).  "Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).  A "complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *aff'd en banc*, 764 F.2d 1400 (11th Cir. 1985).

## VII.  Analysis

An understanding of the law that applies to drugs approved by the FDA is necessary to understand the arguments that the parties make in briefing the Motion to Dismiss.  Before turning to the parties' arguments, the Court (A) discusses key statutes and regulations that govern the FDA's regulation of drugs.  The Court next addresses impossibility pre-emption and significant cases that have addressed impossibility pre-emption in the drug context.  The Court then turns to the issues raised in the briefing: (B) impossibility pre-emption for design-defect claims, and (C) express pre-emption under 21 U.S.C. § 379r.  For each issue, the Court reviews the arguments of the parties, any relevant allegations in the Master Complaints, and additional, issue-specific law before providing the Court's analysis and conclusion on the issue.

### A.  Federal Regulation of Drug Products

The FDA regulates prescription and OTC drugs under the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. § 301 *et seq.* ("FDCA").  The FDCA provides a process for the FDA to approve a new drug through a new drug application ("NDA") and a process for the FDA to approve a drug that is the same as a previously approved drug through an abbreviated new

drug application ("ANDA").  *See* 21 U.S.C. § 355.  A drug must have an FDA-approved NDA or ANDA to be introduced into interstate commerce.  *Id.* § 355(a).

### 1. NDAs

An NDA must contain scientific data and other information showing that the new drug is safe and effective and must include proposed labeling. *See id.* § 355(b)(1).  The FDCA defines the term "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." *Id.* § 321(m).  The FDA may approve the NDA only if it finds, among other things, that the new drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling"; that there is "substantial evidence that the drug will have the effect it purports or is represented to have . . . in the proposed labeling"; that the methods and facilities for manufacturing, processing, and packaging the drug are adequate "to preserve its identity, strength, quality, and purity"; and that the labeling is not "false or misleading in any particular." *Id.* § 355(d).  A drug approved under the NDA process, commonly referred to as a "brand-name drug," is "listed" by the FDA as having been "approved for safety and effectiveness." *See id.* § 355(j)(7).  Following the approval of its NDA, a brand-name drug has a certain period of exclusivity in the marketplace. *See id.* § 355(j)(5)(F).

### 2. ANDAs

Subject to that period of exclusivity, a drug manufacturer may seek the approval of a drug that is identical in key respects to a listed drug by filing an ANDA. *See id.* § 355(j); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 477 (2013) (explaining that a generic drug may be approved through the ANDA process "provided the generic drug is identical to the already-approved brand-name drug in several key respects").  A drug approved under the ANDA process is commonly referred

to as a "generic drug."  The ANDA must contain information showing that the generic drug has

the same active ingredient(s), route of administration, dosage form, strength, therapeutic effect,

and labeling as the listed drug and is "bioequivalent" to the listed drug. 21 U.S.C.

§ 355(j)(2)(A).  With limited exceptions, the FDA may approve the ANDA only if it finds that the

generic drug and its proposed labeling are the same as the listed drug and the listed drug's labeling.

*See id.* § 355(j)(4); *see also* 21 C.F.R. § 314.94(a)(8)(iii), (iv) ("Labeling (including the container

label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be

the same as the labeling approved for the reference listed drug . . . .").

### 3.  Changes to Drugs with Approved NDAs and ANDAs

The FDA also has requirements for when and how a drug manufacturer may change a drug

or drug labeling that has an approved NDA or ANDA. *See* 21 C.F.R. §§ 314.70, .97(a).  These

requirements differ depending on the category of change that the manufacturer seeks to make.

A "major change" is

any change in the drug substance, drug product, production process, quality
controls, equipment, or facilities that has a substantial potential to have an adverse
effect on the identity, strength, quality, purity, or potency of the drug product as
these factors may relate to the safety or effectiveness of the drug product.

*Id.* § 314.70(b)(1).  Such changes include certain labeling changes, changes "in the qualitative or

quantitative formulation of the drug product, including inactive ingredients," and changes "in the

synthesis or manufacture of the drug substance that may affect the impurity profile and/or the

physical, chemical, or biological properties of the drug substance." *Id.* § 314.70(b)(2)(i), (iv), (v).

A major change requires a "supplement submission and [FDA] approval prior to distribution of

the product made using the change." *Id.* § 314.70(b).  This supplement is referred to as a "Prior

Approval Supplement." *See In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,

756 F.3d 917, 923 (6th Cir. 2014).

A "moderate change" is

> any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a moderate potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product.

21 C.F.R. § 314.70(c)(1).  The process for making a moderate change is commonly called the "changes-being-effected" process or "CBE" process. *See Mensing*, 564 U.S. at 614.  A moderate change generally requires a "supplement submission at least 30 days prior to distribution of the drug product made using the change." 21 C.F.R. § 314.70(c).  The drug product with the change may be distributed prior to FDA-approval, but only after the passage of 30 days from the FDA's receipt of the supplement. *Id.* § 314.70(c)(4).  This supplement is referred to as a "Changes Being Effected in 30 Days" supplement. *See id.* § 314.70(c)(3).

However, the FDA may designate certain moderate changes that may be made upon the FDA's receipt of the supplement and need not await the passage of 30 days. *Id.* § 314.70(c)(6). Such changes include certain changes "in the labeling to reflect newly acquired information" and "changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength, quality, purity, or potency that it purports or is represented to possess." *Id.* § 314.70(c)(6)(i), (iii).  Where the passage of 30 days is not required, the supplement is referred to as a "Changes Being Effected" supplement. *Id.* § 314.70(c)(3).

Finally, a "minor change" is a change "in the drug substance, drug product, production process, quality controls, equipment, or facilities that ha[s] a minimal potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product." *Id.* § 314.70(d)(1).  Such a change includes an "extension of an expiration dating period based upon full shelf life data on production

batches obtained from" an approved protocol. *Id.* § 314.70(d)(2)(vi).   A minor change must be "described in an annual report." *Id.* § 314.70(d).

### 4.  Impossibility Pre-emption

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.   "It is basic to this constitutional command that all conflicting state provisions be without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819)).   The pre-emption doctrine is derived from the Supremacy Clause. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

Supreme Court caselaw has recognized that state law is pre-empted under the Supremacy Clause in three circumstances. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990).   First, "Congress can define explicitly the extent to which its enactments pre-empt state law." *Id.*   Second, "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *Id.* at 79.   Third, state law is pre-empted "to the extent that it actually conflicts with federal law . . . where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citation and quotation marks omitted).   Three key Supreme Court opinions have addressed impossibility pre-emption—a subset of conflict pre-emption—in the drug context.

### a.  *Wyeth v. Levine*

In *Wyeth v. Levine*, a consumer of a brand-name drug sued the brand-name drug manufacturer on negligence and strict-liability theories under Vermont law for failure to provide

an adequate warning on the drug's labeling. 555 U.S. 555, 559-60 (2009).  The Supreme Court held that the consumer's labeling claims were not pre-empted because the CBE process permitted the brand-name drug manufacturer to "unilaterally strengthen" the warning on the labeling, without waiting for FDA approval. *Id.* at 56869, 571, 573.  The Court stated that it could not conclude that it was impossible for the brand-name drug manufacturer to comply with both its federal-law and state-law duties "absent clear evidence that the FDA would not have approved" a labeling change. *Id.* at 571.  The brand-name drug manufacturer "offered no such evidence," and the fact that the FDA had previously approved the labeling did "not establish that it would have prohibited such a change." *Id.* at 572-73.

> **b.** *PLIVA, Inc. v. Mensing*

In *PLIVA, Inc. v. Mensing*, consumers of generic drugs sued the generic drug manufacturers under Minnesota and Louisiana tort law for failure to provide adequate warnings on the drugs' labeling. 564 U.S. at 610.  The Supreme Court held that the consumers' labeling claims were pre-empted because the generic drug manufacturers could not "independently" change the labeling while remaining in compliance with federal law. *Id.* at 618-20, 623-24.  The generic drug manufacturers' "duty of 'sameness'" under federal law required them to use labeling identical to the labeling of the equivalent brand-name drug. *Id.* at 613.  Thus, the CBE process was unavailable to the generic drug manufacturers to change labeling absent a change to the brand-name drug's labeling. *Id.* at 61415.  Because any change that the generic drug manufacturers made to the drugs' labeling to comply with duties arising under state tort law would have violated federal law, the state tort claims were pre-empted. *Id.* at 618, 623-24.

The consumers argued, and the FDA asserted in an amicus brief, that even if the generic drug manufacturers could not have used the CBE process to change the labeling, the manufacturers

could have "asked the FDA for help" by proposing a labeling change to the FDA. *Id.* at 616, 619. The consumers further argued that their state-law claims would not be pre-empted unless the generic drug manufacturers demonstrated that the FDA would have rejected a proposed labeling change. *Id.* at 620. The generic drug manufacturers conceded that they could have asked the FDA for help. *Id.* at 619.

The Supreme Court rejected the argument that the ability to ask the FDA for help defeated impossibility pre-emption. *Id.* at 620-21. The Court stated that the "question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *Id.* at 620 (citing *Wyeth*, 555 U.S. at 573). "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24. Asking the FDA for help "would have started a Mouse Trap game" that eventually may have led to a labeling change, "depending on the actions of the FDA and the brand-name manufacturer." *Id.* at 619-20. But, the Court stated, pre-emption analysis that was dependent on what a third party or the federal government might do would render impossibility pre-emption "all but meaningless." *Id.* at 620-21 ("If these conjectures suffice to prevent federal and state law from conflicting for Supremacy Clause purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have any force.").

   **c.  *Mutual Pharmaceutical Co. v. Bartlett***

In *Mutual Pharmaceutical Co. v. Bartlett*, a consumer of a generic drug brought a design In *Mutual Pharmaceutical Co. v. Bartlett*, a consumer of a generic drug brought a design defect claim under New Hampshire law against a generic drug manufacturer for failure to ensure that the drug was reasonably safe. 570 U.S. at 475. Under New Hampshire law, a drug manufacturer could

satisfy its duty to ensure that its drug was reasonably safe "either by changing a drug's design or by changing its labeling." *Id.* at 482, 492.  However, because the generic drug manufacturer was unable to change the drug's composition "as a matter of both federal law and basic chemistry," the only way for the manufacturer to fulfill its state-law duty and "escape liability" was by changing the labeling. *Id.* at 475, 483-84 (citing 21 U.S.C. § 355(j) for the proposition that "the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based").  The Supreme Court concluded that, under *Mensing*, federal law prohibited the generic drug manufacturer "from taking the remedial action required to avoid liability" under state law, that is, changing the labeling, and therefore the consumer's design-defect claim was pre-empted. *Id.* at 475, 486-87 (citing *Mensing*, 564 U.S. 604).

The First Circuit Court of Appeals had ruled that the generic drug manufacturer could comply with both federal and state law by removing the drug from the market. *Id.* at 475, 479.  The Supreme Court stated that this was "no solution" because adopting this "stop-selling rationale would render impossibility pre-emption a dead letter and work a revolution in th[e] Court's pre-emption case law." *Id.* at 475, 488-90 (rejecting the stop-selling rationale as "incompatible" with pre-emption jurisprudence because, in "every instance in which the Court has found impossibility pre-emption, the 'direct conflict' between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting").  Pre-emption caselaw "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.* at 488.

**B. Impossibility Pre-emption and Design-Defect Claims**

    **1. Arguments and Allegations**

        The Defendants seek dismissal of Counts II and V of the MPIC and of the 47 design-defect counts in the CCCAC listed in Appendix A to the Motion to Dismiss. DE 1580 at 27, 32-35.  The Defendants argue that these design-defect claims are premised on the theory that they should have designed ranitidine products to be safer. *Id.* at 7-8, 22, 24-25.  Such claims are pre-empted because the Defendants could not change the design of ranitidine products without FDA approval while remaining in compliance with federal law, and therefore it was impossible for them to independently fulfill any duties under state design-defect causes of action. *Id.* at 7-8, 22-27.

        The Plaintiffs concede that the Defendants could not independently redesign the FDA-approved formulation of ranitidine products while remaining in compliance with federal law. DE 1976 at 16 (citing 21 C.F.R. § 314.70(b)(2)(i) for the proposition that "[c]hanging the formulation of an approved medication is a major change requiring FDA preapproval").  The Plaintiffs contend, however, that their design-defect claims should not be dismissed as pre-empted for two reasons. *Id.* at 7, 16.  First, they have alleged in the Master Complaints that ranitidine products were "misbranded" as that term is defined in 21 U.S.C. § 352(a)(1) and (j). *Id.* at 20-21, 24.  The U.S. Code prohibits the introduction of misbranded drugs into interstate commerce. *Id.* at 11, 21.  And state laws prohibit the sale of defectively designed drugs. *Id.* at 21.  Therefore, because federal law and state laws "parallel" to prohibit the same action, the sale of drugs that are misbranded and dangerous, there is no conflict between federal and state law and no impossibility in complying with both federal and state law. *Id.* at 17, 21-23.  The Defendants can be held liable under state design-defect causes of action for failing to stop selling misbranded ranitidine products. *Id.* at 7, 17.

Second, the Plaintiffs assert that some states consider a drug's labeling to be part of the drug's design, and therefore they may pursue design-defect claims against the Defendants under the laws of those states. *Id.* at 7, 16-20.  The Supreme Court ruled in *Wyeth v. Levine* that labeling claims against brand-name drug manufacturers are not necessarily pre-empted. *Id.* at 15-16; *see Wyeth*, 555 U.S. at 571-73.

The Plaintiffs maintain that, as to design-defect claims against GSK, there is a third reason that the claims should not be dismissed as pre-empted. DE 1976 at 17.  That is, GSK could have proposed a different drug formulation and/or different labeling to the FDA when seeking approval of the initial NDA for a ranitidine product. *Id.*  The Plaintiffs may pursue a pre-approval design-defect claim against GSK. *Id.*

The Plaintiffs allege in each Master Complaint that ranitidine products were misbranded because the named defendants "did not disclose NDMA as an ingredient" in the products, "did not disclose the proper directions for storage" of the products, and "did not disclose the proper directions for expiration" of the products. MPIC ¶¶ 421-23; CCCAC ¶¶ 601-03; CTPPCC ¶¶ 338-40.  The Plaintiffs allege in the MPIC that ranitidine products "were defective in design and formulation in that . . . they were unreasonably dangerous" because they were susceptible to breaking down into NDMA. MPIC ¶¶ 478-79, 481(a)-(b), 523(a)-(c).  The named defendants "could have designed ranitidine-containing products to make them less dangerous" and "could have employed safer alternative designs and formulations." *Id.* ¶¶ 481(k), 485, 523(j).  The Defendants, as well as the Generic Manufacturer and Repackager Defendants, breached their duty to use reasonable care in designing ranitidine products because the products had "an inherent susceptibility to form NDMA" and "exposed users to unsafe levels" of NDMA. *Id.* ¶¶ 521-22, 525.

Plaintiffs make similar allegations in the CCCAC.  The CTPPCC does not contain a design-defect count.

### 2.  Law on Design Defects

A change "in the qualitative or quantitative formulation of the drug product, including inactive ingredients" is a major change that requires the submission of a Prior Approval Supplement to the FDA and FDA approval. 21 C.F.R. § 314.70(b)(2)(i); *see also Bartlett*, 570 U.S. at 477 (citing § 314.70(b)(2)(i) for the proposition that "[o]nce a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the qualitative or quantitative formulation or the drug product" (quotation marks omitted)).  A claim that a brand-name drug manufacturer should have changed a drug's FDA-approved formulation is a pre-empted claim because the manufacturer cannot make such a change independently and while remaining in compliance with federal law. *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298-99 (6th Cir. 2015); *see Epstein v. Gilead Scis., Inc.*, No. 19-81474-CIV, 2020 WL 4333011, at *2 (S.D. Fla. July 27, 2020) (holding that a claim that a brand-name drug manufacturer should have designed drugs with different ingredients was pre-empted because the FDA had approved the drugs' formulas and "any changes would have required further approval"); *see also Mensing*, 564 U.S. at 620 ("The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it.").

Federal courts are split on the issue of whether a design-defect claim against a brand-name drug manufacturer is pre-empted if based on an allegation that the manufacturer should have proposed a safer drug to the FDA for initial approval.  The Sixth Circuit Court of Appeals held in *Yates* that such a pre-approval design-defect claim was pre-empted. 808 F.3d at 299-300.  The court reasoned that the claim was "too attenuated" and "speculative" because it would require a

court or jury to assume that the FDA would have approved an alternative design for a drug, that the plaintiff would have selected the alternatively designed drug for use, and that the alternatively designed drug would have been safer. *Id.* at 299.  The court further reasoned that, under *Mensing*, impossibility pre-emption existed because any initial alternative design would have required FDA approval before being marketed. *Id.* at 300 ("Defendants could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the drug], and certainly prior to Yates's use of the drug.").  Finally, the court stated that a pre-approval design-defect claim was similar to a stop-selling argument, which the Supreme Court rejected in *Bartlett*. *Id.* ("In contending that defendants' pre-approval duty would have resulted in a birth control patch with a different formulation, Yates essentially argues that defendants should never have sold the FDA-approved formulation . . . in the first place.  We reject this never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale of the First Circuit.").

Some district courts have likewise ruled that pre-approval design-defect claims are pre-empted. *See, e.g.*, *Gustavsen v. Alcon Lab'ys, Inc.*, 272 F. Supp. 3d 241, 254-55 (D. Mass. 2017) (acknowledging the split among federal courts, finding "the Sixth Circuit's conclusion in *Yates* more consistent with" *Mensing* and *Bartlett*, and stating that "defendants here could not have marketed [eye] droppers . . . in the manner plaintiffs advocate without the FDA's prior approval" and that it was "irrelevant that the defendants could have designed an entirely different product before they sought approval, which may never have been granted"), *aff'd*, 903 F.3d 1 (1st Cir. 2018); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185-86 (S.D.N.Y. 2016) (concluding that a negligent design-defect claim was pre-empted where plaintiffs asserted "that the defendants had a pre-approval duty to submit a differently designed drug for FDA approval"); *Brazil v.*

*Janssen Rsch. & Dev. LLC*, 196 F. Supp. 3d 1352, 1364 (N.D. Ga. 2016) (concluding that a plaintiff's "original design theory of liability makes little sense in the face of the Supreme Court's precedents" such as *Mensing* and *Bartlett*).

Other district courts have held that pre-approval design-defect claims are not pre-empted. Courts have reasoned that it is not impossible for a manufacturer to design a drug differently before seeking FDA approval. *See, e.g.*, *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 824 (N.D. Cal. 2019) (concluding that pre-approval design-defect claims were not pre-empted where there was no evidence "that the FDA would not have approved the allegedly safer versions of the drugs" that the plaintiffs contended would have complied with state law); *Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187, 1208 (E.D. La. 2016) ("[T]he dispositive question presented here is simply: Can a drug manufacturer independently design a reasonably safe drug in compliance with its state-law duties before seeking FDA approval?  The answer is yes."); *Trahan v. Sandoz, Inc.*, No. 3:13-cv-350-J-34MCR, 2015 WL 2365502, at *6 (M.D. Fla. Mar. 26, 2015) (ruling that, "because there is no basis to find that Sandoz was required under federal law to choose the purportedly substandard glass vial in the first place, the fact that Sandoz could not later change the vial without FDA approval does not establish impossibility preemption"); *Est. of Cassel v. Alza Corp.*, No. 12-cv-771-WMC, 2014 WL 856023, at *6 (W.D. Wis. Mar. 5, 2014) (rejecting a defense of impossibility pre-emption where "[n]o federal law prohibited defendants from submitting a different design" and where the defendants offered no "evidence that the FDA would have exercised its authority to prohibit defendants from creating and submitting such a design for approval").

Courts that have rejected pre-emption of pre-approval design-defect claims have also refused to accept that there may be no way for a consumer to hold any drug manufacturer—either

brand-name or generic—liable for a defective drug formulation. *See, e.g.*, *Guidry*, 206 F. Supp. 3d at 1206-07 (stating that, if the court were to rule that "the plaintiff's defective design claim is preempted, even under a pre-FDA approval theory, the result is that a Louisiana plaintiff can *never* bring a defective design claim against a drug manufacturer"); *Est. of Cassel*, 2014 WL 856023, at *5 (explaining that, "[s]ince defendants would find preemption wherever a manufacturer needs to ask for FDA approval before marketing, and since *all* new drugs require FDA approval before marketing, no drug manufacturer could *ever* be liable for a defectively designed product under defendants' interpretation" and rejecting that interpretation because "[n]one of the impossibility preemption cases to date contemplates this wholesale preemption of state product liability claims, at least in the drug context").

### 3.  Analysis and Conclusion

The Court discusses the Plaintiffs' misbranding theory at length in the Order Granting Generic Manufacturers' and Repackagers' Rule 12 Motion to Dismiss on the Ground of Preemption. DE 2512 at 20-30.  There, the Court explains that no court has adopted the theory that impossibility pre-emption can be avoided by showing that a drug is misbranded under federal law. *Id.* at 27.  The Court further explains why *Mensing* and *Bartlett* dictate a contrary result. *Id.* at 22-28.  As with generic drugs, a claim based on an allegation that a brand-name drug's FDA-approved formulation renders the drug misbranded is a pre-empted claim because the drug's manufacturer cannot independently and lawfully change a drug formulation that the FDA has approved.  The Plaintiffs' claims against the Defendants based on allegations of failure to make changes to the FDA-approved design that they could not have made independently while remaining in compliance with federal law are dismissed with prejudice as pre-empted.  Because all of the Plaintiffs' design-defect counts in the Master Complaints incorporate these allegations,

all of the design-defect counts against the Defendants are dismissed.  The Plaintiffs should omit such allegations from claims against the Defendants when repleading the Master Complaints.

The Plaintiffs are correct that some states address the adequacy of drug labeling as part of a design-defect claim. *See, e.g.*, *Bartlett*, 570 U.S. at 482-84 (analyzing the requirements of a design-defect claim under New Hampshire law and explaining that the duty to ensure that a drug's design is not unreasonably dangerous "can be satisfied either by changing a drug's design or by changing its labeling").  Because the CBE process enables brand-name drug manufacturers to strengthen warnings on labeling without waiting for FDA approval, a labeling claim against a brand-name drug manufacturer is not necessarily pre-empted. *Wyeth*, 555 U.S. at 568-73 (concluding that claims against a brand-name drug manufacturer for inadequate warnings on labeling were not pre-empted where the manufacturer offered no "clear evidence that the FDA would not have approved" a labeling change).  Therefore, the Plaintiffs are granted leave to replead design-defect claims against the Defendants that are based on the labeling of ranitidine products.

The Court declines to determine at this juncture whether a pre-approval design-defect claim is pre-empted.  This is because the Plaintiffs have not pled a pre-approval design-defect claim.  The design-defect counts in the Master Complaints do not differentiate between GSK—the entity alleged to have initially designed the ranitidine molecule—and any other named defendant.  The Plaintiffs instead allege that all of the named defendants could have designed safer ranitidine products. *See, e.g.*, MPIC ¶¶ 481(k), 485.  The Plaintiffs have not identified which, if any, states recognize a pre-approval duty that drug manufacturers owe to consumers.

Moreover, the parties' briefing on whether a pre-approval design-defect claim is pre-empted is inadequate in informing the Court of the parties' positions.  The Defendants devote only one paragraph to this issue, and the Plaintiffs devote only one footnote to the issue.

*See* DE 1580 at 26-27; DE 1976 at 17.  Neither side acknowledges that this is an issue on which federal courts are split; neither side provides substantive legal analysis; and neither side addressed the matter at the Hearing.  Should the Plaintiffs raise a pre-approval design-defect claim or claims upon repleading, and should the Defendants challenge the claim(s) on the ground of pre-emption in a future motion, the parties shall meaningfully brief this matter.

Accordingly, Counts II and V of the MPIC and the 47 design-defect counts in the CCCAC listed in Appendix A to the Motion to Dismiss are dismissed against the Defendants without prejudice and with leave to amend, consistent with this Order. *See* DE 1580 at 32-35.  Upon repleading, the Plaintiffs should bring all claims arising under separate states' laws in separate counts in each of the Master Complaints.  The Plaintiffs should also bring any pre-approval design-defect claims in separate counts from any post-approval design-defect claims that are based on labeling. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense.").

## C.  Express Pre-emption under 21 U.S.C. § 379r

The Defendants move to dismiss all 320 state-law claims to recover alleged monetary losses from the purchase of OTC ranitidine.  The basis for the Defendants' requested dismissal is that 21 U.S.C. § 379r expressly pre-empts these state-law claims.  In response, the Plaintiffs argue that their claims are not pre-empted for two reasons.  First, the Plaintiffs characterize their claims as parallel to federal claims because they have alleged that ranitidine products were misbranded under federal law.  Second, the Plaintiffs invoke the savings clause in § 379r, which exempts from pre-emption any claim arising under the product liability law of a state.  The Court briefly addresses the Plaintiffs' argument about misbranding before analyzing the § 379r savings clause.

Although the Plaintiffs argue that their state-law claims parallel federal misbranding law, this argument cannot be squared with their pleadings.  First, the Plaintiffs have not pled any standalone state-law count for misbranding, nor have the Plaintiffs pled the jurisdictions where, according to the Plaintiffs, state causes of action impose requirements identical to federal misbranding law.  Second, only 14 of the Plaintiffs' 323 counts in the CCCAC and CTPPCC explicitly reference misbranding at all. *See* CCCAC, Counts 2, 5, 33, 97, 99, 208, 264, and 266; CTPPCC, Counts 2, 3, 5, 7, 8, and 9.[8]  Third, federal misbranding law arguably applies only to labeling, *see* 21 U.S.C. § 352(a)-(j), but the Plaintiffs' claims encompass more than just labeling. By way of example, the Plaintiffs allege that the Defendants could have complied with state law through disclosures in advertisements and public service announcements. CCCAC ¶ 2367.  Fourth, the Court has ruled that the Master Complaints are shotgun pleadings that must be amended. *See* DE 2515.  Fifth, any analysis of state misbranding claims requires a careful consideration of whether state-law requirements are greater than federal requirements. *E.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005) (remanding for the circuit court to consider whether state-law duties are equivalent to federal misbranding requirements).  As the Master Complaints are currently pled, the Court cannot undertake a careful, state-by-state analysis of state-law-based misbranding claims.  Sixth and finally, the Court has found that the Plaintiffs' allegations of misbranding lack clarity and must be repled. *See* DE 2515 at 43.  For all of these reasons, the Court rejects the Plaintiffs' misbranding-based arguments as an exception to § 379r pre-emption but will permit the Plaintiffs, in an amended and clarified pleading, to raise the exception anew.[9]

---

[8] Each of the Plaintiffs' counts incorporate every factual allegation.  For this reason, as well as others, the Court concluded that all of the Master Complaints are shotgun pleadings that must be repled. *See* DE 2515 at 18, 22-23.

[9] This issue should also receive additional attention and discussion in future briefing.

27

The Court turns to the Plaintiffs' remaining argument that the savings clause in § 379r preserves their claims.  To analyze this argument, the Court considers (1) the facial applicability of § 379r to the Plaintiffs' claims, (2) the appropriate body of authority to consider the scope of the § 379r savings clause, and (3) the scope of the § 379r savings clause.

### 1.   The Facial Applicability of § 379r to the Plaintiffs' Claims

### a.   Arguments

The Defendants cite to 21 U.S.C. § 379r(a) and argue that the express pre-emption provision contained therein bars the Plaintiffs' claims for refunds.[10]  In response, the Plaintiffs do not argue that their claims are outside of the scope of § 379r(a).[11]  Instead, the Plaintiffs rely upon the proposition that the savings clause in § 379r permits their claims to proceed because their claims sound in product liability law.  Before examining the specifics of the Plaintiffs' position, however, the Court examines the law generally applicable to federal pre-emption under § 379r.

### b.   Applicable Law as to § 379r Pre-emption, Generally

Congress has explicitly mandated that federal law pre-empts nearly all state-law claims relating to OTC medications.  *See* 21 U.S.C. § 379r(a).  Specifically, consumers may not bring any state-law claims that would impose duties on companies marketing OTC products that are "different from," "in addition to," or "otherwise not identical with" a federal requirement under the FDCA. *Id.*

Courts interpret § 379r's "federal requirement" pre-emption broadly, applying § 379r to federal regulations. *See Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 793-95 (2002) (finding that a federal regulation for OTC head lice products established federal "requirements");

---

[10] The Defendants do not argue § 379r pre-emption for claims premised upon personal injury.

[11] The Plaintiffs did make one related argument; the Plaintiffs argued that, because ranitidine was misbranded, their claims were parallel to federal requirements.  The Court has already rejected that argument.

*see also Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 785-87 (E.D. Tex. 2008).  Courts find that § 379r pre-empts even state-law advertising claims, provided the advertisements are based upon content approved by the FDA for a drug's labeling, *Andrus v. AgrEvo USA Co.*, 178 F.3d 395, 400 (5th Cir. 1999), in addition to claims that would require additional warnings on labeling or in an advertisement. *Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008) ("A reasonable reading of §379r(c)(2) is that it expands the universe of potentially pre-empted state law claims to include those that require additional warnings in the advertising for nonprescription drugs, and not only on the labeling.").  Finally, § 379r pre-empts not only state legislation and regulations, but also common-law duties. *Cf. Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324-25 (2008) (holding that common-law causes of action were pre-empted under the express pre-emption provision of the Medical Device Amendments of 1976).

Courts, therefore, find claims that are founded in FDA-approved labeling to be pre-empted under § 379r, regardless of how those claims are styled.  For example, in *Carter v. Novartis Consumer Health, Inc.*, consumers filed class actions against manufacturers of OTC cough and cold medicines, claiming that the manufacturers knew or should have known that their medications were unsafe for children. 582 F. Supp. 2d at 1276-77.  The plaintiff-consumers brought causes of action that included fraud, unjust enrichment, false and misleading advertising, fraudulent concealment, unfair and deceptive business practices, and breach of express and implied warranties. *Id.* at 1277.  The court dismissed all claims, finding § 379r pre-emption.  *See id.* at 1284 ("[T]he analysis under § 379r depends not on the theory upon which the claim is brought, but its ultimate outcome: would a finding of liability impose requirements that are different from or in addition to FDA requirements?"), 1290 ("Defendants' Motion to Dismiss is GRANTED as to all claims pursuant to express pre-emption under 21 U.S.C. § 379r.").  Similarly, in *Kanter v.*

*Warner-Lambert Co.*, consumers brought a class action against three manufactures of OTC head lice medication under causes of action including breach of warranty, fraud and deceit, false advertising, and unfair competition. 99 Cal. App. 4th at 788, 796.  The California state court found each cause of action pre-empted under § 379r because, although "the legal theories underlying these causes of action . . . differ[ed], each [was] bottomed on the assertion that th[e] approved label [was] no longer accurate or adequate and that the label should be changed or the product banned." *Id.* at 796.

   c.   **Analysis and Conclusion as to § 379r Pre-emption, Generally**

   The Court agrees with the Defendants that, at least as a facial matter, caselaw establishes that all of the Plaintiffs' state-law claims against the Defendants are pre-empted to the extent those claims are premised upon the adequacy of OTC ranitidine products' design or label and are limited to injuries stemming from the purchase of ranitidine.  In response, the Plaintiffs have provided neither argument nor caselaw to the contrary—the Plaintiffs do not argue, for example, that some of their claims are not premised upon the adequacy of ranitidine products' design or label; the Plaintiffs rest upon their misbranding argument which the Court rejected, *supra*.  The Court therefore turns to the Plaintiffs' argument that their claims satisfy the savings clause in § 379r.[12]

   2.   **The Appropriate Body of Authority to Consider the Scope of the § 379r Savings Clause**

   a.   **Arguments on the Appropriate Body of Authority**

   The Plaintiffs cite to 21 U.S.C. § 379r(e), which reads as follows: "Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the

---

[12] The parties dispute whether the Plaintiffs have the burden to show that their claims survive pre-emption under the § 379r savings clause.  The Court notes that there is caselaw to support the Defendants' argument that Plaintiffs do carry such a burden, *see Carter*, 582 F. Supp. at 1288, but the Court need not resolve this dispute, as the Court's conclusions are not based upon any allocation of burden.

product liability law of any State."  Because the Plaintiffs contend that their claims sound in state product liability law, they argue that their claims are saved under § 379r(e), and because the Defendants have not made a state-by-state argument that the Plaintiffs' claims fail under state product liability law, the Motion to Dismiss must be denied.  The Defendants reply that the Court must look to federal law—not state law—to define the phrase "product liability law" as used in § 379r(e) because, while the states may have been granted some leeway under § 379r(e) to expand or contract product liability law, there is a limit on just how much leeway § 379r(e) grants to the states.  Put another way, it is the Defendants' position that, when Congress saved causes of action sounding in product liability law, Congress had a certain intent as to what type of claims could be saved on a state-by-state basis.

The phrase at issue in § 379r(e) is "the product liability law of any State."  The Defendants argue that the appropriate body of authority to consult in the interpretation of a phrase in a federal statute is federal law, not state law.  The Plaintiffs argue that state law should be consulted because of the wording in § 379r(e): "Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State."  If Congress had intended federal law to govern the scope of the § 379r savings clause, the Plaintiffs argue, the statute would have saved "product liability claims," not the "product liability law of any State."

### b.  Applicable Law, the Appropriate Body of Authority

Federal law generally governs terms used in federal statutes. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) (holding that the meaning of "physical force" is a question of federal law, not state law); *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 111-12 (1983) (holding that the meaning of "convicted" is a question of federal law, not state law, despite the fact "that the

predicate offense and its punishment are defined by the law of the State"), *superseded by* 18 U.S.C. § 921(a)(20); *United States v. Alexander*, 802 F.3d 1134, 1139 (10th Cir. 2015) (holding that the meaning of "consensual" is a question of federal law, not state law).  It is undisputed that the phrase "product liability law" in § 379r is an undefined term, and "where a federal statute contains a term with settled meaning under the common law, courts must presume Congress meant to import that meaning unless the statute says otherwise." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1118 (11th Cir. 2018).

In response, the Plaintiffs provide no authority for the proposition that the Court should consult state law to interpret phrases in federal statutes.  Instead, the Plaintiffs cite to two cases where courts considered the boundaries of the § 379r savings clause and, in each case, the court consulted state law, not federal law.

The Plaintiffs' first citation is to *Carter v. Novaritis Consumer Health, Inc.*, 582 F. Supp. at 1271.  In *Carter*, the defendant argued that because the plaintiff was seeking only economic damages—not damages for personal injury—the plaintiff's claims could not arise under the product liability law of California and, as a result, § 379r did not save the plaintiff's claims from pre-emption. *Id.*  The *Carter* court agreed with the defendant because California law supported the defendant's position. *Id.*  The *Carter* court was not called upon to consult federal law or the law of any other state because whether other states were at issue was "unclear." *Id.* ("[B]ut the extent to which the four Complaints at issue are brought under the laws of other states is unclear.").

The Plaintiffs' second citation is to *In re Tylenol (Acetaminophen) Mktg.*, No. 2:13-md-02436, 2015 WL 7076012, at *6 n.20 (E.D. Pa. Nov. 13, 2015).  In *Tylenol*, the defendant argued that the plaintiff's state-law fraud claims did not qualify as product liability claims. *Id.*  The court cited Alabama law—the state the claims were brought under—and concluded that Alabama law

*did* classify the claims at issue as falling under the more general umbrella of "product liability" claims. *Id.* Nothing in the *Tylenol* decision suggests that the court was asked to consider federal law on the scope of § 379r.

### c.   Analysis and Conclusion, the Appropriate Body of Authority

The Defendants have cited a plethora of authority for the proposition that federal law should be consulted to determine the meaning of phrases in federal statutes—authority that the Plaintiffs have not refuted.  The caselaw is binding. *E.g., Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 854 (11th Cir. 2009) ("Because the Disclosure Act is a federal statute its interpretation is a matter of federal law.").  Of course, this is not to suggest that state law is irrelevant—just as a claim under § 379r could be foreclosed by federal law, state law could foreclose the very same claim.  This is precisely what happened in *Carter*—the court in *Carter* had no need to consult federal law when state law foreclosed a claim from the § 379r savings clause.  And while it is true that the *Tylenol* court found that state law permitted a claim under § 379r, the *Tylenol* court did not reach the question of whether federal law foreclosed the same claim.  In conclusion, the Court must consult federal law to determine the meaning of the phrase "product liability law" in § 379r(e).

### 3.   The Scope of the § 379r(e) Savings Clause

### a.   Arguments as to the Scope of § 379r(e)

The Defendants only move to dismiss claims that seek monetary losses stemming from the purchase of ranitidine products themselves—the Defendants do not seek to dismiss any claims where the Plaintiffs have suffered a personal injury.[13]  Limiting their requested relief as such, the Defendants argue that Congress did not intend for certain claims to be saved as product liability

---

[13] The Defendants move to dismiss Count 2 and Counts 4-314 from the CCCAC, Count 12 from the MPIC, and Counts 2, 3, 5, and 9 from the CTPPCC.

claims when the injury supporting those claims was limited to the purchase of a product and did not include any injury to a plaintiff's person or property.   In response, the Plaintiffs make two arguments.   First, the Plaintiffs argue that *remedies* cannot be pre-empted—only *claims* can be— and a request for a refund is a remedy, not a claim.   Second, the Plaintiffs argue that the definition of product liability under federal common law is unsettled and, as a result, cannot bar their claims.

### b.   Applicable Law, the Scope of § 379r(e)

Although Congress did not expressly define "product liability" in § 379r, if the term has certain meanings under the common law then the Court must presume that Congress intended to utilize those meanings. *See Garcia-Celestino*, 898 F.3d 1110 at 1118.   In *Home Warranty Corp. v. Caldwell*, the Eleventh Circuit Court of Appeals was called upon to conduct an exhaustive, comprehensive analysis of the history of product liability law, together with common-law definitions of the same and congressional understanding of those definitions. 777 F.2d 1455, 1457-62 (11th 1985).   Based upon its review, the *Caldwell* court concluded that "[i]t is a traditional concept of products liability law that the products liability risk does not include the loss of or damage to the product itself." *Id.* at 1486.   Instead, the general scope of product liability law encompasses injuries to a person or a person's property.   *See id.* at 1457-59. Federal regulations comport with this general definition. *See* 26 C.F.R. § 1.172-13(b)(2)(i) (federal regulation defining "product liability" to "mean[ ] the liability . . . for damages resulting from physical injury or emotional harm to individuals, or damage to or loss of the use of property").   The Restatement also comports with this definition. Restatement (Third) of Torts: Products Liability § 21 (Am. L. Inst. 1998) (providing that the only economic losses recoverable in product liability are those involving personal injury or property damage other than damage to the defective product itself).   State law generally conforms to this definition as well. *See E. River S.S. Corp. v. Transam. Delaval, Inc.*,

476 U.S. 858, 868-69 (1986) (explaining that the majority of states preclude tort liability for pure economic loss); *Carter*, 582 F. Supp. 2d at 1288 ("In fact, Plaintiffs have not demonstrated that product liability law in *any* state omits a requirement for injury to one's person or property.").

In response to the foregoing authority, the Plaintiffs have not provided a citation to any federal case holding that a product liability claim may be pursued where the plaintiff has not suffered a *personal* injury.

### c.  Analysis, the Scope of § 379r(e)

The Court rejects the Plaintiffs' argument that the Defendants have focused on the pre-emption of a remedy in lieu of the pre-emption of a claim.  The Defendants' argument is not that the Plaintiffs' claims are pre-empted because of the remedy (a refund) that the Plaintiffs seek; the Defendants' argument is that the Plaintiffs have not suffered a personal *injury* that, under federal law, is required for a claim to qualify as a product liability claim.

The Plaintiffs contend that there is no settled meaning of product liability law in either the federal common law or the common law of the states, and the Plaintiffs' proposition is adequately supported with citations to authority.  *E.g., E. River S.S. Corp.*, 476 U.S. at 868-69.  Even so, the Defendants do not necessarily dispute that, in the general sense, there is uncertainty as to the *precise* common-law definition of "product liability law."  Ultimately, however, this Court need not define the precise boundaries of product liability law, nor does the Court need to define everything that Congress intended when it enacted § 379r.  What is before this Court is whether Congress intended to permit state-law causes of action when no plaintiff suffered a *personal injury* to their person or to their property—when a plaintiff's damages are limited solely to the purchase of the product itself.  As to this specific boundary, as to this specific question, the Defendants have the more persuasive argument.  The Court concludes that Congress did not intend for any state to

have the authority, under the § 379r(e) savings clause, to classify a claim as a product liability claim when the plaintiff did not suffer a personal injury.  Thus, any claim for a refund for the purchase of OTC ranitidine products that is premised upon the allegation that Plaintiffs suffered no personal injury—to themselves or to their property—is not saved under the § 379r savings clause.[14]

## VIII.   Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Branded Defendants' Rule 12 Partial Motion to Dismiss Plaintiffs' Three Complaints as Preempted by Federal Law [DE 1580] is **GRANTED** consistent with this Order.

1.      Counts II and V of the MPIC and the 47 design-defect counts in the CCCAC listed in Appendix A to the Motion to Dismiss as against Defendants are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, consistent with this Order.

2.      The Plaintiffs' amended pleadings are due within 30 days of the date of this Order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 8th day of January, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

---

[14] Although the CCCAC alleged personal injury in the form of cellular and sub-cellular damage, the Court struck those allegations from the CCCAC at docket entry 2515, permitting the Plaintiffs to seek leave of Court for an alternative pleading to allege their class physical injury and/or medical monitoring claims.