## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

                                    JUDGE ROBIN L. ROSENBERG
                          MAGISTRATE JUDGE BRUCE E. REINHART

_____/
THIS DOCUMENT RELATES TO ALL CASES IN WHICH
ANY GENERIC MANUFACTURER IS NAMED
_____

### MOTION FOR PROTECTIVE ORDER REGARDING PORTIONS OF PLAINTIFFS' NOTICE OF ORAL AND VIDEO DEPOSITION OF GENERIC DEFENDANT PURSUANT TO RULE 30(b)(6) (MANUFACTURING) FILED ON BEHALF OF ALL GENERIC MANUFACTURERS
_____

Pursuant to Federal Rules of Civil Procedure 26 and 30 and PTOs 32, 54, and 60, the Generic Manufacturers move for a protective order as to portions of the "Notice of Oral and Video Deposition of Generic Defendant Pursuant to Fed. R. Civ. P. Rule 30(b)(6)" that were deemed served as of February 9, 2021 relating to manufacturing (the "Manufacturing Notice").[1]

The Generic Manufacturers incorporate by reference its Introduction and discussion of the law in its contemporaneously filed Motion relating to the Storage and Transportation Notice.

I.      **The Generic Manufacturer Defendants Have Agreed to Provide Witnesses on Many of the Topics in the Manufacturing Notice.**

Plaintiffs' manufacturing defect claim was dismissed on December 31, 2020 and there is no manufacturing defect claim in the Amended Master Personal Injury Complaint ("AMPIC"). Instead, Plaintiffs allege that the Generic Manufacturers should have set shorter expiration dates and should have done other testing to uncover NDMA. Although such claims are also subject to dismissal, the Generic Manufacturers who manufacture ranitidine-containing products ("RCPs") have nonetheless offered to present witnesses to testify in response to the Manufacturing Notice as it relates to setting, evaluating, and retesting the expiration dates for their RCPs"; those who do not, have offered to respond to written discovery confirming that fact. The Generic Manufacturers who manufacture RCPs also have offered to provide testimony as to testing performed on RCPs that relate to detection of NDMA as well as related policies and procedures. This covers portions of most of the 46 total topics in the Manufacturing Notice.[2]

Plaintiffs, however, are not happy with these offers, and instead demand that the Generic Manufacturers prepare and present witnesses to testify regarding (1) the *entire* manufacturing process for both API and finished dose product ("FDP"); (2) the results of *all* "Testing" *ever* conducted on ranitidine; (3) *all other* nitrosamines in addition to NDMA, *regardless* of product; (4) *all* impurities, *regardless* of whether they have anything to do with NDMA; and (5) communications with *every* regulatory authority *in the entire world;* (6) during an *unlimited* time period. As set forth below and in the accompanying Motions, Plaintiffs' demands are unreasonable and disproportionate to the needs of the litigation.

II.     **Global Issues with the Manufacturing Notice.**

A.      **The AMPIC Does Not Include a Manufacturing Defect Claim So Topics Directed to the Manufacturing Process Should Be Excluded.**

Despite the AMPIC not including any manufacturing defect claims, Plaintiffs demand that the Generic Manufacturers present a witness on "the specific process or processes used to manufacture the [ranitidine], including, but not limited to, the drug substance, synthesis, purification, crystallization or recrystallization process, testing of the pH values of the drug substance, grade of ranitidine drug substance, solvent composition, solvent volume, water concentration, and crystal morphology." *See* Manufacturing Notice, Topic No. 1. Preparing a witness to testify regarding minute details of the manufacturing process when there is no claim

---

[1] All Generic Manufacturers were served with identical notices. A copy of the Notice is attached as Exhibit 1.
[2] The Generic Manufacturers also note that a number of topics in the Manufacturing Notice do not relate to manufacturing, expiration dates, or testing, and instead are duplicative of topics in the S&T Notice.

against the Generic Manufacturers regarding their manufacturing process is not proportional. Moreover, this topic (among others) focuses on the manufacture of API, even though the vast majority of Generic Manufacturers did not manufacture API and there are no claims directed to API manufacturing.  Requiring a witness to simply state this (as opposed to responding via interrogatory) is not proportional to the needs of the case.

Plaintiffs also demand a witness to provide detailed information regarding solvents used during the manufacturing process.[3]  Topics directed to "recovered" or "recycled" solvents or ingredients in ranitidine finished drug product are entirely unrelated to the claims asserted in the AMPIC and thus disproportional to the needs of the case.  As discussed in the Motion directed to the S&T Notice, Plaintiffs allege that the ranitidine API molecule is itself allegedly inherently defective.  Preparing a witness to testify regarding the historic use and/or practice of using any ingredient, including "recovered" or "recycled" solvents is overly burdensome.  This is an open-ended fishing expedition which goes far beyond the confines of this MDL—which is limited to NDMA by the explicit terms of the referral from the JPML.

> **B.      The Relevant Testing Should Be Limited to that which Can Detect NDMA.**

In their Manufacturing Notice, plaintiffs define "Testing" to cover any "testing capable of identifying the presence of nitrosamine contamination and/or detecting other carcinogens, general toxic impurities (including genotoxic impurities), and residual solvents, in connection with the manufacture and content of RCPs.  They go on to identify 28 different test methods as a non-exhaustive list of testing examples.  Plaintiffs then list ten different broad topics related to "testing", including a demand that the Generic Manufacturers present a witness to testify regarding the "***Testing results for all testing by You or Your agents of Your RCPs.***"  *See* Manufacturing Notice at p. 7, Topic. 5 (emphasis added).  This topic is not limited to NDMA, and would require testimony regarding every test result over what would be a period of *decades* for some Generics. Moreover, the types of tests identified are not proportional to the specific needs of this case.  To the extent any of these tests are directed to or may have detected the presence of N-Nitrosodimethylamine ("NDMA") in the ranitidine finished product, those tests may be relevant, and the Generic Manufacturers have accordingly agreed to present witnesses on those issues. Plaintiffs' demands for ***all*** testing results from ***all*** tests capable of detecting ***all*** impurities, ***all*** carcinogens, and ***all*** residual solvents is overly broad and not proportional.

> **C.      The Notice Should Be Limited to NDMA, Not All Nitrosamines or Impurities.**

Plaintiffs also demand testimony on "policies and procedures" about the detection and prevention of impurities and contamination in general, including policies and procedures regarding the packaging of the ranitidine finished product.  These topics are not limited in any meaningful way that would allow Generic Manufacturers to identify a single witness who could speak to these topics or properly prepare any witness to testify on behalf of the corporation on these topics.

---

[3] *See* Manufacturing Notice at Topics 1; 5; 4; 7; 8; 9; 11-17; 25; 27-29.

*First,* as discussed above, these topics are not limited to NDMA.  Having to prepare a witness or multiple witnesses to testify about all nitrosamines and/or impurities, when the asserted claims are directed to NDMA, is not proportional to the case.  *Second*, these topics are not related to the manufacturing process. Thus, Generic Manufacturers would have to identify a witness or multiple witnesses to speak to these topics in addition to any witness or witnesses already identified for any topics directed to manufacturing that may remain in the Notice.  *Third*, the definitions of "Quality" and "Quality Management" in the Notice are impossibly overbroad and include issues related to the supply chain and storage and transportation of ranitidine finished drug products. To the extent topics directed to "Quality" or "Quality Management" are permitted, they should be limited to storage and transportation, which Plaintiffs were allowed to replead, and are the subject of a different deposition notice.  Accordingly, such topics should not be permitted here.

## D.    The Notice Lacks an Appropriate Time Limitation and is Not Properly Limited to Activities Directed at the U.S. Market.

The Generic Manufacturers incorporate by reference the arguments made in the contemporaneously filed Motion directed to the Pharmacovigilance Notice as it relates to time limitations, as well as the arguments made in the contemporaneously filed Motion directed to the Storage and Transportation Notice as it relates to communications with regulatory authorities outside of the U.S.

## III.    Specific Objections to Topics in Notice

Generic Manufacturers also identify specific objections to topics listed in this Notice and incorporate by reference those objections as set forth in the Chart, attached hereto as Exhibit 2.

Respectfully submitted,

/s/ Richard M. Barnes
Richard M. Barnes
Kamil Ismail
Sean Gugerty
**Goodell, DeVries, Leech & Dann, LLP**
One South Street, 20th Floor
Baltimore, Maryland 21202
Tel: (410)783-4000
rmb@gdldlaw.com
kxi@gdldlaw.com
sgugerty@gdldlaw.com

*Attorneys for Defendant*
*L. Perrigo Company*

/s/ Thomas J. Yoo
Thomas J. Yoo
**HOLLAND & KNIGHT LLP**
400 South Hope Street, 8th Floor
Los Angeles, CA  90071
T: 213.896.2400
F: 213.896.2450
Thomas.Yoo@hklaw.com

*Attorneys for Glenmark Pharmaceuticals Inc.,*
*USA, f/k/a Glenmark Generics Inc., USA and*
*Glenmark  Pharmaceuticals  Ltd.  (f/k/a*
*Glenmark Generics Ltd.)*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE:  ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 2924 20-MD-2924 |
| | **JUDGE ROBIN L. ROSENBERG MAGISTRATE JUDGE BRUCE E. REINHART** |

_____/

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**NOTICE OF ORAL AND VIDEO DEPOSITION OF
GENERIC DEFENDANT
PURSUANT TO FED. R. CIV. P. RULE 30(b)(6)**

**TO: [Counsel for Generic Manufacturer]**

*Attorney for Defendant Generic Manufacturer,*

PLEASE TAKE NOTICE that pursuant to Rule 26 and Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs, by and through their undersigned attorneys, the Plaintiffs will take the oral videotaped deposition of Generic Manufacturer on February 23, 2021 at 2 PM EST, via video conferencing through US Legal Support.  Pursuant to Fed. R. Civ. P. 30(b)(6), Defendants shall designate and produce a representative or representatives, as may be required, to testify on behalf of Generic Manufacturer, concerning the topics identified in Exhibit A attached hereto. The deposition shall be recorded by stenographic and audiovisual means, as well as a webcast to a remote location, and taken before a person authorized by law to administer oaths, pursuant to Fed. R. Civ. P. 28, and will continue from day-to-day, excluding Sundays and court-recognized holidays, until the examination is completed.

PLEASE TAKE FURTHER NOTICE that we will be conducting this deposition utilizing the secure, web-based deposition option afforded by US Legal Support, or in the alternative,

1

video teleconferencing (VTC) services offered by US Legal Support.  Also take notice that the court reporter may also be remote via one of the options above for the purposes of the proceeding, as well as swearing in the deponent, and may or may not be in the presence of the deponent.  The deposition shall have been deemed to have been taken before an appropriate court officer despite the court reporter not being in the same physical location as the witness.  The oral examination is to be taken for purposes of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and/or the local rules of the United States District Court for the Southern District of Florida.  The witness, questioning and defending attorneys, and documents will be recorded by video.  Any deposition noticed to take place remotely and recorded remotely may be admitted at trial with the same effect of one recorded in person.  Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise that it is your desire to appear via this remote participating means so that the necessary credentials, call-in numbers, testing and information, if necessary, can be provided to you prior to the proceedings.


Dated:  January 29, 2021

/s/ Michael L. McGlamry
Michael L. McGlamry
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Ph: (404) 523-7706
Email: efile@pmkm.com

Tracy A. Finken
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Ph: (215) 735-1130
Email: tfinken@anapolweiss.com

Adam Pulaski
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Ph: (713) 664-4555
Email: adam@pulaskilawfirm.com

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Ph: (305) 384-7269
Email: gilbert@kolawyers.com

### <u>CERTIFICATE OF SERVICE</u>

The undersigned herby certifies that a copy of the foregoing was served via electronic mail, on January 29, 2021 to Counsel for Defendants.

*/s/ Marlene J. Goldenberg*
Marlene J. Goldenberg

**EXHIBIT A**

**INSTRUCTIONS**

To the extent You determine that one or more topics is inapplicable and expect the witness to testify to that effect, please notify Plaintiffs in writing at least 14 days prior to the deposition.

**DEFINITIONS**

1. "YOU" or "YOUR" refers to [All Generic Family Names], and any of its predecessor companies, successor companies, members, partners, directors, officers, employees, servants, agents, attorneys, joint venturers, licensors, third party contractors, or other representatives, including all parent entities.

2. "PERSON(s)" means any individual or entity.

3. "API" means active pharmaceutical agreement.

4. "QUALITY" refers to any physical, chemical, microbiological, biological, bioavailability, and stability attributes that a drug product should maintain in order to be deemed suitable for therapeutic or diagnostic use.

5. "QUALITY MANAGEMENT" refers to the identification, measurement, control, and improvement of the distribution and storage of a drug product, with regard to quality, including, but not limited to, any program, practice, policy or procedure regarding: (1) used to control storage of drug products; (2) that covers the movement, including storage and transportation, of drug products; (3) that allows for the identification of quality critical environmental aspects (such as temperature, humidity, and/or other environmental factors) for a drug product and/or ensures that the adequate processes to maintain that environment are in place; (4) used to assess, control, communicate, and review risks to the quality of a drug product across the product lifecycle; or (5) relating to 21 U.S.C. s. 501(a)(2), 21 C.F.R. Parts 210 & 211, or USP [1079] Good Storage and Distribution Packages for Drug Products

6. "RANITIDINE-CONTAINING PRODUCT(S)" of "RCPs" means any product in which an active ingredient is ranitidine, including but not limited to Zantac or ranitidine, Zantac or ranitidine API (Active pharmaceutical Ingredient) whether or not the product was brought to market, including any branded, unbranded (i.e. generic), prescription, and over-the-counter ("OTC") product, that was or is in development, and used to treat, among other things, heartburn, gastroesophageal reflux disease, ulcers in the stomach or intestines, or Zollinger-Ellison syndrome.

7. "REGULATORY AGENCY" or "REGULATORY AUTHORITY" means the United States Food & Drug Administration or any equivalent regulatory authority globally or in other countries that is charged with the regulation of RCPs, including but not limited to the European Medicines Agency, Health Canada, and the World Health Organization.

8. All references to "Testing" are defined to include testing capable of identifying the presence of nitrosamine contamination, and/or detecting other carcinogens, general toxic impurities (including genotoxic impurities), and residual solvents, in connection with the manufacture and contents of RCPs, include but are not limited to the following:

   a. Gas Chromatography (GC)
   b. Gas Chromatography- Flame Ionization Detector (GC-FID)
   c. Gas Chromatography- Mass Spectrometry (GC-MS)
   d. Gas Chromatography- tandem Mass Spectrometry (GC-MS/MS)
   e. Gas Chromatography- Selective Ion Monitoring Mass Spectrometry (GC-SIM MS)
   f. Gas Chromatography- High Resolution Mass Spectrometry (GC-HRMS)
   g. Gas Chromatography- Atomic Emission Spectrometry (GC-AES)
   h. Gas Chromatography- Flame Photometric Detector (GC-FPD)
   i. Gas Chromatography- Nitrogen Phosphorus Detector (GC-NPD)
   j. Gas Chromatography- Thermal Conductivity Detector (GC-TCD)
   k. Gas Chromatography- Photoionization Detector (GC-PID)
   l. Gas Chromatography- Electrolytic Conductivity Detector (GC-ELCD)
   m. Headspace Gas Chromatography (HS-GS)
   n. Liquid Chromatography (LC)
   o. High Performance Liquid Chromatography (HPLC)
   p. Liquid Chromatography-Mass Spectrometry (LC-MS)
   q. Liquid Chromatography-tandem Mass Spectrometry (LC-MS/MS)
   r. Liquid Chromatography- Selective Ion Monitoring Mass Spectrometry (LC-SIM MS)
   s. Liquid Chromatography- High Resolution Mass Spectrometry (LC-HRMS)
   t. Atomic Absorption Spectroscopy (AAS)
   u. Atomic Emission Spectrometry (AES)
   v. Thin Layer Chromatography (TLC)
   w. X-ray Diffraction
   x. Infra-red (IR) Spectroscopy
   y. Fourier Transform Infrared (FTIR) microscopy
   z. Scanning Electron Microscope Images
   aa. Optical micrographs and Stereo Light Microscopy
   bb. Ultraviolet Exposure (UV) Testing

## DEPOSITION TOPICS

### *The Manufacturing Processes*

1. The specific process or processes used to manufacture the ranitidine free base, ranitidine active drug substance (API) and ranitidine finished drug product of YOUR RCP's including, but not limited to, the drug substance, synthesis, purification, crystallization or recrystallization process, testing of the pH values of the drug substance, grade of ranitidine drug substance, solvent composition, solvent volume, water concentration, and crystal morphology;
2. The policies and procedures relating to the sourcing and utilization of ranitidine base and the drug substance used to manufacture finished drug product of Your RCP's.

### *API Sourcing and Testing*

1. The process for obtaining RCP API.
2. Any due diligence you conducted on API manufacturers that you considered or used to purchase or obtain RCP API.
3. The policies and procedures relating to the process for storing and handling of API after it arrives at your premises.
4. Any testing conducted on raw RCP API before it is used in the manufacture of RCPs.
5. The use of any recovered or recycled solvents in the manufacture of RCPs.

### *Expiration and Retest Dates*

1. All policies and procedures relating to expiration or retest dates for your RCPs.
2. Any testing relating to setting, adjusting, verifying, or testing retest or expiration dates for RCPs.
3. Any communications with Regulatory Authorities about retest or expiration dates of Your RCPs.
4. Communications with RCP API manufacturers about retest or expiration dates for RCPs.
5. Communications with any third party about retest or expiration dates for Your RCPs.
6. Internal communications concerning setting, adjusting, verifying, or testing retest or expiration dates for RCPs.

### *Testing*

1. The Testing performed by You or Your agents to evaluate the expiration, stability, degradation, purity and contents of Your RCPs, including API and finished drug product.

2. The location, storage, and retention of any Testing conducted on your RCPs.

3. The Testing performed by any entity or person other than You or Your agents but which were known to You, to evaluate the purity and contents of Your RCPs.

4.  The Testing performed by You or Your agents to evaluate the purity and contents of recovered or recycled solvents provided by third parties.

5.  The Testing results for all testing by You or Your agents of Your RCPs.

6.  The Testing results for all Testing by any entity or person other than You or Your agents but known to You, of Your RCPs.

7.  Your evaluation of the potential risks to the purity or contents of Your RCPs posed or caused by recovered or recycled solvents used during the manufacturing process.

8.  The Testing results for all testing by You or Your agents of the solvents utilized in the manufacture of Your RCPs.

9.  The Testing results for all testing by any entity or person other than You or Your agents but known to You, of the solvents utilized in the manufacture of Your RCPs.

10. The extent of the actual and potential nitrosamine contamination of Your RCPs sold in the United States, both in terms of the concentration per pill, and across all lots/batches manufactured by You.

### *Quality Assurance and Quality Control Activities*

11. Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture and contents of Your RCPs.

12. Your application of cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, relating to the manufacture of Your RCPs.

13. Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services.

14. Your policies and procedures intended to evaluate and select proper packaging for your RCPs to prevent, degradation or transformation of the RCP, into for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services.

15. Your policies and procedures intended to prevent, detect, or act in response to any degradation or transformation of Your RCPs, into for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services.

### *Process Development*

16.  To the extent you own a ranitidine DMF, the development of each Drug Master File, including any risk assessments conducted on starting materials, or solvents.

17.  Any evaluation conducted by or on behalf of You relating to health or safety issues arising from the use of recovered or recycled solvents, and in particular potential nitrosamine impurities, in the manufacturing process for Your RCPs

18.  Your policies and procedures relating to temperature, light, and humidity controls, settings, or specifications for the manufacture of Your RCPs.

19.  Your policies and procedures relating to temperature, light, and humidity specifications for RCP API prior to the beginning of the manufacture process.

20.  Your policies and procedures relating to temperature, light, and humidity specifications for storage of RCPs during after the manufacture process.

21.  Your policies and procedures relating to the packaging of RCP API.

22.  Your policies and procedures relating to the packaging of RCPs.

23.  Your policies and procedures relating to the labeling of RCPs with instructions regarding storage, transportation, heat, light, and humidity.

24.  Your evaluation and knowledge of the risk of the creation of nitrosamines as a result of the manufacturing process for Your RCPs.

25.  Your evaluation and knowledge of the risks of using recovered or recycled solvents in the manufacture of Your RCPs.

26.  Your evaluation and knowledge of the health risks of exposure to nitrosamines, including but not limited to nitrosamines as a contaminant of Your RCPs.

### *Compliance with cGMPs*

27.  Your compliance or non-compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination (i.e., carcinogens), general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, as it relates to the manufacture, quality assurance, quality control, and sale of Your RCPs.

28.  The polices, practices, procedures and trainings for monitoring compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in the manufacture of Your RCPs.

29.     Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, for monitoring material providers and their compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents.

### *Communications with Finished Dose Customers and Downstream Customers*

30.     Your oral and written communications with Your Customers (including vertically integrated facilities) or other downstream entities (i.e. other manufacturers, wholesalers, retailers, consumers) regarding quality, contents, purity, or contamination issues related to the Your RCPs.

31.     Your product recall for Your RCPs, including who You communicated with, how, and about what, and the retention of recalled or sequestered RCPs.

32.     All credits, indemnification, refunds, and/or penalties paid or provided by or to You (i.e. to/from customers, regulatory agencies) in connection with the nitrosamine contamination of Your RCPs.

### *Relevant Individuals and Documents*

33.     With respect to each of the above topics:
   a)  Your current (and any prior) corporate organization, and structure of departments or divisions responsible for any related practices, policies, and procedures.
   b)  The identity of Your corporate officers and managers responsible for, or having any knowledge thereof.
   c)  The existence, name, location, and nature of any related informational database.
   d)  The location, storage, and organization of Your related documents.

### **DOCUMENTS TO BE PRODUCED**

Deponent shall produce the following documents three (3) business days prior to the deposition:

1.      Current resume and curriculum vitae of deponent.

2.      All documents reviewed by the deponent in preparing for this deposition.

3.      All documents in the deponent's possession, custody, or control related to the deposition's topics listed above.

# EXHIBIT 2

**DEFENDANTS' OBJECTIONS AND PLAINTIFFS' POSITION ON OBJECTIONS TO
MANUFACTURING DEPOSITION NOTICE**

| Definition | Generic Defendants' Objection(s) | Plaintiffs' Position |
|---|---|---|
| 1. "YOU" or "YOUR" refers to [Generic Family], and any of its predecessor companies, successor companies, members, partners, directors, officers, employees, servants, agents, attorneys, joint venturers, licensors, third party contractors, or other representatives, including parent entities. | The definition of "YOU" or "YOUR" is overly broad and purports to require a response on behalf of separate corporate entities, including some that are not even subject to jurisdiction here, and it purports to require testimony regarding information that is not within a Generic Defendants' possession, custody, or control, especially as it relates to third party contractors. | |
| 4. "QUALITY" refers to any physical, chemical, microbiological, biological, bioavailability, and stability attributes that a drug product should maintain in order to be deemed suitable for therapeutic or diagnostic use. | The definition of "QUALITY" as overly broad to the extent it expands the noticed topics beyond issues relating to storage and transportation and to the extent it purports to require testimony regarding claims that have been dismissed with prejudice. | |
| 5. "QUALITY MANAGEMENT" refers to the identification, measurement, control, and improvement of the distribution and storage of a drug product, with regard to quality, including, but not limited to, any program, practice, policy or procedure regarding: (1) used to control storage of drug products; (2) that covers the movement, including storage and transportation, of drug products; (3) that allows for the identification of quality critical environmental aspects (such as temperature, humidity, and/or other environmental factors) for a drug product and/or ensures that the | 1. The definition of "QUALITY MANAGEMENT" is overly broad to the extent it expands the noticed topics beyond issues relating to storage and transportation and to the extent it purports to require testimony regarding claims that have been dismissed with prejudice.<br>2. The definition is vague and overbroad in that it seeks to incorporate USP standards that have changed over time, without specifying which version(s) or time period is relevant. | |

| | | |
|---|---|---|
| adequate processes to maintain that environment are in place; (4) used to assess, control, communicate, and review risks to the quality of a drug product across the product lifecycle; or (5) relating to 21 U.S.C. s. 501(a)(2), 21 C.F.R. Parts 210 & 211, or USP [1079] Good Storage and Distribution Packages for Drug Products. | | |
| 6. "RANITIDINE-CONTAINING PRODUCT(S)" of "RCPs" means any product in which   an active ingredient is ranitidine, including but not limited to Zantac or ranitidine, whether or not the product was brought to market, including any branded, unbranded (i.e. generic), prescription, and over-the-counter ("OTC") product, that was or is in development, and used to treat, among other things, heartburn, gastroesophageal reflux disease, ulcers in the stomach or intestines, or Zollinger-Ellison syndrome. | 1.  The definition of "RANITIDINE-CONTAINING PRODUCT(S)" or "RCPs" seeks information that is irrelevant to any claim against some Generic Defendants in that it seeks testimony including those products that were never marketed and therefore never received or used by any consumer.<br><br>2.  The definition is overbroad and disproportionate because only ranitidine-containing products made and/or sold in the United States are relevant to plaintiffs' claims. To the extent the definition refers to products made and/or sold in other countries, it is outside the scope of plaintiffs' allegations and claims and is therefore disproportionate. | |
| 7. "REGULATORY AFGENCY" [sic] means the United States Food & Drug Administration or any equivalent regulatory authority globally or in other countries that is charged with | 1.  Any topics seeking interaction or communication with foreign regulatory bodies, or adherence to foreign regulatory standards, are not relevant to what happened in the | |

| | | |
|---|---|---|
| the regulation of RCPs, including but not limited to the European Medicines Agency, Health Canada, and the World Health Organization. | United States market and therefore not relevant to plaintiffs' claims in this litigation.<br>2. The definition is overbroad and disproportionate to the case by calling for irrelevant information. | |
| 8. All references to "Testing" are defined to include testing capable of identifying the presence of nitrosamine contamination, and/or detecting other carcinogens, general toxic impurities (including genotoxic impurities), and residual solvents, in connection with the manufacture and contents of RCPs, include but are not limited to the following:<br>a. Gas Chromatography (GC)<br>b. Gas Chromatography- Flame Ionization Detector (GC-FID)<br>c. Gas Chromatography- Mass Spectrometry (GC-MS)<br>d. Gas Chromatography- tandem Mass Spectrometry (GC-MS/MS)<br>e. Gas Chromatography- Selective Ion Monitoring Mass Spectrometry (GC-SIM MS)<br>f. Gas Chromatography- High Resolution Mass Spectrometry (GC-HRMS)<br>g. Gas Chromatography- Atomic Emission Spectrometry (GC-AES)<br>h. Gas Chromatography- Flame Photometric Detector (GC-FPD) | The definition of testing should be limited to those tests relevant to identifying NDMA. | |

| | | |
|---|---|---|
| i.  Gas Chromatography- Nitrogen Phosphorus Detector (GC-NPD) <br> j.  Gas Chromatography- Thermal Conductivity Detector (GC-TCD) <br> k.  Gas Chromatography- Photoionization Detector (GC-PID) <br> l.  Gas Chromatography- Electrolytic Conductivity Detector (GC-ELCD) <br> m.  Headspace Gas Chromatography (HS-GS) <br> n.  Liquid Chromatography (LC) <br> o.  High Performance Liquid Chromatography (HPLC) <br> p.  Liquid Chromatography-Mass Spectrometry (LC-MS) <br> q.  Liquid Chromatography-tandem Mass Spectrometry (LC-MS/MS) <br> r.  Liquid Chromatography- Selective Ion Monitoring Mass Spectrometry (LC-SIM MS) <br>   s.  Liquid Chromatography- High Resolution Mass Spectrometry (LC-HRMS) <br> t.  Mass Spectrometry (MS) <br> u.  Thin Layer Chromatography (TLC) <br> v.  Atomic Absorption Spectroscopy (AAS) <br> w.  Atomic Emission Spectrometry (AES) <br> x.  X-ray Diffraction <br> y.  Infra-red (IR) Spectroscopy | | |

| | | |
|---|---|---|
| z.  Fourier Transform Infrared (FTIR) microscopy<br>aa. Scanning Electron Microscope Images<br>bb. Optical micrographs and Stereo Light Microscopy<br>cc. Ultraviolet Exposure (UV) Testing | | |

| Topic | Generic Defendants' Objection(s) | Plaintiffs' Position |
|---|---|---|
| 1. The specific process or processes used to manufacture the ranitidine free base, ranitidine active drug substance (API) and ranitidine finished drug product of YOUR RCP's including, but not limited to, the drug substance, synthesis, purification, crystallization or recrystallization process, testing of the pH values of the drug substance, grade of ranitidine drug substance, solvent composition, solvent volume, water concentration, and crystal morphology. | 1. This topic does not apply to the Generic Defendants that did not manufacture API or ranitidine-containing products.<br>2. To the extent it applies to a Generic Defendant, it is beyond the scope of plaintiffs' amended allegations and not one of the theories plaintiffs were granted leave to re-plead.<br>3. The topic is beyond the scope of plaintiffs' claims in that their API sourcing-related claims are limited to the storage and transport of API.<br>4. Even if relevant to plaintiffs' amended claims, the requested information is obtainable through less burdensome or less expensive means, like a document request. | |
| 2. The policies and procedures relating to the sourcing and utilization of ranitidine base and the drug substance used to manufacture finished drug product of Your RCP's. | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API.<br>2. To the extent it applies to a Generic Defendant, it is beyond the scope of plaintiffs' amended allegations and | |

5

| | | |
|---|---|---|
| | not one of the theories plaintiffs were granted leave to re-plead.<br>3. Even if relevant to plaintiffs' amended claims, the requested information is obtainable through less burdensome or less expensive means, like a document request.<br>4. The topic is beyond the scope of plaintiffs' claims in that their API sourcing-related claims are limited to the storage and transport of API. | |
| 1. The process for obtaining RCP API.[1] | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API.<br>2. To the extent it applies to a Generic Defendant, it is beyond the scope of plaintiffs' amended allegations and not one of the theories plaintiffs were granted leave to re-plead.<br>3. Even if relevant to plaintiffs' amended claims, the requested information is obtainable through less burdensome or less expensive means, like a document request.<br>4. The topic is beyond the scope of plaintiffs' claims in that their API sourcing-related claims are limited to the storage and transport of API. | |

---

[1] The numbering of topics in this submission reflects plaintiffs' numbering in the Notice. Plaintiffs re-started numbering for the first four sub-headings in the Notice, until Topic 11, below, at which point they adopted sequential numbering for the remainder of the Notice.

| | | |
|---|---|---|
| 2. Any due diligence you conducted on API manufacturers that you considered or used to purchase or obtain RCP API. | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API.<br>2. To the extent it applies to a Generic Defendant, it is beyond the scope of plaintiffs' amended allegations and not one of the theories plaintiffs were granted leave to re-plead.<br>3. The topic is beyond the scope of plaintiffs' claims in that their API sourcing-related claims are limited to the storage and transport of API. | |
| 3. The policies and procedures relating to the process for storing and handling of API after it arrives at your premises. | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API.<br>2. To the extent it applies to a Generic Defendant, it is disproportional to the needs of the case because the requested information is obtainable through less burdensome or less expensive means. | |
| 4. Any testing conducted on raw RCP API before it is used in the manufacture of RCPs. | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API.<br>2. To the extent it applies to a Generic Defendant, it should be limited to information within the knowledge of that Generic Defendant. As written, the topic calls for information beyond the knowledge of a Generic Defendant. | |

| | | |
|---|---|---|
| | 3. The topic is beyond the scope of plaintiffs' claims in that their API sourcing-related claims are limited to the storage and transport of API. | |
| 5. The use of any recovered or recycled solvents in the manufacture of RCPs. | 1. This topic does not apply to the Generic Defendants that did not source or manufacture API, or that did not utilize recovered or recycled solvents in the manufacture of ranitidine-containing products.<br>2. The topic is irrelevant to plaintiffs' claims because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br>3. This topic is beyond the scope of plaintiffs' amended allegations and claims. | |
| 1. All policies and procedures relating to expiration or retest dates of your RCPs.<br>2. Any testing relating to setting, adjusting, verifying, or testing restest or expiration dates of Your RCPs. | This topic is disproportionate because it could be reduced to written discovery. | |
| 3. Any communications with Regulatory Authorities about retest or expiration dates of Your RCPs. | This topic is beyond the scope of plaintiffs' claims to the extent it seeks information related to communication with foreign regulatory agencies. | |
| 4. Communications with RCP API manufacturers about retest or expiration dates for RCPs. | This topic does not apply to Generic Defendants that did not source, purchase, or otherwise communicate with API manufacturers. | |

| | | |
|---|---|---|
| 5. Communications with any third party about retest or expiration dates for RCPs.<br>6. Internal communications concerning setting, adjusting, verifying, or testing retest or expiration dates for RCPs. | 1. This topic is disproportionate because it could be reduced to written discovery.<br>2. This topic should be limited to RCPs that a Generic Defendant manufactured or sold. As drafted, the topic seeks information for all ranitidine-containing products, regardless of whether it was manufactured or sold by a particular Generic Defendant. | |
| 1. The Testing performed by You or Your agents to evaluate the expiration, stability, degradation, purity and contents of Your RCPs, including API and finished drug product. | 1. This topic does not apply to the Generic Defendants that did not manufacture API or finished ranitidine-containing products.<br>2. To this extent this topic is applicable to a Generic Defendant, it is beyond the scope of plaintiffs' amended allegations and amended claims.<br>3. Plaintiffs do not have any manufacturing defect claims and this topic, to the extent it seeks information as to a Generic Defendants' manufacturing processes, is irrelevant.<br>4. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 2. The location, storage, and retention of | As drafted, the term "Testing" calls for | |

| | | |
|---|---|---|
| any Testing conducted on your RCPs. | irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 3. The Testing performed by any entity or person other than You or Your agents but which were known to You, to evaluate the purity and contents of Your RCPs. | 1. The topic is disproportionate in that it should be limited to seeking information related to evaluating the presence of NDMA in ranitidine-containing products.<br><br>2. The topic is beyond the scope of plaintiffs' claims to the extent it is not limited to NDMA.<br><br>3. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 4. The Testing performed by You or Your agents to evaluate the purity and contents of recovered or recycled solvents provided by third parties. | 1. This topic does not apply to the Generic Defendants that did not manufacture ranitidine-containing products, or that did not utilize recovered or recycled solvents in the manufacture of ranitidine-containing products.<br><br>2. The topic is beyond the scope of plaintiffs' claims because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>3. This topic is beyond the scope of | |

10

| | | |
|---|---|---|
| | plaintiffs' amended allegations and claims. | |
| 5. The Testing results for all testing by You or Your agents of Your RCPs. | 1. The topic is duplicative of API Sourcing and Testing Topic No. 4, Expiration and Retest Dates Topic No. 2, and Testing Topic Nos. 1, 3, and 4.<br>2. The topic is disproportionate in that it should be limited to seeking information related to testing for the presence of NDMA in ranitidine-containing products.<br>3. The topic is beyond the scope of plaintiffs' claims to the extent it is not limited to NDMA.<br>4. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 6. The Testing results for all Testing by any entity or person other than You or Your agents but known to You, of Your RCPs. | 1. The topic is disproportionate in that it should be limited to seeking information related to testing for the presence of NDMA in ranitidine-containing products.<br>2. The topic is beyond the scope of plaintiffs' claims to the extent it is not limited to NDMA.<br>3. As drafted, the term "Testing" calls for irrelevant information beyond the | |

| | | |
|---|---|---|
| | scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 7. Your evaluation of the potential risks to the purity or contents of Your RCPs posed or caused by recovered or recycled solvents used during the manufacturing process. | 1. This topic does not apply to the Generic Defendants that did not manufacture ranitidine-containing products, or that did not utilize recovered or recycled solvents in the manufacture of ranitidine-containing products.<br><br>2. The topic is irrelevant to plaintiffs' claims because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>3. This topic is beyond the scope of plaintiffs' amended allegations and claims.<br><br>4. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 8. The Testing results for all testing by You or Your agents of the solvents utilized in the manufacture of Your RCPs. | 1. This topic does not apply to the Generic Defendants that did not manufacture ranitidine-containing products, or that did not utilize | |

|  |  |  |
|---|---|---|
|  | recovered or recycled solvents in the manufacture of ranitidine-containing products.<br><br>2. The topic is irrelevant to plaintiffs' claims because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>3. This topic is beyond the scope of plaintiffs' amended allegations and claims.<br><br>4. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. |  |
| 9. The Testing results for all testing by any entity or person other than You or Your agents but known to You, of the solvents utilized in the manufacture of Your RCPs. | 1. This topic does not apply to the Generic Defendants that did not manufacture ranitidine-containing products, or that did not utilize recovered or recycled solvents in the manufacture of ranitidine-containing products.<br><br>2. The topic is irrelevant to plaintiffs' claims because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>3. This topic is beyond the scope of |  |

| | | |
|---|---|---|
| | plaintiffs' amended allegations and claims.<br>4. As drafted, the term "Testing" calls for irrelevant information beyond the scope of the specific cancers plaintiffs have alleged are related to the presence of NDMA in ranitidine-containing products, rendering the topic disproportionate. | |
| 10. The extent of the actual and potential nitrosamine contamination of Your RCPs sold in the United States, both in terms of the concentration per pill, and across all lots/batches manufactured by You. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products.<br>2. To the extent it could be relevant, this topic is disproportionate because it is duplicative of information plaintiffs already have and it is more easily obtainable through less expensive or less burdensome means. | |
| 11. Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture and contents of Your RCPs. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in ranitidine-containing products and because plaintiffs have no manufacturing defect claim.<br>3. The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the | |

| | | |
|---|---|---|
| | manufacturing process to support their claims.<br>4.  The topic is disproportionate because the information is more easily discoverable through less expensive and less burdensome means. | |
| 12.  Your application of cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, relating to the manufacture of Your RCPs. | 1.  This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2.  The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in ranitidine-containing products and because plaintiffs have no manufacturing defect claim.<br>3.  The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. | |
| 13.  Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services. | 1.  This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2.  The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in recycled or recovered solvents.<br>3.  The topic is beyond the scope because plaintiffs do not rely on any | |

| | | |
|---|---|---|
| | allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. | |
| 14. Your policies and procedures intended to evaluate and select proper packaging for your RCPs to prevent, degradation or transformation of the RCP, into for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and disproportionate because it is not limited to the presence of NDMA in recycled or recovered solvents.<br>3. The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. | |
| 15. Your policies and procedures intended to prevent, detect, or act in response to any degradation or transformation of Your RCPs, into for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines relating to procurement of recovered or recycled solvents, and selection of vendors to provide such services. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in recovered or recycled solvents.<br>3. The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. | |

16

| | |
|---|---|
| 16. To the extent you own a ranitidine DMF, the development of each Drug Master File, including any risk assessments conducted on starting materials, or solvents. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and therefore disproportionate to the case.<br>3. The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. |
| 17. Any evaluation conducted by or on behalf of You relating to health or safety issues arising from the use of recovered or recycled solvents, and in particular potential nitrosamine impurities, in the manufacturing process for Your RCPs. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in recovered or recycled solvents and plaintiffs do not have a manufacturing defect claim.<br>3. The topic is beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. |
| 18. Your policies and procedures relating to temperature, light, and humidity controls, settings, or specifications for the manufacture of Your RCPs. | 1. This topic is beyond the scope because plaintiffs' manufacturing defect claims have been dismissed.<br>2. This topic is disproportionate because |

17

| | | |
|---|---|---|
| | the same information can be obtained through less expensive and less burdensome means.<br>3. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products. | |
| 19. Your policies and procedures relating to temperature, light, and humidity specifications for RCP API prior to the beginning of the manufacture process. | 1. This topic is disproportionate because the same information can be obtained through less expensive and less burdensome means.<br>2. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products.<br>3. This topic is also disproportionate because the same information can be obtained through less expensive and less burdensome means. | |
| 20. Your policies and procedures relating to temperature, light, and humidity specifications for storage of RCPs during after the manufacture process. | 1. This topic is disproportionate because the same information can be obtained through less expensive and less burdensome means.<br>2. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products.<br>3. This topic is also disproportionate because the same information can be obtained through less expensive and less burdensome means. | |
| 21. Your policies and procedures relating to the packaging of RCP API. | 1. This topic does not apply to Generic Defendants that did not manufacture API.<br>2. This topic is beyond the scope to the | |

| | | |
|---|---|---|
| | extent that all of plaintiffs' claims related to warnings and labeling on packaging have been dismissed.<br>3. This topic is disproportionate because the same information can be obtained through less expensive and burdensome means. | |
| 22. Your policies and procedures relating to the packaging of RCPs. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products.<br>2. This topic is beyond the scope to the extent that all of plaintiffs' claims related to warnings and labeling on packaging have been dismissed.<br>3. This topic is disproportionate because the same information can be obtained through less expensive and burdensome means. | |
| 23. Your policies and procedures relating to the labeling of RCPs with instructions regarding storage, transportation, heat, light, and humidity. | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products.<br>2. This topic is beyond the scope to the extent that all of plaintiffs' claims related to warnings and labeling on packaging have been dismissed.<br>3. This topic is disproportionate because the same information can be obtained through less expensive and burdensome means. | |
| 24. Your evaluation and knowledge of the risk of the creation of nitrosamines as a result of the | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products. | |

| | | |
|---|---|---|
| manufacturing process for Your RCPs. | 2. This topic is beyond the scope of plaintiffs' claims because their manufacturing defect claims have been dismissed. | |
| 25. Your evaluation and knowledge of the risks of using recovered or recycled solvents in the manufacture of Your RCPs | 1. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing product.<br>2. The topic is beyond the scope of plaintiffs' claims and disproportionate to the case in that it is not limited to the presence of NDMA in recovered or recycled solvents and plaintiffs do not have a manufacturing defect claim.<br>3. The topic is also beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. | |
| 26. Your evaluation and knowledge of the health risks of exposure to nitrosamines, including but not limited to nitrosamines as a contaminant of Your RCPs. | This topic is disproportionate because it is not limited to the presence of NDMA in ranitidine-containing products and, therefore, calls for irrelevant information. | |
| 27. Your compliance or non-compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination (i.e., carcinogens), general toxic impurities (including genotoxic impurities) such as nitrosamines, | 1. This topic is disproportionate because it is not limited to the presence of NDMA in ranitidine-containing products and, therefore, calls for irrelevant information.<br>2. This topic is beyond the scope of plaintiffs' allegations and claims to | |

20

| | | |
|---|---|---|
| and residual solvents, as it relates to the manufacture, quality assurance, quality control, and sale of Your RCPs. | the extent their manufacturing defect claims were dismissed.<br><br>3. The topic is also beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>4. This topic is disproportionate because it is duplicative.<br><br>5. This topic does not apply to Generic Defendants that did not manufacture ranitidine-containing products. | |
| 28. The polices, practices, procedures and trainings for monitoring compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in the manufacture of Your RCPs. | 1. This topic is disproportionate because it is not limited to the presence of NDMA in ranitidine-containing products and is beyond the scope of plaintiffs' claims and this MDL.<br><br>2. This topic is beyond the scope of plaintiffs' allegations and claims to the extent their manufacturing defect claims were dismissed.<br><br>3. The topic is also beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims.<br><br>4. This topic is disproportionate because it is duplicative.<br><br>5. This topic is disproportionate because the information can be obtained through less expensive or less | |

| | | |
|---|---|---|
| | burdensome means. <br> 6. This topics does not apply to Generic Defendants that did not manufacture ranitidine-containing products. | |
| 29. Your policies and procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, for monitoring material providers and their compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents. | 1. This topic is disproportionate because it is not limited to the presence of NDMA in ranitidine-containing products and is beyond the scope of plaintiffs' claims and this MDL. <br> 2. This topic is beyond the scope of plaintiffs' allegations and claims to the extent their manufacturing defect claims were dismissed. <br> 3. The topic is also beyond the scope because plaintiffs do not rely on any allegations related to the use of recovered or recycled solvents in the manufacturing process to support their claims. <br> 4. This topic is disproportionate because it is duplicative. <br> 5. This topic is disproportionate because the information can be obtained through less expensive or less burdensome means. <br> 6. This topics does not apply to Generic Defendants that did not manufacture ranitidine-containing products. | |
| 30. Your oral and written communications with Your Customers (including vertically integrated facilities) or other | This topic is beyond the scope of plaintiffs' allegations and claims because they have no pending claims related to warnings, labels, or communications with customers or downstream entities. | |

| | | |
|---|---|---|
| downstream entities (i.e. other manufacturers, wholesalers, retailers, consumers) regarding quality, contents, purity, or contamination issues related to the Your RCPs. | | |
| 31. Your product recall for Your RCPs, including who You communicated with, how, and about what, and the retention of recalled or sequestered RCPs. | 1. This topic is beyond the scope of plaintiffs' allegations and claims because they have no pending claims related to warnings, labels, or communications with customers or downstream entities. <br> 2. This topic is irrelevant because a Generic Defendant's recall of ranitidine-containing products, and communications related to the recall, are beyond the scope of plaintiffs' remaining claims. | |
| 32. All credits, indemnification, refunds, and/or penalties paid or provided by or to You (i.e. to/from customers, regulatory agencies) in connection with the nitrosamine contamination of Your RCPs. | 1. This topic is beyond the scope of plaintiffs' allegations and claims because they have no pending claims related to warnings, labels, or communications with customers or downstream entities. <br> 2. This topic is irrelevant because a Generic Defendant's recall of ranitidine-containing products, and communications related to the recall, are beyond the scope of plaintiffs' remaining claims. <br> 3. This topic is disproportionate to the extent it seeks information related to the presence of nitrosamines other | |

| | | |
|---|---|---|
| | than NDMA in ranitidine-containing products.<br>4. The topic is not relevant to Generic Defendants that have not been named in the class complaints. | |
| 33. With respect to each of the above topics:<br>a. Your current (and any prior) corporate organization, and structure of departments or divisions responsible for any related practices, policies, and procedures.<br>b. The identity of Your corporate officers and managers responsible for, or having any knowledge thereof.<br>c. The existence, name, location, and nature of any related informational database.<br>d. The location, storage, and organization of Your related documents. | 1. This topic is overly broad in that it would require a witness to testify regarding (i) the corporate organization and structure of many different departments and divisions over many years; (ii) each and every corporate officer and manager having any knowledge of any topic implicated in this Notice over that same time period; and (iii) the location, storage, and organization of every single document related to each of the Topics contained in the Notice.<br>2. The term "informational database" is also undefined and not reasonably particular such that the Generic Defendants are unable to prepare a witness.<br>3. Finally, requiring a witness to testify to this topic is not proportional to the needs of this case, particularly where the Generic Defendants can provide this information – to the extent it exists and is not otherwise objectionable – through other, less expensive and intrusive means, like a response to a written discovery request. | |