# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY                                    20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO ALL CASES IN WHICH
ANY GENERIC MANUFACTURER IS NAMED

_____

## MOTION FOR PROTECTIVE ORDER FROM CERTAIN PORTIONS OF PLAINTIFFS' NOTICE OF ORAL AND VIDEO DEPOSITION OF GENERIC DEFENDANT PURSUANT TO RULE 30(b)(6) (PHARMACOVIGILANCE) FILED ON BEHALF OF ALL GENERIC MANUFACTURERS

_____

Pursuant to Federal Rules of Civil Procedure 26 and 30 and PTOs 32, 54, and 60, the Generic Manufacturers move for a protective order from certain portions of the "Notice of Oral and Video Deposition of Generic Defendant Pursuant to Fed. R. Civ. P. Rule 30(b)(6)" that were deemed served as of February 9, 2021 relating to pharmacovigilance (the "PV Notice").[1]

The Notice seeks testimony on all aspects of a Generic Manufacturers' pharmacovigilance practice as it relates to ranitidine-containing products ("RCP").

## I.     The Generic Manufacturers Have Offered Witnesses on Many of the Topics in the Pharmacovigilance Notice.

Plaintiffs' Amended Master Personal Injury Complaint ("AMPIC") includes only one count that arguably contains a claim relevant to the Generic Manufacturers' pharmacovigilance ("PV") practices – Count V – Failure to Warn Consumers through the FDA. In that count, Plaintiffs argue that the Generic Manufacturers failed to submit adverse event reports and/or other notifications to the FDA regarding a risk for cancer related to the presence of NDMA in ranitidine products. (AMPIC Dkt. 2759 at ¶¶ 1371-1405.) Importantly, Plaintiffs themselves allege that "[b]efore 2019, the volume of adverse events reported [to FDA] for ranitidine-containing products that mentioned cancer as a reaction was insignificant." *Id.* ¶ 1391.

The Generic Manufacturers have offered to provide a witness to testify on topics related to pharmacovigilance, which broadly involves the detection, assessment, understanding and reporting of adverse events by a pharmaceutical company. Adverse events are generally defined as any untoward medical occurrence associated with the use of a drug in humans whether or not considered drug related. *See* 21 C.F.R. § 312.32. Given the narrow claim involving this issue, the Generic Manufacturers have offered a witness on topics regarding the processes and procedures for the submission of adverse event reports to the FDA and adverse events related to the identified cancers in the U.S. The Generic Manufacturers have offered a witness on: 1) standard operating procedures regarding adverse event reporting to the FDA; and 2) adverse event reporting to FDA concerning the identified cancers and ranitidine.

## II.    Protective Order Requests for the Pharmacovigilance Notice.

### A.      <u>The PV Notice is Grossly Disproportionate to the Only Claim to Which it Relates, Failure to Warn the FDA</u>

Plaintiffs have not pleaded any specifics as to what adverse event information they believe Generic Manufacturers *should* have acquired through pharmacovigilance and reported to FDA prior to 2019. However, based on conversations between counsel, it appears that Plaintiffs will argue that Generic Manufacturers failed to obtain and disclose certain scientific studies. Generic Manufacturers do not concede that there are **any** studies, literature, or reports that have linked an individual person's development of cancer or death with ranitidine use, as would be required for an adverse event report to be sent to FDA. *See* 21 C.F.R. § 314.80. Nonetheless, the names of authors of the studies Plaintiffs have identified have been included in the search terms the Generic Manufacturers have agreed to run. Generic Manufacturers agree that documents obtained from those searches (if any) are an appropriate deposition topic. Generic Manufacturers also agree that

---

[1] All Generic Manufacturers were served with identical notices. A copy of the Notice is attached as Exhibit 1.

Plaintiffs should be able to question witnesses about policies and practices pertaining to adverse event reporting to FDA, generally.

But Plaintiffs' PV Notice is full of other topics that are irrelevant and disproportionate to the only claim for with pharmacovigilance has any relevance (failure to warn the FDA). For example, while there are dozens of different types of cancer,[2] Plaintiffs are proceeding in this MDL as to claims for only 10 specific cancers: bladder, breast, colorectal/intestinal, esophageal, gastric, intestinal, kidney, liver, lung, pancreatic, and prostate. Yet Plaintiffs request all "evaluations, analysis, discussions, recommendations, or reports pertaining to" any form of "precancer, cancer markers, cancers, carcinogenicity. . ."—without regard to whether this data bears any relationship to ranitidine, and without limiting it to the cancers at issue in the MDL. *See* PV Notice Topic 14, 24. Even more broadly, Plaintiffs ask for all reports, articles and studies contained or referenced in any annual adverse event summary submitted to any regulatory agency (even non-U.S. agencies)—a request that would implicate many non-cancerous adverse events. *See* PV Notice Topics 26 and 27.

## B.   The PV Notice Lacks an Appropriate Time Limitation.

As written, the Notice does not define a relevant time period or date range. Leaving the date range undefined or requiring a defendant to go back to 1997 when generic ranitidine was first introduced would impose enormous burdens to locate information and documents from over 23 years ago, for which no current corporate representatives will have personal knowledge. Serving broad 30(b)(6) notices without tailoring a relevant date range to the facts of the case improperly flouts the purposes of the proportionality rule. *See, e.g., Klopman-Bareselman v. Air Liquid Sys. Corp.,* No. 3:18-cv-05536, 2019 U.S. Dist.  LEXIS 132804 at **9-10 (W.D. Wa. 2019) (granting protective order for 30(b)(6) notice without defined date range that potentially sought to go back decades, "rais[ing] concerns of relevancy and proportionality"); *Fish v. Air Liquid Sys. Corp.,* No. GLR-16-496, 2017 U.S. Dist. LEXIS 24188 at **68-69 (D. Md. 2017) (granting protective order as to 30(b)(6) notices regarding products, materials, suppliers and other topics over a 29-year period where notice failed to appropriately define the relevant time period); *McArthur v. Rock Woodfired Pizza Spirits,* 318 F.R.D. 136, 143 (W.D. Wa. 2016) (granting protective order for 30(b)(6) notice that "fail[ed] to provide a date range").

To balance the burdens on Generic Manufacturers proportionally to the needs of Plaintiffs' case, Generic Manufacturers propose a date range of January 2010 to February 2020 for the corporate representative depositions, with the understanding that if Plaintiffs determine a particular Generic Manufacturer has information available before 2010 important to their case, Plaintiffs may seek leave to expand their date range for that defendant upon a showing of proportionality. Alternatively, Plaintiffs could negotiate a specific date range with each Generic Manufacturer taking into account the individual history, availability of information and documents, and burdens that would be imposed.

---

[2] National Cancer Institute, Cancer Types, available at https://www.cancer.gov/types (last accessed February 28, 2021)

    **C.**    <u>**The PV Notice Is Not Limited to Ranitidine Activity Directed at the U.S. Market, or to NDMA, and It Should Be.**</u>

The Generic Manufacturers incorporate by reference the arguments made in other contemporaneously filed Motions filed that topics pertaining to communications with foreign regulators or to nitrosamines other than NDMA are irrelevant and disproportionate.

**III.**    **Specific Objections to Topics in Notice.**

Generic Manufacturers also identify specific objections to topics listed in this Notice and incorporate by reference those objections as set forth in the chart attached hereto as Exhibit 2.

Respectfully submitted,

*/s/ Richard M. Barnes*
Richard M. Barnes
Kamil Ismail
Sean Gugerty
**Goodell, DeVries, Leech & Dann, LLP**
One South Street, 20th Floor
Baltimore, Maryland 21202
Tel: (410)783-4000
rmb@gdldlaw.com
kxi@gdldlaw.com
sgugerty@gdldlaw.com

*Attorneys for Defendant*
*L. Perrigo Company*

*/s/ Thomas J. Yoo*
Thomas J. Yoo
**HOLLAND & KNIGHT LLP**
400 South Hope Street, 8th Floor
Los Angeles, CA  90071
T: 213.896.2400
F: 213.896.2450
Thomas.Yoo@hklaw.com

*Attorneys for Glenmark Pharmaceuticals Inc., USA, f/k/a Glenmark Generics Inc., USA and Glenmark Pharmaceuticals Ltd. (f/k/a Glenmark Generics Ltd.)*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE:  ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 2924 20-MD-2924 |
| | **JUDGE ROBIN L. ROSENBERG** **MAGISTRATE JUDGE BRUCE E. REINHART** |

_____/

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

<u>NOTICE OF ORAL AND VIDEO DEPOSITION OF</u>
<u>GENERIC DEFENDANT</u>
<u>PURSUANT TO FED. R. CIV. P. RULE 30(b)(6)</u>

**TO: [Counsel for Generic Manufacturer]**

*Attorney for Defendant Generic Manufacturer,*

PLEASE TAKE NOTICE that pursuant to Rule 26 and Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs, by and through their undersigned attorneys, the Plaintiffs will take the oral videotaped deposition of Generic Manufacturer on February 23, 2021 at 2 PM EST, via video conferencing through US Legal Support.  Pursuant to Fed. R. Civ. P. 30(b)(6), Defendants shall designate and produce a representative or representatives, as may be required, to testify on behalf of Generic Manufacturer, concerning the topics identified in Exhibit A attached hereto. The deposition shall be recorded by stenographic and audiovisual means, as well as a webcast to a remote location, and taken before a person authorized by law to administer oaths, pursuant to Fed. R. Civ. P. 28, and will continue from day-to-day, excluding Sundays and court-recognized holidays, until the examination is completed.

PLEASE TAKE FURTHER NOTICE that we will be conducting this deposition utilizing the secure, web-based deposition option afforded by US Legal Support, or in the alternative,

video teleconferencing (VTC) services offered by US Legal Support.  Also take notice that the court reporter may also be remote via one of the options above for the purposes of the proceeding, as well as swearing in the deponent, and may or may not be in the presence of the deponent.  The deposition shall have been deemed to have been taken before an appropriate court officer despite the court reporter not being in the same physical location as the witness.  The oral examination is to be taken for purposes of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and/or the local rules of the United States District Court for the Southern District of Florida.  The witness, questioning and defending attorneys, and documents will be recorded by video.  Any deposition noticed to take place remotely and recorded remotely may be admitted at trial with the same effect of one recorded in person.  Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise that it is your desire to appear via this remote participating means so that the necessary credentials, call-in numbers, testing and information, if necessary, can be provided to you prior to the proceedings.

Dated:  January 29, 2021

/s/ Michael L. McGlamry
Michael L. McGlamry
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Ph: (404) 523-7706
Email: efile@pmkm.com

Tracy A. Finken
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Ph: (215) 735-1130
Email: tfinken@anapolweiss.com

Adam Pulaski
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Ph: (713) 664-4555
Email: adam@pulaskilawfirm.com

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Ph: (305) 384-7269
Email: gilbert@kolawyers.com

## CERTIFICATE OF SERVICE

The undersigned herby certifies that a copy of the foregoing was served via electronic mail, on January 29, 2021 to Counsel for Defendants.

*/s/ Marlene J. Goldenberg*
Marlene J. Goldenberg

**EXHIBIT A**

**INSTRUCTIONS**

To the extent You determine that one or more topics is inapplicable and expect the witness to testify to that effect, please notify Plaintiffs in writing at least 14 days prior to the deposition.

**DEFINITIONS**

1. "YOU" or "YOUR" refers to [Generic Family], and any of its predecessor companies, successor companies, members, partners, directors, officers, employees, servants, agents, attorneys, joint venturers, licensors, third party contractors, or other representatives, including all parent entities.

2. "PERSON(s)" means any individual or entity.

3. "API" means active pharmaceutical agreement.

4. "QUALITY" refers to any physical, chemical, microbiological, biological, bioavailability, and stability attributes that a drug product should maintain in order to be deemed suitable for therapeutic or diagnostic use.

5. "QUALITY MANAGEMENT" refers to the identification, measurement, control, and improvement of the distribution and storage of a drug product, with regard to quality, including, but not limited to, any program, practice, policy or procedure regarding: (1) used to control storage of drug products; (2) that covers the movement, including storage and transportation, of drug products; (3) that allows for the identification of quality critical environmental aspects (such as temperature, humidity, and/or other environmental factors) for a drug product and/or ensures that the adequate processes to maintain that environment are in place; (4) used to assess, control, communicate, and review risks to the quality of a drug product across the product lifecycle; or (5) relating to 21 U.S.C. s. 501(a)(2), 21 C.F.R. Parts 210 & 211, or USP [1079] Good Storage and Distribution Packages for Drug Products

6. "RANITIDINE-CONTAINING PRODUCT(S)" of "RCPs" means any product in which an active ingredient is ranitidine, including but not limited to Zantac or ranitidine, Zantac or ranitidine API (Active pharmaceutical Ingredient) whether or not the product was brought to market, including any branded, unbranded (i.e. generic), prescription, and over-the-counter ("OTC") product, that was or is in development, and used to treat, among other things, heartburn, gastroesophageal reflux disease, ulcers in the stomach or intestines, or Zollinger-Ellison syndrome.

7. "REGULATORY AFGENCY" means the United States Food & Drug Administration or any equivalent regulatory authority globally or in other countries that is charged with the regulation of RCPs, including but not limited to the European Medicines Agency, Health Canada, and the World Health Organization.

8. All references to "Testing" are defined to include testing capable of identifying the presence of nitrosamine contamination, and/or detecting other carcinogens, general toxic impurities (including genotoxic impurities), and residual solvents, in connection with the manufacture and contents of RCPs, include but are not limited to the following:

    a. Gas Chromatography (GC)
    b. Gas Chromatography- Flame Ionization Detector (GC-FID)
    c. Gas Chromatography- Mass Spectrometry (GC-MS)
    d. Gas Chromatography- tandem Mass Spectrometry (GC-MS/MS)
    e. Gas Chromatography- Selective Ion Monitoring Mass Spectrometry (GC-SIM MS)
    f. Gas Chromatography- High Resolution Mass Spectrometry (GC-HRMS)
    g. Gas Chromatography- Atomic Emission Spectrometry (GC-AES)
    h. Gas Chromatography- Flame Photometric Detector (GC-FPD)
    i. Gas Chromatography- Nitrogen Phosphorus Detector (GC-NPD)
    j. Gas Chromatography- Thermal Conductivity Detector (GC-TCD)
    k. Gas Chromatography- Photoionization Detector (GC-PID)
    l. Gas Chromatography- Electrolytic Conductivity Detector (GC-ELCD)
    m. Headspace Gas Chromatography (HS-GS)
    n. Liquid Chromatography (LC)
    o. High Performance Liquid Chromatography (HPLC)
    p. Liquid Chromatography-Mass Spectrometry (LC-MS)
    q. Liquid Chromatography-tandem Mass Spectrometry (LC-MS/MS)
    r. Liquid Chromatography- Selective Ion Monitoring Mass Spectrometry (LC-SIM MS)
    s. Liquid Chromatography- High Resolution Mass Spectrometry (LC-HRMS)
    t. Mass Spectrometry (MS)
    u. Thin Layer Chromatography (TLC)
    v. Atomic Absorption Spectroscopy (AAS)
    w. Atomic Emission Spectrometry (AES)
    x. X-ray Diffraction
    y. Infra-red (IR) Spectroscopy
    z. Fourier Transform Infrared (FTIR) microscopy
    aa. Scanning Electron Microscope Images
    bb. Optical micrographs and Stereo Light Microscopy
    cc. Ultraviolet Exposure (UV) Testing

**DEPOSITION TOPICS**

1. The overall structure, policies and procedures relating to YOUR pharmacovigilance practices.

2. The safety of your RCP's including the investigation into the safety, risks, and cause of NDMA in Your RCPs.

3. The root cause investigation for the nitrosamine impurities in Your RCPs.

4. The Health Hazard Evaluation for the nitrosamine impurities in Your RCPs.

5. Any Corrective And Preventative Action ("CAPA") and related documents relating to nitrosamines, degradation, stability, heating, humidity, storage, warehousing, transportation, or retest or expiration dating of Your RCPs.

6. Any assessment or root cause analysis conducted by You or a third party relating to the nitrosamine impurities in YOUR RCP's including any investigation into nitrosamine contamination in residual, recycled or recovered solvents used in the manufacture of Your RCPs.

7. The identity, title, and function of all personnel, departments, and/or groups within Defendants responsible for the receipt, recording, identification, collection, evaluation, analysis, and reporting of Adverse Events relating to ranitidine-containing product(s).

8. The identity, title, and function of all personnel, departments, and/or groups within any agent, partner, licensor, consultant, or collaborator of Defendants, responsible for the identification, collection, evaluation, analysis, and reporting of Adverse Events relating to ranitidine-containing product(s).

9. Any protocols, procedures, manuals, and/or guidance documents relating to the identification, collection, evaluation, analysis, and reporting of Adverse Events, from any source, related to ranitidine-containing product(s).

10. Any policies, procedures, training materials, instructions, protocols, definitions and other writings which govern, instruct, direct or guide you regarding the collection, analysis, follow-up, investigation, grading, and reporting of injuries and damages associated with the use of ranitidine-containing product(s).

11. Any communications among Defendants or with any United States or foreign regulatory agencies concerning Adverse Event reporting, pharmacovigilance plans and/or programs regarding ranitidine-containing product(s).

12. Any due diligence, research, searches, reports, or presentations you generated or obtained relating to adverse events, risks, or side effects of RCPs prior to filing any ANDA.

13. Any due diligence, research, searches, reports, or presentations you generated or obtained relating to adverse events, risks, or side effects of RCPs after filing any ANDA approval.

14. Any evaluations, analysis, discussions, recommendations, statistical analyses or reports pertaining to ranitidine-containing product(s) and/or $H_2$ blockers and NDMA, N-nitrosamines, nitrite, dimethylamine, genotoxins, Class 1 residual solvents, precancer, cancer markers, cancer, carcinogenicity, nitrosation, tumor development, tumor inducer and/or tumor promotor.

15. Any communications, evaluations, analysis, discussions, recommendations, or reports between Defendants or any other NDA or ANDA holder pertaining to ranitidine-containing product(s), and/or $H_2$ receptor blockers, and their potential risks.

16. Any protocols, procedures, manuals, directives and/or guidance documents relating to post-approval risk and/or safety assessment and pharmacovigilance, including evaluation of published literature or studies, pertaining to/of ranitidine-containing product(s), including but not limited to identifying which adverse events will be reported to any regulatory agency, and the manner and timeframe in which the adverse events will be reported.

17. The current location, including any sharepoints and/or databases, of all information pertaining to post-approval risk and/or safety assessment and pharmacovigilance of ranitidine-containing product(s).

18. A complete description of any database, repository, computer program or other means used by Defendants used to track, store, back-up, and/or organize any and all data and reports of adverse events beginning with any clinical testing of ranitidine-containing product(s) to present, including:
    a. The processing of Adverse Events/ICSRs;
    b. Triage of Adverse Events;
    c. Data entry into related databases or repositories;
    d. Medical review of Adverse Events;
    e. Medical follow-up of Adverse Events;
    f. Assessment of reportability of Adverse Events with regulatory authorities;
    g. Similar case listings and duplicate case removals from the Adverse Event database or repository; and
    h. Medical Literature or studies.

19. Any and all documents which govern, instruction, direct or guide Defendants regarding signal detection practices, including, but not limited to, any automated tool, algorithms, and protocols used to find, identify assess and review safety signals.

20. Any communications among Defendants or with any United States or foreign regulatory agencies concerning Risk Management plans, evaluations, procedures, and/or strategies relating to of RCPs.

21. Any communications with any other Defendant concerning any Adverse Event, Adverse Event reporting, medical literature assessment or pharmacovigilance plans and/or programs regarding ranitidine-containing product(s).

22. Communications with customers or API suppliers about RCP-related adverse events, risks, or side effects.

23. Any communications with any pharmacy benefit manager, third party administrator, or third party payor or any pharmacy benefit-related association concerning any Adverse Event, Adverse Event reporting, medical literature assessment or pharmacovigilance plans and/or programs regarding ranitidine-containing product(s).

24. Any evaluations, analysis, discussions, recommendations, or reports pertaining to post-approval risk and/or safety assessment and pharmacovigilance pertaining to/of ranitidine-containing product(s), $H_2$ blockers, NDMA, N-nitrosamines, nitrites, dimethylamine, genotoxins, Class 1 residual solvents, precancer, cancer markers, cancers, carcinogenicity, nitrosation, tumor development, tumor inducer and/or tumor promotor.

25. Post Market reporting and/or Post Marketing Surveillance documents and materials including all Serious Adverse Events, adverse events, and MedWatch Forms and all corresponding documents, materials, data, medical records, correspondence, investigations, and memoranda related to every and all adverse experiences and or events concerning the use of ranitidine-containing product(s), reported to, aware of and/or known by, Defendants.

26. The process for compiling and submitting PADERs, PBERs, PSURs, and other annual reports submitted to Regulatory Agencies containing information about new studies, articles, or adverse events.

27. The adverse events, studies, and articles contained in the reports mentioned in Topic 26.

28. Your communications with Regulatory Authorities relating to the actual or potential contamination of Your RCPs with nitrosamines and the safety or risks associated with nitrosamines found in your RCPs.

29. The processes, policies, procedures, and training materials used to determine the seriousness of an adverse event.

30. The processes, policies, procedures, and training materials used to determine reportability of adverse events.

31. The processes, policies, procedures, and training materials used to determine whether an adverse event is related to RCPs.

32. The circumstances under which any analysis of adverse events can or must trigger any communication to the FDA.

33. The circumstances under which any analysis of adverse events can or must trigger any adjustment to or review or study of shipping, warehousing, storage, or distribution policies or methods for RCPs.

34. The circumstances under which any analysis of adverse events can or must trigger any adjustment to or review or study of expiration or retest dates for RCPs.

**Identity of Your Witnesses and Documents**

35. With respect to each of the above topics:
   a. Your current (and any prior) corporate organization, and structure of departments or divisions responsible for any related practices, policies, and procedures.
   b. The identity of Your corporate officers and managers responsible for, or having any knowledge thereof.
   c. The existence, name, location, and nature of any related informational database.
   d. The location, storage, and organization of Your related documents.

## <u>DOCUMENTS TO BE PRODUCED</u>

Deponent shall produce the following documents three (3) business days prior to the deposition:

1. Current resume and curriculum vitae of deponent.

2. All documents reviewed by the deponent in preparing for this deposition.

3. All documents in the deponent's possession, custody, or control related to the deposition's topics listed above.

# EXHIBIT 2

**GENERIC DEFENDANTS' OBJECTIONS AND PLAINTIFFS' POSITION ON OBJECTIONS
TO PLAINTIFFS' PHARMACOVIGILANCE DEPOSITION NOTICE**

| Definition | Generic Defendants' Objection(s) | Plaintiffs' Position |
|---|---|---|
| 1. "YOU" or "YOUR" refers to [Generic Family], and any of its predecessor companies, successor companies, members, partners, directors, officers, employees, servants, agents, attorneys, joint venturers, licensors, third party contractors, or other representatives, including parent entities. | The definition of "YOU" or "YOUR" is overly broad and purports to require a response on behalf of separate corporate entities, including some that are not even subject to jurisdiction here, and it purports to require testimony regarding information that is not within a Generic Defendants' possession, custody, or control, especially as it relates to third party contractors. | |
| 4. "QUALITY" refers to any physical, chemical, microbiological, biological, bioavailability, and stability attributes that a drug product should maintain in order to be deemed suitable for therapeutic or diagnostic use. | The definition of "QUALITY" as overly broad to the extent it noticed topics beyond issues relating to storage and transportation and to the extent it purports to require testimony regarding claims that have been dismissed with prejudice. | |
| 5. "QUALITY MANAGEMENT" refers to the identification, measurement, control, and improvement of the distribution and storage of a drug product, with regard to quality, including, but not limited to, any program, practice, policy or procedure regarding: (1) used to control storage of drug products; (2) that covers the movement, including storage and transportation, of drug products; (3) that allows for the identification of quality critical environmental aspects (such as temperature, humidity, and/or other environmental factors) for a | 1. The definition of "QUALITY MANAGEMENT" is overly broad to the extent it expands the noticed topics beyond issues relating to storage and transportation and to the extent it purports to require testimony regarding claims that have been dismissed with prejudice. <br> 2. The definition is vague and overbroad in that it seeks to incorporate USP standards that have changed over time, without specifying which version(s) or time period is relevant. | |

| | | |
|---|---|---|
| drug product and/or ensures that the adequate processes to maintain that environment are in place; (4) used to assess, control, communicate, and review risks to the quality of a drug product across the product lifecycle; or (5) relating to 21 U.S.C. s. 501(a)(2), 21 C.F.R. Parts 210 & 211, or USP [1079] Good Storage and Distribution Packages for Drug Products. | | |
| 6. "RANITIDINE-CONTAINING PRODUCT(S)" of "RCPs" means any product in which   an active ingredient is ranitidine, including but not limited to Zantac or ranitidine, whether or not the product was brought to market, including any branded, unbranded (i.e. generic), prescription, and over-the-counter ("OTC") product, that was or is in development, and used to treat, among other things, heartburn, gastroesophageal reflux disease, ulcers in the stomach or intestines, or Zollinger-Ellison syndrome. | 1.  The definition of "RANITIDINE-CONTAINING PRODUCT(S)" or "RCPs" seeks information that is irrelevant to any claim against some Generic Defendants in that it seeks testimony including those products that were never marketed and therefore never received or used by any consumer.<br>2.  The definition is overbroad and disproportionate because only ranitidine-containing products made and/or sold in the United States are relevant to plaintiffs' claims. To the extent the definition refers to products made and/or sold in other countries, it is outside the scope of plaintiffs' allegations and claims and is therefore disproportionate. | |
| 7. "REGULATORY AFGENCY" [sic] means the United States Food & Drug Administration or any equivalent regulatory authority globally or in | 1.  Any topics seeking interaction or communication with foreign regulatory bodies, or adherence to foreign regulatory standards, are not | |

| | | |
|---|---|---|
| other countries that is charged with the regulation of RCPs, including but not limited to the European Medicines Agency, Health Canada, and the World Health Organization. | relevant to what happened in the United States market and is irrelevant to plaintiffs' claims in this litigation.<br>2. The definition is overbroad and disproportionate to the case by calling for irrelevant information. | |
| 8. All references to "Testing" are defined to include testing capable of identifying the presence of nitrosamine contamination, and/or detecting other carcinogens, general toxic impurities (including genotoxic impurities), and residual solvents, in connection with the manufacture and contents of RCPs, include but are not limited to the following:<br>a. Gas Chromatography (GC)<br>b. Gas Chromatography- Flame Ionization Detector (GC-FID)<br>c. Gas Chromatography- Mass Spectrometry (GC-MS)<br>d. Gas Chromatography- tandem Mass Spectrometry (GC-MS/MS)<br>e. Gas Chromatography- Selective Ion Monitoring Mass Spectrometry (GC-SIM MS)<br>f. Gas Chromatography- High Resolution Mass Spectrometry (GC-HRMS)<br>g. Gas Chromatography- Atomic Emission Spectrometry (GC-AES)<br>h. Gas Chromatography- Flame Photometric Detector (GC-FPD) | The definition of testing should be limited to those tests relevant to identifying NDMA. | |

| | | |
|---|---|---|
| i.  Gas Chromatography- Nitrogen Phosphorus Detector (GC-NPD)<br>j.  Gas Chromatography- Thermal Conductivity Detector (GC-TCD)<br>k.  Gas Chromatography- Photoionization Detector (GC-PID)<br>l.  Gas Chromatography- Electrolytic Conductivity Detector (GC-ELCD)<br>m.  Headspace Gas Chromatography (HS-GS)<br>n.  Liquid Chromatography (LC)<br>o.  High Performance Liquid Chromatography (HPLC)<br>p.  Liquid Chromatography-Mass Spectrometry (LC-MS)<br>q.  Liquid Chromatography-tandem Mass Spectrometry (LC-MS/MS)<br>r.  Liquid Chromatography- Selective Ion Monitoring Mass Spectrometry (LC-SIM MS)<br>   s.  Liquid Chromatography- High Resolution Mass Spectrometry (LC-HRMS)<br>t.  Mass Spectrometry (MS)<br>u.  Thin Layer Chromatography (TLC)<br>v.  Atomic Absorption Spectroscopy (AAS)<br>w.  Atomic Emission Spectrometry (AES)<br>x.  X-ray Diffraction<br>y.  Infra-red (IR) Spectroscopy | | |

| | | |
|---|---|---|
| z. Fourier Transform Infrared (FTIR) microscopy<br>aa. Scanning Electron Microscope Images<br>bb. Optical micrographs and Stereo Light Microscopy<br>cc. Ultraviolet Exposure (UV) Testing | | |

| Topic | Defendants' Position | Plaintiffs' Position |
|---|---|---|
| 1. The overall structure, policies and procedures relating to YOUR pharmacovigilance practices. | 1. This topic is overly broad and disproportionate to the needs of the case to the extent plaintiffs are seeking testimony broader than pharmacovigilance practices related to ranitidine.<br>2. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>3. This topic can be reduced to an interrogatory or request for production. | |
| 2. The safety of your RCP's including the investigation into the safety, risks, and cause of NDMA in Your RCPs. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. This topic seeks information beyond NDMA and the cancer risk alleged by plaintiffs in their January 8, 2021 disclosure to the MDL Court and in plaintiffs' Amended Master Personal Injury Complaint.[1] | |

---

[1] In Plaintiffs' Amended Master Personal Injury Complaint, Plaintiffs identify the following types of cancer alleged to be associated with NDMA: bladder, breast, colorectal/intestinal, esophageal, gastric, intestinal, kidney, liver, lung, pancreatic and prostate.

| | | |
|---|---|---|
| | 3. "Safety" is not a properly defined term.<br>4. The Generic Defendants have also already produced documentation regarding investigations conducted by each Generic Defendant regarding NDMA and ranitidine which was submitted to the FDA. | |
| 3. The root cause investigation for the nitrosamine impurities in Your RCPs. | 1. This topic appears related to the recalls of ranitidine-containing products and is irrelevant to plaintiffs' claims.<br>2. This topic seeks information that has already been produced under the Core Discovery Agreement.<br>3. Further, the only chemical at issue in this litigation is NDMA, not nitrosamines generally. This topic is beyond the scope of plaintiffs' claims and the MDL consolidation order.<br>4. This topic seeks information that is disproportionate to the needs of the case by seeking information related to all nitrosamines.<br>5. Plaintiffs have not defined "nitrosamine impurities" or "root cause investigation." | |
| 4. The Health Hazard Evaluation for the nitrosamine impurities in Your RCPs. | 1. This topic appears related to the recalls of ranitidine-containing products and is irrelevant to plaintiffs' claims.<br>2. This topic is disproportionate to the needs of the case because this information has already been produced under the Core Discovery Agreement. | |

|  |  |  |
|---|---|---|
|  | 3. The only chemical at issue in this litigation is NDMA, not nitrosamines generally. This topic is beyond the scope of plaintiffs' claims and the MDL consolidation order.<br>4. Plaintiffs have not defined "nitrosamine impurities" or "Health Hazard Evaluations." |  |
| 5. Any Corrective And Preventative Action ("CAPA") and related documents relating to nitrosamines, degradation, stability, heating, humidity, storage, warehousing, transportation, or retest or expiration dating of Your RCPs. | 1. This topic seeks information not within the functions of pharmacovigilance.<br>2. This information can be provided in response to written discovery requests.<br>3. The only chemical at issue in this litigation is NDMA, not nitrosamines generally. This topic is beyond the scope of plaintiffs' claims and the MDL consolidation order.<br>4. The topic is duplicative of topics in the "Storage and Transportation" notice. |  |
| 6. Any assessment or root cause analysis conducted by You or a third party relating to the nitrosamine impurities in YOUR RCP's including any investigation into nitrosamine contamination in residual, recycled or recovered solvents used in the manufacture of Your RCPs. | 1. This topic appears related to the recalls of ranitidine-containing products are is irrelevant to plaintiffs' claims.<br>2. This topic does not apply to all Generic Defendants, who did not all manufacture ranitidine products.<br>3. To the extent it applies to a Generic Defendant, the topic seeks irrelevant information because none of plaintiffs' causes of action rely on an allegation that use of residual, recycled, or recovered solvents used in the manufacturing process caused |  |

| | | |
|---|---|---|
| | the presence of NDMA in ranitidine products.<br>5. The only chemical at issue in this litigation is NDMA, not nitrosamines generally. This topic is beyond the scope of plaintiffs' claims and the MDL consolidation order.<br>4. Plaintiffs have not defined "nitrosamine impurities," "root cause investigation," or "residual, recycled, or recovered solvents." | |
| 7. The identity, title, and function of all personnel, departments, and/or groups within Defendants responsible for the receipt, recording, identification, collection, evaluation, analysis, and reporting of Adverse Events relating to ranitidine-containing product(s). | 1. This topic is not proportional by asking the witness to memorize lists of the names, titles, and functions of all employees, departments, and groups within each Generic Defendant responsible for receipt, recording, identification, collection, evaluation, analysis, and reporting of Adverse Events relating to ranitidine-containing product(s) over an unlimited period of time.<br>2. This same information can be obtained through less burdensome and less expensive means, like a written discovery request. | |
| 8. The identity, title, and function of all personnel, departments, and/or groups within any agent, partner, licensor, consultant, or collaborator of Defendants, responsible for the identification, collection, evaluation, analysis, and reporting of Adverse Events relating to ranitidine-containing product(s). | This topic is not proportional to the needs of the case by requiring each Generic Defendant to prepare a witness by asking the witness to memorize lists of the names, titles, and functions of every person responsible for Adverse Events relating to ranitidine-containing products over an unlimited period of time, without regard to whether the person was even an employee of a Generic | |

| | | |
|---|---|---|
| | Defendant. The same information can be obtained through written discovery. | |
| 9. Any protocols, procedures, manuals, and/or guidance documents relating to the identification, collection, evaluation, analysis, and reporting of Adverse Events, from any source, related to ranitidine-containing product(s). | This topic is disproportionate to the needs of the case because the same information can be obtained through less burdensome and less expensive means, like a written discovery request. | |
| 10. Any policies, procedures, training materials, instructions, protocols, definitions and other writings which govern, instruct, direct or guide you regarding the collection, analysis, follow- up, investigation, grading, and reporting of injuries and damages associated with the use of ranitidine-containing product(s). | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events. 2. This topic is disproportionate to the needs of the case because the same information can be obtained through less burdensome and less expensive means, like a written discovery request. 3. It is disproportionate because the only alleged injuries in this case are the cancers identified by Plaintiffs to be associated with NDMA in Plaintiffs' January 8, 2021 disclosure to the MDL Court and in plaintiffs' Amended Master Personal Injury Complaint. 4. Any other alleged "injury" stemming from use of ranitidine products is beyond the scope of plaintiffs' claims and the scope of this MDL. | |
| 11. Any communications among Defendants or with any United States or foreign regulatory agencies concerning Adverse Event reporting, pharmacovigilance plans and/or | 1. The topic is overly broad and disproportionate to the needs of the case because only pharmacovigilance processes and procedures regarding | |

| | | |
|---|---|---|
| programs regarding ranitidine-containing product(s). | ranitidine in the United States are relevant to plaintiffs' claims.<br>2. The information sought by the topic can be more easily discovered through less burdensome or less expensive means, like a document request of interrogatory. | |
| 12. Any due diligence, research, searches, reports, or presentations you generated or obtained relating to adverse events, risks, or side effects of RCPs prior to filing any ANDA.<br>13. Any due diligence, research, searches, reports, or presentations you generated or obtained relating to adverse events, risks, or side effects of RCPs after filing any ANDA approval. | 1. A Generic Defendants' decision to file an ANDA is not relevant to plaintiffs' claims.<br>2. This topic is beyond the scope, and irrelevant to, plaintiffs' amended allegations.<br>3. The topic is overly broad by seeking information beyond the specific cancers identified by plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 14. Any evaluations, analysis, discussions, recommendations, statistical analyses or reports pertaining to ranitidine-containing product(s) and/or $H_2$ blockers and NDMA, N-nitrosamines, nitrite, dimethylamine, genotoxins, Class 1 residual solvents, precancer, cancer markers, cancer, carcinogenicity, nitrosation, tumor development, tumor inducer and/or tumor promotor. | 1. Only ranitidine-containing products, NDMA, and the cancers alleged to be related to NDMA by plaintiffs in their January 8, 2021 submission to the Court and in Plaintiffs' Amended Master Personal Injury Complaint are relevant. This topic seeks information related to all nitrosamines, such that it is beyond the scope of plaintiffs' claims and beyond the scope of this MDL.<br>2. The topic should be limited in time. As written, the topic is disproportionate by requiring each Generic Defendant to prepare a witness on the topic with information over many years. | |

10

| | | |
|---|---|---|
| 15. Any communications, evaluations, analysis, discussions, recommendations, or reports between Defendants or any other NDA or ANDA holder pertaining to ranitidine-containing product(s), and/or $H_2$ receptor blockers, and their potential risks. | 1. Only ranitidine-containing products, NDMA, and the cancers alleged to be related to NDMA by plaintiffs in their January 8, 2021 submission to the Court and in Plaintiffs' Amended Master Personal Injury Complaint are relevant. This topic seeks information related to all nitrosamines, such that it is beyond the scope of plaintiffs' claims and beyond the scope of this MDL.<br>2. The topic should be limited in time. As written, the topic is disproportionate by requiring each Generic Defendant to prepare a witness on the topic with information over many years. | |
| 16. Any protocols, procedures, manuals, directives and/or guidance documents relating to post-approval risk and/or safety assessment and pharmacovigilance, including evaluation of published literature or studies, pertaining to/of ranitidine-containing product(s), including but not limited to identifying which adverse events will be reported to any regulatory agency, and the manner and timeframe in which the adverse events will be reported. | This information is obtainable through less burdensome or less expensive means, like a written discovery request. | |
| 17. The current location, including any sharepoints and/or databases, of all information pertaining to post-approval risk and/or safety assessment and pharmacovigilance of ranitidine-containing product(s). | 1. This topic should be limited to the specific cancers identified by plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. This topic seeks | |

| | | |
|---|---|---|
| | information related to all nitrosamines, such that it is beyond the scope of plaintiffs' claims and beyond the scope of this MDL.<br>2. As written, the topic is disproportionate by seeking irrelevant information and seeking information that could be obtained through less burdensome and less expensive means. | |
| 18. A complete description of any database, repository, computer program or other means used by Defendants used to track, store, back-up, and/or organize any and all data and reports of adverse events beginning with any clinical testing of ranitidine-containing product(s) to present, including:<br>a. The processing of Adverse Events/ICSRs;<br>b.   Triage of Adverse Events;<br>c.   Data entry into related databases or repositories;<br>d.   Medical review of Adverse Events;<br>e.   Medical follow-up of Adverse Events;<br>f.   Assessment of reportability of Adverse Events with regulatory authorities;<br>g.   Similar case listings and duplicate case removals from the Adverse Event database or repository; and<br>h.   Medical Literature or studies. | 1.   The topic is disproportionate by seeking irrelevant information unrelated to the specific cancers identified by plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>2.   The information can be obtained through less expensive and less burdensome means like a document request.<br>3.   This topic is beyond the scope plaintiffs' amended allegations, to the extent it seeks information unrelated to plaintiffs' allegations of a failure to report adverse events. | |

| | | |
|---|---|---|
| 19. Any and all documents which govern, instruction, direct or guide Defendants regarding signal detection practices, including, but not limited to, any automated tool, algorithms, and protocols used to find, identify assess and review safety signals. | The topic should be limited to pharmacovigilance processes and procedures regarding ranitidine and the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 20. Any communications among Defendants or with any United States or foreign regulatory agencies concerning Risk Management plans, evaluations, procedures, and/or strategies relating to of RCPs. | 1. This topic is beyond the scope of plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. The topic should be limited to communications with United States regulatory agencies. Communications with foreign agencies are not relevant to plaintiffs' claims.<br>3. The topic should be limited to communications related to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 21. Any communications with any other Defendant concerning any Adverse Event, Adverse Event reporting, medical literature assessment or pharmacovigilance plans and/or programs regarding ranitidine-containing product(s). | 1. The topic should be limited to communications related to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>2. The requested information could be more easily obtained through a written discovery request. | |
| 22. Communications with customers or API suppliers about RCP-related adverse events, risks, or side effects. | 1. This topic does not apply to Generic Defendants who did not source or purchase API. | |

13

| | | |
|---|---|---|
| | 2. To the extent it applies to a Generic Defendant, it should be limited to communications related to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>3. The requested information could be more easily obtained through a written discovery request. | |
| 23. Any communications with any pharmacy benefit manager, third party administrator, or third party payor or any pharmacy benefit-related association concerning any Adverse Event, Adverse Event reporting, medical literature assessment or pharmacovigilance plans and/or programs regarding ranitidine-containing product(s). | 1. This topic is irrelevant to Generic Defendants that are not named in the class complaints.<br>2. To the extent it applies to a Generic Defendant, it should be limited to communications related to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>3. The requested information could be more easily obtained through a written discovery request. | |
| 24. Any evaluations, analysis, discussions, recommendations, or reports pertaining to post-approval risk and/or safety assessment and pharmacovigilance pertaining to/of ranitidine- containing product(s), $H_2$ blockers, NDMA, N-nitrosamines, nitrites, dimethylamine, genotoxins, Class 1 residual solvents, precancer, cancer markers, cancers, carcinogenicity, nitrosation, tumor | 1. The topic should be limited to communications related to NDMA in ranitidine-containing products. This topic seeks information well beyond NDMA, such that it is beyond the scope of plaintiffs' claims and beyond the scope of this MDL.<br>2. None of the other sub-topics are relevant to plaintiffs' claims.<br>3. This topic is beyond the scope plaintiffs' amended allegations, which | |

| | | |
|---|---|---|
| development, tumor inducer and/or tumor promotor. | are limited to a failure to report adverse events. | |
| 25. Post Market reporting and/or Post Marketing Surveillance documents and materials including all Serious Adverse Events, adverse events, and MedWatch Forms and all corresponding documents, materials, data, medical records, correspondence, investigations, and memoranda related to every and all adverse experiences and or events concerning the use of ranitidine-containing product(s), reported to, aware of and/or known by, Defendants. | 1. This topic should be limited to communications related to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>2. The requested information could be more easily obtained through a written discovery request. | |
| 26. The process for compiling and submitting PADERs, PBERs, PSURs, and other annual reports submitted to Regulatory Agencies containing information about new studies, articles, or adverse events. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. The topic is overbroad to the extent it seeks information related to compiling and submitting reports to foreign regulatory agencies, which are irrelevant to plaintiffs' claims.<br>3. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 27. The adverse events, studies, and articles contained in the reports mentioned in Topic 26. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events. | |

| | | |
|---|---|---|
| | 2. The topic is overbroad to the extent it seeks information related to compiling and submitting reports to foreign regulatory agencies, which are irrelevant to plaintiffs' claims.<br>3. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 28. Your communications with Regulatory Authorities relating to the actual or potential contamination of Your RCPs with nitrosamines and the safety or risks associated with nitrosamines found in your RCPs. | 1. The topic is overbroad to the extent it seeks information related to compiling and submitting reports to foreign regulatory agencies, which are irrelevant to plaintiffs' claims.<br>2. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. This topic seeks information related to all nitrosamines, such that it is beyond the scope of plaintiffs' claims and beyond the scope of this MDL. | |
| 29. The processes, policies, procedures, and training materials used to determine the seriousness of an adverse event. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |

| | | |
|---|---|---|
| | 3. The information is obtainable through less burdensome and expensive means, like a document request. | |
| 30. The processes, policies, procedures, and training materials used to determine reportability of adverse events. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>3. The information is obtainable through less burdensome and less expensive means, like a document request. | |
| 31. The processes, policies, procedures, and training materials used to determine whether an adverse event is related to RCPs. | 1. This topic is beyond the scope plaintiffs' amended allegations, which are limited to a failure to report adverse events.<br>2. The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint.<br>3. The information is obtainable through less burdensome and less expensive means, like a document request. | |
| 32. The circumstances under which any analysis of adverse events can or must trigger any communication to the FDA. | The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 33. The circumstances under which any analysis of adverse events can or must | The topic should be limited to the cancers alleged to be associated with NDMA per | |

17

| | | |
|---|---|---|
| trigger any adjustment to or review or study of shipping, warehousing, storage, or distribution policies or methods for RCPs. | plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 34. The circumstances under which any analysis of adverse events can or must trigger any adjustment to or review or study of expiration or retest dates for RCPs | The topic should be limited to the cancers alleged to be associated with NDMA per plaintiffs in their January 8, 2021 submission to the Court and in plaintiffs' Amended Master Personal Injury Complaint. | |
| 35. With respect to each of the above topics:<br>a. Your current (and any prior) corporate organization, and structure of departments or divisions responsible for any related practices, policies, and procedures.<br>b. The identity of Your corporate officers and managers responsible for, or having any knowledge thereof.<br>c. The existence, name, location, and nature of any related informational database.<br>d. The location, storage, and organization of Your related documents | 1. This topic is overly broad in that it would require a witness to testify regarding (i) the corporate organization and structure of many different departments and divisions over many years; (ii) each and every corporate officer and manager having any knowledge of any topic implicated in this Notice over that same time period; and (iii) the location, storage, and organization of every single document related to each of the Topics contained in the Notice.<br>2. The term "informational database" is also undefined and not reasonably particular such that the Generic Defendants are unable to prepare a witness.<br>3. The topic is not proportional to the needs of this case, particularly where the Generic Defendants can provide this information – to the extent it exists and is not otherwise objectionable – through other, less expensive and intrusive means, like a response to a written discovery request. | |