## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                             MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO ALL CASES

_____

## THE GENERIC DEFENDANTS'
## RULE 12 MOTION TO DISMISS ON THE GROUND OF PREEMPTION
## AND INCORPORATED MEMORANDUM OF LAW

_____

## <u>TABLE OF CONTENTS</u>

I.    **INTRODUCTION** ................................................................................................ 1

II.    **BACKGROUND** ................................................................................................. 2

     A. As Mandated By Supreme Court Precedent, This Court Dismissed Plaintiffs' Claims Against The Generic Defendants On Preemption Grounds………………..................2

     B. Plaintiffs Still Allege That NDMA Forms Under Normal Storage Conditions And In the Human Body When Taken As Intended………………………………….…………...4

     C. Even As Amended, Plaintiffs' Factual Allegations Remain Fundamentally Inconsistent With Their Theories of Liability…………………….....................…………………..5

III.   **LEGAL ARGUMENT** ........................................................................................... 8

     A. Plaintiffs' Failure-To-Warn-FDA Claim Is Preempted by *Mensing*…………………...8

           1. Plaintiffs' "Failure-To-Warn-FDA" Claim Is Preempted Because It Is Dependent On Actions By the FDA……………………………...…………9

           2. The Court Cannot Nullify *Mensing* By Giving Credence to Plaintiffs' "Failure to Warn FDA" Claim……………………...………………………………11

     B. Plaintiffs' "Failure-To-Warn-FDA" Claim Is Also Preempted By *Buckman*……...…14

     C. Plaintiffs' Expiration Date Claims Are Preempted By *Mensing* and *Bartlett*………...16

     D. Plaintiffs' Negligent Storage And Transportation Claim Is Preempted Under *Mensing* and *Bartlett*………….....………………………..……………………………………20

           1. Plaintiffs' Storage and Transportation Claim Is Preempted Because The Changes Called For Would Not Meet The Alleged State-Law Duty of Care, And All Independent Actions That Would Meet That Duty Are Barred By Federal Law…………………………...………………………………………...20

           2. Plaintiffs' "Storage and Transportation" Claim Is Preempted Because It Seeks to Impose A Duty to Make "Major Changes" That Would Affect The Ranitidine Medications' Impurity Profile And Chemical Properties…………22

     E. Plaintiffs' Negligent Product Containers Claim Is Preempted Under *Mensing* And *Bartlett*……………………….…………….…………………………………………25

           1. Plaintiffs' Negligent Product Containers Claim Is Preempted Because The Packaging Changes At Issue Are "Major Changes" That Would Affect The Ranitidine Medications' Impurity Profile……………………………………..25

2. The Negligent Product Containers Claim Is Preempted Because The Container Changes Would Not Meet The State-Law Duty of Care…………………....27

F. Plaintiffs' Failure-To-Test Claim Is Preempted Under *Mensing* and *Bartlett*………..27

G. Plaintiffs' Derivative Claims In The AMPIC Are Preempted………………………..31

H. Plaintiffs' State-Law Claims In The CELC and MMC Are Substantively Similar To The State-Law Claims In The Personal Injury Complaint And Are Preempted For The Same Reasons…………………………………………………………………………31

I. The Generic Defendants Incorporate The Branded Defendants' Express Preemption Argument…………………………………….………………………………………...33

**IV. CONCLUSION**......................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allbright v. Teva Pharms. USA, Inc.*,
   290 F. Supp. 3d 1321 (S.D. Fla. 2017) ................................................................................11

*Bobo v. Tennessee Valley Auth.*,
   855 F.3d 1294 (11th Cir. 2017) ...........................................................................................30

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001).................................................................................................14, 15, 16

*City of Miami v. Bank of Am. Corp.*,
   800 F.3d 1262 (11th Cir. 2015), *vacated on other grounds and remanded sub
   nom. Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017)...............................30

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig*,
   756 F.3d 917 (6th Cir. 2014) ..........................................................................................31, 32

*Douglas Asphalt Co. v. QORE, Inc.*,
   657 F.3d 1146 (11th Cir. 2011) ...........................................................................................30

*Drager v. PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014) ...............................................................................................27

*Greager v. McNeil-PPC, Inc.*,
   414 F. Supp. 3d 1137 (N.D. Ill. 2019) .................................................................................32

*Grubbs v. Medtronic, Inc.*,
   No. 2:18-CV-01468-AKK, 2019 WL 3288263 (N.D. Ala. July 22, 2019) ............................15

*Guarino v. Wyeth, LLC*,
   719 F.3d 1245 (11th Cir. 2013) ......................................................................................11, 30

*Gustavsen v. Alcon Labs., Inc.*,
   903 F.3d 1 (1st Cir. 2018)....................................................................................................23

*Kruszka v. Novartis Pharms. Corp.*,
   19 F. Supp. 3d 875 (D. Minn. 2014)....................................................................................21

*Lance v. Wyeth*,
   85 A.3d 434 (Pa. 2014).........................................................................................................21

*Marsh v. Genentech, Inc.*,
   693 F.3d 546 (6th Cir. 2012) ...............................................................................................16

*In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*,
    623 F.3d 1200 (8th Cir. 2010) ................................................16

*Metz v. Wyeth, LLC*,
    No. 8:10-CV-2658-T-27AEP, 2011 WL 5024448 (M.D. Fla. Oct. 20, 2011) .......................10

*Mink v. Smith & Nephew, Inc.*,
    860 F.3d 1319 (11th Cir. 2017) ................................................15, 16

*Morris v. PLIVA USA, Inc.*,
    713 F.3d 778 (5th Cir. 2013) ................................................27

*Mut. Pharm. Co. v Bartlett*,
    570 U.S. 472 (2013)................................................ *passim*

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)................................................ *passim*

*Rice v. Allergan USA, Inc.*,
    No. 2:16-CV-01374-MHH, 2018 WL 1618036 (N.D. Ala. Apr. 4, 2018) ............................15

*Rojas v. Teva Pharm. USA, Inc.*,
    920 F. Supp. 2d 772 (S.D. Tex. 2013) ................................................29

*Rowe v. Mentor Worldwide, LLC*,
    297 F. Supp. 3d 1288 (M.D. Fla. 2018) ................................................15

*Tinkler v. Mentor Worldwide, LLC*,
    No. 1:19-CV-23373-UU, 2019 WL 7291239 (S.D. Fla. Dec. 30, 2019)................................................15

*In re Trasylol Prods. Liab. Litig.*,
    763 F. Supp. 2d 1312 (S.D. Fla. 2010) ................................................15

*Tsavaris v. Pfizer, Inc.*,
    717 F. App'x. 874 (11th Cir. 2017) ................................................15

*Westerfield v. Corin Grp., PLC*,
    No. 819CV00146T02AEP, 2019 WL 1233634 (M.D. Fla. Mar. 15, 2019) ................................15

*Williams v. St. Jude Med., S.C., Inc.*,
    No. 1:16-CV-04437-ELR, 2017 WL 11113322 (N.D. Ga. Oct. 19, 2017) ............................15

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ................................................23

**Statutes**

21 U.S.C. § 337(a) ................................................14, 16

21 U.S.C. § 356a(c)................................................................................................22, 23

21 U.S.C. § 379r ........................................................................................................33

Magnusson-Moss Warranty Act .........................................................................3, 5, 6

**Other Authorities**

21 C.F.R. § 314.70 ................................................................3, 20, 22, 23, 24, 26

21 C.F.R. § 314.80 ....................................................................................................16

Rule 12 ....................................................................................................................1, 33

Pursuant to this Court's Pretrial Order #61, the Generic Manufacturer Defendants ("Generic Defendants") (as those entities are identified in the Amended Complaints), hereby submit this Rule 12(b)(6) motion to dismiss the Amended Master Personal Injury Complaint ("AMPIC"), Dkt. 2759, the Consolidated Amended Consumer Economic Loss Class Action Complaint ("CELC"), Dkt. 2835, and the Consolidated Medical Monitoring Class Action Complaint ("MMC"), Dkt. 2832-1, (collectively, "the Amended Complaints") on the ground of preemption and incorporated memorandum of law in support.

## I.      INTRODUCTION

On December 31, 2020, this Court dismissed all of Plaintiffs' claims in their Master Personal Injury Complaint, Consolidated Consumer Class Action Complaint, and Consolidated Third Party Payor Class Complaint (the "Original Complaints") as preempted under the U.S. Supreme Court's decisions in *Mensing* and *Bartlett*.[1] In so doing, the Court recognized that the fundamental question to be asked in a preemption case is whether a Generic Defendant can independently do what needs to be done to avoid liability under a state cause of action while remaining in compliance with federal law. If a Generic Defendant cannot do so, *i.e.*, if federal law prohibits the manufacturer from making the change without the FDA's approval, or if the only way to comply with both the asserted state-law duty and federal law is to stop selling the drug altogether, then the state-law claims are preempted. The Court dismissed all of Plaintiffs' claims in the Original Complaints because they were based on allegations that the Generic Defendants should have changed the design of generic ranitidine to eliminate the potential formation of N-Nitrosodimethylamine ("NDMA") or changed the label to warn of the presence of NDMA in

---

[1] *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mut. Pharm. Co. v Bartlett*, 570 U.S. 472 (2013).

ranitidine and the alleged risk of developing cancer. Because the Generic Defendants could not independently make those changes, all of Plaintiffs' claims were preempted.

In the Amended Complaints, Plaintiffs again assert legal claims that would require the Generic Defendants to alter the label or design of generic ranitidine in ways that federal law does not permit. Plaintiffs' claims continue to be based on the fundamental allegations that ranitidine is inherently defective from the time it is manufactured, that NDMA will develop when ranitidine is stored under normal conditions and when ingested in the human body as directed, and that no level of NDMA is safe to consume. Ultimately, despite Plaintiffs' attempt to thread the needle on preemption, their continued emphasis on a fundamental safety defect in every dose of ranitidine dooms all of their claims. Under their theory, none of the actions that Plaintiffs assert the Generic Defendants independently could have taken under state law would have been enough to avoid liability without *also* making changes to the design of the ranitidine molecule itself, adding warnings about NDMA or cancer to the labeling, or removing the product from the market entirely. Consequently, all of Plaintiffs' claims against the Generic Defendants in the Amended Complaints are preempted and must be dismissed with prejudice.

## II.     BACKGROUND

### A.     As Mandated By Supreme Court Precedent, This Court Dismissed Plaintiffs' Claims Against The Generic Defendants On Preemption Grounds

In dismissing the Original Complaints, the Court applied the chief holding from *Mensing* and *Bartlett,* describing it as follows: "[i]f a defendant cannot, independently and while remaining in compliance with federal law, do what needs to be done to avoid liability under a state cause of action, the cause of action is pre-empted." Dkt. 2512 (the "Preemption Order") at 37. Relying on *Bartlett,* the Court also recognized that claims that would require a Generic Defendant to stop selling a product are also preempted. *Id.* at 16-17 ("Pre-emption caselaw 'presume[s] that an actor

2

seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability.") (citing 570 U.S. at 488). And, the Court made clear that *Mensing* and *Bartlett*'s holdings are not limited to claims styled as "design defect" or "failure to warn," citing cases dismissing claims against generic drug manufacturers even when couched as a failure to communicate warnings to consumers, to test, to inspect, or to conduct post-market surveillance; breach of express and implied warranties; misrepresentation; fraud; and violation of consumer protection statutes. *Id.* at 17-19.

The Court also held that claims that require a Generic Defendant to make a "major change" to its production process for a drug (as defined under FDA regulations, see 21 C.F.R. § 314.70(b) are preempted because such changes cannot be made independently without FDA pre-approval. *Id.* at 13-14. Lastly, the Court rejected Plaintiffs' sweeping misbranding theory because no court has adopted that theory and doing so "would render the vast body of pre-emption caselaw in the drug context, including binding Supreme Court decisions, meaningless." *Id.* at 27-28.

Ultimately, the Court dismissed all of the claims in the Original Complaints because they all were premised on allegations that the Generic Defendants should have changed their products' design or labeling, but federal law prohibited the Generic Defendants from doing so without prior FDA approval. *Id.* at 7. The Court dismissed the design defect and failure to warn-based claims with prejudice, but allowed Plaintiffs to attempt to re-plead narrow claims based on failure to warn the FDA, expiration dates, testing, storage and transportation conditions, the Magnusson-Moss Warranty Act, and associated derivative counts. *Id.* at 53-54.

Thereafter, Plaintiffs filed the AMPIC, MMC, and CELC. In the AMPIC, Plaintiffs assert claims against the Generic Defendants sounding in failure to warn the FDA; failure to warn through expiration dates; negligent storage and transportation, negligent product containers, and

failure to test. In the MMC, Plaintiffs assert claims for medical monitoring (styled either as an independent cause of action or form of relief) based on the same underlying allegations of tortious conduct in the AMPIC. In the CELC, Plaintiffs assert claims sounding in violation of state consumer protection laws (and fraud), breach of implied warranties, and unjust enrichment, all of which (for Generic Defendants) are premised on substantively similar expiration date and product container allegations as in the AMPIC.[2] As set forth below, all of the claims against the Generic Defendants, in all three Amended Complaints, must be dismissed with prejudice as preempted.

### B.  Plaintiffs Still Allege That NDMA Forms Under Normal Storage Conditions And In the Human Body When Taken As Intended

Despite the length of the Amended Complaints, all of Plaintiffs' claims against the Generic Defendants are grounded on the same constant factual allegations. As in their Original Complaints, Plaintiffs allege that the risk of NDMA formation is intrinsic to all ranitidine products, that the ranitidine molecule itself contains the constituent molecules to form NDMA and that, at all relevant times, the ranitidine products were defective. *See, e.g.,* AMPIC ¶¶ 343, 953; CELC ¶ 383; MMC ¶¶ 250; 253. Plaintiffs assert that the ranitidine molecule itself internally degrades to form NDMA and that NDMA formation increases over time and under normal storage conditions. AMPIC ¶¶ 6; 346; CELC ¶¶ 384, 386; *see also* p. 3 ("Defendants knew…that ranitidine is an unstable molecule that breaks down under normal conditions into dangerous NMDA, and that this breakdown process is made worse when Zantac and/or other Ranitidine-Containing Products are used in the manner directed or when exposed to routine heat or humidity."); MMC at 1 ("ranitidine transforms over time and under natural conditions into high levels of [NDMA]").

---

[2] The Third Party Payors chose not to amend their Complaint, instead appealing the Court's decision as to that Complaint to the Eleventh Circuit.

Plaintiffs also allege that ranitidine degrades and NDMA forms in the human digestive system when taken as instructed on the label. AMPIC ¶¶ 6, 346, 347, 377-79; CELC ¶¶ 386-387, 416-417; MMC ¶¶ 253-254. They claim that when the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by chemicals found in heartburn-inducing foods, the nitroso molecule and the DMA molecule break off and reform as NDMA. *Id.* They further allege that NDMA similarly forms in other organs and tissues due to an enzymatic reaction. *Id.*

In sum, Plaintiffs allege that NDMA forms under *normal* storage conditions, when exposed to *routine* heat or humidity, and in the body as part of the normal digestive process *when taken as intended. See, e.g.,* AMPIC ¶¶ 343, 953; CELC at 3; MMC at 1. Thus, fundamentally, Plaintiffs' theory is that *no* ranitidine product is safe to ingest. And while Plaintiffs also allege that NDMA formation increases over time and at higher temperatures, they do not allege that there is any period of time after manufacture or any storage conditions that would render ranitidine safe to consume. To the contrary, they assert that "NDMA is not akin to other compounds that have a salutary effect at low levels and a negative effect with greater exposure. **There is no recommended daily dose of NDMA. The ideal level of exposure is zero.**" AMPIC ¶ 4 (emphasis added); *see also id.* ¶ 459 ("Based on prevailing scientific evidence, exposure to NDMA caused by consuming Defendants' ranitidine-containing products causes cancer in humans."); CELC ¶ 341 ("NDMA is a genotoxin which interacts with DNA and may subsequently induce mutations. Genotoxins are not considered to have a safe threshold due to their ability to alter DNA."); MMC ¶ 209 (same as CELC).

## C.    Even As Amended, Plaintiffs' Factual Allegations Remain Fundamentally Inconsistent With Their Theories of Liability

In the Preemption Order, the Court noted that the allegations in the Original Complaints were fundamentally inconsistent with the legal theories articulated in Plaintiffs' briefing and at

oral argument – especially for the expiration date theory. Dkt. 2512 at 34. As the Court explained, "Plaintiffs' allegations that expiration dates for ranitidine products should have been shortened because the products *became dangerous over time* are inconsistent with their allegations that the products *were dangerous upon being manufactured*." *Id.* (emphasis added). The Court held that while a plaintiff may plead inconsistent claims in separate counts, "a party may not plead internally inconsistent facts within a count." *Id.* at 34-35.

Despite the Court's admonition, this fundamental inconsistency remains in all of Plaintiffs' claims. Plaintiffs continue to contend that ranitidine is inherently defective, that all ranitidine forms NDMA, and that no level of NDMA is safe to consume. In light of those allegations, none of the actions that Plaintiffs claim the Generic Defendants independently could have taken would have been enough to avoid liability under state law. And the actions that Generic Defendants could independently take that *would* have met the purported state law duty – making changes to the design of the ranitidine molecule itself or adding warnings about NDMA or cancer to the labeling – are barred by federal law.

For example, in Plaintiffs' claims based on expiration dates (Counts III, IV, and VII in the AMPIC), they allege that "[t]o **mitigate** degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be **warned to consume ranitidine shortly after manufacturing**. **No ranitidine product contained this warning**. AMPIC ¶ 937 (emphasis added). Plaintiffs further allege that to comply with state law, the Generic Defendants would have needed not only to change the label to shorten the expiration date but also to "**accurately warn consumers not to consume ranitidine after significant portions of it had progressively deteriorated into NDMA**." AMPIC ¶ 958 (emphasis added). Plaintiffs' claim, therefore, is that even if the Generic Defendants had used a shorter expiration date, they would also have needed to

6

provide the *reason* that there was a shorter expiration date, *connect* the expiration date to a risk of cancer, and *instruct* consumers to take ranitidine in specified ways.

Similarly, Plaintiffs allege in their negligent storage and transportation claim (Count XI of the AMPIC) that the Generic Defendants had "a duty to exercise reasonable care in the storage and transportation of ranitidine active pharmaceutical ingredient ("API") and ranitidine-containing products **to <u>ensure</u> the products were not unreasonably dangerous to consumers and users**." AMPIC ¶ 2453 (emphasis added). But Plaintiffs also allege that NDMA formation over time is intrinsic to the ranitidine molecule and that it forms under normal storage conditions and in the human body when taken as intended. Therefore, Plaintiffs are really asserting that to ensure safety, the Generic Defendants would have needed to change ranitidine's molecular design, add warnings regarding NDMA and cancer to the label, or stop selling the product entirely.

The same is true for Plaintiffs' failure-to-test claim (Count VIII of the AMPIC), where Plaintiffs similarly allege that the Generic Defendants had a "duty to exercise reasonable care in the testing of ranitidine-containing products **to ensure** the products were not unreasonably dangerous to end consumers or users." AMPIC ¶¶ 1973, 1979 (emphasis added). But again, a test alone would not meet this alleged state-law duty. Therefore, Plaintiffs' claim is that the Generic Defendants should have used the test results to change the label, change the design, ask the FDA for assistance, or stop selling the product.

Yet again, in their negligent product container claim (Count IX of the AMPIC), Plaintiffs allege that the Generic Defendants should have changed the product's packaging to "plac[e] each unit of ranitidine in a blister pack or similarly individually packaged container" and to "reduc[e] the number of units of ranitidine in each bottle to a low number." AMPIC ¶ 1992. Plaintiffs allege that these changes would have "reduce[d] the amount of NDMA produced." AMPIC ¶ 1995. They

ignore that the packaging configuration for every Generic Defendant's ranitidine product is set by the ANDA as approved by FDA and cannot be changed without prior FDA approval if such change might impact purity or stability. And they do not allege that the changes would have made ranitidine safe or otherwise eliminated the alleged risks to consumers. Once more, because Plaintiffs allege that the risk of NDMA ingestion remained *even if* the containers were changed, the Generic Defendants would still need to take additional steps to change the label to include warnings about NDMA and a risk of cancer to meet the claimed state law duty.

As set forth in more detail in Section III.H below, the claims in the CELC and MMC suffer from the same flaws. Ultimately, in all three Amended Complaints and each cause of action against the Generic Defendants, the only way the Generic Defendants could have avoided Plaintiffs' alleged harm would be to change the design of the ranitidine molecule itself, change the labeling to include warnings about NDMA and cancer, or to stop selling ranitidine. Because they could not independently take the first two actions and are not required to take the last, Plaintiffs' claims are preempted pursuant to *Mensing* and *Bartlett* and must be dismissed.

## III.   LEGAL ARGUMENT

### A.   Plaintiffs' Failure-To-Warn-FDA Claim is Preempted by *Mensing*

Plaintiffs failure-to-warn-FDA claim (AMPIC Count V) is preempted under a straightforward application of *Mensing*. The Supreme Court in *Mensing* held that state-law failure to warn claims against generic-drug manufacturers are preempted because the manufacturers could not meet both the state-law warning duty and the federal duty of "sameness" to use only warnings appearing on the brand name drug's label. 564 U.S. at 613-14, 619-24. In the decade since that landmark decision, dozens of federal courts applying *Mensing* have dismissed with prejudice warnings-based claims against generic drug manufacturers as preempted—regardless of whether

the claims were based solely on the text of the warning label appearing on the product itself or on a failure to otherwise "communicate" the warning to consumers.[3]

Plaintiffs now ask the Court to hold, contrary to *Mensing* and the vast body of preemption case law, that they can state a warning claim against Generic Defendants so long as it is couched as a failure to warn *through the FDA*. *See* AMPIC ¶¶ 1371-1510. This Court should deny Plaintiffs' request out-of-hand and dismiss the failure-to-warn-FDA claim because, under *Mensing*, claims against generic drug manufacturers are preempted when the manufacturer could not avoid liability through its own independent actions without the assistance of FDA. This Court is bound to apply *Mensing*, and should not rely on the cases set forth in Plaintiffs' AMPIC, all of which are distinguishable medical device express preemption cases (or, for Oregon only, one pre-*Mensing* case involving a brand-name drug). *Id.* ¶¶ 1407-1505.

## 1. Plaintiffs' "Failure-To-Warn-FDA" Claim Is Preempted Because It Is Dependent On Actions By the FDA

The Court summarized *Mensing's* holding pertinent to Plaintiffs' failure-to-warn-FDA claim in the Preemption Order:

> The [*Mensing*] Court stated that the "question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." [564 U.S.] at 620 (citing [*Wyeth v. Levine*, 555 U.S. 555, 573 (2009)]). "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for preemption purposes." *Id.* at 623-24. Asking the FDA for help "would have started a Mouse Trap game" that eventually may have led to a labeling change, "depending on the actions of the FDA and the brand-name manufacturer." *Id.* at 619-20.

---

[3] Generic Defendants have prepared an appendix listing these federal circuit and district court cases, many of which were previously raised in prior preemption briefing or cited in the Court's Order. *See* Dkt. 2512 at 17. In compliance with PTO 61, Generic Defendants do not submit any appendix at this time but will gladly do so if it would assist to the Court.

Dkt. 2512 at 15. Here, Plaintiffs assert that the manufacturer's ultimate duty was "to warn Plaintiffs of dangers associated with ranitidine." AMPIC ¶ 1379. But Plaintiffs concede, as they must, that "[b]ecause federal law requires generic drug labels to largely match branded drug labels . . . Generic Manufacturer Defendants were not able to warn consumers directly of the cancer risks of NDMA in ranitidine." *See, e.g.,* AMPIC ¶ 1410. In other words, the Generic Defendants were unable to **independently** convey or disseminate a warning to consumers about alleged cancer risks in the use of generic ranitidine. Instead, Plaintiffs' claim relies entirely on what **the FDA** might have done. *See, e.g., id.* ¶¶ 1408, 1409 (alleging that had FDA received certain allegedly unreported adverse event data from the manufacturer defendants, FDA was "reasonably expected to pool and share" it "to the medical community" or otherwise "disseminate this information"). Because the Generic Defendants could not avoid liability solely through their own independent actions, and the claim is necessarily "dependent on the exercise of judgment" of the FDA, it is preempted under *Mensing. See also Metz v. Wyeth, LLC,* No. 8:10-CV-2658-T-27AEP, 2011 WL 5024448, at *2-3 and n.3 (M.D. Fla. Oct. 20, 2011) (dismissing failure-to-warn-FDA claim against generic-drug manufacturer on pleading grounds, but also holding in the alternative that the Supreme Court's reasoning in *Mensing* "likely bars Plaintiffs' claims in this case to the extent they are based on [generic-drug manufacturer's] failure to notify the FDA of alleged risks associated with metoclopramide").

Moreover, *Mensing* held that a "pre-emption analysis that was dependent on what a third party or the federal government might do would render impossibility pre-emption 'all but meaningless.'" Dkt. 2512 at 15 (quoting *Mensing*, 564 U.S. at 620-21). That concern is magnified with a "failure-to-warn FDA" claim. Because of the FDA's central role in approval and regulation of generic drugs, **any** failure-to-warn claim aimed at a generic drug product could as easily be

styled as a failure-to-warn-FDA claim. That is precisely what Plaintiffs have done here, taking the Original Complaints' allegations of failure to warn of a purported risk of cancer from NDMA in ranitidine – which the Court has already held preempted as to the Generic Defendants – and reframing them as a failure to "sufficiently" gather or report information about that alleged risk to FDA, assuming that had they done so, FDA would have issued a warning to consumers. *See* AMPIC ¶¶ 1391-1400. Plaintiffs' effort fails. As this Court explained in rejecting Plaintiffs' similar effort to avoid preemption of their design defect claims by re-styling them as "parallel misbranding" claim, the Court cannot adopt a position that "would render the vast body of pre-emption caselaw in the drug context, including binding Supreme Court decisions, meaningless." *See* Dkt. 2512 at 28; *see also Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1249 (11th Cir. 2013) ("No matter the garb in which she attempts to present them, Guarino's claims are at bottom allegations regarding Teva's failure to warn her of the dangers of long-term metoclopramide use, and they therefore cannot escape *Mensing*'s grasp."); *Allbright v. Teva Pharms. USA, Inc.*, 290 F. Supp. 3d 1321, 1331 (S.D. Fla. 2017) ("[Plaintiff's] negligence claims based on failure to . . . conduct market surveillance fail because Plaintiff cannot avoid preemption by hypothesizing a potential scenario in which Defendant may have complied with both its federal and state obligations.").

### 2.    The Court Cannot Nullify *Mensing* By Giving Credence To Plaintiffs' "Failure to Warn FDA" Claim

Plaintiffs have not cited any authority that would support a decision endorsing a failure-to-warn-FDA claim in a generic drug case that would nullify *Mensing* and a vast body of preemption caselaw. Nor can they. Plaintiffs cannot distinguish *Mensing's* holding, which is dispositive as to all of their claims against Generic Defendants, including their "failure-to-warn-FDA" claim. And it is irrelevant that the *Mensing* plaintiffs declined to frame their state-law warnings claim in such

narrow terms as Plaintiffs here. *See* 564 U.S. at 608-09, 619.[4] Despite the difference in pleading strategies, the necessity of preemption is the same: for both the traditional failure to warn claim at issue in *Mensing* and Plaintiffs' failure-to-warn-FDA claim here, it is insufficient to merely *inform* FDA of a safety issue or a proposed labeling change. Rather, satisfying the state law duty requires *conveying* a warning *to the end user,* whether directly or to their physician. *See* 564 U.S. at 619 ("State law demanded a safer label; it did not instruct the Manufacturers to communicate with the FDA about the possibility of a safer label."); AMPIC ¶ 1379 ("Manufacturer Defendants had a duty to warn Plaintiffs of dangers associated with ranitidine."). Because the impossibility preemption analysis considers only the actions generic-drug manufacturers could independently take, and because it is undisputed that Generic Defendants could not have independently ensured that a warning was conveyed to consumers or their physicians about ranitidine without violating federal law, the "failure-to-warn FDA" claim is preempted.

Nor can Plaintiffs distinguish *Mensing* on the facts. Plaintiffs contend that this case is distinct because "no speculation is necessary" as to whether FDA would have disseminated a warning to the medical community or consumers about the alleged cancer risks of ranitidine had

---

[4] In their brief to the Supreme Court, the *Mensing* plaintiffs stated that they were asserting "traditional, black-letter products liability claims under Minnesota and Louisiana law for injuries caused by a product sold with inadequate warnings" as opposed to "claims that state law required Generic Defendants of metoclopramide to 'take steps' to seek FDA approval for stronger warnings." Brief for Respondents in Nos. 09-993, 09-1039, 09-1501, pp. 40-41; *see also Mensing*, 564 U.S. at 619 (noting that the plaintiffs "deny that their state tort claims are based on the Manufacturers' alleged failure to ask the FDA for assistance in changing the labels"). But, the *Mensing* plaintiffs nonetheless relied on a *theory* that generic metoclopramide manufacturers could have met the Minnesota and Louisiana duty to warn law while still complying with federal law by seeking the assistance of FDA to conveying a warning to consumers, such as by proposing a new warning label, seeking FDA's assistance in sending "Dear Doctor" letters, etc. Brief for Respondents in Nos. 09-993, 09-1039, 09-1501, pp. 17-18. The Supreme Court evaluated that theory and rejected it, holding it was insufficient to defeat preemption. *Mensing*, 564 U.S. at 619-20.

it earlier learned of them "because the FDA in fact did warn consumers and the medical community when they learned of these risks" from testing data submitted to FDA by a pharmacy. *See, e.g.,* AMPIC ¶ 1409. But this argument ignores that strikingly similar facts were present for the drug at issue in *Mensing*, metoclopramide. As the Supreme Court noted in its opinion, long-standing studies showed nearly 30% of patients who took metoclopramide for several years developed a severe neurological disorder, tardive dyskinesia. 564 U.S. at 609. And, when in 2004 the brand-name manufacturer of metoclopramide took that data to FDA and requested a labeling change, *the FDA immediately approved the requested change*. *Id.* A lay jury might well have inferred from those facts that the FDA would have taken the same or similar action had it been approached at an earlier date by the generic metoclopramide manufacturer. But the Supreme Court nonetheless held that the *Mensing* plaintiffs' failure to warn claims were preempted, and refused to be swayed by what it described as "conjectures" about what FDA might have done if the generic metoclopramide manufacturer had asked it for help. *Id.* at 620-21. Thus, evidence about what FDA might have done differently had it been contacted earlier by a Generic Defendant is irrelevant to and cannot sway the *Mensing* preemption analysis.

Finally, it is likewise irrelevant that courts in a minority of states have held that plaintiffs raising failure-to-warn claims against manufacturers of Class III medical devices can rely on a failure-to-warn-FDA theory. As this Court recognized, cases involving only express preemption for medical devices that "did not address impossibility pre-emption" are of no assistance in determining whether a claim against a generic-drug manufacturer is preempted. *See* Dkt. 2512 at 35-37. None of the cases cited in Plaintiffs' AMPIC address whether the states in question would recognize a failure-to-warn-FDA theory brought against a generic-drug manufacturer as surviving impossibility preemption under *Mensing*.

In summary, applying *Mensing*'s holding, which preempts claims unless a generic-drug manufacturer could take an action independently and rejects the premise that preemption can depend on what the FDA *might* do (because doing so would "render conflict pre-emption largely meaningless," 564 U.S. at 620-21), this Court should dismiss Count V of the AMPIC as preempted.

## B.  Plaintiffs' "Failure-To-Warn-FDA" Claim Is Also Preempted by *Buckman*

Plaintiffs' "failure-to-warn-FDA" claim also runs headlong into *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) and binding Eleventh Circuit precedent. In *Buckman*, the Supreme Court held that a plaintiff's state-law claims based on alleged fraudulent representations made by a manufacturer to obtain approval for orthopedic bone screws were preempted by federal law that empowered the FDA to punish and deter fraud perpetrated against it. *Id.* at 347-52. The *Buckman* Court recognized "[t]he FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with FDCA provisions. *Id.* at 349 n.4 (citing 21 U.S.C. § 337(a)). Thus, the Supreme Court held that when "the existence of . . . federal enactments is a critical element" in a tort claim, as opposed to the plaintiff merely relying on well-settled "traditional state tort law which had predated the federal enactments in question," the claim is impliedly preempted. *Id.* at 353.

The *Buckman* analysis requires courts to look beyond mere labels, and the fact that a claim may be *styled* as a traditional state-law action does not insulate it from scrutiny. Otherwise, a plaintiff could take the exact sort of fraud-on-the-FDA claim that was held preempted in *Buckman* (*i.e.,* a claim that could not exist without federal law or regulatory enactments) and have that claim survive so long as the plaintiff frames it as a breach of a "traditional" state law products liability or negligence duty owed to the plaintiff. That is not the law.

The Eleventh Circuit has made it clear that even if there is a cognizable state law cause of action for a failure to warn FDA, where the duty is owed to the plaintiff, such a claim nonetheless

arises entirely out of FDA reporting obligations and as such is preempted under *Buckman.* In *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319 (11th Cir. 2017), the court addressed a traditional state-law negligence claim brought against a medical device manufacturer that was based, in part, on a theory for "failure to report adverse events" to FDA. *See id.* at 1329-30. The court explained that because the plaintiff's "theory of liability is based on a duty to file a report with the FDA, it is very much like the 'fraud-on-the FDA' claim the Supreme Court held was impliedly preempted in *Buckman*. In both cases, a plaintiff alleged a manufacturer failed to tell the FDA those things required by federal law**.**" *Id.* In other words, the federal-law duty to file adverse event reports with the FDA was a "critical element" of the Plaintiff's state-law claim, without which it could not stand. *See Buckman*, 531 U.S. at 353.

Since *Mink* was issued, the Eleventh Circuit has affirmed the dismissal of failure to report adverse event claims brought against a brand-name drug manufacturer. *See Tsavaris v. Pfizer, Inc.*, 717 F. App'x. 874, 877 (11th Cir. 2017). Multiple district courts within the Circuit likewise have dismissed similar claims premised on a failure to provide information to FDA. *See Rowe v. Mentor Worldwide, LLC*, 297 F. Supp. 3d 1288, 1295-96 (M.D. Fla. 2018); *Tinkler v. Mentor Worldwide, LLC*, No. 1:19-CV-23373-UU, 2019 WL 7291239 (S.D. Fla. Dec. 30, 2019); *Grubbs v. Medtronic, Inc.*, No. 2:18-CV-01468-AKK, 2019 WL 3288263 (N.D. Ala. July 22, 2019); *Westerfield v. Corin Grp., PLC*, No. 819CV00146T02AEP, 2019 WL 1233634 (M.D. Fla. Mar. 15, 2019); *Rice v. Allergan USA, Inc.*, No. 2:16-CV-01374-MHH, 2018 WL 1618036 (N.D. Ala. Apr. 4, 2018); *Williams v. St. Jude Med., S.C., Inc.*, No. 1:16-CV-04437-ELR, 2017 WL 11113322 (N.D. Ga. Oct. 19, 2017); *see also In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1329-30 (S.D. Fla. 2010) (granting motion in *limine* to preclude evidence regarding failure to report adverse events to FDA as it was relevant only to "a fraud-on-the-FDA claim that is preempted by

*Buckman*"). The Sixth and Eighth Circuits agree. *See, e.g.*, *Marsh v. Genentech, Inc.*, 693 F.3d 546, 553 (6th Cir. 2012) ("failure to submit reports to the FDA that the FDA requires is arguably a species of fraud on the agency under the state Act" preempted); *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1205-06 (8th Cir. 2010) (claims that manufacturer failed to provide adverse reports to the FDA as required by federal regulations "are simply an attempt by private parties to enforce the MDA, claims foreclosed by § 337(a) as construed in *Buckman*").

Here, Plaintiffs' "failure-to-warn-FDA" claim is based entirely on an alleged failure to gather and report adverse event data to FDA. *See* AMPIC ¶¶ 1390-1400. As to the duty element, the claim hinges on alleged failures by the Generic Defendants to comply with the duty to report certain adverse event information to FDA stated in 21 C.F.R. § 314.80, a regulation which the FDA has sole authority to enforce. *See* AMPIC ¶ 1390. Moreover, for the causation element, Plaintiffs rely entirely on the existence of a database developed and maintained by FDA, the FDA's Adverse Event Reporting System (FAERS), and on the FDA's discretionary role in analyzing data reported through that system and determining what (if anything) to communicate to the public. AMPIC ¶¶ 1391-1399. Thus, the claim is preempted under *Buckman* as interpreted by *Mink*, and on the persuasive weight of other decisions within the Eleventh Circuit cited above.

C.   **Plaintiffs' Expiration Date Claims Are Preempted By *Mensing* And *Bartlett***

Plaintiffs' expiration date claims (AMPIC Counts III, IV, and VII) are also preempted under *Mensing, Bartlett,* and their progeny. Accepting Plaintiffs' allegations as true, shortening expiration dates alone would not be enough to avoid liability under the alleged state-law duty to warn. Instead, to comply with the state-law duty, Plaintiffs contend that the Generic Defendants

would have had to shorten the expiration date *and also* warn Plaintiffs that consumption of ranitidine after that date posed a risk of NDMA ingestion and cancer.

Although Plaintiffs previously raised arguments involving expiration dates in response to the Generic Defendants' first preemption motion, this is the first time they have attempted to bring an "expiration date" claim. *See* Dkt. 2512 at 31-33; *see also* AMPIC Counts III, IV, and VII. In the Preemption Order the Court made clear that, if pleading an expiration date claim, Plaintiffs would need to "consider, as to each cause of action, the elements under each state's law and what state law would require of Defendants to avoid liability." *Id.* at 37. The Court rejected Plaintiffs' argument that an expiration date claim would not be preempted under *Mensing* and *Bartlett* if a defendant could take actions that would satisfy part, but not all, of a state-law duty (such as a failure to warn claim), finding it was based on inapplicable express preemption case law:

> Finally, the Court addresses an issue raised during the Hearing. Plaintiffs asserted that "preemption applies only to the extent of the difference between state and Federal responsibilities." DE 2499 at 26-27. Plaintiffs explained that, if "a state cause of action creates duties A, B, and C, and Federal law makes it impossible to comply with duty C," then a plaintiff "can still plead and prove her case based on either . . . a breach of duty A, or a breach of duty B," and there "is only preemption to the extent of the difference." *Id.* at 27. To support their assertion, Plaintiffs pointed to statements in Supreme Court opinions such as *Reigel v. Medtronic, Inc.*, [52 U.S. 312 (2008)], *Bates v. Dow Agrosciences LLC*, [544 U.S. 431 (2005)], and *Medtronic, Inc v. Lohr* [518 U.S. 470 (1996)]. . . .
>
> *Reigel*, *Bates*, and *Lohr* did not address impossibility pre-emption. In each case, the Supreme Court examined a statutory provision that expressly pre-empted state law that was "different from" federal law, and therefore state law was pre-empted only to the extent of its difference from federal law. . . .

*Id.* at 35-36.

In the AMPIC, Plaintiffs allege that the Generic Defendants should have shortened their expiration dates and warned Plaintiffs that use of ranitidine posed a risk of developing cancer. Plaintiffs first assert that the "Generic Manufacturer Defendants . . .  had a duty to warn **of the**

risks associated with the use of ranitidine." *See* AMPIC ¶¶ 944, 946, 1162, 1746, 1748 (emphasis added).[5] Plaintiffs further claim that state law required providing "**adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA**." *Id.* ¶¶ 943, 1159, 1745;[6] *see also id.* ¶¶ 959, 1175, 1761 (emphasis added). Within the expiry counts, Plaintiffs clarify that the specific "risk" and "dangerous characteristic" of which the Generic Defendants were required to warn consumers was the risk of developing cancer. *Id.* ¶¶ 935-936, 1150-51, 1737-38. Plaintiffs also incorporate by reference into their expiry counts allegations in which they assert that Generic Defendants caused Plaintiffs injury by failing to convey warnings about the alleged risks of cancer, serious injury, and death in ranitidine use to the end users and their physicians. *Id.* ¶¶ 461- 464. They further allege that the Generic Defendants should have included a "warning" to consume ranitidine more quickly in the form of a shorter expiration date, asserting that "[t]o **mitigate** degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be **warned to consume ranitidine shortly after manufacturing**. **No ranitidine product contained this warning**." *Id.* ¶ 937 (emphasis added), ¶ 958. Thus, put quite simply, Plaintiffs' expiration date claims are expressly premised on a purported state-law duty to provide stronger warnings regarding the risks associated with the use of generic ranitidine, specifically including the risks of NDMA and cancer, *and* a "warning" to consumer the products more quickly in the form of shorter expiry date.

---

[5] This allegation appears in each of Plaintiffs' expiry counts and, through incorporation, all of the state-specific sub-counts within those counts. *See* AMPIC ¶¶ 963-1146; 1179-1370; 1765-1948.

[6] Plaintiffs make this allegation when describing why they believe the Brand-Name Manufacturers' ranitidine products were "defective and unreasonably dangerous to consumers." AMPIC ¶¶ 943, 1159, 1745. But because Plaintiffs raise identical expiry claims against the Generic Defendants, Plaintiffs' allegation that state law requires "adequate warnings . . . concerning the dangerous characteristics of ranitidine and NDMA" applies equally to the Generic Defendants.

All of these claims are therefore preempted. Given Plaintiffs' own allegations and accepting them as true for these purposes only, even if the Generic Defendants had used a shorter expiration date, they would *still* be liable to Plaintiffs unless there was more on the label that provided the *reason* for the shorter expiration date, connected the expiration date to the risk of cancer and NDMA, and provided instructions for use in light of that cancer risk. Indeed, an expiration date appearing on a medication's label—a string of numbers, without any words—does not plausibly convey any specific warning about the risks allegedly associated with using the product before or after that date. And an expiration date certainly cannot convey the specific warning that Plaintiffs contend was required under state law, *i.e.,* a warning adequate to inform consumers or their physicians of the alleged risks of NDMA formation, NDMA ingestion, cancer, serious injury, or death. Indeed, Plaintiffs' counsel conceded as much at the December 15, 2020 hearing, stating unequivocally that "the law of no state would be fully satisfied by just shortening the expiration dates," unless Generic Defendants also added warnings, changed the design, or pulled the product from the market. Dkt. 2499 at 42.

To independently satisfy Plaintiffs' alleged duty, the Generic Defendants had only two options: (i) craft or communicate new warnings regarding the risk of ranitidine use beyond those contained in the brand-name labeling; or (ii) cease the sale of ranitidine. But as made clear in the Preemption Order, the warning duty is clearly preempted by *Mensing* while the stop-selling duty was disposed of by *Bartlett*. And to the extent that Plaintiffs allege that Generic Defendants could have met part, but not all, of their state-law duty to warn by conveying a more limited "warning" to consumers through a shorter expiry period, that cannot save the claim from preemption. *See* Preemption Order at 35-36. Indeed, Plaintiffs themselves *concede* (as they must) that "[b]ecause federal law requires generic drug labels to largely match branded drug labels . . . Generic

Manufacturer Defendants were not able to warn consumers directly of the cancer risks of NDMA in ranitidine." *See, e.g.*, AMPIC ¶ 1410. Therefore, because Generic Defendants could not independently meet the duty to warn described in the expiry counts and thereby avoid state-law liability while at the same time remaining in compliance with federal law, the expiry counts are preempted and must be dismissed. *See* Dkt. 2512 at 37; *Bartlett*, 570 U.S. at 486-87.

### D.   Plaintiffs' Negligent Storage and Transportation Claim Is Preempted Under *Mensing* and *Bartlett*

Plaintiffs' negligent storage and transportation claim (Count XI of the AMPIC) is also preempted, for two reasons. First, like Plaintiffs' expiration date claims, the changes Plaintiffs call for are insufficient to meet the purported state law duty of care upon which the claim relies, and all actions that Generic Defendants could have taken that would suffice to meet the state-law duty of care are barred by federal law. Second, the changes called for in this claim could affect ranitidine's "impurity profile" and "the physical, chemical, or biological properties of the drug substance" and are therefore "major changes" requiring FDA pre-approval. *See* 21 C.F.R. § 314.70(b)(iv).

### 1.   Plaintiffs' Storage And Transportation Claim Is Preempted Because The Changes Called For Would Not Meet The Alleged State-Law Duty of Care, And All Independent Actions That Would Meet That Duty Are Barred By Federal Law

Plaintiffs' storage and transport claim should be dismissed because, even assuming *arguendo* that Generic Defendants could have independently made the changes argued by Plaintiffs to storage and transportation policies or practices without FDA pre-approval (which the Generic Defendants could not, as discussed below), those changes would be insufficient to meet the alleged state-law duty.

Plaintiffs allege that the state-law duty underlying their storage and transportation claim is "a duty to exercise reasonable care in the storage and transportation of ranitidine API and

ranitidine-containing products **to <u>ensure</u> the products were not unreasonably dangerous to consumers and users**." AMPIC ¶ 2453 (emphasis added).[7] This characterization of the state-law duty is consistent across the states in which Plaintiffs have raised storage and transportation claims. For example, courts have held that a manufacturer's duty of care in negligence with respect to a drug product is to act to ensure that the product as delivered to the end customer in a non-defective, reasonably safe condition. *See, e.g., Lance v. Wyeth*, 85 A.3d 434, 454-56 & n.27 (Pa. 2014) (rejecting a brand name manufacturer's request "to scale back the existing duty of pharmaceutical companies" under Pennsylvania negligence law "to independently and vigilantly protect against unreasonable health risks which may be posed by products made for human consumption"); *Kruszka v. Novartis Pharms. Corp.*, 19 F. Supp. 3d 875, 893 (D. Minn. 2014) (drug manufacturer has "duty to exercise ordinary and reasonable care not to expose the potential consumer to an unreasonable risk of harm from the use of its products").

Plaintiffs' own allegations show that the storage and transportation changes called for in Count XI are insufficient to do what would be needed to meet the alleged state-law duty of care, *i.e.*, to deliver a non-defective, reasonably safe product to the end consumer. Although Plaintiffs assert that NDMA may form more quickly if it is exposed to excessive heat or humidity, they also allege that it degrades to form NDMA over time, even during "normal transport and storage,"[8] and in the human body when taken as intended. AMPIC ¶¶ 389, 2436.[9] Based on these allegations, and for the sake of argument, Generic Defendants' ranitidine medications would have developed

---

[7] This summary of the applicable state-law duty is incorporated by reference into all of Plaintiffs' state-specific subcounts for all 52 states and territories at issue. *See* AMPIC ¶¶ 2460-2667.

[8] Any claim that the Generic Defendants may be liable for having stored and transported ranitidine products within the temperature and humidity ranges provided in the FDA-approved labeling is an attack on the adequacy of the label that *Mensing* plainly forecloses. *See* Dkt. 2512 at 39.

[9] Paragraph 389 is incorporated by reference into Count XI. *See* AMPIC. ¶ 2435.

unsafe levels of NDMA *even if* they had always been stored and transported within the storage

range listed on the products' label, *and even if* never exposed to excessive humidity. Therefore,

the state-law duty to ensure the products were (by Plaintiffs' definition) reasonably safe could not

be met through the storage and transportation changes asserted in Count XI, which would (at most)

address only one out of several purported mechanisms of NDMA formation in ranitidine that

Plaintiffs have asserted. Instead, the Generic Defendants would have had to *change* the storage

conditions on the label or *re-design* the product to eliminate the risk of NDMA. As outlined in

above and as recognized in the Preemption Order, the Generic Defendants could not make these

changes unilaterally. Because they "cannot, independently and while remaining in compliance

with federal law, do what needs to be done to avoid liability under a state cause of action" for

negligent storage and transportation, these claims are preempted. *See* Dkt. 2512 at 37.

### 2. Plaintiffs' "Storage and Transportation" Claim Is Preempted Because It Seeks to Impose a Duty to Make "Major Changes" That Would Affect The Ranitidine Medications' Impurity Profile And Chemical Properties

In the Storage and Transportation Claim, Plaintiffs allege that the Generic Defendants

should have made significant changes to their existing storage and shipping practices to "ensure

that their finished Ranitidine-Containing products were stored and transported safely and were not

exposed to excessive heat and humidity." AMPIC ¶ 2451. But any changes to procedures

governing how ranitidine is to be stored or shipped aimed at preventing formation of NDMA

(alleged to be a significant and carcinogenic impurity) would be "major changes" that the Generic

Defendants could not unilaterally make.

If a plaintiff's claim would require the defendant to make a "major change" requiring FDA

approval before implementation, it is preempted. *See* 21 U.S.C. § 356a(c); 21 C.F.R. § 314.70(b);

Dkt. 2512 at 38-39 (relying on major change regulation and FDA guidance to dismiss with

prejudice storage and transportation-related major changes as pre-empted).[10] A "major change" is defined in 21 U.S.C. § 356a(c)(2) and 21 C.F.R. § 314.70(b). In sections (b)(2)(i)-(vii) of the regulation, the FDA has enumerated specific changes to drug products that automatically constitute "major changes." Such changes include "changes in the synthesis or manufacture of the drug substance that may affect the impurity profile and/or the physical, chemical, or biological properties of the drug substance," *id.* at (b)(2)(iv), as well as "[c]hanges in a drug product container closure system that controls the drug product delivered to a patient or changes in the type . . . or composition . . . of a packaging component that may affect the impurity profile of the drug product." *Id.* at (b)(2)(vi).

At the hearing on Defendants' motions to dismiss the Original Complaints, Plaintiffs conceded that changing storage and transportation conditions for ranitidine medications could be a major change and, therefore, preempted:

> THE COURT: Okay. Let me move on to the topic of storage and transportation conditions. This question is directed to the Plaintiffs.
>
> Your opposition contains arguments on page 32 relating to storage and transportation conditions. When you allege, for example, in 496(e) and 536(e) of the master personal injury complaint that Defendants failed "to implement appropriate handling instructions and storage conditions," what precisely do you mean by that and where is that explained in the master complaints?
>
> Do you mean that any Defendant kept Ranitidine products under the wrong conditions within their own facilities, or do you mean something else?
>
> MR. KELLER: We mean the former, your Honor. **We agree that changing the storage and transport conditions to the extent that it <u>could</u> impact the identity, quality, and purity profile of the drug and pose risk to the ultimate consumer**

---

[10] *See also Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 9-14 (1st Cir. 2018) (state law unjust enrichment claims against eye drop manufacturers preempted by federal law because changing the drug delivery system design as sought by plaintiffs was a "major change"); *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015) (state law design defect claim preempted by federal law where it was impossible to alter the dosages to comply with state law without violating FDA regulations and where the alteration constituted a "major change").

**would constitute a major change, but our plausible allegation in the complaints is that this wasn't adhered to**. . . .

Dkt. 2499 at 46-47 (emphasis added); *see also* Dkt. 2512 at 39 (quoting from this portion of the hearing transcript). Plaintiffs made that concession because they have alleged that NDMA is an impurity, *see* AMPIC ¶ 279, and have cited to numerous FDA publications in which the agency refers to NDMA as an impurity. *See, e.g.,* AMPIC ¶ 279 n. 51. Because NDMA is an impurity, changes to the storage and transportation conditions aimed at reducing or eliminating NDMA in ranitidine necessarily "affect [ranitidine's] impurity profile," and therefore require FDA pre-approval. *See* 21 C.F.R. § 314.70(b)(2)(iv). In addition, Plaintiffs further allege that ranitidine contains the constituent molecules to form NDMA. *See* AMPIC ¶ 343. Thus, any changes aimed at preventing NDMA formation in ranitidine are also major changes requiring pre-approval because those changes would "affect . . . the physical, chemical, or biological properties of the drug substance." *See* 21 C.F.R. § 314.70(b)(2)(iv). Consequently, to the extent that Plaintiffs' storage and transportation claim would require any changes to existing storage and transportation practices to address ranitidine's alleged propensity to form dangerous levels of NDMA impurities, it is a preempted "major change."

Here, Plaintiffs have alleged that the Generic Defendants needed to make significant changes to their storage and transportation processes and procedures to "ensure that their finished Ranitidine-Containing products were stored and transported safely and were not exposed to excessive heat and humidity." *See* AMPIC ¶ 2447. Similar allegations are made with respect to ranitidine API. *Id.* at ¶ 2448. Although Plaintiffs are vague about what measures should have been taken to "ensure" ranitidine was never exposed to excessive heat or humidity at any stage of storage

or transport,[11] they are clear that the existing policies and procedures Generic Defendants had in place with regards to storage and transport were, in Plaintiffs' minds, entirely insufficient. *See id.* ¶ 2449 ("Upon information and belief, Brand-Name and Generic Manufacturer Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and/or humidity requirements on product labels. This failure led to widespread noncompliance."). Plaintiffs further assert that the failure to implement these changes proximately caused "excessive levels" of NDMA impurities to build up in ranitidine-containing products. *See, e.g., id.* ¶ 2463. Thus, because Plaintiffs' claim calls for changes to storage and transport practices that are aimed at addressing a significant impurity concern posing a risk to consumers, the changes are "major changes" that could only be implemented with FDA's approval, and the claim is preempted.

     **E.**    **Plaintiffs' Negligent Product Containers Claim Is Preempted Under *Mensing* And *Bartlett***

Plaintiffs' Negligent Product Containers claim (Count IX of the AMPIC) is preempted under the "major change" regulation and also for similar reasons as their expiration date count and storage and transportation claims.

     **1.**    **Plaintiffs' Negligent Product Containers Claim Is Preempted Because The Packaging Changes At Issue Are "Major Changes" That Would Affect The Ranitidine Medications' Impurity Profile**

The design of the packaging for ranitidine, including both the exterior packaging and the materials used in the container closure system, is part of the ANDA approved by the FDA. But Plaintiffs now call for "a different container" for ranitidine sold in pill form, which they contend

---

[11] Plaintiffs have framed their storage and transport allegations in Count XI vaguely, failing to include any details as to how the Generic Defendants' policies and practices fell short other than a reference to alleged transport by mail (with no allegations about storage). But the Generic Defendants produced documents regarding their storage and shipment policies and procedures well before the Amended Complaints were due pursuant to PTO 34. *See* Dkt. 1117. The Omnibus Motion to Dismiss Plaintiffs' AMPIC addresses those deficiencies.

"would have reduced the amount of NDMA Plaintiffs consumed." AMPIC ¶ 1992. Plaintiffs specifically allege that the containers should have been changed to "plac[e] each unit of ranitidine in a blister pack or similarly individually packaged container" and to "reduc[e] the number of units of ranitidine in each bottle to a low number." *Id.* These are all "[c]hanges in a drug product container closure system" that would impact ranitidine's "impurity profile" by reducing its propensity to form NDMA. 21 C.F.R. § 314.70(b)(2)(vi). Additionally, the blister pack allegation is also a change to the "type . . . of a packaging component" relating to impurity profile. *Id.* As such, the negligent product containers claim is preempted because it calls for "major changes" requiring FDA pre-approval.

Plaintiffs have cited to the FDA guidance document interpreting 21 C.F.R. § 314.70 for the proposition that the container changes they call for could be made as "moderate changes" through a Changes-Being-Effected ("CBE") supplement. AMPIC ¶ 1993. However, the guidance does not support that proposition. To the contrary, the guidance states that "[c]hanges in the synthesis or manufacture of the drug substance that may affect its impurity profile and/or the physical, chemical, or biological properties" are major changes. *See* FDA, *Guidance for Industry, Changes to an Approved NDA or ANDA*, Revision 1, at 13 (Apr. 2004). Further, if changes arguably fall within multiple reporting categories (*e.g.*, when it is unclear whether the changes are properly viewed as "major changes" requiring pre-approval or "moderate changes" that can be made through a CBE), the FDA's Center for Drug Evaluation and Research ("CDER") "recommends that the submission be in accordance with the most restrictive of the categories recommended[.]" *Id.* at 28. Accordingly, because the container changes at issue are aimed at addressing an impurity issue in ranitidine (NDMA) and thus fall within the "major change" reporting category under the language of both the regulation and the guidance, it is irrelevant that they might arguably also fall

within a less restrictive reporting category. Per the FDA guidance, the Generic Defendants would need to make the more restrictive of the two submissions and submit a major change supplement for FDA's pre-approval of the change. The claims are therefore preempted.

### 2. The Negligent Product Containers Claim Is Preempted Because The Container Changes Would Not Meet The State-Law Duty of Care

The negligent product containers count is also preempted because, like the expiration date and storage and transport count, Plaintiffs allege only that the container changes would have "reduce[d] the amount of NDMA produced." AMPIC ¶ 1995. Plaintiffs do not allege that the changes would have led to a product that was safe to sell to consumers, with either no NDMA or a level Plaintiffs believe is acceptable. To meet the alleged state-law duty, the Generic Defendants would have needed to *also* change the design or labeling. As such, Generic Defendants could not do independently and without violating federal law what would have needed to be done to avoid liability under the state-law duty of care on which the claim is based, and the claim is preempted.

### F. Plaintiffs' Failure-To-Test Claim Is Preempted Under *Mensing* and *Bartlett*

Plaintiffs' failure-to-test claim (AMPIC Count VIII) is also preempted under *Mensing*, *Bartlett*, and cases applying them to failure-to-test allegations because the Generic Defendants could not independently make the allegedly required changes and are not required to stop selling to avoid liability. Indeed, multiple federal Circuit Courts "have held that claims against generic drug manufacturers for failure to conduct testing of their drug products are pre-empted" when all of the possible actions that a manufacturer could take based on testing, such as label changes, design changes, or product withdrawal, would be subject to preemption. Dkt. 2512 at 17-18 (citing *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 476-77 (4th Cir. 2014) and *Morris v. PLIVA, Inc.*, 713 F.3d 774, 778 (5th Cir. 2013)).

27

Plaintiffs assert that Kansas and Texas law both recognize a standalone negligent failure-to-test claim, which they contend imposes a "duty to exercise reasonable care in the testing of ranitidine-containing products to ensure the products were not unreasonably dangerous to end consumers or users." [12] AMPIC ¶¶ 1973, 1979. Thus, according to Plaintiffs, to avoid liability under the purported Kansas and Texas duty, Generic Defendants needed to **ensure** that the products would be safe and not unreasonably dangerous to the end consumer.

Here, even if the Generic Defendants had conducted testing of their ranitidine medications and uncovered NDMA, the Generic Defendants could not have independently taken any actions sufficient to meet the purported state law duty to ensure a safe product. The Court already held that federal law barred Generic Defendants from issuing a warning about ranitidine directly to consumers, changing the design of ranitidine, or ceasing to market their products. *See* Dkt. 2512 at 6-8, 28-29. The Court dismissed with prejudice Plaintiffs' claims "based on allegations that Defendants should have conducted better testing of ranitidine products to enable them to provide the appropriate storage and transportation information on labeling…." *Id*. at 39. That leaves only the actions that Plaintiffs outline elsewhere in their AMPIC: lowering expiration dates to a period of months, AMPIC ¶¶ 938, 1153, 1740, making changes to the amount of pills or packaging of certain types of ranitidine medications sold in pill form, AMPIC ¶¶ 1991-1994, and changing procedures for the storage and transport of ranitidine with regards to temperature or humidity and/or stronger enforcement of existing procedures, AMPIC ¶¶ 2433-2667. Of course, testing – in and of itself – would have no impact on the potential levels of NDMA in ranitidine. If the product is to be rendered non-defective, which according to Plaintiffs means the absence of NDMA, the

---

[12] The Omnibus Motion to Dismiss Plaintiffs' AMPIC addresses the fact that neither Kansas nor Texas law recognizes a standalone negligent failure-to-test claim. However, such a claim is still preempted for the reasons given here.

Generic Defendants would have needed to take some further action to affect the risk profile of the drug. But the Generic Defendants were barred by federal law from making the changes proposed by Plaintiffs. And, in any event, Plaintiffs only allege that those changes may have *reduced* the amount of NDMA in the generic ranitidine medications – they do not allege that any of those changes would be sufficient to ensure a reasonably safe product. To the contrary, Plaintiffs allege that ranitidine breaks down on ingestion in the human stomach into unsafe quantities of NDMA. AMPIC ¶¶ 347-77. And, they expressly incorporate those allegations into their negligent failure to test claim. *See id.* ¶ 1949. Therefore, even if the Generic Defendants had done additional testing, they would still have had to take additional steps to make the product "safe" under Plaintiffs' own theories, or stopped selling the product entirely. None of these claims survive *Mensing. See, e.g., Rojas v. Teva Pharm. USA, Inc.*, 920 F. Supp. 2d 772, 778-79 (S.D. Tex. 2013) (failure to test allegations against generic-drug manufacturer under Texas state law held preempted).

Plaintiffs' only remaining theory as to how Generic Defendants could have acted to ensure customer safety based on test results is that those results could have been "publicized," which they allege would then have led to the FDA or other third parties ("other manufacturers and laboratories," "[t]he medical community," or "Brand-Name Manufacturers") to issue a warning, recall the products from the market, or take other steps that allegedly would have "eliminated or reduced Plaintiffs' exposure[.]" AMPIC ¶ 1964.[13] Because the claim necessarily relies on actions by the federal government or other third parties, as opposed to independent actions by Generic

---

[13] It is telling that Plaintiffs allege only that testing would have "eliminated **or reduced**" Plaintiffs' NDMA exposure. AMPIC ¶ 1964 (emphasis added). Plaintiffs do not contend, in this claim or anywhere else in their three amended complaints, that Generic Defendants could have independently taken any action that would have eliminated the presence of NDMA in generic ranitidine. Nor do they allege that Generic Defendants could have taken actions that would have reduced the level of NDMA in generic ranitidine below the threshold level of safe exposure to NDMA set by the federal government.

Defendants, it is preempted. *See* Dkt. 2512 at 15; *Mensing*, 564 U.S. at 619-21 (asking the FDA for help "would have started a Mouse Trap game" and would not necessarily led to any change).

Moreover, even if the Court were willing to entertain Plaintiffs' argument, ignore *Mensing's* holding, and rely on decisions in certain states that purportedly have recognized claims for failure to warn through the FDA or other third parties in the medical device context (which the Court should not do), neither Kansas nor Texas are among the states that Plaintiffs contend have adopted a failure-to-warn-FDA claim, even for medical devices. As the Court noted in its ruling on the motion to dismiss innovator liability claims, in the Eleventh Circuit, "when a federal court is called upon to recognize a cause of action under a state's laws that the state itself has yet to recognize, 'considerations of comity and federalism counsel that [the federal court] proceed gingerly when venturing into uncharted waters of state substantive law.'" Dkt. 2516 at 11 (quoting *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1251 (11th Cir. 2013)).[14] Further, it is "generally presume[d] that [state] courts would adopt the majority view on a legal issue in the absence of indications to the contrary." *Id.* (quoting *Bobo v. Tennessee Valley Auth.*, 855 F.3d 1294, 1304 (11th Cir. 2017)). Thus, the Court should not presume that either state would recognize a claim against a manufacturer for failure to warn through the FDA or other third parties.

Because all of the actions that Generic Defendants allegedly could take had they tested ranitidine specifically for the presence of NDMA are either insufficient to meet the purported

---

[14] *See also City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1289 (11th Cir. 2015), *vacated on other grounds and remanded sub nom. Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017) (declining "to invent a novel basis for unjust enrichment under Florida law" because the Florida Supreme Court had not yet ruled on whether such law existed and because of "the complete lack of supporting Florida caselaw"); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011) ("It is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so.").

Kansas and Texas duty to ensure a safe product or are preempted under federal law, Plaintiffs

failure-to-test claim must be held preempted and dismissed as to Generic Defendants.

### G.     Plaintiffs' Derivative Claims In The AMPIC Are Preempted

The remaining counts in the AMPIC raised against Generic Defendants are for Unjust

Enrichment (Count XIV), Loss of Consortium (Count XV), Survival (Count XVI), Wrongful

Death (Count XVII) and allegations of Punitive Damages. *See* AMPIC ¶¶ 2722-3267. Those are

derivative claims that rely on Plaintiffs' other substantive state-law claims and therefore are

preempted. *See In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig*, 756 F.3d 917, 936

(6th Cir. 2014) ("derivative claims for wrongful death, survivorship, unjust enrichment, loss of

consortium, and punitive damages stand or fall with the underlying claims on which they rest" and

are properly dismissed when underlying claims are preempted).[15]

### H.     Plaintiffs' State-Law Claims In The CELC and MMC Are Substantively Similar To The State-Law Claims In The Personal Injury Complaint And Are Preempted For The Same Reasons

Plaintiffs' state-law claims in the CELC[16] and MMC are substantively similar to and rely

on the same underlying facts as the AMPIC, *i.e.,* that ranitidine is inherently defective, that NDMA

forms under "routine" and "natural" storage conditions, and that NDMA forms in the body when

---

[15] Plaintiffs' Unjust Enrichment claim is also preempted under *Mensing* and *Bartlett*. Plaintiffs assert that the state-law duty on which the claim rests is to "avoid causing harm to those that consumed [ranitidine]." AMPIC ¶ 2723. Plaintiffs have not raised any actions that Generic Defendants could independently take that would have led to a safe product and avoided causing any exposure to NDMA and consequent alleged harm. Further, the only specific negligent acts or omissions mentioned in the unjust enrichment claim are "fail[ing] to warn of the dangerous risks associated with use and exposure to the products," or allegedly "false and misleading" communications about those products. *Id.* ¶¶ 2724, 2725. Because Generic Defendants could not add a warning about the alleged dangers of ranitidine use without violating federal law, the claim is preempted.

[16] The only Generic Defendants named in the CELAC and MMC are Amneal, Apotex, Dr. Reddy's, Glenmark, Perrigo, Sandoz, Strides, and Teva.

31

taken as intended. *See, e.g.* CELC at 1, 3; ¶¶ 865,1116; MMC ¶¶ 253, 871. In the MMC, Plaintiffs rely on the same underlying state tort claims advanced in the AMPIC as the basis for the "tortious conduct" element of their medical monitoring claims. MMC at 3-5. In the CELC, Plaintiffs assert claims sounding in violation of consumer protection statutes, fraud, breach of warranty, and unjust enrichment based on (1) improper expiration dates; (2) improper storage; and (3) improper containers. CELC at 5–6; MMC at 4. These claims are substantively the same as the expiration date, storage and transportation, and container-based claims in the AMPIC and are preempted for the same reasons.

For example, in the CELC, Plaintiffs allege that the Generic Defendants should have included "a warning on the labels for ranitidine-containing products that consumers were at elevated risk of developing cancer if the products were: (i) exposed to excessive heat; (ii) exposed to excessive moisture/humidity; (iii) consumed with high-nitrite foods; (iv) consumed daily for a period of greater than a few months."[17] *See, e.g.,* CELC ¶¶ 1114; 1149. They also claim that the Generic Defendants should have shortened the expiration dates *and* disclosed the presence and increase of NDMA in the product as time passed. *Id.* at 5, 6; *see also, e.g.,* ¶ 9429. Further, they assert that the Generic Defendants should have reduced the number of pills in the containers and packaged them in blister packs. *See, e.g.,* CELC ¶¶ 1162-1163. The Generic Defendants could not independently take these actions and therefore the claims in the CELC are also preempted under *Mensing* and *Bartlett* for the reasons discussed herein.[18]

---

[17] These claims, which require substantive changes to the label, were dismissed in the Preemption Order **with prejudice** and therefore should not even be a part of the Amended Complaints.

[18] *See also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig*, 756 F.3d 917 (affirming dismissal of failure-to-warn, design defect, breach of express implied warranty, breach of consumer protection statutes, unjust enrichment, and numerous other claims against generics); *Greager v. McNeil-PPC, Inc.*, 414 F. Supp. 3d 1137 (N.D. Ill. 2019) (dismissing claims of design

I.    **The Generic Defendants Incorporate The Branded Defendants' Express Preemption Argument**

As permitted by the Court's Order Granting Leave to Incorporate Certain Arguments, Dkt. 3085, the Generic Defendants incorporate and adopt the express preemption argument pursuant to 21 U.S.C. § 379r made in Branded Defendants Rule 12 Partial Motion to Dismiss Plaintiffs' Three Complaints as Preempted and Incorporated Memorandum of Law. The 21 U.S.C. § 379r argument applies equally to the claims made in the CELC against Generic Defendants who manufactured and/or sold over-the-counter generic ranitidine. *See* CELC, Counts 1198-1675, ¶¶ 16429-22157

**IV.    CONCLUSION**

For the reasons set forth herein, all claims asserted against the Generic Defendants in Plaintiffs' Amended Complaints must be dismissed, with prejudice, in their entirety.

Dated:  March 24, 2021                                    Respectfully submitted,

*Generic Defendants' Co-Liaison Counsel:*

*/s/ Richard M. Barnes*                              */s/ Thomas J. Yoo*
Richard M. Barnes                                    Thomas J. Yoo
Kamil Ismail                                         **HOLLAND & KNIGHT LLP**
Sean Gugerty                                         400 South Hope Street, 8th Floor
**Goodell, DeVries, Leech & Dann, LLP**              Los Angeles, CA  90071
One South Street, 20th Floor                         T: 213.896.2400
Baltimore, Maryland 21202                            F: 213.896.2450
Tel: (410)783-4000                                   Thomas.Yoo@hklaw.com
rmb@gdldlaw.com
kxi@gdldlaw.com
sgugerty@gdldlaw.com                                 Philip E. Rothschild
                                                     Fla. Bar No.: [0088536]
*\*\*Attorneys for Defendant*                        515 East Las Olas Boulevard, Ste  1200
*L. Perrigo Company*                                 Fort Lauderdale, Florida 33301
                                                     T: 954.525.1000
                                                     F: 954.463.2030
                                                     Phil.Rothschild@hklaw.com

---

defect, failure-to-warn, consumer fraud, and other claims asserted against manufacturer and retailer of generic OTC medications); *see also* Dkt. 2512 at 19.

Daniel Mateo
Amy McVeigh
2929 Arch Street
Philadelphia, PA  19104
T: 215.252.9600
Daniel.Mateo@hklaw.com
Amy.McVeigh@hklaw.com

Daniel Winters
31 West 52nd Street, 12th Floor
New York, NY  10019
T: 212.513.3200
Daniel.Winters@hklaw.com

*\*\*Attorneys for Defendants Glenmark
Pharmaceuticals Inc., USA, f/k/a Glenmark
Generics Inc., USA and Glenmark
Pharmaceuticals Ltd. (f/k/a Glenmark
Generics Ltd.)*

**Counsel for Generic Defendants:**
**Those marked with \*\* are named in the AMPIC, CELC, and MMC**

| | |
|---|---|
| **As to Ajanta Pharma USA Inc.:** | **\*\*As to Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals of New York, LLC:** |
| */s/ Neal Seth*<br>Neal Seth<br>Corey Weinstein<br>WILEY REIN LLP<br>1776 K Street NW<br>Washington, DC 20006<br>Tel:  202.719.4179<br>nseth@wiley.law<br>cweinstein@wiley.law | */s/ Paul J. Cosgrove*<br>Paul J. Cosgrove<br>Ulmer & Berne LLP<br>600 Vine Street, Suite 2800<br>Cincinnati, OH 45202<br>Tel: 513-698-5104<br>pcosgrove@ulmer.com |
| *Attorneys for*<br>*Ajanta Pharma USA Inc.* | Georgia Hatzis<br>Ulmer & Berne LLP<br>1660 West 2nd Street, Suite 1100<br>Cleveland, Ohio 44113<br>Tel: 216-583-7000<br>ghatzis@ulmer.com |
| | *Attorneys for Defendants*<br>*Amneal Pharmaceuticals LLC and*<br>*Amneal Pharmaceuticals of New York, LLC* |

**\*\*As to Apotex Corp.:**

*/s/ Terry M. Henry*
Terry M. Henry
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA  19103
Tel: (215) 569-5644
THenry@BlankRome.com

Jane Thomas
**BLANK ROME LLP**
1825 Eye Street NW
Washington, D.C. 20006
Tel: (202) 420-2577
JThomas@BlankRome.com

*Attorneys for Defendants*
*Apotex Corp.*

**\*\*As to Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories Limited, and Dr. Reddy's Laboratories, S.A.:**

*/s/ John R. Ipsaro*
John R. Ipsaro
Megan B. Gramke
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-698-5104
jipsaro@ulmer.com
mgramke@ulmer.com

*Attorneys for Defendants*
*Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories Limited, and Dr. Reddy's Laboratories, S.A.*

**As to Aurobindo Pharma USA, Inc. and Auro Health LLC:**

*/s/ Joshua A. Klarfeld*
Joshua A. Klarfeld
Ulmer & Berne LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113
Tel: 216-583-7000
jklarfeld@ulmer.com

Kevin M. Bandy
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
Tel: (513) 698-5166
kbandy@ulmer.com

*Attorneys for Defendants*
*Aurobindo Pharma USA, Inc., and Auro Health LLC*

**As to Granules USA, Inc.**

*/s/ Walter H. Swayze, III*
Walter H. Swayze, III
Megan E. Grossman
Lewis Brisbois Bisgaard & Smith, LLP
550 E. Swedesford Road
Suite 270
Wayne, PA 19087
Tel: 215-977-4100
Pete.Swayze@lewisbrisbois.com
Megan.Grossman@lewisbrisbois.com

*Attorneys for Defendant*
*Granules USA, Inc*

**As to Lannett Co., Inc.:**

*/s/ Eileen Oakes Muskett*
Eileen Oakes Muskett
FOX ROTHSCHILD LLP
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, NJ
Tel: (609) 572-2355
emuskett@foxrothschild.com

*/s/ Maura L. Burke*
Maura L. Burke, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 299-2000
mburke@foxrothschild.com

*/s/ Susanne M. Calabrese*
Susanne M. Calabrese
Fla Bar No: 89512
FOX ROTHSCHILD LLP
One Biscayne Tower, Suite 2750
2 South Biscayne Blvd.
Miami, FL 33131
Tel: (305) 442-6547
SCalabrese@FoxRothschild.com

*/s/ Allison L. Hollows*
Allison L. Hollows
FOX ROTHSCHILD LLP
101 Park Ave, Suite 1700
New York, NY 10017
Tel: (212) 878-7900
AHollows@FoxRothschild.com

*Attorneys for Defendant*
*Lannett Co., Inc.*

**As to Nostrum Laboratories Inc.:**

*/s/ Jonathan C. Abel*
Jonathan C. Abel
Florida Bar No. 370721
Drew M. Levin
Florida Bar No. 0048419
Conroy Simberg
3440 Hollywood Boulevard, Second Floor
Hollywood,  FL 33021
Tel: 954-961-1400
eservicehwd@conroysimberg.com
jabel@conroysimberg.com

*Attorneys for Defendant*
*Nostrum Laboratories Inc.*

**As to Heritage Pharmaceuticals, Inc.:**

*/s/ Neal Seth*
Neal Seth
Corey Weinstein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel:  202.719.4179
nseth@wiley.law
cweinstein@wiley.law

*Attorneys for*
*Heritage Pharmaceuticals, Inc.*

**As to Novitium Pharma LLC:**

*/s/ Amy L. Baker*
Amy L. Baker
Florida Bar No. 86912
Wilson Elser
111 N Orange Ave., Ste. 1200
Orlando, FL 32801
Tel: 407-203-7599
amy.baker@wilsonelser.com

*Attorneys for Defendant*
*Novitium Pharma LLC*

**As to Par Pharmaceutical, Inc.:**

*/s/ Lisa M. Baird*
Edward M. Mullins
Florida Bar:  863920
Lisa M. Baird
Florida Bar:  961191
lbaird@reedsmith.com
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
Tel: 786-747-0200
emullins@reedsmith.com
lbaird@reedsmith.com

*Attorneys for Defendant*
*Par Pharmaceutical, Inc.*

**As to PAI Holdings, LLC:**

*/s/ Jennifer Snyder Heis*
Jennifer Snyder Heis
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-698-5058
jheis@ulmer.com

*Attorneys for Defendant*
*PAI Holdings, LLC*

**\*\*As to Sandoz Inc.**

*/s/ Donald R. McMinn*
Donald R. McMinn
Heather A. Pigman
Florida Bar No. 0119938
Hollingsworth LLP
1350 I Street, NW
Washington, DC  20005
Tel:  (202) 898-5800
dmcminn@hollingsworthllp.com
hpigman@hollingsworthllp.com

*Attorneys for Defendant Sandoz Inc.*

**\*\*As to Strides Pharma, Inc.:**

*/s/ Douglas Tween*
Douglas Tween
John Eichlin
Linklaters LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-903-9072
douglas.tween@linklaters.com
john.eichlin@linklaters.com

*Attorneys for Defendant*
*Strides Pharma, Inc.*

**As to Sun Pharmaceutical Industries, Inc.**
**and Ranbaxy Inc.:**

*/s/ Jason M. Reefer*
Jason M. Reefer
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel: 412-263-1840
Fax: 412-263-2001
jmr@pietragallo.com

*Attorneys for Defendants Sun Pharmaceutical*
*Industries, Inc. and Ranbaxy Inc.*

**\*\*As to Teva Pharmaceuticals USA,**
**Inc.,  Watson Laboratories, Inc., and**
**Actavis Mid Atlantic, LLC**

*/s/ Lori G. Cohen*
Lori G. Cohen
cohenl@gtlaw.com
Sara K. Thompson
thompsons@gtlaw.com
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Tel: (678) 553-2100
Fax: (678) 553-2212

*Counsel for Defendants Teva Pharmaceuticals*
*USA, Inc., Watson Laboratories, Inc., and*
*Actavis Mid Atlantic, LLC*

**As to Torrent Pharma Inc.:**

*/s/ Neal Seth*
Neal Seth
Corey Weinstein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel:  202.719.4179
nseth@wiley.law
cweinstein@wiley.law

*Attorneys for*
*Torrent Pharma Inc.*

**As to Wockhardt USA LLC (f/k/a Wockhardt USA Inc.) and Wockhardt Ltd.:**

*/s/ Neil Merkl*
Neil Merkl
Clifford E. Katz
Sojin Yoon
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Tel: 212-808-7811
nmerkl@kelleydrye.com
ckatz@kelleydrye.com
syoon@kelleydrye.com

*Attorneys for Defendants Wockhardt USA LLC (f/k/a Wockhardt USA Inc.) and Wockhardt Ltd*

**As to Zydus Pharmaceuticals (USA) Inc.:**

*/s/ Arthur J. Liederman*
Arthur J. Liederman
Nicole Battisti
Morrison Mahoney LLP
88 Pine Street
Suite 1900
New York, NY  10005
Tel: 212- 825-1212
aliederman@morrisonmahoney.com
nbattisti@morrisonmahoney.com

Nichole M. Mooney
Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A.
Florida Bar No. 057908
Post Office Box 2346
Orlando, Florida 32802-2346
Tel: 407-841-1200
nmooney@deanmead.com

*Attorneys for Defendant*
*Zydus Pharmaceuticals (USA) Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2021, I electronically filed the foregoing **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE GENERIC DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS ON THE GROUND OF PREEMPTION** with the Clerk of Court using the CM/ECF system, which will provide automatic notification to all counsel of record.

<u>*/s/ Thomas J. Yoo*</u>
Thomas J. Yoo