**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)               MDL NO. 2924
PRODUCTS LIABILITY                       20-MD-2924
LITIGATION

                                    **JUDGE ROBIN L. ROSENBERG**
                        **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO ALL CASES**

---

**THE RETAILER AND PHARMACY DEFENDANTS' MOTION TO DISMISS**
**AMENDED MASTER PERSONAL INJURY COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

---

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.    PROCEDURAL HISTORY ....................................................................................... 3

    A.    December 31, 2020 RPD Order ..................................................................... 3

    B.    Amended Master Personal Injury Complaint ......................................... 5

        1.    No good-faith basis to plead "global" Retailer policy regarding improper storage .................................................................. 6

        2.    Plaintiffs ignore the Court's instruction to identify MDL issues................ 7

        3.    Contradictory pleading regarding Plaintiffs' global theory of liability ...... 8

III.    ARGUMENT ............................................................................................................. 9

    A.    Plaintiffs' Negligence Claim Against the Retailers Fails to Satisfy Basic Pleading Requirements Under Fed. R. Civ. P. 8 ..................................................... 9

        1.    Plaintiffs' allegations "on information and belief" do not move their claim against the Retailers from merely possible to plausible................. 10

        2.    Plaintiffs cannot rely on anecdotal speculation regarding shipping through the mail to support their Negligence count.................................. 13

    B.    Plaintiffs' Claims Against the Retailers Remain Preempted ............................... 14

    C.    Plaintiffs Were Not Permitted Leave to Re-Plead Their Claim for Unjust Enrichment Against the Retailers, and Count XIV Should Be Dismissed or Stricken ................................................................................................................. 16

    D.    Plaintiffs Do Not Plausibly Allege Entitlement to Punitive Damages From the Retailers ................................................................................................................ 17

    E.    Because the Underlying Claims Against the Retailers Fail, Plaintiffs' Derivative Claims (Counts XV, XVI, and XVII) Also Fail ................................. 19

IV.    CONCLUSION ......................................................................................................... 20

SECOND AMENDED APPENDIX A .................................................................................. A-1

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 10, 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 10, 12

*Diverse Power, Inc. v. City of LaGrange, Ga.*,
    934 F.3d 1270 (11th Cir. 2019) ......................................................................... 9

*In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,
    756 F.3d 917 (6th Cir. 2014) ........................................................................... 12

*Kuenzig v. Kraft Glob. Foods, Inc.*,
    No. 8:11-CV-838-T-24 TGW, 2012 WL 366927 (M.D. Fla. Feb. 3, 2012) ........................ 17

*Mann v. Palmer*,
    713 F.3d 1306 (11th Cir. 2013) .................................................................. 10, 12

*McCullough v. Bd. of Regents of the Univ. Sys. of Georgia*,
    623 F. App'x 980 (11th Cir. 2015) .................................................................... 12

*Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*,
    221 F.3d 235 (1st Cir. 2000) ....................................................................... 13, 14

*The Cincinnati Ins. Co. v. Cochran*,
    No. 05-16867, 2006 WL 4495335 (11th Cir. Dec. 27, 2006) ................................. 16

*Veritas Pers. Servs., Inc. v. ADP Totalsource, Inc.*,
    No. 1:19-CV-22435-UU, 2019 WL 11506035 (S.D. Fla. Dec. 27, 2019) ....................... 16

**Other Authorities**

United States Pharmacopeia and National Formulary, USP 40-NF35 .......................................... 9

Pursuant to this Court's Pretrial Orders #31, 36, and 61, the Retailer and Pharmacy Defendants (collectively, the "Retailers") hereby move to dismiss the Amended Master Personal Injury Complaint (Dkt. 2749, 2759) for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## I.   **INTRODUCTION**

Although this Court provided Plaintiffs with explicit directives to follow if they chose to re-plead their sole count of Negligence against the Retailers, Plaintiffs have ignored not only the Court's instructions but also basic federal pleading requirements.

In its December 31, 2020 Order granting the Retailer Defendants' Rule 12 Motion to Dismiss on the Ground of Preemption (Dkt. 2513) ("RPD Order"), this Court dismissed all of Plaintiffs' claims against the Retailers with prejudice, with one very narrow exception. Specifically, the Court granted leave to re-plead only the Negligence count, and only within the circumscribed confines of Plaintiffs' new temperature-based theory of negligence.  In doing so, the Court instructed Plaintiffs to address its overarching question of how Plaintiffs' *specific* theory of liability is compatible with their *global* theory (and thus appropriate for this MDL).  In other words, Plaintiffs were to explain how the Retailers' allegedly negligent storage of ranitidine caused the formation of NDMA when Plaintiffs themselves contend that ranitidine is inherently defective and NDMA forms at any point during the manufacturing process and thereafter—*regardless of how ranitidine is stored*.  However, Plaintiffs' sweeping, conclusory allegations purporting to address their "global" theory of liability against the Retailers are unresponsive to the Court's questions, insufficient to form *any* basis for liability against the Retailers (let alone Negligence), and deficient by any pleading standard under the Federal Rules.

Plaintiffs' claims in the Amended Master Personal Injury Complaint, Dkt. 2749, 2759 ("AMPIC"), including their claims for Negligence (Count X) and Unjust Enrichment (Count XIV) against the Retailers, are deficient and should be dismissed for the following reasons:

***First***, Plaintiffs' 18-paragraph Negligence count—comprised of allegations that are repeated nearly verbatim 52 times in each of their sub-counts—contains nothing more than categorical conclusions, made "upon information and belief," about *all* Retailers in *all* states and territories with *no* supporting facts, in an unsuccessful attempt to assert a "global" theory of liability. But in so doing, Plaintiffs run headlong into the well-established rule against shotgun pleadings. Plaintiffs' nebulous allegations of "systematic" and "widespread" deviations impermissibly lump all Retailers together (Retailers that operated different stores, in different parts of the country, and sold different ranitidine products at different times) without attempting to distinguish their conduct. Moreover, the conclusory claim that the Retailers universally failed to adopt sufficiently "rigorous" policies, without providing any details as to how those policies fell short, is a clear attempt to avoid answering the specific questions posed by this Court and to dodge the requirement of pleading plausible supporting facts.

***Second***, Plaintiffs contend throughout the AMPIC, and within their Negligence count against the Retailers, that NDMA would have formed regardless of what the Retailers did or did not do—and whether they did or did not act negligently in their storage of ranitidine. Dkt. 2513 at 25, 27; *see also* AMPIC at ¶ 2212. In an attempt to articulate a claim against the Retailers despite these allegations of an intrinsic defect, Plaintiffs haphazardly claim that the Retailers *sometimes* shipped ranitidine products in the mail, and thus, *some* ranitidine was subject to excessive heat and humidity during storage, transportation, or shipping, which resulted in the formation of NDMA. Not only does this assertion cut against what remains the core premise of this MDL (that ranitidine is inherently defective and NDMA can form even at controlled room temperatures), but it also demonstrates that the Retailers would be left with only one option to avoid liability: to stop selling ranitidine altogether. This Court has already found that argument preempted.

**Third**, Plaintiffs re-assert an Unjust Enrichment count against the Retailers, seeking to circumvent the narrow scope of leave this Court gave to Plaintiffs to re-plead Negligence. Plaintiffs' Unjust Enrichment count was already dismissed, *with prejudice*, by this Court, and therefore, this same claim in Count XIV of the AMPIC should be stricken or dismissed.

**Finally**, for the same reasons that Plaintiffs' Negligence count fails, Plaintiffs' derivative claims (including their vague request for punitive damages from "all Defendants" that ignores state-specific rules for pleading punitive damages) also fail.

For these reasons, and on the grounds set forth below,[1] Plaintiffs' claims in the AMPIC against the Retailers should be dismissed with prejudice.

## II.   PROCEDURAL HISTORY

### A.      December 31, 2020 RPD Order.

On December 31, 2020, this Court issued its Order granting the Retailers' Rule 12 Motion to Dismiss on the Ground of Preemption. *See generally,* Dkt. 2513. In the RPD Order, the Court dismissed all but one of Plaintiffs' claims with prejudice, granting a narrow window for Plaintiffs to re-plead their Negligence count against the Retailers, "subject to certain rulings" in the Order. *Id.* at 9, 45.

Acknowledging the distinct role of retailers and pharmacies as opposed to manufacturers with respect to the labeling and design of a drug, the Court found that all of Plaintiffs' state-law claims were preempted because the Retailers "have no ability to alter a label or alter a drug's

---

[1] As permitted by the Court's March 22, 2021 Order (Dkt. 3085) granting Defendants' Unopposed Motion for Leave to Incorporate Certain Arguments in Motion to Dismiss Briefing (Dkt. 3084), the Retailers incorporate by reference certain arguments made by the Generic Manufacturer Defendants related to storage and transportation in response to Plaintiffs' Negligence counts. Likewise, additional arguments related to shotgun pleading pursuant to Fed. R. Civ. P. 8, 9(b), and 12 are raised in the concurrently-filed Defendants' Omnibus Motion to Dismiss and/or Strike Amended Master Personal Injury Complaint and incorporated by reference, and therefore not repeated herein.

design." *Id.* at 9, 26; *see also id.* at 24 (finding that "any claim based upon a faulty label is pre-empted" and "any claim based upon drug design is pre-empted").  Similarly, the Court held that preemption "cannot be avoided by arguing that a party could have ceased to sell a product." *Id.* at 25; *see also id.* at 27 (finding that "a 'stop-selling' theory cannot be the basis on which a state law claim survives pre-emption").  Further, it rejected Plaintiffs' argument that Retailers were required by federal law to stop selling misbranded drugs.  In doing so, the Court was clear that Plaintiffs had failed to plausibly allege that the Retailers actually knew that the drugs were misbranded or could have otherwise detected the alleged defect in the ranitidine molecule. *Id.* at 30.

As to Plaintiffs' Negligence claim, the Court concluded that Plaintiffs had intended the claim "to be based, at least in part, on the adequacy of the ranitidine label and the alleged defective design of the drug"—a claim that is preempted. *Id.* at 34.  It also found that Plaintiffs had intended to premise their Negligence claim on the concept of temperature, namely that the Retailers should have used "cooled storage and transport" for the ranitidine products that they sold/dispensed. *Id.* During the December 15, 2020 hearing, Plaintiffs raised new negligence theories—neither of which, as the Court noted, were pled in the Master Complaints. *Id.* at 35.  Plaintiffs argued, for the first time, that (1) Retailers could be held liable for "not cooling ranitidine to a low-end-of-the-range temperature permitted by the ranitidine label[,]" which Plaintiffs contend would be consistent with federal regulation and would not invoke impossibility preemption; and (2) Retailers could be held liable for violating both federal and state law by storing ranitidine at an elevated temperature. *Id.* at 35.

While the Court doubted Plaintiffs' ability to re-plead a Negligence claim, it provided Plaintiffs with explicit instructions and questions that should be addressed if they chose to re-plead the claim. *Id.* at 35-36, 38.  Specifically, the Court directed Plaintiffs to re-plead in a manner in

which the following issues would be addressed: (1) whether Plaintiffs could plead in good faith that any Retailer had a *policy* to store ranitidine products at temperatures above those approved by the FDA; (2) if Plaintiffs alleged that *individual* Retailers—*i.e.*, individual stores or warehouses—negligently stored ranitidine, how such a claim could constitute a global MDL issue; and (3) how Plaintiffs' new high-temperature theory was not in conflict with Plaintiffs' core theory that ranitidine is inherently dangerous.  *Id.* at 36-38.  As the Court stated, "[s]hould the Plaintiffs proceed with a high-temperature theory, the Plaintiffs must explain how that *specific* theory of liability is compatible with the Plaintiffs' *global* theory of liability."  *Id.* at 37-38 (emphasis in original).  As discussed below, Plaintiffs have failed to do so.

### B.     Amended Master Personal Injury Complaint.

On February 8, 2021, Plaintiffs filed their AMPIC, naming 22 Retailers and Pharmacies (exclusive of subsidiaries and related companies) as Defendants.   AMPIC at ¶¶ 168-219.[2] Consistent with common sense and the Court's findings in the RPD Order, the Retailers this time are alleged to be mere *sellers* of ranitidine and *not* responsible (as previously alleged) for the design, manufacture, testing, or labeling of ranitidine.  *Compare id.* at ¶ 40 (Brand-Name Manufacturer Defendants designed, manufactured, tested, labeled, and/or sold ranitidine); *and id.* at ¶ 154 (Generic Manufacturer Defendants manufactured, tested, labeled, and/or sold ranitidine); *with id.* at ¶¶ 168, 219 (Retailers sold ranitidine).[3]   Notably, Plaintiffs do not allege that the

---

[2] *See* Second Amended Appendix A, *infra*, for an updated listing of the Retailer and Pharmacy Defendants named in the AMPIC and in certain individual cases in this MDL.

[3] Although the Retailers are alleged to have "derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products[,]" (AMPIC at ¶ 168; *see also id.* at ¶ 219), the Retailers assume that this allegation refers only to the Retailers' sale of ranitidine, as it is difficult to comprehend how they could have derived revenue from "handling" or "storing" ranitidine.

Retailers had *knowledge* about the alleged defect associated with ranitidine.  *See e.g.*, *id.* at ¶ 429 ("Based on the public scientific information, the Manufacturer Defendants [not Retailers] knew or should have known that NDMA could form in ranitidine by exposure to heat, humidity, nitrites, the conditions of the human stomach, and/or over time in storage.").

Departing from the RPD Order, however, and despite this Court's clear communication to Plaintiffs regarding the requisite specificity of the allegations needed in their amended complaint, Plaintiffs failed to heed the Court's directives or even address its concerns.  Indeed, in their 3,268-paragraph AMPIC, Plaintiffs assert only 18 paragraphs of allegations relating to any conduct of the Retailers, all of which are based on bald conclusions which are unsupported by any facts. *Id.* at ¶¶ 2207-24.

       1.   <u>No good-faith basis to plead "global" Retailer policy regarding improper storage</u>.

In its RPD Order, the Court questioned whether Plaintiffs could, in good faith, claim a "global" policy consistent among the Retailers to store ranitidine at temperatures outside of the range prescribed by the drug label.  Dkt. 2513 at 36.  Rather than addressing the Court's concern, Plaintiffs instead make categorical and sweeping claims—*solely* on "information and belief"— that the Retailers "systematically exposed ranitidine to excessive levels of heat and humidity that violated the instructions on the products' labels" and "failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on products labels."  *See* AMPIC at ¶¶ 2214-15.[4]  Across these 18 paragraphs, Plaintiffs cite no support for their contention,

---

[4] Although the Retailers' document productions cannot be considered at the pleadings stage, the fact that Plaintiffs have alleged such sweeping claims against the Retailers is even more troubling when considering that Plaintiffs filed their AMPIC *after* having already received the very policy documents that flatly contradict this allegation.

do not bother to reference any individual Retailers by name, and fail to distinguish the roles of the Retailers from each other or from the Distributors.[5]

2.   <u>Plaintiffs ignore the Court's instruction to identify MDL issues</u>.

Ignoring the Court's instruction to specify how the issue of an individual store, warehouse, or truck's allegedly negligent storage/transportation of ranitidine is a "global, MDL-based issue" (Dkt. 2513 at 36), Plaintiffs offer only a single "example" in an attempt to create a global issue: they allege that the Retailers *sometimes* "shipped ranitidine-containing products through the mail" (AMPIC at ¶ 2216) and, therefore, "*some* ranitidine was subject to excessive humidity and heat during storage, transportation, and shipping which caused the drug to degrade leading to the formation of excessive levels of NDMA" (*id.* at ¶ 2220 (emphasis added)).   In other words, Plaintiffs ask this Court to permit MDL claims that would functionally impose industry-wide liability for the use of U.S. Mail and common carriers, which may have, at most, allegedly affected "some" ranitidine.[6]

---

[5] Plaintiffs fail to draw any distinctions among the Retailers, including based on simple, publicly-available information.  For instance, Plaintiffs claim that all 22 Retailers are liable under the laws of every state and territory, making the same generic allegation that, "[u]nder [state or territory] law, a retailer or distributor has a duty to exercise reasonable care in transporting and storing products"—without actually identifying the specific law, or the manner in which each Retailer allegedly violated it.   In these 52 different sub-counts (*id.* at ¶¶ 2225-432), Plaintiffs fail to acknowledge that most of these 22 Retailers do not all operate in every single state and territory. Likewise, Plaintiffs do not acknowledge that similar publicly-available information would inform them as to which Retailers had pharmacy operations and which did not, significantly limiting the claims against certain Retailers who are indiscriminately lumped in with those that function significantly differently.  Defendants' Omnibus Motion at I.A-B.

[6] The Retailers posit that this not only fails to raise an MDL issue, but actually raises an issue more appropriately determined by FDA.  For instance, Plaintiffs repeatedly acknowledge that FDA was asked by Emery Pharma to require the use of refrigerated trucks for the shipment of ranitidine, but that FDA declined to do so (*see, e.g.*, AMPIC at ¶¶ 337-39, 449), recognizing that such a decision was within FDA's purview.  The Court should abstain from imposing, through this litigation, an industry-wide dictate that common carriers are no longer permissible means of transportation for drug products.

7

　　　　　3.　　　Contradictory pleading regarding Plaintiffs' global theory of liability.

Finally—and most notably—Plaintiffs fail to explain how their "*specific* theory of liability is compatible with the Plaintiffs' *global* theory of liability."   Dkt. 2513 at 37-38 (emphasis in original).   Plaintiffs' Negligence count against the Retailers is framed as an alleged breach of the "duty to exercise reasonable care in the storage and transportation of ranitidine-containing products to *ensure* the products were not unreasonably dangerous to consumers and users." AMPIC at ¶ 2218 (emphasis added).   In other words, the Retailers' duty, as asserted, is to ensure the sale of a product that is not unreasonably dangerous.

As to the "dangerous" qualities of the product, however, Plaintiffs outline a global theory of defect *not* tied to the actions of the Retailers, but rather, regarding the inherently unstable nature of ranitidine and its alleged propensity to form NDMA at any point in the manufacturing process or thereafter.   *See, e.g.*, AMPIC at:

- ¶¶ 343, 346 (the ranitidine molecule contains constituent molecules to form NDMA and internally degrades to form NDMA);

- ¶¶ 346, 389, 390 (ranitidine degrades and forms NDMA even under normal conditions or when stored at room temperature);

- ¶¶ 346, 347, 374, 377 (ranitidine degrades and forms NDMA in the stomach after consumption);

- ¶¶ 379, 384 (ranitidine degrades and forms NDMA in other organs);

- ¶¶ 346, 385, 389, 395 (ranitidine degrades and forms NDMA with exposure to heat or humidity); and

- ¶¶ 388-89, 1990 (ranitidine degrades and forms NDMA after purchase and with expected storage conditions by the consumer—*e.g.*, with storage in a consumer's bathroom at home).

By Plaintiffs' own allegations, NDMA would have formed regardless of what the Retailers did or did not do—including storing ranitidine at controlled room temperature[7] pursuant to labeling conditions.  Stated differently, nothing that the Retailers could have done would change whether ranitidine was unreasonably dangerous at the time the Retailers sold it or at any point thereafter and through its shelf life.  Thus, the only manner in which the Retailers could have ensured that they were not selling an unreasonably dangerous product, in light of Plaintiffs' allegations, was to stop selling ranitidine altogether.  This is a claim that the Court has already found preempted.  *See* Dkt. 2513 at 25, 27.

## III.   **ARGUMENT**

### A.   **Plaintiffs' Negligence Claim Against the Retailers Fails to Satisfy Basic Pleading Requirements Under Fed. R. Civ. P. 8.**

As this Court recognized in its RPD Order, a court "need not accept legal conclusions couched as factual allegations."  Dkt. 2513 at 9 (citing *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019)).  While Plaintiffs were permitted a narrow window in which to re-plead their Negligence count with factual support, the AMPIC fails to assert any actual *facts* regarding the Retailers' alleged negligent storage and transportation.  Instead, the key allegations about how the Retailers' conduct purportedly caused any injury are merely conclusory statements that rest entirely on "information and belief."  None of Plaintiffs' allegations move their

---

[7] "[A] common label requirement was 'store at 20°C to 25°C (68°F to 77°F).'"  *See* AMPIC at ¶ 2213; *see also* United States Pharmacopeia and National Formulary, USP 40-NF35 ("Controlled room temperature" is defined as "[t]he temperature maintained thermostatically that encompasses the usual customary working environment of 20°−25° (68°−77° F)").

claims from being merely possible to being plausible, either for a single case or, more fundamentally, for a master complaint in the context of an MDL.  Contrary to this Court's specific direction for Plaintiffs to "address the Court's concerns" about pleading a temperature-based negligence theory (Dkt. 2513 at 35), Plaintiffs have repeated the same mistakes that led to this Court's prior dismissal of their claims and which now support dismissal, with prejudice, of their claims against the Retailers in the AMPIC.

> 1.    Plaintiffs' allegations "on information and belief" do not move their claim against the Retailers from merely possible to plausible.

The AMPIC's allegations about negligent storage and transportation fail to allege sufficient facts to plausibly state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545-46 (2007) (explaining that allegations need sufficient "factual enhancement" to cross "the line between possibility and plausibility").  As the Eleventh Circuit has noted, courts "do not have to take as true [a plaintiff's] allegations 'upon information and belief[.]'"  *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (noting that *Twombly* itself "declin[ed] to take as true the conclusory allegation that defendants had entered a conspiracy 'upon information and belief' without enough facts to make that statement plausible").

Here, the AMPIC alleges virtually no facts about any conduct of the Retailers.  Indeed, while the Retailers are identified as parties early in the AMPIC, they are not mentioned again by name across 600+ pages and thousands of paragraphs of Plaintiffs' pleading.  As to knowledge and notice, the AMPIC never alleges that the Retailers knew about any issues specific to ranitidine. *Compare* AMPIC at ¶¶ 2207–24 (no allegations that Retailers knew of NDMA in ranitidine), *with* ¶¶ 405–08 (alleging that Manufacturers, not Retailers, knew about NDMA being a carcinogen), ¶ 439 (alleging that Manufacturers concealed the ranitidine-NDMA link), *and* ¶ 462 (alleging that

even physicians did not know about this risk). The only allegation about ranitidine and what the Retailers ostensibly knew is that "a common label requirement" for ranitidine-containing products was to store them at room temperature and to avoid excessive heat or humidity. *Id.* at ¶ 2213.

There are two—and only two—allegations about the Retailers' conduct with respect to ranitidine, both of which rest merely on "information and belief." First, "[*u*]*pon information and belief*, Retailer and Distributor Defendants systematically exposed ranitidine to excessive levels of heat and humidity that violated the instructions on the products' labels." *Id.* at ¶ 2214 (emphasis added). Second, "[*u*]*pon information and belief*, Retailer and Distributor Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on product labels. This failure led to widespread noncompliance." *Id.* at ¶ 2215 (emphasis added).

The conclusory averment that all Retailers "failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on product labels" (*id.* at ¶ 2215) is the very type of allegation of which this Court has already expressed skepticism. Dkt. 2513 at 36. Arguing that every single Retailer failed to *implement* policies about proper storage and transport of labeled drugs is just as unlikely as arguing that they all had policies *calling* for improper storage and transport. And, as this Court recognized, concerns about the temperatures in specific stores or during specific instances of transportation—such as "whether or not a specific truck broke down in a desert" (*id.*)—are not the types of global questions that belong in this MDL, or any other MDL. In an attempt to avoid the "specific truck broke down in a desert" problem, the AMPIC improperly lumps all Retailers together without any distinction or specific details of their alleged conduct, again violating this Court's instruction and guidance. The Court previously

explained that it had "serious reservations" about precisely this type of blanket allegation, and Plaintiffs have done nothing to alleviate the Court's concerns.

Even apart from their failure to follow this Court's guidance, Plaintiffs' allegations of "belief" do not make their claim plausible because "[t]he mere fact that someone believes something to be true does not create a plausible inference that it is true." *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 682). In *Darvocet*, the plaintiffs alleged, on "information and belief," that manufacturers of a prescription drug failed to timely update the drug's labeling to add a black box warning; the Sixth Circuit dismissed the claim on the grounds that allegations based on "belief" are insufficient to support such allegations. *Id.* As the Eleventh Circuit has explained, allegations that rest on information and belief need not be accepted as true. *Mann*, 713 F.3d at 1315 (stating that "we do not have to take as true [plaintiff's] allegations 'upon information and belief' that the supply of pentobarbital possessed by [defendant] is either expired, illegally obtained, or compounded pentobarbital" and dismissing plaintiff's claim because he did not "allege[] enough facts to nudge his claim" across the line "from conceivable to plausible"); *see also McCullough v. Bd. of Regents of the Univ. Sys. of Georgia*, 623 F. App'x 980, 983 (11th Cir. 2015) (holding that a plaintiff "failed to set out sufficient facts to raise his allegations of retaliation above the speculative level" because his statement that was based "'[u]pon information and belief'" was "insufficient to allege a causal link").

Aside from Plaintiffs' alleged *beliefs*, the allegations here do not allege any *facts* to support the conclusion that the Retailers exposed ranitidine-containing drugs to any excess heat or humidity. No factual allegations support Plaintiffs' belief that the Retailers "systematically" failed to implement appropriate policies. The AMPIC does not provide any context for such sweeping

12

conclusions, and therefore, does not adequately articulate a Negligence claim against the Retailers. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

> 2.  Plaintiffs cannot rely on anecdotal speculation regarding shipping through the mail to support their Negligence count.

Plaintiffs' lone example of the Retailers' alleged unreasonable transport and storage is the use of common carriers for shipping, which in turn "may" have exposed "some" ranitidine to unknown increased heat and humidity at unknown times and for unknown durations.  AMPIC at ¶ 2216.  Such speculative assertions, however, are insufficient to support Plaintiffs' Negligence claim.  Even if Plaintiffs were found to have plausibly alleged a Negligence claim based on these assertions, Plaintiffs still fail to connect this purported global Retailer "policy" (*e.g.*, of shipping drugs through common carriers) to any cognizable duty or theory of liability appropriate for this MDL.

Although Plaintiffs include 52 sub-counts in their Negligence claim, covering each state, the District of Columbia, and Puerto Rico, they do not identify a single jurisdiction that forbids shipping drugs by mail, whether for ranitidine or any other drug.  *Id.* at ¶¶ 2731–938.  Nor do they point to any FDA, state, or other regulation to that effect.  In fact, Plaintiffs fail to identify *any* source for a duty to not ship room-temperature drugs through the mail, despite the fact that, over twenty years ago, "[n]early four-fifths of the states of the Union [had] acted to regulate mail-order pharmacy, utilizing a number of distinct approaches."  *Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*, 221 F.3d 235, 242 (1st Cir. 2000).  This omission is significant because "the practice of providing pharmaceuticals by mail or other courier has existed for at least a century and was

particularly prevalent in rural areas where distances between pharmacists often made in-person dispensing of medications impractical." *Id.* at 237.

Although they are unable to point to any jurisdiction that has made this judgment, or to any regulation adopting it, Plaintiffs nevertheless ask this Court to impose an industry-wide duty to not ship room-temperature drugs through the use of common carriers. This request has no basis in law or fact, nor have Plaintiffs presented any.

### B.      Plaintiffs' Claims Against the Retailers Remain Preempted.

Plaintiffs plead that ranitidine contained NDMA *regardless* of any conduct by the Retailers. Specifically, the AMPIC alleges that ranitidine breaks down into NDMA "*in normal transport and storage*, and especially when exposed to heat or humidity . . . ." AMPIC at ¶ 389 (emphasis added); *see also id.* at ¶ 2207 (incorporating ¶¶ 385–97). As the AMPIC makes clear: "FDA acknowledged that testing revealed that NDMA levels in ranitidine products *stored at room temperature* can increase with time to unacceptable levels." *Id.* at ¶ 390 (emphasis added). Further, the AMPIC alleges that *all* products containing ranitidine—not just those exposed to excess heat or humidity—contained NDMA: "GSK's testing revealed NDMA in *all batches of drug product from all formulations tested* as well as varying levels of NDMA *in all historical batches of drug substance (API) from multiple manufacturers*." *Id.* at ¶ 393 (emphasis in original); *see also id.* at ¶ 2212 ("NDMA forms due to chemical reactions in the human body, and degradation before consumption (principally heat, humidity, or time)."). These allegations (which are specifically incorporated into the Negligence count, and which are based on facts, not information and belief, and thus must be taken as true), show that the ranitidine-containing drugs would include NDMA *regardless* of any conduct by the Retailers. *See* Dkt. 2513 at 37 (explaining

that Plaintiffs' central theory is "that the Plaintiffs' harm was caused at the very moment ranitidine was manufactured").

These allegations demonstrate why Plaintiffs' claims remain preempted against the Retailers.  As framed by Plaintiffs, "[a]t all relevant times, Retailer and Distributor Defendants had a *duty* to exercise reasonable care in the storage and transportation of ranitidine-containing products to *ensure* the products were not unreasonably dangerous to consumers and users." AMPIC at ¶ 2218 (emphasis added).   That duty, however, could *only* be satisfied if the Retailers refused to sell ranitidine *altogether*, because the products were *already* allegedly "unreasonably dangerous to consumers and users" by virtue of their design.  Even if Plaintiffs could prove that a Retailer deviated from the federally-mandated temperature range in a specific case (*e.g.*, a hot warehouse or a broken-down truck in a desert), Plaintiffs would seek to impose a duty *even in that case* for the Retailers to "ensure the products were not unreasonably dangerous"—something the Retailers could *never* be able to do.  *See* Generics Preemption Brief at IV.D.1 and the cases cited therein (discussing state-law duty in storage and transport claims).

The *duty* Plaintiffs claim that Retailers breached is one that *must* be preempted, because it is fundamentally a duty to stop selling ranitidine, which is, as the Court has previously held, a preempted claim.  *See* Dkt. 2513 at 27 ("The Defendants would therefore have no recourse to avoid liability except to stop selling the drug altogether. But one thing that *Bartlett* made clear is that a "stop-selling" theory cannot be the basis on which a state law claim survives pre-emption.").[8]

---

[8] As to the Pharmacy Defendants that dispensed ranitidine, this "stop-selling" theory would also have required pharmacists to refuse to honor prescriptions written by doctors who had ordered ranitidine as treatment for patients.

C. **Plaintiffs Were Not Permitted Leave to Re-Plead Their Claim for Unjust Enrichment Against the Retailers, and Count XIV Should Be Dismissed or Stricken.**

In its RPD Order, the Court dismissed Plaintiffs' Unjust Enrichment count against the Retailers, *without* leave to amend. Specifically, the Court concluded that "Plaintiffs' twelfth count [in the MPIC], Unjust Enrichment, alleges that the Defendants omitted disclosures that ranitidine consumption presented an unreasonable risk," and as such, the Unjust Enrichment count was preempted on the same grounds as Plaintiffs' other state-law claims related to ranitidine's allegedly defective design and inadequate labels/warnings. *See* Dkt. 2513 at 25-26.

The Court therefore dismissed the Unjust Enrichment claims against the Retailers with prejudice, denying leave to amend: "further amendment of claims predicated on design defect or an improper label would be futile," and the Court therefore "denies leave to amend for that reason." *Id.* at 28; *see also id.* at 45 ("The Court's dismissal is *with prejudice* except as to the Plaintiffs' general negligence and derivative counts, and as to the Plaintiffs' Magnuson-Moss Warranty Act count, all of which may be re-pled in accordance with the rulings in this Order" (emphasis added).).

Perhaps the re-assertion of the Unjust Enrichment count was inadvertent, as none of Plaintiffs' amendments go to the substance of the cause of action. *Compare* MPIC, Dkt. 887, at ¶¶ 628–36, *with* AMPIC at ¶¶ 2722–30. Nevertheless, if a court gives a party leave to make only specific amendments, changes outside the scope of that leave violate Fed. R. Civ. P. 15(a) and should be stricken and disregarded. *See, e.g.*, *The Cincinnati Ins. Co. v. Cochran*, No. 05-16867, 2006 WL 4495335, at *3 (11th Cir. Dec. 27, 2006) (affirming dismissal of newly asserted counterclaim exceeding the scope of the district court's grant of leave to amend); *Veritas Pers. Servs., Inc. v. ADP Totalsource, Inc.*, No. 1:19-CV-22435-UU, 2019 WL 11506035, at *2 (S.D. Fla. Dec. 27, 2019) (striking new count that exceeded the scope of the Court's prior order granting

leave to amend); *Kuenzig v. Kraft Glob. Foods, Inc.*, No. 8:11-CV-838-T-24 TGW, 2012 WL 366927, at *3 (M.D. Fla. Feb. 3, 2012) (striking portions of amended complaint that exceeded the court's grant of leave to amend).

Here, re-pleading claims previously dismissed *with prejudice*, including the Unjust Enrichment count, is outside the scope of the Court's leave, and therefore, any Unjust Enrichment claim against the Retailers should be dismissed or stricken.

**D.      Plaintiffs Do Not Plausibly Allege Entitlement to Punitive Damages From the Retailers.**

Despite asserting only a Negligence claim against the Retailers supported by threadbare allegations, Plaintiffs nevertheless seek punitive damages from all Defendants, including the Retailers.  For the reasons articulated in the concurrently-filed Defendants' Omnibus Motion to Dismiss and/or Strike Amended Master Personal Injury Complaint, Plaintiffs ignore state-specific rules for pleading punitive damages, merely adding a request for punitive damages in the wherefore clause of each count and offering three broad, conclusory all-Defendant paragraphs. AMPIC at ¶¶ 473-75.  These allegations do not in any way distinguish among the various supply chain tiers of Defendants, and as such, do not state a claim for punitive damages.  Additionally, and specific to the Retailers, Plaintiffs' punitive damages request is unsupported and, in fact, flatly contradicted by other allegations in the AMPIC.

For example, the first punitive damages allegation claims that "Defendants were fully aware of the safety risks of ranitidine . . . [but] deliberately crafted their label . . . to mislead consumers."  *Id.* at ¶ 473.  As the Court confirmed in its RPD Order, the Retailers did not control the ranitidine label, and there are no allegations in the AMPIC that they did.  More fundamentally, Plaintiffs *omitted* the Retailers from all allegations in the AMPIC related to knowledge or notice of the alleged defect in ranitidine.  Notably, Plaintiffs make numerous allegations regarding what

17

the Manufacturer Defendants knew or should have known regarding the NDMA risk—but these allegations are not asserted against the Retailers.  *See id.* at ¶¶ 405-08, 460.  Likewise, Plaintiffs allege that "the Manufacturer Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat, humidity, nitrites, the conditions of the human stomach, and/or over time in storage."  *Id.* at ¶ 429.  Again, no such allegation is lodged against the Retailers.

In the specific averments purportedly supporting their punitive damages request, Plaintiffs continue with the conclusory assertion that consumers were misled regarding the dangers associated with ranitidine, but with no substantive allegations directed at the Retailers.  *See id.* at ¶ 474.  This paragraph discusses only "full disclosure of the true risks of ranitidine" (which Retailers had no knowledge of, nor are they alleged to); "selective misleading research and testing" (which Retailers did not conduct or even have knowledge of, nor are they alleged to); and "false advertising" (which Retailers did not do, nor are they alleged to).  *Id.*

The closest Retailer-specific allegation is Plaintiffs' contention within the Negligence count against the Retailers that they "knew or should have known of the need for storing and transporting ranitidine-containing products within the labeled temperature range and at low humidity," and that the Retailers "ignored this risk."  *Id.* at ¶ 2219-20.  Plaintiffs do not explain *how* the Retailers ignored this risk other than through the everyday practice of shipping drugs.  Plaintiffs do not point to a single policy, example, or document supporting *any* violation, let alone an across-the-board (and across-the-industry) practice of reckless conduct by the Retailers.

In short, for the reasons asserted in Defendants' Omnibus Motion, the punitive damages allegations in the AMPIC are wholly inadequate to state a claim for punitive damages against any

Defendant, and Plaintiffs further fail to even attempt to flesh out this claim in any way specifically as to the Retailers.

> **E.      Because the Underlying Claims Against the Retailers Fail, Plaintiffs' Derivative Claims (Counts XV, XVI, and XVII) Also Fail.**

The three remaining claims asserted against the Retailers—loss of consortium, survival actions, and wrongful death (Counts XV, XVI, and XVII)—are all derivative claims, and thus, fail because they lack any valid underlying claim.  For example, the loss-of-consortium claim relies on "Defendants' conduct as described above" (AMPIC at ¶ 2939); the survival-action claim also refers back to "the conduct of Defendants" in the foregoing claims (*id.* at ¶ 3049); and the wrongful-death claim relies on "the conduct of Defendants and the defective nature of ranitidine-containing products as outlined above" (*id.* at ¶ 3161).  Because the referenced conduct does not state a claim against the Retailers, for the reasons explained above, the derivative claims also fail. *See, e.g.*, *Darvocet*, 756 F.3d at 936 ("Because the district court correctly dismissed the underlying claims, it did not err in dismissing their derivative claims," which included "wrongful death," "survivorship," and "loss of consortium[.]").  Indeed, this Court previously dismissed Plaintiffs' derivative claims for this very reason. *See* Dkt.  2513 at 44 ("Because the Court is dismissing all underlying claims against Defendants for the reasons given herein, the derivative claims raised against Defendants in Counts XIII [loss of consortium], XIV [survival actions], and XV [wrongful death] of the MPIC and any identical claims in the CCCAC are dismissed without prejudice.").

Accordingly, the derivative counts against the Retailers should be dismissed once again, with prejudice.

IV.     **CONCLUSION**

For the reasons set forth herein, all of Plaintiffs' claims asserted against the Retailer and

Pharmacy Defendants in the Amended Master Personal Injury Complaint must be dismissed with

prejudice.

Dated: March 24, 2021                         Respectfully submitted,

                                              /s/ Sarah E. Johnston
                                              Sarah E. Johnston
                                              BARNES & THORNBURG LLP
                                              2029 Century Park East, Suite 300
                                              Los Angeles, CA 90067
                                              Tel: (310) 284-3798
                                              sjohnston@btlaw.com
                                              *Liaison Counsel for All Retailer and Pharmacy*
                                              *Defendants; and Attorney for Defendants Albertsons*
                                              *Companies, Inc.; Amazon.com, Inc.; BJ's Wholesale*
                                              *Club Holdings, Inc.; Costco Wholesale Corporation;*
                                              *CVS Pharmacy, Inc.; Duane Reade, Inc.; Giant Eagle,*
                                              *Inc.; Publix Super Markets, Inc., Rite Aid Hdqtrs.*
                                              *Corp.; Safeway Inc.; ShopRite Supermarkets, Inc.;*
                                              *Southeastern Grocers, Inc.; Walgreen Co.; Walgreens*
                                              *Boot Alliance, Inc.; Wakefern Food Corporation; and*
                                              *Winn-Dixie Stores, Inc.*


                                              /s/ R. Trent Taylor (signed with consent)
                                              R. Trent Taylor
                                              MCGUIRE WOODS LLP
                                              800 East Canal Street
                                              Richmond, VA 23219
                                              Tel: (804) 775-1182
                                              rtaylor@mcguirewoods.com

                                              Emily Y. Rottmann
                                              MCGUIRE WOODS LLP
                                              50 N. Laura Street, Suite 3300
                                              Jacksonville, FL 32202
                                              Tel: (904) 798-3200
                                              erottmann@mcguirewoods.com
                                              *Attorneys for Defendants Dolgencorp, LLC and Dollar*
                                              *General Corporation*

*/s/ Christopher M. Strongosky (signed with consent)*
Christopher M. Strongosky
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel: (212) 335-4643
christopher.strongosky@dlapiper.com
*Attorney for Defendants Dollar Tree Stores, Inc.*
*and Family Dollar, Inc.*

*/s/ Matt D. Knepper (signed with consent)*
Matt D. Knepper
A. James Spung
Sarah L. Zimmerman
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480-1500
matt.knepper@huschblackwell.com
james.spung@huschblackwell.com
sarah.zimmerman@huschblackwell.com
*Attorneys for Defendant Express Scripts, Inc.*

*/s/ Kirstin B. Ives (signed with consent)*
Kirstin B. Ives
Tyler Johannes
FALKENBERG IVES LLP
230 W. Monroe Street, Suite 2220
Chicago, IL 60606
Tel: (312) 566-4803
kbi@falkenbergives.com
tgj@falkenbergives.com
*Attorneys for Defendant Humana Pharmacy, Inc.*

*/s/ Jeffrey A. Kennard (signed with consent)*
Jeffrey A. Kennard
Cameron E. Grant
SCHAENHORST AST KENNARD GRIFFIN PC
1100 Walnut Street, Ste. 1950
Kansas City, MO 64106
Tel: (816) 268-9400
jkennard@sakg.com
cgrant@sakg.com
*Attorneys for Defendant Hy-Vee, Inc.*

/s/ Robert J. Guite (signed with consent)
Robert J. Guite
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Tel: (415) 434-9100
rguite@sheppardmullin.com

Moe Keshavarzi
Jennifer Pennington
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Tel: (213) 620-1780
mkeshavarzi@sheppardmullin.com
jepennington@sheppardmullin.com
*Attorneys for Defendant Kaiser Permanente
International*

/s/ Fredrick H. L. McClure (signed with consent)
Fredrick H. L. McClure
William A. McBride
TRENAM, KEMKER, SCHARF, BARKIN, FRYE,
O'NEILL & MULLIS, P.A.
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
Tel: (813) 223-7474
fmcclure@trenam.com; jamer@trenam.com
bmcbride@trenam.com; lbehr@trenam.com
*Attorneys for Defendants The Kroger Co., Fred Meyer
Stores, Inc. and Smith's Food & Drug Centers, Inc.*

/s/ Shevon Rockett (signed with consent)
Shevon Rockett
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 415-9357
rocket.shevon@dorsey.com
*Attorney for Defendant OptumRx, Inc.*

*/s/ Jerauld E. Brydges (signed with consent)*
Jerauld E. Brydges
HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, NY 14604
Tel: (585) 231-1239
jbrydges@hselaw.com

Manuel Farach
MRACHEK, FITZGERALD, ROSE, KONOPKA,
THOMAS & WEISS, P.A.
505 S. Flagler Drive, Suite 600
West Palm Beach, FL 33401
Tel: (561) 655-2250
mfarach@mrachek-law.com
*Attorneys for Defendant Price Chopper Operating Co.,*
*Inc.*

*/s/ Harley Ratliff (signed with consent)*
Harley Ratliff
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Tel: (816) 474-6550
hratliff@shb.com

William P. Geraghty
Devin A. Moss
SHOOK, HARDY & BACON L.L.P.
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, FL 33131
Tel: (305) 358-5171
wgeraghtv@shb.com
dmoss@shb.com
*Attorneys for Defendants Walmart, Inc. and Sam's*
*West, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2021, I caused the foregoing Retailer and Pharmacy Defendants' Motion to Dismiss Amended Personal Injury Complaint and Incorporated Memorandum of Law to be filed electronically through the CM/ECF system, which will send notice of filing to all CM/ECF participants.

*/s/ Sarah E. Johnston*
Sarah E. Johnston

# SECOND AMENDED APPENDIX A

## RETAILER/PHARMACY DEFENDANTS
## NAMED IN THE AMPIC, MMC, AND/OR CELAC

| RETAILER DEFENDANTS (RETAILER OTC ONLY) | |
|---|---|
| **Defendant** | **Associated Corporate Entities** |
| Amazon.com, Inc. | |
| Dolgencorp, LLC | Dollar General Corporation |
| Family Dollar, Inc. | Dollar Tree Stores, Inc. |

| PHARMACY DEFENDANTS (PHARMACY PRESCRIPTION ONLY) | |
|---|---|
| **Defendant** | **Associated Corporate Entities** |
| Express Scripts, Inc.[9] | |
| OptumRx, Inc. | |

| RETAILER AND PHARMACY DEFENDANTS (BOTH OPERATIONS) | |
|---|---|
| **Defendant** | **Associated Corporate Entities** |
| Albertsons Companies, Inc. (improperly named as Albertson's Companies, Inc.) | Safeway Inc. (improperly named as Safeway, Inc.) |
| BJ's Wholesale Club Holdings, Inc. | |
| Costco Wholesale Corporation | |
| CVS Pharmacy, Inc.* | |
| Giant Eagle, Inc. | |

*These Defendants are named both as "Retailer Defendants" in the Amended Master Personal Injury Complaint (Dkt. 2749, 2759) ("AMPIC") and "Store-Brand Retailer" Defendants in the Consolidated Medical Monitoring Complaint (Dkt. 2832) ("MMC") and the Consolidated Amended Consumer Economic Loss Class Action Complaint (Dkt. 2835) ("CELAC").

[9] Express Scripts, Inc. is not a pharmacy and does not dispense medications, including brand or generic ranitidine.

A-1

| | |
|---|---|
| H-E-B Grocery Company, LP (improperly named as H-E-B LP f/k/a HEB Grocery Company) | |
| Humana Pharmacy, Inc. | |
| Hy-Vee, Inc. | |
| Kaiser Permanente International | |
| The Kroger Co. | Fred Meyer Stores, Inc. Smith's Food & Drug Centers, Inc. |
| Price Chopper Operating Co., Inc. | |
| Publix Super Markets, Inc. (improperly named as Publix Supermarkets, Inc.) | |
| Rite Aid Hdqtrs. Corp.* (improperly named as Rite Aid Corporation) | |
| ShopRite Supermarkets, Inc. (improperly named as Shop-Rite Supermarkets, Inc.) | Wakefern Food Corporation |
| Walgreen Co.* | Duane Reade, Inc.* Walgreens Boots Alliance, Inc.* |
| Walmart, Inc.* | Sam's West, Inc.* |
| Winn-Dixie Stores, Inc. | Southeastern Grocers, Inc. (improperly named as Southeastern Grocers, Inc. f/k/a Southeastern Grocers, LLC) |

**RETAILERS AND PHARMACIES**
**NOT NAMED IN THE AMPIC, MMC, OR CELAC**

| PHARMACIES (PHARMACY PRESCRIPTION ONLY) | |
|---|---|
| **Pharmacy** | **Associated Corporate Entities** |
| Innovis Health, LLC dba Essentia Health West (improperly named as Essentia Health) | |

| RETAILERS AND PHARMACIES (BOTH OPERATIONS) | |
|---|---|
| **Retailer/Pharmacy** | **Associated Corporate Entities** |
| Bob's Discount Pharmacy | |
| The GIANT Company LLC f/k/a Giant Food Stores, LLC | |
| Giant of Maryland, LLC | |
| Memorial Hospital at Gulfport Foundation, Inc. (improperly named as Memorial Outpatient Pharmacy) | |
| Target Corporation[10] | |

---

[10] Target Corporation is named in three cases that have been transferred into the MDL, but is only referenced and not named as a Defendant in the AMPIC. *See* AMPIC at ¶ 179 ("any current or former Target pharmacy" is included in the definition of "CVS").