## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                                        MDL NO. 2924
PRODUCTS LIABILITY                                                20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

### ORDER GRANTING IN PART AND
### DENYING IN PART THE BRANDED DEFENDANTS'
### RULE 12 PARTIAL MOTION TO DISMISS PLAINTIFFS'
### THREE MASTER COMPLAINTS AS PREEMPTED BY FEDERAL LAW

This matter is before the Court on the Branded[1] Defendants ("Defendants") Rule 12 Partial Motion to Dismiss Plaintiffs' Three Master Complaints as Preempted by Federal Law [DE 3114]. The Court held a hearing on the Motion on June 4, 2021 ("the Hearing"). The Court has carefully considered the Motion, the Response [DE 3325], the Reply [DE 3426], the arguments that the parties made during the Hearing, and the record and is otherwise fully advised in the premises. For the reasons set forth below, the Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART** insofar as a subset of the Plaintiffs' claims are **DISMISSED WITH PREJUDICE** as more fully described in this Order and the Motion to Dismiss is denied in all other respects.

---

[1] The "Branded Defendants" include Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"); Chattem, Inc., Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC, Patheon Manufacturing Services, LLC (collectively, "Sanofi"); Pfizer Inc. ("Pfizer"); and GlaxoSmithKline LLC ("GSK").

## I.       Factual Background[2]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980s, first by prescription and later as an over-the-counter ("OTC") medication.  In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. AMPIC ¶ 240.  GSK first developed and patented Zantac. *Id.* ¶ 239.  Zantac was a blockbuster—the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 240.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233.  Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237.  The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 243.  Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 245. The right to sell OTC Zantac in the United States later passed to BI and then to Sanofi. *Id.* ¶¶ 249–50, 253–55.  When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 260–62.

---

[2] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.") (quotation marks omitted).  Plaintiffs have set forth their factual allegations in three "master" complaints: the Amended Master Personal Injury Complaint ("AMPIC"); the Consolidated Amended Consumer Economic Loss Class Action Complaint ("ELC"); and the Consolidated Medical Monitoring Class Action Complaint ("MMC") (collectively, the "Master Complaints"). DE 2759, 2835, 2832-1.  Unless otherwise noted, all citations will be made to the redacted versions of the Master Complaints.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 348, 359, 365, 367.   Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 398–404.   The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 275, 279.   The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 302.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 322.   The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 323.   On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 333.   The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.*   Five months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 338.

## II.      Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products.   On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1.   Since that time, approximately 1,400 plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the

Southern District of Florida.  In addition, this Court has created a Census Registry where tens of thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed their first Master Complaints on June 22, 2020. DE 887, 888, 889. In those Master Complaints, Plaintiffs contended that the ranitidine molecule is unstable, breaks down into NDMA, and caused thousands of consumers of ranitidine products to develop various forms of cancer. DE 887 ¶¶ 1, 6, 19.  They alleged that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4.  They pursued federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* DE 889.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 30, the Court set a case management schedule that was intended to prepare the MDL for the filing of *Daubert* motions on general causation and class certification motions in December 2021. DE 875; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  In Pretrial Order # 36, the Court set a schedule for the filing and briefing of the first round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346.  The various defendants filed motions to dismiss.

On January 8, 2021, the Court granted the Defendants' Partial Motion to Dismiss Plaintiffs' Three Complaints as Preempted by Federal Law. *See* DE 2532.  The Court's order of dismissal concluded that, in the absence of a personal injury, the Plaintiffs' over-the-counter claims for a refund were pre-empted pursuant to 21 U.S.C. § 379r.  As for the Plaintiffs' other claims against the Defendants, the Plaintiffs were granted leave to, *inter alia*, correct shotgun pleading deficiencies. *See* DE 2515.

Following an amendment to Pretrial Order # 36, Plaintiffs filed the AMPIC on February 8, 2021. DE 2759.  After the Court granted a two-week extension of time [DE 2720], Plaintiffs filed the MMC [DE 2832-1] and the ELC [DE 2835] on February 22, 2021.  In Pretrial Order # 61, the Court set a schedule for the filing and briefing of the second round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 2968.  The Defendants filed the Motion to Dismiss addressed herein pursuant to that schedule.

### III.    The Master Complaints

#### A.  The Amended Master Personal Injury Complaint

All individuals who filed a Short Form Complaint adopt the AMPIC. AMPIC at 2.[3]  The Plaintiffs allege that they developed cancers from taking Defendants' ranitidine products. *Id.* at 1.  The AMPIC "sets forth allegations of fact and law common to the personal-injury claims" within the MDL. *Id.* at 1-2.  Each Plaintiff seeks compensatory damages, punitive damages, restitution, and all other available remedies. *Id.* at 1-2.

The Defendants "are entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine." *Id.* ¶ 21.  They are categorized into four groups: (1) Brand Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; and (4) Retailer Defendants.  Within each category, the AMPIC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named Defendants.[4]

The AMPIC contains 17 counts and numerous state-specific sub-counts: Strict Products Liability—Failure to Warn Through Warnings and Precautions (Count I, 46 sub-counts); Negligence—Failure to Warn Through Warnings and Precautions (Count II, 48 sub-counts); Strict

---

[3] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.
[4] For example, Defendant "Sanofi" refers to five entities: Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Patheon Manufacturing Services LLC, and Boehringer Ingelheim Promeco, S.A. de C.V. AMPIC ¶ 39.

Products Liability—Failure to Warn Through Proper Expiration Dates (Count III, 46 sub-counts); Negligence—Failure to Warn Through Proper Expiration Dates (Count IV, 48 sub-counts); Failure to Warn Through the FDA (Count V, 15 sub-counts); Strict Products Liability—Design Defect Due to Warnings and Precautions (Count VI, 46 sub-counts); Strict Products Liability—Design Defect Due to Improper Expiration Dates (Count VII, 46 sub-counts); Negligent Failure to Test (Count VIII, 2 sub-counts); Negligent Product Containers (Count IX, 52 sub-counts); Negligent Storage and Transportation Outside the Labeled Range (Count X, 52 sub-counts); Negligent Storage and Transportation (Count XI, 52 sub-counts); Negligent Misrepresentation (Count XII); Reckless Misrepresentation (Count XIII); Unjust Enrichment (Count XIV, 52 sub-counts); Loss of Consortium (Count XV, 52 sub-counts); Survival Actions (Count XVI, 52 sub-counts); and Wrongful Death (Count XVII, 52 sub-counts). Counts I, II, VI, XII, and XIII are brought against every Brand Manufacturer Defendant. Counts III, IV, V, VII, VIII, and XI are brought against every Brand and Generic Manufacturer Defendant. Count IX is brought against every Brand and Generic Manufacturer Defendant who manufactured and sold ranitidine-containing pills. Count X is brought against every Retailer and Distributer Defendant. Counts XIV, XV, XVI, and XVII are brought against every Defendant.

## B. The Consolidated Amended Consumer Economic Loss Class Action Complaint

One hundred and eighty named Plaintiffs bring the ELC on behalf of themselves and all others similarly situated. Each Plaintiff asserts that he or she purchased and/or used a ranitidine product during an approximate timeframe.

The Plaintiffs bring the action in their individual capacities and on behalf of numerous classes pursuant to Rule 23. The Plaintiffs bring state class actions under various state laws stemming from the Defendants' sale of prescription-strength ranitidine for approximately forty

states.[5]  Additionally, the Plaintiffs bring state class actions under approximately forty-three states'

laws for the Defendants' sale of OTC ranitidine.

The Defendants named in the ELC are entities that "designed, manufactured, marketed,

distributed, labeled, packaged, handled, stored and/or sold Zantac or generic Ranitidine-

Containing Products." ELC ¶ 1.  The Defendants are categorized by the Plaintiffs into three groups:

(1) Brand Manufacturer Defendants (Prescription and OTC); (2) Generic Prescription

Manufacturer and/or Store-Brand Manufacturer Defendants; and (3) Store-Brand Defendants.  The

ELC alleges 1,675 counts against the Defendants.  The Plaintiffs bring claims for violation of

various state consumer protection statutes, common-law unjust enrichment, common-law breach

of quasi-contract, and breach of implied warranty.

### C.  The Medical Monitoring Class Action Complaint

Fifty-two named Plaintiffs bring the MMC on behalf of themselves and the various classes

established in the MMC. MMC ¶¶ 93-144.  The Plaintiffs purchased and used ranitidine products

in fourteen jurisdictions.[6]  Each Plaintiff alleges that he or she purchased and used ranitidine

products during an approximate timeframe.

There are five categories of classes: (1) Brand Manufacturer Prescription Medical

Monitoring Classes; (2) Brand Manufacturer OTC Medical Monitoring Classes; (3) Generic

Prescription Medical Monitoring Classes; (4) Store-Brand Medical Monitoring Classes; and (5)

Store-Brand Manufacturer Medical Monitoring Classes.  Within each category, there are state- and

Defendant-specific classes.  For example, within the third category (Generic Prescription Medical

Monitoring Classes), several named Plaintiffs bring claims against Defendant Amneal on behalf

---

[5] The Plaintiffs have brought a varying number of state-law counts against each Defendant.
[6] Arizona, California, Colorado, District of Columbia, Florida, Indiana, Maryland, Missouri, Montana, Nevada, Ohio, Pennsylvania, Utah, and West Virginia.

of themselves and eleven state-specific "Amneal Prescription Medical Monitoring Classes." *Id.* ¶ 998. Within the fourth category (Store-Brand Medical Monitoring Classes), five named Plaintiffs bring claims against Defendant CVS on behalf of themselves and four state-specific "CVS Medical Monitoring Classes." *Id.* ¶ 1004. The various classes are comprised of individuals who purchased and used one of the Defendants' ranitidine products while residing in a particular state, and who have not been diagnosed with a Subject Cancer.[7]

The Defendants named in the MMC are "entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold Zantac or generic Ranitidine-Containing Products." *Id.* ¶ 6. The Plaintiffs categorized the Defendants into three groups: (1) Brand Manufacturer Defendants (Prescription and OTC); (2) Generic Prescription Manufacturer Defendants and/or Store-Brand Manufacturer Defendants; and (3) Store-Brand Defendants. The MMC alleges 638 counts against the various Defendants.[8] Each count falls within one of five general causes of action: (1) Failure to Warn through Warnings and Precautions; (2) Failure to Warn through Proper Expiration Dates; (3) Failure to Warn Consumers through the FDA; (4) Negligent Product Containers; and (5) Negligent Storage and Transportation.

## IV.     Summary of the Parties' Arguments and the Court's Rulings

The Defendants argue that the Plaintiffs' claims premised upon the sale of OTC ranitidine are pre-empted pursuant to the express pre-emption provision in 21 U.S.C. § 379r(a), and that the Plaintiffs' claims for failure to warn through the FDA are pre-empted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). The Plaintiffs respond that their OTC claims are parallel to federal law (and are therefore not pre-empted) because they have alleged that

---

[7] Plaintiffs define "Subject Cancers" as "[t]hose cancers includ[ing] serious and potentially fatal bladder, breast, colorectal/intestinal, esophageal, gastric, kidney, liver, lung, pancreatic, and prostate cancers." MMC at 3.
[8] While the MMC lists 640 total counts, there is no Count 222 or Count 223.

ranitidine was a misbranded drug under federal law.  As for their claims for failure to warn through the FDA, the Plaintiffs argue that this Court should adopt the position held by some Circuit Courts of Appeals that *Buckman* does not preclude the claims.

The Court concludes that because the Plaintiffs have adequately pled that ranitidine was a federally misbranded drug, the Plaintiffs have alleged state-law claims that parallel federal law and are therefore not pre-empted.  As for the Plaintiffs' claims for failure to warn through the FDA, the Court concludes that *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319 (11th Cir. 2017), compels the conclusion that *Buckman* pre-empts the claims.  Therefore, the Court grants in part and denies in part the Defendants' Motion to Dismiss.

## V.       Standard of Review

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The pleading must contain more than labels, conclusions, a formulaic recitation of the elements of a cause of action, and naked assertions devoid of further factual enhancement. *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850

(11th Cir. 2017).  But the court need not accept as true allegations upon information and belief that lack sufficient facts to make the allegations plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551, 557); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true.").  The court also need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019).  "Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).

## VI.      Analysis of the Defendants' Motion to Dismiss

A review of the law applicable to drugs approved by the FDA is necessary to evaluate the arguments that the parties make in briefing the Motion to Dismiss.  Therefore, the Court first discusses (A) key statutes and regulations that govern the FDA's regulation of drugs, and (B) impossibility pre-emption and significant cases that have addressed impossibility pre-emption in the drug context.  The Court then turns to (C) the issues raised in the briefing: whether the Plaintiffs have pled claims that parallel federal law and whether the Plaintiffs' claims for failure to warn consumers through the FDA are pre-empted.  For each issue, the Court reviews the parties' arguments, the relevant allegations, and the relevant law before providing its analysis and conclusion on the issue.

## A.  Federal Regulation of Drug Products

The FDA regulates prescription and OTC drugs under the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. § 301 *et seq.* ("FDCA").  The FDCA provides a process for

the FDA to approve a new drug through a new drug application ("NDA") and a process for the FDA to approve a drug that is the same as a previously approved drug through an abbreviated new drug application ("ANDA"). *See* 21 U.S.C. § 355. A drug must have an FDA-approved NDA or ANDA to be introduced into interstate commerce. *Id.* § 355(a).

## 1. NDAs

An NDA must contain scientific data and other information showing that the new drug is safe and effective and must include proposed labeling. *See id.* § 355(b)(1). The FDCA defines the term "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." *Id.* § 321(m). The FDA may approve the NDA only if it finds, among other things, that the new drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling"; that there is "substantial evidence that the drug will have the effect it purports or is represented to have . . . in the proposed labeling"; that the methods and facilities for manufacturing, processing, and packaging the drug are adequate "to preserve its identity, strength, quality, and purity"; and that the labeling is not "false or misleading in any particular." *Id.* § 355(d). A drug approved under the NDA process, commonly referred to as a "brand-name drug," is "listed" by the FDA as having been "approved for safety and effectiveness." *See id.* § 355(j)(7). Following the approval of its NDA, a brand-name drug has a certain period of exclusivity in the marketplace. *See id.* § 355(j)(5)(F).

## 2. ANDAs

Subject to that period of exclusivity, a drug manufacturer may seek the approval of a drug that is identical in key respects to a listed drug by filing an ANDA. *See id.* § 355(j); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 477 (2013) (explaining that a generic drug may be approved

through the ANDA process "provided the generic drug is identical to the already-approved brand-name drug in several key respects"). A drug approved under the ANDA process is commonly referred to as a "generic drug." The ANDA must contain information showing that the generic drug has the same active ingredient(s), route of administration, dosage form, strength, therapeutic effect, and labeling as the listed drug and is "bioequivalent" to the listed drug. 21 U.S.C. § 355(j)(2)(A). With limited exceptions, the FDA may approve the ANDA only if it finds that the generic drug and its proposed labeling are the same as the listed drug and the listed drug's labeling. *See id.* § 355(j)(4); *see also* 21 C.F.R. § 314.94(a)(8)(iii), (iv) ("Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug . . . ."). One such exception is that the generic drug's proposed labeling "may include differences in expiration date" from the listed drug. 21 C.F.R. § 314.94(a)(8)(iv).

### 3.  Changes to Drugs with Approved NDAs and ANDAs

The FDA also has requirements for when and how a drug manufacturer may change a drug (or drug labeling) that has an approved NDA or ANDA. *See id.* §§ 314.70, .97(a). These requirements differ depending on the category of change that the manufacturer seeks to make. However, despite the availability of these processes to make changes, "generic drug manufacturers have an ongoing federal duty of 'sameness'" that requires "that the warning labels of a brand-name drug and its generic copy must always be the same." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011); *see also* 21 C.F.R. § 314.150(b)(10) (explaining that approval for an ANDA may be withdrawn if the FDA finds that the drug product's labeling "is no longer consistent with that for the listed drug"). Thus, the Changes Being Effected ("CBE") process allows "changes to generic

drug labels only when a generic drug manufacturer changes its label to match an updated brand-name label or to follow the FDA's instructions." *Mensing*, 564 U.S. at 614.

## B. Impossibility Pre-emption

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "It is basic to this constitutional command that all conflicting state provisions be without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819)). The pre-emption doctrine is derived from the Supremacy Clause. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

Supreme Court caselaw has recognized that state law is pre-empted under the Supremacy Clause in three circumstances. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). First, "Congress can define explicitly the extent to which its enactments pre-empt state law." *Id.* Second, "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *Id.* at 79. Third, state law is pre-empted "to the extent that it actually conflicts with federal law . . . where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citation and quotation marks omitted). Three key Supreme Court opinions have addressed impossibility pre-emption—a subset of conflict pre-emption—in the drug context.

### 1. *Wyeth v. Levine*

In *Wyeth v. Levine*, a consumer of a brand-name drug sued the brand-name drug manufacturer on negligence and strict-liability theories under Vermont law for failure to provide

an adequate warning on the drug's labeling. 555 U.S. 555, 559-60 (2009). The Supreme Court held that the consumer's labeling claims were not pre-empted because the CBE process permitted the brand-name drug manufacturer to "unilaterally strengthen" the warning on the labeling, without waiting for FDA approval. *Id.* at 568-69, 571, 573. The Court stated that it could not conclude that it was impossible for the brand-name drug manufacturer to comply with both its federal-law and state-law duties "absent clear evidence that the FDA would not have approved" a labeling change. *Id.* at 571. The brand-name drug manufacturer "offered no such evidence," and the fact that the FDA had previously approved the labeling did "not establish that it would have prohibited such a change." *Id.* at 572-73.

### 2. *PLIVA, Inc. v. Mensing*

In *PLIVA, Inc. v. Mensing*, consumers of generic drugs sued the generic drug manufacturers under Minnesota and Louisiana tort law for failure to provide adequate warnings on the drugs' labeling. 564 U.S. at 610. The Supreme Court held that the consumers' labeling claims were pre-empted because the generic drug manufacturers could not "independently" change the labeling while remaining in compliance with federal law. *Id.* at 618-20, 623-24. The generic drug manufacturers' "duty of 'sameness'" under federal law required them to use labeling identical to the labeling of the equivalent brand-name drug. *Id.* at 613. Thus, the CBE process was unavailable to the generic drug manufacturers to change labeling absent a change to the brand-name drug's labeling. *Id.* at 614-15. Because any change that the generic drug manufacturers made to the drugs' labeling to comply with duties arising under state tort law would have violated federal law, the state tort claims were pre-empted. *Id.* at 618, 623-24.

The consumers argued, and the FDA asserted in an amicus brief, that even if the generic drug manufacturers could not have used the CBE process to change the labeling, the manufacturers

could have "asked the FDA for help" by proposing a labeling change to the FDA. *Id.* at 616, 619.  The consumers further argued that their state-law claims would not be pre-empted unless the generic drug manufacturers demonstrated that the FDA would have rejected a proposed labeling change. *Id.* at 620.  The generic drug manufacturers conceded that they could have asked the FDA for help. *Id.* at 619.

The Supreme Court rejected the argument that the ability to ask the FDA for help defeated impossibility pre-emption. *Id.* at 620-21.  The Court stated that the "question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *Id.* at 620 (citing *Wyeth*, 555 U.S. at 573).  "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24.  Asking the FDA for help "would have started a Mouse Trap game" that eventually may have led to a labeling change, "depending on the actions of the FDA and the brand-name manufacturer." *Id.* at 619-20.  But, the Court stated, pre-emption analysis that was dependent on what a third party or the federal government might do would render impossibility pre-emption "all but meaningless." *Id.* at 620-21 ("If these conjectures suffice to prevent federal and state law from conflicting for Supremacy Clause purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have any force.").

### 3.  *Mutual Pharmaceutical Co. v. Bartlett*

In *Mutual Pharmaceutical Co. v. Bartlett*, a consumer of a generic drug brought a design defect claim under New Hampshire law against a generic drug manufacturer for failure to ensure that the drug was reasonably safe. 570 U.S. at 475.  Under New Hampshire law, a drug manufacturer could satisfy its duty to ensure that its drug was reasonably safe "either by changing

a drug's design or by changing its labeling." *Id.* at 482, 492.  However, because the generic drug manufacturer was unable to change the drug's composition "as a matter of both federal law and basic chemistry," the only way for the manufacturer to fulfill its state-law duty and "escape liability" was by changing the labeling. *Id.* at 475, 483-84 (citing 21 U.S.C. § 355(j) for the proposition that "the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based").  The Supreme Court concluded that, under *Mensing*, federal law prohibited the generic drug manufacturer "from taking the remedial action required to avoid liability" under state law, that is, changing the labeling, and therefore the consumer's design-defect claim was pre-empted. *Id.* at 475, 486-87 (citing *Mensing*, 564 U.S. 604).

The First Circuit Court of Appeals had ruled that the generic drug manufacturer could comply with both federal and state law by removing the drug from the market. *Id.* at 475, 479.  The Supreme Court stated that this was "no solution" because adopting this "stop-selling rationale would render impossibility pre-emption a dead letter and work a revolution in th[e] Court's pre-emption case law." *Id.* at 475, 488-90 (rejecting the stop-selling rationale as "incompatible" with pre-emption jurisprudence because, in "every instance in which the Court has found impossibility pre-emption, the 'direct conflict' between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting").  Pre-emption caselaw "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.* at 488.

## C.  Issues in the Defendants' Motion to Dismiss

The Defendants contend that, consistent with the Court's prior rulings, all of the Plaintiffs' claims that seek a refund (Counts 72 through 408) for OTC ranitidine are pre-empted and must be

16

dismissed.  The Court's prior rulings included a dismissal of the Plaintiffs' OTC refund claims because those claims were subject to the express pre-emption clause in 21 U.S.C. § 379r(a). DE 2532 at 35-36.  The Court reached this conclusion because § 379r pre-emption is broad, the Plaintiffs' claims fell within the broad scope, and no exception to pre-emption applied. *Id.* Distilled down, the Court's ruling was that because the Plaintiffs' claims for a refund would require the Defendants to alter ranitidine's design or label, the Plaintiffs' claims could only survive pre-emption if the claims were premised upon a personal injury. *Id.*  Because the Plaintiffs' claims were, at best, based upon an economic injury, the Plaintiffs' claims were pre-empted. *Id.*  The Court's rulings, however, assumed that the Plaintiffs had not pled claims that paralleled federal law because, at that time, the Court simply could not understand the theory underpinning the Plaintiffs' arguments; the Court found that an amended pleading would be required before it could rule on that issue.  Now that the Plaintiffs have amended their pleadings, the Plaintiffs again argue that their claims survive pre-emption because their claims parallel federal law.  This forms the first issue in dispute in the Motion to Dismiss.  To analyze that issue, the Court (a) discusses its prior ruling on § 379r pre-emption before (b) turning to the parties' arguments.  After discussing the parties' arguments, the Court (c) explains its prior ruling on misbranding, (d) summarizes the Plaintiffs' allegations, (e) sets forth the governing law, and (f) explains its final conclusion.

The Defendants also contend the claims against them in the AMPIC and the MMC for failure to warn consumers through the FDA are pre-empted and must be dismissed.  For their part, the Plaintiffs maintain that none of these claims are pre-empted.  This forms the second issue in dispute in the Motion to Dismiss.  The Court discusses each issue in turn.

1. **Parallel Claims – Misbranding**

   a. **Prior Ruling on § 379r Pre-Emption**

In their response to an earlier motion to dismiss on § 379r pre-emption grounds, the Plaintiffs argued that their claims for refunds for their purchase of ranitidine products were not pre-empted because their claims paralleled federal law. DE 1976 at 20. The Plaintiffs relied upon federal misbranding law—the Plaintiffs argued that their state-law claims paralleled federal misbranding law. The Court ruled as follows:

> Although the Plaintiffs argue that their state-law claims parallel federal misbranding law, this argument cannot be squared with their pleadings. First, the Plaintiffs have not pled any standalone state-law count for misbranding, nor have the Plaintiffs pled the jurisdictions where, according to the Plaintiffs, state causes of action impose requirements identical to federal misbranding law. Second, only 14 of the Plaintiffs' 323 counts in the CCCAC and CTPPCC explicitly reference misbranding at all. *See* CCCAC, Counts 2, 5, 33, 97, 99, 208, 264, and 266; CTPPCC, Counts 2, 3, 5, 7, 8, and 9.[9] Third, federal misbranding law arguably applies only to labeling, *see* 21 U.S.C. § 352(a)-(j), but the Plaintiffs' claims encompass more than just labeling. By way of example, the Plaintiffs allege that the Defendants could have complied with state law through disclosures in advertisements and public service announcements. CCCAC ¶ 2367. Fourth, the Court has ruled that the Master Complaints are shotgun pleadings that must be amended. *See* DE 2515. Fifth, any analysis of state misbranding claims requires a careful consideration of whether state-law requirements are greater than federal requirements. *E.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005) (remanding for the circuit court to consider whether state-law duties are equivalent to federal misbranding requirements). As the Master Complaints are currently pled, the Court cannot undertake a careful, state-by-state analysis of state-law-based misbranding claims. Sixth and finally, the Court has found that the Plaintiffs' allegations of misbranding lack clarity and must be repled. *See* DE 2515 at 43. For all of these reasons, the Court rejects the Plaintiffs' misbranding-based arguments as an exception to § 379r pre-emption but will permit the Plaintiffs, in an amended and clarified pleading, to raise the exception anew.

DE 2532 at 27.

**b. Arguments**

Because the Court permitted the Plaintiffs to argue that their claims are parallel to federal misbranding law a second time, the Plaintiffs response again relies upon that position to avoid

---

[9] Each of the Plaintiffs' counts incorporated every factual allegation. For this reason, as well as others, the Court concluded that all of the Master Complaints were shotgun pleadings that had to be repled. *See* DE 2515 at 18, 22-23.

express pre-emption. DE 3325 at 12.  The Defendants argue that the Plaintiffs have not pled any state-law claims that parallel federal misbranding law, noting that of the approximately three hundred causes of action put forth, only four reference misbranding in any way.  In light of the very limited allegations of misbranding, the Defendants argue that the Plaintiffs have not met their burden to plead any parallel claims.

In response, the Plaintiffs argue that they are not required to plead independent "misbranding" claims, nor are they required to use the word "misbranded."  Instead, the Plaintiffs' position is that so long as the duties imposed by their claims parallel duties imposed by federal law, their claims survive pre-emption.  As to this point, the Plaintiffs contend that the parallel duty in this case is the duty to create a non-misleading label, a label that would have warned the Plaintiffs about the risk of cancer associated with the consumption of ranitidine.

In reply, the Defendants argue that if the Plaintiffs' misbranding argument were to be accepted, "that argument would swallow decades of express preemption jurisprudence, run counter to the FDA's lack of any such enforcement action, and effectively eliminate express preemption whenever a plaintiff challenges the adequacy of FDA-approved labeling." DE 3426 at 5.  The Defendants further argue that the Plaintiffs seek to impose state-law requirements that are in addition to the requirements imposed by federal law.

### c.  Prior Ruling on Misbranding

Before analyzing the specifics of the parties' arguments on misbranding in the present, it is important for the Court to address in detail its rulings on misbranding in the past.  In their prior pleadings, the Plaintiffs brought a variety of claims against retailers, distributors, generic manufacturers, and brand manufacturers.  In response, the Defendants argued that the Supreme Court's decisions in *Mensing* and *Bartlett* precluded the vast majority of the Plaintiffs' claims

because, *inter alia*, it was impossible for the Defendants to satisfy both federal duties and state-law duties without ceasing ranitidine sales entirely and, pursuant to the foregoing cases, the cessation of sales could not be the only avenue to comply with both state and federal law.

In response, the Plaintiffs argued that the duties imposed by their state law claims did not conflict with federal duties—the duties were parallel. DE 1976.  The duties were parallel, the Plaintiffs argued, because federal law imposed a duty not to sell misbranded drugs.[10]  It was therefore the Plaintiffs' position that because they had alleged that ranitidine products were misbranded, the Defendants had both a federal duty and a state-law duty not to sell ranitidine.

The Court's ruling on this issue was lengthy, and it was difficult.  The Court held that *Mensing* and *Bartlett* controlled and, pursuant to those decisions, many of the claims against the retailers, distributors, and generic manufacturers were pre-empted and, additionally, a small subset of claims against the brand manufacturers were pre-empted as well.  The focus of the Court's prior analysis was misbranding in the context of Supreme Court precedent on impossibility pre-emption. What the Court did not address was misbranding in the context of § 379r pre-emption. *See* DE 2532 at 27.  Below, in subsection (c), the Court examines the parties' arguments on the intersection of misbranding and § 379r pre-emption, but first the Court more fully explains and augments its prior ruling on impossibility pre-emption and misbranding and the concept of a federal duty not to sell misbranded drugs.

Congress granted the FDA broad powers to prohibit the sale of misbranded drugs. Examples of this broad grant of authority are found in two subsections of the relevant misbranding

---

[10] Initially, the Plaintiffs' Master Personal Injury Complaint alleged that ranitidine was adulterated—a potential legal basis to avoid a pre-emption challenge. *See* DE 887 at 97.  The Plaintiffs either abandoned or waived this legal argument, however, when the Plaintiffs raised only misbranding—not adulteration—in their written responses to the Defendants' first-round motions to dismiss on pre-emption.  Further, the Plaintiffs did not raise an adulteration defense to pre-emption at the hearing on the first-round pre-emption motions to dismiss on December 15, 2020.  The Plaintiffs only argued adulteration in the context of establishing an economic injury in opposition to the Defendants' Motion to Dismiss for Lack of Standing.

statute, 21 U.S.C. § 352, upon which the Plaintiffs relied.[11]  First, subsection (a)(1) classifies a drug as misbranded if its label is "false or misleading in any particular."  Second, subsection (j) classifies a drug as misbranded if it is "dangerous to health when used in the dosage or manner" prescribed on the label.  The duty not to sell misbranded drugs arises under 21 U.S.C. § 331:

> The following acts and the causing thereof are prohibited:
>
> (a)  The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

The Plaintiffs argued that ranitidine was misbranded because their pleadings alleged that the ranitidine label was false or misleading—the label contained no warning about cancer, the potential of ranitidine to break down into a carcinogen, or the accumulating risk over time of ranitidine to cause cancer through perpetual degradation into a carcinogen.  Stated simply, the Plaintiffs alleged that the ranitidine label failed to warn the consumer that ranitidine could cause cancer and, as a result, there was a federal duty not to sell ranitidine.  The problem with the Plaintiffs' argument, however, was not that they had failed to allege that ranitidine was a misbranded drug, but rather that their precise argument had already been presented to the Supreme Court, which rejected the argument not once, but twice.

In *Mensing v. Wyeth, Inc.*, 588 F.3d 603, 604 (8th Cir. 2009), a plaintiff brought a claim for strict liability failure to warn against a generic manufacturer for an incorrect label on a drug, much like the instant case.  The trial court dismissed the claim, reasoning that the state-law duty imposed by the claim—fix the label—conflicted with federal law that prohibited a generic manufacturer from changing a label. *Id.* at 605.  On appeal to the Eighth Circuit, the plaintiff argued that if a label was not properly updated or current, the drug would be rendered misbranded.

---

[11] At the hearing on December 15, 2020, the Plaintiffs relied upon subsections (a)(1) and (j) to establish misbranding. DE 2499 at 28, 146.

2008 WL 5707474.   Accepting this proposition, the Eighth Circuit noted that a manufacturer "cannot distribute" a misbranded drug. *Mensing*, 588 F.3d at 606.   With respect to the cessation of the sale of a drug, the Eighth Circuit elaborated further:

> The generic defendants were not compelled to market metoclopramide. If they realized their label was insufficient but did not believe they could even propose a label change, they could have simply stopped selling the product. Instead, they are alleged to have placed a drug with inadequate labeling on the market and profited from its sales. If Mensing's injuries resulted from their failure to take steps to warn their customers sufficiently of the risks from taking their drugs, they may be held liable.

*Id.* at 611.   Reaching the conclusion that the generic manufacturer could have been required to cease the sale of the drug, the Eighth Circuit reversed the trial court. *Id.*

With the Eighth Circuit's holding in mind—that the manufacturer could have simply been required to stop selling its drug—the Court turns to the arguments the parties made in their appeal. At the Supreme Court, the Government (on behalf of the FDA) took the position that the plaintiff's state-law failure to warn claim was not pre-empted. *PLIVA, Inc. v. Mensing*, 2011 WL 741927, at *12-13.   The claim was not pre-empted, the Government argued, because federal misbranding law permitted the claim to be brought and saved the plaintiff's claim from pre-emption. *Id.*   The parties vigorously disputed whether the generic manufacturer had a duty under federal law to try to change the drug's label through communications with the FDA. *Mensing*, 564 U.S. at 616-17.   Ultimately, the Supreme Court decided not to resolve the question of whether the federal duty to change the label existed. *Id.* at 617.   Instead, the Court assumed the duty existed for the purposes of its analysis. *Id.*   Of great importance to the instant case, however, are the logical implications that flow from the Supreme Court's express finding in that regard:

> **Because we ultimately find pre-emption even assuming such a duty existed**, we do not resolve the matter.

*Id.* (emphasis added).  The Court makes two observations about this finding.  First, this finding is not dicta because it goes to the very core of the issue before the Court: Was the plaintiff's claim pre-empted? *E.g.*, *Hitchcock v. DOC*, 745 F.3d 476, 490 (11th Cir. 2014) (utilizing the Black's Law Dictionary definition of dicta: "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case.").[12]  Second, this finding must be analyzed in the context of the background described above—the argument that there is no pre-emption when a manufacturer can stop selling its drug.

The Supreme Court was certainly aware of the Eighth Circuit's holding that a manufacturer could be required to stop selling a drug, *see Mensing*, 564 U.S. at 635 n.8, just as the Court would have been aware of the plaintiff's misbranding-based arguments in the appellate briefs which contended that misbranded drugs could not be sold under federal law. *Mensing*, 2008 WL 5707474, 2009 WL 1574508.  Further underscoring the deliberate intent of the Supreme Court to reject misbranding-based arguments, the respondent filed a petition for rehearing after the *Mensing* decision, squarely raising before the Supreme Court the precise arguments the Plaintiffs raise in the instant case:

> A decision by Petitioners to stop selling generic metoclopramide with inadequate safety warnings would not only have satisfied their duties under Minnesota and Louisiana tort law; it would also have complied with their duties under the Federal Food, Drug, and Cosmetic Act (FDCA). As Justice Thomas noted in his concurrence in *Wyeth v. Levine*, "the statutory provisions governing FDA drug labeling, and the regulations promulgated thereunder, do not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA." 129 S. Ct. at 1210 (Thomas, J., concurring). **Federal law prohibits the sale of misbranded drugs**, 21 U.S.C. § 331, and deems a drug to be misbranded if it lacks "adequate warnings." 21 U.S.C. § 352(f)(2). **Thus, Respondents' state law failure-to-warn claims "parallel" the duties imposed on drug manufacturers under federal**

---

[12] While it is true that courts should not read too much into the assumption of an "antecedent proposition," *see Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 478-79 (2006), this Court's analysis does not flow from what the Supreme Court assumed; instead, this Court's analysis flows from the logical implications of the Supreme Court's **finding** as a **result** of its legal conclusion, which was in turn premised upon an assumption.

**law**. This Court has repeatedly held that such parallel claims escape preemption, even under statutory schemes with express preemption provisions. *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 330 (2008); *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 447-48 (2005); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 495 (1996). **Indeed, so far as Respondents are aware, the decision in this case represents the first and only time this Court has ever held a traditional state-law cause of action preempted where the duties imposed by that cause of action were parallel to requirements imposed by federal law**.

2011 WL 2874547, at *3 (emphasis added).  The petition was denied.  Thus, the Supreme Court rejected the Plaintiffs' arguments in the instant case not once, but twice.

Subsequent to *Mensing*, courts have universally rejected misbranding-based arguments as a means to avoid impossibility pre-emption, citing the express finding of the Supreme Court and the implicit reasoning therein. *See, e.g.*, *Gardley-Starks v. Pfizer, Inc.*, 917 F. Supp. 2d 597, 607 (N.D. Miss. 2013) (explaining, where a plaintiff asserted that *Mensing* did not apply to a claim that a manufacturer had distributed a misbranded drug, that "no matter how Plaintiff styles her theories of recovery, her claims ultimately relate to the Generic Defendants' alleged failure to warn about the side effect of metoclopramide"); *Moretti v. PLIVA, Inc.*, No. 2:08-CV-00396-JCM, 2012 WL 628502, at *2, *5 (D. Nev. Feb. 27, 2012) (rejecting a plaintiff's argument that *Mensing* did not foreclose liability based on a generic drug manufacturer continuing to distribute a misbranded drug), *aff'd sub nom. Moretti v. Wyeth, Inc.*, 579 F. App'x 563 (9th Cir. 2014); *Moretti v. Mutual Pharm. Co.*, 852 F Supp. 2d 1114, 1118 (D. Minn. 2012) (stating that the court was "not persuaded" by a plaintiff's attempt to differentiate her misbranding claim from the types of claims addressed in *Mensing* and that, "[d]espite the different 'labels' given these claims, the essence of these claims is that . . . Defendants failed to warn of material safety information concerning metoclopramide"), *aff'd*, 518 F. App'x 486 (8th Cir. 2013); *Metz v. Wyeth, LLC*, No. 8:10-CV-2658-T-27AEP, 2011 WL 5024448, at *4 (M.D. Fla. Oct. 20, 2011) (dismissing plaintiffs' claim that a generic drug was misbranded because the claim fell "directly within the scope of *Mensing*

24

because it [was] based on Actavis' purported failure to provide an adequate label and package insert for metoclopramide").  The Plaintiffs have not cited any decision where their misbranding theory has been accepted, and the Court has located none.  Finally, even the Government has taken the position that *Mensing* foreclosed the possibility that a misbranded-drugs argument may defeat impossibility pre-emption. *Bartlett*, 2013 WL 314460, at *17-21.

What then is the reason the Supreme Court concluded that the Plaintiffs' misbranding arguments do not overcome an impossibility pre-emption defense?  The Court does not know, because the Supreme Court did not explain its finding.  What the Court does know, however, is that the instant case resembles *Mensing* in many key respects.  *Mensing* was in the same procedural posture as the instant case—motions to dismiss—and the *Mensing* plaintiff alleged that the manufacturer either knew or should have known that the drug could be dangerous and needed to have its label changed. 588 F.3d at 605.  Also like the instant case, the FDA ultimately took action after the relevant events in the case—the FDA changed the label in *Mensing* consistent with the plaintiff's allegations and, here, the FDA issued a voluntary recall of ranitidine-containing products. *Id.* at 607.

The Court now addresses the Supreme Court's subsequent decision, *Bartlett*.  In *Bartlett*, the Supreme Court took an implicit holding in *Mensing*—the cessation of the sale of a drug is not a valid basis to avoid pre-emption—and made the holding express. *Bartlett*, 570 U.S. at 488.  Additionally, the Supreme Court included a footnote:

> We do not address state design-defect claims that parallel the federal misbranding statute. The misbranding statute requires a manufacturer to pull even an FDA-approved drug from the market when it is "dangerous to health" even if "used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 352(j); *cf. Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 447 (2005) (state-law pesticide labeling requirement not pre-empted under express pre-emption provision, provided it was "equivalent to, and fully consistent with, [federal] misbranding provisions"). The

25

> parties and the Government appear to agree that a drug is misbranded under federal law only when liability is based on new and scientifically significant information that was not before the FDA. Because the jury was not asked to find whether new evidence concerning sulindac that had not been made available to the FDA rendered sulindac so dangerous as to be misbranded under the federal misbranding statute, the misbranding provision is not applicable here. *Cf.* 760 F. Supp. 2d 220, 233 (D.N.H. 2011) (most of respondent's experts' testimony was "drawn directly from the medical literature or published FDA analyses").

*Id.* at 487 n.4.  As a threshold matter, this footnote is confusing.  As the Sixth Circuit put it: "Academics, commentators, and even the parties to this case are not clear on what precisely Footnote 4 means and what its impact might be." *In re Darvocet*, 756 F.3d at 929.  Even so, a few things are clear about this footnote.  First, it is dicta.  Second, it expressly does not address the precise question before the instant Court.  Third and finally, the federal definition of misbranding may extend beyond the definition of misbranding at 21 U.S.C. § 352—the FDA certainly took that position during *Bartlett*.  Regardless of what this footnote was intended to mean, the *Bartlett* court certainly did not overrule or modify *Mensing*; indeed, to the contrary the *Bartlett* court actually concluded that *Mensing* **controlled** its decision. *Bartlett*, 570 U.S. at 491.  Even if *Bartlett* declined to address misbranding-based pre-emption arguments because of the procedural posture of the case and the appellate record, this Court has already concluded that *Mensing* **did** reject misbranding-based pre-emption arguments.  Therefore, this Court concludes that *Mensing* and the finding therein controls its decision, and the dicta in *Bartlett*, a footnote, does not.  For these reasons, the Court rejected the Plaintiffs' contention that, pursuant to their allegations, there was a federal duty not to sell misbranded ranitidine products such that the Plaintiffs' state-law claims paralleled federal law.  For these reasons, the Court previously dismissed all of the Plaintiffs' claims that would have required the Defendants to cease the sale of ranitidine products in order to satisfy both federal and state law.

### d.  Allegations

Because the Plaintiffs have brought hundreds of counts against the Defendants across thousands of pages, a certain level of abstraction is necessary to summarize the Plaintiffs' allegations.  The ELC contains claims for the violation of various state consumer protection statutes, for common-law unjust enrichment, for common-law breach of quasi-contract, and for breach of implied warranty.  For the purposes of analyzing concrete duties, the Court sets forth below a claim brought under a single state's law: Arkansas.

The Arkansas Deceptive Trade Practices Act ("DTPA") forbids a company from "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations . . . [of their] goods." ELC ¶ 2218 (quoting Ark. Code Ann. § 4-88-107(a)).  Further, Arkansas law similarly forbids "engaging in any other . . . false or deceptive act or practice in business." *Id.* ¶ 2219 (quoting Ark. Code Ann. § 4-88-107(a)(10)).  Plaintiffs allege that Defendant GSK "violated the Arkansas DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts *on the labels* for its Ranitidine-Containing Products, including that: such drugs . . . contained elevated levels of NDMA [and] caused cancer." *Id.* ¶ 2221 (emphasis added).

Plaintiffs go on to detail similar laws from thirty-three other states and explain how each individual Defendant violated them. *See id.* ¶¶ 2256-6729. Some of these laws are grounded in a state's consumer-protection statutes. *See, e.g.*, *id.* ¶¶ 2256–75 (alleging that Defendant GSK violated the California Unfair Competition Law).  Others are based on a state's warranty or false advertising laws. *See, e.g.*, *id.* ¶¶ 4865–83 (alleging that Defendant BI violated the New York False Advertising Act).  Still others are grounded in a state's equitable rules against unjust enrichment.

*See, e.g.*, *id.* ¶¶ 3045-53 (alleging that Defendant Pfizer was unjustly enriched under Florida law); AMPIC ¶¶ 2731-34 (alleging that defendants were unjustly enriched under Alabama law).

The Plaintiffs contend that there is one fundamental premise underpinning all of their claims: the ranitidine label needed to warn about the risk of NDMA and cancer in order to avoid misleading consumers about the true nature of the product they were purchasing.

### e.  Applicable Law

Pursuant to 21 U.S.C. § 379r(a)(2), a state-law claim is not pre-empted (and is parallel) so long as it does not impose any "requirement" on an OTC drug that is "different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA.  To be parallel to federal law, a state-law claim need not have the same name as a provision of federal law.  "[I]ndeed, it would be surprising if a common-law requirement used the same phraseology as" federal law.  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 454 (2005).  A parallel claim also need not have the exact same elements as a federal law. *See Medtronic v. Lohr*, 518 U.S. 470, 495 (1996).

With respect to pleading a parallel claim, a plaintiff need not "invoke magic words in their complaints" for claims to be parallel. *Godelia v. Doe 1*, 881 F.3d 1309, 1319 (11th Cir. 2018).  Conversely, "Plaintiffs cannot simply incant the magic words '[defendants] violated FDA regulations' in order to avoid preemption." *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011).  A plaintiff must clearly allege the factual basis for any alleged federal violation and explain how the same conduct violated state law as well. *Id.* at 1301-02.

In summary, the core question before the Court is this: Do the Plaintiffs seek to impose liability on the Defendants notwithstanding compliance with the relevant federal requirements? *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008).

### f.   Analysis and Conclusion

Although the Court previously dismissed the Plaintiffs' OTC claims for a refund in part on the grounds that no misbranding causes of action had been separately pled, the Court's ruling was in the context of (i) a shotgun pleading and (ii) minimal argument and discussion on how the Plaintiffs' state-law claims paralleled federal law.  As more fully detailed in the Court's Order on Defendants' Omnibus Motion to Dismiss and/or Strike Consolidated Medical Monitoring Class Action Complaint and Consolidated Amended Consumer Economic Loss Class Action Complaint (June 30, 2021), the Plaintiffs have since corrected many shotgun pleading deficiencies and, upon review of the parties' briefing, the Court now has a better understanding of how the Plaintiffs' misbranding theory should be applied to the Plaintiffs' state-law claims.

The Plaintiffs' misbranding theory in the current pleadings differs from the misbranding theory the Court considered in the prior pleadings and related round of motions to dismiss. Whereas the Plaintiffs' earlier misbranding theory would have permitted claims to be brought that would have necessarily imposed a duty not to sell ranitidine upon a Defendant (which the Court rejected as set forth in subsection (b)), the Plaintiffs' current misbranding theory is more limited; the Plaintiffs argue that the federal duty at issue is only the duty to have an accurate label, not the duty to cease selling ranitidine.  Relatedly, while the Plaintiffs previously sought to impose liability for a misleading label on parties who had no duty or authority under federal law to alter a label (such as retailers and distributors), the Defendants bringing the instant Motion are brand manufacturers—they *can* change a label and are required to do so. *See* section (A), *supra.*  The federal duty is sourced in 21 U.S.C. § 352(a)(1), which prohibits a drug label that is "false or misleading in any particular," as well as § 352(f), which requires adequate warnings on a label.

It is therefore the Plaintiffs' position that the Defendants engaged in deceptive conduct, prohibited under state law, when they created a false or misleading label and, furthermore, that federal law similarly prohibits the sale of a drug that contains a false or misleading label. The Plaintiffs' interpretation of federal law is grounded in the plain wording of the misbranding statute, § 352. Additionally, the Plaintiffs' position is grounded in the well-known principle (established by the Supreme Court) that state juries are permitted to question the judgment of the FDA. *Wyeth*, 555 U.S. at 575 ("Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."). Similarly, the Supreme Court has held that state juries may decide whether a product was federally misbranded:

> The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption. If Congress has intended to deprive injuries parties of a long available form of compensation, it surely would have expressed that intent more clearly. Overenforcement of [a federal] misbranding prohibition creates a risk of imposing unnecessary financial burdens on manufacturers; under-enforcement creates not only financial risks for consumers, but risks that affect their safety and the environment as well. . . . Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of [federal misbranding law].

*Bates*, 544 U.S. at 450-51. As explained by Justice Thomas:

> Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or . . . the application of state law.

*Wyeth*, 555 U.S. at 592 (concurring).

In reply to the foregoing, the Defendants do not argue that the Plaintiffs have failed to plead misbranding under the plain wording of § 352, nor do the Defendants argue that the FDA's determinations are exempt from jury review or that the elements of federal misbranding cannot be weighed by a jury. Instead, the Defendants point out that the Plaintiffs do not cite to a case where an OTC drug was found to be misbranded. As an initial matter, the Court notes that the burden to

establish pre-emption is upon the Defendants—not the Plaintiffs—and that the burden is a heavy one; there is a presumption *against* pre-emption. *Bates*, 555 U.S. at 575.  The Defendants certainly have no binding caselaw that stands for the proposition that an OTC drug can never, as a matter of law, be misbranded when the drug complies with its label.  True, as the Defendants point out, this Court previously found that, at least for impossibility pre-emption purposes, *Mensing* compelled this Court to reject the Plaintiffs' misbranding-based arguments, but the Defendant before the Court is a brand manufacturer that *can* change a label—not a generic manufacturer that *can't* change a label—and impossibility is therefore not a barrier to the Plaintiffs' claims.[13]  As a result, the Court's prior rulings do not compel the Court to reach any particular conclusion.  Outside of those prior rulings, the Defendants rely upon two areas of law to argue that an OTC drug can never be misbranded when it conforms to its label.

First, the Defendants rely upon three FDA regulations for OTC drugs.  21 C.F.R. §§ 330.1, .10, .11.  By way of example, section 331.10(a)(4)(v) stands for the proposition that when the FDA approves a drug for OTC status, the drug is not misbranded, and the other regulations stand for this proposition as well. *Id.*  The drug is not misbranded because, *inter alia*, the label is not false or misleading. *Id.*  The Plaintiffs' allegations, however, are that when the FDA approved ranitidine, it did not have full and accurate information about ranitidine because, at that time, the Defendants had withheld information about the dangers of ranitidine from the FDA. *E.g.*, ELC ¶¶ 444-47, 462-63.  This precise situation (involving inadequate information at the FDA) was discussed by the Government (acting on behalf of the FDA) in an amicus brief in *Bartlett*.  In that brief, the FDA took the position that if a drug were alleged to be misbranded due to new, scientifically significant information that the FDA did not previously possess, the claim would not be pre-empted. *Bartlett*,

---

[13] Similarly, what is not before the Court is any claim contending that the Defendants should have done something (such as alter ranitidine's design) that federal law prohibits.

2013 WL 314460, at *17-21; *see also Bartlett*, 570 U.S. at 487 n.4 (declining to decide the elements of federal misbranding for FDA-approved drugs). Subsequent to *Bartlett*, courts have assumed without deciding that the federal misbranding standard is the standard discussed in the *Bartlett* amicus brief. *See In re Darvocet*, 756 F.3d at 929. This Court need not decide whether the definition of federal misbranding is limited to § 352 or, alternatively, consists of the higher standard articulated in *Bartlett* because, even if the higher standard applies, the Plaintiffs have met the standard as (i) they have alleged the Defendants withheld information about ranitidine's propensity to form NDMA from the FDA, (ii) they have alleged that the FDA recently learned about ranitidine's propensity to form NDMA, and (iii) they have alleged that the FDA issued a voluntary recall of ranitidine as a result of its receipt of that information. *E.g.*, ELC Introduction. Construing all inferences in favor of the Plaintiffs as the Court must, the Plaintiffs have alleged that, if the FDA had the information in the past that the FDA possesses in the present, the FDA never would have permitted ranitidine to be sold.[14] Stated another way, it is the Plaintiffs' allegation that ranitidine products should never have been approved for OTC status, and were therefore misbranded, because the FDA-approved label was false and misleading and caused harm when taken as directed due to the Defendants' deception. In sum, the Court is not persuaded that the FDA's regulations that set forth the process for classifying a drug as OTC render any effort to allege federal misbranding impossible. The Plaintiffs' more persuasive position is grounded in the common-sense statement by Justice Thomas in *Wyeth*:

> Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or . . . the application of state law.

555 U.S. at 592 (concurring).

---

[14] At a supplemental hearing on June 7, 2021, the Plaintiffs clarified that they have not alleged the precise date upon which ranitidine became a misbranded product. Tr. at 44.

Second, the Defendants rely upon Medical Device Amendment regulations because the express pre-emption provision in the Medical Device Amendments, 21 U.S.C. § 360k, is similar to the express pre-emption provision in § 379r.  The FDA has issued a regulation on § 360k, 21 C.F.R. § 808.1.  That regulation states that misbranding claims are pre-empted when they "ha[ve] the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement" that is "different from, or in addition to," a federal requirement. 21 C.F.R. § 808.1(d)(6)(ii).  The Defendants rely upon this regulation because the Supreme Court explained, in *Riegel v. Medtronic, Inc.*, 552 U.S. at 329, that the regulation "[s]urely means that the [Medical Device Amendments] would pre-empt a jury determination that the FDA-approved labeling for a pacemaker violated a state common-law requirement for additional warnings."  The Defendants contend that any claim disputing the FDA-approved label for ranitidine would be pre-empted consistent with the Supreme Court's statement in *Riegel*.  That position is unpersuasive for several reasons.

As to the regulation itself, the Defendants omit text that is harmful to their position.  The regulation also states that "[g]enerally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices." 21 C.F.R. § 808.1(d)(6)(ii). When the Supreme Court analyzed § 808.1 in its totality in *Riegel*, the Supreme Court discerned a conflict, wherein certain portions of the regulation implied that mislabeling claims were pre-empted, while other portions implied that mislabeling claims were not pre-empted: "The Riegels' reading of § 808.1(d)(1), however, would allow a claim for tortious mislabeling . . . so long as such a claim could also be brought against objects other than medical devices." *Riegel*, 552 U.S. at 329. Noting the conflict and confusion in § 808.1, the Supreme Court declined to make any holding based upon that regulation: "All in all, we think that § 808.1(d)(1) can add nothing to our analysis

but confusion." *Id.*  The Supreme Court flatly refused to decide whether the plaintiff in *Riegel* had brought claims that paralleled federal law. *Id.* at 330 ("Although the Riegels now argue that their lawsuit raises parallel claims, they made no such contention in their briefs before the Second Circuit, nor did they raise this argument in their petition for certiorari. We decline to address that argument in the first instance here.").  Based upon the Supreme Court's refusal to pass on the question of the intersection of parallel-misbranding arguments and the Medical Device Amendments, the Court can assign no weight to the Defendants' reliance upon that case—the Defendants' argument on this point is unpersuasive, particularly given that there is no comparable FDA regulation for drugs.[15]  Similarly, the Court fails to see how regulations for medical devices could alter the plain definition of a misbranded drug when, in the drug context, the FDA has not issued misbranding regulations notwithstanding its authority to do so.  The Court therefore concludes that the Defendants have not met their burden to persuade the Court that it is impossible to allege an OTC drug is misbranded (when it conforms to its approved label) as a matter of law.

Having rejected the Defendants' broad, general argument that OTC drugs cannot be misbranded, the Court turns to the more specific question of whether the Plaintiffs' claims, as pled, parallel federal misbranding law.  Such a determination requires a focused, detailed analysis that carefully compares the elements of a state cause of action with the elements of federal misbranding law.  By way of example, in *Bates*, the Supreme Court instructed the Fifth Circuit to conduct such an analysis as follows:

> Having settled on our interpretation of § 136v(b), it still remains to be decided whether that provision pre-empts petitioners' fraud and failure-to-warn claims. Because we have not received sufficient briefing on this issue, which involves

---

[15] The Defendants also cite to two district court decisions, *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780 (2002) and *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772 (E.D. Tex. 2008), that deferred to the FDA's labeling decisions and found federal pre-emption, however those cases predate the combination of *Bates* and *Wyeth* and, as a result, are unpersuasive.  *Wyeth* resolved that the FDA's determination may be reviewed by state juries, and *Bates* resolved that the mere fact that a jury verdict may *motivate* a label change is insufficient to find federal pre-emption.

questions of Texas law, we remand it to the Court of Appeals. We emphasize that a state-law labeling requirement must in fact be equivalent to a requirement under FIFRA in order to survive pre-emption. For example, were the Court of Appeals to determine that the element of falsity in Texas' common-law definition of fraud imposed a broader obligation than FIFRA's requirement that labels not contain "false or misleading statements," that state-law cause of action would be pre-empted by § 136v(b) to the extent of that difference. State-law requirements must also be measured against any relevant EPA regulations that give content to FIFRA's misbranding standards. For example, a failure-to-warn claim alleging that a given pesticide's label should have stated "DANGER" instead of the more subdued "CAUTION" would be pre-empted because it is inconsistent with 40 CFR § 156.64 (2004), which specifically assigns these warnings to particular classes of pesticides based on their toxicity.

In undertaking a pre-emption analysis at the pleadings stage of a case, a court should bear in mind the concept of equivalence. To survive pre-emption, the state-law requirement need not be phrased in the identical language as its corresponding FIFRA requirement; indeed, it would be surprising if a common-law requirement used the same phraseology as FIFRA. If a case proceeds to trial, the court's jury instructions must ensure that nominally equivalent labeling requirements are genuinely equivalent. If a defendant so requests, a court should instruct the jury on the relevant FIFRA misbranding standards, as well as any regulations that add content to those standards. For a manufacturer should not be held liable under a state labeling requirement subject to § 136v(b) unless the manufacturer is also liable for misbranding as defined by FIFRA.

544 U.S. at 453-54.  Just as the Supreme Court in *Bates* did not have enough information to decide whether the specific state-law causes of action were parallel to federal misbranding law, this Court also lacks sufficient state-specific information to decide whether and how the hundreds of OTC claims parallel federal law.  The Defendants have brought no state-specific arguments before the Court in their Motion to Dismiss.  At this juncture, the Court is not prepared to rule out the possibility that a false or misleading label could render a Defendant liable for deceptive conduct under a state consumer protection statute.  For these reasons, the Defendants' Motion to Dismiss is denied in part as to the Defendants' § 379r arguments, and the Court concludes that, at least for now, the Plaintiffs' claims as alleged are sufficiently parallel to § 379r that the claims are not pre-empted.  To be sure, the Court's ruling, not grounded in the particulars of any state's law, is a

ruling that can be revisited at the proper time.[16]  Should a Defendant believe that the elements of a specific state's law could not be satisfied by a mere violation of federal labeling duties alone, and would therefore impose a duty "in addition to" the duties imposed by federal law, such an argument may be raised in the future, but no such argument is brought before the Court in the instant Motion to Dismiss.  Ultimately, trials on specific state claims will apply § 379r and the bedrock principle that the Plaintiffs may not impose liability on the Defendants notwithstanding the Defendants' compliance with relevant federal requirements. *See Riegel*, 552 U.S. at 330.  The Court is satisfied that, at this procedural stage of the litigation, the Plaintiffs' OTC claims are sufficiently parallel to § 379r that the claims may proceed against the Defendants.

The Court addresses one final matter.  Because the Plaintiffs have limited their opposition to § 379r pre-emption to the argument that "false or misleading label" claims are parallel to federal law, the Plaintiffs have abandoned any defense of OTC claims that are not premised upon a false or misleading label.  The Plaintiffs conceded this point at the Hearing, admitting that, for example, their claims based upon negligent product containers would not, consistent with the Court's prior rulings, be parallel claims. Hearing Tr. at 206. ("Based on your Honor's previous order which limited the scope of misbranding to just the label, I think I would have to concede that the product container is not the label itself, and so the product container would not count to satisfy the misbranding definition.").  The Court therefore grants the Defendants' Motion in part insofar as any OTC claim not based upon a false or misleading label is dismissed with prejudice as pre-empted.  Determining precisely just which abandoned claims are pre-empted, however, is not an issue that has been adequately briefed by the parties.  The Plaintiffs' response is effectively silent

---

[16] In an effort to streamline the page count and briefing of the Motions to Dismiss, the parties reached an agreement whereby the Defendants were not required to raise every state-specific argument in the Motions. *See* Pretrial Order # 61 ("To the extent that other state-specific issues become relevant at a later stage of the litigation, such as the bellwether trial stage, the parties agree that they may seek leave of Court to raise the issues at that time.").

on the topic and the reply contains only a single paragraph on the issue.  Because the Court will require the Plaintiffs to replead their claims as a result of other rulings, the Court elects not to determine which counts are dismissed because they are not based upon a false or misleading label. Instead, the Court requires that the Plaintiffs omit claims not premised on a false or misleading label from future pleadings.  To the extent the Defendants believe that any future amended pleading improperly includes OTC counts that are not based upon a false or misleading label, that is a matter the Defendants may raise at such time as the Court hears arguments on state-specific matters as more fully discussed above.

### 2.  Failure to Warn Consumers Through the FDA

#### a.  Arguments and Allegations

During the prior round of motions to dismiss, the briefing on the Generic Manufacturer Defendants' motion to dismiss raised the issue of whether a claim based on failure to warn consumers through the FDA is pre-empted. *See* DE 1978 at 28-31; DE 2133 at 13-15.  The Court declined to resolve the pre-emption question because the Plaintiffs had not pled such a claim. DE 2512 at 43-44.  The Plaintiffs have now pled claims against the Defendants for failure to warn consumers through the FDA in Count V of the AMPIC and in MMC Counts 3, 16, 21, 26, 35, 40, 53, 58, 63, 68, 81, 86, 91, 108, 121, 126, 131, 140, 161, 174, 179, and 184.

The Defendants contend that all of these claims are pre-empted and must be dismissed. DE 3114 at 6-7.  The claims are pre-empted under 21 U.S.C. § 337(a) and binding precedent because they seek to enforce FDCA requirements on drug manufacturers to report to the FDA, and only the United States may enforce such requirements. *Id.* at 6, 8-9, 19-22; DE 3426 at 12-13.  The Plaintiffs respond that their claims are not pre-empted because they seek to enforce traditional

state-law duties to warn that the Defendants owed to consumers and do not seek to enforce the FDCA. DE 3325 at 20-23.

The Plaintiffs bring AMPIC Count V under strict products liability law in California, Hawaii, Louisiana, and Missouri and under negligence law in Delaware, the District of Columbia, Indiana, Kentucky, Maryland, Massachusetts, Minnesota, Nevada, New York, Oregon, and Pennsylvania.  The Plaintiffs allege that the laws of these 15 jurisdictions impose a duty on product manufacturers to convey warnings about the dangers associated with their products to third parties such as the FDA when the warnings can be expected to reach consumers.  *See, e.g.*, AMPIC ¶¶ 1407-08, 1414-15.  "This duty to warn is ultimately owed to the consumer, not the FDA." *Id.* ¶¶ 1408, 1415.  Federal law required the Defendants to submit adverse event reports concerning ranitidine products to the FDA. *Id.* ¶ 1390 (citing 21 C.F.R. § 314.80).  The Defendants also could, consistently with federal law, "inform the FDA of new analyses of data, newly revealed risks, new testing, or other information about their drugs." *Id.* ¶ 1392.  Thus, the state-law duty to convey warnings to the FDA does not conflict with federal law. *Id.* ¶ 1389.

The Plaintiffs further allege that the Defendants "failed to adhere to their pharmacovigilance obligations to collect, analyze, and report adverse events to consumers and physicians through the FDA," including their obligation to report that ranitidine breaks down into NDMA and poses a cancer risk. *Id.* ¶¶ 1390, 1393-95, 1397.  Had the Defendants satisfied these obligations, the FDA would have publicized warnings, initiated an investigation, and recalled ranitidine products years earlier, and the Plaintiffs would have avoided the risk of developing cancer. *Id.* ¶¶ 1399-1400.  The Plaintiffs' MMC claims for failure to warn consumers through the FDA contain similar allegations and are brought under the laws of California, the District of

Columbia, Indiana, Maryland, Missouri, Nevada, and Pennsylvania. *See, e.g.*, MMC ¶¶ 921-32, 1068-73.

### b.  Applicable Law

There is no private right of action to enforce the FDCA. *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002).  All proceedings to enforce the FDCA "shall be by and in the name of the United States." 21 U.S.C. § 337(a).  The Supreme Court addressed the FDA's enforcement of the FDCA in *Buckman Co. v. Plaintiffs' Legal Committee.*

In *Buckman*, patients claiming injuries from the use of orthopedic bone screws in their spines brought state-law fraud claims against a consulting company for misrepresentations that the company had made to the FDA in the course of assisting the screws' manufacturer in obtaining FDA approval to market the screws. 531 U.S. at 343.  The patients contended that the consulting company had represented to the FDA that the screws would be marketed for use in bones in the arms and legs, when the screws actually were intended for spinal use, and had gained the FDA's market approval as a result of this misrepresentation. *Id.* at 346-47.  The consulting company challenged the state-law fraud claims as pre-empted, and the Supreme Court held that the claims were pre-empted for a combination of reasons. *See id.* at 348-53.

First, the Court stated that the "federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration." *Id.* at 348-49 (citing "various [statutory and regulatory] provisions aimed at detecting, deterring, and punishing false statements made during [the medical device] approval processes" to show that the FDA "has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Administration").  Congress intended the United States exclusively to enforce these statutory and regulatory provisions. *Id.* at 349 n.4, 352 (citing 21 U.S.C. § 337(a)).

Next, the Court explained that giving the FDA the discretion and flexibility to employ its enforcement options was "a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives." *Id.* at 349-50 (stating, as an example, that the FDA must both ensure that medical devices are reasonably safe and effective and ensure that qualifying devices are on the market within a relatively short period of time). Permitting state-law claims for fraud on the FDA to proceed would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives" and "exert an extraneous pull on the scheme established by Congress." *Id.* at 348, 350, 353 (explaining that the FDA's "somewhat delicate balance" of objectives could "be skewed by allowing fraud-on-the-FDA claims under state tort law").

The Court then stated as "a practical matter" that permitting state-law fraud-on-the-FDA claims would "dramatically increase the burdens" that applicants for FDA approval face and could discourage and deter potential applicants from seeking FDA approval out of fear of exposure to unpredictable civil liability under state law. *Id.* at 350-51.  Applicants who were not deterred from applying for FDA approval might "submit a deluge of information that the Administration neither wants nor needs" out of fear that their disclosures to the FDA may later be judged insufficient in state court. *Id.* at 351.  This "deluge" could result in "additional burdens on the FDA's evaluation" of applications and delay the approval process. *Id.*

Finally, the Court stated that the patients' state-law fraud-on-the-FDA claims existed "solely by virtue of the FDCA disclosure requirements" and did not rely on "traditional state tort law which had predated" the FDCA. *Id.* at 352-53.  The existence of the federal requirements was "a critical element" in the patients' case. *Id.* at 353.  For these reasons, the Court concluded that the fraud claims were pre-empted. *Id.*

In *Mink v. Smith & Nephew, Inc.*, the Eleventh Circuit Court of Appeals applied *Buckman* to hold that a negligence claim based on failure to report information about a medical device to the FDA was pre-empted. 860 F.3d at 1330.  In that case, a plaintiff who maintained that he had sustained injuries due to a hip replacement system sued the device's manufacturer for negligence, among other claims. *See Mink v. Smith & Nephew, Inc.*, 0:15-cv-61210-BB (S.D. Fla.), DE 29. His negligence claim was based in part on the manufacturer's alleged failure to report known or knowable safety information about the device to the FDA, including through the submission of annual reports, adverse event reports, and device defect reports required under federal regulations. *Id.* at 12-28.  The plaintiff asserted that these violations constituted common-law negligence under Florida law and that he was enforcing common-law duties that the manufacturer owed to him, "but only to the extent that [the duties were] parallel to and not different from or in addition to the requirements of federal law." *Id.* at 12-13 (alleging that the manufacturer's failure to report "was a violation of federal law and was also a violation [of] Florida's common law duties as a manufacture[r] and seller to the Plaintiff").  And he alleged that, had the FDA received the safety information, it would have taken action that included changing the device's labeling, issuing safety warnings, stopping sales, and/or ordering a recall, which would have prevented his injuries. *Id.* at 25.

The Eleventh Circuit explained that the plaintiff's negligence claim based on failure to report to the FDA was a claim for negligent failure to warn. *Mink*, 860 F.3d at 1329 ("Although Mr. Mink describes this claim using various terms, Florida law recognizes this theory as 'negligent failure to warn.' . . . Florida law recognizes the common law duty of failure to warn as a basis for a negligence claim.").  The court held that this claim was pre-empted. *Id.* at 1330.  The court reasoned that the plaintiff's "theory of liability [was] based on a duty to file a report with the FDA"

and was "very much like the 'fraud-on-the-FDA' claim the Supreme Court held was impliedly preempted in *Buckman*." *Id.* "In both cases, a plaintiff alleged a manufacturer failed to tell the FDA those things required by federal law." *Id.* The court concluded that federal law pre-empted the plaintiff's claim "insofar as [the manufacturer's] duty [was] owed to the FDA and [the plaintiff's] theory of liability [was] not one that state tort law has traditionally occupied." *Id.* (holding, in contrast, that the plaintiff's negligence claim based on a manufacturing defect was not pre-empted because it fell within "traditional state tort law" and sought to enforce a duty both that the manufacturer owed to the plaintiff and that predated the federal statutes regulating medical devices).

Consistent with *Mink*, district courts within this Circuit have held that claims based on failure to warn through the FDA are pre-empted. *See, e.g.*, *Tinkler v. Mentor Worldwide, LLC*, No. 1:19-cv-23372-UU, 2019 WL 7291239, at *5 (S.D. Fla. Dec. 30, 2019) ("To the extent Plaintiff's theory is that Mentor failed to report or underreported to the FDA information about Breast Implant Illness, such that the FDA could not ensure that the Breast Implants came with warnings that adequately disclosed the risk of Breast Implant Illness, this theory cannot support a state-law failure-to-warn claim due to implied preemption." (citation omitted)); *Rice v. Allergan USA, Inc.*, No. 2:16-cv-01374-MHH, 2018 WL 1618036, at *7 (N.D. Ala. Apr. 4, 2018) ("[T]he [Medical Device Amendments] impliedly preempt[] Ms. Rice's failure to report claim because her claim rests on her allegation that Allergan failed to tell the FDA those things required by federal law." (quotation marks omitted)); *Rowe v. Mentor Worldwide, LLC*, 297 F. Supp. 3d 1288, 1296 (M.D. Fla. 2018) ("Rowe alleges that Mentor should have reported adverse events, presumably to the FDA as required by federal regulations. . . . Rowe cannot pursue negligence based on this theory of liability."); *Williams v. St. Jude Med., S.C., Inc.*, No. 1:16-cv-04437-ELR, 2017 WL

11113322, at *9 (N.D. Ga. Oct. 19, 2017) ("As for Plaintiff's claim that the SJM Defendants failed to report to the FDA, Plaintiff asserts that this claim is premised on the SJM Defendants' failure to follow federal requirements regarding the reporting of adverse event information, and if the SJM Defendants had followed these federal requirements, the information would have been publicly available to the decedent and his physicians. . . . Such a claim is impliedly preempted.").

When analyzing questions of federal law, a transferee court in an MDL applies the law of the Circuit in which it is located. *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("We have previously held that a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit."); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

### c.   Analysis and Conclusion

As in *Mink*, the Plaintiffs bring state common-law claims for failure to warn.  As in *Mink*, the Plaintiffs seek to hold the Defendants liable for failing to provide product safety information to the FDA.  As in *Mink*, the Plaintiffs fault the Defendants for failing to provide information that is required under federal regulations.  As in *Mink*, the Plaintiffs contend that they are enforcing state common-law duties that the Defendants owe to them.  And as in *Mink*, the Plaintiffs allege that, had the Defendants provided the safety information to the FDA, the FDA would have taken action that would have prevented the Plaintiffs' injuries.

The Eleventh Circuit ruled in *Mink* that claims such as the Plaintiffs' claims are pre-empted because they are "very much" like the claims that the Supreme Court held were pre-empted in *Buckman*. *Mink*, 860 F.3d at 1330.  The Eleventh Circuit declined to draw a distinction between

claims for telling the FDA something that was wrong (the fraud claims in *Buckman*) and claims for not telling the FDA something (the failure-to-warn claim in *Mink*).  And because the Supreme Court's rationales for holding the claims pre-empted in *Buckman* pertain in this context as well, this approach makes sense.

First, the FDA has the "authority to promulgate regulations for the efficient enforcement" of the FDCA. 21 U.S.C. § 371(a).  It thus has the ability and the authority to demand from drug manufacturers the information that it believes it needs to continue to evaluate drug safety after drugs receive market approval, in the form and with the frequency that the FDA deems appropriate. The FDA has exercised this authority through the regulations.  As an example, the FDA has set forth requirements in 21 C.F.R. § 314.80 for drug manufacturers to report "adverse drug experiences," defined as "[a]ny adverse event associated with the use of a drug in humans." 21 C.F.R. § 314.80(a), (c).  The FDA has specified further information that it requires from drug manufacturers in supplements, in annual reports, and in miscellaneous other types of post-marketing reports. *See, e.g.*, *id.* §§ 314.70, .81.  Should the FDA desire other information about drug products, it has the authority to promulgate additional regulations. *See* 21 U.S.C. § 371(a).

As with the fraud at issue in *Buckman*, the FDA is empowered to detect, deter, and punish a drug manufacturer's failure to comply with the reporting requirements. *See Buckman*, 531 U.S. at 348-49.  The FDA has the authority to conduct examinations and investigations. 21 U.S.C. § 372.  It may inspect factories, warehouses, and establishments where drugs are manufactured, processed, packed, and held. *Id.* § 374.  Consumers may petition the FDA to report wrongdoing. 21 C.F.R. § 10.30.  If the FDA discovers that a drug manufacturer has failed to comply with its reporting requirements, the FDA may withdraw a drug's NDA or ANDA and prohibit further sale

of the drug.  *Id.* §§ 314.80(k), .81(d).  This regulatory scheme enables the FDA to use its discretion and judgment to determine how to respond to a reporting violation, taking into consideration such factors as the magnitude of the violation, the safety and effectiveness of the drug at issue, and the consequences of removing the drug from the market. *See id.* §§ 314.80(k), .81(d) (stating that the "FDA *may* withdraw approval" of a drug application for failure to make required reports (emphasis added)).

State-law claims based on failure to comply with the FDA's reporting requirements, or based on failure to make disclosures to the FDA in addition to those that the FDA itself requires, could conflict with the FDA's objective to have reasonably safe and effective drugs on the market and with its continued evaluation of drug safety post-approval.  As the Supreme Court reasoned in *Buckman*, fear of exposure to unpredictable civil liability under state law for a reporting violation could discourage and deter drug manufacturers from applying for FDA approval of drugs with potentially beneficial uses. *See Buckman*, 531 U.S. at 350.  This concern over unpredictable civil liability exists when the reporting violation is for a failure to comply with a federal regulation.  But the concern becomes even more pronounced if the violation may be for *additional* disclosures that each individual state determines, under its own law, should also have been made to the FDA.

And, as the Supreme Court reasoned in *Buckman*, drug manufacturers that are not discouraged from applying for drug approval could fear that the disclosures they make to the FDA will later be judged insufficient in state court. *See id.* at 351.  This fear could incentivize drug manufacturers "to submit a deluge of information" in the form of disclosures that the FDA has not said that it wants or needs but that a jury might later determine were required under state law. *See id.*  Such a deluge could place additional burdens on the FDA's ability to sift through the information that is before it to evaluate drug safety post-approval. *See id.*

Given these similarities to the Supreme Court's rationales for finding pre-emption in *Buckman*, it is unsurprising that the Eleventh Circuit ruled in *Mink* that a state-law failure-to-warn claim that is based on a failure to provide information to the FDA is pre-empted. *Mink*, 860 F.3d at 1330 (construing the plaintiff's claim as "very much like" the pre-empted fraud claims in *Buckman*).  The Plaintiffs attempt to distinguish their failure-to-warn claims from the claim presented to the Eleventh Circuit in *Mink*.  These attempts are unpersuasive.

The Plaintiffs argue that their claims are based on common-law duties owed to consumers and not on duties owed to the FDA. DE 3325 at 22.  So too, though, was the claim at issue in *Mink*. The plaintiff there alleged that the manufacturer's failure to report to the FDA was "a violation [of] Florida's common law duties as a manufacture[r] and seller to the Plaintiff." *Mink*, 0:15-cv-61210-BB, DE 29 at 12-13.  To the extent that Florida law may not in fact recognize a duty that manufacturers owe to consumers to report to the FDA, the Eleventh Circuit did not provide analysis of Florida law or give that as its rationale to affirm the dismissal of the plaintiff's claim. The Court cannot conclude that the Eleventh Circuit's holding was based on any particularities of Florida law.

The Plaintiffs contend that they raise traditional state tort claims for "failure to warn a third party." DE 3325 at 22.  This is indistinguishable from *Mink*, where the plaintiff also brought a traditional state tort claim (negligent failure to warn) for failing to warn the same third party: the FDA. *Mink*, 860 F.3d at 1329.  The Eleventh Circuit accepted that negligent failure to warn was a traditionally recognized Florida tort. *Id.* ("Florida law recognizes the common law duty of failure to warn as a basis for a negligence claim.").  The Eleventh Circuit determined, however, that the plaintiff's "theory of liability"—that is, liability to the plaintiff for failure to convey a warning to the FDA—was "not one that state tort law has traditionally occupied." *Id.* at 1330.  The Eleventh

Circuit's distinction between the plaintiff's claim of failure to warn (a traditionally recognized tort) and his theory of liability finds support in *Buckman*. Fraud is also a traditionally recognized state tort claim, but the patients' "fraud-on-the-agency theory" was not an area that state tort law had traditionally occupied. *See Buckman*, 531 U.S. at 351-52; s*ee also id.* at 347 ("Policing fraud against federal agencies is hardly a field which the States have traditionally occupied . . . ." (quotation marks omitted)).

The Plaintiffs assert that their claims are not based on the Defendants' failure to tell the FDA things required under federal law. DE 3325 at 22. Count V as pled directly contradicts this assertion. The Plaintiffs explicitly base their claims on the Defendants' alleged failure to submit adverse event reports as required under 21 C.F.R. § 314.80. *See, e.g.*, AMPIC ¶ 1390 ("Both Brand-Name Manufacturer Defendants and Generic Manufacturer Defendants are required under federal law to submit adverse event reports. See 21 C.F.R. § 314.80. . . . Each Manufacturer Defendant systematically failed to submit adverse event reports about the cancer risks of ranitidine. Each Manufacturer Defendant failed to put in place procedures ensuring full compliance with their reporting obligations."); ¶ 1400 ("Had Manufacturer Defendants submitted adverse event reports concerning ranitidine's cancer risks or otherwise informed the FDA of those risks years earlier, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication."); ¶ 1412 ("Manufacturer Defendants failed to submit adverse event reports related to cancer for ranitidine, as required by FDA regulations."). The Plaintiffs' pleading is similar to that in *Mink*, where the plaintiff alleged that the manufacturer had failed to submit post-approval reports to the FDA as required under 21 C.F.R. § 814.84, a reporting regulation that applies to medical devices. *Mink*, 0:15-cv-61210-BB, DE 29 at 12-20.

The Plaintiffs argue that their claims are based not only on the Defendants' failure to submit what the regulations require, but also on their failure to provide the FDA with other, non-required communications. DE 3325 at 22. The Plaintiffs point to allegations that, in addition to failure to submit adverse event reports, the Defendants "also failed to warn the FDA of the risks that ranitidine degrades into NDMA and causes cancer through other communication channels that were available, including ordinary correspondence with the agency or regulatory reporting." *See* AMPIC ¶ 1412. Such an allegation cannot save the claims from pre-emption. To the extent that the Plaintiffs base their claims on failures to communicate with the FDA in ways additional to what the FDA requires, the Court has already explained why such a state-law claim poses an obstacle to the FDA's accomplishment of its objectives. Varying requirements across the states for communications in addition to what the FDA itself demands could (i) discourage and deter drug manufacturers from applying for FDA approval of drugs with potentially beneficial uses out of fear of unpredictable civil liability under state law, and (ii) incentivize drug manufacturers who have gained market approval to submit to the FDA a "deluge" of information that the FDA has not said that it wants or needs out of fear of liability under state law, burdening the FDA's ability to evaluate drug safety post-approval. *See Buckman*, 531 U.S. at 350-51. It is within the FDA's purview to designate how it receives drug safety information. *See* 21 U.S.C. § 371(a); *see, e.g.*, 21 C.F.R. §§ 314.70, .80, .81.

The Court recognizes that some Circuit Courts of Appeals have reached the opposite conclusion as *Mink*, ruling that failure-to-warn claims based on a lack of disclosures to the FDA are not pre-empted. *See Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1233 (9th Cir. 2013) ("The Stengels' new claim specifically alleges, as a violation of Arizona law, a failure to warn the FDA. . . . It is a state-law claim that is independent of the FDA's pre-market approval process that was

48

at issue in *Buckman*."), *abrogated in part on state law grounds by Conklin v. Medtronic, Inc.*, 431 P.3d 571 (Ariz. 2018); *Hughes v. Bos. Sci. Corp.*, 631 F.3d 762, 775-76 (5th Cir. 2011) (construing the pre-empted claims in *Buckman* as "attempting to assert a freestanding federal cause of action based on violation of the FDA's regulations," rather than asserting a "violation of a state tort duty").

Other Circuit Courts of Appeals have viewed this issue similarly to the Eleventh Circuit in *Mink*. *See Marsh v. Genentech, Inc.*, 693 F.3d 546, 550-54 (6th Cir. 2012) (explaining that a plaintiff's claim that a drug manufacturer failed to comply with federal reporting requirements "would require a court to rule on the adequacy of [the manufacturer's] post-marketing disclosures to the FDA, which is the kind of inter-branch meddling that concerned the Court in *Buckman*" (alteration and quotation marks omitted)); *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1205-06 (8th Cir. 2010) ("Plaintiffs alleged that Medtronic failed to provide the FDA with sufficient information and did not timely file adverse event reports, as required by federal regulations. . . . [T]hese claims are simply an attempt by private parties to enforce the [Medical Device Amendments], claims foreclosed by § 337(a) as construed in *Buckman*[.]").

The Court need not, and cannot, resolve a circuit split on this issue. The Court is bound by the Eleventh Circuit's holding in *Mink*, and the Plaintiffs' claims are indistinguishable from the plaintiff's claim in *Mink*. *See e.g.*, *In re TMJ Implants Prods. Liab. Litig.*, 97 F.3d at 1055 (requiring a transferee court in an MDL to apply the law of the Circuit in which it is located when analyzing questions of federal law).

For these reasons, the Plaintiffs' claims for failure to warn consumers through the FDA are pre-empted. AMPIC Count V and MMC Counts 3, 16, 21, 26, 35, 40, 53, 58, 63, 68, 81, 86, 91, 108, 121, 126, 131, 140, 161, 174, 179, and 184 are dismissed with prejudice.

### VII.   Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Brand Defendants'
Motion to Dismiss [DE 3114] is **GRANTED IN PART AND DENIED IN PART**.  Every OTC-
count in the ELC that is not premised upon a false or misleading label is **DISMISSED WITH
PREJUDICE**.  AMPIC Count V and MMC Counts 3, 16, 21, 26, 35, 40, 53, 58, 63, 68, 81, 86,
91, 108, 121, 126, 131, 140, 161, 174, 179, and 184 are **DISMISSED WITH PREJUDICE**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of June,
2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record