**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                    MDL NO. 2924
PRODUCTS LIABILITY                                             20-MD-2924
LITIGATION

                                         **JUDGE ROBIN L. ROSENBERG**
                              **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**ORDER GRANTING THE RETAILER AND PHARMACY**
**DEFENDANTS' MOTION TO DISMISS AMENDED MASTER PERSONAL**
**INJURY COMPLAINT AND GRANTING THE DISTRIBUTOR DEFENDANTS'**
**MOTION TO DISMISS AMENDED MASTER PERSONAL INJURY COMPLAINT**

This matter is before the Court on the Retailers and Pharmacy Defendants' ("Retailer

Defendants") Motion to Dismiss Amended Master Personal Injury Complaint [DE 3112] and the

Defendant Distributors' ("Distributor Defendants") (when referencing both Defendants,

collectively "Defendants") Motion to Dismiss Amended Master Personal Injury Complaint [DE

3107].  The Court held a hearing on the Motions to Dismiss on June 4, 2021 ("the Hearing").  The

Court has carefully considered the Motions, the Responses [DE 3410, 3420], the Replies [DE

3504, 3503], the arguments that the parties made during the Hearing, and the record and is

otherwise fully advised in the premises.  For the reasons set forth below, the Defendants' Motions

to Dismiss are **GRANTED** and the Plaintiffs' claims are **DISMISSED**.  The Court's dismissal is

without leave to amend.

# I.     Factual Background[1]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980s, first by prescription and later as an over-the-counter ("OTC") medication.  In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. AMPIC ¶ 240.  GlaxoSmithKline ("GSK") first developed and patented Zantac. *Id.* ¶ 239.  Zantac was a blockbuster—the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 240.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233.  Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237.  The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 243.  Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 245.  The right to sell OTC Zantac in the United States later passed to Boehringer Ingelheim Pharmaceuticals and then to Sanofi. *Id.* ¶¶ 249–50, 253–55.  When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 260–62.

---

[1] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.") (quotation marks omitted).  Plaintiffs have set forth their factual allegations in three "master" complaints: the Amended Master Personal Injury Complaint ("AMPIC"); the Consolidated Amended Consumer Economic Loss Class Action Complaint ("ELC"); and the Consolidated Medical Monitoring Class Action Complaint ("MMC") (collectively, the "Master Complaints"). DE 2759, 2835, 2832-1.  Unless otherwise noted, all citations will be made to the redacted versions of the Master Complaints.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 348, 359, 365, 367.   Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 398–404.   The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 275, 279.   The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 302.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 322.   The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 323.   On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 333.   The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.*   Five months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 338.

## II.     Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products.   On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1.   Since that time, approximately 1,400 plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the

Southern District of Florida.  In addition, this Court has created a Census Registry where tens of thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed their first Master Complaints on June 22, 2020. DE 887, 888, 889.  In those Master Complaints, Plaintiffs contended that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. DE 887 ¶¶ 1, 6, 19.  They alleged that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4.  The Plaintiffs pursued federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* DE 889.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 36, the Court set a schedule for the filing and briefing of the first round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346.  The various defendants filed motions to dismiss.

On December 31, 2020, the Court granted the Defendants' Motions to Dismiss and dismissed all claims brought against the Defendants. DE 2513.  The Court's dismissal was with only partial leave to amend.  The Plaintiffs were granted leave to amend their negligence claim against the Defendants, provided the Plaintiffs' amendment was responsive to the Court's concerns about that claim as more fully articulated in the Court's Order of Dismissal.  Stated briefly, the Court was concerned that the Plaintiffs' negligence claim was not suitable for adjudication in an MDL.

Following an amendment to Pretrial Order # 36, Plaintiffs filed the AMPIC on February 8, 2021. DE 2759.  After the Court granted a two-week extension of time [DE 2720], Plaintiffs filed the MMC [DE 2832-1] and the ELC [DE 2835] on February 22, 2021.  In Pretrial Order # 61, the

4

Court set a schedule for the filing and briefing of the second round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 2968.  The Defendants filed the Motion to Dismiss addressed herein pursuant to that schedule.

### III.    The Amended Master Personal Injury Complaint

All individuals who filed a Short Form Complaint adopt the AMPIC. AMPIC at 2.[2]  The Plaintiffs allege that they developed cancers from taking Defendants' ranitidine products. *Id.* at 1. The AMPIC "sets forth allegations of fact and law common to the personal-injury claims" within the MDL. *Id.* at 1-2.  Each Plaintiff seeks compensatory damages, punitive damages, restitution, and all other available remedies. *Id.* at 1-2.

The Defendants "are entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine." *Id.* ¶ 21.  They are categorized into four groups: (1) Brand Manufacturer Defendants; (2) Generic Manufacturer Defendants; (3) Distributor Defendants; and (4) Retailer Defendants.  Within each category, the AMPIC combines distinct corporate entities, including parents, subsidiaries, and affiliates, into single named Defendants.[3]

The AMPIC contains 17 counts and numerous state-specific sub-counts: Strict Products Liability—Failure to Warn Through Warnings and Precautions (Count I, 46 sub-counts); Negligence—Failure to Warn Through Warnings and Precautions (Count II, 48 sub-counts); Strict Products Liability—Failure to Warn Through Proper Expiration Dates (Count III, 46 sub-counts); Negligence—Failure to Warn Through Proper Expiration Dates (Count IV, 48 sub-counts); Failure to Warn Through the FDA (Count V, 15 sub-counts); Strict Products Liability—Design Defect Due to Warnings and Precautions (Count VI, 46 sub-counts); Strict Products Liability—Design

---

[2] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.

[3] For example, Defendant "Sanofi" refers to five entities: Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Patheon Manufacturing Services LLC, and Boehringer Ingelheim Promeco, S.A. de C.V. AMPIC ¶ 39.

Defect Due to Improper Expiration Dates (Count VII, 46 sub-counts); Negligent Failure to Test (Count VIII, 2 sub-counts); Negligent Product Containers (Count IX, 52 sub-counts); Negligent Storage and Transportation Outside the Labeled Range (Count X, 52 sub-counts); Negligent Storage and Transportation (Count XI, 52 sub-counts); Negligent Misrepresentation (Count XII); Reckless Misrepresentation (Count XIII); Unjust Enrichment (Count XIV, 52 sub-counts); Loss of Consortium (Count XV, 52 sub-counts); Survival Actions (Count XVI, 52 sub-counts); and Wrongful Death (Count XVII, 52 sub-counts). Counts I, II, VI, XII, and XIII are brought against every Brand Manufacturer Defendant. Counts III, IV, V, VII, VIII, and XI are brought against every Brand and Generic Manufacturer Defendant. Count IX is brought against every Brand and Generic Manufacturer Defendant that manufactured and sold ranitidine-containing pills. Count X is brought against every Retailer and Distributer Defendant. Counts XIV, XV, XVI, and XVII are brought against every Defendant.

### IV.    Summary of the Parties' Arguments and the Court's Rulings

The Defendants argue that the Plaintiffs' negligence claim, Count X, is implausibly pled and pre-empted under federal law. The Defendants further contend that because the Plaintiffs' negligence claim fails, all other claims against them necessarily fail as well. The Plaintiffs respond by contending that they have plausibly pled negligence and that none of their claims are pre-empted; they further contend that because their negligence claim survives, all other claims against the Defendants survive as well.

The Court concludes that the Plaintiffs' negligence clam is implausibly pled and is therefore dismissed. As a result of that dismissal, the Plaintiffs' remaining claims against the Defendants are also dismissed. The Court does not address the Defendants' pre-emption

arguments because it is not necessary for the Court to do so.  Therefore, the Court grants the Defendants' Motion to Dismiss.  The Court's dismissal is without leave to amend.

## V.     Standard of Review

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The pleading must contain more than labels, conclusions, a formulaic recitation of the elements of a cause of action, and naked assertions devoid of further factual enhancement. *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).  But the court need not accept as true allegations upon information and belief that lack sufficient facts to make the allegations plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551, 557); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true.").  The court also need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019).  "Under Rule 12(b)(6), dismissal is proper

when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).

## VI.    Analysis of the Defendants' Motions to Dismiss

The Defendants' Motions to Dismiss are sufficiently similar that the Court addresses both Motions together in this Order; the Court's conclusions as to the Retailer Defendants apply equally to the Distributor Defendants and vice versa.  The Defendants contend that each of the claims against them must be dismissed for various reasons, including that the claims are pre-empted and that the claims are implausibly pled.  For their part, the Plaintiffs maintain that none of their claims are pre-empted and that each claim is plausibly pled.  The Court addresses the following legal issues raised in the briefing: (A) the plausibility of the Plaintiffs' negligence claim and (B) the interaction of the Plaintiffs' unjust enrichment claims with the Plaintiffs' negligence claim.  The Court then turns to (C) the Plaintiffs' derivative claims.  The Court does not address the Defendants' pre-emption arguments because it is ultimately unnecessary for the Court to do so. For each issue, the Court reviews the parties' arguments, the relevant allegations, and the relevant law before providing its analysis and conclusion on the issue.

## A.  Plausibility of the Negligence Claim, Count X

### 1.  Prior Pleading

In the AMPIC, the Plaintiffs bring a single count for negligence against the Defendants entitled:

> COUNT X: NEGLIGENT STORAGE AND TRANSPORTATION OUTSIDE THE
> LABELED RANGE
> (Against All Retailer and Distributor Defendants)

8

DE 2759 at 440.  In their prior master pleadings, the Plaintiffs brought their negligence count against *all* of the defendants in the case—not only the Retailer and Distributor Defendants, but also the defendants that are manufacturers. DE 2513 at 32.  Because every defendant was encapsulated in the count, the Plaintiffs alleged that every defendant had committed every tortious act.  By way of example, the Plaintiffs alleged that the Distributor Defendants had negligently designed and manufactured ranitidine. *Id.*  Because of the shotgun nature of the pleading, the Court dismissed the Plaintiffs' negligence count for the Plaintiffs to separate the various defendants. *Id.* at 39.  The Court's analysis of the negligence count, however, was made difficult for reasons extending beyond the mere delineation of the defendants.

In the Plaintiffs' earlier negligence count, the Plaintiffs sought to hold the Defendants liable for their storage and transportation of ranitidine, and the concept of temperature was central to the Plaintiffs' theory. *Id.*  The Court, however, could not discern if the Plaintiffs were pursuing a "cold" temperature theory (contending that ranitidine should have been cooled to temperatures lower than the drug label required), a "hot" temperature theory (contending that ranitidine had been improperly heated beyond the required label range), or a theory based upon the proposition that a Defendant could be held liable for complying with the temperature ranges on the drug's label. *Id.* at 32-39.

In the current AMPIC, the Plaintiffs are not seeking to hold the Defendants liable for complying with the temperature requirements on the ranitidine label.  And, the Plaintiffs have abandoned any "cold" theory of liability wherein they contend that the Defendants should have affirmatively cooled the ranitidine in their possession.[4]  Instead, the Plaintiffs have pled that the Defendants should be held liable for negligently permitting ranitidine to be heated in excess of the

---

[4] The Plaintiffs admit that they have abandoned a "cold" theory at docket entry 3410, footnote 2.

maximum temperature permitted on the ranitidine label—the "hot" theory raised in the Plaintiffs' earlier master pleadings.

The Court addressed this "hot" theory in its prior order of dismissal.  In that order, the Court was uncertain whether the Plaintiffs could allege in good faith that every retailer and every distributor had policies to improperly store or transport ranitidine.  The Court reasoned that the more likely basis for the Plaintiffs' negligence claim was that *some* retailers and *some* distributors had overheated *some* ranitidine.  In the event the Court's reasoning was consistent with the Plaintiffs' theory of liability, the Court requested that the Plaintiffs explain how any resolution of such negligence was a global, MDL-based issue.

The AMPIC does not allege that the Defendants had policies to improperly store or transport ranitidine.  The AMPIC also does not allege any concrete, specific act of negligence (such as an overheated store, truck, or warehouse), nor does the AMPIC explain how such acts of negligence would lend themselves to resolution in an MDL.  Instead, the AMPIC relies upon the Defendants' usage of common carriers (such as the postal service) to plead a claim for negligence.

## 2.  Arguments and Allegations

The Plaintiffs allege that the Defendants "are well aware of the need to maintain sensitive pharmaceutical drugs under proper shipping and storage conditions." AMPIC ¶ 2210.  The Plaintiffs further allege that although "[d]ifferent ranitidine-containing products listed slightly different storage and transportation requirements," "a common label requirement" provided that ranitidine should be stored between "68 degrees Fahrenheit to 77 degrees Fahrenheit." *Id.* ¶ 2213. In connection therewith, the Plaintiffs allege that each Defendant had a duty to exercise reasonable care in the shipping and storage of ranitidine, and that because this duty was breached, the Plaintiffs

developed cancer because ranitidine quickly degrades into a cancer-causing carcinogen (NDMA) when exposed to high temperatures. *Id.* ¶¶ 2209, 2226.

The critical issue before the Court is just *how* the Defendants are alleged to have breached their duty of care; the Defendants contend that the Plaintiffs have failed to plausibly allege breach. Although the AMPIC spans 3,628 paragraphs, the Defendants contend that only the three following paragraphs have any bearing on breach of the duty of care, and two of those allegations are "upon information and belief," while the third lacks any degree of specificity:

> Upon information and belief, Retailer and Distributor Defendants systematically exposed ranitidine to excessive levels of heat and humidity that violated the instructions on the products' labels.
>
> Upon information and belief, Retailer and Distributor Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on product labels. This failure led to widespread noncompliance.
>
> For example, Retailer and Distributor Defendants shipped ranitidine-containing products through the mail. This method of transportation—whether through the United States Postal Service or large common carriers such as FedEx and UPS—does not guarantee controlled temperature or humidity. Because of Distributor and Retailer Defendants' choice to allow this method of transportation, ranitidine-containing products shipped through the mail were systematically subject to excessive heat or humidity on days when the weather was hot or humid.

*Id.* ¶¶ 2214-16. The Defendants contend that the Court should disregard the Plaintiffs' allegations that are premised upon information and belief. As to the third allegation, the Defendants emphasize that this allegation is limited to their mere usage, from time to time, of common carriers. The Defendants argue that this solitary allegation is insufficient to plausibly allege that any Defendant breached its duty of care.

In response, the Plaintiffs make the general argument that the AMPIC is not conclusory, and that the Defendants have fair notice of the Plaintiffs' claims. The Plaintiffs argue that there is sufficient factual content in the AMPIC to satisfy federal pleading standards.

### 3.  Analysis and Conclusion

The Court divides its analysis into the following four components: (a) the Plaintiffs' usage of "upon information and belief," (b) FDA standards governing storage and transportation, (c) the Plaintiffs' specific allegations about ranitidine's heat sensitivity, and (d) the ramifications of the Plaintiffs' legal position.  Each component is discussed in turn.

### a.  Usage of "Upon Information and Belief"

The Defendants argue that of the three key allegations of breach of duty, two must be disregarded as they are premised "upon information and belief."  The Eleventh Circuit has instructed this Court that allegations upon information and belief need not be accepted as true. *Mann*, 713 F.3d at 1315.  This principle traces its origin to the bedrock case of *Bell Atlantic Corp. v. Twombly*, wherein an allegation "upon information and belief" was not accepted by the Supreme Court. 550 U.S. at 551.  The underlying rationale is that, "[t]he mere fact that someone believes something to be true does not create a plausible inference that it is true." *In re Darvocet*, 756 F.3d at 931.  Even so, it is sometimes permissible to plead a fact "upon information and belief" when the fact is "peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  The Plaintiffs have had the opportunity to engage in discovery for a considerable period of time and the Court has not prevented the Plaintiffs from pleading, based upon their own knowledge through discovery, whether the Defendants systemically exposed ranitidine to heat or failed to implement policies to ensure otherwise.[5]

---

[5] To the extent the Plaintiffs' discovery was limited because of a discovery agreement it reached with the Defendants, PTO # 35, that was the Plaintiffs' choice.  Additionally, although the Retailer Defendants concede that it is outside of the four corners of the AMPIC, the Retailer Defendants represent to the Court that the reason the Plaintiffs did not directly allege the failure to implement policies for temperature control is because, through discovery, the Plaintiffs have received copies of the Retailer Defendants' policies on temperature control. DE 3410 at 6 n.4.  This representation by the Retailer Defendants has no bearing on the Court's decision.  Finally, the Court notes that the Plaintiffs **did** bring allegations based upon materials obtained in discovery as to the manufacturing defendants in this case. *See* AMPIC ¶¶ 2447-48.

The Plaintiffs make no argument in defense of their usage of "upon information and belief," as the Plaintiffs neither acknowledge *Mann* nor acknowledge that two of their three allegations are so qualified.  The Plaintiffs make no argument, for example, that they pled "upon information and belief" because the information was peculiarly in the possession of the Defendants; furthermore, there are no companion factual allegations in the AMPIC that would render those allegations made "upon information and belief" plausible.  The Court can see no reason to disagree with the Defendants, and the Plaintiffs have not provided any through their silence.  For these reasons, the Court disregards the Plaintiffs' two allegations of breach that are "upon information and belief."

The Court addresses one additional matter.  At the Hearing, the Plaintiffs relied upon a fourth paragraph in the AMPIC to establish breach, paragraph 2220.  *See* Hearing Tr. at 55.  The Plaintiffs did cite to that paragraph in their Response, albeit to a limited extent.  Paragraph 2220 alleges that the Defendants "did not ensure ranitidine-containing products were stored at low humidity or within the temperature range on the label.  Instead, some ranitidine was subjected to excessive humidity and heat during storage, transportation, and shipping."  The Court considers this paragraph to be conclusory for several reasons.  First, as discussed below in subsection (b), paragraph 2220 does not address the fact that, pursuant to federal law, the Defendants are permitted to store drugs outside of the conditions on a label.  Second, paragraph 2220 contains no specifics— it does not explain how any Defendant failed to ensure ranitidine was properly stored or how ranitidine was exposed to heat.  Third and finally, the Defendants are large companies in the business of ensuring that drugs are properly transported and stored and, if they are alleged to have systematically failed in that core purpose for forty years, that is a weighty allegation that must be accompanied with at least one concrete allegation of breach to become plausible; the AMPIC lacks any such allegation.  The Court addresses this problem in subsection (d)—the Plaintiffs seek to

13

state a claim based upon the routine nationwide distribution of room-temperature drugs without any specific allegations whatsoever.  In short, paragraph 2220, like the Plaintiffs' allegations "upon information and belief," contains no facts such that the Court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

Thus, the Plaintiffs' negligence theory turns upon one non-conclusory allegation containing concrete factual allegations:

> For example, Retailer and Distributor Defendants shipped ranitidine-containing products through the mail. This method of transportation—whether through the United States Postal Service or large common carriers such as FedEx and UPS— does not guarantee controlled temperature or humidity. Because of Distributor and Retailer Defendants' choice to allow this method of transportation, ranitidine-containing products shipped through the mail were systematically subject to excessive heat or humidity on days when the weather was hot or humid.

AMPIC ¶ 2216.  The Plaintiffs' negligence theory thus turns upon the Defendants' use of common carriers, but the Plaintiffs' theory must be considered in the context of the Plaintiffs not alleging that the Defendants had any knowledge that ranitidine had a unique propensity to become dangerous at temperatures above room temperature. *Compare id.* ¶¶ 2207-24, *with* ¶¶ 405-08, 439, *and* 462 (alleging that only manufacturers had knowledge of the dangers of ranitidine); *see also* Hearing Tr. at 88 (conceding at the Hearing that the Plaintiffs have not alleged that the Defendants had knowledge of ranitidine's dangers).

### b.  FDCA Standards Governing the Transportation and Storage of Ranitidine

Here, it is the Plaintiffs' general allegation that, through exposure to heat, an impurity in the form of a carcinogen—NDMA—was created in each dose of ranitidine.  The Food, Drug, and Cosmetic Act ("FDCA") addresses the scenario where a drug's quality or purity degrades to the point where it becomes improper to sell in 21 U.S.C. § 351(b).  Pursuant to § 351(b), a drug's quality or purity may not fall below the standard articulated in "an official compendium."  The

"official compendium" is a defined term, and it is defined in 21 U.S.C. § 321(j): "The term 'official compendium' means the official United States Pharmacopoeia." ("USP"). The USP addresses how a room-temperature drug—such as ranitidine—may be transported and stored. USP 659 is a standard entitled "Packaging and Storage Requirements." USP 659 defines how a drug may be stored or transported when it must be subjected to a controlled room temperature:

> The temperature maintained thermostatically that encompasses the usual and customary working environment of 20°–25° (68°–77° F). The following conditions also apply. Mean kinetic temperature not to exceed 25°. Excursions between 15° and 30° (59° and 86° F) that are experienced in pharmacies, hospitals, and warehouses, and during shipping are allowed. Provided the mean kinetic temperature does not exceed 25°, transient spikes up to 40° are permitted as long as they do not exceed 24 [hours]. Spikes above 40° may be permitted only if the manufacturer so instructs.

Thus, a controlled room-temperature drug is properly stored and transported, and may be sold pursuant to the FDCA, even when it is subjected to temperatures above 77 degrees. Indeed, a room-temperature drug may even be subjected to a temperature of 104 degrees (40 degrees Celsius), provided the exposure to 104 degrees does not exceed 24 hours.

The Defendants point out that the Plaintiffs have not alleged that any Defendant violated the USP; there is no allegation that the *mean* temperature for any transported or stored ranitidine exceeded 77 degrees, or that there was a sustained exposure to a temperature in excess of 104 degrees for greater than 24 hours. As to this argument, the Plaintiffs are completely silent—the Plaintiffs' response does not even acknowledge the Defendants' argument premised upon the USP.

The Court juxtaposes the specificity in the USP with the Plaintiffs' general allegation that some ranitidine was shipped by some Defendants through standard carriers and that, as a result, some ranitidine was exposed to elevated temperatures. The Court fails to see how this general allegation plausibly suggests a Defendant violated a duty of care because, pursuant to the FDCA through the USP, it is lawful for a room-temperature drug to be subjected to elevated temperatures,

within certain limitations.  Through their silence on the topic, the Plaintiffs have made no argument that the Defendants could somehow be found to have breached a state duty of care if they fully complied with the federal transportation requirements contained in the USP.  Moreover, there are no factual allegations in the AMPIC that standard carriers do not comply with the USP.  Similarly, there are no allegations pertaining to geography or weather patterns in the United States from which the Court could plausibly infer that shipments through standard carriers would subject ranitidine to temperatures above 104 degrees for over 24 hours.

Instead, what the Court might be able to infer is that from time to time, in certain locations, in certain weather, there may have been a rogue truck, a rogue warehouse, or a rogue store where, as a result of negligence, not just ranitidine but *every* room-temperature drug in a Defendant's possession was adulterated through exposure to heat.  But the Plaintiffs have expressly disavowed any intent to plead a specific, concrete example of negligence of this sort: "But this argument either misunderstands the nature of Plaintiffs' allegations or misunderstands how different issues are analyzed within the context of an MDL.  Plaintiffs are not alleging that a few one-off trucks or retail stores goofed upon occasion and ended up shipping or storing ranitidine improperly." DE 3420 at 16.  In sum, the Plaintiffs' single allegation is insufficient to nudge the Plaintiffs' claim from "possible" to "plausible," and the Plaintiffs have therefore failed to allege that the Defendants breached a duty of ordinary care through their shipment of ranitidine through common carriers.[6]

### c.   Specific Allegations about Ranitidine's Heat Sensitivity

The Court has thus far only addressed the Plaintiffs' general allegations of ranitidine's sensitivity to heat exposure, but the Plaintiffs explain their heat-based theory in some level of detail in paragraph 387 (which is incorporated into the Plaintiffs' negligence count) of the AMPIC.  That

---

[6] The Court concentrates its analysis on temperature because that has been the focus of the parties' arguments on this issue, but the Court's conclusions on temperature are equally applicable to humidity.

paragraph sets forth a chart, wherein a private laboratory tested the proclivity of ranitidine to form

NDMA when it was exposed to heat:



Using the highest, most helpful number to the Plaintiffs, this graph stands for the proposition that

if ranitidine is exposed to 5 days of continuous 158-degree heat (70 degrees Celsius) then the

ranitidine will degrade to more than 96 nanograms of NDMA and therefore cross an important

threshold. That 96 nanogram threshold comes from the FDA and, pursuant to the Plaintiffs'

allegations, represents an unacceptable daily level of NDMA. AMPIC ¶ 390.[7] For the reasons

already set forth, the Court finds it implausible to conclude, without any supporting factual

allegations, that common carriers would expose the products in their care to 158-degree heat for a

continuous period of 5 days before the ranitidine reached its ultimate destination. By way of

example, the AMPIC is devoid of allegations of how many days ranitidine would be in a common

---

[7] The Plaintiffs' negligence count incorporates paragraph 390 which in turn cites to footnote 146. Footnote 146 refers the reader to a letter at footnote 109. Footnote 109 cites to a government document, a letter drafted by the FDA (the "Woodcock Letter"). The Woodcock Letter is therefore incorporated into the Defendants' negligence count.

carrier's care before reaching a store shelf or the conditions of storage utilized by the common

carrier. Therefore, without any supporting allegations allocating the amount of time ranitidine

spent with common carriers, the Court cannot conclude that the Plaintiffs have plausibly alleged a

claim for negligence.

### d. The Ramifications of the Plaintiffs' Legal Position

The Plaintiffs have elected not to base their negligence claim on any concrete act of

negligence, such as an overheated warehouse in South Florida or, as was discussed at the prior

motion to dismiss hearing, a "hot [delivery] truck in the Arizona desert." DE 2499 at 77. Instead,

the Plaintiffs' negligence claim rests upon the decision of the Defendants to, from time to time,

utilize the services of common carriers to deliver room-temperature drugs. It would be no small

act for this Court to conclude that the decision to utilize common carriers to ship room-temperature

drugs—and nothing else—plausibly stated a claim for negligence. As explained by the First

Circuit Court of Appeals:

> The practice of providing pharmaceuticals by mail or other courier has existed for
> at least a century and was particularly prevalent in rural areas where distances
> between pharmacists often made in-person dispensing of medications
> impractical. The precursor of today's large-scale mail-order pharmacy services
> came after World War II, when the United States Veterans Administration
> established a mail-order pharmacy program to provide prescription medications to
> veterans returning from the war. The private sector followed suit, and, following
> the lead of groups such as the American Association of Retired Persons, and its
> AARP Pharmacy Service, mail-order pharmacy services have become a significant
> provider of prescription drugs to older consumers as well as to low-income, remote,
> rural, disabled, or home-bound individuals. For example, according to its amicus
> brief, the AARP Pharmacy Service has delivered some two-hundred and twenty-
> five million prescriptions by mail to individuals in all fifty states, the District of
> Columbia, Puerto Rico, the Virgin Islands, and Guam. Some seventeen thousand
> AARP members in Puerto Rico use the AARP Pharmacy Service, amounting to
> over one hundred thousand prescriptions filled annually.

*Nat'l Pharms., Inc. v. Feliciano-de-Melecio*, 221 F.3d 235, 237 (1st Cir. 2000). Accordingly, at

least as of the year 2000, "nearly four-fifths of the states of the Union have acted to regulate mail-

order pharmac[ies], utilizing a number of distinct approaches." *Id.* at 242 (citing *Nat'l Pharms., Inc. v. De Melecio*, 51 F. Supp. 2d 45, 60 (D.P.R. 1999)). If the usage of common carriers alone stated a breach of the duty of ordinary care,[8] it would mean that each of the numerous states that have regulated mail-order drugs expressly permit such shipments with one law while simultaneously penalizing the shipments with another. Similarly, the shipment of drugs through a common carrier in the United States is such a routine, ubiquitous practice, it would mean that each day thousands of companies commit ordinary negligence. As to all of this, the Plaintiffs' response is silent; the Plaintiffs do not acknowledge that far from banning the shipment of drugs through a common carrier, various states have chosen to regulate the practice.

Juxtaposed to the serious ramifications of the Plaintiffs' legal position is one allegation in one paragraph in a complaint spanning 3,268 paragraphs. That paragraph, predicated upon the Defendants' usage of common carriers, seeks to impose liability on 22 Retailer Defendants and 5 Distributor Defendants on behalf of approximately 1,400 Plaintiffs and over approximately 100,000 claimants in the case-related registry. This is an MDL of massive size due in no small part to the fact that ranitidine was consumed by the public for almost four decades. In cases of sufficiently great magnitude, "a district court must retain the right to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Assoc'd Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983) (cited in *Twombly*, 550 U.S. at 558). The Plaintiffs' single paragraph is simply insufficient to "nudge their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The Plaintiffs

---

[8] The Plaintiffs provide no citation for the proposition that any jurisdiction imposes a duty not to ship room-temperature drugs through a common carrier. By way of example, one state that expressly permits the shipping of drugs through a common carrier is Florida. Fla. Stat. § 499.0121(12).

have not plausibly alleged that the Defendants breached a duty of ordinary care through their usage of common carriers.

For all of the foregoing reasons, the Plaintiffs have failed to plausibly plead a claim for negligence and Count X is dismissed.

## B.  Unjust Enrichment Claims

The Plaintiffs concede that their count for unjust enrichment, Count XIV, is based "on allegations that Defendants should have stored and transported ranitidine in accordance with the label." DE 3420 at 24.  Count XIV is therefore dismissed as to the Defendants for the same reasons Count X, negligence, is dismissed.

## C.  The Derivative Claims

The Plaintiffs concede that all remaining counts against the Defendants are derivative (loss of consortium, survival, and wrongful death) and, as a result, rise or fall with their negligence count. *Id.* at 25.  *See generally In re Darvocet*, 756 F.3d at 936 (affirming a district court's dismissal of "derivative claims for wrongful death, survivorship, unjust enrichment, loss of consortium, and punitive damages" when the district court had dismissed all "underlying claims" because the derivative claims "stand or fall with the underlying claims on which they rest").  The Plaintiffs' derivative counts (Count XV, Count XVI, and Count XVII) are therefore dismissed.  No further counts remain against the Defendants.

## VII.    Leave to Amend

In general, a plaintiff must be given at least one opportunity to amend a complaint. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).[9]  After a plaintiff's first opportunity to amend,

---

[9] Arguably, the one-chance-to-amend requirement only applies to *pro se* litigants. *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1132 (11th Cir. 2019) ("Our cases make clear that 'a [pro se] plaintiff must be given at least once chance to amend the complaint before the district court dismisses the action with prejudice.'"); *see also Wagner*

leave for additional amendments may be denied because of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1236 (11th Cir. 2005) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

This MDL contains approximately 1,400 cases and spans in excess of 3,700 docket entries. The Defendants, over the course of the past sixteen months, have no doubt incurred substantial costs in the form of motion practice and discovery, as well as costs associated with the Court's own administration of the MDL such as status conferences and special master fees. Notwithstanding the significant costs that the Defendants have incurred, at no time have the Plaintiffs stated a claim against the Defendants.  The Court provided the Plaintiffs a fair and just opportunity to state a claim against the Defendants; this is not a case where the Plaintiffs lack in resources, such that they were unable to research and prepare a complaint over the past sixteen months.  Were the Plaintiffs to file a third master pleading, any sustainable theory in that pleading against the Defendants would be a new, previously untested theory.  The introduction of new legal theories at a later stage of proceedings amounts to undue prejudice. *See Cline v. Adv. Neuromodulation Sys., Inc.*, 921 F. Supp. 2d 1374, 1378 n.3 (N.D. Ga. 2012) (citing *Dannebrog Rederi AS v. M/Y True Dream*, 149 F. Supp. 2d 1307, 1317-1318 (S.D. Fla. 2012)).  Similarly, while *nominal* expenses incurred as a result of amendment do not amount to undue prejudice, the litigation costs imposed upon the Defendants by virtue of a third round of motion practice and on-going discovery would be anything but nominal. *See Loggerhead Turtle v. Cnty. Council*, 148 F.3d

---

*v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (holding that a party represented by counsel is only entitled to a chance to amend if the party requests amendment).

1231, 1257 (11th Cir. 1998).  The Court concludes that permitting the Plaintiffs to file yet another master pleading against the Defendants would result in undue prejudice to the Defendants.

The Court further concludes that permitting the Plaintiffs to file a third master complaint against the Defendants would be futile.  The Plaintiffs previously brought claims against the Defendants on the legal theory that all Defendants should be held absolutely liable for the sole act of reselling ranitidine, but the Supreme Court precluded such a claim. DE 2513 at 24-28.  The Court gave the Plaintiffs sufficient opportunity to plead a different basis to hold the Defendants liable; the Court gave the Plaintiffs the opportunity to plead that the Defendants had policies that systematically degraded ranitidine, but the Plaintiffs declined to do so.  In the alternative to an allegation of a global policy, the Court gave the Plaintiffs the opportunity to plead a negligence claim that *some* NDMA in the possession of *some* of the Defendants was overheated, provided the Plaintiffs could explain why such a claim should be resolved globally in this MDL.  The Plaintiffs did not do so.  In sum, while the Court, consistent with its prior rulings, does not doubt that the Plaintiffs could theoretically plead a negligence claim against a specific Defendant in regards to some specific lot of ranitidine, the Plaintiffs have expressly declined to bring such a claim—the Plaintiffs' desire is to hold *all* Defendants liable in a master pleading for *all* sales of ranitidine *without* a concrete, affirmative allegation of breach of duty; any further amendment under such a theory would be futile for all of the reasons the Court has previously stated.

At some point the pleadings must begin to close, and that time has come.  For all of the foregoing reasons, the Court's dismissal is without leave to amend.

## VIII.   Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Retailer Defendants' Motion to Dismiss at docket entry 3112 is **GRANTED** and the Distributor

Defendants' Motion to Dismiss at docket entry 3107 is **GRANTED**.  All of the Plaintiffs' claims against the Retailer and the Distributor Defendants are **DISMISSED WITHOUT LEAVE TO AMEND**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of June, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record