UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                             MDL NO. 2924
PRODUCTS LIABILITY                                    20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**ORDER GRANTING BRAND MANUFACTURER
DEFENDANTS' MOTION TO DISMISS RICO CLAIM IN CONSOLIDATED
AMENDED CONSUMER ECONOMIC LOSS CLASS ACTION COMPLAINT**

This matter is before the Court on Brand Manufacturer Defendants'[1] ("Defendants") Motion to Dismiss RICO Claim in Consolidated Amended Consumer Economic Loss Class Action Complaint ("Motion to Dismiss"). DE 3115. The Court held a hearing on the Motion to Dismiss on June 3, 2021 (the "Hearing"). The Court has carefully considered the Motion to Dismiss, Plaintiffs' Opposition thereto [DE 3327], Defendants' Reply [DE 3425], the arguments that the parties made during the Hearing, and the record and is otherwise fully advised in the premises. For the reasons set forth below, the Defendants' Motion to Dismiss is **GRANTED** and Count I of the Amended Consumer Economic Loss Class Action Complaint ("ELC") is **DISMISSED WITH PREJUDICE**.

---

[1] The Brand Manufacturer Defendants include Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"); Chattem, Inc., Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC (collectively, "Sanofi"); Pfizer Inc. ("Pfizer"); and GlaxoSmithKline LLC ("GSK").

1

## I. Factual Background[2]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments. The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980s, first by prescription and later as an over-the-counter ("OTC") medication. In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. AMPIC ¶ 240. GSK first developed and patented Zantac. *Id.* ¶ 239. Zantac was a blockbuster—the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 240.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233. Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237. The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 243. Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 245. The right to sell OTC Zantac in the United States later passed to BI and then to Sanofi. *Id.* ¶¶ 249–50, 253–55. When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 260–62.

---

[2] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.") (quotation marks omitted). Plaintiffs have set forth their factual allegations in three "master" complaints: the Amended Master Personal Injury Complaint ("AMPIC"); the Consolidated Amended Consumer Economic Loss Class Action Complaint; and the Consolidated Medical Monitoring Class Action Complaint ("MMC") (collectively, the "Master Complaints"). DE 2759, 2835, 2832-1. Unless otherwise noted, all citations will be made to the redacted versions of the Master Complaints.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 348, 359, 365, 367. Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 398–404. The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 275, 279. The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 302.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 322. The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 323. On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 333. The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.* Five months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 338.

## II. Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products. On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1. Since that time, approximately 1,400 plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the

Southern District of Florida. In addition, this Court has created a Census Registry where tens of thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed their first Master Complaints on June 22, 2020. DE 887, 888, 889. In those Master Complaints, Plaintiffs contended that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. DE 887 ¶¶ 1, 6, 19. They alleged that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4. The Plaintiffs pursued federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* DE 889.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 36, the Court set a schedule for the filing and briefing of the first round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346. The various defendants filed motions to dismiss.

Following an amendment to Pretrial Order # 36, Plaintiffs filed the AMPIC on February 8, 2021. DE 2759. After the Court granted a two-week extension of time [DE 2720], Plaintiffs filed the MMC [DE 2832-1] and the ELC [DE 2835] on February 22, 2021. In Pretrial Order # 61, the Court set a schedule for the filing and briefing of the second round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 2968. The Defendants filed the Motion to Dismiss addressed herein pursuant to that schedule.

### III. The Economic Loss Class Action Complaint

One hundred and eighty named Plaintiffs bring the ELC on behalf of themselves and all others similarly situated. Each Plaintiff asserts that he or she purchased and/or used a ranitidine product during an approximate timeframe. The Plaintiffs bring the complaint in their individual

4

capacities and on behalf of numerous classes pursuant to Rule 23.  Among the various classes is one nationwide class: the "RICO Class," comprised of one hundred and six named Plaintiffs (hereafter referred to as "Plaintiffs") who purchased Defendants' OTC Zantac. ELC ¶ 708.

Plaintiffs assert Count I of the ELC against Defendants for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d). *Id.* ¶¶ 485, 720.  At the Hearing, Plaintiffs clarified that they are pursuing two claims within Count I. Hearing Tr. at 121.  One claim is for violating 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.*  The second claim is for violating 18 U.S.C. § 1962(d), which makes it unlawful to conspire to violate § 1962(c).  *Id.*

Plaintiffs allege that Defendants were aware of the risks associated with ranitidine consumption. ELC ¶ 529.  Rather than remove OTC Zantac from store shelves or warn the public about its safety risks, Defendants formed an enterprise to deliberately and unlawfully misrepresent and conceal the safety risks. *Id.* ¶¶ 501, 528-68, 569-606, 733-34.  Defendants' motivation was to increase their "revenues and profits from the OTC Zantac and minimize their losses from the manufacture and the sale of all their Ranitidine-Containing Products." *Id.* ¶ 734.  Defendants carried out their scheme through "thousands" of fraudulent interstate mail and wire communications during a decades-long marketing and promotional campaign to mislead the public [*id.* ¶¶ 615-17, 627, 629-48], through misleading communications with federal regulators [*id.* ¶¶ 552, 574, 582, 584, 589], and through efforts to manipulate key opinion leaders and industry groups regarding the science and safety of ranitidine products [*id.* ¶¶ 675-96].  Plaintiffs purchased

OTC Zantac because of these misrepresentations and omissions regarding its safety. *Id.* ¶¶ 773, 790. Had Plaintiffs known that OTC Zantac was unreasonably dangerous, they would not have purchased the drugs, much less at the price they paid. *Id.* ¶¶ 779-80.

### IV. Summary of the Parties' Arguments and the Court's Rulings

Defendants filed the instant Motion to Dismiss seeking the dismissal with prejudice of Plaintiffs' RICO claim in Count I of the ELC. DE 3115 at 6.[3] Defendants make three primary arguments in support of dismissal. First, Plaintiffs lack statutory standing to assert a RICO claim for three reasons: Plaintiffs did not purchase OTC Zantac directly from any Defendant and therefore cannot sue them under the indirect purchaser rule; Plaintiffs have not alleged a cognizable injury; and Plaintiffs have not plausibly alleged proximate causation. *Id.* at 12, 14-15. Second, Plaintiffs failed to allege an "association-in-fact enterprise," a basic element of a civil RICO claim, because they did not plausibly allege a common, criminal purpose or relationships amongst Defendants. *Id.* at 17-18. And third, Plaintiffs failed to allege that Defendants committed a pattern of racketeering activity. *Id.* at 25.

Plaintiffs respond that they have standing to sue Defendants under RICO because the indirect purchaser rule does not apply to RICO claims; they have alleged a cognizable injury in that they spent money on a worthless product; and, they have plausibly alleged proximate causation. DE 3327 at 11-18. Next, Plaintiffs have pled an "association-in-fact enterprise" because they allege that Defendants' common purpose was fraudulent in nature and that the dependent relationships between Defendants ensured a common purpose. *Id.* at 19-24. Finally, Plaintiffs have pled a pattern of racketeering by means of wire and mail fraud that spanned more than two decades. *Id.* at 25.

---

[3] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.

The Court concludes that the indirect purchaser rule applies to RICO claims and the facts of this case. The indirect purchaser rule is a limitation on statutory standing that authorizes suits by direct purchasers, but bars suits by indirect purchasers. The indirect purchaser rule bars Plaintiffs' RICO claim because they did not purchase OTC Zantac directly from Defendants. Plaintiffs therefore do not have statutory standing to sue Defendants under RICO. The Court does not reach the merits of Defendants' other arguments in the Motion to Dismiss.

Therefore, the Court grants Defendants' Motion to Dismiss. Plaintiffs' RICO claim in Count I of the ELC is dismissed with prejudice.

## V. Standard of Review

The inquiry when determining if a plaintiff has statutory standing is whether the plaintiff has a cause of action under the statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleading must contain more than labels, conclusions, a formulaic recitation of the elements of a cause of action, and naked assertions devoid of further factual enhancement. *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

## VI. Analysis of the Defendants' Motion to Dismiss

The Motion to Dismiss raises several separate legal issues, however, the applicability of the indirect purchaser rule is dispositive in this case. The Court first explains in greater depth the parties' arguments relating to the indirect purchaser rule, and then reviews the relevant law governing the indirect purchaser rule before providing its analysis and conclusion.

### A. Arguments

Defendants argue that the indirect purchaser rule bars Plaintiffs' RICO claims. DE 3115 at 12. This rule of statutory standing originated in the antitrust context. *Id.* at 9. The rule prohibits a product consumer from suing a defendant such as manufacturers from whom the consumer did not directly purchase the product. *Id.* The indirect purchaser rule is a simple, bright-line rule. DE 3425 at 8 (citing *Apple Inc. v. Pepper*, 129 S. Ct. 1514, 1521 (2019)). The Supreme Court and the Eleventh Circuit have explained that Congress modeled RICO's civil-action provision, 18 U.S.C. § 1964(c), on the civil-action provision of federal antitrust law. DE 3115 at 9-10 (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) and *Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014)). It follows that limits on antitrust standing, like the indirect purchaser rule, apply in the RICO context as well. *Id.* at 10. Because Plaintiffs did not purchase OTC Zantac directly from Defendants, the indirect purchaser rule bars the RICO claim. *Id.* at 12.

Plaintiffs respond that the indirect purchaser rule does not apply outside of the antitrust context. DE 3327 at 13. Plaintiffs argue that Supreme Court and Eleventh Circuit precedent do not support applying the rule in the RICO context; in fact, precedent requires the opposite. *Id.* at 13-14. The Eleventh Circuit has held that plaintiffs bringing RICO claims have standing as long as they show that their injuries were proximately caused by the RICO violation. *Id.* at 14 (citing

*Corcel*, 551 F. App'x at 576). Because Plaintiffs have plausibly pled proximate causation, they have standing to sue Defendants under RICO. *Id.* Even if the indirect purchaser rule were to apply in the RICO context, the rule cannot apply in this case. *Id.* This is because Plaintiffs are "direct victims and targets of" Defendants' fraudulent scheme and suffered "the first—and perhaps only—injury by purchasing a drug with a material, undisclosed safety risk." *Id.* at 14-15. Any intermediaries, such as the retailers from whom Plaintiffs did directly purchase OTC Zantac, only benefitted from the demand for the drug. *Id.* at 15. These intermediaries would likely lack standing to sue under RICO because the fraudulent scheme did not target them, and the indirect purchaser rule cannot apply if no one would have standing to sue. *Id.* 15 n.4. Consequently, the indirect purchaser rule does not bar Plaintiffs' RICO claim. *Id.* at 16.

**B. Law on the Indirect Purchaser Rule**

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977), the Supreme Court interpreted federal antitrust law to contain a statutory standing principle called the indirect purchaser rule. In that case, the Illinois Brick Company manufactured and distributed concrete blocks and sold those blocks to masonry contractors, who sold masonry structures to general contractors, who sold their services for construction projects to the State of Illinois, the ultimate consumer of the blocks. *Id.* at 726. The State sued Illinois Brick, alleging that Illinois Brick had engaged in a conspiracy to fix the price of the blocks, leading to an overcharge that flowed down the distribution chain to the ultimate consumer, the State. *Id.* at 727.

The Supreme Court ruled that the State did not have standing to bring an antitrust action against Illinois Brick because the State had not purchased the blocks directly from Illinois Brick. *Id.* at 737. The Court held that plaintiffs who are two or more steps removed from the antitrust violator in a distribution chain have no statutory standing. *Id. Illinois Brick* "established a

9

bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple*, 139 S. Ct. at 1520 (emphasis in original). "For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator. That is the straightforward rule of *Illinois Brick*." *Id.* at 1521.

The Supreme Court created the indirect purchaser rule to prevent the transformation of "treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Illinois Brick*, 431 U.S. at 740; *see* 15 U.S.C. § 15(a) (providing that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and shall recover threefold the damages by him sustained"). The rationales for barring indirect purchaser suits are: "(1) facilitating more effective enforcement of antitrust laws; (2) avoiding complicated damages calculations; and (3) eliminating duplicative damages against antitrust defendants." *Apple*, 139 S. Ct. at 1521, 1524.

The Supreme Court has emphasized, however, that "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Id.* (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990)). In cases where some or all of these rationales do not apply to the facts of a particular case, the Court has warned against engaging in "an unwarranted and counterproductive exercise to litigate a series of exceptions" to the indirect purchaser rule. *UtiliCorp*, 497 U.S. at 208 (rejecting a proposal to create an exception to *Illinois Brick* where it was relatively simple to trace the pass-on of an alleged overcharge to indirect purchasers and where intermediaries passed on most or all of the overcharge to the ultimate consumer).

In *Holmes v. Securities Investor Protection Corp.*, the Supreme Court noted that it had "repeatedly observed, that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws." 503 U.S. at 267-68; *see* 18 U.S.C. § 1964(c) (providing that "[a]ny person injured in his business or property by reason of a [RICO] violation . . . may sue therefor . . . and shall recover three fold the damages he sustains"). The Court stated that it could "fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used" in federal antitrust legislation. *Holmes*, 503 U.S. at 268. Because Congress "used the same words," in the RICO statute as it used in antitrust law, the Court could "only assume that [Congress] intended them to have the same meaning that courts had already given them." *Id.* (holding that proximate causation is a requirement of RICO claims as it is of antitrust claims).

Turning to whether the indirect purchaser rule applies in the RICO context, the majority of federal courts to address the issue have applied the rule to RICO claims. These courts rely on the language of *Holmes* and include the Third, Sixth, and Seventh Circuits. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *see Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985). In *McCarthy*, the Third Circuit held that "the precepts taught by *Illinois Brick* and *Utilicorp* apply to RICO claims, thereby denying RICO standing to indirect victims." 80 F.3d at 855 ("Indeed, plaintiffs have conceded that, if they lacked antitrust standing, they also lacked RICO standing."). In *Trollinger*, the Sixth Circuit held that "indirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen." 370 F.3d at 616. And in *Carter*, the Seventh Circuit held that, because the indirect purchaser rule promotes the enforcement of antitrust and RICO laws, it "therefore applies to RICO, too." 777 F.2d at 1177. *See also Hu v. BMW of N. Am.,*

11

*LLC*, No. CV184363KMJBC, 2021 WL 346974, at *4 (D.N.J. Feb. 2, 2021); *Gamboa v. Ford Motor Co.*, No. 18-10106, 2020 WL 7047612, at *6 (E.D. Mich. Nov. 30, 2020); *Rickman v. BMW of N. Am.*, No. CV 18-4363(KM) (JBC), 2020 WL 3468250, at *8 (D.N.J. June 25, 2020); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, No. 318CV14999BRMLHG, 2020 WL 2394155, at *8 (D.N.J. Mar. 31, 2020); *Albers v. Mercedes-Benz USA, LLC*, No. CV 16-881(KM)(ESK), 2020 WL 1466359, at *7 (D.N.J. Mar. 25, 2020); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *13 (D.N.J. Mar. 29, 2019); *In re Insulin Pricing Litig.*, No. 3:17-CV-0699-BRM-LHG, 2019 WL 643709, at *8 (D.N.J. Feb. 15, 2019).

Even within Circuits that have not addressed this issue, several federal district courts have held that the indirect purchaser rule applies in the RICO context. These district courts include one within the Southern District of Florida. *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2021 WL 908552, at *12 (S.D. Fla. Mar. 9, 2021) (holding that the indirect purchaser rule applies in the RICO context as well"); *Harris Cnty., Tex. v. Eli Lilly & Co*., No. CV H-19-4994, 2020 WL 5803483, at *12 (S.D. Tex. Sept. 29, 2020) (declining "to follow the minority rule" and holding "that indirect purchasers lack standing under RICO").

Other federal district courts have held that the indirect purchaser rule does not apply to federal RICO claims. These courts have reached this decision within circuits that have yet to provide guidance on the rule's application to federal RICO claims. *See*, *e.g.*, *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1325 (D. Kan. 2018) (declining to apply the indirect purchaser rule to a RICO claim in the absence of supporting Tenth Circuit authority and instead holding that RICO standing requires only a showing of proximate causation); *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-24431-CIV, 2018 WL

1393790, at *19 (S.D. Fla. Jan. 26, 2018) (noting the parties' failure to cite to any Eleventh Circuit authority applying the indirect purchaser rule and holding that the Eleventh Circuit's standard for RICO standing is no more than proximate causation).

## C. Analysis and Conclusion

### 1. The Applicability of the Indirect Purchaser Rule in the RICO Context

The Court must first decide whether the indirect purchaser rule applies in the RICO context. The Court looks to the Supreme Court's decision in *Holmes* which held that, because RICO's civil-suit provision was modeled on federal antitrust law, antitrust standing principles like proximate causation apply equally to RICO claims. 503 U.S. at 267-68. This Court recently concluded, "[i]t logically follows that the limits the Supreme Court has placed on anti-trust standing, namely the [in]direct purchaser rule, would apply in the RICO context as well." *In re Takata*, 2021 WL 908552, at *12.

Plaintiffs, relying on *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498-99 (1985), argue that, despite the Supreme Court's holding in *Holmes*, the indirect purchaser rule does not apply to RICO claims. Specifically, Plaintiffs argue that *Sedima* represents the Supreme Court's unwillingness to interpret RICO statutory standing requirements identically to those under antitrust law. DE 3327 at 13-14. In *Sedima*, the Supreme Court rejected the Second Circuit's conclusion that "just as an antitrust plaintiff must allege an 'antitrust injury,' so a RICO plaintiff must allege a 'racketeering injury.'" *Id.* at 485. The Court held that it did not perceive a distinct "racketeering injury" requirement from the text of the RICO statute. *Id.* However, as the Seventh Circuit explained in *Carter*, "*Sedima* held that the 'antitrust injury' rule of antitrust does not apply to RICO, but this is so because 'RICO injury' would be an unintelligible requirement, not because there is no parallel between the two statutes." *Carter*, 777 F.2d at 1176 (citation omitted).

13

Additionally, the plaintiff in *Sedima* was not an indirect purchaser, and the case "does not at all mention the indirect purchaser rule," nor does it provide any "analysis tending to suggest a preference that such rule not be applied in the RICO context." *In re Insulin Pricing Litig.*, 2019 WL 643709, at *11. Thus, Plaintiffs' reliance on *Sedima* is inapposite.

So too is their reliance on Eleventh Circuit authority. Plaintiffs rely primarily upon *Grogan v. Platt*, 835 F.2d 844, 847-48 (11th Cir. 1988) to demonstrate that the Eleventh Circuit would refrain from applying the indirect purchaser in the RICO context. In *Grogan*, the court did acknowledge "the perils in relying too closely on the analogy of the antitrust laws" to RICO. *Id.* at 847-88. However, the court was faced with the question of whether the plain language of the RICO statute authorizes recovery of a particular category of damages, not whether the indirect purchaser rule applies to RICO. *Id.*

Plaintiffs rely upon *Corcel*, 551 F. App'x at 576, and *Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 906 (11th Cir. 1998), to argue that proximate causation is all that is required in the Eleventh Circuit to establish RICO standing. DE 3327 at 14. However, as in *Grogan*, these cases did not involve indirect purchaser plaintiffs and did not mention the indirect purchaser rule. And while these cases held that a RICO plaintiff must demonstrate that his or her injuries were proximately caused by the RICO violation, proximate causation and the indirect purchaser rule, while related, are "two analytically distinct aspects" of standing. *McCarthy*, 80 F.3d at 851. Because the Supreme Court's message in *Holmes* was clear, the Court is persuaded to join the prevailing view that the indirect purchaser rule applies to RICO claims.

### 2. The Applicability of the Indirect Purchaser Rule to Plaintiffs' RICO Claim

The Court next turns to the question of whether Plaintiffs are indirect purchasers, as contemplated by *Illinois Brick*. The bright-line indirect purchaser rule leaves no question that they are. Plaintiffs do not allege that they purchased OTC Zantac directly from any Defendant. Instead, Plaintiffs conceded at the Hearing that OTC Zantac was sold by Defendants to various distributors, then sold to retailers, and then sold to consumers. *See* Hearing Tr. at 125. Thus, Plaintiffs were not the first, nor even the second, purchasers in the OTC Zantac distribution chain. They were, by definition, indirect purchasers who lack standing to sue Defendants under RICO. *See McCarthy*, 80 F.3d at 848, 855 (explaining that "only the purchaser immediately downstream" has standing to assert RICO claims for payment of "excessive prices").

A case from the District of New Jersey is most analogous to this case. *See Rickman*, 2020 WL 3468250, at *1. In *Rickman*, class plaintiffs asserted that the automaker BMW colluded with several other defendants to market cars as "clean diesel," when they knew that the cars discharged emissions at impermissible levels and concealed the true level of emissions through deceptive technology. *Id.* The plaintiffs alleged that the defendants misled them by making affirmative misrepresentations and by failing to disclose material information and that, but for the defendants' conduct, the plaintiffs either would not have bought the cars or would have paid less for them. *Id.* at *7. The plaintiffs did not allege that they bought cars directly from BMW or the other defendants; rather, the plaintiffs bought them from dealers, from private parties, or at auctions. *Id.* at *9. The court held that the plaintiffs did not have standing to sue under RICO when they did not purchase their cars directly from the defendants. *Id.* ("The Third Circuit and courts in this District have repeatedly held that such indirect purchasers lack standing to assert RICO claims.").

15

Here, Plaintiffs similarly purchased OTC Zantac from various retailers, not directly from Defendants. Thus, Plaintiffs, like the *Rickman* plaintiffs, are barred from suing Defendants.

Plaintiffs argue that they "are not 'indirect purchasers' as understood by *Illinois Brick* because they are the direct victims and targets of Defendants' fraud" and "any intermediaries purely *benefitted* from the increased demand for OTC Zantac." *Id.* at 14-15 (emphasis in original). Plaintiffs further argue that they "suffered the first—and perhaps only—injury by purchasing a drug with a material, undisclosed safety risk." *Id.* at 15. Faced with identical arguments in *Warren General Hospital v. Amgen Inc.*, 643 F.3d 77, 92 (3d Cir. 2011), the Third Circuit noted that *Illinois Brick* and its progeny:

> [D]id not resolve what party was a direct purchaser by calculating exactly where the harm lay. In fact, the [Supreme] Court's discussion in those cases of the policy rationales underpinning the rule manifests the Court's intent to *avoid* linking direct purchaser status to injury calculations in determinations. In *UtiliCorp*, the consumer plaintiffs also argued that the public utility (the direct purchaser) had not been harmed by the antitrust defendant's actions, and that consumers had borne the full brunt of the injuries, thus justifying an exception to the *Illinois Brick* rule. The Court highlighted the need to apply the rule consistently: "[T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the [indirect purchaser] rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same massive evidence and complicated theories into treble-damages proceedings, albeit at a somewhat higher level of generality.

643 F.3d 77, 92 (3d Cir. 2011) (quoting *UtiliCorp*, 497 U.S. at 216-17).

The Court agrees with the Third Circuit's interpretation of *Illinois Brick* and *UtiliCorp*: there are no "direct-harm" or "first victim" exceptions to the indirect purchaser rule. *Id.*; *see also Hu*, 2021 WL 346974, at *4 (holding that there is no direct-harm exception to the indirect purchaser rule). Accordingly, the Plaintiffs' assertion that they are not true indirect purchasers is unpersuasive. The bright-line indirect purchaser rule, as articulated in *Illinois Brick* and reiterated in *UtiliCorp* and *Apple*, is an unsurmountable hurdle for Plaintiffs. As the Supreme Court

16

explained, the rule is simple and straightforward. *See Apple*, 139 S. Ct. at 1521 ("[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.").

Additionally, the Supreme Court has noted that "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case" as it is unwise to "engage in 'an unwarranted and counterproductive exercise to litigate a series of exceptions.'" *Id.* at 1524 (quoting *UtiliCorp*, 497 U.S. at 216-17). Because the rationales underpinning the indirect purchaser rule are not dispositive, the Court need not discuss them here in order to apply the indirect purchaser rule to Plaintiffs' RICO claim.

In sum, the Court's examination of the Supreme Court's rulings in cases such as *Illinois Brick*, *UtiliCorp*, and *Apple*, and of other caselaw applying those rulings, leads it to the conclusion that the indirect purchaser rule applies in the RICO context and in this case. Because Plaintiffs did not purchase OTC Zantac directly from Defendants, Plaintiffs' RICO claim fails for lack of statutory standing.

### VII. Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Brand-Name Manufacturer Defendants' Motion to Dismiss [DE 3115] is **GRANTED**. Count I of the Consolidated Amended Consumer Economic Loss Class Action Complaint [DE 2835] is **DISMISSED WITH PREJUDICE**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of June, 2021.

*/s/ Robin L. Rosenberg*
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record