**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                      MDL NO. 2924
PRODUCTS LIABILITY                                             20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**BRAND-NAME MANUFACTURER DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFFS' INNOVATOR-LIABILITY CLAIMS**

This matter is before the Court upon Brand-Name Manufacturer Defendants'[1]

("Defendants") Rule 12 Motion to Dismiss Plaintiffs' Innovator-Liability Claims ("Motion to

Dismiss"). DE 3109.  The Court held a hearing on the Motion to Dismiss on June 3, 2021 (the

"Hearing").  The Court has carefully considered the Motion to Dismiss, Plaintiffs' Opposition

thereto [DE 3328], Defendants' Reply [DE 3428], the arguments that the parties made during the

Hearing, and the record and is otherwise fully advised in the premises.  For the reasons set forth

below, the Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**

and Plaintiffs' innovator-liability claims are **DISMISSED WITHOUT PREJUDICE**.  The

Court's dismissal is with leave to amend.

---

[1] The Brand-Name Manufacturer Defendants include Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"); Chattem, Inc., Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC (collectively, "Sanofi"); Pfizer Inc. ("Pfizer"); and GlaxoSmithKline LLC ("GSK").

# I. Factual Background[2]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980s, first by prescription and later as an over-the-counter ("OTC") medication.  In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. AMPIC ¶ 240.  GSK first developed and patented Zantac. *Id.* ¶ 239.  Zantac was a blockbuster—the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 240.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233.  Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237.  The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 243.  Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 245. The right to sell OTC Zantac in the United States later passed to BI and then to Sanofi. *Id.* ¶¶ 249–50, 253–55.  When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 260–62.

---

[2] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.") (quotation marks omitted).  Plaintiffs have set forth their factual allegations in three "master" complaints: the Amended Master Personal Injury Complaint ("AMPIC"); the Consolidated Amended Consumer Economic Loss Class Action Complaint ("ELC"); and the Consolidated Medical Monitoring Class Action Complaint ("MMC") (collectively, the "Master Complaints").  DE 2759, 2835, 2832-1.  Unless otherwise noted, all citations will be made to the redacted versions of the Master Complaints.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 348, 359, 365, 367. Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 398–404. The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 275, 279. The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 302.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 322. The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 323. On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 333. The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.* Five months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 338.

## II.  Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products. On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1. Since that time, approximately 1,400 plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the

Southern District of Florida.  In addition, this Court has created a Census Registry where tens of thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed their first Master Complaints on June 22, 2020. DE 887, 888, 889.  In those Master Complaints, Plaintiffs contended that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. DE 887 ¶¶ 1, 6, 19.  They alleged that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4.  The Plaintiffs pursued federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* DE 889.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 36, the Court set a schedule for the filing and briefing of the first round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346.  The various defendants filed motions to dismiss.

Relevant to this Order, Defendants moved to dismiss all claims premised upon the innovator-liability theory[3] asserted against them by generic ranitidine product consumer Plaintiffs in California and Massachusetts courts for lack of specific personal jurisdiction. DE 1584 at 14.[4] Additionally, Defendants moved to dismiss claims premised on the same theory brought in states in which Defendants were subject to general personal jurisdiction because the Due Process Clause constrains those states from applying the law of California or Massachusetts to Plaintiffs' claims. *Id.* at 17.  The Court first concluded that Plaintiffs failed to allege a prima facie case of specific

---

[3] The Court recognizes that Plaintiffs reject Defendants' description of their claims as "innovator-liability" claims because, in Plaintiffs' view, they are merely claims seeking to hold Defendants accountable for the misrepresentations they made about Zantac. DE 3328 at 6.  The Court uses the phrase "innovator-liability" for convenience only.

[4] Unless noted otherwise, all page number references herein are to the page numbers generated by CM/ECF in the header of each document.

personal jurisdiction as to any Defendant in California or Massachusetts. The Court's analysis of the parties' respective arguments was limited because Plaintiffs failed to allege specific, non-conclusory facts demonstrating that any of Defendants' activities took place in any state or territory, including in California or Massachusetts, the only two states that recognize Plaintiffs' theory of liability.  In light of the absence of specific factual allegations, Plaintiffs failed to meet their burden to establish specific jurisdiction because they failed to allege that Plaintiffs' claims arose from or related to Defendants' activities in California and Massachusetts.[5]  Plaintiffs also failed to meet their burden because they failed to allege that Defendants should have foreseen being haled into Massachusetts or California court due to their activities within those forums. The Court also held that Plaintiffs failed to establish that California and Massachusetts have legislative jurisdiction within those states that have general personal jurisdiction over Defendants. DE 2516 at 20-23.  Therefore, the Court granted Defendants' Motion to Dismiss, dismissing without prejudice for lack of personal jurisdiction all claims brought by generic ranitidine product consumer Plaintiffs against Defendants, with the exception of Defendant Patheon Manufacturing Services, LLC ("Patheon"), in California and Massachusetts. *Id.* at 23-24.  The Court granted Plaintiffs leave to amend the MPIC to plead a prima facie case of personal jurisdiction in California and Massachusetts. *Id.*

Following an amendment to Pretrial Order # 36, Plaintiffs filed the AMPIC on February 8, 2021. DE 2759.  After the Court granted a two-week extension of time [DE 2720], Plaintiffs filed the MMC [DE 2832-1] and the ELC [DE 2835] on February 22, 2021.  In Pretrial Order # 61, the

---

[5] The Court noted Plaintiffs' failure to allege that Defendants' activities were the "but-for" cause of Plaintiffs' ingestion of generic ranitidine products and injuries. DE 2516 at 20 (citing *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018) (holding that a tort arises out of or relates to a defendant's activity only if the activity is a but-for cause of the tort)). As discussed below, in light the Supreme Court's recent opinion in *Ford Motor Co.. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1026 (2021), Plaintiffs are no longer required to plead a "strict causal relationship" to support a finding that their claims arise from or relate to Defendants' activities within California and Massachusetts. 141 S. Ct. at 1028.

Court set a schedule for the filing and briefing of the second round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 2968.  The Defendants filed the Motion to Dismiss addressed herein pursuant to that schedule.

### III.  The Amended Master Personal Injury Complaint

Plaintiffs assert Counts XII and XIII against Defendants under the innovator-liability theory. AMPIC ¶¶ 2668-2721.  Count XII is a claim for negligent misrepresentation brought by generic ranitidine product consumers residing in California ("California Plaintiffs"). *Id.* ¶¶ 2668-92.  California Plaintiffs allege that Defendants owe a duty of care to all generic consumers of ranitidine products and that Defendants made false representations regarding the safety of ranitidine products, thereby breaching their duty. *Id.*  Count XIII is a claim for reckless misrepresentation brought by generic ranitidine product consumers residing in Massachusetts ("Massachusetts Plaintiffs"). *Id.* ¶¶ 2693-2721.  Massachusetts Plaintiffs allege that Defendants owe a duty of care to all generic consumers of ranitidine products, that Defendants made false representations regarding the safety of ranitidine products, and that Defendants' conduct demonstrated a "conscious disregard, or indifference to, a significant possibility of causing serious injury" to any consumer of ranitidine products. *Id.* ¶¶ 2718-20.  Additionally, Counts XV-XVII are derivative claims and include: loss of consortium, survival actions, and wrongful death. *Id.* ¶¶ 2939-3267.

It is undisputed that Counts XII and XIII are based on a theory of liability that is currently recognized under only California and Massachusetts law. *See* DE 1585 at 6; DE 1973 at 15.  This theory of liability has been widely referred to as innovator-liability. *See* Allen Rostron, *Prescription for Fairness: A New Approach to Tort Liability of Brand–Name and Generic Drug Manufacturers*, 60 Duke L.J. 1123, 1176 (2011).  Under this theory of liability, the consumers of

a generic product may hold a brand-name manufacturer liable for failing to warn of a defect in the product—a product that the brand-name manufacturer did not itself make, sell, or distribute. *See id.* The theory is based on a principle articulated in Section 311 of the Restatement (Second) of Torts, which provides in relevant part:

> One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results . . . to such third persons as the actor should expect to be put in peril by the action taken.

Restatement (Second) of Torts § 311(1)(b) (Am. Law Inst. 1965).

Here, California and Massachusetts Plaintiffs (collectively "Plaintiffs") have pled that Defendants are liable for their alleged negligent and reckless misrepresentations concerning the safety of ingesting brand-name ranitidine products; according to Plaintiffs, this created the market for generic ranitidine products, foreseeably led to the ingestion of generic ranitidine products, and, in turn, foreseeably led to generic consumers' injuries.

### IV. Summary of the Parties' Arguments and the Court's Rulings

Defendants filed their Motion to Dismiss seeking the dismissal with prejudice of Counts XII and XIII of the AMPIC. DE 3109 at 15. Defendants' Motion to Dismiss has three primary arguments. First, Plaintiffs have again failed to allege a prima facie case of specific personal jurisdiction in California and Massachusetts. *Id.* at 7. Second, Plaintiffs' claims fail even in those states in which Defendants are subject to general personal jurisdiction because the Due Process Clause constrains those states from applying the law of California or Massachusetts to Plaintiffs' claims. *Id.* at 13. Lastly, Plaintiffs' claims against Patheon, the only Defendant named in the AMPIC that may be subject to general jurisdiction in a state that recognizes the innovator-liability theory, fail as a matter of law because Plaintiffs do not allege that Patheon had any responsibility for labeling. *Id.* at 14.

In response, Plaintiffs argue that, in light of the Supreme Court's recent decision in *Ford Motor Co.*, Plaintiffs have pled a prima facie case of specific jurisdiction in California and Massachusetts. DE 3328 at 13.  It follows that those states in which Defendants are subject to general personal jurisdiction may constitutionally apply California and Massachusetts law to Plaintiffs' claims. *Id.* at 21.  Additionally, Plaintiffs' claims against Patheon survive at the motion-to-dismiss stage because Plaintiffs have sufficiently alleged that Patheon, as part of the Sanofi entity, controlled the labeling for branded Zantac and, as a result, for the generic ranitidine product as well. *Id.* at 22.

First, the Court concludes that Plaintiffs failed to allege a prima facie case of specific personal jurisdiction as to any Defendant in California or Massachusetts.  Second, the Court concludes that the issue of legislative jurisdiction is not ripe for ruling at this stage of the litigation. Lastly, the Court concludes that Plaintiffs have stated a claim against Patheon.  Therefore, the Court grants in part and denies in part Defendants' Motion to Dismiss.  Counts XII and XIII are dismissed without prejudice and with leave to amend to plead a prima facie case of personal jurisdiction in California and Massachusetts.

## V.  Standards of Review

### A.  Rule 12(b)(2)

A court may grant a motion to dismiss a pleading for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).  At the pleading stage, the burden is on the plaintiff to establish a prima facie case of personal jurisdiction over the nonresident defendant. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (holding that the plaintiffs failed to meet their burden and dismissing the case for lack of personal jurisdiction).  A prima facie case of personal jurisdiction is established if a plaintiff presents sufficient facts, entitled to the assumption of truth and viewed

in the light most favorable to the plaintiff, to withstand a motion for directed verdict. *Id.* Non-specific statements providing "labels and conclusions" or "a formulaic recitation of the elements of [jurisdiction]" are not accepted as true and are insufficient to establish a prima facie case of jurisdiction. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see, e.g.*, *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (holding that the plaintiff's "vague and conclusory allegations" presented in his complaint were insufficient to establish a prima facie case of personal jurisdiction over a defendant); *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1148-49 (S.D. Fla. 2019) (concluding that plaintiffs failed to establish a prima facie case of personal jurisdiction over foreign defendants where the "generalized allegations [were] devoid of specificity, and thereby fail[ed] to establish that the Foreign Defendants 'purposefully availed' themselves of the privileges of conducting activity" in the states at issue).

**B.  Rule 12(b)(6)**

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The pleading must contain more than labels, conclusions, a formulaic recitation of the elements of a cause of action, and naked assertions devoid of further factual enhancement. *Id.*  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017). But the court need not accept as true allegations upon information and belief that lack sufficient facts to make the allegations plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551, 557); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true."). The court also need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019). "Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).

### VI.  Analysis of the Defendants' Motion to Dismiss

The Motion raises several separate legal issues: specific personal jurisdiction, legislative jurisdiction, and a pleading challenge as to Patheon. For each issue, the Court reviews the parties' arguments, the relevant allegations, and the relevant law before providing its analysis and conclusion.

### A.  Personal Jurisdiction

### 1.  Arguments and Allegations

Plaintiffs' AMPIC contains allegations of Defendants' sales and marketing activities in California and Massachusetts. AMPIC ¶ 232. Plaintiffs allege that these activities confer specific personal jurisdiction for all claims arising out of those activities, including Counts XII and XIII. *Id.* ¶ 231. Specifically, Plaintiffs allege that Defendants "targeted the California and

Massachusetts markets" by: (i) employing large forces of salespersons to educate physicians about the Zantac label and to promote prescriptions of the drug; (ii) conducting research and studying market share and consumer purchasing of brand-name and generic ranitidine products; (iii) contracting with social media outreach firms to increase targeted advertising and marketing efforts; (iv) conducting medical studies and scientific seminars and/or attempting to influence the medical profession; (v) advertising via television, radio, and newspaper to promote the sale of Zantac; and (vi) contracting with retailers and wholesalers to expand their Zantac business. *Id.* ¶ 232(a)-(f). For each of these general activities, Plaintiffs provide examples of how and when one or more of Defendants undertook such activities. *Id.*

Plaintiffs' allegations in support of Count XII, a claim for negligent misrepresentation under California law, and Count XIII, a claim for reckless misrepresentation under Massachusetts law, are largely identical. Plaintiffs allege that because of the generic manufacturers' ongoing duty of "sameness" under federal law, it was certain that the misrepresentations and omissions on Defendants' warning labels for brand-name ranitidine products would be copied onto the generic ranitidine product label. *Id.* ¶¶ 2675, 2700. Plaintiffs also allege that Defendants knew that their brand-name product labels are intended to influence physicians' decisions to prescribe a drug, and consumers' decisions to purchase and consume a drug (in either brand or generic form). *Id.* ¶¶ 2676, 2701. Plaintiffs allege that under California law, brand-name manufacturers owe a duty to use reasonable care to all those who consume the brand-name drug or its generic equivalent to draft and maintain an accurate warning label. *Id.* ¶¶ 2682-83. Under Massachusetts law, brand-name manufacturers owe a duty to generic drug consumers not to act in reckless disregard of an unreasonable risk of death or grave bodily injury. *Id.* ¶ 2707. Plaintiffs allege that because Defendants negligently and recklessly failed to create and maintain a label that accurately

described the risks associated with brand-name ranitidine products, Defendants breached their duty of care to Plaintiffs under California and Massachusetts law. *Id.* ¶ 2687, 2712, 2719.

Further, Plaintiffs allege that Defendants negligently and recklessly misrepresented the safety and efficacy of ranitidine products "to Plaintiffs via the media, advertising, website, social media, packaging, and promotions" and intended for Plaintiffs and/or their physicians to rely upon those misrepresentations. *Id.* ¶¶ 2684-88, 2709, 2718.  Plaintiffs allege that but for those misrepresentations, Plaintiffs would not have been prescribed, purchased, or consumed generic ranitidine products and would not have been injured. *Id.* ¶ 2690-91.

Despite these new allegations, Defendants argue that Plaintiffs have again failed to establish a prima facie case of specific personal jurisdiction in California and Massachusetts for two primary reasons. DE 3109 at 7.  First, while Defendants served the market for Zantac in California and Massachusetts and thus have purposefully availed themselves of the privilege of conducting activities within those states relating to their own products, Defendants never served the market for generic ranitidine products. DE 3428 at 4.  Therefore, a court exercising specific jurisdiction over Defendants for claims concerning products made and sold by a third-party would violate the longstanding principle that specific jurisdiction must be based on a defendant's own contacts with the forum and not on the "unilateral activity of a thirty party." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  Further, exercising specific jurisdiction would violate the "foreseeability and fundamental fairness principles" of specific jurisdiction because Defendants' activities with regard to their own products did not give them "fair warning" of exposure to claims stemming from the ingestion of generic ranitidine products. *Id.* at 3.

Second, Defendants argue that California and Massachusetts have specific personal jurisdiction over Plaintiffs' claims only if Defendants' contacts with those states "relate to"

Plaintiffs' claims. *Id.* at 5.[6]  Plaintiffs' argument that Counts XII and XIII arise out of or relate to Defendants' alleged misrepresentations regarding their own products has no basis in California or Massachusetts law. *Id.* at 6.  Rather, the culpable conduct by a brand-name manufacturer under the laws of those states is the failure to update the brand-name product's warning label, not any misrepresentations the brand-name manufacturer made regarding its own products in the forum state. *Id.* at 7–8 (citing *Rafferty v. Merck & Co., Inc.*, 92 N.E.3d 1205, 1209 (Mass. 2018) and *T.H. v. Novartis Pharmaceuticals Corp.*, 407 P.3d 18, 22, 34 (Cal. 2017)).  Thus, because Plaintiffs' claims stem exclusively from Defendants' alleged failure to update Zantac's label, and because Plaintiffs fail to allege that Defendants undertook any labeling decisions within California or Massachusetts, Plaintiffs' claims do not relate to any of Defendants' contacts with California and Massachusetts. *Id.* at 8–9.

In response, Plaintiffs argue that, particularly, in light of the Supreme Court's ruling in *Ford Motor Co.*, they have sufficiently pled a prima facie case of specific jurisdiction over Defendants in California and Massachusetts. DE 3328 at 13.  First, there is no doubt that Defendants purposefully availed themselves in California and Massachusetts because, in all of the ways alleged in the AMPIC, Defendants exercised the privilege of conducting activities within California and Massachusetts, enjoying the benefits and protection of those states' laws. *Id.*; *see* AMPIC ¶ 232.  Whether or not Defendants could have "foreseen being sued in the relevant forum states for *the specific claims* that Plaintiffs brought" is not the relevant inquiry; when a defendant

---

[6] Defendants filed their Motion to Dismiss on March 24, 2021, one day before the Supreme Court issued its opinion on specific jurisdiction in *Ford Motor Co.*, 141 S. Ct. 1017. Defendants argued in their Motion to Dismiss that Plaintiffs' failed to plead that Defendants' activities were a but-for cause of Plaintiffs' ingestion of generic ranitidine products. DE 3109 at 5. At the time Defendants filed their Motion to Dismiss, but-for causation was the required showing for specific jurisdiction under Eleventh Circuit caselaw. *See Waite*, 901 F.3d at 1314. However, in their Reply, Defendants acknowledge that, post-*Ford Motor Co.*, Plaintiffs are no longer required to allege but-for causation; rather, Plaintiffs must allege that Defendants' forum contacts "relate to" Plaintiffs' claims. DE 3428 at 1. Therefore, the Court omits discussion of Defendants' arguments regarding but-for causation.

has continuously and deliberately exploited a state's market, it must reasonably anticipate being haled into that state's courts to defend actions there. DE 3328 at 18.  The only remaining question is whether Plaintiffs' claims "relate to" Defendants' contacts with the forum states, and there is no question that they do. *Id.* at 13.  Plaintiffs seek to hold Defendants accountable for the "misrepresentations they made about Zantac—misrepresentations that failed to inform doctors and patients that ranitidine contains NDMA and causes cancer—" "via the media, advertising, website, social media, packaging, and promotions." *Id.* at 14.  Defendants made these misrepresentations in California and Massachusetts, and thus, at the very least, Plaintiffs' claims "relate to" Defendants' contacts with those states, which is all that is required under *Ford Motor Co*. *Id.* at 12, 17.

### 2. Law on Personal Jurisdiction

There are two types of personal jurisdiction: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Absent exceptional circumstances, general jurisdiction over a corporation exists only in its place of incorporation and principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 138-39 & n.19 (2014).

Under the Due Process Clause, the exercise of specific jurisdiction or "case-linked" jurisdiction over a non-resident defendant is appropriate when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v.*

*Meyer*, 311 U.S. 457, 463 (1940)).  To determine whether the exercise of specific jurisdiction affords due process, courts in this Circuit apply a three-part test, considering: (i) "whether the plaintiffs have established that their claims 'arise out of or relate to' at least one of the defendant's contacts with the forum;" (ii) "whether the plaintiffs have demonstrated that the defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state;" and (iii) if the plaintiffs meet their burden regarding the first two prongs, "whether the defendant has 'ma[de] a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Waite*, 901 F.3d at 1313 (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).[7]

As for the first prong, known as the "relatedness" prong, the Eleventh Circuit has said that "a tort 'arise[s] out of or relate[s] to' the defendant's activity in a state only if the activity is a 'but-for' cause of the tort." *Id.* at 1314 (quoting *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1223 (11th Cir. 2009)).  The Supreme Court recently clarified in *Ford Motor Co.*, however, that a "strict causal relationship between the defendant's in-state activity and the litigation" is not necessary to meet the "relate to" part of the standard, which "contemplates that some relationships will support jurisdiction without a causal showing." *See Ford Motor Co.*, 141 S. Ct. at 1026.  Thus, the Eleventh Circuit's "but-for" causation standard was rejected as a required showing. *See id.* at 1033 (Alito, J., concurring) ("Ford, however, asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff's injury. The Court properly rejects that argument . . . ."); *see also Israel v. Alfa Laval Inc. et al.*, No. 8:20-CV-2133-WFJ-AAS, 2021 WL 1662770, at \*4 (M.D. Fla. Apr. 28, 2021)

---

[7] The Court looks to Eleventh Circuit law here because, when applying federal law, "the [MDL] court should apply the law of the circuit in which it is located." *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (citing *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987)).

(noting that *Ford Motor Co.* rejected the Eleventh Circuit's but-for cause approach); *Clarke v. Dutton Harris & Co., PLLC & Bob W. Dutton*, No. 220CV00160JADBNW, 2021 WL 1225881, at *4 (D. Nev. Mar. 31, 2021) (holding that *Ford Motor Co.* rejected the Ninth Circuit's but-for cause approach); *Lewis v. Mercedes-Benz USA*, LLC, No. 19-CIV-81220-RAR, 2021 WL 1216897, at *35 (S.D. Fla. March 30, 2021) (same); *James Lee Constr., Inc. v. Gov't Emps. Ins. Co.*, No. CV 20-68-M-DWM, 2021 WL 1139876, at *2 (D. Mont. Mar. 25, 2021) (same).

In *Ford Motor Co.*, two plaintiffs sued Ford in Montana and Minnesota for injuries sustained in car accidents in each of those states allegedly as a result of two defective Ford vehicles. 141 S. Ct. at 1023. Although Ford conceded that it conducted "substantial business" in both states, including advertising, selling, and servicing the models of the cars at issue, Ford argued that neither state could assert specific jurisdiction over the company because the company's conduct in the states did not give rise to the plaintiff's claims. *Id.* at 1026. According to Ford, specific jurisdiction only existed in the states where Ford "designed, manufactured, or—most likely—sold in the State the particular vehicle involved in the accident." *Id.* at 1023. Neither of the specific Ford cars at issue were designed, manufactured, or sold within the forum states; rather, they were brought to those states through resales and relocations. *Id.* Thus, in Ford's view, neither forum state had specific jurisdiction over Ford because of the absence of a causal connection between the plaintiffs' claims and Ford's contacts in those states. *Id.* at 1026.

The Supreme Court rejected Ford's arguments, ultimately holding that the "connection" between the plaintiffs' claims and Ford's activities in the forum states was "close enough to support specific jurisdiction" because the defendant had "systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege[d] malfunctioned and injured them in those States." *Id.* at 1026, 1032. In support of its ruling, the Supreme Court also

noted that the plaintiffs were residents of the forum States, used the allegedly defective products in the forum states, and suffered injuries in the forum states when those products malfunctioned. *Id.* at 1031. Those facts made the forum states "the most natural" states for plaintiffs to bring suit. *Id.* The Supreme Court concluded that the requisite "strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction" existed, such that Montana and Minnesota could properly assert specific jurisdiction over Ford. *Id.* at 1028; *cf. Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1776, 1781 (2017) (holding that, when there is the absence of such a relationship or connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State").

The Supreme Court emphasized that, although a causal relationship is not required, "[t]hat does not mean anything goes." *Ford Motor Co.*, 141 S. Ct. at 1026. "[T]he phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id*; *cf. World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) ("Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." (citation omitted)). Further guidance on what exact "limits" the phrase "relate to" incorporates was not provided, leaving lower courts to determine how and when to limit the phrase in the interests of Due Process. *See Ford Motor Co.*, 141 S. Ct. at 1034 (Alito, J., concurring) ("But without any indication what those limits might be, I doubt that the lower courts will find that observation [that the phrase "relate to" "incorporates real limits"] terribly helpful."); *see also id.* at 1035 (Gorsuch, J., concurring) ("The majority promises that its new test 'does not

mean anything goes,' but that hardly tells us what does."); *cf. Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]s many a curbstone philosopher has observed, everything is related to everything else.").

The second prong of the three-part test requires that there be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum. . . thus invoking the benefits and protections of its laws." *Oldfield*, 558 F.3d at 1220 (quotations omitted).  In return for these "benefits and protections a defendant must—as a quid pro quo— submit to the burdens of litigation in that forum." *Oldfield*, 558 F.3d at 1221 n.30 (citations omitted). The contacts with the forum must be such that the defendant "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  In other words, "litigation in the forum" must be "reasonably foreseeable." *Oldfield*, 558 F.3d 1223 (citations omitted).  This requirement ensures "that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." *Burger King Corp.*, 471 U.S. at 475 (citations and quotations omitted).  For example, in *Ford Motor Co.*, Ford conceded "purposeful availment" of the two forum states' markets because, "[b]y every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail," Ford urged forum residents to buy its vehicles, including the vehicles at issue, Ford cars were available for sale throughout the forums, and Ford fostered ongoing connections to its cars' owners via maintenance and repair services. 141 S. Ct. at 1028.

Upon satisfaction of the first two prongs, a court then evaluates whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1358.  In undertaking this analysis, courts consider the following

factors: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Id.* (quotations omitted). "[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Burger King*, 471 U.S. at 477-78.

### 3. Law on Innovator-Liability

As it is Plaintiffs' burden to establish that Defendants' contacts in the forum states "arise out of or relate to" Plaintiffs' claims brought under the innovator-liability theory, an understanding of this theory of liability is useful. A discussion of the evolution of the innovator-liability theory under California and Massachusetts law follows.

#### a. Innovator-Liability under California Law

In 2008, a California Court of Appeals became the first court in the nation to adopt the innovator-liability theory. *Conte v. Wyeth, Inc.*, 160 Cal. App. 4th 89 (2008). In *Conte*, a plaintiff who had consumed a generic drug product sued a brand-name drug manufacturer for, *inter alia*, negligent misrepresentation. *Id.* at 95. The plaintiff claimed that the brand-name manufacturer knew or should have known of a widespread tendency among physicians to prescribe both the brand-name and generic versions of the drug at issue for longer than the approved use because the drug's labeling substantially understated the risks of side-effects from extended use. *Id.* The plaintiff's claim presented the court with an issue of first impression: does a brand-name manufacturer of a prescription drug owe a duty of care to patients who take a generic version of the drug pursuant to a prescription written in reliance on the brand-name manufacturer's product information? *Id.* at 101.

The court, in its opinion, highlighted the generic manufacturer's duty to certify that its product is a bioequivalent of the brand-name drug and that the labeling and warnings of the generic drug are identical to those of the brand-name drug. *Id.* at 98.  In conducting a duty analysis, the court looked primarily to the foreseeability of physical harm, as required under California law. *See id.* at 104.  The court noted that, in California, pharmacists are authorized by law to fill brand-name drug prescriptions with generic equivalents unless forbidden by the prescribing physician, making it highly likely that a prescription for a drug written in reliance on a product's label will be filled with a generic equivalent. *Id.* at 105.  And because by law generic and brand-name drugs are bioequivalents, it is "eminently foreseeable" that a physician might prescribe a generic product in reliance upon a brand-name manufacturer's representations about its product. *Id.*  Thus, the court held that there was no question that the brand-name manufacturer could foresee injurious reliance on its "product information" (i.e. the product's label) by a generic drug consumer. *Id.*

Next, the court looked to the various factors California courts must consider when determining whether a duty of care exists, including, in relevant part:

> [T]he closeness of the connection between the defendant's conduct and the plaintiff's injury; the moral blame attached to the defendant's conduct; the policy goal of preventing future harm; the burden to the defendant and consequences to the community of imposing a duty of care; and broader consequences including the availability, cost, and prevalence of insurance for the risk involved.

*Id.* (citing *Randi W. v. Muroc Joint Unified School Dist.*, 14 Cal. 4th 1066, 1077 (1997)).  The court held that, if it could be established that (i) the plaintiff's physician relied upon the brand-name manufacturer's product label warnings when prescribing the generic drug and (ii) the plaintiff's long-term use of the generic drug led to her injuries, a close link between the brand-name manufacturer's non-disclosure of the brand-name drug's long-term effects and the plaintiff's condition would be apparent. *Id.* at 106.  In addition, the court held that, if the brand-name

20

manufacturer misrepresented the risks of taking its drug, the manufacturer was equally morally culpable for that misrepresentation whether the individual harmed by his or her reliance on it ingested the generic or brand-name version of the drug. *Id.* The court was also unpersuaded by the assertion that imposing liability would undermine the goal of preventing harm or subject the brand-name manufacturer to uncontrolled liability. *Id.* at 106-07. Further, the court noted that the record was too limited to inform a debate about the burdens, societal consequences, cost, and insurance implications of imposing liability. *Id.* at 107. Therefore, the court concluded that a brand-name manufacturer's "duty of care in disseminating product information" extends to patients injured by generic products as a result of prescriptions written in reliance on a brand-name manufacturer's "product information" for its brand-name product. *Id.*

In 2017, the California Supreme Court became the first state high court to adopt the innovator-liability theory. *T.H.*, 407 P.3d at 47-48. In *T.H.*, the plaintiffs sued a brand-name manufacturer for negligence and negligent misrepresentation to recover for injuries allegedly sustained in-vitro through their mother's consumption of a generic product, prescribed to her to suppress premature labor. *Id.* at 22. The plaintiffs alleged that the brand-name manufacturer knew or should have known that the drug posed a serious risk to fetal brain development, and further alleged that "the drug's label unreasonably failed to include a warning about this risk." *Id.* Prior to determining the viability of the plaintiffs' claims, which the court referred to as "warning label liability" claims, the court provided an in-depth overview of federal drug labeling regulations and the respective drug labeling duties of brand-name and generic drug manufacturers—for a brand-name manufacturer, the duty is to ensure the accuracy of its label as long as the drug is on the market, and for a generic manufacturer, the duty is to ensure that its label is the same as the brand-name manufacturer's. *Id.* at 23. The court then explained that, "in the context of prescription

drugs, a brand-name manufacturer's duty under California law is to warn physicians about the risks known or reasonably known to the manufacturer." *Id.* at 28 (citations omitted). If the warning to the prescribing physician is adequate, the brand-name manufacturer is not required to communicate a warning directly to the patient who uses the drug. *Id.*

With this background, the court described its task as: "to determine whether a brand-name manufacturer owes a duty of ordinary care to those who may be injured by deficiencies in its warning label." *Id.* The court began, as the *Conte* court did, with the "most important" consideration under California law: the foreseeability of physical harm. *Id.* at 29. The court noted that, because a generic manufacturer has a duty to ensure that its product's label matches that of the brand-name drug, a brand-name manufacturer "knows to a legal certainty" that "any deficiencies in the label for its drug will be perpetuated in the label for its generic bioequivalent." *Id.* Accordingly, the court held that it is:

> [F]oreseeable that the warnings included (or not included) on the brand-name drug label would influence the dispensing of the generic drug, either because the generic is substituted by the pharmacist or the insurance company after the physician has prescribed the brand-name drug, or because the warning label on the generic drug is legally required to be identical to the label on the brand name drug.

*Id.* at 30.

Turning next to the relevant public policy factors, the court concluded that there was a close connection between the brand-name manufacturer's allegedly negligent conduct with respect to its label and the plaintiffs' injuries. *Id.* at 30. The court reasoned that because the brand-name manufacturer is the only entity with the ability to strengthen the warning label, imposing a duty of care on behalf of all those who consume the brand-name product or its bioequivalent provides the proper incentive to the brand-name manufacturer to prevent harm. *Id.* at 32. The court held that placing the burden on brand-name drug manufacturers to satisfy a duty of care to those who are

prescribed the generic version of drugs is "zero" because the manufacturers already have a duty to warn of potential risks on their products' labels. *Id.* The court, in responding to the brand-name manufacturer defendant's assertion that expanding its duty would make brand-name drug manufacturers the insurers for the entire market, explained that "[u]nder warning label liability, the brand-name drug manufacturer is liable *only* in a narrow circumstance—when deficiencies in its *own* label foreseeably and proximately caused injury." *Id.* at 32-33 (emphasis in original). Finally, the court found that the brand-name manufacturer is the party best positioned to bear the costs of harm suffered by innocent plaintiffs, that the brand-name manufacturer's moral blame is great when it fails to warn about the unsafe effects of its drug, and that there is no reason why a brand-name manufacturer would not be able to insure against the risk for "warning label liability." *Id.* at 34-35. The court reached the conclusion that "brand-name drug manufacturers have a duty to use ordinary care in warning about the safety risks of their drugs, regardless of whether the injured party (in reliance on the brand-name manufacturer's warnings) was dispensed the brand-name or generic version of the drug." *Id.* at 47.

### b. Innovator-Liability Under Massachusetts Law

In the year following *T.H.*, the Massachusetts Supreme Judicial Court also adopted the innovator-liability theory, albeit in a narrower fashion. *Rafferty*, 92 N.E.3d at 1209. In *Rafferty*, the plaintiff sued a brand-name manufacturer for negligent failure to warn for injuries sustained through consumption of the generic version of a drug. *Id.* at 1212. The plaintiff alleged that the brand-name manufacturer knew or should have known of a dangerous side effect of its drug and failed to include a warning about the side effect on its label, thus breaching its duty to the plaintiff because, under federal law, the brand-name manufacturer controlled the label on the generic version of the drug that the plaintiff ingested. *Id.* at 1211-12. Like the California courts, the court

in *Rafferty* began its analysis by reviewing the federal drug regulatory scheme and the duties that scheme imposes upon brand-name and generic drug manufacturers. *Id.* at 1209-11. The court recognized that the "general principle" of Massachusetts negligence law is that "a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Id.* at 1213-14. In the context of the federal regulatory scheme, the court reasoned that, "[w]here a brand-name manufacturer provides an inadequate warning for its own product, it knows or should know that it puts at risk not only the users of its own product, but also the users of the generic product." *Id.* at 1215. Consequently, the court held the requirements of general negligence under Massachusetts law were satisfied. *Id.* However, the court noted that, even where such requirements are satisfied, public policy considerations may make the imposition of a duty "inadvisable or unworkable." *Id.* (citation omitted). The court determined that, while brand-name manufacturers are in the best position to prevent an injury arising from an inadequately labeled generic drug because of their labeling duties, they are not in the best position to bear its costs. *Id.* at 1217. This is so because the additional costs would inevitably affect their financial incentives to invest in drug research and development. *Id.* Thus, the court concluded "as a matter of public policy that allowing a generic drug consumer to bring a general negligence claim for failure to warn against a brand-name manufacturer poses too great a risk of chilling drug innovation." *Id.* at 1219. But the court also recognized that "public policy is not served if generic drug consumers have no remedy for the failure of a brand-name manufacturer to warn in cases where such failure exceeds ordinary negligence, and rises to the level of recklessness." *Id.* Seeking to strike a balance between these competing public policy concerns, the court held that "a brand-name manufacturer that controls the contents of the label on a generic drug owes a duty to consumers of that generic drug not to act

in reckless disregard of an unreasonable risk of death or grave bodily injury." *Id.* Under that standard, "a brand-name manufacturer that intentionally fails to update the label on its drug to warn of an unreasonable risk of death or grave bodily injury, where the manufacturer knows of this risk or knows of facts that would disclose this risk to any reasonable person, will be held responsible for the resulting harm." *Id.* at 1220. Thus, the court directed the lower court to grant leave to the plaintiff to amend his complaint if he believed he could state facts sufficient to support a claim of recklessness against the defendant. *Id.* at 1222.

### 5. Analysis and Conclusion

Plaintiffs do not argue that California or Massachusetts has general jurisdiction over Defendants.[8] The Court therefore addresses the question of specific jurisdiction and concludes that Plaintiffs have failed to establish a prima facie case of specific jurisdiction because Plaintiffs have not met their burden to show that their claims arise out of or relate to Defendants' activities in California or Massachusetts. *See* AMPIC ¶¶ 232, 2684.

The negligent and reckless misrepresentation claims against Defendants are based on an innovator-liability theory that has been adopted in two states: California and Massachusetts. The Court previously held that claims based on an innovator-liability theory would be rejected by the highest courts of thirty-five other jurisdictions. *See* DE 2516 at 14-15, Appendix A. The innovator-liability theory adds a layer of uniqueness and complexity to the traditional specific personal jurisdiction analysis because it seeks to hold brand-name product manufacturers liable for injuries caused by products that they did not manufacture, distribute, or sell. Under this theory, the nexus between the brand-name product manufacturer's conduct and the generic product consumer's claims is more tenuous than had the claims been based on consumption of the brand-name

---

[8] That is with one exception, Patheon, which the Court addresses below.

manufactures' products. *See Henry v. Angelini Pharma, Inc.*, No. 217CV02593TLNKJN, 2020 WL 1532174, at *4 (E.D. Cal. Mar. 31, 2020) (describing the innovator-liability legal theory as "attenuated").   The link is established because of the federal regulations that require a generic product's label to match the label of the brand-name product, which arises from the brand manufacturer's labeling decisions.

In the AMPIC, Plaintiffs allege the ways in which each Defendant targeted the California and Massachusetts markets to "spur consumption" of their own brand-name ranitidine products. *See* AMPIC ¶¶ 231-32.  Plaintiffs allege that Defendants specifically targeted the markets in those states through the employment of large salesforces; by conducting research and studying consumer purchasing of brand-name ranitidine products and generic ranitidine products; by contracting with social media outreach firms to target advertising and marketing; by conducting medical studies, scientific seminars, and/or attempting to influence the medical profession; by regularly and systematically advertising in those states for the purpose of growing interest in sales of ranitidine products; and by contracting with retailers and wholesalers to expand the Zantac business. *Id.* ¶ 232.   Additionally, Plaintiffs describe the various misrepresentations regarding the safety and effectiveness of brand-name ranitidine products that Defendants' allegedly made in California and Massachusetts "via the media, advertising, website, social media, packaging, and promotions." *Id.* ¶¶ 2684, 2709.

Such allegations are sufficient to support a finding that Defendants purposefully availed themselves "of the privilege of conducting activities" within California and Massachusetts and thus should reasonably anticipate being haled into court in those forums. *Oldfield*, 558 F.3d at 1220. There is ample Supreme Court precedent to illustrate this conclusion. For example, in *Bristol-Myers*, there was "no dispute" that the defendant, a pharmaceutical company, purposefully

availed itself of California because it employed hundreds of people in the state, maintained research and development facilities in the state, entered into contracts with a California-based distributor, and marketed and sold its drugs throughout the state. 137 S. Ct. at 1786 (Sotomayor, J., dissenting).  And, in *Ford Motor Co.*, it was a "[s]mall wonder" that the defendant conceded purposeful availment of the forum states' markets because "[b]y every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urge[d] [residents of the forum states] to buy its vehicles," which were available for purchase at defendants' dealerships across the forum states. 141 S. Ct. at 1028.

Here, Defendants' alleged activities are no less pervasive in the forum states. *See* AMPIC ¶ 232.  Yet, Defendants only concede that they have purposefully availed themselves of the laws of the forum states and thus have the obligation to defend litigation there stemming from brand-name ranitidine products, not generic ranitidine products. *See* DE 3428 at 4.  Defendants posit that finding purposeful availment based on products that Defendants had no control over and did not benefit from would violate the Supreme Court's holding that purposeful availment must be based on "contacts that the defendant *himself* creates with the forum States," and not the "unilateral activity of another party." *Id.* (quoting *Walden*, 571 U.S. at 284).  Defendants further argue that Plaintiffs' innovator-liability claims were not "reasonably foreseeable." *Id.* at 3–4 (quoting *Oldfield*, 558 F.3d at 1223).

The Court is unpersuaded by Defendants' arguments.  First, as alleged, Defendants themselves had numerous contacts with the forum states. *See* AMPIC ¶ 232.  Defendants concede as much by acknowledging that they "served the market for Zantac in California and Massachusetts, enjoying the protection of those states' laws, and thus have the obligation to defend Zantac's safety in the courts of those states." *See* DE 3428 at 4.  Second, whether or not Plaintiffs'

specific claims were reasonably foreseeable is irrelevant.  As of a result of their contacts in the forum states, "litigation" in the forum states was made "reasonably foreseeable." *Oldfield*, 558 F.3d at 1221, 1223.   Defendants do not cite to any caselaw to support the proposition that a defendant must have foreseen the specific claims brought by a plaintiff.   The Court concludes that Plaintiffs have satisfied the purposeful availment prong of the specific personal jurisdiction analysis.

However, Plaintiffs have not sufficiently alleged that Defendants' contacts "relate to" Plaintiffs' claims for purposes of establishing specific personal jurisdiction over Defendants for the sale of a generic manufacturer's products.  That is, the specific allegations about Defendants' sales and marketing activities in California and Massachusetts [AMPIC ¶ 232] do not relate to the core conduct that constitutes the rationale for holding brand-name manufacturers liable for claims brought by consumers of generic bioequivalent products based on the theory of innovator-liability, as articulated by the courts in *T.H.* and *Rafferty*: a brand-name manufacturer's labeling decisions regarding its own product.

The courts in *Conte*, *T.H.*, and *Rafferty* went into great detail to explain why they extended a brand-name manufacturer's duty to warn to the consumers of generic bioequivalent products. *See Conte*, 168 Cal. App. 4th at 107; *T.H.*, 407 P.3d at 28; *Rafferty*, 92 N.E.3d at 1215.   In extending the duty, the courts reasoned that a brand-name manufacturer has a duty to maintain and update the label of its brand-name product; the warning label of a generic product must be identical to the warning label of the brand-name product; and a generic product manufacturer cannot independently revise its warning labels.  The federal regulation, the courts noted, makes it "certain" that the warning label provided by the brand-name manufacturer will be identical to the warning label provided by the generic manufacturer and that brand-name product consumers, generic

28

product consumers, physicians, and pharmacists will rely on the label. *Rafferty*, 92 N.E. 3d at 1215-16; *see Conte*, 168 Cal. App. 4th at 107; *T.H.*, 407 P.3d at 29-30.  In *Conte*, although the plaintiff brought a claim for negligent misrepresentation, like the Plaintiffs here, the brand-name manufacturer defendant's culpable conduct giving rise to a claim by generic consumers under California law was its failure to disseminate accurate brand-name product label information, not any alleged misrepresentations made regarding the safety of its product outside of the label. 168 Cal. App. 4th at 107.  Similarly, in *T.H.*, where the plaintiffs brought negligence and negligent misrepresentation claims, the brand-name manufacturer defendant's culpable conduct under California law was only its "failure to update and maintain the warning label" of its product. 407 P.3d at 34.  Likewise, in *Rafferty*, the brand-name manufacturer defendant's culpable conduct giving rise to a claim by generic consumers under Massachusetts law was only its "intentional[] fail[ure] to update the label on its drug." 92 N.E.3d at 1220.[9]

From this body of caselaw, the Court concludes that the Defendants' only conduct that gives rise to Plaintiffs' claims is Defendants' alleged failure to update the warning label for brand-name ranitidine products, not the alleged misrepresentations about the safety and efficacy of Zantac that Defendants made in the course of sales and marketing activities.  Such misrepresentations made in the course of sales and marketing, as contrasted with those activities related to a brand-name manufacturer's labeling decisions regarding its own product, are not necessary to state a misrepresentation claim premised on the innovator-liability theory; thus, these alleged misrepresentations do not give rise to "jurisdictionally relevant" contacts between the brand-name manufacturers and the forum (California and Massachusetts). *Walden*, 571 U.S. at 289.  This conclusion is consistent with the rationale for the courts' decisions in *Conte*, *T.H.*, and

---

[9] In fact, as Defendants note in their Reply, the *Rafferty* opinion does not once use the word "misrepresentation."

*Rafferty* to allow claims premised upon the innovator-liability theory to proceed. *See Conte*, 168 Cal. App. 4th at 105-107; *T.H.*, 407 P.3d 40-47; *Rafferty*, 92 N.E.3d at 1213-22.  A brand-name manufacturer's activities, such as sales and marketing, not related to labeling decisions are unnecessary to state and support such a claim because the purpose of innovator-liability is to hold a brand-name manufacturer liable for injuries caused by products manufactured and sold by the generic manufacturers without any regard to the Defendants' forum contacts.  Following from this premise, if the Court were to nonetheless find specific personal jurisdiction because of Defendants' forum-based marketing and sales contacts relating to their *own products*, conduct that the Court has concluded is not "jurisdictionally relevant" to the claim, the phrase "relate to" would have no "real limits."  But such limits are contemplated in *Ford Motor Co.*, in which the Supreme Court noted that "the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." 141 S. Ct. at 1026.  The nature of an innovator-liability claim, therefore, compels the Court to establish those "real limits," for purposes of specific personal jurisdiction, as only those activities that relate to the brand-name manufacturers' labeling decisions regarding their own product.  It follows that Defendants' other activities do not relate to the claim and as such, allegations relating to those activities do not support specific personal jurisdiction of the brand-name manufacturers in California and Massachusetts.

In light of the Court's conclusion above, in order to find that the AMPIC alleges specific personal jurisdiction, the Court would have to read into *T.H.* and *Rafferty* an expanded duty on the part of a brand-name manufacturer, beyond its duty to update the warning label, to include any and all product representations.  The Court declines to do so because Plaintiffs failed to cite, either in their briefing or at the Hearing [Hearing Tr. at 72], any California or Massachusetts caselaw that supports holding a brand-name manufacturer liable for conduct unrelated to its labeling decisions

in the context of an innovator-liability claim.  As the Court noted previously, "considerations of comity and federalism counsel that [the federal court] proceed gingerly when venturing into uncharted waters of state substantive law." *Guarino v. Wyeth, LLC,* 719 F.3d 1245, 1251 (11th Cir. 2013).  Due to the absence of supporting caselaw, the Court will not "invent a novel basis" for an innovator-liability claim here. *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1289 (11th Cir. 2015) (declining "to invent a novel basis for unjust enrichment under Florida law" because the Florida Supreme Court had not yet ruled on whether such law existed and because of "the complete lack of supporting Florida caselaw").

Finally, turning to the one forum-based contact that *does* clearly relate to an innovator-liability claim—labeling decisions—Plaintiffs conceded at the Hearing that they do not allege that Defendants made labeling decisions related to brand-name ranitidine products in California or Massachusetts. *See* Hearing Tr. at 80.  As such, Plaintiffs' claims, as alleged, do not "arise out of or relate to" Defendants' alleged activities within those forums.

Although Plaintiffs met their burden for the purposeful availment prong, because Plaintiffs have not met their burden for the relatedness prong, the Court need not address whether a court's exercise of jurisdiction over Defendants in those forums would violate traditional notions of fair play and substantial justice. *See Waite,* 901 F.3d at 1313 n.2 (holding that the plaintiffs failed to satisfy the relatedness prong and that it was unnecessary for the court to address the remaining prongs of the three-part test).  Counts XII and XIII of the AMPIC are dismissed with leave to amend.  Plaintiffs are granted leave to amend Counts XII and XIII, as well the jurisdictional allegations specific to those counts [AMPIC ¶¶ 228-232], for the purpose of alleging, if they are able to do so, that Defendants' labeling decisions regarding brand-name ranitidine products occurred in California or Massachusetts.

### B. Legislative Jurisdiction

#### 1. Arguments

Defendants next argue that, because there are insufficient contacts between Defendants and California or Massachusetts to support specific jurisdiction in those states for Plaintiff's innovator-liability claims, it follows that there are insufficient contacts to support the extraterritorial application of California or Massachusetts law in any forum. DE 3109 at 13.  Plaintiffs, in response, agree that "legislative and personal jurisdiction rise and fall together." DE 3328 at 20. However, Plaintiffs argue that, because California and Massachusetts courts could properly exercise personal jurisdiction over Defendants with respect to Counts XII and XIII, courts in other states could constitutionally choose to apply those states' laws. *Id.* at 21.

#### 2. Law on Legislative Jurisdiction

Legislative jurisdiction is a type of jurisdiction "relevant to determining the extraterritorial reach of a statute." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting) (explaining that legislative jurisdiction refers to "the authority of a state to make its laws applicable to persons or activities" beyond its borders).  "A state's legislative jurisdiction is circumscribed by the Due Process Clause: 'There must be at least some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction.'" *Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas Cty.*, 221 F.3d 1211, 1216 (11th Cir. 2000) (quoting *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 314 n.2 (1970) (Harlan, J., dissenting)).  To determine whether a state has legislative jurisdiction, courts "look to choice-of-law and personal jurisdiction analyses." *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1235 (11th Cir. 2001).  Those analyses assist courts in assessing whether "sufficient contacts" exist between the defendant, the subject

matter, and the state such that "it would not be fundamentally unfair to subject" the defendant to the state's regulations. *Id.*

### 3.   Analysis and Conclusion

Although there is agreement between the parties that the outcome of the legislative jurisdiction analysis is tied to the Court's ruling on whether specific jurisdiction exists in California or Massachusetts, a legislative jurisdiction determination necessarily requires an analysis of a particular state's choice-of-law principles in the context of a specific plaintiff's case. *Id.*   The parties' disagreement centers on their differing views of a hypothetical—a hypothetical state applying California or Massachusetts law to Plaintiffs' claims.   The Court declines to reach a conclusion as to legislative jurisdiction based upon a hypothetical; the Court cannot rule on legislative jurisdiction without first conducting a concrete choice-of-law analysis.   And, since a concrete choice-of-law analysis requires consideration of a specific plaintiff's facts, the Court cannot conduct a choice-of-law analysis based on the facts alleged in the AMPIC.   Therefore, the Court denies without prejudice Defendants' Motion as it relates to Defendants' request for a ruling on legislative jurisdiction, consistent with its prior ruling that if the parties sought adjudication on the subject of  legislative jurisdiction, they must first "argue the appropriate choice-of-law factors and must apply those factors to the facts of this case." DE 2516 at 23.   Defendants may renew their request at the appropriate time in the context of an individual case and choice-of-law analysis. *See* Pretrial Order # 61 (explaining that some state-specific issues will be resolved at a later stage of this litigation, such as at the bellwether trial stage).

## C.  Patheon Manufacturing Services

### 1.  Arguments and Allegations

Plaintiffs define the term "Sanofi" to include Patheon. *See* AMPIC ¶ 39 ("Defendants Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. are subsidiaries of Defendant Sanofi SA. Defendants Patheon Manufacturing Services LLC and Boehringer Ingelheim Promeco, S.A. de C.V. packaged and manufactured the finished Zantac product for Sanofi. Collectively, these entities shall be referred to as 'Sanofi.'").  Later in the AMPIC, Plaintiffs allege that "Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a global recall and ceased marketing, selling, and distributing OTC Zantac.  In addition, Sanofi has marketed, sold, and distributed ranitidine globally since 1983." *Id.* ¶ 254.

Defendants argue that, while Patheon is the only Defendant named in the AMPIC that is arguably subject to general jurisdiction in Massachusetts based on the citizenship of its sole member Thermo Fisher Scientific, Inc., the claims against Patheon nevertheless must be dismissed for failure to state a claim. DE 3109 at 14.[10]  This is so because the "sole premise" of Plaintiffs' claims against Defendants is "the requirement that generic companies copy the brand-name label, so that the brand-name company is effectively responsible for the contents of the generic label." *Id.* (quoting *Rafferty*, 92 N.E.3d at 1219).  Plaintiffs allege that Patheon simply "manufactured the finished drug product" for Sanofi. *Id.*  Their use of "Sanofi" as an umbrella term in the complaint does not constitute an allegation that Patheon and Sanofi are "legally one and the same." DE 3428 at 10.  If fairly read, the AMPIC merely alleges that Patheon is an "independent manufacturer with

---

[10] Defendants do not concede that Patheon is subject to general jurisdiction because they argue that it is disputable whether Thermo Fisher Scientific, Inc.'s Massachusetts citizenship confers general jurisdiction over Patheon in Massachusetts. DE 3108 at 14 n.5. Because that issue has not been briefed, the Court takes no position on the matter.

no control over the label for branded Zantac;" thus, Patheon is an inappropriate Defendant, and Count XIII against Patheon fails as a matter of law. *Id.*

Plaintiffs in turn argue that a determination that Count XIII fails against Patheon as a matter of law would be inappropriate at the motion-to-dismiss stage because Defendants are "simply disputing the truth of the allegations in the complaint." DE 3328 at 21.  In the AMPIC, the term "Sanofi" is defined to include Patheon, and Plaintiffs allege that "Sanofi" "controlled the label for branded Zantac—and thus for generic ranitidine as well." *Id.* at 21-22; *see* AMPIC ¶¶ 39, 254. Therefore, as alleged, Plaintiffs have stated a claim against Patheon. DE 3328 at 22.

**2.  Analysis and Conclusion**

A fair reading of Plaintiffs' factual allegations supports Plaintiffs' argument. *See Allen*, 790 F.3d at 1278.  As alleged, Patheon, included in the definition of "Sanofi," controlled the label for brand-name and generic ranitidine products. *See* AMPIC ¶¶ 39, 254.  The Court must view those allegations in the light most favorable to Plaintiffs and accept them at true at this stage in the litigation. *Jones*, 857 F.3d at 850.  Thus, dismissal under Rule 12(b)(6) is improper. *See Allen*, 790 F.3d at 1278.  Plaintiffs have stated a claim against Patheon.

### VII. Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Brand-Name Manufacturer Defendants' Motion to Dismiss [DE 3109] is **GRANTED IN PART AND DENIED IN PART**.

1.  Count XII of the AMPIC brought against Defendants in California courts fails for lack of personal jurisdiction and is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** consistent with this Order.

2. Count XIII of the AMPIC brought against Defendants, with the exception of Patheon Manufacturing Services, LLC, in Massachusetts courts fails for lack of personal jurisdiction and is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** consistent with this Order.

3. Count XIII of the AMPIC may proceed against Defendant Patheon Manufacturing Services, LLC.

4. Leave to amend is granted as to the AMPIC.  The Court will further address the Plaintiffs' leave to amend and describe the process for that amendment in a future order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of June, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record