UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                    MDL NO. 2924
PRODUCTS LIABILITY                            20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

ORDER GRANTING IN PART AND DENYING
IN PART THE DEFENDANTS' OMNIBUS MOTION TO
DISMISS AND/OR STRIKE CONSOLIDATED MEDICAL
MONITORING CLASS ACTION COMPLAINT AND CONSOLIDATED
AMENDED CONSUMER ECONOMIC LOSS CLASS ACTION COMPLAINT

This matter is before the Court on the Defendants' Omnibus Motion to Dismiss and/or

Strike Consolidated Medical Monitoring Class Action Complaint and Consolidated Amended

Consumer Class Action Complaint [DE 3116] (the "Motion").  The Court held a hearing on the

Motion to Dismiss on June 3, 2021 (the "Hearing").  The Court has carefully considered the

Motion, the Response [DE 3429], the Reply [DE 3508], the arguments that the parties made during

the Hearing, and the record, and is otherwise fully advised in the premises.  For the reasons set

forth below, the Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN**

**PART**, and the Plaintiffs' claims are **DISMISSED IN PART** as more fully set forth in this Order.

The Court's dismissal is with leave to amend.

# I.    Factual Background[1]

This case concerns the pharmaceutical product Zantac and its generic forms, which are widely sold as heartburn and gastric treatments.  The molecule in question—ranitidine—is the active ingredient in both Zantac and its generic forms.

Zantac has been sold since the early 1980s, first by prescription and later as an over-the-counter ("OTC") medication.  In 1983, the U.S. Food and Drug Administration ("FDA") approved the sale of prescription Zantac. AMPIC ¶ 240.  GlaxoSmithKline ("GSK") first developed and patented Zantac. *Id.* ¶ 239.  Zantac was a blockbuster—the first prescription drug in history to reach $1 billion in sales. *Id.* ¶ 240.

GSK entered into a joint venture with Warner-Lambert in 1993 to develop an OTC form of Zantac. *Id.* ¶ 233.  Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac. *Id.* ¶¶ 233, 237.  The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States. *Id.* ¶ 243.  Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States. *Id.* ¶ 245. The right to sell OTC Zantac in the United States later passed to Boehringer Ingelheim Pharmaceuticals and then to Sanofi. *Id.* ¶¶ 249–50, 253–55.  When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers began to produce generic ranitidine products in prescription and OTC forms. *Id.* ¶¶ 260–62.

---

[1] A court must accept a plaintiff's factual allegations as true at the motion–to–dismiss stage. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.") (quotation marks omitted).  Plaintiffs have set forth their factual allegations in three "master" complaints: the Amended Master Personal Injury Complaint ("AMPIC"); the Consolidated Amended Consumer Economic Loss Class Action Complaint ("ELC"); and the Consolidated Medical Monitoring Class Action Complaint ("MMC") (collectively, the "Master Complaints").  DE 2759, 2835, 2832-1.  Unless otherwise noted, all citations will be made to the redacted versions of the Master Complaints.

Scientific studies have demonstrated that ranitidine can transform into a cancer-causing molecule called N-nitrosodimethylamine ("NDMA"), which is part of a carcinogenic group of compounds called N-nitrosamines. *Id.* ¶¶ 348, 359, 365, 367.   Studies have shown that these compounds increase the risk of cancer in humans and animals. *Id.* ¶¶ 398–404.   The FDA, the Environmental Protection Agency, and the International Agency for Research on Cancer consider NDMA to be a probable human carcinogen. *Id.* ¶¶ 275, 279.   The FDA has set the acceptable daily intake level for NDMA at 96 nanograms. *Id.* ¶¶ 302.

Valisure LLC and ValisureRX LLC, a pharmacy and testing laboratory, filed a Citizen Petition on September 9, 2019, calling for the recall of all ranitidine products due to high levels of NDMA in the products. *Id.* ¶ 322.   The FDA issued a statement on September 13 warning that some ranitidine products may contain NDMA. *Id.* ¶ 323.   On November 1, the FDA announced that testing had revealed the presence of NDMA in ranitidine products. *Id.* ¶ 333.   The FDA recommended that drug manufacturers recall ranitidine products with NDMA levels above the acceptable daily intake level. *Id.*   Five months later, on April 1, 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. *Id.* ¶ 338.

## II.   Procedural Background

After the discovery that ranitidine products may contain NDMA, plaintiffs across the country began initiating lawsuits related to their purchase and/or use of the products.   On February 6, 2020, the United States Judicial Panel on Multidistrict Litigation created this multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407 for all pretrial purposes and ordered federal lawsuits for personal injury and economic damages from the purchase and/or use of ranitidine products to be transferred to the undersigned. DE 1.   Since that time, approximately 1,400 plaintiffs have filed lawsuits in, or had their lawsuits transferred to, the United States District Court for the

Southern District of Florida.  In addition, this Court has created a Census Registry where tens of thousands of claimants who have not filed lawsuits have registered their claims. *See* DE 547.

Plaintiffs filed their first Master Complaints on June 22, 2020. DE 887, 888, 889.  In those Master Complaints, Plaintiffs contended that the ranitidine molecule is unstable, breaks down into NDMA, and has caused thousands of consumers of ranitidine products to develop various forms of cancer. DE 887 ¶¶ 1, 6, 19.  They alleged that "a single pill of ranitidine can contain quantities of NDMA that are hundreds of times higher" than the FDA's allowable limit. *Id.* ¶ 4.  The Plaintiffs pursued federal claims and state claims under the laws of all 50 U.S. states, Puerto Rico, and the District of Columbia. *See generally* DE 889.

The Court has entered numerous Pretrial Orders to assist in the management of this MDL. In Pretrial Order # 36, the Court set a schedule for the filing and briefing of the first round of motions to dismiss under Rule 12 directed to the Master Complaints. DE 1346.  The various defendants filed motions to dismiss.

On December 31, 2020, the Court granted the Defendants' Motions to Dismiss and dismissed the Master Complaints without prejudice and with leave to amend. DE 2515.  The Court also struck all allegations of physical injury and medical monitoring from the Consolidated Consumer Class Action Complaint, while permitting the plaintiffs to seek leave of Court for an alternative pleading to allege their class physical injury and/or medical monitoring claims.

Following an amendment to Pretrial Order # 36, Plaintiffs filed the AMPIC on February 8, 2021. DE 2759.  After the Court granted a two-week extension of time [DE 2720], Plaintiffs filed the MMC [DE 2832-1] and the ELC [DE 2835] on February 22, 2021.  In Pretrial Order # 61, the Court set a schedule for the filing and briefing of the second round of motions to dismiss under

Rule 12 directed to the Master Complaints. DE 2968.  The Defendants filed the Motion to Dismiss addressed herein pursuant to that schedule.

### III.   The Master Complaints

### A.  The Consolidated Medical Monitoring Class Action Complaint

Fifty-two named Plaintiffs bring the MMC on behalf of themselves and the various classes established in the MMC. MMC ¶¶ 93-144.  The Plaintiffs purchased and used ranitidine products in fourteen jurisdictions.[2]  Each Plaintiff alleges that he or she purchased and used ranitidine products during an approximate timeframe.

There are five categories of classes: (1) Brand Manufacturer Prescription Medical Monitoring Classes; (2) Brand Manufacturer OTC Medical Monitoring Classes; (3) Generic Prescription Medical Monitoring Classes; (4) Store-Brand Medical Monitoring Classes; and (5) Store-Brand Manufacturer Medical Monitoring Classes.  Within each category, there are state- and Defendant-specific classes.  For example, within the third category (Generic Prescription Medical Monitoring Classes), several named Plaintiffs bring claims against Defendant Amneal on behalf of themselves and eleven state-specific "Amneal Prescription Medical Monitoring Classes." *Id.* ¶ 998.  Within the fourth category (Store-Brand Medical Monitoring Classes), five named Plaintiffs bring claims against Defendant CVS on behalf of themselves and four state-specific "CVS Medical Monitoring Classes." *Id.* ¶ 1004.  The various classes are comprised of individuals who purchased and used one of the Defendants' ranitidine products while residing in a particular state, and who have not been diagnosed with a Subject Cancer.[3]

---

[2] Arizona, California, Colorado, District of Columbia, Florida, Indiana, Maryland, Missouri, Montana, Nevada, Ohio, Pennsylvania, Utah, and West Virginia.

[3] Plaintiffs define "Subject Cancers" as "[t]hose cancers includ[ing] serious and potentially fatal bladder, breast, colorectal/intestinal, esophageal, gastric, kidney, liver, lung, pancreatic, and prostate cancers." MMC at 3.

The Defendants named in the MMC are "entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold Zantac or generic Ranitidine-Containing Products." *Id.* ¶ 6.   The Plaintiffs categorized the Defendants into three groups: (1) Brand Manufacturer Defendants (Prescription and OTC); (2) Generic Prescription Manufacturer Defendants and/or Store-Brand Manufacturer Defendants; and (3) Store-Brand Defendants.   The MMC alleges 638 counts against the various Defendants.[4]   Each count falls within one of five general causes of action: (1) Failure to Warn through Warnings and Precautions; (2) Failure to Warn through Proper Expiration Dates; (3) Failure to Warn Consumers through the FDA; (4) Negligent Product Containers; and (5) Negligent Storage and Transportation.

**B.  The Consolidated Amended Consumer Economic Loss Class Action Complaint**

One hundred and eighty named Plaintiffs bring the ELC on behalf of themselves and all others similarly situated.   Each Plaintiff asserts that he or she purchased and/or used a ranitidine product during an approximate timeframe.

The Plaintiffs bring the action in their individual capacities and on behalf of numerous classes pursuant to Rule 23.   The Plaintiffs bring state class actions under various state laws stemming from the Defendants' sale of prescription-strength ranitidine for approximately forty states.[5]   Additionally, the Plaintiffs bring state class actions under approximately forty-three states' laws for the Defendants' sale of OTC ranitidine.

The Defendants named in the ELC are entities that "designed, manufactured, marketed, distributed, labeled, packaged, handled, stored and/or sold Zantac or generic Ranitidine-Containing Products." ELC ¶ 1.   The Defendants are categorized into three groups: (1) Brand Manufacturer Defendants (Prescription and OTC); (2) Generic Prescription Manufacturer and/or

---

[4] While the MMC lists 640 total counts, there is no Count 222 or Count 223.
[5] The Plaintiffs have brought a varying number of state-law counts against each Defendant.

Store-Brand Manufacturer Defendants; and (3) Store-Brand Defendants.  The ELC alleges 1,675 counts against the Defendants.  The Plaintiffs bring claims for violation of various state consumer protection statutes, common-law unjust enrichment, common-law breach of quasi-contract, and breach of implied warranty.

<h3 style="text-align:center">IV.    Summary of the Parties' Arguments and the Court's Rulings</h3>

**A.  The Consolidated Medical Monitoring Class Action Complaint**

The Defendants move to dismiss and/or strike the MMC.  They contend that Indiana and Montana do not recognize medical monitoring claims, and additionally, that the Plaintiffs fail to plausibly plead several required elements for medical monitoring that are common across jurisdictions.  The Defendants also contend that the Plaintiffs fail to plead their claims of negligence and strict liability.  Finally, the Defendants argue that the MMC violates the Eleventh Circuit's rule against claim splitting.

The Plaintiffs respond that medical monitoring is an available remedy in Indiana and a cause of action in Montana.  Additionally, the Plaintiffs cite allegations in the MMC that, in their view, plausibly demonstrate each medical monitoring element that the Defendants challenge.  The Plaintiffs also cite allegations in the MMC to demonstrate that they plausibly plead their negligence and strict liability claims.  Lastly, the Plaintiffs respond that the MMC does not constitute claim splitting, since the Plaintiffs complied with the Court's order (and the Defendants' request) that they allege their class physical injury and/or medical monitoring claims in an alternative pleading.

The Court concludes that the Indiana Supreme Court would recognize medical monitoring as an available remedy, but that the Montana Supreme Court would not recognize medical monitoring as a cause of action.  Separately, the Plaintiffs have failed to plausibly plead required

elements for medical monitoring.  The Plaintiffs have plausibly pled some of their negligence and strict liability claims, but the Court need not address every claim, as certain claims are dismissed with prejudice on grounds of pre-emption through other orders.  Finally, the Defendants' claim splitting argument is premature.  Given the foregoing, the Court dismisses Plaintiffs' Montana medical monitoring claims (Counts 134-137) with prejudice, and dismisses all remaining Counts in the MMC without prejudice and with leave to amend consistent with this Order.

**B.  The Consolidated Amended Consumer Economic Loss Class Action Complaint**

The Defendants argue that the ELC remains a shotgun pleading, and that the Plaintiffs still lack Article III standing because they have not alleged an injury-in-fact.  Additionally, the Plaintiffs' claims related to prescription ranitidine should be dismissed under the learned intermediary doctrine.  Furthermore, many of the ELC's state-law claims are barred pursuant to state consumer protection safe harbors, or relatedly, because the Defendants' FDA-approved labels were presumptively valid.  Finally, the Plaintiffs fail to state claims for unjust enrichment.

The Plaintiffs respond that the ELC is not a shotgun pleading because the Plaintiffs addressed the shotgun deficiencies that the Court identified in the prior version of the ELC.  The Plaintiffs also have Article III standing because they suffered economic injury-in-fact.  The Court should not dismiss the Plaintiffs' prescription-based claims pursuant to the learned intermediary doctrine, in part because it is premature to determine the doctrine's applicability.  Further, the Defendants' safe-harbor and FDA labeling arguments lack specificity and are inapplicable because the Plaintiffs allege that the Defendants' product labels violated both state and federal law.  Finally, the Plaintiffs have stated a claim for unjust enrichment, since they allege that they conferred a benefit on the Defendants due to misrepresentations.

The Court concludes that the ELC is not a shotgun pleading, and the Plaintiffs have Article III standing because they allege that they suffered economic injury.  The Plaintiffs' prescription-based claims lack allegations that are relevant to the learned intermediary doctrine.  The Defendants' arguments related to state safe harbors, FDA labeling, and unjust enrichment are inadequately briefed for the Court to reach a conclusion at this juncture.  Given the foregoing, the Court dismisses the Plaintiffs' prescription-based claims (Counts 2-71 and 409-1062) without prejudice and with leave to amend consistent with this Order.

## V.    Standard of Review

### A.  Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

### B.  Rule 12(b)(6)

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion to dismiss should be granted only when the pleading fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The pleading must contain more than labels, conclusions, a formulaic recitation of the elements of a cause of action, and naked assertions devoid of further factual enhancement. *Id.*

The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

A court ruling on a motion to dismiss accepts the well-pled factual allegations as true and views the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017). But the court need not accept as true allegations upon information and belief that lack sufficient facts to make the allegations plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551, 557); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true."). The court also need not accept legal conclusions couched as factual allegations. *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019). "Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).

## VI.     Analysis of the Defendants' Motion to Dismiss

The Motion raises several separate legal issues. For each issue, the Court reviews the parties' arguments, the relevant allegations, and the relevant law before providing its analysis and conclusion.

### A. Issues Raised in the MMC

#### 1. Medical Monitoring Claims in Montana and Indiana

##### a. Arguments and Allegations

The Defendants argue that the Plaintiffs' Indiana medical monitoring claims should be dismissed.  Indiana state and federal courts have held that medical monitoring is not a cognizable claim. DE 3116 at 20 (citing *Hunt v. Am. Wood Preservers Inst.*, No. IP 02-0389-C-M/S, 2002 WL 34447541, at *1 (S.D. Ind. July 31, 2002), and *Johnson v. Abbott Labs.*, Nos. 06C01-0203-PL-89, 06C01-0206-CT-243, 2004 WL 3245947, at *6 (Ind. Cir. Ct. Dec. 31, 2004)).  Although an Indiana federal court recognized medical monitoring damages in *Allgood v. General Motors Corp.*, No. 102CV1077DFHTAB, 2005 WL 2218371 (S.D. Ind. Sept. 12, 2005), it did so only for nuisance claims, which are not alleged in this case. DE 3116 at 20.  Nuisance claims are fundamentally different than the negligence and strict liability claims alleged in the MMC. DE 3508 at 10.

The Defendants also argue that the Plaintiffs' Montana medical monitoring claims should be dismissed.  Only one Montana trial court case, *Lamping v. American Home Products., Inc.*, No. DV-97-85786, 2000 Mont. Dist. LEXIS 2580 (Mont. Dist. Feb. 21, 2000), has recognized medical monitoring. DE 3116 at 20.  *Lamping* is more than twenty years old, is unpublished, has not been acknowledged by other Montana courts, and only recognized medical monitoring on that case's specific facts. *Id.*  The Eleventh Circuit has said that state trial court opinions are not authoritative for purposes of an *Erie* analysis, and that is particularly true here, where no Montana case post-*Lamping* has acknowledged medical monitoring as a cause of action under Montana law. DE 3508 at 11 (citing *Mesa Air Grp., Inc. v. Delta Air Lines, Inc.*, 573 F.3d 1124, 1131 n.8 (11th Cir. 2009)).

The Plaintiffs first argue that Indiana recognizes medical monitoring damages. DE 3429 at 29.  In *Gray v. Westinghouse Electric. Corp.*, 624 N.E.2d 49 (Ind. Ct. App. 1993), the Indiana Court of Appeals recognized that a plaintiff could obtain medical monitoring despite the absence of a present physical injury. DE 3429 at 29.  This Court is bound by *Gray* given that there is no persuasive evidence suggesting that the Indiana Supreme Court would decline to follow *Gray*. *Id.* That the plaintiffs in *Gray* alleged nuisance, rather than negligence, is of no consequence, as courts in other jurisdictions have recognized medical monitoring damages for both torts, or have acknowledged that medical monitoring is compensable under "traditional tort theories of recovery." *Id.* at 29-30 (citing *Meyer ex rel. Coplin v. Flour Corp.*, 220 S.W.3d 712, 714 (Mo. 2007), *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 77 (Md. 2013), and *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 823 (Cal. 1993)).  *Gray* is also consistent with Indiana caselaw permitting plaintiffs to recover for all harms proximately caused by a defendant's tortious conduct, including future medical expenses. *Id.* at 30.  The Defendants' reliance on *Hunt* and *Johnson* does not command a different result. *Id.*  *Hunt* is a two-paragraph opinion that contains no analysis or caselaw, and merely concludes that medical monitoring claims are not cognizable in Indiana. *Id.* The Plaintiffs, however, seek medical monitoring as a remedy. *Id.*  *Johnson* is an unreported trial court opinion that is also void of analysis. *Id.*

The Plaintiffs also argue that Montana recognizes medical monitoring as a cause of action. *Lamping* is well reasoned, has never been rejected through another Montana case, and has been recognized by other courts as reflecting Montana's medical monitoring law. *Id.* at 31.  The case warrants even greater weight because Montana does not have an intermediate appellate court. *Id.* Moreover, *Lamping* is like the instant case, for it involved drugs that caused a high risk of serious heart valve disease. *Id.*  Similarly, the Plaintiffs here allege that because of their exposure to

dangerous levels of NDMA, they have a significantly increased risk of developing serious and potentially fatal cancers. *Id.*

### b.  Law on *Erie* Prediction

A federal court sitting in diversity must apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Where the highest state court has spoken on a topic, the federal court must follow its rule. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).  Where the highest state court has not spoken on the topic, the federal court must follow the decisions of intermediate appellate courts unless persuasive evidence demonstrates that the highest court would conclude otherwise. *Id.*  If there is no explicit state law on an issue, "a federal court attempting to forecast state law must consider whatever might lend it insight, including 'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) (quoting *McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657, 663 (3d Cir. 1980)).  "It is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).

### c.  Analysis and Conclusion

The Plaintiffs seek medical monitoring damages for their Indiana negligence claims. DE 3429 at 30.  They allege medical monitoring as an independent cause of action in Montana. *Id.* at 31.  The highest courts in Indiana and Montana have not addressed whether medical monitoring is a form of damages or an independent cause of action, respectively.  The Court must therefore make *Erie* predictions for those jurisdictions.

Indiana: At least one Indiana appellate court and one federal district court have recognized medical monitoring as a form of damages. In *Gray*, property owners near a dump alleged nuisance claims against a company that worked with independent contractors to dispose of toxic chemicals, including polychlorinated biphenyls ("PCB"). 624 N.E.2d at 52. The property owners alleged that the defendant-company knew the chemicals were poisonous, and that damage to the owners' properties was likely. The owners sought compensation for property damage and medical monitoring. After the trial court dismissed their claims on a motion to dismiss, the owners appealed. Indiana's Court of Appeals reversed and remanded in part, concluding that under Indiana's nuisance statute, the plaintiff needed to plead only a "situation [that] is injurious to health . . . so as to interfere with comfortable enjoyment of life or property." *Id.* at 54. The court held that one plaintiff did so:

> Taken as true, Griffin's allegations that his property is unmarketable and his health is at risk due to PCB contamination are sufficient to sustain a nuisance claim. We think it is reasonable to believe that a substantial financial loss, combined with whatever health risks and consternation Griffin may have suffered due to the possible contamination of his property with a carcinogen, would cause physical discomfort. Griffin's proof of these allegations will determine whether a nuisance in fact exists and the damages to which he is entitled.

*Id.*

By reversing the dismissal of the owners' claim for medical monitoring damages, the Court of Appeals implicitly recognized the availability of such damages in Indiana. The Southern District of Indiana acknowledged that point in *Allgood*, stating: "If medical monitoring were not an available remedy under these circumstances . . . the *Gray* court could have affirmed the trial court to the extent it had dismissed that request for relief." 2005 WL 2218371, at *7. The court in *Allgood* also clarified that "[t]he *Gray* court did not treat medical monitoring as a cause of action, but simply as one form of relief that could be available under the traditional common law tort of

14

nuisance." *Id.*  Based on its review of *Gray*, the *Allgood* court predicted that Indiana courts would recognize a claim for medical monitoring damages for nuisance claims.  The court, however, declined to articulate the precise elements necessary to obtain medical monitoring damages.

This Court predicts that the Indiana Supreme Court would recognize medical monitoring as a form of damages for negligence claims.  Since *Gray* is an Indiana appellate court decision, the Court must follow its recognition of medical monitoring damages absent persuasive evidence that the Indiana Supreme Court would conclude otherwise.  The Defendants have not presented such evidence.

While the Defendants argue that *Gray* and *Allgood* only recognize medical monitoring damages for nuisance claims, the Court does not construe those cases so narrowly.  In *Allgood*, the court stated that that "[i]f plaintiffs are able to prove the elements *of a recognized tort such as nuisance*, then the court will need to craft jury instructions to provide more specific guidance as to available remedies." *Id.* (emphasis added).  *Allgood* thus contemplated medical monitoring damages for torts beyond just nuisance, and negligence certainly qualifies as a recognized tort. This reading is consistent with other jurisdictions which have acknowledged that medical monitoring relief can be sought for both nuisance and negligence claims or that medical monitoring is a compensable item of damage under traditional tort theories of recovery. *See, e.g.*, *Meyer*, 220 S.W.3d at 714 (recognizing medical monitoring as a form of relief where the plaintiff alleged negligence and nuisance, among other claims); *see also Potter*, 863 P.2d at 823 (medical monitoring is a "compensable item of damage when liability is established under traditional tort theories of recovery").

*Hunt* and *Johnson* do not persuade the Court.  Unlike *Gray*, neither is an Indiana appellate court decision.  Moreover, whereas *Gray* and *Allgood* contain detailed analyses of the plaintiffs'

medical monitoring claims, *Hunt* and *Johnson* do not.  In *Hunt*, the Southern District of Indiana granted a motion to dismiss the plaintiffs' medical monitoring claim and stated, without explanation or citations, that "such a claim is not cognizable in the State of Indiana." 2002 WL 34447541, at *1.  In *Johnson*, the Indiana Circuit Court denied plaintiffs' motion for class certification, in part because the plaintiffs' request for a medical monitoring class did not satisfy the predominance requirement for class certification. 2004 WL 3245947, at *6.  The court merely cited *Hunt* and stated that "Indiana does not recognize medical monitoring as a cause of action." *Id.*  The lack of analysis in these cases is inadequate to overcome the Indiana Court of Appeals' decision in *Gray*.  This is especially true of *Johnson*, which addresses whether Indiana recognizes medical monitoring as a cause of action, rather than whether medical monitoring is an available remedy.

    Montana: The Defendants correctly note that the Court lacks guidance from the Montana Supreme Court regarding medical monitoring, and that only one state trial court opinion—*Lamping*—has recognized a medical monitoring claim.[6]  In *Lamping*, the plaintiffs alleged a cause of action for medical monitoring due to taking prescription appetite-suppression drugs—commonly referred to as "fen/phen" drugs—manufactured and sold by the defendant. 2000 Mont. Dist. LEXIS 2580, at *1-2.  Following FDA approval, the drugs were voluntarily withdrawn from the market after reports linked the drugs to heart valve abnormalities.  The plaintiffs acknowledged that the Montana Supreme Court had not recognized medical monitoring absent proof of present injury, but urged the trial court to do so.  The *Lamping* court concluded that Montana recognized medical monitoring as an independent cause of action, on that case's specific facts. *Id.* at *14.

---

[6] Montana does not have an intermediate appellate court.

It is not this Court's role to expand state tort law absent the propriety of doing so. *Douglas Asphalt*, 657 F.3d at 1154; *see Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1251 (11th Cir. 2013) ("[C]onsiderations of comity and federalism counsel that [federal courts] proceed gingerly when venturing into unchartered waters of state substantive law."). Notwithstanding the Plaintiffs' reliance on *Lamping*, the Court does not believe that the opinion supports expanding Montana law in the manner that the Plaintiffs suggest; to conclude otherwise would run counter to Eleventh Circuit guidance. *See Mesa Air Grp.,* 573 F.3d at 1131 n.8 (11th Cir. 2009) ("On no interpretation of *Erie* of which we are aware may a decision by a state trial court be credited as determining the law of the state."). The Defendants' reasoning is more persuasive, including that the Court lacks any relevant guidance from the Montana Supreme Court, and that no Montana trial court has cited *Lamping* since it was issued more than twenty years ago.

Given the foregoing, Defendants' Motion is denied as to the Plaintiffs' Indiana medical monitoring claims but granted as to the Plaintiffs' Montana medical monitoring claims, which are dismissed with prejudice.

**2. Plausibility as to Medical Monitoring Claims**

**a. Arguments and Allegations**

The Defendants argue that the Plaintiffs fail to plausibly allege facts supporting several elements of medical monitoring claims that are common across multiple jurisdictions. DE 3116 at 21.

First, the Plaintiffs fail to allege any exposure to a hazardous substance, since no Plaintiff plausibly alleges that the ranitidine he or she took actually contained NDMA. *Id.* at 21-23. The Plaintiffs instead allege that because they consumed ranitidine, and the testing of some ranitidine products at various times revealed NDMA, the Plaintiffs must have been exposed to NDMA. DE

3508 at 11.  That chain of inferences is inadequate to plausibly plead exposure to NDMA. *Id.* Further, the mere risk that ranitidine products might have contained NDMA is insufficient. DE 3116 at 23.  Even if the Plaintiffs did plausibly allege some exposure, they neither allege a threshold level of exposure that places them at an increased risk of developing a Subject Cancer, nor that any Plaintiff's exposure exceeded that threshold. DE 3116 at 23.  By failing to allege a threshold level of exposure, the Plaintiffs essentially argue that any level of exposure to NDMA is sufficient to obtain medical monitoring. DE 3508 at 12.  And to the extent that the Plaintiffs rely on the FDA's daily allowable limit of 96 nanograms of NDMA, that regulatory threshold is too low and would lead to a monitoring program of unlimited scale. *Id.* (citing *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045 (N.D. Cal. 2015)).

Second, the Plaintiffs fail to plead that diagnostic testing exists that would make the early detection of any Subject Cancer possible, since they merely allege that their proposed medical monitoring regime would include "baseline tests and diagnostic examinations that will assist in early detection." *Id.* at 24 (quoting MMC ¶ 1043).

Third, the Plaintiffs fail to plead that their proposed medical monitoring regime differs from routine examinations that they would normally undergo as members of the public. *Id.* at 25- 26.  The Plaintiffs' allegation that their proposed regime "is not generally given to the public at large" is insufficient, and courts in multiple jurisdictions have dismissed medical monitoring claims containing such a formulaic recitation of this required element. *Id.* at 26.

The Plaintiffs argue that whether medical monitoring is an appropriate remedy is a fact-intensive question requiring expert testimony, and one that should not be decided on a Rule 12 motion. DE 3429 at 24.  Moreover, the Plaintiffs plausibly allege exposure to NDMA through years of ingesting ranitidine, which contained levels of NDMA many multiples beyond the FDA's

allowable limit. *Id.* at 25, 27.  Regarding diagnostic testing, the Plaintiffs satisfy the element by alleging that they require monitoring that includes "baseline tests and periodic diagnostic examinations." *Id.* at 26 (citing MMC ¶¶ 978, 980).  The Court must accept this allegation as true. *Id.*  The Plaintiffs also plausibly allege a monitoring regime that is different from routine examinations, since they allege that their injuries "require specialized testing . . . that is not generally given to the public at large," and which is "different from that normally recommended in the absence of exposure to this risk of harm." *Id.* (citing MMC ¶ 979).  The Court must also accept those allegations as true. *Id.*  Rule 8 does not require the detail that the Defendants suggest is necessary to plausibly plead the various medical monitoring elements, particularly when expert testimony is needed. *Id.* at 26-27.  At this procedural juncture, the Plaintiffs need not allege a "threshold level" of NDMA exposure that creates an increased risk of the Subject Cancers, specify which diagnostic tests allow for early detection of those cancers, or explain how their proposed monitoring regime differs from what is given to the public at large. *Id.* at 26.

### b.  Law on Medical Monitoring

Medical monitoring claims are non-traditional torts, through which individuals "seek to recover the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure." *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 259-60 (D. Minn. 2018) (quotation marks omitted).  Medical monitoring claims "evolved from the realization that widely recognized tort law concepts premised upon a present physical injury are ill-equipped to deal with cases involving latent injury." *Id.* at 260 (quotation marks omitted).  "[A]n action for monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm . . . ." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850 (3d Cir. 1990).

The law of medical monitoring varies across jurisdictions, with some requiring a showing of manifest physical injury, some requiring subcellular or subclinical injury, and others not requiring any present physical injury. *Nat'l Hockey League*, 327 F.R.D. at 260.  The Plaintiffs here seek medical monitoring in states where they allege that proof of present physical injury is not required: Arizona, California, Colorado, Florida, District of Columbia, Indiana, Maryland, Missouri, Montana,[7] Nevada, Ohio, Pennsylvania, Utah, and West Virginia. MMC at 43.  The elements to obtain medical monitoring under Florida law illustrate what some of these jurisdictions require:

> (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Petito v. A.H. Robins Co., Inc.*, 750 So. 2d at 106-07.

Yet among these states, the elements differ in nuanced ways.  For example, some states require that testing procedures exist to detect diseases early, while others do not. *Compare id.* at 106 (requiring that "a monitoring procedure exists that makes the early detection of the disease possible"), *with Nat'l Hockey League*, 327 F.R.D. at 263 (citing *Meyer*, 220 S.W.3d at 712, and *Burns v. Jaquays Min. Corp.*, 752 P.2d 28 (Ariz. 1987), to note that Missouri and Arizona do not require that procedures exist).

### c.   Analysis and Conclusion

<u>No Exposure</u>: Defendants first assert that the Plaintiffs allege no exposure at all to NDMA. DE 3116 at 22-23.  The Plaintiffs respond that they plausibly allege exposure, because each

---

[7] For reasons discussed earlier, Plaintiffs' Montana medical monitoring claims are dismissed with prejudice.

Plaintiff ingested or consumed ranitidine products that contained NDMA at levels many times above the FDA-allowable limit. DE 3429 at 25.

The Court concludes that the Plaintiffs have plausibly alleged at least some exposure to NDMA.  Each paragraph identifying the named Plaintiffs alleges the timeframes during which they used ranitidine. MMC ¶¶ 93-144.  Next, the Plaintiffs allege that NDMA is a known carcinogen, as determined by several agencies and health authorities and supported by various studies. *Id.* ¶¶ 185-229.  The Plaintiffs then allege that testing revealed the presence of NDMA in ranitidine products, which in turn led to voluntary recalls. *Id.* ¶¶ 230-49.  The Plaintiffs further allege that ranitidine degrades to form excessive levels of NDMA by breaking down in the human body and upon exposure to heat, moisture, and/or time. *Id.* ¶¶ 250-304.  The Plaintiffs later allege that they "ingested Ranitidine-Containing Products at various times," and that "unbeknownst to the Plaintiffs, [the Ranitidine-Containing Products] transformed into dangerous levels of NDMA." *Id.* ¶¶ 975-76.  Collectively, the Plaintiffs' allegations create a reasonable inference that they were exposed to NDMA.

Significantly Increased Risk: The Defendants argue that, even if the Plaintiffs have alleged some exposure to NDMA, they have not alleged that their exposure was so significant that medical monitoring is warranted.  Although the Plaintiffs disagree and argue that their allegations are sufficient, the parties agree that the Plaintiffs are not entitled to medical monitoring for just *any* exposure; they agree that the Plaintiffs' exposure to NDMA must have been significant. *E.g.,* MMC ¶ 978; DE 3429 at 24 ("The injury is plaintiff's significantly increased risk of disease . . . ."). In some states, the requirement for a significant exposure is an express element of the medical monitoring claim. *Petito*, 750 So. 2d at 106 (requiring a plaintiff to plead a "significantly increased risk of contracting a serious latent disease"). In other states, the requirement for a significant

exposure exists in the form of a reasonable treating physician's diagnosis. *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993) (requiring a plaintiff to show that because of an exposure to a toxic substance, "a reasonable physician would prescribe for her or him a monitoring regime"); *Cook v. Rockwell Int'l Corp.*, 755, F. Supp. 1468, 1477 (D. Colo. 1991) (requiring a plaintiff to show that because of an exposure, "periodic diagnostic medical examinations" are reasonably necessary).   Regardless of some variations in state law as to the level of exposure required to state a claim, the parties nevertheless agree that the Plaintiffs must allege a significant increase in their risk of cancer—a risk significant enough that a treating physician would prescribe a monitoring regime.

The Defendants' plausibility challenge—that the Plaintiffs have failed to allege a significant increase in their risk of cancer—raises two distinct questions.   First, pursuant to the Plaintiffs' allegations, how much NDMA[8] must a Plaintiff be exposed to before the Plaintiff has a significantly increased risk of cancer?   Second, how much NDMA exposure have the Plaintiffs alleged?   In arguing that the Plaintiffs have failed to plausibly plead the answer to both questions, the Defendants cite to *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045 (N.D. Cal. 2015).

In *Riva*, the trial court concluded that the plaintiffs had adequately alleged that a certain chemical was a dangerous carcinogen. *Id.* at 1058.   The problem, however, was that while the plaintiffs had alleged *how much* exposure to the chemical would result in cancer in animals, the plaintiffs had failed to adequately plead how much exposure would result in cancer in humans and how much exposure the plaintiffs had received. *Id.* at 1060.   Here, the Court concludes that, like *Riva*, the Plaintiffs have adequately alleged that NDMA is a dangerous carcinogen, but, also like

---

[8] At the Hearing, the Plaintiffs clarified that while the MMC references epidemiological studies on ranitidine that do not focus on NDMA, they are relying upon exposure to NDMA to establish their claim for medical monitoring. Hearing Tr. at 213-14.

*Riva*, the Plaintiffs have failed to clearly plead just *how much* exposure the Plaintiffs received and how much exposure is needed to warrant the remedy of medical monitoring.  The Plaintiffs' response to *Riva* is illuminating on these points.

The Plaintiffs distinguish *Riva* by arguing that, unlike the plaintiff in *Riva*, their complaint is specific. DE 3429 at 28.  To demonstrate the specificity of their allegations, the Plaintiffs aver:

> The MMC alleges that exposure to NDMA above 96 ng is unacceptable and increases the risk of cancer, that one ranitidine dose exposes the user to over 3000 ng of NDMA, that doses of NDMA even lower than that significantly increase the risk of cancer, that certain Defendants' testing showed NDMA in all batches of ranitidine, and that MM Plaintiffs took therapeutic doses of ranitidine for years.

*Id.*  The Court analyzes this response phrase-by-phrase.  First, the Court construes the Plaintiffs' position to be that the level of exposure to NDMA needed to warrant the remedy of medical monitoring could be as low as 96 ng of NDMA but is, in any event, no greater than 3,000 ng. Second, the Court construes the Plaintiffs' position to be that each ranitidine dose gives the consumer at least 3,000 ng of NDMA.  Third and finally, the Plaintiffs describe the frequency of doses by each Plaintiff as "therapeutic doses."  The Court addresses each of these topics in turn before turning to the level of specificity the Court requires in any amended MMC.[9]

<u>The Amount of NDMA Needed to Significantly Increase the Risk of Cancer</u>

If the Plaintiffs' position is that 3,000 ng of NDMA is the amount necessary to significantly increase a Plaintiff's risk of cancer, the Plaintiffs should clearly allege this.  The Plaintiffs' response quoted above contains no citation to the MMC for this proposition.  True, the Plaintiffs have clearly alleged that the consumption of 96 ng each day, for seventy years, will result in a .001% increase in the risk of cancer.  MMC ¶ 210.  But by the Court's math, that would mean a

---

[9] The Plaintiffs dispute whether they must allege a "threshold exposure level," a concept discussed by the *Riva* court. The Court's focus is not on whether the Plaintiffs have alleged a threshold exposure, but rather whether the Plaintiffs have plausibly alleged an undisputed element of medical monitoring—a substantial increase in the risk of disease.

Plaintiff consumed not 96 ng, but 2,452,800 ng of NDMA, albeit over the course of an entire lifetime.  Relatedly, if the Plaintiffs equate a .001% increased risk with a significantly increased risk, then the Plaintiffs should clearly make that argument.  The Court is unable, however, to find any allegation in the MMC from which the Court could infer that a single dose of NDMA, be it 96 ng or 3,000 ng, is equated to a substantial increase in the risk of cancer.  Instead, the scientific studies that the Plaintiffs rely upon study *lifetime diet habits* and then conclude, based upon a lifetime of eating or not eating NDMA-rich foods, the relative risk of a consumer's cancer.  If the Plaintiffs' position is that the Court may infer, from those studies, that a single exposure to 3,000 ng results in a significantly increased risk of cancer, the Plaintiffs should make that argument and allege this with greater clarity.

Based upon the Court's review of the MMC, the Court believes that the more likely basis for the Plaintiffs' position is that a 3,000 ng exposure to NDMA, frequently administered, would result in a significant increase in the risk of cancer.  The Court is unable to analyze that position, however, without more information.

To explain, the Plaintiffs allege that every human being consumes NDMA through eating, drinking, and even breathing. *E.g.,* MMC ¶ 252 (NDMA in drinking water); ¶ 185 n.35[10] (NDMA in air and food).  Indeed, the NDMA studies upon which the Plaintiffs rely find a large variance in the amount of NDMA that each human being consumes on a daily basis.  For example, the

---

[10] The Court considers the Plaintiffs' footnotes, which cite to government documents and scientific studies, to have been incorporated into the MMC as attachments; attachments may be considered by the Court on a motion to dismiss. *E.g., Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (noting that a court may consider a document attached to a complaint without converting the motion to dismiss into a motion for summary judgment if "the attached document is: (1) central to the plaintiff's claim; and is (2) undisputed").  The Court considers scientific studies about ranitidine and government publications about ranitidine to be central to the Plaintiffs' claims and to be undisputed documents. In the event the Plaintiffs disagree and instead believe that the cited documents and studies should not be considered by the Court, the Plaintiffs should omit the citations in any future pleading.  At the Hearing, the Plaintiffs did not dispute that the Court could consider the cited documents, provided the content was not in dispute. Hearing Tr. at 209-10.

Plaintiffs' study at footnote 71 found daily NDMA consumption levels in cases as low as 200 ng but as high as 510 ng.  The study at footnote 72 found levels as low as 130 ng but as high as 191 ng.  The study at footnote 73 found levels as low as 6 ng but as high as 179 ng.[11]  The Court does not know the Plaintiffs' position on how much NDMA a typical Plaintiff consumes (outside of ranitidine consumption) because the Court is unable to locate any allegation to that effect, but this is a number that matters.

Suppose, for the sake of illustration, that the Plaintiffs allege that a typical Plaintiff consumes 50 ng of NDMA per day from food and water.  Further suppose that the Plaintiffs rely upon the study at footnote 71 which found that there was a statistically significant increase in the rate of cancer for persons who consumed 510 ng per day.  This would mean that, if the Plaintiffs allege that every ranitidine pill contained 360 ng (discussed below), then, according to the Plaintiffs' allegations the total daily NDMA consumption would be 50 + 360 = 410 ng.  This number would fall short of the daily 510 ng cited in the study as showing a statistically significant increase in the rate of cancer.

The Court is also unable to apply the Plaintiffs' allegations to the NDMA studies of lifetime eating habits because the Court does not know the frequency of the Plaintiffs' ranitidine dosages (also discussed below).   By way of example, if a typical Plaintiff consumed 50 ng of NDMA per day, and received 3,000 ng of NDMA from one ranitidine pill, but only consumed one pill per week, the Plaintiffs' weekly consumption of NDMA would still fall short of the daily 510 ng threshold discussed at footnote 71.[12]  In summary, the Court cannot ascertain from the MMC the amount of NDMA the Plaintiffs contend would equate to a significant increase in the risk of cancer.

---

[11] The studies divided NDMA consumption into quartiles, and the Court references those quartiles.
[12] 50 ng x 7 days + 3,000 ng = 3,350 ng. 510 ng x 7 days = 3,570 ng.

<u>The Amount of NDMA in Each Ranitidine Dose</u>

To the extent the Plaintiffs rely upon the 3,000 ng of NDMA per-dose referenced in their response, the Court has been unable to locate that number anywhere in the 2,192-page MMC, and the Plaintiffs provide no citation.  Because the Plaintiffs argue in their response that the amount of NDMA per ranitidine pill is **over** 3,000 ng, the Court has conducted an extensive review of the MMC in an effort to determine the amount of NDMA each ranitidine dose is alleged to contain. The Court has been able to locate four different sets of numbers, and each set has been referenced by the Plaintiffs in their various responses throughout the entirety of this MDL; the Court addresses each set of numbers below.

First, the Court has been able to locate an allegation that each ranitidine dose contained 47,000 ng of NDMA. MMC ¶ 274.  This number is sourced from a Stanford University study where researchers measured levels of NDMA in urine samples after a subject consumed a ranitidine pill. *Id.*  The citation to the study is provided in footnote 126, however, when the Court utilized the citation to read the study, a red retraction notice appears on the top of the study:



If the Plaintiffs' position is that the Court may conclude that the Plaintiffs have plausibly alleged a claim for medical monitoring based upon a retracted study, the Plaintiffs should clearly argue and explain that position.[13]  In the absence of such argument, the Court does not conclude that a retracted study plausibly establishes a significantly increased risk of cancer.

---

[13] According to the retraction notice, the study was retracted after the Plaintiffs filed the MMC.  The retraction notice indicates that the scientists' measurements of NDMA were flawed and therefore unreliable.

Second, the Court has been able to locate an allegation that each ranitidine dose contained over 2,000,000 ng of NDMA.  MMC ¶ 276.  That number is sourced in the laboratory tests of a private company, Valisure. *Id.*  Valisure arrived at that number by heating ranitidine to 266 degrees Fahrenheit. *Id.*  Pursuant to the Plaintiffs' allegations, however, the temperature of the human body is 98.6 degrees, not 266 degrees. MMC ¶ 278.  If the Plaintiffs' position is that the Court may conclude that the Plaintiffs have plausibly alleged a claim for medical monitoring based upon a study utilizing 266-degree temperatures, the Plaintiffs should clearly allege and explain that position.  In the absence of such allegation, the Court does not conclude that a test utilizing 266 degrees of heat plausibly establishes a significantly increased risk of cancer, particularly given the additional findings of Valisure discussed below.

Valisure did not end its testing after the 266-degree test.  Instead, Valisure conducted an additional test using 98.6 degrees of heat.  MMC ¶ 281.  That test detected no NDMA in ranitidine. *Id.*  Valisure then conducted additional tests with a new variable.

Postulating that ranitidine degrades into NDMA when combined in the human stomach with foods rich in nitrites (such as tacos or pizza), Valisure conducted additional tests in an artificial human stomach where, using 98.6 degrees of heat, ranitidine was mixed with sodium nitrite.  *Id.*  Valisure's sodium nitrite findings are the third set of numbers that the Court has been able to locate in the MMC.  Using "25 mM" of sodium nitrite in an artificial stomach, Valisure detected 23,600 ng of NDMA per ranitidine pill. *Id.*  Using "50 mM" of sodium nitrite, Valisure detected 304,500 ng of NDMA per pill. *Id.*  The Plaintiffs have repeatedly relied upon this 304,500 ng of NDMA number in their various filings in this Court.[14]  Yet the amount of sodium nitrite necessary to produce this NDMA, 50 mM, is unaccompanied by explanation or context.

---

[14] For example, on page 19 of the Plaintiffs' response, the Plaintiffs represent that the amount of NDMA found in one dose of ranitidine is as much as "3,100 times above the FDA-allowable limit." 3,100 x 96 = 297,600.

At the Court's initial conference on law and science, the Defendants gave their own opinion on what 50 mM of sodium nitrite means and whether such an allegation renders the Plaintiffs' claims plausible. According to the Defendants, for a human stomach to contain the 50 mM of sodium nitrite necessary to produce 304,500 ng of NDMA, the consumer would first have to eat "33 pounds of bacon" before consuming ranitidine. DE 960 at 38. Because this statement was made to the Court outside of the briefing on the current Motion to Dismiss, the Court assigns no weight to the Defendants' position. The Plaintiffs did not offer their own explanation or context as to what 50 mM of sodium nitrite means, either in the MMC or in their response to the Motion to Dismiss. The Court gave the Plaintiffs the opportunity at the Hearing to explain the significance and context for 50 mM of sodium nitrite, but the Plaintiffs did not do so: "I don't have an opinion. . . . I would need to refresh my recollection from an expert." Hearing Tr. at 218.

In the absence of an explanation or context from the Plaintiffs, the Court endeavored to understand what, mathematically and scientifically, 50mM of sodium nitrite means. The Court attempted to perform its own mathematical calculations to discern the amount of bacon[15] necessary to collect 50 mM of sodium nitrite in the human stomach. The Court's own calculations estimated the amount of bacon to be necessary at around 25 pounds.

Just as the Court assigns no weight to the Defendants' representations about the significance of 50 mM, the Court similarly assigns no weight to its own calculations. The Court merely explains why the Plaintiffs must provide context and explanation if the Plaintiffs are to rely upon the 50mM number. Furthermore, the Plaintiffs' need to explain is directly traceable to the Plaintiffs' related allegations; Valisure concluded that 10 mM of sodium nitrite in the human stomach produced no NDMA. MMC ¶ 281. As a result, the difference between these two amounts

---

[15] The reason the Defendants and the Court have utilized bacon as a baseline measurement is because bacon is particularly rich in sodium nitrite.

of sodium nitrite matters pursuant to the Plaintiffs' own pleading—according to Valisure, 10 mM results in no NDMA, while 50 mM results in a large amount of NDMA. The Court therefore requires additional and sufficient allegations to determine that 50 mM represents an amount of sodium nitrite that plausibly supports a substantial increase in the risk of cancer, and 10 mM does not. If the Plaintiffs intend to rely upon either the 304,500 ng or 23,600 ng of NDMA found by Valisure, the Plaintiffs must clearly allege so in a manner that explains the significance and context of the amount of sodium nitrite utilized by Valisure, together with the amount of food that would be necessary to generate that amount of sodium nitrite in the human stomach.

Fourth and finally, the Court has been able to locate allegations about the amount of NDMA in ranitidine from tests performed by the FDA. At footnote 90, the Plaintiffs incorporate a laboratory study by the FDA. In that study, the FDA tested a large number of ranitidine batches— batches from many different manufacturers. *Id.* The amount of NDMA found in the ranitidine was not equal across the Manufacturing Defendants.[16] *Id.* For example, the NDMA found by the FDA ranged from 360 ng (Sanofi) to 4 ng (Pharma Associates). *Id.* One Defendant's ranitidine tested as having zero NDMA (Strides Shasun Ltd.). *Id.* Even if the Court were to utilize the highest amount of NDMA found by the FDA (360 ng) and assume that every Defendant's ranitidine had that much NDMA, that number is still an order of magnitude lower than the 3,000 ng number argued in the Plaintiffs' response.

The Court addresses one final point about the FDA's findings. In the FDA's own words, the "NDMA levels FDA found are similar to the levels a consumer would expect to be exposed to when eating common foods like grilled and smoked meats." MMC ¶ 237 n.87. For this reason, the FDA characterized the amount of NDMA in a ranitidine dose as "low levels." *Id.* The

---

[16] The Court is uncertain whether it is the Plaintiffs' position that each Defendant's ranitidine was equally dangerous, given that the FDA found varying amounts of NDMA among the various Defendants' products.

European Medicine Agency's findings (incorporated into the MMC) are similar: "Available safety data do not show that ranitidine increases the risk of cancer, and any possible risk is likely to be considered very low." MMC ¶ 249 n.102. If the Plaintiffs ultimately rely upon the FDA's findings to plausibly establish the amount of NDMA per ranitidine pill is around 360 ng, then the Plaintiffs should also explain why the statements of the FDA about the low levels of danger of ranitidine (also incorporated into the MMC) should be disregarded or otherwise not impact the Court's decision on plausibility.

In summary, with the possible exception of the FDA's findings, the Court is unclear on just how much NDMA exposure the Plaintiffs have alleged is caused through ranitidine ingestion. And, even if the Court were to base its plausibility determination on the FDA's findings, the Court is still unable to conclude that the Plaintiffs have plausibly alleged a significant increase in the risk of cancer because of the Plaintiffs' lack of allegations about the *frequency* of ranitidine consumption, discussed below.

<u>The Frequency of the Plaintiffs' Dosages</u>

The Plaintiffs contend in their response that the MMC is specific about the number of doses that each Plaintiff received because each Plaintiff is alleged to have received "therapeutic dosages." On page 8 of the Plaintiffs' response, footnote 3, the Plaintiffs contend that "All MM Plaintiffs took therapeutic doses of ranitidine." For support, the Plaintiffs cite to paragraph 975 of the MMC. Paragraph 975 contains no information on the frequency of the Plaintiffs' dosages, only stating that the Plaintiffs "ingested [ranitidine] at various times as part of their treatment." That allegation says nothing about "therapeutic dosages." The Plaintiffs also cite to the individual Plaintiffs' allegations of dosage, but the Court has similarly been unable to locate the frequency of ranitidine use in those paragraphs. For example, the Plaintiffs cite to paragraph 93, but in that

paragraph the Plaintiff only alleges that she used ranitidine products from 2009 to 2020.  There is no allegation as to the frequency of use, nor is there a reference to "therapeutic dosages."  The Plaintiffs' alleged class definitions similarly do not assist the Court, because the Plaintiffs define the class as being anyone "who used" ranitidine without qualification. *E.g.,* MMC ¶ 993.  The closest the Court can come to ascertaining a frequency of use is not in a specific paragraph in the MMC, but in the unnumbered introduction which states: "the typical recommended dose of ranitidine for therapy of peptic ulcer disease in adults is 150 mg twice daily or 300 mg once nightly for four to eight weeks, and maintenance doses of 150 mg once daily."  If the Plaintiffs elect to allege that they took ranitidine according to this frequency, they should do so with clarity in the body of the MMC.  Similarly, if the Plaintiffs allege that they took ranitidine with this frequency because they suffered from peptic ulcer disease, that too should be alleged with clarity.  At present, the Court simply does not know the frequency with which the Plaintiffs have alleged they consumed ranitidine.  Because the Court does not know the frequency, the Court does not know the amount of NDMA to which the Plaintiffs have alleged they were exposed.  Without that information, the Court cannot ascertain whether the Plaintiffs have alleged they have a significantly increased risk of cancer.

<u>The Level of Specificity Required in any Amended MMC</u>

The Plaintiffs rely upon three cases to argue that they do not need to plead any additional facts in the MMC.  First, the Plaintiffs cite to *Trujillo v. Ametek, Inc.*, but in that case the plaintiffs were specific—the plaintiffs went so far as to allege with precision that their risk of cancer had increased from 5.6 chances in a million to 42 chances in a million. No. 15-CV-1394, 2015 WL 7313408, at *6 (S.D. Cal. Nov. 18, 2015).  Second, the Plaintiffs cite to *Allgood v. General Motors Corp.*, but in that case the trial court was not presented with a plausibility challenge on the

"substantial increase" element; the trial court was even uncertain what, under Indiana law, the remedy of medical monitoring required. 2005 WL 2218371, at *7-8. Third and finally, the Plaintiffs spent most of their argument at the Hearing and in their response in reliance upon *In re Paulsboro Derailment Cases*, and it is true that the *Paulsboro* court was presented with a plausibility challenge. No. 13-784, 2013 WL 5530050 (D.N.J. Oct. 4, 2013). It is equally true that the *Paulsboro* court was satisfied with the allegations in the complaint and required no further level of detail from the plaintiffs, however the Court sets forth below some of the allegations that the Court was able to locate in the *Paulsboro* complaint at docket entry 29 in the court file.

A train carrying vinyl chloride, a carcinogen, crashed, leaking the carcinogen into the water supply of a town and the air as well. *Id.* at p. 16. The leakage into the air created a poison mist, a fog. *Id.* The townspeople began to walk through the fog with small children, for example to get to school, and they were completely exposed. *Id.* The fog could be tasted in the mouths of those who walked through it. *Id.* at p. 17. Townspeople immediately received pain in their chests and eyes while inside the fog. *Id.* The pain lasted a long time. *Id.* Many townspeople developed debilitating coughs from walking through the fog, and the coughs lasted for several weeks. *Id.* Townspeople went to the hospital and were diagnosed as having been chemically exposed to a dangerous carcinogen. *Id.* The fog was sufficiently dangerous that townspeople were evacuated from their homes. *Id.* The Court is unpersuaded that this MDL is sufficiently analogous to *Paulsboro* such that the Court should not require an amended medical monitoring complaint.[17]

In conclusion, the Court cannot clearly ascertain from the MMC: (i) the number of doses of ranitidine the Plaintiffs consumed, (ii) the amount of NDMA each Plaintiff received per dose,

---

[17] In another area of the response, the Plaintiffs cite to *In re Valsartan, Losartan, & Irbesartan Products Liability Litigation*, MDL No. 2875, 2021 WL 364663, at *4 (D.N.J. Feb. 3, 2021) and *Vavak v. Abbott Laboratories, Inc.*, No. SACV 10-1995, 2011 WL 10550065 (C.D. Cal. June 17, 2011), but neither of those cases considered whether the Plaintiffs had plausibly alleged a significant increase in the risk of cancer.

and (iii) how much NDMA is necessary to cause a significantly increased risk of cancer for each of the Subject Cancers alleged in the MMC.  The Court does not mean to suggest that the only way that the Plaintiffs may plausibly plead a substantial increase in the risk of cancer is by answering in detail, through their allegations, the questions the Court has posed or by dispelling all of the uncertainty that the Court has highlighted in this Order.  The Plaintiffs may, of course, plead a substantial increase in the risk of cancer in whatever way they deem best, including through avenues other than NDMA exposure and NDMA frequency.  The Court's ruling is merely that, as pled, the Court cannot conclude that the Plaintiffs have plausibly alleged a substantial increase in the risk of cancer.  The Plaintiffs must replead their medical monitoring claims, and the MMC is dismissed without prejudice and with leave to amend.

Diagnostic Testing: The Defendants argue that the Plaintiffs have not plausibly pled that testing exists to detect their alleged cancers early. DE 3116 at 24.  The Plaintiffs respond that they satisfy this element by alleging that the required monitoring would include "baseline tests and periodic diagnostic examinations that will assist in early detection and diagnosing the Subject Cancers." DE 3429 at 26.

The Court concludes that the Plaintiffs have failed to plausibly allege that diagnostic tests exist for early detection of the Subject Cancers.  The Plaintiffs' allegation amounts to a "naked assertion devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.  The Plaintiffs do not expressly allege that any tests and exams *exist*, much less specify what they are.

The Defendants' caselaw is persuasive.  In *Slemmer v. McGlaughlin Spray Form Insulation, Inc.*, the plaintiffs proposed a monitoring regime of "diagnostic tests and pharmaceutical interventions." No. 12-6542, 2013 WL 5655480, at *3 (E.D. Pa. Oct. 17, 2013).  Their class action complaint was dismissed for "fail[ure] to identify specific medical monitoring

procedures as required," and for "fail[ure] to aver that a monitoring program procedure exists that makes early detection of a specific disease possible." *Id.*; *see also In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL Nos. 1871, 07-MD-01871, 2011 WL 4006639, at *3 (E.D. Pa. Sept. 7, 2011) (granting a motion to dismiss where "[t]he claim for medical monitoring essentially tracks the elements of the claim, but without any specific facts alleged (e.g., as to what medical monitoring procedure exists and how it differs from the monitoring for all patients with Type 2 diabetes)"). Additionally, the Defendants cite *Bell v. 3M Co.*, where medical monitoring claims were dismissed for, among other deficiencies, the plaintiffs' failure to allege that there were any diagnostic tests that could detect the plaintiffs' diseases early. 344 F. Supp. 3d 1207, 1227 (D. Colo. 2018). At the Hearing, counsel for the Defendants noted that, in *Bell*, the plaintiffs subsequently filed an amended complaint alleging sufficient factual detail regarding the tests and evaluations that were needed. Hearing Tr. at 208. The Court's review of the relevant pleading in *Bell* confirms this point. *See* Third Am. Class Compl. with Individual Claims and Demand for Jury Trial, *Bell v. 3M Co.*, No. 16-cv-02351-RBJ (D. Colo. Oct. 5, 2018), CM/ECF No. 333, ¶¶ 140-42, 224.

Courts overseeing large cases—including those involving medical monitoring claims—have demanded specificity in pleadings before permitting the case to advance further. *See, e.g.*, *Cook v. Rockwell Intern. Corp.*, 755 F. Supp. 1468, 1475 (D. Colo. 1991) ("In a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.") (quotation marks omitted). As to this element, the Plaintiffs' current allegations lack the specificity present in the Third Amended Complaint in *Bell*. They likewise suffer from deficiencies similar to those in the complaints that were dismissed in *Slemmer*, *Avandia*, and *Bell*. The Court will not permit those deficiencies, and

thus dismisses the Plaintiffs' medical monitoring claims in all jurisdictions requiring a diagnostic testing element.[18]   At the Hearing, counsel for the Plaintiffs stated that on replead, the Plaintiffs could provide greater specificity as to this element:

> [The Court:]  If the Court finds the Defendants' argument is persuasive, and if you were to replead . . . could you allege on a replead that diagnostic testing exists to make early detection of the [S]ubject [C]ancers possible? . . . .
>
> Ms. Meeder:  Your Honor, I understand you to be asking if we could plead the specific tests, because we do plead generally that there are baseline and other diagnostic tests that exist.  I am understanding we are talking about specific tests.
>      If your Honor would like us to replead this with more specificity, we are able to do so.

Hearing Tr. at 198-99.  The Plaintiffs' claims are thus dismissed without prejudice on this basis, and with leave to replead as to this specific element.

    <u>Medical Monitoring Regime</u>: The Defendants argue that the Plaintiffs have not pled that their proposed monitoring regime differs from what is normally recommended absent exposure. DE 3116 at 26.  The Plaintiffs argue that they plausibly plead this element by alleging that "[t]he latent injuries from which Plaintiffs [and] the Class members suffer require specialized testing (with resultant treatment) that is not generally given to the public at large," and that the regime "is different from that normally recommended in the absence of exposure to this risk of harm." DE 3429 at 26 (citing MMC ¶ 979).

    The Court concludes that the Plaintiffs' allegations are merely a recitation of the required element.  Indeed, the Plaintiffs' allegations are like those in cases that Defendants cite, where medical monitoring claims were dismissed. *See Coffie v. Fla. Crystals Corp.*, 460 F. Supp. 3d 1297, 1314 (S.D. Fla. 2020) (dismissing a medical monitoring count where plaintiffs "merely pled

---

[18] In their Motion to Dismiss, the Defendants included a footnote citing those jurisdictions which they believe require this element. DE 3116 at 24 n.6.  The Plaintiffs did not respond to the footnote.  In any repleading, it is incumbent upon the Plaintiffs to ascertain what each jurisdiction requires and amend the MMC accordingly, consistent with the Court's ruling.

a formulaic recitation of" the required elements, including that the regime differed from what is normally recommended absent exposure, and did not provide supporting facts); *Barker v. Naik*, No. 2:17-cv-04387, 2018 WL 3824376, at *5 (S.D. W. Va. Aug. 10, 2018) (dismissing a medical monitoring claim where plaintiffs' allegations mirrored the necessary factors—including that they needed to "undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of their exposure"—but failed to allege supporting facts); *Gibson v. Lapolla Indus., Inc.*, No. 6:13–cv–646–Orl–36KRS, 2014 WL 12617007, at *4 (M.D. Fla. Jan. 31, 2014) (dismissing a medical monitoring claim where plaintiff pled "a rote recitation of the required elements," including that "[m]onitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure").

Although Rule 8 does not require that a pleading contain an extraordinary level of detail, the Court will not accept a pleading that merely recites a necessary element and does not provide any factual support.  The Court thus dismisses the Plaintiffs' medical monitoring claims in all jurisdictions requiring that a proposed monitoring regime differ from what is recommended to the public at large.  At the Hearing, counsel for the Plaintiffs stated that they may be able to allege more regarding this element. Hearing Tr. at 203 ("[T]here may be a bit measure more of explanation that we could plead . . . .").  The Plaintiffs' claims are therefore dismissed without prejudice, and with leave to replead as to this specific element.

### 3. Failure to Plead the Claims Based on Expiration Dates and Product Containers

#### a. Arguments and Allegations

The Defendants contend that the Plaintiffs have failed to plausibly plead the claims based on improper expiration dates and product containers, and the Defendants therefore seek dismissal

of all of these claims in the MMC.[19] DE 3116 at 27-29.  The Plaintiffs have not plausibly alleged that any Defendant knew or should have known that ranitidine degrades to form NDMA over time or due to exposure to moisture. *Id.*  The Plaintiffs respond that they have plausibly alleged that the Defendants knew or should have known that ranitidine degrades into NDMA due to time and exposure to moisture because (i) the ranitidine molecule contains all of the ingredients needed to form NDMA, (ii) federal law requires drug manufacturers to conduct stability testing on their products to assess drug stability, and (iii) research published in the 1980's revealed elevated levels of NDMA in ranitidine. DE 3429 at 31-34.

The Plaintiffs allege that ranitidine internally degrades to form NDMA, that the level of NDMA in a ranitidine product increases over time, and that this higher level of NDMA increases the risk of cancer. *See, e.g.*, MMC ¶¶ 880-81, 883.  The cancer risk is lower if the product is consumed shortly after it is manufactured. *Id.* ¶¶ 882-83.  Therefore, had ranitidine products had shorter expiration dates, the ranitidine that consumers ingested would have had lower levels of NDMA, and their cancer risks would have been lower. *Id.* ¶ 883.  Pill bottles with a large number of pills are likely to be stored for long periods of time. *Id.* ¶ 941.  Selling ranitidine products with a smaller quantity of pills in each bottle would have ensured that the products were fully consumed closer to their dates of manufacture, when they contained lower levels of NDMA. *Id.* ¶ 942. Ranitidine internally degrades to form NDMA more quickly at higher humidity levels. *Id.* ¶ 938. Packaging ranitidine pills "in a blister pack or similar individually packaged container" would have protected them from exposure to humidity. *Id.* ¶ 942.

The Plaintiffs also allege that the Defendants knew or should have known about all of the risks associated with ranitidine. *Id.* ¶ 183.  They "knew or should have known that ranitidine had

---

[19] The Defendants do not make this argument as to the claims for negligent storage and transportation.

an inherent risk of degrading into NDMA because it has both a nitroso (N) and dimethylamine (DMA), which are all the ingredients needed to form NDMA." *Id.* ¶ 939.  Federal law requires drug manufacturers to conduct stability testing on their products to assess drug stability and to determine appropriate storage conditions and expiration dates. *Id.* ¶¶ 885-86; *see* 21 C.F.R. § 211.166(a) ("There shall be a written testing program designed to assess the stability characteristics of drug products.  The results of such stability testing shall be used in determining appropriate storage conditions and expiration dates.").  "Simple, widely available and cost-effective tests" would have reveled degradation and NDMA accumulation in ranitidine products. MMC ¶¶ 882-84.  Furthermore, research conducted and published before Zantac entered the market revealed elevated levels of NDMA in ranitidine when it was properly tested. *Id.* ¶ 312.  For example, a doctor published a note in a popular scientific journal in 1981 that discussed "the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites—a substance commonly found in food and in the body." *Id.* ¶ 314.

### b.  Analysis and Conclusion

The parties utilize a "known or should have known" standard in making their respective arguments about the sufficiency of the pleading.  The parties have not briefed whether any state's law would use a different standard to meet the element of notice for any of the claims at issue.  For purposes of analyzing the adequacy of the Plaintiffs' pleading, the Court utilizes a "known or should have known" standard.  Should any party contend that the standard is different under a particular state's law, that party may raise the issue at the appropriate time in connection with state-specific arguments. *See* Pretrial Order # 61 ("To the extent that other state-specific issues

become relevant at a later stage of the litigation, such as at the bellwether trial stage, the parties agree that they may seek leave of the Court to raise the issues at that time.").

The Plaintiffs have plausibly pled that the Defendants should have known, through stability testing of their ranitidine products, that ranitidine can degrade to form NDMA over time and due to exposure to moisture.  The Plaintiffs allege that federal law requires all drug manufacturers to conduct stability testing on their products to assess drug stability and to determine appropriate storage conditions and expiration dates. MMC ¶ 886 (citing 21 C.F.R. § 211.166).  The Plaintiffs further allege that testing would have revealed degradation and NDMA accumulation in ranitidine products. *Id.* ¶ 884.

The Defendants argue that the Plaintiffs' allegations about stability testing are insufficient because they do not identify which tests the Defendants should have conducted that would have revealed ranitidine degradation or when such tests became available. DE 3116 at 28.  The Defendants assert that some of them manufactured ranitidine products decades in the past. *Id.*

But the Plaintiffs have identified one test that they maintain could have detected NDMA and that was available at all times that ranitidine products were manufactured.  That is, the Plaintiffs have alleged that "mass spectrometry" was a "gold-standard" test that was available by at least 1982, around the same time that the FDA approved the first ranitidine product for sale. MMC ¶ 264 (faulting a 1982 GSK study for failure to use "gold-standard mass spectrometry"), ¶ 151 (alleging that the FDA approved the sale of Zantac in 1983).  And the Plaintiffs have alleged that "gas chromatography-mass spectrometry" testing in 2019 revealed high levels of NDMA in ranitidine pills. *Id.* ¶ 230.  These allegations, in conjunction with the allegations about federal requirements for stability testing and the availability of testing that would have revealed degradation, plausibly plead that the Defendants should have known that ranitidine can degrade to

form NDMA with time and with exposure to moisture.[20]  Therefore, the Plaintiffs have plausibly

pled notice for the claims based on expiration dates and product containers.  The Defendants'

request to dismiss those claims is denied.

### 4.  Viability and Pleading of the Claims for Failure to Warn Consumers Through the FDA

The Plaintiffs bring claims against the Manufacturer Defendants in the MMC for failure to

warn consumers through the FDA.  These claims are raised under the laws of California, the

District of Columbia, Indiana, Maryland, Missouri, Nevada, and Pennsylvania.  The Plaintiffs

allege that the Manufacturer Defendants breached their duties, under the laws of these

jurisdictions, to convey warnings to the FDA of the dangers of ranitidine products when those

warnings could have reached consumers. *See, e.g.*, MMC ¶¶ 1068-69.

The Manufacturer Defendants argue that the claims must be dismissed because they are

not viable under the laws of the seven jurisdictions and because the claims are not plausibly pled.

DE 3116 at 29-33.  The Plaintiffs' response incorporates by reference their opposition to the

dismissal of Count V of the AMPIC, another claim for failure to warn consumers through the FDA.

DE 3429 at 34; *see* DE 3424.  The Plaintiffs argue that their claims are plausibly pled and that the

Manufacturer Defendants incorrectly interpret state law in reaching their conclusion that

jurisdictions would not recognize the claims. DE 3424 at 35-44.  The Plaintiffs concede that the

District of Columbia and Indiana would not recognize the claims, and they seek leave to amend

their pleading to raise the claims under the laws of Idaho and Wisconsin. *Id.* at 45.

In the Court's Order Granting in Part and Denying in Part the Branded Defendants' Rule

12 Partial Motion to Dismiss Plaintiffs' Three Master Complaints as Preempted by Federal Law,

---

[20] Given this conclusion, the Court does not address the parties' arguments about notice based on ranitidine's molecular structure and research from the 1980s.

the Court concluded that the Plaintiffs' claims for failure to warn consumers through the FDA are pre-empted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), for the reasons that the Eleventh Circuit Court of Appeals outlined in *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1330 (11th Cir. 2017). The Court dismisses the claims with prejudice for that reason. In light of this ruling, the Court need not address arguments directed to the viability of the claims under state law and pleading deficiencies or the Plaintiffs' request to add sub-counts under the laws of Idaho and Wisconsin.

### 5. Claim Splitting

The Defendants argue that the Plaintiffs have impermissibly split their claims between the MMC and the ELC. This is impermissible, the Defendants argue, because in the Eleventh Circuit all of a plaintiff's related claims must be brought in one pleading. As explained by the Eleventh Circuit: "The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017). The rule exists "to allow district courts to manage their docket and dispense with duplicative litigation." *Id.* The Defendants' claim-splitting argument is premature for several reasons.

First, there is no "duplicative litigation," because there is but one case pending before the Court—this MDL—and all other cases have been administratively closed pending remand. Second, the reason the Plaintiffs have arguably split their claims between two master pleadings is because the Court expressly granted the Plaintiffs permission to do so at docket entry 2720. Third, the reason the Court granted the Plaintiffs permission to file an additional master complaint was *because* the Court was exercising its authority to "manage [its] docket."[21] The Court will not

---

[21] Furthermore, the reason an additional master pleading is useful to the Court is because it assists the Court in analyzing *the Defendants'* motion to dismiss challenges. *See generally* DE 2515.

penalize the Plaintiffs through dismissal for filing a master pleading that the Court expressly authorized. Fourth and finally, once the pleadings have closed and this matter is ripe for remand the Defendants may, upon proper motion, raise this issue anew. The Defendants may raise this issue at such time to the extent they believe it is necessary to avoid duplicative litigation in any transferee court. At this stage of the MDL, the Court denies without prejudice the Defendants' request to dismiss any complaint because of improper claim splitting.

### 6. Factual Inconsistencies

The Defendants argue that certain counts in the class complaints are factually inconsistent because, within the allegations incorporated into the counts, the Plaintiffs advance multiple theories as to how ranitidine injured the Plaintiffs. *E.g.,* MMC ¶¶ 185-304. The Defendants contend that these different theories of injury are inconsistent. In response, the Plaintiffs argue that their theories are not inconsistent—they simply postulate *different* explanations for the Plaintiffs' injuries, not *inconsistent* explanations. The Court concludes that Plaintiffs' claims need not be dismissed or amended based on these alleged inconsistencies. To the extent the Plaintiffs' various theories for recovery implicate pre-emption concerns, that is a matter that will be addressed in the Court's Order on the Generic Defendants' Rule 12 Motion to Dismiss on the Ground of Preemption.

## B. Issues Raised in the ELC

### 1. Shotgun Pleading

#### a. Arguments and Allegations

The Defendants argue that the ELC is still a shotgun pleading that violates Rule 8, despite the Court's Order at docket entry 2515 ("Shotgun Order") noting that the ELC impermissibly incorporated hundreds of allegations into every count and lumped the Defendants together. DE

3116 at 35.  Rather than cure those deficiencies, the Plaintiffs merely re-organized their claims. *Id.* In turn, each of the ELC's 1,675 counts still incorporate hundreds of paragraphs of allegations, and many of the same paragraphs are alleged against all the Defendants. *Id.* at 36.  While all the Defendants are no longer lumped together in the same counts, the Plaintiffs still sue multiple Defendants for identical claims without differentiating their actions. *Id.*  As to their fraud-based claims that are subject to Rule 9(b), the Plaintiffs' pleading falls even shorter. *Id.* at 38.  The Plaintiffs' shotgun pleading again precludes the Court from undertaking a proper standing analysis. *Id.* at 37.

The Plaintiffs argue that the ELC neither impermissibly incorporates paragraphs nor lumps the Defendants together. DE 3429 at 40-41.  The Plaintiffs incorporate only relevant factual allegations into each count, and it is of no consequence that there may be hundreds of relevant paragraphs. *Id.* at 40.  The Plaintiffs also separately set forth each Defendant and each claim in the ELC. *Id.* at 41.

### b.  Law on Shotgun Pleading

Rule 8(a) requires that any claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A shotgun pleading fails "to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claims rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). There are roughly four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not

obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1321-23 (footnotes omitted).

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must set forth:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

**c.   Analysis and Conclusion**

In the Shotgun Order, the Court concluded that the Plaintiffs (1) impermissibly incorporated hundreds of allegations into every count, and (2) impermissibly lumped related and unrelated Defendants together. DE 2515 at 22.  The Defendants argue that the ELC still commits both sins.  The Court disagrees.

As noted in the Shotgun Order, the original ELC indiscriminately incorporated the first 748 paragraphs into all 314 counts, including every factual allegation. *Id.*   Such wholesale incorporation is not present in the amended ELC, as each count incorporates a narrower set of allegations. *See, e.g.*, ELC ¶¶ 1302, 1304.  Although the Defendants argue that many of the same voluminous allegations are alleged against each Defendant, that does not, by necessity, deprive the Defendants of notice of the claims against them. *Cf. Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) (complaint not a shotgun pleading) ("[T]he complaint can be fairly read to aver that all

defendants are responsible for the alleged conduct."); *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x 597, 603 (11th Cir. 2008) ("[A] complaint—so long as it is minimally sufficient to put a defendant on notice of the claims against him—will not fail for mere surplusage."); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-1928, 2009 WL 577726, at *6 (S.D. Fla. Mar. 5, 2009) (citing *Bailey* and concluding that MDL master complaint was not a shotgun pleading).

Separately, the Defendants argue that the Plaintiffs "still lump groups of Defendants together and allege in undifferentiated fashion the purported conduct supposedly underlying the subsequent, separated claims." DE 3508 at 19.   Contrary to the Defendants' argument, the Plaintiffs appear to have eliminated the lumping that the Court found problematic in the original ELC.  While many counts in the original ELC were alleged against multiple groups of Defendants, or all Defendants, each count in the amended ELC appears to be alleged against one specific Defendant (or related Defendants). *Compare* DE 889 at 354 (Count 9, violation of the Alabama Deceptive Trade Practices Act, alleged "Against Brand-Name Manufacturer Defendants and Generic Manufacturer Defendants"), *with* ELC at 1554 (Count 409, violation of the Alabama Deceptive Trade Practices Act, alleged "Against Amneal").

Finally, the Defendants' argument that the Plaintiffs' "fraud-based claims" fail under Rule 9(b) is unpersuasive. DE 3116 at 38.  The Defendants appear to devote just one sentence in their Motion to this argument, and do not specify which of Plaintiffs' ELC counts are "fraud-based claims."  Absent adequate briefing on the issue, the Court declines to consider the matter.

Even if the Defendants view the ELC as imperfect, the Court is satisfied that the Plaintiffs have adequately addressed the shotgun pleading sins that were previously present.  The ELC need not be perfect; it need only provide the Defendants with fair notice of the allegations. *Twombly*, 550 U.S. at 554-56. If the Court ordered the Plaintiffs to replead with the detail that the Defendants

demand, the ELC would likely balloon to thousands of more pages and make an already massive pleading even larger.  That would in turn jeopardize one major purpose of multidistrict litigation, namely to "promote the *just and efficient conduct*" of "actions involving one or more common questions of fact pending in different districts." 28 U.S.C. § 1407(a) (emphasis added).

Particularly in an MDL of this size, a district court retains wide discretion to ensure that the litigation progresses efficiently and without undue delay.  This Court has exercised that discretion at various stages of the litigation in order to efficiently administer this MDL, including through the issuance of more than 60 Pretrial Orders.  Its conclusion on this issue is consistent with fulfilling the Court's obligation to properly manage the MDL.

### 2.  Article III Standing: Injury-in-Fact

#### a.  Arguments and Allegations

Renewing an argument raised in a prior motion to dismiss,[22] the Defendants argue that the ELC should be dismissed because the Plaintiffs fail to plead an injury-in-fact to satisfy Article III standing. DE 3116 at 38.  The Defendants argue that in an earlier Order, the Court rejected the Plaintiffs' theory of economic injury based on *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019). *Id.* at 38-39 (discussing DE 2515).  On replead, "Plaintiffs' burden [was] to supply plausible factual allegations explaining their assertions of economic loss for a ranitidine medication created 'exactly in the manner in which the FDA approved it.'" *Id.* at 39 (citing DE 2515 at 43).  Yet the Plaintiffs rely on "the same rejected theory that all ranitidine-containing medications are defective as approved, and therefore 'worthless' or 'worth less' because the Plaintiffs would not have made their purchases if they had known of the purported 'safety risks.'" DE 3508 at 19-20 (citing DE 3429 at 18-22).  The Plaintiffs do so without any new supporting

---

[22] *See* DE 2037.

factual allegations, and in lieu of attributing their losses to the conduct that is now allegedly at issue, namely expiration dates, packaging, and storage.  But the Plaintiffs' allegations again fall short under *Debernardis* and do not constitute a concrete, particularized, and actual or imminent harm that is required for Article III standing. DE 3116 at 39; DE 3508 at 20.  The Plaintiffs do not allege that the ranitidine they took was ineffective, and although they allege that NDMA is a carcinogen with dangerous properties, the Plaintiffs do not allege that they experienced toxic or carcinogenic consequences due to ingesting the Defendants' ranitidine products. *Id.*  Absent allegations of physical injury or inefficacy, the Plaintiffs cannot allege that they purchased a "worthless" product. *Id.*

The Plaintiffs respond that they plausibly plead an economic injury, since they purchased ranitidine products that they would not have bought had they known that the products cause cancer. DE 3429 at 35.  Their financial injury is equal to the price that they paid for the products, which is adequate for Article III standing. *Id.* at 36.  The Plaintiffs' case is exactly like *In re Valsartan, Losartan, & Irbesartan Products Liability Litigation*, MDL No. 2875, 2021 WL 1000204 (D.N.J. Jan. 12, 2021).  *Valsartan* also involved allegations that the defendants' products contained NDMA, and the district court found that the plaintiffs pled an injury-in-fact by alleging that they did not receive the benefit of their bargain when purchasing the defendants' products. *Id.* at 37.

While the Plaintiffs do not rely exclusively on *Debernardis* to establish injury-in-fact, the case's principles apply here, including that under a benefit-of-the-bargain theory, a purchaser who buys a product with significant defects may receive nothing of value. *Id.*  The Plaintiffs' case is stronger than *Debernardis*, for the Plaintiffs here allege a substantive safety defect—that the Defendants' products contained NDMA—while the plaintiffs in *Debernardis* alleged a procedural defect, namely that the defendants sold a presumptively adulterated dietary supplement containing

an ingredient that the FDA had not approved. *Id.* at 37-38. In this regard, the Plaintiffs' case is more like *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748 (7th Cir. 2011), wherein the plaintiffs alleged that they would not have purchased the defendants' products had they known of their real-world defects. *Id.* at 38. Further, the Defendants' argument that the Plaintiffs allege neither physical injury, nor that the ranitidine products were ineffective, is unpersuasive, as the Plaintiffs' theory of economic injury is not premised on those circumstances, and courts have routinely rejected the Defendants' argument. *Id.* at 38-39. Finally, that the FDA approved the Defendants' products does not impact the Plaintiffs' injury, since the Plaintiffs allege that the products contain NDMA and cause cancer, and they would not have purchased ranitidine products had they known. *Id.* at 39.

### b. Law on Article III Injury-In-Fact

"Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). That a case or controversy exists is a bedrock requirement, and courts cannot exercise judicial power without it. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc). "Standing, ripeness and mootness are three traditional doctrines governing whether a case or controversy exists." *Id.* Standing is "perhaps the most important of the jurisdictional doctrines." *Id.* (quotation marks omitted).

The "irreducible constitutional minimum of standing" entails three elements: injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The party invoking federal jurisdiction bears the burden of establishing each element. *Id.* at 561. The *Lujan* elements are "an indispensable part of the plaintiff's case, [and] each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

The Defendants only challenge the injury-in-fact element.  To show an injury-in-fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks omitted).  A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  A concrete injury is one that is "real" and not "abstract." *Id.*  A plaintiff can allege concrete harm in three ways:

> First, he can allege a tangible harm—a category that is the most obvious and easiest to understand and that includes, among other things, physical injury, financial loss, and emotional distress. Second, a plaintiff can allege a risk of real harm. Third, in the absence of a tangible injury or a risk of real harm, a plaintiff can identify a statutory violation that gives rise to an intangible-but-nonetheless-concrete injury.

*Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 994 F.3d 1341, 1346 (11th Cir. 2021) (quotation marks and citations omitted).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim." *Lujan*, 504 U.S. at 561.  "But that is not a free pass—these general factual allegations must plausibly and clearly allege a concrete injury," and mere conclusory allegations are insufficient. *Godiva*, 979 F.3d at 924 (quotation marks omitted). Courts "will not imagine or piece together an injury sufficient to give a plaintiff standing when it has demonstrated none," and "are powerless to create jurisdiction by embellishing a deficient allegation of injury." *Id.* at 925 (quotation marks omitted).

Economic harm is the epitome of a concrete injury. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).  A person experiences economic harm when, due to a

defendant's conduct, she is deprived of the benefit of her bargain. *Debernardis*, 942 F.3d at 1084. Under a benefit-of-the-bargain theory, damages are generally equal to the difference in value between the product in the condition in which it was delivered versus its value if it were delivered in the condition according to the parties' contract. *Id.* "Ordinarily, when a plaintiff purchases a product with a defect, the product retains some value, meaning her benefit-of-the-bargain damages are less than the entire purchase price of the product." *Id.* Yet when a product is rendered valueless due to a defect, a plaintiff receives a worthless product, and his or her damages are equal to the product's full purchase price. *Id.* "The benefit-of-the-bargain theory thus recognizes that a purchaser who acquires a product with significant defects may effectively receive nothing of value." *Id.*

### c.   Analysis and Conclusion

Relying on a benefit-of-the-bargain theory, the Plaintiffs allege that they have suffered tangible harm through financial loss. *E.g.,* ELC ¶¶ 92-272 (The Plaintiffs have "suffered concrete injury in the form of economic damages," since due to the Defendants' conduct, the ranitidine products they purchased "were unsafe for human ingestion and, therefore, were worthless at the time of purchase"); *id.* ¶ 1319 ("Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and the Class members would not have purchased the drug, and, thus, they did not receive the benefit of the bargain and/or suffered out-of-pocket loss."). The Plaintiffs' theory for injury-in-fact is not premised on present physical injury, an increased risk of some future injury, or "statutory violation that gives rise to an intangible-but-nonetheless-concrete injury." *Hunstein*, 994 F.3d at 1346.[23]

---

[23] This is so despite permission from the Court for the Plaintiffs to seek leave to allege class physical injuries through an alternative class pleading.   The Court stated that the Plaintiffs, "without any prejudice to their substantive claims, may seek leave of Court for an alternative pleading to allege their *class physical injury and/or medical monitoring*

The Court concludes that at this procedural juncture, the Plaintiffs have plausibly alleged economic injury-in-fact through purchasing worthless drugs that contained NDMA and were misbranded, and which the Plaintiffs would not have purchased but for the Defendants' conduct. This conclusion is supported by allegations throughout the ELC, including those discussed below.

The Plaintiffs allege that NDMA has been a known human carcinogen since the 1970s. ELC ¶ 443. Two years before Zantac entered the market, Dr. Silvio de Flora published research warning of "toxic and mutagenic effects" when ranitidine interacted with human gastric fluid and nitrites. *Id.* ¶¶ 373, 388. Dr. de Flora's research was allegedly "known to GSK and should have been known by each Defendant prior to their manufacturing, marketing, labeling, packaging, handling, distribution, and/or sale of ranitidine as the information was available in medical literature." *Id.* ¶ 445. Yet GSK attempted to discredit Dr. de Flora's research, and the Defendants could and should have known of those attempts. *Id.* ¶ 447. Furthermore, at various times, GSK conducted studies investigating the relationship between ranitidine and NDMA, some of which were flawed. *E.g.*, *id.* ¶¶ 395, 446, 448, 450, 452. "Defendants either knew or should have known about the inadequacy of GSK's studies, the impact and cautionary instructions of independent studies, and should have, through due diligence and/or their own independent testing, investigated the issue properly and/or took action to protect consumers from the NDMA risks in their products." *Id.* ¶ 454.

---

*claims.*" *Id.* (emphasis added). During the December 14, 2020 hearing, the Plaintiffs suggested that moving their allegations of physical injury to another pleading would not be problematic. DE 2498 at 161-62.

The Plaintiffs subsequently moved to certify a question for interlocutory appeal. DE 2693. In that motion, the Plaintiffs argued that because of the Court's Order on preemption for Brand-Name Manufacturer Defendants [DE 2532], they could no longer allege economic loss claims premised on personal injury. The Court denied the motion without prejudice, and re-clarified that its prior Order did not preclude the Plaintiffs from pleading as they described. DE 2716 at 2. The Plaintiffs' decision to premise their economic loss purely on purchasing an allegedly unsafe and worthless product—rather than on personal injuries—was not because they were prohibited from doing so. At the Hearing, the Plaintiffs confirmed that they were aware of their right to seek leave to file a class personal/physical injury complaint, but did not exercise it. Hearing Tr. at 167-68.

The Plaintiffs later allege that pursuant to federal regulations, the Defendants were required to inform the FDA annually about new information affecting ranitidine's safety, effectiveness, or labeling. *Id.* ¶¶ 464-65.  Despite publicly available science demonstrating that ranitidine products contained and exposed users to NDMA, the Defendants allegedly disregarded that science and never disclosed those risks to the FDA, in violation of their reporting obligations. *Id.* ¶¶ 462, 466-68.  "Because Manufacturer Defendants never properly disclosed the risks to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this risk." *Id.* ¶ 468.  Yet once the FDA learned about the NDMA risks associated with ranitidine products, it ordered voluntary recalls of the products. *Id.* ¶¶ 372, 469.  Had any Manufacturer Defendant notified the FDA about the risks sooner, the FDA would have ordered the ranitidine products removed from the market. *Id.* ¶ 469.  And by failing to include warnings on labels that consumers were at elevated risks of cancer, the Defendants made false statements in the labeling of their products. *E.g., id.* ¶ 844.

In sum, the Plaintiffs allege that based on research pre-dating the FDA's approval of ranitidine, the Defendants knew or should have known that ranitidine transformed into NDMA. Notwithstanding that research, the Defendants withheld the information from the FDA and consumers, including through product labeling that did not warn about NDMA exposure or an increased risk of cancer.  In turn, the Plaintiffs purchased products that contained NDMA, were mislabeled, and were worthless.  The Plaintiffs were thus denied the benefit of their bargain, and had they been properly warned of the risks associated with the Defendants' ranitidine products, they would not have purchased them.  Those allegations suffice at this stage of the litigation.  While the Defendants argue that, because the Plaintiffs do not allege physical injury or product inefficacy, they cannot say that the ranitidine products were worthless, courts inside and outside this circuit

have rejected that argument. *See, e.g.*, *Valsartan*, 2021 WL 100204, at *10-11 ("Defendants argue [that] unless Plaintiffs allege they were physically harmed by a product or that it failed to perform its anticipated benefit, there is no economic injury in fact. This is just not true."); *see also Aqua Dots*, 654 F.3d at 750-51 (rejecting argument that absent physical injury, plaintiffs lacked standing, since "[t]he plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing."); *Yachera v. Westminster Pharms., LLC*, 477 F. Supp. 3d 1251, 1263 (M.D. Fla. 2020) ("Such allegations may be '*sufficient* to establish standing,' but they are not '*necessary* to establish standing.'") (quoting *Debernardis*, 942 F.3d at 1086).

The Court's decision does not settle the issue of standing for the remainder of the case. The Court is free, and in fact obligated, to consider the question of standing *sua sponte* at each stage of the litigation:

> Before rendering a decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it.

*Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991). Discovery may reveal additional facts bearing on the Plaintiffs' standing (or lack thereof), and the Plaintiffs must back up the allegations that they rely on for standing with evidentiary support in the record. *Debernardis*, 942 F.3d at 1090 (Sutton, J., concurring) ("At summary judgment, each claimant will need evidence to back the point up. Why was the product worthless as to each of them? How did it deliver less than expected? Did each of them use the product even after they knew of the labeling deficiency? The answers to these questions and others will

determine whether the case may proceed further . . . .").[24]  The Court is sufficiently satisfied that, at this stage of the litigation, the ELC should survive the motion to dismiss as to Article III standing.

The legal landscape as to standing in general, and standing based on economic injury, is less than clear. *See Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1116 (11th Cir. 2021) (Newsom, J., concurring) ("Despite nearly universal consensus about standing doctrine's elements and sub-elements, applying the rules has proven far more difficult than reciting them."); *id.* at 1117 ("[O]ur Article III standing jurisprudence has jumped the tracks.").  Indeed, caselaw cited by the parties reveals a range of approaches to analyzing economic injury as a basis for Article III injury-in-fact, with many cases emphasizing different factual aspects to justify their conclusions. *Compare, e.g., Debernardis*, 942 F.3d at 1088 (standing where "the plaintiffs purchased adulterated dietary supplements that they would not have purchased had they known that sale of the supplements was banned"), *with Doss v. Gen. Mills, Inc.*, No. 18-61924, 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019) (no standing where plaintiff did not allege health effects from eating Cheerios, or that "the Cheerios she herself bought actually contain[ed] any glyphosate"), *with Aqua Dots*, 654 F.3d at 751 (plaintiffs suffered economic injury, despite their children not suffering

---

[24] At the Hearing, the Plaintiffs acknowledged that subsequent discovery will bear on the issue of standing:

> [The Court]: Are there particular facts that can be developed on the record beyond, obviously, the pleading stage and the 12(b)(6) [stage] that would further illuminate this issue?
>     For example, am I understanding what you just said to say that perhaps, once we get into individual Plaintiff discovery and we learn, let's just say hypothetically . . . the risk was not so great, it wasn't so harmful, or it wasn't as harmful as alleged, would that bear – should that bear on the Court's consideration of standing, and . . . if yes, would that be a reason why the Court would want to consider that at a later point, or does that have nothing to do with the analysis of standing?

> Ms. Fegan: Your Honor, if ultimately the proof showed that the drug was not dangerous, or did not create NDMA, absolutely, I think we lose. But at this point, that is not the allegation[], and certainly that is not bearing out in the case at large.

Hearing Tr. at 183-84.

physical injury, since plaintiffs "paid more for the toys than they would have, had they known of the risk the beads posed to children"), *with Medley v. Johnson & Johnson Cons. Cos., Inc.*, No. 10-cv-02291, 2011 WL 159674, at *2 (D.N.J. Jan. 18, 2011) (plaintiffs did not suffer economic injury, since "[o]nce the product had been consumed . . . there was no economic injury for Plaintiffs to complain of").

While this Court is bound by *Debernardis*, the Eleventh Circuit stated that its opinion was intended to be read narrowly. *See* 942 F.3d at 1088 ("We caution that our decision is limited to the specific facts alleged in this case—that the plaintiffs purchased dietary supplements that Congress, through the FDCA and the [Dietary Supplement Health and Education Act], had banned from sale with the purpose of preventing consumers from ingesting an unsafe product."). *Debernardis* thus left open meaningful questions as to whether the factual allegations in the instant case should result in the same outcome, or whether the Plaintiffs' allegations, without more, will open the floodgates to future litigation—a concern expressed at the oral argument in *Debernardis*. *Id.* Because the Court has the duty to re-examine standing at every juncture of the case, it is reasonable, and arguably consistent with the reasoning in *Debernardis*, to allow the case to proceed at this time. With a more fully developed factual record, the Court will be better positioned to discern whether this case leans toward or away from *Debernardis*, and if the latter, whether the rationale for finding standing in *Debernardis* nevertheless supports standing in this case.

### 3. Learned Intermediary Doctrine

The Defendants argue that the Plaintiffs' failure-to-warn claims concerning prescription ranitidine fail as a matter of law under the learned intermediary doctrine. DE 3116 at 42. This is so because "Plaintiffs do not allege that their physicians were inadequately warned about the

alleged cancer risk associated with ranitidine, or that their physicians would have made different prescribing decisions if they had been warned." *Id.*

At the Hearing, the Court noted that the Defendants did not challenge the MMC or the AMPIC on the basis of the doctrine; it also observed that, unlike the ELC, those complaints contain allegations about the Defendants' failure to warn the Plaintiffs' prescribing physicians. Hearing Tr. at 191-92.[25]  Also at the Hearing, counsel for the Plaintiffs stated that if the Court ordered repleading, the Plaintiffs could include similar allegations in the ELC:

> The Court: I understand both sides disagree about what needs to be pled, but can I confirm my understanding of this discussion, which is, if the Court, for whatever reason, concludes that it is necessary to plead for the purpose of addressing learned intermediary, that the Plaintiffs would readily amend their ELC to add the type of language . . . that you have in your AMPIC and MMC. Maybe you would even add more in light of the arguments you have seen by Defense, but at a minimum, you would add what you already have with the other two [complaints]?

> Ms. Fegan: Absolutely.

Hearing Tr. at 194-95.  While the Defendants did not commit to the position that the relevant allegations in the AMPIC and MMC were sufficient to overcome the learned intermediary doctrine, they did suggest that at this stage, such allegations would be sufficient if made in the ELC, subject to the Defendants' ability to re-raise the issue later in the litigation:

> The Court: To recap what I think I understood you to say is, it is possible, if I were to allow a replead and [Plaintiffs] were to come back with similar allegations, you might find that for purposes of now that might be okay, but you would want to preserve your right, as with other state specific doctrines, laws, that we would take that up in terms of the nuances of the different state laws, and how they apply the doctrine at the appropriate time for PTO 61, like [at the] bellwether stage.

> Ms. Cohan: I think that is fair, your Honor.

*Id.* at 196:15-23.

---

[25] *See, e.g.*, ELC ¶¶ 983-84; *see also* AMPIC ¶¶ 462-63.

Given the foregoing, the Court dismisses the Plaintiffs' prescription-based claims—namely, Counts 2-71 and 409-1062—without prejudice, and with leave to plead allegations that are specifically relevant to the learned intermediary doctrine.  This scope of leave is not broad, but rather extremely narrow and specific as to this discrete issue.  Following the Plaintiffs' replead as to this issue, the Court will not entertain further motions to dismiss on this issue.  Consistent with Pretrial Order #61, however, the Defendants may seek leave of Court to re-raise this issue as it becomes relevant at a later stage of the litigation.

### 4. Consumer Protection Safe Harbors; FDA Labeling Presumed Valid; Unjust Enrichment

The Defendants argue that for 24 states,[26] "statutory or judicially-created 'safe harbor' provisions bar the Plaintiffs' state consumer protection claims as a matter of law, because the FDA approved the Defendants' sale of ranitidine products and labeling associated with the products." DE 3116 at 46-47 (collecting cases).  Relatedly, the Plaintiffs' consumer protection, implied warranty, and unjust enrichment claims are barred, since the Defendants' FDA-approved labels were presumptively lawful and not false or misleading.  *Id.* at 50.  Finally, the Plaintiffs' unjust enrichment claims should be dismissed because the Plaintiffs cannot plead that they conferred a benefit on the Defendants, or that the Defendants committed any wrongdoing. *Id.* at 51.

Notwithstanding the Defendants' ability to move for dismissal on the issues summarized above, their briefing of each is inadequate.  Due to each issue's complexity, the number of jurisdictions involved, and the number of claims that the Defendants seek to dismiss through each issue, the Court would need far more extensive briefing to reach fully informed conclusions.  The Defendants' Motion is therefore denied without prejudice as to these issues.  Consistent with

---

[26] Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Tennessee, Utah, Virginia, and Washington.

Pretrial Order # 61, the Defendants may seek leave of Court to raise these state-law issues at a later stage of the litigation.

### VII.    Conclusion

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Defendants' Omnibus Motion to Dismiss and/or Strike Consolidated Medical Monitoring Class Action Complaint and Consolidated Amended Consumer Class Action Complaint [DE 3116] is **GRANTED IN PART AND DENIED IN PART**.

1. In the MMC, Plaintiffs' Montana medical monitoring Counts (Counts 134-137) are **DISMISSED WITH PREJUDICE**.  The remaining Counts in the MMC are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** consistent with this Order.

2. In the ELC, Counts 2-71 and 409-1062 are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** consistent with this Order.

3. Leave to amend is granted as to the MMC and the ELC.  The Court will further address the Plaintiffs' leave to amend and describe the process for that amendment in a future order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of June, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record