**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924
JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E.
REINHART

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

<u>**BRAND DEFENDANTS' OPPOSITION TO VALISURE LLC'S MOTION TO QUASH
AND FOR PROTECTIVE ORDER AND CROSS-MOTION TO COMPEL SUBPOENA
COMPLIANCE, AND INCORPORATED MEMORANDUM OF LAW**</u>

The Brand Defendants are seeking documents related to Valisure's ranitidine testing,
financial bias, relationship with plaintiffs' attorneys and law firms, and political influence.  As the
Court has recognized: "The Valisure study and the scientific linkage between NDMA and
ranitidine are vitally important issues in this litigation."  This discovery is proportional to the needs
of the case, especially in light of the importance of this evidence and the Brand Defendants' efforts
to limit Valisure's burden.  The Brand Defendants have already voluntarily agreed to pay 50% of
Valisure's e-discovery technology vendor costs and reviewed metadata for all of the documents
responsive to the search terms in order to reduce Valisure's review burden by around one third.

The undersigned Brand Defendants respectfully ask the Court to deny Valisure LLC's
motion to quash or for a protective order (including its request for costs) and to compel Valisure
to: **(1)** produce all non-privileged documents identified through the parties' agreed upon search
terms (except those documents the Brand Defendants have already identified as not relevant based
on its review of Valisure's metadata hit report); **(2)** not withhold non-privileged documents based
on "confidentiality" (as documents can be designated as confidential pursuant to PTO 26);

(**3**) include all email accounts or storage accounts used by Valisure officers or employees for work purposes in its collection (e.g., Valisure CEO's personal Gmail account); and (**4**) produce a privilege log of all documents it contends are privileged or otherwise exempt from production.

## BACKGROUND[1]

### *Valisure's Ranitidine Campaign*

On September 13, 2019, online pharmacy Valisure made headlines by reporting to the U.S. Food & Drug Administration (FDA) in a citizen petition that it had "detected extremely high levels of N-Nitrosodimethylamine ('NDMA')" in ranitidine and by executing a coordinated press campaign about its findings.[2]  Beginning the very same day, lawsuits were filed around the country against manufacturers and retailers of ranitidine medications—including one filed by Valisure CEO David Light's brother-in-law (a plaintiffs' attorney)—directly relying on Valisure's testing.[3] These lawsuits were eventually consolidated in this MDL.

But Valisure's story of "extremely high levels" of NDMA was false.  Valisure generated these NDMA numbers by using a testing method that was never validated for testing for NDMA in ranitidine and that involved super-heating the sample to 130 C° / 266 F°.[4]  The super-heating

---

[1] In addition to this Background section, Brand Defendants submit a chronology listing the events relevant to Valisure, attached as Exhibit 58.  As this timeline shows, Valisure and other third parties have produced relatively few documents prior to Valisure filing its citizen petition that are relevant to its ranitidine testing, financial bias, relationship with plaintiffs' attorneys and law firms, and political influence.

[2] Valisure, *Valisure Citizen Petition on Ranitidine*, FDA Docket No. FDA-2019-P-4281 (dated Sept. 9, 2019, submitted Sept. 13, 2019), https://www.regulations.gov/docket/FDA-2019-P-4281, https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf ("Valisure Citizen Petition") (Exhibit 27).

[3] *See* Complaint and Demand for Jury Trial, *Galimidi v. Sanofi US Services, Inc., et al.*, No. 132019CA027190000001 (Fla. 11th Cir. Ct. Sept. 13, 2019), *removed to federal court*, No. 1:19-cv-24395 (S.D. Fla) (Exhibit 28).

[4] Valisure Citizen Petition at 6, n.8.

degraded the ranitidine molecule thereby creating the NDMA that Valisure "detected." Valisure knew its test method was flawed long before it pushed its misinformation to the FDA and the public.[5]

The FDA immediately responded to Valisure's claims by announcing an investigation, but stated that it was "not calling for individuals to stop taking ranitidine at this time," and explained that "[a]lthough NDMA may cause harm in large amounts, the levels the FDA is finding in ranitidine from preliminary tests barely exceed amounts you might expect to find in common foods."[6] Out of an abundance of caution, manufacturers and retailers recalled and stopped selling ranitidine medications in order to further investigate the potential NDMA contamination. A few weeks after receiving Valisure's citizen petition, the FDA publicly criticized the testing method used by Valisure, stating that "the testing method used by a third-party laboratory [Valisure] uses higher temperatures . . . [which] generated very high levels of NDMA from ranitidine products because of the test procedure . . . [therefore this] method is not suitable for testing ranitidine because heating the sample generates NDMA."[7]

Valisure knew that its testing method produced artificially high levels of NDMA. Its citizen petition mentions that its "modest heating"—266 F°—may itself produce NDMA,[8] but downplayed that possibility by stating that "other conditions that are designed to reflect those in

---

[5] *See, e.g.*, Email dated Apr. 1, 2019, EMERY 0122-40 (Exhibit 8).

[6] FDA, *FDA Statement: Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[7] FDA, *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)*, https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (Oct. 2, 2019 update) (Exhibit 34).

[8] Valisure Citizen Petition at 3-4, 6-7.

the human body were also tested . . . reveal[ing] high NDMA levels."[9]  However, that claim was

seriously misleading, if not downright false.  When Valisure tested ranitidine at body temperature,

it found **no NDMA**.[10]  Similarly, its testing with industry-standard simulated gastric fluid and

simulated intestinal fluid found **no NDMA**.[11]  It was only when Valisure treated the ranitidine

sample with very high levels of sodium nitrite that it was able to "detect" any NDMA.[12]  Even

then, the NDMA levels were only a small fraction of the NDMA levels from the high-temperature

test method.[13]  And the high levels of sodium nitrite did not "reflect th[e conditions] in the human

body"[14]—these levels were actually hundreds of times higher than the upper range of physiological

conditions.[15]

Valisure also omitted information from its petition that undermined its test results, despite

certifying that it was not omitting any such information as required by federal regulations

(21 C.F.R. § 10.30(b)(3)).[16]  Valisure failed to tell the FDA that it had retained Emery Pharma—a

company it had retained to validate its results[17]—had reported to Valisure that, "the [very high]

---

[9] *Id.* at 3-4.

[10] *Id.* at 7.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 6-7.  Of course, whether NDMA can form in the body after taking ranitidine is a separate issue from whether NDMA was already present in ranitidine (what the high-temperature testing purported to show).

[14] *Id.* at 3-4.

[15] *See* Gao Zongming, et al,, *In Vitro Analysis of N-Nitrosodimethylamine (NDMA) Formation From Ranitidine Under Simulated Gastrointestinal Conditions*, JAMA Netw Open. 2021 Jun 1;4(6):e2118253, https://pubmed.ncbi.nlm.nih.gov/34181009/.

[16] Valisure Citizen Petition at 18 ("The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all the information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition."); *see also* 21 C.F.R. § 10.30(b)(3).

[17] *See id.*; Emails dated Mar. 29, 2019, EMERY 0122-40 (Exhibit 8).

levels [of NDMA] obtained are suspected to be caused by the heating produced in this method."[18] After the FDA publicly criticized Valisure's flawed testing method, Emery noted internally that this "shows what happens when **Valisure rushed to deliver** ████████████,"[19]

Valisure also claimed that its research was buttressed by a study by a Stanford professor that measured NDMA in urine after test subjects took ranitidine.[20]  Leaving aside that NDMA formation in the stomach is a separate issue from whether excess amounts of NDMA were present in ranitidine products (Valisure's claim), Valisure did not disclose to the FDA that it had retained the primary author of that study as a consultant or that it knew the results were obtained using the same faulty high-temperature method used by Valisure (the study was later retracted).[21]

To date, Valisure has never withdrawn its citizen petition or publicly admitted that its ranitidine testing was flawed and inaccurate.  In fact, after being rebuked by the FDA, Valisure

---

[18] Confidential Report (R&D) by Emery Pharma, EMERY 0151-0153 (emphasis added) (Exhibit 20).

[19] *See* Email dated Dec. 5, 2019, EMERY 1879-80 (emphasis added) (Exhibit 45).

[20] Valisure Citizen Petition at 10-11 (citing T. Zeng and W. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016), https://www.ncbi.nlm.nih.gov/pubmed/26992900).

[21] *See* Email dated Mar. 27, 2019 MITCH001081-82; VAL-1104-05 (David Light contacting Drs. Mitch and Zeng) (Exhibit 7); Confidentiality Agreement between Valisure and Dr. William Mitch, MITCH 000004-09 (Exhibit 10); Email dated Apr. 19, 2019, MITCH 001080 (David Light emailing Dr. Mitch discussing potential methodological flaw in Dr. Mitch's ranitidine urine study) (Exhibit 12); Emails dated Apr. 12, 17, 18, and 19, 2019, MITCH 01115-18 (David Light communicating with Dr. Mitch and others about ranitidine research and Dr. Mitch's consulting role) (Exhibit 11); Emails dated Apr. 30 and May 1, 2019, VAL 01050-51 (Dr. Mitch sending David Light a draft correction to the publisher of his ranitidine urine study because of a methodological flaw) (Exhibit 15); Draft Correction Letter from Dr. William Mitch to Dr. Curtis Harris, Chief Editor, Carcinogenesis (Apr. 29, 2019), VAL 01116-17 (Exhibit 15); *Retraction to: Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 42(7) CARCINOGENESIS 1008 (advanced publication May 4, 2021) (Exhibit 47).

continued to push its misinformation in the press[22] and even attempted to get it published in peer-reviewed journals.

Valisure also continued lobbying to get public officials to pressure the FDA to take action on ranitidine based on Valisure's false and misleading testing information.  For example, less than a week after filing its citizen petition, David Light and Michael Bretholz visited the chair of the U.S. House of Representatives Energy and Commerce Committee, Subcommittee on Health, who in turn sent a letter to the FDA about ranitidine a few days later.[23]  A few months later, Valisure took another lobbying trip (set up by its lobbyist) to meet with about a dozen members of Congress to discuss ranitidine.[24]

### *Valisure's Business Model*

Valisure's flawed science should come as no surprise given its cozy relationship with the plaintiffs' bar.  Valisure receives funding from plaintiffs' attorneys and had discussions with plaintiffs' firms prior to filing its citizen petition.[25]

Valisure's conduct with regard to ranitidine reflects its *modus operandi*, which is: (1) identify a widely used drug or consumer product to test; (2) upon finding (or manufacturing) any adverse outcome, file a citizen petition with the FDA asking it to take the product off the market; (3) run a media and lobbying campaign to publicize its test results—all of which are often

---

[22] *See,e.g.*, Email dated Sept. 14, 2019, MSK00009784-85 (Valisure CEO had interviews with the New York Times, Wall Street Journal, Reuters, CNBC, Bloomberg Radio, NBC, and USA Today the day after the ranitidine citizen petition) (Exhibit 29).

[23] Emails dated Sept. 19, 20, 2019, MSK00009801-02; MSK00009829-30, MSK00009833-34 (Exhibit 30); Anna Edney, *Generic Zantac is Recalled from Major U.S. Pharmacies after Carcinogen is Found in Pills*, L.A. Times (Sept. 26, 2019) (Exhibit 31).

[24] *See* Emails dated Dec. 15, 2019, MSK00010262-64 (Exhibit 46).

[25] *See* Exhibit 11 to Valisure's Brief.

done in coordination or consultation with plaintiffs' attorneys; and (4) numerous lawsuits are filed, often by attorneys that have coordinated or communicated with Valisure.

For example, mere months after Valisure formed, it published an article claiming that rapid-release acetaminophen gel caps actually dissolve slower than regular acetaminophen gel caps.[26]  And on the same day that Valisure issued a press release about its findings,[27] a class action lawsuit was filed against a manufacturer of rapid-release acetaminophen gel caps.[28]  Court filings show that, despite plaintiffs portraying Valisure's testing as an independent study and Valisure initially denying any relationship with the plaintiffs' attorney, the attorney had retained Valisure as a consultant months before the study was published.[29]  Plaintiffs were eventually required to turn over communications with Valisure to the defendant.[30]  The court in that case noted that "the study [by Valisure] may not have been independent, given the possible relationship between the authors of the study and [plaintiff's] counsel."[31]  Following a similar pattern, Valisure recently filed a citizen petition and announced that it had detected the chemical benzene in various body spray products.  The very same day that Valisure announced its findings, a class action was filed

---

[26] Kaury Kucera et al., *Rapid and Fast-Release Acetaminophen Gelcaps Dissolve Slower Than Acetaminophen Tablets*, KENKYU OPEN ACCESS PUBLISHERS, Dec. 11, 2018, https://www.kenkyugroup.org/images/articles/cbd4b1c4680cdfd6e16e3f8ecdc39b6b.pdf.

[27] Valisure, *Scientific Study Reports That On Average Rapid-Release Acetaminophen Gelcaps Dissolve Slower Than Standard-Release Tablets* (Cision PR Newswire Nov. 15, 2018), https://www.prnewswire.com/news-releases/scientific-study-reports-that-on-average-rapid-release-acetaminophen-gelcaps-dissolve-slower-than-standard-release-tablets-300750824.html (Exhibit 3).

[28] *See* Class Action Complaint, *Bailey v. Rite Aid Corporation*, Docket No. 1, No. 3:18-cv-6926 (N.D. Cal. Nov. 15, 2018) (Exhibit 4).

[29] *See* Letter Brief at 2, *Bailey v. Rite Aid Corporation*, Docket No. 94, No. 3:18-cv-6926 (N.D. Cal. Oct. 20, 2020) (Exhibit 2).

[30] *See* Order, *Bailey v. Rite Aid Corporation*, Docket No. 104, 2020 WL 6789435, No. 3:18-cv-6926 (N.D. Cal. Nov. 18, 2020) (Exhibit 5).

[31] *See id.* at *2.

the brother-in-law (a plaintiffs' attorney) of Valisure CEO David Light against a body spray manufacturer, relying on Valisure's testing.[32]

Valisure's ranitidine campaign is no different (and involves the same sequence and many of the same players). While Valisure has not produced documents showing the full extent of its communications and coordination with third parties and public officials regarding ranitidine, the Brand Defendants have learned through discovery obtained from other third parties that a key player in coordinating Valisure's ranitidine testing and citizen petition was plaintiffs' class action attorney Gregory Frank.[33] Having a plaintiffs' attorney direct the Valisure testing and citizen petition that triggered a mass tort litigation based on Valisure's purportedly "independent" testing is an obvious conflict of interest that suggests that Valisure may have intentionally skewed the science.

Valisure also received millions more dollars than ever before in investments after its ranitidine citizen petition.[34] Discovery regarding to Valisure's financial motives, financial bias, and false and misleading PR and lobbying campaign is relevant and proportional to the needs of this case.

Finally, the flaws in Valisure's ranitidine testing are sadly not unique. In 2021, the FDA inspected Valisure's facilities and cited it for numerous violations.[35] The FDA found that Valisure consistently failed to validate and verify its analytical methods and failed to properly qualify its

---

[32] Valisure, *Valisure Detects Benzene in Body Spray Products* (Nov. 4, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products/; Class Action Complaint, *Bryski v. The Proctor & Gamble Co.*, No. 0:21-cv-62285 (S.D. Fla. Nov. 4, 2021) (filed by attorney Yitzhak Levin).

[33] Email dated Apr. 19, 2019, MITCH001115-18 (Exhibit 11); Email dated May 2, 2019, MITCH000557-60 (Exhibit 16); Email dated May 8, 2019, MITCH001086-90 (Exhibit 17).

[34] Valisure S.E.C. filings (Exhibit 37).

[35] Form 483 for Valisure, LLC (May 26 to July 6, 2021) (Exhibit 54).

equipment, and found that Valisure's "laboratory investigations are inadequate."[36]  Nevertheless, Valisure still publicly touts itself as being registered with the FDA.[37]

***Valisure Third-Party Discovery: Procedural History***

In June 2020, Sanofi issued a document subpoena to Valisure.  Several months later, Valisure produced some documents.  But additional discovery from other third parties later showed that Valisure had failed to produce a significant number of responsive documents.  So in June 2021, Boehringer Ingelheim ("B.I.") issued an additional subpoena to Valisure.  Valisure and the Brand Defendants began negotiating the issues of cost and search terms in August 2021.  Valisure eventually produced a detailed hit report with document metadata based on agreed upon search terms in November 2021.  The Brand Defendant GSK quickly reviewed the metadata hit report (attached as Exhibit 57) in its entirety (despite extensive redactions of non-privileged information) and identified documents that were not relevant, thereby reducing the number of documents for Valisure to review by about one-third.  The parties then engaged in several meet and confer meetings with Special Master Jaime Dodge, but were unable to resolve all of the issues in dispute.  A more detailed explanation of the procedural history is set forth in the Brand Defendants' letter to Valisure dated December 20, 2021, attached as Exhibit 56.

**ARGUMENT**

**I. EVIDENCE RELATED TO VALISURE'S RANITIDINE TESTING AND ITS FINANCIAL BIAS ARE RELEVANT AND IMPORTANT IN THIS LITIGATION.**

Valisure's testing, lobbying, and publicity campaign is the ground zero of this entire litigation.  As this Court has correctly recognized when deciding a discovery issue related to Dr.

---

[36] *Id.*

[37] *E.g.*, Valisure, *Valisure Citizen Petition on Benzene in Body Spray Products* at 4 (Nov. 3, 2021), https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-1.pdf.

Adam Bretholz, "The Valisure study and the scientific linkage between NDMA and ranitidine are *vitally important issues in this litigation*. *The origins and motivation of the study, including* when and how Dr. Bretholz suspected a linkage and *Dr. Bretholz's financial relationship with Valisure, is important to the resolution of this issue*."[38]

Almost every ranitidine complaint—from the very first ranitidine lawsuit filed[39] to the current operative Master Complaint expressly cite and rely on Valisure's ranitidine testing. Even if Plaintiffs may have other scientific evidence they intend to rely on, Valisure's testing remains an important part of Plaintiffs' case and this litigation.

Not only is Valisure's "science" part of Plaintiffs' case, but the broader narrative of an "independent" testing pharmacy discovering and blowing the whistle on very high levels of NDMA in ranitidine is key to Plaintiffs' story. Conversely, Defendants are entitled to evidence to show that this litigation was manufactured through a well-coordinated campaign to create and disseminate false and misleading information through Valisure's testing, which was funded and influenced by third party groups and the plaintiffs' bar.

The importance of the Valisure evidence is the most important proportionality factor and weighs strongly in favor of the Brand Defendants.

## II.   DEFENDANTS CANNOT EVALUATE VALISURE'S PRIVILEGE CLAIMS WITHOUT A PRIVILEGE LOG.

Rule 45(e)(2)(A) requires third parties withholding information from a subpoena response based on privilege to "expressly make the claim" and "describe the nature of the withheld documents [or] communications . . . in a manner that, without revealing information itself

---

[38] Order on Motions for Letters Rogatory at 4, ECF No. 4481 (Oct. 27, 2021) (emphases added).

[39] Complaint and Demand for Jury Trial, *Galimidi v. Sanofi US Services, Inc., et al.*, No. 132019CA027190000001 (Fla. 11th Cir. Ct. Sept. 13, 2019), *removed to federal court*, No. 1:19-cv-24395 (S.D. Fla) (Exhibit 28).

privileged or protected, will enable the parties to assess the claim"—in other words, make a privilege log.

Valisure's privilege claims must be properly supported with a privilege log. For example, Valisure investor and business consultant Michael Bretholz is also an attorney. Although he does not work in a law firm or in a legal job, he maintains an active attorney license. Valisure contends that some communications involving Bretholz constitute privileged legal advice. But as Plaintiffs in this MDL have argued, "the mere fact that an attorney is present at a meeting or is copied on a document does not in and of itself afford privilege protection to such a meeting or document."[40] It is clear that not all communications involving Bretholz are privileged—many are not. Productions from other parties indicate that Bretholz helped raise awareness for Valisure's citizen petition by communicating and meeting with influential officials that included White House staff, Department of Justice counsel, and multiple members of Congress.[41] These meetings led to correspondence with the FDA from influential policy makers duplicating Valisure positons.[42] Without a privilege log, the Brand Defendants cannot reasonably determine the veracity of individual claims of privilege.

Additionally, given Valisure's false and misleading statements and omissions to the FDA, the public, and others (in violation of 21 C.F.R. § 10.30(b)(3) as to the FDA), it is possible

[40] Pls.' Opp. To Defs. Sanofi US Services, Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.'s Mtn. to Compel the Return or Destruction of Privileged Docs. and Incorporated Mem. Of Law at 8-9, ECF No. 3698 (June 24, 2021) (quoting *In re Seroquel Products Liab. Litig.*, Case No. 6:06-md-1769, 2008 WL 1995058 at *2 (M.D. Fla. May 7, 2008)).

[41] *See* Email dated May 8, 2019, MSK00009555-58 (Exhibit 19); Emails dated Sept. 19, 20, 2019, MSK00009801-02; MSK00009829-30, MSK00009833-34 (Exhibit 30); Emails dated Dec. 15, 2019, MSK00010258-61 (Exhibit 46).

[42] *See* Email dated Dec. 18, 2019, MSK00010262-64 (Exhibit 47); Letter dated Dec. 18, 2019 (Exhibit 48); Edney, *Generic Zantac is Recalled* (mentioning letter by Rep. Eshoo to FDA) (Exhibit 31).

exceptions to the attorney-client privilege could apply to some communications, if those communications are indeed privileged.  However, it is impossible for the Brand Defendants to evaluate this possibility without a privilege log.

Finally, in Valisure's metadata hit report (a hit report with metadata, such as email subject lines, for each document responsive to the search terms), it redacted numerous fields based on "confidentiality" for documents it does not claim are privileged—including documents that appeared to be highly relevant to the issues in this litigation.  Valisure can designate non-privileged documents as confidential pursuant to PTO #26, which will adequately protect any legitimate confidentiality interests it may have, but it cannot simply withhold those highly relevant documents from production.

## III.  DEFENDANTS SHOULD NOT BEAR ANY ADDITIONAL COSTS FOR VALISURE'S PRODUCTION.

The Brand Defendants have voluntarily agreed to pay half of Valisure's e-discovery technology vendor capped costs.  Because Valisure is not an innocent bystander, but played a key role in the events initiating this litigation, it should bear its remaining costs of document review and production.

Rule 45(d)(1) requires parties to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  "The intention of the rule 'is to protect disinterested non-parties from incurring significant expense in complying with a subpoena in a case for which they have no interest.'"  *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156-CIV, 2016 WL 6917231, at *2 (S.D. Fla. Nov. 10, 2016) (quoting *Sun Capital Partners, Inc. v. Twin City Fire Insurance Co.*, 2016 WL1658765, *7 (S.D. Fla., Apr. 26, 2016)).  In determining whether, and if so, how much cost to shift to a requesting party, courts consider factors such as "1) whether the non-party actually has an interest in the outcome of the case, 2) whether the non-party can

more readily bear its cost than the requesting party, and 3) whether the litigation is of public importance." *Id.*

Importantly, a non-party is considered "interested" for purposes of cost shifting where "***it was substantially involved in the underlying transaction, and should have reasonably anticipated being drawn into subsequent litigation***." *In re Seroquel Prod. Liab. Litig*., 2007 WL 4287676, at *3 (M.D. Fla. Dec. 6, 2007) (quoting *In re First Am. Corp*., 184 F.R.D. 234, 241-42 (S.D.N.Y.1998)). "When a party from whom documents are sought is not a classic disinterested non-party, . . . the court can order that the non-party produce the documents at its own expense." *Id.*

The *Seroquel* litigation illustrates this principle.   In that case, plaintiffs sued a pharmaceutical company for its marketing of the drug Seroquel.  Plaintiffs sought discovery from a third-party vendor that had done marketing work for the manufacturer regarding Seroquel.  The vendor asked the court to require plaintiffs to reimburse it for its discovery costs.  The court found that the vendor was not a "classic disinterested non-party" because of its relationship to the facts underlying the litigation: "It should come as no surprise to [the vendor] that market research work it did for Seroquel would be relevant to Plaintiffs' claims and [the vendor] ***should have reasonably anticipated being involved in the discovery process of subsequent litigation*** concerning the marketing/prescribing behavior it studied for Seroquel." *Id.* at *4 (emphasis added).

So too here.  Valisure laid the groundwork for this litigation.  It actively created and aggressively publicized false and misleading testing information.  It had at least one plaintiffs' attorney assist in coordinating its ranitidine campaign.  Valisure has received significant funding from, and had extensive communications with, plaintiffs' attorneys.  It has a history of coordination with plaintiffs' attorneys to prepare lawsuits in advance of its science being made

public, and Valisure appears to have done so in this litigation.  Like in *Seroquel*, Valisure "should have reasonably anticipated being involved in the discovery process of subsequent litigation concerning" its science and the financial bias behind it.  *Id.*

The Brand Defendants have also taken reasonable steps to minimize Valisure's burden. First, they have voluntarily agreed to pay for half of Valisure's capped e-discovery technology vendor fees.  Second, they have proposed reasonable search terms targeted at relevant information. And third, they have spent a considerable number of attorney hours reviewing Valisure's metadata hit report in order to identify irrelevant documents, thereby reducing the number of documents for Valisure to review by about one-third.  In light of these efforts and the fact that Valisure is not a disinterested "classic third party," the Brand Defendants should not have to bear any additional costs for Valisure's subpoena compliance.

## CONCLUSION

For the reasons set forth above, the Brand Defendants respectfully ask that the Court deny Valisure LLC's motion to quash and compel Valisure to: **(1)** produce all non-privileged documents identified through the parties' agreed upon search terms (except those documents the Brand Defendants have already identified as not relevant based on its review of Valisure's metadata hit report); **(2)** not withhold non-privileged documents based on "confidentiality" (as documents can be designated as confidential pursuant to PTO 26); **(3)** include all email accounts or storage accounts used by Valisure officers or employees for work purposes in its collection (e.g., Valisure CEO's personal Gmail account); and **(4)** produce a privilege log of all documents it contends are privileged or otherwise exempt from production.  The Court should also deny Valisure's request to have the Brand Defendants bear additional costs (i.e., attorney document review costs) beyond the 50% of e-discovery technology vendor costs they have already voluntarily agreed to pay.

Respectfully submitted,

*/s/ Patrick Oot*
Patrick Oot
SHOOK, HARDY & BACON LLP
1800 K St. NW, Suite 1000
Washington, D.C. 20006
Tel: (202) 783-8400
Fax: (202) 783-4211
oot@shb.com

*Attorney for GlaxoSmithKline LLC (and filing on behalf of Brand Defendants)*

*/s/ Will W. Sachse*
Will Sachse
DECHERT LLP
2929 Arch Street
Philadelphia, PA. 19104
Tel: (215) 994-2496
Fax: (215) 655-2496
will.sachse@dechert.com

*Attorney for GlaxoSmithKline LLC*

*/s/ M. Elaine Horn*
M. Elaine Horn
Annie Showalter
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
ehorn@wc.com
ashowalter@wc.com

*Attorney for Pfizer Inc.*

*/s/ Paige H. Sharpe*
Paige H. Sharpe
ARNOLD & PORTER
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
paige.sharpe@arnoldporter.com

*Attorney for Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

*/s/ Michael B. Shortnacy*
Michael B. Shortnacy
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Tel: (213) 443 4355
Fax: (404) 572-5100
mshortnacy@kslaw.com

*/s/ Eva Canaan*
Eva Canaan
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
ecanaan@kslaw.com

*Attorneys for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*