# EXHIBIT F

## DECLARATION OF LEONARD J. CHYALL

I, Leonard J. Chyall, Ph.D., submit this declaration under Federal Rule of Civil Procedure 26(a)(2)(B) in support of Brand Defendants' Expedited Motion to Compel Production of Facts and Data Considered by Plaintiffs' Experts Ramin (Ron) Najafi, Ph.D. and Charles S. Davis, Ph.D.

### BACKGROUND

1. I have been retained on behalf of Brand Defendants in connection with the above-identified action. I submit this Affidavit in support of their motion to compel Plaintiffs' production of certain documents and laboratory testing results related to the testing of ranitidine products.

2. It is my understanding that Plaintiffs allege that certain pharmaceutical products containing ranitidine drug substance also contain unacceptably high amounts of N-nitrosodimethylamine ("NDMA"). Plaintiffs allege that NDMA is present at the time sale to the consumer and/or upon storage of the products under certain environmental conditions. It is also my understanding that Plaintiffs allege that unacceptably high amounts of NDMA are formed in the human body upon ingestion of products that contain ranitidine. I also understand that Plaintiffs allege that they have been harmed by those products. Plaintiffs have relied on the opinion of Dr. Ramin (Ron) Najafi, Ph.D. ("the Najafi report") and testing conducted by Emery Pharma ("Emery") referenced in the Najafi report to support their allegations.

### SUMMARY OF OPINION

3. It is my opinion that Dr. Najafi has not disclosed basic information about the Emery testing methods that would permit a reviewer of the work to determine whether the tests results are accurate and reliable.

4. I have carefully reviewed the types of documents and other information that Brand Defendants identified in their Motion to Compel and Letter as being deficient in the Najafi report. I agree with Brand Defendants that those documents and information are absent from the Najafi report.

5.      Without this basic information that underlies the Emery testing, it is not possible to assess the reliability of Emery's results and the conclusions drawn from them by Dr. Najafi in his expert report.

6.      It is also my opinion that the documentation identified by Defendants should exist and be readily accessible because the documentation is generated during testing. If the documentation does not exist, potential data integrity issues arise, which would be important information to consider when interpreting analytical results.

7.      The documentation identified by Defendants is basic information that should be kept during the normal course of business by a cGMP/GLP pharmaceutical contract research organization.  Even if Emery did not follow cGMP/GLP standards for individual tests, these records still should be kept in accordance with best laboratory practices.

8.      The bases for my opinions are set forth in the following paragraphs.

**EDUCATION AND EXPERIENCE**

9.      I am an independent consultant and the president of Chyall Pharmaceutical Consulting, LLC ("Chyall Pharma"), which is my consulting business.  I am a Ph.D. chemist with expertise in the study of organic materials and the synthesis, characterization, and analytical testing of organic compounds.

10.     I obtained my Bachelor of Arts degree from Oberlin College in 1986, with a major in chemistry, and my Ph.D. in chemistry from the University of Minnesota in 1991.  My doctoral research focused on the synthesis and characterization of novel organic molecules, and my dissertation focused on understanding the reactivity of high-energy cyclopropane molecules.  I was a postdoctoral fellow from 1992-1996 in the chemistry department at Purdue University, where I studied the properties and reactivity of organic molecules using the techniques of mass spectrometry.  My research involved both small molecular weight molecules as well as large biological molecules.  Following my postdoctoral fellowship, I worked as a research chemist at Great Lakes Chemical Corporation, which is now part of LANXESS.  My research involved the identification, characterization, and development of new products for the

company. In 2000, I joined SSCI, Inc. as a Research Investigator. In 2003, I was promoted to Senior Research Investigator. In 2006, Aptuit, Inc. purchased SSCI. In 2007, I was promoted to Principal, and in 2010, I was promoted to Director. While at Aptuit, Inc., I served as project leader and group manager for external client projects involving various aspects of organic and analytical chemistry. I was also involved in the development of new pharmaceutical products and providing outside testing for chemical products.

11. I am qualified to teach university-level chemistry classes. Most recently I was employed as a lecturer at Purdue University, where in the summer of 2020 I taught introductory organic chemistry to students majoring in the life sciences. My class concerned the properties and reactivity of organic molecules as they relate to synthetic organic chemistry.

12. I have spent my career working in the fields of analytical and organic chemistry. I have extensive experience with the characterization of organic compounds using a variety of analytical techniques, including mass spectrometry.

13. I have been an author on 23 publications in peer-reviewed journals and have had 8 papers presented before various conferences, including multiple papers presented at the National Meeting of the American Chemical Society. I am named as an inventor on five U.S. patents directed to novel compounds, compositions, and crystalline materials. My publications and presentations include the application of mass spectrometry to identify and characterize organic compounds among other areas.

14. Through my education and work experiences, I have obtained extensive education and training in chemistry with specific experience in organic chemistry. I have worked on numerous projects providing research and consulting services related to the analysis of organic substances, particularly those involving pharmaceutical applications. I have directed research projects conducted on behalf of clients who were interested in quantitative determinations of the purity and contents of various products (e.g., assay determinations). Other projects involved determining the

identity and quantity of trace levels of impurities in products and mixtures. I have also worked on research projects concerning the development of analytical methods for the preparation, characterization, and stability of solid compounds used in pharmaceutical applications.

15.     Among other techniques, I have extensive experience in the analysis of organic compounds using mass spectrometry, including quadrupole and triple-quadrupole systems, quadrupole ion traps, and ion cyclotron resonance ("ICR") systems. I am familiar with the underlying technology of other mass spectrometers including sector instruments and time-of-flight mass spectrometers. I am also familiar with techniques used in tandem mass spectrometry (or "MS/MS") analysis, and I have published several research articles involving MS/MS techniques.

16.     I have extensive experience with high performance liquid chromatography ("HPLC"), particularly HPLC techniques involving assay determinations of organic compounds. I am familiar with the applications of mass spectrometry as a means of detection and quantification of compounds, including analytical techniques where mass spectrometry is coupled with HPLC analysis. I am familiar with various sample preparation techniques used for analyses involving HPLC, MS, HPLC-MS, and HPLC-MS/MS systems.

17.     I am qualified to review the research activities of other scientists and laboratories operating within the discipline of pharmaceutical chemistry. I am also qualified to testify on the scientific aspects of drug substance and drug product characterization. I am also qualified to testify about the analytical method development and validation activities that may be found in the CMC sections of NDAs and ANDAs as required by the FDA, as well as cGMP practices required by the FDA in approved facilities. My background, qualifications, and a complete list of my publications are more fully set out in my curriculum vitae, which is attached to this report as Appendix A.

**PRIOR TESTIMONY**

18. I have testified at trial or by deposition in the following cases within the preceding four years.

- *AstraZeneca Pharmaceuticals v. Amneal Pharmaceuticals*, C.A. No. 15-1056-RGA (D. Del.) (deposition)

- *Novo Nordisk v. Teva Pharmaceuticals*, C.A. No. 17-227 (JFB) (SRF) (D. Del.)

- *IBSA Institut Biochimique, v. Teva Pharmaceuticals USA*, C.A. No. 18-555 (RGA) (D. Del.) (deposition)

- *Wyeth Pharmaceuticals, Inc. v. Sun Pharmaceuticals*, C.A. No. 16-1305 (RGA) (D. Del.) (deposition)

- *Pfizer, Inc. v. Zydus Pharmaceuticals*, C.A. No. 17-158 (LPS) (D. Del.) (deposition)

- *Par Pharmaceutical v. Eagle Pharmaceuticals, Inc.*, C. A. No. 18-00823 (CFC) (D. Del.) (deposition and trial)

- *Baxalta Inc., Baxalta US Inc., and Nektar Therapeutics v. Bayer Healthcare LLC*, C.A. No. 17-1316-RGA (deposition)

- *Boehringer Ingelheim v. Mankind Pharma LTD*, et al. C.A. No. 18-1689 (CFC) (deposition)

- *In re: Sitagliptin ('708 & '921) Patent Litigation* MDL No. 19-2902 (RGA) (D. Del.) (deposition)

- *Takeda Pharmaceutical v. Norwich Pharmaceutical* C.A. No. 20-cv-8966-SRC-CLW (D.N.J.) (deposition)

**COMPENSATION**

19. I am being compensated at a rate of $600 per hour for work performed on this matter. I am also being reimbursed for any authorized travel and miscellaneous expenses related to my involvement in the case.

20. My compensation is in no way dependent on the outcome of this litigation.

**MATERIALS CONSIDERED**

21.     In formulating my opinions, I have reviewed and considered the following materials:

- The expert report of Dr. Najafi dated January 24, 2022 ("the Najafi report") including Appendices A – C of the Najafi report

- Brand Defendants' Expedited Motion to Compel Production of Facts and Data Considered by Plaintiffs' Expert Ramin (Ron) Najafi, Ph.D. and Charles S. Davis, Ph.D.

- Brand Defendants' letter dated February 7, 2022 to Plaintiffs regarding "Deficiencies in Plaintiffs' Expert Witness Disclosures" ("Letter")

22.     In addition to my review the materials cited above, I rely upon my education and over twenty years of experience with the analysis of pharmaceutical drug substances and drug products.

**THE NAJAFI REPORT**

23.     Dr. Najafi's expert report relies on a variety of tests for NDMA that broadly fit into one of three categories: 1) determination of NDMA allegedly present in ranitidine products that were obtained by or given to Emery; 2) determination of NDMA allegedly produced from ranitidine products that have undergone stress testing at elevated temperatures and high humidity; 3) *in vitro* studies that allegedly demonstrate that NDMA is produced in the body upon ingestion of ranitidine products.

24.     Central to Dr. Najafi's opinions are laboratory testing results conducted by Emery Pharma that measure the amounts of NDMA in various samples.  While Dr. Najafi presents numerous results in his expert report and draws conclusions from those results, there is no disclosure of precisely how Dr. Najafi and Emery Pharma obtained those results.  Dr. Najafi spends four paragraphs contained in roughly half a page of his 137-page report summarizing the test procedures that Emery employed. (Najafi report ¶¶120 -123).  Elsewhere Dr. Najafi merely references the protocols

provided in Appendix A or provides brief summaries of those methods (Najafi report ¶¶230, 258, 263).

25. Although Dr. Najafi has provided in his expert report protocols and validation summaries in Appendix A, tables of testing results in Appendix B, and thumbnails of SEM images in Appendix C, those disclosures are insufficient to allow any meaningful review of the data, analyses, and conclusions provided in the Najafi report.

**THE WITHHELD INFORMATION IS CRITICAL TO EVALUATE THE ACCURACY AND RELIABILITY OF EMERY'S TEST METHODS**

26. The Letter attached to Brand Defendants' Motion to Compel, sent to Plaintiffs dated February 21, 2022, identifies appropriate categories of material critical to an analysis of the accuracy and reliability of the Emery test methods. By way of illustration, I have expounded on the importance of lab notebooks, validation reports, and experimental data, as well as the deficiencies of Dr. Najafi's report with respect to those categories. These illustrations should not be considered to limit or undermine the other categories of withheld information identified by Brand Defendants.

**Laboratory Notebooks**

27. Laboratory notebooks are kept by experimental scientists to provide an accurate accounting of the work that was actually performed. It is common practice, especially in a cGMP/GLP laboratory, for a colleague to review each laboratory notebook page with an eye toward understanding the work that was documented on each notebook page. A properly maintained laboratory notebook will contain enough information for a scientist reviewing the work to understand precisely what was done. Laboratory notebook entries should contain enough detail to permit another scientist to reproduce the work if necessary.

28. Because Dr. Najafi has not provided Emery's laboratory notebooks that underlie the testing in his affidavit, it is impossible to test whether the work conformed to the protocols in Appendix A. The Emery notebooks should contain particularly relevant information such as sample weights and volumes, specific

conditions concerning sample preparation, and preparation of calibration standards, among other information.

29.     The Emery laboratory notebooks should also contain the experiments that were conducted for the purpose of developing and validating the analytical methods that are referenced in the Najafi report and Appendix A.  For example, the protocols provided in Appendix A contain specific instructions for preparing and analyzing samples.  These instructions necessarily required experimentation to develop the protocols.  An understanding of specific details of how those protocols were developed and validated is necessary to determine whether the results obtained from them can be relied upon.

30.     Emery's laboratory notebooks should also contain a full accounting of all experiments and laboratory tests that were conducted in its laboratory. It is necessary for all those experiments and results to be disclosed as they would provide the whole picture of the ranitidine testing that was conducted at Emery.

31.     The Emery notebooks should also contain documentation concerning the stability experiments conducted on the ranitidine tablets and active pharmaceutical ingredient.  Without the laboratory notebook pages, it is impossible to know whether the stability conditions described in the Najafi report accurately represent the stability conditions of the samples.

**Validation Reports**

32.     Analytical methods must be validated to provide confidence that the results obtained are accurate and can be relied upon in reaching a scientific conclusion. Dr. Najafi contends that the analytical methods developed at Emery were validated and points to the validation summaries that are provided in Appendix B. (Najafi ¶¶121 - 122).  I note that the validation summaries are actually provided in Appendix A of his report. Notwithstanding the apparent typo, those summaries do not provide sufficient information to determine whether the methods were properly validated.

33.     Method validation activities require a validation protocol, experiments conducted according to the protocol, and a validation report to properly validate the

analytical method. It is important to review those documents to assess whether or not the analytical methods provide accurate and reliable results.

**Experimental Data**

34. Dr. Najafi provides only summaries and averages of the NDMA test results in Appendix B and low-resolution thumbnail images of SEM images in Appendix C. These disclosures are insufficient to permit a scientific review of the accuracy of the data.

35. For the LC MS/MS analyses, each NDMA test result should have one or more HPLC chromatograms that show the separation of NDMA from other components in the samples. There should also be chromatograms for "blank" analyses that show the baseline signals in the absence of any sample being analyzed, and "calibration standards" which are solutions of known concentration. Each sample analysis will also contain a measure of the signal obtained for the analyte ions that were used in the mass spectrometry analysis of the NDMA signal. The amount of analyte signal is related to the concentration of NDMA. Without the actual data obtained from each analysis, it is impossible to review the results presented in Appendix B for accuracy. The LC MS/MS data that underlies the analytical method validation activities is also required to determine whether the values provided in validation summaries in Appendix A are accurate.

36. The SEM images in their original high-resolution format are also required so that an independent reviewer may analyze the images without any loss of information. At present only low-resolution reproductions of the data are provided in Appendix C. The production of the image files in electronic format is also necessary so that a reviewer may inspect the data without any loss of information.

37. The analytical data files and documentation associated with the development of the SEM protocol for ranitidine API as described in Appendix A are also necessary to determine whether sample preparation procedure and analysis provides data that accurately depicts the characteristics of the samples.

**BRAND DEFENDANTS' REQUESTS ARE REASONABLE AND REFLECT THE TYPE OF INFORMATION ROUTINELY PROVIDED ALONG WITH EXPERT REPORTS**

38. According to Dr. Najafi, "Emery Pharma is a FDA registered and Inspected, cGMP/GLP compliant Contract Research Laboratory." (Najafi report ¶6). As such, Emery is required to maintain the documents and laboratory notebooks that contain the specific details concerning how the laboratory experiments and experimental testing were developed and performed. Emery must also maintain documents that demonstrate that its standard operating procedures ("SOP's") were properly followed in conducting their work. As a former employee of a cGMP contract research laboratory, it is my experience that SOP's will include the maintenance, performance, calibration, and verification of all laboratory testing equipment used at the facility. SOP's will also provide the written instructions and policies on properly maintaining laboratory notebooks used to document the laboratory work.

39. In my experience, the FDA will audit cGMP laboratories with little to no advance notice. During the audit, the FDA inspector may request any notebook or document related to the laboratory activities conducted at the facility. The quality assurance department at the laboratory is expected to provide any document for inspection at the time of the audit.

40. Because Emery Pharma is a cGMP facility, the lab should maintain documents such as SOPs, laboratory notebooks, and validation reports, and be prepared to produce any document on short notice as requested by an FDA auditor. I point this out because the document requests made by Brand Defendants in this litigation are completely in line with any request that could made by an FDA inspector. In other words, Emery Pharma has or should have those documents readily available for inspection or production.

41. In my capacity as a consultant and expert witness I have written numerous expert reports that have relied upon laboratory testing to support my opinions. For matters involving litigation in United States courts, without exception I have provided all laboratory notebook entries and analytical tests results that I generated in

the course of my work. I produced *all* notebook pages and laboratory tests regardless of whether I relied upon all the experiments conducted or results in formulating my opinions. On occasion, I have been asked to provide sample and reagent receipt information, certificates of analyses, instrument logs, SOPs, instrument maintenance records, temperature and humidity logs of the laboratory, instrument operation manuals, maintenance records, CVs of technicians working under my direction, and other ancillary documents related to my work. I have always complied with those requests and did not find them to be overly burdensome.

42. I have reviewed the requests contained within Brand Defendants' Expedited Motion to Compel Production of Facts and Data Considered by Plaintiffs' Expert Ramin (Ron) Najafi, Ph.D. and Charles S. Davis, Ph.D. It is my opinion that those requests are reasonable in scope because they are needed to assess the reliability of the proffered results and because a cGMP testing laboratory should maintain these records. In my experience as an expert witness in prior matters, the scope of documents requested by Brand Defendants here is consistent with the documents that I have produced along with my expert report.

**CONCLUSION**

43. The Najafi report does not contain the underlying notebook entries, test methods, results, and other documentation for the NDMA tests conducted at Emery Pharma. Therefore, it is impossible to determine whether the results summarized in the Najafi report are accurate and reliable. Brand Defendants' requests for those documents are reasonable and not overly burdensome.

I declare under penalty of perjury that the foregoing and the contents and opinions expressed in my written declaration, to the best of my knowledge, are true and correct.

Dated: February 22, 2022

*Leonard J. Chyall*

Leonard J. Chyall, Ph.D.