**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                         **MDL No. 2924**
PRODUCTS LIABILITY                                **20-MD-2924**
LITIGATION

                                     **JUDGE ROBIN L. ROSENBERG**
                   **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**<u>BRAND DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF
PLAINTIFFS' EXPERTS, RAMIN NAJAFI, PH.D., CHARLES DAVIS, PH.D. AND
OTHER EXPERTS WHO RELY ON THEIR OPINIONS</u>**[1][2]

---

[1] The Brand Defendants have separately filed on this date an Expedited Motion to Strike Dr. Najafi pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure for his failure to timely produce the complete set of facts and data considered in forming his opinions (ECF ##5693-5694). If the Court grants the Motion to Strike, this Motion will be moot.

[2] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................4

II. STANDARDS OF ANALYTICAL CHEMISTRY ......................................................8

    A.  Scientists must use scientifically reliable methods to measure substances. ........................8

    B.  Scientists must keep proper documentation of their testing. .................................9

        1.  Prescriptive documentation is necessary to ensure that the results are a true product of the scientific process, without bias. ..............................................10

        2.  Descriptive documentation is necessary to ensure the scientific process was properly followed and the experiment was performed in a reliable and replicable manner. .......................................................................................11

    C.  Scientists must reliably interpret their data. ................................................12

III. STATEMENT OF RELEVANT FACTS .................................................................12

    A.  Investigations by the Scientific Community ................................................12

    B.  Litigation-Driven Testing ........................................................................14

IV. LEGAL ARGUMENT ........................................................................................18

    A.  Dr. Najafi's experimental designs are litigation-driven and unreliable to support any valid inferences. ................................................................................20

        1.  Dr. Najafi and Emery did not follow any experimental methodology for determining baseline levels of NDMA in ranitidine. ......................................20

        2.  Dr. Najafi and Emery's consumer experience testing used litigation-driven study designs which biased results high in contradiction of well-establish scientific methodology. ............................................................................26

            a)  Hot Car Testing ..............................................................................27

            b)  Bathroom Shower Testing ................................................................29

            c)  Zone Testing ..................................................................................31

        3.  Dr. Najafi and Emery's meat incubation testing used a litigation-driven study design which biased results high in contradiction of well-establish scientific methodology. ............................................................................................33

B. Dr. Najafi did not use a reliable analytical method to measure the levels of NDMA in his testing...................................................................................................37

    1. Dr. Najafi failed to ensure his method to measure the levels of NDMA in his baseline and consumer experience tested is valid........................................................38

    2. Dr. Najafi failed to ensure his method to measure NDMA in meat-matrices was valid......................................................................................................................39

C. Dr. Najafi's testing is unreliable because it lacks adequate documentation, has data integrity issues, and precludes full analysis of his data.............................................42

    1. Dr. Najafi failed to adequately document his baseline testing....................................43

    2. Dr. Najafi failed to adequately document his consumer experience testing...............44

    3. Dr. Najafi provided conflicting and inadequate documentation related to his meat incubation testing. ...........................................................................................47

D. Plaintiffs' Remaining Expert Opinions Based on Emery's Testing are Unreliable and Cannot Stand on Their Own.....................................................................................48

**V. CONCLUSION** .................................................................................................................**50**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allison v. McGhan Medical Corp.*,
  184 F.3d 1300, 1312 (11th Cir. 1998) .............................................................23, 48

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
  No. 10-23869-CIV, 2012 WL 13012778 (S.D. Fla. May 24, 2012)......................43

*BASF Corp. v. Sublime Restorations, Inc.*,
  880 F. Supp. 2d 205 (D. Mass. 2012) ...................................................................32

*Black v. Rhone-Poulenc, Inc.*,
  19 F. Supp. 2d 592 (S.D.W.Va. 1998)....................................................................46

*Cedillo v. Sec'y of Health & Human Servs.*,
  No. 98-916V, 2009 WL 331968 (Fed. Ct. Cl. Feb. 12, 2009),................................46

*City of Tuscaloosa v. Harcros Chems., Inc.*,
  158 F.3d 548 (11th Cir. 1998) ...............................................................................19

*Cook v. Sheriff of Monroe Cnty.*,
  402 F.3d 1092 (11th Cir. 2005) .............................................................................42

*Craig v. Orkin Exterminating Co.*,
  No. 99-8931-CIV, 2000 WL 35593214 (S.D. Fla. Nov. 22, 2000).........................22

*Daubert v. Merrell Dow Pharms, Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .....................................................................20, 26, 45

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)....................................................................................... *passim*

*Finestone v. Florida Power & Light Co.*,
  No. 03-14040-civ, 2006 WL 267330 (S.D. Fla. 2006)..........................................21

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).........................................................................................21, 42

*Guinn v. AstraZeneca Pharms. LP*,
  602 F.3d 1245 (11th Cir. 2010) .............................................................................18

*Hughes v. Kia Motors Corp.*,
  766 F.3d 1317 (11th Cir. 2014) .............................................................................19

*La Gorce Palace Condo. Assn., Inc. v. Blackboard Specialty Ins. Co.*,
    No. 19-24016-CIV, 2022 WL 479877 (S.D. Fla. Feb. 16, 2022) ..................................... 25, 42

*Marsh v. W.R. Grace & Co.*,
    80 F. Appx 883 (4th Cir. 2003) ........................................................................................ 22

*McClain v. Metabolife Intern. Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ....................................................................................... 22

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) .................................................................................. 18, 50

*Mitchell v. Gencorp Inc.*,
    165 F.3d 778 (10th Cir. 1999) ......................................................................................... 22

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir. 1998) ........................................................................................... 22

*Morehouse v. Louisville Ladder Group LLC*,
    No. Civ.A 3:03-887-22, 2004 WL 2431796 (D.S.C. June 28, 2004) ..................................... 46

*In re Nexium Esomeprazole*,
    662 F. Appx 528 (9th Cir. 2016) ...................................................................................... 22

*Otto v. Refacciones Neumaticas La Paz, S.A., DE C.V.*,
    No. 3:16-cv-00451-MMD-WGC, 2020 WL 907560 (D. Nev. Feb. 25, 2020) ...................... 32

*Palazzolo v. Hoffman La Roche, Inc.*,
    2010 WL 363834 (N.J. Super. Ct. App. Div. Feb. 3, 2010) ................................................ 46

*Raynor v. Merrell Pharms. Inc.*,
    104 F.3d 1371 (D.C. Cir. 1997) ....................................................................................... 23

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    282 F.R.D. 655 (M.D. Fla. 2012) ................................................................................ 43, 44

*Romano v. John Hancock Life Ins. Co. (USA)*,
    No. 19-21147-CIV, 2022 WL 1447733 (S.D. Fla. May 9, 2022) ......................................... 20

*Sheehan v. Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) ........................................................................................... 20

*Simmons v. Ford Motor Co.*,
    132 F. Appx 950 (3d Cir. 2005) ....................................................................................... 23

*Smelser v. Norfolk S. Ry. Co.*,
    105 F.3d 299 (6th Cir. 1997) ........................................................................................... 46

*Snoznik v. Jeld-Wen, Inc.*,
    No. 1:09-cv-42, 2010 WL 1924483 (W.D.N.C. May 12, 2010).................................43, 44, 46

*Summer v. Biomet, Inc.*,
    434 F. Appx 834 (11th Cir. 2011) .........................................................................................20

*United States v. $141,770.00 in U.S. Currency*,
    157 F.3d 600 (8th Cir. 1998) ................................................................................................22

*United States v. Frabizio*,
    445 F. Supp. 2d 152 (D. Mass. 2006) ...................................................................................32

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................................................46

*United States v. Hebshie*,
    754 F. Supp. 2d 89 (D. Mass. 2010) .....................................................................................46

*United States v. Loaiza-Clavijo*,
    No. 1:08-CR-356-18-WSD-ECS, 2012 WL 529981 (N.D. Ga. Jan. 25, 2012).....................32

*United States v. Monteiro*,
    407 F. Supp. 2d 351 (D. Mass. 2006) ...................................................................................46

*United States v. Vitek Supply Co.*,
    144 F.3d 476 (7th Cir. 1998) ..........................................................................................22, 28

*Whiting v. Boston Edison Co.*,
    891 F.Supp. 12 (D. Mass. 1995) ...........................................................................................30

*Zenith Electronics Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) ................................................................................................46

## Rules and Regulations

21 C.F.R. § 207.1 ........................................................................................................................24

21 C.F.R. § 211.111 .....................................................................................................................24

Fed. R. Evid. 702 ................................................................................................................ *passim*

Pursuant to Rule 702 of the Federal Rules of Evidence and this Court's Pretrial Order # 77 (ECF #5579), the Brand Defendants ("Defendants"), through their undersigned counsel, respectfully move this Court to exclude the opinions and testimony of Plaintiffs' experts, Ramin Najafi, Ph.D. ("Dr. Najafi"), Charles Davis, Ph.D. ("Dr. Davis"), and other experts to the extent that they rely on their testing and opinions. Because Plaintiffs cannot meet their burden of showing that Dr. Najafi and Dr. Davis's opinions are based upon a reliable methodology, their opinions are inadmissible under Rule 702 and *Daubert* and its progeny.

Attempting to guess how much NDMA might have been present in ranitidine drug products taken in the past is impossible to do precisely because "NDMA levels go up, level off, go down, go up again, etc. depending on the lot and the experimental conditions."  Ex. 10, Najafi First Rebuttal Rep. at 17-18.[3]  Nevertheless, Plaintiffs have paid Dr. Najafi and Emery over $2,200,000 dollars to run tests designed to drive up those NDMA values well beyond the low levels of NDMA found by reputable, unbiased third parties such as the U.S. Food and Drug Administration ("FDA").  Ultimately, Dr. Najafi's opinions speculating about levels of NDMA in ranitidine are irrelevant.  Whatever the level of NDMA, human epidemiology has not demonstrated a valid association, much less causation, between real-world ranitidine use and any cancer.[4] If there is no causation, speculation about levels of NDMA is immaterial.  In any case, Dr. Najafi's novel methods are wholly unreliable and, therefore, so too are the opinions of Dr. Davis and others who rely on his testing.

## I.    INTRODUCTION

Plaintiffs in this litigation claim that Zantac's active pharmaceutical ingredient ("API"), ranitidine hydrochloride ("ranitidine"), is an "unstable" molecule that degrades into unacceptable levels of N-Nitrosodimethylamine ("NDMA"), which they claim is a "potent carcinogen." To support their claims, Plaintiffs retained Dr. Najafi and his laboratory, Emery Pharma ("Emery"), to test samples of ranitidine for NDMA.  They retained Dr. Davis to conduct statistical analyses of the Emery data.

---

[3]  All exhibits are indexed and attached to the Declaration of Eva Canaan, which is being filed together with this Motion.

[4]  *See* Brand Defendants' Motion to Exclude Plaintiffs' General Causation Experts' Opinions Related to Epidemiology and Incorporated Memorandum of Law, filed concurrently herewith.

Over the course of several months, Dr. Najafi's team at Emery ran numerous tests and experiments on ranitidine samples Defendants had produced. Specifically, Emery ran (1) "baseline" tests of ranitidine drug products and drug substances which purportedly represent levels of NDMA in ranitidine products at the time of purchase; (2) simulated testing to purportedly "mimic" real-life consumer storage conditions; and (3) meat-incubation studies to test formation of NDMA from ranitidine "by its interaction with nitrites in food and gastric fluids."[5] Based on these novel tests created for litigation, Dr. Najafi intends to opine that he can reliably quantify how much NDMA forms under various "real-world" conditions.

None of Dr. Najafi's tests, however, utilized generally accepted analytical methodologies. In 2019, after it was first discovered that some ranitidine products had detectable levels of NDMA, FDA determined that some common analytical methods such as headspace Gas Chromatography-Mass Spectrometry ("GC-MS") should not be used to test ranitidine, because the heat of the method itself generated NDMA as an artifact.[6] Accordingly, FDA developed and validated two analytical methods to measure NDMA in ranitidine drug products and drug substances: a reverse-phase liquid chromatography-high resolution mass spectrometry ("LC-HRMS") method and a Liquid Chromatography-Tandem Mass Spectrometry ("LC-MS/MS") method.[7]

Dr. Najafi, however, did not use either method for the testing that forms the basis for his expert opinions. Notably, the methods Dr. Najafi used for his litigation testing have not been used by any other scientist or any regulatory agency that has evaluated the levels of NDMA in ranitidine

---

[5] Emery also conducted testing relating to the crystal morphology of ranitidine, stress studies, simulated gastric fluid studies, experiments to evaluate whether NDMA formation from ranitidine is "further potentiated by potassium thiocyanate," and other miscellaneous studies. Ex. 9, Expert Report of Dr. Ron Najafi ("Najafi Rep.") at 6. However, Dr. Najafi and Plaintiffs' other experts either do not rely upon the results of those other tests or, for efficiency's sake, Defendants have addressed the flaws relating to these tests in the simultaneously filed Brand Defendants' Motion to Exclude Remaining Expert Opinions Relating to General Causation and Incorporated Memorandum of Law ("Remaining Opinions Motion").

[6] Dr. Najafi concedes that the headspace GC method is "a significant confounding factor resulting in falsely elevated levels of NDMA." Ex. 9, Jan. 24, 2022 Najafi Rep. at 10. Therefore, Dr. Najafi was well aware of the importance of selecting an appropriate analytical method to test ranitidine samples.

[7] The two approved and validated FDA test methods are available at https://www.fda.gov/media/130801/download#:~:text=N%2Dnitroso%2Ddi%2Ddmethylamine%20(NDMA)%20impurity%20is,of%20the%20protonated%20impurity%20ion (09/13/2019) Ex. 28 and https://www.fda.gov/media/131868/download (10/17/2019) Ex. 29, respectively.

products.  Nor were they used by Dr. Najafi or Emery analysts for the testing they performed outside of litigation—some of which they reported in a Citizen Petition to FDA in January 2020, before they were retained by Plaintiffs in this litigation.[8]  In fact, the analytical methods that Dr. Najafi and Emery selected to test ranitidine products for this litigation have not been peer-reviewed or adequately validated.  Dr. Najafi and Emery's testing suffers from many other fatal flaws.  For example, the baseline testing does not reflect real world conditions, including, significantly, that the samples tested were all years old—and many were expired—and thus are not representative of what consumers would actually take.

Equally problematic are Dr. Najafi's novel experiments purporting to determine the levels of NDMA formed during "consumer experience" (*e.g.*, product stored in extreme temperature or humidity conditions) or when ranitidine allegedly combines with processed meats in the body. None of these studies meets generally accepted standards for testing of impurities in pharmaceutical products.  Rather, Dr. Najafi and his team made up experiments exclusively for this litigation.  The tests are unlike anything designed or required by any regulatory agency or oversight body.  These experiments have never been peer-reviewed and there is no known error rate for his testing.  No other reputable scientists have ever used these experiments to test whether a drug breaks down in a hot car or in a humid bathroom simulated conditions, as Dr. Najafi and Emery have done here.  In fact, the conditions used in his testing are more extreme—with higher combined temperatures and relative humidity—than what is presented in the literature that Dr. Najafi purports to rely on.  The bottom line is that Dr. Najafi failed to test for NDMA formation from ranitidine in real world conditions, relying instead on simulated conditions that are not realistic and cannot be used to reliably predict what levels of NDMA, if any, consumers could be expected to have been exposed to when taking ranitidine containing products.  This is not reliable science and does not fit the facts of this litigation.

Dr. Najafi's unreliable litigation-driven testing methodology is even more problematic because he and Emery failed to follow minimum laboratory practices and generally accepted standards of analytical chemistry in documenting their work.  Dr. Najafi did not have written

---

[8] Emery and Dr. Najafi did not include all of the results of ranitidine testing they had conducted as of January 2020 in their Citizen Petition, Ex. 35.  Even though Emery tested four different ranitidine products, the Citizen Petition included only the results of the sample with the highest NDMA levels.  Ex. 18, Emery 30(b)(6) Dep. at 131:6–23; 136:2–18.  Even that sample (Cool Mint) had baseline NDMA levels below the FDA's 96 ng ADI.  *See id*.

protocols prepared before many of the tests were conducted, asserting instead that the common purpose of all his studies was "to evaluate the instability of ranitidine under various conditions,"[9] a *post-hoc* justification so broad as to be meaningless.  Neither he nor the Emery analysts properly documented the details of the tests and experiments in accordance with generally accepted laboratory standards, which would include, for example, how samples were selected and why, how many samples were tested, how samples were handled during testing, and information about the analytical equipment used, such as maintenance logs.

Further, Dr. Najafi failed to maintain or produce all of his testing data[10] and failed to record the methods used to generate that data.  At his deposition, Dr. Najafi refused to acknowledge that reports generated from Emery's own data, using standard templates from the Agilent MassHunter software Emery used, showed the results of Emery's testing.  Instead, he insisted that he would only be comfortable answering questions about his data if he could look at the data on Emery's computer in Alameda, California.  Dr. Najafi has not submitted his results for peer review, and the lack of documentation for most of his tests would make his testing unpublishable in a reputable journal anyway.  Indeed, Dr. Najafi and Emery's documentation practices are so poor that there is no way to trace back from the results he provided in his report to the underlying analytical data or the laboratory notebooks associated with those results.  In fact, during his deposition, Dr. Najafi was asked to do just that, but he could not do so.  The majority of the test results he is relying on are, in effect, untraceable, unverifiable, unreplicable, and unpublishable.  Thus, even by Dr. Najafi's own standards,[11] his testing is unreliable.

It is not surprising, then, that Dr. Najafi and Emery's litigation results are significantly higher than the results of testing performed by the FDA, regulatory agencies from other countries, and Emery's own pre-litigation testing.  Looking just at Dr. Najafi's baseline testing as an example, it is clear that the methodology employed by Emery for litigation produced much higher results than anyone else conducting similar testing.  Dr. Najafi reported an average baseline value of

---

[9] Ex. 10, March 28, 2022 Najafi Rep. at 7.

[10] *See* Brand Defendants' Expedited Motion to Strike Plaintiffs' Expert Ramin (Ron) Najafi, Ph.D. (ECF #s 5693 & 5694).

[11] When asked to define what he meant by "the highest standards" that Emery purportedly followed, he replied: "effectively if you're presenting something, it needs to be reproducible, repeatable and … obviously publication quality."  Ex. 17, Najafi Dep. at 140:15–19.

NDMA in unexpired Zantac tablets at 1,096.6 nanograms/150 mg tablet.  These results are more than twice that of the highest levels of NDMA recorded for any Zantac tablet tested by the FDA; they are higher by even greater multiples than the highest recorded levels of any other regulatory body around the world; and most notably, they are more than 70 times greater than the highest levels reported by Dr. Najafi, himself, before he was hired and paid more than $2.2 million by the Plaintiffs in this litigation.  Moreover, the limited analytical data that Emery did produce raises many additional questions about the validity of Dr. Najafi's reported results.

The Emery data which forms the basis of Dr. Najafi's opinions and those of Dr. Davis, who extrapolates from Dr. Najafi's data, is the result of unreliable methodologies and experiments created exclusively for litigation.  They lack the indicia of reliability that *Daubert* and its progeny require.  Dr. Najafi's opinions therefore are unreliable and inadmissible under Rule 702.  Further, any expert opinions that rely upon Dr. Najafi's data, including those of Dr. Davis, who performed statistical analyses of the Emery data without doing anything to verify their validity, are similarly unreliable and should be inadmissible at trial.

## II.   STANDARDS OF ANALYTICAL CHEMISTRY

"[L]egal disputes … increasingly involve the principles and tools of science."  Reference Manual on Scientific Evidence 2 (3d ed. 2011) ("Reference Manual").  Thus, it is important for courts considering motions to exclude expert opinion in a given field to understand the professional standards which govern that discipline before deciding its admissibility.  As former Supreme Court Justice Stephen Breyer noted, "Our decisions should reflect a proper scientific and technical understanding so that the law can respond to the needs of the public."  *Id*.

In the field of analytical chemistry, it is generally accepted that scientists must use reliable methods, scientists must maintain proper documentation, and scientists must reliably interpret that data.  As will be explained fully below, Dr. Najafi's testing fails to meet these standards.  Accordingly, his testimony and opinions—and the testimony and opinions that rely on his opinions, testing, and data—should be excluded.  But first, this brief will provide a brief explanation of some of the generally accepted standards of analytical chemistry, including using reliable methods, keeping proper documentation, and reliably interpretating of data.

### A.   Scientists must use scientifically reliable methods to measure substances.

Whether the results of analytical chemistry analyses are valid depends upon whether the analyst has employed the proper methodology for the chemical being analyzed and the specific

purpose of the test. In other words, the analytical method must be both generally valid and reliably performed.

Validating an analytical procedure is a process of ensuring that the analytical method can produce a valid result. It "is the process by which it is established, by laboratory studies, that the performance characteristics of the procedure meet the requirements for the intended analytical applications." *See* Ex. 22, USP General Chapter <1225>, *Validation of Compendial Procedures* at 1.[12] "When an analytical procedure is used in a non-GMP study, it's good practice to ensure that the analytical procedure is adequately fit for use to support the study objective." Ex. 21, USP Gen. Chapter <1010>, *Analytical Data – Interpretation and Treatment* at 2. But to ensure a validated method produces reliable results also requires that an analyst reliably perform the method. *See id*.

When posing the question, "*How can we be sure that the analytical work was done properly?*", the Reference Manual for Scientific Evidence explains that laboratories should have in place appropriate standard operating procedures ("SOPs") to ensure that the methods and analytical results track the performance standards for a particular test:

> Most major laboratories that routinely engage in this type of analysis have developed standard operating procedures and quality control procedures. Laboratory certification programs of many types also exist to document performance. When analytical work is performed in certified, highly experienced laboratories, there is a reasonably high likelihood that the analytical results are reliable. But it is very difficult to confirm reliability when analytical work is done in laboratories or by individuals who cannot provide evidence of certification or of longstanding quality control procedures.

Reference Manual at 529–530.

**B.    Scientists must keep proper documentation of their testing.**

It is generally accepted in the scientific community that proper record-keeping is a prerequisite for the interpretation of analytical data. *See* Reference Manual at 48 ("[S]cientists have a solemn responsibility to describe the methods they use as fully and accurately as

---

[12] US Pharmacopeia ("USP") is "an independent, non-profit organization that sets legally binding public quality standards for drugs marketed in the U.S. and publishes 'general chapters' which provide guidance on best practices in analytical testing and data interpretation related to pharmaceutical analysis." Ex. 12, Report of Bernard Olsen, Ph.D. ("Olsen Rep.") at 6.

possible.").[13] For example, USP sets "acceptable practices for the use of analytical procedures to make decisions about pharmaceutical processes and products" and specifically cautions that "sound record keeping" is a "prerequisite laboratory practice[] and principle[]." Ex. 21, USP General Chapter <1010>, *Analytical Data—Interpretation and Treatment* at 1–2. Proper record-keeping is so critical, in fact, that the World Health Organization ("WHO") has cautioned that "[d]ocumentation is the only way of demonstrating what actually went on at the time of the experiment. *Without documentation the process is meaningless; essentially there has been no study.*" Ex. 32, WHO HANDBOOK ON QUALITY PRACTICES IN BASIC BIOMEDICAL RESEARCH at 35–36 (2005) (emphasis in original) ("WHO Handbook"). The WHO distinguishes between (1) prescriptive documentation and (2) descriptive documentation. Prescriptive records are necessary to ensure testing is the product of a predetermined experimental design that sets forth what the scientists *should do*, while descriptive records are necessary because they record what the scientists *actually did. See* Ex. 32, WHO Handbook at 43 (stating that good descriptive record keeping requires documentation of the who, what, when, and how a test was performed). Both are necessary for scientists to make a full record of an experimental design, as well as "what actually happened during the course of the study." *Id*. at 35–36.

In other words, while prescriptive records are necessary to ensure testing is the product of a predetermined experimental design that sets forth what the scientists *should do*, descriptive records are necessary because they record what the scientists *actually did. See* Ex. 32, WHO Handbook at 43 (stating that good descriptive record keeping requires documentation of the who, what, when, and how a test was performed).

### 1. Prescriptive documentation is necessary to ensure that the results are a true product of the scientific process, without bias.

Prescriptive documentation is the touchstone of testability of a scientific methodology because it allows others to follow and, if necessary, reproduce a scientist's experiment to ensure the reliability of the results. Ex. 12, March 7, Olsen Rep. at 18. Prespecified protocols and other

---

[13] For example, depending on the type of laboratory involved, scientists are generally required to document the organization and structure of laboratory personnel, the qualifications and training of those involved in testing, the control procedures in place, validation of the analytical methods employed, internal standards for documenting and drafting reports, and procedures for reviewing other case files or testimony, among others. Reference Manual at 154 (discussing proper documentation of laboratory testing in the context of DNA labs).

prescriptive documentation also prevent scientists from data dredging or conducting multiple tests and reporting only those results that support their predetermined position. *See id*.

For sake of clarity, this brief will separately address *experimental protocols* (*i.e.*, the pre-specified study design) and *analytical protocols* (*i.e.*, the pre-specified analytical method), although these documents may be recorded together or separately and may be recorded in stand-alone documents or within laboratory notebooks.

> **2.      Descriptive documentation is necessary to ensure the scientific process was properly followed and the experiment was performed in a reliable and replicable manner.**

In addition to prescriptive documentation, it is also important to keep sufficiently detailed descriptive documentation of the experiment itself. *See* Reference Manual at 125 n.454 (noting that adequate laboratory records "facilitate technical review of laboratory work, both within the laboratory and by outside experts"). When experts fail to document what they actually did during an experiment or test, it is impossible to replicate the testing results, and, therefore, the data cannot reasonably be relied upon.

Two primary forms of descriptive documentation are relevant here: laboratory notebooks and chromatography data. Laboratory notebooks are used by laboratory scientists to record descriptions of their work. Although the level of detail may vary from test to test, the laboratory scientist, or analyst, should capture sufficient details to allow another scientist to understand how the experiment was conducted and to allow for replication. Ex. 32, WHO Handbook at 46–47. Chromatography, in turn, is an analytical technique that separates a sample into its component parts. *See* Ex. 12, March 7, 2022 Olsen Rep. at 13. Once the sample is properly separated and run through the analytical equipment, the analyst can identify the compound of interest and define the area of the relevant peak (*i.e.*, "integrate"), compare it to a "standard" of the compound, and calculate the amount of a chemical substance present. *Id*. at 13; Ex. 7, June 3, 2022 Guengerich Rep. at 5–6.

Processing chromatograms is a critical step that may inject error or bias because the analyst exercises judgment to determine exactly what portions of the instrument's response to attribute to NDMA and how to quantify the results. *See* Ex. 33, May 19, 2022 Benotti Decl. at 2. Analysts often rely on "automatic" integration (*i.e.*, what the computer algorithm determines is the relevant peak). But in some cases, analysts may resort to "manual" integration (*i.e.*, adjusting the peak to what the analyst determines is the relevant peak). *See* Ex. 7, June 3, 2022 Guengerich Rep. at 7.

Agilent, the manufacturer of the analytical software Emery used in its analyses, warned that manual integrations should be used sparingly, and advised that, at a minimum, "A laboratory-wide standard operating procedure (SOP) for integration should establish when manual integration is justifiable and how it should be performed in a way that is most sound." Ex. 34, B. McDowall, *Controlling Chromatographic Integration to Ensure Data Integrity; Adequate training and a well-defined set of procedures for dealing with integration is essential element in for a laboratory operating in a regulated environment*, Agilent Technologies, LCGC N. Am. (2018) ("McDowall 2018"). In fact, "[i]n some cases, it may be best to disallow manual integration altogether." *Id.*

### C.      Scientists must reliably interpret their data.

Finally, assuming the methodology is proper, validated, and the documentation is complete and proper, scientists may proceed to make inferences from the data. "The inferences that may be drawn from a study depend on the design of the study and the quality of the data." Reference Manual at 240. "Study validity is the extent to which results from a study can be relied upon. Study validity has two aspects, internal and external." *Id.* at 301. Internal validity considers whether the results observed under the particular experimental conditions are true findings or whether the results are skewed based on the experimental design. *Id.* ("A study has high internal validity when its conclusions hold under the particular circumstances of the study."). External validity considers whether the experimental design is representative of real-world conditions such that the results can be generalized to other scenarios. *Id.* ("A study has high external validity when its results are generalizable."). In other words, questions related to external validity include whether the samples tested are representative, whether the study design is representative, and whether appropriate inferences may be drawn from that data. A study should be both internally and externally valid before scientists can properly generalize from any particular test.

### III.      STATEMENT OF RELEVANT FACTS

### A.      Investigations by the Scientific Community

On September 13, 2019, the FDA announced that NDMA, a chemical "found in water and foods, including meats, dairy products, and vegetables" was also found in ranitidine medicines.[14]

---

[14] Ex. 26, FDA, *Statement alerting patients and health care professionals of NDMA found in samples of ranitidine* (Sept. 13, 2019), available at https://www.fda.gov/news-events/press-

FDA reported that the levels of NDMA found in ranitidine "barely exceed amounts you might expect to find in common foods." *Id.* Along with this announcement, FDA also published a validated method to measure the levels of NDMA in ranitidine using reverse-phase technique called liquid chromatography with high resolution mass spectrometry (LC-HRMS).[15] On October 17, 2019, FDA published a second validated method to measure the levels of NDMA in ranitidine. Again, FDA used a reverse-phased technique this time called liquid chromatography with tandem mass spectrometry (LC-MS/MS).[16]

Shortly after FDA's statement, the scientific community went to work to investigate the levels of NDMA in ranitidine. FDA tested 180 samples that "were purchased from the marketplace, collected by FDA inspectors, or received in response to information requests." Ex. 12, Marcy 7, 2022 Olsen Rep. at 41. FDA reported that the "range of NDMA observed in ranitidine was 0.013 ppm to 2.97 ppm," or roughly 1.95 nanograms to 445.5 nanograms (assuming a 150-milligram tablet). *See id.* Other international regulatory agencies also tested ranitidine product with similar overall results. *See id.* at 41–42. Numerous researchers also have published validated methods in peer-reviewed literature that report levels of NDMA found in ranitidine-containing products collected from store shelves. *Id.* (and studies cited therein). The results reported in the peer-reviewed literature were also consistent with FDA's findings.

Dr. Najafi and Emery Pharma submitted a Citizen Petition to FDA on January 2, 2020. Ex. 35, Emery Pharma Citizen Petition. Leading up to that submission, Dr. Najafi and his team at Emery acquired Zantac-brand and other ranitidine-containing products from local pharmacies or eBay. Ex. 18, Emery 30(b)(6) deposition at 128:2–8. Emery tested those samples and found a baseline range between 0.74 nanograms to 19.43 nanograms per tablet—all within FDA's ADI limit. Ex. 12, March 7, 2022 Olsen Rep. at 42.

---

announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[15] Ex. 27, FDA, *Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product* (Sept. 13, 2019), available at https://www.fda.gov/media/130801/download.

[16] Ex. 28, FDA, *Liquid Chromatography-Tandem Mass Spectrometry (LC-MS/MS) Method for the Determination of NDMA in Ranitidine Drug Substance and Solid Dosage Drug Product* (Oct. 17, 2019), available at https://www.fda.gov/media/131868/download.

On April 1, 2020, FDA reported that it "didn't observe unacceptable levels of NDMA in many of the samples that [FDA] tested," but requested a recall of all ranitidine-containing products until quality could be assured.[17]

While the scientific community thoroughly investigated the levels of NDMA in ranitidine tablets, FDA through its Center for Drug Evaluation and Research (CDER) tested a separate and distinct theory related to whether NDMA would form from ranitidine in the human body.  On July 2, 2021, FDA published, on the Agency's official website, the results of FDA's "rigorous, randomized, double-blinded, placebo-controlled clinical trial" and a complementary "in vitro study" both designed to test whether NDMA forms in the human body.[18]  In no uncertain terms, FDA concluded: "The combined findings from CDER's in vivo clinical trial and in vitro experiments do not support the conclusion that ranitidine is converted to NDMA in humans."

## B.     Litigation-Driven Testing

On January 24, 2022, Plaintiffs disclosed Dr. Najafi and Dr. Davis as experts in the fields of organic chemistry and statistics, respectively.  Both were disclosed to give testimony concerning the amount of NDMA formation from Zantac.  *See, e.g.*, Ex. 9, Jan. 24, 2022 Najafi Rep. at 4–5.[19]

In forming their opinions, rather than rely on the ample amount of peer-reviewed and regulatory testing available, Dr. Najafi conducted litigation-driven testing and Dr. Davis performed statistical analyses of some of that data at the behest of Plaintiffs' counsel.  But Dr. Najafi's testing fails to comport with even minimum standards for analytical chemistry, and, because Dr. Davis merely extrapolates from certain portions of Dr. Najafi's data selected by Plaintiffs' counsel, none of their opinions can be considered reliable, and they are inadmissible.

---

[17] Ex. 29, FDA, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market*, (Apr. 1, 2020), available at https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market.

[18] Ex. 31, FDA, *Ensuring the Rigor of Regulatory Science: CDER Conducts Laboratory and Clinical Studies to Investigate Reports of NDMA Production from Ingested Ranitidine Products*, (July 2, 2021), available at https://www.fda.gov/drugs/news-events-human-drugs/ensuring-rigor-regulatory-science-cder-conducts-laboratory-and-clinical-studies-investigate-reports.

[19] Importantly, Dr. Najafi and Dr. Davis are not offered to proffer opinions that ranitidine causes cancer.  Other experts, such as Dr. Dipak Panigrahy, Dr. Andrew Salmon, and Dr. Jennifer Le rely on Dr. Najafi's opinions and data to support their causation opinions.  Plaintiffs' epidemiologists, Dr. Anne McTiernan and Dr. Patricia Moorman, state that Dr. Najafi's opinions and data support their opinions.

### *Dr. Najafi*

In his report and deposition, Dr. Najafi has opined that ranitidine is an unstable molecule which transforms into unacceptable levels of NDMA.  *See* Jan. 24, 2022 Najafi Rep. at 4.  To reach these opinions, Dr. Najafi relies primarily on three sets of tests: (1) baseline testing, (2) simulated consumer experience testing (*i.e.*, sun-shower-shade and zone testing), and (3) meat-incubation testing.[20]

*Baseline testing*: Dr. Najafi conducted baseline testing of expired and unexpired samples of ranitidine containing products, all of which were produced by Defendants in the litigation, years after Zantac was no longer on the market.  Instead of using one of the two FDA approved and validated analytical methods, Dr. Najafi used a completely different method for his litigation baseline testing, hydrophilic interaction chromatography ("HILIC"), a method which has never been peer-reviewed or validated for the measurement of NDMA in ranitidine.  There is no known error rate for Dr. Najafi's new methodology, and the results of his testing have not been peer-reviewed.  Dr. Najafi also did not explain how the samples were selected for testing, other than to say that Emery tested a large number of batches.  *See* Ex. 17, Deposition of Ramin Najafi ("Najafi Dep.") at 366:4–367:23.  Dr. Najafi did not know whether Emery tested all of the samples which were produced in litigation; he could not identify and did not produce any experimental protocol showing how to select which samples to test; his team of scientists failed to describe the work they did in Emery laboratory notebooks; and Dr. Najafi left much of the professional judgment behind his testing to his team.  *Id.*  At his deposition, Dr. Najafi could not provide adequate explanations for much of Emery's work, including:

- he was unable to trace back his data to individual chromatograms in Emery's files;

- he admitted that his team had no documented standards for manually integrating chromatograms, which included measuring multiple peaks, peaks beyond the measuring midpoint, and areas above the chromatogram curve; and

- he admitted that he relied on the professional judgment of his team rather than any written protocols for some of his data collection, because many of his testing methods were undocumented.

Ex. 17, Najafi Dep. at 95:14-96:2; 106:17-107:3; 441:6-15.

---

[20]  Dr. Najafi also purportedly conducted a long-term refrigeration study, NDMA content uniformity testing, nitrosation assay procedures, potassium thiocyanate formation testing, and morphology testing.  But none of these tests are central to his or any other experts' opinions.

Although prior to being retained by Plaintiffs, Dr. Najafi conducted baseline testing of ranitidine containing products and reported NDMA levels ranging between 0.74 nanograms and 19.43 nanograms per 150 mg ranitidine tablets (all well below the FDA ADI limit of 96 nanograms/day). For his litigation testing, Dr. Najafi's NDMA values skyrocketed, with the mean for unexpired product (1,096.6 ng per 150 mg tablet) now more than 70-times higher than the highest value from Emery's pre-litigation samples. Further, his litigation data also far exceeded that of every other major regulatory body that conducted baseline testing, including the FDA, Health Canada, the Saudi Food & Drug Authority, the Australian Therapeutic Goods Administration, and the Gimenez-Campillo (Spain) dataset. Ex. 12, March 7, 2022 Olsen Rep. at 44. These results are reflected in the below scatterplot and callout, which show the significant differences in the results (both the median—the purple line—and the mean—the black diamond) between Emery's litigation testing on the one hand and the agencies' baseline testing (adapted from Fig. 11 in March 7, 2022 Olsen Rep. at 44).





Dr. Najafi does not provide any explanation for these discrepancies or for the obvious inconsistencies with Emery's own earlier data in his report (the "Emery – Market" data in the figure).

*Simulated consumer experience testing*: Dr. Najafi performed so-called "consumer experience" testing, in which he claims to show how keeping Zantac in a hot car, a bathroom, or in certain climatic zones causes NDMA to form. But Dr. Najafi does not explain how these experiences actually simulate real world conditions. Dr. Najafi also failed to perform any testing, or perform any analysis, of the conditions of actual cars, bathrooms, or climates. For example, Dr. Najafi concedes he did not perform any testing of Zantac actually left in a car, *see* Ex. 17, Najafi Dep. at 230:16–17 ("We have not tested Zantac pills in a -- anybody's car"), but rather conducted a simulated hot car study subjecting the ranitidine samples to 75°C conditions, which equates to 167°F. There are similar design flaws for his bathroom and climate studies as well. Further, Dr. Najafi could not point to any agency that has validated the experimental design of his consumer experience testing, his results were not subjected to peer review, and he has not accounted for an

error rate for his data.  Additionally, like his baseline testing, Dr. Najafi developed his own analytical method for litigation (which departs from all other researchers' methods, including the method Dr. Najafi used before he was retained in the litigation) and failed to adequately document his testing, which precludes a complete analysis regarding the reliability of his data.

*Meat Incubation studies*: Dr. Najafi performed testing purporting to measure the amount of NDMA formation when in the human stomach with and without food.  Based on that testing, he concludes that ranitidine interacts with nitrite-containing meats (*i.e.*, ham, bacon, hot dogs, and sausage).  Ex. 9, Jan. 24, 2022 Najafi Rep. at 93–101.  But Dr. Najafi departed from established scientific models for simulating the digestive process and failed to account for natural physiological processes, such as ranitidine leaving the stomach over time.  Ex. 17, Najafi Dep. at 285:5–286:22.  Additionally, Dr. Najafi's analysts did not follow any standard operating procedures and the analytical method for measuring NDMA in these meat-matrices was unvalidated and subject to high error rate based on the analysts' subjective and uncontrolled discretion.  Moreover, here again, Dr. Najafi failed to adequately document the testing which precludes a comprehensive analysis of the scientific reliability.

### Dr. Davis

Dr. Davis is a biostatistician and the founder of CSD Biostatistics, Inc., a litigation consulting company.  In his report, Dr. Davis analyzed certain data cherry-picked by the Plaintiffs' lawyers, which he then extrapolates to conclude that, in general, the rate of NDMA formation in ranitidine is adversely affected by high temperatures and relative humidity conditions.  *See* Ex. 3, Report of Dr. Charles Davis ("Davis Rep.").  Other than making statistical calculations with Dr. Najafi's results, Dr. Davis did nothing to determine the representativeness of the Emery data or testing.  *See* Ex. 16, Davis Dep. at 51:25–52:12; 81:19–82:3.

### IV.   LEGAL ARGUMENT

A party seeking to introduce expert testimony bears the burden of proving that the testimony satisfies the criteria set forth in Federal Rule of Evidence 702.  *See McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).  Specifically, the party must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *See Guinn v. AstraZeneca Pharms. LP*,

602 F.3d 1245, 1252 (11th Cir. 2010) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  Plaintiffs cannot establish that Dr. Najafi or Dr. Davis's methodologies are sufficiently reliable, and, therefore, they should be excluded.

To be sufficiently reliable, and, therefore, admissible, expert opinions must be "the product of reliable principles and methods," which must have been "reliably applied" to the facts of the case.  *See* Fed. R. Civ. P. 702(b)–(d).  The Eleventh Circuit has instructed courts to look at several non-exhaustive factors for determining whether an expert's methodology is sufficiently reliable, including: "(1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted."  *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993); other citation omitted) (affirming district court's decision to exclude testimony of medical causation expert as unreliable).

Dr. Najafi and other experts rely on the results of Emery Pharma's baseline testing, simulated consumer experience testing, and meat-incubation testing to offer opinions regarding the amount of NDMA that will form under various conditions that they assumed relevant to real-world use of ranitidine.  But none of these tests are based on reliable science, nor are they reliably applied to the facts of this case, and thus Dr. Najafi's opinions should be excluded.  *See* Fed. R. Evid. 702 (noting an expert may testify if, among other things, his "testimony is the product of reliable principles and methods; and [] the expert has reliably applied the principles and methods to the facts of the case").  First, Dr. Najafi's litigation-driven experimental designs are unreliable and do not support the inferences being made for purposes of this litigation.  Second, Dr. Najafi's analytical methods for quantifying NDMA depart from established-scientific practice both in overall design and in execution.  Third, although Defendants have enough information about Dr. Najafi's testing to show that his methods and interpretations are neither reliable nor generally accepted, his improper documentation practices preclude a complete scientific evaluation of his testing.  For these reasons, as discussed further below, Plaintiffs have not met their burden of proof of establishing that Dr. Najafi's testing is reliable.

A. **Dr. Najafi's experimental designs are litigation-driven and unreliable to support any valid inferences.**

In determining whether an expert's methodology is reliable, courts routinely consider whether an expert's testing is performed or a testing model was developed for the purposes of litigation. One of the relevant factors courts consider for their *Daubert* analysis is "[w]hether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying'" and "[w]hether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting." Fed. R. Civ. P. 702, Advisory committee note to 2000 amendment (quoting *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), and *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)). *See also Summer v. Biomet, Inc.*, 434 F. App'x 834, 842-43 (11th Cir. 2011) (affirming district court's determination that the fact that an expert's theory appeared to have been arrived at for purposes of the litigation weighed heavily against the opinion's admissibility); *Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 WL 1447733, at *14 (S.D. Fla. May 9, 2022) (same).

All of the Emery testing that Dr. Najafi relies on in his expert report was designed and conducted solely for this litigation. Ex. 9, Jan. 24, 2022 Najafi Rep. at 4. While Emery has conducted about a dozen types of testing, Dr. Najafi's opinions largely focus of three core tests: (1) baseline testing; (2) consumer experience testing; and (3) meat-incubation testing. The methodologies Dr. Najafi and Emery used in these experiments, however, are not standard tests used by pharmaceutical manufacturers or scientific researchers, are not generally accepted in the industry, and do not accurately reflect real-world conditions.

1. **Dr. Najafi and Emery did not follow any experimental methodology for determining baseline levels of NDMA in ranitidine.**

Dr. Najafi has conducted unreliable testing that purportedly tests the "baseline" levels of NDMA, *i.e.*, the levels that would be present in ranitidine products at the time of purchase by consumers. To put this in context, researchers at FDA and in peer-reviewed literature actually purchased ranitidine products from store-shelves and tested the levels of NDMA. *See* Ex. 12, March 7, 2022 Olsen Rep. at 41–42. These results are the most reliable evidence related to the levels on NDMA in ranitidine samples that may have been taken by consumers because they were selected from the market and generated at or near the time of recall (in other words, at a time when

consumers could have actually purchased the products).  Studies performed years after the fact, by a paid expert using unvalidated methods, are patently less reliable than FDA's results using recognized and validated methods on actual samples a consumer could have purchased during the relevant timeframe.

Notwithstanding the available evidence and the obvious bias of *post-hoc* testing, Plaintiffs were not satisfied with the levels of NDMA previously reported and instead retained their own expert to conduct litigation-driven testing years after the product had been recalled.  Importantly, none of the samples tested by Emery were from the market, and many were either past their expiration date or were past their holding time, meaning that these products, by definition, could not be sold to consumers.  Unsurprisingly, as described above, the distribution of Dr. Najafi's baseline data is much higher than any regulatory agency or independent party has ever reported. The Court may consider the inconsistency of Dr. Najafi's data when compared to the other available testing data because "conclusions and methodology are not entirely distinct from one another."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  *See also Finestone v. Florida Power & Light Co.*, No. 03-14040-civ, 2006 WL 267330, at *11 (S.D. Fla. 2006) (ruling that expert's opinions were inadmissible because his theory was refuted by "actual sample results completed by government agencies").

Although highly flawed and suspect, Plaintiffs' experts rely on Emery's baseline testing dataset, which specifically excludes the lower levels found by independent third parties.  This is troubling because Plaintiffs' experts rely on the mean (or average) levels generated by Emery Pharma, which drives the results higher by excluding levels that are lower, derived by reliable methods, and reported by regulators and peer-reviewed literature.  In doing so, Plaintiffs' experts discount the levels reported by regulators and FDA or conduct dose-extrapolations based on averages limited to Emery's dataset, both of which are improper misuses of the data.  Expert opinion based on Dr. Najafi's baseline testing is inadmissible because the underlying testing is scientifically unreliable.

A major issue with Emery's baseline data is that they were generated with no true experimental design.  In fact, at his deposition, it became apparent that Dr. Najafi never created an experimental protocol for how he would request samples.  Ex. 17, Najafi Dep. at 368:5–6 (Plaintiffs' Counsel: "They were requested by counsel.").  Even worse, Dr. Najafi did not know whether he tested all the samples produced, *id*. at 366:4–366:12, and he had no protocol for

selecting which samples to test, *id*. at 366:25–367:5 ("I left it really up to of [*sic*] the analysts, my team, to -- but what I instructed them was I wanted a very good cross-section of locations, batch numbers, manufacturers, and that's what we did.").

Since there was no experimental design, there is no error rate associated with Emery's methodology. *See United States v. Vitek Supply Co.*, 144 F.3d 476, 485 (7th Cir. 1998) ("[T]he purpose of an inquiry into error rates is to determine whether tests are accurate and reliable."). Here, Dr. Najafi does not even account for an error rate for his methodology, *i.e.*, whether his methodology for selecting and testing samples accurately reflects the levels of NDMA that would have been on the market.  To the extent any error rate can be ascertained, it is expected to be quite high, especially when considering that much lower levels of NDMA have been reported by regulatory agencies, peer-reviewed authors, and even Emery's own non-litigation testing.  Ex. 12, March 7, 2022 Olsen Rep. at 43.

"Another pertinent consideration is whether the theory or technique has been subjected to peer review." *Daubert*, 509 U.S. at 593; *See McClain v. Metabolife Intern. Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (reversing admission of plaintiffs' expert whose opinion regarding the toxicity of ephedrine and caffeine and that their use can cause strokes and heart attacks, in part, because plaintiffs had "failed to present evidence of any peer review of his opinions"); *In re Nexium Esomeprazole*, 662 F. App'x 528 (9th Cir. 2016) (affirming exclusion of expert whose opinions had not been subject to peer review).[21]  "[S]ubmission to the scrutiny of the scientific

---

[21] *See also Craig v. Orkin Exterminating Co.*, No. 99-8931-CIV, 2000 WL 35593214, at *3 (S.D. Fla. Nov. 22, 2000) (excluding chemist and neurologist from testifying that acephate exposure causes a variety of cardiac and neurological conditions because, in part, "[t]he theories or techniques that they formulated were not subject to peer review or publication"); *Marsh v. W.R. Grace & Co.*, 80 F. App'x 883, 887 (4th Cir. 2003) (affirming district court's decision to exclude expert testimony that picloram, a tobacco fertilizer, causes cancer because "his theories underlying his conclusion had not been subject to peer review or publication"); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 784 (10th Cir. 1999) (affirming district court's exclusion of expert opinion that plaintiff's exposure to toluene, xylene, hexane and haptene caused his leukemia because, in part, "the opinions prepared by plaintiffs' experts were not published and subjected to peer review.  By failing to subject their opinions to peer review, the experts missed the opportunity to have other scientists review their work and warn them of possible flaws in their methodology"); *United States v. $141,770.00 in U.S. Currency*, 157 F.3d 600, 605 (8th Cir. 1998) (affirming district court's exclusion of expert who had not submitted his test results to peer review and had an "unknowable but potentially very high" rate of error); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (affirming district court's exclusion of plaintiff's expert testimony that exposure to toluene,

community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593–94 (citing J. Ziman, RELIABLE KNOWLEDGE: AN EXPLORATION OF THE GROUNDS FOR BELIEF IN SCIENCE 130–133 (1978) & Relman & Angell, *How Good Is Peer Review?,* 321 NEW ENG. J. MED. 827 (1989)). Here, none of Dr. Najafi or Emery's tests have ever been peer-reviewed. Beyond his actual results, since the experimental design for Emery's baseline testing is non-existent, the methodology obviously has not been peer-reviewed either, nor could it be replicated by any researcher. This is to say that, although many other researchers have published peer-reviewed articles reporting baseline levels of NDMA in ranitidine (results which are inconsistent with Emery's results), there would be no way to replicate the same methodology used by Emery since critical elements, such as sample selection, were left to the uncontrolled discretion of Dr. Najafi's team and other key aspects of the experimental design (to the extent on existed) either were not properly documented or were not retained.

Moreover, the flaws of Dr. Najafi's testing become even more apparent when evaluating how his results "fit" into the claims alleged in this litigation. *See Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance . . . [and it] has been aptly described . . . as one of 'fit.'" (internal citations and quotations omitted)). In *Allison v. McGhan Medical Corporation*, the Eleventh Circuit described this analysis as a requirement that:

> [T]he evidence must have a valid scientific connection to the disputed facts in the case. *Daubert*, 509 U.S. at 591 … (holding "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes … Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"). This connection has been appropriately denominated as "fit." *Id.*

---

among others, caused plaintiffs' pulmonary illness because, among other reasons, plaintiffs' expert's "theory had not been subjected to peer review or publication"); *Raynor v. Merrell Pharms. Inc.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997) (affirming exclusion of plaintiffs' expert's testimony that Bendectin caused child birth defects because, in part, "[n]one of the plaintiffs' experts had published their conclusions regarding Bendectin, nor had their work been subject to peer review"); *cf. Simmons v. Ford Motor Co.*, 132 F. App'x 950, 952 (3d Cir. 2005) (finding district court did not exceed its discretion in excluding plaintiff's expert testimony regarding a proposed alternative design to remedy an alleged susceptibility to placing a vehicle in "false park," because "the method [the expert] utilized [to simulate a false park situation] was not subject to peer review").

184 F.3d 1300, 1312 (11th Cir. 1998).  Dr. Najafi only tested old samples of ranitidine (either expired or within one year of expiration).  Ex. 6, March 7, 2022 Guengerich Rep. at 92–93; Ex. 12, March 7, 2022 Olsen Rep. at 42–43.  None of the samples that Emery tested and that Dr. Najafi relied on in his report were pulled from store shelves.[22]  Even for the unexpired product, some of this was bulk product, which is not sold to consumers, and Dr. Najafi failed to consider whether the bulk product tested was held longer than its established "holding time."  *See* 21 C.F.R. § 207.1 (defining finished drug product as being within a "finished package form suitable for distribution"); *id.* § 211.111 (requiring "time limits for the completion of each phase of production").  Here, Plaintiffs bear the burden of proving that Dr. Najafi's opinions are the result of reliable methodology.  However, there is insufficient evidence that the samples tested are representative of what a consumer might actually purchase; in fact, the available evidence proves otherwise.  Ex. 12, March 7, 2022 Olsen Rep. at 43.

The fact that the testing conducted in 2021 and 2022 cannot be extrapolated to what any individual consumer purchased is illustrated best by Plaintiffs' own expert, Dr. Charles Davis, who agreed he was retained "to let folks know what statistical inferences we could or couldn't draw from that data."  Ex. 16, Davis Dep. at 209:12–18.  But even Dr. Davis did not do any work to ensure that the samples Dr. Najafi tested were representative of the type of Zantac product sold to consumers:

> Q.     Let me ask you this Dr. Davis, what work did you do to ensure that the dataset or the samples that you received were reflective of Zantac that had been sold years before or by other companies or manufactured in other places?
>
> A.     I worked as a statistician for 45 years and I've never done anything like that on any project.  It's simply impossible.

Ex. 16, Davis Dep. at 81:19–82:3.  Notwithstanding Dr. Davis's warning, Plaintiffs' other experts did just that.  Specifically, Drs. Panigrahy and Salmon performed calculations assuming daily exposure to Dr. Najafi's mean baseline level which make a host of erroneous assumptions.  First, such assumptions ignored the fact that Dr. Najafi's data is highly elevated—and inconsistent— with other available data.  Ex. 12, March 7, 2022 Olsen Rep. at 43 (comparing Emery's litigation

---

[22]  This is in contrast to the samples Emery tested for its Citizen Petition, all of which had significantly lower NDMA levels.

testing with data derived from marketplace samples, including Emery's own testing outside of litigation). Additionally, Dr. Najafi's baseline dataset is heavily influenced by outlier data, so using the mean level (as opposed to the median level) also biases the results even higher. *Id.* at 46 ("Rather than using the mean, the median is the more appropriate statistic because it is not heavily influenced by atypical or outlier data"); Reference Manual at 238 (explaining that a mean can be "heavily influenced by" the magnitudes of a few very large numbers, whereas "[i]f one is seeking a single, representative number for the [dataset], the median may be more useful than the mean.").

Finally, Dr. Davis performed statistical analyses on Dr. Najafi's baseline data to identify whether high levels of NDMA were associated with certain factors, such as form (categorized as regular or cool mint), dose (categorized as 75 mg, 150 mg, or 300 mg), container (categorized as bottle, blister, bulk, or individual), *etc.* Although Defendants have other criticisms of Dr. Davis's statistical analyses,[23] the true issue with Dr. Davis's opinion is that it is not relevant to any products outside the limited subset of data he analyzed. And courts routinely exclude experts whose opinions are based upon unreliable data. *See La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, No. 19-24016-CIV, 2022 WL 479877, at *7 (S.D. Fla. Feb. 16, 2022) ("Unreliable inputs yield unreliable outputs." (citing cases)); *see e.g.*, 81:19–82:3 (quoted above); *see also* Ex. 16, Davis Dep. at 82:17–25 (Q. "[Y]ou didn't perform any analysis to confirm whether or not the data that you reviewed was representative of data of Zantac that was sold in, say, 1987; right?" A. "I can say, no, I didn't do it, but it's just a question that doesn't even make any sense."). This is critical because none of the products in his dataset, by definition, were ingested by consumers, let alone Plaintiffs in this litigation. *id.* at 60:12–19; *see also id.* at 60:20–613 (Q: "Let me ask you this: You don't have any information about whether any particular plaintiff may have taken Zantac that was produced in a batch with some of the samples that Dr. Najafi tested?" A: I obviously don't have any information like that. I don't know anything about plaintiffs individually or even as a group.").

There is simply "too great an analytical gap" between the testing generated by Dr. Najafi and the resulting opinions that assume these levels of NDMA are reflective of what would be found on the market. *Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either

---

[23] *See generally* Ex. 5, Report of Dr. Robert Gibbons.

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert*, 43 F.3d at 1319–20.  This is particularly true where, as here, there is consistent, reliable data from the relevant time period conducted by accepted authorities, yet the retained expert asks the Court to override that with outlier results created after the fact with outlier models.  As such, opinions relying from Dr. Najafi's baseline data should be excluded as unreliable.

> **2.  Dr. Najafi and Emery's consumer experience testing used litigation-driven study designs which biased results high in contradiction of well-establish scientific methodology.**

Plaintiffs' experts, Dr. Ramin Najafi, Dr. Andrew Salmon, Dr. Jennifer Le, and Dr. Charles Davis all offer quantitative opinions regarding the levels of NDMA that form during "common consumer experiences." Ex. 9, Jan. 24, 2022 Najafi Rep. at 78, ¶ 162; Ex. 15, March 28, 2022 Salmon Updated Rep. at 5; Ex. 8, Jan. 24, 2022 Le Rep. at 55–57; Ex. 3, Jan. 24, 2022 Davis Rep. at 5–7). These "common" experiences, however, assume that Plaintiffs ignore the packaging, which instructs consumers both to store Zantac between 20–25°C (OTC) or 15–30°C (Rx) and to "avoid excessive heat and humidity" or to store "in a dry place." In fact, the Emery testing purports to simulate what would occur if Zantac users stored their medicine in extreme conditions, including in hot cars, humid bathrooms, or outdoors climatic zones for prolonged periods. These opinions also rely entirely on "consumer experience" testing designed and performed by Dr. Najafi exclusively for purposes of this litigation. The testing, however, is fundamentally flawed and cannot form the basis of expert witness opinions, as discussed below.

As a preliminary matter, it is important to consider that there are established scientific methods for testing a product's stability during consumer use of the product—for example, by conducting "in use" stability testing. *See* Ex. 12, March 7, 2022 Olsen Rep. at 11–12. Yet, rather than following an established scientific method for assessing the product's stability during consumer use, Plaintiffs' experts made up their own study designs, all which bias NDMA levels high. Nor is this type of testing intended to retrospectively guess how much NDMA formed in untested tablets many years ago. *See id*. at 5 ("Chemists do not, however, typically conduct *post hoc* analyses for the purposes of estimating what level of impurities might have existed under hypothetical consumer circumstances many years ago."). As discussed below, the three consumer

scenarios were simulated hot car testing, simulated bathroom shower testing, and outside climatic zone testing.

### a)    Hot Car Testing

Plaintiffs' experts argue, without support, that storing Zantac® in a hot car is a "common consumer experience." Ex. **9**, Jan. 24, 2022 Najafi Rep. at 115, ¶ 244. Dr. Najafi did not actually store Zantac in a real-life car to test that hypothesis. *See* Ex. 17, Najafi Dep. at 230:16–17. Instead, Dr. Najafi "simulated" what he claims is representative of what a hot car would be. Dr. Najafi's study has not been peer-reviewed. Even worse, the study design generally has never appeared in any peer-reviewed literature that Defendants could identify. Dr. Najafi purports to rely on a single peer-reviewed study to support the hot car testing, but he acknowledged during his deposition that the Vanos 2018 study[24] "was about [the] risk of leaving childrens [*sic*] -- children in the car during summertime." *See id*. at 227:23–25.  The study is not related to pharmaceutical products, and it has never been used in any peer-reviewed publication or relied on by any regulatory agency to test the stability of pharmaceutical products.  Nor does the study validate that the conditions described in the study would be representative or informative for purposes of assessing pharmaceutical stability.

In fact, Emery's hot car conditions are inconsistent not only with Vanos 2018, but with Dr. Najafi's own opinions outside of litigation. Specifically, Emery's scientists previously prepared a presentation, approved by Dr. Najafi, which concluded that storing products at 40°C (104°F) represents conditions "if left in your car during the heat of summer!"  *See* Ex. 36, EMERY 0321–0338 at EMERY 0329. Yet, for his opinion in litigation, Dr. Najafi applied a different standard and now claims that up to 75°C (167°F)[25] represents hot car conditions.

Likewise, even though Dr. Najafi claimed to rely on Vanos to support his use of 75°C in his hot car experiment, the study does not support those conditions. Ex. 12, March 7, 2022 Olsen Rep. at 54. If any condition in Vanos were relevant, it would be the "cabin air" temperature, which ranged from 47.6°C and 39.5°C for sun and shade respectively. Ex. 10, March 28, 2022 Najafi Rep. at 14. Dr. Najafi discounts the relevance of air cabin temperature arguing that: "A ranitidine

---

[24] Ex. 23, J. Vanos, et al., *Evaluating the Impact of Solar Radiation on Pediatric Heat Balance within Enclosed, Hot Vehicles*, TEMPERATURE 5(3):276-292 (2018).

[25] Note, in Dr. Najafi's rebuttal report, he states Emery actually used 75°C (167°F) for sun and 50°C for shade.  Ex. 9, March 22, 2022 Najafi Rep. at 15.

pill being carried in a car will not be magically suspended mid-air to justify considering the cabin air temperatures." *Id*.  The irony, however, is that Dr. Najafi used a stability chamber which literally heats samples via air.  *See* Ex. 17, Najafi Dep. at 511:3–511:11.  Dr. Najafi cannot justify using an air temperature of 75°C for his test but discount the fact that the study he relies on reported that a car in the sun in Arizona during summer only rises to, at most, 47.6°C. Such internal inconsistency suggests a results-driven design.

After conducting his experiments and seeing Dr. Olsen's criticisms, Dr. Najafi attempted to identify additional literature to support his conditions, *see* Ex. 10, March 28, 2022 Najafi Rep. at 15 (citing Grundstein 2009 and Forest Products Laboratory Forest Service 1979), but these publications actually demonstrate the high error rate on his testing. In his rebuttal report, Dr. Najafi admits that actual hot car conditions "varied considerably," March 28, 2022 Najafi Rep. at 15— yet Dr. Najafi's test only considered the most "extreme" conditions. *See id*. at 14. Even then, Dr. Najafi admits that "no two ranitidine batches have behaved identically when exposed to stress/stability conditions" and that "it is possible that some ranitidine drug product may only generate a few nanograms NDMA during consumer use." *Id*. at 13. The significant discrepancy demonstrates that this testing has an extremely high error rate and could never be used to reliably estimate how much NDMA would form in any particular product that any one person may have taken many years ago. This high error rate alone is sufficient to justify exclusion. *See Daubert*, 509 U.S. at 593–94 (instructing district courts to consider, among other facts, a scientific field's rate of error); *United States v. Vitek Supply Co.*, 144 F.3d 476, 485 (7th Cir. 1998) ("[T]he purpose of an inquiry into error rates is to determine whether tests are accurate and reliable.").

Moreover, Dr. Davis's statistical analysis does nothing to cure the significant error rate observed in Dr. Najafi's hot car testing.  Dr. Davis calculated the "mean increases in NDMA level per 1 cycle," but he never quantified the statistical significance or uncertainty related to the mean increases. Instead, Dr. Davis calculated the statistical significance of whether the change in NDMA levels generally had a positive or negative slope. In doing so, Davis admits, however, that this analysis is "specifically not focused on quantity," *i.e.*, the mean increase.  *See* Ex. 16, Davis Dep. at 212:16–17; *id*. at 269:9–12 (Q. "[Y]ou didn't quantify any uncertainty around the slopes that you calculated here by, for example, reporting p-values for them?" A. "That's correct."). Accordingly, Dr. Davis's analyses are not relevant to understanding whether the results observed here are reliable or subject to a high error rate.

Critically, Dr. Davis specifically admits that his opinions are limited to the samples tested and cannot be extrapolated to untested tablets:

> Q.    Okay. Dr. Davis, I just have one more question for you for now, and that is you're not offering any opinion in this case about the rates of NDMA formation for product that were not included in the dataset that you reviewed; right?
>
> A.    I could not possibly do that.  I can't talk about data I don't have.

Ex. 16, Davis Dep. at 274:16–24 (objection omitted). As a result, there could never be a clear fit between Dr. Davis's analyses and the issues for any particular Plaintiffs' case.

### b)    Bathroom Shower Testing

Next, Dr. Najafi proffers opinions concerning NDMA formation if Zantac is stored in a bathroom. Here again, however, Dr. Najafi's testing is flawed. At the outset, Dr. Najafi did not test Zantac product in a real-world bathroom. *See* Ex. 17, Najafi Dep. at 232:16–17 ("We have not conducted a study in a real-world bathroom."). Tellingly, Dr. Najafi admitted that the reason he did not test in a real-world bathroom is because he wanted to control the simulation, *id*. at 233:2–4, rather than, for example, let the conditions be what they naturally are in a real-world bathroom. Further, like the hot car testing, Dr. Najafi's study is not peer-reviewed, nor could Defendants identify any instance where the study design was used by a researcher in peer-reviewed literature.

Additionally, Dr. Najafi relied on the Aizawa 2006 study[26] to support the conditions used, but that study is not peer-reviewed either. *See* Ex. 20, Aizawa Study, and Ex. 12, March 7, 2022 Olsen Rep. at 59–60. No aspect of Emery's bathroom study is supported by peer-reviewed literature. Setting that aside, however, Emery failed to even use the relevant conditions from Aizawa anyway. The Aizawa 2006 authors were based in Japan and tested the temperature and humidity levels in what the authors referred to as a "bathroom," and a "changing room." Given the differences between American and Japanese bathrooms, it is the "changing room" – not the "bathroom" – that what would be relevant to location of an American medicine cabinet. Dr. Najafi agrees: "[T]he conditions in the 'changing room' (*where a medicine cabinet would presumably be located*) reached 25°C/85% RH for about five minutes when starting at about room temperature." *See* Ex. 10, March 28, 2022 Najafi Rep. at 16 (emphasis added). Instead of testing 25°C/85% RH

---

[26] Ex. 20, Y. Aizawa, et al., *Thermal Environment and Moisture Production in the Bathroom* (2006).

for five minutes, however, Dr. Najafi tested 40°C/100% RH for thirty minutes.[27]   There is simply no real-world significance or value to the conditions Emery used in the shower experiments.

Further, as he did for the hot car study, after seeing Defendants' experts' criticisms of his assumptions and study design, Dr. Najafi attempted to bolster his prior assumptions with additional literature he had not considered before designing or running the experiment. Just like the hot car study, the additional literature further undermines his findings. Dr. Najafi cites Yokoo 2009 (another non-peer-reviewed abstract), which found that the temperature of the changing room was affected by the size of the room, and, again, the conditions reported are much lower than the ones Emery used. Ex. 24, Yokoo K, et al. "*Amount of Moisture Produced Inside Bathroom and Appurtenant Changing Room.*" Ventilation & Energy Conservation in Buildings IAQVEC 2007. Sendai, Japan; 2007.

As with the hot car study, the error rate in the shower study is significant. As Dr. Olsen noted: "An overall average increase in NDMA levels is not consistent across all time points as shown by several instances where NDMA levels decreased with additional cycles. Also, tablet-to-tablet variability is not shown in these results and Dr. Najafi does not consider this source of variability in his interpretation of NDMA levels." Ex. 12, March 7, 2022 Olsen Rep. at 62. The significant variability illustrates that each product is unique and the test is subject to a high error rate. Thus, this test could never be used to reliably estimate how much NDMA would form for a particular person's product many years ago.

Dr. Davis's analysis does nothing to cure the significant error rate.  The same issues in Dr. Davis's analysis of the hot car study (*i.e.*, that he did not assess the uncertainty of his "mean increases") apply equally here. Dr. Davis's broad disclaimer that his opinions are unrelated to products other than those specifically analyzed by him applies here too. Accordingly, Dr. Davis's

---

[27] Dr. Najafi passingly claims, without any support, that "[t]he impact of a few degrees in temperature is negligible."  *See* Ex. 9, March 28, 2022 Najafi Rep. at 16.  But this is not just a few degrees—a jump from 25°C to 40°C is nearly a doubling of the temperature.  Dr. Najafi may be referring to the 37°C reading which lasted about 2–3 minutes in the more extreme condition tested by Aizawa 2006.  Even if that were the case, that condition would only be relevant if someone showered in a Japanese-style shower with the medicine literally in the shower with them, which is simply an implausible assumption for purposes of this litigation.  Ex. 12, March 7, 2022 Olsen Rep. at 60; *see also Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 18 (D. Mass. 1995) (excluding expert's dose calculation based on formula of his own invention which, although superficially impressive, was "so riddled with factual inaccuracies and unproven assumptions that no reasonable jury could give his opinion credence").

analyses are not relevant to understanding whether the results observed here are reliable or subject to a high error rate, nor can Dr. Davis opine on any ranitidine products beyond the exact products he analyzed.

c)      Zone Testing

Finally, in the last of his consumer experience tests, Dr. Najafi proffers quantitative opinions regarding the rate of NDMA formation when storing Zantac in various climatic zones. But just as with the other consumer experience testing, the study design for his zone testing is critically flawed and it does not "fit" the facts of the case because it assumes Plaintiffs would store their ranitidine outside or in a home with no temperature control.

First, there are established methods for testing pharmaceutical products within the various climatic zones. Emery did not follow any of them. As noted in Dr. Olsen's report, stability studies are conducted in a product's final container closure system (including an induction seal for additional protection) and with minimal headspace. *See* Ex. 12, March 7, 2022 Olsen Rep. at 8–9. Dr. Najafi's zone testing, however, departed from the actual Zantac container closure system by (1) using a different container closure system, (2) failing to include an induction seal, and (3) including more headspace in the bottle. *See* Ex. 9, March 28, 2022 Najafi Rep. at 4. Dr. Najafi provided no justification for his departure from accepted study methods, he tested Zantac in conditions which do not reflect intended storage conditions, and he failed to account for the confounding effect of introducing new variables into these studies. Although some of the study's conditions are derived from ICH guidelines, the study design makes significant departures from ICH that would likely affect the results and that do not enjoy scientific acceptance.

Dr. Najafi also seemingly admits that the study has a large and unknown error rate. For context, Dr. Olsen identified that prior to the initiation of the test, one of the samples used for the test that had been stored at ambient conditions formed *less than* 1 ng per week over 4 years. *See* Ex. 12, March 7, 2020 Olsen Rep. at 63. Yet, during Dr. Najafi's stability study, for similar conditions, the rate increased to about 72 ng per week—a *highly* suspect finding. *Id*. In response to Dr. Olson's criticism of Dr. Najafi's high variability in results, Dr. Najafi claimed that "NDMA levels go up, level off, go down, go up again, etc. depending on the lot and the experimental conditions." Ex. 10, March 28, 2022 Najafi Rep. at 17–18. Relatedly, Dr. Najafi's admits that "the rates of formation of NDMA across different lots … is highly dependent on the product itself." *Id*. at 17–18. If Dr. Najafi is correct that levels of NDMA haphazardly rise and fall over time, and are

variable across different ranitidine products, it is unclear how anyone could ever be confident in the levels of NDMA that would exist at any timepoint before or after analytical testing—let alone be confident enough to opine on what levels existed in untested products up to 30 or 40 years ago.

This is critical because Dr. Najafi used three expired samples and only two unexpired samples for this test. Testing two samples (or even five, if considering expired samples) with highly variable rates will yield a high error rate that Dr. Najafi has not attempted to quantify. *See* Najafi Dep. at 222:9-10 ("We have not conduct [*sic*] any statically -- statistical studies."). *See Otto v. Refacciones Neumaticas La Paz, S.A., DE C.V.*, No. 3:16-cv-00451-MMD-WGC, 2020 WL 907560, at \*4 (D. Nev. Feb. 25, 2020) (finding that unknown error rate weighed against admission of expert); *BASF Corp. v. Sublime Restorations, Inc.*, 880 F. Supp. 2d 205, 214 (D. Mass. 2012) ("Miller grounds his opinion on his own visual inspection, a method with an unknown error rate as his technique amounts to little more than 'eyeballing' the various [ ] materials." (citation omitted)); *United States v. Frabizio*, 445 F. Supp. 2d 152, 166 (D. Mass. 2006) ("Lack of a known error rate also prevents the jury from assessing the proper level of deference to accord the expert's conclusions.").

Likewise, Dr. Davis statistically analyzed the data, but did not quantify the uncertainty related to the rise or fall in NDMA levels. This is the same basic issue described for the hot car and bathroom shower studies, discussed above. Dr. Davis generally assessed whether, over the course of the experiment, the levels had a positive or negative slope and then assessed the statistical significance of whether the levels went up or down. But, in doing so, he failed to test the statistical significance of the "estimated increase in NDMA level per 1-week change."  *See* Ex. 3, Jan. 24, 2022 Davis Rep. at 5. In other words, Plaintiffs' experts have not even assessed whether there is any statistical significance (or uncertainty) related to the rate of NDMA formation in any of the consumer experience studies, including the zone study. *See* Ex. 5, March 7, 2022 Gibbons Rep. at 23, ¶ 68 ("Dr. Davis provides rates (*i.e.* slopes) of formation per week for both expired and unexpired product in the various zones. Again, there is no level of uncertainty associated with these calculations, nor are there any tests of statistical hypotheses."). Given Dr. Najafi's concessions that the rate is highly variable from batch to batch, the failure to provide this analysis is fatal. *See United States v. Loaiza-Clavijo*, No. 1:08-CR-356-18-WSD-ECS, 2012 WL 529981, at \*4 (N.D. Ga. Jan. 25, 2012) (noting "highly variable" results were problematic for establishing an error rate).

Understanding just how Dr. Najafi's data has been even further misused by Plaintiffs' other experts illustrates how it cannot form the reliable basis of expert witness opinion. Specifically, Dr. Salmon used Emery's consumer experience zone data to calculate a "multiplier" of 2.5—meaning that, first, Dr. Salmon estimated how much NDMA a consumer would ingest by starting with an already elevated baseline level and then multiplying the amount of NDMA by a factor of 2.5. *See* Ex. 15, March 28, 2022 Salmon Updated Rep. at 220. The derivation of Dr. Salmon's 2.5 used data from only a single product from Emery's zone testing and assumed one person simultaneously lived in all climatic zones, including a non-existent "Zone ACC" (this refers to an accelerated stability condition, which is not an ICH climatic zone expected to be present on earth), *see e.g.*, Ex. 12, March 7, 2022 Olsen Rep. at 11 (describing "Accelerated Stability Testing."). Dr. Salmon's inclusion of the non-existent climatic zone biases the results high, since results from "Zone ACC" drive an increase in the levels of NDMA. *See* Ex. 15, March 28, 2022 Salmon Updated Rep. at 218.  Dr. Salmon's analysis also assumes that everyone stores their medicine outside or has no air conditioning (even in the extremely hot regions) and that parts of the United States are 40°C (104°F) and 75% RH all year long—even in winter. *See* Ex. 12, March 7, 2022 Olsen Rep. at 64–65 (discussing Dr. Salmon's "unfounded and implausible assumptions.")

Given that Dr. Salmon could not rely on Dr. Najafi's data in a way that could be relevant for any real-world consumer of Zantac product further demonstrates that there is no true "fit" between this testing and the issues in the litigation. Moreover, the widely variable results demonstrate that the testing has a high error rate and that no expert could reliably apply the data to any claims in this case.  Therefore, Dr. Najafi's consumer experience testing is unreliable and cannot support expert witness opinions.

> **3.      Dr. Najafi and Emery's meat incubation testing used a litigation-driven study design which biased results high in contradiction of well-establish scientific methodology.**

Dr. Najafi has conducted unreliable testing to claim that ranitidine forms in the stomach when consumed with high nitrite foods (*i.e.*, meat), but no other expert in this litigation relies on Dr. Najafi's meat incubation testing. In fact, FDA rejected this hypothesis after conducting two rigorous peer-reviewed studies to examine whether NDMA forms endogenously in the bodies of patients taking ranitidine. As explained in another concurrently filed motion, FDA conducted a randomized, double-blind human clinical trial and additional laboratory studies using simulated gastric fluid to assess whether ranitidine would form in the human body. *See* Remaining Opinions

Motion. FDA has unequivocally concluded on its official website: "The combined findings from CDER's *in vivo* clinical trial and *in vitro* experiments do not support the conclusion that ranitidine is converted to NDMA in humans." FDA, *Ensuring the Rigor of Regulatory Science: CDER Conducts Laboratory and Clinical Studies to Investigate Reports of NDMA Production from Ingested Ranitidine Products*, (July 2, 2021), available at https://www.fda.gov/drugs/news-events-human-drugs/ensuring-rigor-regulatory-science-cder-conducts-laboratory-and-clinical-studies-investigate-reports. (accessed June 11, 2022). FDA's findings are consistent with the entire body of literature related to the theory of endogenous NDMA formation. *See* Remaining Opinions Motion. In fact, the scientific evidence is in agreement, except for the lone non-peer-reviewed laboratory results generated by Dr. Najafi. Nevertheless, Plaintiffs' experts continue to offer opinions that ranitidine forms NDMA in the presence of nitrite-containing foods. In addition to its total lack of acceptance, much less general acceptance, this testing is also unreliable for the reasons set forth below.

First, Emery's meat incubation study design is significantly flawed and not accepted by the scientific community. There are "internationally recognized consensus protocols" for simulating "complex physiological digestion processes" that take into account, for example, the effect of stomach contents emptying over time. *See* Ex. 1, March 7, 2022 Bumpus Rep. at 36; *see also* Ex. 6, March 7, 2022 Guengerich Rep. at 177–178. Dr. Najafi did not use these models and instead invented his own, which biased the results high.

Neither Dr. Najafi's model nor his results have been subjected to peer-review. The fact that this model has not been peer-reviewed is telling given that the model appears to bias the levels of NDMA high. Specifically, unlike well-established models, Dr. Najafi's model assumes the entire amount of stomach contents would be present throughout the duration of his experiments, which lasts for up to four hours. An incubation time of four hours does not represent realistic conditions for a human stomach, and, perhaps predictably, the testing resulted in the highest levels of NDMA. *See* Ex. 9, Jan. 24, 2022 Najafi at 95–100.

Researchers at FDA considered this very issue and noted that "a drug dissolved in gastric fluid and/or liquids empties throughout the digestive period" and found 2 hours to be relevant

incubation time.  *See* Ex. 25, Gao 2021 at 4.[28]  FDA researchers also noted that "the actual residence time of ranitidine in the fasted stomach may be much shorter" and cited studies noting a gastric residence time of 4.2 and 13 minutes.  *Id.*  Dr. Najafi did not know that most of the ranitidine would have left the stomach in an hour, much less 4.2 or 13 minutes, after ingestion.  *See* Ex. 17, Najafi Dep. at 286:23–287:4) (Q. "In a real stomach, after 60 minutes, much of the Zantac may have already left the stomach; isn't that true?" A. "Not to my knowledge.")  (Objection omitted).  Dr. Najafi also admitted his study does not follow the dynamic flow of a real-world digestive system. *Id.* at 286:15–19) ("Obviously we did not have a dynamic flow unit where you have, you know, gastric emptying and after three hours, you know, some -- so much of it leaves and all that.")

It is important to note that Dr. Najafi discounts an 8-hour incubation period because, he claims, the maximum amount of ranitidine will be in the blood within two to three hours after ingestion. *See* Ex. 9, Jan. 24, 2022 Najafi Rep. at 91–92, ¶ 190) ("with peak serum concentrations within 2–3 hours in adults, the 8-hour NDMA level would not be expected to be relevant to real world conditions.").  While a significant amount of ranitidine will already be in the blood after two hours, Dr. Najafi's model assumes 100% of it sits in the stomach for four hours.

Dr. Najafi's model also assumes that the pH of the human stomach remains acidic during the four hours simulating ingestion and digestion of a meal.  *See* Ex. 9, Jan. 24, 2022 Najafi Rep. at 94, ¶ 197; Ex. 6, March 7, 2022 Guengerich Rep. at 176–178. However, researchers at FDA have described that stomach pH increases with a meal (*i.e.,* becomes more basic) and that FDA's "experiments at higher pH levels that occur following a meal… led to decreased formation of NDMA."  *See* Ex. 25, Gao 2021 at 8.  Furthermore, the mechanism of action of ranitidine is to "decrease acid secretion," or in other words, to increase the stomach pH.  *See* Ex. 9, Jan. 24, 2022 Najafi Rep. at 19-20, ¶ 35.  Thus, ignoring the physiologic higher pH levels in the stomach that realistically occur following both a meal and ranitidine ingestion resulted in higher levels of NDMA formation.

---

[28] Zongming Gao, et al., "*In Vitro Analysis of N-Nitrosodimethylamine (NDMA) Formation From Ranitidine Under Simulated Gastrointestinal Conditions*," JAMA Network Open 2021;4(6):1-11, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2781455?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamanetworkopen.2021.18253.

Additionally, the validity of the study is further undermined because there is no "fit" between any of Dr. Najafi's data and real-world dietary habits. Instead, Dr. Najafi utilized a results-oriented approach to find NDMA by assuming people eat meat products only, with no other foods:

> Q.    Did you ever try to conduct the SGF test with a combination of multiple foods being incubated with Zantac?
>
> A.    No.
>
> Q.    So you never tried to conduct the test incubating ranitidine and meat with natural sources of vitamin C, for example?
>
> A.    I believe during our development we looked at some, you know, foods. We looked at arugula. We looked at a number of things that, you know, we felt might be -- might have nitrate or nitrite, and we just decided that those were not -- **they were not generating, they were not having sufficient nitrite to actually give us the, you know, proper sort of outcomes.** We were looking to see what food would generate nitrite -- would generate NDMA when it comes in contact. So arugula, I think we looked at, didn't, you know, and a few other things, but I think those were part of our development. We might have disclosed all of them to you. It's in Ryan's notebook, I'm sure. You can look at it. **But in my report I'm relying on primarily cooked bacon, sausage, ham. Those types of food.**
>
> Q.    Your goal was to find NDMA in your testing; is that correct?
>
> A.    **Our goal was to -- again, our goal was to see what food, when comes in contact with Zantac, develops NDMA.**

Ex. 17, Najafi Dep. at 282:15–284:5 (objections omitted, emphasis added).  Further, although Dr. Najafi's initial report states that the meats were "cooked," what he means is that the meats were pre-cooked prior to sale.  *See id*. at 257:13–17.  Emery did not cook the meats prior to testing, so the meat does not represent what an actual consumer would eat.  *See id*.  ("We have no kitchen here to cook.  Everything, they come as is.  And if they were precooked, they were precooked.  If they weren't, you know, they were used however they came.").  This is critical because Dr. Najafi did not assess whether the nitrite levels decreased upon cooking a meal.  *See id*. at 258:20–259:17. In all, Dr. Najafi cannot say that his testing is representative of a consumer's ordinary experience.

Lastly, Dr. Najafi conducts calculations from his meat experiments to estimate the nitrite concentrations "which [are] plausibly expected in real human stomach after intake of these meat product[s]."  *See* Ex. 9, Jan. 24, 2022 Najafi Rep. at 100, 103.  He further compares these nitrite

concentrations to the Gao *et al.* (2021) study conducted by the FDA to suggest their "absolute upper limit for physiological consideration is extremely conservative." *See id.* at 103. However, even if Dr. Najafi's experiments were valid, which they are not, his calculations based on his own experiments "are incorrect by several orders of magnitude" (*i.e.,* 250-folder higher than the correct calculations). *See* Ex. 6, March 7, 2022 Guengerich Rep. at 178-180.  Thus, the conclusions Dr. Najafi draws from his experiments are based on unreliable and inaccurate data.

Dr. Najafi's meat incubation study design issues range from implausible to impossible and do not "fit" the litigation.  Based on Dr. Najafi's own testimony, this test was a results-oriented testing to manufacture NDMA levels without respect to more complex dietary patterns one would expect in any real-world human diet. *Id.* at 282:19–285:4).  Moreover, these results are not peer-reviewed, have no basis in peer-reviewed literature, and contradict multiple peer-reviewed articles, including literature approved by FDA. As such, the testing cannot be considered valid and thus no expert witness could properly rely on this data.

### B.     Dr. Najafi did not use a reliable analytical method to measure the levels of NDMA in his testing.

Dr. Najafi's testing should be excluded as unreliable because Emery did not follow generally accepted practices in analytical chemistry.  "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community, may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (internal citations and quotations omitted).  Specifically, Dr. Najafi's testing departs from accepted practice because (a) his laboratory did not follow any Standard Operating Procedures (SOPs) to carry out the testing and (b) his analytical methods are not validated, but instead either invented for purposes of litigation or significantly altered methods in ways that have never been used outside of this litigation.

First, Dr. Najafi admits that none of his testing was conducted according to standard operating procedures ("SOPs").  Although Emery follows SOPs for other work, Emery uses different standards which ignore their SOPs when they conduct testing for litigation. *See* Ex. 17, Najafi Dep. at 48:8–19, 506:2–14 ("We have extensive SOPs for conduct of our GMP/GLP project, and it's -- it's really an entirely different process. We do not have those with our research investigations work.").  Putting aside the fact that Emery uses different standards outside litigation,

the failure to follow any SOP is itself a fundamental flaw which makes it "very difficult to confirm reliability" of the analytical work.  *See* Reference Manual at 529–530.

Additionally, Emery invented all-new testing for litigation which has not been properly validated or subject to peer review.  The following sections cover the two methods Dr. Najafi used: (1) the method to measure NDMA in baseline and consumer experience studies; and (2) the method to measure NDMA in his meat-incubation studies.

> 1. **Dr. Najafi failed to ensure his method to measure the levels of NDMA in his baseline and consumer experience tested is valid.**

Dr. Najafi's method for measuring the level of NDMA in his baseline and consumer experience testing is not peer-reviewed and has never been used by any researcher to measure the levels of NDMA in ranitidine outside this litigation.  Every regulatory body (*e.g.*, FDA, Health Canada, Australian Therapeutic Goods Administration) and every peer-reviewed author who has ever reported on the levels of NDMA in ranitidine use a reverse-phase liquid chromatography mass spectrometry technique.  *See* March 7, 2022 Olsen Rep. at 35.  Emery also used this type of analytical method is its Citizen Petition, prior to being retained by Plaintiffs.  *See* Ex. 36, Letter from Ramin Najafi to the FDA, Division of Dockets Management, Re: Emery Pharma Citizen Petition; Ex. 12, March 7, 2022 Olsen Rep. at 35.

Despite the entire scientific community using one method, Emery used a completely different method for its baseline testing in litigation.  Emery used hydrophilic interaction chromatography ("HILIC")—a method which has *never* been peer-reviewed or scientifically validated for the measurement of NDMA in ranitidine.  Even worse, Defendants' experts have reviewed Emery's HILIC method and determined that the method risks artifactual NDMA formation and cannot be consider as a valid or reliable method for measuring the level of NDMA in ranitidine.  *See* Ex. 12, March 7, 2022 Olsen Rep. at 3–4; Ex. 6, March 7, 2022 Guengerich Rep. at 7–9.  At deposition, Dr. Najafi attempted to refute this potential by offering three untested suppositions.[29]  *See* Ex. 17, Najafi Dep. at 517:19–520:23. His three untested suppositions,

---

[29] Dr. Najafi's three suppositions are that artifactual NDMA formation was not likely because (1) the amount of time from ranitidine to actually form NDMA is too short for the experiment at issue; (2) the artifactual formation would be consistent; and (3) that an instrument vendor's application note tested and found artifactual formation did not occur for that vendor's method.  *See* Ex. 17, Najafi Dep. at 517:19–520:23.

however, were considered and rejected by another expert and contradict findings in peer-reviewed literature.  *See* Ex. 6, June 3, 2022 Guengerich Rep. at 8–9.

Likewise, while Dr. Najafi claims his analytical methods are validated, he has not been able to articulate a scientific bases to support them.  Importantly here, Dr. Najafi did not decide what methods to use because all "operational decisions" were made by his team.[30]  *See* Ex. 17, Najafi Dep. at 133:16–134:7.  Dr. Najafi claims he conducted a series of testing to confirm the "numbers are correct" but he can't recall whether this was in relation to baseline testing or some other testing, and he didn't maintain any records of his confirmatory testing. *id.* at 134:19–135:22. Even worse, he admitted that his own confirmatory testing was not necessary for him to consider the results reliable.  *id*. at 145:25–146:7 (Q. "[W]as it necessary for you to go back and do that testing to be confident on the results that—that Emery analyst were obtaining?"  A. "No. It was not necessary").  Therefore, aside from reliance on non-testifying experts, Dr. Najafi has no basis either to affirmatively claim that his method is valid or to refute the opinions of Drs. Guengerich and Olsen who uniformly opine that the analytical methods used to measure NDMA in the baseline and consumer experience testing are invalid.  *See* Ex. 6, June 3, 2022 Guengerich Rep. at 9; Ex. 12, May 21, 2022 Olsen Rep. at 4.

**2.      Dr. Najafi failed to ensure his method to measure NDMA in meat-matrices was valid.**

There is insufficient evidence that either Emery's method is generally reliable for quantifying the levels of NDMA in ranitidine from a meat-matrix or that Emery's analysts reliably performed analyses related to these measurements.  First, Emery's method for measuring NDMA in meat-matrices has not been validated.  Thus, the results cannot be considered valid. In analytical chemistry, a "matrix" refers to the combination of all the compounds in a sample other than the compound one is trying to measure.  Validating a test in every type of matrix is critical for ensuring the reliability of the results.  *See* Ex. 22, USP General Chapter <1225>, *Validation of Compendial Procedures* at 3–4 (discussing analytical parameters dependence on, in part, matrix components).

Despite the need to specifically validate the method within each meat-matrix, Dr. Najafi did not validate his method for any of the meat-matrices.  (Ex. 1, March 7, 2022 Bumpus Rep. at

---

[30] The team members responsible for determining what methods to use (Dr. Ryan Cheu and Dr. Neelanjan Bose), have not been designated as experts in the litigation and cannot be questioned related to the validity of the analytical method.

6) ("[T]here are no records of method validation, which is an absolute minimum when determining the validity of experimental parameters."); Ex. 6, March 7, 2022 Guengerich Rep. at 176–177) ("The methods used in Emery Pharma's SGF food study have not been validated by Emery Pharma or other researchers."). In response to Dr. Bumpus and Guengerich's criticisms, Dr. Najafi provides conclusory responses that "[a]ll validation protocols and associated summary reports were provided with my report." Ex. 11, Apr. 12, 2022 Najafi Rep. at 12. A review of those materials, however, illustrates that no such meat-matrix validation exists. The only validation summary that could plausibly be mistaken for a meat-matrix validation is Emery's "Validation Summary Table for NDMA Quantitation in Ranitidine in SGF." Ex. 9, Jan. 24, 2022 Najafi Rep. at Appendix A.[31] But the matrix for this testing is "50 mM KCl, Pepsin activity 400, 1 N HCl" *i.e.*, not meat. Therefore, to date, Dr. Najafi has not put forth any evidence that his meat-matrix studies were appropriately validated for their intended use.

Putting aside that the method generally is not valid, Emery's analysts also failed to properly perform these analyses. During his deposition, Dr. Najafi testified that his analysts are trained to follow online guidelines provided by their software vendor Agilent and that these guides can be found via Google searches. *See* Ex. 17, Najafi Dep. at 444:9–450:11. When pressed, Dr. Najafi could not identify any of these purported training materials. *id.* at 448:25–449:10.

Even assuming Emery analysts strive to follow Agilent's guidelines, they were not successful. In understand Emery's shortcomings, one must understand the distinction between *automatic integration* and *manual integration*. In automatic integration, a computer algorithm searches for and integrates the relevant peaks to eliminate potential for analytical bias. In manual integration, however, analysts can manipulate the data to both identify substances that the computer considered to not be present and can alter the amount of substance quantified by the computer. In Agilent's guideline on "Controlling Chromatographic Integration to Ensure Data Integrity," Agilent notes that "[b]ecause manual integration is such a powerful data manipulation tool, it will almost always attract attention."[32]

First, Agilent's guideline recommends: "A laboratory-wide standard operating procedure (SOP) for integration should establish when manual integration is justifiable and how it should be

---

[31] The Defendants also dispute the sufficiency of this validation summary to demonstrate validation, but because it is not related to this testing anyway, it will not be separately briefed.

[32] Ex. 34 McDowall 2018 at 1.

performed in a way that is most sound." *See* Ex. 34, McDowall 2018 at 2. As already stated, Emery did not comply with any SOPs, let alone ones that dictate when manual integration is appropriate.

Second, Agilent's note recommends that manual integrations be limited. *See* Ex. 34, McDowall 2018 at 2–3 ("In situations where integration is allowed, the number of times it can be performed should be limited." And "In some cases, it may be best to disallow manual integration altogether."). Emery did not comply because many of their integrations were manual. *See* Ex. 7, June 3, 2022 Guengerich Rep. at 9, 14–15.

Third, Agilent notes: "Leaving an audit trail of a large number of reintegrations produces the impression of 'playing' with the data to get a desired result." *See* Ex. 34, McDowall 2018 at 4. To date, despite criticisms from other experts, Dr. Najafi has not produced any audit trails. *See* Ex. 12, March 7, 2022 Olsen Rep. at 33; Ex. 34 May 19, 2022 Benotti Decl. at 4, so one cannot determine how many integrations Emery's analysts performed prior to finalizing their results. Again, here, Emery failed to comply with the very guideline Dr. Najafi claims they follow.

Fourth, Agilent notes: "Once validated, the integration parameters should be set by the method." *See* Ex. 34, McDowall 2018 at 4. Again, Emery did not comply because they inconsistently integrated peaks for the same method which manufactured invalid results. *See* Ex. 7, June 3, 2022 Guengerich Rep. at 14–15. The failure to comply with pre-specified integration criteria may be derivative of the fact that the method was never appropriately validated (as discussed above) so integration parameters were never established.

Lastly, it is important to understand that Dr. Najafi did not rely on any chromatograms when forming his opinions in this case and instead relied on tabulated results. *See* Ex. 17, Najafi Dep. at 292:14–24; *see also id.* at 38:7–11. Therefore, no expert who affirmatively relies on Emery's data has actually assessed Emery's chromatograms for accuracy. To the contrary, Defendants' experts have reviewed these chromatograms and uniformly find the results to be invalid. *See* Ex. 1, March 22, 2022 Bumpus Rep. at 2; Ex. 6, June 3, 2022 Guengerich Rep. at 10–11.

Of notable concern, Dr. Najafi's method of quantifying NDMA in his meat incubation studies has a significant error rate. Specifically, Emery analysts manually integrated "poorly resolved peaks" in an "arbitrary way" where nearly identical peaks could range from no detectable NDMA to over 70,000 nanograms. *See* Ex. 7, June 3, 2020 Guengerich Rep. at 9; *id.* at App'x A

("[T]he chromatograms demonstrate a significant amount of potential error associated with each measurement. . . . small changes in the analysts' judgment can lead to results with a significant error.")

Under such circumstances where Emery failed to follow basic scientific standards, like failing to have an SOP, failing to have adequate training materials, failing to validate the method, and failing to follow the laboratory's guidelines, there are too many reasons warranting exclusion of the testing data and all opinions that results from them.

### C. Dr. Najafi's testing is unreliable because it lacks adequate documentation, has data integrity issues, and precludes full analysis of his data.

Dr. Najafi's testing should be excluded as unreliable because he did not adequately document his testing which makes it extremely difficult to fully evaluate the reliability of the data. Like his failure to employ generally accepted methodologies and his failure to validate his analytical methods, Dr. Najafi's failure to document his testing is fatal to the opinions he is attempting to offer here.

As the WHO has explained, "Documentation is the only way of demonstrating what actually went on at the time of the experiment. *Without documentation the process is meaningless; essentially there has been no study.*" *See* Ex. 32, WHO Handbook at 35–36 (emphasis original). If an expert cannot explain what he has done to reach an opinion, he is merely asking the court to take his word for it. Such *ipse dixit* testimony is never admissible under Rule 702. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, No. 19-24016-CIV, 2022 WL 479877, at *7 (S.D. Fla. Feb. 16, 2022) (noting the court "may exclude expert testimony where 'there is simply too great an analytical gap between the data and the opinion proffered[,]' or where the testimony's 'factual basis is not adequately explained' in the first instance." (quoting *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). Courts around the country routinely exclude experts who fail to document their methodologies as unreliable.[33] Here, Dr. Najafi's baseline testing, consumer experience testing,

---

[33] *See, e.g., Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 13012778, at *10 (S.D. Fla. May 24, 2012) (excluding an expert's opinion because the expert did

and meat study testing lacks adequate documentation and, therefore, his—and any other experts' testimony that relies upon that testing—should be excluded.

### 1. Dr. Najafi failed to adequately document his baseline testing.

First, Dr. Najafi's baseline testing does not meet scientific standards for documentation and there is no feasible way to confirm the validity of many of his measurements. As a threshold matter, Dr. Najafi's baseline testing is missing half of the necessary prescriptive documents to establish scientific reliability. While he produced one document (CHM-021), this is just an analytical protocol. As noted above, Dr. Najafi has not produced any experimental protocol because one was never created. *See supra* Section IV(A)(1).[34]

Further, in terms of the descriptive documentation, Dr. Najafi has next to nothing. For baseline testing, the notebook entries are sparse stating, for example: "add'l baseline per CHM 021.00." (Ex. 37, Notebook No. 078-RC at PDF 43). This comment is insufficient because it only refers to the prescriptive analytical protocol and completely omits any descriptive documentation. In his rebuttal report, Dr. Najafi claims that analysts only needed to reference the protocols because "reiterating the same designs that are included in a written protocol is superfluous and irrelevant." Ex. 11, Apr. 12, 2022 Najafi Rep. at 4. Dr. Najafi's rationale, however, precludes another scientist from being able to evaluate whether Emery's analysts actually followed the method as intended— instead we must just take their word for it. *See* Ex. 32, WHO Handbook at 36 ("[T]he study records must prove that all the required procedures were correctly carried out at the stipulated time."); Fed. R. Evid. 702, advisory committee's note, 2000 amendment ("The trial court's gatekeeping function requires more than simply taking the expert's word for it." (internal quotation marks omitted)). Dr. Najafi's rationale also ignores that other critical elements like how many samples were tested,

---

not provide documentation on how it conducted his tests, which meant it was impossible to verify the results); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 (M.D. Fla. 2012) ("Not only did [the expert] depart from generally accepted scientific standards, his methodology is also unreliable because he failed to keep proper records and documentation of his procedures."); *Snoznik v. Jeld-Wen, Inc.*, No. 1:09-cv-42, 2010 WL 1924483, at *13 (W.D.N.C. May 12, 2010) (finding the experts' "failure to document his testing adequately makes it extremely difficult for the Court to determine whether his work is reliable. Without adequate documentation, whether in writing, through photographs or by video, [the experts'] testing simply cannot be replicated by others in the scientific community.").

[34] Since this issue extends beyond simply failure to *document* the experimental protocol and related more broadly to the failure to develop an experimental design (whether written or unwritten), this issue will be discussed in more detail as it related to the study's validity.

which samples were tested, and how they were selected are all omitted from both the notebooks *and* the analytical protocol. *See* Ex. 20 USP General Chapter <1010> at 2 ("Study protocols and data analyses should be adequately documented so that a reviewer can understand the bases of the study design and the pathway to study decisions.").

Likewise, Dr. Najafi's baseline tested cannot be reliably traced back to processed chromatograms. This is important because Dr. Najafi claims to have provided his "entire trove of raw LC-MS/MS" which amounts to "over 1.5 TB [terabytes] of data." As previously submitted to this Court in a Motion to Strike, most of Dr. Najafi's data is currently missing. *See ECF #s 5693 & 5694*. Therefore, to date, it has been impossible for Defendants' experts to fully evaluate or replicate the judgement calls made by Emery's analysts when integrating the chromatograms because the results in Dr. Najafi's report cannot be fully linked to the associated chromatograms. *See* Ex. 7, June 3, 2022 Guengerich Rep. at 4–5; Ex. 12, May 21, 2022 Olsen Rep. at 4.

Dr. Najafi's inability to provide sufficient documentation to evaluate the validity of his results is reason enough to exclude any expert opinion related to Emery's baseline testing. Simply put, Dr. Najafi's "failure to document his testing adequately makes it extremely difficult for the Court to determine whether his work is reliable." *Snoznik*, 2010 WL 1924483 at *13. And by ignoring scientific standards articulated by bodies such as USP, WHO, and the Reference Manual, Dr. Najafi's "testing procedures are undocumented and do not conform to the governing scientific standards. The Court would be abdicating its gatekeeping role if it allowed the jury to rely" on the resulting opinions. *See Rembrandt Vision Techs., L.P.*, 282 F.R.D. at 667.

## 2. Dr. Najafi failed to adequately document his consumer experience testing.

Dr. Najafi's consumer experience testing also does not meet scientific standards for documentation. First, in terms of prescriptive records, Dr. Najafi provided both an analytical protocol and experimental protocol, however, the experimental protocol was deficient for reasons discussed above, *see supra* Section IV(A)(2).

In terms of the descriptive records, many of the same data integrity issues from baseline testing apply here. First, the laboratory notebooks do not provide sufficient detail to understand what the analysts actually did or how one could replicate the experiment. For instance, on page 19 of one of Emery's notebooks, the analyst merely cut-and-pasted three tables from the experimental protocol (a prescriptive record) into the notebook, wrote "-no RH control!" and referenced the analytical protocol used. *See* Ex. 37, Notebook No. 078-RC. What this page omits, however, is

any account of what the analysts actually did, making it impossible to confirm via scientifically accepted methods that the protocol was followed.  The only evidence that it was followed is Dr. Najafi's "self-serving assertion" that the protocols were followed.  *See Daubert*, 43 F.3d at 1319 (affirming the exclusion of plaintiffs' expert, noting, "plaintiffs rely entirely on the experts' unadorned assertions that the methodology they employed comports with standard scientific procedures . . . . Under *Daubert*, that's not enough.").  Moreover, at his deposition, Dr. Najafi revealed that he has no basis to know whether protocols were followed. *See* Najafi Dep. at 351:21–352:22 (noting Dr. Najafi is "in the lab, out of the lab" and does not review the work until "they show it to me in the morning.").

In fact, Dr. Najafi's data has serious data integrity issues because his team conducted testing without documenting anything other than the final results, making it impossible to substantively analyze his methodology.  To illustrate this, in Dr. Najafi's second supplemental report, he included photographs of testing on April 5, 2020, but there are no other documentation of this testing. Ex. 11**,** Apr. 12, 2022 Najafi Rep. at 5. A review of the relevant laboratory notebook demonstrates that there is a single page for this test, Ex. 37, Notebook No. 078-RC page 57, and his analyst did not document *anything* other than the final results (*i.e.*, the picture)—in other words, there are no notes by any analyst that the test would be redone in April, why they were redoing their test, how many pills they tested, how they tested, etc.  It is also unclear if this tablet was tested for NDMA or where those results are. Therefore, it is impossible to follow what Dr. Najafi and his team actually did.

In addition to a lack of descriptive records showing what the analysts actually did, Dr. Najafi is unable to trace the results back to processed chromatograms for his consumer experience data. Notably, the Emery laboratory notebooks include notations, like "Data → Levin on Server," *see* Ex. 38, Notebook No. 078-RC at 20, and "data on Levin Law folder," *id*. at 35. But these notations are inadequate for several reasons. First, electronic data files should be referenced by the specific name of the file as opposed to referring to a data-dump of thousands of folders and subfolders. *See* Ex. 12, March 7, 2022 Olsen Rep. at 32. Second, at his deposition, Plaintiff's counsel objected to questions asking Dr. Najafi to trace his results, stating that the only way he could do so would be to open every single file in Emery's production, including more than 180 main folders all with multiple subfolders. *See* Ex. 17, Najafi Dep. at 101:21–24 (Plaintiffs' Counsel: "[Y]ou'd have to open every file in order to see where the results would be from a test

that was done on 11/11/2001."). Plus to be repeatable, the data must be sufficiently organized to allow independent observers to track a scientist's work.[35] *See* Ex. 32, WHO Handbook at 62. Third, Dr. Najafi repeatedly testified that his raw data is kept within the proprietary Agilent software, so these references to "data" in the "Levin Law" folder are likely referring to tabulated results (not raw data). In any event, nothing under the name of a "Levin Law" folder has ever been produced in litigation. Therefore, much like the documentation issues discussed above relating to Emery's baseline testing, Emery's simulated consumer experience testing is similarly unreliable.

---

[35] *See Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("Someone else using the same data and methods must be able to replicate the result."); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (reversing district court's admission of expert testimony where expert "failed to adequately document testing conditions and the rate of error so the test could be repeated and its results verified and critiqued."); *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of science."); *Snoznik v. Jeld-Wen, Inc.*, No. 1:09cv42, 2010 WL 1924483, at \*37–38 (W.D.N.C. May 12, 2010) (finding the experts' "failure to document his testing adequately makes it extremely difficult for the Court to determine whether his work is reliable. Without adequate documentation, whether in writing, through photographs or by video, [the experts'] testing simply cannot be replicated by others in the scientific community."); *Cedillo v. Sec'y of Health & Human Servs.*, No. 98-916V, 2009 WL 331968, at \*50 (Fed. Cl. Ct. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010) ("I again find it to be crucial that the data in question has *never been published* or otherwise made available to other scientists. The gist of Dr. Rima's testimony was that, in science, a mere statement in an article that certain testing has been done and certain results were achieved, *without showing the data*, is *not* sufficient to demonstrate to other scientists that, in fact, such results were accurately achieved. To have scientific credibility, rather, the data must be shown."); *United States v. Monteiro*, 407 F. Supp. 2d 351, 369 (D. Mass. 2006) ("Documentation and peer review ensure that defense counsel will be able to challenge the results through their own testing and effective cross examination."); *Morehouse v. Louisville Ladder Group LLC*, No. Civ.A 3:03–887–22, 2004 WL 2431796, at \*7 (D.S.C. June 28, 2004) (excluding expert testimony in part because the expert "failed to record his hypothesis testing or include relevant details in his report"); *Black v. Rhone–Poulenc, Inc.*, 19 F. Supp. 2d 592, 598 (S.D.W.Va. 1998) (finding that an expert's failure to document his study weighed against admissibility because "independent reconstruction would be exceedingly difficult if not impossible."); *Palazzolo v. Hoffman La Roche, Inc.*, 2010 WL 363834, at \*4–5 (N.J. Super. Ct. App. Div. Feb. 3, 2010) ("An expert's scientific peers cannot fairly judge the expert's written work, including whether it is worthy of publication, if his article does not accurately represent either the underlying data or what the author did to produce his results. We agree with the trial judge that, in essence, Bremner's study was not soundly and reliably generated." (internal citations and quotations omitted)); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 1063 (2005) (noting courts must conduct an "exacting analysis of the foundations of expert opinions." (emphasis added)).

      **3.**      **Dr. Najafi provided conflicting and inadequate documentation related to his meat incubation testing.**

Dr. Najafi's meat incubation testing does not meet scientific standards for documentation and in some cases his documentation was conflicting which precludes the ability to assess the reliability of his work. First, in terms of prescriptive records, Dr. Najafi provided a document which includes both the experimental and analytical protocols for the meat incubation study. *See* Ex. 9 at Appendix A, PLEV-NB210812C. But the experimental portions of the protocol are insufficiently vague, and the experimental design is scientifically invalid for reasons discussed above, *see supra* Section IV(3).

In terms of the descriptive records, Dr. Najafi's laboratory notebooks omit essential information about what the analysts actually did in performing these tests. The little information that is provided also raises significant concerns and illustrates why documentation is needed to ensure compliance with prescriptive protocols. First, it is important to understand that the amount of meat used would be proportional to the amount of nitrite. Therefore, the amount of meat is an important experimental parameter to control. While the prescriptive protocol requires the analyst to "[a]dd 1 serving size" of meat, the actual amount of meat used was not sufficiently controlled and often more than one serving was used. *See* March 7, 2022 Guengerich Rep. at 175–176 ("Although Dr. Najafi's report states "one serving size of each food item was used," based on additionally produced files, it appears more than one serving was used for all experiments except for ham."); March 22, 2022 Bumpus Rep. at 6 ("In general, from the materials I am able to read, the newly produced Emery materials are inconsistent with the results reported in the expert report. For example, instead of the "one serving size" used according to Dr. Najafi, higher amounts of sausage (2 servings and 1.2 servings), bacon (2.2 servings), and hot dog (2 servings) are documented in the productions.").

Additionally, at least half of the processed chromatograms related to the meat incubation studies have not been produced in a format that allows the data to be analyzed by Defendants experts. *See generally* Ex. 33 Benotti Decl. and Ex. C; *see also* Motion to Strike (ECF #s 5693 & 5694). Specifically, while Dr. Najafi's ham and bacon experiments have processed chromatograms (which were generated by Defendants' consultant), Defendants have not been able to export any processed chromatograms related to the hot dog and sausage experiments. Therefore, much like documentation issues presented for Emery's other testing, Emery's meat incubation testing is similarly unreliable due to the failure to keep proper documentation of its testing. *See* WHO

Handbook at 35–36. Under such circumstances, the testing and any resulting opinions are unreliable.

D.    **Plaintiffs' Remaining Expert Opinions Based on Emery's Testing are Unreliable and Cannot Stand on Their Own.**

Dr. Najafi conducted a host of ancillary testing that cannot form the bases of any expert witness opinion. While many of these studies suffer the same methodological issues as the prior testing discussed, this brief will only mention the most relevant aspects of each test. On the whole, these tests have no purpose or connection to the facts of the case, *i.e.*, they lack the requisite fit required under *Daubert*. *See* 509 U.S. at 591; *Allison*, 184 F.3d at 1312.

**WHO NAP Test.**   Dr. Najafi conducted the World Health Organization's Nitrosation Assay Procedure (NAP), but this test does not represent *in vivo* physiological conditions and therefore has no "fit" to the case. *See* Ex. 6, March 7, 2022 Guengerich Rep. at 58; Ex. 1, March 7, 2022 Bumpus Rep. at 6; *see also* Remaining Opinions Motion.

**Simulated Gastric Fluid Testing.**   Dr. Najafi conducted various simulated gastric fluid studies (SGF), but the primary issue is that supra-physiological levels of nitrite are needed for the reaction to occur. *See* Remaining Opinions Motion. In some instance, Dr. Najafi observed NDMA formation at lower levels of nitrite, but in these same experiments, his control group formed higher levels of NDMA than the experimental groups, which indicate the experimental parameters were wrong. *See* Ex. 6, March 7, 2022 Guengerich Rep. at 174; Ex. 2, March 22, 2022 Bumpus Rep. at 5. Therefore, this testing has no "fit" to the case.

**KSCN Testing.**   Dr. Najafi conducted testing with a compound potassium thiocyanate (KSCN), under the theory that it would enhance the effect of nitrite to form NDMA. Dr. Najafi's testing is invalid and his conclusions were based on a single data point. *See* Ex. 6, March 7, 2022 Guengerich Rep. at 175 ("[T]here was no NDMA formation at physiologic nitrite concentrations of 0.1 mM, irrespective of the addition of potassium thiocyanate."). In any event, the single data point relied on by Dr. Najafi was generated at unrealistically high levels of nitrite, so this testing has no "fit" to the case.

**Stress Testing.**   Dr. Najafi conducted stress testing, where he exposed ranitidine to high levels of heat and humidity. These tests employ implausible conditions, including subjecting ranitidine to 60°C and 95% relative humidity for 7 days in both sealed and unsealed conditions. (For reference, the National Weather Service calculates this as a "feels-like" temperature, *i.e.*, a

heat index of 603.5°F (Ex. 38, Brice, T. and Hall, T., Heat Index Calculator, National Weather Service, https://www.weather.gov/epz/wxcalc_heatindex). It goes without saying these conditions do not occur during typical consumer use, *see* Ex. 12*, March 7, 2022 Olsen Rep. at 21, and is akin to baking ranitidine prior to ingestion.  Thus, this testing has no "fit" to the case.

 **Content Uniformity Testing.** Dr. Najafi conducted content uniformity testing to justify testing only "representative" samples in all of his tests.  *See* Ex. 12, March 7, Olsen Rep. 38–41. His content uniformity testing is fatally flawed and actually shows significant variability that Dr. Najafi never considered in *any* of his testing.  *See id*.  While the errors in Dr. Najafi's content uniformity testing demonstrate universal errors that warrant exclusion of all of his testing, no relevant opinions are derived solely from content uniformity alone.

 **Refrigeration Testing.** Dr. Najafi conducted a refrigeration test, but later clarified it was just a control group with no experimental group.  *See* Ex. 10, March 28, 2022 Najafi Rep. at 22. Results cannot be drawn from a control group alone, so the testing is not relevant to the case.

 **Morphology Study.**  In the peer-reviewed King 2020 paper, GSK scientists concluded that ranitidine containing columnar crystals exhibited a slower rate of NDMA formation. Dr. Najafi disagrees with this finding on the basis of his own flawed morphology "study" that supposedly found some columnar crystal with elevated levels of NDMA.  Dr. Najafi did not consider the age of these samples, and therefore conflates the *rate* of NDMA formation (*e.g.*, nanograms per year) with the *amount* of NDMA formation (*e.g.*, nanograms).  *See* Ex. 6, March 7, 2022 Guengerich Rep. at 94. Given that Dr. Najafi's testing did not consider time or rate of formation, there are no findings from Dr. Najafi's morphology study that can "fit" into the facts of the case.  His study protocol also does not provide any method for sample selection, which is especially troubling here because he relies entirely on anecdotal information about one sample. Because Dr. Najafi did not disclose how he selected samples, one cannot replicate the study and reporting just "exemplar" results is not scientifically reliable.

 **Emery's Manufactured Tablet Study.**  Emery conducted studies on tablets they manufactured themselves. These tablets did not use the proprietary protective coating, or the actual packaging used by the relevant manufacturers. Therefore, these results do not "fit" the facts of the case.

 **Testing on API.** Emery conducted various stability testing on API products, although API products cannot be purchased by consumers.  Prior to consumer purchase, API is manufactured

into drug product, which is more protective.  *See* Ex. 12*,* March 7, 2022 Olsen Rep. at 9.  Testing on API not only biases the results high, but also is not representative for what a consumer might ingest. *See id*. at 66–67.  Therefore, these results do not "fit" the facts of the case.

## V.       CONCLUSION

"[S]omething doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive."  *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (alteration in original) (internal quotation marks omitted).  "The trial court's gatekeeping function requires more than simply taking the expert's word for it."  Fed. R. Evid. 702, advisory committee's note, 2000 amendment (internal quotation marks omitted).  Here, plaintiffs are merely asking this Court to take Dr. Najafi's word for it. His opinions are unreliable, and any experts who rely upon his opinions should not be allowed to testify at trial.


Dated:  June 13, 2022                              Respectfully submitted,

                                          By: */s/ Andrew T. Bayman*
                                              Andrew T. Bayman
                                              KING & SPALDING LLP
                                              1180 Peachtree Street, NE, Suite 1600
                                              Atlanta, GA 30309-3521
                                              Tel: (404) 572-4600
                                              Fax: (404) 572-5100
                                              abayman@kslaw.com

                                              Eva Canaan
                                              KING & SPALDING LLP
                                              1185 Avenue of the Americas, 34th Floor
                                              New York, NY 10036-2601
                                              Tel: (212) 556-2100
                                              Fax: (212) 212-556-2222
                                              ecanaan@kslaw.com

                                              *Counsel for Defendant Boehringer Ingelheim*
                                              *Pharmaceuticals, Inc.*

                                               */s/ Joseph G. Petrosinelli*
                                              Joseph G. Petrosinelli
                                              WILLIAMS & CONNOLLY LLP
                                              725 Twelfth Street, N.W.
                                              Washington, DC 20005

Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Counsel for Defendant Pfizer Inc.*

/s/ Mark Cheffo
Mark S. Cheffo
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

*Counsel for Defendant GlaxoSmithKline
LLC*

/s/ Anand Agneshwar
Anand Agneshwar
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Counsel for Defendants Sanofi US Services
Inc., Sanofi-Aventis U.S. LLC, and Chattem,
Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2022, I electronically filed the foregoing **BRAND DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS, RAMIN NAJAFI, PH.D., CHARLES DAVIS, PH.D. AND OTHER EXPERTS WHO RELY ON THEIR OPINIONS** through the CM/ECF system, which will provide automatic notification to all CM/ECF participants.

*/s/ Andrew T. Bayman*
Andrew T. Bayman