**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                              MDL No. 2924
PRODUCTS LIABILITY                                        20-MD-2924
LITIGATION

                                    JUDGE ROBIN L. ROSENBERG
                      MAGISTRATE JUDGE BRUCE E. REINHART

_____ /

**THIS DOCUMENT RELATES TO: ALL CASES**

<u>**BRAND DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' GENERAL
CAUSATION EXPERTS' OPINIONS RELATED TO EPIDEMIOLOGY AND
INCORPORATED MEMORANDUM OF LAW**[1]</u>

---

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................5

I.      Chronology of Relevant Events ..................................................................5

      A.    For More than 35 Years, Ranitidine Was a Safe and Effective Treatment Option for Tens of Millions of Patients with Heartburn and Other Gastroesophageal Conditions..................................................................5

      B.    In 2019, in Coordination with Plaintiffs' Lawyers, Valisure Filed a Citizen Petition Questioning Whether Ranitidine Causes Cancer ......................6

      C.    Follow-Up Testing by FDA and Manufacturers Did Not Corroborate Valisure's Claims ..................................................................8

      D.    The Medical and Scientific Communities Mobilized to Investigate Whether Real-World Use of Ranitidine Could Cause Cancer ............................11

      E.    The FDA Has Found No Consistent Evidence of Ranitidine Risk for Any Cancer ..................................................................13

      F.    No Medical or Scientific Organization Identifies Ranitidine as a Risk Factor for Cancer ..................................................................14

II.     Reliable Epidemiological Methods to Evaluate General Causation ..................15

      A.    The Hierarchy of Scientific Evidence..................................................15

           i.    Randomized Controlled Trials..................................................16

           ii.    Controlled Observational Studies..................................................16

           iii.   Animal and "Petri Dish" (In Vitro) Experiments ..........................18

      B.    Valid Statistical Association..................................................19

           i.    Statistical Significance..................................................20

           ii.    Bias and Confounding..................................................21

      C.    Causation:  The Bradford-Hill Criteria..................................................23

III.    Epidemiological Data for Ranitidine Do Not Show An Increased Cancer Risk ............27

      A.    Gastric Cancer..................................................30

      B.    Esophageal Cancer..................................................32

      C.    Liver Cancer..................................................33

      D.    Bladder Cancer..................................................34

      E.    Pancreatic Cancer..................................................37

      F.    Non-Ranitidine Data On Which Plaintiffs' Epidemiology Experts Rely ............38

IV.    Overview of Plaintiffs' Experts' Unreliable Methodologies and Opinions ...................... 40

    A.    Anne McTiernan, MD, PhD ...................................................................... 41

        i.    Dr. McTiernan Relies Principally on Studies of Dietary and Occupational Exposures, Rather than Studies of Ranitidine .................... 41

        ii.    Dr. McTiernan Dismisses the Active Comparator Studies of Ranitidine and Cancer as Uninformative ........................................ 42

        iii.    Dr. McTiernan Does Not Provide a Reliable Basis for Extrapolating Data from Dietary and Occupational Studies to Ranitidine Cancer Risk ........................................................... 43

        iv.    Dr. McTiernan Believes That Any Risk Estimate Other than 1.0 Reflects an Association ............................................................. 44

        v.    Dr. McTiernan Gives Greater Weight to Studies Showing a Relative Risk Above 1.0 than to Studies Showing a Relative Risk Below 1.0 .................................................................................. 45

        vi.    Dr. McTiernan Applied an Inconsistent Methodology to Her Analysis Of the Epidemiological Data ........................................ 46

    B.    Patricia Moorman, MSPH, PhD .............................................................. 48

        i.    Dr. Moorman Gives Greater Weight to Dietary and Occupational Studies Than to Ranitidine Studies ............................................. 48

        ii.    Dr. Moorman's Methodology Failed Meaningfully to Address Confounding and Bias ............................................................... 50

    C.    Andrew Salmon, MA, DPhil, CChem ....................................................... 55

        i.    Dr. Salmon Is Not Qualified to Offer Opinions Regarding Epidemiology ........................................................................... 55

        ii.    Dr. Salmon Did Not Perform a Reliable Evaluation of the Ranitidine Epidemiology ........................................................... 55

        iii.    Dr. Salmon Improperly Relies on Dietary and Occupational Studies for His Causation Opinion ............................................. 57

        iv.    Dr. Salmon's Dose-Response Opinion is Based on an Unreliable, Results-Oriented Methodology ................................................. 57

    D.    Paul Michaels, MD .............................................................................. 59

        i.    Dr. Michaels Is Not Qualified to Offer Opinions Based On Epidemiology ........................................................................... 59

        ii.    Dr. Michaels Did Not Perform a Reliable Evaluation of the Ranitidine Epidemiology ........................................................... 60

    E.    Jennifer Le, PharmD ........................................................................... 62

    F.    Mira Hidajat, PhD ............................................................................... 64

ARGUMENT ...................................................................................................................66

I.      Legal Framework ....................................................................................................66

II.     Plaintiffs' Experts' General Causation Opinions Are Not Generally Accepted..............70

III.    Plaintiffs' Experts Have Not Conducted Reliable Analyses of the Available Data
        on Ranitidine and Cancer ........................................................................................71

        A.     Plaintiffs' Experts Do Not Reliably Apply Basic Principles Regarding
               Bias and Confounding in Analyzing the Ranitidine Literature ............................72

        B.     Plaintiffs' Experts Failed to Apply a Reliable Methodology to Weigh and
               Evaluate the Ranitidine Data ...................................................................76

        C.     Plaintiffs' Experts' Reliance on Non-Ranitidine Studies is Unreliable and
               Lacks General Acceptance.......................................................................79

               i.     Plaintiffs' Experts' Reliance on Dietary Studies is Unreliable................81

               ii.    Plaintiffs' Experts' Reliance on Occupational Studies is Unreliable ........85

IV.     Drs. Moorman and McTiernan Failed to Conduct a Reliable Bradford Hill
        Analysis...................................................................................................88

V.      Dr. McTiernan Contradicts Her Own Opinions Expressed Outside of This
        Litigation ................................................................................................93

VI.     Dr. Salmon's, Dr. Michaels', and Dr. Le's Causation Opinions Should Be
        Excluded .................................................................................................96

        A.     Dr. Salmon's "Dose-Response" Analysis is Facially Unreliable .........................96

        B.     Dr. Michaels Fails to Consider the "Totality" of Ranitidine Literature ...............98

        C.     Dr. Le Cherry Picks Study Results that Support Her Causation Opinions...........99

CONCLUSION..................................................................................................100

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prods. Liab.*,
 511 F. Supp. 2d 1288 (M.D. Fla. 2007) ...........................................................68, 86

*Allen v. Pa. Eng'g Corp.*,
 102 F.3d 194 (5th Cir. 1996) ....................................................................3, 90

*Allison v. McGhan Med. Corp.*,
 184 F.3d 1300 (11th Cir. 1999) ..........................................................3, 66, 67

*Burst v. Shell Oil Co.*,
 2015 WL 3755953 (E.D. La. June 16, 2015) ........................................70, 80, 84

*Cartwright v. Home Depot U.S.A., Inc.*,
 936 F. Supp. 900 (M.D. Fla. 1996) ...............................................................68

*Daubert v. Merrell Dow Pharmaceuticals*,
 509 U.S. 579 (1993) ............................................................................ *passim*

*Daubert v. Merrell Dow Pharms.* (*Daubert II*),
 43 F.3d 1311 (9th Cir. 1995) ...................................................................8, 76

*In re Denture Cream Prod. Liab. Litig.*,
 795 F. Supp. 2d 1345 (S.D. Fla. 2011), *aff'd, Chapman v. Procter & Gamble Dist., LLC*, 766 F.3d 1296 (11th Cir. 2014) ........................................................97

*Faulkner v. Arista Recs. LLC*,
 46 F. Supp. 3d 365 (S.D.N.Y. 2014) .........................................................76, 98

*Henricksen v. ConocoPhillips Co.*,
 605 F. Supp. 2d 1142 (E.D. Wash. 2009) ....................................................23, 70

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
 524 F. Supp. 3d 1007 (S.D. Cal. 2021) .............................................................26

*Kilpatrick v. Breg, Inc.*,
 613 F.3d 1329 (11th Cir. 2010) .....................................................................66

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ....................................................................5, 67, 94, 96

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    227 F. Supp. 3d 452 (D.S.C. 2017), *aff'd sub nom. In re Lipitor (Atorvastatin
    Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892
    F.3d 624 (4th Cir. 2018) .......................................................................................23

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No
    II) MDL 2502*, 892 F.3d 624 (4th Cir. 2018) ..............................................23, 26

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 F. App's 356 (3d Cir. 2003)...........72

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ................................................................... *passim*

*McCorvey v. Baxter Healthcare Corp.*,
    298 F.3d 1253 (11th Cir. 2002) .............................................................................66

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ................... *passim*

*Orrell v. Astrazeneca Pharms. (In re Nexium Esomeprazole)*,
    662 F. App'x 528 (9th Cir. 2016) ...........................................................................3

*Perry v. Novartis Pharms. Corp.*,
    564 F. Supp. 2d 452 (E.D. Pa. 2008) ...................................................................98

*Rider v. Sandoz Pharms. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) ................................................................... *passim*

*Rink v. Cheminova, Inc.*,
    400 F.3d 1286 (11th Cir. 2005) ................................................................... *passim*

*Soldo v. Sandoz Pharm.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003)...................................................................68

*Sumner v. Biomet, Inc.*,
    434 Fed. Appx. 834 (11th Cir. 2011)....................................................................68

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) .......................................................................5, 66

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) ..................................................................26

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000).............................................................................................67

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
   858 F.3d 787 (3rd Cir. 2017) ................................................................26

*In re: Zoloft (Sertraline Hydrocloride) Prod. Liab. Litig.*, No. 12-MD-2342, 2015
   *WL 7776911, at \*1 (E.D. Pa. Dec. 2, 2015), aff'd sub nom. In re Zoloft*
   *(Sertraline Hydrochloride) Prod. Liab. Litig., 858 F.3d 787 (3d Cir. 2017)* ........................73

## Rules

Fed. R. Civ. P 26 ..............................................................................................9

Fed. R. Evid. 702(d) ................................................................... *passim*

## Other

Reference Manual on Scientific Evidence, 3d. ed., 2011 .................................... *passim*

## <u>INTRODUCTION</u>

For 35 years, tens of millions of patients relied on ranitidine, also known as Zantac, to treat heartburn, stomach ulcers, gastroesophageal reflux disease ("GERD"), erosive esophagitis, and other conditions.  In that time, ranitidine was studied extensively and repeatedly found to be safe and effective.  No regulatory agency or scientific body ever concluded that ranitidine was a risk factor for or cause of cancer.

In 2019, an online pharmacy submitted a citizen petition hypothesizing that ranitidine was a "likely human carcinogen" after measuring high levels of NDMA in ranitidine tablets.  On the same day that the citizen petition went public, several Plaintiffs' law firms filed suits alleging ranitidine caused various types of human cancer and quoting extensively from the citizen petition. These lawsuits led to the creation of this MDL.

Outside the courtroom, the medical, scientific, and regulatory communities took a more deliberate approach.  The U.S. Food and Drug Administration (FDA) criticized the pharmacy's testing methods and found, based on the Agency's own testing, far lower levels of NDMA—levels below the FDA's allowable limit in many lots it tested—than the online pharmacy reported.  In the meantime, manufacturers voluntarily recalled ranitidine in an abundance of caution while they, too, performed additional analyses.

In the following years, the medical and scientific communities carefully studied the issue. Since 2019, researchers from 17 medical institutions have published 11 peer-reviewed studies, analyzing data from nearly seven million patients, to assess whether real-world use of ranitidine, including any NDMA ranitidine may contain, causes cancer.  None of these studies, nor any regulatory body or medical association, has concluded that ranitidine causes cancer.  To the contrary, over the past three years of research, independent investigators and regulatory agencies

consistently concluded that there was "no evidence"[2] of any increased risk. They found "no demonstrable association"[3] between ranitidine and cancer types, "no association between ranitidine and overall or specific cancer risk"[4] and "no evidence of a causal association between ranitidine therapy and the development of cancer in patients."[5] They also concluded that their results should "alleviate concerns of patients exposed to ranitidine," and that ranitidine patients should find the results "reassuring."[6] Summarizing the totality of peer-reviewed evidence, FDA concluded "no consistent signals emerged, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk."[7]

The extensive research and scrutiny that has taken place following the 2019 citizen petition demonstrate that science worked exactly as it is supposed to work. The citizen petition raised a

---

[2] Iwagami et al., *Risk of Cancer in Association with Ranitidine and Nizatidine vs Other H2 Blockers: Analysis of the Japan Medical Data Center Claims Database 2005 – 2018*, DRUG SAFETY 2021;361, 370 (2021), Brown Decl. Ex. 55 ("we found no evidence of an increased risk of cancer in people receiving ranitidine and nizatidine compared with people receiving other H2 blockers overall, by follow-up length, by cumulative dose, or by cancer site. These results may alleviate concerns of patients exposed to ranitidine/nizatidine"); Yoon et al., *Risk of Cancer Following the Use of N-Nitrosodimethylamine (NDMA) Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea*, J. CLIN. MED. 2021, 10, 153, 1 (2021), Brown Decl. Ex. 77 ("We found no evidence that exposure to NDMA through ranitidine increases the risk of cancer.").

[3] Kumar et al., *Ranitidine Use and Gastric Cancer Among Persons with Helicobacter pylori*, DIGESTIVE DISEASES AND SCIENCES, 1, 1 (2021), Brown Decl. Ex. 61 ("There is no demonstrable association between ranitidine use and future gastric cancer among individuals with [Helicobacter pylori] on long-term acid suppression.").

[4] Florian et al., *Effect of oral ranitidine on urinary excretion of n-nitrosodimethylamine (NDMA): A Randomized Clinical Trial*, JAMA 2021;326(3):240, 247 (2021), Brown Decl. Ex. 49.

[5] EMA Report, Referral under Article 31 of Direction 2001/83/EC, INN: Ranitidine (Sept. 17, 2020) ("EMA Assessment") at 18, Brown Decl. Ex. 83.

[6] Norgaard et al., *Ranitidine and risk of bladder and kidney cancer: a population based cohort study*, CANCER EPIDEMIOL BIOMARKERS PREV. 2022 Jan;31(1):45, 45 (2021), Brown Decl. Ex. 68.

[7] Florian (2021) at 247.

question based on preliminary data; regulatory agencies took a precautionary approach while scientists across the globe went to work investigating the issue; and independent researchers subjected their studies to peer review so the broader scientific community could evaluate them and accept or reject their validity. In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court recognized the essential role this scientific process plays in evaluating the reliability of an expert's opinion and noted the importance of general acceptance in evaluating the admissibility of expert testimony. *Id.* at 594. Today, after all this research and study, no investigator, regulatory body, or medical organization has concluded that ranitidine causes cancer.

Plaintiffs' retained experts alone depart from this worldwide scientific consensus. Their opinions "do not, to understate the point, reflect the consensus within the scientific community." *Daubert v. Merrell Dow Pharms.* (*Daubert II*), 43 F.3d 1311, 1314 (9th Cir. 1995); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999). Not only are Plaintiffs' experts' opinions not "generally accepted"; they are not accepted at all, anywhere. Where, as here, an expert "claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied." *Orrell v. Astrazeneca Pharms. (In re Nexium Esomeprazole)*, 662 F. App'x 528, 530 (9th Cir. 2016) (quoting *Lust ex rel. Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996)); *see also Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 n.4 (5th Cir. 199.6)

This lack of general acceptance is just the tip of the iceberg, as Plaintiffs' experts' novel, untested methodologies raise numerous additional red flags under *Daubert*. For example, in the peer-reviewed epidemiology studies that have been published since the NDMA issue arose, researchers consistently compared ranitidine users to other patients taking similar heartburn medications, rather than to people who do not take heartburn medications. Researchers performed

these analyses, known as "active comparator" studies, to minimize the risk of false associations caused by differences between the groups being compared (a phenomenon known as "confounding"). And those authors' primary analyses *uniformly* failed to demonstrate a significant difference in the risk of any type of cancer between patients taking ranitidine and those taking other heartburn medications in the same class that have not been linked to NDMA. Faced with that body of data, Plaintiffs' experts either abandon principles of statistical significance they have followed their entire careers; claim, without articulating any objective criteria, that none of the studies is long enough, large enough, or contains enough data on over-the-counter ("OTC") use; or otherwise invent reasons the results must be skewed by factors they cannot measure. These results-oriented methods are not reliable under *Daubert*.

As another example, while the global scientific community universally turned to epidemiological studies of ranitidine to assess the question of whether ranitidine increases the risk of cancer, Plaintiffs' experts claim that this globally-accepted body of direct evidence is not "informative."[8] Instead, they ask the Court to impute causation by extrapolating from studies involving British rubber workers exposed to dozens of chemicals or dietary studies that ask people to remember what they ate earlier in their lives (typically after they have been diagnosed with cancer), an approach found nowhere else in the global response to this issue. If extrapolating from these occupational and dietary studies were a generally accepted methodology for assessing whether ranitidine causes cancer, Plaintiffs' experts would be able to point to at least a single regulator, medical organization, or scientific organization that relied on them to consider causation. But they cannot. Plaintiffs' experts swim upstream to avoid the consistent conclusion arising from accepted methodologies.

---

[8] Rule 26 Expert Report of Dr. McTiernan ("McTiernan Rep.") at 37, Brown Decl. Ex. 9.

This Court's gatekeeping function requires "an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  The Court must exclude expert opinion testimony that is not "based on sufficient facts or data," is not "the product of reliable principles and methods," or has not "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  It is no surprise that to reach conclusions that are not accepted by a single independent scientific body—let alone generally accepted—Plaintiffs' experts must urge methods that no peer-reviewed response to this issue has endorsed and thereby fail to demonstrate "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  For these reasons, the Court should grant Defendants' motion and exclude Plaintiffs' experts' general causation opinions.

## BACKGROUND

### I.     Chronology of Relevant Events

#### A.     For More than 35 Years, Ranitidine Was a Safe and Effective Treatment Option for Tens of Millions of Patients with Heartburn and Other Gastroesophageal Conditions

Zantac, also referred to as ranitidine, is part of a class of medications known as Histamine-2 Receptor Antagonists ("H2RAs").  H2RAs reduce the production of stomach acid by blocking histamine receptors in the stomach.  In 1983, based on extensive preclinical (animal) and clinical (human) testing, including testing that revealed no heightened risk of carcinogenicity, FDA approved ranitidine for prescription use in the treatment of ulcers.  FDA later approved additional indications, including the treatment of other conditions of the stomach and esophagus.

Zantac was on the market for more than 35 years.  Over that time, FDA determined on multiple occasions that Zantac was a safe and effective treatment that offered relief for millions of patients with heartburn, stomach ulcers, gastroesophageal reflux disease ("GERD"), erosive

esophagitis, and hypersecretory conditions such as Zollinger-Ellison syndrome, and various other conditions.  In 1995, after more than a decade of safe and effective prescription use, FDA authorized over-the-counter ("OTC") use for Zantac 75 mg up to twice daily.  In 2004, FDA approved Zantac 150 mg up to twice daily for OTC use.  Over the course of Zantac's 35 years on the market, no regulatory agency or scientific body ever concluded that Zantac was a risk factor for or the cause of any cancer.

Over Zantac's long history, FDA authorized different companies to market the medication. Glaxo Smith Kline ("GSK") developed the medication and initially marketed it, first in prescription form and then OTC.  In 1998, Warner-Lambert assumed ownership of GSK's OTC products, including Zantac.   In 2000, Pfizer acquired Warner-Lambert and marketed the medication.  In 2006, Johnson & Johnson acquired Pfizer's consumer healthcare business and immediately sold the OTC Zantac brand to Boehringer Ingelheim.  Finally, in 2017, Sanofi began selling OTC Zantac after acquiring the brand from Boehringer Ingelheim.   In addition, after expiration of the patent exclusivity period, several entities sold generic prescription and OTC ranitidine.

### B.     In 2019, in Coordination with Plaintiffs' Lawyers, Valisure Filed a Citizen Petition Questioning Whether Ranitidine Causes Cancer

On September 13, 2019, Valisure, an online pharmacy, submitted a citizen petition to the FDA, claiming that it detected "extremely high levels of N-Nitrosodimethylamine ('NDMA')" in ranitidine.[9]  Valisure tested ranitidine samples using a gas chromatography-mass spectrometry ("GC-MS") method that involved superheating ranitidine tablets to 130℃ / 266℉ and

---

[9] *See, e.g.*, *Valisure Citizen Petition on Ranitidine,* FDA Docket No. FDA-2019-P-4281 (dated Sept. 9, 2019, submitted Sept. 13, 2019) ("Valisure petition") at 1, Brown Dec1. Ex. 100.

subsequently increasing the temperature to 260℃ / 500°F.[10]   The extreme heat of the testing methodology caused the creation of NDMA not previously there.[11]   Using the GC-MS method, Valisure reported detecting NDMA at levels in excess of 3 million nanograms per tablet, which exceeded the regulatory limit of 96 nanograms per day FDA had set for NDMA in the context of an unrelated class of medications.[12]   This 96 nanogram acceptable daily intake (ADI) level is a precautionary, "very conservative" limit FDA developed based on tests administering high doses of NDMA to rodents, which FDA cautions "is a highly conservative concept that should not be regarded a realistic indication of the actual risk" to humans.[13]

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[10] Valisure petition at 6; *see also* Deposition of David Light ("Light Tr.") at 142:1-143:5, Brown Decl. Ex. 102.

[11] *See, e.g.*, FDA, UPDATE – FDA provides update on testing of ranitidine for NDMA impurities (Oct. 2, 2019) at 8, Brown Decl. Ex. 91; FDA Response to Valisure Citizen Petition (April 1, 2020) ("FDA Response to Valisure Citizen Petition") at 10, Brown Decl. Ex. 94; FDA, Ensuring the Rigor of Regulatory Science: CDER Conducts Laboratory and Clinical Studies to Investigate Reports of NDMA Production from Ingested Ranitidine Products (2021) ("July 2021 FDA Statement") at 1, Brown Decl. Ex. 96.

[12] FDA, UPDATE – FDA presents interim limits of nitrosamines in currently marketed ARBs (Dec. 19, 2018) at 9, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (accessed June 2, 2022) ("Dec. 2018 FDA Statement"), Brown Decl. Ex. 87.

[13] FDA, M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk (March 2018) at 5-6, Brown Decl. Ex. 86. The ADI is intended to represent an extremely conservative 1 in 100,000 cancer risk over a lifetime of daily exposure—in other words, FDA estimates that if 100,000 people were to ingest 96 ng of NDMA every day for 70 years, one additional case of cancer could occur.  Other agencies have cautioned that since the calculations are based on rat data "[t]he '1 in 100,000' risk of cancer is the chance of the rodent species developing cancer, not humans."  EMA, Nitrosamine Impurities in Human Medicinal Products (June 25, 2020) at 44, Brown Decl. Ex. 82.



In coordination with Valisure, plaintiffs' firms began filing lawsuits against ranitidine manufacturers and retailers the same day Valisure submitted its citizen petition, well before either FDA or the scientific community had an opportunity to evaluate Valisure's claims.[17]

### C.   Follow-Up Testing by FDA and Manufacturers Did Not Corroborate Valisure's Claims

Shortly after reviewing Valisure's petition, FDA raised concerns about Valisure's testing methodology in several public statements and in a formal response to the citizen petition.  On September 26, 2019, the FDA issued a statement confirming that "GC based methods had been observed to elevate NDMA levels in tested materials."[18]  FDA confirmed that Valisure's GC-MS

---

[14] *See, e.g.,* VAL 01207-01237, at VAL 01224, Brown Decl. Ex. 107 ████████████ ████████████████████████ VAL 01504, Brown Decl. Ex. 108; VAL 01057-01058, Brown Decl. Ex. 104; VAL 01202-01206, Brown Decl. Ex. 106; VAL 01167-01177, Brown Decl. Ex. 105.

[15] ████████████████████████████████████████████ *see also* ████████████ MSK00009592, Brown Decl. Ex. 114 ████████ Light Tr. at 232:13-234:12.

[16] Light Tr. at 302:10-18.

[17] Complaint and Demand for Jury Trial, *Galimidi v. Sanofi US Services, Inc.*, et al., No. 132019CA027190000001 (Fla. 11th Cir. Ct. Sept. 13, 2019), removed to federal court, No. 1:19-cv-24395 (S.D. Fla) ("Galimidi Complaint"); *see also* Light Tr. at 287:14-21, 289:2-22, 290:25-291:5.

[18] FDA, Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product (Sept. 13, 2019), at 1 ("FDA LC-HRMS Method"), Brown Decl. Ex. 89.  Although the test protocol is dated September 13, it was published on September 26. *See, e.g.,* FDA, STATEMENT – FDA alerts health care professionals and patients to voluntary recall of ranitidine medicines (Sept. 26, 2019) (accessed

test protocol was "inappropriate" for testing ranitidine due to the effects of high heat and "contributed to or caused the levels of NDMA to be artificially high."[19]   To avoid the sample degradation problems arising from GC-MS testing, FDA advised manufacturers to use a liquid chromatography mass spectrometry (LC-MS) test protocol that utilizes lower temperatures to evaluate the levels of NDMA in ranitidine.[20]

FDA and ranitidine manufacturers moved quickly to study NDMA levels in ranitidine and examine whether ranitidine use increases cancer risk in patients.[21]   Over the next month, FDA and ranitidine manufacturers tested lots of finished ranitidine drug product and the active pharmaceutical ingredient (API), ranitidine hydrochloride, to see if ranitidine contained NDMA in excess of FDA's limit of 96 nanograms per day.[22]

---

May 31, 2022) ("Sept. 26, 2019, FDA Statement") , Brown Decl. Ex. 90 ("FDA recently posted a testing method  . . .").

[19] FDA Response to Valisure Citizen Petition at 10.

[20] *See* Sept. 26, 2019, FDA Statement at 10; FDA LC-HRMS Method.

[21] FDA, FDA Statement: Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine (2019) ("Sept. 13, 2019 FDA Statement") at 1, Brown Decl. Ex. 88 ("The agency is working with international regulators and industry partners to determine the source of this impurity in ranitidine. The agency is examining levels of NDMA in ranitidine and evaluating any possible risk to patients.").

[22] FDA, FDA Statement: Statement on new testing results, including low levels of impurities in ranitidine drugs (2019) at 1-2, Brown Decl. Ex. 92 ("The agency has tested numerous ranitidine products on the market over the past few months… we have found levels of NDMA in ranitidine that are similar to the levels you would expect to be exposed to if you ate common foods . . . We're also asking manufacturers to continue conducting their own laboratory testing to examine levels of NDMA in ranitidine.").

FDA's tests revealed NDMA levels much lower than what Valisure reported, and many of the lots tested revealed NDMA levels *below* the ADI.[23]  Manufacturers' tests similarly showed a significant share of the lots, though not all, were below FDA's precautionary limit.[24]

FDA went on to conduct additional analyses and studies to investigate whether "the low levels of NDMA in ranitidine pose a risk to patients,"[25] while also confirming that it was not calling for patients to stop taking ranitidine at that time.  FDA explained that "[a]lthough NDMA may cause harm in large amounts, the levels the FDA is finding in ranitidine from preliminary tests barely exceed amounts you might expect to find in common foods."[26]

In late September and October 2019, as a precautionary public health measure, ranitidine manufacturers voluntarily recalled their ranitidine products while they further investigated the potential root causes of NDMA found in some lots.[27]  Manufacturers also undertook analyses to evaluate whether they could ensure that NDMA levels remained below the ADI threshold for the entire shelf life of the medication.

---

[23] FDA, Laboratory Tests Ranitidine:  Laboratory analysis of ranitidine and nizatidine products (Nov. 1, 2019) ("Nov. 2019 FDA Statement- Laboratory Analysis") at 1-3, Brown Decl. Ex. 93; FDA, FDA Requests Removal of All Ranitidine Products (Zantac) form the Market (2020) ("April 2020 FDA Statement") at 1, Brown Decl. Ex. 95 ("We didn't observe unacceptable levels of NDMA in many of the samples that we tested.").

[24] *See., e.g.*, SANOFI_ZAN_MDL_0000142270-142275 at SANOFI ZAN_MDL_0000142272, Brown Decl. Ex. 115.  FDA's ADI in terms of ppb is 320 ppb/day. *See also* GSKZAN0000845208, Brown Decl. Ex. 110.

[25] Sept. 13, 2019 FDA Statement at 1.

[26] *Id.*

[27] Sanofi, Press Release, Sanofi to conduct precautionary voluntary recall of Zantac OTC in U.S. and Canada (Oct. 18, 2019), Brown Decl. Ex. 116; Nasdaq: GSK recalls popular heartburn medicine Zantac – U.K. medicines watchdog (Oct. 8, 2019), https://www.nasdaq.com/articles/gsk-recalls-popular-heartburn-medicine-zantac-u.k.-medicines-watchdog-2019-10-08-0, Brown Decl. Ex. 111.

In April 2020, after further testing confirmed NDMA levels in some samples exceeded the ADI threshold, FDA requested that manufacturers initiate a market withdrawal of any batches remaining in the market.[28]

**D.    The Medical and Scientific Communities Mobilized to Investigate Whether Real-World Use of Ranitidine Could Cause Cancer**

After the recall, researchers around the world mobilized to evaluate whether Zantac, including any NDMA Zantac may contain, increased the risk of cancer for patients who took the medication in their everyday lives.  Prominent independent cancer researchers and specialists from preeminent institutions across the globe[29]—including leading cancer specialists, gastrointestinal specialists, and epidemiologists—designed real-world observational studies to answer this question.  They accessed many of the largest and highest quality healthcare databases,[30] including databases with information on patients who took ranitidine for years,[31] to obtain more than 30

---

[28] April 2020 FDA Statement at 1.

[29] These researchers and specialists hail from many of the world's top-tier research and academic institutions, including Harvard University, University of Pennsylvania, and Dartmouth University, among many others.

[30] Databases include the U.S. Veterans Affairs Corporate Data Warehouse, the Danish National Prescription Registry, the U.S. IBM Explorys, the UK Biobank, the Korean National Health Insurance Service, and the Japan Medical Data Center, among others.  *See* Appendix A.  Notably, several of the studies on which Plaintiffs rely used the same Scottish database.  That database is limited due to its small size, potential confounding, and the fact that the data has not been reproduced in other populations.  *See, e.g.,* Cardwell et al., *Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case-Control Study*, AM J GASTROENTEROL 2021;00:1, 1 (2021), Brown Decl. Ex. 48 ("Further studies are necessary to attempt to replicate this finding in other settings."); McDowell et al., *The effect of medications associated with drug-induced pancreatitis on pancreatic cancer risk: A nested case-control study of routine Scottish data,* CANCER EPIDEMIOL 71, 1, 7 (2021), Brown Decl. Ex. 66 ("[W]e recommend that further studies of the association between ranitidine and pancreatic cancer take place over time-frames and/or in countries where ranitidine was only available on prescription."); Deposition of Patricia Moorman ("Moorman Tr.") at 321:11-322:4, Brown Decl. Ex. 39.

[31] Adami et al., *Ranitidine Use and Risk of Upper Gastrointestinal Cancers*, CANCER EPIDEMIOL BIOMARKERS PREV 2021 30 (12): 2302, 2303 (2021), Brown Decl. Ex. 45; Yoon (2021) at 2; Norgaard (2021) at 48.

years of human data for their analyses.[32]  Afterward, these researchers subjected their studies to independent peer-review and published their work in leading medical journals, such as *Drug Safety* and *Cancer Epidemiology, Biomarkers and Prevention*.[33]

In total, since 2019, researchers from 17 medical institutions have published 11 peer-reviewed studies, analyzing data from nearly seven million patients in six countries,[34] to directly address whether ranitidine causes cancer as a result of real-world use of the medication.  Those studies of ranitidine necessarily account for any exposure to NDMA from ranitidine.  Based on their extensive analyses, none of these authors determined there was an association, much less a causal association, between ranitidine use and *any* type of cancer—including the five cancers at issue in this litigation—when compared to patients taking other heartburn medications in the same class as ranitidine that are not alleged to contain NDMA.  To the contrary, the study authors consistently concluded that there was "no evidence"[35] of increased risk, "no demonstrable

---

[32]  *See, e.g.,* Adami (2021) at 230, 7; Norgaard (2021) at 50; Kumar (2021) at 2.

[33]  Since 2019, researchers have published observational studies of ranitidine in the British Journal of Cancer, Drug Safety, Cancer Epidemiology Biomarkers & Prevention, the American Journal of Gastroenterology, Alimentary Pharmacology & Therapeutics, Gastroenterology, Digestive Diseases and Sciences, Cancer Epidemiology, the Journal of Clinical Medicine, and Healthcare. *See* Liu et al., *Use of proton pump inhibitors and histamine-2 receptor antagonists and risk for gastric cancer in two population-based studies*, BRITISH J. OF CANCER (2020), Brown Decl. Ex. 63, Iwagami (2021), Adami (2021), Norgaard (2021), Cardwell (2021), Kim Y et al., *No association between chronic use of ranitidine, compared with omeprazole or famotidine, and gastrointestinal malignancies*, ALIMENT PHARMACOL THER. 2021;00:1-10 (2021), Brown Decl. Ex. 60, Kantor et al., *Ranitidine Use and Cancer Risk: Results from UK Biobank*, Gastroenterology 2021;160:1856-1859 (2021), Brown Decl. Ex. 57, Kumar (2021), McDowell (2021), Yoon (2021), Kim S et al., *Effect of Ranitidine Intake on the Risk of Gastric Cancer Development*, HEALTHCARE 2021, 9, 1071 (2021), Brown Decl. Ex. 59.

[34]  *See* Appendices A and B; Liu (2020), Iwagami (2021), Adami (2021), Norgaard (2021), Cardwell (2021), Kim Y (2021), Kantor (2021), Kumar (2021), McDowell (2021), Yoon (2021), Kim S (2021).

[35]  Iwagami (2021) at 370; Yoon (2021) at 1.

association"[36] between ranitidine use and any cancer types, and that ranitidine patients should find the results "reassuring."[37]  *See infra* Background Section III.

### E.   The FDA Has Found No Consistent Evidence of Ranitidine Risk for Any Cancer

Since 2019, FDA scientists have conducted their own studies and reviewed the totality of the scientific evidence to evaluate whether Zantac users are at increased risk of cancer.  Like the other researchers evaluating this question, FDA scientists have emphasized the primacy of real-world  study data in humans: "We have to look at what really matters, human data; however much we can do in a lab, we can't replicate humans."[38]

As part of that effort, FDA researchers conducted a randomized controlled trial—the "gold standard" for assessing causal relationships in humans, *see infra* Background Section II.A.i—to assess whether ranitidine converts to NDMA in the human body.  In July 2021, FDA researchers Florian et al. published the results of that study, concluding that the "findings do not support that ranitidine is converted to NDMA in a general, healthy population."[39]  In that same publication, these researchers concluded from the totality of available observational data that "[w]hen considering all cancer types . . . no consistent signals emerged across studies, and studies with

---

[36] Kumar (2021) at 1.

[37] Norgaard (2021) at 45 ("These findings are reassuring for previous ranitidine users."); Kumar (2021) at 5 ("the true gastric carcinogenic impact of NDMA-containing ranitidine in persons in the US with [Helicobacter pylori] is likely minimal to nonexistent, providing reassurance to those who have taken ranitidine"); Iwagami (2021) at 370 ("These results may alleviate concerns of patients exposed to ranitidine/nizatidine . . . .").

[38] FDA, *Laboratory and Clinical Studies Investigate Whether Ranitidine Converts to a Probable Carcinogen in Humans*, Grand Rounds (October 14, 2021, 12:00 pm) ("FDA Grand Rounds"), *webcast recording available at* https://collaboration.fda.gov/p9oq7j6y76zz/.

[39] Florian (2021) at 247 ("In this trial that included 18 healthy participants, oral ranitidine (300 mg), compared with placebo, did not significantly increase 24-hour urinary excretion of NDMA when participants consumed noncured-meats or cured-meats diets.").

comparison to active controls found no association between ranitidine and overall or specific cancer risk."[40]  Other regulatory bodies such as the European Medical Association (EMA) issued statements similar to those of the FDA, concluding "[b]ased on a comprehensive review of epidemiological and post marketing data currently available . . . that there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients."[41]

### F. No Medical or Scientific Organization Identifies Ranitidine as a Risk Factor for Cancer

Many institutions around the world involved in the research and treatment of cancer regularly publish information on cancer risk factors and health issues related to the types of cancer they treat.  These institutions—including organizations like the American Cancer Society, the Center for Disease Control and Prevention, the Cancer Research Institute, the Mayo Clinic, Cancer Research UK, The Pancreatic Cancer Action Network, the Gastric Cancer Foundation, the American Liver Foundation, and the American Bladder Cancer Society—regularly issue statements and publicize recommendations regarding cancer risk factors as part of their missions to arm the public with the most reliable and up-to-date public health information.[42]

---

[40] Florian (2021) at 247.  FDA has presented the results of the Florian 2021 study as its own research.  *See, e.g.*, July 2021 FDA Statement at 1 ("To better address the possibility of NDMA production from ranitidine in humans, CDER scientists conducted a more rigorous, randomized, double-blinded, placebo-controlled clinical trial, published in JAMA.").

[41] EMA Assessment at 18.

[42] The American Cancer Society "attack[s] cancer from every angle" for which it "research[es] cancer and its causes to find more answers and better treatments."  *See, e.g.,* https://www.cancer.org/about-us/what-we-do.html  (accessed June 2, 2022); CDC: "To accomplish our mission, CDC conducts critical science and provides health information." *See, e.g.,* https://www.cdc.gov/about/organization/mission.htm (accessed June 2, 2022); Cancer Research Institute: "Our Mission: Save more lives by fueling the discovery and development of powerful immunotherapies for all types of cancer." *See, e.g.,* https://www.cancerresearch.org/en-us/about-cri (accessed June 2, 2022); Mayo Clinic's mission is to "promot[e] health through integrated clinical practice, education and research." *See, e.g.*, https://www.mayoclinic.org/about-mayo-clinic/mission-values (accessed June 2, 2022); Cancer Research UK: "We exist to beat cancer."

Today, after years of extensive, peer-reviewed research evaluating whether ranitidine use causes cancer, none of these organizations, and indeed no major medical or scientific body, has concluded that ranitidine use increases the risk of any type of cancer.

## II.   Reliable Epidemiological Methods to Evaluate General Causation

### A.   The Hierarchy of Scientific Evidence

To evaluate whether a medicine is associated with an adverse event, the scientific community assesses available data using a well-established "hierarchy of scientific evidence," which ranks different forms of scientific evidence in terms of quality and reliability.  It is broadly accepted within the scientific community that the strongest, most reliable form of scientific evidence for assessing causal associations are randomized controlled clinical trials ("RCTs"). Next in line are *controlled* observational studies.  Then finally, at the bottom, are *uncontrolled* observational data, post-marketing adverse event reports, animal studies, and test tube (a.k.a. *in vitro*) experiments.  *See* Federal Reference Manual on Scientific Evidence ("Ref. Man.") at 723-24; *see also* Moorman Rep. at 6-7, Brown Decl. Ex. 15; McTiernan Rep. at 73; Le Tr. at 37:7-38:18, Brown Decl. Ex. 30.

---

*See, e.g.,* https://www.cancerresearchuk.org/about-us/our-organisation/our-strategy-to-beat-cancer (accessed June 2, 2022); Pancreatic Cancer Action Network:  "Our mission is to take bold action to improve the lives of everyone impacted by pancreatic cancer by advancing scientific research, building community, sharing knowledge, and advocating for patients." *See, e.g.,* https://www.pancan.org/about-us/ (accessed June 2, 2022); Gastric Cancer Foundation: "We serve as a centralized and practical resource for people affected by this disease, including nutrition guidance and the latest news about research progress." *See, e.g.,* https://gastriccancer.org/about-us/ (accessed June 2, 2022); American Liver Foundation: "ALF's mission is to promote education, advocacy, support services and research for the prevention, treatment and cure of liver disease." *See, e.g.,* https://liverfoundation.org/for-patients/about-alf/ (accessed June 2, 2022); American Bladder Cancer Society: "The ABLCS will strive to grasp every possible opportunity to raise awareness of bladder cancer . . . Through all means at our disposal including printed publications, utilization of the media and internet presence." *See, e.g.,* https://bladdercancersupport.org/about.html (accessed June 2, 2022).

Each of these types of evidence is described below.

### i.     Randomized Controlled Trials

At the top of the hierarchy of scientific evidence are randomized controlled trials ("RCTs"). In RCTs, patients are assigned at random to receive either the medication under study or a comparator (either a placebo or different medicine).  The purpose of this approach is to minimize the likelihood of baseline differences between the exposed and unexposed groups at the start of the study.  By distributing baseline differences evenly across the groups researchers can ensure that the groups being compared are sufficiently similar—thereby narrowing the difference to exposure to the medication in question—to reach reliable conclusions.  Ref. Man. at 555.  By isolating the effects of the drug in question and minimizing the possible effect of other variables— i.e., biases and confounding, *see infra* Background Section II.B.ii—clinical trials are considered the "gold standard for determining the relationship of a [medication] to a [particular] health outcome or adverse side effect."  Ref. Man. at 555.  Here, as Plaintiffs' experts acknowledge, there are no RCTs on the relationship between ranitidine use and cancer in humans.  *See* Moorman Rep. at 53-54; McTiernan Rep. at 155; Michaels Rep. at 37-38, Brown Decl. Ex. 13.

### ii.     Controlled Observational Studies

Epidemiological observational studies differ from RCTs in that patients are not randomly assigned to a treatment group before receiving the treatment.  Instead, researchers assemble, usually through databases, "a group of individuals who have been exposed to an agent of interest" and, ex post, compare them with a "comparator" group, also identified ex post, for whom there is no documented exposure to the agent of interest.  Ref. Man. at 556.  Unlike RCTs, observational studies cannot control for potential confounding factors—such as smoking, diet, exercise, genetics, or exposure to other agents—through randomization.  Instead, investigators try to limit, and then

16

to assess, the role of confounding and bias "in the design of the study and in the [statistical] analysis and interpretation of the study results" after the fact. *Id.*

The two main types of observational studies are cohort studies and case-control studies. *Id.* at 556-57. Cohort studies measure and compare the incidence of a disease in the exposed and unexposed ("control") groups. Case-control studies measure and compare the frequency of exposure in the group with a disease (the "cases") and the group without the disease (the "controls"). *Id.* at 557. "The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured." *Id.*

Not all observational studies are created equal. The greater the differences between characteristics (e.g., risk factors, demographics, etc.) between the two groups, the more likely bias and confounding are to affect the study results. This is because differences between the groups can introduce uncontrolled variables that skew the results. As a result, "[s]electing a comparator group is arguably the most fundamental choice in a pharmacoepidemiology study design and may influence results substantially." Rothman, Modern Epidemiology, Ch. 43, at 1131 (2021), Brown Decl. Ex. 70.

To address concerns about uncontrolled variables, epidemiologists often utilize an "***active comparator***" study design. Active comparator studies compare the "exposure" group to a "control" group made up of individuals who have the same underlying condition, but who have used other medicines of interest to treat it—thereby helping to isolate the *medicine* as the variable being measured. This design feature, or its absence, is directly relevant here: Patients who use heartburn medications—because of overall higher rates of smoking, alcohol use, fatty diet, obesity,

certain medical conditions (e.g., *H. pylori* infection, hepatitis B or C infection, diabetes, and Barrett's esophagus), and the potential effects of chronic heartburn itself—have a higher baseline risk of cancers than patients who do not require heartburn medications. *See* Moorman Rep. at 25-26; Moorman Tr. at 176:6-23, 205:13-207:14; McTiernan Rep. at 105. As a result, studies that do not use an "active comparator" design—i.e., studies that compare individuals who have used ranitidine to a "control" group of individuals who have not used heartburn medication of any kind—leave the results vulnerable to bias, confounding, and unreliable outcomes. *See* Chan Rep. at 26-28, Brown Decl. Ex. 1; Vaezi Rep. at 11-13, 18-19, Brown Decl. Ex. 24. Scientists can try to assess and control for these issues, but residual and unmeasured confounding and bias inevitably remain in studies that do not feature an "active comparator" design.

Indeed, FDA and EMA direct the scientific community to use active comparator observational studies when assessing potential associations between the use of medications and adverse outcomes. *See* FDA, Guidance for Industry and FDA Staff, Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data (May 2013), at 14, Brown Decl. Ex. 85 ("it is ideal to use a comparator group taking a drug used to treat the same disease, with the same level of disease severity, and from the same time period."); EMA Assessment at 18.

### iii.    Animal and "Petri Dish" (In Vitro) Experiments

Researchers may also perform experiments in a laboratory, either in test tubes or in living animals. Such studies may "provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies." Ref. Man. at 563. But they are "fraught with considerable, and currently unresolvable, uncertainty" due to differences between animal and human physiology, the doses used in animal studies, and other factors. *Id.* Therefore, as

with post-marketing adverse event reports and other forms of uncontrolled data, animal and in vitro experiments cannot establish associations or measure risk of disease. *See* McTiernan Tr. at 102:4-103:3, Brown Decl. Ex. 32 (acknowledging that epidemiologic studies are required to establish associations and causality); Le Rep. at 118, Brown Decl. Ex. 5 (same); *id.* at 13 ("In the hierarchy of evidence-based medicine, animal research provides the lowest level of evidence for therapeutic studies.").

### B.    Valid Statistical Association

Before the question of causation arises, researchers must establish a valid statistical association between an exposure to the medication in question and the development of a particular disease. *See* Ref. Man. at 566. To be sure, an association is not causation—two things can be associated (gray hair and wrinkles), yet not *causally* related (gray hair and wrinkles occur together, but they are not *causally* related).

A statistical association exists when, as measured by reliable epidemiological studies, exposure to the medication and development of the disease "occur together more frequently than one would expect by chance." *Id.* at 374; Moorman Rep. at 56-57. In general, epidemiological studies report statistical relationships between exposure and outcome—whether that relationship is positive, neutral, or negative—in the form of statistically generated, numeric "point estimates," sometimes referred to as "relative risk," "risk ratio," "odds ratio," or "hazard ratio." *See* Ref. Man. at 291, 295. A study reporting a point estimate of greater than 1.0 may reflect a positive association between an exposure and an outcome, whereas a point estimate of less than 1.0 may indicate a decreased risk.

To be clear, however, the point estimate alone does not answer the question of whether an association exists. *Id.* at 575. "Three general categories of phenomena can result in an association found in a study to be erroneous: chance, bias, and confounding. Before any inferences about

causation are drawn from a study, the possibility of these phenomena must be examined." *Id.* at 572; Le Tr. at 57:19-58:22. First, as referenced above, researchers must consider potential sources of bias or confounding that render the observed relationship unreliable. Ref. Man. at 572-73. Second, researchers use additional statistical analysis to measure whether a point estimate is "statistically significant," the conventional analytical tool in biostatistics for assessing the likelihood that a point estimate is the result of random chance. *Id.* at 576-78.

### i.      Statistical Significance

In epidemiological studies, it is important to determine whether an observed association reflects a true relationship between an exposure and an outcome or if it is a product of chance (random error). *See id*. at 566, 575. The classic example is a coin toss; a coin tossed 10 times would be expected to result in heads 5 times (50%), however, in a single set of 10 coin tosses, heads may result only 2 times (20%) due to random chance alone. *Id.* at 575. Thus, researchers use statistical tools—through the use of p-values and confidence intervals—to determine if a point estimate is "statistically significant." *Id.* at 575-78; Le Tr. at 58:23-59:4.

First, a "***p-value***" measures the probability that any given point estimate "result[s] from random error." Ref. Man. at 576. *P*-values are expressed in numerical terms, and Plaintiffs' experts agree that, in the field of biostatistics, a *p*-value of $\geq 0.05$—which indicates the probability that the risk estimate is greater than or equal to its observed value if the null hypothesis is true (i.e., if the exposure actually has no effect)—is the usual cut point for what is considered statistically significant. *See id.* at 320, 576-77; Moorman Rep. at 14; Michaels Tr. at 208:12-209:5, Brown Decl. Ex. 36.

Second, a ***confidence interval*** represents the range of likely outcomes if the same trial were repeated 100 times. Plaintiffs' experts agree that the standard confidence interval used in the field of biostatistics is the 95% confidence interval, which reflects a statistical prediction that if the

study were repeated 100 times, the study results would fall within the "confidence interval" range 95 times out of 100. *See* Moorman Rep. at 14; Ref. Man. at 580. Where the confidence interval range does not include 1.0—i.e., both the upper and lower bound are either entirely below 1.0 (a negative association) or entirely above 1.0 (a positive association)—the finding is considered statistically significant. *Id*. If the confidence interval includes 1.0, there is no statistical association between the exposure and the disease. *See* Le Tr. at 61:25-62:12. Study results that are not statistically significant do not sufficiently rule out the possibility of chance. *See* Ref. Man. at 573.

### ii. Bias and Confounding

Even if a study result is statistically significant, this "is not enough to warrant a causal inference." *Id*. at 264. Researchers must still evaluate whether the apparent statistical association is the result of bias or confounding. *Id*. After all, a study might reveal an indirect association that is "confounded" or "biased" by a variable other than the risk factor at issue, thereby creating an apparent (but untrue) association.

Confounding occurs when an observed association between an exposure and outcome is due to *another* factor that is associated with both the exposure and the outcome. Plaintiffs' experts acknowledge that studies of ranitidine and cancer are potentially subject to at least four forms of bias and confounding. *See* Moorman Rep. at 21-31, 69; McTiernan Rep. at 79, 122, 146, 150.

*Reverse causality.* The first potential source of bias in ranitidine studies is "reverse causality" or "protopathic bias." This refers to the possibility that a disease (or its symptoms) may prompt patients to take the medication in question, rather than the medication leading to the disease. *See* Moorman Rep. at 21-25; McTiernan Tr. at 177:22-178:11. For example, patients may take ranitidine to alleviate gastrointestinal symptoms that, unbeknownst to them, are caused by as-yet-undiagnosed underlying cancer. Thus, an apparent positive association between ranitidine intake and certain types of cancer might in fact be the result of reverse causality.

21

McTiernan Tr. at 177:22-178:11.  It is imperative to consider this possibility in the analysis of the epidemiological data for all five cancers.  McTiernan Rep. at 202, 206, 221, 235, 253-54, 257, 282.

**Confounding by indication**.  The possibility of confounding by indication exists when the underlying disease or risk factors associated with the underlying disease also are reasons to take the medication in question.  Ulcers, gastroesophageal reflux disease (GERD), and *H. pylori*, for example, are established risk factors for gastric and esophageal cancer.  Moorman Rep. at 25.  They also are conditions that ranitidine and other H2RAs are used to treat.

**Residual confounding.**  Residual confounding is confounding that a researcher cannot control for in their analyses because the data on that confounder is inaccurate or incomplete.  *See* Moorman Tr. at 65:18-66:5; 304:10-307:14.  For example, smoking is an established risk factor and known cause of each cancer in this litigation.  Smokers are also more likely to use H2RAs.  If a researcher cannot control for smoking in an analysis due to inaccurate or incomplete data, then an increased risk between ranitidine and cancer may be found and attributed to ranitidine, when the increased risk is in fact due to residual confounding.  *See* Moorman Tr. at 65:18-66:25; McTiernan Rep. at 105.  In this example, the missing confounder information was related to smoking.  However, inability to control for baseline differences between groups in their distribution of risk factors can result in overestimates or underestimates of risk estimates.  *See* Moorman Tr. at 82:16-84:9; McTiernan Tr. 231:8-12.  Residual confounding was identified by researchers to explain several findings in the studies on ranitidine and cancer risk.  *See* Kantor (2021) at 1858 (describing residual confounding as a possible explanation for why a risk estimate was higher when comparing ranitidine users to non-users than when comparing ranitidine users to active comparators); Cardwell (2021) at 7 (acknowledging that "smoking and alcohol [data] were

incomplete and did not capture detailed information on the extent of exposure, and consequently, there remains the possibility of residual confounding").

***Exposure Misclassification***.  Misclassification of exposure—i.e., mistaking whether the study subject actually was or was not exposed to the relevant exposure, or misestimating magnitude of exposure—is a feature of some observational studies that can produce incorrect results.  This is particularly the case, for example, in studies measuring dietary exposures, which typically rely on individuals' self-reported memory (usually via questionnaire) rather than objective and verifiable evidence about exposures.

### C.    Causation:  The Bradford-Hill Criteria

Establishing the existence of a valid, statistically significant association is not the end of the inquiry.  "*An association is not equivalent to causation*."  Ref. Man. at 552; Moorman Tr. at 162:23-164:3.  After a valid association has been demonstrated, rigorous analysis is required to determine whether an observed association reflects a *causal* relationship between the medication and the disease of interest.  *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 482 (D.S.C. 2017), *aff'd sub nom. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624 (4th Cir. 2018); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1175 (E.D. Wash. 2009).

To assess causation, epidemiologists often employ a framework known as the Bradford Hill criteria.  As the Reference Manual makes clear—and as courts repeatedly have stressed—the Bradford Hill "guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship."  Ref. Man. at 598-99; *see also, e.g.*, *In re Lipitor*, 892 F.3d at 642 (affirming trial court's finding that epidemiologic analysis of causation

"requires a statistician to find a statistically significant association at step one before moving on to apply the factors at step two"). Several of those criteria are particularly salient here:[43]

**Strength of Association.** Also known as "relative risk," this factor is "one of the cornerstones for causal inference." Ref. Man. at 602. "The higher the relative risk, the greater the likelihood that the relationship is causal." *Id.* For example, a relative risk of 10 means that those who are exposed to the risk are 10 times more likely to experience an associated outcome than those who were not exposed to the same risk. *Id.* By contrast, a lower relative risk has a "greater chance that [the association is] the result of uncontrolled confounding or biases." *Id.* Therefore, the first step in assessing whether an observed association is causal is to identify the size, or "magnitude," of the association. Observed associations that are numerically small—especially those below 2.0—are less likely to be causal and more likely to be "spurious." *Id.*; *see* Moorman Tr. at 162:23-164:3.

**Consistency.** Consistency across available epidemiological evidence is critical to achieving reliable conclusions about causation. Consistency refers to whether an association has been "repeatedly observed by different persons, in different places, circumstances and times." Bradford Hill, *The environment and disease: association or causation?*, JRSM; 1965, Vol. 58 issue 5, at 33 (1965), Brown Decl. Ex. 46. Inconsistent results, by contrast, weaken any causal inference. Replication of study results is important because, as the Reference Manual explains, there are "a variety of ways" in which an apparent positive study result can turn out to be incorrect, including "chance, bias, and confounding." Ref. Man. at 572; *see also id.* at 583-91 (discussing

---

[43] There are nine Bradford Hill criteria: strength of association, consistency (or reproducibility), specificity, temporality, dose-response relationship, biological plausibility, coherence (epidemiological evidence and lab results match), experiment (inducing an exposure to test for hypothesized outcome), and analogy.

selection bias, information bias, limited sample size, invalid assumptions, and confounding factors); *id.* at 604 (discussing the importance of replication). Indeed, it is not uncommon to "find a positive association . . . when there is no true association." *Id.* at 572. "Consistency in [epidemiologic] findings is an important factor in making a judgment about causation," *id.* at 604; and "[a] good general rule of thumb in science is never to rely on any experimental finding until it has been independently replicated," *id.* at 777. In studies relying on the use of health claims databases, as is typically the case with observational studies, consistency requires replication *across different data sources*. Multiple analyses based on the same data source do not serve the principle of replication "in different places, circumstances, and times." Bradford Hill (1965) at 33; *see also* Moorman Rep. at 57, 109 (describing consistency as whether the association has been repeatedly observed by different investigators, in different study populations, in different places, circumstances and time and applying this standard for consistency to discuss where studies were conducted and which research databases were used).

*Temporality*. Temporality is among the most essential of the Bradford Hill factors and one that must be satisfied before any causation opinion reliably may be drawn. "A temporal, or chronological, relationship must exist for causation to exist." Ref. Man. at 601. Temporality stands for the simple proposition that "if an exposure causes [a] disease, the exposure must occur before the disease develops." *Id.*

*Dose response*. "A dose-response relationship means that the greater the exposure, the greater the risk of disease. Generally, higher exposures should increase the incidence (or severity) of disease." Ref. Man. at 603.

In multi-district litigations involving claims that a particular medication causes an adverse health outcome, courts are often presented with expert causation opinions founded on Bradford-

Hill analyses.  Recognizing that it is "all too easy for an expert to manipulate the Bradford Hill factors to support a desired conclusion of causation, and far too hard for an ensuing expert to replicate and rigorously test the expert's analytic approach," district courts carefully scrutinize—and have repeatedly excluded—Bradford Hill analyses that lack sufficient indicia of reliability.  *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 268 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).  Crucial to the admissibility determination, courts must critically examine *how* experts apply the Bradford Hill criteria to ensure it has been done reliably and in accordance with accepted scientific standards.  *See, e.g.*, *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 797 (3rd Cir. 2017) (affirming exclusion where expert did not "adequately explain how this analysis supports specified Bradford Hill criteria"); *In re Lipitor*, 892 F.3d at 638−42 (affirming exclusion of expert who inappropriately applied Bradford Hill); *In re Nexium*, 662 F. App'x at 530 (same).  To make certain that the Bradford Hill factors are "truly a methodology, rather than a mere conclusion-oriented selection process," reviewing courts must ensure that there is "a scientific method of weighting that is used and explained" as to the relative contributions of each factor.  *In re Zoloft*, 858 F.3d at 796 (citation omitted).  Thus, courts have insisted "that experts who apply multi-criteria methodologies such as Bradford Hill . . . rigorously explain how they have weighted the criteria.  Otherwise, such methodologies are virtually standardless and their applications to a particular problem can prove unacceptably manipulable."  *Mirena (II)*, 341 F. Supp. 3d at 247 (internal quotation marks and citations omitted); *see also In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1044 (S.D. Cal. 2021); *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 798–99 (N.D. Cal. 2020).

### III.    Epidemiological Data for Ranitidine Do Not Show An Increased Cancer Risk

Although they cite epidemiology studies of ranitidine and cancer risk to varying degrees, none of Plaintiffs' experts offer the opinion that there is an association between ranitidine and any of the five cancers based specifically on ranitidine epidemiology.[44]  This is because the ranitidine epidemiology does *not* show, as reported by the study authors themselves, a valid association between ranitidine and cancer:

- **Iwagami (2021)**:  "[W]e found *no evidence of an increased risk of cancer* in people receiving ranitidine and nizatidine compared with people receiving other H2 blockers overall, by follow-up length, by cumulative dose, or by cancer site.  These results may alleviate concerns of patients exposed to ranitidine."[45]

- **Adami (2021)**:  "In this large, population-based study using high-quality exposure and outcome data, we *consistently observed HRs and risk differences close to unity* [i.e., no increased risk] when use of ranitidine was compared with use of either other H2R[A]s or PPIs [proton pump inhibitors, another medication used to treat GERD and other gastroesophageal conditions]."[46]

- **Cardwell (2021)**:  "[T]here was *little evidence of difference in bladder cancer risk* when directly comparing ranitidine users with users of nonranitidine histamine-2 receptor agonists."[47]

- **Kantor (2021)**:  "Ranitidine use was *not associated with overall cancer risk*."[48]

- **Kim Y (2021)**:  "Use of ranitidine was *not associated with an increased odds of developing gastrointestinal malignancies* compared to omeprazole or famotidine use."[49]

- **Kumar (2021):** "There is *no demonstrable association between ranitidine use and future gastric cancer* among individuals with HP [Helicobacter pylori] on long-term acid suppression . . . the true gastric carcinogenic impact of NDMA-containing

---

[44] McTiernan Tr. at 577:22-580:7; Moorman Tr. at 245:8-247:3; Salmon Tr. at 347:1-19.

[45] Iwagami (2021) at 370 (emphasis added).

[46] Adami (2021) at 2306 (emphasis added).

[47] Cardwell (2021) at 6 (emphasis added).

[48] Kantor (2021) at 1858 (emphasis added).

[49] Kim Y (2021) at 606 (emphasis added).

ranitidine in persons in the US with HP is likely minimal to nonexistent, providing reassurance to those who have taken ranitidine."[50]

- **Yoon (2021):** "We found ***no evidence that exposure to NDMA through ranitidine increases the risk of cancer***."[51]

- **Norgaard (2021):** "In conclusion, this large nationwide study with complete ascertainment of bladder and kidney cancers provided ***little evidence of any substantially increased risk of bladder or kidney cancer*** in ranitidine exposed individuals."; "These findings are reassuring for previous ranitidine users."[52]

- **Kim S (2021):** "We found no significant difference in terms of gastric cancer development among the three study groups (control, other histamine-2 blockers, and ranitidine), suggesting that ***the intake of ranitidine, even if it contains NDMA, may not be associated with an increased risk of developing gastric cancer***."[53]

None of these authors concluded that ranitidine causes any type of cancer. To the contrary, these authors consistently concluded that there was "little evidence"[54] or "no evidence"[55] of increased risk, "no demonstrable association"[56] between ranitidine and cancer types, and that ranitidine patients should find the results "reassuring."[57]

---

[50] Kumar (2021) at 1, 5 (emphasis added).

[51] Yoon (2021) at 1 (emphasis added).

[52] Norgaard (2021) at 1 (emphasis added).

[53] Kim S (2021) at 7 (emphasis added).

[54] Norgaard (2021) at 50, 45 (emphasis added); *see also* Kumar (2021) at 5 ("the true gastric carcinogenic impact of NDMA-containing ranitidine in persons in the US with [Helicobacter pylori] is likely minimal to nonexistent, providing reassurance to those who have taken ranitidine"); Iwagami (2021) at 370 ("These results may alleviate concerns of patients exposed to ranitidine/nizatidine. . .").

[55] Iwagami (2021) at 360; Yoon (2021) at 1.

[56] Kumar (2021) at 1.

[57] Norgaard (2021) at 45; *see also* Kumar (2021) at 5 ("the true gastric carcinogenic impact of NDMA-containing ranitidine in persons in the US with [Helicobacter pylori] is likely minimal to nonexistent, providing reassurance to those who have taken ranitidine"); Iwagami (2021) at 370 ("These results may alleviate concerns of patients exposed to ranitidine.").

After FDA's 2019 announcement, researchers published 11 peer-reviewed epidemiology studies examining ranitidine use and risk of cancer.[58]  Nine of these studies were undertaken for the purpose of examining ranitidine specifically, and two studies, Liu and McDowell, reported results on ranitidine in studies designed to analyze other medications.[59]  Nearly all nine studies were designed to compare ranitidine users to users of other H2RAs or to another class of acid-suppressing drugs, PPIs.[60]  The authors chose these active comparator designs over comparisons to the general population to minimize confounding and other sources of bias.[61]

Overall, and as discussed more fully below, these data are consistent with other ranitidine data published prior to 2019, showing that there is no valid association between ranitidine use and the five cancers Plaintiffs allege.  Although a few spurious statistically significant increased risks were reported in some studies, in every single study that reported an increased risk, there was another analysis that better controlled for confounding, bias, and/or dose-response that showed no statistically significant association.  And there are numerous studies reporting statistically

---

[58] Liu (2020), Iwagami (2021), Adami (2021), Cardwell (2021), Kantor (2021), Kim Y (2021), Kumar (2021), McDowell (2021), Yoon (2021), Kim S (2021), and Norgaard (2021).

[59] As Dr. McTiernan acknowledged, "the primary focus [of Liu] was to look at associations between use of proton pump inhibitors or H2 blockers in general and risk for stomach cancer." McTiernan Rep. at 145.

[60] The Cardwell (2021) study was not designed to test the ranitidine/NDMA hypothesis and was conducted as a "more extensive analys[i]s" of a prior "hypothesis-generating screening study" (Cardwell (2021) at 2).  The Kim S (2021) study did not use an active comparator design, although assessed other H2RA users to non-users as a comparator analysis.

[61] *See, e.g.*, Adami (2021) at 2302 ("Research on ranitidine use . . . has been inconclusive[].  This lack of clarity stems in part from potential confounding by indication and reverse causality, which favor spurious positive associations[] . . . To reduce these concerns, we undertook a cohort study . . . comparing cancer risk between ranitidine users and an active comparator group. . . ."); Yoon (2021) at 7 (comparison to users of other acid-suppressors is "more appropriate than [comparison to] the general population"); Norgaard (2021) at 50 ("[S]moking and other lifestyle factors are unlikely to be strongly related to choice of type of H2-blocker; thus, the active comparator design likely averted potential confounding by these factors.").

significant decreased risks between ranitidine and different types of cancer. As illustrated below, when comparing ranitidine to other H2RAs that are not alleged to contain NDMA, the primary analyses showed *no* statistically significant positive associations between ranitidine use and any of the cancers. *See also* Appendix C (same).

## Totality of Observational Studies: Ranitidine Use Versus Other H2RA Use

| | Study | | Value |
|---|---|---|---|
| **Gastric** | Iwagami (2021) | | 1.09 [0.96, 1.24] |
| | Adami (2021) | | 0.98 [0.84, 1.14] |
| | Kim Y (2021) | | 0.43 [0.36, 0.51] |
| | Kumar (2021) | | 0.55 [0.40, 0.74] |
| | Yoon (2021) | | 1.06 [0.86, 1.31] |
| **Esophageal** | Adami (2021) | | 1.09 [0.91, 1.29] |
| | Kim Y (2021) | | 0.51 [0.43, 0.60] |
| **Liver** | Adami (2021) | | 0.89 [0.72, 1.10] |
| | Kim Y (2021) | | 0.39 [0.36, 0.41] |
| | Yoon (2021) | | 0.85 [0.69, 1.05] |
| **Bladder** | Cardwell (2021) | | 1.05 [0.86, 1.28] |
| | Norgaard (2021) | | 1.11 [0.95, 1.29] |
| | Yoon (2021) | | 1.41 [0.88, 2.24] |
| **Pancreas** | Adami (2021) | | 0.97 [0.87, 1.10] |
| | Kim Y (2021) | | 0.54 [0.49, 0.62] |

**Primary Endpoints**

### A.    Gastric Cancer

Seven ranitidine studies examined the association between ranitidine use and gastric cancer: Liu (2020), Iwagami (2021), Yoon (2021), Kumar (2021), Kim S (2021), Kim Y (2021), Adami (2021). One ranitidine study, Habel (2000), examined the association between ranitidine use and gastric/esophageal cancer combined.[62]  *See* Appendix A.

*Ranitidine v. Active Comparators.*  None of the studies using active comparators reported statistically significant positive associations between ranitidine use and gastric cancer, but several

---

[62] Habel et al., *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, PHARMACOEPIDEMIOLOGY AND DRUG SAFETY 9:149-155 (2000), Brown Decl. Ex. 53.

reported statistically significant *decreased* risks.[63]  As Dr. Moorman summarized, "[t]he studies that compared ranitidine users to users of other acid-suppressing drugs generally did not find that the risk of gastric cancer among ranitidine users was higher than that of other H2RAs or PPIs."[64] Dr. McTiernan described the use of an active comparator as a "strength" of many of these studies because it "removed the potential confounding effect of medical indication for use of an H2 blocker."[65]

*Ranitidine v. Non-Use.*  The Kim S (2021) study reported no statistically significant association between ranitidine/nizatidine use compared to non-use.[66]  A single study, Liu (2020), reported a statistically significant increased risk of gastric cancer ($OR_{1 \text{ yr lag}}$ = 1.42 [95% CI 1.10, 1.85]) when comparing ranitidine use to non-use.[67]  This statistically significant estimate used a lag time of one year between ranitidine prescription and cancer diagnosis (i.e., it removed ranitidine exposures that occurred within one year prior to diagnosis).[68]  This association was no longer significant—and consistently decreased—when the lag time increased from one to three years ($OR_{2 \text{ yr lag}}$ = 1.22 [95% CI 0.89, 1.67], $OR_{3 \text{ yr lag}}$ = 1.17 [95% CI 0.81, 1.68]).  the authors concluded, therefore, that their "results revealed a marked increase in the prescription of acid-suppressing medications immediately before gastric cancer diagnosis suggesting the role of reverse

---

[63] *See* Iwagami (2021) at 366, 368; Yoon (2021) at 5; Kumar (2021) at 1; Kim Y (2021) at 613; Adami (2021) at 2305; Habel (2000) at 151 (reporting on gastric/esophageal cancers combined).

[64] Moorman Rep. at 220.

[65] McTiernan Rep. at 263-264; *see also id.* at 259 (similar re: Adami (2021)).

[66] Kim S (2021) at 5.

[67] Liu (2020) at 312 (Table 3).  Both Dr. Moorman and Dr. McTiernan opined that it is impossible to estimate the risk of gastric cancer in a combined analysis of gastric/esophageal cancer.  Moorman Rep. at 78; McTiernan Rep. at 211.

[68] Liu (2020) at 312.

causation."[69]  Dr. McTiernan characterized Liu (2020) as "no association,"[70] and did not disagree with the authors conclusions that the results "suggest[] the role of reverse causation."[71]

The final study, Habel (2000), reported a statistically significant positive association for the combined outcome of gastric/esophageal cancer with ranitidine use compared to non-use on the basis of six total cancer cases immediately following the prescription date.[72]  Furthermore, both Dr. Moorman and Dr. McTiernan opined that it is impossible to estimate the risk of gastric cancer in a combined analysis of gastric/esophageal cancer.[73]

## B.    Esophageal Cancer

Three ranitidine studies examined the association between ranitidine use and esophageal cancer: Tan (2018),[74] Kim Y (2021), and Adami (2021).  *See* Appendix A.  One study, Habel, examined the association between ranitidine use and gastric/esophageal cancer combined (as described above).

***Ranitidine v. Active Comparators.***  None of the studies using active comparators reported statistically significant positive associations between ranitidine use and an overall increased risk

---

[69] *Id.*

[70] McTiernan Rep. at 147.

[71] McTiernan Tr. at 458:15-25; *see also id.* at 456:6-24.

[72] Habel (2000) at 151.  The Habel authors noted that this estimate was no longer significant when ranitidine users were compared to users of another H2RA, *and* further noted that the significant result "might reflect the use of either of these drugs for early symptoms of cancer" given that the risk was only significantly elevated during the first 12 months after the prescription date.  *Id.* at 152.

[73] *See* Moorman Rep. at 78; McTiernan Rep. at 211.

[74] Tan et al., *Acid suppression medications reduce risk of oesophageal adenocarcinoma in Barrett's oesophagus: a nested case-control study in US male veterans*, ALIMENT PHARACOL THER. 2018; 48:469-477 (2018), Brown Decl. Ex. 74.

Case 9:20-md-02924-RLR   Document 5736   Entered on FLSD Docket 06/23/2022   Page 40 of 112

of esophageal cancer; one reported a statistically significant *decreased* risk.[75]  Adami performed analyses with patients who had received at least five prescriptions and at least ten prescriptions and had ten years of follow up, and none of these analyses were statistically significant.[76]

*Ranitidine v. Non-Use.*  No statistically significant associations between ranitidine use and an overall increased risk of esophageal cancer were reported in Tan, the only ranitidine v. non-use study.[77]  In fact, Dr. Moorman characterized Tan as "suggest[ing] that acid suppression therapy could reduce the risk of progression in esophageal cancer among patients who already have pre-cancerous cellular changes in the esophagus."[78]

### C.    Liver Cancer

Five ranitidine studies examined the association between ranitidine use and liver cancer: Tran (2018),[79] Kantor (2021), Yoon (2021), Kim Y (2021), and Adami (2021).  *See* Appendix A.

*Ranitidine v. Active Comparators.*  None of the studies using active comparators reported statistically significant positive associations between ranitidine use and an overall increased risk of liver cancer, but several reported statistically significant *decreased* risks.[80]  As Dr. Moorman

---

[75] Kim Y (2021) at 606; Adami (2021) at 2305; Habel (2002) at 151 (reporting on gastric and esophageal cancers combined).

[76] Adami (2021) at 2305; *see also* Moorman Rep. at 175.  Adami did identify a statistically significant positive association between ranitidine use and a subtype of esophageal cancer (esophageal adenocarcinoma), but this result was no longer significant when the number of ranitidine prescriptions filled was greater than five or greater than 10.  *See* Adami (2021) at 2305-06.

[77] Tan (2018) at 474; *but see supra* notes 72-73.

[78] Moorman Rep. at 177 (emphasis added); *see also* McTiernan Tr. at 566:11-19, 423:15-19, 426:6-10, 428:9-19.

[79] Tran et al., *Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies,* ALIMENT PHARMACOL THER. 2018;48:55-64 (2018), Brown Decl. Ex. 76.

[80] Yoon (2021) at 5, Kantor (2021) at 1856, Kim Y (2021) at 606, and Adami (2021) at 2305.

acknowledged, "Among the studies that compared ranitidine users to users of other acid-suppressing drugs (i.e., active comparator studies) only one reported a slightly but not statistically significant increased risk compared to omeprazole users, while the others did not find increased risk for liver cancer among ranitidine users."[81]

*Ranitidine v. Non-Use.*  No statistically significant associations were found in the Tran study.[82]  A single study, Kantor, reported a statistically significant association between ranitidine use and increased risk of liver cancer (OR = 1.91 [1.09, 3.36]) when comparing ranitidine use to non-use.[83]  Kantor characterized these findings as "compelling for hypothesis generation," and indicated that they should be confirmed "in other populations."[84]  Kantor also performed active comparator analyses and concluded that "no association was observed in active comparator analyses (HR = 1.15 [0.58, 2.26])."[85]

### D.   Bladder Cancer

Four ranitidine studies examined the association between ranitidine use and bladder cancer: Kantor, Yoon, Norgaard (2021), and Cardwell (2021).  One study, Habel, examined the association between ranitidine use and bladder/kidney cancer combined.  *See* Appendix A.

*Ranitidine v. H2RAs.*   None of the studies using H2RA active comparators reported statistically significant associations between ranitidine use and bladder cancer.[86]  Cardwell (2021) concluded that "there was little evidence of difference in bladder cancer risk when directly

---

[81] Moorman Rep. at 158.

[82] Tran (2018) at 60-61.

[83] Kantor (2021) at 1856.

[84] *Id.* at 1859.

[85] *Id.* at 1856.

[86] Yoon (2021) at 5; Cardwell (2021) at 6; and Norgaard (2021) at 448; Habel (2000) at 151 (reporting on bladder/kidney cancers combined).

comparing ranitidine users with users of nonranitidine histamine-2 receptor agonists."[87]    In Norgaard (2021), all risk estimates for ranitidine exposure greater than five or ten prescriptions and for ten prescriptions with ten years of follow up were less than 1.0.[88]

**_Ranitidine v. PPIs._**  Two of the three studies comparing ranitidine use to PPI use, Cardwell and Norgaard, identified statistically significant associations, while no association was found in Kantor.[89]  Norgaard (2021) characterized the PPI result as a "slightly increased risk,"[90] and noted that, "[s]tarting time of follow-up 10 years after the 10th prescription did not suggest any associations," and that likewise patients with "more than 10 years of follow-up" resulted in risk estimates less than 1.0.[91]

Importantly, both of these studies also performed comparisons of ranitidine users to other H2RA users and did not report statistically significant results in these analyses.[92] Given this context, Norgaard concluded that, "this large nationwide study with complete ascertainment of bladder [] cancer[] provided little evidence of any substantially increased risk of bladder [] cancer in ranitidine exposed individuals," and that "[t]hese findings are reassuring for previous ranitidine users."[93]  Cardwell provided several explanations for why "the associations were attenuated when comparing ranitidine users with users of other histamine-2 receptor agonists," including

---

[87] Cardwell (2021) at 6.

[88] Norgaard (2021) at 48.

[89] Cardwell at 6; Norgaard (2021) at 48; *but see* Kantor at 1857 (reporting non-significant results).

[90] Norgaard (2021) at 47.

[91] *Id.* at 48.

[92] Cardwell (2021) at 6, Norgaard (2021) at 48.

[93] Norgaard (2021) at 50, 45.

confounding by indication.[94]  Cardwell also noted that "there remains the possibility of residual confounding," as they were "unable to control for several bladder cancer risk factors such as family history and occupational exposures," and "smoking and alcohol were incomplete and did not capture detailed information on the extent of exposure."[95]

Dr. Moorman asserts that PPIs are not an appropriate active comparator for ranitidine.[96] Specifically, she believes that "one of the key assumptions of active comparator analyses—that the drugs are used for similar underlying conditions—is certainly not valid for comparisons between ranitidine and PPIs."[97]  At her deposition, she further stated that having "PPI users as a control does not help evaluate whether or not ranitidine use increases the risk of any of the five cancers."[98]  Dr. McTiernan similarly opines that other H2RAs are the better comparator as other H2RAs have not been associated with cancer, while there are some studies reporting an increased risk with PPIs.[99]

*Ranitidine v. Non-Use.*  One of two studies comparing ranitidine use to non-use, Cardwell (2021), identified a statistically significant association, while no association was found in Kantor.[100]  However, the Cardwell association originated from a "hypothesis-generating screening study," and which the Cardwell authors, Dr. McTiernan, and Dr. Moorman all admit could be a

---

[94] Cardwell (2021) at 7.

[95] *Id.*

[96] Moorman Report at 28.

[97] *Id.*

[98] Moorman Tr. at 190:16-192:19.

[99] McTiernan Tr. at 172:8-13, 175:4-7.

[100] Cardwell (2021) at 5; *but see* Kantor (2021) at 1857 (reporting non-significant results).  In addition, Habel (2000) did not find a statistically significant association for bladder and kidney cancers combined.  Habel (2000) at 151.

chance finding due to the large number of comparisons performed.[101]  Furthermore, as discussed above, Cardwell noted no statistically significant results in the more appropriate active comparator analysis:  ranitidine compared to other H2RAs.

### E.    Pancreatic Cancer

Four ranitidine studies examined the association between ranitidine use and pancreatic cancer: McDowell (2021), Kim Y (2021), Adami (2021), and Habel (2000).  *See* Appendix A.

***Ranitidine v. Active Comparators.***  None of the studies using active comparators reported statistically significant associations between ranitidine use and an overall increased risk of pancreatic cancer.[102]  In fact, both Adami and Kim Y reported statistically significant *decreased* risks.[103]  Adami performed analyses with patients who had received at least five prescriptions and at least ten prescriptions and had ten years of follow up, and none of these analyses were statistically significant risk estimates above 1.0.[104]

***Ranitidine v. Non-Use.***  Two studies, McDowell and Habel, reported statistically significant associations between ranitidine use and an overall increased risk of pancreatic cancer in a non-user analysis.[105]  McDowell compared thirteen different medications and pancreatic cancer risk and identified statistically significant associations between ranitidine and another drug

---

[101] Cardwell (2021) at 2, 7; McTiernan Tr. at 521:8-522:21; 527:12-19; Moorman Rep. at 82.

[102] Kim Y (2021) at 613; Adami (2021) at 2305-07; Habel (2000) at 151.

[103] Kim Y (2021) at 613; Adami (2021) at 2305–07.

[104] Adami (2021) at 2307; *see also* Moorman Rep. at 175.  Adami (2021) did identify a statistically significant association between ranitidine use and an increased risk in a subtype of esophageal cancer (i.e., esophageal adenocarcinoma), but this increased risk was no longer significant when the number of ranitidine prescriptions filled was greater than 5 or greater than 10.  *See* Adami (2021) at 2306.

[105] McDowell (2021) at 5; Habel (2000) at 151.

and pancreatic cancer.[106]   However, McDowell did not observe a dose-response relationship between either of these medications, and the risk estimate decreased as the number of prescriptions filled increased.[107]  The authors concluded that "[t]here is little evidence that commonly-prescribed medicines associated with inflammation of the pancreas are also associated with pancreatic cancer."[108]  McDowell also counseled that "[t]hese findings should provide reassurance to patients and prescribing clinicians."[109]  Habel reported a statistically significant estimate between ranitidine use and pancreatic cancer based on a total of 5 pancreatic cancer cases.  This estimate was no longer significant when ranitidine users were compared to users of another H2RA.[110]

### F.      Non-Ranitidine Data On Which Plaintiffs' Epidemiology Experts Rely

This case is about whether ranitidine causes cancer.  It is not about whether dietary exposure to processed meats or occupational exposure to fumes in a rubber factory cause cancer. Nonetheless, Plaintiffs' epidemiology experts principally rely on dietary and occupational studies that do not involve the study of ranitidine to reach conclusions about ranitidine.  No other independent scientists have taken this approach.

*Dietary Studies*.   Plaintiffs' experts rely on dietary NDMA studies to establish an association between ranitidine and the five cancers,[111] despite the fact that no independent scientists have done so.  Dietary NDMA studies attempt to correlate the amounts of NDMA that people ingest through food with cancer risk.  These studies have a variety of important limitations,

---

[106] McDowell (2021) at 1.

[107] *Id.* at 5; McTiernan Tr. at 542:3-15

[108] McDowell (2021) at 1.

[109] *Id*.

[110] Habel (2000) at 151.

[111] McTiernan Tr. at 578:11-580:7; Moorman Tr. at 166:23-167:17; Salmon Tr. at 347:1-19.

including their reliance on study participants' memories about their prior eating habits over a number of years rather than objective measures. These studies also assume that NDMA content in food items can be accurately quantified and does not vary depending on the brand of food, different geographic locations, or different preparation and cooking methods.

Importantly, almost all of the dietary NDMA studies Plaintiffs' experts identify that report any statistically significantly increased risks for NDMA and cancer are case-control studies:

- ***Bladder, pancreatic, and liver cancers:*** There is not a single cohort study reporting a statistically significant increased risk.[112]

- ***Stomach cancer:*** A meta-analysis of cohort studies reported no statistically significantly increased risk.[113]

- ***Esophageal cancer:*** One cohort study reported no statistically significant increased risk (Loh 2011),[114] and one cohort study (Keszei 2013)[115] reported mixed results (no statistically significant increased risk for esophageal adenocarcinoma, but a statistically significant increased risk of esophageal squamous cell carcinoma).

***Occupational Studies***. Plaintiffs' experts also rely on occupational NDMA studies—specifically the Hidajat (2019), Straif (2000), and Vlaanderen (2013) studies—to establish an association between ranitidine and the five cancers.[116] As with the NDMA dietary studies, no

---

[112] Jakszyn et al., *Red Meat, Dietary Nitrosamines, and Heme Iron and Risk of Bladder Cancer in the European Prospective Investigation into Cancer and Nutrition*, CANCER EPIDEMIOL BIOMARKERS PREV. 2011 Mar;20(3):555-9 (2011), Brown Decl. Ex. 56.

[113] Song et al., *Dietary Nitrates, Nitrites, and Nitrosamines Intake and the Risk of Gastric Cancer: A Meta-Analysis*, NUTRIENTS 2015, 7, 9872, 9885 (2015), Brown Decl. Ex. 71.

[114] Loh et al., *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study*, AM J CLIN NUTR 2011;93:1053, 1056-57, 1059 (2011), Brown Decl. Ex. 64.

[115] Keszei et al., *Dietary N-nitroso compounds, endogenous nitrosation, and the risk of esophageal and gastric cancer subtypes in the Netherlands Cohort Study*, AM J CLIN NUTR 2013;97:135, 135, 141 (2013), Brown Decl. Ex. 58.

[116] McTiernan Tr. at 578:11-580:7; McTiernan Rep. at 190, 212, 231, 244, 265; Moorman Tr. at 245:8-24.

independent scientist, outside of the litigation context, has looked to these studies of NDMA exposure through inhalation in the rubber-manufacturing industry to assess cancer risk with ranitidine.

## IV.    Overview of Plaintiffs' Experts' Unreliable Methodologies and Opinions

Plaintiffs proffer five experts who offer the opinion that ranitidine is causally associated with five types of cancer: gastric, esophageal, liver, bladder, and pancreatic.  Those experts are Drs. Patricia Moorman, Anne McTiernan, Andrew Salmon, Paul Michaels, and Jennifer Le. Plaintiffs initially alleged that ranitidine use is associated with 10 cancer types—and their principal epidemiology experts, Drs. McTiernan and Moorman, each testified that they examined the available literature as to all 10.[117]  Plaintiffs have since dropped all claims relating to half of those cancers:  breast, colorectal, kidney, lung, and prostate cancer.

Plaintiffs proffer one expert, Dr. Mira Hidajat, who submitted only a rebuttal report asserting that NDMA (but not ranitidine) is causally associated with cancer in humans.  At her deposition, however, Dr. Hidajat testified that she is no longer offering any causation opinions in this case.[118]

---

[117] *See* Moorman Rep. at 6 ("There is also supportive evidence that ranitidine causes other human cancers (e.g., lung, colorectal, prostate and breast); however, the evidence for those cancers, in my judgment, is not at this time sufficient for me to conclude that ranitidine is a cause."); McTiernan Rep. at 16 ("[A]pplying a Bradford Hill analysis, the evidence was not sufficient to support an opinion that the use of ranitidine can cause breast, prostate, kidney, lung or colorectal cancer.").  Dr. Moorman did not make a specific statement regarding kidney cancer, and omitted it from her affirmative opinion, despite acknowledging that she was tasked with opining on kidney cancer.  *See* Moorman Rep. at 5.

[118] Hidajat Tr. at 53:2-55:9, Brown Decl. Ex. 29.

### A.      Anne McTiernan, MD, PhD

Dr. McTiernan is an epidemiologist who is employed part time at the Fred Hutchinson Cancer Research Center.[119]   Although she holds a medical degree, she has not practiced as a physician since 1997.[120]   Dr. McTiernan has never published any paper about acid suppressant medications, NDMA, or nitrosamines.[121]   Before she became a paid expert in litigation, Dr. McTiernan did not hold the opinion that NDMA, much less ranitidine, causes cancer of any type.[122]

### i.      Dr. McTiernan Relies Principally on Studies of Dietary and Occupational Exposures, Rather than Studies of Ranitidine

Dr. McTiernan acknowledges that epidemiological data are required to reach causation conclusions with respect to ranitidine and cancer risk.[123]   She reached her causation opinions after reviewing four buckets of epidemiological literature looking at cancer outcomes: (1) the ranitidine studies; (2) the dietary NDMA studies; (3) the occupational NDMA studies; and (4) dietary and occupational studies of nitrate and nitrite exposure.   Based on those four sources of data, Dr. McTiernan proffers the opinion that ranitidine use can cause the five cancers at issue here.

In conducting her causation analysis, however, Dr. McTiernan did not consider whether there was a valid association, much less a causal association, between ranitidine and cancer based specifically on ranitidine data.[124]   Instead, Dr. McTiernan testified that, because she found the

---

[119] McTiernan Tr. at 42:7-11.

[120] *Id.* at 716:9-717:2.

[121] *Id.* at 94:12-95:9.

[122] *Id.* at 95:10-23.

[123] *Id.* at 102:4-103:3.

[124] *Id.* at 578:11-580:7 ("Q. Okay. Would it be possible for you to assess the ranitidine epidemiological data in totality and determine whether it demonstrates an association between ranitidine and increased risk of any cancer, is that possible? A.  I don't know. I haven't done that. I looked at everything together.").

ranitidine data largely "uninformative," her analysis mixed in other non-ranitidine datasets—including dietary, occupational, and nitrate/nitrite studies—to determine whether there is an association between ranitidine and cancer.[125]  Her testimony confirms that absent her reliance on those non-ranitidine dietary, occupational, and nitrate/nitrite studies, Dr. McTiernan has no basis to opine that there is even an association, much less causation, between ranitidine and any cancer.

### ii.  Dr. McTiernan Dismisses the Active Comparator Studies of Ranitidine and Cancer as Uninformative

Dr. McTiernan claims that cancer studies comparing ranitidine to other H2RAs or PPIs (i.e., the active comparator studies) are largely uninformative on two grounds.

*First*, she asserts that other H2RAs and PPIs may *also* increase the risk of cancer, and thus an active comparator design could mask any true association between ranitidine use and cancer.[126] When pressed, however, Dr. McTiernan acknowledged that she had not performed any kind of systematic review or analysis of PPIs and cancer risk and therefore could not say whether any PPIs are in fact associated with any kind of cancer.[127]  She also testified that she does *not* believe that any H2RA other than ranitidine in fact increases cancer risk.[128]

*Second*, Dr. McTiernan suggests that ranitidine users have important baseline differences from users of other H2RAs and PPIs, making users of those drugs an improper comparator group.[129]  Once again, however, she later conceded that she had not done any investigation to support that assertion.  She admitted that she could not name a single study showing that ranitidine

---

[125] McTiernan Rep. at 37; McTiernan Tr. at 570:18-22.

[126] McTiernan Rep. at 126.

[127] McTiernan Tr. at 172:14-173:12.

[128] *Id.* at 175:4-7.

[129] *Id.* at 686:16-20.

users are more similar to non-users than users of other H2RAs; she could not name any indications for ranitidine that differ from indications for other H2RAs or PPIs; and, because she is not a practicing clinician, she has no knowledge of whether patients who are prescribed acid suppressants in the U.S. are more likely than the general population to smoke, be obese, use alcohol, or have other preexisting risk factors for the cancers at issue in this litigation.[130]

### iii. Dr. McTiernan Does Not Provide a Reliable Basis for Extrapolating Data from Dietary and Occupational Studies to Ranitidine Cancer Risk

Rather than base her causation opinions on the ranitidine studies, which address the precise causation question presented in this case, Dr. McTiernan places significant weight on a variety of non-ranitidine dietary and occupational studies of NDMA and nitrates/nitrites.  Yet she provides no scientifically sound basis for extrapolating conclusions about ranitidine and cancer risk from a body of literature that examines different sources and routes of exposure.

Importantly, Dr. McTiernan acknowledges the important limitations inherent in any dietary study that requires participants to reconstruct a lifetime of eating habits:  "There are many sources of error in dietary measurement. … Therefore, estimating the 'dose' of NDMA, nitrate, or nitrite ingested through diet may not be precise."[131]  One of the chief problems with dietary studies is referred to as "recall bias."  Recall bias is particularly pronounced in studies of diet and cancer risk because past dietary recall is difficult and cancer patients tend to recall more unhealthy eating habits than healthy controls.  For this reason, the World Cancer Research Fund (WCRF)—an independent worldwide organization that synthesizes data on nutrition and cancer risk, for which Dr. McTiernan served as a member of its advisory panel of experts[132]—has indicated that, because

---

[130] *Id.* at 717:3-719:19; 135:10-137:12; 156:12-160:9.

[131] McTiernan Rep. at 53.

[132] McTiernan Rep. at 10.

dietary "case-control studies are *particularly prone to recall (and other) bias*, they were not routinely reviewed" by WCRF.[133]

Consistent with WCRF's position, in another recent litigation in which she served as an expert witness, Dr. McTiernan described her work as a panel member for WCRF and testified that dietary case-control studies are ***not*** a reliable source of information regarding cancer risk: "If you want to know what somebody's previous diet effect of cancer risk is, *it is very difficult to do that in a case-control study*. The person has already changed. Diet, you can't ask somebody what they have eaten in the past."[134]  Dr. McTiernan's reliance on dietary NDMA studies to support her causation opinions in this case cannot be reconciled with the position she took just four years ago, where she emphasized the notorious unreliability of these very kinds of studies.

### iv.   Dr. McTiernan Believes That Any Risk Estimate Other than 1.0 Reflects an Association

Dr. McTiernan interprets all epidemiological study results based on the principle that every relative risk other than 1.0 indicates an association, irrespective of its magnitude or statistical significance.[135]  This interpretation is contrary to generally accepted epidemiological principles, and to the position of Plaintiffs' other lead epidemiology expert, Dr. Moorman, who states: "If

---

[133] World Cancer Research Fund / American Institute for Cancer Research, Continuous Update Project Expert Report: Judging the Evidence (2018), at 21, *available at* https://www.wcrf.org/wp-content/uploads/2021/02/judging-the-evidence.pdf (accessed June 11, 2022) (emphasis added), Brown Decl. Ex. 79.  WCRF includes case-control studies in its review only when there are "no or very few RCTs or cohort studies."  *Id.*

[134] *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, Daubert Hearing Testimony, July 25, 2019, at 737:21-738:9, Brown Decl. Ex. 34.

[135] McTiernan Rep. at 108.

there is *no association* between an exposure and outcome, one would expect to see the relative risk estimates clustered around one, *with some estimates greater than one and some less than one.*"[136]

### v. Dr. McTiernan Gives Greater Weight to Studies Showing a Relative Risk Above 1.0 than to Studies Showing a Relative Risk Below 1.0

Dr. McTiernan's report does not explain her methodology for weighing any of the epidemiological studies that she reviewed.[137]   But in describing her review of the individual studies, Dr. McTiernan repeatedly stated that she "gave less weight to the relative risks that were not greater than 1.0, and put more weight on relative risks that were greater than 1.0."[138]   In other words, by her own account, Dr. McTiernan assigned greater weight to results potentially indicating a positive association (i.e., results that arguably favored her causation conclusions) than to studies indicating a negative association (i.e., results that arguably cut against a causal relationship).   Dr. McTiernan claimed that her decision to give greater weight to favorable study results was appropriate because of a purportedly universal "bias towards the null" from misclassification of ranitidine exposure—i.e., that positive associations between ranitidine and cancer were obscured because the studies *underestimated* the true extent of patients' ranitidine use.[139]   She conceded, however, that she could not confirm whether "even a single person was definitively misclassified in any study of ranitidine and cancer."[140]

---

[136] Moorman Rep. at 109 (emphasis added).

[137] McTiernan Tr. at 193:3-6.

[138] *See e.g.*, McTiernan Rep. at 145; *see also id.* at 134, 149.

[139] *Id.* at 145, 149.

[140] McTiernan Tr. at 420:7-25.

### vi.   Dr. McTiernan Applied an Inconsistent Methodology to Her Analysis Of the Epidemiological Data

Dr. McTiernan's analysis of the epidemiological data relies on inconsistencies engineered to favor her causation opinions. For example, in her report, Dr. McTiernan repeatedly cautions about the risk of bias and confounding inherent in certain crude (unadjusted) risk estimates.[141]  Yet when she discussed Adami (2021), she relied on fully *unadjusted* risk estimates more conducive to her opinions, despite the fact that adjusted risk estimates are available in that study.[142]

Similarly, Dr. McTiernan dismissed numerous findings of "no association" in ranitidine studies because, by her account, "[m]ost of the analyses were performed for all cancers combined," rather than using the "accepted method" of "look[ing] at associations with *specific cancer type*."[143] But she relied on the "all cancers combined" finding from another study to support the proposition that "daily intake of just 47 nanograms of NDMA from foods is enough to elevate" the risk for "*all cancer[s] combined*."[144]  Dr. McTiernan's inconsistent treatment of the Loh (2011) study is particularly telling, considering that Loh (2011) reported a statistically significant association *only* for rectal cancer—with respect to which Dr. McTiernan declined to offer a causation opinion.[145]

Even more strikingly, Dr. McTiernan could not interpret the findings from the Habel study consistently with her own stated methodology regarding combined cancer outcomes.  In her report, she concluded that results from Habel that grouped different cancer types together was

---

[141] McTiernan Rep. at 139, 142, 185.

[142] McTiernan Tr. at 730:7–731:22.

[143] McTiernan Rep. at 141 (emphasis added); *see also* McTiernan Tr. at 116:13-20 (similar).

[144] McTiernan Rep. at 15 (emphasis added).

[145] Loh (2011) at 1060 ("In conclusion, our results suggested that there was a positive association between NDMA intake and gastrointestinal cancer risk, specifically of rectal cancer.").

uninformative and did not weigh in her causal assessment.[146]  Yet at her deposition, she was unable (or unwilling) to offer any insight into whether (i) she was relying on those lumped data from Habel, or (ii) it was scientifically reliable to extrapolate from or otherwise reach any conclusions about those data.[147]

Likewise, Dr. McTiernan dismissed the findings from several ranitidine studies as uninformative because those studies examined users of ranitidine and other H2RAs together, rather than conducting a *ranitidine-user-specific* analysis.[148]  With respect to the Iwagami study, Dr. McTiernan described this approach of grouping users as "highly problematic" because "the two drugs grouped together will not show the specific effects of ranitidine use on cancer risk."[149]  When it came to her reliance on dietary and occupational studies of nitrosamines, nitrates/nitrites, and processed meats, however, Dr. McTiernan had no such qualms about relying on "lumped" data—notwithstanding the fact that (i) there are at least *300* different nitrosamines;[150] (ii) not all nitrates and nitrates form nitrosamines after consumption;[151] and (iii) data on processed meats captures exposures to numerous nitrosamines, in addition to numerous other carcinogenic compounds.[152]

In short, Dr. McTiernan extrapolates from lumped exposure data when it suits her and rejects such extrapolation when it does not advance her bottom line.

---

[146] McTiernan Rep. at 187-88, 211.

[147] McTiernan Tr. at 360:11-362:11; 362:18-363:22.

[148] McTiernan Rep. at 140 (discussing Iwagami (2021)); *id.* at 186–87 (discussing Michaud (2004)).

[149] *Id.* at 140.

[150] *See* Le Rep. at 9.

[151] McTiernan Rep. at 54 ("Not all nitrite or nitrate convert to nitrosamines, and of the conversions, not all of the resulting nitrosamines are NDMA.").

[152] McTiernan Tr. at 505:3-15; 509:15-511:23.

### B.      Patricia Moorman, MSPH, PhD

Dr. Moorman is a retired professor of epidemiology.[153]  She is not a medical doctor, and has never conducted research relating to ranitidine, H2RAs, or the medical conditions these medications treat.[154]  Dr. Moorman has not published any research related to four of the five cancers at issue.[155]

### i.      Dr. Moorman Gives Greater Weight to Dietary and Occupational Studies Than to Ranitidine Studies

Dr. Moorman reviewed "epidemiologic studies that addressed ranitidine or NDMA exposure and the risk of human cancers[.]"[156]  But like Dr. McTiernan, Dr. Moorman did not analyze whether there was an association between ranitidine and cancer based specifically on the ranitidine data.[157]

Dr. Moorman categorized the studies she reviewed into three buckets—"strong," "moderate," or "lesser"—based on a subjective assessment.[158] Of the ranitidine studies, she rated only four studies as "strong," all of which come from the same data source, a health claims

---

[153] Moorman Rep. at 1.

[154] Moorman Tr. at 26:19-20; 28:16-29:19.

[155] *See* Moorman Tr. at 29:25-30:10 (testifying that she has only been a coauthor on one pancreatic cancer study).

[156] Moorman Rep. at 5.

[157] Moorman Tr. at 167:23-167:17, 245:8-247:3.  Dr. Moorman makes one exception for bladder cancer, seemingly for no other reason that she found it more support of her results-driven analysis than the data for the remaining four cancers at issue.  *See* Moorman Rep. at 98-99 ("The findings of increased risk for bladder cancer among ranitidine users . . . provide strong evidence that ranitidine exposure can cause bladder cancer.").

[158] *See* Moorman Rep. at 63, 68, 71, 72, 74, 75, 77, 78, 79, 80, 81, 83, 85, 100, 101, 102, 127, 128, 154, 180, 181, 183 (using "little," "very little," and "lesser" interchangeably); Moorman Tr. at 247:4-19.

database from Scotland.[159] Dr. Moorman uniformly assigns to the remaining ranitidine studies "little" or "very little" weight.[160]

| WEIGHT | STUDIES[161] | | |
|---|---|---|---|
| | Ranitidine | NDMA: Dietary | NDMA: Occupational |
| "Strong" | 4 (all from a single data source – Scottish health claims database) | 0 | 0 |
| "Moderate" | 0 | 4 | 1 |
| "Little" | 13 (all non-Scottish Data – UK, US, South Korea, Japan, Denmark) | 36 | 1 |

Dr. Moorman inexplicably categorized the Scottish ranitidine analyses as "strong," but assigned "little" weight to analysis of a different UK database performed by the same research group.[162]  This contradicts the views of the authors themselves, who viewed the use of "two independent UK datasets" as a strength.[163]

---

[159] Moorman Rep. at 63, 65, 198; Moorman Tr. at 263:14-23, 264:5-12.

[160] Moorman Rep. at 68, 72, 74, 75, 77, 78, 81, 83, 85, 94.

[161] *See id.* at 62-230.

[162] Moorman Rep. at 65, 68 (Tran), 198, 68-69 (Liu).

[163] *See* Tran (2018) at 59; Liu (2020) at 34.  Tran (2018) and Liu (2020) also noted that the UK Biobank data has "detailed information on lifestyle risk factors including smoking and alcohol," while their summary tables showed 10-fold more missing smoking information in the Scottish data set as compared to the UK Biobank.  Liu (2020) at 310 (Table 1); Tran (2018) at 60, 58 (Table 1).

      ii.     **Dr. Moorman's Methodology Failed Meaningfully to Address Confounding and Bias**

Dr. Moorman relies on her own non-replicable "qualitative judgment"—rather than well-established methods and standards she applies outside the courtroom—in categorizing, reviewing, and analyzing the available epidemiological evidence at issue in this case.[164]

***Confounding***.  Dr. Moorman defines confounding as a form of bias whereby a confounder "is a factor that is associated with both the exposure and the outcome."[165]  Dr. Moorman considers confounding "an important issue for any study,"[166] and agrees that several are specifically relevant to observational studies.  Dr. Moorman agrees confounding and bias are more likely "if the exposed group had a higher prevalence of some of the risk factors than the unexposed group . . . failure to control for [that risk factor] could result in an overestimate of the relative risk."[167]  Dr. Moorman acknowledges that active comparator designs are a "typical approach" to address

---

[164] Moorman Tr. at 156:7-12 ("Q: What type of methodology did you use to weight the studies in this case?  A. In this case, it was a qualitative judgment, which took into consideration several different aspects of it."); *id.* at 248:20-249:2 ("Q. I'm just trying to understand whether you used a specific scale that's recognized in the scientific community to weight these studies. A. I did not apply either the New Castle or AHRQ scale. It is *my* qualitative rating of the studies.") (emphasis added); *id.* at 508:12-17, 509:7-12.

[165] Moorman Tr. at 64:7-65:17 ("[I]f I were interested in whether drinking alcohol increased the risk of cancer, I might consider smoking as a possible confounder, because people who drink alcohol might also smoke more. And then if smoking is a risk factor for that cancer, then one might be concerned that it's not the alcohol that is totally responsible for the increased risk but also the smoking.").

[166] *Id.* at 299:6-8.

[167] *Id.* at 81:5-19.

confounding by indication,[168] and for ranitidine studies in particular "are an appropriate design for gastric and esophageal cancer (and maybe liver cancer)."[169]

Nevertheless, Dr. Moorman largely dismisses active comparator studies for purposes of her analysis. Her rationale is the possibility that other H2RAs might increase cancer risk. Dr. Moorman theorizes that "if the active comparators (PPIs and other H2RAs) also increase the risk for certain types of cancer, a carcinogenic effect of ranitidine is likely to be missed."[170] But Dr. Moorman admitted that she had not done "a full causal analysis of other H2RAs and these cancers."[171] And when asked whether her opinion that other H2RAs increase the risk of cancer is "well established and generally accepted in the scientific community," she could not say.[172] She also did not know whether the FDA-approved labels for any of these other H2RAs say anything about cancer risk or whether any medical guidelines speak to this hypothetical risk.[173]

***Statistical Significance***. Dr. Moorman describes statistical significance as one of the "tool[s] for interpreting how likely the observed outcomes could be due to chance[.]"[174] And "in the epidemiologic community," Dr. Moorman acknowledges that it is typical and "conventional"

---

[168] Moorman Rebuttal Rep. at 4, Brown Decl. Ex. 16; Moorman Rep. at 25-26.

[169] Moorman Rep. at 25-26. Dr. Moorman claims that "for the other cancers [bladder and pancreatic] confounding by indication is not an important concern because the indications for use of acid-suppressant drugs are not risk factors for these cancers." *Id.* However, when asked if smoking is associated with an increased prevalence or aggravation of GERD, she responded that she "certainly h[as] heard individuals state that smoking and GERD are related." Moorman Tr. at 207:6-14. Because smoking is also a known cause of each of the human cancers at issue, smoking is a confounder that must be addressed. *See id.* at 206:24-209:2; Moorman Rep. at 26.

[170] Moorman Rep. at 27.

[171] Moorman Tr. at 179:8-10.

[172] *Id.* at 180:7-14, 182:6-22.

[173] *Id.* at 180:24-181:9, 185:3-11.

[174] Moorman Rep. at 14.

to use "95 percent confidence intervals" and "0.05 as the cut point for what is considered statistically significant."[175]

Outside of litigation, Dr. Moorman regularly relies on statistical significance thresholds as a basis to determine whether an exposure is "associated" or not with a particular outcome.[176] Even in this litigation, Dr. Moorman's expert report repeatedly relies on statistically significant examples from the literature to support her view that general causation can be established with relative risks of 1.5 or less. Indeed, in her five examples of other "widely accepted" causal associations, Dr. Moorman only selected statistically significant point estimates with precise 95-percent confidence intervals.[177]

For each of the five cancers here, however, Dr. Moorman found associations in the *absence* of statistically significant results.[178] While she concludes for purposes of this litigation that ranitidine causes each of the five cancers by using NDMA dietary and occupational studies, she could not provide any risk estimate for ranitidine use and any cancer.[179]

---

[175] Moorman Rep. at 14; Moorman Tr. at 214:7-20.

[176] Moorman Tr. at 217:21-218:10 (affirming a paper she coauthored found no association for a non-significant odds ratio of 1.60, CI 0.79 to 3.24); *id.* at 227:24-228:12 (characterizing relative risks of 1.18, 1.04, 1.02, 2.32, 1.58, and 1.22 that were not statistically significant as "null and imprecise"); *id.* at 229:23-230:15 (characterizing relative risks of 1.19 and 1.16 "no association").

[177] Moorman Rep. at 56 ("Oral contraceptive use and breast cancer [RR] 1.08 (1.03-1.165)"; "Menopausal estrogen use and breast cancer, [RR] 1.20 (95% CI 1.06-1.37)"; "Passive smoking [] and lung cancer, [RR] 1.27 (95% CI 1.17-1.37)"; "Residential radon exposure and lung cancer, [RR] 1.29 (95% CI 1.10-1.51)"; "Red meat or processed meat and colon cancer, [RR] 1.25 (95% CI 1.10-1.43) . . . [RR] 1.17 (95% CI 1.02-1.33)").

[178] Moorman Rep. at 127-28 (pancreatic cancer results); *id.* at 142, 160 (liver cancer results); *id.* at 181, 186 (esophageal cancer results).

[179] Moorman Tr. at 169:4-13.

*Extrapolation from Non-Ranitidine Data*.  Dr. Moorman principally relies on dietary and occupational studies that do not look at ranitidine, but rather at NDMA exposure through food and workplace environments.  Dr. Moorman asserts that dietary NDMA studies are "relevant and important" in determining whether ranitidine is associated with cancer based on a single observation by the FDA that the amount of NDMA in tested lots of ranitidine was comparable to the levels in grilled or smoked meats.[180]  But she could not identify any literature or peer-reviewed method establishing that dietary and occupational studies reliably can be extrapolated to ranitidine.[181]  In justifying her reliance on dietary studies, Dr. Moorman assumes "levels of NDMA detected in ranitidine" are consistent and comparable to the levels detected in the dietary studies,[182] which measured NDMA exposures that occur on a daily basis.[183]  Notably, however, two of the four dietary studies she weights "moderately" in her causation analysis do not report NDMA exposure levels *at all*,[184] and Dr. Moorman made no attempt to compare NDMA exposure levels in those studies to the FDA test results for ranitidine.[185]

---

[180] *Id.* at 506:2-13.

[181] *See id.*

[182] Moorman Rep. at 153.

[183] *Id.* at 153.

[184] *Vingeliene et al., An Update of the WCRF/AICR Systematic Literature Review and Meta-Analysis on Dietary and Anthropometric Factors] and Esophageal Cancer Risk.* Ann. Oncol. 2017;28:2409, 2415 (2017), Brown Decl. Ex. 78 (reporting data on *processed meat* intake rather than NDMA specifically); Moorman Rep. at 100 ("An additional limitation [of Ronco, et al.] is that the investigators did not report the levels of NDMA intake . . .").

[185] Moorman Rep. at 36; Moorman Tr. at 328:3-6; *id.* at 329:3-5.  Of the 19 Sanofi ranitidine samples tested by the FDA, Dr. Moorman knows neither the individual results nor the distribution of the results above or below the FDA limits.  *See* Moorman Tr. at 329:3-14.  More than 80% of the Sanofi products tested were under the FDA's acceptable daily intake of 96 nanograms.  *See* SANOFI_ZAN_MDL_0000227689, Brown Decl. Ex. 117.

Dr. Moorman also gave "considerable weight" to non-ranitidine occupational studies, assuming that evidence would be "presented at trial" showing "that the estimated intake of NDMA from occupational exposure . . . is in the same range as the exposure levels of ranitidine."[186]  As of the date of her deposition, however, she had "not seen those data."[187]  Dr. Moorman made no attempt to determine how inhaled levels of NDMA correlate to ranitidine.[188]

*Ascertainment of Exposure*. Dr. Moorman believes that exposure misclassification—the possibility that exposure to the substance of interest is not measured accurately—is present in every observational study, and that it is important to consider the effect that exposure misclassification has on the reported results.[189]  Yet Dr. Moorman made no effort to quantify its effect on any of the ranitidine study results.  Instead, she states that the "precise amount of misclassification is unknown"[190] and that she did not perform any exposure misclassification calculations herself, even though she admitted she could have.[191]

*Follow-Up Time.*  Dr. Moorman believes that studies should have "adequate follow-up time to assess the risk of cancer considering the long latency period between exposure and development of clinical disease."[192]  When asked what threshold she chose to "judge whether the follow-up time in a ranitidine observational study was adequate," she stated that "there is no cut point for what follow up time is long enough."[193]

---

[186] Moorman Rep. at 105, 228.

[187] Moorman Tr. at 407:14-408:6.

[188] *Id.* at 390:9-391:11.

[189] Moorman Rep. at 18.

[190] Moorman Tr. at 120:11-122:5, 379:17-380:15.

[191] *Id.* at 359:16-362:17; *id.* at 350:14-352:17; *id.* at 435:15-436:16.

[192] Moorman Rep. at 85.

[193] Moorman Tr. at 102:9-24.

***Sample Size***.  Dr. Moorman placed greater weight on studies with larger sample sizes, but when asked "what is an appropriate sample size to evaluate the relationship between ranitidine use and any of the five cancers," she could not provide an estimation and described it as a "continuum" subject to "many considerations."[194]  When asked about sample size in the "ranitidine studies that [she] reviewed in this case," all she could say is that there is "a continuum[.]"[195]

**C.    Andrew Salmon, MA, DPhil, CChem**

      **i.    Dr. Salmon Is Not Qualified to Offer Opinions Regarding Epidemiology**

Dr. Salmon is a toxicologist.  None of his faculty appointments have been in the field of epidemiology, and he does not belong to any professional organizations focused on epidemiology.[196]  Dr. Salmon has never conducted or designed a cancer epidemiology study, nor do any of the publications on his resume involve epidemiology studies.[197]  Dr. Salmon spent most of his career as a toxicologist for Office of Environmental Health Hazard Assessment within the California Environmental Protection Agency, where he performed public health risk assessments of environmental exposures.[198]

      **ii.    Dr. Salmon Did Not Perform a Reliable Evaluation of the Ranitidine Epidemiology**

Dr. Salmon purports to have reached his opinions after a review of the available ranitidine epidemiology, but he offers no consistent methodology for interpreting those studies.   At deposition, Dr. Salmon conceded that he previously has written, outside of litigation, that whether

---

[194] *See, e.g., id.* at 103:14-104:5.

[195] Moorman Tr. at 104:8-16.

[196] *See* Salmon Report (Updated 3/28) ("Salmon Rep."), Ex. 2 (CV) at 1-2, Brown Decl. Ex. 22.

[197] Salmon Tr. at 37:12-21, Brown Decl. Ex. 43; *see generally* Salmon Rep., Att. A (List of Publications).

[198] Salmon Rep. at 14.

there is sufficient epidemiological evidence of a causal relationship with cancer depends on "statistically significant results and properly designed studies, and appropriate control of confounding carcinogenic influences."[199]  But his report takes the opposite view.[200]

Dr. Salmon acknowledges that "a considerable proportion" of the findings in the ranitidine studies "are not statistically significant as individual observations," yet he does not explain how or to what degree he relies on those studies in forming his opinion.[201]  Moreover, in his analysis of ranitidine epidemiology, Dr. Salmon inappropriately dismisses active comparator analyses. Contrary to the instructions of both FDA and EMA, he routinely describes the use of active comparators as a study "limitation"[202] and contends that "use vs. non-use of ranitidine . . . is the question of importance in [his] analysis."[203]  But Dr. Salmon offers no reliable justification for this approach.  He contends that active comparator analyses "will tend to underestimate the risk of ranitidine,"[204] but provides no explanation or evidence to support this contention.[205]

---

[199] Salmon Tr. at 80:1-14.

[200] Salmon Rep. at 11 ("the value of P and statistical significance is not a threshold that must be reached.").

[201] *Id.* at 161; *see also id.* at 138 (describing Adami (2021)); *id.* at 151 (describing Kim S. (2020) gastric cancer results)); *id.* at 153 (describing Kumar gastric cancer results); *id.* at 159 (describing Tran liver cancer results); *id.* at 159-60 (describing Yoon results for "any site").

[202] *See, e.g.*, *id.* at 138, 187, 196, 200 ("There are important limitations to all these studies, as discussed above in my report, in particular where the studies compare ranitidine to other acid suppressing medications, which will tend to understate or miss the risk of ranitidine.").

[203] *Id.* at 138.

[204] *Id.* at 187.

[205] *See id.* at 187, 196, 200.

Dr. Salmon also improperly cherry-picks the point estimates of the active comparator analyses.[206]   For example, in his Bradford Hill analysis of pancreatic cancer, Dr. Salmon states that the Adami study reported a "significant association between ranitidine use and pancreatic cancer."[207]  Dr. Salmon appears to be referencing the results derived from the crude, unadjusted results in Adami rather than the adjusted, corrected results from the same authors.[208]

### iii.   Dr. Salmon Improperly Relies on Dietary and Occupational Studies for His Causation Opinion

Given the absence of ranitidine epidemiology supporting his opinions, Dr. Salmon relies heavily on NDMA data from dietary and occupational studies.[209]  Tellingly, Dr. Salmon does not cite a single regulatory body, peer-reviewed study, or medical or scientific agency that relies on data from non-ranitidine studies to support a finding that ranitidine causes cancer.  As with the rest of Plaintiffs' epidemiology experts, Dr. Salmon's methodology of relying on non-ranitidine studies is entirely out of step with the broader scientific, regulatory, and medical communities.

### iv.   Dr. Salmon's Dose-Response Opinion is Based on an Unreliable, Results-Oriented Methodology

To support his causal analysis of ranitidine use and cancer outcomes, Dr. Salmon purports to conduct a dose-response analysis based on data from non-ranitidine dietary and occupational

---

[206] *See, e.g.*, *id.* at 179 (reporting statistically significant results from Adami (2021)'s crude estimates on esophageal cancer but ignoring the *adjusted*, lower nonsignificant results), 138 (reporting crude hazard ratios for Adami), 178 (reporting results for Cardwell's use v. non-use analysis of 1.45 95% CI (1.09-1.93) but omitting results for Cardwell's active comparator analysis of 1.05 95% CI (0.86-1.28)); *compare* Adami (2021) at 2305 (Fig. 1), Cardwell (2021) at 5.

[207] Salmon Rep. at 196.

[208] *See, e.g.,* Moorman Rep. at 122 (reporting HRs of 0.97 and 0.99 for pancreatic cancer in Adami and HRs of 0.81 and 0.66 when adjusted for more than 10 prescriptions).

[209] *See, e.g.,* Salmon Rep. at 4, 133 (studies "in both dietary and occupational contexts . . .  weigh heavily in confirming numerous Bradford Hill factors."); Salmon Tr. at 347:1-19.

studies.[210]  Dr. Salmon's purported "dose-response analysis" of NDMA epidemiology studies is unreliable on its face and does not extrapolate to ranitidine users.  Dr. Salmon claims to rely on an EPA method for assessing real-world risk of various levels of NDMA, but the EPA itself warned that its methodology was for precautionary regulatory use and "does not necessarily give a realistic prediction of the risk.  The true value of the risk is unknown, and may be as low as zero."[211]  Dr. Salmon uses this method in precisely that erroneous manner, contrary to EPA's direction.[212]

Moreover, Dr. Salmon did not even follow the EPA method on which he purports to rely. Instead, he conducted separate dose-response analyses on select NDMA studies that evaluated different populations, then averaged the results of those varied studies[213]—a method he concedes is not used by EPA or any regulatory agency.[214]  He then went one step further by extrapolating the average results directly to ranitidine users in the U.S.,[215] despite his concession that such results only apply to similar populations.[216]

Strikingly, Dr. Salmon preordained the outcome of his dose-response curve by *omitting* all studies that showed no dose response.  Specifically, Dr. Salmon used as inputs to his equation only

---

[210] *See id.* at 5 ("Dose-response has been demonstrated … based on the NDMA testing results of the FDA, Defendants and Emery Pharma, and comparable to NDMA exposure in dietary studies, the Hidajat study and Cardwell to lead to an increased risk of bladder, esophageal, liver, pancreatic and stomach cancer."); *see also id.* at 134.

[211] EPA, Guidelines for Carcinogenic Risk Assessment (1986) at 13, Brown Decl. Ex. 84; *see also* Salmon Rep. at 23 (employing "[t]he multi-stage model…[that] predicts a linear dose-response…").

[212] *See, e.g.,* Salmon Rep. at 4-5, 23.

[213] *See* Salmon Rep. at 127-129; Salmon Tr. at 203:19-21 ("[I]n this case, I averaged the dietary studies.").

[214] Salmon Tr. at 208:25-209:19.

[215] *Id.* at 315:5-316:1.

[216] Salmon Rep. at 24.

those studies that found a statistically significant dose-response relationship.[217]  He systematically omitted the studies that looked for a dose-response but did not find one.  This would be like measuring the average test score of a class by excluding students who failed the test.

Dr. Salmon seeks to bolster this extrapolation by pointing to a single study, Cardwell (2021), but he wholly ignores that the active comparator dose-response analysis in that study found "little evidence of difference in bladder cancer risk."[218]  Moreover, he claims that Cardwell is the only dose-response study of ranitidine, disregarding the Norgaard, Adami, and Iwagami studies— all of which found no evidence of dose-response between ranitidine and cancer.[219]

### D.    Paul Michaels, MD

#### i.    Dr. Michaels Is Not Qualified to Offer Opinions Based On Epidemiology

Dr. Michaels is a pathologist who examines tissues under a microscope "for the presence of cancer development."[220]  He does not have any advanced degrees in epidemiology; he has not taught a course focused on epidemiology; none of his faculty appointments has been in the field

---

[217] Salmon Tr. at 185:10-19, 218:10-18 ("[I]f you're feeding in numbers which don't show a tangible dose response effect into an equation which is designed to analyze the dose response, then it shouldn't be surprising that you wouldn't get a sensible answer.").

[218] Salmon Rep. at 184 ("The one study of bladder cancer associated with ranitidine use which is susceptible to quantitative analysis of dose response, Cardwell et al. (2021), shows an overall dose related trend. . .").  *Compare* Cardwell (2021) at 6 ("there was little evidence of difference in bladder cancer risk when directly comparing ranitidine users with users of nonranitidine histamine-2 receptor agonists.").

[219] *See, e.g.*, Salmon Report at 180 (when discussing bladder cancer: "The **only** study that measured long term usage and robust [*sic*] was Cardwell.") (emphasis added).  *But see* Norgaard (2021) at 49 ("[W]e found no dose-response association [for bladder cancer] when restricting to persons who redeemed at least five and persons who redeemed at least 10 prescriptions."); Adami (2021) at 2 ("We observed no association after restriction to subjects with at least 5 or 10 prescriptions or those with 10 prescriptions and at least 10 years of follow-up."); Iwagami (2021) at 369 ("We found no dose-response relationship (i.e., larger adjusted hazard ratio in the higher cumulative dose group)" in active comparator study).

[220] Michaels Rep. at 2.

of epidemiology; and he does not belong to any professional organizations focused on epidemiology.[221]   He also never has designed an epidemiology study, nor do any of the publications on his resume involve epidemiology studies.[222]  He repeatedly deferred to Plaintiffs' other experts on questions about ranitidine epidemiology.[223]

### ii.    Dr. Michaels Did Not Perform a Reliable Evaluation of the Ranitidine Epidemiology

Dr. Michaels described his assignment as evaluating "the *biologic plausibility* that the oral consumption of ranitidine (Zantac) can be a cause of cancer development/growth within certain tissues in the human body," not as an assessment of the epidemiological data.[224]  He acknowledged that he had "not performed a fully comprehensive and exhaustive analysis of the epidemiologic data" in forming his opinions.[225]  Indeed, in a 65-page report, he devoted only a few sentences to the ranitidine studies.[226]  And he repeatedly conceded at his deposition that his report did not describe relevant ranitidine studies for the five types of cancer on which he opined.[227]

---

[221] *See* Michaels Tr. at 92:11-94:10.

[222] *See id.* at 94:11-18; Michaels CV at 3-4, Brown Decl. Ex. 37.

[223] *See* Michaels Tr. at 249: 4-9 ("… I did not do an exhaustive or report on an exhaustive epidemiologic literature search with regards to the ranitidine epidemiologic studies because my understanding was that other experts were going to be doing that."); *id.* at 251-52.

[224] Michaels Rep. at 2 (emphasis added); *see also* Michaels Tr. Ex. 7 (invoices) at 1-4, Brown Decl. Ex. 38 (describing report as pertaining to "biological plausibility," "pathology," and "general causation," not epidemiology).

[225] Michaels Rep. at 64.

[226] *Id.* at 44-45 (citing Tran and Kantor studies regarding liver cancer); *id.* at 49 (citing Habel study regarding stomach cancer); *id.* at 53 (citing Tan and Adami studies regarding esophageal cancer); *id.* at 56-57 (citing Habel, Adami, and McDowell studies regarding pancreatic cancer); *id.* at 60-61 (citing Michaud, Cardwell, Norgaard, Kantor, and Yoon studies regarding bladder cancer); *id.* at 64 (summarizing ranitidine epidemiology studies).

[227] *See* Michaels Tr. at 203:3-10, 225:7-227:5 (admitting report did not discuss Adami, Kim Y, or Yoon for liver cancer); *id.* at 228:2-21, 248:6-13 (report did not discuss Yoon, Iwagami, or Kim Y for gastric cancer); *id.* at 250:4-251:25 (report did not discuss Kim S, Kim Y, Kumar,

Of the studies Dr. Michaels did mention, he offered no reliable methodology for interpreting them.  Despite admitting that it is conventional in the scientific community to report confidence intervals and *p*-values to reflect statistical significance[228] and acknowledging that many of the ranitidine studies employing active comparator designs do not demonstrate a statistically significant difference, he did not explain how he accounted for those non-significant results in forming his opinion.[229]  Nor did he offer any scientifically reliable explanation for disregarding studies with active comparators in favor of studies comparing ranitidine users to non-users.[230]  He also repeatedly disagreed with the conclusions of the authors of studies on which he relied.[231]

Lastly, Dr. Michaels failed to reliably analyze study results that contradict his causation opinions.  Near the end of his report, he acknowledged that some published studies "have not shown a uniformly increased risk of cancer following elevated exposure to NDMA/nitrosamines or … ranitidine products."[232]  But he brushed aside those contrary studies in a single sentence, without analyzing their findings, design, or supposed limitations in any detail.[233]

---

Liu, or Yoon for esophageal cancer); *id.* at 271:5-272:3 (report did not discuss Kim Y for pancreatic cancer).

[228] *See id.* at 77:6-78:5, 208:12-209:5.

[229] *Id.* at 203:15-22, 213:6-215:9, 217:5-219:5, 243:13-244:14, 265:3-11, 279:18-280:5, 284:14-285:13 (admitting various studies did not report statistically significant results); *see also* Michaels Rep. at 44, 53, 56-57, 61.

[230] *See* Michaels Tr. at 206:04-207:6, 222:24-225:3.

[231] *See id.* at 220:18-22:21 (disagreeing with Kantor study authors' conclusion that active comparator results reflect residual confounding by indication or another jointly related factor); *id*. at 151:13-153:7 (disagreeing with Florian study authors' conclusion that there were no consistent causal associations that emerged between ranitidine and cancer across the ranitidine epidemiology studies); *see also* Michaels Rep. at 59-60 (disagreeing at length with findings of the Florian study).

[232] Michaels Rep. at 64 (citing Yoon (2021), Iwagami (2021), and Kim Y (2021) studies).

[233] *See id.*

### E.    Jennifer Le, PharmD

Dr. Le is a pharmacist and pharmacologist.  She does not have an advanced degree in epidemiology and has participated in designing only one cross-sectional epidemiological study over the course of her career.[234]

Dr. Le agrees that analyzing the ranitidine epidemiological data is required to reach causation opinions about ranitidine and particular cancers.[235]  She also conceded that, as to esophageal cancer and ranitidine, she could not have concluded that there was a valid association based solely on the ranitidine studies.[236]  Like Plaintiffs' other experts, however, she reaches her causation opinions only by relying on dietary and occupational studies of NDMA exposure.[237]

Dr. Le repeatedly disregards basic principles of epidemiology, fails to follow her stated methodological principles, cherry picks the available data, and applies internally inconsistent methods to support her preferred opinions. For example, Dr. Le agrees that the use of adjusted relative risks is "preferred" over the use of unadjusted data "to account for confounders."[238]  Yet she failed to adhere to that principle in her analysis of the ranitidine epidemiology—concluding that there is a statistical association between ranitidine and stomach, pancreatic, and liver cancers, Dr. Le relied on unadjusted data (i.e., data generated before statistical adjustment for known confounders).[239]  When asked why she relied on crude risk estimates for these three cancer types, Dr. Le testified that some of the studies "likely didn't have an adjustment that was integrated in

---

[234] Le Tr. at 130:2-17; *id.* at 162:18-163:8.

[235] *Id.* at 42:15-43:7; *see also id.* at 44:15-23.

[236] *Id.* at 244:13-245:18.

[237] *See, e.g.*, *id.* at 274:7-11, 291:22-294:11.

[238] Le Rep. at 93-94.

[239] Le Tr. at 167:9-168:2; 173:3-174:14.

their study"—but she could not point to a single study of ranitidine and cancer that presented only crude risk estimates.[240]

Dr. Le also applied inconsistent standards in evaluating the ranitidine data, depending on whether a particular study result supported her causation opinions.  In her report, she criticized ranitidine studies employing an active comparator design, claiming that they "lack" a "true control group" and "cannot truly assess magnitude of risk for cancer development.[241] Instead, she claimed, a non-user control group is required to assess cancer risk, yet for her opinion on esophageal cancer, Dr. Le purported to rely on the crude risk estimates from Adami, which were all based on active comparator analyses.[242]

Lastly, Dr. Le cherry-picked the data from within individual studies to highlight the results that favored her preferred outcome and downplay (or outright ignore) those that did not.  In her discussion of the Cardwell study, for example, Dr. Le presents only the statistically significant results comparing ranitidine users to nonusers,[243] but she failed to acknowledge that the study showed *no* statistical association when ranitidine was compared to other H2RAs.[244] Likewise, in her discussion of the Kantor study, Dr. Le presents only the statistically significant results comparing ranitidine to nonusers, and omits the non-significant results comparing ranitidine to omeprazole.[245] When asked why she omitted these data, Dr. Le testified that did not report *any*

---

[240] *Id.* at 186:13-192:7.

[241] Le Rep. at 9; 96; 99-101.

[242] Le Tr. at 100:12-17; 226:9-23; 227:12-20; 229:24-231:12; 238:25-241:11.

[243] Le Rep. at 97.

[244] Le Tr. at 197:17-199:25.

[245] Le Rep. at 99; Kantor (2021) at 1857.

active-controlled analyses in her report.[246]  In fact, she does include and rely on active-controlled analyses, but only *when they show a statistically significant increased risk*.[247]

Similarly, in her discussion of the Adami study, Dr. Le presents some "crude" and some "adjusted" analyses, depending on which results were statistically significant.[248]  For example, she presents *crude* statistically significant increased risks of esophageal cancer, stomach cancer of unknown/several regions, and pancreatic cancer for ranitidine vs. other H2RAs, when all of the adjusted figures were not statistically significant.[249]  At the same time, she reports the statistically significant *adjusted* esophageal adenocarcinoma risk estimate for ranitidine vs. PPIs, which was *not* significant in the crude analysis.[250]  Finally, she simply omits numerous analyses showing *no* statistical association and/or statistically significant *decreased* risk.[251]

### F.     Mira Hidajat, PhD

Dr. Hidajat submitted a rebuttal report to Defendants' expert reports, asserting a single opinion: "[I]t is my professional opinion within a reasonable degree of scientific certainty that NDMA can cause cancer."[252]  Her report did not express any causation opinions specific to

---

[246] Le Tr. at 199:2-25.  Similarly, for the Kantor study, Dr. Le reported the statistically significant results for liver cancer when ranitidine was compared to nonusers, but not the results showing no statistically significant association when ranitidine was compared to an active comparator.  Le Rep. at 99; Kantor (2021) at 1857.

[247] Le Rep. at 96-97, 101-102.

[248] *Id.* at 96-97.

[249] Adami (2021) at 2305 and Supplementary Figure 1.

[250] *Id.*

[251] *Id.* at 2305-2307; Le Tr. at 111:12-22, 113:12-114:16, 116:13-117:2, 437:25-438:20.

[252] Hidajat Rebuttal Rep. at 28, Brown Decl. Ex. 4.

ranitidine or to NDMA in ranitidine.  At her deposition, she clarified that she is no longer offering *any* causation opinion in this case—including as to NDMA and cancer generally.[253]

Dr. Hidajat's rebuttal report was primarily a response to criticisms by Defendants' experts of certain occupational studies of NDMA exposure.[254]  Dr. Hidajat was part of a long-term cohort-based study of workers in the rubber industry in the UK, and co-authored one of the occupational studies on which Plaintiffs' causation experts rely.[255]  Dr. Hidajat admits that this study did not involve ranitidine and was not designed to assess cancer risk associated with any NDMA-containing oral medication.[256]  Dr. Hidajat also admits that NDMA exposure in a rubber factory is not analogous to NDMA exposure via oral consumption of medications such as ranitidine.[257]  Instead, occupational NDMA exposures in rubber factories primarily consist of inhalation and, to a lesser extent, skin absorption.[258]  Dr. Hidajat does not and cannot make any leap or connection between inhalation or absorption of NDMA and oral ingestion of NDMA.[259]

---

[253] *See* Hidajat Tr. at 53:2-54:25.

[254] *See id.* at 54:14-16 ("Yes.  So as I said before, the opinion that I'm offering is to address the criticisms of the defense experts on my study.").

[255] Hidajat et al., *Lifetime exposure to rubber dusts, fumes and N-nitrosamines and cancer mortality in a cohort of British rubber workers with 49 years follow-up*, Occup Environ Med 2019;76:250-258 (2019), Brown Decl. Ex. 54.

[256] *Id.* at 54:14-55:20, 144:23-145:19.

[257] *Id.* at 144:23-145:19.

[258] IARC Monograph - Chemical Agents and Related Occupations, Vol. 100 at p. 543-45 (Rubber Manufacturing Industry), Brown Decl. Ex. 97.

[259] Hidajat Tr. 144:6-22 ("But in terms of the portability of the results of my study into the population of ranitidine patients, I think that's something that I don't have the expertise to kind of conduct any, you know, calculations or anything like that that would need to be made. I know that inhalation and ingestion are a bit different.").

## <u>ARGUMENT</u>

### I.     **Legal Framework**

Trial courts are required to ensure expert testimony is both reliable and relevant.  *Daubert*, 509 U.S. at 597; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).  Expert testimony is admissible under three conditions: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  It is the trial court's role in applying these standards to ensure that "speculative [or] unreliable expert testimony does not reach the jury."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

The importance of this function "cannot be overstated"—expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it."  *Frazier*, 387 F.3d at 1260(quoting *Daubert*, 509 U.S. at 595).  For this reason, the court's gatekeeping role requires "exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702," *id.* (quoting *McCorvey*, 298 F.3d at 1257), and forms the "centerpiece of any determination of [expert] admissibility," *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) ("The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it.").

Trial courts should not "simply rubber stamp the opinions of expert witnesses once they are determined to be an expert."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999).  Although courts may be reluctant to "don[] white coats and mak[e] determinations that are outside their field of expertise, the Supreme Court has obviously deemed this less objectionable than dumping a barrage of questionable scientific evidence on a jury, who would likely be even less equipped than the

66

judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique." *Allison*, 184 F.3d at 1310.[260]

Importantly, cross-examination of an expert at trial is not a substitute for reliability, but rather a way to probe evidence that has been carefully scrutinized by the trial court and found to meet the "exacting standards of reliability" set forth in Rule of Evidence 702. *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000); *see also Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination" is an "appropriate safeguard[] where the basis of scientific testimony meets the standards of Rule 702"); Advisory Committee's Note to 2000 Amendment to Rule 702 ("The amendment makes clear that the sufficiency of the basis of an expert's testimony is to be decided [by the court] under Rule 702."). Plaintiffs cannot prove general causation without expert testimony, and they bear the burden of proving by a preponderance of the evidence that their experts' opinions are admissible under *Daubert* and Rule 702. *See Daubert*, 509 U.S. at 592 n.10; *Allison*, 184 F.3d at 1306; Advisory Committee's Note to 2000 Amendment to Rule 702

***Reliability***. The Supreme Court has identified four factors courts should use to determine reliability: (1) whether the theory undergirding the opinions can be and has been tested; (2) whether it has been subject to peer review; (3) the known or expected rate of error; and (4) whether the theory or methodology is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Rider*, 295 F.3d at 1197. These standards are designed "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

---

[260] *See also Daubert*, 509 U.S. at 597 ("We recognize that . . . a gatekeeping role for the judge … inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.").

(1999).  In other words, there cannot be a double standard between courtroom science and real-world science, and a litigation expert cannot employ a methodology that is not followed by real-world scientists in the same field.

Opinions "arrived at for the purposes of…litigation" are particularly suspect, and weigh "heavily against…admissibility." *Sumner v. Biomet, Inc.*, 434 Fed. Appx. 834, 843 (11th Cir. 2011).  Indeed, courts "may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7.  Courts have found several indicia of results-oriented conclusions meaningful.  First, "[w]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Advisory Committee's. Note to 2000 Amendment to Rule 702.  A second indicator of a results-driven expert opinion is  "[w]hen an expert . . . exceed[s] the limitations the authors themselves place on the study.  [Experts] must not draw overreaching conclusions." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007); *see also Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 902 (M.D. Fla. 1996) (excluding expert who "relied on his review of scientific literature to support his conclusion that latex paint causes asthma" but "none of the four reports he cited so states")..  A third indicator is when experts *purport* to rely on a particular scientific methodology (e.g., Bradford Hill criteria), but do not "faithfully compl[y] with their own views of what standards constitute the scientific method." *Soldo v. Sandoz Pharm.*, 244 F. Supp. 2d 434, 560 (W.D. Pa. 2003).  The presence of any one of these features—and certainly a combination of them—calls the reliability of expert conclusions squarely into question.

*Relevance*.  Additionally, an expert must apply her selected methodology faithfully to the particular facts of a case, a requirement courts often refer to as "fit."  *Daubert*, 509 U.S. at 591-92; Fed. R. Evid. 702(d) ("A witness who is qualified . . . may testify in the form of an opinion or otherwise if [the court finds] the expert has reliably applied the principles and methods to the facts of the case.");  *see also* Advisory Committee's Note to 2000 Amendment to Rule 702 ("Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact.  These factors include:  . . . (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.").  A district court "may not admit evidence when there is 'simply too great an analytical gap between the data [at issue in a particular case] and the opinion proffered.'"  *Rider*, 295 F.3d at 1197 (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)).

The "fit" requirement has at least two important applications here.  First, "courts may only admit the state of science as it is.  Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles."  *Id.* at 1202.  "'The courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it.'"  *Id.* (quoting *Rosen v. Ciba- Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)).

Second, courts have held that experts must base their causation analysis on the particular product at issue in the litigation, not on other data purported to be "close enough."  Where experts extrapolate their conclusions based on a purportedly *adjacent* dataset, as the Eleventh Circuit put it, this amounts to "[s]peculation replac[ing] science."  *McClain,* 401 F.3d at 1240, 1244–45 (affirming exclusion of expert's opinion where expert relied on data concerning related but different compounds); *see also Rider*, 295 F.3d at, 1201.  It is a classic "analytical gap" under *Daubert*: "[T]he court cannot simply presume that the qualitative toxic and carcinogenic effects of

[an alleged carcinogen] from *any source* are the same" as the *particular* source at issue in the case. *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *10 (E.D. La. June 16, 2015) (quoting *Henricksen*, 605 F.Supp.2d at 1156), *aff'd*, 650 F. App'x 170 (5th Cir. 2016)).

As set forth below, Plaintiffs' causation experts' opinions fail entirely to satisfy the standards set out in *Daubert* and its progeny. First, their opinions lack one of *Daubert*'s primary hallmark of reliability: general acceptance. Aside from plaintiffs' experts in this litigation, *no one* in the scientific community has concluded that ranitidine is causally associated with any kind of cancer. Second, Plaintiffs' experts offer unreliable, results-driven analyses of the literature on ranitidine (which overwhelmingly reveals no association between ranitidine and any specific cancer), and instead place improper weight on non-ranitidine studies not equipped to answer the causal question here.

Taken together, these methodological flaws reveal a results-driven approach that contradicts basic principles of sound science. For these reasons, the Court should exclude Plaintiffs' causation experts' opinions.

## II. Plaintiffs' Experts' General Causation Opinions Are Not Generally Accepted

"Widespread acceptance can be an important factor in ruling particular evidence admissible." *Daubert*, 509 U.S. at 594. An expert theory that "lacks any acceptance, let alone general acceptance, in the scientific community" is a powerful indication of an unreliable method. *Mirena II*, 341 F. Supp. 3d at 268; *see id.* at 238 (excluding expert testimony accepted by "no medical organization or regulator or peer-reviewed scientific literature").

Plaintiffs' experts' opinions lack any acceptance in the scientific community. None of the authors of the studies Plaintiffs' experts cite have concluded that real-world ranitidine exposure increases the risk of any form of cancer. In fact, nearly all of the studies say the opposite. *See supra* Background Section III. Nor do the medical, scientific, and regulatory communities accept

that there is a causal relationship between ranitidine use and cancer.  To the contrary, the FDA, after conducting its *own* review of observational data on ranitidine and cancer, concluded that the existing literature revealed "*no consistent signals*" across the board.  Florian (2021) at 247 (emphasis added).[261]  As to the studies FDA reviewed that compared ranitidine to active controls—i.e., the studies specifically designed to account for the significant risk of protopathic bias and confounding by indication—the FDA "found *no association* between ranitidine and overall or specific cancer risk" whatsoever.  *Id.*

Plaintiffs' experts' opinions "do not, to understate the point, reflect the consensus within the scientific community."  *Daubert II*, 43 F.3d at 1314.  For this reason, the Court should be "wary" that Plaintiffs' experts have not "faithfully applied" their methodologies.  *In re Nexium*, 662 F. App'x at 530.

## III.   Plaintiffs' Experts Have Not Conducted Reliable Analyses of the Available Data on Ranitidine and Cancer

The robust body of literature on ranitidine and cancer does not support a consistent, valid association between ranitidine and cancer.  That is even more true when one narrows the focus to the body of data that is best equipped to answer the causal question here—i.e., the active comparator studies examining ranitidine use in comparison to other H2RAs.

Drs. McTiernan and Moorman do not dispute that the ranitidine-specific data, standing alone, cannot support their causation opinions as to the cancers at issue here.  Instead, in the face of a growing body of epidemiological literature on ranitidine and cancer that lends no support to their causation opinions, *see supra* Background Section III, Plaintiffs' causation experts resort to unreliable, results-driven analyses of the available data to reach their preferred conclusions.

---

[261] FDA has presented the results of the Florian 2021 study as its own research. *See, e.g.*, July 2021 FDA Statement at 1.

As a first step, Plaintiffs' causation experts breeze past the results of studies overwhelmingly showing no statistically significant association between ranitidine and any kind of cancer. They disregard basic principles of epidemiology and statistical analysis, as well as their own stated methodologies for assessing the existence of a valid association. Next, having failed to identify a valid association in the ranitidine data, Plaintiffs' epidemiology experts attempt to build a causation opinion out of a distinct body of literature—namely, dietary and occupational studies of NDMA and other compounds—that the rest of the scientific community does not consider relevant to the question of causation at issue here. At each step of their analyses, Plaintiffs' experts fail to demonstrate "the kind of empirically supported, rationally explained reasoning required by science" and *Daubert*. *Rider*, 295 F.3d at 1197.

### A. Plaintiffs' Experts Do Not Reliably Apply Basic Principles Regarding Bias and Confounding in Analyzing the Ranitidine Literature

It is axiomatic that scientists "*must* account for the roles of bias [and] confounding factors" when assessing the validity of an epidemiological study's results. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002) (emphasis added) (citation omitted), *aff'd*, 68 F. App'x 356 (3d Cir. 2003); *see also* Ref. Man. 572-73. An expert's failure to "demonstrate that [he or she] has adequately accounted for obvious alternative explanations" for a study's results, including bias or confounding, is a hallmark of an unreliable methodology. *Mirena II*, 341 F. Supp. 3d at 262. Plaintiffs' causation experts purport to apply these fundamental principles, but fail to reliably analyze the risk of bias and confounding in their own analyses of the ranitidine literature. Instead, they rely on speculation and conjecture to discount the results of active comparator studies designed to address the very kinds of bias and confounding that Plaintiffs' experts themselves identify.

Dr. Moorman and Dr. McTiernan acknowledge a number of basic epidemiological

principles regarding bias and confounding:

- Both experts concede the importance of considering possible sources of confounding
  and bias when assessing the results of *any* epidemiological study.  *See* Moorman Tr. at
  299:6-8; McTiernan Rep. at 34.

- Both experts also agree that certain study designs and statistical methods can be utilized
  to minimize the risk of false results due to bias and confounding.  *See* McTiernan Rep.
  at 104, 107; Moorman Tr. at 85:8–88:11; *see also In re: Zoloft*, 2015 WL 7776911, at
  *3 (when "specific … potential confounders or biases are identified, researchers will
  attempt to design studies in such a way that they can determine the degree to which
  those factors contributed to an outcome").

- In the context of studies of ranitidine and cancer specifically, Drs. McTiernan and
  Moorman agree that is a potential risk of at least two specific types of bias and
  confounding: confounding by indication and reverse causation (or "protopathic bias").
  *See* McTiernan Rep. at 105, 202, 206, 221, 235, 253-54, 257, 282 (acknowledging risks
  of confounding and reverse causation for all five cancers); Moorman Tr. at 175:5-
  176:18 (acknowledging risk of confounding by indication for esophageal, gastric, and
  liver cancers).

- Lastly, both experts acknowledge that active comparator studies are widely recognized
  as a "standard design in pharmacoepidemiologic research" to address possible
  confounding by indication.  Moorman Rebuttal Rep. at 4; *see also* Moorman Rep. at
  25-26; McTiernan Tr. at 130:17-23.  Indeed, Dr. McTiernan testified that she used
  active comparator designs in her *own* studies of medications and cancer risk.  *Id.* at
  149:3-152:22.

Because of the acknowledged risk of confounding by indication and residual confounding,

many of the ranitidine studies included active comparator analyses that compared patients who

used ranitidine to patients who took other H2RAs.  *See supra* Background Section III; Appendix

A.  Active comparator studies overwhelmingly reveal *no* association between ranitidine and

cancer.   *See supra* Background Section III.   Yet despite having acknowledged the risks of

confounding by indication and residual confounding, and the appropriateness of active comparator

studies, Plaintiffs' experts largely dismiss those study results.

Drs. McTiernan and Moorman offer two primary justifications for discounting the results

of active comparator studies.  ***First***, they suggest that other, non-ranitidine H2RAs also increase

cancer risk.  And *second*, they assert that users of ranitidine and other H2RAs are too dissimilar to be good comparators.  McTiernan Tr. at 686:16-20; Moorman Rep. at 27-29.  Neither expert offered any reliable data or analysis to support those assumptions; instead, they simply "substituted [their] own *ipse dixit* for scientific proof" on these issues.  *McClain*, 401 F.3d at 1242.

As to the first point, Dr. Moorman asserts that "if the active comparators (PPIs and other H2RAs) also increase the risk for certain types of cancer, a carcinogenic effect of ranitidine is likely to be missed," and that there is "good evidence to support that other acid-suppressing drugs increase risk for certain types of cancer."  Moorman Rep. at 27.  Dr. McTiernan likewise asserted in her report that comparisons of ranitidine users to PPI users "is problematic" because PPIs "are themselves associated with increased risk of developing cancer."  McTiernan Rep. at 126; *see also id.* at 135.  When pressed to substantiate these assertions, however, both experts pointed to a handful of cherry-picked studies, admitting they did not perform a comprehensive analysis of whether other H2RAs or PPIs increase the risk of cancer.  In her deposition, Dr. Moorman admitted that she had not done "a full causal analysis of other H2RAs and these cancers"; could not opine on whether other H2RAs cause cancer within a reasonable degree of scientific certainty because she "did not go through the full Bradford Hill analysis"; and could not say whether her opinion that other H2RAs increase the risk of cancer is "well established and generally accepted in the scientific community."  Moorman Tr. at 179:8-180:14, 182:6-22.  Dr. McTiernan was similarly unable to defend this claim.  She could not name a "single cancer that PPI use is associated with" and testified unequivocally that she does not believe that any H2RA other than ranitidine increases cancer risk.  McTiernan Tr. at 172:21-173:12; *id.* at 175:4-7.

Drs. McTiernan's and Moorman's second assumption—that active comparator studies are limited by significant differences between users of ranitidine and other H2RAs—is similarly

lacking in scientific support.  Dr. Moorman, for example, notes that "data from *certain* studies []

*seem* to indicate" that there are "differences in underlying conditions between ranitidine and

famotidine users" and that "there *may* be differences" in prescription choices between the users.

Moorman Rep. at 28-29.  She later admitted, however, that the FDA-approved indications for the

different H2RAs are similar, and that she was unable to "find a lot of published data" reporting

"characteristics of [] other H2 blockers as compared to ranitidine" or any data demonstrating that

ranitidine users were more similar to non-users at baseline than to users of other H2RAs.  Moorman

Tr. at 193:9-194:25, 345:25-347:16.  The same was true of Dr. McTiernan:  She could not name a

single labeled indication for ranitidine that differs from a labeled indication from another H2RA

or PPI.  135:10-137:12.  Nor could she name a single study that shows that ranitidine users are

more similar to non-users than to users of other H2RAs.  *Id.* at 717:3-719:19; *see also* McTiernan

Rep. at 134 (acknowledging that "[f]amotidine [another H2RA] and ranitidine have similar clinical

efficacy, and therefore it is not clear why one is chosen over the other by prescribing physicians.").

And indeed, as defense expert Dr. Chan (a gastroenterologist) testified, the different H2RAs are

prescribed interchangeably to the same population of patients.  Chan Tr. at 170:4-15; 172:13-22;

318:19-319:9, Brown Decl. Ex. 27.  As neither Dr. Moorman nor Dr. McTiernan is a practicing

physician, they have no basis to challenge Dr. Chan's testimony on this point.  *See* McTiernan Tr.

at 99:18-100:16 (acknowledging that gastroenterologists are "highly qualified" to comment on the

patient populations prescribed acid suppressants).

Importantly, Dr. Moorman's and Dr. McTiernan's opinions about active comparator

studies also conflict with those of the study authors themselves, who explained that their decision

to employ an active comparator design was specifically rooted in the fact that "such a comparison

is less prone to indication bias than a comparison between users and non-users of ranitidine."

Iwagami (2021) at 369.[262]  *None* of these authors suggested that any other H2RAs increase cancer risk or that there is any reason to believe that non-users of H2RAs are superior to other H2RA users as a comparator group.  *See McClain*, 401 F.3d at 1240 (affirming exclusion where expert "infer[red] conclusions from studies and reports that the papers do not authorize").

In short, Dr. Moorman's and Dr. McTiernan's criticisms of the ranitidine active comparator studies—all of which undermine their causation opinions here—are not based on reliable science. Instead, their results-driven critiques of the active comparator data are rooted in "speculation, conjecture, [and] inference" that has not been accepted by anyone else in the scientific community (including the study authors themselves) and "cannot be supported by sound scientific principles." *Rider*, 295 F.3d at 1202.

### B.     Plaintiffs' Experts Failed to Apply a Reliable Methodology to Weigh and Evaluate the Ranitidine Data

In analyzing the ranitidine literature, Plaintiffs' experts persistently disregarded basic principles of epidemiology and statistical analysis, failing to articulate any sound, objective methodology for weighing and evaluating the scientific data.  For example, Plaintiffs' experts assigned greater weight to study results they believed might support their causation opinions—even if those data did not address ranitidine at all—while simultaneously and uniformly discounting evidence indicating the absence of association (much less a causal association) between ranitidine and cancer.  This results-driven approach to scientific analysis is exactly what *Daubert* forbids.  *See, e.g.*, *Mirena (II)*, 341 F. Supp. 3d at 251 (excluding expert testimony that suggested "motivated, result-driven reasoning"); *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) (a methodology "aimed at achieving one result … is unreliable").

---

[262] *See supra* note 61.

Dr. Moorman, for example, repeatedly stressed the importance of accounting for exposure misclassification—i.e., the risk that patient's exposure to a drug will be under- or over-estimated due to self-reporting or incomplete information in drug databases.  Yet Dr. Moorman conceded she made no attempt to determine the amount of misclassification or its impact on ranitidine study results.  Moorman Tr. at 119:19-120:10, 316:12-20, 362:10-17.  Instead, she stated simply that the "precise amount of misclassification is unknown" and that "it is impossible to quantify the exact amount of misclassification." *Id.* at 120:11-122:5, 379:17-380:15, 435:3-436:16.  When asked whether she used a methodology to assess the impact that any exposure misclassification, she asserted "you cannot give a precise quantification of how much it affected the relative risk" and admitted she only "review[ed] epidemiologic literature" and made a "reasoned judgment on the effect of relative risk.  *Id.* at 119:19-120:10, 121:12-122:5.   Perhaps unsurprisingly, Dr. Moorman's "reasoned judgments" about exposure misclassification lead almost universally to the conclusion that a particular study *underestimated* the true relative risk of ranitidine exposure— thus providing a basis to assign less weight to study results that failed to show an association.  *See, e.g.*, Moorman Rep. at 67 (concluding that "[t]he resulting misclassification would tend to underestimate a true association with ranitidine use" in Kantor (2021)); *id.* at 70 (similar for Adami (2021)); *id.* at 72 (similar for Norgaard (2021)); *id.* at 77 (similar for in Kim Y (2021)); *Id.* at 94 (similar for Cardwell (2021)).  Even when the study authors themselves conclude that the direction of the bias is not clear, Dr. Moorman concludes it is an underestimate.  *Id.* at 20 (discussing Adami (2021)).  In a similar display of litigation-driven reasoning, Dr. Moorman also departed from her practices outside of the courtroom of using established and objective criteria for weighting studies and using meta-analysis to estimate risk across studies.  *See supra* Background Section IV.B.ii and note 164; *infra* Argument Section IV and note 264.

Dr. McTiernan adopted a similarly results-driven approach to weighing the relevant studies. Throughout her report, in describing her review of individual epidemiological studies, Dr. McTiernan repeatedly stated that she "gave less weight to the relative risks that were not greater than 1.0, and put more weight on relative risks that were greater than 1.0." *E.g.*, McTiernan Rep. at 145; *see also id.* 134, 149. In other words, by her own account, Dr. McTiernan assigned greater weight to results indicating a positive association (i.e., results that favored her causation opinions) than to studies indicating a negative association (i.e., results that cut against a causal relationship). Dr. McTiernan claimed that her decision to give greater weight to favorable study results was appropriate because of a purportedly universal "bias towards the null" due to exposure misclassification—i.e., the risk that positive associations between ranitidine and cancer were obscured because the studies underestimated the true extent of patients' ranitidine use. *Id.* Yet Dr. McTiernan admitted that exposure misclassification also can bias risk estimates *away* from the null—i.e., creating the appearance of an association that is not real—yet made no attempt to account for this in her review of the literature. McTiernan Tr. at 211:6-10, 226:21-20. Nor did she attempt to estimate the magnitude of any potential misclassification bias. *Id.* at 228:4-12.[263] Indeed, like Dr. Moorman, she conceded that she could not confirm for any given study whether exposure misclassification actually occurred at all. *See id.* at 420:20-25.

In a similar vein, Dr. McTiernan disregarded the generally accepted understanding of what constitutes an "association." Dr. McTiernan treats any relative risk greater than 1.0 as a "positive association," regardless of how close the relative risk is to 1.0 and regardless of whether the result is statistically significant. *See, e.g.*, McTiernan Rep. at 28, 108. Dr. McTiernan thus finds an

---

[263] By contrast, defense epidemiologist Dr. Chan did estimate the magnitude of potential bias in the ranitidine literature and concluded that—even if it exists—it would not have any appreciable effects on the reported risk estimates. Chan Rep. at 35-37.

association in the ranitidine literature, which reports a number of non-statistically significant point estimates just above 1.0, only by employing this novel, unsupported, and unreliable definition of an association.

Finally, Dr. McTiernan applied an internally inconsistent methodology to her assessment of the epidemiological data, repeatedly abandoning her own stated standards for weighing the data when doing so served her causation opinions. In particular, Dr. McTiernan extrapolated from "lumped" exposure and outcome data when those data showed an increased risk, but uniformly rejected such extrapolation when the data showed no association between ranitidine and cancer risk. *See supra* Background Section IV.A.vi.

In sum, Dr. Moorman's and Dr. McTiernan's general causation opinions rely on unsupported theories and assumptions about possible biases and confounding in the ranitidine literature, idiosyncratic approaches to identifying and calculating an association, and improper discounting of the epidemiological data on ranitidine that overwhelmingly shows *no* statistically significant association between ranitidine and cancer when ranitidine is compared to other drugs in its class. Where, as here, the expert's "methods" uniformly lead to an interpretation of studies that favors her preferred outcome, the "district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. These experts' results-driven approach fails to satisfy Rule 702, and their opinions should be excluded.

### C. Plaintiffs' Experts' Reliance on Non-Ranitidine Studies is Unreliable and Lacks General Acceptance

Having failed to locate a valid association between ranitidine and cancer in the numerous studies that examine this exact question, Plaintiffs' experts look instead to support their causation opinions through a separate body of literature:  dietary studies (e.g., processed meats) and occupational studies (e.g., rubber mill workers in the United Kingdom) of NDMA.  This is not a

reliable method to address the causation question at issue, and *none* of the many scientists, research organizations, and governmental agencies that have undertaken studies of ranitidine and cancer risk since 2019 has found it appropriate to answer this question by looking at this body of literature. *See Mirena (II)*, 341 F. Supp. 3d at 268 (excluding opinion that "lacks any acceptance, let alone general acceptance, in the scientific community outside of this litigation").

That is no accident.  The mere fact that exposure to a particular compound might be carcinogenic under *some* circumstances does not mean one can "simply presume that the qualitative toxic and carcinogenic effects of [that compound] from *any source* are the same." *Burst*, 2015 WL 3755953, at *10 (quotation marks omitted) (excluding expert's opinion that exposure to benzene *via gasoline* causes cancer based on unreliable extrapolation from studies on carcinogenic effects of *benzene generally*); *Rider*, 295 F.3d at 1201 ("[E]ven minor deviations in chemical structure can radically change a particular substance's properties and propensities."). Here, Plaintiffs' epidemiology experts' attempts to extrapolate causation opinions about ranitidine from dietary and occupational studies of NDMA and processed meats are particularly unreliable for a number of reasons.  ***First***, as Dr. McTiernan has previously acknowledged, dietary studies suffer from a number of inherent flaws and methodological shortcomings that limit their reliability for reaching any kind of causal determination.  ***Second***, occupational NDMA studies differ from pharmacological epidemiology studies in critical respects—including, in particular, the route of exposure (i.e., inhalation vs. ingestion).  And ***third***, as to both categories of studies, Plaintiffs' experts fail to offer any reliable basis for the Court to conclude that the estimated dose of exposure to NDMA in dietary or occupational studies remotely approximates the level of NDMA exposure from real-world use of ranitidine.

### i.      Plaintiffs' Experts' Reliance on Dietary Studies is Unreliable

Notwithstanding that no one else in the scientific community has relied on dietary studies to answer the question of whether ranitidine increases the risk of any cancer, Plaintiffs' epidemiology experts attempt to justify their reliance on dietary NDMA studies on three grounds: (1) FDA stated in its 2019 press release announcing the results of its ranitidine testing that the amount of NDMA in the tested lots was similar "to levels in grilled and smoked meats," and thus, dietary studies may "provide evidence of the carcinogenic effects of NDMA at levels one would be exposed to through consumption of ranitidine"; (2) the patterns of exposure—i.e., likely daily or weekly intake—between dietary NDMA intake and ranitidine are comparable; and (3) the "dose-response trends" observed in the dietary studies shed light on the likely dose-response trends for ranitidine.  Moorman Rep. at 48-49, 153; *see also* McTiernan Rep. at 12, 15.

This analysis is flawed on multiple levels.  First, nearly all of the dietary studies on which Plaintiffs' experts rely employ a "case-control" design that requires participants who had already been diagnosed with cancer to reconstruct their long-term dietary habits.  *See supra* Background Section III.F.  As Dr. McTiernan has previously acknowledged, this study design is notoriously unreliable due to the inherent challenges of accurately reconstructing dietary behaviors years after the fact and the likelihood that cancer patients will recall more unhealthy eating habits than controls.  Just three years ago, as a paid expert in another litigation, Dr. McTiernan testified about her work as a panel member for the World Cancer Research Fund and expressed serious concerns about such studies:

> Once somebody develops cancer, their diet changes dramatically.  If you want to know what somebody's previous diet effect of cancer risk is, it is very difficult to do that in a case-control study.  The person has already changed. Diet, you can't ask somebody what they have eaten in the past.

Daubert Hearing Testimony, *In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practice and Prods. Litig.*, at 737:20-738:9 (2019).  In the course of the same litigation, she elaborated, observing: "The amount that people eat, what they're eating, how often they're eating, ***the variables are so difficult to collect, that the results from case-control studies are a concern to some investigators***."  Jan 28, 2019 Tr. at 115:13-16 (emphasis added), Brown Decl. Ex. 33. When asked, Dr. McTiernan stated that she could not recall her earlier testimony, but nonetheless agreed that "[it] can be difficult in case-control studies to make sure that there isn't recall bias for diet studies, that is why WCRF has historically not used – or not relied as much on case-control studies."  McTiernan Tr. at 497:22-498:4.  Given these significant methodological limitations, it is unsurprising that no one else in the regulatory, medical, or scientific community views these concededly flawed dietary studies of NDMA as a reliable source of data on *ranitidine* and cancer.

Despite acknowledging significant sources of error in dietary NDMA studies, Plaintiffs' experts nonetheless rely on them because they claim that "this lower accuracy of exposure estimates biases studies to the null."  McTiernan Rep. at 53; *see also* Moorman Rep. at 49 (describing the overall effect of measurement error in dietary studies as attenuating the relative risk estimates).  This assumption is erroneous, for reasons that Dr. McTiernan herself acknowledges: All of the NDMA dietary studies involved multiple categories of "exposure variables"—such as low, medium, and high dietary exposure to NDMA.  McTiernan Tr. at 216:21-25.  As Dr. Moorman admits, "when the data are in categories rather than binary, [exposure] misclassification *does not always result in a bias towards the null*."  Moorman Rep. at 19; *see also* McTiernan Tr. 211:6-10; 226:21-227:20  (acknowledging that the bias may not be away from the null).

Contrary to Plaintiffs' experts' assertions, the FDA's observation (in a single sentence of the press release announcing its ranitidine testing results) that the levels of NDMA in grilled and smoked meats may approximate those in ranitidine does not provide a reliable basis for their reliance on dietary studies to assess the causal question here.  The FDA did not specify how much NDMA is in grilled or smoked meats or compare the amount of NDMA in ranitidine or grilled and smoked meats to other types of dietary intakes.  *See* Nov. 2019 FDA Statement – Laboratory Analysis; *see also* Moorman Tr. at 506:8-21.  Nor did any of Plaintiffs' experts attempt to undertake that calculation to determine whether dietary exposure to NDMA *via smoked and grilled meats* reliably approximates dietary exposure to NDMA from *all possible sources*.

Plaintiffs' experts' misinterpretation of the FDA's press release went a step further to sweep in studies not only on dietary NDMA, but also on processed meats generally.  As Plaintiffs' experts acknowledge, however, processed meat studies have a limited ability to distinguish the potential cancer risks associated with NDMA from the rest of the "components of processed meats [that] could contribute to cancer risk, including salt and fat content, heme iron" and "other *carcinogens* such as heterocyclic amines and polycyclic aromatic hydrocarbons."  Moorman Rep. at 52; *see also* McTiernan Tr. at 510:6-511:23.  And as Plaintiffs' experts also acknowledge, there is no general consensus that *NDMA* in processed meats is associated with increased cancer risk, as opposed to any *other* component (or combination thereof) unique to processed meats.  This is reflected by the fact that IARC has classified processed meats, which contain a number of chemicals associated with an increased cancer risk, as Group 1, known human carcinogens for colorectal cancer (which is not at issue here)—while NDMA is classified as only a Group 2A, probable human carcinogen.  *See* "N-Nitrosodimethylamine" & "Processed Meat," INT'L AGENCY FOR RESEARCH ON CANCER, *List of Classifications*, at 8, 31 (2022) ("IARC Classifications"),

https://monographs.iarc.who.int/list-of-classifications/, Brown Decl. Ex. 98; McTiernan Rep. at 19, 54.   In other words, Plaintiffs' experts are using data from a known human carcinogen (containing multiple chemical compounds other than NDMA) to prove that NDMA and *ranitidine specifically* are human carcinogens.   At no point, however, do Plaintiffs' experts purport to offer a scientifically reliable basis for extrapolating conclusions about exposure to ranitidine from data about different exposures, through different pathways, and in different amounts.   *Cf. Burst*, 2015 WL 3755953, at *10.

Lastly, Dr. Moorman asserted that dietary NDMA studies are an appropriate source of evidence on ranitidine because "patterns of exposure to NDMA through dietary intake—frequent or even daily intake—is comparable to patterns of exposure of individuals who have taken ranitidine on a chronic basis over a period of many years."   Moorman Rep. at 48.   Consistent with her overarching refusal to articulate concrete standards or criteria that drove her causation analysis, *see supra* Background Section IV.B, Dr. Moorman resisted actually quantifying or estimating what chronic ranitidine use entails.   She eventually conceded that patients typically take ranitidine for five or ten years, not every day for their lifetime.   *See* Moorman Tr. at 501:21-502:14.   But she did not explain why, despite her inability to substantiate her assumption about similar exposure levels, dietary studies nonetheless provided a viable source of data for the causal question here.

Despite these methodological shortcomings and the fact that no one else in the medical, scientific, or regulatory communities has relied on dietary studies in addressing this precise question, these studies weigh heavily in Plaintiffs' experts' analyses.   Indeed, in *all* of Dr. Moorman's cancer-specific analyses, dietary studies equal or outnumber the rest of the studies combined.   *See, e.g.*, Moorman Rep. at 88-93 (processed meat studies accounting for 56% of all studies in Bladder Cancer Table), 118-21, 142-45, 172-74, 199-203.   The Court should not allow

results-driven causation opinions that principally rely on studies that do not involve ranitidine, the medicine at issue in this litigation.

### ii. Plaintiffs' Experts' Reliance on Occupational Studies is Unreliable

Plaintiffs' experts' method for analyzing and weighing occupational studies of NDMA exposure in rubber factory workers is at least as unreliable. As with the dietary studies, Plaintiffs' experts offer no sound basis to conclude that the amount of exposure to NDMA (or other nitrates/nitrites) would remotely approximate the amount of exposure to NDMA via ranitidine. Indeed, they did not even try to make that showing. Dr. McTiernan acknowledged that occupational studies may have "inexact estimates of exposure to NDMA," and that "[f]or any of these NDMA exposure sources, the dose and length of exposure may not have been accurately ascertained *if at all*." McTiernan Rep. at 58 (emphasis added). Similarly, in an effort to support her reliance on occupational studies, Dr. Moorman assumed that data would be "presented at trial" showing "that the estimated intake of NDMA from occupational exposure . . . is in the same range as the exposure levels of ranitidine." Moorman Rep. at 105. But she admitted that as of the date of her deposition, she had "not seen those data." Moorman Tr. at 408:5-6.

Moreover, as Plaintiffs' experts acknowledge, the NDMA exposure measured in occupational studies occurs through *inhalation*, not through the ingestion of a medication like ranitidine. Once again, none of Plaintiffs' experts were able to offer any reliable explanation for their assumption that exposure to NDMA via workplace inhalation would have the same allegedly carcinogenic effects as exposure via medication. Dr. McTiernan admitted that "calculating an exposure conversion rate from inhalation to ingestion … is *outside of [her] expertise*," McTiernan Rep. at 51, and disavowed any attempt to calculate how inhaled levels of NDMA compare to ingested levels. McTiernan Tr. at 624:4-627:14; *see also* Moorman Tr. at 390:9-391:11. It is well-established that analyzing the specific *route of exposure* (such as inhalation vs. ingestion) to a

particular substance is important because "those routes affect the magnitude of ultimate exposures and because they often affect health outcomes" in different ways.  Ref. Man. at 518.  Indeed, Dr. Hidajat, who is the author of one of the primary occupational studies on which Plaintiffs' experts rely, conceded during her deposition that her study was strictly limited to NDMA exposures in rubber factories; was not designed to assess NDMA exposures via oral consumption of medication; and that she is not qualified to draw any conclusions about whether inhalation or skin absorption of NDMA is analogous to NDMA exposure via oral medication.  Hidajat Tr. at 142:20-145:19.  Plaintiffs' experts' willingness to "draw overreaching conclusions" that are unsupported by the studies on which they rely is yet another indication of an unreliable methodology.  *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1291.

Lastly, as both IARC and the authors of the occupational studies themselves acknowledge, work in the rubber factory industry includes multiple carcinogenic exposures other than NDMA, and it is therefore "difficult to relate the observed cancer hazards in the rubber-manufacturing industry to exposure to *specific chemicals*."  "Rubber Manufacturing Industry," at 552, 559; *see also* Hidajat (2019) at 250-51.  Consistent with that recognition, IARC has classified employment in the rubber industry as a "Group 1 carcinogen (established human carcinogen)"—but has *not* reached the same conclusion about NDMA.  "N-Nitrosodimethylamine" & "Rubber Manufacturing Industry," IARC Classifications at 8, 31.  Tellingly, Dr. Moorman was not aware of IARC's classification of work in the rubber-manufacturing industry.  *See* Moorman Tr. at 393:17-395:19, 396:4-16.

Dr. McTiernan also relies on occupational and dietary studies of nitrate and nitrite exposures, purportedly because they are potential "precursors of NDMA."  McTiernan Rep. at 99.  Her reliance on these data presents yet another analytical gap in her analysis.  For starters, Dr.

McTiernan acknowledges that *"[n]ot all nitrite or nitrate convert to nitrosamines*, and of the conversions, *not all of the resulting nitrosamines are NDMA.*" *Id.* at 54 (emphasis added).  Dr. McTiernan admits that "neither nitrate nor nitrite levels correlate perfectly with NDMA levels, because some foods with high nitrate levels (e.g., some vegetables) are low in NDMA." *Id.* at 99. The fact that Dr. McTiernan relies on this data on "lumped exposures"—while simultaneously dismissing data that combines ranitidine users with users of other H2RAs, *id.* at 186-87—underscores her results-driven, litigation-focused, and scientifically unreliable approach.  No one else in the scientific community—not even Dr. Moorman—extrapolates opinions about whether ranitidine causes cancer from nitrate/nitrite studies.

*    *    *

Plaintiffs' experts' unfounded assumptions about doses and routes of exposure in the dietary and occupational studies cannot form the basis of a reliable causation opinion on ranitidine. *See McClain*, 401 F.3d at 1242 ("The expert who avoids or neglects [the dose-response] principle of toxic torts without justification casts suspicion on the reliability of his methodology"); Ref. Man. at 518.  That is precisely why no one else in the scientific community has seen fit to extrapolate conclusions about ranitidine and cancer from this distinct set of data.

Because Plaintiffs' experts attempt to extrapolate causation opinions about ranitidine from a body of literature that cannot support them are unreliable and lack general acceptance, the only possible remaining support for their causation opinions are studies that actually examine ranitidine. But, as Drs. McTiernan and Moorman admitted, Plaintiffs' experts cannot (and have not attempted to) show that the ranitidine studies alone can support their causation opinions.  McTiernan Tr. at 577:22-580:7; Moorman Tr. at 167:23-168:17, 245:8-247:3.  The Court should exclude their opinions on that basis alone.

## IV.    Drs. Moorman and McTiernan Failed to Conduct a Reliable Bradford Hill Analysis

In addition to the reasons set forth in Part II, Dr. Moorman's and Dr. McTiernan's causation opinions should also be excluded because each fails to conduct a reliable Bradford Hill analysis. Repeatedly, neither expert could articulate any standard or objective standards she used to apply the Bradford-Hill criteria. Dr. Moorman's analyses of three of those criteria in particular— strength of association; consistency; and dose response—are plagued by methodological flaws that render her resulting causation opinions fundamentally unreliable. Dr. McTiernan's analysis of those three factors, as well as her analysis of the "temporality" factor, are similarly flawed.

***Strength of association.***   Strength of association "refers to the observation that a stronger association between an exposure and disease [is] more likely to [be] causal than weaker association."   Moorman Rep. at 56; McTiernan Rep. at 92.   Dr. Moorman concedes that, with "weaker associations, i.e., [] relative risks below 2, it is particularly important to consider whether the results [of a study] are due to confounding or other forms of bias."   *Id*. at 57.   The cancer-specific summary tables included in her report list risk estimates from the ranitidine literature that are *all* below 2.0 for bladder and liver cancers, with only a few dietary or occupational NDMA studies reporting risk estimates above 2.0 with high or lifetime NDMA exposure.   *See id*. at 88-93.[264]   A similar pattern exists for esophageal, gastric, and pancreatic cancers, though Habel and McGwin (an observational ranitidine study and an FDA adverse event study to which Dr. Moorman assigned "little" weight in her overall analysis) do report some results above 2.0.   *Id.* at 142-45.   Notably, as Dr. Moorman acknowledges, none of the ranitidine studies using other

---

[264] In evaluating strength of association, Dr. Moorman admits that she did not attempt to calculate an *overall* relative risk (i.e., a "summary estimate") for ranitidine and any of the five cancers at issue based on the individual study results.   Moorman Tr. at 169:4-13; *see id.* at, 154:17-20.   Dr. Moorman did not conduct a meta-analysis in this litigation even though she has extensive experience performing meta-analyses in her peer-reviewed publications. *Id.* at 44:2-5.

H2RAs as active comparators report risk estimates above 1.5 for *any* cancer.  *See* Moorman Rep. at 88-89, 118-19, 142-43, 171-72, 199-200.  And none of the positive risk estimates reported in the primary analyses of the H2RA active comparator studies are statistically significant.

Notwithstanding the weak risk estimates observed in the ranitidine studies, Dr. Moorman fails to give adequate consideration to "whether the results [of those studies] are due to confounding or other forms of bias."  *Id.* at 57.  Far from it, she assigns the least weight to the very studies that were designed to address those concerns.  *See supra* Background Section IV.B.ii.  Dr. Moorman's analysis of the active comparator studies is unreliable for the reasons already stated.  *See id.*  And her failure to follow her own stated methodology regarding "weak" risk estimates in assessing strength of association is another sign of a results-oriented, unreliable methodology.  *See Mirena (II)*, 341 F. Supp. 3d at 251 (excluding expert testimony that suggested "motivated, result-driven reasoning").

Dr. McTiernan's assessment of strength of association is based overwhelmingly on non-ranitidine data, including the occupational NDMA and nitrate-nitrite studies.  *See* McTiernan Rep. at 201, 219-220, 234, 252, 280-82.  Dr. McTiernan agrees that strength of association should be considered along with statistical significance, but glosses over the fact that virtually all of the ranitidine risk estimates she relied on are *not* statistically significant.  *See* McTiernan Rep. at 318-19, 332-33, 341-42, 349-50, 362-63.  While she claims that the lack of statistical significance does not weigh against her conclusions due to these studies' potentially inadequate statistical power, she offers no evidence to support her concerns about the power calculations of these studies beyond her own speculation, nor did she perform any power calculations of her own in this litigation.  McTiernan Tr. at 466:23-467:24.

***Dose-Response.***  Dr. Moorman's lack of rigor in evaluating the dose-response criteria is particularly striking.  According to Dr. Moorman, dose response, "in its simplest conception . . . means that as the level of exposure increases the risk of the disease decreases."  Moorman Rep. at 59.  Dr. Moorman acknowledged the importance of "examin[ing] dose-response trends in relation to cancer risk," *id.* at 39, but she claimed that the ranitidine observational studies "did not have the data available to do an adequate dose-response" analysis based on long-term use of ranitidine, Moorman Tr. at 291:17-21, 292:23-293:4; Moorman Rep. at 48.

If this were accurate, it would mean that Dr. Moorman does not have the evidence required to conclude causation.  *See McClain*, 401 F.3d at 1241 ("'[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden. . . .'") (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)).  In reality, however, the ranitidine studies *did* perform "dose-response analyses [] based on the number of defined daily doses and the number of prescriptions," as Dr. Moorman acknowledged in her report.  Moorman Rep. at 81, 222.  And nearly all of those study authors relied on their dose-response analyses in concluding that ranitidine use is ***not*** associated with an increased risk of cancer. .  *See* Tran (2018) at 62; McDowell (2021), at 4, 7; Norgaard (2021), at 49.   When pressed to reconcile those analyses with her claim that she was unable to calculate a dose response, Dr. Moorman was unable to offer any coherent explanation of what would have made the data in the ranitidine studies adequate or inadequate to conduct a reliable dose response analysis.

Dr. Moorman's lack of rigor in analyzing the dose-response factor became even more apparent when she was asked about the amount of ranitidine that is needed to cause any of the five cancers.  She responded that, "any dose of ranitidine could ultimately lead to cancer," Moorman

Tr. at 288:17-25—even a single OTC ranitidine pill, *see id.* at 289:19-290:2.  Expert opinions, like Dr. Moorman's, that *any* level of NDMA or ranitidine may cause cancer are suspect because such statements "conflict[] with the importance of individual responses to toxins."  *McClain*, 401 F.3d at 1241 (rejecting expert's opinion "that any amount of Metabolife is too much" as "clearly contradict[ing] the principles of reliable methodology….").

Dr. McTiernan, meanwhile, relied almost exclusively on dietary and occupational NDMA and nitrate/nitrite studies in her assessment of dose response.  *See* McTiernan Rep. at 203, 222, 236, 254, 282-83.  Indeed, she repeatedly dismissed the apparent *lack* of evidence of dose response in the ranitidine data in favor of a purported dose response in the non-ranitidine studies.  *Id.* at 222, 236, 254, 283.  Not surprisingly, Dr. McTiernan testified that she will not be offering an opinion about the minimum dose or duration of exposure to ranitidine that would be necessary to cause any type of cancer.  McTiernan Tr. at 607:2-608:18; 627:19-628:3.

**Consistency**.  In her report, Dr. Moorman defines consistency to mean an "association [that] has been repeatedly observed by different investigators, in different places, circumstances and time."  Moorman Rep. at 57.  Additionally, Dr. Moorman acknowledges that causation is "typically [] not based on a single study or *even a few* studies but are based on the totality of evidence from multiple studies conducted *in different study populations, in different locations, and across different time periods*."  *Id.* at 11 (emphasis added).  She also admits that, as with strength of association, "chance, bias[]," and "differences in exposure levels across studies or differences in characteristics of study population" can lead to "variation in the magnitude of the observed relative risk or even in the direction of the effect across studies."  *Id.* at 57.  This understanding of consistency—if reliably applied—is exactly what a scientifically sound Bradford Hill analysis requires.  *See* Bradford Hill (1965) at 33.

In conducting her Bradford Hill analyses in this case, however, Dr. Moorman did not reliably apply that accepted understanding of consistency.  As FDA researchers recognized in 2021, "[w]hen considering all cancer types … *no consistent signals emerged across studies*, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk."  Florian (2021) at 247.  Dr. Moorman did not review the FDA's analysis of the ranitidine studies and therefore did not factor it into her analysis of the "consistency" factor.  Moorman Tr. at 69:19-70:24.  Moreover, despite acknowledging the importance of replication across different populations, the only ranitidine studies that weighed heavily in Dr. Moorman's Bradford Hill analysis all relied on the same Scottish database.  *See id.* at 262:8-263:13 ("Q. [A]ll of the ranitidine observational studies that you weighted strongly were based on use of the Scottish database, is that right?  A. [I] gave them greater weight than [] the other studies that I described in my report.").  The authors of one of those studies (which weighed heavily in Dr. Moorman's analysis of ranitidine and bladder cancer) explicitly cautioned *against* over-reliance on the Scottish database, precisely because of its limited population: "*[T]hese findings merit further investigation* in epidemiological studies to examine the association between ranitidine and other histamine-2-receptor agonists *across a range of settings*."  Cardwell (2021) at 6.  Dr. Moorman's willingness to reach beyond the conclusions of the study authors, coupled with her failure to consider FDA's analysis of the ranitidine literature, further underscores the unreliable, results-driven nature of her Bradford Hill analysis.  *See McClain*, 401 F.3d at 1247 ("The authors of the articles limit the application of their studies consistent with the principles of good science; [expert] expands the application beyond good science.").

The flaws in Dr. McTiernan's consistency analysis once again turn on her heavy reliance on the dietary and occupational studies of NDMA.  Dr. McTiernan pays little to no attention to the

apparent inconsistencies between the data in those studies and the ranitidine literature.  To provide just one example, the ranitidine studies show *no* adjusted risk estimate above 1.0 for esophageal cancer, aside from a single sub-analysis in a single study that reported an overall non-significant *decreased* risk and no positive dose response.  *See* McTiernan Tr. at 423:15-19; 426:6-19; 428:9-19; 566:11-19 (acknowledging these facts about the Tan study).  The fact that Dr. McTiernan nonetheless claims to find consistency in the face of these data underscores her results-oriented and unreliable approach.

*Temporality.*  Dr. McTiernan acknowledges that temporality (the requirement that the exposure precede the disease) is an absolute requirement for establishing causation.  *Id.* at 191:21-192:2.  She also acknowledges that (i) if patients may have taken ranitidine in response to early symptoms of cancers, temporality may not be established due to reverse causality, and (ii) that this is a concern with respect to all five cancers.  McTiernan Rep. at 105, 202, 221, 235, 253, 282.  She then claims that "[t]o guard against this, researchers have discounted ranitidine or NDMA exposure in the 1-2 years before cancer diagnoses"—in other words, that they adjusted their study results by incorporating a "lag period." *Id.* at 235.  Yet she was once again unable to articulate any replicable, objective criteria for weighing whether studies adequately accounted for reverse causality.  At her deposition, Dr. McTiernan could not recall whether she gave less weight to studies that did not use lag periods.   McTiernan Tr. at 191:21-192:8.  And she repeatedly relied on findings from studies that did not incorporate *any* lag period (such as the Kantor, Yoon, and Habel), while failing to include the lagged analyses from the Liu study showing *no* statistically significant increased risks.  McTiernan Tr. at 453:10-454:22.

## V.     Dr. McTiernan Contradicts Her Own Opinions Expressed Outside of This Litigation

In addition to those cross-cutting bases for exclusion, which apply to *all* of Plaintiffs' general causation experts, Dr. McTiernan's causation analysis suffers from other, independent

methodological flaws that also merit her exclusion.  In particular, Dr. McTiernan's rejection of accepted statistical methods and her reliance on dietary studies of NDMA to support her causation opinions—beyond revealing her unreliable analysis of the available scientific data, *see supra* Background Section IV.A—reflects another fundamental flaw under *Daubert*:  She has overtly failed to "employ[] in the courtroom the same level of intellectual rigor that characterizes" her own practice outside of this litigation.  *Kumho Tire*, 526 U.S. at 152.

Just three years ago, as a paid expert in the talc litigation, Dr. McTiernan testified about her work as a panel member of the World Cancer Research Fund and repeatedly stressed the inherent unreliability of dietary case-control studies to assess cancer risk.  *See supra* Background Section IV.A.iii.  In the context of this litigation, however, she not only considers but places significant weight on the exact kinds of studies that she previously criticized as unreliable.  *See supra* Background Section IV.A.i.

Dr. McTiernan has also previously embraced the generally accepted understanding of what constitutes an "association," as well as the importance of statistical significance in identifying a valid association—both concepts that she now claims to reject.  *See supra* at Background Section IV.A.iv.  In her expert report in the talc litigation, for example, she described a risk estimate of 1.04 as showing "no association."  McTiernan Tr. at 468:7-14.  Similarly, in her own peer-reviewed writings, Dr. McTiernan routinely refers to non-statistically significant results above 1.0 as showing "no association."[265]  Those (scientifically accurate) characterizations are in direct contrast to her position in this case that *any* relative risk other than 1.0 reflects an association,

---

[265] *See* McTiernan Tr. at 301:10-302:11; 308:5-14 (re: Kabat (2009) describing HRs of 1.12, 1.19, and 1.43 as "no association"); *id.* at 312:12-313:12 (re: Frydenberg (2016) describing HR of 1.17 as "no association"); *id.* at 314:2-315:19 (similar); *id.* at 317:16-319:16 (similar); *id.* at 320:16-321:19 (similar); *id.* at 322:2-323:2 (similar).

regardless of its magnitude or statistical significance. *See* McTiernan Tr. at 468:7-14, 531:21-532:7 (describing risk estimates of 1.05 and 1.06 as an "increased risk" and stating that she "can't recall" her contradictory testimony in the talc litigation). Along the same lines, Dr. McTiernan's report in the talc litigation used the term "statistically significant" no fewer than 113 times across 77 pages and described virtually every risk estimate discussed therein in terms of whether it was statistically significant or not. *See, e.g.*, McTiernan Report, *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, at 8-64, Brown Decl. Ex. 118. Yet here, she purports to eschew the term "statistically significant," as well as the role of statistical significance in evaluating risk estimates. *See* McTiernan Tr. at 561:2-6 ("Q. So it was not statistically significant? A. If you're using that terminology, but I prefer to say that the confidence interval includes 1."). When shown examples of these peer-reviewed publications at her deposition, Dr. McTiernan testified that her methodology had changed and invoked Dr. Rothman's textbook, Modern Epidemiology. McTiernan Tr. at 309:9-310:19. But she ultimately admitted that she had learned about Dr. Rothman's views on statistical significance in 1977, long before the publication dates of all the peer-reviewed publications shown to her at her deposition. McTiernan Tr. at 311:2-13.

Moreover, irrespective of how Dr. McTiernan's views on statistical significance or interpretation of risk estimates may have changed, she does not apply them in a consistent or reliable manner in her expert report. For example, she claims that "there is no level of relative risk other than 1.0 that indicates lack of association," McTiernan Rep. at 108, and consistently interprets relative risks above 1.0 as an association/increased risk in her expert report. Yet in the same report, Dr. McTiernan interprets risk estimates below 1.0 as reflecting "no association." *See, e.g., id.* at 210 ("Overall, there was no association between use of ranitidine and risk for esophageal

cancer (relative risk 0.71, 95% CI 0.5-1)"; *id.* at 211-212 (similar with respect Chow study).  In fact, across more than 450 pages of three expert reports in this litigation, Dr. McTiernan never describes a risk estimate below 1.0 as reflecting a "decreased risk."  This inconsistency is another indicator of her results-driven approach.

These inconsistencies between Dr. McTiernan's methodological approaches and analyses reinforce the results-driven nature of her analysis in this case, and further undermine the reliability of the opinions proffered here.  *See Kumho Tire*, 526 U.S. at 152.

## VI.    Dr. Salmon's, Dr. Michaels', and Dr. Le's Causation Opinions Should Be Excluded

Plaintiffs' remaining causation experts—Drs. Salmon, Michaels, and Le—offer causation opinions that suffer from many of the same flaws as Drs. Moorman and McTiernan.  Each of these experts dismisses the results of the ranitidine active comparator studies as largely uninformative, relies heavily on dietary and occupational studies of NDMA, and disregards accepted statistical principles to reach their preferred conclusions.  *See supra* Background Sections III.C, III.D, and III.E.  And like Drs. Moorman and McTiernan, they fail to offer any sound scientific basis for their apparently results-driven approaches.  For the reasons already stated as to Drs. Moorman and McTiernan, their opinions should also be excluded.

Each of these experts' analyses suffers from additional methodological flaws that independently merit their exclusion.

### A.    Dr. Salmon's "Dose-Response" Analysis is Facially Unreliable

Dr. Salmon's purported "dose-response analysis" of NDMA epidemiology studies is unreliable on its face and does not extrapolate to ranitidine users.  As an initial matter, Dr. Salmon's purported method for assessing "real world" risk of various levels of NDMA exposure is intended to be applied to regulatory risk analyses.  But a regulatory risk analysis is not the same as an epidemiological causation analysis.  *See Rider*, 295 F.3d at 1201 ("[T]he [FDA] statement merely

states that possible risks outweigh the limited benefits of the drug. This risk-utility analysis involves a much lower standard than that which is demanded by a court of law. A regulatory agency such as the FDA may choose to err on the side of caution. Courts, however, are required by the *Daubert* trilogy to engage in objective review of evidence to determine whether it has sufficient scientific basis to be considered reliable.").  Indeed, EPA itself acknowledges that its risk-analysis methodology should not be used in this way, noting that this kind of analysis "does not necessarily give a realistic prediction of the risk."  EPA, *Guidelines for Carcinogen Assessment* at 13 (1986).  A risk analysis cannot serve as a basis for finding causation.  *In re Denture Cream Prod. Liab. Litig.*, 795 F. Supp. 2d 1345, 1364-65 (S.D. Fla. 2011), *aff'd, Chapman v. Procter & Gamble Dist., LLC*, 766 F.3d 1296 (11th Cir. 2014) ("[R]egulatory agencies follow different standards than courts in toxic-tort cases," namely the risk-utility standard, and "[t]he risk—utility analysis involves a much lower standard than that which is demanded by a court of law.").

Moreover, Dr. Salmon did not even follow the EPA method on which he purports to rely. Instead, he conducted separate dose-response analyses on select NDMA studies that evaluated different populations, then averaged the results of those varied studies—a method that he concedes is not generally accepted by regulatory or governmental agencies.  Salmon Tr. at 208:25-209:19. While Dr. Salmon has previously conceded that extrapolations only work between similar populations,[266] here he has averaged together dietary studies, including from men in Uruguay and retirees in the Netherlands, with occupational exposures of British rubber workers, to create a single purported "dose response," then extrapolated that hodgepodge to *ranitidine* users in the

---

[266] Salmon Rep. at 24 ("But the estimate of additional risk applies, as an average, to a specific individual who fits the description of *the population on which the estimate is based*." (emphasis added)).

US.[267]   Dr. Salmon's reliance on dietary and occupational studies is subject to significant additional error because he is using data from cohorts simultaneously exposed to known human carcinogens (such as benzene in rubber factories) to infer that *ranitidine* is a human carcinogen.

Dr. Salmon's dose-response analysis was also facially results-driven.   Indeed, he preordained the outcome of his dose-response curve from the outset by *deliberately* omitting all studies that showed no dose response.   *See supra* Background Section IV.C.iv.   His ultimate conclusion that there is a positive dose-response relationship between ranitidine and cancer is fundamentally unreliable because he designed his experiment in a way that was *guaranteed* to produce that outcome.   This kind of outcome-oriented approach to analyzing dose-response is "aimed at achieving one results" and the very opposite of sound science, and Dr. Salmon's dose-response opinion should be excluded.   *Rink*, 400 F.3d at 12 93 n.7; *Faulkner*, 46 F. Supp. 3d at 381.

**B.    Dr. Michaels Fails to Consider the "Totality" of Ranitidine Literature**

It is well-established that an expert conducting an epidemiological causation analysis must consider the totality of the available literature.   "[N]o reliable scientific approach can simply ignore the epidemiology that exists."   *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 465-66 (E.D. Pa. 2008).   Yet Dr. Michaels conceded that he had not conducted a thorough review of all of the ranitidine literature and repeatedly admitted throughout his deposition that he had "missed" particular studies.   *See supra* Background Section IV.D.ii.   That alone merits his exclusion.   Further

---

[267] *See, e.g.,* Salmon Rep. at 127-129.  The populations in this chart encompass rubber workers, Uruguayan men, and many others that are wholly dissimilar to ranitidine users.  *See, e.g.,* Salmon Report at 49 (Hidajat studied workers "in the British rubber industry…", at 59 (De Stefani 1996 was a "case-control study in Uruguay…", at 62 (De Stefani 1998 studied "dietary intake in Uruguay…"), at 69 (Keszei 2013 "was a cohort study based in the Netherlands…[of] men and women aged 55-69.")

reinforcing his lack of qualification to opine on causation, however, Dr. Michaels repeatedly disclaimed any expertise as an epidemiologist and deferred to Plaintiffs' "epidemiology experts" as to what the totality of the ranitidine literature shows.  *See id.*

### C.      Dr. Le Cherry Picks Study Results that Support Her Causation Opinions

Dr. Le's opinions should be excluded because she applied a glaringly results-driven approach to assessing the ranitidine scientific literature, thereby failing to meet even her own self-described standards for scientific reliability.  *See supra* Background Section IV.E.  Throughout Dr. Le's report and deposition, there are numerous examples of her inconsistent methodological approach to unadjusted vs. adjusted study results, active comparator vs. non-user results, and the minimal requirements for finding a causal association.  All of those inconsistencies point in a single direction: Dr. Le reported on study results that favored her causation opinions and downplayed those that did not.  The clear implication of this cherry-picked analysis is that Dr. Le's "methodology has been contrived to reach a particular result."  *Rink*, 400 F.3d at 1293 n.7.  Her causation opinions should be excluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should exclude Plaintiffs' general causation experts' opinions in their entirety.

Dated: June 13, 2022     Respectfully submitted,


               */s/ Anand Agneshwar*
               Anand Agneshwar
               ARNOLD & PORTER KAYE SCHOLER LLP
               250 West 55th Street
               New York, NY 10019
               Tel: (212) 836-8011
               Fax: (212) 836-8689
               anand.agneshwar@arnoldporter.com

               *Attorney for Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.*


               */s/ Mark Cheffo*
               Mark Cheffo
               DECHERT LLP
               Three Bryant Park
               1095 Avenue of the Americas
               New York, NY 10019
               Tel: (212) 689-3500
               Fax: (212) 689-3590
               mark.cheffo@dechert.com

               *Attorney for GlaxoSmithKline LLC*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Tel: (404) 572-3583
Fax: (404) 572-5100
abayman@kslaw.com

*Attorney for Defendant Boehringer Ingelheim*
*Pharmaceuticals, Inc.*


*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202)-434-5000
Fax: (202)-434-5029
jpetrosinelli@wc.com

*Attorney for Defendant Pfizer Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Joanne M. O'Connor*
Joanne M. O'Connor
JONES FOSTER P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
Tel: (561) 659-3000
Fax: (561) 650-5300
JOConnor@jonesfoster.com

## APPENDIX A

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Ranitidine Observational Studies Evaluating Cancer Risk** | | | | | | | | | |
| Year | Author | Comparison | Database (* = case control) | No. of Participants (Green font indicates participants in studies with active comparators) | Gastric | Esophageal | Liver | Bladder | Pancreatic |
| 2000 | Habel | Non-Use | Northern California Kaiser Permanente Pharmacies | 54,276 | ✓ (gastric & esophageal) | ✓ (gastric & esophageal) | | ✓ (bladder & kidney) | ✓ |
| 2018 | Tan | Non-Use | Veterans Affairs Corporate Data Warehouse* | 1,098 | | ✓ | | | |
| 2018 | Tran | Non-Use | Scottish Primary Care Clinical Info Unit Data* UK Biobank | 478,305 | | | ✓ | | |
| 2020 | Liu | Non-Use | Scottish Primary Care Clinical Info Unit Data* | 6,513 | ✓ | | | | |
| 2021 | Adami | Active Comparator (H2RA and PPI) | Danish Prescription Registry | 1,093,787 | ✓ | ✓ | ✓ | | ✓ |
| | Cardwell | Non-Use & Active Comparator (H2RA and PPI) | Scottish Primary Care Clinical Info Unit Data* | 17,297 | | | | ✓ | |
| | Iwagami | Active Comparator (H2RA) | Japan Medical Data Center Claims Database | 617,727 | ✓ | | | | |
| | Kantor | Non-Use & Active Comparator (PPI) | UK Biobank | 459,204 | | | ✓ | ✓ | |
| | Kim S | Non-Use | Korean National Health Insurance Service | 40,877 | ✓ | | | | |
| | Kim Y | Active Comparator (H2RA and PPI) | Explorys Database | 3,670,046 | ✓ | ✓ | ✓ | | ✓ |
| | Kumar | Active Comparator (H2RA and PPI) | Veterans Health Administration Corporate Data Warehouse | 279,505 | ✓ | | | | |
| | McDowell (Cancer Epi) | Non-Use | Scottish Primary Care Clinical Info Unit Data* | 5,798 | | | | | ✓ |
| | Norgaard | Active Comparator (H2RA and PPI) | Danish Prescription Registry | 606,626 | | | | ✓ | |
| | Yoon | Active Comparator (H2RA) | Health Insurance Review and Assessment database in South Korea | 50,610 | ✓ | | ✓ | ✓ | |
| Total Participants in Active Comparator Studies: | | | | 6,794,802 | | | | | |

**APPENDIX B**

Observational Studies Evaluating
Ranitidine Cancer Risk Before 2019

Observational Studies Evaluating
Ranitidine Cancer Risk After 2019



0 / 533,679

6,794,802 / 6,847,990

Total participants in studies with
active comparators /
total participants in all studies

Total participants in studies with
active comparators /
total participants in all studies

**APPENDIX C**

# Totality of Observational Studies: Ranitidine Use Versus Other H2RA Use



| | | |
|---|---|---|
| **Gastric** | Iwagami (2021) | 1.09 [0.96, 1.24] |
| | Adami (2021) | 0.98 [0.84, 1.14] |
| | Kim Y (2021) | 0.43 [0.36, 0.51] |
| | Kumar (2021) | 0.55 [0.40, 0.74] |
| | Yoon (2021) | 1.06 [0.86, 1.31] |
| **Esophageal** | Adami (2021) | 1.09 [0.91, 1.29] |
| | Kim Y (2021) | 0.51 [0.43, 0.60] |
| **Liver** | Adami (2021) | 0.89 [0.72, 1.10] |
| | Kim Y (2021) | 0.39 [0.36, 0.41] |
| | Yoon (2021) | 0.85 [0.69, 1.05] |
| **Bladder** | Cardwell (2021) | 1.05 [0.86, 1.28] |
| | Norgaard (2021) | 1.11 [0.95, 1.29] |
| | Yoon (2021) | 1.41 [0.88, 2.24] |
| **Pancreas** | Adami (2021) | 0.97 [0.87, 1.10] |
| | Kim Y (2021) | 0.54 [0.49, 0.62] |

**Primary Endpoints**