UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)     MDL NO. 2924
PRODUCTS LIABILITY     20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO: ALL ACTIONS

PLAINTIFFS' MOTION TO EXCLUDE
TESTIMONY OF DR. ROBERT GIBBONS[1]

---

[1] This Motion is filed under seal pursuant to the order at ECF No. 5684.

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD ...................................................................................................... 3

ARGUMENT .................................................................................................................... 5

I.   Dr. Gibbon's opinions are unreliable because he fundamentally misunderstands the experiments he critiques ................................................................................................. 5

   A. Dr. Gibbons misunderstands how the Sun, Shade, Shower and Zones Experiments were conducted, and therefore, his criticisms regarding these experiments and regarding Dr. Davis' analyses of the data are unreliable .............................................. 7

   B. Dr. Gibbons places unrealistic standards on pill testing, while not understanding that not even the FDA follows those same standards, and therefore, his opinions are unreliable ........................................................................................................... 9

II.  Dr. Gibbons reached conclusions that his own randomization experiment does not support, and therefore, these opinions should be excluded ................................................. 9

III. Dr. Gibbons based his analysis of Dr. Najafi's baseline data on cherry-picked data and, therefore, these opinions should be excluded. .................................................................. 10

IV.  Dr. Gibbons attempts to impose unrealistically strict standards on Dr. Davis that are not required in this type of statistical analysis and, therefore, these opinions should be excluded ........................................................................................................... 11

CONCLUSION & REQUESTED RELIEF ................................................................................ 11

TABLE OF AUTHORITIES

*City of Tuscaloosa v. Harcros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ...................................................................................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)..................................................................................................................3, 5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)....................................................................................................................4

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
    609 F.3d 1183 (11th Cir. 2010) ..................................................................................................4

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    No. 3:16-md-2734, 2021 WL 4951944 (N.D. Fla. July 15, 2021) .....................................4

*In re TMI Litig.*,
    193 F.3d 613 (3d. Cir. 1999)......................................................................................................5

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................................3, 5

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ..............................................................................................4, 5

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ..................................................................................................4

*Soldo v. Sandoz Pharms. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) ....................................................................................4, 7

*Thomas v. Publix Super Markets, Inc.*,
    No. 1:09-CV-01933, 2011 WL 13177240 (N.D. Ga. July 22, 2011) ...................................4

*Thomas v. Publix Super Markets, Inc.*,
    460 F. App'x 859 (11th Cir. 2012)............................................................................................4

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) .............................................................................................3, 4

*United States v. Rouco*,
    765 F.2d 983 (11th Cir. 1985) ....................................................................................................4

Fed. R. Evid. 702 ..............................................................................................................................1, 3

## INTRODUCTION

Defendants' expert, Robert D. Gibbons, Ph.D., a Professor of Biostatistics at the University of Chicago, submitted a report criticizing Plaintiffs' expert Dr. Charles Davis' statistical analyses. Dr. Gibbons was hired by Defendants to assess the statistical analysis of a series of ranitidine tests that were conducted by Emery Pharma to determine the effect of heat and humidity on NDMA levels in ranitidine tablets. Dr. Gibbons purports to opine on the statistical methodologies of Dr. Davis, and the design of the testing conducted by Emery Pharma.

Dr. Davis analyzed two data sets based on testing conducted by Emery Pharma – baseline testing and Sun, Shade, Shower (SSS) and Zones test. The baseline NDMA testing demonstrates the amount of NDMA that was found to be in the pills upon initially opening the bottle. The Sun, Shade, Shower (SSS) and Zones NDMA testing demonstrates the amount of NDMA that was found in the pills after they were subjected to heat and humidity conditions similar to those encountered from a pill bottle in a car in the sun or shade, from a pill bottle in the medicine cabinet of a bathroom, or from a pill bottle in climatic zones across the United States. Before conducting any statistical analyses, Dr. Davis prepared a pre-specified Statistical Analysis Plan (SAP) for each data set (Ex. 4 Davis Rep., App. 1).[2] He then reported the findings from each SAP, as well as any deviations from the pre-specified plans after seeing the data (*id*. at App. 2). Notably, Dr. Gibbons was tasked with critiquing the SAPs in Dr. Davis' report, but he failed to conduct any himself.

Dr. Gibbons' opinion should be excluded for two reasons. First, throughout his deposition, Dr. Gibbons demonstrated that his opinions were not based on reliable principles and methods. Dr. Gibbons does not understand Emery's testing or the purpose of Dr. Davis' statistical analysis, rendering his criticisms wholly unreliable. Second, his opinions would not "help the trier of fact to understand the evidence." Fed. R. Evid. 702. He admits his randomized simulation could have been conducted differently to better analyze the data from Emery's testing but chose instead to take the route to better serve his already decided conclusory opinions. Therefore, Plaintiffs hereby move to exclude Dr. Gibbons' entire opinion.

---

[2] All exhibits cited herein are attached to the Declaration of Tracy Finken filed contemporaneously with Plaintiffs' *Daubert* motions and bear the numbers as referenced in that Declaration. Publicly available materials are separately cited and not attached as exhibits, though courtesy copies will be provided to the Court and all parties.

## BACKGROUND

In January 2020, Dr. Najafi, on behalf of Emery Pharma, submitted a Citizen Petition to inform the FDA of its findings that the ranitidine molecule is inherently unstable and progressively accumulates NDMA at elevated temperatures. *See* Emery Pharma Citizen Petition. After being alerted by Dr. Najafi, and then conducting its own investigation, on April 1, 2020, the FDA announced that it agreed with Dr. Najafi, granted the Emery Pharma Citizen Petition, and requested a market withdrawal of all ranitidine products. *See* FDA Letter to Emery Pharma; FDA Press Release Requesting Recall of Zantac (www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market) (last accessed July 1, 2022).

After the market withdrawal of all ranitidine-containing products, the FDA requested that manufacturers of ranitidine investigate the "true source of NDMA" to understand the root cause. *See* FDA New Testing Results (www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs) (last accessed July 1, 2022). GSK conducted a root cause analysis into the presence of NDMA in Ranitidine. *See* Ex. 62 GSK Root Cause Analysis. ███████████████████████████████████████████████████████████████████. *Id.* The FDA itself also conducted additional testing after Emery Pharma's Citizen Petition, again confirming that NDMA was consistently detected in ranitidine and that elevated temperatures and time contribute to an increase in NDMA levels. *See* FDA Statement on new testing results, including low levels of impurities in ranitidine drug, November 1, 2019 (www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs) (last accessed July 1, 2022) (the "FDA Statement, Nov. 1, 2019").

As part of this litigation, Plaintiffs retained Dr. Najafi to conduct further testing to investigate the presence of NDMA in ranitidine containing products. *See* Ex. 13 Najafi Rep. at 4. That testing was extensive. Dr. Najafi performed baseline testing of 254 batches of sample product and found that only 5 batches had NDMA levels lower than the FDA's NDMA acceptable daily intake of 96 nanograms. *See id.* at 62–63. Dr. Najafi tested to assess NDMA content uniformity within a finished dose container by testing multiple lots, each with multiple representative tablets, and found that NDMA is formed uniformly (with a variation of 10.9% or less) across all tablets within a single container. *See id.* at 67–68. Dr. Najafi also performed tests to assess the stability of

ranitidine as it varies with time, temperature, humidity, and light, *see id.* at 68, and to determine if NDMA would be formed in storage conditions simulating common consumer experiences with Zantac, *see id.* at 115–25. Each of these tests utilized numerous product lots, drawn from a cross section of product type and manufacturer. *Id.*

To assist with the analysis of this trove of data from Dr. Najafi's testing, Plaintiffs retained a statistician, Dr. Davis, to prepare a Statistical Analysis Plan (SAP) for the data sets produced by Dr. Najafi and Emery Pharma. *See* Ex. 4 Davis Rep. at 1–2. Defendants proffer the opinion of Dr. Gibbons to rebut Dr. Davis' statistical analyses and criticize the design of Dr. Najafi's testing. But as shown below, Dr. Gibbons has no idea how Dr. Najafi's product testing was designed, what its purpose was, or what standards ought to be applied to it. *See* infra § I. Dr. Gibbons' own alternative statistical experiment does not support his conclusions. *See infra* § II. His analysis of Dr. Najafi's data fails to properly account for outliers in the data. *See infra* § III. And Dr. Gibbons' criticisms of Dr. Davis would impose unrealistically strict standards not recognized for studies of this sort, nor in the FDA's own testing for NDMA. *See infra* § IV.

## LEGAL STANDARD

Federal Rule of Evidence 702 "compels the district courts to perform the critical 'gatekeeping' function" concerning the admissibility of scientific and technical expert evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n. 7 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). Under Federal Rule of Evidence 702, one who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"The inquiry envisioned by Rule 702 is ... a flexible one. Its overarching subject is the scientific validity[—]and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594–95 (footnote omitted). Although the inquiry focuses "on principles and methodology, not on the conclusions that they generate," *id.* at 595, "conclusions and methodology are not entirely distinct from one another .... [and] nothing in

3

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

In deciding whether to admit expert testimony, the Eleventh Circuit requires district courts to confirm that three requirements are satisfied:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent of the expert testimony bears the burden of establishing, by a preponderance of evidence, the expert's qualification, reliability, and helpfulness. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010). To satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect" of the proposing party's case and "fit[s]" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Joiner*, 522 U.S. at 146; *accord In re Abilify (Aripiprazole) Prods. Liab. Litig.*, No. 3:16-md-2734, 2021 WL 4951944, at *2 (N.D. Fla. July 15, 2021).

Under Rule 702, the proponent of expert testimony must establish that the testimony is "reliable," which requires "that it must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than speculative belief or unsupported speculation." *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 527 (W.D. Pa. 2003); *see also Thomas v. Publix Super Markets, Inc.*, No. 1:09-CV-01933, 2011 WL 13177240, at *3 (N.D. Ga. July 22, 2011), aff'd, 460 F. App'x 859 (11th Cir. 2012).

"Daubert requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). The Court's "gatekeeper" role requires it "to make certain that an expert, whether

4

basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. When an expert's testimony "relies in part on his own *ipse dixit*, rather than on something more readily verifiable . . . it is open to attack." *In re TMI Litig.*, 193 F.3d 613, 687 (3d. Cir. 1999) ("[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive.").

With regard to reliability, the Supreme Court suggests a non-exhaustive list of several factors to consider: whether the methodology can and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593–94. The court must undertake an independent analysis of each step in the logic leading to the expert's conclusions, as "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d 1233, 1245 (11th Cir.2005).

## ARGUMENT

### I. Dr. Gibbons' opinions are unreliable because he fundamentally misunderstands the experiments he critiques.

Dr. Gibbons' report is replete with criticisms of Emery's testing because of it purportedly used "too small of a sample size." Ex. 5 Gibbons Rep. at 6. But Dr. Gibbons' deposition shows he lacks a fundamental understanding as to how the Sun, Shade, Shower and Zone tests were conducted, rendering his criticisms of the studies unreliable and speculative.

Despite his repeated contention that the sample size was too small for a valid statistical analysis, Dr. Gibbons did not know how many samples were tested by Emery:

> Q. So, if a product goes through, first it's tested for baseline, then it goes through 6 cycles, then 15 cycles, then 30 cycles and then 15 – and then 50 cycles, how many pills do you think were tested in that experiment?
>
> A. It's unclear to me from – from the data whether or not what specific pills were repeatedly evaluated under all those different cycles that you just described.
>
> Q. So you believe that it may have been one pill?
>
> A. I don't – I don't know one way or the other.

***

> Q. Do you know how many total samples were run in looking at whether or not NDMA increases as a result of sun, shade and shower, how many total pills were tested?
>
> A. I believe it was a total of 25, but I'm not positive.
>
> Q. Would it surprise you if that number is wildly off?
>
> A. It would depend on whether or not there were 25 actual tablets tested under all of the conditions or separate. I mean, looking on page 20 of my report at the top, which is abstracted from Dr. Davis' report, there were 25 samples at baseline, a maximum of 25 samples that were in shade under 15 cycles, same number for sun, same number for shower. So, it could be if those are all independent, it was a little unclear to me whether or not those were the same samples tested under each condition or independent samples, then it could be as high as 100.

Ex. 31 Gibbons Dep. 57:08–22, 58:25–59:14, 187:04–25 (objections omitted). Dr. Gibbons obviously does not understand the nature of Gas Chromatography-Mass Spectrometry (GC/MS) testing performed by Emery Pharma, which destroys each individual pill after testing. In fact, it is impossible to repeatedly run the same pill through various cycles. Each test result in Davis' report was reported as "average amount of NDMA" and nearly all of observations contain at least two test results for each reported value. While Dr. Gibbons critiques Dr. Davis' statistical analysis as invalid because the sample sizes are "too small," every test result run is its own sample and Dr. Gibbon's opinions are based on a fundamental misunderstanding of the testing.

Dr. Gibbons again testified that he did not know how many pills were actually tested and falsely assumed when forming his opinions that the ID number identified each individual pill. *Id.* at 193:24–194:24. In fact, the ID numbers in Dr. Davis' report identified the **Lot or Batch number of bottles or collection of pills**, rather than individual pills. For example, in the Sun, Shade and Shower tests there were at least 400 pills tested and over 200 observations of average amount of NDMA. *See* Ex. 4 Davis Rep., App. 5. In the Zones tests, there were at least 150 pills tested and 80 observations of average amount of NDMA. *Id.* The baseline factors described in Dr. Davis' report are factors describing the pills for that Lot or Batch number, not to an individual pill being tested. *Id.*

Beyond exhibiting a misunderstanding of the testing conducted in this case, Dr. Gibbons admitted he is unfamiliar with the statistical analysis of drug testing generally:

> Q. Have you ever done statistical analysis on pill testing before this case?
>
> A. I can't recall.

> Q. Can you think of any situation that you've been in where you've analyzed statistical properties related to pills that were tested?
>
> A. Well, I've analyzed lots of data on concentration distributions that are a function of characteristics of the sample. So, lots of analogies to this, but I can't remember right now is if the subject of that – of those analyses were pill specific and I think that I have, but I can't quite remember.
>
> Q. So, you can't – you can't point to anything where you've actually run statistical analyses on pill on results from pill testing, right?
>
> A. I just answered that, I didn't – I can't recall right now, I've done lots of analyses that are similar to this. Whether or not the subject was a pill or some other medium, I just can't remember.

Ex. 31 Gibbons Dep. 194:25–195:25 (objections omitted). Dr. Gibbons' critique of the design of Emery's testing and Dr. Davis' statistical analysis of the resulting data is grounded in speculation, confusion, and ungrounded assumption. This is exactly the type of expert opinion Daubert is designed to keep from confusing the trier of fact. *See Soldo, supra*, 244 F. Supp. at 527. Therefore, the opinions in Dr. Gibbons' expert report should be excluded in their entirety.

**A. Dr. Gibbons misunderstands how the Sun, Shade, Shower and Zones Experiments were conducted, and therefore, his criticisms regarding these experiments and regarding Dr. Davis' analyses of the data are unreliable.**

Dr. Gibbons criticizes the data Dr. Davis analyzes despite his ignorance of how it was collected and how Emery's tests, which sourced the data Dr. Davis then analyzed, were designed. Dr. Gibbons characterizes Emery Pharma's testing as "poorly designed," yet admits he has no idea *how* it was designed:

> Q. For the sun, shade, shower and zones experiment, do you know where those samples or product came from?
>
> A. So, those were described in Dr. Najafi's report. Where – the initial sources of the tablets is unclear to me, where they came from. And **it was also unclear to me what exactly, you know, how Dr. Najafi actually designed the experiments**, particularly since they were so unbalanced in terms of numbers of tablets within different conditions.
>
> \*\*\*
>
> Q. So, you don't know if that data came from Dr. Najafi, Emery Pharma or even some other place like the FDA or defendants' internal documents?
>
> A. Again, as I've indicated, it's unclear to me one way or the other where those – what the original source of those data were after reading Dr. Najafi's report and Dr. Davis' report.

7

Ex. 31 Gibbons Dep. 37:16–38:20, 38:10–39:04; 39:15–39:23 (emphasis added) (objections omitted). By contrast, in his deposition, Dr. Davis was able to clearly describe the purpose of Emery's testing:

> Q. Okay. All right. What's your understanding of the purpose of measuring the NDMA in the samples of Zantac tablets?
>
> A. There were two purposes. And one relates to the baseline data. And that's – the general question was, are there factors associated with the baseline level of NDMA. That was that purpose.
>
> Q. Okay.
>
> A. And then in the other experiments it was, do these additional factors, like sun, shade, shower and zone, does the NDMA level increase based on exposure, I'll say, just in general. So those were the two purposes of the work I did. So that's why I wrote one statistical analysis plan for baseline, and one statistical analysis plan for sun, shade, shower, zone.

Ex. 28 Davis Dep. 80:13–81:06.

Dr. Gibbons also criticizes the small sample size and small number of observations for the Sun, Shade, Shower and Zones tests, but fails to understand just how large the sample size truly was. The sample sizes and number of observations were clearly adequate to demonstrate that, as the number of cycles increased, so too did amount of NDMA (and to give details as to how much NDMA is forming as cycles increase). Between the Sun, Shade, and Shower experiment, Emery Pharma made over 200 observations of the average amount of NDMA. Similarly, over 150 pills were tested in the Zones experiment and 80 observations were made of the average amount of NDMA. This is substantially more testing of brand name pills (and observations) than the number of name brand pills tested by the FDA. *See* FDA Statement, Nov. 1, 2019, *supra*. Also, Dr. Davis analyzed low variation between pills in the same bottle, which demonstrates reliability of the testing. *See* Ex. 4 Davis Rep. at 3. In addition, the FDA and Defendants both found that ranitidine breaks down into NDMA due to the factors of heat and humidity over time. Likewise, Dr. Davis' analyses consistently demonstrate that as ranitidine pills were exposed to an increasing number of cycles in the Sun, Shade, Shower and Zones testing, the amount of NDMA formed would also increase. Dr. Gibbons did not refute Dr. Davis' analyses that the likelihood that these findings were due to chance was extremely low. *See* Ex. 28 Davis Dep. 284:18-287:21 (objections omitted).

8

Dr. Gibbons clearly misunderstands Dr. Najafi's testing and Dr. Davis' analyses, which is why his criticisms of the resulting data and Dr. Davis' analyses thereof are completely unreliable and should be excluded.

> **B. Dr. Gibbons places unrealistic standards on pill testing, while not understanding that not even the FDA follows those same standards, and therefore, his opinions are unreliable.**

Dr. Gibbons also criticizes Dr. Davis' statistical analysis because a power calculation was not performed before testing, and pills were not randomly selected for testing. *See* Ex. 5 Gibbons Rep. ¶ 55, 7. But this again demonstrates Dr. Gibbons' unfamiliarity with pill testing and shows he is not reliably opining on Dr. Davis' methodology. For pill testing experiments, a power calculation is not commonly set up beforehand to establish how many pills need to be tested, nor to extrapolate results to population. *See* Ex. 28 Davis Dep. 295:18–297:04. In fact, when the FDA tested pills and reported the results, the FDA did not perform a power calculation before testing to determine how many pills needed to be tested to extrapolate the results to all ranitidine pills on the market. *See* FDA Statement, Nov. 1, 2019, *supra*. In addition, the FDA did not randomly select pills before testing ranitidine for NDMA. *See id.* There is no support for Dr. Gibbons' contention that these statistical methods—which are not used even by governing regulatory authorities—should have been employed in this case. That opinion should be excluded.

> **II. Dr. Gibbons reached conclusions that his own randomization experiment does not support, and therefore, these opinions should be excluded.**

But Dr. Gibbons' own randomization experiment does not support his opinions that the number of statistically significant findings in Dr. Davis' analyses could have been due to chance. In assessing the Summary Statistics for Baseline Average NDMA Level by Factor, in Appendix 3 of Dr. Davis' report, Dr. Gibbons admitted that eight of the twelve ANOVA p-value tests were found to be statistically significant. *See* Ex. 31 Gibbons Dep. 141:12–21. However, in Gibbons' randomized experiment, Dr. Gibbons ran 1,000 simulations and none of Dr. Gibbons' experiments had five or more statistically significant results. *Id.* at 141:22–142:10. Therefore, the chances that eight factors had statistically significant results would be extremely low.

In addition, Dr. Gibbons' randomized experiment was flawed. Dr. Gibbons made conclusory statements regarding adjustments he believed should be made for "confounding" factors in Dr. Davis' analysis, but instead of repeating the same type of analysis and performing the adjustment he claims should have been made, he randomized the factors and conducted an

9

entirely different simulation. *Id.* at 128:01–130:18. Notably, Dr. Gibbons did not adjust for confounding in his own randomized simulation. *Id.* at 128:16–129:11. The simulation conducted by Dr. Gibbons, designed essentially to find fault with Dr. Davis' methodology, was an entirely different experiment with no bearing on the results Dr. Davis reported. *Id.* at 130:03–131:05. Dr. Gibbons acknowledged that he could have conducted his randomized experiment differently to better analyze whether the various factors resulted in an increased risk of NDMA forming:

> Q. In your simulation, you could run a program that, rather than assigning the value per each and breaking up each individual factor, you could have assigned the value randomly of the 254 products that were tested, the NDMA that was given for the average NDMA, and you could've randomized that over the 254 and you could've done 1000 simulations of that to see how many were statistically significant. How is that more difficulty (*sic*)?
>
> A. So, as I indicated before, what I wanted to do was to create the most conservative case. **I could've done that.** My guess is it would have produced even more significant results by chance alone.
>
> Q. But that's a guess because you didn't do it, right?
>
> A. That's correct…

*Id.* at 132:04–23 (objections omitted) (emphasis added). Dr. Gibbons' methodology is flawed because he ran a simulation that was entirely different from the data Dr. Davis analyzed. Dr. Gibbons designed a randomized experiment that was flawed, and the results do not even match his opinions. Therefore, his criticisms regarding Dr. Davis' analyses of Emery Pharma's baseline testing results should be excluded.

### III. Dr. Gibbons based his analysis of Dr. Najafi's baseline data on cherry-picked data and, therefore, these opinions should be excluded.

Dr. Gibbons cherry-picked the Sanofi data to run his analysis and criticize Dr. Davis, which renders his opinion unreliable. He ignores obvious outliers in a whopping 5% of data with NDMA levels between 8,000–15,000 nanograms, compared to the other 95% of tested pills with closer to 0–3,500 nanograms of NDMA. Dr. Gibbons was asked if he looked to see if there were clear outliers, to which he responded, "not specifically," then provided only evasive and non-responsive answers after being asked five times whether he even noticed that approximately 5% of the results in pills that came from Sanofi were clear outliers, with NDMA levels that were much higher than in 95% of the tablets tested. *See* Ex. 31 Gibbons Dep. 39:24–41:20, 42:10–45:08, 46:15–47:08. This means that Dr. Gibbons could not have accounted for outliers, and his testimony demonstrated

10

a fundamental misunderstanding of the variability he did recognize, which renders his analysis wholly unreliable.

Despite Dr. Gibbons' evasiveness, it is clear he either failed to observe obvious outliers in the baseline data, or purposefully ignored them. Such blatant outliers in the baseline data would knowingly cause more variance and non-normality of data, suggesting that some segment of the Sanofi pills had very high levels of NDMA compared to the other pills analyzed. This explains many of Dr. Gibbons' findings, but he fails to acknowledge this baseline cause in his report or the obvious effect it will have on his analyses. Instead, acting as an advocate for Defendants, he criticizes Emery's testing as poorly designed and suggests statistical issues with Dr. Davis' analysis. On the other hand, Dr. Davis recognized this non-normality of the data, explained it in his deposition, and also accounted for it by also running a non-parametric analysis, the Kruskal-Wallis test. *See* Ex. 28 Davis Dep. 146:08–14, 147:21–149:08. Dr. Gibbons' choice to focus on outlier data—and his failure to appropriately account for them—demonstrates that his opinion is not rooted in sound methodology and should be excluded.

**IV.    Dr. Gibbons attempts to impose unrealistically strict standards on Dr. Davis that are not required in this type of statistical analysis and, therefore, these opinions should be excluded.**

Dr. Gibbons criticizes Dr. Davis for failing to adjust for multiplicity in his analysis. In suggesting that an adjustment for multiplicity is required for this type of analysis, Dr. Gibbons attempts to impose a standard not recognized in epidemiological studies of this sort, nor in FDA testing for NDMA, nor in Defendants' own root cause testing for NDMA. In fact, Dr. Gibbons did not even adjust for multiplicity when he conducted his own analyses, yet he suggests this is something Dr. Davis must do. *See* Ex. 31 Gibbons Dep. 97:22–101:04. Regardless of the appropriate standard for this type of testing, when asked, Dr. Gibbons did not know whether the FDA performed a multiplicity analysis for its testing, whether NDMA epidemiology studies used multiplicity analyses, or even whether defendants used multiplicity analyses in their root cause analyses and testing for NDMA in tablets. *Id.* at 96:6–97:21, 98:13–99:16. Dr. Gibbons' criticisms regarding multiplicity are unreliable, and therefore, should be excluded.

## CONCLUSION & REQUESTED RELIEF

Dr. Gibbons' opinions are unreliable pursuant to *Daubert,* because he lacks the practical experience and a basic understanding of the science involved in this case. This resulted in many methodological errors in Dr. Gibbons' report, including requiring standards that do not exist for

11

pill testing, cherry-picking evidence that suited his conclusions, and misinterpreting the experiment he criticizes. For these reasons, this Court should exclude his opinions.

DATED: July 18, 2022.

Respectfully submitted,

| | |
|---|---|
| */s/ Tracy A. Finken* <br> Tracy A. Finken <br> Email: tfinken@anapolweiss.com <br> ANAPOL WEISS <br> One Logan Square <br> 130 North 18th Street, Suite 1600 <br> Philadelphia, PA 19103 <br> Tel: (215) 735-1130 | By: */s/ Robert C. Gilbert* <br> Robert C. Gilbert, FBN 561861 <br> Email: gilbert@kolawyers.com <br> KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT <br> 2800 Ponce de Leon Boulevard, Suite 1100 <br> Coral Gables, FL 33134 <br> Tel: (305) 384-7270 |
| */s/ Michael L. McGlamry* <br> Michael L. McGlamry <br> Email: efile@pmkm.com <br> POPE McGLAMRY, P.C. <br> 3391 Peachtree Road NE, Suite 300 <br> Atlanta, GA 30326 <br> Tel: (404) 523-7706 | */s/ Adam Pulaski* <br> Adam Pulaski <br> Email: adam@pulaskilawfirm.com <br> PULASKI KHERKHER, PLLC <br> 2925 Richmond Avenue, Suite 1725 <br> Houston, TX 77098 <br> Tel: (713) 664-4555 |

*Plaintiffs' Co-Lead Counsel*

| | |
|---|---|
| Rosemarie R. Bogdan <br> Email: Rosemarie.bogdan@1800law1010.com <br> MARTIN, HARDING & MAZZOTTI <br> 1 Wall Street <br> Albany, NY 12205 <br> Tel: (518) 862-1200 | Mark J. Dearman, FBN 0982407 <br> Email: mdearman@rgrdlaw.com <br> ROBBINS GELLER RUDMAN & DOWD <br> 120 East Palmetto Park Road, Suite 500 <br> Boca Raton, FL 33432 <br> Tel: (561) 750-3000 |
| Elizabeth A. Fegan <br> Email: beth@feganscott.com <br> FEGAN SCOTT, LLC <br> 1456 Sycamore Rd. <br> Yorkville, IL 60560 <br> Tel: (312) 741-1019 | Marlene J. Goldenberg <br> Email: mjgoldenberg@goldenberglaw.com <br> GOLDENBERG LAW, PLLC <br> 800 LaSalle Avenue, Suite 2150 <br> Minneapolis, MN 55402 <br> Tel: (855) 333-4662 |

| | |
|---|---|
| Ashley Keller<br>Email: ack@kellerpostman.com<br>KELLER \| POSTMAN<br>2800 Ponce de Leon Boulevard, Suite 1100<br>Coral Gables, FL 33134<br>Tel: (312) 741-5222 | Frederick S. Longer<br>Email: flonger@lfsblaw.com<br>LEVIN SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Tel: (215) 592-1500 |
| Roopal P. Luhana<br>Email: luhana@chaffinluhana.com<br>CHAFFIN LUHANA LLP<br>600 Third Avenue, 12th Floor<br>New York, NY 10016<br>Tel: (888) 480-1123 | Francisco R. Maderal, FBN 0041481<br>Email: frank@maderalbyrne.com<br>MADERAL BYRNE PLLC<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Tel: (305) 520-5690 |
| Ricardo M. Martinez-Cid, FBN 383988<br>Email: RMartinez-Cid@Podhurst.com<br>PODHURST ORSECK, P.A.<br>SunTrust International Center<br>One S.E. 3rd Avenue, Suite 3200<br>Miami, FL 33130<br>Tel: (305) 358-2800 | Lauren S. Miller<br>Email: laurenm@hbsslaw.com<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1914 4th Avenue North<br>Suite 320<br>Birmingham, AL 35203<br>Tel: (205) 533-4175 |
| Melanie H. Muhlstock<br>Email: mmuhlstock@yourlawyer.com<br>PARKER WAICHMAN LLP<br>6 Harbor Park Drive<br>Port Washington, NY 11050<br>Tel: (516) 723-4629 | Daniel A. Nigh, FBN 30905<br>Email: dnigh@levinlaw.com<br>LEVIN PAPANTONIO THOMAS<br>MITCHELL RAFFERTY & PROCTOR, P.A.<br>316 South Baylen Street, Suite 600<br>Pensacola, FL 32502<br>Tel: (888) 435-7001 |
| Carmen S. Scott<br>Email: cscott@motleyrice.com<br>MOTLEY RICE LLC<br>28 Bridgeside Blvd.<br>Mount Pleasant, SC 29464<br>Tel: (843) 216-9160 | Mikal C. Watts<br>Email: mcwatts@wattsguerra.com<br>WATTS GUERRA LLP<br>4 Dominion Drive<br>Building 3, Suite 100<br>San Antonio, TX 78257<br>Tel: (800) 294-0055 |

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

| | |
|---|---|
| Lea P. Bucciero<br>Email: lbucciero@podhurst.com<br>PODHURST ORSECK, P.A.<br>SunTrust International Center<br>One S.E. 3rd Avenue, Suite 3200<br>Miami, FL 33130<br>Tel: (305) 358-2800 | Alexander C. Cohen<br>Email: acohen@rgrdlaw.com<br>ROBBINS GELLER RUDMAN & DOWD<br>120 East Palmetto Park Road<br>Suite 500<br>Boca Raton, FL 33432<br>Tel: (561) 750-3000 |
| Marlo E. Fisher<br>Email: marlo@pulaskilawfirm.com<br>PULASKI KHERKHER, PLLC<br>2925 Richmond Avenue, Suite 1725<br>Houston, TX 77098<br>Tel: (713) 664-4555 | Kendra Goldhirsch<br>Email: goldhirsch@chaffinluhana.com<br>CHAFFIN LUHANA LLP<br>600 Third Avenue, 12th Floor<br>New York, NY 10016<br>Tel: (888) 480-1123 |
| Noah Heinz<br>Email: noah.heinz@kellerpostman.com<br>KELLER \| POSTMAN<br>1100 Vermont Avenue NW, Floor 12<br>Washington, DC 20005<br>Tel: (202) 918-1841 | Catelyn McDonough<br>Email: cmcdonough@anapolweiss.com<br>ANAPOL WEISS<br>One Logan Square<br>130 North 18th Street, Suite 1600<br>Philadelphia, PA 19103<br>Tel: (215) 735-1130 |
| Caroline G. McGlamry<br>Email: carolinemcglamry@pmkm.com<br>POPE McGLAMRY, P.C.<br>3391 Peachtree Road NE, Suite 300<br>Atlanta, GA 30326<br>Tel: (404) 523-7706 | Madeline Pendley<br>Email: mpendley@levinlaw.com<br>LEVIN PAPANTONIO THOMAS<br>MITCHELL RAFFERTY & PROCTOR, P.A.<br>316 South Baylen Street, Suite 600<br>Pensacola, FL 32502<br>Tel: (850) 435-7003 |
| Laura K. Stemkowski<br>Email: lstemkowski@motleyrice.com<br>MOTLEY RICE LLC<br>28 Bridgeside Blvd.<br>Mount Pleasant, SC 29464<br>Tel: (843) 216-9165 | Daniel E. Tropin<br>Email: tropin@kolawyers.com<br>KOPELOWITZ OSTROW FERGUSON<br>WEISELBERG GILBERT<br>2800 Ponce de Leon Boulevard, Suite 1100<br>Coral Gables, FL 33134<br>Tel: (954) 990-2216 |

*Plaintiffs' Leadership Development Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

/s/ *Robert C. Gilbert*
Robert C. Gilbert