**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                      MDL NO. 2924
PRODUCTS LIABILITY                                              20-MD-2924
LITIGATION

                                              JUDGE ROBIN L. ROSENBERG
                                    MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO: ALL ACTIONS


**PLAINTIFFS' MOTION TO EXCLUDE**
**INADMISSIBLE OPINIONS OF DR. BERNARD OLSEN[1]**

---

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................... 2

DR. OLSEN'S UNSUPPORTED OPINIONS .................................................... 3

     cGMP/GLP ....................................................................................................4

     Outlier Data Opinion.....................................................................................4

     Hypothetical Volatilization Theory ...............................................................6

     Opinions That Amount to Concerns with No Underlying Proof .......................6

LEGAL STANDARDS ........................................................................................... 7

ARGUMENT ......................................................................................................... 8

I.      Dr. Olsen seeks to hold Dr. Najafi to inapplicable standards ..............................8

II.     Dr. Olsen speculative opinions were formed without reviewing and reporting all the available testing, including that performed by GSK, and are unreliable ............................9

III.    Dr. Olsen's hypothetical opinion that Dr. Najafi's testing itself somehow caused the presence of NDMA is not based on any scientific methodology......................................11

IV.    Dr. Olsen repeatedly expresses imprecise, unspecified, and unsubstantiated "concerns" with Dr. Najafi's methodology, but does not base those concerns in scientific methodology.....................................................................12

CONCLUSION & REQUEST FOR RELIEF .................................................. 13

TABLE OF AUTHORITIES

*Bowe v. Pub. Storage*,
   No. 14-cv-21559, 2015 WL10857339 (S.D. Fla. June 2, 2015)........................................12

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
   No. 14-cv-24277, 2016 WL 7507848 (S.D. Fla. Aug. 1, 2016) ......................................11

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) ...................................................................................12

*Chapman v. Procter & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014) .....................................................................................9

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) .......................................................................................7

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)......................................................................................................1, 7

*DeWit v. UPS Ground Freight, Inc.*,
   No. 16-cv-36, 2017 WL 3141074 (N.D. Fla. June 29, 2017) ...........................................13

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..................................................................................................11, 12

*Hendrix v. Evenflo Co., Inc.*,
   255 F.R.D. 568 (N.D. Fla. 2009) ..................................................................................11

*Hi-Tech Pharma. Inc. v. Dynamic Sports Nutrition, LLC*,
   No. 16-cv-949, 2021 WL 2185699 (N.D. Ga. May 28, 2021)......................................8, 13

*In re Trasysol Prods. Liabl. Litig.*,
   No. 08-md-01928, 2010 WL 4052141 (S.D. Fla. May 12, 2010) ....................................12

*Kilpatrick v. Breg, Inc.*,
   No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)...................................11

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010) ......................................................................................7

*King v. Cessna Aircraft Co.*,
   No. 03-20482-CIV, 2010 WL 1980861 (S.D. Fla. May 18, 2010)...................................12

*Kuhn v. Wyeth, Inc.*,
   686 F.3d 618 (8th Cir. 2012) ........................................................................................12

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ......................................................................................13

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
    25 F.4th 1312 (11th Cir. 2022) ..................................................................................7, 11

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
    No. 13-CIV-80371, 2015 WL 11251759 (S.D. Fla. July 6, 2015) ....................................8

*Parkervision, Inc. v. Qualcomm Inc.*,
    No. 3:11-cv-719, 2013 WL 12152672 (M.D. Fla. 2013).............................................9–10

*PODS Enters. v. U-Haul Inter., Inc.*,
    No. 8:12-CV-01479, 2014 WL 12628664 (M.D. Fla. June 27, 2014) ..............................9

*Price v. Carnival Cruise Lines*,
    No. 20-cv-20621, 2022 WL 951318 (S.D. Fla. Mar. 30, 2020) ......................................12

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ...................................................................................7, 9

*Rider v. Sandoz Pharm. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) .......................................................................................7

*Romano v. John Hancock Life Ins. Co. (USA)*,
    No. 19-21147-CIV, 2022 WL 1447733 (S.D. Fla. May 9, 2022)......................................8

*Robinson v. City of Montgomery*,
    No. 2:01cv400, 2005 WL 6743206 (M.D. Ala. Mar. 2, 2005).........................................12

*Siharath v. Sandoz Pharm. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001) ............................................................................7

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ......................................................................................12

21 C.F.R. § 58.1 .....................................................................................................................4, 9

Fed. R. Evid. 702 .......................................................................................................................7

**INTRODUCTION**

Dr. Olsen was retained to provide "opinions on behalf of the Defendants to analyze and comment on the scientific reliability of the opinions expressed in the reports of Plaintiffs' experts." Ex. 14 Olsen Rep. at 4.[2] He does no original analysis of the chemistry presented in this case, such as developing or validating a testing method for NDMA or testing ranitidine for the presence of NDMA. Most of his report is directed towards criticizing the opinions of Dr. Ron Najafi and the work of Emery Pharma. But Dr. Olsen goes too far when advocating Defendants' positions by offering opinions that are based on his subjective beliefs and unsupported speculation, in violation of the well-worn standards of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In those instances, his opinions should be excluded.

Specifically, Dr. Olsen reported that Dr. Najafi should have used Current Good Manufacturing Practices (cGMP) and Good Laboratory Practices (GLP) standards, but at deposition conceded these standards are inapplicable. He says Emery Pharma's baseline NDMA results are incorrect because they show higher amounts of NDMA than reported by others, but he did not review the methodology behind any of the other reported baseline results and does not even know the amounts of NDMA found by the defendants in their own testing of ranitidine. Given his lack of knowledge of the comparator studies' methodology, Dr. Olsen cannot possibly know whether there are valid reasons for the distinctions between those results and Dr. Najafi's results. Dr. Olsen also suggests a potential alternative hypothesis that NDMA is somehow forming during the ionization process of Dr. Najafi's testing method, but he offers no evidence for this hypothesis and instead insists that it is Dr. Najafi's burden to disprove his unsupported theory. Lastly, Dr. Olsen raises a multitude of vague "concerns," untethered to any methodological basis, instead asking the Court to accept them as valid without explanation.

In sum, Dr. Olsen fails to constrain his critiques to those grounded in observable fact and sound methodology. As a result, the Court must exclude the inadmissible opinions contained in his reports and stated in his testimony.

---

[2] All exhibits cited herein are attached to the Declaration of Tracy Finken filed contemporaneously with Plaintiffs' *Daubert* motions and bear the numbers as referenced in that Declaration. Publicly available materials are separately cited and not attached as exhibits, though courtesy copies will be provided to the Court and all parties.

## BACKGROUND

In September 2019, the Valisure laboratory filed a Citizen Petition with the FDA explaining that it had found NDMA in Zantac tablets. In November, the FDA reported the results of its own tests, making two key findings. *See* FDA New Testing Results (www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs) (last accessed July 1, 2022). First, while Valisure utilized a "published method" for testing a different pharmaceutical (Valsartan) for nitrosamine carcinogen impurities (i.e., gas chromatography-mass spectrometry), Zantac's apparent susceptibility to degrading when exposed to heat—when combined with the high-temperatures inherent in GC-MS testing—was causing falsely high NDMA levels. *Id.* Second, the FDA reported that, when using a testing protocol that did not rely on heating the sample (i.e., liquid chromatography high resolution mass spectrometry), NDMA was still detected in some lots of ranitidine that exceeded the daily intake limit of 96 nanograms. *Id.* Accordingly, the FDA asked manufacturers to conduct their own laboratory testing to examine levels of NDMA and voluntarily recall ranitidine if NDMA levels above the acceptable limits (96 ng per day) were found. *Id.* The FDA had discovered a problem the root cause of which was not yet known.

Emery Pharma went to work conducting a preliminary investigation of the root cause of NDMA in Zantac. Emery learned that NDMA was not caused by contamination but instead was forming from a degradation of the ranitidine molecule itself.  Accordingly, on January 2, 2020, Dr. Najafi, on behalf of Emery Pharma, submitted a Citizen Petition to inform the FDA of its findings that the ranitidine molecule is inherently unstable and progressively accumulates NDMA at elevated temperatures. *See* Emery Pharma Citizen Petition. After being alerted by Dr. Najafi, and then conducting its own investigation, on April 1, 2020, the FDA announced that it agreed with Dr. Najafi, granted the Emery Pharma Citizen Petition, and requested a market withdrawal of all ranitidine products. *See* FDA Letter to Emery Pharma; FDA Press Release Requesting Recall of Zantac (www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market) (last accessed July 1, 2022).

After the market withdrawal of all ranitidine-containing products, the FDA requested that manufacturers of ranitidine investigate the "true source of NDMA" to understand the root cause. *See* FDA Statement on new testing results, including low levels of impurities in ranitidine drug, November  1,  2019  (www.fda.gov/news-events/press-announcements/statement-new-testing-

results-including-low-levels-impurities-ranitidine-drugs) (last accessed July 1, 2022). GSK conducted a Root Cause Analysis (RCA) into the presence of NDMA in Ranitidine Hydrochloride Drug Substance and Associated Drug Products. *See* Ex. 62 GSK Root Cause Analysis.



*. Id.*

Due to this Court's preservation order, Defendants were obliged to retain adequate inventory of Zantac and have always possessed the capacity and product necessary to conduct their own testing, but apparently have declined to do so. *See* Ex. 51 Jung Decl. ¶ 9. Instead, Defendants presented the opinion of Dr. Bernard Olsen, who conducted no independent investigation into this matter, did no testing himself, did not compare the results of Emery Pharma to the Defendants' testing results or other publicly available ranitidine testing results, but still managed to amass a laundry list of (unsupported) criticisms of the work Dr. Najafi and the team at Emery Pharma performed.

### DR. OLSEN'S UNSUPPORTED OPINIONS

Dr. Olsen, a 29-year veteran of the pharmaceutical industry, now does consulting work for pharmaceutical companies. Ex. 37 Olsen Dep. 26:9–19, 44:16–45:5. In his work as a pharmaceutical consultant, Dr. Olsen advises companies on how to identify impurities—including genotoxic impurities like NDMA, which he agrees is a probable human carcinogen—but was not asked to do any such assessment in this case. *Id.* at 26:9–28:17, 65:16–66:24, 73:18–74:02.

Dr. Olsen has never personally performed a mass spectrometry assay for a nitrosamine. *Id.* at 49:07–25. He has never directed work with mass spectrometry to measure NDMA. *Id.* at 50:01–03. He has never developed or validated any analytical assays for NDMA. *Id.* at 57:03–10. He has not personally run a triple quadrupole mass spectrometer like the one used by Emery Pharma in this case, nor has he worked hands-on with the MassHunter software used by Emery Pharma. *Id.* at 62:06–14, 63:03–09. Indeed, Dr. Olsen has never used MRM mass spectrometry to measure nitrosamines of any kind. *Id.* at 63:10–15. Despite his own lack of experience and specific knowledge, Dr. Olsen was retained to pontificate "on the scientific reliability of the opinions

expressed in the report of Plaintiffs' experts," including Ramin Najafi, Ph.D. *See* Ex. 14 Olsen Rep. at 4.  From his shaky vantage, Dr. Olsen concludes that Dr. Najafi's testing was invalid based on certain alleged methodological flaws and resulting calculation errors based on that data. *Id.*  As demonstrated below, it is Dr. Olsen's opinion that is unreliable and flawed.

## cGMP/GLP

Dr. Olsen chastises Dr. Najafi for not applying the Current Good Manufacturing Practices (cGMP) and Good Lab Practices (GLP) standards to his testing. *Id.* at 30–34. But Dr. Olsen himself acknowledged, when showed the FDA's statement about cGMP regulations, that they do not apply to Dr. Najafi's testing because Emery Pharma was not manufacturing a drug product. *See* Ex. 37 Olsen Dep. 153:6-22, 154:9–10, 154:19–25, 155:12–19; FDA Statement on Current Good Manufacturing Practice (CGMP) Regulations. Similarly, Dr. Olsen acknowledged that GLP applies to laboratory studies that are intended to support applications for research or marketing permits for products regulated by the FDA (21 CFR § 58.1), and that Emery was not doing that type of work in this case. *See* Ex. 37 Olsen Dep. 146:21–149:05.  Most incredibly, Dr. Olsen should know better than to cast such aspersions since he has personally disregarded the same cGMP standard in his own practice. *Id.* at 130:3–143:12. Hypocrisy is not a reliable methodology.

## Outlier Data Opinion

Dr. Olsen also offers an opinion that Dr. Najafi's findings of excess NDMA being present in Defendants' ranitidine products is unreliable outlier data. *See* Ex. 14 Olsen Rep. at 41–48. To make this assertion Dr. Olsen averts his attention from all testing results and restricts his reporting to the low NDMA results reported by the regulatory agencies. But this is classic cherry-picking. There are many ranitidine NDMA testing results that are higher than those included by Dr. Olsen in his report. It is not a reliable methodology to ignore all results that do not suit your clients.

For example, when listing the FDA results, Dr. Olsen omits the testing result for the Novitium 300 mg Ranitidine tablet (showing 860 ng of NDMA) or the Aurobindo 300 mg tablet (with 560 ng of NDMA), and only reports the NDMA ppm of 2.97 without explanation that this amount equates to 445.5 ng (150 mg tablet) and 891 ng (300 mg tablet).  *See* FDA Statement on Laboratory Analysis of Ranitidine and Nizatidine Products (www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine) (last accessed July 1, 2022); FDA Letter to Emery Pharma, *supra*. He likewise did not report the baseline levels of the 150 mg tablets used in the Abe Study (28.5 and 433.5 ng, which increased to 17,400 ng and 2,700 ng under accelerated conditions of 40

4

°C /75% RH). *See* Abe, et al., *Temperature-Dependent Formation of NDMA during the Storage of Ranitidine Reagent Powders and Tablets*, CHEM. PHARM. BULL. ADV. PUB. (2020). Nor did he report the baseline NDMA levels of the tablets in the Braunstein study (947 ng). *See* Braunstein, et al., *Analysis of Ranitidine-Associated NDMA Production Under Simulated Physiologic Conditions*, JAMA OPEN (2021); Ex. 34 Light Dep. 188:01–191:21.

Most importantly, Dr. Olsen fails to properly compare Emery Pharma's results to the results of GSK, which tested a wide variety of API and Finished Drug Product samples with varying manufactured and expiration dates as part of their root case analysis. Inexplicably, Dr. Olsen opines that Dr. Najafi's results are too far afield from the results of GSK's root cause analysis to be reliable. But despite claiming his opinion was based on a comparative analysis between Dr. Najafi's testing and the testing of GSK, Dr. Olsen conceded at deposition that he did not actually review or analyze the results of the GSK testing. *See* Ex. 37 Olsen Dep. 115:21–116:12, 117:2–16. Dr. Olsen testified he did not know how many tablets GSK found that had more than 1,000 ng of NDMA because he never analyzed the data himself and only relied on the range reported by Dr. Najafi in his report. *Id.* at 116:13–18, 117:22–118:20.

Had Dr. Olsen done a proper comparison, he would have discovered an absence of support for his position. In fact, the results of GSK's root cause analysis and Emery Pharma's testing are similar, and as such Emery Pharma's results are certainly not "much higher than the data from all other sources." Ex. 14 Olsen Rep. at 43. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████. *See* Ex. 62 GSK Root Case Analysis; Ex. 63 Master Data Spreadsheet. ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████. *Id.* Emery Pharma measured the baseline levels of NDMA in ranitidine and got similar results. The Emery API baseline average NDMA levels expressed in terms of a 150 mg dose of ranitidine ranged from 57.9 to 6,671.4 nanograms per 150 mg of ranitidine. *See* Ex. 13 Najafi Rep. ¶ 135. The NDMA levels found by Emery Pharma in the tablets ranged from 11.7 ng to 14,991.6 ng for 150 mg tablets, with the mean NDMA-level for an unexpired 150 mg tablet reported as 1,096.6 ng. For expired 150 mg tablets, the mean NDMA level was 2,222.2 ng. *Id.* at ¶ 131.

In further derogation of any semblance of a comparative analysis, Dr. Olsen ignored the NDMA values measured by Sanofi in their root cause analysis and conceded that he did not review any of the validation data from Sanofi. *See* Ex. 37 Olsen Dep.167:3–12. ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████. Again, this value is in line with the Emery Pharma test results but was not considered by Dr. Olsen.

In fact, Dr. Olsen helps prove Plaintiffs' point by arguing that three of Dr. Najafi's reported results (out of 166) for unexpired lots are above 11,000 ng/150 mg, with all other results below 3,000 ng/150 mg. *See* Ex. 14 Olsen Rep. at 46. Dr. Olsen notes that the mean, excluding the three atypical results, calculates as 879.60 ng/150 mg. *Id.* Of course, as recounted above, that recalculated mean (879.60 ng/150 mg tablet) is consistent with other reported results, albeit results not considered by Dr. Olsen. So, Dr. Olsen's own analysis—when paired with a full review of available data—disproves his opinion that Emery Pharma's data are "outliers."

### Hypothetical Volatilization Theory

In his supplemental report, Dr. Olsen introduces a new alternative hypothesis for Dr. Najafi's results. *See* Ex. 15 Olsen Supp. Rep. at 3. He posits a hypothetical theory that NDMA was created during the volatilization or ionization process. *Id.* at 3–4. But Dr. Olsen has no evidence to support this hypothesis, admitting "I don't know of a study that has shown that" and "Yokoo's paper does not talk about high heat in a mass spec necessarily." Ex. 37 Olsen Dep. 195:15–197:15. Instead, Dr. Olsen seeks to impose a "burden of proof" on Dr. Najafi to disprove his unsupported hypothetical opinion, failing to realize he has the burden to support his own hypotheses.

### Opinions That Amount to Concerns with No Underlying Proof

Lastly, Dr. Olsen continuously raises unsubstantiated and unspecified "concerns" related to Dr. Najafi's testing. *See, e.g.*, *id.* at 126:10–19 ("Q: But you, Dr. Olsen, have no testing data for these samples to show that the amounts that Emery Pharma has measured in the drug substance or drug product are incorrect? A: I don't have data for those samples, but the concern about the Emery data as it is by itself."), 124:25–125:3 ("A: I don't have a dataset to compare to Emery's results. I can only look at the gaps and validations and concerns about the data that Emery has generated."), 125:4–15 ("Q: But as you sit here today, you can't say that the amount of NDMA that Emery Pharma measured in the API or the tablets is incorrect. A: I have reason to doubt that it is correct as I have expressed in my report and supplemental report; and, not to mention, the inconsistency

with Emery's previous data for the citizens' petition and all the other independent parties that have generated data on ranitidine."). But these speculative "concerns" are not related to any scientific methodology. As discussed above, there is no significant inconsistency between Emery Pharma's results and the other reported test results showing the levels of NDMA found in ranitidine.

## LEGAL STANDARDS

Expert testimony is admissible only when consistent with Federal Rule of Evidence 702. *See MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022). Rule 702 states: "An expert witness who is qualified may testify in the form of an opinion or otherwise if his specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the testimony is based on sufficient facts or data, is the product of reliable principles and methods which have been reliably applied." Observing *Daubert*'s teachings, courts understand "the purpose of the expert admissibility rules is to enlist the federal courts as 'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" *MidAmerica*, 25 F.4th at 1326 (citing *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597)). When evaluating expert admissibility, courts in this Circuit require the proffered testimony to meet three requirements:

(1)     the expert is qualified to testify competently regarding the matters he intends to address;

(2)     the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and

(3)     the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*MidAmerica*, 25 F.4th at 1326 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The accepted shorthand for this three-part inquiry is qualification, reliability, and helpfulness. Each factor is distinct and must be separately addressed. *Id.*; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Proffered expert testimony is unreliable where it "is no more than a hypothesis not adequately supported by the scientific method." *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) (citation omitted); *accord Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202–03 (11th Cir. 2002) (citation omitted) ("The courtroom is not the place for scientific

guesswork….”). Rather, “[p]roposed testimony must be supported by appropriate validation[.].” *Daubert*, 509 U.S. at 590. To be admissible, the testimony must provide “something more than subjective belief or unsupported assumptions.” *Hi-Tech Pharma. Inc. v. Dynamic Sports Nutrition, LLC*, No. 16-cv-949, 2021 WL 2185699, at *13 (N.D. Ga. May 28, 2021) (citation omitted). In short, expert testimony that is “just throwing mud” on another expert’s opinion should be excluded. *Id.*

## ARGUMENT

### I.    Dr. Olsen seeks to hold Dr. Najafi to inapplicable standards.

Dr. Olsen’s opinion that Dr. Najafi’s testing should have employed cGMP and GLP standards should be excluded because those standards are inapplicable to the type of evaluative testing performed by Dr. Najafi. Not only did Dr. Olsen change his opinion on the “required” nature of these standards during his deposition (eventually revising his opinion that “minimum standards” should be followed), he did not hold himself to those standards in other pharmaceutical litigation where he conducted his own evaluative testing. *See* Ex. 37 Olsen Dep. 130:03–144:13.

A court in this district recently made clear that an expert who applies an erroneous standard should be excluded. In *Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 WL 1447733 (S.D. Fla. May 9, 2022), the court considered whether to admit expert testimony in a case alleging breach of fiduciary duty under ERISA. *Id.* at *3. One of the plaintiffs’ experts in that case was a CEFEX (Centre for Fiduciary Excellence) analyst. *Id.* at *10 & n.12. The defendant challenged that expert’s opinions, in part, on the basis that he applied CEFEX standards, not those applicable to ERISA. *Id.* at *14. The court excluded the expert’s testimony in its entirety, stating “the standards he champions, although admirable, are not necessarily the standards of ERISA.” *Id.* at 15. Another court in this District held similarly, when excluding expert testimony in a non-banking cybersecurity case where an expert sought to hold the party to higher standards applicable to the banking industry. *See Nat’l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 11251759, at *6–7 (S.D. Fla. July 6, 2015). Just as it was unreliable to compare a parties’ conduct against a higher standard used in a highly regulated industry like banking in *Tyco*, it is likewise unreliable to compare Dr. Najafi’s evaluative testing here to the highly regulated standards required when manufacturing medication for public consumption.

The simple fact is that cGMP and GLP standards do not apply to the testing completed by Dr. Najafi. Both standards are established by federal regulations and overseen by the FDA, and

both articulate when they apply. In the case of cGMP, the FDA explains that "CGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing a drug product." *See* FDA cGMP Statement, *supra*. And in the case of GLP, the standards apply when "conducting nonclinical laboratory studies that support or are intended to support applications for research or marketing permits for products regulated by the Food and Drug Administration[.]" *See* 21 C.F.R. § 58.1.

As Dr. Olsen himself (reluctantly) acknowledged, cGMP and GLP regulations do not apply to Dr. Najafi's testing because he and Emery Pharma were not developing or manufacturing a drug product. *See* Ex. 37 Olsen Dep. 144:21–145:06, 148:01–07, 145:15–147:12, 148:15–149:18, 152:13–153:20. In fact, they were doing quite the opposite. They were investigating the presence of NDMA, a known mutagenic carcinogen, in a drug that had been withdrawn from the market. Indeed, when Dr. Olsen was called upon to design an evaluative testing procedure in another pharmaceutical case, he did not follow cGMP standards. *Id.* at 130:03–144:13. And, when Dr. Olsen was pressed on the applicability of these standards in his deposition, he eventually conceded that "minimum scientific standards" must be applied,[3] not necessarily the cGMP standards. *Id.* at 144:21–145:06, 148:01–07. It is incorrect—and frankly, misleading—to tell the jury that Dr. Najafi's testing should be discounted because it did not follow standards that on their face, and as Dr. Olsen now concedes, are inapplicable. Defendants should not be permitted to cloak such advocacy with the imprimatur of an expert. *See Quiet Tech.*, 326 F.3d at 1341.

## II. Dr. Olsen's speculative opinions were formed without reviewing and reporting all the available testing, including that performed by GSK, and are unreliable.

Where an expert fails to review all the evidence in a data set and fails to do his own independent testing of that data, he cannot opine on the validity of the data. *See PODS Enters. v. U-Haul Inter., Inc.*, No. 8:12-CV-01479, 2014 WL 12628664, at *3–4 (M.D. Fla. June 27, 2014). This is because the Court must consider the reliability of the proffered expert's sources and methods. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). And where the Court determines there is too large an analytical gap between the data and the opinion proffered, the Court should exclude the opinion. *Id.* at 1305–06. If the analytical gap of the expert's selective methodology exceeds the bounds of reason and appears speculative, courts

---

[3] These minimum standards were easily met by Dr. Najafi as evidenced by the extensive method development and validation outlined in his reports, appendices, and data production.

will exclude opinions that fail to consider the totality of the available evidence. *See Parkervision, Inc. v. Qualcomm Inc.,* No. 3:11-cv-719, 2013 WL 12152672, at *4 (M.D. Fla. 2013). Here, Dr. Olsen's opinion that Dr. Najafi's results are outliers is premised on several analytical gaps.

First, Dr. Olsen consistently failed to consider and include in his analysis the higher levels of NDMA found in ranitidine as determined by GSK, Sanofi, and the authors of peer-reviewed studies. Dr. Olsen reviewed neither the totality of GSK's root cause analysis, nor the levels of NDMA found in the tested samples. *See* Ex. 37 Olsen Dep. 115:14–119:25. This selective citation to data that supports his opinion while failing to report data that does not, is "cherry-picking"—a failure to consider the totality of available evidence—and it renders his opinion unreliable. *See Parkervision*, 2013 WL 12152672, at *4.

Second, Dr. Olsen did not review the methodologies employed by the various comparators. *See* Ex. 14 Olsen Rep. at 43–45. Dr. Olsen, thus, seeks to opine on Dr. Najafi's results as outliers, but he admits to having no knowledge of his comparators' methods.[4] Most importantly, he does not analyze or even report the age, expiration dates or the storage conditions of the samples tested. *See* Ex. 37 Olsen Dep. 121:18–122:03, 206:02–21, 209:06–210:13; *see also* Ex. 14 Olsen Rep. (failing to report on the age, expiration, or the storage conditions of comparator studies). For these reasons, he has not considered—and thus cannot opine—on whether there were factors in the various studies that could lead to varying results. Without this knowledge, Dr. Olsen cannot support his attack on Dr. Najafi's methodology by comparison of the Emery NDMA test results with the other sources of baseline data. Dr. Olsen's opinions on this point are not rooted in any consistent methodology and, thus, are unreliable.

Notably, Dr. Olsen's refusal to acknowledge GSK's own testing is not simply a situation where an expert has used his scientific knowledge to craft an appropriate data set. In those ordinary situations, courts routinely hold criticisms of the inputs of a data set are appropriate subjects for

---

[4]  *See* Ex. 37 Olsen Dep. 111:07–13 (discussing the testing data for GSK's root cause analysis, A: "I don't remember if I looked at that or not."), 112:07–18 (A: "I really don't recall how much of the spreadsheet data I -- I looked at and -- and how it related to the root cause analysis."), 115:14–20 (Q: You didn't look at GSK's results yourself? [Objection]. A: Did I audit Dr. Najafi's citing the results? No. I took them from his reports since that's what he was saying."); 116:13–119:25 (admitting he only quoted from Dr. Najafi and did not review GSK's specific testing results); 163:24–167:12 (Dr. Olsen admitting that he did not look at any of the specific test results or validations from the testing done by GSK or Sanofi, and that he did not request any of the details or methodology of the FDA, PGA, and EDQM studies he compares Dr. Najafi's work to).

cross-examination, not exclusion. *See, e.g.*, *Companhia Energetica Potiguar v. Caterpillar Inc.*, NO. 14-CV-24277, 2016 WL 7507848, at \*19 (S.D. Fla. Aug. 1, 2016) ("The Court finds … complaints about the reliability of [an expert's] analysis are appropriate for cross-examination."). But that is not this situation. This is a case where Dr. Olsen's entire methodology is fundamentally flawed because he drew conclusions based on a comparison between data sets without confirming the data sets, sample history, or methodology were appropriately comparable to justify his conclusions. Such rank speculation is unreliable and unhelpful opinion evidence that should be excluded.

### III.     Dr. Olsen's hypothetical opinion that Dr. Najafi's testing itself somehow caused the presence of NDMA is not based on any scientific methodology.

When evaluating the reliability of an expert's scientific opinion, the Court must assess both whether the methodology is scientifically valid and whether that methodology can be applied to the facts at issue. *See MidAmerica*, 25 F.4th at 1326. The Court should exclude expert opinions connected to existing data only by the *ipse dixit* of the expert because, in those situations, there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Where an expert offers a mere hypothesis without foundation in scientific principles, peer review, or a known rate of error, the Court should exclude such an opinion as unreliable. *See Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at \*8–9 (S.D. Fla. June 25, 2009) (excluding expert opinion on general causation where expert could not identify source of opinion in medical literature and conceded hypothesis was speculative).

*Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568 (N.D. Fla. 2009), is illustrative. *Hendrix* was a products liability action involving an allegedly defective infant car seat where the consumer plaintiff challenged a defense expert's hypotheses about the severity of damages following a car wreck on the grounds that the hypotheses had not been tested. *Id.* at 588. Judge Rodgers excluded the proffered expert's opinions on these "alternative explanations" because the expert "conducted no testing of any of these scenarios" and "there [was] no factual support for these scenarios in the record." *Id.* at 588–89. As the court concluded, "[a]lthough testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with a good explanation as to why his … conclusion remains reliable notwithstanding the absence of testing." *Id.* (quotation omitted).

Here, Dr. Olsen opined that he believes it is possible that NDMA was created during the volatilization of the samples and this method created NDMA. *See* Ex. 15 Olsen Supp. Rep. at 3–4; *see* Ex. 37 Olsen Dep. 195:15–197:15. But Dr. Olsen admitted he had no proof to support this

hypothesis (*id.* at 185:17–186:05), and in his report he simply cites to authority that states ranitidine degrades over time with heat to form NDMA. *See* Ex. 15 Olsen Supp. Rep. at 3–4. Then contrary to the law governing expert evidence, Dr. Olsen insisted the burden was on Dr. Najafi to disprove his unfounded hypothesis. *See* Ex. 37 Olsen Dep. 185:17–186:05, 195:15–197:15; *but see Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 626–28 (8th Cir. 2012) (proponent of expert testimony does not have "burden to disprove" a contrary hypothesis); *Robinson v. City of Montgomery*, No. 2:01cv40, 2005 WL 6743206, at *4 (M.D. Ala. Mar. 2, 2005) (race discrimination case excluding expert testimony where expert assumed discrimination existed and opponent should be made to disprove that hypothesis). It should be excluded from evidence.

## IV.    Dr. Olsen repeatedly expresses imprecise, unspecified, and unsubstantiated "concerns" with Dr. Najafi's methodology, but does not base those concerns in scientific methodology.

The Court should exclude expert opinions connected to existing data only by the *ipse dixit* of the expert because, in those situations, there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. "Thus, [the Court] may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004)). An imprecise and unspecific expert opinion "easily could serve to confuse the jury" or mislead it. *Frazier*, 387 F.3d at 1266. In short, "[s]ubjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of [an] expert opinion." *King v. Cessna Aircraft Co.*, No. 03-20482-CIV, 2010 WL 1980861, at *6 (S.D. Fla. May 18, 2010) (citation and alteration omitted); *see also Bowe v. Pub. Storage*; No. 1:14-cv-21559, 2015 WL10857339, at *4 (S.D. Fla. June 2, 2015) ("[R]ank speculation would only unfairly prejudice Plaintiffs by advocating for a certain result in the guise of offering expert opinions. This is unacceptable.").

Other courts in this district have excluded expert testimony on this basis because such testimony is speculative and lacks proper foundation. *See Price v. Carnival Cruise Lines*, No. 20-cv-20621, 2022 WL 951318, at *3–4 (S.D. Fla. Mar. 30, 2020); *see also In re Trasysol Prods. Liab. Litig.*, No. 08-md-01928, 2010 WL 4052141, at *2–3 & n.4 (S.D. Fla. May 12, 2010) (holding a proffered expert's causation opinion was inadmissible where it lacked sufficient scientific foundation).

Dr. Olsen's testimony that he has "concerns" with Dr. Najafi's testing is not supported by sufficient foundation. The following is illustrative (Ex. 37 Olsen Dep. 126:10–19):

> Q: But you, Dr. Olsen, have no testing data for these samples to show that the amounts that Emery Pharma has measured in the drug substance or the drug product are incorrect?
>
> [objection]
>
> A: I don't have the data for those samples, but have the concern about the Emery data as it is by itself.

The above example confirms that "something doesn't become 'scientific knowledge' just because it's uttered by a scientist ..." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citation omitted). Dr. Olsen repeated continuously various "concerns" at his deposition without attaching them to any scientific methodology. *See, e.g.,* Ex. 37 Olsen Dep. 124:18–125:03 ("A: I don't have a dataset to compare to Emery's results. I can only look at the gaps and validations and concerns about the data that Emery has generated."). For instance, when asked if the amount of NDMA that Emery Pharma measured was incorrect, Dr. Olsen could only state, "I have reason to doubt that it is correct. As I have expressed in my report and supplemental report and not to mention the inconsistency with Emery's previous data for the citizens petition and all the other independent parties that have generated data on ranitidine." *Id.* at 125:04–125:15. These statements are nothing more than the impermissible *ipse dixit* of the expert and should be excluded. *See DeWit v. UPS Ground Freight, Inc.¸* No. 1:16cv36, 2017 WL 3141074, at *2 (N.D. Fla. June 29, 2017) (expert may not "baldly assert that another expert's opinion … is wrong"). Where experts simply express concerns without having performed any analysis or specialized knowledge, they are "just throwing mud" and are justifiably excluded. *Hi-Tech Pharma.*, 2021 WL 2185699, at *13

Accordingly, Dr. Olsen's testimony that the levels of NDMA measured by Dr. Najafi are inaccurate should be excluded because that testimony is grounded only in Dr. Olsen's "concerns" with Dr. Najafi's methodology, concerns that are not based on any articulated methodology.

## CONCLUSION & REQUEST FOR RELIEF

Dr. Olsen embraces the critic's easy task of complaining about Dr. Najafi's work. But criticisms based on inapplicable standards, baseless comparisons, untested hypotheses, and vague concerns are justifiably excluded as lacking any sound reliable basis. As such, Plaintiffs respectfully ask the Court to exclude the following:

→ Testimony criticizing Dr. Najafi and Emery Pharma's investigation based on the fact the study neither sought to comply, nor in fact did comply, with cGMP and GLP standards;

→ Testimony criticizing Dr. Najafi's results as being unreliable by virtue of a comparison with other sources of baseline data when Dr. Olsen did not report the sources of higher baseline data, and Dr. Olsen did not review the comparator's methods to determine if the two data sets were even comparable;

→ Testimony hypothesizing without evidentiary foundation that NDMA somehow formed as a result of the ionization process during LC-MRM testing; and

→ Testimony expressing "concerns" about Dr. Najafi's work that are fully not articulated with a basis in scientific methodology.

Dated:  July 18, 2022.

Respectfully submitted,

/s/ Tracy A. Finken
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: /s/ Robert C. Gilbert
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

/s/ Michael L. McGlamry
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

/s/ Adam Pulaski
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX 78257
Tel: (800) 294-0055

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

/s/ *Robert C. Gilbert*
Robert C. Gilbert

18