# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

                                                     JUDGE ROBIN L. ROSENBERG
                                     MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**PLAINTIFFS' OPPOSITION TO BRAND DEFENDANTS' MOTION TO EXCLUDE**
**REMAINING EXPERT OPINIONS RELATING TO GENERAL CAUSATION[1]**

DATED: August 1, 2022

---

[1] This Motion is filed under seal pursuant to the Order at D.E. 5684.

TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................................... 1

FACTS ................................................................................................................................... 2

    A.  NDMA Forms Endogenously in the Human Body ........................................................ 2

    B.  Animal Studies Provide Evidence That NDMA Causes Cancer ....................................... 8

    C.  NDMA Is a Genotoxic Carcinogen That Exhibits a Dose Response Relationship ......... 11

ARGUMENT ........................................................................................................................ 13

I.   Plaintiffs' Experts' Opinions on Endogenous NDMA Formation Are Based on Reliable Scientific Bases ........................................................................................................... 13

    A.  "Weight Of All The Evidence" Methodology Is Well-Supported ................................... 14

    B.  Plaintiffs' Experts Reliably Applied the "Weight of All the Evidence" Methodology to Determine That NDMA Forms from Ranitidine Endogenously ...................................... 15

        1.  Plaintiffs' Experts Considered a Wide Array of Evidence ......................................... 16

        2.  Plaintiffs' Experts Provided Valid Rationales for How They Weighted the Evidence ............................................................................................................... 16

    C.  Defendants Err by Asking the Court to Weigh Evidence in Isolation ............................ 18

        1.  Defendants err by asking the court to judge causation based exclusively on the urine studies ......................................................................................................... 18

        2.  Defendants err by asking the court to judge causation based exclusively on the in vitro studies ......................................................................................................... 19

II.  Plaintiffs' Experts Properly Relied Upon Animal Studies, Only in Part, to Conclude That NDMA Is a Carcinogen ............................................................................................... 20

    A.  Plaintiffs' Experts Reliably Applied the "Weight of All the Evidence" Methodology to Determine That NDMA Causes Cancer in Humans ..................................................... 20

        1.  Plaintiffs' experts considered more than just animal studies ..................................... 20

        2.  Plaintiffs' experts provided valid rationales for how they weighted evidence ........... 21

    B.  Defendants Again Err by Asking the Court to Weigh the Animal Studies in Isolation ... 22

III.  Plaintiffs' Experts Did Not Opine on the Legal Question of Threshold Dose, but Merely Testified as to the Scientific Reality That Any Amount of a Carcinogen Is Dangerous ........ 23

IV.  Dr. Panigrahy Properly Relied upon the FDA's "Acceptable Daily Intake" for NDMA as Evidence ................................................................................................................... 245

CONCLUSION ..................................................................................................................... 24

TABLE OF AUTHORITIES

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..........................................................................................20

*Forced Air Warnings Devices Prods. Liab. Litig.*,
    9 F.4th 768 (8th Cir. 2021) ..........................................................................15, 20

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................ *passim*

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*, Case No. 14 C 1748, 2017 WL
    1833173 (N.D. Ill. May 8, 2017) ......................................................... *passim*

*In re Trasylol Prods. Liab. Litig.*,
    Case No. 08-md-01928, 2010 WL 1489793 (S.D. Fla. Feb. 24, 2010) .....................20, 23

*In re Valsartan*,
    Case No. 19-MD-2875 (D.N.J. Mar. 4, 2022) ..................................................21

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) .......................................................15–16, 18, 23

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
    639 F.3d 11 (1st Cir. 2011) .......................................................15, 16, 20

*NutraSweet Co. v. X-L Eng'g Co.*,
    227 F.3d 776 (7th Cir. 2000) .......................................................15, 20

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ...................................................19, 20, 23

*Rider v. Sandoz Pharms. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) ..........................................................22

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ..................................................19, 23

*Waite v. All Acquisitions Corp.*,
    194 F. Supp. 3d 1298 (S.D. Fla. 2016) ..........................................................21

Plaintiffs submit this Response in Opposition to Brand Defendants' Motion to Exclude Remaining Expert Opinions Relating To General Causation [D.E. 5696].

## INTRODUCTION

Both parties' experts set out to answer the same big question: whether the NDMA that forms in ranitidine can cause human cancer. Different sub-questions inform that big question. For example, how much NDMA forms in ranitidine before it is ingested, mostly due to heat, humidity, and time (*i.e.*, exogenous formation)? And how much NDMA forms after ranitidine is ingested, due to reactions within the body (*i.e.*, endogenous formation)? Finally, how much NDMA can cause cancer in a human (*i.e.*, the "dose" question)?

As is typically the case, no single study was ever designed to perfectly address any one of these questions. But there is a large body of relevant evidence that skillful experts can analyze to form firm, scientifically valid opinions.

Plaintiffs' experts reviewed that corpus of evidence. They evaluated *in vivo* studies and *in vitro* studies, urine studies and gastric juice studies, human studies (that could not ethically be conducted today) and animal studies. Every one of these studies has benefits and drawbacks given the limitations of each study's design. But, in viewing the totality of this evidence, Plaintiffs' experts can evaluate the signal that emerges.

After reviewing the evidence, Plaintiffs' experts concluded that ranitidine does form endogenously. Plaintiffs' experts further concluded that no threshold of NDMA carried *zero risk* of producing cancer, though the risk is small at low doses. In coming to these conclusions, Plaintiffs' experts adhered to the mainstream standards adopted by the FDA and international organizations.

Now, the Court must scrutinize the experts' qualifications and methodologies—and Plaintiffs' experts will pass that inquiry. Their qualifications are undisputed. And their methodologies are sound. The experts did not review these studies in a vacuum. Rather, Plaintiffs' experts applied their scientific training, extensive experience, and careful judgment to give each piece of evidence more or less weight to form overall conclusions. Weighing *each* piece of evidence in order to form a conclusion is not only *a* valid methodology; it is also the *only* way to properly analyze a large corpus of scientific literature. Scientific bodies, governmental health agencies, and case law confirm that point.

To be sure, an expert cannot assign more weight or less weight to a strand of evidence for

scientifically invalid reasons. An expert who over-weights a study because she befriended the author, or under-weights it because it supports a litigation adversary, must be excluded. Venality is not a valid methodology. But where an expert considers a study and has scientifically grounded reasons to under- or over-weight that study, her testimony is not inadmissible simply because a competing expert weighs the evidence differently. Yet that is precisely the rule that Defendants seek. Plaintiffs' experts explained in extensive detail the scientifically valid reasons they discounted certain studies that superficially appear to support Defendants—while giving more credence to the substantial evidence that proves (1) ranitidine forms NDMA endogenously, and (2) *no* amount of NDMA has *zero risk* of producing cancer. Disagreeing with Defendants' experts on this score is not a methodological flaw. It is a difference of opinion that the jury—not this Court—must carefully consider, evaluate, and resolve.

## FACTS

### A. NDMA Forms Endogenously in the Human Body

NDMA forms endogenously from ranitidine. Reliable, consistent scientific evidence demonstrates this point in both *in vivo* and *in vitro* studies. Plaintiffs' experts reviewed relevant published peer-reviewed scientific studies and medical literature, applying the same scientific rigor that they use in their other professional work.[2, 3]

Moreover, endogeneity is not informed by one variable alone—or one set of "actual human physiological conditions" as Defendants unusually assert, despite the established body of scientific literature to the contrary.[4] Rather, numerous variables exist that affect the amount of nitrites in the stomach, including diet, bacterial content of the stomach, inflammation, pH, volume of gastric

---

[2] This brief cites to the Defense exhibits catalogued in the Brown Declaration.

[3] Def. Ex. 5 (Le Rep.) at 6–7; Def. Ex. 7 (Marletta Rep.) at 4–5; Def. Ex. 13 (Michaels Rep.) at 3–4; Def. Ex. 17 (Najafi Report) at 6; Def. Ex. 19 (Panigrahy Report) at 10–11.

[4] *See e.g.*, Xu et al., *N-nitroso compounds in fresh gastric juice and their relation to intragastric pH and nitrite employing an improved analytical method*, CARCINOGENESIS 14, 2547–51, (1993), https://doi.org/10.1093/carcin/14.12.2547 (study authors reported that intra-gastric nitrosation was complicated based on finding significantly higher n-nitroso concentration at both low and high pH ranges); Barnard et al., *Gastric Juice, Nitrite, and Nitroso Compounds*, BANBURY REPORT 12:369–377 (1982) (finding that during a 24-hour period nitrite concentration in gastric juice varies significantly depending on food consumption and higher nitrite concentrations were found at pH values above 5); Hall et al., *Evaluation of the nitrosamine hypothesis of gastric carcinogenesis in precancerous conditions*, GUT 27, 491–98, (1986), https://doi.org/10.1136/gut.27.5.491 (in a 24-hour monitoring study finding that nitrite concentrations in gastric juice increased with increasing pH and the total n-nitroso compounds were highest with pH ranging from 5 to 6); *see also* Def. Ex. 7 (Marletta Rebuttal Rep.) at 1–2.

fluid and thiocyanate levels.[5] To attempt to define a single physiologically relevant condition is foolish at best. Plaintiffs' experts therefore never closed their eyes to any body of evidence.

How Plaintiffs' experts reviewed the urine studies is informative, for example. They noted that it is difficult to measure NDMA in urine samples because the body metabolizes (*i.e.*, breaks down) NDMA quickly. The FDA recently noted that "[o]nly rough estimates are available in the literature on endogenous formation of NDMA based on its detection in blood and urine; because of its rapid metabolism, only a small fraction is excreted in urine unchanged."[6] Defendants' own expert conceded that only a "low fraction [of NDMA] would be present in the plasma or urine."[7] This position is consistent with the evidence in studies such as Spiegelhalder, *et al.*, which showed that humans rapidly metabolize NDMA such that it is mostly undetectable in urine.[8] In that study, humans ingested 13-26 micrograms of pure NDMA (13,000-26,000 nanograms) with orange juice, and 0% of the NDMA was detected in the urine (with a detection limit of 0.05%). NDMA only became detectable in urine when the study designers co-administered the NDMA with orange juice *and* alcohol. The study authors concluded that "[t]o detect NDMA exposure by urine monitoring, single doses would have to be of the order of hundreds of micrograms[.]" *Id.* at 446. Similarly, Hrudey SE, *et al.*[9] noted that humans metabolized the majority of NDMA, and only very small amounts of NDMA appear in the urine.

Due to the significant limitations of the urine studies, Plaintiffs' experts supplemented these studies with other types of evidence that evaluated endogenous formation of NDMA. For example, they looked at studies where researchers measured concentrations of nitrosamines, including NDMA, in gastric juice. These studies consistently demonstrated that NDMA forms endogenously.[10] Krawczynski (2002), is illustrative. Researchers gave children ranitidine and

---

[5] Def. Ex. 17 (Najafi Rep.) at 103, discussing nitrite levels at 7,400 μM–84,100 μM expected in real human stomach after intake of meat products like bacon and ham; *see also* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841), p. 19–24, discussing the routes of endogenous formation, including conditions and variables of nitrosation.

[6] Ex. 37 FDA, Nitrosamines as Impurities in Drugs-Health Risk Assessment and Mitigation Public Workshop, March 29–30, 2021 (GSKZAN0003505669) at '673.

[7] Ex. 15 Guengerich Dep. 442:10–25.

[8] Def. Ex. 72 (Spiegelhalder et al. 1982).

[9] Hrudey et al., *Drinking water as a proportion of total human exposure to volatile Nnitrosamines*, RISK ANALYSIS 33, 2179–208, (2013).

[10] Def. Ex. 65 (Matsuda et al. 1990) at 162–68; Krawczynski et al., Nitrosamines in children with chronic gastritis, JOURNAL OF THE POLISH PAEDIATRIC SOCIETY, 1–11 (2002); Garcia Del Risco et al., *The Effect of Ranitidine Over a 24-Hour Period on the Content of Nitrites, Nitrates, Nitrosamines and on the Bacterial*

subsequently measured their gastric juice for nitrosamines. They detected nitrosamines, including NDMA. After treatment, there was a statistically significant increase of nitrosamine concentration, including NDMA, in the gastric juice (1.031 mg/l), particularly in boys (1.499 mg/l) in comparison with the values obtained before treatment (0.074 mg/l), with the control group (0.063 mg/l), and an age-matched group of girls (0.924 mg/l). Similarly, in Matsuda (1990) the concentration of NDMA in the stomach of volunteers after ingesting ranitidine was *five* times higher than that in the healthy control cohort. The NDMA detected was likely an underestimation of nitrosation given that researchers did not analyze the gastric fluid until after a 12-hour fast. Plaintiffs' experts further viewed *in vivo* studies which, like Krawczynski and Matsuda, demonstrated that NDMA formed endogenously after ranitidine use.[11]

These studies did not contradict the urine studies—even though the urine studies did not accurately measure NDMA in the body.[12] Defendants invoke Florian, *et al.* (Def. Ex. 49) to argue

---

*Flora of The Gastric Juice in Healthy Subjects*, GASTROENTEROL. CLIN. BIOL. 8, 749–53, (1984); Houben et al., *Are Intragastric N-Nitroso Compounds Elevated After Short-Term Acid Suppression*, EUR J CANCER PREV. 5 SUPPL. 1, 83-87 (1996); Thomas et al., *Effect of One Year's Treatment with Ranitidine and of Truncal Vagotomy on Gastric Contents*, 28 GUT, 726–38 (1987); Morris et al., *Mutagenicity in Gastric Juice*, 7 GUT, 723–27 (1984); O'Connor et al., *Effect of histamine H2-receptor antagonist therapy on the mutagenic activity of gastric juice*, MUTATION RESEARCH, 188 (1987) pp. 201-209 (evidence of mutagenic activity in gastric juice is transient in the hours immediately following ranitidine ingestion).

[11] Def. Ex. 65 (Matsuda et al. 1990) (NDMA measured in gastric juice of fasting patients after ranitidine and other H2RAs treatment); Garcia del Risco et al. (1984), *supra* note 10 (increase in nitrosamines, expressed as NDMA, with ranitidine treatment); Houben et al. (1996), *supra* note 10 (ranitidine use increased nitrate, nitrite, and N-nitroso compounds in intragastric compounds measured after overnight fasting); Morris et al. (1984), *supra* note 10 (transient rise in mutagenicity following ranitidine and cimetidine use 1-3 hours after ingestion).

[12] Defendants raise that the results from a 2020 human urine NDMA study conducted by Drs. Mitch and Najafi outside of litigation were never published. Motion p. 5–6. They fail to disclose the reasons the study could not be completed or published; namely, the Stanford IRB was revoked because ranitidine was recalled for containing NDMA, a genotoxic carcinogen, and thus could no longer be used in human studies. Def. Ex. 40 (Najafi Dep. Tr.) at 194:16–195:10, 197:10–17. Dr. Mitch associated with Emery Pharma to conduct analytical testing for the 2020 urine study, which was intended to replicate the 2016 Zeng and Mitch study (and had a similar design to the Florian study), but using LC/MS instead of GG/MS. *Id.* 195:19–196:9, 196:23–197:6; Ex. 25 Mitch Dep. 348:8–350:17. Some of the samples collected before the study was shut down were analyzed, most of which failed to show detectible levels of NDMA, a result that was expected because NDMA is known to metabolize and be converted to a methyldiazonium molecule, which is a highly mutagenic compound. Def. Ex. 40 (Najafi Dep. Tr.) at 198:2–199:12. Indeed, the rapid metabolization of NDMA in humans has been well documented in studies, including the Spieglehalder study, for example, which showed that when high amounts of NDMA are administered, it is not detectable in human urine and only a small amount is detected when co-administered with alcohol. Ex. 25 Mitch Dep. 347:3–19. Dr. Mitch explained that this occurrence is one of the reasons they sought to collect plasma samples (in addition to urine samples) in the 2020 study. *Id.* at 347:22–348:3.

against endogenous NDMA formation, for example, but—limitations notwithstanding[13]—the data showed that members of the ranitidine treatment group who ate cured meats had NDMA plasma levels nearly double that of the placebo cohort group who ate cured meats. In Florian, *et al*., ranitidine and nitrite combined to form NDMA in the ranitidine treatment group, just as Plaintiffs' experts opine.

Plaintiffs' experts also reviewed *in vitro* studies, in conjunction with the urine studies and the *in vivo* studies. These studies also supported the conclusion that NDMA formed endogenously from ranitidine.[14] Although Defendants imply that Plaintiffs' experts relied on only four *in vitro* studies, that is not so. Panigrahy, Michaels, Marletta, and Le considered *all* relevant *in vitro* and *in vivo* evidence. This included (but was not limited to):

(1) Brambilla (1983),[15] confirmed that high doses of ranitidine with sodium nitrite produced DNA fragmentation in the liver or in gastric mucosa in rats. The authors warned of the potential of ranitidine to nitrosate and recommended taking ascorbic acid with ranitidine.

(2) Braunstein (2021),[16] which initially reported the minimum amount of NDMA formed after two hours equaled 947 ng with 1 mmol/L of sodium nitrite and a pH of 2.5 with 150 mg ranitidine tablets, but did not include the exogenous NDMA originally in the tablets.[17]

---

[13] Plaintiffs' experts detailed the various limitations of the Florian and Gao studies, explaining why each study was not supportive of Defendants' position. *See* Def. Ex. 7 (Marletta Rep.) at 46, 52–56; Def. Ex. 13 (Michaels Rep.) at 48–49, 59–60; Def. Ex. 19 (Panigrahy Rep.) at 107.

[14] *See* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841), p. 19–24, discussing simulated gastric fluid studies.

[15] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, CARCINOGENESIS 4, 1281–85, (1983).

[16] Def. Ex. 47 (Braunstein et al. 2021).

[17] This was later corrected to reflect that 921 ng was found at baseline in the 150 mg ranitidine tablets, which increased by 56% to 1440 ng at the same pH (and what Defendants have asserted are physiologically relevant sodium nitrite levels of .01 mmol/L). *See* Error in a Figure, JAMA NETWORK OPEN 5, e227178, (2022), https://doi.org/10.1001/jamanetworkopen.2022.7178, Erratum for: Braunstein et al., *Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions*, JAMA NETWORK OPEN 4, e2034766, (2021), https://doi.org/10.1001/jamanetworkopen.2020.34766; Ex. 51 Ranitidine MSK Data (MSK00007347) at '7353 (Table 1.B. details ranitidine 150mg tablets at pH 2.5 in simulated gastric fluid with varying sodium nitrite concentrations and respective NDMA means, *e.g.*, .25 mmol/L with 1340 ng, .5 mmol/L with 902ng and 1.0 mmol/L with 947 ng.) GSK and Dr. Najafi have both recognized fluctuations in NDMA levels with initially increasing NDMA levels that subsequently decrease. *See* Def. Ex. 18 (Najafi Rebuttal Rep.) at 16; Ex. 43 June 2020 Root Cause Analysis (GSKZAN0000051927) at 26.

(3) DeFlora (1981),[18] which confirmed ranitidine's mutagenicity when bacteria preincubated with nitrite in human gastric juice from untreated individuals. The authors warned that to avoid nitrosation, individuals taking ranitidine should maintain diets low in nitrates and nitrites, avoid taking ranitidine close to meals, and take ascorbic acid with ranitidine to inhibit nitrosation and block mutagenic derivatives from forming.

(4) Franekic (1989),[19] which found that a mixture of ranitidine and nitrite was both mutagenic and genotoxic with .4 mM sodium nitrite and .1 mM ranitidine.

(5) Maura (1983),[20] which determined that ranitidine was genotoxic and DNA-damaging using cultured mammalian cells.

(6) Martelli (1983),[21] which found that ranitidine is mutagenic without nitrite, using cultures of rat hepatocytes.

(7) Özhan and Alpertunga (2003),[22] in which researchers administered ranitidine (and other *N*-Nitroso compound drugs) with little nitrite (0.13 mM) under simulated stomach conditions, and found significant genotoxic activity of nitrite ranitidine reaction products.

As their expert reports detail, the *in vitro* studies demonstrate that NDMA can form endogenously from ranitidine.[23]

Defendants emphasize the simulated gastric fluid study Gao (2021),[24] insisting that it

---

[18] De Flora et al., *Cimetidine, ranitidine, and their mutagenic nitroso derivatives*, LANCET 2, 993–94 (1981), https://doi.org/10.1016/s0140-6736(81)91199-5.

[19] Franekic et al., *Genotoxicity of nitrosated ranitidine*, MUTATATION RES. 227, 13–16, (1989), https://doi.org/10.1016/0165-7992(89)90061-4.

[20] Maura et al., *DNA damage induced by nitrosated ranitidine in cultured mammalian cells*, Toxicology Letters 18, 97–102, (1983), https://doi.org/10.1016/0378-4274(83)90077-2.

[21] Martelli et al., *Unscheduled DNA synthesis induced by nitrosated ranitidine in primary cultures of rat hepatocytes*, MUTATATION RES. 122, 373–376, (1983), https://doi.org/10.1016/0165-7992(83)90022-2.

[22] Ozhan et al., *Genotoxic activities of drug-nitrite interaction products*, DRUG CHEMICAL TOXICOLOGY 26, 295–308, https://doi.org/10.1081/dct-120024844 (2003).

[23] Def. Ex. 5 (Le Rep.) at 34, 36–45, 47–48, 51–52, 61, 73, 78–80, 141; Def. Ex. 7 (Marletta Rep.) at 33, 35, 41, 43–47, 49, 52, 60; Def. Ex. 13 (Michaels Rep.) at 7, 17, 25–27, 29–31, 35, 43, 48, 51, 59–60, 85; Def. Ex. 19 (Panigrahy Rep.) at 20, 27–31, 73, 81, 83, 92–103; 109, 110, 113, 116–119, 121–127, 141, 186–189, 205, 212; Def. Ex. 20 (Panigrahy Rebuttal Rep.) at 2; Def. Ex. 11 (Melnick Rep.) at 13–14, 19, 24, 55, 67, 69–72, 79–84, 86–88, 93; Def. Ex. 12 (Melnick Rebuttal Report) at 13–14; and Def. Ex. 17 (Najafi Report) at 23, 44–48, 50–52, 54-57, 80, 109.

[24] Def. Ex. 50 (Gao et al. 2021) (notably, although Defendants misleadingly represent that the Gao study is FDA research, implying that it represents the FDA's views and policies, the study contains a clear disclaimer stating: "This manuscript reflects the views of the authors and should not be construed to

demonstrates NDMA does not form in "physiologically relevant nitrite concentrations." Motion at 11. This emphasis is misplaced: multiple factors influence nitrite levels, including diet, bacterial content of the stomach, inflammation, pH, volume of gastric fluid, and thiocyanate levels.[25] Yet the Gao study itself noted that the in vitro model it used had "inherent limitations and [did] not reflect all aspects of human physiology" and that it "did not include gastric conditions in the presence of a meal" aside from testing at higher pH levels.[26] It also did not account for typical stomach conditions expected with ranitidine use, such as ranitidine-use after a large acidic meal, ranitidine-use by obese individuals with larger stomachs, or ranitidine-use after consumption of a meal rich in processed nitrites. Moreover, the 26 studies the Gao authors reviewed had similar flaws: a vast majority of them were done under fasted conditions[27] (and, of the non-fasting studies, only one examined ranitidine specifically[28]). For these reasons, Plaintiffs' experts concluded that the Gao study offered minimal insight on endogenous NDMA formation with ranitidine use.

Further, endogenous formation of NDMA from ranitidine is not a novel theory. It has been well known since the 1970s that nitrosation of tertiary amines, like ranitidine, when exposed to nitrite can form genotoxic carcinogens like NDMA.[29] In 1982, GSK acknowledged this in the

---

represent FDA's views or policies."). Further, the Gao researchers issued a correction to address errors in their report. *See* Errors in Figure Captions. *JAMA Netw Open.* 2021;4(7):e2123189.

[25] For the fulsome explanation from Plaintiffs' experts regarding Gao's limitations, see Def. Ex. 7 (Marletta Rep.) at 52–53; Def. Ex. 8 (Marletta Rebuttal Rep.) at 7; Def. Ex. 13 (Michaels Rep.) at 48–49; Def. Ex. 19 (Panigrahy Rep.) at 107.

[26] Def. Ex. 50 (Gao et al. 2021), p. 8.

[27] *See* Gao Supplement, eTable 1, summarizing the results of the fasted studies.

[28] *See* Gao Supplement, eFigure 1; Thomas et al. (1987), supra note 10. The limitations of Thomas are discussed at length in D.E. 5841 (Plaintiffs' Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702) at 22–23. *See also* Def. Ex. 19 (Panigrahy Rep.) at 97–100.

[29] *See e.g.*, Gillatt et al., *Susceptibilities of drugs to nitrosation under standardized chemical conditions*, FOOD CHEMICAL TOXICOLOGY 22, 269–74, (1984); Mirvish et al., *Kinetics of the nitrosation of aminopyrine to give dimethylnitrosamine*, ZEITSCHRIFT FUR KREBSFORSCHUNG UND KLINISCHE ONKOLOGIE, CANCER RES. AND CLINICAL ONCOLOGY 82, 259–68, (1974), https://doi.org/10.1007/BF00285560 (well-known that tertiary amine like dimethylamine (DMA) in ranitidine and nitrosation source, when exposed to nitrite, can form NDMA); IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, vol. 94: Ingested Nitrate and Nitrite, and Cyanobacterial Peptide Toxins, at 274; Reed et al., *Gastric juice N-nitrosamines in health and gastroduodenal disease,* LANCET 2, 550–52, (1981), https://doi.org/10.1016/s0140-6736(81)90939-9; Tannenbaum *et al.*, *N-Nitroso compounds from the reaction of primary amines with nitrite and thiocyanate,* IARC SCIENTIFIC PUBLICATIONS, 155–59, (1978); Tannenbaum, *N-nitroso compounds: a perspective on human exposure,* LANCET 1, 629–32, (1983); Zeilmaker et al., *Risk assessment of N-nitrosodimethylamine formed endogenously after fish-with-vegetable meals*, TOXICOLOGY SCIENCES 116, 323–35 (2010), https://doi.org/10.1093/toxsci/kfq093; and Ohshima et al., *Quantitative estimation of endogenous nitrosation in humans by monitoring N-nitrosoproline excreted in the urine*, CANCER RES. 41., 3658–62, (1981).

Tanner study[30]:

> The dimethylamino groups of aminopyrine and oxytetracyclin react with nitrite under certain conditions to yield N-nitrosodimethylamine (NDMA), (Lijinsky et al 1972; Mirvish et al 1974). The mechanism of nitrosation of tertiary amines has been discussed, (Singer 1980).
>
> Ranitidine hydrochloride contains a dimethyl amino group therefore experiments were carried out to determine whether NDMA could be formed from the drug in the presence of nitrite.

Tanner confirmed that ranitidine can form NDMA in the presence of nitrite. GSK used conditions similar to the WHO Nitrosation Assay Procedure and found 232 µg (232,000 ng) of NDMA formed when ranitidine (10mM) was incubated with sodium nitrite (40 mM). Though it was conducted in 1982, GSK did not produce Tanner to the FDA until 2019.

In a clear attempt to distance themselves from GSK's knowledge in the early 1980s, Defendants argue that the sodium nitrite levels from *in vitro* studies, such as GSK's Tanner study, are too high and not "physiological."[31] Defendants' arguments distract from the key point: these tests are designed to determine a drug's capability to nitrosate.[32] In 1981, Smith Kline and French combined 0.01 M concentrations of ranitidine and sodium nitrite to form a significant amount of NDMA.[33] Beyond the ranitidine manufacturers' *in vitro* studies, Plaintiffs' experts reviewed and analyzed the other available *in vitro* evidence, which consistently demonstrated that ranitidine forms NDMA endogenously in the stomach when ingested under certain conditions.

## B. Animal Studies Provide Evidence That NDMA Causes Cancer

Tellingly, all available data supports a consistent dose response between NDMA and cancer. Animal studies make-up a part of this corpus of data, and both regulatory agencies and reputable scientific bodies review such studies. As one organization has observed, "the toxic responses in laboratory animals are useful predictors of toxic responses in humans." *Ref Man*. at 637. To determine the effect of exposure to an agent in humans, human epidemiologic observational studies have limitations that toxicology models based on live animal studies can

---

[30] Def. Ex. 109 (GSKZAN0000084994) at 5002.

[31] *See* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841), p. 21–24, discussing the factors impacting endogenous formation.

[32] *See* Gillatt et al., *Susceptibilities of drugs to nitrosation under simulated gastric conditions*, FOOD CHEMICAL TOXICOLOGY 23, 849–55 (1985), doi.org/10.1016/0278-6915(85)90286-8.

[33] Ex. 44 1982 SKF NDA supplement, (GSKZAN0003535320) at '5392, 95; *see also* Def. Ex. 22 (Salmon Rep.) at 168–169.

overcome. *Ref. Man.* at 563. Animal studies may be conducted as actual experiments with researchers exercising total control over study conditions, including agent exposure and subject participation. *Ref. Man.* at 563.[34]

Scientists outside of litigation review animal studies to assess NDMA's carcinogenic potential.[35] In 1978, the World Health Organization's ("WHO") International Agency for Research on Cancer ("IARC") researched NDMA exposure by various routes of administration and concluded that NDMA "is carcinogenic in all animal species tested."[36] Similarly, the WHO concluded, based on metabolic NDMA studies in human liver preparations, that no qualitative differences existed in the metabolism of NDMA between humans and laboratory animals.[37] Relatedly, the Agency for Toxic Substances and Disease Registry (ASTDR) reviewed the tumor findings from oral administration studies of NDMA in animals and similarly concluded that "[t]he carcinogenicity of orally-administered NDMA has been demonstrated unequivocally in acute-, intermediate-, and chronic-duration studies with rats, mice, hamsters, and mink."[38]

Defendants argue that animal studies do not "fit" the theory of general causation, even though they do not believe this outside of this litigation. [39] Even so, their contention does not provide a ground to exclude a competing opinion. It is generally accepted that NDMA is metabolized similarly in human tissue and rodent tissue.[40] Both the FDA and GSK have relied on

---

[34] Animal studies can avoid the issue of confounding and do not have the same ethical considerations required of studies in human populations. *See* National Research Council, Reference Manual on Scientific Evidence: Third Edition. Washington, D.C.: The National Academies Press, at 563, (2011) https://doi.org/10.17226/13163 ("Reference Manual") "[A]nimal studies often provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies." *Ref. Man.* at 563.

[35] *See* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841), pp. 2–4, discussing how authorities have concluded that NDMA causes cancer.

[36] IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, vol. 17. IARC, Lyon, France, pp. 125-75, 1978 ("IARC 1978"); *Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42*, IARC MONOGRAPHS ON THE EVAL. OF CARCINOGENIC RISKS TO HUMANS Suppl. 7, 1-440, (1987), PMID: 3482203 ("IARC 1987").

[37] Liteplo et al., World Health Organization, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, at 15 (2002).

[38] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological profile for n-Nitrosodimethylamine (Draft for Public Comment)*, at 57, (2022) ("ATSDR NDMA Tox. Profile (2022)").

[39] *See* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841), pp. 5–7, providing Defendants' admissions that NDMA is a carcinogen.

[40] Tricker et al., *Carcinogenic N-nitrosamines in the diet: occurrence, formation, mechanisms and carcinogenic potential*, MUTATION RES. 259, 277–89, (1991).

these studies when assessing the carcinogenicity of NDMA in ranitidine. The FDA recently included several NDMA rat carcinogenicity studies in a PowerPoint presentation that it compiled for the 2021 Nitrosamines as Impurities in Drugs Working Group.[41] When assessing NDMA, Defendants have analyzed relevant animal studies to evaluate the potential risks.[42] IARC reviewed long-term animal studies that reported tumors at multiple sites in rats and mice following NDMA administration, and GSK itself considered these studies in a draft FDA submission.[43]

Further, direct site to site concordance between tumor formation in animals and humans is not required to come to a causation conclusion. For example, Dr. Salmon relied on NDMA studies finding tumors in a rodent's forestomach to support his opinions regarding esophageal cancer.[44] Reliance on these studies is appropriate, however, as the IARC, EPA, and FDA also rely on forestomach tumor data when evaluating the risk of human esophageal and gastric cancers. This is because "the esophagus and the stomach" are "[h]uman organs that histologically relate[] to the rodent forestomach[.]"[45] And despite Defendants' attempts to confuse the issue, Dr. Salmon did not extrapolate data from rodents to humans.[46] Instead, Dr. Salmon considered animal data to support the human epidemiological data and other lines of evidence.

Finally, Defendants mislead when they assert that "an overwhelming majority" of the animal studies reviewed observed only liver tumors. It is expected that NDMA-induced animal tumors in rodent studies are mainly seen in the liver due to the inter-species differences in the bioavailability of NDMA. The level of NDMA in the blood following oral administration is primarily controlled by the amount metabolized in the liver. Studies have measured the fraction of orally administered NDMA in the blood in various experimental animals, which have shown that

---

[41] FDA PowerPoint for Nitrosamines as Impurities in Drugs; Health Risk Assessment and Mitigation Workshop Day 1, p. 5–6 (citing Schmähl et al., *The carcinogenic effect of nitrosodimethylamine in Rats*, NATURWISSEN 175, 46, (1959); Magee et al., *The production of malignant primary hepatic tumours in the rat by feeding dimethylnitrosmine*, BRIT. J. OF CANCER 10, 114–122, (1956); Druckrey et al., *Organotropic carcinogenic effects of 65 various N-nitroso- compounds on BD rats*, ZEITSCHRIFT FUR KREBSFORSCHUNG 69, 103–201, (1967).

[42] Ex. 45 December 2019 follow-up communication submitted to the FDA, GSK cited gastric carcinoid findings from IARC rat studies (GSKZNDAA0000636880) at '6886.

[43] Ex. 46 EMA Article 31 Addendum to response to Question 6 (GSKZAN0000080232).

[44] Def. Ex. 43 (Salmon Dep. Tr.) at 406:15–412:6.

[45] Proctor et al., *Mode-of-Action Framework for Evaluating the Relevance of Rodent Forestomach Tumors in Cancer Risk Assessment*, TOXICOL. SCI. 98, 313–326, (2007).

[46] Def. Ex. 23 (Salmon Rebuttal Rep.) at 7–8.

approximately 8% of the dose was measured in the blood of a rat[47], while 49% of the dose was bioavailable in a monkey[48], 67% in a pig[49] and 93% in a dog.[50] As a result, because NDMA's bioavailability is higher in larger experimental animals compared to rodents, NDMA's carcinogenic activity can be more aggressive and result in many more tumor types in humans compared to rodents. Indeed, researchers have indicated that humans are likely more sensitive to NDMA than animals.[51] Despite these differences, Plaintiffs' experts have identified animal studies supporting all five of the designated cancers. *See, e.g.*, Def. Ex. 22 (Salmon Rep.) at 4, 185, 190, 195, 199, 203-204; Def. Ex. 19 (Panigrahy Rep.) at 186, 201–209, 213, 215–216, 218; Def. Ex. 13 (Michaels Rep.) at 7, 42–43, 45, 50, 54, 57.

### C.  NDMA Is a Genotoxic Carcinogen That Exhibits a Dose Response Relationship

The opinions shared by Dr. Panigrahy, Dr. Michaels, Dr. McTiernan, and Dr. Moorman that there is no threshold safe dose of NDMA are tethered to the established science in this case and are well-founded. Four points are worth highlighting.

First, it is well established in the scientific community that NDMA is a potent genotoxic carcinogen. *See* Plaintiffs' Opposition To Brand Defendants' Motion To Exclude Plaintiffs' General Causation Experts' Opinions Related To Epidemiology at § I.A.

Second, studies of NDMA have proven that it does not exhibit a no -observed -adverse -effect level (NOAEL). The NOAEL is the highest dose level that does not produce a significant increase in adverse effects in comparison to the control group. Peto *et al.*, the most extensive rat carcinogenicity study done for NDMA, and which has been used by FDA to calculate the Acceptable Daily Intake (ADI) for NDMA, confirmed that NDMA does not have a threshold for tumor induction.[52] FDA concludes the following for NDMA: "cancer bioassay and

---

[47]  Mico et al., *Low-dose in vivo pharmacokinetic and deuterium isotope effect studies of N-nitrosodimethylamine in rats*, CANCER RES. 45, 6280–85, (1985).

[48] Gombar et al, *Interspecies scaling of the pharmacokinetics of Nnitrosodimethylamine*, CANCER RES. 50, 4366–70, (1990).

[49]  Gombar et al., *Pharmacokinetics of N-nitrosodimethylamine in swine*, CARCINOGENESIS 9,1351–54, (1988).

[50]  Gombar et al., *Pharmacokinetics of N-nitrosodimethylamine in beagles*, CANCER RES. 47, 343–47, (1987).

[51] Hakura et al., *Advantage of the use of human liver S9 in the Ames test*, Mutation Res. 438, 29–36, (1999), https://doi.org/10.1016/s1383-5718(98)00159-4.

[52] Peto et al., *Effects on 4080 rats of chronic ingestion of N-nitrosodiethylamine or N-nitrosodimethylamine: a detailed dose-response study*, CANCER RES. 51, 6415–6451 (1991).

adduct formation results produced a linear dose response *without evidence of a threshold*."[53] Dr. Craig Lindsey, who Defendants recently withdrew as an expert, agreed that there is no threshold akin to what the scientific community has concluded, contrary to his colleagues' opinions. Ex. 20 Lindsley Dep. 136:24–137:4.

Third, Defendants themselves acknowledge in internal documents that NDMA is a genotoxic carcinogen and that NDMA exposure at any level should therefore be avoided to avoid cancer. *See* D.E. 5841 at 5–7. GSK reported, for example, that "NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible," because it is "highly likely that NDMA is carcinogenic to humans potentially at low levels of exposure."[54] Arthur Ciociola, Ph.D., a regulatory witness for Pfizer, testified "I'm aware that NDMA is a carcinogen" and "it makes common sense that no level would be an acceptable level of NDMA." Ex. 11 Ciociola Dep. 171:11–14.

Fourth, the FDA has set the ADI for NDMA at 96 ng/day based on the ICH M7 guidelines.[55] Because of their known genotoxic and carcinogenic properties, NDMA and other N-nitroso compounds are classified by ICH as falling within a "cohort of concern" because they can display extremely high carcinogenic potency.[56] Under ICH M7 guidelines, NDMA is a controlled class 1 impurity and is subject to the most stringent controls.[57] Notably, the ICH M7 calculates a cancer threshold of toxicological concern ("TTC") for genotoxic impurities in drug products or drug substances (1.5 µg/day as the lifetime limit), but if a drug is included in its "cohort of concern" (like ranitidine is) then the ICH M7 does not give a TTC. Instead, for Class 1 (and Class 2) mutagenic impurities with positive carcinogenicity data, compound specific risk assessments are used to derive an ADI based on carcinogenic potency and linear extrapolation. *Id.* p. 11–12. To calculate the ADI for NDMA, the FDA uses linear extrapolation to TD50. *Id.* p. 5.

Contrary to the FDA/ICH M7 requirement of a linear dose extrapolation, Defendants seek

---

[53] FDA, Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public Workshop at 11 (March 29-30, 2021) (emphasis added), available at https://www.fda.gov/media/150932/download. *See also* Ex. 37 (GSKZAN0003505669).
[54] Ex. 41 GSK Health Hazard Report (GSKZAN0003419540).
[55] FDA, *Control of Nitrosamine Impurities in Human Drugs, Guidance for Industry* (Feb. 2021). According to the FDA, Nitrosamines are "potent genotoxic agents" and probable human carcinogens" p. 5.
[56] ICH guidance for industry M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limits Potential Carcinogenic Risk (March 2018) ("ICH M7").
[57] *Id*. Control of Nitrosamine Impurities in Human Drugs, Guidance for Industry (Feb. 2021), Appendix B, p. 1.

to convince the Court that a different standard applies: the BMD (Benchmark Dose) approach. The FDA's 2021 Working Group on Nitrosamines explicitly rejected the BMD approach for NDMA, noting that—even though "generally[] BMDL is the preferred approach"—"the consensus of the expert panelists" was that "for nitrosamines, the TD50 is the best available- carcinogenic risk estimation."[58] Likewise, James Harvey, a GSK witness and one of the authors of Johnson *et al.* (2021) (an article that, in contradiction to the FDA, used the BMDL approach) admitted that the BMD approach has not been adopted for NDMA by *any* regulatory agency, and that there is no precedent for it. Dr. Harvey testified that: "This [Johnson] paper is about alternative modeling approaches to define acceptable intakes. It's not been accepted as a standard." Ex. 16 Harvey Dep. 58:12–18, 68:6–25. He further described the Johnson BMDL approach as a mere "proposal." *Id.*

Lastly, the NDMA quantities associated with the five specific cancers identified in the human epidemiological diet and occupational studies are consistent with the NDMA quantities found in ranitidine. As Dr. Salmon opines "[d]ose-response has been demonstrated, where the levels of NDMA in ranitidine formulations, as discussed in my Dose Response section, are sufficient, based on the NDMA testing results of the FDA, Defendants and Emery Pharma, and comparable to NDMA exposure in dietary studies, the Hidajat study and Cardwell to lead to an increased risk of bladder, esophageal, liver, pancreatic and stomach cancer."[59]

In sum, Defendants' position alleging that NDMA has a safe threshold is not based on accepted science. It also directly conflicts with the FDA's applicable regulatory standard for NDMA, which requires application of a linear dose extrapolation.

## ARGUMENT

### I.     Plaintiffs' Experts' Opinions on Endogenous NDMA Formation Are Based on Reliable Scientific Bases

Five of Plaintiffs' experts opined that NDMA forms endogenously in the human body as a result of ingestion of ranitidine: Panigrahy, Michaels, Marletta, Le, and Najafi.[60] All five of these

---

[58] Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public Workshop at 8 (FDA March 29-30, 2021) at 8.

[59] Def. Ex. 22 (Salmon Rep) at 5; *see also* Def. Ex. 19 (Panigrahy Rep) at 195–199.

[60] Defendants have not moved to exclude Dr. Salmon's opinions regarding endogenous formation of NDMA—and, since the time for making such challenges has passed, Defendants have forfeited any such arguments. Moreover, contrary to Defendants' passing claim in a footnote, Dr. Salmon has not withdrawn his opinions about endogenous formation of NDMA. Motion at 3 n.9. At deposition, Dr. Salmon clarified that his focus was exogenous formation and dose response of NDMA. While he reviewed some literature

experts reviewed multiple types of evidence before arriving at this conclusion. In reviewing that evidence, these experts assigned strong weight to some studies and weak weight to other studies— but they assigned that weight for scientifically valid reasons. Because each expert employed a "weight of all the evidence" methodology, with valid explanations for the weight they assigned to various evidence, the Court should admit their opinions.

### A.  "Weight Of All The Evidence" Methodology Is Well Supported

An expert can base his or her opinion on a "weight of all the evidence" methodology. This methodology essentially boils down to a three-step process: (1) the witness consults a corpus of scientific evidence, (2) the witness weights various pieces of evidence, and (3) the witness comes to an overall conclusion about what the evidence shows. In step one, the witness must consult the relevant corpus. In step two, the witness must have valid scientific reasons for assigning the weights she assigns. But, so long as the witness consults a corpus of evidence and weights things validly, then her conclusion must be admitted to the jury. This methodology finds support both in the scientific community and in the law.

The scientific community approves of the "weight of all the evidence" methodology. Indeed, the *Reference Manual on Scientific Evidence* all but commands it. It notes that an expert should "consider all the relevant available scientific evidence, taken as a whole, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence." *Ref. Man.* at 20. The *Manual* details that "many of the most well-respected and prestigious scientific bodies" employ this method. *Id.* These include IARC, the Institute of Medicine, the National Research Council, and the National Institute for Environmental Health Sciences. *Id*; *see also* IARC Preamble at 8 (detailing that it considers multiple types of evidence when determining causation, including "epidemiological studies, cancer bioassays in experimental animals, and mechanist evidence, as well as pertinent information on exposure in humans"). Indeed, "[i]n applying the scientific method, scientists do not review each scientific study individually for whether by itself it reliably supports the causal claim." *Reference Manual* at 20. Such tunnel -vision would commit scientific malpractice because one study (or one type of evidence) "when considered alone, may not individually prove the contention." *Id.* at 20. Rather, "[s]cientific inference typically requires

---

on endogenous formation of NDMA, he concluded that the endogenous formation was due to multiple factors in addition to ranitidine. Consistent with the opinions in his Reports, Dr. Salmon opines that NDMA forms in the stomach by a reaction of ranitidine with dietary nitrite under certain physiological conditions and consumption of nitrite rich meals. *See, e.g.*, Def. Ex. 22 (Salmon Rep.) at 5.

considerations of numerous findings[.]" *Id*. at 19-20.

The law also approves of the "weight of all the evidence" methodology. Courts routinely classify it as a reliable method to reach conclusions about causation. For example, courts frequently admit opinions finding causation under this method, "even if no one line of evidence support[ed] a reliable inference of causation by itself." *Forced Air Warnings Devices Prods. Liab. Litig.*, 9 F.4th 768, 781 (8th Cir. 2021) (cleaned up); *see also Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 23 (1st Cir. 2011) ("The district court erred in reasoning that because no one line of evidence supported a reliable inference of causation, an inference of causation based on the totality of the evidence was unreliable."); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000) (same). But, as noted, a court must pay attention to how the expert weights the evidence: the expert cannot over-weight one study based on a coin flip and under-weight another study because her dog barked too loudly when she read it. The rationale behind the weighting must meet scientific scrutiny. *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) (noting that the methodology is "generally reliable," but acknowledging "all of the relevant evidence must be gathered, and the assessment or weighing of that evidence must not be arbitrary, but must itself be based on methods of science.") (internal quotation marks omitted); *Milward*, 639 F.3d at 23 ("The hallmark of the weight of the evidence approach is *reasoning* to the best explanation for all of the available evidence.") (emphasis added); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018) ("This 'weight of the evidence' approach to analyzing causation can be considered reliable, provided the expert considers all available evidence carefully and explains how the relative weight of the various pieces of evidence led to his conclusion."); *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, Case No. 14 C 1748, 2017 WL 1833173, at *9 (N.D. Ill. May 8, 2017) ("The Court agrees with plaintiffs that there is nothing inherently unreliable about a method that relies on the totality of the evidence, provided that the expert considers the evidence carefully and explains how the weight of the various pieces led him to his conclusion.").

**B. Plaintiffs' Experts Reliably Applied the "Weight of All the Evidence" Methodology to Determine That NDMA Forms from Ranitidine Endogenously**

Plaintiffs' experts reliably applied the "weight of all the evidence" methodology to conclude that NDMA forms from ranitidine endogenously. For each Plaintiffs' expert, the record shows that the expert considered all relevant evidence, and then weighted that evidence based on

valid scientific rationales.

### 1. Plaintiffs' Experts Considered a Wide Array of Evidence

First, Plaintiffs' experts considered a wide array of evidence. Panigrahy reviewed *in vivo* studies that evaluated gastric fluid, *in vivo* studies that evaluated plasma, and *in vitro* nitrosation studies. *See* Def. Ex. 19 (Panigrahy Rep.) at 86–108. He reviewed multiple studies that examined the biomechanisms by which NDMA formed from ranitidine. *See id*. at 118–127. His "materials considered" list spans 99 pages. *See id*. at PDF 289–387.

Michaels reviewed *in vivo* studies, *in vitro* human studies, and *in vitro* animal studies. *See* Def. Ex. 36 (Michaels Dep. Tr.) at 97:9–98:18. As part of this process, he addressed urine studies (and their weaknesses), plasma studies, and gastric fluid studies. Def. Ex. 13 (Michaels Rep.) at 7, 26–31. His "materials considered" list spans hundreds of entries. *See id*. at PDF 75–99.

Marletta's previous work specialized in endogenous formation of nitrite and nitrosamines. *See* Def. Ex. 31 (Marletta Dep. Tr.) at 33:21-25. He has published *in vitro* studies using cell cultures. *See id*. at 34:25-35:9. Marletta reviewed and evaluated various types of endogenous formation evidence, including studies with gastric fluid, studies with simulated gastric fluid, and studies with plasma. Def. Ex. 7 (Marletta Rep.) at 32–33, 35–47. His "materials considered" list spans hundreds of entries. *See id.* at PDF 90–114.

Le considered urine studies, plasma studies, gastric fluid studies, and simulated gastric fluid studies. *See, e.g.*, Def. Ex. 5 (Le Rep.) at 37–38, 70. Her materials considered list spans hundreds of entries. *See id*. at PDF 196–210.

Finally, Najafi based his opinion on endogenous NDMA formation on multiple categories of evidence: simulated gastric fluid testing, plasma studies, urine studies, the overall stability of ranitidine, and his own simulated gastric fluid experiments. *See* Def. Ex. 17 (Najafi Rep.) at 80–104. His materials considered list spans hundreds of entries. *See id*. at PDF 226–28.

### 2. Plaintiffs' Experts Provided Valid Rationales for How They Weighted the Evidence

Plaintiffs' experts also provided valid rationales for how they weighted the evidence. Each expert's report outlines these rationales in extensive detail, and the overall themes are highlighted in this brief's Facts section. It would be tedious (and likely violate the local rule's page count requirements) to catalogue here every rationale for every expert's weighting of every study. But— given that Defendants' have specifically criticized Plaintiffs' experts for under-weighting urine

studies—Plaintiffs' bring the following examples to the Court's attention as a representative sample:

- Panigrahy underweighted the urine studies. But, in doing so, he addressed the many difficulties inherent in measuring NDMA in the urine—in particular the body's quick metabolization of NDMA. *See* Def. Ex. 19 (Panigrahy Rep.) at 83.

- Michaels "consider[ed] valid, alternate, and opposing perspectives when [he] assess[ed] the entire body of scientific and medical literature[.]" Def. Ex. 13 (Michaels Rep.) at 4. In doing so, he addressed the difficulties of measuring NDMA in the urine, given that the human body metabolizes it quickly. *Id*. at 58–60.

- Marletta underweighted the urine studies, but did so because of "analytical difficulties in measuring it." Def. Ex. 31 (Marletta Dep Tr.) at 241:22. He testified that "with [its] rapid metabolism" it is wrong "to expect[] to find [NDMA] in the urine." *Id*. at 241:23–242:3.

- Le underweighted the urine studies, but did so because a "lack of urinary concentration cannot be interpreted as [a] lack of plasma or blood concentration of NDMA." Def. Ex. 5 (Le Rep.) at 36, 44. For example, she noted that "Florian et al. omitted discussion on the unique pharmacokinetic characteristics of NDMA in the human plasma and tissue, which should be seriously cogitated in order to adequately extrapolate the study results to the clinical setting where serious and potentially lethal toxic effects are of concern." *Id*.

- Najafi also addressed the weaknesses in the urine studies, noting that Florian et al. (1) made "no attempt to evaluate if NDMA was formed in the gastrointestinal tract and then was metabolized/reacted with biomolecules,"[61] (2) identified "several outliers" yet "explained [them] away without any additional experimental insights," and (3) contained numerous data points (73%) in its urinary NDMA analysis that "were below limit of quantitation." Def. Ex. 17 (Najafi Rep.) at 107–108.

- All five of these Plaintiffs' experts provided detailed reasoning for why they discounted the Florian results. *See* Def. Ex. 5 (Le Rep.) at 43–45; Def. Ex. 7 (Marletta Rep.) at 46, 54–56; Def. Ex. 13 (Michaels Rep.) at 58–60; Def. Ex. 17 (Najafi Rep.) at 104–109; Def. Ex. 19 (Panigrahy Rep.) at 106–107, 156.

---

[61] Florian and colleagues confirm this point acknowledging that their study would not detect the formation of NDMA in the gastrointestinal tract that was metabolized and would not be found in plasma or urine. *See* Def. Ex. 49 (Florian, et al. 2021) at E8.

In sum, all five of these experts considered multiple types of evidence, looked at multiple studies within each type of evidence, and weighed this evidence carefully and with thorough scientific explanation. Each of Plaintiffs' experts therefore "consider[ed] all available evidence carefully and explain[ed] how the relative weight of the various pieces of evidence led to [the expert's] conclusion." *In re Abilify*, 299 F. Supp. 3d at 1311; *see also In re Zoloft*, 858 F.3d at 796 (same); *In re Testosterone Replacement Therapy*, 2017 WL 1833173 at *9 (same).

## C. Defendants Err by Asking the Court to Weigh Evidence in Isolation

Notwithstanding the scrutiny that Plaintiffs' experts devoted to their analyses, Defendants ask this Court to collectively reject their opinions for two reasons. Neither argument persuades.

### 1. Defendants err by asking the court to judge causation based exclusively on the urine studies

Defendants first contend that "human studies of NDMA in urine prov[e] that NDMA is not formed endogenously." Motion at 4. Per Defendants, no reasonable expert could disagree that human urine studies are entitled to low weight. This argument commits two fundamental errors.

First, Defendants' argument asks the Court to judge Plaintiffs' experts based on only one type of evidence: the urine studies. But the Court cannot do this: its task is to assess whether each Plaintiffs' expert faithfully followed the "weight of all the evidence" methodology that he or she purported to follow. That means the Court must judge whether each expert "consider[ed] all available evidence carefully and explain[ed] how the relative weight of the various pieces of evidence led to [the expert's] conclusion." *In re Abilify*, 299 F. Supp. 3d at 1311; *see also In re Zoloft*, 858 F.3d at 796 (same); *In re Testosterone Replacement Therapy*, 2017 WL 1833173 at *9 (same). And Plaintiffs' experts followed the "weight of all the evidence" methodology well precisely *because* they did not *only* focus on the urine studies: they scrutinized everything available and only then came to conclusions. Indeed, if Plaintiffs' experts had ignored entire categories of relevant evidence, which is precisely what the defense experts did, *that* would have provided fodder for a valid *Daubert* challenge. By asking this Court to ignore entire bodies of evidence, Defendants therefore ironically ask the Court to commit a methodological sin itself.

Second, Defendants' argument asks the Court not only to exclusively rely on the urine studies (error #1), but then also to weigh those studies highly (error #2). It is a textbook rule under *Daubert*, however, that Courts cannot weigh evidence—that's the jury's job. *See, e.g.*, *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343-44 (11th Cir. 2003) ("[A]ppellant's

arguments go to the weight, not the admissibility, of the evidence [the expert] offered."); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 did not require, or even permit, the district court to choose between those two studies at the gatekeeping stage. Both experts were entitled to present their views, and the merits and demerits of each study can be explored at trial."). As detailed above, Plaintiffs' experts provided a valid rationale for weighing the urine studies poorly: namely, that NDMA metabolizes quickly in the human body and therefore would not show up in urine samples. This suffices to provide a valid scientific rationale. It is "empirically testable" and thus "subject to effective cross examination[.]" *QuietTech*, 326 F.3d at 1343-44 (11th Cir. 2003). A jury should thus be entitled to hear that rationale.

### 2. Defendants err by asking the court to judge causation based exclusively on the in vitro studies

Next, Defendants contend that Plaintiffs' experts' reliance on *in vitro* studies "do not support, let alone prove[,] the formation of NDMA by ranitidine in human physiological conditions." Motion at 9. This argument commits the same two errors.

First, it asks the Court to focus exclusively on the *in vitro* studies. For the reasons already stated, the Court must not do this: the Court must instead ask whether each expert "consider[ed] all available evidence carefully and explain[ed] how the relative weight of the various pieces of evidence led to [the expert's] conclusion." *In re Abilify*, 299 F. Supp. 3d at 1311; *see also In re Zoloft*, 858 F.3d at 796 (same); *In re Testosterone Replacement Therapy*, 2017 WL 1833173 at *9 (same). This means the Court must consider whether Plaintiffs' experts considered *in vivo* studies, *in vitro* studies, animal studies, and even (ironically enough) the urine studies. It was error for Defendants to ask the Court to consider only the urine studies—and it is equally error to ask the Court to judge Plaintiffs' experts based only on *in vitro* studies.

Second, Defendants' argument again asks the Court to weigh the evidence—but this time, rather than weigh the urine studies strongly, they ask the Court to weigh the *in vitro* studies weakly. For the same reasons as before, the Court cannot do this. Defendants argue that the *in vitro* studies are flawed and do not support causation, but that "does not support the argument that [Plaintiffs' experts] did not consider the totality of the evidence necessary to arrive at a scientifically reliable opinion" on endogenous NDMA formation. *In re Trasylol Prods. Liab. Litig.*, Case No. 08-md-01928, 2010 WL 1489793, *4 (S.D. Fla. Feb. 24, 2010). Again, Courts routinely admit opinions finding causation based on a "weight of all the evidence" approach, "even if no one line

of evidence support[ed] a reliable inference of causation by itself." *Forced Air Warnings Devices Prods. Liab. Litig.*, 9 F.4th 768 at 781 (cleaned up); *see also Milward*, 639 F.3d at 23 (same); *NutraSweet Co.*, 227 F.3d at 789 (same). And even if Defendants are correct, and flaws exist in the *in vitro* studies, those flaws must face the crucible of aggressive cross examination. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Quiet Tech.*, 326 F.3d at 1345 ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross examination.") (collecting cases). As before, the jury must be permitted to weigh the virtues and vices of the *in vitro* studies, not this Court.

In short, Defendants "simply have competing beliefs as to the best practice for understanding the different factors at play in this case as to causation and the development of cumulative diseases"—such as how much weight to give to various studies—but "none of the[ir] concerns presented bear on reliability." *Waite v. All Acquisitions Corp.*, 194 F. Supp. 3d 1298, 1313-14 (S.D. Fla. 2016). The Court must therefore permit Plaintiffs' experts to give their opinions on endogenous NDMA formation.

## II.     Plaintiffs' Experts Properly Relied Upon Animal Studies, Only in Part, to Conclude That NDMA Is a Carcinogen

Defendants criticize four of Plaintiffs' experts who opine that NDMA causes cancer in humans: Panigrahy, Le, Melnick, and Salmon.  All four reviewed multiple types of evidence before arriving at this conclusion (including animal studies and human epidemiological studies), and gave scientifically valid reasons for weighing the studies how they did.  (Indeed, Dr. Panigrahy provided the same opinions based upon the same methodology in the Valsartan litigation, and the Honorable Robert Kugler blessed his methodology—and the opinions that resulted from it—as reliable and sound.  *See* Ex. 54 Order, *In re Valsartan*, Case No. 19-MD-2875 (D.N.J. Mar. 4, 2022).)  Because each expert thoroughly employed a "weight of all the evidence" methodology, the Court should admit their opinions.

### A.  Plaintiffs' Experts Reliably Applied the "Weight of All the Evidence" Methodology to Determine That NDMA Causes Cancer in Humans

#### 1.  Plaintiffs' experts considered more than just animal studies

Defendants would have the Court believe that Panigrahy, Le, Melnick, and Salmon *only* considered animal studies before each concluded that NDMA causes cancer in humans. To the

contrary, Plaintiffs' experts relied upon this evidence only in part: in concluding that NDMA causes cancer in humans, Plaintiffs' experts also relied upon various types of epidemiology (namely, dietary, occupational, and ranitidine epidemiology) and various mechanistic evidence (namely, *in vitro* studies, animal studies, and the IARC 10 Key Characteristics of Carcinogens). *See, e.g.*, Def. Ex. 5 (Le Rep.) at 8, 93–118; Def. Ex. 11 (Melnick Rep.) at 15–19, 22–65; Def. Ex. 19 (Panigrahy Rep.) at 27–63, 78–81, 83–88; Def. Ex. 22 (Salmon Rep.) at 4, 48–161. In context, then, the animal studies on carcinogenicity informed only one part of the analysis of Plaintiffs' experts. And, as established, an expert who employs a "weight of all the evidence" methodology *should* consider the corpus of relevant evidence. Plaintiffs' experts, in relying on animal studies in context with other evidence, therefore did the very thing that their methodology commanded.

### 2. Plaintiffs' experts provided valid rationales for how they weighted evidence

Each expert's report explains in detail why and how the expert weighed the animal studies—and the Facts section of this brief again provides a helpful summary. It is worth noting, however, that the studies upon which Plaintiffs' experts relied showed that NDMA caused various forms of cancers at various doses in all experimental species tested. In 1978, for example IARC found that NDMA "is carcinogenic in all animal species tested" including "mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs." IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, vol. 17, IARC, Lyon, France, 151, 1978 ("IARC 1978"). NDMA induced "malignant tumours following its administration by various routes, including ingestion and inhalation, in various organs in various species" including tumours "of the liver, kidney and respiratory tract." *Id*. Moreover, the WHO determined that "NDMA is clearly carcinogenic" "[b]ased upon laboratory studies in which tumours have been induced in all species examined at relatively low doses." Liteplo et al., WHO, *Concise International Chemical Assessment Document 38: N-Nitrodimethylamine*, at 4 (2002) ("WHO 2002"). Finally, the NTP has found that NDMA "caused tumors in numerous species of experimental animals, at several different tissue sites, and by several different routes of exposure" including liver, kidney, lung, ovary, digestive glands, hematopoietic system, blood vessels, and nasal cavity. NTP, U.S. Department of Health and Human Services, *15th Report on Carcinogens* at 7 (2021).

When Plaintiffs' experts weighted the animal studies as relevant, they did so in tandem

with IARC, the WHO, and the NTP. And they did so because it is generally accepted that NDMA is metabolized similarly in human tissue and rodent tissue.[62] Indeed, both the FDA and GSK have relied on these studies when assessing the carcinogenicity of NDMA in ranitidine. And as Defendants themselves admit, "[t]here is no question that animal studies can be a helpful tool in drug research[.]" Motion at 15. What's more, these animal studies are supplemented by epidemiology, *see generally* Plaintiffs' Opposition To Brand Defendants' Motion To Exclude Plaintiffs' General Causation Experts' Opinions Related To Epidemiology, something that the law does not even require. *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002) (noting that "[i]t is well-settled" that epidemiology studies are not required to corroborate other types of evidence to prove causation). Plaintiffs' experts therefore provided valid scientific rationales for weighting the animal studies as relevant. A jury can and should judge those rationales.

**B. Defendants Again Err by Asking the Court to Weigh the Animal Studies in Isolation**

Nonetheless, Defendants' ask the Court to collectively reject any expert's "opinion[] based on animal studies." Motion at 14. In doing so, Defendants commit the exact same two errors that they previously committed.

First, just like they asked the Court to judge opinions based solely on the urine studies, and then based solely on the *in vitro* studies, Defendants now ask the Court to judge Plaintiffs' experts' opinions based solely on animal studies. Again, the Court cannot do this: its task is only to assess whether each Plaintiffs' expert faithfully followed the "weight of all the evidence" methodology. *In re Abilify*, 299 F. Supp. 3d at 1311; *see also In re Zoloft*, 858 F.3d at 796 (same); *In re Testosterone Replacement Therapy*, 2017 WL 1833173 at *9 (same). Plaintiffs' experts did just that: they considered a range of evidence in addition to animal studies, including various forms of human epidemiology and various forms of mechanistic evidence, and they provided valid rationales for how they weighted that evidence. Defendants again ask the Court to commit the methodological sin of judging each Plaintiffs' experts' "weight of all the evidence" analysis based on only a sliver of that expert's *actual* analysis.

Second, just like they did before, Defendants ask the Court to weigh the evidence. They first ask the Court to accept the premise that the human epidemiological studies show no

---

[62] Tricker AR, Preussmann R., *Carcinogenic N-nitrosamines in the diet: occurrence, formation, mechanisms and carcinogenic potential*, Mutation Res., 277-89, (1991).

relationship between ranitidine and cancer (a premise the Court cannot accept without itself weighing the human epidemiology evidence—something it cannot do). Then, based on that faulty premise, Defendants ask the Court to ignore the animal studies (and thus to ignore the conclusions of IARC, NTP, and WHO) because "animal studies cannot 'trump' human epidemiological studies." Motion at 16. Even if you grant the (again, faulty) premise that the human ranitidine epidemiology does not show a relationship between ranitidine and cancer (which it does), the Court cannot then proceed to weigh the animal studies evidence. Again, it is left to the jury to decide whether Plaintiffs' experts properly assigned the right weights to the various forms of evidence the experts considered. *See Quiet Tech.*, 326 F.3d at 1343-44; *Schultz*, 721 F.3d at 433. That Defendants' think the animal studies, standing alone, cannot support causation is of no matter— those studies are only a fraction of what Plaintiffs' experts considered. And—to the extent that Defendants think the animal studies flawed—their flaws await the test of cross examination. *See Daubert*, 509 U.S. at 596; *Quiet Tech.*, 326 F.3d at 1345; *In re Trasylol*, 2010 WL 148793 at *4. The Court must again reject Defendants' request that it stand-in for the role of juror.

### III. Plaintiffs' Experts Did Not Opine on the Legal Question of Threshold Dose, but Merely Testified as to the Scientific Reality That Any Amount of a Carcinogen Is Dangerous

Three of Plaintiffs' experts testified to the unremarkable conclusion that a human ought not ingest *any* amount of a genotoxic, clastogenic, and mutagenic carcinogen. *See* Def. Ex. 36 (Michaels Dep. Tr.) at 48:11–16; Def. Ex. 39 (Moorman Dep. Tr.) at 288:21–25; Def. Ex. 41 (Panigrahy Dep. Tr.) at 100:24–101:3. (Notably, even though Defendants portray her as doing so, McTiernan did not opine on the "minimum dose and duration of exposure to ranitidine that is necessary to cause" any of the five cancers. *See* Def. Ex. 32 (McTiernan Dep. Tr.) at 607:2–11.) In doing so, Panigrahy, Michaels, and Moorman recognized the uncontroversial scientific reality— established "from 40 years of literature"—that "anything that's mutagenic and changes the DNA base can initiate cancer." Def. Ex. 41 (Panigrahy Dep. Tr.) at 100:24–101:3. Notably, each expert qualified his or her testimony, recognizing that the risk of cancer increases with the dose, and that a mere molecule of a carcinogen is unlikely to cause cancer (even if there is a theoretical possibility that it might do so). *See* Def. Ex. 36 (Michaels Dep. Tr.) at 52:4–7 ("I would say that just exposure to one molecule, just like smoking one cigarette in your life, would be unlikely with just exposure to one molecule."); Def. Ex. 39 (Moorman Dep. Tr.) at 289:13–18 ("[A]s I stated, theoretically, because NDMA is a genotoxin, any exposure could cause cancer. But our general thought is that

the greater the exposure to a carcinogen, the higher the risk for cancer."); Def. Ex. 41 (Panigrahy Dep. Tr.) at 101:5–7 ("[M]ultiple studies have said that the risk may be very, very, very, very, very small with one molecule.").

Defendants object to this unremarkable testimony by mischaracterizing it: to read their motion is to think that Michaels, Moorman, and Panigrahy all gave an opinion as to what amount of NDMA suffices to establish a *legal* causation threshold. That is, of course, not what they opined. They merely testified as to the same scientific reality that GlaxoSmithKline recognized in its 2019 Hazard Assessment Report: "NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible." Ex. 41 GSK Hazard Assessment (GSKZAN0003419540). If that sentence is valid enough for GSK to adopt as company policy and write on its letterhead, its valid enough for Michaels, Moorman, and Panigrahy to repeat at trial.

## IV.   Dr. Panigrahy Properly Relied upon the FDA's "Acceptable Daily Intake" for NDMA as Evidence

Defendants ask that the Court "preclude" Panigrahy "from offering an opinion that FDA's [acceptable daily intake] is proof of general causation[.]" Motion at 23. In making this request, Defendants once again mischaracterize the testimony of a Plaintiffs' expert. Panigrahy did not opine that the FDA's 96 nanogram daily limit established a 96 nanogram threshold to trigger causation. Rather, Panigrahy testified: (1) that the FDA, a generally well-regarded body, saw fit to establish *some* limit on the amount of NDMA a person should ingest daily, and (2) that the FDA chose to establish any limit at all provides *one piece* of evidence that NDMA causes cancer. (If the FDA knew beyond a doubt that no dose of NDMA would cause cancer, why, then, would it establish a limit?) Neither statement is controversial, despite Defendants' attempts to make them so. But lest there be any doubt, Panigrahy, like Plaintiffs' other experts, based his opinions on the weight of all the evidence he reviewed, including human dietary and occupational studies that showed a statistically significant increased risk of cancer at various lifetime cumulative exposures to NDMA. *See, e.g.*, Def. Ex. 19 (Panigrahy Rep.) at 200–201 (noting that he reviewed "occupational exposure and dietary studies").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion.

Dated: August 1, 2022.

Respectfully submitted,

*/s/ Tracy A. Finken*
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

*/s/ Michael L. McGlamry*
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

*/s/ Adam Pulaski*
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Marlo E. Fisher
Email: marlof@lpm-triallaw.com
Laminack, Pirtle & Martines
5020 Montrose Blvd., 9th Floor
Houston, TX 77006
Tel: (713) 292-2750

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 1, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and is being served on counsel via email pursuant to ECF No. 5684.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

**Motion to Seal/Sealed and Exparte Filings:**

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

## U.S. District Court

### Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered by Gilbert, Robert on 8/1/2022 at 11:17 PM EDT and filed on 8/1/2022

| | |
|---|---|
| **Case Name:** | IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION |
| **Case Number:** | 9:20-md-02924-RLR |
| **Filer:** | Zantac (Ranitidine) Products Liability Litigation |
| **Document Number:** | 5913 |

**Docket Text:**
**Plaintiff's SEALED MOTION *Plaintiffs Opposition to Brand Defendants Motion to Exclude Remaining Expert Opinions Relating to General Causation* by Zantac (Ranitidine) Products Liability Litigation. (Gilbert, Robert)**

**9:20-md-02924-RLR** No electronic public notice will be sent because the case/entry is sealed.

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=8/1/2022] [FileNumber=22428878-0
] [995804ce343e781d4b4de637a77dfe2a7e27d9ec6cf0ab504c46ce47b1ad88c001e
05229488d7cb0ba0f36b99f7a5abc0f14e2d9b64161ce6d9bc494e2506ee0]]