UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY\_\_\_\_PE\_\_\_\_D.C.

Nov 18, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

IN RE: ZANTAC (RANITIDINE)      MDL NO. 2924
PRODUCTS LIABILITY      20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO: ALL CASES

# PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO EXCLUDE DEFENDANTS' PUTATIVE EXPERT OPINIONS ON GENERAL CAUSATION UNDER RULE 702

DATED: November 11, 2022

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................................. 1

I.      Witte's Supplemental Report Repeats His Original Report's Methodological Flaws ........ 1

II.     Witte's Analysis of the Wang Study Reveals Additional Methodological Flaws .............. 2

        A.      Witte's Assessment of the Strengths of the Wang Study Is Facially Unbalanced ................................................................................................... 2

        B.      Witte's "No True Active Comparator" Criticism Is Patently Unreliable ............... 3

        C.      Witte's Confounders Critique Is Unreliable .......................................................... 4

CONCLUSION .............................................................................................................................. 5

Plaintiffs submit this supplemental brief as required by the Order of October 28, 2022 [D.E. 6083]. Witte's supplemental report cures none of the infirmities of his original report. It adds new problems and displays litigation-driven inconsistency in his methodology. He should be excluded as a general causation expert.

## ARGUMENT

**I.     Witte's Supplemental Report Repeats His Original Report's Methodological Flaws.**

Witte's supplemental report doubles down on the flaws identified in Plaintiffs' Motion.

First, Witte's supplemental report says nothing at all about NDMA science. Previously, Defendants' response to the argument that he "'did not consider … any studies of NDMA'" was that no one else did either: "Witte is in good company." D.E. 5968 at 38 (quoting Pls' Mot. at 66). The Wang study, however, called NDMA "a known carcinogen," Wang at 2, and cited a substantial volume of NDMA science,[1] clearly demonstrating the importance of NDMA science to non-litigation scientists. Witte did not review the NDMA science cited in the Wang study and made no effort to explain why Wang thought this literature crucial—but Witte nevertheless thought it irrelevant. The terms "NDMA" or "nitrosodimethylamine" do not appear in the body of Witte's report. Without explanation, Witte again ignores key evidence that is contrary to his litigation-driven opinions.

Second, Witte made no attempt to factor in the Plaintiff population—overwhelmingly long-term users—into his analysis. He never acknowledges that a finding of no association for short-term use would not provide evidence of no association for long-term use. Notably, he fails even to report the hazard ratios for greater than 360 DDD, which were calculated for liver (1.42), gastric (1.33) and pancreatic (1.22), and statistically significant for the first two. Wang at 9. Rather than discuss these more relevant results, he ignores them, emphasizing "the modest magnitude of HRs reported" for the mix of *all* users (not longer than a year). D.E. 6071-1 at 4.

Third, Witte's supplemental report does nothing to remedy his deficient analysis of prior active comparator studies. In his earlier report, Witte opined that the Yoon study (which Defendants admitted only examined "*short-term risk of cancer*"[2]) ruled out an association for the

---

[1] *See* Wang endnotes 3 (Tricker), 8 (Lijinsky), 10 (Brambilla), 11 (Loh), 12 (Zhu), 19 (Song), 20 (Hidajat), 35 (Knekt), 36 (Bartsch) 40 (Tannenbaum), 41 (Mitacek), 53 (Swenberg), 54 (Bedell), 55 (Dumenco), 57 (Zaidi), 58 (Souliotis).
[2] D.E. 5968 at 42 (quoting Yoon (2021) at 7)).

1

Plaintiffs here (who were long-term users). Wang disagreed, stating both Yoon and Iwagami had "short follow-up duration [that] may cause statistical bias and inaccurate conclusions." Wang at 12. Witte did not try to reconcile his overreaching interpretation with Wang's (or Yoon's).

## II. Witte's Analysis of the Wang Study Reveals Additional Methodological Flaws.

Witte's application of his methodology to the Wang study is inconsistent with his prior reports and deficient on its own terms.

### A. Witte's Assessment of the Strengths of the Wang Study Is Facially Unbalanced.

In his initial report, Witte "summarize[d] each study's design, analysis, results, and g[ave] a brief discussion of strengths, weaknesses, and conclusions." Witte Rep. at 12. In his supplemental report, the word "strength," or any word carrying similar meaning does not appear *anywhere*, even though the Wang study has what he identifies as strengths in other studies. The Wang study was a "population-based claims database,"[3] Wang at 2, with a "huge population size,"[4] *id.* at 12, "propensity score matching,"[5] *id.* at 1, and "a new-user design,"[6] *id.* at 3, in which "outcome data were retrieved from formal cancer registries, which are more accurate than other sources,"[7] *id.* at 12-13, that had detailed information on prescribed medicine that allowed calculating DDD,[8] *id.* at 2, and adjustment for confounders, *id.* at 3.[9] Witte's evaluation lacks even the appearance of balance, and is, in truth, a hatchet-job meant as damage control. A reliable

---

[3] *Compare* Witte Rep. at 45 (Adami: "Strengths included: … a population-based cohort"); 48 (Yoon: "Strengths include a large population-based study"); 51 (Liu: "Strengths … population-based studies"); 54 (Tran: "Strengths … population-based studies").

[4] *Compare* Witte Rep. at 46 (Cardwell: "Strengths … very large sample size"); 46 (Iwagami: "Strengths … large sample size"); 47 (Kumar: "Strengths … include a large sample size"); 49 (Kantor: "Strengths of this study include a very large cohort"); 52 (McDowell: "Strengths … include a very large sample size").

[5] *Compare* Witte Rep. at 45 (Adami: "Strengths included … use of propensity scores"); 51 (Kim S: "Strengths … propensity score matching").

[6] *Compare* Witte Rep. at 45 (Adami: "Strengths included: … restriction to new users of the drugs").

[7] *Compare* Witte Rep. at 45 (Adami: "Strengths included … prescription and cancer registry information"); 48 (Norgaard: "Strengths … nationwide registry"); 51 (Kim S: "Strengths … nation-wide database").

[8] *Compare* Witte Rep. at 46 (Cardwell: "Strengths … detailed information on prescribed medicine"); 52 (McDowell: "Strengths … detailed information on prescribed medicine").

[9] *Compare* Witte Rep. at 51 (Liu: "Strengths include … ability to adjust for numerous potential confounders."); 54 (Tran: "Strengths include … ability to adjust for numerous potential confounders.").

2

evaluation would also have noted the Wang study's controls went beyond those of other studies.[10]

Witte is not always over-critical—when it suits him, he ignores weaknesses. For bladder cancer, the Wang study caught only "ICD-10 code C67," while the Norgaard study also caught "ICD-10: C67, D303, D090, D095" (as did Cardwell). *Compare* Norgaard at 9 *with* Wang at 3. This matters because Wang is an outlier for bladder cancer, finding a smaller association than other studies, and the fact that the study omitted several bladder cancer codes is one possible explanation—but not one Witte even considered.

### B. Witte's "No True Active Comparator" Criticism Is Patently Unreliable.

The Wang study is devastating to Witte's opinions precisely because Witte put so much stock into active comparators as the *only* ranitidine epidemiology worth considering—and his false opinion that no active comparator study had found any association between ranitidine and cancer. When confronted by Wang, an active comparator study that contradicts his view, Witte defaults to the No True Scotsman fallacy by protesting that the Wang study is "not a true active comparator design." D.E. 6071-1 at 2. This is due to two study design features: First, that Wang excluded ranitidine users (but not famotidine users), who consumed the drug for less than 3 months; second, that some ranitidine users also took famotidine.[11] Neither feature makes any relevant difference, and both features exist in prior studies Witte trumpets as *true* active comparators.

On the first critique, the study authors had good reason to exclude ranitidine users who took *less than 3 months' worth* of ranitidine—namely, nobody believes such a short time causes enough cancer to detect and by eliminating very short-term users, Wang avoided the problem in

---

[10] *See* Wang at 3 (the study controlled for: "exact age, sex, the Charlson comorbidity index (CCI), comorbidities (hypertensive cardiovascular disease (HCD0, hyperlipidemia, diabetes mellitus (DM), and chronic kidney disease (CKD)), medications (aspirin, statins, angiotensin-converting enzyme inhibitors (ACEIs),  -blockers, spironolactone, glucocorticoids, and selective serotonin reuptake inhibitors (SSRIs), and antiviral therapy for hepatitis B or C virus (HBV and HCV, respectively) infection)"). Few, if any, other studies corrected for many of these.

[11] Witte actually says, "every ranitidine user in the active comparator study was also a famotidine user." This is misleading. The study appears to report that 64% (or 35,269) of the ranitidine users took famotidine. *See* Wang at 6. There are multiple active comparator analyses, including one between *that* 64% (R&F) versus 35,269 famotidine-only users (Fig. 5A), another between the total ranitidine cohort of 55,110 versus 35,269 famotidine-only users and 17,116 non-famotidine users (Fig. 5B), and a third between the total ranitidine cohort versus PPI-only users and non-PPI users (Fig. 6). The charts show quite clearly that the risk levels of the 100% ranitidine cohort (some with famotidine, some without), and the 64% ranitidine sub-cohort (all with famotidine) are virtually identical. The study itself refutes Witte's concern but he omits this from his report.

3

Adami in which half of the ranitidine users had only one prescription. Witte provides no reason for why that sound methodological choice confounds or biases the study. He simply asserts that the individuals "may be very different," *id.*, with no plausible mechanism (much less a mechanism that is not corrected by the robust statistical controls in the Wang study).

The second critique shows Witte's bald inconsistency. He claims, citing, for example, the Adami and Iwagami studies, that *real* active comparator studies "used appropriate comparison groups"—specifically, they "compared ranitidine to famotidine or to famotidine and cimetidine," rather than including users of ranitidine and famotidine in the ranitidine group. D.E. 6071-1 at 2. But Witte's claim is factually wrong. The studies he lauds as "true" active comparator studies *compare ranitidine and famotidine use* to famotidine use—in fact, the other studies, unlike Wang, did not report the degree of overlap, and lumped ranitidine and *many* other drugs together:

- "We **allowed** ranitidine users to redeem prescriptions for **other H2RBs or PPIs**, but censored users of other H2RBs and PPIs if they redeemed a ranitidine prescription." Adami at 3 (emphasis added).
- "if a patient in the other H2 blockers group subsequently received ranitidine or nizatidine during follow-up, the patient was censored from the other H2 blockers group and **included in the ranitidine/nizatidine group** as a new user of ranitidine/nizatidine from that timepoint forward. However, once a patient had been allocated to the ranitidine/nizatidine group, he or she stayed in that group even if **other H2 blockers were subsequently prescribed**." Iwagami at 3-4 (emphasis added).

Witte gives no justification for his abrupt about-face, and there is no sound methodological reason to think one type of active comparator study is better than the other. If there were any doubt, the authors of a published, peer-reviewed article are well-positioned to explain what their own methodology actually was, and the paper says it used an "active comparator."

        C.     **Witte's Confounders Critique Is Unreliable.**

*Smoking*: Witte finds a new way to be inconsistent by criticizing the Wang study for failing to control for smoking. "Typically, an active comparator analysis would help control for these factors, but given the limitations of the purported active comparator design in Wang et al., these confounders are problematic for that analysis as well, and may result in biased associations." D.E. 6071-1 at 4. Witte must mean that Wang's inclusion of famotidine-and-ranitidine users in the ranitidine arm biases the study, but this is plainly wrong.

4

The theory fails on its face. For an active comparator to "typically" remedy confounding-by-smoking, three premises must be true: (A) smoking by H2RA users must be roughly similar, and (B) higher than smoking for non-users, *but* (C) people who use two H2RAs (or who use H2RAs for more than 90 days) must smoke more than users of a single H2RA (or for less than 90 days). Each premise is questionable,[12] and the last premise is undefended and implausible on its face. Even if true, Witte's theory would *also* undermine the Adami and Iwagami studies. He excuses the lack of smoking data in those studies because they used active comparators, but by his logic their inclusion of ranitidine + other drugs in the ranitidine arm makes them not "true" active comparators. Such inconsistency demonstrates unreliability.

*Reverse Causation*: Witte opines that Wang "does not Control for Reverse Causality," D.E. 6071-1 at 3, but the study disagreed. Wang utilized a "washout period" specifically to address reverse causation: "our study used 1 year as the washout period, during which the participants were taken off ranitidine, to remove the effects of treatment before the study initiation. Nonetheless, ranitidine still showed similar results after excluding 'protopathic bias' [reverse-causation]." Wang at 12. The Kaplan-Meier analyses (Figures 3 and 4) clearly refute reverse causation by showing that the cancer risks of ranitidine users and non-users are the same *early on* but diverge *over time*. If reverse-causation explained the association, the trend would be separation *at first*, but convergence *over time*.

*Liver Disease*: Witte says "[p]re-existing liver disease" is "an important potential confounder," but the study was "unable to control for them." D.E. 6071-1 at 4. But Wang used the Charlson Comorbidity Index as a control, which includes mild, moderate, and severe liver disease.[13] Witte overlooks this fact, which negates his critique.

## CONCLUSION

Defendants' putative expert Witte on general causation should be excluded under Rule 702.

---

[12] These assumptions are unsound, since, as Plaintiffs' Motion argued, ranitidine users smoke *less*. See D.E. 5841 at 70. Figure 5B contradicts Defendants' argument too, since it shows *highest* risk for ranitidine users (which included some famotidine), *middling* risk for non-users (no famotidine and no ranitidine), and *lowest* risk for famotidine-only users. Adding famotidine users cannot *increase* the reported risk of the ranitidine cohort when it *decreases* the risk of the non-user cohort.

[13] The Wang study did not list the components of the Charlson Comorbidity Index, but it is standard and widely available. *E.g.*, https://www.mdcalc.com/calc/3917/charlson-comorbidity-index-cci.

Dated: November 11, 2022                     Respectfully submitted,


/s/ Tracy A. Finken                          By: /s/ Robert C. Gilbert
Tracy A. Finken                              Robert C. Gilbert, FBN 561861
Email: tfinken@anapolweiss.com               Email: gilbert@kolawyers.com
ANAPOL WEISS                                 KOPELOWITZ OSTROW FERGUSON
One Logan Square                             WEISELBERG GILBERT
130 North 18th Street, Suite 1600            2800 Ponce de Leon Boulevard, Suite 1100
Philadelphia, PA 19103                       Coral Gables, FL 33134
Tel: (215) 735-1130                          Tel: (305) 384-7270


/s/ Michael L. McGlamry                      /s/ Adam Pulaski
Michael L. McGlamry                          Adam Pulaski
Email: efile@pmkm.com                        Email: adam@pulaskilawfirm.com
POPE McGLAMRY, P.C.                          PULASKI KHERKHER, PLLC
3391 Peachtree Road NE, Suite 300            2925 Richmond Avenue, Suite 1725
Atlanta, GA 30326                            Houston, TX 77098
Tel: (404) 523-7706                          Tel: (713) 664-4555


*Plaintiffs' Co-Lead Counsel*


Rosemarie R. Bogdan                          Mark J. Dearman, FBN 0982407
Email: Rosemarie.bogdan@1800law1010.com      Email: mdearman@rgrdlaw.com
MARTIN, HARDING & MAZZOTTI                   ROBBINS GELLER RUDMAN & DOWD
1 Wall Street                                120 East Palmetto Park Road, Suite 500
Albany, NY 12205                             Boca Raton, FL 33432
Tel: (518) 862-1200                          Tel: (561) 750-3000


Elizabeth A. Fegan                           Marlene J. Goldenberg
Email: beth@feganscott.com                   Email: mjgoldenberg@goldenberglaw.com
FEGAN SCOTT, LLC                             GOLDENBERG LAW, PLLC
1456 Sycamore Rd.                            800 LaSalle Avenue, Suite 2150
Yorkville, IL 60560                          Minneapolis, MN 55402
Tel: (312) 741-1019                          Tel: (855) 333-4662

6

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 11, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert