**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                             MDL NO. 2924
PRODUCTS LIABILITY LITIGATION                              20-MD-2924
                                            JUDGE ROBIN L. ROSENBERG
                                    MAGISTRATE JUDGE BRUCE E.
                                                        REINHART

_____

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**BRAND DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING WANG STUDY**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

    I.      Background on the Wang Study ............................................................................. 2

    II.    Dr. McTiernan's Causation Opinions Remain Unreliable and Inadmissible. ............................................................................................................. 6

           A.    Dr. McTiernan Applied An Inconsistent And Result-Driven Methodology in Her Assessment of Confounding in the Wang Study. ................................................................................................................ 6

           B.    Dr. McTiernan Applied An Inconsistent And Unreliable Methodology to Her Interpretation of the Non-Significant Risk Estimates from the Wang Study. ............................................................... 8

           C.    Dr. McTiernan's Assessment of Dose-Response in the Wang Study Is Unreliable. ............................................................................................... 9

           D.    Dr. McTiernan Applied An Inconsistent And Unreliable Methodology in Her Assessment of the Active Comparator Analyses And Other Aspects of the Wang Study. ................................... 10

    III.   Dr. Moorman's Causation Opinions Remain Unreliable and Inadmissible. ....... 12

           A.    Dr. Moorman's "Association" Opinions Remain Unreliable. ................. 12

           B.    Dr. Moorman's Bradford Hill Analysis Remains Unreliable. ................. 18

    IV.   Dr. Salmon's Causation Opinions Remain Unreliable and Inadmissible. ........... 20

    V.    Dr. Michaels' Causation Opinions Remain Unreliable and Inadmissible. .......... 23

    VI.   Dr. Le's Causation Opinions Remain Unreliable and Inadmissible. ................... 25

CONCLUSION .......................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018).................................................................................22

*In re Accutane Prods. Liab.*,
   No. 804-MD-2523-T-30TBM, 2009 WL 2496444 (M.D. Fla. Aug. 11, 2009),
   *aff'd*, 378 F. App'x 929 (11th Cir. 2010).............................................................................20

*In re Accutane Prods. Liab. Litig.*,
   511 F. Supp. 2d 1288 (M.D. Fla. 2007)................................................................................22

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ......................................................................................18, 19

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)....................................................................................................8

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................................................16

*In re Deepwater Horizon Belo Cases*,
   No. 3:19CV963, 2020 WL 6689212 (N.D. Fla. Nov. 4, 2020) .............................................21

*In re Denture Cream Prods. Liab. Litig.*,
   795 F. Supp. 2d 1345 (S.D. Fla. 2011), *aff'd, Chapman v. Procter & Gamble
   Dist., LLC*, 766 F.3d 1296 (11th Cir. 2014)............................................................................9

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..................................................................................9, 14, 20

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ......................9, 21

*Rimbert v. Eli Lilly & Co.*,
   No. CIV 06-0874, 2009 WL 2208570 (D.N.M. July 21, 2009), *aff'd*, 647 F.3d
   1247 (10th Cir. 2011)...............................................................................................................8

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) .............................................................................................13

*Siharath v. Sandoz Pharms. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz
   Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002)...................................................................20

*Soldo v. Sandoz Pharm.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003) .................................................................................7, 13

*United States v. City of Miami, Fla.*,
  115 F.3d 870 (11th Cir. 1997) ...............................................................................................23

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  26 F. Supp. 3d 449 (E.D. Pa. 2014) ...................................................................................8, 18

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  No. 12-MD-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd*, 858 F.3d
  787 (3d Cir. 2017) .............................................................................................................12, 18

## INTRODUCTION

Wang 2022 does not change the *Daubert* analysis for this Court. The Wang study reveals the absence of statistically significant associations for bladder, esophageal, gastric, and pancreatic cancers, and as a result, the Wang authors reach none of the conclusions Plaintiffs' experts now advocate. The authors do find an association with liver cancer, though it has not been replicated, and is inconsistent with every other active comparator analysis in the published literature (*e.g.*, Adami, Kantor, Kim Y, and Yoon) which uniformly find **no statistically significant positive association** between ranitidine use and liver cancer. As one of Plaintiffs' experts emphasized during her deposition, it would be scientifically inappropriate to "form a conclusion from just one study."[1] Replication and consistency are cornerstones of the scientific method, and for this reason alone the Wang liver cancer finding does not meaningfully change the methodological underpinnings of plaintiffs' experts' causation opinions as to liver cancer (which continue to be principally based on **non-ranitidine** data), much less as to the other four cancers at issue.

Furthermore, Wang's liver cancer finding is based on an active comparator analysis and methods that Plaintiffs' experts repeatedly condemned. But now, after Wang 2022 reported an active comparator *result* that Plaintiffs' experts like, these experts embrace that lone result among all the other active comparator study results. They do not explain why the active comparator analysis in Wang 2022 is any more reliable than eight other active comparator studies, including the four on liver cancer that all found either *no risk* or a statistically significantly *decreased risk* for ranitidine users. Further, they ignore critical design limitations particular to Wang 2022 – namely, a study design that fails to compare equivalent doses of ranitidine and famotidine, and that includes famotidine users in both the ranitidine and famotidine groups. As Plaintiffs' expert Dr. Le notes, such a design "does not make sense."[2]

Indeed, Plaintiffs' experts previously rejected eight active comparator studies whose results they did not like by, among other complaints, speculating without evidence about possible drug crossover between study groups. Yet they embrace the liver cancer result here, even though Wang 2022 expressly ensured crossover usage. This is situational science—consistent with

---

[1] Supplemental Deposition of Dr. Le ("Le Supp. Tr.") at 42:3, Brown Second Supplemental Declaration ("2ⁿᵈ Supp. Decl.") Ex. 132. References to the "Brown Decl." are references to the exhibits filed at DE 5692 while references to the "Brown Supp. Decl." are references to the exhibits filed at DE 5961, both in support of Defendants' *Daubert* motions.

[2] Le Supp. Tr. at 135:23-136:2.

1

Plaintiffs' flawed view that a study can be reliable when it helps them and unreliable if it does not.[3]

Notably, before Wang 2022, Plaintiffs' experts focused the Court's attention on bladder cancer. Now, Plaintiffs' experts turn to Wang 2022 for its liver cancer finding, ignoring that Wang 2022's active comparator analyses found no statistically significant increased risk of bladder cancer, along with no significantly increased risk of the three other cancers at issue in this litigation. This sort of cherry-picking underscores why independent scientists demand replication and consistency across multiple studies and populations before reaching conclusions about causation. Plaintiffs' experts do the opposite here. As stated above, every liver cancer active comparator result prior to Wang 2022 was either non-significant or significantly below 1.0. And Plaintiffs' experts disregard Wang 2022's failure to control for smoking and alcohol—two of the most significant risk factors for cancer—despite the fact that these same experts criticized other ranitidine studies for lacking those very controls.

Plaintiffs' experts perform contortions to elevate Wang 2022's liver cancer finding, in ways that contradict both their previously stated methodologies, which relied on non-ranitidine epidemiology, and their weightings and approaches to the ranitidine literature, in which they ignore inconsistent results in other studies, and otherwise depart from reliable methods. These inconsistencies are the hallmark of an unreliable, results-driven methodology, and they provide further support for Defendants' motion to exclude all of Plaintiffs' general causation experts.

## ARGUMENT

### I.   Background on the Wang Study

Wang et al. presented their findings as an unpublished poster at the Digestive Disease Week conference in May 2022. That poster only reported comparisons of ranitidine users to non-users; it did not report any active comparator analyses.[4] Wang et al. submitted their paper for review in July 2022. On September 24, two days after this Court's hearings on Defendants' *Daubert* motions, Wang et. al revised their submitted article.[5] The revised article – which reports the same non-user analysis reflected in the poster from May but also contains a new active comparator analysis that was not present in the earlier poster – was published on September 30, 2022.

---

[3] *See* Hr'g Tr., Oct. 7, 2022, at 236:9-238:10, Brown 2nd Supp. Decl. Ex. 144.
[4] *Available at* https://tinyurl.com/y2pburzu.
[5] Revision history available at https://doi.org/10.3390/ijerph191912469.

Wang 2022 is a cohort study that matched new users of at least 90 Defined Daily Doses ("DDDs") of ranitidine with non-users of ranitidine, using the Taiwan National Health Insurance Research Database. Wang 2022 examined a study population of 110,220 people (55,110 90+ DDD ranitidine users and 55,110 non-ranitidine users) for an overall median follow-up time of 8.3 years. Of the five Designated Cancers, the study's active control analysis found a statistically significant increased risk only for liver cancer.[6] The study's non-user analyses found modest statistically significant increased risks for liver, gastric, and pancreatic cancers, all considerably below 2.0; the non-user results for esophageal and bladder cancer results were not statistically significant.[7]

***Purported Active Comparator Analysis.*** Although Plaintiffs herald the study as "highly relevant" due in part to its "sub-analyses using famotidine and PPIs as active comparators,"[8] the authors did not perform a true active comparator analysis. Wang 2022's purported active comparator analysis suffers from two significant design flaws not present in any other ranitidine epidemiology study. First, Wang 2022 compared *higher* dose (90 DDD+) users of ranitidine to *all* (*i.e.*, lower and higher dose) users of famotidine, which undermines an apples-to-apples design as it compares users with different medication needs and likely, different underlying conditions.[9] Figure 1 illustrates this imbalanced design:




---

[6] Wang et al., *Pharmacoepidemiological Research on N-Nitrosodimethylamine-Contaminated Ranitidine Use and Long-Term Cancer Risk: A Population-Based Longitudinal Cohort Study*, INT. J. ENVIRON. RES. PUBLIC HEALTH 2022; 1, 10 (2022) ("Wang 2022"), Brown 2nd Supp. Decl. Ex. 143; *see also, e.g.*, Le Supp. Tr. at 23:2-17; Supplemental Deposition of Dr. McTiernan ("McTiernan Supp. Tr.") at 117:23-118:6, Brown 2nd Supp. Decl. Ex. 138; Supplemental Deposition of Dr. Michaels ("Michaels Supp. Tr.") at 44:17-22, Brown 2nd Supp. Decl. Ex. 139; Supplemental Deposition of Dr. Moorman ("Moorman Supp. Tr.") at 646:19-647:6, Brown 2nd Supp. Decl. Ex. 140; Supplemental Deposition of Dr. Salmon ("Salmon Supp. Tr.") at 105:10-107:3, Brown 2nd Supp. Decl. Ex. 141.

[7] Wang 2022 at 7 (Fig. 2); *see also* Michaels Supp. Tr. at 42:2-8; Salmon Supp. Tr. at 33:17-25, 34:13-22, 64:4-17; McTiernan Supp. Tr. at 28:3-6.

[8] Pls.' Mot. for Leave to File Supp. Reps., DE 6041, at 2.

[9] Wang 2022 at 5 (Fig. 1); *see also, e.g.*, Michaels Supp. Tr. at 26:16-25; McTiernan Supp. Tr. at 127:20-128:16.

Moreover, the study did not isolate ranitidine use from the use of other H2RAs. Instead of comparing users of one H2RA (ranitidine) to users of another H2RA (famotidine), it appears that Wang 2022 compares patients who used *both* ranitidine (at higher doses) and famotidine to patients who used famotidine (at any dose) alone.[10] Table 1 illustrates that all of the 90 DDD+ ranitidine users in the active control analysis (*i.e.*, the 35,269 ranitidine users in Figure 1) also had taken famotidine:

| Characteristics | | Untreated *n* = 55,110 | % | Ranitidine *n* = 55,110 | % | *p*-Value |
|---|---|---|---|---|---|---|
| **Table 1.** Baseline characteristics of the non-ranitidine cohort and ranitidine cohort with over 90 DDDs. | | | | | | |
| Famotidine | No | 19,841 | 36.0% | 19,841 | 36.0% | 1.000 |
| | Yes | 35,269 | 64.0% | 35,269 | 64.0% | |

As a consequence, the study authors could not effectively isolate the effects of ranitidine, the exposure of interest. As Plaintiffs' expert Dr. Le testified, "if you're going to set [up] a study that you're actually comparing or trying to ascertain an association between ranitidine and cancer, I don't want to include subjects who were on another H2 blocker in . . . the ranitidine group" because that "can lead to different results."[11] And as Dr. Michaels testified, well-designed active comparator studies compare populations with similar baseline characteristics; a "poorly done active comparator study" that does not compare "apples to apples . . . [is] not going to be as useful."[12] However, the authors of Wang 2022 ensured that they were *not* comparing apples to apples by enforcing uneven baseline inclusion requirements on the two arms of their "active comparator" study.

---

[10] *See* Wang 2022 at 5 (Fig. 1), 6 (Table 1). Plaintiffs' experts have taken inconsistent positions on this point. Some argue that the inclusion of famotidine users in the ranitidine group was a "typo" or a "mistake," while others take the position that famotidine users were intentionally included in both study populations. *Compare* Le Supp. Tr. at 69:20-70:19 (implying the data depiction is a mistake) *with* McTiernan Supp. Tr. at 119:8-122:22 (uncertain whether the data refers to a propensity batch score or actual use of famotidine) *and* Michaels Supp. Tr. at 37:9-19 (noting that whether there is crossover is "hard to tell" and presuming the chart is "not a typo and it isn't a mistake"). Plaintiffs' experts face a conundrum: either Wang is mistaken in its design or its presentation of data; neither is the hallmark of a reliable study.

[11] Le Supp. Tr. at 70:14-19, 67:3-12; *see id.* at 135:21-136:2 ("[Y]ou can't include an active comparator in the same group that you're comparing the drug to. It just does not make sense that way.").

[12] Michaels Supp. Tr. at 32:13-18.

***Non-User Analysis.*** All of Wang 2022's reported findings besides the one liver finding mentioned above reflect *non-user* comparisons.[13] Wang 2022 acknowledges that comparisons based on a non-user analysis have a greater risk of bias and confounding than active comparator designs, which is of particular concern in H2RA studies where the potential for bias and confounding is high.[14] Wang 2022's non-user analyses are especially vulnerable to confounded outcomes because the study authors lacked direct data on multiple key variables – including *smoking, alcohol use, obesity, H. pylori infection, Barrett's esophagus, and pre-existing liver disease* – that are substantial risk factors for the cancers at issue here.[15] Plaintiffs' experts have conceded that, without this data, the study authors could not directly control for these important confounders.[16] Dr. Michaels acknowledged that the authors' inability to control for smoking and alcohol use is a "weakness" of the study.[17] Likewise, Wang 2022 recognizes that propensity score matching ("PSM") cannot specifically control for unmeasured variables and thus "some experts argue[] that substantial bias exists in a PSM study, which is one of our study limitations."[18]

---

[13] *See* Wang 2022 at 7 (Fig. 2), 11; McTiernan Supp. Tr. at 97:20-23 ("I'm looking at the main analysis, which was ranitidine versus non-users.").

[14] *See, e.g.*, Wang 2022 at 12 ("[B]ased on a direct comparison with either the non-ranitidine group or the famotidine group (similar indication to ranitidine users), only liver cancer displayed a significant association with long-term ranitidine use. *This approach was used to ameliorate the implicit indication bias that occurs when the cancer risk is related to the indication for medication use but not to the use of the medication itself.*") (emphasis added); *id.* at 12 n.46, citing Salas et al., *Confounding by Indication: An Example of Variation in the Use of Epidemiologic Terminology*, AM. J. EPIDEMIOL. 1999 Vol. 149, 981 (1999), Brown 2nd Supp. Decl. Ex. 142 ("*Confounding by indication* is a term used when a variable is a risk factor for a disease among *nonexposed persons*. . . .") (first emphasis in original, second added).

[15] *See* Wang 2022 at 13 (acknowledging as a limitation that the study did not control for smoking or alcohol use); *see also, e.g.,* Salmon Supp. Tr. at 23:22-25:3; Supplemental Expert Report of Dr. Moorman ("Moorman Supp. Rep.") at 3, Brown 2nd Supp. Decl. Ex. 135; Michaels Supp. Tr. at 67:16-23, 65:12-66:5; McTiernan Supp. Tr. at 34:22-35:21, 43:6-44:19, 47:19-48:19. All references to Plaintiffs' supplemental expert reports follow the pagination in Plaintiffs' filing at DE 6061, because Plaintiffs' supplemental expert reports are not individually paginated. For convenience, these documents have also been attached to the Second Supplemental Brown Decl., filed concurrently herewith.

[16] *See, e.g.*, Michaels Supp. Tr. at 67:8-15; Moorman Supp. Tr. at 540:15-541:3, Salmon Supp. Tr. at 21:13-18, 23:22-24; McTiernan Supp. Tr. at 34:22-35:9

[17] Supplemental Expert Report of Dr. Michaels ("Michaels Supp. Rep.") at 4, Brown 2nd Supp. Decl. Ex. 134; Michaels Supp. Tr. at 67:8-15.

[18] Wang 2022 at 12.

***Kaplan-Meier Curves and Dose-Response Analyses Subject to the Same Biases.*** The confounding inherent in Wang 2022's non-use analyses also infects the study's dose-response and Kaplan-Meier results.[19] The study's lone statistically significant dose-response trend, for liver cancer, was limited to a *non-user* comparison; Wang 2022 did not perform *any* dose-response analysis for *any* cancer using active comparators.[20] In addition, every Kaplan-Meier curve presented other than liver cancer reflected non-user comparisons only.[21] The active-comparison controlled Kaplan-Meier curves for liver cancer, at Figures 5 and 6, suffer from the same dose mismatch between users of famotidine or omeprazole and ranitidine users, which confounds the comparison.[22]

## II.     Dr. McTiernan's Causation Opinions Remain Unreliable and Inadmissible.

### A.     Dr. McTiernan Applied An Inconsistent And Result-Driven Methodology in Her Assessment of Confounding in the Wang Study.

Dr. McTiernan acknowledges that the Wang study did not control for a litany of cancer risk factors including: (i) smoking, which is a risk factor for all 5 cancers;[23] (ii) alcohol, which is a risk factor for esophageal, stomach, liver and pancreatic cancers;[24] (iii) obesity, which is a risk factor for esophageal adenocarcinoma, liver cancer and pancreatic cancer;[25] (iv) *H. pylori*, which is a risk factor for stomach cancer;[26] or (v) Barrett's esophagus, which is, by far, the strongest risk factor for esophageal cancer.[27] She also acknowledges that smoking, alcohol, obesity, *H. pylori*,

---

[19] Kaplan-Meier curves show the cumulative incidence rate of an event over time.

[20] *See* Wang 2022 at 12 ("[B]ased on a direct comparison with either the non-ranitidine group or the famotidine group . . . only liver cancer displayed a significant association with long-term ranitidine use."); *see also id.* at 13 ("[W]hen considering the dose–response of ranitidine usage, there were significant trends of increased liver cancer risk with an increasing dose of ranitidine. However, there was no continuous dose-response relationship among the other individual cancers."); Michaels Supp. Tr. at 56:5-14.

[21] *See* Moorman Supp. Tr. at 677:8-25; McTiernan Supp. Tr. at 160:16-161:7.

[22] *See* Michaels Supp. Tr. at 26:16-25; McTiernan Supp. Tr. at 127:20-130:4; *see also* Wang 2022 at 12 n.46 (citing Salas 1999 at 982 (listing several examples where "[t]he most frail patients also receive the largest drug burden" resulting in selection bias and confounding when studies do not control for severity)).

[23] McTiernan Supp. Tr. at 34:22-35:12; 46:12-47:9.

[24] *Id.*

[25] *Id.* at 43:11-14; 46:12-47:9.

[26] *Id.* at 43:15-20; 46:12-47:9.

[27] *Id.* at 44:8-10; 45:19-46:5.

and Barrett's esophagus can cause symptoms that would lead patients to take ranitidine, so they are all potential confounders in studies of ranitidine and cancer risk.[28]

Yet, Dr. McTiernan's methodology in analyzing these and other confounders in the Wang study is starkly different from the methodology that she applied in analyzing confounders in other ranitidine studies. For example, in her rebuttal report, Dr. McTiernan wrote that "[b]y and large, the active-comparator studies relied upon by Dr. Witte and the other experts hired by the defense *have serious flaws which rendered their results unreliable. For example, . . . The Nørgaard study did not have information on smoking*, which is a risk factor for bladder cancer and can influence use of acid-reducing drugs, and therefore could have been a confounder or effect modifier."[29] Yet, while Dr. McTiernan eschewed the Norgaard study as "unreliable" for failing to control for smoking, she extols the "improved methodologies" of the Wang study notwithstanding its identical failure to control for smoking.[30] Similarly, Dr. McTiernan claims that the Wang authors adequately controlled for Hepatitis B and C, strong risk factors for liver cancer,[31] by using an adjustment method "very similar" to what was used in the Adami study.[32] Yet, she previously criticized the Adami study for failing to control for Hepatitis B and C.[33]

Dr. McTiernan's use of inconsistent criteria in evaluating the ranitidine studies, depending on whether study results are favorable or unfavorable, is a hallmark of an unreliable and result-driven methodology. *Soldo v. Sandoz Pharm.*, 244 F. Supp. 2d 434, 557, 560 (W.D. Pa. 2003) ("[I]nconsistency is the hallmark of a decidedly unscientific approach" and "[t]he reliability of

---

[28] *Id.* at 47:17-48:19.

[29] Expert Rebuttal Report of Dr. McTiernan ("McTiernan Rebuttal Rep.") at 30, Brown Decl. Ex. 10 (emphasis added).

[30] Supplemental Expert Report of Dr. McTiernan ("McTiernan Supp. Rep.") at 11, Brown 2nd Supp. Decl. Ex.133; McTiernan Supp. Tr. at 41:25-43:5.

[31] Expert Report of Dr. McTiernan ("McTiernan Rep.") at 105, Brown Decl. Ex. 9, (noting that hepatitis B or C infection are a risk factor for liver cancer and that "[t]hese conditions could cause symptoms, leading patients to take ranitidine (or comparator drugs) and therefore, are candidates for confounding variables."); McTiernan Supp. Tr. at 68:24-69:5 (stating that she has no basis to disagree that "at least 80 percent of liver cancer cases worldwide are attributed to hepatitis B or C infection.").

[32] McTiernan Supp. Tr. at 54:24-55:7 ("And this is similar -- what the Charlson Comorbidity Index separation and how they categorize liver disease is very similar to how Adami did, for example, one of the other studies, when they were adjusting for liver disease, they used the same broad categories: Mild liver disease and moderate to severe liver disease.").

[33] *Id.* at 68:13-23; McTiernan Rep. at 129.

plaintiff's experts' opinions is significantly undermined by the fact that they abandon the method that they themselves have defined."); *Rimbert v. Eli Lilly & Co.*, No. CIV 06-0874, 2009 WL 2208570, at *14 (D.N.M. July 21, 2009), *aff'd*, 647 F.3d 1247 (10th Cir. 2011) (an expert's "cho[ice] not to apply the methodology that she personally considers to be the standard in her field to assess causation undermines the reliability of her testimony"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002) (affirming exclusion where expert "failed to apply his own methodology reliably").

### B. Dr. McTiernan Applied An Inconsistent And Unreliable Methodology to Her Interpretation of the Non-Significant Risk Estimates from the Wang Study.

When study results show a statistically significant increased risk, Dr. McTiernan emphasizes that this "increases the likelihood that the observed relative risk was reflective of the real relative risk."[34] Yet, with respect to the non-significant results in the Wang study, Dr. McTiernan refuses to acknowledge that the lack of statistical significance "decreases the likelihood that the observed relative risk is reflective of the real relative risk[.] . . ."[35]

Instead, Dr. McTiernan speculates that the non-significant results in Wang – such as the result for bladder cancer – were underpowered ("[t]he inclusion of 1.0 [in the confidence intervals] is likely to be related to low numbers of cases"[36]). Yet, she acknowledges that (i) she did not do any power calculations;[37] (ii) the non-significant bladder cancer analysis in the non-user comparison, in fact, had substantially more cases than the significant pancreatic cancer analysis;[38] and (iii) another reason why a study may not show an increased risk is "that there's no true increased risk."[39] Similarly, Dr. McTiernan acknowledges that one way to increase statistical power is to conduct a meta-analysis; yet, she did not attempt to perform a meta-analysis of ranitidine and any cancer outcome.[40] *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab.*

---

[34] McTiernan Supp. Tr. at 31:16-32:13.

[35] *Id.* at 32:14-34:7.

[36] McTiernan Supp. Rep. at 5.

[37] McTiernan Supp. Tr. at 26:10-13. Notably, Dr. McTiernan acknowledged that "[i]f you saw a non-statistically significant association, then you might do power calculations to explain why" the analysis may be underpowered. *Id.* at 221:3-6. Indeed, in the talc litigation, Dr. McTiernan performed power calculations to substantiate her claims about purportedly underpowered analyses. McTiernan Hearing Testimony in *In re Johnson & Johnson Talcum Powder Prods. Litig.*, No. 16-MD-2738 (D.N.J. July 25, 2019) at 856:24-857:4, Brown Decl. Ex. 34.

[38] McTiernan Supp. Tr. at 28:3-21; 218:6-13.

[39] *Id.* at 34:11-16.

[40] *Id.* at 28:22-29:8.

*Litig.*, 26 F. Supp. 3d 449, 457 (E.D. Pa. 2014) ("*In re Zoloft* 2014") ("When epidemiologists hypothesize that there is a 'true' association which individual studies are underpowered to detect at a statistically significant level, the widely accepted approach to combining data from multiple studies … is to conduct a systematic meta-analysis."). In short, Dr. McTiernan's approach to statistical significance is "virtually standardless" and "unacceptably manipulable" – another reason why her opinions should be excluded. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 247 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

### C.    Dr. McTiernan's Assessment of Dose-Response in the Wang Study Is Unreliable.

Dr. McTiernan's assessment of dose-response in the Wang study is unreliable. First, although she admits that there was no continuous dose response for any cancer other than liver,[41] Dr. McTiernan contends that there was a dose-response "trend" for gastric cancer.[42] Dr. McTiernan's reliance on purported "trends" is not only unreliable, but contrary to the Wang authors' conclusions.[43] *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005) ("The authors of the articles limit the application of their studies consistent with the principles of good science; [but the expert] expands the application beyond good science."); *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1362 (S.D. Fla. 2011), *aff'd, Chapman v. Procter & Gamble Dist., LLC*, 766 F.3d 1296 (11th Cir. 2014) ("Because the authors of the Nations Article themselves do not conclude there is a causal relationship . . . it is inappropriate for Plaintiffs' experts to draw that conclusion for them.").

Second, Dr. McTiernan agrees with the Modern Epidemiology textbook that "[a]ssociations that do show a monotonic trend in disease frequency with increasing levels of exposure are not necessarily causal. Confounding can result in a monotonic relation between a non-causal risk factor and disease if the confounding factor itself demonstrates a biologic gradient in its relation with disease."[44] In other words, for example, if people who smoke more or drink more alcohol tend to use greater amounts of ranitidine and are more likely to get cancer than people who smoke or drink less, failure to adequately control for smoking or alcohol use can lead to a spurious dose-response relationship. Yet, Dr. McTiernan never assessed whether failure to control

---

[41] McTiernan Supp. Tr. at 60:16-18.
[42] McTiernan Supp. Rep. at 5.
[43] McTiernan Supp. Tr. at 62:23-63:24.
[44] *Id.* at 75:8-76:11.

for smoking or alcohol or obesity or Hepatitis B or C could be responsible for the continuous dose-response for liver cancer reported in the Wang study. Dr. McTiernan's failure to make this assessment is particularly egregious given her admission that all the dose-response analyses in Wang compared ranitidine use to non-use[45] and therefore could not account for confounding by indication.[46]

Third, Dr. McTiernan did not attempt to reconcile the dose response for liver cancer observed in the Wang study with the lack thereof reported in the Adami study. Instead, Dr. McTiernan testified that Adami's method of assessing dose response – based on the number of prescriptions of ranitidine – "is not a real dose response."[47] Yet, in the context of other studies, Dr. McTiernan had previously written that "[a] particular strength of the studies was that the investigators . . . tested the dose-response relationship using . . . the number of prescriptions for ranitidine."[48]

Fourth, Dr. McTiernan extols the "defined daily dose" (DDD) method of assessing dose response used in both the Cardwell and Wang studies because "DDD combines dose and duration of use into one variable."[49] Despite characterizing DDD as a unifying measurement for dose, she cannot provide *what* DDD represents the minimum dose and duration of ranitidine use necessary to cause any of the five cancers.[50]

### D. Dr. McTiernan Applied An Inconsistent And Unreliable Methodology in Her Assessment of the Active Comparator Analyses And Other Aspects of the Wang Study.

Dr. McTiernan repeatedly criticized prior ranitidine studies on the ground that comparing ranitidine to PPIs or other H2RAs would lead to "biased" (falsely lower) risk estimates because these drugs purportedly "are themselves associated with increased risk for cancer."[51] She

---

[45] *Id.* at 57:3-24.

[46] McTiernan Supp. Rep. at 6 (noting active control analyses conducted "to address the issue of indication bias").

[47] McTiernan Supp. Tr. at 78:11-12 ("So this is not a real dose response in my opinion."); *see also id.* at 243:4-8 (claiming that Adami had no "dose-response information").

[48] *Id.* at 79:22-81:16.

[49] McTiernan Supp. Rep. at 14.

[50] McTiernan Supp. Tr. at 87:5-16; 88:12-89:13.

[51] McTiernan Rep. at 119 ("Furthermore, selection of users of protein pump inhibitors as comparators is problematic, because those medications are themselves associated with increased risk for cancer, and therefore comparing ranitidine to PPI users will be biased."); *id.* at 261 ("By

ultimately walked back her claims that PPIs and other H2RAs increase cancer risk, admitting that they had no reliable factual basis.[52]

By contrast, the Wang study showed that both PPIs and famotidine were ***protective*** for liver cancer in the study population.[53] In fact, Dr. McTiernan admits that – in the database used by Wang – there was a 51% statistically significant ***decreased*** risk of liver cancer with PPI use.[54] Similarly, she admitted that famotidine users had a ***lower*** risk of liver cancer than those who did not use famotidine.[55] These inexorable facts mean that comparing ranitidine to the active comparators in the Wang study population would show an increased risk for liver cancer, even if no true risk existed. Yet, here, Dr. McTiernan did not conclude that comparing ranitidine to medications that are ***protective*** for liver cancer would lead to biased (falsely higher) risk estimates. Again Dr. McTiernan applies a double standard – rejecting active comparators that purportedly increase cancer risk but giving a free pass to active comparators shown to be associated with a decreased cancer risk.

Moreover, there are many other examples of Dr. McTiernan's inconsistent and result-driven evaluation of the Wang study. For example, Dr. McTiernan previously criticized the Adami study (which she admits used a cancer registry) because the high number of liver cancers could purportedly represent metastases from other cancer sites.[56] Yet, with respect to Wang, she claims that because the liver cancer cases were ascertained from a cancer registry, they would be "primary" cancers, as opposed to metastases.[57] Indeed, Dr. McTiernan acknowledges that she never even mentions the word "metastases" in her supplemental report,[58] even though liver cancer had a higher background incidence rate in the study population than any other cancer.[59]

Similarly, at her deposition, Dr. McTiernan criticized the Wang study for only looking at "invasive" bladder cancers (an argument never raised in her supplemental expert report); yet, she

---

comparing only to PPI or other H2 blockers, the study is comparing ranitidine to other agents that could increase risk for gastric cancer.").

[52] Deposition of Dr. McTiernan ("McTiernan Tr.") at 173:7-12; 175:4-7, Brown Decl. Ex. 32.

[53] Dr. McTiernan admits that only liver cancer had statistically significantly increased risk in both non-use and the famotidine-controlled analyses. McTiernan Supp. Tr. at 117:23-118:6.

[54] *Id.* at 91:25-92:9.

[55] *Id.* at 99:12-21.

[56] *Id.* at 112:25-115:2.

[57] *Id.* at 111:11-112:24.

[58] *Id.* at 115:3-116:8.

[59] *Id.* at 140:15-19.

proffered no similar criticism with respect to the Kantor study, which she acknowledged similarly only looked at invasive bladder cancers.[60] Finally, Dr. McTiernan previously criticized defense experts for "not address[ing] . . . the applicability of study results from other countries to the U.S. population."[61] Yet, in her supplemental report, she herself never addresses the generalizability of Wang's findings to the US population,[62] despite acknowledging the much higher liver cancer incidence observed in Wang's Taiwanese population.[63]

Finally, Dr. McTiernan claims that the Wang study had "improved methodologies" compared to prior ranitidine studies (*e.g.*, longer follow-up; cancers ascertained from cancer registries, exposure based on dispensed prescriptions; active comparator analyses; 1-year lag).[64] However, Dr. McTiernan's own report, and the underlying studies, undermines this claim. For example, the Adami and Norgaard studies also had exposure based on dispensed prescriptions, cancers ascertained from cancer registries, active comparator analyses, 1-year lags, and substantially longer follow-up than Wang.[65]

In short, Dr. McTiernan's supplemental report on the Wang study only reinforces the fact that she "has failed to consistently apply the scientific methods [s]he articulates, has deviated from or downplayed certain well-established principles of [her] field, and has inconsistently applied methods and standards to the data so as to support [her] *a priori* opinion." *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, No. 12-MD-2342, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015), *aff'd*, 858 F.3d 787 (3d Cir. 2017) ("*In re Zoloft* 2015"). Her opinions must be excluded.

## III.   Dr. Moorman's Causation Opinions Remain Unreliable and Inadmissible.

### A.   Dr. Moorman's "Association" Opinions Remain Unreliable.

#### 1.   Dr. Moorman's Weighting of the Wang Study Is Based on A Shifting and Unreliable Methodology.

In her supplemental report, Dr. Moorman gives "considerable" weight to the Wang study,[66] and claims it is the only ranitidine study other than Cardwell in which the strengths of the study

---

[60] *Id.* at 218:14-219:5.
[61] McTiernan Rebuttal Rep. at 31.
[62] McTiernan Supp. Tr. at 138:16-139:12.
[63] *Id.* at 109:20-110:8, 140:15-19, 231:16-20.
[64] McTiernan Supp. Rep. at 11.
[65] *Compare* McTiernan Supp. Rep. at 10-11, 16, *with* McTiernan Rep. at 121-125.
[66] The category of "considerable" weight is new in Dr. Moorman's supplemental report. *See generally* Moorman Supp. Rep. Previously, she only weighted ranitidine studies as either

outweigh its limitations.[67] Dr. Moorman further claims that the findings of the Wang study strengthen her opinions related to liver, gastric, pancreatic, and esophageal cancer—despite the fact that Wang 2022 only found an association for liver cancer.[68] Notably, her supplemental report *does not* include this same claim for bladder cancer.

The methods Dr. Moorman uses to elevate the Wang study above all other ranitidine studies except for Cardwell are not based on a reliable methodology consistently applied across the total body of ranitidine data. Further, Dr. Moorman's weighting of Wang is not supported by any of the factors that received the greatest weight in her original analysis. In her original expert report, despite not being able to articulate any standard or objective criteria that she used to evaluate the following factors, Dr. Moorman gives "greater weight in [her] analysis to evidence from well-designed studies with good ascertainment of exposure, adequate follow-up, and larger sample sizes."[69] In relation to the Wang study, however, Dr. Moorman does not attempt to rank the study based on any of these original factors – another example of her inconsistent, results-oriented methodology. *Soldo*, 244 F. Supp. 2d at 557-60 ("[I]nconsistency is the hallmark of a decidedly *unscientific* approach…[t]he reliability of plaintiff's experts' opinions is significantly undermined by the fact that they abandon the method that they themselves have defined."); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("[A] district court may properly consider whether the expert's methodology has been contrived to reach a particular result."). For example, the criterium of "sample size" is not mentioned a *single time* in Dr. Moorman's supplemental report.[70] With respect to follow-up time, Dr. Moorman identifies it as a strength in the Wang study, but later admitted that the Adami and Norgaard studies, to which she gives very little weight, have

---

"strong" or of "little" or "lesser" weight. Expert Report of Dr. Moorman ("Moorman Rep.") at 62-85, Brown Decl. Ex. 15.

[67] *See* Moorman Supp. Rep. at 6; Moorman Supp. Tr. at 593:22-594:4, 595:6-13.

[68] *See* Moorman Supp. Rep. at 6.

[69] Moorman Rep. at 7; *see* Deposition of Dr. Moorman ("Moorman Tr."), Brown Decl. Ex. 39, at 120:11-122:5, 316:12-317:9, 379:17-380:15, 435:3-436:9 (acknowledging that it is "impossible to quantify the exact amount of misclassification" and that she did not perform any calculations to estimate misclassification, despite having OTC prevalence data from the United Kingdom and Denmark); *id*. at 102:9-24 (failing to define adequate follow-up time); *id*. at 103:14-104:5 (failing to define adequate sample size).

[70] *See generally* Moorman Supp. Rep.

longer follow-up times.[71] With respect to ascertainment of exposure, Dr. Moorman "cannot say what the impact of the misclassification would be," let alone compare the misclassification in the Wang study to any of the ranitidine studies assigned "little" weight.[72] In sum, Dr. Moorman provides no objective method or analysis to justify the "considerable weight" she places on the Wang study. Instead, her methods are a moving target, shifting constantly to achieve a particular result.

### 2.    Dr. Moorman Does Not Reliably Rule Out Confounding As The Explanation for Wang's Non-User Study Results.

Dr. Moorman claims that the non-user analyses from the Wang study strengthen her causality opinions related to gastric, pancreatic, and esophageal cancers.[73] In stark contrast, the Wang authors limit their conclusions to liver cancer, and make no causality claims related to these other cancers.[74] Dr. Moorman's interpretation of the data improperly exceeds the that of the study authors'. *See, e.g.*, *McClain*, 401 F.3d at 1247 ("The authors of the articles limit the application of their studies consistent with the principles of good science; [but the expert] expands the application beyond good science.").

The Wang authors did not reach conclusions about bladder, gastric, pancreatic, or esophageal cancer because they recognized the limitations (*e.g.*, inability to control for significant confounders) of non-user designs and adhered to principles of statistical significance. Dr. Moorman, on the other hand, selectively downplays these limitations and abandons these principles.[75]

---

[71] *See id.* at 4; *see also* Moorman Supp. Tr. 550:18-552:13. Dr. Moorman also admits that Cardwell, a study she assigned strong weight, does not have a follow-up time. Moorman Supp. Tr. 551:13-15.

[72] *See* Moorman Supp. Rep. at 5; *see also* Moorman Supp. Tr. at 553:15-556:4; Moorman Rep. at 97 ("Because of the substantial concern about misclassification of exposure, [Norgaard] was given little weight.").

[73] Moorman Supp. Rep. at 6 (describing statistically significant increased risk of gastric and pancreatic cancers and increased risk of esophageal cancer); *compare* Wang 2022 at 7 (Figure 2), *with* Wang 2022 at 10 (Table 4) (reporting the results Dr. Moorman references for the non-user analyses, but no statistically significant increased risks for the active comparator analyses).

[74] *See* Wang 2022 at 13.

[75] Nevertheless, Dr. Moorman admitted in her deposition that statistical significance gives "you an overall feel for how likely the results could be due to chance or not." Moorman Supp. Tr. at 560:17-561:3.

Indeed, in her prior deposition, Dr. Moorman admitted that failing to control for confounders can impact reported risk estimates,[76] and that, "with ***weaker associations***, i.e., relative risks below 2, it is ***particularly important*** to consider whether the results are due to confounding or other forms of bias."[77] The Wang study reports non-user risk estimates ranging from 1.06 for bladder cancer to 1.35 for pancreatic cancer: all weak associations.[78] Given Dr. Moorman's own admonition, it is particularly important to consider the effect of confounding with these weaker associations.

In her supplemental report, Dr. Moorman notes that "[n]o information was available for potential confounders such as smoking history, body mass index, alcohol consumption and certain gastrointestinal conditions," which the Wang authors also identify as a limitation.[79] At her deposition, Dr. Moorman conceded that she could not analyze the extent to which this missing information would change the Wang study's results.[80] In other words, she could not satisfy her own directive to consider whether the results are due to confounding.

With respect to liver cancer specifically, Dr. Moorman acknowledges that alcohol consumption, smoking, and pre-existing liver disease (such as cirrhosis) are risk factors for liver cancer.[81] She also admits that smokers are more likely to use H2RAs than non-smokers, and that H2RAs are used to treat cirrhosis symptoms.[82] It logically follows that, if smokers and those with cirrhosis are more likely to use ranitidine than those who do not smoke or have cirrhosis, and both smoking and cirrhosis increase the risk of liver cancer, then any increased risk seen in Wang 2022 may be due to failure to control for smoking and cirrhosis, rather than the effect of ranitidine.

When asked what controls exist for smoking and alcohol consumption in the Wang study, Dr. Moorman suggested for the first time that hypertensive coronary disease and hyperlipidemia

---

[76] *See* Moorman Tr. at 83:15-84:11; *see also* Moorman Rep. at 148; Moorman Supp. Tr. at 544:16-545:7.

[77] Moorman Rep. at 57 (emphasis added); *see also* Moorman Tr. at 165:17-166:22 ("If you do not have information on an important confounder, it could – you know, it doesn't have to be quite as strongly associated with the outcome as what I described for smoking and lung cancer . . . a larger relative risk is harder to attribute to confounding than a smaller relative risk as a rule.").

[78] *See* Moorman Supp. Rep. at 3.

[79] *Id.*; *see* Wang 2022 at 13 ("[T]here were no data available in our database regarding certain confounders, such as alcohol consumption and cigarette smoking.").

[80] Moorman Supp. Tr. at 535:25-536:13, 538:15-539:8.

[81] *Id.* at 536:16-538:14.

[82] *Id.* at 689:14-16, 641:21-642:7.

"indirectly" control for smoking, and that diabetes is an "indirect" control for alcohol consumption.[83] However, these brand new claims do not appear in any of her expert reports, she provides no literature references to support them, and she concedes that Wang 2022 does not make these claims in the publication.[84] Such post-hoc rationalizations – not supported by the Wang study itself – are not a reliable basis to exclude confounding as the explanation for any of the small numerical imbalances observed in the study.

Further, Dr. Moorman cites to a similar lack of information on smoking and alcohol consumption as limitations that justify ascribing "little weight" to other ranitidine studies whose findings do not support her opinions.[85] With respect to the Kim Y study, Dr. Moorman concludes, "[a] very important limitation is that the study failed to adequately control for confounding variables . . . In particular, their analyses did not control for alcohol use, smoking or diabetes, all established risk factors for liver cancer . . ."[86] When discussing the Adami study, Dr. Moorman notes, "[t]he effect of not controlling for [] confounding variables is not predictable and could have resulted in either an underestimate or overestimate of the risk associated with ranitidine use depending on how the proportions of smokers and drinkers varied between ranitidine users and users of other acid-suppressant drugs. Because of the important limitations in this study, I gave it little weight in my analyses."[87] In assessing the Wang study, however, Dr. Moorman does not consider the lack of information on potential confounders as a reason to give the study "little" or "lesser" weight. Instead, she downplays these significant limitations and overstates supposed strengths in order to give the study "considerable weight." Here, too, Dr. Moorman alters her methods to fit a desired result, a quintessential *Daubert* red flag. *See In Re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007) (excluding expert's opinion because "she ignores all the evidence that contradicts her litigation created conclusion and instead bases her opinion on [a] cherry-picked study . . . even though that study suffers from the exact same limitations that caused her to reject other studies that do not support her conclusion").

---

[83] *Id.* at 539:9-540:6.
[84] *Id.* at 540:7-541:25.
[85] Moorman Rep. at 148-149.
[86] *Id.* at 149.
[87] *Id.* at 148.

**3.     Dr. Moorman's Sudden Reliance on Active Comparator Analyses From Wang Is Based on A Shifting and Unreliable Methodology.**

Dr. Moorman considers the use of an H2RA active comparator in the Wang study to be a strength of the study.[88] This abrupt pivot in favor of active comparator results is in contrast to her prior treatment of active comparator studies – and it again constitutes a results-oriented analysis.

Prior to the Wang study, Dr. Moorman rejected all the active comparator results. In her original expert report, Dr. Moorman extensively discusses the supposed drawbacks of using active comparator studies to assess the relationship between ranitidine and the cancers at issue.[89] And Dr. Moorman's original conclusion, after ten pages of exposition, was that "it is difficult, perhaps even impossible to make a determination of the overall risk for cancer, and for specific cancers, from use of ranitidine in [active comparator] studies."[90] And, again, in her cancer-specific analyses, including her analysis of liver cancer, Dr. Moorman repeated that it is difficult, if not impossible, to interpret the active comparator data for ranitidine.[91] Of course, when Dr. Moorman took these positions, she knew that six different active comparator studies showed *no* statistically significant associations in overall analyses between ranitidine and the cancers at issue in this litigation.

Now, in a 180-degree turn, Dr. Moorman characterizes the Wang study's use of an active comparator as a strength. She does so without any explanation as to why Wang 2022's analysis is more reliable than the numerous other active comparator study results she previously rejected.[92] Indeed, Dr. Moorman avoided a close inspection of the Wang study's active comparator design, admitting that she does not know whether longer-term users of ranitidine are compared to all famotidine users.[93] When asked if comparing groups exposed to different amounts of a medication would concern her, she admits that "[i]t would certainly depend on the level," which Wang 2022 did not report.[94] Dr. Moorman's failure to examine the Wang 2022 active comparator design and her sudden reliance on active comparator studies is not coincidental. The Wang study is the first time an H2RA active comparator study has reported a statistically significant difference for any

---

[88] Moorman Supp. Rep. at 4; Moorman Supp. Tr. at 577:4-578:7.
[89] *See* Moorman Rep. at 27-28 (discussing that comparator drugs increase cancer risks and are used by patients with more serious conditions).
[90] *Id.* at 31.
[91] *Id.* at 152, 158, 213, 221.
[92] *See generally* Moorman Supp. Rep.
[93] Moorman Supp. Tr. at 602:12-23.
[94] *Id.* at 602:12-603:13.

cancer in primary findings. Again, it is clear that Dr. Moorman altered her methods to fit a desired result – even though that result is legally insufficient to carry Plaintiffs' burden. *See, e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999) ("The court found that Gershwin's proposed four studies were in direct contrast to over twenty other epidemiological studies which found no statistical correlation . . . strong evidence that a consensus exists in the general scientific community that no correlation exists."); *In re Zoloft* 2015 at *3 ("Even where the confidence interval is narrow and the increased risk is statistically significant, scientists will not draw firm conclusions from a single study, as apparent associations may reflect random error, bias, confounding, or some weakness in the study design.").

### B.     Dr. Moorman's Bradford Hill Analysis Remains Unreliable.

The same flaws that rendered Dr. Moorman's original Bradford Hill analysis unreliable reappear in her analysis of the Wang study.

#### 1.     Dr. Moorman's Supplemental Analysis Fails to Reliably Analyze Strength of Association.

Dr. Moorman acknowledges that "with weaker associations, i.e., with relative risks below 2, it is particularly important to consider whether the results are due to confounding or other forms of bias."[95] Indeed, when "weaker" associations are at issue, Dr. Moorman repeatedly relies on overall point estimates from meta-analyses, which is a method used to "assess[] the magnitude and consistency of an effect across multiple studies."[96] Prior to the Wang study, Dr. Moorman neither performed a meta-analysis nor provided any other method to evaluate the overall strength of association for each of the five cancers.[97] *See In re Zoloft* 2014, 26 F. Supp. 3d at 457 (noting that when epidemiologists suspect that individual studies are underpowered, proper methodology is to conduct a meta-analysis).

The Wang study has not changed the fact that Dr. Moorman is unable to provide an overall risk estimate for each cancer or to assess the strength of any purported association.[98] The reason for her failure to do so is obvious. Given the very low point estimates, and inconsistent results across the studies, any meta-analysis of all the ranitidine study data would not support Plaintiffs'

---

[95] Moorman Rep. at 57; *see also* Moorman Tr. at 295:15-18 ("When the relative risks are lower, the confounder doesn't have to be quite as strongly associated with [the risk of cancer] to explain it.").
[96] *See, e.g.*, Moorman Rep. at 51.
[97] *See* Moorman Tr. at 170:4-13.
[98] *See* Moorman Supp. Tr. at 616:7-617:15.

claims in this case.[99] Moreover, relying on the very small risk differences in the Wang study would only raise further questions about the purported method Dr. Moorman used to rule out confounding as the explanation for any of them.

### 2. Dr. Moorman Does Not Reliably Address Wang's Non-Replicated and Inconsistent Findings.

In her original report, Dr. Moorman repeatedly recognizes the importance that replication and consistency play in any Bradford Hill analysis.[100] While Wang provides one statistically significant risk estimate above 1.0 in its active comparator analysis for liver cancer, Dr. Moorman could "not identify another [liver cancer] risk ratio above [1.0] for ranitidine use when compared to other H2 active comparators."[101] Indeed, Kim Y., a study from the U.S.; Yoon, a study from South Korea; and Adami, a study from Denmark – all with risk estimates below 1.0 for liver cancer – are inconsistent with the Wang study's results.[102] *See Allison*, 184 F.3d at 1315. Dr. Moorman also failed to assess whether the Taiwanese and U.S. populations are comparable enough to generalize the Wang results to U.S. plaintiffs in this litigation.[103]

Despite this lack of consistency and replication among the liver cancer studies, Dr. Moorman nevertheless finds that "an association between ranitidine use and increased risk of . . . liver cancer have been demonstrated at typical doses of 300 mg daily for . . . 1 year."[104] Dr. Moorman's disproportional reliance on Wang's non-replicated and inconsistent results reinforces the unreliable nature of her Bradford Hill analysis.

### 3. Dr. Moorman's Supplemental Analysis Fails to Reliably Address Dose-Response.

Dr. Moorman's analysis of Wang 2022's dose-response also fails to properly account for confounding and ignores the lack of consistency across the studies.[105] Wang 2022's dose-response results are all based on comparing ranitidine user to non-user comparisons, and the Wang authors themselves conclude that there is no dose-response association for any cancer other than liver

---

[99] Moorman Supp. Rep. at 3-4; *see* Moorman Tr. at 169:11-13 ("[I] did not conduct a meta-analysis to come up with a summary estimate for the ranitidine and each of the five cancers."); Moorman Supp. Tr. at 616:12-617:15.

[100] *See, e.g.*, Moorman Rep. at 11, 57.

[101] Moorman Supp. Tr. at 678:21-24.

[102] *See* Moorman Rep. at 142-43.

[103] Moorman Supp. Tr. at 570:16-21, 571:11-17.

[104] Moorman Supp. Rep. at 5.

[105] Dr. Moorman still maintains that there is no threshold dose. Moorman Dep. at 683:5-684:3.

cancer.[106] The dose-response data for liver cancer is derived from data that produces "weaker" point estimates, which, according to Dr. Moorman herself, are particularly susceptible to confounding and bias.[107] As an example, Dr. Moorman acknowledges the possibility that "confounding could be amplified" at higher doses because "if somebody is taking more ranitidine, they might have more severe [GI] conditions that might increase risk for gastric cancer."[108] With respect to liver cancer, Dr. Moorman's supplemental analysis also ignores Adami's analysis of dose-response, which showed that increased dose was associated with a decreased risk of liver cancer.[109] This is not a reliable Bradford Hill analysis, but rather cherry picking a single study's confounded results and ignoring data inconsistent with a preordained conclusion.

## IV.    Dr. Salmon's Causation Opinions Remain Unreliable and Inadmissible.

Dr. Salmon uses a flawed methodology and situational science to arrive at his inadmissible supplemental opinions. First, Dr. Salmon relies on non-significant findings, even as he concedes the critical importance of statistical significance.[110] *See Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1358 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002) ("[T]he burden is on Plaintiffs to show that well-conducted epidemiological studies do show a statistically significant relationship . . ."). Most egregiously, Dr. Salmon's loose approach to statistical significance leads him to refuse to accept the Wang 2022 conclusion that there was no dose response between ranitidine and gastric cancer.[111] *See, e.g.*, *McClain* 401 F.3d at 1247; *In re Accutane Prod. Liab.*, No. 804-MD-2523-T-30TBM, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11, 2009), *aff'd*, 378 F. App'x 929 (11th Cir. 2010) ("[W]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study."). Dr. Salmon bases his contrary dose-response opinion on a purported "statistically

---

[106] *See* Wang 2022 at 13; *see also* Moorman Supp. Tr. at 609:18-611:7.

[107] *See* Moorman Tr. at 295:15-18 ("When the relative risks are lower, the confounder doesn't have to be quite as strongly associated with [the risk of cancer] to explain it.").

[108] *See* Moorman. Supp. Tr. at 688:4-689:6.

[109] Adami et al., *Ranitidine Use and Risk of Upper Gastrointestinal Cancers*, CANCER EPIDEMIOL., BIOMARKERS & PREV. 2021;30:2302, 2307 (Fig. 3) (2021) Brown Decl. Ex.45; Moorman Supp. Tr. at 6:18:10-20.

[110] *Compare* Salmon Supp. Tr. at 37:11-22 (testifying that non-significant data "may be relevant . . . in comparison to other data to determine whether there is consistency, even if not all of the available results are actually individually statistically significant."), *with* 37:2-7 ("I suppose what I'm really saying is that the statistical significance is an important and widely recognized decision criteria to help you decide … what you can conclude from that individual result.").

[111] *See* Wang 2022 at 8; Salmon Supp. Tr. at 80:8-17.

significant *trend* for dose response in those data" despite "some scatter."[112] He certainly understands the importance of statistical significance when interpreting epidemiological data, yet he fails to properly use bedrock principles of statistical significance and non-significance in his evaluation of Wang 2022. *See In re Deepwater Horizon Belo Cases*, No. 3:19CV963, 2020 WL 6689212, at *12 (N.D. Fla. Nov. 4, 2020).

Second, Dr. Salmon admits that Wang 2022 does not control for smoking and alcohol.[113] Dr. Salmon also acknowledges that smoking can cause or is linked with ***every cancer*** at issue in this litigation,[114] and alcohol use is a known cause of liver cancer.[115] Dr. Salmon cannot explain away this fundamental and indisputable problem: smoking and alcohol use are two well-known cancer risk factors that could confound the Wang 2022 study results yet were not reported or controlled. Dr. Salmon tries to sidestep this inconvenient truth with speculation that "[t]here's no particular reason to expect that . . . the incidence of smoking . . . in the exposed group is different than in the matched controls."[116] Dr. Salmon even grasps for the unsupported conclusion that smoking somehow biases to the null (*i.e.*, a finding of no association) by making it more likely one would observe a "relatively small and random difference" in the study populations.[117] Yet he cannot say whether smoking or alcohol use was more common among patients taking acid suppressants, and he has not investigated the issue.[118] He also has not done a quantitative analysis of the potential impact of study subjects' smoking or alcohol use on the results.[119] Dr. Salmon's failure to account for these confounders when interpreting Wang 2022 is a serious methodological flaw that makes his opinion inadmissible. *In re Mirena IUS*, 341 F. Supp. 3d at 262 ("For an expert's testimony to be reliable, []he 'must demonstrate that [he] has adequately accounted for obvious alternative explanations…such as bias or confounding factors.'").

---

[112] Salmon Supp. Tr. at 47:16-48:8 (emphasis added).

[113] *Id.* at 21:13-22:2 (smoking); *id.* at 23:25-24:3 (alcohol).

[114] *Id.* at 24:4-25:3.

[115] *Id.* at 25:21-26:8.

[116] *Id.* at 21:22-22:2.

[117] *Id.* at 22:16-23.

[118] *Id.* at 25:4-20, 26:9-24.

[119] *Id.* at 27:12-25.

Third, Dr. Salmon opines that "[t]he dose response relationship reported for liver and gastric cancer risk provides additional evidence" to support a Bradford Hill analysis.[120] But his methodology is flawed here as well. Dr. Salmon starts by disagreeing once again with Wang 2022, which found no statistically significant increased risk of gastric cancer in ranitidine users compared to famotidine users. Dr. Salmon nonetheless engages in situational science to dismiss the Wang 2022 finding, explaining that he "chose[] to emphasize the influential pieces of information here,"[121] and again relies on a purported "statistically significant trend" between ranitidine dose and gastric cancer.[122] *See In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1367 (N.D. Fla. 2018). Even if this analysis were scientific, Dr. Salmon did not calculate any p-value for that supposed trend.[123] When confronted with his failure to include confidence intervals for his dose-response analysis, he responded, "I don't regard it as a failure. I regard it as *a choice of what I chose to present*."[124] *See In re Accutane Prods. Liab. Litig.*, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007) (expert's willingness to "draw overreaching conclusions" unsupported by studies is indication of an unreliable methodology). Similarly, when asked about his failure to use active comparator data for his dose-response analysis, Dr. Salmon brushed these data away as "just . . . not as informative with regard to the dose response."[125] Selectively choosing the data to present and baselessly declaring other contrary data "not as informative" is the epitome of situational science and litigation-driven cherry-picking.

Fourth, Dr. Salmon continues to improperly ignore other ranitidine epidemiological studies with active comparator data – despite the fact that Wang 2022 itself looks at ranitidine, not NDMA, and has active comparator analyses. In fact, Dr. Salmon testified that Wang 2022 is an "important contribution" to the data on cancer associated with ranitidine use but claimed that other ranitidine studies "are important but not as influential" – without providing a benchmark for that influence.[126] Finally, although Dr. Salmon agrees active comparators can "address indication bias and

---

[120] Supplemental Expert Report of Dr. Salmon ("Salmon Supp. Rep.") at 6, Brown 2nd Supp. Decl. Ex 136.
[121] Salmon Supp. Tr. at 121:21-122:21.
[122] *Id.* at 47:16-48:4.
[123] *Id.* at 49:14-18.
[124] *Id.* at 81:15-82:17 (emphasis added).
[125] *Id.* at 116:23-117:8.
[126] *Id.* at 19:17-20:13.

confounding," he does not rely on the active comparator analyses in Wang in his Bradford Hill or dose-response opinions.[127]

## V.     Dr. Michaels' Causation Opinions Remain Unreliable and Inadmissible.

In his supplemental report, Dr. Michaels spends 1.5 pages discussing the Wang study.[128] That is more than he spent on any ranitidine epidemiology study in his original report, in which Dr. Michaels acknowledged that he had "not performed a fully comprehensive and exhaustive analysis of the epidemiologic data."[129] This is a basis for exclusion. *See United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion."). Dr. Michaels' supplemental report also spends approximately one page contrasting the Yoon, Iwagami, and Kim Y ranitidine epidemiology studies with the Wang study, although he only wrote two sentences – combined – about those three studies in his initial report, and he did not discuss them at all in the section of his report addressing liver cancer.[130] Recognizing the limitations of his initial report, Dr. Michaels acknowledges that his initial report "did not elaborate on all of the nuances, partly because my ultimate synthesis of all the available evidence incorporated further analysis."[131]

Like his initial report, Dr. Michaels' supplemental report shows his lack of familiarity with the ranitidine epidemiology and his flawed methodology in analyzing those studies. For example, he again rejects statistical significance as a basic guiding principle of epidemiology.[132] He demonstrates his lack of awareness of basic statistical tools for evaluating dose response, such as

---

[127] *Id.* at 129:23-130:11; *id.* at 145:2-8. Dr. Salmon also incorrectly asserted at his deposition (after not mentioning Kaplan-Meier in any reports) that a Kaplan-Meier curve demonstrates a lack of indication bias in Wang 2022. Dr. Salmon offered this as another excuse for his failure to look at the active comparator data. *Id.* at 145:9-149:8, 151:11-152:12.

[128] Michaels Supp. Rep. at 3-4.

[129] Expert Report of Dr. Michaels ("Michaels Rep.") at 64, Brown Decl. Ex. 13; *see* Deposition of Dr. Michaels ("Michaels Tr.") at 79:12-16, 251:22-252:5, Brown Decl. Ex. 36.

[130] *Compare* Michaels Supp. Rep. at 4-5 (discussing Yoon, Iwagami, and Kim Y studies) *with* Michaels Rep. at 41-45 (no discussion of those studies in liver cancer section); *id.* at 61 & n. 506 (single sentence discussing Kantor and Yoon bladder cancer results); *id.* at 64 & nn. 517-18 (single sentence discussing Yoon, Iwagami, and Kim Y studies); *see* Michaels Supp. Tr. at 16:8-14 (did not discuss Yoon or Kim Y in the liver cancer section of his initial report).

[131] Michaels Supp. Rep. at 3.

[132] *See* Michaels Supp. Tr. at 54:17-55:3.

a test for trend.[133] He lauds the Wang study for its total and median follow-up time, but did not know how the study compared to other epidemiology studies, nor did he know how the number of ranitidine users compared to other ranitidine epidemiology studies.[134]

Dr. Michaels also cannot explain why he believes the Wang study "provides additional support and strengthens [his] opinions that the NDMA in ranitidine" can cause all five of the designated cancers despite the study's important methodological limitations.[135] For instance, Dr. Michaels could not identify any other ranitidine epidemiology study that defined the ranitidine group to exclude short-term users, while not imposing a similar limitation on the comparator group.[136] In fact, he could not identify *any* other epidemiology study that did so.[137]

Dr. Michaels also offers inconsistent opinions with respect to the active control analysis in the Wang study and its attempt to address confounding. On one hand, his supplemental report asserts that Wang's comparison of ranitidine to users of famotidine and PPIs "represent[s] an active comparator study to address possible indication bias."[138] On the other hand, he testified that he does not think all active comparator studies compare "apples to apples" or "the same disease severity," which means results are "not going to be as useful."[139] He also would not agree that the active comparator analysis in the Wang study reduced the possibility of confounding.[140]

With regard to confounding generally, Dr. Michaels admits that smoking, alcohol use, and cirrhosis are all risk factors for liver cancer (with cirrhosis having a relative risk of greater than 11.0 in the Kim Y study), and that those variables are appropriate controls when analyzing the risk of liver cancer, but that the Wang authors did not control for them in their study.[141] Dr. Michaels also admitted he did not know if the database the Wang authors used had data on smoking or cirrhosis, despite that information being readily available in the published study.[142]

---

[133] *See id.* at 53:3-55:17 (blurring tests for trend instead about trends in individual results).

[134] *See id.* at 29:16-31:14, 24:17-25:6.

[135] Michaels Supp. Rep. at 5.

[136] *See* Michaels Supp. Tr. at 26:7-15, 27:8-28:19.

[137] *See id.* at 28:20-29:15.

[138] Michaels Supp. Rep. at 3.

[139] Michaels Supp. Tr. at 32:3-19.

[140] *See id.* at 35:3-36:9 ("I don't think that it would make much of a difference or would have made much of a difference if they didn't do the active comparative analysis…").

[141] *See id.* at 64:25-66:5, 67:8-68:22.

[142] *See id.* at 68:23-69:9; *but see* Wang 2022 at 13 ("[T]here were no data available in our database regarding certain confounders, such as alcohol consumption and cigarette smoking.").

## VI.    Dr. Le's Causation Opinions Remain Unreliable and Inadmissible.

Dr. Le's reliance on the Wang study to "bolster[] [her] opinion for liver cancer, gastric cancer, and pancreatic cancer" and her statements that Wang does "not change [her] opinions regarding bladder and esophageal cancer" ignore the lack of consistency across active comparator studies – which she acknowledges are ideal – as well as flaws in the Wang study design.[143]

Dr. Le acknowledges that active comparator data are valuable because "ideally what you want is a group that has similar risks in terms of cancer."[144] Yet in relying on the Wang study to support her opinions, she ignores that the active comparator data showed "no statistically significant associations between ranitidine use and . . . four out of those five cancers."[145] And as to the remaining cancer—liver—Dr. Le could not identify *any* active comparator data besides the Wang study showing a statistically significant association with ranitidine. Even she acknowledged that she "wouldn't form a conclusion from just one study."[146]

And Dr. Le further agreed that the active comparator study design as to liver cancer in Wang is flawed. "[I]f you're going to set a study that you're actually comparing or trying to ascertain an association between ranitidine and cancer, [she wouldn't] want to include subjects who were on another H2 blocker in [the] – in the ranitidine group."[147] Yet Table 1 indicates famotidine users *were* in the ranitidine group. That approach, which "just does not make sense,"[148] can "lead to different results."[149] And Dr. Le also acknowledged that Wang could not control for important risk factors including smoking, alcohol, and liver disease.[150] Those serious inconsistencies and methodological flaws make Dr. Le's supplemental opinion inadmissible.

## CONCLUSION

For the foregoing reasons, the Court should exclude Plaintiffs' general causation experts' opinions in their entirety, and nothing in the Wang 2022 study suggests otherwise.

---

[143] Supplemental Expert Report of Dr. Le ("Le Supp. Rep.") at 3, Brown 2nd Supp. Decl. Ex. 132.
[144] Le Supp. Tr. at 18:12-13.
[145] *Id.* at 23:2-8.
[146] *Id.* at 42:3.
[147] *Id.* at 70:13-19.
[148] *Id.* at 135:25-136:2.
[149] *Id.* at 67:3-12.
[150] *Id.* at 82:16-23.

Dated: November 9, 2022                          Respectfully submitted,

**Lead Counsel:**

*/s/ Mark Cheffo*
Mark S. Cheffo
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

*Counsel for Defendant GlaxoSmithKline
LLC*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com

*Counsel for Defendant Boehringer Ingelheim
Pharmaceuticals, Inc.*

*/s/ Anand Agneshwar*
Anand Agneshwar
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Counsel for Defendants Sanofi US Services
Inc., Sanofi-Aventis U.S. LLC, and Chattem,
Inc.*

/s/ Joseph G. Petrosinelli
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Counsel for Defendant Pfizer Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was previously served on the Court and the

co-leads by email on November 9, 2022 as a result of an outage that prevented filing and service

using the Court's CM/ECF system. Now that service has been restored, I hereby certify that a

copy of the foregoing was filed on November 18, 2022, using the Court's CM/ECF system,

which will provide automatic notification to all counsel of record.

*/s/ Joanne M. O'Connor*
Joanne M. O'Connor
JONES FOSTER, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
Tel: (561) 659-3000
Fax: (561) 650-5300
JOConnor@jonesfoster.com
