**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY_____ *PE* ____D.C.

*Nov 18, 2022*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

                                    **JUDGE ROBIN L. ROSENBERG**
                          **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**


**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO DEFENDANTS'**
**SUPPLEMENTAL BRIEF REGARDING THE WANG STUDY**



DATED: November 18, 2022

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.      The Wang Study Confirms Plaintiffs' Experts' Opinions. ................................... 4

II.     Dr. McTiernan's Opinions Are Reliable. ........................................................... 9

      A.     Dr. McTiernan Appropriately Analyzed the Strengths and Limitations of the Wang Study. ......................................................................................... 9

      B.     Dr. McTiernan Appropriately Analyzed the Statistical Significance of the Results of the Wang Study. ..................................................................... 11

      C.     Dr. McTiernan Appropriately Analyzed Dose-Response in the Wang Study. ...... 13

      D.     Dr. McTiernan Appropriately Analyzed *All* Active-Comparator Studies. ........... 16

III.    Dr. Moorman's Methodology Is Consistent and Reliable. ............................... 17

      A.     Dr. Moorman's Association and Weight Opinions Are Reliable. ....................... 17

      B.     Dr. Moorman Properly Addresses Confounding. .................................................. 18

      C.     Dr. Moorman's Approach to Active Comparators Is a Model of Consistency. ... 19

      D.     Dr. Moorman's Bradford Hill Analysis Is Reliable. ............................................. 20

IV.    Dr. Salmon's Methodology Properly Found Causation. ................................... 21

V.     Dr. Michaels' Opinions Surmount *Daubert* ..................................................... 23

VI.    Dr. Le's Opinions Are Admissible. ................................................................... 24

CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Chapman v. Proctor & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ............................................................................. 1, 6

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018) .............................................................. 1, 4, 24

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) .............................................................. 15, 16

*In re Johnson & Johnson Talcum Powder Prods. Litig.*,
    509 F. Supp. 3d 116 (D.N.J. 2020) ............................................................................ 23

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    174 F. Supp. 3d 911 (D.S.C. 2016) ..................................................................... 15, 16

*In re Roundup Prod. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) .................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ......................................................................................... 11, 21

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) .................................................................... 6, 15, 22

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) .............................................................................. 24

*Rider v. Sandoz Pharm Corp.*,
    295 F.3d 1194 (11th Cir. 2002) ........................................................................... 1, 4

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ........................................................................... 15, 24

*Williams v. Mosaic Fertilizer, LLC*,
    889 F.3d 1239 (11th Cir. 2018) .............................................................................. 13

# INTRODUCTION[1]

Plaintiffs' experts recognize the Wang study for what it is: evidence confirming that NDMA in ranitidine causes the five designated cancers at issue. Patients in the Wang study who took ranitidine developed all *five* cancers at a *higher* rate than those who did not. Full stop. For three cancers—liver, gastric, and pancreatic—the Wang study shows a "statistically significant association" between ranitidine use and the cancers, providing "'powerful' evidence of general causation." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (quoting *Rider v. Sandoz Pharm Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002)). It analyzed dose-response for some cancers, showing clear dose-response for liver and gastric cancer. Wang also demonstrated that the doses of ranitidine taken by thousands of Plaintiffs and Registry Claimants in this MDL were sufficient to cause cancer. Finally, the Wang study provides evidence supporting each of the independently sufficient "primary methodologies" sanctioned by the Eleventh Circuit that were utilized by Plaintiffs' experts. *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014). It is an "epidemiological" study; it demonstrates "dose-response" for two of the cancers; and it details the "background risk" for each cancer. *Id.* In short, the Wang study confirms beyond any doubt that Plaintiffs' experts' opinions are admissible under *Daubert*.

To sidestep that clear-cut conclusion, Defendants accuse the experts of engaging in "situational science." Br. at 1. The Wang study has some of the limitations Plaintiffs criticized in other studies, Defendants say, so it is "inconsistent" to rely on Wang (even in part) to evaluate cancer risk. Defendants ignore the *actual* explanations each expert gave for their differing interpretations of study results, explanations rooted in the study designs. In any scientific study, from lab benches to large-scale epidemiology, a study can be "unreliable" in two different ways— it can be prone to false positives or to false negatives. *See, e.g.*, Hernberg, Sven, *"Negative" Results in Cohort Studies—How to Recognize Fallacies*, 7 Scandinavian J. of Work, 121, 122 (1981) ("Insensitive [epi] studies . . . can be compared to an insensitive laboratory test in clinical diagnosis."). During the early days of the COVID pandemic, for example, there were certain tests that were notorious for showing false negative results, *i.e.*, suggesting that someone did *not* have

---

[1] Although this Court ordered the parties to brief "five pages per expert," D.E. 6083 at 1, Defendants allocated 20 pages to Drs. McTiernan and Moorman, and just 5 to Drs. Salmon, Michaels, and Le. To respond adequately, Plaintiffs felt compelled to brief matters similarly.

COVID when he or she *did* have COVID.  Someone who received a *negative* COVID test could not be sure he was healthy (due to false negatives), but someone with a *positive* COVID result had strong evidence of a COVID infection.  Those tests were biased toward a false negative result—healthy users saw negative results, but so did many sick users.

That distinction, at bottom, is why Defendants are wrong to describe Plaintiffs' experts as engaging in "situational science," "results driven reasoning" and "cherry picking."  In epidemiological terms, a propensity for false negative results is a "bias[] to[ward] the null," and that propensity plagues nearly every study Defendants rely upon—Iwagami, Yoon, Norgaard, and the rest—and likely Wang as well.  This is unsurprising, as false negatives are more common than false positives in epidemiology.  *See* Hernberg at 122 ("Negative bias is more easily obtained than positive errors; furthermore negative errors are often more difficult to detect.").  None of these studies (including Wang) followed patients for "about 30 years" as IARC requires before accepting that a study can "provide evidence of **lack** of carcinogenicity."[2]  None looked at patients who took Zantac for as long as many Plaintiffs in this MDL.  And all of these studies had misclassification due to untracked OTC ranitidine exposure.

But these limitations cut in one direction, leading all of these studies (including Wang) to *understate* the true risk of cancer.[3]  So it is hardly "situational science" to conclude that Wang's positive result provides particularly strong evidence that Zantac causes cancer—and that Defendants' preferred studies are likely false negatives caused by the limitations in their study designs.  *See, e.g.*, Hernberg at 121 (flagging low exposure, short follow-up, and other common reasons for false negatives)).  Again, the same would be true for someone who took three COVID

---

[2] IARC Monographs on the Identification of Carcinogenic Hazards to Humans, Preamble, Amended January 2019, at 22 (emphasis added).  IARC presents the follow-up length as a concern for false *negatives*.  A study shorter than 30 years can "provide evidence" *of carcinogenicity*, but not the *lack* of carcinogenicity: short studies are prone to false negatives, but not false positives.

[3] In the interest of candor, there is at least one limitation that Defendants identify that could *theoretically* produce false positive results: residual confounding.  If ranitidine users smoke more than famotidine users, for example, then a ranitidine/famotidine comparison could show a false positive result for reasons having nothing to do with NDMA.  But, the opposite can also be true.  If famotidine users smoke more than ranitidine users, then a ranitidine/famotidine comparison could show a false negative result.  And the only data we have on this issue—from the Kim study—suggests that ranitidine users smoke less, drink less, and generally have fewer risk cancer factors than famotidine users.  *See* Def. Ex. 60 (Kim, Y, et al. 2021) at Table 2.  This suggests that residual confounding (like the other limitations) will lead to false negatives.

2

tests prone to false-negatives.  If came back positive—and two came back negative—that would be powerful evidence that someone had COVID.  There is nothing "situational" about recognizing that, in light of the test design, the positive test is probably right, and the negative tests failed to detect the infection even though it was there.

All that, of course, is *before* considering *any other* evidence—and there is ample evidence here in the form of ranitidine studies looking at non-users, occupational studies about NDMA, dietary studies about NDMA, tissue studies, animal studies, and basic laboratory studies.  For that reason, the situation here is more like a patient who recently interacted with someone with COVID, who has COVID symptoms, and who has one positive test and some negative—the only rational answer is that she is infected.  At a bare minimum, an expert could so conclude without being deemed categorically unreliable under *Daubert*.

At bottom, Defendants' argument is this: a causation expert *must* be *excluded* under *Daubert* unless and until she can point to (1) a *large* number of; (2) large-scale; (3) statistically significant; (4) peer-reviewed; (5) active-comparator; (6) human; (7) ranitidine-specific studies; (8) that are not, even in far-fetched theoretical speculation, susceptible to any kind of potential bias—and only then (9) if the study authors specifically state in their text that they believe their study establishes causation.  Where are these gerrymandered criteria for valid evidence coming from?  Not from the law, in the Eleventh Circuit or elsewhere, and not from sound science.  Defendants argue that user versus non-user does not count; NDMA science does not count; animal studies do count; studies with small effects do not count; studies with effects that are not statistically significant do not count; and so forth.  But no scientist assesses causation that way.  Rather, scientists "consider all the relevant available scientific evidence, taken as a whole." *Reference Manual* at 20.  Epidemiologists are taught to refuse the "temptation to dichotomize study results into qualitative categories that notoriously have led to misinterpreting nonsignificant findings to be support for the null hypothesis," *i.e.*, of tragically failing to recognize *real* causal relationships just because certain studies failed to detect statistically significant evidence of them. Lash, Timothy L., et al., *Modern Epidemiology* at 360 (4th ed. 2021).  This Court should not hold any expert to Defendants' false standard, but instead should instead examine their methodology to ensure they considered all evidence and provided "a reasonable basis for placing [] weight" on the evidence they considered.  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 964 (9th Cir. 2021). Plaintiffs' experts here have done that, so Defendants' *Daubert* motions should be denied.

3

## ARGUMENT

### I.     The Wang Study Confirms Plaintiffs' Experts' Opinions.

During the nearly 19 years between January 2000 and December 2018, a group of more than 55,000 Taiwanese people ingested ranitidine in the real world.  The Wang study, published in September 2022, showed exactly what happened to those people.  The purpose of the study was to "assess the relationship between the cumulative individual cancer incidence and long-term ranitidine use."  Wang at 1 ("We conducted a population-based study to explore ranitidine use and cancer emergence over time."); *id.* at 2 ("[W]e aimed to conduct a large-scale, long-term follow-up cohort study to investigate ranitidine use and subsequent emergence of cancer over time in a real-life setting.").  The results were striking: "long-term ranitidine use [was] associated with a higher likelihood of cancer development in ranitidine users."  *Id.* at 12.  How much higher?  A patient who took ranitidine had a 10% higher risk of developing any cancer, a 6% higher risk of developing bladder cancer, 35% for pancreatic cancer, 26% for stomach cancer, 27% for esophageal cancer, and 22% for liver cancer.  *See id.* at 7 Figure 2 (also showing hazard ratios of 1.27 and 1.06 for esophageal and bladder cancer).  Defendants do not dispute that this increased risk happened in this real-world study: the people who took ranitidine got more cancers—and specifically more of each of the five designated cancers—than those who did not take ranitidine.

For this straightforward reason, the Wang study confirms what Plaintiffs' experts have always said: the NDMA in ranitidine can cause cancer.  *See* Wang at 1 ("Our real-world observational study strongly supports the pathogenic role of NDMA contamination.").  And it makes even clearer that their opinions are admissible under *Daubert*.  Under Eleventh Circuit law, "[a]n epidemiological study identifying a statistically significant association between the use of a drug and a particular adverse effect, accompanied by a reliable expert opinion that the association is causal, is 'powerful' evidence of general causation."  *In re Abilify*, 299 F. Supp. 3d at 1307 (quoting *Rider*, 295 F.3d at 1198).  For three of the designated cancers—pancreatic, gastric, and liver—and cancer overall, the Wang study shows "a statistically significant association between the use of a drug"—namely Zantac—and "a particular adverse effect," namely those three cancers.  *Id.*; *see* Wang at 6 ("[R]anitidine use was associated with overall cancer . . . liver cancer . . . gastric cancer . . . [and] pancreatic cancer."); *id.* ("In the Kaplan-Meier analysis, the ranitidine cohort exhibited significantly higher risk of developing liver cancer . . . gastric cancer . . . and pancreatic cancer . . . than the non-ranitidine cohort."); *id.* at 7 Figure 3 (showing the Kaplan-Meier curves

for these cancers); *id.* at 12 ("we estimated the impact of ranitidine intervention on cancer risk, which showed increased odds of developing liver . . . pancreatic, and gastric cancers.  The Kaplan-Meier analysis of our 18-year dataset confirmed these findings."); *id.* at 12 ("Another comparative approach in our study revealed the association of ranitidine usage with four individual cancers … including liver[,] gastric, and pancreatic cancers.").

The Wang study authors forcefully state that "the conclusive results of our study after gathering data emphasize that consuming high levels of NDMA due to ranitidine use is linked to liver cancer development."  Wang at 13 (emphasis added); *see also id.* ("To conclude, the clinically meaningful results of this large-scale, longitudinal population-based cohort study using an excellent prescription and cancer database provide concrete evidence with very convincing long-term follow-up information for exploring the causative role of ranitidine in increasing the risk of carcinogenic effects on the liver.").

Wang also provides solid evidence that ordinary doses of ranitidine—taken by thousands of Plaintiffs in this MDL—are sufficient to cause liver and gastric cancer.  For those cancers, the Wang study showed that even 3-6 months of use was enough to slightly elevate the risk—3% for liver cancer, 26% for gastric cancer.  *See* Wang at 9 Table 3 (showing a HR of 1.03 for liver cancer in patients taking 90-180 DDDs and a HR of 1.26 for gastric cancer in patients taking 90-180 DDDs).  Risk also increased for patients who took ranitidine for 6-9 months.  *See* Wang at 9 Table 3 (showing a HR of 1.12 for liver cancer in patients taking 181-270 DDDs and a HR of 1.13 for gastric cancer in patients taking 181-270 DDDs).  And still more for patients who took ranitidine for 9 months to one year.  *See* Wang at 9 Table 3 (showing a HR of 1.26 for liver cancer in patients taking 271-360 DDDs and a HR of 1.27 for gastric cancer in patients taking 271-360 DDDs).  Last, the Wang study showed even more elevated risks for patients who took ranitidine for more than a year, and the study had enough people in that category that the risk ratios (42% increased risk for liver cancer and 33% increased risk for gastric cancer) were statistically significant.  *See* Wang at 9 Table 3 (showing a HR of 1.42 for liver cancer in patients taking over 360 DDDs and a HR of 1.33 for gastric cancer in patients taking over 360 DDDs).  For bladder and esophageal cancer, Wang shows that more people who took ranitidine got those cancers than people who did not take ranitidine.  *See* Wang at 7 (showing elevated hazard ratios for these two cancers).

Meanwhile, Wang provides a solid basis for each of the independently sufficient "primary methodologies" identified by the Eleventh Circuit: "epidemiological evidence," "dose-response

relationship," and "background risk of disease." *Chapman*, 766 F.3d at 1308.  Wang is of course an "epidemiological stud[y]," *id.*, an extremely large and well-designed one that "imitates a randomized trial to control for confounding factors."  Wang at 12.[4]  Its own authors state that "long-term ranitidine use is associated with a higher likelihood of cancer development" and that ranitidine users "showed increased odds of developing liver . . . pancreatic . . . and gastric cancers." Wang at 12.  The Wang study also included a "dose response" analysis for two of the cancers that demonstrated that people who took more ranitidine got even more liver and gastric cancer than people who took less ranitidine.  *See* Wang at 13 (describing "an additional dose-response subanalysis" in which the authors "further stratified the extent of NDMA exposure by cumulative ranitidine usage based on drug exposure"); *id.* at 8 ("[I]ncreased ranitidine exposure was associated with liver cancer risk"); *id.* at 9 Table 3 (showing a higher hazard ratio for liver and gastric cancer in patients taking more than 360 DDDs of ranitidine than patients who took 90-180 DDDs and patients who never took ranitidine).  And the Wang study reported the "background risk" of each cancer.  *See* Wang at 8 Table 2 (reporting the "incidence rates" for each of the cancers for ranitidine users and "untreated" individuals); *cf. McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("if Plaintiffs could show that taking Metabolife increases the risk of heart attack and ischemic stroke beyond the usual incidence of these common diseases, that would support their methodology").

Wang also confirms that Plaintiffs' experts were *correct* to look at the NDMA literature and to flag that the other human ranitidine literature had limitations suggesting their findings were false negatives.  Indeed, that is what the Wang study authors *themselves* did.  The Wang study authors analyzed the NDMA literature, noting that "observational human studies have reported that consuming a high number of NDMA-contaminated foods may be linked to an increased risk of stomach and colon cancer," that "several studies have … reported that NDMA could be oncogenic in animals," that "detailed experimental animal studies showed that cancer risk may increase with NDMA exposure," and that "according to the [IARC] report, NDMA has been proven to belong to group 2A and to be 'probably carcinogenic to humans.'"  Wang at 2; *see also id.* at 11 ("Several epidemiological analyses have reported the public health concern of NDMA

---

[4] As the Wang authors note, "it is impractical and unethical to conduct a [randomized controlled trial] to test the carcinogenicity of ranitidine in a patient."  Wang at 13.  That is, given the *cancer risk* from ranitidine, medical ethics now *forbids* giving it to test subjects.

exposure, which has been linked to an increased risk of stomach and colon cancers. The carcinogenic effects of NDMA theoretically result from inducing DNA-damaging metabolites in the gastrointestinal tract and liver, as suggested by animal studies."); *id.* at 1-2 (describing NDMA as "a known carcinogen, according to laboratory results").[5] As for prior ranitidine studies—specifically Iwagami and Yoon—the Wang authors concluded that "their small sample size and short follow-up duration may cause statistical bias and inaccurate conclusions,"—two of the criticisms Plaintiffs' experts also made. *Id.* at 12-13 (Iwagami "acknowledged a weakness in the study design due to the limited sample size and statistical power").

Indeed, the import of Plaintiffs' experts' criticisms is apparent from the study's graphs. As Plaintiffs' experts and voluminous briefing has emphasized, exposure and follow-up are each critical to measuring cancer risk. *See e.g.*, D.E. 5915 at 54-60 (summarizing and citing expert reports). A picture, at right, is worth a thousand words:



The graph teases out the independent effects of exposure and follow-up. With short follow-up (as the red arrow suggests), very little risk can be detected. Over time, closer to the arrow in the same graph on the left, one can observe the lines separate.



This separation also underscores the vital importance of exposure information. The 3-6 month group has risks only slightly higher than the unexposed group—but it goes up and up, to the over-a-year group. Even one year is not very long—the *ten-years-of-exposure* line would be far above the green one-year line, and 60% of Plaintiffs in this MDL would be above even the ten-year line.

---

[5] To be sure, the Wang authors noted that there were "equivocal" results in the previous literature that "examined the carcinogenic effects of NDMA on humans." Wang at 2. The Wang authors noted that some previous studies (namely Kantor, Yoon, and Iwagami) had "reported no association" while other studies (namely Cardwell, McGwin, Song, and Hidajat) had "supported the connection." *Id.* Clearly, the Wang authors—like Plaintiffs' experts—considered all types of evidence about NDMA and cancer, not just the results from the human ranitidine epidemiology employing active comparators and demonstrating statistically significant results.

The graph powerfully illustrates why the studies Defendants emphasize are likely to be false negatives. For example, the Kumar, Adami, Norgaard, Kim S., Iwagami, Tran, and Kantor studies *all* analyzed ranitidine use of *less than 90 DDDs* (300 mg once per day for 90 days). *E.g.*, D.E. 5915 at 56-57 (summarizing).[6] That would place those studies *between* the red line and the dotted blue line on this graph. That is simply not enough exposure to support a conclusion of no increased risk. *See* Hernberg at 123 ("Basing a qualitative negative conclusion only on the outcome of subjects with very low exposure intensity and/or short exposure time is unjustifiable.").

These studies had follow-up of 2.4, 4.4, 5, 5.6, 6.7, 7, 8, 10, and up to 14 years. D.E. 5915 at 59-60 (summarizing). That is insufficient to support a conclusion of no increased risk. *See* Hernberg at 123 ("Whenever diseases with long latency periods (*e.g.* occupational cancer) are studied, a falsely negative result emerges if the follow-up time is too short."). Compare those numbers to the x-axis of the graph, then following it up to the trends—limiting the follow-up would miss the true risk. If the follow-up period in Wang were limited to the average in Iwagami (2.4 years), the graph would be truncated, as one can see here: The study would have shown essentially no difference. That is true even though there *is* a difference—one that more significant follow-up reveals.



The Wang study shows that Defendants have no basis to criticize Plaintiffs' experts. For months, Defendants have insisted that the only valid demonstration that the NDMA in ranitidine causes cancer is an active-comparator analysis showing that patients taking ranitidine had higher cancer rates than patients taking other antacids. But that is exactly what Wang shows. *See* Wang at 12 ("The overall cancer risk was statistically different between these two groups compared with famotidine or non-ranitidine users."). The study showed increased risks for all five designated cancers. *See* Wang at 10 Table 4.[7] Defendants cannot do anything but begrudgingly agree.

Finally, the Wang study demonstrates that Defendants are wrong that there is something unique about ranitidine users that makes them more susceptible to cancer—and thus biases any of the comparisons between ranitidine users and non-users. If Defendants were correct in that hypothesis, the result would show up immediately. For example, if ranitidine users were more

---

[6] The problem is worse than that, since none of these studies quantified exposure *at all*, but simply relied on prescriptions or self-reports over a few weeks. *See* Def. Ex. 15 (Moorman Rep.) at 47; accord, Def. Ex. 9 (McTiernan Rep.) at 99, 233, 251 ("none assessed long-term use"); Def. Ex. 39 (Moorman Dep. Tr.) at 476:21-477:5 (few "even discussed frequency of use").

[7] At the 95% confidence interval, these values were statistically significant for liver cancer.

likely to smoke and drink and have other cancer risk factors than non-users, they would experience higher rates of cancer even in the first year after taking ranitidine.  The Kaplan-Meier curves in the Wang study—which show cancer risk over time after taking ranitidine—should show an *immediate* separation in cancer risk between ranitidine users and non-users.  But they do not.  Quite the opposite.  For the three cancers for which Kaplan-Meier curves are provided, the Wang study shows no increased risk of cancer after one year of follow-up.  Only later in the follow up period— years after taking Zantac—does the increased risk materialize.

**Liver Cancer**                                                          **Gastric Cancer**




**Pancreatic Cancer**



Wang at 7, Figure 3.  These curves provide powerful evidence that the increased risk of cancer is being driven by the NDMA in ranitidine itself rather than by some pre-existing characteristics of patients who end up using ranitidine.[8]

## II.    Dr. McTiernan's Opinions Are Reliable.

### A.    Dr. McTiernan Appropriately Analyzed the Strengths and Limitations of the Wang Study.

Defendants first argue that Dr. McTiernan treated the Wang study inconsistently (and more favorably) than Defendants' preferred studies.  That is demonstrably false.  *Compare* McTiernan Supp. Rep. at 4-5 *with* McTiernan Rep. at 101-08 (statements on "smoking" or "hepatitis" are

---

[8] At times, Defendants have also suggested ranitidine users exhibit higher cancer rates because of "protopathic bias," *i.e.*, they are being prescribed ranitidine for early symptoms of esophageal and stomach cancers, leading to artificially increased cancer rates.  But the Wang authors ruled this out: "ranitidine still showed similar results after excluding 'protopathic bias.'"  Wang at 12; *see also* Moorman Tr. at 633-34 (Kaplan-Meier analysis also shows there is no protopathic bias).

almost verbatim the same).  Unlike Defense expert Witte, Dr. McTiernan flagged strengths *and* weaknesses in exactly the same way for every study.  Defendants have never argued that the list of strengths and weaknesses she has consistently evaluated for each study are unscientific.

Nonetheless, Defendants say she "extols the 'improved methodologies' of the Wang study notwithstanding its identical failure to control for smoking." Br. at 7.[9]  Dr. McTiernan addressed this head-on, noting that "there are several limitations to the study." McTiernan Supp. Rep. at 4. One such limitation was that "[s]everal potential confounding variables were not available (*e.g.*, smoking, alcohol use)." *Id.* at 5; *see also* McTiernan Rep. at 127 (almost identical wording, describing Adami and Norgaard).  But, "this lack of confounding variables can bias the relative risk in either direction," *i.e.*, it can lead to false positives or negatives.  McTiernan Sup. Rep. at 7. Based on the data available, there is every reason to think that it increases the risk of a false negative here.  The Kim Y.D. study shows that famotidine users are more likely to have cancer risk factors than ranitidine users—more likely to smoke, drink, have diabetes, be obese, and so on. Def. Ex. 60 (Kim, Y, et al. 2021) at Table 2; *cf.* D.E. 5915 at 68 (discussing this).  Any confounding, therefore, would make ranitidine look *safer* than it actually is (by virtue of being compared to a patient population predisposed to develop cancer) and that makes the already striking results of the Wang study even more striking.

More fundamentally, Defendants' critique omits the entire reason Dr. McTiernan called the Wang study "improved." Br. at 7, 12.  True, as Dr. McTiernan acknowledged, it is "identical" to Defendants' preferred studies in lacking smoking information, but she identified *six separate ways* in which its methodology is "improved." *See* McTiernan Supp. Rep. at 8-9 ("the Wang et al. study has some of the same weaknesses" but had better information on "1) cancer diagnoses … 2) Length of follow-up … 3) Use of propensity score matching … [without] 'trimming' … 4) The medication database included information on dispensed medication … 5) Dose-response data … 6) [two methods addressing] indication bias").  There is nothing unreliable in saying that, all else

---

[9] Defendants accuse Dr. McTiernan of deeming studies "unreliable," and cite "McTiernan Supp. Tr. at 41:25-43:5." Br. at 7.  This is strange because page 42:12-18 says: "I did not see any place where I said that a study—that the Wang study was unreliable, nor in my original report did I label studies as 'unreliable.' I went through, did a systematic review, gave the strengths and weaknesses of every study that met criteria." As for the rebuttal report quotation, Dr. McTiernan explained on page 197:2-14 that "their results unreliable" "refers to the reports of Dr. Witte and those other defense experts," not the underlying studies.

equal (including the weakness of missing smoking information), a study with six important advantages is "improved" compared to studies without those advantages.

**B.      Dr. McTiernan Appropriately Analyzed the Statistical Significance of the Results of the Wang Study.**

Defendants next argue that Dr. McTiernan applied an unreliable methodology "to her interpretation of the non-significant risk estimates from the Wang study." Br. at 8.  Specifically, they fault her for relying in part on "the non-significant results in the Wang study" because (in their view) the lack of statistical significance "decreases the likelihood that the observed relative risk is reflective of the real relative risk." Br. at 8.  Again, Dr. McTiernan appropriately discussed statistical significance in her supplemental report, following the *same* methodology.   She specifically noted that two of the cancers had results that were not statistically significant, "likely … related to low numbers of cases." Br. at 8.  There is nothing unreliable about considering those results as one signal—among others—of increased risk.   After all, the "lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and" a disease. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011). Sir Austin Bradford Hill cautioned in 1965 that researchers should not "deduce 'no difference' from 'no significant difference.'"[10]   Modern epidemiologists are even more strident.   *See* D.E. 5915 at 70-74 (addressing this issue).    As the leading textbook puts it, "a common *misinterpretation* of significance tests is to claim that there is no difference between two observed groups because the null test is not statistically significant, in that the *P* is greater than the cutoff for declaring statistical significance (again, usually .05)."    *Modern Epidemiology* at 335. Defendants exemplify this "misinterpretation" over and over again, *e.g.*, Br. at 13 (stating that "Wang 2022 only found an association for liver cancer" despite the positive associations demonstrated for all five cancers across both the non-user and active-comparator analyses), yet argue that Plaintiffs' experts are unreliable for not following their misguided lead.  *See* Hernberg at 122 (cautioning that "uncritical authors" and "unsophisticated readers" "often *misinterpret* the failure to obtain 'statistical significance' as being evidence of" no association).

---

[10] Def. Ex. 46 (Bradford Hill 1965) at 300; *see also id.* at 299 (criticizing "some editors of journals [who] will return an article because tests of significance have not been applied"); *id.* at 299 ("No formal tests of significance can answer those questions [about causation]. Such tests can, and should, remind us of the effects that the play of chance can create, and they will instruct us in the likely magnitude of those effects. Beyond that they contribute nothing to the 'proof' of our hypothesis.").

Defendants' criticisms are all the more misplaced given that Dr. McTiernan explained why she believed the results for two of the cancers (bladder and esophageal) did not reach statistical significance: the low statistical power due to "low numbers of cases."  McTiernan Supp. Rep. at 5.  The Wang study included only invasive bladder cancer, reducing the sample size and increasing the likelihood that the elevated bladder cancer result was not statistically significant.  McTiernan Tr. at 218:14-219:5.  As for esophageal cancer—the only other designated cancer without a statistically significant increase in Wang—the results were statistically significant at the 90% level sometimes employed by epidemiologists.  *See Modern Epidemiology* at 341-42 (showing 90% confidence intervals and related p-values); *id.* at 335 (describing "0.05" value which is "usually" used as "an arbitrary cutoff").  Indeed, the Wang study showed a 27% increased risk in esophageal cancer for patients taking ranitidine, and the p-value associated with that increased risk—.107— means that there is nearly a 90% chance that this increased risk is not due to chance.  *See id.* at 336-37 (describing the proper interpretation of p-values):

| Cancers | untreated | % | ranitidine | % | *p*-value | HR (95% CI) | *p*-value | |
|---|---|---|---|---|---|---|---|---|
| Esophageal cancer | 82 | 0.10% | 101 | 0.20% | 0.161 | 1.27(0.95–1.70) | 0.107 | |

In response, Defendants argue that Dr. McTiernan should have done more to explore why the two results for esophageal and bladder cancer showed increased risks but were not statistically significant.  Br. at 8.  Specifically, she should have "conduct[ed] a meta-analysis" or performed a "power calculation."  *Id.*  As for the meta-analysis, Dr. McTiernan explained why such an analysis—which essentially combines the results from multiple studies—would have been impossible in light of the differences in study design.  McTiernan Tr. at 29:8-30:10.  As for power calculations, those are used to *plan* a study, not to *evaluate* one.  *Id.* at 683-85.

The reason why these results can still constitute a signal is simple and fundamental.  When Wang reports a hazard ratio above one for all five cancers, that means the tens of thousands of real people who took ranitidine developed the five cancers in the real world at a higher rate than the people who did not take ranitidine.  *See Modern Epidemiology* at 335-36 ("To say that the difference is not statistically significant . . . does *not* imply that the two observed groups are the same.  One needs only to look at the two observed groups to see whether they are different.") (emphasis in original).  There is nothing "unreliable" about considering that undisputed fact when reaching a conclusion about whether ranitidine causes cancer.  That is what Dr. McTiernan did.

Defendants are free to explain away why people taking ranitidine in the Wang study developed more cancer than those who did not, but pointing out that this result (more Zantac, more cancer) is what one would expect for a drug that causes all five designated cancers is hardly unreliable.

### C.     Dr. McTiernan Appropriately Analyzed Dose-Response in the Wang Study.

Defendants offer four reasons why "Dr. McTiernan's assessment of dose-response in the Wang study is unreliable," Br. at 9, but none is persuasive.

First, Defendants argue that Dr. McTiernan was wrong to "contend[] that there was a dose response 'trend' for gastric cancer" and that this opinion is "contrary to the Wang authors' conclusions." *Id.* This is doubly mistaken. The dose-response numbers for gastric cancer clearly show a trend. Patients who used ranitidine for 3-6 months developed more gastric cancer than those who never used it at all; patients who used ranitidine for 9-12 months developed more gastric cancer than those who used ranitidine for 3-6 months; and patients who used ranitidine for more than 12 months developed even more gastric cancers than those who used ranitidine for 9-12 months. *See* Wang at 9 Table 3. That is a trend. True, the risk from 6-9 months of use was lower than the risk from 3-6 months of use—an unsurprising anomaly given the small sample size in these subanalyses—but that merely means the trend was not continuous. That distinction— between a *trend* and a *perfectly linear and continuous* trend—is why Dr. McTiernan's opinion does not contradict the Wang study authors. They say, "there was no *continuous* dose–response relationship among the other individual cancers [*e.g.*, gastric cancer]." Wang at 13 (emphasis added). Dr. McTiernan agreed. *See* McTiernan Dep. Tr. at 63:7-11 ("It just says there was no continuous dose-response relationship among the other individual cancers. It does not state that there wasn't a dose-response relationship."). There is nothing inconsistent in recognizing a discontinuity at 6-9 months while also recognizing that there *is* a clear "trend." And *Daubert* does not even require quantification, much perfectly continuous trend: "To be clear, we have never required an expert to 'give precise numbers about a dose-response relationship,' and we do not do so here." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1248 (11th Cir. 2018).

Second, Defendants suggest that "failure to control" for confounders "could be responsible for the continuous dose response for liver cancer reported in the Wang study." Br. at 10. This is simply speculation. Their brief presents no evidence—at all—that the dose response was due to confounding. For confounding to explain the result, there would need to be evidence that patients who took more ranitidine somehow had more liver-cancer risk factors than patients who took some

(but less) ranitidine.  There is no evidence of that, even though Defendants had every incentive to introduce it (through Dr. Witte, the deposition, or as an exhibit).  Bradford Hill warned against this gambit: "If we cannot detect [a confounder] or reasonably infer a specific one, then in such circumstances I think we are reasonably entitled to reject the vague contention of the armchair critic—'you can't prove it, there may be such a feature.'"  Bradford Hill at 296.

Third, Defendants argue that Dr. McTiernan's treatment of the dose response analysis in Wang is somehow inconsistent with her analysis of the purported "dose response" in Adami.  Br. at 10.  But the Adami method was "not a real dose response."  Br. at 10 (quoting McTiernan Dep. Tr. at 78).  Dr. McTiernan is correct on that point.  The Wang study's dose-response analysis compared actual doses of ranitidine to one another—90-180 daily doses, 181-270 daily doses, and so on.  *See* Wang at 9 Table 3.  Their study looked at *actual* dispensed milligrams of ranitidine. The Adami authors did not compare actual doses of ranitidine but simply compared different numbers of prescriptions, with no information about how much ranitidine was in each prescription (ten 75 mg pills? One-hundred 300 mg pills?), whether prescriptions were filled, and whether the prescriptions were comparable (*i.e.*, were some 75 mg and others 300?  Were famotidine prescriptions filled more often?).  Dr. McTiernan is right: that is "not a real dose response."[11]

Fourth, Defendants repeat their shopworn argument that to survive *Daubert* on general causation, an expert must identify the theoretical, absolute, bare-minimum dose at which a substance can cause disease.  *See* Br. at 10 ("[Dr. McTiernan] cannot provide what DDD represents the minimum dose and duration of ranitidine use necessary to cause any of the five cancers.").  That is not even true, since the relevant literature demonstrates that realistic doses of ranitidine are sufficient to cause cancer.  For example, the Wang study shows that patients who took ranitidine for more than 360 daily doses (one year of daily use) experienced a 33% and 42% statistically significant increased risk of gastric and liver cancers respectively.  Wang at 9 Table 3.  Thus, the theoretical minimum dose—whatever it is precisely—must be less than 360 DDD, a dose taken by essentially every Plaintiff in this MDL.  Is the theoretical minimum 100 daily doses?  1 daily dose? Neither Wang nor any other study provides a clear answer.  Given the genotoxic nature of the

---

[11] Defendants' quotation about "prescriptions" in the "context of other studies" on page 10 is about Cardwell, which (unlike Adami) had dosage information.  *See* McTiernan Tr. at 81:2-11. Defense counsel claimed, "they didn't tell you the dose," *id.* but actually "quantity" or "dose was missing [in] less than .1% of prescriptions." Cardwell at 2—Cardwell *had* dose for 99.9% of patients.

NDMA molecule, a much lower dose could theoretically increase the risk of cancer, as Defendants themselves acknowledged before this litigation began. *See, e.g.*, Finken Decl. Ex. 60 (GSK Hazard Assessment Report, GSKZAN0003419540), at 541; *id.* at 545; D.E. 5841 at 5-7, 10 & n.57. But there is simply no reason an expert needs to answer this (likely unanswerable) question, since thousands of Plaintiffs easily exceed any plausible minimum. The Wang study shows a statistically significant increased risk after one year of taking ranitidine for liver and gastric cancer; the Cardwell study showed a statistically significant increased risk at three years for bladder cancer (versus non-users and using an active comparator), and various papers on NDMA confirm these amounts for those cancers and demonstrate a dose of ranitidine that can cause cancer for esophageal and pancreatic cancer.[12]

Defendants have often stated, but never defended, their argument that *Daubert* somehow requires this kind of how-low-can-you-go minimum dose analysis "in the Eleventh Circuit for sure, and certainly in pharmaceutical MDLs." Oct. 7 Tr. at 266:22-23. There is no case saying this, and several saying the opposite. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432-33 (7th Cir. 2013); *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1113 (N.D. Cal. 2018). Defendants failed to identify any legal authority for their argument—in their opening and reply briefs, at argument, or now. The closest they came was saying, at *closing argument*, that dose mattered in *McClain*, and the Lipitor and Celebrex MDLs. Oct. 7 Tr. at 266:22-23. *McClain* directly supports Plaintiffs by putting dose in the specific causation bucket. It deems the issue of exposure "to a sufficient amount … to elicit the health effect" to be "focuse[d] on the issue of individual causation," and *then* faults the expert for offering "no opinion about the dose of Metabolife that caused" plaintiffs' injuries, and instead "only sa[ying] that any amount of Metabolife is too much." *McClain*, 401 F.3d at 1242-43.[13] Defendants never briefed the Lipitor and Celebrex MDL dose rulings, for good reason: neither supports Defendants' radical position.[14]

---

[12] *E.g.*, D.E. 5841 at 43-56 (citing sources); D.E. 5915 at 12-22 (same); Def. Ex. 58 (Keszei, 2013); Def. Ex. 64 (Loh 2011); Def. Ex. 54 (Hidajat, 2019).

[13] To the extent Defendants argue that the dose-response analysis in *McClain* requires showing minimum dose, that is not true—but if it were that would make it one sub-part of dose-response, and Eleventh Circuit case law makes clear that other primary methodologies can show causation.

[14] *See In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166 (N.D. Cal. 2007); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 916 (D.S.C. 2016). In both cases, the court allowed claims based on

### D.    Dr. McTiernan Appropriately Analyzed *All* Active-Comparator Studies.

Finally, Defendants describe a hodge-podge of purported inconsistencies in her opinions. They start with the false attack that Dr. McTiernan discounts active comparators principally because H2RAs and PPIs cause cancer. *See* D.E. 5915 at 65-69 (refuting this). They argue that Wang shows famotidine and PPIs have "***decreased*** risk," and those "inexorable facts mean that comparing ranitidine to the active comparators" produces "biased (falsely higher) risk estimates." Br. at 11. What a striking reversal this is. How often have Defendants—and their experts— insisted that active comparator analyses are *always* superior? Yet now, they claim that the "inexorable facts" are that active comparator studies are "biased." Unlike Defendants, Dr. McTiernan has been fully consistent: "there are advantages of properly performed active comparator studies … [t]he issue … is the way the specific studies discussed in my report were designed and conducted." McTiernan Rebuttal Rep. at 8. Dr. McTiernan opined that active comparator *and* non-user analyses are better than just active comparator or just non-user: "An example is the Cardwell et al study, which was not solely conducted as an active comparator study (that is, comparisons to non-users was presented)." *Id.*[15]

---

consuming high milligram pills (80 mg of Lipitor, 400 mg of Celebrex), but not claims based on lower milligram pills. Epidemiological studies for Lipitor and Celebrex reported risks for the different milligram amounts separately. In fact, both sides agreed the milligram level in the pills was crucial: "plaintiffs' experts agree that the available evidence at 200 mg/d is inadequate to prove causation." *Celebrex*, 524 F. Supp. 2d at 1175. The different doses were, in effect, different products. The analogy here would be allowing claims for anyone who took 300 mg ranitidine pills, but not 75 mg (no matter how long). Even Defendants have not argued for that, and unlike the Lipitor and Celebrex studies, no ranitidine study has reported risk levels for 300 mg, 150 mg, or 75 mg separately—studies like Cardwell and Wang that collected dosage converted it to a cumulative DDD, and other studies did not distinguish among them at all. So, Defendants cannot ask this Court to apply the dose holdings from *Lipitor* or *Celebrex*. Instead, they apparently demand not "dose" in milligrams, but *cumulative* dose. Requiring *that* would be unprecedented. Plaintiffs who took 80 mg of Lipitor surmounted general causation *with no showing* of cumulative dose. *Lipitor*, 174 F. Supp. 3d at 936. Pfizer sought a ruling "that Celebrex is capable of causing heart attacks or strokes **only** after 33 months of continuous use." *Celebrex*, 524 F. Supp. 2d at 1183 (emphasis added). Judge Breyer denied the motion, *id.*, deciding cumulative dose questions at specific causation. *Celebrex*, *Lipitor*, and *RoundUp* each treated cumulative dose similarly.

[15] *E.g.*, McTiernan Rep. at 126 (for Adami, active comparator "could theoretically reduce indication bias," but absence of "incidence in the entire cohort limits the information available"); *id.* at 133 (Yoon, active comparator could "remove[] the potential confounding effect of medical indication," but by omitting non-users "the full picture of cancer risk was obscured"); *id.* at 145 (by having *both* active comparator analyses and a non-user analysis, Cardwell is "substantially more informative than the studies that compared ranitidine only to" active comparators).

Defendants accuse Dr. McTiernan of inconsistency in pondering whether the Adami study caught metastasized liver cancers because the number was high for a "Western European country," while she made no similar observation for Wang, but Taiwan has no simple geographical comparator like "Western Europe" that she could be familiar with to perceive the number as higher than expected.  McTiernan Tr. at 115:16-21.  Defendants say Dr. McTiernan noted, based on ICD codes, that Wang had only invasive bladder cancer and say she should have said the same about Kantor, but the Kantor study nowhere says it excluded *in situ* bladder cancer.  And in any event, this makes no difference at all: if a study includes only certain subtypes of cancer (be it Wang, Kantor or any other), that will bias the study toward the null, *i.e.*, lead to false *negatives*.

### III.    Dr. Moorman's Methodology Is Consistent and Reliable.

#### A.    Dr. Moorman's Association and Weight Opinions Are Reliable.

Defendants' arguments on association and weight rely on misdirection.  They pretend that the Wang study weakens her opinions via the pants-on-fire misrepresentation that "Wang 2022 only found an association for liver cancer," Br. at 13, despite all five cancers showing a positive association compared to non-users *or* famotidine, three of the five cancers showing a statistically significant association, and two of the cancers showing a clear dose response; *see supra* at 4-9.  Defendants' arguments on weight are insubstantial, since they depend on truncating her methodology.  *See* D.E. 5915 at 35 (summarizing the criteria she employed, with citations).  Dr. Moorman's summary of the strengths and limitations is clearly the same analysis she used in her principal report, addressing the design, Moorman Supp. Rep. at 3 ("cohort study"), size, *id.* at 1-2 ("55,110 ranitidine users and 55,110 nonusers" from a "database with virtually complete coverage of the Taiwanese population"[16]), exposure assessment, *id.* ("database … that had information on all medical services, procedures, and prescriptions" and "dose and duration was available"), follow-up, *id.* (10-18 year "follow-up period was longer than most of the other studies," but "given that the latency period for the development of cancer can be decades" longer would have been better), misclassification, *id.* at 2, dose-response *id.* at 3 ("more detailed than … other ranitidine and cancer studies"), and so forth.

Defendants' OTC misclassification point is worth lingering on, because, though it is a

---

[16] Contrary to Defendants' argument, Dr. Moorman did not need to say the magic words "sample size," Br. at 13, in her report to properly weigh this factor.  If it were needed, she said the study had a "good sample size overall" in her deposition.  Moorman Tr. at 575:13-16.

limitation Dr. Moorman notes, it does not help Defendants here: "If there was similar use of non-prescription ranitidine in the groups being compared, the misclassification would be considered non-differential and lead to an underestimate of the relative risk," Moorman Supp. Rep. at 5, *i.e.*, they would make the study susceptible to false *negative* results.  *See* Reference Manual at 589 (explaining that nondifferential misclassification biases toward the null).

> **B.**   **Dr. Moorman Properly Addresses Confounding.**

Defendants' say that Dr. Moorman contradicted the Wang authors who "make no causality claims related to" gastric, pancreatic, and esophageal cancers, but there is no disagreement.  Br. at 14.  The Wang authors perform no causation analysis for ranitidine and cancer—they did not examine the Bradford Hill factors, for example, nor did they review all the scientific literature. Rather, they were conducting one study.  That Dr. Moorman integrated their study results into her causation opinion, while they came to no causal conclusion, is not surprising or suspect.  *See* Reference Manual at 553 ("Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings *fit with other scientific knowledge*.") (emphasis added).

If Defendants meant to say Wang found no *association*, that is just not true.  The authors did not limit their comments to liver cancer when they wrote that "the clear data" in Wang "strongly support the pathogenic role of NDMA" and that "ranitidine use is associated with a higher likelihood of cancer development in ranitidine users compared to the control groups of non-ranitidine users who were treated with PPIs or famotidine."  Wang at 12.  They added that the study "showed increased odds of developing liver, lung, pancreatic, and gastric cancers. The Kaplan–Meier analysis of our 18-year dataset confirmed these findings."  *Id.* And they stated that the incidence rate for four cancers exceeded the background rate in the population. Wang at 12 ("[a]nother comparative approach in our study revealed the association of ranitidine usage with four individual cancers with a high incidence rate (per 1000 person-years), including liver, lung, gastric, and pancreatic cancers, compared with the general population.").

Defendants claim that the "Wang authors did not reach conclusions" about cancer "because they recognized the … inability to control for significant confounders."  Br. at 14.  This appears to be an attempted séance with the Wang authors rather than an argument, since it is evidence free: the Wang study says no such thing.  Faced with the (real) results of the non-user comparison in Wang, showing elevated risks for *all five* of the designated cancers, Defendants are making the

(hypothetical) suggestion that perhaps users of ranitidine smoked more than non-users, thereby leading to increased cancer rates across the board.  If that were true, however, the rates of lung cancer should have spiked, as lung cancer is the most closely associated with smoking.  This did not happen—the lung cancer rates were *lower* than the rates for pancreatic, gastric, esophageal, and liver cancer.[17] And if confounding explained the raised risks, there should be a difference between the active comparator results and the non-user results (since these are two separate populations, with non-correlated confounders), but there is not.[18] The dose-response analysis also refutes confounding— could it really be true that people who take ranitidine for a year smoke *twice as much* as people who take ranitidine for 6 months?  Besides that, Wang used far more controls than other studies, including "smoking-related conditions" which provided a "way of trying to balance these factors between the exposed and unexposed groups."  Moorman Tr. at 535:3-25.

**C.    Dr. Moorman's Approach to Active Comparators Is a Model of Consistency.**

Plaintiffs already deconstructed Defendants' argument that Dr. Moorman gave low weight to their preferred studies *because* she distrusts active comparator studies—that has never been true. *E.g.*, D.E. 5915 at 65-66; Moorman Rep. at 25-30; Moorman Rebuttal Rep. at 4-5.  Instead, Dr. Moorman points to *other* "limitations" having *nothing to do* with the active comparator design "including inadequate follow-up periods and likely misclassification [make] it [] difficult, perhaps even impossible to make a [causation] determination …from use of ranitidine in ***these studies***." Moorman Rep. at 31.    Undeterred, Defendants misleadingly edit what Dr. Moorman said. Defendants use brackets to change the word "these"—*i.e.*, the particular studies with design flaws—to "[active comparator] studies." Br. at 17 (alteration in Defendants' Br.).  This brazen deep-fake does not demonstrate that Dr. Moorman has ever stated that she mistrusts active-comparator studies categorically.  In any event, Dr. Moorman specifically praised studies like Cardwell's with *both* a non-user and an active comparator analysis.  Moorman Rep. at 63.  Here, Wang has both, an undeniable strength.  As for the argument that Wang compared any-famotidine with specific doses of ranitidine, this nitpick has no stakes at all.  The supposed fear for confounding would be that longer-term famotidine users are sicker, but this apparently was not true, since the famotidine arm of the study had *less* cancer than non-users, which vitiates any concern.  Wang at 10-11.

---

[17] Notably, this comparison is unavailable for most studies, which did not measure lung cancer.
[18] This comparison too is unavailable for studies with only active comparators.

### D.     Dr. Moorman's Bradford Hill Analysis Is Reliable.

Despite this Court's admonition, *see* D.E. 6083, Defendants' association arguments from their opening motion "reappear." Br. at 18 (repeating arguments that purportedly "weaker" associations require additional statistical analyses). But they fare no better than before. *See* D.E. 5915 at 62-74, 86-93 (refuting these arguments). No meta-analysis is necessary or even possible with the disparate data from studies with different designs. Moorman Tr. at 154:22-155:10. And no case has required an expert to calculate a numerical relative risk for each cancer from the totality of the evidence. Such a calculation would represent false precision. Defendants essentially concede that Wang provides *more* data points supporting causation than existed before. Br. at 19. They simply believe there are not enough. But when one considers the totality of the evidence— including ranitidine, dietary, and occupational studies, animal studies, and so forth—the consistency is unmistakable. Defendants so-called "dose-response" arguments are another rehash of the "confounders" argument, and provide no explanation for what confounder could cause *ranitidine* users to get more cancer compared to famotidine, PPIs, non-users, and *users of less ranitidine*. Epidemiologists are entitled to rely on study results without paralyzing doubt about the hypothetical possibility of a confounding factor. *See* Bradford Hill at 296 (inviting epidemiologists to "reject" this kind of hypothesizing as "the vague contention of the armchair critic").

Defendants rehash of the "weak associations" point, Br. at 15, is no stronger now, and ignores the fact that, given the limitations in the studies, the true risks experienced by Plaintiffs in this MDL are *higher* than any reported in these studies, including Wang. No study evaluates cancer risk for 10 years of use (which most Plaintiffs exceed). Studies of short exposure will understate the strength of an association, as the graphs demonstrate using the DDD levels Wang calculated. As Dr. Moorman testified, "If NDMA is causing …these types of cancers, one would expect that with longer duration of exposure, we would expect to see higher relative risk." Moorman Tr., at 658:10-20; 697:14-25; 698:1-4, 9-12. As Dr. Salmon explained:

> cancer incidence as a result of exposure to a carcinogen is a function of the lifetime cumulative dose. So …the larger the dose and the longer that it's continued for, the larger the impact of that exposure is going to be. So if you have a study where exposure is short and the level of exposure is low, that's evidently going to show a lower effect, in other words, a smaller hazard ratio, than a situation where you have longer exposure and higher dose.

Salmon Dep. Tr., at 191:7-22. As Dr. Moorman testified, "if you see increased risk even at lower

levels of exposure, that is …a very important signal.  Conversely, if you're not seeing any increased risk, and you only have very short-term exposure, that is not so much evidence of no effect, but it's just—you don't have sufficient evidence to make a conclusion….With virtually any exposure…if there is an association, you're more likely to detect it with higher exposure." Moorman Dep. Tr. at 697:14-698:12.

IV.    **Dr. Salmon's Methodology Properly Found Causation.**

Defendants' arguments against Dr. Salmon bottom out on the same points they made against others, and raise no arguments specific to the Wang study.

*Statistical Significance*: They argue that an expert, to be reliable *must* ignore all results that are not statistically significant, but all authorities require the opposite—not ignoring results *merely* because they are not statistically significant.  As a leading textbook explains, "The conclusion that 'there is no effect' as a conclusion drawn solely from a P-value above 0.05 is never justified." *Modern Epidemiology* at 23; *see also Manual for Complex Litigation* at 487 n.1621 ("data … even though lacking statistical significance … should not be automatically discarded as legally insufficient").  More importantly, as the Supreme Court explains, "lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and" a disease.  *Matrixx Initiatives*, 563 U.S. at 40.  It makes no difference that Dr. Salmon "concedes the critical importance of statistical significance."  Br. at 20.  Everyone agrees statistical significance is informative.  But a non-statistically significant result can show a real, causal signal. Dr. Salmon looked at all the data and weighed it.  Salmon Tr. at 37:2-10.

Defendants are doubly wrong in accusing Dr. Salmon of disagreeing with the Wang study on whether gastric cancer demonstrated dose-response due to his supposed "loose approach to statistical significance."  Br. at 20.  Dr. Salmon concluded that a "statistically significant [dose-response] trend" exists for gastric cancer (with "some scatter").  Salmon Tr. at 47:16-48:25.[19]  The Wang study authors noted that there is "no continuous dose-response relationship."  Wang at 13. Any disagreement here has nothing to do with statistical significance.  Looking at the p-values for Liver Cancer, three values in the dose-response are not statistically significant and one (the over 360 DDD) is, while for Gastric Cancer, two out of four are statistically significant (the first and

---

[19] Defendants argue he "did not calculate any p-value," Br. at 22, but the "p-values reported in the Wang paper in Table 3 … are significant values," so all he needed to calculate was the "R-squared value instead," Salmon Tr. at 49:21-23, which Defendants have not suggested is unreliable.

last).  Wang at 9 Table 3.  Clearly, the Wang study authors thought one statistically significant point in the trend was fine, so two should be even better.  *See* Salmon Tr. at 49:4-9 (no need to calculate p-values because "the p-values reported … are significant values").  The only difference is that the Liver Cancer trend was *continuous*.  On that point, both Wang and Dr. Salmon are correct because (1) there is a trend, and (2) the trend is not continuous.  Dr. Salmon confirmed the trend by "calculating … the R squared value, which is the measure of linear correlation."  Salmon Tr. at 49:4-13.  Defendants have never suggested this method of calculating linear correlation is unreliable (and could not).  The Wang study never suggested the trend should be *disregarded* by scientists integrating this subanalysis with other information.  Eleventh Circuit law does not even require "precise numbers about a dose-response relationship," much less precise numbers that are statistically significant *and* continuous throughout the curve.  *McClain*, 401 F.3d at 1241 n.6.

*Confounders*: Defendants raise smoking and alcohol against Dr. Salmon, but he addresses this limitation robustly.  Principally, the matched control group mitigates the concern.  Salmon Supp. Rep. at 4.  Wang had far more controls than other studies (which was possible because they started with a vastly larger population, before constructing a matched cohort), including the Charlson comorbidity index and many comorbidities that are each correlated with smoking and drinking.  *See* Wang at 3; Salmon Supp. Rep. at 4; Salmon Tr. at 22:3-15 ("the matched control group and the exposed group were similar in terms of their smoking experience"), 153:23-154:22.  The similarity of the non-user and active comparator analyses shows the controls were effective.  If controls were ineffective, one would expect to see very high lung cancer rates (and bladder cancer, for that matter[20])—which one does not.

*Bradford Hill*: Defendants say Dr. Salmon "disagreed … with Wang" in finding an association between ranitidine and gastric cancer, but the gymnastics required to launch this attack are heroic.  Br. at 22.  Defendants must *disregard* the statistically significant use / non-use main analysis for gastric cancer (1.26) *and* the statistically significant 360+ DDD dose-response finding (1.33), *and* the barely not statistically significant active comparator finding (1.19, CI: .95-1.49).  Wang repeatedly stated that gastric cancer is associated with ranitidine.  Wang at 12 (study "showed increased odds of developing … gastric cancers. The Kaplan-Meier analysis of our 18-year dataset confirmed these findings"); *id.* ("Another comparative approach … revealed the

---

[20] That is why the Cardwell study is particularly informative on bladder cancer, because Cardwell *did have* smoking data that it used to *control for* any confounding due to smoking.  Cardwell at 3.

association of ranitidine usage with … gastric [cancer]" which remained "after excluding 'protopathic bias'"). No scientists—anywhere except Defendants' payroll—ignore *all* non-user findings, and *all* active comparator findings without statistical significance. Defendants also argue Dr. Salmon should have "use[d] active comparator data for his dose-response analysis," Br. at 22, but never engage with his explanation that dose-response always looks at use versus non-use (the Wang study, for example, did dose-response only that way). No *Daubert* case has ever suggested that dose-response *must be* based on active comparator studies to be reliable.

## V.      Dr. Michaels' Opinions Surmount *Daubert*.

Defendants' anemic attacks on Michaels do not move the needle. Bizarrely, they argue that 1.5 pages was somehow too long to analyze Wang, but this is not excessively long by any measure, and Dr. Michaels needed somewhat more space to set up the context as compared to an analysis in his initial report. There is nothing nefarious about "contrasting" with Wang, Br. at 23, three studies that "Wang specifically mentioned," Michaels Tr. at 21:16-23; especially since the contrast was only "one page." Br. at 23.[21] Defendants' other attacks go to weight. Dr. Michaels did not have to prove his "awareness" of "statistical tools" to Defendants during his deposition. His knowledge and experience easily surmount the minimal qualifications to be an expert. Similarly, Defendants cannot conjure a *Daubert* issue by claiming he "cannot explain why he believes the Wang study 'provides additional support.'" Br. at 24. He *did* explain it, and the reasons are obvious. *See* Michaels Tr. at 42-44. That Dr. Michaels could not think up another ranitidine study that "exclude[d] short-term users," Br. at 24, does not suggest unreliability, especially since he found this a study strength in light of other studies' having "a predominance of subjects or patients that had a very limited exposure to ranitidine." Michaels Tr. at 26:7-15.

The next attacks are bizarre. It is true—and uncontroversial—to say that not "all active comparator studies compare 'apples to apples,'" and some are "'not going to be as useful.'" Br. at 24. Separately, it is true that there was not much confounding in the Wang study for the active-comparator analysis to reduce, since, as Dr. Michaels explained, "based on the graphs … [of] the famotidine group versus the nonuse group versus the ranitidine group" there was basically no difference, since there was little-to-no confounding to begin with. Michaels Tr. at 35:2-36:9. On

---

[21] Defendants again attack Dr. Michaels' thoroughness, but "[t]here is not, however, any requirement that an expert review every single study in the relevant body of literature." *In re Johnson & Johnson Talcum Powder Prods. Litig.*, 509 F. Supp. 3d 116, 194 (D.N.J. 2020).

confounding, Defendants mostly try to portray Dr. Michaels as clueless, but the transcript belies their nitpicking criticisms. *See id.* at 67:8-68:22. Dr. Michaels explained that the controls—many of which no other study had—indirectly controlled for smoking and alcohol. *Id.*

## VI.   Dr. Le's Opinions Are Admissible.

Defendants' principal argument against Le—as with others—is that her testimony is unreliable unless she exclusively considers active comparator studies. Accepting this argument would violate the core *Daubert* principle that "a district court may not 'evaluate the credibility of opposing experts' or 'the persuasiveness of competing scientific studies.'" *In re Abilify*, 299 F. Supp. 3d at 1372 (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). Clearly, "Rule 702 d[oes] not require, or even permit, the district court to choose between those two studies at the gatekeeping stage," *Schultz*, 721 F.3d at 432-33, but that is Defendants' entire argument. When she points out that she relied on *numerous* studies, they say the only "valid" ones are active comparator studies. When she then points to an active comparator study (Wang) that confirms her analysis, they then say that she has "form[ed] a conclusion from just one study." Br. at 25. Many other studies show an association even with active comparator analyses, but that is beside the point, which is that Dr. Le can consider more than *just* active comparator studies, and so has more than "just one study."

Unsurprisingly, when Dr. Le said, "ideally what you want is a group that has similar risks in terms of cancer," she did *not* say—or mean—that active comparators are ideal, but instead that *controls* are ideal (including propensity matching, as Wang does, and, if well-designed, an active comparator). Everyone agrees that cohorts with "similar risks in terms of cancer" are ideal, but only Defendants insist that H2RA active comparators perfectly produces that, and no other methods come close. As for including other H2 blockers "in the ranitidine group," Dr. Le was initially confused at her deposition, believing that the Wang study had a typographical error regarding whether there were some famotidine users who also took ranitidine in the ranitidine cohort. This confusion is immaterial, since, as Dr. Le explained, if there were no typographical error, the result would simply be stronger by diluting any risk difference. Le Tr. at 71:15-74:8. *I.e.*, once again, it would bias the study toward the null, raising the risk of a false *negative* but not a false positive result.

## CONCLUSION

Defendants' *Daubert* motions should be denied.

Dated: November 18, 2022

Respectfully submitted,

/s/ Tracy A. Finken
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: /s/ Robert C. Gilbert
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

/s/ Michael L. McGlamry
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

/s/ Adam Pulaski
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert
