**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924
JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E.
REINHART

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**BRAND DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL BRIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................... 1

      I.       Plaintiffs' Familiar Attacks on Dr. Witte's Methodology Fail. ............................. 1

      II.     Plaintiffs' New Criticisms of Dr. Witte's Supplemental Report Also Fail............ 2

CONCLUSION ......................................................................................................................... 5

## INTRODUCTION

Plaintiffs did not depose Dr. Witte. Instead, they proffer five pages of argument contradicted by the plain language of Dr. Witte's report and the Wang paper itself. Plaintiffs praise the Wang study when they believe it suits them (liver cancer), and just as readily criticize it when it does not—for example, claiming the study's bladder cancer findings, which reveal no association with ranitidine use, were due to poor study design. This is an extension of the ad hoc, situational science that animates Plaintiffs' overarching approach to Wang, and it does nothing to undermine the reliability and consistency of Dr. Witte's opinions. Plaintiffs' motion should be denied.

**I.      Plaintiffs' Familiar Attacks on Dr. Witte's Methodology Fail.**

Plaintiffs begin by claiming that Dr. Witte failed to consider NDMA literature, long-term use, and study follow-up periods. This argument is nothing new, and it fails for the same reasons set forth in Defendants' earlier briefing.

*NDMA Literature.* Contrary to Plaintiffs' assertions, Dr. Witte did address NDMA literature in his initial report, and he explained why that body of evidence is not the most relevant for assessing whether ranitidine causes the cancers at issue in this MDL.[1] Dr. Witte's approach to the NDMA literature is consistent with the methodological approach adopted by the Wang authors (and by the scientific community in general), who acknowledge these data but do not rely on them to reach conclusions about causation. Wang specifically did not find that NDMA evidence is sufficient to support conclusions regarding a purported association between ranitidine and cancer.[2]

*Long-Term Use.* Plaintiffs contend that Dr. Witte did not account for the plaintiff population of "overwhelmingly long-term users."[3] Again, this argument is not new or accurate. Dr. Witte analyzed long-term use data both in his initial and supplemental reports.[4] With respect

---

[1] *See, e.g.*, Witte Rep. at 11, Finken Decl. Ex. 22 ("Extrapolating from NDMA studies requires speculation, whereas studying ranitidine reflects the effects, if any, of the actual question here – NDMA in ranitidine."). References to "Brown Decl." are to DE 5692, the "Brown Supp. Decl." are to DE 5961, and the "Brown 2nd Supp. Decl." are to DE [pending], all in support of Defendants' Daubert motions.

[2] *See, e.g.*, Wang 2022 at 2, Brown 2nd Supp. Decl. Ex. 143 ("Several studies previously examined the carcinogenic effects of NDMA on humans, although they were equivocal.").

[3] Plaintiffs' Supplemental Brief ISO Motion to Exclude Defendants' Putative Expert Opinions On General Causation Under Rule 702, DE [pending] ("Pls.' Supp. Br."), at 1.

[4] *See* Witte Rep. at 26 ("No consistent overall dose- and duration-response relationships or trends were detected across the studies, and the RRs generally shifted up and down with increasing drug levels."); Witte Supplemental Report, DE 6071 ("Witte Supp. Rep.") at 4, 8, 9, 10.

to the Wang study, Dr. Witte considered the dose-response results in Table 1, which expressly references the dose-response results Wang reports in its Table 3. Dr. Witte also described these results, noting that "[f]or gastric and liver cancer the highest HR [hazard ratio] was in the highest dose category."[5]

*Follow-Up Period.* Plaintiffs also assert, without citation, that Dr. Witte "opined that the Yoon study . . . ruled out an association for the Plaintiffs here (who were long-term users)."[6] It is unclear what relevance this has, as Dr. Witte made no such statement in his report. Moreover, this argument demonstrates that Plaintiffs still conflate duration of use with follow up, because Dr. Witte stated in his initial report that Yoon's "[l]imitations include a follow-up period of only 7 years[.]"[7]

## II.     Plaintiffs' New Criticisms of Dr. Witte's Supplemental Report Also Fail.

*Dr. Witte's Assessment of Wang is Balanced.* Plaintiffs assert that Dr. Witte did not discuss the strengths of the Wang study – including Wang's population size, propensity score matching, use of defined daily doses (DDDs), and adjustment for confounding variables – but those are all aspects of the Wang study Dr. Witte reviewed in detail.[8] Plaintiffs also criticize Dr. Witte for not mentioning that the cancer outcomes in the Wang study were purportedly derived from cancer registries, but the study does not mention the use of a cancer registry anywhere in the methods section. Instead, Wang's methods description only discloses the use of a health care claims database and the use of ICD codes, both of which Dr. Witte *does* discuss.[9] Moreover, Plaintiffs' claim that the use of a cancer registry is a particular strength unique to the Wang study falls flat, as the Adami, Norgaard, Kantor, Tran, and Kumar studies also used cancer registries.[10]

Next, Plaintiffs' attorneys argue Dr. Witte failed to criticize Wang for using only one ICD-10 code to identify bladder cancers, in contrast to other active comparator studies, which used more.[11] This last-ditch attempt to try to explain the non-significant bladder cancer findings in the

---

[5] Witte Supp. Rep. at 4 (Table 1).

[6] Pls.' Supp. Br. at 1.

[7] Witte Rep. at 48 [App'x 1].

[8] *See* Witte Supp. Rep. at 6.

[9] *See generally* Witte Supp. Rep.; *see* Wang 2022 at 2-4. A separate Taiwan Cancer Registry is publicly available, but is not disclosed in the study's methods. *See* Taiwan Cancer Registry.

[10] *See* Adami (2021) at 2303, Brown Decl. Ex. 45; Norgaard (2022) at OF2, Ex. 68; Kantor (2021) at 1856, Ex. 57; Tran (2018) at 57, Ex. 76; Kumar (2022) at 2, Ex. 61.

[11] *See* Pls.' Supp. Br. at 3.

Wang study is factually incorrect. Wang used ICD-9 and ICD-10 codes, not a single ICD-10 code, to identify bladder cancer cases.[12] While Norgaard did use three additional ICD-10 codes (*i.e.*, D303, D090, and D095),[13] these codes identify non-malignant cancers,[14] whereas Wang only analyzed cases of malignant bladder cancer. Cardwell, contrary to Plaintiffs' assertion, did not use the ICD system to identify bladder cancers at all; indeed, "ICD" does not appear in the Cardwell paper a single time. Rather, in Cardwell, "[c]ases were identified based on a primary care record of a diagnosis of primary bladder cancer (read code B49)[.]"[15] The read code system is a UK National Health Service system and B49 corresponds to "malignant neoplasm of urinary bladder."[16] In sum, the Cardwell study analyzed only malignant bladder cancer cases, just like Wang did. Plaintiffs' efforts to manufacture an expert argument through briefing to explain away Wang's bladder cancer results are the very definition of situational science. *See In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 2015 WL 7776911, at *10 (E.D. Pa. Dec. 2, 2015) (expert's "selective emphasis on trends and general consistency only when such concepts support his opinion is one example of 'situational science' which renders his opinions unreliable").

***Dr. Witte's Criticism of the Wang Study's 'Active Comparator' Arm is Reliable.*** As Dr. Witte explains in his supplemental report, the Wang active comparator analysis is not a true active comparator design because it compared higher dose users of ranitidine to any dose users of famotidine; and because, as a result of the unusual study design, apparently every ranitidine user also used famotidine.[17] Rather than meeting this criticism head-on, Plaintiffs assert that neither of these design flaws "makes any relevant difference" because "nobody believes" that short term (<90 DDD) use of ranitidine causes cancer.[18] On that much, the parties agree. But that does not change the importance of using *comparable* doses in conducting an active comparison. Wang's comparison of high-dose ranitidine use to any dose of famotidine use undermines the fundamental tenet of active comparator studies: the comparison of populations with similar baseline risk. As Dr. Witte explained, certain cancer symptoms and risk factors (including alcohol use and smoking)

---

[12] *See* Wang 2022 at 3 (reporting use of codes 188 and C67 to identify bladder cancer cases).
[13] *See* Norgaard (2022) at Supplemental Table S1, Brown Decl. Ex. 68.
[14] *See* National Cancer Institute, SEER Training Modules, Differences Between ICD-O & ICD-10 (Figure 4), available at https://training.seer.cancer.gov/coding/differences/.
[15] Cardwell (2021) at 2, Brown Decl. Ex. 48.
[16] *See* Guide-to-coding-and-safety-netting-in-cancer-by-Dr-A-Bhuiya_V5-Feb-17.pdf.
[17] *See* Witte Supp. Rep. at 1-2.
[18] Pls.' Supp. Br. at 3.

are associated with higher H2RA use, so comparing higher dose users of ranitidine to lower dose users of famotidine may result in a ranitidine user population with higher baseline risk, making results susceptible to bias.[19] Plaintiffs make no attempt to address this fundamental critique.

Plaintiffs also argue that Dr. Witte's critique of Wang's active comparator design is "inconsisten[t]" because other studies – namely Adami and Iwagami – also "compare ranitidine and famotidine use to famotidine use."[20] This is incorrect. The Wang study design, used by no other ranitidine study authors, apparently guaranteed that every ranitidine user was also a famotidine user in the treatment arm. Plaintiffs' expert Dr. Le testified that this "does not make sense"[21] and "would defeat the purpose of [] trying to find out if there is a risk with ranitidine."[22]

Although Plaintiffs' tried during Dr. Le's deposition to suggest that Wang couldn't possibly have been designed this way,[23] they now seem to accept it was. And they pivot instead to argue that the design is no worse than other ranitidine epidemiological studies. That, too, is incorrect. Adami and Iwagami acknowledge some amount of crossover, but those investigators performed sensitivity analyses specifically to demonstrate quantitatively that such crossover did not alter their findings.[24] That is a very different from Wang's approach, which was designed to introduce famotidine users into the ranitidine cohort, without any quantification of (or even comment about) its effect on the study's results. As Dr. Le said, that "defeat[s] the purpose" of the study. Again, Plaintiffs elevate nonstandard design and critique generally accepted methodology.

***Dr. Witte's Criticisms of the Wang Study's Controls are Reliable.*** Dr. Witte also identified several key limitations of the Wang study's controls for bias and confounding, including lack of controls for smoking and liver disease and failure to institute a lag time to address reverse causation. These flaws create a potential for bias and confounding that is magnified by Wang's study design defects.

Plaintiffs argue that Wang properly controlled for reverse causation by instituting a "washout period," but Plaintiffs miss the mark once again. Wang's washout period excluded users who had taken ranitidine in the year prior to the start of follow-up (i.e., a "new user" design"). But

---

[19] *See* Witte Supp. Rep. at 2-4.
[20] Pls.' Supp. Br. at 4.
[21] Le Supp. Tr. at 135:23-136:2, Brown 2nd Supp. Decl. Ex. 137.
[22] *Id.* at 113:15-17.
[23] *See, e.g., id.* at 107:15-114:3.
[24] Adami (2021) at 2303; Iwagami (2021) at 363, Brown Decl. Ex. 55.

as Dr. Witte explained, washout periods do not effectively control for reverse causation because underlying cancer symptoms are often not present at the start of follow up. Lag times – *i.e.*, removing ranitidine exposure for a period *prior to cancer diagnosis* – more robustly address reverse causation. Unlike several other active comparator ranitidine studies,[25] Wang did not use lag times to address reverse causality. Plaintiffs do not dispute this fact.

Instead, to counter Wang's failure to use lag times, Plaintiffs claim that the Kaplan-Meier curves in the Wang study demonstrate that reverse causation is not an issue. First and foremost, these curves plot cumulative cancer incidence, *not* risk estimates with confidence intervals. As such, they are of limited, if any, relevance to the causation question before the Court.

Moreover, as Dr. Witte explained, Wang's Kaplan-Meier curves rely on the same primary analyses and are subject to the same bias and confounding limitations discussed above. The curves Plaintiffs reference only plot non-user comparison data – resulting in bias which can be amplified with higher doses.[26] As just one example, in Figure 4 of Wang 2022, the fact that cumulative incidence of liver cancer increases with higher doses of ranitidine may indicate that those who smoke for longer periods also use ranitidine for longer periods to treat reflux associated with smoking; therefore, the increased cumulative incidence may reflect confounding introduced from a smoking-related, rather than ranitidine-related, dose-response association with liver cancer.

Lastly, in response to Dr. Witte's observation that the Wang study fails to control for pre-existing liver disease, Plaintiffs assert that the Charlson Comorbidity Index ("CCI") serves as a control for liver disease.[27] There are at least two problems with this argument. First, the Wang study does not disclose what inputs were used in its CCI calculation; thus, it is impossible to know whether liver disease was included in the calculation. Moreover, even if it did include liver data inputs, this would not explain Wang's failure to utilize separate comorbidity controls for liver disease, particularly given that Wang *did* include additional comorbidity controls for other inputs traditionally included in a CCI calculation, such as diabetes mellitus and chronic kidney disease.[28]

**CONCLUSION**

For the reasons set forth above and Defendants' earlier briefs, Plaintiffs' motion to exclude Dr. Witte's general causation opinions should be denied.

---

[25] *See* Witte Supp. Rep. at 3 (citing Adami, Cardwell, Iwagami, and Kim Y).
[26] *See* Pls.' Supp. Br. at 5; Witte Supp. Rep. at 3.
[27] *See* Pls.' Supp. Br. at 5.
[28] *See* Wang 2022 at 3.

5

Dated: November 18, 2022

**Lead Counsel:**

Respectfully submitted,

/s/ Mark Cheffo

Mark S. Cheffo
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

*Counsel for Defendant GlaxoSmithKline LLC*

/s/ Andrew T. Bayman

Andrew T. Bayman
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com

*Counsel for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

/s/ Anand Agneshwar

Anand Agneshwar
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Counsel for Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Counsel for Defendant Pfizer Inc.*

7

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was previously served on the Court and the co-leads by email on November 18, 2022 as a result of an outage that prevented filing and service using the Court's CM/ECF system. Now that service has been restored, I hereby certify that a copy of the foregoing was filed on November 18, 2022, using the Court's CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Joanne M. O'Connor*
Joanne M. O'Connor
JONES FOSTER, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
Tel: (561) 659-3000
Fax: (561) 650-5300
JOConnor@jonesfoster.com