**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                    MDL NO. 2924
PRODUCTS LIABILITY                                            20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**ORDER GRANTING IN PART AND DENYING IN PART**
**THE CLAIMANTS' MOTION FOR CLARIFICATION OF PRETRIAL ORDER 15**[1]

In November of 1891, Ms. Louisa Carlill observed an advertisement in a local paper, the

*Pall Mall Gazette*. *Carlill v. Carbolic Smoke Ball Co.*, (1983) 1. Q.B. 256 (Court of Appeal).  The

advertisement was for a "carbolic smoke ball" which, when squeezed, could release inhalable

vapors that, at least according to the advertisement, would prevent the common cold. *Id.*[2]



---

[1] Although the Motion is styled as "Plaintiffs' Expedited Motion Objecting to Paragraph 7 of PTO 79 and to Clarify PTO 15 and the Definition of 'Tolling,'" the Motion is actually brought on behalf of Claimants.  The Court previously denied treating the motion on an expedited basis at docket entry 5952 and advised the Claimants of its tentative ruling that the definition of tolling that the Defendants and the Plaintiffs agreed to applies to the Claimants' claims.

[2] The carbolic smoke ball advertisement is viewable at https://en.wikipedia.org/carlill_v_carbolic_smoke_ball_co. The Court's reference to the carbolic smoke ball case is for illustrative purposes only.

The manufacturer's guarantee of cold prevention was backed by a promise of compensation; if anyone contracted a cold after using a smoke ball, the manufacturer promised a payment of one hundred pounds. *Id.* Enticed, Ms. Carlill purchased a smoke ball and used it as directed. *Id.* After she contracted a cold, Ms. Carlill demanded that she be paid the promised one hundred pounds. *Id.* The manufacturer refused, stating that it did not know for certain that Ms. Carlill had used the product as directed. *Id.* Ms. Carlill filed suit.

At trial, the manufacturer raised several defenses, including that the advertisement was "mere puff" and that there was no enforceable contract. *Id.* The appellate court found that there was an enforceable contract; the court found that the manufacturer had communicated an offer to Ms. Carlill via the *Gazette* and that Ms. Carlill had accepted that offer through her purchase of the smoke ball. *Id.*

In this multidistrict litigation ("MDL"), the Defendants, like the Carbolic Smoke Ball Company, communicated an offer to persons with a potential claim against them, potential Claimants.[3] Like Ms. Carlill, many Claimants accepted that offer. Also like the carbolic smoke ball case, the Claimants now contest the terms of their agreement. But the analogy ends with how the Claimants seek to resolve their contract dispute. In lieu of suing the Defendants and litigating a breach of contract claim, as Ms. Carlill did, the Claimants ask this Court to define the particulars of their agreement through a "Motion for Clarification." This would be as if Ms. Carlill asked the *Gazette* newspaper to "clarify" her agreement with the Carbolic Smoke Ball Company.

For the reasons set forth in this Order, a motion for clarification is not the appropriate avenue for a breach of contract dispute to be adjudicated. The appropriate avenue is through a

---

[3] "Defendants agree . . . that PTO 15 memorialized a contract that was voluntarily entered and agreed [sic] by Lead Counsel for the respective parties." DE 5880 at 8.

complaint, motion practice, evidence, and potentially, a trial.  Even so, the Claimants' Motion for Clarification, which the Court will describe in detail below, does touch upon areas that the Court may clarify, such as the Court's intent in managing this MDL.  Because some of the Claimants' requests for clarification are granted and some of the requests are denied, the Court organizes this Order as follows.

First, the Court sets forth the factual and procedural background giving rise to the Motion for Clarification.  Second, the Court addresses a request for clarification that is denied: the Claimants' request for the Court to independently define certain contract terms.  Third, the Court addresses a request for clarification that is granted: the Court explains its intent in memorializing the Defendants' offer in a pretrial order and explains its case management decisions.  Fourth, the Court addresses an argument in the Defendants' Response: that the parties[4] resolved the definition of a contract term in a prior agreement.  Fifth and finally, the Court addresses how any Claimant may seek relief from the Court, should the Claimant believe that he or she has been prejudiced as a result of the Court's management of the MDL.

## 1.  Factual and Procedural Background

Quickly after the inception of this MDL, the Court appointed leadership. Pretrial Orders 2, 4, 10.  Among other things, the Court directed leadership to "formulate an initial census process to assist in overall effective case management and the orderly and efficient progression of this proceeding." Pretrial Order 15.  The result of the Court's directive, the parties' conferral, the input of a special master, and extensive negotiations was "the Registry." *Id.*

The Registry is a database administered by a private litigation services company. *Id.* at 3-

---

[4] The Court uses the term "parties" in this Order to refer to the Plaintiffs and the Defendants, collectively; the Court does not use the term to refer to the Claimants.

4.  A Claimant, meaning anyone with a potential claim against the Defendants, may record his or her claim in the Registry. *Id.*  Also, filed Plaintiffs in this MDL all recorded their claims in the Registry.  Together, the Claimants and the Plaintiffs registered approximately 150,000 claims during the pendency of this MDL.  The Registry's data  assists the Court with its administration of this MDL.  For example, upon recording a claim in the Registry, a Claimant or Plaintiff must include certain information such as when he or she used a Defendant's product and what sort of cancer developed. *Id.* at Ex. A.  Therefore, together with other recorded information, the Registry is a useful starting point for the careful selection of bellwether trials because the data in the Registry facilitates the selection of a representative cross-section of claims.  Accordingly, this Court utilized the Registry to choose cases for preliminary bellwether discovery in November of 2021. Pretrial Order 69.

In addition to providing benefits to the Court in its administration of the MDL, the Registry confers benefits on the Defendants and the Claimants.  As for the Defendants, any Claimant's claim recorded in the Registry was a claim that was not filed in court.  The Registry therefore resulted in fewer cases for the Defendants to defend.  With fewer cases to defend, the Defendants were better able to focus on their defense of this MDL.  As for the Claimants, they too received benefits, including that any claim recorded in the Registry was, for statute of limitation purposes, tolled.[5]  Importantly, the source of this tolling was the Defendants themselves.  The Defendants agreed and consented to the tolling of claims recorded in the Registry. Pretrial Order 15 at 11.  The core issue in this Motion for Clarification is the tolling, and the Court now briefly summarizes the

---

[5] Other benefits included that the Claimants were entitled to cost sharing when seeking medical records and other documentation. Pretrial Order 15 at 13.  The Registry also served the goals of MDLs, generally: consolidation, coordination, and conservation of judicial resources.

history of tolling disputes in this MDL.

<u>The Registry's Tolling Provision and the Parties' Differing Definitions of Tolling</u>

The Registry's tolling provision, memorialized in Pretrial Order 15, reads as follows:

> Participation in the Registry will toll the applicable statute of limitations as of the date of the uploading of the CPF; however, such tolling will expire ninety (90) days after the date that the Claimant exits the Registry or ninety (90) days after the date that the Registry expires, as set forth below, whichever comes first.

*Id.* at 11. For approximately sixteen months after Pretrial Order 15 was entered, the Court was unaware of any dispute between the parties on the meaning of this tolling provision. However, in the summer of 2021, the parties informed the Court of a dispute. For the Defendants' part, the Defendants argued that the tolling provision meant that, if a claim surpassed its statute of limitations period while it was recorded in the Registry, the claim could nonetheless be filed in court, provided that the claim was filed within ninety days of the date the claim left the Registry. For the Plaintiffs' part, the Plaintiffs argued that, once a claim was recorded in the Registry, the statute of limitations clock "stopped" and would only restart ninety days after the claim left the Registry.

To illustrate these two competing definitions, suppose a claim was recorded in the Registry on day 1, the claim's statute of limitations expired on day 50, and the claim left the Registry on day 100. Under the Defendants' definition, such a claim would have to be filed in court within 90 days of exiting the Registry because, while the claim was recorded in the Registry, its statute of limitations expired. Under the Plaintiffs' definition, however, the claim would have to be filed in court within 140 days of exiting the Registry because 50 days of time remained to the claim when it was recorded, and the limitations clock would not begin to run until 90 days after the claim left the Registry. The Plaintiffs' definition therefore results in a much greater amount of time to file a

claim, provided the claim was recorded early in its statutory lifecycle.  For context, here, many Claimants recorded their claims in the Registry early in the claims' statutory lifecycles.  Thus, if the Plaintiffs' definition was applicable, many Claimants could still have several years to file their claims upon exiting the Registry, a far cry from ninety days.

Despite these competing definitions, the parties never moved for any relief on the issue. The parties never moved for relief because the parties reached an agreement.  The Plaintiffs acceded to the Defendants' definition of tolling. DE 5881 at 9.  For almost an entire year, the Court believed that the issue was resolved per their agreement.

In the spring of 2022, the parties again brought the definition of tolling to the Court's attention.  At that time, the parties informed the Court that they were concerned that *pro se* litigants would not understand how the tolling provision should be applied to their claims.  Because of that concern, the parties requested that the Court insert their agreed-upon definition of tolling in Pretrial Order 79, a forthcoming pretrial order.  Pretrial Order 79 concerned the finalization of certain information in the Registry, but, at the parties' request, the Court inserted the following text:

> Tolling Calculation.  Pretrial Order # 74 recognized that there are an increasing number of *pro se* Registry Participants, who need to determine whether to remain in the Registry with its tolling or to opt-out and exit the Registry.  The Court therefore takes this opportunity to inform all Registry Participants that the Plaintiffs and the Brand Defendants have agreed how the tolling provision in Pretrial Order # 15 applies, as follows:   While a Registry Participant is (or was) in the Registry, all statutes of limitations applicable to his or her claims continue (or continued) to run.  However, if any applicable statute of limitations that was tolled under Pretrial Order # 15 would have expired while the Registry Participant is (or was) in the Registry, then (under Pretrial Order # 15) that statute of limitations does not expire (or did not expire) until 90 days after exit from the Registry.

Pretrial Order 79 at 5 (omitting modifications to the ninety-day deadline which concern an

unrelated issue).[6]

To the Court's surprise, inclusion of the agreed-upon definition of tolling in Pretrial Order 79 resulted in an objection. That objection was filed not on behalf of the Plaintiffs in this MDL or by lead Plaintiffs' counsel, but instead on behalf of the Claimants in the Registry.[7] The objection took the form of the Motion for Clarification before the Court.

<u>The Claimants' Motion for Clarification</u>

Around the time the Court entered Pretrial Order 79, many Claimants exited the Registry.[8] As a result of the large-scale departure of claims from the Registry, the tolling provision in Pretrial Order 15 became very important, and the Claimants filed their Motion for Clarification to determine when their claims had to be filed in court.

The Claimants request in their Motion that the Court define the tolling provision in Pretrial Order 15. The Claimants argue that the Court should define tolling as "stopping the clock." For legal support, the Claimants cite to case law on the interpretation of contract terms and to federal law on the definition of tolling. In response, the Defendants cite to similar bodies of law in support of their own definition of the tolling provision.

**2. The Claimants' Request for the Court to Define Terms in Pretrial Order 15**

The Claimants and the Defendants agree that the tolling provision in Pretrial Order 15 is derived from the Defendants' consent and partial waiver, not from the Court's equitable power or

---

[6] Pretrial Order 74 recognized an increasing number of *pro se* litigants because, after Plaintiffs' lead counsel elected to pursue only a subset of the cancers at issue in the MDL, some of the Claimants' counsel withdrew from representation of the Claimants.

[7] Also to the Court's surprise, two Plaintiffs' leadership attorneys, along with non-leadership attorneys, filed the Motion for Clarification. The Court was surprised because it was leadership that negotiated the definition of tolling, yet the leadership attorneys filed their Motion on the premise that leadership had never communicated the negotiated definition of tolling to the Claimants in the Registry.

[8] The Defendants exercised their power to remove cases from the Registry under Pretrial Order 15. *See* Pretrial Order 15 at 12. The Defendants removed cases from the Registry that concerned "Non-Designated Cancers," or cancers that Plaintiffs' lead counsel elected not to pursue in this MDL.

from a state statute. *E.g.,* DE 5849 at 3.  For that reason, the Claimants and the Defendants agree that their dispute is one of contract interpretation.  In other words, what the Court has before it is a preview of a potential breach of contract claim.

Yet, no breach of contract claim has been filed.  There is no complaint and related motion for summary judgment with case-specific facts seeking adjudication on the plain meaning of the contract terms memorialized in Pretrial Order 15.  There is no motion to dismiss on statute of limitations grounds, accompanied with case-specific briefing on whether there was a meeting of the minds on the tolling provision.  Under either of the foregoing procedural scenarios, the Court could see how it may be called upon to define a contract term.  Relatedly, the Court could see how it might have to take evidence on the formation of a contract, such as at an evidentiary hearing or a trial, to define the contract term.

But, absent such a proceeding, the Court cannot independently define the terms of the agreement memorialized in Pretrial Order 15.  In effect, what the Claimants request is that the Court issue an advisory opinion on contract interpretation, bereft of the rules of civil procedure, motion practice, and evidence that should support such an interpretation.  Therefore, the Court denies the Claimants' request to define the terms memorialized in Pretrial Order 15.

### 3. The Court's Intent in Entering Pretrial Order 15 and the Court's Case Management Decisions

Although the Court declines to rule on any interpretation of the terms in Pretrial Order 15 on the motion before it, that does not mean that the Court denies the Claimants' Motion for Clarification in its entirety.  The Court's role in this MDL was not merely to memorialize the terms of the parties' agreements; its role was to manage and administer the MDL.  The Court may clarify its intent in how it administered the MDL, including its decision to enter Pretrial Order 15.  The

Court may clarify what it did and did not intend when it entered Pretrial Order 15. *E.g., In re Optical Techs., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005) ("[A] court that issued an order is in the best position to interpret it." (quoting *In re Consolidated Indus. Corp.*, 360 F.3d 712, 716 (7th Cir. 2004))).  As to its intent, the Court clarifies two points.

First, the Court's intent was to grant the parties' joint request.  The parties informed the Court that they had reached an agreement on the creation of the Registry, and the parties requested that the Court memorialize their agreement in a pretrial order.  It was never the Court's intent, for example, to create the Registry pursuant to its own power.  To convey to potential Claimants that Pretrial Order 15 was a result of the parties' agreement, the Court repeatedly referenced the same: "As detailed in this Order, the parties created a framework that provides for a two-step census process. . . .  The parties also provided for a second phase of the census . . . .  In addition, the parties have agreed to the creation of a voluntary opt-in Registry." Pretrial Order 15 at 2-3.  After a preamble, page 3 of Pretrial Order 15 reads as follows: "The parties stipulate to the content and timing of the census process, and the Court hereby ORDERS . . . ."  Thus, to the extent that the parties seek clarification of the Court's intent regarding specific terms in Pretrial Order 15, the content of the Order was the terms of the parties' agreement, as provided to the Court.

Second, although the parties drafted the terms in Pretrial Order 15, the Court administered this MDL based upon its understanding of those terms and the Court's understanding of those terms developed throughout the course of the MDL.  The Court spent much time reviewing Pretrial Order 15 prior to its execution, and the Court devoted much time to analysis of the Order long after its execution.  In addition, through discussions with the parties, the Court came to understand the parties' agreed-upon meaning of the terms of Pretrial Order 15.  Further, the Court administered the MDL based upon that understanding.  If the Court had ever subjectively believed or been

informed that the Claimants' definition of tolling applied to the terms in Pretrial Order 15, the Court would have reexamined its use and reliance on the Registry or, alternatively, the Court may have declined to sanction the use of the Registry.  This statement warrants a detailed explanation.

It is hornbook law that terms in a contract cannot be interpreted in isolation. *E.g., TYR Tactical, LLC v. Protective Prod. Enters., LLC*, No. 15-CV-61741, 2016 WL 10647315, at *4 (S.D. Fla. Oct. 13, 2016); *Canal Lumber Co. v. Fla. Naval Stores & Mfg. Co.*, 92 So. 279, 281 (Fla. 1922).  The terms of a contract must be interpreted in light of the contract as a whole. *Canal*, 92 So. at 281.  The purpose of the Registry was never, as the Court understood it, to grant the Claimants the opportunity to observe the Court's rulings and then, if a Claimant disagreed with the Court, to *enable*[9] the Claimant to file in state court instead of federal court.  Yet the Claimants' interpretation of the terms encapsulated in Pretrial Order 15, taken as a whole, would permit just that for the reasons set forth below.

### The Parties' Dispute over Forum Selection

In the summer of 2021, the parties made the Court aware of another dispute stemming from the terms of Pretrial Order 15.  That dispute concerned something other than tolling; it concerned the Claimants' commitment to file their claims in federal court.  In outlining this commitment, page 11 of Pretrial Order 15 reads as follows: "Claimants who participate in the Registry commit to filing any action relating to Zantac or any ranitidine products, if at all, before this Court in MDL No. 2924."  The Order then proceeds to limit the types of claims that a Claimant may bring: "Claimants further commit, to the extent that they file an action, to name only those defendants that they have a good faith belief marketed or manufactured Zantac or ranitidine products that such

---

[9] Of course, a Claimant could, independently of the Registry, select a forum for any reason at all, including agreement or disagreement with this Court's rulings.

Claimants ingested or that they in good faith believe they may have a valid claim against for other reasons." *Id.* If a Claimant has a good faith claim that he or she wishes to bring, pursuant to the previously quoted passage, and that claim eliminates federal court diversity jurisdiction, the Claimants' commitment to file in federal court no longer applies. *Id.* ("The requirement to file in federal court shall not be applicable to actions as to which a federal court would lack diversity jurisdiction.").

The parties dispute about the commitment is summarized as follows. The Plaintiffs took the position that a Claimant would have unilateral control over whether a claim would be filed in federal court or state court because the Claimant would have control over the decision to file or not file non-diverse claims. To explain, if a Claimant wanted to bring a claim against an in-state, non-diverse retailer, the Claimant could do so and, through that decision, file in state court. Conversely, a Claimant could elect to forgo a claim against an in-state retailer and, through abandonment of the claim, file his or her claim in federal court. Thus, the commitment to file in federal court in Pretrial Order 15 was, for the most part,[10] vested in the discretion of the Claimant and the Claimant's counsel.

The Defendants took the position that the Claimants could not bring a claim against in-state retailers for "marketing or manufacturing" ranitidine, and, as a result, the Claimants would be in violation of Pretrial Order 15 when they filed such claims in state court. The Defendants painted some Claimants' decisions to file in state court in the summer of 2021 as an attempt to avoid adverse MDL rulings. DE 4569.

For context, in the summer of 2021, the Court entered its first order dismissing a Defendant

---

[10] As the Plaintiffs emphasized, state bar rules and state pleading law would limit the bringing of claims in bad faith solely to destroy diversity of the parties.

from the MDL with prejudice. DE 3750.  Within a few days of the Court's ruling, a member of the Plaintiffs' leadership team withdrew some Claimants from the Registry and filed their claims in state court, naming a small, in-state retailer that destroyed diversity jurisdiction as a defendant. The Defendants' fear was that the trend would continue and that, if the Defendants secured any additional favorable rulings in the MDL, the Claimants would continue to file claims against retailers in state court to avoid adverse rulings.  The specifics of the Claimants' pleadings against small in-state retailer defendants also provides context to the Defendants' fears.

As an example, many states contain liability shields that protect retailers from suits involving nothing more than the routine sale of FDA-approved over-the-counter drugs.  To overcome such a shield, a plaintiff must allege affirmative wrongdoing on behalf of the retailer defendant.  In case number 21-CV-82174, a former-Registry-Claimant brought such a claim in state court.  The case was removed to federal court over the Plaintiff's objection, and it was transferred and consolidated into this MDL over the Plaintiff's objection.  After consolidation, this Court ruled on the Plaintiff's motion to remand the case back to state court.  The critical issue for this Court's determination was whether the Plaintiff fraudulently joined a small, in-state retailer for the sole purpose of defeating federal court jurisdiction.

The standard for fraudulent joinder is one of the highest standards in the law.  For the doctrine to apply, there must be no "possibility that a state court would find the complaint states a cause of action." *Grancare, LLC v. Thrower ex rel. Mills*, 889 F.3d 543, 549 (9th Cir. 2018). Therefore, the Court had to find that no state court would conclude that the Plaintiff stated a cause of action for affirmative wrongdoing on the part of the small, in-state retailer.  To assert affirmative wrongdoing by the retailer, and to satisfy the Plaintiff's Pretrial Order 15 obligation to only bring claims in good faith, the Plaintiff alleged the following:

12

> To that end, Schnucks employs or employed a chief medical officer, and actively audited and researched the safety and efficacy of products offered for sale in its stores. It researched, investigated, and monitored the medical and scientific literature, as well as the regulatory and public health landscape in order to provide health resources and information, and product safety and recall information to its consumers, the general public, and Plaintiff.
>
> At all pertinent times, Schnucks knew or should have known, that NDMA is a deadly human carcinogen, known to cause a variety of deadly health conditions and cancers, including kidney cancer, and at all pertinent times Schnucks knew or should have known of such risks.

21-CV-82174, DE 1-3 at 43. Simply stated, it was the Plaintiff's allegation that the retailer would have known, through its employment of a chief medical officer, that the FDA's approval of an over-the-counter drug was in error and that the sale of the drug for almost forty years, in almost every country in the world, should be disregarded. This was so, according to the Plaintiff, because the chief medical officer should have independently determined that the drug caused cancer and, through that determination, refused to sell the drug.

The Court concluded that the in-state retailer had been fraudulently joined for the sole purpose of defeating federal court jurisdiction, and the Court denied the Plaintiff's motion to remand the case back to state court. What this case, and many other related disputes between the parties, demonstrated to the Court was that the Claimants' commitment to file their claims in the MDL, as drafted in Pretrial Order 15, was unworkable. Because pleading standards are lenient in many states, and because it is a necessary reality that counsel—not judges—make decisions on where cases will be filed, the practical result of Pretrial Order 15 was exactly what the Defendants described. The practical result was that the commitment to file in the MDL in Pretrial Order 15 had the potential to lack any real significance, and enforcing the clause seemed problematic, if not impossible, to the Court as well.

A registry without any corresponding commitment to file claims in any particular forum,

be it state or federal, is unworkable as a case management tool, in the Court's opinion, because of the potential of the registry to allow for forum shopping.  Because the Defendants made it clear that they would not support the creation and use of the Registry if it permitted forum shopping, the Registry's lack of an enforceable forum commitment—left unaltered—would have resulted in the Defendants' termination of the Registry. *See* Pretrial Order 15 at 12 (outlining the Defendants' retention of the power to unilaterally terminate tolling in the Registry).  To correct the potential for forum shopping after the Court's *Daubert* rulings, the Court undertook an effort to address the forum selection provision in Pretrial Order 15 pursuant to its case management authority.

<u>The Court's Case Management Power and Pretrial Order 72</u>

In Pretrial Order 72, this Court began the process of requiring all Claimants in the Registry to make a decision on forum selection.[11]  The Court explained the basis for its decision as follows:

> Now, almost two years after the inception of this MDL, the time has come for the data in the Registry to be finalized; the pleadings have closed, the Plaintiffs' Leadership has designated the specific cancers it will pursue, the parties have begun the process of preparing *Daubert* challenges on the issue of general causation, and the bellwether trial selection process has begun.  For this MDL to proceed in an orderly fashion, both the parties and the Court need to know with some degree of certainty who the Claimants are, what claims they intend to file, and where the Claimants will file their claims.

*Id.* at 2.  Under Pretrial Order 72, the Claimants could choose, if they wished, to certify (under penalty of estoppel) that their claims would be filed in federal court.  No Claimant, however, was *required* to certify.  The Claimants could stay silent if they wished.  But if a Claimant *did* certify, then the Claimant was committed to filing in federal court.  Through this procedure, the Court anticipated that it would evaluate whether the Registry would remain a useful tool for the

---

[11] The Court furthered additional goals in Pretrial Order 72 besides addressing forum section.  For example, the Court required the Claimants to finalize the identity of the Defendants that they intended to sue and the claims that they intended to bring.

management of this MDL.  If many of the Claimants certified, the value of the Registry to the MDL would be readily apparent.  If many of the Claimants did not certify, the value of the Registry to the MDL would, perhaps, be worth a second look.  At a minimum, the Court believed that the percentage of federally-registered Claimants would assist the Defendants in deciding whether they wished to continue or to terminate the Registry.[12]

In the Court's own opinion, the Court's certification requirement proved that the Registry was a valuable case management tool.  Approximately 80% of the Claimants certified for federal court.  At the same time as the Claimants finalized their forum selection certification, however, many Claimants exited the Registry.  Anticipating the departure of those Claimants, the Court scheduled its *Daubert* general causation hearing roughly ninety days after the Claimants' departure from the Registry.  The Court scheduled its *Daubert* hearing, pursuant to the Defendants' request and the Plaintiffs' agreement, so that the Claimants who exited the Registry could not wait for a *Daubert* ruling (unless state law permitted such a wait) and then, after the ruling, decide upon their forum of choice.  In short, the Court's goal was to eliminate the case management problem it had previously identified.

The Court's discussion now turns back to the tolling dispute before the Court.  The Defendants maintained their support of the Registry because of the Court's efforts to resolve the forum selection difficulties described above.  But the Court's case management efforts were premised on the Court's understanding (and the Plaintiffs' agreement) that the Claimants' tolling would expire ninety days after the Claimants exited the Registry.  If instead the Claimants'

---

[12] Pursuant to Pretrial Order 15, the Defendants retained the ability to terminate tolling in the Registry.  Throughout the pendency of this MDL, the Defendants have consistently taken the position that not every Claimant need commit to filing in federal court for Defendants to maintain their support for the Registry; the Defendants have deemed 80% to be the threshold of federally-bound-Claimants at which they would not terminate tolling in the Registry. *See* DE 5991-1.

definition of tolling applied, and the Claimants thereby had several additional years in which to file their claims, the Registry's design again would enable forum shopping and again would run contrary to the Defendants' intent for the Registry.  Because the source of tolling in the Registry was the Defendants' consent and waiver, the Claimants' definition of tolling equates to an unworkable Registry.  It is for this reason that, if the Court had ever believed or been informed that the Claimants had years, not ninety days, to file their claims upon exit from the Registry, the Court likely would have reexamined the Registry or declined to sanction its use in this MDL.

**4. The Defendants' Argument that the Definition of Tolling Was Previously Resolved through Agreement**

Although the Court declines to issue its own opinion on the definition of the terms in Pretrial Order 15, the Court can render a ruling on a related, but distinct, issue.  The Defendants argue in their Response that Plaintiffs' lead counsel and the Defendants resolved the definition of tolling and that lead counsel's assent binds the Claimants to the agreed-upon definition.  This argument does not seek adjudication of a disputed contract term, but instead focuses on the ramifications of the Court's case management decisions and the Claimants' prior delegation of authority to Plaintiffs' lead counsel.  Because both subjects are grounded in the Court's case management of the MDL, both are fair game for a motion for clarification, and the Court addresses the Defendants' argument in detail.

Not long after the Court entered Pretrial Order 15, the Court entered Amended Pretrial Order 37.  That Order focused on common benefit expense reimbursement procedures.  Pretrial Order 37 also included an agreement, attached as Exhibit A, that all attorneys utilizing the Registry had to execute.  That agreement was entitled: "Zantac/Ranitidine Registry Consent by Counsel."  Although the agreement was to be executed by counsel, its terms applied to the Claimants as well:

16

"I have reviewed PTO # 37 and understand that if my law firm elects (now or in the future) to enroll any Claimant in the voluntary Registry created in MDL No. 2924, then the following terms will apply to our firm's Zantac/ranitidine clients." *Id.* Two provisions in the agreement are relevant here, and each is discussed in turn.

First, the agreement required all Claimants to consent to be bound by the Court's pretrial orders, regardless of when the orders were entered. The Claimants also consented to the Court's jurisdiction to resolve any dispute related to a pretrial order or any dispute related to the Registry:

> Each Claimant is bound by the terms of the existing PTOs, consents to the authority of the Court to issue additional PTOs governing Claimants, including but not limited to those furthering the Registry's purpose of assisting parties in the joint investigation and assessment of potential claims, and consents to this Court's jurisdiction as to the operation of the Registry, common benefit funds, and any other dispute related to the operation of any PTO in this MDL or contract related to the Registry.

*Id.*

Second, the Claimants agreed to authorize the MDL Plaintiffs' lead counsel to act on their behalf:

> In order to negotiate these PTOs, each Claimant agrees that Lead Counsel is authorized to represent them in these negotiations and, more broadly, to act on their behalf to the same extent as a Filed Plaintiff in this MDL. The scope of this authorization is that set forth in PTO # 20.

*Id.* The scope of the Claimants' authorization is therefore governed by Pretrial Order 20. That Order charges lead counsel with many duties. One such duty is to "determine . . . and present . . . to the Court . . . the position of the Plaintiffs on matters arising during the coordinated pretrial proceedings." *Id.* at 14. As outlined above, pursuant to that duty, lead counsel informed the Court that they had agreed to the Defendants' definition of tolling and the Court structured its case management decisions in reliance upon that agreement.

Additionally, lead counsel may "enter into stipulations with opposing counsel necessary for the conduct of the MDL." *Id.* Pursuant to that authority, lead counsel entered into the stipulation with the Defendants on the definition of tolling. In light of the fact that the Defendants would have terminated the Registry had the terms of the Registry permitted the Claimants to avoid unfavorable MDL rulings, lead counsel's agreement on tolling was "necessary for the conduct of the MDL." Furthermore, without lead counsel's agreement on tolling, the Defendants may have argued there was no meeting of the minds on tolling *at all*, and, as a result, there could have been no tolling for any Claimant, for any period of time. Lead counsel's agreement avoided that possibility, in furtherance of the MDL, the Registry, and the Claimants as a whole.

Thus, whatever the parties' understanding of the definition of tolling in Pretrial Order 15 may have been when it was entered, as a result of Plaintiffs' lead counsels' and Defendants' agreement the definition of tolling is the Defendants' definition, as memorialized in Pretrial Order 79. The Claimants are bound by the Defendants' definition pursuant to the Claimants' authorization for Plaintiffs' lead counsel to act on their behalf. In the alternative, the Claimants agreed to be bound by the Court's pretrial orders, and Pretrial Order 79 contained the negotiated definition.

The Claimants dispute the authority under Pretrial Order 37 of Plaintiffs' lead counsel to act on their behalf with an analogy and with citations to case law on selection of counsel. As for the analogy, the Claimants analogize lead counsel's negotiations on tolling to a hypothetical scenario where lead counsel agreed "in secret" to dismiss certain claims (such as bladder cancer claims) in exchange for the Defendants' agreement to admit liability for other claims (such as liver cancer claims). Using that analogy, the Claimants argue that lead counsel would never have the authority to dismiss the Claimants' individual cases, so lead counsel could never have the authority

to modify a definition on tolling.  That analogy does not fit.

The Court and leadership attorneys on all sides were always aware of the agreement on tolling, and the agreement was published in Pretrial Order 79.  Moreover, lead counsel did not negotiate a definition that, when applied to the Claimants, resulted in the dismissal or expiration of any Claimants' claim, as is the case in the Claimants' analogy.  Lead counsel negotiated for a shorter period of time for a Claimant to file his or her claim.  Instead of hundreds of days to file a claim, lead counsel negotiated for ninety days.  Each Claimant who was in the Registry at the time Pretrial Order 79 was entered was informed of the ninety-day deadline prior to the imposition of the deadline.[13]  That is a far cry from lead counsel agreeing to dismiss any particular claim.  Indeed, the definition of tolling applies to everyone in the Registry, not a subset of Claimants.  Additionally, the definition would even apply to Plaintiffs with filed cases in the MDL, should a Plaintiff dismiss a suit and enter the Registry as a Claimant.

As for the Claimants' citations to case law, the Claimants rely upon cases that affirm a plaintiff's general constitutional right to counsel of choice, arguing that that lead counsels' negotiated agreement deprives them of that choice. *E.g., In re BellSouth Corp.*, 334 F.3d 941, 956 (11th Cir. 2003).  Those cases do not apply here.  Plaintiffs' lead counsel became the Claimants' counsel of choice, at least for Registry-related matters, pursuant to the Pretrial Order 37 contract that the Claimants accepted when they entered the Registry.  Moreover, "the right to counsel of choice is not absolute and can be overridden where the choice of counsel interferes with the orderly administration of justice." *In re Baycol Prods. Litig.*, No. 1431, 2007 WL 9717940, at *2 (D. Miss. July 13, 2007) (citing *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976)).  The authority

---

[13] The Court is unaware of any Claimant who exited the Registry prior to the entry of Pretrial Order 79.

of an MDL court in a complex matter to appoint leadership attorneys to handle pre-trial matters, for the "orderly administration of justice," is a matter beyond debate. *See In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1014 (5th Cir. 1977) ("It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide.").

In sum, lead counsel's negotiated agreement on the definition of tolling was within the scope of lead counsel's duties, it was within the scope of the Claimants' authorization, and it had the result of rendering earlier definitions of tolling irrelevant.  Lead counsels' negotiated agreement was in furtherance of the preservation of the Registry and in furtherance of the preservation of tolling for *all* Claimants; lead counsels' actions pertained to a matter where "the interests of all co-parties coincide[d]."  To the extent that lead counsel did not inform the Claimants of their agreement regarding the definition of tolling until the entry of Pretrial Order 79, delay is distinct from authorization.  The Court now turns to the potential prejudice of delay to the Claimants.

### 5.  Potential Prejudice to the Claimants

The Claimants identify two ways in which the Defendants' definition of tolling harms them.  Each alleged harm is based upon a premise.  That premise is that the Claimants were entitled to rely upon the conventional, unambiguous definition of tolling in Pretrial Order 15, which in turn was that tolling "stopped the clock."  With that premise in mind, the Court sets forth below the two ways the Claimants contend that they have been harmed.

First, in reliance upon the belief that they had years—not ninety days—to file their claims, when many Claimants passed away from cancer, counsel for those Claimants did not immediately seek the probate authorization necessary to file a case in court.  Lacking that authorization, the

Claimants represent that ninety days is an insufficient amount of time to obtain probate authorization and file their claims. Second, counsel for the Claimants represent that they have inadequate staff to file all necessary claims in ninety days, based upon their reasonable belief that they would have years, not days, to file. In response, the Defendants contend that the Claimants' attorneys' lack of diligence in failing to pursue probate authorization in the past and inadequate staffing are problems of their own making.

The Court lacks sufficient case-specific information, such as knowledge of the agreement and the timing of lead counsel's communication, to evaluate any Claimant's potential prejudice on multiple fronts. The record only reflects lead counsels' statement that they did not "formally" communicate the agreement to the Claimants. DE 5881 at 10. What the Court can conclude at this juncture is that, should any Claimant seek individual relief, at a minimum that Claimant must carefully explain the factual predicate supporting the Claimant's assertion of prejudice.

For all of the foregoing reasons, the Claimants' Motion for Clarification is **GRANTED IN PART AND DENIED IN PART**, consistent with the Court's Order.

**DONE and ORDERED** in Chambers at West Palm Beach, Florida, this 19th day of December, 2022.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE