**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                   MDL NO 2924
PRODUCTS LIABILITY                                           20-MD-2924
LITIGATION
                                                    JUDGE ROBIN L ROSENBERG
                                           MAGISTRATE JUDGE BRUCE REINHART

_____/

**THIS DOCUMENT RELATES TO:  ALL CASES**

**PLAINTIFFS' OPPOSITION TO BRAND DEFENDANTS' EXPEDITED**
**MOTION TO STRIKE PLAINTIFFS' EXPERT RAMIN (RON) NAJAFI, PH.D. [i]**

---

[i] Plaintiffs' Opposition to Brand Defendants' Expedited Motion to Strike is filed under seal pursuant to the Order at ECF No. 5684.

## <u>TABLE OF CONTENTS</u>

PAGE

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... ii-iii

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL AND FACTURAL BACKGROUND ......................................... 3

III.   DR. NAJAFI'S EXPERT REPORT AND DISCLOSURES SATISFY
THE REQUIREMENTS OF RULE 26(A)(2)(B) .................................................. 9

IV.   RULE 37(c)(1) DOES NOT APPLY WHEN THERE IS NO NTENT
OR EVIDENCE TO MISLEAD, PROVIDE FALSE DISCOVERY
RESPONSES OR OMITTED INFORMATION .................................................. 12

V.    PLAINTIFFS PRODUCED AND DISCLOSED ALL NATIVE DATA
UNDERLYING DR. NAJAFI'S ANALYSIS AND OPINIONS
WITH COMPLETE PROTOCOLS USED AND TEST RESULTS
ACHIEVED IN AN ORGANIZED MANNER IN FULL COMPLIANCE
WITH RULE 26(A)(2)(B) ................................................................................... 14

VI.   DR. NAJAFI'S PRODUCTION OF EMERY'S RANITIDINE FILE IN
NATIVE FORM IN THE MANNER IN WHICH IT IS KEPT COMPLIES
WITH RULE 26'S DISCLOSURE OBLIGATIONS............................................ 17

VII.  CONCLUSION ................................................................................................... 18

## **TABLE OF AUTHORITIES**

PAGE

*Ash v. Tyson Foods, Inc.,* 546 U.S. 454 (2006) ....................................................................... 13

*Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568
(M.D. Fla. 2009) ....................................................................................................................... 16

*Cedent v. United States,* No. 19-248777, 2021 WL 2895714
(S.D. Fla. July 9, 2021) ............................................................................................................ 18

*Companhia Energetica Potiguar v. Caterpillar, Inc.,* No. 14-cv-24277,
2016 WL 7507848 (S.D. Fla. Aug. 1, 2016) ........................................................................... 11

*Cook v. Rockwell Int'l Corp.,* 580 F. Supp. 2d 1071
(D. Colo. 2006) ......................................................................................................................... 12

*Cooper v. S. Co.,* 390 F. 3d 695 (11ᵗʰ Cir. 2004) ................................................................... 13

*CSX Transp., Inc. v. Kirkland*, No. CV416-117, 2017 WL 2271120
(S.D. Ga. May 24, 2017) ............................................................................................... 10, 17, 18

*Fast v. DoDaddy.com LLC,* 340 F.R.D. 326 (D. Ariz. 2022) .................................................. 14

*Flebotte v. Dow Jones & Co.,* No. Civ.A. 97-30117, 2000 WL 35539238
(D. Mass. Dec. 6, 2000) ........................................................................................................... 12

*Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21 (1st Cir. 2004) ........................................... 10

*Hahn v. Massage Envy Franchising, LLC,* No. 12cv153, 2014 WL 12899290
(S.D. Ca., July 24, 2014) ..................................................................................................... 11, 19

*Helmert v. Butterball, LLC,* No. 4:08CV00342, 2011 WL 3157180
(E.D. Ark. July 27, 2011) .................................................................................................... 12, 17

*In re 3M Combat Arms Earplug Prods. Liab. Litig.,* No. 3:19-md-2885,
2020 WL 6504419 (N.D. Fla. Nov. 5, 2020) ........................................................................... 10

*In re Levaquin Prod. Liab. Litig.,* No. 08-5743, 2012 WL 3568887
(D. Minn. Aug. 17, 2012) ......................................................................................................... 12

*Kleiman v. Wright*, No. 18-CV-80176, 2020 WL 6729362
(S.D. Fla. Nov. 16, 2020) .................................................................................................... 10, 18

*Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc.,* No. 05-23106
2007 WL 781909 (S.D. Fla. March 13, 2007) ................................................................ 14, 19

*McClain v. Metabolife Int'l, Inc.,* 193 F. Supp. 2d 1252 (N.D. Ala. 2002) ........................ 1, 14

*McGraw v. Cobra Trucking, Inc.,* No. 20-CV-01032, 2021 WL 5050416
(D. Colo. Nov. 1, 2021) ........................................................................................................ 12

*N. Natural Gas Co. v. Teksystems Global Applications, Outsourcing L.L.C.*,
No. 8:05-316, 2006 WL 6886660 (D. Neb. Sept. 6, 2006) .................................................. 17

*Reese v. Herbert*, 527 F. 3d 1253 (11ᵗʰ Cir. 2008) ............................................................... 13

*United States v. Batchelor-Robjohns,* No. 03-20164-CIV, 2005 WL 1761429
(S.D. Fla. June 3, 2005) ........................................................................................................ 14

*Vox Marketing Group, LLC v. Prodigy Promos, L.C.*, 521 F. Supp. 3d 1135
(D. Utah 2021) ....................................................................................................................... 11

*W. Union Holdings, Inc. v. E. Union, Inc.,* 316 F. App'x 850 (11ᵗʰ Cir. 2008) .................... 11

Plaintiffs submit this opposition to the Brand Defendants' ("Defendants") Expedited Motion To Strike Plaintiffs' Expert Ramin (Ron) Najafi, Ph.D.

## I.  <u>INTRODUCTION</u>

Once again Defendants reveal that Emery Pharma is their boogeyman. It was Emery Pharma's Citizen Petition that alerted the FDA that ranitidine formed NDMA when subjected to heat and over time.  As a result of that revelation, all ranitidine-containing products are off the market.  In the interest of public health, the FDA took Emery Pharma seriously.  In the interest of minimizing damages, Defendants hope this Court will do otherwise. Defendants are so desperate to avoid Dr. Najafi's testimony that they have filed an improper, expedited motion to strike, attempting to sidestep *Daubert* altogether.  *See McClain v. Metabolife Int'l, Inc*., 193 F. Supp. 2d 1252, 1259 (N.D. Ala. 2002) ("the proper avenue through which to challenge the admissibility of [an expert's] testimony is by filing a Daubert motion," not a motion for sanctions for failure to disclose computer records).  Their motion is as meritless substantively as it is procedurally out of line.

Rule 26 requires an expert to disclose the facts or data he considered in forming his opinions.  Fed.R.Civ.P. 26(a)(2)(B)(ii).  Dr. Najafi easily met this requirement. As agreed by the parties, on January 24, 2022, Plaintiffs produced a 133-page narrative expert report (Ex. A) with appendices listing every testing result considered and relied on by Dr. Najafi, including detailed information regarding the testing methodology and protocols used by Emery Pharma.  At Defendants' request, Plaintiffs also provided additional materials on February 23 (SEM instrument specifications, Standard Operating Procedures (SOP's), 2372 pages of SEM images); on February 24 (Project Photo Inventory 380 pages of photographs); on February 25 (33 spreadsheets and 5 laboratory notebooks); on February 27 (Validation protocols); and on

1

February 28 (chain of custody documents).[2]   After additional meet and confers, Plaintiffs offered to produce to Defendants all of the native data from Emery's testing of ranitidine on behalf of the MDL on a hard drive.[3]   The parties continued to negotiate terms of production of expert discovery with multiple proposals sent back and forth for consideration.[4]   The parties notified the Court that the motion to compel expert materials was moot on March 1, 2022.[5]

On March 3, the parties had a meet and confer wherein Defendants divulged that their experts did not use, and were unfamiliar with, Agilent systems, which is the widely used software that contained Dr. Najafi's test results.  Plaintiffs pointed out to defense counsel that their clients did, in fact, use Agilent technology for NDMA testing of ranitidine, so perhaps the defense experts could view the data on the Defendants' own systems. Subsequently, in an email dated March 3, 2022, Plaintiffs again provided the exact specifications of the Agilent systems that Emery utilized in conducting its testing.[6]   Defendants' experts were unable or unwilling to work on Agilent software so consulting expert, Dr. Benotti was retained.

On March 11, 2022, Plaintiffs produced a hard drive with the raw and processed data including seventy-three (73) batch files. All of the batch files had native data files. Thirty-nine (39) of the batch files were qualitative development work which would not have batch.bin[7] files stored within them because no quantitation work was done.  The other thirty-four (34) batch files were NDMA testing results for every test that was performed for MDL Plaintiffs' Leadership ("PSC") (the "MDL testing") including batch.bin files. One month after receiving the hard drive, with no explanation for the delay, Defendants claimed that batch.bin files were missing from the

---

[2] Ex. A - Dr. Najafi's Expert Report and all productions aside from the 2,372 pages of SEM images.
[3] Ex. B - Finken email dated March 1, 2022.
[4] Ex. C - Sachse email dated March 1, 2022
[5] Ex. D - Email to Special Master Dodge dated March 1, 2022.
[6] Ex. E - March 3, 2022 email from T. Finken to Will Sachse and Kimberly Penner.
[7] A batch.bin file is an electronic record that references a selected group of data files which are analyzed together as a group instead of individually.

original hard drive. Plaintiffs reproduced the MDL testing data on yet another hard drive, along with an additional 92 batch files associated with ranitidine testing other than MDL testing.

Defendants have long possessed all the information Rule 26 requires.  Their motion is baseless and should be denied.

## II.     PROCEDURAL AND FACTUAL BACKGROUND

It took almost one year, from December 2020 through October 2021, for the PSC to get Zantac and ranitidine API samples from Defendants. After much delay caused by numerous meet and confers, the exchange of dozens of spreadsheets and data related to Defendants' inventory, and four (4) PTO 32 discovery dispute escalations before Magistrate Judge Reinhart [DE 4130, 4262, 4413, 4485], Defendants finally sent a limited amount of product inventory to the PSC's expert, Dr. Ron Najafi at Emery Pharma, with the final samples arriving from Patheon on November 11, 2021.

Prior to Dr. Najafi even receiving all samples, on October 19, 2021, Defendants prematurely served overbroad interrogatories seeking a preview of the results of ranitidine testing they knew an expert had to conduct. Since the interrogatories were clearly seeking information that would be the subject of expert reports and/or expert discovery that were not due until January 24, 2022, the PSC objected.  *See* Defendants' Ex. E.

On January 24, 2022, Plaintiffs timely served Dr. Najafi's expert report, which contained LC-MS/MS test results generated from Agilent instruments and software. Ex. A. This surely came as no surprise to Defendants, as Emery Pharma reported their use of Agilent in their 2019 Citizen's Petition, and their continued use of Agilent was evident throughout the documents that Emery Pharma produced in response to the three subpoenas served upon it by Defendants over the past two years. Ex. Q.  Despite this clear notice, Defendants did not retain a consultant

"experienced with the technology used by Dr. Najafi" until sometime in March 2022. Def. Ex. A. Notably, Agilent is a well-known manufacturer of analytical chemistry instruments and software, and in fact, Defendants themselves are familiar with Agilent Technologies.[8]  In addition, Agilent systems have been used for a portion of the testing in the GSK root cause analysis (King, *Ranitidine - Investigations into the Root Cause for the Presence of N-Nitroso-N,N-dimethylamine in Ranitidine Hydrochloride Drug Substances and Associated Drug Products,* Experimental Section, Method C., Organic Process Research & Development,  p. I, 2020);[9] and is an extensively used, reliable and tested instrumentation to test for NDMA in ranitidine in multiple peer-reviewed publications.[10]

Emery does not create, consider or rely on PDFs in its work as a full-service contract research laboratory. This has been repeatedly explained to Defendants. *See* Ex. L - Email dated April 14, 2022. As is custom and practice in the analytical research laboratory industry, Emery Pharma keeps the electronic LC-MS/MS data and spreadsheets as their record of the testing. These files were *twice* produced to Defendants.

Nevertheless, in an effort to meet Defendants' requests, Dr. Najafi and Emery Pharma

---

[8] Ex. F ████████████████████████████████████████████████. (BOE_ZAN_MDL_0000974356) A book entitled "Identifying and Quantifying Mutagenic Impurities in Pharmaceutical Products" published by Agilent was produced by Sanofi. (SANOFI_ZAN_MDL_0000780857) The same is true of a peer-review research article written by Agilent employees regarding the testing of NDMA in ranitidine which was produced by GSK (GSKZAN0003395434).  Defendant expert, Dr. Olsen, also acknowledged knowing of the company and using the equipment himself in the distant past. Depo of Olsen p. 57-59.

[9] Ex. G - King, et al, *Ranitidine - Investigations into the Root Cause for the Presence of NDMA dimethylamine in Ranitidine Hydrochloride Drug Substances and Associated Drug Products (2020)*

[10] Ex. R - SANOFI_ZAN_MDL_0000534544 - Wang et al., *Effect of oxidation on amine-based pharmaceutical degradation and N-Nitrosodimethylamine formation,*, Water Research (2015); SANOFI_ZAN_MDL_0000812300 - Lim et al., *Determination of N-nitrosodimethylamine and N-nitrosomethylethylamine in drug substances and products of sartans, metformin and ranitidine by prescription and solid phase extraction and gas chromatography-tandem mass spectrometry*, Journal of Pharmaceutical and Biomedical Analysis (2020); SANOFI_ZAN_MDL_0000817802 – Seid et al., *Nitrite ion mitigates the formation of NDMA during chloramination of ranitidine*, Science of the Total Environment (2018)

attempted to create and produce PDFs, but these attempts failed due to the limitations of Emery's computer system.  Dr. Najafi testified to this and the 1.5 TB of data present on the Emery system which prevented the production of any PDFs. Ex. I - Najafi Depo. at 56:7-24.  However, the 1.5 TB data he referenced was the ***total data*** on the Emery computer system,[11] not data related only to ranitidine.[12]

In addition to providing this trove of testing data, the PSC also provided to Defendants the native LC-MS/MS data and batch.bin files for all MDL testing on an external hard drive delivered on March 11, 2022. This hard drive was far from a "document dump" as all data on the hard drive was organized into batch folders named by date of testing and most have a descriptor of the type of testing. Within each batch folder were well-organized subfolders that anyone familiar with Agilent MassHunter would expect to find such as: 1) the .d folders (commonly referred to as data files which are folders that house various files with the native data collected and recorded by the instrument etc.); 2) a QuantResults subfolder containing a batch.bin file only if NDMA levels in the samples were quantified; and 3) a QuantReports subfolder only if a PDF was generated.  When new batches are created in MassHunter, a subfile called QuantResults is created and inside of it a file called batch.bin file with no data is created as an empty placeholder. So, if a batch is created to review data, but no quantitation is performed, there is only an empty batch.bin file which would not be saved, but a QuantResults folder will be present. This accounts for the so-called missing batch.bin files.  Ex. H - Steffes Declaration.  Again, it is critical to understand that Emery does not create, produce, consider or rely upon PDFs in the normal course of its work. Any attempt to accommodate Defendants' request and do so is outside the scope of

---

[11] Dr. Najafi candidly admitted that he is "not very good with IT" and relies on his team for IT support, which is the source of his understanding that Emery has 1.5 terabytes of data related to ranitidine.  Ex. I - Najafi Depo. at 58:22 – 59:9; 66:6-7; 67:6 – 9.  As evident from his testimony, he was not speaking from personal knowledge as to the amount of data in Emery's computers related to ranitidine.
[12] Ex. J - Email from counsel dated June 10, 2022.

what Emery does in the normal course and is also outside of the scope of what Dr. Najafi is required to do or produce under Rules 26 or 37.

It is important to note that if the work done by Emery was qualitative (also referred to as development work) no quantitation was performed and therefore, no batch.bin file was created. The hard drive delivered on March 11 contained 73 folders (39 of which are development files in which no quantitation work was performed and as such would not have a batch.bin file because no such file would exist). The other 34 folders related to testing for levels of NDMA so batch.bin files were created as part of the analysis and were on the hard drive. This has been confirmed by inspection of the duplicate copy of the hard drive which clearly shows that the batch.bin files were included in all folders regarding MDL testing. Ex. K. The native data is preserved by MassHunter. Notably, the provision of the native data and method/protocols allows an analytical chemist using the MassHunter software to quantitate the amount of NDMA in the samples. The native data is what is needed to conduct an LC-MS/MS analysis, not a batch.bin file. Ex. H - Declaration of Steffes.

It wasn't until April 11, one month after sending the hard drive, that Defendants first claimed that the hard drive delivered on March 11, 2022 had only unprocessed chromatographic results. Upon receiving the email, the PSC researched the issue and responded demonstrating that the hard drive did in fact have all the native data and processed data (batch.bin files) for the MDL testing. See Ex. L. It is inexplicable why Defendants one month later raised this issue as everything needed to review the LC-MS/MS data was on the hard drive. The only explanation is Defendants' experts admitted lack of experience with MassHunter or a complete lack of understanding. By requesting that Plaintiffs provide all LC-MS/MS data, the hard drive contained folders for work in which no quantitation was performed and hence, would not have

any batch.bin files. All of the testing folders contained batch.bin files. Again, the provision of the 73 folders on March 11 demonstrates that Plaintiffs were fully compliant with Defendants' request and actually went above and beyond what is required by providing the electronic data for not only the MDL testing but all development work.

As Defendants continued to struggle with their experts' inability to understand the data produced to them, the parties engaged in meet and confers. Plaintiffs explained that all the data necessary to review the native and processed data was provided on the March 11 hard drive, and that we were able to open and see the data, chromatograms and samples on multiple computers. Nevertheless, to try to solve whatever IT problem Defendants were experiencing, Plaintiffs proposed to provide a computer to the Defendants to demonstrate that the files provided on March 11 would allow them to review the chromatographic data.[13]

After the meet and confer on April 19, 2022, wherein the parties agreed that Plaintiffs would attempt to build a computer for them, Plaintiffs immediately began the process and quickly learned there was no laptop available on the market powerful enough to meet the minimum specifications needed, but satisfactory desktop units existed. Unfortunately, supply chain issues and other issues caused some delay. Plaintiffs immediately alerted Defendants of some of the difficulties and proposed another solution by attaching a test recording of the processed data which would eliminate any IT processing issue. Defendants rejected this proposal.  See Ex. M - Email of Friday, April 29, 2022.

Instead, Defendants requested that Plaintiffs resend the LC-MS/MS data on another hard drive.  Plaintiffs shipped the hard drive the very next business day, Monday, May 2, 2022. Ex. N - Email Monday, May 2, 2022. This second hard drive contained all ranitidine testing data done

---

[13] This building of a computer was contingent on sourcing an acceptable unit with the necessary requirements of MassHunter which are an Intel processor with a minimum of 3.50 GHz of processing speed, 10MB Cache and 4 cores, a minimum of 16 GB of RAM and 500 GB of available HDD space.

by Emery (pre-retention and post-retention totaling 165 batch folders), even work not done for the MDL.[14] Plaintiffs explained the details by email dated May 10, 2022.  Ex. O – Email of May 10, 2022.

Defendants' consultant, Dr. Benotti, who has a Ph.D. in Coastal Oceanography, was able to use the Agilent MassHunter software to view the chromatographic data from the second hard drive and generate 8,700 pages of PDFs from the electronic data files.  Significantly, these 8,700 pages of PDFs are records created by Defendants' consultant and are *not* Emery Pharma records, which explains why Dr. Najafi was unwilling to speak to their authenticity and accuracy. He even called out their dissimilarities: "We have a different view of the same data in our MassHunter than he does." [15]  Defense counsel mischaracterizes these 8,700 pages of PDFs as "the hard drive" contents. Def. Brief at p. 10.  They are not.

As Dr. Najafi explained during his deposition, his review showed that some data, like the internal standard, was missing from the PDFs.[16]  Apparently, "[t]he raw data unfortunately is not transforming properly."[17]  To confirm Dr. Najafi's understanding, the accompanying Declaration of Professional Chemist Patrick Steffes (Ex. H), explains why there is good reason Dr. Najafi cannot attest to the accuracy of the PDFs: "The baselines used in Dr. Benotti's report, and those found in original source (native) data and batch file from Emery are different and affect the concentration of NDMA found in the sample so in these instances the PDFs do not reflect the electronic batch files from Emery." *Id.,* ¶15(c).

The fact that Defendants' created their own PDF reports of Emery data and they do not

---

[14] As Plaintiffs have already completely satisfied all disclosure obligations by the production of all Emery Pharma's electronic data related to ranitidine there is no need or reason to go to Emery Pharma. Defendants with the use of MassHunter can view all of the data. Ex. I - Najafi Depo at 340:2-24.
[15] Ex. I - Najafi Depo. at 95:4-5.
[16] Ex. I - Najafi Depo. at 299:7–307:3.
[17] Ex. I - Najafi Depo at 302:21-22.

accurately reflect the native data provided to them, does not negate the fact that Emery and Dr. Najafi fully complied with Rule 26's requirement that the expert provide the data he considered and that he provided usable data.

## III.   DR. NAJAFI'S EXPERT REPORT AND DISCLOSURES SATISFY THE REQUIREMENTS OF RULE 26(A)(2)(B).

Rule 26(a)(2)(B)(ii) requires that an expert must identify "the facts or data considered by the witness in forming" his opinions. *In re 3M Combat Arms Earplug Prods. Liab. Litig.,* No. 3:19-md-2885, 2020 WL 6504419, at *3 (N.D. Fla. Nov. 5, 2020).

Plaintiffs have satisfied this requirement by timely disclosing Dr. Najafi's expert report detailing testing results *with* Appendices containing all the test protocols used and the spreadsheet of generated NDMA test results for every batch or lot tested. This was the information relied upon by Dr. Najafi to form his opinions and are the back-up data for his expert report. Plaintiffs subsequently produced on two separate occasions external hard drives with the raw, native data underlying all of Dr. Najafi's testing and research in the same format used by Emery Pharma during the testing.  This electronically stored native data contains the "factual ingredients" [18] considered by Dr. Najafi in rendering his opinion and has been in Defendants' possession since March 11, 2022.

Nothing in Rule 26 entitles Defendants to data other than what the expert considered. *See Kleiman v. Wright,* No. 18-CV-80176, 2020 WL 6729362, at *7 (S.D. Fla. Nov. 16, 2020) (citing *Gillespie v. Sears, Roebuck & Co.,* 386 F.3d 21, 35 (1st Cir. 2004) (rejecting a motion to compel discovery under Rule 26(a) as it does not require that the expert report contain, or be accompanied by, all of the expert's working notes or recordings).  "There is not any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and

---

[18] Fed.R.Civ.P. 26, Comment to 2010 Amendment.

detail for an opposing expert to replicate and verify in all respects both the method and results described in the report." *CSX Transp., Inc. v. Kirkland*, No. CV416-117, 2017 WL 2271120 at *3 (S.D. Ga. May 24, 2017) (internal citation omitted). Rather, "[t]he bottom line is that a report must help the opposing party prepare for a deposition and cross examination." *Id*.  In other words, when producing his reliance material, the expert need only faithfully reproduce the source data, not reformat it in a manner more suitable to the sensibilities or desires of the opponent. *See Hahn v. Massage Envy Franchising, LLC*, No. 12cv153, 2014 WL 12899290, at *8 (S.D. Ca. July 24, 2014) ("Rule 34 does not demand that a responding party produce ESI in the format the requesting party believes is a reasonably useable form.").  It should be remembered that the purpose of the expert witness discovery rules is to provide notice to opposing counsel of the expert witness's testimony to prepare for cross-examination and to prevent surprise. *See W. Union Holdings, Inc. v. E. Union, Inc.*, 316 F. App'x 850, 854 (11th Cir. 2008); *see also Companhia Energetica Potiguar v. Caterpillar Inc.,* No. 14-CV-24277, 2016 WL 7507848, at *4 (S.D. Fla. Aug. 1, 2016) ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel - before the deposition - as to what the expert witness will testify" so as to "minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial."); *Vox Marketing Group, LLC v. Prodigy Promos L.C.*, 521 F.Supp.3d 1135, 1146 (D. Utah 2021) (rejecting motion to exclude expert challenging the methodology of his use of screenshots since it "does not implicate Rule 702").

Here, because Defendants' experts were unfamiliar with and did not possess the commercially available proprietary software they needed to evaluate the data or understand how to operate it once they acquired it, they contend that Dr. Najafi's disclosures were insufficient; that he did not disclose all the information "generated in connection with the formulation of [his]

opinions."  Def. Brf. at 11 (citations omitted).  But that is not the case, as Defendants concede

they received the hard drives containing the data. *Id*. at 5.  As Dr. Najafi made crystal clear: "We

have provided you with all the data and I attest he's not properly opening [the files]. Therefore,

[Dr. Benotti's] having missing data."[19]

Defendants seem to think Rule 26 requires disclosures that would let them replicate all

of Dr. Najafi's tests.  That is not the law.  A Rule 26(a) disclosure is *not* "incomplete unless it

contains sufficient information and detail for an opposing expert to replicate and verify in all

respects both the method and results described in the report." *Cook v. Rockwell Int'l Corp.,* 580

F. Supp. 2d 1071, 1121–22 (D. Colo. 2006). *See also Helmert v. Butterball, LLC*, No.

4:08CV00342, 2011 WL 3157180, at \*2 (E.D. Ark. July 27, 2011) (holding that while the

opposing party was entitled to the underlying data used by an expert, the expert did not have to

produce all of his notes and calculations); *In re Levaquin Prod. Liab. Litig*., No. 08-5743, 2012

WL 3568887, at \*5 (D. Minn. Aug. 17, 2012) (expert did not have to produce all of his notes and

calculations), aff'd, 739 F.3d 401 (8th Cir. 2014); *Flebotte v. Dow Jones & C*o., No. Civ.A. 97–

30117, 2000 WL 35539238, at \*7 (D. Mass. Dec. 6, 2000) ("Therefore, neither the plain

language of [Rule 26] nor its purpose compels disclosure of every calculation or test conducted

by the expert during formation of the report.").

As in *McGraw v. Cobra Trucking, Inc*., No. 20-CV-01032, 2021 WL 5050416, at \*6-\*7

(D. Colo. Nov. 1, 2021), the native datasets that have been provided by Dr. Najafi are able to be

analyzed by anyone with adequate expertise and technological capabilities following the

methodologies outlined in his expert report.  *Id.*  Here, there is no dispute that Defendants have

everything needed to replicate and verify in all respects the testing results detailed in Dr. Najafi's

report.

---

[19] Ex. I – Najafi Depo. At 305:23 – 306:2.

Importantly, Defendants concede that they have had the native data files and protocols since March which is all that is needed for anyone trained in LC-MS/MS to review and analyze the samples. Steffes Dec. Ex H. Even Defendants' consultant, Dr. Benotti, acknowledges that he has everything he needed "to process the data" himself.  Def. Ex. J - Benotti Dec., ¶9.

Defendants have Emery's native data, batch.bin files, protocols and testing methods, and can analyze the native data generated by Emery Pharma themselves. They also could actually perform the testing themselves to determine the amount of NDMA in the samples, which apparently, they have declined to do.[20]

## IV:   RULE 37(c)(1) DOES NOT APPLY WHEN THERE IS NO INTENT OR EVIDENCE TO MISLEAD, PROVIDE FALSE DISCOVERY RESPONSES OR OMITTED INFORMATION

Based on the false premise that Dr. Najafi's production was insufficient, Defendants suggest that pursuant to Rule 37(c)(1), Dr. Najafi's reports should be automatically excluded. Rule 37(c)(1) provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  As expressly provided by the Rule, there are exceptions to any exclusion where the matter in dispute was substantially justified or harmless. *See Reese v. Herbert*, 527 F. 3d 1253, 1266 (11th Cir. 2008) (quoting *Cooper v. S. Co*., 390 F. 3d 695, 728 (11th Cir. 2004), overruled on other grounds *by Ash v. Tyson Foods, Inc*., 546 U.S. 454, 457-58 (2006) ("Because the expert witness disclosure rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational.").

---

[20] Defendants retained adequate inventory of the specific product samples produced to Plaintiffs to conduct their own testing. Ex. P – Declaration of Je Yon Jung.

Typically, courts award Rule 37(c)(1) sanctions and remedies in cases with intentional disclosure of incomplete, misleading or false discovery responses which are not corrected. *See, e.g., United States v. Batchelor-Robjohns*, No. 03-20164-CIV, 2005 WL 1761429, at *4 (S.D. Fla. June 3, 2005) (granting motion to exclude where Plaintiff "failed to justify its refusal to disclose [the expert's] models and curves"); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334-36 (D.Ariz. 2022)  (noting that  Rule 37(c)(1) sanctions apply only when there is intentional, misleading or false/incomplete discovery or spoliation of evidence by a party which therefore establishes a failure to properly disclose under Rule 26(a)).

Striking witnesses in response to a discovery violation is "a drastic remedy that should only be considered after other alternatives are exhausted or unavailable, and clearly only when the moving party has suffered irreparable harm or undue prejudice." *Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc.*, No. 05-23106, 2007 WL 781909, at *1 (S.D. Fla. March 13, 2007).  And Defendants' delay in raising this matter, while simultaneously asking for the most severe penalty possible when no prior finding of discovery violations exist, is hardly justification for such drastic action.  *See McClain v. Metabolife Int'l, Inc*., 193 F. Supp. 2d at 1259 ("The Court recognizes that merely having to depose a party on information that should have been disclosed in a Rule 26 Report is a form of prejudice. However, it does not appear that Plaintiffs were attempting to 'hide the ball' in any way. Without a finding of bad faith or gamesmanship on the eve of trial, many courts are loathe to invoke the strong medicine of precluding expert testimony.").  Instead, "the proper avenue through which to challenge the admissibility of [an expert's] testimony is by filing a *Daubert* motion." *Id.*

Here, there was no failure to provide information.  Plaintiffs provided Defendants  with all of Dr. Najafi's MDL testing data by: 1) sending the hard drive in March with all of the MDL

testing electronic data, including the native data and batch.bin files; 2) despite being given no reason for the month delay in reviewing the electronic files sent in March, offering to try to provide Defendants with a computer loaded with the software and data to solve their issues in seeing "processed data"; and 3) sending a second hard drive with the data in the same format as was provided on the first hard drive which Defendants were then able to view on the MassHunter software, and at their choosing created 8,700 pages of PDFs.

There has been no harm to Defendants, as they had all of the facts and data needed to question Dr. Najafi at his deposition about his detailed expert report and subsequent discovery disclosures. By their own admission, Defendants even had Dr. Benotti "generate" PDFs, at the latest, a full week prior to Dr. Najafi's deposition, and were able to question Dr. Najafi about their inaccurate PDFs at his deposition.[21]

## V:   PLAINTIFFS PRODUCED AND DISCLOSED ALL NATIVE DATA UNDERLYING DR. NAJAFI'S ANALYSIS AND OPINIONS WITH COMPLETE PROTOCOLS USED AND TEST RESULTS ACHIEVED IN AN ORGANIZED MANNER IN FULL COMPLIANCE WITH RULE 26(A)(2)(B).

Defendants contend that their ability to challenge Dr. Najafi was impeded by 1) the absence of "contemporaneously prepared reports" reflecting his testing, or 2) that his data was never produced in "any usable format." Def. Brf. at 13. Neither of these contentions are valid.

First, Emery Pharma performed its tests on Agilent LC-MS/MS instrument with Agilent MassHunter software, which, in fact contemporaneously creates native data and prepares an electronic record of the NDMA testing. All native data files and 34 batch.bin were produced to the Defendants – twice, in fact: once on March 11, and a second time on May 2. Defendants demand that this Court accept their representations that the first hard drive was missing batch.bin files. Plaintiffs cannot account for this happening and dispute its accuracy. Why? Because

---

[21] Def. Ex. J - Benotti Declaration dated May 19, 2022; Ex. I - Najafi Depo. at 294:17 – 307:4.

Emery created a duplicate hard drive identical to that produced to Defendants on March 11 and it contained the batch.bin files that Defendants claim are missing. *See e.g.,* Def. Brf., Ex. M ("Please note that our duplicate copy of the hard drive that was previously sent to you has these data files."). But even if the original production was missing batch.bin files, Plaintiffs did not resist discovery. To the contrary, to be sure nothing was left to chance, Plaintiffs made multiple efforts to produce a second hard drive with every ranitidine file on Emery's computer system. This was accomplished on May 2, 2022.

Dr. Najafi testified that the missing batch.bin files "were there" always, but to be safe the second time around Emery gave Defendants "everything."[22] Against these facts demonstrate Plaintiffs' efforts to fully cooperate with Defendants to overcome inexplicable IT problems that curiously only presented on their end, Defendants turn around and accuse Dr. Najafi of failing to make adequate disclosures under Rule 26(a)(2)(B)(ii) that were so severe that the only remedy is exclude Dr. Najafi from testifying, which then they argue just happens to affect the testimony of other Plaintiffs' experts that must also be excluded. In support, Defendants cite to inapposite authority where the party sanctioned actively sought to conceal the facts or data their expert relied upon.[23] Their factual scenarios are completely contradictory to those here. Plaintiffs wanted Defendants to have the raw data, and actually offered to provide it so they would have everything necessary to fully review the data and replicate the results. Plaintiffs then worked

---

[22]   Ex. I - Najafi Depo. at 46:22-23; 53:10 -54:2, 64:8-11, 110: 22-25; 114:6-10; 339:19-25; and 344:3-6 ("Data….from our computers are absolutely solid and valid and reproducible").

[23]   *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co*., 259 F.R.D. 568, 587 (M.D. Fla. 2009) (producing party and their counsel were sanctioned for "fabricate[d] explanations" to "conceal information and make material misrepresentations about the way ESI was collected and the form in which it was kept in the … database"), affirmed in part and quashed in part, No. 607CV-0222ORL-35KRS, 2009 WL 5606058 (M.D. Fla. Nov. 16, 2009); *Rambus Inc. v. Hynix Semiconductor Inc.*, No. 05-00334, 2007 WL 9653194, at *6 (N.D. Cal. Sept. 21, 2007) (noting that producing party "does not have to produce [data] in native format" but because Samsung did not produced its schematics in PDFs, not "in the form in which it was ordinarily maintained" it had to produce them "in a form that is reasonably usable," which the PDFs did not do).

diligently to provide this as quickly as possible given supply chain issues caused by the global pandemic. Again, the inability of Defendants to access the batch.bin files is not something we can explain. Defendants' attempts to project their problems onto Dr. Najafi are ill-founded. *See, e.g., CSX Transp., supra; Cook, supra; Helmert, supra.*

Second, Defendants' suggestion that producing every one of Emery Pharma's native data files and batch.bin files (in the instances where they exist) was not in "any usable format" is specious. Their contention is belied by Dr. Benotti's sworn declaration testifying to his ability view and process the data himself. He also elected to "generate reports" in Adobe PDF form so others could access and review the data in usable format. Def. Ex. J - Benotti Dec. ¶¶ 6, 8. As Dr. Najafi testified, in the normal course of business, he and his team work off the dashboard of MassHunter and do not create PDFs. Ex. I - Najafi Depo. at 52:22 – 53:9; 294:17-307:4.[24]

"[I]t is commonly held that while the respondent must not be required to create what it does not have, it must produce the responsive documents it does have in a form readable to the requesting party." *N. Natural Gas Co. v. Teksystems Global Applications, Outsourcing, L.L.C,* No. 8:05-316, 2006 WL 6886660, at *2 (D. Neb. Sept. 6, 2006). It is abundantly clear that both the native data and batch.bin files were produced to Defendants. In his declaration, Dr. Benotti states that using the MassHunter software he was able to access both Emery's "unprocessed" and "processed" data. The provision of Emery's electronic data satisfies any Rule 26 discovery obligation.[25]

---

[24] When Emery Pharma tried to create and print such reports at the Defendants' request, it crashed Emery's system. *Id.*

[25] Defendants instead of analyzing the native data and resulting chromatograms on the MassHunter software are insistent on creating PDFs "so others could access and review the data in a usable format" through "built-in templates which are ready-to-use for anyone who has the software." Def. Ex. J – Dec. of Benotti. The 8,700 pages of generated PDFs were not included by the defendants as an exhibit to this motion. Plaintiffs are providing copies of the 8,700 pages so there is a complete record, and the Court may see the extent of the generated PDFs. Notably, the inability of Dr. Najafi to authenticate or verify the

## VI.  DR. NAJAFI'S PRODUCTION OF EMERY'S RANITIDINE FILE IN NATIVE FORM IN THE MANNER IN WHICH IT IS KEPT COMPLIES WITH RULE 26'S DISCLOSURE OBLIGATIONS.

In response to Defendants' pleas for help accessing the electronic data on the original hard drive, which Defendants improbably maintain did not contain any batch.bin files, Dr. Najafi again produced a second hard drive with all of Emery Pharma's Ranitidine files, 165 batch folders in all, including the original 73 batch folders.  Like the dog that caught the car, Defendants now contend they have too much data from Dr. Najafi, that they have a document dump.  But Emery Pharma produced its files in the way they are kept at Emery Pharma, which is entirely appropriate under Rules 26, 34 or 45, and the files are neatly organized in folder structures with the folders being named by testing initiation date and/or test descriptor.  Far from concealing the data, each of the hard drives contained uniquely identified batch folders for the various testing that correspond to the NDMA levels discussed in Dr. Najafi's expert report and/or detailed in Appendix B.  The dated lab notebooks reference the testing that was initiated, the identity of the samples tested, and Dr. Najafi has disclosed the testing results for each sample. These descriptions satisfy Plaintiffs' and Dr. Najafi's disclosure obligations.

Unlike the situation present in Defendants' authority, *Cedant v. United States*, No. 19-248777, 2021 WL 2895714, at *5 (S.D. Fla. July 9, 2021), Dr. Najafi has not "pointed" to the entirety of his files, he specifically listed results he considered and relied upon.  Experts are not obliged to teach their opposing counsel how to work software, nor provide any more granularity than to identify "the facts or data considered by the witness."  Fed.R.Civ.P. 26(a)(2)(B)(ii).  *See Kleiman*, 2020 WL 6729362, at *7; *CSX Transp.,* 2017 WL 2271120 at *3.

As Dr. Najafi fully complied with his disclosure obligations, Defendants' motion should

---

accuracy of 8,700 pages of defendant created PDFs does not somehow undo the fact that his discovery obligations were completely fulfilled by providing all of the MDL testing data. See Ex. S.

be denied as not being substantially justified.  If that is the Court's decision, then Rule 37(a)(5)(B) mandates that Defendants pay Plaintiffs their costs, including attorneys' fees, for responding to their meritless motion.  In *Hahn,* the court awarded the non-movant fees for reasons applicable here, finding: the Court preliminarily finds that Plaintiff's motion was not substantially justified because: (1) Defendant produced ESI pursuant to a negotiated agreement with Plaintiff, (2) Defendant produced the ESI in the format it is ordinarily maintained, (3) the format is also reasonably useable as evidenced by Defendant's retained expert's ability to conduct queries and analysis of the data, and (4) the Court never ordered Defendant to produce the data." *Hahn*, 2014 WL 12899290, at *11.  As Defendants' motion was unjustified, such an award should be granted.

However, out of an abundance of caution, Plaintiffs argue in the alternative, in the event the Court finds otherwise, the drastic sanction of striking Dr. Najafi's report should be denied especially given the fact that a trial date has not even been set yet and likely will not take place for another year.  *See Lamothe*, 2007 WL 781909, at *1.  Plaintiffs made every accommodation of Defendants' requests and sought to diligently correct inexplicable gaps in data that were only presenting to Defendants.  Given the extraordinary prejudice that would befall Plaintiffs, in contrast to Defendants' ability to provide (which they already have) supplemental reports against Dr. Najafi, there is no basis to strike Dr. Najafi's report or any other expert that used his measured NDMA levels as examples of the amount of NDMA in Zantac tablets in their expert reports.

## VII.  <u>CONCLUSION</u>

Based on the foregoing, Brand Defendants' Expedited Motion to Strike Plaintiffs' Expert Ramin (Ron) Najafi should be denied, in its entirety, as there has been no failure to disclose and

no resulting harm to Defendants, and Defendants should be required to pay Plaintiffs' costs,

including attorneys' fees, for responding to their meritless motion pursuant to Rule 37(a)(5)(B).

DATED: June 27, 2022.

Respectfully submitted,

*/s/ Tracy A. Finken*
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

*/s/ Michael L. McGlamry*
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

*/s/ Adam Pulaski*
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

19

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO
LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800
Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000
Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

21

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706


Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (850) 435-7003


Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

/s/ *Robert C. Gilbert*
Robert C. Gilbert

23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE:  ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 2924 <br><br> Civil Action No. 9:20-md-2924 <br><br> JUDGE ROBIN L. ROSENBERG <br> MAGISTRATE JUDGE <br> BRUCE E. REINHART |

**THIS DOCUMENT RELATES TO:  ALL CASES**

## DECLARATION OF OF ROSEMARIE RIDDELL BOGDAN

**Rosemarie Riddell Bogdan,** hereby declare as follows:

1.       I am an attorney in the State of New York and a partner with the law firm of Martin, Harding & Mazzotti, LLP.  I am a member of the Court-appointed Plaintiffs' Steering Committee in MDL 2924. I am familiar with the facts and circumstances set forth herein. I submit this declaration in connection with Plaintiffs' Opposition to Defendants' Expedited Motion to Strike Plaintiffs' Expert Ramin (Ron) Najafi, Ph.D.

2.       Attached hereto as **Exhibit A** is a true and accurate copy of Dr. Ron Najafi's expert report and supplemental disclosures to Defendants.

3.       Attached hereto as **Exhibit B** is a true and accurate copy of an email by T. Finken dated March 1, 2022.

4.       Attached hereto as **Exhibit C** is a true and accurate copy of an email by W. Sachse dated March 1, 2022.

5.      Attached hereto as **Exhibit D** is a true and accurate copy of an email to Special Master Dodge by W. Sachse dated March 1, 2022.

6.      Attached hereto as **Exhibit E** is a true and accurate copy of an email by T. Finken to W. Sachse and K. Penner dated March 3, 2022.

7.      Attached hereto as **Composite Exhibit F** are true and accurate copies of: Boehringer Ingelheim's list of laboratory equipment including Agilent instruments such as Agilent 1290 Infinity (BOE_ZAN_MDL_0000974356); a book entitled "Identifying and Quantifying Mutagenic Impurities in Pharmaceutical Products" published by Agilent and produced by Sanofi (SANOFI_ZAN_MDL_0000780857); a peer-reviewed research article written by Agilent employees regarding the testing of NDMA in ranitidine which was produced by GSK (GSKZAN0003395434); and excerpts of deposition testimony of B. Olsen, pp. 57-59.

8.      Attached hereto as **Exhibit G** is a true and accurate copy of the study:  King, et al., *Ranitidine-Investigations into the Root Cause for the Presence of N-Nitroso-N, N-dimethylamine in Ranitidine Hydrochloride Drug Substances and Associated Drug Products,* Experimental Section, Method C, Organic Process Research & Development (2020).

9.      Attached hereto as **Exhibit H** is a true and accurate copy of the Declaration of Patrick Steffes, P. Chem.

10.      Attached hereto as **Exhibit I** is a true and accurate copy of the deposition testimony of Dr. Ramin Najafi.

11.      Attached hereto as **Exhibit J** is a true and accurate copy of an email by the undersigned dated June 10, 2022.

12.      Attached hereto as **Exhibit K** are true and accurate copies of screenshots of duplicate hard drives showing batch.bin files.

13.     Attached hereto as **Exhibit L** is a true and accurate copy of an email by T. Finken dated April 14, 2022.

14.     Attached hereto as **Exhibit M** is a true and accurate copy of an email by L. Bosso dated April 29, 2022.

15.     Attached hereto as **Exhibit N** is a true and accurate copy of an email by the undersigned dated May 2, 2022.

16.     Attached hereto as **Exhibit O** is a true and accurate copy of an email by the undersigned dated May 10, 2022.

17.     Attached hereto as **Exhibit P** is a true and accurate copy of the Declaration of Je Yon Jung.

18.     Attached hereto as **Composite Exhibit Q** are true and accurate copies of Emery Pharma's Citizens' Petition dated January 2, 2020 and documents from Emery Pharma's production to Defendants' subpoenas.

19.     Attached hereto as **Composite Exhibit R** are true and accurate copies of: SANOFI_ZAN_MDL_0000534544 - Wang et al., *Effect of oxidation on amine-based pharmaceutical degradation and N-Nitrosodimethylamine formation*, Water Research (2015); SANOFI_ZAN_MDL_0000812300 - Lim et al., *Determination of N-nitrosodimethylamine and N-nitrosomethylethylamine in drug substances and products of sartans, metformin and ranitidine by prescription and solid phase extraction and gas chromatography-tandem mass spectrometry*; and Journal of Pharmaceutical and Biomedical Analysis (2020); SANOFI_ZAN_MDL_0000817802 – Seid et al., *Nitrite ion mitigates the formation of NDMA during chloramination of ranitidine*, Science of the Total Environment (2018).

20.     Attached hereto as **Exhibit S** are true and accurate copies of the PDFs attached as

Exhibit C to Dr. Benotti's Declaration.

     I declare under penalty of perjury under the laws of the United States of America that the forgoing statements are true and accurate.

<i><u>/s/ Rosemarie Riddell Bogdan</u></i>

Dated:  June 27, 2022.

Motion to Seal/Sealed and Exparte Filings.

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

### U.S. District Court

### Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered by Gilbert, Robert on 6/27/2022 at 10:36 PM EDT and filed on 6/27/2022

**Case Name:**      IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

**Case Number:**    9:20-md-02924-RLR

**Filer:**               Zantac (Ranitidine) Products Liability Litigation

**Document Number:** 5750

**Docket Text:**
**Plaintiff's SEALED MOTION *Plaintiffs Opposition to Brand Defendants Expedited Motion to Strike* is filed under seal pursuant to the Order at ECF No. 5684 by Zantac (Ranitidine) Products Liability Litigation. (Attachments: # (1) Declaration of Rosemarie Riddell Bogdan) (Gilbert, Robert)**

**9:20-md-02924-RLR** No electronic public notice will be sent because the case/entry is sealed.

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=6/27/2022] [FileNumber=22326599-0] [53ad743802917be2a39d90577a262ab98763cd266947e1a991fb186588c9b37c42 f13db84ecac2f4cee4388b026584875fcd4b5cd92658701d1c86c31116b6b6]]
**Document description:** Declaration of Rosemarie Riddell Bogdan
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=6/27/2022] [FileNumber=22326599-1] [06f844215e4ffa5fb10d3aa6341a52fbb4895e133c6f5159b77086eef6f2e40647 a1780bf4d22e003f7c6d9153a54c3321ef8c38fe5161fecbcabe797ebc7dc6]]