# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| IN RE:  ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 2924<br>20-MD-2924<br><br>JUDGE ROBIN L. ROSENBERG<br>MAGISTRATE JUDGE BRUCE E. REINHART |

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS, RAMIN NAJAFI, PH.D., CHARLES DAVIS, PH.D. AND OTHER EXPERTS WHO RELY ON THEIR OPINIONS

## TABLE OF CONTENTS

I.      Emery Did Not Use Any Scientific Standard Applicable to Analytical Chemistry for Their Testing..................................................................................................................1

II.     Emery's NDMA Levels are Higher because of Emery's Flawed Methodology, which Departs from Well Established, Generally Accepted Methods ....................4

III.    Emery's Significantly Higher Results Cast Doubt on The Reliability of its Methods ..............................................................................................................................9

IV.     Dr. Najafi Ignored His Pre-Litigation, Citizen Petition Testing............................10

V.      Emery's Testing Is Not Peer Reviewed ...................................................................12

VI.     Dr. Najafi's Data is Untraceable and Unverifiable ..................................................14

VII.    Plaintiffs' attempts to Bolster and Recast Emery's testing as "Independent" are Meritless ..............................................................................................................15

VIII.   Opinions by other Experts premised on Dr. Najafi's Methods are Equally Unreliable ...............................................................................................................17

IX.     Conclusion ...............................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allgood v. GMC,*
  No. 1:02-cv-1077-DFH-TAB, 2006 U.S. Dist. LEXIS 70764 (S.D. Ind. Sep.
  18, 2006) ....................................................................................................................6

*Black v. Rhone-Poulenc, Inc.,*
  19 F. Supp. 2d 592 (S.D. W. Va. 1998)........................................................1, 6, 14

*Craig v. Orkin Exterminating Co.,*
  No. 99-8931-CIV, 2000 WL 35593214 (S.D. Fla. Nov. 22, 2000) ........................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)....................................................................................... *passim*

*In re Denture Cream Prod. Liab. Litig.,*
  No. 09-2051-MD, 2015 WL 392021 (S.D. Fla. Jan. 28, 2015), *aff'd sub nom.*
  *Jones v. SmithKline Beecham*, 652 F. App'x 848 (11th Cir. 2016) ..........................4

*Fail–Safe, L.L.C. v. A.O. Smith Corp.,*
  744 F. Supp. 2d 870 (E.D. Wis. 2010)...................................................................15

*Hendrix ex rel. G.P. v. Evenflo Co.,*
  609 F.3d 1183 (11th Cir. 2010) ..............................................................................3

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)................................................................................................15

*Hayer v. Univ. of Med.,*
  490 F. App'x 436 (3d Cir. 2012) ..............................................................................7

*Invitrogen Corp. v. Clontech Labs., Inc.,*
  429 F.3d 1052 (Fed. Cir. 2005)................................................................................7

*In re Johnson & Johnson Talcum Powder Prods. Liab. Litig.,*
  509 F. Supp. 3d 116 (D.N.J. 2020) ..........................................................................7

*Kilpatrick v. Breg, Inc.,*
  613 F.3d 1329 (11th Cir. 2010) ...............................................................................4

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999)................................................................................................11

*DRAFT 8/22/2022*
*Privileged & Confidential – Attorney Work Product*

*Lawrence v. Raymond Corp.*,
  No. 09–cv–1067, 2011 WL 3418324 (N.D.Ohio Aug. 4, 2011), *aff'd*, 501 F.
  App'x 515 (6th Cir. 2012) .................................................................................15

*In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig.*,
  892 F.3d 624 (4th Cir. 2018) ...............................................................................9

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ..............................4

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ......................................................................2, 13

*Moore v. Ashland Chem., Inc.*,
  151 F.3d 269 (5th Cir. 1998) ...............................................................................2

*In re Silica Prods. Liab. Litig.*,
  398 F. Supp. 2d 563 (S.D. Tex. 2005) ................................................................11

*Sutherland v. Matrixx Initiatives, Inc.*,
  No. CIV.A. 04-AR-0129-M, 2006 WL 6617000 (N.D. Ala. Nov. 7, 2006) .............................5

*In re TMI Litig. Cases Consol. II*,
  911 F. Supp. 775 (M.D. Pa. 1996), *aff'd*, 193 F.3d 613 (3d Cir. 1999),
  *amended*, 199 F.3d 158 (3d Cir. 2000) ...........................................................2, 12

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004)...................................................................6

*In re Viagra Prods. Liab. Litig.*,
  658 F. Supp. 2d 936 (D. Minn. 2009) .................................................................14

*Wade-Greaux v. Whitehall Labs., Inc.*,
  874 F. Supp. 1441 (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994)............................................11

*Watkins v. Telsmith, Inc.*,
  121 F.3d 984 (5th Cir. 1997) ..............................................................................11

*In re Zantac Prod. Liab. Litig.*,
  MDL No. 2924, Dkt. 3716 (S.D. Fla June 30, 2021) ............................................5

**Rules and Regulations**

21 C.F.R. 314.3 .......................................................................................................7

FED. R. EVID. 702 ............................................................................................. *passim*

**Other Authorities**

Charles J. Walsh & Marc S. Klein, *Dog Food to Prescription Drug Advertising:*
 *Litigating False Scientific Establishment Claims Under the Lanham Act*, 22
 SETON HALL L. REV. 389, 431 (1991-1992). ............................................................6

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011). ...................................3, 6

The FDA and regulatory agencies around the world, as well as scientists who have published peer-reviewed studies, have tested the levels of NDMA in ranitidine. Plaintiffs do not like those results, so they hired Dr. Ron Najafi and his laboratory Emery Pharma and paid them more than $2 million to do their own testing of ranitidine products for this litigation. After getting hired, Dr. Najafi rejected the FDA-validated analytical methods in favor of his own non-peer-reviewed and unvalidated methodology, which is unanchored to any objective scientific standards. Using this unreliable method, Dr. Najafi reported NDMA levels that are significantly higher than levels reported by FDA and every other independent researcher. Tellingly, these levels are also significantly higher than Dr. Najafi's own pre-litigation testing data for ranitidine, which he brushes aside in favor of his litigation-motivated opinion. Worse still, Dr. Najafi's ranitidine data are entirely unverifiable. Indeed, at his deposition, Dr. Najafi claimed that the **only** way to view Emery's actual data is to view it on Emery's internal computers, extending an invitation to Defense counsel that was immediately rescinded by Plaintiffs' counsel.

Plaintiffs effectively concede that, in many instances, Dr. Najafi departed from generally accepted methodology but argue that these departures go to weight, not admissibility. The issues with Dr. Najafi's testing, however, are not small and they are not few. At every step of his testing, Dr. Najafi departed from established scientific methodology in ways guaranteed to drive up the levels of NDMA. As another court put it under similar circumstances: "Perhaps one, or even several, of the issues set out above would, in isolation, be a matter of weight rather than admissibility. One can readily see the distinction here. ***The depth and breadth of litigation taint is so substantial the very validity of the study is compromised***." *Black v. Rhone-Poulenc, Inc.*, 19 F. Supp. 2d 592, 603-04 (S.D. W. Va. 1998) (emphasis added). Dr. Najafi's results-oriented methodology is unreliable and should not be allowed into evidence.

## I.     EMERY DID NOT USE ANY SCIENTIFIC STANDARD APPLICABLE TO ANALYTICAL CHEMISTRY FOR THEIR TESTING

Plaintiffs bear the burden of proving Dr. Najafi's opinions are reliable under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)*,* but they have not come forward with any evidence that Dr. Najafi met even the most basic of scientific standards. Plaintiffs' opposition attempts to bolster Emery's testing by stating that Emery is an "FDA registered and inspected laboratory, which authorizes it to conduct cGMP/GLP compliant work," but Emery did not use those standards or, indeed, any other standards, for its ranitidine testing.

While Dr. Najafi boasts that Emery's testing met the "highest scientific standards," he has never been able to identify what those standards are. It is indisputable that guidelines articulating scientific standards for analytical chemistry testing exist,[1] but Dr. Najafi did not use those standards. Instead, Dr. Najafi claims he followed standards that are not written down anywhere.[2] Dr. Najafi asks this Court to just take him at his word that his testing adhered to recognized, objective standards, without pointing to anything to support that claim. Dr. Najafi's unsupported assurances are insufficient to carry Plaintiffs' burden under Rule 702 and *Daubert*. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("O'Donnell attempts to anoint his opinions by claiming that he based them on the 'broad principles of pharmacology.' In the *Daubert* context, such phrases have little value."); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient."); *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 803 (M.D. Pa. 1996), *aff'd*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ("An expert's self-serving assertion that his methodology is standard of generally accepted will not withstand the rigors of a *Daubert/Paoli II* analysis.").

Indeed, in the one instance where Dr. Najafi was able to identify a written guidance (related only to a narrow topic), he did not follow that guidance. Specifically, when asked about the process for integrating chromatograms, Dr. Najafi testified that his lab follows guidance published on the Agilent website.[3] But the Agilent website suggests that standard operating procedures (SOPs) should be established to ensure reliability of manual integration, yet Emery did not establish or follow any SOPs for its ranitidine testing.[4] Likewise, Agilent says manual integrations should be

---

[1] *E.g.*, Olsen Rep. at 15-17, Ex. 12 to Decl. of Eva Canaan (Dkt. 5698-1) (describing various written standards for laboratory documentation and the ability to substantiate scientific findings for publication).

[2] Najafi Tr. at 140:11-12, Ex. 17 to Decl. of Eva Canaan ("Q. So I'm asking you for those highest generally acceptable standards that are not cGMP or GLP, what is your authority? Where are those standards listed? A. So these are -- these are generally accepted scientific principles. *They're not written anywhere that I can go to and point to you*.") (emphasis added).

[3] Najafi Tr. at 447:14-448:6, Ex. 17 to Decl. of Eva Canaan.

[4] *Id.* at 48:17-19 ("[T]here were no SOPs provided to us by the – by anybody or by the government or by ourselves.").

limited,[5] yet Emery routinely conducted manual integrations. The list of Emery's deviations from generally accepted standards goes on, and now when faced with potential exclusion, Plaintiffs pivot to argue that the Agilent guidance is inapplicable. Plaintiffs' Opposition, however, entirely ignores that this is the guidance that Dr. Najafi himself claimed to follow but did not. Plaintiffs cannot contradict Dr. Najafi's sworn testimony to save him from exclusion.

Emery's failure to follow any scientific standards is further illustrated by its failure to adhere to any SOPs for its ranitidine testing. Plaintiffs misleadingly quote the Reference Manual to suggest that "certified, highly experienced laboratories" should be considered to generally produce valid results, but they omit the beginning of the Reference Manual's statement: "Most major laboratories that routinely engage in this type of analysis have developed standard operating procedures…." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011) at 529-530. In fact, Dr. Najafi has previously testified in another matter that "everything we do is SOP driven. So we have SOP's on everything."[6] In this litigation, however, Dr. Najafi admitted that Emery did not have SOPs for its testing of ranitidine for NDMA, claiming instead that SOPs were not necessary because Emery was not following – and was not required to follow – cGMP or GLP.[7]

At every step, Dr. Najafi has resisted committing himself to any scientific standard to which he could be held to account. Instead, he invites the Court to accept his conclusions based on his own *ipse dixit*. This is contrary to the Court's gatekeeping duty. *Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183, 1197 (11th Cir. 2010) (affirming exclusion of expert because "other than Dr.

---

[5] *See* B. McDowall, *Controlling Chromatographic Integration to Ensure Data Integrity*, at https://www.agilent.com/cs/library/articlereprints/public/executivesummary-controllingchromatographic-integration-LCGC-openlab-agilent.pdf., Ex. 34 to Decl. of Eva Canaan.

[6] Najafi Valsartan Tr. at 114:21-22, Ex. A to Supp. Decl. of Eva Canaan (filed concurrently herewith).

[7] Najafi Tr. at 48:8-19. Plaintiffs' contention that SOPs are only necessary for GLP or cGMP is likewise wrong. Even non-regulated laboratories follow SOPs. As the National Institutes of Health has aptly put it: "Standard Operating Procedures (SOPs) are required for the operation of *all* laboratories." National Institute of Health, Office of Research Facilities, *Design Requirements Manual News to Use, Standard Operating Procedures and Lab Designs* (Oct. 2020)*,* available at https://orf.od.nih.gov/TechnicalResources/Documents/News%20to%20Use%20PDF%20Files/20 20%20NTU/Standard%20Operating%20Procedures%20and%20Lab%20Designs-October%202020%20News%20to%20Use_508.pdf) (emphasis added), Ex. D to Supp. Decl. of Eva Canaan.

Hoffman's own unsupported and qualified assertion of general acceptance in the scientific community, there is no evidence that Dr. Hoffman's theory is generally accepted in the relevant scientific community"); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1341 (11th Cir. 2010) (affirming exclusion of an expert's testimony because "vague reference … does not render his methodology reliable"); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 249 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) (excluding an expert who used an "unscientific 'black box' approach . . . [which] almost entirely prevents the finder of fact, or other experts seeking to validate or check his work, from conducting a meaningful and informed review").

## II.   EMERY'S NDMA LEVELS ARE HIGHER BECAUSE OF EMERY'S FLAWED, UNRELIABLE METHODOLOGY, WHICH DEPARTS FROM WELL ESTABLISHED, GENERALLY ACCEPTED METHODS

Plaintiffs effectively acknowledge that there are many instances where Emery's experimental designs departed from well-established methods, but they continuously argue that these issues go to weight, rather than admissibility. Emery's departure from established and generally accepted methodology, however, introduced a "myriad [of] serious methodological flaws" that cannot be ignored. *In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2015 WL 392021, at *11 (S.D. Fla. Jan. 28, 2015), *aff'd sub nom. Jones v. SmithKline Beecham*, 652 F. App'x 848 (11th Cir. 2016) ("While some of these flaws, on their own, may not be serious enough to justify exclusion of the Fixodent Blockade Study; taken together, the Court finds Fixodent Blockade Study is not 'good science,' and is not admissible."). Here, as in *Denture Cream*, Emery's methodological flaws were so numerous that its testing results are inadmissible.

*First*, Emery conducted testing where established, validated, and generally accepted methods existed, but in every instance, Emery departed from those methods to utilize methods that increased the levels of NDMA. For example, when designing its "consumer experience" experiments (experiments no other researcher or agency has ever used), Emery purported to rely on experimental designs described in published studies. But Emery's experiments consistently used conditions that were either the most extreme conditions of the study or were actually more extreme than any condition reported in the study. For instance, Dr. Najafi claimed to base some of his testing on the Aizawa study, where – as he candidly admitted – the relevant temperature only

reached 25°C (77°F) for five minutes.[8]  Yet, Emery's testing (which Dr. Najafi claimed was based on the Aizawa design) went up to 40°C (104°F) for thirty minutes—far higher than the study's relevant temperature and six-times the relevant amount of time. In fact, Emery's bathroom conditions of 40°C (104°F) and 100% Relative Humidity (RH) are well within the "extreme danger" zone in the heat index chart (*see* Figure 1, below), yet Plaintiffs would have this Court believe that consumers experience this condition for 30 continuous minutes every single day. As this Court has already held, it need not credit implausible arguments. *In re Zantac Prod. Liab. Litig.*, MDL No. 2924, Dkt. 3716 (S.D. Fla June 30, 2021) ("For the reasons already set forth, the Court finds it implausible to conclude, without any supporting factual allegations, that common carriers would expose the products in their care to 158-degree heat for a continuous period of 5 days before the ranitidine reached its ultimate destination."); *see also Sutherland v. Matrixx Initiatives, Inc.*, No. CIV.A. 04-AR-0129-M, 2006 WL 6617000, at *5 (N.D. Ala. Nov. 7, 2006) (excluding an expert whose underlying factual assertions were "facially implausible").



**Figure 1.** *National Weather Service, Heat Index Chart*[9]

---

[8] Najafi Reb. Rep. at 16, Ex. 10 to Decl. of Eva Canaan (noting that the changing room "is where a medicine cabinet would presumably be located" and only "reached 25°C/85% RH for about five minutes").

[9] Available at https://www.weather.gov/media/unr/heatindex.pdf; *see also* Olsen Rep. Fig. 6, Ex. 12 to Decl. of Eva Canaan.

**Second**, Emery did not use reliable sample selection methodologies for any of its testing, which undermines the reliability of the analyses. Plaintiffs attempt to justify the failure to have a sampling protocol by claiming that the various tests still used "a wide cross section of products," but most of the testing only used five batches total, with two of those batches being expired product. Moreover, the sampling methodology was not random, and it is basic scientific knowledge that failure to conduct random sampling significantly limits the study's value. *See, e.g.*, *U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 231-235 (S.D.N.Y. 2004) (excluding an expert's opinion because it was not based on a random or representative sample); *Allgood v. GMC*, No. 1:02-cv-1077-DFH-TAB, 2006 U.S. Dist. LEXIS 70764, at *35 (S.D. Ind. Sep. 18, 2006) ("Dr. Molholt's risk assessment, which is apparently meant to assess the risk on plaintiffs' land in general, was performed by using only a limited number of the available samples, and those that would tend to magnify greatly the risk calculation. Dr. Molholt has failed to offer any scientific justification for his sample selection choices, which are central to the reliability of his methodology. For this reason, as well, the court finds that Dr. Molholt's methodology for assessing the plaintiffs' risk of developing cancer was not sufficiently reliable to satisfy the demands of *Daubert* and Rule 702 due to selection bias and therefore cannot be admitted.").[10]

In their Opposition, Plaintiffs attempt to justify Dr. Najafi's disregard for reliable sampling protocols by arguing that regulatory requirements for drugs to be "bioequivalent" means that all samples tested by Emery would *de facto* have similar levels of NDMA as ranitidine drug products consumed by a patient. No expert has supported this newly-minted argument, because it is patently

---

[10] The Reference Manual emphasizes that "[s]tudy designs are developed before [scientists] begin gathering data" and constitute "procedures and methods, predetermined by an investigator, to be adhered to in conducting a research project." Ref. Man. at 573, 627. Further, "[a] protocol insures that, as the test progresses, investigators will not make *ad hoc* adjustments to reach a desired outcome. The protocol should prescribe, in advance, how the test will be conducted and how the data will be analyzed. The latter is essential to avoid 'data dredging'—looking through results without a predetermined plan until one finds data to support a claim." Charles J. Walsh & Marc S. Klein, *Dog Food to Prescription Drug Advertising: Litigating False Scientific Establishment Claims Under the Lanham Act*, 22 SETON HALL L. REV. 389, 431 (1991-1992), Ex. C to Supp. Decl. of Eva Canaan; *Black*, 19 F. Supp. 2d at 604 n.25 ("unnecessary deviation from [the] protocol raises the issue of [data dredging]").

wrong.[11]  Bioequivalence is not related to a product's impurities, but rather "is the absence of a significant difference in the rate and extent to which the *active ingredient or active moiety* in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action…" 21 C.F.R. 314.3. The measurement extends only to the active ingredient (here, ranitidine) and only as a measurement of the molecule within the human body. This requirement has absolutely nothing to do with impurities, which are monitored under an entirely separate set of tests and can vary batch-to-batch. Therefore, Plaintiffs' argument is unsupported by expert witness testimony and cannot be used to salvage Dr. Najafi's opinions. *See, e.g.*, *Hayer v. Univ. of Med.*, 490 F. App'x 436, 439 (3d Cir. 2012) ("[W]e do not have the benefit of any expert statistical analysis or opinion and counsel's own analysis is no substitute."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony."); *In re Johnson & Johnson Talcum Powder Prods. Liab. Litig.*, 509 F. Supp. 3d 116, 130, n. 6 (D.N.J. 2020) ("because the experts who are the subject of these *Daubert* motions did not review the newly-released studies in forming their expert opinions challenged here, I will not consider those studies for the purpose of resolving the pending motions.").

   ***Third***, Dr. Najafi used a testing method that is different than the ones recommended by FDA and used by every single researcher who has ever looked at the issue.[12]  Plaintiffs assert a brand-new argument that Emery's HILIC method is essentially the same as the reverse-phase method used by everyone else, but this is not supported by any expert testimony. In fact, Plaintiffs'

---

[11] Indeed, Plaintiffs' argument is inconsistent with their theory in this case. Plaintiffs have repeatedly claimed that storage conditions are a driving factor for the rate of NDMA formation, yet now they claim that all ranitidine is the same with respect to NDMA. Even their own expert disagrees, stating that one must look at the *exact batch* to determine the level of NDMA. Najafi Reb. Rep. at 13, Ex. 10 to Decl. of Eva Canaan ("To reiterate the results, the exact batch/lot of products dictated the course of NDMA formation from ranitidine."). Likewise, Plaintiffs' biostatistician refused to extend the results of his analyses to any ranitidine product that was not tested. Davis Tr. at 274:16–24, Ex. 16 to the Decl. of Eva Canaan ("I could not possibly do that.").

[12] The Opposition leaves the misimpression that LC-MS/MS is a single "widely accepted scientific method." *See, e.g.*, Pl. Opp. at 6. LC-MS/MS is an umbrella term that encompasses various different analytical testing methods, each of which must be validated for a particular purpose. The specific variation (HILIC) used by Emery is not an accepted methodology for testing NDMA in ranitidine, and has never been validated for this specific purpose.

argument is belied by Dr. Najafi, who acknowledged that the methods are different.[13] Additionally, Plaintiffs cite a Thermo Scientific document – which has not been interpreted by any of their experts – but even that document states that the methods are *opposites*.[14] Plaintiffs cannot claim that the two methods are essentially the same when their own expert, and their own cited literature, prove otherwise. Dr. Najafi has done nothing to justify his departure from established methods or to explain why his HILIC method yields more accurate results.

**Fourth**, Dr. Najafi did not validate his novel testing method to confirm its accuracy. Plaintiffs repeatedly parrot Dr. Najafi's self-serving claims that his HILIC method is validated without addressing the arguments raised by Defendants' Motion. In his deposition, Dr. Najafi admitted that his methods were not fully validated, but rather "fit-for-purpose" – meaning that Emery skipped certain validation parameters.[15]  When developing his method, Dr. Najafi believed that separation of chemicals during chromatography was "not as much of a concern."[16]  The scientific community disagrees and has repeatedly reminded researchers that they need to properly separate ranitidine from NDMA during the analysis for the results to be valid.[17]  Since Dr. Najafi openly admits he did not consider every validation parameter and that he did not think separation was important, there is an obvious flaw in Dr. Najafi's methodology.

The methodological flaws underlying Emery's testing are pervasive. At every step, Emery altered methods to increase the levels of NDMA. Dr. Najafi failed to properly explain his departures from established methodology, and justified his different methods based only on his own self-serving claims that his methods are reliable. He cannot cite any support for his opinions

---

[13] Najafi Rebuttal Rep. at 11, Ex. 10 to Decl. of Eva Canaan (recognizing the distinction between reverse phase HPLC and HILIC: "the method description in a validation summary as 'reverse-phase HPLC' is a typographical error – it should be HILIC chromatography.").

[14] Thermo Scientific, *HILIC Separations* (noting that HILIC "has been described as "reversed 'reversed phase'" . . .*which is the opposite of conventional reversed phase chromatography*.") (emphasis added), Ex. K to Supp. Decl. of Eva Canaan.

[15] Najafi Tr. 492:12-17, Ex. 17 to Decl. of Eva Canaan ("Our validations are fit-for-purpose validations. In other word, there may be different parameters. We only focus on what matters for the methodology we're pursuing.").

[16] Najafi Rebuttal Rep. at 10, Ex. 10 to Decl. of Eva Canaan.

[17] Olsen Supp. Rep. at 3, Ex. 13 to Decl. of Eva Canaan (citing EMA 2019, Trudeau Lame 2020, Yamamoto 2022).

or for his methods. The flaws in Dr. Najafi's testing are cumulative, growing on each other, to yield the highest levels of NDMA. Nonetheless, Dr. Najafi effectively ignores all data other than his litigation testing, including that of the FDA, other independent regulators, and his own pre-litigation testing. He does not even attempt to square his opinions with the discrepant data. Such results-oriented cherry-picking of data is a textbook case for exclusion. *In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

## III.   EMERY'S SIGNIFICANTLY HIGHER RESULTS CAST DOUBT ON THE RELIABILITY OF ITS METHODS

As detailed in the Defendant's Motion, numerous reliable, independent, and unbiased sources tested the baseline levels of NDMA in ranitidine products. Many of these sources tested products purchased directly from store shelves. Without exception, those independent researchers reported NDMA levels that are significantly lower than the results of Emery's litigation testing. This – in and of itself – casts doubt on the reliability of Emery's data. "[U]nder *Daubert*, when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." FED. R. EVID 702 advisory committee's note to 2000 amendment (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

Plaintiffs do not dispute that Emery's baseline testing results are significantly higher than baseline levels found by every other researcher.[18] Instead, Plaintiffs suggest that products from store shelves tested by other researchers were "only pristine product." Pl. Opp. at 27.  Plaintiffs are mistaken because all those products had necessarily been in the supply chain; they were stored for some period of time, transported to retailers, and then stored on retail shelves.  In addition,

---

[18] Higher results reported by Valisure in its September 2019 Citizen Petition were the result of the use of an inappropriate analytical methodology (GC/MS), which uses high heat and actually generates NDMA in ranitidine where there was none before.  FDA has expressly rejected the use of gas chromatography for analysis of NDMA in ranitidine. FDA response to Valisure, Ex. K to Suppl. Decl. of Eva Canaan.

Plaintiffs fail to acknowledge that Emery's cherry-picked litigation samples consisted entirely of older products (either expired or within one year of expiry) – most of which could not be marketed.

In short, Emery's baseline results are inconsistent with data generated by independent researchers from real-world evidence. Dr. Najafi's methodology – which ignores these real-world data to consider only the much higher results from his unrepresentative dataset – is patently results-oriented and litigation-driven.

## IV.    DR. NAJAFI IGNORED HIS PRE-LITIGATION CITIZEN PETITION TESTING

Plaintiffs do not dispute that Dr. Najafi's litigation-driven opinions are inconsistent with his own prior pre-litigation work. In fact, Dr. Najafi completely ignores his own testing performed outside the scope of this litigation. Dr. Najafi repeatedly ignores his own unfavorable pre-litigation data and instead reworked unreliable methods to drive the levels of NDMA higher.

For instance, Dr. Najafi conducted four baseline tests when preparing his Citizen Petition but does not include any of those results in the cherry-picked "baseline" level calculations he offers in this litigation.[19] The failure to include these data is a critical omission because the pre-litigation levels are significantly lower than his litigation-driven testing (*see* Figure 2 below). Additionally, his pre-litigation data were generated with the FDA-recommended method and are more representative of what consumers might be exposed to (because those products actually were sourced from the market and were unexpired at the time of testing). Yet Dr. Najafi does not properly account for this discrepant data in his opinions.



**Figure 2**

---

[19] Olsen Rep. at 27, Ex. 12 to Decl. of Eva Canaan.

Additionally, prior to retention, Dr. Najafi tested Zantac product at elevated temperatures 37°C (98.6°F) and reported "no differences" in the NDMA level at thirty-days.[20]  Dr. Najafi entirely ignores this data and now reports that NDMA levels rise even at lower temperatures (*e.g.*, 21°C/69.8°F) for shorter periods of time (*e.g.*, 2 weeks).[21]  In fact, Dr. Najafi goes so far as to claim that "[m]ost notably ***all samples*** tested, regardless of starting NDMA level, formed more NDMA."[22]  Dr. Najafi makes absolutely no attempt to square his litigation opinions with the contrary data he generated prior to being retained as Plaintiffs' expert.

Likewise, outside the scope of litigation, Dr. Najafi and his team considered 40°C (104°F) to be representative of conditions "if left in your car during the heat of summer!"[23]  Yet, for this litigation, Dr. Najafi used a far higher (and unrealistic) temperature – up to 75°C (167°F) to "simulate" a hot car.  Despite bearing the burden to prove Dr. Najafi's opinions to be reliable, Plaintiffs do not offer any explanation for these inconsistencies.

The differences between Dr. Najafi's pre-litigation testing and his litigation testing demonstrate that he did not follow the same rigor in the litigation work as in his other professional endeavors, a key factor weighing against admissibility. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The 'objective' 'of *Daubert's* gatekeeping requirement' 'is to make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"); *Watkins v. Telsmith, Inc*., 121 F.3d 984, 990 (5th Cir. 1997) ("Rule 702 demands that experts 'adhere to the same standards of intellectual rigor that are demanded in their professional work'"); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1456 (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (excluding expert who "[a]lthough [she] disavows in the courtroom the methodology generally accepted by the scientific community, … has published articles to the scientific community … in which she has recognized and adopted that methodology"); *In re Silica Prods. Liab. Litig*., 398 F. Supp. 2d 563, 639 (S.D. Tex. 2005) ("Indeed, the gulf between the methodology Dr. Levy employed for this litigation and the

---

[20] Olsen Rep. at 28-29, Ex. 12 to Decl. of Eva Canaan; EMERY 0369-0374, Ex. C to Supp. Decl. of Eva Canaan.

[21] Najafi Rep. at 122-125, Ex. 9 to Decl. of Eva Canaan.

[22] *Id.* at 125 (emphasis added).

[23] EMERY 0321–0338 at EMERY 0329, Ex. 36 to Decl. of Eva Canaan.

methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that 'an expert ... employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'").

The fact that Dr. Najafi failed to properly take into account his own discrepant data underscores the unreliability, and results-oriented nature, of his litigation opinions. *In re TMI Litig.*, 911 F. Supp. at 802 (excluding expert witness opinion on analytical testing which failed to consider contrary data because "[a] proper methodology would have incorporated these [contrary] findings and appropriately modified the underlying hypothesis.").

## V.   EMERY'S TESTING IS NOT PEER REVIEWED

Plaintiffs admit that none of Emery's data or methodology is peer-reviewed but argue that peer review is impossible given the Court's confidentiality order.[24]  There are three main problems with this argument:

*First*, Defendants have never claimed confidentiality over Emery's data. In fact, just the opposite: Defendants asked the Court to unseal Plaintiffs' expert reports, including Dr. Najafi's, and the Court granted that motion. Dkt. 5453. Currently, Dr. Najafi's data is discussed and summarized publicly on the Court's docket,[25] so it is not clear what Plaintiffs believe is confidential. Plaintiffs cite inapposite language from several orders to suggest that the data is "highly confidential," but those designations related to paperwork transmitting the samples—not the samples themselves, the results of Emery's testing, or Dr. Najafi's methods or experimental designs.

*Second,* Dr. Najafi's claim that he will eventually test the reliability of the work through peer-reviewed publication – but only after this litigation has concluded – confirms that he does not

---

[24] Plaintiffs also argue that another expert of theirs, Dr. Marletta, believes Emery's data was publishable. Not only is this hypothetical purely speculative, but it is also contrary to Dr. Marletta's testimony. Dr. Marletta testified that he needed to analyze Emery's original data, which he has not done, before he assessed its reliability. Marletta Tr. 261:12-13, Ex. B to Supp. Decl. of Eva Canaan ("I would want to see the original data, analyze it for myself.").

[25] *See, e.g.*, Brand Def. Mot. (Dkt. 5732).  The Emery data is also discussed and summarized in the Reports of Dr. Davis (Dkt. 5946-3), Dr. Olsen (Dkt. 5946-43), and Dr. Guengerich (Dkt. 5946-42).  Further, Plaintiffs have not sought to keep the Najafi Report under seal.

have an earnest belief that the data are confidential.[26]  Confidentiality will not change depending on whether the litigation is active or concluded.[27]  Therefore, Plaintiffs cannot claim both that the data is confidential, and that they intend to publish it in the future.

   **Third,** even if Emery was under the impression that Defendants were claiming confidentiality over their samples, Emery had additional samples it acquired by other means and was free to publish its methodology. In fact, Emery told FDA in its Citizen Petition that it intended to get its data peer-reviewed and published, but Emery never made any effort to publish any of its work,[28] and Dr. Najafi has since admitted that the data were not suitable for publication.[29] Moreover, after the Citizen Petition, Emery conducted additional testing with products it acquired from eBay and typeset a manuscript that underwent multiple rounds of edits.[30]  Emery actually presented its methodology and results both on YouTube and at a conference (which plainly illustrates that at least some of the data is not confidential), but again chose not to subject that methodology or those test results to the peer-review process.[31]

   Given the above, there can be no doubt that Emery opted to forgo the peer-review process entirely by choice, likely because Dr. Najafi realized the work was not of publication quality. Regardless of the reason, Dr. Najafi has not tested his theories in the peer reviewed literature, and this significantly weighs against the admissibility of the data. *See, e.g., McClain*, 401 F.3d at 1251

---

[26] Najafi Reb. Rep. at 13, Ex. 10 to Decl. of Eva Canaan ("[W]e would certainly like to publish these data once the litigation has concluded.").

[27] PTO 26 specifically requires that "[t]he provisions of this Order shall not terminate at the conclusion of this Litigation. This Order shall remain in full force and effect …" and the attestation requires signatories to agree that their "obligation to honor the confidentiality…will continue even after this Litigation concludes."

[28] Emery Pharma Citizen Petition at 6, Ex. 35 to Decl. of Eva Canaan ("Emery Pharma expects to complete the study over the next few weeks and is preparing the data for a peer-reviewed publication."); Emery 30(b)(6) Tr. at 229:11-19, Ex. 18 to Decl. of Eva Canaan ("Our intent was to publish at the time."); *id.* at 243:8-11 (Q. "[H]as any of that data or Emery's methodology been submitted for publication in a peer-reviewed journal? A. No, it has not.").

[29] Najafi Tr. at 560:15-18, Ex. 17 to Decl. of Eva Canaan ("[T]he preliminary results that we have filed during our Citizen Petition was not sufficient for a publication.").

[30] EMERY 02294-316; EMERY 02442-465; EMERY 02387-410; EMERY-02411-441, Exs. D, E, F and G to Supp. Decl. of Eva Canaan.

[31] Emery 30(b)(6) Tr. at 172:18-173:2, Ex. 18 to Decl. of Eva Canaan.

(reversing admission of plaintiffs' expert's opinions, in part, because plaintiffs had "failed to present evidence of any peer review of his opinions"); *Craig v. Orkin Exterminating Co*., No. 99-8931-CIV, 2000 WL 35593214, at *3 (S.D. Fla. Nov. 22, 2000) (excluding chemist and neurologist from testifying that acephate exposure causes a cardiac and neurological injury because, in part, "[t]he theories or techniques that they formulated were not subject to peer review or publication").

## VI.   DR. NAJAFI'S DATA IS UNTRACEABLE AND UNVERIFIABLE

There is no way for Defendants or this Court to trace or verify Dr. Najafi's methodology and testing.  Plaintiffs argue that Emery "meticulously documented" its testing, and that any analyst can evaluate its results. Nothing could be further from the truth. In fact, during his deposition, Dr. Najafi could not do so: he was unable to trace a single result he provided in his report to the raw data folders (either in the pdf reports or in MassHunter files shown to him through a screen share) or in the Emery lab notebooks.[32]  And, because Emery did not maintain or produce all the data and documentation underlying its testing, it is now impossible to replicate or verify the testing methodology or the reliability of the reported results.

Numerous courts have ruled that testing results are inadmissible when sufficient information regarding the underlying methodology and testing is not available, so that it is impossible to assess the testing's reliability. *See, e.g., Black,* 19 F. Supp. 2d at 598-600 (precluding reliance on a study where "independent reconstruction would be exceedingly difficult if not impossible" given the investigator's "poor record keeping"); *In re Viagra Prods. Liab. Litig*., 658 F. Supp. 2d 936, 944–45 (D. Minn. 2009) (ruling that study that was based on data "that cannot now be documented or supported renders it inadmissibly unreliable"; the study as published "lacks sufficient indicia of reliability to be admitted as a general causation opinion").

Plaintiffs argue in their Opposition that Emery properly documented all its work, and that it is reproducible and traceable. But Defendants' experts reviewed Emery's data and could not trace the data with the information produced by Dr. Najafi.[33]  In response to the fact that not even Dr. Najafi could trace his results to the raw data, Plaintiffs purportedly "trace" a single value. Pl. Opp. at 42. But that effort falls flat, since they are forced to admit that the number transforms from

---

[32] Najafi Tr. at 106:17-107:3, Ex. 17 to Decl. of Eva Canaan.

[33] Guengerich Supp. Rep. at 4-5, Ex. 7 to Decl. of Eva Canaan; Olsen Supp. Rep at 4, Ex. 13 to Decl. of Eva Canaan; Bumpus Supp. Rep. at 2, Ex. 2 to Decl. of Eva Canaan.

376.5 to 412.9 and 444.0 to 407.5 **without any written record to support this transformation**.[34] This is the epitome of untraceability in laboratory work. Simply changing numbers and claiming there is a justification – but the reason is kept inside a black box at Emery – cannot meet Plaintiffs' burden of proving Dr. Najafi's opinions are reliable and based on a methodology that can be reviewed and replicated. Experts must follow some discernible methodology, and it may not be "a black box into which data is fed at one end and from which an answer emerges at the other." *Lawrence v. Raymond Corp.*, No. 09–cv–1067, 2011 WL 3418324, at *7 (N.D.Ohio Aug. 4, 2011), *aff'd*, 501 F. App'x 515 (6th Cir. 2012). Rather, "the Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Id.*; *accord Fail–Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court ... the court cannot simply take an expert's word for a specific proposition."). It is well settled that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

There is no way to verify Emery's data, to trace the results from Dr. Najafi's reports to the raw data, or to reproduce Dr. Najafi's reported results. Dr. Najafi himself acknowledged that the testing methods must be "reproducible" and "repeatable."[35]   Emery's lack of proper documentation and traceability renders the ranitidine testing inherently unreliable and inadmissible.

## VII.   PLAINTIFFS' ATTEMPTS TO BOLSTER AND RECAST EMERY'S TESTING AS "INDEPENDENT" ARE MERITLESS

Emery has a significant financial incentive to find high levels of NDMA, and – as one would expect – Emery found significantly higher levels, on average, than other researchers and the FDA. Plaintiffs argue that the obvious financial bias ($2,200,000 in payments from Plaintiffs'

---

[34] In their Opposition, Plaintiffs admit that the transformation occurred during a "second review" which is not justified, explained, or properly recorded anywhere. Pl. Opp. at 42. Emery analysts just changed the final value but did not record how or why. Nonetheless, Plaintiffs ask this Court to assume the change is proper without offering any evidence or expert witness testimony to support it.

[35] Najafi Tr. at 140:17-19, Ex. 17 to Decl. of Eva Canaan.

counsel) is immaterial because Plaintiffs paid Emery instead of Dr. Najafi.[36]  This is, however, a meaningless distinction since Emery is wholly owned by Dr. Najafi and his wife.[37,38]

The significant financial incentives to design a methodology that would drive up NDMA levels, coupled with the fact that Emery's analysts were able to exercise uncontrolled discretion during testing (something Plaintiffs do not dispute), cast serious doubt on the reliability of Emery's testing. Plaintiffs' only response is that because Dr. Najafi submitted his Citizen Petition prior to his formal retention, he must be unbiased. But even that is a fallacy: by the time Dr. Najafi was preparing his Citizen Petition, he had already been retained as an expert in the Valsartan litigation (which also alleges nitrosamine contamination of pharmaceutical products) by these same Plaintiffs' counsel; he was being paid by Valisure to conduct ranitidine testing; and he told a reporter that he anticipated being retained in the instant litigation.[39]  And, of course, $2.2 million later, Dr. Najafi's testing results were dramatically higher than Emery's initial testing.

Plaintiffs also attempt to bolster Dr. Najafi's litigation testing by falsely claiming that FDA relied on Emery's Citizen Petition (and thus implying that all of Emery's results must be reliable). Plaintiffs' argument, however, ignores the factual record.  Any action FDA took with respect to the Citizen Petition is irrelevant because Dr. Najafi changed the analytical methodology for his litigation testing, and FDA did not review or approve of or validate the methodology Emery used

---

[36] Pl. Opp. at 28.

[37] Najafi Tr. 126:4-5, Ex. 17 to Decl. of Eva Canaan.

[38] Plaintiffs have taken markedly inconsistent positions regarding bias. Plaintiffs have urged this Court to disregard the findings of peer-reviewed studies simply because some of the authors have ties to the pharmaceutical industry. Dkt. 5841 (MDL Plaintiffs arguing that a peer-reviewed article co-authored by scientists employed by pharmaceutical companies "is a highly suspect source"); Dkt. 5915 (MDL Plaintiffs arguing that a peer-reviewed article written by party's prior consultant "surely is relevant to the weight of that study"). While the studies Plaintiffs attack were not conducted for litigation and have successfully undergone peer review, Emery's data is in a significantly worse position since it was generated for litigation, was entirely funded by Plaintiffs' counsel, and has never undergone peer review.

[39] EMERY 0555-0556, Ex. H to Supp. Decl. of Eva Canaan (Dec. 17, 2019: "Daniel Nigh, the lawyer focused on both Valsartan and Zantac. Just for the sake of full disclosure I have been retained by him and his partners as expert witness on Valsartan. They may also engage us on Zantac."); Emery 30(b)(6) Tr. at 55:21-56:7, Ex. 18 to Decl. of Eva Canaan.

for the litigation testing.  In any event, FDA did not actually rely on the Emery Citizen Petition.[40]
Instead, FDA performed its own testing which formed the basis of its decision.[41]  This is not a
disputed fact and even Dr. Najafi acknowledged this during his deposition:

> Q.      Are you aware that FDA relied solely on their own testing
>         when requesting a recall of ranitidine products?
>
> A.      I believe so.[42]

Nonetheless, Plaintiffs continue to mischaracterize the evidence and advance a false narrative that
even their expert has refuted.

Despite Plaintiffs' meritless assertions, the fact remains that Dr. Najafi's testing is the result
of a methodology generated solely for litigation and that has not been validated or peer reviewed.
Dr. Najafi's financial bias casts doubt on the reliability of his testing and weighs against the
admissibility of the evidence.

## VIII.   OPINIONS BY OTHER EXPERTS PREMISED ON DR. NAJAFI'S METHODS ARE EQUALLY UNRELIABLE

Any expert witness opinion that relies on Emery's testing or Dr. Najafi's opinions should
likewise be excluded.  If this Court finds that Dr. Najafi's testing was unreliable, the portions of
expert witness opinions that rely on the data or Dr. Najafi's analysis should be excluded as well.

## IX.    CONCLUSION

Plaintiffs failed to carry their burden of proving Dr. Najafi's opinions are based on reliable
methodology. This failure extends to experts' opinions who rely on Dr. Najafi's data or
conclusions. Accordingly, the Court should grant Defendants' Motion and exclude as inadmissible
the opinions of Dr. Najafi in their totality, as well as any portions of other experts' opinions that
rely on Dr. Najafi's testing.

Dated: August 22, 2022                    Respectfully submitted,

                                          By:   /s/ Andrew T. Bayman
                                                Andrew T. Bayman
                                                KING & SPALDING LLP

---

[40] FDA Letter to Ramin Najafi, PhD at 1, n.2, Ex. I to Supp. Decl. of Eva Canaan.

[41] *Id.* at sections II and III; *see id.* at 11-12 (referencing the FDA's laboratory tests, not Emery's results).

[42] Najafi Tr. 559:16-21, Ex. 17 to Decl. of Eva Canaan (objection omitted).

1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com

*Attorneys for Defendant Boehringer Ingelheim*
*Pharmaceuticals, Inc.*

By:   /s/ Mark S. Cheffo
      Mark S. Cheffo
      DECHERT LLP
      1095 Avenue of the Americas
      New York, NY 10036
      Tel: (212) 698-3500
      Fax: (212) 698-3599
      mark.cheffo@dechert.com

      *Attorneys for Defendant GlaxoSmithKline LLC*

By:   /s/ Joseph G. Petrosinelli
      Joseph G. Petrosinelli
      WILLIAMS & CONNOLLY LLP
      725 Twelfth Street, N.W.
      Washington, DC 20005
      Tel: (202) 434-5000
      Fax: (202) 434-5029
      jpetrosinelli@wc.com

      *Counsel for Defendant Pfizer Inc.*

By:   /s/ Anand Agneshwar
      Anand Agneshwar
      ARNOLD & PORTER KAYE SCHOLER LLP
      250 West 55th Street New York, NY 10019
      Tel: (212) 836-8000
      Fax: (212) 836-8689
      anand.agneshwar@arnoldporter.com

      *Attorneys for Defendants Sanofi US Services Inc.,*
      *Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

18

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of August, 2022, I electronically filed the foregoing DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS, RAMIN NAJAFI, PH.D., CHARLES DAVIS, PH.D. AND OTHER EXPERTS WHO RELY ON THEIR OPINIONS through the CM/ECF system, which will provide automatic notification to all CM/ECF participants.

*/s/ Andrew T. Bayman*
*Andrew T. Bayman*

1