## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                              MDL No. 2924
PRODUCTS LIABILITY                                      20-MD-2924
LITIGATION

JUDGE ROBIN L. ROSENBERG

MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**BRAND DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE INADMISSIBLE OPINIONS OF DR. BERNARD OLSEN (DE 5870)[1]**

---

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.  Emery's Pre-Litigation Testing ................................................................................2

    B.  Emery's Post-Retention Litigation Testing and Dr. Olsen's Criticisms.......................3

ARGUMENT........................................................................................................................5

    A.  Dr. Olsen correctly and reliably demonstrates that Dr. Najafi failed to follow
        *any* generally accepted standards for analytical laboratory testing............................5

    B.  Dr. Olsen correctly demonstrates that Dr. Najafi's methodology is unreliable
        by showing the extreme disparity between Dr. Najafi's data and other results .........7

        1.  Dr. Olsen considered all the relevant data.................................................8

        2.  Dr. Olsen considered the real-world, marketplace conditions of the
           samples ....................................................................................................11

    C.  Dr. Olsen correctly criticized Dr. Najafi for failing to consider confounding
        in his results ........................................................................................................12

    D.  Plaintiffs' catch-all argument that Dr. Olsen's opinions regarding "concerns"
        over Dr. Najafi's data are "imprecise, unspecified, and unsubstantiated"
        mischaracterizes the record ..................................................................................16

CONCLUSION ..................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
  402 F.3d 1092 (11th Cir. 2005) ...............................................................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................................................................1, 8

*Diamond Resorts U.S. Collection Development, LLC v. Newton Group Transfers,*
  *LLC*, No. 9:18-CV-80311, 2022 WL 1642865 (S.D. Fla. Mar. 31, 2022) ........................5, 14

*Hendrix v. Evenflo Co. Inc.*,
  255 F.R.D. 568 (N.D. Fla. 2009) ...............................................................................16

*Interra Int'l LLC v. Al Khafaji*,
  No. 1:16-CV-1523-MHC, 2020 WL 10727982 (N.D. Ga. Sept. 18, 2020) ...........................5

*King v. Cessna Aircraft Co.*,
  No. 03-20482-CIV, 2010 WL 1980861 (S.D. Fla. May 18, 2010).........................................17

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
  No. 13-CIV-80371, 2015 WL 11251759 (S.D. Fla. July 6, 2015) ...........................................7

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017)......................................................................2

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)........................................................................................8

*Parkervision, Inc. v. Qualcomm Inc.*,
  No. 3:11-cv-719, 2013 WL 12152672 (M.D. Fla. 2013)........................................................11

*PODS Enters. v. U-Haul Inter., Inc.*,
  No. 8:12-CV-01479, 2014 WL 12628664 (M.D. Fla. June 27, 2014)....................................11

*Price v. Carnival Cruise Lines*,
  No. 20-cv-20621, 2022 WL 951318 (S.D. Fla. Mar. 30, 2020) ...............................................17

*Romano v. John Hancock Life . Co. (USA)*,
  No. 19-21147-CIV, 2022 WL 1447733 (S.D. Fla. May 9, 2022).............................................7

*Soldo v. Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003) ........................................................................7

*In re Traysol Prods. Liab. Litig.*,
  No. 08-md-01928, 2010 WL 4052141 (S.D. Fla. May 12, 2010) ..........................................17

*Wicker v. Ford Motor Co.*,
  393 F. Supp. 2d 1229 (W.D. Okla. 2005) .................................................................................14

*Wilder v. Eberhart*,
  977 F.2d 673 (1st Cir. 1992) .....................................................................................................14

*Wreal LLC v. Amazon.com, Inc.*,
  No. 14-21385, 2016 WL 8793317 (S.D. Fla. Jan. 7, 2016) ......................................................14

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..............................................................................5, 14

**Other Authorities**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011) ......................................................13

## INTRODUCTION

Plaintiffs seek to exclude some – not all – of the opinions of Dr. Bernard Olsen, an analytical chemist who identified numerous flaws in the testing of ranitidine samples performed by Plaintiffs' expert Ron Najafi and his analytical laboratory, Emery Pharma ("Emery"). Dr. Najafi claims that his testing showed NDMA levels in the ranitidine samples that were orders of magnitude higher than the results reported by independent third parties such as the U.S. Food and Drug Administration ("FDA"). Dr. Olsen identified sloppy laboratory practices and pointed out methodological flaws in the Najafi/Emery testing.[2] Now Plaintiffs seek to limit the opinions expressed by Dr. Olsen.

Plaintiffs understandably do not challenge Dr. Olsen's impeccable qualifications or that Dr. Olsen's opinions will be helpful to a jury.  Dr. Olsen is an analytical chemist with more than four decades of experience in the development of pharmaceutical products; for twenty years, he served as an expert for United States Pharmacopeia (USP), the leading authority on public quality standards for the pharmaceutical industry.[3]  He has experience in directing testing for trace-level potential genotoxic impurities and served on USP's Joint Expert Subcommittee on Nitrosamine Impurities.

Instead, Plaintiffs challenge certain discrete opinions in which Dr. Olsen has identified errors or flaws in Dr. Najafi's data and claims.[4]  Plaintiffs' arguments are based on their upside-down view of the role of rebuttal experts and a misapprehension of Dr. Olsen's opinions and the scientific data.  For example, Plaintiffs effectively argue that Dr. Olsen must affirmatively prove the inverse of Dr. Najafi's opinions and cannot merely identify the gaps and errors in those

---

[2] Defendants have filed a motion to strike Dr. Najafi's data based on his failure to produce all the relevant data and laboratory documentation (ECF #5732), as well as a motion to exclude his unreliable opinions under *Daubert* (ECF #5733).

[3] *See* https://www.usp.org/about.

[4] Thus, Plaintiffs effectively concede that Dr. Olsen's remaining opinions are reliable and admissible.  For instance, Plaintiffs do not challenge Dr. Olsen's opinions that Dr. Najafi used experimental designs that are scientifically invalid and unreliable and that Dr. Najafi provided contradictory and unreliable interpretations of his data.  Olsen Rep. at 4-5, 46, 69-70, Ex. 4 to Decl. of Eva Canaan.

opinions.[5]  Plaintiffs' argument, however, finds no support in the law and would improperly shift the burden to Defendants to disprove that which Plaintiffs bear the burden of proving.  *See, e.g., Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1302 (N.D. Fla. 2017) ("The task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal expert, by definition, criticizes or rebuts the methodology or opinions of another expert.  There is no requirement that a rebuttal expert offer a competing [ ] analysis, for example; his opinions properly may be limited to criticizing the analysis and conclusions presented by another party.") (citations omitted).  Dr. Olsen's opinions criticizing Dr. Najafi's methods are themselves based on a reliable and generally accepted methodology and properly supported, and thus are admissible.

## BACKGROUND

### A.    Emery's Pre-Litigation Testing

In September 2019, FDA announced that an outside laboratory had found NDMA in some ranitidine products, and that it would be conducting its own investigation.  After that announcement, and before Dr. Najafi was retained as an expert in this litigation, Emery tested ranitidine samples for the presence of NDMA, purportedly to submit to FDA and publish in the peer-reviewed literature.  Emery's pre-litigation testing revealed that ranitidine was a "seemingly stable" medicine that contained only low levels of NDMA.[6]

Emery obtained those initial ranitidine samples from the marketplace and found that the samples tested contained baseline NDMA levels well below FDA's daily intake limit of 96 ng.[7]  In addition, Emery conducted stability testing and found that ranitidine was stable even at elevated

---

[5] Plaintiffs complain that Dr. Olsen "managed to amass a laundry list of (unsupported) criticisms of the work Dr. Najafi and the team at Emery Pharma performed" despite not doing any testing of his own.  *See* Pl. Mot. at 3.  Plaintiffs later conclude that "Dr. Olsen embraces the critic's easy task of complaining about Dr. Najafi's work."  *See id*. at 13.  Not only is this appropriate territory for expert opinions, but the Rules expressly allow such testimony.

[6] Emery Pharma Citizen Petition on Ranitidine, FDA Docket No. FDA-2020-P-0042-0001 (Jan. 2, 2020) ("Emery Petition"), Ex. 10 to Decl. of Eva Canaan, at 2.

[7] The results for the four samples Emery tested were: 1.33 ng/pill for Top Care ranitidine 150 mg, 1.44 ng/pill for Signature Care ranitidine 75 mg, 0.74 ng/pill for Zantac 150 mg, and 19.43 ng/pill for Zantac Cool Mint 150 mg. EMERY 0580, Ex. 12 to Decl. of Eva Canaan.  Of these, Dr. Najafi only reported the highest result (19.43 ng) in the Citizen Petition.  In any event, even if one were to assume taking the maximum daily dose of 300 mg, the results for all pre-litigation samples tested by Emery would be well below the FDA's 96 ng acceptable daily intake level.

temperatures, specifically finding that there were "no differences" in the level of NDMA after storage at 37°C (or 98.6°F) for thirty days.[8]  Emery, however, did not disclose most of its test results from this time period to either FDA or the general public.  Instead, in January 2020, Emery submitted its Citizen Petition to FDA, signed by Dr. Najafi, in which he reported only the highest NDMA results.  Likewise, Dr. Najafi failed to disclose to FDA that he was being paid by counsel for the plaintiffs in the Valsartan nitrosamine litigation, that those same counsel were already filing Zantac lawsuits at the time he submitted the Petition, and that he expected to be retained in the instant litigation by the same Plaintiffs' counsel.[9]

**B.     Emery's Post-Retention Litigation Testing and Dr. Olsen's Criticisms**

Shortly after submitting the Citizen Petition, Dr. Najafi was formally retained by Plaintiffs. Since then, Dr. Najafi has directed and supervised litigation-driven testing to support Plaintiffs' case-in-chief.  Rather than follow his laboratory's pre-retention testing method – which, as stated above, had found very low levels of NDMA – Dr. Najafi took a different approach. Specifically, he tested ranitidine products that were either expired or close to their expiry date, years after ranitidine had been taken off the market; he rejected the FDA-validated analytical methodology in favor of a method that no one else has used for this purpose; and, not surprisingly, he reported levels much higher than anyone has ever found.  Yet Dr. Najafi now claims, without support, that his litigation testing data alone is representative of NDMA levels to which individual Plaintiffs were allegedly exposed.

In response to Dr. Najafi's litigation testing, Defendants retained Dr. Olsen, an expert in analytical chemistry relating to pharmaceutical products.  Dr. Olsen reviewed Dr. Najafi's data and uncovered numerous inaccuracies related to the testing, deficiencies in Emery's laboratory documentation and testing methodology, and misrepresentations made by Dr. Najafi and the entire

---

[8] EMERY 0160, Ex. 11 to Decl. of Eva Canaan; Emery 30(b)(6) Tr. at 142:5-20. Ex. 6 to Decl. of Eva Canaan.

[9] EMERY 0555-0556, Ex. 13 to Decl. of Eva Canaan; Emery 30(b)(6) Tr. at 148:21-149:22, Ex. 6 to Decl. of Eva Canaan. Plaintiffs' Motion also mischaracterizes the significance of the January 2020 Emery Citizen Petition.  Throughout this litigation, Plaintiffs have repeatedly claimed that Emery was the first to observe the effect of heat and humidity on NDMA formation, but this is belied by the factual record.  Months before Emery submitted its Citizen Petition, GSK had identified this issue in a submission to FDA.  *See* GSKZNDAA0000636707, Ex. 14 to Decl. of Eva Canaan.  Plaintiffs ignore this evidence to improperly bolster their own expert's testimony.

Emery team.  The following are just a few of the significant errors Dr. Olsen identified in Dr. Najafi's reports and testing:

- On both the face of the Citizen Petition and again in his expert report, Dr. Najafi repeatedly claims that Emery is "cGMP/GLP compliant."[10]  *See, e.g.,* Najafi Rpt. at 3, Ex. 2 to Decl. of Eva Canaan.  Yet, upon review of the materials provided by Dr. Najafi in support of his litigation opinions, Dr. Olsen discovered that Emery did not comply with cGMP or GLP standards for any of its ranitidine testing.  Dr. Najafi has since had to admit as much. Najafi Tr. at 48:15-17, Ex. 8 to Decl. of Eva Canaan (admitting that "[t]he work that we have done for the plaintiffs were not done under GLP and GMP"); *see also* Najafi Reb. Rep. at 1, Ex. 3 to Decl. of Eva Canaan; Najafi Tr. at 47:22-48:4 and 48:15-17, Ex. 8 to Decl. of Eva Canaan. And, of even more significant concern, Dr. Olsen determined that Dr. Najafi failed to comply with *any* of the generally accepted standards for laboratory documentation and scientific recordkeeping.

- In formulating his litigation opinions, Dr. Najafi abandoned his own pre-litigation data and conclusions and ignored all validated data available in the public literature.  Instead, Dr. Najafi relied only on his own litigation-driven data which, as a whole, are substantially higher than the levels generally observed in testing performed by other researchers (including government agencies) using validated analytical methods.

- Emery's test methods have not been properly validated.  In his report, Dr. Olsen provides evidentiary support from peer-reviewed literature, statements from international regulators, application notes from the equipment manufacturers, and Emery's own data in support of his opinion.

Because the flaws in Dr. Najafi's opinions and Emery's testing are pervasive—far beyond the three issues noted above—Dr. Olsen provided a comprehensive 73-page report and a 5-page supplemental report.  Plaintiffs now choose to challenge some of Dr. Olsen's opinions that criticize

---

[10] "cGMP" refers to current Good Manufacturing Practice regulations enforced by FDA to ensure the safety of pharmaceutical products.  *See*  https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps.  "GLP" refers to Good Laboratory Practice regulations.  *See*  https://www.fda.gov/about-fda/economic-impact-analyses-fda-regulations/good-laboratory-practice-nonclinical-laboratory-studies.

Dr. Najafi's opinions and testing methodology.  For the reasons that follow, however, Dr. Olsen's criticisms are reliable and admissible.

**ARGUMENT**

Plaintiffs seek to exclude four of Dr. Olsen's opinions that criticize Dr. Najafi's report.  *See* Pl. Mot. at 1.  Specifically, Plaintiffs argue that: (1) Dr. Olsen improperly opined that Dr. Najafi did not comply with cGMP/GLP because these standards are inapplicable to Dr. Najafi's testing; (2) Dr. Olsen did not consider all of the relevant data in reaching his conclusion that Dr. Najafi's results are much higher than other comparable data; (3) Dr. Olsen did not properly support his claim that NDMA could be created during the volatilization or ionization process; and (4) Dr. Olsen's opinions criticizing Dr. Najafi's testing are not "specific" enough.  Plaintiffs' arguments mischaracterize Dr. Olsen's reports, testimony, and the evidentiary record.  They also attempt to flip the burden of proof.  Contrary to Plaintiffs' claims, a rebuttal expert—like Dr. Olsen—can criticize Dr. Najafi's data and methods, without performing calculations to conclusively disprove them.  *See, e.g.*, *Diamond Resorts U.S. Collection Development, LLC v. Newton Group Transfers, LLC*, No. 9:18-CV-80311, 2022 WL 1642865, at *12 (S.D. Fla. Mar. 31, 2022) (Reinhart, J.) (allowing defendants' statistics expert, who was tasked to provide a rebuttal opinion, to testify even though the expert had not "run his own model" of the data); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts."); *Interra Int'l LLC v. Al Khafaji*, No. 1:16-CV-1523-MHC, 2020 WL 10727982, at *5 (N.D. Ga. Sept. 18, 2020) ("As a rebuttal expert, Dopp is permitted to offer testimony that is critical of Hampton and Hampton's Report without offering his own opinion as to the amount of Plaintiff's damages.").

A.     **Dr. Olsen correctly and reliably demonstrates that Dr. Najafi failed to follow *any* generally accepted standards for analytical laboratory testing**

Plaintiffs mischaracterize Dr. Olsen's opinions and testimony regarding laboratory testing standards.  Plaintiffs argue that "Dr. Olsen reported that Dr. Najafi should have used Current Good Manufacturing Practices (cGMP) and Good Laboratory Practices (GLP) standards, but at deposition conceded these standards are inapplicable."  Pl. Mot. at 1; *see also id*. at 4, 8–9.  But Dr. Olsen has never claimed that Dr. Najafi was required to comply with cGMP or GLP standards.

5

Instead, it was *Dr. Najafi himself* who claimed to do so when he repeatedly stated (including in his Citizen Petition and again in his report) that his laboratory was "cGMP / GLP compliant," thereby creating the false impression that his testing of ranitidine samples complied with these industry standards.  Citizen Petition at 2 and 4, Ex. 10 to Decl. of Eva Canaan; Najafi Rep. at 3, Ex. 2 to Decl. of Eva Canaan.  After reviewing the relevant documentation, however, Dr. Olsen found that Dr. Najafi did not actually follow cGMP, GLP, or indeed any other generally accepted laboratory standards for his ranitidine testing.  Dr. Olsen called Dr. Najafi out for implying that he had complied with cGMP/GLP standards, when he clearly had not – a fact that Dr. Najafi ultimately had to admit in his supplemental report, where he, for the first time, stated that those standards did not apply to "research and development work."  Najafi Reb. Rep. at 2-3, Ex. 3 to Decl. of Eva Canaan.

In any event, Dr. Olsen's criticisms go beyond cGMP/GLP.  In his report, Dr. Olsen explains that regardless of what scientific standards a laboratory uses – cGMP, GLP, publishing standards, academic standards, etc. – all such standards have common, minimum requirements that Dr. Najafi failed to meet.[11]  Dr. Olsen correctly acknowledges that cGMP and GLP standards would not constitute legal requirements, although researchers voluntarily comply with those standards to increase the legitimacy of their work.  Olsen Rep. at 16, Ex. 4 to Decl. of Eva Canaan.  Dr. Olsen further states, "even though Dr. Najafi cites Emery as being a GMP and GLP compliant facility in his report discussing the results of his data, *his documentation does not satisfy basic requirements for either GMP or GLP*."  Olsen Rep. at 30, *id.* (emphasis added).  Dr. Olsen then goes on to explain in detail why Dr. Najafi's record-keeping practices are deficient; why they would not be relied upon by any similarly situated analytical chemist; and why Dr. Najafi's methodology is not generally accepted in the scientific community.  *See generally* Olsen Rep. at 30-41, *id.*  Finally, Dr. Olsen explains that Dr. Najafi's data could never be considered reliable because it is not reproducible, repeatable, or of publication quality.  *See, e.g.,* Olsen Rep. at 18, 30-32, 35, 37, *id.*  Dr. Najafi himself admits these criteria must be met for scientific data to be reliable.  *See* Najafi Tr. at 140:17-19, Ex. 8 to Decl. of Eva Canaan ("[Your methods] need[] to be reproducible, repeatable, and it needs to be, you know, obviously publication quality.").

---

[11] Notably, at his deposition Dr. Najafi could not identify *any* standards that he followed in his ranitidine testing. Najafi Tr. at 140:4-14, Ex. 8 to Decl. of Eva Canaan.

The cases Plaintiffs cite are inapposite.  *See* Pl. Mot. at 8 (citing *Romano v. John Hancock Life . Co. (USA)*, No. 19-21147-CIV, 2022 WL 1447733 (S.D. Fla. May 9, 2022), and *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 11251759 (S.D. Fla. July 6, 2015) ("*Tyco*")).  In both *Romano* and *Tyco*, the court excluded an expert because the expert applied inapplicable standards to reach his opinions.  Here, Dr. Olsen is not applying an inapplicable standard—he is assessing whether Dr. Najafi complied with the standards he cited in his opening report.   Courts routinely exclude experts who fail to follow their own stated methodology.  *See, e.g., Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 560 (W.D. Pa. 2003) ("The reliability of plaintiff's experts' opinions is significantly undermined by the fact that they abandon the method that they themselves have defined.").  Similarly, here, Dr. Olsen is simply pointing out that Dr. Najafi's methodology is unreliable because he did not do what he initially claimed to have done, namely, follow cGMP or GLP standards, irrespective of whether they are required.

### B.    Dr. Olsen correctly demonstrates that Dr. Najafi's methodology is unreliable by showing the extreme disparity between Dr. Najafi's data and other results

Dr. Olsen opines that Dr. Najafi's testing methodology is unreliable based in part on how extreme Dr. Najafi's test results were when compared to publicly available testing performed by unbiased third parties (including FDA).  For example, he showed that Dr. Najafi's *mean* NDMA level for a 150 mg dose of unexpired ranitidine product (1,096.6 ng) was:

- 2.35 times greater than the *highest value* reported by FDA (465 ng);

- 15.30 times greater than the *highest value* reported by Health Canada (71.685 ng);

- 10.15 times greater than the *highest value* reported by the Saudi Food & Drug Authority (108 ng); and, notably,

- nearly 72 times greater than the *highest value* found by Emery before Dr. Najafi was retained as an expert in this case.  Olsen Rep. at 43, Ex. 4 to Decl. of Eva Canaan.

Plaintiffs argue that Dr. Olsen (1) cherry-picked data to make these comparisons and (2) failed to consider "the age, expiration dates or the storage conditions of the samples" that he compared to Dr. Najafi's data.  Pl. Mot. at 1, 4–5, 9–11.  Both arguments are meritless.

## 1.      Dr. Olsen considered all the relevant data

Plaintiffs accuse Dr. Olsen of "cherry-picking" data (Pl. Mot. at 4–5, 9–11), claiming that he did not consider (1) certain results from FDA, (2) the baseline data points in the Abe 2020 or Braunstein 2021 studies, and (3) GSK or Sanofi's internal testing results. *See id.* at 4–5.  However, the purportedly missing data is either plainly included in Dr. Olsen's report or is irrelevant (does not fit) the specific analysis Dr. Olsen made.[12]

*First*, contrary to Plaintiffs' representations, Dr. Olsen's report discusses and analyzes all of FDA's results.  *See* Olsen Rep. at 41, Ex. 4 to Decl. of Eva Canaan ("FDA tested thirty-five ranitidine tablets … FDA also tested 180 ranitidine samples…").  Plaintiffs' argument appears to stem from confusion about the data: their motion cites levels of NDMA per 300 mg doses of ranitidine, whereas Dr. Olsen reported the same results per 150 mg doses of ranitidine.  In fact, since Dr. Najafi reported his results per 150 mg doses, Dr. Olsen standardized all results to a 150 mg dose so that an apples-to-apples comparison of the concentrations could be made.

*Second*, Plaintiffs' arguments regarding the two datapoints referenced in the Abe 2020 study and the single datapoint in the Braunstein 2021 study mischaracterize the studies.  For starters, Abe 2020 describes a *stress test* where researchers forced ranitidine to degrade into brown tablets.  Thus, most of the results cited by Plaintiffs are not relevant to and do not "fit" in a discussion of *baseline* NDMA levels.  *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("'Fit' is not always obvious, and the scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) ("[A]dmissibility depends in part on the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.") (internal citations and quotations omitted).  As Dr. Olsen notes in his report, "[t]he researchers' findings report that tablet browning occurred during the study, calling into question the practical significance of their data."  Olsen Rep. at 52, Ex. 4 to Decl. of Eva Canaan.  Although

---

[12] The irony cannot be lost that while there is no factual basis to claim Dr. Olsen cherry-picked any data, Dr. Najafi clearly did.  Dr. Najafi relied **only on his own litigation-driven testing** to reach his opinions.  Najafi Rep. at 5-6, Ex. 2 to Decl. of Eva Canaan.  He used only his own litigation results to calculate the mean baseline levels and excluded all other data, including his own pre-retention results, from his calculation.  Najafi Rep. at 5 and 64, *id*.  In essence, Plaintiffs claim Dr. Olsen did not consider enough data when their own expert considered even less.

not the purpose of their analysis, the Abe 2020 authors did report baseline levels of NDMA for two samples: 48 ng and 433.5 ng per 150 mg.[13]  These levels, however, would only further confirm that Dr. Najafi's results, with a mean baseline level of 1,096.6 ng, are biased extremely high.  It is telling that even the data Plaintiffs claim Dr. Olsen overlooked also support Dr. Olsen's opinions.

Moreover, the Braunstein 2021 study does not report any baseline results.  The result Plaintiffs cite in their Motion (947 ng) is actually not even the study's "baseline," since that NDMA level was measured after incubation in simulated gastric fluid (SGF) at pH 2.5 for 2 hours with 1 mM sodium nitrite.[14]  Further, Dr. Olsen did not rely on the Braunstein data because it was not generated by an independent third party.  The laboratory work for Braunstein 2021 was performed by David Light and his company, Valisure LLC, hardly a disinterested third party.  Light and Valisure have a clear financial interest in the ranitidine litigation, given that Light is the brother-in-law of one of the Plaintiffs' counsel in the instant litigation.  Because the single datapoint from Braunstein 2021 that Plaintiffs cite was not generated by an independent third party, it would not have been appropriate for Dr. Olsen's comparison, which looked only at testing done by independent third parties such as FDA.

*Third*, contrary to Plaintiffs' statements, Dr. Olsen reviewed and considered GSK's and Sanofi's data.  However, he did not rely on their data for his analysis, because both are defendants in this litigation, *i.e.*, not independent third parties.  Even if Dr. Olsen did rely on GSK and Sanofi's results, they would not impact the analysis because they are, like the data from all sources other than Emery, significantly lower than Dr. Najafi's baseline data.  *See* Olsen Rpt. at 45, Ex. 4 to Decl. of Eva Canaan ("Although I do not rely on the data from GSK and Sanofi for my opinions, the results of their testing are consistent with those from independent parties such as FDA and TGA and are not consistent with Emery's results.").

Further, Plaintiffs mischaracterize the data and incorrectly claim that Dr. Najafi's results are "similar" to Sanofi's and GSK's results.  Pl. Mot. at 5.  This is demonstrably untrue: Dr. Najafi's results are actually much higher and Plaintiffs' cherry-picked comparisons are misleading.

---

[13] These levels in units of ng/150 mg tablet have been mathematically determined from the levels reported by Abe in parts per million (0.19 and 2.89 ppm).

[14] *See* Braunstein, et al., *Analysis of Ranitidine-Associated NDMA Production Under Simulated Physiologic Conditions*, JAMA OPEN (2021), Ex. 19 to Decl. of Eva Canaan; VAL-BI 00033, Ex. 15 to Decl. of Eva Canaan; David Light Tr. 188:15-25, Ex. 7 to Decl. of Eva Canaan.

For example, Plaintiffs compared the *highest* result found by Sanofi with the *average* result found by Emery.  Even if that were an apt comparison—it is not—Emery's *average* is still about 200 nanograms higher than Sanofi's *highest* result.  The fact that certain of Emery's results at the lower range of the distribution overlap with the entirety of the ranges found by GSK and Sanofi does not support a claim that the results are "similar."  Figure 1 below compares Dr. Najafi's results to GSK's, Sanofi's, and the Abe 2020 data points.[15]  The figure confirms that Dr. Najafi's baseline results for unexpired ranitidine products are substantially *inconsistent* with GSK's baseline results. Specifically, Dr. Najafi's test results had a mean of 1096.61 ng NDMA /150 mg ranitidine and a median of 602.7; in contrast, GSK's results were 210.7 (mean) and 120.75 (median), and Sanofi's were 78.5 (mean) and 34.7 (median).



Figure 1
Reported Levels of NDMA
in 150 mg Ranitidine Drug Product

---

[15] Note that the graph in Figure 1 does not include three data points from Emery's results that exceeded the graph's range (outlier results = 11,425.8 ng, 12,076.5 ng, and 14,991.6 ng).  Only Emery has ever reported detecting values this high.

### 2. Dr. Olsen considered the real-world, marketplace conditions of the samples

Plaintiffs complain that Dr. Olsen did not consider "the age, expiration dates or the storage conditions of the samples" that he used to compare to Dr. Najafi's data. Pl. Mot. at 10. Again, Plaintiffs' argument misses the mark. Dr. Olsen compared Dr. Najafi's *litigation testing* samples (admittedly *not* from the marketplace, but rather retained samples produced by Defendants in the litigation) with *actual, real-world* marketplace samples analyzed by independent researchers and international regulatory bodies. As Dr. Olsen explained in his report, "for products actually obtained from the market, the storage conditions, container closure system, and sample selection are *de facto* representative of real-world conditions." Olsen Rep. at 12, Ex. 4 to Decl. of Eva Canaan. In other words, the results from testing of marketplace samples already show the effect of age, storage conditions, etc., in the real world. Moreover, contrary to Plaintiffs' claims, Dr. Olsen did in fact discuss the testing methodologies used by the various published studies that reported baseline levels of NDMA in ranitidine. *See* Olsen Rep. at 35, *id.* (commenting on the reversed phase method widely used by all non-Emery researchers, including FDA, Yamamoto 2022, Abe 2020, Yokoo 2021, King 2021, Waters 2020, Scheibner 2021, Mani 2020, EMA-Official Medicines Control Laboratory, and Health Canada). Plaintiffs have not cited any instance where Dr. Olsen relied on data but could not discuss the underlying testing methodology.

Lastly, here too, the cases Plaintiffs cite are inapposite. *See* Pl. Mot. at 9–10 (citing *PODS Enters. v. U-Haul Inter., Inc.*, No. 8:12-CV-01479, 2014 WL 12628664 (M.D. Fla. June 27, 2014), and *Parkervision, Inc. v. Qualcomm Inc.*, No. 3:11-cv-719, 2013 WL 12152672 (M.D. Fla. 2013)). In both cases, the experts failed to consider significant applicable data, which, as explained above, is not the situation here. In *PODS Enterprises*, for example, the court excluded the expert's opinion because he failed to consider all uses of the term "Pods" to develop his opinion that it was not a generic name for purposes of a trademark dispute. 2014 WL 12628664, at *3–4. In *Parkervision*, the expert only considered "cherry-picked, seven-year-old, internal documents to establish a reasonable royalty," which was unprecedented in a patent litigation case. 2013 WL 12152672, at *4. These cases are clearly distinguishable—both as to subject matter and as to their application to Dr. Olsen's opinions. Further, in these cases there were "radical differences" between what the expert considered and what the expert ignored. *Id.* The opposite is true here,

where the GSK and Sanofi data not only would not have changed the analysis in any way, but actually was consistent with and provides further support for Dr. Olsen's opinions.

In short, Dr. Olsen's opinion that Dr. Najafi's data is inconsistent with other publicly available test data from independent third parties is undeniably true and is based on a reliable methodology and sufficient data. Plaintiffs' arguments to the contrary are only designed to distract this Court from the fact that it was Dr. Najafi who failed to consider all of the relevant data and that his testing was designed to – and effectively did – drive up the levels of NDMA found in ranitidine samples, irrespective of their source or representativeness of real-world Zantac conditions.

**C.    Dr. Olsen correctly criticized Dr. Najafi for failing to consider confounding in his results**

In September 2019, the FDA issued a statement that analytical methods that use heat are inappropriate for testing ranitidine, because the testing itself generates NDMA (even in samples that contained no NDMA).[16]  FDA developed and published two analytical methods that were validated to test for NDMA in ranitidine.[17]  Dr. Najafi rejected both of those methods, and elected to use another analytical method instead (HILIC chromatography),[18] one that no one – not FDA and not any other regulatory body or independent researcher – has used for this purpose before or

---

[16] FDA, *UPDATE – FDA provides update on testing of ranitidine for NDMA impurities* (Oct. 2, 2019), available at https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine#:~:text=FDA%20has%20advised%20companies%20to%20recall%20their%20ranitidine%20if%20testing,conduct%20their%20own%20laboratory%20testing, Ex. 16 to Decl. of Eva Canaan.

[17] FDA, *Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product* (Sept. 13, 2019), available at https://www.fda.gov/media/130801/download, Ex. 17 to Decl. of Eva Canaan; FDA, *Liquid Chromatography-Tandem Mass Spectrometry (LC-MS/MS) Method for the Determination of NDMA in Ranitidine Drug Substance and Solid Dosage Drug Product* (Oct. 17, 2019), https://www.fda.gov/media/131868/download, Ex. 18 to Decl. of Eva Canaan.

[18] Hydrophilic interaction chromatography (HILIC) is a form of chromatography different and distinct from traditional reverse phase chromatography. The key difference relates to how the two methods separate the molecules for analysis. As Dr. Olsen noted, Dr. Najafi has never demonstrated that his method offers better, or even comparable, separation compared to FDA's method.  Olsen Supp. Rep at 3-4, Ex. 5 to Decl. of Eva Canaan.

since.  Dr. Olsen pointed out in his report that Dr. Najafi failed to properly validate his analytical method and to account for a potential confounding factor in the method, namely, high heat applied to vaporize the sample, that could inappropriately drive up the results for NDMA.  Dr. Olsen's concern is shared by the scientific community and is referenced in various peer-reviewed articles and authoritative documents.  Plaintiffs challenge this opinion, arguing that it is an "unsupported theory" because Dr. Olsen did not perform the testing to prove it.  Pl. Mot. at 1.  Plaintiffs' argument turns the science, the law, and the facts on their heads.

As a matter of proper scientific practice, since Dr. Najafi is affirmatively producing data, it is his obligation to ensure his methods are properly validated.  Olsen Supp. Rep. 2-3, Ex. 5 to Decl. of Eva Canaan.  This is how science works.  *See, e.g.*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 529-30 (3d ed. 2011) (noting that "it is very difficult to confirm reliability when analytical work is done in laboratories or by individuals who cannot provide evidence of certification or of longstanding quality control procedures"); USP Gen. Chapter <1225>, *Validation of Compendial Requirements* ("Validation of an analytical procedure is the process by which it is established, by laboratory studies, that the performance characteristics of the procedure meet the requirements for the intended analytical applications.").  For instance, when peer reviewers analyze manuscripts for potential publication, if a reviewer finds gaps in the validation, the work is unpublishable.[19]  It is not the peer reviewer's job to completely re-do the research just to prove a gap exists in the validation.  Here, Dr. Olsen's opinion is just that—a gap exists in Dr. Najafi's validation which calls into question the reliability of all his testing.  Plaintiffs appear to take the position that analytical methods are presumed valid until proven otherwise, but this position has absolutely no support in the scientific community and is actually the opposite of what the scientific method requires.

---

[19] *E.g.*, Jacalyn Kelly et al., *Peer Review in Scientific Publications: Benefits, Critiques, & A Survival Guide*, THE JOURNAL OF THE INTERNATIONAL FEDERATION OF CLINICAL CHEMISTRY AND LABORATORY MEDICINE (Oct. 24, 2014), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4975196/ ("When a reviewer is provided with a paper, he or she reads it carefully and scrutinizes it to evaluate the validity of the science, the quality of the experimental design, and the appropriateness of the methods used."); Wiley, *What is Peer Review?*, (last accessed Aug. 23, 2022), available at https://authorservices.wiley.com/Reviewers/journal-reviewers/what-is-peer-review/index.html (noting that a peer-review editor should inquire "Are methods valid. . . ?").

The law is also against Plaintiffs.  The relevant case law makes clear that Plaintiffs bear the burden of showing the reliability of Dr. Najafi's methods.  Yet, Plaintiffs attempt to improperly shift this burden to Defendants by claiming that Dr. Olsen must affirmatively and conclusively conduct his own testing to prove the unreliability of Dr. Najafi's testing, as opposed to merely pointing out flaws (such as lack of validation and potential confounding) in the methods used.  Under circumstances where there is an obvious gap in Dr. Najafi's testing, it is entirely appropriate for Dr. Olsen, as a rebuttal expert, to explain that this gap exists and why it undermines support for Dr. Najafi's conclusion.  *See Diamond Resorts*, 2022 WL 1642865, at *12 (defendants' rebuttal expert could testify even though he had not "run his own model" of the data); *Zyprexa*, 489 F. Supp. 2d at 285 (defendant's experts do not have the burden "to produce models or methods of their own" but rather "need only attack those of plaintiff's experts"); *Wreal LLC v. Amazon.com, Inc.*, No. 14-21385, 2016 WL 8793317, at *17 (S.D. Fla. Jan. 7, 2016) (allowing expert to proffer opinions reviewing and critiquing the opposing expert's methodology); *compare Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992) ("[D]efendant need not disprove causation.  Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence." (citation omitted)); *Wicker v. Ford Motor Co.*, 393 F. Supp. 2d 1229, 1238 (W.D. Okla. 2005) ("[I]t is not defendants' burden to disprove plaintiff's theory, but only to show that there is an absence of proof to support plaintiff's claim.").

Finally, as a matter of fact, Dr. Olsen fully supports his opinions.  Dr. Olsen is a leading authority on HILIC chromatography (the analytical methodology that Dr. Najafi utilized in his litigation testing), having published a book dedicated entirely to HILIC methods.[20]  Dr. Olsen is well aware of the steps required to validate a HILIC method for a particular use and what issues the method could pose.  Moreover, Dr. Olsen arrived at his opinion based on his review of the literature and of Dr. Najafi's own chromatograms and data.  Specifically, he explained that Emery's chromatograms demonstrate that Dr. Najafi's HILIC method failed to adequately separate ranitidine and other impurities from NDMA.  If proper separation has not taken place, the method may artifactually generate NDMA from the ranitidine because the test uses extremely high heat (300°C/572°F).  *See* Olsen Supp. Rep. at 3, Ex. 5 to Decl. of Eva Canaan.  A review of Dr. Najafi's

---

[20] Bernard A. Olsen & Brian W. Pack, HYDROPHILIC INTERACTION CHROMATOGRAPHY: A GUIDE FOR PRACTITIONERS (2013).

chromatograms shows that its chromatograms had multiple "peaks," which are not properly separated. A properly separated peak would look like a single mountain peak and be symmetrical on either side (as in FDA's chromatogram in Figure 2, below). The exemplar of Emery's chromatogram (below, Figure 2), on the other hand, shows multiple peaks which overlap with each other – in other words, one peak starts before the earlier one has ended and gone back down to the baseline – and the quantified peak is not symmetrical. This demonstrates insufficient and unreliable separation of the sample before being put through the test equipment. This is in direct contrast with FDA's method which provides a clear and resolved peak that can be reliably quantified.



**Figure 2. NDMA Chromatograms (FDA vs. Emery)**

---

[21] *Supra* note 16, Ex. 17. FDA, *Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product* (Sept. 13, 2019), available at https://www.fda.gov/media/130801/download, Ex. 17 to Decl. of Eva Canaan

[22] Benotti Decl. Exhibit C at NF-EMERY-02765, NF-EMERY-02810, Ex. 9 to Decl. of Eva Canaan.

Therefore, Dr. Olsen's opinions that Dr. Najafi used a novel, unvalidated, and non-peer-reviewed methodology that could have produced confounded results are well supported by the evidence and the scientific literature.[23]

As with their other arguments, the lone case Plaintiffs cite in support of this argument is distinguishable. *See* Pl. Mot. at 11 (citing *Hendrix v. Evenflo Co. Inc.*, 255 F.R.D. 568 (N.D. Fla. 2009)). In *Hendrix*, a car seat expert testified about hypothetical scenarios that have affirmatively caused injuries, but there was "no factual support for these scenarios in the record." Here, as explained above, Dr. Olsen fully supported his opinions. Olsen Supp. Rep. at 2-4, Ex. 5 to Decl. of Eva Canaan.

### D. Plaintiffs' catch-all argument that Dr. Olsen's opinions regarding "concerns" over Dr. Najafi's data are "imprecise, unspecified, and unsubstantiated" mischaracterizes the record

Finally, Plaintiffs include a throw-away argument that Dr. Olsen should be excluded due to what they claim are "a multitude of vague 'concerns,' untethered to any methodological basis …" Pl. Mot. at 1. Notably, Plaintiffs fail to identify which of Dr. Olsen's concerns they are claiming are vague or how those concerns impact the reliability of Dr. Olsen's methods. *See generally* Pl. Mot. at 6–7, 12–13.

In any event, even if taken at face value, Plaintiffs' argument ignores the record. Dr. Olsen submitted a detailed 73-page report and a 5-page supplemental report which provide detailed explanations and support for his opinions. Any overarching concerns Dr. Olsen has relating to Dr. Najafi's opinions and the lack of sufficient indicia of reliability of Dr. Najafi's methodologies are spelled out there. *See* Brand Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Experts, Ramin Najafi, Ph.D., Charles Davis, Ph.D and Other Experts Who Rely on Their Opinions (ECF 5732).

Further, although Plaintiffs now claim that certain parts of Dr. Olsen's deposition testimony were unclear, they failed to ever ask for clarification when given the opportunity. If

---

[23] On redirect during his deposition, Dr. Najafi attempted to refute this potential by offering three untested and speculative potential explanations. Najafi Dep. at 517:19–520:23, Ex. 8 to Decl. of Eva Canaan. His three untested suppositions, however, contradict findings in peer-reviewed literature. Guengerich Supp. Rep. at 8–9 (discussing the relevant literature), Ex. 1 to Decl. of Eva Canaan.

Plaintiffs were genuinely confused or had questions about which portion of Dr. Olsen's 73-page report he was referring to when he referenced his concerns, they could have asked. They made a strategic decision not to do so. In fact, there is not a single instance where Dr. Olsen could not elaborate on his opinions when asked to do so at his deposition. Therefore, the cases Plaintiffs cite—all involving experts who could not explain the bases for their opinions when pressed—are entirely inapposite.[24]

## CONCLUSION

Dr. Olsen's opinions are properly supported and reliable. The Court should therefore deny Plaintiffs' Motion.

Dated: August 24, 2022                          Respectfully submitted,

By:   */s/ Andrew T. Bayman*
      Andrew T. Bayman
      KING & SPALDING LLP
      1180 Peachtree Street, NE, Suite 1600
      Atlanta, GA 30309-3521
      Tel: (404) 572-4600
      Fax: (404) 572-5100
      abayman@kslaw.com

      *Attorneys for Defendant Boehringer Ingelheim*
      *Pharmaceuticals, Inc.*


By:   */s/ Mark Cheffo*
      Mark S. Cheffo
      DECHERT LLP
      1095 Avenue of the Americas
      New York, NY 10036
      Tel: (212) 698-3500
      Fax: (212) 698-3599
      mark.cheffo@dechert.com

      *Attorneys for Defendant GlaxoSmithKline LLC*

---

[24] *See* Pl. Mot. at 12 (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092 (11th Cir. 2005); *King v. Cessna Aircraft Co.*, No. 03-20482-CIV, 2010 WL 1980861 (S.D. Fla. May 18, 2010); *Price v. Carnival Cruise Lines*, No. 20-cv-20621, 2022 WL 951318 (S.D. Fla. Mar. 30, 2020); and *In re Traysol Prods. Liab. Litig.*, No. 08-md-01928, 2010 WL 4052141 (S.D. Fla. May 12, 2010)).

By:  */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Attorneys for Defendant Pfizer Inc.*

By:  */s/ Anand Agneshwar*
Anand Agneshwar
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Attorneys for Defendants Sanofi US Services Inc.,
Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of August, 2022, I electronically filed the foregoing **BRAND DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE INADMISSIBLE OPINIONS OF DR. BERNARD OLSEN (DE 5870)** through the CM/ECF system, which will provide automatic notification to all CM/ECF participants.

*/s/ Andrew T. Bayman*
*Andrew T. Bayman*
