**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC
(RANITIDINE)
PRODUCTS LIABILITY
LITIGATION

MDL NO. 2924
20-MD-2924
JUDGE ROBIN L.
ROSENBERG
MAGISTRATE JUDGE
BRUCE E. REINHART

_____

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**<u>BRAND DEFENDANTS' EXPEDITED MOTION TO STRIKE PLAINTIFFS' EXPERT
RAMIN (RON) NAJAFI, PH.D.[1]</u>**

_____

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

<u>**TABLE OF CONTENTS**</u>

TABLE OF CONTENTS ................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................... ii

**INTRODUCTION**........................................................................................................................... 1

**BASIS FOR EXPEDITED TREATMENT** ................................................................................. 3

**FACTUAL BACKGROUND** ......................................................................................................... 3

    **I.**      **DEFENDANTS' REQUESTS BEFORE PLAINTIFFS' EXPERT DISCLOSURES** ........................................................................................... 3

    **II.**    **PLAINTIFFS' DISCLOSURES AND DEFENDANTS' MOTION TO COMPEL** ......................................................................................................... 4

    **III.**   **PLAINTIFFS' FIRST HARD DRIVE PRODUCTION**................................... 5

    **IV.**   **PLAINTIFFS' SECOND HARD DRIVE PRODUCTION** ............................. 6

    **V.**     **DR. NAJAFI'S DEPOSITION** ........................................................................ 8

**ARGUMENT** ................................................................................................................................ 11

    **I.**      **THE NAJAFI REPORT VIOLATES RULE 26(a) AND SHOULD BE STRICKEN.**......................................................................................................... 13

    **II.**    **PLAINTIFFS' PRODUCTION OF RAW DATA THAT CANNOT BE RELATED TO THE RESULTS PROVIDED DOES NOT MEET RULE 26 REQUIREMENTS.**....................................................................................... 15

    **III.**   **PURSUANT TO RULE 37, DR. NAJAFI MUST BE STRICKEN.**............... 16

**CONCLUSION** ............................................................................................................................ 17

**CERTIFICATE OF COUNSEL**................................................................................................. 19

**CERTIFICATE OF SERVICE** .................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 6504419 (N.D. Fla. Nov. 5, 2020) ..................................................................................................................................11

*Ace Tech. Corp. v. GFM Corp.*, 2010 WL 900525 (S.D. Fla. Mar. 11, 2010) ............................12

*Advocate Comms., Inc. v. Town Foundation, Inc.*,  2005 WL 8155324 (S.D. Fla. Sept. 13, 2005) .................................................................................................................................11

*Berkower v. USAA Cas. Ins. Co.*, 2017 WL 11615107 (S.D. Fla. Mar. 23, 2017) .......................12

*Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568 (M.D. Fla. 2009) ...............14

*Cedant v. United States*, No. 19-24877-CIV, 2021 WL 2895714 (S.D. Fla. July 9, 2021) ...........15

*Daewoo Elec. Co. v. United States*, 650 F. Supp. 1003 (Ct. Int'l Trade 1986) ............................15

*Donahoo v. CSX Transp., Inc.*, No. 4:12-CV-00104-JHM-HBB (W.D. Ky. Aug. 15, 2013) .......15

*Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141 (N.D. Ill. 1982)............................................15

*Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745 (7th Cir. 2005) .................................................................................................................................12

*Frye v. CSX Transp., Inc.*, No. 14-cv-11996, 2016 WL 2758268 (E.D. Mich. May 12, 2016) ....15

*Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795 (11th Cir. 2017).....................................16

*Longhini v. W. 97 Corp.*, 2016 WL 7442798 (S.D. Fla. July 7, 2016) ............................................12

*Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 2010 WL 1837724 (S.D. Fla. May 3, 2010) ..........................................................................................................................12, 16

*Pero v. Norfolk S. Ry. Co.*, No. 3:14-CV-16-PLR-CCS, 2014 WL 6772619 (E.D. Tenn. Dec. 1, 2014) ..................................................................................................................................15

*Quantum Cap., LLC v. Banco De Los Trabajadores*, 2015 WL 12156137 (S.D. Fla. Oct. 19, 2015) ..................................................................................................................................12

*Rambus Inc. v. Hynix Semiconductor Inc.*, Nos. C 05-00334 RMW, C 05-02298 RMW, 06-00244 RMW, 2007 WL 9653194 (N.D. Cal. Sept. 25, 2007) .................................................14–15

*Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008)............................................................12, 15, 17

*Republic of Ecuador v. Hinchee*, 741 F.3d 1185 (11th Cir. 2013) ................................................11

*Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008) ............................................12, 15, 17

*Suppa v. Costa Crociere S.p.A*, 2008 WL 11401796 (S.D. Fla. March 7, 2008) ...........................11

*Trigon Ins. Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001) ........................................12–13

*United States v. Batchelor–Robjohns*, 2005 WL 1761429 (S.D. Fla. June 3, 2005) .........12, 16–17

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) ............................16

**Statutes and Rules**

Federal Rule of Civil Procedure 26 ........................................................................... passim

Federal Rule of Civil Procedure 37 .....................................................................1, 12–13, 16–17

Federal Rule of Evidence 106 ........................................................................................11

U.S. District Court for the Southern District of Florida Local Rule 7.1 ..........................................3

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 26(a)(2)(B)(ii), 37(c)(1), and 37(e)(1), Defendants Boehringer Ingelheim Pharmaceuticals, Inc., GlaxoSmithKline LLC, Pfizer Inc., Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc. (collectively, "Defendants") move the Court for an Order striking Plaintiffs' expert Ramin (Ron) Najafi, Ph.D. for failure to timely produce the complete set of facts and data considered in forming his opinions as required by Federal Rule of Civil Procedure 26 and that Plaintiffs represented to Defendants would be produced.[2]  Specifically, Plaintiffs have failed to produce a complete set of all chromatograms, analyses, and analytical data relating to Emery Pharma's testing of ranitidine samples.

Plaintiffs designated Dr. Najafi as an expert to offer opinions about NDMA levels in ranitidine based on testing performed at his laboratory, Emery Pharma.  The levels of NDMA in the ranitidine samples Emery tested, if valid, would be far in excess of any levels reported by leading regulatory bodies such as FDA.  Despite repeated requests—even predating service of his expert report—Plaintiffs have repeatedly declined to produce all the underlying data on which Dr. Najafi relied. In doing so, Plaintiffs have prevented Defendants and their experts from performing full and thorough review of Dr. Najafi's outlier results and conclusions.

On January 24, 2022, Plaintiffs produced Dr. Najafi's expert report, which contained final numeric values for Emery's ranitidine testing, but Plaintiffs failed to produce basic laboratory documentation substantiating those results. This is important because – as Agilent Technologies, Inc., the developer of the MassHunter software that Emery used in its analyses of ranitidine samples, has warned – the results of analytical chemistry analyses can be manipulated.[3] Therefore, understanding the bases for Dr. Najafi's test results and viewing the analyses and chromatograms

---

[2] The reliability and admissibility of Dr. Najafi's opinions under Fed. R. Evid. 702 will be addressed in the Brand Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Experts, Ramin Najafi, Ph.D. & Charles Davis, Ph.D.

[3] *See* B. McDowall, *Controlling Chromatographic Integration to Ensure Data Integrity*, at https://www.agilent.com/cs/library/articlereprints/public/executivesummary-controlling-chromatographic-integration-LCGC-openlab-agilent.pdf (attached as **Ex. B**). When a sample is run through the analytical equipment, the equipment generates a chromatogram with "peaks" for the different compounds in the sample. *See* **Ex. C** (Report of Bernard Olsen, Ph.D.), at 13. The size of the peak is then compared to a "standard" for the compound of interest and measured to calculate the amount of that compound in the sample. *Id.* How the peak is drawn and quantified (or "integrated") can be adjusted manually by the analyst. **Ex. B** (McDowall) at 1-2, Fig. 2.

is of critical importance to test the reliability of the data that forms the basis of Dr. Najafi's opinions.

Understanding the need for this information and the strict timeline for responding to Dr. Najafi's claims, Defendants requested the relevant data in advance of receiving Dr. Najafi's report. Plaintiffs claimed the requests were premature. After reviewing the materials Dr. Najafi produced with his report, it was apparent that he failed to produce the complete set of data, information, and documents he is relying on to form his opinions, as required by the Federal Rules of Civil Procedure.

For months, Defendants worked with Plaintiffs to obtain the complete set of data Dr. Najafi relied upon, all the while being assured by Plaintiffs and Dr. Najafi that the data either had been, or was about to be, produced.  But, despite numerous meet-and-confers, the retention of a consultant, and the purchase of proprietary software, Defendants have *still* only received partial, unworkable selected data from Dr. Najafi.   As a result, Defendants had to serve their own expert reports, depose Dr. Najafi and other of Plaintiffs' proposed experts who rely on Dr. Najafi's testing, and prepare their *Daubert* briefing, all without being able to review and evaluate the complete set of data considered and relied upon by Dr. Najafi.

Dr. Najafi testified that Emery has 1.5 terabytes (TB) of data relating to its ranitidine testing, but the latest hard drive produced to Defendants contains only 73.3 gigabytes (GB). As explained by Defendants' analytical chemistry consultant, even the limited data that Plaintiffs produced cannot be processed because files necessary to view the data were missing from the hard drive that Plaintiffs did not produce until May 2022, *months* after Plaintiffs served Dr. Najafi's expert report. Despite this evidence, both Dr. Najafi and Plaintiffs repeatedly (and incorrectly) claimed (and Plaintiffs certified on May 25 pursuant to 26(g)) that their production is complete.[4] But, at Dr. Najafi's deposition on May 26 and 27, 2022, neither Plaintiffs nor Dr. Najafi would confirm that the data received by Defendants is a true, uncorrupted copy of the test data Plaintiffs produced.

---

[4] On Friday, June 10, 2022, after a meet and confer to discuss the Brand Defendants' proposed filing of this motion, Plaintiffs' counsel sent an email indicating that the 1.5 TB number does not refer to the volume of the ranitidine data in Emery's computers, but rather to the total data on the system. This statement by counsel is directly contrary to Dr. Najafi's sworn testimony and statements in his rebuttal report. *See, e.g.*, **Ex. D** (Najafi 3/28/22 Rebuttal Rep.) at 5 ("Emery Pharma collected **many terabytes** of data").

Without the underlying data, it is impossible to fully evaluate the validity of Dr. Najafi's report and opinions. Because Plaintiffs' omission—in violation of the applicable rules—prevents both Defendants and the Court from assessing Dr. Najafi's methodology and the reliability of the testing he considered, Dr. Najafi's report, test data, and opinions should be stricken.

## BASIS FOR EXPEDITED TREATMENT

Defendants file this expedited motion pursuant to Local Rule 7.1(d)(2). Defendants respectfully ask this Court to enter an expedited briefing schedule and set a hearing as soon as possible following the close of briefing on this Motion, and before responses to Defendants' forthcoming *Daubert* motions are due on August 1, 2022. This request is made in good faith, and the relief sought is necessary to ensure that the Court does not needlessly consider the reliability of expert opinions that must be struck for failure to comply with Rule 26(a). An expedited briefing schedule for this Motion is not unfair to Plaintiffs, as counsel have been on notice since last year of Defendants' need for a complete production of the documents and data Dr. Najafi considered (including as a result of a prior motion to compel such materials at ECF No. 5301), which is the basis for this motion to strike.

## FACTUAL BACKGROUND

Defendants repeatedly requested – over the course of nearly eight months – that Plaintiffs comply with their Rule 26 obligations by producing the complete set of testing data and related materials that Dr. Najafi considered in forming his general causation opinions in this case. They have failed to do so. The limited data that has been produced is unusable. *See* **Ex. A** (Demonstrative Timeline).

## I.   DEFENDANTS' REQUESTS BEFORE PLAINTIFFS' EXPERT DISCLOSURES

In October 2021, in connection with their shipment of hundreds of samples of ranitidine API and finished product to be tested by Dr. Najafi and Emery Pharma, Defendants served interrogatories seeking, among other things, information related to testing conducted by Plaintiffs or their experts on ranitidine, including design and testing protocols, methodologies, specifications for each test, testing parameters, and results. Plaintiffs refused to answer on the grounds that the discovery was premature because it related to work to be performed by their experts. *See* **Ex. E** (Plaintiffs' Objections to First Set of Interrogatories, 11/22/21).

During a December 2021 meet and confer, Plaintiffs' counsel again argued the interrogatories were premature, but invited Defendants to make a specific request for the testing

materials expected to accompany the Rule 26 expert disclosures. Defendants made that request on December 24th, asking that Plaintiffs' expert disclosures (due January 24, 2022) be accompanied by, among other things, "[t]he results of any testing of ranitidine-containing products performed on behalf of Plaintiffs in this litigation, whether or not those results are reproduced or summarized in your expert reports, including testing methodology and storage conditions/handling/chain of custody of the samples from date of receipt to date of testing[.]" **Ex. F** (Emails Re: Follow-up on Plaintiffs' Testing). Defendants reached out to Plaintiffs' counsel regarding this request again on January 5 and January 21, 2022. *Id.* Plaintiffs' counsel never responded before serving their expert disclosures.

## II.     PLAINTIFFS' DISCLOSURES AND DEFENDANTS' MOTION TO COMPEL

On January 24, 2022, Plaintiffs served their Rule 26 expert disclosures, which included a report from Dr. Najafi. After reviewing these disclosures, Defendants found that Dr. Najafi's report failed to include complete testing data and related analytical information central to understanding the bases for his opinions, and that several of Plaintiffs' other experts relied on Dr. Najafi's test results when forming their general causation opinions.[5] Defendants sent a detailed list of deficiencies on February 7, 2022. *See* **Ex. G** (2/7/22 Letter to Plaintiffs re: Deficiencies in Expert Witness Disclosures). Subsequent meet and confers failed to resolve these issues.

With the March 7, 2022 deadline for their own expert disclosures fast approaching, and based on Plaintiffs' refusal to comply with their Rule 26(a) obligations related to Dr. Najafi and another expert, Defendants filed a Motion to Compel on February 22, 2022. (*See* ECF No. 5301.) Defendants noted that Dr. Najafi's disclosure referred to, and relied upon, facts and data that were not produced with his report. Although the report included graphs and tables that summarized or provided averages of data, the material provided did not include the underlying information purportedly being summarized, any of the contemporaneously generated data reports Dr. Najafi considered, or the data itself. *Id.* at 8–9.

At a discovery conference a day later, Plaintiffs' counsel represented that they would provide certain expert materials to Defendants later that week. *See* **Ex. H** (2/23/22 Hr'g Tr.), at 10:17-23. Counsel for Defendant GSK made clear that Defendants were requesting "all testing, all testing that was done, … all the protocols, we don't want it in summary form." *Id.* at 13:8-14.

---

[5] Drs. Salmon, Davis, and Panigrahy rely on Dr. Najafi's and Emery's testing.  In addition, Drs. McTiernan, Moorman, and Le state that the Emery data "strengthen" their causation opinions.

Counsel for Plaintiffs assured the Court that they "don't have any intention of withholding any information." *Id.* 15:11-12. The Court warned that "[i]f it turns out that" the expert materials Defendants have requested is "discovery that the Plaintiffs should have given under Rule 26 and they don't give it," Plaintiffs "run the risk that Dr. Najafi is going to get struck as an expert." *Id.* 14:16-22.

In the days following the discovery conference, the parties continued to meet and confer, and Plaintiffs produced some limited additional data and analyses. Surprisingly, that supplemental production included data related to previously undisclosed experiments. But despite those supplemental productions in February 2022, Plaintiffs' production remained woefully deficient – Defendants did not receive a complete set of the testing data (including contemporaneously generated reports and raw chromatography test data) that Dr. Najafi considered, materials related to all the experiments of ranitidine samples Emery conducted, or all the protocols Emery used. Nevertheless, relying on Plaintiffs' representations that the missing data would be produced – including the chromatography testing data in Emery's possession that Dr. Najafi considered, Defendants withdrew the Motion to Compel. *See* **Ex. I** (3/2/22 E-mail from T. Finken).

## III.   PLAINTIFFS' FIRST HARD DRIVE PRODUCTION

Defendants served their expert reports on March 7, 2022, without the benefit of the complete production of data and materials that Dr. Najafi considered. On March 11, 2022, Plaintiffs shipped a hard drive purporting to contain native chromatographic data in a proprietary file format. In his rebuttal expert report served March 28, 2022, Dr. Najafi stated that he and Emery had produced "terabytes of data" representing the "entire trove" of chromatography and mass spectrometry testing data Emery had, "including associated metadata so that [Defendants] would have a copy of our complete record of the testing." **Ex. D** (3/28/22 Najafi Rebuttal Rep.), at 6. He represented that "to the best of [his] knowledge, there can be no more complete set of information" than what he and Plaintiffs had provided. *Id.*

Unfortunately, the data on the hard drive could be accessed only with proprietary software —MassHunter software from Agilent Technologies, Inc.—to which none of Defendants' experts had access: The hard drive did not include any data or reports in a useable format that Defendants or their experts could access or review.

Because Defendants were unable to access the data, they retained an analytical chemistry consultant, Dr. Mark Benotti, Ph.D., and his firm, NewFields. NewFields could access the data

only after purchasing the specific version of Agilent MassHunter software Emery used. *See* **Ex. J** (Benotti Decl.), at ¶ 4; **Ex. K** (4/11/22 E-mail regarding Dr. Najafi's Unproduced Data). But even with the proprietary software, NewFields could not access the data on the March 11 hard drive because the hard drive lacked essential files necessary to read the data. Specifically, the hard drive did not contain any ".batch.bin" files, which "run" the analyses to show how the samples were *processed* by Emery analysts. *See* **Ex. J** (Benotti Decl.), at ¶ 4. It is the *processed* data that would show how an analyst conducting chromatography identified and quantified NDMA in any given sample. *Id.* Because the March 11 hard drive contained neither contemporaneously prepared quantitation reports in any usable format, nor *any* ".batch.bin" files that would allow Dr. Benotti to generate such reports, it remained impossible to evaluate whether Dr. Najafi's/Emery's methodology or results were valid, replicable, or reliable. *Id.*

On April 11, 2022, Defendants wrote to inform Plaintiffs of the missing files and to request prompt production of the contemporaneously generated quantitation reports, or the ".batch.bin" files that would show how Emery quantified or processed the data, and that would allow defense experts and the Court to evaluate and assess the validity of Emery's test results. *Id.*; **Ex. K** (4/11/22 E-mail regarding Dr. Najafi's Unproduced Data).

## IV.   PLAINTIFFS' SECOND HARD DRIVE PRODUCTION

Following another meet and confer on April 19, 2022, Plaintiffs' counsel assured defendants that the required information would be provided.  Plaintiffs' counsel represented that Defendants would receive a computer with the Agilent software installed, which purportedly would include the complete set of Emery data, by April 22, 2022. *See* **Ex. L** (4/19/22 E-mail regarding Dr. Najafi's Unproduced Data). Plaintiffs never sent the promised laptop. Initially, they blamed supply chain issues for an inability to acquire a laptop with sufficient speed and capacity for "terabytes" of storage. Then, on April 27, 2022 they suggested that, in lieu of the full production of Emery data they had promised, they could produce "movies" of Emery personnel manually clicking through chromatograms on an Emery computer. Plaintiffs' counsel provided an example of one poor-resolution video, suggesting that Defendants could pause the video file and create screenshots to view the processed data. *See* **Ex. M** (4/22–5/2/22 E-mails regarding "Zantac – Laptop"). Defendants responded on April 29, 2022 to once again demand that Plaintiffs produce contemporaneously prepared chromatography reports and ".batch.bin" files that would allow for analysis of the processed data. *Id.*

Ultimately, Plaintiffs produced a second hard drive. On May 2, 2022, Plaintiffs sent the second drive to Defendants, which they *again* represented would "contain the entire set" of chromatography / mass spectrometry files "associated with [Emery's] testing in native format." *Id.* Despite Dr. Najafi's testimony that Emery had 1.5 TB of data, the second hard drive contained less than five percent of that amount: 73.3 GB (1 TB = 1000 GB) *See* **Ex. N** (Properties of Hard Drive 2 (Ex. 8 to Najafi Dep.)); **Ex. O** (Demonstrative 1.5 TB vs. Plaintiff Hard Drive).

After reviewing the second hard drive, Defendants' consultant Dr. Benotti reported that there were nearly 100 new batch folders[6] that had not been included on the first hard drive. Of the 165 batch folders on the second hard drive, only 78 included the critical ".batch.bin" files needed to view Emery's processed chromatography data. **Ex. J** (Benotti Decl.), at ¶¶ 5, 7.[7] For the remaining 87 batch folders on the second hard drive, the ".batch.bin" files were missing, rendering that data unreadable. Even more troubling, in six of those 87 batch folders the ".batch.bin" files appeared to have been generated at some point, but inexplicably omitted from the hard drive.[8] *Id.* at ¶ 10. Plaintiffs have offered no explanation as to why the ".batch.bin" files are missing in these six batch folders, or, for that matter, in any of the 87 batch folders.

For the tests where Plaintiffs and Dr. Najafi *did* produce ".batch.bin" files, Dr. Benotti and NewFields used the data to generate reports in Adobe PDF format, using accessible built-in templates in the same Agilent MassHunter software used by Emery.[9] *Id.* at ¶¶ 6–8. Notably, these PDF reports could be generated in minutes, and could have been provided by Plaintiffs in January. *See id.* at ¶ 8. As Dr. Benotti stated in his Declaration, in generating these PDF reports of those test results for which Plaintiffs produced the required ".batch.bin" processed data, neither he nor

---

[6] "Batch folders" contain the results of testing relating to a particular experiment, including the results and chromatograms for the NDMA standards, blanks, and samples.

[7] Even among those 78 folders that included at least one ".batch.bin" file, some could not be used by Dr. Benotti to review the processing performed by Emery. Specifically, thirty-three of the files returned error messages asking him to "analyze or quantitate [the] batch before generating reports." Dr. Benotti did not do so, of course, because that would not provide information on the actual integrations and quantifications of NDMA performed by Emery and considered by Dr. Najafi. *See* **Ex. J** (Benotti Decl.), at ¶ 9.

[8] The six batch folders contained "QuantResults" folders, which (as Agilent has confirmed), are automatically created when ".batch.bin" files are created. *Id.* at ¶ 10.

[9] The Agilent MassHunter software has "many templates that you can easily edit to in order to give you exactly the report you want." *See* https://www.agilent.com/en/products/software-informatics/masshunter-suite/pdf-report-builder-existing-templates-column-edits.

NewFields altered the data received from Plaintiffs and Dr. Najafi in any way; the reports that were generated showed the analyses and quantifications that Emery personnel had performed, without any modifications or changes. *Id.* at ¶¶ 7–8. A fact that could be confirmed if Plaintiffs had produced Emery's contemporaneously generated reports for comparison.

Dr. Najafi represented that "even chromatograms from a single sequence (including calibration standards + QC samples + ~40 test samples) cannot be printed or exported as PDF due to the sheer size of the file." **Ex. D** (3/28/22 Najafi Rebuttal Rep.), at 6. That claim is belied by the fact that Dr. Benotti was able to easily export the data into a readily accessible PDF report in approximately 1-2 minutes per injection sequence. At his deposition, Dr. Najafi admitted that he had no personal knowledge on the issue of PDF reports. He testified that he relied on his team to *try* to generate reports and he was simply repeating what he was told when he included that information in his expert report. **Ex. P** (Najafi Dep.), at 58:22-59:20. Even after exploring this issue at deposition, it is still unclear why Emery did not perform basic laboratory operations such as exporting data, which is routinely done in the scientific community and necessary for data transparency and peer-review.

Defendants provided Dr. Benotti's sworn declaration regarding his and NewField's review of the contents of Plaintiffs' second hard drive on May 19, 2022.

## V.   DR. NAJAFI'S DEPOSITION

Defendants hoped that the continuing unresolved questions could be addressed at Dr. Najafi's deposition. Unfortunately, Dr. Najafi's deposition exacerbated the deficiencies in Plaintiffs' production to date.

Plaintiffs and Dr. Najafi had claimed that "all ranitidine testing data"[10] had been produced to Defendants, and Dr. Najafi *repeatedly* testified that Emery has 1.5 TB of data. Nevertheless, he could not explain why the second hard drive contained only a small fraction of that amount of data. When confronted with a document demonstrating that the second hard drive provided to

---

[10] On May 25, 2022, Plaintiffs responded to the Rule 30(b)(2) and Rule 34 requests for production served with Dr. Najafi's notice of deposition. *See* **Ex. Q** (Responses to Najafi RFPs). In response to Defendants' request for any documents or data Dr. Najafi considered, reviewed, or relied upon in forming his opinions, Plaintiffs responded that they had "provided all data and test results considered or relied on to provide the opinions offered in this case." *Id.* Plaintiffs certified the truth of those statements to the best of their knowledge, information, and belief, formed after a reasonable inquiry. *See* Fed. R. Civ. P. 26(g)(1).

Defendants contained only 73.3 GB of data, *see* **Ex. N** (Properties of Hard Drive 2 (Ex. 8 to Najafi Dep.)), Dr. Najafi expressed doubt that the document accurately reflected the amount of data on the drive. *See, e.g.*, **Ex. P** (Najafi Dep.), at 64:17-68:2. Defendants' consultant then plugged the second hard drive into a computer, shared his screen to show the file size, and presented the exact same image to Dr. Najafi. This time, Plaintiffs' counsel interrupted with a speaking objection and said Dr. Najafi was not offered to testify about MassHunter software, *id.* at 107:14-109:5.

The following day, during a one-and-a-half hour re-direct, Dr. Najafi acknowledged that the drive contained far less than 1.5 TB, but speculated the data had simply been "compressed." *See id.* at 386:23-387:15. The drive did not show any indicia of such compression, and Plaintiffs have never provided any support for the claim that Emery compressed 1.5 TB of data into 73.3 GB for production to Defendants. In any event, since more than half of the batch folders are missing the necessary ".batch.bin" files, it is clear that not all the data has been produced.

When asked about Dr. Benotti's declaration, which explained that even after the production of the second hard drive, only half of the batch folders contained the necessary ".batch.bin" files, Dr. Najafi testified that he was unaware there were still files missing, and continued to claim that Plaintiffs had produced all 1.5 TB of Emery's ranitidine testing data to Defendants. *See, e.g.*, *id.* at 54:22–58:21.

Defendants sought to ask Dr. Najafi about data "traceability" or how to link a chromatogram with a result in his report. To do this, Defendants introduced the first data point provided in Dr. Najafi's Appendix B and invited Dr. Benotti to share his screen to show the contents of the second hard drive. Defendants then asked Dr. Najafi how to find the data associated with that result. *See id.* at 92:14-93:22. At first, Dr. Najafi testified that one would need to go to the folder with the applicable date. *Id.* After going to the folder with the applicable date and realizing the associated data did not match the result reported in his Appendix B, he backtracked and said he could not answer because Dr. Benotti "has a different view of the data." *Id.* at 94:2–23 (Note: the view was the "Windows File Explorer", *i.e.*, the standard view for any Windows operating system). Next, to accommodate Dr. Najafi, Defendants opened the data through the Agilent Software, and Dr. Najafi agreed that the layout looked familiar. *Id.* at 103:20-22. When asked how to find the data inside the MassHunter Software, Dr. Najafi refused to answer: "I'm not going to sit here and, you know, teach how MassHunter works." *Id.* at 105:10–18. When

Defendants clarified that the question was simply how to find the chromatogram for the very first result in his report, he balked:

> We've shared with you all the raw data and -- that you have, and we don't know how that data has been modified, viewed, possibly even -- possibly corrupted through software manipulations and whatnot, and so I cannot tell you how to find it through your system.

*Id.* at 106:21-107:3.

Defendants represented to Dr. Najafi that no one had altered the hard-drive, and referred him to Dr. Benotti's sworn Declaration that no changes had been made to the data or batch files. Nonetheless, Dr. Najafi refused to agree that the hard copy reports and chromatograms produced by Dr. Benotti were accurate representations of the Emery data:

> I would – you know, Ms. Toledo, I would really need to verify it at – because we provided raw data to Dr. Benotti and he also has a different view of the data. And so if he shows me the 8,000 page and points to it -- points to a page, **I cannot attest that that is the actual data.** We have a different view of the same data in our MassHunter than he does.

*Id.* at 94:19-95:5. While declining to answer questions regardless of the format in which Defendants displayed the data, Dr. Najafi noted that he had offered a solution to this issue long ago: invite Defendants' experts to the Emery laboratory to analyze the data:

> And I went one step further and invited, you know, the defense expert to come to our lab and spend a day in front of our computer and be able to actually walk through all of our files, and if they had any questions, our team would be able to answer them. So we are -- we even suggested that -- I don't know if you got the word, but...

*Id.* at 57:24-58:13; *see also id.* at 95:6-13 ("I would, you know, send him a ticket, buy him a ticket to come here and just look at a computer . . . directly from here. Really, that's the bottom line."); *id.* at 96:19-23 ("That's what I originally had suggested, that we have the expert, Olsen -- whoever wanted to come out here and spend a day just going through our computer. We'll be happy to host them.").

Defendants' counsel accepted Dr. Najafi's offer on the record, to which he remarked "It would be my pleasure," but Plaintiffs' counsel, who had never passed along to Defendants Dr. Najafi's initial invites, quickly retracted Dr. Najafi's renewed invitation. *Id.* at 97:14–103:2. Immediately after the deposition, Defendants wrote to Plaintiffs requesting that their consultant be allowed to inspect the data on Emery's computer, since Dr. Najafi could not otherwise affirm the veracity of the hard drive contents (and thus would not testify about them), and had even suggested

that the produced data could have been modified, corrupted, or manipulated. *Id.* at 103:14–107:3. Plaintiffs' counsel rejected the request. *See* 6/3/22 E-mail from Plaintiffs' Counsel regarding "Emery test data."

In sum, Dr. Najafi refuses to confirm the veracity, accuracy, or validity of the data in the hard-drive he produced to Defendants. He has also not been able to confirm the veracity, accuracy, or validity of the reports generated by Dr. Benotti, which were attached to Dr. Benotti's Declaration and created from Emery's data. Dr. Najafi has not been able to export his data into his own PDF format and provide those reports to Defendants. Nor has Dr. Najafi been able to copy the files to a laptop and confirm the veracity, accuracy, or validity of a laptop's contents. And Dr. Najafi, due to Plaintiffs' counsel's refusal, will not allow Defendants' expert to visit Emery Pharma in person to view the data on Emery's computers.

## ARGUMENT

Pursuant to Rule 26(a)(2)(B), an expert report must include, among other items, "the facts or data considered by the witness in forming" their opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). The Eleventh Circuit has endorsed the Advisory Committee's broad application of the Rule "to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1195 (11th Cir. 2013) (quoting Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note). Rule 26(a)(2)(B) is "a bright-line rule requiring disclosure of all information provided to testifying experts." *Id.* at 1193. Consistent with this broad interpretation, experts must disclose information "generated . . . in connection with the formulation of [their] opinions." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 6504419, at *4 (N.D. Fla. Nov. 5, 2020). The rules require disclosure of these materials "whether or not ultimately relied upon by the expert." Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note. "A majority of courts," including those in this District, "have held that [Rule 26(a)(2)(B)] requires disclosure of all materials . . . that have been provided to a testifying expert, whether or not the expert actually relied on the materials to form an opinion." *Suppa v. Costa Crociere S.p.A*, 2008 WL 11401796, at *2 (S.D. Fla. March 7, 2008); *accord Advocate Comms., Inc. v. Town Foundation, Inc.*, 2005 WL 8155324, at *6 (S.D. Fla. Sept. 13, 2005).[11]

---

[11] Federal Rule of Evidence 106 and the rule of completeness provide further support for the rationale underlying Rule 26(a)(2)(B) – when a party presents selected data as evidence, the other party must have the opportunity to complete the record. Here, Plaintiffs' repeated failures to

Federal Rule of Civil Procedure 37 provides "[i]f a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).   "The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 2010 WL 1837724, at *3 (S.D. Fla. May 3, 2010) (quotation omitted). "Rule 26(a)(2)(B) places an absolute duty on the party seeking to introduce the expert testimony." *United States v. Batchelor–Robjohns*, 2005 WL 1761429, at *3 (S.D. Fla. June 3, 2005). "This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence."  Fed. R. Civ. P. 37, cmt., 1993 amendment.

"Given these rules, courts do not hesitate to strike experts when adequate reports have not been timely provided, and appellate courts regularly affirm orders excluding experts under these scenarios." *Berkower v. USAA Cas. Ins. Co.*, 2017 WL 11615107, at *2 (S.D. Fla. Mar. 23, 2017). *See, e.g.*, *Romero v. Drummond Co.*, 552 F.3d 1303, 1323–24 (11th Cir. 2008) (affirming district court's exclusion of experts for failure to comply with Rule 26(a)(2)(B)); *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) (striking of untimely expert affidavit was warranted).[12]

To the extent the information and data at issue have not been provided because they are no longer available, the same result is warranted. A necessary implication of Rule 26(a)(2)(B)(ii)'s requirement to disclose information that an expert considered is the duty to preserve that information. *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005) (Rule 26(a)(2)(B) "does not require merely that the party disclose data that it happens to have retained; it must disclose all the data that an expert that it retained at trial 'considered,' implying that it must retain those data, as otherwise it could not disclose them"); *see also Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 282 (E.D. Va. 2001) (Rule 26(a)(2)(B)

---

provide a complete set of data considered and relied on by Dr. Najafi, including the contemporaneously generated reports, make that impossible.

[12] *See also Longhini v. W. 97 Corp.*, 2016 WL 7442798, at *2 (S.D. Fla. July 7, 2016) (striking expert whose disclosure did not fully comply with Rule 26(a)(2)(B)); *Quantum Cap., LLC v. Banco De Los Trabajadores*, 2015 WL 12156137, at *2 (S.D. Fla. Oct. 19, 2015) (same); *Essent Healthcare*, 2010 WL 1837724 at *5 (same); *Ace Tech. Corp. v. GFM Corp.*, 2010 WL 900525, at *4 (S.D. Fla. Mar. 11, 2010) (same).

12

"requires, on this record, the retention and production of draft reports and the correspondence reviewed by the testifying expert"). When a failure to retain such electronically stored information results in prejudice to another party, sanctions are warranted to cure the prejudice resulting from that spoliation. Fed. R. Civ. P 37(e)(1).

I.      **THE NAJAFI REPORT VIOLATES RULE 26(a) AND SHOULD BE STRICKEN.**

Dr. Najafi should be stricken as an expert because his report violates the complete disclosure requirements of Rule 26(a). As set forth above, Dr. Najafi and Plaintiffs have never – despite Defendants' repeated requests for more than eight months – made a complete disclosure and production of the facts and data for the testing results he considered and relied upon.

Dr. Najafi's opinions are central to Plaintiffs' allegations. Dr. Najafi and other experts rely on the Emery test data in arriving at their opinions. As Dr. Najafi states, he performed testing to "quantify the amount of potential exposure to NDMA from ranitidine drug products." **Ex. R** (Najafi Rep.), at ¶ 9. Defendants are entitled to evaluate the validity of the data upon which he and the other experts rely in arriving at their opinions, the methods used to analyze that data, and whether Dr. Najafi's wide array of opinions and the data his lab generated satisfied Rule 702. Being able to assess the reliability of that testing and Dr. Najafi's opinions is all the more critical because six of Plaintiffs' experts consider or rely upon Dr. Najafi's report for their own opinions. Specifically, all of Dr. Charles Davis's opinions and analyses related to and are based on Dr. Najafi's data, as are portions of the opinions of Drs. Jennifer Le, Dipak Panigrahy, and Andrew Salmon. Drs. Anne McTiernan and Patricia Moorman both considered Emery's data in forming their opinions.[13]

The deficiencies in Plaintiffs' Rule 26 disclosures impeded analysis of Dr. Najafi's methodology and the reliability of the testing he considered. Plaintiffs and Dr. Najafi never produced any contemporaneously prepared reports that show how Emery quantified or processed the chromatography data it collected, or otherwise produced the data in any usable format.[14] Emery

---

[13] *See* **Ex. S** (Davis Rep.) (conducting analyses based on Dr. Najafi's data); **Ex. T** (Le Rep.), at 56-60 (same); **Ex. U** (Panigrahy Rep.), at 198-199 (same); **Ex. V** (Salmon Rep.), at 215-220 (same), **Ex. W** (McTiernan Rep.), at 14 (considering Emery data); and **Ex. X** (Moorman Rep.), at 36-37 (same).

[14] Dr. Najafi could have provided reports and printouts of his data and chromatograms in PDF format but did not. Instead, in his rebuttal report, he stated that the data "cannot be printed or exported as PDF due to the sheer size of the file." **Ex. D** (Najafi 3/28/22 Rebuttal Rep.), at 6. The

used a proprietary software that none of Defendants' experts have or use, so they were not able to access the data in their native format. Defendants had to identify and retain a new consultant with experience with Agilent software and acquire the software at a considerable cost to be able to finally access the data that Plaintiffs produced in the second hard drive in early May.

Moreover, even after Defendants' consultant had acquired the software, he still could not access Plaintiffs' processed data. In the first hard drive, Plaintiffs failed even to provide the processed (".batch.bin") data files that would allow Defendants to determine how Emery processed the data. But that is the critical data Defendants need to evaluate – Dr. Najafi considered and relied upon the data as processed by Emery analysts.

Dr. Najafi would not authenticate the limited testing data Plaintiffs did produce, regardless of the form it was presented in, whether as the hard-copy reports created from the hard drive data using templates included in the same software Emery uses, or as shown in MassHunter through a live screen share during his deposition. Nor could he explain why half the batch folders Plaintiffs produced on the second hard drive still lacked the critical ".batch.bin" files necessary to assess how Emery personnel processed or quantified the chromatography data. To the extent that data exists, his only proposed solution – offering to have Defendants or their consultant come to Emery to view the data on Emery's own computers – was rejected by Plaintiffs' counsel.

What Defendants and the Court are left with is a production of data that is incomplete and not reasonably usable. Because production of data that cannot be accessed or viewed is tantamount to no production of all, Plaintiffs' disclosures and productions violate Rule 26(a)(2)(B)(ii)'s requirements. *See, e.g.*, *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 588 (M.D. Fla. 2009) (ordering plaintiff to bear costs of re-production, "including purchasing software or paying license fees for [defendant's] use of the database software, and hiring professionals to copy the database, if necessary"), *affirmed in part and quashed in part*, No. 607CV-0222ORL-35KRS, 2009 WL 5606058 (M.D. Fla. Nov. 16, 2009); *Rambus Inc. v. Hynix Semiconductor Inc.*, Nos. C 05-00334 RMW, C 05-02298 RMW, 06-00244 RMW, 2007 WL 9653194, at *6 (N.D. Cal.

---

facts proved otherwise. As soon as he was able to open the batch folders with ".batch.bin" files, Dr. Benotti generated PDF reports using readily-available templates in the MassHunter software. Each report took between 1-2 minutes to generate. **Ex. J** (Benotti Decl.), at ¶ 8.

Sept. 25, 2007) (ordering production of certain schematics and "a copy of any proprietary software necessary to view such files")[15]

Plaintiffs' and Dr. Najafi's repeated failure to disclose the facts and data he considered in forming his opinions as required by Rule 26(a)(2)(B)(ii) warrants his exclusion. *See Romero*, 552 F.3d at 1323–24; *Reese*, 527 F.3d at 1266.

## II.     PLAINTIFFS' PRODUCTION OF RAW DATA THAT CANNOT BE RELATED TO THE RESULTS PROVIDED DOES NOT MEET RULE 26 REQUIREMENTS.

There is no way to trace the data that Dr. Najafi produced back to the raw data or laboratory notebooks produced. The sample results are not identified in a unique manner in Appendix B to Dr. Najafi's report[16] or in the raw data batch folders, forcing Defendants to ferret through the data and laboratory notebooks trying – and more often than not failing – to find the underlying data corresponding to any given test result. This is another major violation of Rule 26.

Courts regularly reject such document dumps. In *Cedant v. United States*, plaintiff's medical experts' reports pointed to the entirety of "the Plaintiff's medical records in an attempt to identify the facts and data considered by [the experts] in forming their opinions." No. 19-24877-CIV, 2021 WL 2895714, at *5 (S.D. Fla. July 9, 2021). The court rejected this approach, ruling that "[a] party cannot satisfy Federal Rule 26(a)(2)(B)'s requirements to identify the basis for an expert's opinions by saying the party produced all the necessary information for their adversary to determine the basis for an expert's opinions." *Id.* (noting that a records "dump" is contrary to the

---

[15] *See also, e.g., Frye v. CSX Transp., Inc.*, No. 14-cv-11996, 2016 WL 2758268, at *3 (E.D. Mich. May 12, 2016) (ordering defendants to either (1) provide plaintiff with a laptop containing the data and the necessary software to view it or (2) produce the data and reimburse plaintiff for the cost to license a copy of the software needed to view the data); *Donahoo v. CSX Transp., Inc.*, No. 4:12-CV-00104-JHM-HBB (W.D. Ky. Aug. 15, 2013) (same); *Pero v. Norfolk S. Ry. Co.*, No. 3:14-CV-16-PLR-CCS, 2014 WL 6772619, at *3 (E.D. Tenn. Dec. 1, 2014) (defendant cannot "use its choice to enter into a software agreement as a shield against producing a relevant piece of discovery, [or] use the agreement as a basis for attaching burdensome conditions to the production of the recording"); *Daewoo Elec. Co. v. United States*, 650 F. Supp. 1003, 1007 (Ct. Int'l Trade 1986) (ordering production of computerized data with computerized instructions); *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 144–46 (N.D. Ill. 1982) (sanctioning party for not producing codes necessary to understand electronic data).

[16] The "spreadsheet" attached to the report is a PDF printout of a spreadsheet. Plaintiffs did not produce the spreadsheet of test results in its native format, which might have contained formulas or links to the raw data batch files. Even if they had produced the spreadsheet in native format, however, it is still likely that Defendants would have no way to trace back from the test results to the corresponding data files and lab notebooks.

rule). The court determined that plaintiff's failure was not harmless because it required defendant "to guess at . . . which materials such experts may rely upon in forming [their] opinions." *Id.* (excluding experts' opinions; granting summary judgment).

Here, Dr. Najafi could not explain how to find the raw data. Defendants pointed him to the very first result listed in his chart and asked him to find that sample in the hard drive files that had been produced to Defendants. He could not. Defendants then asked him to find the experiment related to that single result in the corresponding lab notebook. Again, he could not. Defendants cannot be reasonably expected to explain what Dr. Najafi cannot. The 165 main batch folders, each with *numerous* subfolders, would require Defendants to open thousands of files to ask about a single datapoint. Given the lack of traceability, Defendants are left "to guess at" the data on which Dr. Najafi actually relied, contrary to the Rules. Dr. Najafi's report should therefore be stricken.

## III.      PURSUANT TO RULE 37, DR. NAJAFI MUST BE STRICKEN.

Plaintiffs' refusal to provide the complete information required by Rule 26 is not substantially justified and is not harmless. "The burden rests upon the [non-compliant] party to demonstrate that its actions were substantially justified or harmless." *Batchelor–Robjohns*, 2005 WL 1761429 at *2 (citation omitted).[17] Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."). "Generally, when assessing whether there was substantial justification for the failure to disclose or whether the failure to disclose was harmless courts consider four factors: (1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Essent Healthcare*, 2010 WL 1837724 at *4 (quotation omitted).

Dr. Najafi's opinions are central to Plaintiffs' case.  Because "Defendants are unable to test the reliability of" an expert's methods or "verify the accuracy of" the expert's opinions without data "which formed the basis for [the expert's] calculations," failure to disclose such data is inherently "not harmless within the meaning of Rule 37(c)(1)." *Batchelor–Robjohns*, 2005 WL

---

[17] *See also Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 812 (11th Cir. 2017) ("The plaintiffs . . . have not carried their burden of showing a substantial justification for their tardiness" to avoid sanctions under Rule 37(c)); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) ("[The offending party] asserts that the burden of proving harm is on the party seeking sanctions; we disagree.

1761429 at *3 (excluding plaintiff's expert for failure to comply with the Rules' disclosure requirements).

As a direct result of Plaintiffs' and Dr. Najafi's failures, Defendants spent countless hours of attorney time over the course of several months, retained a consultant, and purchased expensive proprietary software, all in an attempt to obtain what should have been produced with Dr. Najafi's disclosures in January. And, in the end, those efforts were fruitless: Defendants are left with incomplete data they cannot use and that Dr. Najafi refuses to stand behind.

## <u>CONCLUSION</u>

Because Plaintiffs' failure is not substantially justified and is not harmless, the Court should strike Dr. Najafi as an expert pursuant to Rule 37(c)(1). *See Romero*, 552 F.3d at 1323–24; *Reese*, 527 F.3d at 1266.


Dated: June 13, 2022                                Respectfully Submitted,



By: */s/ Andrew T. Bayman*
    Andrew T. Bayman
    KING & SPALDING LLP
    1180 Peachtree Street, NE, Suite 1600
    Atlanta, GA 30309-3521
    Tel: (404) 572-4600
    Fax: (404) 572-5100
    abayman@kslaw.com

    *Attorney for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

By: */s/ Mark Cheffo*
    Mark S. Cheffo
    DECHERT LLP
    1095 Avenue of the Americas
    New York, NY 10036
    Tel: (212) 698-3500
    Fax: (212) 698-3599
    mark.cheffo@dechert.com

    *Attorneys for Defendant GlaxoSmithKline LLC*

By:   */s/ Joseph G. Petrosinelli*
       Joseph G. Petrosinelli
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, DC 20005
       Tel: (202) 434-5000
       Fax: (202) 434-5029
       jpetrosinelli@wc.com

       *Counsel for Defendant Pfizer Inc.*

By:   */s/ Anand Agneshwar*
       Anand Agneshwar
       ARNOLD & PORTER KAYE SCHOLER LLP
       250 West 55th Street New York, NY 10019
       Tel: (212) 836-8000
       Fax: (212) 836-8689
       anand.agneshwar@arnoldporter.com

       *Attorneys for Defendants Sanofi US Services Inc.,*
       *Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

18

## <u>CERTIFICATE OF COUNSEL</u>

In accordance with S.D. Fla. L.R. 7.1(a)(3), Counsel for Defendants have conferred with

Counsel for Plaintiffs and have been advised that Plaintiffs oppose the relief sought.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of June, 2022, I electronically filed the foregoing **BRAND DEFENDANTS' EXPEDITED MOTION TO STRIKE PLAINTIFFS' EXPERT RAMIN (RON) NAJAFI, PH.D** through the CM/ECF system, which will provide automatic notification to all CM/ECF participants.

*/s/ Patrick Oot*
Patrick Oot
