**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                                   MDL No. 2924
PRODUCTS LIABILITY                                                              20-MD-2924
LITIGATION

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E.  REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**BRAND DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE**
**DEFENDANTS' EXPERTS ON GENERAL CAUSATION UNDER RULE 702[1]**

---

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 2

I.   THERE IS NO SCIENTIFICALLY RELIABLE EVIDENCE THAT
     RANITIDINE CAUSES THE DESIGNATED CANCERS. .................. 2

    A.   The Best Data About Whether Ranitidine Causes Cancer Are Studies
         Investigating Ranitidine......................................................................... 3

    B.   The Ranitidine Epidemiology Is Not Rendered "Uninformative" By The
         Purported Study Limitations Plaintiffs Identify. ................................. 4

    C.   Dietary and Occupational Studies on NDMA and Other Chemicals Are
         Not Equipped to Answer Whether *Ranitidine* Causes Cancer In Humans. .......... 9

    D.   Available Epidemiological Literature Does Not Support a Causal
         Connection Between Ranitidine and Cancer...................................... 13

II.  PLAINTIFFS MISSTATE THE CONCLUSIONS OF REGULATORY
     AGENCIES AND DEFENSE EXPERTS ABOUT WHETHER NDMA IS AN
     ESTABLISHED HUMAN CARCINOGEN. ...................................... 20

III. THE EXTENT TO WHICH RANITIDINE ALLEGEDLY DEGRADES INTO
     NDMA DOES NOT AMOUNT TO EPIDEMIOLOGICAL EVIDENCE OF
     CAUSATION. ...................................................................................... 23

ARGUMENT ........................................................................................... 24

I.   PLAINTIFFS' CRITIQUE OF DEFENDANTS' EXPERTS HIGHLIGHTS THE
     CENTRAL METHODOLOGICAL FLAW IN THEIR OWN EXPERTS'
     OPINIONS. ........................................................................................... 24

II.  DR. ANDREW CHAN ........................................................................ 30

    A.   Dr. Chan Conducted a Comprehensive Review of the NDMA
         Epidemiology but Appropriately Gave the Literature Little Weight.................. 31

    B.   Dr. Chan Conducted a Comprehensive and Reliable Analysis of the
         Ranitidine Epidemiology.................................................................. 33

        i.   Dr. Chan Consistently Considered Frequency and Duration of
             Ranitidine Exposure................................................................. 33

        ii.  Dr. Chan Reliably Accounted for Latency and Follow-Up Times In
             The Ranitidine Epidemiology............................................... 35

III. DR. JOHN WITTE ............................................................................... 37

    A.   Dr. Witte Considered the Evidence Concerning Whether Ranitidine
         Causes Bladder, Gastric, Esophageal, Liver, or Pancreatic Cancer. .................. 37

| | | | |
|---|---|---|---|
| **B.** | | Dr. Witte Opined That Ranitidine Use is Not Associated with the Designated Cancers, and Analyzed Dose-Response and Follow-Up Times in the Ranitidine Studies to Support His Conclusion | 40 |
| | **i.** | Dr. Witte's Conclusions are Wholly Supported by the Exposure Analyses in Ranitidine Studies. | 40 |
| | **ii.** | Dr. Witte Considered Follow-Up Periods in the Ranitidine Studies. | 41 |
| **C.** | | Dr. Witte Properly Considered Confounding and Addressed Such Concerns By Prioritizing Active Comparator Studies. | 44 |
| | **i.** | Dr. Witte's Consistent Approach to Confounding is Exhibited By His Prioritizing the Active Comparator Design | 44 |
| | **ii.** | Dr. Witte Did Not Misrepresent Any Data. | 46 |
| | **iii.** | Dr. Witte's Reliance on Aggregate Data is Appropriate. | 47 |
| **D.** | | Dr. Witte Concluded that There is No Valid Association Between Ranitidine and the Designated Cancers, But Conducted a Bradford Hill Analysis Across Cancers to Emphasize the Lack of Evidence Supporting Causation | 47 |
| **IV.** | **DR. MARY BETH TERRY** | | **50** |
| **A.** | | Plaintiffs Mischaracterize Dr. Terry's Methodologies. | 50 |
| | **i.** | Available Epidemiological Data Do Not Support An Association, Much Less a Causal Relationship, Between Ranitidine And The Designated Cancers. | 50 |
| | **ii.** | Dr. Terry Did Not Ignore NDMA Data. | 54 |
| | **iii.** | Dr. Terry Did Not Ignore Confounding Factors | 54 |
| | **iv.** | Dr. Terry's Methodology Is Consistent With Her Prior Statements Regarding Case-Control Studies. | 56 |
| **V.** | **DR. MICHAEL VAEZI** | | **57** |
| **A.** | | Dr. Vaezi Appropriately Considered All Evidence, Including NDMA Epidemiological Studies. | 58 |
| | **i.** | Plaintiffs Ignore Dr. Vaezi's Testimony And Conflate Epidemiological Data With Animal Studies. | 58 |
| | **ii.** | Plaintiffs Misunderstand Risk Analyses Performed By Regulatory Agencies And Scientific Organizations, None of Which Have Categorized NDMA As a "Known Human Carcinogen." | 58 |
| **B.** | | Dr. Vaezi Engaged In a Thoughtful and Thorough Review of the Ranitidine Epidemiology Studies | 60 |
| | **i.** | Dr. Vaezi Assessed And Accounted for Duration of Exposure | 61 |
| | **ii.** | Dr. Vaezi Did Not Confuse Follow-Up And Exposure Period | 61 |

    **C.**    Plaintiffs' Final Paragraph is a Hodgepodge of Irrelevant, Misleading, and Inaccurate Arguments. ............................................................................................ 62

**VI.**    **DR. BENJAMIN HATTEN**        63

    **A.**    Dr. Hatten's Opinion That Therapeutic Use of Ranitidine Does Not Cause the Designated Cancers is Based on Sound and Reliable Methodology ............. 64

        **i.**    Dr. Hatten Applied Bradford Hill Criteria to Reach His Conclusion. ................................................................................. 64

        **ii.**    Dr. Hatten Considered NDMA Literature. ............................... 65

        **iii.**    Plaintiffs Mischaracterize Dr. Hatten's Literature Review and Wrongly Suggest He Was Bound to Follow the Writings of a Single Epidemiologist. ............................................................. 66

        **iv.**    Dr. Hatten's Methodology Did Not Involve "Cherry-Picking" Data. ....................................................................................... 67

    **B.**    Dr. Hatten Applied the Bradford Hill Criteria to Reach His Conclusion That The Evidence is Not Sufficient to Support Causation. ............................... 67

    **C.**    Dr. Hatten's Opinion Does Not Conflict With the Findings of GSK, IARC, or Other Organizations. ...................................................................................... 68

**VII.**    **MICHAEL PORTER**        69

    **A.**    Plaintiffs' Claims That Dr. Porter "Overstated" or "Understated" the Evidence Are Incorrect. ...................................................................................... 70

        **i.**    Plaintiffs Mischaracterize the Florian Study .......................... 70

        **ii.**    Plaintiffs Misunderstand Statements By Regulatory Agencies and Scientific Organizations, None of Which Characterize NDMA as a "Known Human Carcinogen." ..................................... 70

        **iii.**    Dr. Porter Reliably Evaluated the Yoon and Norgaard Studies. ............. 71

        **iv.**    Plaintiffs Misrepresent the Data and Dr. Porter's Opinions Regarding the Cardwell, Habel, Kantor, and Hidajat Studies. ................ 72

    **B.**    Plaintiffs' Attacks on Dr. Porter's Bradford Hill Analysis Are Meritless. .......... 74

        **i.**    Temporality ............................................................................. 74

        **ii.**    Consistency ............................................................................. 74

        **iii.**    Strength of Association ............................................................ 75

        **iv.**    Consideration of Alternative Explanations .............................. 76

        **v.**    Dose-Response ........................................................................ 76

        **vi.**    Biological Plausibility ............................................................. 77

        **vii.**    Consistency with Other Knowledge ........................................ 77

**VIII.**    **DR. PETER GUENGERICH**        77

|     | **A.** | Dr. Guengerich Reliably Concluded That There are Effective Thresholds for NDMA Toxicity. | 78 |
|     | **B.** | Dr. Guengerich Reliably Concluded That a DNA Repair Mechanism Reverses Damage Caused By NDMA. | 82 |
|     | **C.** | Dr. Guengerich Did Not Need to Review Epidemiology to Reliably Conclude That It Is Not Biologically Plausible For Ranitidine to Cause Cancer In Humans. | 83 |
| **IX.** | **DR. TIMOTHY WANG** | | 85 |
|     | **A.** | Dr. Wang Does Not Premise His Opinions On Whether There Is a Threshold Amount of NDMA Required to Cause Cancer. | 85 |
|     | **B.** | Dr. Wang's Estimates of NDMA From Ranitidine Are Based on Reliable Methodology. | 87 |
|     | **C.** | Dr. Wang Accurately Characterizes and Considers NDMA Animal Studies. | 88 |
|     | **D.** | Criticisms of Dr. Wang's Opinions Regarding Valsartan Epidemiological Studies are Meritless. | 89 |
|     | **E.** | Dr. Wang's Bradford Hill Analysis Is Reliable. | 90 |
|     | **F.** | Dr. Wang Did Not "Cherry-Pick" or Fail to Consider Literature Regarding Endogenous Formation | 90 |
| **X.** | **DR. LEWIS CHODOSH** | | 91 |
|     | **A.** | Plaintiffs Did Not Challenge Dr. Chodosh's Expertise. | 91 |
|     | **B.** | Plaintiffs Substitute Regulatory Assumptions for Causation | 91 |
|     | **C.** | The Existence of Threshold Doses for Genotoxins is Well Accepted in the Scientific Community. | 92 |
|     | **D.** | Plaintiffs Wholly Ignore that Dr. Chodosh Addressed Other DNA Adducts Formed by NDMA | 94 |
| **XI.** | **DR. NAMANDJÉ BUMPUS** | | 95 |
| **CONCLUSION** | | | 98 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prods. Liab.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007)...........................................................................31

*Allison v. McGhan Med. Corp*.,
    184 F.3d 1300 (11th Cir. 1999) ..........................................................................3, 25, 74

*Andrade v. Merson*,
    2012 WL 7451931 (S.D. Fla. Dec. 3, 2021) ....................................................................93

*In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*,
    2009 WL 2750462 (D.S.C. Aug. 26, 2009) ....................................................................31

*Burst v. Shell Oil Co.*,
    2015 WL 3755953 (E.D. La. June 16, 2015) ....................................................................9

*Dawsey v. Carnival Corp.*,
    2018 WL 4854651 (S.D. Fla. Oct. 5, 2018).....................................................................23

*In re Deepwater Horizon Belo Cases*,
    2020 WL 6689212 .......................................................................................................27, 72

*In re Denture Cream Prods. Liab. Litig.*,
    795 F. Supp. 2d at 1354 ..................................................................................................58

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................................................3, 19, 58

*Henricksen v. ConocoPhillips Co.*,
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........................................................................9

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................................................1, 9, 38

*McWilliams v. Novartis AG*,
    2018 WL 3364608 (S.D. Fla. July 9, 2018).....................................................................46

*Morrison v. ExxonMobil Corp.*,
    2007 WL 9888622 (M.D. Ga. Mar. 29, 2007) ...............................................................93

*Perry v. Novartis Pharms. Corp*.,
    564 F. Supp. 2d 452 (E.D. Pa. 2008).................................................................................4

*In re Prempro Prod. Liab. Lit.*,
    738 F. Supp. 2d 887 (E.D. Ark. 2010)................................................................. 25

*Rider v. Sandoz Pharms. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) .........................................................*passim*

*Siharath v. Sandoz Pharms. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001), *aff'd sub nom. Rider*, 295 F.3d 1194 ........ 3, 5, 26, 38

*Soldo v. Sandoz Pharms. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) ....................................................5, 24, 94

*Wicker v. Ford Motor Co.*,
    393 F. Supp. 2d 1229 (W.D. Okla. 2005)....................................................5, 24

*Wilder v. Eberhart*,
    977 F.2d 673 (1st Cir. 1992).........................................................5, 24, 74

*Wolfe v. McNeil-PPC, Inc.*,
    2011 WL 1673805 (E.D. Pa. May 4, 2011) ................................................ 24

**Rules**

Fed. R. Evid. 702.........................................................................*passim*

**Other**

Reference Manual on Scientific Evidence, 3d. ed., 2011 ...................................*passim*

# INTRODUCTION

Plaintiffs' motion to exclude Defendants' experts asks this Court to deem unreliable the same methods used and findings reached by the U.S. Food & Drug Administration, the European Medicines Association, the Harvard School of Public Health, and peer-reviewed studies from across the globe, from the United States to Norway to China.

Under Rule 702 and *Daubert*, it is a red flag when science performed by experts in litigation is out of step with corresponding analysis undertaken in the broader scientific community. For Defendants' experts, there is no divide. They apply the same methods, study the same literature, and reach the same conclusions as scientists and regulators examining ranitidine's safety outside of litigation. Plaintiffs' experts, by contrast, employ methodologies not accepted in the scientific or regulatory communities—discounting ranitidine studies in favor of *non-ranitidine* data the broader scientific community views as secondary and theoretical; framing regulatory precaution, contrary to Eleventh Circuit law, as if it reflected evidence of biological causation; and rejecting bedrock scientific principles such as statistical significance and use of active-comparator data. At bottom, Plaintiffs are asking the Court to swap out the question actually at issue in this litigation— whether scientific data establish a reliable causal association between *ranitidine* and the Designated Cancers—in favor of uncorroborated speculation, extrapolation, and conjecture based on *non-ranitidine* data.

"[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). Here, Plaintiffs do more than try to "lead" science; they openly defy it. Their motion to exclude the methods utilized and conclusions reached by Defendants' experts—which parallel those reached by the broader scientific and regulatory community—should be denied.

## BACKGROUND

I.     **There Is No Scientifically Reliable Evidence That Ranitidine Causes The Designated Cancers.**

Plaintiffs contend that their use of ranitidine caused them to develop the Designated Cancers.  The general causation question in this case, therefore, is whether *ranitidine* causes those particular cancers.[2]  Epidemiological studies investigating this question in ranitidine users, many of which were designed specifically to answer this question, fail to demonstrate a reliable association—much less a causal relationship—between *ranitidine* and any of the five cancers at issue in this case.

Plaintiffs use this motion to sidestep their burden of proof by brushing aside ranitidine data and directing the Court's attention instead to *non-ranitidine* studies (i) performed in animals (not humans); (ii) involving NDMA (not ranitidine); and/or (iii) investigating exposure to NDMA through dietary and chemicals in rubber manufacturing factories (not through ranitidine).  Indeed, this motion is a reflection of the central methodological flaw that renders their own experts' causation opinions inadmissible.[3]  Plaintiffs—contrary to every regulatory, medical, and scientific entity that has investigated the question of whether ranitidine causes cancer—contend that Defendants' experts afford too much weight to ranitidine studies and too little to the *non-ranitidine data* upon which their experts principally rely, which involve different chemicals, different exposures, different species, different routes of exposure, and different populations.  In other words, Plaintiffs brush aside epidemiological studies examining *the real-world effects of ranitidine*

---

[2] *See* ECF No. 5958, Brand Defendants' Reply in Support of Their Motion to Exclude Plaintiffs' Experts' Opinions Related To Epidemiology ("Defs.' G.C. Epi Reply") at 4–13.
[3] *See* ECF No. 5699, Brand Defs.' Mot. to Exclude Pls.' General Causation Experts' Opinions Related to Epidemiology ("Defs.' G.C. Epi Mot."), at 79–87.

*use* on cancer risk in favor of data that does not involve ranitidine at all—at any dose, in any formulation, or for any duration of time.

Plaintiffs cannot meet their burden by substituting the general causation question at issue in this litigation—whether *ranitidine* is causally associated with an increased incidence of the Designated Cancers—in favor of a different question of their own choosing.

### A. The Best Data About Whether Ranitidine Causes Cancer Are Studies Investigating Ranitidine.

Studies that examine ranitidine and cancer in humans provide the most informative epidemiological data to consider when assessing whether ranitidine causes cancer in humans. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" where an epidemiological study "ma[k]e[s] no mention" of the substance alleged to cause cancer); *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) ("The existence of *relevant* epidemiological studies can be a significant factor in proving general causation.") (emphasis added), *aff'd sub nom. Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999) (finding two epidemiological studies "irrelevant" because they scrutinized conditions that plaintiff did not allege she had). The ranitidine epidemiological studies were designed specifically to capture the effects of real-world ranitidine use on cancer risk—including the extent to which any purported exposure to *NDMA* from ranitidine affects real-world cancer risk. This is why the global scientific community, including numerous independent researchers and scientific and regulatory authorities (including the FDA), has considered only this body of direct evidence when assessing whether ranitidine increases the risk of cancer.

What Plaintiffs refer to as the "narrow band of epidemiology" examining ranitidine and cancer risk[4] is what the scientific and medical communities uniformly have relied on to investigate the very question at issue in this litigation.  Plaintiffs have not identified a single member of the scientific community (aside from their own litigation experts) who has assessed the potential link between ranitidine and cancer by focusing on *non-ranitidine* studies.  Indeed, researchers who have conducted studies investigating the potential relationship between ranitidine and cancer risk expressly have rejected the approach Plaintiffs advance here.[5]

### B.    The Ranitidine Epidemiology Is Not Rendered "Uninformative" By The Purported Study Limitations Plaintiffs Identify.

Plaintiffs attempt to justify their emphasis on non-ranitidine epidemiology by highlighting purported limitations that render ranitidine studies "uninformative."  Those efforts are misguided and unavailing.  As an initial matter, even if Plaintiffs were correct about the limitations of the ranitidine studies (which they are not), those limitations would not help Plaintiffs carry their burden of proof at the Rule 702/*Daubert* stage.  Rather, purported study limitations would serve only to highlight the absence of scientifically reliable evidence in support of Plaintiffs' claims—*i.e.*, that the use of ranitidine causes the Designated Cancers—and result in the exclusion of *Plaintiffs'* general causation experts.  *See, e.g.*, *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 468 (E.D. Pa. 2008) ("[T]he non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science.  In cases where no adequate study shows the link between a substance and a disease, expert testimony will generally be

---

[4] ECF No. 5841, Plaintiffs' Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 ("Pls.' Mot.") at 65.

[5] *See, e.g.*, Adami et al., *Ranitidine Use and Risk of Upper Gastrointestinal Cancers*, CANCER EPIDEMIOL., BIOMARKERS & PREV. 2021;30:2302 (2021), ECF No. 5692 Declaration of Loren Brown ("Brown Decl.") Ex. 45 ("[A]nalyses of cancer risk following ranitidine use per se—*rather than studies based on debatable estimates of NDMA exposure*—are more informative about possibly increased cancer risk from use of this drug.") (emphasis added).

inadmissible, even if there are hints in the data that some link might exist."). The burden to establish a causal association between ranitidine use and the Designated Cancers rests with Plaintiffs and with Plaintiffs alone. It is not, as Plaintiffs incorrectly suggest, Defendants' burden to prove that an association does not exist. *See, e.g.*, *Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992) ("[D]efendant need not disprove causation. Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence." (citation omitted)).[6]

Regardless, Plaintiffs vastly overstate limitations of the robust body of ranitidine-specific epidemiological data and avert their attention from the methods by which Defendants' experts—like the study authors themselves—account for and correct study limitations in their analyses. Plaintiffs, for example, make much of the possibility that the magnitude of exposure and length of follow-up for study participants was inadequate to capture the effects of long-term, high-dose ranitidine use, and that the ranitidine studies therefore *understated* the likely effects of ranitidine on cancer risk. But this possibility was specifically considered and addressed by the study authors, who included analyses designed to test this theory. Indeed, contrary to Plaintiffs' unsupported assumption that the ranitidine epidemiology underestimates cancer risk, numerous ranitidine epidemiological studies specifically analyzed the effects of increasing ranitidine exposures and

---

[6] *See also Wicker v. Ford Motor Co.*, 393 F. Supp. 2d 1229, 1238 (W.D. Okla. 2005) ("[I]t is not defendants' burden to disprove plaintiff's theory, but only to show that there is an absence of proof to support plaintiff's claim."); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 434, 534 (W.D. Pa. 2003) ("It is not a defendant's burden to disprove causation . . ."); *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1358 (N.D. Ga. 2001) ("[T]he burden is on Plaintiffs to show that well-conducted epidemiological studies do show a statistically significant relationship between Parlodel® and seizures and stroke. It is not Defendant's burden to show the lack of such relationship.").

longer follow-up and found that *more* use of ranitidine[7] and longer follow-up[8] did not demonstrate an increased risk of cancer.  These data—which contradict Plaintiffs' theory of causation—are directly applicable to real-world ranitidine users, who typically take medications like ranitidine for years because GERD and certain indications for ranitidine use are chronic conditions.[9]

Plaintiffs' arguments regarding the amount of exposure and length of follow-up

---

[7] Tan et al., *Acid Suppression Medications Reduce Risk of Oesophageal Adenocarcinoma in Barrett's Oesohagus: A nested Case-Control Study in US Male Veterans*, ALIMENT. PHARMACOL. THER. 2018;48:469, 473 (2018), Brown Decl. Ex. 74 (2018) ("[A]n inverse association with OAC risk was seen with higher doses."); Yoon et al., *Risk of Cancer Following the Use of N-Nitrosodimethylamine (NDMA) Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea*, J. CLIN. MED. 2021, 10(1):153, 4-5 (2021), Brown Decl. Ex. 77 ("When analyzed according to the cumulative duration of ranitidine and famotidine intake, there was again no difference in the overall cancer risk."); McDowell et al., *The Effect of Medications Associated With Drug-Induced Pancreatitis On Pancreatic Cancer Risk: A Nested Case-Control Study*, AM. J. GASTROENTEROL. 2021;00:1, 3 (2021), Brown Decl. Ex. 66; Iwagami et al., *Risk of Cancer in Association with Ranitidine and Nizatidine vs other H2 Blockers: Analysis of the Japan Medical Data Center Claims Database 2005 – 2018*, DRUG SAFETY 2021;361, 369-370 (2021), Brown Decl. Ex. 55; Norgaard et al., *Ranitidine and risk of Bladder and Kidney Cancer: A Population Based Cohort Study*, CANCER EPIDEMIOL. BIOMARKERS PREV. 2022 Jan;31(1):45, 50 (2022), Brown Decl. Ex. 68; Adami (2021) at 2306.

[8] Iwagami (2021) at 370 ("[W]e found no evidence of an increased risk of cancer in people receiving ranitidine and nizatidine compared with people receiving other H2 blockers overall, by follow-up length, by cumulative dose, or by cancer site."); Kantor et al., *Ranitidine Use and Cancer Risk: Results from UK Biobank,* GASTROENTEROLOGY 2021;160:1856, 1858 (2021), Brown Decl. Ex. 57 ("In sensitivity analyses, the association between ranitidine and overall cancer risk was null in the first 5 years of follow-up, and inverse thereafter."); Norgaard (2022) at 48 ("Changing start of follow-up to 1, 5, and 10 years after the second prescription did not substantially change our estimates…Starting time of follow-up 10 years after the 10th prescription did not suggest any associations."); Adami (2021) at 2302 ("We observed no association after restriction to subjects with at least 5 or 10 prescriptions or those with 10 prescriptions and at least 10 years of follow-up.").

[9] *See, e.g.*, Deposition of Dr. Chan ("Chan Tr.") at 132:12–14; 168:23–169:2; 171:10–19, Brown Decl. Ex. 27 ("[I]n my experience in taking care of patients with reflux or heartburn symptoms, if I decide to give someone ranitidine, I'm going to assume that they're going to be taking it for their symptoms . . . And these are conditions that are chronic, so these are conditions for which I reasonably anticipate that these patients will be taking it long term."); Deposition of Dr. Vaezi ("Vaezi Tr.") at 103:1–3, 21–25, ECF No. 5840 Declaration of Tracy Finken ("Finken Decl.") Ex.41.

ranitidine studies are contradicted by the study authors themselves and by their own experts.  For example, Dr. Panigrahy admitted that a "measurable effect in observational data of cancer initiated by NDMA" should be observable with a follow-up of "anywhere from a year to a couple years."[10] When pressed, Dr. Panigrahy shortened the follow-up length to as little as six months.[11]  Plaintiffs' epidemiologist Dr. Moorman offered testimony that accords with Dr. Panigrahy—she testified that just a single pill of ranitidine could cause cancer and that, under Plaintiffs' "cancer promoters" theory, utilizing a lag-time greater than a year would "understate the true association with cancer risk."[12]  Most importantly, Plaintiffs' claims about the problems with the purportedly low exposure assessed in the ranitidine studies are undercut by their own arguments—in the same brief—that there is no safe dose or threshold for NDMA toxicity.[13]

On the one hand, Plaintiffs argue that even one pill of ranitidine can cause cancer.[14]  On the other, they argue that the doses of ranitidine examined in nearly every ranitidine epidemiological study are too low to cause cancer,[15] despite studies examining millions of people taking ranitidine chronically for many years.[16]  Plaintiffs cannot have it both ways.  If the levels

---

[10] Deposition of Dr. Panigrahy ("Panigrahy Tr.") at 434:4–20, Brown Decl. Ex. 41 ("Q. But you should be able to see a measurable effect in observational data of cancer initiated by NDMA in the period of, say, four years or so? A. So as I said, there can be a range of anywhere from a year to a couple years. That's where we know from a cancer biology mechanism point of view from these key characteristics.") (objections omitted).

[11] *Id.* at 398:2–6 ("Q. Okay. And you have said the lag time is much shorter, perhaps even six months; is that right?  A. Are you talking about with NDMA and --- Q. Yes. A. Yes."); Rebuttal Report of Dr. Panigrahy ("Panigrahy Rebut. Rep.") at 56, Brown Decl. Ex. 20 ("[C]ancers caused by these carcinogens do not necessarily take years or decades to develop . . . we need to abandon the concept of cancer latency.").

[12] Rule 26 Expert Report of Dr. Moorman ("Moorman Rep.") at 24–25, Brown Decl. Ex. 15.

[13] *See, e.g.*, Pls.' Mot. at 66 ("[G]enotoxins like NDMA simply do not have any safe threshold.").

[14] *Id.* at 66; *see also* Deposition of Dr. Moorman ("Moorman Tr.) at 288:17–25, Brown Decl. Ex. 39 ("[A]ny dose of ranitidine could ultimately lead to cancer.").

[15] *See, e.g.*, Pls.' Mot. at 27-41.

[16] *See, e.g.,* Adami (2021); Iwagami (2021); Yoon (2021); Norgaard (2021); Kantor (2021).

of NDMA in ranitidine cause cancer as Plaintiffs claim, then the ranitidine epidemiology would reveal an association. It does not. Plaintiffs' contradictory positions extend even further: Plaintiffs argue that the ranitidine epidemiology is biased "toward showing less association than a study of the population of Plaintiffs would."[17] Yet Plaintiffs' own experts acknowledge the existence of biases that would create spurious increased risk, such as confounding by indication and reverse causation.[18]

Plaintiffs also make the baseless claim that over-the-counter ("OTC") ranitidine use diluted the risk estimates in the ranitidine epidemiology. But when considering active comparator epidemiology (which FDA states is best practice),[19] all other H2RA medications were similarly affected by the availability of OTC use.[20] Therefore, any theoretical bias from OTC use would not be expected to affect the results of the active comparator studies. Study authors directly addressed the possible effects of OTC use, and concluded—contrary to Plaintiffs' claims—that it would have only a limited (if any) effect on the study results.[21]

Defendants' expert Dr. Chan analyzed the magnitude of any potential bias from OTC use and concluded that it would not appreciably change the risk estimates of the ranitidine epidemiology.[22] None of Plaintiffs' experts performed a similar calculation: in fact,

---

[17] Pls.' Mot. at 45.

[18] *See* Defs.' G.C. Epi Reply, at Section III.A.

[19] FDA, Guidance for Industry and FDA Staff, Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data (May 2013), Brown Decl. Ex. 85 ("FDA Best Practices") at 14 ("[I]t is ideal to use a comparator group taking a drug used to treat the same disease, with the same level of disease severity, and from the same time period.").

[20] *See* discussion at Defs.' G.C. Epi Reply at 16–18.

[21] *See, e.g.*, Adami (2021) at 2308 ("[T]he magnitude of any bias would be limited in the comparison between users of ranitidine and other H2RBs, since all major H2RBs were similarly impacted by over-the-counter use over time.")

[22] Rule 26 Expert Report of Dr. Chan ("Chan Rep.") at 32–38, Brown Decl. Ex. 1.

Dr. McTiernan admitted that she could not definitively state that even a single person was misclassified in the ranitidine epidemiology.[23]  Likewise, Dr. Moorman could not quantify the amount of hypothesized misclassification or identify potential effects of misclassification in the ranitidine epidemiology.[24]  Plaintiffs' claims regarding the impact of OTC use on risk estimates are pure speculation, and run contrary to the conclusions of both the study authors themselves and the testimony of both side's expert witnesses.

### C.    Dietary and Occupational Studies on NDMA and Other Chemicals Are Not Equipped to Answer Whether *Ranitidine* Causes Cancer In Humans.

Plaintiffs (like their experts) place heavy emphasis on dietary and occupational studies of exposure to NDMA and claim that body of literature supports a causal connection between ranitidine and cancer, even though (in their view) the epidemiological studies of ranitidine use do not.  While Plaintiffs argue that the existing ranitidine epidemiology has limitations, the Court should reject their invitation to fill any gaps with dietary and occupational studies.  As noted above, *supra* at 1, "[l]aw lags science; it does not lead it" and "the courtroom is not the place for scientific guesswork."  *McClain*, 401 F.3d at 1237.  The direct studies do not support Plaintiffs' general-causation burden and turning to further-afield indirect evidence is no solution to this basic failure of proof.  For multiple reasons, the so-called "NDMA" studies cannot answer the causal question with respect to ranitidine specifically.

Courts conducting a Rule 702/*Daubert* analysis in the context of chemical exposures must consider whether the studies on which experts rely inform the general causation question at issue.[25]  That includes careful scrutiny of whether the experts can reach scientifically reliable causation

---

[23] Deposition of Dr. McTiernan ("McTiernan Tr.") at 420:20–25, Brown Decl. Ex 32.
[24] Moorman Tr. at 115:7–117:20, 118:22–121:13.
[25] A district court "may not admit evidence when there is 'simply too great an analytical gap between the data [at issue in a particular case] and the opinion proffered.'" *Rider*, 295 F.3d at 1197 (quoting *Joiner*, 522 U.S. at 146).

conclusions about exposure to a compound via a *specific source* by relying on studies about exposure to that compound *generally*. The mere fact that a compound is suspected to be carcinogenic to humans does not establish that any and all exposures to that compound—in every possible permutation—are carcinogenic, regardless of the source. Indeed, courts repeatedly have excluded expert testimony that reaches causation conclusions about exposure to a specific final product (such as gasoline) based solely on evidence about exposure to a compound contained in that product (such as benzene). *See, e.g., Burst v. Shell Oil Co.*, 2015 WL 3755953, at *10 (E.D. La. June 16, 2015) (excluding expert testimony where expert relied primarily on benzene studies and the proper question was "*whether exposure to gasoline containing benzene can cause* [the outcome]*, not whether exposure to benzene generally can cause* [the outcome]") (emphasis added); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1175 (E.D. Wash. 2009) (similarly differentiating between exposure to benzene and exposure to gasoline)[26]; *Rider,* 295 F.3d at 1201 ("[E]ven minor deviations in chemical structure can radically change a particular substance's properties and propensities.").[27]

The general causation question in this case is whether ranitidine, including any alleged exposure to NDMA via ranitidine, can cause the five cancers at issue. The so-called "NDMA" studies on which Plaintiffs rely, which attempt to approximate exposure to NDMA via dietary and occupational sources, do not reliably inform that question.

***Dietary studies.*** As explained in Defendants' Motion to Exclude Plaintiffs' Epidemiology Experts, dietary studies that attempt to correlate cancer risk with the amount of NDMA people

---

[26] *See also* Reference Manual on Scientific Evidence (3d. ed. 2011) ("Ref. Man.") at 26 (discussing *Henricksen*).
[27] *See also* Defs.' G.C. Epi Reply at 5–6.

ingest through food suffer from numerous inherent flaws and limitations.[28]  In particular, these studies are not based on objective measures of dietary NDMA intake, but instead rely on participants' memories about their eating habits many years in the past.  Such dietary estimates are notoriously prone to recall bias, as Plaintiffs' own experts have acknowledged.[29]  These studies also make uncorroborated assumptions about levels of NDMA in food without regard to a variety of variables, including differences in brand, ingredients, and preparation methods.

Beyond these inherent limitations, many of the dietary studies on which Plaintiffs' experts rely do not even focus specifically on NDMA, much less ranitidine.  Rather, they assess cancer risk associated with eating particular foods without attempting to quantify participants' exposure to any *specific* chemicals in those foods, such as NDMA.  But exposure to processed meats is not equivalent to exposure to NDMA.  This is illustrated by IARC's classification of processed meats as a Group 1 *known* human carcinogen for colorectal cancer (which is not at issue here), while IARC classifies NDMA as only a Group 2A *probable* human carcinogen.[30]  Put simply, processed meat studies shed no light on the pharmacoepidemiology question before the Court—namely, whether *ranitidine* causes the Designated Cancers.

***Occupational studies.***  Occupational studies of cancer risk in rubber factory workers are even less equipped to answer the causation question at issue here.  For one, occupational studies assess lifetime exposure to NDMA (and numerous other chemicals) via *inhalation*, rather than oral

---

[28] Defs.' G.C. Epi Mot. at 81–85.

[29] *See, e.g.*, *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, Daubert Hearing Testimony of Dr. Anne McTiernan, July 25, 2019, at 737:21–738:9 ("If you want to know what somebody's previous diet effect of cancer risk is, it is very difficult to do that in a case-control study. . . . Diet, you can't ask somebody what they have eaten in the past.").

[30] *See* "N-Nitrosodimethylamine" & "Processed Meat," INT'L AGENCY FOR RESEARCH ON CANCER, *List of Classifications*, at 8, 31 (2022) ("IARC Classifications"), Brown Decl. Ex. 98.

ingestion.  Inhaling high levels of chemicals, such as NDMA, in an industrial workplace setting over the course of decades is not analogous to ingesting trace amounts of the same chemical in medication.  Failing to account for the differences in those routes of exposure is the hallmark of an unreliable scientific analysis.[31]

The lead author of one of the principal occupational studies on which Plaintiffs' experts rely confirmed this point.  Dr. Hidajat testified that the rubber factory study was *not* designed to assess the effect of any medication ingested orally, such as ranitidine, on cancer risk—instead, that study examined "very high exposures over a number of years, significant levels of exposure of NDMA" via inhalation.[32]  She went on to explain that attempting to extrapolate findings from rubber factory studies to draw conclusions about ingestion of a medication like ranitidine is "a complex issue" that raises "all kinds of different issues"—including, specifically, variation as between "different route of exposure."[33]

Moreover, as with many of the dietary studies Plaintiffs emphasize, the occupational studies Plaintiffs cite do not attempt to isolate workers' exposure to individual chemicals, such as NDMA.  Instead, they assess the cancer risk associated with long-term work in rubber factories *generally*.  Work in the rubber factory industry includes exposure to multiple potentially carcinogenic substances, making it "difficult to relate the observed cancer hazards in the rubber-manufacturing industry to exposure to *specific chemicals*."[34]  Consistent with that recognition,

---

[31] *See, e.g.*, Ref. Man. at 518 (different routes of exposure "affect the magnitude of ultimate exposures and . . . often affect health outcomes").

[32] Deposition of Dr. Hidajat ("Hidajat Tr.") at 144:23–145:19, Brown. Decl. 29.

[33] *Id.* at 142:20–144:22.

[34] IARC Monograph - Chemical Agents and Related Occupations, Vol. 100 at p. 552, 559 (Rubber Manufacturing Industry) (emphasis added), Brown Decl. Ex. 97; *see also* Hidajat et al., *Lifetime Exposure to Rubber Dusts, Fumes and N-Nitrosamines and Cancer Mortality in a Cohort of British Rubber Workers with 49 Years Follow-Up*, Occup. Environ. Med. 2019;76:250, 250–51 (2019), Brown Decl. Ex. 54.

IARC has classified employment in the rubber industry as a "Group 1 carcinogen (established human carcinogen)"—but has *not* reached the same conclusion about NDMA.

Plaintiffs are therefore wrong to insist that dietary and occupational studies of NDMA "fill the gap" left by the ranitidine studies.[35]   They point to no literature or peer-reviewed method establishing that data from non-ranitidine dietary and occupational studies can be extrapolated reliably to inform potential risks associated specifically with ranitidine, especially when studies of ranitidine show no causal association.   Nor have they identified any scientific, medical, or regulatory authority that has considered those studies when assessing whether *ranitidine*—as opposed to NDMA generally—causes cancer, including the five cancers at issue here.   Without providing a scientifically reliable basis for extrapolating conclusions about one exposure source to another, these different bodies of evidence cannot inform the causal question here.   *See Burst*, 2015 WL 3755953 at *9–10 (noting the expert relied primarily on benzene studies and the proper question was "*whether exposure to gasoline containing benzene can cause* [the outcome], *not whether exposure to benzene generally can cause* [the outcome]") (emphasis added).

> **D.**     **Available Epidemiological Literature Does Not Support a Causal Connection Between Ranitidine and Cancer.**

Defendants' Rule 702 motion to exclude Plaintiffs' epidemiology experts sets forth the data on ranitidine and cancer risk in detail.[36]   As explained, the studies of ranitidine and cancer risk—including, in particular, the H2RA active comparator analyses—overwhelmingly show no statistically significant positive association between ranitidine use and any of the five cancers at issue.   And for the reasons already stated, the non-ranitidine studies on which Plaintiffs' experts rely do not provide reliable evidence with respect to the general causation question presented here.

---

[35] Pls.' Mot. at 41.
[36] *See* Defs.' G.C. Epi Mot. at 27–39.

Plaintiffs' assertion that "there is evidence in the ranitidine studies, the dietary studies, and the occupational studies, that ranitidine use is associated with an increased risk of each of the five cancers at issue in this litigation,"[37] is based on a fundamental mischaracterization of the available data. To reach that conclusion, Plaintiffs cherry-pick and distort the findings of the ranitidine (and non-ranitidine) studies, rely on data that their own experts eschew, and vacillate between internally inconsistent positions about the "dose" of NDMA exposure required for ranitidine to pose an increased risk of cancer.

For example, Plaintiffs disregard basic and generally accepted epidemiological principles regarding what findings constitute a valid association by jettisoning the foundational principle of statistical significance. Plaintiffs assume that every risk estimate above 1.0 shows an increased risk, explicitly relying upon *non-statistically significant findings* to assert that a statistical association exists.[38] That is not a generally accepted or reliable methodology, as confirmed by Plaintiffs' own experts and the Reference Manual. Dr. Le testified at her deposition that "[w]hen the confidence interval includes 1.0, you interpret the finding as no statistical association."[39] The Reference Manual confirms what Dr. Le acknowledged but Plaintiffs ignore: Results that are not statistically significant do not sufficiently rule out the possibility of chance.[40]

The inconsistencies present in Plaintiffs' attack on Defendants' experts do not end with their failure to acknowledge generally accepted methodologies surrounding statistical significance.

---

[37] Pls.' Mot. at 43

[38] *See, e.g.*, *id.* at 44 ("Every result exceeds the 1.0 null hypothesis and therefore each result shows an increased risk."); *but see id.* at 45 (the majority of results that Plaintiffs rely on as showing increased risk cross 1.0 and are therefore not significant and may be due to chance).

[39] Deposition of Dr. Le ("Le Tr.") at 62:5–12, Brown Decl. Ex. 30 ("Q. When the confidence interval includes 1.0, you interpret the finding as no statistical association; correct? A. So 1.0, correct. Q. When the confidence interval includes 1.0. A. I would agree with that." (objection omitted); *id.* at 168:23–169:10.

[40] Ref. Man. at 573.

Plaintiffs also rely on data and methodologies that their own experts eschew as improper. For example, Dr. McTiernan did not rely on the Habel (2000) study for analyses in that study that lumped together different cancers like gastric and esophageal or kidney and bladder, stating that the combination of multiple cancers rendered the study "not informative."[41] Yet Plaintiffs claim that Defendants' experts should have relied on precisely those uninformative results.[42] Similarly, Plaintiffs include the McGwin (2021) analysis as data that Defendants' experts purportedly ignored, but Plaintiffs' own experts characterized that study as unreliable and likewise did not use it in their analyses. Dr. McTiernan "did not discuss this study in [her] causal analysis description" because of its "many weaknesses."[43] Dr. Moorman likewise noted that the McGwin study "is of limited utility" and that "it is not possible to calculate incidence rates and relative risks" from the data provided.[44] In this specific instance, Dr. McTiernan and Dr. Moorman followed FDA's methodology; FDA states that the dataset upon which McGwin is based "is not a tool for establishing causal attributions between products and adverse events" and that the "data may be affected by… reporting stimulated by publicity or litigation."[45]

Similarly, Plaintiffs present a series of forest plots that contain estimates from an analysis co-authored by Valisure.[46] This analysis did not successfully pass peer review; instead, it was

---

[41] *See, e.g.*, Rule 26 Expert Report of Dr. McTiernan ("McTiernan Rep.") at 187–188, Brown Decl. Ex. 9 ("[T]he study combined bladder cancers with kidney cancers, with only 7 cases in total. Therefore, this study is not informative on the relationship between ranitidine use and bladder cancer risk"); McTiernan Tr. at 568:19–569:21.

[42] Pls.' Mot. at 47–48, 51 (including the "not informative" combined results from Habel on forest plots for bladder, esophageal, and stomach cancer).

[43] Rule 26 Expert Rebuttal Report of Dr. McTiernan ("McTiernan Rebuttal Rep.") at 38 ("I listed many weaknesses of this study as repeated below, and did not discuss this study in my causal analysis description."), Brown Decl. Ex. 10.

[44] Moorman Rep. at 125.

[45] FDA Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005, available at https://www.fda.gov/media/71546/download, at 8–9.

[46] Pls.' Mot. at 45–57.

posted to the Internet after at least four scientific publications declined to publish the results.[47] Plaintiffs attempt to disguise this by referring to the data as coming from "Memorial Sloan Kettering hospital," but their own experts found this data unreliable and not worthy of inclusion.[48] Even the lead study author testified that his study "certainly cannot be used to say that ranitidine increases the risk of any cancer type" and that it "does not provide any evidence of increased risk, much less causation."[49]

Contrary to the opinions of their own experts, Plaintiffs include risk ratios for McGwin (2021), Habel (2000), and Braunstein (2021) in the forest plots presented to this Court, purportedly as evidence of the studies that defense experts disregarded.[50]  Given that Plaintiffs' own experts found that data unreliable,[51] Plaintiffs' argument must be rejected.  And this is far from the only issue with the forest plots Plaintiffs use to support their motion.  Plaintiffs' forest plots rely on cherry-picked data and include results Plaintiffs' own experts say are unreliable and should not be considered.  For example, Plaintiffs attack Defendants' experts for not crediting supposed "increased risks"[52] that study authors explicitly ascribed to confounding and bias, and that actually

---

[47] *See* Deposition of David Light ("Light Tr.") at 174:10–22, Brown Decl. Ex. 102; Deposition of Dr. Braunstein ("Braunstein Tr.") at 43:6–44:15, 184:22–185:12, Declaration of Mark Cheffo ("Cheffo Decl.") filed concurrently herewith, Ex. 2.

[48] Pls.' Mot. at 45, 47; *cf.* Moorman Rep. at 98 ("Overall, this descriptive study with its cross-sectional assessment of drug use only at the time of diagnosis and its lack of control group could be considered a hypothesis-generating study but it does not provide useful data for the assessment of ranitidine as a potential etiologic factor for bladder cancer.").

[49] Braunstein Tr. at 81:14–25: "Q. Now, the results of your MSK study certainly cannot be used to say that ranitidine increases the risk of any cancer type, correct? A. Correct. Q. And your study does not provide any evidence of increased risk, much less causation, correct? A. Correct." (objections omitted).

[50] *See, e.g.*, Pls.' Mot. at 47–48, 54, 57.

[51] *See e.g.*, Moorman Rep. at 98 ("Braunstein et al. . . . could be considered a hypothesis-generating study but it does not provide useful data for the assessment of ranitidine as a potential etiologic factor for bladder cancer.").

[52] Pls.' Mot. at 41, 47, 54, 57.

*disappeared* when the study authors implemented further controls for confounding by indication and reverse causation.[53]   Plaintiffs' own experts recognized the error in relying on such estimates, noting that "[i]f more than one relative risk [is] presented," the reliable method is to "choose the most-adjusted relative risk to present."[54]   Plaintiffs also present crude, unadjusted risk ratios in their forest plots, contrary to all reliable epidemiological practice.[55]   For example:

- Plaintiffs provide risk ratios from Habel (2000) in their forest plots on pages 47, 48, 51, and 57 of their Motion.   Not only are the bladder results shown on page 47 part of a combined analysis that Dr. McTiernan found "not informative,"[56] as discussed above, but the Habel study itself explicitly attributes the combined esophageal/stomach data (presented by Plaintiffs on pages 48 and 51) to reverse causation and suggests that reverse causation might have biased all study results.[57]

- Plaintiffs report only the first-year analysis of Liu (2020) in the forest plot on page 51 of their Motion, citing it again (along with Habel) on page 52 as "show[ing] increased risk of stomach cancer."[58]   However, as Dr. McTiernan admitted, the Liu study shows "no association" and she had no basis to disagree that fully-adjusted results "suggest[] the role of reverse causation" in the results cited by Plaintiffs.[59]

---

[53] For example, the statistically significant finding from Liu disappeared with implementation of two- to three-year lags (Liu (2020) at 309) and the statistically significant findings from Habel attenuated and became non-significant in lagged analyses and analyses comparing ranitidine to cimetidine.   Liu et al., *Use of proton pump inhibitors and histamine-2 receptor antagonists and risk of gastric cancer in two population-based studies*, BRITISH JOURNAL OF CANCER *available at* https://doi.org/10.1038/s41416-020-0860-4 (2020), Brown Decl. Ex. 64; Habel et al., *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, PHARMACOEPIDEMIOL. & DRUG SAFETY 9;149, 151–152 (2000), Brown Decl. Ex. 53.

[54] McTiernan Rep. at 96 ("If more than one relative risk was presented, I chose the most-adjusted relative risk to present…").

[55] *Id.* at 185 ("The crude relative risk, therefore, could represent a biased estimate.").

[56] *Id.* at 187–188 ("[T]he study combined bladder cancers with kidney cancers, with only 7 cases in total. Therefore, this study is not informative on the relationship between ranitidine use and bladder cancer risk.")

[57] Habel (2000) at 152 ("An elevation in cancer risk among cimetidine and ranitidine users might reflect the use of either of these drugs for early symptoms of cancer[ This was suggested by a lagged analysis of cancer of the esophagus or stomach; relative risks associated with cimetidine use and ranitidine use were only significantly elevated during the first 12 months after prescription date.").

[58] *See* Pls.' Mot. at 51–52.

[59] McTiernan Rep. at 147 ("Liu et al. interpreted the relative risks seen in ranitidine users versus nonusers… as no association."); McTiernan Tr. at 458:15–25, 456:6–24 (no basis to disagree that the results "suggest[] the role of reverse causation").

- Plaintiffs cite the Adami paper for the proposition that it found an increased risk of esophageal adenocarcinoma,[60] but fail to acknowledge that the increased risk disappeared when the paper examined esophageal adenocarcinoma with increasing exposure and follow-up, and that the authors therefore attributed the lower-exposure finding to chance.[61]

- Plaintiffs include the not fully adjusted risk ratios from the De Stefani (2001) study in their forest plot on page 51 of their Motion, a result that not even Dr. McTiernan or Dr. Moorman relies upon.[62]  Plaintiffs notably do not provide this 2001 paper with their submission to the Court.

Plaintiffs' forest plots are also misleading because Plaintiffs report multiple findings from the same study when the risk estimates are above 1.0, but *not* when the risk estimates are below 1.0. For example, the liver cancer forest plot reflects two separate risk estimates from Kantor above 1.0 ("regular use" and "vs. omeprazole"), but only one risk estimate from Adami (where both other H2RA and PPI comparisons were below 1.0) and only one finding from Kim Y. (2021) (where both famotidine and omeprazole comparisons were below 1.0).[63]  This cherry-picking results in the forest plots being falsely skewed to the right.

Plaintiffs attack the methods employed by Defendants' experts to support the conclusion that there is no association between ranitidine and cancer.  But this requires that Plaintiffs cherry-pick only results that show a statistically significant increased risk, wholly disregarding the overwhelming amount of data demonstrating no association or that reflect a statistically significant

---

[60] Pls.' Mot. at 28, 49.

[61] *See, e.g.,* Adami (2021) at 2305–2307 (Figs. 1, 2, and 3); *id.* at 2306 ("Because we calculated many estimates, some (on average 1 in 20) are expected to be significant due to chance. Thus, chance might explain the modest excess risk of esophageal adenocarcinoma among ranitidine users compared with users of other H2RBs or PPIs… If a causal association existed, we would expect to observe stronger associations with a larger number of prescriptions and, most likely, with longer follow-up, yet such patterns were not evident.").

[62] Pls.' Mot. at 51, citing the "T3 v T1 OR1."; *cf.* McTiernan Rep. at 302 (not citing DeStefani (2001)); McTiernan Rebuttal Rep. at Ex. C (same); Rule 26 Expert Rebuttal Report of Dr. Moorman ("Moorman Rebuttal Rep.") at 19–21, Brown Decl. Ex. 16 (same).

[63] Pls.' Mot. at 54; *see also* Adami (2021) at 2305 (Fig. 1); Kim Y. et al., *No Association Between Chronic Use of Ranitidine, Compared With Omeprazole or Famotidine, and Gastrointestinal Malignancies*, ALIMENT. PHARMACOL. THER. 2021;54:606, 613 (2021), Brown Decl. Ex. 60.

*decreased* risk.[64]  For example, Plaintiffs ignore that the Norgaard study contained several non-significant risk ratios for kidney and bladder cancer that can only be interpreted as no association or, using Plaintiffs' methodology, as proof of decreased risk.[65]  Plaintiffs also misleadingly claim that all the bladder cancer results reported by Dr. Porter show an increased risk,[66] but this is based on their disregard of all risk estimates under 1.0 and refusal to apply generally accepted principles of statistical significance, interpreting anything that "exceeds the 1.0" threshold as "an increased risk," even if the confidence interval crosses 1.0.[67]  Plaintiffs' own experts disagree with this interpretation of risk estimates[68], and, as a matter of fact, Dr. Porter cited numerous results from the Norgaard study for bladder cancer that were not statistically significant *and* below 1.0.[69] Plaintiffs likewise ignore the *statistically significant decreased risks* for high-dose ranitidine and esophageal cancer in the Tan study,[70] the significant and non-significant *decreased risk* reported by the Adami study,[71] and the fact that long-term dose response studies showed no evidence of dose response.[72]

---

[64] *See, e.g.*, Kim Y. (2021) at 613 (reporting statistically significant decreased risks).

[65] *See, e.g.,* Norgaard (2021) at 48 (reporting non-significant decreased risk for kidney cancer, for example "0.89 (95% CI: 0.72–1.10) compared with users of other H2-blockers and 0.87 (95% CI: 0.67–1.13) compared with PPI users.").

[66] Pls.' Mot. at 45.

[67] *Id.* at 44–45.

[68] Le Tr. at 61:2–62:12 ("Q. When the confidence interval includes 1.0, you interpret the finding as no statistical association; correct?. . . A. I would agree with that.") (objections omitted); *id.* at 68:10–69:9, 168:22–169:10.

[69] Rule 26 Expert Report of Dr. Porter ("Porter Rep.") at 18–19, Finken Decl. Ex. 17.

[70] Tan (2018) at, *e.g.*, 473 (for Ranitidine, "an inverse association with OAC risk was seen with higher doses (>150 mg, OR 0.17, 95% CI 0.09-0.32) compared with no use.")

[71] *See, e.g.*, Adami (2021) at 2306 (Fig. 1); 2306 (Fig. 2); 2307 (Fig. 3); *id.* at 2306 ("[W]e consistently observed HRs and risk differences close to unity when use of ranitidine was compared with use of either other H2RBs or PPIs. Analyses by number of prescriptions and duration of follow-up showed no evidence of trends.")

[72] *See, e.g.*, Tan (2018) at 473; McDowell (2021) at 3 (6+ prescription OR was "1.24 (95 % CI 0.91, 1.69; p =0.179)", <5 prescriptions OR was "1.49 (95 %CI 1.12.1.99; p =0.007)"); Iwagami

## II.  Plaintiffs Misstate The Conclusions of Regulatory Agencies And Defense Experts About Whether NDMA Is An Established Human Carcinogen.

Plaintiffs' core theory for excluding Defendants' causation experts—namely, their purported failure to give appropriate weight to *non-ranitidine* studies—not only misstates the relevant general causation question, it mischaracterizes the evidence about what is known about NDMA.  Throughout their brief, Plaintiffs offer a muddled description of the available data on NDMA's carcinogenicity in humans.  For example, Plaintiffs state that "NDMA is recognized by the FDA as a Class 1 genotoxic carcinogen."[73]  But they fail to mention that FDA described NDMA as "a genotoxic and carcinogenic agent *in animals*, and is classified as *probably* carcinogenic to humans to humans (Class 2A carcinogen) by the World Health Organization's (WHO's) International Agency for Research on Cancer."[74]  Plaintiffs make numerous similar attempts to blur the line between animal and human data on NDMA throughout their brief.[75]  But animal studies are not equivalent to human studies.[76]  Moreover, the studies involved exposure to

---

(2021) at 369 ("[I]nvestigating the risk of cancer among people receiving ranitidine or nizatidine" from 2005 to 2018; finding "no dose–response relationship . . ."); Norgaard (2021) at 49 ("[W]e found no dose response association . . ."); Adami (2021) at 2302 ("[N]o association after restriction to subjects with at least 5 or 10 prescriptions or those with 10 prescriptions and at least 10 years of follow-up," concluding that "if a causal association existed, we would expect to observe stronger associations with a larger number of prescriptions and, most, likely, with longer follow-up, yet such patterns were not evident."); Yoon (2021) at 4–5 ("When analyzed according to the cumulative duration of ranitidine and famotidine intake, there was again no difference in the overall cancer risk [].").

[73] Pls.' Mot. at 2.

[74] U.S. Dep't of Health and Human Servs., Food and Drug Admin., Center for Drug Evaluation and Research, *Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry*, at 1 n.4 (Feb. 2021), https://www.fda.gov/media/141720/download; *see also id.* at App'x B ("NDMA . . . is listed as a probable human carcinogen").

[75] Pls.' Mot. at 2–4  89, 95, 96, 101.

[76] *See* Ref. Man. at 563 (noting inferring causation from animal studies is "fraught with considerable, and currently unresolvable, uncertainty"); *id.* at 723–24 (discussing hierarchy of medical evidence).

*extremely* high doses of NDMA (orders of magnitude higher than the amount of NDMA that has ever been detected in ranitidine).[77]

Whether NDMA can induce tumors in particular organs in certain animal species at high doses is irrelevant to whether NDMA has been identified as a *known human* carcinogen.  And whether high doses of NDMA can induce cancer in rodents is even further removed from the inquiry here:  whether *ranitidine* increases the risk of the Designated Cancers in humans.  *See, e.g.*, *Joiner*, 522 U.S. at 139, 146 (upholding district court's exclusion of expert testimony offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans, finding there was  "simply too great an analytical gap between the data and the opinion offered"); *Rider*, 295 F.3d at 1202 (affirming exclusion of plaintiff's expert who "admitted that with respect to animal studies generally, what happens in an animal would not necessarily happen in a human being").

Similarly, Plaintiffs gloss over the actual standards that organizations like IARC and NTP apply when classifying the strength of the evidence as to whether exposure to particular substances can cause cancer.  Under IARC's classification system, a substance is classified as a Group 1, *known* human carcinogen if there is (1) sufficient evidence of carcinogenicity in humans," or (2) "*both* strong evidence in exposed humans that the agent exhibits key characteristics of carcinogens *and* sufficient evidence of carcinogenicity in experimental animals."[78]  NDMA is *not* classified as a Group 1 carcinogen under IARC's system.  Instead, IARC has classified NDMA as a Group 2A, *probable* human carcinogen—a classification that applies when there is "limited evidence of

---

[77] Rule 26 Expert Report of Dr. Guengerich ("Guengerich Rep.") at 7, 134–136, Finken Decl. Ex. 6.

[78] IARC Monographs on the Identification of Carcinogenic  Hazards to Humans, Preamble, Amended   January   2019,   ("IARC   Preamble")   at   35,   available   at: https://monographs.iarc.who.int/wp-content/uploads/2019/07/Preamble-2019.pdf.

carcinogenicity in humans" or "*inadequate*" evidence in humans, but strong evidence in human cells that the agent exhibits key characteristics of carcinogens.[79]   The National Toxicology Program employs a similar classification, and likewise classifies NDMA as "reasonably anticipated to be a human carcinogen" rather than as a "*known*" human carcinogen.[80]

As Plaintiffs point out, IARC first determined that NDMA is carcinogenic in certain *animals* in 1978 based on extremely high doses of NDMA administered in laboratory experiments. And in 2002, WHO published a report on NDMA that examined the exact kinds of dietary epidemiological studies on which Plaintiffs' experts rely to support their causation opinions. Despite decades of research, IARC has never concluded that there is sufficient evidence to upgrade NDMA from "probably" carcinogenic in humans to a "known" human carcinogen.   The same is true of multiple other organizations, including the NTP, all of which have long acknowledged NDMA's carcinogenic *potential* in humans, but have never deemed the scientific evidence sufficient to confirm that NDMA in fact causes cancer in humans.   Plaintiffs' reliance on those classifications to suggest that NDMA's carcinogenicity in humans has been definitively established is incorrect.

Similarly, Plaintiffs repeatedly misconstrue the statements of defense experts and Defendants themselves about NDMA's classification.   In reality, Defendants' statements simply mirror the same regulatory language that Plaintiffs misconstrue above.   For example, Plaintiffs claim, "Defendants admit that NDMA is a known carcinogen"[81] but cite statements agreeing that

---

[79] IARC Classifications at 8.
[80] N-Nitrosodimethylamine, National Toxicology Program, Dep't of Health and Human Services, 15th Ed. (2021) ("NTP 15th Ed.") at 7, ECF No. 5961 Supplemental Declaration of Loren Brown ("Brown Suppl. Decl.") Ex. 129.
[81] Pls.' Mot. at 5

"per the FDA's Guidance on Nitrosamines, [nitrosamines are] . . . *probable* human carcinogens,"[82] or that NDMA is a "probable" or "possible human carcinogen" and only a "'rat carcinogen for sure.'"[83]  Put simply, the quotes that Plaintiffs cite do not support the proposition they advance. Instead, these statements reflect that NDMA has been classified as a *probable* human carcinogen based on an *absence* of sufficient human evidence.  Notably, what these classifications actually show is that IARC and other regulatory bodies that have addressed NDMA recognize that there is insufficient evidence establishing its carcinogenicity in humans.[84]

## III. The Extent to Which Ranitidine Allegedly Degrades Into NDMA Does Not Amount to Epidemiological Evidence of Causation.

Plaintiffs' assertions about exogenous formation of NDMA (based on Dr. Najafi's flawed testing of ranitidine samples)[85] and endogenous formation of NDMA are not only scientifically unreliable, but also, as to endogenous formation, contradicted by evidence from FDA's own analyses and admissions by Plaintiffs' own experts.[86]

---

[82] *Id.* at 6 (emphasis added).

[83] *Id.* at 7.

[84] Human evidence is required to classify an agent as a known human carcinogen, which NDMA is not.  *See, e.g.*, IARC Preamble at 37 (Table 4, showing that "[e]vidence of cancer in humans" is required for Group 1 classification); EPA, Risk Assessment for Carcinogenic Effects, *available at* https://www.epa.gov/fera/risk-assessment-carcinogenic-effects ("Probably Carcinogenic to Humans" means sufficient evidence from "animal bioassay data," but either "limited human evidence…Group B1" or "with little or no human data (Group B2)"), Brown Decl. Ex. 84; NTP, Report on Carcinogens Process & Listing Criteria, *available at* https://ntp.niehs.nih.gov/whatwestudy/assessments/cancer/criteria/index.html ("Reasonably Anticipated To Be Human Carcinogen" means "There is limited evidence of carcinogenicity from studies in humans…but that alternative explanations, such as chance, bias, or confounding factors, could not adequately be excluded, OR there is sufficient evidence from studies in experimental animals.").

[85] *See generally*, ECF No. 5698, Brand Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Experts, Ramin Najafi, Ph.D., Charles Davis, Ph.D., and Other Experts Who Rely on Their Opinions.

[86] *See, e.g.,* Gao et al., *In vitro analysis of N-nitrosodimethylamine (NDMA) formation from ranitidine under simulated gastrointestinal conditions*. JAMA OPEN 2021;4(6):e2118253 (2021), Brown Decl. Ex. 50, at 8 ("These findings suggest that ranitidine is not converted to NDMA in

Even if Plaintiffs *were* correct about the mechanisms by which ranitidine might degrade into NDMA, that would not amount to epidemiological evidence of a causal association between ranitidine and the Designated Cancers.  It also would not justify leaping to conclusions about ranitidine based on studies that do not actually involve ranitidine.  Relying on ranitidine studies, by contrast, makes sense *regardless* of the viability of Plaintiffs' (flawed) degradation theories.  Any study of patients taking ranitidine necessarily accounts for exposure to NDMA, if any, via ranitidine (including from any purported exogenous or endogenous formation of NDMA).

\* \* \*

Plaintiffs' motion seems principally an effort to justify Plaintiffs' experts' own departure from scientific principles and methodological norms.  It is unavailing and should be denied.

## ARGUMENT

**I.    Plaintiffs' Critique of Defendants' Experts Highlights The Central Methodological Flaw In Their Own Experts' Opinions.**

Plaintiffs mount a variety of attacks on Defendants' experts that can be addressed globally before focusing on the arguments specific to individual defense experts.  Namely, Plaintiffs argue that several, if not all, defense experts conducted incomplete and improperly limited reviews of the relevant data on NDMA, inflated the importance of ranitidine data (rather than focusing on NDMA studies, as Plaintiffs' experts did), and failed to account for alleged evidence regarding the degradation of ranitidine into NDMA.

---

gastric fluid at physiologic conditions and are further supported by the results of a recent clinical trial."); Panigrahy Tr. at 420:1–18 ("The results of this in vitro study suggests that ranitidine does not convert to NDMA in the human stomach or small intestine under physiological conditions. Do you see that?  A. Yes. Q. Do you agree with the FDA's conclusion? A. As I said…I agree with the sentence.") (objections omitted); *see, e.g.*, ECF No. 5696, Brand Defendants' Motion to Exclude Remaining Expert Opinions Relating to General Causation ("Defs.' G.C. Remaining Opinion Mot."), at 3–14.

Plaintiffs' critique underscores the central methodological flaw that animates Plaintiffs' own epidemiological experts' opinions.  Plaintiffs' argument goes like this:  (i) NDMA is established to cause cancer in humans; (ii) ranitidine inevitably degrades into NDMA under certain conditions; (iii) therefore, it necessarily follows that exposure to NDMA via ranitidine causes cancer in humans.  The flaw in Plaintiffs' syllogism is that—rather than resting on scientifically reliable evidence that *real-world use of ranitidine* causes cancer—it instead assumes it to be true via a string of uncorroborated inferences.  Plaintiffs' claims must rely on reliable scientific data demonstrating a causal association between real-world use of ranitidine and the cancers plaintiffs allege, not by inferring unsubstantiated conclusions through inductive reasoning.  That is how hypotheses are formed, not how they are tested, and the Court should not accept Plaintiffs' invitation to condone the analytical gaps in Plaintiffs' theory of causation.

One persistent, underlying flaw in Plaintiffs' critiques of Defendants' experts is Plaintiffs' effort to recast their burden to demonstrate a causal association between ranitidine and cancer as though it is *Defendants'* burden to prove otherwise.  It is not Defendants' burden to "prove the negative."  *See, e.g.*, *Dawsey v. Carnival Corp.*, 2018 WL 4854651, at *4 (S.D. Fla. Oct. 5, 2018) "[The plaintiff] bears the burden of proving causation; the burden does not fall on [d]efendants to *disprove* causation.") (citing *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014)).  To be sure, Defendants' causation experts opine that available ranitidine data do not support a causal association between ranitidine and the Designated Cancers.  But the burden is not on Defendants to prove that ranitidine *does not* cause cancer; rather, it is on Plaintiffs to prove that it *does*.  *See, e.g.*, *Wilder*, 977 F.2d at 676 ("[D]efendant need not disprove causation. Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence."); *Wolfe v. McNeil-PPC, Inc.*, 2011 WL 1673805, at *14 (E.D. Pa. May 4, 2011) ("[Defense] expert need

not definitively rule out plaintiff's theory for his testimony to be admitted. . . . This difference stems from the fact that plaintiff is the party with the burden of proving causation." (citation omitted)); *Wicker ex rel. Wicker v. Ford Motor Co.*, 393 F. Supp. 2d 1229, 1238 (W.D. Okla. 2005) ("[I]t is not defendants' burden to disprove plaintiff's theory, but only to show that there is an absence of proof to support plaintiff's claim."); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003) ("It is not a defendant's burden to disprove causation . . . ."). Thus, even assuming defense experts ignored some limitation of the ranitidine studies (which they did not), that would not change the fact that those studies simply do not support an increased risk of cancer.

**First**, Plaintiffs assert that Defendants' causation experts failed to conduct a comprehensive review of the available data and "ignored" numerous relevant studies (in animals and in humans) on NDMA and other exposures. That is incorrect. Each of the experts considered non-ranitidine studies and offered reasonable, thorough, and scientifically valid explanations (which are accepted by regulatory authorities) for why such studies do not reliably inform the specific causation question at issue in this litigation—whether there is a causal association between *ranitidine* and any of the five cancers at issue.[87]

Moreover, Plaintiffs' argument mischaracterizes the types of evidence that Courts deem as relevant to general causation. Courts have firmly established the superiority of epidemiological studies over other types of evidence in the hierarchy of general causation evidence:

---

[87] *See* Rule 26 Expert Report of Dr. Witte ("Witte Rep.") at 11, Finken Decl. Ex. 22 ("[T]he exposure of concern is ranitidine, which includes any consequential or incidental exposure to NDMA from ingestion of the drug . . . . Extrapolating from NDMA studies requires speculation, whereas studying ranitidine reflects the effects, if any, of the actual question here – NDMA in ranitidine."); *see also* Chan Rep. at 105–43; Rule 26 Expert Report of Dr. Vaezi ("Vaezi Rep.") at 51–53, Brown Decl. Ex. 24; Rule 26 Expert Report of Dr. Terry ("Terry Rep.") at 75–76, Finken Decl. Ex. 19.

"[e]pidemiology, a field that concerns itself with finding the causal nexus between external factors and disease, is generally considered to be the best evidence of causation in toxic tort actions." *Rider*, 295 F.3d at 1201; *see also In re Prempro Prod. Liab. Lit.*, 738 F. Supp. 2d 887, 894 (E.D. Ark. 2010) (citations omitted) ("Federal courts have consistently cautioned against extrapolation of human effects from animal [and cell] studies. In addition to the biological differences between species, most animal studies involve significantly higher concentrations of a substance than would ever be present in humans."); *Allison*, 184 F.3d at 1313–14 (excluding expert who did not explain why the results of animal studies should trump "more than twenty epidemiological studies of breast implants in humans which found no valid increased risk of autoimmune disease.").

In asserting that Defendants' experts fail to account for non-ranitidine NDMA evidence, Plaintiffs incorrectly characterize animal and *in vitro* studies as epidemiological studies.[88] This is incorrect. Similarly, Plaintiffs improperly import regulatory risk assessments into their causation analysis of the evidence regarding NDMA carcinogenicity. This, too, runs contrary to Eleventh Circuit case law. The Eleventh Circuit has long held that agency risk-assessments involve a lower standard than courts require when applying Rule 702: "A regulatory agency such as the FDA may choose to err on the side of caution. Courts, however, are required by the *Daubert* trilogy to engage in objective review of evidence to determine whether it has sufficient basis to be considered reliable." *Rider*, 295 F.3d at 1201; *see also Siharath*, 131 F. Supp. 2d at 1370 ("The standard by which the FDA deems a drug harmful is much lower than is required in a court of law. The FDA's lesser standard is necessitated by its prophylactic role in reducing the public's exposure to potentially harmful substances.").

---

[88] Pls.' Mot. at 44–59.

**Second,** Plaintiffs erroneously claim that Defendants' experts failed to account for the alleged limitations in ranitidine studies. More specifically, Plaintiffs focus on various alleged deficiencies in the dose, duration, and follow-up elements of different studies. Contrary to Plaintiffs' claims, defense experts recognized limitations of the ranitidine studies and factored those limitations (along with the specific analyses the study authors conducted to address those limitations) into their assessment of the available literature. In any event, as explained above, Plaintiffs mischaracterize and overstate the limitations of the ranitidine epidemiology. *See supra* Background Section I.B.

Notably, Plaintiffs' critiques regarding limitations of the ranitidine epidemiological data are unreliable and inconsistent. On the one hand, Plaintiffs argue that NDMA is a powerful carcinogen with no safety threshold, and their experts contend that ranitidine at any dose, even a single pill, can cause cancer.[89] On the other hand, in their attempts to discount the results of ranitidine epidemiology, Plaintiffs argue that short-term exposure to ranitidine would not increase the risk of any cancer and that the exposure levels in all the ranitidine epidemiological studies were too short to cause cancer.[90] Obviously, both contentions cannot be correct.

**Third,** Plaintiffs assert that defense experts erred by failing to conduct a reliable Bradford Hill analysis to assess causation. This argument is flawed on multiple levels. First and foremost, Plaintiffs ignore the basic principle of epidemiology that it is not possible for there to be a *causal* association between an exposure and an outcome without first establishing a statistical association (causal or not) as a threshold matter. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (considering such factors in the absence of an association identified in epidemiologic studies

---

[89] Moorman Tr. at 288:17–290:2.
[90] *See, e.g.*, Pls.' Mot. at 28 ("Plaintiffs do not claim that 5 or 10 prescriptions of ranitidine cause cancer").

"does not reflect accepted epidemiologic methodology") (quoting Ref. Man. at 598-99 & n. 141), *aff'd sub nom. In re Deepwater Horizon BELO Cases*, 2022 WL 104243 (11th Cir. Jan. 11, 2022). Here, Defendants' experts explained that ranitidine epidemiological data do not reveal a reliable statistical association of any kind—much less a causal association—between ranitidine and any of the Designated Cancers.  Bradford Hill criteria are designed for assessing whether an observed association is causal, not for manufacturing an association where one otherwise does not exist.

Despite finding no reliable association in the relevant literature, Defendants' causation experts applied the Bradford Hill criteria to the question of whether ranitidine causes any of the five cancers at issue.[91]  As explained in detail in each expert's report, those criteria do not support a causal association.[92]

Plaintiffs' chief criticism of Defendants' experts' Bradford Hill analyses rests on the same flawed (and factually inaccurate) argument that forms the basis of their Rule 702 motion—namely, that Defendants' experts "ignor[ed] a large body of relevant evidence demonstrating an association between different exposures to NDMA and cancers."[93]  Again, Defendants' experts did review non-ranitidine studies, offering scientifically valid explanations—which are shared by the broader regulatory and scientific communities—for their conclusion that those studies do not provide reliable evidence of an association between *ranitidine* use and the Designated Cancers.

**Fourth,** Plaintiffs assert that defense experts failed to account for evidence that ranitidine can degrade to form trace amounts of NDMA.  This, too, misses the mark.  Whatever amounts of NDMA may or may not exist in ranitidine, those amounts would be reflected in epidemiological studies evaluating real-world use of ranitidine.  In other words, even if Plaintiffs were correct that

---

[91] Witte Rep. at 27–28; Chan Rep. at 143–161; Vaezi Rep. 59–61; Terry Rep. 100–105.
[92] *Id*.
[93] Pls.' Mot. at 63.

ranitidine forms NDMA endogenously (despite conclusive FDA studies to the contrary), any increased cancer risks associated with such endogenous formation would be evident in the robust body of ranitidine epidemiological data. *See supra* Background Section I.D.

*Finally*, Plaintiffs attack a number of the defense experts for their opinions that (1) NDMA in ranitidine has been investigated thoroughly and has not been shown to cause cancer in humans, and (2) after decades of research, NDMA has not been shown to cause cancer in humans. Those opinions, however, are universally shared by independent scientists and regulatory organizations worldwide. *See supra* Background Section II.

Plaintiffs have the burden of proving that ranitidine causes the cancers at issue by presenting reliable scientific evidence. But, as explained above, data from ranitidine epidemiological studies simply do not show an increased risk. *See supra* at Background Section I.D. Speculation about what theoretical, non-existent studies involving ranitidine users taking the highest possible ranitidine dose every day for 30 years *might* show similarly does not satisfy Plaintiffs' burden. Plaintiffs recognize this. That is why they attempt to shore up their own experts' flawed analyses by sweeping aside studies looking specifically at ranitidine use in favor of non-ranitidine data.[94]

## II.     Dr. Andrew Chan

Plaintiffs do not dispute that Dr. Chan is highly qualified in the field of cancer epidemiology and gastroenterology. Dr. Chan earned both a Medical Degree and a Master of Public Health from Harvard Medical School.[95]   He currently serves as Director of Cancer Epidemiology at Massachusetts General Hospital (MGH) Cancer Center, Chief of the Clinical and Translational Epidemiology Unit, and Vice Chair of Clinical Research in Gastroenterology at

---

[94] Defs.' C.G. Epi. Mot. at 38–40.
[95] Chan Rep., Ex. A (CV).

MGH, as well as Co-Leader of the Cancer Epidemiology Program at the Dana-Farber Harvard Cancer Center.[96]  Dr. Chan is one of the most prolific researchers in his field and has published over 570 peer-reviewed articles, including over 520 research investigations, and has authored book chapters and other scholarly work with a focus on cancer epidemiology.[97]

Plaintiffs' arguments attacking Dr. Chan's opinions are contradicted by the factual record.

### A.   Dr. Chan Conducted a Comprehensive Review of the NDMA Epidemiology but Appropriately Gave the Literature Little Weight.

Plaintiffs' arguments that Dr. Chan ignored NDMA epidemiology and did not sufficiently address other data related to NDMA misrepresent Dr. Chan's report and testimony.

*First,* Plaintiffs argue that "Chan ignored the NDMA epidemiology."  Even a cursory review of Dr. Chan's report demonstrates that this claim is false.  Across *33 pages* of his report, Dr. Chan conducted a comprehensive analysis of the entire body of epidemiological literature assessing whether an association existed between NDMA and any of the five cancer types alleged by Plaintiffs.[98]  Dr. Chan concluded that while the NDMA epidemiological studies were less relevant to his opinion than the ranitidine epidemiological data, they, in any event, did not show a true association with any of the alleged cancer types.[99]

Further, Plaintiffs claim Dr. Chan testified that he (i) lacks the expertise to assess NDMA epidemiology and (ii) considers it irrelevant.[100]  However, Plaintiffs take his testimony out of context: these portions of Dr. Chan's testimony discuss animal studies, not NDMA epidemiology studies.[101]  For example, Dr. Chan's testimony that he did not "have the specific expertise to do

---

[96] *See id.* at 1.
[97] *See id.* at 1–2; *see also id.*, Ex. A (CV).
[98] Chan Rep. at 110–143.
[99] *Id.* at 110; 143–144.
[100] Pls.' Mot. at 76 ("According to him, those studies were "not relevant[,]" . . . and he lacked 'the specific expertise to do that sort of review[.]'").
[101] *See* Chan Tr. at 119:17–19, 41:3–4.

that sort of review" was related to animal and toxicological data on NDMA.[102]   In the next sentence, he emphasized: "[m]y expertise, as I said, is in epidemiology and human studies and clinical use of ranitidine and that was the focus on my report."[103]

**Second,** Plaintiffs accuse Dr. Chan of misrepresenting the positions of scientific organizations (e.g., IARC, NTP) on NDMA.  But Dr. Chan opined that no scientific organization in the world classifies NDMA as a known human carcinogen.  This is unassailably true.  Instead, these organizations classify NDMA as a "probable human carcinogen" or "reasonably anticipated to be a human carcinogen" based on extremely high doses of NDMA administered to animals.[104]

**Third,** Plaintiffs complain that Dr. Chan did not sufficiently address biological plausibility (i.e., the NDMA animal and *in vitro* studies).  Again, Plaintiffs misstate the evidence.  Dr. Chan emphasized that human studies are more informative than animal and *in vitro* studies.[105]  This is not controversial and is generally accepted in the scientific community.  *See* Federal Reference Manual on Scientific Evidence at 563, 723-24 (noting inferring causation from animal studies is "fraught with considerable, and currently unresolvable, uncertainty.").  For this reason, while biological plausibility can strengthen an inference of a causal relationship, "a hypothetical biologically plausible mechanism can never serve as a foundation for a causal relationship in the absence of reliable and consistent epidemiological evidence."[106]  *See In re Bausch & Lomb Contact Lens Sol. Prods. Liab. Litig.*, MDL No. 1785, Civ. No. 2:06-MN-77777-DCN, 2009 WL 2750462, at \*12 (D.S.C. Aug. 26, 2009) ("These tests' suggestion of biological plausibility is insufficient to

---

[102] *See id.* at 41:3–4.
[103] *Id.* at 41:5–7.
[104] Chan Rep. at 136–138, describing WCRF, IARC, NTP & EPA; Chan Tr. at 117:5–11. Notably, of the Designated Cancers, only liver tumors have been found in animals.
[105] Chan Tr. at 115:9–119:25.
[106] Chan Rep. at 146; *see also id.* at 150, 154, 157, 161.

demonstrate causation, and unreliable under *Daubert*, absent evidence establishing an association between MoistureLoc and non-Fusarium infections."); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) ("[B]iological possibility is not proof of causation[.]").

Additionally, Dr. Chan reiterated, again and again, that human studies do not show a valid association between ranitidine (or NDMA) and any type of cancer.[107]  Accordingly, there is no reason to assess whether the non-existent association may be biologically plausible.  *See supra* Argument Section I.  Nevertheless, Dr. Chan considered the NDMA animal studies, as summarized in the NDMA monographs, and as evidenced both in his report and his deposition testimony.[108]

### B.    Dr. Chan Conducted a Comprehensive and Reliable Analysis of the Ranitidine Epidemiology.

Dr. Chan spent about 64 pages thoroughly discussing the ranitidine epidemiology and, contrary to Plaintiffs' claims, there was nothing "limited" in his review.[109]  Nonetheless, Plaintiffs raise two arguments: ***First***, Plaintiffs wrongly claim that Dr. Chan failed to account for frequency and duration of exposure to ranitidine.  ***Second***, Plaintiffs wrongly claim that Dr. Chan failed to account for latency and follow-up times.

### i.    Dr. Chan Consistently Considered Frequency and Duration of Ranitidine Exposure.

Plaintiffs falsely claim that "[Dr.] Chan failed to account for study participants' frequency and duration of exposure to ranitidine when he evaluated the human ranitidine epidemiology studies."[110]  ***First***, Dr. Chan systematically considered the studies' frequency and duration of use and arrived at his opinion: the available evidence indicates that there is no increased risk with

---

[107] *See* Chan Rep. at 4–5, 99–103, 135–137, 143–162.
[108] *Id.* at 138; Chan Tr. at 115:9–117:11; 263:20–265:19.
[109] *See* Chan Rep. at 41–105.
[110] Pls.' Mot. at 80.

higher doses and number of prescriptions. In fact, Dr. Chan comprehensively analyzed how associations changed with changing frequency and duration of ranitidine exposure in his report:

- **Iwagami:** As the cumulative dose increased, the risk decreased.[111]

- **Yoon:** "This large population-based study is particularly notable for limiting its study population to long-term users of ranitidine (>1 year of use with average cumulative dosage of 220,395 mg, which is approximately 2 years of use using a DDD of 300 mg). Despite this high level of exposure, the authors found no statistically significant associations with the individual cancer types that were examined."[112]

- **Adami:** "In analyses restricted to patients with at least 10 filled prescriptions *and* at least 10 years of follow-up (high exposure and long follow-up), no statistically significant increased risks were observed . . ."[113]

- **Norgaard:** "[T]here was no association in ranitidine users with both high exposure (at least 10 filled prescriptions) and long follow-up (at least 10 years of follow-up after the 10th prescription). . . . The risk estimates in both comparator analyses decreased with increasing number of redeemed prescriptions which is the exact opposite of what would be expected if there was a biological gradient consistent with a truly causal association."[114]

- **Tan:** The highest dose group has a statistically significant decreased risk—contrary to Plaintiffs' claim that higher doses cause an increased risk.[115]

- **McDowell 2021a:** There was no association with the highest number of prescriptions.[116]

Not only did Dr. Chan consider the frequency and duration of ranitidine use in the context of individual ranitidine studies, but he also considered these factors in the context of the totality of evidence with respect to each cancer type.[117]

---

[111] *Id.* at 43–44.

[112] *Id.* at 49.

[113] *Id.* at 63 (emphasis in original).

[114] *Id.* at 57, 60.

[115] *Id.* at 73.

[116] *Id.* at 82–83.

[117] *See e.g.*, *id.* at 146 ("There are no associations between ranitidine and gastric cancer in studies or analyses assessing high exposure (Adami (2021)) and long-term use (Yoon (2021)) of ranitidine."); *id.* at 150 ("There are no increased risks for esophageal cancer in studies or analyses assessing high dose or exposure of ranitidine (Tan (2018); Adami(2021)). Moreover, the risk for esophageal adenocarcinoma decreased in both studies as the ranitidine dose increased.").

Dr. Chan also relied on his experience as a gastroenterologist and explained that GERD is a chronic condition and ranitidine users are typically long-term users.  Thus, these studies (and particularly the analyses of highest dose and greatest number of prescriptions) are capturing real-world long-term use.[118]  Notably, none of Plaintiffs' experts disagrees with Dr. Chan on this.

Plaintiffs misunderstand how epidemiologists define exposure in pharmacoepidemiology studies.  Using prescription refills as a method to measure exposure is a well-accepted practice in pharmacoepidemiology studies because it ensures the patients actually took the medicine – hence the need for a refill.[119]  Having ten or more refills increases confidence that the study participants were compliant, long term users of ranitidine.  Plaintiffs now effectively argue that the field of pharmacoepidemiology got it wrong.  Notably, however, none of Plaintiffs' experts specializes in the area of pharmacoepidemiology, nor have they cited to any authority that suggests that prescription refills are invalid measures of exposure.  To the contrary, Plaintiffs' epidemiologist, Dr. McTiernan, considers "[a] particular strength of the studies was that the investigators… tested the dose-response relationship using either the WHO daily defined dose or the number of prescriptions for ranitidine."[120,121]

### ii.    Dr. Chan Reliably Accounted for Latency and Follow-Up Times In The Ranitidine Epidemiology.

Plaintiffs also assert that Dr. Chan "ignored" the length of the follow-up times in ranitidine epidemiological studies.  *First*, even a brief review of Dr. Chan's report demonstrates that he

---

[118] *See, e.g.*, Chan Tr. at 166:16–173:15.

[119] *See* Chan Rep. at 34, 60, 63–64, 83.

[120] McTiernan Rep. at 145.

[121] Plaintiffs also advance hypothetical arguments which ask this Court to assume prescriptions were for a 30-day regimen, but they cite no authority for this assumption.  A 90-day regimen is more likely for the countries, like Norgaard in Denmark, where these studies were performed. Pottegard et al., *Identification of Associations Between Prescribed Medications and Cancer: A Nationwide Screening Study*, EBIOMEDICINE 2016 May;7:73-79 (2016), Cheffo Decl. Ex. 12.

thoroughly considered follow-up times, including where study authors stratified by length of follow-up.[122]  As background, epidemiologists commonly evaluate whether follow-up time impacts the analysis by stratifying by length of follow-up—in other words, creating subgroups where individuals who have only longer follow-up times can be analyzed separately from individuals with shorter follow-up times.  In many of the ranitidine studies, the authors did this exact type of analysis, which Dr. Chan incorporated into his opinion, as shown below.

*Second*, Plaintiffs speculate that longer follow-up time would have led to an increased risk of cancer among ranitidine users.  Not only is this argument unanchored to any methodological attack on Dr. Chan, but it is entirely belied by the epidemiological data.  Across the ranitidine literature, Dr. Chan observed the same critical finding: *longer follow-up times do not lead to an increased risk of cancer*.  Dr. Chan repeatedly emphasized these findings in his report:

- **Iwagami:** The study authors found *decreased risk* with longer follow-up.[123]

- **Kantor:** The study authors found *decreased risk* with longer follow-up.[124]

- **Kumar:** The study authors found *statistically significant decreased risk* among ranitidine users with the longest follow-up.[125]

- **Norgaard:** "There was no increase in risk of bladder cancer for those who initiated treatment in the earliest time period (1996-1999) and thus had the longest follow-up period . . . . there was no association in ranitidine users with both high exposure (at least 10 filled prescriptions) and long follow-up (at least 10 years of follow-up after the 10th prescription)."[126]

- **Adami:** "In analyses restricted to patients with at least 10 filled prescriptions *and* at least 10 years of follow-up (high exposure and long follow-up), no statistically significant increased risks were observed."[127]

---

[122] *See* Chan Rep. at 43–98.
[123] *Id.* at 44.
[124] *Id.* at 48.
[125] *Id.* at 53.
[126] *Id.* at 56–60.
[127] *Id.* at 63 (emphasis in original).

Similarly, at his deposition, Dr. Chan reiterated that there is no reliable scientific evidence to suggest that cancer risk would increase with longer follow-up—and indeed, that the results of the ranitidine studies contradict that hypothesis.[128]

### III.    Dr. John Witte

Dr. Witte is the Vice Chair of the Department of Epidemiology and Public Health at Stanford University.[129]   Dr. Witte also serves as a senior editor for the journal Cancer Epidemiology, Biomarkers & Preventions, is a member of the National Cancer Institute Board of Scientific Counselors—Clinical Sciences and Epidemiology, and has published over 250 peer-reviewed scientific articles and a widely used textbook on statistics.[130]   He earned a Master of Science degree in engineering from UC Berkeley and a doctoral degree in epidemiology from UCLA.[131]   Plaintiffs do not and cannot challenge Dr. Witte's qualifications as an epidemiologist. Instead, Plaintiffs try to undermine his credibility by mischaracterizing his opinions and cherry-picking the record.   When placed in their full and proper context, however, Dr. Witte's opinions are reliable, well-supported, and the result of the same rigorous methodology he employs in his professional and academic life.

### A.    Dr. Witte Considered the Evidence Concerning Whether Ranitidine Causes Bladder, Gastric, Esophageal, Liver, or Pancreatic Cancer.

Plaintiffs accuse Dr. Witte, as they do all Defendants' experts, of ignoring NDMA scientific literature, notwithstanding the fact that Dr. Witte assessed the same relevant body of evidence as the numerous independent peer-reviewed experts and regulatory bodies that addressed the issue.[132]   Specifically, Plaintiffs argue Dr. Witte should have but "did not consider animal

---

[128] Chan Tr. 109:17–110:4; 109:17–110:4.
[129] *See* Witte Rep. at 3.
[130] *Id.*
[131] *Id.*
[132] *See* Pls.' Mot. at 66.

studies of ranitidine, nor any studies [] of NDMA."[133]  Plaintiffs' assertion, however, reflects a misunderstanding of the key and "limited question" in this case:  "[W]hether ranitidine can cause one of the five designated cancers."[134]  While Plaintiffs continue focusing on studies that speak to whether breathing fumes while working in a rubber factory,[135] or consuming organ meat[136] (or whole milk and eggs[137]) might lead to cancer, Dr. Witte focused on studies examining ranitidine.[138] And Dr. Witte is in good company.  Since NDMA was detected in ranitidine, researchers worldwide have consistently turned to *ranitidine* studies to determine whether *ranitidine use* is associated with increased risk of cancer.[139]  Meanwhile, Plaintiffs' experts—and they alone—have pursued a novel and unreliable methodology predicated on improper extrapolation and speculation.[140]

---

[133] *Id.*

[134] Order at D.E. 5579 ("PTO 77").

[135] *See* Moorman Rep. at 104–105 (examining Hidajat et al.)

[136] *See id.* at 90 (citing Dianatinasab, et al., *The Association Between Meat and Fish Consumption and Bladder Cancer Risk: A Pooled Analysis of 11 Cohort Studies*, EUR. J. EPIDEMIOL. 2021; 781, Brown Suppl. Decl. Ex. 119).  The authors concluded that "organ meats may be a risk factor for bladder cancer."  Dianatinasab (2021) at 789.

[137] *See id.* (citing Ronco et al., *Meat Consumption, Animal Products, and the Risk of Bladder Cancer: A Case-Control Study in Uruguayan Men*, ASIAN PAC. J. CANCER PREV. 15 (14) 5805 (2014), Brown Suppl. Decl. Ex. 123).  The authors concluded, in part, "boiled eggs, fried eggs, total eggs, and whole milk were positively associated with increased risk of bladder cancer." Ronco (2014) at 5808.

[138] Witte Rep. at 4 (answering the question as to "whether there is reliable evidence from human studies to indicate that ranitidine use can cause specific cancer(s)").

[139] *See e.g.,* Iwagami (2021) at 361–62 ("In September 2019, the [EMA] and [FDA] announced that ranitidine [] contains [NDMA] . . . Thus, from a public health perspective, it is important to promptly investigate the risk of cancer associated with ranitidine and nizatidine using the best available data accumulated to date."); Yoon (2021) at 2–3 ("In September 2019, the [FDA] and [EMA] announced that NDMA was detected in Zantac . . . Pharmacoepidemiologic studies are needed for clinically relevant causality assessment.").

[140] *Compare* Moorman Tr. at 407:14–408:6 (confirming that Dr. Moorman still had "not seen the[] data" that would justify her presumption that "the estimated intake of NDMA [] from occupational exposure . . . is in the same range as the exposure levels from ranitidine"), *with* Witte Rep. at 11 ("Extrapolating from NDMA studies requires speculation, whereas studying ranitidine reflects the effects, if any, of the actual question here—NDMA in ranitidine.").

Plaintiffs criticize Dr. Witte's decision not to approximate levels of NDMA in ranitidine and characterize his reasoning for not doing so as "nonsensical."[141]  To mischaracterize his reasoning as "nonsensical," Plaintiffs elide two of Dr. Witte's statements and add their own illogical connector:  "[Dr. Witte] explain[ed] that while he could have 'approximate[d] NDMA levels in ranitidine' he did not because the . . . 'the scientific community following detection of NDMA in ranitidine have focused directly on use of ranitidine.'"[142]  Apparently, Plaintiffs' re-write of Dr. Witte's report is meant to imply his decision not to approximate NDMA was predicated on following the decisions of others, rather than exercising his own scientific judgment.[143]  But Dr. Witte's actual reasoning is clear once Plaintiffs' creative additions are removed and the full text of his statement is provided:

> [S]cientists investigating the question about the potential association between ranitidine and cancer with observational studies have looked at the drug itself.  *This is because the exposure of concern is ranitidine, which includes any consequential or incidental exposure to NDMA from ingestion of the drug* . . . Extrapolating from NDMA studies requires speculation, whereas studying ranitidine reflects the effects, if any, of the actual question here – NDMA in ranitidine.[144]

In other words, Dr. Witte did not seek to approximate NDMA levels in ranitidine because he recognized that was an unreliable method based on unfounded inferences, whereas studying the ranitidine literature would capture whatever amounts of NDMA were in real-world ranitidine and its effects under real-world usage conditions.  Rather than extrapolate from far-removed sources like occupational and processed meat studies, Dr. Witte arrived at the same conclusion as to reliable methodology as researchers around the world; he looked to the ranitidine literature.

---

[141] *See* Pls.' Mot. at 67.

[142] *Id.* (quoting Witte Rep. at 11).

[143] *See* Pls.' Mot. at 67 ("But this is nonsensical.  There is no basis to infer from the existence of studies on ranitidine that the scientists *considered*, but *decided not* to study NDMA.")

[144] Witte Rep. at 11 (emphasis added).

Plaintiffs also intimate that Dr. Witte's decision not to examine NDMA studies was wrong because the "FDA obviously" considered more than ranitidine-focused studies in "pull[ing] Zantac from the market."[145]  This argument, made repeatedly by Plaintiffs and reflected in their approach to the epidemiologic data, wrongly conflates precautionary regulatory standards with the scientific rigor required by this Circuit in a causation analysis, which Dr. Witte performed here.[146]

### B.    Dr. Witte Opined That Ranitidine Use is Not Associated with the Designated Cancers, and Analyzed Dose-Response and Follow-Up Times in the Ranitidine Studies to Support His Conclusion

Plaintiffs argue that the "sources [Dr.] Witte relies on demonstrate that he has not answered" the question as to whether "ranitidine can cause cancer when consumed regularly over multiple years."[147]  Dr. Witte's report and testimony reveal such assertions are baseless.

### i.    Dr. Witte's Conclusions are Wholly Supported by the Exposure Analyses in Ranitidine Studies.

Plaintiffs accuse Dr. Witte of "extrapolat[ing] beyond the lower exposure in ranitidine studies to Plaintiffs," the majority of whom, they claim, used ranitidine regularly "over many years."[148]  As a preliminary matter, Plaintiffs do not provide a single cite to Dr. Witte's report or deposition supporting their assertion that he impermissibly extrapolated from low exposure to long-term use.  In fact, Plaintiffs do not discuss Dr. Witte at all here.[149]  Instead, Plaintiffs focus on alleged limitations of two of the papers Dr. Witte reviewed, Adami (2021). and Norgaard

---

[145] Pls.' Mot. at 67.

[146] *See McClain*, 401 F.3d at 1250 (explaining that regulatory agency's "risk-benefit analysis . . . does not directly focus on the question of causation in [a] toxic tort case"); *see also Siharath*, 131 F. Supp. 2d at 1366, 1370 (holding that "Plaintiffs' reliance on this FDA action to show reliability [of their expert's opinions] is insufficient to satisfy the requirements of Daubert" and "[t]he standard by which the FDA deems a drug harmful is much lower than is required in a court of law. The FDA's lesser standard is necessitated by its prophylactic role in reducing the public's exposure to potentially harmful substances.").

[147] Pls.' Mot. at 67.

[148] *Id.*

[149] *Id.* at 67–68.

(2021).[150]  But Dr. Witte reviewed dose-response data presented in numerous ranitidine studies[151] and analyzed those data both individually and as "an overall global evaluation."[152]  Based on those analyses—which involved substantially more literature than the two papers Plaintiffs raised— Dr. Witte found "[n]o consistent overall dose- and duration-response relationships or trends" and that the relative risks "shifted up and down with increasing drug levels."[153]  Dr. Witte's ranitidine-exposure conclusions are firmly anchored to the available data, and he does not extrapolate beyond those bounds.

### ii.  Dr. Witte Considered Follow-Up Periods in the Ranitidine Studies.

Plaintiffs argue that Dr. Witte "did not acknowledge the short duration of follow-up in the studies he relied upon."[154]  This is incorrect.  Plaintiffs, for example, accuse Dr. Witte of ignoring the Adami (2021) study's language that a "severe shortcoming of [the] study is the limited number of participants with long-term follow up."[155]  But Dr. Witte expressly acknowledged this limitation in his report, stating:  "Other limitations [of Adami] were the number of subjects followed-up for a long time period."[156]

---

[150] *Id.*

[151] *See e.g.,* Witte Rep. at 14, Table 2.3 (examining dose-response data in Iwagami (2021) for all cancers); *id.* at 16, Table 3.2 (examining same in Adami (2021) and Tan (2018) for esophageal cancer); *id.* at 19, Table 4.3 (examining same in Adami (2021)., Liu (2020)., and Pottegard (2016) for gastric cancer); *id.* at 22, Table 5.3. (examining same in Cardwell (2021), Norgaard (2022), and McDowell (a) for bladder cancer); *id.* at 23, Table 6.2 (examining same in Adami (2021) for liver cancer); *id.* at 25, Table 7.2 (examining same in Adami (2021) and McDowell (b) (2021) for pancreatic cancer).

[152] *Id.* at 26.

[153] *Id.*

[154] Pls.' Mot. at 68.

[155] *Id.*

[156] Witte Rep. App'x 1, A.1.1.  Additionally, while Plaintiffs cite this under a section *on short follow-up periods*, the limitation described does not relate to a truncated follow-up.  On the contrary, Adami had a *median* follow-up time of 14 years.  *See* Adami (2021) at 2304, Table 1. The limitation was the number of participants that fell within this "*long-term follow-up*" period. Adami (2021) at 2307 (emphasis added).

Next, Plaintiffs accuse Dr. Witte of contradicting the study authors' statements about the length of follow-up, but this too requires Plaintiffs to mischaracterize Dr. Witte's and the study authors' words.[157]  For instance, Plaintiffs cherry-pick an excerpt from Yoon (2021) stating that the study's seven-year follow-up "period is not long enough to assess the onset of cancer"[158] and then juxtapose that with Dr. Witte's statement that Yoon's large number of cases and follow-up time were "enough to assess the onset of some cancer."[159]  By taking a statement from Yoon out of context, Plaintiffs try to pass off the improbable conclusion that, despite writing and publishing the paper, the authors of the Yoon (2021) study believed their work lacked the ability to assess anything at all.  But Dr. Witte reached the same conclusion as the study itself, given that the authors went on to explain:  "[W]e found no association between probable NDMA exposure through ranitidine and the *short-term risk of cancer*.  However, further research is needed to assess the long-term cancer risk."[160]  In other words, just as Dr. Witte stated, Yoon (2021) was able to assess *some* (i.e., short-term) cancer risk.  Dr. Witte and Yoon (2021) are not at odds, but in unison, when the actual text is read.

Plaintiffs try a similar tactic with the Kim S (2021) study, implying that the authors "understood" its design was too limited to assess the onset of cancer.[161]  Plaintiffs derive this conclusion from the authors' statement that the "five year-follow up period may not be long enough to detect gastric cancer development."[162]  But Kim S, like Yoon, subjected the study to peer-review and published its findings, including the conclusion that the data "suggest[ed] that the

---

[157] *See* Pls.' Mot at 68.

[158] *Id.* at 68.

[159] Deposition of Dr. Witte ("Witte Tr.") at 122:20–23, Finken Decl. Ex. 43.

[160] Yoon (2021) at 7.

[161] Pls.' Mot. at 68.

[162] *Id.* (quoting Kim S et al., *Effect of Ranitidine Intake on Risk of Gastric Cancer Development*, Healthcare 2021,9,1071 (2021) at 7, Brown. Decl. Ex. 59).

intake of ranitidine, even if it contains NDMA, may not be associated with an increased risk of developing gastric cancer."[163]  The shorter follow-up in Kim S is one of a handful of "limitations" provided by the authors that researchers should consider when analyzing the study.[164]  Dr. Witte did precisely that.[165]

Finally, Plaintiffs accuse Dr. Witte of "obscur[ing]" the length of follow-up periods in the literature "by listing 'the time period from when the earliest possible exposure to ranitidine or other H2RAs all the way up to the last follow-up period.'"[166]  But Dr. Witte expressly defined and labeled that interval as the "Time Period" of the study and neither the label nor its description conflate that period with follow-up time, which is by definition different.[167]  Separately from this statistic, as noted above, Dr. Witte repeatedly and specifically addressed follow-up times in his assessment of the individual studies.  The utility of Dr. Witte's "Time Period" metric is that it can be applied across the ranitidine studies.  By contrast, follow-up time cannot, since many studies do not provide a follow-up time at all, and those that do often use different metrics (e.g., median, mean, total) that cannot be directly compared across studies.  Ironically, while Plaintiffs assert that looking at "Time Period" is "not probative at all," the Cardwell study, repeatedly relied upon by Plaintiffs and lauded by their expert, Dr. Moorman, does precisely that.[168]  Cardwell (2021) does

---

[163] Kim S (2021) at 7.
[164] *See id.*
[165] Witte Rep. at App'x 1, A.1.2 ("Limitations [of Kim S (2021)] include . . . only five years of follow-up.").
[166] Pls.' Mot. at 68 (quoting Witte Rep. at 14 n.2).
[167] *See e.g.,* Witte Rep. at 14 n.2.
[168] Pls.' Mot. at 68; *see* Moorman Rep. at 63 ("Prescription data was available for up to 18 years, which is an important strength given the expected long latency period between exposure and the development of cancer.") *see also* Pls.' Mot. at 60 n.177 (characterizing Cardwell's (2021) follow up as "similar to 18 years" which is "the length of the study").

not report a follow-up time and instead reports results over an 18-year window which begins with the earliest ranitidine use and ends with the cancer outcome during that period.[169]

### C.   Dr. Witte Properly Considered Confounding and Addressed Such Concerns By Prioritizing Active Comparator Studies.

Plaintiffs accuse Dr. Witte of a "post-hoc" analysis that relies *solely* on active comparator studies.[170]   Plaintiffs also claim that Dr. Witte "repeatedly insisted that the *only* reliable study methodology is an active comparator study comparing ranitidine and H2RAs."[171]   Plaintiffs, however, do not—and cannot—provide a single cite to Dr. Witte's report or deposition testimony to legitimize this claim. While Dr. Witte, like FDA and other regulatory authorities, prioritizes active comparator studies (and provides extensive reasoning for doing so), he is explicit about his study hierarchy, which includes all reliable study designs.[172]   Claims that he considered only active comparator studies are mistaken.

#### i.   Dr. Witte's Consistent Approach to Confounding is Exhibited By His Prioritizing the Active Comparator Design

Plaintiffs argue that Dr. Witte's entire report is premised on the presumption that "H2RAs and ranitidine [users] *are the same with respect to confounders . . .*"[173]   Again, Plaintiffs provide no cite to Dr. Witte's report or deposition stating this presumption.   Instead, Plaintiffs infer this from an exchange at his deposition where they claim Dr. Witte presumes smoking will always be

---

[169] *See generally* Cardwell et al., Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case-Control Study, AM J GASTROENTEROL 2021;00:1–8 (2021), Brown Decl. Ex. 48.
[170] Pls.' Mot. at 69.
[171] *Id.*
[172] *See* Witte Rep. at 9 ("Thus, in this report I prioritize comparisons of ranitidine to other H2RAs, followed by ranitidine to PPIs, and then to ranitidine to non-use."); *see also id.* at 8–9, Section I.D. (discussing strengths of active comparator studies in pharmacoepidemiology, including their attempts to "mimic a randomized controlled trial" and intrinsic ability to "control[] potential sources of bias, even if [the biases] are not directly measured").
[173] Pls.' Mot. at 70.

a positive confounder.[174]  In that exchange, however, Dr. Witte affirmed that smoking differences between the comparator groups could lead to bias *in either* direction.[175]

Plaintiffs also allege that Dr. Witte did not "determine a baseline" between ranitidine users and other H2RA users.[176]  But Dr. Witte followed the same generally accepted methodology as every scientific body and peer-reviewed investigator, which is to use active comparators to *reduce* baseline differences.  As FDA explained: "it is ideal to use a comparator group taking a drug used to treat the same disease, with the same level of disease severity, and from the same time period."[177]  It is Plaintiffs who ignore baseline differences by inexplicably favoring comparisons between ranitidine users and those who do not need an antacid, an approach disfavored by the relevant scientific community.[178]  As Dr. Witte explained,  "patients who are receiving treatment are often very different with respect to their disease severity and risk of adverse events compared with patients who are not receiving treatment for the same disease."[179]

Finally, Plaintiffs argue that Dr. Witte "said nothing about the [lack of smoking data inactive comparators] in his report."[180]  But Dr. Witte provides several reasons why confounding

---

[174] *Id.* at 69–70.

[175] *Id.*

[176] *Id.*

[177] FDA, Guidance for Industry and FDA Staff, Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data, (May 2013), at 14, available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/best-practices-conducting-and-reporting-pharmacoepidemiologic-safety-studies-using-electronic.

[178] *See e.g.*, Adami (2021) ("To reduce [] concerns [of potential confounding by indication and reverse causality] we undertook a cohort study . . . comparing cancer risk between ranitidine users and an active comparator group. . ."); Iwagami (2021) ("[W]e employed an active comparator design . . . such a comparison is less prone to indication bias than a comparison between users and non-users of ranitidine/nizatidine.").

[179] Witte Rep. at 8.

[180] Pls.' Mot. at 70.

may be present in the studies, including failure to properly account for smoking.[181]  Potential

confounding by smoking, due to its impact on both cancer and antacid use, is one of the reasons

Dr. Witte explained that the active comparator design is particularly methodologically appropriate

here.[182]

### ii.    Dr. Witte Did Not Misrepresent Any Data.

Plaintiffs allege that Dr. Witte misrepresents data with which he disagrees.[183]  First,

Plaintiffs claim that that Dr. Witte's misrepresents the active comparator numbers by concluding

that they do not show a "valid association" for bladder cancer.[184]  But Dr. Witte plainly presented

all point estimates in his report.  Accordingly, Plaintiffs do not claim that Dr. Witte presented the

wrong data or omitted data.  Rather, while claiming "misrepresentation," in reality Plaintiffs just

dislike Dr. Witte's *conclusion* about the data and hope the Court will accept their anomalous

position that any point estimate over 1.0 indicates an association, regardless of chance, bias, or

confounding.[185]

Plaintiffs further challenge Dr. Witte's bladder conclusions based on their interpretation of

the Norgaard (2021) study's PPI data.[186]  Plaintiffs point to Norgaard's PPI point estimate—which

Dr. Witte examined[187]— and claim that it renders "inexplicable" his finding of no association.[188]

Plaintiffs base this accusation on the speculation that PPIs likely cause cancer, that PPI users are

---

[181] Witte Rep. at 5–6 ("As another example, smoking is a risk factor for the cancers considered here and is associated with use of H2RAs.").

[182] *See id.* at 9 (citing Norgaard's (2021) discussion about the unlikelihood that smoking and other lifestyle factors would change depending on H2RA type).

[183] Pls.' Mot. at 72.

[184] *Id.*

[185] *See* Witte Rep. at 2 (noting an "association[]" which "most likely reflect issues with reverse causation, confounding, or chance" are "not a valid association").

[186] *See id.*

[187] *See* Witte Rep. at 19, 20.

[188] Pls.' Mot. at 72.

consistently sicker on the whole than ranitidine users, and that these factors must bias comparisons with H2RAs "toward the null."[189]   Thus, they argue, since the H2RA point estimate was higher than the PPI point estimate in Norgaard, Dr. Witte's opinion is "inexplicable."[190]   In the near-full page that this argument spans, Plaintiffs do not cite to any scientific source, including their own experts, to support their argument.[191]   Nor do they address the fact that the direct evidence—the actual comparison between ranitidine users and users of drugs *in the same class*—shows no association.   Lawyer speculation is not a substitute for valid authorities, methodologies affirmed by FDA, and direct scientific evidence.[192]

### iii.    Dr. Witte's Reliance on Aggregate Data is Appropriate.

Plaintiffs devote a sliver of their motion to argue that Dr. Witte ignored the "infirmities of the Explorys" aggregated data.[193]   Notably, Plaintiffs provide no basis supporting that the peer-reviewed literature using Explorys is "infirm."   By contrast, Dr. Witte explained that grouped data lends itself to analyses similar to individualized data and that the Explorys database has been used in numerous peer-reviewed publications and is widely accepted as an appropriate dataset.[194]

### D.    Dr. Witte Concluded that There is No Valid Association Between Ranitidine and the Designated Cancers, But Conducted a Bradford Hill Analysis Across Cancers to Emphasize the Lack of Evidence Supporting Causation.

Plaintiffs accuse Dr. Witte of performing a "conclusory [Bradford Hill] analysis" that is generally unhelpful to a jury and particularly cursory as applied to some of the criteria.[195]   But as

---

[189] *Id.*

[190] *Id.* at 72–73.

[191] *Id.*

[192] *Id.*

[193] *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.").

[194] *See* Witte Tr. 251:24–253:9.

[195] *See* Pls.' Mot. at 74–76.

Dr. Witte and the Reference Manual note, performing a Bradford Hill *Causality Analysis* follows detection of a valid association, which Dr. Witte concluded is lacking here.[196]  This is "because if there is no valid association between an exposure and an outcome, there cannot be a causal relationship between the exposure and outcome."[197]  This is well-accepted.[198]  Dr. Witte was clear that no Bradford Hill analysis was warranted and that he reviewed those factors only for completeness, given Plaintiffs' claims.

**Temporality**.  Plaintiffs argue that Dr. Witte's temporality evaluation is flawed because he (1) addressed all cancers together and (2) believes, based on some of the lag-time analyses, it is possible "ranitidine use began after cancer initiation."[199]  But there is an established risk of reverse causation, bias, and confounding in all cancers alleged.  Plaintiffs accept Dr. Witte's lag-time reasoning for most cancers but argue it does not apply to bladder cancer.[200]  But Defendants' experts, including a practicing gastroenterologist, have contradicted Plaintiffs' assumption about bladder cancer and protopathic bias.[201]  Plaintiffs also fail to note that Dr. Witte's temporality assessment is not based solely on lag-time analyses and protopathic bias.  While he points to that as one potential explanation for the diminishing risk estimates with increasing lag times, he also

---

[196] *See* Ref. Man. at 598-99 ("We emphasize that these [Bradford Hill] guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship."); Witte Rep. at 27.

[197] Witte Rep. at 27.

[198] *See, e.g.*, *McWilliams v. Novartis AG*, 2018 WL 3364608, at *4 (S.D. Fla. July 9, 2018) (quoting *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1267 (N.D. Ala. 2017) ("[T]he Bradford Hill factors cannot be applied without first establishing a causal association."); *see also* Ref. Man. at 598–99 ("We emphasize that these [Bradford Hill] guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship.").

[199] Pls.' Mot. at 74.

[200] *Id*.

[201] *See* Chan Rep. at 31 ("I cared for many patients who [] had long-standing symptoms of abdominal pain that [were] treated with acid suppressive agents [and] were ultimately diagnosed with esophageal, gastric, liver, pancreatic, or bladder cancer.").

notes that "many cancers are slow growing," which means "we cannot be assured that ranitidine use began after cancer initiation."[202]

**Consistency**.  Plaintiffs accuse Dr. Witte of "*only* [] look[ing] at H2RA active comparator studies" and ignoring the rest, including non-use, PPI active comparators and NDMA studies.[203] As noted above, and clear throughout his report, Dr. Witte *prioritizes* H2RA active comparators, and for good reason, but he considered and analyzed the results of *all* ranitidine studies.[204]

**Plausibility**.  Plaintiffs accuse Dr. Witte of dodging the biological plausibility question by "deferring to 'other expert reports'" and "not engag[ing] with the biological mechanisms that render causation plausible[.]"[205] Dr. Witte is not a cancer biologist.  He appropriately stayed within the scope of his professional scientific training and deferred to cancer biologists for in-depth biological assessments.  Dr. Witte, moreover, acknowledged the biological findings generally known about NDMA:  It is "a probable carcinogen, with limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animal studies, at certain doses in certain species."[206]

**Analogy**.  Finally, Plaintiffs point to the fact that Dr. Witte did not consider analogies as further evidence that his Bradford Hill analysis was unreliable.  But here, again, Plaintiffs are inconsistent:  Dr. Witte's treatment of analogy is uncontroversial, and Plaintiffs' experts employed the same approach.[207]

---

[202] Witte Rep. at 27.

[203] Pls.' Mot. at 74.

[204] *See e.g.*, Witte Rep. at 19 (reviewing Cardwell's active comparator findings and use-nonuse findings, as well as Kantor's use-nonuse results).

[205] Pls.' Mot. at 75.

[206] Witte Rep. at 27.

[207] *See* Moorman Rep. at 167 (not analogizing and noting that "[b]ecause [analogy] is rather vague, it is not often incorporated into causal assessments").

## IV.    Dr. Mary Beth Terry

Plaintiffs do not challenge Dr. Terry's qualifications as an expert in this litigation, and for good reason: she is a tenured Professor of Epidemiology at Columbia University's Mailman School of Public Health who oversees cancer epidemiology faculty and students who study multiple cancer types, and has published more than 415 peer-reviewed articles in clinical, cancer, and epidemiology journals.[208]   Instead, Plaintiffs lob attacks at Dr. Terry's methodology and opinions that fail for the reasons mentioned below.

### A.    Plaintiffs Mischaracterize Dr. Terry's Methodologies.

Plaintiffs argue that Dr. Terry disregards or "devalues" studies that do not support her conclusion. But Plaintiffs misrepresent Dr. Terry's methodology and the facts on which she relied. Plaintiffs' challenge to Dr. Terry's opinions is without merit.

#### i.    Available Epidemiological Data Do Not Support An Association, Much Less a Causal Relationship, Between Ranitidine And The Designated Cancers.

##### a.    Dr. Terry Did Not Extrapolate Regarding "Low Exposure."

Plaintiffs argue that Dr. Terry "[e]xtrapolated [b]eyond the [l]ow [e]xposure in [r]anitidine [s]tudies to Plaintiffs" by "disregard[ing] missing data on dose and long-term use."[209]   Plaintiffs allege that Dr. Terry erred by "relying" on data from the Explorys Database and the Adami, Norgaard, Iwagami, and Kantor studies.[210]   Plaintiffs are incorrect for many of the same reasons discussed above.

First, Dr. Terry did not extrapolate to reach any of her conclusions, let alone conclusions about the alleged exposure of any specific Plaintiffs.  Instead, she evaluated and interpreted the

---

[208] Terry Rep., Ex. A (CV).
[209] Pls.' Mot. at 83–84.
[210] *Id.*

scientific evidence and arrived at methodologically and scientifically sound conclusions that are consistent with those of FDA and the broader scientific community. *See supra* Background Section II.

Second, Plaintiffs' contention that Dr. Terry gave "considerable weight" to the Explorys Database is their own characterization, not Dr. Terry's.[211] Regardless, Dr. Terry appropriately described the Explorys Database as "an aggregated, deidentified electronic medical record registry" and described the methodology of the Kim Y (2021) study, which used data from the Explorys Database, in her report.[212] The Kim Y study found statistically significant *decreased* risks for several cancer types in ranitidine users, yet Dr. Terry did not reach the conclusion that ranitidine use is, in fact, protective against these cancer types. Instead, Dr. Terry appropriately, and cautiously, evaluated and interpreted the study results, considering strengths and weaknesses. Dr. Terry acknowledged the limitations of the data regarding intensity of exposure but also explained her opinion that the study validly measured exposure.[213] Plaintiffs' assertion that Dr. Terry makes "a leap of faith with no scientific basis" is wrong.[214]

Third, Plaintiffs argue that Dr. Terry "relie[d] heavily" on the Adami (2021) and Norgaard (2021) studies, which they claim are "fundamentally flawed."[215] Again, "relie[d] heavily" is Plaintiffs' characterization—not Dr. Terry's. Plaintiffs' other criticisms are without merit. They claim that Dr. Terry "rationalize[d] the lack of exposure data by saying" the study design did not "have to state" that data, and further call this a "presumption" by Dr. Terry.[216] Plaintiffs are simply

---

[211] Pls.' Mot. at 84.
[212] Terry Rep. at 44-45; Kim Y (2021).
[213] Deposition of Dr. Terry ("Terry Tr.") at 183:19–184:7, Finken Decl. Ex. 40.
[214] Pls.' Mot. at 84.
[215] *Id.*
[216] *Id.*

recycling their prior criticisms of the exposure data reported in Adami (2021) and Norgaard (2021), while also ignoring the fact that Dr. Terry indeed addressed this data. Regarding the Adami (2021) study specifically, Dr. Terry explained—repeatedly—that Adami looked at exposure as a distribution, which is a well-accepted approach in pharmacoepidemiology studies.[217]  And regarding the Norgaard (2021) study, Dr. Terry specifically referenced Norgaard's definition of "first time users" in her report, but also discussed Norgaard's additional analyses of users who redeemed at least five or at least ten prescriptions.[218]  The Adami (2021) and Norgaard (2021) studies are not fundamentally flawed, but regardless, Dr. Terry accurately contextualized and considered them.

Fourth, Plaintiffs claim that Dr. Terry ignores data in the Iwagami (2021) study.[219]  Again, Plaintiffs are wrong.  Dr. Terry did not ignore any data; rather, she discussed in her report the sensitivity analysis that focused on higher cumulative dosing, which did not support any duration response effect.[220]

### b. Plaintiffs' Claim That Dr. Terry Ignored "Short" Follow-up Periods In Studies Is Incorrect And Irrelevant.

Plaintiffs argue that Dr. Terry "applies inconsistent methods in her review of the ranitidine versus active comparator studies" because she "*only* acknowledges short follow-up as an actual limitation in *one* post-2019 active comparator study . . . ."[221]  This misses the point.  To reach her opinion that *the evidence is insufficient to conclude* that ranitidine causes cancer in humans,

---

[217] *See, e.g.*, Terry Tr. at 346:10–20 ("Again, there's a distribution such that they had short-term users, they had long-term users and this is how ranitidine is used in a general population and they were able to rule out any finding, any association between ranitidine and the cancers that they reported on.").

[218] Terry Rep. at 52–53.

[219] Pls.' Mot. at 84.

[220] Terry Rep. at 38.

[221] Pls.' Mot. at 85 (emphases in original).

Dr. Terry need not demonstrate, as Plaintiffs claim, that "longer follow-up times would *not* detect more cancers."[222]

Nevertheless, Dr. Terry discussed the methodologies of the various studies she addressed in her report, including discussions of follow-up periods.[223]  Dr. Terry's analysis of the studies, and her methodology more generally, were consistent with her years of experience as a cancer epidemiologist.  Furthermore, as she explained at deposition, in cancer epidemiology, there have been associations with cancer that were found to be causal with less follow-up.[224]  Dr. Terry further testified that when assessing any causal association, one must look at the strengths and limitations of each study and at the overall evidence[225]—just as she did with ranitidine.  *See supra* Background Section I.B.  Dr. Terry did not ignore follow-up periods; rather, she addressed them and weighed them in her analysis.  *See supra* Argument Section I.

### c.  Plaintiffs' Allegation of "Creative Editing" is Baseless.

Plaintiffs claim that Dr. Terry engaged in "creative editing" when describing the follow-up period in the Yoon (2021) study and also that she "mischaracterized the Yoon authors' discussion of the limitations of their study" so that she could "ignore[] the concerns that hurt her opinion, and emphasize[] the concerns that helped."[226]  Yet again, Plaintiffs mischaracterize Dr. Terry's words.  The Yoon study authors wrote that "the overall follow-up period is not long enough to assess the onset of cancer."[227]  Dr. Terry summarized this as: "The overall cohort was followed for 7 years, which the authors noted may not be sufficient to assess the onset of

---

[222] *Id.*
[223] *See* Terry Rep. at 24–56.
[224] Terry Tr. at 153:4–154:11.
[225] *Id.* at 155:4–22.
[226] Pls.' Mot. at 85.
[227] Yoon (2021) at 7.

cancer."[228]  Beyond the fact that the Yoon (2021) authors did indeed assess the onset of the cancers they reported in their cohort, Dr. Terry used her own words to describe the Yoon (2021) study, based on her expertise and analysis.

### ii.    Dr. Terry Did Not Ignore NDMA Data.

As with all other defense experts, Plaintiffs claim that Dr. Terry ignored NDMA studies.[229]  Not true.  *See supra* Argument Section I.  First, contrary to Plaintiffs' assertion, Dr. Terry adhered to her methodology of "reviewing the totality of the epidemiological evidence."[230]  More to the point, however, Dr. Terry devoted more than 25 pages of her expert report to an analysis of epidemiological studies regarding cancer *and NDMA*, addressing studies of NDMA in valsartan, dietary NDMA exposure, and occupational NDMA exposure.[231]  And even after explaining the various limitations of using animal data to derive conclusions of causation in humans, Dr. Terry expressly considered studies involving NDMA animal data.[232]  Tellingly, Plaintiffs do not point to *any* NDMA study that Dr. Terry allegedly "ignored."[233]

### iii.    Dr. Terry Did Not Ignore Confounding Factors.

Plaintiffs allege that Dr. Terry "is inconsistent in [how] she considers important confounders like smoking,"[234] because, for example, she did not mention the Yoon (2021) study's "absence of information on smoking" but opined that "incomplete information" on smoking in the Cardwell (2021) study may have impacted the study's findings.[235]  Plaintiffs' claims disregard Dr. Terry's methodology and supporting data.

---

[228] Terry Rep. at 39.
[229] Pls.' Mot. at 83.
[230] Terry Rep. at 20; *see* Pls.' Mot. at 83.
[231] *Id.* at 74–100.
[232] *Id.* at 4; *see also id.* at 78.
[233] *See* Pls.' Mot. at 83.
[234] *Id.* at 85.
[235] *Id.* at 86.

From a methodologic perspective, one of the most important considerations is ensuring that patient populations are similar.[236]   Dr. Terry noted in her report that "[s]moking may be associated with conditions for which ranitidine is prescribed, like GERD [], which illustrates the importance of comparing ranitidine to another H2RA."[237]   Thus, she focused on the incomplete smoking data in the Cardwell (2021) study because it was relevant to the differences in the active comparator and the non-use groups.[238]   By contrast, the Yoon (2021), Adami (2021), and Norgaard (2021) studies did not report comparisons to non-use, and Plaintiffs cite each of these studies as providing evidence of the alleged increased risk associated with ranitidine—despite the lack of smoking information.[239]   Moreover, Table 1 in Dr. Terry's report specifically discussed the "confounders assessed" for each of the ranitidine epidemiology studies.[240]

Plaintiffs further criticize Dr. Terry for allegedly "avoid[ing] the question" about whether the Norgaard (2021) study had information on smoking by referring to "propensity score matching," which Plaintiffs claim "alone, does *not* control for confounding."[241]   This is a red herring.   The Norgaard study lists the many and various characteristics used in the propensity score.[242]   As with the use of comparator groups, "[t]he use of propensity scores is a reliable method to ensure the groups being compared have similar baseline risks of cancer."[243]   Plaintiffs' claim that Dr. Terry "ignored" confounders is mistaken.

---

[236] *See* Ref. Man. at 559–60.
[237] Terry Rep. at 43.
[238] Terry Tr. at 174:9–175:5.
[239] Pls.' Mot. at 28, 45.
[240] *See* Terry Rep. at 108–14.
[241] Pls.' Mot. at 86.
[242] Norgaard (2021) at 46.
[243] Terry Rep. at 51.

iv.     **Dr. Terry's Methodology Is Consistent With Her Prior Statements Regarding Case-Control Studies.**

Plaintiffs assert that Dr. Terry has previously "cheer[ed] on" population-based case-control studies but then "degrades the value of them in her report."[244]  But Plaintiffs mischaracterize both Dr. Terry's prior statements and her opinions in this litigation.  At deposition, Dr. Terry explained that the strength of case-control studies is "highly exposure dependent" and dietary exposures are not as easy to assess in case-control studies.[245]  In short, the strength of a case-control study depends on multiple factors—no one study is more valid or stronger by virtue of being a case-control study.[246]

At a more basic level, Plaintiffs' argument is premised on cherry-picked and misstated excerpts from a video clip.[247]  Dr. Terry's statements in that 2017 lecture are entirely consistent with her deposition testimony in this litigation.  In that lecture, Dr. Terry described case-control studies as "the most efficient kind of design and in many ways, if they can be executed, really are sort of the best design because they *can* capture the complete exposure period throughout life . . . ."[248]  Plaintiffs' transcription omitted the italicized "can."[249]  Beyond this transcription error, Plaintiffs ignore the fact that in the same lecture, Dr. Terry went on to explain the "practical issues with conducting case-control studies," explaining, "When we do try to capture a more generalizable population, we may not have enough precision for the tail of any one distribution.

---

[244] Pls.' Mot. at 87.

[245] Terry Tr. at 85:3–88:1.

[246] *See* Ref. Man. at 583–84.

[247] Pls.' Mot. at 87.

[248] Terry, Mary Beth.  "When population-based approaches are insufficient and inefficient: Rethinking how we study risk factors for cancer." Presentation at Robert C. Millikan Cancer Epidemiology Seminar Series, UNC Gillings School of Global Public Health ("Terry 2017 Lecture").  YouTube.com.  April  7,  2017.  Available  at: https://www.youtube.com/watch?v=Y7UGjNIQyyM. (Emphasis added.)

[249] *See* Pls.' Mot. at 87.

It's really that tail where we can get a signal that is relevant to the whole."[250]   These comments regarding case-control studies were conditioned on the studies being properly executed.  Plaintiffs' cherry-picking and misstatements do not change the validity of Dr. Terry's methodology in this litigation.

## V.    Dr. Michael Vaezi

Dr. Michael Vaezi is a medical doctor who specializes in gastroenterology and also holds a PhD in bio-organic chemistry and a Masters of Epidemiology (MSc) degree.[251]  Dr. Vaezi serves as the Associate Chief and the Clinical Director of the Division of Gastroenterology, Hepatology and Nutrition at Vanderbilt University Medical Center, as well as the Director of the Center for Swallowing and Esophageal Disorders and the Director of Clinical Research; he has been involved in clinical research for esophageal disease for the past 30 years.[252]  Dr. Vaezi has held several roles with the American Gastroenterological Association (or AGA), including serving as past Chair of the Esophageal, Gastric and Duodenal section; serving on the AGA Research Council; being an Associate Editor for *Gastroenterology*, the premier journal in the specialty; and being selected to educate other gastroenterologists on the role of acid suppressive therapies in GERD and their purported associations with various outcomes.[253]

Plaintiffs' motion to exclude Dr. Vaezi does not challenge his credentials or qualifications, and instead rests solely on accusations that Dr. Vaezi ignored or misunderstood studies.  These allegations are refuted by his expert report and testimony.

---

[250] Terry 2017 Lecture.
[251] *See* Vaezi Rep. at 1.
[252] *See id*.; *see also id.* Ex. A (CV).
[253] *Id.* at 1–2.

A. **Dr. Vaezi Appropriately Considered All Evidence, Including NDMA Epidemiological Studies.**

i. **Plaintiffs Ignore Dr. Vaezi's Testimony And Conflate Epidemiological Data With Animal Studies.**

Plaintiffs' claim that Dr. Vaezi failed to consider "a single NDMA epidemiology study" is plainly refuted by his report.  As he states in his report, Dr. Vaezi "reviewed over 20 studies on dietary NDMA and cancer risk," NDMA-contaminated valsartan studies, and occupational studies.[254]  Dr. Vaezi's report provides a comprehensive analysis of his review of the NDMA epidemiological studies.[255]

Far from ignoring the NDMA epidemiological studies, Dr. Vaezi explained in detail why he discounted them based on his review.[256]  Dr. Vaezi's report concluded: "[b]ecause there are large, well-conducted studies on ranitidine specifically conducted to test the NDMA hypothesis, studies on NDMA exposure from other medications, the diet, or occupational settings have very limited relevance to my causation opinions."[257]

ii. **Plaintiffs Misunderstand Risk Analyses Performed By Regulatory Agencies And Scientific Organizations, None of Which Have Categorized NDMA As a "Known Human Carcinogen."**

Plaintiffs argue that Dr. Vaezi is somehow unaware of NDMA's classification as a "probable human carcinogen" or "reasonably anticipated to be a human carcinogen."[258]  This is contradicted by the plain language of Dr. Vaezi's report: "while regulatory and scientific organizations have classified NDMA as 'reasonably anticipated' or 'probably' carcinogenic to humans based on high doses used in experimental rodent studies, *no agency has classified NDMA*

---

[254] *See id.* at 51–54; *see also id.* Ex. B (Materials Considered).
[255] *Id.*
[256] *Id.* at 52–53; Vaezi Tr. 78:25–80:19, 256:6–227:10.
[257] Vaezi Rep. at 54.
[258] *See* Pls.' Mot. at 88.

*as a 'known' human carcinogen* due to limited evidence of carcinogenicity in humans (U.S. NTP 2021; WHO IARC 1987)."[259]

As Dr. Vaezi goes on to explain, some agencies have made risk assessments and categorizations based on animal studies involving extremely high doses of NDMA.[260]  But no agency has stated that NDMA is a known carcinogen in humans, just as Dr. Vaezi testified.[261]  Moreover, it is well-established in the Eleventh Circuit that agency risk-assessments involve a much lower standard than what is demanded by a court applying Rule 702.  *Rider*, 295 F.3d at 1201; *see also Siharath*, 131 F. Supp. 2d at 1370 ("The standard by which the FDA deems a drug harmful is much lower than is required in a court of law.  The FDA's lesser standard is necessitated by its prophylactic role in reducing the public's exposure to potentially harmful substances.").

Far from disregarding these agencies' findings regarding NDMA, Dr. Vaezi considered them but did not deem them the best sources of evidence in reaching his opinions regarding *ranitidine* and claims of cancer in *humans*.  Having considered the evidence, Dr. Vaezi stated the obvious: "[i]n order to determine whether ranitidine increases the risk of cancer, the most reliable and relevant source of information are epidemiological studies on ranitidine and cancer."[262]  *See In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d at 1354 ("'Epidemiology is the 'best

---

[259] *See* Vaezi Rep. at 8 (emphasis added); *see also id.* at 53 ("The U.S. National Toxicology Program Report on Carcinogens includes a review of NDMA epidemiological studies and concludes NDMA is 'reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in experimental animals;' in other words, there was insufficient human evidence to classify NDMA in the highest category of 'known to be a human carcinogen' (U.S. NTP 2021).").

[260] *See id.* at 53–54; Vaezi Tr. 76:13–17.

[261] The claim that Dr. Vaezi testified that these organizations concluded "definitively" that NDMA does not cause cancer in humans, Pls.' Mot. at 89, misrepresents his testimony.  He explained that these agencies "landed on probable, not definitive, because there aren't enough data in support of definitive association." Vaezi Tr. 78:17–19; *see id.* at 70:9–12 (explaining findings were in high doses for liver cancer in rats, and "not in humans definitive").

[262] *See* Vaezi Rep. at 54.

evidence of causation'" in toxic tort cases) (quoting *Kilpatrick*, 613 F.3d at 1337 n.8).  As his testimony makes clear, whether NDMA can induce liver tumors in rodents—rats, mice, or hamsters—is irrelevant to Dr. Vaezi's opinion that NDMA is not a *known human* carcinogen. And whether huge doses of *NDMA* can induce cancer in *rodents* is even further removed from the inquiry here, of whether *ranitidine* increases the risk of certain cancers in *humans*.  *See, e.g.*, *Joiner*, 522 U.S. at 139 (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion proffered"); *Rider*, 295 F.3d at 1202 (affirming exclusion of plaintiff's expert who "admitted that with respect to animal studies generally, what happens in an animal would not necessarily happen in a human being").  As discussed above, Dr. Vaezi carefully and comprehensively analyzed the epidemiological studies (both on ranitidine and NDMA), concluding that they do not show a reliable association with any cancer type.

> **B.    Dr. Vaezi Engaged In a Thoughtful and Thorough Review of the Ranitidine Epidemiology Studies.**

As evidenced by his report's 30-plus-page discussion, Dr. Vaezi engaged in a detailed and well-reasoned analysis of the epidemiological studies addressing ranitidine and each of the Designated Cancers.[263]

Plaintiffs' contrary claims—that Dr. Vaezi purportedly did not account for the length of exposure and confused follow up time with exposure period—lack merit.

---

[263] *See* Vaezi Rep. at 18–51.

### i.   Dr. Vaezi Assessed And Accounted for Duration of Exposure.

Dr. Vaezi examined and accounted for the duration of ranitidine exposure in his analysis. Indeed, Dr. Vaezi's discussion of Yoon[264] and Adami[265]—the studies Plaintiffs cited in support of their claim that Dr. Vaezi did not consider duration—accounted for exposure duration. Again, in his analysis of causality using the Bradford Hill criteria, Dr. Vaezi specifically discussed ranitidine exposure duration, explaining, "[s]everal studies have assessed cancer risk with ranitidine use in dose- or duration-response analyses and not only is there no evidence of a reliable gradient, but *many studies showed the risk estimate decreases with higher doses or longer durations of use* (Tan et al 2018; Iwagami et al 2021; McDowell et al 2021; Adami et al 2021; Norgaard et al 2021)."[266]

### ii.   Dr. Vaezi Did Not Confuse Follow-Up And Exposure Period.

Plaintiffs claim Dr. Vaezi "erred by confusing the follow up time with exposure period."[267] To the contrary, Dr. Vaezi explained, based on his clinical expertise as a gastroenterologist, that for chronic ranitidine users, exposure time can be (and typically is) the same as the follow-up time.[268] This is particularly true for patients with reflux who do not suddenly "go from being a refluxer to a non-refluxer."[269]

Similarly, Plaintiffs accuse Dr. Vaezi of making an "untenable assumption when interpreting the Adami 2021 study: namely, that if a patient fills ten ranitidine prescriptions, then

---

[264] *See id.* at 23–24 ("These null findings are particularly reassuring as they are in the context of long-term durations (>1 year; 61% ≥ 2 years) and high cumulative dosages (mean 220,395 mg) of ranitidine…High cumulative dose and long duration analysis reassures about the possibility of misclassification from filling a prescription and not taking the drug.").

[265] *Id.* at 24–25 ("There was also no association when the analyses were stratified by long-term users (≥5 or ≥10 Rx) or long-term follow-up (>10 years). This study adequately controlled for confounding and biases by using two active comparators, propensity score adjustment, and lag periods, and also accounted for histological subtypes, long-term use, and long latency periods.").

[266] *See id.* at 60 (emphasis added).

[267] Pls.' Mot. at 90.

[268] Vaezi Tr. at 100:4–104:3.

[269] *Id.* at 100:20–101:4.

she ingested ranitidine for the entire ten-year follow up period."[270]  However, again, Dr. Vaezi testified that, based upon his clinical experience and expertise, the number of prescriptions acts as a "surrogate marker" for a chronic disease state, and, therefore, duration of use.[271] In relying on his own clinical experience in his testimony (which Plaintiffs' own experts cannot rebut), Dr. Vaezi essentially reiterated the conclusions of the authors of the Adami study, who emphasized that analyses of subjects with more than 5 or 10 prescriptions enabled them to conduct "analyses of *long-term exposure* with up to 20 years of follow-up."[272]

## C.  Plaintiffs' Final Paragraph is a Hodgepodge of Irrelevant, Misleading, and Inaccurate Arguments.

Finally, Plaintiffs make the empty assertion that Dr. Vaezi "Misrepresent[s] Basic Science," although they fail to tether this unsupported argument to any of Dr. Vaezi's opinions. Dr. Vaezi correctly, and consistently with FDA's conclusions, testified that ranitidine does not form NDMA endogenously (inside the body).[273]  Similarly, Dr. Vaezi correctly testified that, of the Designated Cancers at issue in this litigation, NDMA has only been found to induce liver cancer in animals.[274] And, as discussed above, *see supra* Section V.A.ii., Dr. Vaezi correctly noted

---

[270] Pls.' Mot. at 91.

[271] Vaezi Tr. at 100:8–105:1.

[272] *See* Adami (2021) (emphasis added).

[273] *See* Vaezi Tr. 79:20–80:3, 88:7–25; FDA Grand Rounds Webcast, *Laboratory and Clinical Studies to Investigate Whether Ranitidine Converts to a Probable Carcinogen in Humans* (Oct. 14, 2021), https://www.fda.gov/science-research/fda-grand-rounds/laboratory-and-clinical-studies-investigate-whether-ranitidine-converts-probable-carcinogen-humans (discussing the two FDA studies (Florian *et al.* 2021 and Gao *et al.* 2021); *see also id.* ("This research found no evidence of elevated NDMA content in urine or blood when participants consumed ranitidine and showed that ranitidine does not convert to NDMA in vitro studies under physiologic gastric nitrite concentrations.").

[274] *See* Vaezi Tr. 66:1–6; International Agency for Research on Cancer (IARC). N-Nitrosodimethylamine. Some N-Nitroso Compounds. IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, Volume 17. 1978; International Agency for Research on Cancer (IARC).  Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42. IARC Monographs on the Evaluation of the Carcinogenic Risk to Humans, Supplement 7, 1987.

that NDMA is not a known human carcinogen.  Finally, Plaintiffs fault Dr. Vaezi for not knowing the specific conditions under which ranitidine can form NDMA.  But Dr. Vaezi explained why this is irrelevant to his causation opinions—whatever levels of NDMA may (or may not) exist in ranitidine are what the patients in the epidemiological studies were exposed to in the course of ranitidine's "real-world" use.  Those real-world studies did not show a signal of an increased risk.[275]

## VI.      Dr. Benjamin Hatten

Dr. Hatten is a medical toxicologist, emergency physician, and epidemiologist who is currently an Associate Professor at the University of Colorado School of Medicine with a primary appointment in toxicology.[276]  He holds a master's in public health ("MPH") in epidemiology and biostatistics.[277]  Without actually challenging Dr. Hatten's qualifications, Plaintiffs state that "[e]pidemiology does not fall within the scope of any of [Dr. Hatten's] employment at any point throughout his career."[278]  Plaintiffs have identified no basis and, in fact, have no basis, to make such a statement and they ignore the fact that Dr. Hatten has an MPH in epidemiology and biostatistics.

Instead, Plaintiffs claim that Dr. Hatten offers "several striking opinions that are unsupported by sound and reliable scientific methodology."[279]  But Plaintiffs' arguments, as before, mischaracterize opinions, methods, and often both.  Such strawman arguments necessarily fail.  Of note, Plaintiffs challenge only Dr. Hatten's analysis of epidemiological literature; they do

---

[275] *See* Vaezi Tr. at 91:13–15; 92:13–15.
[276] Rule 26 Expert Report of Dr. Hatten ("Hatten Rep.") at 2, Finken Decl. Ex. 7.
[277] *Id.*
[278] Pls.' Mot. at 93.
[279] *Id.*

not challenge his analyses of *in vitro* and animal data for either ranitidine or NDMA.  The attacks Plaintiffs do make on Dr. Hatten's analysis are meritless.

### A.   Dr. Hatten's Opinion That Therapeutic Use of Ranitidine Does Not Cause the Designated Cancers is Based on Sound and Reliable Methodology.

Plaintiffs claim that Dr. Hatten's opinion "that ranitidine use does not cause any of the designated cancers suffers from a cascading series of methodological errors that render it wholly unreliable" and should be excluded.[280]  But Plaintiffs' attempt to improperly shift their burden of proof of establishing that use of ranitidine *causes* the Designated Cancers; there is no burden on Defendants to establish affirmatively that it *does not*.  *See supra* Background Section I.B.

In any event, Plaintiffs' arguments fail to address Dr. Hatten's key opinion:  "Thus, based on the current scientific evidence, there is no reliable basis supporting that either ranitidine or NDMA exposure from ranitidine causes esophageal, gastric, pancreatic, liver, or bladder cancer in humans."[281]

### i.   Dr. Hatten Applied Bradford Hill Criteria to Reach His Conclusion.

Plaintiffs argue that "Hatten . . . failed to include a formal Bradford Hill analysis in his report."[282]  Absent reliable evidence of an association between ranitidine and one or more of the designated cancers, a Bradford Hill analysis was unnecessary; nevertheless, Dr. Hatten's Bradford Hill analysis for the ranitidine epidemiology supports and is consistent with his opinion that "[t]herapeutic use of ranitidine is not a cause of esophageal, gastric, pancreatic, liver, or bladder cancer in humans."[283]  Indeed, he had separate sections for each of the designated cancers and discussed the relevant literature for each one.[284]  He also testified to his methodology, including,

---

[280] *Id.* at 97.
[281] Hatten Rep. at 66.
[282] Pls.' Mot. at 97.
[283] Hatten Rep. at 3.
[284] *Id.* at 16–28.

in Plaintiffs' counsel's words, "look[ing] at the Bradford-Hill criteria in the context of [his] opinions in this case."[285]  Plaintiffs' claim that Dr. Hatten failed to perform a Bradford Hill analysis is plain wrong.

### ii. Dr. Hatten Considered NDMA Literature.

Plaintiffs argue that Dr. Hatten failed "to consider the robust epidemiological literature regarding NDMA."[286]  Dr. Hatten's report expressly stated that he considered that exact body of literature: "Nevertheless, the separate body of NDMA literature will also be considered to ensure that a proposed causal relationship is not inappropriately dismissed."[287]  As with multiple other defense experts, Plaintiffs turn a blind eye to Dr. Hatten's 10-page discussion of NDMA literature.[288]

Additionally, Plaintiffs' example of arsenic in hot dogs,[289] is inapposite, unsupported, and undermines their own theory.  First, arsenic is classified as an established human carcinogen, so there is relevant and reliable human data to consider.  Second, Plaintiffs' example speaks to specific causation—is a particular hot dog poisonous—and, tellingly, does not speak to carcinogenicity at all.  Third, Plaintiffs acknowledge the importance of dose and duration with respect to arsenic toxicity, which undermines their argument that NDMA has no threshold dose.[290]

Plaintiffs also claim that Dr. Hatten failed to recognize the "dramatic limitations of the ranitidine epidemiology," claiming that ranitidine studies "are severely limited in both the levels of exposure they examined and in the length of follow-up they observed."[291]  But this attack

---

[285] Deposition of Dr. Hatten ("Hatten Tr.") at 140:5–22, Finken Decl. Ex. 33.
[286] Pls.' Mot. at 97.
[287] Hatten Rep. at 51.
[288] *See id.* at 52–61.
[289] Pls.' Mot. at 98.
[290] *See, e.g.*, American Cancer Society, Arsenic and Cancer Risk, available at https://www.cancer.org/healthy/cancer-causes/chemicals/arsenic.html.
[291] Pls.' Mot. at 98.

likewise fails because Dr. Hatten, and the authors of the ranitidine studies themselves, acknowledged and accounted for purported limitations. *See supra* Background Section I.B.

Plaintiffs' attack on Dr. Hatten's literature review misrepresents his analysis and the literature itself, and is without merit.

> ### iii. Plaintiffs Mischaracterize Dr. Hatten's Literature Review and Wrongly Suggest He Was Bound to Follow the Writings of a Single Epidemiologist.

Plaintiffs also argue that Dr. Hatten disregarded "the studies that show a non-statistically significant association," and contend he purportedly admitted to the impropriety of his approach.[292] Plaintiffs further assert, without support, that Dr. Hatten was somehow bound to follow the opinions expressed in a textbook by Kenneth Rothman because Dr. Hatten recognized Dr. Rothman as a prominent epidemiologist.[293]  However, Dr. Hatten's testimony as to meta-analyses does not support Plaintiffs' assertion.  First, Dr. Hatten referred to general statistical principles and was not referring specifically to ranitidine literature, and his comment allowed for analysis of each individual meta-analysis.  Second, a meta-analysis is a specific type of analysis; it is more complex than Plaintiffs' unscientific position that any point estimate above 1.0 should be as important as a statistically significant result.  Moreover, Dr. Hatten directly rejected reliance on Rothman's text as authoritative because he "would be concerned if any epidemiologist said that they thought a text was authoritative when it comes to causation."[294]  Rather than blindly following a single text, "each epidemiologist should evaluate the literature and take the opportunity to evaluate the literature themselves."[295]

---

[292] Pls.' Mot. at 99–100.

[293] *Id.*

[294] Hatten Tr. at 136:19–137:7.

[295] *Id.*

66

Finally, Plaintiffs unfairly criticize Dr. Hatten for purportedly ignoring the bladder-cancer epidemiology,[296] by misstating both those results and Dr. Hatten's opinion. *See supra* Background Section I.D.

### iv.   Dr. Hatten's Methodology Did Not Involve "Cherry-Picking" Data.

Plaintiffs claim Dr. Hatten "cherry-picked active comparator data," and "weighed heavily the Cardwell study's adjusted odds ratio" while purportedly ignoring Cardwell's active comparator analysis and "the actual study conclusion of the study's authors."[297]

But Plaintiffs have no evidence that Dr. Hatten "weighed heavily"—their words—any one study, including Cardwell, or any one finding.  Dr. Hatten's report and testimony are clear as to his methodology.  Dr. Hatten's opinions are not at odds with those of the Cardwell study authors, who found "there was little evidence of difference in bladder cancer risk when directly comparing ranitidine users with users of non-ranitidine histamine-2 receptor antagonists."[298]

### B.   Dr. Hatten Applied the Bradford Hill Criteria to Reach His Conclusion That The Evidence is Not Sufficient to Support Causation.

Though Plaintiffs improperly attempt to shift the burden to Defendants and Dr. Hatten to prove that NDMA does not cause cancer, Dr. Hatten's testimony was clear:  the epidemiologic evidence is insufficient to support a causal connection between NDMA and cancer in humans. Dr. Hatten did not "formally" document a Bradford Hill analysis for the NDMA literature,[299] but he did in fact review the NDMA epidemiology and apply the Bradford Hill criteria.[300]

---

[296] Pls.' Mot. at 99.
[297] Pls.' Mot. at 100.
[298] Cardwell (2021).
[299] Pls.' Mot. at 93–94.
[300] Hatten Tr. 137:12–15; 140:5–22; 187:12–188:6.

### C.    Dr. Hatten's Opinion Does Not Conflict With the Findings of GSK, IARC, or Other Organizations.

Plaintiffs assert that Dr. Hatten's opinion "conflicts with the conclusions of every major organization to have addressed the issue" and "contradicts the findings of GSK."[301]   As noted above, none of the agencies with carcinogenicity categorization schemes categorize NDMA in the highest category of established human carcinogens.[302]   As for GSK's internal assessment, it too is consistent with those agencies' classifications of NDMA as a probable but not proven human carcinogen.

Plaintiffs' argument that Dr. Hatten "misunderstood" the purpose of IARC to be a policy-making body,[303] is a useless detour.   The language quoted in the brief is misconstrued[304]— Dr. Hatten was not discussing the overarching purpose of IARC and its various classifications. Rather, he was directly responding to a question about the IARC language: "Although no epidemiological data were available . . . NDMA should be regarded for practical purposes as if it were carcinogenic to humans."[305]   Plaintiffs ignore the fact that Dr. Hatten was discussing the difference between "should be regarded for practical purposes" and actual *scientific* causation.

Additionally, the IARC preamble is consistent with Dr. Hatten's testimony:   "The identification of a cancer hazard should trigger some action to protect public health, either directly as a result of the hazard identification or through the conduct of a risk assessment.   Although such actions are outside the scope of the programme, the *Monographs* are used by national and international authorities and organizations to inform risk assessments, formulate decisions about

---

[301] Pls.' Mot. at 95.
[302] *See supra* at Background Section II; *see also* Hatten Rep. at 54 (correctly identifying NDMA classifications by IARC, NTP, and other agencies).
[303] Pls.' Mot. at 95.
[304] *See id.* at 96 (quoting Hatten Tr. at 71–72).
[305] Hatten Tr. at 77:8–78:9.

preventive measures, motivate effective cancer control programmes, and choose among options for public health decisions."[306] Dr. Hatten's position is consistent with the purpose behind IARC's classification and the overall distinction between scientific causation—the question here—and public and occupational health.

## VII.   Michael Porter

Plaintiffs do not dispute that Dr. Porter is qualified to render his opinions in this litigation. Dr. Porter is a highly experienced urologist and clinical expert in the treatment of urologic cancer with a focus on bladder cancer.[307] Dr. Porter earned a Medical Degree from the University of Iowa in 1997, before completing a six-year residency in Urologic Surgery at the University of Washington.[308] During his residency, he also earned an M.S. in Epidemiology.[309] Following his residency, Dr. Porter completed a two-year fellowship as a Robert Wood Johnson Clinical Scholar.[310]

Dr. Porter is currently a Professor of Urology and Adjunct Professor of Epidemiology at the University of Washington and Chief of Urology at the VA Puget Sound Health Care System.[311] Dr. Porter has also served two terms as National Cancer Institute Bladder Cancer Task Force member (2010–2016), ten years as a member of the National Comprehensive Cancer Network Bladder Cancer Guideline Panel (2010–2019), and is currently a board member of the Scientific Advisory Board of the Bladder Cancer Advocacy Network (2012–present).[312]

---

[306] IARC Preamble (2019), at 3. Available at: https://monographs.iarc.who.int/wp-content/uploads/2019/07/Preamble-2019.pdf.
[307] *See* Porter Rep. at 1.
[308] *Id.*
[309] *Id.*
[310] *Id.*
[311] *Id.*
[312] *Id.*

### A.   Plaintiffs' Claims That Dr. Porter "Overstated" or "Understated" the Evidence Are Incorrect.

#### i.   Plaintiffs Mischaracterize the Florian Study.

Plaintiffs claim that Dr. Porter "vastly overreache[d]" in concluding that the Florian study "refute[s]" Plaintiffs' theory that NDMA can form endogenously from ranitidine.  Plaintiffs are mistaken.  *First*, Dr. Porter's conclusion mirrors that of the FDA, which stated unequivocally that "results from a clinical study and in vitro investigations initiated by the FDA [] *refute* concerns that ranitidine is converted to NDMA in humans."[313]

*Second*, Dr. Porter explained that while Florian did not detect significant differences in urinary NDMA between ranitidine and placebo groups, "a significantly higher level of urinary NDMA was found in those who consumed the high NDMA diet compared to the low NDMA diet . . . demonstrating the adequate design of the study to detect small, significant differences in urine NDMA."[314]  Thus, Plaintiffs' claims about Florian's purported inability to detect urinary NDMA are undercut by the fact that statistically significant differences in NDMA *were* detected among participants who consumed a high NDMA diet, regardless of whether they took ranitidine or placebo.

#### ii.   Plaintiffs Misunderstand Statements By Regulatory Agencies and Scientific Organizations, None of Which Characterize NDMA as a "Known Human Carcinogen."

Plaintiffs misrepresent both Dr. Porter's opinions and the statements by regulatory agencies and scientific organizations (such as IARC and NTP) regarding NDMA.  Dr. Porter appropriately

---

[313] FDA Grand Rounds Webcast, *Laboratory and Clinical Studies to Investigate Whether Ranitidine Converts to a Probable Carcinogen in Humans* (Oct. 14, 2021), https://www.fda.gov/science-research/fda-grand-rounds/laboratory-and-clinical-studies-investigate-whether-ranitidine-converts-probable-carcinogen-humans (discussing the two FDA studies (Florian (2021) and Gao (2021)).

[314] Porter Rep. at 3.

considered the findings of these agencies, including the findings that NDMA may be a carcinogen in certain animals only at very high doses and in organs other than bladder.[315]   However, it is undisputable that no scientific organization in the world classifies NDMA as a "known human carcinogen."[316]   Indeed, Dr. Porter systematically reviewed the NDMA epidemiology on bladder cancer[317] and concluded "there was no reliable or consistent association for bladder cancer in studies on NDMA exposure."[318]

### iii.   Dr. Porter Reliably Evaluated the Yoon and Norgaard Studies.

Plaintiffs fault Dr. Porter for relying on the Yoon study that evaluated long-term (≥ 1 year) ranitidine use, claiming that "[o]ne year is far *too short* to be expected to show much of an effect from ranitidine."   However, as Dr. Porter explained, the average cumulative ranitidine dose in the Yoon study was 220,395 mg.[319]   By contrast, Plaintiffs' own epidemiology expert, Dr. Moorman, testified that *any* dose of ranitidine, including a single OTC ranitidine pill (only 75 mg or 150 mg of ranitidine) could cause cancer.[320] Additionally, Plaintiffs claim there is no safe threshold for NDMA.   As discussed above, Plaintiffs cannot have it both ways.

Plaintiffs also allege Dr. Porter glossed over the fact that the Norgaard and Yoon studies did not control for smoking as a confounder.   In fact, Dr. Porter evaluated the fact that smoking information was unavailable in these studies.[321]   He explained that any confounding by smoking is mitigated in the comparison to other H2RAs (as there is no reason ranitidine users and other

---

[315] Porter Rep. at 2; Deposition of Dr. Porter ("Porter Tr.") at. 114:15–22, 27:4–6, 44:17–45:3, 219:13–220:11, Finken Decl. Ex. 75.
[316] *Id.*
[317] *See* Porter Rep. at 23–26.
[318] *Id.* at 29.
[319] *Id.* at 15.
[320] *See* Moorman Tr. at 288:17–290:2.
[321] *See* Porter Rep. at 15, 18.

H2RA users would have significantly different rates of smoking).[322]  Importantly, the study authors
came to the same conclusions as Dr. Porter.[323]

        **iv.**      **Plaintiffs Misrepresent the Data and Dr. Porter's Opinions Regarding
the Cardwell, Habel, Kantor, and Hidajat Studies.**

Plaintiffs allege that Dr. Porter discounted four studies with purportedly "strong
associations" (specifically, Cardwell, Habel, Kantor, and Hidajat). This is simply wrong and
misrepresents the study results.

Contrary to Plaintiffs' assertion that the Cardwell study "still showed a strong effect" in
"the H2RA active comparator," the Cardwell study authors found that "there was little evidence
of difference in bladder cancer risk when directly comparing ranitidine users with users of non-
ranitidine histamine-2 receptor antagonists."[324] Cardwell showed a statistically significant
association ***only*** in the non-user and PPI comparator analysis.  Plaintiffs' claim that "Cardwell
himself believed they had adequately controlled for smoking" is also belied by the Cardwell study
authors' acknowledgement that "smoking and alcohol [information] were incomplete and did not
capture detailed information on the extent of exposure, and consequentially, there remains the
possibility of residual confounding."[325]  Dr. Porter evaluated the Cardwell study and explained
that "[t]he analysis best controlling for confounding in the Cardwell study was the comparison to
other H2 blockers (as the most similar active comparators to ranitidine), which showed no
increased risk for bladder cancer."[326]  As explained above, this is consistent with generally

---

[322] Porter Tr. at 142:7–143:8.
[323] *See* Porter Rep. at 17–19 (discussing Norgaard (2021) at 50; *id.* at 15 (explaining that, though
the Yoon "study only controlled for a few confounding factors through matching, the use of an
active comparator [famotidine] likely mitigates the effect of confounding by smoking and other
variables."); Yoon (2021) at 7 ("[A] control group using a similar indication drug is more
appropriate than the general population.").
[324] Cardwell (2021) at 1617.
[325] *See id.* at 1618.
[326] *See* Porter Rep. at 15–17.

accepted epidemiological principles that active comparators are a typical method to reduce confounding.[327]

Plaintiffs also misrepresent the results of the Habel study. Contrary to Plaintiffs' suggestion, the Habel study did not show a statistically significant association between ranitidine and bladder cancer.[328] Plaintiffs accuse Dr. Porter of improperly discounting Habel because it combines kidney and bladder cancers. However, Plaintiffs' own experts reach the same conclusion.[329]

Similarly, the Kantor study did not find a statistically significant association between bladder cancer and ranitidine.[330] This was not just Dr. Porter's conclusion, but also the conclusion of the Kantor study authors, who stated that "[n]o associations were observed for bladder... cancer."[331]

Finally, Plaintiffs criticize Dr. Porter's analysis of the Hidajat occupational study. Tellingly, Plaintiffs' criticisms are based not on the published, peer-reviewed manuscript, but on the report of Dr. Hidajat generated for this litigation. Even so, Dr. Hidajat's report does not negate the limitations outlined in the published study, including the fact that the study did not control for other carcinogenic exposures and that employment in the rubber industry is itself an IARC Group 1 carcinogen (i.e., a known human carcinogen) whereas NDMA is not.[332] Moreover, there is no reason why Dr. Porter or this Court should credit Dr. Hidajat's litigation testimony to the extent

---

[327] *See* Moorman Rep. at 25; McTiernan Tr. at 130:17–23; *Modern Epidemiology* (2021), Ch. 43, Pharmacoepidemiology, at 1131-1133 (cited by Drs. Moorman and McTiernan).
[328] *See* Porter Rep. at 13; Habel (2000) at 151.
[329] *See* McTiernan Rep. at 187–188 ("the [Habel] study combined bladder cancers with kidney cancers, with only 7 cases in total. Therefore, this study is not informative on the relationship between ranitidine use and bladder cancer risk"); Moorman Rep. 95, 170.
[330] *See* Porter Rep. at 14.
[331] *See* Kantor (2021) at 1858.
[332] *See* Porter Rep. at 25–26.

that it contradicts the limitations spelled out by the authors of the published, peer-reviewed Hidajat study.[333]

### B.    Plaintiffs' Attacks on Dr. Porter's Bradford Hill Analysis Are Meritless.

Having considered the literature and concluded there was no reliable association between ranitidine and bladder cancer, Dr. Porter correctly stated that a Bradford-Hill causal analysis was unnecessary.[334]  This is consistent with the consensus in the scientific community[335] and the case law, as recognized in the Reference Manual.  *See, e.g.*, *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (considering such factors in the absence of an association identified in epidemiologic studies "does not reflect accepted epidemiologic methodology") (quoting Ref. Man. at 598-99 & n. 141).  Nonetheless, Dr. Porter analyzed the Bradford-Hill factors.  Plaintiffs' attacks on Dr. Porter's analysis are unfounded and unsupportable.

#### i.    Temporality

Dr. Porter appropriately concluded that "temporality may not be guaranteed." Contrary to Plaintiffs' claims, a lag by itself does not necessarily negate protopathic bias. Rather, the results may change based on the length of the lag. For example, as Dr. Porter writes in his report, "[i]n sensitivity analyses increasing the lag period from 1 to 2 years, there was no longer a statistically significant dose-response relationship compared to nonusers" in the Cardwell study.[336]

#### ii.    Consistency

Plaintiffs' claim that "*every single study of ranitidine showed an association with bladder*

---

[333] *See* Fed. R. Evid. 702 *Advisory Committee Notes*, 2000 amd. (when assessing reliability, courts should consider whether the testimony "grow[s] naturally and directly out of research [experts] have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying….[and whether] the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting").
[334] *See* Porter Rep. at 27.
[335] *See* Ref. Man. 572, 598–99; Plaintiffs' expert, Dr. Le, agrees. *See* Le Tr. at 57:19–59:4.
[336] *See* Porter Rep. at 16.

*cancer*" (emphasis in original) is not correct. As Dr. Porter points out in his reports, some studies detected no statistically significant associations at all[337] while others reported no associations in the most reliable analyses that compared ranitidine to other H2RAs.[338]  Plaintiffs' claim that the "authors themselves disagree" with Dr. Porter is incorrect.  The authors of the Habel,[339] Kantor,[340] Yoon,[341] and Norgaard[342] studies do not conclude there is an increased risk of bladder cancer with ranitidine.  And the Cardwell authors explicitly state that there was "little evidence of difference in bladder cancer risk when directly comparing ranitidine users with users of no ranitidine histamine-2 receptor agonists."[343]

### iii.    Strength of Association

Plaintiffs claim no authority supports Dr. Porter's assessment that risk estimates below 1.5 show a weak association.  But Plaintiffs' own epidemiologist agrees with Dr. Porter.[344]  So does the Eleventh Circuit law.  *See Allison*, 184 F.3d at 1315 (affirming district court's rejection of epidemiological study that "had a relative risk of only 1.24, a finding so significantly close to 1.0 that the court thought the study was not worth serious consideration for proving causation.").

---

[337] *Id.* at 13–15 (discussing Habel (bladder/kidney cancer combined), Kantor, and Yoon).

[338] *Id.* at 15–19 (discussing Cardwell and Norgaard).

[339] *See* Habel (2000) at 149 ("While there were very modest increases and decreases in risk for some cancer sites among cimetidine users, most were within the limits of chance given no true association. Furthermore, similar risks of these cancers were also observed among ranitidine users.").

[340] *See* Kantor (2021) at 1858 ("No associations were observed for bladder or ovarian cancer.").

[341] *See* Yoon (2021) at 1 ("We found no evidence that exposure to NDMA through ranitidine increases the risk of cancer.").

[342] *See* Norgaard (2021) at 50 ("In conclusion, this large nationwide study with complete ascertainment of bladder and kidney cancers provided little evidence of any substantially increased risk of bladder or kidney cancer in ranitidine exposed individuals.").

[343] *See* Cardwell (2021) at 1617.

[344] *See* Moorman Rep. at 57 ("[W]ith weaker associations, i.e., with relative risks below 2, it is particularly important to consider whether the results are due to confounding or other forms of bias.").

### iv.    Consideration of Alternative Explanations

Plaintiffs criticize Dr. Porter's consideration of smoking as a potential confounder (that could bias the ranitidine risk upward) because in the Kim Y study, ranitidine users had lower smoking rates than users of famotidine.  First, the Kim study did not show that ranitidine users had lower rates of smoking as compared to users of PPIs or non-users.[345]  Thus, smoking could have biased the results of analyses comparing ranitidine users to PPI users or non-users.  Second, Plaintiffs do not claim that the smoking rates in Kim Y study must represent the smoking rates in other studies.  Third, Plaintiffs' selective reliance on the Kim Y study's smoking data conflicts with their experts' claims that the study is unreliable and uninformative.[346]  Finally, and most importantly, it is not Defendants' burden to prove that smoking was definitively a confounder in every study of ranitidine and cancer outcomes.  *Wilder*, 977 F.2d at 676 ("[D]efendant need not disprove causation.  Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence.") (citation omitted).

### v.    Dose-Response

Plaintiffs criticize Dr. Porter's dose-response analysis, claiming that the lack of dose response was due to low dose of ranitidine exposure.  But, as Dr. Porter emphasized, there was no association between ranitidine and bladder cancer in analyses focusing on longest follow-up and highest exposure.[347]  Moreover, Plaintiffs again dismiss the role of statistical significance to claim that the H2RA comparator analysis in Cardwell showed dose-response.  To the contrary, there was no significant association.[348]

---

[345] Kim Y (2021) at 612.

[346] *See, e.g.*, McTiernan Rep. at 120 (characterizing the Kim Y study as "not informative"); Moorman Tr. at 298:7–18 (criticizing the Kim Y study's data and inadequate information on confounding variables).

[347] *See* Porter Rep. at 18; Porter Tr. at 185:3–19.

[348] Porter Rep. at 16.

### vi.     Biological Plausibility

While Plaintiffs baldly claim that "obviously it is plausible that the NDMA in ranitidine also causes cancer," Dr. Porter provided a detailed explanation why that is not true for ranitidine and bladder cancer risk:  The FDA's studies refuting the endogenous formation claims, that "there was no reliable or consistent association for bladder cancer in studies on NDMA exposure," that NDMA is not classified as a known human carcinogen, and that there is no animal study reporting an increased incidence of bladder cancer with NDMA.[349]

### vii.    Consistency with Other Knowledge

Plaintiffs re-label this factor as "coherence" and claim that Dr. Porter's discussion of this factor is somehow inapposite.  Contrary to Plaintiffs' claim, Dr. Porter's discussion is consistent with the epidemiology textbook that their own epidemiologist, Dr. McTiernan, relies on (Gordis 2014 at 252-253; reference 16 in Porter Report).  Furthermore, Plaintiffs' claim that Dr. Porter should have considered that "non-ranitidine-based NDMA . . . causes bladder cancer" ignores the fact that Dr. Porter reviewed *the entirety of the data on NDMA and bladder cancer* and concluded that it shows no reliable association.[350]

## VIII.   Dr. Peter Guengerich

Plaintiffs do not dispute that Dr. Guengerich is extremely well-qualified.  Dr. Guengerich is a Professor and Chair of the Department of Biochemistry at Vanderbilt University and previously served as Director of the Center in Molecular Toxicology.[351]  He has won numerous national and international awards in the fields of toxicology, pharmacology, chemistry, and cancer research.[352]  In fact, he has been among the top three most cited researchers in pharmacology and

---

[349] *See* Porter Rep. at 2, 29; Porter Tr. at 27:4–6, 44:17–45:3, 114:9–115:9.
[350] *See* Porter Rep. at 23–26, 29; Porter Tr. at 27:4–6, 44:17–45, 114:9–115:9.
[351] Guengerich Rep. at 1.
[352] *See id.* at 1–5.

toxicology in the entire world.[353]  Dr. Guengerich also has extensive direct laboratory experience working with nitrosamines, including NDMA, and is the author of over 900 peer-reviewed publications in the most prestigious publications in the world.[354]

Dr. Guengerich offers several opinions regarding biological plausibility, but Plaintiffs challenge only three discrete opinions.[355]  Specifically, Plaintiffs criticize Dr. Guengerich for (1) opining that there is a threshold for NDMA toxicity; (2) allegedly failing to consider certain types of DNA damage that can cause cancer; and (3) failing to review the epidemiological evidence. Each argument is based on a distortion of Dr. Guengerich's opinions and/or the scientific evidence. Significantly, Plaintiffs base their arguments almost exclusively on regulatory standards and risk assessment methodologies that do not—and cannot—prove causation.  *See supra* at 24–25.

### A.    Dr. Guengerich Reliably Concluded That There are Effective Thresholds for NDMA Toxicity.

Dr. Guengerich opines that the current scientific evidence demonstrates NDMA has a threshold—meaning that at doses below the threshold, risk is negligible or non-existent. Thresholds are a basic principle of toxicology and embody the often-cited principle that "the dose makes the poison."[356]  Plaintiffs argue that this opinion is unreliable, quoting an article that relates

---

[353] *See id.* at 4*; see also Biography of Dr. F. Peter Guengerich*, INT'L J. OF TOXICOLOGY, https://journals.sagepub.com/doi/full/10.1080/10915810590918652.

[354] *See* Guengerich Rep. at 1–5; *see also id.* Ex. A (CV).

[355] *See id.* at 6–7. Plaintiffs do not challenge Dr. Guengerich's numerous other opinions, including, for example, that "[t]here is no reliable or consistent scientific evidence that ranitidine can endogenously form NDMA in the human body" and that "[t]he recently detected NDMA levels in ranitidine products are very low, particularly in relation to total NDMA exposure from other environmental sources and endogenous formation." *Id.*   Nor do they challenge the merits of Dr. Guengerich's numerous criticisms of Dr. Najafi's data, as stated in his Supplemental Report dated June 3, 2022. (Plaintiffs have filed a motion to strike the supplemental report asserting solely an argument that it was untimely.  *See* ECF No. 5900.)

[356] Guengerich Rep. at 27 (quoting Paracelsus, the "father of toxicology").

to "*regulation* of genotoxic materials" and on FDA regulatory guidelines.[357]   Plaintiffs are mistaken.

**First,** the fact that there is a threshold for NDMA should be obvious.  As Plaintiffs' experts admit, everyone is exposed to NDMA on a daily basis.[358]   Since not everyone gets cancer, there are obviously some levels of NDMA that do not cause cancer.  Even under FDA's linear threshold model, which is based on extremely conservative assumptions, if someone were to consume 96 ng of NDMA in medications per day, every day, for 70 years, they would not be expected to be at an increased risk of cancer.[359]   Moreover, FDA has not set any limit for the level of NDMA in foods and our bodies naturally form up to 1,000,000 ng NDMA per day through natural processes.[360]

**Second,** elsewhere in their motion, Plaintiffs acknowledge that a threshold for NDMA risk does exist.  Specifically, in their attempts to discount the results of ranitidine epidemiology, Plaintiffs argue that short-term exposure to the NDMA in ranitidine would *not* increase the risk of any cancer.[361]

**Third,** Plaintiffs argue that Dr. Guengerich's opinion is "whimsically his own," while turning a blind eye to the numerous scientific studies he cites supporting his opinion.[362]   As Dr. Guengerich explains, the World Health Organization, the European Medicines Agency, the

---

[357] Pls.' Mot. at 107 n.302 (emphasis added).

[358] *See, e.g.*, Rule 26 Expert Report of Dr. Michaels ("Michaels Rep.") at 31 (discussing estimated daily dietary intake of NDMA), Brown Decl. Ex. 13.

[359] FDA, M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Carcinogenic Risk (March 2018) at 5–6, Brown Decl. Ex. 86.

[360] Guengerich Rep. at 70 (citing Hrudey et al., *Drinking Water as a Proportion of Total Human Exposure to Volatile N-Nitrosamines*, RISK ANAL. 33(12):2179-2208 (2013), Cheffo Decl. Ex. 7).

[361] *See, e.g.*, Pls.' Mot. at 75 ("Plaintiffs do not claim that 5 or 10 prescriptions of ranitidine cause cancer"); *id.* at 105 ("One would not expect to find any effect at one-year's worth of ranitidine, for example, but might *begin* to at four years.").

[362] Guengerich Rep. at 123, Table 4.

European Commission's Scientific Committee on Consumer Safety, and several peer-reviewed articles have all demonstrated thresholds for NDMA.

*Fourth*, Plaintiffs quibble over whether a logarithmic scale is appropriate for assessing dose-response at low doses, but the argument misconstrues how thresholds are determined and the approach Dr. Guengerich used.  First, plotting data on a logarithmic scale is a means of data presentation; it does not alter the data, nor is it the sole means by which scientists determined that effective NDMA thresholds exist.  Second, Plaintiffs suggest that Dr. Guengerich relied entirely on an article by Waddell, but this is not true[363] and, as explained above, ignores that numerous regulatory agencies and researchers have demonstrated that a threshold exists for NDMA. Plaintiffs also paint a misleading picture that Waddell has been heavily criticized and lacks support, but they only cite to a single person's comment in 2003.  Tellingly, despite that lone criticism, the model has continued to enjoy acceptance in peer-reviewed literature and has been applied specifically to genotoxic impurities, including nitrosamines.[364]

*Fifth*, Plaintiffs' reliance on precautionary regulatory agency standards and risk assessments is wholly misplaced.  As numerous courts have recognized, regulatory agency action is not relevant to a determination of causation because regulatory agencies regularly make hyper-conservative assumptions which knowingly overestimate risk.  *See Rider*, 295 F.3d at 1201; *see also Siharath*, 131 F. Supp. 2d at 1370 ("The standard by which the FDA deems a drug harmful is much lower than is required in a court of law.  The FDA's lesser standard is necessitated by its

---

[363] *Id.* (citing studies).

[364] *See, e.g.*, Waddell et al., Concordance of thresholds for carcinogenicity of N-nitrosodiethylamine, ARCH TOXICOL. 2006 Jun;80(6):305-309 (2006), Cheffo Decl. Ex. 14; Kobets et al., Review of the evidence for thresholds for DNA-Reactive and epigenetic experimental chemical carcinogens, CHEM BIOL INTERACT. 2019 Mar 1;301:88-111 (2019), Cheffo Decl. Ex. 8.

prophylactic role in reducing the public's exposure to potentially harmful substances."). Plaintiffs effectively ask this Court to depart from consistent case law holding that regulatory thresholds are inapposite for determining medical causation.

*Sixth,* Plaintiffs misstate the conclusions of the Peto study on which Dr. Guengerich relied. The Peto study neither attempted to calculate a threshold for NDMA specifically nor conclusively determined that a threshold for NDMA does not exist. In fact, the Peto study specifically warns that its data *cannot* be used to reliably estimate "the effects of very low doses of nitrosamines."[365] Yet, that is the exact conclusion Plaintiffs are now urging the Court to make.

*Finally*, Plaintiffs fault Guengerich for relying on the Johnson 2021 article. Plaintiffs' *only* argument is that the paper—which was published in a peer-reviewed journal—was co-authored by scientists employed by the pharmaceutical industry and therefore the findings must be biased. Plaintiffs do not advance a single substantive argument that the alleged bias actually affected the underlying science. Plaintiffs thus argue, in effect, that all science generated by the pharmaceutical industry is invalid, yet their own experts rely on such research when helpful to them. For instance, Plaintiffs' experts rely on GSK's King 2020,[366] GSK's Broom 1986,[367] GSK's Root Cause Analysis,[368] and GSK's Haywood 1984,[369] to name a few. Likewise, Plaintiffs affirmatively rely on research by GSK and Sanofi in their master complaint.[370] Moreover, Plaintiffs ignore that the results of Johnson 2021 are consistent with the results of other researchers who found practical

---

[365] *See* Peto et al, *Effects of 4080 Rats of Chronic Ingestion of N-Nitrosodiethylamine or N-nitrosodimethylamine: A Detailed Dose-Response Study*, Cancer Researcher 51 (1991) (Effects) at 64463 ("data have been pooled… for both NDMA and NDEA"), Brown Decl. Ex. 69.
[366] *See* Rule 26 Expert Report of Dr. Panigrahy ("Panigrahy Rep.") at 170–171, Brown Decl. Ex. 19.
[367] *See* Rule 26 Expert Report of Dr. Marletta ("Marletta Rep.") at 40, Brown Decl. Ex. 7.
[368] *See* Rule 26 Expert Report of Dr. Najafi ("Najafi Rep.") ¶¶ 56–76, Brown Decl. Ex. 17.
[369] *See* Marletta Rep. at 50.
[370] *See* Pls.' Second Am. PIC ¶¶ 192–194.

thresholds for NDMA—all of which were considered by Dr. Guengerich when formulating his opinion.[371]  Finally, the irony cannot be lost that although Johnson 2021 was conducted outside of litigation and is merely co-authored by scientists employed by pharmaceutical companies, Plaintiffs offer their own expert, Dr. Najafi, whose non-peer-reviewed opinions are supported solely by his own testing generated specifically for this litigation at a price tag of over $2,200,000. Using Plaintiffs' logic, all of Dr. Najafi's testing should be excluded on the basis of bias alone.

In short, Plaintiffs' criticism of Dr. Guengerich's threshold opinion ignores common sense, the peer reviewed literature, and their own criticisms of the ranitidine epidemiology studies.

### B.    Dr. Guengerich Reliably Concluded That a DNA Repair Mechanism Reverses Damage Caused By NDMA.

Plaintiffs do not dispute Dr. Guengerich's well-supported conclusion that the DNA repair process is real and that it can repair any damage from NDMA.  Nor could they—Plaintiffs' own experts recognize that there is "ample evidence" that humans can repair damage caused by NDMA.[372]  Rather, Plaintiffs accuse Dr. Guengerich of addressing repair of only one type of DNA adduct ($O^6$-methylguanine) and purportedly ignoring other types of DNA damage ($N^7$-methylguanine, $N^3$-methyladenine, and $O^4$-methylthymine; collectively "other DNA adducts"). The argument mischaracterizes Dr. Guengerich's opinions and is meritless.

In fact, Dr. Guengerich *does* consider these other types of DNA damage and their repair systems in his report.[373]  Dr. Guengerich also testified that the scientific community, including his own lab, has conducted research on these other types of DNA damage, but no one has determined

---

[371] *See, e.g.*, Guengerich Rep. at 123, Table 4.

[372] Panigrahy Rep. at 188; *see also* Marletta Rep. at 48–49 (recognizing DNA repair of NDMA damage).

[373] Guengerich Rep. at 117.

that they cause cancer.[374]   Plaintiffs, however, fail to acknowledge that there is insufficient evidence that these other DNA adducts will lead to cancer.[375]

Indeed, Plaintiffs' own cancer biology expert, Dr. Panigrahy, discusses the various DNA adducts that can form from NDMA, but never states (much less cites any authority for the proposition) that any DNA adduct other than $O^6$-methylguanine can directly lead to cancer.[376]  In fact, in extrapolating from NDMA animal studies to humans, Dr. Panigrahy relied solely on $O^6$-methylguanine,[377] emphasizing that the repair of $O^6$-methylguanine was "critical" to determining susceptibility to forming cancer.[378]

Plaintiffs have put forth absolutely no reliable evidence that anyone legitimately believes other DNA adducts lead to cancer in laboratory animals, let alone humans.  Essentially, Plaintiffs ask this Court to now leap ahead of – and contradict – the current state of the science.  Nothing under Rule 702 encourages – or allows – such a ruling.  *Rider*, 295 F.3d at 1202 ("Law lags science; it does not lead it.") (*quoting Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)).

### C.    Dr. Guengerich Did Not Need to Review Epidemiology to Reliably Conclude That It Is Not Biologically Plausible For Ranitidine to Cause Cancer In Humans.

Dr. Guengerich offers opinions that the level of NDMA in ranitidine could not plausibly cause the five cancer types at issue based on the biological, mechanistic evidence.  This is a classic

---

[374] *See, e.g.*, Guengerich Tr. at 403:7–16.
[375] A World Health Organization document Plaintiffs rely on discusses *mutagenicity* of other DNA adducts, but *carcinogenicity* only of O6-methylguanine.  Liteplo et al, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, World Health Organization (2002) at 20, 23, 25, Cheffo Decl. Ex. 9 ("WHO 2002").
[376] Panigrahy Rep. at 159; Panigrahy Rebut. Rep. at 2.
[377] *Id*. at 130.
[378] *Id*. at 167.

opinion on biological plausibility.[379]  While epidemiologists may ultimately rely on biological
plausibility to assess if a valid association is causal, toxicologists and biochemists like
Dr. Guengerich often have the unparelled expertise necessary to address complex mechanistic
evidence.

In the case of ranitidine and the Designated Cancers, there is no valid epidemiological
association between ranitidine and any cancer.  Therefore, one does not need to consider if an
association (which does not exist) is biologically plausible.  Nevertheless, Defendants are entitled
to offer expert witness opinions to rebut Plaintiffs' arguments and their experts' opinions about
biological plausibility. Dr. Guengerich provides a reliable and valid analysis to opine that it is not
plausible for ranitidine to cause the Designated Cancers.  Plaintiffs' chief complaint about
Dr. Guengerich's biological plausibility opinion is that he did not thoroughly analyze the
epidemiology.  But that is not how biological plausibility works.  Biological plausibility, as
Plaintiffs themselves acknowledge, is based on experimental—that is, not observational or
epidemiological—evidence.  Plaintiffs themselves point only to *in vivo* animal and *in vitro* studies,
with no mention of human studies, being informative of potential biological plausibility.[380]

Plaintiffs further claim that Dr. Guengerich does not consider data regarding certain DNA
adducts, polymorphisms, and chromosomal aberrations.[381]  This is not accurate, as Dr. Guengerich
discusses these factors in his expert report.[382]  To reach his opinion that it is not biologically
plausible for ranitidine to cause cancer in humans, Dr. Guengerich has evaluated relevant human

[379] "Biological plausibility" refers to whether there is mechanistic evidence to support a causal
association.  Biological plausibility is not sufficient, alone, to establish causation.  The absence of
biological plausibility may cast doubt on whether a valid association is causal. Ref. Man. at 604.
[380] Pls.' Mot. at 61–62.
[381] *Id.* at 114–115.
[382] Guengerich Rep. at 97–98, 117, 126, 241–249.

clinical, *in vivo* experimental animal—including long-term carcinogenicity bioassays, *in vitro* human cell, *in vitro* animal cell, and *in vitro* bacterial cell studies on both ranitidine and NDMA. He also relies on fundamental scientific principles in pharmacology, toxicology, biochemistry, and enzymology and widely known and accepted knowledge about CYP2E1—the enzyme responsible for the bioactivation of NDMA—and alkylguaninetransferase—the DNA repair enzyme responsible for preventing mutations due to NDMA. Indeed, he has a performed a more comprehensive review and evaluation of the non-epidemiological evidence than any of Plaintiffs' experts. His interpretations of and the conclusions he draws from the extensive body of evidence, informed by his decades'-long experience and profound expertise in all the relevant scientific disciplines, are reliable.

## IX.    Dr. Timothy Wang

Plaintiffs do not challenge Dr. Wang's qualifications. He is the Chief of the Columbia University Medical Center's Division of Digestive and Liver Diseases, past president of American Gastroenterology Association, and one of the world's leading experts in gastrointestinal cancers.[383] He has published more than 300 peer-reviewed articles and 88 reviews, editorials, commentaries and book chapters and has served as peer reviewer and editor for many premier journals and as editor of the Yamada Textbook of Gastroenterology.[384] Instead, Plaintiffs resort to manufactured and baseless attacks not on his methodology, but on the conclusions he draws.

### A.    Dr. Wang Does Not Premise His Opinions On Whether There Is a Threshold Amount of NDMA Required to Cause Cancer.

Contrary to Plaintiffs' arguments,[385] the existence of a threshold amount of NDMA needed to cause cancer is neither a "premise" nor a "foundation" of Dr. Wang's overall opinion that there

---

[383] *See* Rule 26 Expert Report of Dr. Wang ("Wang Rep."), Ex. A (CV), Finken Decl. Ex. 21.
[384] *Id.*
[385] Pls.' Mot. at 115–16.

is no reliable epidemiologic evidence to support the hypothesis that ranitidine use causes any type of gastrointestinal cancers.[386]  Dr. Wang's opinions regarding animal and *in vitro* studies—including his opinion that these studies "indicate the presence of a minimum NDMA threshold dose needed to induce cancer"—are relevant only to assessing whether it is biologically plausible that NDMA exposure from ranitidine use can cause cancer of any type in humans.[387]  As discussed *infra*, biological plausibility was one of the Bradford Hill factors Dr. Wang considered in an abundance of caution even though he found no reliable evidence even for an association.[388]

Beyond this, Plaintiffs are mistaken when it comes to the basis of this opinion.  Dr. Wang reached his opinion after a detailed analysis of the NDMA animal and *in vitro* studies—much more than the Peto study, on which Plaintiffs focus their attention.[389]

Even as to Plaintiffs' narrow attacks on Dr. Wang's use of the Peto study, they misstate the conclusions of the study.  *See supra* at 78.  Other findings from the Peto study support Dr. Wang's opinion.  The low doses of NDMA in the Peto study: (1) have not been shown to induce adenocarcinoma; (2) do not shorten the lives of animals; (3) do not show a significant increase in the number of tumors, the "tumors" observed were mostly benign growths and thus not cancer, and the threshold observed was consistent with the results of other rat studies.[390]

---

[386] Wang Rep. at 5.

[387] Wang Rep. at 5; *see also id.* at 44–49.

[388] *See id.* at 33.

[389] *See* Wang Rep. at 26–27 (discussing the various threshold mechanisms, including liver first pass, DNA repair, apoptosis, and elimination of premalignant cells by the immune system, demonstrated in the NDMA mechanistic studies), 28 (discussing evidence that these threshold mechanisms are also operative in humans).

[390] Deposition of Dr. Wang, May 26, 2022 ("Wang Tr.") at 390:6–391:16, Finken Decl. Ex. 42; Wang Rep. at 24–25.

Without a meritorious challenge, Plaintiffs insinuate that Dr. Wang's opinion related to a threshold amount "directly contradict[s] the conclusions reached by the FDA, EPA, and WHO."[391] Plaintiffs are wrong.  *See supra* at Background Section II.

### B.   Dr. Wang's Estimates of NDMA From Ranitidine Are Based on Reliable Methodology.

Plaintiffs next attack Dr. Wang's purported opinion that Plaintiffs "were not exposed to enough NDMA to cause cancer," claiming such an opinion is based on a "faulty assumption" about NDMA levels in baseline testing data.[392]  But this is not Dr. Wang's opinion.  He opined that there is no reliable epidemiologic evidence of an association between ranitidine and any type of gastrointestinal cancer.[393]  Without evidence of an association, Dr. Wang could not and did not opine on how much NDMA would be "enough" or "not enough" to cause cancer in humans. Because Plaintiffs misrepresent Dr. Wang's opinions, their representation of alleged "faulty assumption[s]" necessarily fails.  Instead, they merely challenge his conclusions regarding these studies.

Dr. Wang's opinion regarding the NDMA levels in ranitidine drug product was relevant only to his assessment of the biological plausibility of whether NDMA exposure from ranitidine use can cause cancer of any type in humans.[394]  In examining NDMA levels in ranitidine drug product for purposes of assessing biological plausibility, Dr. Wang considered the relevant data and studies.[395]  In arguing otherwise, Plaintiffs gloss over the extent of Dr. Wang's thorough analysis and fault him for supposedly not considering testing data. In fact:

- Dr. Wang did consider Dr. Najafi's testing and determined it to be unreliable.[396]

---

[391] Pls.' Mot. at 116.
[392] Pls.' Mot. at 116.
[393] Wang Rep. at 5.
[394] *See* Wang Rep. at 44–49.
[395] *See id.* at 5, 33–49.
[396] *See* Wang Tr. 113:11–25; Wang Rep. at 19–20.

- Dr. Wang explained that FDA's stability testing, which is conducted under extreme conditions and thus does not reveal the quantitative NDMA amounts in ranitidine drug product to which a consumer might be exposed, is not a reliable basis for estimating the amount of NDMA formed from ranitidine.[397]

- Dr. Wang analyzed studies related to potential endogenous formation of NDMA from ranitidine use[398] before concluding that "I am not aware of any reliable evidence demonstrating that ranitidine produces NDMA in the body (i.e., endogenous formation of NDMA)."[399]

- With regard to data on NDMA amounts after the consumer opens the bottle, Dr. Wang opined that such data do not exist.[400]

Taking all of this information into consideration, Dr. Wang opined that "[o]nly studies of ranitidine reflect actual clinical use of ranitidine and can account for any NDMA that results from exposure to ranitidine and whether such exposure has any effect on cancer risk."[401]  Dr. Wang analyzed these studies individually and in his Bradford Hill analysis.[402]  While Plaintiffs may disagree with Dr. Wang's conclusions, their mischaracterizations of the data and the scope of Dr. Wang's analysis do not support their challenges.

### C.    Dr. Wang Accurately Characterizes and Considers NDMA Animal Studies.

Plaintiffs attack Dr. Wang's opinion regarding NDMA animal studies by mischaracterizing his analysis of a single study (of the dozens) he reviewed—the Thorgeirsson study.  Contrary to Plaintiffs' incorrect characterization, Dr. Wang concluded that this study exposed primates to

---

[397] *See* Wang Tr. 137:18–138:10; *see also* Janet Woodcock, FDA, Response to Emery Pharma Citizen Petition, (Apr. 1, 2020), at 12. Available at: https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf  ("The purpose of stability testing is to provide evidence on how the quality of a drug substance or drug product varies over time under the influence of a variety of environmental factors such as temperature, humidity, and light.").

[398] *See* Wang Rep. at 16–20.

[399] *Id.* at 5.

[400] Wang Tr. 116:14–117:8 ("I don't think there's really good data on this.").

[401] Wang Rep. at 5.

[402] *See id.* at 20–23, 44–49; *see also supra* Background Section I.A.

NDMA for a period much longer than that sufficient for another nitrosamine to induce tumors and showed that NDMA is liver toxic, but not carcinogenic, in primates.[403]   This conclusion is consistent with the conclusion of the study's authors.[404]   The WHO review of the NDMA animal carcinogenicity studies was limited to rodent studies.[405]   Indeed, the Thorgeirsson primate study was not even discussed or referenced in this document.[406]

> ### D.   Criticisms of Dr. Wang's Opinions Regarding Valsartan Epidemiological Studies are Meritless.

Plaintiffs challenge Dr. Wang's reliance on the 2022 Chan study involving valsartan, citing supposed limitations in the study period.[407]   As an initial matter, Dr. Wang does not opine, as Plaintiffs claim, "that epidemiological evidence demonstrates that there was no increased cancer risk among patients who took NDMA-contaminated valsartan."[408]   Rather, Dr. Wang opines on the *lack* of evidence of an association.[409]   The Chan study is one of three valsartan studies that Dr. Wang reviewed (along with the Pottegard and Gomm studies), and all three support his conclusion.  Plaintiffs' belief that the Chan authors should have conducted a different study is irrelevant.

---

[403] Wang Rep. at 23; *see also* Wang Tr. 33:4–34:16.

[404] Thorgeirsson et al., *Tumor incidence in a chemical carcinogenesis study of nonhuman primates*, REGUL. TOXICOL. PHARMACOL. 1994 APR;19(2):130–151 (1994) at 141, Brown Decl. Ex. 75 ("All of the compounds, except [NDMA] and MNNG were shown to be hepatocarcinogens in the monkeys; [NDMA], however, was a potent liver toxin.").

[405] WHO (2002).

[406] *See generally id.*

[407] Pls.' Mot. at 118.

[408] *Id.*

[409] Wang Rep. at 23 ("[T]he NDMA epidemiology studies showed no reliable, consistent association between NDMA exposure and specific cancer outcomes.").

### E.     Dr. Wang's Bradford Hill Analysis Is Reliable.

Plaintiffs' claim that Dr. Wang failed to consider "non-ranitidine epidemiology" as part of his Bradford Hill analysis is unfounded.[410]   Dr. Wang *did* consider non-ranitidine, NDMA epidemiology studies and even analyzed those studies individually, concluding that they were unreliable.[411]   Moreover, Dr. Wang did not even need to perform a Bradford Hill analysis after concluding that the evidence did not support a statistical association—but did so anyway out of any abundance of caution.[412]   Dr. Wang's Bradford Hill analysis is reliable.

### F.     Dr. Wang Did Not "Cherry-Pick" or Fail to Consider Literature Regarding Endogenous Formation.

Plaintiffs next claim that Dr. Wang "cherry-picked" data he considered on endogenous NDMA formation, citing the Zeilmaker study and a 2020 statement by the EMA as examples of studies Dr. Wang did not consider.[413]   In truth, Dr. Wang *did* consider Zeilmaker (2010) in connection with his opinion regarding the levels of NDMA exposure from endogenous sources and found it to be irrelevant.[414]   This was because the data in Zeilmaker (2010) were not actual human observations, but rather were based on "a dynamic in vitro gastrointestinal model [that] was used to simulate NDMA formation in the stomach after a fish + vegetable meal."[415]

Finally, contrary to Plaintiffs' assertion, EMA did not state that estimates of NDMA exposure from endogenous sources are unreliable—instead, it stated that the extent of NDMA formation, endogenous or external, was "not clearly established" because of variability in

---

[410] Pls.' Mot. at 119.

[411] *See* Wang Rep. at 23, 44–49.

[412] *See id.* at 44–49.

[413] Pls.' Mot. at 119–20.

[414] Wang Tr. 95:8–96:9.

[415] Zeilmaker et al., *Risk Assessment of N-nitrosodimethylamine Formed Endogenously after Fish-with-Vegetable Meals*, Toxicological Sciences 2010;116(1):323-335 (2010) at 323, Cheffo Decl. Ex. 15.

estimates on the level of background exposure to NDMA.[416]  Dr. Wang's opinion that "NDMA exposure from exogenous sources is considered negligible compared to endogenous exposure that results from normal human physiology" considered the variability in the estimates and is consistent with EMA's conclusions.[417]

## X.      Dr. Lewis Chodosh

### A.      Plaintiffs Did Not Challenge Dr. Chodosh's Expertise.

Plaintiffs do not challenge Dr. Chodosh's expertise—because they cannot.  Dr. Chodosh's credentials are unassailable.[418]  And out of Dr. Chodosh's entire 93-page report, Plaintiffs only challenge part of his opinion on DNA repair and threshold dose, raising no challenges to the remainder of his opinions.

### B.      Plaintiffs Substitute Regulatory Assumptions for Causation.

Plaintiffs claim  Dr. Chodosh should be excluded based on conservative assumptions adopted by regulatory agencies.[419]  As discussed *supra* at 25–27, that is not the law in the Eleventh Circuit.

---

[416]    EMA Ranitidine Assessment Report (2020), at 15.  Available at https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-assessment-report_en.pdf.

[417] *See* Wang Tr. at 88:1–10.

[418] Dr. Chodosh earned his M.D. at Harvard, his Ph.D. in Biochemistry at MIT, and is an active researcher at the University of Pennsylvania, where he is the Chairman of the Department of Cancer Biology at the Perelman School of Medicine. He is also an elected member of the National Academy of Medicine, leads a research laboratory, and is also the Associate Director of the Abramson Cancer Center, an NCI-designated Comprehensive Cancer Center (a designation less than 4% of centers receive).  *See* Expert Report of Dr. Chodosh ("Chodosh Rep."), Ex. 2 (CV), Finken Decl. Ex. 3.

[419] Pls.' Mot. at 120–121.

### C. The Existence of Threshold Doses for Genotoxins is Well Accepted in the Scientific Community.

Plaintiffs argue, without citation, that "no toxicologist or public health agency" agrees with Dr. Chodosh that a non-linear dose threshold can exist.[420]   Plaintiffs cite no support for this proposition because there is none.  To the contrary, and as Dr. Chodosh explained at length,[421] the existence of threshold doses is generally accepted in biology and has specifically been demonstrated for NDMA and O6-methylguanine.  Even Dr. Nohmi, whom Plaintiffs hold out as a neutral unbiased expert,[422] agrees.  Discussing biology instead of—as Plaintiffs do—unsupported assumptions, Dr. Nohmi stated that "humans have a variety of self-defense mechanisms such as antioxidants, detoxification mechanisms, [and] DNA repair," and "[t]herefore, it is expected that chemicals that induce oxidative DNA damage via ROS may have practical thresholds or safe doses."[423]   Plaintiffs' own experts argue that NDMA is one such chemical.[424]   Hence, under Dr. Nohmi's theory, NDMA is expected to have a dose threshold.  Dr. Nohmi's theory is shared

---

[420] *Id.* at 121.

[421] *See* Chodosh Rep. at ¶¶ 68, 100–101, 159–163, 241–250, 276–279, 359–361.

[422] Pls.' Mot. at 107.

[423] Nohmi T, Matsumoto K. *Effects of DNA Polymerase Kappa and Mismatch Repair On Dose-Responses of Chromosome Aberrations Induced By Three Oxidative Genotoxins In Human Cells*, ENVIRON. MOL. MUTAGEN. 2020;61(1):193, 194, Cheffo Decl. Ex. 11.

[424] *See, e.g.*, Rule 26 Expert Report of Dr. Panigrahy ("Panigrahy Rep.") at 170–172, Brown Decl. Ex. 19.

by the broader scientific community,[425] as discussed in Dr. Chodosh's report.[426]  Plaintiffs do not

address any of this peer-reviewed, published scientific literature.

Plaintiffs point to the Peto studies to argue there is no threshold for NDMA.  Yet the 'no-

threshold' data that Plaintiffs cite is a combined analysis that includes data for NDEA (a more

potent substance).[427]  Dr. Peto himself called this combination "artificial[]"[428] and admitted his

---

[425] *See, e.g.,* Arai et al., *Long-term Experiment of Maximal Non-Carcinogenic Dose of Dimethylnitrosamine For Carcinogenesis In Rats*, GAN. 1979;70(4):549, 549, Cheffo Decl., Ex. 3 ("[A] level of about 0.1 ppm [NDMA] is non-carcinogenic."); Fahrer et al. *DNA Repair By MGMT, But Not AAG, Causes a Threshold in Alkylation-Induced Colorectal Carcinogenesis*, Carcinogenesis. 2015;36(10):1235,1235, 1240, Cheffo Decl., Ex. 5 (demonstrating "a non-linear dose–response for" carcinogenesis due to O6-methlyguanine); Gocke et al., In Vivo *Studies in the Mouse to Define a Threshold for the Genotoxicity of EMS and ENU*, MUTAT RES. 2009;678(2):101, 104, Cheffo Decl., Ex. 6 (finding "clear evidence that up to a certain level of DNA damage the repair is fully error free and only at doses above the threshold" are mutations formed); Kobets et al., *Review of the Evidence For Thresholds for DNA-Reactive and Epigenetic Experimental Chemical Carcinogens*, CHEM. BIOL. INTERACT. 2019;301:8, 88, Cheffo Decl., Ex. 8 ("thresholds exist for the induction of experimental cancer by all types of carcinogens"); Thomas et al., *Influence of DNA Repair on Nonlinear Dose-Responses For Mutation*, TOXICOL. SCI. 2013;132(1):87, 87, Cheffo Decl., Ex. 13 (finding "a nonlinear dose-response with a no observed genotoxic effect level" that is "dependent upon repair of O6-methylguanine (O6MeG) by…(MGMT)."); Hrudey et al., *Is There A Safe level of Exposure to a Carcinogen?*, ENVIRON. SCI. TECHNOL. 1995;29(8):370A, 370A, Cheffo Decl., Ex. 7 ("[E]xposing the entire world population to the smallest nonzero dose [of the most potent carcinogen] likely would not yield a single case of cancer.").

[426] *See, e.g.,* Chodosh Rep. at 242.

[427] Peto (1991) (Effects) at 6442 ("data have been pooled… for both NDMA and NDEA"); *id.* ("[I]f each were examined separately…it would be impossible to characterize reliably the shapes of any of these separate dose-response relationships below a dose of about 1 ppm."); Peto et al, *Dose and Time Relationships for Tumor Induction in the Lier and Esophagus of 4080 Inbred Rats by Chronic Ingestion of N-Nitrosodietheylamine or N-Nitrosodimethylamine*, Cancer Research 1991;51:6452-6469 (1991) (Dose) at 6452 ("…NDEA appears to be about 2 or 3 times as potent as NDMA.").

[428] Peto (1991) (Effects) at 6442.

data was "consistent with either a linear or a nonlinear response."[429]  As to NDMA itself, Dr. Peto wrote that the data is "clearly nonlinear"[430]

### D.   Plaintiffs Wholly Ignore that Dr. Chodosh Addressed Other DNA Adducts Formed by NDMA.

Plaintiffs' claim that Dr. Chodosh ignored all DNA adducts other than O6- methylguanine. In fact, Dr. Chodosh addressed all four DNA adducts possibly generated by NDMA: N7-methylguanine, O6-methylguanine, N3-methyladenine, and O4-methylthymine, as well as their repair mechanisms.[431]

Moreover, Plaintiffs' focus on "other" DNA adducts is a red herring.  The WHO, Dr. Chodosh, and Plaintiffs' own expert Dr. Panigrahy all agree that O6-methylguanine is the *only* mechanism by which NMDA exerts its potential carcinogenicity.[432]  Plaintiffs do not dispute that Dr. Chodosh addressed and studied O6-methylguanine and related DNA repair mechanisms.  They also fail to address the substantial scientific literature showing thresholds for chemicals that operate via O6-methylguanine.  Plaintiffs' last-ditch effort to distract by ignoring evidence and

---

[429] *Id.* at 6441 ("in the dose range from 0 to 1 ppm of nitrosamines, the data are consistent with either a linear or a nonlinear response.")

[430] Peto (1991) (Dose) at 6458 ("the [NDMA] dose-response relationship for 'all liver' is of some interest and is given in Table 8 and Fig. 8. The relationship is clearly nonlinear"); *id.* at 6465, Fig. 8 ("The plotted lines…cannot be trusted").

[431] *See, e.g.*, Chodosh Rep. at ¶¶ 156-157; Deposition of Dr. Chodosh ("Chodosh Tr.") at 155:10–157:6 ("MGMT specifically repairs the O6-methylguanine adduct. However, each of our cells has multiple different overlapping mechanisms of DNA repair that would address the other types of adducts and DNA damage that are alluded to here."), Finken Decl. Ex. 26.

[432] *See, e.g.*, WHO (2002) at 20 ("Available data are consistent with the formation and persistence of the secondary adduct, O6 -methylguanine, being associated with both the carcinogenicity and mutagenicity of NDMA."); Panigrahy Rep. at 159 ("O6-methylguanine is the most potent premutagenic lesion induced by NDMA."); Panigrahy Rebut. Rep. ("The genotoxicity of NDMA (likely involving the formation of O6 -methylguanine in DNA) is critical in its mechanism of causing cancer."); Chodosh Tr. at 158:9–159:11 ("…the N7-Methylguanine adduct is referred to as **not** being promutagenic…") (emphasis added); *id.* at 160:21–161:22.

pointing to avenues of causation that their own experts disagree with should not be credited, and it is not a reason to exclude Dr. Chodosh.

## XI.    Dr. Namandjé Bumpus

Dr. Namandjé Bumpus is a highly accomplished and nationally recognized pharmacologist with a "stellar reputation."[433]  She has been on the faculty of the Department of Pharmacology and Molecular Sciences at Johns Hopkins University School of Medicine for over 12 years, and from 2020 until last month, served as the Director (Chair) of her department.[434]  She has published more than 60 articles in peer-reviewed publications.  She also is President-Elect of the American Society for Pharmacology & Experimental Therapeutics.

Dr. Bumpus served an expert report and two supplemental reports in this litigation, in which she proffered well-supported opinions, including: (1) that NDMA is not formed from ranitidine in the human body; and (2) that the testing conducted by Plaintiffs' expert Dr. Ron Najafi and his laboratory, Emery Pharma, is unreliable and grossly inflated the levels of NDMA purportedly found in ranitidine.[435]  On May 20, 2022, Plaintiffs deposed Dr. Bumpus for nearly six hours, during which time they were able to thoroughly cross-examine her and fully explore her opinions.

On June 30, 2022, after all discovery relating to her opinions had been completed, Dr. Bumpus was named Chief Scientist of the FDA.[436] This is a prestigious national position that

---

[433] Z. Brennan, "FDA adds some fresh senior leadership with new chief scientist, chief medical officer," Endpoints News (June 30, 2022), at https://endpts.com/fda-adds-some-fresh-senior-leadership-with-new-chief-scientist-chief-medical-officer/.

[434] *Id.*

[435] Expert Report of Namanje Bumpus, Finken Decl. Ex. 1; Supplemental Expert Report of Dr. Namanje Bumpus, Cheffo Decl. Ex. 1; ECF No. 5856-3, Second Supplemental Report of Dr. Namanje Bumpus (May 19, 2022).

[436] Dr. Robert M. Califf (@Dr.Califf_FDA), Twitter (June 30, 2022 at 11:01 AM), https://twitter.com/DrCaliff_FDA/status/1542523732203274240?s=20&t=l45vLKKaF5xzZU7Rj CWI6w.

"supports the research foundation, science, and innovation that underpins FDA's regulatory mission" and that oversees, among others, the National Center for Toxicological Research and the FDA's Office of Laboratory Safety and Office of Scientific Integrity.[437]   While she serves in her new government role, Dr. Bumpus cannot testify in private litigation.   Accordingly, on July 5 Defendants advised Plaintiffs that Dr. Bumpus would not be able to participate in the litigation going forward, but expressly stated that "the Court can still consider Dr. Bumpus' report and deposition testimony for purposes of *Daubert*."[438]

Plaintiffs do not argue that Dr. Bumpus is not qualified to proffer the opinions she has expressed.  Rather, Plaintiffs' sole argument is that "any motion to exclude her testimony would be moot" because she cannot testify at trial.[439]  Plaintiffs imply that she was voluntarily withdrawn as an expert, and cite cases that are inapposite.

First, the cases do not involve an expert who has become unavailable, as Dr. Bumpus has; instead, the experts were voluntarily withdrawn before trial.  *See, e.g., Andrade v. Merson*, 2012 WL 7451931 (S.D. Fla. Dec. 3, 2021).  Nor do the cases share a similar procedural posture with this one—all looked at the issue of whether the withdrawn experts' opinions could be considered at trial.  Here, in contrast, the Court is set to consider the general causation opinions of the parties' experts to determine whether Plaintiffs can meet their burden of showing that ranitidine can cause the Designated Cancers.  No trial has yet been scheduled.  Most importantly, however, in each of the cases Plaintiffs cite, discovery of the expert *had not been completed*.  *See, e.g., Morrison v.*

---

[437] *See* https://www.fda.gov/about-fda/office-commissioner/office-chief-scientist.
[438] July 5, 2022 email from E. Canaan to T. Finken, Exhibit 4 to Brand Defendants' Motion for Leave to Substitute Expert Witness [ECF 5856-4] at 2.  Defendants have filed a separate Motion for Leave to Substitute Dr. Bumpus in light of her unavailability to testify at trial.  [ECF 5856 at 3 n.3]
[439] Pls.' Mot. at 122.

*ExxonMobil Corp.*, 2007 WL 9888622, *5 (M.D. Ga. Mar. 29, 2007) (explaining that "Defendant was unable to complete a full cross-examination" before the plaintiff withdrew the expert). That is obviously not the situation here, where (1) Dr. Bumpus is unexpectedly unavailable due to her acceptance of an important government position that does not allow her to testify in private litigation; (2) Defendants had no control over Dr. Bumpus' unavailability; (3) Dr. Bumpus explained her opinions and their basis in detail in three separate reports; and (4) Plaintiffs completed their cross-examination of Dr. Bumpus during a six-hour deposition.

Dr. Bumpus' reports and deposition discuss complex issues of pharmacology and analytical chemistry that will be helpful to the Court as it considers the general causation Rule 702/*Daubert* briefs and argument. In *Soldo v. Sandoz Pharmaceuticals Corp.*, the court considered the opinion of even a withdrawn expert "directly and as part of its determination whether to exclude the testimony of plaintiff's other experts." 244 F. Supp. 2d 434, 573-74 (W.D. Pa. 2003) (citing *Wade-Greaux v. Whitehall Labs.*, 874 F. Supp. 1441, 1485 (D. Va.), *aff'd without opinion*, 46 F.3d 1120 (3d Cir. 1994)). The Court here may consider Dr. Bumpus' reports and opinions as part of its general causation Rule 702/*Daubert* analysis.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: August 24, 2022                        Respectfully submitted,


                                                */s/ Anand Agneshwar*
                                                Anand Agneshwar
                                                ARNOLD & PORTER KAYE SCHOLER
                                                LLP
                                                250 West 55th Street
                                                New York, NY 10019
                                                Tel: (212) 836-8011
                                                Fax: (212) 836-8689
                                                anand.agneshwar@arnoldporter.com

                                                *Attorney for Defendants Sanofi US Services*
                                                *Inc., Sanofi-Aventis U.S. LLC, and Chattem,*
                                                *Inc.*


                                                */s/ Mark Cheffo*
                                                Mark Cheffo
                                                DECHERT LLP
                                                Three Bryant Park
                                                1095 Avenue of the Americas
                                                New York, NY 10019
                                                Tel: (212) 689-3500
                                                Fax: (212) 689-3590
                                                mark.cheffo@dechert.com

                                                *Attorney for GlaxoSmithKline LLC*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Tel: (404) 572-3583
Fax: (404) 572-5100
abayman@kslaw.com

*Attorney for Defendant Boehringer Ingelheim*
*Pharmaceuticals, Inc.*


*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202)-434-5000
Fax: (202)-434-5029
jpetrosinelli@wc.com

Attorney for Defendant Pfizer Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Mark Cheffo*