**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY LITIGATION                        20-MD-2924
                                            JUDGE ROBIN L. ROSENBERG
                                            MAGISTRATE JUDGE BRUCE E.
                                            REINHART

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**BRAND DEFENDANTS' MOTION TO EXCLUDE REMAINING**
**EXPERT OPINIONS RELATING TO GENERAL CAUSATION AND**
**<u>INCORPORATED MEMORANDUM OF LAW</u>**

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    PLAINTIFFS' EXPERTS' ENDOGENOUS FORMATION OPINIONS LACK A
RELIABLE SCIENTIFIC BASIS AND SHOULD BE EXCLUDED............................. 3

     A.    Plaintiffs' Experts Fail to Overcome the Reliable Human Studies of
NDMA In Urine Proving That NDMA Is Not Formed Endogenously. ................ 4

     B.    Plaintiffs' Reliance On In Vitro Studies Is Unreliable and Misplaced
Because They Do Not Support, Let Alone Prove the Formation of NDMA
By Ranitidine In Human Physiological Conditions................................ 9

III.   PLAINTIFFS' EXPERTS' OPINIONS BASED ON ANIMAL STUDIES
SHOULD BE EXCLUDED BECAUSE THOSE STUDIES DO NOT "FIT" THE
QUESTION OF GENERAL CAUSATION IN HUMANS ........................................ 14

IV.   PLAINTIFFS' EXPERTS "NO THRESHOLD" OPINIONS SHOULD BE
EXCLUDED AS UNRELIABLE..................................................................... 20

V.    DR. PANIGRAHY'S OPINION THAT FDA'S ADI IS EVIDENCE OF
GENERAL CAUSATION SHOULD BE PRECLUDED ............................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Accutane Prods. Liab.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007) ................................................................12, 15, 17

*Allen v. Pennsylvania Eng'g Corp.*,
    102 F.3d 194 (5th Cir. 1996) ...............................................................................19, 22

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ..................................................................................16

*Baker v. Chevron USA, Inc.*,
    680 F. Supp. 2d 865 (S.D. Ohio 2010) ......................................................................20

*Bell v. Swift Adhesives, Inc., a div. of Reichhold Chemicals, Inc.*,
    804 F. Supp. 1577 (S.D. Ga. 1992) ...........................................................................16

*Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc.*,
    189 F. Supp. 2d 482 (S.D.W. Va. 2002) ....................................................................15

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ..............................................................................1, 14

*In re Denture Cream Prods. Liab. Litg.*,
    No. 09-MD-2051, 2015 WL 392021 (S.D. Fla. Jan. 28, 2015) ................................12

*Glastetter v. Novartis Pharms. Corp.*,
    252 F.3d 986 (8th Cir. 2001) .....................................................................................19

*Henricksen v. ConocoPhillips Co.*,
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ................................................................. 21

*Jones v. Novartis Pharms. Corp.*,
    235 F. Supp. 3d 1244 (N.D. Ala. 2017) ......................................................................1

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) ............................................................................12, 20

*Krik v. Exxon Mobil Corp.*,
    870 F.3d 669 (7th Cir. 2017) .....................................................................................20

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................................................21, 22

*McCorvey v. Baxter Healthcare Corp.*,
    289 F.3d 1253 (11th Cir. 2002) ....................................................................................8

*Rider v. Sandoz Pharms. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ...................................................................14, 15, 23

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ...........................................................................8, 14

*Siharath v. Sandoz Pharms. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001) ..........................................................15, 16, 22

*Sutera v. Perrier Grp. of Am. Inc.*,
   986 F. Supp. 655 (D. Mass. 1997) .............................................................................21

*Tershakovec v. Ford Motor Co.*,
   No. 17-CV-21087, 2021 WL 2592390 (S.D. Fla. May 12, 2021) .......................8, 14

*Wade-Greaux v. Whitehall Lab'ys, Inc.*,
   874 F. Supp. 1441 (D.V.I. 1994) ...............................................................................15

*Whiting v. Boston Edison Co.*,
   891 F. Supp. 12 (D. Mass. 1995) .........................................................................20, 21

*Williams v. Mosaic Fertilizer, LLC*,
   889 F.3d 1239 (11th Cir. 2018) .................................................................................22

*Wills v. Amerada Hess Corp.*,
   98-CV-7126, 2002 WL 140542 (S.D.N.Y. Jan. 31, 2002) .......................................21

## Other Authorities

Federal Rule of Evidence 702 ................................................................................ *passim*

Michael D. Green, et al., *Reference Guide on Epidemiology*,
   in *Reference Manual on Scientific Evidence* 333
   (Federal Judicial Center, 2d. ed.2000) ......................................................................17

## I.    PRELIMINARY STATEMENT

Lacking any reliable epidemiological basis to support the opinion that ranitidine causes cancer,[1] several of Plaintiffs' experts proffer a series of methodologically flawed opinions in an effort to establish general causation.  Those opinions include:

- NDMA forms from ranitidine in the human body, after ingestion (endogenous formation).

- Animal studies prove that ranitidine causes the Designated Cancers.

- There is "no threshold" level at which NDMA does not cause cancer.

- Regulatory thresholds are proof that ranitidine causes cancer.

As an initial matter, these "secondary methodologies" are "insufficient proof of general causation" absent a valid statistical association.  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).  If the Court rules, as it should, to exclude Plaintiffs' experts' opinions on the epidemiology of ranitidine and cancer risk, the opinions addressed in this Brief cannot salvage Plaintiffs' general causation theories.[2]  *See Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1269 (N.D. Ala. 2017) ("Bradford Hill factors cannot be applied without first establishing a causal association"), *aff'd in part sub nom. Jones v. Novartis Pharms. Co.*, 720 F. App'x 1006 (11th Cir. 2018).  Regardless, these experts' opinions are inadmissible under *Daubert* even setting aside their inherent insufficiency to address the question of general causation.

***First***, Plaintiffs' experts fail to provide any reliable support for their theory of endogenous formation of NDMA from ingestion of ranitidine.   The overwhelming human evidence

---

[1] *See* Brand Defendants' Motion to Exclude Plaintiffs' General Causation Experts' Opinions Related to Epidemiology and Incorporated Memorandum of Law ("Epidemiology Motion").

[2] *See* Deposition Transcript of Dr. Jennifer Le (May 6, 2022), Brown Decl. Ex. 30, at 91:17-93:5 ("[B]efore you get to Bradford Hill criteria, the Reference Manual is telling us, you need to have an association that is not likely to be a product of chance, bias and confounding."); Epidemiology Motion at Section II.C.

demonstrates that NDMA does not form endogenously and the *in vitro* evidence cited by Plaintiffs' experts cannot support this theory because it says nothing about the ability of NDMA to form under actual human conditions.

**Second**, Plaintiffs' experts impermissibly extrapolate opinions about humans based on animal studies to demonstrate general causation, ignoring **human** epidemiological evidence that shows no statistically significant association, much less a causal association.  Further, the animal studies on which Plaintiffs rely explicitly caution against extrapolating their findings to humans.

**Third**, Plaintiffs' expert's theory that there is "no threshold" at which NDMA does not present a cancer risk is precisely the type of "no threshold" theory that has been consistent rejected by courts applying *Daubert*.  Moreover, it is directly contradicted by the human epidemiological evidence and FDA's Acceptable Daily Intake ("ADI") for NDMA.

**Fourth**, Plaintiffs cannot rely on FDA's ADI as evidence of general causation because FDA itself has said its regulatory threshold does not make this showing.  Courts have universally rejected regulatory thresholds as evidence of causation because of the fundamental differences in standards of proof relied on in making regulatory threshold determinations.

For these reasons, Plaintiffs' experts should be precluded from offering these opinions.[3]

---

[3] Many experts addressed by this motion proffer opinions not directly related to general causation, including opinions that Defendants were or should have been aware of certain studies and Plaintiffs' experts' interpretations of those studies.  Based on the Court's Pretrial Orders Numbers 63 (Dkt. 4660) and 77 (Dkt. 5579), Defendants reserve the right to dispute and move to exclude such opinions at the appropriate time after the Rule 702 Motions on General Causation Opinions have been decided.

## II.    PLAINTIFFS' EXPERTS' ENDOGENOUS FORMATION OPINIONS LACK A RELIABLE SCIENTIFIC BASIS AND SHOULD BE EXCLUDED

Plaintiffs' experts should be barred from opining that NDMA forms from ranitidine endogenously, i.e., that NDMA forms inside the human body *after* ingestion of ranitidine.  This hypothesis has been disproven by well-designed studies published in the peer-reviewed scientific literature, which Plaintiffs' experts fail to refute with any reliable scientific evidence.

Five of Plaintiffs' experts opine that NDMA forms endogenously:  Dr. Dipak Panigrahy,[4] Dr. Paul Michaels,[5] Dr. Michael Marletta,[6] Dr. Jennifer Le,[7] and Dr. Ramin Najafi.[8,9]  These experts point to two categories of studies to support their endogenous formation theory:  (1) human studies measuring NDMA in urine following ingestion of ranitidine, and (2) *in vitro* studies in which ranitidine is incubated in simulated gastric fluid ("SGF") with various nitrite concentrations. The recent, well-designed, published, and peer-reviewed studies conducted by FDA researchers in each of these categories all conclude that there is no reliable evidence of endogenous formation of NDMA from ranitidine.

It is therefore no surprise that while Plaintiffs' experts criticize those studies, they cannot point to any reliable, affirmative evidence to support their theory of endogenous formation. Plaintiffs' experts' continued insistence that endogenous formation occurs—in the absence of

---

[4] *See* Expert Report of Dr. Dipak Panigrahy, Brown Decl. Ex. 19, at 83-118; *see also* Deposition Transcript of Dr. Dipak Panigrahy (April 25-26, 2022), Brown Decl. Ex. 41, at 445:2-446:5.
[5] Expert Report of Dr. Paul Michaels, Brown Decl. Ex. 13, at 2, 32, 58-61.
[6] Expert Report of Dr. Michael Marletta, Brown Decl. Ex. 7, at 40-41.
[7] Expert Report of Dr. Jennifer Le, Brown Decl. Ex. 5, at 70.
[88] *See* Expert Report of Dr. Ron Najafi, Brown Decl. Ex. 17, at 93.  Dr. Najafi's experiments are discussed in more detail in the Brand Defendants' Motion to Exclude Plaintiffs' General Causation Experts' Opinions Related to Testing and Incorporated Memorandum of Law ("Testing Motion").
[9] Another of Plaintiffs' experts, Dr. Salmon, previously offered an opinion on endogenous formation of NDMA from ranitidine, but withdrew that opinion during deposition.  Deposition Transcript of Dr. Andrew Salmon (May 12-13, 2022), Brown Decl. Ex. 43, at 386:7-17.

supporting facts or data—is based on these experts' failure to apply reliable principles and scientific methodologies.

### A.    Plaintiffs' Experts Fail to Overcome the Reliable Human Studies of NDMA In Urine Proving That NDMA Is Not Formed Endogenously.

The single study that reports observing elevated levels of NDMA in human urine following ranitidine use is a 2016 study conducted by Drs. Teng Zeng and William Mitch ("Zeng (2016)"). This study has since been retracted by the study's own authors.  The Zeng (2016) study—which was later cited in the September 2019 Valisure Citizen Petition[10]—hypothesized that "ranitidine served as a direct precursor for the endogenous formation of NDMA"; however, the study tested for NDMA using gas chromatography mass spectrometry (GC-MS).[11]  Since the Valisure Citizen Petition, FDA has confirmed that GC-MS testing is "not suitable for testing ranitidine because" GC-MS results in "heating the sample," which in turn "generates NDMA."[12]  Drs. Zeng and Mitch agreed with FDA, later retracting this article in its entirety, stating that "their NDMA measurements" from the 2016 study were "not reliable."[13]

In 2020, Dr. Mitch, along with Plaintiffs' expert, Dr. Ramin Najafi, conducted a new study measuring NDMA in the urine of eight volunteers, to be measured using liquid chromatography-

---

[10] Val00047-00065, Brown Decl. Ex. 103, at -53-54.

[11] Zeng et al., *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, CARCINOGENESIS 2016;37(6):625-634 (2016)(Retraction published 2021, CARCINOGENESES. 1-1.), Brown Decl. Ex. 80 ("Zeng (2016)"). *See* Epidemiology Motion at Section I.B (discussing GC-MS and its application to measuring NDMA from ranitidine-containing samples).

[12] FDA: Updates and Press Announcements on NDMA in Zantac (ranitidine), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (last accessed June 12, 2022), Brown Decl. Ex. 91; *see also* FDA, Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product (Sept. 13, 2019), *available at* https://www.fda.gov/media/130801/download (accessed June 11, 2022), Brown Decl. Ex. 89 ("As GC based methods had been observed to elevate NDMA levels in tested materials an alternative method which prevents the degradation of ranitidine and the subsequent formation of NDMA was therefore needed.").

[13] Zeng et al., *Retraction*, CARCINOGENESIS 2021:1-1 (2021), Brown Decl. Ex. 81.

mass spectrometry (LC-MS)—as recommended by the FDA—rather than GC-MS.[14]  While the study by Drs. Mitch and Najafi was never published, an unpublished draft manuscript of the study states that "[a]ll 8 volunteers did not demonstrate any detectable levels of NDMA following consumption of ranitidine throughout the 24-hour collection period."[15]

In 2021, FDA researchers likewise found no evidence of endogenous formation when they conducted and published their own peer-reviewed study.  That study, Florian (2021), involved a randomized, double-blind, placebo-controlled, cross-over study, in which NDMA levels in the urine and plasma of 18 participants was measured.[16]  The subjects of the study each underwent four treatments:  placebo on a cured-meats diet, ranitidine on a cured-meats diet, placebo on a noncured-meats diet, and ranitidine on a noncured-meats diet.  This design allowed each participant to serve as their own control to test the endogenous formation hypothesis under both a noncured-meats diet and a high-nitrate and high-nitrite diet (cured meats).  The study found "***no statistically significant difference*** between ranitidine and placebo in 24-hour urinary excretion of NDMA with a noncured-meats diet . . . or a cured-meats diet."  These results were confirmed by testing of the subject's plasma, which also found no statistically significant differences of NDMA levels between ranitidine and placebo with either the noncured-meats diet or the cured-meats diet.  The study did, however, detect a statistically significant difference in urinary NDMA (regardless of ranitidine use) between the low-nitrite and high-nitrite diets, with and without ranitidine use, "suggesting that the study design and methods were sufficiently sensitive to detect the relatively

---

[14] MITCH001548-001569, Brown Decl. Ex. 113.
[15] MITCH000424, Brown Decl. Ex. 112, at -000441.
[16] Florian et al., *Effect of oral ranitidine on urinary excretion of n-nitrosodimethylamine (NDMA): A Randomized Clinical Trial*, JAMA 2021;326(3):240-249 (2021), Brown Delc. Ex. 49 ("Florian (2021)").

small effect of diet on NDMA urinary excretion."  The FDA researchers concluded that "the findings did not support that ranitidine is converted to NDMA in a general, healthy population."[17]

Plaintiffs' experts offer only anemic criticisms of Florian (2021).  Drs. Marletta and Michaels opine that the levels of vitamins C and E in the diets of participants in Florian (2021) inhibit formation of NDMA.[18]  Both conceded during their depositions, however, that they could not say if those vitamin levels impacted the study outcome.[19]  Dr. Michaels also criticizes the timing of administration in Florian (2021), arguing that ranitidine should have been administered with meals rather than in the morning.[20]  But he fails to acknowledge, must less refute with any reliable scientific evidence, that the FDA researchers' timed ranitidine administration to maximize stomach acidity and enhance any NDMA formation.[21]  And while Drs. Michaels and Melnick find fault with the fact that FDA studied healthy volunteers, they offer no metabolic or biochemical rationale for suggesting unhealthy volunteers would have substantially different results; they state only that different patients may have different characteristics.[22]

In the face of the retraction of Zeng (2016) and the findings of Florian (2021), Plaintiffs' experts fail to identify any reliable human studies supporting endogenous formation.

---

[17] *Id.*

[18] Michaels Rep. at 59; Marletta Rep. at 55-56.

[19] Marletta Rep. at 55; Deposition Transcript of Dr. Michael Marletta (May 20, 2022), Brown Decl. Ex. 31, at 251:15-20 ("You've seen what I said in my report about the diet, the cured meat diet, that significantly alters the levels of vitamin C and vitamin E.  Now, do I know that that made a difference?  I don't know."); Deposition Transcript of Dr. Paul Michaels (May 22, 2022), Brown Decl. Ex. 36, at 170:6-171:3 (testifying that vitamin E and C impact nitrosation, but unable to provide the amounts of vitamin C and E necessary to have an impact).

[20] Michaels Rep. at 59.

[21] Florian (2021) (explaining that morning administration "was done because formation of NDMA is dependent on having nitrite and acidic conditions.  Because gastric acidity is highest in the fasting state and then deceases after eating, this sequence was selected to maximize the 2 factors.").

[22] Michaels Tr. at 198:16-200:15 ("My entire point [in critiquing Florian (2021)] . . . is to point out . . . how this is not necessarily applicable to the patients that we're talking about in this litigation."); *see* Expert Rebuttal Report of Dr. Ronald Melnick, Brown Decl. Ex. 12, at 85.

Dr. Panigrahy attempted to rely on Matsuda (1990),[23] a study that tested NDMA levels in the gastric fluid of humans taking ranitidine and other H2 blockers (drugs in the same class as ranitidine).[24]  Dr. Panigrahy testified that these other H2 blockers do not share the same chemical structure as ranitidine and would not degrade to form NDMA endogenously in the stomach.[25]  Yet Matsuda detected similar levels of NDMA regardless of the H2 blocker used, and found that ranitidine did not uniquely degrade or form NDMA in the stomach as Dr. Panigrahy claimed.[26]  Dr. Panigrahy ultimately admitted that Matsuda (1990) did not support his hypothesis and that he had not cited any other human study on point.[27]

When asked what evidence he found more reliable than Florian (2021) for determining endogenous formation of NDMA from ranitidine, Dr. Marletta pointed only to *in vitro* studies, which, as discussed *infra*, also fail to support a theory of endogenous formation.[28]  Dr. Melnick conceded that, even considering his critiques, Florian (2021) is the best available evidence on endogenous NDMA formation.[29]

Plaintiffs' experts lob one final, self-defeating argument:  they claim that endogenous formation of NDMA from ranitidine is happening, it just cannot be measured, pointing to a 40-year-old study using outdated and insensitive methods.[30]  This speculative claim is disproven by

---

[23] Matsuda et al., *N-Nitrosamines in gastric juice of patients with gastric ulcer before and during treatment with histamine H2-receptor antagonists*, Gatroenterologia Japonica Vol. 25, No. 2 (1990), Brown Decl. Ex. 65 ("Matsuda (1990)").

[24] Panigrahy Tr. at 452:7-12; Matsuda (1990) at 166.

[25] Panigrahy Tr.at 448:18-22, 449:18-22.

[26] *See* Matsuda (1990) at 166; Panigrahy Tr. at 448:18-22.

[27] Panigrahy Tr. at 451:6-12, 452:7-12.

[28] Marletta Tr. at 254:8-25.

[29] *See* Deposition Transcript of Dr. Ronald Melnick (April 28, 2022), Brown Decl. Ex. 35, at 285:14-286:11.

[30] *See* Marletta Rep. at 46-47 *and* Michaels Rep. at 60 (both citing Spiegelhalder et al., *Urinary excretion of N-nitrosamines in rats and humans*, IARC SCI. PUBL. 1982;41:443-9 (1982), Brown Decl. Ex. 72); *see also* Michaels Tr.at 123:13-124:18; Le Tr. at 308:20-309:23.

Florian (2021), which did detect and reliably measure NDMA levels in the participant's urine and plasma and found that increased NDMA levels are not associated with ranitidine intake.[31]

Furthermore, Plaintiffs' experts' opinions that increased NDMA content in the stomach is undetectable in urine is contradicted by Florian (2021).  The Florian study's design allowed direct evaluation of this theory, measuring each participant's urinary NDMA output with and without the nitrites associated with a cured-meats diet.  That Florian detected increased NDMA with the cured-meats diet demonstrates that NDMA present in the stomach is detectable in the urine.[32]

Moreover, in claiming that endogenous formation is real but cannot be measured or detected, Plaintiffs' experts' unintentionally confirm that their theory of endogenous formation amounts to speculation.  As Dr. Le put it, "just because the data is not there doesn't mean it doesn't exist."[33]  The primary purpose of Rule 702 is "'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony,'" including where, as here, an expert parades as scientific expertise nothing more than speculation based on insufficient data. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)).  As here, a method that "cannot be tested" is "inherently unreliable." *Tershakovec v. Ford Motor Co.*, No. 17-CV-21087, 2021 WL 2592390, at *4 (S.D. Fla. May 12, 2021) (excluding expert).

---

[31] *See* Michaels Tr. at 38:12-41:7 (explaining endogenous NDMA formation cannot be accurately measured); *Id.* at 174:19-177:14.

[32] Florian (2021) ("[T]he cured-meats diet was associated with a significant increase in NDMA urinary excretion, suggesting that the study design and methods were sufficiently sensitive to detect the relatively small effect of diet on NDMA urinary excretion.").

[33] Le Tr. at 338:14-339:10.

**B.**    **Plaintiffs' Reliance On *In Vitro* Studies Is Unreliable and Misplaced Because They Do Not Support, Let Alone Prove the Formation of NDMA By Ranitidine In Human Physiological Conditions.**

The *in vitro* studies on which Plaintiffs' experts rely fail to demonstrate that NDMA is formed **in the human body** after ingestion of ranitidine.  These studies show not only that NDMA is formed **only** when subjected to supraphysiological conditions, i.e., conditions that do not and cannot exist in humans, but also that NDMA is **not** formed when subjected to actual human physiological conditions.[34]

Plaintiffs' experts emphasize four *in vitro* studies as evidence of endogenous formation: Tanner (1982), Zeng (2016), the 2019 Valisure Citizen Petition, and Braunstein (2021).[35]  In each of these studies, ranitidine is incubated with simulated gastric fluid ("SGF") at certain levels of acidity and with certain concentrations of sodium nitrite.  As FDA researchers have explained, "to investigate the potential for pharmaceuticals to lead to *in vivo* formation of NDMA or other nitrosamines, the test conditions used *in vitro* should include physiologically relevant conditions."[36]  And, with respect to SGF experiments specifically, studies dating back to 1984 have "highlighted the importance of the nitrite concentration and noted that reactivity at the higher concentration was not always predictive of nitrosamine formation at the lower concentration."[37]

---

[34] Gao et al., *In vitro analysis of N-nitrosodimethylamine (NDMA) formation from ranitidine under simulated gastrointestinal conditions*, JAMA NETWORK OPEN 2021;4(6):e2118253 (2021), Brown Decl. Ex. 50 ("Gao (2021)").  *See* Braunstein Tr. at 166:19-167:17; GSKZAN0000084994.

[35] *See* Michaels Rep. at 25-26, 30, 48; Marletta Rep. at 51-53; Le Rep. at 37-39, 61; Najafi Rep. at 45-46, 80-83, 105; Melnick Rep. at 78-83; Braunstein et al., *Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions*, JAMA NETWORK OPEN 2021;4(1):e2034766 (2021), Brown Decl. Ex. 47 ("Braunstein (2021)").

[36] Gao (2021).

[37] Gao (2021) (citing Gillatt et al., *Susceptibilities of drugs to nitrosation under simulated gastric conditions*, FOOD CHEM. TOXICOL. 1985; 23(9):849-855 (1985), Brown Decl. Ex. 52, and Gillatt et al., *Susceptibilities of drugs to nitrosation under standardized chemical conditions*, FOOD CHEM. TOXICOL. 1984;22(4):269-274 (1984), Brown Decl. Ex. 51).

.

In each of the four studies relied on by Plaintiffs, the only NDMA observed was formed at levels of sodium nitrite far in excess of the upper range of sodium nitrite concentration in the actual human stomach (which FDA researchers have reported as 0.0082 mM to 0.1 mM, depending on pH levels).[38]  More importantly, however, in each of these studies, no NDMA was observed under actual human physiological conditions.

In Tanner (1982), an unpublished internal GSK study, NDMA was detected when ranitidine was incubated with sodium nitrite concentrations of 40mM, but not with sodium nitrate concentrations of 0.3 mM, which were intended to "simulate the concentrations . . . expected in the human stomach."[39]

In Zeng (2016), NDMA was detected when ranitidine was incubated with sodium nitrite concentrations of approximately 5 mM (nitrite-ranitidine molar ration of 1) and higher.[40]

In testing performed by Valisure (as discussed in its 2019 Citizen Petition), NDMA was detected when ranitidine was incubated with sodium nitrite concentrations of 25 mM and 50 mM, but not with sodium nitrate concentrations of 10 mM, which per FDA is 100 times higher than the upper range of sodium nitrite concentrations in humans.  And while in Braunstein (2021), NDMA was detected when ranitidine was incubated with sodium nitrite at concentrations of 1 mM, 2.5 mM, 5 mM, 10 mM, 25 mM, and 50 mM, the NDMA levels detected with 1 mM and 2.5 mM sodium nitrite were roughly equivalent to the NDMA levels detected in a control sample with no sodium nitrite.[41]

---

[38] Gao (2021) at figure 4.

[39] GSKZAN0000084994, Brown Decl. Ex. 109.

[40] As previously discussed, this study—including its *in vitro* findings—has since been retracted as "not reliable."  Zeng et al., *Retraction*, CARCINOGENESIS 2021:1-1 (2021).

[41] Deposition Transcript of Lior Braunstein (October 25, 2021), Brown Decl. Ex. 101, at 167:14-17.

In another recent study, Gao (2021), FDA researchers further confirmed NDMA does not form from ranitidine in physiologically relevant nitrite concentrations.  The Gao authors conducted a systematic review of the medical literature containing measurements of human gastric nitrite concentration—evaluating the measurements with consideration of study conditions, measurement tools, and available dietary information—in order to determine the physiologically relevant levels of nitrite in the human stomach at varying acidity levels.  Based on this review, it was determined that the upper range of the nitrite level in the human stomach decreases with the increase of gastric acidity, ranging from 0.0082 mM when at a pH of 2 or lower, to 0.1 mM when at a pH of 5-7.

After conducting a series of experiments involving ranitidine and nitrites at various pH levels, the FDA researchers determined that ranitidine reacts to form NDMA most readily in very acidic conditions, at a pH of 1.2-2.5.[42]  The FDA researchers found that the human gastric sodium nitrite concentration observed at that acidity (0.00056 mM in the fasting state and 0.0082 mM in the fed state) is considerably lower that higher pH levels (0.1 mM).[43]  Having determined the optimal pH at which NDMA is formed from ranitidine, the FDA scientists incubated ranitidine in 50 ml SGF (representative of the fasted stomach) at a pH of 1.2 with sodium nitrite at both physiologic and supraphysiologic concentrations of 0 mM, 0.1 mM, 1 mM, 5 mM, and 10 mM. The researchers found that "ranitidine conversion to NDMA was not detected until the nitrite concentration was [10 mM], which is approximately 18,000-fold greater than the clinically observed" sodium nitrite levels of 0.00056 mM at a pH of 2.[44]  The study authors concluded that

---

[42] Gao (2021) found ideal reaction pH to be 1.2.  Braunstein (2021) found ideal reaction pH to be 2.5.

[43] Gao (2021).

[44] The FDA researchers also conducted the same experiments in 250 ml SGF (representative of consuming ranitidine with 200 ml water) and found no NDMA formation until the nitrite concentration was 5 mM or above, which is "600-fold greater than the 95th percentile of gastric nitrite at pH values of less than 2 from patients with 24-hour (combined fed and fasted) gastric

when *in vitro* studies of ranitidine were conducted under "physiologically relevant conditions," the "*in vitro* formation of NDMA ***did not occur*."[45]

By examining the key factors affecting NDMA formation (i.e., pH and nitrite concentrations) in a controlled manner, Gao (2021) provided reliable supporting evidence as to whether NDMA can be formed in the human body after ingestion of ranitidine.  The Gao (2021) researchers also observed that their findings that ranitidine "is not converted to NDMA in gastric fluid at physiologic conditions" were "supported by the results" of the Florian (2021) *in vivo* study. Courts have repeatedly recognized that the value of *in vitro* studies in supporting reliable causation opinions depends upon how reliably those studies predict what happens in the human body.  *See, e.g.*, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1340–41 (11th Cir. 2010) (affirming finding *in vitro* study did not support expert's opinion of a direct causal link where the authors of the study "could not state how their test results would transfer when conducted on a live human subject"); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d. 1288, 1294–95 (M.D. Fla. 2007) ("The problem with this approach is also extrapolation—whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.") (internal quotations omitted); *In re Denture Cream Prods. Liab. Litg.*, No. 09-MD-2051, 2015 WL 392021, at *14 (S.D. Fla. Jan. 28, 2015) (excluding causation opinion based on *in vitro* studies due to expert's "failure to explain the relevancy of the *in vitro* studies to humans or to account for factors needed to make a proper extrapolation").  The Gao (2021) authors explain how their study relates to human conditions, and their findings are consistent with the relevant *in vivo* human data, Florian (2021).

---

fluid measurements."  The FDA researchers noted that in addition to the supraphysilogical level of nitrite required, "this scenario is unlikely to be encountered in patients, as consuming water will increase pH and decrease the gastric nitrite concentration by dilution."  Gao (2021).
[45] *Id.* (emphasis added).

Most of Plaintiffs' experts concede—as they must—that Braunstein (2021) and other *in vitro* studies employing high sodium nitrite concentrations are not physiologically relevant.[46]  Yet incredibly, Dr. Le refused to acknowledge biological relevance at all.  When asked, "[C]an you cite to me any study . . . that shows that more than 0.1 millimolar of nitrite can be found in a human stomach?"  Dr. Le answered, "You know, something early in my career that I've learned related to this is, just because you don't have data doesn't mean there's an absence of that."[47]

In contrast with the Gao study's methodical review of nitrite levels, even Plaintiffs' experts who do recognize biological relevance refuse to opine on what nitrite level *is* physiologically relevant.  Dr. Marletta went so far as to describe the question as "the most complicated torturous aspect[] to discuss."[48]

Instead, Plaintiffs' experts tacitly admit that the *in vitro* studies on which they rely cannot support general causation by opining that in order to be physiologically relevant, a study must be tailored to the conditions of an individual human patient at a given point in time.[49]  But the Gao authors took into account individual variations in gastric nitrite by considering measurements from "a variety of patient populations, receiving different medications, and tested in fasted and fed states."[50]  More importantly, however, by arguing (wrongly) that there is no reliable method for

---

[46] Marletta Tr. at 206:4-210:21; Panigrahy Tr. at 419:7-24 (agreeing that "None of the experiments in the study by Braunstein et al included physiological conditions."); Panigrahy Tr. at 425:10-22, 421:15-422:7 (acknowledging De Flora (1981) and De Flora (1983) studies used sodium nitrite levels at least 300 times greater than levels present in a human stomach after a nitrite-rich meal; agreeing such nitrite levels would be fatal).

[47] Le Tr. at 321:13-23; *see also id*. at 308:20-309:23.

[48] Marletta Tr. at 206:4-21.

[49] Michaels Tr. at 160:18-162:23l 286:4-13; 293:2-296:14; *see also* Marletta Tr. at 206:4-207:13. (agreeing the WHO NAP test, which utilizes a 40mM sodium nitrite concentration "was never meant to be a physiological[ly] relevan[t] experimental condition[]"); *see also*, Marletta Rep. at 44, 52.

[50] Gao (2021).

testing their opinions on endogenous formation, Plaintiffs' experts concede that their opinions are not and cannot be supported by reliable evidence or methodology. *See, e.g.*, *Rink*, 400 F.3d at 1292 (identifying "whether the expert's methodology can be tested" as the first factor in ascertaining reliability of an expert opinion); *Tershakovec*, 2021 WL 2592390, at *4 (excluding expert where his "methodology cannot be tested and is, therefore, inherently unreliable").

In sum, Plaintiffs' experts seek to tell the jury that endogenous formation of NDMA from ranitidine use happens, without providing any scientifically reliable evidence showing that it does, without offering any scientific basis to reject the significant body of reliable evidence showing that it does not, and while opining that their theories cannot be reliably tested. Such opinions are unscientific, unreliable, and precisely the kind of *ipse dixit* the Court should exclude under Rule 702.

## III. PLAINTIFFS' EXPERTS' OPINIONS BASED ON ANIMAL STUDIES SHOULD BE EXCLUDED BECAUSE THOSE STUDIES ARE CONTRARY TO THE HUMAN EPIDEMIOLOGICAL EVIDENCE AND DO NOT "FIT" THE QUESTION OF GENERAL CAUSATION IN HUMANS

Plaintiffs' experts also should be excluded from offering opinions that ranitidine is carcinogenic in humans based on animal studies. As Plaintiffs' own expert, Dr. Le concedes, "[i]n the hierarchy of evidence-based medicine, animal research provides the lowest level of evidence for therapeutic studies."[51]  That is because, as the Eleventh Circuit has recognized, "what happens in an animal would not necessarily happen in a human being." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002). Therefore when, as here, there is no human evidence of causation, animal evidence is insufficient as a matter of law and misleading to juries. *See Chapman*, 766 F.3d at 1308 (finding that "animal studies are insufficient proof of general

---

[51] Le Rep. at 13.

causation" that "could mislead the jury by causing it to consider testimony that was insufficient by recognized primary methodologies").

Moreover, animal studies cannot "fit" a theory of general causation absent some reliable scientific link showing that a substance acts in the same way in humans as in animals. *Id*. at 1306 (internal citation omitted). In other words, "[e]xtrapolations from animal studies to human beings generally are not considered reliable in the absence of credible scientific explanation of why such extrapolation is warranted." *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1366 (N.D. Ga. 2001), *aff'd sub nom. Rider*, 295 F.3d 1194. Numerous courts have excluded expert opinions on general causation that rely on animal studies. *See In re Accutane*, 511 F. Supp. 2d at 1291–92 (denying admission of expert causation testimony relying, in part, on animal studies); *Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., Inc.*, 189 F. Supp. 2d 482, 496 (S.D.W. Va. 2002) ("Courts considering the reliability of experts' extrapolation to human[s] . . . from *in vivo* and *in vitro* [animal] tests have recognized that such tests are generally considered to be suspect when relied upon for that purpose."), *aff'd,* 85 Fed. App'x 964 (4th Cir. 2004); *Wade-Greaux v. Whitehall Lab'ys, Inc.*, 874 F. Supp. 1441, 1480, (D.V.I. 1994) (recognizing that "the scientific community does not extrapolate from experimental animal studies to the human experience"), *aff'd*, 46 F.3d 1120 (3d Cir. 1994).

There is no question that animal studies can be a helpful tool in drug research, including because they allow scientists to generate and test hypotheses about drug responses that can then be tested in human studies. But it is not the case, as Plaintiffs' expert Dr. Panigrahy testified, that "any chemical that causes cancer in animals is a presumed human carcinogen until proven

otherwise" by "compelling evidence in human epidemiology."[52]  Just the opposite is true:  "Animal studies, singly or in combination, do not have the capability of proving causation in human beings in the absence of any confirmatory epidemiological data."  *Bell v. Swift Adhesives, Inc., a div. of Reichhold Chemicals, Inc.*, 804 F. Supp. 1577, 1579 (S.D. Ga. 1992) (quoting *Lynch v. Merrell–National Lab'ys*, 830 F.2d 1190, 1194 (1st Cir. 1987)) (internal alteration omitted).   As Dr. Melnick confirmed, "[a]nimal studies by [themselves are] not proof of causation in humans."[53]

More importantly, animal studies cannot "trump" human epidemiological studies that establish "no valid increased risk of . . . disease."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999).   And as set forth in Defendants' Epidemiology Motion, human epidemiological evidence concerning ranitidine's carcinogenic effect in humans does exist and it confirms that ranitidine does not cause cancer in humans.[54]  Animal studies, therefore, are not a fit for Plaintiffs' theory that ranitidine causes cancer.

But even if the human epidemiological evidence did not conflict with the animal studies Plaintiffs' expert cite, Plaintiffs would still be precluded from opining that ranitidine causes cancer in humans based on these animal studies because the experts provide no "credible scientific explanation" why "extrapolation" from these animal studies to humans "is warranted."  *Siharath*, 131 F. Supp. 2d at 1366.   Courts have focused on two particularly problematic aspects of expert opinions on general causation that rely on animal studies, both of which favor exclusion of Plaintiffs' experts' opinions here:   (1) species extrapolation, i.e., physiological differences in

---

[52] Panigrahy Tr. at 335:14-336:14.   Indeed, Dr. Panigrahy went so far as to state that even if "studies showed no reliable causal effect between NDMA from ranitidine and cancer," that would still fail to "rebut [the] presumption that NDMA from ranitidine is a human carcinogen."  *Id.* at 337:21-338:8.

[53] Melnick Tr. at 104:7-9.

[54] *See generally* Epidemiology Motion.

humans and the species tested that affect drug response; (2) dose extrapolation, i.e., the doses of a medication used in animal testing are higher (often orders of magnitude) than the therapeutic doses that a human would ingest.  *See In re Accutane*, 511 F. Supp. 2d at 1292 (citing Michael D. Green, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 333, 345–46 (Federal Judicial Center, 2d. ed.2000)).

The primary animal studies cited by Plaintiffs' experts include (1) a series of more than 175 animal studies involving several different non-primate species from the 1960s and 1970s that were previously reviewed by IARC when it classified NDMA as a probable human carcinogen, and (2) Peto (1991), a rat study that assessed the dose-response relationship in the carcinogenicity of NDMA in research animals.[55]  In the overwhelming majority of these studies, the only Designated Cancer observed in the animals was liver cancer.[56]  For example, the Peto study— "generally seen as being the upper limit in size and power of what is technically and economically possible in an animal carcinogenesis bioassay"—identified a causal effect of NDMA in rats only for liver and "perhaps" lung tumors, after administering doses orders of magnitude above those reported in ranitidine.[57]

Nevertheless, in his report, Plaintiffs' expert Dr. Andrew Salmon opined that the "animal studies of NDMA carcinogenicity overwhelmingly confirm that NDMA causes cancerous tumors in multiple organs including the bladder, esophagus, liver, pancreas and stomach."[58]  But his

---

[55] *See* Expert Report of Dr. Andrew Salmon, Brown Decl. Ex. 22, at 32-50; Panigrahy Rep. at 146-151.
[56] *See* Salmon Rep. at 32-47.
[57] Salmon Rep. at 132; Peto, et al., *Effects of 4080 Rats of Chronic Ingestion of N-Nitrosodiethylamine or N-Nitrosodimethylamine: A Detailed Dose-Response Study*, Cancer Research 51, 6415-6451, at 6440 (1991), Brown Decl. Ex. 69 ("Peto (1991)").
[58] *Id*. at 133.

opinion that NDMA causes bladder cancer in animals is based on findings in kidney tumors.[59] And at his deposition, given the dearth of animal studies demonstrating esophageal cancer as a result of NDMA ingestion, Dr. Salmon conceded that he could not offer an opinion that NDMA causes esophageal cancer in animals.[60]   Similarly, when asked whether he could point to any studies that demonstrate that NDMA causes pancreatic tumors in animals, he testified that he "would be the first to agree" that those findings were not "particularly high up the level of confidence."[61]

Likewise, Dr. Le could only identify a single animal study—Mirvish (1995)—that she claimed supported the theory that NDMA causes esophageal, pancreatic, and bladder cancer in research animals, but she was forced to acknowledge that Mirvish (1995) looked at nitrosamines generally and did not and could not report any findings specific to NDMA.[62]

Moreover, even the liver tumor findings in these animal studies are unreliable evidence of general causation in humans.   As Dr. Le acknowledges, researchers "expect that chronic administration of low doses of NDMA results in liver tumors since first-pass metabolism occurs there."[63]   More importantly, however, these studies explicitly caution that their findings cannot be extrapolated to humans:   Peto (1991) itself states that "the effects of ppb nitrosamine concentrations *on rats* . . . does not provide reliable information as the effects of ppb nitrosamine

---

[59] Salmon Rep. at 185.
[60] Salmon Tr. at 125:2-10.
[61] *Id.* at 127:3-19.
[62]  Le Tr. at 379:16-381:4; *see* Mirvish et al., *Role of N-nitroso compounds (NOC) and N-nitrosation in etiology of gastric, esophageal, nasopharyngeal and bladder cancer and contribution to cancer of known exposures to NOC*, CANCER LETT. Jun 29 1995; 93(1):17-48 (1995), Brown Decl. Ex. 67.
[63] Le Rep. at 52.

concentrations *on humans*, and it would be a serious distortion of these experimental results to suggest otherwise."[64]

Indeed, that these animal studies are not a fit to support general causation in humans is confirmed by studies involving NDMA and nonhuman primates—which are indisputably more similar to humans.[65]   In Thorgeirsson (1994), researchers found that treatment of nonhuman primates with NDMA did not produce any liver tumors, despite that nitrosamines *other than NDMA* did produce tumors in these nonhuman primates.[66]   And while Dr. Le cites to the Lhasa (2020) carcinogenicity database in her report,[67] she fails to discuss or even disclose that the Lhasa database reports "no positive evidence" of cancer with NDMA in nonhuman primates that were tested.[68]   These nonhuman primate studies demonstrate that the animal studies on which Plaintiffs' experts do opine fail to "predict" how nonhuman primates respond to NDMA, which "necessarily undercuts confidence that [those studies] will predict accurately how . . . humans will respond" to NDMA.  *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996).

At bottom, these studies do not conclude that NDMA is associated with causing most of the Designated Cancers in the animals tested and Plaintiffs' experts fail to provide any scientifically acceptable basis for extrapolating this animal data to humans.  *See Glastetter v.*

---

[64] Peto (1991) (emphasis in original).

[65] *See* Le Rep. at 71 (noting that "[n]on-human primates (e.g., monkeys) closer represent humans due to the similar sequence homology between the proteomes of humans and non-human primates"); Melnick Tr. at 216:2-7 (confirming single study in nonhuman primates involving NDMA).

[66] Thorgeirsson et al., *Tumor incidence in a chemical carcinogenesis study of nonhuman primates*, REGUL. TOXICOL. PHARMACOL. 1994 Apr;19(2):130-51 (1994), Brown Decl. Ex. 75; *see also* Melnick Tr. at 213:12-215:25 ("Q. So all of the other nitroso compounds were carcinogenic except for NDMA and MNNG, right?  A. In this study.  Yes.").

[67] *See* Le Rep. at 71,

[68] Lhasa Ltd. Carcinogenicity Database, *available at* https://carcdb.lhasalimited.org/ (accessed June 12, 2022) (searchable database of published findings using term "Nitrosodimethylamine (NDMA)") (2020), Brown Decl. Ex. 62.

*Novartis Pharms. Corp.*, 252 F.3d 986, 991 (8th Cir. 2001) (affirming exclusion of opinions based on animal studies because of the "difficulty in reliably extrapolating from the results of studies on small animals to effects on much larger humans" and because studies did not "conclude[]" that disease "was associated" with medication tested). "[A]t most," these studies "suggest[] a connection between" ranitidine and cancer with respect to the particular animal tested, but "[t]his does not equate to a conclusion of direct causation (or a connection of any degree)" between ranitidine and cancer "in humans." *Kilpatrick*, 613 F.3d at 1338.

## IV. PLAINTIFFS' EXPERTS "NO THRESHOLD" OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE

Several of Plaintiffs' experts—Dr. Panigrahy, Dr. Michaels, Dr. Anne McTiernan, and Dr. Patricia Moorman—also opine that ***any*** amount of NDMA can cause cancer and therefore there is "no threshold" at which NDMA cannot cause cancer.[69] The "no threshold" theory boils down to: "if a lot of something is bad for you, a little of the same thing, while perhaps not equally bad, must be so in some degree." *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 23 (D. Mass. 1995). But the theory that "exposure to one molecule of a cancer-causing agent has some finite possibility of causing a genetic mutation leading to cancer" has been squarely rejected by courts as unreliable under *Daubert*. *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 878 n.9 (S.D. Ohio 2010) (citing cases), *aff'd sub nom. Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013); *see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017) (noting that "more than thirty other

---

[69] Panigrahy Tr. at 348:20-349:2; Michaels Rep. at 3 ("[T]here is no safe exposure threshold or dose for NDMA."); Michaels Rep. at 62-63 ("[T]here would be no indication of a "no-effect" level . . . ."); Deposition Transcript of Dr. Anne McTiernan (April 28-29 and May 31, 2022), Brown Decl. Ex. 32, at 605:16-606:17 ("[I]t's really difficult to state that there's any safe level or any minimal amount of time beyond which this probable carcinogen could be could be harmful."); Deposition Transcript of Dr. Patricia Moorman (May 16-17, 2022), Brown Decl. Ex. 39, at 288:17-290:2 ("[I]n theory, any dose of ranitidine could ultimately lead to cancer.").

federal courts and state courts have held that this cumulative/'any exposure' theory is not reliable"); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1166 (E.D. Wash. 2009) (excluding testimony that "any amount of exposure" to chemical "can cause" cancer); *Wills v. Amerada Hess Corp.*, 98-CV-7126, 2002 WL 140542, at *15 (S.D.N.Y. Jan. 31, 2002) (excluding "no threshold" theory because "it is too difficult a leap to allow testimony that says any amount of exposure" to toxin can cause cancer), *aff'd*, 379 F.3d 32 (2d Cir. 2004); *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 666 (D. Mass. 1997) ("[T]here is no scientific evidence that the linear no-safe threshold analysis is an acceptable scientific technique . . . ."). That is because a "no threshold" theory "cannot be falsified, nor can it be validated," and therefore it "is merely an hypothesis." *Whiting*, 891 F. Supp. at 25; *see also Wills*, 2002 WL 140542, at *15 (finding that an opinion that "any exposure" to toxin can cause cancer "is merely a hypothesis" based only on "presumptions" and "not grounded in reliable scientific methods").

Moreover, a "no threshold" theory of causation "flies in the face of the scientific literature" that there are doses of NDMA at which "you do not see a statistically significant risk of developing" cancer. *Henricksen*, 605 F. Supp. 2d at 1162.[70] As the Eleventh Circuit has explained, an opinion that exposure to a toxin at "any level is too much . . . conflicts with the importance of individual responses to toxins." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005). And such a theory here is also in direct conflict with the FDA's ADI of 96 ng/day for NDMA. While the ADI does ***not*** represent the threshold at which NDMA causes cancer in humans,[71] it fully refutes Plaintiffs' experts claim that there is no level of NDMA to which a human can be exposed and not cause cancer.

---

[70] *See generally* Epidemiology Motion.
[71] *See infra* at Section V.

## V.    DR. PANIGRAHY'S OPINION THAT FDA'S ADI IS EVIDENCE OF GENERAL CAUSATION SHOULD BE PRECLUDED

In addition to being precluded from opining that there is "no threshold" at which NDMA does not cause cancer, Dr. Panigrahy should also be excluded from opining that FDA's ADI for NDMA of 96 ng/day is "evidence of real-world cancer causation in humans."[72]

To be clear, FDA itself has stated that its threshold levels, including ADI "should not be regarded as a realistic indication of the actual risk."[73]   Moreover, the Eleventh Circuit has repeatedly explained the "methodological perils of relying" on regulatory thresholds "to establish causation."   *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1246–47 (11th Cir. 2018); *McClain*, 401 F.3d at 1250 (explaining that regulatory agency's "risk-benefit analysis . . . does not directly focus on the question of causation in [a] toxic tort case"); *see also Siharath*, 131 F. Supp. 2d at 1366 (holding that "Plaintiffs' reliance on this FDA action to show reliability [of their expert's opinions] is insufficient to satisfy the requirements of Daubert").   That is because a regulatory agency is ultimately concerned with reducing the risk that a medication ***may*** cause harm, not determining whether it actually does.   Thus, its "threshold of proof is reasonably lower than that appropriate in tort law, which traditionally makes more particularized inquiries into cause and effect and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm."   *Siharath*, 131 F. Supp. 2d at 1366; *see also McClain*, 401 F.3d at 1250 (regulatory agencies use "a much lower standard that that which is demanded by a court of law"); *Allen*, 102 F.3d at 198 (finding that "agencies' threshold of proof is reasonably lower than that appropriate in tort law").   So while "[a] regulatory agency such as the FDA may choose to err on

---

[72] *Id.* at 12:23-127:2.
[73] FDA, *M7(R1)* Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk: Guidance for Industry (March 2018), available at https://www.fda.gov/media/85885/download, Brown Decl. Ex. 86.

the side of caution," courts "are required under the *Daubert* trilogy to engage in objective review of evidence to determine whether it has sufficient scientific basis to be considered reliable." *Rider*, 295 F.3d at 1201.

In sum, while Dr. Panigrahy concedes that he will not offer an opinion "that the available safety data show that ranitidine increases the risk of cancer," he should be precluded from offering an opinion that FDA's ADI is proof of general causation because it is contrary to the human epidemiological evidence and has no basis in law or fact.[74]

## CONCLUSION

Plaintiffs' experts' opinions on endogenous formation of NDMA from ranitidine, the use of animal NDMA studies to support general causation, and the mischaracterization of regulatory and toxicological thresholds are not supported by facts, data, or a reliable scientific methodology.  Untestable theories that are inconsistent with the state of the science have no place in the courtroom and should be excluded under the requirements of Rule 702.

Dated: June 13, 2021                                  Respectfully submitted,

**Lead Counsel:**

                                                             */s/ Mark Cheffo*
                                                             Mark S. Cheffo
                                                             DECHERT LLP
                                                             1095 Avenue of the Americas
                                                             New York, NY 10036
                                                             Tel: (212) 698-3500
                                                             Fax: (212) 698-3599
                                                             mark.cheffo@dechert.com

                                                             *Counsel for Defendant GlaxoSmithKline LLC*

                                                             */s/ Andrew T. Bayman*
                                                             Andrew T. Bayman

---

[74] Panigrahy Tr. at 348:20-349:2.

KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com

*Counsel for Defendant Boehringer Ingelheim
Pharmaceuticals, Inc.*

/s/ *Anand Agneshwar*
Anand Agneshwar
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Counsel for Defendants Sanofi US Services
Inc., Sanofi-Aventis U.S. LLC, and Chattem,
Inc.*

/s/ *Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Counsel for Defendant Pfizer Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed on June 13, 2022 using the Court's

CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Mark Cheffo*
Mark S. Cheffo
