# EXHIBIT 37

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

______________________________/

VIDEO RECORDED DEPOSITION OF

BERNARD OLSEN, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Monday, May 23, 2022

TIME: 9:06 a.m. - 5:34 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6133467-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

MARTIN, HARDING & MAZZOTTI LLP
One Wall Street
Albany, New York 12205
BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
DOLORES DeSALVO, ESQ.
E-MAIL: rosemarie.bogdan@1800law1010.com
dolores.desalvo@1800law1010.com

Appearing on behalf of the Zantac PSC:
ANAPOL WEISS
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
BY: TRACY A. FINKEN, ESQ.
E-MAIL: tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC:
MAY LIGHTFOOT, PLLC
3200 Martin Luther King Jr. Avenue S.E.
Third Floor
Washington, D.C. 20032
BY: JE YON JUNG, ESQ.
E-MAIL: jjung@maylightfootlaw.com

Appearing on behalf of the Zantac PSC:

LEAR WERTS, LLP
103 Ripley Street
Columbia, Missouri 65201
BY: BRADFORD B. LEAR, ESQ.
E-MAIL: lear@learwerts.com



Appearing on behalf of the Defendant,
Boehringer Ingelheim:

KING & SPALDING
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
BY: CARMEN R. TOLEDO, ESQ.
LUKE BOSSO, ESQ.
EVA CANAAN, ESQ.
ROBERT B. FRIEDMAN, ESQ.
E-MAIL: ctoledo@kslaw.com
lbosso@kslaw.com
ecanaan@kslaw.com
rfriedman@kslaw.com

Appearing on behalf of the Defendants,
Walmart, Inc. and GlaxoSmithKline, LLC
GlaxoSmithKline, PLC
SHOOK, HARDY & BACON LLP
1325 Avenue of the Americas
28th Floor
New York, NY 10019
BY: PEIYUAN GUO, ESQ.
E-MAIL: pguo@shb.com

Appearing on behalf of the Defendant,
Chattem Inc., Sanofi U.S. Services, Inc.
Sanofi-Avertis U.S. LLC:
DLA PIPER
303 Colorado Street
Suite 3000
Austin, Texas 78701
BY: ASHLEY ALLEN CARR, ESQ.
E-MAIL: ashley.carr@dlapiper.com

Appearing on behalf of the Defendant,
Perrigo:

GOODELL, DeVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
BY: MATTHEW H. TRANTER, ESQ.
E-MAIL: mtranter@gdldlaw.com



Appearing on behalf of the Defendant,
Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
BY: NILDA M. ISIDRO, ESQ.
E-MAIL: isidron@gtlaw.com

Appearing on behalf of the Defendant,
Mylan Pharmaceuticals, Inc.:
PIETRAGALLO, GORDON, ALFANO,
BOSICK & RASPANTI, LLP
301 Grant Street
38th Floor
Pittsburgh, Pennsylvania 15219
BY: FRANK H. STOY, ESQ.
E-MAIL: FHS@pietragallo.com

ALSO PRESENT:
VIDEOGRAPHER: CARLOS COELLO
TRIAL PRESENTATION SPECIALIST:
GREG CASSIN



------------------I N D E X------------------


WITNESS: BERNARD OLSEN

| EXAMINATION BY | PAGE |
|---|---|
| MS. BOGDAN | 8 |
| MS. TOLEDO | 212 |


----------------E X H I B I T S-------------


| NUMBER | PAGE |
|---|---|
| Exhibit 1 | 14 |
| Exhibit 2 | 16 |
| Exhibit 3 | 17 |
| Exhibit 4 | 18 |
| Exhibit 5 | 22 |
| Exhibit 6 | 24 |
| Exhibit 7 | 34 |
| Exhibit 8 | 69 |
| Exhibit 9 | 74 |
| Exhibit 10 | 97 |
| Exhibit 11 | 110 |
| Exhibit 12 | 111 |
| Exhibit 13 | 137 |
| Exhibit 14 | 145 |
| Exhibit 15 | 149 |
| Exhibit 16 | 151 |
| Exhibit 17 | 152 |
| Exhibit 18 | 197 |
| Exhibit 19 | 199 |
| Exhibit 20 | 201 |

THE VIDEOGRAPHER: Good morning. We are now on the record. Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness.

For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.


This is the remote video-recorded deposition of Bernard Olsen, Ph.D., being taken by counsel for the plaintiff. Today is Monday, May 23, 2022. The time is now 13:06 UTC, 9:06 a.m. EDT. We are here in the matter of In Re Zantac Ranitidine Products Liability Litigation.

My name is a Carlos Coello, remote video technician on behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome.

At this time will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in


lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting. If there are no objections, I will now swear in the witness.

B E R N A R D O L S E N,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. BOGDAN:
Q. Good morning, Dr. Olsen. My name is Rosemary Bogdan, and I'm going to be questioning you on behalf of the plaintiffs in this litigation.
A. I'm sorry. You're a little faint.
Q. I'm faint?
A. Your voice.
Q. Okay. Let's see if we can correct


that. Okay. It might be on your end with the volume, so can you hear me clearly now?
A. Yes. Yes, ma'am.
Q. Okay, good. So I'll repeat what I had said before.

Good morning, Dr. Olsen. My name is Rosemary Bogdan, and I'm going to be questioning you this morning into the afternoon on behalf of the plaintiffs in this litigation.

Is this your first experience doing a deposition remotely by Zoom?
A. Yes, it is.
Q. Okay. So, there's a couple things with regard to doing depositions like this, which will be helpful to have this proceeding go a little bit more smoothly.

We have to make sure we are not speaking over each other because it is very difficult for the court reporter to get down the questions and the answers. So, if you could just wait until I'm done asking my question before you begin answering, that would be very helpful. There's sometimes a little bit of a delay on the audio as well,

so that will help with that.
Do you have any devices with you as you're sitting there today, any iPads, iPhones, any other type of communication device?
A. No.
Q. Okay. The computer that you're using to do this Zoom deposition, does that have any applications open, messaging, e-mail or anything like that?
A. No.
Q. Okay. You're simply using it on this Zoom platform for this deposition?
A. That's correct.
Q. Okay. And where are you sitting today?
A. I'm sitting in the offices of King & Spalding in Atlanta.
Q. Okay. And who is with you in the room today, if anyone?
A. Carmen Toledo and Luke Bosso.
Q. And I see that they're both on the Zoom as well. Is anyone else with you?
A. No.
Q. Okay. Now, if you don't understand


any of the questions that I ask you today, will you please let me know that so I have the opportunity to rephrase them?
A. Yes.
Q. Now, did you bring anything with you today for this deposition?
A. I have -- I have copies of reports and other documents, hard copies.
Q. Okay. When you say "reports," what reports are you referring to?
A. My expert report, Dr. Najafi's expert report and rebuttals, my supplement report, Dr. Davis's report, and I may have some -- some other reports as well. I haven't looked through all of them yet.
MS. BOGDAN: Okay. I just want to put a statement on the record.
You mentioned a supplemental report of yours. We received that shortly before midnight on May 21st, which was about 34 hours or less ago, and I'm just making a statement on the record that we're not waiving our rights with regard to that disclosure and when it was served by taking this


deposition here today.
Q. Now, those documents that you mention that you have in front of you, do you have any notes on them?
A. No.
Q. So, they are just as they were served?
A. Yes.
Q. And you said other documents. Did you give me a quick -- or excuse me, a complete list of the other documents that you were referring to?
A. Yes. I have the USP General Chapter 1010 on Analytical Data, Interpretation and Treatment. I have the Aizawa article on Thermal environment and moisture production in the bathroom.
Q. I can't see what you have. I don't know how big of a pile this is of what you have there. Okay. I don't need you to go through each of them. Let me ask you a more encompassing question.
Are the documents that you have in front of you today all documents that were references or cited in the various reports


that you have?
A. Yes.
Q. Okay. And none of them have notes or comments on them or -- or anything that you've -- that you noted on the documents itself, correct?
A. That's right.
MS. BOGDAN: If we could please pull up the plaintiffs' notice for this deposition and mark it as an exhibit.
For this deposition today, if I call for an exhibit and have it shown to the witness, are we going to be marking them just for purposes or can we please mark them for purposes of the dep?
THE VIDEOGRAPHER: Yes, Counselor. Absolutely. What exhibit number would you like to start at?
MS. BOGDAN: Were numbers reserved for this particular deposition or are we just going to start with 1? If you don't know the answer, let's just start with 1.

THE VIDEOGRAPHER: Yeah. I apologize. I don't know the answer to that, Counselor.
MS. BOGDAN: All right.
THE VIDEOGRAPHER: So this will be marked as Exhibit 1.
(Plaintiffs' Exhibit 1 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see Plaintiffs' Exhibit 1, the notice for this deposition today?
A. I see the first page of it.
Q. Okay. Have you seen that document before?
A. Yes.
Q. Okay. Did you go about making an effort assembling documents that would be responsive to the demands that were in that document?
A. Through the attorneys, yes.
Q. Okay. And one of the demands asked for identification of any research grants that you received involving the study of ranitidine-containing products, NDMA or


cancer.
Have you received any research grants regarding those three?
A. No, I have not.
MS. TOLEDO: Counsel, I will reference the objections and responses that were served; they -- they give answers to the demands as well.
MS. BOGDAN: Yes. I will be happy to mark that. I'm just questioning the witness with regard to the demands.
BY MS. BOGDAN:
Q. Have you prepared any articles or papers or done any presentations on Zantac or ranitidine?
A. No, I have not.
Q. Have you written any articles or papers on NDMA?
A. I believe NDMA is mentioned in a book chapter that I was a co-author of.
Q. And in addition to that book chapter, have you authored any other writings on NDMA?
A. I -- I don't believe so.


Q. Have you presented at any seminars or webinars or any presentations with regard to NDMA?
A. No, I have not.
MS. BOGDAN: If we can please pull up the defendant's responses and objections to the plaintiffs' notice.
(Plaintiffs' Exhibit 2 was marked for identification.)
BY MS. BOGDAN:
Q. Do you see that exhibit, Dr. Olsen?
A. Yes.
Q. All right. Have you seen that response document before?
A. I don't think I've seen this.
MS. BOGDAN: We can take that down.
Q. Is there any reason, Dr. Olsen, that you cannot testify truthfully or accurately today?
A. No.
Q. Did you prepare a report in this case?
A. Yes.
MS. BOGDAN: Okay. If we could


please pull up Dr. Olsen's report that's dated March 7, 2002 [sic].
MS. TOLEDO: 2022?
MS. BOGDAN: 2022, yep.
(Plaintiffs' Exhibit 3 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, can you see that document? I'm not sure how quickly these are loading. Are they loading pretty quickly?
A. Yes. I can see it.
Q. All right. And is that a copy of the report that you drafted and was served in this litigation?
A. It's the first page of it.
Q. Okay. Do you have a hard copy of the report?
A. Yes.
Q. And if we could just go to the last written page of the report. The report in total is 93 pages long?
A. Yes.
Q. And did you serve a supplemental report in this matter?
A. Yes.

Q. Okay.
MS. BOGDAN: If we could please pull up and mark Dr. Olsen's supplemental report, which is dated May 21, 2022.
THE COURT REPORTER: Counsel, the last exhibit you had up is being marked, correct?
MS. BOGDAN: Yes. If I pull up the exhibit and I had asked of our tech, are we going -- do you need me to call to mark it or are you marking them?
THE VIDEOGRAPHER: Counsel, I'm having a little trouble with Box, but I'm following along. So Exhibit Number 1 is the Notice, Exhibit Number 2 is the Responses, Exhibit Number 3 is the Expert Report, and this next one is going to be Exhibit Number 4.
MS. BOGDAN: Excellent. Thank you.
(Plaintiffs' Exhibit 4 was marked for identification.)



BY MS. BOGDAN:
Q. Dr. Olsen, this supplemental report is dated May 21, 2022?
A. Yes.
Q. Okay. So that's less than two days ago, correct?
A. Yes.
Q. And this report is five pages in length?
A. Yes.
Q. What did you do to prepare for your testimony here today?
A. I reviewed a lot of documents related to my report and other reports. I had conversations with the attorneys I've been working with.
Q. Did you review any transcripts in preparation for your testimony here today?
A. Yes. Some of them I think were preliminary transcripts.
Q. Meaning rough transcripts?
A. I don't know. Is that the same as a preliminary transcript?
Q. Whose transcripts were they?
A. I think not Dr. Ron Najafi but his



daughter, her transcript, and -- and Dr. Davis's transcript. Also looked at Dr. Gibbons' transcript.
Q. Okay. Any others?
A. I -- I don't recall if I looked at others.
Q. So you have Dr. Najafi's, Dr. Davis, and Dr. Gibbons. And when I'm referring to Dr. Najafi I'm referring to Dr. Anita Najafi.
A. Right. Those are the ones I recall at the moment.
Q. Did you review any transcripts of witnesses that you understood to be chemists?
A. One that I remember now is I reviewed Dr. Searle's transcript.
Q. Doctor who?
A. Andrew Searle from GSK.
Q. Okay.
A. And I understand that he is a chemist.
Q. Okay. Any other chemists' transcripts?
A. Yeah, not that I remember at the moment.



MS. BOGDAN: We can take down the supplemental report.
Q. Now, with regard to your two reports that have been served, do they contain all the opinions you intend to offer in this litigation?
A. I reserve the right to add to those opinions in future reports.
Q. Do you have an understanding that you'd be able to continue to write future reports?
A. That's my understanding.
Q. Did you write the two expert reports?
A. Yes, I did.
Q. Did you use a research assistant, resident, or fellow, or anyone else?
A. No.
Q. Now, for your reports, you have a Materials Considered list as well?
A. Yes.
Q. Okay.
MS. BOGDAN: If we could please pull that up and mark it as an exhibit.

THE VIDEOGRAPHER: This will be marked as Exhibit Number 5.
(Plaintiffs' Exhibit 5 was marked for identification.)
Q. And Doctor, can you see what's been pulled up as Exhibit B?
A. Yeah. The -- just the Exhibit B page.
MS. BOGDAN: Let's go to the first page, please.
Q. Do you recognize that to be your Materials Considered list?
A. One page of it, yes.
Q. Okay. And it is -- if we could go to the last page please -- seven pages long?
A. I don't recall how many pages it was.
Q. Did you read all of the documents that are noted on your Materials Considered list?
A. Not all of them completely.
Q. And when you say "not all of them completely," can you please expand on what you mean by that?
A. Well, some of those I may have



scanned for pertinent sections and others I would have read completely.
Q. Did you keep a list of the materials that you read completely as opposed to just scanning?
A. No, I didn't note that.
Q. Between the references that are actually noted in your report and your supplemental report and the documents that are listed on the Materials Considered list, does that encompass all of the references and authorities that you are relying on in this case?
A. To the best of my knowledge, it does. In addition to, of course, my own background and experience.
Q. My question was asking about whether the list encompasses all of the references and authorities that you are relying on; the studies, the regulations, the documents, does it include all of those?
MS. TOLEDO: Object to form.
A. Yeah. I mean I thought I answered that.
Q. So that's a yes?



MS. TOLEDO: Object to form.
A. To the best of my knowledge, these -- these are the documents that I relied on that, but my experience is part of my basis for my opinions.
Q. Understood.
MS. BOGDAN: If we could please pull up Dr. Olsen's invoices and mark those as an exhibit, please.
THE VIDEOGRAPHER: This will be marked as Exhibit Number 6.
(Plaintiffs' Exhibit 6 was marked for identification.)
DOCUMENT TECHNICIAN: Stand by. I'm looking for that one in my list here.
BY MS. BOGDAN:
Q. Dr. Olsen, can you see what's been marked as Plaintiffs' Exhibit 6?
A. Yes.
Q. Which is a series of invoices. The first one is an invoice date of August 2, 2021 for a period of services July 12th through July 31st?
A. Yes.



Q. How many invoices have you served in this matter?
A. I think you have them all, and I think they have been monthly since starting with this one.
Q. Okay. We were provided with ten invoices. Does that sound to be about right?
A. Yes.
Q. And so you began work on this matter back in July of 2021?
A. Yes.
Q. So a little less than a year ago, correct?
A. Yes.
Q. Okay. And these invoices that we were provided reflect that you've done 338 and a half hours of work on this matter up through the date of the last invoice.
Does that sound correct?
A. I haven't totalled up the -- all the hours but the totals for each month are listed.
Q. What are you charging per hour for your work?
A. As indicated on my invoice, I

charge $450 per hour and I charge $550 per hour for deposition and trial testimony.
Q. And from reviewing your invoices, I see that you billed a total of $152,212.50 for your work on this litigation?
A. That sounds correct.
Q. Are you self-employed?
A. Yes.
Q. And what type of work do you do as a self-employed person?
A. I do pharmaceutical consulting, so I work with pharmaceutical companies, small, medium and -- mostly small and medium. And several of the small ones don't have full-time expertise, so they hire consultants and they also usually don't have their own manufacturing and testing capabilities, so they rely on contract organizations. And I help them with those activities.
I also have done some training-type work giving short courses. And I have done other work for law firms.
Q. What percentage of your work is done for the pharmaceutical industry?
A. As opposed to -- can you clarify a



little bit?
Q. As opposed to any other business sector, what percentage of your work is done for pharmaceutical companies?
A. Well, for example, the work I've done in training, I don't know if you classify that as for pharmaceutical companies. I suppose my students that attend my training sessions are usually from pharmaceutical companies, so the predominance of my work is for pharmaceutical companies.
Q. And you mention that you've done other work for law firms. Are those law firms that are representing pharmaceutical companies?
A. Yes. I think they have all been related to pharmaceutical questions.
Q. They're all related to pharmaceutical questions but is the client that you're working on behalf of or have been hired by a pharmaceutical company?
A. Yes. I remember that one other consulting position I had was at Purdue University where I was working with a professor there.



Q. And when was that?
A. Well, that was a few years ago now, about I'd say eight years ago for -- for a few months.
Q. You worked for Purdue University for a few months about eight years ago?
A. I worked for her -- she had a company. She was a Purdue professor and she also had a company. I was working in her lab but for her company.
Q. And did that company also do work for pharmaceutical companies?
A. They were trying to develop a product that could be -- could be used by pharmaceutical companies, could be used by academic laboratories. It was more -- analytical chemistry device.
Q. Now, on your invoices I know that from reading them you have an activity description of document review.
A. Yes.
Q. What does the description "document review" encompass?
A. Well, just as it says. That's when I'm reviewing various documents that are



furnished and related to -- to this case.
Q. And with regard to the documents that are on your Materials Considered list, where did you get those from?
A. Those would be furnished through -- through the attorneys, although some of them I found myself actually in doing some of my own literature searching.
Q. What percentage of the documents on the Materials Considered list were furnished by the lawyers as opposed to you finding them during your literature search?
A. I really don't know, of course, all the reports and so forth that were furnished through the lawyers and -- but literature articles, I -- I don't know what percentage that would've been.
Q. How many articles did you find on your own doing your literature search that you used for purposes of writing your reports in this matter?
A. I didn't know which ones I found on my own. Some of -- and some of these I requested, you know, saw references and requested and they were furnished that way.

Q. There are over 220 documents listed on your Materials Considered list. How many of those are studies that you found on your own?
MS. TOLEDO: Objection. Asked and answered.
A. I'd have to go through. If you like, I can try and -- well, I just don't know what percentage of those would have been things that I -- I found and requested or I already had or was aware of.
Q. Were the majority of those items provided to you by counsel?
A. Can I take a look at that list?
Q. Sure. Do you have it there in front of you?
A. I don't know if it's -- (inaudible).
THE COURT REPORTER: I'm sorry?
A. I don't know if it's in my hard copies here.
Q. Well, let's just -- we'll move on. Let's go back to your invoices.
With regard to your invoices, I also see an activity description listed



that's entitled Literature Search. And, for example, the first one of those is on the third page of this exhibit, and it's on September 8th and September 9th. Do you see that?
A. Yes.
Q. When you noted literature search as your activity description, were you doing the work that you have previously testified about as far as doing your own searching?
A. That -- that would've been time stamped doing my own literature searching, although some of that additional time doing literature search I may have captured under Report Preparation as well.
Q. And then you also have a Report Preparation?
A. Yeah.
Q. Okay. So, for example, on this invoice we're looking at right now, the Literature Search category has 4.75 hours noted, correct?
A. For this invoice, yes.
Q. Okay. And then Report Preparation is listed as a separate activity, correct?



A. It's listed as a separate activity, but, as I mentioned, I may have lumped that together in some cases with literature searching during the report preparation.
Q. So if you were doing literature searches but not preparing the report, you would note that as a separate activity but if you were doing literature searches and doing report preparation together, you would note it as a report preparation activity?
MS. TOLEDO: Object to form.
A. Well, I wasn't -- I guess as -- what's the right word -- distinct in keeping literature searching and report preparation as distinct activities. I have some literature searching where that's -- that's what I was only doing at that time. Of course, that did play into report preparation and so I think I started, well, not delineating the time stamps separately.
Q. Literature Search and Review is noted on this invoice on September 8th and 9th, and if we go to the next invoice, it's noted for 2.25 hours on October 12th.
Do you see that?



A. Yes.
Q. And if we skip ahead the rest of the invoices, I don't see that noted at all, is that correct?
A. I believe that's probably correct. As I mentioned, during report preparation, I would also be checking literature references and some of that could've involved literature searching that I didn't carve out as a specific activity description.
Q. What literature searches did you conduct in this matter?
A. I don't remember all of them, but I looked for things on methodology for nitrosamine was one definite one --
(Court reporter clarification.)
A. Literature methodology for nitrosamine determination.
Q. Do you recall any other literature searches that you did?
A. I did others. I don't recall the exact subjects on them.
Q. Did you keep a record of the literature searches you did?
A. No. I didn't record those.

Q. Did you keep a record of the articles that you found based upon the literature searches you did do?

A. Articles that I requested and reviewed and used in my report, those are in my Materials Considered list. But just any -- you know, the overall hits on a particular search, I didn't keep a record of that.

MS. BOGDAN: If we could please pull up Dr. Olsen's CV and mark it as an exhibit.

THE VIDEOGRAPHER: Yes, Counsel. This will be marked as Exhibit Number 7.

(Plaintiffs' Exhibit 7 was marked for identification.)

BY MS. BOGDAN:

Q. And you see your curriculum vitae, Doctor?

A. Yes.

Q. Okay. And is this an up-to-date CV that you provided to counsel for this litigation?

A. Yes.



Q. Not for this litigation, but it's an up-to-date CV? It's your most current?

A. Yes.

Q. Okay. Now, I see that you -- your business name is Olsen Pharmaceutical Consulting, LLC?

A. That's correct.

Q. And are a part of the consulting services that you offer impurity investigations, including related substances, degradation products and catalyst?

A. I don't know about catalysts but impurities, yes.

Q. Okay. And what does that service entail?

A. Well, impurity investigations are an important part of pharmaceutical development, and firms need help in deciding how -- how to do those, you know, what to do at what time, regulatory framework for those kinds of activities.

Q. Why are impurity investigations an important part of pharmaceutical development?

A. Well, for doing drug development, control of impurities, which are present in



every pharmaceutical product, is an expectation of regulators and companies themselves to have adequate quality of the materials they are using in clinical trials. And then, eventually, if the drug makes it to market, you know, in their approved product.

Q. And why is it important to control impurities?

MS. TOLEDO: Object to form.

A. Impurities need to be controlled to an acceptable level to -- for both efficacy and safety.

Q. And is another service that you offer genotoxic impurity strategies?

A. Yes.

Q. What is encompassed in the work you do regarding genotoxic impurity strategies?

A. Well, since -- especially since ICH and seven guidelines have been published, companies are expected to deal with any compounds that are identified as impurities that they need to be assessed for their genotoxic potential. And the guidelines outline, you know, what those expectations are, and there are several options for



addressing those that -- I work with companies on, you know, making those kinds of recommendations.

Q. So you advise companies as to how to identify impurities and assess them for their genotoxic potential and also make recommendations as to how to control them?

MS. TOLEDO: Object to form.

A. Can we take one question at a time there so...

Q. In your work for Olsen Pharmaceutical Consulting, you advise companies as to how to identify genotoxic impurities, correct?

A. I wouldn't say how to identify genotoxic impurities. I work with them on impurity identification in general. And -- and then a question would be, does this have this impurity after it's identified? Does it have genotoxic potential, or mutagenic potential is the, I think, term that's used now.

Q. And so when you work with pharmaceutical companies on impurity identification in general, if an impurity is

identified, then the next step would be to evaluate it for its genotoxic or mutagenic potential, correct?
MS. TOLEDO: Object to form.
A. So if I understand what you're asking, if the structure of an impurity is identified, then the -- yeah, the question is asked, does this have an alerting structure for mutagenicity or is it -- does it give a positive response in a structure activity relationship in silico assessment. And, you know, then, depending on the outcome of those kinds of assessments, then, you know, advising what next steps might be.
Q. Now, is NDMA a compound that has an alerting structure for mutagenicity?
MS. TOLEDO: Object to form.
A. NDMA as a nitrosamine would be an alert.
Q. And why would NDMA as a nitrosamine have an alerting structure?
A. It does -- well, nitrosamines are grouped in ICH M7 as a cohort of concern, it's how it's termed, because of known mutagenic properties.



Q. And how long has NDMA been known to have mutagenic properties?
MS. TOLEDO: Object to form.
A. I don't know how long that's been studied.
Q. When did -- well, you've been in the pharmaceutical business since, it looks like, the 1970s, is that true?
A. 19 -- October 1979.
Q. And so when did you first become familiar with NDMA?
A. I don't -- I don't know if NDMA -- I really don't recall then -- when that would've been.
Q. Did you do any work with NDMA before being hired as a consultant for this case?
A. No, I did not.
Q. Did you review the IARC monograph that was done in 1978 on NDMA as part of your research into this case?
A. Yes. I looked at that.
Q. And that IARC monograph in 1978, under its evaluation, stated that there is sufficient evidence of a carcinogenic effect



of N-nitrosodimethylamine in many experimental animal species.
Are you aware of that?
MS. TOLEDO: Object to form.
A. Can you -- can you pull that up to look at?
Q. I'm asking you if you are aware that the IARC monograph in 1978 stated that there is a sufficient evidence of a carcinogenic effect of N-nitrosodimethylamine in many experimental species.
MS. TOLEDO: Object to form.
If you want him to comment on a document, he should be able to look at it.
A. I know that the IARC classification for NDMA is as a probable human carcinogen but that's based on animal studies.
Q. Are you aware back in 1978 IARC stated that N-nitrosodimethylamine should be regarded for practical purposes as if it were carcinogenic to humans?
MS. TOLEDO: Object to form.
A. Again, if I could see that document, I could say whether that's what it



said. But yeah, I -- my review of that document was to confirm the classification as a probable human carcinogen based on the animal data.
Q. Now, I see on your curriculum vitae that you worked for a company called Aptuit Consulting?
A. Yes.
Q. For a short period of time in 2009?
A. Yes.
Q. Did I pronounce that correctly?
A. Yes.
Q. Okay. What was your role there as the managing director?
A. I had a dual role as it turned out. Aptuit is, well, the site I was at in West Lafayette was a contract laboratory and they did primarily solid state development for pharmaceutical firms. And I was spending about half my time directing some of their laboratory personnel who were also -- or doing -- branching out into other activities, such as HPLC analysis. And the other part of my time was spent directing the work of a support litigation support group, and this

was primarily related to support a patent litigation matters.
Q. Why did you leave Aptuit Consulting after working there about seven months?
A. Well, if you note the time, that is right when the recession hit and business slowed down, and we came to a mutual agreement that I would leave as a full-time employee but remain as a contractor to Aptuit for consulting work where I might be a good fit.
Q. You continued to do consulting work for Aptuit?
A. As a contractor, yes. That's when I started my own independent company and -- but I continued some projects going through Aptuit for other clients.
Q. And how long did you continue your association with Aptuit Consulting?
A. It was a few years. In fact, that's when my other legal-related work initiated. That was actually right after I left as a full-time person.
Q. And you were the managing director at Aptuit. Wasn't one of the scientists



found guilty for altering preclinical data designed to support applications to perform clinical trials?
MS. TOLEDO: Object to form.
A. I have no knowledge of that at all.
Q. Do you know a scientist named Eaton when you worked for Aptuit Consulting as the managing director?
A. Pardon me? What was the name?
Q. Eaton, E-A-T-O-N.
A. I do not. I do not.
Q. And as the managing director for Aptuit Consulting, you aren't aware that one of the scientists was sentenced to a three-month prison term for altering preclinical data that was designed to support applications to perform clinical trials?
MS. TOLEDO: Object to form.
A. I don't know when this occurred, and I was not involved in -- in that at all. There was -- I was going to say there were other parts of Aptuit in other sites doing -- supporting other types of work that what you're referring to may -- may have come from, but I -- I was not involved or aware of



any of that.
Q. So as the managing director, it's your testimony that you were not aware of this criminal fraud investigation or sentencing of one of the Aptuit consulting scientists that took place during the time you worked there?
MS. TOLEDO: Object to form. Asked and answered.
A. I have -- I was not involved and have no knowledge of -- of that.
Q. Why don't you have Aptuit Consulting listed on your LinkedIn profile?
MS. TOLEDO: Object to form.
A. I don't think it's necessary.
Q. I see that you also worked for many years at Eli Lilly?
A. Yes.
Q. Did you work with pharmaceutical impurities while you worked for Eli Lilly?
A. Yes.
Q. Was that your major area of concentration?
A. That was one of the main activities I was involved in as what we talked about



earlier, impurity investigations and control. That was not the only activity however.
Q. And so you worked with Eli Lilly from 1979 until 2008?
A. Correct.
Q. As far as analytical methods to do impurity investigations while you worked for Eli Lilly, what was the primary method that was used for that type of analysis during that time period?
MS. TOLEDO: Object to form.
A. There were lots of different methods depending on the nature of the impurity, the question being answered -- or asked, what kind of information we needed, so chromatography is a -- in general a major tool for looking at impurities.
Q. Was HPLC one of the methods that was often employed to do impurity investigations during the time that you worked for Eli Lilly?
MS. TOLEDO: Object to form.
A. HPLC was becoming -- when I started, was becoming more widespread as -- and more common for impurity investigations.

And as instrumentation technology improved, it became a primary tool certainly by the time I retired.
Q. You mentioned that HPLC was becoming more wide spread. What was the method that predated HPLC?
A. Well, other methods -- there wasn't a single other precursor to HPLC, and HPLC wasn't -- isn't even today not the only thing that can be used for impurity investigations. So, you know, during the time HPLC was becoming more widespread, techniques such as NMR, gas chromatography, MIR chromatography, color metric analysis.
(Court Reporter clarification.)
Q. Ion chromatography?
A. Yeah, ion, I-O-N. It was actually introduced early in my career.
Q. Was gas chromatography in use for impurity identification back when you worked for Eli Lilly?
A. I wouldn't say that was its sole or even predominant use, but gas chromatography was used.
Q. Was gas chromatography used to


measure residual solvents in API back when you worked for Eli Lilly?
MS. TOLEDO: Object to form.
A. Yes. Gas chromatography is used for residual solvents determination.
Q. And back when you worked at Eli Lilly was GC coupled with mass spectometry in order to identify compounds?
A. Not on a routine basis. If there was a question about a compound's identity that might have been looked at by GC-MS.
Q. But the technology of gas chromatography, mass spectrometry was available at the time you worked at Eli Lilly, correct?
A. Yes, that's correct.
Q. What kind of detectors did you work with when using liquid chromatography at Eli Lilly?
MS. TOLEDO: Object to form.
A. I worked with a lot of different detectors. UV detection is probably the most common HPLC detector, but I also worked with conductivity detection which is used for ion chromatography, which is a form of liquid


chromatography. I've used refractive index detection. I've used charge aerosol detection, evaporative light scattering detection, and mass spec detection. There may be some others in there, but...
Q. Roughly how many years have you worked with mass spectrometry as a detector?
A. As a detector for what kind of instrument?
Q. Any instrument.
A. I'd say starting in 1984 for a GC and starting in early '90s for LC.
Q. That would be both during your time when you were working at Eli Lilly, correct?
A. Yes.
Q. And what kind of mass spectrometry assays have you performed?
MS. TOLEDO: Object to form.
A. Well, initially I've used it as more of an identification tool initially but, later on, I also used it as a -- for quantitative analysis.
Q. And when you say you used it for a quantitative analysis, what compounds were you using MS to quantitate?


A. I really can only comment on one that is published or I can mention things that are published. One was a mesylate ester as a potential impurity and mesylate salt and another was for a -- I believe it was a hydrazine derivative.
Q. Have you personally ever performed a mass spectrometry assay to identify a nitrosamine?
MS. TOLEDO: Object to form.
A. I'm not sure I understand your question. You say assay to identify. I don't know exactly what that means.
Q. All right. Have you ever personally used a mass spectrometry assay for a nitrosamine?
MS. TOLEDO: Object to form.
A. By "personally used," are you asking if I pushed the buttons on the instrument?
Q. Yes.
A. I have not done that.
Q. Have you --
A. I've directed work with mass spectrometry though.

Q. You directed work with mass spectrometry to measure NDMA?
A. No, not to measure NDMA.
Q. What is your familiarity with MRM mass spectrometry?
MS. TOLEDO: Object to form.
A. I'm -- I know how the basis of the technique and how -- how it works.
Q. What does MRM stand for?
A. Multiple reaction monitoring.
Q. And can you explain to me the basis of how it works?
A. The first part of any mass spec analysis is itemizing the analytes in the source of the mass spectrometer. And if you have a target analyte that you're looking for, you know what its mass molecular ion is and that, then, is selected to go pass through to a collision chamber where it fragments into its characteristic fragment ions, and those fragments then can be passed on to third analyze -- mass analyzer for detection.
Q. Okay. You used the word "analyte." What is an analyte?


A. That is the compound you're looking for, what you're trying to determine.
MS. TOLEDO: Counsel, we've been going over an hour. Would it be a good time for a break?
MS. BOGDAN: Let me just finish up with this line of questioning, and then absolutely.
MS. TOLEDO: Thank you.
BY MS. BOGDAN:
Q. So, as you gave that description, you were talking about different I guess you said you called one part of MRM a collision chamber, correct?
A. Yes.
Q. Okay. Does the analyte go through a filter before it reaches the collision chamber?
A. Well, the ion that is characteristic of the analyte or if there is another substance there that gives the same ion that is selected, yes, to go through to the next stage, in the collision chamber.
Q. So that filter that takes place before the ion would reach the collision


chamber is set to only let certain ions through, correct?
MS. TOLEDO: Object to form.
A. That -- that you select -- sort of a range of ions that go through usually a narrow range to select the ions you want.
Q. And those are based on a particular mass-to-charge ratio?
MS. TOLEDO: Object to form.
A. Yes. If you know what you're looking for and it gives an ion of a particular mass-to-charge ratio, you can select for that ion.
Q. And then those ions that are allowed through the mass filter end up in the collision chamber, correct?
A. Yes.
Q. And then after the ions end up in the collision chamber, they go through yet another mass filter, correct?
MS. TOLEDO: Object to form.
A. Well, the fragmentation takes place and then going through the filter selects for those -- the fragment ions.
Q. And again, that filter, which would


be the second filter, is set up to only essentially let through particular fragments based on mass-to-charge ratio, correct?
MS. TOLEDO: Object to form.
A. That's the basis for it, but you have to show that analysis, nothing else, is giving rise to -- to those signals.
Q. And then those particular fragments that have been allowed to pass through quadrupole mass filter are the ones that actually go to the detector, correct?
MS. TOLEDO: Object to form.
A. That's the idea of monitoring those fragments or sometimes called daughter ions.
Q. Just for the stenographer, your response said daughter, right, like D-A-U-G-H-T-E-R?
A. Yes.
Q. And what does daughter ion mean?
A. Well, that's one of the -- another name for one of the fragments from the parent ion.
Q. So the ion that's created in the beginning of the MRM analysis is called a parent ion, correct?

A. Yes.
Q. And then during the analysis, that parent ion is fragmented into daughter ions, correct?
A. Yes.
MS. BOGDAN: All right, Carmen. You had asked to take a break and I'm done with that line of questioning, so.
MS. TOLEDO: Thank you.
MS. BOGDAN: Do you want to take five or ten minutes?
MS. TOLEDO: Ten minutes would be great. Thank you.
MS. BOGDAN: Okay. You're welcome.
THE VIDEOGRAPHER: We are now off the record. The time is 1428 UTC, 10:28 a.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1444 UTC, 10:44 a.m. EDT.
BY MS. BOGDAN:



Q. Dr. Olsen, do you have any direct experience working with NDMA in the lab?
A. Not with NDMA. I've looked for other potentially mutagenic impurities in various compounds.
Q. You had mentioned earlier in your testimony that you could only speak to -- I believe you were talking about certain esters that you were quantitating that you could only speak to those because they were published.
Do you remember testifying to that?
A. Yes. I can't give details of confidential things that I did while at Eli Lilly.
Q. Okay. And things that are of confidential nature that you did at Eli Lilly, you can't speak about at this deposition nor would you be able to publish about them?
A. I have published some things; as I said, mesylate esters. Another example would be formaldehyde and, as I mentioned, hydrazine was another example.
Q. But those weren't of a confidential



nature, correct?
A. No. Those were -- had to be approved through Lilly's publication approval system.
Q. And if something was a confidential matter that wasn't approved through Lilly's public indication approval system, then you couldn't publish about it, correct?
MS. TOLEDO: Object to form.
A. I would have to go through Lilly's public disclosure approval process to publish about something, anything else that I wanted to publish related to my work at Lilly.
Q. And if you weren't granted that approval, then you would not be able to publish it, correct?
MS. TOLEDO: Object to form.
A. Lilly's publication approval process is necessary to, you know, publish something about work anybody has done at Lilly.
Q. And that's because the work that's done at Lilly was confidential, correct?
A. Every scientist's work at Lilly is treated as confidential, proprietary



information until it goes through an approval process for -- for disclosure.
Q. Do you have any direct experience developing or validating any analytical assays for NDMA?
MS. TOLEDO: Object to form.
A. In any analytical assays for NDMA, no. But, as I mentioned, I have used or done development and validation for other trace level of potentially mutagenic impurities.
Q. Have you personally used Agilent laboratory equipment?
MS. TOLEDO: Object to form.
A. Any particular kind of equipment or just Agilent overall?
Q. Agilent instruments.
A. Yes. I've used Agilent equipment.
Q. What types of Agilent instruments have you used?
A. I can't recall all the different types that I've used. They used to be branded as Hewlett-Packard and then became Agilent. And then I've used Agilent HPLC systems and chromatography software. I have also used Agilent gas chromatography systems.

Q. Your -- your audio cut out a little bit for me so I heard that you've used Agilent gas chromatography systems, and then there was another type of system you mentioned before that.
A. I mentioned HPLC.
Q. Have you used an Agilent UHPLC instrument?
A. I have used Agilent UHPLC instruments.
Q. And where have you used those?
A. I was at Lilly and I have directed further work that utilizes that technology.
Q. What was the model of UHPLC instrument that you used at Eli Lilly?
MS. TOLEDO: Object to form.
A. I -- I don't recall the model number.
Q. But that would be a model that was available as of 2008, correct?
A. Yes.
Q. Have you used an Agilent UHPLC instrument personally since 2008?
A. I haven't -- well, by personally, I have, again, directed work that uses Agilent



as well as other instrument vendors, UPLC systems such as Waters and Thermo Fisher.
Q. When you say "directed work," that doesn't mean that you actually did the work yourself, correct?
A. I had not been pushing the buttons and running the instrument.
Q. And you haven't been preparing the samples and actually running the analysis using the instruments, correct?
A. I have not been doing hands-on laboratory work in -- in those instances but am involved with and aware of what the people who are, are doing.
Q. When is the last time you did hands-on laboratory work?
MS. TOLEDO: Object to form.
A. I don't recall the exact last time, you know, doing -- doing hands on.
Q. Is the last time you did hands-on laboratory work when you worked for Eli Lilly?
A. I was doing a little bit when I was at Purdue.
Q. And when you were at Purdue, that



was for how many months?
A. I don't recall how many months that was exactly.
Q. It was a few months right?
A. Yes.
Q. And what type of equipment were you using hands on when you did that work at Purdue?
A. Well, by hands on, I'm in the laboratory working with other people. This was a Thermo Fisher instrument. And we also did an instrument evaluation where we did look at both Waters and Agilent systems.
Q. And what type of systems are you speaking of, HPLC?
A. UPLC systems.
Q. Were you using any type of mass spectrometer for your work at Purdue?
A. Not -- not at that time.
Q. And you said that you were working in the lab with others. Were you actually running the instruments?
A. I was there with the graduate student I was working with, and that person was doing the hand -- entering commands on



the -- on the instrument, but I was present.
Q. So the answer is no, you were not actually running the instruments?
MS. TOLEDO: Object to form.
A. Depends. If you mean by "running" pressing the buttons, no I was not doing that. But that, you know, that is not -- that's more of a technician kind of role for just doing the running of the instrument.
Q. Have you personally used a triple quadrupole mass spectrometer?
A. Again, can you clarify what you mean by "personally used"?
Q. Meaning actually run the instrument.
Have you personally run a triple quadrupole mass spectrometry?
A. I have not hands-on run a triple quadrupole mass spectrometer. I have worked with others in many types of mass spec systems --
THE COURT REPORTER: The audio cut out.
MS. BOGDAN: His audio is very choppy.

THE WITNESS: Well, I'll move it a little closer. Is that better?
THE COURT REPORTER: I guess for now. We'll have to see as we go.
BY MS. BOGDAN:
Q. Let me ask the question again because your response -- your audio was kicking in and out.
Have you personally run a triple quadrupole mass spectrometer instrument?
A. I have directed work on a triple quad mass spectrometer, as well as other mass spec systems, but I did not push the buttons on the instrument or operate it myself.
Q. Have you used a UHPLC together with a triple quadrupole mass spectrometer?
MS. TOLEDO: Objection. Asked and answered.
A. I directed work that has used that combination of technology.
Q. But have you ever personally run samples on those instruments being used together?
MS. TOLEDO: Objection. Asked and answered.



A. I have not operated the instrument myself.
Q. Have you personally used MassHunter Quantitative Analysis software for data processing?
A. I have seen output from MassHunter software, but I have not worked hands on with it myself other than reviewing results from it.
Q. Have you personally used MRM mass spectrometry to measure nitrosamines?
A. I have not used MRM for nitrosamines specifically but have done mass spec detection of other potentially genotoxic or mutagenic impurities at low levels.
Q. Have you testified in past litigations?
A. Yes, I have.
Q. And in those past litigations, were you an expert for the pharmaceutical company?
A. The client was a pharmaceutical company, so was the defendant.
Q. Okay. And what were -- do you recall the name of those litigations?
A. The first one was in Canada and it



was related to lovastatin.
Q. What type of a drug is lovastatin?
A. That is a statin drug for cholesterol.
(Court Reporter clarification.)
A. Lowering.
Q. Was there another litigation where you testified?
A. Yes. I testified a few times in Delaware.
Q. Okay. And what were those litigations?
A. Those involved Fentora.
Q. And what type of drug is Fentora?
A. Fentora is a fentanyl filtrate which is a pain medication.
Q. And what was the other litigation?
A. They were both for that -- that product.
Q. And that was a fentanyl medication?
A. Yes. It was related for -- to especially -- I think they called it breakthrough cancer pain.
Q. What is NDMA currently used for, if anything?



MS. TOLEDO: Object to form.
A. I don't know of any particular uses for NDMA.
Q. Do you know if NDMA is used for research purposes?
MS. TOLEDO: Object to form.
A. What type of research purposes would that be?
Q. If NDMA is used in animal studies as the chemical that will initiate cancer in animals so the cancer can be studied?
MS. TOLEDO: Object to form.
A. I don't know what -- what's involved in those studies. I'm not aware of use of NDMA for that.
Q. Do you agree that NDMA is carcinogenic?
MS. TOLEDO: Object to form.
A. I'm not a cancer biologist. I -- that's why I would refer to the IARC classification as a probable human carcinogen as shown in animal laboratory testing.
Q. As part of your investigation into this case, did you research the properties of NDMA?

MS. TOLEDO: Object to form.
A. Properties encompassing what, for example?
Q. The chemical properties of NDMA, since your expertise is in chemistry?
MS. TOLEDO: Object to form.
A. I looked at things like its characterization data, some of its physical properties. I don't recall them all at the moment, but I looked at some of those things.
Q. Why did you look at those things?
A. To understand how NDMA would behave during analysis.
Q. Do you agree that NDMA is mutagenic?
MS. TOLEDO: Object to form.
A. My understanding is that NDMA has been mutagenic in laboratory testing, but has not been shown to be carcinogenic in humans.
Q. And what are you basing that statement on?
A. The IARC classification as a probable human carcinogen based on the animal and laboratory studies.
Q. And that classification was made in



1987, correct?
MS. TOLEDO: Object to form.
A. Can you show me that classification or that document that has the date? I don't recall the date.
Q. So when looking at that IARC classification during your investigation into this matter, you didn't notice the date that it was classified as a probable human carcinogen?
MS. TOLEDO: Object to form.
A. I don't -- I may have noticed it at the time. I didn't -- I don't remember it exactly right now.
Q. Was it a recent classification, meaning in the last ten years? Do you remember that?
MS. TOLEDO: Object to form.
A. Can we -- can we look at it and see, 'cause I don't remember the dates.
Q. Do you agree that NDMA is genotoxic?
MS. TOLEDO: Object to form.
A. I can only really classify it or agree with the IARC classification as a



probable human carcinogen based on laboratory studies. Genotoxic is a broad term now that is ill-defined I would say.
Q. What does probable human carcinogen mean to you?
MS. TOLEDO: Object to form.
A. I would have to look up what it means to IARC to comment on that. Again, I'm not a cancer biologist so I have not been focused on that.
Q. Do you agree that the IARC monographs are authoritative with regard to the classification of NDMA?
MS. TOLEDO: Object to form.
A. This is not an area that I have a lot of familiarity with, so as far as IARC's authoritativeness, that's -- I guess others can debate whether that is or is not.
Q. But you're relying on IARC's classification as a probable human carcinogen, correct?
A. That's the classification that I'm aware of that has been accepted, I think IARC is part of WHO, if I'm not mistaken.
Q. Do you agree with that



classification?
MS. TOLEDO: Object to form.
A. I have not studied NDMA so or -- again, I'm not a toxicologist or a cancer biologist, so I -- I have no opinion on that.
MS. BOGDAN: If we can please pull up the 1978 IARC monograph.
THE VIDEOGRAPHER: And this will -- this will be marked as Exhibit Number 8.
(Plaintiffs' Exhibit 8 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see the IARC monograph?
A. Yes, the first page.
Q. Yes.
MS. BOGDAN: And if we could go to page 125 where it has N-nitrosodimethylamine.
Q. Do you see that?
A. Yes.
Q. And N-nitrosodimethylamine is also known as NDMA, correct?
A. Yes.

Q. And then bringing you to page 127, you see the section that says, Use?
A. Yes.
Q. And do you see where it says:
Prior to the 1st of April 1976 NDMA was used in the US as an intermediate in the production of 1,1-dimethylhydrazine, a storable liquid rocket fuel which is believed to have contained up to 0.1 percent as an NDMA impurity?
Do you see that?
A. Yes.
Q. Were you aware that NDMA was used in the production of rocket fuel?
MS. TOLEDO: Object to form.
A. I remember reading that previously.
Q. Do you know if it's currently used in any commercial capacity in the United States today --
MS. TOLEDO: Object to form.
Q. For research purposes?
A. By "commercial capacity" meaning what?
Q. Is it used in manufacturing or in any capacity in the United States today



except for research?
MS. TOLEDO: Object to form.
A. I don't know whether it's used or not.
Q. The next sentence reads:
No evidence was found that NDMA is used at present, except for research purposes?
Do you see that?
A. Yes.
Q. Do you know why NDMA is no longer used except for research purposes?
MS. TOLEDO: Object to form.
A. Well, this -- this statement just says no evidence was found, so...
Q. Do you have any evidence that you know of that NDMA is used other than for research?
MS. TOLEDO: Object to form.
A. I -- I don't have that evidence of use of NDMA.
MS. BOGDAN: If we can go to page 151, please.
Q. See under 4.1 Experimental Data?
A. Yes.



Q. Is this part of what you read when you read the IARC monograph on NDMA?
A. I don't recall whether I looked at this section or not.
Q. The first sentence begins:
N-nitrosodimethylamine is carcinogenic in all animal species tested.
Do you see that?
A. Yes.
Q. And it lists a bunch of different species, correct?
MS. TOLEDO: Object to form.
A. Lists several animals, yes.
Q. Do you know of any animal species that was tested with NDMA where NDMA was not carcinogenic?
MS. TOLEDO: Object to form. This is outside his area of expertise.
A. That was going to be my response was I've not studied the toxicity of NDMA.
MS. BOGDAN: If we can go to page 152, please.
Q. Directing your attention to the Evaluation section, and the last sentence which reads:



Although no epidemiological data were available (and efforts should be directed toward this end), N-nitrosodimethylamine should be regarded for practical purposes as if it were carcinogenic to humans.
Do you see that?
A. Yes, I see that.
Q. Do you disagree with that statement by IARC?
MS. TOLEDO: Object to form. This is outside his area of expertise, outside the scope of his opinions.
A. Yeah. I have no basis to comment one way or another because I have not studied the -- the data on this topic, and it is outside my expertise.
Q. So when you were retained as an expert in this litigation, you did not conduct any type of investigation to determine a carcinogenic, mutagenic or genotoxic nature of NDMA?
MS. TOLEDO: Object to form.
A. I was not asked to give an opinion about the carcinogenicity or -- or lack

thereof of NDMA because it's not in my area of expertise.
MS. BOGDAN: And what was this IARC monograph marked as far as the exhibit number?
THE VIDEOGRAPHER: Exhibit Number 8.
MS. BOGDAN: If we could please pull up the GSK Hazard Assessment Report and mark it as Exhibit 9.
THE COURT REPORTER: I'm sorry, Charles. Could you just double-check the number of the exhibits? I may have written it down in error, but I already had 8.
THE VIDEOGRAPHER: That's correct. Exhibit Number 8 was a 1978 IARC monograph, and now the GSK will be Exhibit Number 9.
THE COURT REPORTER: Okay. Thank you. I'm sorry.
(Plaintiffs' Exhibit 9 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, is Exhibit 9 loaded for



your review? Do you see it?
A. I see it on the screen. It's not coming up in our Box access. The IARC monograph is. I don't think this GSK one is.
Q. You might have to refresh it. We could use the one -- I mean can you read the one that's on the screen?
A. There it is. I had to do it twice. Okay. I have it now.
Q. Did the defendants provide this document to you as part of your review for this case?
A. I don't recall if I looked at this or not. Is it in my list of things considered?
Q. I didn't see it, but I'm asking if you have seen this document before.
A. That's why I don't recall.
Q. All right. So if we look at this document, it gives the molecular formula for NDMA, correct?
A. Yes.
Q. And is that correct to the best of your knowledge?
A. Yes.



Q. And it also gives the molecular weight?
A. Yes.
Q. And what is the molecular weight of NDMA that is on this exhibit?
A. 74 grams per mol.
Q. Is that correct?
A. I think so to -- are -- the significant figures that are listed there.
Q. Do you know the molecular weight of NDMA to be something different?
A. No, I don't think so.
Q. But you're not sure?
A. Well, I haven't calculated it specifically myself, but I don't know why it would be incorrect here.
Q. And it gives a structural formula. You see that?
A. Yes.
Q. Okay. And is that a chemical structural formula?
A. Yes.
Q. And is that structural formula correct for NDMA?
A. Yes.



Q. And can you describe the structure of NDMA from a chemical perspective?
A. Describe the structure. Well, the -- there are two methyl groups, hence the dimethyl, connected to a nitrogen, so you have a dimethylamine part. And then the N-nitroso is the rest of the molecule.
Q. In this diagram, what part is the N-nitroso?
A. The right part.
Q. And that's the structure that you testified earlier as being an alerting structure?
MS. TOLEDO: Object to form.
A. That is -- the nitroso part of it is, yeah, N-nitroso part, as a nitrosamine, is a -- in the ICH M7 guideline part of that cohort of concern because it's in this category.
Q. What about that nitroso structural group makes it an alerting structure for purposes of being in the cohort of concern?
MS. TOLEDO: Object to form.
A. I don't understand what you mean by what about it. It's a -- it's a nitrosamine

and that would -- that would be what puts it in that category.
Q. And why are nitrosamines put into the category of the cohort of concern?
MS. TOLEDO: Object to form.
A. They have potential mutagenicity as indicated in some laboratory studies.
Q. As a chemist, do you understand the mechanism of action of nitrosamines that gives rise to them having the potential for mutagenicity?
MS. TOLEDO: Object to form.
A. I have not studied -- that's outside my -- scope of my report, and I've not studied any mechanism of action of toxicity of nitrosamines.
Q. Well, in your role as a pharmaceutical consultant, you advise regarding genotoxic impurity strategies, correct?
MS. TOLEDO: Object to form.
A. Strategies don't -- I advise on chemistry, manufacturing and control-related strategies, regulatory strategies for potentially mutagenic impurities and not what



any mechanism of action of toxicity for any impurity might be.
Q. Why is it important to control the amount of mutagenic impurities in a pharmaceutical?
MS. TOLEDO: Object to form.
A. It's important to control any impurity that's known in a pharmaceutical to acceptable levels.
Q. And are mutagenic impurities controlled at lower levels in other impurities?
MS. TOLEDO: Object to form.
A. It depends on several things. You know, what the -- I guess what's known about the impurity's toxicity, what the dose indication, course of treatment of, you know, the use of the pharmaceutical; all that would figure into what kind of level would be a concern.
Q. And with regard to NDMA, is that control at a low level of impurity pursuant to ICH M7?
MS. TOLEDO: Object to form.
A. Again, it would depend on, you



know, what impurity is in, what -- what it's going to be used for, what would be the dose of the drug; so just saying NDMA in general is not specific enough.
Q. Has the FDA established an acceptable daily intake limit for NDMA in pharmaceuticals?
A. FDA established, based on what they acknowledged as a highly conservative ICH M7 approach for NDMA, where they extrapolated animal data and also considered 70 years dosing and one in 100,000 risk of cancer all to come up with a very conservative limit of 96 nanograms per day.
Q. So the FDA's acceptable daily intake limit for NDMA in pharmaceuticals is 96 nanograms per day, correct?
A. That's what they published in their guideline that could be discussed with FDA, again, depending on use of the drug, dose, course of treatment, all those kinds of things. And even then they haven't said that higher doses constitute an increased risk.
Q. Doctor, the question that I asked you was, is the FDA's acceptable daily intake



limit for NDMA in pharmaceuticals 96 nanograms a day; is that true?
A. That's what they have indicated in their guideline.
Q. So the answer is yes?
MS. TOLEDO: Object to form.
A. That would be the starting point. They may have situations where a higher limit or a lower limit would be something they'd look at.
Q. Have you seen the FDA publish any limit that allows more than 96 nanograms per day in a pharmaceutical regarding NDMA?
MS. TOLEDO: Object to form.
A. Well, can we pull up their guideline and --
Q. I'm asking if you -- I'm asking if you are aware of the FDA allowing more than 96 nanograms a day of NDMA in any pharmaceutical.
MS. TOLEDO: Object to form.
A. I would not have awareness of individual companies' discussions with FDA to know whether that daily limit was changed from their guideline limit of 96 nanograms

per day.
Q. So you don't have, as you sit here, any authority to suggest that the FDA has allowed more than 96 nanograms per day of NDMA in any pharmaceutical, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. I can only comment on what they have put in their guideline as years -- here's a limit that they are comfortable with if you're under that. If you're over that, then, yeah, individual companies would have their own discussions, but I would not be privy to those.
MS. BOGDAN: You can go to page 2 of this document, please.
Q. And up in the chart at the top of the document, do you see where GSK is noting that NDMA is a positive genotoxicant?
A. I see that.
Q. Do you agree with GSK?
MS. TOLEDO: Object to form.
A. Yeah. I have not studied the toxicological properties of NDMA. Here they also have it in the comments that they put it



as a positive genotoxicant because it's -- it is a mutagen or a clastogen.
Q. Do you see where they have in this chart potential carcinogen, and they have checked the box "yes"?
A. I see that. And that is modified -- or the reason it is checked is because it is classified as a probable human carcinogen as they noted.
Q. Right. Over in the comment box on the right, correct?
A. Yes.
Q. Okay. If we could go on this page to number 1 where it says:
NDMA is a semivolatile organic chemical that forms both -- in both industrial and natural processes?
Do you see that?
A. Yes.
Q. Is NDMA a semivolatile organic chemical?
A. Well, if we look back at the physical properties -- oh. They don't have it here, but I think on the IARC monograph they had some other properties, so I don't



know exactly what the range of boiling points is for semivolatile, but I think NDMA falls into that category.
Q. And is NDMA an organic chemical?
A. Yes.
Q. Any volatile organic chemical can NDMA be detected with gas chromatography-mass spectrometry?
A. Yes, it can.
Q. Now the next sentence reads:
It is a member of N-nitrosamines, a family of point carcinogen?
Do you see that sentence?
A. Yes.
Q. Are you aware that N-nitrosamines are a family of potent carcinogens?
MS. TOLEDO: Object to form.
Q. From a chemical perspective?
MS. TOLEDO: Object to form. Again, outside the scope of his opinions.
A. Yeah. I have not given an opinion on this and whether -- my understanding is this is all based on animal data and laboratory data.



Q. Well, when it's talking about NDMA being a member of N-nitrosamines, it's talking about its chemical -- chemical composition, correct, when it's talking about it being in the family of N-nitrosamines?
MS. TOLEDO: Object to form.
A. NDMA, that is an N-nitrosamine.
Q. And N-nitrosamine describes certain chemical attributes of those compounds, correct?
MS. TOLEDO: Object to form.
A. There are other N-nitrosamines.
Q. It's a family of chemical compounds, correct?
A. There can be other groups on the amine besides methyl groups.
Q. But N-nitrosamines are known as a family of chemical compounds, correct?
A. I don't know if "family" is the right word. It's a -- contains the functional groups, nitroso and amine.
Q. And is there something about having those functional groups, the nitroso groups and the amines, that makes those chemicals potent carcinogens?

Page 86

B. Olsen

MS. TOLEDO: Object to form.
A. I don't -- I'm not a toxicologist or a pharmacologist, so I have not studied the mechanism of any toxicity in animals or -- or other laboratory organisms for -- for nitrosamines.
Q. Do you know how NDMA is metabolized?
MS. TOLEDO: Object to form. Outside the scope of his opinions.
A. Not in detail I don't. I just heard about enzymatic processes but not -- I have not studied that.
Q. And what do you know about the enzymatic processes, even if it's just in general?
A. Yeah. I -- I don't want to comment on that because I'd have to go look again at what I read about it.
Q. Have you studied the stability of NDMA as a compound?
A. Do you mean if I have a sample of NDMA is it stable?
Q. Yes. Have you studied the stability of NDMA?

Page 87

B. Olsen

A. I have not looked at the stability of NDMA as a neat compound.
MS. BOGDAN: You can take that down.
Q. For your work on this case, did you start with a research question?
MS. TOLEDO: Object to form.
A. I was asked to review the testing data and conclusions offered by Dr. Najafi, and so this is not a research project.
Q. So your work on this case was limited to commenting on the reports of others?
MS. TOLEDO: Object to form.
A. Well, by -- by work -- yeah, work of others related to testing of NDMA in ranitidine.
Q. Well, you indicate that you were going to comment on the report of Charles Davis, and he did not do any testing of NDMA in ranitidine, did he?
A. He did not do testing himself, but he did statistical analyses of data on NDMA in ranitidine that was furnished to him.
Q. So, what was the scope of what you

Page 88

B. Olsen

were asked to do as an expert in this litigation?
MS. TOLEDO: Object to form.
A. I looked at the validity of testing of NDMA in ranitidine and the various studies done to investigate or to try and -- try and retrospectively assign levels of NDMA that consumers years ago might have been exposed to, and give opinions as to the validity of those types of experiments.
Q. And in order to do this work of commenting on the reports and work of others, did you come up with any type of research question or hypothesis?
MS. TOLEDO: Object to form.
A. Again, I was not conducting research into -- into this question -- these questions.
Q. Now, I see on page 4 of your report that you also have listed to review the report of Dr. Jennifer Le.
A. Yes.
Q. Did you, in fact, do that?
A. Yes. Not her complete report; but another area of my scope was on exogenous

Page 89

B. Olsen

NDMA formation and levels.
Q. And how did the review of Dr. Le's report relate to exogenous NDMA and levels?
A. I would need to go back to her report to look at specifics of what she said. It's been a while since I looked at her report.
Q. Are you offering any opinions as you sit here today with regard to Dr. Le's report?
A. I have to, again, look at what -- what I said in my report would be the opinion for Doctor -- Dr. Le. I think I only commented on one aspect of what she said.
Q. As you sit here, do you know what that was?
A. She commented without support -- literature support or evidence that NDMA could go on to form the species that is purported to be part of a mechanism for mutagenicity. I believe that's how it was described.
Q. You previously told me here today that you didn't do any research or analysis and are offering no opinions with regard to

the mutagenic properties of NDMA, isn't that correct?

MS. TOLEDO: Object to form.

A. I didn't give an opinion about that. What you asked was what comment did I make on Dr. Le's report, and it was the comment that she mentioned that NDMA could decompose not -- this was exogenously to form this other -- other species but there were no data for that.

Q. But I asked you, but you did not study the stability of NDMA, correct?

A. You asked about it and I said, Are you talking about NDMA as a neat compound? No. I did not study the stability of that.

Q. And you did not study NDMA and what makes it a mutagen, correct?

MS. TOLEDO: Object to form.

A. That -- that's outside the scope of my expertise and so I had not looked at or given opinions about why NDMA may give mutagenic response in petri dishes and animals.

Q. So you are not giving any opinion with regard to Dr. Le's comments about NDMA



going on to form species that are part of the mechanism of mutagenicity of NDMA, correct?

MS. TOLEDO: Object to form.

A. Well, can -- can we look at her report to see exactly what she said that I commented on?

Q. Doctor, I'm asking if you're giving any opinions with regard to the mutagenic properties of NDMA.

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I'm getting two different questions here, so I'm not following. My -- my recollection of Dr. Le's report was trying to come up with an explanation for why some levels of NDMA reported by Dr. Najafi appeared to decrease rather than a continual increase.

And her comment was that it must be degrading and -- but gave no evidence of what it's degrading to. And I think the question or the concern was that she extrapolated into -- degrading into the whatever might be responsible for mutagenic properties. So, I don't comment on NDMA's mechanism of



mutagenicity.

Q. You remember my question?

My question was, I'm asking if you're giving any opinions with regard to the mutagenic properties of NDMA, independent of Dr. Le.

MS. TOLEDO: Object to form. Asked and answered.

A. The only thing that I have -- I am not giving an opinion on it. I'm just citing --

Q. Thank you.

A. -- information.

MS. TOLEDO: Please don't interrupt the witness when he's still answering.

A. I -- my comment was that if NDMA has been -- determined to be a mutagen in the Ames test or other laboratory tests, you know, that's -- that's -- I don't have an opinion as to whether that's correct or not. It's just it is what it is.

Q. Are you offering any opinions in this matter that are not in response to the opinions offered by one of the plaintiffs'



experts?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. Yeah. I didn't understand your question, please.

Q. Are you offering any opinions in this case that are not in response to the opinions offered by one of the plaintiffs' experts?

MS. TOLEDO: Object to form. Mischaracterizes his testimony and his report.

A. My opinions are in my report.

Q. And in your report on page 4, you write --

MS. BOGDAN: And if we can pull up the expert report, please.

Q. And this is in the fourth full paragraph down, and I'm just going to read the first sentence:

I have been retained to provide opinions on behalf of the defendants to analyze and comment on the scientific reliability of the opinions expressed in the reports of Plaintiffs' experts, Ramin Najafi

Ph.D., Charles Davis Ph.D., Andrew Salmon, M.A., Doctor of Philosophy, C.Chem, M.R.S.C., Jennifer Le PharmD and Dipak Panigrahy, M.D.
That is what you wrote, correct?
A. Yes.
Q. And the scope of your work on that case, was that defined by what you were asked to do by the defendants?
MS. TOLEDO: Object to form.
A. That's what I did in my report, is analyze and comment on the reliability of these opinions.
Q. And is that -- that is all you did, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony and his report.
A. Well, if we look at the summary at the end of my report, I think it's got the conclusion.
Q. But what I have read and highlighted here is the question that you were asked to answer, correct?
MS. TOLEDO: Object to form.
A. This may not have been the total of



the scope of what I was asked to do, but I guess I'm not understanding what's -- what's outside or what's different than what is in my report.
Q. Well, what else were you asked to do other than provide opinions and analyze and comment regarding these five Plaintiff experts?
MS. TOLEDO: Object to form.
A. This was the primary aspect of it. I guess how other things enter into this, I'm not sure I -- I'm following how to answer this.
Q. Let's go to page 7 of your report and under Principles of Drug Stability at the very end of that section you write: As such once a drug is made, the next questions are under what conditions and at what rate does the drug degrade?
Do you see that sentence in your report?
A. Yes.
Q. Did you answer that question in this case?
MS. TOLEDO: Objection to form.



A. This is a background discussion of drug stability investigation in general. It was not my job in this case to determine what -- well, to investigate what's happening with ranitidine.
Q. So the answer to that question would be no, you did not answer those next questions under what conditions and at what rate does ranitidine degrade?
MS. TOLEDO: Object to form. Asked and answered.
A. Again, these are -- this was background information on drug stability in general, and I did not for ranitidine specifically.
Q. So you did not answer those questions, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. I didn't set out to answer those questions.
Q. Because you didn't set out to answer those questions you didn't answer them, correct?
MS. TOLEDO: Object to form.



Asked and answered.
A. I reviewed data that attempted to -- to look at this, so in that sense, you know, I was investigating ranitidine's stability.
MS. BOGDAN: If we could please pull up the King publication from 2020.
A. Are we about ready for a lunch break?
THE VIDEOGRAPHER: This exhibit will be marked as Exhibit Number 10.
(Plaintiffs' Exhibit 10 was marked for identification.)
MS. BOGDAN: Carmen, the witness has just asked me about lunch break, so -- you're muted so I --
MS. TOLEDO: Well, I just -- we're just using the one speaking.
MS. BOGDAN: Sorry. I thought you might be speaking and I wasn't hearing.
MS. TOLEDO: No. I mean, do you have -- if he'd rather wait to ask about King after lunch break or if you

don't have a lot to go.
MS. BOGDAN: I'd rather go ahead and ask the questions on the King study. I'm thinking it's maybe 15 minutes, 20 minutes, and that would be a good time for a break. Is that --
MS. TOLEDO: It's up to you, Dr. Olsen.
THE WITNESS: I'm okay for that.
MS. TOLEDO: If it's -- if it's all right -- we actually got lunch delivered. So if it's all right and we can take the break now.
MS. BOGDAN: That's fine.
MS. TOLEDO: Okay. How much time, 20 minutes, 30 minutes?
MS. BOGDAN: Say 20 and hope to get started by 30.
MS. TOLEDO: Sounds fair.
THE VIDEOGRAPHER: We're now off the record. The time is 1607 UTC, 12:07 p.m. EDT.
(Whereupon, a lunch recess was taken.)


THE VIDEOGRAPHER: We are now back on the record. The time is 1644 UTC, 12:44 p.m. EDT.
THE WITNESS: Can I go back and provide some clarification to the discussion of the Le report?
I had a chance to look at my expert report and what I did was quoted what she said about NDMA transforming to other entities, and she said that it -- that could be potentially it's toxic metabolite.
So she was offering that opinion, and I said she didn't give any evidence that that was occurring, and she didn't account for other potential reasons that the NDMA levels may have been observed to decrease, such as variation among the tablets or, you know, loss of the physical integrity of the -- the tablet.
So, that's -- I think we were getting what she said and what I said maybe conflated there.
MS. BOGDAN: My questions were not


asking about what Dr. Le said. It was asking about what opinions you're offering with regard to the metabolic activation or the mutagenic capacity of NDMA, but we'll let the record speak for itself. But I do appreciate you providing that additional information.
If we could start -- I believe it was marked Exhibit 10 before we had the break for lunch.
BY MS. BOGDAN:
Q. Dr. Olsen, are you familiar with this study by first author King, which is a GSK, GlaxoSmithKline, study?
A. Yes, in general.
Q. Did you review this as part of your work on this case?
A. Yes. I reviewed this paper.
Q. Did you understand that the defendants have admitted that ranitidine degrades into NDMA with heat?
MS. TOLEDO: Object to form.
A. Yeah. In that sentence, I -- I don't know that the word "admitted" is


appropriate. I would say they found that ranitidine, under certain conditions, different samples, certain temperatures, humidity and time, can at highly variable rates form NDMA.
Q. Do you have an understanding that Defendants have found that ranitidine degrades into NDMA with humidity?
MS. TOLEDO: Object to form.
A. Again, ranitidine, humidity can be a contributing factor among others, such as the particular sample, container closure, heat, time, and humidity all can impact NDMA formation.
Q. If I could direct your attention to the abstract of this GlaxoSmithKline publication. This publication is essentially GSK's undertook a root cause analysis to investigate NDMA found in ranitidine drug products, correct?
A. Yes. They were looking at trying to find out what was going on.
Q. Okay. And in the abstract written by GSK it states:
The root cause analysis suggested

that the presence of NDMA results from a slow degradation of the ranitidine molecule?
Had you read that sentence as part of your investigation into this matter?
A. Yes.
Q. What does degradation -- the presence of NDMA results from a slow degradation of the ranitidine molecule mean to you as a chemist?
MS. TOLEDO: Object to form.
A. Well, that ranitidine can be reacting. This doesn't imply that it's reacting with itself. It could be or it could be reacting with something else present in a slow degradation process.
Q. Directing your attention to the next sentence which reads:
Analysis using suitably isotopically labeled ranitidine hydrochloride confirmed the formation of NDMA solely from an intermolecular reaction of ranitidine hydrochloride without involvement of impurities?
Did I read that correctly?
A. Yes.



Q. And as a chemist what does that sentence mean to you?
MS. TOLEDO: Object to form.
A. Well, they're -- they do provide evidence that the NDMA formation is from ranitidine molecules rather than interaction with other species that could be present; although, they don't give a -- really a specific mechanism for how that occurs.
Q. But they are confirming in this study that the NDMA is forming from the ranitidine molecules interacting with each other, correct?
MS. TOLEDO: Object to form.
A. Can you repeat that again? You kind of cut out at the first.
Q. Sure.
But they are confirming in this study that the NDMA is forming from the ranitidine molecules interacting with each other, correct?
MS. TOLEDO: Object to form.
A. Well, they didn't confirm that. They -- they were trying to find out what was -- was happening, whether it was presence



of impurities that was influencing this or not.
Q. And in the abstract, they confirmed that this NDMA was forming without involvement of impurities, correct?
A. They stated that in the abstract as one of their findings.
Q. Then GSK authors go on to say:
Factors that influence the rate of degradation include heat, humidity, and the crystal morphology of ranitidine hydrochloride with a material exhibiting a columnar habit showing a slower rate of degradation?
Correct?
A. That's what that says.
Q. And so that is acknowledging that their studies and investigation found that heat and humidity are factors that affect the rate of NDMA formation from ranitidine?
MS. TOLEDO: Object to form.
Q. Correct?
A. Well, this particular finding was related to API and they were looking at what -- what can influence the rate of



formation of NDMA and found that it can be influenced by heat, humidity, and crystal morphology.
Q. And this analysis that's being done by GSK is a post hoc analysis, correct?
MS. TOLEDO: Object to form.
A. Can -- can you define that a little -- little more for me?
Q. Well, you use post hoc analysis in your report. Can you tell me what you meant by the words "post hoc analysis"?
A. Well, I think you're asking the question, so I want to answer your questions so I would appreciate that clarification.
Q. Page 5 of your report you write:
Chemists, -- chemists do not, however, typically conduct post hoc analyses.
What did you mean by the term "post hoc analyses" when you wrote it in your report?
MS. TOLEDO: Object to form.
A. I need to look at where -- where I said that to know the context.
DOCUMENT TECHNICIAN: Counsel, do you want that put up on the screen?

Q. It's on page 5 of your report, and it's under the Introduction section in the first full paragraph.
And I'm simply asking, Dr. Olsen, what you meant by your definition of post hoc.
A. Well, in -- this case, the whole sentence is post hoc analyses for estimating what levels of impurities might have existed many years ago, so trying to do a retrospective estimate of that.
Q. So what you mean by "post hoc" is basically doing something after the event has occurred, correct?
MS. TOLEDO: Object to form.
A. Here is retrospectively, yeah, trying to go back and know what happened at an earlier time.
Q. And isn't the study here being done by GSK to find out why there is NDMA in ranitidine a post hoc analysis?
MS. TOLEDO: Object to form.
A. I don't know what -- I guess they're trying to answer the question if NDMA is in ranitidine, where is it coming from.



Q. And they concluded that the NDMA is coming from the ranitidine molecule itself, correct?
MS. TOLEDO: Object to form.
A. That it's coming -- if there are any material -- slow degradation via an intermolecular reaction.
Q. For those who are not chemists, an intermolecular reaction would be a reaction between ranitidine molecules, correct?
A. Yes. That would be as opposed to, as it says, other components such as other impurities.
Q. Directing your attention to page 2919 of this study.
And in the last sentence on this page it reads:
The key observations made from accelerated stability studies reported in Table 6 were as follows.
And then it says:
Both an elevation in temperature and relative humidity increased the rate of formation of NDMA?
And then the next sentence on the next page reads:
A similar finding has recently been reported for ranitidine drug substances and tablets?



Do you see that?
A. Yes.
Q. So this published study by GSK does not only comment on API, correct?
MS. TOLEDO: Object to form.
A. They -- they give a reference. I don't know what, but that's -- yeah, that's the Abe paper, so they reference that.
Q. And they're acknowledging that that has been found with drug product as well, correct? The authors are mentioning that in their study?
MS. TOLEDO: Object to form.
A. They don't -- let's see. If we go back to the bottom of that, that temperature and relative humidity. And I would emphasize that the -- they called it accelerated stability but this was really stress conditions at 60 degrees.
Q. My question simply is if the authors of the study are acknowledging that the elevation and temperature in RH, which is relative humidity, was found to increase the rate of formation of NDMA in drug substances and tablets?



MS. TOLEDO: Object to form.
Asked and answered.
A. They say similar and reference another paper, so.
Q. Well, they -- and that's what the study says, correct?
MS. TOLEDO: Object to form.
Which study?
Q. The King study. It references the finding has been reported for ranitidine drug substances and tablets, and then cites to the Abe paper, correct?
A. It references the Abe paper, which also shows that ranitidine under certain conditions of heat, humidity, exposure, packaging. And although I don't know in the Abe paper if -- how many different samples they looked at, but -- so that they -- they also saw in some cases NDMA was increased.
Q. Did you look at the internal RSK root cause analysis that was done as part of

your investigation into this case?
A. The GSK root cause analysis?
Q. Yes. Not the -- not the published version, which was the article that I've just shown you marked as Exhibit 10, but the internal root cause analysis document.
A. I looked at the -- I don't know if you'd call it summary report of that, which I think also references many individual reports that are discussed there.
MS. BOGDAN: Would you please pull up and mark as Exhibit 11 the GlaxoSmithKline investigations into the root cause, which is dated June 15, 2020?
DOCUMENT TECHNICIAN: We're working on pulling it up for you.
MS. BOGDAN: Okay.
(Plaintiffs' Exhibit 11 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, I see it on my screen now so let me know once it arrives.
A. Okay.
MS. TOLEDO: We're still waiting



for it to load.
A. Okay. We -- I have that.
Q. Okay. Did you review this document as part of your investigations into this case?
A. Yes.
Q. And along with this root cause for the presence of NDMA in ranitidine hydrochloric drug substance and associated drug products, did you also review the Excel sheet with all of the testing data that was done with this RCA?
A. I don't remember if I looked at that or not.
Q. It's on your Materials Considered list.
MS. BOGDAN: Can we please pull up the GSK master data sheet?
A. Yes. I remember looking at some of this.
(Plaintiffs' Exhibit 12 was marked for identification.)
Q. Did you go through the GSK root cause for the presence of NDMA in ranitidine that was marked as Exhibit 11 and the data



from that study, which is on this master spreadsheet marked as Exhibit 12, and look to see how much NDMA GlaxoSmithKline found when they were testing the ranitidine drug substance and drug product?
A. Okay. Can you state that again?
Q. Did you go through GSK's root cause analysis that was marked as Exhibit 11 and the material data spreadsheet, which has been marked Exhibit 12, and look to see how much NDMA GlaxoSmithKline found when they tested the ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I really don't recall how much of the spreadsheet data I -- I looked at and -- and how it related to the root cause analysis.
Q. Did you read the root cause analysis and take note of the amount of NDMA that GSK was reporting to have found in the drug substance and the drug product in the root cause analysis marked as Exhibit 11?
MS. TOLEDO: Object to form.
A. Well, I looked at the experiments



they did. Do you have a specific set of data that I can comment on? I have a lot of data here.
Q. Yes, they do have a lot of data.
And I'm asking if you looked at the results with regard to the amount of NDMA they found in the drug substance, meaning the API, and the drug product.
MS. TOLEDO: Object to form.
A. No. I'd have to go back. If you like, I can look through and see what data I recall looking at. If you're talking just about the -- well, you know, I'd have to look really -- go through and look to see what data you're talking about.
Q. I'm talking about any of the test results that they list in their root cause analysis as far as how much NDMA they found in ranitidine drug substance or drug product.
MS. TOLEDO: Object to form.
A. Well, for example, I looked at Table 1 or the figure showing NDMA levels in drug substance.
Q. Do you record in your report any of the NDMA levels that were detected by GSK in

its root cause analysis, either of the drug substance, the drug tablets?
A. Well, I need to look at my report to make sure I -- I'm accurate on what I cited there.
Q. Is there any table or figure in your report where you discuss the findings of GSK and the levels of NDMA that it found in the drug product and drug substance it tested?
MS. TOLEDO: Object to form. Let him have a look at his report.
A. In one instance in my report I actually gave the range for GSK film-coated tablets that Dr. Najafi listed in his report of 36 to 1140-nanograms per 150-milligram tablet.
Q. My question is, did you note anywhere in your report the amounts of NDMA that GSK found when measuring the levels in drug substance and drug product?
MS. TOLEDO: Object to form. Asked and answered.
A. Those were the GSK results.
Q. Listing them from Dr. Najafi's



report, correct?
A. He quoted them or cited them in his report.
Q. Did you look at GSK's report?
MS. TOLEDO: Objection.
Q. And look at all of the values for NDMA that they found when they tested the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered.
A. I took the values from my report that Dr. Najafi decided -- cited as the tablet analysis by GSK, so.
Q. You didn't look at GSK's results yourself?
MS. TOLEDO: Objection. Misstates his testimony.
A. Did I audit Dr. Najafi's citing the results? No. I took them from his reports since that's what he was saying.
Q. Did you look at the results that are on Exhibit 12, which is put up in front of you, for GSK's testing of API and finished-dose products and compare them to the results that Emery Pharma got when



testing ranitidine drug substance and drug products?
MS. TOLEDO: Object to form.
A. The only -- I think the only GSK results that I mentioned in my report were those that Dr. Najafi mentioned in his report which were consistent with testing from parties such as FDA and TGA as discussed on -- in my report, but I didn't include -- even include those in the graph showing the disparity between Emery's results and the rest of the world.
Q. Did you do a review of GSK's results to determine the upper level of NDMA that they found in a 150-milligram tablet?
MS. TOLEDO: Object to form.
A. I took the result range given by Dr. Najafi.
Q. Did you independently look at the GSK results to determine from their results what the values were in the tablets that they tested?
MS. TOLEDO: Objection. Asked and answered.
A. I quoted the results that



Dr. Najafi was citing in his report.
Q. In order to form an opinion with regard to the testing levels found by Emery Pharma in ranitidine drug substance and drug product, you didn't feel it important to compare those values to the values found by GSK when they tested ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. That's why I took the values directly from Dr. Najafi's report as comparison. And in my report, I am not relying on GSK or Sanofi other than to say that their results are consistent with the others that have looked at ranitidine levels -- or NDMA levels in ranitidine.
Q. Were you aware that GSK found over 1,000-nanograms in 150-milligram tablet of ranitidine when they did their testing?
MS. TOLEDO: Object to form.
A. The range was 36 to 1140-nanograms.
Q. Do you know how many tablets GSK found that had more than 1,000-nanograms?
MS. TOLEDO: Object to form.
A. No. I -- I believe Dr. Najafi only

cited the range in his report.
Q. But you didn't look at the results of GSK yourself to see all of the values that are in between that range?
MS. TOLEDO: Object to form. Misstates his testimony.
A. The range that he quoted that I cite from his report is consistent -- more consistent with the other analyses reported by independent parties than it is with Emery's results.
Q. But the question was, did you look at the GSK results yourself to perform an independent analysis on the levels that they found in the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered several times now.
A. I looked at -- I guess if Dr. Najafi didn't do that, then I don't know why he would report this range.
Q. Did you ask the defendants to provide you as an expert in this litigation with all the information they had regarding the testing that they did of ranitidine drug substance and drug product?



MS. TOLEDO: I'm going to object on the basis of privilege. Communications with counsel are outside the scope of discovery.
Q. Do you have an understanding as to whether or not you had been provided with all the information regarding the testing for NDMA that has been done by the defendants of ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I have not asked for additional information.
Q. As an expert giving an opinion with regard to validity of test results, wouldn't you want to have all the information available regarding others' test results of ranitidine drug substance and drug product in order to be able to compare the results?
MS. TOLEDO: Object to form. Argumentative.
A. In my report, I state that I am not relying on GSK data for my opinions. But again, I make the observation that they're -- the range quoted by Dr. Najafi was consistent with those results from independent parties.



Q. Do you know how GSK came about selecting the various drug product and drug substance it tested?
MS. TOLEDO: Object to form.
A. I'd have to look through the root cause analysis to see what they said about that.
Q. You said that you read Andy Searle's transcript as part of your investigation into this case, correct?
A. I read it some time ago.
Q. Did you make any note as to his testimony regarding how they determined what product they would test in their root cause analysis?
A. I don't recall what he had to say about that.
MS. BOGDAN: Okay. We can take this exhibit down.
Q. Did you test any of the defendants' ranitidine API for the presence of NDMA?
A. I was retained just last summer and, so testing of ranitidine at -- at that time, I wouldn't -- I don't know what the purpose of that would be.



Q. Now, when you say that, that would be in the summer of 2021?
A. Yes.
Q. Did you test any of the defendants' ranitidine finished drug product for the presence of NDMA?
A. Well, that would be the same answer as I wasn't retained until then and the recall had occurred many months ago, so no -- no real reason to do that.
Q. Well, wouldn't one reason to do it be to see how much NDMA is actually in the drug substance and the drug product?
MS. TOLEDO: Object to form.
A. Well, it depends on, you know, why look at samples that are old and not relevant any longer.
Q. Did you make inquiry as to whether there were samples available that were still within their expiration date?
MS. TOLEDO: Object to form.
A. No. I didn't ask about that because by that point, again, they were -- would not represent what would -- if the question was, you know, what was available on

the market at the time consumers had access to ranitidine, then those samples wouldn't -- wouldn't be as relevant.
Q. Did you ask if the defendants had preserved samples of ranitidine API and ranitidine drug product for testing?
MS. TOLEDO: Object to form.
A. The information I got was that samples either had been or were being furnished to Plaintiffs to -- as part of this litigation.
Q. Do you have an understanding that any samples that were furnished to the plaintiffs for testing in this litigation there was part of that batch or lot that was retained by the defendants? That Plaintiffs were not provided the only sample available from any particular batch or lot?
MS. TOLEDO: Object to form.
A. I'm not aware of how -- how many samples and whether, you know, they were retained at -- at separate places.
Q. Have you ever tested ranitidine for the presence of NDMA?
A. Have I conducted a test or directed


a test for ranitidine?
Is that the question?
Q. Yeah.
A. I had no -- no reason to do that.
Q. Did you make any suggestion that you should test ranitidine API and drug product to determine the levels of NDMA?
MS. TOLEDO: Objection. Privilege.
Q. As an expert, do you think it's important to have tested the ranitidine drug product and drug substance in order to give an opinion with regard to the levels of NDMA in the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered.
A. I guess the question is also what -- for what purpose? What are you going to try and use that information for?
And testing had already been conducted on tablets and API.
BY MS. TOLEDO:
Q. Other than the GSK root cause analysis and the master spreadsheet that I've already marked as an exhibit, are you aware


of any other testing done by the defendants on ranitidine drug substance or API? This is a drug substance or drug product.
MS. TOLEDO: Object to form.
A. I don't -- I don't recall seeing other testing that -- that was done.
Q. As you sit here today, can you offer an opinion with a reasonable degree of scientific certainty as to the levels of NDMA in any of the tablets that were provided to the plaintiffs for testing?
MS. TOLEDO: Object to form.
A. I think you're asking do I have a comparison dataset to compare to the Emery results and, to my knowledge, that doesn't exist, but that doesn't soothe my concerns about the Emery dataset itself being invalid.
Q. You, as you sit here today, can't offer testimony as to what levels are in the tablets or the API that was provided to the plaintiffs for testing because you, yourself, have not tested the samples and you have no dataset to compare it to, correct?
MS. TOLEDO: Object to form.
A. I don't have a dataset to compare


to Emery's results. I can only look at the gaps and validations and concerns about the data that Emery had generated.
Q. But as you sit here today, you can't say that the amount of NDMA that Emery Pharma measured in the API or the tablets is incorrect.
MS. TOLEDO: Object to form.
A. I have reason to doubt that it is correct as I have expressed in my report and supplemental report; and, not to mention, the inconsistency with Emery's previous data for the citizens' petition and all the other independent parties that have generated data on ranitidine.
Q. When you say you have reason to doubt, that doesn't mean that you can prove that their reporting of NDMA in the drug substance and drug tablets that they tested is wrong, correct?
MS. TOLEDO: Object to form. Misstates his testimony and his reports.
A. And if you -- in fact, I address that in my supplemental report where it seems

Page 126
B. Olsen

that Emery wants to claim validity of the -- their data until it's proven not reliable. And that's not the way it works.
They need to show that it's reliable and that it -- interferences have not occurred even if there's no other dataset to compare it to. And especially when we see the inconsistencies with all the other data that's been generated.
Q. But you, Dr. Olsen, have no testing data for these samples to show that the amounts that Emery Pharma has measured in the drug substance or the drug product are incorrect?
MS. TOLEDO: Object to form. Misstates his testimony.
A. I don't have data for those samples but have the concern about the Emery data as it is by itself.
Q. You live within about 20 miles of the GSK Zebulon facility located in Zebulon, North Carolina?
A. I'm not far from Zebulon.
Q. At the Zebulon facility, does GSK have LC-MS/MS capacity?

Page 127
B. Olsen

A. I don't know what capacity they have in that facility.
Q. Are you familiar with what is known as the Research Triangle Regional Partnership in North Carolina, sort of from your part of the country there?
MS. TOLEDO: Object to form.
A. I'm not -- I'm not familiar with what research partnership refers to. I'm familiar with the Research Triangle area.
Q. Okay. And what is the Research Triangle area?
A. That is a large area kind of between Raleigh, West Raleigh and Durham, North Carolina, which has a lot of different technology-related companies, including some pharma companies.
Q. And are there analytical laboratory service providers in that Research Triangle?
MS. TOLEDO: Object to form.
A. Are there contract analytical laboratories, is that --
Q. Yes.
A. Yes. I know -- I know of at least one.

Page 128
B. Olsen

Q. And are there Tier 1 research universities also located in the Research Triangle?
MS. TOLEDO: Object to form.
A. By "Tier 1," do you mean well-known universities?
Q. Like Duke, UNC at Chapel Hill, North Carolina State?
A. Those would be the -- the ones, yes.
Q. Did you make any inquiry as to whether any of those laboratory service providers, GSK Zebulon facility, or any of the research universities would be willing to test ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I had no -- no reason to -- to inquire about external testing. It had already been done by FDA, Health Canada, TGA, all the other data sources I cite in my report.
Q. Had those agencies tested the samples of ranitidine drug product and drug substance that were sent to the plaintiffs?

Page 129
B. Olsen

MS. TOLEDO: Object to form.
A. They tested samples as described in their results, FDA's samples coming from both the marketplace and some furnished by suppliers, and same situation with other -- some of the other independent laboratories.
Q. My question was, did they test the batches or lots that were provided to the plaintiffs?
MS. TOLEDO: Object to form.
A. I don't know if any of the lot numbers that they tested corresponded to any of the samples tested by Emery a couple years later.
MS. BOGDAN: Mind if we take just a quick five-minute break here?
MS. TOLEDO: Sure.
THE WITNESS: Okay.
THE VIDEOGRAPHER: We are now off the record. The time is 1742 UTC, 1:42 p.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1754 UTC,

1:54 p.m. EDT.
BY MS. BOGDAN:
Q. Dr. Olsen, in other cases you've been retained to actually do testing, correct?
A. Testing or experiments related to a question at hand.
Q. And one of those cases was the Cephalon and C-I-M-A Labs versus Watson Pharmaceuticals?
A. Cephalon, CIMA LABS, yes.
Q. And you were retained to design and execute testing to detect carbon dioxide gas that evolve from Watson tablets upon contact with aqueous media?
A. It was experiments to monitor the evolution of CO2.
Q. And did you design an experiment in order to do that?
A. Did I design an experiment? I designed the testing that we did for it.
Q. So you designed a test method that was used in that case?
A. The procedure that we used.
Q. And what test method did you come



up with in that case?
MS. TOLEDO: Object to form.
A. Well, this was -- this was a much different situation than doing a -- like a quality control-type measurement or an impurity measurement, for example. In -- in this case the question we were trying to answer is how much carbon dioxide is released when a tablet is introduced into various aqueous media. I don't remember how many different ones we looked at, but.
Q. And to do this testing you used a device equipped with an infrared sensor which was an accepted scientific methodology for detecting carbon dioxide gas, correct?
MS. TOLEDO: Object to form.
A. Carbon dioxide has a very distinctive infrared band that is well known and, in fact, the device we use to monitor the CO2 could be used as a field device; in other words, portable. Wouldn't even have to remain in the laboratory for use.
Q. That was actually an EA80 indoor air quality meter data logger?
A. I believe that's the -- the model



that had -- had capability for outputting data to a computer.
Q. And so you designed this testing method in that case to fit the issues that were presented in the litigation, correct?
MS. TOLEDO: Object to form.
A. It was designed to, as I said, monitor CO2 when a tablet was exposed, introduced to aqueous media.
Q. Okay. And so when you designed that test method, you attached an experimental vessel containing the tablet to the meter's gas inlet port via tubing and then you use nitrogen gas to carry the gas to the meter's infrared sensor to measure the amount of CO2?
MS. TOLEDO: Object to form.
A. It's been -- been a long time since I did those experiments, but in general, that is the idea of how that went.
Q. So you developed the experimental design and test method based upon your scientific experience and knowledge, correct?
MS. TOLEDO: Object to form.
A. Yes. And the -- this was a -- not



a standard test method. It was something designed for this particular purpose.
Q. Right. So it was a fit-for-purpose design based upon your scientific experience and knowledge in that case, right?
A. And using a well-accepted principle for looking at CO2 and -- and equipment.
Q. And the manufacturer of that meter device that was being used to measure the CO2, how is that device calibrated to work in 5 to 50 degree Celsius and between 10 and 90 percent relative humidity, correct?
MS. TOLEDO: Object to form.
A. I don't remember the exact specifications on -- on the meter.
Q. Do you remember using the meter in less than the relative humidity condition that the meter was calibrated for?
MS. TOLEDO: Object to form.
A. No. I don't recall what -- what the humidity was.
Q. Do you have a memory of using the meter in conditions that were outside of what the manufacturer calibrated the meter to work in?

MS. TOLEDO: Object to form.
A. Can you ask that again?
Q. Did you use the meter in that case in conditions that were outside of the conditions that the manufacturer calibrated the device to work within?
MS. TOLEDO: Object to form.
A. That's what I don't recall; what specific conditions were outside, if they were.
Q. But you can't say if you did or you didn't as you sit here today. You just don't remember?
A. It was, what, 12 years ago.
Q. In that case, did the testing you conducted take more than one day?
A. I don't remember if it did or not.
Q. Did you use more than one sample when you were doing your testing in that case?
A. By one sample, you have to define sample for me.
Q. Did you run the test on more than one tablet?
A. Yes. We did replicates for each



condition. It was a destructive test.
Q. Do you know how many tablets you tested?
A. Not all together.
Q. Was it more than ten?
A. I believe so. I don't -- I don't recall for each condition exactly how many tablets were -- were used.
Q. Was it more than 50?
A. I don't think we needed that many tablets for what we did.
Q. And the testing protocol that you detected in that case was based upon your scientific judgment of over 29 years as an analytical chemistry or analytical chemist?
MS. TOLEDO: Object to form.
A. That plus the well-accepted common use of infrared as a CO2 measurement tool. And this was such a robust technology that it, you know, could be used as an air quality monitor in the field.
Q. Did you follow CGMP or GLP to conduct your testing in that case?
MS. TOLEDO: Object to form.
A. We followed all of the standard



operating procedures in place. This was at the Aptuit laboratory, which included CGMP notebook documentation. And also, since the samples were controlled substances, we had to maintain careful accountability and a chain of custody of those -- excuse me -- even while testing.
Q. That's because you were working with fentanyl, correct, which is a controlled substance?
A. Yes.
Q. Fentanyl has never been available over the counter, has it?
A. Just -- no, just illegally.
Q. And when you say you maintained a lab notebook, are you telling me that this was done with CGMP and QA oversight and all the documentation that comes with CGMP work?
MS. TOLEDO: Objection --
(Cross-talk.)
Q. -- talking about maintaining a lab notebook?
A. I said we followed the laboratory documentation procedures, which are consistent with CGMP requirements, unlike



what I saw in Emery's notebook documentation. Much, much more complete in Aptuit lab.
Q. And you created protocols for your testing methodology in that case, didn't you?
A. Yes. We had a protocol that described how the test was to be conducted.
MS. BOGDAN: If we could please mark Dr. Olsen's Cephalon protocol as an exhibit. What exhibit number are we on, please?
THE VIDEOGRAPHER: This will be marked as Exhibit Number 13, Counsel.
(Plaintiffs' Exhibit 13 was marked for identification.)
BY MS. BOGDAN:
Q. Doctor, do you see Exhibit Number 13?
A. Yes.
Q. And this is your Cephalon protocol?
A. This was what was furnished as an appendix to my report.
Q. There's no date on this protocol, is there? And I'm not talking about the timestamp from the cord at the top.
A. Right. The date that this would've

Page 138
B. Olsen

been applied to would've been in the notebook. So this was taken -- procedure from the notebook where the date was. And in this case, we didn't have the date for the exhibit.
Q. But there's no date on the protocol, correct?
MS. TOLEDO: Object to form.
A. Not on this example that was furnished in my report. But in the notebook, the date -- dates are clear.
Q. And there's no revision history on this protocol, correct?
MS. TOLEDO: Object to form.
A. We did not use a different -- different protocol for it.
Q. And there's no author written on this protocol, correct?
MS. TOLEDO: Object to form.
A. Not as furnished in the expert report; although, it's mentioned that I developed the protocol and it's in the laboratory notebook of the person who executed it.
Q. Does the protocol list the brand

Page 139
B. Olsen

and type of syringe needles that were used?
A. That's not the type of thing that's necessary for something like this. This is a -- all the information here given is sufficient to reproduce this test.
Q. Does it mention the type of tubing that was used, the brand?
A. It doesn't give the brand because that's not a critical factor.
Q. I'm sorry?
A. I was just gonna say, I think we're getting a bit of a false comparison. In the Emery testing methods, some of the --
Q. Doctor, I'm not asking you for a comparison right now with the Emery testing methods. I'm asking you with regard to what's on this particular protocol.
MS. TOLEDO: Please don't interrupt the witness. He was finishing his answer.
Q. My question was, does it mention the type of tubing that was used, the brand. That was the question; that there is no question pending that that was an answer to, so I will continue to ask my question.

Page 140
B. Olsen

MS. TOLEDO: He's entitled to provide an explanation to his answer and he can finish.
You can finish your answer, Dr. Olsen.
MS. BOGDAN: That wasn't an answer to the question that was posed. He had stopped and he answered the question that was posed, and then was just providing a narrative if you look at the transcript.
So, there isn't a question pending right now. I certainly will ask another question, and then the doctor can -- I've not interrupted the doctor. I've let him answer the questions that are pending, but what he was just doing there was not in response to any question that was asked.
A. Yes, it was in response to the tubing question.
I mentioned that the pipe or the brand of tubing was not a critical factor in reproducing this -- this testing. However,

Page 141
B. Olsen

in the -- as opposed to the Emery method where Dr. Najafi has noted such a concern with ranitidine being a highly unstable molecule that there is no information about avoiding heat during sample preparation and things like that that could -- as already known artifactually formed NDMA.
Q. Back to the protocol. You mention an electronic gas flow meter in the protocol. Does it tell us the type of electronic gas flow meter?
MS. TOLEDO: Object.
Q. In number 6?
MS. TOLEDO: Object to form.
A. It doesn't list the brand there and the -- that's because it's not specific to a brand that's necessary to conduct the test.
Q. And your protocol here mentioned tablet but does not provide any information about the identification of the tablet, correct?
MS. TOLEDO: Object to form.
A. This was for a fen- -- in this case, the defendants' tablets. So this could be used -- that would've been in the notebook

statement of purpose of which tablets you're going to use this method for.
Q. Protocol fails to prespecify the number and identity of samples that you're gonna use in the testing, correct?
MS. TOLEDO: Object to form. It misstates his testimony. He's already explained that this information is included in notebooks.
BY MS. BOGDAN:
Q. I'm asking if it's written in -- on the protocol. The protocol does not prespecify the number and identity of samples to use in the testing, does it?
MS. TOLEDO: Object to form.
A. This protocol is how to conduct the test. The information in the notebook is what to conduct the tests on.
Q. The protocol doesn't include anything about visual inspection of the tablets, does it?
MS. TOLEDO: Object to form.
A. Was not at all necessary or related to -- to this -- this work. This -- this was not involving degradation. This was just



determining the CO2 evolution properties of these tablets.
Q. And the protocol doesn't include anything about how you would choose a tablet to use for the testing, correct?
MS. TOLEDO: Object to form.
A. There was no concern about differentiation of tablets that had been treated in some accelerated or stressed way, and then there were replicas done as part of the individual protocols for -- for this testing.
Q. And you mention notebooks. Were the notebooks provided to the parties in this case?
A. I don't recall what all was provided for this matter.
Q. And were those your own personal notebooks?
A. No. These were maintained at -- on experiments conducted by a bachelor's degree person at the laboratory under my direction and in my presence.
Q. And this is when you were doing consulting work but using Aptuit's laboratory



after you no longer worked there?
A. That's right.
Q. And who would maintain those lab notebooks?
A. Aptuit would maintain those. And they have CGMP SOP procedures for recording all experimental data in the notebook. They don't do anything, even things that would be considered development work, they follow their notebook documentation procedures because it gets to be really tricky, difficult to try and keep kinda two sets of rules for documentation.
Q. So you've mentioned development work. Is it also known as R&D work, research and development work?
A. That's a very loosely defined term. I think what Emery has tried to portray it as anything that doesn't involve, you know, manufacturing or releasing drugs to market.
Q. Are you familiar with a term, that is research and development work, as it's used in the chemistry field?
MS. TOLEDO: Object to form.
A. Again, that covers a wide range of



activities but, nevertheless, for anything under that umbrella, appropriate documentation minimum standards should be metaphor any laboratory work. And my opinion was that Emery's notebook documentation in this matter fell far short of that.
MS. BOGDAN: Okay. If we could please pull up the next exhibit, which would be CFR 58.1.
THE VIDEOGRAPHER: And this will be marked as Exhibit 14.
(Plaintiffs' Exhibit 14 was marked for identification.)
BY MS. BOGDAN:
Q. Are you familiar with the Code of Federal Regulations that pertains to GLP?
A. Yes.
Q. And if we look here in the scope for GLP, it states that:
This part prescribes good laboratory practices for conducting nonclinical laboratory studies that support or are intended to support applications for research or marketing permits for products regulated by the Food and Drug

Administration, including food and color additives, animal food additives, human and animal drugs, medical devices for human use, biological products, and electronic products?
Do you see that?
A. Yes.
Q. So the Code of Federal Regulations describes the scope of GLP as pertaining to studies that support or are intended to support applications for research or marketing permits for products like human drugs, correct?
MS. TOLEDO: Object to form.
A. Well, the same thing applies as what I said about GMPs. Just saying that something is not a GLP study doesn't absolve one of the need for careful and complete laboratory notebook documentation of -- so that results can be checked, retrieved, examined and reproduced if -- if desired.
Q. But you agree that GLP is required only in instances where the research is being done for drug application seeking drug approval for human use?
MS. TOLEDO: Objection.


Q. Definition of the statute itself?
MS. TOLEDO: Object to form.
Asked and answered.
A. In the, you know, good laboratory practices covers a lot more than documentation. It covers a lot of the other aspects of preclinical studies that get demitted for -- to FDA. But again, it doesn't -- calling something non-GLP does not give leeway from a scientific standards standpoint to use substandard documentation practices.
Q. But you agree that the work that Emery Pharma did as an expert in this litigation was not for the purpose of investigating new drug applications or seeking approval of a drug for sale for human use, correct?
MS. TOLEDO: Object to form.
A. That's not the purpose of the litigation, but Emery was also not doing what I would call R&D. They were not developing anything. They were trying to design tests and take measurements in support of the litigation.


Q. Which is not developing a drug for regulatory approval to be used in humans, correct?
MS. TOLEDO: Object to form.
A. Not going to be used for that purpose but still needs to meet minimum scientific standards for documentation.
Q. The work that they did was not a GLP project, correct?
MS. TOLEDO: Object to form.
Asked and answered.
A. It's -- I don't know what aspect of that it would pertain to, you know, not following good documentation practices.
Q. You're using the term "good documentation practices," and I'm asking about the regulatory requirements of -- of GLP.
I'm asking if the work that Emery did in this litigation was to do research in furtherance of getting a drug approved regulatorily for use in humans?
MS. TOLEDO: Objection. Asked and answered.
A. They were not conducting testing


for that purpose but still need to follow minimum scientific standards for documentation to defend the integrity and quality of their -- their data which was in my examination not present.
Q. Did you undertake an investigation as to whether the defendants engaged in non-GLP research regarding ranitidine?
MS. TOLEDO: Object to form.
A. To my knowledge, the defendants followed their own internal SOPs related to their documentation in support of the data they're generating, and my understanding is that that still followed what would be considered at least at CGMP documentation practices as well as other things like instrument qualification, training, et cetera.
MS. BOGDAN: If you could please pull up Exhibit GSKZAN3395640, which is called Bioanalysis.
THE VIDEOGRAPHER: This will be marked as Exhibit 15, Counselor.
(Plaintiffs' Exhibit 15 was marked for identification.)

BY MS. BOGDAN:
Q. Doctor, do you see this exhibit that's been loaded? Is it up on your screen?
A. Yes.
Q. Okay. Have you seen this method sheet before?
MS. TOLEDO: We need to see the document on Box, please. Give us a second for it to load.
Do you see it?
THE WITNESS: Not yet. Okay.
BY MS. BOGDAN:
Q. Have you seen this document before, Dr. Olsen?
A. I don't recall having seen this.
Q. Okay. It's a GlaxoSmithKline document. Do you see that at the top?
A. Yes.
Q. Okay. And you see that it pertains to ranitidine? That's in the top right.
A. Yes.
Q. Okay. And then you see in the center of the document it says:
Non-GLP Method Sheet?
A. Yes.


Q. But you hadn't seen this document before today and me showing it to you, correct?
MS. TOLEDO: Objection. This clearly shows that it is not an exogenous text document. It is outside the scope of his opinions.
Q. I'm just asking if you've seen it before me showing it to you today. That was my question.
A. I don't recall having seen this.
MS. BOGDAN: We can take that down. And if we could pull up Protocol Amendment 4, GSKZAN3692463.
THE VIDEOGRAPHER: This one will be marked as Exhibit 16.
(Plaintiffs' Exhibit 16 was marked for identification.)
THE WITNESS: Okay.
BY MS. BOGDAN:
Q. And do you see this document, it says, Sponsor GlaxoSmithKline in the center?
A. Yes.
Q. And the Study Title is N-nitrosodimethylamine Transgenic Gene


Mutation Assay in MutaMice?
A. Yes.
Q. And Compliance Status, do you see it says, Non-GLP?
MS. TOLEDO: Again, objection. This is outside the scope of his opinions.
Q. Have you seen this document before I showed it to you today at this deposition?
A. No. It would not pertain to -- to my opinions. And it's well known that not all studies are GLP.
MS. BOGDAN: We can take this exhibit down.
If we can please bring up the exhibit, Current Good Manufacturing Practice Regulations.
THE VIDEOGRAPHER: This one will be marked as Exhibit 17.
(Plaintiffs' Exhibit 17 was marked for identification.)
BY MS. BOGDAN:
Q. Has that loaded for you, Dr. Olsen, on the computer?
A. Not quite. Not -- not come through


yet.
Q. It's only a two-page document.
A. Here it is. Loading now.
Q. Okay.
A. Okay.
Q. Okay. And this is from the FDA website with regard to Current Good Manufacturing Practice Regulations. And I would direct you to the first paragraph where the FDA is stating that the FDA ensures the quality of drug products by carefully monitoring drug manufactures' compliance with its good manufacturing practice (CGMP) regulations.
And then they go on to say:
The CGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used in the manufacturing, processing, and packaging of a drug product?
Do you see that?
A. Yes.
Q. Okay. And in this case, was Emery Pharma manufacturing a drug product?
MS. TOLEDO: Object to form.

A. Well, what's puzzling is that in I think all of Dr. Najafi's or Emery's communications they lead with a claim that Emery is GMP, GLP certified. Then they go on to describe results that apparently are not following their -- any GMP, GLP practices that they might have.
So I would find that misleading from the start. But no, they're not, to my knowledge, manufacturing any -- any products.
Q. So, my question, Doctor, and if you could please listen to the question, but -- that I'm asking, and my question to that in this case was Emery manufacturing a drug product?
MS. TOLEDO: Object to form. Asked and answered.
Q. And so -- go ahead.
My next question is, was Emery manufacturing, processing, or packing a drug product?
MS. TOLEDO: Object to form. Asked and answered.
A. Be the same response, is while they are not doing that, they highlight their


come -- certification as CGMP, GLP, so.
Q. Which means that they can do that kind of work, correct?
MS. TOLEDO: Object to form.
A. Presumably that's what that means. But when it's followed immediately by discussion of results they did for NDMA and ranitidine, it strongly implies, in my opinion, that that's what they're doing. I don't ever state that for this study we're -- we're not following our standard SOPs.
Q. To your knowledge, did Emery -- has Emery Pharma manufactured, processed and packaged Zantac or ranitidine for sale to humans?
MS. TOLEDO: Object to form. Asked and answered.
A. No. That -- I don't know that they have done that.
MS. BOGDAN: Take this exhibit down.
MS. TOLEDO: Before we start over with new line of questions, Rosemary, could we take a five-minute break?
MS. BOGDAN: Sure.


MS. TOLEDO: Thank you.
THE VIDEOGRAPHER: We are now off the record. The time is 1840 UTC, 2:40 p.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1851 UTC, 2:51 p.m. EDT.
BY MS. BOGDAN:
Q. Welcome back, Doctor.
Would you agree that analytical chemistry is the science of obtaining, processing and communicating information about the composition and structure of matter?
MS. TOLEDO: Object to form.
A. There's a lot -- a lot of descriptors in there. You want to go through that again?
Q. Well, what -- how would you describe analytical chemistry?
A. Well, did I talk about that in my report?
Q. Just asking you for what you


believe the field of analytical chemistry is.
A. I'm just trying to find where -- 'cause I thought I mentioned some of that. Okay.
The way I described it in my report was, analytical chemistry is a discipline concerned with developing methods to qualitatively and quantitatively evaluate chemical substances.
Q. And within the field of analytical chemistry, there are various techniques used to qualitatively and quantitatively detect, identify, characterize, and quantify chemical substances, correct?
MS. TOLEDO: Object to form.
A. I would say various methods to qualitatively and quantitatively evaluate chemical substances.
Q. And gas chromatography would be one of those, correct?
A. Gas chromatography is a technique used in analytical chemistry.
Q. And gas chromatography works for separating and analyzing compounds that can be vaporized without decomposition, correct?

MS. TOLEDO: Object to form.
A. It -- it works by separating and detecting compounds that have been vaporized.
Q. And it works for separating and analyzing those compounds that can be vaporized without decomposition, correct?
MS. TOLEDO: Object to form.
A. Well, if we start talking about the whole technique, then there's a number of aspects that we'll have to get into which start with the introduction of the sample. You know, is it coming from a head space file, is it coming from direct injection, how hot is the injection port.
You know, all of those things lead to what's -- what's present in the vapor stage -- phase. And if you are concerned about decomposition, then that can happen, you know, in several ways.
That could happen at the -- even when a sample solution is made up before injection there could be decomposition of some sort. If you have as were shown in the artifactual NDMA formation in Valisure's analysis, repeated by Emery, but where NDMA



was formed in the solution for analysis from heating, and another -- and that was before introduction into the gas chromatograph. And then in the injection port you could also have decomposition from a component of a sample itself in the injection port. So, there are a lot of possibilities there.
Q. Now, GC/MS doesn't work for qualifying NDMA in ranitidine. Do you agree?
A. Well, you haven't talked about how a sample is introduced there. One author showed a -- at least one author showed a technique to avoid decomposition -- or to avoid interference from ranitidine in a GC analysis.
Q. And there's a difference between interference and decomposition, correct?
A. Inter- -- decomposition could lead to interference or interference could be caused by some other mechanism that's not related to decomposition.
Q. And when you were referring to interference, were you referring to that heating the ranitidine in a head space GC environment would result in the creation of



NDMA?
A. I don't think -- I don't know if you've got it quite right there. The -- it's the environment in the head space vial that's getting heated external. It's part of the sampling mechanism or injection mechanism for a head space GC, but it's the heating in the solution, such as shown in FDA's Grand Rounds seminar when they showed the black vials of ranitidine solution that had degraded.
Q. Which was the reason the FDA advises against using GC/MS to measure the amount of NDMA in ranitidine, correct?
A. They advised against using head space GC, the previous method that had been used for the sartans that would not be appropriate for -- for ranitidine.
Q. And doesn't the fact that NDMA forms from ranitidine when using the GC/MS head space method confirm that NDMA forms from ranitidine with heat?
MS. TOLEDO: Object to form.
A. That's a very apples and oranges comparison. You have ranitidine in solution experiencing high heat, so very stressed



conditions as opposed to in a product.
Q. But it is the heat that is applied during the GC head space analysis that causes the artifactual formation of NDMA, correct?
MS. TOLEDO: Object to form.
A. Valisure, in fact, showed data that NDMA was not detected when they used lower temperatures in the head space file.
Q. Do you recommend using GC/MS to detect the amount of NDMA in ranitidine as long as a lower temperature was used?
MS. TOLEDO: Object to form.
A. That was not what I -- what I said. I said that's what Valisure showed or reported in their citizens' petition.
Q. Did you take any steps to ascertain the validity of that statement?
A. Did I take any steps? That's -- that's what they reported.
Q. I understand that's what they reported.
But did you do your own independent analysis to determine if that statement of Valisure was correct?
A. I was retained well after

Valisure's citizens' petition so none of that would have been relevant to -- to what I've been trying to do.

Q. Did you do an independent evaluation of the method that GSK used to test the ranitidine drug substance in drug products?

MS. TOLEDO: Object to form.

A. The GSK method, the FDA method, everybody's method except Emery's has employed reverse phase HPLC coupled to LC-MS or LC-MS/MS. And so if validation data were obtained using that technique, it would not be necessary for me to go further to validate that.

Q. Did you independently look at the validation data from the FDA or from GSK with regard to the methodologies used to measure NDMA in ranitidine drug substance and drug product?

MS. TOLEDO: Object to form.

A. I looked at the validation data that FDA supplied with their method where they -- they gave validation results as well as other -- oh, the EDQM Laboratory in



Europe. I looked at their validation summaries.

I don't recall how much of GSK's validation I reviewed. I don't -- I can look in the King paper to see if it's summarized there, but it would have been available to a reviewer if they wanted.

Q. I'm asking if you personally, independently validated or -- excuse me. Strike that.

I'm asking if you independently looked at the validation done, if any, by GSK of the method that it used to test ranitidine drug substance and drug product.

A. Well, I can go back through what I've seen. I've looked at so many of these I don't recall exactly which ones I looked at and the details around that. Might be in the -- it's probably not in the root -- I don't know if it's in the root cause analysis or other documents, but I'm happy to spend time looking there and take a look at the King paper.

Q. I'm asking if you did that as part of your investigation into this case and



that -- and not do it now but did you already do that?

A. That's what I'm saying is I don't recall the exact, specific information that I reviewed because I have reviewed so much of it that I don't want to say something that I -- I didn't do.

Q. Is there anywhere in your report where you go through the actual procedures that were done by GSK to validate their testing method?

A. I was concerned more with the data supplied by independent laboratories like FDA and PGA and EDQM and other independent groups where, in some cases, they give validation data. In other cases, it's in peer-reviewed publications where the validation data, if not explicit, would've been available to -- to people. So that, you know, given their independence and not being biased in this matter, as well as their reputations as leading regulatory authorities, I was satisfied with what -- what they had done.

Q. And when you say the validation data if not explicit would be available to



people, did you go about requesting any of the validation data for the methods used in any of the peer-reviewed publications on this issue?

MS. TOLEDO: Object to form.

A. What I -- what I believe I said was that would be available to reviewers on request, as I have requested in my review of journal articles in the past, if not for inclusion in the paper, for support of the -- the data and conclusions made in -- in the paper.

Q. But in this case, you didn't ask for any of the underlying validation data for the methods that were used in the peer-reviewed publications, correct?

MS. TOLEDO: Object to form.

A. That would've been available to reviewers. Whether authors would want to furnish that to a, you know, an independent requestor, I don't know. But I'm confident in the standards of the journals that these articles appeared in to -- to not need to request an independent review.

Q. And how many of these peer-reviewed

publications were you actually able to review the validation data for? Did you note that in your report?
MS. TOLEDO: Object to form. Misstates his testimony.
A. What -- what I -- what I said was I did not request validation data from peer-reviewed articles because it had already gone through a peer review, so I didn't find that necessary. And unlike Emery's incomplete validation summary and further concern generated by seeing some of the chromatograms of samples, I have large concerns about the validation status or reliability of their results.
Q. You didn't look at GSK's validation data when evaluating their root cause analysis, correct?
MS. TOLEDO: Objection. Asked and answered.
A. I don't recall exactly what validation information I looked at from GSK. I'd have to go back and look through those documents and separate reports, which I can do that, and refresh my memory as to what I


reviewed and, you know, if I didn't, then that would be accurate.
Q. Did you review any validation data from Sanofi regarding their testing of Zantac finished-dosed product?
MS. TOLEDO: Objection. Asked and answered.
A. I don't recall if I saw validation data from Sanofi or -- or not, and I didn't -- I don't think I cited other than Dr. Najafi's citation of GSK's results in my report.
Q. Now, liquid chromatography is another technique to separate a sample into its individual components, correct?
A. Yes. Liquid chromatography is a separation technique.
(Cross-talk.)
A. Sorry. It may or may not separate all the components depending on the conditions under which the analysis is conducted.
Q. And for liquid chromatography, the mobile phase is a liquid instead of a gas, like as used for gas chromatography, correct?


A. Yes, that's correct.
Q. And liquid chromatography separates samples based on the interaction of the sample with the mobile and stationary phases in a column, correct?
A. A column contains the stationary phase and the mobile phase flows through it. Things that tend to interact more strongly with the stationary phase take longer to go through the column, and that's the basis for separating so that they come out of the column at different times.
Q. So the column is filled with a solid phase which interacts differently with each component causing different flow rates through the column leading to the separation, correct?
A. May or may not act differently. Some things act very similarly and are not completely separated.
Q. But that's the idea of liquid chromatography, right?
A. That's the goal, is to affect the separation of the desired components.
Q. And the old style flash


chromatography relied on gravity to move the liquid solvent containing the sample through the column, correct?
A. One form of flash chromatography, column chromatography, relied on gravity. I think there was also some low pressure devices that could make that happen more quickly, and that is primarily used for purification purposes.
Q. But high performance liquid chromatography, which is known as HPLC, does this by passing a pressurized liquid solvent through the column, correct?
A. In order to put, you know, directly mobile -- liquid mobile phase through the column a pump is used and that creates some degree of pressure.
Q. And for most HPLC systems, there is a column oven that allows for controlling the temperature at which the separation is performed?
A. I don't know if that's the case for most HPLC systems. For -- certainly for some that the column temperature can be controlled.

Q. And HPLC typically uses UV detection to identify the components of a sample?
A. UV is used whether it's typical or not kind of depends on the types of compounds that one is looking -- looking to detect.
Q. Would you agree that HPLC UV alone cannot accurately measure the amount of NDMA in ranitidine?
MS. TOLEDO: Object to form.
A. Depends on -- that would depend on how much NDMA is present or the levels of interest but for trace type levels, UV detection would be difficult.
Q. And what about for quantification, not just identification but quantification? Would you agree that HPLC UV alone cannot accurately quantify the amount of NDMA in ranitidine?
A. What was your previous question about identifying NDMA or quantifying it?
Q. I -- I used the word "measure" in my previous statement, my previous question, and what I was asking for was quantification and that's why I asked the question using the



other word because I didn't know, from your perspective, using the word "measure" if you might have thought I was asking about identification, so --
A. Okay.
Q. -- I rephrased the question.
A. So, quantification ability by UV depends on, you know, properties of the anilide and how low detection you need to have. And for NDMA, it would be difficult to go to very trace levels by UV detection.
Q. And so there is another analytical method for HPLC, which is LC-MS. Are you familiar with that?
A. I'm familiar with LC-MS, yes.
Q. Okay. And that's liquid chromatography coupled with mass spectrometry, correct?
A. That's what that stands for.
Q. And can LC-MS be used to detect, identify, characterize, and quantify NDMA in a sample?
A. You listed a lot of things there. Can we -- can you specify which one you're interested in?



Q. Sure. I can break the question up. Can LC-MS be used to detect NDMA in a sample?
A. It depends on what levels. Do you -- are you -- do you know you're looking for NDMA? And, you know, what -- what sample do you have? What else is present?
So a number of factors there that kind of relate to that general question.
Q. Can you design a testing method using LC-MS to detect NDMA in a sample?
A. If you know you're looking for NDMA in a sample, it's possible to develop an LC-MS method to detect certain levels; then the -- things like sample concentration and other instrumental parameters govern what levels one is able to see.
Q. Can you design a testing method using LC-MS/MS to detect NDMA in a sample?
A. Same kinds of factors enter in. Do -- you know, what sample concentration? What levels are you looking for? What -- whether components are present that could impact the validity, reliability of your results, which is why the concern is there



about Emery's, so far, unique use of the HILIC mode as opposed to the rest of the world using reverse phase; in fact, Emery using reverse phase for some of its methods.
So this use of HILIC is still, to this day, unjustified in my opinion because we don't know what's -- what's happening to the rest of the sample.
Q. My question was, can you design a testing method using LC-MS/MS to detect NDMA in a sample? Is it possible to do that?
A. Well, FDA has done that, for one.
Q. So the answer is yes?
A. FDA and others have all designed methods that have shown -- been shown to be valid for determination of NDMA and ranitidine, unlike Emery's method.
Q. And what does mass spectrometry rely on to detect, identify and quantify a compound?
A. Again, do you want to break that up into what...
Q. How does mass spectrometry identify and quantify a compound?
A. Okay. By identify, if you're

talking about -- identification, that can mean a couple of different things. One is you see a response that you don't know what the particular compound is.

In -- in mass spec, you can get qualitative information about that through fragmentation of -- well, the molecular ion and then the fragments that are produced. Things break apart according to various patterns depending on, you know, structure of the molecule and so forth.

So if you -- if that's your goal, you don't -- you're trying to identify an unknown, then that's -- that's one aspect of MS. The other one is if you know what you're looking for and you see a response at that -- if you know the retention time, how that compound is retained on the HPLC part of it and when it comes into the detector, that can give an indication that that's when that -- that that's the molecule you're -- you're looking at, and so you've identified it by retention time.

Dr. Najafi argues that the two stages of MS/MS offers further selectivity in



identification such that only NDMA will respond to the detector -- in the detector. But what -- what the problem is, is his own data shows something else is responding as in early in the chromatogram in the -- especially the HILIC mode chromatograms that I focused on.

And if it's -- if only NDMA can come through the mass filters we talked about earlier, then that would be an indication that NDMA is being formed in the detector itself and represents an interference and inaccuracy and, therefore, non-reliability of -- of the data.

Q. And with regard to when you say something else is responding, do you know what that is?

A. Well, this is -- the question has been a concern to other workers doing -- developing methods for NDMA in ranitidine and they explicitly talk about the need to demonstrate the separation of ranitidine itself from NDMA. And, in particular, they usually then actually divert the flow of the HPLC away from the detector so ranitidine



doesn't enter it. The -- it may not --

Q. I'm sorry.

A. I'm not quite done.

It may not -- you could say, well, that's not a problem if it's separated and that -- that may be the case but that's when the potential for large -- relatively large quantities of ranitidine building up in the source could cause interference and unreliability later on.

But anyway, that's why FDA saw fit to include a chromatogram -- example chromatogram in their method showing the separation of NDMA and ranitidine. And at least three other sources that I've cited have done that, including the -- the EMA EDQM Lab in Europe that actually states it's important to -- critical to separate ranitidine from NDMA because ranitidine, in the mass spec, can form NDMA.

And that's where -- and now I want to talk about the difference between reverse phase and HILIC mode chromatography.

Q. I'd like to just stop you there because the question was -- do you remember



what the question was at this point?

A. You asked if an HPLC MS/MS method could be developed.

Q. That was a long, long, long time ago that question was asked. I'd like to ask you, you mentioned studies when you gave your narrative answer.

What studies are you referring to? You specifically mentioned the EMA EDQM, but you also mentioned authors and studies.

What study are you referring to, or studies?

A. Well, I said methods. If I -- If I said studies, that would encompass method developments that others, independent labs have done, including the EDQM, FDA, the Waters Corporation. And I think Yamamoto in that paper also talks about the concern of ranitidine getting into the mass spec detector.

Q. So Yamamoto, the EMA EDQM, and the FDA?

A. And the Waters application note also mentions this explicitly.

Q. When you say the Waters application

note, is that a document or a peer-reviewed study or what is that?
A. I reference that in my report. See what it's -- how it's termed there. I have to find it.
Q. Is this in your supplemental report?
A. It's in my initial report. Sorry. It's in my supplement as well. It's Reference 3.
(Cross-talk.)
A. I'm not sure that -- somehow that doesn't sound like the right title, but it was a latter application. So Waters pub- --
Q. I'm sorry?
A. -- Waters published a -- on their website an application describing determination of NDMA and ranitidine.
Q. You mentioned the FDA, the EMA and what you cited as Reference Number 3 in your supplemental report?
A. And if I can take a moment to look at my report, I can try and give you a more complete list.
Q. That's fine. I'm -- I'm going to


move on.
On your Materials Considered list, do you list any documentation that is the FDA's validation of the LC-MS/MS method that it published?
A. Sorry. Can you repeat that?
Q. On your Materials Considered list for your references in your report, is there any reference listed that includes the FDA's validation of the LC-MS/MS method?
A. Their validation is described in the LC-MS/MS method, which, if you hold on for a minute, I will find that.
Q. That's fine. If it's in the LC-MS/MS method that the FDA has published, then you've told me where it is.
So with mass spectrometry, does mass spectrometry ionize the molecules using an energy source?
MS. TOLEDO: Object to form.
A. I don't know what you mean by an energy source.
Q. Well, does -- does MS ionize the molecules?
A. They -- molecules entering the mass


spec source need to be vaporized and ionized.
Q. How do they vaporize and ionize?
A. Pardon me?
Q. How are the molecules vaporized and ionized?
A. There are different techniques for doing that. Emery has used an electro spray interface. This is the -- the interface or the source; it's the part Dr. Najafi left out of his supplemental -- rebuttal diagram.
It's probably the more critical aspect of things. And in that case, there's a high field, 2500 volts, that ionizes -- or ionizes particles that then are evaporated and break up into ions or component ions from the sample.
Another type of source is called atmospheric pressure chemical ionization. It works on a somewhat different mode, but -- and that's -- that's a mode that other workers have used for NDMA and ranitidine, but it eventually achieves ionization as well.
And all of these are in as the flow of the liquid from the HPLC goes into the


source, it gets sprayed in many cases in the presence of a heated gas that also contributes to volatilization.
Q. Doesn't that ionization take place in a matter of milliseconds?
A. I don't know how long it takes place. It is a relatively rapid event. But to the issue is if we have ranitidine, for example, coming into the mass spec over a period of -- some period of time, because it will be a relatively wide peak because there's such a large -- a relatively large amount coming in, then it has an opportunity during that time to, under those conditions, be degraded into NDMA, especially if one believes that ranitidine is such an unstable molecule.
Q. Let's get back to how mass spectrometry works.
So these ionized molecules then pass through a set of electromagnetic fields, which will further separate the molecules based on their mass-to-charge ratio?
A. Different mass analyzers that -- that are being used for MS/MS I believe in

most of the cases are quadrupole analyzers that provide the selection of a mass to go on to the next stage or to be detected.
Q. And the detection is performed based on charged particles striking a detector and creating a current, correct?
A. Yes. After they've been through the last stage.
Q. And this detector only detects charges and cannot differentiate based on mass, correct?
A. Well, the mass to charge particular particles get -- or ions get directed on to the detector, so then the detector is just responding to the ions that are -- that are getting it.
Q. It's the magnetic separation that provides the selectivity of the methodology, correct?
MS. TOLEDO: Object to form.
A. Well, the methodology includes the separation part of it, and then the goal of MS/MS is to only be looking at one particular component. And as long as there are no other components that have those same precursor and


product ions, then it should be the idea is that that will be selective for that compound but that doesn't -- that is not going to differentiate things that are like NDMA that is present from the sample going into the detector from NDMA that's formed in the detector as an artifact.
Q. So two molecules that are ionized at the same time but have different masses can be detected independently using mass spectrometry detection, correct?
MS. TOLEDO: Object to form.
A. So just in general talking about things that are ionized?
Q. Yes.
A. To give -- okay. We're not -- we're not separating or not doing a filtering, just looking at other, I guess, scanning across mass-to-charge ratios?
Q. Yes.
A. Yeah. Different mass to charge can be detected in a -- in a mass spec.
Q. And two molecules that are ionized at the same time and have different masses but have different charges tend to be


detected independently using a mass detection, correct?
MS. TOLEDO: Object to form.
A. Yeah. We've got multiple differences in there; different masses and different charges, same mass-to-charge ratio. The issue is whether the same molecule, NDMA, is being formed and subsequently detected in Emery's system.
Q. And with MS, further specificity can be obtained when fragments of the ions are performed within a collision cell of the mass spec, correct?
MS. TOLEDO: Object to form.
A. As we talked about before, this is the basis for the MRM mode, but it, as I said before, does not differentiate NDMA that's formed in the detector from compounds entering the detector and degrading, doesn't differentiate that from NDMA that was -- may have been present to start with.
Q. But you don't have any proof, as you sit here today, that NDMA is formed in the detector, correct?
MS. TOLEDO: Object to form.


A. The concern I have is based on a couple of things. One is the much higher levels distribution of NDMA in over, you know, multiple ranitidine samples using the HILIC method compared to all the data obtained using reverse phase methods. And then finally getting to see some chromatograms from Emery's HILIC method, seen responses for NDMA coming out throughout the initial part of the chromatogram and overlapping with what should be the -- an NDMA peak.
That's an indication that something is going on there that is creating a response that should be specific to NDMA, according to Dr. Najafi.
Q. But the question that I asked you is if you, as you're sitting here today, have any proof that NDMA is being formed in the detector. You say you have a concern.
I'm asking if you have proof that NDMA is being formed in the detector.
MS. TOLEDO: Object to form. Asked and answered.
A. This would go back to the burden of

proof is on the validation of the method to show that that is not happening rather than being able to prove exactly what is happening. Something is happening. There's no doubt about that.
Q. We spoke about this a little earlier and I think you -- did you call it a collision cell or a collision -- what did you call that part of the MRM?
A. I --
Q. Chamber maybe?
A. I don't remember.
Q. Okay. And that would be a quadrupole 2 of an MRM system, correct, the collision chamber?
A. Yes. That's usually how -- it's called q2 often.
Q. Q2? Okay. And that is introduced into LC-MS/MS to fragment the molecules into pieces that each have their own mass-to-charge ratio, correct?
A. That takes the parent or precursor ion from the first quadrupole into the second one where the fragmentation occurs to produce the daughter ions.


Q. And that follows to my next question that these pieces are called daughter ions that can be detected instead or along with the precursor in parent ion, correct?
A. Well, if the precursor ion, if that last filter is scanned to let it through, it would be detected too. But, yeah, the -- the product or daughter ions are the ones that go through to the detector.
Q. And since each parent molecule fragments into a predictable fashion, thus, even if two parent molecules have the same mass-to-charge ratio, if they break into different daughter ions, then these can be differentiated from each other, correct?
MS. TOLEDO: Object to form.
A. It depends -- now it depends on the resolution of the filter and how -- how unique these daughter ions are.
Q. But if the daughter ions are unique, then they can be differentiated from each other, correct?
MS. TOLEDO: Object to form. Misstates his testimony.


A. Depends on the resolution. You know, what's the window of mass that is being allowed into the -- the last stage and would that allow slightly different mass to charge ratios through.
Q. If the resolution is sufficient, then it can differentiate them, correct?
MS. TOLEDO: Object to the form. Misstates his testimony.
A. Yeah. You'd have to know what, you know, the possibilities are to determine or to know whether there would be a potential interference there.
Q. And generally, the MS/MS technology is only used when a single source ionization is not adequate to achieve the desired sensitivity or specificity, correct?
MS. TOLEDO: Object to form.
A. I don't -- can you -- you're saying -- can you ask that again just to make sure I know what you mean?
Q. I'm asking the reason that you would have the double MS instead of just LC-MS, you have LC-MS/MS, that's when you use that when a single source ionization isn't


adequate to achieve the desired specificity.
MS. TOLEDO: Object to form.
A. If you -- that could be a reason for using the LC-MS/MS mode as opposed to a single stage technique. And again, this is why the data, the chromatograms are concerning from Emery with supposedly high selectivity of MRM.
If that is only responding to NDMA, then there's some source of NDMA coming through there early in the chromatogram that's interfering with that -- that looks like an NDMA peak, that it's on the shoulder of this hump or poorly resolved. And that's what's -- makes -- that would only lead to a bias, high bias in results, and it's not been demonstrated that that is not a factor.
Q. When you say that there's some source of NDMA coming through early in the chromatogram, what are you basing that on, that that's NDMA?
A. Dr. Najafi claims and we've been talking about MRM supposedly being a very selective way of only looking at one particular component, even at -- he will

almost implies that no separation is even necessary because of the high selectivity of MRM mode.

But when you look at the chromatograms for the signal that's supposed to be just NDMA in the samples, you see this other misshapen response that comes through. It's not a -- I wouldn't call it a peak. It's just a big slug of response that shows up for NDMA. And you can contrast that with the response that is quite clean for the internal standard.

There's no corresponding signal like that for the deuterated internal standard, which is another -- is more data that's consistent with NDMA being formed in the detector because you would not form a deuterated NDMA. And we see nothing related to that.

Q. And you're basing this opinion on what you perceive to be a slug response, correct?

MS. TOLEDO: Object to form misstates his testimony.

A. I hesitated to call that a response



that I'm seeing a peak. It's a response above what would be considered a flat baseline in front of a clean NDMA peak. And, again, if that mode or detection is only responding to NDMA, then nothing else could be giving rise to that response.

And as pointed out, concern from other workers, that's a distinct possibility and -- if a big relatively large concentration of ranitidine goes into a mass spec.

Q. What is the ionized mass-to-charge ratio for NDMA?

A. Let me look at Dr. Najafi's method, and I'll tell you which ions he's monitoring.

Q. Do you know, as you sit here, what the mass-to-charge ratio is for NDMA?

MS. TOLEDO: Objection. He needs to look through the report and he can give you the answer.

Q. You're looking through Dr. Najafi's report?

A. Yes.

Q. Not your own report to answer this question?



MS. TOLEDO: Object to form.

A. He lists the precursor on as 75.1.

Q. What is the ionized mass-to-charge ratio for ranitidine?

A. That's not the point. It's whether ranitidine forms NDMA, which then would have a mass-to-charge ratio of 75.1.

Q. My question was, what is the ionized mass-to-charge ratio for ranitidine? Do you know that value?

A. No, not off the top of my head.

Q. Would you expect to see ranitidine and NDMA ions in the same MRM transition?

MS. TOLEDO: Object to form.

A. I would not -- I would expect to see -- well, what I've said is if NDMA is formed from ranitidine, it will give a signal just like NDMA are coming in from the sample that was there initially.

Q. But my question, Doctor, is would you expect to see ranitidine and NDMA ions in the same MRM transition?

MS. TOLEDO: Object to form.

A. By transition, you're referring to how NDMA is being monitored for.



Q. Same transition. Would you expect to see them in the same MRM transition?

A. Just -- just to be clear, does that mean the 75 to 43 transition?

Q. Yes. Would you expect to see ranitidine and NDMA in the same MRM transition?

MS. TOLEDO: Object to form.

A. I wouldn't expect ranitidine to appear as an impact molecule when monitoring that transition, which is what the concern is, that if it's not -- if ranitidine itself can't do that, then NDMA must be -- be informed which does give rise to that signal.

Q. Do you expect to see NDMA and any of the ranitidine impurities that all have different molecular weights in the same MRM transitions?

MS. TOLEDO: Object to form.

A. The same thing would apply. In fact, the impurities in Yokoo's paper, he showed that impurities were even more likely to form NDMA; so impurities, in addition to ranitidine, could be degrading in the mass specs or to form NDMA and giving an

unreliable response or --
Q. The question -- I'm sorry. Were you finished? There was a little gap on the --
A. Yeah. Just I was saying that that would lead to an unreliable response if those impurities were present and that they -- if they could also give rise to -- degrade to form NDMA in -- in the detector and cause a high bias.
Q. What I'm asking, and the question that I asked if you could please listen to the question, would you expect to see NDMA and any of the ranitidine impurities that all have different molecular weights in the same MRM transition?
MS. TOLEDO: Object to form. Asked and answered.
A. It's not the ionized intact impurity or ranitidine itself that would be the concern. It's the -- any NDMA degradation product that would not be differentiated.
Can we take a -- a little break?
Q. Sure. If you'd like to take a



five-minute break?
A. Yeah.
MS. TOLEDO: That would be great. Thank you.
THE WITNESS: Thanks.
THE VIDEOGRAPHER: We are now off the record. The time is 2004 UTC, 4:04 p.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2024 UTC, 4:24 p.m. EDT.
BY MS. BOGDAN:
Q. Dr. Olsen, in your supplemental report you state that the high voltage, 2500 volts, used to ionize sample components could also contribute to artifactual NDMA formation?
Can you -- can you name one study that states that 2500 volts used to ionize sample components contributes to artifactual NDMA formation? A study that actually proves that that phenomenon occurs?
MS. TOLEDO: Object to form.



A. I don't know of a study that has shown that. But it is incumbent on Dr. Najafi to show that that is not causing NDMA to form as has been a concern from other workers that explicitly highlight the need to separate ranitidine from NDMA.
Q. Can you point to one part of the Yokoo 2021 study where it affirmatively states that high heat in LC-MS source is a contributing to NDMA formation from ranitidine?
MS. TOLEDO: Object to form.
A. My report actually says high heat is applied right before samples are analyzed by a mass spectrometer detector. This can present an issue and confound the results because when high heat is used -- and Yokoo's paper does not talk about high heat in a mass spec necessarily, he's talking about just high heat in general -- ranitidine or its impurities may artifactually degrade into NDMA.
So, that's -- that's the concern about the impurities, could be even more subject to this degradation than even



ranitidine.
Q. But the Yokoo paper does not state that heat from the ionization source causes NDMA formation, isn't that correct?
MS. TOLEDO: Object to form.
A. I didn't say that it did, that his paper did state that. It's just an acknowledgment that it's not just ranitidine; that it's the impurities that could be a concern as well and, you know, further exercises the need to demonstrate separation and non-introduction into the mass spec of ranitidine and related compounds.
And as yet, I haven't seen anything that demonstrates that from Dr. Najafi.
MS. BOGDAN: If we could please pull up 2003 Olsen Strategies For Investigation and Control of Processed and Degradation Related Impurities.
THE VIDEOGRAPHER: This will be marked as Exhibit 18.
(Plaintiffs' Exhibit 18 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you recognize this

book chapter that you authored?
A. I'm waiting to pull it up on our screen here. Okay. Yes.
Q. This was a book chapter that you authored with Dr. Steven Baertschi?
A. Yes.
Q. Okay. And this was an entire chapter that you wrote with Dr. Baertschi regarding strategies for investigation and control of process and degradation-related impurities, correct?
A. Yes, that's the topic.
Q. And NDMA from ranitidine is a degradation impurity, correct?
MS. TOLEDO: Object to form.
A. It is a degradation impurity, but it wouldn't have normally been identified as such in the description we have of investigation of degradation-related impurities.
Q. Despite you writing an entire book chapter on strategies for investigation and control of process and degradation-related impurities, you were not hired by the defendants in this case to investigate those



issues, correct?
MS. TOLEDO: Object to form.
A. Investigate those issues, that's a really broad category, so do you have specific thing in mind there?
Q. Well, are you offering any opinions in this case regarding the manufacturing and processing of ranitidine and controlling the amount of NDMA in the drug?
A. I, at present, haven't given impure cal- -- opinions on that, but I may do so in the future.
MS. BOGDAN: Please pull up Chapter 12, Mutagenic impurities, please.
THE VIDEOGRAPHER: This will be marked as Exhibit 19.
(Plaintiffs' Exhibit 19 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see Chapter 12?
A. Again, we're lagging a bit getting ours loaded. Here we are. Okay.
Q. And this is a chapter that you wrote with Dr. Baertschi and it was published



in 2020, correct?
A. Yes.
Q. And this chapter is entitled Mutagenic impurities, correct?
A. Yes.
Q. But in this litigation, you are not offering any opinion with regard to the mutagenic nature of NDMA.
Is that my understanding from your earlier testimony?
MS. TOLEDO: Object to form.
A. Only -- only what I've referenced previously about its classification as a probable human carcinogen.
Q. And despite writing an entire chapter of a book regarding mutagenic impurities, when I asked you about the mutagenic characteristics of NDMA, you told me that was outside the scope of your opinion in this case, correct?
MS. TOLEDO: Object to form.
A. I have not studied the mutagenic properties of NDMA and -- and, again, stating that the IARC classification is it is a probable human carcinogen.



MS. BOGDAN: Will you please pull up the FDA news release from April 1st of 2020?
THE VIDEOGRAPHER: This will be marked as exhibit 20.
(Plaintiffs' Exhibit 20 was marked for identification.)
BY MS. BOGDAN:
Q. Has Exhibit 20 been loaded for you, Dr. Olsen?
A. Not yet. Okay.
Q. Are you familiar with the FDA news release requesting removal of all ranitidine products from the market?
MS. TOLEDO: Object to form.
A. I have seen this.
Q. Did you consider this when you were forming your opinions in this case?
A. Just taking a minute to look it over.
(Document review.)
Is it on my Materials Considered list?
Q. I'm asking if you, as you sit here today, you don't know if you considered this

when forming your opinions in the case?
A. I looked at a lot of things from FDA so trying to make sure that this was one.
Q. Well, this was an FDA release requesting removal of ranitidine from the market.
A. Yes. Yes. This was in my Materials Considered list.
Q. And drawing your attention to the first paragraph where it reads after they announced the withdrawal they say:
The agency has determined that the impurity in some ranitidine products increases over time and when stored at higher than room temperatures which may result in consumer exposure to unacceptable levels of this impurity.
Did you consider that statement of the FDA when writing your report and offering your opinions in this case?
A. I considered that statement, as well as where the rest of this release. For example, lower than that, next paragraph, it says:
The FDA conducted thorough



laboratory tests and found NDMA in ranitidine at low levels.
They didn't have enough information so they continued to look at that.
Q. And then the next sentence in this first paragraph states that:
As a result of this immediate market withdrawal request, ranitidine products will not be available for new or existing prescriptions or OTC use in the U.S?
You see that?
A. Yes.
Q. Would that mean after April 1st of 2020 ranitidine or Zantac would not be available for sale?
MS. TOLEDO: Object to form.
A. I don't know how the timing of an immediate market withdrawal request would work, whether it goes into effect right then. I will say that what the agency said in that previous sentence was consistent with what everyone has found, that NDMA can increase in some products over time and some higher temperatures can increase the levels.
Q. Bring you down to the last sentence



on this first page, or actually it might be on the top of the next page. Right. That reads:
New FDA testing and evaluation prompted by information from third-party laboratories confirmed that NDMA levels increase in ranitidine even under normal storage conditions.
Do you see that statement from the FDA?
A. Yes.
Q. Did you consider that statement when formulating your opinions in this case?
A. I considered this in its entire context, along with the other data from FDA and -- and others.
Q. And the FDA goes on to say:
And NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures that the product may be exposed to during distribution and handling by consumers.
Did you consider that statement in formulating your opinions in this case?
A. This, again, is a finding that may



increase, depending on the -- how high a temperature, how long a time, how it -- material is stored and at different rates, depending on all those factors, plus the samples themselves.
Q. Do you disagree with the FDA's statement that NDMA levels increase in ranitidine even under normal storage conditions?
MS. TOLEDO: Object to form.
A. They can increase under normal storage conditions. In fact, in Emery's non-disclosed 37 degrees Celsius data for over a month, NDMA levels didn't increase, so that is even an elevated temperature condition.
Q. So do you disagree with the FDA statement that NDMA levels increase in ranitidine even under normal storage conditions?
MS. TOLEDO: Object to form. Asked and answered.
A. I agree with what they've put in context previously, that it can increase depending on many factors and temperatures is

one of them.
Q. And do you agree with the FDA statement that NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers?
A. This, again, is consistent with other findings that NDMA raise a formation can vary significantly and, you know, what's -- it doesn't -- it's not explicit here about what "increase significantly" means or "stored at higher temperatures" means and what -- what conditions "during distribution and handling" are referring to.
But, you know, all -- that whole realm of possibilities and variation is -- is possible, but it still would not be possible to go back and retrospectively know what levels of NDMA might have been in an individual consumer's Zantac.
Q. So do you agree or disagree with the FDA's statement?
MS. TOLEDO: Objection to form. Asked and answered.



A. I agree -- I agree with the context -- overall context and the other information FDA has -- has provided and others have shown; that rate of NDMA formation is highly variable, it's dependent on sample, container closure, temperature, humidity, time and varies significantly.
Q. Do you agree with the FDA's decision to recall ranitidine from the market?
MS. TOLEDO: Object to form.
A. That kind of policy decision is not, you know, something I am involved with.
Q. Well, as someone that advises pharmaceutical companies on genotoxic impurity strategies and impurity investigations related to degradation, do you have an opinion as to whether the FDA should've recalled ranitidine knowing that it can transform into NDMA?
MS. TOLEDO: Object to form. This goes beyond the scope of this phase of the litigation.
A. So, yeah. That was kind of a run-on question. Can you shorten that?



Q. My question was, do you agree with the FDA's decision to recall ranitidine from the market?
MS. TOLEDO: Object to form.
A. I'll answer that's not something -- that's a FDA policy question that I don't get involved with. If manufacturers disagreed with that, they would need to make the case for it.
My understanding is that that decision was based on an abundance of caution based on very highly conservative evaluation of what an acceptable daily intake would be.
Q. Does that mean you disagree with the FDA's decision to recall the product?
MS. TOLEDO: Object to form. This goes beyond the scope of this phase of the litigation.
A. That's not what I said.
MS. BOGDAN: Why don't we take a five-minute break?
THE VIDEOGRAPHER: We are now off the record. The time is 2050 UTC, 4:50 p.m. EDT.
(Whereupon, a brief recess was



taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2104 UTC, 5:04 p.m. EDT.
BY MS. BOGDAN:
Q. And one of the studies that you relied on and referenced in your report is the Abe study, correct, Dr. Olsen?
A. I looked at the Abe study.
Q. Okay. And in the Abe study, there were tablets stored at 40 degrees Celsius and 75 percent relative humidity for up to eight weeks and then were analyzed for NDMA content by liquid chromatography-mass spectrometry. And they found that the NDA -- NDMA levels increased from 28.5-nanograms to 17,400-nanograms, and another set of pills increased from 433.5-nanograms to 2700-nanograms.
Did you consider those test results when forming your opinions in this case?
A. Can I look at that paper to refresh my memory of the context they were doing the study?
Q. Well, they did accelerated testing

study under conditions. And I'm asking if you considered the values that they found of NDMA in those tablets in formulating your opinions in this case since you cited that study in your references in Materials Considered.

MS. TOLEDO: Objection. He asked to have a look at the document, so I think he should be given the opportunity to do that.

A. Also, I don't know if I referenced that in my report. I read the -- I read the paper.

Q. So you did read this paper as part of your investigation into the case?

A. I read the paper in looking at other studies on ranitidine.

Q. Since you -- since I received the supplemental report less than -- well, at this point, it might be 40 hours ago, are you, as you sit here today, drafting any more supplemental reports or anticipating serving another supplemental report?

A. At this point, I think I need to reserve the right to do that, but I don't



know that I have any unless additional information comes to light.

MS. TOLEDO: And I -- I will just add that we are in the general causation phase of the litigation. If the case proceeds, there may be also need for another separate report, so I -- I want to make sure that is clear.

Q. And when I was asking the question I meant a supplemental report in this phase of the litigation, if the doctor is drafting one or if he is in process of doing another report currently.

A. I am not currently working on one.

MS. BOGDAN: At this point, I will pass the witness and reserve the remaining time.

MS. TOLEDO: All right. We'll take a quick break, ten minutes, and we may have a couple of questions on our end.

MS. BOGDAN: Okay.

MS. TOLEDO: Thank you.

MS. BOGDAN: Thank you.



THE VIDEOGRAPHER: We are now off the record. The time is 2109 UTC, 5:09 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 2120 UTC, 5:20 p.m. EDT.

EXAMINATION BY
MS. TOLEDO:

Q. Dr. Olsen, I'm going to ask you just a few questions to clarify a couple of things from -- mostly from questioning earlier.

And the first question I have for you is, earlier do you recall that counsel asked you about whether you literally pushed the buttons of the equipment related to various tests that you have conducted in the past?

A. Right. And one of the points there is that often there will be an instrument or equipment operator who is at a lower degree level than a Ph.D. scientist but has adequate and thorough training on operation of the



instrument, but then would perform analyses at the direction of the Ph.D. scientist. And so I filled more of the -- the latter role, not only in, you know, looking at the conditions and so forth to make sure they were appropriate but evaluating the data coming from the experiment.

Q. And do you also recall when counsel asked you about a protocol that you had produced in prior litigation?

A. Yes.

Q. And we looked at that document, right?

A. Right.

Q. Was the testing in that prior litigation similar to the testing that Emery has done for purposes of this litigation?

A. It was totally different, apples and oranges situation. It was a patent litigation. So the question was what does the -- what did the generic product do in terms of what might infringe on the patent. And much different than trying to go back in a retrospective manner to determine what consumers might have been exposed to.

So the nature of the testing was totally different. And even then, we recorded under GMP practices in lab notebooks to provide total traceability of the data, the experimental plan that was outlayed -- outlined in the notebook, as well as sufficient information for anybody to replicate the study.

MS. BOGDAN: Please just note I think my audio might have cut out. I wanted to object to the form but once the doctor started answering his question, I didn't want to interrupt his response.

MS. TOLEDO: Okay.

BY MS. TOLEDO:

Q. And I believe earlier you were looking through your supplemental report and were looking for a reference, and there might have been a wrong reference cited, is that right?

A. Right. I'd like to correct that. It's Reference 3 in my supplemental report. It's -- it's got the incorrect title there. I don't know if the link reference is correct



or not.

But the correct reference is given in my Materials Considered. It's same first author, Lame, MT, et al. And the title is High Sensitivity Quantitation of Nitrosamine Genotoxic Impurities: LC-MS Analysis of Ranitidine Drug Product using the Waters ACUITY UPLC I-Class/Xevo TQ-XS Tandem Quadrupole Mass Spectrometer.

And the date is 2020.

Q. Thank you.

Then you were also asked earlier this question: Do you disagree with the FDA's statement that NDMA levels increase in ranitidine even under normal storage conditions?

Do you remember that question?

A. Yes.

Q. Okay. And I believe you said that they can increase under normal storage conditions. And then you added:

In fact, in Emery's non-disclosed 37 degrees Celsius data for over a month, NDMA levels didn't increase, so that is even an elevated temperature condition.



So, can you please clarify for me your answer?

A. Yes.

MS. BOGDAN: Objection -- objection to the form of the question. It mischaracterizes the previous testimony.

MS. TOLEDO: I read it from the transcript.

A. Well, what the difficulty was is when I said it -- it can increase, I added that inflection, which doesn't come across in -- in the written transcript. And given the generality of the statement and that I was asked about, what I would clarify is to say it may or may not increase. And again, that depends on materials involved, the -- what the normal storage conditions would be in their range and time, not to mention the FDA was not clear on what levels of increase they were observing.

So, that was a -- something that maybe didn't come across as intended and -- but I still would use the 37 degree Centigrade, 90- -- 98-degree Fahrenheit data



as support that sometimes it doesn't increase, and why Emery never disclosed that is still unclear.

MS. TOLEDO: All right. Well, those are all my questions. Thank you.

MS. BOGDAN: Okay. Let's take just five minutes.

THE VIDEOGRAPHER: We are now off the record. The time is 2128 UTC, 5:28 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. Time is 2133 UTC, 5:33 p.m. EDT.

MS. BOGDAN: Dr. Olsen, I have no further questions, so I'd like to thank you for your time today and wish you safe travels home.

THE WITNESS: Thank you.

MS. TOLEDO: Thank you.

MS. BOGDAN: And to everyone else, take care.

THE VIDEOGRAPHER: We are now off

the record. The time is 2134 UTC, 5:34 p.m. EDT.

(Time noted: 5:34 p.m. Eastern Time)



J U R A T

I, BERNARD OLSEN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 23, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

______________________

BERNARD OLSEN, Ph.D.

Subscribed and sworn to before me

This _______ day of __________, 20__.

____________________________________

NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, BERNARD OLSEN, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of June, 2022.

Candida Borriello
______________________

CANDIDA BORRIELLO



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 23, 2022
Deponent: BERNARD OLSEN

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |

________________________

BERNARD OLSEN, Ph.D.

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________

Notary Public

My Commission Expires:__________

**Exhibits**

**EX 0001 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:11 14:6,7,11 18:16,17
**EX 0002 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:12 16:8 18:17,18
**EX 0003 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:12 17:5 18:18,19
**EX 0004 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:13 18:20,21,24
**EX 0005 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:13 22:2,3
**EX 0006 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:14 24:11,12,19
**EX 0007 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:14 34:14,15,16
**EX 0008 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:15 69:9,10,11 74:6,7,17
**EX 0009 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:15 74:10,19,22,25
**EX 0010 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:16 97:12,13 100:10 110:5
**EX 0011 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:16 110:12,19 111:25 112:8,23
**EX 0012 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:17 111:21 112:2,10 115:22
**EX 0013 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:17 137:12,13,16,17
**EX 0014 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:18 145:11,12
**EX 0015 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:18 149:23,24
**EX 0016 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:19 151:16,17
**EX 0017 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:19 152:19,20
**EX 0018 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:20 197:21,22
**EX 0019 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:20 199:17,18
**EX 0020 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:21 201:5,6,9

**$**

**$152,212.50**
26:4
**$450**
26:1
**$550**
26:1

**-**

**------------------I**
5:2
**----------------E**
5:8

**0**

**0.1**
70:9

**1**

**1**
5:11 13:23,25 14:6,7,11 18:17 83:14 113:22 128:1,5
**1,000-nanograms**
117:18,23
**1,1-dimethylhydrazine**
70:7
**10**
5:16 97:12,13 100:10 110:5 133:11
**100,000**
80:12
**10017**
4:9
**1010**
12:14
**10:28**
54:19
**10:44**
54:24
**11**
5:16 110:12,

19 111:25 112:8,23
**110** 5:16
**111** 5:17
**1140-nanograms** 114:16 117:21
**12** 5:17 111:21 112:2,10 115:22 134:14 199:14,21
**125** 69:19
**127** 70:1
**12:07** 98:23
**12:44** 99:3
**12th** 24:23 32:24
**13** 5:17 137:12, 13,17
**137** 5:17
**13:06** 7:5
**14** 5:11,18 145:11,12
**1428** 54:18
**1444** 54:23
**145** 5:18
**149** 5:18
**15** 5:18 98:5 110:15 149:23,24
**150-milligram** 114:16 116:15 117:18
**151** 5:19 71:23
**152** 5:19 72:22
**15219** 4:16
**16** 5:12,19 151:16,17
**1607** 98:22
**1644** 99:2
**17** 5:12,19 152:19,20
**17,400-nanograms** 209:17
**1742** 129:20
**1754** 129:25
**18** 5:13,20 197:21,22
**1840** 156:3
**1851** 156:8
**19** 5:20 39:9 199:17,18
**197** 5:20
**1970s** 39:8
**1976** 70:5
**1978** 39:20,23 40:8,19 69:7 74:17
**1979** 39:9 45:4
**1984** 48:11
**1987** 67:1
**199** 5:20
**1:42** 129:21
**1:54** 130:1
**1st** 70:5 201:2 203:13

**2**

**2** 5:12 16:8 18:18 24:22 82:15 186:14
**2.25** 32:24
**20** 5:21 98:5, 17,18 126:20 201:5,6,9
**2002** 17:2
**2003** 197:17
**2004** 195:7
**2008** 45:4 58:20, 23
**2009** 41:9
**201** 5:21
**2020** 97:8 110:15 200:1 201:3 203:14 215:10
**2021** 24:23 25:10 121:2 196:8
**2022** 7:5 17:3,4 18:5 19:3
**2024** 195:12
**2050** 208:23
**21** 18:5 19:3
**2104** 209:3
**2109** 212:2
**212** 5:6
**2120** 212:7
**2128** 217:10
**2133** 217:15
**21st** 11:20
**22** 5:13
**220** 30:1
**23** 7:4
**24** 5:14
**2500** 180:13 195:17,21
**2700-nanograms** 209:19
**28.5-nanograms** 209:16
**29** 135:14
**2901** 4:3

**2919** 107:15
**2:40** 156:4
**2:51** 156:9

3

**3** 5:12 17:5 18:19 178:10,20 214:23
**30** 98:17,19
**301** 4:15
**31st** 24:24
**338** 25:16
**34** 5:14 11:21
**36** 114:16 117:21
**37** 205:13 215:23 216:24

4

**4** 5:13 18:21, 24 88:19 93:14 151:14
**4.1** 71:24
**4.75** 31:21
**40** 209:11 210:20
**43** 193:4
**433.5-nanograms** 209:18
**4:04** 195:8
**4:24** 195:13
**4:50** 208:24

5

**5** 5:13 22:2,3 105:15 106:1 133:11
**50** 133:11 135:9
**500** 4:3
**58.1** 145:9
**5:04** 209:4
**5:09** 212:3
**5:20** 212:8
**5:28** 217:11
**5:33** 217:16

6

**6** 5:14 24:11, 12,19 107:20 141:13
**60** 108:23
**69** 5:15

7

**7** 5:14 17:2 34:15,16 95:14
**70** 80:11
**74** 5:15 76:6
**75** 193:4 209:12
**75.1** 192:2,7
**78746** 4:4

8

**8** 5:5,15 69:10,11 74:7,15,17
**8th** 31:4 32:22

9

**9** 5:15 74:10, 19,22,25
**90** 133:12
**90-** 216:25
**90s** 48:12
**93** 17:21
**96** 80:14,17 81:2,12,19, 25 82:4
**97** 5:16
**98-degree** 216:25
**9:06** 7:6
**9th** 31:4 32:23

A

**a.m.** 7:6 54:19,24
**Abe** 108:12 109:16,17,21 209:8,9,10
**ability** 171:7
**able** 21:10 40:14 55:19 56:15 119:18 166:1 172:17 186:3
**above** 191:2
**absolutely** 13:19 51:8
**absolve** 146:16
**abstract** 101:16,23 104:3,6
**abundance** 208:11
**academic** 28:16
**accelerated** 107:19 108:21 143:9 209:25
**acceptable** 36:11 79:9 80:6,15,25 208:13
**accepted** 68:23 131:14
**access** 75:3 122:1

**account** 99:16
**accountability** 136:5
**accurate** 114:4 167:2
**accurately** 16:20 170:8, 18
**achieve** 188:16 189:1
**achieves** 180:22
**acknowledge** 7:21,25
**acknowledged** 80:9
**acknowledging** 104:17 108:13,25
**acknowledgment** 197:8
**across** 183:19 216:12,23
**act** 168:18,19
**action** 7:12 78:9,15 79:1
**activation** 100:4
**activities** 26:19 32:15 35:21 41:22 44:24 145:1
**activity** 28:19 30:25 31:8,25 32:1,7,10 33:10 38:10 45:2
**actual** 164:9
**ACUITY** 215:8
**add** 21:7 211:4
**added** 215:21 216:11
**addition** 15:22 23:15 193:23
**additional** 31:13 100:7 119:11 211:1
**additives** 146:2
**address** 125:24
**addressing** 37:1
**adequate** 36:3 188:16 189:1 212:24
**administered** 8:1
**Administration** 146:1
**admitted** 100:21,25
**advise** 37:4,12 78:18,22
**advised** 160:14
**advises** 160:12 207:14
**advising** 38:14
**aerosol** 48:2
**affect** 104:19 168:23
**affirmatively** 196:8
**afternoon** 9:9
**agencies** 128:23
**agency** 202:12 203:20
**Agilent** 57:11,15,16, 17,18,23,25 58:3,7,9,22, 25 60:13
**ago** 11:21 19:6 25:12 28:2, 3,6 88:8 106:10 120:11 121:9 134:14 177:5 210:20
**agree** 65:16 66:14 67:21,25 68:11,25 82:21 146:21 147:13 156:12 159:9 170:7,17 205:23 206:2,22 207:1,8 208:1
**agreement** 6:7 42:8
**ahead** 33:2 98:2 154:18
**air** 131:24 135:20
**Aizawa** 12:16
**alert** 38:19
**alerting** 38:8,16,21 77:12,21
**ALFANO** 4:14
**allow** 188:4
**allowed** 52:15 53:9 82:4 188:3
**allowing** 81:18
**allows** 81:12 169:19
**altering** 43:1,15
**Amendment** 151:14
**Ames** 92:19
**amine** 85:16,21
**amines** 85:24
**amount** 79:4 112:20 113:6 125:5 132:16 160:13 161:10 170:8,18 181:13 199:9
**amounts** 114:19 126:12
**analyses** 87:23 105:17,19 106:8 118:9 213:1
**analysis** 41:23 45:9 46:14 48:22, 24 50:14 53:6,24 54:2 59:9 63:4 66:13 89:24 101:18,25 102:18 105:4,5,9,11

106:21 109:25 110:2,6 112:8,18,20, 23 113:18 114:1 115:13 118:14 120:6,15 123:24 158:25 159:1,15 161:3,23 163:20 166:18 167:21 215:6
**analyte** 50:16,24,25 51:16,20
**analytes** 50:14
**analytical** 12:14 28:17 45:6 57:4,7 127:18,21 135:15 156:12,22 157:1,6,10, 22 171:12
**analyze** 50:22 93:23 94:11 95:6
**analyzed** 196:14 209:13
**analyzer** 50:22
**analyzers** 181:24 182:1
**analyzing** 157:24 158:5
**and/or** 6:8
**Andrew** 20:18 94:1
**Andy** 120:8
**anilide** 171:9
**animal** 40:2,18 41:4 65:9,22 66:23 72:7, 14 80:11 84:24 146:2, 3
**animals** 65:11 72:13 86:4 90:23
**Anita** 20:10
**announced** 202:11
**answer** 13:24 14:2 61:2 81:5 94:23 95:12, 23 96:6,7, 16,20,23 105:13 106:24 121:7 131:8 139:20,24 140:2,4,6,16 173:13 177:7 191:20,24 208:5 216:2
**answered** 23:23 30:6 44:9 45:14 62:18,25 82:7 92:8 96:11,19 97:1 109:6 114:23 115:10 116:24 118:17 123:16 140:8 147:3 148:11,24 154:17,23 155:17 166:20 167:7 185:24
194:18 205:22 206:25
**answering** 9:23 92:16 214:12
**answers** 9:21 15:8
**anticipating** 210:22
**anybody** 56:20 214:7
**anyone** 6:21 10:20, 23 21:17
**apart** 174:9
**API** 47:1 104:24 108:8 113:8 115:23 120:21 122:5 123:6,21 124:2,20 125:6
**apologize** 14:2
**apparently** 154:5
**appeared** 91:17 165:23
**Appearing** 4:1,7,12
**appendix** 137:21
**apples** 160:23 213:18
**application** 146:23 177:23,25 178:14,17
**applications** 10:9 43:2,17 145:23 146:10 147:16
**applied** 138:1 161:2 196:14
**applies** 146:14
**apply** 193:20
**appreciate** 100:6 105:14
**approach** 80:10
**appropriate** 101:1 145:2 160:17 213:6
**approval** 56:3,7,11, 15,18 57:1 146:24 147:17 148:2
**approved** 36:6 56:3,6 148:21
**April** 70:5 201:2 203:13
**Aptuit** 41:6,16 42:3,9,13, 17,19,25 43:7,13,22 44:5,12 136:2 137:2 144:5
**Aptuit's** 143:25
**aqueous** 130:15 131:10 132:9
**area** 44:22 68:15 72:18 73:12 74:1 88:25 127:10,12,13
**argues** 174:24
**Argumentative** 119:20

**around**
163:18
**arrangement**
8:6
**arrives**
110:23
**article**
12:16 110:4
**articles**
15:14,18 29:16,18 34:2,4 165:9,23 166:8
**artifact**
183:7
**artifactual**
158:24 161:4 195:18,22
**artifactually**
141:7 196:21
**ascertain**
161:16
**asked**
14:22 18:10 30:5 38:8 44:9 45:15 54:7 62:17, 24 73:24 80:24 82:7 87:8 88:1 90:5,11,13 92:8 94:7,23 95:1,5 96:11,19 97:1,16 109:6 114:23 115:9 116:23 118:16 119:11 123:15 140:20 147:3 148:11,23 154:17,23 155:17 166:19 167:6 170:25 177:2,5 185:17,24 194:12,18 200:17 205:22 206:25 210:7 212:17 213:9 215:12 216:15
**asking**
9:22 23:17 38:6 40:7 49:19 75:16 81:17 91:7 92:3 100:1,2 105:12 106:4 113:5 124:13 139:14,16 142:11 148:16,19 151:8 154:13 156:25 163:8,11,24 170:24 171:3 185:21 188:22 194:11 201:24 210:1 211:10
**aspect**
89:14 95:10 148:12 174:14 180:12
**aspects**
147:7 158:10
**assay**
49:8,12,15 152:1
**assays**
48:17 57:5,7
**assembling**
14:18
**assess**
37:5
**assessed**
36:22
**assessment**
38:11 74:9
**assessments**
38:13
**assign**
88:7
**assistant**
21:16
**associated**
111:9
**association**
42:19
**Atlanta**
10:18
**atmospheric**
180:18
**attached**
132:11
**attempted**
97:2
**attend**
27:8
**attention**
72:23 101:15 102:16 107:14 202:9
**attorney-client**
6:9
**attorneys**
7:19 14:21 19:15 29:6
**attributes**
85:9
**audio**
9:25 58:1 61:22,24 62:7 214:10
**audit**
115:18
**August**
24:22
**Austin**
4:4
**author**
100:14 138:17 159:11,12 215:4
**authored**
15:23 198:1, 5
**authoritative**
68:12
**authoritativeness**
68:17
**authorities**
23:12,19 164:22
**authority**
82:3
**authors**
104:8 108:15,25 165:19 177:10
**available**
47:14 58:20 73:2 119:16 121:19,25 122:17 136:12 163:6 164:18,25 165:7,18 203:9,15
**Avenue**
4:9
**avoid**
159:13,14
**avoiding**
141:5
**aware**
6:3 30:11 40:3,7,19 43:13,25 44:3 59:13 65:14 68:23 70:13 81:18 84:15 117:17 122:20 123:25
**awareness**
81:22

B

**bachelor's** 143:21
**back** 25:10 30:23 40:19 46:20 47:1,6 54:22 83:22 89:4 99:1,4 106:17 108:19 113:10 129:24 141:8 156:7,11 163:15 166:23 181:18 185:25 195:11 206:19 209:2 212:6 213:23 217:14
**background** 23:16 96:1, 13
**Baertschi** 198:5,8 199:25
**band** 131:18
**based** 34:2 40:18 41:3 52:7 53:3 66:23 68:1 80:8 84:24 132:22 133:4 135:13 168:3 181:23 182:5,10 185:1 208:11,12
**baseline** 191:3
**basically** 106:13
**basing** 66:20 189:20 190:20
**basis** 24:5 47:9 50:7,11 53:5 73:14 119:2 168:10 184:16
**batch** 122:15,18
**batches** 129:8
**bathroom** 12:17
**began** 25:9
**begin** 9:23
**beginning** 53:24
**begins** 72:5
**behalf** 4:1,7,12 7:10,15 8:20 9:9 27:20 93:22
**behave** 66:12
**believe** 15:20,25 33:5 49:5 55:8 89:21 100:9 117:25 131:25 135:6 157:1 165:6 181:25 214:17 215:19
**believed** 70:8
**believes** 181:16
**Bernard** 5:3 7:2
**besides** 85:16
**best** 23:14 24:2 75:23
**better** 62:2
**bias** 189:16 194:10
**biased** 164:20
**big** 12:19 190:9 191:9
**billed** 26:4
**Bioanalysis** 149:21
**biological** 146:4
**biologist** 65:19 68:9 69:5
**bit** 9:17,25 27:1 58:2 59:23 139:12 199:22
**black** 160:9
**Bogdan** 5:5 8:17,19 9:7 11:16 13:8,21 14:4,9 15:9, 13 16:5,10, 16,25 17:4,7 18:2,9,22 19:1 21:1,23 22:9 24:7,17 34:10,18 51:6,10 54:6,11,15, 25 61:24 62:5 69:6, 13,18 71:22 72:21 74:3, 8,24 82:15 87:3 93:16 97:6,15,20 98:2,15,18 99:25 100:12 110:11,18,21 111:17 120:18 129:15 130:2 137:7,15 140:6 142:10 145:7,14 149:19 150:1,12 151:12,20 152:13,22 155:20,25 156:10 195:14 197:16,24 199:13,20 201:1,8 208:20 209:5 211:16,23,25 214:9 216:4 217:7,17,23
**boiling** 84:1
**book** 15:21,22 198:1,4,21 200:16
**Borriello** 7:15
**BOSICK** 4:14
**Bosso** 10:21
**bottom** 108:19
**BOWMAN** 4:2
**box** 18:15 75:3 83:5,10 150:8

**branching** 41:22
**brand** 138:25 139:7,8,22 140:24 141:15,17
**branded** 57:22
**break** 51:5 54:7 97:10,16,25 98:6,14 100:11 129:16 155:24 172:1 173:21 174:9 180:15 187:14 194:24 195:1 208:21 211:20
**breakthrough** 64:23
**brief** 54:20 129:22 156:5 195:9 208:25 212:4 217:12
**bring** 11:5 152:15 203:25
**bringing** 70:1
**broad** 68:2 199:4
**BROOKE** 4:2
**building** 176:8
**bunch** 72:10
**burden** 185:25
**business** 27:2 35:5 39:7 42:6
**button** 6:24
**buttons** 49:19 59:6 61:6 62:13 212:18

**C**

**C-I-M-A** 130:9
**C.chem** 94:2
**cal-** 199:11
**calculated** 76:14
**calibrated** 133:10,18,24 134:5
**call** 13:13 18:12 110:8 147:22 186:7,9 190:8,25
**called** 8:12 41:6 51:13 53:14, 24 64:22 108:21 149:21 180:17 186:17 187:2
**calling** 147:9
**Canada** 63:25 128:20
**cancer** 15:1 64:23 65:10,11,19 68:9 69:4 80:12
**Candida** 7:15
**capabilities** 26:17
**capability** 132:1
**capacity** 70:18,22,25 100:4 126:25 127:1
**captured** 31:14
**carbon** 130:13 131:8,15,17
**carcinogen** 40:17 41:3 65:21 66:23 67:10 68:1, 4,21 83:4,9 84:12 200:14,25
**carcinogenic** 39:25 40:10, 22 65:17 66:19 72:7, 16 73:5,21
**carcinogenicity** 73:25
**carcinogens** 84:16 85:25
**care** 217:24
**career** 46:18
**careful** 136:5 146:17
**carefully** 153:11
**Carlos** 4:20 7:9
**Carmen** 10:21 54:6 97:15
**Carolina** 126:22 127:5,15 128:8
**carry** 132:14
**carve** 33:9
**case** 16:23 23:13 29:1 39:17, 21 65:24 75:12 87:5, 11 93:7 94:7 95:24 96:3 100:18 106:7 110:1 111:5 120:10 130:23 131:1,7 132:4 133:5 134:3,15,20 135:13,23 137:4 138:4 141:24 143:15 153:23 154:14 163:25 165:13 169:22 176:6 180:12 198:25 199:7 200:20 201:18 202:1,20 204:13,24 208:8 209:21 210:4,15 211:6
**cases** 32:3 109:23 130:3,8 164:15,16 181:1 182:1
**CASSIN** 4:21
**catalyst** 35:11
**catalysts** 35:12
**category** 31:21 77:19 78:2,4 84:3

199:4
**causation**
211:5
**caused**
159:20
**causing**
168:15 196:3
**caution**
208:11
**cell**
184:12 186:8
**Celsius**
133:11
205:13
209:11
215:23
**center**
150:23
151:22
**Centigrade**
216:25
**Cephalon**
130:9,11
137:8,19
**certain**
52:1 55:8
85:8 101:2,3
109:18
172:14
**certainly**
46:2 140:13
169:23
**certainty**
124:9
**certification**
155:1
**certified**
154:4
**cetera**
149:18
**CFR**
145:9
**CGMP**
135:22
136:2,17,18,
25 144:6
149:15

153:13,16
155:1
**chain**
136:5
**chamber**
50:19 51:14,
18,23 52:1,
16,19
186:11,15
**chance**
99:7
**changed**
81:24
**Chapel**
128:7
**chapter**
12:14 15:21,
23 198:1,4,
8,22 199:14,
21,24 200:3,
16
**characteristi c**
50:20 51:20
**characteristi cs**
200:18
**characterizat ion**
66:8
**characterize**
157:13
171:21
**charge**
26:1 48:2
182:12
183:21 188:4
**charged**
182:5
**charges**
182:10
183:25 184:6
**charging**
25:23
**Charles**
74:12 87:19
94:1

**chart**
82:17 83:4
**checked**
83:5,7
146:19
**checking**
33:7
**chemical**
65:10 66:4
76:20 77:2
83:16,21
84:4,6,18
85:3,9,13,18
157:9,13,18
180:18
**chemicals**
85:24
**chemist**
20:21 78:8
102:9 103:1
135:15
**chemistry**
28:17 66:5
78:23 135:15
144:23
156:13,22
157:1,6,11,
22
**chemists**
20:14 105:16
107:8
**chemists'**
20:22
**cholesterol**
64:4
**choose**
143:4
**choppy**
61:25
**chromatogram**
175:5
176:12,13
185:10
189:11,20
**chromatograms**
166:13 175:6
185:8 189:6

190:5
**chromatograph**
159:3
**chromatograph y**
45:16 46:13,
16,19,23,25
47:4,13,18,
25 48:1
57:24,25
58:3 157:19,
21,23
167:13,16,
23,25 168:2,
22 169:1,4,
5,11 171:17
176:23
**chromatograph y-mass**
84:7 209:14
**CIMA**
130:11
**citation**
167:11
**cite**
118:8 128:21
**cited**
12:25 114:5
115:2,12
118:1 167:10
176:15
178:20 210:4
214:20
**cites**
109:15
**citing**
92:11 115:18
117:1
**citizens'**
125:13
161:15 162:1
**claim**
126:1 154:3
**claims**
189:22
**clarification**
33:16 46:15

64:5 99:5 105:14
**clarify** 26:25 61:12 212:12 216:1,15
**classification** 40:16 41:2 65:21 66:22, 25 67:3,7, 15,25 68:13, 20,22 69:1 200:13,24
**classified** 67:9 83:8
**classify** 27:7 67:24
**clastogen** 83:2
**clean** 190:11 191:3
**clear** 138:11 193:3 211:9 216:20
**clearly** 9:2 151:5
**click** 6:23
**client** 27:19 63:21
**clients** 42:17
**clinical** 36:4 43:3,17
**closer** 62:2
**closure** 101:12 207:6
**co-author** 15:21
**CO2** 130:17 131:20 132:8,16 133:7,10 135:18 143:1
**Code** 145:15 146:7
**Coello** 4:20 7:9
**cohort** 38:23 77:18, 22 78:4
**collision** 50:19 51:13, 17,23,25 52:16,19 184:12 186:8,15
**color** 46:14 146:1
**column** 168:5,6,10, 12,13,16 169:3,5,13, 16,19,24
**columnar** 104:13
**combination** 62:20
**come** 43:24 80:13 88:13 91:15 130:25 152:25 155:1 168:11 175:9 216:12,23
**comes** 136:18 174:19 190:7 211:2
**comfortable** 82:10
**commands** 60:25
**comment** 40:13 49:1 68:8 73:14 82:8 83:10 86:17 87:19 90:5,7 91:19,25 92:17 93:23
94:11 95:7 108:8 113:2
**commented** 89:14,17 91:6
**commenting** 87:12 88:12
**comments** 13:4 82:25 90:25
**commercial** 70:18,22
**common** 45:25 47:23 135:17
**communicating** 156:14
**communication** 10:4
**communications** 119:3 154:3
**companies** 26:12 27:4, 8,10,11,15 28:12,15 36:2,20 37:2,4,13,24 82:12 127:16,17 207:15
**companies'** 81:23
**company** 27:21 28:8, 9,10,11 41:6 42:15 63:20, 22
**compare** 115:24 117:6 119:18 124:14,23,25 126:7
**compared** 185:5
**comparison** 117:12
124:14 139:12,15 160:24
**complete** 12:11 88:24 137:2 146:17 178:24
**completely** 22:21,23 23:2,4 168:20
**compliance** 152:3 153:12
**component** 159:5 168:15 180:15 182:24 189:25
**components** 107:12 167:15,20 168:24 170:2 172:23 182:25 195:17,22
**composition** 85:4 156:15
**compound** 38:15 51:1 86:21 87:2 90:14 173:20,24 174:4,18 183:2
**compound's** 47:10
**compounds** 36:21 47:8 48:24 55:5 85:9,14,18 157:24 158:3,5 170:5 184:18 197:13
**computer** 10:7 132:2 152:24

**concentration** 44:23 172:15,21 191:10
**concern** 38:23 77:18, 22 78:4 79:20 91:22 126:18 141:2 143:7 166:12 172:25 175:19 177:18 185:1,20 191:7 193:11 194:21 196:4,23 197:10
**concerned** 157:7 158:17 164:12
**concerns** 124:16 125:2 166:14
**concluded** 107:1
**conclusion** 94:20
**conclusions** 87:9 165:11
**condition** 133:17 135:1,7 205:16 215:25
**conditions** 95:18 96:8 101:2 108:23 109:19 133:23 134:4,5,9 161:1 167:21 181:14 204:8 205:9,12,20 206:14 210:1 213:5 215:16,21 216:18
**conduct** 33:12 73:20 105:17 135:23 141:17 142:16,18
**conducted** 122:25 123:21 134:16 137:6 143:21 167:22 202:25 212:19
**conducting** 88:16 145:21 148:25
**conductivity** 47:24
**confident** 165:21
**confidential** 55:14,17,25 56:5,23,25
**confirm** 41:2 103:23 160:20
**confirmed** 102:20 104:3 204:6
**confirming** 103:10,18
**conflated** 99:24
**confound** 196:16
**connected** 77:5
**consent** 8:6
**conservative** 80:9,13 208:12
**consider** 201:17 202:18 204:12,23 209:20
**considered** 21:20 22:12, 19 23:10 29:3,10 30:2 34:6 75:15 80:11 111:15 144:9 149:15 179:2,7 191:2 201:22,25 202:8,21 204:14 210:2,6 215:3
**consistent** 116:7 117:14 118:8,9 119:24 136:25 190:16 203:21 206:8
**constitute** 80:23
**consultant** 39:16 78:18
**consultants** 26:15
**consulting** 26:11 27:23 35:6,8 37:12 41:7 42:3, 10,12,19 43:7,13 44:5,13 143:25
**consumer** 202:16
**consumer's** 206:21
**consumers** 88:8 122:1 204:22 206:7 213:25
**contact** 130:14
**contained** 70:9
**container** 101:12 207:6
**contains** 85:20 168:6
**content** 209:13
**context** 105:23 204:15 205:24 207:2 209:23
**continual** 91:17
**continue** 21:10 42:18 139:25
**continued** 42:12,16 203:4
**contract** 26:18 41:17 127:21
**contractor** 42:9,14
**contrast** 190:10
**contribute** 195:18
**contributes** 181:3 195:22
**contributing** 101:11 196:10
**control** 35:25 36:7 37:7 45:1 79:3,7,22 197:18 198:10,23
**control-related** 78:23
**control-type** 131:5
**controlled** 36:10 79:11

136:4,9 169:25
**controlling** 169:19 199:8
**controls** 153:18
**conversations** 6:5,8 19:15
**copies** 11:7,8 30:21
**copy** 17:12,16
**cord** 137:24
**corner** 6:25
**Corporation** 177:17
**correct** 8:25 10:14 13:6 18:8 19:6 25:13, 19 26:6 31:22,25 33:4,5 35:7 37:14 38:3 45:5 47:15, 16 48:14 51:14 52:2, 16,20 53:3, 11,25 54:4 56:1,8,16,23 58:20 59:5, 10 67:1 68:21 69:24 72:11 74:16 75:21,23 76:7,24 78:20 80:17 82:5 83:11 85:4,10,14, 18 90:2,12, 17 91:2 92:21 94:4, 14,23 96:17, 24 101:20 103:13,21 104:5,15,22 105:5 106:14 107:3,10 108:8,15 109:10,16 115:1 120:10 124:23 125:10,20 130:5 131:15 132:5,23 133:12 136:9 138:7,13,18 141:21 142:5 143:5 146:12 147:18 148:3,9 151:3 155:3 157:14,20,25 158:6 159:17 160:13 161:4,24 165:16 166:18 167:15,25 168:1,5,17 169:3,13 171:18 182:6,11,19 183:11 184:2,13,24 186:14,21 187:5,16,23 188:7,17 190:22 197:4 198:11,14 199:1 200:1, 4,20 209:8 214:22,25 215:2
**correctly** 41:11 102:24
**corresponded** 129:12
**corresponding** 190:13
**could've** 33:8
**counsel** 7:3 8:5 15:5 18:6,14 30:13 34:13, 23 51:3 105:24 119:3 137:12 212:16 213:8
**Counselor** 13:18 14:3 149:23
**counter** 136:13
**country** 127:6
**couple** 9:14 129:13 174:2 185:2 211:21 212:12
**coupled** 47:7 162:11 171:17
**course** 23:15 29:13 32:18 79:17 80:21
**courses** 26:21
**court** 7:19 9:20 18:6 30:19 33:16 46:15 61:22 62:3 64:5 74:11, 20
**covers** 144:25 147:5,6
**created** 53:23 137:3
**creates** 169:16
**creating** 6:12 182:6 185:14
**creation** 159:25
**criminal** 44:4
**critical** 139:9 140:24 176:18 180:11
**Cross-talk** 136:20 167:18 178:11
**crystal** 104:11 105:2
**current** 35:2 152:16 153:7 182:6
**curriculum** 34:19 41:5
**custody** 136:6
**cut** 58:1 61:22 103:16 214:10
**CV** 34:11,22 35:2

## D

**D-A-U-G-H-T-E-R** 53:17
**daily** 80:6,15,25 81:24 208:13
**data** 12:14 41:4 43:1,16 63:4 66:8 71:24 73:1,16 80:11 84:24, 25 87:9,23 90:10 97:2 111:11,18,25 112:9,16 113:1,2,4, 11,15 119:22

125:3,12,14 126:2,8,11, 17,18 128:21 131:24 132:2 144:7 149:4, 12 161:6 162:12,17,22 164:12,16, 17,25 165:2, 11,14 166:2, 7,17 167:3,9 175:4,14 185:5 189:6 190:15 204:15 205:13 213:6 214:4 215:23 216:25

**dataset** 124:14,17, 23,25 126:6

**date** 24:22 25:18 67:4,5,8 121:20 137:22,25 138:3,4,6,11 215:10

**dated** 17:2 18:4 19:3 110:14

**dates** 67:20 138:11

**daughter** 20:1 53:14, 16,19 54:3 186:25 187:3,9,15, 20,21

**Davis** 20:8 87:20 94:1

**Davis's** 11:13 20:2

**day** 80:14,17 81:2,13,19 82:1,4 134:16 173:6

**days** 19:5

**deal** 36:20

**debate** 68:18

**decided** 115:12

**deciding** 35:18

**decision** 207:9,12 208:2,11,15

**declare** 8:3

**decompose** 90:8

**decomposition** 157:25 158:6,18,22 159:5,13,17, 18,21

**decrease** 91:17 99:18

**defend** 149:3

**defendant** 4:1,7,12 63:22

**defendant's** 16:6

**defendants** 75:10 93:22 94:8 100:21 101:7 118:21 119:8 122:4, 16 124:1 149:7,10 198:25

**defendants'** 120:20 121:4 141:24

**define** 105:7 134:21

**defined** 94:7 144:17

**definite** 33:15

**definition** 106:5 147:1

**degradation** 35:11 102:2, 6,8,15 104:10,14 107:6 142:25 194:22 196:25 197:19 198:14,16 207:17

**degradation-related** 198:10,19,23

**degrade** 95:19 96:9 194:8 196:21

**degraded** 160:10 181:15

**degrades** 100:22 101:8

**degrading** 91:20,21,23 184:19 193:24

**degree** 124:8 133:11 143:21 169:17 212:23 216:24

**degrees** 108:23 205:13 209:11 215:23

**Delaware** 64:10

**delay** 9:25

**delineating** 32:20

**delivered** 98:13

**demands** 14:19,22 15:8,12

**demitted** 147:8

**demonstrate** 175:22 197:11

**demonstrated** 189:17

**demonstrates** 197:15

**dep** 13:17

**depend** 79:25 170:11

**dependent** 207:5

**depending** 38:12 45:13 80:20 167:20 174:10 205:1,4,25

**depends** 61:5 79:14 121:15 170:5,11 171:8 172:4 187:18 188:1 216:17

**deposition** 6:18 7:2,20, 22,24 9:12 10:8,13 11:6 12:1 13:10, 12,22 14:11 26:2 55:19 152:9

**depositions** 9:15

**derivative** 49:6

**describe** 77:1,3 154:5 156:22

**described**
89:22 129:2 137:6 157:5 179:11
**describes**
85:8 146:8
**describing**
178:17
**description**
28:20,22 30:25 31:8 33:10 51:11 198:18
**descriptors**
156:19
**design**
130:12,18,20 132:22 133:4 147:23 172:10,18 173:9
**designed**
43:2,16 130:21,22 132:3,7,10 133:2 173:14
**desired**
146:20 168:24 188:16 189:1
**destructive**
135:1
**detail**
86:11
**details**
55:13 163:18
**detect**
130:13 157:12 161:10 170:6 171:20 172:2,11,14, 19 173:10,19
**detected**
84:7 113:25 135:13 161:7 182:3 183:10,22 184:1,8 187:3,8
**detecting**
131:15 158:3
**detection**
47:22,24 48:2,3,4 50:23 63:14 170:2,14 171:9,11 182:4 183:11 184:2 191:4
**detector**
47:23 48:7,8 53:11 174:19 175:2,11,25 177:20 182:6,9,14 183:6,7 184:18,19,24 185:20,22 187:10 190:17 194:9 196:15
**detectors**
47:17,22
**detects**
182:9
**determination**
33:18 47:5 173:16 178:18
**determine**
51:2 73:21 96:3 116:14, 20 123:7 161:23 188:11 213:24
**determined**
92:18 120:13 202:12
**determining**
143:1
**deuterated**
190:14,18
**develop**
28:13 172:13
**developed**
132:21 138:22 177:3
**developing**
57:4 147:22 148:1 157:7 175:20
**development**
35:18,23,24 41:18 57:9 144:9,14,16, 22
**developments**
177:15
**device**
10:5 28:17 131:13,19,20 133:9,10 134:6
**devices**
10:2 146:3 169:7
**diagram**
77:8 180:10
**difference**
159:16 176:22
**differences**
184:5
**different**
45:12 47:21 51:12 57:20 72:10 76:11 91:12 95:3 101:3 109:21 127:15 131:4,11 138:15,16 168:12,15 174:2 180:6, 19 181:24 183:9,21,24, 25 184:5,6 187:15 188:4 193:17 194:15 205:3 213:18,23 214:2
**differentiate**
182:10 183:4 184:17,20 188:7
**differentiated**
187:16,22 194:23
**differentiation**
143:8
**differently**
168:14,18
**difficult**
9:20 144:12 170:14 171:10
**difficulty**
216:10
**dimethyl**
77:5
**dimethylamine**
77:6
**dioxide**
130:13 131:8,15,17
**Dipak**
94:3
**direct**
55:1 57:3 101:15 153:9 158:13
**directed**
49:24 50:1 58:12,25 59:3 62:11, 19 73:3 122:25 182:13
**directing**
41:20,24 72:23 102:16 107:14
**direction**
143:22 213:2

**directly**
117:11
169:14
**director**
41:14 42:24
43:8,12 44:2
**disagree**
73:9 205:6,
17 206:22
208:14
215:13
**disagreed**
208:7
**discipline**
157:6
**disclosed**
217:2
**disclosure**
11:24 56:11
57:2
**discovery**
119:4
**discuss**
114:7
**discussed**
80:19 110:10
116:8
**discussion**
96:1 99:6
155:7
**discussions**
81:23 82:13
**dishes**
90:22
**disparity**
116:11
**distinct**
32:13,15
191:8
**distinctive**
131:18
**distribution**
185:3 204:21
206:7,15
**divert**
175:24
**doctor**
20:17 22:5
34:20 80:24
89:13 91:7
94:2 137:16
139:14
140:14,16
150:2 154:11
156:11
192:20
211:12
214:12
**document**
14:14,20
16:14 17:9
24:14 28:20,
22 40:14,25
41:2 67:4
75:11,17,20
82:16,18
105:24
110:6,16
111:3 150:8,
13,17,23
151:1,6,21
152:8 153:2
178:1 201:21
210:8 213:12
**documentation**
136:3,18,24
137:1
144:10,13
145:3,5
146:18
147:6,11
148:7,14,16
149:3,12,15
179:3
**documents**
11:8 12:2,9,
11,23,24
13:5 14:18
19:13 22:18
23:9,21 24:3
28:25 29:2,9
30:1 163:21
166:24
**doing**
9:11,15
29:7,19
31:8,10,12,
13 32:5,8,17
35:24 41:22
43:22 59:11,
14,19,23
60:25 61:6,9
106:13 131:4
134:19
140:18
143:24
147:21
154:25 155:9
175:19 180:7
183:17
209:23
211:13
**dose**
79:16 80:2,
20
**doses**
80:23
**dosing**
80:12
**double**
188:23
**double-check**
74:12
**doubt**
125:9,17
186:5
**drafted**
17:13
**drafting**
210:21
211:12
**drawing**
202:9
**drug**
35:24 36:5
64:2,3,14
80:3,20
95:15,17,19
96:2,13
101:19
108:3,14
109:3,14
111:9,10
112:4,5,12,
22 113:7,8,
19,23 114:1,
2,9,21 115:8
116:1 117:4,
7,8 118:15,
24,25 119:9,
17 120:2
121:5,13
122:6 123:6,
11,12,14
124:2,3
125:18,19
126:13
128:15,24
145:25
146:23
147:16,17
148:1,21
153:11,12,
20,24
154:14,20
162:6,19
163:14 199:9
215:7
**drugs**
144:20
146:3,12
153:16
**dual**
41:15
**Duke**
128:7
**duly**
8:13
**Durham**
127:14

**E**

**E-A-T-O-N**
43:10
**e-mail**
4:5,10,17
10:9

**EA80**
131:23
**earlier**
45:1 55:6
77:12 106:18
175:10 186:7
200:10
212:14,16
214:17
215:12
**early**
46:18 48:12
175:5
189:11,19
**Eaton**
43:6,10
**EDQM**
162:25
164:14
176:16
177:9,16,21
**EDT**
7:6 54:19,24
98:23 99:3
129:21 130:1
156:4,9
195:8,13
208:24 209:4
212:3,8
217:11,16
**effect**
39:25 40:10
203:19
**efficacy**
36:11
**effort**
14:18
**efforts**
73:2
**eight**
28:3,6
209:12
**either**
114:1 122:9
**electro**
180:7
**electromagnetic**
181:21
**electronic**
141:9,10
146:4
**elevated**
205:15
215:25
**elevation**
107:22 109:1
**Eli**
44:17,20
45:3,8,21
46:21 47:2,
6,14,18
48:14 55:14,
17 58:15
59:21
**EMA**
176:16
177:9,21
178:19
**Emery**
115:25 117:3
124:14,17
125:3,5
126:1,12,18
129:13
139:13,15
141:1 144:18
147:14,21
148:19
153:23
154:4,14,19
155:12,13
158:25 173:3
180:7 189:7
213:16 217:2
**Emery's**
116:11
118:11
125:1,12
137:1 145:5
154:2 162:10
166:10
173:1,17
184:9 185:8
205:12
215:22
**emphasize**
108:20
**employed**
45:19 162:11
**employee**
42:9
**encompass**
23:11 28:23
177:14
**encompassed**
36:16
**encompasses**
23:18
**encompassing**
12:22 66:2
**end**
9:1 52:15,18
73:3 94:19
95:16 211:22
**energy**
179:19,22
**engaged**
149:7
**ensures**
153:10
**entail**
35:15
**enter**
7:16 95:11
172:20 176:1
**entering**
60:25 179:25
184:19
**entire**
198:7,21
200:15
204:14
**entities**
99:10
**entitled**
31:1 140:1
200:3
**environment**
12:16 159:25
160:4
**enzymatic**
86:12,15
**epidemiological**
73:1
**equipment**
57:12,14,17
60:6 133:7
212:18,23
**equipped**
131:13
**error**
74:14
**ESQ**
4:4,10,16
**essentially**
53:2 101:17
**established**
80:5,8
**ester**
49:3
**esters**
55:8,22
**estimate**
106:11
**estimating**
106:8
**et**
149:18
**et al**
215:4
**Europe**
163:1 176:17
**evaluate**
38:2 157:8,
17
**evaluating**
166:17 213:6
**evaluation**
39:24 60:12
72:24 162:5
204:4 208:12
**evaporated**
180:14
**evaporative**
48:3

**event**
106:13 181:7
**eventually**
36:5 180:22
**everybody's**
162:10
**everyone**
203:22
217:23
**evidence**
39:25 40:9
71:6,15,16,
20 89:18
91:20 99:15
103:5
**evolution**
130:17 143:1
**evolve**
130:14
**exact**
33:22 59:18
133:14 164:4
**exactly**
49:13 60:3
67:14 84:1
91:5 135:7
163:17
166:21 186:3
**examination**
5:4 8:16
149:5 212:9
**examined**
8:14 146:20
**Excel**
111:10
**Excellent**
18:22
**excuse**
12:10 136:6
163:9
**execute**
130:13
**executed**
138:24
**exercises**
197:11
**exhibit**
5:11,12,13,
14,15,16,17,
18,19,20,21
13:11,13,19
14:6,7,11
16:8,11 17:5
18:7,10,16,
17,18,20,24
21:25 22:2,
3,6,7 24:9,
11,12,19
31:3 34:12,
14,16 69:9,
11 74:5,6,
10,17,19,22,
25 76:5
97:11,12,13
100:10
110:5,12,19
111:21,25
112:2,8,10,
23 115:22
120:19
123:25
137:9,12,13,
16 138:5
145:8,11,12
149:20,23,24
150:2
151:16,17
152:14,16,
19,20 155:20
197:21,22
199:17,18
201:5,6,9
**exhibiting**
104:12
**exhibits**
74:13
**exist**
124:16
**existed**
106:9
**existing**
203:10
**exogenous**
88:25 89:3
151:6
**exogenously**
90:8
**expand**
22:23
**expect**
192:12,15,21
193:1,5,9,15
194:13
**expectation**
36:2
**expectations**
36:24
**expected**
36:20
**experience**
9:11 23:16
24:4 55:2
57:3 132:23
133:4
**experiencing**
160:25
**experiment**
130:18,20
213:7
**experimental**
40:2,11
71:24
132:12,21
144:7 214:5
**experiments**
88:10 112:25
130:6,16
132:19
143:21
**expert**
11:11,12
18:19 21:13
63:20 73:19
88:1 93:17
99:8 118:22
119:13
123:10
138:20
147:14
**expertise**
26:15 66:5
72:18 73:12,
17 74:2
90:20
**experts**
93:1,9,25
95:8
**expiration**
121:20
**explain**
50:11
**explained**
142:8
**explanation**
91:15 140:2
**explicit**
164:18,25
206:11
**explicitly**
175:21
177:24 196:5
**exposed**
88:8 132:8
204:21 206:6
213:25
**exposure**
109:19
202:16
**expressed**
93:24 125:10
**external**
128:19 160:5
**extrapolated**
80:10 91:22

**F**

**facilities**
153:18
**facility**
126:21,24
127:2 128:13
**fact**
42:20 88:23
125:24
131:19
160:18 161:6
173:3 193:21

205:12 215:22
**factor** 101:11 139:9 140:24 189:17
**factors** 104:9,19 172:8,20 205:4,25
**Fahrenheit** 216:25
**fails** 142:3
**faint** 8:22,23
**fair** 98:20
**falls** 84:2
**false** 139:12
**familiar** 39:11 100:13 127:3,8,10 144:21 145:15 171:14,15 201:12
**familiarity** 50:4 68:16
**family** 84:12,16 85:5,13,18, 19
**far** 31:10 45:6 68:16 74:4 113:18 126:23 145:6 173:1
**fashion** 187:12
**FDA** 80:5,8,19 81:11,18,23 82:3 116:8 128:20 147:8 153:6,10 160:11 162:9,17,23 164:13 173:12,14 176:11 177:16,22 178:19 179:15 201:2,12 202:3,4,19, 25 204:4,10, 15,17 205:17 206:2 207:3, 18 208:6 216:20
**FDA's** 80:15,25 129:3 160:8 179:4,9 205:6 206:23 207:8 208:2, 15 215:14
**Federal** 145:16 146:7
**feel** 117:5
**fell** 145:6
**fellow** 21:17
**fen-** 141:23
**fentanyl** 64:15,20 136:9,12
**Fentora** 64:13,14,15
**FHS@ PIETRAGALLO. COM** 4:17
**field** 131:20 135:21 144:23 157:1,10 180:13
**fields** 181:21
**figure** 79:19 113:22 114:6
**figures** 76:9
**file** 158:13 161:8
**filled** 168:13 213:3
**film-coated** 114:14
**filter** 51:17,24 52:15,20,23, 25 53:1,10 187:7,19
**filtering** 183:18
**filters** 175:9
**filtrate** 64:15
**final** 6:19
**finally** 185:7
**financially** 7:13
**find** 29:18 101:22 103:24 106:20 154:8 157:2 166:9 178:5 179:13
**finding** 29:11 104:23 108:2 109:14 204:25
**findings** 104:7 114:7 206:9
**fine** 98:15 178:25 179:14
**finish** 51:6 140:3,4
**finished** 121:5 194:3
**finished-dose** 115:24
**finished-dosed** 167:5
**finishing** 139:20
**firms** 26:22 27:13, 14 35:18 41:19
**first** 9:11 14:13 17:15 22:9 24:22 31:2 39:10 50:13 63:25 69:16 72:5 93:20 100:14 103:16 106:3 153:9 186:23 202:10 203:6 204:1 212:15 215:3
**Fisher** 59:2 60:11
**fit** 42:11 132:4 176:11
**fit-for-purpose** 133:3
**five** 19:8 54:12 95:7 217:8
**five-minute** 129:16 155:24 195:1 208:21
**flash** 168:25 169:4
**flat** 191:2

**Floor**
4:15
**flow**
141:9,11
168:15
175:24
180:24
**flows**
168:7
**focused**
68:10 175:7
**follow**
135:22 144:9
149:1
**followed**
135:25
136:23
149:11,14
155:6
**following**
18:16 91:13
95:12 148:14
154:6 155:11
**follows**
8:15 107:20
187:1
**food**
145:25
146:1,2
**form**
23:22 24:1
32:11 36:9
37:8 38:4,17
39:3 40:4,
12,23 43:4,
18 44:8,14
45:11,22
47:3,20,25
48:18 49:10,
17 50:6
52:3,9,21
53:4,12
56:9,17
57:6,13
58:16 59:17
61:4 65:1,6,
12,18 66:1,
6,16 67:2,
11,18,23
68:6,14 69:2
70:15,20
71:2,13,19
72:12,17
73:11,23
77:14,23
78:5,12,21
79:6,13,24
81:6,14,21
82:6,22
84:17,19
85:6,11
86:1,9 87:7,
14 88:3,15
89:19 90:3,
8,18 91:1,3,
10 92:7
93:2,10
94:9,15,24
95:9,25
96:10,18,25
100:23
101:5,9
102:10
103:3,14,22
104:21
105:6,21
106:15,22
107:4 108:9,
17 109:5,11
112:14,24
113:9,20
114:11,22
116:3,16
117:2,9,20,
24 118:5
119:10,19
120:4
121:14,21
122:7,19
124:4,12,24
125:8,21
126:15
127:7,20
128:4,17
129:1,10
131:2,16
132:6,17,24
133:13,19
134:1,7
135:16,24
138:8,14,19
141:14,22
142:6,15,22
143:6 144:24
146:13
147:2,19
148:4,10
149:9 153:25
154:16,22
155:4,16
156:17
157:15
158:1,7
160:22
161:5,12
162:8,21
165:5,17
166:4 169:4
170:10
176:20
179:20
182:20
183:12
184:3,14,25
185:23
187:17,24
188:8,18
189:2
190:17,23
192:1,14,23
193:8,19,23,
25 194:9,17
195:25
196:4,12
197:5 198:15
199:2
200:11,21
201:15
203:16
205:10,21
206:24
207:11,21
208:4,16
214:11 216:5
**formaldehyde**
55:23
**formation**
89:1 101:14
102:20 103:5
104:20 105:1
107:24 109:3
158:24 161:4
195:19,23
196:10 197:4
206:9 207:5
**formed**
141:7 159:1
175:11 183:6
184:8,18,23
185:19,22
190:16
192:17
**forming**
103:11,19
104:4 201:18
202:1 209:21
**forms**
83:16
160:19,20
192:6
**formula**
75:20 76:17,
21,23
**formulating**
204:13,24
210:3
**forth**
29:14 174:11
213:5
**Fortuna**
4:3
**found**
29:7,22
30:3,10 34:2
43:1 71:6,15
101:1,7,19
104:18 105:1
108:14 109:2
112:3,11,21
113:7,18
114:8,20
115:7 116:15
117:3,6,17,
23 118:15

203:1,22 204:18 206:3 209:15 210:2
**fourth** 93:18
**fragment** 50:20 52:24 186:19
**fragmentation** 52:22 174:7 186:24
**fragmented** 54:3
**fragments** 50:20,21 53:2,8,14,21 174:8 184:11 187:12
**framework** 35:20
**FRANK** 4:16
**fraud** 44:4
**front** 12:3,24 30:16 115:22 191:3
**fuel** 70:8,14
**full** 93:18 106:3
**full-time** 26:15 42:8, 23
**functional** 85:21,23
**furnish** 165:20
**furnished** 29:1,5,10, 14,25 87:24 122:10,13 129:4 137:20 138:10,20
**furtherance** 148:21
**future** 21:8,10 199:12

**G**

**gallery** 6:24
**gap** 194:3
**gaps** 125:2
**GARRETT** 4:4
**gas** 46:13,19,23, 25 47:4,12 57:25 58:3 84:7 130:13 131:15 132:13,14 141:9,10 157:19,21,23 159:3 167:24,25 181:2
**gave** 51:11 91:20 114:14 162:24 177:6
**GC** 47:7 48:11 159:14,24 160:7,15 161:3
**GC-MS** 47:11
**GC/MS** 159:8 160:12,19 161:9
**Gene** 151:25
**general** 12:13 37:17, 25 45:16 80:3 86:16 96:2,14 100:16 132:19 172:9 183:13 196:20 211:4
**generality** 216:14
**generally** 188:14
**generated** 125:3,14 126:9 166:12
**generating** 149:13
**generic** 213:21
**genotoxic** 36:14,17,23 37:6,13,16, 20 38:2 63:14 67:22 68:2 73:22 78:19 207:15 215:6
**genotoxicant** 82:19 83:1
**getting** 91:12 99:23 139:12 148:21 160:5 177:19 182:16 185:7 199:22
**Gibbons** 20:8
**Gibbons'** 20:3
**give** 12:10 15:7 38:9 55:13 73:24 88:9 90:4,21 99:14 103:8 108:10 123:12 139:8 147:10 150:8 164:15 174:20 178:23 183:16 191:20 192:17 193:14 194:8
**given** 84:22 90:21 116:17 139:4 164:19 199:10 210:9 215:2 216:13
**giving** 26:21 53:7 90:24 91:7 92:4,10 119:13 191:6 193:25
**Glaxosmithkline** 100:15 101:16 110:13 112:3,11 150:16 151:22
**GLP** 135:22 145:16,19 146:8,16,21 148:9,18 152:12 154:4,6 155:1
**GMP** 154:4,6 214:3
**GMPS** 146:15
**goal** 168:23 174:12 182:22
**goes** 57:1 180:25 191:10 203:19 204:17

207:22 208:17
**going** 8:19 9:7 13:14,23 18:11,20 42:16 43:21 51:4 52:23 72:19 80:2 87:19 91:1 93:19 101:22 119:1 123:18 142:2 148:5 178:25 183:3,5 185:14 212:11
**good** 6:1 8:18 9:4,6 42:10 51:5 98:6 145:20 147:4 148:14,15 152:16 153:7,13
**GORDON** 4:14
**govern** 172:16
**graduate** 60:23
**grams** 76:6
**Grand** 160:8
**Grant** 4:15
**granted** 56:14
**grants** 14:23 15:3
**graph** 116:10
**gravity** 169:1,5
**great** 54:14 195:3
**GREENBERG** 4:8
**GREG** 4:21
**group** 41:25 77:21
**grouped** 38:23
**groups** 77:4 85:15,16,21,23 164:14
**GSK** 20:18 74:9,18 75:4 82:18,21 100:15 101:24 104:8 105:5 106:20 108:7 110:2 111:18,23 112:21 113:25 114:8,14,20,24 115:13 116:4,20 117:7,13,17,22 118:3,13 119:22 120:1 123:23 126:21,24 128:13 162:5,9,17 163:12 164:10 166:22
**GSK's** 101:18 112:7 115:4,14,23 116:13 163:3 166:16 167:11
**GSKZAN3395640** 149:20
**GSKZAN3692463** 151:14
**guess** 32:12 51:12
62:3 68:17 79:15 95:2,11 106:23 118:18 123:17 183:18
**guideline** 77:17 80:19 81:4,16,25 82:9
**guidelines** 36:19,23
**guilty** 43:1

**H**

**habit** 104:13
**half** 25:17 41:20
**hand** 60:25 130:7
**handling** 204:22 206:7,15
**hands** 59:19 60:7,9 63:7
**hands-on** 59:11,16,20 61:18
**happen** 158:18,20 169:7
**happened** 106:17
**happening** 96:4 103:25 173:7 186:2,4
**happy** 15:9 163:21
**hard** 11:8 17:16 30:20
**Hazard** 74:9
**head** 158:12 159:24 160:4,7,14,20 161:3,8 192:11
**Health** 128:20
**hear** 9:2
**heard** 58:2 86:12
**hearing** 97:22
**heat** 100:22 101:13 104:10,19 105:2 109:19 141:5 160:21,25 161:2 196:9,13,17,18,20 197:3
**heated** 160:5 181:2
**heating** 159:2,24 160:7
**held** 6:5,10
**help** 10:1 26:19 35:18
**helpful** 9:16,24
**hence** 77:4
**hesitated** 190:25
**Hewlett-packard** 57:22
**high** 160:25

169:10 180:13 189:7,16 190:2 194:10 195:16 196:9,13,17, 18,20 205:1 215:5
**higher** 80:23 81:8 185:2 202:14 203:23 204:19 206:5,13
**highlight** 154:25 196:5
**highlighted** 94:22
**highly** 80:9 101:4 141:3 207:5 208:12
**HILIC** 173:2,5 175:6 176:23 185:5,8
**Hill** 128:7
**hire** 26:15
**hired** 27:21 39:16 198:24
**history** 138:12
**hit** 42:6
**hits** 34:7
**hoc** 105:5,9,11, 17,19 106:6, 8,12,21
**hold** 179:12
**home** 217:20
**hope** 98:18
**hot** 158:14
**hour** 25:23 26:1,2 51:4
**hours** 11:21 25:17, 21 31:21 32:24 210:20
**HPLC** 41:23 45:18, 23 46:4,6,8, 11 47:23 57:23 58:6 60:15 162:11 169:11,18,23 170:1,7,17 171:13 174:18 175:25 177:2 180:25
**human** 40:17 41:3 65:21 66:23 67:9 68:1,4, 20 83:8 146:2,3,11, 24 147:17 200:14,25
**humans** 40:22 66:19 73:6 148:2, 22 155:15
**humidity** 101:4,8,10, 13 104:10,19 105:2 107:23 108:20 109:2,19 133:12,17,21 207:7 209:12
**hump** 189:14
**hydrazine** 49:6 55:24
**hydrochloric** 111:9
**hydrochloride** 102:19,22 104:12
**hypothesis** 88:14

**I**

**I-CLASS/XEVO** 215:8
**I-O-N** 46:17
**IARC** 39:19,23 40:8,16,19 65:20 66:22 67:6,25 68:8,11,23 69:7,14 72:2 73:10 74:4, 17 75:3 83:24 200:24
**IARC's** 68:16,19
**ICH** 36:18 38:23 77:17 79:23 80:9
**idea** 53:13 132:20 168:21 183:1
**identificatio n** 14:8,23 16:9 17:6 18:25 22:4 24:13 34:17 37:17, 25 46:20 48:20 69:12 74:23 97:14 110:20 111:22 137:14 141:20 145:13 149:25 151:18 152:21 170:16 171:4 174:1 175:1 197:23 199:19 201:7
**identified** 36:21 37:19 38:1,7 174:22 198:17
**identify** 37:5,13,15 47:8 49:8,12 157:13 170:2 171:21 173:19,23,25 174:13
**identifying** 170:21
**identity** 47:10 142:4, 13
**ill-defined** 68:3
**illegally** 136:14
**immediate** 203:7,18
**immediately** 155:6
**impact** 101:13 172:24 193:10
**implies** 155:8 190:1
**imply** 102:12
**important** 35:17,23 36:7 79:3,7 117:5 123:11 176:18
**improved** 46:1

**impure**
199:10
**impurities**
35:13,25 36:8,10,21 37:5,14,16 44:20 45:17 55:4 57:10 63:15 78:25 79:4,10,12 102:23 104:1,5 106:9 107:13 193:16,21, 22,23 194:7, 14 196:21,24 197:9,19 198:11,20,24 199:14 200:4,17 215:6
**impurity**
35:9,16,22 36:14,17 37:17,19,24, 25 38:6 45:1,7,14, 19,25 46:10, 20 49:4 70:10 78:19 79:2,8,22 80:1 131:6 194:20 198:14,16 202:13,17 207:16
**impurity's**
79:16
**inaccuracy**
175:13
**inaudible**
30:18
**include**
23:21 104:10 116:9,10 142:19 143:3 176:12
**included**
136:2 142:9
**includes**
179:9 182:21
**including**
35:10 127:16 146:1 176:16 177:16 204:20 206:5
**inclusion**
165:10
**incomplete**
166:11
**inconsistencies**
126:8
**inconsistency**
125:12
**incorrect**
76:16 125:7 126:14 214:24
**increase**
91:18 109:2 203:22,24 204:7,18 205:1,7,11, 14,18,24 206:4,12 215:14,20,24 216:11,16,20 217:2
**increased**
80:23 107:23 109:23 209:16,18
**increases**
202:14
**incumbent**
196:2
**independence**
164:20
**independent**
42:15 92:5 118:10,14 119:25 125:14 129:6 161:22 162:4 164:13,14 165:20,24 177:15
**independently**
116:19 162:16 163:9,11 183:10 184:1
**index**
48:1
**indicate**
87:18
**indicated**
25:25 78:7 81:3
**indication**
56:7 79:17 174:20 175:10 185:13
**individual**
81:23 82:12 110:9 143:11 167:15 206:21
**indoor**
131:23
**industrial**
83:17
**industry**
26:24
**inflection**
216:12
**influence**
104:9,25
**influenced**
105:2
**influencing**
104:1
**information**
45:15 57:1 92:13 96:13 100:8 118:23 119:7,12,15 122:8 123:19 139:4 141:4, 19 142:8,17 156:14 164:4 166:22 174:6 203:3 204:5 207:3 211:2 214:7
**informed**
193:14
**infrared**
131:13,18 132:15 135:18
**infringe**
213:22
**initial**
178:8 185:10
**initially**
48:19,20 192:19
**initiate**
65:10
**initiated**
42:22
**injection**
158:13,14,22 159:4,6 160:6
**inlet**
132:13
**inquire**
128:19
**inquiry**
121:18 128:11
**inspection**
142:20
**instance**
114:13
**instances**
59:12 146:22
**instrument**
48:9,10 49:20 58:8, 15,23 59:1,7 60:11,12 61:1,9,15 62:10,14

63:1 149:17 212:22 213:1
**instrumental** 172:16
**instrumentation** 46:1
**instruments** 57:16,18 58:10 59:10 60:22 61:3 62:22
**intact** 194:19
**intake** 80:6,16,25 208:13
**integrity** 99:20 149:3
**intend** 21:5
**intended** 145:23 146:9 216:23
**Inter-** 159:18
**interact** 168:8
**interacting** 103:12,20
**interaction** 103:6 168:3
**interactions** 6:9
**interacts** 168:14
**interest** 170:13
**interested** 7:13 171:25
**interface** 6:11,25 180:8
**interference** 159:14,17, 19,23 175:12 176:9 188:13
**interferences** 126:5
**interfering** 189:12
**intermediate** 70:6
**intermolecular** 102:21 107:7,9
**internal** 109:24 110:6 149:11 190:12,14
**Interpretation** 12:15
**interrupt** 92:15 139:19 214:13
**interrupted** 140:15
**introduced** 46:18 131:9 132:9 159:11 186:18
**introduction** 106:2 158:11 159:3
**invalid** 124:17
**investigate** 88:6 96:4 101:19 198:25 199:3
**investigating** 97:4 147:16
**investigation** 44:4 65:23 67:7 73:20 96:2 102:4 104:18 110:1 120:10 149:6 163:25 197:18 198:9,19,22 210:15
**investigations** 35:10,16,22 45:1,7,20,25 46:10 110:13 111:4 207:17
**invoice** 24:22 25:18, 25 31:20,23 32:22,23
**invoices** 24:8,21 25:1,7,15 26:3 28:18 30:23,24 33:3
**involve** 144:19
**involved** 33:8 43:20, 25 44:10,25 59:13 64:13 65:14 207:13 208:7 216:17
**involvement** 102:22 104:5
**involving** 14:24 142:25
**ion** 46:16,17 47:24 50:17 51:19,22,25 52:11,13 53:19,22,23, 25 54:3 174:7 186:23 187:4,6
**ionization** 180:18,22 181:4 188:15,25 197:3
**ionize** 179:18,23 180:2 195:17,21
**ionized** 180:1,5 181:20 183:8,14,23 191:12 192:3,9 194:19
**ionizes** 180:13,14
**ions** 50:21 52:1, 5,6,14,18,24 53:14 54:3 180:15 182:13,15 183:1 184:11 186:25 187:3,9,15, 20,21 191:15 192:13,21
**ipads** 10:3
**iphones** 10:4
**ISIDRO** 4:10
**isidron@gtlaw.com** 4:10
**isotopically** 102:19
**issue** 165:4 181:8 184:7 196:16
**issues** 132:4 199:1, 3
**itemizing** 50:14
**items** 30:12

J

**Jennifer** 88:21 94:3
**job** 96:3

**JOHN**
4:4
**john.garrett@bowmanandbrooke.com**
4:5
**journal**
165:9
**journals**
165:22
**judgment**
135:14
**July**
24:23,24 25:10
**June**
110:15

**K**

**keep**
23:3 33:23 34:1,8 144:12
**keeping**
32:13
**key**
107:18
**kicking**
62:8
**kind**
45:15 47:17 48:8,16 57:14 61:8 79:19 103:16 127:13 155:3 170:5 172:9 207:12,24
**kinda**
144:12
**kinds**
35:21 37:2 38:13 80:21 172:20
**King**
10:18 97:7, 25 98:3 100:14 109:13 163:5,23
**know**
11:2 12:19 13:24 14:2 19:22 27:6 28:18 29:13, 16,22,24 30:9,17,20 34:7 35:12, 19 36:6,24 37:2 38:12, 13 39:4,12 40:16 43:6, 19 46:11 49:13 50:7, 17 52:10 56:19 59:19 61:7 65:2,4, 13 70:17 71:3,11,17 72:14 76:10, 15 79:15,17 80:1 81:24 84:1 85:19 86:7,14 89:15 92:20 97:4 99:20 100:25 105:23 106:17,23 108:11 109:20 110:7,23 113:13 117:22 118:19 120:1,24 121:15,25 122:21 127:1,24 129:11 135:2,20 144:19 147:4 148:12,13 155:18 158:12,15,19 160:2 163:20 164:19 165:20,21 167:1 169:14,22 171:1,8 172:5,6,12, 21 173:7 174:3,10,15, 17 175:16 179:21 181:6 185:4 188:2, 10,11,12,21 191:16 192:10 196:1 197:10 201:25 203:17 206:10,16,19 207:13 210:11 211:1 213:4 214:25
**knowing**
207:19
**knowledge**
23:14 24:2 43:5 44:11 75:24 124:15 132:23 133:5 149:10 154:10 155:12
**known**
38:24 39:1 69:24 79:8, 15 85:17 127:3 131:18 141:7 144:15 152:11 169:11

**L**

**lab**
28:9 55:2 60:21 136:16,21 137:2 144:3 176:17 214:3
**labeled**
102:19
**laboratories**
28:16 127:22 129:6 164:13 204:6
**laboratory**
41:17,21 57:12 59:12, 16,21 60:10 65:22 66:18, 24 68:1 78:7 84:25 86:5 92:19 127:18 128:12 131:22 136:2,23 138:23 143:22,25 145:4,21,22 146:18 147:4 162:25 203:1
**labs**
130:9,11 177:15
**lack**
73:25
**Lafayette**
41:17
**lagging**
199:22
**Lame**
215:4
**large**
6:22 127:13 166:13 176:7 181:12 191:9
**law**
26:22 27:13
**lawyers**
29:11,15
**LC**
48:12
**LC-MS**
162:11 171:13,15,20 172:2,11,14

188:24 196:9 215:6
**LC-MS/MS** 126:25 162:12 172:19 173:10 179:4,10,12, 15 186:19 188:24 189:4
**Le** 88:21 89:13 92:6 94:3 99:6 100:1
**Le's** 89:2,9 90:6, 25 91:14
**lead** 154:3 158:15 159:18 189:15 194:6
**leading** 164:22 168:16
**leave** 42:3,8
**leeway** 147:10
**left** 42:23 180:9
**Legal** 7:10,16
**legal-related** 42:21
**length** 19:9
**level** 36:11 57:10 79:19,22 116:14 212:24
**levels** 63:15 79:9, 11 88:7 89:1,3 91:16 99:17 106:9 113:22,25 114:8,20 117:3,16 118:14 123:7,13 124:9,19 170:12,13 171:11 172:4,14,17, 22 185:3 202:16 203:2,24 204:6 205:7, 14,18 206:20 209:15 215:14,24 216:20
**Liability** 7:8
**lieu** 8:1
**light** 48:3 211:2
**Lilly** 44:17,20 45:3,8,21 46:21 47:2, 7,15,19 48:14 55:15, 18 56:13,21, 23,24 58:12, 15 59:22
**Lilly's** 56:3,6,10,18
**limit** 80:6,13,16 81:1,8,9,12, 24,25 82:10
**limited** 87:12
**line** 51:7 54:8 155:23
**link** 214:25
**Linkedin** 44:13
**liquid** 47:18,25 70:8 167:13, 16,23,24 168:2,21 169:2,10,12, 15 171:16 180:25 209:14
**list** 12:11 21:20 22:12,20 23:3,10,18 24:15 29:3, 10 30:2,14 34:6 75:14 111:16 113:17 138:25 141:15 178:24 179:2,3,7 201:23 202:8
**listed** 23:10 25:22 30:1,25 31:25 32:1 44:13 76:9 88:20 114:15 171:23 179:9
**listen** 154:12 194:12
**Listing** 114:25
**lists** 72:10,13 192:2
**literally** 212:17
**literature** 29:8,12,15, 19 31:1,7, 12,14,21 32:3,5,8,14, 16,21 33:7, 8,11,17,19, 24 34:3 89:18
**litigation** 7:8 8:21 9:10 17:14 21:6 26:5 34:24 35:1 41:25 42:2 64:7,17 73:19 88:2 118:22 122:11,14 132:5 147:15,21,25 148:20 200:6 207:23 208:18 211:5,12 213:10,16, 17,20
**litigations** 63:17,19,24 64:12
**little** 8:22 9:17,25 18:15 25:12 27:1 58:1 59:23 62:2 105:8 186:6 194:3,24
**live** 126:20
**LLC** 4:1 35:6
**LLP** 4:2,8,14
**load** 111:1 150:9
**loaded** 74:25 150:3 152:23 199:23 201:9
**loading** 17:10 153:3
**located** 126:21 128:2
**logger** 131:24
**long**

17:21 22:15 39:1,4 42:18 132:18 161:11 177:4 181:6 182:24 205:2
**longer**
71:11 121:17 144:1 168:9
**look**
30:14 40:6, 14 60:13 66:11 67:19 68:7 75:19 81:10 83:22 86:18 89:5, 11 91:4 94:18 97:3 99:7 105:22 109:24 112:2,10 113:11,13,14 114:3,12 115:4,6,14, 21 116:19 118:2,12 120:5 121:16 125:1 140:10 145:18 162:16 163:4,22 166:16,23 178:22 190:4 191:14,19 201:19 203:4 209:22 210:8
**looked**
11:15 20:2,5 33:14 39:22 47:11 55:3 66:7,10 72:3 75:13 87:1 88:4 89:6 90:20 109:22 110:7 111:13 112:16,25 113:5,21 117:15 118:18 131:11 162:22 163:1,12,16, 17 166:22 202:2 209:9 213:12
**looking**
24:15 31:20 45:17 50:16 51:1 52:11 67:6 101:21 104:24 111:19 113:12 133:7 163:22 170:6 172:5,12,22 174:16,22 182:23 183:18 189:24 191:21 210:16 213:4 214:18,19
**looks**
39:7 189:12
**loosely**
144:17
**loss**
99:20
**lot**
19:13 47:21 68:16 98:1 113:2,4 122:15,18 127:15 129:11 147:5,6 156:18 159:7 171:23 202:2
**lots**
45:12 129:8
**lovastatin**
64:1,2
**low**
63:15 79:22 169:6 171:9 203:2
**lower**
79:11 81:9 161:7,11 202:23 212:23
**Lowering**
64:6
**Luke**
10:21
**lumped**
32:2
**lunch**
97:9,16,25 98:12,24 100:11

**M**

**M.A.**
94:2
**M.D.**
94:3
**M.R.S.C.**
94:2
**M7**
38:23 77:17 79:23 80:9
**made**
66:25 95:17 107:18 158:21 165:11
**magnetic**
182:17
**main**
44:24
**maintain**
136:5 144:3, 5
**maintained**
136:15 143:20
**maintaining**
136:21
**major**
44:22 45:16
**majority**
30:12
**make**
9:18 37:6 90:6 114:4 119:23 120:12 121:18 123:5 128:11 169:7 188:20 202:3 208:8 211:8 213:5
**makes**
36:5 77:21 85:24 90:17 189:15
**making**
11:22 14:17 37:2
**managing**
41:14 42:24 43:8,12 44:2
**manner**
8:7 213:24
**manufactured**
155:13
**manufacturer**
133:8,24 134:5
**manufacturers**
208:7
**manufactures'**
153:12
**manufacturing**
4:1 26:17 70:24 78:23 144:20 152:16 153:8,13,19, 24 154:10, 14,20 199:7
**March**
17:2
**mark**
13:10,16 15:10 18:3, 12 21:24

24:8 34:11 74:10 110:12 137:8
**marked** 14:6,7 16:8 17:5 18:8,24 22:2,3 24:11,12,19 34:14,16 69:9,11 74:4,22 97:12,13 100:10 110:5,19 111:21,25 112:2,8,10, 23 123:25 137:12,13 145:11,12 149:23,24 151:16,17 152:19,20 197:21,22 199:17,18 201:5,6
**market** 36:6 122:1 144:20 201:14 202:6 203:8,18 207:10 208:3
**marketing** 145:24 146:11
**marketplace** 129:4
**marking** 13:15 18:12
**mass** 47:7,13 48:4,7,16 49:8,15,24 50:1,5,13, 15,17,22 52:15,20 53:10 60:17 61:11,17,19, 20 62:10,12, 16 63:10,13 171:17 173:18,23 174:5 175:9 176:20 177:19 179:17,18,25 181:9,18,24 182:2,11,12 183:10,21,22 184:1,13 188:2,4 191:10 193:24 196:15,18 197:12 215:9
**mass-to-charge** 52:8,12 53:3 181:23 183:19 184:6 186:21 187:14 191:12,17 192:3,7,9
**masses** 183:9,24 184:5
**Masshunter** 63:3,6
**master** 111:18 112:1 123:24
**material** 104:12 107:6 112:9 205:3
**materials** 21:20 22:12, 19 23:4,10 29:3,10 30:2 34:6 36:4 111:15 179:2,7 201:22 202:8 210:5 215:3 216:17
**matter** 7:7 8:4 17:24 25:2, 10,17 29:21 33:12 56:6 67:8 92:24 102:4 143:17 145:6 156:16 164:21 181:5
**matters** 42:2
**mean** 22:24 23:23 53:19 59:4 61:5,13 68:5 75:6 77:24 86:22 97:23 102:8 103:2 105:18 106:12 125:17 128:5 174:2 179:21 188:21 193:4 203:13 208:14
**meaning** 19:21 61:14 67:16 70:22 113:7
**means** 49:13 68:8 155:2,5 206:13,14
**meant** 105:10 106:5 211:11
**measure** 47:1 50:2,3 63:11 132:15 133:9 160:12 162:18 170:8,22 171:2
**measured** 125:6 126:12
**measurement** 131:5,6 135:18
**measurements** 147:24
**measuring** 114:20
**mechanism** 78:9,15 79:1 86:4 89:20 91:2,25 103:9 159:20 160:6
**media** 130:15 131:10 132:9
**medical** 146:3
**medication** 64:16,20
**medium** 26:13
**meet** 148:6
**member** 84:11 85:2
**memory** 133:22 166:25 209:23
**mention** 12:3 27:12 49:2 125:11 139:6,21 141:8 143:13 216:19
**mentioned** 11:18 15:20 32:2 33:6 46:4 55:6,23 57:8 58:5,6 90:7 116:5,6 138:21 140:23 141:18 144:14 157:3 177:6,9,10 178:19
**mentioning** 108:15
**mentions** 177:24

**messaging**
10:9
**mesylate**
49:3,4 55:22
**metabolic**
100:3
**metabolite**
99:12
**metabolized**
86:8
**metaphor**
145:4
**meter**
131:24 133:8,15,16, 18,23,24 134:3 141:9, 11
**meter's**
132:13,15
**method**
45:8 46:6 130:22,25 132:4,11,22 133:1 141:1 142:2 150:5, 24 160:15,20 162:5,9,10, 23 163:13 164:11 171:13 172:10,14,18 173:10,17 176:13 177:2,14 179:4,10,12, 15 185:5,8 186:1 191:14
**methodologies**
162:18
**methodology**
33:14,17 131:14 137:4 182:18,21
**methods**
45:6,13,18 46:7 139:13, 16 153:17 157:7,16 165:2,15 173:4,15 175:20 177:13 185:6
**methyl**
77:4 85:16
**metric**
46:14
**midnight**
11:20
**miles**
126:20
**milliseconds**
181:5
**mind**
129:15 199:5
**minimum**
145:3 148:6 149:2 153:17
**minute**
179:13 201:19
**minutes**
54:12,13 98:5,17 211:20 217:8
**MIR**
46:13
**mischaracterizes**
91:11 93:3, 11 94:16 216:6
**misleading**
154:8
**misshapen**
190:7
**misstates**
115:16 118:6 125:22 126:16 142:7 166:5 187:25 188:9 190:24
**mistaken**
68:24
**mobile**
167:24 168:4,7 169:15
**mode**
173:2 175:6 176:23 180:19,20 184:16 189:4 190:3 191:4
**model**
58:14,17,19 131:25
**modified**
83:7
**moisture**
12:17
**mol**
76:6
**molecular**
50:17 75:20 76:1,4,10 174:7 193:17 194:15
**molecule**
77:7 102:2,8 107:2 141:4 174:11,21 181:17 184:7 187:11 193:10
**molecules**
103:6,12,20 107:10 179:18,24,25 180:4 181:20,22 183:8,23 186:19 187:13
**moment**
20:12,25 66:10 178:22
**Monday**
7:4
**monitor**
130:16 131:19 132:8 135:21
**monitored**
192:25
**monitoring**
50:10 53:13 153:12 191:15 193:10
**monograph**
39:19,23 40:8 69:7,15 72:2 74:4,18 75:4 83:24
**monographs**
68:12
**month**
25:21 205:14 215:23
**monthly**
25:4
**months**
28:4,6 42:4 60:1,2,4 121:9
**morning**
6:1 8:18 9:6,8
**morphology**
104:11 105:3
**move**
30:22 62:1 169:1 179:1
**MRM**
50:4,9 51:13 53:24 63:10, 12 184:16 186:9,14 189:8,23 190:3 192:13,22 193:2,6,17 194:16
**MS/MS**
174:25 177:2 181:25 182:23

188:14
**MT**
215:4
**multiple**
50:10 184:4 185:4
**mutagen**
83:2 90:17 92:18
**mutagenic**
37:20 38:2, 25 39:2 55:4 57:10 63:15 66:15,18 73:21 78:25 79:4,10 90:1,22 91:8,24 92:5 100:4 199:14 200:4,8,16, 18,22
**mutagenicity**
38:9,16 78:6,11 89:21 91:2 92:1
**Mutamice**
152:1
**Mutation**
152:1
**muted**
97:17
**mutual**
42:7
**Mylan**
4:13

**N**

**N-NITROSAMINE**
85:7,8
**N-NITROSAMINES**
84:11,15 85:2,5,12,17
**N-NITROSO**
77:7,9,16
**N-NITROSODIMETHYLAMINE**
40:1,10,20 69:20,23 72:6 73:4 151:25
**Najafi**
19:25 20:9, 10 87:9 91:16 93:25 114:15 115:12 116:6,18 117:1,25 118:19 119:24 141:2 174:24 180:9 185:16 189:22 196:3 197:15
**Najafi's**
11:11 20:7 114:25 115:18 117:11 154:2 167:11 191:14,21
**name**
7:9 8:18 9:6 35:5 43:9 53:21 63:24 195:20
**named**
43:6
**nanograms**
80:14,17 81:2,12,19, 25 82:4
**narrative**
140:10 177:7
**narrow**
52:6
**natural**
83:17
**nature**
45:13 55:17 56:1 73:22
200:8 214:1
**NDA**
209:15
**NDMA**
14:25 15:19, 20,24 16:3 38:15,18,20 39:1,11,12, 15,20 40:17 50:2,3 55:2, 3 57:5,7 64:24 65:3, 4,9,15,16,25 66:4,12,14, 17 67:21 68:13 69:3, 24 70:5,10, 13 71:6,11, 17,21 72:2, 15,20 73:22 74:1 75:21 76:5,11,24 77:2 79:21 80:3,6,10,16 81:1,13,19 82:5,19,24 83:15,20 84:2,4,7 85:1,7 86:7, 21,23,25 87:2,16,20, 23 88:5,7 89:1,3,18 90:1,7,12, 14,16,21,25 91:2,9,16 92:5,17 99:9,17 100:5,22 101:5,8,13, 19 102:1,7, 20 103:5,11, 19 104:4,20 105:1 106:20,24 107:1,24 109:3,23 111:8,24 112:3,11,20 113:6,18,22, 25 114:8,19 115:7 116:14 117:16 119:8 120:21 121:6,12 122:24 123:7,13 124:9 125:5, 18 141:7 155:7 158:24,25 159:9 160:1, 13,18,20 161:4,7,10 162:19 170:8,12,18, 21 171:10,21 172:2,6,11, 12,19 173:10,16 175:1,8,11, 20,23 176:14,19,20 178:18 180:21 181:15 183:4,6 184:7,17,20, 23 185:3,9, 12,15,19,22 189:9,10,13, 19,21 190:6, 10,16,18 191:3,5,13, 17 192:6,13, 16,18,21,25 193:6,13,15, 23,25 194:9, 13,21 195:18,23 196:4,6,10, 22 197:4 198:13 199:9 200:8,18,23 203:1,22 204:6,18 205:7,14,18

206:3,9,20 207:4,20 209:13,15 210:3 215:14,24
**NDMA's** 91:25
**neat** 87:2 90:14
**necessarily** 196:19
**necessary** 44:15 56:19 139:3 141:17 142:23 162:14 166:10 190:2
**need** 12:20 18:11 35:18 36:10, 22 89:4 105:22 114:3 126:4 146:17 149:1 150:7 165:23 171:9 175:21 180:1 196:5 197:11 208:8 210:24 211:7
**needed** 45:15 135:10
**needles** 139:1
**needs** 148:6 191:18
**never** 136:12 217:2
**news** 201:2,12
**NILDA** 4:10
**nitrogen** 77:5 132:14
**nitrosamine** 33:15,18 38:18,20 49:9,16 77:16,25 215:5
**nitrosamines** 38:22 63:11, 13 78:3,9,16 86:6
**nitroso** 77:15,20 85:21,23
**NMR** 46:13
**non-disclosed** 205:13 215:22
**non-glp** 147:9 149:8 150:24 152:4
**non-introduction** 197:12
**non-reliability** 175:13
**nonclinical** 145:22
**normal** 204:7 205:8, 11,19 215:15,20 216:18
**North** 126:22 127:5,15 128:8
**Notary** 8:13
**note** 23:6 32:7,9 42:5 112:20 114:18 120:12 166:2 177:23 178:1 214:9
**notebook** 136:3,16,22 137:1 138:2, 3,10,23 141:25 142:17 144:7,10 145:5 146:18 214:6
**notebooks** 142:9 143:13,14,19 144:4 214:3
**noted** 13:5 22:19 23:8 31:7,22 32:22,24 33:3 83:9 141:2
**notes** 12:4 13:3
**notice** 13:9 14:11 16:7 18:17 67:8
**noticed** 67:12
**noting** 82:18
**number** 5:10 13:19 18:17,18,19, 21 22:2 24:11 34:15 58:18 69:10 74:5,7,13, 17,19 83:14 97:12 137:9, 12,17 141:13 142:4,13 158:9 172:8 178:20
**numbers** 13:21 129:12

**O**

**oath** 8:1
**object** 23:22 24:1 32:11 36:9 37:8 38:4,17 39:3 40:4, 12,23 43:4, 18 44:8,14 45:11,22 47:3,20 48:18 49:10, 17 50:6 52:3,9,21 53:4,12 56:9,17 57:6,13 58:16 59:17 61:4 65:1,6, 12,18 66:1, 6,16 67:2, 11,18,23 68:6,14 69:2 70:15,20 71:2,13,19 72:12,17 73:11,23 77:14,23 78:5,12,21 79:6,13,24 81:6,14,21 82:6,22 84:17,19 85:6,11 86:1,9 87:7, 14 88:3,15 90:3,18 91:3,10 92:7 93:2,10 94:9,15,24 95:9 96:10, 18,25 100:23 101:9 102:10 103:3,14,22 104:21 105:6,21 106:15,22 107:4 108:9, 17 109:5,11 112:14,24 113:9,20 114:11,22 116:3,16

117:9,20,24
118:5 119:1,
10,19 120:4
121:14,21
122:7,19
124:4,12,24
125:8,21
126:15
127:7,20
128:4,17
129:1,10
131:2,16
132:6,17,24
133:13,19
134:1,7
135:16,24
138:8,14,19
141:12,14,22
142:6,15,22
143:6 144:24
146:13
147:2,19
148:4,10
149:9 153:25
154:16,22
155:4,16
156:17
157:15
158:1,7
160:22
161:5,12
162:8,21
165:5,17
166:4 170:10
179:20
182:20
183:12
184:3,14,25
185:23
187:17,24
188:8,18
189:2 190:23
192:1,14,23
193:8,19
194:17
195:25
196:12 197:5
198:15 199:2
200:11,21
201:15
203:16
205:10,21
207:11,21
208:4,16
214:11

**objection**
8:7 30:5
62:17,24
95:25 115:5,
9,16 116:23
118:16
123:8,15
136:19
146:25
148:23 151:4
152:5 166:19
167:6 191:18
206:24 210:7
216:4,5

**objections**
8:9 15:6
16:7

**observation**
119:23

**observations**
107:18

**observed**
99:18

**observing**
216:21

**obtained**
162:13
184:11 185:6

**obtaining**
156:13

**occurred**
43:19 106:14
121:9 126:6

**occurring**
99:15

**occurs**
103:9 186:24
195:24

**October**
32:24 39:9

**offer**
21:5 35:9
36:14 124:8,
19

**offered**
87:9 92:25
93:8

**offering**
89:8,25
92:23 93:6
99:13 100:3
199:6 200:7
202:19

**offers**
174:25

**offices**
10:17

**okay**
8:25 9:1,4,
14 10:7,12,
15,19,25
11:9,16
12:20 13:3
14:14,17,22
16:25 17:16
18:1 19:5
20:4,19,22
21:22 22:14
25:6,15
31:19,24
34:22 35:4,
14 41:13
50:24 51:16
54:15 55:16
63:23 64:11
74:20 75:9
76:20 83:13
98:10,16
101:23
110:18,24
111:2,3
112:6 120:18
127:11
129:18
132:10 145:7
150:5,11,16,
19,22 151:19
153:4,5,6,23
157:4 171:5,
16 173:25
183:16
186:13,18
198:3,7
199:23
201:11
209:10
211:23
214:15
215:19 217:7

**Olsen**
5:3 7:2 8:18
9:6 14:10
16:11,18
17:8 19:2
24:18 35:5
37:11 55:1
69:14 74:25
98:9 100:13
106:4 110:22
126:10 130:3
140:5 150:14
152:23
195:15
197:17,25
199:21
201:10 209:8
212:11
217:17

**Olsen's**
17:1 18:3
24:8 34:11
137:8

**once**
95:17 110:23
214:11

**one**
4:9 14:22
18:20 20:15
22:13 24:15,
22 25:5
27:22 31:2
33:15 37:9
42:25 43:13
44:5,24
45:18 49:1,3
51:13 53:20,

21 63:25 73:15 75:4, 6,7 80:12 89:14 92:25 93:8 97:19 104:7 114:13 121:11 127:25 130:8 134:16,18, 21,24 146:17 151:15 152:18 157:19 159:11,12 169:4 170:6 171:24 172:17 173:12 174:2,14,15 181:15 182:23 185:2 186:24 189:24 195:20 196:7 202:3 206:1 209:6 211:13,15 212:21

**ones** 20:11 26:14 29:22 53:10 128:9 131:11 163:17 187:9

**open** 10:9

**operate** 62:14

**operated** 63:1

**operating** 136:1

**operation** 212:25

**operator** 212:23

**opinion** 69:5 73:24 84:22 89:12 90:4,24 92:10,21 99:13 117:2 119:13 123:13 124:8 145:4 155:9 173:6 190:20 200:7,19 207:18

**opinions** 21:5,8 24:5 73:13 84:21 86:10 88:9 89:8,25 90:21 91:8 92:4,23,25 93:6,8,13, 22,24 94:12 95:6 100:2 119:22 151:7 152:7,11 199:6,11 201:18 202:1,20 204:13,24 209:21 210:4

**opportunity** 11:3 181:13 210:10

**opposed** 23:4 26:25 27:2 29:11 107:11 141:1 161:1 173:2 189:4

**options** 36:25

**oranges** 160:23 213:19

**order** 47:8 88:11 117:2 119:18 123:12 130:19 169:14

**organic** 83:15,20 84:4,6

**organisms** 86:5

**organizations** 26:18

**OTC** 203:10

**others'** 119:16

**outcome** 7:13 38:12

**outlayed** 214:5

**outline** 36:24

**outlined** 214:6

**output** 63:6

**outputting** 132:1

**outside** 6:10 72:18 73:12,13,17 78:14 84:20 86:10 90:19 95:3 119:4 133:23 134:4,9 151:7 152:6 200:19

**oven** 169:19

**overlapping** 185:11

**oversight** 136:17

**P**

**p.m.** 98:23 99:3 129:21 130:1 156:4,9 195:8,13 208:24 209:4 212:3,8 217:11,16

**packaged** 155:14

**packaging** 109:20 153:19

**packing** 154:20

**page** 5:4,10 14:13 17:15,20 22:8,10,13, 15 31:3 69:16,19 70:1 71:23 72:22 82:15 83:13 88:19 93:14 95:14 105:15 106:1 107:15,17 108:1 204:1, 2

**pages** 17:21 19:8 22:15,16

**pain** 64:16,23

**Panigrahy** 94:3

**Pantheon** 4:1

**paper** 100:19 108:12 109:8,16,17, 21 163:5,23 165:10,12 177:18 193:21 196:18 197:2,7 209:22 210:13,14,16

**papers** 15:15,19

**paragraph** 93:19 106:3

153:9 202:10,23 203:6
**parameters** 172:16
**Pardon** 43:9 180:3
**parent** 53:21,25 54:3 186:22 187:4,11,13
**part** 6:23 24:4 35:8,17,23 39:20 41:23 50:13 51:13 65:23 68:24 72:1 75:11 77:6,8,10, 15,16,17 89:20 91:1 100:17 102:3 109:25 111:4 120:9 122:10,15 127:5 143:10 145:20 160:5 163:24 174:18 180:9 182:22 185:10 186:9 196:7 210:14
**participants** 6:3,19
**participating** 7:20
**particles** 180:14 182:5,13
**particular** 13:22 34:8 52:7,12 53:2,8 57:14 65:2 101:12 104:23 122:18 133:2 139:17 174:4 175:23
182:12,23 189:25
**parties** 8:5 116:8 118:10 119:25 125:14 143:14
**partnership** 127:4,9
**parts** 43:22
**party** 7:12
**pass** 50:18 53:9 181:21 211:17
**passed** 50:21
**passing** 169:12
**past** 63:16,19 165:9 212:20
**patent** 42:1 213:19, 22
**patterns** 174:10
**peak** 181:11 185:12 189:13 190:8 191:1,3
**peer** 166:9
**peer-reviewed** 164:16 165:3,16,25 166:8 178:1
**penalty** 8:4
**pending** 139:24 140:12,17
**Pennsylvania** 4:16
**people** 59:13 60:10 164:19 165:1
**perceive** 190:21
**percent** 70:9 133:12 209:12
**percentage** 26:23 27:3 29:9,16 30:9
**perform** 43:2,17 118:13 213:1
**performance** 169:10
**performed** 48:17 49:7 169:21 182:4 184:12
**period** 24:23 41:9 45:10 181:10
**perjury** 8:4
**permits** 145:24 146:11
**person** 8:2 26:10 42:23 60:24 138:23 143:22
**personal** 143:18
**personally** 49:7,15,18 57:11 58:23, 24 61:10,13, 16 62:9,21 63:3,10 163:8
**personnel** 41:21
**perspective** 77:2 84:18 171:2
**pertain** 148:13 152:10
**pertaining** 146:8
**pertains** 145:16 150:19
**pertinent** 23:1
**petition** 125:13 161:15 162:1
**petri** 90:22
**PGA** 164:14
**Ph.d.** 7:2 94:1 212:24 213:2
**pharma** 115:25 117:4 125:6 126:12 127:17 147:14 153:24 155:13
**pharmaceutical** 26:11,12,24 27:4,7,10, 11,14,17,19, 21 28:12,15 35:5,17,23 36:1 37:12, 24 39:7 41:19 44:19 63:20,21 78:18 79:5, 8,18 81:13, 20 82:5 207:15
**pharmaceuticals**

4:7,13 80:7, 16 81:1 130:10
**pharmacologist**
86:3
**Pharmd**
94:3
**phase**
158:17 162:11 167:24 168:7,9,14 169:15 173:3,4 176:23 185:6 207:22 208:17 211:5,11
**phases**
168:4
**phenomenon**
195:24
**Philosophy**
94:2
**physical**
66:8 83:23 99:20
**physically**
7:21
**pieces**
186:20 187:2
**PIETRAGALLO**
4:14
**pile**
12:19
**pills**
209:17
**pipe**
140:23
**Pittsburgh**
4:16
**place**
44:6 51:24 52:22 136:1 181:4,7
**places**
122:22
**plaintiff**
7:4 95:7
**plaintiffs**
8:20 9:9 122:10,14,16 124:11,21 128:25 129:9
**plaintiffs'**
13:9 14:7,10 16:7,8 17:5 18:24 22:3 24:12,19 34:16 69:11 74:22 92:25 93:8,25 97:13 110:19 111:21 137:13 145:12 149:24 151:17 152:20 197:22 199:18 201:6
**plan**
214:5
**platform**
10:13
**play**
32:18
**please**
7:16 11:2 13:8,16 16:5 17:1 18:2 21:23 22:10, 15,23 24:7,9 34:10 69:6 71:23 72:22 74:8 82:16 92:14 93:5, 17 97:6 110:11 111:17 137:7,10 139:18 145:8 149:19 150:8
152:15 154:12 194:12 197:16 199:13,15 201:1 214:9 216:1
**point**
81:7 84:12 121:23 177:1 192:5 196:7 210:20,24 211:16
**pointed**
191:7
**points**
84:1 212:21
**policy**
207:12 208:6
**poorly**
189:14
**port**
132:13 158:14 159:4,6
**portable**
131:21
**portray**
144:18
**posed**
140:7,9
**position**
27:23
**positive**
38:10 82:19 83:1
**possibilities**
159:7 188:11 206:17
**possibility**
191:8
**possible**
172:13 173:11 206:18
**post**
105:5,9,11, 17,18 106:6, 8,12,21
**potent**
84:16 85:25
**potential**
36:23 37:6, 20,21 38:3 49:4 78:6,10 83:4 99:16 176:7 188:12
**potentially**
55:4 57:10 63:14 78:25 99:12
**practical**
40:21 73:5
**practice**
152:17 153:8,13
**practices**
145:21 147:5,12 148:14,16 149:16 154:6 214:3
**preclinical**
43:1,16 147:7
**precursor**
46:8 182:25 186:22 187:4,6 192:2
**predated**
46:6
**predictable**
187:12
**predominance**
27:10
**predominant**
46:23
**preliminary**
19:20,23
**preparation**
19:18 31:15, 17,24 32:4, 9,10,14,18

33:6 141:5
**prepare** 16:22 19:11
**prepared** 15:14
**preparing** 32:6 59:8
**prescribes** 145:20
**prescriptions** 203:10
**presence** 6:10 102:1,7 103:25 111:8,24 120:21 121:6 122:24 143:23 181:2
**present** 4:19 7:22 35:25 61:1 71:7 102:14 103:7 149:5 158:16 170:12 172:7,23 183:5 184:21 194:7 196:16 199:10
**PRESENTATION** 4:21
**presentations** 15:15 16:2
**presented** 16:1 132:5
**preserved** 122:5
**prespecify** 142:3,13
**pressing** 61:6
**pressure** 169:6,17 180:18
**pressurized** 169:12
**Presumably** 155:5
**pretty** 17:10
**previous** 125:12 160:15 170:20,23 203:21 216:6
**previously** 31:9 70:16 89:23 200:13 205:24
**primarily** 41:18 42:1 169:8
**primary** 45:8 46:2 95:10
**principle** 133:6
**Principles** 95:15
**prior** 70:5 213:10, 15
**prison** 43:15
**Private** 6:8
**privilege** 119:2 123:9
**privy** 82:14
**probable** 40:17 41:3 65:21 66:23 67:9 68:1,4, 20 83:8 200:14,25
**probably** 33:5 47:22 163:19 180:11
**problem** 175:3 176:5
**procedure** 130:24 138:2
**procedures** 136:1,24 144:6,10 164:9
**proceeding** 6:4 9:16
**proceedings** 7:17
**proceeds** 211:6
**process** 56:11,19 57:2 102:15 198:10,23 211:13
**processed** 155:13 197:18
**processes** 83:17 86:12, 15
**processing** 63:5 153:19 154:20 156:14 199:8
**produce** 186:24
**produced** 174:8 213:10
**product** 28:14 36:1,6 64:19 108:14 112:5,13,22 113:8,19 114:9,21 115:8 117:5, 8 118:15,25 119:9,17 120:2,14 121:5,13 122:6 123:7, 12,14 124:3 126:13 128:16,24 153:20,24 154:15,21 161:1 162:20 163:14 167:5 183:1 187:9 194:22 204:21 206:6 208:15 213:21 215:7
**production** 12:17 70:7, 14
**products** 7:8 14:25 35:11 101:20 111:10 115:24 116:2 145:24 146:4,11 153:11 154:10 162:7 201:14 202:13 203:9,23
**professor** 27:25 28:8
**profile** 44:13
**project** 87:10 148:9
**projects** 42:16
**prompted** 204:5
**pronounce** 41:11
**proof** 184:22 185:19,21 186:1
**properties** 38:25 39:2 65:24 66:2, 4,9 82:24 83:23,25 90:1 91:9,24 92:5 143:1 171:8 200:23

**proprietary**
56:25
**protocol**
135:12 137:5,8,19, 22 138:7,13, 16,18,22,25 139:17 141:8,9,18 142:3,12,16, 19 143:3 151:14 213:9
**protocols**
137:3 143:11
**prove**
125:17 186:3
**proven**
126:2
**proves**
195:23
**provide**
75:10 93:21 95:6 99:5 103:4 118:22 140:2 141:19 182:2 214:4
**provided**
25:6,16 30:13 34:23 119:6 122:17 124:10,20 129:8 143:14,17 207:3
**providers**
127:19 128:13
**provides**
182:18
**providing**
100:7 140:10
**pub-**
178:14
**public**
8:13 56:7,11
**publication**
56:3,18 97:7 101:17
**publications**
164:17 165:3,16 166:1
**publish**
55:19 56:8, 11,13,16,19 81:11
**published**
36:19 49:2,3 55:11,21 80:18 108:7 110:3 178:16 179:5,15 199:25
**pull**
13:9 16:5 17:1 18:3,9 21:24 24:8 34:11 40:5 69:6 74:9 81:15 93:16 97:7 110:11 111:17 145:8 149:20 151:13 197:17 198:2 199:13 201:1
**pulled**
22:6
**pulling**
110:17
**pump**
169:16
**Purdue**
27:23 28:5,8 59:24,25 60:8,18
**purification**
169:9
**purported**
89:20
**purpose**
6:12 120:25 123:18 133:2 142:1 147:15,20 148:6 149:1
**purposes**
13:15,16 29:20 40:21 65:5,7 70:21 71:8,12 73:5 77:22 169:9 213:17
**pursuant**
79:22
**push**
62:13
**pushed**
49:19 212:17
**pushing**
59:6
**put**
11:17 78:3 82:9,25 105:25 115:22 169:14 205:23
**puts**
78:1
**puzzling**
154:1

**Q**

**q2**
186:17,18
**QA**
136:17
**quad**
62:12
**quadrupole**
53:10 61:11, 17,19 62:10, 16 182:1 186:14,23 215:9
**qualification**
149:17
**qualifying**
159:9
**qualitative**
174:6
**qualitatively**
157:8,12,17
**quality**
36:3 131:5, 24 135:20 149:4 153:11
**quantification**
170:15,16,24 171:7
**quantify**
157:13 170:18 171:21 173:19,24
**quantifying**
170:21
**quantitate**
48:25
**quantitating**
55:9
**Quantitation**
215:5
**quantitative**
48:22,24 63:4
**quantitatively**
157:8,12,17
**quantities**
176:8
**question**
9:23 12:22 23:17 37:9, 18 38:7 45:14 47:10 49:12 62:6 80:24 87:6 88:14,17 91:21 92:2,3 93:5 94:22 95:23 96:6 105:13 106:24 108:24

114:18 118:12 121:25 123:2,17 129:7 130:7 131:7 139:21,23, 24,25 140:7, 9,12,14,19, 22 151:10 154:11,12, 13,19 170:20,23,25 171:6 172:1, 9 173:9 175:18 176:25 177:1,5 185:17 187:2 191:25 192:8,20 194:2,11,13 207:25 208:1,6 211:10 212:15 213:20 214:13 215:13,17 216:5

**questioning** 8:20 9:8 15:10 51:7 54:8 212:13

**questions** 9:21 11:1 27:17,19 88:18 91:12 95:17 96:8, 17,21,23 98:3 99:25 105:13 140:17 155:23 211:21 212:12 217:5,18

**quick** 12:10 129:16 211:20

**quickly** 17:9,10 169:8

**quite** 152:25 160:3 176:3 190:11

**quoted** 99:9 115:2 116:25 118:7 119:24

**R**

**R&d** 144:15 147:22

**raise** 206:9

**Raleigh** 127:14

**Ramin** 93:25

**range** 52:5,6 84:1 114:14 116:17 117:21 118:1,4,7,20 119:24 144:25 216:19

**ranitidine** 7:7 15:16 87:17,21,24 88:5 96:5,9, 14 100:21 101:2,7,10, 19 102:2,8, 11,19,21 103:6,12,20 104:11,20 106:21,25 107:2,10 108:3 109:14,18 111:8,24 112:4,12 113:19 116:1 117:4,7,15, 16,19 118:24 119:9,17 120:21,23 121:5 122:2, 5,6,23 123:1,6,11 124:2 125:15 128:15,24 141:3 149:8 150:20 155:8,14 159:9,14,24 160:10,13, 17,19,21,24 161:10 162:6,19 163:13 170:9,19 173:17 175:20,22,25 176:8,14,19 177:19 178:18 180:21 181:8,16 185:4 191:10 192:4,6,9, 12,17,21 193:6,9,12, 16,24 194:14,20 196:6,11,20 197:1,8,13 198:13 199:8 201:13 202:5,13 203:1,8,14 204:7 205:8, 19 207:9,19 208:2 210:17 215:7,15

**ranitidine's** 97:4

**ranitidine-containing** 14:25

**rapid** 181:7

**RASPANTI** 4:14

**rate** 95:18 96:9 104:9,13,20, 25 107:23 109:3 207:4

**rates** 101:5 168:15 205:3

**ratio** 52:8,12 53:3 181:23 184:6 186:21 187:14 191:13,17 192:4,7,9

**ratios** 183:19 188:5

**RCA** 111:12

**reach** 51:25

**reaches** 51:17

**reacting** 102:12,13,14

**reaction** 50:10 102:21 107:7,9

**read** 22:18 23:2,4 72:1,2 75:6 86:19 93:19 94:21 102:3, 24 112:19 120:8,11 210:12,14,16 216:8

**reading** 28:19 70:16

**reads**
71:5 72:25 84:10 102:17 107:17 108:1 202:10 204:3
**ready**
97:9
**real**
121:10
**realm**
206:17
**reason**
16:18 83:7 121:10,11 123:4 125:9, 16 128:18 160:11 188:22 189:3
**reasonable**
124:8
**reasons**
99:17
**rebuttal**
180:10
**rebuttals**
11:12
**recall**
20:5,11 22:16 33:19, 21 39:13 57:20 58:17 59:18 60:2 63:24 66:9 67:5 72:3 75:13,18 112:15 113:12 120:16 121:9 124:5 133:20 134:8 135:7 143:16 150:15 151:11 163:3,17 164:4 166:21 167:8 207:9 208:2,15 212:16 213:8
**recalled**
207:19
**received**
11:19 14:24 15:2 210:18
**recent**
67:15
**recently**
108:2
**recess**
54:20 98:24 129:22 156:5 195:9 208:25 212:4 217:12
**recession**
42:6
**recognize**
22:11 197:25
**recollection**
91:14
**recommend**
161:9
**recommendations**
37:3,7
**record**
6:2,7 7:18 11:17,23 33:23,25 34:1,8 54:18,23 98:22 99:2 100:5 113:24 129:20,25 156:3,8 195:7,12 208:23 209:3 212:2,7 217:10,15
**recorded**
6:4,6 214:3
**recording**
6:13 144:6
**refer**
65:20
**reference**
15:6 108:10, 12 109:7 178:3,10,20 179:9 214:19,20, 23,25 215:2
**referenced**
200:12 209:7 210:11
**references**
12:25 23:7, 11,19 29:24 33:7 109:13, 17 110:9 179:8 210:5
**referring**
11:10 12:12 20:9 43:24 159:22,23 177:8,11 192:24 206:15
**refers**
127:9
**reflect**
25:16
**refractive**
48:1
**refresh**
75:5 166:25 209:22
**regard**
9:15 11:24 15:11 16:2 21:3 29:2 30:24 68:12 79:21 89:9, 25 90:25 91:8 92:4 100:3 113:6 117:3 119:14 123:13 139:16 153:7 162:18 175:15 200:7
**regarded**
40:21 73:4
**regarding**
15:3 36:17 78:19 81:13 95:7 118:23 119:7,16 120:13 149:8 167:4 198:9 199:7 200:16
**Regional**
127:4
**regulated**
145:25
**regulations**
23:20 145:16 146:7 152:17 153:8,14,16
**regulatorily**
148:22
**regulators**
36:2
**regulatory**
35:20 78:24 148:2,17 164:22
**relate**
89:3 172:9
**related**
7:11 19:14 27:17,18 29:1 35:10 42:1 56:13 64:1,21 87:16 104:24 112:17 130:6 142:23 149:11 159:21 190:18 197:13,19 207:17 212:18
**relationship**
38:11
**relative**
107:23 108:20 109:2 133:12,17 209:12
**release**

201:2,13
202:4,22
**released**
131:8
**releasing**
144:20
**relevant**
121:16 122:3
162:2
**reliability**
93:24 94:11
166:15
172:24
**reliable**
126:2,5
**relied**
24:4 169:1,5
209:7
**rely**
26:18 173:19
**relying**
23:12,20
68:19 117:13
119:22
**remain**
42:9 131:22
**remaining**
211:18
**remember**
20:15,24
27:22 33:13
55:12 67:13,
17,20 70:16
92:2 111:13,
19 131:10
133:14,16
134:13,17
176:25
186:12
215:17
**remote**
6:11 7:1,9,
17
**Remotedepo**
6:25
**remotely**
7:24 9:12
**removal**
201:13 202:5
**remove**
6:16
**repeat**
9:4 103:15
179:6
**repeated**
158:25
**rephrase**
11:3
**rephrased**
171:6
**replicas**
143:10
**replicate**
214:8
**replicates**
134:25
**report**
11:11,12,13,
19 16:22
17:1,13,17,
20,24 18:4,
19 19:2,8,14
21:2 23:8,9
31:15,16,24
32:4,6,9,10,
14,18 33:6
34:5 74:10
78:14 87:19
88:19,21,24
89:3,5,7,10,
12 90:6
91:5,14
93:12,13,14,
17 94:10,17,
19 95:4,14,
21 99:6,8
105:10,15,20
106:1 110:8
113:24
114:3,7,12,
13,15,19
115:1,3,4,11
116:5,6,9
117:1,11,12
118:1,8,20
119:21
125:10,11,25
128:22
137:21
138:10,21
156:24 157:5
164:8 166:3
167:12
178:3,7,8,
21,23 179:8
191:19,22,24
195:16
196:13
202:19 209:7
210:12,19,23
211:7,11,14
214:18,23
**reported**
91:16 107:19
108:3 109:14
118:9
161:15,19,21
**reporter**
7:14,19 9:20
18:6 30:19
33:16 46:15
61:22 62:3
64:5 74:11,
20
**reporting**
7:23 8:8
112:21
125:18
**reports**
11:7,9,10,14
12:25 19:14
21:4,8,11,
14,19 29:14,
20 87:12
88:12 93:25
110:9 115:19
125:23
166:24
210:22
**represent**
121:24
**representing**
27:14
**represents**
175:12
**reproduce**
139:5
**reproduced**
146:20
**reproducing**
140:25
**reputations**
164:21
**request**
6:6 165:8,24
166:7 203:8,
18
**requested**
29:24,25
30:10 34:4
165:8
**requesting**
165:1 201:13
202:5
**requestor**
165:21
**required**
146:21
**requirements**
136:25
148:17
153:17
**research**
14:23 15:2
21:16 39:21
65:5,7,24
70:21 71:1,
7,12,18
87:6,10
88:13,17
89:24 127:4,
9,10,11,19
128:1,2,14
144:15,22
145:24
146:10,22
148:20 149:8
**reserve**
21:7 210:25
211:17

**reserved** 13:21
**resident** 21:17
**residual** 47:1,5
**resolution** 187:19 188:1,6
**resolved** 189:14
**respond** 175:2
**responding** 175:4,16 182:15 189:9 191:5
**response** 16:14 38:10 53:16 62:7 72:19 90:22 92:24 93:7 140:19,21 154:24 174:3,16 185:14 190:7,9,11, 21,25 191:1, 6 194:1,6 214:14
**responses** 15:6 16:6 18:18 185:9
**responsible** 91:24
**responsive** 14:19
**rest** 33:2 77:7 116:12 173:2,8 202:22
**result** 116:17 159:25 202:15 203:7
**results** 63:8 102:1,7 113:6,17 114:24 115:14,19, 21,25 116:5, 11,14,20,25 117:14 118:2,11,13 119:14,16, 18,25 124:15 125:1 129:3 146:19 154:5 155:7 162:24 166:15 167:11 172:25 189:16 196:16 209:20
**retained** 73:18 93:21 120:22 121:8 122:16,22 130:4,12 161:25 174:18
**retention** 174:17,23
**retired** 46:3
**retrieved** 146:19
**retrospective** 106:11 213:24
**retrospective ly** 88:7 106:16 206:19
**reverse** 162:11 173:3,4 176:22 185:6
**review** 19:17 20:13 28:20,23 32:21 39:19 41:1 75:1,11 87:8 88:20 89:2 100:17 111:3,10 116:13 165:8,24 166:1,9 167:3 201:21
**reviewed** 19:13 20:16 34:5 97:2 100:19 163:4 164:5 167:1
**reviewer** 163:7
**reviewers** 165:7,19
**reviewing** 26:3 28:25 63:8
**revision** 138:12
**RH** 109:1
**right** 6:24 13:7 14:4 16:13 17:12 20:11 21:7 25:7 31:20 32:13 42:6,22 49:14 53:16 54:6 60:4 67:14 75:19 77:10 83:10, 11 85:20 98:12,13 133:3,5 137:25 139:15 140:13 144:2 150:20 160:3 168:22 178:13 196:14 203:19 204:2 210:25 211:19 212:21 213:13,14 214:21,22 217:4
**rights** 11:24
**rise** 53:7 78:10 191:6 193:14 194:8
**risk** 80:12,23
**robust** 135:19
**rocket** 70:8,14
**role** 41:13,15 61:8 78:17 213:3
**Ron** 19:25
**room** 7:22 10:20 202:15
**root** 101:18,25 109:25 110:2,6,14 111:7,23 112:7,17,19, 23 113:17 114:1 120:5, 14 123:23 163:19,20 166:17
**Rosemary** 8:19 9:7 155:23
**rough** 19:21
**Roughly** 48:6
**Rounds** 160:8
**routine** 47:9

**RSK**
109:24
**rules**
144:13
**run**
61:14,16,18 62:9,21 134:23
**run-on**
207:25
**running**
59:7,9 60:22 61:3,5,9

## S

**S-------------**
5:8
**safe**
217:20
**safety**
36:12
**sale**
147:17 155:14 203:15
**Salmon**
94:1
**salt**
49:4
**sample**
86:22 101:12 122:17 134:18,21,22 141:5 158:11,21 159:6,11 167:14 168:4 169:2 170:3 171:22 172:3,6,11, 13,15,19,21 173:8,11 180:16 183:5 192:18 195:17,22 207:6
**samples**
59:9 62:22 101:3 109:21 121:16,19 122:2,5,9, 13,21 124:22 126:11,17 128:24 129:2,3,13 136:4 142:4, 13 166:13 168:3 185:4 190:6 196:14 204:19 205:5 206:4
**sampling**
160:6
**Sanofi**
117:13 167:4,9
**sartans**
160:16
**satisfied**
164:23
**saying**
80:3 115:20 146:15 164:3 188:20 194:5
**says**
28:24 70:2,4 71:15 83:14 104:16 107:12,21 109:10 150:23 151:22 152:4 196:13 202:24
**scanned**
23:1 187:7
**scanning**
23:5 183:19
**scattering**
48:3
**science**
156:13
**scientific**
93:23 124:9 131:14 132:23 133:4 135:14 147:10 148:7 149:2
**scientist**
43:6 212:24 213:2
**scientist's**
56:24
**scientists**
42:25 43:14 44:6
**scope**
73:13 78:14 84:20 86:10 87:25 88:25 90:19 94:6 95:1 119:4 145:18 146:8 151:7 152:6 200:19 207:22 208:17
**screen**
6:23 75:2,7 105:25 110:22 150:3 198:3
**screens**
6:15
**search**
29:12,19 31:1,7,14,21 32:21 34:8
**searches**
32:6,8 33:11,20,24 34:3
**searching**
29:8 31:10, 12 32:4,14, 16 33:9
**Searle**
20:18
**Searle's**
20:16 120:9
**second**
53:1 150:9 186:23
**section**
70:2 72:4,24 95:16 106:2
**sections**
23:1
**sector**
27:3
**see**
8:25 10:22 12:18 14:10, 13 16:11 17:8,11 22:5 24:18 26:4 30:25 31:4 32:25 33:3 34:19 35:4 40:24 41:5 44:16 62:4 67:20 69:14, 21 70:2,4,11 71:9,24 72:8 73:7,8 75:1, 2,16 76:18 82:18,20 83:3,6,18 84:13 88:19 91:5 95:20 108:5,18 110:22 112:3,10 113:11,14 118:3 120:6 121:12 126:7 137:16 146:5 150:2,7,10, 17,19,22 151:21 152:3 153:21 163:5 172:17 174:3,16 178:3 185:7 190:6,18 192:12,16,21

193:2,5,15 194:13 199:21 203:11 204:9
**seeing** 124:5 166:12 191:1
**seeking** 146:23 147:17
**select** 52:4,6,13
**selected** 50:18 51:22
**selecting** 120:2
**selection** 182:2
**selective** 183:2 189:24
**selectivity** 174:25 182:18 189:8 190:2
**selects** 52:23
**self-employed** 26:7,10
**seminar** 160:9
**seminars** 16:1
**semivolatile** 83:15,20 84:2
**sense** 97:3
**sensitivity** 188:17 215:5
**sensor** 131:13 132:15
**sentence** 71:5 72:5,24 84:10,13 93:20 95:20 100:24 102:3,17 103:2 106:8 107:16,25 203:5,21,25
**sentenced** 43:14
**sentencing** 44:5
**separate** 31:25 32:1,7 122:22 166:24 167:14,19 176:18 181:22 196:6 211:7
**separated** 168:20 176:5
**separately** 32:20
**separates** 168:2
**separating** 157:24 158:2,4 168:11 183:17
**separation** 167:17 168:16,24 169:20 175:22 176:14 182:17,22 190:1 197:11
**September** 31:4 32:22
**series** 24:21
**serve** 17:23
**served** 11:25 12:7 15:7 17:13 21:4 25:1
**service** 35:14 36:13 127:19 128:12
**services** 4:1 24:23 35:9
**serving** 210:22
**sessions** 27:9
**set** 52:1 53:1 96:20,22 113:1 181:21 209:17
**sets** 144:12
**setting** 6:17
**seven** 22:15 36:19 42:4
**several** 26:14 36:25 72:13 79:14 118:17 158:19
**sheet** 111:11,18 150:6,24
**short** 26:21 41:9 145:6
**shorten** 207:25
**shortly** 11:20
**should've** 207:19
**shoulder** 189:13
**show** 53:6 67:3 126:4,11 186:2 196:3
**showed** 152:9 159:12 160:9 161:6, 14 193:22
**showing** 104:13 113:22 116:10 151:2,9 176:13
**shown** 13:13 65:22 66:19 110:5 158:23 160:8 173:15 196:2 207:4
**shows** 109:18 151:5 175:4 190:9
**sic** 17:2
**signal** 190:5,13 192:17 193:14
**signals** 53:7
**significant** 76:9
**significantly** 204:19 206:4,10,12 207:7
**silico** 38:11
**similar** 108:2 109:7 213:16
**similarly** 168:19
**simply** 10:12 106:4 108:24
**single** 46:8 188:15, 25 189:5
**sit** 82:2 89:9,15 124:7,18 125:4 134:12

184:23 191:16 201:24 210:21
**site** 41:16
**sites** 43:22
**sitting** 10:3,15,17 185:18
**situation** 129:5 131:4 213:19
**situations** 81:8
**skip** 33:2
**slightly** 188:4
**slow** 102:1,7,15 107:6
**slowed** 42:7
**slower** 104:13
**slug** 190:9,21
**small** 26:12,13,14
**smoothly** 9:17
**software** 57:24 63:4,7
**sole** 46:22
**solely** 102:20
**solid** 41:18 168:14
**solution** 158:21 159:1 160:8,10,24
**solvent** 169:2,12
**solvents** 47:1,5
**soothe** 124:16
**SOP** 144:6
**SOPS** 149:11 155:11
**sort** 52:4 127:5 158:23
**sound** 25:7,19 178:13
**sounds** 26:6 98:20
**source** 50:15 176:9 179:19,22 180:1,9,17 181:1 188:15,25 189:10,19 196:9 197:3
**sources** 128:21 176:15
**space** 158:12 159:24 160:4,7,15, 20 161:3,8
**Spalding** 10:18
**speak** 55:7,10,18 100:6
**speaker** 6:15
**speaking** 9:19 60:15 97:19,21
**spec** 48:4 50:13 61:20 62:13 63:14 174:5 176:20 177:19 180:1 181:9 183:22 184:13 191:11 196:19 197:12
**SPECIALIST** 4:21
**species** 40:2,11 72:7,11,14 89:19 90:9 91:1 103:7
**specific** 33:10 80:4 103:9 113:1 134:9 141:16 164:4 185:15 199:5
**specifically** 63:13 76:15 96:15 177:9
**specifications** 133:15
**specificity** 184:10 188:17 189:1
**specifics** 89:5
**specify** 171:24
**specs** 193:25
**spectometry** 47:7 49:15
**spectrometer** 50:15 60:18 61:11,19 62:10,12,16 196:15 215:9
**spectrometry** 47:13 48:7, 16 49:8,25 50:2,5 61:17 63:11 84:8 171:18 173:18,23 179:17,18 181:19 183:11 209:14
**spend** 163:21
**spending** 41:19
**spent** 41:24
**spoke** 186:6
**Sponsor** 151:22
**spotlight** 6:17
**spotlighted** 6:14
**spray** 180:7
**sprayed** 181:1
**spread** 46:5
**spreadsheet** 112:2,9,16 123:24
**stability** 86:20,25 87:1 90:12, 15 95:15 96:2,13 97:5 107:19 108:22
**stable** 86:23
**stage** 51:23 158:17 182:3,8 188:3 189:5
**stages** 174:25
**stamped** 31:12

**stamps** 32:20
**stand** 24:14 50:9
**standard** 133:1 135:25 155:11 190:12,15
**standards** 145:3 147:10 148:7 149:2 165:22
**standpoint** 147:11
**stands** 171:19
**start** 13:20,23,25 87:6 100:9 154:9 155:22 158:8,11 184:21
**started** 32:19 42:15 45:24 98:19 214:12
**starting** 25:4 48:11, 12 81:7
**state** 41:18 112:6 119:21 128:8 155:10 195:16 197:2,7
**stated** 39:24 40:8, 20 104:6
**statement** 7:17 11:17, 22 66:21 71:14 73:9 142:1 161:17,23 170:23 202:18,21 204:9,12,23 205:7,18 206:3,23 215:14 216:14
**states** 70:19,25 101:24 145:19 176:17 195:21 196:9 203:6
**statin** 64:3
**stating** 153:10 200:23
**stationary** 168:4,6,9
**statistical** 87:23
**status** 152:3 166:14
**statute** 147:1
**stenographer** 53:15
**step** 38:1
**steps** 38:14 161:16,18
**Steven** 198:5
**stop** 176:24
**stopped** 140:8
**storable** 70:8
**storage** 204:8 205:8, 12,19 215:15,20 216:18
**stored** 202:14 204:19 205:3 206:4,13 209:11
**STOY** 4:16
**strategies** 36:14,17 78:19,22,24 197:17 198:9,22 207:16
**Street** 4:15
**stress** 108:22
**stressed** 143:9 160:25
**Strike** 163:10
**striking** 182:5
**strongly** 155:8 168:8
**structural** 76:17,21,23 77:20
**structure** 38:6,8,10, 16,21 77:1, 3,11,13,21 156:15 174:10
**student** 60:24
**students** 27:8
**studied** 39:5 65:11 69:3 72:20 73:15 78:13, 15 82:23 86:3,13,20, 24 200:22
**studies** 23:20 30:3 40:18 65:9, 14 66:24 68:2 78:7 88:5 104:18 107:19 145:22 146:9 147:7 152:12 177:6,8,10, 12,14 209:6 210:17
**study** 14:24 90:12, 15,16 98:4 100:14,15 103:11,19 106:19 107:15 108:7,16,25 109:10,12,13 112:1 146:16 151:24 155:10 177:11 178:2 195:20,23 196:1,8 209:8,9,10, 24 210:1,5 214:8
**style** 168:25
**subject** 196:25
**subjects** 33:22
**subsequently** 184:8
**substance** 51:21 111:9 112:5,12,22 113:7,19,23 114:2,9,21 115:8 116:1 117:4,8 118:15,25 119:9,17 120:3 121:13 123:12,14 124:2,3 125:19 126:13 128:15,25

136:10 162:6,19 163:14
**substances** 35:10 108:3 109:3,15 136:4 157:9, 14,18
**substandard** 147:11
**sufficient** 39:25 40:9 139:5 188:6 214:7
**suggest** 82:3
**suggested** 101:25
**suggestion** 123:5
**suitably** 102:18
**Suite** 4:3
**summaries** 163:2
**summarized** 163:5
**summary** 94:18 110:8 166:11
**summer** 120:22 121:2
**supplement** 11:12 178:9
**supplemental** 11:18 17:23 18:4 19:2 21:2 23:9 125:11,25 178:6,21 180:10 195:15 210:19,22,23 211:11 214:18,23
**supplied** 162:23 164:13
**suppliers** 129:5
**support** 7:11,16 41:25 42:1 43:2,16 89:17,18 145:22,23 146:9,10 147:24 149:12 165:10 217:1
**supporting** 43:23
**suppose** 27:8
**supposed** 190:5
**supposedly** 189:7,23
**sure** 9:18 17:9 30:15 49:11 76:13 95:12 103:17 114:4 129:17 155:25 172:1 178:12 188:21 194:25 202:3 211:8 213:5
**swear** 8:9
**sworn** 8:13
**syringe** 139:1
**system** 56:4,7 58:4 184:9 186:14
**systems** 57:24,25 58:3 59:2 60:13,14,16 61:21 62:13 169:18,23

**T**

**table** 107:20 113:22 114:6
**tablet** 99:21 114:17 115:13 116:15 117:18 131:9 132:8,12 134:24 141:19,20 143:4
**tablets** 99:19 108:4 109:4,15 114:2,15 116:21 117:22 123:21 124:10,20 125:6,19 130:14 135:2,8,11 141:24 142:1,21 143:2,8 209:11 210:3
**take** 6:22 16:16 21:1 30:14 37:9 54:7,11 87:3 98:14 112:20 120:18 129:15 134:16 147:24 151:12 152:13 155:20,24 161:16,18 163:22 168:9 178:22 181:4 194:24,25 208:20 211:20 217:7,24
**taken** 7:3 54:21 98:25 129:23 138:2 156:6 195:10 209:1 212:5 217:13
**takes** 51:24 52:22 181:6 186:22
**taking** 11:25 201:19
**talk** 156:23 175:21 176:22 196:18
**talked** 44:25 159:10 175:9 184:15
**talking** 51:12 55:8 85:1,3,4 90:14 113:12,15,16 136:21 137:23 158:8 174:1 183:13 189:23 196:19
**talks** 177:18
**Tandem** 215:8
**target** 50:16
**tech** 18:11
**technician** 7:10 24:14 61:8 105:24 110:16
**technique** 50:8 157:21

158:9 159:13 162:13 167:14,17 189:5
**techniques** 46:12 157:11 180:6
**technology** 46:1 47:12 58:13 62:20 135:19 188:14
**technology-related** 127:16
**tell** 105:10 141:10 191:15
**telling** 136:16
**temperature** 107:22 108:19 109:1 161:11 169:20,24 205:2,15 207:6 215:25
**temperatures** 101:3 161:8 202:15 203:24 204:20 205:25 206:5,13
**ten** 25:6 54:12, 13 67:16 135:5 211:20
**tend** 168:8 183:25
**term** 37:21 43:15 68:2 105:18 144:17,21 148:15
**termed** 38:24 178:4
**terms** 213:22
**test** 92:19 113:16 119:14,16 120:14,20 121:4 122:25 123:1,6 128:15 129:7 130:22,25 132:11,22 133:1 134:23 135:1 137:6 139:5 141:17 142:17 162:6 163:13 209:20
**tested** 72:7,15 112:11 114:10 115:7 116:22 117:7 120:3 122:23 123:11 124:22 125:19 128:23 129:2,12,13 135:3
**testified** 8:14 31:9 63:16 64:8,9 77:12
**testify** 16:19
**testifying** 55:12
**testimony** 8:3 19:12,18 26:2 44:3 55:7 91:11 93:3,11 94:16 115:17 118:6 120:13 124:19 125:22 126:16 142:7 166:5 187:25 188:9 190:24 200:10 216:7
**testing** 26:17 65:22 66:18 87:8, 16,20,22 88:4 111:11 112:4 115:23 116:1,7 117:3,19 118:24 119:7 120:23 122:6,14 123:20 124:1,6,11, 21 126:10 128:19 130:4,6,13, 21 131:12 132:3 134:15,19 135:12,23 136:7 137:4 139:13,15 140:25 142:5,14 143:5,12 148:25 164:11 167:4 172:10,18 173:10 204:4 209:25 213:15,16 214:1
**tests** 92:19 142:18 147:23 203:1 212:19
**Teva** 4:7
**Texas** 4:4
**text** 151:6
**TGA** 116:8 128:20
**thank** 18:22 51:9 54:10,14 74:20 92:12 156:1 195:4 211:24,25 215:11 217:5,19,21, 22
**Thanks** 195:5
**thereof** 74:1
**Thermal** 12:16
**Thermo** 59:2 60:11
**thing** 46:9 92:9 139:2 146:14 193:20 199:5
**things** 9:14 30:10 33:14 49:2 55:14,16,21 66:7,10,11 75:14 79:14 80:22 95:11 141:6 144:8 149:16 158:15 168:8,19 171:23 172:15 174:2,9 180:12 183:4,14 185:2 202:2 212:13
**think** 16:15 19:19, 25 25:3,4 27:16 32:19 37:21 44:15 64:22 68:23 75:4 76:8,12 83:24 84:2 89:13 91:21

94:19 99:22 105:12 110:9 116:4 123:10 124:13 135:10 139:11 144:18 154:2 160:2 167:10 169:6 177:17 186:7 210:9, 24 214:10

**thinking**
98:4

**third**
31:3 50:22

**third-party**
204:5

**thorough**
202:25 212:25

**thought**
23:23 97:20 157:3 171:3

**three**
15:3 176:15

**three-month**
43:15

**Tier**
128:1,5

**time**
7:5,14 31:11,13 32:17,20 35:20 37:9 41:9,20,24 42:5 44:6 45:10,20 46:3,11 47:14 48:13 51:5 54:18, 23 59:15,18, 20 60:19 67:13 98:6, 16,22 99:2 101:4,13 106:18 120:11,24 122:1 129:20,25 132:18 156:3,8 163:22 174:17,23 177:4 181:10,14 183:9,24 195:7,12 202:14 203:23 205:2 207:7 208:23 209:3 211:18 212:2,7 216:19 217:10,15,19

**times**
64:9 118:17 168:12

**timestamp**
137:24

**timing**
203:17

**title**
151:24 178:13 214:24 215:4

**today**
7:4 10:3,16, 20 11:1,6 12:1,24 13:12 14:12 16:20 19:12, 18 46:9 70:19,25 89:9,23 124:7,18 125:4 134:12 151:2,9 152:9 184:23 185:18 201:25 210:21 217:19

**told**
89:23 179:16 200:18

**Toledo**
5:6 10:21 15:5 17:3 23:22 24:1 30:5 32:11 36:9 37:8 38:4,17 39:3 40:4,12,23 43:4,18 44:8,14 45:11,22 47:3,20 48:18 49:10, 17 50:6 51:3,9 52:3, 9,21 53:4,12 54:10,13 56:9,17 57:6,13 58:16 59:17 61:4 62:17, 24 65:1,6, 12,18 66:1, 6,16 67:2, 11,18,23 68:6,14 69:2 70:15,20 71:2,13,19 72:12,17 73:11,23 77:14,23 78:5,12,21 79:6,13,24 81:6,14,21 82:6,22 84:17,19 85:6,11 86:1,9 87:7, 14 88:3,15 90:3,18 91:3,10 92:7,14 93:2,10 94:9,15,24 95:9,25 96:10,18,25 97:18,23 98:8,11,16, 20 100:23 101:9 102:10 103:3,14,22 104:21 105:6,21 106:15,22 107:4 108:9, 17 109:5,11 110:25 112:14,24 113:9,20 114:11,22 115:5,9,16 116:3,16,23 117:9,20,24 118:5,16 119:1,10,19 120:4 121:14,21 122:7,19 123:8,15,22 124:4,12,24 125:8,21 126:15 127:7,20 128:4,17 129:1,10,17 131:2,16 132:6,17,24 133:13,19 134:1,7 135:16,24 136:19 138:8,14,19 139:18 140:1 141:12,14,22 142:6,15,22 143:6 144:24 146:13,25 147:2,19 148:4,10,23 149:9 150:7 151:4 152:5 153:25 154:16,22 155:4,16,22 156:1,17 157:15 158:1,7 160:22

161:5,12 162:8,21 165:5,17 166:4,19 167:6 170:10 179:20 182:20 183:12 184:3,14,25 185:23 187:17,24 188:8,18 189:2 190:23 191:18 192:1,14,23 193:8,19 194:17 195:3,25 196:12 197:5 198:15 199:2 200:11,21 201:15 203:16 205:10,21 206:24 207:11,21 208:4,16 210:7 211:3, 19,24 212:10 214:15,16 216:8 217:4, 22

**tool** 45:17 46:2 48:20 135:18

**top** 82:17 137:24 150:17,20 192:11 204:2

**topic** 73:16 198:12

**total** 17:21 26:4 94:25 214:4

**totalled** 25:20

**totally** 213:18 214:2

**totals** 25:21

**toxic** 99:12

**toxicity** 72:20 78:16 79:1,16 86:4

**toxicological** 82:24

**toxicologist** 69:4 86:2

**TQ-XS** 215:8

**trace** 57:9 170:13 171:11

**traceability** 214:4

**training** 27:6,9 149:17 212:25

**training-type** 26:20

**transcript** 19:23 20:1, 2,3,16 120:9 140:11 216:9,13

**transcripts** 19:17,20,21, 24 20:13,23

**transform** 207:20

**transforming** 99:10

**Transgenic** 151:25

**transition** 192:13,22,24 193:1,2,4,7, 11 194:16

**transitions** 193:18

**TRAURIG** 4:8

**travels** 217:20

**treated** 56:25 143:9

**treatment** 12:15 79:17 80:21

**trial** 4:21 26:2

**trials** 36:4 43:3,17

**Triangle** 127:4,10,12, 19 128:3

**tricky** 144:11

**triple** 61:10,16,18 62:9,11,16

**trouble** 18:15

**true** 39:8 81:2

**truthfully** 16:19

**try** 30:8 88:6 123:19 144:12 178:23

**trying** 28:13 51:2 91:14 101:21 103:24 106:10,17,24 131:7 147:23 157:2 162:3 174:13 202:3 213:23

**tubing** 132:13 139:6,22 140:22,24

**turned** 41:15

**twice** 75:8

**two** 19:5 21:3,13 77:4 91:12 144:12 174:24 183:8,23 187:13

**two-page** 153:2

**type** 10:4 26:9 45:9 58:4 60:6,14,17 64:2,14 65:7 73:20 88:13 139:1,2,6,22 141:10 170:13 180:17

**types** 43:23 57:18, 21 61:20 88:10 170:5

**typical** 170:4

**typically** 105:17 170:1

## U

**U.s** 203:10

**UHPLC** 58:7,9,14,22 62:15

**umbrella** 145:2

**unacceptable** 202:16

**UNC** 128:7

**unclear** 217:3

**underlying** 165:14

**understand** 10:25 20:20

38:5 49:11 66:12 77:24 78:8 93:4 100:20 161:20
**understanding** 21:9,12 66:17 84:23 95:2 101:6 119:5 122:12 149:13 200:9 208:10
**understood** 20:14 24:6
**undertake** 149:6
**undertook** 101:18
**unique** 173:1 187:20,22
**United** 70:18,25
**universities** 128:2,6,14
**University** 27:24 28:5
**unjustified** 173:6
**unknown** 174:14
**unlike** 136:25 166:10 173:17
**unreliability** 176:10
**unreliable** 194:1,6
**unstable** 141:3 181:16
**up-to-date** 34:22 35:2
**UPLC** 59:1 60:16 215:8
**upper** 6:24 116:14
**USP** 12:13
**UTC** 7:5 54:18,23 98:22 99:2 129:20,25 156:3,8 195:7,12 208:23 209:3 212:2,7 217:10,15
**utilizes** 58:13
**UV** 47:22 170:1, 4,7,13,17 171:7,11

**V**

**valid** 173:16
**validate** 162:14 164:10
**validated** 163:9
**validating** 57:4
**validation** 57:9 162:12, 17,22,24 163:1,4,12 164:15,17,24 165:2,14 166:2,7,11, 14,16,22 167:3,8 179:4,10,11 186:1
**validations** 125:2
**validity** 88:4,9 119:14 126:1
161:17 172:24
**Valisure** 161:6,14,24
**Valisure's** 158:24 162:1
**value** 192:10
**values** 115:6,11 116:21 117:6,10 118:3 210:2
**Vanderbilt** 4:9
**vapor** 158:16
**vaporize** 180:2
**vaporized** 157:25 158:3,6 180:1,4
**variable** 101:4 207:5
**variation** 99:19 206:17
**varies** 207:7
**various** 12:25 28:25 55:5 88:5 120:2 131:9 157:11,16 174:9 212:19
**vary** 206:10
**vendors** 59:1
**verbally** 8:2
**version** 110:4
**versus** 130:9
**vessel** 132:12
**vial** 160:4
**vials** 160:9
**video** 6:13,15,20, 22 7:10
**video-recorded** 7:1
**VIDEOGRAPHER** 4:20 6:1 13:18 14:1,5 18:14 22:1 24:10 34:13 54:17,22 69:8 74:6,16 97:11 98:21 99:1 129:19, 24 137:11 145:10 149:22 151:15 152:18 156:2,7 195:6,11 197:20 199:16 201:4 208:22 209:2 212:1,6 217:9,14,25
**view** 6:15,24
**visual** 142:20
**vitae** 34:19 41:5
**voice** 8:24
**volatile** 84:6
**volatilization** 181:3
**voltage** 195:16

**volts**
180:13
195:17,21
**volume**
9:2

**W**

**wait**
9:22 97:24
**waiting**
110:25 198:2
**waive**
8:6
**waiving**
11:23
**want**
6:21 11:16
40:13 52:6
54:11 86:17
105:13,25
119:15
156:19 164:6
165:19
173:21
176:21 211:8
214:13
**wanted**
56:12 163:7
214:11
**Waters**
59:2 60:13
177:17,23,25
178:14,16
215:7
**Watson**
130:9,14
**way**
29:25 73:15
126:3 143:9
157:5 189:24
**ways**
158:19
**webinars**
16:2
**website**
153:7 178:17
**weeks**
209:13
**weight**
76:2,4,10
**weights**
193:17
194:15
**well-accepted**
133:6 135:17
**well-known**
128:5
**went**
132:20
**West**
41:16 127:14
**wide**
46:5 144:25
181:11
**widespread**
45:24 46:12
**window**
188:2
**withdrawal**
202:11
203:8,18
**witness**
5:3 6:14,16,
20 8:2,10,12
13:14 15:11
62:1 92:15
97:15 98:10
99:4 129:18
139:19
150:11
151:19 195:5
211:17
217:21
**witness's**
6:22
**witness-only**
6:13
**witnesses**
20:14
**word**
32:13 50:24
85:20 100:25
170:22
171:1,2
**words**
105:11
131:21
**work**
25:9,17,24
26:5,9,12,
21,22,23
27:3,5,11,13
28:11 31:9
36:16 37:1,
11,16,23
39:15 41:24
42:10,12,21
43:23 44:19
47:17 49:24
50:1 56:13,
20,22,24
58:13,25
59:3,4,12,
16,21 60:7,
18 62:11,19
87:5,11,15
88:11,12
94:6 100:18
133:10,24
134:6 136:18
142:24
143:25
144:9,15,16,
22 145:4
147:13
148:8,19
155:3 159:8
203:19
**worked**
28:5,7 41:6
43:7 44:7,
16,20 45:3,
7,21 46:20
47:2,6,14,
21,23 48:7
59:21 61:19
63:7 144:1
**workers**
175:19
180:21 191:8
196:5
**working**
19:16 27:20,
24 28:9 42:4
48:14 55:2
60:10,20,24
110:17 136:8
211:15
**works**
50:8,12
126:3 157:23
158:2,4
180:19
181:19
**world**
116:12 173:3
**would've**
29:17 31:11
39:14 137:25
138:1 141:25
164:18
165:18
**write**
21:10,13
93:15 95:16
105:15
**writing**
29:20 198:21
200:15
202:19
**writings**
15:23
**written**
15:18 17:20
74:14 101:23
138:17
142:11
216:13
**wrong**
125:20
214:20
**wrote**
94:4 105:19
198:8 199:25

X

**X------------------**
5:2

Y

**Yamamoto**
177:17,21
**yeah**
14:1 20:24 22:7 23:23 31:18 38:7 41:1 46:17 73:14 77:16 82:12,23 84:22 86:17 87:15 93:4 100:24 106:16 108:11 123:3 183:21 184:4 187:8 188:10 194:5 195:2 207:24
**year**
25:12
**years**
28:2,3,6 42:20 44:17 48:6 67:16 80:11 82:9 88:8 106:10 129:13 134:14 135:14
**Yokoo**
196:8 197:2
**Yokoo's**
193:21 196:17
**York**
4:9

Z

**Zantac**
7:7 15:15 155:14 167:4 203:14 206:21
**Zebulon**
126:21,23,24 128:13
**Zoom**
9:12 10:8, 13,23

# EXHIBIT 38

## Deposition of Claude Kugel (09/23/2021)

## Subject to Renewed Motion to Seal Per DE 6124

# EXHIBIT 39

## Deposition of Matt Lochstampfor 03/31/2021

## Subject to Renewed Motion to Seal Per DE 6124

# EXHIBIT
# 40

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_________________________________/

VIDEO RECORDED DEPOSITION OF

MARY BETH TERRY, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Tuesday, May 31, 2022

TIME: 9:12 a.m. - 8:38 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6142252-001

Page 2

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

ANAPOL WEISS
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
BY: JAMES R. RONCA, ESQ.
TRACY A. FINKEN, ESQ.
CATELYN McDONOUGH, ESQ.
E-MAIL: jronca@anapolweiss.com
tfinken@anapolweiss.com
cmcdonough@anapolweiss.com

Appearing on behalf of the Zantac PSC:
LEVIN PAPANTONIO
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
BY: DANIEL NIGH, ESQ.
E-MAIL: dnigh@levinlaw.com

Appearing on behalf of the Defendants, Walmart, Inc. and GlaxoSmithKline, LLC GlaxoSmithKline, PLC

SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com
-and-

Page 3

SHOOK, HARDY & BACON LLP
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614
BY: MICHELLE M. FUJIMOTO, ESQ.
E-MAIL: mfujimoto@shb.com

-and-

SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108
BY: JENNIFER STONECIPHER HILL, ESQ.
E-MAIL: jshill@shb.com

-and-

DECHERT, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
BY: RACHEL PASSARETTI-WU, ESQ.
E-MAIL: rachel.passaretti-wu@dechert.com

Appearing on behalf of the Defendant, Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
BY: JAMES R. BROWNING, ESQ.
E-MAIL browningj@gtlaw.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC:

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
BY: BRADLEY JENNINGS, ESQ.
E-MAIL: bradley.jennings@dlapiper.com

Page 4

Appearing on behalf of the Defendant, Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

Appearing on behalf of the Defendant, Mylan Pharmaceuticals, Inc.:

PIETRAGALLO, GORDON, ALFANO, BOSICK & RASPANTI, LLP
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
BY: JASON M. REEFER, ESQ.
E-MAIL: jmr@pietragallo.com

ALSO PRESENT:

CAROLINE CHAMPION, Scientific Specialist
King & Spalding LLP

STEVE ROTMAN, ESQ.
HAUSFELD
One Marina Park Drive
Suite 1410
Boston, Massachusetts 02210

VIDEOGRAPHER: MICHAEL HOLLANDER
DOCUMENT TECHNICIAN: JOHN SCHMITZER

Page 5

-------------------I N D E X------------------

WITNESS: MARY BETH TERRY


| EXAMINATION BY | PAGE |
|---|---|
| MR. RONCA | 8 |
| MS. FINKEN | 191 |
| MR. SHEEHAN | 381 |
| MS. FINKEN | 383 |


----------------E X H I B I T S--------------


| NUMBER | | PAGE |
|---|---|---|
| Exhibit 6727 | | 14 |
| Exhibit 6736 | | 67 |
| Exhibit 6732 | | 82 |
| Exhibit 6739 | | 104 |
| Exhibit 6403 | (Previously Marked) | 121 |
| Exhibit 6729 | | 128 |
| Exhibit 6433 | | 143 |
| Exhibit 6457 | (Previously Marked) | 152 |
| Exhibit 6737 | | 153 |
| Exhibit 6423 | (Previously Marked) | 176 |
| Exhibit 6341 | (Previously Marked) | 303 |
| Exhibit 6349 | | 342 |


-------Portion of transcript marked--------
Page 61

---------------R E Q U E S T S---------------


Updated materials considered list that reflect citations contained in Dr. Terry's report 384

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who doesn't want the witness' video to take up a large part of your screen, you may click the gallery view button on the upper right corner of the RemoteDepo interface.



This is the remote video-recorded deposition of Mary Beth Terry, Ph.D. being taken by counsel for the plaintiff.

Today is Tuesday, May 31, 2022. The time is now 1:12 p.m. UTC time. We are here in the matter of Zantac ranitidine products liability litigation.

My name is Michael Hollander, remote video technician on behalf of US Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.



They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

M A R Y B E T H T E R R Y,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. RONCA:

Q. Good morning, Dr. Terry.
A. Good morning, Mr. Ronca.
Q. I was just going to introduce myself, I'm Jim Ronca and I represent a number of individuals who have filed suit because they took ranitidine on a long-term basis and they had developed cancer.



I'm going to be asking you some questions today regarding your expert report that you offered in this case.

Have you ever been deposed before?
A. I have not been deposed before.

MR. SHEEHAN: Jim, one -- just one second.

Is this too loud, Mary Beth? Do you want to turn down or is it okay? Is the volume okay?

THE WITNESS: It's okay.

MR. SHEEHAN: Okay, go ahead.

MR. RONCA: Do I sound super loud in there?

MR. SHEEHAN: A little -- a little loud in this room. You know, let me just hit the V real quick.

MR. RONCA: What's it gonna sound like when I actually raise my voice?

MR. SHEEHAN: That's what I'm concerned about. Go ahead, Jim, say something.

MR. RONCA: Dr. Terry, nice to meet you this morning.

MR. SHEEHAN: Okay, perfecto.

THE WITNESS: Very nice to meet you too.
BY MR. RONCA:
Q. Okay. Have you ever testified in court?
A. I have not testified in court.
Q. Have you ever been involved as an expert witness even on just a consulting basis in litigation before?
A. I was involved very briefly before, but I did not -- it did not go to deposition and I was involved very briefly.
Q. And what type of case was that?
A. It was DES, case on DES.
Q. How long ago was that, approximately?
A. Sorry. Yeah, I don't remember approximately, six or seven years ago. I would definitely have to look it up.
Q. And is that the only other time you've been a consultant in litigation other than in this case?
A. Yes, I've actually been approached a lot, but I -- I did not get involved in the past. Yeah.


Q. You understand that your testimony today is under oath and it's the same as if you were in court?
A. Yes, I understand that.
Q. Just a couple rules since you haven't been deposed before. I'm sure the very, very fine attorneys that are representing defendants have gone over all this with you, but I'll just go over with you briefly.
During the course of the deposition, I'll be asking you questions you'll provide answers. It's important for the court reporter that we try not to talk over one another so that the court reporter can get everything down. So, I understand from time to time we might jump in, we shouldn't try to do that.
Is that okay?
A. That makes a lot of sense. The court reporter has a very hard job.
Q. Yeah, it's always amazed me.
MR. RONCA: And while we just said that, can the court reporter -- can you send me the link for the realtime?


THE COURT REPORTER: You want me to do that right now, we'll just pause for a second. Someone from -- if you want pause for a second, I can send that now, is that okay?
MR. RONCA: Yep.
(Brief pause in the record.)
THE COURT REPORTER: Sent.
MR. RONCA: Thank you.
Q. During the course of the deposition, if I ask a question and you don't understand my question for any reason, I may ask it poorly. You may be -- have been distracted or you may be thinking about your prior answer, for whatever reason, if you don't understand the question, would you please tell me that and I'll try to repeat it or rephrase it.
A. Of course.
Q. If you answer a question, can we assume that you believe you understood it before you answered; is that fair?
A. Yes, that's fair.
Q. If you need a break, let us know and we'll try to do that. The only proviso


on that is we usually don't take a break when a question is pending and there's not been an answer, all right?
A. Okay.
Q. During the course of the deposition, we may refer to documents and I think you have access to them in the Box and I may ask for it to come up on the screen, like a screen share, I'm sure you're familiar with that, so you can also look at the document on the screen or a specific part of the document that I'm referring to, okay?
A. Okay.
Q. Who's in the room with you?
A. Just Tom Sheehan.
Q. Okay. How many hours did you spend preparing for this deposition, approximately?
A. Approximately -- approximately 10 or 11 hours.
Q. In this case, you provided an expert report dated March 7, 2022?
A. Yes.
MR. SHEEHAN: And -- and just so you know, Jim, she's got a hard copy in front of her.

MR. RONCA: Okay. Thank you.
So, can we bring up Exhibit 6727, please, see how this works.
(Exhibit 6727 was marked for identification.)
BY MR. RONCA:
Q. I know you may be waiting for it to appear in the Box, but do you see the expert report at least the first page of it on the screen, Dr. Terry?
A. I see it on the Zoom screen, I don't see it in the Box.
MR. RONCA: So, let's practice that function of getting it in the Box and the doctor being able to see it.
THE VIDEOGRAPHER: If you refresh it, it should show up.
A. Okay, I see it.
Q. All right. So, that will probably be the rule going forward, you need to refresh so you can see the document, okay?
A. Okay.
Q. Great, all right. So, now, let's go over what your report consists of. So, as I have it, pages 1 to 107 are the text of


your report, not sort of a narrative text; is that right? And you can go to page 107 of the document.
A. Yes, that's correct. That's correct.
Q. Right, okay. And then after that, you've got pages 108 to 114 and these are tables where you give certain information about the studies that you reported on in your narrative; is that fair?
A. Yes, that's fair.
Q. Okay. Then after that is Exhibit A and the pages aren't numbered that I saw, but it's pages 119 to 229 of 250 of the PDF, that's your curriculum vitae.
A. Yes, that's correct.
Q. And then Exhibit B is a document called materials considered?
A. Yes, that's correct.
Q. And that starts, I guess, at page 230 of the PDF. You can go to page 230.
A. Yes, that's correct.
MR. RONCA: So, John can we just go to 230 without scrolling through?
Q. Okay, materials considered. Okay.


So, my initial question is regarding materials considered list.
How is this made up?
A. So, this includes all of the documents that would've been cited in the report and documents that I reviewed to make this expert report.
Q. Okay. And one of the reasons I have questions is because when I look in your report, some of the items in the report are not in this materials considered list. For example, Hidajat rubber worker study and McElvenny study are cited in your report and discussed, but I don't see them on this list.
Can you check that?
A. Which specific study are you referring to?
Q. The Hidajat rubber worker 20 -- it's also been referred to 2019A?
A. Yeah, on page 8 I see the job matrix Hidajat paper.
Q. Page 8 of Exhibit B?
A. Yes, uh-huh.
Q. Yeah, that's the job exposure matrix, that's not the Hidajat study, right,


that we -- you refer to in the text?
A. No, that's a separate paper.
Q. Is that listed on your materials considered list, that paper?
A. I don't see it here now, no.
Q. And what about McElvenny, you refer to that also? They're alphabetical, so maybe if we go to the end, take a look.
MR. RONCA: You went past it, John. Go back to M, these are in alphabetical order. There you go. Go up one more page, page 13.
A. Yeah, I don't see it here, no.
Q. Okay. How is it that we have an -- and these aren't the only examples, we have referenced in your text of your report, but no reference on your materials considered list?
A. Yeah, I don't know, but all of the citations that I have in my report are the citations that I -- that I referred to, so I can prepare a revised list for the -- for the materials considered to include those two.
Q. But my inclination, I believe that you're a very careful writer and you've done

many papers that have been published which have references and I'm surprised that you would miss references here.
So, my question is, did you make up this list or did someone else make up this list?
MR. SHEEHAN: Objection to the colloquy.
You can answer when I object.
A. Okay. So, I worked on this in the rigorous way that I do all of my reports and when I add citations, I used what's called the PMID locater in the comments and I -- I would do that throughout this report. So, I would put that PMID locater in the comments and the full reference in comments, so that like I typically do where my research assistant puts the bibliography together. And so that's what I did here, I put in the text of the comments all of the references to the articles that I looked at.
Q. Okay. But how did they then not make it on to this list?
A. I don't know. I don't know.
Q. Is it because someone else made the



list and it was not you?
MR. SHEEHAN: Objection.
A. Again, I put in all of the references that I used in the body of the report.
Q. Okay. But you'll agree that I gave two examples, there are more, that some are missing?
MR. SHEEHAN: Objection.
A. Yes, I -- again, I reviewed all of the text and the articles that I cited are in the body of the report.
Q. I'm asking you about the materials considered list.
Did you make this list up yourself?
A. I did not type up this list myself, no.
Q. Was this done by the lawyers?
MR. SHEEHAN: Objection. Jim, I mean, you know that the -- the rules on drafts and that. I'll represent to you that -- that we assisted in putting together the materials considered list. So, the answer is, yes. But to the extent you're going



to get into the drafting of the report, you know that that's off limits.
MR. RONCA: Yeah, I'm not going there, Tom, you know that. I'm just trying to find out why certain items are on there that aren't referenced in the text and certain items were on there that are referenced -- aren't on there that are referenced in the text and how that came about.
MR. SHEEHAN: Understood.
And to the extent you know, Mary Beth, you can answer.
A. I don't know, but so noted.
Q. And when you made up the final version of this report, did you check the references to make sure that they were accurate?
A. I checked every reference that was in the body of the text, 107-page body. I would make sure that the reference that I wrote in the body of the text was correct.
Q. But did you check to make sure that the references, so -- let me start the



question again.
You knew that this report was going to others who were going to review it, right?
A. Yes, of course.
MR. SHEEHAN: Objection.
Q. You knew it was gonna be submitted to the court, right?
MR. SHEEHAN: Objection.
A. Yes, of course.
Q. And that other people might want to look at the references that you made?
A. Yes.
Q. So, there was an importance to the accuracy and completeness of your list of matters considered?
MR. SHEEHAN: Objection.
Q. And I'm wondering what you did to make sure that it was accurate and complete?
MR. SHEEHAN: Same objection.
A. Again, I made sure that the body of the report was accurate and complete and that all of the citations within the body of the report so when you look at the section of, you know, that referred to Hidajat that that was the right Hidajat paper and that was all

correct in the body of the report.
Q. Okay. Well, there are other Hidajat papers, how do we know which one?
A. So, again, I would've checked the body of the report.
Q. All right.
MR. RONCA: So, let's go to page 1 of the report. Okay. And John, will you call out the second paragraph there, like just the first two lines, or the whole thing. There you go, that's good. Okay.
Q. So, this reads:
I have conducted research across many different areas of cancer epidemiology for different cancer types including, for example, colorectal, esophageal stomach and breast cancer.
So, you wrote that, right?
A. I did.
Q. So, I'm wondering about the order of the listed items in parentheses.
So, is it fair to say that all of your work is represented in your curriculum vitae?



A. All of my published work, yes, uh-huh.
Q. So, as I looked at your curriculum vitae, would it be fair to say that breast cancer research has been your predominant research?
MR. SHEEHAN: Objection.
A. It would be fair to say cancer epidemiology has been my predominant area of research, that's what I teach and train and mentor in.
Q. But in terms of your published works am I wrong to say that 266 of the 382 published articles on your CV deal with breast cancer?
MR. SHEEHAN: Object. Just give a beat before you answer.
Objection to the form.
Go ahead.
A. Again, it's fair to say that the majority of my research is focused on cancer epidemiology, methodological studies, life course epidemiology, environmental epi- -- environmental epidemiology and all of these methods are methods that can be transportable



across different cancer types. Most of my grant funding and research funding, as you say, focuses on breast cancer, but the methods and the techniques and the analyses and the study designs are applicable across different cancer types. I did my doctoral dissertation in colorectal cancer. I had one of my first grants on esophageal cancer. And so, I work across many different cancers. My current funding now is focused on liver cancer, breast cancer, prostate cancer as well as colorectal cancer.
Q. Okay. And I appreciate that, I just asked you, if I'm correct if I say 266 of the 382 published articles are on breast cancer?
A. I wouldn't know the number. Again, my methods and my study designs are cancer epidemiology. And again, a lot of my funding, most of my funding has focused on breast cancer, but I have worked across many different types of cancer.
Q. Yeah. I looked at those two. So, I saw ten of the published articles were on colorectal cancer that I could find.



Is that about right?
MR. SHEEHAN: Objection.
A. Again, I don't know the number.
Q. Is it about right?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I don't know. Again, a lot of my studies on life course epidemiology look -- look at antecedents earlier in life that are relevant for a number of different cancers.
Q. Okay. Then I counted three that dealt with esophageal cancer.
Is that about right?
A. Again, I don't know the number off the top of my head, but, yeah, I had a grant on esophageal adenocarcinoma and gastric cancer with alcohol.
Q. That was in early 2000s?
A. Yes, that's correct.
Q. And then I counted four that involved stomach or gastric cancer described in either of those two things.
Is that number about right?
A. That number sounds approximately

right.
Q. And I didn't see any that mentioned bladder or pancreatic cancer; is that fair?
MR. SHEEHAN: Objection.
A. The methods that are being used in all of these studies are relevant across cancer types. I've worked very closely I direct a large unit of cancer epidemiologists and chronic disease epidemiologists and I mentor faculty that focus on pancreatic cancer as well.
Q. Yeah, I understand that. Let me say this: Whether it's you or some other broadly experienced cancer epidemiologist, the fact that you concentrated on one particular type of cancer does not mean that you couldn't offer expert opinion on other types of cancer because, as you put it, the methods are the same.
Is that a fair statement?
A. That's correct. The methods that ground are disciplined are used across different cancer types. I also serve as an editor in multiple journals and so I also review study designs, analytics all of that



across different cancer types.
Q. And so that if there was another expert out there who was broadly experienced in cancer or maybe not specifically the cancers involved in this particular case, they could also opine on an expert basis about these various studies that you have reviewed in your report?
MR. SHEEHAN: Objection. Calls for speculation.
Q. You can answer.
A. Okay. So, what's at issue for the ranitidine litigation is the human studies. And to the extent that the expert would have training and understanding of epidemiological study designs, the principles of data analysis and understand the role of bias and confounding and chance in contributing to findings, that would be the expertise that I would look for.
In addition to my training on cancer epidemiology, I've been doing data analysis since the late '80s and so my training in particular is in really understanding longitudinal design,



measurement error and all of the kinds of statistical biases that are at issue in this litigation.
Q. So, you had on your list of materials considered a report that was prepared by Anne McTiernan; is that right?
A. I did, yes, uh-huh.
Q. And would it be fair to say that Anne McTiernan has broad expertise and experience in cancer epidemiology?
MR. SHEEHAN: Objection.
A. Yeah, I -- I know Anne McTiernan is an expert in physical activity and I know she's had a long career in epidemiology.
Q. And what about Patricia Morgan, is she also expert enough based on the report that you reviewed and her curriculum vitae that she could offer opinions on the cancers that are involved in this case?
MR. SHEEHAN: Objection. Calls for a legal conclusion.
Go ahead.
A. Okay. I know -- I know they both did give expert opinions in this case. I very much disagree with their synthesis of



the literature. So, again, I -- the methods that they used to develop and reach their decisions, I disagree with. And I don't think that the approached they took is valid.
Q. And I understand that, but I asked you if you thought they were qualified.
A. I --
MR. SHEEHAN: Objection.
A. I don't know that that's for me to assess, but...
Q. Well, could you assess it?
MR. SHEEHAN: Objection.
A. Again, my interaction with either of the two of them might have been in reviewing their papers that have been published. So, you know, to the extent that I've read their papers and/or look at single studies, what I fundamentally disagree with here is their synthesis of the data, not in any one particular study that they would've published.
And so, there is a big difference, I would say, in epidemiology and how people come to expert opinions and the data that they chose to, you know, to synthesize into

their expert opinion and that I don't agree with at all.
Q. Understand. I obviously read everything.
My question to you --
A. I'm sorry, I couldn't hear you.
Q. I said, I understand, I obviously read everything, you probably anticipate that.
My question to you is, based on their background, are they qualified to offer opinions on cancer epidemiology? Did you dispute that that they are qualified?
MR. SHEEHAN: Objection. Calls for a legal conclusion.
Go ahead.
A. So, again, they both have long careers in cancer epidemiology. I think what's at heart here is a little different in terms of the expertise that's needed. And in particular, in my opinion, what is needed to understand the literature here is an understanding of measurement issues, statistics and validity and bias and those are topics that I've taught at a very deep



level for over 22 years, taught medical fellows, graduate students, undergraduate students. And so, I don't know their background in training these kind of statistical methods and understanding, for example, inverse probability waiting or time varying covariates. Those are topics that I teach in my methodological classes. Not all epidemiologists are trained in that. Some epidemiologists are trained more in a medical background. My training in epidemiology and how I got into epidemiology, was through the statistical background because I have my Master's in econometrics, and so really what's at play here is understanding the statistics and the bias.
Q. You're not a medical doctor, right?
A. I am not a medical doctor.
Q. Never seen a patient?
A. I've never seen a patient. I've never seen a patient as a medical doctor.
May I just get a water? It's like ten feet from here and I'll be right back.
Q. Only if it's actually only ten feet. Go ahead.



A. I'm not counting.
Q. In your published papers, have you used inverse weighting?
A. Yeah, more recently we used it mostly to understand if there's selection bias going on. So, inverse probability weight something a method to understand that the sample you have, how does it extrapolate to the sample you want to make inference about. And so -- so, we use it more frequently now to understand whether or not there's any kind of selection bias and how the cohort gets retained.
Q. And when you do that in your papers, do you reveal within the paper exactly what process you followed to do that weighting?
A. Often. Again, it will depend on the journal. These days a lot of medical journals have shortened their word count, so whereas it used to be very typical in the past to have a word count of 4,000, 4,500 words. Now, many journals limited it to 3,000 words, so there's sometimes not as much opportunity to -- to go into real



detail.
Q. And in those circumstances, do you publish supplemental materials which contain transparency about how the weighting was done?
A. If -- if that's allowable by the journal. Some journals allow that, some journals do not.
Q. Is it fair to say it's your practice in your published work when you use inverse weighting to be transparent about how you did the weighting?
MR. SHEEHAN: Objection. Vague.
A. So, again, it will depend on the journal and how it was used. Often we use it more as a sensitivity analysis to understand whether or not the results would've changed.
Q. My question is, if the journal allows it, is your practice to be transparent about how --
A. Yes. Yes, or course.
MR. SHEEHAN: Don't -- try not to talk over him and let him finish his question, then allow me to get an objection in.

THE WITNESS: Okay, sorry.
Q. That's okay, I think everybody knows what your answer was and what the question was gonna be, so we're good.
All right. So, getting back to what I was talking about. Again, I looked at your list of fellowship and grant support and out of 56, I counted 36 related to breast cancer; is that about right?
MR. SHEEHAN: Objection.
A. I'm sorry. Were you saying grant support?
Q. Grant and fellowship support.
A. So, again, I would characterize -- I would characterize my work as cancer epidemiology, but the focus often in many of my grants is breast cancer, yes.
Q. Right, 'cause I only saw two related to colorectal cancer; is that right?
A. I don't know offhand. I know I've had several internal and external grants on the colorectal cancer. Right now I'm running a multimillion dollar center where one of the major projects is on colorectal cancer.
Q. But our understanding is that all



of your qualifications, all of your published papers, all of your grant support, all of that is on the curriculum vitae that you attach as Exhibit A to your report.
Is Exhibit A complete and does it have on it all of your background and experience in cancer epidemiology?
MR. SHEEHAN: Objection.
A. So, my curriculum vitae will have all of my grants as well as my papers as of the date that that was submitted. All of my knowledge about cancer epidemiology is beyond just what's on the curriculum vitae and includes all of my mentoring and teaching and training over the years.
Q. Yeah, but I didn't ask you about your knowledge. I asked you about your grant support, published papers, all those things. This curriculum vitae does not look up to date -- I mean, does not look dated to me, but was it up to date as of the time you attached it to your report?
A. It definitely was up to date by the time I attached it to the report. And I'm sorry, I probably misheard you, but I did --



I did think you said "knowledge" in that last question.
Q. Okay. Well, I could've misspoken, so just to -- let's straighten it out.
What I want to know is if the curriculum vitae that you attached as Exhibit A to your report lists all your grants, fellowships, all your courses that you took? I don't know why the exhibit went down.
A. Yes, the best of my knowledge, that was the complete curriculum vitae at the time that it was submitted.
Q. Okay.
MR. RONCA: Yeah, let's just go to page 119 of the PDF and actually the next page.
Q. So, when we look at this curriculum vitae marked as Exhibit A to your report, we can reliably look at that and determine all of your published works, all of your positions that you've held, courses that you've taught and the grants and fellowships, all those things are listed here, it's 100 pages. I mean, aside from just what you



get from walking around the halls and talking to your colleagues, is this a good indication of the background and expertise you have in the field of cancer epidemiology?
MR. SHEEHAN: Objection.
A. Yes, this, to the best of my knowledge, is the complete listing of the papers and grants and other professional activities that I've done.
Q. So, if someone like myself was to look at this and see in terms of your fellowship and grant support two items related to colorectal cancer, those would be the universe of items under that category that exist or ever existed, right?
MR. SHEEHAN: Objection.
A. So, again, the methods and study designs and analyses that are used in all of my papers relate very much to the approach of cancer epidemiology generally. The specific focus for a paper may be related to breast cancer, but I have done many different papers that are focused on common antecedents to multiple common cancers as well.
Q. I'm asking you whether in your

Page 38
M. Terry

grant and fellowship support as listed on your curriculum vitae, there are two items that relate to colorectal cancer, that's what I'm asking you --
MR. SHEEHAN: Objection.
Q. -- is that right?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I think there's more, but I haven't counted them up.
Q. Okay. But if someone wanted to, they could look and it would all be there for them to see, right?
MR. SHEEHAN: Objection.
A. Sure. But there's also -- I would say there's papers that involve again factors that are related to multiple cancers like DNA methylation and oxidative stress and some of the other kinds of outcomes that are important for multiple cancers.
Q. Okay. And then I noticed that of those 56 fellowship and grant items, eight do not relate to cancer at all; is that right?
A. I wouldn't be able to tell you the number, but I don't know how you're

Page 39
M. Terry

characterizing doesn't relate to cancer at all, 'cause I would probably characterize it differently than that. So, I would need to understand what you mean by that.
Q. Now, would it be fair to say that none of the grant re- -- grants you got for research have dealt with stomach or esophageal cancer?
MR. SHEEHAN: Objection.
A. No, that would not be fair.
Q. Okay. Why not?
A. Because I received funding through the American Cancer Society for esophageal cancer and gastric cancer.
Q. Okay. And you've read book chapters and I counted 14 of them deal with breast cancer, right?
A. I don't know the number. But, again, I'm -- I wouldn't characterize it by that. All of my work focuses on understanding cancer and cancer risk. And so, yeah, I would have to understand more how you're characterizing things.
Q. Okay. So, what you're saying essentially is because you may focus or have

Page 40
M. Terry

a predominance of certain cancers, that doesn't lessen your expertise in the ability to talk about other cancers because you have broad experience in cancer epidemiology; is that fair?
A. That's correct. And it also -- my training -- my training is specifically on study design and statistical analyses.
Q. Okay.
A. Which I apply to breast cancer, but I never took a class on breast cancer. I took a class on regression analysis. I took a class on study design. I took a class on inference. So, these are -- this is how we train. We train in cancer epidemiology. I took my qualifying exams on cancer epidemiology and the cancer that, you know, we could've had any topic and we focused -- the faculty focused on Burkitt's lymphoma. So, you know, I trained on the hematological cancers. But, again, these are kinds of methods that can be applied across cancer types.
Q. Now, you did do a book chapter on stomach cancer, right?

Page 41
M. Terry

A. I did a review article on stomach cancer.
Q. You did a book chapter?
A. I would have to look at the list, I'm sorry.
MR. RONCA: Can we bring up Exhibit 736, please?
Q. So, was this a chapter in a book that you wrote?
A. It was a journal article, review article.
Q. Okay. You're the author, right?
A. I'm one of the authors, yes.
Q. And it -- subject matter is the epidemiology of gastric cancer, right?
A. That is correct.
I'm just waiting to get it into the Box. I see it on Zoom, but...
Q. Tell me when it's there.
A. Okay.
Q. So, this is a review article, right?
A. Yes.
MR. RONCA: John, if you would highlight right-hand column, the first

paragraph, not bold. There you go.
Q. So, in this review article, what you say is:
In this review, we highlight the epidemiologic literature on incidence and mortality trends and summarize the evidence of risk factors for gastric cancer, focusing on the most recent epidemiologic study.
So, is that what you were doing in doing this review?
A. Yes.
Q. And would you call this a systematic review?
A. No, this was published in 2002. And so, I would call this more of a -- what was more the norm back then, which is kind of an expert review, if you will. Systemic reviews refer to, you know, the quantification of all of the literature during a defined time window of time and then often accompanied by meta-analysis systematic reviews now because the software in the last 20 years has gotten a lot easier to do this where you can have a random selection of articles and have someone else rate them that



sort of thing. We have all of our doctoral students actually are required to do systematic reviews as part of their dissertation.
But back then, this was more what you would call an expert review and, so, yeah.
Q. Okay. And you prepared this in -- you did it in sections with different topics; is that right?
A. That's correct.
MR. RONCA: Okay, let's go to the fourth page of the document.
Q. You did a section on helicobacter -- helicobacter pylori infection, often referred to as H. pylori?
A. Yes, that's correct.
Q. And H. pylori is a common infection of the stomach?
A. Yes, it's a bacteria.
Q. And this bac- -- the presence of this bacteria changed the way the stomach functions, for example, it can change the pH of the stomach; is that correct?
A. Yes, that's correct.



MR. RONCA: Okay. Next page, please.
Q. So, in the paragraph that --
MR. RONCA: Can you highlight the paragraph that says, H. pylori is thought? It's the first full paragraph on the left. There you go.
Q. I'm particularly interested -- let's look at the first sentence:
H. pylori is thought to increase gastric cancer through a variety of mechanisms, including, but not limited to, its effect on increasing chronic gastritis.
Right? Is that what you wrote?
A. That's what we wrote, yes.
Q. Let's look at the last sentence. The last sentence says:
H. pylori infection may also affect metabolism of nitrites, nitrosamines and other N-nitroso compounds to reduce ascorbic acid in the stomach, which can affect the level of nitroso compounds in the stomach.
Is that what you wrote?
A. Yes, that's what we wrote.
Q. Is NDMA a nitrosamine?



A. Yes.
Q. Is NDMA an N-nitroso compound?
A. Yes.
MR. RONCA: I would like to go back to the page and go to the right-hand column, last paragraph. Next page. Sorry. Let me look. Hold a second. Page 5 of 17. I'm sorry it's my mistake. No, this is page 5 of 17. Oh, yeah, yeah. Highlight that. You had the right paragraph, I was wrong, okay.
Q. Now, you see the part there where it says Chow -- it says:
Chow and colleagues have found a more modest odds ratio equal 1.4 non-significant association between CAGA positive strains and non-cardia gastric cancer.
A. Uh-huh.
Q. So, is that an example of where you're reporting on a non-significant association, meaning it doesn't meet statistical significance, but has an odds ratio greater than 1?

MR. SHEEHAN: Objection.
A. So, in -- in this sentence we're -- we're referring to a finding by Wong-Ho Chow and her colleagues and we're clear that this is the magnitude of the association 1.4, but we're also clear that it's non-significant.
Q. Right. Meaning either the p-value was greater than .05 or the confidence interval included the number 1?
A. So, again, we'd have to look at this article, but if they use the 95 percent confidence limit and we say that it was non-significant, then that would mean that the p-value would be more than .05 and that the confidence limit would include one.
Q. Right. That word "non-significant," that doesn't mean that the finding is insignificant, it means that using statistical testing, the p-value was either greater than .05 or the confidence interval included 1; is that correct?
MR. SHEEHAN: Objection. Vague.
A. So, in the context here, this would've meant it was non-statistically significant.



Q. Right. But statistical significance does not measure the importance of the finding, right?
MR. SHEEHAN: Objection. Vague.
A. So, again, the importance of the finding would have to be qualified, but statistical significance itself is exactly that. And-- and so, you can have very large studies that have statistical significance, but they may not be clinically significant. So, right, statistical significance is something that you have to consider when you're evaluating literature to understand how precise the estimates are.
Q. Yeah. So, an example of reporting on an increased risk even though it was, as you stated here, a non-significant association?
MR. SHEEHAN: Objection.
A. So, this is a review article and in a review article, it's important to -- to relay all of the information on what's been found and this is not a causal analysis, this is -- this is reporting on all of the studies and we report what the magnitude of the



association is and the precision about that estimate.
Q. Okay.
MR. RONCA: Next page, let's take the paragraph that begins with Despite under Alcohol. No. Top paragraph that mean begins Despite. There you go. Okay.
Q. Now, let's look at some of the items that are reported here. Look where it says:
For example, in one study, alcohol consumption of at least one gram per day was associated with a 3.4-fold increase --
MR. RONCA: Stop, stop highlighting.
Q. -- in risk (95 percent confidence interval 0.7 to 15.6.)
Now, this is a situation where the confidence interval includes 1, right?
A. Yes, this is the situation where the confidence limit includes 1, yes.
Q. Would you call that a broad spread of the confidence interval?
A. I wouldn't call it a broad spread



of the confidence limit. I would say it's not statistically significant based on a 95 percent confidence limit -- interval.
Q. So, you wouldn't call 0.7 to 15.6 a wide confidence interval?
A. Sure, you could call it wide. You can say basically the estimate is very imprecise. So -- but, again, what I would point to here is that this is a very strong association, so everything -- when we're doing estimation in epidemiology, everything is about the signal, which is what we call the point estimate. So, in this case, the signal is really large, 3.4 versus the noise. And so, again, this is not a statistically significant association, but the signal is quite big. And so, that's why it's really important to look at the size of effect as well as the precision about that effect.
Q. Well, let's look at the next one. It says:
For gastric cardiac tumors but not other subsites (odds ratio 1.1, 95 percent confidence interval 0.8 to 1.6).
So, that confidence interval also

includes 1, right?
A. Yes, so that confidence limit also includes 1, but what you can see here is you see a very weak signal, the 1.1. So, the weaker the signal, the much more likely it is that -- that the association could be explained away by any number of biases of which we focus on looking at selection bias, information bias confounding bias, first and foremost.
So, again, the 1.1 versus the 3.4, those are quite different in terms of the size of the effect. And so, I would be much more concerned about the 1.1 in terms of that being a real association. I would want to make sure that that couldn't be explained away by bias.
And in this particular example with alcohol, we know that alcohol is severely underreported by most people, I mean, estimates of about 50 percent.
And so, again, the -- the role of bias is going to be such that it's very hard to be confident about associations that are weak, like the 1.1.



Q. But bias didn't keep you from reporting it here?
MR. SHEEHAN: Objection.
A. Again, my job here, along with my co-authors, was to review what's out there and -- and to always look at all of the data and show all of the data.
Q. Okay. So, when a reader looks at this and say, for example, at one study alcohol consumption of at least one gram per day was associated with a 3.4-fold increase risk in the 95 percent confidence interval is equal to 0.7 to 15.6 of gastric cardiac tumors, but not other gastric subsites, odds ratio equalled 1.1, 95 percent confidence interval 0.8 to 1.6, they were somehow to understand that you were saying the second one wasn't an association?
A. Yes, in fact I say that, but not other gastric subsites, so we do say that.
Q. But it wasn't -- aren't you saying that, yes, increased risk for gastric cardia tumors but no -- no evidence of other gastric subsites?
MR. SHEEHAN: Objection.



A. Again, based on this study that we were reporting on, so it was reference 56.
Q. And then in the next sentence, you say:
The difference was even stronger for wine consumption, odds ratio equals 5.1 (95 percent confidence interval equals 0.9 to 29.1) for gastric cardia cancer and odds ratio equal 1.1 (95 percent confidence interval 0.7 to 1.5) for other gastric subsites.
So, same report, none of those numbers would meet the, sort of, traditional deposition of statistical significance, but nevertheless, reported so that a reader of this review article would see the results, right?
MR. SHEEHAN: Objection.
A. Again, the reader would be able to see the results and it's more than just statistical significance. It's the magnitude of the association, plus the variance about that, so it's signal versus noise. And one of the major principles of epidemiology is to understand how -- what is the quantification



of biases and can those biases remove the association down to a one.
So, for example, if you have an association of five, even if it's imprecise, you would have to have enough selection bias or enough information bias or enough confounding bias to move that down.
When you have an association of 1.1 or even 1.2, which is what a lot of the associations are for dietary NDMA and various cancers that are alleged, it is entirely plausible and very easy for those associations to go down to a one from a little bit of measurement error, a little bit of bias. So, that's why we focus on two things; the magnitude of the association and also the statistical significance.
Q. But none of the ones reported here we just read would meet that traditional definition of statistical significance, right?
A. They -- they would not --
MR. SHEEHAN: Let me get my objection in.
Objection.

Go ahead.
THE WITNESS: Sorry.
A. They would not meet the definition of statistical significance using a 95 percent confidence limit. But, again, that's one of the two parts; the magnitude of the association is what we were writing about here. So, the three-fold, the five-fold, that sort of thing.
Q. Got it.
MR. RONCA: Let's go down a little farther where it says, in a large population up, you'll have the draw out more, it's at the very bottom, last three lines. In a large population, you see that? Yeah, there you go.
Q. Now, here, again, going down, you looked at gastric cancer related to specific items like beer. So, beer, the odds ratio was reduced, it was 0.895 percent confidence interval, 0.6 to 1.1. That one also doesn't have or does have a confidence interval that includes 1, correct?
A. Yes, that's correct.



Q. And the next one, 0.8, that looks like a repeat, doesn't it, of the same thing. All right. We'll skip that.
Liquor (1.0, 95 percent confidence interval, 0.7 to 1.4), for example.
In these circumstances, you're reporting results that would not meet the traditional definition of statistical significance, correct?
A. Again, though, here I'm not -- I'm reporting the results because this was one of the large -- largest studies by that time looking at type of alcohol and esophageal and gastric histology. So, I'm not -- I'm not saying anything about the results except for, here they are, right? So, the reader can see that there's no association going on here.
Q. Okay.
A. Right.
Q. All right.
MR. RONCA: Take that -- leave the page, but take down the callout, please.
Q. All right. Now, does tobacco smoke contain nitrosamines?



A. Yes, among many other things.
Q. And does tobacco smoke contain NDMA?
A. I don't know exactly. I would have to check. I'd have to look.
Q. Would you say that because tobacco contains N-nitroso compounds, a role for cigarette smoking and gastric cancer is plausible?
A. So, regardless of the mechanism, there have been many studies of smoking and gastric cancer.
MR. RONCA: Okay. Would you call out the bottom paragraph on the left-hand side, please? The last area that begins with because, just highlight that whole sentence.
Q. Did you write because tobacco contains N-nitroso compounds and other carcinogens, the role for cigarette smoking and gastric cancer is plausible?
A. Yes, we wrote that.
Q. One of the things about cigarette smoke that makes its role in gastric cancer plausible is that it contains N-nitroso



compounds?
MR. SHEEHAN: Objection.
A. That's what we wrote, yes.
Q. And NDMA is an N-nitroso compound, right?
A. Right.
MR. RONCA: Let's go to page 7 of 17. Under Fruits and Vegetables, will you highlight the first sentence? Most epidemiologic studies, highlight that sentence, please.
Q. In most epidemiologic studies -- the highlighted sentence is:
In most epidemiologic studies, a consistent 30 to 50 percent reduction in risk of gastric adenocarcinomas has been observed in relation to intake of fruits and vegetables measured together or grouped separately.
Did you write that?
A. Yes, we wrote that.
Q. And did you include in that discussion there of the confidence intervals?
A. No, 'cause, again, this was an expert review, qualitative review, so it was

a summary statement, we included some citations.
Q. Yeah. And the -- if the reader was interested, they could find that confidence intervals in the citations, right?
A. Again, I would need to look at those specific citations, but, yes.
Q. I mean, you wouldn't put that statement in or put references unless the reference supported what you're saying, right?
A. That's correct.
MR. SHEEHAN: Objection.
Q. I mean, that's the reason you put the reference?
A. Yes.
Q. Is the same true when you did your report, if we wanted to know where you got support for what you were saying, we could look at your reference?
A. Yes, if I was associating a number, I always would give a reference, yes.
Q. How about principles of epidemiology, would you reference this also?
MR. SHEEHAN: Objection.



A. Again, if it's -- if it's something that is well-understood within my field, I might not have given a reference for a specific topic like that. But whenever I cited numbers or papers, specific papers, I gave a reference.
MR. RONCA: Okay. Let's take down that callout and go to the next page. In the left column, one, two, three, four, five, six, seven, eight lines from the bottom of the first full paragraph it says individually, first full paragraph above that. No, down, down, down. Individually, right there. See it? You missed it. Individually, two lines up. Okay, take out that -- take the bottom paragraph from there.
Q. Starting with the word Individually, you wrote:
Individually, vitamin E has also been shown to decrease the formation of nitrosamines in the stomach.
So, based on your review at the time, it was known that vitamin E decreases



the formation of nitrosamines in the stomach, is that what you wrote?
A. Based on my review at the time we wrote this, yes.
Q. That's still true?
MR. SHEEHAN: Objection.
A. I would refer to my report which cites the World Cancer Research Foundation report which was an expert review done more recently. Again, this was, you know, an expert review summary, review paper 20 years ago. And so, based on the World Cancer Research Foundation, they, you know, examined kind of the different factors that are related to gastric cancer and something like citrus fruit at this point has limited suggests -- suggestive evidence. And so, I would refer to that 'cause that's a more recent expert review. The field has really evolved, particularly the field of nutritional epidemiology and specifically as nutrients relate to cancer. So, we wrote this review article over 20 years ago, it was published over 20 -- it was published 20 years ago, we wrote it over 20 years ago,



and at the time, especially for a rare tumor like gastric cancer, the majority of the studies were case-control studies. And one of the things that has been shown to be true in cancer epidemiology, we teach about it all the time, is that in particular for constructs like diet, so that would include fruits and vegetables, vitamin E, alcohol, any of the kinds of things in your diet that case-control studies are not valid designed to look at that, that you would need to have large cohort studies. And so, that's why, you know, for anything related to diet, I would go to more recent review articles that include those cohort studies.
Q. Okay.
MR. RONCA: And court reporter, can you mark that spot, please.
Q. Despite your answer, isn't it true that even up to today, World Cancer Research Fund or wherever you want to look, everyone agrees that vitamin E is shown to decrease the formation of nitrosamines in the stomach?
MR. SHEEHAN: Objection.
A. So, again, I wouldn't know who

everyone is, but I would just refer to kind of what the World Cancer Research Foundation has summarized for gastric cancer, of which, you know, the dietary evidence is either limited suggested or limited no conclusion, including NDMA is listed as limited no conclusion for gastric cancer. And really, the only strong evidence as they've assessed, which is called strong evidence probable, is for alcoholic drinks. Again, we saw that in some of those large signals we just looked at on the other page, as well as food preserved by salting.

So, you know, at this point, the human data is much more limited, no conclusion because of this very big issue that happens with dietary studies and recall bias. The cohort studies have not offered as much strong support.

Q. Yeah. So, while you're look at that, can you tell us, when was the last time that the World Cancer Research Fund reviewed NDMA?

A. So, this report where they reviewing -- were reviewing diet was from, I



think, 2018, I'd have to look it up, I think it's 2018.

Q. Yeah. But doesn't it say right in that report that NDMA has not been reviewed since the second expert report, which was in the time frame of 2005 to 2007?

MR. SHEEHAN: Objection.

A. I don't have the exact verbiage from the report in front of me, but we can look it up if so.

Q. Don't you have the report right in front of you?

A. I don't have the World Cancer Research Foundation report.

Q. So, do you know whether that report on stomach cancer that you're referencing in your answer talks about when the last time the World Cancer Research Fund reviewed NDMA?

MR. SHEEHAN: Objection.

A. I would have to look at the World Cancer Research Foundation report.

Q. So, you don't know without looking?

A. I don't know about looking at the report, but the way these World Cancer Research Foundation reports work is they



bring together the experts, in this case, it was for looking specifically at dietary and physical activity. And so, any -- any new data that would've changed any older assessment would've been evaluated at those expert reviews.

Q. Have you ever been on a World Cancer Research Fund expert committee?

A. I have not, no.

Q. Has Anne McTiernan?

MR. SHEEHAN: Objection.

A. I don't know. I think so.

Q. Have you ever been on an IARC expert group?

A. I have not, no.

Q. What's IARC?

A. The International Agency For Research on Cancer.

Q. That's a well-respected group?

A. I would say so. They have been around a while and they do a lot of cancer research themselves and they do a lot of expert reports.

Q. And you reference IARC in your report, right?



A. I did, of course, yes.

Q. But you've never served on one of their panels, right?

A. No, I have not served on their panels.

Q. Okay. Do you have an understanding of how those panels work?

A. I would imagine, I've been on other panels within the US and so -- -

Q. I don't want you to imagine. I want you to --

A. I have not been on an IARC panel itself --

MR. SHEEHAN: Let's not talk over each other. Jim, if you could -- if you could permit her to answer and she gives you the same courtesy when you're asking questions.

Q. The courtesy I would want is an answer to the question I ask, okay?

So, the question was, do you know how the IARC expert reviews and panels work?

MR. SHEEHAN: Objection.

A. I have not been on an IARC panel, so I am not privy to the internal workings of

an IARC panel.
Q. What about the World Cancer Research Fund, are you privy to the information about how those decisions are made?
MR. SHEEHAN: Objection.
A. The only information I have is the information that they disclose at the beginning of each report.
Q. Okay. And then returning to my earlier question, can you tell us when the last time -- when was the last time the World Cancer Research Fund reviewed NDMA in full?
MR. SHEEHAN: Objection.
A. I would have to look up that date.
Q. And can you tell us the last time IARC reviewed NDMA in full?
MR. SHEEHAN: Objection.
A. I would have to look up the date.
Q. And just like you say with this review article of yours that we would have been going on with here, Exhibit 6736, if the information is dated, there could be newer information that might change your conclusions; is that fair?



A. That is entirely fair, newer information always -- new evidence always changes an overall evaluation. In my review, 'cause I've thoroughly reviewed the NDMA and cancer epidemiology studies from the five cancers that are being alleged and if they were to have updated more recently, any update would include these cohort studies of which the cohort studies had no consistent pattern of any association with any of the five cancers.
(Exhibit 6736 was marked.)
Q. In your opinion?
MR. SHEEHAN: Objection.
A. Again, in my expert opinion of reading the published peer-reviewed data. But there's also been other experts who've weighed in on -- on this as well and I've cited some of that in my report.
Q. And when you refer to the World Cancer Research Fund or IARC in your report, did you specifically refer to how dated their statements may or may not have been?
MR. SHEEHAN: Objection. Vague.
A. Can you repeat the question?
MR. RONCA: Read it back, please.



(Referred to portion of the record was read back by the court reporter.)
MR. SHEEHAN: Same objection.
A. So, when I was referring to the World Cancer Research Fund, I stated the date of that report and if there were other -- if there were other citations from IARC, I stated those dates.
Q. Okay. So, when you say -- as we have on the screen, again, individually, vitamin E has also been shown to decrease the formation of nitrosamines in the stomach, was the point of that statement it's good to have vitamin E in your diet because it reduces the exposure of your stomach to a carcinogen known as nitrosamines?
MR. SHEEHAN: Objection. Mischaracterizes.
A. The point of this statement was to, you know, to review the data as they existed in 2002.
Q. So, the data suggested that if you wanted less nitrosamines in your stomach, you should eat more vitamin E, is that what this sentence suggests?



MR. SHEEHAN: Objection.
A. Again, this whole paragraph was about whether or not different nutrients could interact with other exposures.
Q. And the reason that you would want to have more vitamin E is because you want less nitrosamines in your stomach, right?
MR. SHEEHAN: Objection. Asked and answered.
Go ahead.
A. Okay. Right, that -- the -- this discussion of the paragraph was to -- to understand possible dietary interactions with exposures.
Q. And the reason it's in a chapter called, The Epidemiology of Gastric Cancer, is because nitrosamines have been associated with an increased risk of gastric cancer, correct?
MR. SHEEHAN: Objection.
A. So, again based on the epidemiological data that was available at that time, these are the hypotheses and the thoughts behind this.
Q. Got it.

MR. RONCA: Next page, please.
Let's go to right-hand column, paragraph halfway down that begins with ecological studies. Highlight that.
Q. Last sentence says:
Also, the process of salting fish and meats involves sun drying or smoking, both of which promote the formation of nitrosamines.
So, is that a true statement at the time you wrote it?
A. Yes.
Q. And still true, right?
MR. SHEEHAN: Objection.
A. To the best of my understanding.
Q. In fact, some of the organizations you reference have said that processed meats and fish can be cancer -- or can increase the risk of cancer because of the presence of nitrosamines?
MR. SHEEHAN: Objection.
A. Some of the agencies, do you mean IARC?
Q. IARC, WCRF. Is that true?



A. Yes, I would agree with that.
Q. And one of the nitrosamines they refer to is NDMA?
MR. SHEEHAN: Objection.
Q. Right?
A. Who is they, now?
Q. IARC or WCRF?
A. Again, if there's a specific document or is this a general statement?
Q. I'm asking if you know.
A. I would imagine they would include that in the list, I don't know without looking at a document directly.
Q. Okay.
MR. RONCA: Next paragraph, please.
Q. When you wrote this review article you had a section called Nitrites, Nitrates and Nitrosamines, right?
A. Yes.
MR. RONCA: And let's highlight that first sentence.
Q. You wrote:
Nitrates alone are not toxic, but their conversion to nitrites and further



combination with secondary amines to form N-nitroso compounds have been found to induce gastric tumors in animal studies.
So, was that an accurate statement when you wrote it and included it in this review article?
A. Yes.
Q. And do you know that the method by which ranitidine degrades and forms NDMA is when a nitroso part of the molecule combines with a secondary amine and creates NDMA, did you know that?
MR. SHEEHAN: Objection.
A. Again, my expertise is in cancer epidemiology and statistics, but that is my understanding. I'm not a molecular biologist.
Q. Understood.
So, that's similar concept to what you wrote in this sentence, right?
MR. SHEEHAN: Objection.
A. Again, I'm not an expert in molecular biology, so...
Q. And when you say "induced gastric tumors in animal studies," you're talking



about stomach tumors, right?
A. Yes.
MR. RONCA: Let's go down to the last sentence on that page.
Q. You reported that case-control studies that have examined the relation between dietary intake of nitrate and gastric cancer risk in many diverse populations have yielded complex results.
Right?
A. Yes, that's correct. That's what we wrote.
MR. RONCA: Okay. Next page reading on there.
Q. It says, starting with the word whereas:
A positive relation was noted with dietary intake of nitrosamines and furthermore, the influence of nitrosamines was mitigated by high levels of vitamin C.
So, when you did your review article, was that the information that was available?
MR. SHEEHAN: Objection.
A. Yes, based on what we wrote,

reference 61, would've looked at it in our action analysis of these different dietary components within the case-control study.
Q. Okay.
MR. RONCA: And let's go to the next sentence there.
Q. It says:
In addition, case-control studies in Uruguay and France have reported a four-fold increase in risk in related to a dietary index of nitrosamines in one study and the risk was augmented to the 12-fold increase among persons who ingested heterocyclic amines.
So, you're reporting on two studies, one in Uruguay and one in France that showed a four-fold increase in risk in related to the dietary index of nitrosamines.
Is that what you reported?
A. That's what we reported in this review article over 20 years ago, which was a case-control study which hasn't been backed up by the cohort data.
Q. Okay. But dietary studies, right?
A. Dietary studies, yeah. Dietary



studies again are much more susceptible to recall bias and that's why the fields of cancer epidemiology including IARC focuses on cohort studies of diet and cancer.
Q. Got it.
MR. RONCA: Let's go back and down and under Green Tea, the next section.
Q. Let's go look at the sentence that begins little more than halfway down:
The anti-carcinogenic and anti-mutagenic activity of green tea may act via its ability to reduce [sic] apoptotic cell death and arrest of cell cycle, its inhibition of nitrosamine -- I'm sorry, nitrosation or its antibacterial effects.
That's what you wrote down?
A. Yes, we wrote that then.
Q. Point of the one part of your sentence, its inhibition of nitrosation, is if that you inhibit nitrosation, you could reduce the risk of cancer, right?
MR. SHEEHAN: Objection.
A. Again, that -- that was -- that was the hypothesized mechanism.
Q. And that's because many



nitrosamines are carcinogenic?
MR. SHEEHAN: Objection. Vague.
A. According to IARC, some nitrosamines are probable actual carcinogens, that's mostly based on animal studies and, again, the human studies which are most relevant to understanding if something is a human carcinogen. The case-control studies and the cohort studies have not supported each other. And so, whenever you have case-control studies, finding something different than what cohort studies have found, then you go to an assessment of bias. And in particular, you know, all studies, even clinical trials, have bias, but they operate in very different ways.
So, cohort studies in particular don't have the problem of recall bias. And so, again, I would -- since the field has moved on over the last 20 years, I would really focus much more on when the findings are similar across case-control study and cohort studies, then you can say at least it's not recall bias --
THE COURT REPORTER: I'm sorry.



There's a lot of interference that I'm hearing.
MR. RONCA: Somebody's phone is buzzing. Can you stop it?
Q. Okay. Go ahead, Doctor.
THE WITNESS: Where should I go back to?
THE COURT REPORTER: Cohort studies then you can say it's at least not recall bias.
THE WITNESS: Great.
A. So, that's why it's really important to find consistent associations between case-control studies and cohort studies, because then you can say it's not selective bias or information bias. In the case of the dietary data for NDMA and the different cancers that are being alleged, there's no consistency. The case-controlled studies tend to be more positive than the cohort studies, which -- and very weak effects, 1.1, 1.2. So, that suggests that it is being driven by these biases that are different and in particular, recall bias, because what's been shown to be really hard,

not for all things, but for diet is the reporting of dietary exposures.
Q. Okay.
MR. RONCA: Let's go to page 13. Can you highlight the table or bring out the table, please? There you go, that's good enough.
Q. All right. So, this is Table 1 of your review article. It says:
Summary of epidemiologic evidence of risk factors for gastric cancer.
This is the title of the table that you made up?
A. Yes.
Q. This was a summarization of all the epidemiologic evidence that you reviewed for this article?
A. Yes.
Q. And down there on the left, it says:
Modest strong risk factors (relative risk 1.1 to 2.0.) And you list one, two, three, four, five, six things under modest risk factors.
MR. RONCA: John, on the left.



No, not moderate, modest. There you go.
Q. Under modest risk factors, you list six things, correct?
A. Yes.
Q. One is cigarette smoking, right?
A. Yes.
Q. One is body size, that would be body mass index; is that fair?
A. Yes.
Q. One is gastric ulcer disease, right?
A. Yes.
Q. One is salty or salted foods, right?
A. Yes.
Q. And one is nitrosamines?
A. Yes.
Q. And I only read the five, not the six. The five are all environmental things that you could change and do something about, right?
A. Presumably.
Q. So, if you stop or reduced your cigarette smoking you might lower your risk



of stomach cancer from cigarette smoking, right?
A. Yes, that's correct.
Q. And if you lost weight and reduced your body mass index, you could reduce your risk of cancer from being overweight, right?
MR. SHEEHAN: Objection.
Go ahead.
A. So, again, except for cigarette smoking, a lot of lifestyle factors have not been assessed in that way where you look at if someone actually does change their weight, do they have -- does their outcome change. But theoretically, yes.
Q. Okay. And if you reduced your exposure to nitrosamines, you could reduce your risk of stomach cancer, right?
MR. SHEEHAN: Objection.
A. So, again, when you say "reduce your risk," those kinds of studies would have to show pre/post differences. So, on a population level, how do we know that if you change an exposure it affects risk? The best way we can see that is through large population shifts, which we have that for



cigarette smoking. We don't have that for many other things, so the best we can say is something is correlated. And then, again, this -- this paper itself was not a causal analysis, this paper was showing the summary of the data that existed 20 years ago. Some of these, you know, have changed over time as I mentioned because of the cohort data.
So, throughout the '90s, it was very rare to have any kind of cohort study for cancer given the rarity of the outcome. So, most of these studies were all case-control studies and so this would be a summary of the data as they existed then.
Q. Okay.
MR. RONCA: So, you can take down that exhibit.
Q. Let's just go a little more recent. Did you --
MR. SHEEHAN: If we're at a good breaking point some time soon, we've been going about an hour and a half, I guess, Jim.
MR. RONCA: Yeah, just give me a few more minutes here, okay? It's

right in the same line.
Q. So, did you give a lecture recently, the Millikan lecture?
A. I think that's referring to a lecture I gave at the University of North Carolina.
Q. 2017?
A. I think so.
Q. Yeah.
MR. RONCA: So, let's go to Exhibit 6732. Can you show that -- there you go.
(Exhibit 6732 was marked for identification.)
BY MR. RONCA:
Q. Do you recall giving this lecture?
A. I do, yes.
Q. It's available online to watch, did you know that?
A. I did not, no.
Q. Okay. I watched it.
So, in this part of your lecture, you had a slide presentation that said at the top:
In many situations, population



based approaches are sufficient and efficient. And the transcript of what you said is indicated there at the bottom and I'll read it.
There's many situations where obviously population based approaches are really completely sufficient and case-control studies in particular are the hallmark feature is they are the most efficient kind of design and in many ways, if they can be executed, really are sort of the best design because they captured the complete exposure period throughout life, which sometimes cohorts are incomplete when capturing exposures moving forwards and backwards.
And so, the design itself is a very useful design in particular when we want to generalize to all cases and case-control studies do have that advantage that they really do have complete capture of all cases if designed that way, whereas cohorts, really by design, are picking up the earlier cases first.
Did you say that?
A. I did say that.



Q. And then looking at the poster under case-control studies, you indicate four things:
1) Easier to implement population based strategies.
2) If exposures can be recalled, can capture more complete history.
3) Issue of temporality particularly for biomarkers.
And 4) Efficient.
And then under cohorts, you put:
Challenge in population-based ascertained cohort in follow-up over time, means most cohorts highly selective.
2) Incomplete exposure assessment.
3) May still have issues of temporality.
And 4) Not efficient.
Is that what you put up on the slide for the people who were watching this lecture?
A. Yes, that's what this slide says. And I'd like to then just elaborate what my points mean.
Q. Yeah. Well --



MR. SHEEHAN: Dr. Terry, if you need to explain, please do.
Q. Go ahead.
A. Great.
So -- yeah. So, this lecture, I was speaking at the University of North Carolina School of Public Health, which is one of the largest highly rated schools of public health, so I was trying to get them to think differently about study design. And so, in particular, these points were general points, not specific to an exposure or disease, a specific exposure or a specific disease. So, each point then has to be, you know, has to be given context and that's how I teach.
So, in particular, case-control studies under Number 2, if exposures can be recalled, can capture a more complete history.
But again, the challenge here is it's highly exposure dependent.
So, can you ask a group of women, did they breast feed and how long did they breast feed for? Absolutely.

Can you ask somebody if they had five servings of broccoli last week, last month or last year? Probably not.

So, again, it's highly specific to the exposures.

Can you ask people about, you know, even cooking methods that might have happened 10 or 20 years ago? Possibly.

But can you ask them, you know, they may remember how many times they barbecued, they may not remember what they barbecued. These sorts of things. So, everything is context dependent.

Now, case-control studies do have this issue of temporarily, which is under Point 3, and this comes into play, when I say particularly for biomarkers, because a lot of the field now in order to validate some of the constructs used measurements in blood or urine. And so, that does happen even in nutritional epi because most people recognize how fraught nutritional studies are with measurement error.

The problem, though, is you can't do a case-control study where you're



collecting urine or blood at the time of diagnosis to understand what their exposure might be in terms of vitamin D or any other kind of nutrient. So, all of this is context dependent.

Now, the big challenge that's in the field for cohort studies, which actually doesn't exist for the electronic health record cohort studies that are of issue in this litigation, the challenge of a lot of cohort studies is that they -- they are often, in order to follow people over time, select group of people. So, the nurses' health study out of Harvard, which is where a lot of women's health has come from, those, you know, in order to be part of that study to begin with, you had to be married in 1976 to join the cohort because they were afraid that nurses who were not married would not report accurately on oral contraceptive use. And it was the -- one of the first cohort studies to look at oral contraceptive use and women's cancers.

So, again, these are general points that need to be considered for each and every



exposure disease association.

Q. Okay?

MR. RONCA: Next slide. Next slide, please. I'm only seeing two on mine. Okay, there we go.

Q. Then later actually in the second part you put up this slide and you said quote:

Nobody would debate, most of these, if not all of these, the main evidence came from case-control studies, and most of these, well, all of these actually were all observational studies that found those and they were all done in average risk populations.

Did you say that?

MR. SHEEHAN: Objection.

And to the extent you need to provide context, feel free, Dr. Terry.

A. Okay, let me just read it again.

Yes, I said that. I mean, this is the transcript, so I -- but I've said many things -- many similar things in other talks, yes.

MR. RONCA: Next slide.



Q. So, the list of cancer causing agents where the main evidence came from case-control studies is like a hit list of the most well-known and understood cancer causing agents; tobacco, asbestos, H. pylori infection, HPV infection, vinyl chloride, hepatitis B and C infection, maternal DES use and ionizing radiation.

Is that what you were referring to when you made this statement that's quoted at the bottom of this slide?

MR. SHEEHAN: Objection.

A. Right. So, what I was wanting the audience to appreciate is that we can determine causality without a clinical trial and that many of the causes of cancer that are -- that we know of today came from observational studies. What I would provide context for is -- and many of these also came from case-control studies, you know, but what I would provide the context for is all of these associations have a very large magnitude.

So, again, you need the -- you need the large magnitude, you need the signal, and

then you need the signal versus the noise in order to make an assessment where you can at least be confident that it's not driven by selection bias, information bias or confounding bias. So, it has to be that strong signal.

And again, the challenge if we only had case-control studies of diet, the challenge is that those signals can be easily explained by recall bias because they're weak signals given the measurement issues involving diet. In fact, most studies of diet have shown that the reliability of these measures is, you know, close to .5, a coin flip kind of thing. So, it's just you don't have that kind of consistency with dietary studies.

MR. RONCA: Go back two slides, please. Three. Go back to the first one.

Q. Can we agree that depending on the circumstances, a case-control study can capture complete exposure information throughout life?

MR. SHEEHAN: Objection. Asked



and answered.

A. So, again, it would depend on the exposure. So, you know, we would have to think about what the exposure is and, you know, whether or not it can be reliably recalled.

Q. And can we agree that cohorts sometimes only have incomplete exposure information?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, it depends on the construct and what the exposure disease association is. If a construct is genes, either study, you know, would have complete information if you do a genome-wide association test, you know, that sort of thing.

So, again, it depends on the construct and often in cohort studies we use a measurement to kind of indicate, you know, chronic exposure.

Q. Yeah. But just exclude for the purposes of the next few questions genetic epidemiology.



Is it true that large cohort studies almost always have complete exposure assessment -- I'm sorry, incomplete exposure assessment?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah. So, again, with epidemiology, and I think this is where it can get very misinterpreted by many people, it is highly context specific. It's highly the environment of the reporting has to be assessed, the measurement tools have to be assessed, the analysis has to be assessed. So, something that is valid in one context, you have to repeat that to make sure that the measurement tool is just as valid in another context. So, it's highly dependent on the context.

Q. And this incomplete exposure assessment as you have on your chart there, isn't that particularly true for administrative databases?

MR. SHEEHAN: Objection.

A. I would not say it's particularly true of one thing or another. It would



totally depend on the quality and comprehensive nature of the database.

Q. And if the database, for example, had only prescription information with no information about dose or number of pills, and didn't have whether the information about whether a prescription was filled and the same medication was available over-the-counter, would it be fair to say that in those situations, an administrative database has incomplete exposure information?

MR. SHEEHAN: Objection. Vague.

A. So, again, it would be highly context specific and we would have to look at each individual study, understand the quality of the missingness. This is something that, again, is for -- for people who are assessing kind of individual risk versus population science. It's a concept that it is quite different. So, in population science, as long as individuals stay within the same rank, so even -- even if we let's just take the example of a scale, right, and we know the scale has measurement error, whatever, but -- so, even if the scale were inaccurate,

but it allows for the person who was highest still on that scale to be first in line, the statistical methods are robust to that. And so, even if we undercount in a particular measurement, a measurement method, as long as that kind of undercounting, you know, occurs across and people stay in their same rank, the -- the methods are totally robust to that.

So, that is something that's, you know, unless you want a lot of regressions and -- and look at a lot of data analysis, it may be hard for people to kind of grasp that -- that you could be undercounting, but still get a valid answer. But -- but it is definitely through the way regression works is you're estimating the most likely summary between two factors and as long as people preserve their ranking, it doesn't matter how off you are in that way.

Q. So, what you're saying is --

MR. SHEEHAN: Jim, can we take that break when you're --

MR. RONCA: I have two more questions and then we can take a


break.

MR. SHEEHAN: Okay.

Q. So, what you're saying is that's assuming that individuals stay in the same rank?

A. Yes, if individuals stay in the same rank, the methods are absolutely robust and valid.

Q. And that assumes you have individual information, right?

MR. SHEEHAN: Objection.

A. Again, most of these studies are analyzed at the individual level.

Q. Right. So, you're not talking about aggregate information, you're talking about information on individuals, correct?

MR. SHEEHAN: Objection.

A. Yeah, I was just giving example of how regression works.

MR. RONCA: Now we can take a ten-minute break.

THE VIDEOGRAPHER: We're going off the video record. The time is 3:02 p.m. UTC time.

(Whereupon, a brief recess was


taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:18 p.m. UTC time.

BY MR. RONCA:

Q. We're back on the record, Dr. Terry.

I almost -- well, I do hesitate to ask this, I don't really like these questions, but all of our experts have been asked this, so I'm gonna ask you.

What do you charge per hour for your expert work?

A. It's $500 an hour.

Q. What are you paid per hour by Columbia?

MR. SHEEHAN: Objection.

A. Yeah, I would have to check.

Q. Well, what is your salary?

A. What is my salary?

Q. Yeah.

MR. SHEEHAN: Objection. I mean, I don't think we've asked any of these questions. You really want her to --

MR. RONCA: A hundred percent


wrong, Tom.

(Cross-talk.)

MR. SHEEHAN: We've asked salary?

MR. RONCA: Not only did they ask it, but -- but Eva asked for confirmation at the later deposition later today of Dr. Tiernan [sic] of her hourly rate. I'm only asking the question that Eva asked.

MR. SHEEHAN: Hourly -- wait, hourly rate in litigation are you talking about or...

MR. RONCA: No, no, no. Hourly rate from the University of Washington?

MR. SHEEHAN: All right.

To the extent you know, Dr. Terry, and you feel comfortable divulging that, feel free.

MR. RONCA: Tom, you know we're entitled to know this. I wouldn't ask, but it's been asked of our experts, so I'm just following suit.

A. It's approx- -- it's approximately 280.

Q. Thank you. That's all we're gonna say about that. All right. Let's go to a different topic.
Let's go back to your report, which is Exhibit 6727?
A. And I guess just clarify, I have other sources that I'm paid for leadership that's over my salary. But you just wanted my salary, right?
Q. Yeah, I'm not --
A. Okay.
Q. You're in that kind of 300,000 neighborhood, generally speaking, of what you earn?
A. Yes.
Q. That's all I care. That's all. I'm not gonna get into detail or ask you to come back later with your hourly rate. Okay.
MR. RONCA: So, let's go to page 10 of the report, Number 10 it's 14 of 250. There you go.
Q. So, Dr. Terry, you did a section in your report entitled Statistical significance, right?
A. Yes.



MR. RONCA: And then if we go to the next page and just call out that last paragraph, the last big paragraph. There you go.
Q. You wrote this paragraph regarding confidence intervals, 95 percent confidence intervals and p-values less than 0.05, right?
A. Yes, I wrote this.
Q. Okay. And in this you referenced at the bottom in 2019 -- well, you wrote:
I disagree that the plaintiffs' expert's assertion that the American Statistical Association advocates for abandoning the term "statistically significant."
You wrote that, right?
A. Yes, I wrote that.
Q. And then in the next sentence, you refer to the task force.
Can you tell us what the task force is?
A. I'm sorry. The task force was --
MR. SHEEHAN: Did you ask a question, Jim? You faded out there just for a moment.



Q. Would you tell us what the task force is?
A. The task force was convened, it was a societal task force, so...
Q. And is it your impression that this task force put out an official statement of the American Statistical Association?
MR. SHEEHAN: Objection.
A. Yeah.
THE WITNESS: Can you page down a bit?
MR. RONCA: Sure. Go to the next page.
Q. You also have it on paper in front of you, but go ahead.
MR. SHEEHAN: It's on page 11 and 12 of your report, Dr. Terry.
A. Yeah. So, that's a quote from the Benjamini, Benjamini, 2021, yes.
Q. Okay. But are you certain that the task force put out the -- an official statement of the American Statistical Association or just a statement of the task force?
MR. SHEEHAN: Objection.



A. So, the quotation that I have here is from -- from the Benjamini summary, so we'd have to pull that up.
Q. Yeah, I'm just asking you if you know, while we're sitting here.
A. I know that this, you know, that -- that there's been lots of scientific debate about the advantages and disadvantages of statistical significance testing, that's been around for a very long time. So, the point of -- that all of these -- and I read the back and forths, the point of all of this is that we always have to put things within context and it's about the magnitude of the association and not just the statistical significance. So, if anything, you could say that epidemiology has been ahead of biostatistics for many years because epidemiology has always focused on the point estimate or the risk estimate and -- and the variance around that, the variability around that. Whereas in many other fields in medicine, they sometimes focus just on the statistical significance. But statistical significance, by itself without that context,

is not helpful, because you could have something that's statistically significant, but not clinically significant or not, you know, important enough to change public health or clinical practice. So, that's why the magnitude of the association as well as whether or not that association is reliably reproduced in different settings is important.

Q. Okay. I notice that you referenced Benjamini article regarding the task force, instead of referring to the task force report itself.

Did you review the task force report itself?

A. I did look at the task force report itself, yes.

Q. Did you include it in your list of materials considered?

A. No. I mean, I -- I'm aware of the scientific debate back and forth. We use a lot of the examples in teaching. We also have had people over the years give lectures at Columbia about this. So, yeah, I'm aware of the debate.



What I included in my report which is most relevant is when I'm taking a direct quote from something, what was said.

Q. Okay. So, I want you to just focus for a second on that highlighted sentence on page 11:

I disagree with the plaintiffs' expert's association that the American Statistical Association advocates for abandoning the term "statistically significant."

Keep that in your head, I want to ask you about something.

MR. RONCA: Can you go to page 248 of this report, 248 of 250?

Q. See reference 200 at the bottom on your list of materials considered? Did you review that?

A. Yes, I would've seen that.

Q. Naturally, you wouldn't have included it if it wasn't -- you wouldn't have put on your list of materials considered, right?

A. Right.

Q. Okay.



MR. RONCA: So, let's bring up that reference, 6739.

(Exhibit 6739 was marked for identification.)

BY MR. RONCA:

Q. This is the Wasserstein, Schirm and Lazar article entitled Moving to a World Beyond p less than 0.05.

Do I have the right reference?

A. Yes.

MR. SHEEHAN: Do you have it in your Box there, Dr. Terry?

THE WITNESS: Not quite. Yeah. Now I do, yeah.

MR. RONCA: So, can we go to the third page of the -- before you move, before you move. Too late. All right.

Q. Who's Roger Wasserstein?

A. I would have to look up his full affiliation, but I would imagine -- hang on just one second, give me a minute for it to get in the Box.

I'm not seeing his full affiliation where he is right now.



Q. Is he the executive director of the American Statistical Association?

A. I would have to look that up.

Q. Has he been that for several years?

A. I don't remember who's heads of different societies, to be quite honest.

Q. You're not a member of the American Statistical Society, are you?

A. I am not, no.

Q. And -- and before Dr. Wasserstein was the executive director of the American Statistical Association, are you aware that he was full professor of statistics and had won numerous awards for his work in statistics, are you aware of that?

A. I'm not aware of that, but, yeah, I don't know his background.

MR. RONCA: Let's go to page 3 of 20 and this is -- highlight, Don't say "statistically significant," and that first paragraph.

Q. So, I'm going to read the paragraph that says, Don't say "statistically significant."

The ASA statement on P-Values and

Statistical Significance stopped just short of recommending that declarations of statistical significance be abandoned. We take that step here. We conclude, based on our review of the articles in this special issue and broader literature -- and the broader literature, that it is time to stop using the term statistically significant entirely. Nor should variants such as "significantly different," "p less than 0.05," and "non-significant" survive, whether expressed in words, by asterisks in a table or in some other way.

Now, you remember where you said in your report, I disagree with the plaintiffs' experts that the American Statistical Association has called for the abandonment for the term of the "statistical significance."

Do you remember where you said that?

A. I do, you just showed it.

Q. Yes. And that's -- that's just wrong, the American Statistical Association has recommended that it be abandoned, right?



MR. SHEEHAN: Objection.
Mischaracterizes the editorial.

A. Again, written right here, it says we stopped just short of recommending them.

Q. No. Then the next sentence says, "we take that step here."

A. No, but --

MR. SHEEHAN: Objection.

A. But this is the editorial, not the ASA statement.

Q. The ASA statement referred to in the first sentence was the 2016 statement, not the task force report, right?

A. I don't know the chronology off the top of my head.

Q. So, what you think is that the ASA, the American Statistical Association, still agrees that you should use the term "statistical significance," is that what you think?

MR. SHEEHAN: Objection.
Mischaracterizes testimony.

A. Again, the scientific debate here is one that we've, in epidemiology, have participated in for years, which is the



emphasis of not just summarizing your findings in terms of p-values. So, that I have totally agreed with, that's what we teach. We teach that it has to be about one, the magnitude of the association, in this case, not the causal association, but the risk estimate. So, the magnitude of the risk estimate of what you find. And then the precision about that estimate.

So, this debate, back and forth in the literature, in the statistical literature, again, is something that we've discussed for many years in epidemiology, that you need both; the point estimate and the variability about them.

Q. But what about the term "statistical significance"? Do we need that?

A. So, again --

MR. SHEEHAN: Objection.
Let me just -- just give a beat before you answer.
Object to the form.
Go ahead.

A. So, I consider that there's two parts to everything; one is about the



magnitude of the association and two is about the precision about that. To the extent that we use terms all the time, like variants to understand the variability around an estimate and we do still rely on reporting out the statistical significance of a finding in every major medical journal.

Q. Okay.

MR. RONCA: Drop that down and go back one page. Okay. And highlight the first paragraph, "don't" are not enough. All the way down to the end of the bullet points, the whole paragraph. All the way down to where it says, "don't." All right. Well, you didn't quite get there, but we'll start with this, okay?

Q. So, this says:

There's not much we can say here about the perils of p-values and significance testing that hasn't been said already for decades.

Do you agree with that?

A. Yes. In fact --

MR. SHEEHAN: Objection.

THE WITNESS: Sorry.

MR. SHEEHAN: I'm not sure, is the question, do you agree that that's what it says or what's -- I'm not sure I'm understanding.

MR. RONCA: I think the doctor understands the concept of where we're going. I am asking her if she agrees with the concept.

Q. Do you agree with the concept?

MR. SHEEHAN: Objection. Vague.

A. So, as I stated before, since I've started doing applied epidemiological analyses decades ago, I have always been trained and I teach that it's more than just whether or not the p-value is statistically significant. You have to look at the magnitude of the association and whether or not the magnitude of the association is strong enough such that you can rule out the role of confounding information bias, selection bias. And then the variability about that is important so you can rule out the role of chance. So, both are important, but I've never relied solely on p-values at



all.

Q. So, statistical testing, which includes p-values, confidence intervals, that doesn't take care of problems in studies that involve bias or confounding or things like that.

Is that a fair statement?

A. So, this is where it's very important to have evidence from multiple types of study designs wherever possible. So, because the biases that exist in a case-control study operate differently in a cohort study, it's very important to see consistency in associations across study designs of different types. So -- so, that's what's first and foremost important is to see a consistency of evidence.

Q. Okay. So, I'm gonna read these statements here and if you agree or disagree with me.

First statement: Don't base your conclusion solely on whether an association or effect was found to be "statistically significant" that is the p-value passed some arbitrary threshold such as p less than .05.



Do you agree or disagree?

A. I agree with that general statement, yes.

Q. Second statement:

Don't believe that an association or effect exists just because it was statistically significant.

Agree or disagree?

A. So, the way that this was written is very general, but I would amend it to say, don't believe that an association that is statistically significant is clinically significant.

Q. So, you disagree with the way it's stated?

A. So, I don't know what they mean by don't believe that an association or effect exists. I'm assuming when they say "effect," they mean like a causal effect. So, but again, I -- I don't know want to assume too much, there's only a few words here.

But again, if something's statistically significant, that doesn't mean it's clinically important, public health -- has public health importance, you have to



understand whether or not that result could've been explained by bias. And then you have to understand, you know, the magnitude of that effect.

Q. Third statement:

Don't believe that an association or effect is absent just because it was not statistically significant.

Agree or disagree?

A. So, again, it's a general statement, but I would refer back to what we were discussing before. So, you know, we had an association of five-fold between alcohol and gastric cancer. That was not statistically significant.

So, again, these principles are not new. These are principles, you know, of good practice that gets people to think more about the size of effect, as well as the variability of that effect.

Q. So, you disagree with that statement?

MR. SHEEHAN: Objection.

A. No, I was saying that -- that you could have a very large association like in

the case of alcohol and gastric cancer that we saw that five-fold association, but it wasn't statistically significant.
Q. Fourth statement:
Don't believe that your p-value gives the probability that chance alone produced the observed association or effect or the probability that your test hypothesis is true.
Do you agree or disagree?
A. I agree with that statement.
Q. Fifth:
Don't conclude anything about scientific or practical importance based on statistical significance or lack thereof.
Do you agree or disagree?
A. So, again, it's a general statement. To put it in context, if a whole body of evidence was not consistent and all of that evidence was statistically insignificant, then you have to, as a body of evidence, say that there's still no -- no reason to assume that this is a causal association.
Q. So, you disagree with the


statement?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, it would -- it would -- I don't know if they're talking about a specific study or if they're talking about drawing a causal conclusion. I think if they're talking about a specific study, I would agree with the statement.
Q. Okay.
MR. RONCA: Take down that callout and call out what comes right after it.
Q. So, what the paper says is:
Don't. Don't. Just...don't. Yes, we talk about a lot of don'ts. The ASA Statement on p-Values and Statistical Significant and Wasserstein and Lazar in 2016 was developed primarily because after decades, warnings about the don'ts had gone mostly unheeded the statement was about what not to do, because that was widespread agreement about the don'ts.
Now, I'm going to ask you, is this now a reference in 2019 to the actual ASA


statement on p-values as statistical significance?
A. I just have to look at the document in the Box, but...
So, what is your question that the Wasserstein and Lazar is the -- what is your question?
Q. You don't reference the actual ASA Statement on p-Values and Statistical Significance, you reference an article by someone named Benjamini which talks about a task force report; isn't that true?
A. Well, I was referencing the Benjamini because that was an example of how there still is debate about this.
MR. RONCA: And let's go back to your report for a second on page 12, I think it is. Maybe it's 11, I'm sorry. There you go.
Q. Yeah. So, you say:
In 2019, the president of the ASA could be the task force to address these concerns. And then you talk about the task force and the Benjamini article, but you don't mention the Wasserstein article that


you reference or the actual ASA statement, do you?
MR. SHEEHAN: Objection.
A. Not right here, no.
Q. Why would you do that?
A. I mean, the actual ASA statement is something that, you know, was discussed. I mean, I've read it it's -- it's was discussed by plaintiffs. My point here was that it's not just from that ASA statement that the there's still a debate going on. So, again, I think we're splitting hairs here, so to speak, because I don't disagree with any of what's written here. I've always advocated that it's not just about statistical significance, it's about the point estimate and whether or not that point estimate can be driven down to 1 on a relevant thinks scale or down to 0 on an absolute scale. So -- and that is really the practice of epidemiology. We have not focused on statistical significance testing, which is very different than, for example, laboratory scientists or some other people who do focus primarily on p-values. But, you know, the limitations of

p-values themselves are great, that's why you have to focus on the magnitude of the association as well, you need to describe the variability.

Q. Yeah. But then why would you say in your report, "I disagree with the plaintiffs' experts assertion that the American Statistical Association advocates for abandoning the term 'statistically significant," and then in reference to -- cite to the ASA statement where they say just that that, they call for abandoning it, why would you put that in your report?

MR. SHEEHAN: Objection. Mischaracterizes.

A. This is one paragraph within the background of trying to understand these concepts and to set these concepts up for the rest of the report. So, it's under the concept of statistical significance and I wanted to reference the fact that the plaintiffs' experts discussed this, this was one of the heart of their cases, which I disagree with because, again, the lack of the statistical significance in the literature



that they were prioritizing, which was the dietary NDMA studies, there was nothing in the cohort studies.

So, again, I brought it up here, because this -- to say that this is still a scientific lively debate, but, you know, I, myself, would not put all my priorities on statistical significance.

Q. Why would you say that the American Statistical Association has not abandoned the term "statistically significant" when you reference the exact document where they do so?

MR. SHEEHAN: Objection. Asked and answered. Mischaracterizes the document.

A. Yeah, I -- again, I thought it was relevant for the discussion here which is why I brought up the Benjamini piece as an example of how the debate is continuing.

Q. So, you still use the term "statistical significance" in your papers?

A. I do, yes.

Q. And you don't think it --

(Court reporter clarification.)



Q. You don't in any -- you don't think that in any way mischaracterizes the importance of results reported in studies?

MR. SHEEHAN: Objection. Vague.

A. Absolutely not. I think statistical significant testing is very important, but it's one part of what we use to assess whether or not there's a reliable valid association.

And as I said before, in epidemiology, we have always, always focused on the magnitude of the point estimate and whether or not that point estimate is large enough that we can rule out the role of bias.

Q. So, then a p-value of 0.06, that's not statistically significant in your parlance?

A. Again, using a 95 percent confidence limit, it is not. But in our papers, we focused on the magnitude of point estimate and the variability about that. It's always both things. It's never one or the other.

MR. RONCA: Let's bring up Exhibit 6403.



THE VIDEOGRAPHER: I don't see a 6403 in your private folder.

MR. RONCA: It's from prior deposition. It's not there? It's from the deposition Witte and it was also used in Porter.

DOCUMENT TECHNICIAN: Give me just a moment.

MR. RONCA: Apologize, I thought I can call any of these numbers up that have been used previously.

THE VIDEOGRAPHER: You said 6403, correct?

MR. RONCA: Yes.

THE VIDEOGRAPHER: I got it. I just put it in the shared folder for today. It should show up now.

(Exhibit 6403 was previously marked for identification.)

MR. RONCA: Okay. So, this is a -- there's an article, but I want to get to the actual statements, so go down maybe three pages. Next page.

BY MR. RONCA:

Q. So, Dr. Terry, are you familiar

with this document, the ASA Statement on Statistical Significance in p-Values?

A. Yeah, I'm just pulling it up myself right now. It's not in the Box.

THE VIDEOGRAPHER: Did you refresh it? I'm seeing it in Box.

MR. SHEEHAN: Can you hit refresh there, Dr. Terry?

MR. RONCA: Yeah. Hang on.

MR. SHEEHAN: Has it not shown up?

THE WITNESS: I don't think so. It's okay, I can see it on Zoom.

Q. So, you're familiar with this? Have you seen this before?

A. Yes, it looks very familiar. Again, we look at these documents in teaching and that sort of thing, so we reference them all the time.

Q. You didn't reference this in your report though, did you?

MR. SHEEHAN: Objection.

Q. You didn't reference Exhibit 6403, the ASA Statement on Statistical Significance and p-Values in your report, did you?

A. No, I don't think so, but --



MR. SHEEHAN: Let me just get my objection in.

Objection.

Go ahead.

Q. Your answer?

A. No.

Q. You referenced some task force report and a Benjamini article and that's it, in your text of your report, correct?

A. Yes, that's correct.

Q. And you didn't mention anywhere in the text of your report the Wasserstein article that was in your materials considered list, right?

MR. SHEEHAN: Objection.

A. No. But, again, it -- this is the topic as I mentioned of scientific debate back and forth for many years, not just the last few years, although, you know, obviously it's -- it's been discussed a lot more recently. And so, it didn't have relevance, you know, citing every single article that's been there or statements that have been there wasn't -- didn't affect my overall review and expert report because I know this debate back



and forth and I -- you know.

So, I -- again, I focused on looking at the magnitude of the point estimate as well as the variability around that, so... But we teach about p-values all the time and -- and the advantages and disadvantages and, you know, these concepts are not new.

Q. Why did you feel it was necessary to make a statement about plaintiffs' experts and criticize them for talking about abandoning the term "statistical significance"? How is that relevant to your discussion of p-value and things like that?

A. So, in my expert review of -- of the literature and then in my review of both of their reports and this is something that I do all the time with trying to understand why data are synthesized in a different way by someone and -- and what their -- what their assumptions were in doing that. And the major thrust of their reports were both on the fact that you didn't need statistical significance to see a pattern in the data. And what they both ignored, though, was that



a fundamental principle of epidemiology is that if you see only a pattern of data with one type of design, but not with the other type of design, then you have to look at the role of bias in contributing to that.

So, if all of the NDMA studies that were cohort studies supported this very weak association that's been seen in some of the case-control studies, that would be different, but that's not what the evidence shows. The evidence shows that there's a very weak association if anything and it's not statistically significant with a case-control studies but not with the cohort studies. And I've done exercises for years now with thousands of students and we always focus on not just does bias exist, but how do you quantify that bias. And anything point estimates that are 1.1, 1.2, even 1.5, it's very easy quantitatively to get that bias to go back down to one.

And so, I, myself, focus on both, the magnitude of the point estimate and then the variability about that.

Q. So, you'll agree that there is some

weak evidence of an association between ranitidine containing NDMA and some cancers?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. No. As I said in my report that the studies that have been published on NDMA and the five alleged cancers have no reliable or valid association with any -- any of the five cancers. And in fact, when you look at the data from the NDMA and dietary studies, you cannot rule out recall bias because the cohort studies and the case-control studies show different things.
Q. And so, it's your opinion that there is no evidence of an association between ranitidine containing NDMA and cancer?
MR. SHEEHAN: Objection.
A. It is my expert opinion that the human epidemiological studies show no valid or reliable association between ranitidine and any of the five cancers that are alleged.
Q. Not my question.
My question is, is it your opinion that there is no evidence, none, of an


association between long-term use of ranitidine containing NDMA and any human cancer?
MR. SHEEHAN: Objection. Asked and answered.
A. So, again, in the synthesis of the literature and of the 16 studies that have involved millions of people to involve any alleged association between ranitidine and any of the five cancers that are being alleged, the overall synthesis does not support any reliable or valid causal association.
Q. I want you to listen really carefully to my question.
I know it's your opinion that there's in reliable association. I'm asking you, is there no evidence, none, of an association between ranitidine use long-term and cancer?
MR. SHEEHAN: Objection. Asked and answered.
A. So, by asking if there's any evidence in the human epidemiological studies, just like any exposure disease


association, there may be a selective study that shows some correlation. But, again, the synthesis of the literature has to look at whether or not there's a pattern and whether or not that pattern cannot be explained away by bias.
Q. Got it. Okay.
MR. RONCA: So, now let's go to Exhibit 6729. Please bring it up.
Is there trouble with it, John?
THE WITNESS: I see it.
DOCUMENT TECHNICIAN: It's opening.
MR. RONCA: Okay. I'd like it on -- there you go. Just make that a little bigger. There you go.
(Exhibit 6729 was marked for identification.)
BY MR. RONCA:
Q. So, you just mentioned a pattern, right, you need to see a pattern, is that what you said?
A. Yes, that's correct.
Q. Okay. So, this is a forest plot on page 62 of your report regarding primary


findings for ranitidine and bladder cancer.
Do I have that right?
A. Yes, that's correct.
Q. You prepared this?
A. Yes, that's correct.
Q. And a forest plot is where you take results and you put them with a dot for the actual record and a line representing the confidence interval on a scale where it's either on the right side of one or the left side of one, right?
MR. SHEEHAN: Objection.
A. Yes, it's -- it's actually on a multiplicitas scale because these associations are -- these point estimates are on a ratio scale, so meaning that going from a .5 to a 1 is the same as, you know, the same type of change from a 1 to a 2. And so, on the right-hand side of 1 being for any ratio where a numerator and denominator are not different from each other, and then on the right-hand side would be the numerator would be higher than the denominator and the reverse for -- on the left-hand side.
Q. Yeah. You balanced it, so that the

Page 130

M. Terry

distance from .05 to 1 is the same as the difference from the 1 to 2 at the bottom of the scale there, right?

A. Yes, that's the standard way of presenting it.

Q. Okay. So, you presented this forest plot in the standard way, correct?

A. So, again, it would depend on the journal, but the X axis is presented in the standard way. What I've done with this forest plot is condense what would probably be on two or three different figures in a journal article by showing all of the results on one plot. So, what I mean by that is, this is the summary of four distinct studies. And so, where I'm trying to contrast so the reader can see the different comparisons between ranitidine and other H2RAs and then also the different types of analyses that get done by dose by -- within this.

So, typically, if I were to publish this in a journal and the journal gave me more figures and things like that that I could have, I would probably have one figure that would show the overall association. I'd

Page 131

M. Terry

have another figure that would show the, you know, the dose, if you will. So, it looks like there's a lot of different studies on this figure, but I wanted to put all the data right there to really look at whether or not there was any pattern. And so, I can walk you through this whole figure, if I have a few minutes.

Q. I have some questions, okay?

A. I'm sorry.

Q. So, you assembled this figure with all of the primary findings, right?

A. Exactly. And typically, in a journal, you would probably put like the ever never in one figure and then put the dose response in another. That kind of thing.

Q. Got it.

MR. RONCA: All right. Next slide, please.

Q. For those not used to looking at forest plots every day like you are, is it fair to say that when the dots are to the right, that's higher risk and when the dots are to the left that indicates lower risk?

MR. SHEEHAN: Objection.

Page 132

M. Terry

A. So, again, that would be the interpretation. However, you need to think about whether or not that finding itself could be explained by -- by bias. But so -- but a general start would be things that are to the right would be above 1 and things that are to the left are below 1.

In terms of whether or not something increases risk or decreases risk, you would have to first decide whether or not -- evaluate, rather, whether or not bias could've caused that association and also you would look at the variability around that association.

Q. Right. And would you agree with me that most of the dots that you plotted here are to the right of 1?

MR. SHEEHAN: Okay. If you need to explain, Dr. Terry, as you said, please do so.

MR. RONCA: You know, John -- I'm sorry, not John. You know --

MR. SHEEHAN: Tom.

MR. RONCA: Tom, I got yelled at for speaking objections like that and

Page 133

M. Terry

I'm gonna yell at you for the same reason. I was told 100 times you're only supposed to say objection form and not speak. So, I'm gonna ask you to follow what I ended up following except for four occasions over two depositions, all right?

BY MR. RONCA:

Q. But, Doctor, my question is, are most of the dots on the right side of 1?

MR. SHEEHAN: Objection.

A. So, again, there's -- I think I haven't -- I have to double-check, but I think there's 20 some-odd -- 20 lines here and most of the dots are to the right of 1, but these are not 20 independent point estimates. Again, they're coming from four different studies and that was deliberate so that the reader could evaluate the dose as well as the different types of analyses that were done. So, there's four studies here, the Cardwell findings, which are represented in blue, the Norgaard findings, which are represented in kind of a darker green, if you will, the Yoon findings which are like in a

brown and then the Kantor which are in a red. And these different studies do have different comparator groups. So, if you look up top, the Cardwell findings are for when the comparator group is other H2RAs, and in the middle is the Cardwell findings for PPIs and at the bottom is the non-use. So, visually you can kind of compare what's going on with H2RAs, which are at top.

So, again, if I were to do this in a journal article, I'd probably have several different figures. But if -- if we were to look at just the H2RA comparisons, which, you know, are just the first part, the top part, if you will, you can see that again, the pattern is such that there's no difference from one, based on this. There's one very, you know, decreased association with the Norgaard with more than ten -- ten prescriptions.

The other thing I do want to point out, 'cause it's very important about bladder cancer, and I mention this in my expert report, but it needs to be said again, which is: Bladder cancer is unlike some other



cancers in that a large percent of bladder cancers are non-malignant, which is also referred to as in situ. So, the Norgaard study was able to separately look at invasive bladder cancer compared to overall. And when you look at the invasive bladder cancer, you see that the results are much more close -- are closer to 1 and pretty much than on top of 1.

Q. Okay.

MR. RONCA: John, are you able to draw a line on there? I would like a line under that reference to Yoon, between Yoon and Cardwell. Down, down. Look on the left, you see Yoon's red. Right. Between Yoon -- between the red and blue there, all the way across.

DOCUMENT TECHNICIAN: I don't know if I understand. You mean through the circles or...

MR. RONCA: No. I want -- you see on the left there you see Yoon and Cardwell? Right under Yoon, right under HR there, draw a line that



separates Yoon from Cardwell all the way across.

There you go, perfect.

BY MR. RONCA:

Q. Okay. So, what you were just saying before, Doctor, is that everything above the line is ranitidine versus other H2RAs, right?

A. That's correct.

Q. And everything above the line are most of the dots to the right of the 1?

MR. SHEEHAN: Objection.

A. Again, visually looking at these types of forest plots for decades, I would say that this -- that there's no difference from 1 whatsoever. There's a few point estimates that, you know, are a hair, if you want to say a 1.0, I wouldn't even know what that is, 1. -- well, actually, we have it right there, 1.1. So -- and then there's these like two large departures on either side of 1, it's sort of like, you know, what they say for teaching evaluations, throw your best, throw out your worst and then in the middle is the truth.



So, looking at this, there's no -- there's no -- there's no there there, there's no association between ranitidine and bladder cancer compared to the H2RA comparator.

Q. Yeah. My question was, are most of the dots to the right of 1?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, if you're just counting whether or not mathematically they're different, you know, higher than 1.0, yes, most of the dots are higher than 1.0. But that does not mean that -- that those are different than 1.0 and that's because of both evaluating the role of bias in these associations and then also thinking about precision and the role of chance.

I would also like to point out -- oh, I'm sorry. I would also like to point out that the Yoon study, you know, had a 1.4 hazard ratio with a width of a confidence interval of .88 to 2.24, but that particular study only had 21 exposed cases. So, this is a challenge when you're trying to understand associations when there's so few exposed

cases from this one study.
So, again, I would want to see -- you would have to see replication of that pattern of the 1.4.
Q. Now, in your reporting on the Cardwell study on this forest plot, you have the letters DDD written several times.
Do you see that?
A. Yeah, that's the WHO definition of defined daily dose.
Q. And what is the WHO defined daily dose for ranitidine?
A. It's -- I think it's 300 per day.
Q. Okay. And in the Cardwell study, they actually measured the defined daily dose over periods of time, right?
MR. SHEEHAN: Objection.
A. So, yes, they -- well, they do analyses based on a defined daily dose.
Q. So, they know how many milligrams per day, right?
MR. SHEEHAN: Objection.
A. No, they're doing what is typical with a lot of pharmacoepidemiology studies, which is you're using a WHO standard for a


given medication and they're using that for the conversion.
Q. 300 milligrams a day, right?
A. I'm sorry, was there a question?
Q. It's 300 milligrams a day, right?
A. Yes.
Q. In the other studies you reported on there, you don't have DDD next to anything, right?
MR. SHEEHAN: Objection.
A. So, if the study reported a DDD or they reported a number of prescriptions, it would've been included here.
Q. Okay. So, some of the studies didn't have defined daily dose, they only had number of prescriptions?
A. Yes, that's correct.
Q. Okay.
MR. RONCA: Let's take a look at that. Next slide.
Q. So, I want to look at the ones you picked out under Norgaard, I have them in red boxes, okay? You picked out, let's talk about the prescription first, greater than or equal to five prescriptions or greater than


or equal to ten prescriptions, right?
MR. SHEEHAN: Objection.
A. Yes. But, again, I didn't pick these out, these were the reported results and I'm summarizing everything in a comprehensive way so that the reader can see what the reported results were.
Q. Well, Norgaard had more results than what you reported there, right?
A. Yes, Norgaard did a lot of sensitivity analyses.
Q. Weren't the five and ten prescriptions part of the sensitivity analysis?
MR. SHEEHAN: Objection. If you need to see the article, you can.
THE WITNESS: Okay.
A. Yeah, let me look at the article then.
Q. And while you're looking, I want to know if the dot you've plotted there is for the results at the date of the 10th prescriptions or ten years after the date of the ten prescriptions?
MR. SHEEHAN: Jim, we don't -- we


don't have the article, like, with us. So, when you say "while you're looking," I mean, I think she was saying she'd like to look, but we don't actually have it.
MR. RONCA: I see, okay.
Q. All right. Well, do you know, Doctor, if -- see where I have, at the date of 10th prescription and then arrow?
A. I would have to --
Q. Do you know, as you're sitting here today, whether you plotted the number given by Norgaard at the date of the 10th prescription or ten years after the date of the 10th prescription?
A. I would have to -- I would have to have the article in front of me to verify that.
Q. What would be the relevance of figuring out how many cancers there were at the date of the 10th prescription?
MR. SHEEHAN: Objection. Vague.
A. Yeah. Do you mean at the date of the 10th prescription or ten years after the prescription?

Q. As I read the article, what you plotted is the result at the date of the 10th prescription?
A. I would have to have the article in front of me.
Q. Just in general, what would be the relevance of knowing what the cancers were at the time date of the 10th prescription?
MR. SHEEHAN: Objection. Vague.
A. So, how it's plotted here is -- the relevance here is to distinguish between people who had five prescriptions versus people who had ten or more prescriptions. That's the relevance.
Q. When were the cancers determined?
A. The cancers were determined after the meeting and follow-up time.
Q. Was it?
MR. RONCA: Let's go to Exhibit 6433. Again, that's from prior deposition. 6433, not 6403, 6433.
MR. SHEEHAN: Jim, we have been going about another hour or so or just over an hour by my count. When you



get to a break, we should, which is hopefully in the not so distant future, we should talk about lunch.
MR. RONCA: Okay.
Yeah, let's find this exhibit. Do you have it or no, John?
DOCUMENT TECHNICIAN: I'm looking.
MR. RONCA: All right. Thank you.
DOCUMENT TECHNICIAN: I've got it in the shared folder, 6433.
MR. RONCA: Bring it up.
DOCUMENT TECHNICIAN: Just a moment.
(Exhibit 6433 was marked for identification.)
MR. RONCA: Thank you. Okay. Let's see go down, let's go by page. Let me look. Keep going through. Next. Next. Stop. Let's just look at the top part there.
BY MR. RONCA:
Q. So, you used, start of follow-up at date of 10th prescription?
THE WITNESS: Sorry. Can you zoom in on that while I pull it up over



here. I got it. Never mind.
A. Yeah. So, it looks like that point estimate is the .75.44 to 1. -- 1.28 or 29 my eyes are --
Q. Isn't it really the one above that, .73?
A. No, because if you look at the confidence limit, the one above it, the .73, ends at 1.01 and this confidence limit ends at 1.25 so -- or 28 or whatever. So, it's showing the 10th years after the 10th prescription, so it's showing a longer follow-up.
Q. Let me -- let's go down to the next table. How about this one? Is this the one you're referring to or is it the one before? And the reason I'm asking is because of that number above it you also reported -- prescription --
THE COURT REPORTER: I'm sorry, what?
A. Oh, I'm sorry. Yeah, I'm just -- I'm trying to read both of the documents at once.
MR. SHEEHAN: Hold on a second. I



think the court reporter was asking something.
(Cross-talk.)
A. So, yeah.
MR. SHEEHAN: Was the court reporter asking a question?
THE COURT REPORTER: Yes, I did. I didn't hear the last two words, number above it you also reported, something prescriptions.
MR. RONCA: Five prescriptions.
THE COURT REPORTER: Thank you.
Q. Can we get the right number, Dr. Terry?
A. I'm sorry. Yes. Panel A is the ranitidine versus other H2RAs. And so, I'm just trying to map it visually, so I'm going back and forth between the two documents. But the greater than or equal to 10 prescriptions in the top part of this forest plot is using the -- is using the estimate from panel A and in the bottom of this forest plot is using the estimate from panel B, yes, okay.
Q. Okay.

A. What is your question?
Q. My question is this: Now, looking at where it --
MR. SHEEHAN: I think just so the record's clear, on the screen is like a kidney cancer thing, which I don't think is what you're talking about.
MR. RONCA: I'm sorry. No. Go back up to the other one. I got us on the wrong table.
A. Yeah, I'm sorry. I have it in the Box.
Q. Bladder cancer, are we on the right screen now?
A. Yes.
Q. Okay. So, look at -- it says at the date of 10th prescription for start or follow-up, there are 55 cases?
THE WITNESS: Can you just highlight the row that you're in 'cause I see --
Q. At date of 10th prescription. At date of 10th prescription.
A. Oh, okay. I see you. I see where it is, yeah.



Q. 55 cases. Then ten years after the 10th prescription, there's 24 cases, right?
A. No. So -- so, this is starting follow-up after the 10th prescription, but they're still following the entire time they followed the whole cohort. The next line is showing just for the subset of people who -- who had a 10th prescription and then were followed for at least ten years. So, that's kind of a subanalysis.
But what we showed here, what you can see here, is -- is the estimate for overall everyone, so -- which is the .73 to .531.01 is what's in my forest plot.
Q. Okay.
A. So, I didn't -- I didn't show the sensitivity analysis, I showed the result for the whole cohort, yeah.
Q. I know that. I have a different question.
Is it true only the people under ten years after the 10th prescription were followed for at least ten years?
MR. SHEEHAN: Objection.
A. Please -- yeah, can you rephrase



that or restate that?
Q. Subjects who are on the line, ten years after the 10th prescription, 24 cases, those are the only ones that were followed for at least ten years?
MR. SHEEHAN: Objection.
A. No, those are not the only ones that were followed for at least ten years. This particular study had a range of follow-up. This --- that one line of analysis would be just the subcohort of people who would've had ten prescriptions and then followed ten years.
Q. Okay. So, in the line above, is it fair to say that 31 of those people were not followed for ten years?
MR. SHEEHAN: Objection.
A. So, that would be an estimate. Again, these are inverse probability for treatment analyses. So, you know, so we would have to look at the actual numbers, but that -- that would be -- that would be -- that would be an estimate.
Q. Okay. So, these aren't the actual crude results, these are the adjusted



results, right?
A. These are the results adjusting for the probability of being treated, yes.
Q. Okay.
MR. RONCA: Let's go back to Exhibit 6729. 6729. Next slide. And now I want to concentrate on the Cardwell results. Let's go to the next slide after this.
Q. So, in each of the Cardwell results, you give a number for 365 to 1,095 defined daily doses and 1,095 or greater than 1,095 defined daily doses, right?
A. Yes, that's correct.
Q. And in each case, the longer exposure increased the risk?
MR. SHEEHAN: Objection. Mischaracterizes.
Q. Designated by the blue arrows.
A. So, in -- in the first comparison with compared to other H2RAs, there is a higher point estimate and that's true for PPI and that's true for -- for non-use. Again, though, the -- what I would point out here is that that the variability about that estimate

is such that, you know, there's -- there's a lot more variability, so the finding with H2RAs, the interpretation is the that that's not different after, you know, after considering the role of chance.

MR. RONCA: Next slide.

Q. Another way to look at this is to turn it on its side so you can see the greater risk -- the risk estimate went up when you increased the duration of the defined daily dose; isn't that right?

MR. SHEEHAN: Objection. Mischaracterizes.

A. Again, you can do the same thing for the Norgaard study and it would be going down. So, you know, the pattern here, there's no consistent pattern with a dose response across these four studies.

Q. Great, okay.

MR. RONCA: You can take down that exhibit, please.

MR. SHEEHAN: Jim, we, about 15 minutes ago, asked for a break to do -- to get some lunch. What -- can we do that?



MR. RONCA: Let's go off the video record and talk.

THE VIDEOGRAPHER: Going off the record. The time is 4:33 p.m.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:45 p.m. UTC time.

MR. RONCA: Can you bring up Exhibit 6727 and go to page 39, please?

BY MR. RONCA:

Q. Dr. Terry, on page 39 of your report you talk about the Yoon study?

A. I'm on page 39, yes.

Q. And so, I'd like to look down about the third paragraph after Yoon and I'd like to focus on one sentence here where it says:

The overall cohort was followed for seven years which the authors noted may not be sufficient to assess the onset of cancer.

Is that what you wrote?

A. I did write that.

Q. Okay.



MR. RONCA: Now, I would like to go to the Yoon study itself, which is Exhibit 6457.

(Exhibit 6457 was marked for identification.)

MR. RONCA: And let's see, go down to the maybe second, third to last page. So, bring out the paragraph that starts with, this study has several limitations. And under third the follow-up period down maybe five, six lines from the bottom. There it is. That sentence.

BY MR. RONCA:

Q. The author said was:

Third, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer.

Did I read that correctly?

A. Yes, the -- you read that correctly.

Q. Okay.

MR. RONCA: Now, let's go to Exhibit 6737.



(Exhibit 6737 was marked for identification.)

BY MR. RONCA:

Q. So, then quoting what we read from your report, you reported:

The overall cohort was filed for seven years which the author noted may not be sufficient to assess the onset of cancer. What the authors actually said was:

Third, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer.

So, why did you modify what the authors said to say may not be sufficient from is not long enough?

MR. SHEEHAN: Objection to the characterization as a modification, but go ahead.

A. So, again, I'm -- in my thorough analysis of the ranitidine epidemiology and cancer outcomes, I state what the authors themselves have -- have described as limitations for their studies and, again, that's what I did right here.

I would just add that, again, based on my experience in doing cancer epidemiology studies that many associations that have been shown to be causal in cancer have been found in cohorts with less follow-up. One of the examples that comes to mind, 'cause we teach all the time some of the earlier work, is the doctor study from the UK, and that follow-up was only, I think, under five years and that was a study that's showing the causal association between smoking and lung cancer.

Q. Doesn't the IARC preamble say that follow-up periods for cancer sometimes need to be 20 or 30 years?

MR. SHEEHAN: Objection.

A. I don't have a preamble in front of me right now, but I do recall it says something like that. Again, these are -- these are kind of individual -- these are estimates of latency times for individual cancers, it's highly specific -- it's highly -- you need to specify though exposure itself and the outcome of interest and many factors can both affect the promotion of tumors as well as initiate tumors. And most



cancer cohorts do not follow individuals for their entire life, so you have a distribution of -- of follow-up time.

Q. So, do you disagree when the study author said, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer?

A. Again, I would say it's not that simple. What you have to do when you're assessing any causal association is look at the strengths and limitations of each and every study and then look at the overall -- the overall evidence. So, you know, doing that and looking at all the studies that have been published on ranitidine and cancer outcomes, many of those cohorts have had long follow-up. And so, again, if -- if there were any association, those would've been apparent with all of the different studies that have been published, which again have followed millions of people in totality.

Q. Let me make it clear, I'm not asking about other studies. I'm asking about the Yoon study only.



When the study authors say the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer, are you disagreeing with the authors?

MR. SHEEHAN: Objection.

A. So, I would say a limitation of any study could be if the follow-up time is not long enough, that could be -- so I'm not disagreeing with the authors.

Q. So, you agree with the authors that for their study, the follow-up period of seven years was not long enough to assess the onset of cancer?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, again, a limitation of any study could be that the cohort wasn't followed long enough. In my review of the ranitidine and cancer outcomes studies, they all have collectively followed individuals for as long or longer than many of the medication and cancer outcomes that are known to be causal like hormone replacement therapy and breast cancer those study themselves



didn't follow cohorts for ten or 20 years and, yet, collectively given that the case-control studies and the cohort studies and then match the clinical trial data, we can rule out bias like selection bias, information bias and confounding bias.

So, again, it's not any one study, it has to be a collection of studies and there's just no consistency with the collection of studies for ranitidine epidemiology and these cancer outcomes that are being alleged.

Q. I'm going to remind you again, I am not talking about other studies. I am talking about the Yoon study only.

MR. RONCA: Now, please read back my previous question.

(Referred to portion of the record was read back by the court reporter.)

MR. SHEEHAN: Objection. Asked and answered.

Are you asking this question again, Jim? Is that the point of reading it back?

MR. RONCA: She has never answered

this question. Unless you want to
stipulate that she either agrees or
disagreed with the author.
MR. SHEEHAN: You can answer
again, Dr. Terry.
Note my objection.
A. So, I agree with the authors that it is always better to have longer follow-up time. But I would like to emphasize that plenty of cohorts have shorter follow-up times and associations between different exposures and those cancers have been consistent and valid.
Again, in this study the authors discussed wanting to have more follow-up time, which I would agree that that would be an advantage of the study. I would also just point out that the Yoon study did require that you had to have been on ranitidine for at least one year before you were eligible to be in the cohort. And so, very likely those are longer time period between the exposure and the outcomes of interest.
Q. My question is, do you agree that the study authors, when they said with



respect to that study only, the overall follow-up period is not long enough to assess the onset of cancer?
MR. SHEEHAN: Objection. Asked
and answered.
A. So, I agree that it's always better to have a longer follow-up time. In terms of whether or not it was long enough to assess the cancers, I would have to say that a latency time of ten or 20 years is for some solid tumors, but, you know, some cancers occur in shorter time periods. And so, again, I don't -- I agree with the authors that longer is always better, but I don't know that anyone can know exactly what the latency is for any individual cancer.
MR. RONCA: Next slide, please.
Q. Now, other studies you reported on, and I took these follow-up periods directly out of your report, Iwagami was 2.4 years, Kumar was 4.4 years, S. Kim was five years -- I had Kumar there twice, I must've made a mistake. Let's just go with those three for now.
Is it your opinion that those



studies were long enough to assess the onset of cancer?
MR. SHEEHAN: Objection. Just
objection to the characterization of
these studies as only following
patients for the length of time that
is indicated on the exhibit.
A. So, it's not that simple, again, because there's a range of follow-up and if we were to look at each of these individual studies, and I can pull up my table, which I give the interquartile range where reported. So, yeah -- so, it's not that simple.
Q. Let's go back to your report.
MR. RONCA: Exhibit 6727. Yeah.
Let's go page 40, up top, last
sentence of that first paragraph
limitations include.
BY MR. RONCA:
Q. Wanna read that to us, Doctor?
A. Limitations include that the authors were not able to specifically quantify NDMA content, and medication compliance was not known.
Q. In your discussion in your report



of Yoon, do you mention smoking anywhere?
A. (Document review.)
So, in my summary of the report on page 39 and 40, I don't mention smoking, but what I include in my table is for each and every study what they were able to adjust for. Yeah. And -- and this study in particular had an active comparator analysis which was very important.
Q. You don't mention smoking anywhere on page 39 or 40, do you, with respect to Yoon?
MR. SHEEHAN: Objection. Asked
and answered.
A. Not with respect to this summary of Yoon, but that mischaracterizes my report in general because I talk about the importance of -- of smoking for these alleged cancers and in particular, when it's not available, the importance of having this active comparator analysis, so that the confounders that are not measured can be adjusted for through that kind of design.
Q. You mentioned several times in your report how important it is to account for

smoking in these studies, right?
MR. SHEEHAN: Objection.
A. Yes, absolutely. In fact, we often teach that in cancer epidemiology agent smoking are the most important things to adjust for, but you don't have to always do that adjustment through statistical analysis you can do that adjustment through design. And this is actually the -- the key importance to why an active comparator is really a useful design in this case because, again, a lot of pharmacoepidemiology studies may be using databases that don't have complete data on some of the cancer risk factors that we would want to know about, including smoking, but, you know, also alcohol, frankly.
Q. Okay.
MR. RONCA: Let's go back to Exhibit 6737. Next slide.
Q. So, you said on page 40:
Limitations include that the authors were not able to specifically quantify NDMA content, and medication compliance was not known.



And we've already established that nowhere in that discussion did you even mention smoking, but the Yoon authors said right in their report among the important limitations was:
Fourth was the lack of information about potential confounders of cancer, such as smoking and other underlying diseases other than diabetes mellitus.
Is that what the authors said?
MR. SHEEHAN: Objection.
A. I was --
MR. SHEEHAN: Wait a second. Wait a second.
Are you looking at the study?
THE WITNESS: I'm not looking at the Yoon paper, no.
MR. SHEEHAN: Okay. If you know.
Q. Do you recall if the Yoon authors said this quote that I have in this slide?
A. I don't recall. I would have to read the article again, but it would sound plausible that they said that, but I would want to read the article again.
Q. Okay. So, the Yoon author states



specifically in the article that lack of information about potential confounders of cancer such as smoking and underlying diseases, that information was missing and you didn't mention it at all.
Is that right?
MR. SHEEHAN: Objection. Mischaracterizes the report.
A. Yes. I'm sorry. No, that is not correct because I do a complete assessment of what each study measured in my Table 1 as I refer to in my report. So, I describe in the second to last column what each of those studies adjusted for.
Q. And missing from that is the fact that they didn't have information on smoking or underlying diseases, right?
MR. SHEEHAN: Okay.
A. The Yoon study specifically looked at diabetes, they were able to look at sex, age and diabetes.
Q. Any other underlying diseases?
A. Again, I would want to pull up the study.
Q. Barrett's esophagus?



MR. SHEEHAN: Objection. Asked and answered.
Q. Did they adjust for Barrett's esophagus?
MR. SHEEHAN: Objection. If she's asked to see the study...
Q. If you can't answer it, just say so, Doctor.
A. So, this particular study, Yoon of 2021, I'm just looking at my summary of this. They matched -- they did the active comparator analysis and they were able to adjust for sex, age, diabetes and -- you know, so this particular study was not looking at esophageal cancer, so I don't -- again, without looking at the study, I don't think they would've adjusted for Barrett's esophagus.
Q. How about erosive gastritis?
MR. SHEEHAN: Objection.
A. Again, this is why -- why it's beneficial to use an active comparator analysis --
(Cross-talk.)
MR. SHEEHAN: Please don't cut her

off, Jim. Please don't cut her off.
MR. RONCA: If she's gonna dissemble --
MR. SHEEHAN: Jim, no, she's trying to answer and you cut it off, you cut her off and you're not supposed to.
MR. RONCA: Yeah, good work on prep.
Q. My only question --
MR. SHEEHAN: No, Jim. I don't even know what you're talking about. I have no idea what that means.
(Cross-talk.)
THE COURT REPORTER: There's a lot of cross-talk. I did not get the question on the record.
BY MR. RONCA:
Q. Did they adjust for erosive gastritis?
MR. SHEEHAN: Objection. Asked and answered. And I would ask counsel to please refrain from cutting off the witness's answer.
A. (Document review.)



I'm sorry, just repeat that very last question.
Q. Did they adjust for erosive gastritis?
MR. SHEEHAN: Same objection.
A. I would have to look at the paper, but based on my analysis in the Table 1, no.
Q. Cirrhosis?
A. Again, the design is such that you don't have to adjust for it through statistical analysis that the comparisons are more comparable. It's actually a much more powerful design, but adjusting for all these things, which may be inaccurately measured in any medical record, quite frankly, so the design itself is a powerful way. And if you can adjust for these other factors through a design as opposed to statistical analysis, that often is a more robust way of doing it.
Q. Apparently the authors didn't think so because they thought it was a limitation of the study that they lacked information about potential confounders of cancer, such as smoking and underlying disease.
Do you disagree with them?



MR. SHEEHAN: Objection.
A. So, a discussion of any paper is always to bring out the drawbacks of any one single study and that's why we need findings to be replicated and we need to look at the body of evidence. And when I've looked at the body of evidence for ranitidine, epidemiology and the five cancers being alleged, there's no consistent pattern.
Q. Do you disagree with this statement by the authors?
A. What statement.
Q. The one that's right in front of you on the slide where it says, Yoon said.
MR. SHEEHAN: Just for the record, I mean, we don't need to be condescending toward the witness and I'm not suggesting you meant that, but it comes across a little bit, Jim.
Go ahead, if you can answer the question, Dr. Terry.
A. So, it's not that simple. What I would say is, of course, there's always -- always good to have more data than not, but it's not that simple because, again, if they



were able to statistically adjust for things, then that's -- that's beneficial. But if you adjust for things that are not measured well or measured validly, then you really haven't adjusted for them. So, that's why we always teach that it's much better to deal with confounding through the design and using an active comparator design is a very robust way. And the authors are right to point out that, yes, they could've had more data on these other factors, but I guess if I was writing this sentence, I would add a comma and say, however, through the design, we were able to at least rule out confounding through the design of the active comparator.
Q. But when it came to the Cardwell study, you were critical that they only had 75 to 80 percent smoking information.
Isn't that right?
A. I would have to pull up my report. You have a page number or...
Q. You don't recall that you criticized Cardwell about not having full smoking information?
MR. SHEEHAN: Objection.

A. If you can give me a page number it would help.
Q. My question is, do you recall?
A. I don't recall exactly what I wrote, so I would need a page number for that.
So, but to give context to it, the Cardwell -- are we talking about the Cardwell and bladder cancer study now? Is that what you're talking about?
Q. Yes.
A. I'm sorry?
Q. Yes.
A. Okay. So -- so, to give context to that, what -- what would be important is the Cardwell finding was very different depending on if it was -- or what the comparison group was. So, the point estimate, when comparing to other H2RAs, was not different from one, whereas the point estimate when comparing to non-use was different than one.
So, again, you want to look at what else could've explained that and that's why the active comparator design is a robust way to get at things that might have measurement



error, including smoking.
Q. You said on page 44 of your report:
Further, the incomplete information on smoking history may have impacted the study's finding. Smoking is a known risk factor estimated to account for approximately 50 percent of bladder cancer cases in adults.
MR. SHEEHAN: Is that a question, Jim?
Q. That's what you said on page 44, right?
A. Yes, I did say that.
Q. But Yoon had no information on smoking, but it's okay.
Is that your testimony?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. No, that is definitely not my testimony. It is never okay not to have information on something that would be a confounder. However, you can -- when it's missing, there's again other ways to kind of get at it through the design of the study. So, that's where thee active comparator designs are very important.



Q. So, the authors of the Yoon paper thought it was important enough to say it, but you didn't think it was important enough to say it in your report, isn't that the truth?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. Yeah. No, I don't agree. Throughout my report, and particularly if we go to page 58 and 59, I make a very strong argument that that's exactly why we need the active comparator analysis because for these five cancers, there's risk factors that are very strongly related to the cancer, such as smoking for bladder, esophageal, gastric and factors like alcohol for liver cancer.
And -- and so, that is why if we don't have measurement of these other factors, we have to have a way of analyzing them through the design and that's really why the active comparator designs are the most important designs when assessing ranitidine epidemiology and these five cancers.
Q. It is true that the Yoon authors mentioned lack of smoking and underlying



disease information as a limitation and you did not mention those two things on page 39 and 40 of your report.
That is true, correct?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
Go ahead, Dr. Terry.
A. Sure. I did not mention those on page 39 and 40, but I did mention throughout the report, the importance of always making sure that you measure the factors that are considered confounders for any cancer outcome. And so, I gave a very detailed argument in the report throughout the report about how these factors have to be measured in observational epidemiology. And if they're not measured well, then they have to be adjusted for through some other way, whether that's through the active comparator design.
And so, I would -- I would totally disagree with you because first and foremost, my emphasis on assessing any association is always to look at the role of bias. And if there is an association, again, if there --

the risk estimate is above one, then what -- is it plausible that bias can draw it down to 1. And so, that's what I was assessing in each and every one of these summaries. And so, the summaries of each of these articles, I focus on what -- what the study found and throughout the report, I talk about the importance of smoking.
Q. Okay, but you felt it necessary to specifically say that the results of the Cardwell study may have been impacted by incomplete information on smoking?
A. Again, my orientation is always to understand, is this correlation that we see plus able or not. So, in the Cardwell study, what I wanted to understand was is it plausible that you could have this 1.4 -- hang on, let me get the estimate.
MR. RONCA: You can take down the exhibit while she's doing that. While she's doing that you can look for Exhibit 6423.
A. Okay. Yeah, I'm sorry. What I was saying was with the Cardwell study, I wanted to -- I was assessing the quality of the


study and whether or not -- how to explain the differences between the active comparator and the non-use and that's where missing data, amount of smoking data was relevant to that discussion.
Q. By the way, while we're on Cardwell, what is the treatment for carcinoma in C2 of the bladder?
A. I'm not a clinical doctor, I am an epidemiologist, but my understanding is some sort of ablation. I think it varies depending on the medical center.
Q. Isn't it surgery followed by chemotherapy?
MR. SHEEHAN: Objection.
A. Again, I'm not a medical doctor, but that's not my understanding right now. It has changed over time, the treatment.
Q. So, you would throw out all the carcinoma in situs in the bladder cancer studies, right?
MR. SHEEHAN: Objection. Misstates the testimony.
A. It's not that similar. I wouldn't throw them out. But my point of all this is


that in the -- in the very large study, Norgaard, where they were able to show the findings with and without carcinoma in situ, you can see that the findings for invasive bladder cancer were not different from 1.
So -- so, my concern as an epidemiologist would -- would be that somehow the high proportion of in situ cancers of which, as I mentioned, before is about half of all bladder cancers, but those could've gotten detected more readily in people, you know, who are more attached to the healthcare system, so to speak or being seen more frequently, rather.
So -- so, that would very much concern me as an epidemiologist.
Q. Okay.
MR. RONCA: So, let's go to Exhibit 6423.
(Exhibit 6423 was previously marked for identification.)
BY MR. RONCA:
Q. This is what we've been calling the Y. Kim study, 'cause there's another study.
You're familiar with this, right?


A. Yes, I am.
Q. So, you were the first expert for the defense that I've seen who referred to this as an aggregate study.
So, what's an aggregate study?
MR. SHEEHAN: Do you have it in your Box, Dr. Terry?
THE WITNESS: No, let me just get it.
MR. SHEEHAN: Is it in the Box, John, or Mike? I forget whose controlling that.
THE WITNESS: Yeah, I don't see it in the Box.
Q. Do you know if it's an aggregate study, as you're sitting here, without seeing it?
A. I don't see it in my Box, but do you want to tell me the page that it's referring to? But I know the database, this is the Explorys Database. Is that correct? Hang on.
THE WITNESS: Can you make it a little bigger? 'Cause it's not in my Box?

MR. SHEEHAN: Maybe we can -- maybe we can blow this up and for the purpose --
A. Yes, I'm sorry. This is using the Explorys Database.
MR. SHEEHAN: Can we check on the Box? I mean, is it on other people's boxes? Why is it not loading here?
THE VIDEOGRAPHER: You hit refresh? Just double-checking, 'because it should be -- I see it here in the Box. EX6423 is the beginning of the file name.
THE WITNESS: Oh, now I have it, yeah. I have it now.
MR. SHEEHAN: For one reason or another, it's just taking a while to load to Dr. Terry's Box, but she's got it now.
A. I have it.
Q. Okay. Is this an aggregate study?
A. So, this -- this is using this Explorys Database, which is a pretty comprehensive collection of EMR, electronic medical record data. So, they collected data



from 360 hospitals and 73 million individual patients. So, by aggregate there, what I mean is often this happens with very, very large databases like this, is you're given, not individual data, but data for, you know, chunks of people, like in this case, ten, I think it was, I have to look it up. But this happens all the time with the way data gets shared publically and some of it has to do with like HIPAA regulations and privacy and things like that. We do this all the time in cancer where you can only get data for, you know, like maybe it's a small unit like a census track or something like that. So, that's what they did here, I think, so -- let me see.
Yes, in fact they say on page -- they say in the materials and methods that's exactly why they did it that way, because of HIPAA, the Health Insurance Portability and Accountability Act.
Q. Yeah, it's an aggregate study, right?
MR. SHEEHAN: Objection. Asked and answered.



A. Yes, the data are aggregate like this, yeah.
Q. It's not individual data?
A. So, it's summarized in units of individuals, yes.
Q. So, within the units, how many people were in each unit?
A. I think the counts are per ten people, so. I think that's how the data are delivered.
MR. RONCA: Let's go to page 5 of this document.
Q. See how each number ends in zero, is that because they don't know the exact numbers, they only know numbers of tens?
MR. SHEEHAN: Objection.
Q. Every single number ends in a zero?
A. Right. I mean, these are summary percentages, yes, I would imagine that's the structure of the data, but I would have to look more carefully at that.
Q. You would imagine? You didn't look carefully at it when you prepared this report?
A. No, I did --



MR. SHEEHAN: Objection. Mischaracterizes testimony. Go ahead.
A. I did look carefully at these results. But what I meant is, yes, I -- if the data are summarized like that in units, that's -- that's the valid summary of the data.
Q. Was this Explorys Database created for science or created for insurance?
MR. SHEEHAN: Objection.
A. I don't know why it was created. I know it's being used for a lot of research studies. And I don't know the other uses.
Q. Isn't it a claims database?
A. Again, it's -- it's taking hospital -- data from hospitals and I would have to look at whether or not -- I would imagine it matches it to medical claims data as well.
Q. Does this database have any information on duration of use?
A. So, this analysis was done -- just pulling up my notes, where they focused on concurrent use. So, yes, the people that

were in -- in the cohort for a number of years would've had a number of years of use.
Q. How many years?
A. I don't think that was reported in the paper.
Q. So, the paper doesn't report that the duration of use?
MR. SHEEHAN: Objection.
A. (Document review.)
So, again, there was a range. They looked at esophageal, gastric, liver, pancreatic, colorectal cancer over a large period of time from 2009 to 2018 and they started counting cancers one year following initiation and then they -- they counted -- again, you had to have a concurrent prescription and they counted up to ten years.
Q. Did they have any information on the duration that these people or groups of ten people used the actual drug?
MR. SHEEHAN: Objection. Asked and answered.
A. Not that it was reported.
Q. And did they have any information


on what the dose was that these people were taking in groups of ten?
A. So, no, they had to have -- they give -- in the methods, they give background on how they collected the exposure data and -- and specifically they had to have prescriptions and this particular study, you know, had over -- had -- well, several million people in it. And so, yeah, so they don't have the number of prescriptions or the duration, but again this is -- this has happened in a number of different medication analyses in the cancer epidemiology and what -- what is being examined is -- is prescription which is validly measured and longer term cancer. So, this is a, you know, a totally valid way of looking at that.
Q. And isn't it just a problem with these large cohort studies that you said in your speech in 2017, which is, they don't measure the exposure?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. No. What they have measured really


well is the exposure. In my speech in 2017, what I was referring to is if the exposure changes over time or if people -- so, in this case, they have these cohorts and they know whether or not -- they know the medications that that's a very valid -- a valid measurement.
Q. They know the medication, they just don't know how much for long; isn't that right?
MR. SHEEHAN: Objection.
A. Again, it's a distribution, so this particular study doesn't do any analyses by duration or by -- by, you know, intensity of the exposure.
Q. And the other H2RB comparator is famotidine?
A. Yes.
Q. And were there statistically significant or, as the authors put it, just significant differences in the risk factors for cancer amongst the ranitidine group and the famotidine group?
A. Yes, there were some statistically significant differences between the two


groups. But, again, they were able to both deal with this through the active comparator design, but also to further statistically adjust for some of these differences.
Q. And isn't it true the famotidine group had 23.5 percent more smokers?
A. I would have to look that up.
MR. RONCA: Take down the exhibit.
Q. The famotidine group had 34.8 percent more people who were obese?
MR. SHEEHAN: Objection.
Q. Do you know?
A. I'm looking at the table right now.
So, it's not that simple. You have to look at it by -- by age and by race and by sex.
Q. I'm asking if there were more obese people in the famotidine group than the ranitidine group?
MR. SHEEHAN: Objection.
Q. It's Table 2, third line down, fourth column over. 32.32 percent in the famotidine group 23.97 percent in the ranitidine group.
MR. SHEEHAN: So, are you

asking --
A. Yes. Now, I am -- the table is very -- it's labeled, very hard to read 'cause the blue highlights are for a different factor. Yeah. Okay. Yes, I see where you are.
Q. 34.8 percent more obesity in the famotidine group than the ranitidine group, right?
MR. SHEEHAN: Objection.
A. No. So, the average here for obesity is 32.32 percent for the famotidine group and 23.97 percent.
Q. Yeah. And the difference between those two is that the famotidine is 34.8 percent more, if you do the math?
A. Okay.
MR. SHEEHAN: Objection.
A. It's 9 percent more on an absolute basis, but, yeah.
Q. And if you do the math, cirrhosis is 75 percent more in the famotidine group?
MR. SHEEHAN: Objection.
A. Again, it's 5.5 percent on an absolute scale.



Q. Yeah, it's 11.4 percent versus 6.5 percent. It's 75 percent more. You know what I'm talking about, Doctor, you have the --
MR. SHEEHAN: Hey --
Q. -- in the statistics.
MR. SHEEHAN: Listen, Jim, you don't need -- you don't need to do that. It's condescending and disrespectful, it really is.
(Cross-talk.)
MR. RONCA: She knows exactly what I'm talking about.
MR. SHEEHAN: Jim, you do not need to condescend to the witness, please knock it off.
A. So, I'm just pointing out that the absolute difference between those two, for example, for cirrhosis is the absolute difference is 11.4 minus 6.5, which it sounds bigger on a relative scale, but what matters here, when we're doing analyses, statistical analyses, is what's the absolute difference in terms of how that will impact what percent of individuals may or may not be



misclassified.
But further, in addition to the active comparator design, they were able to further statistically adjust for these factors.
Q. And the atrophic gastritis, a risk for stomach cancer group was 43.6 percent more in the famotidine group than the ranitidine group?
A. Again, on an absolute, it would be about 1.3 percent of the cohort, which is very little. So, would I expect that even, if they weren't able to justify it -- even if it -- excuse me, weren't able to adjust for it through a statistical method, which they were, I would, you know, expect that to have very little impact on a cohort with several million people because the absolute difference is only about 1.3.
Q. What's the average time that people stay in this database?
A. So, this database has been growing over time, so I would -- I would have to -- I don't know that it's reported here, I'd have to look a little bit more carefully. Like in



the supplemental tables, you can see -- or actually not supplemental, Table 5, you can see kind of how the population has grown over time, so -- so, it's a database that's increasing.
Q. It's true that the patients are not identified with any unique number in this database for people doing research from the outside, right?
A. That is my understanding.
Q. And that the average time a person spends in this database is 3.5 years?
MR. SHEEHAN: Is that a question?
Q. Yeah. Isn't that true, Doctor?
MR. SHEEHAN: Objection.
A. I don't know that unless it's reported here. I'm just looking.
Q. I can save you the trouble, it's not reported in this study, it's reported in the basic studies that described by the Explorys Database. Did you look at any of those?
MR. SHEEHAN: Objection. Objection to the colloquy.
Go ahead, Dr. Terry.

A. I did look at -- I have looked at Explorys studies that have used this database before, in addition to this one. Also, what -- how -- what Table 5 shows is that the cancer incidences for the cancers in this study for esophagus, stomach, liver, pancreatic, colorectal cancer that the database actually has valid capture of those cancer outcomes because those match very well with cancer incidences that we know from the US registry databases.
Q. I'm asking you, how long people stay in this database, on average?
MR. SHEEHAN: Objection.
Q. If you don't know, that's a fine answer.
A. Yeah, I don't know offhand.
MR. RONCA: Let's break for lunch. Half an hour?
MR. SHEEHAN: Let's go off the record.
THE VIDEOGRAPHER: We're going off the record. The time is 5:42 p.m. UTC time.
(Whereupon, a lunch recess was



taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 6:38 p.m. UTC time.
EXAMINATION BY
MS. FINKEN:
Q. Good afternoon, Dr. Terry. My name is Tracy Finken. I'm going to be taking the rest of your deposition today because Jim Ronca had another commitment.
So, the same rules that he give at the beginning of the deposition apply to me as well.
Do you understand that?
A. Yes, I do.
Q. And you understand that you're testifying today as if you were testifying in front of a judge or a jury?
A. Yes, I do.
Q. And if you don't understand any of my questions or if there's an issue with my internet connection, just let me know and I'll be happy -- we can either go off the record or I can rephrase my question so that you understand it, okay?



A. Okay. Thank you.
Q. And if you answer my question, I'm going to assume that you understood that; is that fair?
A. That's fair.
Q. Is there anything that would affect your ability to testify truthfully today?
A. No.
Q. And I don't know if -- I'm going to really try not to be repetitive at all during this deposition, but if there's something that I ask you that has already been covered, just bear be me, I'm going to try to not do that, but if there is something that has been covered that I missed, I'm sure your counsel will let me know.
A. Sorry. Can I clarify? Were you on all morning or no?
Q. I was, yes, but --
A. Okay.
Q. -- like I said, off the record, my internet connection was unstable at times, so I don't want to be repetitive. But if I happen to be repetitive, I'm sure Mr. Sheehan will object and let me know.



Do you have anything in front of you today while you're testifying?
A. Just my expert report.
Q. Do you have any type of notes or anything like that in your expert report?
A. No.
Q. Do you have any other notes or anything like that in front of you?
A. Not in front of me, no.
Q. Did you bring anything with you today that other than your expert report?
A. I brought my cell phone and my laptop. But, yeah, I'm using a company laptop, I'm not using my laptop.
Q. Do you have access to any other applications on your computer while -- during the course of this deposition, other than the Zoom?
A. I do not.
Q. And where are you physically located today?
A. I am in the Dechert offices between 41st and 42nd Street and Sixth Avenue.
Q. I understand Mr. Sheehan is present with you in the room?

A. Yes.
Q. Is there anybody else present in the room?
A. Not right now.
Q. Okay. Has there been during the course of the deposition?
A. Not during the deposition, before just to set up some IT people.
Q. Okay. So, just to go back to the questions regarding your report, let me see if I can stop that from happening, give me one second.
So, Dr. Terry, are you currently engaged in any research regarding NDMA?
A. No, I'm not engaged in any research right now.
Q. Okay. Have you ever conducted any research regarding NDMA?
A. No, I conducted dietary analyses in various different shapes and form and as relevant to this case, the NDMA studies are dietary studies and medication of ranitidine, so these types of studies I've conducted in different settings.
Q. Have you conducted any studies


pertinent -- strike that.
Have you conducted any studies specific to ranitidine?
A. I have not conducted any studies specific to ranitidine, but I've used methods that are very similar to all of the different methods that are being proposed here.
Q. Have you ever conducted any studies specific to histamine 2 receptor antagonists?
A. I have not myself led studies specific to H2RA antagonists.
Q. When you say "H2RA," are you referring to histamine 2 receptor antagonists, correct?
A. That's correct.
Q. So, if I refer to H2RAs throughout the course of this deposition, you'll understand what I'm referring to, correct?
A. Yes, that's correct.
Q. Have you ever conducted any type of epidemiological studies relating to proton pump inhibitors?
A. I have not conducted studies that specifically looked at protein pump inhibitors. But, again, I conducted many,


many different studies that use the same techniques that are being described here.
Q. And when you said that you had conducted dietary analysis, I believe was the term that you used, did you conduct any studies that specifically looked at NDMA?
A. Not the NDMA content in a diet, but other aspects that are using the same methods proposed here.
Q. And have you ever conducted any type of published peer-reviewed studies relating to nitrosamines?
A. So, I have conducted studies related to nitrosamines and brain tumors using the same methods that have been used in the dietary analyses in this case.
Q. How many different studies have you conducted relating to nitrosamines?
A. I don't know the exact count.
Q. Are they listed on your CV?
A. Yes, they would be.
Q. Okay. And what is the name of the studies that you conducted relating to nitrosamines and brain tumors?
A. (Document review.)


Can I pull it up on my virtual copy of this 'cause I'd find it quicker? I just have a few pages here and I don't remember exactly where it is on the page.
MR. SHEEHAN: Do you have a virtual copy? I mean, I don't know how critical this is, Tracy, but she's not finding it immediately in the hard copy of her CV.
Q. If you have a virtual copy and you want to pull it up that way, that would be fine.
MR. SHEEHAN: Would you have to open up your laptop, Dr. Terry?
THE WITNESS: Yeah.
MR. SHEEHAN: So, the issue, Tracy, is the laptop she's using, we didn't have the right adapter for, like, the MAC, for her MAC. So, she's not using her computer to do the Zoom, she's using a borrowed laptop. So, she would have to open up her laptop and go through that process and do it. She's happy to do it if you want her to.

MS. FINKEN: That's okay. We'll find it -- we can address it on a break.
A. Yeah, I mean the other reason why it's -- all of the work that I did on this brain tumor study, it took a little while to publish because one of our colleagues passed away untimely, so it took us a while to pick up some of that work. So, it's not -- it's not immediately the year that I would remember the year being, so... But I can definitely find it on a break.
Q. Okay. What approximate year do you believe it was?
A. So, again, if we're talking about the brain tumor study, it would've been in the aughts, but I don't remember what year exactly.
(Court reporter clarification.)
A. In like the '00s.
MR. SHEEHAN: The aughts.
A. Sorry. I will definitely pull that up during the break.
Q. Have you conducted any other studies relating to nitrosamines other than



the study involving brain tumors that you just referenced?
A. No. Although I work on very large collaborative studies and some of those studies do, you know, look at a lot of dietary analyses, so... But, yes, not specific to NDMA.
Q. Have you published any epidemiological study as a co-author with Dr. Mormon?
A. Not that I'm aware of.
Q. Have you published any epidemiological studies as a co-author with Dr. McTiernan?
A. No, not that I'm aware of. I don't think so at all.
Q. Okay. Dr. Terry, are you familiar with IARC?
A. I am familiar with IARC, yes.
Q. Have you ever sat on an IARC Working Group panel?
A. I have not sat on an IARC Working Group.
MR. SHEEHAN: That is a repetitive one, Tracy.



Q. Were you ever invited by IARC to act as an expert on a Working Group panel so assess carcinogenicity of an agent?
MR. SHEEHAN: Objection. Asked and answered.
A. No, I have not been invited to serve on those panels. I have been invited to give talks at IARC. I gave one just this past year. And I almost worked there, so I was -- yeah, I was given a job opportunity to work there.
Q. And what was your talk on?
A. So, my talk was on the changing incidence of global breast cancer trends.
Q. Have you ever been invited to sit on an expert panel for the National Toxicology Program to assess the carcinogenicity of an agent?
A. I have not, no.
Q. Where is that siren coming from? Is that from your office?
A. Outside.
MR. SHEEHAN: That's us, Tracy, and honestly it's constant. There's -- I don't know what's going



on in New York City these days, but there is a constant stream of siren noise.
A. This is quieter than my block, so I didn't even notice.
Q. All right. Let me go back.
Have you ever sat on an expert on an FDA Working Group on the carcinogenicity of an agent?
A. No, I have not sat on an FDA expert panel. I have sat on several national cancer institute panels and I am part of an NSF panel that's coming up in a couple of months. But, yeah, not on FDA.
Q. Have you ever been invited to sit on an expert panel for the FDA to assess the carcinogenicity of NDMA?
A. No, I have not been on any FDA panel.
Q. Have you ever sat on any expert panel to assess the carcinogenicity of NDMA?
A. No, I have not been on panel to assess the carcinogenicity of NDMA.
Q. And what is NDMA?
A. NDMA is a nitrosamine.

Q. And what is a nitrosamine?
A. Chemically what is a nitrosamine or --
Q. Yes.
A. Yeah. I mean, it refers to the chemical structure of, like, nitrites, nitrates those are nitrosamines, we can be exposed to them through -- through diet or through other sources.
Q. You had discussed dietary NDMA studies briefly.
Are dietary NDMA studies human epidemiological studies?
A. So, the -- the way that I was referring to them, I was referring to the human studies that have been done on dietary NDMA.
Q. So, there are human epidemiological studies that you're referring to?
A. The case-control and cohort studies that have been done on dietary NDMA, yes, those are the ones that I'm referring to.
Q. Have you published any studies that involve occupational epidemiology?
A. I mean, the methods that have been



used in patient epidemiology are methods that I teach. I commented on a multiple of different occupational cohorts. I've analyzed optional cohorts data. There's nothing specific to occupational data that's different than others. But, again, we've commented on different -- on -- in different studies, I've looked that occupational exposures, so...
MS. FINKEN: Going to move to strike as nonresponsive.
Q. Have you published any studies that involve occupational epidemiology?
MR. SHEEHAN: Objection. Asked and answered and vague.
A. So, by occupational epidemiology, if you're referring specifically to cohorts of people who may or may not or who have worked in a certain plant or something like that, no. I focus primarily -- most of my studies at least have focused primarily outside of that kind of setting. But, again, the methods and the analysis are no different and within the classes that I've taught, we use occupational cohort data.



Q. So, would you agree that occupational NDMA studies are also human epidemiological studies?
A. So, again, if -- what constitutes whether or not it's an epidemiological study is, did they use a cohort study case-control clinical trial kind of study in human populations.
Q. Dr. Terry, what is a carcinogen?
A. A carcinogen is something that can cause cancer. Again, it's more accurate to say whether or not it's been tested in humans or only animals, so...
Q. And what is a mutagen?
A. A mutagen --
MR. SHEEHAN: Hold on, just before you answer.
Let me get an objection in there as to vague.
A. Sorry. A mutagen is something that can change the DNA and -- yeah.
Q. Theoretically, can a single exposure to a mutagen result in a cancer in humans?
MR. SHEEHAN: Objection.



A. So, I'm not a molecular biologist, I'm a cancer epidemiologist. So, again, I can testify on expertise related to data, data analysis and cancer epidemiology in general.
Q. So, are you unable to answer that question?
A. Again, I'm an expert in the study of -- study of humans. And so, again, my understanding of other fields of data just through colleagues is that, no, it's not, but, you know, I'm not a molecular biologist.
Q. Have you done a comprehensive and systematic review of the medical literature to form an opinion if NDMA meets the criteria off a known human carcinogen?
MR. SHEEHAN: Objection.
A. Yes, I've done a comprehensive analysis of the cancer epidemiological literature to see if there are -- there is any causal association between NDMA and cancers, including the five cancers that are alleged in this litigation.
Q. Do you agree that the NDMA molecule is the same whether it's ingested or inhaled?

MR. SHEEHAN: Objection.
A. So, again, that is not my expertise, whether or not the molecule is the same or not. I do know from my expertise and from the years of reading cancer epidemiology studies and also performing them, that the source of exposure has very different effects in humans. So, whatever source of exposure we're thinking about the outcome in terms of cancer is very different whether or not things are inhaled or ingested.
Q. Doctor, you said that you're not a molecular biologist.
Are you a pathologist?
A. I'm not a pathologist.
Q. Okay. And would you agree that you're not a regulatory expert?
A. I would agree, I'm not a regulatory expert.
Q. And would you agree that you're not an oncologist?
A. I would agree I'm not an oncologist. I work with a lot of cancer biologists. I work with a lot of cancer oncologists. And my expertise, again, is in



epidemiology, understanding large scale studies and the role of bias in contributing to understanding and interpreting the data.
Q. And would you agree you're not a toxicologist?
A. I'm not a toxicologist.
Q. Do you consider yourself an expert in carcinogenesis?
A. I consider --
MR. SHEEHAN: Hold on.
Objection.
Go ahead.
A. I consider myself an expert in cancer epidemiology, which is a very important field within carcinogenesis to understand the effects of exposures in humans.
Q. Okay. What is carcinogenesis?
MR. SHEEHAN: Objection. Vague.
A. So, broadly speaking, carcinogenesis is a process of cancer formation, development formation, sequelae.
Q. So, I asked you previously whether or not you agree that the NDMA molecule is the same whether it's ingested or inhaled.



Do you agree that the NDMA molecule's the same whether it's in processed meat or it's attached to a pill?
A. So, again --
MR. SHEEHAN: Objection.
Just give it a beat.
Objection. Go ahead.
THE WITNESS: Sorry.
A. Okay. So, again, my expertise is in cancer epidemiology. What I can tell you from years and years of research is that exposures through the diet are a very different outcome on human health and cancer specifically than exposures ingested through pills.
Q. And is that specific -- is that -- strike that.
How is it different?
A. So, let's use the example of beta carotene. So, beta carotene is a very famous example where for a number of years it was very consistent association with fruits and vegetables relating to reduced risk of lung cancer. So, some very large trials were conducted in the '90s and those trials showed



that having beta carotene in pill-based form was very different and actually increased lung cancers compared to, you know, the observational findings looking at different sources of beta carotene, including fruits and vegetables.
Q. And my question was specific to NDMA.
How is it different when it comes to NDMA?
MR. SHEEHAN: Objection. Vague.
A. So, again, based on what we know and what we've observed over several decades is that having an exposure through your diet which comes in a very different form at a very different amount and having something similar like a nutrient, a similar nutrient ingested, does not have the same effect whatsoever on cancer incidence.
Q. How is the NDMA molecule in processed meat different from the NDMA molecule in a pill?
MR. SHEEHAN: Objection.
A. So, I can testify based on what I know from the human observational data that

the outcomes are completely different and we have many different examples, not just -- not just the one I gave you, vitamin D is another example. So, again, sources in the diet have been shown over and over again to be very different than pill-based formulations of the same things.

MS. FINKEN: I'm gonna move to strike as nonresponsive.

Q. My question's specific to NDMA. How is the NDMA molecule in processed meat different from the NDMA molecule in a pill?

A. So --

MR. SHEEHAN: Objection.

Go ahead.

A. Again, I'm not a molecular biologist to comment on how it is different. What I can comment on and what I'm an expert in is understanding cancer outcomes in individuals after observing them for years and hundreds of thousands of millions of people. So, I can say that the dietary NDMA literature is very different than what we observe for the ranitidine exposure and cancer outcomes.



Q. Have you ever assessed the amount of NDMA in ranitidine pills compared to the amount of NDMA in dietary epidemiological studies?

A. I have not done that assessment and nor would I. I'm not a laboratory scientist. My expertise is in statistics and epidemiology.

Q. Dr. Terry, you indicate in your report that the Florian study is a clear example of the lack of transportability between medication exposures and dietary NDMA.

MS. FINKEN: And that's on page 75. If we can pull up Exhibit 6727, please.

Q. And on page 75, here you indicate in the second paragraph:

A clear example of the lack of transportability between medication exposures and dietary NDMA is a randomized controlled trial conducted by FDA investigators and published in the journal of the American Medical Association, Florian 2021.

Do you see that?



A. Yes, I see that.

Q. And you indicate that the dietary NDMA exposure is clearly a different exposure construct than NDMA that may be present in ranitidine.

Do you see that?

MR. SHEEHAN: Objection.

A. Yes, I see that.

Q. And you're stating that because the levels of urinary NDMA or higher in the cured meats groups versus the non-cured meats group for the ranitidine and placebo respectively.

Do you see that?

A. Yes, I see that.

Q. And you conclude:

Thus, dietary NDMA exposure is clearly a different exposure construct than NDMA that may be present in ranitidine.

Do you see that?

A. I see that, yes.

Q. How much NDMA was contained in the single doses of ranitidine given to healthy subjects in the Florian study?

A. We would have to pull that up and look at that.



Q. So, you don't know sitting here off the top of your head?

A. No. When I wrote this, I did review that and looked at all of that. But again, the purpose of this art -- this section here is really to give many different examples of how diet and medications you cannot go from one and extrapolate from one to indicate the risk in another.

Q. What was the Florian study attempting to assess?

MR. SHEEHAN: Objection.

A. Again, it was a controlled feeding trial trying to understand differences in urinary and I think they also did biochrome levels of the NDMA. I'd have to take a look at it a little bit more.

Q. Doctor, was Florian designed to look at exogenous formation of NDMA from ranitidine?

A. My understanding of the Florian study is it was designed to look at biomarkers and how they were impacted based on different exposures.

Q. Did Florian take gastric fluid

samples in measuring NDMA?
MR. SHEEHAN: Objection.
A. I would have to take a look at it. I know they did urinary and I know they also did plasma.
Q. Did you undertake an examination of the food that was provided in the cured meats diet versus the non-cured meats diet in the Florian study?
A. I did, I looked at that information.
Q. Are you aware, Doctor, that the Florian study was designed to assess whether or not ranitidine endogenously formed NDMA inside the human body?
A. So, my understanding of the Florian study, it was an experiment to look at what would happen under these two conditions with the cured meat diet and non-cured meat and what would be the effect of the ranitidine and that's my understanding of how they did the trial.
Q. Did you -- do you understand that there's a difference between endogenous formation of NDMA from ranitidine versus


exogenous formation of NDMA from ranitidine?
MR. SHEEHAN: Objection.
A. So, again, my understanding is they wanted to mimic what would be happening from a daily dose of ranitidine versus cured meats diet.
Q. Are you aware, Doctor, sitting here today that the Florian -- strike that.
Are you aware, Doctor, sitting here today about the ranitidine doses that were provided to the healthy volunteers in the Florian study contained ten nanograms or less of NDMA?
A. I would have to take a closer look at the paper now.
Q. Doctor, on page 76 of your report --
MS. FINKEN: If we can go to the next page, please.
Q. -- you discuss an IARC 1999 Working Group regarding gastric cancer in anti-ulcer drugs?
Do you see that?
A. Yes. Is there a specific question?
Q. There will be.


Are you with me and ready to talk about the IARC 1999 Working Group you found it on page 76 of your report?
Do you see that?
A. Towards the -- yeah, towards the bottom.
Q. And if you can turn to the next page you discuss it further on page 77; is that correct?
A. Okay.
Q. So, looking at that, what is the full citation for that IARC 1999 Working Group document?
A. The La Vecchia 2003 is my understanding is the full citation.
Q. So, is it your testimony, Doctor, that the La Vecchia 2003 document provides the findings from the 1999 IARC Working Group that assessed gastric cancer relating to anti-ulcer drugs?
MR. SHEEHAN: Objection.
A. Yes, this is the docu- -- the La Vecchia 2003 is the source of this quote about the Working Group assessment that IARC did in 1999.


Q. Did you actually review any materials that were prepared by the IARC 1999 FDA Working Group that evaluated this?
A. They are included in the source from the La Vecchia source, discusses them.
Q. On page 77, you indicate that the process that the 1999 IARC Working Group undertook is the same process that the scientific community undertook after ranitidine was reported -- after NDMA was reported to be present in ranitidine.
Do you see that?
It's zoomed in on the screen if it's easier for you.
A. Yes, I see that.
Q. Now, Dr. Terry, you are not suggesting that an IARC Working Group -- an IARC expert panel evaluated whether the NDMA in ranitidine can cause human cancer since 2019, correct?
MR. SHEEHAN: Objection.
A. So, my statement here is referring to the process that the scientific community took to evaluate whether or not there is an association, which includes conducting large

scale studies ruling out the role of selection bias, information bias and confounding bias, and then ruling out the -- the role of chance. And that's what the scientific community has done now with 11 studies being published after that time. And having that evidence published in the peer review of which is open for people to comment on and to evaluate themselves and come to the same conclusion that there is no association between ranitidine and any of -- of any specific cancer.

Q. Doctor, did you -- strike that.

The IARC work --- expert Working Group has never undertaken a review of whether the NDMA in ranitidine can cause human cancer, correct?

A. Which IARC Working Group?

Q. Any of them?

MR. SHEEHAN: Objection.

A. Has there been any.

Q. I'll withdraw the question.

Has there been any IARC expert panel that has looked specifically at whether or not the NDMA in ranitidine can cause human



cancer?

A. I am not aware of any specific IARC panel that has been convened since 2019 to evaluate ranitidine and cancer.

Q. Doctor, when you evaluated the ranitidine specific epidemiology, did you take into consideration any bias on behalf of the authors of the studies?

MR. SHEEHAN: Objection.

A. Yes, I always look at -- both as a reviewer as well as an editor when I'm deciding which papers to publish, I always look at the -- and especially as a reader, frankly, when I'm just reading literature for my own work, I always look to see what disclosures people -- people give.

Q. Okay. So, you're aware that, for example, the authors in the Adami study are consultants on behalf of some of the defendants in this case, correct?

A. I am --

MR. SHEEHAN: Objection.

Give it a beat.

Objection.

A. I'm aware of that.



Q. And are you aware that some of the authors in the Y. Kim study have affiliations with pharmaceutical manufacturers of H2RAs?

MR. SHEEHAN: Objection. Vague.

A. So, I don't remember which study -- I don't remember -- I remember the Adami just because I read it recently, but I don't remember -- I do remember when I read each and every one of these studies, I looked at the disclosures. I also have to say that through the years, whenever I'm evaluating something that could have a potential conflict of interest, such as a medication, or any of these kinds of -- anything that could influence how people analyze their data, I always first and foremost look at the tables myself, calculate the crude associations myself, look at the change in the association between the adjusted and the crude. And I always do that before I read the author's interpretation of those data.

So, I always make my own conclusion based on the data and the data tables. I've always been focused on that first and foremost and -- and that really is my



expertise in terms of teaching and research and evaluation.

Again, I've been doing, kind of, applied statistics since the late '80s and so my only concern when someone reports a conflict of interest is if they don't give you the full data. But when -- when it's a study and the data are not readily assessable or you don't -- they're not clear on where the data source comes from, that's when I would ask for more information as either a viewer or editor.

Q. Dr. Terry, do you know whether or not Johnson & Johnson has a financial interest in this case?

A. I don't know off the top of my head, no.

Q. Knowing that the Adami study was conducted by consultants for Sanofi in this litigation, how did you weigh the results in that study?

MR. SHEEHAN: Objection. Just let me get my -- objection to the characterization of the Adami study being performed by consultants for

Sanofi in the litigation.
Go ahead.
A. Sure. So, again, as I do with all studies, I would review any potential conflict. But, I, myself look at the data first, not what the interpretation would say, but I draw my own conclusions based on the strength of the data and understanding the data source.
In the particular example of Adami, they were able to have outcomes data for different cancers based on the Danish cancer registry which is one of the best known cancer registries in the world and goes back a long time. So, that gives a lot of weight to the data. And also, they were linking that data to prescription database.
So, again, for there to be any concern about a conflict of interest would be when you don't have full information about the data source and the data quality and individuals are not transparent with their data. But that was not the case in this study or any of the 16 studies that I reviewed that were related to ranitidine and



cancer.
Q. Did Adami have information on smoking?
A. I have to just consult my table.
So, Adami did also this propensity score matching which allowed for comparison between different groups of people and they were able to have the two different active comparator groups, one with famotidine and one with PPIs, protein pump inhibitors.
Q. Doctor, I'm going to move to strike as nonresponsive.
Did Adami have information on smoking?
MR. SHEEHAN: Objection.
If you need the paper, Doctor.
A. Yeah, maybe we can pull up the paper.
Q. Okay. Do you have that information in your report?
A. I would have it in -- in my table if they did separately adjust for it. But, again, the beauty of the design is that it has an active comparator so -- so that is more well-balanced between the two different



groups.
Q. And Doctor, when you're looking at your table, where -- what page of your report are you referring to?
A. I'm referring to page 113.
MS. FINKEN: Can we put that up on the screen, please?
Q. Fair to say the word smoking is not included in your table as it relates to Adami?
A. Right. And that's, again, they use of propensity score method as their main method for adjusting for all these potential confounders.
Q. Doctor, what is ranitidine?
A. Ranitidine is a medication that people take for a variety of different reasons, one of which is gastrointestinal reflux.
Q. What else was it indicated for besides gastrointestinal reflux disease?
A. It's been indicated for a number of different things. I'm not a medical doctor, so I couldn't give you the full list.
Q. So, you've never prescribed



ranitidine?
A. No, I'm not a medical doctor.
Q. Okay. I noticed you use the term "therapeutic use of ranitidine" in your report.
What is therapeutic use of ranitidine?
A. So, in -- in the way that it's used in the report, it would mean using ranitidine as therapy for some of the symptoms and -- and underlying conditions that might be prescribed, ranitidine might be prescribed for, including GERD.
Q. Is a single dose of ranitidine considered therapeutic use of ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Again, I'm not a medical doctor, so I couldn't tell you in terms of what amount of dose would be therapeutic. What I can tell you though -- sorry.
Q. What was the dosing for ranitidine for the indication of GERD?
MR. SHEEHAN: Objection. Vague.
A. In what context? Again, I'm not a medical doctor, so I know it's prescribed in

different ways depending on people's symptoms.
Q. Do you know what the recommended dose was for ranitidine for the indication of GERD?
MR. SHEEHAN: Objection.
A. Again, that would depend on -- I'm sure that would depend on someone's underlying symptoms and conditions and age and all of that, you know, whether they're adult, whether they're not, that kind of thing.
What I can tell you is that I reviewed the totality of ranitidine epidemiology and -- and cancer and how ranitidine is being used in millions and millions of people is absolutely not associated with cancer based on these large scale studies. So, how it's being used in reality in millions of people there's no association with cancer.
Q. How do you know how it's being used in reality with millions and millions of people?
A. Because these studies are capturing


the real world of what's happening and that's the power of observational studies. So, often when we think about -- ran my clinical trials of which it's really hard to examine different cancer risk factors and randomized clinical trials because you can't ethically randomize them, but what we haven't said through observational designs is a measure of what's happening in reality. So, that's what these studies are capturing, what's happening in reality in terms of prescribing patterns.
Q. Dr. Terry, do you understand that the dose of ranitidine, the recommended dose of ranitidine depends upon the indication?
A. I understand that the recommended dose for any medication would depend on the patient's underlying conditions.
Q. Okay. So, you understand that the recommended dose varies depending on the indication that you're taking it for?
MR. SHEEHAN: Objection.
Go ahead.
A. Yeah. Again, I think that it's just not so straightforward as that and it depends, obviously, on the medication and


that was a general statement what I said, but -- so... But again, it doesn't influence my interpretation of the literature and my overall synthesis of the literature.
Q. Does the length of time a person takes ranitidine depend on the indication?
MR. SHEEHAN: Objection. Vague.
A. Again, I'm not a medical doctor.
Q. Do you know whether the length of time a person takes ranitidine depends upon the indication?
MR. SHEEHAN: Same objection.
A. So, as a general principle, I would imagine that would be the case as with all medications.
Q. Okay. So, sitting here today, do you know, for example, for the indication of active duodenal ulcer how long is it recommended that an individual take ranitidine?
A. So, again, my expertise is an understanding epidemiology design and statistics and I don't and could not testify how long patients should take the medication for different conditions.


Q. For maintenance healing or maintenance therapy indication for ranitidine, how long is it recommended to take ranitidine, do you know?
MR. SHEEHAN: Objection. Vague.
A. I do not know.
Q. Do you know if there's a maximum recommended time for a person to take prescription ranitidine for maintenance therapy or GERD?
A. Again, my expertise as an epidemiology, my understanding is that some patients take it for a very, very long time.
Q. So, are you aware, Doctor, that depending on the indication some people may take up to 600 milligrams of ranitidine per day?
MR. SHEEHAN: Objection. Vague.
A. Again, I don't know that.
Q. Dr. Terry, are you aware that GSK sales force promoted Zantac to be taken once per day for life?
MR. SHEEHAN: Objection. Vague and mischaracterizes.
A. I am not aware of that, no.

Q. Are you aware that Zantac became a blockbuster drug by promoting it for maintenance therapy?
MR. SHEEHAN: Objection.
A. I am not aware of that.
Q. Are you aware or do you -- strike that.
Do you understand that a blockbuster drug is a drug that reaches more than one billion in sales per year?
MR. SHEEHAN: Objection.
A. Again, that would not have relevance to my review of the literature.
Q. So, are you aware that a blockbuster drug is a drug that reaches more than one billion in sales per year?
MR. SHEEHAN: Same objection.
A. I -- I heard the term used before, I don't know what the cutoffs are for that in terms of sales.
Q. Do you know how many tens of billions of dollars the manufacturers profited from selling Zantac during the life time of the product?
A. I do not --


MR. SHEEHAN: Just let me get my objection in.
THE WITNESS: Okay.
MR. SHEEHAN: Objection. Assumes facts not in evidence.
A. I mean -- it would not influence my expert opinion about the ranitidine and cancer epidemiology studies.
Q. So, going back to the term "therapeutic use of ranitidine."
Are those your words or are those the words of your lawyers?
MR. SHEEHAN: Objection.
A. Those are my words.
Q. So, you came up with the terminology "therapeutic use of ranitidine"?
MR. SHEEHAN: Objection.
A. Again, it's in my report and this is very typical way of referring to a medication.
Q. So, did you come up with that terminology yourself?
MR. SHEEHAN: Objection.
A. I would not call that terminology. I would call that a descriptor and in the


literature you hear -- I'm sorry, you see that descriptor sometimes.
Q. So, just going back to my question, the -- the descriptor, using your term, the descriptor "therapeutic use of ranitidine," is that a descriptor that you came up with yourself?
MR. SHEEHAN: Objection.
A. So, if we -- if we start on the very first -- the very first of the 16 studies, which is the one from Penston, that -- that was definitely very -- that was starting pharma study published in 1990 and that was a therapeutic use of ranitidine for treatment for ulcer, which is I think the paper you were referring to before. So, absolutely, that was a therapeutic treatment. And so, again, that's not a word I came up with or a phrase I came up with, that's just describing the fact that the very first study was looking at ranitidine as long-term therapy.
Q. And Penston's the GSK sponsored study, correct?
MR. SHEEHAN: Objection.


A. I don't know, we'd have to pull it up.
MS. FINKEN: Okay. You can take down that exhibit, please.
Q. Doctor, in your report you indicate that ranitidine epidemiology studies are the only reliable source to assess whether the presence of NDMA in ranitidine has any clinical or operative effect on cancer and --
MR. SHEEHAN: Tracy, you're in and out.
MS. FINKEN: Okay.
MR. SHEEHAN: I don't know if others can -- can -- if that's happening, but on our end it's every other word.
MS. FUJIMOTO: It is.
THE COURT REPORTER: It was a lag, it was a very slow lag.
MS. FINKEN: It's coming up that my internet connection is unstable.
Can you hear me right now?
THE COURT REPORTER: No.
MR. SHEEHAN: Yeah, it's tough.
MS. FINKEN: Hold on one second.

MR. SHEEHAN: Sometimes it's fine, Tracy. Like right there, "hold on one second," came through loud and clear, but it's when you continue talking it gets sort of distorted or something.

MS. FINKEN: Okay. Give me one sec. Hold on. This is what happens, Tom, I told you I have to kick my kids off the Xbox --

THE VIDEOGRAPHER: Do you want to go off the record?

MS. FINKEN: We can stay on the record. Hold on one second.

Okay. Can you hear me okay now?

THE WITNESS: Yes.

THE COURT REPORTER: I can hear you now.

MS. FINKEN: Let's try to move ahead and if I start going in and out again, just let me know, okay?

BY MS. FINKEN:

Q. On page 3 of your report, you indicate that the epidemiology studies are the only reliable source to assess whether the presence of NDMA in ranitidine has any



clinical or operative effect on cancer because the studies of ranitidine and cancer outcomes inherently account for any NDMA impurity that may be present in ranitidine, is that right, you state that?

A. Yeah, I didn't find exactly where I stated it, but if you give me a second, I will --

Q. It's on page 3 of your report, Doctor?

MR. SHEEHAN: Do you want to bring up the report, Tracy, or you just -- you're asking her to follow along in her hard copy?

MS. FINKEN: She can just follow along in her hard copy, that's fine.

Q. Do you see where you state --

A. Yeah, I see it. Yes.

Q. Dr. Terry, what is the maximum exposure to ranitidine measured in the ranitidine epidemiological studies you reviewed to reach your conclusions?

MR. SHEEHAN: Objection.

A. So, each of the studies -- it varied, but again, we're talking about 16



studies that started -- first one being published in 1990, the, you know, Wong-Ho Chow article that was published in the mid '90s, the Habel article. There's been a lot of studies over time, some of which had, you know, detailed the exposure window and the length of time. Some of them did not have that. But in Table 1 of my report, I -- I provide the information for each of those studies.

Q. So, if you want to take a look at Table 1 in your report, you can go ahead and do that, Doctor.

My question is, what is the maximum exposure to ranitidine measured in the ranitidine epidemiological study you reviewed to reach your conclusions?

MR. SHEEHAN: Objection.

A. So, the maximum number is, again, would vary by each study, but some of the studies that are concurrent users, so -- and they were followed-up for many years.

So, again, these studies and what's robust about them is the reporting on ranitidine use as it's used in the



population. So, there's a distribution between short-term users and long-term users.

Q. So, Doctor, what is the longest term -- the longest term of exposure to ranitidine that is evaluated in those studies?

MR. SHEEHAN: Objection.

A. So, the McDowell study, for example, has a range of six to 11 years, 11.7 years. The Yoon study did concurrent exposure and did follow people up to ten years. So -- yeah.

Again, I couldn't tell you what is the longest, but that -- those are some of the studies, you know, that have followed that for longer.

Q. So, is it your testimony, Doctor, that the McDowell study evaluated for 11 years of exposure to ranitidine?

MR. SHEEHAN: Objection. Mischaracterizes.

A. Yeah. No, my testimony is that across the 16 studies, they all had a range of exposure windows and across the range of studies there was no consistent pattern

across ranitidine use as it's used in free-living populations and any of the five cancers being alleged.
Q. Did any ranitidine epidemiological study measure ranitidine exposure for more than five years?
MR. SHEEHAN: Objection.
A. So, again, what's the relevant question is how long the follow-up was between the exposure and the cancer, not how long the exposure was and that's because, again, the exposure's being measured how it's being used out in the population in millions of people, but is relevant is -- is to make sure that the follow-up time is long enough to -- to have a valid assessment of cancer. And that's what's been done here.
And again, there's a distribution across the studies, but there's no pattern whatsoever between ranitidine use and any of the cancers.
MS. FINKEN: Move to strike as nonresponsive.
Q. Doctor, my question was, did any ranitidine epidemiological study measure


ranitidine exposure for more than --
THE COURT REPORTER: You trailed at the end there.
Q. Doctor, my question was, did any ranitidine epidemiological study measure ranitidine exposure for more than five years, yes or no?
MR. SHEEHAN: Objection. Asked and answered.
And you can provide context, Dr. Terry, if you want to.
A. So, my summary of the 16 studies that have been published using the data that's reported from these peer-reviewed publications is that some of the studies did have exposure windows that were longer. And again, importantly when we're looking at cancer is also how long have the cohorts been followed. And in my expert opinion that across these 16 studies, there's enough variation in exposure window as well as in outcome follow-up time to allow for a rigorous assessment of whether or not there is any signal related to ranitidine exposure and any of the cancers. And I carefully


evaluated that with respect to ranitidine being a promoter and ranitidine being an initiator.
Q. Doctor, can you identify for me which ranitidine specific epidemiological study measured exposure -- evaluated exposure to ranitidine for more than five years?
MR. SHEEHAN: Objection.
Q. I'm not talking about follow-up, I'm talking about exposure.
Which ranitidine specific epidemiological study looked at ranitidine exposure for more than five years?
MR. SHEEHAN: You keep cutting in and out, Tracy. I mean, we're -- I get the gist of the question, but just so you know, you are cutting in and out.
Objection. Asked --
MS. FINKEN: Go ahead.
MR. SHEEHAN: Say again, Tracy.
MS. FINKEN: I'm letting you make your objection. Go ahead.
MR. SHEEHAN: Objection. Asked and answered.


Go ahead.
Q. So, Candida managed to get my question on the realtime I see it, so I can read it again if I cut out for you.
But my question was, I'm not talking about follow-up, I'm talking about exposure.
Which ranitidine specific epidemiological study looked at ranitidine exposure for more than five years?
MR. SHEEHAN: Objection. Asked and answered. And just for the record, Dr. Terry, obviously does not have realtime.
A. So, I'm just looking at the more recent studies the Adami study, for example, included an exposure period from 1996 to 2008. The Kim study had an exposure window of 2002 to 2008.
Q. You're sure about that, Doctor?
MR. SHEEHAN: Objection.
A. Again, based on my summary in this table, but we can pull up any of the studies and I can double-check that.
Q. So, you said you believe the Adami

study specifically evaluated exposure to ranitidine for more than five years.

Is that your testimony?

MR. SHEEHAN: Objection.

A. My testimony is related to the exposure window which is what's relevant here. So, if anyone in these large cohort studies, again, Adami had over a million people, they defined an exposure window and then they defined the follow-up period.

So, if people were taking a drug that long, then they would be captured in that exposure window. So, my testimony is that these 16 studies have, across millions of people now, assessed whether or not ranitidine is associated with any of these cancers that are being alleged and there is no clear or consistent or valid pattern that that demonstrates that whatsoever. So, it's not for lack of statistical power, there's plenty of data here. So what they're evaluating is what happens in free-living people.

Q. Doctor, what was the second study that you testified that you believe evaluated



ranitidine exposure for more than five years?

MR. SHEEHAN: Objection.
Mischaracterizes testimony.

A. So, again, I want to emphasize what I'm saying is an exposure window as opposed to what -- what you may be asking about five years of exposure. If someone is taking it that long, these studies had a longer exposure window. But my point with all of this is that ranitidine has been evaluated in how it's being used in populations across the world in different settings, in cohort studies, in nested case-control studies and there's no consistent pattern with ranitidine and any of these cancers whatsoever.

Q. Dr. Terry, did Adami pull the data and look at the data specifically and analyze the data for people who took ranitidine for more than five years?

MR. SHEEHAN: Objection.

A. No, they did not. The authors did not do that.

Q. Did the Kim study same question with the Kim study. Did they pool the data and look at data specifically for people who



took ranitidine for more than five years?

MR. SHEEHAN: Objection.

A. No, they did not. But that again is not the relevant question here. The relevant question is how's ranitidine being used in the population and is there any signal and is that signal bigger than the noise after you account for confounding information and selection bias and there is no signal, there's no consistent signal, period.

Q. Doctor, isn't it true that the Adami study looked the maximum exposure that the Adami study looked at was ten prescriptions?

MR. SHEEHAN: Objection.
Mischaracterizes the study.

A. So, that was one of the analysis that they did, they looked at the ten prescriptions, yes.

Q. Did they do an analysis for any exposure more than ten prescriptions?

MR. SHEEHAN: Objection.

A. We can pull it up to verify, but my recollection is that they -- and based on my



reports here, they did it for five plus and ten plus.

Q. So, for example, if somebody took ranitidine for five years, how does the Adami study let you know what the risk of developing cancer is?

A. So, again, they looked at the prescription number, not the years. And again, the most relevant question that is important here is how is ranitidine being used in the population and do you see any signal and there's no signal at a population level that there's any association between ranitidine and any of these cancers. And this kind of methodology has been used for many, many decades and where there are -- I can give you plenty of examples where there are consistent signals with -- with similar kinds of medication measures like hormone replacement therapy or nonsteroidal anti-inflammatory medications, so even selective supplements.

Q. Are you finished, Doctor, I don't want to interrupt you?

A. That's okay.

Q. Are you finished with your answer?
A. Yes.
Q. So, Doctor, how long was each prescription in the Adami study?
MR. SHEEHAN: Objection. Vague.
A. What do you mean by how long?
Q. For example, if they're looking at ten prescriptions, are those 30-day prescriptions, are they ten-day prescriptions? Can you tell me that?
MR. SHEEHAN: Objection.
A. I think I would have to look more carefully at the methods. Right now we can pull it up, but I think just my recollection is that it's five prescriptions. So, you know, again, these are measurements, this is done all the time in population science where you have a measurement that really is all about kind of people's rank, like, where there in line. And if anything, these kinds of measurements are much more valid and have a higher sensitivity and higher specificity than the kind of dietary assessment measurements that are being examined with respect to NDMA, so...



MR. SHEEHAN: Hey, Tracy, we've been going about an, I guess, hour 15 or so, when you get to a natural break, can we just do five or ten?
MS. FINKEN: Yeah, give me like five minutes and we'll take a break, okay?
MR. SHEEHAN: Sure.
MS. FINKEN: Okay, great.
Q. Dr. Terry, isn't it true that the Cardwell study is the only ranitidine specific study that measured ranitidine exposure for more than --
MR. SHEEHAN: Objection.
(Court reporter clarification.)
Q. -- than three years?
A. My notes -- I mean, my summary on page 112 says that the Cardwell study, the median exposure was 8.4 years.
How much NDMA was quantified in the ranitidine that was studied in the ranitidine epidemiological studies?
MR. SHEEHAN: Objection. Vague.
A. So, again, this is very typical of pharmacoepidemiological studies, but you --



you quantify the exposure based on prescriptions, so...
Q. Did any ranitidine epidemiological study quantify the amount of NDMA in the ranitidine?
A. No, because that would not even have been possible. These are studies that are using individuals, millions of individuals. So, what you're asking is, did each and every individuals' pill have quantification of NDMA, is that what you're asking?
Q. I'm asking if any of the studies, at all, quantify the amount of NDMA that was contained in the ranitidine?
A. Not in the 16 epidemiological studies of ranitidine in cancer. There have been, however, and I include them in my expert opinion, three studies of an antihypertensive medication called valsartan, where some proxy for the NDMA contamination was done. And those studies also did not show any association between NDMA contaminated valsartan and cancer.
MS. FINKEN: Move to strike as



nonresponsive.
Actually, you know what, now is a good time to take a break if you want to go off the record.
MR. SHEEHAN: Okay.
THE VIDEOGRAPHER: We're going off the record. The time is 7:53 p.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 8:11 p.m. UTC time.
BY MS. FINKEN:
Q. Okay. Dr. Terry, hopefully my internet connection will remain stable, just let me know if I'm going out again, okay?
Dr. Terry, you're aware that IARC classified NDMA as the probable human carcinogen in 1987, correct?
A. I'm aware of the two-way classification. I think the first IARC report was in 1987.
Q. Do you disagree with the expert's -- (technical distortion) -- in

their evaluation --
MR. SHEEHAN: Tracy, you're --
Q. -- (technical distortion) -- NDMA is a probable human carcinogen?
MR. SHEEHAN: Tracy, that was -- Candida, did you get that?
THE COURT REPORTER: No, I was trying to interrupt, but I was on mute, I was trying to, but you got it.
MS. FINKEN: Let's try this again. Can you hear me okay?
MR. SHEEHAN: You're all distorted.
MS. FINKEN: Let's go off the record. I'm going to go kick everybody off the internet.
THE VIDEOGRAPHER: The time is 8:13 p.m. UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 8:17 p.m. UTC time.
BY MS. FINKEN:



Q. Dr. Terry, do you disagree with the expert's IARC classification in 1987 of NDMA as a probable human carcinogen?
A. So, based on -- based on all the data today -- based on all the data today, the difference between having a probable carcinogen Type 1 or carcinogen which is definitely carcinogenic in humans is that human evidence.
So, I understand the -- the classification of 2A and, yeah, I think 2A is -- there's 75 or more than 75 different probable carcinogens in that risk of which in order to be then carcinogenic in humans or Class 1, you would have to have the human data. So, I understand based on the animal studies to date, that it's in that classification.
Q. And my question was, do you disagree with that classification?
A. No, I wouldn't disagree with that classification 'cause again my expertise is to evaluate the human data which would be evaluating whether or not something should be Class 1.



Q. Do you agree that there's -- sorry. What did you say?
A. Sorry. Group 1 or Class 1. Sorry. I was using those interchangeably, Group 1 according to IARC.
Q. Understood.
Do you agree that there's NDMA in ranitidine?
MR. SHEEHAN: Objection. Vague.
A. So, I understand from the experimental data that NDMA, under certain experimental conditions has shown to be in ranitidine.
Q. Do you agree that the NDMA in ranitidine is variable depending on the conditions it's subjected to?
MR. SHEEHAN: Objection.
A. Again --
MR. SHEEHAN: Objection. Vague. Go ahead.
A. My expertise is not to evaluate the laboratory data, but rather the human data.
Q. Are you aware -- go ahead, sorry.
A. Most exposures it depends on the experimental conditions.



Q. Okay. Are you aware though that the NDMA in ranitidine is variable depending upon the conditions it's exposed to?
MR. SHEEHAN: Objection. Vague.
A. I'm aware there's been experiments that have suggested that -- that it's variable depending on the experimental conditions. But again, this is not my area of expertise. My area of expertise is large scale epidemiological studies and data analyses and ruling out quantitative effects of bias.
Q. Are you aware that ranitidine was globally recalled because it contained NDMA?
A. I'm aware that ranitidine was recalled, yes.
Q. Do you agree that NDMA is mutagenic?
MR. SHEEHAN: Objection. Vague.
A. Again, I am not a laboratory scientist, but I'm aware of experiments that have looked at mechanisms for NDMA and it's a potential -- potential role in carcinogenesis that's why it's labeled as such along with, you know, over 70 or 80 other kinds of

probable carcinogens. In order for it to actually be a carcinogenesis in humans, you need that epidemiological data of which there are none, whether it's assessed through diet and/or through ranitidine exposure.
Q. Is NDMA mutagenic?
MR. SHEEHAN: Objection. Vague.
A. Again, my expertise is not in laboratory science, it's in the assessment of human data. And based on the human data, there's no data to support causality in a role of NDMA in human carcinogenesis.
MS. FINKEN: Again, move to strike as nonresponsive.
Q. And Doctor, if you don't know, I don't know is a perfectly acceptable answer.
My question is, is NDMA mutagenic?
MR. SHEEHAN: Same objection. And asked and answered.
A. So, my understanding is that there are laboratory studies that support a role of NDMA in mutagenesis. But, again, that is likely why it's ruled as probable carcinogen.
Q. Is NDMA clastogenic?
MR. SHEEHAN: Objection. Vague.



A. Yeah. Again, it would be based on laboratory data of what you are describing for mutagenesis.
Q. Is there laboratory data demonstrating that NDMA is clastogenic?
MR. SHEEHAN: Objection. Vague.
A. My expertise is not in the laboratory data, I'm not a laboratory scientist, but again that's not relevant. What's relevant here is is there enough data to examine whether or not NDMA is associated with humans, human cancer. And there has been many, many studies, both in looking at dietary exposures as well as looking at ranitidine exposure itself and there's no consistent association that can't be accounted for by bias.
Q. Is NDMA carcinogenic?
MR. SHEEHAN: Objection. Vague.
A. NDMA, as classified by IARC, is classified as probably carcinogenic -- carcinogenic. But again, is not classified as a human carcinogen or Class 1, Group 1, because the human data are lacking.
Q. Dr. Terry, are you aware that the



National Toxicology Program has conducted a peer review analysis of NDMA in the '80s and determined that it should be reason- -- that it was reasonably anticipated to be a human carcinogen?
A. Again, I'm not aware of the specific report that you are alluding to, but if you wanted to pull it up, but what I would provide for context is that since the 1980s there have been many, many studies.
And I'd like to just correct how I phrased my last answer. It's not that the data are lacking. The data are there, it's that there's no consistent data to support any causal association between exposure and outcome where the exposure is either through the diet or through a pill. So, there's no association.
So, if -- if a report from the '80s or earlier or later that didn't use these human data that now exist on a very broad basis in millions of people, then I would say that report is incomplete in its assessment of causality.
Q. Dr. Terry, did you undertake a



Bradford Hill analysis regarding whether NDMA can cause human cancer?
A. So, throughout my expert report, I undertook a thorough review of the epidemiological data to assess causality, whether that be causality from NDMA in the diet or NDMA from ranitidine. So, in order to undertake a Bradford Hill causal analysis, you would first rule out the role of bias in contributing to the associations that you might see, the risk estimates that you may see.
So, in the case of dietary NDMA and the different cancers, what's -- excuse me, what's become very clear over the last two decades as more and more cohort studies have been published is that the cohort findings do not support the case-controls findings and with NDMA and -- and different cancers.
And so, in my report, for example, I describe the meta- -- systematic review of meta-analysis by Song, and in that they found they clear patterns of differences between cohort studies with dietary NDMA and case-control studies and they did a formal

assessment in a meta-analysis that's referred to as a heterogeneity index and they're looking to see, are these studies heterogenous, meaning that the findings are attributed by the fact that you have different types of design.

So, again, in dietary assessments and cancer risk, when we see something different between case-control studies and cohort studies, the number one thing that people do is they assess whether or not there's recall bias. So, I didn't even need to get to the stage of a formal Bradford Hill for NDMA and these cancers because all of the results and the consistency in the case-control compared to the cohort suggested bias to me.

So, I -- so, I understood it, understanding the causal argument throughout the whole report, including the dietary assessment.

Q. Doctor, where in your report do you undertake a Bradford Hill analysis looking at whether NDMA causes human cancer?

MR. SHEEHAN: Objection. Asked



and answered.

A. So, again, as I describe in the beginning of my report, before even getting to the stage that you would do a formal Bradford Hill causal analysis, you have to first rule out bias and I couldn't rule out bias as contributing to the patterns in NDMA, dietary NDMA and the cancers.

At the end of my report, I do do a formal review of the ranitidine and the different cancers because, again, the -- that's what's relevant for understanding the question of whether or not ranitidine is causal for the different cancers being alleged. So, I did provide that even though, again, there is no consistent pattern or reliable pattern, but I included that just to be complete.

MS. FINKEN: Hello?

MR. SHEEHAN: Hello.

THE WITNESS: Hello.

MS. FINKEN: Can you hear me?

MR. SHEEHAN: Were you asking something, Tracy? Were you asking something? The first word we heard



was "hello."

MS. FINKEN: Yes, I am. I'm having major connection issues. I'm sorry.

BY MS. FINKEN:

Q. Can you just point to me where in the body of the report you undertook a Bradford Hill analysis relating to NDMA causing human cancer?

MR. SHEEHAN: Let me -- before we even go there, Candida, did you hear?

THE COURT REPORTER: No.

MR. SHEEHAN: I just want to make sure we're not on different wave lengths here.

THE COURT REPORTER: No, I heard nothing, I thought there was just a long pause in the record.

MR. SHEEHAN: Okay. All right, fair enough.

MS. FINKEN: Can you hear me now, Candida?

THE COURT REPORTER: I can hear you now, yeah. And your face wasn't frozen so that's why I just thought



you were thinking.

MS. FINKEN: No.

MR. SHEEHAN: So can you just repeat the question, Tracy?

BY MS. FINKEN:

Q. Can you point to where in the body of your report you analyze the Bradford Hill factors in relation to NDMA causing human cancers?

MR. SHEEHAN: Objection. Asked and answered.

A. Can I clarify? Did you hear my last answer or do I -- 'cause I answered that question already.

MR. SHEEHAN: I think she's just asking it again.

But I'm assuming, Tracy, you heard all of her answers.

MS. FINKEN: I'm looking back on realtime right now because I don't know -- I thought you could hear me and you couldn't. So, let me just take a look and see what you said.

Q. So, is the answer, no, you don't conduct a formal Bradford Hill analysis in

the body of your report relating to whether or not NDMA can cause human cancer?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. So, to repeat what I had said earlier. In the beginning of my report, so this is on page 21, I say, quote -- this is from the top of the report:
Key to establishing reliable association from the totality of observational data is a detailed analysis on the role of bias, including confounding, selection bias and information bias may play in the observed association. Two critical pieces of this analysis involve; one, an evaluation of the role of bias given the magnitude of the observed association, the likelihood of potential biases and the likelihood that potential biases may explain the observed the association, and two, an evaluation of comparability of the groups being compared without an apples to apples comparison and showing the baseline pre-exposure risk of assessment, et cetera.
So, only after this do you then go



on to do formal evaluation of causality. And so, when it comes to the dietary studies with NDMA from the diet, there was no evidence that there was any reason to proceed, because, as I mentioned from my expert review, when I looked carefully at every single NDMA and cancer epidemiology study for these five cancers, there was no consistent association in the cohort studies and the case-control studies.
So, when you see that different kind of pattern between the two types of study designs, you cannot rule out recall bias. So, I didn't go on to formally do a causal -- a Bradford Hill for NDMA in diet. What I did at the end of the report was do a formal Bradford Hill on ranitidine, since that is the subject of -- of this litigation. So, I did a formal review, a causal review of ranitidine and the cancers being alleged.
Q. Is it your testimony today, Doctor, that NDMA does not cause human cancer?
A. It is my testimony today that NDMA sources from the diet has -- there's no association, consistent association, reliable



association in the human studies of dietary NDMA, nor in the ranitidine studies and the selected cancers that are being alleged here.
Q. What -- strike that.
So, is it your opinion, Doctor, that NDMA cannot cause cancer in humans?
MR. SHEEHAN: Objection.
A. It is my expert opinion that NDMA, as measured from the diet and/or ranitidine exposure, that there is no consistent or reliable evidence of any causal association between dietary NDMA and ranitidine and the cancers being investigated here.
Q. But you would agree, Doctor, that there is evidence -- there is some evidence of an association between NDMA and certain types of cancers in the epidemiological literature, correct?
MR. SHEEHAN: Objection.
Objection. Mischaracterizes testimony.
Go ahead.
A. So, again, my expert analysis is a synthesis of the literature, which means that when you synthesize the literature you have



to look at the totality of the evidence and that includes studies that have shown no association, studies that have shown associations, studies that have shown no association. And when I say "association" here, I don't mean causal association. Typically, in epidemiology, we use the word "association" to mean correlation. And it's -- so, it's only when I preface that with a causal association that I mean causal association. So, I want to clarify that because we do use it differently sometimes. So, when I say "association," I mean correlation between two factors.
So, it is my testimony that the dietary NDMA studies and the ranitidine studies, which have taken place over the last several decades, that there's no consistent pattern that cannot be explained away by bias.
Q. Doctor, you aren't disputing that NDMA causes cancer of the many different species of animals, are you?
A. Again, I'm an expert in epidemiology in human studies, not in animal

research. For NDMA to be part of the IARC 2A classification means that there are in vitro and different types of animal studies that may be supporting probable association. But until you have human studies of which now we have many, many human studies conducted in many millions of people taking ranitidine and there is no consistent reliable link to cancer.
Q. Doctor, coming to your conclusions in this case, have you undertaken a review of the clinical trial data in relation to ranitidine?
A. Which specific clinical trials do you mean?
Q. The clinical trial data that was conducted by GSK.
A. Again, I focused on the peer-reviewed scientific literature.
Q. So, did you review any of the internal clinical trial data that was conducted by GSK?
MR. SHEEHAN: Objection.
A. I was sent -- I was sent internal documents, but, again, that would not be



relevant to my review here because my review is focused on a scientific peer-reviewed literature on epidemiological studies of ranitidine and other sources including dietary NDMA studies and occupational studies.
Q. Doctor, so, is it fair to say you did not review any of the randomized control trials that were conducted by GSK in forming your conclusions?
MR. SHEEHAN: Objection.
A. I only used epidemiological studies that are part of the peer-reviewed literature, those are the only relevant studies from my assessment.
Q. You only reviewed publically available literature, is that your testimony?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. Again, I was sent internal documents and I could've reviewed whatever I was sent, but then most relevant is the scientific peer review literature of which there's plenty and there's 16 separate studies of ranitidine, there's many more



studies including the diet and occupation. So, those are the studies that I reviewed that are relevant to this discussion.
Q. Did you consider biologically plausible mechanisms whereby NDMA can cause cancer?
MR. SHEEHAN: Objection. Vague.
A. So, in our practice of epidemiology, we are trained to specifically rule out the sources of bias. So, you -- first you start with a hypothesis. You look at the data and to see if the data matched the hypothesis. You get -- you evaluate the point estimate, you interrogate that point estimate, such that you want to know before you report out on a particular finding that that finding couldn't be resulting from bias, which would include section bias, how you picked your subjects, how you followed them over time or information bias, how you measured the outcome, how you measured the exposure and any of the other third variables and/or confounding bias.
When you rule out those roles of biases as contributing to the point estimate,



'cause those are systematic biases, and what that means from a statistical point of view is that they can result in an overestimate or an underestimate of the effect, depending on the direction of those associations. Then you look to see about the precision of the estimate.
So, is it plausible that what you observed, even after you remove the possibility of bias, is what you observe because of chance, and that's where the variability. So, it's about thinking about the role of biases and then the role of chance. And then after that, you can say, okay, there might be something here, is it biologically plausible. But you don't start out in epidemiology saying is something biologically plausible until you actually know that there's something that's consistent and reliable and valid.
And so, once you rule those out then you can talk about biological plausibility. So, in the case of dietary NDMA, those don't get ruled out because, in my expert opinion, those are still driven by

bias because the cohort studies did not find a consistent association.

In the case of ranitidine and the cancers being alleged, again, there's no pattern of data that suggests that there's any association whatsoever. So, you only get to the biological plausibility after you know that what you were observed is reliable and valid.

Q. So, is your answer to my question, no, Doctor?

MR. SHEEHAN: Objection.

A. My answer to your question is that there are lots of mechanisms that have an hypothesis -- excuse me, hypothesize and tested in experimental settings for NDMA. And there's no dispute there, that's why NDMA is a two-way, according to IARC.

But what -- my expert testimony is that until you have the human data of which we have plenty of human data now, until you can rule out the role of bias, the biological plausibility isn't as important as the human data at this point.

Q. Did you consider the biologically



plausible mechanisms whereby NDMA can cause cancer?

MR. SHEEHAN: Objection. Vague and asked and answered.

A. Sure. I mean -- and I understand what many of those mechanisms are, but what I'm saying, it doesn't enter into your assessment of -- of causality until you can first rule out bias and then you can say okay look I have a valid association now, it's reliable. What does it mean? Is it plausible? So, that's what we do for each and every finding that we have, we go then to our colleagues and you know, we work across many different disciplines and that's -- that's when biological mechanisms and plausibility are key, right? But you don't want the laboratory scientists to be working on associations that haven't been shown to be not explained away by bias because, you know, first you want to make sure you have something that's valid and reliable.

Q. So, Doctor, did you consider any biologically plausible mechanisms whereby ranitidine can cause cancer besides NDMA?



MR. SHEEHAN: Objection. Vague.

A. Again, my expertise is in valuating whether or not the study of ranitidine have shown any association with cancer, and they do not.

Q. Did you consider any biologically plausible mechanism whereby ranitidine can cause cancer besides NDMA?

MR. SHEEHAN: Objection. Vague.

A. Again, that would only become important if the point estimates for ranitidine and any of the cancers being alleged were consistent and valid and repeatable, and they are not. So, it is not -- it's not relevant when there's no there there, there's no association.

Q. So, is your answer no?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, it's not relevant to assessing the whether or not there's a causal association in the human data. It's relevant to explain the finding once you have it, but not -- not to do the assessment with the analysis.



Q. So, Doctor, I'm not asking about whether or not you believe it's relevant, I'm asking whether or not you did consider biologically plausible mechanisms besides NDMA whereby ranitidine can cause cancer. It's simple, either you considered it or you didn't, yes or no?

MR. SHEEHAN: Objection. Asked and answered.

And you can provide context where necessary, Dr. Terry.

A. Again, the only relevant question is, does ranitidine cause cancer? And in the human studies that I evaluated, it did not.

Q. What biologically plausible mechanisms did you consider as to whether ranitidine could cause cancer besides NDMA?

MR. SHEEHAN: Objection. Vague.

A. So, again, my job as an epidemiologist is to assess the role of -- to one, examine the magnitude of the association. Two, to assess whether or not bias could change the magnitude of association. And three, to understand the variability of -- about that point estimate.

That is what I've done here, that's what I've done in my expert report.

In doing so, what I did consider quite carefully, because it's a very important issue in the interpretation of these data is whether or not there was confounding by indication. So, I did assess very carefully whether or not underlying conditions might be related to the cancer as opposed to the medication itself. So, I did do that very carefully.

But again, whether or not something is biologically plausible is a question that the biologist can answer. But epidemiologists, typically we turn to our colleagues to answer those questions once we can say to our colleagues, here, we have a reliable valid observation, what do you make of it.

Q. So, Doctor, isn't looking at biologically plausible mechanism part of the Bradford Hill analysis in assessing causality?

A. A hundred percent. And Bradford and Hill in their original article also went



through how you don't -- you can have a causal association without even knowing what the mechanisms are. Take smoking and lung cancer, those associations were known decades before actual mechanisms were available.

So, first, we have to understand is this association strong, the magnitude of the point estimate, can it be explained away by bias. So, again, the stronger the association, the stronger the point estimate, the less likely it can be explained away by bias and is it different than chance.

So, again, with the smoking and lung cancer, these associations were very, very large. And so, biological plausibility is part of a causal criteria, it's not a necessary criteria, but it does have to happen after you have ruled out whether -- you know, whether or not these associations are by chance or by bias.

Q. So, is it your testimony, Doctor, that a Bradford Hill analysis is not necessary in this case because there is no reported association of ranitidine or NDMA and cancer, is that your testimony?



MR. SHEEHAN: Objection.
Mischaracterizes testimony.

A. So, my testimony, to your question, about whether or not I considered the Bradford Hill criteria for NDMA in dietary studies, my answer was yes, absolutely I considered it throughout the report. But early in the report, on page 21, I explain my thought process and how I conduct all of my reviews which is first and foremost before even going to those criteria, I have to make sure that that point estimate and -- is not explained away by bias and that it's reliable and replicable and consistent across these different types of study designs, and then it becomes relevant.

So, my testimony is I didn't include a Bradford Hill causal analysis for NDMA in diet because it wasn't relevant 'cause I never got to that stage where I could say that what was found was, you know, was valid and consistent and repeatable.

Q. And Doctor, when you conducted your analysis of the NDMA epidemiological studies, did you consider the entire universe of NDMA



observational studies?

MR. SHEEHAN: Objection. Vague.

A. I considered the NDMA studies of the cancer epidemiological studies that are available in the peer-reviewed literature.

Q. Did you -- are all of the studies that you -- strike that.

Is that noise -- that feedback coming from my connection?

MR. SHEEHAN: We have sirens here, is that what you hear?

MS. FINKEN: It's the sirens again, okay. Sorry about that.

BY MS. FINKEN:

Q. Dr. Terry, are all of the NDMA studies of the cancer, epidemiological studies, are all of those contained -- that you considered contained in your materials considered list?

A. The ones --

MR. SHEEHAN: Objection.
Go ahead.

A. The ones that I considered are cited in the report, yes.

Q. Doctor, are you intending to offer

an opinion regarding the amount of NDMA contained in different ranitidine products?
A. No, I'm not offering that testimony. That is not my expertise.
Q. Do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A. Again, that's not my expertise. I would defer to molecular biologists on that.
Q. Are you intending to offer an opinion on whether the levels of NDMA contained in ranitidine products are equivalent to the amounts of NDMA that have been associated with certain cancers in the published medical literature?
MR. SHEEHAN: Objection.
A. Can you repeat that?
Q. Sure.
Do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are equivalent to the amounts of NDMA that has been associated with certain cancers in the published medical literature?



MR. SHEEHAN: Objection.
A. So, my expert opinion is based on the totality of human -- of human epidemiological studies on ranitidine and the cancers being alleged.
Q. Doctor, have you evaluated whether the levels of NDMA and ranitidine products are the same or similar to the exposures from other sources that have demonstrated an association with cancer in the published medical literature?
MR. SHEEHAN: Objection. Mischaracterizes evidence.
A. Again, when you talk about the published medical literature, you may be counting nonhuman studies.
In the human studies, what I've evaluated are the sources of NDMA based on diet, occupation and the ranitidine studies that have been conducted in humans, which is the most relevant evidence for assessing whether or not ranitidine causes cancer in humans.
Q. Have you compared whether or not the levels of NDMA in ranitidine are the



same or similar to the amounts of NDMA that are listed in the NDMA observational studies?
MR. SHEEHAN: Objection. Vague. Asked and answered.
A. So, which observational studies are you referring to?
Q. Just generally, have you done it with any of the NDMA epidemiological dietary or occupational exposure studies and looked at what the levels of NDMA in ranitidine are the same or similar to the levels of NDMA in those dietary or occupational exposure studies?
MR. SHEEHAN: Objection. Vague.
A. So, again, the beauty of epidemiology is it's about whether or not the signal is bigger than the noise, and if so, can it be accounted for by bias. And so, comparing different sources of an exposure, some that come from questionnaires, some that come from electronic health records, those sorts of things are not the relevant question.
What I've looked at, which now is



at large literature, 16 different studies for ranitidine and many more studies when you count the dietary NDMA and occupation, when you look at how ranitidine is being used in free-living populations, there's no association whatsoever between ranitidine use and/or dietary NDMA and these cancers.
Q. Doctor, what is the difference between an exposure window and the actual exposure being measured in an epidemiological study?
A. So, an exposure window typically refers to the period of time where you're collecting information on exposure and, you know, of which those are distribution that individuals, you know, individual exposure will differ depending on the individuals within that exposure window.
Q. And how does that differ from the actual exposure being measured in an epidemiological study?
MR. SHEEHAN: Objection. Vague.
A. Yeah, that's a general question, it would have to depend on what the exposure is. So, if the exposure is something that, you

Page 282
M. Terry

know, happened in the past and is not ongoing, those two things would not differ whatsoever. If the exposure is changing over time, then they differ.
Q. So, let's assume that the exposures changing over time, how do they differ?
MR. SHEEHAN: Objection. Vague.
A. So, yes, it's -- it would be highly dependent on the context of the study and what the exposure was, you know, if you're evaluating, I don't know, let's call it some chemotherapy regime that most people take for five years, it may not differ at all. So, it's highly dependent on what the exposure is.
Q. Doctor, have you looked at all at the levels of NDMA that have been found in ranitidine products?
A. So, I have reviewed, in preparing this report, a lot of different background information about, you know, why ranitidine it was recalled, those kinds of reports, if that's what you're talking about.
Q. Have you analyzed the amount of NDMA that has been found in ranitidine

Page 283
M. Terry

products?
A. So, again, I'm not a laboratory scientist --
MR. SHEEHAN: Let me get my objection.
THE WITNESS: Sorry.
MR. SHEEHAN: Vague.
Go ahead.
A. I'm not a laboratory scientist, so, no, I have not analyzed the NDMA levels. What I have analyzed and synthesized and interpreted are the human epidemiological studies.
Q. Doctor -- strike that.
For a study to be robust in evaluating the risk of cancer, wouldn't it have to adequately capture the exposure?
MR. SHEEHAN: Objection. Vague.
A. It's not so simple as that. Again, everything is context dependent.
Q. But you would agree that evaluating the exposure would be a critical component of assessing the list of cancer in an epidemiological study, correct?
A. Yes, I would agree that evaluating

Page 284
M. Terry

the exposure, which often, the first thing that we do is we evaluate the measurement error around an exposure. So, typically what we do is we assess the quantity of that measurement error.
So, for example, in -- in thinking about dietary exposures, typically when the reliability of those measures, often the index that's used to look at that, which is called the CAPA, is in the range of .4, .5. So, again, a lot of measurement error.
As opposed to when you look at electronic health records, the measurement error that may exist in those may be data that are outside of the system. So, you know, there's always measurement error in whatever you do, but the -- the job is to figure out what's the degree of the measurement error and how can impact on the findings.
So -- so, with diet, the big issue is frankly the measurement error, the sensitivity of those measures for all sorts of aspects of the diet, except for things that they've shown now, have more

Page 285
M. Terry

reliability. And so, often that may be more about food patterns as opposed to specific, you know, nutrients within a diet, which is very hard to look up.
So, even though those kind of analyses exist, it's just the quality and the measurement error is so large that, again, the concern is always that you have this kind of recall bias with those diet. So, it's very context specific.
Q. So, you would agree, Doctor, that when assessing the risk of cancer in an epidemiological -- an epidemiological study, it's critical that you adequately evaluate the exposure, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. I would agree as in epidemiology, it's critical you evaluate the measurement of that exposure. Now, in thinking about how that is, it's highly dependent on the context of the exposure. So, again, outside of epidemiology it may -- it may seem if you have an undercounting of -- of an absolute amount of an exposure that that would matter.

But I can tell you from running many, many regressions and analyses for over 30 years, that it doesn't matter as long as people preserve their ranking. So, and that's -- that's true too, so that's why in my assessment and given what I know about applied statistics in conducting statistical analyses, the electronic health record studies that I reviewed, even if they undercounted over-the-counter medication, internally they were valid because they were able to have records and not rely on self-report of these prescriptions. So -- so, again, my assessment of those studies were that they were very high quality and, again, conducted in real living humans and not supporting any association whatsoever between ranitidine and different cancers.

Q. Doctor, you've used smoking as an example several times.

Would you expect to see in an epidemiological study that only looks at smoking for 30 days an increased risk of cancer?

MR. SHEEHAN: Objection. Vague.



A. Again, it's context specific. So, you would have to -- you would have to think about the population. You would have to think about, you know, the smoking rates in a population. So, again, that -- that changes over time in different populations. And so, you know, in -- in some settings, a one-day measure of smoking can be very valid, right, if people aren't changing their quit patterns, that can be a very valid association.

For many years, the best way of asking about whether or not you were a long-term question was a single question related to what time you had your first cigarette during the day. So, again, it's highly context specific.

Q. Doctor, looking at smoking, if the only information that you have is a database full of individuals who smoked for only 30 days, would you expect to see an increased risk of cancer with 30 days of exposure to cigarette smoke?

MR. SHEEHAN: Objection. Asked and answered.



A. So, it's not as simple as that, because, again, a 30-day measure, let's say a physical activity, believe it or not, reliably maps to colorectal cancer. And this has been shown over and over and over again in cohort studies and case-control studies. Even though that, you know, when you ask somebody about their physical activity, it may be underreported. And so, yes, you can have very sophisticated studies where people have accelerometers and they're measuring their daily steps and everything else or you're watching the number of, you know, hours they're at a gym. However, you want to do it, it doesn't matter.

Like, the association between colorectal cancer and physical activity is so robust that you see it over and over again, even if they were to ask about physical activity over the last 30 days.

So, you know, again, it's highly context specific.

Q. So, Doctor, you're not -- are you suggesting that 30 days of physical activity can lead to colorectal cancer, is that what



you're saying?

A. No, it -- physical activity reduces your risk of colorectal cancer. And so, what I'm saying, your question was, can -- how can any measure that's only for 30 days be reflective of cancer. And what I'm trying to give you an example of is that there are -- it's highly context specific and there are plenty of examples where you can use an exposure during a shorter exposure window, but it consistently maps to the outcome. In this case, it's reduced colorectal cancer risk.

So -- but the importance -- the reason we know that even though these factors that are measured were there because everything has some measurement error, including every laboratory study has measurement error. So, the importance here is the signal versus the noise. And the signal for physical activity in colorectal cancer is such that the signal is seen across cohort studies and case-controls which allows you to rule out selection bias and information bias.

And so, that's why even though it's very hard to measure physical activity, we can be very confident that physical activity is related to reduce risk of colorectal cancer.

Q. Doctor, going back to some of the ranitidine specific epidemiological studies, we already established that the maximum exposure that Adami looked at was ten prescriptions, right?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. We've -- Adami summarized their data where it was ten or more prescriptions, so that's not the maximum, but that's the category that they looked at.

Q. Ten or more prescriptions, correct?

A. Yes.

Q. Is that what you said?

A. Yes.

Q. And the exposure in Yoon that was measured was what?

MR. SHEEHAN: If you need the study, Dr. Terry, you can ask to see that.



A. So, again, we -- we can pull up the study if you have a specific question, I'm looking at page 111 of my report where the Yoon study examined defined daily dose and duration.

Q. And Yoon, the maximum exposure that Yoon evaluated was exposure for one year, correct?

MR. SHEEHAN: Objection.

A. I would need to look at the study.

Q. Would you agree with me, Doctor, that the maximum exposure that was evaluated in the Kantor study was four weeks of exposure?

MR. SHEEHAN: Objection. Mischaracterizes the study.

A. No, I would not agree with that.

So, the Kantor study was a study of almost half a million people, 460,000, 459,204 in the UK Biobank. The UK Biobank is a study of volunteers in the UK and they've also collected biospecimens. And so, they -- they looked at baseline. So, at the beginning of someone joining the cohort, they looked at a series of different questions.



And for their medication section, they asked about regular use and so they said, most days for at least four weeks. This is typical of how medication is asked about in a questionnaire study, because, again, dealing with people's recall, what they want to know really is what have you done the last month. And so, it's not just for four weeks, it's just that's how the question is asked. So -- and that would be true of other kinds of medications, typically we ask about, you know, in an average week, how many nonsteroidal anti-inflammatory medications would you have taken? Were you ever prescribed antihypertensives, if so, over the last month? And that's done, you know, purposely because of the idea of getting higher quality data, you know, asking people about recent medication. But it's not used to say that it's only four weeks of exposure.

Q. What is the maximum amount of exposure that was analyzed in the Kantor study?

A. So, again, we don't have a maximum because that's not how the study was done.



The study was done where they're basically able to look at people who have reported having regular intake compared to people who have not reported them. And -- and they actually also had a comparison with PPI as well as with non-use.

Q. So, when they're looking at exposure though, they're looking at people who had regular intake for four weeks correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, again, how they report it is that it's based on self-reported regular use most days for at least four weeks.

Q. And what was the maximum exposure that they evaluated in the Norgaard study?

A. So, their exposure assessment, they use medical records, their exposure assessment was limited to individuals who selected or redeemed at least two prescriptions of the same drug between the period of 1996 to 2008 and had no prescriptions in 1995. They also excluded individuals who redeemed a prescription of

one of the other drug categories before the index date.

Q. So, at least two prescriptions of ranitidine; is that right?

MR. SHEEHAN: Objection.

And again, to the extent you need to see the study, Dr. Terry, feel free.

A. Yes, that's correct.

Q. And Dr. Terry, what about the Kumar study, what is the maximum amount of ranitidine exposure evaluated in the Kumar study?

A. So, this was a study that was looking at a cohort of patients that were treated for H. pylori and they did it -- they conducted it within the Veterans Health Administration and they looked specifically at people who were receiving prescriptions for at least 30 days.

Q. And looking at the -- just letting the sirens stop.

Looking at the Y. Kim study, what's the maximum amount of exposure that was done in the Y. Kim study?



MS. FINKEN: Did you catch that, Candida?

THE COURT REPORTER: I did, yes.

A. Yeah. So, this was the study that was using the Explorys Database. So, this was, you know, this is the database that is including hundreds of hospitals, I think it's 360 hospitals, almost 73 million people. And so, the way that they design their study was they -- they have concurrent medications so that's how they counted their exposed. And so -- so, someone could've been receiving the medication for many years. But we don't have a maximum number, in least in how they reported it out.

Q. So, they could've been taking it for a number of years, but they don't actually analyze the data for individuals who were taking it for a number of years, correct?

MR. SHEEHAN: Objection.

Let me get my objection.

THE WITNESS: Okay, sorry.

MR. SHEEHAN: Objection. Vague.

Go ahead.



A. Again, I would reiterate that the important part here with all of these different studies is that these are assessing how ranitidine use is being used in real -- in real life and this has been looked at in different Asian countries, it's been looked at in different Scandinavian countries, it's been looked at in the US. And there's no consistent pattern whatsoever and -- with ranitidine use, how it's used. You know, some people use it short-term, some use it long-term. So, again, the point here, just like other kinds of medication exposures, this -- they approach that these different studies have taken is very comparable to how other studies have evaluated medication and cancer risk. And, you know, of which there have been, you know, many signals that have been shown for other medications, these are using the same sort of approaches.

Q. So, Dr. Terry, can you tell from evaluating the Y. Kim study how long the individuals were taking ranitidine?

MR. SHEEHAN: Objection. Asked and answered.



A. Yeah. So, they don't report out, you know, duration in their paper.

Q. Okay. You just know that they took ranitidine at some point, correct?

MR. SHEEHAN: Objection.

Mischaracterizes the study.

A. So, we know we know a lot. We know that this was a study done in 73 million -- well, specifically, they had data on 73 million of which there were over half a million ranitidine users, over 900,000 famotidine users and over two million PPI users. So, this -- this is a study that's highly generalizable to, you know, the U.S. population because it captured a lot of the U.S. population. And they have a good reliable measure of exposure because it's using the electronic medical record and internally their results are valid. Even if they -- they're not counting over-the-counter, it's been shown actually by a lot of by different sim- -- by simulation studies that -- that given the percent of -- given -- even if over-the-counter medication was not known, that that kind of bias

wouldn't be high in this setting. And I refer to one of the simulation studies in my expert review.
So, again, the Kim study is just one of many studies that have found no association.
MS. FINKEN: I'm going to move to strike as nonresponsive.
Q. Doctor, you cannot tell from the Y. Kim study how long the individuals in that study were taking ranitidine, correct?
MR. SHEEHAN: Okay. Asked and answered.
A. Again, it would be a distribution upwards of, you know, upwards of ten years. But, again, there's gonna be a distribution where some people took it for short, some took it for intermediate and some took it for long.
Q. Is that breakdown given in the study itself?
MR. SHEEHAN: Objection.
A. No, they did not break it down further.
Q. Did they break it down like you


just suggested, short, intermediate and long?
A. We can look at the paper, but not that -- not that I recall.
Q. And Doctor, what was the maximum exposure that they evaluated in the S. Kim study?
A. So, their exposure window was from 2002 to 2008 and then they counted cancers from 2009 forward.
Q. I didn't ask what the exposure window was.
What was the maximum amount of exposure they evaluated in the Y. Kim study -- in the S. Kim study?
MR. SHEEHAN: Objection.
A. I would have to look at the paper. If we can pull up the paper, I can take a look at it.
Q. You don't have it in your table?
A. I have -- I have the exposure window is 2002 to 2008.
Q. Okay. But you don't have the actual maximum amount of exposure that they studied in the S. Kim study in your tables, correct?


MR. SHEEHAN: Objection.
A. Again, that's not what's relevant here in my expert opinion. What's relevant is in these studies of which this one is also over a million people, was there any association with how ranitidine is being used in free-living populations. And so, that is what I focused on.
MR. SHEEHAN: Tracy, we've been going for about, I don't know, I guess an hour and ten or so. Do you -- are you getting to a maybe a short breaking point?
MS. FINKEN: In about two minutes, okay?
MR. SHEEHAN: Okay.
MS. FINKEN: We can take a -- we can take a break in about just a couple of minutes, okay?
BY MS. FINKEN:
Q. Looking at the Iwagami study, Dr. Terry, what is the maximum amount of exposure to ranitidine that they evaluated in the Iwagami study?
MR. SHEEHAN: Objection. Vague.


A. So, again, I would have to look up the paper for the details. This is a study that followed individuals on average for 2 and a -- 2.4 years and the interquartile range was 1.1 to 4.5 years of follow-up. I would have to look to see if they reported out the maximum exposure.
Q. Isn't it true that the Iwagami study looked at ranitidine and nizatidine combined?
A. Yes, they were looking at ranitidine and nizatidine together, yes.
Q. And they don't have a break -- they don't have a separate analysis for ranitidine and a separate analysis for nizatidine in that paper, correct?
MR. SHEEHAN: Objection.
A. Again, my recall of this paper was they looked at them together because of the hypothesis that they both might have NDMA exposure, so that's why they put them together.
Q. Do you have an understanding of the mechanism by which nizatidine contains NDMA?
A. Again --

MR. SHEEHAN: Objection.
Hold on.
Objection. Vague.
A. Again, in my expert opinion I was evaluating the epidemiological associations and not -- not the biological mechanisms.
Q. Do you know whether or not nizatidine -- strike that.
Do you know the amount of NDMA contained in nizatidine as compared to the levels found in ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Not off the top of my head. I would have to look it up.
Q. Okay.
MS. FINKEN: All right, let's take a break.
THE VIDEOGRAPHER: We're going off the record. The time is 9:26 p.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 9:48 p.m. UTC time.



BY MS. FINKEN:
Q. Dr. Terry, are you communicating with anyone other than your lawyers about your deposition over the course of the day?
A. No, I'm not.
Q. Have you ever had any communications with any of the ranitidine specific study authors about their studies?
A. No, I have not.
Q. Doctor, going --
MS. FINKEN: Let's pull up Exhibit 6341.
(Exhibit 6341 was marked for identification.)
BY MS. FINKEN:
Q. And Doctor, this is a Hazard Assessment Report that was prepared by GSK and produced to us for this litigation, dated December 25, 2019 relating to NDMA.
Do you see that?
A. I do, I'm just waiting for it to come into the Box.
Q. Sure.
THE VIDEOGRAPHER: It just uploaded. You should be able to



refresh and see it now.
Q. Doctor, have you seen this document before?
MR. SHEEHAN: Do you have it on the Box?
A. Still waiting, I don't know why it's taking a while to refresh. Sorry, 63 what?
Q. 41.
A. Yes. Sorry, now I have it, yes.
Q. We're going to mark this as an exhibit to your deposition Exhibit 6341. It's the GSK Hazard Assessment Report for NDMA dated September 25, 2019.
Do you see that?
A. I do see it, yes.
Q. Have you ever seen this document before?
A. Again, I may have seen it, it's not relevant to my expert review, which is based on epidemiological studies that are in the peer-reviewed literature.
Q. Okay. Let's turn to page 5 of that document, please.
At the bottom of that page in the



section, Genotoxicity?
Do you see that? It indicates that:
There is overwhelming evidence that NDMA is mutagenic and clastogenic.
Do you see that?
A. Yes, I see that, yes.
Q. Do you agree or disagree with GSK's statement that there is overwhelming evidence that NDMA is mutagenic and clastogenic?
MR. SHEEHAN: Objection.
A. So, I have no reason to disagree with that statement. Again, this -- this assessment has been made by IARC and others. Again, there's many things that are mutagenic and clastogenic that have not been shown to be causal carcinogens in human populations. So, that is why IARC has not classified NDMA as a Type 1 human carcinogen.
Q. Can you give me specific examples of the many things that have overwhelming evidence that they're mutagenic and clastogenic, but are not carcinogens in humans?
MR. SHEEHAN: Objection.

A. I can give you -- I gave some example in my report. If we're talking about -- if we're talking about compounds that have been classified as 2A from IARC, there's 70 or 80 off the top of my head, that's the range of how many and then there's many more. There are 2B, which are possibly carcinogenic based on tests of mutagenicity as well.
So, again, there's just many, many examples of things that could be potentially mutagenic in animal models that have not been shown to be human carcinogens. So, partly that's just because, you know, the way experiments are done in animal models may not relate to human exposure. And so, there's plenty of examples of mutagens that are not human carcinogens.
Q. So, Doctor, you're not suggesting that because a compound is classified by IARC as 2A or probable human carcinogen that it's not carcinogenic in humans, are you?
MR. SHEEHAN: Objection.
A. So, again, to know whether or not something that has been classified in a lab


as mutagenic is causally related to human cancers, you need studies in humans. So, that's -- was what my assessment was for the entire scientific report.
Q. Let's turn to the next page in that document, please. I'm sorry the next page, 7. Okay. And at the top there there's a section, Carcinogenicity.
Do you see that?
A. Yes.
Q. And GSK indicates in this Hazard Assessment Report that:
In animal studies of various species, including rats and mice, exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and blood vessels.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement that in animal studies of various species, exposure to NDMA has caused tumors of the liver, respiratory tract, kidney and blood vessels?
MR. SHEEHAN: Objection.


A. Again, my expertise is not in laboratory science, but I would agree that that statement is consistent with what the International Agency For Research on Cancer, which evaluated the laboratory data, and that's why it's classified as a two-way.
Q. In looking down in the middle of that paragraph beginning with the sentence, Qualitatively.
Do you see that it states:
Qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered highly likely that NDMA is carcinogenic to humans potentially at relatively low levels of exposure.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement here?
MR. SHEEHAN: Objection.
A. So, again, the mechanisms and metabolism of NDMA in -- in animals and how it pertains to humans is not my area of expertise.


What I can say is, based now on many different studies, there has been no consistent or reliable association between NDMA even at very low levels and human cancers.
MS. FINKEN: So, going down to the bottom of that section, can you zoom out, please?
Q. Very last sentence in the conclusion of the Carcinogenicity section is:
NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.
Do you see that?
A. Yes, I see that.
Q. Do you agree or disagree with GSK's statement that NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible?
MR. SHEEHAN: Objection.
A. So, again, it's not as simple as that. Had there been experiments to show that NDMA can be genotoxic? Yes. And whether or not exposure should be reduced to the extent possible, that's a general

Page 310
M. Terry

statement. So, that is a general statement that you have to evaluate within the context of who's -- what your exposure for NDMA and, for example, if it's from medication, then you have to evaluate that with respect to what the medication is doing for -- for the individual person, so I think it's highly content specific.

But, yes, I would say anything that's listed in 2A, which is a probable human carcinogen, a general advice should be that exposure should be reduced. But, again, what's in 2A, for example, one is nightshift work.

So, yes, based on the human epidemiological studies and based on other types of evidence, you should reduce your exposure to night -- night work, shift work. Most people can't, right? So, you know, so that's a general statement.

And so, if -- if the person was taking a medication that had NDMA and, again, you want to evaluate it with why the medication is being used in the first place.

Q. Is nightshift work considered to be

Page 311
M. Terry

a genotoxic carcinogen?

A. Again, it depends on -- it's classified as a two-way, classified as a two-way. And there have been -- you know, there have a number of laboratory studies related to, you know, how it affects circadian rhythm genes, so...

MS. FINKEN: You can zoom out, please.

Q. Okay. At the bottom of that page looking at human use, the very last sentence it indicates:

Relevant epidemiological studies include case-control investigations in which the potential risks of cancer of the stomach, (Risch, Gonzalez, La Vecchia, Pobel) of the upper digestive track, looking at (Rodgers), and the lung (Goodman) and if we can -- associated with the ingestion of NDMA has been assessed.

Do you see that?

MR. SHEEHAN: I think she's on page 8 if you're trying to follow on the --

A. Yeah, I see the -- yeah, that's

Page 312
M. Terry

okay. I see the top -- top of page 8, yes.

Q. So, it starts on the previous page. And essentially, GSK is indicating that there have been relevant epidemiological studies including case-control investigations in which potential cancers -- or potential risks of cancer of the stomach the upper digestive tract, the lung, have been assoc- -- and the association with the ingestion of NDMA has been assessed.

Is that correct?

MR. SHEEHAN: Objection.

Q. That's what GSK is saying here, correct?

A. That's what they're saying there, yes. I didn't read the full paragraph, but I read up until the -- the top of page 8.

Q. Okay. So, if you go further down that paragraph it says:

In some of these reports, Goodman, Gonzalez, Pobel, the estimated intake of NDMA was based upon recollection of an individual's typical diet consumed in the year preceding the onset of illness, as well as the reported levels of nitrosamine in the

Page 313
M. Terry

foodstuffs consumed, derived from other studies.

Do you see that?

A. I do see that, yes.

Q. Okay. And it goes on to state that:

In the studies conducted by De Stefani (1996) and Rogers (1995), subjects were asked to recall their typical diet in the 5 and 10 years respectfully prior to the onset of illness.

Do you see that?

A. I see that, yes.

Q. And then GSK states:

In the studies -- strike that.

Then GSK states:

In three of four case-control studies, there was a positive relationship with evidence of exposure response for the intake of NDMA and gastric cancer, although not in an additional study in which --

MR. SHEEHAN: Sorry, Tracy. That's us. Lord knows why this is going off.

Do you want to just go off the

record real quick? Let's go off the record.
THE VIDEOGRAPHER: Off the record --
MS. FINKEN: What is that?
MR. SHEEHAN: Actually, it stopped, it stopped.
MS. FINKEN: What was that?
MR. SHEEHAN: I think it's some sort of phone that's sitting in the middle of the conference table.
MS. PASSARETTI-WU: Yeah, it must be the Polycom in the conference room. If you wanna just unplug it, you can so that doesn't happen again.
MS. FINKEN: Okay, so...
MR. SHEEHAN: I'm not unplugging anything. Let's keep going.
BY MS. FINKEN:
Q. All right. Let's go back. Let's go back, I'm gonna start over there.
So, it says here: In three -- GSK states here in the middle of the paragraph:
In three of four case-control studies, there was a positive relationship



with evidence of exposure response for the intake of NDMA and gastric cancer.
Do you see that?
A. Yes, I see that.
Q. Okay. And it's citing to GSK is citing to (Gonzalez, 1994; La Vecchia, 1995 and Pobel, 1995, correct?
A. Yes, that's correct.
Q. When they -- when GSK is stating that there's evidence of exposure response for intake of NDMA and gastric cancer, what is exposure response referring to?
MR. SHEEHAN: Objection.
A. So, again, this document -- I -- I focused on the peer-reviewed epidemiological data, what -- what exposure response in this context likely means is the tertiles or the quartiles that these studies used in -- in looking at this association. So, again, I would point out that most of these studies as you already yourself pointed out from the previous page, most of these studies were case-control studies and I considered all the case-control studies and the cohort studies, many of the ones you're referring to now are



for gastric cancers. And so, in my report, I go into great detail about each of these studies and also specifically review the Song study, which I -- I have on page 95 now and --
Q. Sorry to interrupt you, because I'm not asking you about your report right now and we only have limited time here and we'll be here all night.
My question was, what does evidence of exposure response for the intake of NDMA and gastric cancer mean?
MR. SHEEHAN: Tracy, please try not to interrupt the witness when she's answering.
You can go ahead, Dr. Terry. To the extent you need to provide context, you're -- you're free to do so.
A. So, within this context, I would imagine -- I mean, I know because I read these studies that it pertains to tertiles quantiles, whether that's -- quantiles just meaning just cutting up the data, whether that's by tertiles into three groups or



quartiles into four groups some of the dietary studies even did it into five groups.
However, even when you break up things like that into quantiles, those studies are still susceptible to recall bias. And what we do know now is that many of these studies from the '90s have not been replicated in large cohort studies and that's what the Song meta-analysis found.
Q. Okay. Dr. Terry, I would just ask you to please respond to my questions. And I understand there's a lot of things that you want to say and you will have your opportunity when your counsel questions you at the end of the deposition. But if we want to get done tonight at a relatively decent time, I need you to respond to the questions that I'm asking and not, you know, to what you want to respond about your report.
So --
MR. SHEEHAN: And let me say -- Tracy, I don't mean to cut you off, but let me just say for the record that she's responding to your questions, obviously you disagree.

This has come up in other depositions as you well know with plaintiffs' experts. If she has context to provide, the witness is free to provide the context so that her testimony is not misconstrued.

MS. FINKEN: Okay.

BY MS. FINKEN:

Q. Dr. Terry, is it true that a positive relationship of exposure response means that the more that you are exposed to whatever the agent is, the increase -- the higher the risk -- the more increase in risk?

MR. SHEEHAN: Objection.

Q. Generally.

A. So, again, it's -- it's not so simple as that. Again, it depends on how you measure the exposure to understand the degree of bias in the different quantiles. But as a general statement, yes, the more exposure would -- I mean, the dose response would be looking at higher quantiles compared to lower quantiles. But, again, that's a general statement and it would highly depend on the measurement error for each of those



quantiles.

Q. So, do you disagree with GSK's statement here that three of the four case-control studies demonstrate -- demonstrated a positive relationship with evidence of exposure response for the intake of NDMA and gastric cancer?

Do you disagree with GSK?

MR. SHEEHAN: Objection.

A. So, I would have to look -- and this is what I've done throughout my report, but I would have to look up each of those studies before I agreed or disagreed with that statement.

MS. FINKEN: Okay, let's move down the page.

Q. So, it indicates in --

MR. SHEEHAN: Tracy, I'm gonna be out of the shot here just for a moment, I'm just grabbing a seltzer.

MS. FINKEN: Is it a hard seltzer?

MR. SHEEHAN: I wish.

MS. FINKEN: You want me to continue while you're out of the shot?

MR. SHEEHAN: Yeah, go ahead. I'm



back in my chair already.

Q. Okay. In two case-control studies in which masks were controlled for confounders was rather more extensive than that to the investigations of gastric cancer mentioned above, there were clear exposure response relationship for NDMA and lung cancer.

Do you see that?

A. Could you just highlight exactly where you are right now?

Q. Sure.

MS. FINKEN: So, it's the next sentence down. Can you high- -- no, where we just were the next sentence.

Q. In two case-control studies in which matching or control for confounders was rather more extensive than that for investigations of gastric cancer mentioned above, there were clear exposure response relationships for NDMA and lung cancer.

Do you see that?

A. I see that, yes.

Q. Did you review the Goodman 1992 study and the De Stefani 1996 study relating



to NDMA in association with lung cancer?

A. Again, I focused on reviewing the NDMA and epidemiological studies for the five cancers alleged. I did look at NDMA and other cancers. And again, I'd have to refer to my report and to those specific studies to provide more -- to provide more interpretation now. So, if you want to pull up the Goodman study or the De Stefani study, I can look at that and see whether or not I would agree with that.

Q. As you sit here today, do you have a recollection of reviewing the Goodman 1992 study or the De Stefani 1996 study regarding NDMA in association with lung cancer?

A. So, as I sit here today, I cannot tell you from many studies that I've read in the past based on a first author, except if it's a study that, for whatever reason, I remember the first author, I would need like the full title and I would need to see the study, 'cause, you know, that's a study that's 30 years old now, so I would have to see it and look at it.

Q. Going on down this page, the next

sentence, GSK notes:
In almost all studies, associations between the cancers of interest and nitrate and nitrite and NDMA were examined; results were relatively consistent in this regard, with there being an association with cancer most commonly with NDMA.
Do you see that?
A. I do see that, yes.
Q. Okay. Do you agree or disagree with GSK's statement that the results of these studies were relatively consistent showing an association with cancer with NDMA?
MR. SHEEHAN: Objection.
A. So, again, if these studies refer to all of these different studies in this paragraph, I would want to look at the studies. I know, myself, how -- how these food frequency questionnaires work and how the assessment of NDMA coming out of those food frequency questionnaires is measured, so it does not surprise me at all that there would be a positive correlation across all three of those categories.
And in fact, in the studies that



I've read for the five cancers that are being alleged. There were similar patterns. And again, that's because of the way the food frequency questionnaire works and how people are asked those questions, so... But I would want to read these studies before making that clear assessment.
Q. Okay, strike that.
Doctor, what is a DNA adduct?
A. So, a DNA adduct refers to something that attaches itself to DNA and that can change then how the DNA is read out into RNA.
Q. Further down this paragraph, GSK states:
There appears to be no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement that there's no qualitative difference between rodents and humans in the formation of DNA adducts following exposure



to NDMA?
MR. SHEEHAN: Objection.
A. Again, that's a general statement and requires context, so -- and I -- I reviewed the human data, not the rodent data.
I can tell you in my own research and working in the field of polycyclic aromatic hydrocarbon adducts that -- that -- that in those kind of adducts, it's highly dependent on exposure levels and there isn't a one-to-one match when you look in the animal model and you look in the human data.
MS. FINKEN: You can take that down, please.
Q. Doctor, you had indicated previously that you do not do an assessment of Bradford Hill criteria at since a finding an association.
Do you recall that?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
Go ahead.
A. I first need to rule out whether or not bias or chance have contributed to the associations that are seen. And again, just



to clarify for the record, when I say "association," I'm not meaning causal association, I'm using it in the way that it's used routinely in epidemiology, as first we see this correlation, which we often call an association, but that does not mean a causal association. We do not call something a causal association from any one study. We have to make that assessment from a collection of study after we've ruled out the role of bias contributing to those findings, as well as chance.
Q. Doctor, isn't the purpose of the Bradford Hill factors to determine whether or not an association arises to the level of causation?
MR. SHEEHAN: Objection.
A. So, again, the Bradford Hill criteria are used to make an assessment about causation, but in order to do that you have to understand first if what you observed is a real finding and different from what you would expect by chance or different -- or explained away by bias.
Q. Can you cite to any scientific

authority that indicates that you should not consider Bradford Hill criteria unless you find an association first?
MR. SHEEHAN: Objection.
A. Again, it's -- it's a common practice in the field of epidemiology and it's what we teach all of our doctoral students and doctoral level and Master's level students.
Q. Can you cite to any scientific authority that supports the proposition that you shouldn't look at Bradford Hill criteria unless you find an association?
MR. SHEEHAN: Objection. Asked and answered.
A. I mean, I would cite Bradford themselves if you read the discussion of which it's a very thorough discussion. They talk about how you should not reach causal conclusions when something could've been contributed to by bias.
Q. And you said that's in the Bradford Hill publication?
A. The original Bradford Hill publication talks about how you have to rule


out the role of chance and bias in contributing to the association.
Q. Okay. Let's look at -- well, Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and bladder cancer?
A. I'm going to pull out my summary, which we looked at earlier today of the four studies that have looked at ranitidine and bladder cancer.
So, these four studies have reported out different findings and of these studies, these four studies, the Cardwell study, when it was comparing versus PPI, but not with other H2RAs, did report a statistically significant association for greater than 1,095 defined daily dose.
And then the Cardwell study found something similar too when reporting out to non-use overall and then for that higher dose. The other three studies did not find anything.
Q. In the Cardwell study, the authors concluded that in this large population-based study, the use of ranitidine, particularly


long-term use, was associated with an increased risk of bladder cancer.
Do you recall that?
MR. SHEEHAN: Objection.
A. We can pull up the papers, the paper itself, and if you pull that up, we can look at exactly what the authors say.
But, again, I would reiterate that my assessment of the literature comes first and foremost from the data and less about the interpretation of what the authors themselves think of the data. It's -- I'm doing an assessment on my own about the point estimates with my experience and knowledge of what can take a point estimate and bring it down to one.
Q. Do you disagree with the -- Dr. Terry, were you finished with your answer?
A. I was just gonna say in this situation in the Cardwell study, which is the only study of the four studies that had a statistically significant association, and even within that study, they only found it when they were comparing it to non-use or to


PPI for -- for over 1,095 defined daily dose. They did not find that when they compared it to other H2RAs.
Q. Doctor, do you disagree with authors -- the Cardwell authors' conclusion that there was an association between ranitidine and bladder cancer?
MR. SHEEHAN: Objection.
A. Again, I -- without seeing the paper --
MR. SHEEHAN: Let me just get my objection -- just let me get my objection.
THE WITNESS: Okay.
MR. SHEEHAN: Objection. Vague and asked and answered.
Go ahead.
A. If you pull up the paper, we can see what they said exactly.
Q. Do you disagree -- if the Cardwell authors concluded that there was an association between ranitidine and bladder cancer, do you disagree with that conclusion?
MR. SHEEHAN: Objection.
A. Based on my expert assessment of

Page 330
M. Terry
that article, I disagree with that assessment. I would say that -- and that is based because on -- in their study which I reviewed, the more appropriate comparison group would be the other H2RAs.
Q. Doctor, with long-term use of ranitidine in comparison to H2RAs, it did show an increased risk of bladder cancer, although it didn't reach statistical significance; is that correct?
MR. SHEEHAN: Objection.
A. Again, with the Cardwell study, that finding was not statistically significant, that is correct.
So, what I would want to see is I would want to see that replicated in other studies. So, if four out of these four studies or even three out of these four studies, if most of these studies found something similar, then that would be a consistent pattern. But there's no consistent pattern from these different studies.
Q. Which four studies are you referring to?

Page 331
M. Terry
A. I'm referring to the Cardwell, Norgaard, Yoon and Kantor.
Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?
A. So, again, I have summarized literature on page 67 where you can see that the studies that have been published on ranitidine and stomach cancer are not consistent with being -- do not show a consistent pattern in the data whatsoever.
Q. Okay, that wasn't my question though.
My question was, are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?
MR. SHEEHAN: Objection. Vague and asked and answered.
A. So, there are individual associa- -- individual studies that report a decreased association. So, if you look at the Kim YD and also Kumar, so there's two studies that report a decreased association.

Page 332
M. Terry
And there's one study, the Lu, which reports an increased association of -- or an increased risk estimate.
Again, when I use association, I don't mean causal here, it's the use -- how we used in the field, which is a correlation.
So, there's an increase point estimates in the Lu that's statistically significant, but it's not after longer life period. So, that's suggestive that that -- that was not met, so then that that would be suggestive of reverse causality.
Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and liver cancer?
MR. SHEEHAN: Objection. Vague.
A. So, again, my summary of the published literature on liver cancer and ranitidine use is on page 68 and what you can see there is that the Kim study, the Kim Y study found statistically significant decreased point estimate with liver cancer. So, there was one study that found a statistically significant decrease and. Then

Page 333
M. Terry
the Kantor study found a statistically significant increase association.
So -- and the other studies did not find anything that would be different from chance.
I do want to point out that the Tran and the Kantor analyses on my summary, that they both use the UK Biobank, so these are not independent replications of each other.
Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and esophageal cancer?
MR. SHEEHAN: Objection. Vague.
A. So, now, I'm referring to my summary of the results on page 65 of my report and in this report, there's the Kim study, the point estimates are statistically different from 1 and it's a decreased association or point estimates are lower than 1 for the -- for use of ranitidine, and the other ones are not statistically significant. I'm sorry, the Tan -- the Tan finding at the bottom is also decreased association.

Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and pancreatic cancer?
MR. SHEEHAN: Objection. Vague.
A. So, on page 69 is my summary of the published literature on ranitidine and pancreatic cancer. The Kim study found a point estimate that is below 1 for ranitidine users compared to famotidine. And the Habel study found a point estimate that was above 1 that was statistically significant.
Q. What was the point estimate for Habel?
A. The point estimate for Habel was 2.6 with a range of 1.06 to 6.38 for the confidence limit. And also the Adami study found the finding that was a decreased point estimate for less -- for -- for five or more prescriptions.
Q. Doctor, are there any published peer-reviewed studies reporting an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection. Did you say bladder?



MS. FINKEN: Yeah.
MR. SHEEHAN: Oh, okay. Objection. Asked and answered.
A. Do you want me to repeat my answer from before?
Q. No, I am not asking you about ranitidine. I'm asking you, are there any published peer-reviewed studies reporting an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection.
A. So, in my report, I report the dietary NDMA and occupational NDMA in my report.
Q. And which studies in your report do you report that report in -- oh, my gosh, strike that.
Which studies -- which peer-reviewed publications report an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection.
A. (Document review.)
So, I report the Ronco 2014, which is a retrospective case-control study that was conducted in Uruguay and then I report the Jackson 2011 study. So, the Jackson was



a cohort study that was conducted within the European prospective investigation for cancer and nutrition. This is a very large cohort study that was started by many people at IARC and other countries in Europe specifically because of all of the -- all of the concern about case-control studies and diet and so this included almost a half a million people from ten European countries. And the cohort study did not find any consistent association whatsoever with NDMA in the diet and bladder cancer risk.
And so, I explain in my report on page 87 that the different reported results from Ronco and Jackson illustrate why cancer researchers look for consistency and replication across different study designs and populations, particularly as positive case-control studies of diet and cancer is often not replicated in cohort studies.
Q. Doctor, did the authors of the Ronco study indicate that there was a higher risk of bladder cancer observed with NDMA in that study?
MR. SHEEHAN: Objection.



If you need to see the study, you can of course get access to it, Dr. Terry.
A. Sure. Again, I don't have the study in front of me.
MS. FINKEN: Let me just respond to Tom. I don't appreciate him coaching the witness.
Q. My question was, did the authors of the Ronco study indicate that there was a higher risk of bladder cancer observed with NDMA in that study?
And you're looking at your report, do you report that in your report?
MR. SHEEHAN: Let me just say for the record that I am not coaching the witness in any way, shape or form. I'm merely -- you're asking her about a study and if she -- there's a lot of data out there, if she needs to see the study, she can have access to the study to answer your questions. I mean, this is what happens at every deposition. I didn't think that was controversial.

MS. FINKEN: Are you finished, Tom?

MR. SHEEHAN: I am now that I've responded to you, yes.

A. So, again, I heard your question as, did the authors of this Ronco paper say something, and that's why I had asked to see what the authors had said and I have asked a few times in this deposition to see the articles for more detail. But if -- if you want me to say what the authors said, I would definitely need to see that. I can tell you from my own report and expert evaluation is exactly what I say on page 87, was you have these two studies, one in Uruguay that's a case-control studies which is subject to recall bias and one of the largest cohort studies of diet and cancer which has yielded a lot of really important findings on diet and cancer. And the second one didn't find anything. And that was a cohort design which is not susceptible to recall bias.

So, based on this assessment, as well as the assessment on ranitidine and bladder cancer, there is no consistent



pattern with dietary exposure to NDMA and bladder cancer, nor with ranitidine and bladder cancer. Absolutely no consistent pattern.

MS. FINKEN: I'll move to strike as nonresponsive.

Q. Dr. Terry, in your report, do you provide the authors conclusion of the Ronco study that indicate that there was a higher risk of bladder cancer observed with NDMA intake?

MR. SHEEHAN: Objection. Asked and answered.

A. So, I provide in this paragraph context with which to evaluate the Ronco study. Did I repeat the findings that they reported in their study? I didn't repeat them here because I'm evaluating the context between these two studies of which --

Q. And what --

MR. SHEEHAN: Go ahead, Dr. Terry, if you're not done with your answer.

Q. What page of -- I wasn't trying to interrupt you, I just wanted to know what page of your report you're referring to.



A. I'm on page 86 and 87. So, I'm very transparent and I say these are different reported results. That's page 87 first full paragraph.

Q. Doctor, I want to turn your attention to page 89 of your report.

Are you there?

A. I'm here, yes.

Q. Okay. You just discuss on page 89 of your report regarding the De Stefani 2012 study.

Do you see that?

A. Yes.

Q. What was the relevant risk of -- strike that.

Okay. Looking at the -- midway down the -- that particular paragraph about the De Stefani 2012 study, you indicate the study reported statistically significant positive associations with the risk of ESCC for lamb meat, fried red meat, barbecued red meat, boiled red meat, salted meat, heterocyclic amines and NDMA.

Do you see that?

A. Yes, I see that.



Q. Okay. What was the odds ratio reported for NDMA and esophageal squamous cell carcinoma in the De Stefani 2012 study?

A. We would have to pull up the paper to look at that.

Q. Okay. You don't include it in your analysis of the study on page 89 of your report, correct?

A. I don't include it in this report. But again, what's relevant in this report is considering all of the human data on NDMA in -- in diet and occupation and ranitidine. And I've done that and I provided the context of those studies here, so...

MS. FINKEN: Let's go off the record for a minute.

THE VIDEOGRAPHER: Going off the record 10:42 p.m. UTC time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:13 p.m. UTC time.

BY MS. FINKEN:

Q. Dr. Terry, I'm going to jump around

a little bit because we're getting to the end of the day, so I may jump around a little bit and we're going to try to just get through this so we can get you out of here, okay?

Quickly, I just wanted to ask you a couple of questions about the Adami study.

Did the Adami study quantify the dose of ranitidine at all?

MR. SHEEHAN: Objection. Vague.

A. Can we pull up the Adami study if we're going to be talking about it in any real detail?

Q. Sure, we can pull it up.

MS. FINKEN: Has been marked yet? I don't think Jim marked it earlier, did he? This would be Exhibit 6349 and we'll mark it as an exhibit to your deposition.

(Exhibit 6349 was marked for identification.)

THE VIDEOGRAPHER: Added it to the Box folder, might take a moment to show up on your end.

MR. SHEEHAN: There are those sirens again. Can you guys hear those



in the background?

THE WITNESS: It is something you get inert to. But, yeah, it doesn't matter to me.

A. Okay, I'm sorry. I have it in front of me, yes.

Q. So, my question was, did the Adami study quantify the dose of ranitidine they were looking at at all?

MR. SHEEHAN: Objection. Vague.

A. So, the Adami study, which was a very large study examining a number of different cancer types and ranitidine use, did show results separately for those with at least five or at least ten prescriptions.

So, again, these cut points just represent those cut points as going into that category. But within that category, there's a range of individuals with those prescriptions and they discuss it a little bit more in their discussion. If we page down, we can see a little bit more about that range.

Q. Dr. Terry, I think you're misunderstanding my question or maybe I



wasn't clear.

Does the Adami study quantify the dose of ranitidine that's provided, for example, does it -- can you tell from the Adami study whether the prescriptions were 150 milligram dose or 300 milligram dose or 75 milligram dose?

A. So, they --

MR. SHEEHAN: Objection.

Let me get my objection in.

Go ahead.

A. They use the Danish prescription registry and they characterize the exposure based on the number of prescriptions.

Q. Okay. So, they don't quantify the milligrams of ranitidine that they are looking at in that study, correct?

A. No. In this study, they quantify the exposure based on the number of prescriptions.

Q. Can you tell from looking at the Adami study whether those prescriptions are 30-day prescriptions or 60-day prescriptions or ten-day prescriptions?

MR. SHEEHAN: Objection.



A. Again, their categories are based on number prescriptions, so it reflects the, you know, the way that ranitidine was prescribed within this very large prescription database.

Q. So, are they 30-day prescriptions?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, and this is done very commonly in pharmacoepidemiology studies. They describe the -- under the materials and methods, they describe the prescriptions generally and how they -- how -- how those were corrected from the national registry. They do go on in their results section -- I'm sorry, in their discussion section to talk about the fact that, again, this is a distribution and even though half of the -- I'm reading now from page 2307, although half of -- approximately half of the ranitidine users -- this is in, I'm sorry, the right-hand column, they say:

Approximately half of the ranitidine users had only one prescription, a substantial number had five or even ten

prescriptions enabling analysis of long-term exposure.

So, again, it's going to be a distribution of regular use of ranitidine and it's a comprehensive database and they have very good quality measurements of exposure and good quality measurements of outcomes. So, this is a very valid study that didn't rely on self-report.

Q. Dr. Terry, according to the sentence that you just read, approximately 50 percent of the ranitidine users had only one prescription, correct?

A. Again, there's a distribution such that they had short-term users, they had long-term users and this is how ranitidine is used in a general population and they were able to rule out any finding, any association between ranitidine and the cancers that they reported on.

MS. FINKEN: I'm gonna move to strike as nonresponsive.

Q. Doctor, according to the sentence that you just read, the authors are reporting that approximately 50 percent of the



ranitidine users had only one prescription, correct?

MR. SHEEHAN: Objection.

Q. Is that what it says there?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, this is a distribution. So, they have, it's a very -- they have people who have used it for many, many years and they've had people who, within their database, they have one prescription, yes.

MS. FINKEN: Again, I'll move to strike as nonresponsive.

Q. Let's do it this way:

It states here in the study, the authors state in the study:

Approximately half of ranitidine users had only one prescription.

Did I read that accurately?

MR. SHEEHAN: Objection. Asked and answered.

A. Yes.

Q. Doctor, you know you had pointed to this paragraph that discusses the one description versus the five prescriptions



versus the ten prescriptions, but does it state how long those prescriptions are? Are they 30-day prescriptions? Can you tell?

MR. SHEEHAN: Objection.

A. No, it doesn't state that. But again, the power of this design is that it doesn't have to state that to look at whether or not there's correlation between regular use and the cancers that are being assessed.

Q. Doctor, can you tell from the Adami study whether or not the five or ten prescriptions are consecutive prescriptions of ranitidine?

A. I'm going back to the methods. I think it was overall, I don't think they looked whether or not it was consecutive.

Q. Doctor, can you tell from the Adami study what the majority of patients were taking ranitidine for?

MR. SHEEHAN: Objection.

A. So, again, this is a really large study and over a million patients, it's a very robust study because it doesn't rely on any self report. It has captured the exposure from an electronic pharmacy database



and its capture linked it to cancer registries.

In Table 1, they list various different GI conditions for ranitidine users for users of other H2RAs and for PPIs.

Q. I don't think you answered my question, Doctor.

Can you tell from the Adami study what the majority of patients were taking ranitidine for?

MR. SHEEHAN: Objection. Asked and answered.

A. I did explain that in Table 1 it shows a number of different underlying GI conditions and -- for each of the medication classes.

Q. Doctor, would you agree with me that if these are 30-day prescriptions, ten prescriptions would equal ten months of ranitidine use?

MR. SHEEHAN: Objection.

A. Again, the cutoff of ten -- ten or more was or more. So, again, it could be a number of different -- it's not ten in everybody, it's ten or more.

Q. It could be, but you have no way of knowing that, correct?
A. Again, that -- when people use cutoffs, that's the minimum. So, everyone that's in that group had at least ten.
Q. Okay. So, going back to my original question, would you agree with me that if these are 30-day prescriptions, it would equal ten months of ranitidine use?
MR. SHEEHAN: Objection.
A. So, again, if that -- if they each were 30-day prescription, that would be the lower bound of what it would be for ten -- ten or more.
Q. Ten months, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, if each prescription is one month, yes. But again, that would be the minimum because these are ten or more.
MS. FINKEN: You can take Adami down for a second.
Q. Doctor, are you aware that the World Health Organization in 2002 concluded that the human epidemiological evidence



fulfilled the criteria for causal association between NDMA and cancer?
MR. SHEEHAN: Objection. Mischaracterizes.
A. I am aware of a 2002 World Health Organization report, which I read and I considered in making this. But, again, the scientific literature has advanced in 20 years and, in particular, we have a lot more studies that are prospective cohort studies and we have a lot more studies of ranitidine specifically of which to make an evaluation of ranitidine and the specific cancers that are being alleged.
Q. So, do you agree with the World Health Organization's assessment in 2000- -- as of 2002 that the human epidemiological data fulfilled the traditional criteria for causality of an association between ingestion of NDMA and cancer?
MR. SHEEHAN: Objection. Mischaracterizes the document.
A. So, again, based on two thousand -- the data that was available in 2002, the primary human evidence on NDMA would've been



NDMA from dietary sources and it would've been specifically case-control studies with few exceptions. Since then, there's been many more cohort studies. Those cohort studies have found no consistent pattern with any of the cancers that are being alleged. So, the -- any kind of Bradford Hill causal criteria of which I have considered throughout my report would assess that there's no evidence because the case-control and the cohort studies are not consistent with each other.
Q. So, is your answer that you disagree with the findings of the World Health Organization in 2002?
A. I think --
MR. SHEEHAN: Objection.
Let me get my objection before you answer.
Objection. Asked and answered.
A. At the time, that they were writing that, the human data would've been overwhelmingly case-controlled data. So, they would've made that assessment based on case controlled data which we now have found



out would've been bias because the cohort findings were not consistent with that.
Q. So, you disagree with their findings, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. Based on all of the data that is available in humans, of which there's millions of people involved in these studies at this point, I -- I would disagree with that statement based on all of the human data that has accumulated over the last 20 years.
Q. So, Dr. Terry, let's look at Y. Kim for just a moment. Well, let me ask you a question about the Y. Kim study.
You discussed that earlier with Mr. Ronca, do you recall that?
A. I recall discussing that study, yes.
Q. Okay. And you agree that the Y. Kim study was using the Explorys Database?
A. Yes, I agree that it was using the Explorys Database.
Q. And did you testify -- I apologize if I'm wrong on this but, did you testify

that you have used the Explorys Database in studies previously?

A. I don't think I testified that -- about that specifically. I probably said that I have read studies that have used the Explorys Database.

Q. Does the Y. Kim study provide information about the duration of use of ranitidine for any individual?

MR. SHEEHAN: Objection.

A. So, the way the Y. Kim study was designed is that it's looking at concurrent use. So, to the extent that they have followed people upwards of ten years, some of those users could've had that many years of duration.

Q. Is it possible to obtain information about the duration of use from the Explorys Database?

A. I would have to investigate that closely and look at the data myself.

Q. So, you don't know?

A. Again, I would have to look at the database.

Q. Did you ever look at the actual



Explorys Database design and determine whether or not it's possible to obtain information about the duration of use of prescription medication from that database?

A. So, I -- sorry.

MR. SHEEHAN: Go ahead.

A. I have looked at the Explor- -- the publications that have been published off of Explorys Database. Explorys Database is, I would imagine, the public database that people can download is -- is very different than if -- if you could obtain the individual data within the dataset, which -- because its claims data they de-identify all of it.

Q. Are you aware that the authors of the Y. Kim study have indicated that there -- it is impossible to obtain information about the duration of use from the Explorys Database?

MR. SHEEHAN: Objection.

A. If you want to pull up the study and we can see what they said exactly about it.

Q. I'm not suggesting that it was said in the study. I'm just suggesting, are you



aware -- I'm asking you if you are aware that the authors of the Y. Kim study have indicated that it's impossible to obtain information about the duration of use from the Explorys Database.

Are you aware of that?

MR. SHEEHAN: Objection.

A. So, again, I would have to read the study, if it's said in the study. If it's coming from some other source, I don't know -- I would not be privy to that source, if it's an e-mail or something else.

Q. Okay. Doctor, going back to the Norgaard study for a moment.

What was the dose of ranitidine that was studied in the Norgaard study?

A. So, in the Norgaard study, they focused on individuals within also the Danish National Prescription Registry that had at least two prescriptions.

Q. And can you tell from the Norgaard study whether those prescriptions were 150 milligrams of ranitidine or 300 milligrams of ranitidine?

MR. SHEEHAN: Objection.



Just give it a beat there, Dr. Terry.

THE WITNESS: Sorry.

MR. SHEEHAN: Go ahead.

A. Again, these are large scale studies. This one in particular had over half a million people looking -- that had reported PPI. It had 65,000 initiators of some other H2RA and it had 31,393 initiators of ranitidine. So, the overall exposure was based on prescription, not based on, you know, milligrams in a tablet. This is commonly done across cancer epi. And, again, consistent associations have been found with a number of different medications without knowing the exact doses because it's trying to -- these large scale analyses in millions of people are trying to get at whether or not -- whether or not there's any consistent pattern, and there's no consistent pattern based on this.

Q. So, are you able to tell from the Norgaard study whether they were 150 milligram prescription doses or 300 milligram prescription doses or some other?

MR. SHEEHAN: Objection.
A. No. They again focused their analysis based on the exposure of prescription, which -- which is done routinely.
MR. SHEEHAN: If you were not done, please finish your answer, Dr. Terry.
A. I was just gonna add, for example, with nonsteroidal anti-inflammatory medications, many studies that have been consistent between cohort studies and case-control studies have found just people reporting regular use, like we saw in the UK Biobank, without knowing if it's a baby aspirin or not a baby aspirin. So, these kind of things are looking -- these studies are looking at how medications are used in free-living individuals.
Q. Are you able to tell from your review of the Norgaard study the length of each prescription?
MR. SHEEHAN: Objection. Vague.
A. So, in the Norgaard study, they did look at individuals that had at least ten



prescription and they were able to also further look at individuals -- they did individuals who filled at least five and then at least ten and then they were able to look at individuals that filled ten prescriptions and were followed for ten years.
So, again, we're not talking about a study of 20 people, we're talking about a study of hundreds of thousands of people where there was no consistent signal.
Q. Any 30-day prescriptions?
MR. SHEEHAN: Objection.
A. So, again, the Danish National Prescription Registry is the source of the exposure information and they specifically report out number of prescriptions, not whether or not it's 30 days.
Q. You can't tell whether they're 30-day prescriptions from looking at the Norgaard study?
MR. SHEEHAN: Objection. Asked and answered.
A. No. But what you can tell, which is a very valuable piece of data, is you can tell that in this study, which was over half



a million people that there is no consistent signal between having at least two prescriptions, 'cause that was the eligibility criteria to get into this, whether or not having five or more, whether or not having ten or more, whether or not having ten or more for ten years, whether any of those were associated with bladder cancer.
Further, they were able to look at whether or not it was specific to invasive bladder cancer.
So, this is a very well-done study that's prospective. We know that we have a temporal association, which is an important Bradford Hill criteria, and we know that there's no signal here.
Q. Doctor, you stated -- and I don't know if this is what you meant to say or not, but I believe you said that the Norgaard study looked at -- prescriptions or more for ten years.
Is that what you meant to say?
THE COURT REPORTER: I'm sorry. You cut out just as you said the amount of prescriptions.



Q. I think that you said that the Norgaard study looks at ten prescriptions or more for ten years, is that what -- is that what you meant to say?
A. So --
MR. SHEEHAN: Objection.
Hold on, let me -- before you jump in, just give me -- give me a second.
Objection. Asked and answered.
Go ahead.
A. So, it looked at ten or more prescriptions with at least ten years of follow-up.
Q. Okay. And you would agree with me, Doctor, similarly to the Adami study, if those are 30-day prescriptions, ten prescriptions would equal ten months, correct?
MR. SHEEHAN: Objection.
A. Again, they looked at ten or more. But, yes, if it was exactly ten and each prescription was 30 days, then it would be ten months.
Q. And does the Norgaard study look at ten prescriptions consecutively, can you

tell?
A. So, the Norgaard looks at ten or more prescriptions, so they don't specify whether or not it's consecutive.
Q. Doctor, have you reviewed any of the epidemiological literature relating to pediatric cancers associated with NDMA?
A. Not for this expert review, I focused on the five cancers that were alleged.
Q. Are you aware that ranitidine was indicated for pediatric use?
A. I'm aware as general knowledge that it's used for pediatric patients in some settings.
Q. Is there a reason why you didn't look at the NDMA epidemiological literature relating to pediatric cancers?
MR. SHEEHAN: Objection.
A. So, I looked at all of the relevant -- I looked at all of the human studies of ranitidine and -- and cancers. I further also -- whether or not they were cancers, the five cancers alleged here, I looked at the other types. I also looked at



NDMA in diet and the five cancers here.
Q. Is there a reason why you didn't look at the pediatric -- strike that.
Is there a reason why you didn't look at the NDMA epidemiological literature relating to pediatric cancers?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. Sure. So, my -- let me answer that. So, there's a very clear reason why I didn't look at those because, again, cancer is not one entity. We know that each and every cancer is different, in the risk factors that contribute to those cancers.
And so, again, my focus here is understanding the human evidence on NDMA and the five specific cancers that are alleged for dietary NDMA.
And then further, I looked at any cancer with respect to ranitidine use that's -- that's been in the human epidemiological data, so...
Q. Are you aware of any medical literature that looks at pediatric cases of liver cancer associated with ranitidine?



MR. SHEEHAN: Objection.
A. Again, if there are case reports, I'm not aware of them, but they may exist. But my focus here was on large scale epidemiological studies.
Q. Do you understand that there is large scale epidemiological studies evaluating pediatric cancers associated with NDMA?
MR. SHEEHAN: Objection.
A. Again, for my expert, I focused on the ranitidine studies and the published data on NDMA in diet and the cancers that are being alleged here.
Q. Doctor, are you aware that there are cases in this litigation involving children who have developed cancer after taking ranitidine?
MR. SHEEHAN: Objection.
A. Again, it's not relevant to my assessment of the literature here for these five cancers, because cancers have very different risk factors. And so, something that may affect a pediatric cancer, does not necessarily affect the bladder cancer or



pancreatic cancer or liver cancer, adult liver cancer.
Q. Doctor, are you aware that there are cases in this litigation involving children who have developed liver cancer after taking ranitidine?
MR. SHEEHAN: Objection.
A. Again, that would not be relevant to my expert review of the ranitidine and cancer literature for these five cancers that I'm evaluating as well as the NDMA in diet, and the five cancers that I am evaluating, of which there are plenty of studies which we've talked about all today in millions of people that show absolutely no consistent pattern between ranitidine use and these five cancers.
Q. Do you know whether or not there are any published peer-reviewed articles that discuss pediatric liver cancer and ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Again, without doing that literature search myself, I could not tell you that answer right now.

Q. Doctor, have you undertaken any type of evaluation of whether or not NDMA meets the ten key characteristics of carcinogens?
MR. SHEEHAN: Objection.
A. So, again, the ten key characteristics of -- are you referring now to the ten key characteristics that the FDA has reported out and/or are you talking about -- they build off of Michael Smith's paper that had a -- I think it's Hanahan and Weinberg paper originally. But I'm aware of how you assess the key characteristics of cancer, if that's the question.
And I would say that as a cancer epidemiologist, those are absolutely important criteria, but we do not even go to that stuff until we are confident that there's a robust association between an exposure of a disease that isn't explained away -- it can't be explained by bias and/or chance. Once we have that kind of consistency, again, consistency across cohort studies and case-control studies, then the next step is usually to look more



mechanistically at what's driving that.
So, for example, in our own research, we would look mechanistically after we've seen consistent findings and, for example, you had mentioned DNA adducts before. We would then look at whether or not the exposure we were interested in work through, you know, the exposure disease association worked by rather adduct formation.
So, that's, you know, the characteristics of cancer absolutely important, but you have to get there first by a consistent or reliable and valid association.
Q. So, is it fair to say that you did not assess the ten key characteristics of carcinogens in relation to NDMA?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. Again, I would do that if there were consistent associations. So, with ranitidine and the five cancers that I reviewed, there was absolutely no consistent reliable or valid association. With the



dietary studies and NDMA, there were also no consistent and reliable association. What patterns exist, could easily being explained away by recall bias because the cohort studies found something very different than what the case-control studies found.
Q. Okay. Doctor, just very quickly, did you --
MS. FINKEN: You actually how much time do we have on the record?
THE VIDEOGRAPHER: We have seven hours and 56 minutes on the record.
MS. FINKEN: Okay.
Q. So, Doctor, very briefly did you review the Hidajat occupational exposure study relating to NDMA exposure?
A. I did review that, yes.
Q. Okay. And you're aware that Hidajat -- the Hidajat study found there was a linear exposure response association with NDMA and cancers of the bladder?
MR. SHEEHAN: You cut out there, Tracy, at least for us at the end of that.
Q. Okay, let me ask it again. I'll



withdraw that question.
Doctor, are you aware that the Hidajat study found linear exposure response associations where the highest exposures to NDMA was associated with cancers of the bladder?
MR. SHEEHAN: Objection.
Q. Actually, let me withdraw that question and try it one more time.
Doctor, are you aware that the Hidajat study found a linear exposure response association between the risk of mortality from cancers of the bladder with exposure to NDMA?
A. So, I am aware that the Hidajat study, which was an occupational cohort study a rubber plant workers, that they use the job information to come up with a matrix of -- to -- to estimate how much exposure would be from NDMA and then they associated that with -- with cancer mortality, as you say. Yes, I'm aware of that study.
Q. Do you disagree with the Hidajat authors' conclusions that NDMA was associated with an increase in mortality from bladder

cancer?
MR. SHEEHAN: Objection.
A. Can we just pull up the study for a minute?
Q. Do you need to pull up the study to answer the question of whether or not you agree or disagree with Hidajat studies conclusions that NDMA was associated with an increase in mortality from bladder cancer?
A. I guess it depends on how many more questions that you're gonna ask about this study. But, no, my assessment of the Hidajat study is as follows:
One is they didn't have cancers incidents, they had cancer mortality, which is challenging for a valid measurement because just a challenge you have with understanding the cause of death. So, that's one challenge.
The other major challenge from the Hidajat study is the fact that when you're working at a rubber plant, that there's many, many, carcinogens that you're exposed to. Many of those exposures, those carcinogens are actually shown to be through human



studies, Type 1 human carcinogens as it pertains to IARC. So, the Hidajat study did try to detail out the NDMA exposure from many of these other chemicals.
But, again, for bladder cancer in particular, we know a lot more about all of these different environmental chemicals and how they affect bladder cancer.
So, my biggest concern with the Hidajat study is I would want to see it repeated and I would want to -- I would really want to understand that exposure separate from some of these other major Type 1, Class 1 carcinogens, which they would've all been exposed to. And they try to get at that, but I wasn't convinced after reading that that they can really do that in -- in a really robust way.
So, I considered that paper, absolutely, but it's relevance to ranitidine and the five cancers that are being alleged is not there, because, again, we're talking about very different exposures, we're talking about inhalation versus ingestion and we're talking about, you know, individuals who are



exposed to many, many different types of carcinogen through their occupation.
Q. Did you read Dr. Hidajat's expert report in this case?
A. I did. Yes, I did.
Q. So, you disagreed with Dr. Hidajat's conclusions based upon the results of her study; is that fair?
MR. SHEEHAN: Objection.
A. So, I disagree that the Hidajat study has relevance to the question of whether or not ranitidine causes cancers of the five types that are in this report, absolutely, I disagree.
Q. Doctor, for purposes of your expert report, did you review the McDowell study?
A. So, I did review the McDowell study. Can you be more specific and tell me what year or which study or pull it up just to jog my memory? It's been a long day.
Q. Okay. Well, looking at your report. Did you review the McDowell study regarding the association between ranitidine and pancreatic cancer?
MR. SHEEHAN: Objection.



A. So, again, can you pull up the McDowell study? My recollection is that one of the McDowell studies was like a hypothesis generating study, if that's the one I'm thinking about offhand. But if you can pull it up, that would be helpful.
Q. Well, let me ask you this: Did you refer to the McDowell pancreatic study in your report?
A. Can you please let me know what's the title of the McDowell study you're talking about and/or put it up on the screen? I found one McDowell study in my report, it's a little hard to search because I don't have the electronic copy in front of me, but on page 54 I refer to it. I can read from the report if you would like.
Q. No, that's okay. There's no question pending.
Okay. Let's look at -- I don't want to pull it up, but I know that Mr. Ronca had asked you some questions about the --
THE COURT REPORTER: I'm sorry. About the what? You cut out.
Q. The Chow study --

A. Yeah, I'm having a hard time hearing you too.
(Cross-talk.)
A. The Wong-Ho Chow study?
Q. I couldn't hear what you said. The Chow study that's on page 27 of your report.
A. Yes, I'm on that page.
Q. Does the Chow study provide the analysis of ranitidine separate and apart from the analysis of H2RAs?
A. So, in the paper itself, it discusses the findings for ranitidine separately and said that those findings did not differ. And they used, you know, this was very common at the time of data not shown, but -- but they did that analysis and said it didn't differ.
Q. But they didn't provide the analysis in the report, did they?
A. They didn't provide the numbers in the report.
MR. SHEEHAN: Just let me object. Go ahead.
THE WITNESS: Sorry.
Q. Okay. Dr. Terry, have you reviewed



any of the other epidemiological literature relating to H2RAs and increased risk of certain cancers as a class of medicines?
A. Yes, I mean, I did review the H2RA literature as a class and specifically for the five cancers here.
Q. Can you direct me to where you do a review and analysis of that literature in your report?
A. They start on page 70.
Q. Dr. Terry, let me ask you a question. Did you find any of the epidemiological literature, whether it's NDMA or ranitidine, that shows a statistically significant increased risk of cancer to be a valid and reliable study?
MR. SHEEHAN: Objection.
Q. Do you understand my question?
A. So, within my report, I give context for each and every study, each and every study has strengths and limitations. But what's important is collectively, is there consistency? Is there replication of findings?
And so, again, using Bradford Hill,



I went through very carefully from the beginning; are there any consistent patterns, does the signal -- is the signal higher than the noise, can it be accounted for by selection information or confounding bias?
And so, again, looking at the literature as the whole, there's some studies that are very individually rigorous and things like that. But again, across the pattern, across the number of studies as a whole, there's no consistent pattern. There's absolutely no consistent pattern whatsoever in ranitidine and any of these five cancers or in dietary NDMA in any of these five cancers.
Q. You indicated that there's some studies that are very individually rigorous.
Which studies were you referring to?
A. So, again, for the ranitidine studies, when -- when you have a good capture of the outcome data, so when it links to cancer registry data or has electronic health record data to verify the cancer diagnoses, that's better than self-reported cancer



diagnoses. When you have exposure data, that's from the electronic health record, that's also higher quality than self-reported use. So, you know, each study needs to be considered for their strengths and limitations and collectively the quality of the studies are higher for the cohort studies that are dietary NDMA and these cancers as well as the large studies that now involve millions of people and how ranitidine is used -- has been used every day in different countries all around the world, so...
MS. FINKEN: Okay, I'm going to move to strike as nonresponsive.
Q. Dr. Terry, my question was, which specific studies do you believe were individually rigorous or associated with either ranitidine or NDMA?
MR. SHEEHAN: Objection.
THE COURT REPORTER: Ms. Finken, you froze. I think I got the question, but you did freeze, if you want to check the realtime.
A. Okay. And --
Q. I'll say the question again just to

make sure that the record is clear.
My question was, which specific studies do you believe were individually rigorous, but demonstrated an association with either ranitidine or NDMA in cancer?
MR. SHEEHAN: Objection.
A. And I'd like to just qualify my last answer. I think I misheard you. I just thought -- I was responding to what I thought your question was was which studies are rigorous, not which studies were specifically showing a finding between ranitidine or dietary NDMA and cancer.
So, again, I would answer that it's not just for one study, it has to be collectively.
So, again, collectively, there -- there's not sufficient data that's rigorous to support either dietary NDMA and/or ranitidine exposure in any of the cancers.
Q. Dr. Terry, though, I'm just quoting what you said which is that some of the studies were individually rigorous.
Which studies were you referring to?



A. So --
MR. SHEEHAN: Hold on.
Objection.
Go ahead.
A. All right. So, for example, again, I would say the Cardwell study itself had different comparators, had an H2RA comparator, had a PPI comparator and had a non-use comparator. So, that's a study that had multiple comparisons and so allows the reader themselves to decide the quality and the rigor of this.
So, again, I disagree with the authors' conclusion that their finding -- their overall study was supporting a finding, their overall study supported no finding whatsoever when they had a comparison of H2RAs. And only found something when they were looking specifically at non-user PPI.
So, that's a study where you can look at the data more closely and you can look to see what's the more valid comparison group. So, the comparison group of H2RAs in this setting was a valid comparison.
Q. Were there any others besides



Cardwell?
A. Again, many of these studies on ranitidine and cancer were rigorous. It's -- the majority of them found absolutely no positive association and many of them also found a decreased association, so...
MS. FINKEN: Let's go off the record for just a moment, please.
THE VIDEOGRAPHER: We're going off the record. The time is 12:07 a.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:31 a.m. UTC time.
MR. SHEEHAN: Tracy? I didn't mean to -- I didn't know what --
MS. FINKEN: Sorry, it's been a long day. I forgot I didn't pass before we went on a break. Sorry about that.
Dr. Terry, I have no questions for you. I'm reserving the remainder of my time for after your counsel



questions you, okay? Thank you very much for your time, I appreciate it.
THE WITNESS: Okay, thank you.
MR. SHEEHAN: Appreciate that Tracy, thanks.
FURTHER EXAMINATION BY
MR. SHEEHAN:
Q. Dr. Terry, thank you so much for your time today. As Tracy says, it's been a long day and I'll attempt to be very brief here.
I'm Tom Sheehan, as you know. I represent GlaxoSmithKline in this matter, and I'm just going to ask you a couple of questions in response to some of the questions that Ms. Finken asked, okay? Okay.
Now, Dr. Terry, Ms. Finken asked you whether you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans.
Do you recall that?
A. I recall being asked that, yes.
Q. And I think you responded that you would defer to a molecular biologist.

Do you recall that testimony?
A. I recall that yes.
MS. FINKEN: Objection.
Q. Was that testimony accurate in response to that question?
A. No. I misunderstood the question. I thought it applied to specifically levels of NDMA and any one pill which is not what we would do in epidemiology.
Q. Okay. Dr. Terry, do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A. Absolutely. I intend to offer an opinion on both in my expert report, as I have, and then today, my expert opinion after reviewing the 16 studies of ranitidine and cancer as well as the NDMA in dietary sources and occu- -- as estimated in dietary sources as well as occupational studies, that there is no consistent reliable finding in any of these studies. The ranitidine studies and cancer risk involve real world use of the medication in millions of people and there is no evidence that there's any consistent



pattern of -- of increased risk from ranitidine in any of the five cancers being alleged.
Q. Dr. Terry, are the studies of ranitidine and cancer outcomes a robust assessment of whether NDMA in ranitidine is capable of causing human cancer?
A. Yes, the highest level of evidence in -- because they are addressing how the medication is used in real world settings and in millions of people, so they're the highest level and that's specifically why IARC also requires human evidence in order to say something is a human carcinogen.
MR. SHEEHAN: Thank you very much, Dr. Terry. I don't have any further questions.
MS. FINKEN: Dr. Terry, I just have one question.
FURTHER EXAMINATION BY
MS. FINKEN:
Q. Are you aware of the average length of use for ranitidine for the individuals who have brought lawsuits against the manufacturers in this case?



MR. SHEEHAN: Objection.
A. I am not aware of the individual use of the medication on the individuals who have -- are part of this case. What I am aware of is the real world use of this medication in millions of people of which there is no reliable valid finding between ranitidine and these five cancers.
Q. I would only have one more request and I just want to put it on the record.
There was some issues with your report with the references and the materials considered not being consistent and we would just ask for an updated materials considered list that accurately reflects all the citations that are contained in your report because as Mr. Ronca had stated earlier, and I did as well, there were some times that there were certain citations in your report that aren't contained in your materials considered list. So, if you can update that and provide it to us, I would appreciate it.
MR. SHEEHAN: We'll -- we'll take it under consideration.
And just -- just to be very clear,



the report is very comprehensive and describes the studies that are -- that are described within the body of the report and there is a separate materials considered list. Whether there may be some delta between those two, we can -- we can go back and look, but I don't think -- to the extent there's any implication that the studies and data described in the body of the report were somehow not considered or not reviewed because they did not appear on the materials considered list, I think that would be a -- a false implication. I just want to put that on the record.
MS. FINKEN: I can disagree with you on that, but there are not full citations in the body of the report. And one of the examples that I gave was the IARC Working Group study in 1999, there's no -- I don't know what the name of that report is, there's nothing there. So, it's not in the materials considered list. What we

would ask for is you provide an updated materials considered list that's comprehensive with all of the -- the studies and the documents that are cited within the body of your report, but they are not full citations. So, I want to make sure that when we're looking at your report, that we're looking at the correct citations for the body of your report. If they're not contained on the materials considered list, I have no way of evaluating that. So, I would just appreciate it if you could provide an updated materials considered list that is comprehensive, please.

MR. SHEEHAN: And as I said, I mean, I think we disagree with -- with your characterization of the citations in the body of the report. We will certainly take it under consideration and we can have that conversation off the record in connection with this deposition.



MS. FINKEN: Great. Thank you. Thank you for your time, Dr. Terry. I appreciate it.

Let's go off the record.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 12:38 a.m. UTC time.

(Time noted: 9:12 a.m. Eastern Time)



J U R A T

I, MARY BETH TERRY, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 31, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

________________________
MARY BETH TERRY, Ph.D.

Subscribed and sworn to before me

This _______ day of __________, 20__.

____________________________________
NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, MARY BETH TERRY, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June, 2022.

Candida Borriello
CANDIDA BORRIELLO

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 31, 2022
Deponent: MARY BETH TERRY

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |

________________________
MARY BETH TERRY, Ph.D.

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

## Exhibits

**EX 6349 Mary Beth Terry, Ph.D. 053122**
5:17 342:17, 19
**EX 6433 Mary Beth Terry, Ph.D. 053122**
5:15 142:20 143:14
**EX 6727 Mary Beth Terry, Ph.D. 053122**
5:12 14:2,4 98:5 151:11 160:15 211:16
**EX 6729 Mary Beth Terry, Ph.D. 053122**
5:14 128:9, 17 149:6
**EX 6732 Mary Beth Terry, Ph.D. 053122**
5:13 82:11, 13
**EX 6736 Mary Beth Terry, Ph.D. 053122**
5:12 66:22 67:11
**EX 6737 Mary Beth Terry, Ph.D. 053122**
5:16 152:25 153:1 162:20
**EX 6739 Mary Beth Terry, Ph.D. 053122**
5:13 104:3

## $

**$500**
96:14

## (

**(1995)**
313:8
**(1996)**
313:8

## -

**-------------------I**
5:2
**----------------E**
5:10
**---------------R**
5:21
**------- portion**
5:19

## 0

**0**
117:19
**0.05**
99:7 104:8 106:11
**0.06**
120:15
**0.6**
54:22
**0.7**
48:18 49:4 51:13 52:10 55:5
**0.8**
49:24 51:16 55:1
**0.895**
54:21
**0.9**
52:7
**00s**
198:20
**02210**
4:18
**05**
46:8,14,20 111:25 130:1

## 1

**1**
14:25 22:7 45:25 46:9, 21 48:20,22 50:1,3 54:24 78:8 84:4 117:18 129:17,18,19 130:1,2 132:6,7,17 133:10,15 135:8,9 136:11,16, 19,22 137:6 144:3 164:11 167:7 174:3 176:5 236:8, 12 251:7,15, 25 252:3,4 255:23 305:19 333:20,22 334:9,11 349:3,13 371:1,14
**1,095**
149:11,12,13 327:17 329:1
**1.0**
55:4 136:18 137:11,12,14
**1.01**
144:9
**1.06**
334:16
**1.1**
49:23 50:4, 11,14,25 51:15 52:9 53:8 54:22 77:22 78:22 125:19 136:20 301:5
**1.2**
53:9 77:22 125:19
**1.25**
144:10
**1.28**
144:3
**1.3**
188:11,19
**1.4**
45:16 46:5 55:5 137:20 138:4 174:17
**1.5**
52:10 125:19
**1.6**
49:24 51:16
**10**
13:18 86:8 98:20 145:19 313:10
**100**
36:25 133:2
**104**
5:13
**107**
14:25 15:2
**107-page**
20:21
**108**
15:7
**10:42**
341:18
**10th**
140:22 141:9,13,15, 21,24 142:2,

8 143:23 144:11 146:17,22,23 147:2,4,8,22 148:3
**11**
13:19 100:16 103:6 116:18 218:5 237:9, 19
**11.4**
187:1,20
**11.7**
237:10
**111**
291:3
**112**
247:18
**113**
224:5
**114**
15:7
**119**
15:14 36:16
**11:13**
341:22
**12**
100:17 116:17
**12-fold**
74:12
**121**
5:14
**128**
5:14
**12:07**
380:10
**12:31**
380:15
**12:38**
387:7
**13**
17:12 78:4
**14**
5:12 39:16 98:21
**1410**
4:18
**143**
5:15
**15**
150:23 247:2
**15.6**
48:18 49:4 51:13
**150**
344:6 356:23 357:23
**152**
5:15
**15219**
4:10
**153**
5:16
**16**
127:7 222:24 232:10 235:25 237:23 239:12,20 242:14 248:16 267:24 281:1 382:17
**17**
45:8,10 57:8
**176**
5:16
**191**
5:6
**1976**
87:17
**1980s**
256:9
**1987**
249:20,23 251:2
**1990**
232:13 236:2
**1992**
320:24 321:13
**1994**
315:6
**1995**
293:24 315:6,7
**1996**
241:17 293:23 320:25 321:14
**1999**
215:20 216:2,12,18, 25 217:2,7 385:22
**1:12**
7:6

**2**

**2**
84:6,15 85:18 129:18 130:2 185:21 195:9,13 301:3
**2.0**
78:22
**2.24**
137:22
**2.4**
159:20 301:4
**2.6**
334:16
**20**
16:18 42:23 60:11,23,24, 25 74:21 76:20 81:6 86:8 105:19 133:14,16 154:14 157:1 159:10 351:9 353:12 359:8
**200**
103:16
**2000-**
351:16
**2000s**
25:19
**2002**
42:14 68:21 241:19 299:8,21 350:24 351:5,17,24 352:15
**2003**
216:14,17,23
**2005**
63:6
**2007**
63:6
**2008**
241:18,19 293:23 299:8,21
**2009**
182:13 299:9
**2011**
335:25
**2012**
340:10,18 341:3
**2014**
335:22
**2016**
107:12 115:18
**2017**
82:7 183:21 184:1
**2018**
63:1,2 182:13
**2019**
99:10 115:25 116:21 217:20 219:3 303:19 304:14
**2019A**
16:19

**2021**
100:19
165:10
211:24
**2022**
7:5 13:21
**21**
137:23 262:7
276:8
**22**
31:1
**229**
15:14
**23.5**
185:6
**23.97**
185:23
186:13
**230**
15:21,24
**2307**
345:19
**24**
147:2 148:3
**248**
103:14,15
**25**
303:19
304:14
**250**
15:14 98:21
103:15
**266**
23:13 24:14
**27**
374:6
**28**
144:10
**280**
97:25
**29**
144:3
**29.1**
52:8
**2901**
4:3
**2A**
251:11 266:1
306:4,21
310:10,13
**2B**
306:7

**3**

**3**
84:8,16
86:16 105:18
234:22 235:9
**3,000**
32:24
**3.4**
49:14 50:11
**3.4-fold**
48:14 51:11
**3.5**
189:12
**30**
57:15 154:14
286:3,23
287:21,22
288:20,24
289:5 294:20
321:23
359:17
361:22
**30-day**
246:8 288:2
344:23 345:6
348:3 349:18
350:8,12
359:11,19
361:16
**300**
138:13
139:3,5
344:6 356:24
357:24
**300,000**
98:12
**301**
4:10
**303**
5:17
**31**
7:5 148:15
**31,393**
357:9
**32.32**
185:22
186:12
**34.8**
185:10
186:7,16
**342**
5:17
**36**
34:8
**360**
179:1 295:8
**365**
149:11
**381**
5:7
**382**
23:13 24:15
**383**
5:8
**384**
5:22
**38th**
4:10
**39**
151:11,14,16
161:4,11
173:2,9
**3:02**
95:24
**3:18**
96:3

**4**

**4**
84:10,18
284:10
**4,000**
32:22
**4,500**
32:23
**4.4**
159:21
**4.5**
301:5
**40**
160:16
161:4,11
162:21
173:3,9
**41**
304:9
**41st**
193:23
**42nd**
193:23
**43.6**
188:7
**44**
171:2,10
**459,204**
291:20
**460,000**
291:19
**4:33**
151:4
**4:45**
151:8

**5**

**5**
45:8,9 90:14
129:17
180:11 189:2
190:4 284:10
304:23
313:10
**5.1**
52:6
**5.5**
186:24
**50**
50:21 57:15
171:7
346:12,25

**500**
4:3
**531.01**
147:14
**54**
373:16
**55**
146:18 147:1
**56**
34:8 38:22 52:2 368:12
**58**
172:10
**59**
172:10
**5:42**
190:23

## 6

**6.38**
334:16
**6.5**
187:2,20
**60-day**
344:23
**600**
229:16
**61**
5:20 74:1
**62**
128:25
**63**
304:7
**6341**
5:17 303:12, 13 304:12
**6349**
5:17 342:17, 19
**6403**
5:14 120:25 121:2,12,18 122:22 142:21
**6423**
5:16 174:22 176:19,20
**6433**
5:15 142:20, 21,22 143:10,14
**6457**
5:15 152:3,4
**65**
333:17
**65,000**
357:8
**67**
5:12 331:8
**6727**
5:12 14:2,4 98:5 151:11 160:15 211:16
**6729**
5:14 128:9, 17 149:6
**6732**
5:13 82:11, 13
**6736**
5:12 66:22 67:11
**6737**
5:16 152:25 153:1 162:20
**6739**
5:13 104:2,3
**68**
332:20
**69**
334:6
**6:38**
191:3

## 7

**7**
13:21 57:7 307:7
**70**
253:25 306:5 375:10
**73**
144:6,8 147:13 179:1 295:8 297:8, 9
**736**
41:7
**75**
169:18 186:22 187:2 211:15,17 251:12 344:7
**75.44**
144:3
**76**
215:16 216:3
**77**
216:8 217:6
**78746**
4:4
**7:53**
249:7

## 8

**8**
5:5 16:20,22 311:23 312:1,17
**8.4**
247:19
**80**
169:18 253:25 306:5
**80s**
27:23 221:4 256:2,19
**82**
5:13
**86**
340:1
**87**
336:14 338:14 340:1,3
**88**
137:22
**89**
340:6,9 341:7
**8:11**
249:12
**8:13**
250:18
**8:17**
250:23

## 9

**9**
186:19
**900,000**
297:11
**90s**
81:9 208:25 236:4 317:7
**95**
46:11 48:17 49:3,23 51:12,15 52:7,9 54:5 55:4 99:6 120:18 316:4
**9:12**
387:9
**9:26**
302:19
**9:48**
302:24

## A

**a.m.**
380:10,15 387:7,9
**abandoned**
106:3,25 119:10
**abandoning**
99:14 103:10 118:9,12 124:12

**abandonment**
106:17
**ability**
40:2 75:12 192:7
**ablation**
175:11
**able**
14:15 38:24 52:19 135:4, 11 160:22 161:6 162:23 164:20 165:12 169:1,14 174:15 176:2 185:1 188:3, 13,14 222:11 223:8 286:12 293:2 303:25 346:18 357:22 358:20 359:1,4 360:9
**above**
59:13 132:6 136:7,10 144:5,8,18 145:9 148:14 174:1 320:6, 20 334:11
**absent**
113:7
**absolute**
117:19 186:19,25 187:18,19,23 188:10,18 285:24
**absolutely**
85:25 95:7 120:5 162:3 226:17 232:17 276:6 339:3 365:15 366:16 367:12,24
371:20 372:14 376:12 380:4 382:14
**accelerometers**
288:11
**acceptable**
254:16
**access**
13:7 193:15 337:2,21
**accompanied**
42:21
**account**
161:25 171:6 235:3 244:8
**Accountability**
179:21
**accounted**
255:17 280:19 376:4
**accumulated**
353:12
**accuracy**
21:14
**accurate**
20:19 21:18, 21 72:4 204:11 382:4
**accurately**
87:20 347:19 384:15
**acid**
44:21
**acknowledge**
7:22 8:1
**across**
22:14 24:1, 5,9,21 26:6, 22 27:1 40:22 76:22 94:7 111:14 135:18 136:2 150:18 168:19
237:23,24 238:1,19 239:20 242:14 243:11 271:14 276:14 289:22 322:23 336:17 357:13 366:23 376:9,10
**act**
75:11 179:21 200:2
**action**
7:13 74:2
**active**
161:8,21 162:10 165:11,22 169:8,15 170:24 171:24 172:12,21 173:19 175:2 185:2 188:3 223:8,24 228:18
**activities**
37:9
**activity**
28:13 64:3 75:11 288:3, 8,17,20,24 289:2,21 290:2,3
**actual**
76:4 115:25 116:8 117:1, 6 121:22 129:8 148:21,24 182:21 275:5 281:9,20 299:23 354:25
**Adami**
219:18 220:6 221:18,24 222:10 223:2,5,13 224:10 241:16,25 242:8 243:16 244:13,14 245:4 246:4 290:9,13 334:17 342:6,7,10 343:7,11 344:2,5,22 348:10,17 349:8 350:21 361:15
**adapter**
197:18
**add**
18:12 154:1 169:12 358:9
**Added**
342:21
**addition**
27:21 74:8 188:2 190:3
**additional**
313:21
**address**
116:22 198:2
**addressing**
383:9
**adduct**
323:9,10 367:9
**adducts**
323:18,25 324:8,9 367:5
**adenocarcinoma**
25:17
**adenocarcinomas**
57:16

**adequately**
283:17
285:14
**adjust**
161:6 162:6
165:3,13
166:19
167:3,10,17
169:1,3
185:4 188:4,
14 223:22
**adjusted**
148:25
161:23
164:14
165:17 169:5
173:18
220:19
**adjusting**
149:2 167:13
224:13
**adjustment**
162:7,8
**administered**
8:2
**Administration**
294:18
**administrative**
92:22 93:10
**adult**
226:11 365:1
**adults**
171:7
**advanced**
351:8
**advantage**
83:19 158:17
**advantages**
101:8 124:6
**advice**
310:11
**advocated**
117:14
**advocates**
99:13 103:9
118:8
**affect**
44:18,21
123:24
154:24 192:6
364:24,25
371:8
**affects**
80:23 311:6
**affiliation**
104:21,24
**affiliations**
220:2
**afraid**
87:18
**afternoon**
191:7
**age**
164:21
165:13
185:15 226:9
**agencies**
70:23
**Agency**
64:17 308:4
**agent**
162:4 200:3,
18 201:9
318:12
**agents**
89:2,5
**aggregate**
95:15 177:4,
5,15 178:21
179:2,22
180:1
**ago**
10:15,18
60:12,23,25
74:21 81:6
86:8 110:14
150:23
**agree**
19:6 30:1
71:1 90:21
91:7 109:23
110:3,10
111:19
112:1,2,8
113:9
114:10,11,16
115:9 125:25
132:15
156:11
158:7,16,24
159:6,13
172:8 204:1
205:24
206:16,18,
20,22 207:4,
24 208:1
252:1,7,14
253:17
264:14
283:21,25
285:11,18
291:11,17
305:8 307:20
308:2,19
309:16
321:11
322:10
323:22
349:17 350:7
351:15
353:20,22
361:14 370:7
**agreed**
108:3 319:13
**agreement**
6:7 115:23
**agrees**
61:22 107:18
110:8 158:2
**ahead**
9:12,21
23:19 28:22
30:16 31:25
54:1 69:10
77:5 80:8
85:3 100:15
101:17
108:23 123:4
153:19
168:20 173:7
181:3 189:25
207:12 208:7
210:15 222:2
227:22
234:19
236:12
240:20,23
241:1
252:20,23
264:22
277:22 283:8
295:25
316:16
319:25
324:22
329:17
339:21
344:11 355:6
357:4 361:10
374:23 379:4
**alcohol**
25:18 48:6,
12 50:19
51:10 55:13
61:8 113:13
114:1 162:17
172:16
**alcoholic**
62:10
**ALFANO**
4:8
**alleged**
53:11 67:6
77:18 126:7,
22 127:9,11
157:12
161:18 168:9
205:23 238:3
242:17
259:15
263:20 264:3
270:4 272:13
279:5 321:4
323:2 351:14
352:6
362:10,24
363:17
364:14

371:21 383:3
**allow**
33:7,24
239:22
**allowable**
33:6
**allowed**
223:6
**allows**
33:19 94:1
289:23
379:10
**alluding**
256:7
**alphabetical**
17:7,11
**amazed**
11:22
**amend**
112:10
**American**
39:13 99:12
100:7,22
103:8 105:2,
7,11 106:16,
24 107:17
118:8 119:9
211:23
**amine**
72:11
**amines**
72:1 74:14
340:23
**amount**
175:4 209:16
211:1,3
225:18
248:4,14
278:1 282:24
285:25
292:21
294:11,24
299:12,23
300:22 302:9
360:25
**amounts**
278:14,23
280:1
**analyses**
24:4 37:18
40:8 110:14
130:19
133:20
138:19
140:11
148:20
183:13
184:13
187:22,23
194:19
196:16 199:6
253:11 285:6
286:2,8
333:7 357:17
**analysis**
27:17,23
33:16 40:12
47:23 74:2
81:5 92:13
94:12 140:14
147:17
148:11
153:21
161:8,21
162:7
165:12,23
167:7,11,18
172:12
181:23 196:4
203:23
205:4,19
244:18,21
256:2 257:1,
8 258:23
259:5 260:8
261:25
262:11,15
264:23
272:25
274:22
275:22
276:18,24
301:14,15
341:7 346:1
358:3 374:9,
10,16,19
375:8
**analytics**
26:25
**analyze**
220:15
243:17 261:7
295:18
**analyzed**
95:13 203:4
282:24
283:10,11
292:22
**analyzing**
172:19
**And--**
47:8
**and/or**
6:8 29:17
254:5 264:9
268:23 281:7
366:9,21
373:12
378:19
**animal**
72:3,25 76:5
251:16
265:25 266:3
306:12,15
307:13,21
324:12
**animals**
204:13
265:23
308:13,23
**Anne**
28:6,9,12
64:10
**answer**
12:15,20
13:3 18:9
19:24 20:14
23:17 27:11
34:3 61:19
63:17 65:16,
20 94:15
108:21 123:5
158:4 165:7
166:5,24
168:20
190:16 192:2
204:17 205:6
246:1 254:16
256:12
261:13,24
270:10,13
272:17
274:14,16
276:6 328:19
335:4 337:22
339:22
352:13,19
358:7 363:9
365:25 370:6
378:8,14
**answered**
12:22 25:6
38:8 69:9
91:1,11 92:6
115:3 119:15
127:5,22
137:8
157:21,25
159:5 161:14
165:2 166:22
179:25
182:23 200:5
203:15 239:9
240:25
241:12
254:19 259:1
261:11,13
271:4 272:19
273:9 280:5
285:17
287:25
296:25
298:13
326:15
329:16
331:20 335:3
339:13 345:8
347:6,21
349:6,12
350:17
352:20 353:6
359:22 361:9

**answering** 316:15
**answers** 11:13 261:18
**antagonists** 195:9,11,14
**antecedents** 25:9 37:23
**anti-carcinogenic** 75:10
**anti-inflammatory** 245:21 292:13 358:10
**anti-mutagenic** 75:11
**anti-ulcer** 215:21 216:20
**antibacterial** 75:15
**anticipate** 30:8
**anticipated** 256:4
**antihypertensive** 248:20
**antihypertensives** 292:15
**anybody** 194:2
**anyone** 6:21 159:15 242:7 303:3
**apart** 374:9
**apologize** 121:9 353:24
**apoptotic** 75:12
**apparent** 155:20
**Apparently** 167:20
**Appearing** 4:1,7
**appears** 308:12 323:16
**apples** 262:22
**applicable** 24:5
**applications** 193:16
**applied** 40:22 110:13 221:4 286:7 382:7
**apply** 40:10 191:12
**appreciate** 24:13 89:14 337:7 381:2,4 384:22 386:14 387:3
**approach** 37:19 296:14
**approached** 10:23 29:4
**approaches** 83:1,6 296:20
**appropriate** 330:4
**approx-** 97:24
**approximate** 198:13
**approximately** 10:16,18 13:17,18 25:25 97:24 171:6 345:20,23 346:11,25 347:17
**arbitrary** 111:25
**area** 23:9 56:15 253:8,9 308:24
**areas** 22:15
**argument** 172:11 173:14 258:19
**arises** 325:15
**aromatic** 324:8
**around** 37:1 64:21 101:10,21 109:4 124:4 132:13 284:3 341:25 342:2 377:12
**arrangement** 8:7
**arrest** 75:13
**arrow** 141:9
**arrows** 149:19
**art** 213:5
**article** 41:1,10,11,21 42:2 46:11 47:20,21 52:16 60:23 66:21 71:17 72:6 73:22 74:21 78:9,17 102:11 104:7 116:10,24,25 121:21 123:8,13,22 130:13 134:11 140:16,18 141:1,17 142:1,4 163:22,24 164:1 236:3,4 274:25 330:1
**articles** 18:21 19:11 23:14 24:15,24 42:25 61:14 106:5 174:5 338:10 365:19
**ASA** 105:25 107:10,11,16 115:16,25 116:8,21 117:1,6,10 118:11 122:1,23
**asbestos** 89:5
**ascertained** 84:13
**ascorbic** 44:20
**Asian** 296:6
**asked** 24:14 25:5 29:5 35:17 38:7 69:8 90:25 91:10 92:5 96:11,23 97:3,5,9,22 115:2 119:14 127:4,21 137:7 150:23 157:20 159:4 161:13 165:1,6 166:21 179:24 182:22 200:4 203:14 207:23 239:8

240:19,24 241:11 254:19 258:25 261:10 271:4 272:18 273:8 280:5 285:16 287:24 292:1,4,9 296:24 298:12 313:9 323:5 326:14 329:16 331:20 335:3 338:7,8 339:12 345:7 347:5,20 349:11 350:16 352:20 353:5 359:21 361:9 373:22 381:16,17,23

**asking**
9:1 11:12 19:13 37:25 38:4 65:18 71:10 97:8 101:4 110:8 127:17,23 144:17 145:1,6 155:24 157:22 185:17 186:1 190:12 235:13 243:6 248:9,12,13 259:23,24 261:16 273:1,3 287:13 292:18 316:7 317:18 335:6,7 337:18 356:1

**aspects**
196:8 284:24

**aspirin**
358:16

**assembled**
131:11

**assertion**
99:12 118:7

**assess**
29:10,11 120:8 151:22 152:18 153:8,12 155:7 156:4, 13 159:2,8 160:1 200:3, 17 201:16, 21,23 213:11 214:13 233:7 234:24 257:5 258:11 273:20,22 274:7 284:4 352:9 366:13 367:17

**assessable**
221:8

**assessed**
62:8 80:11 92:12,13 211:1 216:19 242:15 254:4 311:20 312:10 348:9

**assessing**
93:17 155:11 172:22 173:23 174:3,25 272:21 274:22 279:21 283:23 285:12 296:3

**assessment**
64:5 76:13 84:15 90:2 92:3,4,20 164:10 211:5 216:24 238:16 239:23 246:23 254:9 256:23 258:1,21 262:24 267:15 271:8 272:24 286:6,14 293:18,20 303:17 304:13 305:14 307:3,12 322:20 323:7 324:16 325:9,19 328:9,13 329:25 330:2 338:23,24 351:16 352:24 364:21 370:12 383:6

**assessments**
258:7

**assistant**
18:18

**assisted**
19:22

**assoc-**
312:8

**associa-**
331:22

**associated**
48:14 51:11 69:17 226:18 242:16 255:11 278:15,23 311:19 328:1 360:8 362:7 363:25 364:8 369:5,20,24 370:8 377:17

**associating**
58:21

**association**
45:17,23 46:5 47:18 48:1 49:10, 16 50:6,15 51:18 52:22 53:2,4,8,16 54:7 55:17 67:10 88:1 91:14,17 99:13 100:7, 23 101:15 102:6,7 103:8,9 105:2,12 106:17,24 107:17 108:5,6 109:1 110:18,19 111:22 112:5,11,17 113:6,13,25 114:2,7,24 118:3,8 119:10 120:9 125:8,12 126:1,8,15, 21 127:1,9, 13,17,19 128:1 130:25 132:12,14 134:18 137:3 154:11 155:11,19 173:23,25 205:21 208:22 211:24 217:25 218:10 220:19 226:21 245:13 248:23 255:16 256:15,18 262:10,14, 17,20 263:9,

25 264:1,11, 16 265:3,5, 6,8,10,11,13 266:4 270:2, 6 271:10 272:4,16,22 273:22,24 275:2,7,10, 24 279:10 281:6 286:17 287:11 288:16 298:6 300:6 309:3 312:9 315:19 321:1,15 322:6,13 324:18 325:2,3,6,7, 8,15 326:3, 13 327:2,5, 16 328:23 329:6,22 331:5,17,23, 25 332:2,4, 15 333:2,13, 21,25 334:3, 23 335:9,19 336:10 346:18 351:1,19 360:14 366:19 367:9,15,25 368:2,20 369:12 372:23 378:4 380:5,6

**associations**
50:24 53:10, 13 77:13 89:22 111:14 129:15 137:16,25 154:3 158:11 220:18 257:10 265:4 269:5 271:19 275:4,14,19 302:5 322:2 324:25 340:20 357:14 367:22 369:4

**assume**
12:21 112:20 114:23 192:3 282:5

**assumes**
95:9 231:4

**assuming**
95:4 112:18 261:17

**assumptions**
124:21

**asterisks**
106:12

**atrophic**
188:6

**attach**
35:4

**attached**
35:22,24 36:6 176:12 208:3

**attaches**
323:11

**attempt**
381:10

**attempting**
213:11

**attention**
340:6

**attorney-client**
6:9

**attorneys**
7:20 11:7

**attributed**
258:5

**audience**
89:14

**aughts**
198:17,21

**augmented**
74:12

**Austin**
4:4

**author**
41:12 152:15 153:7 155:5 158:3 163:25 321:18,20

**author's**
220:21

**authority**
326:1,11

**authors**
41:13 151:21 153:9,15,22 156:1,5,10, 11 158:7,14, 25 159:13 160:22 162:23 163:3,10,19 167:20 168:11 169:9 172:1,24 184:20 219:8,18 220:2 243:21 303:8 327:23 328:7,11 329:5,21 336:21 337:9 338:6,8,11 339:8 346:24 347:16 355:15 356:2

**authors'**
329:5 369:24 379:14

**available**
69:22 73:23 82:18 93:8 161:20 267:17 275:5 277:5 351:24 353:8

**Avenue**
193:23

**average**
88:14 186:11 188:20 189:11 190:13 292:12 301:3 383:22

**awards**
105:14

**aware**
6:3 102:20, 24 105:12, 15,16 199:11,15 214:12 215:7,9 219:2,17,25 220:1 229:14,20,25 230:1,5,6,14 249:18,21 252:23 253:1,5,13, 15,21 255:25 256:6 350:23 351:5 355:15 356:1,6 362:11,13 363:23 364:3,15 365:3 366:12 368:18 369:2,10,15, 22 383:22 384:2,5

**axis**
130:9

## B

**baby**
358:15,16

**bac-**
43:21

**back**
17:10 31:23 34:5 42:16 43:5 45:5 67:25 68:2 75:6 77:7

90:18,19 96:2,6 98:4, 18 101:12 102:21 108:10 109:10 113:11 116:16 123:18,25 125:21 145:18 146:9 149:5 151:7 157:16,19,24 160:14 162:19 191:2 194:9 201:6 222:14 231:9 232:3 249:11 250:22 261:19 290:6 302:23 314:20,21 320:1 341:21 348:14 350:6 356:13 380:14 385:7

**backed**
74:22

**background**
30:11 31:4, 11,13 35:6 37:3 105:17 118:17 183:4 282:20 343:1

**backwards**
83:15

**bacteria**
43:20,22

**balanced**
129:25

**barbecued**
86:11,12 340:21

**Barrett's**
164:25 165:3,17

**base**
111:21

**based**
28:16 30:10 49:2 52:1 59:24 60:3, 12 69:21 73:25 76:5 83:1,6 84:5 106:4 114:14 134:17 138:19 154:1 167:7 209:12,24 213:23 220:23 222:7,12 226:18 241:22 244:25 248:1 251:4,5,16 254:10 255:1 279:2,18 293:14 304:20 306:8 309:1 310:15,16 312:22 321:18 329:25 330:3 338:23 344:14,19 345:1 351:23 352:24 353:7,11 357:11,21 358:3 372:7

**baseline**
262:23 291:23

**basic**
189:20

**basically**
49:7 293:1

**basis**
8:25 10:9 27:6 186:20 256:22

**bear**
192:13

**beat**
23:17 108:20 208:6 219:23 357:1

**beauty**
223:23 280:16

**beer**
54:20

**begin**
87:17

**beginning**
66:9 178:12 191:12 259:3 262:6 291:24 308:8 376:2

**begins**
48:5,7 56:16 70:3 75:9

**behalf**
4:1,7 7:11, 16 219:7,19

**behind**
69:24

**believe**
12:21 17:24 112:5,11,17 113:6 114:5 196:4 198:14 241:25 242:25 273:2 288:3 360:19 377:16 378:3

**below**
132:7 334:9

**beneficial**
165:22 169:2

**Benjamini**
100:19 101:2 102:11 116:11,14,24 119:19 123:8

**besides**
224:21 271:25 272:8 273:4,17 379:25

**best**
36:11 37:6 70:16 80:23 81:2 83:11 136:24 222:13 287:12

**beta**
208:19,20 209:1,5

**Beth**
5:3 7:2 9:8 20:14

**better**
158:8 159:6, 14 169:6 376:25

**bias**
27:17 30:24 31:16 32:6, 12 50:8,9, 17,23 51:1 53:5,6,7,15 62:18 75:2 76:13,15,18, 24 77:10,16, 24 90:4,5,10 110:21,22 111:5 113:2 120:14 125:5,17,18, 20 126:11 128:6 132:4, 11 137:15 157:5,6 173:24 174:2 207:2 218:2, 3 219:7 244:9 253:12 255:17 257:9 258:12,17 259:6,7 262:12,13,16 263:14 265:20 268:10,17, 18,20,23 269:10

270:1,22 271:9,20 273:23 275:9,12,20 276:13 280:19 285:9 289:24,25 297:25 317:5 318:19 324:24 325:11,24 326:21 327:1 338:17,22 353:1 366:21 368:4 376:5
**biases**
28:2 50:7 53:1 77:23 111:11 262:18,19 268:25 269:1,13
**bibliography**
18:18
**big**
29:22 49:17 62:16 87:6 99:3 284:21
**bigger**
128:16 177:24 187:21 244:7 280:18
**biggest**
371:9
**billion**
230:10,16
**billions**
230:22
**Biobank**
291:20 333:8 358:15
**biochrome**
213:15
**biological**
269:22 270:7,22 271:16 275:15 302:6
**biologically**
268:4 269:16,18 270:25 271:24 272:6 273:4,15 274:13,21
**biologist**
72:17 205:1,12 206:13 210:17 274:14 381:25
**biologists**
206:24 278:10
**biology**
72:23
**biomarkers**
84:9 86:17 213:23
**biospecimens**
291:22
**biostatistics**
101:18
**bit**
53:14 100:11 168:19 188:25 213:17 342:1,2 343:21,22
**bladder**
26:3 129:1 134:22,25 135:1,5,6 137:3 146:13 170:9 171:7 172:15 175:8,20 176:5,10 327:6,10 328:2 329:7,22 330:8 334:23,25 335:9,19 336:11,23 337:11 338:25 339:2,3,10 360:8,11 364:25 368:21 369:6,13,25 370:9 371:5,8
**block**
201:4
**blockbuster**
230:2,9,15
**blood**
86:19 87:1 307:16,24
**blow**
178:2
**blue**
133:23 135:17 149:19 186:4
**body**
19:4,12 20:21,23 21:20,22 22:1,5 79:8,9 80:5 114:19,21 168:6,7 214:15 260:7 261:6 262:1 385:3,11,19 386:5,10,21
**boiled**
340:22
**bold**
42:1
**book**
39:15 40:24 41:3,8
**Borriello**
7:16
**borrowed**
197:21
**BOSICK**
4:9
**Boston**
4:18
**bottom**
54:14 56:14 59:11,17 83:3 89:11 99:10 103:16 130:2 134:7 145:22 152:12 216:6 304:25 309:7 311:10 333:25
**bound**
350:13
**BOWMAN**
4:2
**Box**
13:7 14:8,12,14 41:18 104:12,23 116:4 122:4,6 146:12 177:7,10,14,18,25 178:7,12,18 303:22 304:5 342:22
**boxes**
139:23 178:8
**Bradford**
257:1,8 258:13,23 259:5 260:8 261:7,25 263:15,17 274:22,24 275:22 276:5,18 324:17 325:14,18 326:2,12,16,22,24 352:7 360:15 375:25
**brain**
196:14,24 198:6,16 199:1

**break**
12:24 13:1 94:23 95:1, 21 143:1 150:23 190:18 198:3,12,23 247:4,6 249:3 298:23,25 300:18 301:13 302:17 317:3 380:21
**breakdown**
298:20
**breaking**
81:21 300:13
**breast**
22:18 23:4, 15 24:3,11, 15,21 34:8, 17 37:22 39:17 40:10, 11 85:24,25 156:25 200:14
**brief**
12:7 95:25 151:5 249:9 250:20 302:21 341:19 380:12 381:10
**briefly**
10:10,12 11:10 202:11 368:14
**bring**
14:2 41:6 64:1 78:5 104:1 120:24 128:9 143:11 151:10 152:8 168:3 193:10 235:11 328:15
**broad**
28:9 40:4 48:23,25 256:21
**broader**
106:6,7
**broadly**
26:14 27:3 207:20
**broccoli**
86:2
**BROOKE**
4:2
**brought**
119:4,19 193:12 383:24
**brown**
134:1
**build**
366:10
**bullet**
109:13
**Burkitt's**
40:19
**button**
6:24
**buzzing**
77:4

**C**

**C2**
175:8
**CAGA**
45:17
**calculate**
220:17
**call**
22:9 42:12, 15 43:6 48:23,25 49:4,6,12 56:13 99:2 115:12 118:12 121:10 231:24,25 282:11 325:5,7
**called**
8:13 15:18 18:12 62:9 69:16 71:18 106:17 248:20 284:10
**calling**
176:23
**callout**
55:22 59:8 115:11
**Calls**
27:9 28:20 30:14
**cancer**
8:25 22:15, 16,18 23:5, 8,15,21 24:1,3,6,7, 8,11,12,16, 18,21,22,25 25:13,18,22 26:3,7,8,11, 14,16,18,23 27:1,4,22 28:10 30:12, 18 34:9,15, 17,19,22,24 35:7,12 37:4,13,20, 22 38:3,23 39:1,8,13, 14,17,21 40:4,10,11, 15,16,17,22, 25 41:2,15 42:7 44:11 45:19 52:8 54:19 56:8, 12,21,24 60:8,12,15, 22 61:2,5,20 62:2,3,7,22 63:13,16,18, 21,24 64:8, 18,21 66:2, 13 67:5,20 68:5 69:16, 18 70:19,20 72:14 73:8 75:3,4,21 78:11 80:1, 6,17 81:11 89:1,4,16 113:14 114:1 126:17 127:3,20 129:1 134:23,25 135:5,6 137:4 146:6, 13 151:22 152:19 153:8,13,22 154:2,4,11, 13 155:1,8, 16 156:5,14, 20,23,25 157:11 159:3,16 160:2 162:4, 14 163:7 164:3 165:15 167:23 170:9 171:7 172:14,16 173:12 175:20 176:5 179:12 182:12 183:13,16 184:22 188:7 190:5,7,9,10 200:14 201:11 204:11,23 205:2,4,19 206:5,10,23, 24 207:14,21 208:10,13,24 209:19 210:19,25 215:21

216:19 217:19 218:12,17 219:1,4 222:12,14 223:1 226:15,18,21 227:5 231:8 233:9 235:1, 2 238:10,16 239:18 245:6 248:17,24 255:12 257:2 258:8,24 260:9 262:2 263:7,22 264:6 265:22 266:9 268:6 271:2,25 272:4,8 273:5,13,17 274:9 275:4, 14,25 277:4, 16 278:8 279:10,22 283:16,23 285:12 286:24 287:22 288:4,17,25 289:3,6,12, 22 290:5 296:17 308:4 311:15 312:7 313:20 315:2,11 316:12 319:7 320:5,8,19, 21 321:1,15 322:6,13 327:6,10 328:2 329:7, 23 330:8 331:6,10,18 332:16,19,23 333:14 334:4,8,23 335:9,19 336:2,12,15, 19,23 337:11 338:18,20,25 339:2,3,10 343:13 349:1 351:2,20 357:13 360:8,11 363:11,13, 20,25 364:17,24,25 365:1,2,5, 10,20 366:14,15 367:12 369:21 370:1,9,15 371:5,8 372:24 375:15 376:23,24,25 378:5,13 380:3 381:21 382:13,18,23 383:5,7

**cancers**
24:9 25:11 27:5 28:18 37:24 38:17, 20 40:1,3,21 53:11 67:6, 10 77:18 87:23 126:2, 7,9,22 127:10 135:1,2 141:20 142:7,15,16 154:21 158:12 159:9,11 161:19 168:8 172:13,23 176:8,10 182:14 190:5 205:22 209:3 222:12 238:3,21 239:25 242:17 243:15 245:14 257:14,19 258:14 259:8,11,14 261:9 263:8, 20 264:3,13, 17 270:4 272:12 278:15,24 279:5 281:7 286:18 299:8 307:2 309:5 312:6 316:1 321:4,5 322:3 323:1 346:19 348:9 351:14 352:6 362:7,9,18, 22,24 363:1, 6,14,17 364:8,13,22 365:10,12,17 367:23 368:21 369:5,13 370:14 371:21 372:12 375:3,6 376:14,15 377:8 378:20 383:2 384:8

**Candida**
7:16 241:2 250:6 260:11,22 295:2

**CAPA**
284:10

**capable**
278:7 381:20 382:13 383:7

**capture**
83:20 84:7 85:19 90:23 190:8 283:17 349:1 376:21

**captured**
83:12 242:12 297:15 348:24

**capturing**
83:14 226:25 227:10

**carcinogen**
68:15 76:8 204:9,10 205:16 249:20 250:4 251:3,7 254:23 255:23 256:5 305:19 306:21 309:11,17 310:11 311:1 372:2 383:14

**carcinogenesis**
207:8,15,18, 21 253:23 254:2,12

**carcinogenic**
76:1 251:8, 14 255:18, 21,22 306:8, 22 308:14

**carcinogenicity**
200:3,18 201:8,17,21, 23 307:8 309:10

**carcinogens**
56:20 76:4 251:13 254:1 305:17,23 306:13,18 366:4 367:18 370:23,24 371:1,14

**carcinoma**
175:7,20 176:3 341:3

**cardia**
51:22 52:8
**cardiac**
49:22 51:13
**Cardwell**
133:22
134:4,6
135:14,24
136:1 138:6,
14 149:8,10
169:16,23
170:8,16
174:11,15,24
175:7
247:11,18
327:13,18,23
328:21
329:5,20
330:12 331:1
379:6 380:1
**care**
98:16 111:4
**career**
28:14
**careers**
30:18
**careful**
17:25
**carefully**
127:15
180:21,23
181:4 188:25
239:25
246:13 263:6
274:4,8,11
376:1
**Carolina**
82:6 85:7
**CAROLINE**
4:15
**carotene**
208:20
209:1,5
**case**
9:3 10:13,
14,22 13:20
27:5 28:19,
24 49:13
64:1 77:17
108:6 114:1
149:15
162:11 179:6
184:4 194:21
196:16
219:20
221:15
222:23
228:14
257:13
266:11
269:23 270:3
275:23
289:12
352:25 364:2
372:4 383:25
384:4
**case-control**
61:3,10 73:5
74:3,8,22
76:8,11,22
77:14 81:13
83:7,18 84:2
85:17 86:14,
25 88:11
89:3,20
90:8,22
111:12
125:9,14
126:12 157:3
202:20 204:6
243:13
257:25
258:9,16
263:10 288:6
311:14 312:5
313:17
314:24
315:23,24
319:4 320:2,
16 335:23
336:7,19
338:16
352:2,10
358:13
366:24 368:6
**case-controlled**
77:19 352:23
**case-controls**
257:18
289:23
**cases**
83:18,20,22
118:23
137:23 138:1
146:18
147:1,2
148:3 171:7
363:24
364:16 365:4
**catch**
295:1
**categories**
294:1 322:24
345:1
**category**
37:14 290:16
343:18
**causal**
47:23 81:4
108:6 112:19
114:23 115:7
127:12
154:4,10
155:11
156:24
205:21
256:15 257:8
258:19
259:5,14
263:15,19
264:11
265:6,10
272:21
275:2,16
276:18
305:17
325:2,7,8
326:19 332:5
351:1 352:7
**causality**
89:15 254:11
256:24
257:5,6
263:1 271:8
274:23
332:12
351:19
**causally**
307:1
**causation**
325:16,20
**caused**
132:12
307:15,22
**causing**
89:1,5 260:9
261:8 278:7
381:20
382:13 383:7
**cell**
75:13 193:12
341:3
**census**
179:14
**center**
34:23 175:12
**Centre**
4:9
**certain**
15:8 20:6,8
40:1 100:20
203:19
252:11
264:16
278:15,24
375:3 384:19
**certainly**
386:22
**cetera**
262:24
**chair**
320:1
**challenge**
84:12 85:21
87:6,10
90:7,9
137:24
370:17,19,20

**challenging**
370:16
**CHAMPION**
4:15
**chance**
27:18 110:24 114:6 137:17 150:5 218:4 269:11,14 275:12,20 324:24 325:12,23 327:1 333:5 366:22
**change**
43:23 66:24 79:21 80:12, 13,23 102:4 129:18 204:21 220:18 273:23 323:12
**changed**
33:17 43:22 64:4 81:7 175:18
**changes**
67:3 184:3 287:5
**changing**
200:13 282:3,6 287:9
**chapter**
40:24 41:3,8 69:15
**chapters**
39:16
**characteristics**
366:3,7,8,13 367:12,17
**characterization**
153:18 160:4 221:24 386:20
**characterize**
34:14,15 39:2,19 344:13
**characterizing**
39:1,23
**charge**
96:12
**chart**
92:20
**check**
16:15 20:17, 24 56:5 96:18 178:6 377:23
**checked**
20:20 22:4
**chemical**
202:6
**Chemically**
202:2
**chemicals**
371:4,7
**chemotherapy**
175:14 282:12
**children**
364:17 365:5
**chloride**
89:6
**chose**
29:25
**Chow**
45:14,15 46:3 236:3 373:25 374:4,6,8
**chronic**
26:9 44:13 91:22
**chronology**
107:14
**chunks**
179:6
**cigarette**
56:8,20,23 79:6,25 80:1,9 81:1 287:16,23
**circadian**
311:7
**circles**
135:21
**circumstances**
33:2 55:6 90:22
**cirrhosis**
167:8 186:21 187:19
**citation**
216:12,15
**citations**
5:23 17:20, 21 18:12 21:22 58:2, 5,7 68:7 384:16,19 385:19 386:7,10,20
**cite**
118:11 325:25 326:10,16
**cited**
16:5,13 19:11 59:5 67:18 277:24 386:5
**cites**
60:8
**citing**
123:22 315:5,6
**citrus**
60:16
**City**
201:1
**claims**
181:15,19 355:14
**clarification**
119:25 198:19 247:15
**clarify**
98:6 192:17 261:12 265:11 325:1
**class**
40:11,12,13 251:15,25 252:3 255:23 371:14 375:3,5
**classes**
31:8 203:24 349:16
**classification**
249:22 251:2,11,18, 20,22 266:2
**classified**
249:19 255:20,21,22 305:18 306:4,20,25 308:6 311:3
**clastogenic**
254:24 255:5 305:5,10,16, 23
**clear**
46:4,6 146:5 155:23 211:10,19 221:9 234:3 242:18 257:15,23 320:6,20 323:7 344:1 363:10 378:1 384:25
**clearly**
212:3,17
**click**
6:23
**clinical**
76:15 89:15 102:5 157:4 175:9 204:7

227:3,6 233:9 235:1 266:12,14, 16,21
**clinically** 47:10 102:3 112:12,24
**close** 90:14 135:7
**closely** 26:7 354:21 379:21
**closer** 135:8 215:14
**co-author** 199:9,13
**co-authors** 51:5
**coaching** 337:8,16
**cohort** 32:13 61:12, 15 62:18 67:8,9 74:23 75:4 76:9, 12,17,23 77:8,14,21 81:8,10 84:13 87:7, 9,11,18,21 91:20 92:1 111:13 119:3 125:7,14 126:12 147:6,18 151:20 153:6 156:18 157:3 158:21 182:1 183:20 188:11,17 202:20 203:25 204:6 242:7 243:12 257:16,17,24 258:10,16 263:9 270:1 288:6 289:23 291:24 294:15 315:24 317:8 336:1,3,9,20 338:17,21 351:10 352:4,11 353:1 358:12 366:23 368:4 369:16 377:7
**cohorts** 83:14,21 84:11,14 91:7 154:5 155:1,17 157:1 158:10 184:4 203:3, 4,17 239:18
**coin** 90:14
**collaborative** 199:4
**colleagues** 37:2 45:15 46:4 198:7 205:11 271:14 274:16,17
**collected** 178:25 183:5 291:22
**collecting** 87:1 281:14
**collection** 157:8,10 178:24 325:10
**collectively** 156:21 157:2 375:22 377:6 378:16,17
**colloquy** 18:8 189:24
**colorectal** 22:17 24:7, 12,25 34:19, 22,24 37:13 38:3 182:12 190:7 288:4, 17,25 289:3, 12,21 290:4
**Columbia** 96:16 102:24
**column** 41:25 45:6 59:9 70:2 164:13 185:22 345:22
**combination** 72:1
**combined** 301:10
**combines** 72:10
**come** 13:8 29:24 87:15 98:18 218:9 231:21 280:21,22 303:22 318:1 369:18
**comes** 86:16 115:12 154:6 168:19 209:9,15 221:10 263:2 328:9
**comfortable** 97:18
**comma** 169:12
**comment** 210:17,18 218:8
**commented** 203:2,7
**comments** 18:13,15,16, 20
**commitment** 191:10
**committee** 64:8
**common** 37:23,24 43:18 326:5 374:15
**commonly** 322:7 345:10 357:13
**communicating** 303:2
**communications** 303:7
**community** 217:9,23 218:5
**company** 193:13
**comparability** 262:21
**comparable** 167:12 296:15
**comparator** 134:3,5 137:4 161:8, 21 162:10 165:12,23 169:8,15 170:24 171:24 172:12,21 173:19 175:2 184:16 185:2 188:3 223:9, 24 379:8,9
**comparators** 379:7
**compare** 134:8
**compared** 135:5 137:4 149:21 209:3 211:2 258:16 262:22 279:24 293:3 302:10 318:22 329:2 334:10

**comparing**
170:18,20 280:20 327:14 328:25
**comparison**
149:20 170:17 223:6 262:23 293:5 330:4,7 379:17,22, 23,24
**comparisons**
130:17 134:13 167:11 379:10
**complete**
21:18,21 35:5 36:12 37:7 83:12, 20 84:7 85:19 90:23 91:15 92:2 162:14 164:10 259:18
**completely**
83:7 210:1
**completeness**
21:14
**complex**
73:9
**compliance**
160:24 162:25
**component**
283:22
**components**
74:3
**compound**
45:2 57:4 306:20
**compounds**
44:20,22 56:7,19 57:1 72:2 306:3
**comprehensive**
93:2 140:6 178:24 205:13,18 346:5 385:1 386:3,16
**computer**
193:16 197:20
**concentrate**
149:7
**concentrated**
26:15
**concept**
72:19 93:19 110:7,9,10 118:20
**concepts**
118:18 124:7
**concern**
176:6,16 221:5 222:19 285:8 336:6 371:9
**concerned**
9:21 50:14
**concerns**
116:23
**conclude**
106:4 114:13 212:15
**concluded**
327:24 329:21 350:24
**conclusion**
28:21 30:15 62:5,7,16 111:22 115:7 218:10 220:22 309:10 329:5,23 339:8 379:14
**conclusions**
66:25 222:7 235:22
236:17 266:10 267:10 326:20 369:24 370:8 372:7
**concurrent**
181:25 182:16 236:21 237:10 295:10 354:12
**condense**
130:11
**condescend**
187:15
**condescending**
168:17 187:9
**conditions**
214:18 225:11 226:9 227:17 228:25 252:12,16,25 253:3,8 274:9 349:4, 15
**conduct**
196:5 261:25 276:9
**conducted**
22:14 194:17,19, 23,25 195:2, 4,8,20,23,25 196:4,10,13, 18,23 198:24 208:25 211:22 221:19 256:1 266:6,17,22 267:9 276:23 279:20 286:16 294:17 313:7 335:24 336:1
**conducting**
217:25 286:7
**conference**
314:11,13
**confidence**
46:8,12,15, 20 48:17,20, 22,24 49:1, 3,5,24,25 50:2 51:12, 15 52:7,9 54:5,21,23 55:4 57:23 58:4 99:6 111:3 120:19 129:9 137:21 144:8,9 334:17
**confident**
50:24 90:3 290:3 366:18
**confirmation**
97:6
**conflict**
220:13 221:6 222:5,19
**confounder**
171:21
**confounders**
161:22 163:7 164:2 167:23 173:12 224:14 320:4,17
**confounding**
27:18 50:9 53:7 90:5 110:21 111:5 157:6 169:7, 14 218:3 244:8 262:12 268:23 274:7 376:5
**connection**
191:22 192:22 233:21 249:16 260:3

277:9 386:24
**consecutive** 348:12,16 362:4
**consecutively** 361:25
**consent** 8:7
**consider** 47:12 108:24 207:7,9,13 268:4 270:25 271:23 272:6 273:3,16 274:3 276:25 326:2
**consideration** 219:7 384:24 386:22
**considered** 5:22 15:18, 25 16:2,11 17:4,17,23 19:14,24 21:15 28:5 87:25 102:19 103:17,22 123:13 173:12 225:15 273:6 276:4,7 277:3,18,19, 23 308:13 310:25 315:23 351:7 352:8 371:19 377:5 384:13,14,21 385:5,12,14, 25 386:2,12, 16
**considering** 150:5 341:11
**consistency** 77:19 90:16 111:14,17 157:9 258:15 336:16
366:23 375:23
**consistent** 57:15 67:9 77:13 114:19 150:17 158:13 168:9 208:22 237:25 242:18 243:14 244:10 245:18 255:16 256:14 259:16 263:8,25 264:10 265:18 266:8 269:19 270:2 272:13 276:14,22 296:9 308:3 309:3 322:5, 12 330:21,22 331:11,12 336:10 338:25 339:3 352:5,11 353:2 357:14,19,20 358:12 359:10 360:1 365:15 367:4,14,22, 24 368:2 376:2,11,12 382:21,25 384:13
**consistently** 289:11
**consists** 14:24
**constant** 200:24 201:2
**constitutes** 204:4
**construct** 91:13,14,20 212:4,17
**constructs** 61:7 86:19
**consult** 223:4
**consultant** 10:21
**consultants** 219:19 221:19,25
**consulting** 10:8
**consumed** 312:23 313:1
**consumption** 48:13 51:10 52:6
**contained** 5:23 212:21 215:12 248:15 253:14 277:17,18 278:2,6,13, 21 302:10 381:19 382:12 384:16,20 386:11
**contains** 56:7,19,25 301:24
**contaminated** 248:24
**contamination** 248:21
**content** 160:23 162:24 196:7 310:8
**context** 46:23 85:15 86:13 87:4 88:19 89:19, 21 92:10,14, 17,18 93:14 101:14,25 114:18 170:7,14 225:24 239:10 256:9 273:10 282:9 283:20 285:10,21 287:1,17 288:22 289:8 310:2 315:17 316:18,20 318:3,5 324:4 339:15,18 341:13 375:20
**continue** 234:4 319:24
**continuing** 119:20
**contraceptive** 87:20,22
**contrast** 130:16
**contribute** 363:14
**contributed** 324:24 326:21
**contributing** 27:18 125:5 207:2 257:10 259:7 268:25 325:11 327:2
**control** 267:8 320:17
**controlled** 211:21 213:13 320:3 352:25
**controlling** 177:12
**controversial** 337:25

**convened**
100:3 219:3
**conversation**
386:23
**conversations**
6:5,8
**conversion**
71:25 139:2
**convinced**
371:16
**cooking**
86:7
**copy**
13:24 197:1, 6,9,10 235:14,16 373:15
**corner**
6:25
**correct**
15:4,5,16, 19,22 20:23 22:1 24:14 25:20 26:21 40:6 41:16 43:11,17,24, 25 46:21 54:24,25 55:9 58:12 69:19 73:11 79:4 80:3 95:16 121:13 123:9,10 128:23 129:3,5 130:7 136:9 139:17 149:14 164:10 173:4 177:21 195:14,15, 18,19 216:9 217:20 218:17 219:20 232:24 249:20 256:11 264:18 283:24 285:15 290:17 291:8 293:10 294:9 295:20 297:4 298:11 299:25 301:16 312:11,14 315:7,8 330:10,14 341:8 344:17 346:13 347:2 350:2,15 353:4 361:18 386:10
**corrected**
345:14
**correctly**
152:20,22
**correlated**
81:3
**correlation**
128:2 174:14 265:8,14 322:23 325:5 332:6 348:8
**could've**
36:3 40:18 113:2 132:12 169:10 170:23 176:10 267:21 295:12,16 326:20 354:15
**counsel**
7:3 8:6 166:22 192:15 317:14 380:25
**count**
32:20,22 142:25 196:19 281:3 295:3 360:23 373:23 377:20
**counted**
25:12,21 34:8 38:10 39:16 182:15,17 295:11 299:8
**counting**
32:1 137:9 182:14 279:16 297:20
**countries**
296:6,7 336:5,9 377:12
**counts**
180:8
**couple**
11:5 201:13 300:19 342:6 381:14
**course**
11:11 12:10, 19 13:5 21:4,9 23:23 25:8 33:21 65:1 168:23 193:17 194:6 195:17 303:4 337:2
**courses**
36:8,22
**court**
7:20 10:5,6 11:3,14,15, 21,24 12:1,8 21:7 61:17 68:2 76:25 77:8 119:25 144:20 145:1,5,7,12 157:19 166:15 198:19 233:18,23 234:16 239:2 247:15 250:7 260:12,16,23
**courtesy**
65:17,19
**covariates**
31:7
**covered**
192:12,15
**created**
181:9,10,12
**creates**
72:11
**creating**
6:12
**criteria**
205:15 275:16,17 276:5,11 324:17 325:19 326:2,12 351:1,18 352:8 360:4, 15 366:17
**critical**
169:17 197:7 262:14 283:22 285:14,19
**criticize**
124:11
**criticized**
169:23
**cross-talk**
97:2 145:3 165:24 166:14,16 187:11 374:3
**crude**
148:25 220:17,20
**cured**
212:10 214:7,19 215:5

**current**
24:10
**curriculum**
15:15 22:24 23:3 28:17 35:3,9,13,19 36:6,12,18 38:2
**cut**
165:25 166:1,5,6 241:4 317:22 343:16,17 360:24 368:22 373:24
**cutoff**
349:22
**cutoffs**
230:19 350:4
**cutting**
166:23 240:14,17 316:24
**CV**
23:14 196:20 197:9
**cycle**
75:13

**D**

**daily**
138:10,11, 15,19 139:15 149:12,13 150:11 215:5 288:12 291:4 327:17 329:1
**Danish**
222:12 344:12 356:18 359:13
**darker**
133:24
**data**
27:16,22 29:19,24 51:6,7 62:15 64:4 67:15 68:20,22 69:22 74:23 77:17 81:6, 8,14 94:12 124:19,24 125:2 126:10 131:4 157:4 162:14 168:24 169:10 175:4 178:25 179:5,8,12 180:1,3,9,20 181:6,8,17, 19 183:5 203:4,5,25 205:3,4,10 207:3 209:25 220:16,21,23 221:7,8,10 222:5,8,9, 11,16,17,21, 23 239:13 242:21 243:16,17, 18,24,25 251:5,16,23 252:11,22 253:10 254:3,10,11 255:2,4,8, 10,24 256:13,14,21 257:5 262:11 266:12,16,21 268:12 270:5,20,21, 24 272:22 274:6 284:14 290:14 292:18 295:18 297:9 308:5 315:16 316:24 324:5,12 328:10,12 331:12 337:20 341:11 351:18,24 352:22,23,25 353:7,11 354:21 355:13,14 359:24 363:22 364:12 374:15 376:22,23,24 377:1 378:18 379:21 385:10
**database**
93:2,3,11 177:20,21 178:5,23 181:9,15,21 188:21,22 189:4,8,12, 21 190:2,8, 13 222:17 287:19 295:5,6 345:5 346:5 347:11 348:25 353:21,23 354:1,6,19, 24 355:1,4, 9,10,19 356:5
**databases**
92:22 162:13 179:4 190:11
**dataset**
355:13
**date**
35:11,20,21, 23 66:15,19 68:5 140:22, 23 141:8,13, 14,21,23 142:2,8 143:23 146:17,22,23 251:17 294:2
**dated**
13:21 35:20 66:23 67:21 303:18 304:14
**dates**
68:8
**day**
48:13 51:11 131:21 138:13,21 139:3,5 229:17,22 287:16 303:4 342:2 372:20 377:11 380:20 381:10
**days**
32:19 201:1 286:23 287:21,22 288:20,24 289:5 292:2 293:15 294:20 359:17 361:22
**DDD**
138:7 139:8, 11
**De**
313:7 320:25 321:9,14 340:10,18 341:3
**de-identify**
355:14
**deal**
23:14 39:16 169:6 185:2
**dealing**
292:5

**dealt**
25:13 39:7
**death**
75:13 370:18
**debate**
88:9 101:7 102:21,25 107:23 108:10 116:15 117:11 119:6,20 123:17,25
**decades**
109:22 110:14 115:20 136:14 209:13 245:16 257:16 265:18 275:4
**December**
303:19
**decent**
317:16
**Dechert**
193:22
**decide**
132:10 379:11
**deciding**
219:12
**decisions**
29:3 66:4
**declarations**
106:2
**declare**
8:4
**decrease**
59:22 61:22 68:11 332:25
**decreased**
134:18 331:23,25 332:23 333:20,25 334:18 380:6
**decreases**
59:25 132:9
**deep**
30:25
**Defendant**
4:1,7
**defendants**
11:8 219:20
**defense**
177:3
**defer**
278:10 381:25
**defined**
42:20 138:10,11, 15,19 139:15 149:12,13 150:11 242:9,10 291:4 327:17 329:1
**definitely**
10:19 35:23 94:16 171:18 198:12,22 232:12 251:8 338:12
**definition**
53:20 54:3 55:8 138:9
**degrades**
72:9
**degree**
284:18 318:18
**deliberate**
133:18
**delivered**
180:10
**delta**
385:6
**demonstrate**
319:4
**demonstrated**
279:9 319:5 378:4
**demonstrates**
242:19
**demonstrating**
255:5
**denominator**
129:20,23
**departures**
136:21
**depend**
32:18 33:14 91:2 93:1 130:8 226:7, 8 227:16 228:6 281:24 318:24
**dependent**
85:22 86:13 87:5 92:17 282:9,14 283:20 285:21 324:10
**depending**
90:21 170:16 175:12 226:1 227:19 229:15 252:15 253:2,7 269:4 281:17
**depends**
91:12,19 227:14,25 228:10 252:24 311:2 318:17 370:10
**deposed**
9:4,5 11:6
**deposition**
6:18 7:2,21, 23,25 10:11 11:12 12:11 13:6,17 52:14 97:6 121:4,5 142:21 191:9,12 192:11 193:17 194:6,7 195:17 303:4 304:12 317:15 337:24 338:9 342:18 386:25
**depositions**
133:7 318:1
**derived**
313:1
**DES**
10:14 89:7
**describe**
118:3 164:12 257:21 259:2 345:11,12
**described**
25:22 153:23 189:20 196:2 385:3,10
**describes**
385:2
**describing**
232:20 255:2
**description**
347:25
**descriptor**
231:25 232:2,4,5,6
**design**
27:25 40:8, 13 83:10,11, 16,17,22 85:10 125:3, 4 161:23 162:8,11 167:9,13,16, 18 169:7,8, 13,15 170:24 171:23 172:20 173:20 185:3 188:3 223:23 228:22 258:6

295:9 338:21 348:6 355:1
**Designated** 149:19
**designed** 61:10 83:21 213:18,22 214:13 354:12
**designs** 24:5,18 26:25 27:16 37:18 111:10,15 171:25 172:21,22 227:8 263:13 276:15 336:17
**detail** 33:1 98:17 316:2 338:10 342:12 371:3
**detailed** 173:13 236:6 262:11
**details** 301:2
**detected** 176:11
**determine** 36:20 89:15 325:14 355:1
**determined** 142:15,16 256:3
**develop** 29:2
**developed** 8:25 115:19 364:17 365:5
**developing** 245:6
**development** 207:22
**diabetes** 163:9

164:20,21 165:13
**diagnoses** 376:24 377:1
**diagnosis** 87:2
**diet** 61:7,9,13 62:25 68:14 75:4 78:1 90:8,12,13 196:7 202:8 208:12 209:14 210:4 213:7 214:8,19 215:6 254:4 256:17 257:7 263:3,15,24 264:9 268:1 276:19 279:19 284:21,24 285:3,9 312:23 313:9 336:7,11,19 338:18,19 341:12 363:1 364:13 365:11
**dietary** 53:10 62:4,17 64:2 69:13 73:7,18 74:2,11,18,24,25 77:17 78:2 90:16 119:2 126:10 194:19,22 196:4,16 199:6 202:10,12,16,21 210:22 211:3,12,21 212:2,16 246:23 255:14 257:13,24

258:7,20 259:8 263:2 264:1,12 265:16 267:5 269:23 276:5 280:9,13 281:3,7 284:7 317:2 335:12 339:1 352:1 363:18 368:1 376:14 377:8 378:13,19 382:18,19
**differ** 281:17,19 282:2,4,6,13 374:14,17
**difference** 29:22 52:5 130:2 134:16 136:15 186:14 187:18,20,23 188:19 214:24 251:6 281:8 323:17,24
**differences** 80:21 175:2 184:21,25 185:4 213:14 257:23
**different** 22:15,16 24:1,6,9,22 25:10 26:23 27:1 30:19 37:22 43:9 50:12 60:14 69:3 74:2 76:12,16 77:18,24 93:20 98:3 102:8 105:6 106:10 111:15 117:22

124:19 125:10 126:13 129:21 130:12,17,19 131:3 133:18,20 134:2,12 137:11,14 147:19 150:4 155:20 158:11 170:16,19,21 176:5 183:12 186:5 194:20,24 195:6 196:1,17 203:3,6,7,23 206:7,10 208:13,18 209:2,4,9,15,16,21 210:1,2,6,12,17,23 212:3,17 213:6,24 222:12 223:7,8,25 224:17,23 226:1 227:5 228:25 243:12 251:12 257:14,19 258:6,9 259:11,14 260:14 263:11 265:22 266:3 271:15 275:12 276:15 278:2 280:20 281:1 282:20 286:18 287:6 291:25 296:3,6,7,14 297:22 309:2 318:19

322:16 325:22,23 327:12 330:22 333:4,20 336:14,17 340:3 343:13 349:4,14,24 355:11 357:15 363:13 364:23 368:5 371:7,23 372:1 377:11 379:7
**differently** 39:3 85:10 111:12 265:12
**digestive** 311:17 312:7
**direct** 26:8 103:2 375:7
**direction** 269:5
**directly** 71:13 159:19
**director** 105:1,11
**disadvantages** 101:8 124:7
**disagree** 28:25 29:3, 18 99:11 103:7 106:15 111:19 112:1,8,14 113:9,21 114:10,16,25 117:13 118:6,24 155:4 167:25 168:10 173:22 249:24 251:1,20,21 305:8,12 307:20 308:19 309:16 317:25 319:2,8 322:10 323:22 328:17 329:4,20,23 330:1 352:14 353:3,10 369:23 370:7 372:10,14 379:13 385:17 386:19
**disagreed** 158:3 319:13 372:6
**disagreeing** 156:5,10
**disciplined** 26:22
**disciplines** 271:15
**disclose** 66:8
**disclosures** 219:16 220:10
**discuss** 215:20 216:8 340:9 343:20 365:20
**discussed** 16:14 108:13 117:7,8 118:22 123:20 158:15 202:10 353:16
**discusses** 217:5 347:24 374:12
**discussing** 113:12 353:18
**discussion** 57:23 69:12 119:18 124:14 160:25 163:2 168:2 175:5 268:3 326:17,18 343:21 345:16
**disease** 26:9 79:11 85:13,14 88:1 91:13 127:25 167:24 173:1 224:21 366:20 367:8
**diseases** 163:8 164:4, 17,22
**dispute** 30:13 270:17
**disputing** 265:21
**disrespectful** 187:10
**dissemble** 166:3
**dissertation** 24:7 43:4
**distance** 130:1
**distant** 143:2
**distinct** 130:15
**distinguish** 142:11
**distorted** 234:5 250:13
**distortion** 249:25 250:3
**distracted** 12:14
**distribution** 155:2 184:12 237:1 238:18 281:15 298:14,16 345:18 346:4,14 347:7
**diverse** 73:8
**divulging** 97:18
**DNA** 38:17 204:21 323:9,10,11, 12,18,25 367:5
**doctor** 14:15 31:17, 18,21 77:5 110:6 133:9 136:6 141:8 154:8 160:20 165:8 175:9, 16 187:3 189:14 206:12 213:18 214:12 215:7,9,16 216:16 218:13 219:5 223:11,16 224:2,15,23 225:2,17,25 228:8 229:14 233:5 235:10 236:13 237:3,17 238:24 239:4 240:4 241:20 242:24 244:12 245:23 246:3 254:15 258:22 263:21 264:5,14 265:21 266:10 267:7

270:11 271:23 273:1 274:20 275:21 276:23 277:25 279:6 281:8 282:16 283:14 285:11 286:19 287:18 288:23 290:6 291:11 298:9 299:4 303:10,16 304:2 306:19 323:9 324:15 325:13 327:4 329:4 330:6 331:3 332:13 333:11 334:1,21 336:21 340:5 346:23 347:23 348:10,17 349:7,17 350:23 356:13 360:17 361:15 362:5 364:15 365:3 366:1 368:7,14 369:2,10 372:15

**doctoral**
24:6 43:1 326:7,8

**docu-**
216:22

**document**
4:21 13:11,12 14:21 15:3,17 43:13 71:9,13 116:3 119:12,16 121:7 122:1 128:12 135:19 143:7,9,12 161:2 166:25 180:12 182:9 196:25 216:13,17 304:2,17,24 307:6 315:14 335:21 351:22

**documents**
13:6 16:5,6 122:16 144:23 145:18 266:25 267:21 386:4

**doing**
27:22 42:9,10 49:11 110:13 124:21 138:23 154:2 155:14 167:19 174:20,21 187:22 189:8 221:3 274:3 310:6 328:12 365:23

**dollar**
34:23

**dollars**
230:22

**don'ts**
115:16,20,23

**dose**
93:5 130:20 131:2,15 133:19 138:10,12,15,19 139:15 150:11,17 183:1 215:5 225:14,19 226:4 227:13,16,19 291:4 318:21 327:17,21 329:1 342:8 343:8 344:3,6,7 356:15

**doses**
149:12,13 212:22 215:10 357:16,24,25

**dosing**
225:21

**dot**
129:7 140:21

**dots**
131:22,23 132:16 133:10,15 136:11 137:6,12

**double-check**
133:13 241:24

**double-checking**
178:10

**download**
355:11

**drafting**
20:1

**drafts**
19:21

**draw**
54:13 135:12,25 174:2 222:7

**drawbacks**
168:3

**drawing**
115:7

**drinks**
62:10

**Drive**
4:17

**driven**
77:23 90:3 117:18 269:25

**driving**
367:1

**Drop**
109:9

**drug**
182:21 230:2,9,15 242:11 293:22 294:1

**drugs**
215:22 216:20

**drying**
70:8

**duly**
8:14

**duodenal**
228:18

**duration**
150:10 181:22 182:7,20 183:11 184:14 291:5 297:2 354:8,16,18 355:3,18 356:4

**E**

**e-mail**
4:5,11 356:12

**earlier**
25:9 66:11 83:22 154:7 256:20 262:6 327:8 342:16 353:16 384:17

**early**
25:19 276:8

**earn**
98:14

**easier**
42:23 84:4

217:14
**easily**
90:9 368:3
**Eastern**
387:9
**easy**
53:12 125:20
**eat**
68:24
**ecological**
70:4
**econometrics**
31:14
**editor**
26:24 219:11 221:12
**editorial**
107:2,9
**effect**
44:13 49:18, 19 50:13 111:23 112:6,17,18, 19 113:4,7, 19,20 114:7 209:18 214:20 233:9 235:1 269:4
**effects**
75:15 77:22 206:7 207:16 253:11
**efficient**
83:2,9 84:10,18
**eight**
38:22 59:10
**either**
25:23 29:13 46:7,19 62:4 91:15 129:10 136:21 158:2 191:23 221:11 256:16 273:6 377:18 378:5,19
**elaborate**
84:23
**electronic**
87:8 178:24 280:22 284:13 286:8 297:18 348:25 373:15 376:23 377:2
**eligibility**
360:4
**eligible**
158:20
**emphasis**
108:1 173:23
**emphasize**
158:9 243:4
**EMR**
178:24
**enabling**
346:1
**end**
17:8 109:12 233:15 239:3 259:9 263:16 317:15 342:1,23 368:23
**ended**
133:5
**endogenous**
214:24
**endogenously**
214:14
**ends**
144:9 180:13,17
**engaged**
194:14,15
**enter**
7:17 271:7
**entire**
147:5 155:2 276:25 307:4
**entirely**
53:11 67:1
106:9
**entitled**
97:21 98:23 104:7
**entity**
363:12
**environment**
92:11
**environmental**
23:23,24 79:20 371:7
**epi**
86:21 357:13
**epi-**
23:23
**epidemiologic**
42:5,8 57:10,12,14 78:10,16
**epidemiological**
27:15 69:22 110:13 126:20 127:24 195:21 199:9,13 202:13,18 204:3,5 205:19 211:3 235:21 236:16 238:4,25 239:5 240:5, 12 241:9 247:22 248:3,16 253:10 254:3 257:5 264:17 267:3,12 276:24 277:4,16 279:4 280:9 281:10,21 283:12,24 285:13 286:22 290:7 302:5 304:21
310:16 311:13 312:4 315:15 321:3 350:25 351:17 362:6,17 363:5,22 364:5,7 375:1,13
**epidemiologist**
26:14 175:10 176:7,16 205:2 273:20 366:16
**epidemiologists**
26:8,9 31:9, 10 274:15
**epidemiology**
22:15 23:9, 22,23,24 24:19 25:8 27:22 28:10, 14 29:23 30:12,18 31:11,12 34:16 35:7, 12 37:4,20 40:4,15,17 41:15 49:11 52:24 58:24 60:21 61:5 67:5 69:16 72:15 75:3 91:25 92:8 101:17,19 107:24 108:13 117:20 120:11 125:1 153:21 154:2 157:11 162:4 168:8 172:23 173:16 183:14 202:24 203:1,13,16

205:4 206:5 207:1,14 208:10 211:8 219:6 226:15 228:22 229:12 231:8 233:6 234:23 263:7 265:7, 25 268:9 269:17 280:17 285:18,23 325:4 326:6 382:9
**equal** 45:16 51:13 52:9 139:25 140:1 145:19 349:19 350:9 361:17
**equalled** 51:15
**equals** 52:6,7
**equivalent** 278:14,22
**erosive** 165:19 166:19 167:3
**error** 28:1 53:14 86:23 93:24 171:1 284:3, 5,11,14,16, 19,22 285:7 289:17,19 318:25
**ESCC** 340:20
**esophageal** 22:17 24:8 25:13,17 39:8,13 55:13 165:15 172:15 182:11 333:13 341:2
**esophagus** 164:25 165:4,18 190:6
**ESQ** 4:4,11,16
**essentially** 39:25 312:3
**established** 163:1 290:8
**establishing** 262:9
**estimate** 48:2 49:7,13 101:20 108:7,8,9,14 109:4 117:16,17 120:12,13,21 124:4 125:23 144:3 145:21,23 147:12 148:18,23 149:22,25 150:9 170:18,20 174:1,18 268:14,15,25 269:7 273:25 275:8,10 276:12 328:15 332:3,23 334:9,11,13, 15,19 369:19
**estimated** 171:6 312:21 382:19
**estimates** 47:14 50:21 125:19 129:15 133:17 136:17 154:20 257:11 272:11
328:14 332:8 333:19,21
**estimating** 94:17
**estimation** 49:11
**et** 262:24
**ethically** 227:6
**Europe** 336:5
**European** 336:2,9
**Eva** 97:5,9
**evaluate** 132:11 133:19 217:24 218:9 219:4 251:23 252:21 268:13 284:2 285:14,19 310:2,5,23 339:15
**evaluated** 64:5 217:3, 18 219:5 237:5,18 240:1,6 242:1,25 243:10 273:14 279:6,18 291:7,12 293:17 294:12 296:16 299:5,13 300:23 308:5
**evaluating** 47:13 137:15 220:11 242:22 251:24 282:11 283:16,21,25
296:22 302:5 339:18 364:8 365:11,12 386:13
**evaluation** 67:3 221:2 250:1 262:16,21 263:1 338:13 351:13 366:2
**evaluations** 136:23
**everybody** 34:2 250:16 349:25
**everyone** 61:21 62:1 147:13 350:4
**evidence** 42:6 51:23 60:17 62:4, 8,9 67:2 78:10,16 88:10 89:2 111:9,17 114:19,20,22 125:10,11 126:1,15,25 127:18,24 155:14 168:6,7 218:7 231:5 251:9 263:3 264:11,15 265:1 279:13,21 305:4,9,22 310:17 313:19 315:1,10 316:10 319:6 350:25 351:25 352:10 363:16 382:25 383:8,13

**evolved**
60:20
**EX6423**
178:12
**exact**
63:8 119:12 180:14 196:19 357:16
**exactly**
32:16 47:7 56:4 131:13 159:15 170:4 172:11 179:19 187:12 197:4 198:18 235:6 320:10 328:7 329:19 338:14 355:22 361:21
**examination**
5:4 8:17 191:5 214:6 381:6 383:20
**examine**
227:4 255:11 273:21
**examined**
8:15 60:13 73:6 183:15 246:24 291:4 322:4
**examining**
343:12
**examples**
17:15 19:7 102:22 154:6 210:2 213:7 245:17 289:9 305:20 306:11,17 385:20
**exams**
40:16
**exceptions**
352:3
**exclude**
91:23
**excluded**
293:24
**excuse**
188:14 257:14 270:15
**executed**
83:11
**executive**
105:1,11
**exercises**
125:15
**exhibit**
5:12,13,14, 15,16,17 14:2,4 15:12,17 16:22 35:4,5 36:7,9,19 41:7 66:22 67:11 81:17 82:11,13 98:5 104:3 120:25 121:18 122:22 128:9,17 142:20 143:5,14 149:6 150:21 151:11 152:3,4,25 153:1 160:7, 15 162:20 174:20,22 176:19,20 185:8 211:16 233:4 303:12,13 304:12 342:17,18,19
**exist**
37:15 87:8 111:11 125:17 256:21
284:14 285:6 364:3 368:3
**existed**
37:15 68:20 81:6,14
**exists**
112:6,18
**exogenous**
213:19 215:1
**expect**
188:12,16 286:21 287:21 325:23
**experience**
28:10 35:7 40:4 154:2 328:14
**experienced**
26:14 27:3
**experiment**
214:17
**experimental**
252:11,12,25 253:7 270:16
**experiments**
253:5,21 306:15 309:22
**expert**
9:2 10:8 13:21 14:8 16:7 26:17 27:3,6,14 28:13,16,24 29:24 30:1 42:17 43:6 57:25 60:9, 11,19 63:5 64:6,8,14,23 65:22 67:14 72:22 96:13 123:25 124:15 126:19 134:23 177:2 193:3,5,11 200:2,16
201:7,10,16, 20 205:8 206:17,19 207:7,13 210:18 217:18 218:14,23 231:7 239:19 248:19 257:3 263:5 264:8, 23 265:24 269:25 270:19 274:2 279:2 298:3 300:3 302:4 304:20 329:25 338:13 362:8 364:11 365:9 372:3,15 382:15,16
**expert's**
99:12 103:8 249:25 251:2
**expertise**
27:19 28:9 30:20 37:3 40:2 72:14 205:3 206:3, 4,25 208:9 211:7 221:1 228:21 229:11 251:22 252:21 253:9 254:8 255:7 272:2 278:4, 9 308:1,25
**experts**
64:1 67:16 96:10 97:23 106:16 118:7,22 124:10 318:3
**explain**
85:2 132:19 175:1 262:19 272:23 276:8

336:13 349:13
**explained** 50:7,16 90:10 113:2 128:6 132:4 170:23 265:19 271:20 275:8,11 276:13 325:24 366:20,21 368:3
**Explor-** 355:7
**Explorys** 177:21 178:5,23 181:9 189:21 190:2 295:5 353:21,23 354:1,6,19 355:1,9,18 356:5
**exposed** 137:23,25 202:8 253:3 295:11 318:11 370:23 371:15 372:1
**exposure** 16:24 68:15 80:16,23 83:12 84:15 85:12,13,22 87:2 88:1 90:23 91:3,4,8,13,22 92:2,3,19 93:11 127:25 149:16 154:22 158:22 183:5,22 184:1,2,15 204:23 206:7,8 209:14 210:24 212:3,16,17 235:20 236:6,15 237:4,11,19,24 238:5,10,11 239:1,6,16,21,24 240:6,10,13 241:7,10,17,18 242:1,6,9,13 243:1,5,7,9 244:13,22 247:13,19 248:1 254:5 255:15 256:15,16 264:10 268:22 280:10,13,20 281:9,10,12,14,16,18,20,24,25 282:3,10,14 283:17,22 284:1,3 285:15,20,22,25 287:22 289:10 290:9,21 291:6,7,12,14 292:20,22 293:8,16,18,19 294:12,24 297:17 299:5,7,10,13,20,23 300:23 301:7,21 306:16 307:14,22 308:16 309:12,18,24 310:3,12,18 313:19 315:1,10,12,16 316:11 318:10,18,20 319:6 320:6,20 323:18,25 324:10 339:1 344:13,19 346:2,6 348:25 357:10 358:3 359:15 366:20 367:7,8 368:15,16,20 369:3,11,14,19 371:3,12 377:1 378:20
**exposure's** 238:12
**exposures** 69:4,14 78:2 83:15 84:6 85:18 86:5 158:12 203:9 207:16 208:12,14 211:12,20 213:24 252:24 255:14 279:8 282:5 284:7 296:13 369:4 370:24 371:23
**expressed** 106:12
**extensive** 320:4,18
**extent** 19:25 20:13 27:14 29:16 88:18 97:17 109:2 294:6 309:12,18,25 316:17 354:13 385:9
**external** 34:21
**extrapolate** 32:8 213:8
**eyes** 144:4

**F**

**face** 260:24
**fact** 26:15 51:19 70:17 90:12 109:24 118:21 124:23 126:9 162:3 164:15 179:17 232:20 258:5 322:25 345:17 370:21
**factor** 171:6 186:5
**factors** 38:16 42:7 60:14 78:11,21,24 79:3 80:10 94:18 154:24 162:15 167:17 169:11 172:13,16,19 173:11,15 184:21 188:5 227:5 261:8 265:14 289:15 325:14 363:14 364:23
**facts** 231:5
**faculty** 26:10 40:19
**faded** 99:24

**fair**
12:22,23 15:10,11 22:23 23:4, 8,20 26:3,20 28:8 33:9 39:5,10 40:5 66:25 67:1 79:9 93:9 111:7 131:22 148:15 192:4,5 224:8 260:20 267:7 367:16 372:8
**false**
385:15
**familiar**
13:9 121:25 122:13,15 176:25 199:17,19
**famotidine**
184:17,23 185:5,9,18, 23 186:8,12, 15,22 188:8 223:9 297:12 334:10
**famous**
208:20
**farther**
54:12
**FDA**
201:8,10,14, 16,18 211:22 217:3 366:8
**feature**
83:9
**feed**
85:24,25
**feedback**
277:8
**feeding**
213:13
**feel**
88:19 97:18, 19 124:9 294:7
**feet**
31:23,25
**fellows**
31:2
**fellowship**
34:7,13 37:12 38:1, 22
**fellowships**
36:8,23
**felt**
174:9
**field**
37:4 59:2 60:19,20 76:19 86:18 87:7 207:15 324:7 326:6 332:6
**fields**
75:2 101:22 205:10
**Fifth**
114:12
**figure**
130:24 131:1,4,7, 11,15 284:18
**figures**
130:12,23 134:12
**figuring**
141:20
**file**
178:13
**filed**
8:23 153:6
**filled**
93:7 359:3,5
**final**
6:19 20:16
**financial**
221:14
**financially**
7:14
**find**
20:6 24:25 58:4 77:13 108:8 143:5 197:2 198:2, 12 235:6 270:1 326:3, 13 327:21 329:2 333:4 336:10 338:20 375:12
**finding**
46:3,18 47:3,6 76:11 109:6 132:3 150:2 170:16 171:5 197:8 268:16,17 271:13 272:23 324:17 325:22 330:13 333:24 334:18 346:18 378:12 379:14,15,16 382:21 384:7
**findings**
27:19 76:21 108:2 129:1 131:12 133:22,23,25 134:4,6 168:4 176:3, 4 209:4 216:18 257:17,18 258:4 284:20 325:11 327:12 338:19 339:16 352:14 353:2,4 367:4 374:12,13 375:24
**fine**
11:7 190:15 197:12 234:1 235:16
**finish**
33:23 358:7
**finished**
245:23 246:1 328:18 338:1
**Finken**
5:6,8 191:6, 8 198:1 203:10 210:8 211:14 215:18 224:6 233:3,12,20, 25 234:6,12, 18,21 235:15 238:22 240:20,22 247:5,9 248:25 249:14 250:10,14,25 254:13 259:19,22 260:2,5,21 261:2,5,19 277:12,14 295:1 298:7 300:14,17,20 302:16 303:1,11,15 309:6 311:8 314:5,8,16, 19 318:7,8 319:15,21,23 320:13 324:13 335:1 337:6 338:1 339:5 341:15,24 342:14 346:21 347:12 350:21

368:9,13 377:13,20 380:7,19 381:16,17 382:3 383:18,21 385:17 387:1
**first**
14:9 22:10 24:8 41:25 44:6,9 50:9 57:9 59:11, 12 71:22 83:23 87:21 90:19 94:2 105:21 107:12 109:11 111:16,21 132:10 134:14 139:24 149:20 160:17 173:22 177:2 220:16,24 222:6 232:10,20 236:1 249:22 257:9 259:6, 25 268:11 271:9,21 275:6 276:10 284:1 287:15 310:24 321:18,20 324:23 325:4,21 326:3 328:9 340:4 367:13
**fish**
70:7,19
**five**
53:4 59:10 67:5,10 78:23 79:19, 20 86:2 126:7,9,22 127:10 139:25 140:12 142:12 145:11 152:11 154:9 159:21 168:8 172:13,23 205:22 238:2,6 239:6 240:7, 13 241:10 242:2 243:1, 6,19 244:1 245:1,4 246:15 247:4,6 263:8 282:13 317:2 321:3 323:1 334:19 343:15 345:25 347:25 348:11 359:3 360:5 362:9, 24 363:1,17 364:22 365:10,12,16 367:23 371:21 372:13 375:6 376:14,15 383:2 384:8
**five-fold**
54:8 113:13 114:2
**flip**
90:15
**Floor**
4:10
**Florian**
211:10,24 212:23 213:10,18, 21,25 214:9, 13,16 215:8, 12
**fluid**
213:25
**focus**
26:10 34:16 37:21 39:25 50:8 53:15 76:21 101:23 103:4 117:24 118:2 125:17,22 151:19 174:6 203:20 363:15 364:4
**focused**
23:21 24:10, 20 37:23 40:18,19 101:19 117:21 120:11,20 124:2 181:24 203:21 220:24 266:18 267:2 300:8 315:15 321:2 356:18 358:2 362:9 364:11
**focuses**
24:3 39:20 75:3
**focusing**
42:7
**folder**
121:2,16 143:10 342:22
**follow**
87:12 133:5 155:1 157:1 235:13,15 237:11 311:23
**follow-up**
84:13 142:17 143:22 144:13 146:18 147:4 148:10 152:11,16,18 153:10,12 154:5,8,13 155:3,5,7,18 156:2,3,8,12 158:8,10,15 159:2,7,19 160:9 238:9, 15 239:22 240:9 241:6 242:10 301:5 361:13
**followed**
32:16 147:6, 9,23 148:4, 8,13,16 151:20 155:22 156:19,21 175:13 237:15 239:19 268:19 301:3 354:14 359:6
**followed-up**
236:22
**following**
97:23 133:5 147:5 160:5 182:14 323:18,25
**follows**
8:16 370:13
**food**
62:12 214:7 285:2 322:19,21 323:3
**foods**
79:14
**foodstuffs**
313:1
**force**
99:19,20,22 100:2,3,4,6, 21,24 102:11,12,

14,16 107:13 116:12,22,24 123:7 229:21
**foremost** 50:10 111:16 173:22 220:16,25 276:10 328:10
**forest** 128:24 129:6 130:7,11 131:21 136:14 138:6 145:20,22 147:14
**forget** 177:11
**forgot** 380:20
**form** 23:18 72:1 108:22 133:3 194:20 205:15 209:1,15 337:17
**formal** 257:25 258:13 259:4,10 261:25 263:1,17,19
**formally** 263:14
**formation** 59:22 60:1 61:23 68:12 70:9 207:22 213:19 214:25 215:1 323:18,25 367:10
**formed** 214:14
**forming** 267:9
**forms** 72:9
**formulations** 210:6
**forth** 102:21 108:10 123:18 124:1 145:18
**forths** 101:12
**Fortuna** 4:3
**forward** 14:20 299:9
**forwards** 83:15
**found** 45:15 47:23 72:2 76:13 88:13 111:23 154:4 174:6 216:2 257:22 276:21 282:17,25 298:5 302:11 317:9 327:18 328:24 330:19 332:22,24 333:1 334:8, 11,18 352:5, 25 357:14 358:13 368:5,6,19 369:3,11 373:13 379:18 380:4,6
**Foundation** 60:8,13 62:2 63:14,21,25
**four** 25:21 59:10 78:23 84:2 130:15 133:6,17,21 150:18
291:13 292:3,8,20 293:9,15 313:17 314:24 317:1 319:3 327:8, 11,13 328:22 330:17,18,24
**four-fold** 74:10,17
**fourth** 43:13 114:4 163:6 185:22
**frame** 63:6
**France** 74:9,16
**frankly** 162:17 167:15 219:14 284:22
**fraught** 86:22
**free** 88:19 97:19 294:8 316:18 318:4
**free-living** 238:2 242:22 281:5 300:7 358:19
**freeze** 377:22
**frequency** 322:19,21 323:4
**frequently** 32:11 176:14
**fried** 340:21
**front** 13:25 63:9, 12 100:14 141:17 142:5 154:16 168:13
191:18 193:1,8,9 337:5 343:6 373:15
**froze** 377:21
**frozen** 260:25
**fruit** 60:16
**fruits** 57:8,17 61:8 208:22 209:5
**FUJIMOTO** 233:17
**fulfilled** 351:1,18
**full** 18:16 44:6 59:11,13 66:13,17 104:20,24 105:13 169:23 216:12,15 221:7 222:20 224:24 287:20 312:16 321:21 340:4 385:18 386:6
**function** 14:14
**functions** 43:23
**Fund** 61:21 62:22 63:18 64:8 66:3,13 67:20 68:5
**fundamental** 125:1
**fundamentally** 29:18
**funding** 24:2,10,20 39:12

**future**
143:3

## G

**gallery**
6:24
**GARRETT**
4:4
**gastric**
25:17,22 39:14 41:15 42:7 44:11 45:18 49:22 51:13,14,20, 22,23 52:8, 10 54:19 55:14 56:8, 12,21,24 57:16 60:15 61:2 62:3,7 69:16,18 72:3,24 73:7 78:11 79:11 113:14 114:1 172:15 182:11 213:25 215:21 216:19 313:20 315:2,11 316:1,12 319:7 320:5, 19
**gastritis**
44:13 165:19 166:20 167:4 188:6
**gastrointestinal**
224:18,21
**gave**
19:6 59:6 82:5 130:22 173:13 200:8 210:3 306:1 385:20
**general**
71:9 85:11 87:24 112:2, 10 113:10 114:17 132:5 142:6 161:17 205:5 228:1, 13 281:23 309:25 310:1,11,20 318:20,23 324:3 346:17 362:13
**generalizable**
297:14
**generalize**
83:18
**generally**
37:20 98:13 280:8 318:15 345:13
**generating**
373:4
**genes**
91:14 311:7
**genetic**
91:24
**genome-wide**
91:16
**genotoxic**
309:11,17,23 311:1
**Genotoxicity**
305:1
**GERD**
225:13,22 226:5 229:10
**getting**
14:14 34:5 259:3 292:17 300:12 342:1
**GI**
349:4,14
**gist**
240:16
**give**
15:8 23:16 28:24 58:22 81:24 82:2 102:23 104:22 108:20 121:7 149:11 160:12 170:1,7,14 183:4 191:11 194:11 200:8 208:6 213:6 219:16,23 221:6 224:24 234:6 235:7 245:17 247:5 289:7 305:20 306:1 357:1 361:8 375:19
**given**
59:3 81:11 85:15 90:11 139:1 141:12 157:2 179:4 200:10 212:22 262:16 286:6 297:23,24 298:20
**giving**
82:16 95:18
**Glaxosmithkline**
381:13
**global**
200:14
**globally**
253:14
**goes**
222:14 313:5
**going**
8:21 9:1 14:20 19:25 20:4 21:2,3 32:6 50:23 54:18 55:17 66:22 81:22 95:22 105:22 110:8 115:24 117:11 129:16 134:8 142:24 143:18 145:17 150:15 151:3 157:13 190:22 191:8 192:3,9,13 200:25 203:10 223:11 231:9 232:3 234:19 247:2 249:6, 17 250:15,18 276:11 290:6 298:7 300:10 302:18 303:10 304:11 309:6 313:24 314:18 321:25 327:7 341:17,25 342:3,11 343:17 346:3 348:14 350:6 356:13 377:13 380:9 381:14 387:6
**gonzalez**
311:16 312:21 315:6
**good**
8:19,20 22:12 34:4 37:2 68:13 78:7 81:20 113:17 166:8 168:24 191:7 249:3 297:16 346:6,7 376:21
**Goodman**
311:18 312:20 320:24 321:9,13

**GORDON**
4:8
**gosh**
335:15
**grabbing**
319:20
**graduate**
31:2
**gram**
48:13 51:10
**grant**
4:10 24:2 25:16 34:7, 11,13 35:2, 17 37:12 38:1,22 39:6
**grants**
24:8 34:17, 21 35:10 36:8,23 37:8 39:6
**grasp**
94:13
**great**
14:23 77:11 85:4 118:1 150:19 247:9 316:2 387:1
**greater**
45:25 46:8, 20 139:24,25 145:19 149:12 150:9 327:17
**green**
75:7,11 133:24
**ground**
26:22
**group**
64:14,19 85:23 87:13 134:5 170:17 184:22,23 185:6,9,18, 19,23,24 186:8,13,22 188:7,8,9 199:21,23 200:2 201:8 212:11 215:21 216:2,13,18, 24 217:3,7, 17 218:15,18 252:3,4 255:23 330:5 350:5 379:23 385:21
**grouped**
57:18
**groups**
134:3 182:20 183:2 185:1 212:11 223:7,9 224:1 262:21 316:25 317:1,2
**growing**
188:22
**grown**
189:3
**GSK**
229:20 232:23 266:17,22 267:9 303:17 304:13 307:11 312:3,13 313:14,16 314:22 315:5,9 319:8 322:1 323:14
**GSK's**
305:8 307:20 308:19 309:16 319:2 322:11 323:22
**guess**
15:20 81:23 98:6 169:11 247:2 300:10 370:10
**guys**
342:25
**gym**
288:14

**H**

**H2ra**
134:13 137:4 195:11,12 357:9 375:4 379:7
**H2ras**
130:18 134:5,9 136:8 145:16 149:21 150:3 170:19 195:16 220:3 327:15 329:3 330:5,7 349:5 374:10 375:2 379:18,23
**H2rb**
184:16
**Habel**
236:4 334:10,14,15
**hair**
136:17
**hairs**
117:12
**half**
81:22 176:9 190:19 291:19 297:10 336:8 345:18,19, 20,23 347:17 357:7 359:25
**halfway**
70:3 75:9
**hallmark**
83:8
**halls**
37:1
**Hanahan**
366:11
**hang**
104:21 122:9 174:18 177:22
**happen**
86:20 192:24 214:18 275:18 314:15
**happened**
86:7 183:12 282:1
**happening**
194:11 215:4 227:1,9,10 233:15
**happy**
191:23 197:24
**hard**
11:21 13:24 50:23 77:25 94:13 186:3 197:8 227:4 235:14,16 285:4 290:2 319:21 373:14 374:1
**Harvard**
87:14
**HAUSFELD**
4:17
**hazard**
137:21 303:16 304:13 307:11
**head**
25:16 103:12 107:15 213:2 221:17 302:13 306:5

**heads**
105:5
**healing**
229:1
**health**
85:7,9 87:8, 14,15 102:5 112:24,25 179:20 208:13 280:22 284:13 286:8 294:17 350:24 351:5,16 352:15 376:23 377:2
**healthcare**
176:12
**healthy**
212:22 215:11
**hear**
30:6 145:8 232:1 233:22 234:14,16 250:11 259:22 260:11,21,23 261:12,21 277:11 342:25 374:5
**heard**
230:18 259:25 260:16 261:17 338:5
**hearing**
77:2 374:2
**heart**
30:19 118:23
**held**
6:5,10 36:22
**helicobacter**
43:15
**hello**
259:19,20,21 260:1
**help**
170:2
**helpful**
102:1 373:6
**hematological**
40:20
**hepatitis**
89:7
**hesitate**
96:8
**heterocyclic**
74:14 340:23
**heterogeneity**
258:2
**heterogenous**
258:4
**Hey**
187:5 247:1
**Hidajat**
16:12,18,21, 25 21:24,25 22:3 368:15, 19 369:3,11, 15,23 370:7, 12,21 371:2, 10 372:10
**Hidajat's**
372:3,7
**high**
73:20 176:8 286:15 298:1
**high-**
320:14
**higher**
129:23 131:23 137:11,12 149:22 212:10 246:22 292:18 318:13,22 327:20 336:22 337:11 339:9 376:3 377:3, 7
**highest**
94:1 369:4 383:8,11
**highlight**
41:25 42:4 44:4 45:10 56:17 57:9, 10 70:4 71:21 78:5 105:19 109:10 146:20 320:10
**highlighted**
57:13 103:5
**highlighting**
48:16
**highlights**
186:4
**highly**
84:14 85:8, 22 86:4 92:10,17 93:13 154:21,22 282:8,14 285:21 287:17 288:21 289:8 297:14 308:13 310:7 318:24 324:9
**Hill**
257:1,8 258:13,23 259:5 260:8 261:7,25 263:15,17 274:22,25 275:22 276:5,18 324:17 325:14,18 326:2,12,23, 24 352:7 360:15 375:25
**HIPAA**
179:10,20
**histamine**
195:9,13
**histology**
55:14
**history**
84:7 85:20 171:4
**hit**
9:17 89:3 122:7 178:9
**hold**
45:7 144:25 204:16 207:10 233:25 234:2,7,13 302:2 361:7 379:2
**Hollander**
4:20 7:10
**honest**
105:6
**honestly**
200:24
**hormone**
156:24 245:19
**hospital**
181:17
**hospitals**
179:1 181:17 295:7,8
**hour**
81:22 96:12, 14,15 142:24,25 190:19 247:2 300:11
**hourly**
97:8,10,11, 13 98:18
**hours**
13:16,19 288:14 368:12

**how's**
244:5
**HPV**
89:6
**HR**
135:25
**human**
27:13 62:15 76:6,8 126:20 127:2,24 202:12,16,18 204:2,7 205:16 208:13 209:25 214:15 217:19 218:17,25 249:19 250:4 251:3,9,15, 23 252:22 254:10,12 255:12,23,24 256:4,21 257:2 258:24 260:9 261:8 262:2 263:22 264:1 265:25 266:5,6 270:20,21,23 272:22 273:14 279:3,17 283:12 305:17,19 306:13,16, 18,21 307:1 309:4 310:11,15 311:11 324:5,12 341:11 350:25 351:17,25 352:22 353:11 362:21 363:16,21 370:25 371:1 383:7,13,14
**humans**
204:12,24 205:9 206:8 207:17 251:8,14 254:2 255:12 264:6 278:8 279:20,23 286:16 305:24 306:22 307:2 308:12,14,24 323:17,24 353:8 381:21 382:13
**hundred**
96:25 274:24
**hundreds**
210:21 295:7 359:9
**hydrocarbon**
324:8
**hypotheses**
69:23
**hypothesis**
114:8 268:11,13 270:15 301:20 373:3
**hypothesize**
270:15
**hypothesized**
75:24

**I**

**IARC**
64:13,16,24 65:12,22,24 66:1,17 67:20 68:7 70:24,25 71:7 75:3 76:3 154:12 199:18,19, 20,22 200:1, 8 215:20 216:2,12,18, 24 217:2,7, 17,18 218:14,18,23 219:2 249:18,22 251:2 252:5 255:20 266:1 270:18 305:14,18 306:4,20 336:4 371:2 383:12 385:21
**idea**
166:13 292:17
**identificatio n**
14:5 82:14 104:4 121:19 128:18 143:15 152:5 153:2 176:21 303:14 342:20
**identified**
189:7
**identify**
240:4
**ignored**
124:25
**illness**
312:24 313:11
**illustrate**
336:15
**imagine**
65:8,10 71:11 104:21 180:19,22 181:19 228:14 316:21 355:10
**immediately**
197:8 198:10
**impact**
187:24 188:17 284:19
**impacted**
171:4 174:11 213:23
**implement**
84:4
**implication**
385:9,15
**importance**
21:13 47:2,5 112:25 114:14 120:3 161:18,20 162:10 173:10 174:8 289:14,19
**important**
11:13 38:20 47:21 49:18 77:13 102:4, 9 110:23,24 111:9,13,16 112:24 120:7 134:22 161:9,25 162:5 163:4 170:15 171:25 172:2,3,22 207:15 245:10 270:23 272:11 274:5 296:2 338:19 360:14 366:17 367:13 375:22
**importantly**
239:17
**impossible**
355:17 356:3

**imprecise**
49:8 53:4
**impression**
100:5
**impurity**
235:4
**inaccurate**
93:25
**inaccurately**
167:14
**incidence**
42:5 200:14
209:19
**incidences**
190:5,10
**incidents**
370:15
**inclination**
17:24
**include**
17:23 46:15
57:22 61:7,
15 67:8
71:11 102:18
160:18,21
161:5 162:22
248:18
268:18
276:18
311:14
341:6,9
**included**
46:9,21 58:1
72:5 103:1,
21 139:13
217:4 224:9
241:17
259:17 336:8
**includes**
16:4 35:14
48:20,22
50:1,3 54:24
111:3 217:25
265:2
**including**
22:16 44:12
62:6 75:3
162:16 171:1
205:22 209:5
225:13
258:20
262:12 267:4
268:1 289:18
295:7 307:14
312:5
**incomplete**
83:14 84:15
91:8 92:3,19
93:11 171:3
174:12
256:23
**increase**
44:10 48:14
51:11 70:19
74:10,13,17
318:12,13
332:7 333:2
369:25 370:9
**increased**
47:16 51:22
69:18 149:16
150:10 209:2
286:23
287:21 328:2
330:8 332:2,
3 375:2,15
383:1
**increases**
132:9
**increasing**
44:13 189:5
**independent**
133:16 333:9
**index**
74:11,18
79:9 80:5
258:2 284:9
294:2
**indicate**
84:2 91:21
211:9,17
212:2 213:9
217:6 233:5
234:23
336:22
337:10 339:9
340:18
**indicated**
83:3 160:7
224:20,22
324:15
355:16 356:3
362:12
376:16
**indicates**
131:24 305:2
307:11
311:12
319:17 326:1
**indicating**
312:3
**indication**
37:2 225:22
226:4
227:14,20
228:6,11,17
229:2,15
274:7
**individual**
93:15,18
95:10,13
154:19,20
159:16
160:10
179:1,5
180:3 228:19
281:16 310:7
331:21,22
354:9 355:12
384:2
**individual's**
312:23
**individually**
59:12,14,16,
20,21 68:10
376:8,17
377:17
378:3,23
**individuals**
8:23 93:21
95:4,6,16
155:1 156:21
180:5 187:25
210:20
222:22
248:8,9
281:16,17
287:20
293:20,25
295:18
296:23
298:10 301:3
343:19
356:18
358:19,25
359:2,3,5
371:25
383:23 384:3
**individuals'**
248:10
**induce**
72:2
**induced**
72:24
**inert**
343:3
**infection**
43:16,18
44:18 89:6,7
**inference**
32:9 40:14
**influence**
73:19 220:15
228:2 231:6
**information**
15:8 47:22
50:9 53:6
66:4,7,8,23,
24 67:2
73:22 77:16
90:4,23
91:9,16
93:4,5,6,11
95:10,15,16
110:21 157:6
163:6 164:2,
4,16 167:22
169:18,24
171:3,13,20
173:1 174:12
181:22

182:19,25 214:11 218:2 221:11 222:20 223:2,13,19 236:9 244:9 262:13 268:20 281:14 282:21 287:19 289:25 354:8,18 355:3,17 356:4 359:15 369:18 376:5
**ingested** 74:13 205:25 206:11 207:25 208:14 209:18
**ingestion** 311:19 312:9 351:19 371:24
**inhalation** 371:24
**inhaled** 205:25 206:11 207:25
**inherently** 235:3
**inhibit** 75:20
**inhibition** 75:14,19
**inhibitors** 195:22,25 223:10
**initial** 16:1
**initiate** 154:25
**initiation** 182:15
**initiator** 240:3
**initiators** 357:8,9
**inside** 214:15
**insignificant** 46:18 114:21
**institute** 201:12
**insurance** 179:20 181:10
**intake** 57:17 73:7, 18 293:3,9 312:21 313:20 315:2,11 316:11 319:6 339:11
**intend** 278:5,20 381:18 382:10,14
**intending** 277:25 278:11
**intensity** 184:14
**interact** 69:4
**interaction** 29:13
**interactions** 6:9 69:13
**interchangeably** 252:4
**interest** 154:23 158:23 220:13 221:6,15 222:19 322:3
**interested** 7:14 44:8
58:4 367:7
**interface** 6:11,25
**interference** 77:1
**intermediate** 298:18 299:1
**internal** 34:21 65:25 266:21,24 267:20
**internally** 286:11 297:19
**International** 64:17 308:4
**internet** 191:22 192:22 233:21 249:16 250:16
**interpretation** 132:2 150:3 220:21 222:6 228:3 274:5 321:8 328:11
**interpreted** 283:12
**interpreting** 207:3
**interquartile** 160:12 301:4
**interrogate** 268:14
**interrupt** 245:24 250:8 316:6,14 339:24
**interval** 46:9,20 48:18,20,24 49:3,5,24,25 51:12,16 52:7,10 54:22,23
55:5 129:9 137:22
**intervals** 57:23 58:5 99:6,7 111:3
**introduce** 8:21
**invasive** 135:4,6 176:4 360:10
**inverse** 31:6 32:3,6 33:11 148:19
**investigate** 354:20
**investigated** 264:13
**investigation** 336:2
**investigations** 311:14 312:5 320:5,19
**investigators** 211:22
**invited** 200:1,6,7,15 201:15
**involve** 38:16 111:5 127:8 202:24 203:13 262:15 377:9 382:23
**involved** 10:7,10,12, 24 25:22 27:5 28:19 127:8 353:9
**involves** 70:8
**involving** 90:12 199:1 364:16 365:4
**ionizing** 89:8

**issue**
27:12 28:2 62:16 84:8 86:15 87:9 106:6 191:21 197:16 274:5 284:21
**issues**
30:23 84:16 90:11 260:3 384:11
**items**
16:10 20:6,8 22:22 37:12, 14 38:2,22 48:10 54:20
**Iwagami**
159:20 300:21,24 301:8

**J**

**Jackson**
335:25 336:15
**JASON**
4:11
**Jim**
8:22 9:6,21 13:24 19:19 65:15 81:23 94:22 99:24 140:25 142:23 150:22 157:23 166:1,4,11 168:19 171:9 187:7,14 191:9 342:15
**jmr@ pietragallo. com**
4:11
**job**
11:21 16:20, 24 51:4 200:10 273:19 284:17 369:17
**jog**
372:20
**John**
4:4,21 15:23 17:10 22:8 41:24 78:25 128:10 132:21,22 135:11 143:6 177:11
**john.garrett@ bowmanandbroo ke.com**
4:5
**Johnson**
221:14
**join**
87:18
**joining**
291:24
**journal**
32:19 33:7, 15,18 41:10 109:7 130:9, 13,22 131:14 134:11 211:23
**journals**
26:24 32:20, 23 33:7,8
**judge**
191:18
**jump**
11:17 341:25 342:2 361:7
**jury**
191:18
**Just...don't.**
115:15
**justify**
188:13

**K**

**Kantor**
134:1 291:13,18 292:22 331:2 333:1,7
**keep**
51:1 103:12 143:18 240:14 314:18
**key**
162:9 262:9 271:17 366:3,6,8,13 367:17
**kick**
234:8 250:15
**kidney**
146:6 307:16,23
**kids**
234:8
**Kim**
159:21 176:24 220:2 241:18 243:23,24 294:23,25 296:22 298:4,10 299:5,13,14, 24 331:24 332:21 333:18 334:8 353:13,15,21 354:7,11 355:16 356:2
**kind**
31:4 32:12 42:16 60:14 62:1 81:10 83:9 87:4 90:15,16 91:21 93:18 94:6,13 98:12 131:16 133:24 134:8 147:10 154:19 161:23 171:22 189:3 203:22 204:7 221:3 226:11 245:15 246:19,23 263:12 285:5,8 297:25 324:9 352:7 358:17 366:22
**kinds**
28:1 38:19 40:21 61:9 80:20 220:14 245:19 246:20 253:25 282:22 292:10 296:13
**King**
4:15
**knew**
21:2,6
**knock**
187:16
**know**
9:16 12:24 13:24 14:7 17:19 18:24 19:20 20:2, 5,13,15 21:24 22:3 24:17 25:3, 7,15 28:12, 13,23 29:9, 16,25 31:3 34:20 36:5,9 38:25 39:18 40:17,20 42:18 50:19 56:4 58:18 60:10,13

61:13,25 62:4,14 63:15,22,23 64:12 65:21 68:20 71:10, 12 72:8,12 76:14 80:22 81:7 82:19 85:15 86:6,9 87:16 89:17, 20 90:14 91:3,5,15, 17,21 93:23 94:6,11 97:17,20,21 101:5,6 102:4 105:17 107:14 112:16,20 113:3,12,17 115:5 117:7, 25 119:6 123:19,22,25 124:1,7 127:16 129:17 131:2 132:21,22 134:14,18 135:19 136:17,18,22 137:11,20 138:20 140:21 141:7,11 147:19 148:20 150:1,4,16 155:14 159:11,15 162:15,16 163:18 165:14 166:12 176:12 177:15,20 179:5,13 180:14,15 181:12,13,14 183:8,17 184:4,5,8,9, 14 185:12 187:2 188:16,24 189:16 190:10,15,17 191:22 192:9,16,25 196:19 197:6 199:5 200:25 205:12 206:4 209:3,12,25 213:1 214:4 221:13,16 225:25 226:3,10,22 228:9,17 229:4,6,7,19 230:19,21 233:1,13 234:20 236:2,6 237:15 240:17 245:5 246:16 249:2,17 253:25 254:15,16 261:21 268:15 269:19 270:7 271:14,20 275:19 276:21 281:15,16 282:1,10,11, 21 284:16 285:3 286:6 287:4,7 288:7,13,21 289:15 292:6,12,16, 18 295:6 296:10,17,18 297:2,3,7,14 298:15 300:10 302:7,9 304:6 306:14,24 310:19 311:4,6 316:21 317:6,18 318:2 321:22 322:18 339:24 345:3 347:23 354:22 356:11 357:12 360:13,15,18 363:12 365:18 367:8,11 371:6,25 373:10,21 374:14 377:4 380:18 381:12 385:22

**knowing**
142:7 221:18 275:2 350:2 357:16 358:15

**knowledge**
35:12,17 36:1,11 37:7 328:14 362:13

**known**
59:25 68:16 156:23 160:24 162:25 171:5 205:16 222:13 275:4 297:25

**Kumar**
159:21,22 294:10,12 331:24

**L**

**La**
216:14,17,23 217:5 311:16 315:6

**lab**
306:25

**labeled**
186:3 253:24

**laboratory**
117:23 211:6 252:22 253:20 254:9,21 255:2,4,8 271:18 283:2,9 289:18 308:2,5 311:5

**lack**
114:15 118:24 163:6 164:1 172:25 211:11,19 242:20

**lacked**
167:22

**lacking**
255:24 256:13

**lag**
233:18,19

**lamb**
340:21

**laptop**
193:13,14 197:14,17, 21,22

**large**
6:22 26:8 47:8 49:14 54:12,15 55:12 61:12 62:11 80:24

89:22,25 92:1 113:25 120:13 135:1 136:21 176:1 179:4 182:12 183:20 199:3 207:1 208:24 217:25 226:18 242:7 253:9 275:15 281:1 285:7 317:8 327:24 336:3 343:12 345:4 348:21 357:5,17 364:4,7 377:9

**largest**
55:12 85:8 338:17

**late**
27:23 104:17 221:4

**latency**
154:20 159:10,16

**lawsuits**
383:24

**lawyers**
19:18 231:12 303:3

**Lazar**
104:7 115:18 116:6

**lead**
288:25

**leadership**
98:7

**leave**
55:21

**lecture**
82:2,3,5,16, 22 84:21 85:5

**lectures**
102:23

**led**
195:10

**left**
44:7 59:9 78:19,25 129:10 131:24 132:7 135:15,23

**left-hand**
56:15 129:24

**legal**
7:12,17 28:21 30:15

**length**
160:6 228:5, 9 236:7 358:21 383:22

**lengths**
260:15

**lessen**
40:2

**letters**
138:7

**letting**
240:22 294:21

**level**
31:1 44:22 80:22 95:13 245:13 325:15 326:8,9 383:8,12

**levels**
73:20 212:10 213:16 278:6,12,21 279:7,25 280:11,12 282:17 283:10 302:11 308:15 309:4 312:25 324:10 381:19 382:7,11

**liability**
7:8

**lieu**
8:2

**life**
23:22 25:8,9 83:13 90:24 155:2 229:22 230:23 296:5 332:9

**lifestyle**
80:10

**likelihood**
262:18,19

**limit**
46:12,15 48:22 49:1,3 50:2 54:5 120:19 144:8,9 334:17

**limitation**
156:7,17 167:21 173:1

**limitations**
117:25 152:10 153:24 155:12 160:18,21 162:22 163:5 375:21 377:6

**limited**
32:23 44:12 60:16 62:5, 6,15 293:20 316:8

**limits**
20:3

**line**
82:1 94:2 129:8 135:12,13,25 136:7,10 147:6 148:2, 10,14 185:21 246:20

**linear**
368:20 369:3,11

**lines**
22:10 54:15 59:10,16 133:14 152:12

**link**
11:25 266:8

**linked**
349:1

**linking**
222:16

**links**
376:22

**Liquor**
55:4

**list**
5:22 16:2, 11,14 17:4, 18,22 18:5, 6,23 19:1, 14,15,16,24 21:14 28:4 34:7 41:4 71:12 78:22 79:3 89:1,3 102:18 103:17,22 123:14 224:24 277:19 283:23 349:3 384:15,21 385:5,14,25 386:2,12,16

**listed**
17:3 22:22 36:24 38:1 62:6 196:20 280:2 310:10

**listen**
127:14 187:7

**listing**
37:7

**lists**

36:7
**literature**
29:1 30:22 42:5,19 47:13 106:6, 7 108:11,12 118:25 124:16 127:7 128:3 205:14,20 210:23 219:14 228:3,4 230:13 232:1 264:18,24,25 266:19 267:3,14,17, 23 277:5 278:16,25 279:11,15 281:1 304:22 328:9 331:8 332:19 334:7 351:8 362:6, 17 363:5,24 364:21 365:10,24 375:1,5,8,13 376:7
**litigation**
7:9 10:9,21 27:13 28:3 87:10 97:11 205:23 221:20 222:1 263:18 303:18 364:16 365:4
**little**
9:15 30:19 53:14 54:11 75:9 81:18 128:16 168:19 177:24 188:12,17,25 198:6 213:17 342:1,2 343:20,22 373:14
**lively**
119:6
**liver**
24:10 172:16 182:11 190:6 307:16,23 332:15,19,23 363:25 365:1,2,5,20
**living**
286:16
**LLC**
4:1
**LLP**
4:2,9,15
**load**
178:18
**loading**
178:8
**located**
193:21
**locater**
18:13,15
**locked**
6:14
**long**
10:15 28:14 30:17 85:24 93:21 94:5, 18 101:10 152:18 153:12,16 155:7,17 156:4,9,13, 19,22 159:2, 8 160:1 184:9 190:12 222:15 228:18,24 229:3,13 238:9,11,15 239:18 242:12 243:8 246:3,6 260:18 286:3 296:22 298:10,19 299:1 348:2 372:20 380:20 381:10
**long-term**
8:24 127:1, 19 232:21 237:2 287:14 296:12 328:1 330:6 346:1, 16
**longer**
144:12 149:15 156:22 158:8,22 159:7,14 183:16 237:16 239:16 243:8 332:9
**longest**
237:3,4,14
**longitudinal**
27:25
**look**
10:19 13:10 16:9 17:8 21:11,23 25:9 27:20 29:17 35:19, 20 36:18,20 37:11 38:12 41:4 44:9,16 45:7 46:10 48:9,10 49:18,20 51:6 56:5 58:6,20 61:11,21 62:20 63:1, 10,20 66:15, 19 75:8 80:11 87:22 93:14 94:12 102:16 104:20 105:3 110:17 116:3 122:16 125:4 126:9 128:3 131:5 132:13 134:3,13 135:4,6,15 139:19,21 140:18 141:4 143:18,19 144:7 146:16 148:21 150:7 151:17 155:11,13 160:10 164:20 167:6 168:5 170:22 173:24 174:21 179:7 180:21,22 181:4,18 185:7,15 188:25 189:21 190:1 199:5 212:25 213:16,19,22 214:3,17 215:14 219:10,13,15 220:16,18 222:5 236:11 243:17,25 246:12 261:23 265:1 268:11 269:6 271:10 281:4 284:9,12 285:4 291:10 293:2 299:2, 16,18 301:1, 6 302:14 319:10,12 321:4,10,24 322:17 324:11,12 326:12 327:3 328:7 331:23 336:16 341:5 348:7 353:13

354:21,23,25
358:25
359:2,4
360:9 361:24
362:17
363:3,5,11
366:25
367:3,6
373:20
379:21,22
385:8

**looked**
18:21 23:3
24:23 34:6
54:19 62:11
74:1 164:19
168:6 182:11
190:1 195:24
196:6 203:8
213:4 214:10
218:24 220:9
240:12 241:9
244:13,14,19
245:7 253:22
263:6
280:10,25
282:16
290:9,16
291:23,25
294:18
296:5,6,8
301:9,19
327:8,9
348:16 355:7
360:20
361:11,20
362:20,21,25
363:19

**looking**
50:8 55:13
63:22,23
64:2 71:13
84:1 124:3
131:20
136:13 137:1
140:20 141:3
143:7 146:2
155:15
163:15,16
165:10,15,16
183:18
185:13
189:17 209:4
216:11 224:2
232:21
239:17
241:15 246:7
255:13,14
258:3,23
261:19
274:20
287:18 291:3
293:7,8
294:15,21,23
300:21
301:11 308:7
311:11,17
315:19
318:22
337:13
340:16 343:9
344:17,21
354:12 357:7
358:17,18
359:19
372:21 376:6
379:19
386:8,9

**looks**
51:8 55:1
122:15 131:2
144:2 286:22
361:2 362:2
363:24

**Lord**
313:23

**lost**
80:4

**lot**
10:24 11:20
24:19 25:7
32:19 42:23
53:9 64:21,
22 77:1
80:10 86:17
87:10,15
94:11,12
102:22
115:16
123:20 131:3
138:24
140:10 150:2
162:12
166:15
181:13 199:5
206:23,24
222:15 236:4
282:20
284:11
297:7,15,22
317:12
337:19
338:19
351:9,11
371:6

**lots**
101:7 270:14

**loud**
9:8,13,16
234:3

**low**
308:15 309:4

**lower**
79:25 131:24
318:22
333:21
350:13

**Lu**
332:1,8

**lunch**
143:3 150:24
190:18,25

**lung**
154:11
208:23 209:3
275:3,14
311:18 312:8
320:7,21
321:1,15

**lymphoma**
40:19

**M**

**MAC**
197:19

**made**
16:3 18:25
20:16 21:11,
20 66:5
78:13 89:10
159:22
305:14
352:24

**magnitude**
46:5 47:25
52:21 53:16
54:6 89:23,
25 101:14
102:6 108:5,
7 109:1
110:18,19
113:4 118:2
120:12,20
124:3 125:23
262:17
273:21,23
275:7

**main**
88:10 89:2
224:12

**maintenance**
229:1,2,9
230:3

**major**
34:24 52:24
109:7 124:22
260:3 370:20
371:13

**majority**
23:21 61:2
348:18 349:9
380:4

**make**
16:6 18:4,5,
23 19:15
20:18,22,24
21:18 32:9
50:16 90:2

92:15 124:10 128:15 155:23 172:10 177:23 220:22 238:14 240:22 260:13 271:21 274:18 276:11 325:9,19 351:12 378:1 386:7
**makes**
11:20 56:24
**making**
173:10 323:6 351:7
**managed**
241:2
**manner**
8:8
**manufacturers**
220:3 230:22 383:25
**Manufacturing**
4:1
**map**
145:17
**maps**
288:4 289:11
**March**
13:21
**Marina**
4:17
**mark**
61:18 304:11 342:17
**marked**
5:14,15,16, 17 14:4 36:19 67:11 82:13 104:3 121:19 128:17 143:15 152:4 153:1 176:21 303:13 342:14,15,19
**marked--------**
5:19
**married**
87:17,19
**Mary**
5:3 7:2 9:8 20:13
**masks**
320:3
**mass**
79:9 80:5
**Massachusetts**
4:18
**Master's**
31:14 326:8
**match**
157:4 190:9 324:11
**matched**
165:11 268:12
**matches**
181:19
**matching**
223:6 320:17
**materials**
5:22 15:18, 25 16:2,11 17:3,17,23 19:13,23 28:5 33:3 102:19 103:17,22 123:13 179:18 217:2 277:18 345:11 384:12,14,20 385:5,13,25 386:2,12,15
**maternal**
89:7
**math**
186:16,21
**mathematically**
137:10
**matrix**
16:21,25 369:18
**matter**
7:7 8:5 41:14 94:19 285:25 286:3 288:15 343:4 381:13
**matters**
21:15 187:21
**maximum**
229:7 235:19 236:14,19 244:13 290:8,15 291:6,12 292:21,24 293:16 294:11,24 295:14 299:4,12,23 300:22 301:7
**Mcdowell**
237:8,18 372:16,17,22 373:2,3,8, 11,13
**Mcelvenny**
16:13 17:6
**Mctiernan**
28:6,9,12 64:10 199:14
**mean**
19:20 26:16 35:20 36:25 39:4 46:13, 17 48:7 50:20 58:8, 14 70:23 84:24 88:21 96:22 102:20 112:16,19,23 117:6,8 130:14 135:20 137:13 141:3,23 168:16 178:7 179:3 180:18 197:6 198:4 202:5,25 225:9 231:6 240:15 246:6 247:17 265:6,8,10, 13 266:15 271:5,11 316:12,21 317:22 318:21 325:6 326:16 332:5 337:23 375:4 380:18 386:19
**meaning**
45:23 46:7 129:16 258:4 316:24 325:2
**means**
46:18 84:14 166:13 264:24 266:2 269:2 315:17 318:11
**meant**
46:24 168:18 181:5 360:18,22 361:4
**measure**
47:2 173:11 183:22 227:8 238:5,25 239:5 287:8 288:2 289:5 290:2 297:17 318:18
**measured**
57:18 138:15 161:22

164:11 167:14 169:3,4 173:15,17 183:16,25 235:20 236:15 238:12 240:6 247:12 264:9 268:21 281:10,20 289:16 290:22 322:21

**measurement**
28:1 30:23 53:14 86:23 90:11 91:21 92:12,16 93:24 94:5 170:25 172:18 184:7 246:18 284:2,5,11, 13,16,19,22 285:7,19 289:17,19 318:25 370:16

**measurements**
86:19 246:16,21,24 346:6,7

**measures**
90:14 245:19 284:8,23

**measuring**
214:1 288:11

**meat**
208:3 209:21 210:11 214:19 340:21,22

**meats**
70:8,18 212:11 214:7,8 215:5

**mechanism**
56:10 75:24 272:7 274:21 301:24

**mechanisms**
44:12 253:22 268:5 270:14 271:1,6,16, 24 273:4,16 275:3,5 302:6 308:22

**mechanistically**
367:1,3

**median**
247:19

**medical**
31:1,10,17, 18,21 32:19 109:7 167:15 175:12,16 178:25 181:19 205:14 211:24 224:23 225:2,17,25 228:8 278:16,24 279:11,15 293:19 297:18 363:23

**medication**
93:8 139:1 156:23 160:23 162:24 183:13 184:8 194:22 211:12,20 220:13 224:16 227:16,25 228:24 231:20 245:19 248:20 274:10 286:10 292:1,4,19 295:13 296:13,16 297:24 310:4,6,22, 24 349:15 355:4 382:24 383:10 384:3,6

**medications**
184:5 213:7 228:15 245:21 292:11,13 295:10 296:19 357:15 358:11,18

**medicine**
101:23

**medicines**
375:3

**meet**
9:24 10:1 45:23 52:13 53:19 54:3 55:7

**meeting**
142:17

**meets**
205:15 366:3

**mellitus**
163:9

**member**
105:7

**memory**
372:20

**mention**
116:25 123:11 134:23 161:1,4,10 163:3 164:5 173:2,8,9

**mentioned**
26:2 81:8 123:17 128:20 161:24 172:25 176:9 263:5 320:6, 19 367:5

**mentor**
23:11 26:10

**mentoring**
35:14

**met**
332:11

**meta-**
257:21

**meta-analysis**
42:21 257:22 258:1 317:9

**metabolism**
44:19 308:11,23

**method**
32:7 72:8 94:5 188:15 224:12,13

**methodological**
23:22 31:8

**methodology**
245:15

**methods**
23:25 24:4, 18 26:5,19, 21 29:1 31:5 37:17 40:22 86:7 94:3,8 95:7 179:18 183:4 195:5, 7 196:8,15 202:25 203:1,23 246:13 345:12 348:14

**methylation**
38:18

**mice**
307:14
**Michael**
4:20 7:10
366:10
**mid**
236:3
**middle**
134:6 136:25
308:7
314:11,23
**midway**
340:16
**Mike**
177:11
**milligram**
344:6,7
357:24
**milligrams**
138:20
139:3,5
229:16
344:16
356:23,24
357:12
**Millikan**
82:3
**million**
179:1 183:9
188:18 242:8
291:19 295:8
297:8,10,11,
12 300:5
336:8 348:22
357:7 360:1
**millions**
127:8 155:22
210:21
226:16,17,
20,23 238:13
242:14 248:8
256:22 266:7
353:9 357:17
365:14
377:10
382:24
383:11 384:6
**mimic**
215:4
**mind**
144:1 154:6
**mine**
88:5
**minimum**
350:4,20
**minus**
187:20
**minute**
104:22
341:16 370:4
**minutes**
81:25 131:8
150:23 247:6
300:14,19
368:12
**mischaracterizes**
68:18 107:2,
22 118:15
119:15 120:2
126:4 149:18
150:13
156:16
161:16 164:8
171:17 172:7
173:6 181:2
183:24
229:24
237:21 243:3
244:17 262:4
264:20
267:19 276:2
279:13
290:12
291:16
293:12 297:6
324:21
351:4,22
363:8 367:20
**misclassified**
188:1
**misconstrued**
318:6
**misheard**
35:25 378:8
**misinterpreted**
92:9
**missed**
59:15 192:15
**missing**
19:8 164:4,
15 171:22
175:3
**missingness**
93:16
**misspoken**
36:3
**Misstates**
175:23
**mistake**
45:9 159:23
**misunderstanding**
343:25
**misunderstood**
382:6
**mitigated**
73:20
**model**
324:12
**models**
306:12,15
**moderate**
79:1
**modest**
45:16 78:21,
24 79:1,3
**modification**
153:18
**modify**
153:14
**molecular**
72:16,23
205:1,12
206:13
210:16
278:10
381:25
**molecule**
72:10 205:24
206:3 207:24
209:20,22
210:11,12
**molecule's**
208:2
**moment**
99:25 121:8
143:13
319:20
342:22
353:14
356:14 380:8
**month**
86:3 292:7,
16 350:19
**months**
201:13
349:19
350:9,15
361:17,23
**Morgan**
28:15
**Mormon**
199:10
**morning**
8:19,20 9:24
192:18
**mortality**
42:6 369:13,
21,25 370:9,
15
**move**
53:7 104:16,
17 203:10
210:8 223:11
234:18
238:22
248:25
254:13 298:7
319:15 339:5
346:21
347:12
377:14
**moved**
76:20
**moving**
83:15 104:7

**multimillion**
34:23
**multiple**
26:24 37:24
38:17,20
111:9 203:2
379:10
**multiplicitas**
129:14
**must've**
159:22
**mutagen**
204:14,15,
20,23
**mutagenesis**
254:22 255:3
**mutagenic**
253:18
254:6,17
305:5,10,15,
22 306:12
307:1
**mutagenicity**
306:8
**mutagens**
306:17
**mute**
250:9
**Mylan**
4:7

**N**

**N-NITROSO**
44:20 45:2
56:7,19,25
57:4 72:2
**name**
7:10 178:13
191:7 196:22
385:23
**named**
116:11
**nanograms**
215:12
**narrative**
15:1,10
**national**
200:16
201:11 256:1
345:14
356:19
359:13
**natural**
247:3
**Naturally**
103:20
**nature**
93:2
**NDMA**
44:25 45:2
53:10 56:3
57:4 62:6,23
63:4,18
66:13,17
67:4 71:3
72:9,11
77:17 119:2
125:6 126:2,
6,10,16
127:2 160:23
162:24
194:14,18,21
196:6,7
199:7
201:17,21,
23,24,25
202:10,12,
17,21 204:2
205:15,21,24
207:24 208:1
209:8,10,20,
21 210:10,
11,12,22
211:2,3,13,
21 212:3,4,
10,16,18,21
213:16,19
214:1,14,25
215:1,13
217:10,18
218:16,25
233:8 234:25
235:3 246:25
247:20
248:4,11,14,
21,23 249:19
250:3 251:2
252:7,11,14
253:2,14,17,
22 254:6,12,
17,22,24
255:5,11,18,
20 256:2
257:1,6,7,
13,19,24
258:14,24
259:7,8
260:8 261:8
262:2 263:3,
7,15,22,23
264:2,6,8,
12,16
265:16,22
266:1 267:5
268:5 269:24
270:16,17
271:1,25
272:8 273:5,
17 275:24
276:5,19,24,
25 277:3,15
278:1,6,12,
14,21,23
279:7,18,25
280:1,2,9,
11,12 281:3,
7 282:17,25
283:10
301:20,24
302:9 303:19
304:14
305:5,10,18
307:15,22
308:12,14,23
309:4,11,17,
23 310:3,22
311:19
312:9,21
313:20
315:2,11
316:11 319:7
320:7,21
321:1,3,4,15
322:4,7,13,
20 323:19
324:1 334:23
335:9,12,19
336:11,23
337:12
339:1,10
340:23
341:2,11
351:2,20,25
352:1 362:7,
17 363:1,5,
16,18 364:9,
13 365:11
366:2 367:18
368:1,16,21
369:5,14,20,
24 370:8
371:3 375:13
376:14
377:8,18
378:5,13,19
381:19
382:8,12,18
383:6
**necessarily**
364:25
**necessary**
124:9 174:9
273:11
275:17,23
**need**
12:24 14:20
39:3 58:6
61:11 85:2
87:25 88:18
89:24,25
90:1 108:14,
17 118:3
124:23
128:21
132:2,18
140:16
154:13,22
168:4,5,16
170:5 172:11
187:8,14
223:16 254:3

258:12 290:23 291:10 294:6 307:2 316:17 317:17 321:20,21 324:23 337:1 338:12 370:5
**needed** 30:20,21
**needs** 134:24 337:20 377:4
**neighborhood** 98:13
**nested** 243:13
**never** 31:19,20,21 40:11 65:2 110:25 120:22 131:15 144:1 157:25 171:19 218:15 224:25 276:20
**newer** 66:23 67:1
**nice** 9:23 10:1
**night** 310:18 316:9
**nightshift** 310:13,25
**nitrate** 73:7 322:3
**nitrates** 71:18,24 202:7
**nitrite** 322:4
**nitrites** 44:19 71:18, 25 202:6
**nitrosamine** 44:25 75:14 201:25 202:1,2 312:25
**nitrosamines** 44:19 55:25 59:23 60:1 61:23 68:12, 16,23 69:7, 17 70:10,21 71:2,19 73:18,19 74:11,18 76:1,4 79:17 80:16 196:12,14, 18,24 198:25 202:7
**nitrosation** 75:15,19,20
**nitroso** 44:22 72:10
**nizatidine** 301:9,12,15, 24 302:8,10
**noise** 49:14 52:23 90:1 201:3 244:8 277:8 280:18 289:20 376:4
**non-cardia** 45:18
**non-cured** 212:11 214:8,19
**non-malignant** 135:2
**non-significant** 45:17,22 46:6,13,17 47:17 106:11
**non-statistically** 46:24
**non-use** 134:7 149:23 170:21 175:3 293:6 327:20 328:25 379:9
**non-user** 379:19
**nonhuman** 279:16
**nonresponsive** 203:11 210:9 223:12 238:23 249:1 254:14 298:8 339:6 346:22 347:13 377:14
**nonsteroidal** 245:20 292:13 358:10
**Norgaard** 133:23 134:19 135:3 139:22 140:8,10 141:13 150:15 176:2 293:17 331:2 356:14,16, 17,21 357:23 358:21,24 359:20 360:19 361:2,24 362:2
**norm** 42:16
**North** 82:5 85:6
**Notary** 8:14
**Note** 158:6
**noted** 20:15 73:17 151:21 153:7 387:9
**notes** 181:24 193:4,7 247:17 322:1
**notice** 102:10 201:5
**noticed** 38:21 225:3
**NSF** 201:12
**number** 5:11 8:23 24:17 25:3, 10,15,24,25 38:25 39:18 46:9 50:7 58:21 85:18 93:5 98:20 139:12,16 141:12 144:18 145:9,13 149:11 169:21 170:1,5 180:13,17 182:1,2 183:10,12 189:7 208:21 224:22 236:19 245:8 258:10 288:13 295:14,17,19 311:5 343:12 344:14,19 345:2,25 349:14,24 357:15 359:16 376:10
**numbered** 15:13
**numbers** 52:13 59:5 121:10 148:21 180:15

374:20
**numerator**
129:20,22
**numerous**
105:14
**nurses**
87:19
**nurses'**
87:13
**nutrient**
87:4 209:17
**nutrients**
60:22 69:3 285:3
**nutrition**
336:3
**nutritional**
60:21 86:21, 22

**O**

**oath**
8:2 11:2
**obese**
185:10,17
**obesity**
186:7,12
**object**
18:9 23:16 108:22 192:25 374:22
**objection**
8:8 18:7 19:2,9,19 21:5,8,16,19 23:7,18 25:2,5 26:4 27:9 28:11, 20 29:8,12 30:14 33:13, 25 34:10 35:8 37:5,16 38:5,7,14 39:9 46:1,22 47:4,19 51:3,25 52:18 53:24, 25 57:2 58:13,25 60:6 61:24 63:7,19 64:11 65:23 66:6,14,18 67:13,23 68:3,17 69:1,8,20 70:15,22 71:4 72:13, 21 73:24 75:22 76:2 80:7,18 88:17 89:12 90:25 91:10 92:5,23 93:12 95:11, 17 96:17,22 100:8,25 107:1,8,21 108:19 109:25 110:11 113:23 115:2 117:3 118:14 119:14 120:4 122:21 123:2,3,15 126:3,18 127:4,21 129:12 131:25 133:3,11 136:12 137:7 138:17,22 139:10 140:2,15 141:22 142:9 147:24 148:6,17 149:17 150:12 153:17 154:15 156:6,15 157:20 158:6 159:4 160:3, 4 161:13 162:2 163:11 164:7 165:1, 5,20 166:21 167:5 168:1 169:25 171:16 172:6 173:5 175:15,22 179:24 180:16 181:1,11 182:8,22 183:23 184:11 185:11,20 186:10,18,23 189:15,23,24 190:14 200:4 203:14 204:18,25 205:17 206:1 207:11,19 208:5,7 209:11,23 210:14 212:7 213:12 214:2 215:2 216:21 217:21 218:20 219:9,22,24 220:4 221:22,23 223:15 225:16,23 226:6 227:21 228:7,12 229:5,18,23 230:4,11,17 231:2,4,13, 17,23 232:8, 25 235:23 236:18 237:7,20 238:7 239:8 240:8,19,23, 24 241:11,21 242:4 243:2, 20 244:2,16, 23 246:5,11 247:14,23 252:9,17,19 253:4,19 254:7,18,25 255:6,19 258:25 261:10 262:3 264:7,19,20 266:23 267:11,18 268:7 270:12 271:3 272:1, 9,18 273:8, 18 276:1 277:2,21 278:17 279:1,12 280:4,15 281:22 282:7 283:5,18 285:16 286:25 287:24 290:11 291:9,15 293:11 294:5 295:21,22,24 296:24 297:5 298:22 299:15 300:1,25 301:17 302:1,3,12 305:11,25 306:23 307:25 308:21 309:20 312:12 315:13 318:14 319:9 322:14 324:2,20 325:17 326:4,14 328:4 329:8, 12,13,15,24

330:11
331:19
332:17
333:15
334:5,24
335:3,10,20
336:25
339:12 342:9
343:10
344:9,10,25
345:7 347:3,
5,20 348:4,
20 349:11,21
350:10,16
351:3,21
352:17,18,20
353:5 354:10
355:20
356:7,25
358:1,23
359:12,21
361:6,9,19
362:19 363:7
364:1,10,19
365:7,22
366:5 367:19
369:7 370:2
372:9,25
375:17
377:19 378:6
379:3 382:3
384:1

**objections**
8:10 132:25

**observation**
274:18

**observational**
88:13 89:18
173:16
209:4,25
227:2,8
262:11 277:1
280:2,6

**observe**
210:24
269:10

**observed**
57:16 114:7
209:13
262:14,17,20
269:9 270:8
325:21
336:23
337:11
339:10

**observing**
210:20

**obtain**
354:17
355:2,12,17
356:3

**obviously**
30:3,7 83:6
123:19
227:25
241:13
317:25

**occasions**
133:6

**occu-**
382:19

**occupation**
268:1 279:19
281:3 341:12
372:2

**occupational**
202:24
203:3,5,8,
13,16,25
204:2 267:5
280:10,13
335:12
368:15
369:16
382:20

**occur**
159:12

**occurs**
94:6

**odds**
45:16,24
49:23 51:14
52:6,8 54:20
341:1

**offer**
26:17 28:18
30:11 277:25
278:5,11,20
381:18
382:11,14

**offered**
9:3 62:18

**offering**
278:3

**offhand**
34:20 190:17
373:5

**office**
200:21

**offices**
193:22

**official**
100:6,21

**okay**
9:9,10,11,
12,25 10:4
11:19 12:5
13:4,12,13,
16 14:1,18,
21,22 15:6,
12,25 16:8
17:14 18:10,
22 19:6
22:2,8,12
24:13 25:12
27:12 28:23
34:1,2 36:3,
14 38:11,21
39:11,15,24
40:9 41:12,
20 43:8,12
44:1 45:12
48:3,8 51:8
55:18 56:13
59:7,16
61:16 65:6,
20 66:10
68:9 69:11
71:14 73:13
74:4,24 77:5
78:3 80:15
81:15,25
82:21 88:2,
5,20 95:2
98:11,18
99:9 100:20
102:10
103:4,25
109:8,10,17
111:18
115:10
121:20
122:12
128:7,14,24
130:6 131:9
132:18
135:10 136:5
138:14
139:14,18,23
140:17 141:6
143:4,16
145:24,25
146:16,24
147:15
148:14,24
149:4 150:19
151:25
152:23
162:18
163:18,25
164:18
170:14
171:14,19
174:9,23
176:17
178:21
186:5,17
191:25
192:1,20
194:5,9,17
196:22
198:1,13
199:17
206:16
207:18 208:9
216:10
219:17
223:19 225:3
227:18
228:16 231:3
233:3,12
234:6,14,20

245:25 247:7,9 249:5,15,17 250:11 253:1 260:19 269:15 271:9 277:13 295:23 297:3 298:12 299:22 300:15,16,19 302:15 304:23 307:7 311:10 312:1,18 313:5 314:16 315:5 317:10 318:7 319:15 320:2 322:10 323:8 327:3 329:14 331:13 335:2 340:9,16 341:1,6 342:4 343:5 344:15 350:6 353:20 356:13 361:14 368:7,13,18, 25 372:21 373:18,20 374:25 377:13,24 381:1,3,16 382:10

**older**
64:4

**once**
144:24 229:21 269:21 272:23 274:16 366:22

**oncologist**
206:21,23

**oncologists**
206:25

**one**
4:9,17 9:6 11:15 16:8 17:12 22:3 24:7 26:15 29:20 34:23 41:13 46:15 48:12,13 49:20 51:9, 10,18 52:23 53:2,13 54:6,22 55:1,11 56:23 59:9 61:3 65:2 71:2 74:11, 16 75:18 78:23 79:6, 8,11,14,17 85:8 87:21 90:20 92:14, 25 104:22 107:24 108:4,25 109:10 118:16,23 120:7,22 125:3,21 129:10,11 130:14,24 131:15 134:17 138:1 144:5,8,15, 16 146:9 148:10 151:19 154:5 157:7 158:20 168:3,13 170:19,21 174:1,4 178:16 182:14 190:3 194:12 198:7 199:25 200:8 210:3 213:8 220:9 222:13 223:9,10 224:18 230:10,16 232:11 233:25 234:2,6,13 236:1 244:18 258:10 262:15 273:21 291:7 294:1 298:2, 5 300:4 310:13 325:8 328:16 332:1,24 338:15,17,20 345:24 346:13 347:1,11,18, 24 350:18 357:6 363:12 369:9 370:14,19 373:2,4,13 378:15 382:8 383:19 384:9 385:20

**one-day**
287:7

**one-to-one**
324:11

**ones**
53:18 139:21 148:4,7 202:22 277:20,23 315:25 333:23

**ongoing**
282:2

**online**
82:18

**onset**
151:22 152:19 153:8,13 155:8 156:4, 14 159:3 160:1 312:24 313:11

**open**
197:14,22 218:8

**opening**
128:13

**operate**
76:16 111:12

**operative**
233:9 235:1

**opine**
27:6

**opinion**
26:17 30:1, 21 67:12,14 126:14,19,24 127:16 159:25 205:15 231:7 239:19 248:19 264:5,8 269:25 278:1,5,12, 20 279:2 300:3 302:4 381:18 382:11,15,16

**opinions**
28:18,24 29:24 30:12

**opportunity**
32:25 200:10 317:14

**opposed**
167:18 243:5 274:10 284:12 285:2

**optional**
203:4

**oral**
87:20,22

**order**
17:11 22:21 86:18 87:12, 16 90:2 251:14 254:1

257:7 325:20 383:13
**Organization**
350:24 351:6 352:15
**Organization's**
351:16
**organizations**
70:17
**orientation**
174:13
**original**
274:25 326:24 350:7
**originally**
366:12
**outcome**
7:14 80:13 81:11 154:23 173:13 206:9 208:13 239:22 256:16 268:21 289:11 376:22
**outcomes**
38:19 153:22 155:17 156:20,23 157:11 158:23 190:9 210:1,19,25 222:11 235:3 346:7 383:5
**outside**
6:10 189:9 200:22 203:22 284:15 285:22
**over-the-counter**
93:9 286:10 297:21,24
**overestimate**
269:3
**overweight**
80:6
**overwhelming**
305:4,9,21
**overwhelmingly**
352:23
**Oxford**
4:9
**oxidative**
38:18

**P**

**p-value**
46:7,14,19 110:16 111:24 114:5 120:15 124:14
**p-values**
99:7 105:25 108:2 109:20 110:25 111:3 115:17 116:1,9 117:25 118:1 122:2,24 124:5
**p.m.**
7:6 95:24 96:3 151:4,8 190:23 191:3 249:7,12 250:18,23 302:19,24 341:18,22
**page**
5:4,11,20 14:9 15:2,20,21 16:20,22 17:12 22:7 36:16,17 43:13 44:1 45:5,7,8,9 48:4 55:22 57:7 59:8 62:12 70:1 73:4,13 78:4 98:20 99:2 100:10,13,16 103:6,14 104:16 105:18 109:10 116:17 121:23 128:25 143:17 151:11,14,16 152:8 160:16 161:4,11 162:21 169:21 170:1,5 171:2,10 172:10 173:2,9 177:19 179:17 180:11 197:4 211:15,17 215:16,19 216:3,8 217:6 224:3,5 234:22 235:9 247:18 262:7 276:8 291:3 304:23,25 307:5,6 311:10,23 312:1,2,17 315:22 316:4 319:16 321:25 331:8 332:20 333:17 334:6 336:14 338:14 339:23,25 340:1,3,6,9 341:7 343:21 345:19 373:16 374:6,7 375:10
**pages**
14:25 15:7,13,14 36:25 121:23 197:3
**paid**
96:15 98:7
**pancreatic**
26:3,10 182:12 190:7 334:3,8 365:1 372:24 373:8
**panel**
65:12,24 66:1 145:15,22,23 199:21 200:2,16 201:11,13,16,19,21,22 217:18 218:24 219:3
**panels**
65:3,5,7,9,22 200:7 201:12
**Pantheon**
4:1
**paper**
16:21 17:2,4 21:25 32:15 37:21 60:11 81:4,5 100:14 115:14 163:17 167:6 168:2 172:1 182:5,6 215:15 223:16,18 232:16 297:2 299:2,16,17 301:2,16,18 328:6 329:10,18 338:6 341:4 366:11,12

371:19 374:11
**papers**
18:1 22:3 29:15,17 32:2,15 35:2,10,18 37:8,19,23 38:16 59:5 119:22 120:20 219:12 328:5
**paragraph**
22:9 42:1 44:3,5,7 45:6,11 48:5,6 56:14 59:12,13,18 69:2,12 70:3 71:15 99:3, 4,5 105:21, 22 109:11,14 118:16 151:18 152:8 160:17 211:18 308:8 312:16,19 314:23 322:17 323:14 339:14 340:4,17 347:24
**parentheses**
22:22
**Park**
4:17
**parlance**
120:17
**part**
6:22 13:11 43:3 45:13 72:10 75:18 82:22 87:16 88:7 120:7 134:14 140:13 143:20 145:20 201:12 266:1 267:13 274:21 275:16 296:2 384:4
**participants**
6:3,19
**participated**
107:25
**participating**
7:21
**particular**
26:16 27:5, 24 29:20 30:21 50:18 61:6 76:14, 17 77:24 83:8,17 85:11,17 94:4 137:22 148:9 161:8, 19 165:9,14 183:7 184:13 222:10 268:16 340:17 351:9 357:6 371:6
**parties**
8:6
**partly**
306:13
**parts**
54:6 108:25
**party**
7:13
**pass**
380:20
**PASSARETTI-WU**
314:12
**passed**
111:24 198:7
**past**
10:25 17:9 32:22 200:9 282:1 321:18
**pathologist**
206:14,15
**patient**
31:19,20,21 203:1
**patient's**
227:17
**patients**
160:6 179:2 189:6 228:24 229:13 294:15 348:18,22 349:9 362:14
**Patricia**
28:15
**pattern**
67:9 124:24 125:2 128:4, 5,20,21 131:6 134:16 138:4 150:16,17 168:9 237:25 238:19 242:18 243:14 259:16,17 263:12 265:19 270:5 296:9 330:21,22 331:12 339:1,4 352:5 357:20 365:15 376:10,11,12 383:1
**patterns**
227:11 257:23 259:7 285:2 287:10 323:2 368:3 376:2
**pause**
12:2,4,7 260:18
**PDF**
15:14,21 36:16
**pediatric**
362:7,12,14, 18 363:3,6, 24 364:8,24 365:20
**peer**
218:7 256:2 267:23
**peer-reviewed**
67:15 196:11 239:14 266:19 267:2,13 277:5 304:22 315:15 327:4 331:4,16 332:14 333:12 334:2,22 335:8,18 365:19
**penalty**
8:5
**pending**
13:2 373:19
**Pennsylvania**
4:10
**Penston**
232:11
**Penston's**
232:23
**people**
21:10 29:23 50:20 84:20 86:6,21 87:12,13 92:9 93:17 94:7,13,18 102:23 113:18 117:24 127:8 142:12,13 147:7,21 148:12,15 155:22

176:11 179:6 180:7,9 181:25 182:20,21 183:1,9 184:3 185:10,18 188:18,20 189:8 190:12 194:8 203:18 210:22 218:8 219:16 220:15 223:7 224:17 226:17,20,24 229:15 237:11 238:14 242:9,11,15, 23 243:18,25 256:22 258:11 266:7 282:12 286:4 287:9 288:10 291:19 292:18 293:2,3,8 294:19 295:8 296:11 298:17 300:5 310:19 323:4 336:4,8 347:8,10 350:3 353:9 354:14 355:11 357:7,18 358:13 359:8,9 360:1 365:14 377:10 382:24 383:11 384:6

**people's** 178:7 226:1 246:19 292:6

**percent** 46:11 48:17 49:3,23 50:21 51:12, 15 52:7,9 54:5,21 55:4 57:15 96:25 99:6 120:18 135:1 169:18 171:7 185:6, 10,22,23 186:7,12,13, 16,19,22,24 187:1,2,24 188:7,11 274:24 297:23 346:12,25

**percentages** 180:19

**perfect** 136:3

**perfectly** 254:16

**perfecto** 9:25

**performed** 221:25

**performing** 206:6

**perils** 109:20

**period** 83:13 152:11,16,18 153:10,12 155:5,7 156:2,3,12 158:22 159:2 182:13 241:17 242:10 244:11 281:13 293:23 332:10

**periods** 138:16 154:13 159:12,19

**perjury** 8:5

**permit** 65:16

**person** 8:3 94:1 189:11 228:5,10 229:8 310:7, 21

**persons** 74:13

**pertains** 308:24 316:22 371:2

**pertinent** 195:1

**ph** 43:23

**Ph.d.** 7:2

**pharma** 232:13

**pharmaceutical** 220:3

**Pharmaceuticals** 4:7

**pharmacoepidemiological** 247:25

**pharmacoepidemiology** 138:24 162:12 345:10

**pharmacy** 348:25

**phone** 77:3 193:12 314:10

**phrase** 232:19

**phrased** 256:12

**physical** 28:13 64:3 288:3,8,17, 19,24 289:2, 21 290:2,3

**physically** 7:22 193:20

**pick** 140:3 198:8

**picked** 139:22,23 268:19

**picking** 83:22

**piece** 119:19 359:24

**pieces** 262:15

**PIETRAGALLO** 4:8

**pill** 208:3 209:22 210:12 248:10 256:17 382:8

**pill-based** 209:1 210:6

**pills** 93:5 208:15 211:2

**Pittsburgh** 4:10

**place** 265:17 310:24

**placebo** 212:12

**plaintiff** 7:4

**plaintiffs** 117:9

**plaintiffs'** 99:11 103:7 106:15 118:7,22 124:10 318:2

**plant**
203:19 369:17 370:22
**plasma**
214:5
**plausibility**
269:23 270:7,23 271:17 275:15
**plausible**
53:12 56:9, 21,25 163:23 174:2,17 268:5 269:8, 16,18 271:1, 12,24 272:7 273:4,15 274:13,21
**play**
31:15 86:16 262:13
**please**
7:17 12:17 14:3 41:7 44:2 55:23 56:15 57:11 61:18 67:25 70:1 71:16 78:6 85:2 88:4 90:19 128:9 131:19 132:20 147:25 150:21 151:12 157:16 159:17 165:25 166:1,23 187:15 211:16 215:19 224:7 233:4 304:24 307:6 309:8 311:9 316:13 317:11
324:14 358:7 373:10 380:8 386:17
**plenty**
158:10 242:21 245:17 267:24 270:21 289:9 306:17 365:13
**plot**
128:24 129:6 130:7,11,14 138:6 145:21,23 147:14
**plots**
131:21 136:14
**plotted**
132:16 140:21 141:12 142:2,10
**PMID**
18:13,15
**Pobel**
311:16 312:21 315:7
**point**
49:9,13 60:16 62:14 68:13,19 75:18 81:21 85:14 86:16 101:10,12,19 108:14 117:9,16,17 120:12,13,20 124:3 125:18,23 129:15 133:16 134:21 136:16 137:18,19 144:2
149:22,24 157:23 158:18 169:9 170:18,20 175:25 243:9 260:6 261:6 268:14,25 269:2 270:24 272:11 273:25 275:8,10 276:12 296:12 297:4 300:13 315:20 328:13,15 332:7,23 333:6,19,21 334:9,11,13, 15,18 353:10
**pointed**
315:21 347:23
**pointing**
187:17
**points**
84:24 85:11, 12 87:24 109:13 343:16,17
**Polycom**
314:13
**polycyclic**
324:7
**pool**
243:24
**poorly**
12:13
**population**
54:13,16 80:22,25 82:25 83:6 84:4 93:18, 20 189:3 237:1 238:13 244:6 245:11,12 246:17
287:3,5 297:15,16 346:17
**population-based**
84:12 327:24
**populations**
73:8 88:15 204:8 238:2 243:11 281:5 287:6 300:7 305:17 336:18
**Portability**
179:20
**Porter**
121:6
**portion**
68:1 157:18
**positions**
36:22
**positive**
45:18 73:17 77:20 313:18 314:25 318:10 319:5 322:23 336:18 340:20 380:5
**possibility**
269:10
**possible**
69:13 111:10 248:7 309:13,19,25 354:17 355:2
**possibly**
86:8 306:7
**poster**
84:1
**potential**
163:7 164:2 167:23 220:12 222:4 224:13 253:23 262:18,19

311:15 312:6
**potentially**
306:11
308:15
**power**
227:2 242:20
348:6
**powerful**
167:13,16
**PPI**
149:22 293:5
297:12
327:14 329:1
357:8 379:8,
19
**PPIS**
134:6 223:10
349:5
**practical**
114:14
**practice**
14:13 33:10,
19 102:5
113:18
117:20 268:8
326:6
**pre-exposure**
262:24
**pre/post**
80:21
**preamble**
154:12,16
**preceding**
312:24
**precise**
47:14
**precision**
48:1 49:19
108:9 109:2
137:17 269:6
**predominance**
40:1
**predominant**
23:5,9
**preface**
265:9
**prep**
166:9
**prepare**
17:22
**prepared**
28:6 43:8
129:4 180:23
217:2 303:17
**preparing**
13:17 282:19
**prescribed**
224:25
225:12,25
292:15 345:4
**prescribing**
227:11
**prescription**
93:4,7
139:24
141:9,14,15,
21,24,25
142:3,8
143:23
144:12,19
146:17,22,23
147:2,4,8,22
148:3 182:17
183:15
222:17 229:9
245:8 246:4
293:25
344:12
345:5,24
346:13
347:1,11,18
350:12,18
355:4 356:19
357:11,24,25
358:4,22
359:1,14
361:22
**prescriptions**
134:20
139:12,16,25
140:1,13,23,
24 142:12,13
145:10,11,20
148:12
183:7,10
244:15,20,22
246:8,9,10,
15 248:2
286:13
290:10,14,17
293:22,24
294:3,19
334:20
343:15,20
344:5,14,20,
22,23,24
345:2,6,12
346:1 347:25
348:1,2,3,12
349:18,19
350:8
356:20,22
359:5,11,16,
19 360:3,20,
25 361:2,12,
16,17,25
362:3
**presence**
6:10 43:21
70:20 233:8
234:25
**present**
4:13 7:23
193:24 194:2
212:4,18
217:11 235:4
**presentation**
82:23
**presented**
130:6,9
**presenting**
130:5
**preserve**
94:19 286:4
**preserved**
62:12
**president**
116:21
**Presumably**
79:23
**pretty**
135:8 178:23
**previous**
157:17 312:2
315:22
**previously**
5:14,15,16,
17 121:11,18
176:20
207:23
324:16 354:2
**primarily**
115:19
117:24
203:20,21
307:15
**primary**
128:25
131:12
351:25
**principle**
125:1 228:13
**principles**
27:16 52:24
58:23
113:16,17
**prior**
12:15 121:3
142:21
313:10
**priorities**
119:7
**prioritizing**
119:1
**privacy**
179:10
**private**
6:8 121:2
**privy**
65:25 66:3
356:11
**probability**
31:6 32:6
114:6,8
148:19 149:3
**probable**
62:9 76:4
249:19 250:4
251:3,6,13

254:1,23 266:4 306:21 310:10
**probably** 14:19 30:8 35:25 39:2 86:3 130:11, 24 131:14 134:11 255:21 354:4
**problem** 76:18 86:24 183:19
**problems** 111:4
**proceed** 263:4
**proceeding** 6:4
**proceedings** 7:18
**process** 32:16 70:7 197:23 207:21 217:7,8,23 276:9
**processed** 70:18 208:2 209:21 210:11
**produced** 114:7 303:18
**product** 230:24
**products** 7:8 278:2,7, 13,22 279:7 282:18 283:1 381:20 382:12
**professional** 37:8
**professor** 105:13
**profited** 230:23
**Program** 200:17 256:1
**projects** 34:24
**promote** 70:9
**promoted** 229:21
**promoter** 240:2
**promoting** 230:2
**promotion** 154:24
**propensity** 223:5 224:12
**proportion** 176:8
**proposed** 195:7 196:9
**proposition** 326:11
**prospective** 336:2 351:10 360:13
**prostate** 24:11
**protein** 195:24 223:10
**proton** 195:21
**provide** 11:13 88:19 89:18,21 236:9 239:10 256:9 259:15 273:10 316:17 318:4,5 321:7 339:8, 14 354:7 374:8,18,20 384:22 386:1,15
**provided** 13:20 214:7 215:11 341:13 344:3
**provides** 216:17
**proviso** 12:25
**proxy** 248:21
**public** 8:14 85:7,9 102:4 112:24,25 355:10
**publically** 179:9 267:16
**publication** 326:23,25
**publications** 239:15 335:18 355:8
**publish** 33:3 130:21 198:7 219:12
**published** 18:1 23:1, 12,14 24:15, 24 29:16,21 32:2 33:10 35:1,18 36:21 42:14 60:24 67:15 126:6 155:16,21 196:11 199:8,12 202:23 203:12 211:23 218:6,7 232:13 236:2,3 239:13 257:17 278:16,24 279:10,15 327:4 331:3, 9,16 332:13, 19 333:11 334:1,7,21 335:8 355:8 364:12 365:19
**pull** 101:3 143:25 160:11 164:23 169:20 197:1,11 198:22 211:15 212:24 223:17 233:1 241:23 243:16 244:24 246:14 256:8 291:1 299:17 303:11 321:8 327:7 328:5, 6 329:18 341:4 342:10,13 355:21 370:3,5 372:19 373:1,5,21
**pulling** 122:3 181:24
**pump** 195:22,24 223:10
**purpose** 6:12 178:3 213:5 325:13
**purposely** 292:17
**purposes** 91:24 372:15
**put** 18:15,19 19:3 26:18 58:8,9,14 84:11,19 88:7 100:6, 21 101:13 103:22

114:18 118:13 119:7 121:16 129:7 131:4,14,15 184:20 224:6 301:21 373:12 384:10 385:16
**puts** 18:18
**putting** 19:23
**pylori** 43:15,16,18 44:5,10,18 89:5 294:16

**Q**

**qualifications** 35:1
**qualified** 29:6 30:11, 13 47:6
**qualify** 378:7
**qualifying** 40:16
**qualitative** 57:25 323:16,23
**Qualitatively** 308:9,11
**quality** 93:1,15 174:25 222:21 285:6 286:15 292:18 346:6,7 377:3,6 379:11
**quantification** 42:19 52:25
248:11
**quantified** 247:20
**quantify** 125:18 160:23 162:24 248:1,4,14 342:7 343:8 344:2,15,18
**quantiles** 316:23 317:4 318:19,22,23 319:1
**quantitative** 253:11
**quantitatively** 125:20
**quantity** 284:4
**quartiles** 315:18 317:1
**question** 12:11,12,16, 20 13:2 16:1 18:4 21:1 30:5,10 33:18,24 34:4 36:2 65:20,21 66:11 67:24 97:9 99:24 110:3 116:5, 7 126:23,24 127:15 133:9 137:5 139:4 145:6 146:1, 2 147:20 157:17,22 158:1,24 166:10,17 167:2 168:21 170:3 171:8 189:13 191:24 192:2 205:7 209:7 215:24
218:22 232:3 236:14 238:9,24 239:4 240:16 241:3,5 243:23 244:4,5 245:9 251:19 254:17 259:13 261:4,14 270:10,13 273:12 274:13 276:3 280:24 281:23 287:14 289:4 291:2 292:9 316:10 331:13,15 337:9 338:5 343:7,25 349:7 350:7 353:15 366:14 369:1,9 370:6 372:11 373:19 375:12,18 377:15,22,25 378:2,10 382:5,6 383:19
**question's** 210:10
**questionnaire** 292:5 323:4
**questionnaires** 280:21 322:19,21
**questions** 9:2 11:12 16:9 65:18 91:24 94:25 96:10,24 131:9 191:21 194:10
274:16 291:25 317:11,14, 17,25 323:5 337:22 342:6 370:11 373:22 380:23 381:1,15,16 383:17
**quick** 9:17 314:1
**quicker** 197:2
**quickly** 342:5 368:7
**quieter** 201:4
**quit** 287:9
**quite** 49:17 50:12 93:19 104:13 105:6 109:16 167:15 274:4
**quotation** 101:1
**quote** 88:8 100:18 103:3 163:20 216:23 262:7
**quoted** 89:10
**quoting** 153:4 378:21

**R**

**race** 185:15
**radiation** 89:8
**raise** 9:19
**ran** 227:3

**random**
42:24
**randomize**
227:7
**randomized**
211:21 227:5 267:8
**range**
148:9 160:9, 12 182:10 237:9,23,24 284:10 301:5 306:6 334:16 343:19,23
**ranitidine**
7:8 8:24 27:13 72:9 126:2,16,21 127:2,9,19 129:1 130:18 136:7 137:3 138:12 145:16 153:21 155:16 156:20 157:10 158:19 168:7 172:22 184:22 185:19,24 186:8 188:9 194:22 195:3,5 210:24 211:2 212:5,12,18, 22 213:20 214:14,20,25 215:1,5,10 217:10,11,19 218:11,16,25 219:4,6 222:25 224:15,16 225:1,4,7,9, 12,14,15,21 226:4,14,16 227:13,14 228:6,10,20 229:3,4,9,16 231:7,10,16 232:5,14,21 233:6,8 234:25 235:2,4,20, 21 236:15, 16,25 237:5, 19 238:1,4, 5,20,25 239:1,5,6,24 240:1,2,5,7, 11,12 241:8, 9 242:2,16 243:1,10,14, 18 244:1,5 245:4,10,14 247:11,12,21 248:3,5,15, 17 252:8,13, 15 253:2,13, 15 254:5 255:15 257:7 259:10,13 263:17,20 264:2,9,12 265:16 266:7,13 267:4,25 270:3 271:25 272:3,7,12 273:5,13,17 275:24 278:2,7,13, 22 279:4,7, 19,22,25 280:11 281:2,4,6 282:18,21,25 286:18 290:7 294:4,12 296:4,10,23 297:4,11 298:11 300:6,23 301:9,12,14 302:11 303:7 327:6,9,25 329:7,22 330:7 331:5, 10,17 332:15,20 333:13,22 334:3,7,9 335:7 338:24 339:2 341:12 342:8 343:8, 13 344:3,16 345:3,20,24 346:4,12,16, 19 347:1,17 348:13,19 349:4,10,20 350:9 351:12,13 354:9 356:15,23,24 357:10 362:11,22 363:20,25 364:12,18 365:6,9,16, 21 367:23 371:20 372:12,23 374:9,12 375:14 376:13,20 377:10,18 378:5,12,20 380:3 381:20 382:12,17,22 383:2,5,6,23 384:8
**rank**
93:22 94:7 95:5,7 246:19
**ranking**
94:19 286:4
**rare**
61:1 81:10
**rarity**
81:11
**RASPANTI**
4:9
**rate**
42:25 97:8, 11,14 98:18
**rated**
85:8
**rates**
287:4
**ratio**
45:16,25 49:23 51:15 52:6,9 54:20 129:16,20 137:21 341:1
**rats**
307:14
**re-**
39:6
**reach**
29:2 235:22 236:17 326:19 330:9
**reaches**
230:9,15
**read**
29:17 30:3,8 39:15 53:19 67:25 68:2 79:19 83:4 88:20 101:11 105:22 111:18 117:8 142:1 144:23 152:20,21 153:4 157:16,19 160:20 163:22,24 186:3 220:7, 8,20 241:4 312:16,17 316:21 321:17 323:1,6,12 326:17 346:11,24 347:19 351:6 354:5 356:8 372:3 373:16

**reader**
51:8 52:15, 19 55:16 58:3 130:17 133:19 140:6 219:13 379:11
**readily**
176:11 221:8
**reading**
67:15 73:14 157:24 206:5 219:14 345:19 371:16
**reads**
22:13
**ready**
216:1
**real**
9:17 32:25 50:15 227:1 286:16 296:4,5 314:1 325:22 342:12 382:23 383:10 384:5
**reality**
226:20,23 227:9,11
**realtime**
11:25 241:3, 14 261:20 377:23
**reason**
12:12,15 58:14 69:5, 15 114:23 133:2 144:17 178:16 198:4 263:4 289:15 305:12 321:19 362:16 363:2,4,10
**reason-**
256:3
**reasons**
16:8 224:18
**recall**
62:17 75:2 76:18,24 77:10,24 82:16 90:10 126:11 154:17 163:19,21 169:22 170:3,4 258:12 263:13 285:9 292:6 299:3 301:18 313:9 317:5 324:19 328:3 338:17,22 353:17,18 368:4 381:22,23 382:1,2
**recalled**
84:6 85:19 91:6 253:14, 16 282:22
**received**
39:12
**receiving**
294:19 295:12
**recent**
42:8 60:19 61:14 81:18 241:16 292:19
**recently**
32:4 60:10 67:7 82:3 123:21 220:7
**receptor**
195:9,13
**recess**
95:25 151:5 190:25 249:9 250:20 302:21
341:19 380:12
**recognize**
86:21
**recollection**
244:25 246:14 312:22 321:13 373:2
**recommended**
106:25 226:3 227:13,15,19 228:19 229:3,8
**recommending**
106:2 107:4
**record**
6:2,7 7:19 12:7 68:1 87:9 95:23 96:3,6 129:8 151:2,4,8 157:18 166:17 167:15 168:15 178:25 190:21,23 191:3,24 192:21 234:11,13 241:13 249:4,7,12 250:15,19,23 260:18 286:8 297:18 302:19,24 314:1,2,4 317:23 325:1 337:16 341:16,18,22 368:10,12 376:24 377:2 378:1 380:8, 10,15 384:10 385:16 386:24 387:4,7
**record's**
146:5
**recorded**
6:4,6
**recording**
6:13
**records**
280:22 284:13 286:12 293:19
**red**
134:1 135:16,17 139:22 340:21,22
**redeemed**
293:21,25
**reduce**
44:20 75:12, 21 80:5,16, 19 290:4 310:17
**reduced**
54:21 79:24 80:4,15 208:23 289:12 309:12,18,24 310:12
**reduces**
68:14 289:2
**reduction**
57:15
**REEFER**
4:11
**refer**
13:6 17:1,6 42:18 60:7, 18 62:1 67:19,21 71:3 99:19 113:11 164:12 195:16 298:2 321:5 322:15 373:8,16

**reference**
17:17 18:16 20:20,22 52:2 58:10, 15,20,22,24 59:3,6 64:24 70:18 74:1 103:16 104:2,9 115:25 116:8,10 117:1 118:10,21 119:12 122:17,19,22 135:13
**referenced**
17:16 20:7, 9,10 99:9 102:10 123:7 199:2
**references**
18:2,3,20 19:4 20:18, 25 21:11 58:9 384:12
**referencing**
63:16 116:13
**referred**
16:19 17:21 21:24 43:16 68:1 107:11 135:3 157:18 177:3 258:1
**referring**
13:12 16:17 46:3 68:4 82:4 89:9 102:12 144:16 177:20 184:2 195:13,18 202:15,19,22 203:17 217:22 224:4,5 231:19 232:16 280:7 315:12,25 330:25 331:1 333:16 339:25 366:7 376:18 378:24
**refers**
202:5 281:13 323:10
**reflect**
5:23
**reflective**
289:6
**reflects**
345:2 384:15
**reflux**
224:19,21
**refrain**
166:23
**refresh**
14:16,21 122:5,7 178:10 304:1,7
**regard**
322:5
**regarding**
9:2 16:2 99:5 102:11 128:25 194:10,14,18 215:21 257:1 278:1 321:14 340:10 372:23
**regime**
282:12
**registries**
222:14 349:2
**registry**
190:11 222:13 344:13 345:14 356:19 359:14 376:23
**regression**
40:12 94:16 95:19
**regressions**
94:11 286:2
**regular**
292:2 293:3, 9,14 346:4 348:8 358:14
**regulations**
179:10
**regulatory**
206:17,18
**reiterate**
296:1 328:8
**relate**
37:19 38:3, 23 39:1 60:22 306:16
**related**
7:12 34:8,19 37:13,21 38:17 54:19 60:15 61:13 74:10,18 172:14 196:14 205:3 222:25 239:24 242:5 274:9 287:15 290:4 307:1 311:6
**relates**
224:9
**relating**
195:21 196:12,18,23 198:25 208:23 216:19 260:8 262:1 303:19 320:25 362:6,18 363:6 368:16 375:2
**relation**
57:17 73:6, 17 261:8 266:12 367:18
**relationship**
313:18 314:25 318:10 319:5 320:7
**relationships**
320:21
**relative**
78:22 187:21
**relay**
47:22
**relevance**
123:21 141:19 142:7,11,14 230:13 371:20 372:11
**relevant**
25:10 26:6 76:7 103:2 117:18 119:18 124:13 175:4 194:21 238:8,14 242:6 244:4, 5 245:9 255:9,10 259:12 267:1,14,22 268:3 272:15,20,22 273:2,12 276:16,19 279:21 280:23 300:2,3 304:20 311:13 312:4 340:14 341:10 362:21 364:20 365:8
**reliability**
90:13 284:8

285:1
**reliable**
120:8 126:7, 21 127:12,17 233:7 234:24 259:17 262:9 263:25 264:11 266:8 269:20 270:8 271:11,22 274:18 276:13 297:17 309:3 367:14,25 368:2 375:16 382:21 384:7
**reliably**
36:20 91:5 102:7 288:4
**relied**
110:25
**rely**
109:5 286:12 346:9 348:23
**remain**
249:16
**remainder**
380:24
**remember**
10:17 86:10, 11 105:5 106:14,20 197:3 198:11,17 220:5,6,8 321:20
**remind**
157:13
**remote**
6:11 7:1,11, 18
**Remotedepo**
6:25
**remotely**
7:25
**remove**
6:17 53:1

269:9
**repeat**
12:17 55:2 67:24 92:15 167:1 261:4 262:5 278:18 335:4 339:16,17
**repeatable**
272:14 276:22
**repeated**
371:11
**repetitive**
192:10,23,24 199:24
**rephrase**
12:18 147:25 191:24
**replacement**
156:24 245:20
**replicable**
276:14
**replicated**
168:5 317:8 330:16 336:20
**replication**
138:3 336:17 375:23
**replications**
333:9
**report**
5:23 9:2 13:21 14:9, 24 15:1 16:6,7,10,13 17:16,20 18:14 19:5, 12 20:2,17 21:2,21,23 22:1,5,8 27:8 28:5,16 35:4,22,24 36:7,19 47:25 52:12

58:18 60:7,9 62:24 63:4, 5,9,11,14, 15,21,24 64:25 66:9 67:18,20 68:6 87:20 98:4,20,23 100:17 102:12,15,16 103:1,15 106:15 107:13 116:12,17 118:6,13,19 122:20,24 123:8,9,12, 25 126:5 128:25 134:24 151:15 153:5 159:20 160:14,25 161:3,16,25 163:4 164:8, 12 169:20 171:2 172:4, 9 173:3,10, 14 174:7 180:24 182:6 193:3,5,11 194:10 211:10 215:17 216:3 223:20 224:3 225:5,9 231:18 233:5 234:22 235:9,12 236:8,12 249:23 256:7,19,23 257:3,20 258:20,22 259:3,9 260:7 261:7 262:1,6,8 263:16 268:16 274:2

276:7,8 277:24 282:20 291:3 293:13 297:1 303:17 304:13 306:2 307:4,12 316:1,7 317:19 319:11 321:6 327:15 331:22,25 333:18 335:11,13, 14,15,18,22, 24 336:13 337:13,14 338:13 339:7,25 340:6,10 341:8,9,10 348:24 351:6 352:9 359:16 372:4,13,16, 22 373:9,13, 17 374:6,19, 21 375:9,19 382:15 384:12,16,19 385:1,4,11, 19,23 386:6, 9,11,21
**reported**
15:9 48:10 52:15 53:18 73:5 74:9, 19,20 120:3 139:7,11,12 140:4,7,9 144:18 145:9 153:5 159:18 160:12 182:4,24 188:24 189:17,19 217:10,11 239:14 275:24 293:2,4

295:15 301:6 312:25 327:12 336:14 339:17 340:3,19 341:2 346:20 357:8 366:9
**reporter** 7:15,20 11:14,15,21, 24 12:1,8 61:17 68:2 76:25 77:8 119:25 144:20 145:1,6,7,12 157:19 166:15 198:19 233:18,23 234:16 239:2 247:15 250:7 260:12,16,23 295:3 360:23 373:23 377:20
**reporting** 7:24 8:9 45:22 47:15, 24 51:2 52:2 55:7,11 74:15 78:2 92:11 109:5 138:5 236:24 327:5,19 331:4,16 332:14 333:12 334:2,22 335:8 346:24 358:14
**reports** 18:11 63:25 64:23 124:17,22 221:5 245:1 282:22
312:20 332:1 364:2
**represent** 8:22 19:21 343:17 381:13
**represented** 22:24 133:22,24
**representing** 11:8 129:8
**reproduced** 102:8
**request** 6:6 384:9
**require** 158:18
**required** 43:2
**requires** 324:4 383:13
**research** 18:17 22:14 23:5,6,10,21 24:2 39:7 60:8,13 61:20 62:2, 22 63:14,18, 21,25 64:8, 18,22 66:3, 13 67:20 68:5 181:13 189:8 194:14,15,18 208:11 221:1 266:1 308:4 324:6 367:3
**researchers** 336:16
**reserving** 380:24
**respect** 159:1 161:11,15 240:1 246:25 310:5 363:20
**respectfully** 313:10
**respectively** 212:12
**respiratory** 307:16,23
**respond** 317:11,17,19 337:6
**responded** 338:4 381:24
**responding** 317:24 378:9
**response** 131:16 150:18 313:19 315:1,10,12, 16 316:11 318:10,21 319:6 320:7, 20 368:20 369:3,12 381:15 382:5
**rest** 118:19 191:9
**restate** 148:1
**restricted** 152:17 153:11 155:6 156:2
**result** 113:1 142:2 147:17 204:23 269:3 308:13
**resulting** 268:17
**results** 33:17 52:16, 20 55:7,11, 15 73:9 120:3 129:7 130:13 135:7 140:4,7,8,22 148:25
149:1,2,8,11 174:10 181:5 221:20 258:15 297:19 322:4,11 333:17 336:14 340:3 343:14 345:15 372:8
**retained** 32:13
**retrospective** 335:23
**returning** 66:10
**reveal** 32:15
**reverse** 129:24 332:12
**review** 21:3 26:25 41:1,10,21 42:2,4,10, 13,17 43:6 47:20,21 51:5 52:16 57:25 59:24 60:3,9,11, 19,23 61:14 66:21 67:3 68:20 71:17 72:6 73:21 74:21 78:9 102:14 103:18 106:5 123:24 124:15,16 156:19 161:2 166:25 182:9 196:25 205:14 213:4 217:1 218:8, 15 222:4 230:13 256:2 257:4,21 259:10

263:6,19 266:11,20 267:1,8,23 298:3 304:20 316:3 320:24 335:21 358:21 362:8 365:9 368:15,17 372:16,17,22 375:4,8
**reviewed**
16:6 19:10 27:8 28:17 62:22 63:4, 18 66:13,17 67:4 78:16 222:25 226:14 235:22 236:16 267:16,21 268:2 282:19 286:9 324:5 330:4 362:5 367:24 374:25 385:12
**reviewer**
219:11
**reviewing**
29:15 62:25 321:2,13 382:17
**reviews**
42:18,22 43:3 64:6 65:22 276:10
**revised**
17:22
**rhythm**
311:7
**right**
6:24 12:2 13:3 14:19, 23 15:2,6 16:25 21:3, 7,25 22:6,19 25:1,4,14,24 26:1 28:6 31:17,23 34:5,9,18, 19,22 37:15 38:6,13,23 39:17 40:25 41:12,15,22 43:10 44:14 45:11 46:7, 16 47:1,3,11 48:20 50:1 52:17 53:21 55:3,16,19, 20,24 57:5,6 58:5,11 59:14 63:3, 11 64:25 65:3 69:7,11 70:14 71:5, 19 72:20 73:1,10 74:24 75:21 78:8 79:6, 12,15,22 80:2,6,17 82:1 89:13 93:23 95:10, 14 97:16 98:2,9,24 99:7,16 103:23,24 104:9,18,25 106:25 107:3,13 109:15 115:12 117:4 122:4 123:14 128:21 129:2,10,11 130:3 131:5, 12,18,23 132:6,15,17 133:7,10,15 135:16,24 136:8,11,20 137:6 138:16,21 139:3,5,9 140:1,9 141:7 143:8 145:13 146:13 147:2 149:1,13 150:11 153:25 154:17 162:1 163:4 164:6, 17 168:13 169:9,19 171:11 175:17,21 176:25 179:23 180:18 184:10 185:13 186:9 189:9 194:4, 16 197:18 201:6 224:11 233:22 234:2 235:5 246:13 260:19 261:20 271:17 287:8 290:10 294:4 302:16 310:19 314:20 316:7 320:11 365:25 379:5
**right-hand**
41:25 45:6 70:2 129:19, 22 345:22
**rigor**
379:12
**rigorous**
18:11 239:23 376:8,17 377:17 378:4,11,18, 23 380:3
**risch**
311:16
**risk**
39:21 42:7 47:16 48:17 51:12,22 57:15 69:18 70:20 73:8 74:10,12,17 75:21 78:11, 21,22,24 79:3,25 80:6,17,20, 23 88:14 93:18 101:20 108:7 131:23,24 132:9 149:16 150:9 162:14 171:5 172:13 174:1 184:21 188:6 208:23 213:9 227:5 245:5 251:13 257:11 258:8 262:24 283:16 285:12 286:23 287:22 289:3,13 290:4 296:17 318:13 328:2 330:8 332:3 336:12,23 337:11 339:10 340:14,20 363:13 364:23 369:12 375:2,15 382:23 383:1
**risks**
311:15 312:6
**RNA**
323:13
**robust**
94:3,8 95:7 167:19 169:8 170:24 236:24

283:15 288:18 348:23 366:19 371:18 383:5
**rodent** 324:5
**rodents** 323:17,24
**Rodgers** 311:17
**Roger** 104:19
**Rogers** 313:8
**role** 27:17 50:22 56:7,20,24 110:21,24 120:14 125:5 137:15,17 150:5 173:24 207:2 218:1, 4 253:23 254:12,21 257:9 262:12,16 269:13 270:22 273:20 325:11 327:1
**roles** 268:24
**Ronca** 5:5 8:18,20, 22 9:13,18, 23 10:3 11:23 12:6,9 14:1,6,13 15:23 17:9 20:4 22:7 36:15 41:6, 24 43:12 44:1,4 45:4 48:4,15 54:11 55:21 56:13 57:7 59:7 61:17 67:25 70:1 71:15,21 73:3,13 74:5 75:6 77:3 78:4,25 81:16,24 82:10,15 88:3,25 90:18 94:24 95:20 96:5, 25 97:4,13, 20 98:19 99:1 100:12 103:14 104:1,5,15 105:18 109:9 110:6 115:11 116:16 120:24 121:3,9,14, 20,24 122:9 128:8,14,19 131:18 132:21,24 133:8 135:11,22 136:4 139:19 141:6 142:19 143:4,8,11, 16,21 145:11 146:8 149:5 150:6,20 151:1,10,13 152:1,6,14, 24 153:3 157:16,25 159:17 160:15,19 162:19 166:2,8,18 174:19 176:18,22 180:11 185:8 187:12 190:18 191:10 353:17 373:21 384:17
**Ronco** 335:22 336:15,22 337:10 338:6 339:8,15
**room** 7:23 9:16 13:14 193:25 194:3 314:13
**ROTMAN** 4:16
**routinely** 325:4 358:5
**row** 146:20
**rubber** 16:12,18 369:17 370:22
**rule** 14:20 110:20,23 120:14 126:11 157:5 169:14 257:9 259:6 263:13 268:10,24 269:21 270:22 271:9 289:24 324:23 326:25 346:18
**ruled** 254:23 269:24 275:18 325:10
**rules** 11:5 19:20 191:11
**ruling** 218:1,3 253:11
**running** 34:22 286:1

**S**

**S-------------** 5:10
**S--------------** 5:21
**salary** 96:19,20 97:3 98:8,9
**sales** 229:21 230:10,16,20
**salted** 79:14 340:22
**salting** 62:13 70:7
**salty** 79:14
**sample** 32:8,9
**samples** 214:1
**Sanofi** 221:19 222:1
**sat** 199:20,22 201:7,10,11, 20
**save** 189:18
**saying** 34:11 39:24 51:17,21 55:15 58:10, 19 94:21 95:3 113:24 136:6 141:4 174:24 243:5 269:17 271:7 289:1,4 312:13,15
**says** 44:5,17 45:14 48:11

49:21 54:12 59:12 70:6 73:15 74:7 78:9,20 84:22 105:23 107:3,5 109:15,18 110:4 115:14 146:16 151:19 154:17 168:14 247:18 312:19 314:22 347:4 381:9
**scale**
93:23,24,25 94:2 117:18, 19 129:9,14, 16 130:3 186:25 187:21 207:1 218:1 226:19 253:10 357:5,17 364:4,7
**Scandinavian**
296:7
**Schirm**
104:6
**SCHMITZER**
4:21
**School**
85:7
**schools**
85:8
**science**
93:19,20 181:10 246:17 254:9 308:2
**scientific**
4:15 101:7 102:21 107:23 114:14 119:6 123:17 217:9,23 218:5 266:19 267:2,23 307:4 325:25 326:10 351:8
**scientist**
211:6 253:21 255:9 283:3, 9
**scientists**
117:23 271:18
**score**
223:6 224:12
**screen**
6:23 13:8,9, 11 14:10,11 68:10 146:5, 14 217:13 224:7 373:12
**screens**
6:15
**scrolling**
15:24
**search**
365:24 373:14
**sec**
234:7
**second**
9:7 12:3,4 22:9 45:8 51:17 63:5 88:6 103:5 104:22 112:4 116:17 144:25 152:7 163:13,14 164:13 194:12 211:18 233:25 234:3,13 235:7 242:24 338:20 350:22 361:8
**secondary**
72:1,11
**section**
21:23 43:14 71:18 75:7 98:22 213:6 268:18 292:1 305:1 307:8 309:7,10 345:15,16
**sections**
43:9
**see**
14:3,8,11, 12,15,18,21 16:14,20 17:5,13 26:2 37:11 38:13 41:18 45:13 50:3,4 52:16,20 54:16 55:16 59:15 80:24 103:16 111:13,16 121:1 122:12 124:24 125:2 128:11,21 130:17 134:15 135:7,15,22, 23 138:2,3,8 140:6,16 141:6,8 143:17 146:21,24 147:12 150:8 152:6 165:6 174:14 176:4 177:13,18 178:11 179:16 180:13 186:5 189:1,3 194:10 205:20 211:25 212:1,6,8, 13,14,19,20 215:23 216:4 217:12,15 219:15 232:1 235:17,18 241:3 245:11 257:11,12 258:3,8 261:23 263:11 268:12 269:6 286:21 287:21 288:18 290:24 294:7 301:6 303:20 304:1,15,16 305:2,6,7 307:9,18,19 308:10,17,18 309:14,15 311:21,25 312:1 313:3, 4,12,13 315:3,4 320:9,22,23 321:10,21,24 322:8,9 323:20,21 325:5 329:19 330:15,16 331:8 332:21 337:1,20 338:7,9,12 340:12,24,25 343:22 355:22 371:10 379:22
**seeing**
88:4 104:24 122:6 177:16 329:9
**select**
87:13
**selected**
264:3 293:21
**selection**
32:5,12 42:24 50:8

53:5 90:4 110:22 157:5 218:2 244:9 262:13 289:24 376:5
**selective** 77:16 84:14 128:1 245:22
**self-report** 286:13 346:9
**self-reported** 293:14 376:25 377:3
**selling** 230:23
**seltzer** 319:20,21
**send** 11:25 12:4
**sense** 11:20
**sensitivity** 33:16 140:11,13 147:17 246:22 284:23
**sentence** 44:9,16,17 46:2 52:3 56:17 57:9, 11,13 68:25 70:6 71:22 72:20 73:4 74:6 75:8,19 99:18 103:5 107:5,12 151:19 152:13 160:17 169:12 308:8 309:9 311:11 320:14,15 322:1 346:11,23
**separate** 17:2 267:24 301:14,15
371:13 374:9 385:4
**separately** 57:19 135:4 223:22 343:14 374:13
**separates** 136:1
**September** 304:14
**sequelae** 207:22
**series** 291:25
**serve** 26:23 200:7
**served** 65:2,4
**Services** 4:1
**servings** 86:2
**set** 118:18 194:8
**setting** 6:17 203:22 298:1 379:24
**settings** 102:8 194:24 243:12 270:16 287:7 362:15 383:10
**seven** 10:18 59:10 151:21 152:17 153:7,11 155:6 156:2, 13 368:11
**several** 34:21 105:4 134:11 138:7 152:10 161:24 183:8 188:17
201:11 209:13 265:18 286:20
**severely** 50:19
**sex** 164:20 165:13 185:16
**shape** 337:17
**shapes** 194:20
**share** 13:9
**shared** 121:16 143:10 179:9
**she'd** 141:4
**Sheehan** 5:7 9:6,12, 15,20,25 13:15,23 18:7 19:2,9, 19 20:12 21:5,8,16,19 23:7,16 25:2,5 26:4 27:9 28:11, 20 29:8,12 30:14 33:13, 22 34:10 35:8 37:5,16 38:5,7,14 39:9 46:1,22 47:4,19 51:3,25 52:18 53:23 57:2 58:13, 25 60:6 61:24 63:7, 19 64:11 65:14,23 66:6,14,18 67:13,23 68:3,17
69:1,8,20 70:15,22 71:4 72:13, 21 73:24 75:22 76:2 80:7,18 81:20 85:1 88:17 89:12 90:25 91:10 92:5,23 93:12 94:22 95:2,11,17 96:17,22 97:3,10,16 99:23 100:8, 16,25 104:11 107:1,8,21 108:19 109:25 110:2,11 113:23 115:2 117:3 118:14 119:14 120:4 122:7,10,21 123:1,15 126:3,18 127:4,21 129:12 131:25 132:18,23 133:11 136:12 137:7 138:17,22 139:10 140:2,15,25 141:22 142:9,23 144:25 145:5 146:4 147:24 148:6,17 149:17 150:12,22 153:17 154:15 156:6,15 157:20 158:4 159:4 160:3 161:13 162:2 163:11,13,18

164:7,18
165:1,5,20,
25 166:4,11,
21 167:5
168:1,15
169:25
171:8,16
172:6 173:5
175:15,22
177:6,10
178:1,6,16
179:24
180:16
181:1,11
182:8,22
183:23
184:11
185:11,20,25
186:10,18,23
187:5,7,14
189:13,15,23
190:14,20
192:24
193:24
197:5,13,16
198:21
199:24
200:4,23
203:14
204:16,25
205:17 206:1
207:10,19
208:5
209:11,23
210:14 212:7
213:12 214:2
215:2 216:21
217:21
218:20
219:9,22
220:4 221:22
223:15
225:16,23
226:6 227:21
228:7,12
229:5,18,23
230:4,11,17
231:1,4,13,
17,23 232:8,
25 233:10,
13,24 234:1
235:11,23
236:18
237:7,20
238:7 239:8
240:8,14,21,
24 241:11,21
242:4 243:2,
20 244:2,16,
23 246:5,11
247:1,8,14,
23 249:5
250:2,5,12
252:9,17,19
253:4,19
254:7,18,25
255:6,19
258:25
259:20,23
260:10,13,19
261:3,10,15
262:3 264:7,
19 266:23
267:11,18
268:7 270:12
271:3 272:1,
9,18 273:8,
18 276:1
277:2,10,21
278:17
279:1,12
280:4,15
281:22 282:7
283:4,7,18
285:16
286:25
287:24
290:11,23
291:9,15
293:11 294:5
295:21,24
296:24 297:5
298:12,22
299:15
300:1,9,16,
25 301:17
302:1,12
304:4
305:11,25
306:23
307:25
308:21
309:20
311:22
312:12
313:22
314:6,9,17
315:13
316:13
317:21
318:14
319:9,18,22,
25 322:14
324:2,20
325:17
326:4,14
328:4 329:8,
11,15,24
330:11
331:19
332:17
333:15
334:5,24
335:2,10,20
336:25
337:15 338:3
339:12,21
342:9,24
343:10
344:9,25
345:7 347:3,
5,20 348:4,
20 349:11,21
350:10,16
351:3,21
352:17 353:5
354:10
355:6,20
356:7,25
357:4 358:1,
6,23 359:12,
21 361:6,19
362:19 363:7
364:1,10,19
365:7,22
366:5 367:19
368:22 369:7
370:2 372:9,
25 374:22
375:17
377:19 378:6
379:2 380:17
381:4,7,12
383:15
384:1,23
386:18

**shift**
310:18

**shifts**
80:25

**short**
106:1 107:4
298:17 299:1
300:12

**short-term**
237:2 296:11
346:15

**shortened**
32:20

**shorter**
158:10
159:12
289:10

**shot**
319:19,24

**show**
14:17 51:7
80:21 82:11
121:17
126:13,20
130:25 131:1
147:16 176:2
248:23
309:22 330:8
331:11
342:23
343:14
365:15

**showed**
74:17 106:22
147:11,17
208:25

**showing**
81:5 130:13
144:11,12

147:7 154:10 262:23 322:13 378:12
**shown**
59:22 61:4, 22 68:11 77:25 90:13 122:10 154:4 210:5 252:12 265:2,3,4 271:19 272:4 284:25 288:5 296:19 297:21 305:16 306:13 370:25 374:16
**shows**
125:11 128:2 190:4 349:14 375:14
**sic**
75:12 97:7
**side**
56:15 129:10,11, 19,22,24 133:10 136:22 150:8
**signal**
49:12,14,16 50:4,5 52:23 89:25 90:1,6 239:24 244:7,10 245:12 280:18 289:20,21,22 359:10 360:2,16 376:3
**signals**
62:11 90:9, 11 245:18 296:18
**significance**
45:24 47:2, 7,9,11 52:14,21 53:17,20 54:4 55:9 98:24 101:9, 16,24,25 106:1,3,19 107:19 108:17 109:6,20 114:15 116:2,10 117:16,22 118:20,25 119:8,22 122:2,23 124:13,24 330:10
**significant**
46:25 47:10 49:2,16 99:15 102:2, 3 103:11 105:20,24 106:8 110:17 111:24 112:7,12,13, 23 113:8,15 114:3 115:18 118:10 119:11 120:6,16 125:13 184:20,21,25 327:16 328:23 330:14 332:9,22,25 333:2,23 334:12 340:19 375:15
**significantly**
106:10
**sim-**
297:22
**similar**
72:19 76:22 88:23 175:24 195:6 209:17 245:18 279:8 280:1,12 308:12 323:2 327:19 330:20
**similarly**
361:15
**simple**
155:10 160:8,13 168:22,25 185:14 273:6 283:19 288:1 309:21 318:17
**simulation**
297:22 298:2
**single**
29:17 123:22 168:4 180:17 204:22 212:22 225:14 263:7 287:14
**siren**
200:20 201:2
**sirens**
277:10,12 294:22 342:25
**sit**
200:15 201:15 321:12,16
**sitting**
101:5 141:11 177:16 213:1 215:7,9 228:16 314:10
**situ**
135:3 176:3, 8
**situation**
48:19,21 328:21
**situations**
82:25 83:5 93:10
**situs**
175:20
**Sixth**
193:23
**size**
49:18 50:13 79:8 113:19
**skip**
55:3
**slide**
82:23 84:20, 22 88:3,4,7, 25 89:11 131:19 139:20 149:6,9 150:6 159:17 162:20 163:20 168:14
**slides**
90:18
**slow**
233:19
**small**
179:13
**Smith's**
366:10
**smoke**
55:24 56:2, 24 287:23
**smoked**
287:20
**smokers**
185:6
**smoking**
56:8,11,20 70:8 79:6,25 80:1,10 81:1 154:11 161:1,4,10,

18 162:1,5, 16 163:3,8 164:3,16 167:24 169:18,24 171:1,4,5,14 172:15,25 174:8,12 175:4 223:3, 14 224:8 275:3,13 286:19,23 287:4,8,18

**societal** 100:4

**societies** 105:6

**Society** 39:13 105:8

**software** 42:22

**solely** 110:25 111:22

**solid** 159:11

**some-odd** 133:14

**Somebody's** 77:3

**someone's** 226:8

**something's** 112:22

**Song** 257:22 316:3 317:9

**sophisticated** 288:10

**sort** 15:1 43:1 52:13 54:9 83:11 91:17 122:17 136:22 175:11 234:5 296:20 314:10

**sorts** 86:12 280:23 284:23

**sound** 9:13,18 163:22

**sounds** 25:25 187:20

**source** 206:7,8 216:23 217:4,5 221:10 222:9,21 233:7 234:24 356:10,11 359:14

**sources** 98:7 202:9 209:5 210:4 263:24 267:4 268:10 279:9,18 280:20 352:1 382:18,19

**Spalding** 4:15

**speak** 117:13 133:4 176:13

**speaker** 6:15

**speaking** 85:6 98:13 132:25 207:20

**special** 106:5

**Specialist** 4:15

**species** 265:23 307:14,22

**specific** 13:11 16:16 37:21 54:19 58:7 59:4,5 71:8 85:12, 13 86:4 92:10 93:14 115:6,8 154:21 195:3,5,9,11 199:7 203:5 208:16 209:7 210:10 215:24 218:12 219:2,6 240:5,11 241:8 247:12 256:7 266:14 285:2,10 287:1,17 288:22 289:8 290:7 291:2 303:8 305:20 310:8 321:6 351:13 360:10 363:17 372:18 377:16 378:2

**specifically** 27:4 40:7 60:21 64:2 67:21 160:22 162:23 164:1,19 174:10 183:6 195:24 196:6 203:17 208:14 218:24 242:1 243:17,25 268:9 294:18 297:9 316:3 336:5 351:12 352:2 354:4 359:15 375:5 378:11 379:19 382:7 383:12

**specificity** 246:22

**specify** 154:22 362:3

**speculation** 27:10

**speech** 183:21 184:1

**spend** 13:16

**spends** 189:12

**splitting** 117:12

**sponsored** 232:23

**spot** 61:18

**spotlight** 6:17

**spotlighted** 6:14

**spread** 48:23,25

**squamous** 341:2

**stable** 249:16

**stage** 258:13 259:4 276:20

**standard** 130:4,7,10 138:25

**start** 20:25 109:17 132:5 143:22 146:17 232:9 234:19 268:11 269:16 314:21 375:10

**started** 110:13 182:14 236:1 336:4

**starting**
59:19 73:15 147:3 232:13
**starts**
15:20 152:9 312:2
**state**
153:22 235:5,17 313:5 347:16 348:2,5,7
**stated**
47:17 68:5,8 110:12 112:15 235:7 360:17 384:17
**statement**
7:18 26:20 58:1,9 68:13,19 70:11 71:9 72:4 89:10 100:6,22,23 105:25 107:10,11,12 111:7,21 112:3,4 113:5,11,22 114:4,11,18 115:1,9,17, 21 116:1,9 117:1,6,10 118:11 122:1,23 124:10 168:10,12 217:22 228:1 305:9,13 307:21 308:3,20 309:17 310:1,20 318:20,24 319:3,14 322:11 323:23 324:3 353:11
**statements**
67:22 111:19 121:22 123:23
**states**
163:25 308:10 313:14,16 314:23 323:15 347:15
**stating**
212:9 315:9
**statistical**
28:2 31:5,13 40:8 45:24 46:19 47:1, 7,9,11 52:14,21 53:17,20 54:4 55:8 94:3 98:23 99:13 100:7, 22 101:9,15, 24 103:9 105:2,8,12 106:1,3,16, 18,24 107:17,19 108:11,17 109:6 111:2 114:15 115:17 116:1,9 117:15,21 118:8,20,25 119:8,10,22 120:6 122:2, 23 124:12,23 162:7 167:11,18 187:22 188:15 242:20 269:2 286:7 330:9
**statistically**
49:2,15 99:14 102:2 103:10 105:20,23 106:8 110:16 111:23 112:7,12,23 113:8,15 114:3,20 118:9 119:11 120:16 125:13 169:1 184:19,24 185:3 188:4 327:16 328:23 330:13 332:8,22,25 333:1,19,23 334:12 340:19 375:14
**statistics**
30:24 31:16 72:15 105:13,15 187:6 211:7 221:4 228:23 286:7
**stay**
93:21 94:7 95:4,6 188:21 190:13 234:12
**Stefani**
313:8 320:25 321:9,14 340:10,18 341:3
**step**
106:4 107:6 366:25
**steps**
288:12
**STEVE**
4:16
**stipulate**
158:2
**stomach**
22:17 25:22 39:7 40:25 41:1 43:19, 22,24 44:21, 22 59:23 60:1 61:23 63:16 68:12, 15,23 69:7 73:1 80:1,17 188:7 190:6 311:15 312:7 331:5,10,17
**stop**
48:15 77:4 79:24 106:7 143:19 194:11 294:22
**stopped**
106:1 107:4 314:7
**straighten**
36:4
**straightforward**
227:24
**strains**
45:18
**strategies**
84:5
**stream**
201:2
**Street**
4:10 193:23
**strength**
222:8
**strengths**
155:12 375:21 377:5
**stress**
38:18
**strike**
195:1 203:11 208:17 210:9 215:8 218:13 223:11 230:6

238:22 248:25 254:13 264:4 277:7 283:14 298:8 302:8 313:15 323:8 335:16 339:5 340:15 346:22 347:13 363:3 377:14

**strong**
49:9 62:8,9, 19 78:21 90:6 110:20 172:10 275:7

**stronger**
52:5 275:9, 10

**strongly**
172:14

**structure**
180:20 202:6

**students**
31:2,3 43:2 125:16 326:8,9

**studied**
247:21 299:24 356:16

**studies**
15:9 23:22 25:8 26:6 27:7,13 29:18 47:9, 24 55:12 56:11 57:10, 12,14 61:3, 10,12,15 62:17,18 67:5,8,9 70:4 72:3,25 73:6 74:8, 16,24,25 75:1,4 76:5, 6,8,9,11,12, 14,17,23 77:9,14,15, 20,21 80:20 81:12,13 83:8,19 84:2 85:18 86:14, 22 87:7,9, 11,22 88:11, 13 89:3,18, 20 90:8,12, 17 91:20 92:2 95:12 111:4 119:2, 3 120:3 125:6,7,9, 14,15 126:6, 10,12,20 127:7,25 130:15 131:3 133:18,21 134:2 138:24 139:7,14 150:18 153:24 154:3 155:15,20,24 156:20 157:3,8,10, 14 159:18 160:1,5,11 162:1,12 164:14 175:21 181:14 183:20 189:20 190:2 194:21,22, 23,25 195:2, 4,8,10,21,23 196:1,6,11, 13,17,23 198:25 199:4,5,13 202:11,12, 13,16,19,20, 23 203:8,12, 21 204:2,3 206:6 207:2 211:4 218:1, 6 219:8 220:9 222:4, 24 226:19,25 227:2,10 231:8 232:11 233:6 234:23 235:2,21,24 236:1,5,10, 21,23 237:6, 15,23,25 238:19 239:12,15,20 241:16,23 242:8,14 243:8,13 247:22,25 248:7,13,17, 19,22 251:17 253:10 254:21 255:13 256:10 257:16,24,25 258:3,9,10 263:2,9,10 264:1,2 265:2,3,4, 16,17,25 266:3,5,6 267:3,5,6, 12,15,25 268:1,2 270:1 273:14 276:6,24 277:1,3,4,6, 16,17 279:4, 16,17,19 280:3,6,10, 14 281:1,2 283:13 286:9,14 288:6,10 289:23 290:7 296:3,15,16 297:23 298:2,5 300:4 303:8 304:21 307:2,13,21 309:2 310:16 311:5,13 312:4 313:2, 7,15,18 314:25 315:18,20, 22,23,24 316:3,22 317:2,5,7,8 319:4,13 320:2,16 321:3,6,17 322:2,12,15, 16,18,25 323:6 327:5, 9,11,13,21 328:22 330:17,18, 19,23,24 331:4,9,16, 22,25 332:14 333:3,12 334:2,22 335:8,14,17 336:7,19,20 338:15,16,18 339:19 341:14 345:10 351:10,11 352:2,4,5,11 353:9 354:2, 5 357:6 358:11,12, 13,17 362:22 364:5,7,12 365:13 366:24 368:1,5,6 370:7 371:1 373:3 376:7, 10,17,18,21 377:7,9,16 378:3,10,11, 23,24 380:2 382:17,20,22 383:4 385:2, 10 386:4

**study**
16:12,13,16, 25 24:5,18

26:25 27:16 29:20 37:17 40:8,13 42:8 48:12 51:9 52:1 74:3, 11,22 76:22 81:10 85:10 86:25 87:14, 16 90:22 91:15 93:15 111:10,12, 13,14 115:6, 8 128:1 135:4 137:20,23 138:1,6,14 139:11 148:9 150:15 151:15 152:2,9 154:8,10 155:4,13,25 156:1,8,12, 18,25 157:7, 15 158:14, 17,18,25 159:1 161:6, 7 163:15 164:11,19,24 165:6,9,14, 16 167:22 168:4 169:17 170:9 171:23 174:6,11,15, 24 175:1 176:1,24 177:4,5,16 178:21 179:22 183:7 184:13 189:19 190:6 198:6,16 199:1,9 204:5,6,7 205:8,9 211:10 212:23 213:10,22 214:9,13,17 215:12 219:18 220:2,5 221:8,18,21, 24 222:24 232:13,20,24 236:16,20 237:8,10,18 238:5,25 239:5 240:6, 12 241:9,16, 18 242:1,24 243:23,24 244:13,14,17 245:5 246:4 247:11,12,18 248:4 263:7, 13 272:3 276:15 281:11,21 282:9 283:15,24 285:13 286:22 289:18 290:24 291:2,4,10, 13,16,18,21 292:5,23,25 293:1,17 294:7,11,13, 14,23,25 295:4,9 296:22 297:6,8,13 298:4,10,11, 21 299:6,14, 24 300:21,24 301:2,9 303:8 313:21 316:4 320:25 321:9,14,19, 22 325:8,10 327:14,18, 23,25 328:21,22,24 330:3,12 332:1,21,22, 24 333:1,19 334:8,11,17 335:23,25 336:1,4,10, 17,22,24 337:1,5,10, 12,19,21,22 339:9,16,17 340:11,18,19 341:3,7 342:6,7,10 343:8,11,12 344:2,5,17, 18,22 346:8 347:15,16 348:11,18, 22,23 349:8 353:15,18,21 354:7,11 355:16,21,25 356:2,9,14, 16,17,22 357:23 358:21,24 359:8,9,20, 25 360:12,20 361:2,15,24 368:16,19 369:3,11,16, 22 370:3,5, 12,13,21 371:2,10 372:8,11,16, 18,19,22 373:2,4,8, 11,13,25 374:4,6,8 375:16,20,21 377:4 378:15 379:6,9,15, 16,20 385:21

**study's** 171:5

**stuff** 366:18

**subanalysis** 147:10

**subcohort** 148:11

**subject** 41:14 263:18 338:16

**subjected** 252:16

**subjects** 148:2 212:23 268:19 313:8

**submitted** 21:6 35:11 36:13

**subset** 147:7

**subsites** 49:23 51:14, 20,24 52:11

**substantial** 345:25

**sufficient** 83:1,7 151:22 153:8,15 378:18

**suggested** 62:5 68:22 253:6 258:16 299:1

**suggesting** 168:18 217:17 288:24 306:19 355:24,25

**suggestive** 60:17 332:10,12

**suggests** 60:17 68:25 77:22 270:5

**suit** 8:23 97:23

**Suite** 4:3,18

**summaries** 174:4,5

**summarization** 78:15

**summarize**
42:6
**summarized**
62:3 180:4 181:6 290:13 331:7
**summarizing**
108:1 140:5
**summary**
58:1 60:11 78:10 81:5, 14 94:17 101:2 130:15 161:3,15 165:10 180:18 181:7 239:12 241:22 247:17 327:7 332:18 333:7,17 334:6
**sun**
70:8
**super**
9:13
**supplemental**
33:3 189:1,2
**supplements**
245:22
**support**
7:12,17 34:7,12,13 35:2,18 37:12 38:1 58:19 62:19 127:12 254:11,21 256:14 257:18 378:19
**supported**
58:10 76:9 125:7 379:16
**supporting**
266:4 286:17 379:15
**supports**
326:11
**supposed**
133:3 166:7
**sure**
11:6 13:9 20:18,22,24 21:18,20 38:15 49:6 50:16 92:15 100:12 110:2,4 173:8,11 192:15,24 222:3 226:8 238:15 241:20 247:8 260:14 271:5,21 276:12 278:19 303:23 320:12 337:4 342:13 363:9 378:1 386:7
**surgery**
175:13
**surprise**
322:22
**surprised**
18:2
**survive**
106:11
**susceptible**
75:1 317:5 338:22
**swear**
8:11
**sworn**
8:14
**symptoms**
225:10 226:2,9
**synthesis**
28:25 29:19 127:6,11 128:3 228:4 264:24
**synthesize**
29:25 264:25
**synthesized**
124:19 283:11
**system**
176:13 284:15
**systematic**
42:13,21 43:3 205:14 257:21 269:1
**Systemic**
42:17

**T**

**table**
78:5,6,8,12 106:12 144:15 146:10 160:11 161:5 164:11 167:7 185:13,21 186:2 189:2 190:4 223:4, 21 224:3,9 236:8,12 241:23 299:19 314:11 349:3,13
**tables**
15:8 189:1 220:17,23 299:24
**tablet**
357:12
**take**
6:22 13:1 17:8 48:4 55:21,22 59:7,17 81:16 93:22 94:22,25 95:20 106:4 107:6 111:4 115:11 129:6 139:19 150:20 174:19 185:8 213:16,25 214:3 215:14 219:7 224:17 228:19,24 229:4,8,13, 16 233:3 236:11 247:6 249:3 261:23 275:3 282:12 299:17 300:17,18 302:16 324:13 328:15 342:22 350:21 384:23 386:22
**taken**
7:3 96:1 151:6 191:1 229:21 249:10 250:21 265:17 292:14 296:15 302:22 341:20 380:13
**takes**
228:6,10
**taking**
103:2 178:17 181:16 183:2 191:8 227:20 242:11 243:7 266:7 295:16,19 296:23 298:11 304:7 310:22

348:19 349:9 364:18 365:6
**talk**
11:14 33:23 40:3 65:14 115:16 116:23 139:23 143:3 151:2,15 161:17 174:7 200:12,13 216:1 269:22 279:14 326:19 345:16
**talked**
365:14
**talking**
34:6 37:1 72:25 95:14, 15 97:12 115:5,6,8 124:11 146:7 157:14,15 166:12 170:8,10 187:3,13 198:15 234:4 235:25 240:9,10 241:6 282:23 306:2,3 342:11 359:7,8 366:9 371:22,23,25 373:12
**talks**
63:17 88:23 116:11 200:8 326:25
**Tan**
333:24
**task**
99:19,20,22 100:1,3,4,6, 21,23 102:11,12, 14,16 107:13 116:12,22,23 123:7
**taught**
30:25 31:1 36:23 203:24
**tea**
75:7,11
**teach**
23:10 31:8 61:5 85:16 108:4 110:15 124:5 154:6 162:4 169:6 203:2 326:7
**teaching**
35:14 102:22 122:16 136:23 221:1
**technical**
249:25 250:3
**technician**
4:21 7:11 121:7 128:12 135:19 143:7,9,12
**techniques**
24:4 196:2
**tell**
12:17 38:24 41:19 62:21 66:11,16 99:20 100:1 177:19 208:10 225:18,20 226:13 237:13 246:10 286:1 296:21 298:9 321:17 324:6 338:12 344:4,21 348:3,10,17 349:8 356:21 357:22 358:20 359:18,23,25 362:1 365:24 372:18
**temporal**
360:14
**temporality**
84:8,17
**temporarily**
86:15
**ten**
24:24 31:23, 24 134:19 140:1,12,23, 24 141:14,24 142:13 147:1,9,22, 23 148:2,5, 8,12,13,16 157:1 159:10 179:6 180:8 182:17,21 183:2 215:12 237:11 244:14,19,22 245:2 246:8 247:4 290:9, 14,17 298:15 300:11 336:9 343:15 345:25 348:1,11 349:18,19, 22,24,25 350:5,9,13, 14,15,20 354:14 358:25 359:4,5,6 360:6,7,21 361:2,3,11, 12,16,17,20, 21,23,25 362:2 366:3, 6,8 367:17
**ten-day**
246:9 344:24
**ten-minute**
95:21
**tend**
77:20
**tens**
180:15 230:21
**term**
99:14 103:10 106:8,18 107:18 108:16 118:9 119:11,21 124:12 183:16 196:5 225:3 230:18 231:9 232:4 237:4
**terminology**
231:16,22,24
**terms**
23:12 30:20 37:11 50:12, 14 87:3 108:2 109:3 132:8 159:7 187:24 206:9 221:1 225:18 227:11 230:20
**Terry**
5:3 7:2 8:19 9:23 14:10 85:1 88:19 96:7 97:17 98:22 100:17 104:12 121:25 122:8 132:19 145:14 151:14 158:5 168:21 173:7 177:7 189:25 191:7 194:13 197:14 199:17 204:9 211:9 217:16 221:13 227:12 229:20

235:19
239:11
241:13
243:16
247:10
249:15,18
251:1 255:25
256:25
273:11
277:15
290:24
294:7,10
296:21
300:22 303:2
316:16
317:10 318:9
328:18 337:3
339:7,21
341:25
343:24
346:10
353:13 357:2
358:8 374:25
375:11
377:15
378:21
380:23
381:8,17
382:10
383:4,16,18
387:2

**Terry's**
5:23 178:18

**tertiles**
315:17
316:22,25

**test**
91:17 114:8

**tested**
204:12
270:16

**testified**
8:15 10:4,6
242:25 354:3

**testify**
192:7 205:3
209:24
228:23

353:24,25

**testifying**
191:17 193:2

**testimony**
8:4 11:1
107:22 126:4
156:16
171:15,17,19
172:7 173:6
175:23 181:2
183:24
216:16
237:17,22
242:3,5,13
243:3 262:4
263:21,23
264:21
265:15
267:17,19
270:19
275:21,25
276:2,3,17
278:4 290:12
293:12 318:6
324:21 363:8
367:20
382:1,4

**testing**
46:19 101:9
109:21 111:2
117:22 120:6

**tests**
306:8

**Texas**
4:4

**text**
14:25 15:1
17:1,16
18:20 19:11
20:8,10,21,
23 123:9,12

**thank**
12:9 14:1
98:1 143:8,
16 145:12
192:1 381:1,
3,8 383:15
387:1,2,5

**thanks**
381:5

**thee**
171:24

**theoretically**
80:14 204:22

**therapeutic**
225:4,6,15,
19 231:10,16
232:5,14,17

**therapy**
156:24
225:10
229:2,10
230:3 232:22
245:20

**thereof**
114:15

**thing**
22:11 43:1
54:9 55:2
90:15 91:18
92:25 122:17
131:16
134:21 146:6
150:14
226:12
258:10 284:1

**things**
25:23 35:18
36:24 39:23
53:16 56:1,
23 61:4,9
78:1,23
79:4,20 81:2
84:3 86:12
88:23 101:13
111:5 120:22
124:14
126:13
130:23
132:5,6
162:5 167:14
169:1,3
170:25 173:2
179:11
206:11 210:7
224:23

280:23 282:2
284:24
305:15,21
306:11
317:4,12
358:17 376:9

**think**
13:7 29:4
30:18 34:2
36:1 38:9
63:1 64:12
82:4,8 85:10
91:4 92:8
96:23
107:16,20
110:6 113:18
115:7 116:18
117:12
119:24
120:1,5
122:11,25
132:2
133:12,14
138:13 141:3
145:1 146:4,
7 154:9
165:17
167:20 172:3
175:11
179:7,15
180:8,9
182:4 199:16
213:15
227:3,23
232:15
246:12,14
249:22
251:11
261:15
287:2,4
295:7 310:7
311:22 314:9
328:12
337:24
342:15
343:24
348:15 349:6
352:16 354:3
361:1 366:11

377:21 378:8 381:24 385:8,14 386:19
**thinking**
12:14 137:16 206:9 261:1 269:12 284:6 285:20 373:5
**thinks**
117:18
**third**
104:16 113:5 151:18 152:7,10,16 153:10 185:21 268:22
**thorough**
153:20 257:4 326:18
**thoroughly**
67:4
**thought**
29:6 44:6,10 119:17 121:9 167:21 172:2 260:17,25 261:21 276:9 378:9 382:7
**thoughts**
69:24
**thousand**
351:23
**thousands**
125:16 210:21 359:9
**three**
25:12 54:15 59:9 78:23 90:19 121:23 130:12 159:23 247:16 248:19 273:24 313:17 314:22,24
316:25 319:3 322:24 327:21 330:18
**three-fold**
54:8
**threshold**
111:25
**throw**
136:23,24 175:19,25
**thrust**
124:22
**Tiernan**
97:7
**time**
7:6,15 10:20 11:17 31:6 35:21,24 36:12 42:20 55:12 59:25 60:3 61:1,6 62:21 63:6, 17 66:12,16 69:23 70:12 81:7,21 84:13 87:1, 12 95:23,24 96:3,4 101:10 106:7 109:3 122:18 124:6,18 138:16 142:8,17 147:5 151:4, 8,9 154:7 155:3 156:8 158:9,16,22 159:7,10,12 160:6 175:18 179:8,11 182:13 184:3 188:20,23 189:4,11 190:23,24 191:3,4 218:6 222:15 228:5,10
229:8,13 230:24 236:5,7 238:15 239:22 246:17 249:3,7,8, 12,13 250:17,23,24 268:20 281:13 282:4,6 287:6,15 302:19,20, 24,25 316:8 317:17 341:18,22,23 352:21 368:10 369:9 374:1,15 380:10,11, 15,16,25 381:2,9 387:2,7,8,9
**times**
86:10 133:2 138:7 154:20 158:11 161:24 192:22 286:20 338:9 384:18
**title**
78:12 321:21 373:11
**tobacco**
55:24 56:2, 6,18 89:5
**today**
7:5 9:2 11:2 61:20 89:17 97:7 121:17 141:12 191:9,17 192:7 193:2, 11,21 215:8, 10 228:16 251:5
263:21,23 321:12,16 327:8 365:14 381:9 382:16
**told**
133:2 234:8
**Tom**
13:15 20:5 97:1,20 132:23,24 234:8 337:7 338:2 381:12
**tonight**
317:16
**tool**
92:16
**tools**
92:12
**top**
25:16 48:6 82:24 107:15 134:3,9,14 135:8 143:20 145:20 160:16 213:2 221:16 262:8 302:13 306:5 307:7 312:1, 17
**topic**
40:18 59:4 98:3 123:17
**topics**
30:25 31:7 43:9
**totality**
155:22 226:14 262:10 265:1 279:3
**totally**
93:1 94:8 108:3 173:21 183:17
**tough**
233:24

**toxic**
71:24
**toxicologist**
207:5,6
**Toxicology**
200:17 256:1
**track**
179:14
311:17
**tract**
307:16,23
312:8
**Tracy**
191:8 197:7,
17 199:25
200:23
233:10 234:2
235:12
240:15,21
247:1 250:2,
5 259:24
261:4,17
300:9 313:22
316:13
317:22
319:18
368:23
380:17
381:5,9
**traditional**
52:13 53:19
55:8 351:18
**trailed**
239:2
**train**
23:10 40:15
**trained**
31:9,10
40:20 110:15
268:9
**training**
27:15,21,24
31:4,11
35:15 40:7
**Tran**
333:7
**transcript**
5:19 83:2
88:22
**transparency**
33:4
**transparent**
33:11,19
222:22 340:2
**transportability**
211:11,20
**transportable**
23:25
**treated**
149:3 294:16
**treatment**
148:20
175:7,18
232:15,17
**trends**
42:6 200:14
**trial**
89:15 157:4
204:7 211:22
213:14
214:22
266:12,16,21
**trials**
76:15
208:24,25
227:4,6
266:14 267:9
**trouble**
128:10
189:18
**true**
58:17 60:5
61:4,19
70:11,14,25
92:1,21,25
114:9 116:12
147:21
149:22,23
172:24 173:4
185:5 189:6,
14 244:12
247:10 286:5
292:10 301:8
318:9
**truth**
136:25 172:5
**truthfully**
192:7
**try**
11:14,18
12:17,25
33:22
192:10,13
234:18
250:10
316:13 342:3
369:9 371:3,
15
**trying**
20:6 85:9
118:17
124:18
130:16
137:24
144:23
145:17 166:5
213:14
250:8,9
289:6 311:23
339:23
357:16,18
**Tuesday**
7:5
**tumor**
61:1 198:6,
16
**tumors**
49:22 51:14,
23 72:3,25
73:1 154:25
159:11
196:14,24
199:1
307:15,22
**turn**
9:9 150:8
216:7 274:15
304:23 307:5
340:5
**twice**
159:22
**two**
17:23 19:7
22:10 24:23
25:23 29:14
34:18 37:12
38:2 53:15
54:6 59:9,16
74:15 78:23
88:4 90:18
94:18,24
108:24 109:1
130:12 133:6
136:21
145:8,18
173:2 184:25
186:15
187:18
214:18
223:8,25
257:15
262:14,20
263:12
265:14
273:22 282:2
293:21 294:3
297:12
300:14
320:2,16
331:24
338:15
339:19
351:23
356:20 360:2
385:7
**two-way**
249:21
270:18 308:6
311:3,4
**type**
10:13 19:16
26:16 55:13
125:3,4
129:18 193:4
195:20
196:11 251:7
305:19 366:2

371:1,13
**types**
22:16 24:1, 6,22 26:7, 18,23 27:1 40:23 111:10,15 130:19 133:20 136:14 194:23 258:6 263:12 264:17 266:3 276:15 310:17 343:13 362:25 372:1,13
**typical**
32:21 138:23 231:19 247:24 292:3 312:23 313:9
**typically**
18:17 130:21 131:13 265:7 274:15 281:12 284:3,7 292:11

**U**

**U.S.**
297:14,16
**uh-huh**
16:23 23:2 28:7 45:20
**UK**
154:8 291:20,21 333:8 358:14
**ulcer**
79:11 228:18 232:15
**unable**
205:6
**undercount**
94:4
**undercounted**
286:10
**undercounting**
94:6,14 285:24
**underestimate**
269:4
**undergraduate**
31:2
**underlying**
163:8 164:3, 17,22 167:24 172:25 225:11 226:9 227:17 274:8 349:14
**underreported**
50:20 288:9
**understand**
11:1,4,16 12:12,16 26:12 27:17 29:5 30:3,7, 22 32:5,7,11 33:16 39:4, 22 47:13 51:17 52:25 69:13 87:2 93:15 109:4 113:1,3 118:17 124:18 135:20 137:24 174:14,16 191:14,16, 20,25 193:24 195:18 207:16 213:14 214:23 227:12,15,18 230:8 251:10,16 252:10 271:5 273:24 275:6
317:12 318:18 325:21 364:6 371:12 375:18
**understanding**
27:15,25 30:23 31:5, 15 34:25 39:21 65:6 70:16 72:16 76:7 110:5 175:10,17 189:10 205:10 207:1,3 210:19 213:21 214:16,21 215:3 216:15 222:8 228:22 229:12 254:20 258:19 259:12 301:23 363:16 370:18
**understands**
110:7
**understood**
12:21 20:12 72:18 89:4 192:3 252:6 258:18
**undertake**
214:6 256:25 257:8 258:23
**undertaken**
218:15 266:11 366:1
**undertook**
217:8,9 257:4 260:7
**unheeded**
115:21
**unique**
189:7
**unit**
26:8 179:13 180:7
**units**
180:4,6 181:6
**universe**
37:14 276:25
**University**
82:5 85:6 97:14
**unlike**
134:25
**unplug**
314:14
**unplugging**
314:17
**unstable**
192:22 233:21
**untimely**
198:8
**update**
67:7 384:21
**updated**
5:22 67:7 384:14 386:2,15
**uploaded**
303:25
**upper**
6:24 311:17 312:7
**upwards**
298:15 354:14
**urinary**
212:10 213:15 214:4
**urine**
86:20 87:1
**Uruguay**
74:9,16 335:24 338:15
**users**
236:21 237:2

297:11,12,13 334:10 345:21,24 346:12,15,16 347:1,18 349:4,5 354:15
**UTC**
7:6 95:24 96:3 151:8 190:23 191:3 249:7,12 250:18,23 302:19,24 341:18,23 380:11,16 387:8

## V

**vague**
33:13 46:22 47:4 67:23 76:2 93:12 110:11 120:4 141:22 142:9 203:15 204:19 207:19 209:11 220:4 225:16,23 228:7 229:5, 18,23 246:5 247:23 252:9,19 253:4,19 254:7,25 255:6,19 268:7 271:3 272:1,9 273:18 277:2 280:4,15 281:22 282:7 283:7,18 286:25 295:24 300:25 302:3,12 329:15 331:19 332:17 333:15 334:5 342:9 343:10 358:23 365:22
**valid**
29:4 61:10 92:14,16 94:15 95:8 120:9 126:8, 20 127:12 158:13 181:7 183:17 184:6 190:8 238:16 242:18 246:21 269:20 270:9 271:10,22 272:13 274:18 276:22 286:11 287:8,10 297:19 346:8 367:14,25 370:16 375:16 379:22,24 384:7
**validate**
86:18
**validity**
30:24
**validly**
169:4 183:16
**valsartan**
248:20,24
**valuable**
359:24
**valuating**
272:2
**variability**
101:21 108:15 109:4 110:22 113:20 118:4 120:21 124:4 125:24 132:13 149:25 150:2 269:12 273:25
**variable**
252:15 253:2,7
**variables**
268:22
**variance**
52:22 101:21
**variants**
106:9 109:3
**variation**
239:21
**varied**
235:25
**varies**
175:11 227:19
**variety**
44:11 224:17
**various**
27:7 53:10 194:20 307:13,21 349:3
**vary**
236:20
**varying**
31:7
**Vecchia**
216:14,17,23 217:5 311:16 315:6
**vegetables**
57:8,18 61:8 208:23 209:6
**verbally**
8:3
**verbiage**
63:8
**verify**
141:17 244:24 376:24
**version**
20:17
**versus**
49:14 50:11 52:23 90:1 93:18 136:7 142:12 145:16 187:1 212:11 214:8,25 215:5 289:20 327:14 347:25 348:1 371:24
**vessels**
307:17,24
**Veterans**
294:17
**video**
6:13,15,20, 22 7:11 95:23 151:1
**video-recorded**
7:1
**VIDEOGRAPHER**
4:20 6:1 14:16 95:22 96:2 121:1, 12,15 122:5 151:3,7 178:9 190:22 191:2 234:10 249:6,11 250:17,22 302:18,23 303:24 314:3 341:17,21 342:21 368:11 380:9,14 387:6
**view**
6:16,24 269:2
**viewer**
221:12

**vinyl**
89:6
**virtual**
197:1,6,10
**visually**
134:7 136:13 145:17
**vitae**
15:15 22:25 23:4 28:17 35:3,9,13,19 36:6,12,19 38:2
**vitamin**
59:21,25 61:8,22 68:11,14,24 69:6 73:20 87:3 210:3
**vitro**
266:2
**voice**
9:19
**volume**
9:10
**volunteers**
215:11 291:21

**W**

**wait**
97:10 163:13
**waiting**
14:7 31:6 41:17 303:21 304:6
**waive**
8:7
**walk**
131:6
**walking**
37:1
**wanna**
160:20 314:14
**want**
6:21 9:9 12:1,4 21:10 32:9 36:5 50:15 61:21 65:10,11,19 69:5,6 83:17 94:11 96:24 103:4,12 112:20 121:21 127:14 134:21 135:22 136:18 138:2 139:21 140:20 149:7 158:1 162:15 163:24 164:23 170:22 177:19 192:23 197:11,24 234:10 235:11 236:11 239:11 243:4 245:24 249:3 260:13 265:11 268:15 271:18,21 288:14 292:6 310:23 313:25 317:13,15,19 319:23 321:8 322:17 323:6 330:15,16 333:6 335:4 338:11 340:5 355:21 371:10,11,12 373:21 377:23 384:10 385:15 386:7
**wanted**
38:11 58:18 68:23 98:8 118:21 131:4 174:16,24 215:4 256:8 339:24 342:5
**wanting**
89:13 158:15
**warnings**
115:20
**Washington**
97:15
**Wasserstein**
104:6,19 105:10 115:18 116:6,25 123:12
**watch**
82:18
**watched**
82:21
**watching**
84:20 288:13
**water**
31:22
**wave**
260:14
**way**
18:11 43:22 63:24 80:11, 24 83:21 94:16,20 106:13 109:12,14 112:9,14 120:2 124:19 130:4,7,10 135:18 136:2 140:6 150:7 167:16,19 169:9 170:24 172:19 173:18 175:6 179:8,19 183:17 197:11 202:14 225:8 231:19 287:12 295:9 306:14 323:3 325:3 337:17 345:3 347:14 350:1 354:11 371:18 386:13
**ways**
76:16 83:10 171:22 226:1
**WCRF**
70:25 71:7
**weak**
50:4,25 77:21 90:10 125:7,12 126:1
**weaker**
50:5
**week**
86:2 292:12
**weeks**
291:13 292:3,8,20 293:9,15
**weigh**
221:20
**weighed**
67:17
**weight**
32:7 80:4,12 222:15
**weighting**
32:3,17 33:4,11,12
**Weinberg**
366:12
**well-balanced**
223:25
**well-done**
360:12
**well-known**
89:4

**well-respected** 64:19
**well-understood** 59:2
**went** 17:9 36:9 150:9 274:25 376:1 380:21
**whatsoever** 136:16 209:19 238:20 242:19 243:15 270:6 281:6 282:3 286:17 296:9 331:12 336:11 376:13 379:17
**who've** 67:16
**wide** 49:5,6
**widespread** 115:22
**width** 137:21
**window** 42:20 236:6 239:21 241:18 242:6,9,13 243:5,9 281:9,12,18 289:10 299:7,11,21
**windows** 237:24 239:16
**wine** 52:6
**withdraw** 218:22 369:1,8
**witness** 5:3 6:14,16, 20 8:3,11,13 9:11 10:1,8 34:1 54:2 77:6,11 100:10 104:13 110:1 122:11 128:11 140:17 143:24 146:19 163:16 168:17 177:8,13,23 178:14 187:15 197:15 208:8 231:3 234:15 259:21 283:6 295:23 316:14 318:4 329:14 337:8,17 343:2 357:3 374:24 381:3 387:5
**witness'** 6:22
**witness's** 166:24
**witness-only** 6:13
**Witte** 121:5
**women** 85:23
**women's** 87:15,23
**won** 105:14
**wondering** 21:17 22:21
**Wong-ho** 46:3 236:2 374:4
**word** 32:20,22 46:16 59:19 73:15 224:8 232:18 233:16 259:25 265:7
**words** 32:23,24 106:12 112:21 145:8 231:11,12,14
**work** 22:24 23:1 24:9 33:10 34:15 39:20 63:25 65:7, 22 96:13 105:14 154:7 166:8 198:5, 9 199:3 200:11 206:23,24 218:14 219:15 271:14 310:14,18,25 322:19 367:7
**worked** 18:10 24:21 26:7 200:9 203:19 367:9
**worker** 16:12,18
**workers** 369:17
**working** 199:21,22 200:2 201:8 215:20 216:2,12,18, 24 217:3,7, 17 218:14,18 271:18 324:7 370:22 385:21
**workings** 65:25
**works** 14:3 23:13 36:21 94:16 95:19 323:4
**world** 60:8,12 61:20 62:2, 22 63:13,18, 20,24 64:7 66:2,12 67:19 68:5 104:7 222:14 227:1 243:12 350:24 351:5,15 352:14 377:12 382:23 383:10 384:5
**worst** 136:24
**would've** 16:5 22:4 29:20 33:17 46:24 64:4,5 74:1 103:19 139:13 148:12 155:19 165:17 182:2 198:16 351:25 352:1,22,24 353:1 371:14
**write** 56:18 57:20 151:24
**writer** 17:25
**writing** 54:7 169:12 352:21
**written** 107:3 112:9 117:14 138:7
**wrong** 23:13 45:12 97:1 106:24

146:10
353:25
**wrote**
20:23 22:19
41:9 44:14,
15,23,24
56:22 57:3,
21 59:20
60:2,4,22,25
70:12 71:17,
23 72:5,20
73:12,25
75:16,17
99:5,8,10,
16,17 151:23
170:5 213:3

**X**

**X------------------**
5:2
**Xbox**
234:9

**Y**

**YD**
331:24
**yeah**
10:17,25
11:22 16:20,
24 17:13,19
20:4 24:23
25:7,16
26:12 28:12
32:4 35:16
36:15 38:9
39:22 43:7
45:10 47:15
54:16 58:3
62:20 63:3
74:25 81:24
82:9 84:25
85:5 91:23
92:7 95:18
96:18,21
98:10 100:9,
18 101:4
102:24
104:13,14
105:16
116:20 118:5
119:17
122:3,9
129:25 137:5
138:9 140:18
141:23 143:5
144:2,22
145:4
146:11,25
147:18,25
160:13,15
161:7 166:8
172:8 174:23
177:13
178:15
179:22 180:2
183:9 186:5,
14,20 187:1
189:14
190:17
193:13
197:15 198:4
200:10
201:14 202:5
204:21 216:5
223:17
227:23
233:24
235:6,18
237:12,22
247:5 251:11
255:1 260:24
281:23 295:4
297:1 311:25
314:12
319:25 335:1
343:3 374:1
**year**
86:3 158:20
182:14
198:10,11,
13,17 200:9
230:10,16
291:7 312:24
372:19
**years**
10:18 31:1
35:15 42:23
60:11,23,25
74:21 76:20
81:6 86:8
101:18
102:23 105:4
107:25
108:13
123:18,19
125:15
140:23
141:14,24
144:11
147:1,9,22,
23 148:3,5,
8,13,16
151:21
152:17
153:7,11
154:9,14
155:6 156:3,
13 157:1
159:10,20,21
182:2,3,18
189:12 206:5
208:11,21
210:20
220:11
236:22
237:9,10,12,
19 238:6
239:6 240:7,
13 241:10
242:2 243:1,
7,19 244:1
245:4,8
247:16,19
282:13 286:3
287:12
295:13,17,19
298:15
301:4,5
313:10
321:23 347:9
351:9 353:12
354:14,15
359:6 360:7,
21 361:3,12
**yell**
133:1
**yelled**
132:24
**yielded**
73:9 338:18
**Yoon**
133:25
135:13,14,
16,23,24
136:1 137:20
151:15,18
152:2 155:25
157:15
158:18
161:1,12,16
163:3,17,19,
25 164:19
165:9 168:14
171:13
172:1,24
237:10
290:21
291:4,6,7
331:2
**Yoon's**
135:16
**York**
201:1

**Z**

**Zantac**
7:7 229:21
230:1,23
**zero**
180:13,17
**zoom**
14:11 41:18
122:12
143:24
193:18
197:20 309:7
311:8
**zoomed**
217:13

# EXHIBIT 41

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBURG
MAGISTRATE JUDGE BRUCE E. Reinhart

/

REMOTE VIDEO RECORDED DEPOSITION OF
MICHAEL VAEZI, M.D., Ph.D.
(Pages 1 - 312)
Thursday, May 12, 2022
10:15 a.m. - 7:47 p.m.
U.S. Legal Support

(Held Remotely)

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

APPEARANCES

On Behalf of the Plaintiffs:

ANAPOL WEISS

One Logan Square
130 North 18th Street
Suite 1600
Philadelphia, Pennsylvania 19103
(215) 735-1130
tfinken@anapolweiss.com
cmcdonough@anapolweiss.com
BY: TRACY A. FINKEN, ESQ. (Via Zoom)
CATELYN McDONOUGH, ESQ.

On Behalf of Defendants:

KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
ecaanan@kslaw.com
BY: EVA CANAAN, ESQ. (Via Zoom)

GREENBURG TRAURIG, LLP

Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-4769
browning@gtlaw.com
BY: JAMES R. BROWNING, ESQ. (Via Zoom)

PIETRAGALLO, GORDON, ALFANO, BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-4383
jmr@pietragallo.com
BY: JASON M. REEFER, ESQ. (Via Zoom)

APPEARANCES (Cont'd)

DLA PIPER, LLP (US)

33 Arch Street
26th Floor
Boston, Massachusetts 02110-1447
(617) 406-6000
katie.insogna@dlapiper.com
BY: KATIE INSOGNA, ESQ. (Via Zoom)

SHOOK, HARDY & BACON, L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
jsh@shb.com
BY: JENNIFER STONECIPHER HILL, ESQ. (Via Zoom)

ALSO PRESENT:

KRYSTAL KELLY, Law Clerk, Anapol Weiss

NICOLE COSTELLO, Scientific Specialist & Pharmacist
King & Spalding

STEVE DECANIO, Videographer, U.S. Legal Support

MICHAEL HOLLANDER, Tech Support, U.S. Legal Support

INDEX OF PROCEEDINGS


| Deposition of MICHAEL VAEZI, M.D., Ph.D. | PAGE |
|---|---|
| Direct Examination by Ms. Finken | 6 |
| Cross Examination by Ms. Caanan | 301 |
| Certificate of Oath | 308 |
| Certificate of Reporter | 309 |
| Witness Notification Letter | 310 |
| Errata Sheet | 311 |


EXHIBITS


| Number | Description | Page |
|---|---|---|
| 6282 | Notice of Deposition | 10 |
| 6283 | Expert Report | 16 |
| 6284 | Curriculum Vitae | 23 |
| 6285 | Materials Considered List *** NOT MARKED ON RECORD **** | |
| 6286 | AGA Clinical Practice Update | 269 |
| 6288 | AGA Clinical Practice Conference Participants | 270 |
| 6324 | AGA Clinical Practice Update | 284 |
| 6292 | McDowell Study | 291 |
| 6299 | Invoices | 24 |
| 6302 | Cardwell Study | 298 |
| 6304 | Adami Study | 293 |
| 6305 | Kantor Study | 294 |
| 6306 | Kim S Study | 294 |
| 6307 | Kim Y Study | 295 |
| 6308 | Tan Study | 296 |

EXHIBITS (Cont'd)

| Number | Description | Page |
|---|---|---|
| 6309 | Tran Study | 296 |
| 6310 | Habel Study | 297 |
| 6311 | Chow Study | 297 |
| 6312 | Liu Study | 298 |
| 6313 | Yoon Study | 298 |
| 6314 | Kumar Study | 299 |
| 6315 | Mohy-ud-din Study | 299 |
| 6316 | Norgaard Study | 300 |
| 6317 | Iwagami Study | 301 |

Deposition taken before Deanne M. Moore, RMR, CRR, FPR, FPR-C and Notary Public in and for the State of Florida at Large in the above cause.

\- - - - -

THE VIDEOGRAPHER: Okay. Please stand by.

We are now on the record for the remote video deposition of Dr. Michael Vaezi. The time is 10:15 a.m. on Thursday May 12th, 2022, In Re: Zantac Ranitidine Products Liability Litigation.

The court reporter is Deanne Moore. The photograph- -- the videographer is Steve Decanio, and both are representatives of U.S. Legal Support.

Court reporter will swear in the witness so we may begin.

THE COURT REPORTER: Doctor, if you'd raise your right hand for me, please.

THE COURT REPORTER: Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

WHEREUPON,

MICHAEL ZAEZI, M.D., Ph.D.,

having been sworn to tell the truth and testified upon his oath as follows:

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

DIRECT EXAMINATION

BY MS. FINKEN:

Q Good morning, Doctor. My name is Tracy Finken. I'm going to be taking your deposition today. Can you state your name for the record?

A Michael Vaezi.

Q Okay. So now I know how to pronounce it correctly. Dr. Vaezi. Got it.

So, Dr. Vaezi, have you had your deposition taken before?

A I have. I have had two prior depositions. I think I outlined that in my report at the bottom, I think. I've had a product liability and -- and another one, yes.

Q Okay. And have you had a deposition taken by Zoom before?

A I have. Actually the -- the second one was Zoom, yes.

Q Okay.

A The first one was in person. That was preCOVID.

Q So there are some unique challenges with taking a deposition by Zoom with technology and things of that

nature. So if at any time during the course of the deposition you can't hear me or my Internet is unstable or your Internet is unstable, just let us know so that we can go off the record and make sure we correct it and everybody can hear and take down what we're saying appropriately. Okay?

A Sounds great.

Q Okay. And where are you located today?

A I am currently in Nashville, Tennessee, and in my office, at Vanderbilt University Medical Center.

Q Okay. And you're appearing on behalf of the manufacturer defendants in this case, correct?

A I don't know what you mean by "on behalf," but if you mean I'm an expert providing an expert opinion on this matter, I am.

Q Okay. And which manufacturer defendants are you testifying on behalf of?

A I don't have a list of all of them, but I know there's GSK and Sanofi and others. I'm not quite sure of all the names.

Q Okay. And are you represented by counsel today?

A I am.

Q And who is your counsel?

A Eva Canaan.

Q Is there anyone in the room with you today?
A No.
Q Okay. And do you have anything in front of you for your deposition, notes or --
A I have a blank piece of paper to -- that's my habit to write on in case I miss something when asked. And then I have my report which is -- I have it electronically, and I also have electronically my -- the papers that I've written.
Q Do you have access to email or text messaging at all?
A My phone is not off, but it is in silent. I have minimized my email. In fact, I just -- thank you for reminding me -- I quit my email. Every now and then it makes a noise when it comes on, so the answer is no.
Q Okay. And will you agree with me that during the course of the deposition, you won't communicate with anyone while we're on the record?
A Yes, absolutely.
Q Okay. And that includes your counsel or anybody else, okay?
A Yes.
Q And that would also include all manner of communication, including text message or email, okay?
A Yes.

(Exhibit 6282 was marked for identification.)

BY MS. FINKEN:

Q Okay. Let's pull up what we've previously marked as Exhibit 6282.

Okay. And, Dr. Vaezi, this is your notice of deposition that we served in this case.

Have you seen this document before?

A Yes.

Q Okay. And did you review it before your deposition today?

A At some point. I don't recall when, but at some point in the past, yes.

Q Okay. And if you can turn to page 4, and there's a list of documents that are requested.

Did you undertake a search of your files and produce any documents that are responsive to these requests?

A Again, the only documents that I have are my PDF files that are electronic and my report, the -- the report that I believe was turned in to you. I have nothing else.

Q Okay. And you -- just to go through this very quickly, you served a copy of your curriculum vitae with your expert report, correct?

A Yes, that's correct.

Q Okay. And is that your most recent copy of your curriculum vitae?

A It was the most recent when I turned it in. I forget exactly when it was, but there may be an additional publication and/or presentations or two, but I would say that was most recent when I submitted it, yes.

Q Okay. And I understand that you produced some invoices in advance of your deposition.

Did you take -- do you have any notes that you prepared in relation to your evaluation of this -- of the case?

A Notes? I -- I don't mean -- I don't understand what you mean by "notes."

Q So when you were preparing your expert report in this case, did you take any notes as you were reviewing the literature and things of that nature?

A Well, typically what I do is I look at the PDF file. I'm more -- I used to be old fashioned, look at paper, but I converted finally to PDF, and I usually do that and then create my report. So that's how I did it.

Q Okay. So you don't have any handwritten notes or electronic notes that you took while you were reviewing the literature or anything like that; is that

fair?
A I don't have any handwritten notes. Electronically, I have my PDF, as I mentioned, that I -- but . . .
Q Okay. And do you make notes within the PDF document itself?
A I do not. I actually don't know how. Someone told me you can. I haven't gotten around learning how.
Q Okay. Just to go to the next page of this document, just quickly go through this list.
Other than the published medical literature and the documents that were provided to you by defendants that are included on your materials considered list, did you review any other material in preparing your expert report?
A Well --
MS. CANAAN: Objection, form.
A Yeah. I don't--- can you repeat that because there were a lot of questions I felt.
Q Sure.
A So can you be more clear or break it down for me? That would be great.
Q Sure. Well, let's -- let's -- I'll go through your materials considered list in a moment, but just going down this list, did you produce -- let me see.

Hold on a second.
Have you produced all documents identifying research grants that you've received involving the study of any ranitidine product?
A I -- study of ranitidine products.
Q Have you conducted any research studies involving ranitidine?
A I don't believe I have. It may have been in congregation with acid suppressive therapies. I don't believe I have.
Q Okay. If you --
A Not off my head. I can't recall that I have.
Q Okay. If any -- if you had conducted any research relating to any ranitidine or Zantac product, would that be contained or listed in your curriculum vitae?
A Again, my curriculum vitae was the most complete as of the date that I submitted it.
Q Okay. Have you conducted any research pertaining to any ranitidine products since you submitted your expert report and curriculum vitae in March of 2022?
A I have not.
MS. FINKEN: You can take that down.
BY MS. FINKEN:

Q Dr. Vaezi, who retained you in this case?
A That was a long time ago, I believe. Counsel reached out regarding my expertise in care of patients with reflux. I believe it was Ms. Eva Canaan.
Q Okay.
MS. CANAAN: And, Dr. Vaezi -- I'm sorry, Tracy.
I just want to put on the record that you should not disclose any communications that you have had with counsel, but it's okay to say that counsel retained you or who retained you.
THE WITNESS: Okay.
BY MS. FINKEN:
Q Okay. So is it your recollection that Ms. Canaan was the first person to reach out to you in relation to providing an expert opinion in this case?
A I believe so. Again, that was a while ago. I believe that was right. I can't recall specifically, but I believe that was right.
Q Do you -- do you know approximately when it was that Ms. Canaan reached out to you?
A Good question. It was a while ago. I have no idea.
Q Okay. Can you give me an estimate on the year that that would have been?

A That's a reach as well. I'm sorry, I -- I couldn't.

Q Do you know how Ms. Canaan got to you for purposes of providing an expert opinion?

A I'm going to assume, but I don't remember. Again, I don't specifically remember -- I'm going to assume it may have been through email. That would be my recollection, but, again, it was a while ago.

Q Had you ever spoken to Ms. Canaan before?

A I had not.

Q And had you ever prepared any type of expert opinion or expert report for Ms. Canaan's law firm, King & Spalding?

A I had not.

Q You had provided with your expert report your -- copy of your curriculum vitae, and there was also a list of the materials that you considered in preparation of your report.

Is it fair to say that all of the facts or the data or the materials that you considered or relied upon in forming your opinions are contained within those two documents: Your expert report and your materials considered list?

A Well, that was a long question, so if I remember everything you said right, I would say that my

report contains what I relied on, but it wasn't solely that because I also -- I may have looked up, as I often do -- on Internet, I do searches to make sure I haven't missed anything. And so that -- that may not specifically be there, but that's part of my usual practice of when I'm looking at evidence and trying to see the data.

Q Okay. And when you would look at the evidence and data to prepare your report, even if you didn't reference it in your report, did you keep a complete list of the documents that you reviewed and relied upon?

A I have not.

Q Doctor, let's mark your expert report as Exhibit 6283 to your deposition. Let me pull it up.

(Exhibit 6283 was marked for identification.)

BY MS. FINKEN:

Q And this is an electronic copy of your report. It looks like it's dated March 7, 2022. And is that your signature on the front page?

A Yes.

Q Okay. And I'd like to mark the materials considered list as Exhibit 6285 to your deposition. And let's pull that up.

(Exhibit 6285 was marked for identification.)

BY MS. FINKEN:

Q Doctor, you had provided this document as Exhibit D I-- Exhibit B, I'm sorry -- Exhibit B to your expert report. Did you prepare this materials considered list?

A What I have is within my report and they are referenced, and I believe these are the references from that. Again, I have to look at the whole thing to make sure. If you want me to go through and look, I believe they are the ones that are within my report.

Q Okay. But my question was did you prepare this list of materials considered, or is this something that would have been prepared by counsel?

A This was from my report. I believe it was created by counsel.

Q Okay. Did you review this materials considered list before your deposition today?

A Yeah, a while ago. Again, this was submitted -- I went through to make sure that there was nothing missed, and I matched to the report. And I don't recall anything that was inaccurate.

Q Okay. So just briefly just going through this materials considered list, it looks like on the first page here that you considered the expert reports of plaintiffs' experts. Do you see that? The very top of the page?

A Yes, yes, uh-huh.
Q And did you review all of these expert reports when preparing your -- your expert report?
A I -- I did not. I sort of -- I had the files. But to be honest with you, the ones I focused on were the ones that I responded to in my report, and that was Dr. McTiernan's, I believe, and Dr. Moorman. The rest I did not feel were relevant to what I was asked to do.
Q Okay. And there's some FDA documents listed next on this list. Did you -- did you consider all of these FDA documents in preparation of your report?
A I'm sorry, can you repeat that? Did I do what?
MS. CANAAN: Form.
BY MS. FINKEN:
Q Do you see the list of FDA documents that are here on your materials considered list?
A Yes, I do.
Q Okay. Did you review and consider all of those FDA documents in preparation of your report?
A I reviewed them, yes.
Q Okay. And it looks like that is followed by medical literature. Do you see that at the bottom of the page?
A Yes, I do.
Q Okay. And there's a listing of medical

literature.

MS. FINKEN: If you can scroll down and -- you can keep scrolling. I just want to get to the end of the medical literature. Okay. You can stop right there.

BY MS. FINKEN:

Q Dr. Vaezi, are these publications you would have pulled and reviewed on your own or are they publications that would have been provided by counsel?

A Combination of both. Counsel provided some documents. But, again to be fair, I wanted to make sure that nothing was missed, so that's what I meant originally when I said I did my own independent to make sure that nothing has been missed. So it's a -- it's a combination of both.

Q Okay. And if you look underneath at the bottom of that page, there's -- it's page 9 -- there's -- it lists some documents produced with some Bates numbers -- what we refer to as Bates numbers. Do you see those?

A I do.

Q Okay. And do you know what those Bates numbers pertain to?

A The numbers specifically?

Q Yeah. What documents are those?

A Again, I -- I just briefly looked at the GSK

ones, so I couldn't tell you what the numbers represent to be honest with you. But the "EMERY" I assume, again, I don't know what the numbers represent, was -- I assume that's the Emery Pharma original report to the FDA.

Q Okay. And do you know what the GSK documents are that you reviewed?

A I -- you would have to pull them up to remind me. This was a long time ago, I'm sorry.

Q Okay.

MS. FINKEN: So we can go to the next page, please.

BY MS. FINKEN:

Q Okay. And there are some additional documents listed by Bates number. Do you see the first two lines start with the word "MITCH." Do you know what those documents are that you reviewed in preparation of your expert report?

A I can't recall. I would have to pull it up and see. I'm sorry.

Q Okay. And what about the other three Bates numbers listed there, the first begins with "MSK," and the second two begin with "VAL-BI." Do you recall what those documents are?

A Again, we would have to pull them for me to remember. It was such a long time ago. I'm assuming

V-A-L is Valisure. I recall having briefly looked at that, but that's what I would assume. I don't know which is which to be honest with you.

Q Okay. And then there's some miscellaneous documents listed here. Are those documents that you would have pulled as part of your research, or are they documents provided by counsel?

A I would have to pull each one to see which I pulled. It was a combination. Like I said, all of these are a combination, so I can't recall which was which, but it was a combination of counsel as well as my reports, yeah.

Q Okay. Doctor, you had indicated that you had conducted some searches in -- in relation to preparation of your expert report.

How would you typically conduct those types of searches?

A Now that I've learned about Google, I use Google all the time, so I do Google searches. I do PubMed searches. I go into the PubMed within each of the articles and if there are references, so there are a variety of ways that I try to get information.

It depends on what information I'm looking for, so in this case, that would have been my typical approach.

Q Okay. And what specifically did you search for in this case?
A Well, it depends on what you mean "specifically," so if it relates to a topic matter that I was interested in, so if it was about FDA, I would have pulled FDA, and then I would have looked -- searched under that, see FDA report or FDA ranitidine, things of that sort.
So it's variable. It depends on what. So it's not just one thing. It would have been -- let's say I looked at an article and -- that highlighted certain things, then I would have gone and searched under the author they may have referenced to see that publication which they had referenced -- the original article had referenced.
So it all depends. There are a variety of things I would have probably done to try to look at an -- you know, an encompassing approach, if you will, of trying to find out what's going on and where the data might be.
Q Did you save any of the searches that you conducted in preparation of your expert report?
A I did not, I'm sorry.
Q Okay. Let's mark your CV as Exhibit 6284, to the report -- I mean to the deposition, sorry.

(Exhibit 6284 was marked for identification.)

BY MS. FINKEN:

Q Okay. Dr. Vaezi, this is the -- the curriculum vitae that was provided to us, and it accompanied your expert report in this case. And this would have been provided in early March of 2022.

Do you know whether or not you have updated your CV since that time?

A I have not. My typical update happens once a year. If you can imagine, I, you know, present a lot, publish a lot, do a lot of research, do a lot of education. I see a lot of patients, so I don't really have the time to do it on a regular basis.

My regular is usually once a year, so that probably is the most updated. Like I said, if there are things that I may have published and/or if there are presentations I may have had and/or educational opportunities I may have had, they may not be there because I usually update them once a year.

Q Okay. So is it your understanding or is it your belief that this version of your curriculum vitae is the most up-to-date, true and correct copy of your professional qualifications, credentials, publications and so forth?

A That is to the best of my ability at the time,

to what I recall, so my CV and curriculum vitae is always remembering what I did when, when I gave a lecture, publications.

Again going back to your original question, I usually go to PubMed, what all -- what all did I publish. I search under my name and try to come up to update my CV.

So is it as complete as it could be? It's the best I could do given the circumstances, so it's the best I have. Are there things that may be missing from it that I may have missed? I hope they're minimal, but if there are -- I know the book chapter section especially may be somewhat anemic because I don't keep track of book chapters that are published. It's hard to search those in PubMed or in Google.

So to the best of my ability, but there may be things that aren't there, but . . .

Q Fair enough, Doctor. We're going to mark -- also you had produced -- or your counsel had produced some invoices related to the work that you did in this case, and we're going to mark those as 6299 to your deposition. Let 's pull those up.

(Exhibit 6299 was marked for identification.)

BY MS. FINKEN:

Q Okay. And, Dr. Vaezi, can you see this on

screen, the invoices?

A Yes.

Q The first one is dated November 2020. Do you see that?

A I do.

Q Okay. And are these invoices that are prepared by you?

A They are.

Q Okay. And this -- the -- I'll represent to you, without going through all 29 pages of these invoices, that this is the first date in chronological order that it appears you submitted an invoice in this case. Is that accurate, do you believe?

A Again, if that's what you're provided. I don't remember when I started providing the invoice. It was a while ago, so if that's what you have, then I -- I would go with that.

Q Okay. So that comports with your recollection of when you approximately were first contacted in relation to providing an expert report in this case; is that fair to say?

A I don't recall. As I said, that's the first invoice -- if you're telling me that's the first invoice date, then, you know, you have to ask counsel. I don't know if that's the correct date.

As far as when, the dates are long time ago. Sorry.

Q Okay. And it seems like your most recent invoice that was produced to us is dated April 22nd, 2022.

Have you provided -- or have you submitted or prepared any invoices since that date?

A I have not.

Q Okay. Have you incurred any time that you will be submitting an invoice for since April 22nd of 2022?

A I have. I had gone through my report, so there -- there are -- there are some times that I have not done yet. Normally I try to do it once a month at the end of the month or when I remember and when I have the time. So I plan to do that at the end of this month. But, yes, there are times in between the two.

Q Okay. And what type of work have you done in this case since April 22nd of 2022?

A I essentially went through my report and looked at my report, looked at some of the studies that I outlined in the report, so that was time reviewing mostly that, as well as, again, if there were studies that I needed to look closely, some of the charts, some of the graphs just to make sure that I'm as up-to-date as possible on that.

Q Okay. How much time have you incurred since this last invoice on April 22nd, 2022?

A Good question. That takes time, so I'm happy to pull that up and go through -- to find them and go through, but I don't -- I have to put it together. I'm sorry.

Q Okay. Do you have an approximate number of hours that you would have incurred since this last invoice?

A It's so variable each time, I couldn't guess. Sorry.

Q Okay. What did you do to prepare for your deposition today, Doctor?

MS. FINKEN: You can take that down.

A I went through my report that you had shown me. I went through the studies mainly. And I had a meeting with counsel regarding just the process-related matters as far as what -- for me what to expect from this because I don't do this often, as you can see from my CV and report, to just make sure that I have the process correct as far as what to expect and also reviewing the material.

Q Okay.

MS. FINKEN: You can take those exhibits down, please. Thank you.

BY MS. FINKEN:
Q Did you meet -- or did you meet with counsel at all to prepare for your deposition?
A I did.
Q Okay. How many times would you say that you met with counsel to prepare for your deposition?
A I would say I met with counsel about maybe twice, two or three times perhaps.
Q Okay. And were those meetings in person or were they on Zoom or some other --
A Yeah, I -- you know, I'm quite social. I wish it had been in person, but everything has been in Zoom. And this is somewhat unfortunate that things have to happen in Zoom, but hopefully next year things will be different. But it has been through Zoom yes.
Q Through Zoom, okay. And who did you meet with?
A With counsel, Eva, Ms. Canaan.
Q Was anybody else present for those meetings?
A Yes. Nicole as well, Nicole Costello was also there.
Q And anybody else?
A No.
Q Sorry about that, Doctor. I have notifications that come up on my computer as well and they make noise. Let me see if I can turn those off.

Did you -- how long were those meetings would you say?

A Variable. I mean, 30 minutes to two hours, two or three hours, so variable.

Q Okay. And when was the last time that you met with counsel to prepare for your deposition?

A I believe counsel for about 10 minutes this morning wanted to make sure that I had all the links and -- so that I could login to make sure that everything was okay from my side. About 10 minutes perhaps.

Q Okay. Did you speak to anyone else to prepare for your deposition today besides Ms. Canaan and Ms. Costello?

A I have not.

Q Did you review any documents besides what you have already identified to prepare for your deposition today?

A I have not.

Q Okay. Did you review any deposition transcripts to prepare for your deposition today?

A I was provided those that I had listed in the document that you showed. But the ones that I really looked at were Ms. Moorman -- I'm sorry, Dr. Moorman and McTiernan were the ones that I looked at more closely.

The others I felt were irrelevant.
Q Okay. And, Doctor, I think that -- are you referring to the expert reports that were listed on the materials considered list?
A Those were the ones that you showed me, their expert report, right?
Q Yes. So my question was a little different. There have been some depositions like what we're doing today.
A Oh, I see. Oh, I see. I'm sorry. Yeah, depositions. Thank you for clarifying. I have not. I haven't seen anything in that regard.
Q Okay. Did you review any videos of any depositions that have taken -- that have taken place in this case?
A I have not.
Q Okay. Just give me one second. I need to try to take care of that notice. It's going to keep --
A Mine just came on too.
Q Oh, is it yours as well?
A Mine as well, yeah.
Q Well, we'll get through it and --
A I don't know how to turn them off, so if you know, tell me.
Q It's the perils of Zoom depositions. This is

what we've -- you know, we've become accustomed to. Hopefully it won't be too distracting.

So going back to my question, you said you did not review any video -- video depositions to prepare for today, correct?

A I have not.

Q Okay. Did you have any discussions with anyone besides your lawyers that you were going to be giving a deposition today?

A No, I have not.

Q To provide a deposition and act as an expert in a case, do you have to seek approval through Vanderbilt University, your employer?

A I have not.

Q Okay. Doctor, just -- if you can just give me a little bit of background into your day-to-day work at Vanderbilt University. What exactly is it that you do?

A It depends on how much you want to know. I can tell you everything. It's sometimes painful. But I'm a clinician. I see patients. I treat patients. I'm also a researcher. I conduct research, clinical, translational research.

I have administrative responsibilities that have been outlined on my CV. I'm the associate chief and the clinical director for the division.

I also have other responsibilities for the department and the institution as a whole. I'm the director of endoscopy -- these are my administrative roles, which take up a lot of my time, as well as research. So I meet with my research team. We conduct a lot of research. We publish. I give lectures.

And those are all outlined on my CV, but it's a lot, so it's a combination of early morning Zoom meetings to in-person meetings, to seeing patients, doing in clinic, as well as doing endoscopies, publications, Zoom meetings.

I was just in Argentina, and I was just in Hong Kong and Taiwan to give lectures, all through Zoom, so that gives you an idea. I have to prepare those.

So it's -- it's a combination of things. Keeps me busy, which is what I like.

Q It sounds like you're a busy guy.

Are you considered -- as a specialty, would you consider yourself a -- strike that.

Are you a gastroenterology?

A By some -- you know, some -- some of my colleagues -- I have a picture I can show you behind me that has me with about 20 arms, and those were given to me by fellows about how I am different things, if you will.

So I am a gastroenterology. I have a Ph.D. in bioorganic chemistry. I have a master's in epidemiology. I do a lot of stuff, so I'm a -- I'm a -- by gastroenterology, you then sub-sub-subspecialize, so for me I'm also a esophagologist. I do a lot of esophogeal work. Within esophagology, I look at motilities, reflux, laryngitis.

I've been given a degree in otolaryngology because of my interest in some of the voice-related issues and reflux.

So I'm a professor of medicine and otolaryngology. I hope that answers your question. I may have babbled on about my credentials, but I hope it was helpful.

Q Yes, it is. So let me just ask you a couple more questions about that.

You do not have a degree in statistics, correct?

A I have a master's in epidemiology, and I do a lot of statistical work. And the studies that you see on my CV, as well as things that I review, you really have to have a good knowledge of statistic and study design.

So I would say my master's in epidemiology and my 30 plus years of doing research, whether it be

clinical or translational, has helped me with a lot of statistical questions.

Q Do you hold yourself out to be a statistician or a biostatistician in your professional work?

A I don't know what you mean by "biostatistician." I'll go back to my prior response in that it -- if by that you mean do I have knowledge of statistics, do I know the statistical protocol when it comes to study design, do I know what it takes and what the differentials might be. Yes, I do. But by that do you mean every day do I sit and -- 80 hours a work do I do just statistic? I would say, no, that -- that is not what I do, but I have a good knowledge of statistic and what it takes from a study design.

And to me that's important because, in fact, the reason -- I can tell you, the reason I got my master's in epidemiology and took a lot of statistical courses was because I wanted to make sure that I didn't miss anything, that I understood things, how it applied to care of patients, and when I did research, what could I have missed, so I -- I have knowledge of that based on my practice and studies that I've done.

Q Okay. Did you -- can you just give me the chronological order of how you obtained your degree since you have quite a few?

A Can you pull up my CV? I can go through that and tell you.

Q Sure. It's exhibit -- if it's helpful, sure. It's exhibit -- what did we mark it as? 6284.

A If you go -- so if we could scroll down. Okay. Stop, yeah.

So -- so you were asking specifically about my degrees?

Q Uh-huh.

A So I have my bachelor of science from Birmingham Southern in '83. Then I got my Ph.D. in bioorganic chemistry from '83 to '88, and in 1988 to '92, my medical degree at University of Alabama.

There was a bit of an overlap between the Ph.D. and the M.D. I was finishing up my Ph.D. I was still in med school, so I defended my thesis after the first year of medical school.

Time is short. But I can tell you stories about that where I lost all of my Ph.D. thesis on those true floppy disk and the computers back then. But I won't go through it.

Then I did my house staff training. What was important about that is usually residency is three years. I did a four-year academic internist training, and again because of my interest in research, so that

was a four-year rather than a three-year because that's a two-year clinical and two-year research.

Then I was recruited to go to the Cleveland Clinic. And I was there from 1996 to -- if you scroll up -- to 2005. I was faculty, not only a fellow -- chief fellow but also faculty there until 2005, and then I was recruited by different organizations.

I got tired of the gray and the snow of Cleveland. I loved the city, but then the opportunities came about, and they were looking for a clinical director here, and that's when I moved here.

But prior to my move, as you see, because of my interest in clinical research, I had submitted a grant to the NIH looking at this area of laryngitis and reflux. I really wanted to better understand the issues regarding epidemiology and statistics and what have you.

And so that's when I went to Case Western Reserve and got my master's in epidemiology, again how it fits into my global training, if you will. My wife says I'm a -- I'm a professional student, but we leave that there.

And then I was -- I moved here in 2005. I've been here since then. And because of my interest in otolaryngology, I've done a lot of research there. And as you can see, I have a professorship of medicine and

otolaryngology, and there are a variety of appointments.

But I've been there since. I -- I don't want to bore you with the rest. If you have specific questions, I'm happy to answer.

Q So you've been at Vanderbilt since 2005?

A That's correct.

Q Okay. And just to go through some of your -- what you had discussed regarding your day-to-day work, you primarily practice as a esophagologist. Did I say that correctly?

MS. CANAAN: Objection.

A Yeah, that's right, esophagology.

Q Okay.

A Well, not really. I mean, I -- I'm a gastroenterologist with interest in esophagology, so that's from a research perspective.

Q Uh-huh.

A So when it comes to clinical care of patients, I do colonoscopies. I do endoscopies. I see patients that have abdominal pain, may have gastroparesis. They may have pancreas issues.

So I round in the -- in the hospital services where we have a variety of presentations, patients present with pancreatitis, liver issues and/or colon issues. So I'm on the services -- I'm on call on the

hospital services. So it's varied, so that -- that's where my gastroenterology training comes in, so I do see patients with different things.

So if I have a patient, let's say, that has heartburn or gastroparesis but they also have rectal bleeding, I don't pawn that off to someone else. I have the appropriate training to take care of that patient, so it's sort of a mixed practice in that sense.

Q Uh-huh. Is your research -- and you had discussed a little bit about the research that you're engaged in.

Would you agree that your research is primarily in the umbrella field of gastroenterology?

A And otolaryngology as I mentioned because of that overlap that we've done. But from clinical care perspective, I see the variety of symptomatology and disease states, yeah.

Q Okay. Are you currently engaged in any clinical research?

A I'm engaged in many clinical research, yes.

Q Okay. And what specifically?

A Well, I'm engaged in research evaluating diagnostic modalities for the esophagus. I have actually come up with a better way to diagnose reflux. Right now our methodologies are somewhat archaic.

So if you come to me with reflux symptoms, typically I would -- in the old way, if you will -- current way, hopefully old way soon -- you have to put a catheter down someone's nose to measure pH and all that.

So through my research, translational and then clinical, we've come up with a much better way to diagnose reflux where we can actually just during endoscopy, look in -- at the epithelium and find out whether or not there are alterations from reflux and use that as the marker. And that has been a -- if you look at my CV, that's the mucosal integrity testing.

I'm also involved in esophageal motility disorders, laryngeal issues. I'm involved with a variety of organizations through the research projects to make sure that we better understand how to diagnose, how to treat patients with reflux disease.

So I hope that answered your question.

Q Are you currently engaged in any research involving the use of any acid -- acid suppressive medications?

A Yes. I have been and continue to because that is my expertise, so that's -- there are many -- the good news is that we have so many options right now when it comes to acid suppressive therapy. There's constancy of evaluating efficacy of drug A versus B versus C.

So there are -- within industry, for example, right now in esophagology, their efforts in optimizing care and looking at specific agents in regards to acid suppression and/or bile suppression and/or other ways of treating reflux -- so when it comes to that, yes, we -- whether it be through multicenter, through individual center studies, yes, I have.

Q Okay. What acid suppressive agents are you currently engaged in clinical research regarding?

A I couldn't tell you the names specifically, but I can tell you there are -- within the industry there -- there's this push for what's called P-CABs. These are potassium. So if you look at acid suppression, we have the H2 receptor antagonists, and then we have the proton pump inhibitors as you're aware. And within proton pump inhibitors, there are classes of agents and differentials, and then now there are these new agents that are coming up. They're called P-CABs, and they're a slightly different way of suppressing acid.

These agents have been available in Europe -- I'm sorry, in Asia, but now there's some move by companies to bring them to market here, and I believe we are one of the sites for some of those studies.

I would have to discuss this with my research coordinator to pull the names specifically, happy to do

that. But that's part of -- again given our -- my expertise, that's part of what I do.

Q Doctor, let me ask you a question. You said -- you used -- you used the term P-CABs. Are you saying P-C-A-B?

A Yeah.

Q Okay. I just wanted to make sure for the --

A Yeah.

Q -- reporter's benefit because --

A They're potassium-competitive acid blockades, so if you need to write that. Potassium-competitive acid blockade.

So, you know, the proton pump inhibitors are really slightly different in the way they block the proton pumps, and these block the potassium pumps within the parietal cells for acid production, so they're doing the same thing, ultimately suppressing acid, but in a slightly different mechanistic way.

And by doing so, the question then becomes are they better, and in what way are they better, in what patient population we can use them, and that gets to the variety of agents that we have, which is good because patients respond, yeah, so we are involved in those things.

Q So for the P-CAB studies that you're engaged

in, are these medications that are currently approved and marketed or is that pre-market approval research that you're doing?

A They are approved in Asia. The companies -- I would have to look up the names. You'll forgive me, I can't remember. As I get older names escape me. But there are companies that want to bring it to U.S. There are active studies with different companies regarding whether it be the P-CABs and/or, for example, biosequestering agents or others.

Q Okay. Are you currently engaged in any clinical research involving histamine receptor antagonists?

A I don't believe so, no.

Q Okay. And when I refer to them throughout this deposition as histamine -- instead of "histamine receptor antagonists," I will refer to them as "H2RAs." Do you understand that H2RAs are histamine receptor antagonists?

A Yes, I do.

Q And can we agree to refer to them as "H2RAs" through the course of this deposition, just so it's easier on all of us?

A I would appreciate it. That's easier on me as well.

Q And similarly for proton pump inhibitors you had mentioned previously, we'll refer to them as "PPIs" during this deposition; is that fair?
A Perfect. Thank you.
Q Great. So -- and when you refer to proton pump inhibitors or PPIs, you're referring to a class of medications, correct?
A That is correct. These are agents that were introduced in the '90s, early '90s, started with omeprazole being one of them. And what's nice about them relative to what we used to have, there's different agents. There's omeprazole -- usually they send with "zoles," if you will: Omeprazole, lansoprazole, rabeprazole, pantoprazole, and then esomeprazole.
So essentially you have all the "zoles," but they all differ slightly in their pharmacodynamics and pharmacokinetics, so they came on at different times, and they were FDA approved at different times.
Those are the agents, going back to your original question of FDA approval, are approved as you well know in the U.S., but not the P-CABs yet.
Q And when you refer to those names, omeprazole, esomeprazole, pantoprazole, lansoprazole, they go by the common trade names of Prilosec, Nexium, Protonix and Prevacid, correct?

A That's correct.
Q Okay. And I'm just -- that's for the jury's ease.
You had also -- we had also discussed a class of medications called H2RAs. And what brand name products are -- are in the class of medications of H2RAs?
A Yeah, and those -- those were available prior to PPIs. So what's nice about H2 receptor antagonists, you know, just from a timeline perspective, prior to H2 receptor antagonists, we really just had coating agents, and our patients were suffering.
So those agents came about in the '70s and '80s, and those are things like cimetidine. That was the first one that came on. And then we had ranitidine that came on. Then we had famotidine and nizatidine, so all the "idines", if you will. That puts them in that H2 receptor antagonist category.
And that was really nice, so if you look at the timeline, you have coating agents, and then you have the H2 receptor antagonist that essentially suppress acid much more than the coating agents would, so that helped patients. And then the next level up are the proton pump inhibitors.
Q Okay. When you're referring to "coating

agents," can you give -- give me an example of what you're referring to?

A Yeah. So prior to the H2 receptor antagonists, you know, we had a lot of patients that would have, let's say, peptic ulcer disease, and they had to have surgery. In fact, surgery was not uncommon when I was in residency, in training or medical school, so many people had surgical intervention for peptic ulcer disease. That's unheard of now. And that's because we didn't have these better agents, the H2 receptor antagonist or the proton pump inhibitors.

So coating agents such as Carafate or Sucralfate is the other name, that was commonly used by our surgical colleagues, by our intensivists, by our gastroenterologists, by our primary care doctors, for patients that would come with similar symptoms. The problem is that those agents don't really help.

We also had antiacids on top of that as you're familiar, we -- you know, Tums and Rolaids and what have you. So those are things that patients would take, but they're really not effective. For short-term, they are. What's nice is they help you with the heartburn right now, and then five minutes later, you have it. My wife was pregnant, and she was going through bottles of those Tums and Rolaids. So they're not as effective.

So then when H2 receptor antagonists came around and then subsequently PPIs, they were better in way of helping our patients, which is important.

Q Okay. Doctor, you had talked a little bit about some of your roles within Vanderbilt University.

And can you give me a breakdown as to how much time you spend in clinical practice versus research versus administrative responsibilities, roughly?

A Yeah, 200 percent, perhaps 250 percent. It depends on the hours, right? So I'm pulled in different directions. Sometimes I joke about I used to have hair before all of those administrative, clinical, and now it's all gone.

But just to give you a rough idea, I mean, I start the day early, end late. It's variable, but I would say probably about 40, 50 percent clinical; the rest a mix of research and administrative.

I try to find time anywhere to do what I need to do, whether it be public -- for example, publication, whether it be various Zoom meetings for administrative or for departmental, divisional, institutional meetings.

So I would say probably 50/50 would be a fair assumption. But, again, you have to extend that time because as we all do, we -- it eats away at your personal time, and you try to accommodate --

Q There's no such thing as work life balance. We understand that in the legal field as well.

Just going back to your 50 percent of the time that you spend in clinical practice, can you break that down for me? How much of that is spent in office hours versus performing endoscopy and things of that nature?

A Well, I -- I've excluded office hours. If by office hours you mean clinic?

Q Correct.

A That's the way I'm taking it. Okay.

So in clinic, I am -- I would say, let's see, 30/20, so it would be 30 percent -- it's a mix. Perhaps a fair way to do it -- because there's some weeks I do more clinic, more endoscopy. Perhaps splitting it would be fair, 25/25, but some days -- some weeks are 20/30, some 30/20, but that's a fair mix.

Q Okay. Do you treat patients in the office as well as in the hospital setting or just one or the other?

A So I want to be clear. When I -- when you talk office, I'm talking about this office, so when I -- when you say "office," I don't treat anyone at my office. This is my private area that I do this kind of stuff or publish or review things.

But in clinic, our clinics are in the hospital,

so there are some practices where the clinics are removed from the hospital, but my clinics are actually in the hospital. And then the endoscopy that I do is also in the hospital.

We do have practices outside of the hospital. Vanderbilt is extending that to different hospitals and different settings. I'm not a part of that right now, but things could change as the demand increases.

Q Okay. Other than endoscopy, are there any other types of procedures that you perform during your practice?

A Well, there are different procedures within endoscopy. So to -- to be fair, to just outline that, so I do esophagoscopy, so I look in the esophagus. I do also look in the larynx. Remember I mentioned that I have interest in that, given patients that may have hoarseness, sore throat, various laryngeal issues, so I look in the larynx. I look in the esophagus. I look in the stomach. I look in the small bowel.

Within the colonoscopy, obviously it entails looking in the colon. From a small bowel perspective, there's what's called a push endoscopy. I can look further into the small bowel.

There are interventional procedures I do in treating patients with reflux, or I have a lot of

patients unfortunately that have laryngeal cancer, and then they have radiation and now they can't swallow, so I do interventions there to help them be able to swallow.

Patients, because of the cancer and radiation, the connection from the mouth to the esophagus is completely blocked off, and now they can't swallow. They're spitting in a cup. So what I attempt to do is go in and -- this is actually very rewarding for me as a clinician. I go in and I'm able to open that for them, and they can actually swallow and eat. So that's really rewarding.

But also in reflux, doing dilations. I have patients with motility disorders where they need the esophagus stretched or injection of Botox, so a variety of techniques that I use.

In the colon, if there are polyps that need to be removed. If I'm in the hospital and someone's bleeding, they're vomiting blood, I have to go in and stop the bleeding in the stomach or in the small bowel or in the esophagus. If they have a polyp and they're bleeding from the colon, we have to intervene.

So that gives you -- I may not have mentioned everything I do, but just a global assessment.

Q And all of that would be under the umbrella of

endoscopy?
A That would be under the umbrella endoscopic techniques and endoscopy, correct.
Q Okay. Is it fair to say that you are not a pathologist?
A I am not a pathologist.
Q Okay. And you're not a regulatory expert, correct?
A What do you mean by that?
Q Do you consider yourself an expert in regulatory matters with FDA labels or -- or approvals or recalls, things of that nature?
A If you mean am I able to assess if they have a recall or approval process, I am able to respond to that. But if you mean do I sit on a board and vote on whether something should be taken off the market or not, I am not.
Q Are you offering any opinions in this matter as to whether or not regulatory approvals, withdrawals, recalls, were appropriate or inappropriate?
A I don't know what you mean by that.
MS. CANAAN: Object to form. Object to form.
A Yeah, I don't know what you mean.
Q I'm just trying to understand if you're going to be testifying and offering opinions as a regulatory

expert in this case.
A Well, again, going to -- am I going to vote on disapproving or taking an indication of, I'm not on those boards. But as a clinician, as a physician, as someone that does research, am I aware of how products are approved, how there may be issues with them, they may have side effect profiles with them, with the process itself of what it takes to do it, I think I'm qualified to answer those questions.
Q Okay. So -- and is it fair to say you're not an oncologist?
A By training I'm not an oncologist. I do see a lot of cancer patients within my practice.
Q Okay. When you -- and I understand you had -- you had discussed that you see some laryngeal cancer patients within your practice.
Do you refer those types of patients out for further treatment?
A It depends on -- so again it depends on what you mean as far as referral. I actually see a lot of patients and take care of a lot of those patients. Those patients -- the care of those patients us somewhat complex in that they may need chemotherapy. That's where our oncologists come in. They may need radiation therapy. That's where our radiation oncologists come

in, and then they need my services for diagnosing the problem, taking still care of their symptomatology.

I already mentioned about radiation-induced or chemotherapy-induced infections, so it's -- it's a group effort as you're aware. That's how we take care of patients, so . . .

Q Okay. So when you have a patient with laryngeal cancer who needs radiation or chemotherapy, you would refer them to an oncologist; is that fair?

A If they need chemotherapy and if they need radiation, they should go to the appropriate people, yes.

Q Okay. Do you consider yourself an expert in carcinogenesis?

MS. CANAAN: Objection.

A I don't know what that means, an expert in carcinogenesis. I didn't know there was a degree in carcinogenesis. But I can tell you that I've done a lot of research. I see a lot of cancer patients, and I'm aware of the cancer process, if you will, so it depends on what you mean.

Q Okay. Well, what do you understand "carcinogenesis" to be?

A Well, that's where a normal tissue becomes apparent. They go through different processes, usually

either through -- usually DNA related, but it doesn't have to be, but they go through different stages, if you will. For example -- I can give you various examples.

But if you look at gastric cancer, for example, it goes through stages, intestinal metaplasia, and there are other things, patients that have chronic atrophic gastritis in the esophagus.

Patients can have reflux that can lead to Barrett's esophagus. Barrett's is a metaplastic condition. That metaplastic condition puts them at risk. Then when there are changes within that, they can go into low grade. They can go into high grade. They can then subsequently go into cancer of the esophagus.

Then that cancer is diagnosed, and then that's when we intervene, whether it be endoscopically, chemotherapy or radiation oncology, or the one I forgot to mention, which is an important element, is also our surgical colleagues that come into play.

Q Okay. And, Doctor, what is a carcinogen?

A A carcinogen is one that predisposes someone to carcinogenesis, I guess, to cancer.

Q Okay. Do you have -- strike that.

What is your understanding of what this case is about?

A That's a -- that's a big question. I mean, is

there something specific you want me to answer? Because I could go on for hours to tell you what I think about what this case is about, but you want me to just give you a global one or is there a specific question?

Q Just a global understanding of what this case is about.

A Very good.

So my understanding is that there was a case presented to the FDA that some ranitidine products -- that ranitidine may not be safe because of some analyses that were performed showing that some of the ranitidine products had very high NDMA levels.

And that was presented to the FDA, and that raised some initial concerns that that may lead to potentially cancer risk for patients, and that led to a variety of studies, which we can discuss.

The initial studies showing very high levels of NDMA were not proven to be accurate by the FDA, and then FDA conducted their own work showing that they were not as high, and that led to epidemiologic studies, which I've outlined in my report, showing whether or not that risk is present regarding specifically ranitidine.

And those epidemiologic studies are the ones that I've outlined in my report about this risk of cancer. But, again, that's somewhat global, but there's

a lot more into it. I'm happy to answer.

Q And we'll -- we'll break some of that down as we -- as we go along.

But you referred to "NDMA." What is "NDMA"?

A N-nitrosodimethylamine.

Q Okay. And what is your understanding of what N-nitrosodimethylamine is?

A Well, it's -- it's -- dimethylamine, there are two amine products, and there's a nitroso product within this compound, so . . . Methyl is CH3, so that's carbon, hydrogen -- three hydrogens that are attached to nitroso compounds.

This product is one that's -- well, I shouldn't say product. This is one that's available in certain food items, for example. There -- they have been shown in -- for example, alcohol has that, like beer, hot dogs.

This is one that had been of concern because of those presence, and there have been some dietary studies about that, but concerns about carcinogenesis, going to your original question, was raised with NDMA.

So it's -- it's important when we look at any of these products, especially ranitidine as we were talking about, that some of these impurities are kept to a minimum, right? So all of -- many of the drugs have

impurities. It's always good to show that the impurities are at a low level.

But NDMAs, one that's of concern clinically and present in various doses and different dietary products that have been shown, again, and the ranitidine was a study that showed high levels.

Again, I -- I hope I'm answering because your question was general, and I'm answering in different aspects to make sure I'm answering your question.

Q Okay. Have you ever conducted any research specific to NDMA?

A I have not.

Q Have you ever utilized NDMA in any type of animal studies or things of that nature to induce cancer?

A Personally, no.

Q Okay. And you referred to -- hang on one second. Strike that.

You had -- you had referred to ranitidine, and ranitidine is in the class of medications known as H2RAs, correct?

A That is correct.

Q Okay. And is it your understanding that ranitidine was primarily used to treat GERD, or gastrointestinal reflux disease?

A That is not correct.
Q Okay.
A Ranitidine was approved for different indications. One indication was gastroesophageal reflux. Another indication peptic ulcer. You may have gastric ulcer, so within the peptic ulcer group, you have gastric ulcer. You have duodenum ulcer.
So there were studies with gastric ulcers and how it helps that. There were also studies with duodenum ulcers.
There's a condition called dyspepsia, and there's condition called Zollinger-Ellison syndrome.
So it wasn't just for GERD. It's used in variety of indications.
MS. CANAAN: Tracy, we've been going for more than an hour, if we could like take a short break when --
MS. FINKEN: Sure. Now is a good time. Let's go off the record.
THE VIDEOGRAPHER: The time is 11:25 a.m., and we're going off the record.
(Break taken.)
THE VIDEOGRAPHER: Okay. Please stand by.
The time is 11:44 a.m., and we're back on the record.

BY MS. FINKEN:
Q Okay. Dr. Vaezi, I just want to -- let's pull up what we've marked -- your report we've marked as Exhibit 6283. Okay.
MS. FINKEN: And I just want to turn to page 1 of that report. Yep. There we go.
BY MS. FINKEN:
Q Okay. Dr. Vaezi, in your summary of opinions on your -- in your report, you indicate that you were "retained to provide an expert opinion on behalf of the defendants on the current evidence regarding the clinical benefits of ranitidine and the epidemiological evidence on the purported association between ranitidine and cancer."
Did I read that accurately?
A Yes. I was -- I was essentially asked to provide my opinion after I've had a chance to review the data about the potential epidemiologic evidence for ranitidine and cancer.
Q Okay. And you go on to state that it is your opinion -- "it is my opinion that (1) ranitidine is a safe and effective medication that was used clinically by gastroenterologists for decades to provide benefit to patients with acid-peptic disorders, and (2) the epidemiological evidence does not support a reliable

association or causal relationship between ranitidine and any type of cancer including gastric, esophageal, liver, pancreatic, and bladder cancer."

Did I read that accurately?

A Yes, you read that correctly.

Q Okay. And is that an accurate depiction of the opinions that you intend to offer in this case?

A Yes. I have reviewed those -- especially the five cancers and the current data that -- or the epidemiologic data that are available, and that is my conclusion.

Q Okay. Are you -- do you intend to offer any other expert opinions in this case besides the two that we just discussed?

A I mean, I'm -- I'm -- I have everything within my report, so my report contains my opinion about all the facts that I've reviewed and based my opinion on.

Q Okay. Now, to reach the conclusions that you -- that are contained in your expert report, did you undertake a review of any of the clinical trial data in relation to ranitidine?

A Clinical trial data. I'm sorry. Can you clarify that?

Q Did you review any clinical trials to reach your conclusions in this case?

A Clinical trials for what? I'm sorry.
Q For ranitidine.
A Clinical trials. I think I outlined that in my report, about their efficacy and their potential side effects. I believe it's further down when I discuss when ranitidine came about.
So there were many clinical trials of not only ranitidine, other H2 receptor antagonists. But to be more specific for ranitidine, there were many trials conducted that showed the efficacy because the FDA requires trials before approval processes, so I've outlined those in my report.
Q Okay. Did you review any clinical trials in relation to whether or not ranitidine was associated with cancers?
A Clinical trials. If by that you mean randomized controlled studies, I'm not aware of any clinical trials that specifically looked at ranitidine in association with cancer.
Q Okay. Did you review any of the manufacturers' internal clinical trial documents regarding ranitidine and its association with cancer?
A I am not --
MS. CANAAN: Objection to form.
A I am not aware --

MS. CANAAN: Give me an opportunity to object. Sorry.

THE WITNESS: Oh, I'm sorry, yes. Yes, sorry.

MS. CANAAN: Go ahead.

A I am not aware of any specific clinical trials that look specifically at randomizing patients to ranitidine or not with the goal of looking at cancer as an outcome.

Q Okay. Did you consider the ranitidine observational studies in reaching your conclusions?

A I have reached my conclusion based on everything that's on my report; the epidemiologic studies that are outlined, as well as other data that have been presented in my report.

Q Did you consider any metaanalyses of ranitidine observational studies in reaching your conclusions?

A I believe everything I have considered are in my report.

Q Did you prepare any metaanalyses of ranitidine observational studies in reaching your conclusion?

A I have -- there's -- there are a few graphs if you see in my report at the end that actually very nicely, at least for me, puts things in perspective.

So it's not a formal metaanalysis. It's more about looking at the data as a whole because it provides

a very nice picture.
So the answer for a formal metaanalysis, no, but the answer for do -- did I look at the evidence as a whole and outlined it in my report, yes.
Q Okay. Did you consider any of the experimental animal evidence that is available in relation to ranitidine?
MS. CANAAN: Objection, form.
A I don't know what you mean animal data pertaining to ranitidine. Can you be more specific?
Q Did you review any of the ranitidine carcinogenicity animal studies in reaching your conclusions?
A I didn't review them specifically, but I am aware that there are studies, if I recall from some of the studies that I was reviewing, that at very high doses, they may have had issues -- side effect profile. I believe that's part of -- majority of the compounds that are going through the process of FDA approval, but other than that, again, I don't know.
Q Okay. You indicated that -- that there are some studies that you reviewed that had a side effect profile at very high doses. What are you referring to there?
A I don't think I said high doses. I think I

said there were studies that looked at side effect profiles of ranitidine, so when you think about randomized trials that have to be done for the FDA approval, they have to track through the phases of the FDA approval. You have to sort of see what side effect profile is associated with whatever compound that's going through FDA approval process.

So that's what I meant in that there are side effect profiles for every drug, whether it be proton pump inhibitors, H2 receptor antagonists, anti-hypertensives, diabetic medications. So there are side effect profiles that have to be monitored, yeah.

Q Did you consider any of the original animal carcinogenicity studies that were submitted to the FDA for FDA approval of ranitidine?

A I -- I did not look at all of the data in that regard, but, again my point -- my task was to look at the human data rather than animal data because the question at hand for me was whether or not ranitidine is associated with increased risk, especially of those five cancers. And that's where I focused the majority of my time and research.

Q Okay. Did you look at -- you indicated that you didn't look at all of the animal data. What animal data specifically did you look at pertaining to

ranitidine?

A Again, as I mentioned before, there are -- as I was reviewing, there were some articles that outlined that at very high doses, ranitidine may be associated with potentially increased adverse outcomes, such as in the clinical practice, we see patients that might have increased symptoms, right?

So if you take any compound, you could have nausea. You could have diarrhea. You could have abdominal pain. So that's what I meant by that, not necessarily going through animal data to see -- I mean, I -- I sort of equate it to the studies with omeprazole, for example, when they first came out.

They gave very high doses of omeprazole to animals, and by that I mean rats, and they found a variety of things, and they were supraphysiologic, one that would not be used in humans.

So at the end of the day, I sort of have to divorce myself from supraphysiologic doses and go back to the question at hand here, and that's why I didn't focus on those. I was specifically interested on -- if patient's take ranitidine, is there evidence that there's cancer.

Q Okay. Did you consider biologically plausible mechanisms whereby NDMA can cause cancer in the

literature that's available to discuss that?

MS. CANAAN: Objection, form.

A Again, just looking at globally, so what is the biological plausibility that's been purported, right? So the suggestion that the NDMA in ranitidine may be problematic, one has to then -- you take it back to the NDMA level.

And within the NDMA level, I'm not aware that any of the agencies, whether it be regulatory or respected authorities, have really said that NDMA by itself is a human carcinogen; in other words, they have not come out definitively saying if you have NDMA, it's going to cause cancer in humans.

So from a biological plausibility, there's -- it's a bit shaky in that at least those authorities, when they've looked at it, have said, well, we're not convinced; maybe, it's probable but not convincingly so.

So to answer your question, based on that, I would say I don't have biological, plausible explanation in humans, so that then leads to the epidemiologic studies that also don't support that conclusion.

Q Okay. What evidence did you consider in evaluating the biologically plausible mechanisms as to whether NDMA can cause cancer in humans?

MS. CANAAN: Objection, form.

A So that is a broad question, but I can just go back to my answer on NDMA. So NDMA in animal studies at very high doses -- and when I say "animal," I'm talking about rodents -- have been shown to be associated with liver problems, right? But not in other animals, not in humans, so the evidence is weak.

And, in fact, that's the conclusion that the IRAC has put forward. They don't have convincing evidence that NDMA -- solely NDMA, getting to the biological plausibility -- is a carcinogen in human. No one's come out at least and said, this is definitively -- definitively the problem. And that's where the problem lies with biological plausibility.

The EPA hasn't done so. The NPT hasn't done that. So I think if you're asking could NDMA cause liver problems in rats at high doses, high exposure, I would say there's evidence for that, but in humans, I'm not aware that any agency's come out definitively and said that.

Q Is there evidence that NDMA can cause any other types of cancer besides liver cancer in animals?

A Again, if by "animals" you mean rodents, then the evidence is at very high exposure -- and I'm focused mainly on the five cancers that we're talking about, you know, esophageal, liver, pancreatic, bladder and

gastric. None of those, even at high doses -- I'm not aware of any animal data at high doses that would have said that the -- the animal -- in this case the rodents -- have those cancers. Liver was the only one of the five. So I would -- I would say it's somewhat shaky.

Q Okay. Have you looked at any other -- well, strike that.

Have you done a review of the literature relating to NDMA and cancer in non-human -- strike that.

Have you done a review of the literature relating to NDMA and cancer in animal species?

MS. CANAAN: Objection, form.

A I guess the question becomes should I do a review of that when the authorities in the field have done so, and I've reached the conclusions that I'm reaching based on their conclusions, right?

So IARC, EPA, NPT, they've all looked at this data, and they've all landed on the same thing that I'm talking about, that in humans, no, but again -- definitively no, but in animals, only liver at high doses in rodents.

So I think we have to be very clear in that we can't extend studies from rodents to other animals. We can't extend the studies from rodents to humans. And

that's important.

As I mentioned earlier, I'll just use the analogy I did of the different compound -- this was a PPI -- that in animals it raised concern at very high doses that, oh, my goodness this could be causing cancer in humans, we shouldn't use omeprazole.

In fact, when omeprazole first came out, it was only approved at a very short time period because of that concern. But over time we've learned that, well, that concern is not valid because it was given at such high doses, that it's unrealistic in humans, right?

So the question becomes the relevance of some of these animal studies that later don't translate into humans because we don't -- we don't go around getting exposed to millions of milligrams a day at high exposure.

I would equate that to getting a chest x-ray. I'm a clinician. I order chest x-ray. It's a radiation, but I wouldn't do that if I thought you were going to get cancer from it, right? So -- versus the exposure of, you know, you're close to a nuclear power plant, and it just goes off, right?

So it's a different dose, and it's a different animal, so to me, one really has to bring it back to the clinical terms. And in the clinical terms, NDMA, again

being very specific animals, and by that I mean rodents, high doses. And that's important. The dose is very important. You can't just say any NDMA. High unphysiologic doses and only liver.

And in fact those authorities have already established that when they review that in humans, they're not landing on my, oh, my goodness, let's get -- stop NDMA and everything because then I wouldn't be able to drink my beer and I couldn't have my hot dog because they have NDMA in it. So that's where the authorities lie.

Q Okay. So my question, and I don't know that you answered it, was is -- is -- strike that.

My question was have you done a review of the literature relating to NDMA and cancer in animal species?

A I think I answered that question before -- the first time, that authorities have looked at that, and I base my --

Q I'm asking -- I'm asking if you've looked at it.

A Well, it's -- it's -- well, to me if the authorities -- the regulatory agencies have done so and I'm basing my opinion on that, do I waste my time and look at that? If they have done an extensive work, do I

need to do it? If authorities that are in regulatory -- excuse me -- and authoritative positions have done so and they've landed on the same conclusions I am, and I'm basing mine on theirs.

Q So you're basing your opinions on the regulatory agencies' review of the -- the literature relating to NDMA and cancer in animal species; is that fair?

A It's fair to say that -- that they essentially have concluded that NDMA -- excuse me -- NDMA at high doses in rats, liver only and not in humans definitive. That would be where I would land.

Q Have the regulatory agencies found that NDMA causes any other types of cancer in any other types of species besides liver cancer in rodents?

MS. CANAAN: Objection, form.

A Yeah, I mean, that's such a broad question. The question that I would answer would be have there been studies on gastric -- the five cancers that -- of interest: Gastric, esophageal, liver, pancreas and bladder.

So the focus, at least for me, was are there studies in rodents at high doses on anything other than liver, and of those five, the answer is no.

Q Okay. Do you have an understanding as to

whether or not an agent causes cancer -- certain types of cancer in animals, whether that translates to the same type of cancer in humans?

A I don't understand. Can you repeat that?

Q Yeah. For example, are you suggesting that if an agent causes bladder cancer in rodents, then that would translate to bladder cancer in humans?

MS. CANAAN: Objection, form.

A I mean, I don't understand the question as a whole. So as a scientist, if one is looking at biological plausibility, if I come up and say, well, this causes cancer in bladder in rats, now I want to look at cancer somewhere else. Well, where there's the biological plausibility for that tissue? Then you don't have one, right?

So I -- to me there's a disconnect, what's the biological plausibility. If animal studies at high doses aren't showing it, what -- what am I basing my clinical studies on, so that's where I would question that.

Q So as part of your inquiry as to whether or not a -- an agent causes a specific type of cancer in humans, would you look at animal studies to determine whether or not it -- the same agent causes that type of cancer in animals?

A Again, I -- I don't understand the question, I'm sorry.

Q Well, you're -- you're referring to -- to studies that show liver cancer in rodents and indicating that there's no other evidence -- and if I'm -- if I'm -- if I'm misstating what your testimony was, please correct me.

But I believe you said there's no other evidence that NDMA causes any other type of cancer in any other type of animals besides liver in rodents; is that correct?

A That is not what I said.

MS. CANAAN: Object to form.

Q Okay.

A That is not what I said.

Q Do you have --

A That is not what I said. I focused on the five cancers. I said of the five cancers, the clinical ones that I looked at, there are no data of the five cancers in rodents at high doses. That's what I said, other than liver.

Q Okay. Have you looked at any other -- any literature of any other animal species and -- and -- strike that.

Have you reviewed any literature pertaining to

NDMA and cancer in any other animal species besides rodents?
A You have to be more clear, I'm sorry. Any cancer?
Q Yes.
A Well, again, I answered that already. I wasn't interested on any cancer. I was interested on the five cancers that clinically have been purported to be an issue with ranitidine.
Q Okay. Have you reviewed any literature pertaining to NDMA and the five cancers in any other animal species besides rodents?
A I am not aware of any other animals other than rodents that show at high doses that it causes those five cancers.
Q Okay. Have you -- did you consider biologically plausible mechanisms whereby ranitidine could cause cancer?
MS. CANAAN: Objection, form.
A I don't know what you mean by that. Can you clarify?
Q Sure. Well, we talked about NDMA. And did you review -- well strike that.
We've talked about NDMA. Besides NDMA, did you review -- or consider any other biologically plausible

mechanisms whereby ranitidine could cause cancer?

MS. CANAAN: Objection to form.

A Again, what started this process, if I recall correctly, was the original studies that raised question about NDMA level in ranitidine. That was the biological plausible, if you will, assertion which was then later -- by the FDA, was not shown to be at the levels of the original study.

So that was the biological plausibility that the -- the majority of the studies are assessing, and that led to not only FDA studies, it led to epidemiological studies that I've outlined.

So when you look at those studies, the biological plausibility is landing on, well, is NDMA problematic, right? So -- and that was because the ranitidine -- the original ranitidine studies showed very high levels which was then subsequently not shown to be true.

Q Okay. Do you have an opinion as to whether or not it is biologically plausible that NDMA can cause cancer?

MS. CANAAN: Objection, form.

A In rats at high doses and liver. That's where we've landed so far based on the data and based on all the regulatory agencies. I can say of the five cancers,

that's where you land.

Q Okay. And when you refer to the regulatory agencies' review of the animal cancer data associated with NDMA, what specific agencies are you referring to?

A The IARC, EPA, NTP.

Q Okay. When you conducted your analysis and reached your conclusions in this case, did you consider the universe of NDMA observational studies?

MS. CANAAN: Objection, form.

A I don't know what that means, universe of observable studies of NDMA.

Q Did you conduct a search for NDMA and cancer observational studies in humans?

MS. CANAAN: Objection, form.

A Again, you have to be more specific about what you mean. Like what would the search look like? Just observational studies in NDMA? That would be very broad.

Q Okay. You tell me. What search did you undertake regarding NDMA and cancer?

A Again I outlined the NDMA studies, the animal studies that we've talked about. We have NDMA endogenous studies that the FDA have done. Those are important studies.

Within those studies, there are other studies

that they have referenced that were the basis for what the FDA set out to assess whether or not there's any issue with ranitidine, for example, and the NDMA hypothesis.

So those are the studies. Those are important studies. But, again, you have to be more specific about what I did or didn't do.

Q Okay. Did you in -- in reaching your opinions, did you consider any metaanalyses of NDMA cancer studies?

MS. CANAAN: Object to form.

A I'll go back to my answer that I mentioned. The agencies that are responsible for looking at this issue have landed on what I mentioned, which is the IARC, EPA and NPT have all landed, after reviewing the data, on the fact that of the five cancers listed, only liver, high doses rats.

So to me, if you do a metaanalysis of a study that shows that same thing, then that's great. It will show the same thing. That's where -- the regulatory and authoritative agencies have landed on, and that's what I base my opinion on.

Q Okay. And is that also true in terms of NDMA in human cancer, you're basing your opinion on the analyses that were conducted by IARC, or I-A-R-C, EPA

and NTP in reaching your conclusions?
MS. CANAAN: Objection.
A Well, human cancer, the ones that I've outlined are the ones that with biological plausibility relate to ranitidine. Those are the ones that have been outlined in my report.
Q Okay. Have you undertaken an evaluation of the literature to determine whether or not NDMA can cause those five cancers in humans?
A You got -- again, you have to be specific about what type of studies. There are dietary studies regarding NDMA. If that's what you're assessing, that's been in my report. I looked at dietary studies that have been outlined, that have been referenced. If by your question you mean those, yes, I've looked at those.
Q Okay. And did you evaluate any other NDMA studies and the five cancers that you reviewed in humans?
A There was also the study on air exposure in rubber manufacturing, and that -- I also looked at that, and that's been outlined also in my report.
Q Okay. And what type of search did you undertake to evaluate those NDMA studies that you discuss in your report?
A Well, I considered them somewhat irrelevant, so

I didn't pursue any further because they were not directly linked to the question at hand for me. The question at hand was if someone takes ranitidine, are they at risk for the five cancers listed. And those were so far removed, you know --

If someone takes a banana can be -- I'm sorry, if they drink beer, can they get cancer, or if someone in rubber industry is exposed to a variety of agents, can they then get cancer. To me they were so far removed that they were somewhat irrelevant.

Q Are you offering an opinion in this case on whether NDMA can cause the five cancers in humans?

A I'm not aware that NDMA causes the five cancers in humans. Remember, again going back to where the authorities have landed. They've looked at all of the data, the clinical data, all of the ones that I'm talking about, and they've landed on probable, not definitive, because there aren't enough data in support of definitive association.

So to me I land where the authorities have landed. I also land where the FDA has landed on this one. They looked at this. They were not concerned regarding the epidemiologic data -- studies that I reviewed.

Q Do you know whether the FDA undertook a review

of the NDMA dietary studies and reached a conclusion whether or not NDMA can cause cancer in humans?

A I'm sure --

MS. CANAAN: Object to form.

A -- they considered it as irrelevant as I do because it's so far removed because that's not the question at hand.

Q Okay --

A The question at hand is --

Q Go ahead.

A -- that was raised about ranitidine specifically is is ranitidine associated. It's not about is drinking beer associated with whatever cancer. That's irrelevant. I'm sure they considered it equally irrelevant.

Q Okay. Did you -- strike that.

Do you know whether the FDA undertook a review of the NDMA dietary studies and reached a conclusion whether or not NDMA can cause cancer in humans?

A My answer is what I already gave. I -- again within the FDA study, if you look at Florian, for example, they said within the epidemiologic data regarding ranitidine because -- remembering, the hypothesis is that if ranitidine has NDMA, going with that biological plausibility, then you could get cancer.

That's the question. They looked at the data.

In fact, within their publication they say we see no evidence. They are not overwhelmed. So now should they do a dietary review to see? I don't know. You would have to ask the FDA on that, but I wouldn't be surprised if they equally found it irrelevant.

Q Okay. Putting the question of ranitidine aside, do you know whether the FDA undertook a review of NDMA dietary studies to reach a conclusion as to whether or not NDMA can cause cancer in humans?

MS. CANAAN: Objection. Asked and answered three times already.

BY MS. FINKEN:

Q You can answer, Doctor.

A Again, I think they would equally consider it irrelevant. The fact that they haven't even mentioned it tells me they don't even consider it irrelevant. If you want to know that, I think you would have to ask the FDA.

Q Okay. So, Doctor, sitting here today do you have an opinion on whether NDMA can cause cancer in humans?

A My opinion is what the -- all the authorities have landed on this, and that is it is not a definitive human carcinogen, so that's where I land, and I've

answered that.

Q You're aware that ranitidine has been globally recalled because it contains NDMA, correct?

MS. CANAAN: Object to form.

A Yeah, I would -- I don't know if I would agree with that completely. So I would say there was concern raised by the original study that suggested there was high level of NDMA in ranitidine.

That was then -- because of over abundance of caution -- and again that's what FDA's role is -- they said, well, let's look at this. This is concerning, let's look.

But then when they did their studies, they found flaws in the original studies that had shown very high levels, and they did not replicate that. They, in fact, said the methodology that was used in the original studies were not appropriate. That's what started this.

And, you know, as we will discuss, where it lands is exactly where the FDA lands at the end of all of this, including the epidemiologic studies. There is no evidence.

Q Do you know whether or not ranitidine has been globally recalled because it contains NDMA?

MS. CANAAN: Objection, asked and answered.

A Again, the original studies raised concern.

FDA, because that is their role, wanted to make sure that that was not, number 1, accurate; number 2, could there be an issue; number 3, look at all the evidence.

And where they landed at the end is highlighted in the Florian study that says we don't see any evidence, so to me that essentially answers your question.

Q Can you currently prescribe ranitidine for your patients in the United States?

A I wish I could.

Q Okay.

A And my understanding is that -- the FDA, in fact, said that if the companies decide to bring it back, it's really up to them. It's not that the FDA has pulled the indication or the approval. So if the companies wanted to, they could go back and actually have it, and I wish they would.

Q And so can you currently prescribe ranitidine for your patients in the United States?

A Not yet.

Q Okay. Do you know if there are any countries in the world that you can prescribe ranitidine for patients?

A I don't know about their regulatory state, so I know about U.S. I don't know about the world.

Q Okay. So when I asked you previously as to whether or not you know whether ranitidine has been globally recalled, do you know whether or not ranitidine has been globally recalled around the world because it contains NDMA?

MS. CANAAN: Objection, form.

A So, again, going back, my answer was regarding what the FDA did. As you know, FDA is a U.S. regulatory agent. It does not have power in the world or the universe, so what happens in Europe and what happens in Africa and Asia and South -- I -- you would have to ask someone in their regulatory agency.

I can tell you in U.S. where I practice, where I see patients, the FDA has the authority, and the FDA has not pulled the indication or the approval. In fact, they said that if the companies decided to come back, they would consider it.

Q Okay. So you don't know one way or the other whether you can prescribe ranitidine in Europe or Italy or Africa? Do you know?

MS. CANAAN: Objection -- objection, asked and answered.

BY MS. FINKEN:

Q It's not a trick question. I'm just asking whether you know or not sitting here today if you can

prescribe it globally, beyond the United States?

A Again, I answered about the FDA, the U.S. What started the process, that was in the U.S., right? The process started here, so if -- if one wants to hypothesize about other countries and what could happen there, one could go there.

But to me what started the process was in the U.S., was FDA, U.S. regulatory agency, what actions they have taken and what conclusion at the end they reached. That is the most important. Because other countries have their processes, and I'm sure they have scientists that will review all of this and will land where they land.

But within the U.S., the FDA already has done the initial experiments that started this, and they refuted those findings. And to me that's very important.

Q So that --

A And they refuted other studies and have concluded what they concluded, so who am I to go against the FDA?

Q So, Doctor, my question isn't about the FDA. My question is whether you, Dr. Michael Vaezi, know whether or not ranitidine has been globally recalled around the world because it contains NDMA. And if -- if

you don't know, you don't know.

But my question is do you know whether or not it has been?

A My answer is what I gave, and I stand with that answer.

Q So you don't know?

A My answer is --

MS. CANAAN: Objection.

A Yeah, it's -- it's -- it's within the U.S. -- it started within U.S. The FDA has looked at it and have concluded there is no evidence.

Q Do you know whether you can prescribe ranitidine in any other country besides the U.S.? Do you have that knowledge? Do you know?

A I -- I feel that we're going in circles, and you're interested to know what's going on in Africa rather than what the FDA -- the process that started would be. And I would say why not focus on what started the process and what the FDA did because other countries usually follow our lead, as they did with this, but I -- you know what? I -- if -- I'm not the expert in Africa or Asia or South America, I'm sorry.

Q Okay. So going back to -- let's move on.

Do you agree with me -- actually, strike that.

Would you agree with me that there are other

options to treat heartburn in the United States besides ranitidine?

A Yes.

Q Okay. So there's other H2RAs, which you had mentioned some of those previously, correct?

A That's correct. We have famotidine, Pepcid. We have cimetidine. We have nizatidine. We had nizatidine. We don't have that.

Q And you also can treat heartburn in the United States with proton pump inhibitors or PPIs, correct?

A Yeah, that's correct.

Q And there's also lifestyle modifications that can be implemented that could treat or prevent heartburn, correct?

A That's correct. But I can tell you good luck on implementing lifestyle modifications for our patients. And just speaking for myself and not putting anyone else down, I've tried to lose 10 pounds in the last year, and good luck on that.

Lifestyle -- within lifestyle modification you have avoiding so many things that you're not supposed to do, which then fails because of it, right? So lose weight, don't drink wine, don't drink beer, you know, don't eat this, don't eat that, no chocolate, no ice

cream, no -- all of that.

So that -- so that is theoretically within all the guidelines. Unfortunately, practically, as we all face some of these realities, our patients have a hard time when it comes to lifestyle modification and reflux.

But to your point, which is a valid one, is can PPIs be prescribed? Sure. Can we tell patients about lifestyle modifications? Sure. And do we? Of course, realizing they won't do it. And are there other H2 receptor antagonists? Of course.

Q Okay. Are you offering an opinion in this case on the amount of NDMA that's contained in different ranitidine products?

MS. CANAAN: Objection, form.

A I don't know what you mean "an opinion." I think within my -- I'll just answer based on what's in my report.

In my report there were levels that were expressed that were very high, and the FDA then re-looked at those levels based on their studies, so by -- if by that -- I've referenced those articles, if that's what you mean. They're within my report.

Q Have you conducted any testing on the levels of NDMA in ranitidine products?

A Myself personally?

Q Correct.
A No.
Q Are you offering an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A Well, I go -- I go to what I've mentioned and expand on that, perhaps. Remembering that what raised concern was these amazingly high levels that originally and falsely elevated numbers that then were not substantiated by the FDA. That then led to studies to suggest whether or not ranitidine, whether it be exogenously or endogenously, puts patients at risk.

As a clinician, that's important for me to know. So this -- a study that comes out that says Drug A could have problems, I think as scientist we should investigate and then land on yea or nay based on the evidence.

So initial studies raised concern, but then subsequently through FDA's work, through showing that there is nothing endogenous, and there's no concern there, then their own studies again showing that the falsely high levels were because of methodologic issues, then that -- as a clinician, I feel a lot better with that.

Then I feel a whole lot more when I look at the

epidemiologic studies of these five cancers. That made me feel a lot better about being able to prescribe ranitidine again. And if different manufacturers come back again, I would -- I will be more than happy to give it to any family members.

Q So, Doctor, you would be comfortable prescribing ranitidine containing NDMA to your family members?

A So that's an interesting question, right? So you're saying that if you put high levels of NDMA, low levels of NDMA, do you put it at thousands of fold above, so it all depends on what you mean.

But trace amounts of impurities -- you know, any drug that we prescribe has trace amounts of impurities, so if you mean trace amounts of NDMA, well, there are studies that actually have looked at that, right? So that's the epidemiologic studies.

They are showing that those trace amounts do not lead to the five cancers that we're talking about. So, yes, if it's trace amounts, I would have no hesitation.

Q And how would you define trace amounts of NDMA?

A I would define it based on the studies that are here, based on the way the FDA looked at it. At the end of the day, you want to reduce as much of the trace

amount as possible. And FDA has guidelines on that, right?

So they essentially told the manufacturers to look at your products to make sure that the level of NDMA is below a certain cutoff -- and again we can talk about that cutoff -- but below the cutoff.

When they did their studies, many of the lots were well below the cutoff, which explains why the epidemiologic studies don't show an association because the fear that originally was introduced has not materialized.

Q Okay. Which ranitidine epidemiological studies did you review that quantified the NDMA in the ranitidine?

MS. CANAAN: Objection, form.

A It doesn't matter. And the reason it doesn't matter, the -- the studies that looked at any ranitidine, right? So these five -- the epidemiologic studies that I've outlined have looked at any lot that was out there, right? And high, low, normal, abnormal, whatever cutoff one wants to use, and the question then becomes are you at risk.

The studies are so overwhelmingly -- don't show an impact that one then says, all right, if I'm worried about any of those levels, at least I can rest assured

that the epidemiologic studies don't show that association.

Q Can you identify a single ranitidine epidemiological study which quantified the amount of NDMA in the ranitidine pills?

MS. CANAAN: Objection, form.

A I answered that. It's irrelevant because it can be at any level that one wants to propose, right? We know it's not at the highest level that the original studies raised fears on.

So if you go by the FDA levels, the levels that the FDA showed on various lots -- let's go with those levels. Well, if these patients in these epidemiologic studies took those levels at whatever range they are, there's no signal. So if one accepts that -- and the FDA does.

And then, going back to your original question, if the companies then say, all right, some lots were X, some lots were Y, you can't -- these epidemiologic studies somewhat normalized this question. They tell us it really doesn't matter. So you could study --

Remember, epidemiologic studies by default cannot look at those quantification because you -- you don't have the patient randomized. You don't have the drug at hand. That's where randomized trials come in.

You have the drug at hand. You can actually look at the levels, just like the FDA did.

The FDA did a great job in their study because they actually looked at the ranitidine. They looked at the NDMA level. Then they looked at what happens in the body with that endogenously.

So you don't have a randomized trial. Your question of which of the epidemiologic studies did that is somewhat irrelevant. None of the epidemiologic studies can do that, other than a randomized trial.

And at baseline, they're essentially saying give me any range, right, because you're providing any range any of those patients took. And if the signal was there, then those studies would show it. The signal's not there. That is reassuring.

Q Are you finished with your answer, Doctor?
A I can go on longer, but I'm finished now.
Q Okay. Can you identify a single ranitidine epidemiological study that quantified the levels of NDMA in the ranitidine?

MS. CANAAN: Objection, asked and answered.

BY MS. FINKEN:
Q It's a -- it's a "yes" or "no" question. Either you can identify them or you cannot. So my --

(Crosstalk.)

MS. CANAAN: He's answered it --

MS. FINKEN: No, he did not, Eva, and we can do this all day long and not get answers to the question, and we can go back to the Court.

BY MS. FINKEN:

Q But my question is simple. Can you identify a single ranitidine epidemiological study that quantifies the amount of NDMA in the ranitidine product?

A It is irrelevant.

Q So yes or no, do they --

A It's irrelevant.

Q Can you identify one; yes or no?

A Irrelevant. I'm sorry.

Q So you're --

A Your question --

Q -- refusing to answer my question?

A I am answering your question. I think you just don't like the answer.

Q No.

A The answer is irrelevant.

Q Do they -- whether or not you believe they're irrelevant, my question is can you identify a single epidemiological study involving ranitidine that quantifies the amount of NDMA in the product? Can you identify a single one?

A They were not randomized control studies. They did not take the patient and the product and measure the NDMA, but because they were from the same lots that the FDA essentially studied, i.e., from the vast availability of ranitidine -- these epidemiologic studies essentially are using any level that's out there.

So that the question is -- and I know that you want a yes or no, but the question here is that if I give -- I'm a clinician. I have ranitidine. I have no idea how much NDMA is in there, and I'm giving it to you. You're the patient. Well, the question then is, If that's been done over 14, 15, 16 years and no signal emerges at whatever level -- you're asking the question did they measure it.

Well, these are epidemiologic, cohort studies, so they're not randomized trial. And they're essentially saying, you know what? Let's take any level.

So I am answering the question. I'm sorry you feel I'm not.

Q Okay. So let me ask you this. Which ranitidine epidemiological studies evaluated ranitidine use over 14, 15, or 16 years to determine whether or not there was a signal of cancer?

A Well, that's a good question because what's -- what's good about some of these epidemiologic studies that I've outlined -- and again they're all in the tables and the follow-up -- the maximum length, the medium length -- they're all in the table. We can go through all of that.

But the later studies that have been published, especially the studies from Denmark, they have very long follow-up. A lot of -- some of the studies not only looked at more than 10 years, less than 10 years. Some of the studies looked at more than five years, less than five years.

So those are the studies that one can then convincingly and -- look at and say long term is there a risk at any level that these patients were exposed at. Some of the studies actually broke it down by amount, right? So they looked at high exposure, lower exposure, no signal --

Q Okay.

A -- so --

Q Doctor, I think you misunderstood my question.

My question was which epidemiological studies evaluated ranitidine use over 14, 15 or 16 years, the exposure, not the follow-up.

My question is which studies looked at people

who took ranitidine for 14, 15, 16 years and looked at whether or not they developed cancer?

A I -- again, those are the -- those are the studies that I've outlined. I answered that question.

Q What's the longest time frame of ranitidine exposure that was studied in the ranitidine epidemiological studies that you evaluated?

A Sure, I can answer. Look at the table. Let me go through the tables.

Q Sure.

THE VIDEOGRAPHER: You want me to keep this document up?

MS. FINKEN: You can keep it up, sure.

THE VIDEOGRAPHER: Okay.

A Okay.

MS. FINKEN: We can follow along with the doctor.

BY MS. FINKEN:

Q What page are you on?

A So Yoon -- Yoon -- yeah, sure. Yoon looked at it at 10 years. You have the Danish studies that -- Adami. You have 10 to 18 years. That's the interquartile range.

Q And, Doctor, hold on one second. What page of your report are you on?

A Oh, I'm sorry. Let's see. Page 28, Adami.
Q Uh-huh. And you're looking where on this table, what --
A Yeah, look at -- on the left after it says "Adami et al.," and then you have the other column, cohort study sort of describes it.
Q Okay. And where does it refer to the length of exposure to ranitidine that was evaluated in the study?
A Well, these are -- again these are the epidemiologic studies that assessed exposure to ranitidine and followed the patients for, again in this study, interquartile up to 18 years.
Q Okay. So is it your understanding or your testimony, I just want to make sure I'm clear, that Adami looked at patients who were taking ranitidine for up to 18 -- they were taking ranitidine for 18 years to determine whether or not they developed cancer?
MS. CANAAN: Objection, form.
A Well, again the study specifically looked at -- and we can pull up Adami, and let -- we can go through the methodology. Let me do that.
Q Well, I'm looking here at your chart. You indicate that the median follow-up was 14 years. Do you see that on the left-hand side?
A Yes, I do.

Q And IQR 10 to 18 years. Do you see that?
A Yes, uh-huh.
Q And what does "IQR" stand for?
A Interquartile range.
Q Okay. And that is referring to -- when you're saying they're looking at the medium follow-up of 14 years, that's referring to whether or not they were diagnosed with cancer during that 14-year time frame, correct?
A That -- that is the follow-up time.
Q Yes. So how long were the patients actually exposed to ranitidine in the Adami study?
A Okay. So in the Adami study, they actually broke it down by follow-up time. They broke it down by number of prescription, right? So more than 10 prescription, less than 10 prescription. They looked at more than 10 years follow-up to your point, less than 10 years. And they're not seeing a signal.
Q Okay. What's the maximum amount of exposure to ranitidine that they looked at in the Adami study?
MS. CANAAN: Objection, form.
A I would have to go through, but this was based on prescription -- I'm looking now at Adami, the methodology section.
Q Uh-huh.

A And the first -- this is their page 2303, so these were the first prescriptions, so they say define first users, so the very first use, they have to identify where the exposure started, was between '96 and 2008.

Q So that means that somebody would have received their first prescription for ranitidine between 1996 and 2008, correct?

A Correct. So then they -- that following paragraph, they're defining the index date as the date of first prescription.

Q So what's the maximum amount of exposure to ranitidine that they looked at in the Adami study?

A They may have outlined that within their statistical analysis. I know that they have 10 year, more than 10 and less than 10-year follow-up. I know they have more than 10 prescription, less than 10 prescription of that.

And with that, that sort of gives you follow-up. That gives you exposure essentially as far as low and high dose, right? Less than 10 prescription, more than 10 prescription. I think that's what you're getting at.

Q Well, let me ask you this. You're -- you're talking about the 10-year follow-up. Is it your

testimony -- and I just -- this isn't a trick question. I just want to make sure --

A Go ahead.

Q -- I understand what you're testifying to?

Is it your testimony that when they're looking at a 10-year follow-up, that those patients would be taking ranitidine that entire 10 years?

A Yeah, so that's where -- again it goes back to the epidemiologic studies, and if you do a randomized control study, and you have, let's say, a six-month study or a year, and you assign the patients to drug versus not, then you know for sure that they took the medication, right?

So as a surrogate marker, then what they've done is they say, all right, let's make sure that we're looking at -- if we look at all the patients, let's make sure we look at those that actually took it more than 10 prescriptions, i.e., these are patients that are chronic users, right?

A chronic user means someone that actually took their medicine. And the fact that they did that, that's reassuring because what it tells me is if a patient needs medication -- and again we have a lot of patients with reflux. You just don't all of a sudden go from being a refluxer to a non-refluxer. You don't just say,

all right, I'm going to just stop taking my medicine by yourself because a chronic user, more than 10-prescription user, is your chronic disease state.

So they're using that as their surrogate marker. And with that use, they're not seeing the signal. And that's reassuring because that tells me that someone that has taken it long time, that's length to follow, long exposure, chronicity, that tells me that there's no signal.

Q You're not suggesting, though, that the follow-up time is the same as the exposure time in the Adami study, correct?

A It can be in the chronic patient, but it doesn't have to be.

Q I'm asking about the Adami study specifically. You're not suggesting that the follow-up time is the same as the exposure time in that study, are you?

A It can be in some. It doesn't have to be in all. If I am a chronic patient that needs chronic therapy, it can be that. But to your point, it doesn't have to be that in that. It could be less for some. It could be more for others, right? That's where that analysis of using more than 10 prescription becomes very helpful.

Q So do they --

MS. CANAAN: Tracy --
MS. FINKEN: No.
MS. CANAAN: Can I say something?
MS. FINKEN: Sure.
MS. CANAAN: Whenever you come to a natural break, let's take lunch, okay?
MS. FINKEN: Okay. Let me just ask a couple more questions about this, and then we'll move on.
MS. CANAAN: Okay.
BY MS. FINKEN:
Q Doctor, I just want to be clear about this. In relation to the Adami study did they quantify the ranitidine exposure in that study beyond less than 10 prescriptions or more than 10 prescriptions?
A Again, I'm answering it as a clinician because you're -- you -- you want -- the way I'm assuming you want, and I don't want to misspeak, is that do they do A or B, but in clinical scenarios -- because these are clinical scenarios, right? These are actual patients that they took. These are cohort studies, actual patients that were treated and they have a database. They're looking at their actual patients, right?
It's not a randomized trial to your point of, oh, my goodness, they're not exposed exactly for this long. But they're using it as a surrogate marker

because in a clinical situation when a patient has heartburn and needs medication, they fill their prescription because they have a chronic disease.

What happens when they don't? They have symptoms. They have to go back on it. And that's where their surrogate marker of more than 10 years comes in because those are the chronic patients that have taken it, and they also looked at follow-up, and in both categories and that combination they're not seeing a signal.

Q So are you assuming that patients who took ranitidine for more than 10 prescriptions in the Adami study were taking it during the entirety of the 10-year follow-up period?

MS. CANAAN: Objection, form.

A Again, it's -- it's a reasonable clinical scenario from which their database comes from. Their database is not just a random created database. It's a database of real patients, real GERD and/or whatever the reason for it was and real therapy.

So to me patients that have reflux disease need their medicine. They need it chronically. If I look at someone that's filled 10 prescriptions or more, they have chronic disease. It's not an unreasonable assumption. It's a good clinical assumption. You are

on your medicine chronically because you need it. So to me the idea of questioning it, whether or not that's appropriate, is not clinically valid.

Q Okay. So when they're pulling the information out about prescriptions of ranitidine, they're pulling that from a database, correct?

A Yes.

Q Okay. And in the Adami study, they quantify it by people who -- who have 10 prescriptions or less of ranitidine or 10 prescriptions or more of ranitidine; is that, correct?

A Yes.

Q So they --

A That's one of their analysis.

Q Okay. Do they quantify any further in terms of ranitidine prescriptions beyond less than or more than 10 prescriptions?

A So they used it as a surrogate marker of chronicity. That's how they assigned it.

Q Okay. And where does it say that in the study itself?

A Well, there are many things studies may or may not tell you, but as a clinician that sees patients, if I -- if I'm told someone has more than 10 prescription that they filled, that tells me they have a disease for

which they need the medication, right?

MS. FINKEN: Okay. Let's take a break.

MS. CANAAN: You want to take a break?

MS. FINKEN: Let's take a break. Do you want -- let's go off the record.

THE VIDEOGRAPHER: The time is 12:51, and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Everyone, please stand by.

The time is 1:37 p.m., and we're back on the record.

BY MS. FINKEN:

Q Did you have a good lunch, Doctor?

A I did, yes.

Q Okay. Let's get back to it then.

So, Doctor, you had indicated previously that you have acted as an expert in two other cases; is that correct?

A Yes, that's correct.

Q Okay. And what types of cases were they?

A I believe the first one was a product liability case brought on by a patient. Do you need specifics or just that?

Q Just what type of product was it, do you

recall?

A Yeah, it was a patient that was having esophageal issue after drink soft -- they had soft drinks, so they had some esophageal issue, and later on they developed esophogeal motility disorder. And the question was could that drink have had anything to do with the motility disorder that the patient ended up having.

Q And did you act as an expert on behalf of the injured plaintiff or the defendant?

A The defendant. I was asked to review the case and see if there's any reasonable association between that soft drink and the eventual motility diagnosis, and that's what I was asked to do.

Q Okay. Did you testify at deposition or trial in that case?

A I think there was an in-person depo- -- this was prior to the COVID pandemic, and that was in-person deposition. It never went into trial.

Q Okay. And where was that located, that case, do you know?

A I don't know. I think I provided that information to counsel. And it may be also in my report, if I'm not mistaken.

Q Okay. That's okay. You don't need to look. I

just didn't know if you knew off the top of your -- of your head.

And the other case -- the second case that you referred to that you were acting as an expert in is in relation to the PPI litigation; is that correct?

A That's correct.

Q And what is that litigation involving?

A I was also -- again, because of my expertise, was asked to review the data on the role of PPIs and this adverse outcome, and I provided -- I believe the -- the counsel had gotten my name because of, again, our -- my publication and expertise, and I -- I did the same. I reviewed the specific case and provided my opinion about that case.

Q Okay. And that was at deposition as well?

A Yes, I had a deposition on it.

Q Okay. Will you be testifying at -- at trial in that case?

A I don't -- to be honest with you, I haven't heard in a long time, so I -- I don't know where it stands. I'm not sure. I'm sorry.

Q Okay. And who was the law firm that retained you in the first case involving the soft drink?

A I -- I'm sorry, I'm bad with names, so I apologize. I don't know. It's in -- I don't know that

indicated -- is there a way of pulling that up? I --
Q I don't think it's in your materials if that's what you're referencing.
A Yes, that's what I was. I'm sorry, I don't know.
Q Okay. Was it any of the same lawyers that you've been involved with in this case?
A Not that I'm aware of. And again I was asked by Ms. Canaan to do this, so I'm not aware of any other attorneys. Now, if there are some that -- that are -- that are distantly connected, I wouldn't know that. I'm sorry.
Q Okay. And as far as the PPI litigation, is it the same lawyers in the PPI litigation who you're working with in the present litigation for Zantac?
A Not that I'm aware of. They're completely different. I'm not aware of any connection.
Q Okay. And when were you first retained in the PPI litigation?
A That was a long time ago as well. I know that last year was the deposition, and I think it was a few years prior to that when I was approached first.
Q Did --
A I honestly don't remember the exact time.
Q Does 2018 ring a bell?

A It's possible. I don't remember specifics.
Q Doctor, have you heard the term "KOL" before?
A KOL. In what -- in what context? I'm sorry.
Q In the context of -- of the pharmaceutical industry.
A Oh, key opinion leaders, yes.
Q Okay. And you anticipated my next question. So KOL refers to key opinion leaders, correct?
A That's correct.
Q And what is a key opinion leader in the context of the pharmaceutical industry?
A Good question. I don't know what they consider key opinion leader is. You know, I -- I usually just do what I do, and if someone comes and says, hey, can you provide an opinion, just like in this case or in others, I -- I tend to mind my own business, and if I'm asked to help, whether it be through consulting or through educational venues -- I don't know what they consider KOL. I'm sorry.
Q Okay. Have you acted as a KOL in the past for pharmaceutical manufacturers?
A I have acted as educational as well as consulting with pharma, yes.
Q Okay. And which manufacturers have you been hired as a KOL?

A Again, I don't know if they hired me as KOL, but I know that I've been involved in consulting and educational with different companies. I can't remember all the names, but I'm sure I -- it's probably in my CV somewhere about -- I don't know. I couldn't tell you.

For example, in the -- I can give you some that I do remember, but I don't remember all of them. I'm sorry.

Q Okay.

A In the era of PPIs, when PPIs were coming out, especially with esomeprazole, this is the enantiomer of omeprazole, I was asked to do some educational and some consulting with AstraZeneca at that time.

And recently, as I mentioned, I've been asked to be consulting with some of the P-CAB companies, which I mentioned, and there's some studies we're doing.

Q And which ones are those, which companies?

A I don't know. I'm happy to find the names and provide it to counsel. I can't remember the names specifically. I'm bad with names. My apologies.

Q Did you -- do you recall any others that you did KOL work for?

A Again, I'm sure there are others. I don't recall all of them, but there were -- most of what I remember -- in fact, I would argue nearly all would --

would have been as consulting, educational opportunities as well as if there are any grants. That would be on my CV, so I didn't commit them to memory, I'm sorry.

MS. CANAAN: Excuse me, I want to put in a belated objection to form to that question. Sorry.

MS. FINKEN: Okay.

BY MS. FINKEN:

Q Did you do -- did you act as a KOL on behalf of Takeda?

MS. CANAAN: Objection, form.

A I don't know. Again, I know the term "KOL." I'm -- I have been retained as either in consulting capacity or speaking capacity and on research funds that we originated with some of those companies, and I'm sure Takeda at the time I believe was involved with Prevacid. Is that right? So Prevacid, so . . .

I'm sure -- it's on my CV if there was any grant related material and if it was speaking or educational opportunities.

Q What about Pfizer?

MS. CANAAN: Objection, form.

A Pfizer, again, if you -- I don't have the context. I'm sorry. I'm not trying to be evasive at all because these -- I haven't reviewed all my consultings. There's a long list, so I would have to

pull out a study and see who the sponsor is.
I seldom look at that. I look at more what it involves. Companies sometimes come to us. They say, hey, can you do this study, and what we do is see if that's appropriate for our patient population, is that someone we could enroll in those studies. So I -- I would have to look. I'm sorry. I don't recall.
Q Do you recall doing any speaking or educate- -- as you referred to, educational opportunities on behalf of Pfizer?
A Again, I've done speaking and educational talks for many companies. And the majority of those have been education regarding reflux, how to diagnose reflux, how to treat reflux and what to do. That's been my pattern. For many years I've done that.
So I don't do any -- I'm a bit sensitive, and I know you didn't intend it or didn't mean it. I don't do speaking for anyone because for me it's -- and in fact, I tell all the companies when they come say, hey, can you speak for us, I go no, I don't speak for you. I speak for me, and then I provide educational opportunities, so -- to just put the context there.
Q Okay. And you get compensated, though, for that -- for those speaking engagements, correct?
A I get compensated for my time for anything I

do, including those, yes.

Q Have you ever been engaged to speak at national sales meetings for companies regarding their products?

MS. CANAAN: Objection, form.

A I've been asked to -- again it goes back to the same three chunk of what I do. I don't know what meetings, but if they ask me to give a lecture about a specific topic to anyone, whether it be providers, nurse practitioners, P.A.s, general GI or primary care doctors, or anyone else, I look and see if it's appropriate for my expertise, and I provide educational opportunities.

Q And did you ever participate in speaking engagements on behalf of companies promoting H2RAs?

MS. CANAAN: Objection, form.

A I believe by the time I started, so if you look at the timeline on my CV when my residency ended and when my academic career, if you will, postresidency/fellowship started, by then the H2 receptor antagonists were not ones that were asking. It was more the PPIs, acid related or industry regarding others, but not H2 that I can recall.

Q Have you ever done any work on behalf of GlaxoSmithKline?

A Not that I recall. And again it would have to

be -- I don't remember names and companies. I don't keep those. But context. I -- I don't know. If you show me a specific meeting, then I can tell you if that was me or not.

Q Have you ever done any work on behalf of Proctor & Gamble?

A Not that I call -- recall.

Q Have you ever done any speaking engagements on behalf of Boehringer Ingelheim?

A Not that I recall.

Q Have you ever done any speaking engagements on behalf of Sanofi?

A Sanofi, I believe there's -- they may have a -- not speaking engagement, no. But I believe -- and I would have to ask my research coordinator if they are the ones involved in some products that they may have approached some -- one of my colleagues about. I'll have to look. I'm -- the name sounds familiar, but I don't --

Q Okay. So sitting here today, you recall engaging in speaking opportunities on behalf of Takeda and on behalf of AstraZeneca; is that right?

MS. CANAAN: Objection, form.

A And, again, I don't do speaking on behalf of anyone. I educate. I think -- I want to make sure --

I'm very sensitive to that because I tell them this, and I want everyone to know this because -- I don't do speaking or engage in any activity for anyone. I do it for educational research or informative matter because again for me it's -- I don't do it for them.

Q So did you ever engage in speaking opportunities where you would discuss the benefits of prescribing proton pump inhibitors for GERD?

A The speaking opportunities that I've given over the past many decades have been about patient presentation, how patients present with reflux, what symptomatology, a lot of focus on extraesophageal reflux because of my interest in the larynx, how we go about diagnosing them, what tests are appropriate at what time, and then what are the current treatment options and how effective those treatment options might be, so I usually lump them altogether.

And the reason I say that is because that's the bigger picture, right? So I -- I try to educate about how to treat a patient. I'm a clinician. How do you diagnose, how do you treat, what are the pitfalls.

That's what I do for any of the lectures I give whether it be asked by industry, by societies or by anyone. I use the same metric.

Q So when you would undertake speaking

engagements on behalf of pharmaceutical companies, you didn't discuss the products to treat those indications; is that your testimony?

MS. CANAAN: Objection.

A I don't --

MS. CANAAN: Objection, form.

Michael? Michael, just give me a second to object.

THE WITNESS: Oh, okay.

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q You can answer.

A I -- I don't -- I mean, if you could clarify because I was going to say I'm not sure what you mean because . . .

Q Okay. So, for example, when you would go and do speaking engagements on behalf of Takeda, you didn't talk about the benefits of prescribing Prevacid or Dexilant to threat certain conditions; is that what you're saying?

MS. CANAAN: Objection, form.

A That is not what I'm saying.

Q Okay. I just want to make sure I'm clear because I don't think -- I think -- I thought that you had testified that you don't actually discuss the

products that the pharmaceutical companies manufacture in treating those indications.

So you're saying you do discuss the products; is that right?

A So again I discuss all available therapies, so it is -- I don't go and just say you should only take this drug because this company paid me to tell you that.

Q Uh-huh.

A That would be wrong. That would be inappropriate. That would be not right, right? So I think if that's what you're asking, the answer is definitely no, because I've never done that.

I do in the context of all therapies. What are the options with treating? What are the PPIs? What are current PPIs? We have X, Y, Z, and you go through it. What are the differences? Which patients might do better with what?

So to put it in that context, yes, I discuss all the therapies, but not specifically a drug and not specifically only a drug. I talk about in the context of education about reflux, how do you diagnose, what are the issues, what are the dosing, how long, what do you do after someone's better, how do you taper the medication. Do I do that? Yes.

Q How many times a year do you engage in speaking

on behalf of pharmaceutical companies?

MS. CANAAN: Objection, form.

A I don't do speaking on behalf of anyone.

Q Okay. How many times a year are you paid to -- to attend and speak in relate- -- paid by -- strike that.

How many times a year would you say that you are paid by pharmaceutical companies to speak at different events?

MS. CANAAN: Objection, form.

A I'm paid for my time spent educating. How many times a year, it's variable. I am giving a lecture virtually in Argentina. I'm giving a lecture virtually in Hong Kong. These are educational opportunities by different societies that have asked. I'm giving a lecture virtually in Taiwan for their motility society.

So it's variable, either in person or virtual now with COVID, but it's variable. They're sometimes more, sometimes less, and it also depends on whether I'm available, do I have other things that I do, so it's --

I can't quanti- -- quantitate based on this year or that year, but if I'm available, if it fits within my expertise, if that's something that I want to do, then that's what I do.

Q Doctor, how many times this year have you been

paid by pharmaceutical companies to speak?

A Again --

MS. CANAAN: Objection, form.

A -- I couldn't tell you. I'm sorry. I don't keep track of that. Just like if you asked me how many times a year have I given talks for societies, I couldn't give you that answer because I don't keep track of that. I -- again looking at what it is they want me to talk about, when, what topic, does that fit within my expertise and do I have the time.

Q Okay. So we're in the month of May, and is it your testimony that you can't give me an approximate of how many times you've spoken on behalf of or -- strike that.

We're in the month of May, and is it your testimony that you can't approximate for me how many times you've been paid by pharmaceutical manufacturers to speak this year in the past five months?

MS. CANAAN: Objection, form. Also asked and answered several times already.

A It's not one that I keep track of. You know, it's like saying how many bananas did I have in the past five months. I don't know. I don't keep track of that.

As I mentioned earlier, I have so many responsibilities: Patient care, administrative,

research. I don't sit there and I go, oh, this month I did X, that month -- I think that would be artificial of me to do, and I don't do that.

Q Who keeps track of your payments that you receive from pharmaceutical companies to speak?

MS. CANAAN: Objection, form.

A I guess they do. When I give the lecture, they send me and I receive the payment in the mail.

Q Okay. So it comes directly to you; you don't have like a secretary or somebody who's in charge of following up to make sure that you get paid for these type of things?

MS. CANAAN: Objection, form.

A I have a secretary, but she's -- she's been out for three years because of Zoom. And she's right now doing everything Zoom because of COVID, but she's been out for three years.

Prior to that, she would probably remind me on my calendar because there may be some on the calendar that she had, but I -- I don't keep track of it. I'm sorry.

Q Okay. Would you say that you speak weekly?

MS. CANAAN: Objection, form.

A I -- I doubt weekly because I don't have that time.

Q Okay. Doctor, have you ever heard the term "speakers' bureau" in the context of the pharmaceutical industry?

A I have.

Q Okay. And what is a speakers' bureau?

A I think from what I understand is -- it's -- it's a list of experts that they have regarding -- for example, if a company -- let's say industry or a pharmaceutical company has certain products, if you will, and their focus let's say is on reflux, then they like to know who the experts in the field are.

My -- I'm assuming that is a list of their experts in the field that they have interests in.

Q And you understand that you've been part of the speakers' bureau on behalf of certain pharmaceutical companies over the years, correct?

MS. CANAAN: Objection, form.

A If that's the case, I -- I don't know what list I'm on. I'm sorry.

Q Back before COVID -- COVID shut the world down, did you engage in what they refer to as lunch and learns on behalf of pharmaceutical companies?

MS. CANAAN: Objection, form.

A I don't know what "lunch and learn" is. Again, I go back to the buckets. If they ask me, Dr. Vaezi,

can you give a lecture of reflux for X, Y and Z, then if I have the time, if it's within my expertise, possible.

Q Did you attend dinner programs and speak at the request of pharmaceutical companies?

MS. CANAAN: Objection, form.

A Same answer.

Q Have you ever heard the term "round tables" in the context of the pharmaceutical industry?

A I believe -- again I'm going to guess, so I don't know if this is correct. I believe they mean the consulting, like if they're asking some experts to come and give them expertise on X, Y and Z. Some companies, for example, want to know if the product they have would be good for a certain disease and they ask -- they have a group of experts come. They sit down, and they present their ideas.

And what they want is the experts to provide them the expertise from clinical care whether or not their product would fit that, how best they could do a study design if they haven't already, or critique their study design, if they have one, does that fit within the therapeutic modality of what they're thinking. I think that's what they mean.

Q Have you ever been paid by pharmaceutical companies to do radio tours and discuss their products?

MS. CANAAN: Objection, form.
A Radio tours?
Q Yeah.
A I don't know what that is. I'm sorry.
Q Okay. Have you -- do you understand that when pharmaceutical companies engage doctors to be part of their speakers' bureau, that that's one way that pharmaceutical companies promote their product to the industry. Do you understand that?
MS. CANAAN: Objection, form.
A I don't know what their goal is. I know what my goal is, right? So I can't answer for their goal. My goal is -- if they're asking my expertise for study design, for reflux, then my goal is to educate them what I know. And -- so I -- I couldn't answer for what their goal is. I'm sorry.
Q During your -- strike that.
I believe, Doctor, you testified earlier that you receive research grant support from pharmaceutical companies at times; is that correct?
MS. CANAAN: Objection, misstates his testimony.
A Yes.
Q Okay. And would the -- well, strike that.
Do you recall which pharmaceutical companies

have provided you research grant support in the past?

A That would be on my CV, so I can pull up my CV. Are you interested in knowing that?

Q That's okay. If you -- if you have been provided research grant support from a pharmaceutical company, that's information that would be contained in your CV; is that correct?

A Going back to my answer on the CV, all the ones that are listed on my CV are those that are accurate. If there are some that are not on that, that's because I wasn't as vigilant in updating my CV.

Q Okay.

A So the ones that you see there would be accurate. I wouldn't have added things that are not true. But there may be some there that I don't have because I didn't have the time to update.

Q So if I wanted to find out generally which pharmaceutical companies provide research grant support, I could look at your CV and see?

A You should be able to. The only exception would be some of the multicenter studies that we're doing. As I mentioned earlier, they -- we have many studies. We have over 130 studies right now, that they come to my research coordinator, they say, hey, do you have the population for this study.

And those normally don't end up necessarily there because they're approaching, you know, the research coordinator, so I may not have that they approached us and we're a part of that, but they don't necessarily provide research fund.

The one that you will see on my CV are the investigator initiated studies. Those are the ones that I would have thought, hey, what about the role of a PPI in treating someone with hoarseness. Could reflux cause that, or could -- what about the role of PPI in treating X, Y and Z, and the company has no interest in pursuing a multicenter study on that.

So that's the investigator initiated studies that then we apply to those companies. We say, hey, here's our research protocol, here's the population, here's what we want to do. So those are the ones that we would have initiated, that we wanted to know the answers to. And we do that all the time in clinical research, what about the role of X and Y. And so that's what you're going to see on my CV. Those are investigator initiated studies.

And then there are the multicenter studies that I mentioned to you that let's say the P-CAB companies want to know whether their product -- they want to go to the FDA to get approval. Then they would approach

multicenters, us being one, and say, hey, would you like to be a site. And I give that to our coordinator, and if they have it, they look at the population and see whether or not it's appropriate for our site.

Q Have you authored any publications that have been sponsored by any pharmaceutical companies?

MS. CANAAN: Objection, form.

A What do you mean by "sponsor"?

Q Paid for.

A Well, in that sense, then the study that I outlined, I have investigated or initiated a study that let's say is on my CV, 10 years ago, 15 years ago, 20 years ago where we wanted to study that, then in that sense, they paid for that grant, but we did the study. We came up with the design, and we published it. So that would have been one that they, quote, paid for? Yes. In that sense, yes.

Q Have you coauthored any articles with individuals within pharmaceutical companies about medications?

MS. CANAAN: Objection, form.

A So if there are some within the other studies that I've highlighted, within the multicenter, let's say, and if we are the lead center, for example, and that can be -- we could be only a part or we could be a

lead site for studies, then in that case that might include those -- their scientific individuals.

But I would have to look and see if that's the case or not. But I could see a scenario where that might be the case. I -- I would have to look. I'm sorry.

Q Okay. Have you coauthored any articles where pharm -- with -- strike that.

Have you coauthored any articles with individuals from within pharmaceutical companies that are seeking new indications for their products?

MS. CANAAN: Objection, form.

A So that would again fall within my last answer, so if they're doing a multicenter -- so remembering -- I think I have that within my report. If companies want to seek FDA approval, they have to do the studies within U.S. usually. There are only so many sites that see that type of population. So for the P-CAB studies, for example, they reach out to us, and they say, hey, can you be a site. Sure, if that's appropriate.

So in that context we -- if we're the lead, then we may very well be on the same manuscript as they take that to the FDA.

But again that -- that gets to the science of these randomized trials, which often they are when

they're multicenter, and they're trying to find efficacy for their drug for whatever the indication might be, so . . .

I can tell you just from -- I forget the year, but long time ago, AstraZeneca was trying to get approval for their product -- or find out whether or not it's effective in laryngitis, in patients with cough, and that -- that was my area of expertise, so that fell within -- they came. They asked us scientific questions. I wasn't just alone, many, and that led to a multicenter study.

And with that study -- unfortunately, the study was a negative study, and by that I mean with the randomized control trial, we didn't find that Nexium, that was the product, compared to a placebo was not more effective, so that was not able to show the benefit for them.

So that would be an example I would give you. The answer is, yes, in that context.

Q Have you ever allowed a pharmaceutical company to add your name to a publication as a co-author on an article that you had no role in writing or editing or anything of that nature?

MS. CANAAN: Form.

A I am not aware of it. Usually with any

publication, we would, you know -- if -- if my name is on it, then I would have some role, so I'm not aware of one where they just put my name on it, and I had no role in it, so . . .

Q Okay. So when you publish in medical journals, you typically have to disclose the conflicts that you have with industry, correct?

A Usually, yes.

Q So, for example, when you receive funding from a pharmaceutical company or act as a consultant, you have to disclose that information with the article that you publish, right?

A Usually --

MS. CANAAN: Form.

A Usually that would be ideal to do. And at times we fail in that process, not on purpose, but at times we fail, and many fall into that. But typically we do, so you want to be able to do that. You should be able to do that, but at times you fail in that process, and either you forget to or if you don't -- but again usually you want to if you can.

Q So is it standard within the industry to disclose conflicts in the publications that you author and that are published in medical journals?

MS. CANAAN: Objection, form.

A It would be -- it would be good if you have thought about all your conflicts, and it would be good to include them in publications if you can recall and -- yes, that would be ideal, if you can.

Q Do the journals actually require that you disclose conflicts with the articles that you publish?

A They ask for it, yes.

Q And why do journals require you to disclose potential conflicts when you publish articles?

A You have to ask them why they require it. If you're asking me what I think about why, I would answer in that sense. It's good, so that if there's a conflict --

So let's say I come out and I say drug A is the best and I am part of the company. Well, it's good for authors to know, for readers to know, that I work for the company, and there could be potential bias in that statement, so it's always good to put those biases if it impacts -- especially in that scenario, if it impacts what the reader would get out of that, right?

So remembering that there are many publications out there, and all publications have biases within them, so it would be good for the readership to get a sense for that and see whether or not that potentially would have resulted in a biased statement, if you will.

Q And, Doctor, just going back a little bit to some of your work in clinical practice. You had indicated that at times you have been -- you -- hold on. Strike that.

Going back to your work in clinical practice, you had indicated that there are times where you might diagnose certain types of cancer in some of your patients. Do you recall that?

A Yes.

Q Okay. And specifically I believe you referenced laryngeal cancer -- cancer. Are there any other types of cancer that you might diagnose in the course of your day-to-day clinical practice?

A Laryngeal cancer, esophageal cancer, gastric cancer, small bowel cancer, colon cancer, pancreatic cancer, liver cancer, and at times -- so if we're looking for --

Let's say someone presents with abdominal pain, we don't know what's going on. At times others. Just two weeks ago renal cell carcinoma. Someone had -- kidney. Because she had abdominal pain, I got a CAT scan, and there was a tumor on the kidneys.

Bladder cancer, you -- you identify it from different areas. If you're looking -- you know, the generalized presentation, I've got abdominal pain, I

have nausea, I'm throwing up, we don't know why. We do our endoscopies, everything is normal. Sometimes we order things like MRIs and CAT scans. And within that, we could then identify certain cancers that we didn't know based on patient presentation.

I've identified tumors in the brain because the patient has just came in and said I have nausea, it was a constant nausea, and we did all the searches, we couldn't find it. We got an MRI of the brain, and there was a tumor there.

So, you know, GI symptoms are nonspecific. Sometimes they are. Sometimes, you know, they're very specific. I'm bleeding, I'm throwing up blood, and we go and find out why. But sometimes they're so nonspecific. A brain tumor, why would you be nauseous? So there are all these mechanisms, but we -- we do searches. We keep searching until we find the answer.

Q And, Doctor, when you refer to gastric cancer, is that the same as stomach cancer?

A Yes.

Q Okay. And what are some causes of stomach cancer?

A Well, you can -- I've sort of outlined that in my report. As far as all the list, I can just give you the top ones that one should worry about.

H. pylori is one of those that you worry about. It's -- H. pylori is essentially a -- Helicobacter pylori is a bacteria that was -- is in the stomach. And we have learned that that is a main risk factor for gastric cancer. And that's still prevalent in many parts of the world.

When you treat that -- it causes peptic ulcer. It can cause cancer, so when you treat that, then the risk of cancer goes down in patients.

In fact, when you look at the U.S. incidence of gastric -- gastric cancer since H. pylori eradication -- and that's something we look for. We look for that in someone who has symptoms -- the incidence of gastric cancer has gone down, so that's a big factor.

In countries where H. pylori is still high in prevalence, a lot of people are still dying from gastric cancer, and that comes to the education. You've got to really try to educate people, look for H. pylori, treat it. So that's one of them.

Smoking --

Q Well, let me ask you a question about that. Is H. pylori considered a carcinogen?

A Yes.

Q Okay. And is it classified as a carcinogen by IARC?

A You know, I --

MS. CANAAN: Objection to form. Give -- give me a moment to object, Michael.

THE WITNESS: Sorry, sorry, sorry.

A You know, I haven't looked, but I would assume it would be.

Q How long does it take for stomach cancer to develop from H. pylori?

A So that's a -- that's variable, right? So it depends on the aggressiveness of it. It depends on, you know, how long the patient has had it. It depends on if they're smoking. It depends on if they're drinking. It depends on if they have a high BMI. So that's so variable, so to me --

I'll give you an analogy. Again, I always fall back on my clinical care. One of the things I teach our fellows is when you want to do research, how does it relate to clinical care and how do you improve patient care.

I had a patient I scoped, had nausea, and we treated with PPIs. They did great, and then we stopped everything. She was still doing great. We had done endoscopy. Everything was normal. We biopsied the stomach. Everything was normal. A year later, she comes back. We do endoscopy. She has gastric cancer.

So to me it's highly variable. What if you have genetic risk factor, right? That's going to increase your risk. We all know about 20 year olds -- I mean, unfortunately, I've seen too many of them, 20 year olds, 30 year olds, 40 year olds diagnosed with cancer.

So it isn't about the exposure in that case, right? So if they smoked for five years, did that cause the cancer? There's so many variables in us.

So to answer your question about H. pylori, I can't give you an answer because there's so many factors that play a role. How long does it take? Each of us are different.

Q And how long does someone need to be exposed to H. pylori to develop stomach cancer?

MS. CANAAN: Objection, asked and answered.

A Yeah, the same. You know, if you have H. pylori and if you smoke and you drink and if you have genetic factors, so it all depends. It's so variable. There's not a you take H. pylori, you come down with cancer in two years and five years. That's a -- that -- I wish it was as simple as that. It isn't.

Biologically we're made differently. We're exposed to different things. We have different risk factors. We have -- we drink, we smoke. There is too many variables.

Q Okay. Have you ever heard the term "cocarcinogen"?
A Cocarcinogen, yes.
Q How would you define the term cocarcinogen?
A Based on what I understand, they're agents, if you will, or risk factors that are both carcinogen.
Q Okay. So when you're referring to variables such as smoking and alcohol and H. pylori, would those all be considered co-carcinogens?
A They're considered --
MS. CANAAN: Objection, form.
A Yeah, they're considered risk factors, right? So alcohol is a carcinogen. It is classified as a carcinogen. H. pylori is a carcinogen. So if I drink and if I have H. pylori, would my risk be higher? Perhaps.
So you have synergistic effect, and sometimes you don't have synergistic effect. Sometimes they're just independently. Sometimes they're dependent variables. So, again we know that --
Go ahead, I'm sorry.
Q I just -- I'm just trying to get a sense. You indicated that alcohol is a carcinogen, and H. pylori is a carcinogen, so would those be considered co-carcinogens, that they both have a carcinogenic

effect?

MS. CANAAN: Objection, form.

A They are both carcinogens. They're classified as carcinogens. If by "co" meaning are they synergistic, are they not, that's a different question. But are they both carcinogens? They are both carcinogens. That's the way I'm answering based on what I understand.

Q Okay. You have indicated that you also diagnose esophageal cancer at times. What are some causes of esophageal cancer?

A Well, that's variable as well in that it depends on the type of esophageal cancer. So you have squamous cancer and you have adenocarcinoma. They're both esophageal cancers.

We have patients that have had lye ingestion, for example, and that puts them at risk for squamous cancer. We have patients that had prior radiation. They had a cancer. They got radiated for the cancer, and now they're at increased risk of getting it back, right? So radiation.

So radiation, lye ingestion. You have HPV which is a risk factor. Smoking, that's a risk factor for -- again, I'm specifically talking about squamous cancer.

For adenocarcinoma, you have -- again reflux is an important risk factor, but you also have genetic risk factors. You also have other issues regarding tobacco.

So with reflux, for example, patients can get adenocarcinoma from -- through the Barrett's mechanism. They get esophagitis. They don't even know they have it. They have chronic reflux, and that turns into Barrett's. They don't even know they have it.

When they develop Barrett's, their symptoms go away. They go, oh, great, I don't need any acid suppressive therapy because I have no symptoms anymore. Well, that's incorrect. So then they don't take something that protects them, then they come up with cancer. So reflux is a -- an important factor as well.

Q And, Doctor, when you use the term "latency period" when talking about cancer, what is that referring to?

A Where do you see that in my report?

Q I didn't. I'm just talking about generally.

A Oh.

Q When -- when you --

Do you understand what I mean when I say the term "latency period"?

A Yeah, I was going to say I haven't mentioned latency period. What do you mean? Yeah.

Q All right. I didn't mean to confuse you. I'm just referring to --

Well, I'm asking the question: Have you heard the term "latency period" when referring to cancer?

A I have, yes.

Q Okay. And what is that referring to?

A I guess -- again it's -- it's kind of variable. The way I see it, the way I look at it as a clinician based on what I see, latency period is variable is the way I see it, so that's the time from exposure to someone getting cancer. And I think that's what you're referring to, if I'm not mistaken.

So from clinical sense, if I drink alcohol today, am I going to come down with cancer tomorrow, right, from alcohol alone? So that -- that's a latency of one day. That's the way I see it. So it's from a time perspective. Is that what you mean?

Q I -- I think so. You're not suggesting, though, that alcohol and cancer develops with a one-day latency period, are you? I think we'd all be in big trouble if that's the case.

A No, no, no, no. I think -- I think -- your point is valid. No, I was using it as an example. I'm just saying that's a one-day latency. I hope not. I would be dead a long time ago.

Q As would I.

So, Doctor, just going back to that for a minute, do you have -- what is a typical latency period for stomach cancer to develop, do you know?

MS. CANAAN: Objection, form.

A Yeah, that gets to what I mentioned earlier. It's -- you know, there's not a single time point, right? Because we're all different. You know, I answered that with respect to your question on H. pylori. There's not a single answer to that. I wish there was.

I wish I would know that, you know, if you're exposed to X, you have only five years or ten years or two years to develop cancer.

It's variable. We have patients that develop it in two. We have those that developed it in five. We have those that developed it in 20. So it's highly variable.

It depends on so many other factors: Am I obese? Am I smoking? Am I drinking? Am I exposed to other things?

So I can't define it specifically. I wish I could and -- sorry, it's variable.

Q Does the same hold true for esophageal cancer?

A I think that holds true for all cancers.

Q Okay. So you would -- you would say the same thing as it relates to liver cancer or pancreatic cancer as well?

A That -- that would hold true for all cancers because -- again, I'm not a pathologist, but pathologists -- and you could ask them, there are different grades of cancer, right? One is aggressive. One is not. One is indolent. So to say that one cancer grows and develops much quicker than another or much less than another -- so there's too many variables to it and what kind of cancer.

So, yeah, I believe it applies to all. Clinically I think it applies to all.

Q Okay. Doctor, what -- and I don't know if I asked you this previously, I apologize, but can you just explain to me what gastroesophageal reflux disease is?

A Yeah, I'll be happy to.

Q I may have asked you it before, and if I did, like I said, I'm sorry.

A No, you didn't, but thank you for asking.

You know, unfortunately this is a disease that is so common around the world, including the U.S. It's essentially a -- an imbalance between our defensive factors and aggressive factors.

So we all reflux. If you ate lunch, if I

ate -- had lunch, which I did, if we're drinking tea, coffee, we all reflux, so reflux is a normal phenomenon.

With gastro reflux -- gastroesophageal reflux disease, the word "disease" is -- is this imbalance, the shifting between defensive factor and aggressive factor. So what happens is we often treat for the aggressive factor being acid, but really it's the defensive factor and imbalance that's leading to it.

So what happens is when you eat, you reflux. So why don't you have reflux disease? Well, the reason you don't have it is because you swallow your saliva. That neutralizes the acid. You have peristalsis, in other words, movement in your esophagus that then squeezes that acid back down, right? And then you have a valve that protects you.

If there's any imbalance in that, then that normal physiologic reflux is altered, and that alteration then makes you have reflux, the disease. And then when you have reflux disease, you have to have the symptom.

And the symptom -- the common symptoms, but people present differently. I may have hoarseness. That's my only symptom of reflux. I may have laryngitis or I may have cough or I make have worsening asthma. And if you asked me do you have heartburn, I would tell

you no, or I could have heartburn. I could have regurgitation. That's the classic. Or I could have abdominal pain, and that could be reflux.

So it presents different which creates a challenge for us about how do we then diagnose it, if patients present different -- heartburn is easy but with others.

So it really physiologically is that imbalance. Symptomatically it is varied. Then you have various ways of treating it.

One way of treating is acid suppression, but really acid is not the problem, right? Because acid is normal. It's not that patients with reflux have so much acid that we need to suppress that acidity. They produce the same amount of acid, so we're just trying to make them feel better.

Q So -- and you have indicated previously that you've prescribed certain medications to treat gastroesophageal reflux disease, which is also called GERD, right? Can we call it GERD for the --
A Yes.
Q Okay. Great, because that's a mouthful.
To treat GERD you've prescribed medications in your clinical practice in the past, right?
A Yes, that's correct.

Q Okay. And some of the medications you indicated that you prescribed were PPIs and H2RAs; is that correct?
A Yes. I still do, yes.
Q Okay. And what is the mechanism by which PPIs work to treat GERD?
A Yeah. So how do we make acid on a physiologic basis, and then how do we suppress it with these agents, PPIs or H2 receptor antagonists?
So PPIs work on the parietal cells. Parietal cells are in our stomachs. And what they do is they produce acid. So if you block that acid formation, then stomach parietal cell does not make acid so your stomach's acidity is reduced. By the way, not eliminated.
There's this misconception that you take a PPI or you take an H2 and you get rid of acid, and that's not true. You get rid of acid for a short period of time, and then your stomach still produces more acid.
So parietal cells make acid. We all make the same amount other than a condition called Zollinger-Ellison syndrome where they have excessive amount of acid. That's a separate process. 99.9 percent of us make the same amount of acid. It's that defensive factor.

So parietal cells work on the proton pumps that are on the parietal cells. It's a potassium Na proton pump, so it exchanges acid -- potassium and protons, so they work on the proton side, so that's why they're called proton pump inhibitors.

The P-CABS I mentioned work on the potassium side, so that's the potassium competition of the same pump. So what happens is it doesn't pump acid into the stomach, it, therefore, reduces gastric acidity for a short time, and in doing so, patients feel better if they're having their symptoms from some of those -- this acid-inducing -- again symptoms related to acid.

Q Okay. And what's the mechanism by which H2RAs work to treat GERD?

A Yeah, so H2RAs, the histamine -- so the name is the histamine receptor antagonist, so there are also -- and so I mentioned about the potassium and the proton pumps. This is a different pump. This is now histamine.

They work by blocking the histamine which then leads to acid production. So it's a different mechanism. That's why they don't -- you know, they all have different ways of affecting the body. The pharmacokinetics, the pharmacodynamics, all of them are different, but this one, especially, H2 receptor

antagonists work on the H2 -- the histamine receptors.

Q Doctor, what is pepsin?

A Pepsin?

Q Yes.

A Yeah. Pepsin is also produced in the stomach. It's a protein essentially that's produced in the stomach, and that along with acid and along with bile acids combined can then lead to severe esophageal injury.

So sometimes patients measure pepsin levels in the saliva to see whether or not someone refluxes. That's not as good a test, but pepsin's made in the stomach, and then it helps us digest food, so it breaks down things, but it also is responsible for some of the injuries in the esophagus when you combine it with acid and with bile acids.

Q So typically, Doctor, how long does food remain in the stomach after you eat a meal?

A So that's a good question. That's -- that's variable as well, so . . . You know, there's liquid, and then there's solid food. So if I drink liquid, it's going to go down into my stomach fast because of that peristalsis, especially upright. Then it's going to empty fast.

In the stomach, liquids don't last long. They

also empty fast, because at the end of the stomach -- so physiologically and pathologically, if you will, because that relates to pathology, pylorus is really tight. It's a very tight muscle.

So the job of the stomach is to grind food, to just make sure that all of these are mixed. The -- whatever we eat is mixed up, and then the acid and the pepsin is breaking things down, and then it spits out small amounts into the small bowel.

And the role of pepsin is to help with that. The role of acid is to help with that. And each of us have different rate of emptying.

The way it's assessed is over -- again, you take a group of people that have no symptoms to assess the range.

But I would say on a normal -- not an abnormal, so there are people that have abnormal emptying. I would say within two, three hours you have a substantial amount of the food you have eaten have emptied. And usually liquids empty pretty fast, within an hour.

Q Liquids within an hour, is that what you said?

A Yeah, pretty much. I mean, unless you have huge volumes, right? So if I'm just sipping on water, that is going to go down pretty fast. But solids -- and also it depends on the type of food.

So if you eat a meal that's more fatty, you know, has more fat in it, then that's going to slow down the stomach more because the body knows to slow it down because it's going to take more time.

But the flipside, if you also eat a meal that has high fiber -- we're recommending high fiber to our patients -- well, the problem is same thing happens. The stomach takes its time to empty that fiber. That's why a lot of our patients that come down with reflux, they may have stomach emptying problem. They -- their reflux is really because things aren't properly emptying from the stomach.

Q Do PPIs have any effect on the timing of -- the gastric emptying rate at all?

Do you understand my question? That was poorly articulated. I think you understood it.

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Let me -- let me ask it again.

Do PPIs have any effect on the rate that the stomach empties?

MS. CANAAN: Objection, form.

A Not substantially. There are some studies -- so again this is -- this has been -- long time ago when PPIs were coming out what could they do, right? I

mentioned that with respect to cancers and concerns because of the studies in animals, but also some investigators looked at could PPIs by virtue of reducing acidity slow things down.

There were some studies that suggested, yes; subsequent studies suggested no. So there are variability on the studies.

I haven't looked at that recently, but I think where we've landed on that as a community is overall it does not appreciably change the gastric emptying rate.

Q What about H2RAs, does that have any effect on the gastric emptying rate?

MS. CANAAN: Objection, form.

A Again same answer because, you know, the -- the hypothesis that was there was, well, if the acidity is reduced, could that impact -- same -- same issue as with PPIs, and that was not appreciated.

At the end, you know, initial studies suggest something, and then subsequent better studies don't find it to be true, so . . .

Q So the studies also were variable on whether or not it affects gastric emptying rate?

MS. CANAAN: Objection.

A For --

MS. CANAAN: Objection. Michael, give me a

chance to object.
THE WITNESS: Sorry. Sorry.
MS. FINKEN: You're in trouble now, look out.
MS. CANAAN: Objection, misstates the testimony.
Go ahead.
BY MS. FINKEN:
Q I'm just trying to understand. I think you indicated that there were studies that did show it -- it had a delay in gastric emptying, and then there were studies that didn't. And that -- I just want to understand if that holds true for both PPIs and for H2RAs?
A Sure. More so for PPIs, less so for H2 because of the amount of acidity that's suppressed with PPIs versus H2. So the answer is more so with PPI, less so -- that was the -- so I guess my comment was there was that initial concern, but then subsequently the answer is no.
Q Okay. So just going back to some of these questions.
So, Doctor, you had mentioned I think before gastrin. What is gastrin?
A Yeah, that -- that's also produced in the stomach, so what happens physiologically in our stomach,

it's amazing -- the human body is amazing -- is all the things that adjust and what we do, right?

So one of the -- let's say I -- I eat a meal, and by doing so, the pH in the stomach goes up, or I take a PPI, and the pH goes up. Well, the stomach then has a way of sensing that and say, hey, maybe we need to produce more acid and then the gastrin level goes up.

And if you remember the comment I made about rats and omeprazole and the studies with that, that was the concern was, well, if you give very high doses of omeprazole to rats that are nonphysiologic, could there be this -- this cancer because of high level of gastrin. And then subsequent studies didn't show that. So that was the initial concern. It didn't materialize in humans, so that's where gastrin comes in.

It's a physiologic balance. Just like in reflux, we have the balance. In gastrin and in stomach and acidity, that's where gastrin balance is, do you have enough acid, do you not. The levels go up if you don't. They go down if you do.

Q Have high levels of gastrin been associated with cancer?

A That was the initial concern with omeprazole when it first came out, and again subsequent studies didn't show it. And then it's the levels, so there have

been studies from different PPIs with regards to if you're on a once-a-day dosing, what happens to the gastrin level. And that gastrin level, there was initial concern that it would really go up, but it didn't.

And the reason it doesn't -- it does go above norm but not substantially, right? So it goes to slightly above norm.

And the reason it doesn't is what I mentioned earlier. What happens is, yes, it suppresses it initially, but then you produce more acid, so that brings the balance down.

So the answer is, yes, it does go up some, but not to a level where that becomes of clinical concern.

Q So putting aside, though, PPIs, if you do high gastrin levels --

Putting aside medications as causing high gastrin levels, do high gastrin levels -- are they associated with cancer just generally?

MS. CANAAN: Objection, asked and answered.

A So it depends on the levels. So high -- if by high you mean slightly above norm -- people don't believe that's the case. If by high you mean thousand folds above norm, that's a different mechanism, different issue.

Patients with Zollinger-Ellison syndrome are going to have a much higher risk of esophagitis, peptic ulcer disease, everything else because of all of that.

So it all depends on what you mean by high. If by high you mean slightly, which is where I learned from the clinical side regarding these medications because I don't want to give something to someone if their gastrin levels go to thousands, and that doesn't happen, and that was the initial concern.

With these medications, PPIs and then H2 less of a concern because they don't suppress it as much, so H2 receptor antagonists only suppress it at about 40 to 50 percent of level of proton pump inhibitors, so the level of suppression is less. The level of gastrin response is less. So it all depends on which agent and what level of gastrin.

Q So is that a symptom of Zollinger-Elli- -- Zollinger-Elli- -- oh, my goodness, I can't pronounce the word.

Zollinger-Ellison syndrome; is that right? Did I say it correctly?

A That's right.

Q Okay.

A Zollinger-Ellison syndrome.

Q Zollinger-Ellison syndrome. Is a symptom of

Zollinger-Ellison syndrome increased gastrin levels?

A It's not a symptom. It's actually pathophysiologically. The reason people end up with a symptom is because they have such high gastrin levels, so what happens is there's this -- there's a disregulation.

So they produce a lot of gastrin, and there's no check on it, so it's a tumor essentially, and what happens is gastrin levels are so high, then acid levels are high, then the symptoms are abdominal pain, heartburn, regurgitation, nausea, vomiting, bleeding, anemia, so those would be the symptoms, and that becomes the pathophysiology.

Q And does that syndrome also -- is that also a risk factor for cancer?

A Yeah. So essentially it is cancer because it's the tumor that's producing a lot of gastrin.

Q Gotcha. Okay. Thank you for explaining that.

So you had mentioned the pH in the stomach and how that's affected by the acidity in the stomach.

So do these types of medications like PPIs and H2RAs affect the pH in the stomach?

A They -- they do. To a different level they do. And that's how they work by reducing acidity in the stomach. Proton pump inhibitors do a better job. When

I say "better," it's all relative to a -- it's to a higher extent than do H2 receptor antagonists, but, yes, they both do reduce acidity in the stomach.

Q Okay. And how does that affect the pH in the stomach?

A Good question. So it -- not only how, but for how long, right? So I sort of talked about how long. So what happens, your stomach -- all of our stomachs, unless there's pathology for some reason, the pH -- if I put a pH electrode in the stomach, it's 1, so that's pretty acidic. So acidity is anywhere between 1 to 5, 6, right? Neutral being 7, above 7 being basic.

So when we eat that acidity of 1 goes up, so just by eating, not any medicine. Then all of a sudden we neutralize that acidity to about 5, 6, so it goes up. It can even go up to 7 depending on what we eat and how much we eat, but for a short time, and then it goes back down to 1.

If we take an H2 receptor antagonist, same thing happens. It suppresses it some, short time, then it goes back to pH 1. And the level it goes to, I would say it's variable, but about 4, 5, 6, so there are different ways of assessing it.

But it changes. It goes up. Less acidic -- I hate to call it neutral because neutral would be 7. It

would really be less acidic, and then it comes back.

Q And I think you had indicated in your report that ranitidine increases the pH in the stomach, correct, for some period of time?

A That is correct.

Q Okay. And I think that you said that -- let's look at your report.

MS. FINKEN: If we can pull it up, please.

A What page?

Q It's -- we'll have -- I think it's on page 3 of your report. Let's look at page 3. Yeah, there we go.

So you say here that "gastric pH, typically less at 2, is maintained at pH 5 or above for four to six hours with ranitidine."

Do you see that? It's right above --

A Yes. It's right above, yes.

Q Okay. And that's consistent with what you're testifying to as well, correct?

A Yes.

Q Okay. And what are the consequences of increasing the pH in the stomach, or are there any?

MS. FINKEN: You can take that report down.

A Well, it depends on again the word "consequence." There's good consequence I think because that's why we treat patients. So the consequence of

reducing acidity in a patient that we give either H2 receptor antagonist or proton pump inhibitor is for them to feel better, so that's a consequence.

Is that what you mean?

Q I'm not suggesting good or bad. What are -- I'm just trying to figure out the effects of increasing the pH in the stomach. Are there any effects?

A I mean, from efficacy perspective, I mean -- again eating is another way of increasing, right? So someone that eats more frequently increases their pH more often independent of any proton pump inhibitors or H2 receptor antagonists. So is there -- is there adverse event to that? I'm not aware of necessarily just from a pH alone perspective.

Q Does -- as a consequence of increasing the pH in the stomach, does it result in an increase in bacteria in the stomach?

A That -- that -- you know, that's an interesting question because that's sort of a hypothesis that has led to so many research, whether it be epidemiologic or concern or various topic.

There were studies that -- not studies but some people that feel that because you take an H2 blocker or a PPI, you reduce so much acid that by default, then you get bacterial overgrowth.

As I've highlighted, you don't get rid of acid. In fact, we did studies -- this was a physiologic study long time ago. We gave someone once a day PPI. We gave them twice a day PPI. We gave them three times a day PPI, and we gave them three times a day PPI and an H2 receptor antagonist.

And the question was can we make them achlorhydric? Can we make it so that that concern of bacterial overgrowth for a long time comes up? We were unable to do it.

And what happens with that is the acidity in the stomach, it follows this acidtonic relationship. What happens is you reduce it some with once a day. You reduce it some with twice a day. Then no matter how much more I give you, I've only reduced it to a certain threshold, and that's about 20 to 30 percent of the original acidity. So I can only suppress so much in the stomach.

So the concept of bacterial overgrowth is not necessarily valid in that it's theoretical. It's hypothesis, but it's not necess- -- it leads to studies to just see, but it's not -- it doesn't translate in most because I can't make someone achlorhydric with, as I said, even that many PPIs.

So does it increase? Yes. Realistically does

it lead to significant -- clinically significant bacterial overgrowth? The answer is no. But what's interesting is this was the same hypothesis that led to studies on role of PPIs and pneumonia.

And in those studies -- because people were concerned. You take that, you're going to get pneumonia. They did epidemiologic studies. They showed that those that were on PPIs were more likely to have pneumonia. Well, guess what? Subsequent studies didn't prove it, and the reason, it's confounding by indication, right?

So you have reflux. You reflux a lot, and because of that, you could aspirate and get pneumonia. So now I put you on a PPI, and that treats your reflux. By doing epidemiologic studies, patients on PPIs are likely to have pneumonia. Subsequent studies didn't prove it.

So I would say it's an interesting hypothesis, and that has been proposed, especially with PPIs since they suppress more acid, but has not translated. And with the pneumonia one, better epidemiologic studies did not prove that to be the case.

Q But there are -- you would agree that there are studies out there that demonstrate that when there is an increase in pH in the stomach from taking either H2RAs

or PPIs, that it does result in an increase in bacteria in the stomach, right?

MS. CANAAN: Objection.

A So there are studies that what -- again, I would have to familiarize myself, but just globally, what I remember where they did some bacterial counts, if you will, but the question then becomes how does that translate to clinical care of our patients.

What do I -- so -- that's -- that's where I land at the end, you know. It's like you need reflux for your -- you need PPIs for your reflux. You have pneumonia because of it. I'm going to give it to you. The clinical translation is (Zoom interference).

Q Yeah. And I'm making a mess in my office. I understand what you're saying, Doctor.

I was just -- and I'm not suggesting or asking about any consequences that result from any bacterial increase in the stomach, but just generally that there is -- whether it's intermittent or long term, there is an increase in bacteria in the stomach when the pH increases; is that fair to say?

A Well --

MS. CANAAN: Objection.

A Well, the problem with that is that, remember, if -- if I made you achlorhydric, yes, if I give a lot

of PPIs, but because I'm suppressing it for a short time and the majority of the time, you're still making acid, then the answer is no, right?

So if I make you achloric -- if I do a study let's say on patients with pernicious amenia, these are patients that don't make acid. They don't have parietal cells. Well, guess what -- or patients post-gastritic, and I do a study on bacterial? Yes. The answer is "yes" in that group. But not in the general population have patients that have reflux for which they take either H2 receptor antagonists or proton pump inhibitors.

In that population, the reduction is short term, so the majority of the time you have acid, so that is not a factor in that group.

Q Okay. Have you reviewed any studies for purposes of providing your expert opinion that demonstrate over a 24-hour pH monitoring with ranitidine, that there is increase in pH and an increase in bacteria in those patients?

MS. CANAAN: Objection, form.

A I would not be surprised if there's increase in pH. I would have to look at the study that you're referring to as far as bacterial. For example, at what point did they do the sampling? Was it done right

after? How long were patients were on some -- any of these therapies? Were there other factors, like I mentioned, whether they've had surgery before, pernicious amenia and all of that.

So I would say pHs, of course, that's how they work. Bacterial overgrowth, it depends on the population and when the study was done. I would be happy to review that.

Q Is it fair to say there's lot of intragastric variability depending on the -- the conditions on -- at any given time?

MS. CANAAN: Objection.

MS. FINKEN: You know what? That's a horrible question. Let me rephrase that. I object as well, Eva. Let me rephrase.

BY MS. FINKEN:

Q Is it fair to say -- and I'm just trying to -- to understand what you had just said to me. There's a lot of factors that go into play that determine what the conditions are in anybody's stomach on any given day.

And those factors include food, and they include pH, and they include bacteria and certain gastrointestinal disorders; is that fair?

MS. CANAAN: Objection, form.

A Yeah. So let me -- let me explain. Again my

apologies if I'm not clear because that could also be the case.

So, look, we have bacteria in our stomach now. Even if I'm not on any medicine, it's the job of the stomach to get rid of it. So the idea that there's bacteria in the stomach, that's -- there is bacteria because when I eat something, it's got bacteria. I'm drinking this water. It's got bacteria, right? I hate to say it, but it does. So it's the stomach's job to get rid of it.

So the idea of bacteria in the stomach is not a new one. We have it. We had it. H. pylori is a bacteria. It's in the stomach.

The idea of --

Now, the bringing in food, medications and what have you, the question becomes the relevance -- and, again, I'm only solely speaking from clinical side. I have bacteria. Now I'm put on a PPI, and it suppresses it for a short-term. What happens to that bacteria?

Well, I still have acidity that's going to kill it, right? If you get rid of all the acid in the stomach, physiologically hard to do, but some --

And the variability I think you're talking about is patients that are post-gastrectomy or make no acid in the stomach. Of course, in that group it could.

But in the general population of patients with reflux that don't have that, I would say, yes, there is bacteria because we all have it, irrelevant of whether or not they're on H2 or PPIs.

Q So putting aside even people who have reflux, just in the normal population without reflux, the conditions within the gut in terms of pH and bacteria and -- they're variable throughout the day; is that fair to say? Okay.

A PH is variable.

Q That was --

A Yeah, pH can be variable depending on when I eat and how much I eat, yes.

Q Right. And that's just what I'm just trying to get to is that depending on when you would, for example, look at the conditions within the gut, that's going to just change depending on when you ate or what you had to drink or what medications you're on or what conditions you might have. It's something that changes over the 24-hour period in a normal person as well as in somebody who has gastroesophageal reflux disease; is that fair?

MS. CANAAN: Objection, form.

A So I would clarify by saying that I make -- I think it's important to recognize this physiological point.

Q Uh-huh.
A We -- our acidity in the stomach is low, period, right? It's low. So let's say I fast overnight, you know, I didn't -- you know, I didn't eat anything overnight, and I wake up, my stomach is acidic because it's acidic.
Let's say now I eat. Well, the pH is going to go up some. Or let's say I took a PPI, after a certain time, once it goes through what it needs to go from a medication perspective and cytochrome P450s and all of that, then it's going to go up as well, right, for a short time?
So when I wake up in the morning, I have bacteria -- I'm sorry, acidity that's essentially -- I'm at norm, and then I increase the pH.
Is that what you're asking? I want to be clear.
Q And that's -- the same holds true for ranitidine, which is what you put in your report as well, that it goes up for a period of time and then --
A Then it goes down.
Q -- goes down, correct.
So I think we're saying the same thing, that there's variability and it depends on a lot of different factors in the stomach as to what type of pH or bacteria

you might find at any given time taking a sample -- a stomach sample.

MS. CANAAN: Objection. Is there a question?

BY MS. FINKEN:

Q Is that fair, Doctor?

A Again, I -- I don't know what you're asking me.

Q Yeah, I'm just --

A That's a broad statement, but there's -- the variability -- there is no variability that -- your stomach is going to be acidic when you wake up in the morning. That is not variable, right?

Q To anybody? You're saying no matter what conditions you have, no matter what medications you're on --

A No.

Q -- if you wake up fasting, your stomach is going to be acidic?

A That's -- that's not what I said.

Q That's what I thought, okay.

A That's all right. We may -- we may be misunderstanding each other. I'm very sensitive about not coming across the wrong way as far as what I'm trying to tell you, is if you're not on any medication, you have no other diseases --

Let's say you have reflux. Let's just go with

reflux. You have reflux but no other diseases. You haven't had gastric surgery. You just have reflux, or you don't have reflux. You're -- you have zero disease. When both of those groups wake up in the morning, they're going to have acid in the stomach. And when they both eat, their pH will go up for a short time, then they'll have acid in the stomach. Let's say both, take PPI or H2, it will go up for a short time, it comes down, and then there's acid in the stomach. So that's what I'm saying.

Q Okay. So there is variability in the stomach depending on if you eat or you don't eat; is that fair?

MS. CANAAN: Objection to form.

A There's no -- yeah, there's no variability. I -- I think the word "variability" -- there is a pH increase with eating. That's not variable.

Q Is that what we're getting hung up on is the word "variable"?

A Yes.

Q Okay. Let's try it with a different term.

The pH changes within the stomach depending upon a whole different variety of conditions that might be occurring; is that fair?

A That's fair to say with food, with PPIs, with pernicious anemia, with surgery, that's correct.

Q Okay. Then that's perfect. Thank you, Doctor.
A I'm sorry.
Q I understand now where we were having a disconnect. But, I think we were ultimately saying the same thing.
Okay. So going back to the different things within the stomach. You had indicated that --
Hold on. Let me just get back to my place here. Oh, okay.
So if there's an increase in pH or an increase in bacteria in the stomach, would there be an increase in nitrite levels in the stomach?
MS. CANAAN: Objection, form.
A So let me -- let me understand your question. If there is an increase in pH and if there is bacteria in the stomach?
Q I said if there's an increase in pH or an increase in bacteria, would -- could there also be an increase in nitrite levels in the stomach?
And I'm saying nitrite with an "I." I'm watching the realtime, and it's coming up as "nitrate" with an "A."
A Yeah. So nitrite levels are -- so again, you know, if -- if we're getting to the protonation stage -- are you talking about the protonated nitrite?

Q I'm just talking about generally nitrite in the stomach. Are they variable depending upon the pH and the bacteria levels?
A Yeah, so --
MS. CANAAN: Objection, form.
A You have higher nitrite level with higher pH, right? So nitrite -- you have to have protonation of nitrite to actually get to -- and that protonation requires acidity, right? So the protonated nitrite requires acidity. I think that's what you're getting at.
Q So is it fair to say -- correct me if it's not. Is it fair to say that the nitrite levels in the stomach also change depending on a whole bunch of different conditions similar to the pH and the bacteria?
A I don't know what conditions, so I'm --
MS. CANAAN: Objection, form.
BY MS. FINKEN
Q Well, depending upon what you eat, for example.
A Okay. So if I eat a hot dog and I drink a beer, right? Is that what you mean?
Q Yes.
A Yeah. Then I would have a different level than if I don't. That is correct.
Q Okay. And --

MS. CANAAN: Tracy, do you want to take a five-minute bio break? We've been going for like an hour and a half or more.

MS. FINKEN: Yeah, we can take one. That's fine.

MS. CANAAN: Yeah, five minutes or something like that.

MS. FINKEN: Sure, no problem. Let's go off the record.

THE VIDEOGRAPHER: The time is 3:05 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Everyone, please stand by.

The time is 3:19 p.m., and we're back on the record.

BY MS. FINKEN:

Q Okay. Dr. Vaezi, previously you had indicated that you have a master's degree in epidemiology; is that correct?

A Yes, that's correct.

Q Okay. And what is epidemiology?

A That's a good question. It's a broad question but a good one.

It's essen- -- essentially looking at study of

disease and outcome, if you will, so in any study -- similar to what we're discussing here, does ex- -- you know, could exposure to X cause Y, or you can also talk about randomized study, so it's really assessing an outcome, if you will, based on exposures.

Q So would it be fair to say it's assessing whether an agent can cause a disease?

A Yeah, that's -- that's -- that's one, yes.

Q And an example of that would be an epidemiological study that determines whether smoking can cause lung cancer, correct?

A Yes, that's correct.

Q And would you agree with me, Doctor -- is it fair to say that epidemiology does not determine whether an agent caused a specific person's disease?

So an epidemiological study couldn't tell me or you as an epidemi- -- as having a master's in epidemiology, it's not going to tell you whether COVID-19 caused me to have cardiac issues specifically, correct?

MS. CANAAN: Objection.

A So in you, I would have to assess your risk, right? In someone -- we would leave you out of it. An individual patient that presents, I would have to see do you -- do you smoke and do you have X, Y and Z, so --

and those are all risks.

Epidemiology assesses the risk in a population. Then when patients present, then you assess the risk in that individual patient, right? So if that patient smokes and drinks and is obese and has reflux and has hypertension and has heart disease, so that's a different risk group than someone else.

So essentially it is helping us as clinicians in better assess risk and also better take care of patients because then we go to the patient based on those epidemiologic studies that you're mentioning and say, look, there are studies that show smoking causes lung cancer, please do your best to stop or minimize because you're increasing your risk.

Q Okay. What are some types of epidemiological studies?

A Yeah. Good question. So, you know, any of the studies -- so randomized control trial, for example, is -- can be a part of that because you're assessing an exposure and an outcome, right?

So in any of the studies regarding the drugs at least I'm familiar with H2 receptor antagonists, with PPIs and all of that, they're randomized to drug A and placebo or drug A versus an active comparator, drug B, and then they show efficacy or if they don't, and then

they get FDA approval, so that is part of that efficacy issue.

Related to ranitidine specifically, then epidemiology would be looking at the data on what do we have. Do we have randomized control studies, and if not, do we have case control or cohort studies? So those are other studies.

You have case control studies that essentially look at the expose- -- I'm sorry, the outcomes. On a case control you say let's look at hundred people with breast cancer and a hundred people without breast cancer. That's your cases and control looking backward at exposure.

And then in -- going forward, if you will, you take a look at cohort studies that look at exposure and then assesses outcome.

So you have the randomized trial, case control and then cohort studies, those are all different types of studies that one could do.

Q And would case control studies and cohort studies be classified as observational studies?

A Yeah, typically that's -- that's how they are set up. But in the hierarchy of importance, if you will, right? So in -- in science and in epidemiology, if you look at what is best, if you will, from

data reduces bias. You want randomized control trial.

If you can't get you randomized control trial, you want cohort studies. If you don't have any cohort studies, then you go to case control studies. If you don't have case control studies, then you go to case reports, right? So those are single case reports. So from the level of importance.

So if I have -- let's say I review a study that -- a single case of a person that had -- was exposed to something, came down with something, it's -- it's -- it's not uncommon that epidemiologists would say that doesn't carry as much weight as if I have a randomized control. So there's a hierarchy of importance.

Q And what is an ecological study?

A Ecology, so it's essentially looking at potentially ecologic exposures, right? So looking at, for example, exposures, looking at other things, environmental factors that would potentially be a factor.

Q Are there specific limitations when -- well, strike that.

What are the potential limitations that can exist when you're looking at observational studies?

A It depends on which observation -- so in case

control studies, it's not unusual to -- the reason it falls short from cohort is because you're really looking at the outcome first, and your uncertainty is the exposure, so there are many biases in those studies.

You have your -- confounding by indication. You don't know why patients were put on that. You have protopathic bias, right? You have recall bias. You're -- you're asking a patient with cancer, you know, were you on X, Y and Z or did you take this medication, or you're looking at their record or, especially in the dietary ones, did you take this diet versus that diet.

So case control studies are problematic in biases and in -- in our ability to control for them, so that becomes problematic.

And then your cohort studies are better because you really didn't look at the outcome. You're looking at the exposure and then assessing the outcome. But even there, you have all of these biases.

So when -- when it comes to observational, you know, cohorts/case control, it is not uncommon that we find observations that lead to a fear -- and that's what I call it, a fear -- that then later better studies don't show it, and that -- the reason for that is all of these observational studies have problem with controlling for various biases.

There was a study that looked at -- I forget how long ago I read this, but there were a study that looked at -- there were 52 observational studies that found an association, and then none of them ended up being confirmed by randomized control studies.

So that's important to keep in mind because it is now -- we are now in an era where observational studies are showing these small associations -- not the one you mentioned, lung cancer. Lung cancer is a no brainer, right, because when you look at the risk estimate, it is so high up.

But when you look at all of these others, they're relying on this zone of bias, if you will. You just don't know if the association exists or not, then that creates the fear.

So these limitations that you ask about are really from the observational, and they're all these publications that we have to be careful --

If we find an association, we have to be careful. If you don't find an association, well, that's great. At least you didn't create the fear, the excitement and all the patient-related effects because it makes a difference. So they -- they have biases. They have a lot of biases.

Q When -- when looking at observational studies,

would it be fair to say that -- well, strike that.
When they're -- generally when they're conducting observational studies like case control or cohort studies, where is the data coming from?
MS. CANAAN: Objection, form.
BY MS. FINKEN:
Q Do you understand my question?
A Yeah, I mean, it's variable. It depends on which specific case control and which specific cohort, so that -- that's going to be highly variable.
Q So when you're conducting observational studies and you're pulling data from, for example, insurance databases -- that's one area where you can pull information to conduct observational studies, correct?
A Some have done that, that's correct.
Q Have you ever evaluated observational studies that have -- has pulled data from an -- a database at an aggregate level instead of an individual level?
MS. CANAAN: Objection, form.
A Yeah, if you could clarify. Have I specifically done this, or are you asking have I seen it?
Q Either. Have you seen it?
A Well, we have studies within the epidemiologic studies that are outlined that have different study

designs. They have different sources from different countries that have done slightly different things, and that's actually good.

The way I see it is you want that variability of data so that the outcome and the estimate you're assessing is not just related to, say, of the Asian a population or just related to U.S. or just related to Denmark.

So they're different databases that all of these investigators have used at various level, so . . . One can critique all databases. I can critique every single database in the world, but guess what? That's what we have, right?

So you do the studies based on databases available to you and then an aggregate to assess a risk for my patient -- when I'm sitting across a patient, I just don't look at a study from this database or that database. I'm looking at what does the aggregate tell me? What does the result of these studies show me? If one tells me it's protective, do I believe it? If one tells me it's high, do I believe it? Where are the signals?

And that's why when you look in my report, I didn't just look at a report. You know, you have a nice -- I actually am proud of the graphs at the end of

my report that really puts all of it together because that is how we should look at data, not individually.

I can critique every one of the data. Every study known to mankind, including mine, can be criticized, but aggregate, how do we go forward? How do we treat patients?

Q Okay. And my -- and my question's just a little bit different.

There are certain databases where you can collect information to conduct a study that provides individual patient level data, correct? There --

A Yes.

Q Yes. And there are also databases where you can get information to conduct an observational study that will only provide you the data in the aggregate, not as an individual patient data. Do you understand that?

A Yes.

Q Okay. Which one of those types of databases would be more precise in evaluating the risk in your opinion?

MS. CANAAN: Objection, form.

A Right. So there are many elements to your question, and I'll break them down, if it helps. Again, I want to make sure I understand your question.

Precision -- which one is precise? Precision is really related to your sample size and to how wide your confidence intervals, right?

So if you're asking me which study is better than the other, I would say they're all important because they all relay different messages, but in aggregate, it completes a nice picture. But more importantly, that gets to study design for all of them, and hopefully we can talk about it.

In a randomized control study, why is it good? In a randomized control study, you're randomizing patients, and that by itself takes care of a lot of the biases, and then you're assessing exposure and then the outcome, so that reduces the bias.

So in a observational study, you don't have that opportunity, right? That's why they're not as good. So how can you make it as close to randomized -- recognizing that none of them will get there, how can we make it as closed to randomized?

Well, then you have to take into account which of those biases can I reduce. So in that -- those two examples that you mentioned, the best way to do it is to have an active comparator, right? Because if you did that for both of those, then what you're saying is in this large database, I don't have individual data.

Well, you're not going to have it because you're limited by your database.

I'm going to look at active comparator. Let's say you do have it. Well, let's look at active comparator. So you're trying to do the best you can with the database that you have knowing the limitations of the study.

In fact, I hope all authors as they publish -- and I try to do that, and hopefully I haven't failed too many times -- you've got to put it in your limitation. Those are your limitations of the study.

But when you do that and when you try to reduce those biases, then you're getting closer to the truth rather than -- or to that randomized trial which we hope is the truth rather than saying, well, this study is -- because it's individual is better than the other.

I would argue, well, how -- how do we reduce those confounding to make it so that they're equivalent in that sense.

Q Have you ever conducted an observational study using a database that is -- that only provides you patient data in the aggregate versus individualized patient data?

A Not that I recall. I'll have to think. It's been a long time. I'm sorry, I --

Q Okay. And, Doctor, you've talked a little bit about randomized control trials. And is it fair to say that it -- in certain instances, it wouldn't be ethical to conduct a randomized control trial?

For example, would it be ethical to give somebody a carcinogen for a long period of time versus a control group and then see if they get cancer? Is that something that would be ethical to do?

A No, it would not be.

Q So in those instances where you're trying to judge the carcinogenicity of an agent, you'd have to rely on observational study data, correct?

A It -- it is -- so let me -- you're correct in a sense, and let me just -- with a caveat, if you don't mind.

So it depends -- so if you're talking about carcinogenicity, you're absolutely right. But if you're looking at side effects, right, so if you're looking at -- that's where randomized trials come in, where you've done the efficacy. You're assessing whether or not there's a specific side effect or not, and sometimes there are unanticipated side effects.

That's why you check blood work. That's why you do chest x-rays. That's why you do X, Y and Z. So if I treat someone, randomize them to drug A versus

placebo or a comparator drug B, and I'm assessing, and all of a sudden I find something that's not good, you know, my patients are having increased liver enzymes because they're -- they are on blinded -- I don't know which but on this arm over that arm, so in that sense you can randomize them if it's unex- --

If you already know, you know what? Radiation at high dose, I'm going to randomize you to radiation versus no radiation, and I think that -- that's unethical. I agree 100 percent.

Q Okay. Is it fair to say that a well-designed observational study can sometimes provide better information than a poorly-designed randomized clinical trial?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Just generally, as a general proposition.

A You know, you have to look at the studies to be honest with you, so I would say by design specifically, randomized control studies are better when it comes to knowing what the exposure was, at what point, the duration of the exposure as well as the outcome because that's part of that.

And the randomization takes into account your confounding, so that design -- so again if there are

specific ones, I'm happy to look at. The design is a better design. So that's why from all of these, you know, assessments of different trial designs, co- -- you know, observational studies fall shorter than randomized trials.

Q Okay. So you would agree, though, that you would have to evaluate the design of a specific study to determine how much weight you would give that study in an analysis of causal inference, right?

A Well, not only the design, you have to look at methodology. You look at the design. Is it randomized? Is it cohort? Is it case control? Did they control for the confounding? Didn't they? Did they assess all the variables? Are their conclusions appropriate?

We have studies where they actually do a great job -- a study, do a great job of actually doing the study, having all the parameters of an observational study to do their best to control for potential confounders, and their conclusions are completely different, so I'm sitting there going, okay, the study is a good study, the conclusion is not.

So it all depends on what you mean by that. But I would say it is dependent on the study and the design and all the factors of if they tried to control for the confounders or not.

Q Okay. In the context of epidemiology, what does the term "association" mean?

A Well, something is associated. So, you know, in laymen's term -- you'll forgive me if I use the analogy I use for my patients when I sit across them. They go, Doctor, I found out that this drug is associated with this, what does it mean?

So if you allow me to go there, it's -- I say I'm drinking a cup of coffee and I don't see that chair, and I fall and I break my leg, and there are enough people that have done that, then drinking a cup of coffee is associated with a fractured leg. It's true. From epidemiologic perspective, that is true. I had that exposure and that outcome, but it was also because I didn't see where I was going, right? So in this case, drinking coffee necessarily wasn't associated with the chair necessarily, but so it's -- it's that association.

So making a false or true association, it's related, if you will, in laymen's terms.

Q Would you agree that an association that is weak does not necessarily preclude a causal relationship?

MS. CANAAN: Objection, form.

A What do you mean "association that is weak"?

Q Well, that's a good question. How do you --

how do you determine whether or not there's an association in an epidemiological study?

A Yeah. So when -- when you look in -- let's say cohort study or case control study, they're looking at things, and they find that either odds ratio or a hazard or relative risk of something is more than another, right? So one being your no association and then moving away but including your confidence intervals to see whether or not there is a, quote, association.

So let's say you find that something has an association, let's say relative risk or observational 1.3 with a confidence interval that does not cross 1. Then you say there is an association between whatever that exposure you were looking at and that outcome.

But let's say you have -- and I outline that in my report.

Let's say you have the same hazard ratio relative to risk of 1.3, but the confidence interval now crosses 1, then you can't argue that there is an association. In fact, that shows there's not an association. That's where the confidence interval comes in.

So an association is, you know, you're finding an association between something and the outcome but you -- I don't personally -- speaking just from me, I

don't just look at a study that found whether it was positive, negative. I look at various factors.

I'm looking at the study design. I'm looking at the relative risk. I'm looking at did they control for biases for all of the factors. Did -- did they do something they shouldn't have? What is their conclusion? What was the exposure? How much, and did they control? Did they do a dose response? Was there a dose response?

So it's hard to say solely based on a relative risk or an odds ratio if the study is a good study, bad study, right?

Q So going back to the example that you gave of a relative risk of 1.3, would you characterize that as a weak association or a strong association?

A I would characterize -- that's all relative, so if you ask me that question regarding association, is that association a weaker association than smoking where relative risk and odds ratio are way above, I would say that's a weaker than the smoking of 20 or 10 or 30, right? So that's how I would assess it, but not excluding the confidence interval because that's where you have to see where the uncertainty lies.

Q Okay. So putting that into context, if you have a relative risk of 1.3, it doesn't necessarily

imply that there's a lack of -- let's strike that.

If you have a relative risk of 1.3, that doesn't preclude that there's a causal relationship, right?

MS. CANAAN: Objection, form.

A Just by relative risk, you can't assess it. So you have to have the confidence intervals, right? So let's say I have a confidence interval of .8 to 1.6, so that means a better done study could show that it's protected.

So to conclude that 1.3 means there's an association, ignoring that confidence interval would be not appropriate. That's why we don't conclude that. That's why we say the risk estimate is this with confidence interval that is not significant. And the word "not significant" is important. It is not significant. We can't just say, well, it's 1.3 here and 1.3, they mean the same, and as I put in my report, they don't mean the same.

It only means that one could be protective or it could not be, and the other one suggests that it isn't, but, yet, you have to look at the confidence intervals, the study of the design, how did they reach that conclusion. Did they do all the factors to reduce bias?

And I mean, again, there are studies that have clearly shown that PPIs are associated with pneumonia. And guess what? The initial studies, I have patients coming in, they've dropped their PPIs, they're symptomatic. I don't want to take them. Subsequent studies, five years later when they were doing better, they don't show the association, so it's important.

So a single study by itself is not as important as the aggregate, the study design and the confidence interval as part of that equation.

Q Okay. Would you agree with the general proposition that an associa- -- association that is weak does not necessarily imply a lack of clinical importance?

MS. CANAAN: Objection, form.

A So I don't know what you mean by that. If you're saying that if I do a study -- so I'm going to answer it in different scenarios. I have 10 studies and all of them have odds ratios of 1.1 with confidence interval that crosses 1. They are all weak risk -- risk -- risk estimates, but they're not significant. They don't have clinical relevance to me.

So if I have 10, 20 studies with relative risk of 1.5, all confidence intervals above 1, consistent, well designed, tried to control for variable -- variable

factors, biases, that is important. You have to look at that.

But it isn't an agg- -- it is not just the number. It's the how many studies, how well designed were they. Did they control for confounding? If -- in this question was an active comparator or not? Did they control for protopathic bias? That all comes into play to relate to the clinical importance, and its importance. And this is important.

I mean, at the end of the day, we've had so many of these false alarms, I put that in there because that does have clinical relevance. To me it does.

I'm faced with patients that come in and say I don't want to take this drug because I read it causes pneumonia or it causes hip fracture, for example, or X, Y and Z. I'm talking about PPIs, and they may take them off. Well, that's incorrect because the association was not proven later to be the case. But try to undo that, right?

The first two studies is hard to undo with the next better 10 studies because the cat's out of the bag. Now patients have the fear.

So to me I'm highly sensitive to make sure that we weigh the evidence in aggregate. We look at the evidence, what type of study, and we look at all of the

factors and put them together. In fact, I hope that that's what I've done in mine.

Q Okay. So going back to the term that you used, an "active comparator study," what does it mean to conduct an active comparator study?

A Yeah. So essentially what you want to do -- I'll -- I'll talk about it with respect to the studies that I've reviewed with ranitidine. If the question at hand -- at least in me as I'm looking at this -- the question is: Could ranitidine, and that's not -- could ranitidine cause cancer, right?

So if I look -- and if I'm doing an epidemiologic studies and comparing the ranitidine to the general population, that doesn't answer the question. I want to know the ranitidine takers versus something else that would control for confounding by indication, i.e., let's say Pepcid or famotidine.

In the population that took -- had the same indication for the drug but one is purported to be associated, the second is not, and I'm following them, whether it be cohort/case control, what have you, and then I find the risk. Did I control for all the factors, and do I see the risk? I think that's what we want.

And that's where the active comparator comes

in. The active being you're trying to control for your confounding by indication because those drugs are given for different reasons, right?

So if I compare it to someone that doesn't need the drug, well, I'm now comparing apples to oranges rather than apples to apples.

Q So would you agree with me that for an active comparator study to be effective, the comparator drug mustn't also be associated with the outcome that you're trying to assess?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Correct?

A Yeah. Can you clarify that question for me?

Q So for -- for what you're proposing, using an active comparator study, for it to be effective in answering the question, you would have to ensure that the comparator drug isn't also associated with the outcome that you're attempting to study, right?

A That would be ideal if you can have a comparator that doesn't have the risk. That's the whole reason to do it is to have it so that the active --

So, for example, in studies that I've reviewed, if you have an active comparator to, say, famotidine or cimetidine, right? So those are good active comparators

because patients were put on H2 receptor antagonists. They're the same class, so now you're follow- -- you're looking at the outcome. So those are good studies to look at so that you would know whether or not there is an association.

Q Okay. And you had talked about previously the expose- -- measuring the exposure. Would you agree that evaluating the exposure is critical to assess causal inference?

MS. CANAAN: Objection.

A So I don't know what you mean by "critical." It's an element, right? So remember the word "critical" means without it, everything falls apart. It is an important component, just as the risk estimate is, just as whether or not there's consistency. And that's what I've been sort of discussing. What is the strength of association? What is the consistency? Is their biological plausibility? Is there a dose response? Those are all part of that analysis, but remember, all of those go away and essentially are irrelevant, if you will, if you already start with the confounding.

Confounding is what's driving a lot of these. And that's not part of that Bradford Hill criteria, right? So confounding is not a part of that.

Confounding is -- by default you have to

control for. So if you have a poorly designed study with tons of confounding, and you have dose response, well, guess what? You just failed everything because you have so much confounding, that dose response doesn't come into play.

So to say critical, it all depends on the variables I discussed.

Q Okay. So we talked a little bit about significance testing. What is -- can you define for me what a p-value is?

A Sure. So traditionally we've used p-value to assess whether or not an observation can happen by chance, and by convention, we've used less than 5 percent, 0 -- .05, right, so less than 5 percent.

So if you find an observation that is statistically significant, then there's less than 5 percent chance that that observation would have occurred by chance alone because remember that if I do many comparators, I'm going to by chance find something that pops up as, quote, significant. And that's where you want to be careful with the multiple comparison studies, but that's where p-value comes in.

But I don't want to emphasize the 5 percent. I also want to emphasize that if you have so many comparators, there is the bond for wrongly correction

that actually then takes that 5 percent to lower. You could -- it would be inappropriate to say, oh, it's less than 5 percent. I see that clinically all the time when I review publications.

I've done 30, 40, a hundred comparisons, and a few of them are .04. It's clinically significant or statistically significant. Well, no, it's not because you've done so many analyses that you need to correct for that, and the way you correct it is you divide it by that number minus 1, and that's how you should do it. And so it's not just 5 percent. It's -- within multiple comparison it's even more stringent than that.

Why is that? I think if we really stuck to that, and we did it scientifically, we wouldn't be in the mess we're in right now because we have so many articles published with incorrect assessments and conclusions that this is statistically significant, so that then gets to the clinical relevance, that gets to did they correct for all the stuff, that gets to the confounding.

I'm trying to answer your question. I hope I've answered it. I apologize if I didn't answer it.

Q So do you believe that a statistically nonsignificant finding provides evidence of no association?

A That depends on the study design, right? So that's where type II error comes in, right? So type II error will say you didn't do the study the right way, and you didn't find it because you never had the opportunity to find it.

But one can't just look at the p-value by itself, but it's an important value in that if you're looking at a study design, if you're looking at a cohort design that by default gives you no association at all, then one can't assume association because the study is negative, so the reverse doesn't work.

If I have a study that shows no association, I can't assume there is one just because I would -- to argue that, well, it's a type II error. Well, not necessarily.

So, you know, I always say so you can't assume association or causality. Lack of evidence does not prove its -- its existence. And that's the issue in current epidemiology where people are assuming things that are inaccurate. They're assuming causal link even with small associations that are not consistent, that didn't control for confounding, that have issues.

So the p-value that doesn't show -- let's say I've looked at 10 studies, and they're all not significant, that is important. It didn't find an

assoc- -- 10 of them didn't show it. Let's say one did, and one had a multiple comparator, but they didn't control for it, I don't put weight on that. So you have to sort of see the aggregate.

I want to go back to that. A single study can be criticized, and -- a second study can be criticized because all studies can be criticized. There's not a single study that cannot be criticized, but then in aggregate, they paint a big picture, and lack of evidence does not prove its causality.

Q In your report you reference the Bradford Hill criteria to assess causality. Do you recall that?

A Yes.

Q Okay. And what are the Bradford Hill criteria used for in the context of epidemiology?

A I have that outlined on page 17, table 3, strength of association, consistency, specificity, temporality, biological gradient, coherence, experiment and analogy.

But I want to emphasize what I emphasized before. The Bradford Hill criteria you don't even need to use if you have all these studies that are cofounders.

So confounding is not a part of this because if you have studies that have tons of confounding and --

they don't even make it to the causal assessment.
Q So you also indicate in your report that the Bradford Hill criteria should only be considered after a study finds an association. Do you recall that?
A Can you show me?
Q Yeah.
A What page is it on?
Q On page -- I believe it's 59 on your report. You indicate --
MS. FINKEN: And if we can pull that up. Yep. Right there in the bold area.
BY MS. FINKEN
Q It says "because the current evidence does not show a reliable association between ranitidine and any type of cancer that is not the product of chance, bias or confounding, it is not necessary to apply the Bradford Hill criteria to assess whether there is a basis for finding causation."
Do you see that?
A Yes.
Q Okay. What is -- what is the basis for that statement in terms of applying Bradford Hill criteria unless you find an association?
A That is actually not what it says. It isn't that you have to find an association, so here -- I want

to clarify that. It says the studies were flawed. So if there are flawed studies that are biased because of confounding and various other biases, and you -- because of that, you have problems with the study as far as going to -- from association to causation, then you wouldn't be able to.

So in these studies that I've looked at, they don't even make it to necessarily applying this. There is no reliable association; in other words, I'm not necessary -- so if you have studies that say -- let me use an example to be clear. I know maybe I'm not being clear.

If you have studies that have hazard ratios 1.1 with confidence intervals that do not cross 1, so, i.e., they are significant statistically, and let's say you have 10 of those. Well, then you apply the Bradford Hill criteria to it. You say, all right, now you have it, can you assess strength of association? Can you assess all of the other factors?

But if you already have studies that don't show an association, which is really the case in the studies that I've reviewed, what is it that we're assessing Bradford Hill criteria for, right? So what are we suggesting? That there is no association. Now let's see if there is a causation. So we have to have an

association to then investigate whether that association is causal.

I hope I'm being clear on that.

Q Okay. Can you cite to any specific authority that indicates that proposition, that you shouldn't apply the Bradford Hill criteria unless you first find an association?

A I'm more than happy to find some and send it to you, but I can't right now offhand.

Q Can you cite to any publication by Bradford Hill himself that -- or Sir Austin Bradford Hill himself that indicates the methodology of considering the Bradford Hill criteria absent finding -- a finding of an association is inappropriate?

MS. CANAAN: Objection -- sorry. Objection, form.

A Yeah, I'll have to pull up Bradford Hill. I'm more than happy to look at his original to see if he's outlined that or not in his statement. It's been a while since I've looked at it.

Q Okay. Are there any published peer-reviewed studies reporting an association between ranitidine and bladder cancer?

A Repeat that again.

Q Are there any published peer-reviewed studies

reporting an association between ranitidine and bladder cancer?

A Association studies, so you're talking about -- so if we go to figure 6 of my report -- I'm sorry, yeah. Figure 6. It's on page 57. Yep.

Those are the studies that I've outlined that looked at -- these are again studies looking at ranitidine and bladder cancer. I've broken them down by whether that comparison was to non-users on the right-hand side in black, ranitidine versus PPI use in green, ranitidine versus other H2 receptor antagonists in blue.

And I've also highlighted if there was a dose response assessment under each one of those sections. And the dots represent the risk estimate, and the bars represent the confidence intervals for those studies.

Q So these studies that you have here in table 6 report an association between ranitidine and bladder cancer?

MS. CANAAN: Objection, form.

A These are the studies that I've reviewed. In fact, when you look -- going back to what I mentioned, look at the blue -- studies that are outlined in blue, that's the active comparator to H2 receptor antagonists. So ranitidine was compared to other H2 receptor

antagonist. There is no association from any of those studies.

Q Okay. Do any of those published articles that you're pointing to here in your figure that are in blue, the active comparator studies, point to -- strike that.

Do any of these studies that are here in your table in blue, the active comparator studies, report an association between ranitidine and bladder cancer?

A Yes, this was what I commented on before. Cardwell study was -- where the author's actually conducted the right study where they looked at ranitidine versus other H2 receptor antagonists, and they don't see an association nor a dose response. If you look in blue, you can see that.

This is the same Cardwell study that incorrectly -- the authors state in their conclusion that there was an association. And that's where the problem lies, right?

So when you have an active comparator, but yet your focus on your conclusion is ranitidine versus non-users, which is at the bottom, that's a problem. It's a problem because what you're focusing on is the incorrect comparator and not the correct comparator which is the active comparator.

None of the studies you see, including

Cardwell, actually show an association between ranitidine and bladder cancer, nor is there a dose response in that same study.

Then you look at Norgaard. In fact, if one looks at Norgaard, there is the opposite, right? So look at that. I would argue, well, then, you know, with Norgaard study, if I take more ranitidine, I'm protected from bladder cancer. That would be an incorrect statement. But if one wanted to make that, one could, again, incorrectly. And the reason it's incorrect is you look at the aggregate there, just the blue. There is no signal.

I don't believe that taking ranitidine protects you from bladder cancer even though Norgaard suggests based on that estimate, nor do I believe that in the Cardwell study that compares ranitidine to non-users as shown underneath is a good comparison.

So I would say the author should focus on the correct assessment that they had actually done. They had done the right study, they just didn't do the right conclusion.

Q So did Cardwell report an association between ranitidine and bladder cancer?

A Compared to non-users --

MS. CANAAN: Objection. Sorry give me a

chance.

THE WITNESS: Yeah, sorry.

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Okay. Let me ask my question again.

Did the authors of the Cardwell study report an association between ranitidine and bladder cancer?

A They did when they analyzed ranitidine versus non-users, yes.

Q And it's my understanding from your discussion that we just had that you disagree with those authors; is that correct?

A That is correct.

MS. CANAAN: Objection.

A 100 percent.

Q Okay. Did you prepare this table yourself that's on page 57 of your report?

A Yes.

Q Are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?

A Can we go to -- can we just scroll up? That gets to page 55. Uh-huh.

So I did the same analysis here. As you can see in the black, ranitidine versus non-users,

ranitidine versus PPIs in green, ranitidine versus other H2 receptor antagonists.

These are all the publications that are out there. And as you can see, again, focusing on the better designed studies, but I'm happy to talk about the less well-designed studies. On those that --

Q Let me -- let me just stop you right there.

A Yeah.

Q Which of those studies would you define as the better design studies?

A The ones that had active comparator, as I outlined, you do want -- in this -- so in studies that we're trying to assess risk of ranitidine based on hypothesis that ranitidine had NDMA in it, therefore, that exogenous exposure in humans can cause cancer, that's the question, then one then has to compare apples to apples.

Those are studies that use ranitidine against active comparator of H2 receptor antagonists. Those are the ones in blue. When you do that, those are the better studies, and what you would see is there is no association.

Q So you would characterize Kim Y as one of the better studies associating the risk?

A On the basis of --

MS. CANAAN: Objection.

Sorry, sorry. I just -- I'm just waiting because I'm not sure sometimes whether Tracy has finished her question or not, so I'm waiting for her to finish, and you're jumping in.

So I just want to put in an objection.

Go ahead.

BY MS. FINKEN:

Q So my question was would you characterize -- are you characterizing Kim Y as one of the better studies comparing the risk?

A I am comparing --

MS. CANAAN: Objection, form.

MS. FINKEN: Actually, let me strike that question.

BY MS. FINKEN:

Q Would you -- you're characterizing Kim Y as one of the better studies assessing study as assessing the risk?

A I'm waiting. I'm sorry.

Okay. Going back to what I was mentioning, the -- it's not about a single study as much as the whole study, so the better studies are those that compare ranitidine to active comparator. Kim Y is one of those. Iwagami is another one. Yoon another one.

Kumar is another one. Adami is another one.

But what's nice about this -- and I actually -- what I really like about this -- and I've outlined it before -- is these studies come from different parts of the world with different databases, and there is no signal.

Now, if one wanted to pick on a signal and say, oh, my goodness, protective, I'm not doing that because I personally don't think taking ranitidine necessarily protects from gastric cancer. I think it may be a confounder, but the point being I'm not seeing a risk of ranitidine causing gastric cancer, i.e., going back to that NDMA hypothesis, going back to what I was asked to look at which is could ranitidine cause in humans gastric cancer and is there evidence for it epidemiologically. This graph beautifully shows it.

Q Okay. So the five studies -- I think it's five -- one, two, three, four. The five studies that you mentioned, Kim Y, Iwagami, Yoon, Kumar and Adami, you believe are the five most well-designed studies to determine whether or not ranitidine is associated with gastric cancer; is that correct?

A They are the better design studies because of the active comparator, that is correct.

Q Okay. Now, going back to Bradford Hill for a

moment, you had gone through the nine factors to consider under the Bradford Hill assessment of causation. Do you recall that?

A Yes.

Q Okay. Would you agree that when you're applying the Bradford Hill factor -- factors, that the factor of consistency carries more weight if the studies use different designs and patient groups and still arrive at the same conclusion?

MS. CANAAN: Objection, form.

A As -- as I mentioned before, it's not just a single factor, right? So you've got to look at so many things. How were the studies designed? Were there confounders? Were there active comparators? Did they control for protopathic bias? If the answer is yes, and yet despite all of that, they show an association -- that's not the case here -- then you would apply the Bradford Hill. And then you would say are they consistent? Is there strength of evidence?

So to me whether you apply Bradford Hill or not, there is not an association, that's number 1.

Number 2, if you apply the Bradford Hill, there is no consistency, i.e., there is consistency, there's no consistency showing an effect. There is no strength of evidence. There is none. So again --

Q Doctor, I'm -- I'm going to interrupt you because we're going to be here all night if -- if we don't -- if we don't get to the crux of some of these questions, but my -- my question --

MS. CANAAN: Tracy, you've been going about an hour, so I don't know if you want to take a break, but I would appreciate a five-minute bio break at some point.

MS. FINKEN: Okay. Well, let me ask the question that I just asked, and then --

MS. CANAAN: Go ahead.

MS. FINKEN: -- we can take a break.

BY MS. FINKEN:

Q I was referring solely to the criteria, not in the context of this graph, but just generally. When you're looking at the Bradford Hill criteria of consistency, would you agree that that would carry more weight if the studies that you're assessing used different designs and different patient groups, and they still arrive at the same conclusion?

MS. CANAAN: Objection, form, asked and answered.

A It would be a factor in that analysis.

MS. FINKEN: Okay. Let's take a break. Just five minutes, is that --

MS. CANAAN: Yeah, five, ten minutes, something like that, yeah.

MS. FINKEN: Okay. Great.

THE VIDEOGRAPHER: The time is 4:15 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Just a moment.

Okay. Please stand by.

The time is 4:31 p.m., and we're back on the record.

BY MS. FINKEN:

Q Okay. Doctor, I just want to shift gears for a moment. We were talking previously about some of the conditions that are in the gut relating to pH and bacteria and nitrite and things like that. Do you recall that testimony?

A Yes, I do.

Q Okay. Now, would you agree that there's also nitrite in the saliva?

A There are some studies suggesting that there are nitrites, yes.

Q Okay. And are salivary nitrite levels also subject to fluctuations depending on certain factors?

MS. CANAAN: Objection, form.

A I -- I -- I don't know, because that -- I'm

sure that's going to depend on various factors, but I don't know.

Q Okay. So I -- I don't want to use the term "variable" since that hung us up previously, but it -- also nitrite -- salivary nitrite levels would change depending on things like diet, similar to the nitrite levels in the gut, correct?

MS. CANAAN: Objection, form.

A There may be some variation. I would have to look at the details. And I don't know what you mean.

Q Okay. What is thiocyanate?

A A what?

Q Do -- do you know what thiocyanate is?

A Thiocyanate. I know what it means chemically, but I don't know what -- in reference to --

Q Okay. Is thiocyanate found in saliva, do you know?

A I'm not sure.

Q Okay. Do you know whether thiocyanate is found in the gut?

A I'm not sure.

Q You had indicated in your report, I believe it's on page 7, that a combination of medications are often used over a treatment course for your patients, sometimes starting with H2RAs like ranitidine and using

step-up therapy to PPIs, or starting with PPIs and using step-down therapy to H2RAs. Do you recall that?

A Can you show me where that is?

Q Yep. It's actually right up on the screen.

MS. FINKEN: Thank you.

BY MS. FINKEN:

Q The bottom of the first paragraph, the last sentence. Do you see that? It says "lastly, a combination of medications is often used over a treatment course, sometimes starting with H2RAs and using step-up therapy to PPIs or starting with PPIs and using step-down therapy to H2RAs."

Did I read that accurately?

A Yes.

Q Okay. And when you're saying that -- that you start with H2RAs and use step-up therapy to PPIs, what do you mean when you're -- when you're using the term "step-up therapy"?

A So in the olden days, as I call it, the old recommendations, if you will, when you look at the clinical guidelines on how to treat reflux, it used to be that you did step-up therapy, and now we're doing step-down therapy.

So what is step up? It used to be -- because we weren't really sure about the efficacy of the drugs

and all of that, we would say we'll start with lifestyle modification first for reflux. If lifestyle modification doesn't work, then go to antacids, H2 receptor antagonists and then to proton pump inhibitors, so that's the step-up therapy.

Then in the '90s, we learned through various studies that it was probably not the most cost effective way to do that because later we learned that it's -- because what was happening is -- was we were seeing patients that were still symptomatic, and what we ended up doing was more procedures on them, so the cost went up.

So then the recommendation changed, and as we highlighted in the '98 AGA guidelines on GERD, we said step-down therapy would be the way to do it from cost effective, and also you're starting at -- because a patient that presents to you with a symptom, you want to help them first, then step it down. So you start with PPIs, then go to H2, and then if you can, take them off.

But again these are -- these are approaches, but not necessarily one that one takes on everyone in that it may or may not be effective in everyone. In some you're able to step down. In some you're unable to step down, and they have to stay on the same medication.

Q Okay. So is it common in your practice to

switch from H2RAs to PPIs or vice versa over the course of the patient's treatment?

A It is not common. It's -- it's a possible approach. So what happens -- again each -- we're now talking about phenotyping patients. Each patient presents as a phenotype. So if a patient comes with really severe disease, then no treatment's going to help them. It's going to be PPIs. And that's a step down. We start with PPIs.

But if a patient you started on an H2 receptor antagonist has responded to that therapy, then they're going to continue on that therapy. So you don't necessarily do the same thing for everyone. You target that patient.

So you start with H2 receptor antagonist. They're doing well. You continue with H2 receptor antagonist. So by this what I meant -- and I should have clarified -- is that they're varied approaches, but most common approach is you tried that phenotype of patient. You treat them. When they do well, you stay the course, and that patient doesn't necessarily need to go to a higher dose of anything else. You just leave them at that.

Q Okay. During the course of your clinical practice do you see that patients switch between

different types of H2RAs or different types of proton pump inhibitors based upon what might be on the formulary or insurance coverage or things of that nature?

A Commonly I don't. So this is what I see. In fact, I have a lot of calls from patients regarding this. So what happens is a patient is started on a medication. They're really reluctant -- especially the ones I talked about. When they're doing well, they're reluctant to switch. And the reason they're reluctant to switch is because they're doing well. So any -- any change is going to create some level of anxiety and fear, and they're less likely to do it. So most of the patients that are doing well that start on the medication, they're going to continue with the same.

And that's why I get a lot of calls, for example, when the FDA -- when ranitidine was taken off the market, I got a lot of calls from patients that were on ranitidine. They didn't know what to do. They said -- and I said, well, we could try a different medication. There's reluctance because I was doing so well on this, I don't want to go to another one that I'm not going to do well on it. And that is true, sometimes they won't do well on a different medicine. But commonly they like to stay on what they're doing well

on.

Q So in your experience in clinical practice do you find that patients are willing to pay out of pocket to stay on a medication versus switching because of formulary changes or things of that nature?

A So there --

MS. CANAAN: Objection -- objection, form.

A So there -- there are differences, right? The formulary issue is different, and then the -- they would rather stay on their same medication that they're doing well on. The formulary issue is a different one.

So if there is a change in their formulary, then that's when they reach out and say, hey, what do I do. Then if we switch them to something else and they're not doing well, then sometimes, yes, they go back to what they were on, and they would have to be over-the-counter. But my sense from most of the patients is they like to stay on what they're on because they're doing well.

Q So when you're prescribing medications, though, to your patients, do you take into consideration affordability that the -- especially within the class of medications, affordability in terms of what patients' insurance coverage provides versus not; is that something that you consider?

A Yeah, so you -- you do have to consider that at times. The issue here is that many patients would -- you know, it's difficult to get over-the-counter medicines because as you highlighted, they may have to pay money for it. So the issue that sometimes comes up is can you write me a prescription for this medication because my insurance covers it, but I -- if I pay for it out of pocket, it doesn't. So that issue comes up a lot where we -- they don't want to take over-the-counter, even though it's available. They would rather be on a prescription that the insurance pays for. So that happens often.

Q Okay. And that holds true whether it's an H2RA or a PPI or any type of class of medication, correct?

A Well, most commonly, if cost is the driver, they would rather be on the prescription.

Q Uh-huh. Are there times when you advise your patients to take over-the-counter medications because it might be more affordable to them than taking a prescription version?

MS. CANAAN: Objection, form.

A I don't drive that as far as me driving what they can afford. I normally prescribe medications, and if they call me and they say, hey, should I take over-the-counter -- they first call because they're --

I've heard it where they're hesitant because is that the same drug nonprescription than prescription. They rely on the prescription because that's the psychology of medicine where a prescription has more efficacy than a nonprescription. So even though they may or may not be the same compound structurally, they're hesitant to go over-the-counter. They'd rather do the prescription.

Q Are there circumstances where your patients would be taking over-the-counter medications such as PPIs or H2RAs that you are aware of that -- that you are aware of and condone versus taking the prescription version of the medication? Do you understand my question?

MS. CANAAN: Objection.

A No, I'm sorry, I don't.

Q Is there ever a circumstance where your patients come in and they're taking an over-the-counter version of a PPI or an over-the-counter version of an H2RA and because that's, you know, working for them, you just continue them on the over-the-counter version versus prescribing the prescription version?

A The reverse is usually the case in that patients don't start on over-the-counter and come and say should I start on it. They usually come with a symptom. They go I have this symptom, and then we

prescribe something, then they stay on that. And they're more like- -- they're more hesitant to switch to something else because it's working.

Q Okay. Do you find at all that there's crossover between over-the-counter use of these types of medications versus prescription?

MS. CANAAN: Objection.

A So for the same reasons that drives all of our psyches, if you will, it's very difficult. If you're doing well on a medication, it's really -- individuals have a hard time switching to something else with that uncertainty of am I going to do well.

Again just looking at the prescription and over-the-counter issue that you're highlighting, patient would rather be on prescription than over-the-counter. They're less likely to want to switch between them because they feel if they're doing well, why should I switch because now I'm afraid I may not do well on that.

Q Are there certain conditions where you -- I'll strike that.

You indicated in the past that you've prescribed Zantac or other H2RAs to your patients, correct?

A Yes.

Q Okay. And you've also prescribed PPIs to your

patients as well, right?
A Correct.
Q Are there certain conditions in which you are more likely to prescribe an H2RA over a PPI?
A So depending on if I'm doing step-up or step-down therapy like I was talking about. So it's not necessarily a situation. It's more driven by a patient comes in with heartburn, you may want to put them on a PPI, step them down to H2.
So there are times -- for example, I highlighted Zollinger-Ellison syndrome where patients we know have significant acid reflux, so you don't want to go there with an H2 receptor antagonist. What you want to do is actually start with a PPI and stay the course with a PPI. So if I understand your question right, that's the group that you wouldn't switch.
And then the other group, normally if you start with an H2 receptor antagonist and they're doing well, no reason to switch. If you start with a PPI, they're doing well, then you could switch to an H2 receptor antagonist to see if they'll equally do well.
Am I answering your question?
Q As a general proposition, would you agree that PPIs are more efficacious than H2RAs?
A They are --

MS. CANAAN: Objection, form.

A They are more efficacious in healing esophagitis. That has been shown. But more efficacious depends on the patient presentation, so, you know, if you have -- again going back to phenotyping, if you have a mild disease, you equally do well with a PPI, then an H2 receptor antagonist.

But if you have severe disease such as severe esophagitis, peptic ulcer disease that's severe, Zollinger-Ellison syndrome, you're bleeding in the stomach because of an active bleed, then that's where PPIs would be more effective.

Q Did you -- during the time frame that you prescribed Zantac to your patients, did it ever carry a warning that it contained a carcinogen?

MS. CANAAN: Objection, form.

A Not that I recall.

Q Did it ever contain a warning -- strike that.

During the time frame that you prescribed Zantac to your patients, did it ever carry a warning that it could cause cancer?

MS. CANAAN: Objection, form.

A No.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it

should be refrigerated?

MS. CANAAN: Objection, form.

A No.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it should be taken with Vitamin C or Vitamin E?

MS. CANAAN: Objection, form.

A Not that I know.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it could form a carcinogen if it was stored in the bathroom?

MS. CANAAN: Objection, form.

A Not that I know of.

Q Okay. Now, when you prescribe medications to your patients, is it fair to say that you conduct a risk benefit analysis? And when I say "risk benefit analysis," I mean that you weigh the risks of the medication versus the benefits of the medication before you prescribe it.

A Yes. That's -- that's what we do in clinical practice, yes.

Q And if Zantac had carried any of the warnings that I just asked you about, is that information that you would have factored into your risk benefit analysis when prescribing it to your patients?

MS. CANAAN: Objection, form.

A If that information was on the label based on accurate and consistent data that then the FDA would have required the company to do, that would have weighed in, yes.

Q Do you generally rely on the accuracy of the data that's contained in the label of the medications that you prescribe?

A Not solely the label because you -- obviously they outline -- there's clinical studies, but typically, especially in my area, I know the studies. I know, you know, the studies that have been done with various drugs and their efficacies and side effects, so it is a component, yes, that -- that does inform me. It's a part of what informs me, yes.

Q So do you assume that the information that's contained in the label that's provided by the manufacturer is accurate and complete when you're prescribing medications to your patients?

MS. CANAAN: Objection, form.

A I -- I assume its accuracy, yes. As far as completeness, again, I don't just rely on it. I -- personally I look at -- just like I do with anything else, I'm looking at all the studies. I'm looking at side effects. I'm listening to my patients

when I give them drug A, and if everybody comes back with abdominal pain, then I'm wondering, and I'm investigating. So it's a part of it, but not the sole issue.

Q Okay. One second. Bear with me for a second. I'm skipping around a little bit because I want to cover some issues that I didn't get to before we get to the end of your deposition.

So, Doctor, going back to some of the concepts of epidemiology, what is "protopathic bias"? I heard you use that term earlier when responding to one of the questions that I posed.

A Yeah, that's really an important one, especially regarding what I was looking at, to assess whether or not there's a risk with ranitidine and cancer. The reason that's important -- especially a compound like ranitidine, you know, any of the acid suppressive therapies, because the symptoms are so common, right?

So patients present with these vague symptoms or with heartburn or with abdominal pain, nausea, as I outlined before, and oftentimes patients may be put on a PPI or in this case ranitidine, but those symptoms may be from malignancy.

So what happens is that one -- one looks at

epidemiologic studies that did not control for protopathic bias, i.e., the drug was given not necessarily because of -- or was given because of a symptom that was not recognized to be cancer, and that patient is diagnosed with cancer.

And then if you don't control for that and adjust, then what happens is you're going to find an association with drug A and cancer, and that association is really not a good association because it's not valid. The drug was given for symptoms precancer.

And, in fact, if you look at my report, I've outlined it, and several studies that I looked at beautifully outlined how that's -- specifically to the ranitidine studies, the Liu study being one where there's a graph that I've outlined in my report that shows that clearly.

And there is a table at the -- in the middle or towards the end of my report that actually shows that very nicely, that patients sometimes are diagnosed with a disease and they're given a drug, and then later studies suggest an association with that drug and that outcome which is not accurate. It's due to a cancer symptom itself.

Q So how do you account for protopathic bias in a study evaluating risks of cancer?

A That -- that's a good question. So there are a couple of ways you can do that. One, you could provide a lag time, right, between the exposure and the outcome. And that -- some studies have done that. So if you look at my report and if you go to -- I forget the page number.

Q Let me ask you a question about that specifically.

When you say apply a lag time, what are you referring to?

A So you're essentially -- so what you're trying to find out is what the time period between the exposure and the outcome was, so if someone is given the drug six months before they develop cancer, then really you don't want to necessarily include that in your analysis, do you, because that is not the appropriate time frame for that.

So what you're trying to do is find out that in -- in any study --

Again looking at page 22 you can see that most of the cancer studies in Liu has shown that if you have one- to two-year lag time, and that's where the association was the highest, so if you ignore that time period, then what you found is that there is no -- the association that was observed goes away with the time

period of 1 to 2. And, in fact, there's a nice table as well that shows that.

Q So what is an appropriate lag time to account for protopathic bias in a study assessing the risk of cancer?

A That's variable. Just like each cancer -- I'm sorry. Go ahead.

MS. CANAAN: Go ahead.

A Yeah. That -- that's variable depending on the cancer, just like each cancer is not created the same. There's aggressiveness to them. And also that's really variable, so one can't say one year is it, six months is it, two years is it.

But what is important in epidemiology is to see if applying different lag time affects the outcome, right? So when you -- when you apply that -- again looking at page 22 and figure 4, you see that by applying different lag time, that association actually is reduced. So that tells you that you need to do that because your observation is based on an association that's due to patient's symptom from the cancer, right? And that's very important.

In fact, if you go to the table at the end that I have created -- and that actually brings it out even better if you like tables better than graphs. Let me

see --

Q Doctor, before we go there, let me ask you a question. Would you -- are you suggesting that a one-year lag time is inappropriate to reduce the risk of protopathic bias in a study assessing the risk of cancer?

MS. CANAAN: Objection, form.

A Yeah. What I said again isn't the number, right? So each cancer is different. The lag time is going to be different. You want to see what -- what is going on when you apply a lag time, so a 1 to 2 to 3. So on this figure that you're seeing, that 1, 2, 3, that association is going away as you apply the lag time. So that tells you as you're trying to better assess whether the association is from an improper exposure, if you will, because of the cancer -- if that association goes away, then you say all right, I'm doing the better study. What is that better study?

The other way you could do it is by an active comparator. So if you do that active comparator, then you're essentially saying all right, I'm going to control for that as well.

So those are two ways you could really get at is the association you're observing really just due to some of these confounding and biases.

Q And, Doctor, when you -- previously we talked about follow-up periods in these studies. What would be an appropriate follow-up period to account for latency periods between exposure and diagnosis of cancer?

MS. CANAAN: Objection to form.

A And that's variable as well, right? So if each cancer is variable in their development, that's going to be variable. But overall, when you look at all the studies that -- in this area of ranitidine and the five cancers, what is important to look at is not only a single study, but all the studies -- and the studies that look at long-term and short-term, more than 10 years, less than 10 years, more than 5 years, less than 5 years.

If a signal emerges that a cancer is more likely to occur after 10 years in these studies, then they would see that risk estimate go up, and they don't see that.

So a specific number would be inappropriate as your oncologist might tell you is that each cancer is different. But it's the pattern that you see with these studies that then lead us to say is there a signal or isn't there a signal.

And in those studies that applied more than 10, less than 10, in ranitidine, there was no risk. There

was no change in the risk estimate, so that's reassuring to me.

Q Okay. And how important is exposure and adequately measuring the exposure in a study to assess the risk?

MS. CANAAN: Objection, form.

A It is -- it is -- again it's part of the epidemiologic studies to assess exposure the best you can, going back to what we discussed about, there is no perfect study design. There is no perfect study in anything, whether it be related to ranitidine or to any other studies. There are always going to be issues, but the best you can with that -- and putting the pattern together.

So is exposure important? Of course. Is outcome important? Of course. All of those are important, but they're pieces of the bigger picture. What is the bigger picture? If I look at long-term versus short-term. I apply lag time. I have confounding by indication. I'm looking at all of those factors, am I seeing a signal? They're all important.

And again if a study looks at an exposure one way and another study looks at it different way, do they come with different conclusions? If everybody comes with the same conclusion looking at it differently with

different population, that's reassuring.

Q Doctor, do you agree with the general proposition that in a study assessing the risk of cancer, the exposure to the agent should be well defined in terms of timing, dose and duration of use?

MS. CANAAN: Objection, form.

A I'm sorry, can you repeat that again?

Q Sure. Do you agree with the general proposition that in a study assessing the risk of cancer, the exposure to the agent should be well defined in terms of timing, dose and duration of use?

MS. CANAAN: Objection, form.

A To the best of the ability of that database and that study, I think that's the key, right? So I -- I remain on -- on this, that there is no perfect study. The best of the ability of the investigators with the tools they have, with the database they have, they should do the best. And then at the end, they should -- you know, apply the limitation. They should discuss their limitations. That's a study.

There is no perfect study. It is not a single factor, but with the best of their ability, they should try to assess exposure and to assess dose and also to assess outcome the best they can.

Q Would you agree that when assessing the risk of

cancer in a study like this, that information about the dose and duration of exposure are essential?

MS. CANAAN: Objection, form.

A So, again, I -- I think you asked the same question, I'm not sure, but they're all important within the database the best they can to assess and to provide as much information as possible.

Q Okay. So looking at this in the context of an example that you've given several times about smoking and cancer, if you're looking at a study, and the exposure -- the smoking history is a month, and it's assessing one month of smoking with everybody in the study and their long-term cancer risk, would you agree that in a situation like that, the exposure would not be adequate to determine the risk?

MS. CANAAN: Objection, form.

A It depends. If the exposure is to high level of smoking short-term, it's like -- you know, that's going to depend. Is it to low level of exposure? It depends on the study, so that's a hypothetical to me, you know.

It's -- each study has its strengths and weaknesses, and you look at all the studies with that in mind, and then you paint the big picture by looking at all the studies, not a single study.

Q So, for example, if you have a study that shows a population of people who smoked for a month, and you assess whether or not those individuals were diagnosed with cancer down the line, and it doesn't show an increased risk, that doesn't necessarily mean that there isn't a risk of cancer from smoking, correct?

A That means there is no risk for that population, depending on the population, depending on the exposure, but that one single study would not be one that I would say I'm going to necessarily use to conclude everything from.

Again going back, it's a constellation of studies. You've got to put all of them together. You look at everything within their limitations, and you come up with that.

And again going to smoking -- you know, with smoking, the signal was really strong, wasn't it? And it didn't matter where you studied, how you studied, the signal was strong. And that gets to the strength of association, so --

Q Let me -- let me ask you a question. Going back to my hypothetical, if you have a situation like I just described, a one month -- a bunch of one-month smokers and it doesn't show an increased risk of cancer, at best that study would tell you that smoking for a

month, one month, doesn't necessarily increase your risk of developing cancer, right?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q It's not telling you your risk of developing cancer for smoking more than a month; it's only limited within the confines of the study itself, right?

MS. CANAAN: Objection, form.

A Again, it -- it depends on the dose, but it tells me within the confines of that one single study, that that study did not show that smoking was associated with it, but that would be that one single study.

But then we would look at other studies. We would look at those that use, you know, more than 10 years, less than 10 years, more than -- you know, if they had -- if there were studies that higher exposure, lower exposure. You look at all of that. You put it together. Every single one of them is showing the same thing. One can't then say, well, none of those studies are good.

And -- and even though there's no good studies, that would be the hypothetical, then I'm going to conclude there is an association, when again, lack of an association does not prove the causal link. There is no association. One can't conclude that there is no

effect, therefore, I'm going to say there is still one. That wouldn't make sense.

Q Okay. Doctor, what is "misclassification bias"?

A Yeah. So you're essentially misclassifying the individual. I'll go back to my report. That would be under -- I guess page 14 is where you see that first; is that right? So the individual is misclassified based on exposure versus non-exposure.

Now, there are two types. You have differential and you have non-differential. And I've outlined that in the section on page 14. For example, "recall bias" would be an example of differential misclassification.

For example, in the NDMA dietary studies, when you ask patients about did you take this -- you know, what did you eat, and they're going to recall a certain fact, that's going to be a differential misclassification because they're remembering things and they're remembering it incorrectly, and they're attributing certain diets they may have heard about, read about, so that's going to by default show you a risk that is based on differential misclassification.

Q So if you're looking at a study that's looking at drug exposure and the study does not account for

over-the-counter use of the drug, it's possible that some individuals in the study can be misclassified as non-users who are actually users, correct?

A It depends. It depends on factors, right? So just OTC use, whether or not individuals may have been misclassified in one by itself is only one issue among these epidemiologic studies. You have to look at misclassi- -- misclassification based on other things, indication bias, protopathic bias. Those are going to drive everything toward -- away from the knoll, right? So you're actually going to get false positives.

So in a given study, you have other factors that are driving things away, so one can't just say misclassification. If it's non-differential, it's going to solely be away from the knoll.

When you have that second, you also have in studies -- especially in some of the cohort studies that did multiple grouping, you have this polytomous exposure where it could go in either direction, so it could be either away or towards the knoll, so that could be variable.

You have your active comparator, right? So you need to have an active comparator. In a study that had active comparator, then it really doesn't matter about the over-the-counter use, right? Because that would be

essentially among both of those groups, so . . .

And then you -- you sort of look at some of the studies among the ones I've looked at that actually did not have an opportunity to have OTCs. There are some of those studies among the ones I've listed that when they looked at their database for -- during the time when over-the-counter use was not possible, and those studies showed the same thing. They do not see an association.

So combining those studies where OTC use was not a problem with these studies and all showing the same thing --

And also I've highlighted, there's that Yoon study that if you pull that up, the significance of over-the-counter driving the estimate one way or the other is really highlighted in that study.

And that's a beautiful graph that is very informative in that if the prevalence of the drug use in this case, ranitidine, is low, which it is, 5 percent -- less than 5 percent in most of these databases, then OTC use does not impact the estimate. The best -- it goes from -- let's say 1.5 was one of their examples to 1.48, that is not a significant change.

So there are multiple variables that affect it, and one can't just say what about the OTC. The reason these studies may have not shown effect because they may

have misclassified differential or non-differential, there are too many variables at play here.

Q So going back to my question, though. Would -- when -- in the scenario that I posed where it -- a study does not account for OTC use of a drug, would that be an example of misclassification bias?

MS. CANAAN: Objection, form.

A Again it would be -- it depends on the percentage of ranitidine use. It depends on the percentage of OTC use --

Q And putting -- Doctor, I don't mean to interrupt you, but putting aside the ranitidine studies, I'm just talking about generally.

A Generally.

Q The study is not accounting for OTC use and it's possible that some individuals might be classified as non-users who are actually users, is that an example of misclassification bias?

MS. CANAAN: Objection, form.

A So in that hypothetical --

THE WITNESS: Go ahead.

MS. CANAAN: Objection, form.

A Yeah. So in the hypothetical example --

Again I go back to the ranitidine just because that's really where I put most of my effort in rather

than the hypothetical, so . . .

In the hypothetical example and solely by itself, yes, that would be. But in the studies I've looked at --

Q Thank you. I'm going -- I'm going --

MS. CANAAN: Don't -- don't -- Tracy --

MS. FINKEN: No, no.

MS. CANAAN: No talking.

MS. FINKEN: Eva? Eva, I've let this go on a lot, but I -- really we have to get through this, and I'm not --

BY MS. FINKEN

Q I'm not trying to interrupt you, Doctor, but you answered my question.

MS. CANAAN: But you are interrupting.

MS. FINKEN: You're interrupting me now. You're interrupting me. Let me finish.

BY MS. FINKEN

Q My question was whether that was an example of misclassification bias. You said yes. That was my question. And I need to interrupt you, or otherwise we're going to have to come back another day to finish this deposition and I really --

MS. CANAAN: Well, I mean, we can -- we can come back.

MS. FINKEN: I'm -- I'm creating -- I'm creating a record, Eva, and when I'm done, you can say what you want to say, but if we don't -- if we don't cut off this dialogue of simple questions, we're going to have to come back another day.

BY MS. FINKEN:

Q So I'm not trying to interrupt you, Doctor. I've let you talk as much as you want during this deposition, I have not interrupted you, but I need to cut it shorter, okay?

MS. FINKEN: And, Eva, go -- say whatever you want to say, but that's -- that's where we are.

MS. CANAAN: So, Dr. Vaezi --

First of all, Tracy, you cut him off. You did interrupt him.

Dr. Vaezi, were you finished with your answer or not, or did you have anything else to add?

THE WITNESS: No.

A I mean, the only thing I would add, to keep it short -- again I'm sensitive to the comments. I will -- I will keep it very short. I apologize.

I -- it -- it is -- it is important to note the situation, right? One can't just say in a hypothetical situation. This is about ranitidine, and it's about ranitidine potentially causing cancer. It's about

misclassification within ranitidine studies. And I'm telling you that based on all of the factors, that misclassification would not play a role on the estimate as a whole.

Q Okay. So OTC not being accounted for in a study, just generally, is an example of misclassification bias, true?

MS. CANAAN: Objection, form.

A It is an example of misclassification bias that does not have an impact on the ranitidine hypothesis in the studies.

Q Have you, Dr. Vaezi, ever conducted a study where there was -- where you found an association between an exposure and an outcome even though the study suffered from limitations such as misclassification bias?

MS. CANAAN: One second. Objection, form.

A So I've conducted studies about exposure and outcome with many limitations. And that's the point I was trying to make, that there is no perfect study. There are many. But the question at hand must be does that limitation impact an overall estimate? And in this case, that misclassification would not impact the overall estimate from the studies of ranitidine, and that's the key.

Q I'm going to move to strike your answer as nonresponsive.
My question was have you ever conducted a study where you found an association between an exposure and an outcome even though the study suffered from limitations such as misclassification bias?
MS. CANAAN: Objection, form.
A My answer is the same.
Q So I don't understand your answer, Doctor.
Have you -- have you found an association between an exposure and an outcome in studies that you've conducted where there have been limitations such as misclassification bias?
A I have been --
MS. CANAAN: Objection.
A I've conducted studies on association exposure and outcome that suffer from many limitations.
Q And when you've conducted those studies, have you -- have you ever conducted any that you still found an association despite those limitations?
A Yes, and --
MS. CANAAN: Objection.
Michael, give me a chance to object.
THE WITNESS: Okay.
MS. CANAAN: Objection, form.

A Yes. And that's why -- even my own study that shows an association, you can't necessarily say, oh, my goodness, that study shows an association. You have to take it in the broader sense. What are the limitations? What are other studies showing? Are there other factors that contribute to that?

I'm one -- I personally from clinical perspective would not take any of those studies and take to my patient and say this is causal to that. At the end of the day, we're talking about a causal link. And an association without a cause, i.e., if it's not causal, has no clinical importance, right? Because it's about taking care of patients.

So to me these studies are interesting, i.e., the ones I'm talking about that I may have done, but if they suffer significant limitations, then I wouldn't necessarily say that means it's causal. I would say it has significant limitations. Let's look at other studies. Let's see whether or not one can say it's causal.

Q Okay. Putting aside causal, though, would you look at studies -- let me strike that.

Putting aside whether it's causal -- because we understand that association and causal are two different things, correct?

A Correct.
Q Okay. You'll agree with me on that, right?
Putting aside whether it's causal, would you still conclude -- have you still concluded in a study that suffers from misclassification bias that there is an association between an exposure and an outcome?
MS. CANAAN: Objection, form.
A Yeah. Again I would have to look at my studies to see, and if the study has all of these limitations and at the end one concludes that, one would have to say that there is an association. However, be careful because of these limitations. So that's where studies have to be.
Let's say I have a study -- and again I don't know. It's hypothetical, or if you have a study, I'm happy to review it, that there is an association, and one says there is an association, to be responsible, you have to then put all the limitations and relay the message this has limitations, and it's not causal.
Q And wouldn't you agree, Doctor, that that's why when you have studies that show an association, you then go and you apply such things like the Bradford Hill criteria to all of the evidence to determine whether or not there's a causal link?
MS. CANAAN: Objection, form.

A That would be -- that would be responsible by reviewing all the data and putting it together, not just your own but others as well, and looking at the limitations and seeing whether or not there's any signal.

Q Okay. And, Doctor, you've used the term "reverse causality." When you use the term "reverse causality," are you using that interchangeably with "protopathic bias"?

A Yes.

Q Have you ever conducted a study where you concluded there was an association between an exposure and an outcome even though the study could not properly account for reverse causality?

MS. CANAAN: Objection, form. Objection, form.

A You have to show me the specific study, but, again, I've -- I've conducted many studies that have multiple limitations.

Q Doctor, are you aware of a single ranitidine study that evaluated an exposure to ranitidine more than three years?

MS. CANAAN: Objection, form.

A So again I -- I sort of outlined that maybe this morning. There are studies that look at again the length of time as far as how long patients were

assessed.

There are studies that have looked at exposures at various levels, various duration.

There was a study that looked at at least one year, for example, exposure to the compound. They also looked at high exposure.

There's studies that looked at more than 10 prescription versus less than 10 prescription, and going back to the clinical -- we've got to connect it to clinical -- is patients that require high doses, many years, are chronic patients that need it chronically. Therefore, clinically it makes sense that those studies are high exposure for long time.

Q And that's based on the assumption that if patients fill prescriptions, 10 prescriptions, that they're going to be on it long term; is that correct?

MS. CANAAN: Objection, form.

A It's a -- it's a valid clinical assumption. I see it daily, right? So if I have patients that come in and they need more than 10 prescription, they have chronic disease. They need to be on something chronically, so it -- it is not an assumption that is not based on clinical facts.

MS. FINKEN: How much time do we have on the record?

THE VIDEOGRAPHER: Just a moment. Let me total it up.

MS. CANAAN: Now might be a good time to take another five minutes, Tracy.

THE VIDEOGRAPHER: Five and a half hours, Counsel.

MS. FINKEN: Okay. Let's take a five-minute break.

THE VIDEOGRAPHER: The time is 5:22 p.m. We're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Everyone's back? Please stand by.

The time is 5:43 p.m., and we're back on the record.

BY MS. FINKEN:

Q Okay, Dr. Vaezi, I just have a few more questions. We're trying -- I'm going try to be relatively brief, but let's try to get through it.

So, Doctor, you agree that there's NDMA in ranitidine, correct?

MS. CANAAN: Objection to form.

A In some -- based on the FDA results, some of the ranitidine tablets had above their cutoff of 96 nanogram. Others did not. Some did. Some did not.

Q Are you aware that the NDMA in ranitidine is variable depending on the conditions it's subjected to?
MS. CANAAN: Objection, form.
A Can you clarify what conditions? I'm sorry.
Q Do you -- do you know that the NDMA in ranitidine increases when ranitidine is subject to heat or humidity?
MS. CANAAN: Objection, form.
A There was a mention of that. I know that in the original Valisure study when they subjected the ranitidine tablets to high heat, it produced high levels of NDMA within their study. So I am aware of that study.
Q Okay. Are you aware that the NDMA in ranitidine can increase just based upon normal storage conditions?
MS. CANAAN: Objection, form.
A I am not aware that in normal conditions it would go up significantly, no.
Q Okay. Are you aware that the NDMA in ranitidine can increase just over a matter of time?
MS. CANAAN: Objection, form.
A I am not aware of that, no.
Q Okay. Would you agree with me, Doctor, that NDMA is mutagenic?

MS. CANAAN: Objection, form.
A So I think this goes back to the original studies with the NDMA in -- in rodents, right? So in those studies, NDMA caused -- at high doses caused liver cancer in rodents at high doses. If by that -- mutagenic you mean that, yes.
Q Okay. Is NDMA clastogenic?
MS. CANAAN: Objection, form.
A I don't understand the question.
Q Is NDMA genotoxic?
MS. CANAAN: Objection, form.
A NDMA at high doses in rodents can cause liver cancer. Again that -- that essentially answers the same question in my mind.
Q Doctor, you had talked previously about the IARC classification of NDMA as a probable human carcinogen. Do you recall that?
A Yes.
Q Okay. When did IARC last undertake a peer review process to classify NDMA?
A I believe -- I have to think back. It may be in my report. I believe it was their '87 class of -- is when their classification came about, if I'm not mistaken.
Q Do you know whether or not IARC has undertaken

a peer review process since 1987 to determine whether or not that's an appropriate classification?

A I don't know that. But what I do know is that the NTP has looked at it more recently, and they land on the same conclusions as the IRAC.

Q When did the NTP last undertake a peer review process to classify NDMA?

A I don't know about the peer review. You're asking about peer review. I don't know that. But I know there was a report in 2021, if I'm not mistaken, but I'm not sure. I have to look that up.

Q Do you know the process by which NTP classifies agents as reasonably anticipated to be human carcinogens?

A I would have to refresh my mind and look at that. I don't recall.

Q Do you know whether or not the NTP undertakes a peer review process to classify agents like NDMA?

A Again, I don't know about the peer review issue, but I'm sure it -- again not knowing specifics, I'm sure they have experts that review the analyses. As far as the peer review component, I don't know.

Q When you refer to the NTP report in 2021, are you referring to the NTP annual report on carcinogens?

A Yes.

Q Okay. Do you -- is it your understanding that when the NTP issues a report annually on carcinogens, that they reevaluate the classifications for those agents each year?

MS. CANAAN: Objection, form.

A I don't know the integral of how they classify, whether it's every year or not, but I know that the last one was in 2020.

Q Okay. So is it your -- strike that.

When the NTP issued their report in 2021, do you know whether or not they undertook an evaluation of NDMA and its carcinogenicity or whether or not they carried over the classification from a peer review conference that had been conducted 20, 30 years ago?

MS. CANAAN: Objection, form.

A So that's a -- if you simplify that question for me, that would be helpful because that was a long question. I lost you in the middle. I'm sorry.

Q Okay. Well, you are relying on the fact that you believe that the NTP issued a report in 2021 categorizing NDMA as reasonably anticipated to be a human carcinogen. You've stated that, correct?

A That is correct.

Q Okay. And is it your understanding or do you -- strike that.

Do you have an understanding as to when the NTP actually issued that classification for NDMA?

A You mean not --

MS. CANAAN: Objection, form.

A Not the report, but the actual -- I -- I have to look at that, but, again, I would be surprised if an organization like NTP has a report out saying that it is, you know, reasonably anticipated in their 2021 report without having looked at the evidence in the -- in the integral, because if they're saying that, the assumption that I'm making, I hope correctly, because it's an agency that's respected, right, that have looked at the evidence up until that report time.

Q Okay. Is it your understanding that the NTP's current classification of NDMA, that it's reasonably anticipated to be a human carcinogen?

MS. CANAAN: Objection, form.

A They stated in there that -- yes, that's correct, that it was reasonably anticipated.

Q And I'm assuming, Doctor, based upon your testimony that you've never done work for the NTP, correct?

A I have not.

Q And you're not a toxicologist, correct?

MS. CANAAN: Objection.

A I'm not a toxicologist. But again within my practice, I assess the toxic effect of various drugs as -- and their clinical efficacy.

Q Have you ever sat on a peer review panel to assess the carcinogenicity of a drug or an agent for purposes of NTP or IRAC or any type of scientific authority?

MS. CANAAN: Objection, form.

A Not IRAC, not NTP. But within my organization, the American Gastroenterologic Association, the American College of Gastroenterologists, there are various committees that I've been a part of that we discuss various factors, so not IRAC nor NTP.

Q Okay. And when you -- you've referred to -- I think you said the -- was it the AGA, the American Gastroenterology Association?

A Yes.

Q Was there another organization that you referred to or was it just the AGA?

A American College of Gastroenterology. Over the past 30 years I've been a part of various committees, yeah.

Q Okay. And those two organizations are not specifically organizations that assess annually carcinogenicity of agents and their risk to the

population, right? They're gastroenterology organizations?

MS. CANAAN: Objection to form.

A Yeah, I would not minimize their importance.

Q Certainly --

A I didn't think you did, but I would highlight that their role to me is highly important because it's the clinical relevance, right? So when one looks at all of these questions about NTP and IRAC and whether or not NDMA is a risk factor in rats, at the end of day as clinicians, we sit back and say what's the evidence in humans.

So, yes, you're right, that I'm not a member of IRAC nor NTP, but it is highly important to me to look at the clinical relevance of any of these.

Q Okay. As a member of the AGA or the ACG, have you ever conducted a peer review panel to assess whether NDMA is carcinogenic in humans?

MS. CANAAN: Objection, form.

A I have not.

Q Have you ever assessed a peer review panel -- strike that.

Have you ever sat on a peer review panel as part of the AGA or ACG that assessed whether or not ranitidine was carcinogenic to humans?

MS. CANAAN: Objection to form.

A I have not.

Q Do you have an understanding, Doctor, one way or the other as to whether or not there's epidemiological evidence of an association between NDMA and human cancer?

A I believe I mentioned this before, that there are the dietary factors that looked at NDMA, and they suffered from a variety of problems, right? So the case control studies and inability for -- you know, the recall biases and what have you, so there are those studies regarding NDMA.

There's the occupational study that looked at, you know, the rubber industry that looked at NDMA and the risk at (Zoom interference). So those are the ones that essentially looked at it.

But going back to -- again those are so far removed -- diet and occupation and airborne from clinical and patients and ranitidine and the epidemiologic evidence for ranitidine, I would say those are too far removed for me to consider them informative.

Q Have you undertaken any investigation into the metab- -- how NDMA is metabolized within the body?

A I have not.

MS. CANAAN: Objection, form.

BY MS. FINKEN:
Q Have you undertaken any investigation into the bioavailability of NDMA within the body?
MS. CANAAN: Objection, form.
A No.
Q You -- you talked a little bit about Bradford Hill earlier. Did you conduct a Bradford Hill analysis relating to whether or not NDMA can cause cancer?
MS. CANAAN: Objection, form.
A And again that's irrelevant to me, and it was irrelevant, and it still is because that's so far removed, right? I was not interested in whether or not if you drink beer, you're going to get cancer.
I was interested in whether or not ranitidine specifically with epidemiologic studies have shown to be associated with the five cancers, so to me that's -- at the end of the day, that's what we're all interested in, and I hope -- at least that's what I'm interested in -- is there evidence clinically, so if it forms -- if it does -- if NDMA results in cancer in the liver at high doses in rats, that is not important to me because at the end of the day is there evidence in humans. So it doesn't inform me because it's irrelevant.
Q Okay. So you did not conduct a Bradford Hill analysis relating to whether or not NDMA can cause human

cancer; is that fair?

MS. CANAAN: Objection to form.

A Again, I -- I -- I relay everything outlined is in the study. I've outlined the dietary studies. I've outlined their limitations. I've outlined how cohort studies following case control studies do not show the impact on NDMA, even though it's so far removed, but then going back to the clinical, going back to what the FDA says about ranitidine. That's where the important -- at least to me the conclusions are.

Q If you had conducted a Bradford Hill analysis regarding the question of whether or not NDMA can cause human cancer, would that have been included in your report?

MS. CANAAN: Objection, form.

A If I had done a what, a metaanalysis?

Q No. If you had conducted a Bradford Hill analysis looking at the question of whether or not NDMA can cause human cancer, would you have included that information in your report?

A If I had done that, I would have included it. Within what I've included, again, are many case control studies and many cohort studies. And the cohort studies in general do not substantiate the case control studies.

If I had done that, again the hypothetical

would show that, again, the cohort studies do not confirm what the case control studies do.

At least in the gastric -- in the gastric cancer, for example, there were six cohort studies, five of which did not show an association. And in gastric cancer, there were six studies that were case control, and four of them did, so you notice when you go from case control to cohort, the association goes away, which is really the pattern.

So the answer to your question is I did not perform Bradford Hill on the dietary for the reasons that I outlined. They're too far removed, and they don't answer the question at hand.

Q So just so I'm clear, Doctor, when you're referring to the case control studies and the cohort studies, the six cohort studies that you just referred to, you're talking about the ranitidine studies, correct?

A I'm talking about --

Q Or were you talking about the NDMA studies?

A I'm talking about the dietary studies that actually looked at gastric cancer. So there were six case control, six cohort. Four of the six case control suggested an association. Then when the cohort studies looked at it, five of six said no.

So if you look at that hierarchy -- and again WCRF being an authority in here, they hi- -- they provide that hierarchy when it comes to dietary, right? They put more weight on cohort studies.

So if one wanted to go there -- then again I don't know why one would want to go there because it's so far removed from the ranitidine and NDMA hypothesis, but if one wanted to go there, then one can go to the WCRF and say, all right, is there evidence.

And there again looking at the hierarchy, the cohort studies, the evidence is weak at best. The WCRF said essentially that in the gastric, they can't make a conclusion. They didn't have enough data on the other five cancers.

So putting that together, even the authorities, or at least the ones that are experts, are suggesting it's too far removed, and there's not a lot of evidence.

Q So, Doctor, you've referred to the WCRF. You're referring to the World Cancer Research Fund, is that -- or Foundation; is that what it is?

A That's correct.

Q Okay. When was the last time the World Cancer or -- strike that.

When was the last time that the WCRF evaluated the carcinogenicity of NDMA specifically?

A That was in 2018.
Q And is it your understanding that the WCRF performed a peer review process to evaluate the carcinogenicity of NDMA and cancer in 2018?
MS. CANAAN: Objection, form.
A I don't know whether it was peer reviewed or not. That part I don't know. But I do know that they are experts at this. This is what they do. And they looked at the five cancers in question that I looked at epidemiologically. And in those five cancers, four of them, they said there are no data at all. And in one they essentially said again, very limited data, and that's the gastric.
Q Doctor, would it surprise you if I told you that you the WCRF has not evaluated whether NDMA causes stomach cancer since 2007?
A Again, I --
MS. CANAAN: Objection, form.
A My answer would be again it's irrelevant based on what I highlighted earlier. It's so far removed from the ranitidine epidemiology and clinical care of patients, so those are irrelevant.
The question is if I give a patient ranitidine, are they at risk for those five cancers. That all falls onto the clinical epidemiology question. Not about

diet.

Q Bear with me for a second, I'm going to jump around a little bit.

Doctor, did you ever undertake an analysis to compare the amount of NDMA that was found in ranitidine tablets versus the amount of NDMA that was being measured in the dietary studies?

MS. CANAAN: Objection, form.

A Did I personally take -- do an analysis on those?

Q Yes.

A On -- on a specific tablet, is that what you mean?

Q No. Did you ever undertake an analysis looking at the levels of NDMA found in ranitidine tablets versus the NDMA that was being studied in the dietary studies?

A So I'll answer --

MS. CANAAN: Objection -- objection, form. Sorry.

A And I'm -- I'm -- I'm not quite clear, but I'll give you an answer based on my understanding of what you're asking. I'm sorry, it wasn't clear to me.

So if you're asking me -- me personally looking at the NDMA levels within tablets, the answer is no. If you're asking me are there data? I have looked at

the FDA data regarding the NDMA levels in various ranitidine tablets, so I have looked at that. And I do know that based on those studies, there was a mixed bag, if you will. There were many that were well within their norm, and there were some that were above the 96 nanogram threshold, but, again remembering that 96 nanogram threshold is somewhat of a very conservative estimate.

And that's based on really the studies that were done on -- on 50 percent incidents of cancer in animals and rats, not necessarily in humans, and based on 1 in 100,000 risk of getting cancer at 70-year exposure.

So leaving that aside, they essentially did that analysis, so I did look at that.

Q Okay. Did you -- did you ever look in -- I just want to make sure I'm clear since it -- you said you didn't quite understand my question.

Did you ever compare the nanograms of NDMA in raniti- -- that were found in ranitidine tablets to the nanograms of NDMA that were being studied in the dietary studies?

A Oh. I understand what you're asking.

So looking at the -- the reports, I would say the dietary studies show very high levels of NDMA, and,

for example, beer and hot dog and what have you, so the levels are just astronomical when it comes to that. So if I were to believe that, then when I have a beer, I'm going to get cancer tomorrow. So it's a bit worrisome.

But the levels were much less in the FDA analysis of the ranitidine tablets where, like I said, most fell within that 96 nanogram threshold. And some were slightly higher, and I think I've outlined that in my note. I believe it went up to 800, if I'm not mistaken, on -- on the FDA analysis.

Q Do you know whether or not there are any NDMA dietary studies that are looking at 800 and -- let's just say 800 nanograms of NDMA --

MS. CANAAN: Objection to form.

BY MS. FINKEN:

Q -- risk of cancer?

A We can go to my report because if I'm not mistaken, there were a lot of dietary studies that had much, much higher levels within their studies. Again we would have to pull each one of them out, and I'm happy to review that.

Q Well --

A But within the dietary studies, it listed much higher levels of NDMA.

Q Okay. Do you list the amount of NDMA that's

contained in the dietary studies in your report?

A I -- I believe I provide -- let me see. If we go within the dietary section. I don't see it. I'm having a hard time finding it, but I do know in review of that -- and again I'll have to look at each of those studies -- they all had tables that outlined that, and they were much higher.

There were some studies that were significantly higher. And I'll have to look at the report in its entire- -- my report in its entirety to see if I've listed that or not.

Q Okay. Doctor, your report -- it looks like you start your analysis of -- or your discussion, I should say -- strike that.

It looks like you start your discussion in your report of the dietary NDMA studies on page 52 to page 53. And I don't see anywhere where you quantify the NDMA that's contained in those studies.

Can you take a look at those two pages for me and let me know if I'm missing it?

MS. CANAAN: And, Dr. Vaezi, I think you also discuss NDMA in other parts of your report, so feel free to look through your report to see.

MS. FINKEN: Okay. Thank you for coaching the witness, Eva.

MS. CANAAN: I'm not coaching. I mean, you -- you put on the record that he only discusses it on these pages, and I'm just saying I think he discusses it in other places too.

MS. FINKEN: What I'm saying is on page 52 and 53 he discusses the dietary NDMA studies, and I'm looking for where he quantifies the levels of NDMA that are evaluated in these studies.

And if he doesn't, he doesn't. I just want to make sure I'm not missing it.

A There's page 7 -- sorry, it took me a while. I apologize. It's a long report.

If you go to page 7 at the bottom, it says "in September," so you go down, it says "to put these values in perspective of dietary intake, a recent U.S. study reported a mean dietary NDMA intake of a thousand nanograms a day with a range of 100 to 19,680 nanograms a day (based on a 2,000 kilocalorie diet.)"

And that's what I meant -- I'm sorry that it took me a while to find it -- about the dietary studies are showing such high levels, and again the presumption being that, oh, my goodness, I'm taking 19,000 nanograms a day of NDMA, then everybody should be coming down with cancer with that. So that's what I meant.

Q So other than your comparison with the Zheng

study -- 2021 Zheng study, did you undertake a comparison of the other dietary NDMA studies and the levels therein compared to what has been found in ranitidine tablets?

A Well -- so the question is if the dietary levels are up to 19,000 and the FDA NDMA level says the maximum is 900 in ranitidine, that's the comparator. So to me you have 19,000, nearly 20,000 nanogram in diet versus not even a thousand in the highest dose, remembering the others were either less than 96 or slightly above, so to me that's important.

Q Do you know whether or not the defendants in this case, the manufacturer defendants, your employers, whether or not they found NDMA levels in their testing of their own product that exceeded the levels found by the FDA?

MS. CANAAN: Objection, form, "your employers."

A Yeah, I mean -- I am not their employee, so again I outlined that, and I sort of -- I'm offended that you would say that, to be honest with you, because I'm a physician. I take care of patients. My aim here is to show from a clinical perspective what's relevant. My aim is not anything but that.

I don't know what other's aims might be, but my aim is to show based on my review of the data, clinical

epidemiology, there is no signal. Based on FDA's report, there is no signal.

So they are not my employees [sic], so I'm offended you would say that.

Q I -- I -- I meant in the sense that they are employing you as an expert in this case. Are they not?

A They're not employing me to tell you what they want you to hear. They're employing me for my time. And again if you use the word "employed" in that sense, they're paying me for my time to review the data to tell you what I believe.

If I had reviewed the data and found that there was an association, I would have told them there is an association.

Q Okay.

A So --

Q Going back --

A -- I'm offended a little bit. I just want to let you know that, again I'm highly sensitive about this topic. This is very important because it gets to the core of the matter for me. My time is my time, and it is for my patients and what I do.

Q Okay. And I apologize if I offended you, Doctor.

But going back to my question. Did you look --

do you know whether or not the defendants in this case, their testing -- their NDMA testing of their product revealed higher levels of NDMA than the FDA testing?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Do you know one way or the other?

A Again to me I don't know that, but I can tell you that the FDA looked at this, and there is a range, and that's what one -- that's the most recent, right? That's the most recent based on the right analysis, so I can tell you --

Q So you --

A -- based on the right methodology, the FDA looked and it gave the range, and that's so much less than any diet study that shows ranges up to 20,000.

Q Okay. You understand, though, that the FDA only tested a sampling of products, correct?

MS. CANAAN: Objection, form.

A That is true for any one study. It's always a sampling of a product. It is not everything. It's always a sample.

Q And let me ask you this question because you said that the FDA testing is the most recent testing. Do you know whether or not the manufacturers have done testing since the FDA testing?

A I'm relying on the FDA's reports, not on the manufacturers' report.

Q Okay. Doctor, let's change gears for just a moment.

Going back to some of the publications that you've authored, I noted that you have recently published or been part of a publication for a clinical practice update through the AGA on the evaluation and management of GERD in 2022; is that correct?

A Do you have that up, if you could?

Q We can pull it up, sure. We're going to pull up what's been marked as 6286. And we'll mark this as an exhibit to your deposition.

(Exhibit 6286 was marked for identification.)

BY MS. FINKEN:

Q Doctor, do you see it's a "Clinical Practice Update" published by the AGA and Clinical Gastroenterology and Hepatology dated 2022. There are some authors there, but it also lists "on behalf of the CGIT GERD Consensus Conference Participants."

Do you see that?

A I do.

Q Okay. Did you participant in establishing this clinical practice update and best practice advice?

A I did, I --

MS. CANAAN: Objection. Objection to form. Sorry.

A I -- again, my name is not up there, but again I forget specifically my role and to what extent I contributed. Normally they put that as the -- you know, the top authors, the ones that have the most significant input. So I would say I forget the specific role I had, but I'm more than happy to comment on anything on this manuscript.

Q All right. So let's pull up what we've marked as Exhibit 6288. And we'll mark this as an exhibit to your deposition.

(Exhibit 6288 was marked for identification.)

BY MS. FINKEN:

Q This is the "CGIT GERD Consensus Conference Participants" that was provided with the publication.

Do you see that?

A I do.

Q And do you see your name listed there?

A Yes, at the bottom.

Q Okay. And it says -- it -- it lists in the top -- in the "CGIT GERD Consensus Conference Participants," your name is listed -- and I believe this is in alphabetical order, Doctor, you happen to be -- end with a V, so you're at the -- the second to the last

name on that list.
Do you see that?
A I do. I'm almost to the end, you're right.
Q Yes. Okay. And if you look at the disclosures that are listed here for the GERD consensus conference participants, down at the bottom there it lists your name and it lists your conflict disclosures as "Ironwood" and "Medtronic" as a consultant.
Do you see that?
A I do.
Q Okay. What type of work are you doing for Ironwood?
A I am currently not doing anything with Ironwood. This was relating to the role of bile reflux and reflux disease and how one suppressing bile might help patients with reflux. I'm currently not doing anything with them. This was in the past.
What year was this report again? I'm sorry.
Q 2022, Doctor.
A Yeah. So there's usually a delay in submission and publication, so, yeah, I submitted it because -- last year and the year before but not this year.
Q Okay. And then what kind of work as a consultant were you doing for Medtronic?
A Yeah. So Medtronic has this device, if you

will, that is measuring different pressures within the esophagus. And what they had asked myself as well as some esophageal experts to do was to look at some of the tracings. They -- they were trying to validate some normative versus abnormal findings within their product. And they were asking me to blindly review. They were trying to see how good experts are at coming down with the diagnosis or not. And that's what I did for them.

Q Okay. And you don't disclose any of the Zantac manufacturer defendants on this disclosure, do you?

A I don't.

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Okay. And you don't disclose any of the PPI manufacturer defendants on this disclosure, do you?

MS. CANAAN: Objection, form.

A I don't.

Q And if we can go back to the prior exhibit, Exhibit 6286, which is the clinical practice update, it lists the best practice advice number 3 as "clinicians should emphasize the safety of proton pump inhibitors (PPIs) for the treatment of GERD."

Did I read that accurately?

A Number 3? Yes, that's correct.

Q Okay. And don't you think it would have been

prudent to list that you were acting as an expert in the PPI litigation in the disclosures as part of this conference -- as being part of this conference participant?

MS. CANAAN: Objection, form.

A And again I forget exactly what my role was and in which of these statements. At the time -- normally when it's relevant, I do disclose. I must have felt based on my role that it was not relevant, so again, I forget which part of these advises I was a part of. I'm sorry.

Q Does the AGA require doctors to list and -- and disclose their conflicts?

MS. CANAAN: Objection, form.

A Yeah, so -- yes. The answer is -- I don't know about require, but they ask for the conflicts, yes.

Q Doctor, when did this conference take place that -- strike that.

When -- when did this conference take place that resulted in the best practice advice that was published in this clinical practice update in March of 2022?

MS. CANAAN: Objection, form.

A Good question. Again, it -- it would not have been in person. It would have been probably through

email back and forth. Each -- I believe each of us had a separate section. This has been a while. I can't remember, but each of us had a section. If I'm not mistaken, my role in this -- hopefully I'm not confusing it with another one -- was regarding some testing because right now my focus has been on diagnostic testing, as I highlighted before.

So I can't remember where my role was, but it would have been not in person and via various emails.

Q So looking at the second page of this document where it states methods.

MS. FINKEN: Okay. You can stop right there.

BY MS. FINKEN:

Q It says "This expert review was commissioned jointly by the American Gastroenterologic Association (AGA), Institute Clinical Practice Updates Committee, the AGA Center For GI Innovation and Technology (CGIT), and the AGA Governing Board to provide timely guidance on a topic of high clinical importance to the AGA membership."

Did I read that accurately?

A You do -- you did.

THE WITNESS: Can you scroll up, I'm sorry, on this form, about the 14 advices.

A I want to make sure that -- if I can recall

where my role might be. I'm sorry, it's been a while.

Q So, Doctor, going down to --

A I'm sorry. If I could -- if I may, that's why I wanted to look at this.

As you can see there are -- there are some statements regarding diagnostic testing. I believe my role here was regarding the 24 RPH, or pH testing, if you will, in reflux disease. But go ahead.

Q Okay. So let's go back down to the methods. And at the bottom of that paragraph it indicates that "The topic of this CPU was thoroughly discussed by expert faculty contributors selected by AGA, CGIT, industry representatives and patient advocates at the conference organized and hosted by AGA CGIT."

Do you see that?

A I -- where is that? I'm sorry.

Q The second to last sentence on the paragraph --

MS. CANAAN: It's not on the screen, Tracy. It's not being shown on the screen.

THE WITNESS: I don't --

MS. CANAAN: You're seeing it, but we're not seeing it.

MS. FINKEN: It should be at the very bottom of the "Methods" section.

Can you highlight that?

MS. CANAAN: Yeah. I think that would be easier if we could highlight the sentence.

MS. FINKEN: Yeah, there we go. Thank you.

BY MS. FINKEN:

Q Do you see what I'm -- where I read the topic?

A I do.

Q Okay. And it says that the topic was "thoroughly discussed by expert faculty contributors selected by AGA, CGIT, industry representatives and patient advocates at the conference organized and hosted by AGA CGIT."

Did I read that accurately?

A You did.

Q Then it goes on to say "the content of this expert report was generated, discussed, and voted upon by the expert --" and if you'll turn to the next page "-- faculty contributors at a closed-door meeting at the AGA CGIT conference."

Did I read that accurately?

A You did.

Q Okay. And do you recall attending a closed-door meeting at the AGA CGIT conference where this paper was discussed?

A I really don't. I wonder if they really mean closed door like we're in a closed door. I really don't

-- whether it was virtual. It would have to be virtual if it was during the pandemic, so if this is published -- I'm just going to now speculate. If this was published in 2022, then I don't see how we would have had it in person.

So if closed door -- it could have been that they sent emails and we had virtual. I really don't remember. I have so many things that I do.

Q Did you attend any in-person AGA conferences or meetings in 2021?

A AGA has been virtual for a couple of years. In fact, the last one was three years ago. And this year will be in person, but it's been virtual the entire time.

Q Okay. It goes on to state here at the top in the left-hand corner of this page that "all faculty contributors provided up-to-date declaration of conflicts of interest to ensure credibility of this document, and signed off on the final manuscript, which underwent internal peer review by the AGA Institute Clinical Practice Updates Committee as well as external peer review through standard procedures of Clinical Gastroenterology and Hepatology."

Did I read that accurately?

A You did.

Q And is it fair to say, though, that you did not provide updated disclosures of conflict of interest for purposes of this document because you did not provide disclosures that you were acting as an expert in the PPI litigation, correct?
MS. CANAAN: Objection, form.
A Again if my role there was -- and I believe it to be that -- again I don't remember, but if my role was regarding pH testing, then my conflict would have been accurate in that my role was really about providing about how best to diagnose reflux disease.
So I felt that the most prudent would be on technologies such as the one I outlined about manometry in assessing motility disorders that I outlined, so that's -- that's all I remember about it to be honest with you.
Q Well, Doctor, it indicates here that you were a conference participant, correct?
A And I don't know what it means by that because there was -- so a conference to -- to you might mean that it was in person, but I can't imagine this would have been an in-person conference --
Q Okay. But it also indicates --
A -- during the pandemic.
Q It also indicates that all contributors

provided up-to-date declarations of conflicts of interest to ensure the credibility of this document, correct?

A Right. Relevant to my contribution. Again my contribution, it makes sense, would have been on the diagnostic test based on those 14 things that you outlined.

Q Okay. And it indicates that all faculty contributors signed off on the final manuscript, correct?

A That's correct.

Q Okay. And is -- does it indicate anywhere on this document where it talks about conflict of interest that the faculty contributors only provided conflict of interest where they thought it was pertinent to topics that they contributed to?

MS. CANAAN: Objection, form.

A So, you know, what is the conflict of interest about my contribution to them is where I contributed, so the -- that's all I can say. I don't remember specifically to be honest with you, so I can't give you specifics.

But I can tell you that if my role was in diagnostic testing, which I'm landing on because I believe -- if I recall right, that's correct, but I

don't remember, then that would have been an accurate conflict of interest because I had no role on the statements regarding PPIs, for example.

Q So you wouldn't have signed off on all of the statements that are contained in this best practice update as one of the faculty contributors?

A My main role would have been on making sure that the parts that I contributed to were accurate and valid.

Q So are you suggesting, Doctor, that this publication that was peer reviewed and published by the AGA is incorrect when it states that all faculty contributors signed off on the final manuscript and provided up-to-date declarations of conflicts of interest to ensure the credibility of the document?

MS. CANAAN: Objection, form. Objection, form.

A Yeah. Again, going back to what I said, I provided conflict of interest based on my involvement. This was not an in-person meeting. This couldn't have been in person. This was during COVID. And I provided the conflict of interest based on my involvement.

If I read the statements and provided -- I have no overall disagreement with the statements, and that's probably what they mean, but you would have to ask them.

Q So when it says "best practice advice number 3"

is that "clinicians should emphasize the safety of proton pump inhibitors for the treatment of GERD," you would agree with that statement?

A That has -- that has always been the case.

Q Okay. And do you think that it could be perceived as bias that you are acting as an expert in the PPI litigation on behalf of the manufacturers but you didn't disclose that in this paper?

A If that was --

MS. CANAAN: Objection, form.

Michael, give me a chance to --

THE WITNESS: Yeah, I'm sorry.

A If that was the part I was involved in, you're absolutely right. But that was not the part I was involved in. My part was on the diagnostic tests based on my recollection.

Q Does it state that anywhere in the listing of the conference participants and the disclosures that your part was only based on the diagnostic tests and not the rest of the document?

A Neither does it --

MS. CANAAN: Objection, form.

A Neither does it list anybody else's who are -- who were responsible for different components about who was responsible for which part.

Q Okay. So have you ever participated in -- in the past in -- as part of a consensus conference on issuing guidelines?

A That's --

MS. CANAAN: Objection, form.

A Yeah, you have to be more specific. I don't know what you mean. I'm sorry.

Q Well, for purposes of the AGA, they often provide clinical practice updates, and at times it's based upon a consensus of expert participants, correct?

MS. CANAAN: Objection, form.

A I mean, if you can be more specific, I don't know what you mean by that. This was -- if you're referring to this document and this process, this was not an in-person, and this was about people doing certain segments providing information, if that's what you mean.

Q Okay. What is your understanding of the definition of "consensus"?

A So there are varied processes. There are Delphi processes, for example, that I've been involved with, and I forget who and how many, but -- that would send you a statement, then you would rate them, so I could get that on email. You would rate whether or not you agree or disagree, and that goes -- and everybody

rates it, and then that process becomes a consensus, if you will, among the experts on various statements. And it goes through that.

So if it's an in-person meeting, in the past, what we have done, you would have a meeting. You would discuss certain matters. You would have a back and forth on the topics and the data, and then you would agree or disagree or you would agree to disagree, and then that would go into the updates.

Q Okay.

MS. FINKEN: Let's pull up -- you can take this one down.

MS. CANAAN: Would this be a good time to take a small break since you're changing topics? Take a five-minute break?

MS. FINKEN: If I can finish with this document that I was going to pull up, it would be a great time to take a five-minute break because I'm almost done. But if you need one now, we can take one now.

MS. CANAAN: How -- how long -- how much longer do you think you're going to be? I mean, I can wait five minutes, but if it's going to be a while, then we probably better take one now.

MS. FINKEN: Well, let's -- let's go through this document very quickly, and then we can take a

break, and I can see what -- where I'm at to wrap up.

Can you pull up what we've marked as Exhibit 6324 to this deposition.

(Exhibit 6324 was marked for identification.)

BY MS. FINKEN:

Q Okay. And, Doctor, this is a document -- or a publication from 2018 that's another "AGA Clinical Practice Update" about "extraesophageal symptoms and diseases attributed to GERD: Where is the pendulum Swinging Now?"

And you are listed as an author on this document. Do you see that?

A Yes, uh-huh.

Q Okay. And this also gives best practice advice as well, correct?

A Yes, that's right.

Q Okay. And some of the -- the best practice advice that is given on this document, for example, best practice advice number 3 is "empiric therapy with aggressive acid suppression for 6 to 8 weeks with special focus on the response of the extraesophageal symptoms" and that "can help in assessing association between reflux and extraesophageal symptoms."

Do you see that?

A I do.
Q When you're referring to acid suppression therapy in the context of this document, you're referring to PPIs, correct?
MS. CANAAN: Objection, form.
A I would have to go through -- I would have to go through that specific of the statement to see if we suggested PPIs or other forms. Is it -- can you scroll down to where it talks specifically about --
MS. CANAAN: Doctor -- Dr. Vaezi, you should be able to scroll yourself through the document. You have a Box setup, so you should be able to scroll through it yourself, just to make things easier for you.
THE WITNESS: I don't have a -- I'm trying.
BY MS. FINKEN:
Q Well, if you'd look -- for example, I'll just point your attention to best practice advice number 6, it's -- it's talking about testing, and it says "testing may need to be off or on proton pump inhibitor therapy depending on patients' presenting demographics and symptoms."
Do you see that?
A I do.
Q Okay. Does that help you with whether or not

the -- you were referring to PPI therapy when you were referring to aggressive acid suppression in best practice advice number 3?

A Well, again, I don't --

MS. CANAAN: Objection to form, and -- and, Tracy, I'm sorry, I have to put this on the record.

I mean, he asked to be able to scroll through the document, and I think he should be entitled to scroll through the document. He can't scroll through it. We can quickly go off the record and help him, you know, with the technology so he can scroll through it. I mean --

MS. FINKEN: Actually he didn't ask. You advised him he could, but he didn't ask to scroll through the document.

MS. CANAAN: No, he did --

MS. FINKEN: He is more --

MS. CANAAN: He had asked the technician to scroll down through the document. That's what he did.

MS. FINKEN: He is more than welcome to scroll through the document. I'm not trying to inhibit his ability to scroll through the document.

THE VIDEOGRAPHER: If it helps, I can give him control of the document. He can scroll through what

we're looking at.
THE WITNESS: Yeah. Could you do that?
MS. CANAAN: That would help. I would appreciate that.
THE WITNESS: Yeah, thank you.
THE VIDEOGRAPHER: All right. Doctor, just click on it one time and you should have control.
THE WITNESS: Okay. Thank you.
BY MS. FINKEN:
Q And, Doctor, if I may, you're certainly welcome to continue scrolling, but it might assist you in speeding up the process. On the -- on page 1025 of this document, you're at 1023 right now, there's an algorithm. Do you see that? If you go down a little bit further. There you go, right there.
A Yep, I see it.
Q And it provides the recommended algorithm in figure 1. Do you see that?
A I do.
Q Okay. And it lists PPIs twice a day, six to eight weeks as part of the algorithm. Do you see that?
A I do, yeah. That's helpful. Thank you.
Q Okay. Now, going back to my question. When you were referring to acid suppressive therapy in best practice advice number 3, you were referring to PPIs,

correct?
A That's correct.
Q Okay. Now, looking at the very end of this document where you list the disclosures, under conflicts of interest, it looks like you list no conflicts. If you go to the tail end of the document.
A Right.
Q There you go. It says "Frank Zerbib" -- I don't know if I'm pronouncing that correctly or not, but Frank Z received devices for research -- "received devices for research purpose from Medtronic and Sandhill Scientific. The remaining authors disclosed no conflicts."
Did I read that accurately?
A That is correct, but Vanderbilt is where I work, and I disclosed that Vanderbilt University and DiversiTech joined Colt patent on this mucosal impedance device, so that was our disclosure for the device that was discussed.
Q Okay. And at this point in 2018 you did not disclose that you were doing any expert work on behalf of the PPI manufacturers, correct?
A I -- I was not --
MS. CANAAN: Objection -- sorry. Go ahead.
A Yeah. I wasn't -- again I wasn't at that time,

so remember, these publications come out. There's a delay in this process and when we actually prepare it, so at that time I was not working for them, no.

Q Okay. In 2017 time frame, were you doing any type of speaking on behalf of the PPI manufacturers?

A I have never done speaking on behalf of anybody.

Q Okay. At the time in 2017 -- I apologize because we've had this discussion before. In 2017 and early 2018, at that point in time, were you engaged in any speaking engagements where you were compensated by the PPI manufacturers?

A I -- not that I know of.

MS. CANAAN: Objection, form.

A I can't remember to be honest with you.

Q I'm sorry, I just want to make sure we got your answer because when you --

A I can't remember.

Q One -- one second, Doctor. When we talk over each other, whether it's Eva or me or you, the court reporter can only hear one of us, so I want to make sure that she's getting everything down. So if you can go ahead and answer, that would be helpful.

A Not that I can remember.

MS. FINKEN: Okay. All right. Let's take a

break.

THE VIDEOGRAPHER: The time is 6:43 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Stand by.

The time is 7:05 p.m., and we're back on the record.

BY MS. FINKEN:

Q Doctor, I just have a quick question about your report that you -- we had talked a little bit about the Bradford Hill analysis that you conducted in your report. And I just wanted to understand if you conducted a Bradford Hill analysis for each of the five cancers that you assessed or did you conduct one Bradford Hill analysis covering all of the cancers?

A So as -- as my report outlines, it was really because of all the issues within -- and again, you don't see an association, right? These clinical studies with ranitidine and the five cancers, there is not an association that's reliable, right? So you essentially have no association based on the graphs that I showed you.

So if you don't have an association, you don't really need to apply the Bradford Hill, but if you do, which I did, you still don't see it in any of the five

cancers that are in the question. In other words, you don't have an association.

You apply Bradford Hill when you find an association. Now you say could it be causal. So the Bradford Hill is not going to be important if you don't have an association. If there's no association, then there's no causality, right? So . . .

Q Okay. So let me just -- quickly I want to mark as exhibits the ranitidine studies that you relied upon in your report and just mark them as exhibits to your deposition, so let's pull up Exhibit 6292.

(Exhibit 6292 was marked for identification.)

BY MS. FINKEN:

Q Okay. And, Doctor, this is the McDowell study that's titled "The effect of medications associated with drug-induced pancreatis on pancreatic cancer risk" that was published in 2021.

Do you see that?

A I do.

Q And is this the McDowell study that you relied upon, the raniti- -- strike that.

Is this the McDowell study that you relied upon in reaching your conclusions about ranitidine's association with pancreatic cancer?

MS. CANAAN: Objection, form.

A Okay. Let me -- I'm sorry. I'm going back to my graph on pancreatic cancer number 1. Just one second.

That's the McDowell study that compared ranitidine versus non-users, yes.

Q Okay. And, Doctor, I'm just -- I'm not going to ask you questions about all these. I just want you to identify them for me.

A I got you, yeah. I'm sorry.

Q Nope, that's okay. I just want you to identify that they're the correct study that you relied upon in your report.

A I see.

Q Okay. So we'll buzz through these pretty quickly.

So let's put up -- so McDowell is marked as 6292 to your deposition.

Let's pull up Exhibit 6302 and mark that.

(Exhibit 6302 was marked for identification.)

BY MS. FINKEN:

Q And, Doctor, this is the Cardwell study titled "Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case Control Study" that was published in 2021, correct?

A Correct.

Q And this is the same Cardwell study that you rely upon in your report?

MS. CANAAN: Objection, form.

A Correct.

Q Okay. All right. And we'll mark that as Exhibit 6302 to your deposition.

(Exhibit 6304 was marked for identification.)

BY MS. FINKEN:

Q Okay. And then let's pull up what's marked -- what we've marked as 6304 to your deposition. Okay. And this is the Adami study entitled "Ranitidine Use and Risk of Upper Gastroenterology Cancers."

Did I read that accurately?

A Yes.

Q Okay. And is this the same Adami study that you relied upon and that we discussed earlier in your deposition?

THE WITNESS: Can you scroll down on there? I'm sorry. Keep going down, yes, uh-huh. Actually go up a little. Okay.

A Yes.

Q Okay. Were you looking to see whether or not this was the one that had the -- the corrected figure?

A Yes, the figure was incorrect. It was so confusing, right?

Q Yes, I think they corrected it multiple times, but this is the most recently corrected copy from March of 2022. Is this the study that you relied upon in your report?

A Yes.

Q Okay. And we're going to mark this as 6304 to your deposition.

(Exhibit 6305 was marked for identification.)

BY MS. FINKEN:

Q And next let's pull up what we've marked as 6305. Okay. And, Doctor, this -- we're going to mark this as Exhibit 6305 to your deposition. This is the Kantor study entitled "Ranitidine Use and Cancer Risk: Results from the UK Bio Bank" that was published in 2021; is that correct?

A Yes.

Q Okay. And this is the same study that you relied upon in your report?

A Yes.

Q Okay.

MS. FINKEN: You can take that down.

BY MS. FINKEN:

Q And we're going to pull up what we're going to mark as 6306 to your deposition.

(Exhibit 6306 was marked for identification.)

BY MS. FINKEN:
Q Okay. And this is a study by Kim titled "Effect of Ranitidine Intake on the Risk of Gastric Cancer Development." And this was published in 2021.
Do you see that?
A I do.
Q Okay. And is this the same Kim S study that you relied upon in your report?
A Yes.
Q Okay. Not to be confused with the Kim Y study which we'll mark next, okay?
MS. FINKEN: All right. You can take that down.
BY MS. FINKEN:
Q And we're going to pull up what we're going to mark as Exhibit 6307 to your report -- I mean to your deposition.
(Exhibit 6307 was marked for identification.)
BY MS. FINKEN:
Q And this is the Kim Y study from 2021 titled "No association between chronic use of ranitidine compared with omeprazole or famotidine in gastrointestinal malignancies." Is that correct?
A Yes.
Q Okay. And this is the same Kim Y study that

you relied on in your report, correct?

A That's correct.

MS. FINKEN: Okay. And you can take that down.

BY MS. FINKEN:

Q And we're going to pull up what we're going to mark as Exhibit 6308 to your deposition.

(Exhibit 6308 was marked for identification.)

BY MS. FINKEN:

Q And this is the Tan study dated 2018 entitled "Acid suppression medications reduce risk of esophageal adenocarcinoma in Barrett's oesophagus: A nested case control study in U.S. male veterans."

Is that correct?

A Yes.

Q Okay. And is this the same Tan study that you relied upon in your report?

A Yes.

Q Okay. And next we're going to mark Exhibit 6309 to your deposition.

(Exhibit 6309 was marked for identification.)

BY MS. FINKEN:

Q Okay. And this is the Tran study, not to be confused with the Tan study -- the Tran study dated 2018 that's entitled "Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two

population-based studies."
Is that correct?
A Yes.
Q Okay. And that's the same Tran study that you relied upon in your report, correct?
A Yes.
Q Okay. And next we're going to mark as Exhibit 6310 to your deposition the Habel study.
(Exhibit 6310 was marked for identification.)
BY MS. FINKEN:
Q And this is dated 2000 entitled cimetidine -- "Cimetidine Use and Risk of Breast, Prostate and Other Cancers." Is that correct?
A Yes.
Q And that's the same Habel study that you relied upon in your report, correct?
A Yeah.
(Exhibit 6311 was marked for identification.)
BY MS. FINKEN:
Q Okay. And next we're going to mark as Exhibit 6311 to your deposition the Chow study. This is dated 1995 and entitled "The Relation of Gastroesophageal Reflux Disease and Its Treatment to Adenocarcinomas of the Esophagus and Gastric Cardia."
Is that correct?

A Yes.
Q Okay. And that's the same study that you relied upon in your report, correct?
A Yes.
Q Okay. And next we're going to mark Exhibit 6312 to your deposition.
(Exhibit 6312 was marked for identification.)
BY MS. FINKEN:
Q And this is the Liu study, correct?
A Yes.
Q And it's entitled "Use of proton pump inhibitors and histamine-2 receptor antagonists and risk of gastric cancer in two population-based studies."
Is that correct?
A Yes.
Q And this is the same Liu study that you rely upon in your report, correct?
A Yes.
Q And next we're going to mark Exhibit 6313 to your deposition, and this is the Yoon study.
(Exhibit 6313 was marked for identification.)
BY MS. FINKEN:
Q And it's entitled "Risk of cancer following the use of N-nitrosodimethylamine contaminated ranitidine products: A nationwide cohort study in South Korea."

Did I read that accurately?
A Yes.
Q And this study is from 2021, correct?
A Correct.
Q And it's the same Yoon study that you're relying upon in your report, correct?
A Correct.
Q And next we're going to mark as Exhibit 6314 to your deposition the Kumar study.
(Exhibit 6314 was marked for identification.)
BY MS. FINKEN:
Q Okay. And this study is entitled "Ranitidine Use in Gastric Cancer Among Persons with --" H-pylori, or Helicobacter pylori; is that correct?
A Correct.
Q And is this the same Kumar study from 2021 that you relied upon in your report?
A Correct.
Q Okay. And next we're going to mark Exhibit 6315 to your deposition.
(Exhibit 6315 was marked for identification.)
BY MS. FINKEN:
Q And I'm going to butcher this name. It's Mohy-ud-din -- Mohy-ud-din. I believe that's how you pronounce it. And it's a 2020 DDW abstract entitled

"Risk of Cancer with Use of Ranitidine: Results of a Cohort Study of 65 million U.S. Adults."

Do you see that?

A I do.

Q Okay. And is this the same abstract that you relied upon in your report?

A Yes.

Q Do you know if that study was ever actually published?

A I am not aware that it's been published.

Q Okay. And next we're going to mark as 6316 to your deposition the Norgaard study. You know, let's skip this one for a minute because I want to sub it out for the final publication. This one is the early publication.

Yeah. Well, what we'll do is we'll sub out the actual publication for this exhibit number, which is 6316, for purposes of the final deposition transcript.

MS. FINKEN: Is that okay, Eva, just for sake of time and just to identify it?

MS. CANAAN: That's fine.

(Exhibit 6316 was marked for identification.)

BY MS. FINKEN:

Q Okay. So the Norgaard study entitled "Ranitidine and Risk of Blacker and Kidney Cancer: A

Population-Based Cohort Study" published in 2021.

Is this the Norgaard study that you relied upon in your report?

A Yes.

Q Okay. And we'll provide the final print publication for purposes of this exhibit, 6316.

Let's pull up what we're going to mark as 6317 to your report.

(Exhibit 6317 was marked for identification.)

BY MS. FINKEN:

Q Okay. And this is the Iwagami study entitled "Risk of Cancer in Association With Ranitidine and Nizatidine Versus Other H2 Blockers: Analysis of the Japan Medical Datacenter Claims Database 2005 to 2018."

Is that correct?

A Yes.

Q And this -- this is the same Iwagami study that you relied upon in your report?

A It is.

Q Okay. And, Doctor, I believe that that covers all of the ranitidine specific studies that you relied upon in reaching your conclusions in your expert report; is that correct?

A Did you show Kim Y and Habel? Yes, yep.

Q Okay. I didn't miss any?

A I don't believe so.

Q Okay. I don't believe so either, but I wanted to make sure that you -- that I crosschecked them against your tables, but I wanted to make sure that there wasn't any that I was missing.

Okay. So, Doctor, with that, I'm going to reserve the rest of my time, and I think Ms. Canaan has some questions for you so I thank you for your time.

A Thank you.

MS. CANAAN: Why don't we take maybe like a 10-minute break, and then I'll do my questions, okay?

MS. FINKEN: Yep, no problem.

THE VIDEOGRAPHER: The time is 7:19 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Everyone set?

Stand by.

The time is 7:35 p.m., and we're back on the record.

CROSS EXAMINATION

BY MS. CANAAN:

Q Good afternoon -- or I should say good evening, Dr. Vaezi.

Dr. Vaezi, I only have a -- a few questions for

you today.

Counsel asked you some questions about whether you applied Bradford Hill criteria to the epidemiological data on NDMA and human cancer. Do you recall that?

A I do.

Q Okay. And what types of epidemiological studies on NDMA and human cancer did you review?

A They're outlined in my report. I looked at the dietary studies. I also looked at the occupational exposure and the Welsar 10 studies (phonetic).

Q Okay. And based on those studies, did you find an association that was not due to chance, bias or confounding?

MS. FINKEN: Objection to form.

A So again I -- I highlighted that about the dietary and the occupational reports and the problems that they have, right? So a lot of case control studies that really rely on a patient to give them an accurate statement about what they ate, how much they ate, when they ate, and those are all problematic.

So I -- I really think that those studies are problematic when it comes to really assessing the risk and the NDMA and what's going on with regards to cancer especially, so there are a lot of biases there.

So I would -- I would be hesitant to draw a direct clinical correlation from those studies regarding especially the ranitidine and cancer outcome that's of interest and was put to me as is there an association.

Q Okay. So did you find an association based on those studies of NDMA in humans that was not due to chance, bias or confounding?

MS. FINKEN: Objection to form.

A Again I didn't. They all suffered from -- especially the dietary and exposure. They suffered from a variety of biases that I outlined.

Q Okay. And counsel asked you some questions about the 2022 AGA clinical practice update.

MS. CANAAN: Maybe we can bring up the document. I think it's Exhibit 6286, if I'm right.

THE VIDEOGRAPHER: 62- what, I'm sorry?

MS. FINKEN: The 2020 one?

MS. CANAAN: 6286.

MS. FINKEN: 2022?

MS. CANAAN: 2022, yeah. Am I right? Is that the one?

MS. FINKEN: 6286, yes.

MS. CANAAN: Can we -- can we scroll to the top so the doctor can see the document, so he can

remember which one it is?
BY MS. CANAAN:
Q So this is the document titled "AGA Clinical Practice Update on the Personalized Approach to the Evaluation and Management of GERD: Expert Review."
Correct?
A Yes.
Q Okay. And do you recall counsel asking you some questions about this -- this document? Do you recall that, Doctor?
A Yes, I was waiting just in case there was an objection. I'm sorry. The wait is -- I'm pausing for that reason. Sorry.
MS. FINKEN: Thank you.
BY MS. CANAAN:
Q Thank you. And, Doctor, the questions related to this document, those questions related to your conflict of interest disclosures, correct?
A That's correct.
Q Okay. And my only question is, Doctor, to your knowledge does this document even mention the word "ranitidine"?
A No, it does not.
Q Okay.
MS. CANAAN: We can take that down.

BY MS. CANAAN:

Q And counsel asked you earlier whether you had ever compared the levels of NDMA in dietary studies to those found in ranitidine product. Do you recall that?

A Yes.

Q Okay. Do you have any opinion as to the accuracy of NDMA levels in those dietary studies?

MS. FINKEN: Objection to form.

A So again just -- just going back to what I mentioned, the issue with those dietary studies is that there's this assumption that I ask a patient -- an individual about their diet, and I can accurately estimate NDMA based on what they tell me, i.e., how much I ate, when I ate, how -- whether or not it was cooked or not, and then to extrapolate from that to the way that I can actually quantitatively assess, based on that information, which may or may not be accurate, to the amount of NDMA.

So that's problematic, right? So those studies are going to be problematic when it comes to quantitation of anything.

Now, I can rely on what the FDA quantitation of the ranitidine tablets are because they actually quantitated that, so that's easier. With the diet, it's hard to do.

So again going back to the question, to me these dietary and the environmental, they're so far removed from the question at hand. You go back to the epidemiology of ranitidine exposure and cancer -- cancer outcome.

So in a real world situation as most of these studies are, right, so they're all about different databases in different countries that use -- looked at ranitidine use in real world, so let's assume they're varied levels as -- again that's the assumption, so in that group, could you then see any risk for cancer.

And the studies -- the epidemiologic studies do not show that ranitidine in a real world situation, again I refer back to the figures, have any association with cancer, especially those five that I've outlined in my report.

Q Thank you, Doctor.

MS. CANAAN: I have no further questions.

MS. FINKEN: Let's just go off the record for one minute. I just need to consult with my colleagues for a second, and then we'll finish up.

THE VIDEOGRAPHER: The time is 7:42 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Please let know when you're

set to go.

MS. FINKEN: Whenever you're ready.

THE VIDEOGRAPHER: All right. Please stand by.

The time is 7:47 p.m., and we're back on the record.

MS. FINKEN: Dr. Vaezi, I thank you for your time. I don't have any further questions today, okay?

THE WITNESS: Thank you. I appreciate it.

MS. FINKEN: Thank you.

MS. CANAAN: Thank you, everyone.

THE VIDEOGRAPHER: That's concludes today's deposition of Dr. Michael Vaezi. The time is 7:47 p.m., and we're going off the record.

MS. FINKEN: Thank you.

(The video-recorded deposition was concluded at 7:47 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF DUVAL

I, Deanne M. Moore, RMR, CRR, FPR, FPR-C mNotary Public of the State of Florida, certify that MICHAEL ZAEZI, M.D., Ph.D. personally appeared before me on the 12th of May, 2022, and was duly sworn.

Signed this 16th day of May, 2022.

Deanne M. Moore, RMR, CRR, FPR, FPR-C
Notary Public, State of Florida
Commission No: HH11232
Commission Expires: 9/11/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY DUVAL

I, Deanne M. Moore, RMR, CRR, FPR, FPR-C certify that I was authorized to and did stenographically report the deposition of MICHAEL ZAEZI, M.D., Ph.D., pages 1 through 308; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 16th day of May, 2022.

Deanne M. Moore, RMR, CRR, FPR, FPR-C

WITNESS NOTIFICATION LETTER

May 14, 2022

MICHAEL VAEZI, M.D., Ph.D.
c/o Eva Caanan, Esq.
King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036

In Re: IN RE: Zantac Products Liability Litigation
Deposition taken on May 12, 2022
U.S. Legal Support Job. No. 6144953

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office at the below address or via e-mail to: southeastproduction@uslegalsupport.com.

Sincerely,
Deanne M. Moore, RMR, CRR
U.S. Legal Support, Inc.
700 East Dania Beach Boulevard
First Floor
Dania Beach, FL 33004
(904) 359-0583

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES OF THIS PAGE

IN RE: Zantac Products Liability Litigation
Deposition taken on May 12, 2022
U.S. Legal Support Job. No. 6144953

| Page No. | Line No. | Change | Reason |
| --- | --- | --- | --- |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

__________ Date

______________________________ MICHAEL VAEZI, M.D., Ph.D.

Exhibits

**EX 6282 Michael Vaezi, M.D., Ph.D. 051222**
10:1,4
**EX 6283 Michael Vaezi, M.D., Ph.D. 051222**
16:14,15 58:4
**EX 6284 Michael Vaezi, M.D., Ph.D. 051222**
22:24 23:1
**EX 6285 Michael Vaezi, M.D., Ph.D. 051222**
16:22,24
**EX 6286 Michael Vaezi, M.D., Ph.D. 051222**
269:14 272:19 304:16
**EX 6288 Michael Vaezi, M.D., Ph.D. 051222**
270:11,13
**EX 6292 Michael Vaezi, M.D., Ph.D. 051222**
291:11,12
**EX 6299 Michael Vaezi, M.D., Ph.D. 051222**
24:23
**EX 6302 Michael Vaezi, M.D., Ph.D. 051222**
292:18,19 293:6
**EX 6304 Michael Vaezi, M.D., Ph.D. 051222**
293:7
**EX 6305 Michael Vaezi, M.D., Ph.D. 051222**
294:8,12
**EX 6306 Michael Vaezi, M.D., Ph.D. 051222**
294:25
**EX 6307 Michael Vaezi, M.D., Ph.D. 051222**
295:16,18
**EX 6308 Michael Vaezi, M.D., Ph.D. 051222**
296:6,7
**EX 6309 Michael Vaezi, M.D., Ph.D. 051222**
296:19,20
**EX 6310 Michael Vaezi, M.D., Ph.D. 051222**
297:8,9
**EX 6311 Michael Vaezi, M.D., Ph.D. 051222**
297:18,21
**EX 6312 Michael Vaezi, M.D., Ph.D. 051222**
298:6,7
**EX 6313 Michael Vaezi, M.D., Ph.D. 051222**
298:19,21
**EX 6314 Michael Vaezi, M.D., Ph.D. 051222**
299:8,10
**EX 6315 Michael Vaezi, M.D., Ph.D. 051222**
299:20,21
**EX 6316 Michael Vaezi, M.D., Ph.D. 051222**
300:22
**EX 6317 Michael Vaezi, M.D., Ph.D. 051222**
301:9
**EX 6324 Michael Vaezi, M.D., Ph.D. 051222**
284:4,5

(

**(1)**
58:21
**(2)**
58:24

0

**0**
194:14
**04**
195:6
**05**
194:14

1

**1**
58:5 82:2 155:10,11, 13,18,21 186:12,19 189:20,24 195:10 199:14 208:21 227:1 228:11,12 262:12 287:18 292:2
**1.1**
189:19 199:13
**1.3**
186:12,18 187:14,25 188:2,11,17, 18
**1.48**
237:21
**1.5**
189:24 237:21
**1.6**
188:8
**10**
29:7,10 86:19 95:10 96:21,22 98:1,16,17, 18 99:15,16, 17,18,21,22 100:7,18 101:23 102:14 103:6,12,23 104:9,10,17, 24 126:12

187:20 189:18,23 190:21 196:24 197:1 199:16 229:13,16, 24,25 234:15 246:8,15,20 303:11
**10-minute** 302:11
**10-prescription** 101:3
**10-year** 99:16,25 100:6 103:13
**100** 183:10 204:15 265:17
**100,000** 262:12
**1023** 287:13
**1025** 287:12
**10:15** 6:8
**11:25** 57:20
**11:44** 57:24
**12:51** 105:6
**12th** 6:8
**130** 124:23
**14** 94:13,24 95:23 96:1 97:23 98:7 235:7,12 274:24 279:6
**14-year** 98:8
**15** 94:13,24 95:23 96:1 126:12
**16** 94:13,24 95:23 96:1
**17** 197:16
**18** 96:22 97:12, 16 98:1
**19,000** 265:22 266:6,8
**19,680** 265:17
**1987** 250:1
**1988** 35:12
**1995** 297:22
**1996** 36:4 99:7
**1:37** 105:11

## 2

**2** 82:2 156:13 208:22 227:1 228:11,12
**2,000** 265:18
**20** 32:23 126:13 135:3,4 140:17 158:16 187:20 189:23 251:14
**20,000** 266:8 268:15
**20/30** 47:15
**200** 46:9
**2000** 297:11
**2005** 36:5,6,22 37:5 301:14
**2007** 260:16
**2008** 99:5,8
**2017** 289:4,8,9
**2018** 108:25 260:1,4 284:8 288:20 289:10 296:9,23 301:14
**2020** 25:3 251:8 299:25 304:18
**2021** 250:10,23 251:10,20 252:8 266:1 277:10 291:17 292:23 294:15 295:4,20 299:3,16 301:1
**2022** 6:8 13:22 16:18 23:6 26:5,10,18 27:2 269:9, 18 271:19 273:22 277:4 294:3 304:14,20,21
**22** 226:20 227:17
**22nd** 26:4,10,18 27:2
**2303** 99:1
**24** 275:7
**24-hour** 161:18 164:20
**25/25** 47:15
**250** 46:9
**28** 97:1
**29** 25:10

## 3

**3** 82:3 156:10, 11 197:16 228:11,12 272:20,24 280:25 284:20 286:3 287:25
**30** 29:3 33:25 47:12 135:5 158:16 187:20 195:5 251:14 253:21
**30/20** 47:12,16
**3:05** 170:10
**3:19** 170:15

4

**4**
10:13 155:22 227:17
**40**
46:16 135:5 153:12 195:5
**4:15**
210:4
**4:31**
210:9

5

**5**
155:11,15,22 156:13 194:14,17,23 195:1,3,11 229:13,14 237:18,19
**50**
46:16 47:3 153:13 262:10
**50/50**
46:22
**52**
176:3 264:16 265:5
**53**
264:17 265:6
**55**
204:23
**57**
201:5 204:17
**59**
198:8
**5:22**
247:9
**5:43**
247:14

6

**6**
155:12,15,22 201:4,5,17 284:21 285:18
**62-**
304:17
**6282**
10:1,4
**6283**
16:14,15 58:4
**6284**
22:24 23:1 35:4
**6285**
16:22,24
**6286**
269:12,14 272:19 304:16,19,23
**6288**
270:11,13
**6292**
291:11,12 292:17
**6299**
24:21,23
**6302**
292:18,19 293:6
**6304**
293:7,10 294:6
**6305**
294:8,11,12
**6306**
294:24,25
**6307**
295:16,18
**6308**
296:6,7
**6309**
296:19,20
**6310**
297:8,9
**6311**
297:18,21
**6312**
298:6,7
**6313**
298:19,21
**6314**
299:8,10
**6315**
299:20,21
**6316**
300:11,18,22 301:6
**6317**
301:7,9
**6324**
284:4,5
**65**
300:2
**6:43**
290:2

7

**7**
16:18 155:12,16,25 211:23 265:11,13
**70-year**
262:12
**70s**
44:13
**7:05**
290:6
**7:19**
302:14
**7:35**
302:19
**7:42**
307:22

8

**8**
188:8 284:21
**80**
34:11
**800**
263:9,12,13
**80s**
44:14
**83**
35:11,12
**87**
249:22
**88**
35:12

9

**9**
19:17
**900**
266:7
**90s**
43:9 213:6
**92**
35:13
**96**
99:4 247:25 262:6,7 263:7 266:10
**98**
213:14
**99.9**
144:24

A

**a.m.**
6:8 57:20,24
**abdominal**
37:20 64:10 131:18,21,25 143:3 154:10 224:2,21

**ability**
23:25 24:16 175:13 231:13,16,22 286:23
**able**
49:3,10 50:13,14 69:8 89:2 124:20 128:16 129:18,19 199:6 213:23 285:11,12 286:7
**abnormal**
90:20 147:16,17 272:5
**above**
6:3 89:12 152:6,8,22, 24 155:12 156:13,15,16 187:19 189:24 247:24 262:5 266:11
**absent**
200:13
**absolutely**
9:19 182:17 281:14
**abstract**
299:25 300:5
**abundance**
81:9
**academic**
35:24 113:18
**accepts**
91:15
**access**
9:10
**accommodate**
46:25
**accompanied**
23:4
**account**
180:20 183:24 225:24 227:3 229:3 235:25 238:5 245:14
**accounted**
241:5
**accounting**
238:15
**accuracy**
223:6,21 306:7
**accurate**
25:13 54:18 59:6 82:2 124:9,14 223:3,18 225:22 278:10 280:1,8 303:19 306:17
**accurately**
58:15 59:4 212:13 272:23 274:21 276:12,19 277:24 288:14 293:13 299:1 306:12
**accustomed**
31:1
**ACG**
254:16,24
**achlorhydric**
158:8,23 160:25
**achloric**
161:4
**acid**
13:9 39:19, 24 40:3,8, 13,19 41:10, 12,16,17 44:21 113:21 138:10 142:7,12,14 143:11,12, 14,15 144:7, 12,13,17,18, 19,20,23,24 145:3,8,12, 21 146:7,15 147:7,11 151:7,19 152:11 154:9 157:24 158:1 159:20 161:2,6,14 163:21,25 167:5,7,9 220:12 224:17 284:21 285:2 286:2 287:24 296:10
**acid-inducing**
145:12
**acid-peptic**
58:24
**acidic**
155:11,24 156:1 165:5, 6 166:10,17
**acidity**
143:14 144:14 145:9 149:4,15 150:15 151:18 154:20,24 155:3,11,13, 15 157:1 158:11,17 163:20 165:2,14 169:9,10
**acids**
146:8,16
**acidtonic**
158:12
**across**
166:22
178:16 185:5
**act**
31:11 106:9 111:8 129:10
**acted**
105:18 109:20,22
**acting**
107:4 273:1 278:4 281:6
**actions**
84:8
**active**
42:8 172:24 180:23 181:3,4 190:6 191:4, 5,25 192:1, 7,16,22,24, 25 201:24 202:5,7,19, 24 205:11,19 206:24 207:24 208:14 221:11 228:19,20 236:22,23,24
**activity**
115:3
**actual**
102:19,20,22 252:5 300:17
**Adami**
96:22 97:1, 5,15,20 98:12,13,20, 23 99:13 101:12,15 102:12 103:12 104:8 207:1,19 293:11,15
**add**
128:21 240:17,19
**added**
124:14

**additional** 11:5 20:13
**adenocarcinoma** 137:14 138:1,5 296:11
**Adenocarcinomas** 297:24
**adequate** 232:15
**adequately** 230:4
**adjust** 151:2 225:7
**administrative** 31:23 32:3 46:8,12,17, 20 119:25
**Adults** 300:2
**advance** 11:9
**adverse** 64:5 107:10 157:13
**advice** 269:24 272:20 273:20 280:25 284:15,19,20 285:18 286:3 287:25
**advices** 274:24
**advise** 217:17
**advised** 286:14
**advises** 273:10
**advocates** 275:13 276:10
**affect** 154:22 155:4 237:23
**affected** 154:20
**affecting** 145:23
**affects** 149:22 227:15
**affirm** 6:17
**afford** 217:23
**affordability** 216:22,23
**affordable** 217:19
**afraid** 219:18
**Africa** 83:11,20 85:16,22
**afternoon** 302:23
**AGA** 213:14 253:15,19 254:16,24 269:8,17 273:12 274:16,17, 18,20 275:12,14 276:9,11,18, 22 277:9,11, 20 280:12 282:8 284:8 304:14 305:3
**agencies** 65:9 69:23 70:13 74:25 75:4 76:13, 21
**agencies'** 70:6 75:3
**agency** 83:12 84:8 252:12
**agency's** 66:18
**agent** 71:1,6,22,24 83:9 153:15 171:7,15 182:11 231:4,10 253:5
**agents** 40:3,8,16, 17,20 41:22 42:10 43:8, 12,19 44:12, 13,20,22 45:1,10,12, 17 78:8 136:5 144:8 250:13,18 251:4 253:25
**agg-** 190:3
**aggregate** 177:18 178:15,18 179:5,15 180:7 181:22 189:9 190:24 197:4,9 203:11
**aggressive** 141:7,24 142:5,6 284:21 286:2
**aggressiveness** 134:10 227:11
**ago** 14:2,17,22 15:8 17:17 20:8,25 25:16 26:1 108:20 126:12,13 128:5 131:20 139:25 148:24 158:3 176:2 251:14 277:12
**agree** 9:16 38:12 42:21 81:5 85:24,25 159:23 171:13 183:10 184:6 185:20 189:11 192:7 193:7 208:5 209:17 210:18 220:23 231:2,8,25 232:13 244:2,20 247:20 248:24 281:3 282:25 283:8
**ahead** 61:4 79:10 100:3 136:21 150:6 206:7 209:11 227:7,8 238:21 275:8 288:24 289:23
**aim** 266:21,23,25
**aims** 266:24
**air** 77:19
**airborne** 255:18
**Alabama** 35:13
**alarms** 190:11
**alcohol** 55:16 136:8, 13,23

139:13,15,19
**algorithm**
287:14,17,21
**allow**
185:8
**allowed**
128:20
**alphabetical**
270:24
**alteration**
142:18
**alterations**
39:9
**altered**
142:17
**altogether**
115:17
**amazing**
151:1
**amazingly**
88:8
**amenia**
161:5 162:4
**America**
85:22
**American**
253:10,15,20
274:15
**amine**
55:9
**amount**
87:12 90:1
91:4 93:8,24
95:16 98:19
99:12 143:15
144:21,23,24
147:19
150:15
261:5,6
263:25
306:18
**amounts**
89:13,14,15,
18,20,22
147:9
**analogy**
68:3 134:15

185:5 197:19
**analyses**
54:10 76:25
195:8 250:21
**analysis**
75:6 99:15
101:23
104:14 184:9
193:19
204:24
209:23
222:16,17,24
226:15
256:7,25
257:11,18
261:4,9,14
262:15
263:6,10
264:13
268:10
290:11,13,15
301:13
**analyzed**
204:8
**and/or**
11:5 23:16,
17 37:24
40:4 42:9
103:19
**anemia**
154:12
167:25
**anemic**
24:13
**animal**
56:14 62:6,
9,12 63:13,
18,24 64:11
66:2,3 67:2,
3,12 68:13,
24 69:15
70:7 71:17,
23 72:23
73:1,12
75:3,21
**animals**
64:15 66:5,
21,22 67:21,

24 68:4 69:1
71:2,25
72:10 73:13
149:2 262:11
**annual**
250:24
**annually**
251:2 253:24
**answer**
9:15 37:4
51:9 54:1
55:1 62:2,3
65:18 66:2
70:18,24
76:12 79:20
80:14 83:7
85:4,5,7
87:16 92:16
93:16,18,20
96:8 116:12
117:11 119:7
122:6
123:12,15
124:8 127:13
128:19
130:11
132:17
135:9,10
140:10
149:14
150:16,19
152:13 159:2
161:3,8
189:18
191:14
195:21,22
208:15
240:16
242:1,8,9
258:10,13
260:19
261:17,21,24
273:15
289:17,23
**answered**
39:17 69:13,
17 73:6
80:11 81:1,

24 83:22
84:2 91:7
92:21 93:1
96:4 119:20
135:15 140:9
152:20
195:22
209:22
239:14
**answering**
56:7,8,9
93:17 94:20
102:15 137:7
192:17
220:22
**answers**
33:12 82:6
93:3 125:18
249:13
**antacids**
213:3
**antagonist**
44:18,21
45:11 145:16
155:19 157:2
158:6 202:1
214:11,15,17
220:13,18,21
221:7 296:25
**antagonists**
40:14 42:13,
17,19 44:9,
11 45:3 46:1
60:8 63:10
87:10 113:20
144:9 146:1
153:12 155:2
157:12
161:11
172:22 193:1
201:11,24
202:12
205:2,19
213:4 298:12
**anti-hypertensives**
63:11

**antiacids**
45:18
**anticipated**
109:7 250:13 251:21 252:8,16,19
**anxiety**
215:12
**anybody**
9:21 28:18, 21 166:12 281:23 289:7
**anybody's**
162:20
**anymore**
138:11
**anyone**
9:1,18 29:12 31:7 47:22 86:19 112:18 113:8,10 114:25 115:3,24 118:3
**apart**
193:13
**apologies**
110:20 163:1
**apologize**
107:25 141:15 195:22 240:21 265:12 267:23 289:8
**apparent**
52:25
**appearing**
8:11
**appears**
25:12
**apples**
192:5,6 205:16,17
**applied**
34:19 229:24 303:3
**applies**
141:12,13
**apply**
125:14 198:16 199:16 200:6 208:17,20,22 226:9 227:16 228:11,13 230:19 231:19 244:22 290:24 291:3
**applying**
198:22 199:8 208:6 227:15,18
**appointments**
37:1
**appreciably**
149:10
**appreciate**
42:24 209:7 287:4
**appreciated**
149:17
**approach**
21:25 22:18 125:25 214:4,19 305:4
**approached**
108:22 114:17 125:4
**approaches**
213:20 214:18
**approaching**
125:2
**appropriate**
38:7 50:20 52:11 81:17 104:3 112:5 113:11 115:14 126:4 127:20 184:14 188:13 226:16 227:3 229:3 250:2
**appropriately**
8:6
**approval**
31:12 42:2 43:20 50:14 60:11 62:19 63:4,5,7,15 82:15 83:15 125:25 127:16 128:6 173:1
**approvals**
50:11,19
**approved**
42:1,4 43:18,20 51:6 57:3 68:8
**approximate**
27:7 119:12, 16
**approximately**
14:20 25:19
**April**
26:4,10,18 27:2
**archaic**
38:25
**area**
36:14 47:23 128:8 177:13 198:11 223:11 229:9
**areas**
131:24
**Argentina**
32:12 118:13
**argue**
110:25 181:17 186:19 196:14 203:6
**arm**
183:5
**arms**
32:23
**around**
12:8 46:2 68:14 83:4 84:25 141:22 224:6 261:3
**arrive**
208:9 209:20
**article**
22:11,14 128:22 129:11
**articles**
21:21 64:3 87:21 126:18 127:7,9 130:6,9 195:16 202:3
**articulated**
148:16
**artificial**
120:2
**Asia**
40:21 42:4 83:11 85:22
**Asian**
178:6
**asked**
9:6 18:8 58:16 80:11 81:24 83:1, 21 92:21 106:11,14 107:9 108:8 109:16 110:12,14 113:5 115:23 118:15 119:5,19 128:9 135:15 141:15,18 142:25 152:20 207:13 209:10,21 222:23 232:4 272:2 286:7,

18 303:2
304:13 306:2
**asking**
35:7 66:15
69:20 83:24
94:14 101:15
113:20
117:11
122:11
123:13
130:11 139:3
141:20
160:16
165:16 166:6
175:8 177:21
180:4 250:9
261:22,23,25
262:23 272:6
305:8
**aspects**
56:9
**aspirate**
159:13
**assertion**
74:6
**assess**
50:13 76:2
147:14
171:22
172:3,9
178:15
184:13
187:21 188:6
192:10 193:8
194:12
197:12
198:17
199:18,19
205:13
224:14
228:14
230:4,8
231:23,24
232:6 233:3
253:2,5,24
254:17
306:16
**assessed**
97:10 147:13
246:1
254:21,24
290:14
**assesses**
172:2 173:16
**assessing**
74:10 77:12
155:23
171:4,6
172:19
175:17 178:6
180:13
182:20 183:1
199:22
206:18
209:18 227:4
228:5 231:3,
9,25 232:12
278:14
284:23
303:23
**assessment**
49:24 198:1
201:14
203:19 208:2
**assessments**
184:3 195:16
**assign**
100:11
**assigned**
104:19
**assist**
287:11
**assoc-**
197:1
**associa-**
189:12
**associate**
31:24
**associated**
60:14 63:6,
20 64:4 66:4
75:3 79:12,
13 151:21
152:19
185:3,7,12,
16 189:2
191:20
192:9,18
207:21
234:11
256:16
291:15
**associating**
205:24
**association**
58:13 59:1
60:19,22
78:19 90:9
91:2 106:12
176:4,14,19,
20 185:2,17,
18,20,24
186:2,7,9,
11,13,20,21,
23,24
187:15,17,18
188:12
189:7,12
190:18
193:5,17
195:25
196:9,10,12,
17 197:17
198:4,14,23,
25 199:5,9,
18,21,24
200:1,7,14,
22 201:1,3,
18 202:1,8,
13,17 203:1,
22 204:7,20
205:22
208:16,21
225:8,9,21
226:23,25
227:18,20
228:13,15,
16,24 233:20
234:23,24,25
237:8 241:13
242:4,10,16,
20 243:2,3,
11,24 244:6,
11,16,17,21
245:12
253:10,16
255:5 258:5,
8,24 267:13,
14 274:15
284:23
290:18,20,
21,23 291:2,
4,6,24
295:21
301:12
303:13
304:5,6
307:14
**associations**
176:8 196:21
**assume**
15:5,7 20:2,
3 21:2 134:5
196:10,13,16
223:16,21
307:9
**assuming**
20:25 102:16
103:11
121:12
196:19,20
252:20
**assumption**
46:23 103:25
246:14,18,22
252:11
306:11
307:10
**assured**
90:25
**asthma**
142:24
**Astrazeneca**
110:13
114:22 128:5
**astronomical**
263:2
**ate**
141:25 142:1
164:17

303:20,21 306:14
**atrophic** 53:6
**attached** 55:11
**attempt** 49:8
**attempting** 192:19
**attend** 118:5 122:3 277:9
**attending** 276:21
**attention** 285:18
**attorneys** 108:10
**attributed** 284:10
**attributing** 235:21
**Austin** 200:11
**author** 22:13 129:23 203:18 284:12
**author's** 202:10
**authored** 126:5 269:6
**authoritative** 70:2 76:21
**authorities** 65:10,15 67:15 69:5, 10,18,23 70:1 78:15, 20 80:23 259:15
**authority** 83:14 200:4 253:7 259:2
**authors** 130:16 181:8
202:16 204:6,11 269:19 270:6 288:12
**availability** 94:5
**available** 40:20 44:8 55:14 59:10 62:6 65:1 117:5 118:20,22 178:15 217:10
**avoiding** 86:22
**aware** 40:15 51:5 52:5,20 60:17,25 61:5 62:15 65:8 66:18 67:2 73:13 78:13 81:2 108:8,9,16, 17 128:25 129:2 157:13 218:10,11 245:19 248:1,12,14, 18,20,23 300:10

## B

**babbled** 33:13
**bachelor** 35:10
**back** 24:4 31:3 34:6 35:20 43:19 47:3 57:24 64:19 65:6 66:2 68:24 76:12 78:14 82:14, 16 83:7,16
85:23 89:4 91:17 93:4 100:8 103:5 105:11,16 113:5 121:20,25 124:8 131:1, 5 134:16,25 137:20 140:2 142:14 150:20 155:17,21 156:1 168:6, 8 170:15 187:13 191:3 197:5 201:22 206:21 207:12,13,25 210:9 216:16 221:5 224:1, 9 230:9 233:12,22 235:6 238:3, 24 239:22,25 240:5 246:9 247:12,14 249:2,21 254:11 255:17 257:8 267:17,25 269:5 272:18 274:1 275:9 280:17 283:6 287:23 290:6 292:1 302:19 306:9 307:1, 3,14
**background** 31:16
**backward** 173:12
**bacteria** 133:3 157:17 160:1,20 161:20 162:22 163:3,6,7,8, 11,13,18,19
164:3,7 165:14,25 168:11,15,18 169:3,15 210:15
**bacterial** 157:25 158:9,19 159:2 160:6, 17 161:8,24 162:6
**bad** 107:24 110:20 157:5 187:11
**bag** 190:21 262:3
**balance** 47:1 151:16, 17,18 152:12
**banana** 78:6
**bananas** 119:22
**Bank** 294:14
**Barrett's** 53:9 138:5, 8,9 296:11
**bars** 201:15
**base** 69:19 76:22
**based** 34:21 59:17 61:11 65:18 67:17 74:24 87:16,20 88:16 89:23, 24 98:22 118:21 132:5 136:5 137:7 139:9 171:5 172:10 178:14 187:10 203:15

205:13 215:2 223:2 227:20 235:8,23 236:8 241:2 246:14,23 247:23 248:15 252:20 260:19 261:21 262:3,9,11 265:18 266:25 267:1 268:10,13 273:9 279:6 280:18,21 281:15,19 282:10 290:21 303:12 304:6 306:13,16

**baseline**
92:11

**basic**
155:12

**basing**
69:24 70:4,5 71:18 76:24

**basis**
23:13 76:1 144:8 198:18,21 205:25

**Bates**
19:18,19,21 20:14,21

**bathroom**
222:11

**Bear**
224:5 261:2

**beautiful**
237:16

**beautifully**
207:16 225:13

**beer**
55:16 69:9 78:7 79:13

86:24 169:21 256:13 263:1,3

**begin**
6:14 20:22

**begins**
20:21

**behalf**
8:11,13,17 58:10 106:9 111:8 112:9 113:14,23 114:5,9,12, 21,22,24 116:1,17 118:1,3 119:13 121:15,22 269:19 281:7 288:21 289:5,6

**behind**
32:22

**belated**
111:5

**belief**
23:21

**believe**
10:20 13:8, 10 14:2,4, 17,18,19 17:6,8,13 18:7 25:13 29:7 40:22 42:14 60:5 61:17 62:18 72:8 93:21 105:22 107:10 111:15 113:16 114:13,14 122:9,10 123:18 131:10 141:12 152:23 178:20,21

195:23 198:8 203:13,15 207:20 211:22 249:21,22 251:20 255:7 263:3,9 264:2 267:11 270:23 274:1 275:6 278:7 279:25 299:24 301:20 302:1,2

**bell**
108:25

**below**
90:5,6,8

**benefit**
41:9 58:23 128:16 222:16,24

**benefits**
58:12 115:7 116:18 222:18

**besides**
29:13,16 31:8 59:13 66:21 70:15 72:10 73:1, 12,24 85:13 86:1

**best**
23:25 24:9, 10,16 122:19 130:15 172:13 173:25 180:22 181:5 184:18 230:8,13 231:13,16, 18,22,24 232:6 233:25 237:20 259:11 269:24

272:20 273:20 278:11 280:5,25 284:15,18,19 285:18 286:2 287:24

**better**
36:15 38:24 39:6,15 41:20 45:10 46:2 88:23 89:2 117:17, 23 143:16 145:10 149:19 154:25 155:1 157:3 159:21 172:9 175:15,22 180:4 181:16 183:12,20 184:2 188:9 189:6 190:21 205:5,10,21, 24 206:10, 18,23 207:23 227:25 228:14,17,18 283:23

**bias**
130:17 174:1 175:7 176:13 180:14 188:25 190:7 198:15 208:15 224:10 225:2,24 227:4 228:5 235:4,13 236:9 238:6, 18 239:20 241:7,9,16 242:6,13 244:5 245:9 281:6 303:13 304:8

**biased**
130:25 199:2
**biases**
130:18,22 175:4,13,18, 25 176:23,24 180:13,21 181:13 187:5 190:1 199:3 228:25 255:11 303:25 304:12
**big**
53:25 133:14 139:20 197:9 232:24
**bigger**
115:19 230:17,18
**bile**
40:4 146:7, 16 271:14,15
**bio**
170:2 209:7 294:14
**bioavailability**
256:3
**biological**
65:4,14,19 66:10,13 71:11,14,17 74:5,9,14 77:4 79:25 193:18 197:18
**biologically**
64:24 65:23 73:17,25 74:20 135:22
**bioorganic**
33:2 35:12
**biopsied**
134:23
**biosequestering**
42:10
**biostatistician**
34:4,6
**Birmingham**
35:11
**bit**
31:16 35:14 38:10 46:4 65:15 112:16 131:1 179:8 182:1 194:8 224:6 256:6 261:3 263:4 267:18 287:15 290:10
**black**
201:10 204:25
**Blacker**
300:25
**bladder**
59:3 66:25 70:21 71:6, 7,12 131:23 200:23 201:1,8,18 202:8 203:2, 8,14,23 204:7 292:22
**blank**
9:5
**bleed**
221:11
**bleeding**
38:6 49:19, 20,22 132:13 154:11 221:10
**blinded**
183:4
**blindly**
272:6
**block**
41:14,15 144:12
**blockade**
41:12
**blockades**
41:10
**blocked**
49:7
**blocker**
157:23
**Blockers**
301:13
**blocking**
145:20
**blood**
49:19 132:13 182:23
**blue**
201:12,23 202:4,7,14 203:11 205:20
**BMI**
134:13
**board**
50:15 274:18
**boards**
51:4
**body**
92:6 145:23 148:3 151:1 255:23 256:3
**Boehringer**
114:9
**bold**
198:11
**bond**
194:25
**book**
24:12,14
**bore**
37:3
**Botox**
49:15
**bottles**
45:24
**bottom**
7:14 18:22 19:16 202:21 212:7 265:13 270:20 271:6 275:10,23
**bowel**
48:19,21,23 49:20 131:15 147:9
**Box**
285:12
**Bradford**
193:23 197:11,14,21 198:3,17,22 199:16,23 200:6,10,11, 13,17 207:25 208:2,6,18, 20,22 209:16 244:22 256:6,7,24 257:11,17 258:11 290:11,13, 15,24 291:3, 5 303:3
**brain**
132:6,9,15
**brainer**
176:10
**brand**
44:5
**break**
12:21 47:4 55:2 57:16, 22 102:6 105:2,3,4,8 170:2,12 179:24 185:10 209:6,7,12, 24 210:6 247:8,11 283:14,15,18 284:1 290:1, 4 302:11,16 307:24
**breakdown**
46:6

**breaking** 147:8
**breaks** 146:13
**breast** 173:11 297:12
**brief** 247:19
**briefly** 17:21 19:25 21:1
**bring** 40:22 42:7 68:24 82:13 304:15
**bringing** 163:15
**brings** 152:12 227:24
**broad** 66:1 70:17 75:18 166:8 170:23
**broader** 243:4
**broke** 95:16 98:14
**broken** 201:8
**brought** 105:23
**buckets** 121:25
**bunch** 169:14 233:23
**bureau** 121:2,5,15 123:7
**business** 109:16
**busy** 32:16,17
**butcher** 299:23
**buzz** 292:14

C

**calendar** 120:19
**call** 37:25 114:7 143:20 155:25 175:22 212:19 217:24,25
**called** 40:12,18 44:5 48:22 57:11,12 143:19 144:21 145:5
**calls** 215:6,16,18
**Canaan** 8:25 12:17 14:4,6,15,21 15:3,9 18:13 28:17 29:13 37:11 50:22 52:15 57:15 60:24 61:1,4 62:8 65:2,25 67:13 70:16 71:8 72:13 73:19 74:2, 22 75:9,14 76:11 77:2 79:4 80:11 81:4,24 83:6,21 85:8 87:14 90:15 91:6 92:21 93:1 97:18 98:21 102:1, 3,5,9 103:15 105:3 108:9 111:4,10,21 113:4,15 114:23 116:4,6,10, 21 118:2,10 119:3,19 120:6,13,23 121:17,23 122:5 123:1, 10,21 126:7, 21 127:12 128:24 129:14,25 134:2 135:15 136:11 137:2 140:5 148:17,22 149:13,23,25 150:4 152:20 160:3,23 161:21 162:12,24 164:22 166:3 167:13 168:13 169:5,17 170:1,6 171:21 177:5,19 179:22 183:15 185:23 188:5 189:15 192:11 193:10 200:15 201:20 203:25 204:3,14 206:1,13 208:10 209:5,11,21 210:1,24 211:8 216:7 217:21 218:14 219:7 221:1,16,22 222:2,7,12 223:1,20 227:8 228:7 229:5 230:6 231:6,12 232:3,16 234:3,8 238:7,19,22 239:6,8,15, 24 240:13 241:8,17 242:7,15,22, 25 244:7,25 245:15,22 246:17 247:3,22 248:3,8,17, 22 249:1,8, 11 251:5,15 252:4,17,25 253:8 254:3, 19 255:1,25 256:4,9 257:2,15 260:5,18 261:8,18 263:14 264:21 265:1 266:17 268:4,18 270:1 272:12,16 273:5,14,23 275:18,21 276:1 278:6 279:17 280:16 281:10,22 282:5,11 283:13,20 285:5,10 286:5,16,18 287:3 288:24 289:14 291:25 293:3 300:21 302:7,10,22 304:15,19, 21,24 305:2, 15,25 306:1 307:18
**Canaan's** 15:12

**cancer**
49:1,5 51:13,15 52:8,19,20 53:4,13,14, 21 54:15,25 56:15 58:14, 19 59:2,3 60:19,22 61:7 64:23, 25 65:13,24 66:21 67:10, 12 68:5,20 69:15 70:7, 14,15 71:1, 2,3,6,7,12, 13,22,25 72:4,9 73:1, 4,7,18 74:1, 21 75:3,12, 20 76:9,24 77:3 78:7,9 79:2,13,19, 25 80:10,21 88:5 94:25 96:2 97:17 98:8 131:7, 11,12,14,15, 16,23 132:18,19,22 133:5,8,9, 11,14,17 134:7,25 135:5,8,14, 20 137:10, 11,13,14,18, 19,25 138:14,16 139:4,11,14, 19 140:4,14, 24 141:2,7, 8,11 151:12, 22 152:19 154:15,16 171:11 172:13 173:11,12 175:8 176:9 182:7 191:11 198:15 200:23 201:2,8,19 202:8 203:2, 8,14,23 204:7,21 205:15 207:10,12, 15,22 221:21 224:16 225:4,5,8, 22,25 226:14,21 227:5,6,10, 21 228:6,9, 16 229:4,7, 15,20 231:4, 10 232:1,10, 13 233:4,6, 24 234:2,6 240:25 249:5,13 255:6 256:8, 13,20 257:1, 13,19 258:4, 6,22 259:19, 23 260:4,16 262:10,12 263:4,16 265:24 291:16,24 292:2,22 294:13 295:4 296:25 298:13,23 299:13 300:1,25 301:12 303:4,8,24 304:3 307:4, 11,15

**cancers**
59:9 60:15 63:21 66:24 67:4 70:19 72:18,19 73:8,11,15 74:25 76:16 77:9,17 78:4,12,13 89:1,19 132:4 137:15 140:25 141:4 149:1 229:10 256:16 259:14 260:9,10,24 290:14,15,19 291:1 293:12 297:13

**capable**
88:5

**capacity**
111:13

**Carafate**
45:12

**carbon**
55:11

**carcinogen**
53:19,20 65:11 66:10 80:25 133:22,24 136:6,13,14, 23,24 182:6 221:15 222:11 249:17 251:22 252:16

**carcinogenesis**
52:14,17,18, 23 53:21 55:20

**carcinogenic**
136:25 254:18,25

**carcinogenicity**
62:12 63:14 182:11,17 251:12 253:5,25 259:25 260:4

**carcinogens**
137:3,4,6,7 250:14,24 251:2

**carcinoma**
131:20

**Cardia**
297:24

**cardiac**
171:19

**Cardwell**
202:10,15 203:1,16,22 204:6 292:21 293:1

**care**
14:3 30:18 34:20 37:18 38:7,15 40:3 45:15 51:21, 22 52:2,5 113:9 119:25 122:18 134:16,18,19 160:8 172:9 180:12 243:13 260:21 266:21

**career**
113:18

**careful**
176:18,20 194:21 244:11

**carried**
222:22 251:13

**carries**
208:7

**carry**
174:12 209:17 221:14,20,25 222:5,10

**case**
8:12 9:6 10:6 11:12, 16 14:1,16

21:24 22:2 23:5 24:21 25:13,20 26:18 30:15 31:12 36:17 51:1 53:23 54:3,5,8 59:7,13,25 67:3 75:7 78:11 87:11 105:23 106:11,16,20 107:3,13,14, 18,23 108:7 109:15 121:18 127:1,4,5 135:6 139:21 152:23 159:22 163:2 173:6,8,10, 17,20 174:4, 5,6,9,25 175:12 177:3,9 184:12 185:15 186:4 190:18 199:21 208:17 218:22 224:23 237:18 241:23 255:9 257:6,22,24 258:2,6,8, 15,23 266:13 267:6 268:1 281:4 292:23 296:11 303:18 305:11

**cases** 105:18,21 173:12

**CAT** 131:22 132:3

**cat's** 190:21

**categories** 103:9

**categorizing** 251:21

**category** 44:18

**catheter** 39:4

**causal** 59:1 184:9 185:21 188:3 193:8 196:20 198:1 200:2 234:24 243:9,10,12, 17,20,21,23, 24 244:3,19, 24 291:4

**causality** 196:17 197:10,12 245:7,8,14 291:7

**causation** 198:18 199:5,25 208:3

**caused** 171:15,19 249:4

**causing** 68:5 88:5 152:17 207:12 240:25

**caution** 81:10

**caveat** 182:14

**cell** 131:20 144:13

**cells** 41:16 144:10,11,20

145:1,2 161:7

**center** 8:10 40:7 126:24 274:17

**certain** 22:11 55:14 71:1 90:5 116:19 121:9,15 122:14 131:7 132:4 143:18 158:15 162:22 165:8 179:9 182:3 210:23 219:19 220:3 235:17,21 282:16 283:6

**certainly** 254:5 287:10

**CGIT** 269:20 270:15,22 274:17 275:12,14 276:9,11,18, 22

**CH3** 55:10

**chair** 185:9,17

**challenge** 143:5

**challenges** 7:24

**chance** 58:17 150:1 194:13,17, 18,19 198:15 204:1 242:23 281:11 303:13 304:8

**change** 48:8 149:10 164:17 169:14 211:5

215:12 216:12 230:1 237:22 269:3

**changed** 213:13

**changes** 53:11 155:24 164:19 167:21 216:5

**changing** 283:14

**chapter** 24:12

**chapters** 24:14

**characterize** 187:14,16 205:23 206:9

**characterizin g** 206:10,17

**charge** 120:10

**chart** 97:22

**charts** 26:23

**check** 154:8 182:23

**chemically** 211:14

**chemistry** 33:2 35:12

**chemotherapy** 51:23 52:8, 10 53:16

**chemotherapy-induced** 52:4

**chest** 68:17,18 182:24

**chief** 31:24 36:6

**chocolate** 86:25

**Chow**
297:21
**chronic**
53:6 100:19, 20 101:2,3, 13,19 103:3, 7,24 138:7 246:11,21 295:21
**chronically**
103:22 104:1 246:11,22
**chronicity**
101:8 104:19
**chronological**
25:11 34:24
**chunk**
113:6
**cimetidine**
44:14 86:7 192:25 297:11,12
**circles**
85:15
**circumstance**
218:16
**circumstances**
24:9 218:8
**cite**
200:4,10
**city**
36:9
**Claims**
301:14
**clarified**
214:18
**clarify**
59:23 73:21 116:13 164:23 177:20 192:14 199:1 248:4
**clarifying**
30:11
**class**
43:6 44:4,6 56:20 193:2 216:22 217:14 249:22
**classes**
40:16
**classic**
143:2
**classification**
249:16,23 250:2 251:13 252:2,15
**classifications**
251:3
**classified**
133:24 136:13 137:3 173:21 238:16
**classifies**
250:12
**classify**
249:20 250:7,18 251:6
**clastogenic**
249:7
**clear**
12:21 47:20 67:23 73:3 97:14 102:11 116:23 163:1 165:17 199:11,12 200:3 258:14 261:20,22 262:17
**clearly**
189:2 225:16
**Cleveland**
36:3,9
**click**
287:7
**clinic**
32:10 36:4 47:8,11,14, 25
**clinical**
31:21,25 34:1 36:2, 10,13 37:18 38:15,19,20 39:6 40:9 42:12 46:7, 12,16 47:4 58:12 59:20, 22,24 60:1, 3,7,13,16, 18,21 61:5 64:6 68:25 71:19 72:18 78:16 102:18,19 103:1,16,25 122:18 125:18 131:2,5,13 134:16,18 139:13 143:24 152:14 153:6 160:8,13 163:17 183:13 189:13,22 190:8,12 195:18 212:21 214:24 216:2 222:20 223:10 243:7,12 246:9,10,18, 23 253:3 254:8,15 255:19 257:8 260:21,25 266:22,25 269:7,16,17, 24 272:19 273:21 274:16,19 277:21,22 282:9 284:8 290:18 304:2,14 305:3
**clinically**
56:3 58:22 73:8 104:3 141:13 159:1 195:3,6 246:12 256:19
**clinician**
31:20 49:10 51:4 68:18 88:13,23 94:10 102:15 104:23 115:20 139:8
**clinicians**
172:8 254:11 272:20 281:1
**clinics**
47:25 48:1,2
**close**
68:21 180:17
**closed**
180:19 276:25 277:6
**closed-door**
276:17,22
**closely**
26:23 29:25
**closer**
181:13
**co-**
184:3
**co-author**
128:21
**co-carcinogens**
136:9,25
**coaching**
264:24 265:1
**coating**
44:11,20,22, 25 45:12
**coauthored**
126:18

127:7,9
**cocarcinogen** 136:2,3,4
**coffee** 142:2 185:9, 12,16
**cofounders** 197:23
**coherence** 197:18
**cohort** 94:16 97:6 102:20 173:6,15,18, 20 174:3 175:2,15 177:4,9 184:12 186:4 196:8 236:17 257:5,23 258:1,4,8, 15,16,23,24 259:4,11 298:25 300:2 301:1
**cohort/case** 191:21
**cohorts/case** 175:20
**colleagues** 32:22 45:14 53:18 114:17 307:21
**collect** 179:10
**College** 253:11,20
**colon** 37:24 48:21 49:17,22 131:15
**colonoscopies** 37:19
**colonoscopy** 48:20
**Colt** 288:17
**column** 97:5
**combination** 19:10,15 21:9,10,11 32:8,15 103:9 211:23 212:9
**combine** 146:15
**combined** 146:8
**combining** 237:9
**come** 24:6 28:24 38:24 39:1,6 45:16 51:24, 25 53:18 65:12 66:11, 18 71:11 83:16 89:3 91:25 102:5 112:3,19 122:11,15 124:24 130:14 135:19 138:13 139:14 148:9 182:19 190:13 194:5 207:4 218:17,23,24 230:24 233:15 239:22,25 240:5 246:19 289:1
**comes** 9:15 34:9 37:18 38:2 39:24 40:5 87:5 88:14 103:6,17 109:14 120:9 133:17 134:25 151:15 156:1 158:9 167:8 175:19 183:20 186:21 190:7 191:25 194:22 196:2 214:6 217:5, 8 220:8 224:1 230:24 259:3 263:2 303:23 306:20
**comfortable** 89:6
**comment** 150:17 151:8 270:8
**commented** 202:9
**comments** 240:20
**commissioned** 274:14
**commit** 111:3
**Committee** 274:16 277:21
**committees** 253:12,21
**common** 43:24 141:22 142:21 213:25 214:3,19 224:19
**commonly** 45:13 215:5, 25 217:15
**communicate** 9:17
**communication** 9:24
**communications** 14:9
**community** 149:9
**companies** 40:22 42:4, 7,8 82:13,16 83:16 91:18 110:3,15,17 111:14 112:3,12,19 113:3,14 114:1 116:1 117:1 118:1, 8 119:1 120:5 121:16,22 122:4,12,25 123:6,8,20, 25 124:18 125:14,23 126:6,19 127:10,15
**company** 117:7 121:8, 9 124:6 125:11 128:20 129:10 130:15,17 223:4
**comparator** 172:24 180:23 181:3,5 183:1 190:6 191:4,5,25 192:8,16,18, 21,24 197:2 201:24 202:5,7,19, 23,24 205:11,19 206:24 207:24 228:20 236:22,23,24 266:7
**comparators** 192:25

194:19,25 208:14
**compare** 192:4 205:16 206:24 261:5 262:19
**compared** 128:15 201:25 203:24 266:3 292:4 295:22 306:3
**compares** 203:16
**comparing** 191:13 192:5 206:11,12
**comparison** 194:21 195:12 201:9 203:17 265:25 266:2
**comparisons** 195:5
**compensated** 112:23,25 289:11
**competition** 145:7
**complete** 13:18 16:10 24:8 223:18
**completely** 49:7 81:6 108:16 184:19
**completeness** 223:22
**completes** 180:7
**complex** 51:23
**component** 193:14 223:14 250:22
**components** 281:24
**comports** 25:18
**compound** 55:10 63:6 64:8 68:3 218:6 224:17 246:5
**compounds** 55:12 62:18
**computer** 28:24
**computers** 35:20
**concept** 158:19
**concepts** 224:9
**concern** 55:18 56:3 68:4,9,10 81:6,25 88:8,18,20 150:18 151:10,14,23 152:4,14 153:9,11 157:21 158:8
**concerned** 78:22 159:6
**concerns** 54:14 55:20 149:1
**conclude** 188:11,13 233:11 234:23,25 244:4
**concluded** 70:10 84:20 85:11 244:4 245:12
**concludes** 244:10
**conclusion** 59:11 61:11, 20 65:21 66:7 79:1,18 80:9 84:9 184:21 187:7 188:24 202:16,20 203:21 208:9 209:20 230:25 259:13
**conclusions** 59:18,25 61:10,16 62:13 67:16, 17 70:3 75:7 77:1 184:14, 19 195:17 230:24 250:5 257:10 291:23 301:22
**condition** 53:10 57:11, 12 144:21
**conditions** 116:19 162:10,20 164:7,16,18 166:13 167:22 169:15,16 210:14 219:19 220:3 248:2,4,16, 18
**condone** 218:11
**conduct** 21:16 31:21 32:5 75:12 177:14 179:10,14 182:4 191:5 222:15 256:7,24 290:14
**conducted** 13:6,13,19 21:14 22:22 54:19 56:10 60:10 75:6 76:25 87:23 181:20 202:11 241:12,18 242:3,12,16, 18,19 245:11,17 251:14 254:17 257:11,17 290:11,13
**conducting** 177:3,11
**conference** 251:14 269:20 270:15,22 271:5 273:3, 17,19 275:14 276:10,18,22 278:18,20,22 281:18 282:2
**conferences** 277:9
**confidence** 180:3 186:8, 12,18,21 187:22 188:7,8,12, 15,22 189:9, 19,24 199:14 201:16
**confines** 234:7,10
**confirm** 258:2
**confirmed** 176:5
**conflict** 130:13 271:7 278:2,9 279:13,14,18 280:2,18,21 305:18

**conflicts**
129:6,23 130:2,6,9 273:13,16 277:18 279:1 280:14 288:4,5,13
**confounder**
207:11
**confounders**
184:19,25 208:14
**confounding**
159:10 175:5 181:18 183:25 184:13 190:5 191:16 192:2 193:21,22, 24,25 194:2, 4 195:20 196:22 197:24,25 198:16 199:3 228:25 230:20 303:14 304:8
**confuse**
139:1
**confused**
295:10 296:23
**confusing**
274:4 293:25
**congregation**
13:9
**connect**
246:9
**connected**
108:11
**connection**
49:6 108:17
**consensus**
269:20 270:15,22 271:5 282:2, 10,19 283:1
**consequence**
156:24,25 157:3,15
**consequences**
156:20 160:17
**conservative**
262:7
**consider**
18:10,18 32:19 50:10 52:13 61:9, 15 62:5 63:13 64:24 65:22 73:16, 25 75:7 76:9 80:15,17 83:17 109:12,18 208:2 216:25 217:1 255:21
**consideration**
216:21
**considered**
12:13,24 15:17,20,23 16:22 17:4, 11,15,22,23 18:16 30:4 32:18 61:17 77:25 79:5, 14 133:22 136:9,10,12, 24 198:3
**considering**
200:12
**consistency**
193:15,17 197:17 208:7,23,24 209:17
**consistent**
156:17 189:24 196:21 208:19 223:3
**constancy**
39:24
**constant**
132:8
**constellation**
233:12
**consult**
307:20
**consultant**
129:10 271:8,24
**consulting**
109:17,23 110:2,13,15 111:1,12 122:11
**consultings**
111:25
**contacted**
25:19
**contained**
13:15 15:21 59:19 87:12 88:4 124:6 221:15 223:7,17 264:1,18 280:5
**contains**
16:1 59:16 81:3,23 83:5 84:25
**contaminated**
298:24
**content**
276:14
**context**
109:3,4,10 111:23 112:22 114:2 117:13,18,20 121:2 122:8 127:21 128:19 185:1 187:24 197:15 209:15 232:8 285:3
**continue**
39:21 214:12,16 215:15 218:20 287:11
**contribute**
243:6
**contributed**
270:5 279:16,19 280:8
**contribution**
279:4,5,19
**contributors**
275:12 276:8,17 277:17 278:25 279:9,14 280:6,13
**control**
94:1 100:10 128:14 172:18 173:5,6,8, 10,12,17,20 174:1,2,4,5, 13 175:1,12, 13,20 176:5 177:3,9 180:10,11 182:2,4,7 183:20 184:12,18,24 186:4 187:4, 8 189:25 190:5,7 191:16,21,22 192:1 194:1 196:22 197:3 208:15 225:1,6 228:22 255:10 257:6,22,24 258:2,6,8, 15,23 286:25

287:7 292:23 296:12 303:18
**controlled** 60:17
**controlling** 175:25
**convention** 194:13
**converted** 11:20
**convinced** 65:17
**convincing** 66:8
**convincingly** 65:17 95:14
**cooked** 306:14
**coordinator** 40:25 114:15 124:24 125:3 126:2
**copy** 10:23 11:1 15:16 16:17 23:22 294:2
**core** 267:21
**corner** 277:16
**correct** 8:4,12 10:24,25 23:22 25:25 27:21 31:5 33:18 37:6 43:7,8,25 44:1 47:9 50:3,8 56:21,22 57:1 72:7,11 81:3 86:5,6, 11,12,15,16 88:1 98:9 99:8,9 101:12 104:6,11 105:19,20 107:5,6 109:8,9 112:24 121:16 122:10 123:20 124:7 129:7 143:25 144:3 156:4, 5,18 165:22 167:25 169:12,24 170:20,21 171:11,12,20 177:14,15 179:11 182:12,13 192:13 195:8,9,19 202:23 203:19 204:12,13 207:22,24 211:7 217:14 219:23 220:2 233:6 236:3 243:25 244:1 246:16 247:21 251:22,23 252:19,22,24 258:18 259:21 268:17 269:9 272:24 278:5,18 279:3,10,11, 25 282:10 284:16 285:4 288:1,2,15, 22 292:11, 24,25 293:4 294:15 295:23 296:1,2,13 297:2,5,13, 16,25 298:3, 9,14,17 299:3,4,6,7, 14,15,18 301:15,23 305:6,18,19
**corrected** 293:23 294:1,2
**correction** 194:25
**correctly** 7:10 37:10 59:5 74:4 153:21 252:11 288:9
**correlation** 304:2
**cost** 213:7,11,15 217:15
**Costello** 28:19 29:14
**cough** 128:7 142:24
**counsel** 8:21,24 9:20 14:2,10 17:12,14 19:9,10 21:7,11 24:19 25:24 27:17 28:2, 6,7,17 29:6, 7 106:23 107:11 110:19 247:6 303:2 304:13 305:8 306:2
**countries** 82:21 84:5, 10 85:19 133:15 178:2 307:8
**country** 85:13
**counts** 160:6
**couple** 33:15 102:7 226:2 277:11
**course** 8:1 9:17 42:22 87:8, 10 131:13 162:5 163:25 211:24 212:10 214:1,21,24 220:14 230:15,16
**courses** 34:18
**court** 6:10,13,15, 17 7:2 93:4 289:20
**cover** 224:6
**coverage** 215:3 216:24
**covering** 290:15
**covers** 217:7 301:20
**COVID** 106:18 118:18 120:16 121:20 280:20
**COVID-19** 171:19
**CPU** 275:11
**cream** 87:1
**create** 11:21 176:21 215:12
**created** 17:14 103:18 227:10,24
**creates** 143:4 176:15

**creating**
240:1,2
**credentials**
23:23 33:13
**credibility**
277:18 279:2
280:15
**criteria**
193:23
197:12,14,21
198:3,17,22
199:17,23
200:6,13
209:14,16
244:23 303:3
**critical**
193:8,11,12
194:6
**criticized**
179:5 197:6,
7,8
**critique**
122:20
178:11 179:3
**cross**
186:12
199:14
302:21
**crosschecked**
302:3
**crosses**
186:19
189:20
**crossover**
219:5
**Crosstalk**
92:25
**CRR**
6:1
**crux**
209:3
**cup**
49:8 185:9,
11
**current**
39:3 58:11
59:9 115:15
117:15
196:19
198:13
252:15
**curriculum**
10:23 11:2
13:15,17,21
15:16 23:3,
21 24:1
**cut**
240:4,10,14
**cutoff**
90:5,6,8,21
247:24
**CV**
22:24 23:8
24:1,7 27:19
31:24 32:7
33:21 35:1
39:11 110:4
111:3,17
113:17
124:2,7,8,9,
11,19 125:6,
20 126:12
**cytochrome**
165:10

**D**

**daily**
246:19
**Danish**
96:21
**data**
15:20 16:7,9
22:19 58:18
59:9,10,20,
22 61:13,25
62:9 63:16,
18,24,25
64:11 67:2,
19 72:19
74:24 75:3
76:16 78:16,
18,23 79:22
80:1 107:9
173:4 174:1
177:4,12,17
178:5 179:2,
3,11,15,16
180:25
181:22,23
182:12
223:3,7
245:2 259:13
260:11,12
261:25 262:1
266:25
267:10,12
283:7 303:4
**database**
102:21
103:17,18,19
104:6 177:17
178:12,17,18
180:25
181:2,6,21
231:13,17
232:6 237:6
301:14
**databases**
177:13
178:9,11,14
179:9,13,19
207:5 237:19
307:8
**Datacenter**
301:14
**date**
13:18 25:11,
24,25 26:7
99:10
**dated**
16:18 25:3
26:4 269:18
296:9,23
297:11,22
**dates**
26:1
**day**
34:11 46:15
64:18 68:15
89:25 93:3
139:16
158:3,4,5,
13,14 162:20
164:8 190:10
239:22 240:5
243:10
254:10
256:17,22
265:17,18,23
287:20
**day-to-day**
31:16 37:8
131:13
**days**
47:15 212:19
**DDW**
299:25
**dead**
139:25
**Deanne**
6:1,10
**decades**
58:23 115:10
**Decanio**
6:11
**decide**
82:13
**decided**
83:16
**declaration**
277:17
**declarations**
279:1 280:14
**default**
91:22 157:24
193:25 196:9
235:22
**defendant**
106:10,11
**defendants**
8:12,16
12:12 58:11
266:12,13
268:1
272:10,15
**defended**
35:16

**defensive** 141:23 142:5,7 144:25
**define** 89:22,23 99:2 136:4 140:22 194:9 205:9
**defined** 231:4,10
**defining** 99:10
**definitely** 117:12
**definition** 282:19
**definitive** 70:11 78:18, 19 80:24
**definitively** 65:12 66:12, 18 67:21
**degree** 33:8,17 34:24 35:13 52:17 170:19
**degrees** 35:8
**delay** 150:10 271:20 289:2
**Delphi** 282:21
**demand** 48:8
**demographics** 285:21
**demonstrate** 159:24 161:18
**Denmark** 95:8 178:8
**department** 32:2
**departmental** 46:21
**depend** 211:1 232:19
**dependent** 136:19 184:23
**depending** 155:16 162:10 164:12,15,17 167:12,21 169:2,14,19 210:23 211:6 220:5 227:9 233:8 248:2 285:21
**depends** 21:23 22:3, 9,16 31:18 46:10 51:19 52:20 89:12 118:19 134:10,11, 12,13 135:18 137:13 140:19 147:25 152:21 153:4,15 156:23 162:6 165:24 174:25 177:8 182:16 184:22 194:6 196:1 221:4 232:17,20 234:9 236:4 238:8,9
**depiction** 59:6
**depo-** 106:17
**deposition** 6:1,7 7:6, 11,17,25 8:2 9:4,17 10:6, 10 11:9 16:14,22 17:16 22:25 24:22 27:13 28:3,6 29:6, 13,17,20,21 31:9,11 42:16,22 43:3 106:15, 19 107:15,16 108:21 224:8 239:23 240:9 269:13 270:12 284:4 291:11 292:17 293:6,10,17 294:7,12,24 295:17 296:6,19 297:8,21 298:6,20 299:9,20 300:12,18
**depositions** 7:13 30:8, 11,14,25 31:4
**described** 233:23
**describes** 97:6
**design** 33:23 34:9, 14 122:20,21 123:14 126:15 180:8 183:19,25 184:1,2,7, 10,11,24 187:3 188:23 189:9 196:1, 8,9 205:10 207:23 230:10
**designed** 189:25 190:4 194:1 205:5 208:13
**designs** 178:1 184:3 208:8 209:19
**details** 211:10
**determine** 71:23 77:8 94:24 97:17 162:19 171:14 184:8 186:1 207:21 232:15 244:23 250:1
**determines** 171:10
**develop** 134:8 135:14 138:9 140:4, 14,15 226:14
**developed** 96:2 97:17 106:5 140:16,17
**developing** 234:2,5
**development** 229:7 295:4
**develops** 139:19 141:9
**device** 271:25 288:18
**devices** 288:10,11
**Dexilant** 116:19
**diabetic** 63:11
**diagnose** 38:24 39:7, 15 112:13 115:21 117:21 131:7,12 137:10 143:5 278:11
**diagnosed** 53:14 98:8 135:5 225:5,

19 233:3
**diagnosing**
52:1 115:14
**diagnosis**
106:13 229:4 272:8
**diagnostic**
38:23 274:6 275:6 279:6, 24 281:15,19
**dialogue**
240:4
**diarrhea**
64:9
**diet**
175:11 211:6 255:18 261:1 265:18 266:8 268:15 306:12,24
**dietary**
55:19 56:4 77:11,13 79:1,18 80:4,9 175:11 235:15 255:8 257:4 258:11,21 259:3 261:7, 16 262:21,25 263:12,18,23 264:1,3,16 265:6,15,16, 20 266:2,5 303:10,17 304:11 306:3,7,10 307:2
**diets**
235:21
**differ**
43:16
**difference**
176:23
**differences**
117:16 216:8
**different**
28:15 30:7 32:24 36:7 38:3 40:19 41:14,18 42:8 43:11, 17,18 46:10 48:6,7,12 52:25 53:2 56:4,8 57:3 68:3,23 87:12 89:3 108:17 110:3 118:9,15 131:24 135:12,23 137:5 140:8 141:7 143:4, 6 145:18,21, 23,25 147:12 152:1,24,25 154:23 155:23 165:24 167:20,22 168:6 169:14,23 172:7 173:18 177:25 178:1,2,9 179:8 180:6 184:3,20 189:18 192:3 207:4,5 208:8 209:19 215:1,20,24 216:9,11 227:15,18 228:9,10 229:21 230:23,24 231:1 243:24 272:1 281:24 307:7,8
**differential**
235:11,13, 18,23 238:1
**differentials**
34:10 40:17
**differently**
135:22 142:22 230:25
**difficult**
217:3 219:9
**digest**
146:13
**dilations**
49:13
**dimethylamine**
55:8
**dinner**
122:3
**direct**
7:3 304:2
**direction**
236:19
**directions**
46:11
**directly**
78:2 120:9
**director**
31:25 32:3 36:11
**disagree**
204:11 282:25 283:8
**disagreement**
280:23
**disapproving**
51:3
**disclose**
14:9 129:6, 11,23 130:6, 8 272:9,14 273:8,13 281:8 288:21
**disclosed**
288:12,16
**disclosure**
272:10,15 288:18
**disclosures**
271:4,7 273:2 278:2, 4 281:18 288:4 305:18
**disconnect**
71:16 168:4
**discuss**
40:24 54:16 60:6 65:1 77:24 81:18 115:7 116:2, 25 117:3,5, 18 122:25 231:19 253:12 264:22 283:6
**discussed**
37:8 38:10 44:4 51:15 59:14 194:7 230:9 275:11 276:8,15,23 288:19 293:16
**discusses**
265:2,4,6
**discussing**
171:2 193:16
**discussion**
204:10 264:13,15 289:9
**discussions**
31:7
**disease**
38:17 39:16 45:5,9 56:25 101:3 103:3, 21,24 104:25 122:14 141:16,21 142:4,10,18, 19 143:19 153:3 164:21 167:3 171:1, 7,15 172:6 214:7 221:6, 8,9 225:20 246:21 271:15 275:8

278:11 297:23
**diseases**
166:24 167:1 284:10
**disk**
35:20
**disorder**
106:5,7
**disorders**
39:13 49:14 58:24 162:23 278:14
**disregulation**
154:6
**distantly**
108:11
**distracting**
31:2
**Diversitech**
288:17
**divide**
195:9
**division**
31:25
**divisional**
46:21
**divorce**
64:19
**DNA**
53:1
**doctor**
6:15 7:5 16:13 17:1 21:13 24:18 27:13 28:23 30:2 31:15 41:3 46:4 53:19 80:14, 20 84:22 89:6 92:16 95:21 96:17, 24 102:11 105:14,17 109:2 118:25 121:1 123:18 131:1 132:18 138:15 140:2 141:14 146:2,17 150:22 160:15 166:5 168:1 171:13 182:1 185:6 209:1 210:12 224:9 228:2 229:1 231:2 235:3 238:11 239:13 240:7 242:9 244:20 245:6,19 247:20 248:24 249:15 252:20 255:3 258:14 259:18 260:14 261:4 264:12 267:24 269:3,16 270:24 271:19 273:17 275:2 278:17 280:10 284:7 285:10 287:6,10 289:19 290:9 291:14 292:6,21 294:11 301:20 302:6 304:25 305:10,16,20 307:17
**doctors**
45:15 113:10 123:6 273:12
**document**
10:7 12:6,10 17:1 29:23 96:12 274:10 277:19 278:3 279:2,13 280:15 281:20 282:14 283:16,25 284:7,13,19 285:3,11 286:8,9,15, 19,22,23,25 287:13 288:4,6 304:16,25 305:3,9,17, 21
**documents**
10:14,16,18 12:12 13:2 15:22 16:11 18:9,11,15, 19 19:11,18, 24 20:5,13, 16,23 21:5,7 29:16 60:21
**dog**
69:9 169:20 263:1
**dogs**
55:17
**doing**
30:8 32:10 33:25 41:16, 19 42:3 49:13 110:16 112:8 120:16 124:22 127:14 134:22 145:10 151:4 159:15 184:16 189:6 191:12 207:8 212:22 213:11 214:16 215:9,11,14, 21,25 216:10,15,19 219:10,17 220:5,18,20 228:17 271:11,13, 16,24 282:15 288:21 289:4
**don't---**
12:18
**door**
276:25 277:6
**dose**
68:23 69:2 99:21 183:8 187:8,9 193:18 194:2,4 201:13 202:13 203:2 214:22 231:5,11,23 232:2 234:9 266:9
**doses**
56:4 62:17, 23,25 64:4, 14,19 66:3, 16 67:1,2,22 68:5,11 69:2,4 70:11,23 71:18 72:20 73:14 74:23 76:17 151:10 246:10 249:4,5,12 256:21
**dosing**
117:22 152:2
**dots**
201:15
**doubt**
120:24
**draw**
304:1
**drink**
69:9 78:7 86:24 106:3, 6,13 107:23 135:17,24 136:14

139:13 146:21 164:18 169:20 256:13
**drinking**
79:13 134:12 140:20 142:1 163:8 185:9, 11,16
**drinks**
106:4 172:5
**drive**
217:22 236:10
**driven**
220:7
**driver**
217:15
**drives**
219:8
**driving**
193:22 217:22 236:13 237:14
**dropped**
189:4
**drug**
39:25 63:9 88:15 89:14 91:25 92:1 100:11 117:7,19,20 128:2 130:14 172:23,24 182:25 183:1 185:6 190:14 191:19 192:5,8,18 218:2 224:1 225:2,8,10, 20,21 226:13 235:25 236:1 237:17 238:5 253:5
**drug-induced**
291:16
**drugs**
55:25 172:21 192:2 212:25 223:12 253:2
**due**
225:22 227:21 228:24 303:13 304:7
**duodenum**
57:7,10
**duration**
183:22 231:5,11 232:2 246:3
**dying**
133:16
**dyspepsia**
57:11

**E**

**earlier**
68:2 119:24 123:18 124:22 140:6 152:10 224:11 256:7 260:20 293:16 306:2
**early**
23:6 32:8 43:9 46:15 289:10 300:14
**ease**
44:3
**easier**
42:23,24 276:2 285:13 306:24
**easy**
143:6
**eat**
49:11 86:25 142:9 146:18 147:7 148:1, 5 151:3 155:13,16,17 163:7 164:13 165:4,7 167:6,12 169:19,20 235:17
**eaten**
147:19
**eating**
155:14 157:9 167:16
**eats**
46:24 157:10
**ecologic**
174:17
**ecological**
174:15
**Ecology**
174:16
**editing**
128:22
**educate**
114:25 115:19 123:14 133:18
**educate-**
112:8
**educating**
118:11
**education**
23:12 112:13 117:21 133:17
**educational**
23:17 109:18,22 110:3,12 111:1,19 112:9,11,21 113:11 115:4 118:14
**effect**
51:7 62:17, 22 63:1,5,9, 12 136:17,18 137:1 148:13,20 149:11 182:21 208:24 235:1 237:25 253:2 291:15 295:3
**effective**
45:21,25 58:22 115:16 128:7,16 192:8,16 213:7,16,22 221:12
**effects**
60:5 157:6,7 176:22 182:18,22 223:13,25
**efficacies**
223:13
**efficacious**
220:24 221:2,3
**efficacy**
39:25 60:4, 10 128:1 157:8 172:25 173:1 182:20 212:25 218:4 253:3
**effort**
52:5 238:25
**efforts**
40:2
**eight**
287:21
**either**
53:1 92:24 111:12 118:17 129:20 157:1 159:25 161:11 177:23 186:5 236:19,20 266:10 302:2

**electrode**
155:10
**electronic**
10:19 11:24
16:17
**electronically**
9:8 12:3
**element**
53:17 193:12
**elements**
179:23
**elevated**
88:9
**eliminated**
144:15
**else's**
281:23
**email**
9:10,13,14,
24 15:7
274:1 282:24
**emails**
274:9 277:7
**emerges**
94:14 229:15
**Emery**
20:2,4
**emphasize**
194:23,24
197:20
272:21 281:1
**emphasized**
197:20
**empiric**
284:20
**employed**
267:9
**employee**
266:18
**employees**
267:3
**employer**
31:13
**employers**
266:13,17
**employing**
267:6,7,8
**emptied**
147:19
**empties**
148:21
**empty**
146:24
147:1,20
148:8
**emptying**
147:12,17
148:10,11,14
149:10,12,22
150:10
**enantiomer**
110:11
**encompassing**
22:18
**end**
19:3 26:14,
15 46:15
61:22 64:18
81:19 82:4
84:9 89:24
125:1 147:1
149:18 154:3
160:10
178:25
190:10 224:8
225:18
227:23
231:18
243:10
244:10
254:10
256:17,22
270:25 271:3
288:3,6
**ended**
106:7 113:17
176:4 213:10
**endogenous**
75:23 88:20
**endogenously**
88:12 92:6
**endoscopic**
50:2
**endoscopically**
53:15
**endoscopies**
32:10 37:19
132:2
**endoscopy**
32:3 39:8
47:6,14
48:3,9,13,22
50:1,3
134:23,25
**engage**
115:3,6
117:25
121:21 123:6
**engaged**
38:11,18,20,
22 39:18
40:9 41:25
42:11 113:2
289:10
**engagement**
114:14
**engagements**
112:24
113:14
114:8,11
116:1,17
289:11
**engaging**
114:21
**enroll**
112:6
**ensure**
192:17
277:18 279:2
280:15
**entails**
48:20
**entire**
100:7 277:13
**entire-**
264:10
**entirety**
103:13
**entitled**
286:8 293:11
294:13
296:9,24
297:11,22
298:11,23
299:12,25
300:24
301:11
**environmental**
174:19 307:2
**enzymes**
183:3
**EPA**
66:14 67:18
75:5 76:15,
25
**epidemi-**
171:17
**epidemiologic**
54:20,23
58:18 59:10
61:12 65:20
78:23 79:22
81:20 89:1,
17 90:9,18
91:1,13,19,
22 92:8,9
94:5,16 95:2
97:10 100:9
157:20
159:7,15,21
172:11
177:24
185:13
191:13 225:1
230:8 236:7
255:20
256:15
307:12
**epidemiological**
58:12,25
74:12 90:12
91:4 92:19
93:7,23
94:23 95:22

96:7 171:10, 16 172:15 186:2 255:5 303:4,7
**epidemiologically** 207:16 260:10
**epidemiologists** 174:11
**epidemiology** 33:3,19,24 34:17 36:16, 18 170:19,22 171:14,18 172:2 173:4, 24 185:1 196:19 197:15 224:10 227:14 260:21,25 267:1 307:4
**epithelium** 39:8
**equally** 79:14 80:6, 15 220:21 221:6
**equate** 64:12 68:17
**equation** 189:10
**equivalent** 181:18
**era** 110:10 176:7
**eradication** 133:11
**error** 196:2,3,14
**escape** 42:6
**esomeprazole** 43:14,23 110:11
**esophageal** 39:12 59:2 66:25 70:20 106:3,4 131:14 137:10,11, 13,15 140:24 146:8 272:3 296:10
**esophagitis** 138:6 153:2 221:3,9
**esophagologist** 33:5 37:9
**esophagology** 33:6 37:12, 15 40:2
**esophagoscopy** 48:14
**esophagus** 38:23 48:14, 18 49:6,15, 21 53:7,9,13 142:13 146:15 272:2 297:24
**esophogeal** 33:6 106:5
**essen-** 170:25
**essential** 232:2
**essentially** 26:19 43:15 44:21 58:16 70:9 82:6 90:3 92:11 94:4,6,18 99:20 133:2 141:23 146:6 154:8,16 165:14 170:25 172:8 173:8 174:16 191:6 193:20 226:11 228:21 235:5 237:1 249:13 255:16 259:12 260:12 262:14 290:20
**established** 69:6
**establishing** 269:23
**estimate** 14:24 176:11 178:5 188:14 193:14 201:15 203:15 229:17 230:1 237:14,20 241:3,22,24 262:8 306:13
**estimates** 189:21
**et al** 97:5
**ethical** 182:3,5,8
**Europe** 40:20 83:10, 19
**Eva** 8:25 14:4 28:17 93:2 162:15 239:9 240:2,11 264:25 289:20 300:19
**evaluate** 77:16,23 184:7 260:3
**evaluated** 94:23 95:23 96:7 97:8 177:16 245:20 259:24 260:15 265:8
**evaluating** 38:22 39:25 65:23 179:20 193:8 225:25
**evaluation** 11:11 77:7 251:11 269:8 305:5
**evasive** 111:23
**evening** 302:23
**event** 157:13
**events** 118:9
**eventual** 106:13
**everybody** 8:5 224:1 230:24 232:12 265:23 282:25
**everyone** 105:9 115:2 170:13 213:21,22 214:13 302:17
**Everyone's** 247:12
**evidence** 16:6,8 58:11,13,18, 25 62:3,6 64:22 65:22 66:6,9,17, 20,23 72:5,9 80:3 81:21 82:3,6 85:11 88:17 190:24,25 195:24 196:17 197:10 198:13 207:15

208:19,25 244:23 252:9,13 254:11 255:5,20 256:19,22 259:9,11,17
**ex-** 171:2
**exact** 108:24
**exactly** 11:4 31:17 81:19 102:24 273:6
**EXAMINATION** 7:3 302:21
**examples** 53:3 180:22 237:21
**exceeded** 266:15
**exception** 124:20
**excessive** 144:22
**exchanges** 145:3
**excitement** 176:22
**excluded** 47:7
**excluding** 187:22
**excuse** 70:2,10 111:4
**exhibit** 10:1,4 16:14,15,22, 24 17:2 22:24 23:1 24:23 35:3,4 58:4 269:13, 14 270:11,13 272:18,19 284:4,5 291:11,12 292:18,19 293:6,7 294:8,12,25 295:16,18 296:6,7,19, 20 297:8,9, 18,21 298:6, 7,19,21 299:8,10,20, 21 300:17,22 301:6,9 304:16
**exhibits** 27:24 291:9, 10
**exist** 174:24
**existence** 196:18
**exists** 176:14
**exogenous** 205:15
**exogenously** 88:12
**expand** 88:7
**expect** 27:18,21
**experience** 216:2
**experiment** 197:18
**experimental** 62:5
**experiments** 84:15
**expert** 8:14 10:24 11:15 12:14 13:21 14:16 15:4,11,12, 15,22 16:13 17:3,23 18:2,3 20:17 21:15 22:22 23:5 25:20 30:3,6 31:11 50:7,10 51:1 52:13,16 58:10 59:13, 19 85:21 105:18 106:9 107:4 161:17 267:6 273:1 274:14 275:12 276:8,15,16 278:4 281:6 282:10 288:21 301:22 305:5
**expertise** 14:3 39:22 41:2 107:8, 12 113:11 118:23 119:10 122:2,12,18 123:13 128:8
**experts** 17:24 121:7, 11,13 122:11,15,17 250:21 259:16 260:8 272:3,7 283:2
**explain** 141:16 162:25
**explaining** 154:18
**explains** 90:8
**explanation** 65:19
**expose-** 173:9 193:7
**exposed** 68:15 78:8 95:15 98:12 102:24 135:13,23 140:13,20 174:10
**exposure** 66:16,23 68:16,21 77:19 95:17, 24 96:6 97:8,10 98:19 99:4, 12,20 101:8, 11,17 102:13 135:6 139:10 171:3 172:20 173:13,15 175:4,17 180:13 183:21,22 185:14 186:14 187:7 193:7,8 205:15 226:3,12 228:15 229:4 230:3,4,8, 15,22 231:4, 10,23 232:2, 11,14,17,19 233:9 234:16,17 235:9,25 236:18 241:14,18 242:4,11,16 244:6 245:12,20 246:5,6,13 262:13 292:22 303:11 304:11 307:4
**exposures** 171:5 174:17,18 246:2
**expressed** 87:19
**extend** 46:23 67:24,

25
**extending**
48:6
**extensive**
69:25
**extent**
155:2 270:4
**external**
277:21
**extraesophageal**
115:12
284:9,22,24
**extrapolate**
306:15

**F**

**face**
87:4
**faced**
190:13
**fact**
9:13 34:15
45:6 66:7
68:7 69:5
76:16 80:2,
16 81:16
82:13 83:15
100:21
110:25
112:18
133:10 158:2
181:8 186:20
191:1 201:22
203:4 215:6
225:11
227:1,23
235:18
251:19
277:12
**factor**
133:4,14
135:2 137:23
138:2,14
142:5,7
144:25
154:15
161:15
174:20
208:6,7,12
209:23
231:22
254:10
**factored**
222:24
**factors**
135:10,18,24
136:6,12
138:3 140:19
141:24
162:2,19,21
165:25
174:19
184:24
187:2,5
188:24 190:1
191:1,23
199:19
208:1,6
210:23 211:1
230:21
236:4,12
241:2 243:5
253:13 255:8
**facts**
15:19 59:17
246:23
**faculty**
36:5,6
275:12
276:8,17
277:16
279:8,14
280:6,12
**fail**
129:16,17,19
**failed**
181:9 194:3
**fails**
86:23
**fair**
12:1 15:19
19:11 24:18
25:21 43:3
46:22 47:13,
15,16 48:13
50:4 51:10
52:9 70:8,9
160:21
162:9,17,23
164:8,21
166:5
167:12,23,24
169:12,13
171:6,14
177:1 182:2
183:11
222:15 257:1
278:1
**fall**
127:13
129:17
134:15 184:4
185:10
**falls**
175:2 193:13
260:24
**false**
185:18
190:11
236:11
**falsely**
88:9,22
**familiar**
45:19 114:18
172:22
**familiarize**
160:5
**family**
89:5,7
**famotidine**
44:16 86:6
191:17
192:24
295:22
**far**
26:1 27:18,
21 51:20
74:24 78:5,9
79:6 99:20
108:13
132:24
161:24
166:22 199:4
217:22
223:21
245:25
250:22
255:17,21
256:11 257:7
258:12
259:7,17
260:20 307:2
**fashioned**
11:19
**fast**
146:22,24
147:1,20,24
165:3
**fasting**
166:16
**fat**
148:2
**fatty**
148:1
**FDA**
18:9,11,15,
19 20:4
22:5,6,7
43:18,20
50:11 54:9,
13,18,19
60:10 62:19
63:3,5,7,14,
15 74:7,11
75:23 76:2
78:21,25
79:17,21
80:5,8,19
81:19 82:1,
12,14 83:8,
14 84:2,8,
14,21,22
85:10,17,19
87:19 88:10
89:24 90:1
91:11,12,16
92:2,3 94:4
125:25
127:16,23

173:1 215:17 223:3 247:23 257:9 262:1 263:5,10 266:6,16 268:3,8,13, 16,23,25 306:22

**FDA's**
81:10 88:19 267:1 269:1

**fear**
90:10 175:21,22 176:15,21 190:22 215:13

**fears**
91:10

**feel**
18:8 85:15 88:23,25 89:2 94:21 143:16 145:10 157:3,23 219:17 264:22

**fell**
128:8 263:7

**fellow**
36:5,6

**fellows**
32:24 134:17

**felt**
12:19 30:1 273:8 278:12

**fiber**
148:6,8

**field**
38:13 47:2 67:15 121:11,13

**figure**
157:6 201:4, 5 202:4 227:17 228:12 287:18 293:23,24

**figures**
307:14

**file**
11:19

**files**
10:15,19 18:4

**fill**
103:2 246:15

**filled**
103:23 104:25

**final**
277:19 279:9 280:13 300:14,18 301:5

**finally**
11:20

**find**
22:19 27:4 39:8 46:18 110:18 124:17 128:1,6,14 132:9,14,17 149:19 166:1 175:21 176:19,20 183:2 186:5, 10 191:22 194:15,19 196:4,5,25 198:23,25 200:6,8 216:3 219:4 225:7 226:12,18 265:20 291:3 303:12 304:6

**finding**
186:23 195:24 198:18 200:13 264:4

**findings**
84:16 272:5

**finds**
198:4

**fine**
170:5 300:21

**finish**
206:5 239:17,22 283:16 307:21

**finished**
92:16,17 206:4 240:16

**finishing**
35:15

**Finken**
7:4,5 10:2 13:24,25 14:13 16:16, 25 18:14 19:2,6 20:10,12 23:2 24:24 27:14,24 28:1 57:18 58:1,5,7 80:13 83:23 92:22 93:2,5 96:13,16,18 102:2,4,7,10 105:2,4,13 111:6,7 116:11 148:18 150:3,7 156:8,22 162:13,16 166:4 169:18 170:4,8,17 177:6 183:16 192:12 198:10,12 204:4 206:8, 14,16 209:9, 12,13,24 210:3,11 212:5,6 234:4 239:7, 9,12,16,18 240:1,6,11 246:24 247:7,16 256:1 263:15 264:24 265:5 268:5 269:15 270:14 272:13 274:12,13 275:23 276:3,4 283:11,16,24 284:6 285:16 286:13,17,21 287:9 289:25 290:8 291:13 292:20 293:8 294:9,21,22 295:1,12,14, 19 296:3,4, 8,21 297:10, 19 298:8,22 299:11,22 300:19,23 301:10 302:13 303:15 304:9,18,20, 23 305:14 306:8 307:19

**firm**
15:12 107:22

**first**
7:22 14:15 17:22 20:14, 21 25:3,11, 19,22,23 35:16 44:15 64:13 68:7 69:18 99:1, 2,3,7,11 105:22 107:23 108:18,22 151:24 175:3 190:20 200:6

212:7 213:2, 18 217:25 235:7 240:14
**fit**
119:9 122:19,21
**fits**
36:19 118:22
**five**
45:23 59:9 63:20 66:24 67:5 70:19, 24 72:17,18, 19 73:7,11, 15 74:25 76:16 77:9, 17 78:4,12, 13 89:1,19 90:18 95:11, 12 119:18,23 135:7,20 140:13,16 170:6 189:6 207:17,18,20 209:25 210:1 229:9 247:4, 5 256:16 258:4,25 259:14 260:9,10,24 283:22 290:13,19,25 307:15
**five-minute**
170:2 209:7 247:7 283:15,18
**flawed**
199:1,2
**flaws**
81:14
**flipside**
148:5
**floppy**
35:20
**Florian**
79:21 82:5
**Florida**
6:3
**fluctuations**
210:23
**focus**
64:21 70:22 85:18 115:12 121:10 202:20 203:18 274:6 284:22
**focused**
18:5 63:21 66:23 72:17
**focusing**
202:22 205:4
**fold**
89:11
**folds**
152:24
**follow**
85:20 96:16 101:8
**follow-**
193:2
**follow-up**
95:4,9,24 97:23 98:6, 10,14,17 99:16,20,25 100:6 101:11,16 103:8,14 229:2,3
**followed**
18:21 97:11
**following**
99:9 120:11 191:20 257:6 298:23
**follows**
6:24 158:12
**food**
55:15 146:13,17,21 147:5,19,25 162:21 163:15 167:24
**forget**
11:4 128:4 129:20 176:1 226:5 270:4, 7 273:6,10 282:22
**forgive**
42:5 185:4
**forgot**
53:16
**form**
12:17 18:13 50:22 60:24 62:8 65:2,25 67:13 70:16 71:8 72:13 73:19 74:2, 22 75:9,14 76:11 79:4 81:4 83:6 87:14 90:15 91:6 97:18 98:21 103:15 111:5,10,21 113:4,15 114:23 116:6,10,21 118:2,10 119:3,19 120:6,13,23 121:17,23 122:5 123:1, 10 126:7,21 127:12 128:24 129:14,25 134:2 136:11 137:2 140:5 148:17,22 149:13 161:21 162:24 164:22 167:13 168:13 169:5,17 177:5,19 179:22 183:15 185:23 188:5 189:15 192:11 200:16 201:20 204:3 206:13 208:10 209:21 210:24 211:8 216:7 217:21 221:1,16,22 222:2,7,11, 12 223:1,20 228:7 229:5 230:6 231:6, 12 232:3,16 234:3,8 238:7,19,22 241:8,17 242:7,25 244:7,25 245:15,22 246:17 247:22 248:3,8,17, 22 249:1,8, 11 251:5,15 252:4,17 253:8 254:3, 19 255:1,25 256:4,9 257:2,15 260:5,18 261:8,18 263:14 266:17 268:4,18 270:1 272:12,16 273:5,14,23 274:24 278:6 279:17 280:16 281:10,22 282:5,11 285:5 286:5

289:14 291:25 293:3 303:15 304:9 306:8
**formal** 61:24 62:2
**formation** 144:12
**forming** 15:21
**forms** 256:19 285:8
**formulary** 215:3 216:5, 9,11,12
**forth** 23:24 274:1 283:7
**forward** 66:8 173:14 179:5
**found** 64:15 70:13 80:6 81:14 176:4 185:6 187:1 211:16,19 226:24 241:13 242:4,10,19 261:5,15 262:20 266:3,14,15 267:12 306:4
**Foundation** 259:20
**four** 156:13 207:18 258:7,23 260:10
**four-year** 35:24 36:1
**FPR** 6:2
**FPR-C** 6:2
**fracture** 190:15
**fractured** 185:12
**frame** 96:5 98:8 221:13,19 226:16 289:4
**Frank** 288:8,10
**free** 264:23
**frequently** 157:10
**front** 9:3 16:19
**fund** 125:5 259:19
**funding** 129:9
**funds** 111:13

G

**Gamble** 114:6
**gastric** 53:4 57:6,7, 8 59:2 67:1 70:19,20 131:14 132:18 133:5,11,13, 16 134:25 145:9 148:14 149:10,12,22 150:10 156:12 167:2 207:10,12, 15,22 258:3, 5,22 259:12 260:13 295:3 297:24 298:13 299:13
**gastrin** 150:23 151:7,12,15, 17,18,21 152:3,16,18 153:7,14,16 154:1,4,7,9, 17
**gastritis** 53:7
**gastro** 142:3
**Gastroenterologic** 253:10 274:15
**gastroenterologist** 37:15
**gastroenterologists** 45:15 58:23 253:11
**gastroenterology** 32:20 33:1,4 38:2,13 253:16,20 254:1 269:18 277:23 293:12
**gastroesophageal** 57:4 141:16 142:3 143:19 164:21 297:23
**gastrointestinal** 56:25 162:23 295:23
**gastroparesis** 37:20 38:5
**gave** 24:2 64:14 79:20 85:4 158:3,4,5 187:13
268:14
**gears** 210:12 269:3
**general** 56:8 113:9 161:9 164:1 183:17 189:11 191:14 220:23 231:2,8 257:24
**generalized** 131:25
**generally** 124:17 138:19 152:19 160:18 169:1 177:2 183:17 209:15 223:6 238:13,14 241:6
**generated** 276:15
**genetic** 135:2,18 138:2
**genotoxic** 249:10
**GERD** 56:24 57:13 103:19 115:8 143:20,23 144:6 145:14 213:14 269:9,20 270:15,22 271:5 272:22 281:2 284:10 305:5
**getting** 66:9 68:14, 17 99:23 137:20 139:11 167:17 168:24

169:10 181:13 262:12 289:22
**GI**
113:9 132:11 274:17
**give**
6:18 14:24 30:17 31:15 32:6,13 34:23 45:1 46:6,14 53:3 54:3 61:1 89:4 92:12 94:10 110:6 113:7 115:22 116:7 119:7, 12 120:7 122:1,12 126:2 128:18 132:24 134:2,15 135:10 149:25 151:10 153:7 157:1 158:15 160:12,25 182:5 184:8 203:25 224:1 242:23 260:23 261:21 279:21 281:11 286:24 303:19
**given**
24:9 32:23 33:8 41:1 48:16 68:10 115:9 119:6 162:11,20 166:1 192:2 225:2,3,10, 20 226:13 232:9 236:12 284:19
**giving**
31:8 94:11 118:12,13,15
**Glaxosmithkline**
113:24
**global**
36:19 49:24 54:4,5,25
**globally**
65:3 81:2,23 83:3,4 84:1, 24 160:5
**goal**
61:7 123:11, 12,13,14,16
**God**
6:20
**goes**
53:5 68:22 100:8 113:5 133:9 151:4, 5,7 152:7 155:13,15, 17,21,24 165:9,20,21, 22 226:25 228:16 237:20 249:2 258:8 276:14 277:15 282:25 283:3
**going**
7:6 12:25 15:5,6 17:21 22:19 24:4, 18,21 25:10 30:18 31:3,8 43:19 45:24 47:3 50:24 51:2 55:20 57:15,21 62:19 63:7 64:11 65:13 68:20 78:14 79:24 83:7 85:15,16,23 91:17 101:1 105:7 116:14 122:9 124:8 125:20 131:1,5,19 135:2 138:24 139:14 140:2 146:22,23 147:24 148:2,4 150:20 153:2 159:6 160:12 163:20 164:16 165:7,11 166:10,17 167:5 168:6 170:2,11 171:18 173:14 177:10 181:1,3 183:8 184:20 185:15 187:13 189:17 191:3 194:19 199:5 201:22 206:21 207:12,13,25 209:1,2,5 210:5 211:1 214:7,8,12 215:12,15,23 219:12 221:5 224:9 225:7 228:10,11, 13,21 229:7 230:9,12 232:19 233:10,12, 16,21 234:22 235:1,17,18, 22 236:9,11, 14 238:3 239:5,22 240:5 242:1 246:9,16 247:10,18 255:17 256:13 257:8 261:2 263:4 267:17,25 269:5,11 275:2 277:3 280:17 283:17,21,22 287:23 290:3 291:5 292:1, 6 293:19 294:6,11,23 295:15 296:5,18 297:7,20 298:5,19 299:8,19,23 300:11 301:7 302:6,15 303:24 306:9,20 307:1,23
**good**
7:5 14:22 27:3 33:22 34:13 39:22 41:22 54:7 56:1 57:18 86:16,20 95:1,2 103:25 105:14 109:12 122:14 130:1,2,12, 15,18,23 146:12,19 155:6 156:24 157:5 170:23,24 172:17 178:3 180:10,17 183:2 184:21 185:25 187:11 192:25 193:3 203:17 225:9 226:1 234:20,21 247:3 272:7

273:24 283:13 302:23
**goodness** 68:5 69:7 102:24 153:18 207:8 243:3 265:22
**Google** 21:18,19 24:15
**Gotcha** 154:18
**Governing** 274:18
**grade** 53:12
**grades** 141:7
**gradient** 197:18
**grant** 36:13 111:18 123:19 124:1,5,18 126:14
**grants** 13:3 111:2
**graph** 207:16 209:15 225:15 237:16 292:2
**graphs** 26:24 61:21 178:25 227:25 290:21
**gray** 36:8
**great** 8:7 12:22 43:5 76:19 92:3 134:21, 22 138:10 143:22 176:21
184:15,16 210:3 283:17
**green** 201:11 205:1
**grind** 147:5
**group** 52:4 57:6 122:15 147:14 161:9,15 163:25 172:7 182:7 220:16,17 307:11
**grouping** 236:18
**groups** 167:4 208:8 209:19 237:1
**grows** 141:9
**GSK** 8:19 19:25 20:5
**guess** 27:10 53:21 67:14 120:7 122:9 139:7 150:17 159:9 161:7 178:12 189:3 194:3 235:7
**guidance** 274:18
**guidelines** 87:3 90:1 212:21 213:14 282:3
**gut** 164:7,16 210:14 211:7,20
**guy** 32:17

**H**

**H-PYLORI** 299:13
**H2** 40:14 44:9, 11,18,21 45:3,10 46:1 60:8 63:10 87:10 113:20,22 144:9,17 145:25 146:1 150:14,16 153:10,12 155:2,19 157:2,12,23 158:6 161:11 164:4 167:8 172:22 193:1 201:11,24,25 202:12 205:2,19 213:4,19 214:10,15,16 220:9,13,18, 20 221:7 301:13
**H2ra** 217:13 218:19 220:4
**H2ras** 42:17,18,21 44:5,7 56:21 86:4 113:14 144:2 145:13,15 149:11 150:13 154:22 159:25 211:25 212:2,10,12, 16 214:1 215:1 218:10 219:22 220:24
**Habel** 297:8,15 301:24
**habit** 9:6
**hair** 46:11
**half** 170:3 247:5
**hand** 6:16 63:19 64:20 78:2,3 79:7,9 91:25 92:1 191:9 241:21 258:13 307:3
**handwritten** 11:23 12:2
**hang** 56:17
**happen** 28:14 84:5 153:8 194:12 270:24
**happening** 213:9
**happy** 27:3 37:4 40:25 55:1 89:4 110:18 141:17 162:8 184:1 200:8, 18 205:5 244:16 263:20 270:8
**hard** 24:14 87:4 163:22 187:10 190:20 219:11 264:4 306:25
**hate** 155:25 163:8
**hazard** 186:5,17 199:13

**head**
13:12 107:2
**healing**
221:2
**hear**
8:2,5 267:8 289:21
**heard**
107:20 109:2 121:1 122:7 136:1 139:3 218:1 224:10 235:21
**heart**
172:6
**heartburn**
38:5 45:22 86:1,9,15 103:2 142:25 143:1,6 154:11 220:8 224:21
**heat**
248:6,11
**Helicobacter**
133:2 299:14
**help**
6:20 45:17, 22 49:3 109:17 147:10,11 213:18 214:7 271:16 284:23 285:25 286:11 287:3
**helped**
34:1 44:22
**helpful**
33:14 35:3 101:24 251:17 287:22 289:23
**helping**
46:3 172:8
**helps**
57:9 146:13 179:24 286:24
**Hepatology**
269:18 277:23
**hesitant**
218:1,6 219:2 304:1
**hesitation**
89:21
**hey**
109:14 112:4,19 124:24 125:8,14 126:1 127:19 151:6 216:13 217:24
**hi-**
259:2
**hierarchy**
173:23 174:13 259:1,3,10
**high**
53:12 54:12, 17,20 56:6 62:16,23,25 64:4,14 66:3,16,23 67:1,2,21 68:4,11,15 69:2,3 70:10,23 71:17 72:20 73:14 74:17, 23 76:17 81:8,15 87:19 88:8, 22 89:10 90:20 95:17 99:21 133:15 134:13 148:6 151:10,12,21 152:15,17, 18,21,22,23 153:4,5 154:4,9,10 176:11 178:21 183:8 232:17 246:6,10,13 248:11 249:4,5,12 256:20 262:25 265:21 274:19
**higher**
136:15 153:2 155:2 169:6 214:22 234:16 263:8,19,24 264:7,9 268:3
**highest**
91:9 226:23 266:9
**highlight**
254:6 275:25 276:2
**highlighted**
22:11 82:4 126:23 158:1 201:13 213:14 217:4 220:11 237:12,15 260:20 274:7 303:16
**highlighting**
219:14
**highly**
135:1 140:17 177:10 190:23 254:7,14 267:19
**Hill**
193:23 197:11,14,21 198:3,17,22 199:17,23 200:6,11,13, 17 207:25 208:2,6,18, 20,22 209:16 244:22 256:7,24 257:11,17 258:11 290:11,13, 15,24 291:3, 5 303:3
**hip**
190:15
**hired**
109:25 110:1
**histamine**
42:12,16,18 145:15,16, 19,20 146:1
**histamine-2**
296:24 298:12
**history**
232:11
**hoarseness**
48:17 125:9 142:22
**hold**
13:1 34:3 96:24 131:3 140:24 141:4 168:8
**holds**
140:25 150:12 165:18 217:13
**honest**
18:5 20:2 21:3 107:19 183:19 266:20 278:15 279:21 289:15
**honestly**
108:24

**Hong**
32:12 118:14
**hope**
24:11 33:12, 13 39:17 56:7 139:24 181:8,14 191:1 195:21 200:3 252:11 256:18
**horrible**
162:13
**hospital**
37:22 38:1 47:18,25 48:2,3,4,5 49:18
**hospitals**
48:6
**hosted**
275:14 276:10
**hot**
55:17 69:9 169:20 263:1
**hour**
57:16 147:20,21 170:3 209:6
**hours**
27:8 29:3,4 34:11 46:10 47:5,7,8 54:2 147:18 156:14 247:5
**house**
35:22
**HPV**
137:22
**huge**
147:23
**human**
63:18 65:11 66:10 76:24 77:3 80:25 151:1 249:16 250:13 251:22 252:16 255:6 256:25 257:13,19 303:4,8
**humans**
64:17 65:13, 20,24 66:6, 17 67:20,25 68:6,11,14 69:6 70:11 71:3,7,23 75:13 77:9, 18 78:12,14 79:2,19 80:10,22 88:5 151:15 205:15 207:14 254:12,18,25 256:22 262:11 304:7
**humidity**
248:7
**hundred**
173:10,11 195:5
**hung**
167:17 211:4
**hydrogen**
55:11
**hydrogens**
55:11
**hypertension**
172:6
**hypothesis**
76:4 79:24 149:15 157:19 158:21 159:3,18 205:14 207:13 241:10 259:7
**hypothesize**
84:5
**hypothetical**
232:20 233:22 234:22 238:20,23 239:1,2 240:23 244:15 257:25

**I**

**I--**
17:2
**I-A-R-C**
76:25
**i.e.**
94:4 100:18 191:17 199:14 207:12 208:23 225:2 243:11,14 306:13
**IARC**
67:18 75:5 76:15,25 133:25 249:16,19,25
**ice**
86:25
**idea**
14:23 32:14 46:14 94:11 104:2 163:5, 11,14
**ideal**
129:15 130:4 192:20
**ideas**
122:16
**identification**
10:1 16:15, 24 23:1 24:23 269:14 270:13 284:5 291:12 292:19 293:7 294:8,25 295:18 296:7,20 297:9,18 298:7,21 299:10,21 300:22 301:9
**identified**
29:17 132:6
**identify**
91:3 92:18, 24 93:6,12, 22,25 99:4 131:23 132:4 292:8,10 300:20
**identifying**
13:2
**idines**
44:17
**ignore**
226:23
**ignoring**
188:12
**II**
196:2,14
**imagine**
23:10 278:21
**imbalance**
141:23 142:4,8,16 143:8
**impact**
90:24 149:16 237:20 241:10,22,23 257:7
**impacts**
130:19
**impedance**
288:17
**implemented**
86:14
**implementing**
86:17
**imply**
188:1 189:13

**importance**
173:23
174:7,14
189:14
190:8,9
243:12 254:4
274:19
**important**
34:15 35:23
46:3 53:17
55:22 68:1
69:2,3 75:24
76:5 84:10,
17 88:13
138:2,14
164:24 176:6
180:5 188:16
189:7,8
190:1,9
193:14
196:7,25
224:13,16
227:14,22
229:10
230:3,15,16,
17,21 232:5
240:22
254:7,14
256:21
257:10
266:11
267:20 291:5
**importantly**
180:8
**improper**
228:15
**improve**
134:18
**impurities**
55:24 56:1,2
89:13,15
**in-person**
32:9 106:17,
18 277:9
278:22
280:19
282:15 283:4
**inability**
255:10
**inaccurate**
17:20 196:20
**inappropriate**
50:20 117:10
195:2 200:14
228:4 229:19
**incidence**
133:10,13
**incidents**
262:10
**include**
9:23 127:2
130:3
162:21,22
226:15
**included**
12:13
257:13,19,
21,22
**includes**
9:20
**including**
9:24 59:2
81:20 113:1
141:22 179:4
186:8 202:25
**incorrect**
138:12
190:17
195:16
202:23
203:8,10
280:12
293:24
**incorrectly**
202:16
203:10
235:20
**increase**
135:3 157:16
158:25
159:25
160:1,18,20
161:19,22
165:15
167:16
168:10,11,
15,17,18,19
234:1
248:15,21
**increased**
63:20 64:5,7
137:20 154:1
183:3 233:5,
24
**increases**
48:8 156:3
157:10
160:21 248:6
**increasing**
156:21
157:6,9,15
172:14
**incurred**
26:9 27:1,8
**independent**
19:13 157:11
**independently**
136:19
**index**
99:10
**indicate**
58:9 97:23
198:2,9
279:12
**indicated**
21:13 62:21
63:23 105:17
108:1 131:3,
6 136:23
137:9 143:17
144:2 150:9
156:2 168:7
170:18
211:22
219:21
**indicates**
200:5,12
275:10
278:17,23,25
279:8
**indicating**
72:4
**indication**
51:3 57:4,5
82:15 83:15
128:2 159:11
175:5
191:17,19
192:2 230:20
236:9
**indications**
57:4,14
116:2 117:2
127:11
**individual**
40:6 171:24
172:4 177:18
179:11,16
180:25
181:16
235:6,8
306:12
**individualize
d**
181:22
**individually**
179:2
**individuals**
126:19
127:2,10
219:10 233:3
236:2,5
238:16
**indolent**
141:8
**induce**
56:14
**industry**
40:1,11 78:8
109:5,11
113:21
115:23
121:3,8
122:8 123:9
129:7,22
255:14
275:13 276:9
**infections**
52:4

**inference**
184:9 193:9
**inform**
223:14
256:23
**information**
21:22,23
104:4 106:23
124:6 129:11
177:14
179:10,14
183:13
222:23
223:2,16
232:1,7
257:20
282:16
306:17
**informative**
115:4 237:17
255:21
**informs**
223:15
**Ingelheim**
114:9
**ingestion**
137:16,22
**inhibit**
286:22
**inhibitor**
157:2 285:20
296:24
**inhibitors**
40:15,16
41:13 43:1,6
44:24 45:11
63:10 86:10
115:8 145:5
153:13
154:25
157:11
161:12 213:5
215:2 272:21
281:2 298:12
**initial**
54:14,17
84:15 88:18
149:18
150:18
151:14,23
152:4 153:9
189:3
**initially**
152:11
**initiated**
125:7,13,17,
21 126:11
**injection**
49:15
**injured**
106:10
**injuries**
146:15
**injury**
146:9
**Innovation**
274:17
**input**
270:7
**inquiry**
71:21
**instances**
182:3,10
**Institute**
274:16
277:20
**institution**
32:2
**institutional**
46:21
**insurance**
177:12 215:3
216:24
217:7,11
**intake**
265:15,16
295:3
**integral**
251:6 252:10
**integrity**
39:11
**intend**
59:7,12
112:17
**intensivists**
45:14
**interchangeab ly**
245:8
**interest**
33:9 35:25
36:13,23
37:15 48:16
70:20 115:13
125:11
277:18 278:2
279:2,13,15,
18 280:2,15,
18,21 288:5
304:4 305:18
**interested**
22:5 64:21
73:7 85:16
124:3
256:12,14,
17,18
**interesting**
89:9 157:18
159:3,18
243:14
**interests**
121:13
**interference**
160:13
255:15
**intermittent**
160:19
**internal**
60:21 277:20
**Internet**
8:2,3 16:3
**internist**
35:24
**interquartile**
96:23 97:12
98:4
**interrupt**
209:1 238:12
239:13,21
240:7,15
**interrupted**
240:9
**interrupting**
239:15,16,17
**interval**
186:12,18,21
187:22
188:8,12,15
189:10,20
**intervals**
180:3 186:8
188:7,23
189:24
199:14
201:16
**intervene**
49:22 53:15
**intervention**
45:8
**interventiona l**
48:24
**interventions**
49:3
**intestinal**
53:5
**intragastric**
162:9
**introduced**
43:9 90:10
**investigate**
88:16 200:1
**investigated**
126:11
**investigating**
224:3
**investigation**
255:22 256:2
**investigator**
125:7,13,21
**investigators**
149:3 178:10
231:16
**invoice**
25:12,15,23
26:4,10
27:2,9

**invoices**
11:9 24:20 25:1,6,11 26:7
**involved**
39:12,13 41:23 108:7 110:2 111:15 114:16 281:13,15 282:21
**involvement**
280:18,21
**involves**
112:3
**involving**
13:3,7 39:19 42:12 93:23 107:7,23
**IQR**
98:1,3
**IRAC**
66:8 250:5 253:6,9,13 254:9,14
**Ironwood**
271:8,12,14
**irrelevant**
30:1 77:25 78:10 79:5, 14,15 80:6, 16,17 91:7 92:9 93:9, 11,13,20,22 164:3 193:20 256:10,11,23 260:19,22
**issue**
73:9 76:3,14 82:3 106:3,4 149:16 152:25 173:2 196:18 216:9,11 217:2,5,8 219:14 224:4 236:6 250:20 306:10
**issued**
251:10,20 252:2
**issues**
33:10 36:15 37:21,24,25 39:13 48:17 51:6 62:17 88:22 117:22 138:3 171:19 196:22 224:7 230:12 251:2 290:17
**issuing**
282:3
**Italy**
83:19
**items**
55:15
**Iwagami**
206:25 207:19 301:11,17

**J**

**Japan**
301:14
**job**
92:3 147:5 154:25 163:4,9 184:16
**joined**
288:17
**jointly**
274:15
**joke**
46:11
**journals**
129:5,24 130:5,8
**judge**
182:11
**jump**
261:2
**jumping**
206:5
**jury's**
44:2

**K**

**Kantor**
294:13
**keep**
16:10 19:3 24:13 30:18 96:11,13 114:2 119:5, 7,21,23 120:20 132:17 176:6 240:19,21 293:19
**kept**
55:24
**key**
109:6,8,10, 13 231:14 241:25
**kidney**
131:21 300:25
**kidneys**
131:22
**kill**
163:20
**kilocalorie**
265:18
**Kim**
205:23 206:10,17,24 207:19 295:2,7,10, 20,25 301:24
**kind**
47:23 139:7 141:11 271:23
**King**
15:13
**knew**
107:1
**knoll**
236:10,15,20
**know**
7:9 8:3,13, 18 12:7 14:20 15:3 19:21 20:3, 5,15 21:2 22:18 23:7, 10 24:12 25:24,25 28:11 30:23, 24 31:1,18 32:21 34:5, 8,9 41:13 43:21 44:10 45:4,19 50:21,23 52:16,17 62:9,20 66:25 68:21 69:12 73:20 75:10 78:5, 25 79:17 80:4,8,18 81:5,18,22 82:21,24,25 83:2,3,8,18, 20,25 84:23 85:1,2,6,12, 14,16,21 86:24 87:15 88:14 89:13 91:9 94:8,18 99:15,16 100:12 106:21,22 107:1,20,25 108:5,11,20 109:12,13,18 110:1,2,5,18 111:11 112:17 113:6 114:2 115:2 119:21,23 121:11,18,24

122:10,13 123:4,11,15 125:2,17,24 129:1 130:16 131:19,24 132:1,5,11, 12 134:1,5, 11 135:3,16 136:20 138:6,8 140:4,7,8,12 141:14,21 145:22 146:20 148:2 149:14,18 157:18 160:10 162:13 165:4 166:6 168:24 169:16 171:3 172:17 175:6,8,20 176:14 178:24 183:3,4,7,18 184:3,4 185:3 186:23 189:16 191:15 193:4,11 196:16 199:11 203:6 209:6 210:25 211:2,10,13, 14,15,17,19 215:19 217:3 218:19 220:12 221:4 222:8,13 223:11,12 224:17 231:19 232:18,21 233:16 234:14,15 235:16 244:15 248:5,9 249:25 250:3,8,9, 10,12,17,19, 22 251:6,7, 11 252:8 255:10,14 259:6 260:6, 7 262:3 263:11 264:4,20 266:12,24 267:19 268:1,6,7,24 270:5 273:15 278:19 279:18 282:7,13 286:11 288:9 289:13 300:8,12 307:25

**knowing**
124:3 181:6 183:21 250:20

**knowledge**
33:22 34:7, 13,21 85:14 305:21

**known**
56:20 179:4

**KOL**
109:2,3,8, 19,20,25 110:1,22 111:8,11

**Kong**
32:13 118:14

**Korea**
298:25

**Kumar**
207:1,19 299:9,16

**L**

**label**
223:2,7,9,17

**labels**
50:11

**lack**
188:1 189:13 196:17 197:9 234:23

**lag**
226:3,9,22 227:3,15,18 228:4,9,11, 13 230:19

**land**
70:12 75:1 78:20,21 80:25 84:12, 13 88:16 160:10 250:4

**landed**
67:19 70:3 74:24 76:14, 15,21 78:15, 17,21 80:24 82:4 149:9

**landing**
69:7 74:14 279:24

**lands**
81:19

**lansoprazole**
43:13,23

**large**
6:3 180:25

**laryngeal**
39:13 48:17 49:1 51:15 52:8 131:11, 14

**laryngitis**
33:7 36:14 128:7 142:23

**larynx**
48:15,18 115:13

**lastly**
212:8

**late**
46:15

**latency**
138:15,23,25 139:4,9,15, 20,24 140:3 229:3

**law**
15:12 107:22

**lawyers**
31:8 108:6, 14

**laymen's**
185:4,19

**lead**
53:8 54:14 85:20 89:19 126:24 127:1,21 146:8 159:1 175:21 229:22

**leader**
109:10,13

**leaders**
109:6,8

**leading**
142:8

**leads**
65:20 145:21 158:21

**learn**
121:24

**learned**
21:18 68:9 133:4 153:5 213:6,8

**learning**
12:8

**learns**
121:21

**leave**
36:20 171:23 214:22

**leaving**
262:14

**lecture**
24:3 113:7 118:12,13,16

120:7 122:1
**lectures**
32:6,13 115:22
**led**
54:15,20 74:11 88:10 128:10 157:20 159:3
**left**
97:4
**left-hand**
97:24 277:16
**leg**
185:10,12
**legal**
6:12 47:2
**length**
95:4,5 97:7 101:7 245:25
**level**
44:23 56:2 65:7,8 74:5 81:8 90:4 91:8,9 92:5 94:6,14,19 95:15 151:7,12 152:3,14 153:13,14,16 154:23 155:21 169:6,23 174:7 177:18 178:10 179:11 215:12 232:17,19 266:6
**levels**
54:12,17 56:6 74:7,17 81:15 87:18,20,23 88:4,8,22 89:10,11 90:25 91:11,13,14 92:2,19 146:10 151:19,21,25 152:16,18,21 153:8 154:1,4,9 168:12,19,23 169:3,13 210:22 211:5,7 246:3 248:11 261:15,24 262:1,25 263:2,5,19,24 265:7,21 266:3,6,14,15 268:3 306:3,7 307:10
**liability**
6:9 7:15 105:22
**lie**
69:11
**lies**
66:13 187:23 202:18
**life**
47:1
**lifestyle**
86:13,17,21 87:5,8 213:1,2
**like-**
219:2
**limitation**
181:10 231:19 241:22
**limitations**
174:21,23 176:16 181:6,11 231:20 233:14 241:15,19 242:6,12,17,20 243:4,16,18 244:9,12,18,19 245:4,18 257:5
**limited**
181:1 234:6 260:12
**line**
233:4
**lines**
20:14
**link**
196:20 234:24 243:10 244:24
**linked**
78:2
**links**
29:8
**liquid**
146:20,21
**liquids**
146:25 147:20,21
**list**
8:18 10:14 12:10,13,24,25 15:17,23 16:11,22 17:4,11,16,22 18:10,15,16 30:4 111:25 121:7,12,18 132:24 263:25 271:1 273:1,12 281:23 288:4,5
**listed**
13:15 18:9 20:14,21 21:5 29:22 30:3 76:16 78:4 124:9 237:5 263:23 264:11 270:19,23 271:5 284:12
**listening**
223:25
**listing**
18:25 281:17
**lists**
19:18 269:19 270:21 271:6,7 272:20 287:20
**literature**
11:17,25 12:11 18:22 19:1,4 65:1 67:9,11 69:15 70:6 72:23,25 73:10 77:8
**litigation**
6:9 107:5,7 108:13,14,15,19 273:2 278:5 281:7
**little**
30:7 31:16 38:10 46:4 131:1 179:8 182:1 194:8 224:6 256:6 261:3 267:18 287:14 290:10 293:20
**Liu**
225:14 226:21 298:9,16
**liver**
37:24 59:3 66:5,16,21,25 67:4,21 69:4 70:11,15,20,24 72:4,10,21 74:23 76:17 131:16 141:2 183:3 249:4,12 256:20 296:25

**located**
8:8 106:20
**login**
29:9
**long**
14:2 15:24 20:8,25 26:1 29:1 93:3 95:8,14 98:11 101:7, 8 102:25 107:20 108:20 111:25 117:22 128:5 134:7,11 135:11,13 139:25 146:17,25 148:24 155:7 158:3,9 160:19 162:1 176:2 181:25 182:6 245:25 246:13,16 251:17 265:12 283:20
**long-term**
229:12 230:18 232:13
**longer**
92:17 283:20
**longest**
96:5
**look**
11:18,19 16:8 17:7,8 19:16 22:17 26:23 33:6 39:8,10 40:13 42:5 44:19 48:14, 15,18,19,22 53:4 55:22 61:6 62:3 63:16,17,23, 24,25 69:25 71:13,23 74:13 75:16 79:21 81:11, 12 82:3 88:25 90:4 91:23 92:1 95:14 96:8 97:4 100:16, 17 103:22 106:25 112:2,7 113:10,16 114:18 124:19 126:3 127:3,5 133:10,12,18 139:8 150:3 156:7,11 161:23 163:3 164:16 172:12 173:9,10,15, 25 175:16 176:10,12 178:17,23,24 179:2 181:3, 4 183:18 184:1,10,11 186:3 187:1, 2 188:22 190:1,24,25 191:12 193:4 196:6 200:18 201:22,23 202:14 203:4,6,11 207:14 208:12 211:10 212:20 223:23 225:11 226:4 229:8,10,12 230:18 232:23 233:14 234:13,14,17 236:7 237:2 243:18,22 244:8 245:24 250:11,15 252:6 254:14 259:1 262:15,16 264:5,9,19, 23 267:25 271:4 272:3 275:4 285:17
**looked**
16:2 19:25 21:1 22:6,11 26:19,20 29:24,25 60:18 63:1 65:16 67:7, 18 69:18,20 72:19,22 77:13,15,20 78:15,22 80:1 85:10 89:16,24 90:17,19 92:4,5 95:10,11,17, 25 96:1,20 97:15,19 98:16,20 99:13 103:8 134:5 149:3, 8 176:1,3 196:24 199:7 200:20 201:7 202:11 225:12 237:3,6 239:4 246:2, 4,6,7 250:4 252:9,12 255:8,13,14, 16 258:22,25 260:9 261:25 262:2 268:8, 14 303:9,10 307:8
**looking**
16:6 21:23 36:10,14 40:3 48:21 61:7,25 65:3 71:10 76:13 97:2,22 98:6,23 100:5,16 102:22 119:8 131:17,24 170:25 173:4,12 174:16,17, 18,24 175:2, 10,16 176:25 178:18 182:18 186:4,14 187:3,4 191:9 193:3 196:8 201:7 209:16 219:13 223:24,25 224:14 226:20 227:17 230:20,25 232:8,10,24 235:24 245:3 257:18 259:10 261:14,23 262:24 263:12 265:7 274:10 287:1 288:3 293:22
**looks**
16:18 17:22 18:21 203:5 224:25 230:22,23 254:8 264:12,15 288:5
**lose**
86:19,23
**lost**
35:19 251:18

**lot**
12:19 23:10, 11,12 32:4, 6,8 33:3,5, 20 34:1,17 36:24 45:4 48:25 51:13, 20,21 52:18, 19 55:1 88:23,25 89:2 90:19 95:9 100:23 115:12 133:16 148:9 154:7,17 159:12 160:25 162:9,19 165:24 176:24 180:12 193:22 215:6,16,18 217:8 239:10 259:17 263:18 303:18,25
**lots**
90:7 91:12, 18,19 94:3
**loved**
36:9
**low**
53:12 56:2 89:10 90:20 99:21 165:2, 3 232:19 237:18
**lower**
95:17 195:1 234:17
**luck**
86:16,20
**lump**
115:17
**lunch**
102:6 105:14 121:21,24 141:25 142:1
**lung**
171:11 172:13 176:9
**lye**
137:16,22

**M**

**M.D.**
6:22 35:15
**made**
89:1 135:22 146:12 151:8 160:25
**mail**
120:8
**main**
133:4 280:7
**maintained**
156:13
**majority**
62:18 63:21 74:10 112:12 161:2,14
**make**
8:4 12:5 16:3 17:7,18 19:11,13 26:24 27:20 28:24 29:8,9 34:18 39:15 41:7 56:9 82:1 90:4 97:14 100:2, 15,16 114:25 116:23 120:11 142:24 143:16 144:7,13,20, 24 147:6 158:7,8,23 161:4,6 163:24 164:23 179:25 180:17,19 181:18 190:23 198:1 199:8 203:9 235:2 241:20 259:12 262:17 265:10 274:25 285:13 289:16,21 302:3,4
**makes**
9:15 142:18 176:23 246:12 279:5
**making**
160:14 161:2 185:18 252:11 280:7
**male**
296:12
**malignancies**
295:23
**malignancy**
224:24
**management**
269:9 305:5
**mankind**
179:4
**manner**
9:23
**manometry**
278:13
**manufacture**
117:1
**manufacturer**
8:12,16 223:18 266:13 272:10,15
**manufacturers**
89:3 90:3 109:21,24 119:17 268:24 281:7 288:22 289:5,12
**manufacturers'**
60:20 269:2
**manufacturing**
77:20
**manuscript**
127:22 270:9 277:19 279:9 280:13
**March**
13:22 16:18 23:6 273:21 294:2
**mark**
16:13,21 22:24 24:18, 21 35:4 269:12 270:11 291:8,10 292:18 293:5 294:6,11,24 295:11,16 296:6,18 297:7,20 298:5,19 299:8,19 300:11 301:7
**marked**
10:1,4 16:15,24 23:1 24:23 58:3 269:12, 14 270:10,13 284:3,5 291:12 292:16,19 293:7,9,10 294:8,10,25 295:18 296:7,20 297:9,18 298:7,21 299:10,21 300:22 301:9
**marker**
39:10 100:14

101:5 102:25 103:6 104:18
**market**
40:22 50:16 215:18
**marketed**
42:2
**master's**
33:2,19,24 34:17 36:18 170:19 171:17
**matched**
17:19
**material**
12:14 27:22 111:18
**materialize**
151:14
**materialized**
90:11
**materials**
12:13,24 15:17,20,22 16:21 17:3, 11,15,22 18:16 30:4 108:2
**matter**
8:15 22:4 50:18 90:16, 17 91:21 115:4 158:14 166:12,13 233:18 236:24 248:21 267:21
**matters**
27:17 50:11 283:6
**maximum**
95:4 98:19 99:12 266:7
**Mcdowell**
291:14,20,22 292:4,16
**Mctiernan**
29:25
**Mctiernan's**
18:7
**meal**
146:18 148:1,5 151:3
**mean**
8:13,14 11:13,14 22:3,25 29:3 34:5,7,11 37:14 46:14 47:8 50:9, 13,15,21,23 51:20 52:21 53:25 59:15 60:16 62:9 64:11,15 66:22 69:1 70:17 71:9 73:20 75:16 77:15 87:15, 22 89:12,15 112:17 116:13,14 122:10,23 126:8 128:13 135:4 138:22,25 139:1,17 147:22 152:22,23 153:4,5 157:4,8 169:21 177:8 184:22 185:2,7,24 188:18,19 189:1,16 190:10 191:4 193:11 211:10 212:17 222:17 233:5 238:11 239:24 240:19 249:6 252:3 261:13 265:1,16 266:18 276:24 278:20 280:24 282:7,12,13, 17 283:21 286:7,12 295:16
**meaning**
137:4
**means**
52:16 75:10 99:6 100:20 188:9,11,20 193:13 211:14 233:7 243:17 278:19
**meant**
19:12 63:8 64:10 214:17 265:19,24 267:5
**measure**
39:4 94:2,15 146:10
**measured**
261:7
**measuring**
193:7 230:4 272:1
**mechanism**
138:5 144:5 145:13,22 152:24
**mechanisms**
64:25 65:23 73:17 74:1 132:16
**mechanistic**
41:18
**med**
35:16
**median**
97:23
**medical**
8:10 12:11 18:22,25 19:4 35:13, 17 45:7 129:5,24 301:14
**medication**
58:22 100:13,23 103:2 105:1 117:24 165:10 166:23 175:9 213:24 215:8,15,21 216:4,10 217:6,14 218:12 219:10 222:18
**medications**
39:20 42:1 43:7 44:5,6 56:20 63:11 126:20 143:18,23 144:1 152:17 153:6,10 154:21 163:15 164:18 166:13 211:23 212:9 216:20,23 217:18,23 218:9 219:6 222:14 223:7,19 291:15 296:10
**medicine**
33:11 36:25 100:21 101:1 103:22 104:1 155:14 163:4 215:24 218:4

**medicines**
217:4
**medium**
95:5 98:6
**Medtronic**
271:8,24,25 288:11
**meet**
28:2,16 32:5
**meeting**
27:16 114:3 276:17,22 280:19 283:4,5
**meetings**
28:9,18 29:1 32:9,11 46:20,21 113:3,7 277:10
**member**
254:13,16
**members**
89:5,8
**membership**
274:20
**memory**
111:3
**mention**
53:17 248:9 305:21
**mentioned**
12:3 38:14 43:2 48:15 49:23 52:3 64:2 68:2 76:12,14 80:16 86:5 88:6 110:14, 16 119:24 124:22 125:23 138:24 140:6 145:6,17 149:1 150:22 152:9 154:19 162:3 176:9 180:22 201:22 207:19 208:11 255:7 306:10
**mentioning**
172:11 206:21
**mess**
160:14 195:15
**message**
9:24 244:19
**messages**
180:6
**messaging**
9:10
**met**
28:6,7 29:5
**metaanalyses**
61:15,19 76:9
**metaanalysis**
61:24 62:2 76:18 257:16
**metab-**
255:23
**metabolized**
255:23
**metaplasia**
53:5
**metaplastic**
53:9,10
**methodologic**
88:22
**methodologies**
38:25
**methodology**
81:16 97:21 98:24 184:11 200:12 268:13
**methods**
274:11 275:9,24
**Methyl**
55:10
**metric**
115:24
**Michael**
6:7,22 7:8 84:23 116:7 134:3 149:25 242:23 281:11
**middle**
225:17 251:18
**mild**
221:6
**milligrams**
68:15
**million**
300:2
**millions**
68:15
**mind**
109:16 176:6 182:15 232:24 249:14 250:15
**mine**
30:19,21 70:4 179:4 191:2
**minimal**
24:11
**minimize**
172:13 254:4
**minimized**
9:13
**minimum**
55:25
**minus**
195:10
**minute**
140:3 300:13 307:20
**minutes**
29:3,7,10 45:23 170:6 209:25 210:1 247:4 283:22
**miscellaneous**
21:4
**misclassi-**
236:8
**misclassification**
235:3,14,19, 23 236:8,14 238:6,18 239:20 241:1,3,7,9, 15,23 242:6, 13 244:5
**misclassified**
235:8 236:2, 6 238:1
**misclassifying**
235:5
**misconception**
144:16
**missed**
16:4 17:19 19:12,14 24:11 34:21
**missing**
24:10 264:20 265:10 302:5
**misspeak**
102:17
**misstates**
123:21 150:4
**misstating**
72:6
**mistaken**
106:24 139:12 249:24 250:10 263:10,18 274:4
**misunderstanding**
166:21
**misunderstood**
95:21

**MITCH**
20:15
**mix**
46:17 47:12, 16
**mixed**
38:8 147:6,7 262:3
**modalities**
38:23
**modality**
122:22
**modification**
86:21 87:5 213:2,3
**modifications**
86:13,17 87:8
**Mohy-ud-din**
299:24
**moment**
12:24 134:3 208:1 210:7, 13 247:1 269:4
**money**
217:5
**monitored**
63:12
**monitoring**
161:18
**month**
26:13,14,16 119:11,15 120:1,2 232:11,12 233:2,23 234:1,6
**months**
119:18,23 226:14 227:12
**Moore**
6:1,10
**Moorman**
18:7 29:24
**morning**
7:5 29:8 32:8 165:13 166:11 167:4 245:24
**motilities**
33:7
**motility**
39:12 49:14 106:5,7,13 118:16 278:14
**mouth**
49:6
**mouthful**
143:22
**move**
36:12 40:21 85:23 102:8 242:1
**moved**
36:11,22
**movement**
142:13
**moving**
186:7
**MRI**
132:9
**MRIS**
132:3
**MSK**
20:21
**mucosal**
39:11 288:17
**multicenter**
40:6 124:21 125:12,22 126:23 127:14 128:1,11
**multicenters**
126:1
**multiple**
194:21 195:11 197:2 236:18 237:23
245:18 294:1
**muscle**
147:4
**mustn't**
192:9
**mutagenic**
248:25 249:6

**N**

**N-NITROSODIMETHYLAMINE**
55:5,7 298:24
**Na**
145:2
**name**
7:5,7 24:6 44:5 45:13 107:11 114:18 128:21 129:1,3 145:15 270:3,19,23 271:1,7 299:23
**names**
8:20 40:10, 25 42:5,6 43:22,24 107:24 110:4,18,19, 20 114:1
**nanogram**
247:25 262:6,7 263:7 266:8
**nanograms**
262:19,21 263:13 265:17,22
**Nashville**
8:9
**national**
113:2
**nationwide**
298:25
**natural**
102:5
**nature**
8:1 11:17 47:6 50:12 56:14 128:23 215:4 216:5
**nausea**
64:9 132:1, 7,8 134:20 154:11 224:21
**nauseous**
132:15
**nay**
88:16
**NDMA**
54:12,18 55:4,21 56:11,13 64:25 65:5, 7,8,10,12,24 66:2,9,15,20 67:10,12 68:25 69:3, 8,10,15 70:7,10,13 72:9 73:1, 11,22,24 74:5,14,20 75:4,8,11, 12,17,20,21, 22 76:3,9,23 77:8,12,16, 23 78:12,13 79:1,2,18, 19,24 80:9, 10,21 81:3, 8,23 83:5 84:25 87:12, 24 88:4 89:7,10,11, 15,22 90:5, 13 91:5 92:5,19 93:8,24

94:3,11 205:14 207:13 235:15 247:20 248:1,5,12, 14,20,25 249:3,4,7, 10,12,16,20 250:7,18 251:12,21 252:2,15 254:10,18 255:5,8,12, 14,23 256:3, 8,20,25 257:7,12,18 258:20 259:7,25 260:4,15 261:5,6,15, 16,24 262:1, 19,21,25 263:11,13, 24,25 264:16,18,22 265:6,7,16, 23 266:2,6, 14 268:2,3 303:4,8,24 304:7 306:3, 7,13,18

**NDMAS** 56:3

**necess-** 158:21

**necessarily** 64:11 125:1, 5 157:13 158:20 185:16,17,21 187:25 189:13 196:15 199:8 207:9 213:21 214:13,21 220:7 225:3 226:15 233:5,10 234:1 243:2, 17 262:11

**necessary** 198:16 199:10

**need** 30:17 41:11 46:18 49:14, 17 51:23,24 52:1,10 70:1 103:21,22 104:1 105:1, 23 106:25 135:13 138:10 143:14 151:6 160:10,11 192:4 195:8 197:21 214:21 227:19 236:23 239:21 240:9 246:11,20,21 283:19 285:20 290:24 307:20

**needed** 26:23

**needs** 52:8 100:23 101:19 103:2 165:9

**negative** 128:13 187:2 196:11

**nested** 292:23 296:11

**neutral** 155:12,25

**neutralize** 155:15

**neutralizes** 142:12

**never** 106:19 117:12 196:4 252:21 289:6

**news** 39:23

**Nexium** 43:24 128:14

**nice** 43:10 44:9, 19 45:22 62:1 178:25 180:7 207:2 227:1

**nicely** 61:23 225:19

**Nicole** 28:19

**night** 209:2

**NIH** 36:14

**nine** 208:1

**nitrate** 168:21

**nitrite** 168:12,19, 20,23,25 169:1,6,7,8, 9,13 210:15, 19,22 211:5, 6

**nitrites** 210:21

**nitroso** 55:9,12

**nizatidine** 44:16 86:7,8 301:13

**noise** 9:15 28:24

**non-differential** 235:11 236:14 238:1

**non-exposure** 235:9

**non-human** 67:10

**non-refluxer** 100:25

**non-users** 201:9 202:21 203:16,24 204:9,25 236:3 238:17 292:5

**nonphysiologic** 151:11

**nonprescription** 218:2,5

**nonresponsive** 242:2

**nonsignificant** 195:24

**nonspecific** 132:11,15

**Norgaard** 203:4,5,7,14 300:12,24 301:2

**norm** 152:7,8,22, 24 165:15 262:5

**normal** 52:24 90:20 132:2 134:23,24 142:2,17 143:13 147:16 164:6,20 248:15,18

**normalized** 91:20

**normative** 272:5

**nose**
39:4
**Notary**
6:2
**note**
240:22 263:9
**noted**
269:6
**notes**
9:4 11:10, 13,14,16,23, 24 12:2,5
**notice**
10:5 30:18 258:7
**notifications**
28:23
**November**
25:3
**NPT**
66:14 67:18 76:15
**NTP**
75:5 77:1 250:4,6,12, 17,23,24 251:2,10,20 252:1,7,21 253:6,9,13 254:9,14
**NTP's**
252:14
**nuclear**
68:21
**number**
20:14 27:7 82:2,3 98:15 190:4 195:10 208:21,22 226:6 228:8 229:19 272:20,24 280:25 284:20 285:18 286:3 287:25 292:2 300:17
**numbers**
19:18,19,21, 23 20:1,3,21 88:9
**nurse**
113:8

O

**oath**
6:24
**obese**
140:20 172:5
**object**
50:22 61:1 72:13 76:11 79:4 81:4 116:8 134:3 150:1 162:14 242:23
**objection**
12:17 37:11 52:15 60:24 62:8 65:2,25 67:13 70:16 71:8 73:19 74:2,22 75:9,14 77:2 80:11 81:24 83:6,21 85:8 87:14 90:15 91:6 92:21 97:18 98:21 103:15 111:5,10,21 113:4,15 114:23 116:4,6,10, 21 118:2,10 119:3,19 120:6,13,23 121:17,23 122:5 123:1, 10,21 126:7, 21 127:12 129:25 134:2 135:15 136:11 137:2 140:5 148:17,22 149:13,23,25 150:4 152:20 160:3,23 161:21 162:12,24 164:22 166:3 167:13 168:13 169:5,17 171:21 177:5,19 179:22 183:15 185:23 188:5 189:15 192:11 193:10 200:15 201:20 203:25 204:3,14 206:1,6,13 208:10 209:21 210:24 211:8 216:7 217:21 218:14 219:7 221:1,16,22 222:2,7,12 223:1,20 228:7 229:5 230:6 231:6, 12 232:3,16 234:3,8 238:7,19,22 241:8,17 242:7,15,22, 25 244:7,25 245:15,22 246:17 247:22 248:3,8,17, 22 249:1,8, 11 251:5,15 252:4,17,25 253:8 254:3, 19 255:1,25 256:4,9 257:2,15 260:5,18 261:8,18 263:14 266:17 268:4,18 270:1 272:12,16 273:5,14,23 278:6 279:17 280:16 281:10,22 282:5,11 285:5 286:5 288:24 289:14 291:25 293:3 303:15 304:9 305:12 306:8
**observable**
75:11
**observation**
174:25 194:12,15,17 227:20
**observational**
61:10,16,20 75:8,13,17 173:21 174:24 175:19,24 176:3,7,17, 25 177:3,11, 14,16 179:14 180:15 181:20 182:12 183:12 184:4,17 186:11
**observations**
175:21
**observed**
226:25
**observing**
228:24

**obtained**
34:24
**obviously**
48:20 223:9
**occupation**
255:18
**occupational**
255:13
303:10,17
**occur**
229:16
**occurred**
194:18
**occurring**
167:23
**odds**
186:5
187:11,19
189:19
**oesophagus**
296:11
**offended**
266:19
267:4,18,23
**offer**
59:7,12
**offering**
50:18,25
78:11 87:11
88:3
**offhand**
200:9
**office**
8:10 47:5,7,
8,17,21,22
160:14
**oftentimes**
224:22
**okay**
6:5 7:9,17,
21 8:6,8,11,
16,21 9:3,
16,20,21,24
10:3,5,9,13,
22 11:1,8,23
12:5,9
13:11,13,19
14:5,10,12,
14,24 16:8,
21 17:10,15,
21 18:9,18,
21,25 19:4,
16,21 20:5,
9,13,20
21:4,13
22:1,24
23:3,20
24:25 25:6,
9,18 26:3,9,
17 27:1,7,
12,23 28:5,
9,16 29:5,
10,12,20
30:2,13,17
31:7,15
34:23 35:5
37:7,13
38:18,21
40:8 41:7
42:11,15
44:2,25 46:4
47:10,17
48:9 50:4,7
51:10,14
52:7,13,22
53:19,22
55:6 56:10,
17,23 57:2,
23 58:2,4,8,
20 59:6,12,
18 60:13,20
61:9 62:5,21
63:23 64:24
65:22 67:7
69:12 70:25
72:14,22
73:10,16
74:19 75:2,
6,19 76:8,23
77:7,16,22
79:8,16
80:7,20
82:11,21
83:1,18
85:23 86:4
87:11 90:12
92:18 94:22
95:19 96:14,
15 97:7,13
98:5,13,19
102:6,7,9
104:4,8,15,
20 105:2,9,
16,21
106:15,20,25
107:15,17,22
108:6,13,18
109:7,20,24
110:9 111:6
112:23
114:20
116:9,16,23
118:4 119:11
120:9,22
121:1,5
123:5,24
124:4,12
127:7 129:5
131:10
132:21
133:24
136:1,7
137:9 139:6
141:1,14
143:22
144:1,5
145:13
150:20
153:23
154:18 155:4
156:6,17,20
161:16 164:9
166:19
167:11,20
168:1,6,9
169:20,25
170:13,18,22
172:15
179:7,19
182:1 183:11
184:6,20
185:1 187:24
189:11 191:3
193:6 194:8
197:14
198:21
200:4,21
202:3 204:5,
16 206:21
207:17,25
208:5 209:9,
24 210:3,7,
8,12,18,22
211:3,11,16,
19 212:15
213:25
214:24
217:13
219:4,25
222:14 224:5
230:3 232:8
235:3 240:10
241:5 242:24
243:21 244:2
245:6 247:7,
12,17
248:14,20,24
249:7,19
251:1,9,19,
24 252:14
253:14,23
254:16
256:24
259:22
262:16
263:25
264:12,24
267:15,23
268:16
269:3,23
270:21
271:4,11,23
272:9,14,25
274:12 275:9
276:7,21
277:15
278:23
279:8,12
281:5 282:1,
18 283:10
284:7,15,18
285:25
287:8,20,23
288:3,20

289:4,8,25 291:8,14 292:1,6,10, 14 293:5,9, 10,15,20,22 294:6,11,17, 20 295:2,7, 10,11,25 296:3,15,18, 22 297:4,7, 20 298:2,5 299:12,19 300:5,11,19, 24 301:5,11, 20,25 302:2, 6,12 303:7, 12 304:6,13 305:8,20,24 306:6

**olden**
212:19

**older**
42:6

**olds**
135:3,5

**omeprazole**
43:10,12,13, 22 64:12,14 68:6,7 110:12 151:9,11,23 295:22

**once**
23:9,14,19 26:13 158:3, 13 165:9

**once-a-day**
152:2

**oncologist**
51:11,12 52:9 229:20

**oncologists**
51:24,25

**oncology**
53:16

**one**
7:16,19,22 21:8 22:10 25:3 30:17 40:23 43:10 44:15 47:18 53:16,20 54:4 55:13, 14,18 56:3, 17 57:4 64:16 65:6 67:4 68:24 71:10,15 78:22 83:18 84:4,6 87:6 90:21,24 91:8,15 93:12,25 95:13 96:24 104:14 105:22 114:17 119:21 122:21 123:7 125:6 126:1, 16 129:3 132:25 133:1,19 134:16 139:16 141:7,8 143:11 145:25 151:3 159:21 163:12 170:4,24 171:8 173:19 176:9 177:13 178:11,20 179:3,19 180:1 186:7 188:20,21 191:19 196:6,10,13 197:1,2 201:14 203:4,9 205:16,23 206:10,17, 24,25 207:1, 7,18 213:21 215:22 216:11 224:5,11,13, 25 225:14 226:2 227:12 230:22 232:12 233:9,23 234:1,10,12, 18,19,25 235:1 236:6, 13 237:14, 21,24 240:23 241:17 243:7,19 244:10,17 246:4 251:8 254:8 255:3 259:5,6,8 260:11 263:20 268:6,9,19 271:15 274:5 277:12 278:13 280:6 283:12,19,23 287:7 289:19,21 290:14 292:2 293:23 300:13,14 304:18,22 305:1 307:20

**one's**
66:11

**one-**
226:22

**one-day**
139:19,24

**one-month**
233:23

**one-year**
228:4

**ones**
17:9 18:5,6 20:1 29:23, 25 30:5 54:23 72:18 77:3,4,5 78:16 110:17 113:20 114:16 124:8,13 125:7,16 132:25 175:11 184:1 205:11,20 215:9 237:3, 5 243:15 255:15 259:16 270:6

**open**
49:10

**opinion**
8:14 14:16 15:4,12 58:10,17,21 59:16,17 69:24 74:19 76:22,24 78:11 80:21, 23 87:11,15 88:3 107:13 109:6,8,10, 13,15 161:17 179:21 306:6

**opinions**
15:21 50:18, 25 58:8 59:7,13 70:5 76:8

**opportunities**
23:18 36:9 111:1,19 112:9,22 113:12 114:21 115:7,9 118:14

**opportunity**
61:1 180:16 196:5 237:4

**opposite**
203:5

**optimizing**
40:2

**options**
39:23 86:1
115:15,16
117:14
**oranges**
192:5
**order**
25:12 34:24
68:18 132:3
270:24
**organization**
252:7 253:9,
18
**organizations**
36:7 39:14
253:23,24
254:2
**organized**
275:14
276:10
**original**
20:4 22:14
24:4 43:20
55:21 63:13
74:4,8,16
81:7,14,16,
25 91:9,17
158:17
200:18
248:10 249:2
**originally**
19:13 88:8
90:10
**originated**
111:14
**OTC**
236:5 237:9,
19,24 238:5,
10,15 241:5
**OTCS**
237:4
**other's**
266:24
**otolaryngolog
y**
33:8,12
36:24 37:1
38:14
**outcome**
61:8 107:10
171:1,5
172:20
173:16
175:3,16,17
178:5 180:14
183:22
185:14
186:14,24
192:9,19
193:3 225:22
226:3,13
227:15
230:16
231:24
241:14,19
242:5,11,17
244:6 245:13
304:3 307:5
**outcomes**
64:5 173:9
**outline**
48:13 186:15
223:10
**outlined**
7:14 26:21
31:24 32:7
54:21,24
60:3,12
61:13 62:4
64:3 74:12
75:21 77:3,
5,14,21
90:19 95:3
96:4 99:14
126:11
132:23
177:25
197:16
200:19
201:6,23
205:12 207:3
224:22
225:12,13,15
235:12
245:23
257:3,4,5
258:12 263:8
264:6 266:19
278:13,14
279:7 303:9
304:12
307:15
**outlines**
290:16
**outside**
48:5
**over-the-
counter**
216:17
217:3,9,18,
25 218:7,9,
17,18,20,23
219:5,14,15
236:1,25
237:7,14
**overgrowth**
157:25
158:9,19
159:2 162:6
**overlap**
35:14 38:15
**overnight**
165:4,5
**overwhelmed**
80:3
**overwhelmingl
y**
90:23

**P**

**P-C-A-B**
41:5
**P-CAB**
41:25 110:15
125:23
127:18
**P-CABS**
40:12,18
41:4 42:9
43:21 145:6
**p-value**
194:10,11,22
196:6,23
**P.a.s**
113:9
**p.m.**
105:11
170:10,15
210:4,9
247:9,14
290:2,6
302:14,19
307:22
**P450s**
165:10
**page**
10:13 12:9
16:19 17:23,
25 18:23
19:17 20:10
58:5 96:19,
24 97:1 99:1
156:9,10,11
197:16
198:7,8
201:5
204:17,23
211:23
226:5,20
227:17
235:7,12
264:16,17
265:5,11,13
274:10
276:17
277:16
287:12
**pages**
25:10 264:19
265:3
**paid**
117:7 118:4,
5,8,11
119:1,17
120:11
122:24
126:9,14,16

**pain**
37:20 64:10 131:18,21,25 143:3 154:10 224:2,21
**painful**
31:19
**paint**
197:9 232:24
**pancreas**
37:21 70:20
**pancreatic**
59:3 66:25 131:15 141:2 291:16,24 292:2
**pancreatis**
291:16
**pancreatitis**
37:24
**pandemic**
106:18 277:2 278:24
**panel**
253:4 254:17,21,23
**pantoprazole**
43:14,23
**paper**
9:5 11:20 276:23 281:8
**papers**
9:9
**paragraph**
99:10 212:7 275:10,17
**parameters**
184:17
**parietal**
41:16 144:10,13,20 145:1,2 161:6
**part**
16:5 21:6 41:1,2 48:7 62:18 71:21 121:14 123:6 125:4 126:25 130:15 172:19 173:1 183:23 189:10 193:19,23,24 197:24 223:15 224:3 230:7 253:12,21 254:24 260:7 269:7 273:2, 3,10 281:13, 14,15,19,25 282:2 287:21
**participant**
269:23 273:4 278:18
**participants**
269:20 270:16,23 271:6 281:18 282:10
**participate**
113:13
**participated**
282:1
**parts**
133:6 207:4 264:22 280:8
**past**
10:12 109:20 115:10 119:18,22 124:1 143:24 219:21 253:21 271:17 282:2 283:4
**patent**
288:17
**pathologically**
147:2
**pathologist**
50:5,6 141:5
**pathologists**
141:6
**pathology**
147:3 155:9
**pathophysiologically**
154:3
**pathophysiology**
154:13
**patient**
38:4,7 41:21 52:7 91:24 94:2,12 100:22 101:13,19 103:1 105:23 106:2,7 112:5 115:10,20 119:25 132:5,7 134:11,18,20 157:1 171:24 172:4,10 175:8 178:16 179:11,16 181:22,23 208:8 209:19 213:17 214:5,6,10, 14,20,21 215:7 219:14 220:7 221:4 225:5 243:9 260:23 275:13 276:10 303:19 306:11
**patient's**
64:22 214:2 227:21
**patient-related**
176:22
**patients**
14:3 23:12 31:20 32:9 34:20 37:18, 19,23 38:3 39:16 41:23 44:12,23 45:4,16,20 46:3 47:17 48:16,25 49:1,5,14 51:13,16,17, 21,22 52:6, 19 53:6,8 54:15 58:24 61:6 64:6 82:9,19,23 83:14 86:18 87:4,7 88:12 91:13 92:13 95:15 97:11, 15 98:11 100:6,11,16, 18,23 102:19,21,22 103:7,11,19, 21 104:23 115:11 117:16 128:7 131:8 133:9 137:16,18 138:4 140:15 143:6,13 145:10 146:10 148:7,9 153:1 156:25 159:15 160:8 161:5,6,7, 10,20 162:1 163:24 164:1 172:3,10 175:6 179:6 180:12 183:3 185:5 189:3 190:13,22 193:1 211:24 213:10 214:5,25 215:6,14,18 216:3,18,21

217:2,18 218:8,17,23 219:22 220:1,11 221:14,20,25 222:5,10,15, 25 223:19,25 224:20,22 225:19 235:16 243:13 245:25 246:10,11, 15,19 255:19 260:22 266:21 267:22 271:16

**patients'**
216:23 285:21

**pattern**
112:14 229:21 230:13 258:9

**pausing**
305:12

**pawn**
38:6

**pay**
216:3 217:5, 7

**paying**
267:10

**payment**
120:8

**payments**
120:4

**pays**
217:11

**PDF**
10:19 11:19, 20 12:3,6

**peer**
249:19 250:1,6,8,9, 18,19,22 251:13 253:4 254:17,21,23 260:3,6 277:20,22 280:11

**peer-reviewed**
200:21,25 204:19

**pendulum**
284:10

**people**
45:8 52:11 95:25 104:9 133:16,18 142:22 147:14,17 152:22 154:3 157:23 159:5 164:5 173:10,11 185:11 196:19 233:2 282:15

**Pepcid**
86:6 191:17

**pepsin**
146:2,3,5,10 147:8,10

**pepsin's**
146:12

**peptic**
45:5,8 57:5, 6 133:7 153:2 221:9

**perceived**
281:6

**percent**
46:9,16 47:3,12 144:24 153:13 158:16 183:10 194:14,17,23 195:1,3,11 204:15 237:18,19 262:10

**percentage**
238:9,10

**perfect**
43:4 168:1 230:10 231:15,21 241:20

**perform**
48:10 258:11

**performed**
54:11 260:3

**performing**
47:6

**perils**
30:25

**period**
68:8 103:14 138:16,23,25 139:4,9,20 140:3 144:18 156:4 164:20 165:3,20 182:6 226:12,24 227:1 229:3

**periods**
229:2,4

**peristalsis**
142:12 146:23

**pernicious**
161:5 162:4 167:25

**person**
7:22 14:15 28:9,12 118:17 164:20 174:9 273:25 274:9 277:5,13 278:21 280:20

**person's**
171:15

**personal**
46:25

**Personalized**
305:4

**personally**
56:16 87:25 186:25 207:9 223:23 243:7 261:9,23

**Persons**
299:13

**perspective**
37:16 38:16 44:10 48:21 61:23 139:17 157:8,14 165:10 185:13 243:8 265:15 266:22

**pertain**
19:22

**pertaining**
13:20 62:10 63:25 72:25 73:11

**pertinent**
279:15

**Pfizer**
111:20,22 112:10

**ph**
39:4 151:4,5 154:19,22 155:4,9,10, 21 156:3,12, 13,21 157:7, 10,14,15 159:25 160:20 161:18,19,23 162:22 164:7,10,12 165:7,15,25 167:6,15,21 168:10,15,17 169:2,6,15 210:14 275:7 278:9

**Ph.d.**
6:22 33:1 35:11,14,15, 19
**pharm**
127:8
**pharma**
20:4 109:23
**pharmaceutical**
109:4,11,21 116:1 117:1 118:1,8 119:1,17 120:5 121:2, 9,15,22 122:4,8,24 123:6,8,19, 25 124:5,18 126:6,19 127:10 128:20 129:10
**pharmacodynamics**
43:16 145:24
**pharmacokinetics**
43:17 145:24
**phases**
63:4
**phenomenon**
142:2
**phenotype**
214:6,19
**phenotyping**
214:5 221:5
**phone**
9:12
**phonetic**
303:11
**photograph-**
6:11
**phs**
162:5
**physician**
51:4 266:21
**physiologic**
142:17 144:7 151:16 158:2
**physiological**
164:24
**physiologically**
143:8 147:2 150:25 163:22
**pick**
207:7
**picture**
32:22 62:1 115:19 180:7 197:9 230:17,18 232:24
**piece**
9:5
**pieces**
230:17
**pills**
91:5
**pitfalls**
115:21
**place**
30:14 168:8 273:17,19
**placebo**
128:15 172:24 183:1
**places**
265:4
**plaintiff**
106:10
**plaintiffs'**
17:24
**plan**
26:15
**plant**
68:22
**plausibility**
65:4,14 66:10,13 71:11,14,17 74:9,14 77:4 79:25 193:18
**plausible**
64:24 65:19, 23 73:17,25 74:6,20
**play**
53:18 135:11 162:19 190:7 194:5 238:2 241:3
**please**
6:5,16 20:11 27:25 57:23 72:6 105:9 156:8 170:13 172:13 210:8 247:13 307:25
**pneumonia**
159:4,7,9, 13,16,21 160:12 189:2 190:15
**pocket**
216:3 217:8
**point**
10:11,12 63:17 87:6 98:17 101:20 102:23 139:23 140:7 161:25 164:25 183:21 202:5 207:11 209:8 241:19 285:18 288:20 289:10
**pointing**
202:4
**polyp**
49:21
**polyps**
49:17
**polytomous**
236:18
**poorly**
148:15 194:1
**poorly-designed**
183:13
**pops**
194:20
**population**
41:21 112:5 124:25 125:15 126:3 127:18 161:9,13 162:7 164:1, 6 172:2 178:7 191:14,18 231:1 233:2, 8 254:1
**population-based**
297:1 298:13 301:1
**posed**
224:12 238:4
**positions**
70:2
**positive**
187:2
**positives**
236:11
**possible**
26:25 90:1 109:1 122:2 214:3 232:7 236:1 237:7 238:16
**post-gastrectomy**
163:24
**post-gastritic**
161:7
**postresidency/fellowship**
113:19

**potassium**
40:13 41:15 145:2,3,6,7, 17
**potassium-competitive**
41:10,11
**potential**
58:18 60:4 130:9,17 174:23 184:18
**potentially**
54:15 64:5 130:24 174:17,19 240:25
**pounds**
86:19
**power**
68:21 83:9
**PPI**
68:4 107:5 108:13,14,19 125:8,10 144:16 150:16 151:5 157:24 158:3,4,5 159:14 163:18 165:8 167:8 201:10 217:14 218:18 220:4,9,14, 15,19 221:6 224:23 272:15 273:2 278:4 281:7 286:1 288:22 289:5,12
**PPIS**
43:2,6 44:9 46:2 86:10 87:7 107:9 110:10 113:21 117:14,15 134:21 144:2,5,9,10 148:13,20,25 149:3,17 150:12,14,15 152:1,15 153:10 154:21 158:24 159:4,8,15, 19 160:1,11 161:1 164:4 167:24 172:23 189:2,4 190:16 205:1 212:1,11,16 213:19 214:1,8,9 218:10 219:25 220:24 221:12 272:22 280:3 285:4,8 287:20,25
**practically**
87:3
**practice**
16:6 34:22 37:9 38:8 46:7 47:4 48:11 51:13, 16 64:6 83:13 131:2, 5,13 143:24 213:25 214:25 216:2 222:21 253:2 269:8,16,24 272:19,20 273:20,21 274:16 277:21 280:5,25 282:9 284:9, 15,18,20 285:18 286:3 287:25 304:14 305:4
**practices**
48:1,5
**practitioners**
113:9
**pre-market**
42:2
**precancer**
225:10
**precise**
179:20 180:1
**Precision**
180:1
**preclude**
185:21 188:3
**precovid**
7:23
**predisposes**
53:20
**pregnant**
45:24
**preparation**
15:18 18:11, 19 20:16 21:14 22:22
**prepare**
16:9 17:3,10 27:12 28:3,6 29:6,12,17, 21 31:4 32:14 61:19 204:16 289:2
**prepared**
11:11 15:11 17:12 25:6 26:7
**preparing**
11:15 12:14 18:3
**prescribe**
82:8,18,22 83:19 84:1 85:12 89:2, 14 217:23 219:1 220:4 222:14,19 223:8
**prescribed**
87:7 143:18, 23 144:2 219:22,25 221:14,19,24 222:4,9
**prescribing**
89:7 115:8 116:18 216:20 218:21 222:25 223:19
**prescription**
98:15,16,23 99:7,11,17, 18,21,22 101:23 103:3 104:24 217:6,11,16, 20 218:2,3, 4,7,11,21 219:6,13,15 246:8,20
**prescriptions**
99:2 100:18 102:14 103:12,23 104:5,9,10, 16,17 246:15
**presence**
55:19
**present**
23:10 28:18 37:24 54:22 56:4 108:15 115:11 122:16 142:22 143:6 172:3 224:20
**presentation**
115:11 131:25 132:5 221:4
**presentations**
11:5 23:17 37:23

**presented** 54:9,13 61:14
**presenting** 285:21
**presents** 131:18 143:4 171:24 213:17 214:6
**pressures** 272:1
**presumption** 265:21
**pretty** 147:20,22,24 155:11 292:14
**Prevacid** 43:25 111:15,16 116:18
**prevalence** 133:16 237:17
**prevalent** 133:5
**prevent** 86:14
**previously** 10:3 43:2 83:1 86:5 105:17 141:15 143:17 170:18 193:6 210:13 211:4 229:1 249:15
**Prilosec** 43:24
**primarily** 37:9 38:12 56:24
**primary** 45:15 113:9
**print** 301:5
**prior** 7:13 34:6 36:12 44:8,10 45:3 106:18 108:22 120:18 137:18 272:18
**private** 47:23
**probable** 65:17 78:17 249:16
**probably** 22:17 23:15 46:16,22 110:4 120:18 213:7 273:25 280:24 283:23
**problem** 45:17 52:2 66:12,13 143:12 148:7,10 160:24 170:8 175:24 202:18,21,22 237:10 302:13
**problematic** 65:6 74:15 175:12,14 303:21,23 306:19,20
**problems** 66:5,16 88:15 199:4 255:9 303:17
**procedures** 48:10,12,24 213:11 277:22
**process** 27:20 50:14 51:8 52:20 62:19 63:7 74:3 84:3,4,7 85:17,19 129:16,19 144:23 249:20 250:1,7,12,18 260:3 282:14 283:1 287:12 289:2
**process-related** 27:17
**processes** 52:25 60:11 84:11 282:20,21
**Proctor** 114:6
**produce** 10:16 12:25 143:15 144:12 151:7 152:11 154:7
**produced** 11:8 13:2 19:18 24:19 26:4 146:5,6 150:24 248:11
**produces** 144:19
**producing** 154:17
**product** 7:15 13:4,14 55:9,13,14 93:8,24 94:2 105:22,25 122:13,19 123:8 125:24 128:6,15 198:15 266:15 268:2,20 272:5 306:4
**production** 41:16 145:21
**products** 6:9 13:5,20 44:6 51:5 54:9,12 55:9,23 56:4 87:13,24 88:4 90:4 113:3 114:16 116:2 117:1,3 121:9 122:25 127:11 268:17 298:25
**professional** 23:23 34:4 36:20
**professor** 33:11
**professorship** 36:25
**profile** 62:17,23 63:6
**profiles** 51:7 63:2,9,12
**programs** 122:3
**projects** 39:14
**promote** 123:8
**promoting** 113:14
**pronounce** 7:9 153:18 299:25
**pronouncing** 288:9
**properly** 148:11 245:13
**propose** 91:8
**proposed** 159:19

**proposing**
192:15
**proposition**
183:17
189:12 200:5
220:23
231:3,9
**Prostate**
297:12
**protected**
188:10 203:7
**protective**
178:20
188:20 207:8
**protects**
138:13
142:15
203:13
207:10
**protein**
146:6
**protocol**
34:8 125:15
**proton**
40:15,16
41:13,15
43:1,5 44:24
45:11 63:10
86:10 115:8
145:1,2,4,5,
17 153:13
154:25
157:2,11
161:11 213:4
215:2 272:21
281:2 285:20
296:24
298:11
**protonated**
168:25 169:9
**protonation**
168:24
169:7,8
**Protonix**
43:24
**protons**
145:3
**protopathic**
175:7 190:7
208:15
224:10
225:2,24
227:4 228:5
236:9 245:9
**proud**
178:25
**prove**
159:10,17,22
196:18
197:10
234:24
**proven**
54:18 190:18
**provide**
31:11 58:10,
17,23 109:15
110:19
112:21
113:11
122:17
124:18 125:5
179:15
183:12 226:2
232:6 259:3
264:2 274:18
278:2,3
282:9 301:5
**provided**
12:12 15:15
17:1 19:9,10
21:7 23:4,6
25:14 26:6
29:22 106:22
107:10,13
124:1,5
223:17
270:16
277:17
279:1,14
280:14,18,
20,22
**providers**
113:8
**provides**
61:25 179:10
181:21
195:24
216:24
287:17
**providing**
8:14 14:16
15:4 25:15,
20 92:12
161:17
278:10
282:16
**prudent**
273:1 278:12
**psyches**
219:9
**psychology**
218:3
**public**
6:2 46:19
**publication**
11:5 22:13
46:19 80:2
107:12
128:21 129:1
200:10 269:7
270:16
271:21
280:11 284:8
300:14,15,17
301:6
**publications**
19:7,9 23:23
24:3 32:11
126:5 129:23
130:3,21,22
176:18 195:4
205:3 269:5
289:1
**publish**
23:11 24:6
32:6 47:24
129:5,12
130:6,9
181:8
**published**
12:11 23:16
24:14 95:7
126:15
129:24
195:16
200:21,25
202:3 204:19
269:7,17
273:21
277:3,4
280:11
291:17
292:23
294:14 295:4
300:9,10
301:1
**Pubmed**
21:20 24:5,
15
**pull**
10:3 16:14,
23 20:7,18,
24 21:8
24:22 27:4
35:1 40:25
58:2 97:20
112:1 124:2
156:8 177:13
198:10
200:17
237:13
263:20
269:11
270:10
283:11,17
284:3 291:11
292:18 293:9
294:10,23
295:15 296:5
301:7
**pulled**
19:8 21:6,9
22:6 46:10
82:15 83:15
177:17
**pulling**
104:4,5
108:1 177:12
**pump**
40:15,16
41:13 43:1,5

44:24 45:11 63:10 86:10 115:8 145:3, 5,8,18 153:13 154:25 157:2,11 161:11 213:4 215:2 272:21 281:2 285:20 296:24 298:11

**pumps**
41:15 145:1, 18

**purported**
58:13 65:4 73:8 191:19

**purpose**
129:16 288:11

**purposes**
15:4 161:17 253:6 278:3 282:8 300:18 301:6

**pursue**
78:1

**pursuing**
125:11

**push**
40:12 48:22

**put**
14:8 27:5 39:3 66:8 89:10,11 111:4 112:22 117:18 129:3 130:18 155:10 159:14 163:18 165:19 175:6 181:10 188:18 190:11 191:1 193:1 197:3 206:6 220:8 224:22 233:13 234:17 238:25 244:18 259:4 265:2,14 270:5 286:6 292:16 304:4

**puts**
44:17 53:10 61:23 88:12 137:17 179:1

**putting**
80:7 86:18 152:15,17 164:5 187:24 230:13 238:11,12 243:21,23 244:3 245:2 259:15

**pylori**
133:1,2,3, 11,15,18,22 134:8 135:9, 14,17,19 136:8,14,15, 23 140:10 163:12 299:14

**pylorus**
147:3

**Q**

**qualification s**
23:23

**qualified**
51:9

**quanti-**
118:21

**quantificatio n**
91:23

**quantified**
90:13 91:4 92:19

**quantifies**
93:7,24 265:7

**quantify**
102:12 104:8,15 264:17

**quantitate**
118:21

**quantitated**
306:24

**quantitation**
306:21,22

**quantitativel y**
306:16

**question**
14:22 15:24 17:10 24:4 27:3 30:7 31:3 33:12 39:17 41:3, 19 43:20 53:25 54:4 55:21 56:8,9 63:19 64:20 65:18 66:1 67:14 68:12 69:12,14,17 70:17,18 71:9,19 72:1 74:4 77:15 78:2,3 79:7, 9 80:1,7 82:7 83:24 84:22,23 85:2 89:9 90:21 91:17, 20 92:8,23 93:4,6,15, 16,17,22 94:8,9,12, 14,20 95:1, 21,22,25 96:4 100:1 106:6 109:7, 12 111:5 133:21 135:9 137:5 139:3 140:9 146:19 148:15 155:6 157:19 158:7 160:7 162:14 163:16 166:3 168:14 170:23 172:17 177:7 179:24,25 185:25 187:17 190:6 191:8,10,15 192:14,17 195:21 204:5 205:16 206:4,9,15 209:4,10 218:13 220:15,22 226:1,7 228:3 232:5 233:21 238:3 239:14,19,21 241:21 242:3 249:9,14 251:16,18 257:12,18 258:10,13 260:9,23,25 262:18 266:5 267:25 268:22 273:24 287:23 290:9 291:1 305:20 307:1,3

**question's**
179:7

**questioning**
104:2

**questions**
12:19 33:16 34:2 37:4 51:9 102:8 128:10 150:21 209:4

224:12 240:4 247:18 254:9 292:7 302:8, 11,25 303:2 304:13 305:9,16,17 307:18
**quick**
290:9
**quicker**
141:9
**quickly**
10:23 12:10 283:25 286:10 291:8 292:15
**quit**
9:14
**quite**
8:19 28:11 34:25 261:20 262:18
**quote**
126:16 186:9 194:20

R

**rabeprazole**
43:14
**radiated**
137:19
**radiation**
49:2,5 51:24,25 52:8,11 53:16 68:19 137:18,21,22 183:7,8,9
**radiation-induced**
52:3
**radio**
122:25 123:2
**raise**
6:15
**raised**
54:14 55:21 68:4 74:4 79:11 81:7, 25 88:7,18 91:10
**random**
103:18
**randomization**
183:24
**randomize**
182:25 183:6,8
**randomized**
60:17 63:3 91:24,25 92:7,10 94:1,17 100:9 102:23 127:25 128:14 171:4 172:18,23 173:5,17 174:1,2,13 176:5 180:10,11, 17,19 181:14 182:2,4,19 183:13,20 184:4,11
**randomizing**
61:6 180:11
**range**
91:14 92:12, 13 96:23 98:4 147:15 265:17 268:8,14
**ranges**
268:15
**raniti-**
262:20 291:21
**ranitidine**
6:9 13:4,5, 7,14,20 22:7 44:15 54:9, 10,11,22 55:23 56:5, 19,20,24 57:3 58:12, 13,19,21 59:1,21 60:2,6,8,9, 14,18,21 61:7,9,15,19 62:7,10,11 63:2,15,19 64:1,4,22 65:5 73:9,17 74:1,5,16 76:3 77:5 78:3 79:11, 12,23,24 80:7 81:2,8, 22 82:8,18, 22 83:2,3,19 84:24 85:13 86:2 87:13, 24 88:4,11 89:3,7 90:12,14,18 91:3,5 92:4, 18,20 93:7, 8,23 94:5, 10,23 95:23 96:1,5,6 97:8,11,15, 16 98:12,20 99:7,13 100:7 102:13 103:12 104:5,10,16 156:3,14 161:19 165:19 173:3 191:8,10,11, 13,15 198:14 200:22 201:1,8,10, 11,18,25 202:8,12,20 203:2,7,13, 16,23 204:7, 8,20,25 205:1,13,14, 18 206:24 207:9,12,14, 21 211:25 215:17,19 224:15,17,23 225:14 229:9,25 230:11 237:18 238:9,12,24 240:24,25 241:1,10,24 245:19,20 247:21,24 248:1,6,11, 15,21 254:25 255:19,20 256:14 257:9 258:17 259:7 260:21,23 261:5,15 262:2,20 263:6 266:4, 7 290:19 291:9 292:5, 22 293:11 294:13 295:3,21 298:24 299:12 300:1,25 301:12,21 304:3 305:22 306:4,23 307:4,9,13
**ranitidine's**
291:23
**rate**
147:12 148:14,20 149:10,12,22 282:23,24
**rates**
283:1
**ratio**
186:5,17 187:11,19
**ratios**
189:19

199:13
**rats**
64:15 66:16 70:11 71:12 74:23 76:17 151:9,11 254:10 256:21 262:11
**re-looked**
87:20
**reach**
14:15 15:1 59:18,24 80:9 127:19 188:23 216:13
**reached**
14:3,21 61:11 67:16 75:7 79:1,18 84:9
**reaching**
61:10,16,20 62:12 67:17 76:8 77:1 291:23 301:22
**read**
58:15 59:4,5 176:2 190:14 212:13 235:22 272:23 274:21 276:5,12,19 277:24 280:22 288:14 293:13 299:1
**reader**
130:20
**readers**
130:16
**readership**
130:23
**real**
103:19,20 307:6,9,13
**Realistically**
158:25
**realities**
87:4
**realizing**
87:9
**realtime**
168:21
**reason**
34:16 90:16 103:20 115:18 142:10 152:6,9 154:3 155:9 159:10 175:1,23 192:22 203:10 215:10 220:19 224:16 237:24 305:13
**reasonable**
103:16 106:12
**reasons**
192:3 219:8 258:11
**reassuring**
92:15 100:22 101:6 230:1 231:1
**recall**
10:11 13:12 14:18 17:20 20:18,22 21:1,10 24:1 25:22 50:14 62:15 74:3 106:1 110:21,24 112:7,8 113:22,25 114:7,10,20 123:25 130:3 131:8 175:7 181:24 197:12 198:4 208:3 210:16 212:2 221:17 235:13,17 249:17 250:16 255:11 274:25 276:21 279:25 303:5 305:8,10 306:4
**recalled**
81:3,23 83:3,4 84:24
**recalls**
50:12,20
**receive**
120:5,8 123:19 129:9
**received**
13:3 99:6 288:10
**recent**
11:1,3,6 26:3 265:15 268:9,10,23
**recently**
110:14 149:8 250:4 269:6 294:2
**receptor**
40:14 42:12, 17,18 44:9, 11,18,21 45:3,10 46:1 60:8 63:10 87:10 113:20 144:9 145:16,25 153:12 155:2,19 157:2,12 158:6 161:11 172:22 193:1 201:11,24,25 202:12 205:2,19 213:4 214:10,15,16 220:13,18,20 221:7 296:25 298:12
**receptors**
146:1
**recognize**
164:24
**recognized**
225:4
**recognizing**
180:18
**recollection**
14:14 15:8 25:18 281:16
**recommendation**
213:13
**recommendations**
212:20
**recommended**
287:17
**recommending**
148:6
**record**
6:6 7:7 8:4 9:18 14:8 57:19,21,25 105:5,7,12 170:9,11,16 175:10 210:5,10 240:2 246:25 247:10,15 265:2 286:6, 10 290:3,7 302:15,20 307:19,23
**recruited**
36:3,7
**rectal**
38:5

**reduce**
89:25 155:3 157:24 158:13,14 180:21 181:12,17 188:24 228:4 296:10
**reduced**
144:14 149:16 158:15 227:19
**reduces**
145:9 174:1 180:14
**reducing**
149:3 154:24 157:1
**reduction**
161:13
**reevaluate**
251:3
**refer**
19:19 42:15, 17,21 43:2, 5,22 51:17 52:9 75:2 97:7 121:21 132:18 250:23 307:14
**reference**
16:10 197:11 211:15
**referenced**
17:6 22:13, 14,15 76:1 77:14 87:21 131:11
**references**
17:6 21:21
**referencing**
108:3
**referral**
51:20
**referred**
55:4 56:17, 19 107:4 112:9 253:14,19 258:16 259:18
**referring**
30:3 43:6 44:25 45:2 62:23 72:3 75:4 98:5,7 136:7 138:17 139:2,4,6,12 161:24 209:14 226:10 250:24 258:15 259:19 282:14 285:2,4 286:1,2 287:24,25
**refers**
109:8
**reflux**
14:4 33:7,10 36:15 38:24 39:1,7,9,16 40:5 48:25 49:13 53:8 56:25 57:5 87:5 100:24 103:21 112:13,14 115:11,12 117:21 121:10 122:1 123:14 125:9 138:1,4,7,14 141:16,25 142:2,3,9, 10,17,18,19, 23 143:3,13, 19 148:9,11 151:17 159:12,14 160:10,11 161:10 164:2,5,6,21 166:25 167:1,2,3 172:5 212:21 213:2 220:12 271:14,15,16 275:8 278:11 284:24 297:23
**refluxer**
100:25
**refluxes**
146:11
**refresh**
250:15
**refrigerated**
222:1
**refusing**
93:16
**refuted**
84:16,19
**regard**
30:12 63:17
**regarding**
14:3 27:17 36:16 37:8 40:9 42:8 54:22 58:11 60:21 75:20 77:12 78:23 79:23 83:7 112:13 113:3,21 121:7 138:3 153:6 172:21 187:17 215:6 224:14 255:12 257:12 262:1 274:5 275:6, 7 278:9 280:3 304:3
**regular**
23:13,14
**regulatory**
50:7,11,19, 25 65:9 69:23 70:1, 6,13 74:25 75:2 76:20 82:24 83:8, 12 84:8
**regurgitation**
143:2 154:11
**relate**
77:4 134:18 190:8
**relate-**
118:5
**related**
24:20 53:1 111:18 113:21 145:12 173:3 178:6,7 180:2 185:19 230:11 305:16,17
**relates**
22:4 141:2 147:3
**relating**
13:14 67:10, 12 69:15 70:7 210:14 256:8,25 271:14
**relation**
11:11 14:16 21:14 25:20 59:21 60:14 62:6 102:12 107:5 297:22
**relationship**
59:1 158:12 185:22 188:3
**relative**
43:11 155:1 186:6,11,18 187:4,10,14, 16,19,25 188:2,6 189:23

**relay**
180:6 244:18 257:3
**relevance**
68:12 163:16 189:22 190:12 195:18 254:8,15
**relevant**
18:8 266:22 273:8,9 279:4
**reliable**
58:25 198:14 199:9 290:20
**relied**
15:20 16:1, 11 291:9,20, 22 292:11 293:16 294:3,18 295:8 296:1, 16 297:5,15 298:3 299:17 300:6 301:2, 18,21
**reluctance**
215:21
**reluctant**
215:8,10
**rely**
182:12 218:2 223:6,22 293:2 298:16 303:19 306:22
**relying**
176:13 251:19 269:1 299:6
**remain**
146:17 231:15
**remaining**
288:12
**remember**
15:5,6,25 20:25 25:15 26:14 42:6 48:15 78:14 91:22 108:24 109:1 110:3, 7,19,25 114:1 151:8 160:6,24 193:12,19 194:18 274:3,8 277:8 278:8, 15 279:20 280:1 289:1, 15,18,24 305:1
**remembering**
24:2 79:23 88:7 127:14 130:21 235:19,20 262:6 266:10
**remind**
20:7 120:18
**reminding**
9:14
**remote**
6:6
**removed**
48:2 49:18 78:5,10 79:6 255:18,21 256:12 257:7 258:12 259:7,17 260:20 307:3
**renal**
131:20
**repeat**
12:18 18:12 71:4 200:24 231:7
**rephrase**
162:14,15
**replicate**
81:15
**report**
7:14 9:7 10:19,20,24 11:15,21 12:15 13:21 15:12,15,18, 22 16:1,9, 10,13,17 17:3,5,9,13, 19 18:3,6, 11,19 20:4, 17 21:15 22:7,22,25 23:5 25:20 26:11,19,20, 21 27:15,20 30:6 54:21, 24 58:3,6,9 59:16,19 60:4,12 61:12,14,18, 22 62:4 77:6,13,21, 24 87:17,18, 22 96:25 106:24 127:15 132:24 138:18 156:2,7,11, 22 165:19 178:23,24 179:1 186:16 188:18 197:11 198:2,8 201:4,18 202:7 203:22 204:6,17 211:22 225:11,15,18 226:5 235:6 249:22 250:10,23,24 251:2,10,20 252:5,7,9,13 257:14,20 263:17 264:1,9,10, 12,16,22,23 265:12 267:2 269:2 271:18 276:15 290:10,12,16 291:10 292:12 293:2 294:4,18 295:8,16 296:1,16 297:5,16 298:3,17 299:6,17 300:6 301:3, 8,18,22 303:9 307:16
**reported**
265:16
**reporter**
6:10,13,15, 17 7:2 289:21
**reporter's**
41:9
**reporting**
200:22 201:1 204:20
**reports**
17:23 18:2 21:12 30:3 174:6 262:24 269:1 303:17
**represent**
20:1,3 25:9 201:15,16
**representatives**
6:12 275:13 276:9
**represented**
8:21
**request**
122:4
**requested**
10:14
**requests**
10:17

**require**
130:5,8,10 246:10 273:12,16
**required**
223:4
**requires**
60:11 169:9, 10
**research**
13:3,6,14,19 21:6 23:11 31:21,22 32:5,6 33:25 34:20 35:25 36:2,13,24 37:16 38:9, 10,12,19,20, 22 39:5,14, 18 40:9,24 42:2,12 46:7,17 51:5 52:19 56:10 63:22 111:13 114:15 115:4 120:1 123:19 124:1,5,18, 24 125:3,5, 15,19 134:17 157:20 259:19 288:10,11
**researcher**
31:21
**reserve**
36:18 302:7
**residency**
35:23 45:7 113:17
**respect**
140:9 149:1 191:7
**respected**
65:10 252:12
**respond**
41:23 50:14
**responded**
18:6 214:11
**responding**
224:11
**response**
34:6 153:15 187:8,9 193:18 194:2,4 201:14 202:13 203:3 284:22
**responsibilities**
31:23 32:1 46:8 119:25
**responsible**
76:13 146:14 244:17 245:1 281:24,25
**responsive**
10:16
**rest**
18:7 37:3 46:17 90:25 281:20 302:7
**result**
157:16 160:1,17 178:19
**resulted**
130:25 273:20
**results**
247:23 256:20 294:14 300:1
**retained**
14:1,11 58:10 107:22 108:18 111:12
**revealed**
268:3
**reverse**
196:11 218:22 245:7,14
**review**
10:9 12:14 17:15 18:2, 18 29:16,20 30:13 31:4 33:21 47:24 58:17 59:20, 24 60:13,20 62:11,14 67:9,11,15 69:6,14 70:6 73:23,25 75:3 78:25 79:17 80:4,8 84:12 90:13 106:11 107:9 162:8 174:8 195:4 244:16 249:20 250:1,6,8,9, 18,19,21,22 251:13 253:4 254:17,21,23 260:3 263:21 264:4 266:25 267:10 272:6 274:14 277:20,22 303:8 305:5
**reviewed**
16:11 18:20 19:8 20:6,16 59:8,17 62:22 72:25 73:10 77:17 78:24 107:13 111:24 161:16 191:8 192:23 199:22 201:21 260:6 267:12 280:11
**reviewing**
11:17,25 26:21 27:21 62:16 64:3 76:15 245:2
**rewarding**
49:9,12
**rid**
144:17,18 158:1 163:5, 10,21
**right**
6:16 14:18, 19 15:25 19:5 30:6 37:12 38:25 39:23 40:2 45:22 46:10 48:7 55:25 64:7 65:4 66:5 67:17 68:11,20,22 71:15 74:15 84:3 86:23 89:9,17 90:2,18,20, 24 91:8,18 92:12 95:17 98:15 99:21 100:13,15,19 101:1,22 102:19,22 105:1 111:16 114:22 115:19 117:4,10 120:15 123:12 124:23 129:12 130:20 134:9 135:2,7 136:12 137:21 139:1,15 140:8 141:7 142:14 143:12,20,24 147:23 148:25 151:2 152:7 153:20,22 155:7,12

156:15,16
157:9 159:11
160:2 161:3,
25 163:8,21
164:14
165:3,11
166:11,20
169:7,9,21
171:23
172:4,20
173:24
174:6,17
175:7 176:10
178:13
179:23
180:3,16,23
182:17,18
184:9 185:15
186:7
187:12,21
188:4,7
190:19
191:11
192:3,19,25
193:12,24
194:14
195:15
196:1,2,3
198:11
199:17,23
200:9
202:11,18
203:5,20
205:7 208:12
212:4 216:8
220:1,15
224:19 226:3
227:16,21
228:9,17,21
229:6 231:14
234:2,7
235:8 236:4,
10,22,25
240:23
243:12 244:2
246:19 249:3
252:12
254:1,8,13
255:9 256:12
259:3,9
268:9,10,13
270:10 271:3
274:6,12
279:4,25
281:14
284:17
287:6,13,15
288:7 289:25
290:18,20
291:7 293:5,
25 295:12
303:18
304:16,21
306:19 307:7

**right-hand**
201:10

**ring**
108:25

**risk**
53:11 54:15,
22,24 63:20
78:4 88:12
90:22 95:15
133:4,9
135:2,3,23
136:6,12,15
137:17,20,23
138:2 153:2
154:15
171:22
172:2,3,7,9,
14 176:10
178:15
179:20
186:6,11,18
187:4,11,14,
19,25 188:2,
6,14 189:20,
21,23
191:22,23
192:21
193:14
201:15
205:13,24
206:11,19
207:11
222:15,16,24
224:15 227:4
228:4,5
229:17,25
230:1,5
231:3,9,25
232:13,15
233:5,6,7,24
234:1,5
235:23
253:25
254:10
255:15
260:24
262:12
263:16
291:16
292:22
293:12
294:13 295:3
296:10,25
297:12
298:12,23
300:1,25
301:12
303:23
307:11

**risks**
172:1 222:17
225:25

**RMR**
6:1

**rodents**
66:4,22
67:4,22,24,
25 69:1
70:15,23
71:6 72:4,
10,20 73:2,
12,14 249:3,
5,12

**Rolaids**
45:19,25

**role**
81:10 82:1
107:9 125:8,
10,19 128:22
129:2,3
135:11
147:10,11
159:4 241:3
254:7 270:4,
7 271:14
273:6,9
274:4,8
275:1,7
278:7,8,10
279:23
280:2,7

**roles**
32:4 46:5

**room**
9:1

**rough**
46:14

**roughly**
46:8

**round**
37:22 122:7

**RPH**
275:7

**rubber**
77:20 78:8
255:14

**S**

**safe**
54:10 58:22

**safety**
272:21 281:1

**sake**
300:19

**sales**
113:3

**saliva**
142:11
146:11
210:19
211:16

**salivary**
210:22 211:5

**sample**
166:1,2
180:2 268:21

**sampling**
161:25
268:17,20
**Sandhill**
288:11
**Sanofi**
8:19 114:12,
13
**sat**
253:4 254:23
**save**
22:21
**saying**
8:5 41:4
65:12 89:10
92:11 94:18
98:6 116:20,
22 117:3
119:22
139:24
160:15
164:23
165:23
166:12
167:10
168:4,20
180:24
181:15
189:17
212:15
228:21
252:7,10
265:3,5
**says**
36:20 82:5
88:14 90:24
97:4 109:14
198:13,24
199:1 212:8
244:17 257:9
265:13,14
266:6 270:21
274:14 276:7
280:25
285:19 288:8
**scan**
131:22
**scans**
132:3
**scenario**
103:17 127:4
130:19 238:4
**scenarios**
102:18,19
189:18
**school**
35:16,17
45:7
**science**
35:10 127:24
173:24
**scientific**
127:2 128:9
253:6 288:12
**scientifically**
195:14
**scientist**
71:10 88:15
**scientists**
84:11
**scoped**
134:20
**screen**
25:1 212:4
275:18,19
**scroll**
19:2 35:5
36:4 204:22
274:23
285:8,11,12
286:7,9,12,
14,19,21,23,
25 293:18
304:24
**scrolling**
19:3 287:11
**search**
10:15 22:1
24:6,15
75:12,16,19
77:22
**searched**
22:7,12
**searches**
16:3 21:14,
17,19,20
22:21 132:8,
17
**searching**
132:17
**second**
7:19 13:1
20:22 30:17
56:18 96:24
107:3 116:7
191:20 197:6
224:5 236:16
241:17 261:2
270:25
274:10
275:17
289:19 292:3
307:21
**secretary**
120:10,14
**section**
24:12 98:24
235:12 264:3
274:2,3
275:24
**sections**
201:14
**see**
12:25 16:7
17:24 18:15,
22 19:19
20:14,19
21:8 22:7,13
23:12 24:25
25:4 27:19
28:25 30:10
31:20 33:20
36:12,25
37:19 38:2,
16 47:11
51:12,15,20
52:19 61:22
63:5 64:6,11
80:3,4 82:5
83:14 97:1,
24 98:1
106:12
112:1,4
113:10
124:13,19
125:6,20
126:3 127:3,
4,17 130:24
138:18
139:8,9,10,
16 146:11
156:15
158:22
171:24 178:4
182:7 185:9,
15 186:8
187:23
191:23 195:3
197:4 198:19
199:25
200:18
202:13,14,25
204:25
205:4,21
212:8 214:25
215:5 220:21
226:20
227:14,17
228:1,10
229:17,18,21
235:7 237:8
243:19 244:9
246:19
264:2,3,10,
17,23
269:16,21
270:17,19
271:2,9
272:7 275:5,
15 276:5
277:4 284:1,
13,25 285:7,
23 287:14,
16,18,21
290:18,25
291:18
292:13
293:22 295:5
300:3 304:25
307:11

**seeing**
32:9 98:18 101:5 103:9 207:11 213:9 228:12 230:21 245:4 275:21,22
**seek**
31:12 127:16
**seeking**
127:11
**sees**
104:23
**segments**
282:16
**seldom**
112:2
**selected**
275:12 276:9
**send**
43:12 120:8 200:8 282:23
**sense**
38:8 126:10, 14,17 130:12,23 136:22 139:13 181:19 182:14 183:5 216:17 235:2 243:4 246:12 267:5,9 279:5
**sensing**
151:6
**sensitive**
112:16 115:1 166:21 190:23 240:20 267:19
**sentence**
212:8 275:17 276:2
**separate**
144:23 274:2
**September**
265:14
**served**
10:6,23
**services**
37:22,25 38:1 52:1
**set**
76:2 173:23 302:17
**setting**
47:18
**settings**
48:7
**setup**
285:12
**several**
119:20 225:12 232:9
**severe**
146:8 214:7 221:8,9
**shaky**
65:15 67:6
**shift**
210:12
**shifting**
142:5
**short**
35:18 57:16 68:8 144:18 145:10 155:17,20 161:1,13 165:12 167:6,8 175:2 240:20,21
**short-term**
45:21 163:19 229:12 230:19 232:18
**shorter**
184:4 240:10
**show**
32:22 56:1 72:4 73:14 76:20 90:9, 23 91:1 92:14 114:3 128:16 150:9 151:13,25 172:12,25 175:23 178:19 188:9 189:7 196:23 197:1 198:5, 14 199:20 203:1 208:16 212:3 233:4, 24 234:11 235:22 244:21 245:16 257:6 258:1,5 262:25 266:22,25 301:24 307:13
**showed**
29:23 30:5 56:6 60:10 74:16 91:12 159:7 237:8 290:21
**showing**
54:11,17,19, 21 71:18 88:19,21 89:18 176:8 208:24 234:18 237:10 243:5 265:21
**shown**
27:15 55:15 56:5 66:4 74:7,17 81:14 189:2 203:17 221:3 226:21 237:25 256:15 275:19
**shows**
76:19 186:20 196:12 207:16 225:16,18 227:2 233:1 243:2,3 268:15
**shut**
121:20
**sic**
267:3
**side**
29:10 51:7 60:5 62:17, 22 63:1,5,8, 12 97:24 145:4,7 153:6 163:17 182:18,21,22 201:10 223:13,25
**signal**
91:15 92:13 94:13,25 95:18 98:18 101:6,9 103:10 203:12 207:6,7 229:15,22,23 230:21 233:17,19 245:5 267:1, 2
**signal's**
92:14
**signals**
178:22
**signature**
16:19
**signed**
277:19 279:9 280:4,13
**significance**
194:9 237:13
**significant**
159:1

188:15,16,17 189:21 194:16,20 195:6,7,17 196:25 199:15 220:12 237:22 243:16,18 270:6
**significantly** 248:19 264:8
**silent** 9:12
**similar** 45:16 169:15 171:2 211:6
**similarly** 43:1
**simple** 93:6 135:21 240:4
**simplify** 251:16
**single** 91:3 92:18 93:7,22,25 140:7,10 174:6,9 178:12 189:8 197:5,8 206:22 208:12 229:11 231:21 232:25 233:9 234:10,12,18 245:19
**sipping** 147:23
**Sir** 200:11
**sit** 34:11 50:15 120:1 122:15 185:5 254:11
**site** 126:2,4 127:1,20
**sites** 40:23 127:17
**sitting** 80:20 83:25 114:20 178:16 184:20
**situation** 103:1 220:7 232:14 233:22 240:23,24 307:6,13
**six-month** 100:10
**size** 180:2
**skip** 300:13
**skipping** 224:6
**slightly** 40:19 41:14, 18 43:16 152:8,22 153:5 178:2 263:8 266:11
**slow** 148:2,3 149:4
**small** 48:19,21,23 49:20 131:15 147:9 176:8 196:21 283:14
**smoke** 135:17,24 171:25
**smoked** 135:7 233:2
**smokers** 233:24
**smokes** 172:5
**smoking** 133:20 134:12 136:8 137:23 140:20 171:10 172:12 187:18,20 232:9,11,12, 18 233:6,16, 17,25 234:6, 11
**snow** 36:8
**social** 28:11
**societies** 115:23 118:15 119:6
**society** 118:16
**soft** 106:3,13 107:23
**sole** 224:3
**solely** 16:1 66:9 163:17 187:10 209:14 223:9 236:15 239:2
**solid** 146:21
**solids** 147:24
**someone's** 39:4 49:18 117:23
**sore** 48:17
**sort** 18:4 22:8 38:8 63:5 64:12,18 97:6 99:19 132:23 155:7 157:19 193:16 197:4 237:2 245:23 266:19
**sounds** 8:7 32:17 114:18
**sources** 178:1
**South** 83:11 85:22 298:25
**Southern** 35:11
**Spalding** 15:13
**speak** 29:12 112:20,21 113:2 118:5, 8 119:1,18 120:5,22 122:3
**speakers'** 121:2,5,15 123:7
**speaking** 86:18 111:13,18 112:8,11,18, 24 113:13 114:8,11,14, 21,24 115:3, 6,9,25 116:17 117:25 118:3 163:17 186:25 289:5,6,11
**special** 284:22
**specialty** 32:18
**species** 67:12 69:16 70:7,15 72:23 73:1,

12
**specific**
37:3 40:3 54:1,4 56:11 60:9 61:5 62:10 69:1 71:22 75:4, 15 76:6 77:10 107:13 113:8 114:3 132:13 171:15 174:21 177:9 182:21 184:1,7 200:4 229:19 245:16 261:12 270:7 282:6,12 285:7 301:21
**specifically**
14:18 15:6 16:5 19:23 22:1,4 35:7 38:21 40:10, 25 54:22 60:18 61:6 62:14 63:25 64:21 79:12 97:19 101:15 110:20 117:19,20 131:10 137:24 140:22 171:19 173:3 177:21 183:19 225:13 226:8 253:24 256:15 259:25 270:4 279:21 285:9
**specificity**
197:17
**specifics**
105:23 109:1 250:20

279:22
**speculate**
277:3
**speeding**
287:12
**spend**
46:7 47:4
**spent**
47:5 118:11
**spits**
147:8
**spitting**
49:8
**splitting**
47:14
**spoken**
15:9 119:13
**sponsor**
112:1 126:8
**sponsored**
126:6
**squamous**
137:14,17,24
**squeezes**
142:14
**staff**
35:22
**stage**
168:24
**stages**
53:2,5
**stand**
6:5 57:23 85:4 98:3 105:10 170:14 210:8 247:13 290:5 302:18
**standard**
129:22 277:22
**stands**
107:21
**start**
20:15 46:15 193:21 212:16

213:1,18 214:9,15 215:14 218:23,24 220:14,17,19 264:13,15
**started**
25:15 43:9 74:3 81:17 84:3,4,7,15 85:10,17,18 99:4 113:16, 19 214:10 215:7
**starting**
211:25 212:1,10,11 213:16
**state**
6:2 7:7 58:20 82:24 101:3 202:16 277:15 281:17
**stated**
251:22 252:18
**statement**
130:18,25 166:8 198:22 200:19 203:9 281:3 282:23 285:7 303:20
**statements**
273:7 275:6 280:3,5,22, 23 283:2
**states**
38:17 82:9, 19 84:1 86:1,10 274:11 280:12
**statistic**
33:22 34:12, 13
**statistical**
33:20 34:2,

8,17 99:15
**statistically**
194:16 195:7,17,23 199:15
**statistician**
34:3
**statistics**
33:17 34:8 36:16
**stay**
213:24 214:20 215:25 216:4,10,18 219:1 220:14
**step**
212:24 213:18,23,24 214:8 220:9
**step-down**
212:2,12,23 213:15 220:6
**step-up**
212:1,11,16, 18,22 213:5 220:5
**Steve**
6:11
**stomach**
48:19 49:20 132:19,21 133:3 134:7, 24 135:14 140:4 144:13,19 145:9 146:5, 7,13,18,22, 25 147:1,5 148:3,8,10, 12,21 150:25 151:4,5,17 154:19,20, 22,25 155:3, 5,8,10 156:3,21 157:7,16,17 158:12,18

159:25 160:2,18,20 162:20 163:3,5,6, 11,13,22,25 165:2,5,25 166:2,10,16 167:5,7,9, 11,21 168:7, 11,12,16,19 169:2,13 204:20 221:11 260:16

**stomach's**
144:14 163:9

**stomachs**
144:11 155:8

**stop**
19:4 35:6 49:20 69:8 101:1 172:13 205:7 274:12

**stopped**
134:21

**storage**
248:15

**stored**
222:11

**stories**
35:18

**strength**
193:16 197:17 199:18 208:19,24 233:19

**strengths**
232:22

**stretched**
49:15

**strike**
32:19 53:22 56:18 67:8, 10 69:13 72:24 73:23 79:16 85:24 118:5 119:13 123:17,24 127:8 131:4 174:22 177:1 188:1 202:5 206:14 219:20 221:18 242:1 243:22 251:9,25 254:22 259:23 264:14 273:18 291:21

**stringent**
195:12

**strong**
187:15 233:17,19

**structurally**
218:6

**stuck**
195:13

**student**
36:20

**studied**
94:4 96:6 233:18 261:16 262:21

**studies**
13:6 26:20, 22 27:16 33:20 34:22 40:7,23 41:25 42:8 54:16,17,20, 23 55:19 56:14 57:8,9 60:17 61:10, 13,16,20 62:12,15,16, 22 63:1,14 64:12 65:21 66:2 67:24, 25 68:13 70:19,23 71:17,19,23 72:4 74:4, 10,11,12,13, 16 75:8,11, 13,17,21,22, 23,24,25 76:5,6,10 77:11,13,17, 23 78:23 79:1,18 80:9 81:13,14,17, 20,25 84:19 87:20 88:10, 18,21 89:1, 16,17,23 90:7,9,12, 17,19,23 91:1,10,14, 20,22 92:8, 10,14 94:1, 6,16,23 95:2,7,8,9, 11,13,16,22, 25 96:4,7,21 97:10 100:9 102:20 104:22 110:16 112:6 124:21,23 125:7,13,21, 22 126:22 127:1,16,18 148:23 149:2,5,6,7, 18,19,21 150:9,11 151:9,13,24 152:1 157:22 158:2,21 159:4,5,7,9, 15,16,21,24 160:4 161:16 172:11,12, 16,18,21 173:5,6,7,8, 15,18,19,20, 21 174:3,4, 5,24 175:1, 4,12,15,22, 24 176:3,5, 8,25 177:3, 4,11,14,16, 24,25 178:14,19 183:18,20 184:4,15 189:1,3,6, 18,23 190:4, 20,21 191:7, 13 192:23 193:3 194:22 196:24 197:7,22,25 199:1,2,7, 10,13,20,21 200:22,25 201:3,6,7, 16,17,21,23 202:2,5,6,7, 25 204:19 205:5,6,9, 10,12,18,21, 24 206:11, 18,23 207:4, 17,18,20,23 208:7,13 209:18 210:20 213:7 223:10,11, 12,24 225:1, 12,14,21 226:4,21 229:2,9,11, 16,22,24 230:8,12 232:23,25 233:13 234:13,16, 19,21 235:15 236:7,17 237:3,5,7,9, 10,25 238:12 239:3 241:1, 11,18,24 242:11,16,18 243:5,8,14, 19,22 244:8, 12,21

245:17,24 246:2,7,12 249:3,4 255:10,12 256:15 257:4,6,23, 24 258:1,2, 4,6,15,16, 17,20,21,24 259:4,11 261:7,16 262:3,9,22, 25 263:12, 18,19,23 264:1,6,8, 16,18 265:6, 8,20 266:2 290:18 291:9 297:1 298:13 301:21 303:8,10,11, 12,18,22 304:2,7 306:3,7,10, 19 307:7,12

**study**
13:3,5 33:22 34:9,14 56:6 74:8 76:18 77:19 79:21 81:7 82:5 88:14 91:4, 21 92:3,19 93:7,23 97:6,8,12,19 98:12,13,20 99:13 100:10,11 101:12,15,17 102:12,13 103:13 104:8,20 112:1,4 122:20,21 123:13 124:25 125:12 126:10,11, 13,14 128:11,12,13 158:2 161:4, 8,23 162:7 170:25 171:1,4,10, 16 174:8,15 176:1,2 177:25 178:17 179:4,10,14 180:4,8,10, 11,15 181:7, 11,15,20 182:12 183:12 184:7,8,16, 17,18,20,21, 23 186:2,4 187:1,3,11, 12 188:9,23 189:8,9,17 190:25 191:4,5 192:8,16,19 194:1 196:1, 3,8,10,12 197:5,6,8 198:4 199:4 202:10,11,15 203:3,7,16, 20 204:6 206:18,22,23 225:14,25 226:19 227:4 228:5,18 229:11 230:4,10,22, 23 231:3,9, 14,15,20,21 232:1,10,13, 20,22,25 233:1,9,25 234:7,10,11, 12 235:24,25 236:2,12,23 237:13,15 238:4,15 241:6,12,14, 20 242:3,5 243:1,3 244:4,9,14, 15 245:11, 13,16,20 246:4 248:10,12,13 255:13 257:4 265:15 266:1 268:15,19 291:14,20,22 292:4,11,21, 23 293:1,11, 15 294:3,13, 17 295:2,7, 10,20,25 296:9,12,15, 22,23 297:4, 8,15,21 298:2,9,16, 20,25 299:3, 5,9,12,16 300:2,8,12, 24 301:1,2, 11,17

**stuff**
33:3 47:23 195:19

**sub**
300:13,16

**sub-sub-subspecialize**
33:4

**subject**
210:23 248:6

**subjected**
248:2,10

**submission**
271:20

**submitted**
11:6 13:18, 21 17:18 25:12 26:6 36:13 63:14 271:21

**submitting**
26:10

**subsequent**
149:6,19 151:13,24 159:9,16 189:5

**subsequently**
46:2 53:13 74:17 88:19 150:18

**substantial**
147:18

**substantially**
148:23 152:7

**substantiate**
257:24

**substantiated**
88:10

**Sucralfate**
45:13

**sudden**
100:24 155:14 183:2

**suffer**
242:17 243:16

**suffered**
241:15 242:5 255:9 304:10,11

**suffering**
44:12

**suffers**
244:5

**suggest**
88:11 149:18 225:21

**suggested**
81:7 149:5,6 258:24 285:8

**suggesting**
71:5 101:10, 16 139:18 157:5 160:16 199:24 210:20 228:3 259:16 280:10

**suggestion**
65:5

**suggests**
188:21
203:14
**summary**
58:8
**support**
6:12 58:25
65:21 78:18
123:19
124:1,5,18
**supposed**
86:22
**suppress**
44:21 143:14
144:8
153:11,12
158:17
159:20
**suppressed**
150:15
**suppresses**
152:10
155:20
163:18
**suppressing**
40:19 41:17
161:1 271:15
**suppression**
40:4,13
143:11
153:14
284:21 285:2
286:2 296:10
**suppressive**
13:9 39:19,
24 40:8
138:11
224:18
287:24
**supraphysiologic**
64:16,19
**sure**
8:4,19
12:20,23
16:3 17:8,18
19:11,14
26:24 27:20
29:8,9 34:18
35:3 39:15
41:7 56:9
57:18 73:22
79:3,14 82:1
84:11 87:7,8
90:4 96:8,
10,13,20
97:14 100:2,
12,15,17
102:4 107:21
110:4,23
111:14,17
114:25
116:14,23
120:11
127:20 147:6
150:14 170:8
179:25
190:23
194:11 206:3
211:1,18,21
212:25 231:8
232:5
250:11,20,21
262:17
265:10
269:11
274:25 280:7
289:16,21
302:3,4
**surgery**
45:6 162:3
167:2,25
**surgical**
45:8,14
53:18
**surprise**
260:14
**surprised**
80:6 161:22
252:6
**surrogate**
100:14 101:4
102:25 103:6
104:18
**swallow**
49:2,4,7,11
142:11
**swear**
6:13,17
**Swinging**
284:11
**switch**
214:1,25
215:10,11
216:14
219:2,16,18
220:16,19,20
**switching**
216:4 219:11
**sworn**
6:23
**symptom**
142:20,21,23
153:17,25
154:2,4
213:17
218:25
225:4,23
227:21
**symptomatic**
189:5 213:10
**Symptomatically**
143:9
**symptomatology**
38:16 52:2
115:12
**symptoms**
39:1 45:16
64:7 103:5
132:11
133:13
138:9,11
142:21
145:11,12
147:14
154:10,12
224:18,20,23
225:10
284:9,23,24
285:22
**syndrome**
57:12 144:22
153:1,20,24,
25 154:1,14
220:11
221:10
**synergistic**
136:17,18
137:5

**T**

**table**
95:5 96:8
97:3 197:16
201:17 202:7
204:16
225:17
227:1,23
**tables**
95:4 96:9
122:7 227:25
264:6 302:4
**tablet**
261:12
**tablets**
247:24
248:11
261:6,15,24
262:2,20
263:6 266:4
306:23
**tail**
288:6
**Taiwan**
32:13 118:16
**take**
8:5 11:10,16
13:24 27:14,
24 30:18
32:4 38:7
45:20 51:21
52:5 57:16
64:8,22 65:6
94:2,18
102:6 105:2,
3,4 117:6

127:23 134:7 135:11,19 138:12 144:16,17 147:14 148:4 151:5 155:19 156:22 157:23 159:6 161:10 167:8 170:1,4 172:9 173:15 175:9,11 180:20 189:5 190:14,16 203:7 209:6, 12,24 213:19 216:21 217:9,18,24 235:16 243:4,8 247:3,7 261:9 264:19 266:21 273:17,19 283:11,13, 14,18,19,23, 25 289:25 294:21 295:12 296:3 302:10 305:25

**Takeda**
111:9,15 114:21 116:17

**taken**
6:1 7:12,17 30:14 50:16 57:22 84:9 101:7 103:7 105:8 170:12 210:6 215:17 222:6 247:11 290:4 302:16 307:24

**takers**
191:15

**takes**
27:3 34:9,14 51:8 78:3,6 148:8 180:12 183:24 195:1 213:21

**taking**
7:6,24 47:10 51:3 52:2 97:15,16 100:7 101:1 103:13 159:25 166:1 203:13 207:9 217:19 218:9,11,17 243:13 265:22

**talk**
47:20 90:5 116:18 117:20 119:9 171:3 180:9 191:7 205:5 240:8 289:19

**talked**
46:4 73:22, 24 75:22 155:7 182:1 193:6 194:8 215:9 229:1 249:15 256:6 290:10

**talking**
47:21 55:24 66:3,24 67:20 78:17 89:19 99:25 137:24 138:16,19 163:23 168:25 169:1 182:16 190:16 201:3 210:13 214:5 220:6 238:13 239:8 243:10,15

258:17,19, 20,21 285:19

**talks**
112:11 119:6 279:13 285:9

**Tan**
296:9,15,23

**taper**
117:23

**target**
214:13

**task**
63:17

**tea**
142:1

**teach**
134:16

**team**
32:5

**technician**
286:18

**techniques**
49:16 50:3

**technologies**
278:13

**technology**
7:25 274:17 286:11

**tell**
6:23 20:1 30:24 31:19 34:16 35:2, 18 40:10,11 52:18 54:2 75:19 83:13 86:16 87:7 91:20 104:23 110:5 112:19 114:3 115:1 117:7 119:4 128:4 142:25 166:23 171:16,18 178:18 229:20 233:25 267:7,10

268:7,11 279:23 306:13

**telling**
25:23 234:5 241:2

**tells**
80:17 100:22 101:6,8 104:25 178:20,21 227:19 228:14 234:10

**temporality**
197:18

**ten**
140:13 210:1

**tend**
109:16

**Tennessee**
8:9

**term**
41:4 95:14 109:2 111:11 121:1 122:7 136:1,4 138:15,23 139:4 160:19 161:14 167:20 185:2,4 191:3 211:3 212:17 224:11 245:6,7 246:16

**terms**
68:25 76:23 104:15 164:7 185:19 198:22 216:23 231:5,11

**test**
146:12 279:6

**tested**
268:17

**testified**
6:23 116:25
123:18
**testify**
106:15
**testifying**
8:17 50:25
100:4 107:17
156:18
**testimony**
6:18 72:6
97:14 100:1,
5 116:3
119:12,16
123:22 150:5
210:16
252:21
**testing**
39:11 87:23
194:9 266:14
268:2,3,23,
25 274:5,7
275:6,7
278:9 279:24
285:19
**tests**
115:14
281:15,19
**text**
9:10,24
**thank**
7:2 9:13
27:25 30:11
43:4 141:20
154:18 168:1
212:5 239:5
264:24 276:3
287:5,8,22
302:8,9
305:14,16
307:17
**theoretical**
158:20
**theoretically**
87:2
**therapeutic**
122:22
**therapies**
13:9 117:5,
13,19 162:2
224:18
**therapy**
39:24 51:25
101:20
103:20
138:11
212:1,2,11,
12,16,18,22,
23 213:5,15
214:11,12
220:6 284:20
285:3,20
286:1 287:24
**thesis**
35:16,19
**thing**
17:7 22:10
41:17 47:1
67:19 76:19,
20 141:2
148:7 155:20
165:23 168:5
214:13
234:19
237:8,11
240:19
**things**
7:25 11:17
22:8,12,17
23:16 24:10,
17 28:13,14
32:15,24
33:21 34:19
38:3 41:24
44:14 45:20
47:6,24 48:8
50:12 53:6
56:14 61:23
64:16 86:22
104:22
118:20
120:12
124:14 132:3
134:16
135:23
140:21
146:14 147:8
148:11 149:4
151:2 168:6
174:18 178:2
186:5 196:19
208:13
210:15 211:6
215:3 216:5
235:19
236:8,13
243:25
244:22 277:8
279:6 285:13
**think**
7:14,15 30:2
51:8 54:2
60:3 62:25
63:2 66:15
67:23 69:17
80:15,18
87:16 88:15
93:17 95:21
99:22
106:17,22
108:2,21
114:25
116:24
117:11 120:2
121:6 122:22
127:15
130:11
139:11,18,
20,22 140:25
141:13
148:16 149:8
150:8,22
156:2,6,10,
24 163:23
164:24
165:23
167:15 168:4
169:10
181:24 183:9
191:23
195:13
207:9,10,17
231:14 232:4
249:2,21
253:15 254:6
263:8 264:21
265:3 272:25
276:1 281:5
283:21 286:8
294:1 302:7
303:22
304:16
**thinking**
122:22
**thiocyanate**
211:11,13,
14,16,19
**thoroughly**
275:11 276:8
**thought**
68:19 116:24
125:8 130:2
166:19
279:15
**thousand**
152:23
265:16 266:9
**thousands**
89:11 153:8
**threat**
116:19
**three**
20:20 28:8
29:4 35:23
55:11 80:12
113:6
120:15,17
147:18
158:4,5
207:18
245:21
277:12
**three-year**
36:1
**threshold**
158:16
262:6,7
263:7
**throat**
48:17

**throwing**
132:1,13
**Thursday**
6:8
**tight**
147:3,4
**time**
6:7 8:1 14:2 20:8,25 21:19 23:8, 13,25 26:1, 9,15,21 27:1,3,10 29:5 32:4 35:18 46:7, 18,23,25 47:3 57:18, 20,24 63:22 68:8,9 69:18,24 87:5 96:5 98:8,10,14 101:7,11,16, 17 105:6,11 107:20 108:20,24 110:13 111:15 112:25 113:16 115:15 118:11 119:10 120:25 122:2 124:16 125:18 128:5 139:10,17,25 140:7 144:19 145:10 148:4,8,24 155:17,20 156:4 158:3, 9 161:1,2,14 162:11 165:9,12,20 166:1 167:6, 8 170:10,15 181:25 182:6 195:3 210:4, 9 219:11 221:13,19,24 222:4,9 226:3,9,12, 16,22,23,25 227:3,15,18 228:4,9,11, 13 230:19 237:6 245:25 246:13,24 247:3,9,14 248:21 252:13 259:22,24 264:4 267:8, 10,21 273:7 277:14 283:13,18 287:7 288:25 289:3,4,8,10 290:2,6 300:20 302:7,8,14, 19 307:22
**timeline**
44:10,20 113:17
**timely**
274:18
**times**
26:12,16 28:5,8 43:17,18 80:12 117:25 118:4,7,12, 25 119:6,13, 17,20 123:20 129:16,17,19 131:3,6,16, 19 137:10 158:4,5 181:10 217:2,17 220:10 232:9 282:9 294:1
**timing**
148:13 231:5,11
**tired**
36:8
**tissue**
52:24 71:14
**titled**
291:15 292:21 295:2,20 305:3
**tobacco**
138:3
**today**
7:6 8:8,22 9:1 10:10 17:16 27:13 29:13,18,21 30:9 31:5,9 80:20 83:25 114:20 139:14 303:1
**told**
12:8 90:3 104:24 260:14 267:13
**tomorrow**
139:14 263:4
**tons**
194:2 197:25
**tools**
231:17
**top**
17:24 45:18 107:1 132:25 270:6,22 277:15 304:24
**topic**
22:4 113:8 119:9 157:21 267:20 274:19 275:11 276:5,7
**topics**
279:15 283:7,14
**total**
247:1
**tours**
122:25 123:2
**toxic**
253:2
**toxicologist**
252:24 253:1
**trace**
89:13,14,15, 18,20,22,25
**tracings**
272:4
**track**
24:14 63:4 119:5,7,21, 23 120:4,20
**Tracy**
7:5 14:7 57:15 102:1 170:1 206:3 209:5 239:6 240:14 247:4 275:18 286:6
**trade**
43:24
**traditionally**
194:11
**training**
35:22,24 36:19 38:2,7 45:7 51:12
**Tran**
296:22,23 297:4
**transcript**
300:18
**transcripts**
29:21
**translate**
68:13 71:7 158:22 160:8
**translated**
159:20
**translates**
71:2

**translation**
160:13
**translational**
31:22 34:1 39:5
**treat**
31:20 39:16 47:17,22 56:24 86:1, 9,14 112:14 115:20,21 116:2 133:7, 8,18 142:6 143:18,23 144:6 145:14 156:25 179:6 182:25 212:21 214:20
**treated**
102:21 134:21
**treating**
40:5 48:25 117:2,14 125:9,10 143:10,11
**treatment**
51:18 115:15,16 211:24 212:10 214:2 272:22 281:2 297:23
**treatment's**
214:7
**treats**
159:14
**trial**
59:20,22 60:21 92:7, 10 94:17 102:23 106:15,19 107:17 128:14 172:18 173:17 174:1,2 181:14 182:4 183:14 184:3
**trials**
59:24 60:1, 3,7,9,11,13, 16,18 61:5 63:3 91:25 127:25 182:2,19 184:5
**trick**
83:24 100:1
**trouble**
139:21 150:3
**true**
23:22 35:20 74:18 76:23 124:15 140:24,25 141:4 144:18 149:20 150:12 165:18 185:12,13,18 215:23 217:13 241:7 268:19
**truth**
6:19,20,23 181:13,15
**try**
21:22 22:17 24:6 26:13 30:17 46:18, 25 115:19 133:18 167:20 181:9,12 190:19 215:20 231:23 247:18,19
**trying**
16:6 22:19 50:24 111:23 128:1,5 136:22 143:15 150:8 157:6 162:17 164:14 166:23 181:5 182:10 192:1,10 195:21 205:13 226:11,18 228:14 239:13 240:7 241:20 247:18 272:4,7 285:15 286:22
**tumor**
131:22 132:10,15 154:8,17
**tumors**
132:6
**Tums**
45:19,25
**turn**
10:13 28:25 30:23 58:5 276:16
**turned**
10:20 11:3
**turns**
138:7
**twice**
28:8 158:4, 14 287:20
**two**
7:13 11:5 15:21 20:14, 22 26:16 28:8 29:3 55:9 59:13 105:18 131:20 135:20 140:14,16 147:18 180:21 190:20 207:18 227:13 228:23 235:10 243:24 253:23 264:19 296:25 298:13
**two-year**
36:2 226:22
**type**
15:11 26:17 56:13 59:2 71:3,22,24 72:9,10 77:11,22 105:25 120:12 127:18 137:13 147:25 165:25 190:25 196:2,14 198:15 217:14 253:6 271:11 289:5
**types**
21:16 48:10 51:17 66:21 70:14 71:1 105:21 131:7,12 154:21 172:15 173:18 179:19 215:1 219:5 235:10 303:7
**typical**
21:24 23:9 140:3
**typically**
11:18 21:16 39:2 129:6, 17 146:17 156:12

173:22
223:10

U

**U.S.**
6:12 42:7 43:21 82:25 83:8,13 84:2,3,8,14 85:9,10,13 127:17 133:10 141:22 178:7 265:15 296:12 300:2
**uh-huh**
18:1 35:9 37:17 38:9 97:2 98:2,25 117:8 165:1 204:23 217:17 284:14 293:19
**UK**
294:14
**ulcer**
45:5,8 57:5, 6,7 133:7 153:3 221:9
**ulcers**
57:8,10
**ultimately**
41:17 168:4
**umbrella**
38:13 49:25 50:2
**unable**
158:10 213:23
**unanticipated**
182:22
**uncertainty**
175:3 187:23 219:12
**uncommon**
45:6 174:11 175:20
**underneath**
19:16 203:17
**understand**
11:8,13 36:15 39:15 42:18 47:2 50:24 51:14 52:22 71:4,9 72:1 100:4 121:6,14 123:5,9 136:5 137:8 138:22 148:15 150:8,12 160:15 162:18 168:3,14 177:7 179:16,25 218:12 220:15 242:9 243:24 249:9 262:18,23 268:16 290:12
**understanding**
23:20 53:23 54:5,8 55:6 56:23 70:25 82:12 97:13 204:10 251:1,24 252:1,14 255:3 260:2 261:21 282:18
**understood**
34:19 148:16
**undertake**
10:15 59:20 75:20 77:23 115:25 249:19 250:6 261:4,14
266:1
**undertaken**
77:7 249:25 255:22 256:2
**undertakes**
250:17
**undertook**
78:25 79:17 80:8 251:11
**underwent**
277:20
**undo**
190:19,20
**unethical**
183:10
**unex-**
183:6
**unfortunate**
28:13
**unheard**
45:9
**unique**
7:24
**United**
82:9,19 84:1 86:1,10
**universe**
75:8,10 83:10
**University**
8:10 31:13, 17 35:13 46:5 288:16
**unphysiologic**
69:4
**unrealistic**
68:11
**unreasonable**
103:24
**unstable**
8:2,3
**unusual**
175:1
**up-to-date**
23:22 26:24 277:17 279:1 280:14
**update**
23:9,19 24:7 124:16 269:8,17,24 272:19 273:21 280:6 284:9 304:14 305:4
**updated**
23:7,15 278:2
**updates**
274:16 277:21 282:9 283:9
**updating**
124:11
**Upper**
293:12
**upright**
146:23
**user**
100:20 101:2,3
**users**
99:3 100:19 236:3 238:17
**usual**
16:5
**utilized**
56:13

V

**V-A-L**
21:1
**Vaezi**
6:7 7:8,10, 11 10:5 14:1,6 19:7 23:3 24:25 58:2,8 84:23 121:25 170:18 240:13,16 241:12 247:17

264:21 285:10 302:24,25
**vague** 224:20
**VAL-BI** 20:22
**valid** 68:10 87:6 104:3 139:23 158:20 225:9 246:18 280:9
**validate** 272:4
**Valisure** 21:1 248:10
**value** 196:7
**values** 265:14
**valve** 142:15
**Vanderbilt** 8:10 31:12, 17 37:5 46:5 48:6 288:15, 16
**variability** 149:7 162:10 163:23 165:24 166:9 167:11,14,15 178:4
**variable** 22:9 27:10 29:3,4 46:15 118:12,17,18 134:9,14 135:1,18 137:12 139:7,9 140:15,18,23 146:20 149:21 155:22 164:8,10,12 166:11 167:16,18 169:2 177:8, 10 189:25 211:4 227:6, 9,12 229:6, 7,8 236:21 248:2
**variables** 135:8,25 136:7,20 141:10 184:14 194:7 237:23 238:2
**variation** 211:9
**varied** 38:1 143:9 214:18 282:20 307:10
**variety** 21:22 22:16 37:1,23 38:16 39:14 41:22 49:15 54:16 57:14 64:16 78:8 167:22 255:9 304:12
**various** 46:20 48:17 53:3 56:4 91:12 143:9 157:21 175:25 178:10 187:2 199:3 211:1 213:6 223:12 246:3 253:2, 11,13,21 262:1 274:9 283:2
**vast** 94:4
**venues** 109:18
**versa** 214:1
**version** 23:21 217:20 218:12,18, 20,21
**versus** 39:25 46:7,8 47:6 68:20 100:12 150:16 172:24 175:11 181:22 182:6,25 183:9 191:15 201:10,11 202:12,20 204:8,25 205:1 216:4, 24 218:11,21 219:6 222:18 230:19 235:9 246:8 261:6, 15 266:9 272:5 292:5 301:13
**veterans** 296:12
**vice** 214:1
**video** 6:6 31:4
**videographer** 6:5,11 57:20,23 96:11,14 105:6,9 170:10,13 210:4,7 247:1,5,9,12 286:24 287:6 290:2,5 302:14,17 304:17 307:22,25
**videos** 30:13
**vigilant** 124:11
**virtual** 118:17 277:1,7,11, 13
**virtually** 118:13,16
**virtue** 149:3
**vitae** 10:23 11:2 13:16,17,21 15:16 23:4, 21 24:1
**Vitamin** 222:6
**voice-related** 33:9
**volumes** 147:23
**vomiting** 49:19 154:11
**vote** 50:15 51:2
**voted** 276:15

**W**

**wait** 283:21 305:12
**waiting** 206:2,4,20 305:11
**wake** 165:5,13 166:10,16 167:4
**want** 14:8 17:8 19:3 31:18 37:2 42:7 47:20 54:1,3 58:2,5 71:12 80:18 89:25 94:9 96:11 97:14 100:2

102:11,16,17 105:3,5 111:4 114:25 115:2 116:23 118:23 119:8 122:13,17 125:16,24 127:15 129:18,21 134:17 150:11 153:7 165:16 170:1 174:1,3 178:4 179:25 189:5 190:14 191:6,15,24 194:21,23,24 197:5,20 198:25 205:12 206:6 209:6 210:12 211:3 213:17 215:22 217:9 219:16 220:8,12,13 224:6 226:15 228:10 240:3,8,12 259:6 262:17 265:9 267:8, 18 274:25 289:16,21 291:8 292:7, 10 300:13

**wanted**
19:11 29:8 34:18 36:15 41:7 82:1,16 124:17 125:17 126:13 203:9 207:7 259:5, 8 275:4 290:12 302:2,4

**warning**
221:15,18, 20,25 222:5, 10

**warnings**
222:22

**waste**
69:24

**watching**
168:21

**water**
147:23 163:8

**way**
38:24 39:2, 3,6 40:19 41:14,18,20 46:3 47:10, 13 83:18 89:24 102:16 108:1 123:7 137:7 139:8, 10,16 143:11 144:14 147:13 151:6 157:9 166:22 178:4 180:22 187:19 195:9 196:3 213:8, 15 228:19 230:23 237:14 255:3 268:6 306:15

**ways**
21:22 40:4 143:10 145:23 155:23 226:2 228:23

**WCRF**
259:2,9,11, 18,24 260:2, 15

**weak**
66:6 185:21, 24 187:15 189:12,20 259:11

**weaker**
187:18,20

**weaknesses**
232:23

**weekly**
120:22,24

**weeks**
47:13,15 131:20 284:21 287:21

**weigh**
190:24 222:17

**weighed**
223:4

**weight**
86:24 174:12 184:8 197:3 208:7 209:18 259:4

**well-designed**
183:11 205:6 207:20

**Welsar**
303:11

**went**
17:18 26:19 27:15,16 36:17 106:19 213:11 263:9

**Western**
36:17

**wide**
180:2

**wife**
36:19 45:23

**wine**
86:24

**withdrawals**
50:19

**witness**
6:13 7:1 14:12 61:3 116:9 134:4 150:2 204:2 238:21 240:18 242:24 264:25 274:23 275:20 281:12 285:15 287:2,5,8 293:18

**wonder**
276:24

**wondering**
224:2

**word**
20:15 142:4 153:19 156:23 167:15,18 188:16 193:12 267:9 305:21

**words**
65:11 142:13 199:9 291:1

**work**
24:20 26:17 31:16 33:6, 20 34:4,11 37:8 47:1 54:19 69:25 88:19 110:22 113:23 114:5 130:16 131:2,5 144:6,10 145:1,4,6, 14,20 146:1 154:24 162:6 182:23 196:11 213:3 252:21 271:11,23 288:16,21

**working**
108:15 218:19 219:3 289:3

**world**
82:22,25 83:4,9 84:25 121:20 133:6 141:22

178:12 207:5 259:19,22 307:6,9,13
**worried** 90:24
**worrisome** 263:4
**worry** 132:25 133:1
**worsening** 142:24
**wrap** 284:1
**write** 9:6 41:11 217:6
**writing** 128:22
**written** 9:9
**wrong** 117:9 166:22
**wrongly** 194:25

X

**x-ray** 68:17,18
**x-rays** 182:24

Y

**yea** 88:16
**yeah** 12:18 17:17 19:24 21:12 28:11 30:10, 21 35:6 37:12 38:17 41:6,8,23 44:8 45:3 46:9 50:23 63:12 70:17 71:5 81:5 85:9 86:12 96:20 97:4 100:8 106:2 123:3 135:16 136:12 138:24,25 140:6 141:12,17 144:7 145:15 146:5 147:22 150:24 154:16 156:11 160:14 162:25 164:12 166:7 167:14 168:23 169:4,23 170:4,6 171:8 172:17 173:22 177:8,20 186:3 191:6 192:14 198:6 200:17 201:4 204:2 205:8 210:1,2 217:1 224:13 227:9 228:8 235:5 238:23 244:8 253:22 254:4 266:18 271:20,21,25 273:15 276:1,3 280:17 281:12 282:6 287:2,5,22 288:25 292:9 297:17 300:16 304:21
**year** 14:24 23:10, 14,19 28:14 35:17 86:20 99:15 100:11 108:21 117:25 118:4,7,12, 22,25 119:6, 18 128:4 134:24 135:3,4,5 227:12 246:5 251:4,7 271:18,22 277:12
**years** 33:25 35:24 94:13,24 95:10,11,12, 23 96:1,21, 22 97:12,16, 23 98:1,7, 17,18 100:7 103:6 108:22 112:15 120:15,17 121:16 126:12,13 135:7,20 140:13,14 189:6 227:13 229:13,14,16 234:15 245:21 246:11 251:14 253:21 277:11,12
**Yoon** 96:20 206:25 207:19 237:12 298:20 299:5

Z

**ZAEZI** 6:22
**Zantac** 6:9 13:14 108:15 219:22 221:14,20,24 222:4,9,22 272:9
**Zerbib** 288:8
**zero** 167:3
**Zheng** 265:25 266:1
**zoles** 43:13,15
**Zollinger-elli-** 153:17,18
**Zollinger-ellison** 57:12 144:22 153:1,20,24, 25 154:1 220:11 221:10
**zone** 176:13
**zoom** 7:18,20,25 28:10,12,14, 15,16 30:25 32:8,11,13 46:20 120:15,16 160:13 255:15