# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO RECORDED DEPOSITION OF

TIMOTHY C. WANG, M.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Thursday, May 26, 2022

TIME: 9:04 a.m. - 8:06 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6152887-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

LEVIN PAPANTONIO
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
BY: DANIEL NIGH, ESQ.
MADELINE PENDLEY, ESQ.
E-MAIL: dnigh@levinlaw.com
mpendley@levinlaw.com

Appearing on behalf of the Defendants, Walmart, Inc. and GlaxoSmithKline, LLC GlaxoSmithKline, PLC
SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com

-and-

SHOOK, HARDY & BACON LLP
1 Seneca Street
29th Floor
Buffalo, New York 14203
BY: PEIYUAN GUO, ESQ.
E-MAIL: pguo@shb.com

-and-

DECHERT, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
BY: RACHEL PASSARETTI-WU, ESQ.
E-MAIL: rachel.passaretti-wu@dechert.com



Appearing on behalf of the Defendant, Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19109
BY: BRIAN RUBENSTEIN, ESQ.
E-MAIL: rubenstein@gtlaw.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC:
ARNOLD & PORTER KAYE SCHOLER, LLP
777 South Figueroa Street
44th Floor
Los Angeles, California 90017-5844
BY: KATHRYN PODSIADLO, ESQ.
E-MAIL: kathryn.podsiadlo@arnoldporter.com

-and-

DLA PIPER
550 South Hope Street
Suite 2400
Los Angeles, California 90071-2678
BY: CONNOR SCOTT, ESQ.
E-MAIL: connor.scott@dlapiper.com

ALSO PRESENT:
MARLENE GOLDENBERG, ESQ.
GoldenbergLaw

CAROLINE CHAMPION, Scientific Specialist
King & Spalding LLP
BETH BEHRENS, ESQ.
Barnes & Thornburg LLP

LAUREN MASSEY, Paralegal,
Levin Papantonio
VIDEOGRAPHER: GREG CASSIN
DOCUMENT TECHNICIAN: JOHN SCHMITZER



-------------------I N D E X------------------


| WITNESS: TIMOTHY C. WANG | |
|---|---|
| EXAMINATION BY | PAGE |
| MR. NIGH | 8 |


----------------E X H I B I T S--------------


| NUMBER | PAGE |
|---|---|
| Exhibit 6647 | 15 |
| Exhibit 6648 | 42 |
| Exhibit 6649 | 92 |
| Exhibit 6650 | 94 |
| Exhibit 6651 | 118 |
| Exhibit 6382 Previously Marked | 126 |
| Exhibit 6652 | 130 |
| Exhibit 6653 | 139 |
| Exhibit 6654 | 150 |
| Exhibit 6655 | 184 |
| Exhibit 6656 | 194 |
| Exhibit 6657 | 201 |
| Exhibit 6658 | 220 |
| Exhibit 6659 | 231 |
| Exhibit 6660 | 233 |
| Exhibit 6661 | 238 |
| Exhibit 6662 | 240 |
| Exhibit 6663 | 250 |
| Exhibit 6664 | 255 |
| Exhibit 6665 | 258 |
| Exhibit 6666 | 263 |
| Exhibit 6667 | 266 |
| Exhibit 6668 | 271 |
| Exhibit 6669 | 279 |
| Exhibit 6670 | 282 |
| Exhibit 6671 | 289 |
| Exhibit 6672 | 289 |


(Exhibits continued on next page.)



(Exhibits continued.)


| | |
|---|---|
| Exhibit 6673 | 305 |
| Exhibit 6674 | 312 |
| Exhibit 6675 | 319 |
| Exhibit 6676 | 327 |
| Exhibit 6677 | 340 |
| Exhibit 6678 | 350 |
| Exhibit 6679 | 353 |
| Exhibit 6680 | 371 |
| Exhibit 6681 | 381 |
| Exhibit 6682 | 394 |

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness only video recording, the witness is being spotlighted or locked on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather just the witness. For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.


This is the remote video-recorded deposition of Timothy C. Wang, MD, being taken by counsel for the plaintiff.

Today is Thursday May 26, 2022. The time is now 13:04 UTC. We are here in the matter of In re: Zantac ranitidine products liability litigation.

My name is Greg Cassin, remote video technician on behalf of US Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.


They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

T I M O T H Y W A N G,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. NIGH:

Q. Good morning, Doctor. My name is Daniel Nigh and I represent the plaintiffs in the MDL.
Can you please state and spell your last name, please?
A. My last name, W-A-N-G, it's actually pronounced Wong, but many people say


Wang and that's fine.
Q. Okay. Thank you, Dr. Wang.
Where are you currently located?
A. I'm currently in New York City and I'm at the Dechert office right now, but I work in New York at Columbia University Medical Center.
Q. And is anyone else in the room with you right now?
A. Just legal counsel here, Tom Sheehan.
Q. Anyone else?
A. No.
Q. Okay. Do you have any electronics in the room with you?
A. Electronics. Well, we've got this computer that I'm speaking from. I've got my cell phone, but it's -- it's off. I have no other computers nothing here.
Q. How many screens do you have in front of you?
A. Well, I've got my laptop, then I've got another larger video screen here to my left for documents and there's a screen on the wall and I'm not sure what this little

iPad is for.
MR. SHEEHAN: Dan, just so you know, we -- we set this up, there's actually a big screen in this room that's on where Tim is spotlighted.
MR. NIGH: Okay.
MR. SHEEHAN: And on the first break, we're gonna -- we're gonna shut all that down. I see that even the room itself is, like, there's a camera on the room or whatever, it's all unnecessary because Tim's got his laptop and --
THE WITNESS: And then the extra video screen.
MR. SHEEHAN: -- the video -- the monitor to see exhibits. But we can just go ahead and turn off the extraneous stuff at the first break.
MR. NIGH: Okay.
BY MR. NIGH:
Q. Doctor, other than this case, have you testified in any other case?
A. Yes, I have testified in several previous legal matters. The most recent one


was the Victoza litigation where I was expert for Novo Nordisk.
Q. And Novo Nordisk, that is a manufacturer?
A. Yeah, pharmaceutical company based in New York that makes the GLP-1 drug.
Q. And before Victoza, what other cases have you testified in?
A. Pfizer, on a celecoxib matter.
Q. Did you represent Pfizer in that case?
A. Yes, I did.
Q. Let me reword that question.
Did you testify on behalf of or were you retained by Pfizer in that case?
A. Yes.
Q. And Pfizer is a pharmaceutical -- Pfizer is a pharmaceutical company, correct?
A. That's correct.
Q. When did you testify in that Celexin case?
A. Could you repeat the question?
Q. When did you testify in that case you were just describing for Pfizer?
A. I'm not sure of the date, I think


it was around 2007, 2008 around that time.
Q. And how about Victoza?
A. That was more recently, I'm guessing 2012, 2013 maybe.
Q. Okay. And what other cases, other than Victoza Celexin and this case, have you been involved in?
A. Those are all the cases that I've been in involved in and testified for.
Q. Okay. Have you had your expert report disclosed in any other case?
A. I have had an expert report submitted in another ongoing case.
Q. Which case -- which case is that?
A. That is a case involving omeprazole for AstraZeneca.
Q. Now, is that omeprazole case where the injuries that are claimed are cancer or is it a different type of injury?
A. I don't know if I'm at liberty to discuss that case.
MR. SHEEHAN: If your expert report has been disclosed, I mean, in general, I think you can describe the allegations that you're aware of.


A. Okay. Yes. So, that case involves an allegation of cancer related to omeprazole, that's correct.
Q. Okay. And were you retained on behalf of the defendants in that case?
A. Yes.
Q. And that's a pharmaceutical company as well?
A. That's correct.
Q. And when did you submit that expert report?
A. I think around a month or two ago.
Q. Other than Victoza, Celexin and omeprazole and this case, are -- is there any other case where you submitted an expert report?
A. Not that I recall.
Q. Okay. And have you ever been retained by plaintiffs?
A. I'm sorry. Have I been retained by individuals alleging what?
Q. Have you ever been retained by plaintiffs at all in any capacity or any case?
A. No, no.

Page 14

Q. All right. Let me go through a couple ground rules.
You've testified before, so you probably know several of these, but I'll go through them again with you, okay?
A. That would be fine.
Q. All right. First one is, we have a court reporter who's trying to take down what you say. So, every answer needs to be a verbal response as opposed to uh-huh, ah-huhs or shaking of the head, okay?
A. Understood.
Q. Second, it's not an endurance test, so if you need a break, just let me know, we can take a break, okay?
A. Thank you, yes.
Q. And finally, if I ask a question and you answer the question, I'm gonna assume that you understood the question.
Is that fair?
A. Yes, understood.
Q. Okay. Doctor, it looks -- from looking at your invoices, it looks like you had billed approximately 75 hours.
Is that a good estimate of the time

Page 15

you spent in this case?
A. Last I checked, I think it was around 100 or so hours, but that's -- yeah, it's in the range.
MR. NIGH: Okay. All right. And let's go ahead and pull up Exhibit LP538 and we'll go ahead and attach this as an exhibit.
Q. And Doctor, this is your -- the expert report you've submitted for this case?
THE VIDEOGRAPHER: Counsel, what exhibit number are we starting that at?
MR. NIGH: That's what I'm looking for here. 6647.
THE VIDEOGRAPHER: Thank you.
(Exhibit 6647 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see the part of this says, Rule 26 Expert Report of Timothy C. Wang.
Do you see that?
A. Yes, I do.
Q. And that's you, correct?

Page 16

A. That is indeed me.
Q. And then that -- the date there is March 7th, that's the date that you disclosed this expert report?
A. Yes, that's correct.
Q. And then that's your signature right next to it, correct?
A. Correct.
Q. And Doctor, are all the opinions and the bases for your opinion contained in this report, correct?
A. Yes, that's correct.
Q. Doctor, first I want to ask you some questions about epidemiology in general. Two of -- two the main principles are important issues that you're trying to study in epidemiology studies are exposure and the outcome, correct?
A. Yes. So, I guess you're asking about epidemiology studies in general and epidemiology studies can vary widely in terms of the information they track. But I guess relevant to your question, two of the things that are often looked at, particularly I guess in cancer risk studies, would be

Page 17

exposure and outcomes, that's correct.
Q. And so, it's important to have adequate information on exposure and adequate information on outcome and epidemiology studies, correct?
A. I'm not sure what you mean by "adequate." One thing to understand in epidemiology studies you're often limited by the databases that you're able to interrogate. And so, I think we need to recognize that epidemiology studies in general can only take advantage of the databases that are available.
So, in many studies, the information is extracted from a variety of databases. And while the information is never perfect, I think many of them do reach excellent conclusions based on the information that is available. So, I'm not sure what you mean by adequate. I'm not sure that's a criteria used when reviewing these sorts of studies. But in general, you'd like as much information as you can, you know, in order to -- to analyze the question that you're investigating in that setting.

Page 18

Q. Doctor, what are the shortcomings or difficulties with epidemiological studies utilizing health insurance databases?

A. Well, health insurance databases have been extremely useful in the last several decades and have been a major source of studies in the clinical epidemiology fields, particularly in -- in also to medical conditions. And so, they differ -- they're retrospective studies and so they differ, I think, from prospective studies where you can decide what sort of information you want to gather and record it as the study goes along. These are retrospective and so you're interrogating essentially issues such as health outcomes and drug use. It doesn't include all of the information you'd like about patients, but they're very useful for making associations and raising hypotheses, I think and -- but in many case they have been very, very effective in answering clinical questions as well.

Q. And Doctor, health databases in the United States, they would be based on the health insurance that -- that people have, in

Page 19

other words, the captured data from various health insurances, correct?

A. I'm sorry. Can you repeat that question again?

Q. I said, health insurance databases in the US are dependent on getting that information from health insurance companies, correct?

A. The information is obtained from -- from a variety of sources. Often they're from billing information, hospital, doctors' offices. Some of it is actually provided by the patient, so it comes from a variety of sources. But, yes, they don't actually query patients themselves, they rely on other providers and mid level managers to provide the information.

Q. But they relay on that information in the context of that insurance company collecting that information, correct?

A. Yes.

Q. So, if a person switches health insurances, then information may be lost or you may lose follow-up on that individual, correct?

Page 20

A. I think -- I guess what you're asking about is how thorough is the follow-up in studies that are based on these sorts of insurance databases. And I would say that similar to clinical studies, you know, the information is never a hundred percent perfect. There's always the possibility of patients being lost to follow-up, but I don't know necessarily that the follow-up, for example, in insurance databases is worse than other types of studies.

But yes, it's not a hundred percent, I would agree with that.

Q. Well, Doctor, isn't it true that health insurance databases have been widely criticized for epidemiological studies in measuring latent adverse events?

A. I don't know if that's true or not.

Q. And isn't the reason because in the US people switch jobs often so they are switching insurance companies often?

A. Yeah, that's an interesting theory. I don't know if that's a bit -- if it's been widely criticized or -- so I -- I can't answer that question.

Page 21

Q. Did you look for any publications as you set out in putting forth your opinion in this case, did you look for any publications that discuss or criticize health insurance databases in the United States for epidemiological studies?

A. I read the clinical literature pretty widely, but I didn't look specifically for critical editorials, if that's what you're asking.

Q. Have you reviewed any that -- that discuss -- that are critical of utilizing health insurance databases for latent adverse events in the United States?

A. I haven't read any recently that I can recall.

Q. Okay. Do you recall reading any at any time?

A. Not that I recall.

Q. Doctor, in terms of your prior work before being retained as an expert in this case, none of your prior research involved ranitidine and cancer, correct?

A. No, I don't believe that I've -- I worked a lot in the field in the secretory

Page 22

medication, but I don't believe I've done any studies with ranitidine in the past.
Q. And none of your prior research has involved the carcinogen NDMA specifically, correct?
MR. SHEEHAN: Objection.
A. I don't think I've specifically used that nitrosamine in any research study that I can recall.
Q. Has any of your prior research involved research on nitrosamines?
A. Yeah, I have done research on nitrosamines.
Q. Which nitrosamines?
A. MNU primarily.
Q. And what is MNU?
A. It's a methylnitrosourea, that's a standard carcinogen used to induce gastric cancer.
I've also, I think, used an nitrosamine DMBA, which is another nitrosamine that's been used to induce cancer. So, these compounds -- I've also worked with MNNG, but I don't believe I've published with MNNG. So, I've used a number

Page 23

of nitrosamines in the laboratory.
Q. And which laboratory do you use these nitrosamines in?
A. My laboratory, which is currently at Columbia University Medical Center since 2004. I believe I've used the drug in my laboratory at the University of Massachusetts. And then prior to that, in my laboratory in Boston Massachusetts at Mass General Hospital.
Q. So, in your laboratory, you have used those nitrosamines to induce tumors inside of animals?
A. Yes.
Q. Okay. Do any of your published papers use inverse probability of treatment waiting?
A. I'm sorry, I don't understand that question. Could you explain what you're asking?
Q. Do you know what inverse probability of treatment waiting is?
MR. SHEEHAN: Objection.
A. Doesn't ring a bell offhand.
Q. Are you aware of whether or not any

Page 24

of your published papers used inverse probability of treatment waiting?
A. I am not understanding your last word "inverse probability of" what again?
Q. Inverse probability of treatment waiting.
A. Waiting. Yeah. No, no, doesn't ring a bell, sorry.
Q. Have you published any studies regarding nutritional epidemiology?
A. Nutritional epidemiology. Well, I've been in interested in nutrition, but I haven't done epidemiology studies in that area.
Q. And dietary studies are human study -- human epidemiological studies, correct?
MR. SHEEHAN: Objection.
A. Didn't follow it. So, diet- -- I've done dietary studies in animal models and that's, you know, as you probably infer from my CV, I'm primarily a bench researcher, a translational researcher. I've also been involved in clinical research. But most of my research has been in animal models and

Page 25

I've done a number of studies with a variety of diets in animal models, primarily in mice. But in terms of dietary studies in humans, I -- I don't do much human research, so I certainly haven't done dietary studies in humans, if that's what you're asking.
Q. It is. And you haven't published any studies that involved occupational epidemiology, correct?
A. No, I had not done research in occupational epidemiology.
Q. Doctor, what is a carcinogen?
MR. SHEEHAN: Objection.
A. Well, I discussed that in my report. Should we look at my report? I have a detailed description of carcinogenesis in my report.
Q. Do you have a printed out version of your report in front of you?
A. I do.
Q. You're free to refer to your report for any of my questions.
So, my question is simply, what is a carcinogen?
MR. SHEEHAN: Same objection.

A. Well, as I discuss in my report in terms of cancer and carcinogenesis on pages 5 to 6 of my report, carcinogens are exposures, chemicals, processes that induce cancer, it involves both initiation and promotion. And so, I do carcinogenesis experiments in the laboratory.

You know, one of the most classic carcinogens that I work with is an infectious agent, if you look back to pylori where we infect mice with this bacteria and both initiates and promotes cancer. So, a carcinogen is sort of defined as a molecule or organism or exposure that both initiates and promotes cancer. And as I've discussed in my report, the most common set of feature apart -- apart from DNA damage is -- is chronic inflammation. So, we've done a lot of carcinogenesis experiments in the laboratory. As we're discussed already, I've been using more recently Helicobacter pylori combination with, for example, MNU. And I've written several papers on the process of how cancer is formed through the combination of those two exposures.



Q. Doctor, what -- what -- the ten key characteristics of the carcinogens, are you aware of that principle?

A. Yes, I actually discuss that in my report as well.

Q. And many of the published articles that you've published reflect that terminology as well, ten key characteristics of carcinogens, correct?

MR. SHEEHAN: Objection.

A. Though, to be honest, the -- most of the sort of cutting edge research, cancer, biology does not really discuss those sorts of terms. Those are terms that are often more of interest to -- to invest to epidemiologists who are trying to look at environmental exposures. But I don't think that concept really is as relevant for basic biology research and cancer experiments in animals.

So -- so, I do discuss, of course, those key characteristics in my report.

Q. Doctor, what is a mutagen?

MR. SHEEHAN: Objection.

A. I also, I think, refer several



times to mutagenesis and this is something that we actually look at in the laboratory. You know, one of the best mutagens is actually aging, because, as you know, mutations occur normally with aging. But a mutation is a change -- typically a change in DNA sequence that arises during replication of DNA chromosomal duplication, and it's a natural process. But many investigators are interested in, sort of, exposures that can increase that rate, for example, sunlight exposure, other sorts of exposures. So, it's a change in DNA sequence, sometimes that DNA sequence change can be, sort of, passive and unimportant, sometimes it can result in an increase in oncogenesis often it leads to the death of the cells. So, mutagenesis is a change in DNA sequence that we are able to assess by sequencing DNA.

Q. Doctor, theoretically, a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?

MR. SHEEHAN: Objection.

A. I don't think it's as simple as that actually. Cancer is a multi-step



process that takes year and years to develop. Mutations are part of it. As I outline in my report, it involves genetic as well as epigenetic changes. And it's -- in answer to your question, it's highly unlikely, I won't say nearly impossible for a single DNA base change to result in cancer. Cancer is a complex process that requires multiple genetic hits, as described by Bob Weinberg, usually in humans more than three or four and the odds of getting those three or four changes are quite low. So, it really requires a lot of time, a lot of exposure and it involves more than just mutations in the end.

Q. Doctor, theoretically, it's possible that a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. I disagree --

MR. SHEEHAN: The exact same question. You just asked the exact same question in the exact same words.

Page 30

MR. NIGH: Tom, Tom. Don't -- don't -- don't use speaking objections. You can look at the realtime and see that it's a different question. Please don't litter the -- litter the deposition with speaking objections, it's not the same question.
MR. SHEEHAN: It's the same question.
MR. NIGH: No, it's not. I used the word "possible" at this point. I can point out the two questions if you really want to look at them and see if they're not the same exact question --
MR. SHEEHAN: Possible and theoretical, I mean, give me a break.
MR. NIGH: Please don't litter --
MR. SHEEHAN: Go ahead.
MR. NIGH: -- with speaking objections.
MR. SHEEHAN: If you want him to answer --
MR. NIGH: It's completely improper.

Page 31

MR. SHEEHAN: Dan, if you want him to answer, just ask him to answer.
MR. NIGH: Okay. You're doing all right with the objections in just as in form or just objection. But to come out and say it's exactly the same question, it's not. You can read the two questions. All right. I'll read the question again.
BY MR. NIGH:
Q. Doctor, give me one second.
Doctor, theoretically, it's possible that a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. As I mentioned before, I don't think it's as simple as that. And is it possible? I guess anything's possible, but it's extremely unlikely. And in my experience in the laboratory, a single exposure is insufficient.
Q. Doctor, are you aware that Zantac has been recalled in every country that has sold it?

Page 32

MR. SHEEHAN: Objection.
A. I understand, I mostly focused on the US. But I think I'm aware that Zantac has been recalled in the US, probably other countries.
Q. And the reason Zantac was recalled in the US was due to presence of NDMA in Zantac, correct?
MR. SHEEHAN: Objection.
A. It's my understanding that -- that the finding of NDMA in some Zantac preparations led to the recall by the FDA.
Q. Is NDMA a mutagen?
MR. SHEEHAN: Objection.
A. Yes, I've looked at a lot of the research and it has been shown that NDMA causes mutations in cancer cell lines and other cell lines that have been studied.
Q. Is NDMA a carcinogen?
MR. SHEEHAN: Objection.
A. NDMA has been shown to be carcinogenic in several animals species. I believe that would include rat, rabbit and mouse, but has not been shown to be a carcinogen in primates. For example, we can quote the Adamson study there and has been not shown to be a carcinogen in humans.

Page 33

Q. It's the Thorgeirsson, the Adamson study that you're quoting to to suggest that it's not been demonstrated to be carcinogenic in -- in primates?
A. That's correct.
Q. You're aware that the primates that were administered NDMA in that study they all died due to toxic effects, correct?
MR. SHEEHAN: Objection.
A. I do describe that in my report and if you don't mind, I'll take a look at that particular section in my report. But I do understand -- I do recall that the animals did die. On the other hand, they lived long enough to develop cancer in response to NDEA. So, that would not be a valid criticism to suggest that the study was -- was negative with respect to NDMA.
Q. Sorry. Your -- your thinking is that because they lived long enough to developed a response for NDEA, that somehow this -- this shows that NDMA did not detect

Page 34

cancer in the animals that all died due to toxic effects?

MR. SHEEHAN: Objection.

A. Again, NDMA did not cause cancer in the primates.

Q. Right. Because they all died due to toxic effects in the study, correct?

MR. SHEEHAN: Objection.

A. So, NDMA was given to the primates, they did not develop cancer, they developed liver fibrosis and they did not develop cancer.

In a similar study, NDEA did induce cancer in the primates. So, we can certainly that the primates, during the duration of the study, did not develop cancer.

Q. But the NDEA did not kill all of the monkeys in the study where -- where you can see the cancer effects of NDEA in the monkeys, correct?

MR. SHEEHAN: Objection.

A. I think we'd have to look at the study to look at the details of that. If you want to pull up the study, we can go through it.

Page 35

Q. Do you -- do you recall, without pulling up the study, do you recall that all the animals -- all the monkeys did not die when they were administered the NDEA?

A. Again, I do know that the monkeys developed cancer with NDEA. And I don't recall the details of their survival rate study, but if you want to pull it up we can certainly discuss it.

Q. Doctor, when all the animals die from a toxic effect, is it your belief that they're also looking for tumors in those animals that died from the toxic effects?

A. You know, when you do a study and I don't know the details about that protocol, but I do know that when we do these sorts of studies, we look at several things. We look at survival from the drug. We look at the development of cancer. I would say having done lots and lots of carcinogenesis studies that if a particular agent is able to induce cancer, you'll see the cancer prior to the death of the animals. It is sort of interesting that they -- the monkeys or the primates died from NDMA, it does suggest it's

Page 36

a fairly -- it can be a fairly toxic compound at those high doses.

But in my experience, if the agent was going to be a significant carcinogen, the animals prior to their death would've developed cancer or certainly signs of cancer. So, I understand your point perhaps in saying, well, you know, maybe we just -- maybe it is -- maybe you're suggesting it is can- -- a carcinogenic and we just didn't see it because they died, but I find that explanation weak. And having done a lot of carcinogenesis studies, I have a lot of faith in the fact that if they didn't find the cancer prior to the death of those animals, and they did live a number of months, it's unlikely to have been carcinogenic in that species at least at the doses given.

Q. Doctor, have you reviewed other studies where they measured DNA adducts after NDMA was given to monkeys?

A. So, you're talking perhaps about 06 methylguanine, is that what you're referring to?

Q. One of them, yes.

Page 37

A. Are you referring to others?

Q. Doctor, are there other adducts that can form from the administration of NDMA?

A. Yes.

MR. SHEEHAN: Objection.

A. Yes, and they are well-outlined in my report, but if you don't want to ask specifically about the others. Yes, so, I was -- so, I've looked at several of the studies, that I have looked at 06 methylguanine, which I think is probably the adduct of -- of greatest relevance. And I think we need to be careful in looking at that as a "biomarker," yes, it has been associated with the development of cancer, but it's not the exact same thing as mutagenesis or cancer.

So, simply finding 06 methylguanine in the liver or other organs, does not give you confidence necessarily that the agent is carcinogenic.

Q. Did you review any studies where monkeys administered NDMA developed DNA adducts 06?

Page 38

MR. SHEEHAN: Objection.
A. I don't recall, I'd have to look at my report.
Q. You're free to look at the report if you need to.
A. So, you're asking specifically with that 06 methylguanine or other adducts in the primate studies; is that right?
Q. Yes.
A. I see in the section I wrote on the primate studies, I don't see that I specifically referred to any DNA adducts. But I comment on 06 methylguanine and several methly- -- and 7-methylguanine, 04-methylthymine, M3 methyladenine, et cetera, et cetera, are a number of the DNA adducts that have been formed.
I don't see that I wrote much here on anything related to the primate studies, but I guess your question is if -- if -- if there were studies that showed presence of adducts in the primates, again, I don't think you can certainly equate that with necessarily the outcome of cancer.
As you know, mammals, humans

Page 39

particularly, but certainly also primates, have very, very strong DNA repair system. And so, simply the finding of the adducts doesn't necessarily lead to cancer. You know, there's the AGT, MGMT system that is able to repair significant amounts of DNA damage. And so, I don't understand the significance of finding any DNA adducts from NDMA.
Q. Doctor, it's been discussed extensively that there are lots of interindividual differences when it comes to a human's ability for MGMT repair, correct?
MR. SHEEHAN: Objection.
A. I haven't -- haven't looked in detail about the degree of interindividual variability. But I would say that for most physiologic processes, of course there's some degree of variability. I don't know how I'd classify it in terms of the range, but certainly there is individual variability in most physiologic responses.
Q. I mean, there are some humans that have complete lack of MGMT repair, correct?
MR. SHEEHAN: Objection.

Page 40

A. Yes, deficiencies have been described.
Q. And there are humans that have complete lack of repair of 06 methylguanine using MGMT repair, correct?
MR. SHEEHAN: Objection.
A. I don't think I've commented on that specific deficiency in the pathways, so I don't know the answer to that.
Q. Doctor, is NDMA a carcinogen?
MR. SHEEHAN: Objection.
A. I believe I addressed that question earlier as -- I'll restate my answer again. It's been shown to be a carcinogen in rats, rabbits, mice, perhaps a few other mammalian species, but has not been shown to be a carcinogen in primates and humans. And so, it is a carcinogen in some animal species that have been studied, but not humans.
Q. Doctor, is NDMA a probable human carcinogen?
A. So, the IARC, a branch of the World Health Organization, has examined the data and I think based on primarily the animal data that I've described has listed it as a

Page 41

Class 2A, which is a probable human carcinogen which, of course, means they've decided that they have not classified it specifically as a known human carcinogen.
Q. Doctor, probable means more likely than not, correct?
MR. SHEEHAN: Objection.
A. I think that interpretation is -- is absolutely wrong. By probable, the classification of probable is based on the strength of the experimental evidence. Again, primarily the animal studies and specifically they have stated that this should not be interpreted as -- in any way as a quantitative estimate of the likelihood that it will cause cancer in humans.
So, I think that is a misinterpretation and probable is simply based on the strength of the experimental evidence, primarily in animals.
Q. So, you disagree that the word "probable" means more likely than not?
MR. SHEEHAN: Objection.
A. I think in this instance and as defined by the IARC and the WHO, I do

Page 42

disagree with it because it's been used somewhat differently here, yes, that's correct.
Q. And Doctor, IARC is an arm of the World Health Organization, correct?
A. Yes, that's what I did state in my last answer.
Q. Okay.
MR. NIGH: Let's go ahead and pull up LP279. This will be marked as Exhibit 6648.
(Exhibit 6648 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, you'll see at the bottom of this document it shows World Health Organization Geneva 2002.
Do you see that?
A. Yes, I do.
Q. And --
MR. SHEEHAN: You can look at it yourself there, Dr. Wang, if you refresh your Box to the extent you want to.
A. Yeah, I want to see the whole

Page 43

document, if I could.
Q. Yeah. And obviously, you're free to look at the document. I'll ask you some questions, if you need to look at more of the document to answer the answer to that questions, feel free to.
My -- my next question is this document, it says it's a Concise International Assessment Document 38, and right below it says, N-nitrosodimethylamine.
Do you see that?
A. Yes, I do.
Q. And N-nitrosodimethylamine stands for NDMA, correct?
A. Yes, that's correct.
MR. NIGH: Let's go ahead and turn to page 4.
Q. Here you can see Executive Summary and I'm going to draw your attention, it's on the right side, if we can bold up the paragraph that says, Based upon laboratory studies, it says:
Based upon laboratory studies in which tumors have been induced in all species examined at relatively low doses, NDMA is

Page 44

clearly carcinogenic.
Do you see that?
A. Yes.
Q. And this is in 20 -- published in 2002, this is nearly two decades after the primate study that we were discussing previously the Adamson study, correct?
A. Correct.
Q. And so, the World Health Organization interpreted the information as:
Based on laboratory studies in which tumors have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic.
Do you disagree with that statement from the World Health Organization?
A. Well, I think I've already answered that question. I believe that NDMA has been shown to be carcinogenic in a number of animal species. I guess the -- the question remains in terms of humans, it has not been shown to be carcinogenic.
Q. Next, Doctor, it says:
There's overwhelming evidence that NDMA is mutagenic and clastogenic.

Page 45

Do you see that?
A. Yes.
Q. Do you agree with that statement by the World Health Organization?
A. NDMA has been shown to be mutagenic and in both rodent and human cell line, so I would agree with that.
Q. And next it shows -- I'm gonna to point the attention to qualitatively:
Qualitatively, the metabolism of NDMA appears to be similar in humans and animals.
Do you agree with that statement?
A. I'm not sure about that. I would say that the processes do appear to be similar. I guess trying to decide whether qualitatively they are highly similar or not similar is more difficult for me. I think there are significant differences between humans and animals, so I'm not -- I don't quite agree with that, no.
Q. Next it says:
As a result, it is considered highly likely that NDMA is carcinogenic to humans.

Do you agree with that statement from the World Health Organization?
A. I don't -- I would not use the term "highly likely." I understand what they're trying to do here and this, you know, the World Health Organization has sort of a different mission than, for example, cancer biologist who's interested in mechanisms and causation. I think this is a document that's presenting a word of caution about this particular substance. I think highly likely is an overestimation of the evidence to date, particularly for humans. So, I would not use that word if I was assessing the data myself, no. I'd say possible, but not highly likely.
Q. And next it says:
Potentially at relatively low levels of exposure.
Do you agree with that statement?
A. No, I don't. I think -- I think the evidence has indicated that low levels are highly likely not carcinogenic. So -- so, I would not agree with that. And I think potentially is -- is -- suggests a strong word of caution here in terms of what the WHO



is saying.
MR. NIGH: Let's take a look at the next page. If we can blow up the first paragraph here.
Q. Next, Doctor, it says:
Cancer is clearly the critical endpoint for quantitation of exposure response for risk characterization of NDMA.
Do you see that?
A. Yes.
Q. Do you agree with that statement?
A. I'm not sure exactly what they're trying to say here, but certainly in studies of NDMA, cancer is an important endpoint in terms of those studies looking at carcinogenesis by NDMA. I think that's fair to say.
Q. Next it says:
In addition to it being best characterized, in general, tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects.
Do you agree with the World Health Organization where they're discussing the



NDMA tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects?
MR. SHEEHAN: Objection.
A. I'm not sure I follow the statement here. Let me read it again. It's written a little awkwardly.
Q. Okay. Let me breakdown the question.
You see that it says, in addition to it. What do you think "it" refers to, NDMA?
A. Not sure, could be.
Q. The sentence right before it discusses NDMA, correct?
A. Yeah, it discusses cancer too, so that's why it's a bit confusing.
Q. Do you think that -- do you think you could misinterpret this as in addition to cancer being best characterized, in general, tumors occur at lowest concentration, that wouldn't make sense, right?
MR. SHEEHAN: Objection.
A. I -- I have trouble with this sentence. I'm not sure what they're trying



to say, to be honest.
Q. So, as you read this sentence, you can't tell that this sentence is stating that NDMA occur -- tumors occur for NDMA at lowest concentration compared with those typically reported to induce non-cancer effects?
A. Yeah, I don't know if I would interpret it that way.
Q. Wouldn't that --
A. I have trouble with this sentence in general because -- you know, and it gets also to a lot of the animal models. When they use the word "tumor," also that -- I find that complicating because tumors can include benign, not -- essentially non-neoplastic lesions, as well as adenocarcinoma or squamous cell carcinoma, for example. So -- and they're referring to a broad range of studies, many of which I've read. So, I -- yeah. No, I -- I am not sure about this sentence.
Q. So, the fact that tumors can refer to different types of tumors, gives you pause to whether or not this sentence is referring to NDMA that for NDMA tumors occur at lowest

concentration compared with those typically reported to induce non-cancer effects?
MR. SHEEHAN: Objection.
A. Yeah. Again, I just -- I just -- not sure what they're saying here. But if you have a specific question you want to ask me, that's not related to interpreting this sentence, I'll be happy -- happy to listen to it.
Q. Did you -- did you review this as part of the materials that you included as part of your opinion, expert opinion?
A. I have seen this document before, yes.
Q. What about this paragraph, do you recall how you would've interpreted this in part of forming your opinion?
A. I -- I don't remember this paragraph specifically, but I did look at it. I did look at the document.
Q. Now, the next sentence says:
The lowest tumorigenic dose for the development of hepatic tumors in male and female rats exposed to NDMA in the critical study was 34 micrograms per kilogram body


weight per day for the development of biliary cystadenomas in female animals.
Do you see that?
A. Yes.
Q. Doesn't that sentence also support that the sentence before it is discussing that, in general, for NDMA, tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects?
MR. SHEEHAN: Objection.
A. Well, I see the sentence and I see the reference to "tumorigenic doses." And again, I've already raised the concern about what tumorigenic dose means. And also, it's talking here about biliary cystoadenomas, which are benign tumors. And I see the dose is listed.
But I guess -- this is a WHO document and I think -- I might guess that it refers to studies done by others. It's a concern that this is actually trying to cite data here and there's not a reference given. Perhaps you could go back and look at the specific reference for the study is not --


not done. So, I think we've got to go back and look at the original studies that they're sort of quoting from.
But having read a lot of the rat studies and in particular having reviewed in detail Peto, which I'm sure you've read in my report, I comment on extensively and criticize extensively, I don't -- I noted specifically that in those rat studies, NDMA at the lowest doses did not induce -- did not raise the risk of tumors and in particular cancer. So -- so, I have a little bit of problem with this, this looks a little loose and dirty here in terms of their citing the literature. So, yeah, I -- I don't -- I don't buy that statement really at all.
Q. You don't recall which study that comes from?
A. I don't -- I don't recall, it certainly could be Peto, could be another study. Again, they don't reference it, so -- so how would we know really? I don't think either of us know exactly what study they're quoting from perhaps.
Q. Okay. Doctor, there's a -- you


mention that at the lowest levels, Peto doesn't show two increasing tumors.
Is that what you just mentioned?
A. Yes, that's correct.
Q. But actually, at the lowest level, it doesn't show statistical significant increase in tumors, but it does show an increase in tumors, right, compared to control?
MR. SHEEHAN: Objection. Mischaracterizes the study.
MR. NIGH: Doesn't mischaracterize the study.
A. No, I did not see any significant increase in tumors.
Q. What's the difference between a statistical significant increase and an increase?
MR. SHEEHAN: Objection.
A. It would be a statistical analysis would be the difference.
Q. Did you look at the bottom four levels of the Peto study to see whether or not there were actually more tumors in those bottom four levels compared to the control?

MR. SHEEHAN: Objection.
A. I looked at the data, yes.
Q. And there were more tumors at the bottom four levels, not talking about statistical significance, but more total tumors compared to the control, correct?
MR. SHEEHAN: Objection.
A. There was really no statistical difference.
Q. I'm not asking about statistical difference, statistical significant tests. I'm asking about whether or not the number was higher.
MR. SHEEHAN: Objection.
A. Well, if you're asking me is five greater than four, I would say that's true.
Q. My question is, in the Peto study there were more tumors in the bottom four levels in the animals administered the NDMA compared to the control, correct?
MR. SHEEHAN: Objection. Asked and answered.
MR. NIGH: Not answered.
A. I think I answered your question that there were minor differences in the



numbers of tumors at the lower doses, but they were not statistically significant. In having done numerous animal models and studies, I can certainly say that I would not regard those as different without any statistical analysis. So, in a research study, if the differences are, you know, less than a statistically significant difference, which required larger numbers in more animals. But overall, even looking at the data, it's clear that there was no increase until a -- a pretty high dose of NDMA was given.
And I would also say that, again, having done these sorts of animal studies extensively in the laboratory, I found issues with them calling them "tumors." And, yeah, when -- in some of their studies they actually group them together with other "lesions." There was no evidence of an increase in cancer in those animals until fairly high doses were used.
So -- so, yeah, that's why I have a problem with the term "tumors" and with minor differences that don't rise to the level of



statistical significance. My conclusion is, there's no increase in tumors up to the -- at least six -- for the lowest six levels, six doses of NDMA.
Q. Doctor, statistic -- when you're testing for statistical significance, you test the null hypothesis in a statistical significant test, correct?
A. Yes, that's correct.
Q. And if the finding has a p-value of less than .05 if you're doing a test at 95 percent confidence intervals, if the p finding is less than .05, then you can reject the null hypothesis, correct?
MR. SHEEHAN: Objection.
A. Depending upon the design of the study and what it is you're testing, that sort of analysis is correct and we use it for many of your studies. But again, it depends on what kind of question you're asking and the design of the study, but that is sort of a simplified version of how you use statistics, yes.
Q. And the Peto study testing for the null hypoth- -- they tested the null



hypothesis using statistical significance, correct?
A. Well, we'd have to look at the study. I'm not sure what comparison you're talking about here.
Q. Isn't the null hypothesis -- what would be the null hypothesis be that was tested in the Peto study?
MR. SHEEHAN: Objection. And if you need to see the document, Dr. Wang, feel free.
A. Yeah. I think we need -- well, specifically, if you want to look at a specific -- so, when we do statistics, we do them in any different settings and many comparisons. But I would just say, in general, what they're often trying to do in these sorts of studies is compare whether or not there's an increase in tumors or cancer specifically in one group of animals versus another. And so, typically in this sort of study, you would compare animals that received no NDMA to animals that received -- to a group of animals that received a certain dose of NDMA and then they would ask the

Page 58

question, is that difference statistically significant.

Q. Now, Doctor, the null hypothesis that's actually tested would be -- in the Peto study would be whether there are the same number of tumors in animals with NDMA versus number of tumors with animals that did not get NDMA, correct?

MR. SHEEHAN: Objection.

A. Again, we'd have to look at the exact comparison, but what you're describing is -- is a reasonable summary, I think, of the application statistics in this study.

Q. And isn't it true that the basic principle is that if you can -- if you cannot reject the null hypothesis, the 95 percent statistical significance, that does not mean you've proven the null hypothesis, correct?

MR. SHEEHAN: Objection.

A. Again, it's hard to discuss this without looking at a specific example.

Q. Doctor, do you know that concept that when you're testing a statistical significant test and you're testing the null hypothesis that just because you can't reject

Page 59

the null hypothesis, does not mean you've proven the null hypothesis? Are you aware of that concept?

MR. SHEEHAN: Objection.

A. Yes. So, statistics are used to give you an increased confidence that it's not a random difference. It doesn't prove that there's not a difference, that's correct. But it gives you confidence as to whether the difference might be real.

Q. So, just because something lacks statistical significance, does not mean that the null hypothesis is proven true, correct?

MR. SHEEHAN: Objection.

A. Again, I think you need to give me an example of what sort of study or conclusion you're asking for here.

Q. I'm asking the basic concept of statistical test using p -- null test hypotheses, not -- not a specific example.

So, again, my question is, just because something lacks statistical significance, that does not mean that the null hypothesis is proven true, correct?

MR. SHEEHAN: Objection.

Page 60

A. So, in answer to your question, if the p-value, for example, is not less than .05, doesn't mean that the two groups are absolutely the same. I think you're asking the question, does it prove that there's really no difference between the two groups. And I think the answers that I would agree that it doesn't prove that the two groups are identical, it just proves that in the -- in the setting of the study, you did not prove that it was significantly likely that the two groups were different.

I think I'm saying similar things to what you just said, but I hope I restated it in a way that makes sense to you.

Q. You are. Okay. Let's turn back to the WHO, put that document back up and let's take a look at page 22. And you'll see at the top here says, Effects Evaluation.

Do you see that on the right side?

A. Yes, yes.

Q. And underneath it it says, Hazard identification.

MR. NIGH: If we can blow up that first paragraph.

Page 61

Q. Do you see that?

A. Yes.

Q. And it says:

Although NDMA is acutely toxic and induces hepatic damage in several species at dose levels of approximately 1 mg per kg body weight per day in short-term experiments, the main concern is its carcinogenicity.

Do you see that?

A. Yes.

Q. And it says:

NDMA has been consistently shown to be a potent carcinogen in all experimental species studied.

Do you see that?

A. Yes.

Q. And do you agree with that statement from the World Health Organization?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah, I think I've already addressed that -- that question. And as I pointed out before, I think NDMA has been shown to be a carcinogen and a limited number of animal species, rats, rabbits, mice, but

Page 62

has not been shown to be a carcinogen in primates or in humans. And so, I don't think that sentence is accurate.
Q. Next, 22 at the bottom, we'll look at the first full paragraph and go to the next page. So, first, we'll start with this.
Do you see where I'm reading from? We can look at the --
A. I'm sorry.
(Cross-talk.)
Q. Yes, there.
A. Bottom there.
Q. It says:
Although the database is rather limited, data from epidemiological studies are at least suggestive of -- and let's take a look at the rest of the paragraph -- of an association between exposure to NDMA and several forms of cancer. And they -- they show gastric cancer there.
Do you see that?
A. Yes.
Q. Were you aware that the World Health Organization in 2002 had stated that epidemiological studies are at least

Page 63

suggestive of the association between exposure to NDMA and gastric cancer?
A. Yes, I was aware of that.
Q. And at the bottom we can see it says:
The data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer.
Do you see that?
A. Yes.
Q. So, here the World Health Organization is discussing these epidemiological dietary studies, correct?
A. Yes.
Q. And they suggest that the data fulfilled, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer.
Do you see that?
MR. SHEEHAN: Objection.
A. I see what they've written.
Q. And you disagree with that statement?

Page 64

A. Well, as I've said before, I don't think that NDMA is proven to be a human carcinogen and -- and I think the WHO would agree with me in that sense because the IARC has classified NDMA as Class 2A, they have not classified it as a known human carcinogen. I think they are pointing out here -- they are pointing to the studies that have been done, the association studies with dietary and occupational exposure and they point out that some of it is suggestive. I would agree that that sort of epidemiologic data with NDMA and humans is hypothesis generating and does raise the question as to whether NDMA might also be a human carcinogen. But proof is lacking and when it says here, at least in part, they're saying it, it's sort of -- it raises some questions, it's suggestive, but it certainly is not saying definitively here that NDMA is a human carcinogen. I have not seen a statement here in this document saying, NDMA is a human carcinogen, so I take it that there's -- they are in the same position as they are as the IARC, which is, it's -- it's a possibility

Page 65

and we're gonna classify it as 2A and we should be careful with this -- this compound, at least keep -- keep an eye on it.
But it's certainly not reaching the conclusion here in any other citations or any other statements that's it's definitely a human carcinogen.
Q. Okay. Let's take a look at the next column and the first full paragraph we can blow -- not -- not that one, the other, on the right side. Thank you.
And the first full paragraph it says:
Therefore, owing to the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumor formation and the apparent lack of qualitative species-specific differences in the metabolism of the substance, NDMA is highly likely to be carcinogenic in humans -- to humans.
Do you see that?
A. Yes.
Q. And do you agree with the World

Page 66

Health Organization's statement that NDMA is highly likely to be carcinogenic to humans?

A. As I've said before, I don't agree with this statement. I think it's a possibility based on the data that we've seen, but I find that the data falls short of -- of proving that. But I can understand the World Health Organization in terms of their role of sort of protecting human health and being very conservative and this document not a causality document, but trying to call attention to this as a potential contaminant that should be looked at. I understand their reason for having what I think is sort of excessively strong scientific language. So, as I said before, I don't -- I don't agree with the term highly likely. I don't think that the evidence meets that bar, but certainly possible, I would agree with, yes.

Q. And they're basing that on carcinogenicity of NDMA and laboratory species in part, correct?

A. They're basing it primarily on the basis of the experimental carcinogenesis in rats, rabbits, mice. The human data, we've

Page 67

already discussed, is -- is associations and weak, but they can -- perhaps they feel it's enough of it -- of it there to at least create this sort of conclusion for the WHO.

Q. Well, they're also basing it on evidence of direct interaction with DNA consistent with tumor formation, that includes human cells, correct?

A. Yes, that would include the mutagenesis studies in human cells.

Q. And then they discuss an apparent lack of qualitative species-specific differences in the metabolism of the substance as another part of the basis of this finding, correct?

A. Well, I think they conclude that many of the pathways are the same. Again, I disagree with the -- as noted before to say that there's really no significant species differences. I don't think that's really been shown, I think the evidence suggests otherwise. But -- but I understand that they feel the pathways are the same.

Q. Okay.

MR. NIGH: We can go ahead and

Page 68

take this document down.

Q. Doctor, have you done a comprehensive and systematic review of the medical literature to form an opinion on whether NDMA meets the criteria of being a human carcinogen?

MR. SHEEHAN: Objection.

A. Well, in my research and due diligence, I've looked at a lot of different sources of information. Certainly this is -- you know, the focus we should remember here is on ranitidine, doesn't seem we've talked about ranitidine very much, but, you know, that really is the focus, I think, of this case. So, I've looked in -- in great depth at all the literature on ranitidine and cancer and its potential or lack of potential to be a carcinogen.

But in my due diligence, I've certainly looked also at the NDMA literature and so I've looked at that as well, including occupational studies, dietary studies, previous evidence of other NDMA contaminated drugs. And we can certainly talk about valsartan, if you want. And I've read the

Page 69

plaintiffs' experts reports and I've commented on many of those.

So, yeah, I've done a broad review and search of the literature.

Q. Doctor, I'm gonna get to the ranitidine, we're only the first hour in. And I'm gonna to get to the valsartan epi. But for now my question is focused on NDMA purposely.

My question is, have you done a comprehensive and systematic review of the medical literature to form an opinion as to whether NDMA meets the criteria of being a human carcinogen?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah, I think I've already answered that. And so my answer is, yes, I've reviewed that literature. I've reviewed the literature and I've -- I've given my conclusions already about NDMA and the fact that it is -- it is a possible human carcinogen and certainly it's a rat carcinogen for sure.

Q. Doctor, is it your opinion that

Page 70

NDMA is a human carcinogen?
A. Again, I think I've -- I've answered that. It's a possible human carcinogen and I think the classification is two-way, seems quite -- quite reasonable and conservative.
Q. Is it your opinion that NDMA is a probable human carcinogen?
MR. SHEEHAN: Objection.
A. Yeah, we've already discussed the term of probable. I think as used by the WHO and IARC, probable means there's sort of extensive experimental evidence, primarily in rats and as we've talked about the human association studies. It doesn't -- it certainly doesn't indicate a quantitative aspect to it. I think, you know, for my own purposes possible I think is a better term, but probable is the term that's -- that's used here by the IARC to indicate extensive experimental evidence in animal models.
Q. Doctor, is it your opinion that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection.

Page 71

A. Again, I would frame it that it's certainly possible. There's enough of a chance that I think a classification is IARC as a two-way compound is perfectly reasonable.
Q. Would you disagree with the statement that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection.
A. Again, I think it could possibly cause cancer in humans, particular at high doses. So, I think, again, it's classification as a two-way compound is perfectly reasonable.
Q. You use the word "possibly." My question is, would you agree that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, I wouldn't use the term "reasonably anticipated" myself.
Q. So, you would disagree with that terminology?
MR. SHEEHAN: Okay.

Page 72

A. When I say that NDMA is a possible carcinogen, am I disagreeing with that? I don't know.
Q. And would you disagree with the statement that NDMA is highly likely to be carcinogenic to humans?
A. I've already answered that question and I think the term "highly likely" is overly strong and inappropriate.
Q. Okay.
MR. SHEEHAN: So, Dan, we've been going about, I guess, a little over an hour. You wanna take five?
MR. NIGH: We never take five-minute breaks, so I think we go ahead and to ten minutes.
MR. SHEEHAN: Ten, you want to take ten?
MR. NIGH: Yeah, let's do ten. We all say five and it never ends up being five, so that sounds good.
THE VIDEOGRAPHER: The time is 14:19 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)

Page 73

THE VIDEOGRAPHER: We're back on the record. The time is 14:34 UTC.
BY MR. NIGH:
Q. Doctor, do you agree the NDMA molecule is the same whether it's ingested or inhaled?
MR. SHEEHAN: Objection.
A. So, you're asking if the NDMA molecule is significantly different depending on what it's carried in. In other words, whether it's carried in the air or whether it's carried in liquid or solid, no, the molecular structure should be the same if it's NDMA. Of course the biological effects will be quite different.
Q. Do you agree that the NDMA molecule is the same whether it is in processed meat or it's attached to a pill?
MR. SHEEHAN: Objection.
A. Again, if we're talking about the NDMA molecule if you define it as NDMA, then its molecular structure is identical regardless of what it's carried in.
Q. Doctor, do you agree that

Page 74

epidemiology is not designed to determine if an individual exposure to a single person resulted in cancer, but rather epidemiology is designed to determine effects of exposure over groups?

A. Well, I find that -- sorry. I find that question confusing. Again, it sort of assumes that epidemiology is primarily designed to study cancer, which it's not. Epidemiology is a broad field of clinical investigation that uses databases to make associations. So, I guess you would have to define a specific study that you're -- you're asking about in this particular case.

Q. Doctor, is it your opinion that there's no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?

A. So, again, I think the question -- let me understand the question. The question is, in terms of the epidemiologic studies of ranitidine, are there any that suggest an increased risk of cancer or are they all uniformly showing no increase risk of cancer.

Well, I'll say the -- just to

Page 75

summarize the epidemiologic study I think they really do show that ranitidine is not associated with any increase in human cancer. Are there some studies that show an increased association? There are a few. And I discuss the reasons for that, of course, you know, some of them, particularly those where they don't use an active comparator, they show an increased risk, but most of that is explained by confounding by indication or reverse causality. So -- so, the studies are -- there are a few studies that show an increase in association. But taken together, there really is no signs of an increased risk of cancer.

Q. And Doctor, you answered that by just limiting my question to epidemiological studies. But I didn't ask in limited just to epidemiological studies, so I'll ask the question again.

Is it your opinion that there is no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?

MR. SHEEHAN: Objection.

Page 76

A. So, I guess your question then is a bit broader in terms of ranitidine, any study with ranitidine. So, I guess that would encompass clinical and nonclinical studies.

I would say that as outlined in my report, I don't think there is any evidence that ranitidine increases the risk of human cancer.

Q. And my -- you went specifically to ranitidine, but my question is ranitidine-containing NDMA.

So, it your opinion that there's no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?

MR. SHEEHAN: Objection. Asked and answered.

A. So, ranitidine containing NDMA versus ranitidine, I find that confusing. I guess I had thought that we had agreed that ranitidine itself, the products that are sold, some do contain -- some or many do contain small amounts of NDMA. So, I don't think that's a distinction that represents a difference here.

Page 77

So -- so, just to put a fine point on it ranitidine containing NDMA, which I believe is the same thing as NDMA, again, I don't -- have not come across any study that really suggests that it indicates an increased risk of cancer.

Q. Doctor, did you not review any of the ranitidine bladder cancer studies?

A. Clearly not discussed in my report. I did look at several of them, but that's not contained in my report. But what I saw in terms of the ranitidine bladder studies, I didn't them suggestive at all of an increased risk of bladder cancer.

Q. And you would find that the ranitidine bladder cancer study were not suggestive of an increased risk of bladder cancer even though every single study that's compared ranitidine to any control has found an increase, whether it be statistically significant, every single one has found an increase in the rate of cancer for bladder cancer for ranitidine compared to control?

MR. SHEEHAN: Objection. Mischaracterizes the evidence.

Page 78

MR. NIGH: Doesn't.
A. Again, the studies I looked at and again they're not in my report and I wasn't asked to do a deep dive on those studies, but the ones I saw, I must say, yes, they were not suggested to me that there was actually an increased risk of cancer or any causal relationship.
Q. Okay. Doctor, you did a Bradford Hill analysis, correct?
A. As noted in my report, I did a Bradford Hill analysis, yes, on ranitidine.
Q. And you did a Bradford --
A. It came with my report.
Q. Sorry. You did a Bradford Hill specifically for esophogeal cancer, gastric cancer, colorectal cancer and pancreatic cancer and liver cancer, correct?
A. That's correct.
Q. You did not do a Bradford Hill analysis for bladder cancer, correct?
A. That's correct.
Q. I want to make sure I understand your Bradford Hill analyses.
As I go through your Bradford Hill

Page 79

analyses, other than an analogy, I don't see where you discuss dietary studies or occupational studies; is that correct?
MR. SHEEHAN: Objection. Do you mean in that specific section of the report or do you mean in his report in general?
MR. NIGH: I'll ask the question again.
Q. I want to make sure I understand your Bradford Hill analysis.
As I go through your Bradford Hill analysis, other than the individual section for analogy in each Bradford Hill analysis, I don't see where you discuss dietary studies or occupational exposure studies for any of those criteria; is that accurate?
MR. SHEEHAN: Objection.
A. Well, the question's a bit confusing. I did a Bradford Hill analysis of ranitidine. And then I think you're asking about dietary and occupational studies of ranitidine, that doesn't really make a whole lot of sense that someone would have a dietary study with ranitidine or an

Page 80

occupational study with ranitidine.
Perhaps you're sort of alluding to whether or not I included the NDMA dietary and occupational studies, which, again, I think if we're talking about cancer risk with ranitidine, we really need to focus on ranitidine and not -- and not get lost with other types of studies. So, no, I don't think that would've been appropriate to include those sorts of NDMA studies because ranitidine has NDMA in it. And so, if you want to know about the NDMA risk from ranitidine, I think you should look at ranitidine studies.
So, no, I would not have found it appropriate and I think any Bradford Hill study that included those would've been, in my mind, highly flawed.
Q. So, you did not include the dietary studies or the occupational exposure study in your Bradford Hill analysis, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. So, as I indicated in my last answer, inclusion of a dietary and

Page 81

occupational studies of NDMA in a ranitidine Bradford Hill analysis would've been highly inappropriate and so they were not included in my analysis.
Q. Okay. Even though NDMA would go to the potential carcinogen that's found in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it wasn't attached to ranitidine, correct?
MR. SHEEHAN: Objection. Mischaracterizes his report. I think, Dan, you --
MR. NIGH: No, no, no. Don't -- don't give speaking objections.
MR. SHEEHAN: At the beginning at this line of questioning --
(Cross-talk.)
MR. NIGH: Let me ask my question again. This is inappropriate.
Q. My question again, even though NDMA has the potential carcinogen in ranitidine, even though that's found in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it was not attached to ranitidine, correct?

Page 82

MR. SHEEHAN: Objection. Mischaracterizes his report.
Q. You can answer.
A. So, the Bradford Hill analysis that I did was focused on ranitidine. I think in terms of understanding the cancer risk --
THE COURT REPORTER: I'm sorry. The doctor muted.
MR. SHEEHAN: We're muted? You can't hear us?
THE COURT REPORTER: I can hear you now.
MR. NIGH: Let's start that over.
Q. My question again, even though NDMA has the potential carcinogen in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it was not attached to ranitidine, correct?
MR. SHEEHAN: Objection. Mischaracterizes the report.
A. So, in my report, I discuss in detail the occupational and dietary studies with NDMA. But with respect to the Bradford Hill analysis, under analogy, in fact, I do comment on the dietary exposure to NDMA and

Page 83

the occupational study. So, let me just read just from the sentence under analogy:
There is no reliable consistent association between dietary exposure to NDMA and increased risk of esophogeal cancer. One occupational study reported an increased risk for esophogeal cancer from NDMA exposure.
So, in fact, under analogy, I do comment on those. But, again, the Bradford Hill analysis really needs to focus primarily on ranitidine. But I do allude and refer to those in my -- under analogy in my Bradford Hill analysis.
Q. Okay. Let me ask the question a little bit differently.
Even though ranitidine has the carcinogen NDMA, you did not include evidence regarding NDMA in your Bradford Hill analysis for any of the criteria other than analogy, correct?
MR. SHEEHAN: Object to the form.
A. I'm not sure. I think in the -- in the Bradford Hill analysis, let me just say, I looked at all the evidence, the totality of evidence, and again, I think the

Page 84

Bradford Hill analysis needs to focus primarily on ranitidine. But certainly all of the evidence was considered and certainly I discussed NDMA specifically in the Bradford Hill analysis. But the most relevant NDMA exposure in -- in the clinical studies is from ranitidine. And so, exposure from other sources is certainly less relevant.
But I think I weighed all the evidence and all this is taken into account in my Bradford Hill analysis.
Q. Let's take a look at page 44 of your report, we don't have to pull it up. But here you have esophogeal cancer.
Did you include any dietary study or did you mention any dietary study or Hidajat in your Bradford Hill criteria other than for analogy?
MR. SHEEHAN: Hold on one second. Objection. Asked and answered. Go ahead.
A. Yeah, I mentioned the dietary exposure in the analogy, I think that's where it belongs.
Q. Well, that's not actually

Page 85

responsive to my question because my question I'm saying other than for analogy, okay? So, I'll start it over again.
Other than for analogy, did you mention any dietary study or Hidajat in any of your other Bradford Hill criteria?
MR. SHEEHAN: Objection.
A. Well, certainly I took into account all the dietary and optional exposure, but it's not specifically -- if you're asking if it's specifically mentioned in the other Bradford Hill criteria, it's mentioned primarily in analogy. It's not reported in the other categories.
Q. Okay. Page 45 for gastric cancer.
Other than for analogy, did you mention any dietary study or Hidajat in any of your other Bradford Hill criteria?
A. Again, I took into account certainly all the evidence from the dietary and occupational exposure, but I didn't mention those exposures specifically in analogy, but I do not mention them in the other criteria.
Q. Okay. Page 46 for colorectal

Page 86

cancer.
Other than for analogy, did you mention any dietary study or Hidajat for any of your other Bradford Hill criteria?
A. Again, I took into account in the Bradford Hill analysis all of the dietary and optional expose data, but I don't mention them in any data -- in any category except under analogy.
Q. For pancreatic cancer, would your answer be the same?
A. Yes, my answer would be the same.
Q. And for liver cancer, would your answer be the same?
A. Yes, it would be the same.
Q. Okay. Doctor, I want to direct your attention to page 16.
Do you recall discussing the endogenous amount of NDMA that can be formed, you know, background regardless of ranitidine ingestion?
A. Are you asking about endogenous NDMA formation from ranitidine versus dietary of food ingestion or are you speaking about NDMA --

Page 87

(Cross-talk.)
A. -- formed endogenously?
Q. No, let me be more clear.
You discuss on page 16 endogenous formation of NDMA from diets, correct?
Let me strike that question. I'm in the wrong spot.
A. I'm not finding that. I do discuss from diet on page 16 in my copy.
Q. On page 20, do you see the paragraph where it starts with:
Before evaluating the alleged risk of GI or -- or any cancer due to NDMA exposure from ranitidine use, it is important to put NDMA in context?
Do you see that?
A. Yes, I do.
Q. And your last two sentences you say:
In fact, it is estimate that endogenous exposure to NDMA is at least two to four orders of magnitude higher than exogenous exposure.
Do you see that?
A. Yes.

Page 88

Q. And it's your opinion then that, in other words, NDMA exposure for endogenous sources is considered negligible compared to endogenous exposure that results from normal human physiology.
Do you see that?
A. Yes, that's what those studies suggest is that the endogenous exposure is greater than intake from normal diets, for example.
Q. And one of those studies that you rely on is the Hrudey study?
A. Yes, 2013.
Q. And Doctor, are you aware that the FDA panel met and discussed that trying to measure the amounts of endogenous formation of NDMA that they've been unreliably measured?
A. I do understand that NDMA is difficult to measure. I don't recall a specific FDA document that commented on that, but happy to review that if you want to show it to me.
Q. Okay. Have you reviewed any panel discussions by panelists invited by the FDA

Page 89

that agree that as of 2020 that attempting to measure the amounts of endogenous formation of NDMA is unreliable as of that time?
MR. SHEEHAN: Objection.
A. I don't recall the reference you're referring to.
Q. And Doctor, are you aware that the Hrudey study and Fristachi made many assumptions in order to try to calculate what the endogenous formation of NDMA is in the human body?
MR. SHEEHAN: Objection.
A. I don't recall all the assumptions and calculations that went into their conclusions, but happy to look at the document and review it if you'd like.
Q. Doctor, are you aware that the studies use Monte Carlo simulations?
MR. SHEEHAN: Objection.
A. I do know what Monte Carlo simulations are, I don't recall whether these studies used those or not.
Q. Doctor, are you aware that if any of the Monte Carlo assump- -- any of the assumptions utilized for the Monte Carlo

calculations are off, then they can have drastic effects to the ultimate output for the Monte Carlo calculation?
MR. SHEEHAN: Objection.
A. I can't comment on that statement without seeing specific examples.
Q. Are you aware that that's a shortcoming of using Monte Carlo simulations?
A. I know that Monte Carlo simulations have limitations, but it all depends on the specific study in terms of the utility of that type of modeling.
Q. Doctor, you cited the Florian study in your report, correct?
A. I did.
Q. Did you ever look at the Hrudey study to see the inputs that they relied upon for assumptions of NDMA in plasma and urine to formulate their calculation?
MR. SHEEHAN: Objection.
A. I'm sorry, I'm confused. Are we talking about the Florian study now or the Hrudey study?
Q. The Hrudey study. Did you ever look at the Hrudey study to look at the



assumptions that were made in terms of the amount of NDMA found in plasma and urine?
A. I do remember the Hrudey study made a number of assumptions. I can't recall the details of what those assumptions were.
Q. Did you ever look to see whether or not those assumptions made in Hrudey were inconsistent with the values given by Florian?
MR. SHEEHAN: Objection.
A. I don't remember comparing those two studies directly, so I -- I don't remember doing that.
Q. Doctor, you didn't consider the Zeilmaker study when you made this conclusion, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, which -- which study?
Q. Zeilmaker, Z-E-I-L-M-A-K-E-R. You didn't cite that here, correct?
A. Well, I didn't cite it in this particular section of my report. I don't recall whether or not -- I'd have to look at the study whether I've ever seen that before.



Q. Okay.
MR. NIGH: Let's go ahead and take a look at Hrudey first, it's LP551. This will be marked as Exhibit 6649.
(Exhibit 6649 was marked for identification.)
BY MR. NIGH:
Q. And do you see at the front here it says, Drinking Water is Proportion of Total Human Exposure to Volatile N-nitrosamines, and the first author is Steve -- I'm gonna to keep calling H-R Rudy, Hrudey, I'm not sure if that's how it's pronounced, but it makes it easier to follow.
Do you see that?
A. Yes, I see the first page of that study.
MR. SHEEHAN: And do you have the document, Dr. Wang, in your Box?
THE WITNESS: Yeah, it just showed up in the box.
Q. And this document has been marked as Exhibit 6649. I want to draw your attention to Table -- Table VII, it's on page 2191.



Doctor, you can see here it says, Inputs to the Dietary Exposure Module with Consumption Data Presented for Two of the Eight Age Cohorts.
Do you see that?
A. Yes, I see Table VII.
Q. And do you see at the top it says Biau- -- Biaudet et al.
Do you see that?
A. Yes.
Q. And underneath that it shows NDMA nanograms per gram?
A. Yes.
Q. And underneath that, the one that has the most NDMA for nanograms per gram, that's fish and seafood, correct?
A. It says, fish and seafood has 0.37 nanograms per gram.
Q. And that's more than cheese, beef, pork, poultry, they're all lower in terms of nanograms per gram, correct?
A. They're a similar range, but, yes, quantitatively lower.
Q. Okay.
MR. NIGH: Let's go ahead and take

a look at the Zeilmaker study, LP560.
And this is marked as Exhibit 6650.
(Exhibit 6650 was marked for identification.)
BY MR. NIGH:
Q. And do you see it says, Risk Assessment of NDMA Formed Endogenously After Fish-With-Vegetable Meals?
Do you see that?
A. Yes.
Q. And the first author is Marco Zeilmaker.
Do you see that?
A. Yes.
Q. And wanna draw your attention to the summary where it shows the 95 percentile of long-term exposure distribution was around 4 nanograms per kilogram body weight in young children and .4 kilogram per .4 nanogram per kilogram body weight in adults.
Do you see that?
A. Yes.
Q. Now, if an adult weighs 50 kilograms, that would only be 20 nanograms per day, correct?



Strike that. Let me reword that.
A. Yeah, I lost the math there.
Q. Now, if an adult weighs 50 kilograms, then that would be 20 total nanograms, correct? 50 times .4?
A. For adults, yeah. Yes, that's correct.
Q. Did you ever consider this study in terms of your thinking that the 95th percentile of long-term exposure would only have 20 nanograms per adults, if they're 50 kilograms?
MR. SHEEHAN: Objection.
A. So, are you asking me whether I've -- I considered this particular study in my report? I don't remember if I -- I don't know if I referenced this one or not in my report. Let me see if I -- yeah. Actually, I do reference this in my report, I think, 336. Sorry, I did see this before and -- and I took this into account. And so, I'm not sure this changes anything in terms of my assessment, I think my assessment still stands. I'm not sure how this is -- how relevant this particular statistical modeling



and estimation of fish and nitrate rich vegetables in NDMA ingestion really is here.
Again, this is a -- an estimation, as we've pointed out, there's no real measurements of NDMA here. And this seemed to be a bit of a higher estimate than other studies I've looked at. So, I did take this into account, I don't think it really alters my conclusions in any way.
Q. You mean this -- this appears to be a much, much lower estimation than what Hrudey and Fristachi show, correct?
MR. SHEEHAN: Objection.
A. So, this is 20 nanograms?
Q. Yeah.
A. Let's go back and look at Hrudey, it was in the name range, I think it was also in the nanogram range.
Q. Well, Hrudey -- let's go back and look at Hrudey. Hrudey --
A. This is Table VIII.
Q. Hrudey showed that for fish exogenously it had the highest amount of nanograms per gram, correct?
A. Yes, it was nanograms per gram.



Q. But when you look at this food inside of the body formed, according to Zeilmaker, it's only 20 nanograms that are forming exogenously, correct?
A. Yeah.
MR. SHEEHAN: Objection.
A. We're getting to some numbers here. So, let's just slow down and take a look at those. So, Hrudey said --
MR. NIGH: We can pull this off the screen.
A. -- 37 -- this is 37 nanograms per gram in fish, right? So, for a hundred gram piece of fish, that would be 37 nanograms.
Now, if we go back to Zeilmaker, they talked about, as you said, 20 nanograms, but it wasn't -- didn't have a denominator of how many grams the fish weighed, so I'm assuming that it's -- again, a hundred grams of fish would be about 20 nanograms. You know, I think they're all in sort of same range, to be honest, but -- but please correct me if I'm wrong here.
Q. The table you're looking at Hrudey is exogenous amounts of NDMA. Zeilmaker is

speaking to endogenous amounts of NDMA being formed, correct? Inside the body.
A. Uh...
MR. NIGH: Let's go ahead and pull up Zeilmaker again. It's Exhibit 6650.
Q. And maybe this helps, if we look at the sentence right before what's highlighted:
The experimental results were combined with statistical modeling of Dutch food consumption data resulting in -- in predicted exposures to endogenously formed NDMA in the population.
Do you see that?
A. Yes.
Q. And the next sentence says:
The 95 percentile of the long-term exposure distribution was around 4 nanograms per kilograms in young children and .4 nanograms per kilogram in adults.
Do you see that?
A. Yes.
Q. So, the 95th percentile, you know, in terms of that exposure, that would be much higher than the median or the mean, correct?


A. Yeah. So, the 95th exposure would be the higher level, so...
Q. So, the higher level of this population would be getting 20 nanograms per day if they weigh 50 kilograms, correct?
MR. SHEEHAN: Objection.
A. Yeah, I'm not -- I'm not sure about their conclusions and their modeling here. I think I have to go back to the article here. I see what you're -- you're highlighting there and I think you're saying that that is their modeling of endogenous generated NDMA, I think that's what you're saying that sentence refers to, I'm a little unsure about that. But seeing more data on this -- let's see. The endogenous NDMA formation... Don't really have any tables that are showing endogenous formation here, so I'm not sure how they got that number. It's probably from their modeling, isn't it.
Q. Doctor, you realize that all these endogenous formation of NDMA studies are doing complicated modeling, including Zeilmaker, Hrudey and Fristachi, correct?
A. Correct, I understand that.


Q. And do you understand that the health organizations that have weighed in on this have criticized the measurements of endogenous formation of NDMA as being unreliable or trying to calculate and quantify how much NDMA is formed endogenously?
MR. SHEEHAN: Objection.
A. Again, I haven't -- I haven't -- I don't recall reading any criticism of that, so I can't really comment on that sort of concern.
Q. And one of the reasons is that depending on which study you look at, there are very wide variations in the estimated or predicted amount of NDMA that's forming inside of the body?
MR. SHEEHAN: Objection.
A. So, I do recognize that there's some uncertainties, certainly about NDMA levels. You're raising the concerns here about what are the exact endogenous levels, the same concerns have been raised about what the exogenous levels are. The same concerns can be raised about all the occupational


exposure and dietary studies. And I think that's a reasonable question and point and I think, for that reason, if your question really is regarding the NDMA in ranitidine, the best way to look at that is to recognize various invariability and then to look at the cancer rates in patients who take ranitidine. So, trying to drill down on trying to say the rates -- the levels of NDMA and -- and the drug equivalent to the lows to foods or optional exposure, those are tricky as you pointed out. And therefore, looking at cancer rates in ranitidine treated patients is the best way to answer those sorts of questions.
Q. Doctor, the amount of uncertainty that's raised for endogenous formation of NDMA is nowhere close to the amount of uncertainty that's raised for exogenous amounts of NDMA in a food, correct?
MR. SHEEHAN: Objection.
A. I wouldn't necessarily agree with that statement.
Q. Isn't it true that the amount of the uncertainty for endogenous formation of

NDMA depending on the study you look it can be as much as five magnitude?
MR. SHEEHAN: Objection.
A. I can't give you a number, I don't know if that's -- that's correct or not.
Q. How much NDMA do you think forms endogenous -- how much NDMA do you think was predicted to form endogenously for the Hrudey study?
A. Well, I think -- I mean, as I comment on my report, it's higher than the typical -- as I say here, the reasonable worst case estimates the total NDMA exposure from endogenous sources is 2.1 micrograms per day and the endogenous exposure to NDMA could be at least two to four orders of magnitudes higher than exogenous exposure. So, I think we do have a bit of a range here, but my reading of literature suggests that endogenous is probably greater than exogenous. But I agree that there is probably a range and the numbers are probably not as precise as we would like them to be.
Q. Doctor, do you -- in terms of your opinion that endogenous is probably greater


than exogenous, have you reviewed any of the health authority statements that suggest that any attempts to measure exogenous formation of NDMA and quantify are unreliable?
MR. SHEEHAN: Objection.
A. I'm not familiar with the reports you're referring to. Be happy to look at them. And I don't know what you mean exactly by exogenous formation of NDMA.
So, a lot of the exogenous NDMA, I think, is contained, right, within food stuffs, various medicinals, other types of things that are ingested or inhaled. I think -- I'm not sure if you're talking about forming NDMA exogenously as -- are you referring to in vitro experiments? Or I am not sure what you -- what you mean.
Q. Let me -- let me strike my last question, it's worded wrong.
Doctor, have you -- in terms of your -- in terms of your opinion that endogenous formation of NDMA is probably greater than exogenous formation of NDMA, have you reviewed any of the health authority statements that suggest any attempts to


measure endogenous formation of NDMA and quantify it are unreliable?
MR. SHEEHAN: Objection.
A. You know, I think you asked that question before about those reports. Again, I don't recall specific reports, so I can't really comment on those.
Q. Okay. So, previously you said you didn't -- you didn't read the statements by the FDA panelists, correct?
MR. SHEEHAN: Objection.
A. I don't recall reading the documents you're alluding to or at least I'm not -- maybe I don't -- I'm not sure what documents you are referring to.
Q. You don't recall reviewing any documents by the EMA, European Medical Agency, that discussed the unreliability of quantifying NDMA formed endogenously, correct?
MR. SHEEHAN: Objection.
A. I don't recall the EMA reports I think you're referring to, yeah, I don't recall those.
Q. And you don't recall reviewing any


other health agency or regulatory agency documents that discuss the unreliability of quantifying NDMA formed endogenously, correct?
MR. SHEEHAN: Objection.
A. I don't recall what documents you're referring to there.
Q. Okay, let's switch to exogenous amounts of NDMA.
Doctor, on page 19, Exogenous amounts of NDMA in ranitidine.
MR. NIGH: Okay, let's go ahead and take this document down.
Q. And Doctor, on page -- sorry, not 15, 19 of your expert report, you give amounts of -- exogenous amounts of NDMA that were found in the ranitidine pill, correct?
A. Yes, I refer to the analyses by FDA and GSK in terms of the amounts the upper limits of -- of NDMA within ranitidine tablets that they analyzed from drugs off the shelf.
Q. Okay. Let's talk about some of the testing that the FDA and defendants have done in terms of measuring exogenous amounts of

NDMA in ranitidine.
First, you're aware that the FDA did baseline testing where they tested the pill itself to see how much NDMA was formed -- was in the pill, correct?
A. Yeah, the FDA measured the amount of NDMA in the pill.
Q. Now, the FDA also did testing of aging the pill and seeing how much NDMA formed in the pill, correct?
A. I believe that's correct, yes.
Q. Now, are you aware that -- are you aware of whether or not the product that was purchased off the shelves that the FDA used for testing, the product purchase off the shelves, whether or not it was for the aging, the stability testing that the FDA did?
MR. SHEEHAN: Objection.
A. I don't recall the sources of all these pills.
Q. Are you aware that after the FDA did the stability testing at room temperature, that that's what initiated the full recall of Zantac in the United States?
MR. SHEEHAN: Objection.


A. I don't remember the exact time course or which -- exactly which tests led to the recall. I just do recall that -- that they found some NDMA that was above the limits of 96 nanograms per day.
Q. Are you aware that the testing that you've cited to on page 19 does not look at the additional amount of NDMA formed after the product is aged or stability testing or after the consumers' experience after they've opened up the bottle and broken the seal?
MR. SHEEHAN: Objection.
A. I'm not sure what data or documents you're referring to here.
Q. I'm referring to the data that you have on your paragraph where you talk about the F -- the amounts of NDMA that GSK found in their pill?
A. Yes.
Q. And the amounts of NDMA that the FDA found. Are you aware --
A. Yes.
Q. -- that that testing is simply opening up the bottle and testing the pill without seeing the effects of aging, heat or


humidity or any sort of stability testing on those pills?
A. Yes, that's my understanding is they -- they tested drugs off -- off the shelf, yes.
Q. This testing isn't the testing the drugs off the shelves, is it? This testing was the testing where the defendants supplied them the bottles for their testing, right?
MR. SHEEHAN: Objection.
A. Again, I'm not sure exactly where the -- where the pills came from that they tested.
Q. Are you aware that later when the FDA did stability testing that they purchased those products off the shelves?
A. Well, I am aware that stability testing was done and I think I comment on that in my report that ranitidine undergoes a slow -- very slow degradation and that occurs over time and is affected by heat, humidity and the crystal morphology. So, I presume that testing was done, and I cite the King article here, that further testing revealed that the levels increased over time, I think


I alluded to that in my report.
Q. But you don't allude to how much -- how much the -- how much additional amounts are forming in the ranitidine bottle over time, right?
A. I don't --
MR. SHEEHAN: Objection.
A. No, I don't -- I don't allude to the amounts that -- that occurred with aging, no.
Q. The FDA initial baseline testing that you've pointed to here that's up to 2.97 ppm, that doesn't answer the question of what happens when the product is aged and goes through the shipping and supply chain, does it?
MR. SHEEHAN: Objection.
A. Again, I just cite the numbers that were revealed by the initial testing.
Q. That testing doesn't include what would occur after the consumer purchases the product, breaks the seal and stores it in common places that consumers would store the product, does it?
MR. SHEEHAN: Objection.

A. I don't provide data on that in my report, no, that's correct.
Q. Okay. In terms of the defendants' testing, the defendants' testing that you've cited here GSK 7.6 ppm.
Do you see that?
A. Yes.
Q. That testing doesn't answer the question of what happens when the product is aged and goes through shipping and supply chain, correct?
MR. SHEEHAN: Objection.
A. I don't comment on that in my report, so I can't answer anymore -- provide anymore information about that here.
Q. And that testing doesn't give information as to what happens when the consumer purchases the product, breaks the seal and the amount of NDMA that can form in those pills after the consumers purchase the product, correct?
MR. SHEEHAN: Objection.
A. I think I've already answered that question.
Q. Well, I asked for FDA, now I'm



asking for defendants' internal testing.
A. I see.
I don't have any information in my report about additional testing here.
Q. Doctor, are you aware that the defendants decided to do two types of testing, see how much was in the bottle -- the pills in the bottle from retained product and then do stability testing, but at very extreme conditions that human -- that 50, 60, 70 degree Celsius, are you aware of that?
A. Yes, I am aware that additional testing was done by the defendants, correct.
Q. Are you aware of any stability testing by the defendants that looks at the extra amount of NDMA that can form when the ranitidine is exposed to temperatures and humidity -- or temperatures between 20 to 40 degrees Celsius?
MR. SHEEHAN: Objection.
A. I did look at the defendants' reports, I don't know if you want to -- are referring to some specific test here or some information.
Q. I'm not, there isn't anything



specific.
My question is, are you aware of any stability tests done by the defendants that looks at the extra amount of NDMA that can form when ranitidine is exposed to temperatures between 20 to 40 degrees Celsius?
MR. SHEEHAN: Objection.
A. Again, I read the defendants' reports, but I don't remember the details of their experiments if they did them.
Q. The defendants have very scant information for that sort of stability testing, correct?
MR. SHEEHAN: Objection.
A. I don't recall.
Q. And have you seen any testing from the defendants that shows how much NDMA would form in pills after the consumer would purchase it and break the seal and store it in a common place that consumers store their product? Have you seen any testing like that from the defendants?
MR. SHEEHAN: Objection.
A. I don't recall seeing any.



Q. Okay. Did you review the testing that Emery Pharma did that would simulate the consumer experience and/or conditions that would be seen in shipping and supply?
MR. SHEEHAN: Objection.
A. I did review Emery Pharma's data. I cite their citizen petition and also the FDA response to Emery Pharma's citizen petition. Yeah, so, I started -- did -- did see that.
Q. But Doctor, you don't cite any of Dr. Najafi's finding or Emery Pharma's findings as to how much NDMA is formed after a consumer would purchase the product and break the seal and store it in a commonplace, you don't mention that testing anywhere, correct?
MR. SHEEHAN: Objection.
A. Well, I do cite Emery Pharma's citizen petition. Yeah, so I -- so I did look at that. As I understand it, they found higher levels, but I'm not sure how reproducible they were and they did a number of manipulations as you're alluding to. So, yeah, but I certainly took that into account.

Page 114

Q. Well, in terms of scenarios, they'd be similar to consumer where they purchase the product and break the seal and store it in a common area that a consumer would store it.
Have you -- other than Emery Pharma, nobody else has done that sort of testing, correct?
MR. SHEEHAN: Objection.
A. I'm not sure that's -- that's right.
Q. Well, who has?
A. I don't recall.
Q. Who can you cite to that's done that sort of testing?
A. I think other testing has been done, but to be honest, I can't recall exactly who might've done the other testing.
Q. Well, who can you -- are there any defendants where they've done testing to simulate that experience?
MR. SHEEHAN: Objection.
A. Not that I recall.
Q. Can you point to any testing done by the defendants that would simulate real

Page 115

world conditions such as 20 to 40 degrees Celsius for stability testing?
MR. SHEEHAN: Objection to the characterization of Najafi's testing as to real world.
A. Yeah, I read the reports, I looked at the testing by GSK and FDA, I find them to be pretty valid. You're suggesting that unless you test in a steam cabinet for days it's not really real world. I don't think that's -- that's correct, so that we know that it does go under some degree of degradation, but to suggest that the baseline levels are totally irrelevant, I think, is a bit far off the mark.
Q. Doctor, I'm not suggesting the baseline levels are totally irrelevant. They're a starting point because we know that they're -- it's going to continue to degrade based on heat and humidity, correct?
MR. SHEEHAN: Objection.
A. So, there's a slow degradation process, it's probably somewhat variable and the factors are time, heat and humidity, but that doesn't mean that in every case, the

Page 116

levels rise to much, much higher levels. I think we don't have data certainly that this degradation process is -- is always significant or accelerated. And so, the -- the experiments that have been done, certainly raise a hypothesis that there can be more formed and I would not disagree that the levels can increase over time and with heat and humidity. But I don't find those sorts of experiments to really be that informative or really raise any other questions that I haven't already considered in my report.
Q. Doctor, you give the -- you give the levels of how much NDMA was found when the FDA and the defendants do their baseline testing. But what would the levels be that simulate shipping and supply chain and/or consumer experience, do you have any idea?
MR. SHEEHAN: Objection.
A. I don't think there's really good data on this. It's probably true. But, again, I'm not sure how important a question it is. I think we can assume that they are higher. But are they higher enough to be

Page 117

carcinogenic? I think we have real world data on consumption of ranitidine by patients and given the absence of any increase in cancer, I think the conclusion is that whatever the levels are in these heated or degraded tablets, they're not high enough to cause cancer and I think that's the bottom line.
Q. Doctor, I'm gonna get to the ranit- -- I think you're referring to ranitidine epidemiology studies, I'll get there. But right now I'm asking about the amount of NDMA in the pills.
So, I guess the answer is, you haven't seen from the defendants or from the FDA anything that reflects how much additional NDMA would form due to conditions that these products would go through in the shipping and supply chain or due to consumers' experience; is that accurate?
MR. SHEEHAN: Objection. Asked and answered.
A. I believe I already answered that question, yes. I don't recall any other information beyond what we've discussed.

Q. Okay. Did you review the Abe study?
A. The Abe?
Q. Abe, A-B-E.
A. That sounds familiar, I think I did.
MR. NIGH: Let's go ahead and pull it up, LP107.
A. I don't think I cited that in my report.
MR. NIGH: And we'll mark this as Exhibit 6651.
(Exhibit 6651 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you'll see the title says, Temperature-dependent formation of NDMA during the storage of ranitidine reagent powders and tablets, and you'll see the name Dr. Abe.
Do you see that?
A. Yes, I do.
Q. And if we take a look at the next page, just the summary. If we can go ahead and blow that up there. I'm gonna start



with, when ranitidine tablets from two different brands, let's go ahead and highlight that. You see where I'm at?
So, I'll read this off, it says:
When ranitidine tablets from two different brands designated as tablet A and tablet B were stored under accelerated conditions 40 degree Celsius with 75 percent relative humidity following, the drug stability guidelines issued by the ICH for up to two -- for up to eight weeks, the amount of NDMA in them substantially increased from 1.9 to 116 parts part million.
Do you see that?
A. Yes.
Q. And Doctor, that would be over a 600-fold increase in the amount of NDMA forming under those conditions, correct?
MR. SHEEHAN: Objection.
And if you need time to review the study, Dr. Wang, please do.
A. Well, I see their conclusion there, so they say that NDMA increased from .1 million to 116 ppm. And they're two different brands, one increased from 2.9 to



18, so that's not much of an increase. So, there's a larger increase 40 degrees for eight weeks. So, let me just take a look at the results here.
Q. Doctor, my question was simply, that would be over a 600-fold increase in the amount of NDMA forming under those conditions, correct?
MR. SHEEHAN: Objection. And I think Dr. Wang is reviewing the article.
MR. NIGH: Tom, it's completely inappropriate at this point.
Q. My question is, those numbers, that would be a 600-fold increase in the amount of NDMA forming under those conditions, correct?
MR. SHEEHAN: So, Dan, you're telling him not to review the article?
MR. NIGH: Mr. Sheehan, what I'm asking you to do is to stop instructing your witness during the deposition, it's inappropriate.
Q. Now, my question is, based on just that information that you see right there, when ranitidine tablets from two different



brands were stored and under accelerated conditions, 40 degrees Celsius with 75 relevant humidity following the drug stability guidelines issued by the International Conference of Harmonization for up to eight weeks, the amount of NDMA in them substantially increased from .19 to 116 parts per million.
My question is, .19 to 116 points per million, that's a 600 fold increase, correct?
MR. SHEEHAN: Mr. Nigh, I'd appreciate it if you wouldn't yell at the witness or at me. I think we've been very civil. All I did was ask whether you're instructing him not to review the article that you put up. I think we can -- I think we can -- I think we can be civil.
MR. NIGH: I agree, but I think it's inappropriate to continue to prompt over and over. My question is on this very specific information here, and I'm gonna ask it again, but the prompts are inappropriate. And

Page 122

I'm not yelling, I think the video will be very clear, this is not yelling. This is precisely --

MR. SHEEHAN: I think the video will be clear as well, you're raising your voice at the witness and it's disrespectful, to be honest.

MR. NIGH: It's not disrespectful.

BY MR. NIGH:

Q. My question here is, again, when ranitidine tablets from two different brands designated as tablet A and B were stored under accelerated conditions, 40 degrees Celsius with 75 percent relative humidity, following the drug stability guidelines issued by the International Conference of Harmonization for up to eight weeks, the amount of NDMA in them substantially increased from .19 to 116 parts per million, that's a 6- -- 600-fold increase, correct?

MR. SHEEHAN: Objection.

A. So, I guess -- let's just be clear about the results here. They -- they tested two different drugs, so they have A and B. We don't know what tablets they are. And I

Page 123

guess if you're asking about simple math for one of the drugs, I guess that was tablet A, it increased from .19 to 116 ppm, that one tablet, tablet A, did show, and I think your math is right, 600-fold increase.

Tablet B, which is 2.89 to 18, obviously showed a lesser, sort of, increase, perhaps, you know, six to seven-fold, but both of them increased at this really temperature 40 degrees C, I guess, that's, you know, well, 102 or higher for eight weeks. So -- so, but they did show an increase in NDMA. Yes, so, I think -- yeah, I think that's correct.

Q. Doctor, in your report, did you ever consider that when exposed to conditions like this, that the amount of NDMA can rise up to 600 times what's seen in baseline testing?

MR. SHEEHAN: Objection.

A. So, I don't think I cited this particular study in my report, but I am certainly aware that NDMA can -- the amount in ranitidine in preparations does increase with heat. This sounds like an interesting

Page 124

experiment at 40 degrees for eight weeks, but I -- I certainly took this possibility into account in my report, sure.

Q. You said this is an interesting experiment, 40 degrees per eight weeks, do you recognize that those are stability guidelines set forth by the ICH?

A. I did not know the exact stability guidelines off the top of my head, no. I didn't know that that -- that that -- if that's -- if that's what the guidelines suggests, that's -- that is interesting, but, no, I didn't know the details of it.

Q. Doctor, did you ever consider the background amounts of NDMA that were seen in the Braunstein study?

A. The Braunstein study, I do remember that name and I think I do comment on that in my report. I don't know if there's something specific about it you want to discuss.

Q. My question is, did you consider that for Braunstein that they found a background amount of 900 to 1,400 nanograms of NDMA for the branded cool mint product that they purchased?

Page 125

MR. SHEEHAN: Objection.

A. I don't remember the exact amounts from the study, no.

Q. Did you consider those levels at all or cite to those in your expert report?

A. I don't know if I cited those levels, certainly I considered all of that data in my -- in my expert report. I cite two papers by Braunstein. Yes, JAMA Open 2021. I mean, he did a simulated physiologic study, now that I'm recalling.

Yeah. So, there was a simulated physiology in one of the studies, but in terms of the background levels, I don't recall the amounts.

Q. Were you aware that Braunstein opines -- I mean, not Braunstein, Bumpus opines levels found between zero amount of nitrite and .25 amount of nitrite that those would be background levels seen in the pill?

MR. SHEEHAN: Objection.

A. Which report are you referring to now.

Q. Defense expert, Bumpus?

A. Bumpus, I did read Bumpus'

Page 126

testimony, I don't remember the reference to the background levels.
MR. NIGH: Let's go ahead and pull up Exhibit 6382. I'm sorry, LP523. And this was previously marked as Exhibit 6382 and we'll stick with that.
(Exhibit 6382 was previously marked for identification.)
BY MR. NIGH:
Q. Do you see this here where it says report of Dr. Bumpus?
A. Yes.
Q. And you reviewed this expert report, correct?
A. Yes, I did.
Q. And if we go to page 33 of your expert report and under Braunstein, the sentence starts with, this is highly misleading.
Do you see that?
A. Yes.
Q. Says:
This is highly misleading as for instance, the concentration of NDMA is

Page 127

virtually the same with 0 millimolar (921 nanograms) as it is with 1 millimolar (940 -- (947 nanograms) and the concentrations of nitrite ranging from 1.0 millimolar to 2.5 millimolar (1270 to 1440 nanograms) are all higher than the data for 1 millimole and 2.5 millimole that are shown on the graph.
Do you see that?
A. I see that section, yes.
Q. So, here she shows that between 0 millimolar, it's 921 nanograms, to .25 millimolar of sodium nitrite, it's 1440 nanograms.
A. Certainly 1440 with a higher concentration, correct.
Q. And on the next page the bottom paragraph, it says:
The consistent NDMA levels observed above 5 millimolar are likely the background levels in the tablet itself as discussed by the FDA and Gao et al.
And I represent to you that she recognized that was a mistake and needed the word below 5 millimolars.
Do you see that? Do you see that

Page 128

statement?
A. Yes.
Q. And she says:
Notably, Braunstein et al did not report the background amounts of NDMA present in the ranitidine product they used in the study. Thus, the constant amount of NDMA that they detected at the lower nitrite conditions may be the result of background NDMA being present in the ranitidine tablets before being placed in simulated gastric fluid and not the result of ranitidine to NDMA conversion and simulated gastric fluid. None of the experiments in the study by Braunstein et al included physiological conditions.
And she says, this assessment is consistent with my own.
Do you see that?
A. Yes.
Q. Were you aware that Dr. Bumpus has opined that the 921 nanograms to 1,440 nanograms of NDMA that were seen in this cool mint branded product likely background amounts of NDMA that were in the pill before

Page 129

any simulations were done?
MR. SHEEHAN: Objection.
A. Yeah. No, I see the report, I see what you're saying about background levels. I'm not quite clear on this.
Q. Doctor, are aware that our plaintiffs, many of them have taken branded cool mint Zantac?
MR. SHEEHAN: Objection.
A. I don't -- I don't know much about the plaintiffs, I haven't received much information on them.
Q. You didn't cite these background levels in your expert report, correct?
A. No, I did not.
Q. Okay.
MR. NIGH: I think now is a pretty good time to take a break. I'm going to switch to a new topic, so...
MR. SHEEHAN: Okay.
THE VIDEOGRAPHER: The time is 15:47 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)

Page 130

THE VIDEOGRAPHER: We're back on the record. The time is 16:12 UTC.
MR. NIGH: Let's go ahead and pull up LP233, this will be marked as Exhibit 6652.
(Exhibit 6652 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, do you see that it has the FDA symbol at the top of this?
A. Yes, I do.
Q. And you see this is addressed to Dr. Najafi, President and CEO of Emery Pharma?
A. Yes, I do.
Q. And it starts out with, Dear Dr. Najafi.
Do you see that?
A. Yes.
Q. Okay. So, this is a letter that the FDA is sending to Dr. Najafi, correct?
A. Yes.
Q. And let's go ahead and blow up the first paragraph where it says, after Dear Dr. Najafi, it says -- let's go ahead and

Page 131

highlight:
This letter responds to your citizen petition submitted on behalf of Emery Pharma received on January 2, 2022 [sic].
Do you see that?
A. Yes.
Q. According to the petition, Emery's preliminary study indicates that the ranitidine molecule may not be heat stable and under elevated temperatures, it generates significant amounts of NDMA, a probable human carcinogen.
Do you see that?
A. Yes.
Q. Okay. Have you reviewed this response from the FDA to Emery Pharma?
A. I don't recall whether I reviewed this or not. I reviewed a number of FDA documents. I'm just looking in my list of exhibits. There's a lot of FDA exhibits here. I don't see it in my documents offhand. I can't tell you for sure that I have reviewed it.
Q. Doctor, I think when you say "I'm not sure if I reviewed it" and you're looking

Page 132

to see if you can go to your exhibits, are you looking at your list of materials considered?
A. Yes, yes.
Q. Okay. So, this list of materials considered has hundreds, if not thousand documents in the list of materials considered, correct?
A. There's a large number, I don't know the exact number.
Q. Doctor, in the approximate hundred hours of work that you've taken to review this literature and write this report, is it your testimony that you looked at all these documents on are on this list of materials considered?
A. Yes, I have.
Q. Okay. Does that mean some of the documents you spent about one minute looking at them or less?
A. I read the documents, some of them I skimmed through parts, I certainly spent more than a minute on each document. I can't tell you how long, but I looked at all the documents.

Page 133

Q. Okay. But you didn't have this one on your list of materials considered, correct?
A. I don't think so.
Q. Now, this document, it's addressed to Dr. Najafi and that's the same Dr. Najafi who's one of the plaintiffs' experts, correct?
A. Yes, I believe so.
Q. And so, you've reviewed that Dr. Najafi's expert report, correct?
A. Yes, I did.
Q. Okay. And that's the same expert that you previously said had what you felt were some unreliable findings?
A. I commented on Dr. Najafi's report and some of his claims in my report. We can -- we can look at that if you want. But, yes, I do comment on his report.
Q. Okay. Let's take a look at page 10 of this pet- -- of this response to Emery Pharma's petition. Under discussion and it says -- if we can blow up that paragraph, it says:
Your petition specifically requests

Page 134

that FDA take eight actions based on the results of your preliminary testing and one action based on statements made in the Valisure petition.
You see that?
A. Yes.
Q. And then it says that:
We are granting your petition with respect to the following requests. One, recall. Two, investigate. Three, inform the public and, five, require manufacturers to conduct stability assessment.
Do you see that?
A. Yes.
Q. Were you aware that the FDA granted Emery Pharma's request that all the Zantac products in the United States be recalled?
MR. SHEEHAN: Objection.
A. I was aware that the FDA asked that ranitidine be removed from the market, yes.
Q. Were you aware that the FDA specifically stated that they're granting Emery Pharma's petition wherein they request this recall?
A. I think I was aware that the

Page 135

decision by the FDA to withdraw ranitidine from the market was in response to this petition, yes.
Q. Okay. Let's take a look at the next page, and let's blow up the FDA's investigation, here is says:
FDA's investigation into NDMA impurities in ranitidine is ongoing.
Says:
Recently, preliminary findings from stability testing raised concerns that NDMA levels in some ranitidine products stored at room temperature can increase with time to unacceptable levels, although in other products smaller changes were observed.
Do you see that?
A. Yes, I see that.
Q. And it says:
FDA's preliminary stability testing using standard accelerated stability testing conditions demonstrated that elevated levels of NDMA were measured in all products after two weeks.
Do you see that?
A. Yes.

Page 136

Q. Were you aware that the -- that they demonstrated that elevated levels of NDMA were measured in all products after two weeks?
A. I understood the FDA also found the levels went up during some of their stability testing, yes.
Q. And it says:
Other testing conducted by FDA suggests that there is a correlation between NDMA levels and expiration date.
Do you see that?
A. Yes.
Q. And then it says:
Based on the data from NDMA testing ranitidine drug products and drug substances, the preliminary results from FDA's stability testing and other information available to the FDA, FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date.
Do you see that?
A. Yes.
Q. Were you aware of the statement that the FDA made that they are no longer

Page 137

confident that any ranitidine product will remain stable through its labeled expiration date?
A. Yes, this is essentially what I understood the reason the FDA withdrew ranitidine from the market was its finding of elevated levels of NDMA in many of the products and I was aware that they found that the levels went up during stability testing with heat and time. And although the levels are certainly variable and perhaps not every product tested had elevated levels, a number of the products had levels that were above the 96 nanograms per day that they have laid down as the benchmark around so this is the reason they withdraw ranitidine from the market.
Q. And you just said perhaps not all products had elevated levels, do you see that sentence we read earlier said:
Demonstrated elevated levels of NDMA were measured in all products after two weeks.
A. Yes, yes.
Q. Okay.

Page 138

A. Under accelerated stability conditions, yeah.
Q. For just two weeks, right?
A. Yes, but these are sort of extreme conditions. You know, I think you're talking about the 40 degrees and so on, this is accelerated stability testing, yes. But I'm talking about bottles of ranitidine that are not in stability testing, they did not find elevated levels in all of them.
Q. For the -- for the baseline testing you mean?
A. Yes.
Q. But here, the FDA makes the statement that the FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date, correct?
A. Yes, I think that's a fair statement that if you find that a number of them had elevated levels of baseline and stability testing, the levels go up above the levels, that would suggest that a significant number would have elevated levels. But certainly they're not saying that they know

Page 139

that every bottle has elevated levels regardless. I think that's -- that's not what the data show.
Q. When you say "that's not what the data show," you're talking about the baseline data before it's exposed to conditions that would simulate heat and humidity, correct?
MR. SHEEHAN: Objection.
A. I'm talking about all the products that are not subjected to accelerated stability testing.
Q. Okay. And let's go ahead and take a look, now we're gonna switch gears, we're talk about that valsartan epidemiology.
Do you remember you reviewed the Dr. Chan -- not Dr. Chan, the Chan 2022 study?
A. I'd have to look at the study.
MR. NIGH: It will be marked as Exhibit 6653. And again, this is LP574.
(Exhibit 6653 was marked for identification.)
BY MR. NIGH:
Q. And title here says, Cancer Risk of

Page 140

Angiotensin II Receptor Blocker Valsartan: A Population-based Study. And the first author is Dr. Chan, correct?
A. Yes, I see the document, yes.
MR. NIGH: And if we can blow up the abstract.
Q. I want to point your attention to the definition of the cohort, like, the time frame, you see where it says:
Patients describe valsartan or amlodipine control group from January 1, 2003 to June 30, 2010 where identified using the clinical data analysis and reporting system of the Hong Kong Hospital Authority.
Do you see that?
A. Yes.
Q. Does that help you to see that the time frame as to when these valsartan or amlodipine users were using the product for the studies between January of 2003 to June 30th of 2010?
A. Yes.
Q. Okay. If you take a look at the next page -- I mean on the other -- if we pull that back, the right side of the column,

Page 141

you can see it shows -- actually, no. I'm going to go to the second page under Study Population and we can blow up that first sentence there. Then it says:
Patients who had initiation of prescriptions of valsartan or amlodipine from January 1, 2003 to June 30, 2010 were identified by the generic name of valsartan and amlodipine from the database in the initial sample population.
Do you see that?
A. Yes.
Q. And so, you're aware that this study is only looking at, in terms of its cohort, valsartan or amlodipine users between January 2003 to June of 2010, correct?
A. Yes.
Q. And Doctor, when was -- when did the valsartan contamination actually occur?
A. I'm sorry, you're talking about when did valsartan contamination with NDMA, I presume, occur?
Q. Yes.
A. I don't know. It's my understanding that similar to other studies,

samples of valsartan were analyzed and found to have higher levels of NDMA. Again, I'm not sure really what you're asking here.
Q. When was the valsartan NDMA actually -- when was valsartan actually contaminated with NDMA, when did that first happen?
A. I presume it's always been contaminated.
Q. Would you be surprised to recognize or know that the valsartan contamination did not occur until at least 2011 or later?
A. I don't know that to be true, but...
Q. Doctor, if the valsartan contamination starts in 2011 or later, this cohort would not be measuring users who took contaminated valsartan, correct?
MR. SHEEHAN: Objection. Mischaracterizes the study.
A. Well, to answer that question, let me just say that I don't know that the valsartan here did not contain NDMA, but I guess if you're asking a hypothetical, if a study is done with a drug that's not



contaminated, then the study would not be able to show effects of the contaminant. I think that -- that hypothetical is true. I'm not sure it applies to this study. And I'm pretty confident that the valsartan here probably contained NDMA similar to the situation with ranitidine. I guess you could ask the same question, was ranitidine contaminated with NDMA 23 years ago. I guess, you know.
So, I -- my understanding again of this study is that valsartan used in this study also contained NDMA.
Q. Doctor, do you understand the difference between the allegations in valsartan versus the allegation in ranitidine that valsartan is a manufacturing defect in ranitidine is not only a manufacturing defect?
A. Yes. No, I'm aware of that, yes.
Q. Are you aware of any allegations that suggest that there was a manufacturing defect of valsartan that caused an NDMA contamination before 2011?
MR. SHEEHAN: Objection.



A. I answer that question by saying I know of no evidence that manufacturing of valsartan before 2010 did not result in NDMA contamination.
Q. How can you be pretty confident that this time frame when January 1, 2003 to June of 2010 would include users who took contaminated valsartan?
A. Well, I guess I'd respond to that by saying that I know of no data that there are -- 2010 there was a major change in the manufacturing of valsartan, so I have no reason to believe really that things changed in a convenient way around that time. So -- so, no reason to believe that there's any difference in this earlier batch versus the later batches.
Q. Do you see anything in this study that suggests that there was a contamination of valsartan before 2011?
A. I don't think -- I see nothing here in this abstract, but let me -- I can go back and look at the paper itself. Thinking most of these epidemiologic studies, they don't go into studying contaminants, but they're just



looking at the drugs themselves in the real world and it does reference studies on NDMA.
Q. Doctor, I'll remind you of my question. My question is, do you see anything in this study that suggests there was a contamination of valsartan before 2011?
MR. SHEEHAN: And if you need to review the study to answer the question, go for it.
A. Okay. It actually gives some good background here.
As I said, they did not investigate specifically NDMA contamination in their batches they looked at. This again is a registry study, so I think the assumption here is that the manufacturing was similar and I guess this is a real world study looking at patients who took valsartan between that time period. And, yeah, so they don't specifically address the amount of NDMA in their -- in the drugs -- that's certainly the case.
Q. Doctor, have you seen information that actually shows that the valsartan contamination was in 2012?

Page 146

A. I don't know what you mean by the 2012. I think 2012 is when they found the contamination. Is that what you're referring to?
Q. Now, if you look at this study, let's go to the first page again. On the right side at the top, we'll just blow up that very --
MR. NIGH: Yeah, that first part, blow up that first paragraph.
Q. You can see:
Initial voluntary recalls in July of 2018 involved valsartan containing pharmaceutical products produced by three manufacturers, Major Pharmaceuticals, Solco Healthcare and Actavis LLC.
Do you see that?
A. Yes.
Q. So, the recalls start occurring in -- in July of 2018 for contaminated valsartan, correct?
A. Yes, that appears to the be case, yes.
Q. Have you seen any information that shows that the contamination seems to be

Page 147

related to a change in the manufacturing process that was implemented in 2012?
A. Well, it says here the -- all it says is, the incident lead to investigations to possible contamination during manufacturing, doesn't talk about a change in manufacturing in 2012, I haven't seen that.
Q. Let's go ahead and take this, let's back out of this blowup 'cause my question's not about this study.
My question is, Doctor, have you seen any information that suggests that this NDMA contamination seems to be related to a change in the manufacturing process that was implemented in 2012?
A. Haven't seen that recently. I don't recall that.
Q. Were you aware that the contamination of valsartan is in the valsartan active pharmaceutical ingredient -- are you aware of that? Doctor?
MR. SHEEHAN: You -- you cut out there for a question.
A. I didn't hear the rest of your

Page 148

question.
Q. Were you aware that the contamination of valsartan is in the valsartan active pharmaceutical ingredient?
A. Well, as I understand it and I think you asked this in a previous question. My understanding is that the contamination in the case of valsartan is with part of the manufacturing process, rather than the simple degradation process.
Q. Were you aware --
(Cross-talk.)
Q. Sorry, go ahead.
A. Yeah. So, I'm not -- I'm not aware exactly the details of what it is in the manufacturing process. I think you're suggesting that it was a specific ingredient. I don't -- I don't recall the details of that.
Q. Were you aware that this manufacturing process contamination was first discovered for the Zhejiang Huahai pharmaceutical factory in China?
A. I do recall that it was a small number, maybe one particular manufacturer,

Page 149

yes.
Q. And were you aware that those recalls in July of 2018 are related to that API manufacturer supplying API to Major Pharmaceuticals, Solco Healthcare and Actavis LLC?
A. Yes, it was -- it was three pharmaceutical companies, I don't remember the names of them, but I think they're -- they're actually in this article you have here highlighted in yellow.
Q. Are you aware that Zhejiang Huahai Pharmaceuticals did not make that change to quince -- quenching with sodium nitrite until 2011 for their manufacturing process?
A. No, I wasn't aware of the time course exactly.
Q. And are you aware that they did not start using DEA -- I mean, DMF as a solvent until later?
A. I was not aware of that specific change.
Q. Doctor, are you aware that the Pottegard study actually states that the contamination was specific to drug products

Page 150

manufactured by Zhejiang Huahai Pharmaceuticals and seems to be related to a change in the manufacturing process that was implemented in 2012?

A. Can you repeat that question?

Q. Were you aware that the Pottegard study --

MR. NIGH: Actually let's go ahead pull up the Pottegard study, LP629. It's Exhibit 6654. And under the introduction, if we can blow up that first paragraph.

(Exhibit 6654 was marked for identification.)

BY MR. NIGH:

Q. Do you see where it says:

In July 2018, some valsartan products were discovered to have been contaminated with NDMA.

Do you see that?

A. Yes, I do.

Q. And it says:

This contamination, which far exceeded regulatory exposure limits, was specific to drug products manufactured by

Page 151

Zhejiang Huahai Pharmaceuticals, a company in Linhai, China, and seems to be related to a change in the manufacturing process that was implemented in 2012.

Do you see that?

A. Correct.

Q. Were you aware that that manufacturing process change happened in or was implemented in 2012?

A. I do see it now, yes.

Q. Are you aware of any manufacturing process that any of the API that's manufactured for valsartan would have a contamination before 2011 or 2012?

A. Again, I don't know of any analysis of the drug before then. On the other hand, I certainly don't know for sure that they were not contaminated. I haven't seen testing of the drug prior to 2012, so I think it remains sort of unknown. It's an interesting hypothesis that -- that the contamination was directly related to these changes, it's certainly a possibility.

Again, I don't think it's proof that this is the change that resulted in

Page 152

the contamination, but certainly a possibility.

Q. Doctor, are you a -- have you reviewed any information regarding name brand Novartis Diovan that shows that they did not have NDMA contamination for their products they were selling in the US?

A. What I do know is, as we talked about, the contaminations appear to be primarily of those three manufacturers, the three pharmaceutical companies.

Q. Do you know that Novartis sold its name brand valsartan in the United States for over a decade before ZHP API product made its way on the market in the US?

A. I don't know the details of that, no, sorry.

Q. And do you know that Novartis tested their product, their name brand Diovan, and reported that they did not have NDMA contamination?

A. Yes, I don't know. I didn't know about that specific testing.

Q. Did you know that Health Canada also tested that name brand Diovan that was

Page 153

on the product for over a decade -- on the market for over a decade, that Health Canada specifically tested name brand Diovan and it did not find NDMA in their product?

A. No, I do not know about that testing.

Q. Doctor, have you done a comprehensive search to see whether or not there's any product that was contaminated with NDMA for valsartan before 2011?

A. Again, I know of no data on NDMA contamination of valsartan before then and no evidence that it was not contaminated. So, I think as we've discussed, the contamination is not entirely clear for valsartan prior to that period.

Q. I recognize that you're not aware of either of those conditions.

My question is, have you done a comprehensive search to see whether or not there's any product that was contaminated with NDMA for valsartan before 2011?

MR. SHEEHAN: Objection.

A. I did not do a search of NDMA contamination prior to 2012, no, I have not

Page 154

done that search.

Q. Have you seen that the FDA in 2018 stated that the impurity for valsartan has been in the product for at least four years?

A. I haven't seen an FDA statement -- at least four years would imply four years or longer, so I guess it's a little open-ended there.

Q. Have you seen the EMA statement that states that the contamination -- in 2018, that states the contamination was for six years?

A. I haven't seen that statement and don't know the details of it.

Q. Sorry, go ahead, I didn't know you weren't finished.

A. Yeah. No. Perhaps you want to put up that statement so we can take a look at it or is that something that's -- that's accurately phrased here.

Q. Doctor, as the co-lead counsel for the valsartan litigation, I am the co-lead counsel in the valsartan NDMA litigation.

Were you aware of that?

A. No, I did not know of your role in

Page 155

valsartan.

Q. We are not aware of any information that there's any contaminated valsartan before 2011.

Are you aware of any information that shows that there's contaminated valsartan before 2011? 'Cause if you are, we would love to know about it.

A. I think I answered that question.

Q. Do you understand that we've done extensive discovery of many of the active pharmaceutical manufacturers, active ingredient pharmaceutical manufacturers and finished-dose manufacturers and we don't have any information that we're aware of that shows that there's a contamination for NDMA before 2011?

A. Understood.

Q. Have you seen anywhere any allegation printed anywhere that shows that there's NDMA contamination of any product in valsartan before 2011?

A. Again, I have no information that any valsartan products have been shown to have or not to have NDMA.

Page 156

Q. Without knowing that any product has been contaminated with valsartan before 2011, the Chan study is simply showing us whether or not valsartan, irrespective of whether it's contaminated with NDMA, whether or not valsartan is capable of increasing the risk of cancer, correct?

A. I would say that the study shows that valsartan taken between those time periods that we discussed did not cause cancer. So, essentially, that's -- that's -- I think that's essentially what you asked.

Q. And if valsartan wasn't contaminated with NDMA between the time frame of 2003 to 2010, that study would be uninformative in whether or not NDMA is capable of causing cancer in humans, correct?

MR. SHEEHAN: Objection.

A. Well, I think that that's -- the study needs to be interpreted in the light of what it is, it's a study in a certain time period, as we've discussed, up to I think it was 2010, and it answers the question that valsartan, whether or not it was contaminated with NDMA, did not cause cancer.

Page 157

Your statement I think is correct, that if it did not contain NDMA, and, again, we don't know since we don't have data on this either way, but if it did not contain NDMA, then obviously the study would not be informative about NDMA. I -- and certainly would not be informative -- but again, it provides no evidence that it causes cancer, but probably could not be informative about patients who took NDMA after 2012, if that was the question in terms of whether or not later drugs were more carcinogenic, that's an interesting theory. But again, you'd have to do studies with that particular batch of valsartan, so I think we're left wondering a lot of questions here.

Q. When you state "we don't have data either way," you haven't seen the statement from the NDM -- from the EMA or the testing results for Diovan name brand, which is name brand valsartan, right?

A. I'm not sure what testing results you're referring to.

Q. I'll represent to you that Novartis tested their name brand Diovan.

Page 158

A. Yes.
Q. And they represent that they do not have NDMA in their name brand Diovan.
Were you aware of that?
A. Yes, I think we've already talked about the Novartis drug preparation. I was referring to the NDMA contamination that you were raising the question of NDMA contamination before 2010 during the period of the study and I was saying that I haven't seen any data either way about NDMA contamination during the period of the Chan study.
Q. You realize name brand Diovan is the valsartan that's on the market between 2003 to 2010, right?
A. Okay. But -- and that test -- I'm sorry, and you're indicating there was testing done in what per- -- when was that done?
Q. When was the testing for Novartis done?
A. Yes.
Q. 2018.
A. Okay. So, we had no testing from the period before 2010.

Page 159

Q. Okay. But in terms of testing their name brand product, they weren't able to find NDMA in their products?
A. I understand, I understand what that means, yes.
Q. Okay. So, when you say "we have no data," you're not referring to that data or the statement from the EMA, correct?
A. Correct.
Q. Let's take a look at -- you mention the Pottegard study in your report.
Do you remember that?
A. Yes, it's in my report on page 21.
MR. NIGH: I want to go ahead and pull that up LP629. And if we can go to conclusion.
MR. SHEEHAN: What number is this gonna be, Dan?
MR. NIGH: It's previously marked as Exhibit 6654.
THE VIDEOGRAPHER: Counsel, I'm looking for 629 if it's newly added, so it's going to take a second to get into the Box.

Page 160

MR. NIGH: I'm sorry. You're looking for LP69?
THE WITNESS: I have it in the box already.
MR. NIGH: Yeah, we've already -- we've already moved it over.
THE VIDEOGRAPHER: Okay, copy that.
MR. NIGH: I used this earlier.
THE VIDEOGRAPHER: Understood, that's why I didn't see it.
MR. NIGH: No problem, no problem.
BY MR. NIGH:
Q. So, under Conclusion, doctor, it says:
The results do not imply a markedly increased short-term overall risk of cancer in users of valsartan contaminated with NDMA.
Do you see that?
A. Yes.
Q. Now, their conclusion discusses whether or not there's a short-term overall risk of cancer, correct?
A. Yes.
Q. They don't opine on whether or not that was a long-term risk of cancer in valsartan users contaminated with NDMA, correct?

Page 161

MR. SHEEHAN: Objection.
A. Well, in this statement, it says it's a -- does not apply in markedly increased short-term risk. I don't see a comment here. It says, longer follow-up is needed to assess long-term cancer risk. Yeah, that's what it says in terms of the conclusions.
Q. And are you aware that the study authors also discussed that their study -- this didn't have a lot of power?
MR. SHEEHAN: Objection.
A. I've looked at the power calculations here, study of 5,000 patients.
MR. NIGH: Well, let's go to the full conclusion on page 6.
Q. Do you see where it says:
Furthermore, owing to the limited follow-up assessment of long-term affects was not possible in the low number of events makes interpretation of estimates per single cancer outcomes difficult.

A. I see that, yes, they qualify the results.
Q. You didn't mention in your study that the low -- their statement that the -- I mean, you didn't mention in your report that the low number of events makes interpretation of estimates for single cancer outcomes difficult, did you?
MR. SHEEHAN: Objection.
A. In my report, you're asking if I commented specifically on that language?
Q. Yes.
A. I did not. This is about single cancer outcomes. I think the major conclusion was about cancer overall, but, yeah, I didn't pay attention to or didn't mention that particular sentence, no.
Q. And what the study actually found was a --
MR. NIGH: Let's go back to the first page for Results. We can blow up the results at the bottom of the page there.
Q. It shows with 104 cancer outcomes among NDMA unexposed participants and 198


among the exposed participants, the adjusted hazard ratio for cancer was 1.09.
Do you see that?
A. Yes.
Q. So, they found a nine percent increase that was not statistically significant for overall cancer, correct?
MR. SHEEHAN: Objection.
A. Yeah. And that's not how I interpret that. You know, these hazard ratios, 1.09 in general is not considered to be any kind of a significant increase. And no, it's not a nine percent increase. And the p-value for this is -- is .7, which is not even suggesting a trend. So, there's -- there's no hint of any increase in cancer in this study.
Q. So, you believe it's inappropriate even though the point estimate is above one, that that point estimate refers to an increased risk even though it's not statistically significant.
Is that your testimony?
MR. SHEEHAN: Objection. Asked and answered.


A. The hazard ratio of 1.09 does not suggest an increased risk of cancer in this study.
Q. If you look at the next paragraph specifically for colorectal cancer, it says:
For single cancer outcomes, increases in risk were observed for colorectal cancer.
Do you see that?
A. Yes.
Q. So, the study authors themselves, even though it's not statistically significant, remark that there's an increase in risk when their hazard ratio is above 1, correct?
MR. SHEEHAN: Objection. Includes only part of the sentence.
A. Yeah. So, I think if you read the whole sentence, it says:
Over the con- -- wide con- -- with wide confidence intervals that included the null.
So, they did note that the numerically the numbers were elevated, but it didn't fall outside of the null hypothesis as


we've discussed.
So, again, concluding that this study suggests an increase in -- in risk of -- of colorectal and uterine cancer, I think is a misinterpretation of what they're trying to say here. But I think they're sort of being straightforward in noting the increase and numerical increase here.
MR. NIGH: Can we underline the words increases in risk?
Q. Do you see that? Those are the study authors words --
A. Yes.
Q. -- increases in risk, correct?
A. When they say increases in risk they're simply saying the numbers were higher. They're not talking about, this means an increased risk for patients in general. That's not what they're saying. They're saying that in the study, the numbers were higher in the exposure group.
Q. They're showing increases in risk were observed for colorectal cancer.
Do you see that?
A. Yes.

Page 166

Q. That's their interpretation of the results, increases in risk. I understand they also talk about it's not statistically significant, but they use the terminology, "increases in risk were observed," correct?
MR. SHEEHAN: Objection.
A. As I said, they use the term "increases in risk," that's not a conclusion, that is their observation that the numbers were higher in the colorectal cancer group and for the uterine cancer group.
Again, they're not implying that -- that this means the conclusion is an increased risk of colorectal cancer, they're simply saying the numbers were higher in those exposure groups.
Q. Let's take a look at page 4 in the study and let's look at that paragraph where it starts with, in analyses of single cancer outcomes. Says:
In analyses of single cancer outcomes, increased risks were seen for colorectal cancer (hazard ratio 1.46, 95 percent confidence intervals .79 to 2.73) and for uterine cancer, although neither

Page 167

these more other single outcomes reached statistical significance.
Do you see that?
A. Yes.
Q. And then next it says:
Analyses of other cancer outcomes were not possible owing to low numbers.
Do you see that?
A. Yes.
Q. Were you aware that the Pottegard study authors themselves stated that analyses of their other single cancer outcomes, other than colorectal cancer and uterine cancer, were not possible?
MR. SHEEHAN: Objection.
A. Well, they point out several times that there is uncertainty about single cancer outcomes and they do comment on that they felt the study was not necessarily powered to reach -- to map small differences in the patient groups I think that's -- that's correct. The numbers of the other cancers were low, so this gives you confidence that whatever those other single cancers are, there's not a plethora of cancers in the

Page 168

valsartan group. But, yes, excluding an effective cancer is difficult in studies that are not really powered for -- four small differences.
Q. Your report doesn't mention that the study authors themselves said that the analyses of the other cancer outcomes were not possible due to the owe- -- were not possible owing to low numbers, correct?
MR. SHEEHAN: Objection.
A. No, I think my report just indicates the major findings from the study. It didn't include every qualification of every study. But, no, so it didn't include this information, if that's what you're asking.
Q. Were you aware they also did an incident users analysis in this study?
A. An incident users analysis. I don't recall anything about that.
Q. Are you aware of publications that state that it's more informative that study may be more informative, the incident user analysis may be more informative than analyses that include prevalent users?

Page 169

MR. SHEEHAN: Objection.
A. I am not aware of that.
Q. Do you have any information or have you reviewed any study articles that suggest that incident user analyses are more informative than overall analyses that include prevalent users?
MR. SHEEHAN: Objection.
A. I'm not aware that's true, but it's an interesting idea.
Q. Do you know of any reason as to why incident user analyses may be more informative than overall analyses that include prevalent users?
MR. SHEEHAN: Objection.
A. I'm not aware of that.
Q. Were you aware of the finding in this study that showed that --
MR. NIGH: Well, let's go to the next page. I'm sorry, not next page, that same page, page 4, the right column.
Q. Were you aware of the finding that stronger association was seen when we restricted incident users during the study

period (hazard ratio 1.5 confidence intervals .99 to 2.52)?
A. Okay. Well, that's an interesting post hoc analysis. I don't think you can put much weight on that, at least it's a post hoc analyses, if it wasn't predefined in their original protocol, you can do a variety of analyses of one's data and increase some associations and decrease other associations. So, it's -- I would take this with a grain of salt. But it would need to be confirmed in further studies.
Q. Doctor, you just mentioned it as post hoc analyses, it was prespecified.
Were you aware of whether or not the -- the incident user analysis was prespecified for Pottegard?
MR. SHEEHAN: Objection.
A. I'd have to look at this, I didn't see that quickly in this.
Q. How about, this public -- published study has many published studies, they don't necessarily indicate all the prespecified analyses on the publication itself, correct?
A. Usually they indicate their primary


analysis and their primary outcomes. I'm looking at the cancer outcome and their methods, it doesn't say anything about incident users as being one of their primary endpoints.
Q. Have you reviewed?
A. Analysis comparison of cancer occurrence. I don't see anything about restricting it to incident users.
Q. But my question is --
A. Restricted it to prevalent valsartan users at the start of the study to the incident users during the study period.
This was a sensitivity analysis, wasn't their primary endpoint. So, I'd have to look at their original protocol. Doesn't sound like it, but I understand your point.
Q. Without looking at the original protocol, you can't determine whether or not it's a post hoc analysis, correct?
MR. SHEEHAN: Objection.
A. I'd have to see the original protocol, but I would say having been at least supervising and being involved in a number of studies, I think that would be


unusual. It does sound like a post hoc analysis, but, again, we can debate this without seeing the protocol, I don't think we know for sure.
Q. Secondary endpoints are oftentimes prespecified in a prespecified analysis, correct?
A. There are secondary endpoints and secondary -- yes, analyses that are prespecified.
MR. SHEEHAN: You want to get lunch? Are you -- are you moving on, Dan, or are you --
MR. NIGH: Yeah, if we want to take a break now, it's okay.
MR. SHEEHAN: Are you hungry?
THE WITNESS: Yeah, it's 1:00, I think it's a good time.
MR. SHEEHAN: Fair enough, let's go off the record.
THE VIDEOGRAPHER: The time is 17:06 UTC. We're going off the record.
(Whereupon, a lunch recess was taken.)


THE VIDEOGRAPHER: We're back on the record. The time is 17:58 UTC.
MR. NIGH: Okay. Let's go ahead and pull up LP629 again, this was previously marked as 6654, this was the Pottegard study.
BY MR. NIGH:
Q. And Doctor, you recall earlier the study authors pointed out the non-statistically significant increased risk of colorectal cancer, correct?
MR. SHEEHAN: Objection.
A. Correct, the author did comment on the numerical increase in colorectal cancer for that -- for that single disease --
THE COURT REPORTER: I'm sorry.
A. -- but also pointed out that it was not specifically significantly and it was consistent also with null hypothesis, so --
THE COURT REPORTER: I'm sorry. Can we just repeat that? The siren in the background is a little distracting. I don't know where it's coming from, but...
MR. SHEEHAN: It's -- it's in New

Page 174

York. There's nothing -- there's nothing I can do about it unfortunately.

THE COURT REPORTER: Okay.

THE WITNESS: Yeah, I'll repeat my -- you got -- you got the question right?

THE COURT REPORTER: Yes, yes.

A. So, I would agree that the authors did point out the numerical increase in colorectal cancer numbers for that single disease, but they also pointed out that it was not statistically significant and was also consistent with the null hypothesis. So, they did not emphasize that particularly, in my view, as an important finding.

Q. Doctor, the use of your terminology consistent with the null hypothesis is concerning. They don't say it's consistent with the null hypothesis they just say that it includes the null hypothesis and the confidence intervals, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. We can go back and look at their

Page 175

specific wording, but they did comment on it, not on the null hypothesis, in my view that's what they meant that it was consistent with the null hypothesis, although I'll take your word in terms of the exact wording.

Q. Doctor, there's a difference between a test that's looking for consistency with the null hypothesis and a test that's looking to reject a null hypothesis, correct?

MR. SHEEHAN: Objection.

A. Well, there's two different ways to design a study, one is -- yes, to exclude the null hypothesis another to say that it is exact -- if you're saying was this study designed for equivalence, it was not designed for that. It was designed to determine or not whether the difference was different from the null hypothesis.

So -- so, yes, there's a different way in terms of designing the study and doing the statistics depending upon whether you're trying to show equivalency or differences.

Q. And their testing is set up to see whether or not there are differences or to reject the null hypothesis, correct?

Page 176

A. Yes, the study is set up to show differences, yes, that's correct.

MR. NIGH: Let's take a look at page 6.

Q. And if you see the left-hand side at the top of the page, we can blow up that paragraph. Here it's the study authors state:

However, as some dietary products (processed meat) are known to contain small amounts of NDMA, epidemiological studies based on food frequency questionnaire data have been performed. Even though such studies are highly prone to confounding, three found an increased risk of gastrointestinal cancer with exposure to NDMA predominantly colorectal corner. This finding, together with that from animal studies, provides some support for the increased although statistically non-significant risk for this particular cancer observed in our study.

Do you see that?

A. Yes.

Q. So, even the study authors are not

Page 177

only looking at the question of valsartan with NDMA having an increased risk of cancer, but also including the animal data and they're including the NDMA dietary studies as they assess that question, correct?

MR. SHEEHAN: Objection.

A. So, I think in their conclusion -- their discussion here, they are commenting -- trying to highlight the potential significance of their findings and I think this was pretty much of a -- a null study, so to speak, and I think the authors are trying to find something interesting in their study.

And so, they're commenting on colorectal cancer. And, yes, so animal studies have shown NDMA can increase a number of cancers and there's also the dietary studies, as you pointed out, so they're, again, noting that the finding of this particular cancer is non-significant, but they're saying perhaps it does raise the hypothesis that there could be something there which would be required, of course, future studies and more -- and much more evidence than they've got so far.

Page 178

So, they're raising hypothesis here in this -- in this discussion and, yeah, they're commenting on other -- other lines of evidence.

MR. NIGH: And if we take a look under Principle findings, if we can blow up that first paragraph.

Q. Do you see where it discusses, while the estimate for our primary outcome?

Do you see that?

A. Yeah.

Q. Says:

While the estimate for our primary outcome suggests the negligible and statistically non-significant increase in cancer risk of 9 percent.

Do you remember previously I asked you if this study showed a 9 percent statistically non-significant increase in cancer risk?

A. Yes.

Q. The study authors actually say that's what it shows, right?

MR. SHEEHAN: Objection.

A. I can read what they wrote. They

Page 179

state that it suggests a negligible and statistically non-significant increase in cancer risk of 9 percent, that's -- that is what they have written.

Q. Now, they next say:

It might be argued that a more cautious interpretation, reflecting the nature of the study question, would be to consider the upper limit of the confidence interval.

Do you see that?

A. Yes.

Q. Doctor, when you're doing a test to see whether or not you can reject the null hypothesis, why would it be a more cautious interpretation to reflecting the nature of that study question to consider the upper limit of the confidence interval?

MR. SHEEHAN: Objection.

A. Well, I -- I don't know how best to answer that question. I think -- so, the confidence intervals tell you the range of findings and if you have a -- I think, a fairly narrow confidence interval, it gives you for confidence that it's -- the

Page 180

differences are not gonna overlap with -- with what you might otherwise expect.

So, I think if you have wide confidence intervals, particularly in the upper side, then there's perhaps possible overlap and I think -- nevertheless, I think if you look at the p-value in this study and I think it was something, what was it, 0.7, there really was no sign of -- of any likelihood that this was statistically significant. I'd have to go back and see what the numbers were here again.

Yeah, again, coming up with 0.70 here for this study. So, I don't really understand their argument here. I guess my take on this -- on this discussion is that, you know, they're trying to get their paper published and this was one of the few small findings that they had in their study, it was really a -- a -- basically a study that confirms the valsartan study where there was no NDMA, which is really there's no differences really overall in any -- in these cancers. And I think they're trying to, little bit, massage their data here and

Page 181

highlighted it in a way to make it more interesting perhaps to the readers. That would be my take on it, because I really don't think there really is any signal here or any sign that there's an increased cancer risk.

And so, I'm a little surprise by this discussion. But I guess on the other hand I can sort of understand it, they undoubtedly put a lot of effort into this study.

Q. Doctor, isn't the -- isn't this explaining the difference between a test for rejecting a null hypothesis and a test as to whether or not there's sameness? This is a test whether or not to reject the null hypothesis, so they're adequately interpreting the results from a test of whether or not it rejected the null hypothesis, correct?

MR. SHEEHAN: Objection.

A. Again, this study was designed to try to show differences. It -- so -- so, I think you're right in the sense that this was not a test to show equivalence between the

Page 182

two, in other words, to show that they were not ident- -- non-identical. So, I don't -- it is not proved that there's -- there is absolutely no difference between the -- between this and the control group.
That said, I don't find that there's any signal here suggesting that there's a likelihood of a difference.
Q. And the next sentence says:
Doing so leads to the different, although related, conclusion that we can reasonably exclude a more than 40 percent increased short-term risk of cancer from exposure to NDMA contaminated valsartan products.
Do you see that?
A. I see that sentence, yes.
Q. And that's because the upper end of that confidence interval, the 95 percent confidence interval, is 1.4, correct?
MR. SHEEHAN: Objection.
A. The upper level is 1.49 and 1.41. Yes, but I -- that's true, but -- yes, this is a hypothetical and they're saying that if we can consider that we can -- we can suggest

Page 183

that there might be this particular outcome, that's what -- they're simply defining what that confidence interval is. But I certainly -- again, there's no evidence here that there is -- there's a possibility of a 40 percent increase short-term risk of cancer.
And I think, again, my interpretation of this study is that it's a negative study, it shows no increase in cancer. And so, all this discussion is -- is interesting, but entirely speculative hypothetical based on data they really don't have.
Q. Doctor, you realize that Dr. Pottegard is well-known in the field of epidemiology?
A. I don't know about the reputation of Dr. Pottegard.
Q. Have you read his textbook in the field of epidemiology?
A. No, I have not read his book.
Q. Are you aware he's well-published in the field of epidemiology?
A. I have not looked at his CV or

Page 184

publication record.
Q. Are you aware of whether or not he's well-published in how you interpret results from epidemiological studies?
A. I don't know much about his other publications, no.
Q. Okay.
MR. NIGH: We can pull that down.
Let's go ahead and pull up LP543. This will be marked as Exhibit 6655.
(Exhibit 6655 was marked for identification.)
BY MR. NIGH:
Q. And this study the title, Dietary nitrosamines, heterocyclic amines, and risk of gastric corner: A risk of control study in Uruguay.
Do you see that?
A. Yes, I do.
MR. NIGH: Let's go ahead and turn to page, it doesn't have page number on the bottom, it's 158. It's the next page, yeah. That's 159, let's go to the page before that. Thank you.
Q. And this shows Dietary

Page 185

nitrosamines, heterocyclic amines and risk of gastric cancer: A case control study in Uruguay. And the first doctor is Dr. De Stefani.
Do you see that?
A. Yes.
Q. And Doctor, this is one of the studies that you cite to in your expert report, correct?
A. Yes, it is.
Q. But you don't give the finding of how much the or the magnitude of the increased risk, correct?
A. I'm sorry. Can you repeat that question?
Q. In your expert report, you don't discuss the magnitude of the increased risk found in this dietary study, correct?
A. The magnitude, you mean the numerical increase?
Q. Yes.
A. In my report, I do not comment on that.
Q. Okay. You don't comment on that for any of the dietary studies, correct?

MR. SHEEHAN: Objection.
A. I don't recall if I did in every case, but certainly in this paragraph here on page 21, I did not comment on it.
Q. Okay.
MR. NIGH: Let's take a look at page 161 and we can look -- if we can blow up Table 4.
Q. Doctor, here it says:
ORs of Gastric Cancer, the time is covering it up, OR is for Gastric Cancer for NDMA and PhIP Dietary Exposures.
Do you see that?
A. Yes.
Q. Do you know what the PhIP stands for?
A. I'd have to go back and look at the -- looks like it's 2 amino, 1 mythyl, 6 phenylimid, 4.5 b/pyridine. Sounds about right?
Q. It does. Do you know what that -- do you know what that is known as commonly?
A. Let's see if they describe it. I presume it's some form of carcinogen. Is it another name for NDMA? I don't know, they



don't -- no, NDMA is different here. It's called nitrosodimethylamine. It's another compound, they don't define it as a common name.
Q. Okay. Do you know whether or not some foods have more PhIP but less NDMA and other foods have more NDMA and less PhIP?
A. Well, I'm sure there's variability from food to food in the contents of these compounds. So, those are -- in this study, those are the two focuses of this study are PhIP and NDMA. And looking at the Uruguayan and diet, salted and barbecued meat. Yeah, seems to be a fairly typical dietary study of cooked -- cooked meat. So, yeah, I don't know -- I'm sorry, what was your question?
Q. Do you know if this is one of the ways in which bacon and processed meats differ, that they have different levels of PhIP?
A. Okay, I'll take your word for it.
Q. No, I'm asking you, do you know?
A. I don't know much about PhIP in relation to bacon, if that's what you're asking.



Q. Or in relation to processed meat?
A. No, I'm guessing it's a form of preservative, but I don't know much more about it.
Q. Okay. For NDMA starting at the second quartile .15 to .1, they found an odds ratio of 2.07 that was statistically significant, correct?
MR. SHEEHAN: Objection.
A. So, now you're looking at Table 4 and they're doing this by quartile range. And so, the bottom quartile, the second quartile with NDMA and PhIP, the odds ratio they say in the table is 2.07, so I see what you're looking at here.
Q. For NDMA specifically, it would be more than a doubling of the risk at the second quartile after you adjust for those confounding factors, correct?
MR. SHEEHAN: Objection.
A. So, as I take it, this is a dietary study where they estimate intake of these compounds, these are not measurements, but estimates. And they're looking -- they're focused on just these two compounds in



dietary studies, looks like it's a case control-study and they're looking at two different regions, which is typical in South America, one has high rates of gastric cancer and the other lower rates and this does tend to correlate with actually elevation in studies that we've written about in terms of gastric cancer, which is something I know pretty well.
And in terms of the diets in these two regions, different regions, there's many differences in the diet besides just cooked red meat, but that's certainly one of the things that does vary in these different regions. And again, they're estimating the amounts of these compounds based on history. Let's see what their controls are, 6798 patient is controls... And so -- yeah, so it's showing an association here, call this association a risk based on -- this is a particular marker of this particular group. And so, yes, the odds ratio is two, which might suggest that a doubling of risk as your sort of suggesting.
Q. And that would be at levels of 150

to 180 nanograms, correct, or .15 to .18 micrograms?
A. Well, that's the estimated -- the estimated risk of ingestion based on their -- their dietary histories, yes.
Q. And this study adjusts for age, sex, residence, urban/rural status, tobacco duration, total alcohol consumption and mate drinking?
A. Yes, down here they were adjusted as ratios, along the parameters that you just read.
Q. And then fourth quartile at greater than or equal to 270 nanogram or .27 micrograms, it's an odds ratio of 3.62, correct, for NDMA?
A. That's the odds ratio they calculated for that particular group with that estimated NDMA level, yes.
Q. Now, the odds ratio is for PhIP for each quartile, those are different than what they are for NDMA, correct?
A. Different. Well, looking at the table, the odds ratio for PhIP is around 3.1, which is about the same in for the last


quartile -- they calculated the quartile a little differently. 3.86 odds ratio, similar odds to ratios in many ways to the NDMA ratios.
Q. Did you ever look at this NDMA PhIP interaction?
A. Yes, the last -- the last is if I try to calculate interaction with low low, high low, low high, high high. Yes, so they try to look to see whether or not there's any additive or synergistic interaction between PhIP and NDMA and they do that sort of analysis as well.
Q. So, if a food is low and -- is high in NDMA and low in PhIP, it still has more than a tripling for the odds ratio, correct, 3.07?
A. Yeah, that's right.
Q. And if a food is high in or if the diets are high in NDMA and high in PhIP, then it has more than a 12-fold increase or an OR of 12.73, correct?
MR. SHEEHAN: Objection.
A. Repeat the question.
Q. If the dietary is high in NDMA and


high in PhIP, it has more than a 12-fold increase or odds ratio of 12.73, correct?
MR. SHEEHAN: Objection.
A. So, according to their analysis, when they identify these groups with the highest levels, if they are high in both of these, they find a much higher rate of -- of gastric cancer.
So -- so, yes, their table does suggest some sort of interaction between them based on these -- analysis of these -- these two groups and based on the anal- -- and based on their estimation of intake, they appear to have identified a high risk group based on these as markers, yeah.
Q. Doctor, in terms of the trend seen for NDMA, it shows a statistically significant trend that as the amount of NDMA increases in the diet, so too does the risk of cancer, correct?
A. I think they -- this study suggests that NDMA is a marker for a diet that seems to be associated with a greater risk of cancer, yes.
Q. And that's a p-value of less than


.001, correct?
A. That's the p-value they cite in this table.
MR. NIGH: And if we take a look at Table 5, we can drop this out.
Q. Table 5, micronutrients. NDMA is mentioned as a micronutrient in this table, correct?
A. Yes, under micronutrients, they include NDMA.
Q. Is it your understanding that NDMA is a micronutrient or classified as a micronutrient?
A. Actually, I haven't -- I'm not familiar with what all is classified as micronutrients. Certainly classified here in this table as a micronutrient, that is an interesting way to classify it. I hadn't heard that before, but -- so I can't really comment further.
Q. Okay.
MR. NIGH: Let's take a look at -- take this down, let's take a look at LP545. This will be marked as Exhibit 6656. And if we can go ahead

Page 194

and blow up the summary. And we'll look at the last couple of sentences.
(Exhibit 6656 was marked for identification.)
BY MR. NIGH:
Q. Doctor, at the bottom, do you see -- sorry, let's go ahead and let's back, I want to talk about the title and the author first.
Doctor, the title says, Processed meat consumption, dietary nitrosamines in stomach cancer risk in a cohort of Swedish women.
Do you see that?
A. Yes, I do.
Q. And this is Dr. Larsson, correct?
A. Correct.
Q. Okay. And now, if we can take a look at the summary. You see where it says, stomach cancer risk, one of the last -- second to last sentence, stomach cancer risk was twofold.
See that where -- where I'm reading from?
A. Yes.

Page 195

Q. Stomach cancer was twofold higher among women in the top quintile of NDMA intake when compared with those in the bottom quintile.
Do you see that?
A. Yes.
Q. And so, this study's showing that NDMA intake at the highest quintile is associated with a -- nearly a doubling of the risk for stomach cancer for the women in this study, correct?
MR. SHEEHAN: Objection.
A. Can you repeat that statement again?
Q. And so, this study's showing that NDMA intake at the highest quintile is associated with nearly a doubling of the risk for the stomach cancer for the women in this study, correct?
MR. SHEEHAN: Objection.
A. Yeah. So, again, we don't know for sure in these studies, in this one and the previous one, whether or not there was actually increased NDMA intake. It's estimated, but certainly this top quintile

Page 196

with this estimated NDMA intake in however that was calculated is -- is a risk group that they've identified. So, however they did -- certainly this is a marker of a group that seemed to have a higher risk twofold, as you said, of stomach cancer.
MR. NIGH: If we take a look at page 918, take a look at that chart, Table 6, we can blow that up.
Q. And the top of this -- this title of this table says, Hazard ratios of stomach cancer by NDMA intake.
Do you see that?
A. Yes.
Q. And for the fifth quintile for the Multivariate HR, it shows a 1.96 HR, that's statistically significant, correct?
A. Yes. So, I see that the ratio 1.96 and the p-trend is .02, so it does look like a significant difference in that group compared to the other.
Q. And of the factors that are adjusted for, it includes BMI, intake of total energy and alcohol, correct?
A. Yes, I see that.

Page 197

Q. And if we go back the median intake for the highest quartile was 277 nanograms, correct?
MR. SHEEHAN: Objection.
Q. Or .277 micrograms per day, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, I'm looking at this. So, I'm sorry, can you repeat that?
Q. Do you see where it says, Median intake, at the --
A. Yes, Median intake. Yes, I see it.
Q. If you follow that over to the fifth quintile, see the 0.277?
A. Yes.
Q. And then if you look at quintile, the title above says, Quintile of NDMA intake, micrograms per day.
Do you see that?
A. Yes.
Q. So, the median intake for that highest quintile is .277 micrograms or 277 nanograms per day, correct?
MR. SHEEHAN: Objection.
A. Again, those are estimates very,

Page 198

very rough and of course error prone estimates, but that is their estimate for that quintile, yes.
Q. Now, you've used this statement of error prone estimates. If the error is identifying the amount of NDMA in these diets and separating them, that would lead more toward non-differential misclassification, correct?
MR. SHEEHAN: Objection.
A. I'm not sure about that.
Q. You have some reason why it would be a differential misclassification?
A. Explain to me what you mean by "misclassification."
Q. Well, Doctor, are you aware that it's been discussed that error in measurements for dietary studies would actually attenuate the risk or lead to more likely bias toward the null?
MR. SHEEHAN: Objection. Mischaracterizes.
A. I'm not sure about that.
Q. Did you review the Freedman 2010 study?

Page 199

A. I don't recall whether I read that one or not.
Q. Did you review the Prentice 2020 study? You cite to that one in your report, correct?
A. Let me take a look. Did you say Prentice?
Q. Prentice, P-R-E-N-T-I-C-E.
A. Yes, yes. I cite that, Annals of Internal Medicine 2020.
Q. Yes. And you actually state -- you cite where it quotes:
The random component of measurement error may substantially attenuate estimated associations.
No, I'm sorry, you cite:
The rough error prone estimation undermines the reliability of the dietary studies.
Do you see that?
A. Yes.
Q. But you didn't discuss how it might underline -- undermine the estimations and the dietary studies, correct?
MR. SHEEHAN: Objection.

Page 200

A. I don't comment on that here, no.
Q. Doctor, there's -- there is a Type I error and a Type II error, correct?
MR. SHEEHAN: Objection.
A. Are you talking about in terms of statistical analysis? Yes, Type I and Type II errors in statistical analysis.
Q. And Type I errors are typically discussed as biases toward the null or attenuating the risk for the null, correct?
A. True.
MR. SHEEHAN: Objection.
Q. In Type II --
(Cross-talk.)
MR. SHEEHAN: Hold on.
A. I'm sorry, repeat that again.
Q. And Type II biases, would be biases that may lead to false positive risk or increase the risk toward a positive association, correct?
MR. SHEEHAN: Objection.
A. I think that's -- that's a common understanding of Type I and Type II errors.
Q. Did you do a comprehensive review of the literature to see whether or not

Page 201

misclassification or misestimization [sic] of NDMA would be more likely to lead to Type I bias, or bias toward the null, versus Type II bias?
MR. SHEEHAN: Objection.
A. I did not do that sort of analysis, no.
Q. Are you aware that there are many studies that have been published where they've measured whether or not misestimization leads to Type I bias or Type II bias?
A. No, I haven't read those studies.
MR. NIGH: Let's go ahead and take a look at Freedman 2010. We'll mark this as exhibit -- sorry, this is LP624, it will be marked as Exhibit 6657.
(Exhibit 6657 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, this study is not on your list of materials considered, correct?
A. I don't recall, but let me look in my reference list. I don't believe I have

this one.
Q. The title of this is Dealing With Dietary Measurement Error in Nutritional Cohort Studies.
Do you see that?
A. Yes, I do.
Q. And the author is Freedman and it's published in October of 2010, correct?
A. Yes, that's correct.
Q. And before today, you haven't seen this paper that you know of, correct?
A. I don't recall this paper.
Q. And let's go ahead and blow up the summary paragraph beginning and it states:
Dietary measurement error creates serious challenges to reliably discovering new diet-disease associations in nutritional cohort studies.
Do you see that?
A. I see that, yes.
Q. And it says:
Such error causes substantial underestimation of relevant -- relative risk and reduction of statistical power for detecting associations.


Do you see that?
A. I see this statement, yes.
Q. And if you haven't seen this paper, you probably haven't seen all the studies that also they cite that shows misclassification or missed dietary measurement error can lead to bias toward the null, correct?
MR. SHEEHAN: Objection.
A. I'm not sure what it can lead to, but, no, I understand the point here.
Q. Doctor, interpreting dietary studies or frequency food questionnaires is not one of your areas of expertise, correct?
MR. SHEEHAN: Objection.
A. Well, I'm very familiar with them. We do -- I don't do them personally, but many of my close colleagues in the cancer center do dietary studies and they will all tell you, they are very inexact. And again, most of what they can do or conclude is to generate hypotheses about diet. There's a long history of dietary studies, particularly in cancer.
As an example, let me just tell


you, going back to the 1960s and 1970s, there were a lot of dietary studies that sort of tried to reach the conclusion that gastric cancer was primarily due to different sort of diet. Gastric cancer was very, very common in Japan, but not so common in the United States. Still isn't very common in the United States, despite all of the carcinogens that we're alleging here. But the investigators in the 1960s and 1970s, reached a conclusion that gastric cancer was due to too much salted and preserved food. They did discuss nitrates even back then and the deficiency in vitamin E, vitamin C and selenium. But then made people question this because, you know, it was hard to show the role of specific nutrients in a diet and the diets differed in a -- in many things. And then of course it turned out that they realized that the major cause of gastric cancer was in fact Helicobacter pylori infection. And the puzzling thing about many of these studies is they didn't even talk about Helicobacter pylori, which is primary cause of gastric cancer in the vast majority


of individuals.
So, I find all of this sort of a bit of rearranging the chairs on the Titanic, it's sort of missing the major point. And certainly, it's possible that diet can modify the risk of gastric cancer. I don't doubt that it has some influence, but many of these studies seem to be highly focused on just a specific group of nutrients and many of them have a -- a model of a single -- a single factor, a single nutrient when in fact diets are very, very complex. And so, when you increase something, you decrease something else.
So, I find this -- this whole field -- I mean, I think it does raise a hypothesis I think of nitrosamines and NDMA and so on, but it's certainly far from proof and certainly in any case the diet is probably gonna modify chronic inflammation from Helicobacter pylori, which is the cause of gastric cancer. So, I'm not quite following what the point of some of these questions is.
Q. Have you seen many of these dietary

Page 206

studies adjust for H. pylori?
MR. SHEEHAN: Objection.
A. Some of them do, not all of them do.
Q. Okay. Let's take a look at the Freedman 1087. Actually, before I go to that page, before I go to that.
You recognize that there's a lot of money spent at numerous health organizations where they spend a lot of focus on looking at whether or not what's in your diet can increase your risk of cancer, right?
A. There's been a whole area of research and a whole industry. I'm familiar with many of the leaders of diet and cancer, many of whom were they Harvard School of Public Health and I interacted with mainly. The interesting thing is that many of the recent AACR meetings they've done sort of mea culpa indicating that by focusing on diet and micronutrients, they may have missed the boat, which is the main mechanisms by which diets may increase the risk of cancer is to modify the microbiome. And several of the Harvard School of Public Health leaders have

Page 207

indicated as such and that they are focusing on small groups of micronutrients really has missed the boat for how diet may interact with cancer.
So, again, I think this is another example of those sorts of studies that in their, sort of, sharp narrow focus on a few micronutrients are missing the fact that these diets differ in many ways and having affects other than simply the inclusion of -- of nitrosamines and other preservatives.
Q. Doctor, are you aware of the National Cancer Institute's metabolic epidemiology branch?
A. I'm familiar that there is a branch, I don't know that much about the work there.
Q. Are you aware that they've opined that potentially modifiable exposures that can decrease the risk of cancer include diet?
A. Yes, I'm aware of that general conclusion.
Q. Are you aware that the American Institute for Cancer Research funds research that focuses on how nutrition can affect

Page 208

prevention, treatment and survival of cancer?
A. I'm aware of such efforts.
Q. Are you aware that the World Cancer Research Fund International, which you've cited to in your expert report, seeks ways to prevent cancer, improve the quality of life of people living with cancer and increase our understanding of the underlying cellular and molecular links between diet and cancer?
A. It sounds like a worthy effort.
Q. Are you aware that the WHO and IARC has the nutrition and meta- -- metabolism branch?
A. Yes, I'm aware of that branch.
Q. And these are all institutions that clearly indicate that dietary studies remain an important part of epidemiological research, correct?
A. Diet can be important that's true.
Q. Now, I want to go back to the -- go to page 1087 on the left side the second to last paragraph, says, in 1999, the US National Cancer Institute.
Are you aware of the US National Cancer Institute?

Page 209

A. The NCI, is that the NCI that you're talking about?
Q. Yes.
A. Yes, they funded my work for 25 years.
Q. The US National Cancer Institute initiated the Observing Protein and Energy Nutrition study in which 261 male and 223 female adult volunteers completed and FFQ, a 24-hour recall, ones doubly labeled water assessment and a 24-hour urinary potassium and urinary nitrogen assessments.
Do you see that?
A. I do, I see that.
Q. And they state:
From the study, it was possible to estimate the level of relative risk attenuation when using an FFQ and as the main instrument in a cohort study for five exposures; energy, protein, potassium, protein density and potassium density.
Do you see that?
A. Yes.
Q. And you understand that even in 1999, it would've been unethical to

specifically give NDMA to volunteers, correct?
A. Yes.
Q. Okay.
MR. NIGH: So, next, if we look at the findings in the next paragraph, we can blow that up. The last paragraph on the left side, and it will be that bottom paragraph on the left side there. We can blow that portion up.
DOCUMENT TECHNICIAN: None of my tools are working, one second.
MR. NIGH: No problem.
Q. And here you can see, Doctor, it says:
Attenuation is quantified by the attenuation factor, a multiplicative factor that operates on the true regression coefficient in the disease model. The smaller the coefficient the greater the attenuation of the relative risk estimate.
Do you see that?
A. Yes.
Q. And below it says:
The attenuation --


MR. NIGH: Yes, right there.
Q. The attenuation factors would cause a true relative risk of 2.0 to be estimated on average as 1.03 to 1.06 for energy.
Do you see that?
A. Yes.
Q. So, what this is showing is even if there was a doubling of the risk for energy, what would show up in this FFQ is just a risk of 1.03 to 1.06 for energy, correct?
MR. SHEEHAN: Objection.
A. That's not exactly what they're saying, but it does say -- it does suggest that on the average, that the attenuation factor would reduce -- would show up as a slightly reduced risk for this particular study looking at, as you said, energy and protein with these particular macronutrients.
Q. You said "slightly reduced," but going from 2.0 to 1.03, that would be a marked reduction or attenuation of the risk, correct?
A. Well, I guess it depends on how you defined marked or -- yeah, so, it would reduce -- it would reduce a risk exactly in


the range that you said.
Q. So, for energy, a 1 -- if it were a true relative risk of 2.0, it would go from 100 percent increase risk to just a three to six percent increase risk for energy, correct?
MR. SHEEHAN: Objection.
A. Well, those are the numbers that they're citing for this attenuation on the average, yes.
Q. And you don't consider that to be a marked reduction in terms of the attenuation to the risk of the null?
A. I think -- I think for this particular instance, I'd be fine with a marked -- your term here, marked reduction risk, I think is fair.
Q. Okay. If we look at the next statement, it says -- at the bottom, it says:
Although this attenuation for the micronutrient potassium, namely, reduction to the relevant risk of 1. -- 1.17 to 1.22 appeared less extreme than that for macronutrient protein, it was nevertheless substantial.


Do you see that?
A. Yes.
Q. So, one of the micronutrients that they were able to look to see how it attenuates or creates bias toward the null, this misclassification of exposure, they were able to see a reduction five-fold in the risk of what the true relative risk would've been, correct?
MR. SHEEHAN: Objection.
A. Well, I see the numbers, potassium, they're classifying which I think is appropriate as a micronutrient. And here looking at these particular endpoints, they are indicating that there's a slight reduction with the estimation of the effects of potassium, and -- but it's not as significant as the earlier risk that we just looked at.
So, the attenuation was less, I think that was one of their conclusions.
Q. It's a substantial reduction to go from a 2.0 true relative risk to only then see a 1.17 to 1.22, that's almost a five --
THE WITNESS: We lost him.

Page 214

MR. SHEEHAN: We lost somebody.
Can you hear us?
MR. NIGH: Yeah, I can hear you just fine.
MR. SHEEHAN: You just -- you actually just popped back in, we lost the last ten seconds or so...
MR. NIGH: Okay.
A. Can you repeat your question?
Q. Yeah, no problem. One second.
Doctor, it's a substantial reduction to go from a 2.0 relative risk to only then see a 1.17 to 1.22, that's almost a five-fold reduction in risk, correct?
MR. SHEEHAN: Objection.
A. Understood. Okay. Yeah, I think -- I think that is a substantial reduction that they're describing here in this particular study.
Q. And next it shows in terms of loss of statistical power --
MR. NIGH: We can zoom out of here and let's blow up the Statistical Power.
Q. It says:

Page 215

Loss of Statistical Power.
Accompanying the severe degree of attenuation is an equally severe loss of statistical power.
Do you see that?
A. Yes, I see that statement.
Q. Doctor, did you consider, as part of your opinion, that FFQ misclassifications often lead toward bias toward the null and/or a reduction of loss of statistical power?
MR. SHEEHAN: Objection.
A. Yes, I considered that. I hadn't looked in detail at this study, which is interesting, of course, focused on two very specific endpoints. It's a -- it's a short-term study, it requires only 24-hour recall, which I don't think is true of every dietary study and very simple and easy to measure endpoints.
So, I think -- I think it -- but it does show that it -- that this -- that it can lead to an underestimation of the differences, but I think it would be a mistake and an incorrect assumption to assume this sort of regression to the mean

Page 216

under estimation of effect is always true with problems in dietary recall.
And again, we don't have any cancer endpoints here, so the relevance of this to cancer studies is yet unclear and hypothetical, but I -- I would acknowledge that in some cases, it can lead to an underestimation of effects.
Q. Doctor, review of any other studies that actually show the longer the period of recall the more the likelihood of attenuation of the relative risk towards the null?
MR. SHEEHAN: Objection.
A. I guess we have to look at those studies. But, again, I'd be most interested if anyone has looked at this in the area of cancer endpoints.
Q. Whether or not anybody has asked about their recall of their cancer?
A. Well, I think in cancer studies, you know, that's -- that's really -- I'm in the, you know, cancer center at Columbia University and the dietary studies that are done are looking at cancer endpoints. And, again, my experience and experience of my

Page 217

colleagues in the leadership committee at the cancer center recognize a lot of flaws in the dietary questionnaires and the dietary recall and it's always been a problem in the field. And, again, I don't know how you would prove that you're -- if anything, you're underestimating endpoints here. I think that's an assumption that's not been shown in the cancer and diet field, but I understand your point.
Sometimes, at least in the studies you've shown me so far, it does look like they -- they do show some attenuation of effects here.
Q. Doctor, remember we talked about there's two parts of a study, exposure and outcome, in an epidemiological study?
MR. SHEEHAN: Objection.
A. So, I remember you asking me about that at the very beginning of the deposition. And, again -- again, two parts of the study, there are two things you can certainly look at, perhaps those are the things you're most focused on, but there's many parts in epidemiologic study and those are two aspects

Page 218

of it. But I understand those two aspects, endpoints, the outcomes and exposure are two things worth considering, particularly if you're looking at studies of cancer risk.
Q. This issue of non-differential misclassification as it relates to FFQs, is an exposure question, not an outcome question, correct?
A. So, yes, I guess in these sorts of studies, the outcome that we're generally looking at is cancer and it's right that when we talk about dietary estimation of intake that's an exposure question, yes.
Q. And you under- -- do you understand that in many of these dietary studies, these questionnaires are asked before the person ever even realizes they have cancer --
MR. SHEEHAN: Objection.
Q. -- or not?
A. That's probably true in some studies I've looked at. I don't recall whether -- what percentage of the studies they were prospective. Would have to go back and look I think at the -- at that. I mean, if we can talk about specific studies in

Page 219

terms of whether the questions were done before and after.
But, yes, in many of them, they were done before.
Q. And Doctor, most people don't have the common knowledge that NDMA leads to cancer or at least didn't in the 1990s and 2000s, right?
MR. SHEEHAN: Object to the premise of the question.
A. I don't know what they knew or what they didn't know. So, NDMA has been studied for a long time. I'm not sure in terms of cancer dietary epidemiology what the knowledge was of the investigators at the time.
I mean, perhaps your point was that they were not focused on that as much. I mean, certainly they've been focused on nitrates and nitrites for 60 years or more, but I don't -- can't tell you specifically about NDMA.
Q. Okay.
MR. NIGH: Let's take a look at LP636. This will be marked as

Page 220

Exhibit 6658. And let's take a look at the right side of page 354.
(Exhibit 6658 was marked for identification.)
Q. Actually, first, the title of this study Dietary Assessment and Opportunities to Enhance Nutritional Epidemiology Evidence and the author is Dr. Prentice.
Do you see that?
A. Yes, I do.
Q. As we discussed earlier, you cited this study in your report, correct?
A. Yes, this is the 2020 annals paper, yes.
Q. And you quoted the language:
The rough error prone estimation undermines the reliability of the dietary studies, right?
A. That's correct.
Q. Now, you didn't cite this statement on the right side -- actually, strike that question.
MR. NIGH: Let's go ahead and take a look at the right side, let's blow up the full paragraph.

Page 221

Q. You see the statement that says:
The random component of measurement error may substantially attenuate estimated associations, so that a recommendation to consume a nutrient or food that seems to convey a small health benefit may reflect a much stronger disease prevention potential.
Do you see that?
A. Yes, I see that.
Q. So, Dr. Prentice actually discusses how this random component of measurement error may substantially attenuate the estimated associations, correct?
MR. SHEEHAN: Objection.
A. I don't think he's talking about NDMA and cancer here and I'd like to go back and look at what sort of endpoints they're talking -- Ross, it's a he, he is talking about here. But I do see that statement and I understand that as we've talked about that and they're talking here about the measurement errors, so acknowledging that there's a lot of error here in dietary assessment. I would not disagree that in some cases and particularly they're talking

here about health benefits, so they're talking about, I think, altering the diet -- primarily, I guess, preventing cardiovascular disease and other things, so that it may underestimate the benefit.

Here, I don't think we're talking about benefit and I think, you know, in terms of cancer causality, there's no specific statement here, so I wouldn't generalize this too much to some of the specifics that we've been discussing, but I do acknowledge the point that the dietary error sometimes can be in the favor of underestimating the benefit of nutritious diet.

Q. Doctor, I -- I pulled up this study because you cited it and referenced it in your report, must have been to suggest unreliability of dietary studies as it pertains to NDMA and cancer.

That was the question you were looking at, right?

MR. SHEEHAN: Objection.

A. Yes, I was simply commenting on the error prone nature of dietary studies and this statement sort of reinforces that and


makes the point that in some cases it can underestimate the differences, that's true.

Q. But Doctor, it's important as opposed to just talking about error or ability to error, it's important to understand how that error may affect the result, is it Type I error that leads to bias toward the null, or is it Type II error that leads to false positive, right?

MR. SHEEHAN: Objection.

A. I'm not -- so, there's two types of errors, we already discussed that. I don't think we can make any assumptions or predictions here which type of error we're actually looking at except to say that the dietary studies are not assessments, the questionnaires are not entirely accurate. And I think apart from the error prone estimation that we're focused on here, I think we're missing the larger concern about these sorts of dietary associations in that they're simply associations. Some seem to want to -- to look at this as -- as proof because of these correlative natures of these NDMA estimates is really proving that NDMA


causes human cancer. And, again, I would certainly accept that they are hypothesis generating.

But the major point, I think, of my report on the dietary studies is that the two groups eating very to very different diets, even though the NDMA may have differ, the diets differ in many other ways and simply taking one micronutrient out of context and saying, here, look, here's an association, certainly doesn't provide very strong evidence.

And I'd say also, we've looked at a few dietary studies. But the overall dietary studies, if you look at the results, are pretty inconsistent in terms of the degree of risk that they come up with, the degree of specific cancers that they find associated with it.

So, I think that there is -- there are some interesting findings here that are hypothesis generating, but I think it's not really worth spending our time guessing as to whether the estimates in any study undershoot or overshoot. I think -- again, I don't


believe that you can -- you can make much of a conclusion from dietary associations, except to say that there's a hypothesis that needs to be tested.

Q. Doctor, isn't it true that non-differential misclassification of exposure generally leads to bias towards the null?

MR. SHEEHAN: Objection.

A. I know that some have claimed this broadly. I don't know specifically in the cancer field if that's true, given the fact that most of the dietary epidemiology in cancer has been wrong for many years, there are still some associations that have been described in the cancer field, the associations are not strong. And in the cancer field, we don't believe that diet is the primarily -- primary cause of cancer. So, I don't know what to conclude about the dietary studies and whether or not they are overshooting or undershooting.

There's -- there's not a strong association with most cancers, aside from things such as obesity, which -- and I think

Page 226

if you look at obesity and overall caloric intake that is the strongest association in terms of perhaps dietary intake in cancer. The micronutrients, not so much. As I mentioned before, there are a lot of studies suggesting that selenium and vitamin E and vitamin C were protective against cancer getting back to all the nitrate theories. But as you should know, the randomized control trials that examined the gastric cancer the effects of adding selenium, vitamin A -- vitamin E and vitamin C to the diets, actually resulted in an increase of incidence cancer.

So, despite the very solid nutritional epidemiology suggesting that deficiency was harmful, in fact it was almost the reverse.

So, until you show me a randomized control trial that -- that validates some of these associations based on dietary recall, I'm just not buying that this is -- that this is solid evidence, at least in the cancer field there's a whole history of this in cancer and it's not been validated.

Page 227

Q. Doctor, until we show you a randomized clinical trial of people who ingest high amounts of NDMA versus people who have low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection.

A. Well, I wouldn't buy the dietary studies alone. There are certainly other ways, I think, to be able to show that NDMA is carcinogenic. And, you know, for example, the human -- I think the human epidemiology studies, particularly with ranitidine, I think the most relevant here. Certainly, I think that you can show these in human epidemiologic studies with ranitidine using that analysis that we referred to before. So, if there was a compelling Bradford Hill analysis, I think that would convincing.

I think with respect to ranitidine, if there was compelling evidence that the ranitidine that patients are taking can cause cancer in an animal on its own, I think that would be compelling, but I think these sorts of dietary studies, again, they are hypothesis generating, but they're far from

Page 228

definitive proof.

And again, I think the much stronger question would be what is ranitidine doing and not focusing just on diets that are that are rich in -- in bacon. I mean, I think bacon is -- as we've sort of discussed, has a number of things in it, we've looked at a couple of them. You've discussed PhIP along with NDMA. But I think there's many other compounds that could be related to the differences assuming that that's the explanation.

MR. NIGH: Move to strike as nonresponsive.

Q. Doctor, I specifically asked about NDMA. I know you want to talk about ranitidine. I'm gonna get there. My question is about NDMA.

Until you -- we show you a randomized clinical trial with people who ingest high amounts of NDMA versus people who ingest no or low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection. Asked and answered.

Page 229

MR. NIGH: Not answered.

MR. SHEEHAN: Disagree with you there, Mr. Nigh.

A. I'm sorry. Can you repeat the question?

Q. Doctor, until we show you a randomize clinical trial of people who ingest high amounts of NDMA versus people who have low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection. Asked and answered.

A. Okay. So -- so, certainly, let's be clear, I'm not -- and I think you suggested this, I'm not suggesting a randomized controlled trial of NDMA in humans, an interesting idea, but certainly not something that I would suggest. But I am suggesting that these sorts of dietary recall epidemiologic studies will never get too very far and the conclusions are highly likely to be in error. Some of these conclusions could possibly be true. But I think putting too much weight in them and assuming that they're proof, I think, is a

mistake that we, in the cancer field, have -- have learned to get beyond. And I think it's -- it does require validation in some ways.

Now, I don't think that -- in many ways, I don't think it's necessary to go that far. I think, you know, what the WHO and IARC is they've classified it as a -- as a 2A, it's possible, let's be careful with it. Do we really need to -- to go there and prove a hundred percent that it can cause cancer in humans? Probably not. I think the safe thing to do is say, even though there's -- there's, you know, it's possible to be careful with the agent. There's no read -- need to -- to do further studies.

And so, I think the association studies are fine, but I just don't think we -- I think we need to be careful about over interpreting them and putting too much weight in them in the absence of further validation in humans.

MR. NIGH: Let's take a look at LP3 -- 458. Sorry, LP548.

MR. SHEEHAN: Before we get into



this one, we've been going about an hour 20, I guess, or so.

MR. NIGH: Let's go ahead and take a break.

MR. SHEEHAN: Ten minutes?

MR. NIGH: Yeah, ten minutes is good.

MR. SHEEHAN: Let's go off the record.

THE VIDEOGRAPHER: The time is 19:11 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 19:25 UTC.

MR. NIGH: Let's go ahead and pull up LP548. This will be marked as Exhibit 6659.

(Exhibit 6659 was marked for identification.)

BY MR. NIGH:

Q. Doctor, this study is titled Nitrosamine, nitrate and nitrite in relation to gastric cancer: A case-control study



Marseille, France. And the first author is Dr. Pobel, correct?

A. That's correct.

MR. NIGH: And if we can blow up the abstract, look at the right side of the abstract.

Q. Here it states -- draw your attention, it states:

The results indicated that high intake of NDMA was associated with an increased risk for gastric cancer. The ORs for the second and third tertile of NDMA intake were 4.13 and 7.0.

Do you see that?

A. Yes, I do.

Q. And for the third tertile, those results would illustrate a seven-fold in the increase of cancer, correct?

A. That's what it says, that's correct.

Q. And those results were found to be statistically significant, correct?

A. Give me a second. Looks like it from the confidence intervals, but if I look a little more carefully at this in the



results it says p-value is .04.

Q. That's the p-value for trend, right?

A. Yes.

Q. And the p-value for trend is also statistically significant, correct?

A. It is for NDMA, but not for nitrates and nitrites according to their study.

Q. Right. And the odds ratio for NDMA at the third tertile is also statistically significant, correct?

A. That's what their results show.

Q. Okay.

MR. NIGH: Let's take a look at LP563. We'll go ahead and mark this as Exhibit 6660.

(Exhibit 6660 was marked for identification.)

BY MR. NIGH:

Q. And the title of this is Nitrosamine intake and gastric cancer risk with the first author being Dr. La Vecchia.

Do you see that?

A. Yes, I do.

Page 234

MR. NIGH: And let's go ahead and blow up the summary.
Q. And in the middle it says:
Compared with subjects in the lowest tertile of NDMA intake, the odds ratios were 1.1 in the intermediate and 1.6 in the highest tertile of intake.
Do you see that?
A. Yes, I see that.
Q. And then it says:
These estimates were not appreciably modified after allowance for total energy intake, other major dietary and non-dietary correlates of gastric cancer, and estimated intake of nitrite and nitrate.
You see that?
A. I see that, yes.
Q. And then it states:
The multi-variant OR for the highest NDMA intake tertile was 1.4.
Do you see that?
A. I do.
Q. And that was -- that finding was statistically significant, correct?
A. I don't have all those stats here.

Page 235

MR. NIGH: If we turn to page 471, Table 2, we can blow up that table.
The one before that, that's Table 3.
Table 2.
Thank you.
A. I see a p-value of less than .01 in the very bottom of the table.
Q. And here it shows for NDMA at 191 nanograms, greater than or equal to 191 nanograms, that's the third tertile, correct?
A. Yes, that's the third tertile.
Q. To be more clear, it's .191 micrograms per day or 191 nanograms per day of NDMA, correct?
MR. SHEEHAN: Objection.
A. So, in that tertile, that is the -- the estimated NDMA intake in that particular group.
Q. Okay. And whether you adjust for nitrite and nitrate as a potential confounder or not, OR2 and OR3, it's still statistically significant at the third tertile of usage, correct?
A. Let me just take a quick look at this again.

Page 236

Q. Let me break that question down a little bit.
Do you see at the bottom under footnote A, it says:
Estimates for multiple logistic regression equations, including terms for OR1, age and sex, OR2, age, sex, family history of gastric cancer, combined food score intake, intake of beta carotene, vitamin C and total calories. And then 3 as OR2 plus nitrite and nitrate intake.
Do you see that?
A. Yes.
Q. So, Column 2 would be adjusting for age, sex, education, family history of gastric cancer, combined score index, intake of beta carotene, vitamine C and total calories, correct?
A. Yes.
Q. And then Column 3 adjusts for all those plus nitrite and nitrate intake, correct?
A. Yes.
Q. And whether or not you adjust for nitrite or nitrate intake, OR2 and OR3 they

Page 237

are still statistically significant when there's more than 191 nanograms of NDMA ingested per day, correct?
MR. SHEEHAN: Objection.
A. So, in the third group, they've adjusted for all of those parameters, age, sex, et cetera, education and they have adjusted for nitrate and nitrate intake, I believe. And although, the odds ratio come down, that quartile 3 with the estimated NDMA intake of greater than 191 nanograms per day still shows a significant difference in the range of seven or so.
Q. No matter which of those three ORs that you use for adjusting for potential confounding factors, the p-value as indicated in footnote C, shows p-value for trend of less than .01, correct?
A. Yes. So, for all three groups, 1, 2 and 3, the p-value is less than 0.01.
Q. Okay.
MR. NIGH: We can put that one away.
Next, LP638. We'll mark this as Exhibit 6661. We can go ahead and

Page 238

take this one down.
(Exhibit 6661 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you mentioned that the amount of time it takes for onset of a cancer from exposure to a carcinogen is often decades, correct?
MR. SHEEHAN: Objection.
A. Yes, it can be somewhat variable. There are some cases that can arise more quickly, but the classic teaching is it takes 10 to 20 years from the time of cancer initiation for many solid malignancies, pancreatic in particular has been the best study. But certainly gastric cancer that we've discussed tends to proceed through a series of histopathologic stages, including atrophy, metaplasia, dysplasia and cancer, primarily initiate and induced by chronic inflammation.
So, yes, the patients who develop GI cancers tend to be middle aged or older and the cancer process takes a number of years to develop typically.

Page 239

Q. Doctor, experience from studies of cancer in humans indicates that the period from first exposure to the development of the clinical cancer is sometimes longer than 20 years, correct?
MR. SHEEHAN: Objection.
A. Of course it would depend upon the particular type of cancer, but as I mentioned it could be somewhat variable. Twenty years is a long time. I mean, most -- for example, gastric cancers are due to Helicobacter pylori is the primary agent in certainly the vast majority of cases. And patients with H. pylori are typically infected for several decades before the emergence of cancer.
Q. For stomach, colorectal, pancreatic esophogeal and liver cancer, the statement would be true, correct?
MR. SHEEHAN: What statement are we talking about?
Q. I'll rephrase.
For stomach cancer, colorectal cancer, pancreatic cancer, esophogeal cancer and liver cancer, the statement would be true that experiences from studies that are

Page 240

studying those types of cancer in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years, correct?
MR. SHEEHAN: Objection.
A. I think sometimes, yes, sometimes it's longer than 20 years. That's -- that would be fair to say for most GI cancers, including the ones you mentioned.
Q. Sorry.
MR. NIGH: Let's go ahead and take a look at LP616. This will be marked as Exhibit 6662.
(Exhibit 6662 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see this document is from IARC, correct?
A. Yes, it's from IARC, correct.
Q. And it is amended January 2019.
Do you see that?
A. Yes, I see that.
Q. And this is the IARC Monograph on the Indemnification [sic] of Carcinogenic Hazards to Humans, and it has the word

Page 241

Preamble, correct?
A. Yes.
MR. NIGH: And let's draw attention to page 22.
A. I see 22.
Q. And if we can take a look at where it says, experience from studies of cancer in humans.
Do you see that? It's line 31.
A. Yes.
Q. It says:
Experience from studies of cancers in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years.
Do you see that?
A. Yes.
Q. And it says:
Therefore, latency periods substantially shorter than about 30 years cannot provide evidence of lack of carcinogenicity.
Do you see that?
A. Yes, I do.
Q. And you would agree with that

statement, correct?

MR. SHEEHAN: Objection.

A. No, no, not -- no, I would not. Perhaps it would be fair to say that to exclude 100 percent that something is carcinogenic would require a period in that range. But, for example, many or most of the carcinogens that have been studied, there's a signal way before, 20 or 30 years, that there's an increase in cancer. I mean, the signal may not be as strong as it is at 20 years and I don't think you want to say for 100 percent certainty that it is not carcinogenic, but in terms of the weight of the evidence, most carcinogens show a signal way before that.

So, I think that's a conservative statement and I think for the IARC, which is trying to look at environmental carcinogens, it's not an unreasonable sort of approach or policy for their organization to monitor for much longer periods of time. But for my own purposes, I think -- I think ignoring all evidence particularly clinical evidence that comes around for less than 30 years is not



correct.

Q. Doctor, isn't this a lesson that was learned after what occurred in the 1900s with lead cancer research?

A. I'm not sure what lessons were learned from lead, but I can certainly say that the lessons learned from smoking is probably the best example where rates started to increase as early as five years, but by ten years, I think, it was clear that individuals who smoke cigarettes for greater than ten years began developing cancer. Now, it's true that with lung cancer and smoking, the cancer rates started to peak around 20 years. But by ten yeas, rates were totally increased for something -- for exposure to something that was clearly carcinogenic.

Q. I'm glad you pointed out smoking, 'cause I was gonna ask that next.

Isn't it true that many of epidemiological studies that came out initially that had shorter follow-up than ten years, demonstrated a lack of statistical significance for increased risk of smoking



and cancers?

MR. SHEEHAN: Objection.

A. I'd have to go back and look. I can't tell you I examined every one of the smoking studies, but I can say that the studies that I've examined, and I don't know when they came out or whether they were first studies or not, have shown an significant increase in cancer rates after ten years of smoking.

Q. Doctor, isn't that what tobacco industry lawyers used to point to in defending the tobacco industry, epidemiological studies that show shorter follow-up up than ten years that didn't demonstrate a lack of increase risk of cancer in the 1950s?

MR. SHEEHAN: Objection. You're asking him to comment on what tobacco lawyers did?

MR. NIGH: Absolutely.

MR. SHEEHAN: If you know. Go for it.

A. I don't really know what the tobacco lawyers did or what data they showed.



But I would say that the epidemiologic studies that I've looked at have clearly shown an increase in lung cancer rates, a significant increase in lung cancer rates more than twofold by ten years.

And I guess smoking is another perhaps good example in terms of looking for the signal because I think a lot of epidemiologists and clinicians in general saw a correlation between smoking rates and the emergence of lung cancer. So, lung cancer rates in the United States also began to skyrocket as smoking became more prevalent.

And so, I think that the other thing to look for is that in terms of rates of cancer in the United States, if there is a new drug or some exposure that is really causing cancer at a large scale, you'd expect to see large increases in that type of cancer in many areas and certainly we're not seeing increases in cancer, we're seeing, in general, decreases in most forms of cancer.

So, I think, again, looking for that broader signal, I think, is important in terms of assessing the risk of exposure.

Page 246

Q. Doctor, I think it's interesting you keep speaking to lung cancer. My questions have not been focused on lung cancer.
Smoking has now been demonstrated to show an epidemiological studies increased risk of many other forms of cancer, correct?
A. That's -- that's true.
Q. And those studies had difficulty detecting increased risk of the other types of cancers until there was a much longer follow-up in the studies, correct?
MR. SHEEHAN: Objection.
A. I'm not sure about that. But smoking has been associated with many other forms of cancer, that's correct.
Q. And that lung cancer is -- your risk of lung cancer from smoking is very prevalent compared to the risk of other cancer types from smoking, correct?
A. Lung cancer and head and neck cancer are the most common risks from -- from smoking.
Q. So, it can be even more difficult to find a cancer that's less prevalent of an

Page 247

increased risk with less follow-up than a cancer that's more prevalent, correct?
MR. SHEEHAN: Objection.
A. I think that in the setting of carcinogenic exposure, that longer follow-up generally reveals more cancers than shorter follow-up. But, again, I would certainly expect a clear signal after five or ten years of exposure if there's an agent that really is truly carcinogenic.
Q. For something that has a prevalent increased risk like tobacco smoke, correct?
MR. SHEEHAN: Objection.
A. Really for any carcinogenic exposure.
Q. Well, there's many other carcinogenic exposures that needed much more long-term follow up in order to be able to see the statistically significant increased risk, correct?
MR. SHEEHAN: Objection. Vague.
A. I'm not sure what you're referring to.
Q. I'm asking you, are you aware of many other carcinogens that needed a longer

Page 248

follow-up in order to detect statistically significant risk in the studies -- in epidemiological studies?
A. Well, I'm not -- sorry.
MR. SHEEHAN: Go ahead.
A. I'm not clear about other carcinogens that are co-linked to human cancer that have been proven to be carcin- -- proven to cause human cancers besides smoking that are generally accepted, but there must be some, I'm just not aware of.
Q. How about hexavalent chromium?
A. Yes, I've heard of hexavalent chromium.
Q. Didn't it take longer term follow-up in epidemiological studies to be able to determine that that's a known car- -- carcinogen?
MR. SHEEHAN: Objection. Beyond the scope and calls for speculation.
A. I'm just not familiar. I do understand that it has been linked to cancer, it's sort of related to toxic spills. I just know the movie with Julia Roberts in it and she talked about hexavalent chromium, but I

Page 249

don't know the details of that particular cancer type and how long it took. It took a -- I think the cancers occurred -- I don't know the details of it, but...
Q. Doctor, how would you characterize the follow-up in the ranitidine studies the length of the follow-up as a whole?
A. I'm sorry, which studies would you like me to refer to?
Q. Any of them.
A. Well, the follow-up vary between study and study. Some of them had really long follow-ups, some of them shorter follow-up.
MR. NIGH: Let's take a look at --
A. There was a collection of studies, I think, that together, I think, as I've written in my report provide very strong evidence for the absence of any cancer signal or carcinogenesis. And, you know, I think that they're extremely strong evidence demonstrating that ranitidine is not associated with human cancer.
MR. NIGH: Let's take a look at LP435.

Q. Doctor, you reviewed the Yoon study, correct?
A. Yes, I did.
MR. NIGH: This will be marked as Exhibit 6663.
A. I think we're looking at the Florian study.
MR. NIGH: Take this one down. LP435 this is Yoon study this will be marked as Exhibit 6663.
(Exhibit 6663 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, do you see that says, Risk of Cancer Following the Use of NDMA Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea?
A. Yes.
Q. The first author is Dr. Yoon?
A. Yes.
MR. NIGH: And if we take a look at the last page, is that page 7 of 8, we'll see -- if we can blow up that middle paragraph.
Q. And in the middle we can see third.



You see:
Third, the follow-up period is restricted to seven years. Thus, the overall follow-up period is not long enough to assess the onset of cancer.
Do you see that?
A. Yes.
Q. Do you agree with the author's statement that the follow-up period of being restricted to seven years is not a long enough follow-up period to assess the onset of cancer?
A. No, I don't agree with that.
Q. Okay.
A. And in fact, I'm not sure -- I'm not sure that the authors agree with that because in -- their study actually gives light of that statement because, in fact, this study does assess the onset of cancer and comments on it.
I think in my opinion, and I can't certainly prove this, I think something was lost in translation here. I think in translating this from Korean to English or in their writing the paper, they sort of



misspoke. I think, what they meant to say, again, I can't prove this a hundred percent, is that the overall follow-up period is not long enough to totally exclude a cancer risk, but in fact, this -- this paper is all about assessing cancer risk in this population. And I think if they really believe that it was not a long enough period, they wouldn't have written this article.
And so, I think that they did believe that seven years is a reasonable period to take a look at whether there's any cancer signal and that's otherwise they probably wouldn't have done the study.
So, I think, again, this is a bit of a probably misstatement or mistranslation in their part and I don't think we should put too much credence into that statement, taking in context with the rest of the paper, they do in fact look at cancer -- onset of cancer. And they -- they have conclusions indicating there's no significant differences in 12 single cancer outcomes.
So, I think this is a very solid study and I think I feel bad the authors sort



of misspoke here.
Q. So, you disagree with the authors' statement that the follow-up period is restricted to seven years, that's the overall follow-up period is not long enough to assess the onset of cancer?
A. As I said, I think that the authors did -- probably did not intend that, so I probably agree with the authors that this a good study looking at cancer outcomes in seven years. And again, if the authors did not believe that it was long enough period, they wouldn't have published the paper. So, I believe that they do believe that this is a long enough period to assess the onset of cancer. The publication in fact demonstrates that they believe it's long enough to assess cancer.
Q. Have you reviewed the South Korean transcript itself to see if that's what the words actually say in Korean?
A. I have not.
Q. This was published in the Journal of Clinical Medicine, correct?
A. Yes, Journal of Clinical Medicine.

Page 254

Q. Do you believe that the Journal of Clinical Medicine is even published in a different language other than English?
A. Perhaps you misunderstood what I was trying to say. And I guess not having worked with agent postdocs who are writing in English, you probably don't appreciate that. I have a large number of Chinese, Japanese and Korean postdocs in my life who are all fantastic, but the language of science really internationally is English. So, I would -- I didn't intend to say that they published this first in Korean, maybe they did, it's possible. I think they probably wrote this in English and the wording here reflects their difficulty with the English language. So, I have had hundreds of papers written by Asian postdocs who try to write drafts in English and unless there's someone like myself to edit it and translate it to some extent -- not translate it, but to correct their English. Sometimes the words come out a bit awkwardly.
So, what I was trying to say is, they probably tried to write in this English

Page 255

and not having good English grammar and syntax misspoke and did not convey what they intended to convey, which is that the overall follow-up period is not long enough to completely exclude the onset of cancer. And so, that's what I was trying to say.
Q. Okay.
MR. NIGH: Let's take a look at LP552. And this will be marked as Exhibit 6664.
(Exhibit 6664 was marked for identification.)
BY MR. NIGH:
Q. The title is Effect of Ranitidine Intake on the Risk of Gastric Cancer Development, the first author is Dr. Kim.
Do you see that?
A. Yes, I do.
MR. NIGH: And let's go to page 7 of 9. And we can blow up that paragraph. Sorry, the third paragraph. Right, that's it.
Q. And it says, starting with fourth:
Fourth, this study had a follow-up period -- had a five-year follow-up period,

Page 256

which may not be long enough to detect gastric cancer development.
Do you see that?
A. Yes.
Q. So, this is another study that suggests that the five-year follow-up period may not be long enough to detect their specific type of cancer development, correct?
MR. SHEEHAN: Objection.
A. So, I think that this sentence is reasonable and, again, indicating that they cannot exclude completely the development of GI cancer. When they say, it may not be long enough, and certainly -- and they're implying it may be long enough. And so, they're leaving some uncertainty here, which I think is a reasonable limitation of any study.
But again, they wouldn't have done the study if they didn't think that the data that they got with this five-year follow-up was important and significant.
So, again, a five-year follow-up study, again, another study showing really no increase in gastric cancer risk and no difference between ranitidine, famotidine and

Page 257

omeprazole. I think this is another study that reinforces the notion that there's no cancer risk here with ranitidine.
Q. With short term use, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, what's the question?
Q. I said with short-term use, correct?
A. So, this is just a real world study of patients who are taking this drug and, you know, the study is the time period that it is, which is five-year follow-up period. Whether that would be considered -- I mean, in our clinical, you know, context, short-term use really means like two or three weeks and I don't think that's what you're trying to say here. This is a pretty good follow-up, five years. And so, that's -- that's a good follow-up, five-year -- five-year period for most clinical studies, this is pretty good follow-up.
Q. Now, follow-up is a different -- is different than the amount of exposure, right?

A. That's true, follow-up period is different from exposure.

MR. NIGH: Let's take a look at LP430. This will be marked as Exhibit 6665.

(Exhibit 6665 was marked for identification.)

BY MR. NIGH:

Q. First, we can see the title is Risk of Cancer in Association with Ranitidine and Nizatidine versus Other H2 Blockers; Analysis of Japan Medical Claims Database [sic] 2005 to 2018. And the first author is Dr. Iwagami.

Do you see that?

A. Yes, I do.

MR. NIGH: And if we take a look at the fourth page, under results. We blow up that first paragraph.

Q. And in the middle we can see medium follow up 2.4 years.

Do you see that?

A. Yes, I do.

Q. Were you aware that the medium follow-up in Iwagami was 2.4 years?



A. Yes, I was.

Q. Okay. Were you aware that --

A. It's in my report.

Q. I'm sorry, what?

A. It's in my report. I write the median follow-up in the ranitidine, nizatidine and other H2R groups was 2.4 years with a range from 1.1 to 4.5 years.

Q. Were you aware that over 90 percent of the users in this study, they only captured less than six months of DDD?

MR. SHEEHAN: Objection.

A. I'm sorry. So, less than six months of -- what was that again? I lost your last word there.

Q. Do you know what DDD stands for?

A. I see it in the paper here. DDD define daily doses I think is the definition, right?

Q. Okay. And in terms of the defined daily dose, take a look at --

MR. NIGH: Let's take a look at Table 3. And let's go ahead and -- yep.

Q. Do you see at the bottom where it



shows Cumulative analysis dose?

A. Yep.

Q. Are you aware that 90 percent of the users were using this for less than six months DDD?

MR. SHEEHAN: Objection.

A. Well, I did look at the exposure levels which you're referring to and they're extremely variable. A number of the patients may have been on shorter term use, but to be honest, this is a drug-based study. I think this is the amount of drugs that could be documented. I would not be surprised if many of the patients took longer amounts of drugs. I mean, these days I guess most patients who are on either H2 blockers or PPIs tend to be on them fairly long-term. But I did see this -- this information in terms of the exposure levels they were able to document.

But this is a nice study that really shows real world use of H2 receptor antagonists and this is, again, a wide swath of -- of users of ranitidine and nizatidine and other drugs and this is what we are



seeing in the real world. And so, I think it's -- it's highly relevant to informing us about relative cancer risk by users of ranitidine and other H2 blockers.

Q. It's your belief that over 90 percent of users are using it for less than six months, using ranitidine for less than six months?

MR. SHEEHAN: Objection.

A. I know they were using it for at least that time period, perhaps they were using it for longer. I'm not quite sure. This is what the -- is captured in this pharmacy sort of database. But I -- I'm aware of that and I -- I find the information extremely useful.

Q. So, you say "it's a drug-based study, I think this is the amount of drugs that can be documented."

Remember you said that?

A. Yes.

Q. Isn't it true that these sorts of drug-based studies utilizing these sorts of databases oftentimes miss exposure to various drugs?

Page 262

MR. SHEEHAN: Objection. Calls for speculation.
A. I don't know the details of how often that happens, so I can't comment any further.
Q. When you said "be honest with you, this is a drug-based study, I think this is the amount of drugs that can be documented," what did you mean by that?
A. I mean that in my experience -- I'm a little surprised at the low level of use here, but I think it could be close to on target. But in my experience as a clinician who treats patients with -- with gastro esophogeal disorders, I would say the majority of patients who are on these drugs are on them for long periods of time.
Q. And when you say "long periods of time," what do you mean by that?
A. Years, lifetime.
Q. And that would be true for ranitidine?
A. It was true for ranitidine, yes.
Q. And that's true for ranitidine in the United States according to your

Page 263

experience?
A. The majority of patients do -- are on them chronically in my experience.
Q. And by "chronically," what do you mean by that?
A. They take them every day for a year or more.
Q. And do many of them take them every day for ten plus years?
A. Some of them do. I don't have the data in terms of how often they take them for a year versus ten years, but in my experience, most patients take them chronically.
Q. Is it your experience that most patients in the United States are taking drugs like ranitidine for more than ten years?
MR. SHEEHAN: Objection. Asked and answered.
A. I can't tell you about ten years.
MR. NIGH: Let's go ahead and take a look at LP553. This will be marked as Exhibit 6666.
(Exhibit 6666 was marked for

Page 264

identification.)
BY MR. NIGH:
Q. And Doctor, this is titled Ranitidine Use and Gastric Cancer Among Persons with Helicobacter pylori, correct?
A. Yes.
Q. And the first author is Dr. Kumar, correct?
A. Yes.
Q. And if we take a look to the third page, we can see the medium follow-up as 4.4 years, underneath results, correct?
A. Yes, 4.4 years is correct with a range from 1.7 to 9.2 years, so -- so for up to as long as nine years.
Q. But you don't know how many people would've had a follow-up as long as nine years in the study, correct?
A. No, we don't. I don't think so. No. Can't see that.
And again, this study shows no association between ranitidine and gastric adenocarcinoma.
Q. Let's take a look at last sentence before the conclusion. And the study authors

Page 265

say:
Our follow-up time was similar to other recent pharmacoepidemiologic studies investigating contaminant and future cancer risk, but, as in those studies, longer follow-up is necessary to confirm those findings.
Do you see that?
A. Yes, I do.
I think, again, the authors are pretty confident of their results, otherwise they probably wouldn't have published them, but they're providing an appropriate caveat, which is, even though the studies really show no signal of increased risk cancer risk with ranitidine, they can't rule out 100 percent that there could be some small late signal. And so, therefore they are appropriately qualifying their results and saying that we need more follow-up studies probably and although the studies are solid, it's always nice to have additional studies to confirm them with longer follow-up, but I think that's a very reasonable conclusion by these doctors.

Page 266

MR. NIGH: Take a look at LP550. This will be marked as Exhibit 6667.
(Exhibit 6667 was marked for identification.)
A. Yes, I see the Tran study.
Q. And for the conclusion -- sorry. This is the Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies. And the leading author is Dr. Tran, correct?
A. That's correct.
Q. And the -- one of the conclusions is that we found some evidence that PPI use was associated with liver cancer.
Do you see that?
A. Yes.
Q. And is this -- this is a study that you would've also reviewed for your work as an expert in the PPI litigation?
A. I can't recall. We wrote whether it's relevant to other activities, but I have reviewed this study before and I certainly think that this statement about residual confounding or reverse causality is

Page 267

certainly relevant, I think, to this particular study.
Q. Well, there are numerous studies that have actually discussed whether there might be an association between PPI use and liver cancer, correct?
A. There's -- there are several other studies, that's correct.
Q. And this study in terms of the results demonstrated in the UK Biobank right before this, in the UC Biobank cohort 182 of 475,768 patients developed liver cancer. If both, ever use of PPIs was associated with increased live cancer risk.
Do you see that?
A. Yes.
Q. Okay. And so, it showed an adjusted odds ratio of 1.8 and an odds HR hazard ratio of 1.99, correct?
A. That's correct.
Q. And for both of those, it shows a statistically significant increased risk of liver cancer associated with PPI use, correct?
A. That's correct.

Page 268

Q. And then it talks about there is little evidence of association with H2RA use, correct?
A. That's correct.
Q. Now, this study actually gives findings specifically to ranitidine as well, correct?
A. Let's see.
Q. Take a look at Exhibit 2. You see at the bottom --
A. Ranitidine, yep. The very bottom it has --
(Cross-talk.)
Q. Right. It shows H2RA by type and it shows cimetidine and ranitidine.
Do you see that?
A. Yes, that's correct, yes.
Q. Over to the right, that would be fully adjusted odds ratio, correct?
A. Yes.
Q. And for cimetidine, it actually shows a non-statistically significant decreased risk of liver cancer is cimetidine, correct?
MR. SHEEHAN: Objection.

Page 269

A. So, for the H2RAs, the p-value is -- they have an adjusted -- unadjusted p-value and fully adjusted p-values. So, if we look at the fully adjusted p-values, they are both non-significant.
Q. That's not my question.
In looking at the odds ratio, the odds ratio for cimetidine is 0.97 and it's not statistically significant, correct?
A. The fully adjusted odds ratio for cimetidine is 0.97.
Q. So, that odds ratio is below one for cimetidine, correct?
A. Correct.
Q. And for ranitidine, the fully adjusted odds ratio is 1.41. That's not statistically significant, correct?
A. That's correct.
Q. Can we take a look at the next page, Table 4. I'm sorry, let's go back to Table 2 first. I need to find out one thing.
At the top of Table 2, the title, that's The association between PPI and H2RA use and risk of cancer in the Primary Care Clinical Informatics Unit, correct?

A. Yeah, that's what it says on Table 2.
Q. So, that's one of the databases that they looked at in this study, correct?
A. Correct.
Q. And they also looked at the database in Table 4, they're looking at the UK Biobank, correct?
A. Table 4 is the UK Biobank.
Q. And for ranitidine and liver cancer, they found a fully adjusted odds ratio of 1.82, correct?
A. Correct, 1.82.
Q. That's above 1, but it's not statistically significant, correct?
A. That's correct.
Q. And page 59 shows that this study had a median follow-up of 5.6 years for the UK Biobank, correct?
MR. NIGH: Let's go ahead and blow up the first paragraph on 59 under UK Biobank.
Q. It shows a median follow-up of 5.6 years, correct?
A. Yes, 5.6 years for the UK Biobank.



Q. And for the PCCIU, the Primary Care Clinical Informatics Unit on page 57.
MR. NIGH: We can blow that up, 3.1, at the bottom right.
Q. That shows a median exposure of 5.5 years, correct?
A. That's correct.
MR. NIGH: We can take this down. Let's take a look at LP490. This is Exhibit 6668.
(Exhibit 6668 was marked for identification.)
BY MR. NIGH:
Q. And the title is Ranitidine Use and Cancer Risk: Results from UK Biobank, with the leading author Dr. Kantor.
A. Yes, Dr. Kantor, that's correct.
Q. And this uses the UK Biobank which is -- was also used in the Tran study, correct?
A. Yes, I believe so.
Q. They utilized different time frames for their cohorts, correct?
A. I don't recall offhand the time frame.



Q. Okay. Is that something you noted as you looked across these studies?
A. I did look at it when I read the papers, yes.
Q. And for the Kantor study utilizing the UK Biobank, the second page for liver cancer regular ranitidine use compared to the general population, you can see has an increased risk of 1.91 for the multi-variable adjusted, correct?
A. Yes, it says 1.91.
Q. And that would be a statistically significant increased risk for liver cancer for ranitidine users compared to the general population, correct?
MR. SHEEHAN: Objection.
A. But I think --
Q. Strike that. Let me reword that.
And that could be a statistically significant increased risk for liver cancer for ranitidine users compared to non-users, correct?
A. So, Kantor did a number of different comparisons, I think it's important to remember that -- and I think the FDA would



agree with this, as they outlined in one of their papers, that the important comparison so is to -- is to an active comparator, so comparing to non-ranitidine users or non -- individuals who don't use either an H2 blocker or PPI will usually give increase rates for a number of things because the patients who are on H2 blockers or PPIs tend to be much sicker. And so, confounding by indication and also reverse causality, leads to a slight increase in rates.
So, I think the important comparison is the one they did here, which is to an active user, which here was omeprazole users. And so, when you compare ranitidine users to omeprazole users, as you can probably see in this table, the hazard ratio which they used here is 1.15 or no difference. And so, I think the authors in their discussion mention that confounding by indication is a potential explanation for this increase number compared to non-ranitidine users.
So -- so -- so, yes, I noticed -- I did comment in my report on this comparison

Page 274

to non-ranitidine users, but I think overall the findings are very, very consistent that when you use an active comparator, there really is no increased risk here of liver cancer.

Q. Doctor, I didn't ask about that, I'm going to. But my question is simply on this finding. And my question was, that this demonstrates statistically significant increased risk for liver cancer for ranitidine users compared to non-users correct?

MR. SHEEHAN: Objection. Asked and answered.

MR. NIGH: Not answered.

A. Yes. No. So, let me just answer it again. There is an increased risk of liver cancer in ranitidine users compared to non-ranitidine users, but the explanation is confounding by indication.

Q. Okay. Couldn't the explanation also be that PPIs cause liver cancer or had an increased risk of liver cancer seen in the UK Biobank?

A. PPIs do not cause an increase in

Page 275

liver cancer. And, you know, I think if the explan- -- if the hypothesis is that ranitidine is causing cancer by NDMA, there's no evidence that omeprazole contains NDMA. And otherwise, the drugs are very comparable, omeprazole is a very powerful acid suppressant. So, I think certainly there's no evidence -- no accepted scientific evidence or consensus that omeprazole causes liver cancers.

So, again, I don't find that to be believable. And I think, you know, if you also -- if you look at the other studies where they've used increased lag time, you know, these cancers that tend to -- they come up in these comparisons to nonactive users tend to dissipate with increasing lag time. And so, again, one can make up a number, sort of, ad hoc hypothesis to otherwise ex- -- to explain it. But I think I -- indication -- confounding by indication is by far the best explanation, certainly the one I think the authors refer to as well.

Q. Doctor, let's take a look back at the Tran study again.

Page 276

MR. NIGH: It's marked Exhibit 6667, LP550. And if we can request to Table 2.

Q. Do you see in the middle, PPIs by type, omeprazole?

A. Yes.

Q. And do you see that omeprazole in the PCCIU database had a fully adjusted OR of 1.83?

A. In the last column, the OR fully adjusted 1.83, I see that, yes.

Q. That was a statistically significant finding with a p-value of less than .001 correct?

A. Yes, I see that.

Q. Now, lansoprazole was not statistically significant, correct?

A. Yes, I see that here.

Q. Doctor, hasn't there been multiple studies that indicate PPIs have increased risk or associations demonstrating increased risk of liver cancer, especially omeprazole?

MR. SHEEHAN: Objection.

A. Well, I think my charge here was not to investigate omeprazole, but I will

Page 277

just say that -- and I don't go into omeprazole in my report, but I will say that PPIs in general have been reported to have numerous associations and complications, including cancers of all types, as well as many other diseases, including Alzheimer's, heart attacks, pneumonia, et cetera, et cetera. And this has been looked at by a number of GI organizations, the AGA, the ACG and others and editorials have been written about this, this is all confounding by indication, reverse causality, sick patients tend to get this. I don't know why in this study omeprazole seems different than lansoprazole, but I guess in most studies there hasn't been a difference.

And again, I think this just goes to the fact that patients who are prescribed PPIs and the same is true of H2 antagonists tend to be sicker than patients who don't get them.

So, most of us in the GI field believe these drugs -- the use of these drugs is a marker of disease, rather than causing these complications. And so, again, we've

Page 278

been able to sort of view these sorts of complications in light that is appropriate, which is that they are markers of disease, rather than causative agents.

Q. Doctor, isn't one of the challenges of utilizing active comparators in cancer studies is that the active comparator may also have an increased risk of cancer?

MR. SHEEHAN: Objection.

A. Well, anything is possible. But I guess it comes down to the issue of, you know, multiple different comparisons. So, if you compare to PPIs, if you compare to different H2 blockers, all of these -- I think the only mistake would be comparing these to a non-active comparator and is pointed out, I think, by the FDA, those sorts of studies are highly flawed. So, I think using a variety of different comparators, which have been done in these studies, in some cases there are about PPIs and some cases there are other H2 blockers. And if it comes down to the NDMA hypothesis, these other drugs do not have NDMA and I think they are the best and the most appropriate

Page 279

comparators for these sorts of studies.

MR. NIGH: I think we've been going over an hour. Is now a good time to take a break?

MR. SHEEHAN: Sure.

THE VIDEOGRAPHER: Time is 20:30 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 20:48 UTC.

MR. NIGH: Okay. Let's go ahead and pull up LP635 and we will mark this as Exhibit 6669.

(Exhibit 6669 was marked for identification.)

BY MR. NIGH:

Q. Doctor, this study is titled A Search for Recall Bias in a Case-Control Study of Diet and Breast Cancer.

Do you see that?

Doctor, can you hear me?

MR. NIGH: Let's go off the record.

MR. SHEEHAN: I'm sorry. I'm

Page 280

sorry. That's my fault, Dan. I didn't hit the button.

MR. NIGH: It's no problem, let's go back on.

THE VIDEOGRAPHER: We stayed on the video for that, so we're on.

MR. NIGH: Okay.

BY MR. NIGH:

Q. Doctor, this study is titled A Search for Recall Bias in a Case-Control Study of Diet and Breast Cancer.

Do you see that?

A. Yes, I do.

Q. And the first author is Dr. Holmberg.

Do you see that?

A. Yes, Dr. Holmberg.

Q. Okay.

MR. NIGH: Let's go ahead and blow up the summary of this.

Q. For methods, it says:

In a case-control study of diet and breast cancer risk nested within a cohort of women screened with mammography.

How do you pronounce that, Doctor?

Page 281

A. Mammography.

Q. Mammography, that's right.

Screened with mammography, we contrasted answers to a retrospective dietary interview with answers to a dietary questionnaire which was filled out before any diagnostic procedures for breast cancer were undertaken.

Do you see that?

A. Yes, under methods. Yes.

Q. Here they're comparing the answers prospectively on a dietary questionnaire compared to the answers retrospectively on a dietary questionnaire, correct?

A. Yes, correct.

Q. And if we go to the conclusions, it says:

We found few signs of recall bias, and the few indications of a differential misclassification that we found were not in food groups that had been publically discussed as causes of breast cancer.

Do you see that?

A. Yes, I do.

Q. Okay.

Page 282

MR. NIGH: Let's go ahead and pull that down. Let's take a look at LP633. We'll mark this as Exhibit 6670.

(Exhibit 6670 was marked for identification.)

MR. NIGH: And let's go ahead and blow up the summary --

BY MR. NIGH:

Q. I mean, first off, this is titled An Investigation of Recall Bias in the Reporting of Past Food Intake Among Breast Cancer Cases and Controls. And first author is Dr. Friedenreich, correct?

A. Yes, Christine Friedenreich.

MR. NIGH: And let's go ahead and blow up the summary at the top.

Q. And here it says:

A nested case-control study was conducted within the Canadian National Breast Screening Study to examine whether there was evidence of biased reporting for past food intake. A total of 325 patients with breast cancer and 628 match control subjects completed a self-administered food frequency

Page 283

questionnaire in 1998, recalling their diets originally reported on enrollment into the National Breast Screening Study between 1982 and 1985.

Do you see this?

A. Yes.

Q. So, again, they're comparing their prospective answers to a dietary questionnaire with their retrospective answers in a dietary questionnaire, correct?

A. Let me just take a minute to look at this.

MR. NIGH: If we look at the bottom of the introduction, let's zoom out --

MR. SHEEHAN: Take your time, Dr. Wang, if you need.

Q. You can take a look at the last paragraph.

MR. NIGH: Let's blow that up.

Q. And it says:

The present investigation -- the sentence:

The present investigation examined the validity of recalled food intake for case

Page 284

patients versus control subjects by comparing retro- -- prospectively collected dietary data, which is used as the gold standard, to data collected retrospectively after the breast cancer diagnosis.

Do you see that?

A. I see that text, yes.

Q. Does that help show that they were looking to compare the answers in a prospective questionnaire versus -- answer prospectively versus data answered retrospectively?

A. Yes, I guess what I'm sort of looking into is how they did the prospective questionnaire and what kind of information they recorded. In the last study, for example, they just simply divided the food into food groups. You know, did you have cereals, did you have fruits and veg- -- you know. So, it wasn't really a very fine analysis just a broad analysis. But here I'm trying to understand and look -- okay. So, here they have mean food groups, dairy products, high-fat dairy producers, vegetables, fruits. So, just the general

Page 285

categories, high fat foods, caffeine, alcohol. So, I guess at that level of just looking at general food groups which was -- I guess somewhere to the last one as well, there seems to be reasonable correspondence here.

Of course, if one is interested in sort of micronutrients, this would be totally insufficient. But I do see that in this particular study, they're getting some reproducibility in terms of retrospective analysis. And I understand why they're doing this, these researches are certainly interested in nutrition and cancer and they want to, sort of, validate their own methodologic approaches. So, they have generated these sorts of studies, sort of, supporting that their data collection is not entirely useless. And I think they've made a reasonable argument that there is some -- some utility to this sort of retrospective dietary questionnaire.

Q. Doctor, on dietary questionnaires or food frequency questionnaires, they don't ask people to recall their micronutrients

such as NDMA and/or PhIP. They ask about broad categories of the foods they consumed, correct?

A. Yes, that's generally what they do in these sorts of food questionnaires, which is why it's -- it's -- when you start to drill down in more specifics and extrapolate from there, it's often very limited in terms of the accuracy of looking for specify items. And that is the weakness of this field. But -- but this -- I'm not disagreeing that this is, in the field of nutrition and disease, a standard approach.

MR. NIGH: And if we can back out of this and go back to the summary.

Q. It says:

Recall of food items was very similar for case patients and control subjects.

Do you see that?

A. Yes.

Q. And it says:

The magnitude of the odds ratios for the association between these food groups and breast cancer from the prospectively and



retrospectively collected data was not systematically different.

Do you see that?

A. Yes.

Q. And then it says:

There was little evidence for recall bias in the reporting of past food intake from these data.

Do you see that?

A. Yes, I do.

Q. Okay.

MR. NIGH: We can go ahead and take that down.

Let's go ahead and pull up -- let's go ahead and take this document down.

Q. Doctor, you discussed Mohy-ud-din abstracts in your expert report, correct?

A. What was the name again that you mentioned Mohy-ud-din, is that -- is that --

Q. Mohy-ud-din.

A. Mohy-ud-din abstracts. I see them, yes. Cancer with ranitidine -- yes, correct.

Q. Okay. And you also discussed Y. Kim study as well, correct?



A. YD Kim, yes.

Q. Yes.

Doctor, did you ever compare these two studies side by side?

A. Are you asking did I compare Mohy-ud-din versus YD Kim abstracts?

Q. Yes.

A. I don't recall making any kind of comparison of those two, no.

Q. Were you aware that they were both presented -- their abstracts were presented for the first time in a DDW in May of 2020?

A. Yes, I'm aware that they were presented at DDW.

Q. Were you aware they both used the same data place the Explorys Database?

A. I did know the database, I hadn't realized that they were the same database, but -- so wasn't paying attention to that.

MR. NIGH: Let's go ahead and pull up LP230. And if we can, let's put 232 side by side with it.

Q. Doctor, do you see both of these papers?

A. Yes, I see the two abstracts, yes,



I do.

Q. Okay.

MR. NIGH: So, we'll mark the Mohy-ud-din abstract as Exhibit 6671. And we'll mark the Kim abstract on the right as Exhibit 6672, okay.

(Exhibit 6671 was marked for identification.)

(Exhibit 6672 was marked for identification.)

BY MR. NIGH:

Q. Now, if we look on the left --

DOCUMENT TECHNICIAN: Counsel, I'm sorry, what was the second LP number for 6672?

MR. NIGH: That's LP232.

THE VIDEOGRAPHER: Okay, copy that.

MR. NIGH: If we can blow up just the title with the author, the top part of this on the left side. That's right. No, on the left side. You had it, sorry.

Q. And Doctor, you can see here this is -- it says, Risk of Cancer with Use of

Ranitidine. And below it shows Dr. Mohy-ud-din, correct?
A. Yes, Dr. Mohy-ud-din.
Q. And if we look at the -- so, you recognize this to be a Mohy-ud-din poster abstract that was presented in May of 2020, correct?
A. Yes, I believe so. I did see the abstract to -- when it was first -- was first made available online, yes.
Q. Okay. And let's take a look at the right side, that study says -- the title is, Chronic Use of Ranitidine Associated with an Increased Risk of Developing Gastrointestinal Malignancies and Leading Authors, Dr. YD Kim, correct?
A. Yes, YD Kim.
Q. And that was also presented in May of 2020 by DDW, correct?
A. Yes, appears so.
Q. Okay.
MR. NIGH: Let's go ahead and back out the titles.
Q. Now, the Kim study, if you go to the methods --



MR. NIGH: Let's blow up the methods section. I mean, not Kim, Mohy-ud-din, sorry, on the left side. If we blow up the section on Mohy-ud-din...
Q. We can see it says:
The Explorys Database is a search the longitudinal real world identified data collected from electronic medical records.
Do you see that?
A. Yes.
Q. And this study used -- looked at the Explorys Database, correct?
A. Yes.
Q. Okay.
MR. NIGH: And if we pull that down, let's look at the other side, the Kim DDW.
Q. And there we can go under methods and you can see there that it says:
Cohort analysis was performed using the multi-institutional database, the IBM Explorys Database.
You see that?
A. Yes.



Q. So, both of these studies utilize the same database, correct?
A. Yes.
MR. NIGH: Let's go ahead and back that down.
Q. If we look at the left side, we can see the Mohy-ud-din study. If we look at results, we can see that the Explorys Database contains over 65 million patients and it shows 1.62 million users of ranitidine were identified, 3.37 million users of famotidine were identified.
Do you see that?
A. Yes.
Q. This study compares the risk of cancer with ranitidine and it compares it to famotidine as one of its comparisons, correct?
A. Yes, they're comparing ranitidine users to famotidine users.
MR. NIGH: And if we put that back.
Q. We also know that DDW did the same thing, it compared ranitidine users to famotidine users as one of its comparisons,



correct?
A. I can't read -- can you blow that up?
Q. Yeah.
MR. NIGH: I'll blow it up.
Q. We can see among patients who developed cancer, second sentence -- I'm sorry, first sentence.
A total of 1,710 patients developed new GI cancers within a one-to-ten-year window and the ranitidine, famotidine and omeprazole cohorts.
You see that?
A. Yes, they also included omeprazole.
Q. So, one of the comparisons in the Kim study is ranitidine to famotidine, correct?
A. Yes.
Q. So, both of these studies compared ranitidine risk to famotidine risk, correct?
A. It appears so.
Q. Now, let's look at the risk factors for ranitidine compared to famotidine.
MR. NIGH: On the left side, let's blow up the results, the first

paragraph.
Q. And do you see where it says:
Users of ranitidine and famotidine when compared to the general population and users of famotidine when compared to ranitidine.
MR. NIGH: Let's highlight years of famotidine when compared to ranitidine.
Q. Those are my questions here now. Users of famotidine when compared to ranitidine.
So, users of famotidine when compared to ranitidine, they were older, correct?
A. It appears so, yes.
Q. Okay. So, according to this abstract in the Explorys Database, famotidine patients were older than ranitidine patients with the p-value of less than .001, correct?
A. Yes, that's what -- what's included in their abstract.
Q. And famotidine users were more often to be smokers than ranitidine users with the p-value of less than .001, correct?


A. Yes.
Q. And famotidine users were more often to be obese than ranitidine users with the p-value of less than .001, correct?
A. Yes.
Q. And famotidine users were more often to have liver cirrhosis with a p-value of less than .001, correct?
A. Yes.
Q. And famotidine users were more often to have a history of alcohol use compared to ranitidine users with the p-value of less than .001, correct?
A. Correct.
Q. And famotidine users were more likely to have a history of family cancer when compared to ranitidine users with the p-value of less than .001, correct?
A. Yes, that's what they say on their abstract.
MR. NIGH: Can we go ahead and take that down.
Q. Let's look at the Kim study. And then the last line of the Kim study says:
Prevalence of risk factors for GI


cancers were all lower in ranitidine cohort p-value less than .001 compared to famotidine and omeprazole cohorts.
Do you see that?
A. Yes.
Q. Doctor, as you considered the Kim study, did you consider that the famotidine population is a more diseased population than the ranitidine population?
MR. SHEEHAN: Objection.
A. Well, I guess this is a recent set of data and in these studies, it's a little unclear, you've just presented both abstracts, and it does appear that they both appear to show that the risk factors that we've discussed were lower than ranitidine cohort.
On the other hand, if you look at the data just right above here, the patients on ranitidine compared to famotidine had an odds ratio that was much lower for all the cancers compared to famotidine.
So, I would say that, yes, in general these studies suggest that patients of ranitidine did not have an increased risk


of any of these GI cancers and probably had a lower risk. But they -- patients in the famotidine group probably had higher risk factors, which explains the difference.
So, overall, the data are totally consistent with all the other studies we've seen, and again, showed no overall difference in GI cancer risk.
So, yes, I did consider all of these factors in evaluating these abstracts.
Q. Now, as you just mentioned, Kim demonstrated statistically significantly decreased risk when comparing ranitidine to famotidine, correct?
A. Well, they were lower. I'm just looking now. Yeah, he -- it says here, p-value is less than 0.05. That's correct.
MR. NIGH: Now, let's take a look at the Kim -- at the Mohy-ud-din abstract, if we can blow up the last paragraph.
Q. And the Mohy-ud-din abstract shows among subjects without risk factors including smoking, obesity, alcohol use, family history, cirrhosis and GERD, the risk of all

cancers was identical for ranitidine and famotidine in the Mohy-ud-din paper, correct?
A. Yes, that's what it says.
Q. And actually, they did a p analysis for sameness as opposed to p analysis to reject the null hypothesis, correct?
A. I don't know -- I'm not sure about that. Well, looks like that's -- I think -- I think that's probably right because they show a p-value of .001 and they say that's identical. So, I believe that they did an analysis, as you said, to show sameness or equivalence, yes.
Q. Now, Doctor, these were both published around the same time utilizing the same database, but Mohy-ud-din shows the risk of all cancers to be identical between ranitidine and famotidine and Kim DDW shows statistically significant decreased risk from famotidine versus ranitidine, correct?
MR. SHEEHAN: Objection. Completely mischaracterizes the data. You're comparing --
MR. NIGH: Tom, this is an appropriate speaking objection.



(Cross-talk.)
MR. NIGH: This is completely in appropriate --
MR. SHEEHAN: What --
(Cross-talk.)
MR. NIGH: No, I'm not gonna let you finish, we'll call the judge if you want to litter with in appropriate speaking objections.
MR. SHEEHAN: Call him up. If you're gonna -- if you're going to make such blatant misrepresentations, please do call the judge.
MR. NIGH: You can question him afterwards. My question stands, it's not a misrepresentation. This is completely inappropriate --
MR. SHEEHAN: Holy cow.
MR. NIGH: -- and you know it.
MR. SHEEHAN: I don't know, Dan. I don't. No, I don't. I don't know it at all.
(Cross-talk.)
MR. NIGH: It is completely inappropriate.



MR. SHEEHAN: I will object to such blatant misrepresentations.
MR. NIGH: There is no doubt it's inappropriate.
BY MR. NIGH:
Q. My question again --
MR. NIGH: You've -- that was a completely inappropriate objection.
Q. My question is --
MR. SHEEHAN: I disagree. I disagree with you, Dan.
Q. -- as you --
MR. NIGH: I understand you disagree and we'll bring it up later.
Q. My question right now is --
MR. SHEEHAN: Please do. Please do. Make me a promise.
Q. As you compare the results of the Mohy-ud-din abstract compared to the results in the Kim abstract, Mohy-ud-din found the rates to be identical, the Kim abstract finds the rates to be statistically significant decrease for famotidine compared to ranitidine, right?
MR. SHEEHAN: Same objection based



on a misrepresentation of the data.
A. So, I looked at both these studies and I think that -- excuse me. I don't think that the studies and their conclusions are at all inconsistent and let me explain why:
I think in both -- both studies they're showing that the overall cancer rate was lower in the ranitidine group compared to the famotidine group. And as you pointed out in the Kim study, they did an analysis and actually showed that ranitidine was statistically lower than famotidine in their study. And this is of course explained by the greater risk factors in the famotidine group as you have pointed out.
Now, in the Mohy-ud-din study the rates of cancer in the ranitidine group are lower, I don't see a p-value here at least, in this abstract, comparing ranitidine to famotidine. I'm guessing it wasn't statistically significant even though it was lower. So, they went back and, although they're saying they're exactly identical, that's not the entire patient group. They clearly point out that what they did was they

Page 302

looked at just the subgroup of subjects without risk factors in the groups. So, that's a subset of the ranitidine and famotidine patients. And then they compared them and they -- and they found and came to the conclusion that basically they are -- the two group -- abstracts taken together do indicate that the difference between ranitidine and famotidine shown in the Kim study is almost certainly due to the change in the risk factors, the baseline characteristics of the two groups and not to the two drugs.

So, it seems pretty clear that in the ab- -- if you had patients that had the same risk factors, the two drugs would behave identically. And so, that's the way I would take the two abstracts taken together and the way I interpreted the data.

Q. I understand.

And so, as you look at the Mohy-ud-din finding, that's what we have up here on the screen, you see overall incidence of cancer was 26.4 percent, 31.1 percent and 13 percent in ranitidine, famotidine and

Page 303

general population.

So, I think your -- as you just addressed, the overall cancer incidence for the famotidine users was higher than the overall cancer incidence for the ranitidine users before adjusting for these confounding factors in the study, correct?

MR. SHEEHAN: Objection.

A. That is my interpretation of the data, yes.

Q. And then ranitidine users was -- the overall incidence of cancer for ranitidine users was higher than the general population, correct?

A. So, the cancer incidence for ranitidine was -- was 26.4 percent compared to 13 percent for the general population and I think as you pointed out, what's driving any of these differences are the baseline characteristics of the individuals. And the fact that patients on acid suppressive drugs, H2 blockers or PPIs, tend to be sicker than the general population, that's why the cancer rates in general, all these studies are higher in non -- patients that are not taking

Page 304

active comparators.

So -- so, yes, it is higher in the ranitidine group compared to the general population.

Q. Now, the Kim study doesn't ever give you the comparison of the ranitidine incidence of cancer for ranitidine compared to the general population, correct?

A. Let me go back and look at that.

So, they didn't -- doesn't appear they included nonactive users, just the ranitidine, famotidine omeprazole cohorts. So, instead of a general -- a non -- non-active comparator, they included omeprazole cohort, yeah, in the Kim study.

Q. Okay.

MR. NIGH: Let's go ahead and take both of these down and let's go ahead and pull up LP447.

Q. Doctor, are you aware that other defense experts are relying on unpublished draft papers that were obtained in response to subpoenas for this litigation?

MR. SHEEHAN: Objection.

A. Well, I've looked at the other

Page 305

expert reports. I don't recall specifically references to unpublished draft reports, so I'd have to look at specific examples.

Q. Doctor, are you aware that Dr. Bumpus is a defense expert who was testified that she relied on Braunstein's unpublished manuscript?

MR. SHEEHAN: Objection.

A. I did see a reference in Dr. Bumpus' report to a Braunstein paper, yes, I don't recall -- did not recall that it was unpublished.

MR. NIGH: Now, this is marked as Exhibit 6673.

(Exhibit 6673 was marked for identification.)

BY MR. NIGH:

Q. And the title is Incidence of Cancer Among Users of Ranitidine: Results of a Cohort Study of 65 million US adults. And the first author is Dr. Mohy-ud-din.

Do you see that?

A. Yes.

Q. And Doctor, as you turn through the pages, we can see that this is a draft

Page 306

manuscript for the full publication study.
You see that?
A. Yes, it's a full manuscript.
Q. And Doctor, I'll draw your attention to page 11, Table 4.
MR. NIGH: If we can blow up that table.
Q. Here it shows an analysis of the incidence of cancer with ranitidine versus the general population with adjustment for risk factors.
Do you see that?
A. Yes.
Q. And for all cancers compared to ranitidine users compared to the general population.
Do you see the odds ratio of 6.38?
A. Yes, I do.
Q. Now, Doctor, in terms of any of the other ranitidine studies, epidemiological studies that compare ranitidine to the general population or to odd -- or to non-users, none of those other studies have findings even close to a sixfold increase when comparing ranitidine users to the

Page 307

general population for all cancers, correct?
A. I -- I think this is a bit of an outlier, it does seem higher than anything I remember reading in any of the other studies. So, I'd say that what you're saying is true, it's probably an outlier.
Q. And Doctor, specifically as we look at liver cancer, we go to the second page, you see liver cancer with an odds ratio of 9.12.
Do you see that?
A. Yes.
Q. And that would be the odds ratio that they're reporting in this draft manuscript for ranitidine users versus general population with adjustment for risk factors, right?
MR. SHEEHAN: Objection.
A. I'm sorry, can you repeat that question?
Q. I said, and that would be the odds ratio that they're reporting in this draft manuscript for the incident of cancer with ranitidine versus general population with adjustment for risk factors, correct?

Page 308

A. Yeah. So, I believe that's the odds ratio with the adjustment for risk factors. So, I think looking at these numbers and the different cancers, I think this is really -- a good example of why, I guess, in these sorts of case-control studies it hasn't pointed out that even adjusting for risk factors the factors of confounding by indication in reverse causality can never be completely controlled for. It's almost certainly the case that this is due to the fact that this -- the patient population taking ranitidine is sicker and more likely to take the drug for symptomatic reasons. So, although the numbers here are -- certainly appear to be a lot higher than we've seen in other studies, I'm totally convinced this is another example of confounding in these sort of case control studies.
Q. Doctor, there's no other study where they compared liver cancer to -- from the general population with -- versus ranitidine users and found a ninefold increase after adjustment for risk factors.

Page 309

There's no other study that you've looked at that's even close to that finding, right?
A. No. And it's not just -- it's interesting you're just looking at the liver cancer here. You know, if you look at, in fact, all the -- all the cancers in your tables seem to be a lot higher in the same range. Again, pointing to sort of a lack of specificity here.
So, yes, all the numbers are higher than I've seen in other studies.
Q. And I'm gonna point out the other ones, but you're right, all of them are much higher than the odds ratio for any other study where they've compared ranitidine to the general population, correct?
A. Correct. Can I -- if I could clarify. This is a manuscript now, has this been published or has this not been published?
Q. It's a draft manuscript.
A. Draft manuscript, okay. Understood.
Q. And you'd never seen this information before today, correct?

Page 310

A. I don't recall this manuscript, but I looked at a lot of things, so I can't say for sure, but I don't remember seeing this before.
Q. And the esophogeal, when comparing the ranitidine users to the general population showed an odds ratio of over tenfold increased risk for the ranitidine users after adjusting for the confounding factors that they adjust for, correct?
A. Correct. Those are the numbers.
Q. But there's no other -- sorry. I didn't know if you weren't done.
A. No, I was just gonna say that -- that this is interesting and it certainly raises questions on why the results here are different from all the other studies that I've really looked at many of the same things. I'd be interested in sort of reading this further and understanding how they arrived at their analysis. But I would say that it really doesn't change my opinion at all that I don't think this at all demonstrates that ranitidine is carcinogenic. And again, I think almost all of this is --

Page 311

is confounding by indication and reverse causality and so it really doesn't change my opinion. I'd be interested to look in and see if they did a lag analysis at all.
But any case, we can discuss this further or move on, however you like.
Q. Well, the question is, doesn't the fact that this finding comparing ranitidine to the general population that it's wildly different than all the other databases where this has been studied, doesn't this call into question the Explorys Database as a whole?
MR. SHEEHAN: Objection.
A. I don't -- so, I can't answer that question without reading these papers in more detail. Is it a question of the Explorys Database? Is it a question of the type or approach to the analysis? Is it something about the way the researcher did this particular analysis? I don't know. I mean, but I certainly would say that -- and this is a draft manuscript. I mean who knows if now the authors have analyzed the data in more detail and come to a completely set -- different set of numbers and figures in their

Page 312

final submission that this is a work in progress.
So, I -- I don't think you should read too much into a draft manuscript in terms of making any big conclusions. But, yeah, that's all I can -- I can say for now about this particular study.
Q. Doctor, do you realize this draft manuscript was submitted to various journals for attempted publication?
MR. SHEEHAN: Objection.
A. Again, this is the first time I'm seeing the manuscript, so obviously I don't know about the history of this manuscript being submitted. And so -- so, no, I'm not aware of that.
Q. Isn't it true that these -- actually, strike that.
MR. NIGH: Let's take a look at -- let's go ahead and take this down, take a look at LP441. This is marked as Exhibit 6674.
(Exhibit 6674 was marked for identification.)
BY MR. NIGH:

Page 313

Q. And Doctor, I'm going to draw your attention to the second to last page, so if we can go there. The page right before this one at the bottom you can see an e-mail.
You see that?
A. Yes, I see the e-mail and there's some things whited out there, but anyway, or blacked out, yeah.
Q. Yeah, some much the --
A. AP&T, I know that journal.
Q. Some of the recipients and/or those that are cc'd has been redacted or blacked out, correct?
A. Yes, and it's from Colin Howden who I just saw at the DDW meeting two days ago. So, yes, I know the editor. And yes, I can see it's a decision letter.
Q. You know Colin Howden?
A. I do.
Q. How do you know Colin Howden?
A. He is a gastric clinical researcher.
Q. And so, as a gastric clinical researcher, how do you know him?
A. I'm a gastric researcher as well.

He's a member of the AGA and I've been at many meetings with Colin.

Q. Okay. And do you see in the CC you see that G. Mohy-ud-din?

A. Yes, I see that.

Q. And here it says:

Dear, Dr. Thakkar, your paper Incidence of Cancer Among Users of Ranitidine Results of a Cohort Study of 65 million US --

MR. NIGH: Take a look at the second page, the next page, if we can blow that up.

Q. -- of 65 million US adults has now been reviewed preliminary by members of the AP&T editorial team.

Do you see that?

A. Yes.

Q. And you said you know what the AP&T refers to?

A. Yes, it's elementary, pharmaceutical, oncology and therapeutics, it's a journal that does primarily a sort of digestive GI journal, yes.

Q. Next it says:

Unfortunately, we are unable to



accept your paper for publication at AP&T. We felt AP&T was not the most suitable journal for this study. We respectfully suggest this would be better suited for a pharmacy journal. There is insufficient information obtainable from the database related to the duration of ranitidine use.

Do you see that?

A. Yes.

Q. So, the reason that they give for rejecting the publication is that there's insufficient information obtainable from the Explorys Database related to the duration of ranitidine use.

Do you see that?

A. Yes, I do.

Q. Do you realize the Kim study has the same problem?

MR. SHEEHAN: Objection.

A. So, again, I've read and written a lot of these sort of decision letters. I wouldn't necessarily put too much weight into the rationale that they're giving for rejecting the paper. Usually, the editors, when they look at a paper like this, sort of,



they comment on the quality and interest of the manuscript to their readership. Many times when they -- when we write rejection letters like this, we find some reason that is comprehensible as opposed to saying, we just didn't like the paper or felt that it was interesting.

So -- so, again, certainly it's a criticism that can be made of a lot of clinical studies, but these sorts of comments and decision letters, you know, they don't -- may not seem fair since in fact other papers have been published with the same weaknesses.

Again, I just wouldn't read that much into it in terms of evaluating this paper. I, myself, you know, I don't think that -- that's necessarily a fatal flaw, but if the editors are not interested in this paper, they could certainly use that as a rationale I suppose. So, that's all I can say, I don't think you can read too much into these sorts of decision letters.

Q. Next it states:

Since we have no clear idea as to the extent of the NDMA contamination, nor



when it first occurred, it is unsurprising even if the contaminant does act as a carcinogen, that you were unable to find increased rates of various cancers among individuals who had been exposed to ranitidine.

Do you see that?

A. Yes, I see that.

Q. Doctor, are you aware that one or more of the Kim study authors have been previously paid by Johnson & Johnson?

MR. SHEEHAN: Objection.

A. I'm sorry, I don't know much about the Kim authors. Certainly don't know anything about their relationship with various pharmaceutical companies. Can't comment on that.

Q. Are you aware of whether Johnson & Johnson has a financial interest in the outcome of this litigation?

MR. SHEEHAN: Objection.

A. I don't know in detail issues regarding Johnson & Johnson's financial interests, that's certainly not something I'm really aware of.

Page 318

Q. You wouldn't have considered that as part of your opinion in this case, correct?
A. I'm sorry, can you repeat the question?
Q. I said, you wouldn't have considered that as part of your opinion in this case, correct?
A. I wouldn't have considered what? I'm sorry.
Q. That one or more of the study authors have been paid by Johnson & Johnson and whether Johnson & Johnson has a financial interest in the outcome of this litigation?
MR. SHEEHAN: Objection.
A. Now, are you speaking specifically to a particular paper at this point? Are you talking about the Kim paper?
Q. The Y. Kim paper yes?
A. The Y. Kim paper. The paper or abstract?
Q. Both. They both have the same authors.
A. Yes, yes. So, again, and it's not something I considered in great detail,

Page 319

industry relationships. No, wasn't really a factor in looking at their data.
Q. Okay. You said not in great detail, industry relationships, did you consider that for any of the ranitidine epidemiological studies?
MR. SHEEHAN: Objection.
A. I was not aware of any industry ties for -- that were apart from those that were sort of indicated in the -- in the -- in the acknowledgments. I didn't really look into detail into the industry ties.
Q. Okay.
MR. NIGH: Let's go ahead and take this down.
Let's take a look at the Kim published the Y. Kim published study, LP432. This will be marked as Exhibit 6675.
(Exhibit 6675 was marked for identification.)
BY MR. NIGH:
Q. Doctor, see that this states, No association between chronic use of ranitidine, compared with omeprazole or

Page 320

famotidine, and gastrointestinal malignancies. And the first author is Y.D. Kim?
You see that?
A. Yes, I see that.
Q. Doctor, the Explorys Database, do you understand that it uses a combination of SNOMED and ICD-9 codes. Sorry, strike that.
The Explorys Database, do you understand that it uses a combination and SNOMED and ICD codes?
A. Yeah, says in the -- it mentions SNOMED-CT codes, and I'm also very familiar with ICD-9 codes and that's -- that's not atypical for medical databases.
Q. Have you seen any publications that discuss the problems with being able to match these codes utilizing the Explorys Database?
MR. SHEEHAN: Objection.
A. I haven't looked in detail, I haven't seen specific manuscripts talking about the difficulties, but I do understand in terms of clinical research that a lot of these codes, particularly ICD-9, are primarily designed for billing. And so, in

Page 321

terms of clinical research, researchers in general struggle a bit to find the information they want on patient diagnoses and patient care in the way they would like to do clinical research.
So, I understand the challenges of clinical databases and also matching up codes, so I haven't read specific papers about that, but I'm familiar with the challenge.
Q. Did you check for any validation of these SNOMED codes?
A. No, I haven't checked for validation of SNOMED codes.
Q. Did you note in your report any validation of these SNOMED codes?
A. No, my report does not mention any validation of SNOMED codes.
Q. Are you aware that for age, gender, race, ethnicity, tobacco and alcohol, Explorys has a custom autology?
MR. SHEEHAN: Objection.
A. I'm afraid I don't know the details of that aspect of the Explorys Database.
Q. Are you aware in a 2017 study of

Page 322

esophagitis, validation of the SNOMED codes was not possible?
MR. SHEEHAN: Objection.
A. I'm not familiar with that item that you just referred to.
Q. Are you aware if there's a lack of the ability to validate the codes utilized in an insurance claims database, that that can call into question the validity of the results of the study?
MR. SHEEHAN: Objection.
A. Well, I would certainly say that some validation of the codes is always useful, but certainly doesn't invalidate the findings from any particular study.
Q. Are you aware that other studies have suggested that the inability to validate the SNOMED codes invalidated the findings of the study?
MR. SHEEHAN: Objection.
A. I haven't heard specific criticism of this study based on SNOMED codes, no.
Q. Are you aware that the -- this study can only report aggregate data?
A. I don't know about that limitation.

Page 323

Q. Have you noticed that all the information, the findings have to be rounded to tens, can't report individual data?
MR. SHEEHAN: Objection.
A. Let me take a second to read through this study design here since this seems to be so interesting.
It actually says they used ICD-10, I think you said ICD-9, but you probably meant ICD-10, that's what it says on the paper.
Q. I actually struck my question on the ICD-9 and reworded it and said ICD codes, so, yes.
A. Okay. Thank you. Thank you for that correction.
Okay. We're talking about the -- I'm sorry, the aggregation of data for analysis.
Q. Make it a little bit more clear, maybe this will help.
MR. NIGH: If we can go to Table 1, page 5, and let's go ahead and just blow up, you know, some of those findings, the first half.

Page 324

Q. You notice how every single finding, the end number, the number of people with a certain age, the -- what their gender, all of them are rounded to ten?
A. Yeah, that does seem a bit unusual, doesn't it?
Q. And if you look at the bottom half of the table, you can see that's still true, they're all rounded to ten?
A. Yes, I see that.
Q. And if you take a look at the next page, you see the same thing.
MR. NIGH: Can we blow up that table?
Q. They're all rounded to ten.
A. Yes, that's correct.
Q. Okay.
MR. NIGH: Let's go ahead and take that down.
Q. And were you also aware that the incidence data is always queried on a one-year basis?
MR. SHEEHAN: Objection.
Q. Go to Study design, we pull that up and you can see it says, incidence data for

Page 325

each cancer were queried up to ten years in one-year intervals.
Do you see that?
A. Yes, it's under study design. I can -- I can see that that's -- incidence data for cancer queried up to ten years in one-year intervals, with the first-time cancer diagnosis indexed at a minimum of one-year following initiation of anti-reflex therapy.
Q. And Doctor, this means that if a person entered the database on January 1st, cancer risk would be counted for one year, for the whole year. And if a person entered that database on December 30th, there would only be one day of risk, but it would still be counted as a whole year. Each person would contribute one person year regardless of the date, specific date as to when they actually have the cancer, correct?
MR. SHEEHAN: Objection.
A. I'm not actually sure about that, but I do understand they used one-year intervals. I'm not sure exactly how they used that, but what you said sounds like a --

plausible approach, but I can't confirm that that's exactly what they did.
Q. And Doctor, because there is no individualized data, the people can move in and out of the database and you wouldn't be able to detect that, correct?
MR. SHEEHAN: Objection.
A. I can't -- I can't reach that conclusion yet on my own. Not sure about that.
Q. Did you look to see if there are any other studies that showed how often people move in and out of this database?
A. Are you asking specifically about this Explorys Database?
Q. Yes.
A. I don't have any further information about that question.
Q. And this database also has no way of knowing if someone died, correct?
A. Again, I don't know enough about this database to comment on that.
MR. NIGH: Okay, we can go ahead and take that down. Actually, let's pull it back up. And let's go to page


5. No, never mind. Take it down.
Let's go ahead and pull up the Adami study. This is LP618. This is marked as Exhibit 6676.
(Exhibit 6676 was marked for identification.)
BY MR. NIGH:
Q. Doctor, the first thing -- first off, the title of this article is, Ranitidine Use and Risk of Upper Gastrointestinal Cancers and the first author is Dr. Adami, correct?
A. That's correct.
Q. And if we look at the Authors' Disclosure on 2308. We can also see it discusses the authors' disclosure H.-O Adami and E.T. Chang report consulting for Sanofi and ranitidine litigation and E.T. Chang has provided ongoing consulting support for Sanofi in other matters.
Do you see that?
A. Yes, I do.
Q. So, they do disclose that they were reporting and/or continued to report -- consult for Sanofi for the ranitidine


litigation, correct?
MR. SHEEHAN: Objection.
A. Well, they report they have consulted for Sanofi in ranitidine litigation. It doesn't say what time period. I don't know anymore details than that.
Q. Doctor, are you aware of whether or not E.T. Chang worked for a company that is known to provide consulting for pharmaceutical industry?
MR. SHEEHAN: Objection.
A. I don't know much background about E.T. Chang.
Q. Are you aware of whether or not E.T. Chang works for a consulting firm that has been accused of manipulating scientific studies that are published, have you heard anything about that?
MR. SHEEHAN: Objection. I wasn't sure whether you were done there, Dan. Objection.
MR. NIGH: No problem.
A. I don't know anything about that. It says in the acknowledgements that E.T. Chang works for the Center for Health


Sciences Exponent, Inc., Menlo Park, California.
Q. Are you aware -- sorry, go ahead. You can finish.
A. That's all I know. Go ahead.
Q. Are you aware of whether or not Exponent has been accused of manipulating scientific articles and publications?
MR. SHEEHAN: Objection.
Q. Your volume just went out.
A. I have no knowledge of that, I don't know that to be true.
Q. So, you certainly wouldn't have considered that as you formulated your opinion, correct?
A. I have not considered things that I have no knowledge of, that would be correct.
MR. NIGH: Let's go ahead and take a look at page 3, this is Table 1. It's 2304. That's the -- right here. We can go ahead and blow up that table. Thank you.
Q. And Doctor, this table shows baseline characteristics of cohort participants.

Page 330

Do you see that?
A. Yes.
Q. Now, in terms of underlying gastrointestinal disease, do you see where it shows that 2.6 percent of the ranitidine population have GERD?
A. Yes, I see that.
Q. Do you see where it says 1.2 percent of the other H2RAs had GERD?
A. Yes, I see that.
Q. Do you see where it shows 2.5 percent of the PPI population had GERD?
A. Yes, I see that.
Q. Doctor, do those numbers make any sense in terms of what you understand to be the incidence of GERD for people that are taking H2RAs and PPIs?
A. It does seem a little bit low, I can't really comment more than that. My experience, patients treated with H2 blockers and PPIs have a higher incidence of GERD, but -- and I don't know if the issue is their -- their database or their particular patient mix, there are a lot of other significant diseases here for which the PPIs

Page 331

and H2 blockers are being used. So, yeah, I really can't comment except to say it seems a little bit low.
Q. Doctor, have you looked at the incidence of the GERD in Denmark?
A. Not specifically in Denmark. I imagine it's similar to the US, although they're not as obese, so probably less than the US.
Q. And this -- this publication, it's looking at the Danish population, Denmark, correct?
A. This is a study based on the Danish prescription registry, so I would assume that most of the patients would be Danish.
Q. Doctor, did you review any materials that demonstrate that the incidence of GERD in benchmark is over 20 percent?
MR. SHEEHAN: Objection.
A. I don't know the exact number. Twenty percent is again pretty close to the US numbers, I would've thought it would've been less. So, I can't tell you the exact number in Denmark.
Q. And are you aware of whether the

Page 332

incidence in Denmark or people taking ranitidine or other H2RAs or PPIs is higher than 20 percent?
A. I'm sorry, can you repeat that question?
Q. Are you aware of whether the incidence of people that have GERD for ranitidine users other H2RAs or PPI users is higher than 20 percent?
MR. SHEEHAN: Objection.
A. Higher than 20 percent for GERD? Certainly depends a certain -- of course how you define GERD, whether it's -- it's two to three times a week of symptoms or more. I don't think it's higher than 20 percent. That's probably around that or lower, depending on what country you look at.
Q. Doctor, have you reviewed any of the Denmark data that demonstrates that most of the people are taking H2RAs or PPIs with the diagnosis of GERD?
MR. SHEEHAN: Objection.
A. Again, I'm not sure what data you're referring to, but I think, you know, GERD is one of the primary indications for

Page 333

taking H2R blockers or PPIs.
Q. Doctor, did you ever look at the Schaffalitzky study?
A. Schaffalitzky? I don't think that's on my records list, so I may not have looked at that. I certainly don't recall the name.
Q. Doctor, are you aware that the Danish National Patient Registry, whether or not it includes -- are you aware -- sorry, strike that.
Are you aware that the Danish National Patient Registry does not include medications used in the hospital?
MR. SHEEHAN: Objection.
A. Not that familiar with the Danish Patient Registry, so I don't know whether that to be true or not.
Q. Doctor, the cohort for ranitidine in this study had no subjects over 64 years of age at index date and it had a median age of 50 years old, correct?
A. The median age in all the groups were in around 50, it does appear that's correct. What was the first part of your

Page 334

question? I'm sorry.
Q. In the Adami study for the ranitidine cohort had no subjects that were over the age of 64 at index date, correct?
A. They range from 36 to 64, so that's -- that is correct.
Q. And Doctor, the median age for being diagnosed with stomach cancer, pancreatic cancer, liver cancer and esophageal cancer is over 64 years old, correct?
MR. SHEEHAN: Objection.
A. The median age is around the 60s to 70s in the US for gastric cancer and esophageal cancer.
Q. Doctor, do you know what percentage of -- what percentage of ranitidine users that they had the information on whether they were a smoker or not in the Adami study?
A. Your question is whether we have information on smoking on these patient cohorts? I'm looking through the tables here. I don't see that information offhand. I don't know whether it was present in the Danish National Patient Registry or not.

Page 335

They retrieved a lot of data here, mostly diagnoses and medications, but I don't see -- they may not have had patient risk factors such as smoking.
Q. Doctor, do you know what factors were adjusted for in their sIPT adjustment?
MR. SHEEHAN: Objection.
A. Let's see, in terms of their statistical analysis, it says they made an adjustment with their sIPT, which you had referred to earlier, I think, in a question to me and doesn't really go into details.
As you know, the inverse probability of the treatment weights the sIPT as you referred to is meant to balance the two patient groups with specific, perhaps, risk factors, but it doesn't -- certainly doesn't -- they do reference it, reference 23. So, maybe that's a published methodology. Perhaps if you wanted we can look at that. But they did try to balance them out using incidence probability of treatment weights.
Q. And Doctor, I'll go to 2303, under Statistical Analyses, we can look at that.

Page 336

MR. NIGH: And we'll blow up the second paragraph under statistical analyses.
Q. Do you see where it says:
To control for potential confounding, we then used the propensity scores to compute stabilize inverse probability of treatment weights.
Do you see that?
A. Yes, I was just reading from that sentence and you reference 23, yes.
Q. Do you know what factors they looked at -- what potential confounding factors are part of that sIPT specifically for this study?
A. I think I already answered that question just now indicating that they don't have the information here in this paper and that potentially there's some more clues about it in reference 23, but it doesn't indicate it in the methodology that I read through.
Q. Doctor, isn't it important that those sorts of diagnostics are published in the paper of supplemental materials?

Page 337

MR. SHEEHAN: Objection.
A. Well, often they are. They're not always included in -- ideally they -- a lot of information such as that would be included. Again, if the approach is more or less standard or pretty established from a previous publication because of space limitations, such information isn't always included and sometimes it's referenced as it seems to be here. But, again, I -- I haven't checked the reference, so I don't know if it includes additional information about how they use sIPT in this particular instance.
Q. Doctor, isn't it true because there's no gold standard how to judge that a good sample balance has been achieved, previous studies suggest that they need to publish what their samples looked at before and after sIPT so that they can prove that they have conducted the balancing correctly?
MR. SHEEHAN: Objection.
A. I can't say for sure if that's a standard in -- in the literature or in clinical studies, but certainly more transparency is always desirable.

Page 338

Q. Have you looked for studies that show that they -- that -- when adjusting for stabilized inverse probability of treatment, that the papers should publish what their samples look like before and after a stabilized inverse probability treatment of weighting, so that they can prove that they conducted the balancing correctly?
MR. SHEEHAN: Objection. Asked and answered.
A. Yes. As I just stated, I don't know that that's necessarily the standard in the field, but again, better -- more transparency is always desirable.
Q. My question actually, the beginning part, is different so, I'm gonna ask it again.
Have you looked for that to see what the standard is in terms of reporting on stabilized inverse probability of treatment weights?
MR. SHEEHAN: Objection.
A. Well, I would say that I have not looked in more detail about standards for stabilized inverse probability of treatment

Page 339

weights. It's -- this approach is -- you know, there's different approaches to try to match your two groups and one approach is, you know, in case-control series is match your patients exactly in these sorts of cohort models. You're not allowed to sort of match your controls exactly, so there's different approaches to try and balance them out. Linear aggression models is one, sIPT is another. I haven't looked in terms of the literature in terms of what the standard is in the field, so -- and I haven't researched in more detail standards for sIPT.
So, I guess the answer to your question is, no, I have not.
Q. Doctor, have you looked for publications that discuss the difficulties in assessing risks for drugs when over the counter use is prevalent?
MR. SHEEHAN: Objection.
A. I have not researched that question in detail, but I am familiar with the challenges of doing drug studies when there is over-the-counter use. I understand that that's always a limitation, although many

Page 340

investigators will try to query patients if it's a prospective study, but certainly in these sorts of retrospective analyses there certainly could be some contamination. So -- so, it's one of the limitations of the field, that that's something you have to live with as a clinical investigator.
Q. Doctor, are you aware that the Adami study shows higher over-the-counter usage for a higher percentage of over-the-counter usage versus prescription usage for ranitidine versus famotidine and PPIs?
MR. SHEEHAN: Objection.
A. I don't remember seeing that in the study.
MR. NIGH: Let's go ahead and take a look at the Supplemental 2 materials. Mark this as L -- this is LP487. We'll mark this -- we'll mark this as Exhibit 6677.
(Exhibit 6677 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see here it says

Page 341

Supplemental material?
A. Yeah, I do see Supplemental material.
MR. NIGH: Let's take a look at page 2 at the bottom -- it's bottom right corner, page two.
Q. Says supplemental tab- -- Supplementary Table 2, the annual proportion of defined daily doses of medication sold by prescription in Denmark.
Do you see that?
A. Yes, I do.
Q. And you'll notice that between 2005 to 2018, it does not report the percentage for famotidine, correct?
A. Yes, it's missing that information.
Q. But if you compare 1999 to 2004, you can see that ranitidine, it starts at 84 percent it drops to 49 percent, correct?
A. Yes, ranitidine dropped in terms of the portion of the defined daily doses and medication sold by prescription. So, suggests fewer prescriptions of ranitidine and perhaps more growth of other drugs perhaps. Yeah.

Page 342

Q. That would suggest the percentage that it's available by prescription, the other way that it's available is via over-the-counter, correct?
A. Yes, that's true.
Q. Okay. So, as the prescript- -- as the percentages drop for being available by prescription, you would assume the percentages increase for being available via over-the-counter, correct?
MR. SHEEHAN: Objection.
A. I understand what you're saying and the math sort of makes sense, but I'm just not sure if it's the right conclusion or not. All I can see is the data before me, the percent of medications sold by prescription, yeah.
Q. As you could see that ranitidine drops from 84 percent to 49 percent, but famotidine holds pretty steady from 98 percent to 97 percent between the years of 1999 and 2004, correct?
A. Yes, I do see that.
Q. Were you aware of these differences as to how ranitidine is prescribed versus

Page 343

famotidine prescribed in the Danish population?
MR. SHEEHAN: Objection.
A. Well, I hadn't looked at these numbers recently. I did know that they were available over-the-counter, yes.
MR. SHEEHAN: We've been going about an hour and 20, Dan. Do you have more on this study or...
MR. NIGH: Give me about, if we can, one or two more minutes, I'm gonna see if I have anything else on this. Actually, you know, we can go and take a break for ten minutes now.
THE VIDEOGRAPHER: The time is 22:12 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 22:36 UTC.
BY MR. NIGH:
Q. Doctor, you reviewed the Hidajat study, correct?
A. Yes, I did review the Hidajat

Page 344

study.
Q. And you reviewed other studies where they explained the exposure assessment, correct?
A. Are you asking did I review other occupational studies?
Q. Other studies that explain the exposure assessment that was utilized in the Hidajat study, correct?
A. Yes.
Q. Doctor, are you aware if there's any correlation between amounts of exposure to NDMA and rubber dust or rubber fumes?
MR. SHEEHAN: Objection.
A. Well, I think it's pretty clear that rubber fumes include a number of carcinogenic substances that includes NDMA. So, yes, I think there is correlation between exposure to rubber fumes and NDMA levels.
Q. Have you seen any calculations in any of the exposure documents where they're measuring the amounts of exposure to rubber dust and rubber fumes versus the amount of exposure to NDMA in the various departments?
MR. SHEEHAN: Objection.

Page 345

A. Sorry, in the various departments?
Q. Departments of the factory, yes, factories.
A. Oh, different parts of the factory?
Q. Yes.
A. I understand what you're saying.
I don't recall the breakdown by departments in the factory, but I have seen estimates of exposure based on working in the rubber plant certainly in the fumes.
Q. Doctor, are you aware of whether these exposure assessment studies for these factories as discussed in the Hidajat study demonstrates that people in the vulcanizing department are exposed to high amounts of the NDMA compared to other departments in the factory?
A. The vulcanizing department, that's interesting. I don't recall specifically about the vulcanizing department, but I would not be surprised if certain jobs within the rubber industry, certain departments would have higher exposure and it would makes sense to me that vulcanizing would be one of the higher ones, yeah.

Page 346

Q. Are you aware that people in the vulcanizing departments are exposed to lower amounts of rubber dust and fumes compared to other departments in the factory?
MR. SHEEHAN: Objection.
A. Again, I -- as I answered before, I don't know the details of the different departments in the rubber industry.
Q. Are you aware that the exposure assessment studies actually demonstrate an inverse relationship that people exposed to higher amounts of NDMA in various departments are actually exposed to lower amounts of rub other dust and rubber fumes?
MR. SHEEHAN: Objection.
A. Again, I'm not aware of those details of that break down in the factory departments as you suggested.
Q. Are you aware of any correlation in terms of the quantity or the amounts of exposure to NDMA in these factories and any other carcinogen in these factories?
MR. SHEEHAN: Objection.
A. Well, I don't think -- in terms of the studies I've seen, a few chemicals have

Page 347

been looked at, but I think the primary focus has been on NDMA as a biomarker. Again, I think in terms of rubber dust exposure, there's an exposure to a diverse array of chemicals in the rubber industry, most of them have not been studied. So, I think because of the focus on NDMA, that there hasn't been as much interest in looking at other chemicals, but I think the majority of observers have suggested that it's probably a combination of chemicals and not just NDMA exposure. And again, I think inhalation certainly leads to higher amounts than oral injection and often bypasses first pass metabolism by the liver. So, there's no question that working in the rubber industry leads to specific carcinogenic exposure.
And if you're suggesting that the data supports that it's primarily NDMA, I think that's -- is not a conclusion that most organizations have reached yet.
Q. Doctor, are you aware of the purpose of a single pollutant model?
A. I'm aware of the single pollutant model, yes.

Page 348

Q. And that is to look at the increasing amount -- the affect based and on increasing amounts of that pollutant, correct?
A. I think --
MR. SHEEHAN: Give it a beat.
Objection. Go ahead.
A. Yeah. So, I understand the rationale for doing the single pollutant model, I guess it's a simpler model to do, easier to investigate if your focus is on one particular chemical and to develop a model for. Of course, it's highly flawed in the sense that instead of -- makes the assumption that it's the only factor responsible. Often it could be a factor that's associated with another factor causing the actual carcinogenic injury.
So, I'm aware of what both the strengths and limitations of the single pollutant model and I just would not necessarily, based on those sorts of studies, necessarily reach the conclusion that that compound or that chemical is the primary culprit in carcinogenic injury.

Page 349

Q. In a single pollutant model, the shortcoming as to whether or not another pollutant may be driving the results, you would need to demonstrate or it would need to be that there's a higher corre- -- or there's a correlation or higher correlation in the amounts of one pollutant with the amounts of another pollutant, correct?
MR. SHEEHAN: Objection.
A. I think if you have data from a single pollutant model, you would need another chemical or another pathway to prove that there's something else causing it. But, again, many -- there have been many sort of misleading conclusions based on, sort of, a single identified factor when in fact it's often multiple factors that are involved.
So, I guess I would just say that I understand again the reasons for modeling using a single pollutant model, but I think it's highly limited and highly flawed and one just needs to be very careful in not making too many assumptions and conclusions based on that sort of data.
MR. NIGH: Okay, let's go ahead

Page 350

and take a look at LP579. This will be marked as Exhibit 6678.

(Exhibit 6678 was marked for identification.)

BY MR. NIGH:

Q. And the title of this study, Chemicals Studied and Evaluated in Long-Term Carcinogenesis Bioassays by Both the Ramazzini Foundation and National Toxicology Program, in Tribute to Cesare Maltoni and David Rall.

Do you see that?

A. Yes, I see that.

Q. And the leading author here is James Huff?

A. Yes, James Huff.

Q. And this was published in 2002.

Do you see that?

A. Correct, 2002.

Q. Take a look at page 209 under the Introduction. Doctor, it says:

Long-term chemical carcinogenesis bioassays are the cornerstone for primary prevention and for protection of the worker and the general public from chemically and

Page 351

occupationally associated cancers.

Do you see that?

A. Yes, I do.

Q. And do you agree with that statement?

A. Well, I'm not sure. I think -- so, the sentence is commenting on what is the best approach to protect the general public and here it's not cancer in general, it's from chemically and occupationally associated cancers, which are probably a very, very small minority of cancers, which, of course, we know are primarily induced by inflammatory injury and genetic inherited predispositions, but no doubt there are some cancers that are related to chemical and occupational injury. And so, they're saying the best way to protect them is from long-term chemical carcinogenesis bioassays. I think that's one approach. Whether they're really the Cornerstone, I don't know, but I think they are a available piece of information.

So -- so, I guess I have no major problem with this statement. I think it's sort of reasonable to sort of introduce

Page 352

their -- their efforts, their work. And it is one approach to looking at chemicals that could be linked potentially to cancer.

MR. NIGH: Let's take a look at the next page, 210, under Carcinogenesis Bioassays. If we can blow up that first paragraph.

Q. Here it says:

Experimental long-term carcinogenesis bioassays are designed and carried out to identify potential carcinogenic effects for humans. Carcinogenesis results in rodents, mainly rats and mice, have been shown to be a consistent and reliable indicator and predictor of human cancer. All known human cancer carcinogens that have been evaluated adequately in animal bioassays are also carcinogenic in animal bioassays. Of the nearly 100 recognized human carcinogens, about one-third were shown first to be carcinogenic in experimental animals.

Do you see that?

A. Yes.

Q. Doctor, do you agree with these

Page 353

statements?

A. I'm not sure. I think carcinogenesis studies in rodents, rats and mice had been useful. I would question whether -- they're actually suggesting it has a very, very high prediction rate, I'm not sure about that. In general, animal studies have not been shown to be highly predictive of human cancer biology. So, I would question that. There's no doubt that some and many human carcinogens have been shown to be carcinogenic in animal assays, but the reverse that every carcinogen shown to be active in rats and mice has been proven in humans, I would question that. It seems to be a bit of an overstatement.

So, I -- I can't agree with it, but I -- but I recognize that there is some correlation.

MR. NIGH: Let's take a look at LP580. This is marked as Exhibit 6679.

(Exhibit 6679 was marked for identification.)

MR. NIGH:

Page 354

Q. And do you see this, the title is Chemicals and Cancers in Humans: First Evidence in Experimental Animals.
Do you see that?
A. Yes, I do.
Q. And the author is Dr. Huff.
Do you see that?
A. Yes, Dr. Huff.
MR. NIGH: And the last two sentences of the summary, if we can blow that up.
Q. It says:
For those that can be studied experimentally, the qualitative concordance between humans and animals approaches unity, and in every case there as at least one common organ site of cancer in both species. The evidence of carcinogenicity in experimental animals preceded that observed in humans for nearly 30 agents and is the subject of this paper.
Do you see that?
A. Yes, I do.
Q. Doctor, were you aware of these statements by Dr. Huff that for those that

Page 355

can be studied experimentally, the qualitative concordance between humans and animals approaches unity?
A. So, I see his statement, it's an interesting statement. I don't know that many experimental toxicologists and carcinogenesis investigators who have parroted that broad statement. I would say it's interesting that this appears to be a single author paper, I am not sure who else agrees with this, but it's an interesting opinion. I mean, I guess he is very much in favor of animal models as being predictive of carcinogens, but many other investigators, and including Boushey, who I cite, has -- and others, have cautioned against extrapolating from animal models. And in my own experience, having done extensive carcinogenesis studies in animal models, I really would question how easy it is to extrapolate from -- from animal models, mice and rats to humans. So, I would -- I would disagree that there's such a linearity here that the concordance is -- he says approaches unity, I'm not sure exactly what he means.

Page 356

But I don't think it's such a linear step from humans and animals. And if it was, I think the IARC would've classified NDMA as a classic carcinogen if it was simply based on -- if the animal models were so predictive. And I think, to be honest, I agree that you cannot classify NDMA as a known human carcinogen and I would stick with my belief that it's possible human carcinogen, probably, you know -- and but is not a known human carcinogen. And so, you can't extrapolate so easily, you need human data.
Q. Doctor, are you aware that these two studies are very well-cited by numerous other study authors?
MR. SHEEHAN: Objection.
A. I don't know how many -- what the citation rate is for this. But no doubt this is something that would be of interest to other people who are studying carcinogenesis. And I don't know if they cite it in a positive or negative manner, but I -- certainly this would catch someone's eye to make such a dramatic statement based on --

Page 357

and again, I haven't seen all the evidence and the arguments, be happy to read through this paper, if you want. But I don't think I would agree with this conclusion at all, which is too broad and sweeping.
Q. Doctor, are you aware that your own publications have cited these two studies?
A. I don't recall which paper I might have used to cite this. But happy to listen and to hear which publication I used to cite this, this paper.
MR. NIGH: Let's take a look at -- let's take a look at page 205 of this study.
Q. Where it states, Experimental Chemical Carcinogenesis: First Evidence.
A. Okay, I see that.
Q. And specifically it states:
These chemical carcinogenesis results.
Do you see that?
A. Yes, I see that.
Q. It says:
These chemical carcinogenesis

Page 358

results in laboratory animals frequently, if not always -- almost always constitute the primary basis for identifying and predicting potential human health hazards. Several chemicals identified first as causing cancer in laboratory animals show associations with human cancers.
Do you see that?
A. Yes.
Q. And do you see for that statement that's highlighted, there are numerous studies that are cited for this?
MR. SHEEHAN: Objection.
A. Yes, there are several references there, correct.
Q. And have you seen that those references also support that statement?
MR. SHEEHAN: Objection.
A. I have not seen those references yet, so I can't say what they support. But, again, I think the major question here is whether or not those chemicals are in fact human carcinogens in every case. There have been so many animal carcinogenesis studies done, I just think it's -- seems a reach to

Page 359

say that it's always the case.
MR. NIGH: Let's take a look at 207.
Q. It states, the second paragraph:
The decades-old question remains: How confident should we be that consensus experimental carcinogens will predict cancers in populations exposed to the same chemical or exposure circumstance? History, biology, and theme of this paper certainly support concept of extrapolating carcinogenesis finding from animals to humans. Even more basic, will chemicals shown conclusively to cause cancers in laboratory animals also eventually be found to cause cancer in humans.
Do you see that?
A. Yes.
Q. And it says:
Ignoring for the moment the important and controversial issue of exposure, the answer is yes.
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?

Page 360

A. As I've said before, I don't. There's a lot of broad talking conclusions here, I'd have to see all of the data and the examples in terms of whether the chemicals in the animal models were actually shown definitively to cause cancer in humans, which is a difficult proposition. So, I assume that this writer and investigator is making a number of assumptions about the human data. It almost seems as an advertisement or marketing tool for rodent carcinogenesis research and the importance of funding it perhaps, who knows what the motivation is.
But again, it just seems to be a gross overestimation, a gross overstatement regarding the value of rodent carcinogenesis studies based on my own experience.
Q. And let's take a look at the bottom paragraph, says:
Data reported herein show that nearly 25 to 30 percent of those agents, substances or chemicals that have been causally or strongly associated with cancer in humans were first identified as being carcinogenic in experimental animals.

Page 361

Do you see that?
A. Yeah, that's interesting in the wording here. It really does make me wonder about -- even more about his conclusions and what he's really talking about here.
So, as I mentioned, the key thing is has the data been shown to prove that it's a human carcinogen. In other words, has every agent that's caused cancer in animals been shown to be a Class I carcinogen. In here, you can see where it begins to slip a bit, chemicals that have been causally or strongly associated, so that falls short of being a clear human carcinogen.
So, my best guess is, not having read this paper, is that he's using a broad umbrella to include anything that's a human carcinogen, perhaps anything classified as Class 1, 2 or even 3 by the IARC. So, I'm not -- just not sure what he's talking about here.
And, of course, what we're most interested in is things that are so clearly known carcinogens and I just -- again, from what you've shown me, the data seems to be

Page 362

missing -- convincing me that that's always the case.

Q. Doctor, isn't he talking about looking at those that are known human carcinogens and seeing how often it was confirmed that they were carcinogenic in animals and every time it's demonstrated as a known human carcinogen, it was demonstrated in animals that it's carcinogenic?

MR. SHEEHAN: Objection.

A. I don't know what he's talking about here.

Q. You couldn't infer that from the two sentences that I read from the summary previously?

A. Possibly he's saying that. Again, not sure it's true. I haven't seen the data. And I think it's almost certainly an overstatement.

Q. Have you ever looked at that, looked at studies that looked at the classified known human carcinogens and looked to see the animal study information to demonstrate that it has been confirmed, as long as there was adequate animal data, that

Page 363

it's been confirmed that it was carcinogenic in animals as well? Have you ever done that sort of research?

MR. SHEEHAN: Objection.

A. I have not looked at every human carcinogen or every animal carcinogenesis experiment. Again, I'm trying to understand now from what you said whether the question is whether every human -- known human carcinogen has been shown to be carcinogenic in animals that's probably closer to the case of the but whether every chemical or substance that's been shown to be carcinogenic animal models has later been shown to be a class one carcinogen. I don't think that's the case even based on my knowledge of animal experiments.

So, again, I'm finding his language and claims particularly broad and not specific enough, almost again seems like a cheerleading exercise for rodent carcinogenesis and just not buying it for now. Don't see the data.

Q. Doctor, isn't it true that when animal carcinogenicity has been confirmed

Page 364

around numerous species including pigs, monkeys -- sorry, pigs, monkeys. Strike that.

Doctor, isn't it true that when carcinogenicity has been demonstrated over numerous species that that is oftentimes very strong evidence that it's a human carcinogen?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, sometimes, not always. And again, depends on the animal species. So, we'd agree that the larger the number of animal species that are -- that behave consistently with the carcinogen, the more likely it would probably be the case. Particularly as you were sort of alluding to, I know you struck that, but primates data would be key to convincing me that something is a human carcinogen. It's surprising that, for example, in the case of NDMA causes cancer in rats and mice, but so far no evidence in primates. So -- and the primates are very close to humans, so one can almost argue that that's -- that one example seems to disprove the entire conclusion here.

Page 365

So, I think these animal experiments are useful, but trying to suggest that it's close to unity, I think is a way overstatement of the data from the carcinogenesis field. And again, doesn't convince me, certainly that the animal experiments will always prove to be untrue in humans.

Q. I want to make sure I understand your testimony.

Doctor, you understand that other than rodents, NDMA has been demonstrated to be carcinogenic in numerous other species, including swine, correct?

MR. SHEEHAN: Objection.

A. So, several species, yes, that's correct.

Q. Including pigs -- I mean, including frogs, correct?

A. Yes, I did not review the frog data.

Q. It's been demonstrated to be carcinogenic in fish, correct?

MR. SHEEHAN: Objection.

A. I saw a reference to other nonhuman

Page 366

species, but I didn't review fish or frogs.
Q. It's been demonstrated to be carcinogenic in dogs, correct?
MR. SHEEHAN: Objection. Mischaracterizes the data.
A. I don't know that to be the case.
Q. It's been demonstrated to be carcinogenic in hamsters, correct?
A. I don't recall whether hamsters were studied or not.
Q. It's been demonstrated to be carcinogenic in several other mammals, correct?
MR. SHEEHAN: Objection.
A. I don't know how many -- I could not give you a total number. But again, as I pointed to before, what is most important is primates, non-human primates and humans. And I would say that again, carcinogens have not -- have not always been shown to be the same in humans as there are in animals. And again, human data is -- is really needed to evaluate and to conclude that a particular agent is carcinogenic in humans.
Q. And I want to make sure I

Page 367

understand this correctly, even though it's been demonstrated in all these other species, the fact that in the one study, the Thorgeirsson study, all the primates died after being administrated NDMA due to toxic effects, you would take that study and suggest that that showed -- demonstrates inner species differences that are more closely related to the -- to the humans?
MR. SHEEHAN: Objection.
A. I do think the primate data is important and requires one to be a little bit cautious about making conclusions to humans. And I'd also say that the -- the human exposure data is far from conclusive. It's a mixed bag. So, I think it's, as I said before, it's possible that NDMA is a human carcinogen, but the data is not conclusive.
Q. Doctor, do you believe that most cancers are not preventable?
A. Certainly some cancers are preventable. I think I've alluded to that a bit in my report. There have been several studies that have come out that I've actually challenged that said that cancer is simply a

Page 368

matter of bad luck, that all cancer is stochastic and simply ramR (phonetic) mutations, and that there's very little that slows down or accelerates cancer. And I'm not of the opinion that that's always the case as suggested in papers by some of the leading cancer researchers, Bert Vogelstein. So, I do think that some cancers can be prevented.
As you know, I'm the senior deputy editor of the Journal of Cancer Prevention Research, and part of the group that has advocated that many more cancers can and should be prevented and we should focus on prevention, rather than simply trying to treat a very difficult and recalcitrant Stage IV cancers.
So, yes, I believe that some are prevented and as outlined in my report, I do think that the majority of cancers are linked to chronic inflammatory disorders and outline this in terms of the GI cancers we discussed. Esophageal cancer is primarily related to gastroesophageal reflux. Stomach cancer is primarily related Helicobacter pylori

Page 369

infection. Liver cancer is primarily related to inflammation of the liver from hepatitis B, hepatitis C, non-alcoholic fatty liver disease. And so, all these cancers have really known causes and known predisposing factors. And so, I think that these can be prevented in identifying these major sort of inflammatory risk factors is very important and could -- could certainly prevent a number of these cancers, if not the majority of them.
I'm almost convinced that other sort of environmental exposures or diet are as critical, but certainly they can modify these other major cancer pathogenic factors.
So, yes, I do believe that a lot of GI cancers can be prevented. Pancreatic cancer, of course, is the major one that's been the most difficult in terms of both identifying the premium classic conditions and identifying biomarkers and clinical factors that can lead to early diagnosis. But cancer is difficult to treat once it's advanced, so preventing it seems to make sense. But I think we're a long ways away

Page 370

from being able to identify and prevent cancer in most cancers.
Q. Doctor, what are extrinsic factors and intrinsic factors?
MR. SHEEHAN: Objection.
A. You'll have to be a little more precise. Those sorts of terms can be used in a number of different contexts. So, please specify a little bit more clearly what in what context you're using those terms.
Q. What are intrinsic risk factors in terms of the cancer development?
MR. SHEEHAN: Objection.
A. I'm still not entirely clear as to what you're referring to.
Q. Doctor, what are intrinsic risk factors in terms of cancer development?
MR. SHEEHAN: Objection.
A. So, I've done a lot of work in cancer and risk factors and there's different ways to define what is intrinsic and what is extrinsic, intrinsic to the cancer, intrinsic to the patient, different ways of classifying it, you may be using your own terminology, but there are patient-based intrinsic risk

Page 371

factors to the patient.
So, for example, if the patient has inherited genes, that can lead the patient to be highly at risk for cancer, that would be, I think, under many definitions considered an intrinsic risk factor.
Extrinsic risk factors would be possibly things that the patient is -- that are not biologically ingrained in their DNA, but maybe various types of exposures, for example, secondhand smoke, the town or city they live in, infections passed down perhaps by the mother, maybe dietary factors would be included. So, certainly there's a variety of different types of risk factors for cancer. I'm not sure what you're asking about specifically.
MR. NIGH: Let's take a look at LP585. This is marked as Exhibit 6680.
(Exhibit 6680 was marked for identification.)
BY MR. NIGH:
Q. Substantial -- and the title is Substantial contribution of extrinsic risk

Page 372

factors to cancer development. And the first author is Dr. Wu.
Have you seen this study before?
A. Not sure, although I do know Wei Zhu. I have not read this one in detail. Let's see. Okay. Well, I see the paper. Do you have a question about this? I guess it addresses the --
(Court reporter clarification.)
A. The "bad luck" hypothesis, that's Bert Vogelstein's paper that many of us commented on.
MR. NIGH: So, let's take a look at the -- not the summary, but in the first full paragraph. We can blow that up.
Q. And it says, starting with many arguments:
Many arguments against the "bad luck" hypothesis have been made, yet none of these offered specific alternatives to quantitatively evaluate the contribution of extrinsic risk factors in cancer development. Applying several distinct modelling approaches, here we provide strong evidence

Page 373

that unavoidable intrinsic risk factors contribute only modestly less than 10 to 30 percent to the development of many common cancers.
Do you see that?
A. Yes.
Q. Were you aware of this information that the study demonstrated that in terms of intrinsic factors and "bad luck" that they provided strong evidence that unavoidable intrinsic risk factors contribute only modestly less than 10 to 30 percent to the development of many common cancers.
MR. SHEEHAN: Objection.
A. I think that they provide evidence. I am sort of remembering this paper a bit since I was involved in some of the discussions about the "bad luck" hypothesis. And I think calling this "strong evidence" is -- again, I'm not sure -- it was Tomassetti and Vogelstein paper that this was reacting to. In Vogelstein, as it shows in Figure 2, came up with this idea of a relationship between the number of stem cells in any tissue and the risk of cancer. And

myself as well as many other cancer researchers pushed bag a little bit on it because there are a number of assumptions and hypotheses made and it was simply a modeling study. And I think looking at this particular paper, they re-analyze to some extent this -- this stem cell number cancer theory. And I think rightly pushed back and say that the correlation is not so strong. However, the evidence for extrinsic factors is again a bit of a modeling exercise and I -- they fall short of really providing convincing evidence of what is going on with the extrinsic factors. But I don't just disagree with the conclusion that -- and that's -- and that's nothing new, really, that people have discussed before the role of genetic predisposition to cancer. And it is clear that the genetic contribution to cancer is more modest than many other diseases and that cancer is much more influenced by external factors. I think that's clear, it's been known for many, many years.

And I think the best example, of



course, is gastric cancer which is caused primarily by helicobacter pylori infection. So, studies back in the 60s showed that patients who grew up, for example, in Japan and moved to Hawaii and then later on their descendents moved to California, that the risk in that family and those families for gastric cancer was primarily related to whether they were living in Japan or Hawaii or California. And I think many cancers are related to the environment that the patients live on.

And so, now, the more evidence is emerging that this is, to a large extent, dictated by cultural aspects and the microbiome probably.

So -- so, yes, cancer is primarily related to environmental influences, including things like smoking and so on, and less so to inherited genetic factors. And I think I would not disagree that the data showing that there's a perfect correlation with stem cell divisions is probably not -- not the single driving factor, although certainly there's some correlation.



Q. Doctor, you mentioned immigrant studies just now where people living in Japan move to Hawaii, is often times referred to as immigrant studies that measure whether or not it's environment or intrinsic factors, correct?

A. Correct.

MR. NIGH: And let's go -- let's turn to page 4 of this study and the very first full paragraph.

Q. And it says:

More importantly, cancers known to have substantial environmental risk proportions, for example, breast cancer, prostate cancer, colorectal cancer, melanoma, esophogeal cancer, cervical cancer, liver cancer and stomach cancer, all harbor large percentages of total extrinsic mutational signatures.

Do you see that?

A. Yes, I see that.

Q. So, you mentioned stomach cancer, and it's true that liver cancer, esophogeal cancer and colorectal cancer that it has been demonstrated that they have substantial



environmental risk proportions for those types of cancer, correct?

MR. SHEEHAN: Objection.

A. Yeah, I'm not entirely sure what they're talking about here. So -- so, there's been a lot of work recently on mutational signatures and mutational burdens for different tumors and, you know, melanoma and head and neck cancer have a large number of mutations, some of the others particularly prostate cancer has a much lower number of total mutations, and that's mostly what people have looked at recently as the number of mutations does correlate with the response to the mean checkpoint therapy. So, I don't -- and there are specific mutational burdens, it's not that specific, but there are mutational signatures, for example, of tobacco smoke with lung cancer and head and neck cancer. But I don't know what they mean by "total extrinsic mutational signature". I'd have to read their paper a little more closely, so I can't really address whether that's true.

But I do know, for example, stomach

cancer and esophogeal cancer have a moderate number of mutations, much less than melanoma head and neck. And so, again, I don't know what they mean there.
Q. Doctor, isn't it true that immigrant studies and identical twin studies have demonstrated the substantial environmental risk proportions for esophogeal cancer, liver cancer, stomach cancer and colorectal cancer?
MR. SHEEHAN: Objection.
A. So, a number of -- so, a number of studies have been done, both sibling studies and twin studies look -- trying to identify the proportion of clearly inherited risk of cancer. And as I mentioned before, there's been a general consensus in the field way before this paper came out that most cancers are determined environmentally. And as I pointed out, I think the majority of those are related to cultural, infectious and perhaps dietary factors that all relate primarily, I think, to microbiome influences, as well as other types of infectious factors.
So, I don't know that -- you know,


so when they do these studies looking at and reaching conclusions about inherited versus environmental, all they can do really is point out what percentages of tumors are eviron- -- are genetically determined, based on family history, twin studies and sibling studies. The hardest part has been teasing out the environmental influences and I think stomach cancer is a perfect example where, you know, the vast majority of these tumors are determined by Helicobacter pylori infection.
Q. Doctor, would you agree that for cervical -- or for colorectal cancer, liver cancer, stomach cancer and colorectal cancer that the majority in terms of looking at extrinsic versus intrinsic factors, the majority of those are extrinsic risk factors that are known to cause those types of cancers?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I think I've already answered that question.
Q. I actually asked a different


question.
Isn't it true that the majority of the colorectal cancers, liver cancers, stomach cancers and esophogeal cancers have been demonstrated that the majority of those cancers are due to extrinsic factors as opposed to intrinsic factors?
MR. SHEEHAN: Objection.
A. Well, again, I think we need to define what is meant by extrinsic versus intrinsic factors. But as I said, for most cancers, and that would include all the cancers that you recently listed, the evidence is clear that the majority of cancers are not inherited genetically -- primarily genetically determined. And how that falls into intrinsic versus extrinsic, I'll leave it to you to, sort of, decipher.
But the question really hasn't -- people in the field don't always use the terms intrinsic and extrinsic, the question really is genetic verses non-genetic. And, again, for all these solid malignancies, particularly in the GI tract, most of the


cancers are not inherited.
MR. NIGH: Let's take a look at LP602. This will be marked as Exhibit 6681. And let's take a look at page 682 under the -- sorry.
(Exhibit 6681 was marked for identification.)
BY MR. NIGH:
Q. First, let's take a look at the title. The title of the study is Carcinogenesis Bioassay in Perspective: Application in Identifying Human Cancer Hazards with leading author Dr. Fung.
Do you see that?
A. Yes, I do.
MR. NIGH: And let's take a look at the page 682.
Q. On the right side the paragraph that begins, our evaluation and the knowledge that all chemicals.
Do you see that?
A. Yes.
Q. Our evaluation and the knowledge that all chemicals known to induce cancer in humans that have been studied under

Page 382

adequate experimental protocols also cause cancer in laboratory animals leads to the persuasive speculation that the obverse would often hold true. Chemicals shown to unequivocally induce cancer in laboratory animals, especially in multiple species, must consider -- must be considered capable ever causing cancer in humans.

Do you see that?

A. Yes.

Q. And then the next says:

Obviously further and detailed evaluations need to be made.

Do you see that as well?

A. Yes.

Q. And it says:

The International Agency for Research on Cancer adopted this widely accepted scientific view: In the absence of adequate data in humans, it is biologically plausible and prudent to regard agents and mixtures for which there is sufficient evidence of carcinogenicity in experimental animals as if they presented a carcinogenic risk to humans.

Page 383

Do you see that?

A. Yes, I do.

Q. And do you agree with the IARC statement that in the absence of adequate data in humans, it is biologically plausible and prudent to regard agents and mixtures for which there's sufficient evidence of carcinogenesis in experimental animals as if they presented a carcinogenic risk to humans?

MR. SHEEHAN: Objection.

A. So, I think I've -- I've commented on this sort of question before, but let me sort of spell it out again once more.

So, I think -- and I think -- thank you for showing me this table, I think this clarifies what Huff has been trying to state, perhaps overstate.

So, I would agree that if there -- if there's consistent evidence showing that an agent is carcinogenic in animal models, that one needs to take it very seriously and I think it is prudent and this is the, I think, the job by the IARC to sort of raise a red flag and caution that this agent has the

Page 384

potential, could possibly cause cancer in humans. And so, I think now that I see this entire IARC list, it's clear that the agents that actually are listed as Category 1 are known carcinogens is -- is a bit -- a bit -- here they're listing -- let's see, IARC, yeah -- are listed as -- are rather low. And I think what this really calls attention to is that many of these -- of these should be certainly classified and caution placed, but not -- it doesn't say that they are known carcinogens. Again, most of these agents are Category 2A, Category 2B, et cetera, et cetera, reasonably anticipated to be carcinogens. I think caution should be given to those chemicals and regulated and monitored.

But it's -- again, I don't think this is saying that they are known carcinogens that they're shown to be cancer in animals, they're simply classified by the IARC as something that needs to be regulated such as Category 2A or 2B.

MR. NIGH: Let's take a look at the beginning of this paper and second sentence, we can blow that up.

Page 385

Q. It says: Due largely to the limited number of animals per test, generally 50 to 60 animals of each sex of two species, rats and mice, and each experimental group, bioassays are conducted at relatively high exposure concentrations to optimize the probability of detecting a carcinogenic response.

Do you see that?

A. Yes.

Q. And doctor, isn't it true that in order to detect -- have adequate power to detect carcinogenic responses at lower levels, it can sometimes take thousands or tens of thousands of animals at those lower levels to have adequate power to detect?

MR. SHEEHAN: Objection.

A. It's hard to know what the right answer is. I guess, if you're looking for something that's extremely carcinogenic, you probably don't need thousands and thousands of animals. And you are correct that in many of these studies, they use relatively high concentrations to address the question of

Page 386

whether it can cause cancer at high doses. But the truth is that for most of these chemicals, there is a threshold effect and as we talked about for NDMA, it's pretty clear to me that there is threshold effect and that going above that threshold effect is necessary to cause cancer. And certainly, we see this in our own studies where we've done carcinogenicity studies in mice with MNU causing stomach cancer and azoxymethane causing cancer -- colon cancer. And it's clear that low doses rarely, if ever, give rise to cancer in animals if they're -- if they're below the threshold needed to induce cancer. So, yes, I understand the reason for using pretty large groups of animals in high doses as long as that data is not extrapolated to, sort of, much lower doses in terms of the ability to cause cancer.

Q. Doctor, there's a difference between demonstrating a threshold of the NOEL effect and having inadequate power to demonstrate whether or not there is a threshold at lower levels?

MR. SHEEHAN: Objection.

Page 387

A. I am not sure I follow. Certainly, you know, the -- to demonstrate a threshold, I guess it depends on what you mean by "threshold." You know, we've -- for example, we've done studies with MNU at low doses in dozens and dozens and dozens of animals. If you're asking the question as have I proven that it can't cause cancer in .1 percent of animals, probably not. But I think the fact that it doesn't cause cancer 99.9 percent of animals, is -- is pretty good.

So -- so, yeah, I think if there -- if the agent is -- is carcinogenic, you'd certainly expect it to cause cancer in specific number of animals in large animal studies. And so, to me, that is sort of definition of a threshold that if it rarely, rarely causes cancer or if it's very, very close to the spontaneous cancer background, that for us is really not -- not carcinogenic.

Q. That's your definition of a threshold?

A. No significant increase in cancer, yes.

Page 388

Q. No statistical significant increase in cancer is your definition of a threshold?

MR. SHEEHAN: Objection.

A. Yeah, not causing cancer, that would be my definition.

Q. Those are different -- that's a different answer than my question.

My question is, is it your definition that a threshold is that it doesn't demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection.

A. There's different definitions of threshold. I guess I told you how I view cancer in the laboratory. I think defining a threshold in human studies might be somewhat different. But, yes, I think the data certainly suggests that -- I think the point of my statement was that the data certainly suggests that for most carcinogens there is a threshold necessary to induce cancer and it's very much dose -- dose related.

And as I pointed out before, the body is able to deal with many carcinogenic insults and want to maintain -- minimize

Page 389

cancer risk. And as suggested by these studies, agents that are identified as carcinogenic in animals should be closely monitored and regulated. But concluding that they are known carcinogens in humans requires a higher level of evidence.

And so, yes, so -- so, I understand this -- this particular study and article is -- is attempting to screen agents, identify potential risks and preserve human health and that all seems very admirable.

MR. NIGH: Let's go ahead take the article down.

Q. I want to be clear on my question.

Is it your definition that a threshold is demonstrated in animal studies if those animal studies do not demonstrate a statistical significant increase at those levels?

MR. SHEEHAN: Objection. Asked and answered.

MR. NIGH: It was a long answer, but there was no answer to it.

A. I think -- I think I've answered that. I think I've answered what the

threshold is. I don't think I need to revisit my -- my answers again.

Q. I'm entitled to this answer, okay? I can ask the question, I'm entitled to an answer.

My question is, is it your definition that a threshold in animal studies -- that there's a threshold in animal studies if it doesn't demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection. Asked and answered.

A. So, I discussed before the notion of a threshold with carcinogens and that the evidence is quite clear that for most carcinogens, low doses don't induce cancer in animals and that you need to exceed a certain level in order to get cancers, at which point cancer's become more common and more frequently and faster induced.

And if we want to take this for as example to the Pino study, as I pointed out before, it's very clear in the Pino study that the low doses of NDMA are not



carcinogenic, they don't -- they have not been shown to induce adenocarcinoma, they don't shorten the lives of the animals, the rats, and they don't show a significant increase in the number of tumors at the lower doses. So, there's a combination of things.

But in general, again, in answer to your question, a threshold means that the -- at lower doses, there is no -- there's no increase in cancer, and that above the threshold, there is an increase in cancer. And to some extent, this does require a statistical analysis to show these differences. But I think -- I think we understand what a threshold means in cancer studies.

Q. I'm not sure I understand your answer and you keep using the words "significant." I want to be clear about my question again.

My question is, is it your definition that a threshold exists in animal studies if the animal studies at that level do not demonstrate a statistical significant increase at that level?



MR. SHEEHAN: Objection. Asked and answered.

A. I have already answered your question and if you want me to repeat my answer again, I'll be happy to do so.

Q. I want you to answer this question, which is talking about statistical significant increase. So, I'm gonna to ask it again.

My question is, is it your definition that a threshold exists in animal studies if the animal studies at those levels do not demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, your question is about the threshold for adduction of cancer by carcinogens and it's a multi-pronged assessment of whether or not the carcinogen is causing cancer and in a dose dependent fashion and at low doses. The data is very clear from a number of animal studies that carcinogens, whether it's MNU or whether it's azoxymethane or whether it's NDMA at low



doses, one sees no tumors, no cancers in multiple, multiple animals and the tumors are only seen once a threshold has been exceeded, presumably that threshold relates to both the dose required to induce sufficient DNA damage and to overcome the detoxifying mechanisms that are inherent to most tissues to handle these sorts of toxic chemicals. And so, you know, so the threshold is the transition from no tumors, no cancers in animals to the point at which an increased number of cancers or tumors are seen. And again, to some extent in a scientific laboratory, this requires some statistical analysis to show that transition point.

MR. NIGH: Okay. Let's go ahead and take a break at this time.

THE VIDEOGRAPHER: Time is 23:42 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 00:00 UTC.

MR. NIGH: Can we pull up LP576.

BY MR. NIGH:
Q. Doctor, these are the invoices that you presented or that you prepared for this case.
Do you see that here on the screen?
A. Yes, I do.
Q. Okay.
MR. NIGH: These will be marked as Exhibit 6682.
(Exhibit 6682 was marked for identification.)
MR. NIGH: And Doctor, I don't have any further questions. I'll reserve the balance of my time for any follow-up, after your -- if your attorney asks questions.
Thank you.
MR. SHEEHAN: Okay. Give me just -- let's go off the record.
MR. NIGH: Okay.
THE VIDEOGRAPHER: The time is 00:01 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)



THE VIDEOGRAPHER: We're back on the record. The time is 00:05 UTC.
MR. SHEEHAN: Dr. Wang, thank you so much for your time today. I don't have any questions. I think we can wrap this up.
MR. NIGH: Thank you, Doctor.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time is 00:06 UTC. We're going off the record.
(Time noted: 8:06 p.m. Eastern Time)



J U R A T

I, TIMOTHY C. WANG, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 26, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

_______________________
TIMOTHY C. WANG

Subscribed and sworn to before me

This _______ day of __________, 20__.

___________________________________
NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, TIMOTHY C. WANG, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of May, 2022.

CANDIDA BORRIELLO

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 26, 2022
Deponent: TIMOTHY C. WANG

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |

________________________
TIMOTHY C. WANG

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

## Exhibits

EX 6647 Timothy C. Wang, M.D. 052622 4:10 15:17
EX 6648 Timothy C. Wang, M.D. 052622 4:11 42:11, 12
EX 6649 Timothy C. Wang, M.D. 052622 4:11 92:4,5, 23
EX 6650 Timothy C. Wang, M.D. 052622 4:12 94:2,3 98:6
EX 6651 Timothy C. Wang, M.D. 052622 4:12 118:12, 13
EX 6652 Timothy C. Wang, M.D. 052622 4:13 130:5,6
EX 6653 Timothy C. Wang, M.D. 052622 4:14 139:20, 22
EX 6654 Timothy C. Wang, M.D. 052622 4:14 150:10, 13 159:21
EX 6655 Timothy C. Wang, M.D. 052622 4:15 184:10, 11
EX 6656 Timothy C. Wang, M.D. 052622 4:15 193:25 194:3
EX 6657 Timothy C. Wang, M.D. 052622 4:16 201:18, 19
EX 6658 Timothy C. Wang, M.D. 052622 4:16 220:1,3
EX 6659 Timothy C. Wang, M.D. 052622 4:17 231:19, 20
EX 6660 Timothy C. Wang, M.D. 052622 4:17 233:17, 18
EX 6661 Timothy C. Wang, M.D. 052622 4:18 237:25 238:2
EX 6662 Timothy C. Wang, M.D. 052622 4:18 240:13, 14
EX 6663 Timothy C. Wang, M.D. 052622 4:19 250:5, 10,11
EX 6664 Timothy C. Wang, M.D. 052622 4:19 255:10, 11
EX 6665 Timothy C. Wang, M.D. 052622 4:20 258:5,6
EX 6666 Timothy C. Wang, M.D. 052622 4:20 263:24, 25
EX 6667 Timothy C. Wang, M.D. 052622 4:21 266:2,3 276:2
EX 6668 Timothy C. Wang, M.D. 052622 4:21 271:10, 11
EX 6669 Timothy C. Wang, M.D. 052622 4:22 279:14, 15
EX 6670 Timothy C. Wang, M.D. 052622 4:22 282:4,5
EX 6671 Timothy C. Wang, M.D. 052622 4:23 289:4,7
EX 6672 Timothy C. Wang, M.D. 052622 4:23 289:6,9
EX 6673 Timothy C. Wang, M.D. 052622 5:3 305:14, 15
EX 6674 Timothy C. Wang, M.D. 052622 5:3 312:22, 23
EX 6675 Timothy C. Wang, M.D. 052622 5:4 319:19, 20
EX 6676 Timothy C. Wang, M.D. 052622 5:4 327:4,5
EX 6677 Timothy C. Wang, M.D. 052622 5:5 340:21, 22
EX 6678 Timothy C. Wang, M.D. 052622 5:5 350:2,3
EX 6679 Timothy C. Wang, M.D. 052622 5:6 353:22, 23
EX 6680 Timothy C. Wang, M.D. 052622 5:6 371:20, 21
EX 6681 Timothy C. Wang, M.D. 052622 5:7 381:4,6
EX 6682 Timothy C. Wang, M.D. 052622 5:7 394:9,10

## -

-----------------I 4:2
----------------E 4:7
-and- 3:12

## 0

0 127:1,10

**0.01**
237:20
**0.05**
297:17
**0.277**
197:14
**0.37**
93:17
**0.7**
180:8
**0.70**
180:13
**0.97**
269:8,11
**001**
193:1 276:14 294:20,25 295:4,8,13, 18 296:2 298:10
**00:00**
393:24
**00:01**
394:22
**00:05**
395:2
**00:06**
395:10
**01**
235:6 237:18
**02**
196:19
**04**
233:1
**04-methylthymine**
38:15
**05**
56:11,13 60:3
**06**
36:22 37:11, 19,25 38:7, 13 40:4

**1**

**1**
61:6 119:24 127:2,6 140:11 141:7 144:6 164:14 186:18 188:6 212:2,22 237:19 270:14 323:23 329:19 361:19 384:4 387:8
**1,400**
124:23
**1,440**
128:22
**1,710**
293:9
**1.0**
127:4
**1.03**
211:4,10,20
**1.06**
211:4,10
**1.09**
163:2,11 164:1
**1.1**
234:6 259:8
**1.15**
273:18
**1.17**
212:22 213:24 214:13
**1.2**
330:9
**1.22**
212:22 213:24 214:13
**1.4**
182:20 234:20
**1.41**
182:22 269:16
**1.46**
166:23
**1.49**
182:22
**1.5**
170:1
**1.6**
234:6
**1.62**
292:10
**1.7**
264:14
**1.8**
267:18
**1.82**
270:12,13
**1.83**
276:9,11
**1.9**
119:13
**1.91**
272:9,11
**1.96**
196:16,18
**1.99**
267:19
**10**
133:20 238:13 373:2,12
**100**
15:3 212:4 242:5,13 265:16 352:20
**102**
123:11
**104**
162:24
**1087**
206:6 208:21
**11**
306:5
**116**
119:13,24 121:7,9 122:19 123:3
**118**
4:12
**12**
252:22
**12-fold**
191:21 192:1
**12.73**
191:22 192:2
**126**
4:13
**1270**
127:5
**13**
302:25 303:17
**130**
4:13
**139**
4:14
**13:04**
7:6
**1440**
127:5,12,14
**14:19**
72:23
**14:34**
73:3
**15**
4:10 105:15 188:6 190:1
**150**
4:14 189:25
**158**
184:22
**159**
184:23
**15:47**
129:22
**16**
86:17 87:4,9
**161**
186:7

**16:12**
130:2
**1717**
3:3
**17:06**
172:22
**17:58**
173:2
**18**
120:1 123:6
190:2
**180**
190:1
**182**
267:11
**184**
4:15
**19**
105:10,15
107:7 121:7,
9 122:19
123:3
**1900s**
243:3
**191**
235:8,9,13
237:2,11
**19109**
3:4
**194**
4:15
**1950s**
244:17
**1960s**
204:1,10
**1970s**
204:1,10
**198**
162:25
**1982**
283:3
**1985**
283:4
**1990s**
219:7
**1998**
283:1
**1999**
208:22
209:25
341:17
342:22
**19:11**
231:11
**19:25**
231:16
**1:00**
172:17
**1st**
325:12

**2**

**2**
131:4 186:18
235:2,4
236:14
237:20 268:9
269:21,22
270:2 276:3
340:18
341:5,8
361:19
373:23
**2.0**
211:3,20
212:3 213:23
214:12
**2.07**
188:7,14
**2.1**
102:14
**2.4**
258:21,25
259:7
**2.5**
127:5,7
330:12
**2.52**
170:2
**2.6**
330:5
**2.73**
166:24
**2.89**
123:6
**2.9**
119:25
**2.97**
109:13
**20**
44:4 87:10
94:24 95:4,
11 96:14
97:3,16,20
99:4 111:18
112:6 115:1
231:2 238:13
239:5 240:4,
7 241:15
242:9,12
243:15
331:18
332:3,9,11,
15 343:8
**2000s**
219:8
**2002**
42:17 44:5
62:24
350:17,19
**2003**
140:11,20
141:7,16
144:6 156:15
158:16
**2004**
23:6 341:17
342:22
**2005**
258:12
341:13
**2007**
12:1
**2008**
12:1
**201**
4:16
**2010**
140:12,21
141:7,16
144:3,7,11
156:15,23
158:9,16
159:1 198:24
201:15 202:8
**2011**
142:12,16
143:24
144:20 145:6
149:15
151:14
153:10,22
155:4,7,17,
22 156:3
**2012**
12:4 145:25
146:2 147:2,
7,16 150:4
151:4,9,14,
19 153:25
157:10
**2013**
12:4 88:13
**2017**
321:25
**2018**
146:13,20
149:3 150:17
154:2,11
158:24
258:13
341:14
**2019**
240:20
**2020**
89:1 199:3,
10 220:13
288:12
290:6,19
**2021**
125:10
**2022**
7:5 131:4
139:16
**205**
357:14
**207**

359:3
**209**
350:20
**20:30**
279:6
**20:48**
279:11
**21**
159:14 186:4
**210**
352:5
**2191**
92:25
**22**
60:18 62:4 241:4,5
**220**
4:16
**223**
209:8
**22:12**
343:16
**22:36**
343:21
**23**
143:9 335:19 336:11,20
**2303**
335:24
**2304**
329:20
**2308**
327:15
**231**
4:17
**232**
288:22
**233**
4:17
**238**
4:18
**23:42**
393:19
**24-hour**
209:10,11 215:16
**240**
4:18
**2400**
3:14
**25**
125:19 127:12 209:5 360:21
**250**
4:19
**255**
4:19
**258**
4:20
**26**
7:5 15:21
**26.4**
302:24 303:16
**261**
209:8
**263**
4:20
**266**
4:21
**27**
190:14
**270**
190:14
**271**
4:21
**277**
197:2,5,22
**279**
4:22
**282**
4:22
**289**
4:23
**2A**
41:1 64:5 65:1 230:9 384:13,23
**2B**
384:13,23

**3**

**3**
235:3 236:10,20 237:10,20 259:23 329:19 361:19
**3.07**
191:17
**3.1**
190:24 271:4
**3.37**
292:11
**3.62**
190:15
**3.86**
191:2
**30**
140:12 141:7 241:20 242:9,25 354:20 360:21 373:3,12
**305**
5:3
**30th**
140:21 325:15
**31**
241:9
**31.1**
302:24
**312**
5:3
**319**
5:4
**325**
282:23
**327**
5:4
**33**
126:17
**336**
95:20
**34**
50:25
**340**
5:5
**350**
5:5
**353**
5:6
**354**
220:2
**36**
334:5
**37**
97:12,14
**371**
5:6
**38**
43:9
**381**
5:7
**394**
5:7

**4**

**4**
43:17 94:18,19 95:5 98:18,19 166:17 169:21 186:8 188:10 269:20 270:7,9 306:5 376:9
**4.13**
232:13
**4.4**
264:12,13
**4.5**
186:19 259:8
**40**
111:19 112:6 115:1 119:8 120:2 121:2

122:13 123:10 124:1,5 138:6 182:12 183:6
**400**
3:3
**42**
4:11
**44**
84:12
**44th**
3:10
**45**
85:15
**458**
230:24
**46**
85:25
**471**
235:1
**475,768**
267:12
**49**
341:19 342:19

**5**

**5**
26:2 127:19, 24 193:5,6 323:23 327:1
**5,000**
161:17
**5.5**
271:6
**5.6**
270:18,24,25
**50**
94:24 95:4, 5,12 99:5 111:10 333:22,24 385:4
**550**
3:14
**57**
271:2
**59**
270:17,21

**6**

**6**
26:3 161:19 176:4 186:18 196:9
**6-**
122:20
**6.38**
306:17
**60**
111:10 219:20 385:4
**600**
121:10 123:18
**600-fold**
119:17 120:6,15 122:20 123:5
**60s**
334:13 375:3
**628**
282:24
**629**
159:23
**6382**
4:13 126:4, 6,8
**64**
333:20 334:4,5,10
**65**
292:9 305:20 314:9,13
**6647**
4:10 15:15, 17
**6648**
4:11 42:11, 12
**6649**
4:11 92:4,5, 23
**6650**
4:12 94:2,3 98:6
**6651**
4:12 118:12, 13
**6652**
4:13 130:5,6
**6653**
4:14 139:20, 22
**6654**
4:14 150:10, 13 159:21 173:5
**6655**
4:15 184:10, 11
**6656**
4:15 193:25 194:3
**6657**
4:16 201:18, 19
**6658**
4:16 220:1,3
**6659**
4:17 231:19, 20
**6660**
4:17 233:17, 18
**6661**
4:18 237:25 238:2
**6662**
4:18 240:13, 14
**6663**
4:19 250:5, 10,11
**6664**
4:19 255:10, 11
**6665**
4:20 258:5,6
**6666**
4:20 263:24, 25
**6667**
4:21 266:2,3 276:2
**6668**
4:21 271:10, 11
**6669**
4:22 279:14, 15
**6670**
4:22 282:4,5
**6671**
4:23 289:4,7
**6672**
4:23 289:6, 9,15
**6673**
5:3 305:14, 15
**6674**
5:3 312:22, 23
**6675**
5:4 319:19, 20
**6676**
5:4 327:4,5
**6677**
5:5 340:21, 22
**6678**
5:5 350:2,3
**6679**
5:6 353:22, 23
**6680**
5:6 371:20, 21
**6681**
5:7 381:4,6
**6682**
5:7 394:9,10

**6798**
189:17
**682**
381:5,17

## 7

**7**
163:14
250:22
255:19
**7-methylguanine**
38:14
**7.0**
232:13
**7.6**
110:5
**70**
111:11
**70s**
334:14
**75**
14:24 119:8
121:2 122:14
**79**
166:24
**7th**
16:3

## 8

**8**
4:5 250:22
**84**
341:19
342:19
**8:06**
395:12

## 9

**9**
178:16,18
179:3 255:20
**9.12**
307:10
**9.2**
264:14
**90**
259:9 260:3
261:6
**900**
124:23
**90017-5844**
3:10
**90071-2678**
3:15
**918**
196:8
**92**
4:11
**921**
127:1,11
128:22
**94**
4:12
**940**
127:2
**947**
127:3
**95**
56:12 58:16
94:16 98:17
166:24
182:19
**95th**
95:10 98:23
99:1
**96**
107:5 137:14
**97**
342:21
**98**
342:21
**99**
170:2
**99.9**
387:10

## A

**A-B-E**
118:4
**AACR**
206:19
**ab-**
302:15
**Abe**
118:1,3,4,20
**ability**
39:13 223:5
322:7 386:19
**able**
17:9 28:18
35:21 39:6
143:2 159:3
213:4,7
227:9 247:18
248:17
260:19 278:1
320:17 326:6
370:1 388:24
**above**
107:4 127:19
137:13
138:22
163:19
164:14
197:17
270:14
296:19 386:6
391:10
**absence**
117:3 230:21
249:19
382:19 383:4
**absolutely**
41:9 60:4
182:4 244:21
**abstract**
140:6 144:22
232:5,6
289:4,5
290:6,9
294:18,22
295:20
297:20,22
300:19,20,21
301:19
318:21
**abstracts**
287:18,22
288:6,11,25
296:14
297:10
302:7,18
**accelerated**
116:4 119:7
121:1 122:13
135:20
138:1,7
139:10
**accelerates**
368:4
**accept**
224:2 315:1
**accepted**
248:10 275:8
382:19
**Accompanying**
215:2
**account**
84:10 85:8,
19 86:5
95:21 96:8
113:25 124:3
**accuracy**
286:9
**accurate**
62:3 79:17
117:20
223:17
**accurately**
154:20
**accused**
328:16 329:7
**ACG**
277:9
**achieved**
337:16
**acid**
275:7 303:21

**acknowledge**
7:22 8:1
216:6 222:11
**acknowledgements**
328:24
**acknowledging**
221:22
**acknowledgments**
319:11
**across**
77:4 272:2
**act**
317:2
**Actavis**
146:16 149:5
**action**
7:13 134:3
**actions**
134:1
**active**
75:8 147:21
148:4
155:11,12
273:3,14
274:3 278:6,
7 304:1
353:14
**activities**
266:22
**actual**
348:18
**acutely**
61:4
**ad**
275:19
**Adami**
327:3,11,16
334:2,19
340:9
**Adamson**
33:2,4 44:7
**added**
159:23
**adding**
226:11
**addition**
47:19 48:10,
19
**additional**
107:8 109:3
111:4,12
117:17
265:22
337:12
**additive**
191:11
**address**
145:20
377:23
385:25
**addressed**
40:12 61:22
130:12 133:5
303:3
**addresses**
372:8
**adduct**
37:13
**adduction**
392:18
**adducts**
36:20 37:2,
25 38:7,12,
17,22 39:3,8
**adenocarcinoma**
49:17 264:23
391:2
**adequate**
17:3,7,20
362:25
382:1,20
383:4
385:13,17
**adequately**
181:17
352:18
**adjust**
188:18 206:1
235:19
236:24
310:10
**adjusted**
163:1 190:10
196:23
237:6,8
267:18
268:19
269:2,3,4,
10,16 270:11
272:10
276:8,11
335:6
**adjusting**
236:14
237:15 303:6
308:7 310:9
338:2
**adjustment**
306:10
307:16,25
308:2,25
335:6,10
**adjusts**
190:6 236:20
**administered**
8:2 33:10
35:4 37:24
54:19
**administrated**
367:5
**administration**
37:3
**admirable**
389:11
**adopted**
382:18
**adult**
94:23 95:3
209:9
**adults**
94:20 95:6,
11 98:20
305:20
314:13
**advanced**
369:24
**advantage**
17:12
**adverse**
20:17 21:13
**advertisement**
360:10
**advocated**
368:13
**affect**
207:25 223:6
348:2
**affected**
108:21
**affects**
161:22
207:10
**afraid**
321:23
**afterwards**
299:15
**AGA**
277:9 314:1
**age**
93:4 190:6
236:7,15
237:6 321:19
324:3
333:21,23
334:4,7,13
**aged**
107:9 109:14
110:10
238:23
**agency**
104:18 105:1
382:17
**agent**
26:10 35:21
36:3 37:21
230:15
239:12 247:9
254:6 361:9
366:24
383:21,25
387:13
**agents**
278:4 354:20

360:21 382:21 383:6 384:3,12 389:2,9
**aggregate** 322:24
**aggregation** 323:18
**aggression** 339:9
**aging** 28:4,5 106:9,16 107:25 109:9
**ago** 13:12 143:9 313:15
**agree** 20:13 45:3, 7,13,21 46:1,19,23 47:11,24 60:7 61:17 64:4,12 65:25 66:3, 16,19 71:16 73:5,17,25 89:1 101:22 102:21 121:20 174:9 241:25 251:8,13,16 253:9 273:1 351:4 352:25 353:17 356:7 357:4 359:25 364:12 379:13 383:3,19
**agreed** 76:20
**agreement** 6:7
**agrees** 355:11
**AGT** 39:5
**ah-huhs** 14:10
**ahead** 10:18 15:6,7 30:19 42:9 43:16 67:25 72:16 84:21 92:2 93:25 98:4 105:12 118:7,24 119:2 126:3 130:3,23,25 139:12 147:9 148:13 150:8 154:15 159:15 173:3 184:9,20 193:25 194:7 201:14 202:13 220:23 231:3,17 233:16 234:1 237:25 240:11 248:5 259:23 263:22 270:20 279:12 280:19 282:1,7,16 287:12,14,15 288:20 290:22 292:4 295:21 304:17,18 312:20 319:14 323:23 324:18 326:23 327:2 329:3,5,18, 21 340:17 348:7 349:25 389:12 393:17
**air** 73:12
**alcohol** 190:8 196:24 285:2 295:11 297:24 321:20
**allegation** 13:2 143:16 155:20
**allegations** 12:25 143:15,21
**alleged** 87:12
**alleging** 13:21 204:9
**allowance** 234:12
**allowed** 339:6
**allude** 83:11 109:2, 8
**alluded** 109:1 367:22
**alluding** 80:2 104:13 113:24 364:16
**altering** 222:2
**alternatives** 372:21
**alters** 96:8
**Alzheimer's** 277:6
**amended** 240:20
**America** 189:4
**American** 207:23
**amines** 184:15 185:1
**amino** 186:18
**amlodipine** 140:11,19 141:6,9,15
**amount** 86:19 91:2 96:23 100:16 101:16,18,24 106:6 107:8 110:19 111:16 112:4 117:13 119:11,17 120:7,15 121:6 122:18 123:17,23 124:23 125:18,19 128:7 145:20 192:18 198:6 238:6 257:24 260:12 261:18 262:8 344:23 348:2
**amounts** 39:6 76:23 88:16 89:2 97:25 98:1 101:20 105:9,11,16, 19,25 107:17,20 109:3,9 124:15 125:2,15 128:5,25 131:11 176:11 189:16 227:3,4 228:21,22 229:8,9 260:14 344:12,22 345:15 346:3,12,13, 20 347:13 348:3 349:7, 8

**anal-**
192:12
**analogy**
79:1,14 82:24 83:2, 8,12,19 84:18,23 85:2,4,13, 16,23 86:2,9
**analyses**
78:24 79:1 105:18 166:19,21 167:6,11 168:7,25 169:5,6,12, 13 170:6,8, 14,24 172:9 335:25 336:3 340:3
**analysis**
53:20 55:6 56:18 78:10, 12,21 79:11, 13,14,20 80:21 81:2, 4,8,24 82:4, 17,24 83:10, 13,18,23 84:1,5,11 86:6 140:13 151:15 168:18,19,24 170:4,16 171:1,7,14, 20 172:2,6 191:13 192:4,11 200:6,7 201:6 227:16,18 258:11 260:1 284:21 285:12 291:21 298:4,5,12 301:10 306:8 310:21 311:4,18,20 323:19 335:9 391:13 393:15
**analyze**
17:24
**analyzed**
105:21 142:1 311:23
**and/or**
6:8 113:3 116:18 215:9 286:1 313:11 327:24
**Angeles**
3:10,15
**Angiotensin**
140:1
**animal**
24:20,25 25:2 40:18, 24 41:12 44:20 49:12 55:3,15 61:25 70:21 176:18 177:3,15 227:22 352:18,19 353:7,12 355:13,17, 19,21 356:5 358:24 360:5 362:23,25 363:6,14,17, 25 364:11,13 365:1,6 383:21 387:15 389:16,17 390:7,8 391:22,23 392:11,12,23
**animals**
23:13 27:20 32:23 33:16 34:1 35:3, 10,13,23 36:5,15 41:20 45:12, 20 51:2 54:19 55:10, 21 57:20,22, 23,24 58:6,7 352:22 354:3,15,19 355:3 356:2 358:1,6 359:12,14 360:25 361:9 362:7,9 363:2,11 366:21 382:2,6,24 383:8 384:21 385:3,4,16, 23 386:13,16 387:6,9,11, 15 389:3 390:18 391:3 393:2,11
**annals**
199:9 220:13
**annual**
341:8
**answer**
14:9,18 20:25 29:4 30:23 31:2 40:9,13 42:7 43:5 60:1 69:18 80:25 82:3 86:11, 12,14 101:14 109:13 110:8,14 117:14 142:21 144:1 145:8 179:21 274:16 284:10 311:14 339:14 359:22 385:20 388:7 389:22,23 390:3,5 391:7,18 392:5,6
**answered**
29:21 31:17 44:17 54:22, 23,24 61:20 69:16,17 70:3 71:20 72:7 75:16 76:17 80:23 84:20 110:23 117:22,23 155:9 163:25 174:24 228:25 229:1,12 263:20 274:14,15 284:11 336:16 338:10 346:6 364:9 379:22,23 389:21,24,25 390:13 392:2,3,16
**answering**
18:21
**answers**
60:7 156:23 281:4,5,11, 13 283:8,10 284:9 390:2
**antagonist**
266:8
**antagonists**
260:23 277:19
**anti-reflex**
325:9
**anticipated**
70:23 71:7, 17,22 384:14
**anybody**
216:18
**anymore**
110:14,15

328:6
**anyone**
6:21 9:8,12
216:16
**anything's**
31:20
**AP&T**
313:10
314:15,18
315:1,2
**apart**
26:17 223:18
319:9
**API**
149:4 151:12
152:14
**apparent**
65:18 67:11
**appeared**
212:23
**Appearing**
3:1,7
**appears**
45:11 96:10
146:22
290:20
293:21
294:16 355:9
**application**
58:13 381:12
**applies**
143:4
**apply**
161:6
**Applying**
372:24
**appreciably**
234:12
**appreciate**
121:13 254:7
**approach**
242:20
286:13
311:18 326:1
337:5 339:1,
3 351:8,20
352:2
**approaches**
285:16
339:2,8
354:15
355:3,24
372:25
**appropriate**
80:9,16
213:13
265:13
278:2,25
298:25
299:3,8
**appropriately**
265:18
**approximate**
132:11
**approximately**
14:24 61:6
**Arch**
3:3
**area**
24:14 114:4
206:13
216:16
**areas**
203:14
245:20
**argue**
364:24
**argued**
179:6
**argument**
180:15
285:20
**arguments**
357:2
372:18,19
**arise**
238:11
**arises**
28:7
**arm**
42:4
**ARNOLD**
3:9
**around**
12:1 13:12
15:3 94:17
98:18 137:15
144:14
190:24
242:25
243:14
298:15
332:16
333:24
334:13 364:1
**arrangement**
8:7
**array**
347:4
**arrived**
310:21
**article**
99:9 108:24
120:11,18
121:17
149:10 252:9
327:9 389:8,
13
**articles**
27:6 169:4
329:8
**Asian**
254:18
**asked**
29:20,24
31:16 54:21
61:19 69:15
71:19 76:16
78:4 80:22
84:20 104:4
110:25
117:21
134:19 148:6
156:12
163:24
174:23
178:17
216:18
218:16
228:15,24
229:11
263:19
274:13 338:9
364:8
379:21,25
389:20
390:12
392:1,15
**asking**
16:19 20:2
21:10 23:20
25:6 38:6
54:10,12,15
56:20 59:17,
18 60:4 73:9
74:14 79:21
85:10 86:22
95:14 111:1
117:12
120:20 123:1
142:3,24
162:10
168:16
187:22,25
217:19
244:19
247:24 288:5
326:14 344:5
371:16 387:7
**asks**
394:16
**aspect**
70:17 321:24
**aspects**
217:25 218:1
375:15
**assays**
353:12
**assess**
28:19 161:9
177:5 251:4,
11,19 253:5,
15,17
**assessing**
46:14 245:25
252:6 339:18
**assessment**
43:9 94:7
95:23 128:17

134:12 161:22 209:11 220:6 221:24 344:3,8 345:12 346:10 392:20
**assessments** 209:12 223:16
**associated** 37:16 75:3 192:23 195:9,17 224:18 232:10 246:15 249:23 266:15 267:13,23 290:13 348:17 351:1,10 360:23 361:13
**association** 62:18 63:1, 8,19 64:9 70:15 75:5, 13 83:4 169:24 189:19,20 200:20 224:10 225:24 226:2 230:17 258:10 264:22 267:5 268:2 269:23 286:24 319:24
**associations** 18:19 67:1 74:12 170:9 199:15 202:17,25 221:4,13

223:21,22 225:2,15,17 226:21 276:21 277:4 358:7
**assume** 14:18 116:24 215:25 331:14 342:8 360:7
**assumes** 74:8
**assuming** 97:19 228:11 229:25
**assump-** 89:24
**assumption** 145:15 215:24 217:8 348:15
**assumptions** 89:9,13,25 90:18 91:1, 4,5,7 223:13 349:23 360:9 374:3
**Astrazeneca** 12:16
**atrophy** 238:19
**attach** 15:7
**attached** 73:19 81:9, 25 82:18
**attacks** 277:7
**attempted** 312:10
**attempting** 89:1 389:9
**attempts** 103:3,25
**attention** 43:19 45:9 66:12 86:17

92:24 94:15 140:7 162:16 232:8 241:4 288:19 306:5 313:2 384:8
**attenuate** 198:19 199:14 221:3,12
**attenuates** 213:5
**attenuating** 200:10
**attenuation** 209:18 210:16,17, 21,25 211:2, 14,21 212:9, 12,20 213:20 215:3 216:11 217:13
**attorney** 394:16
**attorney-client** 6:9
**attorneys** 7:20
**atypical** 320:15
**author** 92:11 94:11 140:2 173:13 194:8 202:7 220:8 232:1 233:23 250:19 255:16 258:13 264:7 266:10 271:16 280:14 282:13 289:20 305:21 320:2 327:11 350:14 354:6 355:10 372:2

381:13
**author's** 251:8
**authority** 103:2,24 140:14
**authors** 161:13 164:11 165:12 167:11 168:6 173:9 174:9 176:7,25 177:12 178:22 251:16 252:25 253:7,9,11 264:25 265:10 273:19 275:23 290:15 311:23 317:10,14 318:12,23 356:16
**authors'** 253:2 327:14,16
**autology** 321:21
**available** 17:13,19 136:18 290:10 342:2,3,7,9 343:6 351:22
**average** 211:4,14 212:10
**aware** 6:3 12:25 23:25 27:3 31:24 32:4 33:9 59:2 62:23 63:3 88:14 89:7,

17,23 90:7 106:2,12,13, 21 107:6,21 108:14,17 111:5,11,12, 14 112:2 123:23 125:16 128:21 129:6 134:15,19, 21,25 136:1, 24 137:8 141:13 143:20,21 147:19,22 148:2,11,14, 20 149:2,12, 16,18,21,23 150:6 151:7, 11 153:17 154:24 155:2,5,15 158:4 161:12 167:10 168:17,21 169:2,9,16, 17,23 170:15 183:23 184:2 198:16 201:8 207:12,18, 21,23 208:2, 3,11,14,24 247:24 248:11 258:24 259:2,9 260:3 261:15 288:10,13,15 304:20 305:4 312:16 317:9,18,25 319:8 321:19,25 322:6,16,23 324:20 328:7,14 329:3,6 331:25 332:6 333:8,10,12 340:8 342:24 344:11 345:11 346:1,9,16, 19 347:22,24 348:19 354:24 356:14 357:6 373:7

**awkwardly**
48:7 254:23

**azoxymethane**
386:10 392:25

**B**

**b/pyridine**
186:19

**back**
26:10 51:24 52:1 60:16, 17 73:2 96:16,19 97:15 99:9 130:1 140:25 144:22 147:10 162:20 173:1 174:25 180:11 186:17 194:7 197:1 204:1, 13 208:20 214:6 218:23 221:16 226:8 231:15 244:3 269:20 275:24 279:10 280:4 286:14,15 290:22 292:4,22 301:22 304:9 326:25 343:20 374:8 375:3 393:23 395:1

**background**
86:20 124:15,23 125:14,20 126:2 127:19 128:5,9,24 129:4,13 145:11 173:22 328:12 387:19

**bacon**
187:18,24 228:5,6

**bacteria**
26:11

**bad**
252:25 368:1 372:10,19 373:9,18

**bag**
367:16 374:2

**balance**
335:15,21 337:16 339:8 394:14

**balancing**
337:20 338:8

**bar**
66:18

**barbecued**
187:13

**Barnes**
3:21

**base**
29:6

**based**
11:5 17:18 18:24 20:3 40:24 41:10, 19 43:21,23 44:11 66:5 115:20 120:23 134:1,3 136:15 176:12 183:13 189:16,20 190:4 192:11,12, 13,15 226:21 300:25 322:22 331:13 345:9 348:2,22 349:15,23 356:5,25 360:17 363:16 379:5

**baseline**
106:3 109:11 115:13,17 116:16 123:18 138:11,21 139:5 302:11 303:19 329:24

**bases**
16:10

**basic**
27:18 58:14 59:18 359:13

**basically**
180:20 302:6

**basing**
66:20,23 67:5

**basis**
66:24 67:14 324:22 358:3

**batch**
144:16 157:14

**batches**
144:17 145:14

**beat**
348:6

**beef**
93:19

**began**
243:12

245:12
**beginning**
81:15 202:14 217:20 338:15 384:25
**begins**
361:11 381:19
**behalf**
3:1,7 7:11, 16 11:14 13:5 131:3
**behave**
302:16 364:13
**BEHRENS**
3:21
**belief**
35:11 261:5 356:9
**believable**
275:12
**believe**
21:24 22:1, 24 23:6 32:24 40:12 44:18 77:3 106:11 117:23 133:9 144:13,15 163:18 201:25 225:1,18 237:9 252:7, 11 253:12, 14,17 254:1 271:21 277:23 290:8 298:11 308:1 367:19 368:18 369:16
**bell**
23:24 24:8
**belongs**
84:24
**below**
43:10 127:24 210:24 269:12 290:1 386:14
**bench**
24:22
**benchmark**
137:15 331:18
**benefit**
221:6 222:5, 7,13
**benefits**
222:1
**benign**
49:15 51:17
**Bert**
368:7 372:11
**besides**
189:12 248:9
**best**
28:3 47:19 48:20 101:5, 14 179:20 238:15 243:8 275:21 278:25 351:8,17 361:15 374:25
**beta**
236:9,17
**BETH**
3:21
**better**
70:18 315:4 338:13
**bias**
198:20 201:3,4,11, 12 203:7 213:5 215:9 223:7 225:7 279:19 280:10 281:18 282:11 287:7
**biased**
282:22
**biases**
200:9,17
**Biau-**
93:8
**Biaudet**
93:8
**big**
10:4 312:5
**biliary**
51:1,16
**billed**
14:24
**billing**
19:11 320:25
**Bioassay**
381:11
**bioassays**
350:8,23 351:19 352:6,10,18, 19 385:6
**Biobank**
267:10,11 270:8,9,19, 22,25 271:15,18 272:6 274:24
**biological**
73:15
**biologically**
371:9 382:20 383:5
**biologist**
46:8
**biology**
27:13,19 353:9 359:9
**biomarker**
37:15 347:2
**biomarkers**
369:21
**bit**
20:23 48:17 52:12 76:2 79:19 83:15 96:6 102:18 115:15 180:25 205:3 236:2 252:15 254:23 307:2 321:2 323:20 324:5 330:18 331:3 353:16 361:12 367:12,23 370:9 373:16 374:2,11 384:5
**blacked**
313:8,12
**bladder**
77:8,12,14, 16,17,22 78:21
**blatant**
299:12 300:2
**blocker**
140:1 273:6
**blockers**
258:11 260:16 261:4 273:8 278:14,22 303:22 330:20 331:1 333:1
**blow**
47:3 60:24 65:10 118:25 130:23 133:23 135:5 140:5 141:3 146:7,10 150:11 162:21 176:6 178:7 186:8 194:1 196:9 202:13 210:7,10 214:23 220:24 232:4 234:2 235:2

250:23
255:20
258:19
270:20 271:3
280:19
282:8,17
283:20
289:19
291:1,4
293:2,5,25
297:20 306:6
314:12
323:24
324:13
329:21 336:1
352:7 354:11
372:15 385:1

**blowup**
147:10

**BMI**
196:23

**boat**
206:22 207:3

**Bob**
29:9

**body**
50:25 61:6
89:11 94:18,
20 97:2 98:2
100:17
388:24

**bold**
43:20

**book**
183:22

**Borriello**
7:16

**Boston**
23:9

**bottle**
107:11,24
109:4 111:7,
8 139:1

**bottles**
108:9 138:8

**bottom**
42:16 53:22,
25 54:4,18
62:4,12 63:4
117:7 127:16
162:22
184:22
188:12 194:6
195:3 210:9
212:19 235:7
236:3 259:25
268:10,11
271:4 283:14
313:4 324:7
341:5 360:18

**Boushey**
355:15

**box**
42:23 92:19,
21 159:25
160:3

**Bradford**
78:9,12,13,
15,20,24,25
79:11,12,14,
20 80:16,21
81:2,8,24
82:4,17,23
83:9,12,18,
23 84:1,4,
11,17 85:6,
12,18 86:4,6
227:17

**branch**
40:22
207:14,16
208:13,14

**brand**
152:4,13,19,
25 153:3
157:20,21,25
158:3,14
159:3

**branded**
124:24
128:24 129:7

**brands**
119:2,6,25
121:1 122:11

**Braunstein**
124:16,17,22
125:9,16,17
126:18
128:4,15
305:10

**Braunstein's**
305:6

**break**
10:8,19
14:14,15
30:17 112:20
113:15 114:3
129:18
172:15 231:4
236:1 279:4
343:14
346:17
393:18

**breakdown**
48:8 345:7

**breaks**
72:15 109:22
110:18

**breast**
279:20
280:11,23
281:7,22
282:12,20,23
283:3 284:5
286:25
376:14

**BRIAN**
3:4

**brief**
72:25 129:24
231:13 279:8
343:18
393:21
394:24

**bring**
300:14

**broad**
49:19 69:3
74:10 284:21
286:2 355:8
357:5 360:2
361:16
363:19

**broader**
76:2 245:24

**broadly**
225:11

**broken**
107:11

**Bumpus**
125:17,24,25
126:12
128:21 305:5

**Bumpus'**
125:25
305:10

**burdens**
377:7,17

**button**
6:24 280:2

**buy**
52:16 227:5,
7 228:23
229:10

**buying**
226:22
363:22

**bypasses**
347:14

**C**

**cabinet**
115:9

**caffeine**
285:1

**calculate**
89:9 100:5
191:8

**calculated**
190:18 191:1
196:2

**calculation**
90:3,19

**calculations**
89:14 90:1
161:17
344:20

**California**
3:10,15 329:2 375:6,10
**call**
66:11 189:19 299:7,10,13 311:11 322:9
**called**
8:13 187:2
**calling**
55:17 92:12 373:19
**calls**
248:20 262:1 384:8
**caloric**
226:1
**calories**
236:10,18
**camera**
10:10
**can-**
36:10
**Canada**
152:24 153:2
**Canadian**
282:20
**cancer**
12:18 13:2 16:25 21:23 22:19,23 26:2,4,12,15,24 27:12,19 28:22,25 29:7,18 31:14 32:18 33:18 34:1,4,10,12,14,16,19 35:6,19,22 36:6,7,15 37:16,18 38:24 39:4 41:16 46:7 47:6,14 48:16,20 52:12 55:21 57:19 62:19,20 63:2,9,20 68:17 70:24 71:8,11,17 74:3,9,18,23,24 75:3,15,24 76:8,15 77:6,8,14,16,18,22,23 78:7,16,17,18,21 80:5 82:6 83:5,7 84:14 85:15 86:1,10,13 87:13 101:7,13 117:4,7 139:25 156:7,11,17,25 157:8 160:17,23 161:1,9,25 162:7,14,15,24 163:2,7,16 164:2,5,6,8 165:4,23 166:10,11,14,19,21,23,25 167:6,12,13,17 168:2,7 171:2,7 173:11,14 174:11 176:16,22 177:2,15,20 178:16,20 179:3 181:5 182:13 183:7,11 185:2 186:10,11 189:4,8 192:8,20,24 194:12,20,21 195:1,10,18 196:6,12 203:18,24 204:4,5,11,21,25 205:6,22 206:12,15,23 207:4,13,20,24 208:1,3,6,7,9,23,25 209:6 216:3,5,17,19,20,22,24 217:2,9 218:4,11,17 219:7,14 221:16 222:8,19 224:1 225:12,14,16,18,19 226:3,7,11,14,23,25 227:22 230:1,11 231:25 232:11,18 233:22 234:14 236:8,16 238:6,13,16,19,24 239:2,4,8,15,17,22,23,24 240:1,3 241:7,15 242:10 243:4,12,13,14 244:9,16 245:3,4,11,16,18,19,21,22 246:2,4,7,16,17,18,20,21,22,25 247:2 248:8,22 249:2,19,23 250:15 251:5,12,19 252:4,6,13,20,23 253:6,10,16,18 255:5,15 256:2,8,13,24 257:3 258:10 261:3 264:4 265:4,15 266:9,15 267:6,12,14,23 268:23 269:24 270:11 271:15 272:7,13,20 274:5,10,18,22,23 275:1,3 276:22 278:6,8 279:20 280:11,23 281:7,22 282:13,24 284:5 285:14 286:25 287:23 289:25 292:16 293:7 295:16 297:8 301:7,17 302:24 303:3,5,12,15,23 304:7 305:19 306:9 307:8,9,23 308:22 309:5 314:8 325:1,6,8,13,20 334:8,9,10,14,15 351:9 352:3,16,17 353:9 354:17 358:6 359:15 360:6,23 361:9 364:21 367:25 368:1,4,7,11,23,24 369:1,15,18,23 370:2,12,17,20,22 371:4,15 372:1,23 373:25 374:1,7,18,20,21 375:1,

8,17 376:14, 15,16,17,22, 23,24 377:2, 9,11,19,20 378:1,9,10, 16 379:9,14, 15 381:12,24 382:2,5,8,18 384:1,20 386:1,7,10, 11,13,15,19 387:8,10,14, 18,19,24 388:2,4,15, 21 389:1 390:17 391:10,11,15 392:18,21

**cancer's**
390:20

**cancers**
167:22,24,25 177:17 180:24 224:18 225:24 238:23 239:11 240:8 241:12 244:1 246:11 247:6 248:9 249:3 275:10,15 277:5 293:10 296:1,22 297:1 298:1, 17 306:14 307:1 308:4 309:6 317:4 327:11 351:1,11,12, 15 354:2 358:7 359:7, 14 367:20,21 368:8,13,17, 20,22 369:4, 10,17 370:2 373:4,13 375:10

376:12 378:18 379:20 380:3,4,6, 12,13,15 381:1 390:19 393:1,11,12

**Candida**
7:16

**capable**
156:6,17 382:7

**capacity**
13:23

**captured**
19:1 259:11 261:13

**car-**
248:17

**carcin-**
248:8

**carcinogen**
22:4,18 25:12,24 26:13 32:20 33:1,3 36:4 40:10,14,17, 18,21 41:2,4 61:13,24 62:1 64:3,7, 16,21,23 65:7 68:6,18 69:14,23,24 70:1,4,8 72:2 81:6,21 82:15 83:17 131:12 186:24 238:7 248:18 317:3 346:22 353:13 356:4,8,10, 11 361:8,10, 14,18 362:8 363:6,10,15 364:7,14,19 367:18 392:20

**carcinogenesis**
25:16 26:2, 6,19 35:20 36:13 47:16 66:24 249:20 350:8,22 351:19 352:6,10,13 353:3 355:7, 19 356:21 357:17,20,25 358:24 359:11 360:11,16 363:6,22 365:5 381:11 383:8

**carcinogenic**
32:23 33:6 36:10,17 37:22 44:1, 14,19,22 45:24 46:22 65:21 66:2 72:6 117:1 157:12 227:10 240:24 242:6,14 243:18 247:5,10,14, 17 310:24 344:17 347:17 348:18,25 352:12,19,22 353:12 360:25 362:6,9 363:1,10,14 365:13,23 366:3,8,12, 24 382:24 383:9,21 385:8,14,21 387:13,21 388:24 389:3 391:1

**carcinogenicity**
61:8 65:15 66:21 241:22 354:18 363:25 364:5 382:23 386:9

**carcinogens**
26:3,9 27:2, 9 204:8 242:8,15,19 247:25 248:7 352:17,20 353:11 355:14 358:23 359:7 361:24 362:5,22 366:19 384:5,12,15, 20 388:20 389:5 390:15,17 392:19,24

**carcinoma**
49:17

**cardiovascular**
222:3

**care**
269:24 271:1 321:4

**careful**
37:14 65:2 230:9,15,19 349:22

**carefully**
232:25

**Carlo**
89:18,20,24, 25 90:3,8,9

**CAROLINE**
3:19

**carotene**
236:9,17

**carried**
73:11,12,13, 24 352:11

**case**
10:22,23 11:11,15,21, 23 12:6,11, 13,14,15,17, 21 13:1,5, 14,15,24 15:1,10 18:20 21:3, 22 68:15 74:14 102:13 115:25 145:22 146:22 148:8 185:2 186:3 189:1 205:19 283:25 286:18 308:11,19 311:5 318:2, 8 354:16 358:23 359:1 362:2 363:11,16 364:15,20 366:6 368:6 394:4

**case-control**
231:25 279:19 280:10,22 282:19 308:6 339:4

**cases**
11:8 12:5,8 216:7 221:25 223:1 238:11 239:13 278:21,22 282:13

**Cassin**
3:24 7:10

**catch**
356:24

**categories**
85:14 285:1 286:2

**category**
86:8 384:4, 13,23

**causal**
78:7

**causality**
63:8,18 66:11 75:11 222:8 266:25 273:10 277:12 308:9 311:2

**causally**
360:23 361:12

**causation**
46:9

**causative**
278:4

**caused**
143:23 361:9 375:1

**causing**
156:17 245:18 275:3 277:24 348:17 349:13 358:5 382:8 386:10,11 388:4 392:21

**caution**
46:10,25 383:25 384:10,15

**cautioned**
355:16

**cautious**
179:7,15 367:13

**caveat**
265:13

**CC**
314:3

**cc'd**
313:12

**celecoxib**
11:9

**Celexin**
11:21 12:6 13:13

**cell**
9:18 32:18, 19 45:6 49:17 374:7 375:23

**cells**
28:17 67:8, 10 373:24

**cellular**
208:8

**Celsius**
111:11,19 112:7 115:2 119:8 121:2 122:14

**center**
9:7 23:5 203:19 216:22 217:2 328:25

**CEO**
130:13

**cereals**
284:19

**certain**
57:24 156:21 324:3 332:12 345:21,22 390:18

**certainly**
25:5 34:14 35:9 36:6 38:23 39:1, 21 47:13 52:20 55:4 64:19 65:4 66:19 68:10, 20,24 69:23 70:16 71:2 84:2,3,8 85:8,20 100:20 113:25 116:2,6 123:23 124:2 125:7 127:14 132:22 137:11 138:25 145:21 151:17,23 152:1 157:6 183:4 186:3 189:13 193:16 195:25 196:4 205:5,18,19 217:22 219:19 224:2,11 227:8,13 229:13,17 238:16 239:12 243:6 245:20 247:7 251:22 256:14 266:24 267:1 275:7,22 285:13 302:10 308:11,16 310:15 311:21 316:8,19 317:14,24 322:12,14 329:13 332:12 333:6 335:17 337:24 340:2,4 345:10 347:13 356:24 359:10 362:18 365:6 367:21 369:9,14 371:14 375:25 384:10 386:7

387:1,14 388:18,19
**certainty** 242:13
**cervical** 376:16 379:14
**Cesare** 350:10
**cetera** 38:16 237:7 277:7,8 384:13,14
**chain** 109:15 110:11 116:18 117:19
**chairs** 205:3
**challenge** 321:10
**challenged** 367:25
**challenges** 202:16 278:5 321:6 339:23
**CHAMPION** 3:19
**Chan** 139:16 140:3 156:3 158:12
**chance** 71:3
**Chang** 327:17,18 328:8,13,15, 25
**change** 28:6,13,14, 18 29:7 144:11 147:1,6,15 149:13,22 150:3 151:3, 8,25 302:10 310:22 311:2
**changed** 144:13
**changes** 29:4,12 95:22 135:15 151:23
**characteristics** 27:2,8,22 302:12 303:20 329:24
**characterization** 47:8 115:4
**characterize** 249:5
**characterized** 47:20 48:20
**charge** 276:24
**chart** 196:8
**Chattem** 3:7
**check** 321:11
**checked** 15:2 321:13 337:11
**checkpoint** 377:15
**cheerleading** 363:21
**cheese** 93:19
**chemical** 348:12,24 349:12 350:22 351:16,18 357:17,20,25 359:8 363:12
**chemically** 350:25 351:10
**chemicals** 26:4 346:25 347:5,9,11 350:7 352:2 354:2 358:5, 22 359:13 360:4,22 361:12 381:20,24 382:4 384:16 386:3 393:9
**children** 94:19 98:19
**China** 148:23 151:2
**Chinese** 254:8
**Christine** 282:15
**chromium** 248:12,14,25
**chromosomal** 28:8
**chronic** 26:18 205:20 238:20 290:13 319:24 368:21
**chronically** 263:3,4,14
**cigarettes** 243:11
**cimetidine** 268:15,21,23 269:8,11,13
**circumstance** 359:9
**cirrhosis** 295:7 297:25
**citation** 356:19
**citations** 65:5
**cite** 51:22 91:20, 21 108:23 109:18 113:7,11,19 114:14 125:5,8 129:13 185:8 193:2 199:4, 9,12,16 203:5 220:20 355:15 356:22 357:10,11
**cited** 90:13 107:7 110:5 118:9 123:21 125:6 208:5 220:11 222:16 357:7 358:12
**citing** 52:14 212:9
**citizen** 113:7,8,20 131:3
**city** 9:4 371:11
**civil** 121:15,19
**claimed** 12:18 225:10
**claims** 133:17 258:12 322:8 363:19
**clarification** 372:9
**clarifies** 383:17
**clarify** 309:18
**class** 41:1 64:5 361:10,19 363:15
**classic** 26:8 238:12 356:4 369:20

**classification**
41:10 70:4
71:3,13
**classified**
41:3 64:5,6
193:12,15,16
230:8 356:3
361:18
362:22
384:10,21
**classify**
39:20 65:1
193:18 356:7
**classifying**
213:12
370:23
**clastogenic**
44:25
**clear**
55:11 87:3
122:2,5,22
129:5 153:15
229:14
235:12
243:10 247:8
248:6 302:14
316:24
323:20
344:15
361:14
370:14
374:19,23
380:14 384:3
386:5,12
389:14
390:16,24
391:19
392:23
**clearly**
44:1,14 47:6
77:9 208:16
243:17 245:2
301:25
361:23 370:9
378:15
**click**
6:23
**clinical**
18:7,21 20:5
21:7 24:24
74:10 76:4
84:6 140:13
227:2,4
228:20,23
229:7,9
239:4 240:3
241:14
242:24
253:24,25
254:2
257:14,21
269:25 271:2
313:21,23
316:10
320:23
321:1,5,7
337:24 340:7
369:21
**clinician**
262:13
**clinicians**
245:9
**close**
101:18
203:18
262:12
306:24 309:2
331:21
364:23 365:3
387:19
**closely**
367:9 377:23
389:3
**closer**
363:11
**clues**
336:19
**co-lead**
154:21,22
**co-linked**
248:7
**codes**
320:8,11,13,
14,18,24
321:8,12,14,
16,18 322:1,
7,13,18,22
323:13
**coefficient**
210:19,20
**cohort**
140:8 141:15
142:17
194:12
202:4,18
209:19
250:17
267:11
280:23
291:21
296:1,17
304:15
305:20 314:9
329:24
333:19 334:3
339:6
**cohorts**
93:4 271:23
293:12 296:3
304:12
334:22
**Colin**
313:14,18,20
314:2
**colleagues**
203:18 217:1
**collected**
284:2,4
287:1 291:9
**collecting**
19:20
**collection**
249:16
285:18
**colon**
386:11
**colorectal**
78:17 85:25
164:5,8
165:4,23
166:10,14,23
167:13
173:11,14
174:11
176:17
177:15
239:16,22
376:15,24
378:10
379:14,15
380:3
**Columbia**
9:6 23:5
216:22
**column**
65:9 140:25
169:22
236:14,20
276:10
**combination**
26:22,24
320:7,10
347:11 391:6
**combined**
98:10 236:8,
16
**come**
31:6 77:4
224:17 237:9
254:22
275:15
311:24
367:24
**comes**
19:13 39:12
52:18 242:25
278:11,23
**comment**
38:13 52:7
82:25 83:9
90:5 100:11
102:11 104:7
108:18
110:13
124:18
133:19 161:8
167:18
173:13 175:1
185:22,24
186:4 193:20
200:1 244:19

262:4 273:25 316:1 317:17 326:22 330:19 331:2
**commented** 40:7 69:2 88:21 133:16 162:11 372:12 383:12
**commenting** 177:8,14 178:3 222:23 351:7
**comments** 251:20 316:10
**committee** 217:1
**common** 26:16 109:23 112:21 114:4 187:3 200:22 204:5,6,7 219:6 246:22 354:17 373:3,13 390:20
**commonly** 186:22
**commonplace** 113:15
**companies** 19:7 20:21 149:8 152:11 317:16
**company** 11:5,18 13:7 19:19 151:1 328:8
**comparable** 275:6
**comparator** 75:8 273:3 274:3 278:7, 16 304:14
**comparators** 278:6,19 279:1 304:1
**compare** 57:18,22 273:15 278:13 284:9 288:3,5 300:18 306:21 341:17
**compared** 47:21 48:2 49:5 50:1 51:8 53:8,25 54:6,20 77:19,23 88:3 195:3 196:21 234:4 246:19 272:7,14,21 273:22 274:11,18 281:13 292:24 293:19,23 294:4,5,8, 11,14 295:12,17 296:2,20,22 300:19,23 301:8 302:4 303:16 304:3,7 306:14,15 308:22 309:15 319:25 345:16 346:3
**compares** 292:15,16
**comparing** 91:11 273:4 278:15 281:11 283:7 284:1 292:19 297:13 298:23
301:19 306:25 310:5 311:8
**comparison** 57:4 58:11 171:7 273:2, 13,25 288:9 304:6
**comparisons** 57:16 272:24 275:16 278:12 292:17,25 293:15
**compelling** 227:17,20,23
**complete** 39:24 40:4
**completed** 209:9 282:25
**completely** 30:24 120:12 255:5 256:12 298:22 299:2,17,24 300:8 308:10 311:24
**complex** 29:8 205:12
**complicated** 99:23
**complicating** 49:14
**complications** 277:4,25 278:2
**component** 199:13 221:2,11
**compound** 36:1 65:2 71:4,13 187:3 348:24
**compounds** 22:23 187:10 188:23,25 189:16
228:10
**comprehensible** 316:5
**comprehensive** 68:3 69:11 153:8,20 200:24
**compute** 336:7
**computer** 9:17
**computers** 9:19
**con-** 164:20
**concentration** 47:21 48:1, 21 49:5 50:1 51:8 126:25 127:15
**concentrations** 127:3 385:7, 25
**concept** 27:18 58:22 59:3,18 359:11
**concern** 51:14,22 61:8 100:12 223:20
**concerns** 100:21,23,24 135:11
**Concise** 43:8
**conclude** 67:16 203:21 225:20 366:23
**concluding** 165:2 389:4
**conclusion** 56:1 59:17 65:5 67:4

91:16 117:4 119:22 159:17 160:14,21 161:19 162:15 166:8,13 177:7 182:11 204:3,11 207:22 225:2 264:25 265:24 266:6 302:6 326:9 342:14 347:20 348:23 357:4 364:25 374:15
**conclusions** 17:18 69:21 89:15 96:9 99:8 161:11 213:21 229:21,23 252:21 266:13 281:16 301:4 312:5 349:15,23 360:2 361:4 367:13 379:2
**conclusive** 367:15,18
**conclusively** 359:13
**concordance** 354:14 355:2,24
**conditions** 18:9 111:10 113:3 115:1 117:17 119:8,18 120:8,16 121:2 122:13 123:16 128:9,16 135:21 138:2,5 139:6 153:18 369:20
**conduct** 134:12
**conducted** 136:9 282:20 337:20 338:8 385:6
**Conference** 121:5 122:16
**confidence** 37:21 56:12 59:6,9 164:21 166:24 167:23 170:1 174:22 179:9,18,22, 24,25 180:4 182:19,20 183:3 232:24
**confident** 136:19 137:1 138:15 143:5 144:5 265:11 359:6
**confirm** 265:6,22 326:1
**confirmed** 170:11 362:6,24 363:1,25
**confirms** 180:21
**confounder** 235:20
**confounding** 75:10 176:14 188:19 237:16 266:25 273:9,20 274:20 275:21 277:11 303:6 308:8,19 310:9 311:1 336:6,13
**confused** 90:21
**confusing** 48:17 74:7 76:19 79:20
**CONNOR** 3:15
**connor.scott@ dlapiper.com** 3:16
**consensus** 275:9 359:6 378:17
**consent** 8:7
**conservative** 66:10 70:6 242:17
**consider** 91:14 95:8 123:16 124:14,21 125:4 179:9, 17 182:25 212:11 215:7 296:7 297:9 319:5 382:7
**considerable** 65:15
**considered** 45:23 84:3 88:3 95:15 116:12 125:7 132:3,6,8,16 133:2 163:11 201:23 215:12 257:13 296:6 318:1,7,9,25 329:14,16 371:5 382:7
**considering** 218:3
**consistency** 175:7
**consistent** 65:17 67:7 83:3 127:18 128:18 173:19 174:14,18,19 175:3 274:2 297:6 352:15 383:20
**consistently** 61:12 364:14
**constant** 128:7
**constitute** 358:2
**consult** 327:25
**consulted** 328:4
**consulting** 327:17,19 328:9,15
**consume** 221:5
**consumed** 286:2
**consumer** 109:21 110:18 112:19 113:3,14 114:2,4 116:19
**consumers** 109:23 110:20 112:21
**consumers'** 107:10 117:20
**consumption** 93:3 98:11 117:2 190:8 194:11
**contained** 16:10 77:11 103:11

143:6,13
**contains**
275:4 292:9
**contaminant**
66:12 143:2
265:4 317:2
**contaminants**
144:25
**contaminated**
68:23 142:6,
9,18 143:1,9
144:8 146:20
150:19
151:18
153:9,13,21
155:3,6
156:2,5,14,
24 160:18
161:2 182:14
250:16
**contamination**
141:19,21
142:11,16
143:24
144:4,19
145:6,13,25
146:3,25
147:5,14,20
148:3,7,21
149:25
150:23
151:14,22
152:1,6,21
153:12,14,25
154:10,11
155:16,21
158:7,9,12
316:25 340:4
**contamination
s**
152:9
**contents**
187:9
**context**
19:19 87:15
224:9 252:19
257:14
370:10
**contexts**
370:8
**continue**
115:19
121:21
**continued**
4:25 5:2
327:24
**contrasted**
281:4
**contribute**
325:18
373:2,11
**contribution**
371:25
372:22
374:19
**control**
53:9,25
54:6,20
77:19,23
140:11 182:5
184:16 185:2
226:10,20
282:24 284:1
286:18
308:19 336:5
**control-study**
189:2
**controlled**
229:16
308:10
**controls**
189:17,18
282:13 339:7
**controversial**
359:21
**convenient**
144:14
**conversations**
6:5,8
**conversion**
128:13
**convey**
221:6 255:2,
3
**convince**
365:6
**convinced**
308:18
369:12
**convincing**
227:18 362:1
364:18
374:13
**cooked**
187:15
189:12
**cool**
124:24
128:23 129:8
**copy**
87:9 160:7
289:17
**corner**
6:24 176:17
184:16 341:6
**cornerstone**
350:23
351:21
**corre-**
349:5
**correct**
11:18,19
13:3,9 15:25
16:5,7,8,11,
12,18 17:1,5
19:2,8,20,25
21:23 22:5
24:17 25:9
27:9 28:22
29:19 31:15
32:9 33:8,11
34:7,20
39:13,24
40:5 41:6
42:3,5
43:14,15
44:7,8 48:15
53:4 54:6,20
56:8,9,14,18
57:2 58:8,18
59:9,13,24
63:14 66:22
67:8,15
78:10,18,19,
21,22 79:3
80:21 81:9,
25 82:18
83:20 87:5
90:14 91:16,
20 93:16,21
94:25 95:5,7
96:12,24
97:4,23
98:2,25
99:5,24,25
101:20 102:5
104:10,20
105:4,17
106:5,10,11
110:2,11,21
111:13
112:14
113:17 114:8
115:11,20
119:18
120:8,16
121:11
122:20
123:14
126:15
127:15
129:14
130:21 132:8
133:3,8,11
138:18 139:7
140:3 141:16
142:18
146:21 151:6
156:7,17
157:1 159:9,
10 160:23
161:3 163:7
164:15
165:14 166:5
167:22 168:9
170:24
171:20 172:7
173:11,13
174:22
175:9,25
176:2 177:5

181:20
182:20
185:9,13,18,
25 188:8,19
190:1,16,22
191:16,22
192:2,20
193:1,8
194:16,17
195:11,19
196:17,24
197:3,6,23
198:9 199:5,
24 200:3,10,
20 201:23
202:8,9,11
203:8,14
208:18 210:2
211:10,22
212:6 213:9
214:14 218:8
220:12,19
221:13
232:2,3,18,
20,22 233:6,
12 234:24
235:10,14,23
236:18,22
237:3,18
238:8 239:5,
18 240:4,18,
19 241:1
242:1 243:1
246:7,12,16,
20 247:2,12,
20 250:2
253:24
254:21 256:8
257:4,8
264:5,8,12,
13,18
266:11,12
267:6,8,19,
20,24,25
268:3,4,7,
17,19,24
269:9,13,14,
17,18,25
270:4,5,8,
12,13,15,16,
19,24 271:6,
7,17,20,23
272:10,15,22
274:12
276:14,17
281:14,15
282:14
283:10 286:3
287:18,23,25
290:2,7,16,
19 291:13
292:2,18
293:1,17,20
294:15,20,25
295:4,8,13,
14,18
297:14,17
298:2,6,20
303:7,14
304:8 307:1,
25 309:16,
17,25
310:10,11
313:13
318:3,8
324:16
325:20
326:6,20
327:12,13
328:1
329:15,17
331:12
333:22,25
334:4,6,11
341:15,19
342:4,10,22
343:24
344:4,9
348:4 349:8
350:19
358:15
365:14,17,
19,23 366:3,
8,13 376:6,7
377:2 385:23

**correction**
323:16

**correctly**
337:20 338:8
367:1

**correlate**
189:6 377:14

**correlates**
234:14

**correlation**
136:10
245:10
344:12,18
346:19 349:6
353:19 374:9
375:22,25

**correlative**
223:24

**correspondence**
285:5

**counsel**
7:3 8:6 9:10
15:11
154:21,23
159:22
289:13

**counted**
325:13,17

**counter**
339:19

**countries**
32:6

**country**
31:25 332:17

**couple**
14:2 194:2
228:8

**course**
27:21 39:18
41:2 73:15
75:6 107:2
149:17
177:23 198:1
204:19
215:14 239:7
285:7 301:13
332:12
348:13
351:12
361:22
369:18 375:1

**court**
7:20 14:8
82:7,11
173:16,20
174:4,8
372:9

**covering**
186:11

**cow**
299:18

**create**
67:4

**creates**
202:15 213:5

**creating**
6:12

**credence**
252:18

**criteria**
17:21 63:7,
18 68:5
69:13 79:17
83:19 84:17
85:6,12,18,
24 86:4

**critical**
21:9,12 47:6
50:24 369:14

**criticism**
33:19 100:10
316:9 322:21

**criticize**
21:4 52:8

**criticized**
20:16,24
100:3

**Cross-talk**
62:10 81:17
87:1 148:12
200:14
268:13
299:1,5,23

**crystal**
108:22

**culpa**
206:20
**culprit**
348:25
**cultural**
375:15
378:21
**Cumulative**
260:1
**custom**
321:21
**cut**
147:23
**cutting**
27:12
**CV**
24:22 183:25
**cystadenomas**
51:2
**cystoadenomas**
51:16

## D

**daily**
259:18,21
341:9,21
**dairy**
284:23,24
**damage**
26:17 39:7
61:5 393:6
**Dan**
10:2 31:1
72:11 81:12
120:17
159:19
172:13 280:1
299:20
300:11
328:20 343:8
**Daniel**
8:20
**Danish**
331:11,13,15
333:9,12,16
334:25 343:1
**data**
19:1 40:23,
25 46:14
51:23 54:2
55:11 62:15
63:6,16
64:13 66:5,
6,25 86:7,8
93:3 98:11
99:15
107:13,15
110:1 113:6
116:2,22
117:2 125:8
127:6 136:15
139:3,5,6
140:13
144:10
153:11
157:3,17
158:11 159:8
170:8 176:12
177:3 180:25
183:13
244:25
256:19
263:11
284:3,4,11
285:18
287:1,8
288:16 291:8
296:12,19
297:5 298:22
301:1 302:19
303:10
311:23 319:2
322:24
323:3,18
324:21,25
325:6 326:4
332:19,23
335:1 342:15
347:19
349:10,24
356:13
360:3,9,20
361:7,25
362:17,25
363:23
364:17
365:4,21
366:5,22
367:11,15,18
375:21
382:20 383:5
386:17
388:17,19
392:22
**database**
62:14 141:9
258:12
261:14 270:7
276:8
288:16,17,18
291:7,13,22,
23 292:2,9
294:18
298:16
311:12,17
315:6,13
320:6,9,18
321:24 322:8
325:12,15
326:5,13,15,
19,22 330:23
**databases**
17:9,13,16
18:3,4,23
19:5 20:4,
10,15 21:5,
13 74:11
261:24 270:3
311:10
320:15 321:7
**date**
11:25 16:2,3
46:12
136:11,21
137:3 138:17
325:19
333:21 334:4
**David**
350:11
**day**
51:1 61:7
94:25 99:5
102:15 107:5
137:14
197:5,18,23
235:13,14
237:3,11
263:6,9
325:16
**days**
115:9 260:15
313:15
**DDD**
259:11,16,17
260:5
**DDW**
288:12,14
290:19
291:18
292:23
298:18
313:15
**De**
185:3
**DEA**
149:19
**deal**
388:24
**Dealing**
202:2
**Dear**
130:16,24
314:7
**death**
28:17 35:23
36:5,15
**debate**
172:2
**decade**
152:14
153:1,2
**decades**
18:6 44:5
238:8 239:15
**decades-old**
359:5
**December**
325:15
**Dechert**
9:5

**decide**
18:12 45:16
**decided**
41:3 111:6
**decipher**
380:19
**decision**
135:1 313:17 315:21 316:11,22
**declare**
8:4
**decrease**
170:9 205:13 207:20 300:23
**decreased**
268:23 297:13 298:19
**decreases**
245:22
**deep**
78:4
**defect**
143:17,19,23
**Defendant**
3:1,7
**defendants**
13:5 105:24 108:8 111:6, 13,15 112:3, 12,18,23 114:20,25 116:16 117:15
**defendants'**
110:3,4 111:1,21 112:9
**defending**
244:13
**defense**
125:24 304:21 305:5
**deficiencies**
40:1
**deficiency**
40:8 204:14 226:17
**define**
73:22 74:13 187:3 259:18 332:13 370:21 380:10
**defined**
26:13 41:25 211:24 259:20 341:9,21
**defining**
183:2 388:15
**definitely**
65:6
**definition**
140:8 259:18 387:17,22 388:2,5,9 389:15 390:7 391:22 392:11
**definitions**
371:5 388:13
**definitive**
228:1
**definitively**
64:20 360:6
**degradation**
108:20 115:13,22 116:3 148:10
**degrade**
115:19
**degraded**
117:6
**degree**
39:16,19 111:11 115:12 119:8 215:2 224:16,17
**degrees**
111:19 112:6 115:1 120:2 121:2 122:13 123:10 124:1,5 138:6
**demonstrate**
244:16 331:17 346:10 349:4 362:24 386:23 387:2 388:10 389:17 390:9 391:24 392:13
**demonstrated**
33:6 135:21 136:2 137:21 243:24 246:5 267:10 297:12 362:7,8 364:5 365:12,22 366:2,7,11 367:2 373:8 376:25 378:7 380:5 389:16
**demonstrates**
253:16 274:9 310:24 332:19 345:14 367:7
**demonstrating**
249:22 276:21 386:21
**Denmark**
331:5,6,11, 24 332:1,19 341:10
**denominator**
97:17
**density**
209:21
**department**
345:15,18,20
**departments**
344:24 345:1,2,8, 16,22 346:2, 4,8,12,18
**depend**
239:7
**dependent**
19:6 392:21
**depending**
56:16 73:10 100:14 102:1 175:21 332:17
**depends**
56:19 90:10 211:23 332:12 364:11 387:3
**deposition**
6:18 7:2,21, 23,25 30:6 120:22 217:20
**depth**
68:15
**deputy**
368:10
**descendents**
375:6
**describe**
12:24 33:13 140:10 186:23
**described**
29:9 40:2,25 225:16
**describing**
11:24 58:11 214:18
**description**
25:16
**design**
56:16,21 175:12 323:6 324:24 325:4

**designated** 119:6 122:12
**designed** 74:1,4,9 175:15,16 181:22 320:25 352:10
**designing** 175:20
**desirable** 337:25 338:14
**detail** 39:16 52:6 82:22 215:13 311:16,24 317:22 318:25 319:4,12 320:20 338:24 339:13,22 372:5
**detailed** 25:16 382:12
**details** 34:23 35:7, 15 91:5 112:10 124:13 148:15,18 152:16 154:14 249:1,4 262:3 321:23 328:6 335:12 346:7,17
**detect** 33:25 248:1 256:1,7 326:6 385:13,14,17
**detected** 128:8
**detecting** 202:25 246:10 385:8
**determine** 74:1,4 171:19 175:16 248:17
**determined** 378:19 379:5,11 380:16
**detoxifying** 393:7
**develop** 29:1 33:18 34:10,11,16 238:22,25 348:12
**developed** 33:24 34:10 35:6 36:6 37:24 267:12 293:7,9
**developing** 74:18 75:23 76:14 243:12 290:14
**development** 35:19 37:16 50:23 51:1 239:3 240:3 241:14 255:16 256:2,8,12 370:12,17 372:1,23 373:3,13
**diagnosed** 334:8
**diagnoses** 321:3 335:2
**diagnosis** 284:5 325:8 332:21 369:22
**diagnostic** 281:7
**diagnostics** 336:24
**dictated** 375:15
**die** 33:17 35:3, 10
**died** 33:11 34:1,6 35:13,25 36:11 326:20 367:4
**diet** 87:9 187:13 189:12 192:19,22 203:22 204:5,17 205:5,19 206:11,15,20 207:3,20 208:9,19 217:9 222:2, 14 225:18 279:20 280:11,22 369:13
**diet-** 24:19
**diet-disease** 202:17
**dietary** 24:15,20 25:3,5 63:14 64:10 68:22 79:2,15,22, 25 80:3,19, 25 82:22,25 83:4 84:15, 16,22 85:5, 9,17,20 86:3,6,23 93:2 101:1 176:9 177:4, 17 184:14,25 185:18,25 186:12 187:14 188:21 189:1 190:5 191:25 194:11 198:18 199:18,24 202:3,15 203:6,12,19, 23 204:2 205:25 208:16 215:18 216:2,23 217:3 218:12,15 219:14 220:6,17 221:23 222:12,18,24 223:16,21 224:5,14 225:2,13,21 226:3,21 227:7,24 229:19 234:13 281:4,5,12, 14 283:8,10 284:2 285:22,23 371:13 378:22
**diets** 25:2 87:5 88:9 189:10 191:20 198:6 204:18 205:11 206:23 207:9 224:6,8 226:13 228:4 283:1
**differ** 18:9,10 187:19 207:9 224:7,8
**differed** 204:18
**difference** 53:16,21 54:9,11 55:9

58:1 59:7,8, 10 60:6 76:25 143:15 144:16 175:6,17 181:13 182:4,8 196:20 237:12 256:25 273:19 277:16 297:4,7 302:8 386:20

**differences**
39:12 45:19 54:25 55:7, 25 65:19 67:13,20 167:20 168:4 175:22,24 176:2 180:1, 23 181:23 189:12 215:23 223:2 228:11 252:22 303:19 342:24 367:8 391:14

**different**
12:19 30:4 46:7 49:23 55:5 57:15 60:12 68:9 73:10,16 119:2,6,25 120:25 122:11,24 175:11,17,19 182:10 187:1,19 189:3,11,14 190:21,23 204:4 224:6 254:3 257:23,24 258:2 271:22 272:24 277:14 278:12,14,19 287:2 308:4 310:17 311:10,25 338:16 339:2,8 345:4 346:7 370:8,20,23 371:15 377:8 379:25 388:6,7,13, 17

**differential**
198:13 281:19

**differently**
42:2 83:15 191:2

**difficult**
45:18 88:20 161:25 162:8 168:2 246:24 360:7 368:16 369:19,23

**difficulties**
18:2 320:22 339:17

**difficulty**
246:9 254:16

**digestive**
314:23

**diligence**
68:9,19

**Diovan**
152:5,20,25 153:3 157:20,25 158:3,14

**direct**
65:17 67:6 86:16

**directly**
91:12 151:22

**dirty**
52:14

**disagree**
29:22 41:21 42:1 44:15 63:24 67:18 71:6,23 72:4 116:7 221:24 229:2 253:2 300:10,11,14 355:23 374:15 375:21

**disagreeing**
72:2 286:12

**disclose**
327:23

**disclosed**
12:11,23 16:3

**disclosure**
327:15,16

**discovered**
148:22 150:18

**discovering**
202:16

**discovery**
155:11

**discuss**
12:21 21:4, 12 26:1 27:4,13,21 35:9 58:20 67:11 75:5 79:2,15 82:21 87:4,8 105:2 124:20 185:17 199:22 204:13 311:5 320:17 339:17

**discussed**
25:14 26:15, 20 39:10 67:1 70:10 77:9 84:4 88:15 104:18 117:25 127:20 153:14 156:10,22 161:13 165:1 198:17 200:9 220:11 223:12 228:6,8 238:17 267:4 281:22 287:17,24 296:16 345:13 368:22 374:17 390:14

**discusses**
48:15,16 160:21 178:8 221:10 327:16

**discussing**
44:6 47:25 51:6 63:13 86:18 222:11

**discussion**
133:22 177:8 178:2 180:16 181:8 183:11 273:20

**discussions**
88:25 373:18

**disease**
173:15 174:12 210:19 221:7 222:4 277:24 278:3 286:13 330:4 369:4

**diseased**
296:8

**diseases**
277:6 330:25 374:21

**disorders**
262:15 368:21

**disprove**
364:25
**disrespectful**
122:7,8
**dissipate**
275:17
**distinct**
372:24
**distinction**
76:24
**distracting**
173:23
**distribution**
94:17 98:18
**dive**
78:4
**diverse**
347:4
**divided**
284:17
**divisions**
375:23
**DLA**
3:13
**DMBA**
22:21
**DMF**
149:19
**DNA**
26:17 28:7, 8,13,18,19 29:6 36:20 37:24 38:12, 16 39:2,6,8 65:17 67:6 371:9 393:6
**doctor**
8:19 10:22 14:22 15:9, 20 16:9,13 18:1,23 20:14 21:20 25:12 27:1, 23 28:20 29:16 31:11, 12,24 35:10 36:19 37:2 39:10 40:10, 20 41:5 42:4,15 44:23 47:5 52:25 56:5 58:3,22 68:2 69:5,25 70:22 73:5, 25 74:15 75:16 77:7 78:9 82:8 86:16 88:14 89:7,17,23 90:13 91:14 93:1 99:21 101:16 102:24 103:20 105:10,14 111:5 113:11 115:16 116:14 117:9 118:16 119:16 120:5 123:15 124:14 129:6 130:9 131:24 132:11 141:18 142:15 143:14 145:3,23 147:12,22 149:23 152:3 153:7 154:21 160:14 170:13 173:8 174:17 175:6 179:13 181:12 183:15 185:3,7 186:9 192:16 194:6,10 198:16 200:2 201:22 203:12 207:12 210:14 214:11 215:7 216:9 217:15 219:5 222:15 223:3 225:5 227:1 228:15 229:6 231:23 238:5 239:1 240:17 243:2 244:11 246:1 249:5 250:1, 14 264:3 274:6 275:24 276:19 278:5 279:18,22 280:9,25 285:23 287:17 288:3,23 289:24 296:6 298:14 304:20 305:4,24 306:4,19 307:7 308:21 312:8 313:1 317:9 319:23 320:6 325:11 326:3 327:8 328:7 329:23 330:14 331:4,16 332:18 333:2,8,19 334:7,16 335:5,24 336:23 337:14 339:16 340:8,25 343:23 344:11 345:11 347:22 350:21 352:25 354:24 356:14 357:6 362:3 363:24 364:4 365:11 367:19 370:3,16 376:1 378:5 379:13 385:12 386:20 394:2,12 395:7
**doctors**
265:25
**doctors'**
19:11
**document**
3:25 42:16 43:1,3,5,8,9 46:9 50:13, 20 51:20 57:10 60:17 64:22 66:10, 11 68:1 88:21 89:16 92:19,22 105:13 132:23 133:5 140:4 210:11 240:17 260:20 287:15 289:13
**documented**
260:13 261:19 262:8
**documents**
9:24 104:13, 15,17 105:2, 6 107:13 131:19,21 132:7,15,19, 21,25 344:21
**dogs**
366:3
**doing**
31:3 56:11 91:13 99:23 175:20 179:13 182:10 188:11 228:4

285:12
339:23 348:9
**dose**
50:22 51:15,
17 55:12
57:25 61:6
259:21 260:1
388:22
392:21 393:5
**doses**
36:2,18
43:25 44:13
51:13 52:10
55:1,22 56:4
71:12 259:18
341:9,21
386:1,12,17,
18 387:5
390:17,25
391:6,9
392:22 393:1
**doubling**
188:17
189:23
195:9,17
211:8
**doubly**
209:10
**doubt**
205:6 300:3
351:15
353:10
356:19
**dozens**
387:6
**draft**
304:22
305:2,25
307:14,22
309:21,22
311:22
312:4,8
**drafts**
254:18
**dramatic**
356:25
**drastic**
90:2
**draw**
43:19 92:23
94:15 232:7
241:3 306:4
313:1
**drill**
101:8 286:7
**drinking**
92:9 190:9
**driving**
303:18 349:3
375:24
**drop**
193:5 342:7
**dropped**
341:20
**drops**
341:19
342:19
**drug**
11:6 18:16
23:6 35:18
101:10 119:9
121:3 122:15
136:16
142:25
149:25
150:25
151:16,19
158:6 245:17
257:10
308:14
339:23
**drug-based**
260:11
261:17,23
262:7
**drugs**
68:24 105:21
108:4,7
122:24 123:2
145:1,21
157:12
260:12,15,25
261:18,25
262:8,16
263:17 275:5
277:23
278:24
302:13,16
303:21
339:18
341:24
**due**
32:8 33:11
34:1,6 68:8,
19 87:13
117:17,19
168:8 204:4,
11 239:11
302:10
308:11 367:5
380:6 385:2
**duly**
8:14
**duplication**
28:8
**duration**
34:15 190:8
315:7,13
**dust**
344:13,23
346:3,14
347:3
**Dutch**
98:10
**dysplasia**
238:19

**E**

**e-mail**
3:5,11,16
313:4,6
**E.T.**
327:17,18
328:8,13,15,
24
**earlier**
40:13 137:20
144:16 160:9
173:8 213:18
220:11
335:11
**early**
243:9 369:22
**easier**
92:14 348:11
**easily**
356:12
**Eastern**
395:12
**easy**
215:18
355:20
**eating**
224:6
**edge**
27:12
**edit**
254:20
**editor**
313:16
368:11
**editorial**
314:15
**editorials**
21:9 277:10
**editors**
315:24
316:18
**education**
236:15 237:7
**effect**
35:11 216:1
255:14
386:3,5,6,22
**effective**
18:21 168:2
**effects**
33:11 34:2,
7,19 35:13
47:23 48:3
49:6 50:2
51:10 60:19
73:15 74:4
90:2 107:25
143:2 213:16
216:8 217:14
226:11
352:12 367:6

**effort**
181:10
208:10
**efforts**
208:2 352:1
**eight**
93:4 119:11
120:3 121:6
122:17
123:11
124:1,5
134:1
**either**
52:23 153:18
157:4,18
158:11
260:16 273:5
**electronic**
291:9
**electronics**
9:14,16
**elementary**
314:20
**elevated**
131:10
135:21 136:2
137:7,12,19,
21 138:10,
21,24 139:1
164:24
**elevation**
189:6
**EMA**
104:17,22
154:9 157:19
159:9
**emergence**
239:15
245:11
**emerging**
375:14
**Emery**
113:2,6,8,
12,19 114:6
130:13
131:3,16
133:21
134:16,23
**Emery's**
131:7
**emphasize**
174:15
**encompass**
76:4
**end**
29:15 182:18
324:2
**endogenous**
86:19,22
87:4,21
88:2,4,8,16
89:2,10 98:1
99:12,16,18,
22 100:4,22
101:17,25
102:7,14,15,
20,25 103:22
104:1
**endogenously**
87:2 94:7
98:12 100:7
102:8 104:19
105:3
**endpoint**
47:7,14
171:15
**endpoints**
171:5 172:5,
8 213:14
215:15,19
216:4,17,24
217:7 218:2
221:17
**ends**
72:20
**endurance**
14:13
**energy**
196:24
209:7,20
211:4,8,10,
17 212:2,6
234:13
**English**
251:24
254:3,7,11,
15,16,19,22,
25 255:1
**Enhance**
220:7
**enrollment**
283:2
**enter**
7:17
**entered**
325:12,14
**entire**
301:24
364:25 384:3
**entirely**
153:15
183:12
223:17
285:19
370:14 377:4
**entitled**
390:3,4
**environment**
375:11 376:5
**environmental**
27:17 242:19
369:13
375:18
376:13 377:1
378:8 379:3,
8
**environmentally**
378:19
**epi**
69:7
**epidemiologic**
64:12 74:21
75:1 144:24
217:25
227:15
229:20 245:1
**epidemiological**
18:2 20:16
21:6 24:16
62:15,25
63:14 75:17,
19 176:11
184:4 208:17
217:17
243:22
244:14 246:6
248:3,16
306:20 319:6
**epidemiologists**
27:16 245:9
**epidemiology**
16:14,17,20,
21 17:4,8,11
18:7 24:10,
11,13 25:9,
11 74:1,3,8,
10 117:11
139:14
183:17,21,24
207:14
219:14 220:7
225:13
226:16
227:11
**epigenetic**
29:4
**equal**
190:14 235:9
**equally**
215:3
**equate**
38:23
**equations**
236:6
**equivalence**
175:15
181:25
298:13
**equivalency**
175:22
**equivalent**
101:10
**error**
198:1,5,17

199:14,17 200:3 202:3, 15,22 203:7 220:16 221:3,12,23 222:12,24 223:4,5,6,7, 8,14,18 229:22
**errors** 200:7,8,23 221:22 223:12
**esophagitis** 322:1
**esophogeal** 78:16 83:5,7 84:14 239:17,23 262:15 310:5 334:10,15 368:23 376:16,23 378:1,8 380:4
**ESQ** 3:4,11,15, 18,21
**essentially** 18:15 49:15 137:4 156:11,12
**established** 337:6
**estimate** 14:25 41:15 87:20 96:6 163:19,20 178:9,13 188:22 198:2 209:17 210:21
**estimated** 100:15 190:3,4,19 195:25 196:1 199:14 211:3 221:3,13
234:15 235:17 237:10
**estimates** 102:13 161:24 162:7 188:24 197:25 198:2,5 223:25 224:24 234:11 236:5 345:9
**estimating** 189:15
**estimation** 96:1,3,11 192:13 199:17 213:16 216:1 218:12 220:16 223:19
**estimations** 199:23
**et** 38:15,16 237:7 277:7 384:13
**et al** 93:8 127:21 128:4,15
**ethnicity** 321:20
**European** 104:17
**evaluate** 366:23 372:22
**evaluated** 350:7 352:17
**evaluating** 87:12 297:10 316:15
**evaluation** 60:19 381:19,23
**evaluations** 382:13
**events** 20:17 21:14 161:23 162:6
**eventually** 359:15
**evidence** 41:11,20 44:24 46:12, 21 55:20 65:15,16 66:18 67:6, 21 68:23 70:13,21 74:16 75:22 76:6,13 77:25 81:7, 23 82:16 83:17,24,25 84:3,10 85:20 144:2 153:13 157:8 177:25 178:4 183:4 220:7 224:12 226:23 227:20 241:21 242:15,24 249:19,21 266:14 268:2 275:4,8,9 282:22 287:6 354:3,18 357:1,17 364:7,22 372:25 373:10,15,19 374:10,13 375:13 380:14 382:23 383:7,20 389:6 390:16
**eviron-** 379:5
**ex-** 275:19
**exact** 29:23,24,25 30:15 37:17 58:11 100:22 107:1 124:8 125:2 132:10 175:5,14 331:20,23
**exactly** 31:6 47:12 52:23 103:8 107:2 108:11 114:18 148:15 149:17 211:12,25 301:23 325:24 326:2 339:5,7 355:25
**EXAMINATION** 4:4 8:17
**examine** 282:21
**examined** 8:15 40:23 43:25 44:13 226:10 244:4,6 283:24
**examples** 90:6 305:3 360:4
**exceed** 390:18
**exceeded** 150:24 393:4
**excellent** 17:18
**excessively** 66:15
**exclude** 175:12 182:12 242:5 252:4 255:5

256:12
**excluding**
168:1
**excuse**
301:3
**Executive**
43:18
**exercise**
363:21
374:11
**exhibit**
4:10,11,12,
13,14,15,16,
17,18,19,20,
21,22,23
5:3,4,5,6,7
15:6,8,12,17
42:11,12
92:4,5,23
94:2,3 98:6
118:12,13
126:4,6,8
130:5,6
139:20,22
150:10,13
159:21
184:10,11
193:25 194:3
201:16,18,19
220:1,3
231:19,20
233:17,18
237:25 238:2
240:13,14
250:5,10,11
255:10,11
258:5,6
263:24,25
266:2,3
268:9
271:10,11
276:2
279:14,15
282:4,5
289:4,6,7,9
305:14,15
312:22,23
319:19,20
327:4,5
340:21,22
350:2,3
353:22,23
371:20,21
381:4,6
394:9,10
**exhibits**
4:25 5:2
10:17 131:20
132:1
**exists**
391:22
392:11
**exogenous**
87:23 97:25
100:24
101:19
102:17,21
103:1,3,9,
10,23 105:8,
10,16,25
**exogenously**
96:23 97:4
103:15
**expect**
180:2 245:18
247:8 387:14
**experience**
31:22 36:3
107:10 113:3
114:21
116:19
117:20
216:25 239:1
241:7,12
262:10,13
263:1,3,13,
15 330:20
355:18
360:17
**experiences**
239:25
**experiment**
124:1,5
363:7
**experimental**
41:11,19
61:13 66:24
70:13,21
98:9 352:9,
22 354:3,19
355:6 357:16
359:7 360:25
382:1,23
383:8 385:5
**experimentall
y**
354:14 355:1
**experiments**
26:6,19
27:19 61:7
103:16
112:11
116:5,10
128:14
363:17
365:2,7
**expert**
11:1 12:10,
12,22 13:10,
15 15:10,21
16:4 21:21
50:12 105:15
125:5,8,24
126:14,18
129:14
133:11,13
185:8,16
208:5 266:20
287:18
305:1,5
**expertise**
203:14
**experts**
69:1 133:7
304:21
**expiration**
136:11,21
137:2 138:17
**explain**
23:19 198:14
275:20 301:5
344:7
**explained**
75:9 301:13
344:3
**explaining**
181:13
**explains**
297:4
**explan-**
275:2
**explanation**
36:12 228:12
273:21
274:19,21
275:22
**Explorys**
288:16
291:7,13,23
292:8 294:18
311:12,16
315:13
320:6,9,18
321:21,24
326:15
**Exponent**
329:1,7
**expose**
86:7
**exposed**
50:24 111:17
112:5 123:16
139:6 163:1
317:5 345:15
346:2,11,13
359:8
**exposure**
16:17 17:1,3
26:14 28:12,
21 29:13,17
31:13,23
46:18 47:7
62:18 63:2
64:10 74:2,
4,16 75:22
76:13 79:16
80:20 82:25
83:4,7 84:6,
7,23 85:9,21
87:14,21,23
88:2,4,8
92:10 93:2

94:17 95:10 98:18,24 99:1 101:1, 11 102:13, 15,17 150:24 165:21 166:16 176:16 182:14 213:6 217:16 218:2,7,13 225:7 238:7 239:3 240:2 241:14 243:17 245:17,25 247:5,9,15 257:24 258:2 260:7,19 261:24 271:5 344:3,8,12, 19,21,22,24 345:9,12,23 346:9,21 347:3,4,12, 17 359:9,22 367:15 385:7

**exposures**
26:3,25 27:17 28:10, 12 85:22 98:12 186:12 207:19 209:20 247:17 369:13 371:10

**extensive**
70:13,20 155:11 355:18

**extensively**
39:11 52:7,8 55:16

**extent**
42:23 254:21 316:25 374:7 375:14

391:12 393:13

**external**
374:22

**extra**
10:14 111:16 112:4

**extracted**
17:15

**extraneous**
10:19

**extrapolate**
286:8 355:21 356:12

**extrapolated**
386:18

**extrapolating**
355:16 359:11

**extreme**
111:10 138:4 212:23

**extremely**
18:5 31:21 249:21 260:9 261:16 385:21

**extrinsic**
370:3,22 371:7,25 372:23 374:10,14 376:18 377:21 379:17,18 380:6,10,18, 22

**eye**
65:3 356:24

**F**

**fact**
36:14 49:22 69:21 82:24 83:8 87:20 204:21

205:11 207:8 225:12 226:17 251:15,18 252:5,20 253:16 277:18 303:21 308:12 309:6 311:8 316:12 349:16 358:22 367:3 387:9

**factor**
205:11 210:17 211:15 319:2 348:15,16,17 349:16 371:6 375:24

**factories**
345:3,13 346:21,22

**factors**
115:24 188:19 196:22 211:2 237:16 293:22 295:25 296:15 297:4,10,23 301:14 302:2,11,16 303:7 306:11 307:17,25 308:3,8,25 310:10 335:3,5,17 336:12,14 349:17 369:6,8,15, 22 370:3,4, 11,17,20 371:1,7,13, 15 372:1,23 373:1,9,11 374:11,14,22

375:20 376:5 378:22,24 379:17,18 380:6,7,11

**factory**
148:23 345:2,4,8,17 346:4,17

**fair**
14:20 47:16 138:19 172:19 212:17 240:8 242:4 316:12

**fairly**
36:1 55:22 179:24 187:14 260:17

**faith**
36:13

**fall**
164:25 374:12

**falls**
66:6 361:13 380:17

**false**
200:18 223:9

**familiar**
103:6 118:5 193:15 203:16 206:14 207:15 248:21 320:13 321:9 322:4 333:16 339:22

**families**
375:7

**family**
236:7,15 295:16 297:24 375:7 379:6

**famotidine**

256:25 292:12,17, 20,25 293:11,16, 20,23 294:3, 5,8,11,13, 18,23 295:2, 6,10,15 296:2,7,20, 22 297:3,14 298:2,18,20 300:23 301:9,12,14, 20 302:4,9, 25 303:4 304:12 320:1 340:12 341:15 342:20 343:1

**fantastic**
254:10

**far**
115:15 150:23 177:25 205:18 217:12 227:25 229:21 230:7 275:21 364:21 367:15

**fashion**
392:22

**faster**
390:21

**fat**
285:1

**fatal**
316:17

**fatty**
369:3

**fault**
280:1

**favor**
222:13 355:13

**FDA**
32:13 88:15, 21,25 104:10 105:18,24 106:2,6,8, 14,17,21 107:21 108:15 109:11 110:25 113:8 115:7 116:16 117:16 127:21 130:10,21 131:16,18,20 134:1,15,19, 21 135:1 136:5,9,19, 25 137:5 138:14,15 154:2,5 272:25 278:17

**FDA's**
135:5,7,19 136:17

**feature**
26:16

**feel**
43:6 57:11 67:2,23 252:25

**felt**
133:14 167:19 315:2 316:6

**female**
50:24 51:2 209:9

**fewer**
341:23

**FFQ**
209:9,18 211:9 215:8

**FFQS**
218:6

**fibrosis**
34:11

**field**
21:25 74:10 183:16,21,24 205:16 217:4,9 225:12,16,18 226:24 230:1 277:22 286:11,12 338:13 339:12 340:5 365:5 378:17 380:21

**fields**
18:8

**fifth**
196:15 197:14

**Figueroa**
3:9

**Figure**
373:23

**figures**
311:25

**filled**
281:6

**final**
6:19 312:1

**finally**
14:17

**financial**
317:19,23 318:13

**financially**
7:14

**find**
36:11,14 49:14 66:6 74:6 76:19 77:15 115:7 116:9 138:9, 20 153:4 159:4 177:13 182:6 192:7 205:2,15 224:18 246:25

261:15 269:21 275:11 316:4 317:3 321:2

**finding**
32:12 37:19 39:3,8 56:10,13 67:15 87:8 113:12 137:6 169:17,23 174:16 176:18 177:19 185:11 234:23 274:8 276:13 302:22 309:2 311:8 324:2 359:12 363:18

**findings**
113:13 133:15 135:10 168:12 177:10 178:6 179:23 180:19 210:6 224:21 265:7 268:6 274:2 306:24 322:15,18 323:2,25

**finds**
300:21

**fine**
9:1 14:6 77:1 212:15 214:4 230:18 284:20

**finish**
299:7 329:4

**finished**
154:16

**finished-dose**
155:14

**firm**
328:15
**first**
10:7,19 14:7 16:13 47:4 60:25 62:5,6 65:9,12 69:6 92:3,11,16 94:11 106:2 130:24 140:2 141:3 142:6 146:6,9,10 148:21 150:12 162:21 178:7 185:3 194:9 220:5 232:1 233:23 239:3 240:2 241:14 244:7 250:19 254:13 255:16 258:9,13,19 264:7 269:21 270:21 280:14 282:10,13 288:12 290:9 293:8,25 305:21 312:12 317:1 320:2 323:25 327:8,11 333:25 347:14 352:7,21 354:2 357:17 358:5 360:24 372:1,15 376:10 381:9
**first-time**
325:7
**fish**
93:16,17 96:1,22 97:13,14,18, 20 365:23 366:1
**Fish-with-vegetable**
94:8
**five**
54:15 72:13, 20,21 102:2 134:11 209:19 213:24 243:9 247:8 257:18
**five-fold**
213:7 214:14
**five-minute**
72:15
**five-year**
255:25 256:6,20,22 257:12,20
**flag**
383:25
**flaw**
316:17
**flawed**
80:18 278:18 348:13 349:21
**flaws**
217:2
**Floor**
3:10
**Florian**
90:13,22 91:9 250:7
**fluid**
128:12,13
**focus**
68:11,14 80:6 83:10 84:1 206:10 207:7 347:1, 7 348:11 368:14
**focused**
32:3 69:8 82:5 188:25 205:8 215:14 217:24 219:18,19 223:19 246:3
**focuses**
187:11 207:25
**focusing**
206:20 207:1 228:4
**fold**
121:10
**follow**
24:19 48:5 92:14 197:13 247:18 258:21 387:1
**follow-up**
19:24 20:2, 8,9 161:8,22 243:23 244:15 246:12 247:1,5,7 248:1,16 249:6,7,11, 14 251:2,4, 9,11 252:3 253:3,5 255:4,24,25 256:6,20,22 257:12,18, 19,22,23 258:1,25 259:6 264:11,17 265:2,6,20, 23 270:18,23 394:15
**follow-ups**
249:13
**following**
119:9 121:3 122:15 134:9 205:23 250:15 325:9
**follows**
8:16
**food**
86:24 97:1 98:11 101:20 103:11 176:12 187:9 191:14,19 203:13 204:12 221:5 236:8 281:21 282:12,22,25 283:25 284:17,18,23 285:3,24 286:5,17,24 287:7
**foods**
101:10 187:6,7 285:1 286:2
**footnote**
236:4 237:17
**form**
31:5 37:3 68:4 69:12 83:21 102:8 110:19 111:16 112:5,19 117:17 186:24 188:2
**formation**
65:18 67:7 86:23 87:5 88:16 89:2, 10 99:16,18, 22 100:4 101:17,25 103:3,9,22, 23 104:1 118:17
**formed**
26:24 38:17 86:19 87:2 94:7 97:2 98:2,12 100:6 104:19 105:3 106:5, 10 107:8 113:13 116:7

**forming**
50:17 97:4 100:16 103:15 109:4 119:18 120:7,16
**forms**
62:19 102:6 245:22 246:7,16
**formulate**
90:19
**formulated**
329:14
**forth**
21:2 124:7
**found**
55:16 77:19, 21 80:15 81:6,22 91:2 105:17 107:4,17,21 113:21 116:15 124:22 125:18 136:5 137:8 142:1 146:2 162:18 163:5 176:15 185:18 188:6 232:21 266:14 270:11 281:18,20 300:20 302:5 308:24 359:15
**Foundation**
350:9
**four**
29:10,11 53:22,25 54:4,16,18 87:22 102:16 154:4,6 168:3
**fourth**
190:13
255:23,24 258:18
**frame**
71:1 140:9, 18 144:6 156:14 271:25
**frames**
271:22
**France**
232:1
**free**
25:21 38:4 43:2,6 57:11
**Freedman**
198:24 201:15 202:7 206:6
**frequency**
176:12 203:13 282:25 285:24
**frequently**
358:1 390:21
**Friedenreich**
282:14,15
**Fristachi**
89:8 96:12 99:24
**frog**
365:20
**frogs**
365:19 366:1
**front**
9:21 25:19 92:8
**fruits**
284:19,25
**fulfill**
63:6
**fulfilled**
63:17
**full**
62:5 65:9,12 106:24 161:19
220:25 306:1,3 372:15 376:10
**fully**
268:19 269:3,4,10, 15 270:11 276:8,10
**fumes**
344:13,16, 19,23 345:10 346:3,14
**Fund**
208:4
**funded**
209:4
**funding**
360:12
**funds**
207:24
**Fung**
381:13
**future**
177:24 265:4

**G**

**gallery**
6:23
**Gao**
127:21
**gastric**
22:18 62:20 63:2 78:16 85:15 128:11,13 184:16 185:2 186:10,11 189:4,8 192:8 204:3, 5,11,20,25 205:6,22 226:10 231:25 232:11 233:22
234:14 236:8,16 238:16 239:11 255:15 256:2,24 264:4,22 313:21,23,25 334:14 375:1,8
**gastro**
262:14
**gastroesophageal**
368:24
**gastrointestinal**
176:16 290:14 320:1 327:10 330:4
**gather**
18:13
**gears**
139:13
**gender**
321:19 324:3
**general**
12:24 16:14, 20 17:12,22 23:10 47:20 48:20 49:11 51:7 57:17 79:7 163:11 165:19 207:21 245:9,22 272:8,14 277:3 284:25 285:3 294:4 296:24 303:1,13,17, 23,24 304:3, 8,13 306:10, 15,22 307:1, 16,24 308:23 309:16 310:6 311:9 321:2 350:25

351:8,9
353:7 378:17
391:7
**generalize**
222:9
**generally**
218:10 225:7
247:6 248:10
286:4 385:3
**generate**
203:22
**generated**
99:12 285:17
**generates**
131:10
**generating**
64:14 224:3,
22 227:25
**generic**
141:8
**genes**
371:3
**genetic**
29:3,9
351:14
374:18,19
375:20
380:23
**genetically**
379:5
380:15,16
**Geneva**
42:17
**GERD**
297:25
330:6,9,12,
16,21 331:5,
18 332:7,11,
13,21,25
**getting**
19:6 29:11
97:7 99:4
226:8 285:10
**GI**
87:13 238:23
240:8 256:13
277:9,22
293:10
295:25
297:1,8
314:23
368:22
369:17
380:25
**give**
30:17 31:11
37:20 59:6,
15 81:14
102:4 105:15
110:16
116:14
185:11 210:1
232:23 273:6
304:6 315:10
343:10 348:6
366:16
386:12
394:18
**given**
34:9 36:18,
21 51:23
55:13 69:20
91:8 117:3
225:12
384:15
**giving**
315:23
**glad**
243:19
**GLP-1**
11:6
**goes**
18:13 109:15
110:10
277:17
**going**
36:4 43:19
72:12,23
115:19
129:18,22
141:2 159:24
172:22 204:1
211:20
231:1,11
274:7 279:3,
7 299:11
313:1 343:7,
16 374:13
386:6 393:20
394:22
395:10
**gold**
284:3 337:15
**GOLDENBERG**
3:18
**Goldenberglaw**
3:18
**good**
8:19 14:25
72:21 116:21
129:18
145:10
172:18 231:7
245:7 253:10
255:1
257:18,19,21
279:3 308:5
337:16
387:11
**grain**
170:10
**gram**
93:12,15,18,
21 96:24,25
97:13
**grammar**
255:1
**grams**
97:18,19
**granted**
134:15
**granting**
134:8,22
**graph**
127:7
**great**
68:15 318:25
319:3
**greater**
54:16 88:9
102:20,25
103:23
190:13
192:23
210:20 235:9
237:11
243:11
301:14
**greatest**
37:13
**GREENBERG**
3:2
**Greg**
3:24 7:10
**grew**
375:4
**gross**
360:15
**ground**
14:2
**group**
55:19 57:20,
24 140:11
165:21
166:10,11
168:1 182:5
189:21
190:18
192:14
196:2,4,20
205:9 235:18
237:5 297:3
301:8,9,15,
17,24 302:7
304:3 368:12
385:5
**groups**
60:3,6,8,12
74:5 166:16
167:21
192:5,12
207:2 224:6
237:19 259:7
281:21
284:18,23
285:3 286:24
302:2,12
333:23
335:16 339:3
386:16

**growth**
341:24
**GSK**
105:19 107:17 110:5 115:7
**guess**
16:19,22,25 20:1 31:20 38:20 44:20 45:16 51:19, 20 72:12 74:12 76:1, 3,20 117:14 122:22 123:1,2,10 142:24 143:7,10 144:9 145:17 154:7 180:15 181:8 211:23 216:14 218:9 222:3 231:2 245:6 254:5 260:15 277:15 278:11 284:13 285:2,4 296:11 308:6 339:14 348:10 349:18 351:23 355:12 361:15 372:7 385:20 387:3 388:14
**guessing**
12:4 188:2 224:23 301:20
**guidelines**
119:10 121:4 122:15 124:7,9,11

**H**

**H-R**
92:12
**H.-o**
327:16
**H2**
258:11 260:16,22 261:4 273:5, 8 277:19 278:14,22 303:22 330:20 331:1
**H2r**
259:7 333:1
**H2ra**
268:2,14 269:23
**H2ras**
269:1 330:9, 17 332:2,8, 20
**half**
323:25 324:7
**hamsters**
366:8,9
**hand**
33:17 151:16 181:9 296:18
**handle**
393:8
**happen**
142:7
**happened**
151:8
**happy**
50:8 88:22 89:15 103:7 357:2,10 392:5
**harbor**
376:17
**hard**
58:20 204:16 385:19
**hardest**
379:7
**harmful**
226:17
**Harmonization**
121:5 122:17
**Harvard**
206:16,25
**Hawaii**
375:5,9 376:3
**hazard**
60:22 163:2, 10 164:1,14 166:23 170:1 196:11 267:19 273:17
**hazards**
240:25 358:4 381:13
**head**
14:11 124:9 246:21 377:9,19 378:3
**health**
18:3,4,16, 23,25 19:2, 5,7,22 20:15 21:4,13 40:23 42:5, 16 44:9,16 45:4 46:2,6 47:24 61:18 62:24 63:12 66:1,8,9 100:2 103:2, 24 105:1 152:24 153:2 206:9,17,25 221:6 222:1 328:25 358:4 389:11
**Healthcare**
146:16 149:5
**hear**
82:10,11
147:25 214:2,3 279:22 357:11
**heard**
193:19 248:13 322:21 328:17
**heart**
277:7
**heat**
107:25 108:21 115:20,24 116:9 123:25 131:9 137:10 139:7
**heated**
117:5
**held**
6:5,10
**helicobacter**
26:21 204:21,24 205:21 239:11 264:5 368:25 375:2 379:11
**help**
140:17 284:8 323:21
**helps**
98:7
**hepatic**
50:23 61:5
**hepatitis**
369:2,3
**heterocyclic**
184:15 185:1
**hexavalent**
248:12,13,25
**Hidajat**
84:17 85:5, 17 86:3 343:23,25 344:9 345:13

**high**
36:2 55:12, 22 71:11 117:6 189:4 191:9,14,19, 20,25 192:1, 6,14 227:3 228:21 229:8 232:9 285:1 345:15 353:6 385:6,24 386:1,16

**high-fat**
284:24

**higher**
54:13 87:22 96:6 98:25 99:2,3 102:11,17 113:22 116:1,25 123:11 127:6,14 142:2 165:17,21 166:10,15 192:7 195:1 196:5 297:3 303:4,13,25 304:2 307:3 308:16 309:7,10,14 330:21 332:2,9,11, 15 340:9,10 345:23,25 346:12 347:13 349:5,6 389:6

**highest**
96:23 192:6 195:8,16 197:2,22 234:7,20

**highlight**
119:3 131:1 177:9 294:7

**highlighted**
98:8 149:11 181:1 358:11

**highlighting**
99:10

**highly**
29:5 45:17, 24 46:4,11, 15,22 65:21 66:2,17 72:5,8 80:18 81:2 126:19, 24 176:14 205:8 229:21 261:2 278:18 348:13 349:21 353:8 371:4

**Hill**
78:10,12,15, 20,24,25 79:11,12,14, 20 80:16,21 81:2,8,24 82:4,17,24 83:10,13,18, 23 84:1,5, 11,17 85:6, 12,18 86:4,6 227:17

**hint**
163:16

**histamine-2**
266:8

**histopatholog ic**
238:18

**histories**
190:5

**history**
189:16 203:23 226:24 236:8,15 295:11,16 297:25 312:14 359:9 379:6

**hit**
280:2

**hits**
29:9

**hoc**
170:4,6,14 171:20 172:1 275:19

**hold**
84:19 200:15 382:4

**holds**
342:20

**Holmberg**
280:15,17

**Holy**
299:18

**honest**
27:11 49:1 97:22 114:17 122:7 260:11 262:6 356:6

**Hong**
140:14

**hope**
3:14 60:14

**hospital**
19:11 23:10 140:14 333:14

**hour**
69:6 72:13 231:2 279:3 343:8

**hours**
14:24 15:3 132:12

**Howden**
313:14,18,20

**HR**
196:16 267:18

**Hrudey**
88:12 89:8 90:16,23,24, 25 91:3,7 92:3,12 96:12,16,19, 20,22 97:9, 24 99:24 102:8

**Huahai**
148:22 149:12 150:1 151:1

**Huff**
350:15,16 354:6,8,25 383:17

**human**
24:15,16 25:4 40:20 41:1,4 45:6 64:2,6,15, 20,22 65:7 66:9,25 67:8,10 68:6 69:14,22 70:1,3,8,14 75:3 76:7 88:5 89:11 92:10 111:10 131:11 224:1 227:11,14 248:7,9 249:23 352:16,20 353:9,11 356:8,9,11, 12 358:4,7, 23 360:9 361:8,14,17 362:4,8,22 363:5,9 364:7,19 366:22 367:14,17 381:12 388:16 389:10

**human's**
39:13

**humans**
25:3,6 28:22 29:10,19

31:15 33:3 38:25 39:23 40:3,17,19 41:16 44:21 45:11,20,25 46:13 62:2 64:13 65:21, 22 66:2 70:24 71:8, 11,18 72:6 74:18 75:24 76:15 156:17 229:17 230:12,22 239:2 240:1, 25 241:8,13 352:12 353:15 354:2,15,20 355:2,22 356:2 359:12,16 360:6,24 364:23 365:8 366:18,21,24 367:9,13 381:25 382:8,20,25 383:5,10 384:2 389:5

**humidity**
108:1,21 111:18 115:20,24 116:9 119:9 121:3 122:14 139:7

**hundred**
20:6,12 97:13,19 132:11 230:11 252:2

**hundreds**
132:6 254:17

**hungry**
172:16

**hypoth-**
56:25

**hypotheses**
18:19 59:20 203:22 374:4

**hypothesis**
56:7,14 57:1,6,7 58:3,16,18, 25 59:1,2, 13,24 64:13 116:6 151:21 164:25 173:19 174:14,18, 20,21 175:2, 4,8,9,13,18, 25 177:22 178:1 179:15 181:14,17,20 205:17 224:2,22 225:3 227:25 275:2,19 278:23 298:6 372:10,20 373:18

**hypothetical**
142:24 143:3 182:24 183:13 216:6

## I

**IARC**
40:22 41:25 42:4 64:4,25 70:12,20 71:3 208:11 230:8 240:18,19,23 242:18 356:3 361:19 383:3,24 384:3,6,22

**IBM**
291:22

**ICD**
320:11 323:13

**ICD-10**
323:8,10

**ICD-9**
320:8,14,24 323:9,13

**ICH**
119:10 124:7

**idea**
116:19 169:10 229:17 316:24 373:23

**ideally**
337:3

**ident-**
182:2

**identical**
60:9 73:23 298:1,11,17 300:21 301:23 378:6

**identically**
302:17

**identificatio n**
15:18 42:13 60:23 92:6 94:4 118:14 126:9 130:7 139:23 150:14 184:12 194:4 201:20 220:4 231:21 233:19 238:3 240:15 250:12 255:12 258:7 264:1 266:4 271:12 279:16 282:6 289:8,10 305:16 312:24 319:21 327:6 340:23 350:4 353:24

371:22 381:7 394:11

**identified**
140:12 141:8 192:14 196:3 291:8 292:11,12 349:16 358:5 360:24 389:2

**identify**
192:5 352:11 370:1 378:14 389:10

**identifying**
198:6 358:3 369:7,20,21 381:12

**ignoring**
242:23 359:20

**II**
140:1 200:3, 7,13,17,23 201:3,12 223:8

**illustrate**
232:17

**imagine**
331:7

**immigrant**
376:1,4 378:6

**implemented**
147:2,16 150:4 151:4, 9

**imply**
154:6 160:16

**implying**
166:12 256:14

**importance**
360:12

**important**
16:16 17:2 47:14 87:14 116:23

174:16 208:17,19 223:3,5 245:24 256:21 272:24 273:2,12 336:23 359:21 366:17 367:12 369:8

**importantly** 376:12

**impossible** 29:6

**improper** 30:25

**improve** 208:6

**impurities** 135:8

**impurity** 154:3

**inability** 322:17

**inadequate** 386:22

**inappropriate** 72:9 81:3,19 120:13,22 121:21,25 163:18 299:17,25 300:4,8

**incidence** 226:14 302:23 303:3,5,12,15 304:7 305:18 306:9 314:8 324:21,25 325:5 330:16,21 331:5,17 332:1,7 335:22

**incident** 147:4 168:18,19,23 169:5,12,25 170:16 171:4,9,13 307:23

**include** 18:17 32:24 49:15 67:9 80:10,19 81:7,23 82:16 83:17 84:15 109:20 144:7 168:13,14,25 169:7,14 193:10 207:20 333:13 344:16 361:17 380:12

**included** 50:11 80:3,17 81:3 128:15 164:21 293:14 294:21 304:11,14 337:3,5,9 371:14

**includes** 67:8 164:16 174:21 196:23 333:10 337:12 344:17

**including** 68:21 99:23 177:3,4 236:6 238:18 240:9 277:5,6 297:23 355:15 364:1 365:14,18

375:19

**inclusion** 80:25 207:10

**inconsistent** 91:8 224:16 301:5

**incorrect** 215:24

**increase** 28:11,16 53:7,8,15,17,18 55:12,21 56:2 57:19 74:24 75:3,12 77:20,22 116:8 117:3 119:17 120:1,2,6,15 121:10 122:20 123:5,7,13,24 135:13 163:6,12,13,16 164:13 165:3,8 170:8 173:14 174:10 177:16 178:15,19 179:2 183:6,10 185:20 191:21 192:2 200:19 205:13 206:12,23 208:7 212:4,5 226:13 232:18 242:10 243:9 244:9,16 245:3,4 256:24 273:6,11,22 274:25 306:24 308:25 342:9 387:24

388:1,11 389:18 390:10 391:5,10,11,25 392:8,14

**increased** 59:6 74:23 75:4,9,14 77:6,13,17 78:7 83:5,6 108:25 119:12,23,25 121:7 122:19 123:3,9 160:17 161:7 163:21 164:2 165:18 166:14,22 173:10 176:15,20 177:2 181:5 182:13 185:13,17 195:24 232:11 243:16,25 246:6,10 247:1,12,19 265:15 267:14,22 272:9,13,20 274:4,10,17,23 275:14 276:20,21 278:8 290:14 296:25 310:8 317:4 393:12

**increases** 74:17 75:23 76:7,14 164:7 165:10,14,15,22 166:2,5,8 192:19 245:19,21

**increasing** 53:2 156:6 275:17

348:2,3
**indeed**
16:1
**Indemnification**
240:24
**index**
236:16
333:21 334:4
**indexed**
325:8
**indicate**
70:16,20
170:23,25
208:16
276:20 302:8
336:21
**indicated**
46:21 80:24
207:1 232:9
237:16
319:10
**indicates**
77:5 131:8
168:12 239:2
240:2 241:13
**indicating**
158:18
206:20
213:15
252:21
256:11
336:17
**indication**
75:10
273:10,21
274:20
275:20,21
277:12 308:9
311:1
**indications**
281:19
332:25
**indicator**
352:15
**individual**
19:24 39:21
74:2 79:13
323:3
**individualized**
326:4
**individuals**
13:21 205:1
243:11 273:5
303:20 317:5
**induce**
22:18,22
23:12 26:4
34:13 35:21
47:22 48:3
49:6 50:2
51:9 52:10
381:24 382:5
386:14
388:21
390:17 391:2
393:5
**induced**
43:24 44:12
238:20
351:13
390:21
**induces**
61:5
**industry**
206:14
244:12,13
319:1,4,8,12
328:10
345:22 346:8
347:5,16
**inexact**
203:20
**infect**
26:11
**infected**
239:14
**infection**
204:22 369:1
375:2 379:12
**infections**
371:12
**infectious**
26:9 378:21,
24
**infer**
24:21 362:13
**inflammation**
26:18 205:20
238:21 369:2
**inflammatory**
351:13
368:21 369:8
**influence**
205:7
**influenced**
374:22
**influences**
375:18
378:23 379:8
**inform**
134:10
**Informatics**
269:25 271:2
**information**
16:22 17:3,
4,15,16,19,
23 18:12,17
19:7,9,11,
17,18,20,23
20:6 44:10
68:10
110:15,17
111:3,24
112:13
117:25
120:24
121:23
129:12
136:18
145:23
146:24
147:13 152:4
155:2,5,15,
23 168:15
169:3 260:18
261:15
284:15
309:25
315:6,12
321:3 323:2
326:18
334:18,21,23
336:18
337:4,8,12
341:16
351:22
362:23 373:7
**informative**
116:11
157:6,7,9
168:22,23,24
169:6,13
**informing**
261:2
**ingest**
227:3
228:21,22
229:7
**ingested**
73:6 103:13
237:3
**ingestion**
63:8,19
86:21,24
96:2 190:4
**ingrained**
371:9
**ingredient**
147:21
148:4,17
155:13
**inhalation**
347:12
**inhaled**
73:7 103:13
**inherent**
393:7
**inherited**
351:14 371:3
375:20
378:15 379:2
380:15 381:1
**inhibitor**
266:7
**initial**
109:11,19

141:10 146:12
**initially** 243:23
**initiate** 238:20
**initiated** 106:23 209:7
**initiates** 26:12,14
**initiation** 26:5 141:5 238:14 325:9
**injection** 347:14
**injuries** 12:18
**injury** 12:19 348:18,25 351:14,16
**inputs** 90:17 93:2
**inside** 23:13 97:2 98:2 100:17
**instance** 41:24 126:25 212:15 337:13
**Institute** 207:24 208:23,25 209:6
**Institute's** 207:13
**institutions** 208:15
**instructing** 120:21 121:16
**instrument** 209:19
**insufficient** 31:23 285:9 315:5,12
**insults** 388:25
**insurance** 18:3,4,25 19:5,7,19 20:4,10,15, 21 21:5,13 322:8
**insurances** 19:2,23
**intake** 88:9 188:22 192:13 195:3,8,16, 24 196:1,12, 23 197:1,11, 12,18,21 218:12 226:2,3 232:10,13 233:22 234:5,7,13, 15,20 235:17 236:9,11,16, 21,25 237:8, 11 255:15 282:12,23 283:25 287:8
**intend** 253:8 254:12
**intended** 255:3
**interact** 207:3
**interacted** 206:17
**interaction** 65:17 67:6 191:6,8,11 192:10
**interactions** 6:9
**interest** 27:15 316:1 317:19 318:14 347:8 356:20
**interested** 7:14 24:12 28:10 46:8 216:15 285:7,14 310:19 311:3 316:18 361:23
**interesting** 20:22 35:24 123:25 124:4,12 151:21 157:13 169:10 170:3 177:13 181:2 183:12 193:18 206:18 215:14 224:21 229:17 246:1 309:4 310:15 316:7 323:7 345:19 355:5,9,11 361:2
**interests** 317:24
**interface** 6:11,25
**interindividual** 39:12,16
**intermediate** 234:6
**internal** 111:1 199:10
**International** 43:9 121:5 122:16 208:4 382:17
**internationally** 254:11
**interpret** 49:8 163:10 184:3
**interpretation** 41:8 161:24 162:6 166:1 179:7,16 183:9 303:9
**interpreted** 41:14 44:10 50:16 156:20 302:19
**interpreting** 50:7 181:18 203:12 230:20
**interrogate** 17:10
**interrogating** 18:15
**interval** 179:10,18,24 182:19,20 183:3
**intervals** 56:12 164:21 166:24 170:1 174:22 179:22 180:4 232:24 325:2,7,24
**interview** 281:5
**intrinsic** 370:4,11,16, 21,22,25 371:6 373:1, 9,11 376:5 379:17 380:7,11,17, 22
**introduce** 351:25
**introduction** 150:11 283:14 350:21
**invalidate** 322:14

**invalidated** 322:18
**invariability** 101:6
**inverse** 23:16,21 24:1,4,5 335:13 336:7 338:3,6,20, 25 346:11
**invest** 27:15
**investigate** 134:10 145:12 276:25 348:11
**investigating** 17:25 265:4
**investigation** 74:11 135:6, 7 282:11 283:22,24
**investigation s** 147:4
**investigator** 340:7 360:8
**investigators** 28:9 204:10 219:15 340:1 355:7,14
**invited** 88:25
**invoices** 14:23 394:2
**involved** 12:7,9 21:22 22:4,11 24:24 25:8 146:13 171:24 349:17 373:17
**involves** 13:1 26:5 29:3,14
**involving** 12:15
**ipad** 10:1
**irrelevant** 115:14,17
**irrespective** 156:4
**issue** 218:5 278:11 330:22 359:21
**issued** 119:10 121:4 122:16
**issues** 16:16 18:15 55:16 317:22
**item** 322:4
**items** 286:10,17
**IV** 368:17
**Iwagami** 258:14,25

**J**

**JAMA** 125:9
**James** 350:15,16
**January** 131:4 140:11,20 141:7,16 144:6 240:20 325:12
**Japan** 204:6 258:12 375:4,9 376:2
**Japanese** 254:8
**job** 383:24
**jobs** 20:20 345:21
**JOHN** 3:25
**Johnson** 317:11,18, 19,23 318:12,13
**Johnson's** 317:23
**journal** 253:23,25 254:1 313:10 314:22,23 315:3,5 368:11
**journals** 312:9
**judge** 299:7,13 337:15
**Julia** 248:24
**July** 146:12,20 149:3 150:17
**June** 140:12,21 141:7,16 144:7

**K**

**Kantor** 271:16,17 272:5,23
**KATHRYN** 3:11
**kathryn. podsiadlo@ arnoldporter. com** 3:11
**KAYE** 3:9
**keep** 65:3 92:12 246:2 391:18
**key** 27:1,8,22 361:6 364:18
**kg** 61:6
**kill** 34:17
**kilogram** 50:25 94:18, 19,20 98:20
**kilograms** 94:24 95:4, 12 98:19 99:5
**Kim** 255:16 287:25 288:1,6 289:5 290:15,17,24 291:2,18 293:16 295:23,24 296:6 297:11,19 298:18 300:20,21 301:10 302:9 304:5,15 315:17 317:10,14 318:18,19,20 319:16,17 320:3
**kind** 56:20 163:12 284:15 288:8
**King** 3:20 108:23
**knew** 219:11
**know** 10:3 12:20 14:4,14 17:23 20:5, 9,18,23 23:21 24:21

26:8 28:3,4 35:5,14,15, 16 36:8 38:25 39:5, 19 40:9 46:5 49:7,11 52:22,23 55:7 58:22 68:11,13 70:17 72:3 75:6 80:12 86:20 89:20 90:9 95:17 97:21 98:23 102:5 103:8 104:4 111:22 115:11,18 122:25 123:8,11 124:8,10,13, 19 125:6 129:10 132:10 138:5,25 141:24 142:11,13,22 143:10 144:2,10 146:1 151:15,17 152:8,12,16, 18,22,24 153:5,11 154:14,15,25 155:8 157:3 163:10 169:11 172:4 173:23 179:20 180:17 183:18 184:5 186:15,21, 22,25 187:5, 16,17,22,23 188:3 189:8 195:21 202:11 204:16 207:16 216:21,22 217:5 219:11,12 222:7 225:10,11,20 226:9 227:10 228:16 230:7,14 244:6,22,24 248:24 249:1,4,20 257:11,14 259:16 261:10 262:3 264:16 275:1,12,15 277:13 278:12 284:18,20 288:17 292:23 298:7 299:19,20,21 309:5 310:13 311:20 312:14 313:10,16, 18,20,24 314:18 316:11,16 317:13,14,22 321:23 322:25 323:24 326:21 328:6,12,23 329:5,12 330:22 331:20 332:24 333:17 334:16,24 335:5,13 336:12 337:11 338:12 339:2,4 343:5,13 346:7 351:13,21 355:5 356:10,18,22 362:11 364:17 366:6,15 368:10 372:4 377:8,20,25 378:3,25 379:10 385:19 387:2,4 393:9

**knowing**
156:1 326:20

**knowledge**
219:6,15 329:11,17 363:17 381:19,23

**known**
41:4 64:6 176:10 186:22 248:17 328:9 352:16 356:8,11 361:24 362:4,8,22 363:9 369:5 374:23 376:12 379:19 381:24 384:5,11,19 389:5

**Kong**
140:14

**Korea**
250:17

**Korean**
251:24 253:19,21 254:9,13

**Kumar**
264:7

## L

**La**
233:23

**labeled**
136:21 137:2 138:17 209:10

**laboratory**
23:1,2,4,7, 9,11 26:7,20 28:2 31:22 43:21,23 44:11 55:16 65:16 66:21 358:1,6 359:14 382:2,5 388:15 393:14

**lack**
39:24 40:4 65:18 67:12 68:17 241:21 243:24 244:16 309:8 322:6

**lacking**
64:16

**lacks**
59:11,22

**lag**
275:14,17 311:4

**laid**
137:14

**language**
66:15 162:11 220:15 254:3,10,16 363:18

**lansoprazole**
276:16 277:15

**laptop**
9:22 10:13

**large** 6:22 132:9 245:18,19 254:8 375:14 376:17 377:9 386:16 387:15
**largely** 385:2
**larger** 9:23 55:9 120:2 223:20 364:12
**Larsson** 194:16
**late** 265:17
**latency** 241:19
**latent** 20:17 21:13
**LAUREN** 3:22
**lawyers** 244:12,20,25
**lead** 39:4 147:4 198:7,19 200:18 201:2 203:7,10 215:9,22 216:7 243:4,6 369:22 371:3
**leaders** 206:15,25
**leadership** 217:1
**leading** 266:10 271:16 290:15 350:14 368:7 381:13
**leads** 28:16 182:10 201:11 219:6 223:7,9 225:7 273:10 347:13,17 382:2
**learned** 230:2 243:3,6,7
**leave** 380:18
**leaving** 256:16
**led** 32:13 107:2
**left** 9:24 157:15 208:21 210:8,9 289:12,21,22 291:3 292:6 293:24
**left-hand** 176:5
**legal** 7:11,17 9:10 10:25
**length** 249:7
**lesions** 49:16 55:20
**lesser** 123:7
**lesson** 243:2
**lessons** 243:5,7
**letter** 130:20 131:2 313:17
**letters** 315:21 316:4,11,22
**level** 19:16 53:5 55:25 99:2,3 182:22 190:19 209:17 262:11 285:2 388:11 389:6 390:11,19 391:23,25 392:14
**levels** 46:18,21 53:1,23,25 54:4,19 56:3 61:6 100:21,22,24 101:9 108:25 113:22 115:14,17 116:1,8,15,17 117:5 125:4,7,14,18,20 126:2 127:18,20 129:4,14 135:12,14,21 136:2,6,11 137:7,9,10,12,13,19,21 138:10,21,22,23,24 139:1 142:2 187:19 189:25 192:6 260:8,19 344:19 385:15,17 386:24 389:19 392:12
**Levin** 3:23
**liability** 7:8
**liberty** 12:20
**lieu** 8:2
**life** 208:6 254:9
**lifetime** 262:20
**light** 156:20 251:18 278:2
**likelihood** 41:15 180:10 182:8 216:11
**limit** 179:9,18
**limitation** 256:17 322:25 339:25
**limitations** 90:10 337:8 340:5 348:20
**limited** 17:8 61:24 62:15 75:18 161:21 286:9 349:21 385:3
**limiting** 75:17
**limits** 105:20 107:5 150:24
**line** 45:6 81:16 117:8 241:9 295:24
**linear** 339:9 356:2
**linearity** 355:23
**lines** 32:18,19 178:3
**Linhai** 151:2
**linked** 248:22 352:3 368:20
**links** 208:9
**liquid** 73:13
**list** 131:19

132:2,5,7,15 133:2 201:23,25 333:5 384:3
**listed**
40:25 51:18 380:13 384:4,7
**listen**
50:8 357:10
**listing**
384:6
**literature**
21:7 52:15 68:4,16,20 69:4,12,19, 20 102:19 132:13 200:25 337:23 339:11
**litigation**
7:9 11:1 154:22,23 266:20 304:23 317:20 318:14 327:18 328:1,5
**litter**
30:5,6,18 299:8
**little**
9:25 48:7 52:12,13 72:12 83:15 99:14 154:7 173:22 180:25 181:7 191:2 232:25 236:2 262:11 268:2 287:6 296:13 323:20 330:18 331:3 367:12 368:3 370:6,9

374:2 377:22
**live**
36:16 267:14 340:6 371:12 375:12
**lived**
33:17,23
**liver**
34:11 37:20 78:18 86:13 239:17,24 266:9,15 267:6,12,23 268:23 270:10 272:6,13,20 274:4,10,18, 22,23 275:1, 10 276:22 295:7 307:8, 9 308:22 309:4 334:9 347:15 369:1,2,3 376:16,23 378:9 379:14 380:3
**lives**
391:3
**living**
208:7 375:9 376:2
**LLC**
3:8 146:16 149:6
**LLP**
3:2,9,20,21
**located**
9:3
**locked**
6:14
**logistic**
236:5
**long**
33:17,23 132:24 203:23

219:13 239:10 249:2,13 251:4,10 252:4,8 253:5,12,15, 17 255:4 256:1,7,13, 15 262:17,18 264:15,17 362:25 369:25 386:17 389:22
**long-term**
94:17 95:10 98:17 161:1, 9,22 247:18 260:17 350:7,22 351:18 352:9
**longer**
136:19,25 138:15 154:7 161:8 216:10 239:4 240:4, 7 241:15 242:22 246:11 247:5,25 248:15 260:14 261:12 265:5,23
**longitudinal**
291:8
**look**
21:1,3,8 25:15 26:10 27:16 28:2 30:3,14 33:14 34:22, 23 35:17,18 38:2,4 42:21 43:3,4 47:2 50:19,20 51:24 52:2 53:22 57:3,

13 58:10 60:18 62:4, 8,17 65:8 77:10 80:13 84:12 89:15 90:16,25 91:6,23 92:3 94:1 96:16, 20 97:1,8 98:7 100:14 101:5,6 102:1 103:7 107:7 111:21 113:21 118:23 120:3 133:18,20 135:4 139:13,18 140:23 144:23 146:5 154:18 159:11 164:4 166:17,18 170:19 171:16 174:25 176:3 178:5 180:7 186:6,7,17 191:5,10 193:4,22,23 194:2,19 196:7,8,19 197:16 199:6 201:15,24 206:5 210:5 212:18 213:4 216:14 217:12,22 218:24 219:24 220:1,24 221:17 223:23 224:10,15 226:1 230:23 232:5,24 233:15 235:24 240:12 241:6

242:19 244:3 245:15 249:15,24 250:21 252:12,20 255:8 258:3, 17 259:21,22 260:7 263:23 264:10,24 266:1 268:9 269:4,19 271:9 272:3 275:13,24 282:2 283:11,13,18 284:22 289:12 290:4,11 291:17 292:6,7 293:22 295:23 296:18 297:18 302:21 304:9 305:3 307:7 309:5 311:3 312:19,21 314:10 315:25 319:11,16 324:7,11 326:11 327:14 329:19 332:17 333:2 335:21,25 338:5 340:18 341:4 348:1 350:1,20 352:4 353:20 357:13,14 359:2 360:18 371:18 372:13 378:14 381:2,4,9,16 384:24

**looked**
16:24 32:16 37:10,11 39:15 54:2 66:13 68:9, 15,20,21 78:2 83:24 96:7 115:6 132:14,24 145:14 161:16 183:25 213:19 215:13 216:16 218:21 224:13 228:7 245:2 270:4, 6 272:2 277:8 291:12 301:2 302:1 304:25 309:1 310:2,18 320:20 331:4 333:6 336:13 337:18 338:1,18,24 339:10,16 343:4 347:1 362:20,21,22 363:5 377:13

**looking**
14:23 15:14 35:12 37:14 47:15 55:10 58:21 97:24 101:12 131:19,25 132:2,19 141:14 145:1,18 159:23 160:2 171:2,18 175:7,9 177:1 187:12 188:10,15,24 189:2 190:23 197:8 206:10 211:17 213:14 216:24 218:4,11 222:21 223:15 245:7,23 250:6 253:10 269:7 270:7 284:9,14 285:3 286:9 297:16 308:3 309:4 319:2 331:11 334:22 347:8 352:2 362:4 374:5 379:1, 16 385:20

**looks**
14:22,23 52:13 111:15 112:4 186:18 189:1 232:23 298:8

**loose**
52:13

**Los**
3:10,15

**lose**
19:24

**loss**
214:20 215:1,3,10

**lost**
19:23 20:8 80:7 95:2 213:25 214:1,6 251:23 259:14

**lot**
21:25 26:18 29:13 32:16 36:12,13 49:12 52:4 68:9 79:24 103:10 131:20 157:16 161:14 181:10 204:2 206:8,10 217:2 221:23 226:5 245:8 308:16 309:7 310:2 315:21 316:9 320:23 330:24 335:1 337:3 360:2 369:16 370:19 377:6

**lots**
35:20 39:11

**love**
155:8

**low**
29:12 43:25 44:13 46:17, 21 161:23 162:4,6 167:7,23 168:9 191:8, 9,14,15 227:4 228:22 229:9 262:11 330:18 331:3 384:7 386:12 387:5 390:17,25 392:22,25

**lower**
55:1 93:20, 23 96:11 128:8 189:5 296:1,16,21 297:2,15 301:8,12,18, 22 332:16 346:2,13 377:11 385:14,16 386:18,24 391:5,9

**lowest**
47:21 48:1, 21 49:4,25 50:22 51:8

52:10 53:1,5 56:3 234:5
**lows**
101:10
**LP**
289:14
**LP107**
118:8
**LP230**
288:21
**LP232**
289:16
**LP233**
130:4
**LP279**
42:10
**LP3**
230:24
**LP430**
258:4
**LP432**
319:18
**LP435**
249:25 250:9
**LP441**
312:21
**LP447**
304:19
**LP487**
340:20
**LP490**
271:9
**LP523**
126:4
**LP538**
15:7
**LP543**
184:9
**LP545**
193:24
**LP548**
230:24 231:18
**LP550**
266:1 276:2
**LP551**
92:3
**LP552**
255:9
**LP553**
263:23
**LP560**
94:1
**LP563**
233:16
**LP574**
139:21
**LP576**
393:25
**LP579**
350:1
**LP580**
353:21
**LP585**
371:19
**LP602**
381:3
**LP616**
240:12
**LP618**
327:3
**LP624**
201:17
**LP629**
150:9 159:16 173:4
**LP633**
282:3
**LP635**
279:13
**LP636**
219:25
**LP638**
237:24
**LP69**
160:2
**luck**
368:1 372:10,20 373:9,18
**lunch**
172:12,24
**lung**
243:13 245:3,4,11 246:2,3,17, 18,21 377:19

**M**

**M3**
38:15
**macronutrient**
212:24
**macronutrients**
211:18
**made**
89:8 91:1,3, 7,15 134:3 136:25 152:14 204:15 285:19 290:10 316:9 335:9 372:20 374:4 382:13
**magnitude**
87:22 102:2 185:12,17,19 286:23
**magnitudes**
102:16
**main**
16:15 61:8 206:22 209:18
**maintain**
388:25
**major**
18:6 144:11 146:15 149:4 162:14 168:12 204:20 205:4 224:4 234:13 351:23 358:21
369:7,15,18
**majority**
204:25 239:13 262:16 263:2 347:9 368:20 369:10 378:20 379:10,16,18 380:2,5,14
**make**
48:22 74:11 78:23 79:10, 23 149:13 181:1 223:13 225:1 275:18 299:12 300:17 323:20 330:14 356:25 361:3 365:9 366:25 369:24
**makes**
11:6 60:15 92:13 138:14 161:24 162:6 223:1 342:13 345:23 348:14
**making**
18:19 288:8 312:5 349:22 360:8 367:13
**male**
50:23 209:8
**malignancies**
238:14 290:15 320:2 380:24
**Maltoni**
350:10
**mammalian**
40:15
**mammals**
38:25 366:12
**mammography**
280:24

281:1,2,3
**managers**
19:16
**manipulating**
328:16 329:7
**manipulations**
113:24
**manner**
8:8 356:23
**manufactured**
150:1,25
151:13
**manufacturer**
11:4 148:25
149:4
**manufacturers**
134:11
146:15
152:10
155:12,13,14
**manufacturing**
143:17,18,22
144:2,12
145:16
147:1,6,7,15
148:9,16,21
149:15 150:3
151:3,8,11
**manuscript**
305:7 306:1,
3 307:15,23
309:18,21,22
310:1 311:22
312:4,9,13,
14 316:2
**manuscripts**
320:21
**map**
167:20
**March**
16:3
**Marco**
94:11
**mark**
115:15
118:11
201:15
233:16
237:24
279:13 282:3
289:3,5
340:19,20
**marked**
4:13 15:17
42:10,12
92:4,5,22
94:2,3
118:13
126:5,9
130:4,6
139:19,22
150:13
159:20 173:5
184:10,11
193:24 194:3
201:17,19
211:21,24
212:12,16
219:25 220:3
231:18,20
233:18 238:2
240:12,14
250:4,10,11
255:9,11
258:4,6
263:23,25
266:2,3
271:11 276:1
279:15 282:5
289:7,9
305:13,15
312:21,23
319:18,20
327:4,5
340:22
350:2,3
353:21,23
371:19,21
381:3,6
394:8,10
**markedly**
160:16 161:6
**marker**
189:21
192:22 196:4
277:24
**markers**
192:15 278:3
**market**
134:20 135:2
137:6,17
152:15 153:2
158:15
**marketing**
360:11
**MARLENE**
3:18
**Marseille**
232:1
**Mass**
23:9
**Massachusetts**
23:8,9
**massage**
180:25
**MASSEY**
3:22
**match**
282:24
320:17
339:3,4,7
**matching**
321:7
**mate**
190:8
**material**
341:1,3
**materials**
50:11 132:2,
5,7,15 133:2
201:23
331:17
336:25
340:19
**math**
95:2 123:1,5
342:13
**matter**
7:7 8:5 11:9
237:14 368:1
**matters**
10:25 327:20
**MD**
7:2
**MDL**
8:21
**mea**
206:20
**Meals**
94:8
**mean**
12:23 17:6,
20 30:17
39:23 58:17
59:1,12,23
60:3 79:5,6
96:10 98:25
102:10
103:8,17
115:25
125:10,17
132:18
138:12
140:24 146:1
149:19 162:5
185:19
198:14
205:16
215:25
218:24
219:17,19
228:5 239:10
242:10
257:13
260:15
262:9,10,19
263:5 282:10
284:23 291:2
311:20,22
355:12
365:18
377:15,20
378:4 387:3
**means**
41:2,5,22
51:15 70:12
159:6 165:18
166:13
257:15
325:11

355:25 391:8,15
**meant** 175:3 252:1 323:10 335:15 380:10
**measure** 88:16,20 89:2 103:3 104:1 215:19 376:4
**measured** 36:20 88:18 106:6 135:22 136:3 137:22 201:10
**measurement** 199:13 202:3,15 203:7 221:2, 11,22
**measurements** 96:5 100:3 188:23 198:18
**measuring** 20:17 105:25 142:17 344:22
**meat** 73:18 176:10 187:13,15 188:1 189:13 194:11
**meats** 187:18
**mechanisms** 46:8 206:22 393:7
**median** 98:25 197:1, 10,12,21 259:6 270:18,23 271:5 333:21,23 334:7,13
**medical** 9:7 18:8 23:5 68:4 69:12 104:17 258:12 291:9 320:15
**medication** 22:1 341:9, 22
**medications** 333:14 335:2 342:16
**medicinals** 103:12
**Medicine** 199:10 253:24,25 254:2
**medium** 258:20,24 264:11
**meeting** 313:15
**meetings** 206:19 314:2
**meets** 66:18 68:5 69:13
**melanoma** 376:15 377:8 378:2
**member** 314:1
**members** 314:14
**Menlo** 329:1
**mention** 53:1 84:16 85:5,17,22, 23 86:3,7 113:16 159:11 162:3,5,17 168:5 273:20 321:17
**mentioned** 31:18 53:3 84:22 85:11, 12 170:13 193:7 226:5 238:5 239:8 240:9 287:20 297:11 361:6 376:1,22 378:16
**mentions** 320:12
**met** 88:15
**meta-** 208:12
**metabolic** 207:13
**metabolism** 45:10 65:20 67:13 208:12 347:15
**metaplasia** 238:19
**methly-** 38:14
**methodologic** 285:16
**methodology** 335:20 336:21
**methods** 171:3 280:21 281:10 290:25 291:2,19
**methyladenine** 38:15
**methylguanine** 36:23 37:12, 19 38:7,13 40:4
**methylnitroso urea** 22:17
**mg** 61:6
**MGMT** 39:5,13,24 40:5
**mice** 25:2 26:11 40:15 61:25 66:25 352:14 353:4,14 355:21 364:21 385:5 386:9
**microbiome** 206:24 375:16 378:23
**micrograms** 50:25 102:14 190:2,15 197:5,18,22 235:13
**micronutrient** 193:7,12,13, 17 212:21 213:13 224:9
**micronutrient s** 193:6,9,16 206:21 207:2,8 213:3 226:4 285:8,25
**mid** 19:16
**middle** 234:3 238:23 250:24,25 258:20 276:4
**might've** 114:18
**millimolar** 127:1,2,4,5, 11,12,19
**millimolars** 127:24
**millimole** 127:6,7

**million**
119:13,24 121:8,10 122:19 292:9,10,11 305:20 314:9,13
**mind**
33:14 80:18 327:1
**minimize**
388:25
**minimum**
325:8
**minor**
54:25 55:24
**minority**
351:12
**mint**
124:24 128:24 129:8
**minute**
132:19,23 283:11
**minutes**
72:16 231:5,6 343:11,14
**mischaracterize**
53:12
**mischaracterizes**
53:11 77:25 81:11 82:2,20 142:20 198:22 298:22 366:5
**misclassification**
198:8,13,15 201:1 203:6 213:6 218:6 225:6 281:20
**misclassifications**
215:8
**misestimization**
201:1,11
**misinterpret**
48:19
**misinterpretation**
41:18 165:5
**misleading**
126:20,24 349:15
**misrepresentation**
299:16 301:1
**misrepresentations**
299:12 300:2
**missed**
203:6 206:21 207:3
**missing**
205:4 207:8 223:20 341:16 362:1
**mission**
46:7
**misspoke**
252:1 253:1 255:2
**misstatement**
252:16
**mistake**
127:23 215:24 230:1 278:15
**mistranslation**
252:16
**misunderstood**
254:4
**mix**
330:24
**mixed**
367:16
**mixtures**
382:22 383:6
**MNNG**
22:24,25
**MNU**
22:15,16 26:22 386:9 387:5 392:24
**model**
205:10 210:19 347:23,25 348:10,13,21 349:1,11,20
**modeling**
90:12 95:25 98:10 99:8,12,20,23 349:19 374:4,11
**modelling**
372:24
**models**
24:20,25 25:2 49:12 55:3 70:21 339:6,9 355:13,17,19,21 356:5 360:5 363:14 383:21
**moderate**
378:1
**modest**
374:20
**modestly**
373:2,12
**modifiable**
207:19
**modified**
234:12
**modify**
205:5,20 206:24 369:14
**Module**
93:2
**Mohy-ud-din**
287:17,20,21,22 288:6 289:4 290:2,3,5 291:3,5 292:7 297:19,22 298:2,16 300:19,20 301:16 302:22 305:21 314:4
**molecular**
73:14,23 208:9
**molecule**
26:13 73:6,10,17,22 131:9
**moment**
359:20
**money**
206:9
**monitor**
10:17 242:21
**monitored**
384:17 389:4
**monkeys**
34:18,20 35:3,5,24 36:21 37:24 364:2
**Monograph**
240:23
**Monte**
89:18,20,24,25 90:3,8,9
**month**
13:12
**months**
36:16 259:11,14 260:5 261:7,8
**morning**
8:19
**morphology**
108:22

**mother** 371:13
**motivation** 360:13
**mouse** 32:25
**move** 228:13 311:6 326:4,13 376:3
**moved** 160:6 375:5, 6
**movie** 248:24
**moving** 172:12
**multi-institutional** 291:22
**multi-pronged** 392:19
**multi-step** 28:25
**multi-variable** 272:9
**multi-variant** 234:19
**multiple** 29:8 236:5 276:19 278:12 349:17 382:6 393:2
**multiplicative** 210:17
**Multivariate** 196:16
**mutagen** 27:23 28:21 29:17 31:13 32:14
**mutagenesis** 28:1,17 37:18 67:10
**mutagenic** 44:25 45:5
**mutagens** 28:3
**mutation** 28:6
**mutational** 376:18 377:7,16,18, 21
**mutations** 28:5 29:2,14 32:18 368:3 377:10,12,14 378:2
**muted** 82:8,9
**mythyl** 186:18

**N**

**N-NITROSAMINES** 92:10
**N-NITROSODIMETHYLAMINE** 43:10,13
**Najafi** 130:13,17, 21,25 133:6
**Najafi's** 113:12 115:4 133:11,16
**name** 7:10 8:19, 23,24 96:17 118:19 124:18 141:8 152:4,13,19, 25 153:3 157:20,25 158:3,14 159:3 186:25 187:4 287:19 333:7
**names** 149:9
**nanogram** 94:19 96:18 190:14
**nanograms** 93:12,15,18, 21 94:18,24 95:5,11 96:14,24,25 97:3,12,14, 16,20 98:18, 20 99:4 107:5 124:23 127:2,3,5, 11,13 128:22,23 137:14 190:1 197:2,23 235:9,10,13 237:2,11
**narrow** 179:24 207:7
**National** 207:13 208:23,24 209:6 282:20 283:3 333:9, 13 334:25 350:9
**Nationwide** 250:17
**natural** 28:9
**nature** 179:8,16 222:24
**natures** 223:24
**NCI** 209:1
**NDEA** 33:18,24 34:13,17,19 35:4,6
**NDM** 157:19
**NDMA** 22:4 32:8, 12,14,17,20, 22 33:10,21, 25 34:4,9 35:25 36:21 37:4,24 39:9 40:10,20 43:14,25 44:13,18,25 45:5,11,24 47:8,14,16 48:1,12,15 49:4,25 50:24 51:7 52:9 54:19 55:13 56:4 57:23,25 58:6,8 61:4, 12,23 62:18 63:2,9,19 64:2,5,13, 15,20,22 65:16,20 66:1,21 68:5,20,23 69:8,13,21 70:1,7,23 71:7,16 72:1,5 73:5, 9,15,17,22 74:17 75:23 76:11,14,18, 23 77:2,3 80:3,10,11, 12 81:1,5,8, 20,23 82:14, 16,23,25 83:4,7,17,18 84:4,5 86:19,23,25 87:5,13,15, 21 88:2,17, 19 89:3,10 90:18 91:2 93:11,15 94:7 96:2,5 97:25 98:1, 13 99:12,16,

22 100:4,6, 16,20 101:4, 9,18,20 102:1,6,7, 13,15 103:4, 9,10,15,22, 23 104:1,19 105:3,9,11, 16,20 106:1, 4,7,9 107:4, 8,17,20 110:19 111:16 112:4,18 113:13 116:15 117:13,17 118:17 119:12,17,23 120:7,16 121:6 122:18 123:13,17,23 124:15,24 126:25 127:18 128:5,7,10, 13,23,25 131:11 135:7,11,22 136:3,11,15 137:7,22 141:21 142:2,4,6,23 143:6,9,13, 23 144:3 145:2,13,20 147:14 150:19 152:6,21 153:4,10,11, 22,24 154:23 155:16,21,25 156:5,14,16, 25 157:2,5, 6,10 158:3, 7,8,11 159:4 160:18 161:2 162:25 176:11,16 177:2,4,16 180:22 182:14 186:12,25 187:1,6,7,12 188:5,13,16 190:16,19,22 191:3,5,12, 15,20,25 192:17,18,22 193:6,10,11 195:2,8,16, 24 196:1,12 197:17 198:6 201:2 205:17 210:1 219:6, 12,22 221:16 222:19 223:25 224:7 227:3,4,9 228:9,16,18, 21,22 229:8, 9,16 232:10, 12 233:7,10 234:5,20 235:8,14,17 237:2,10 250:15 275:3,5 278:23,24 286:1 316:25 344:13,17, 19,24 345:16 346:12,21 347:2,7,11, 19 356:4,7 364:20 365:12 367:5,17 386:4 390:25 392:25

**necessarily**
20:9 37:21 38:24 39:4 101:22 167:19 170:23 315:22 316:17 338:12 348:22,23

**necessary**
230:6 265:6 386:7 388:21

**neck**
246:21 377:9,20 378:3

**need**
14:14 17:10 37:14 38:5 43:4 57:10, 12 59:15 80:6 119:20 145:7 170:11 230:10,16,19 265:20 269:21 283:17 337:17 349:4,11 356:12 380:9 382:13 385:22 390:1,18

**needed**
127:23 161:9 247:17,25 366:22 386:14

**needs**
14:9 83:10 84:1 156:20 225:4 349:22 383:22 384:22

**negative**
33:20 183:10 356:23

**negligible**
88:3 178:14 179:1

**nested**
280:23 282:19

**never**
17:17 20:6 72:14,20 229:20 308:9 309:24 327:1

**newly**
159:23

**nice**
260:21 265:22

**Nigh**
4:5 8:18,20 10:6,20,21 15:5,14,19 30:1,11,18, 20,24 31:3, 10 42:9,14 43:16 47:2 53:12 54:23 60:24 67:25 72:14,19 73:4 78:1 79:8 81:13, 18 82:13 92:2,7 93:25 94:5 97:10 98:4 105:12 118:7,11,15 120:12,19 121:12,20 122:8,9 126:3,10 129:17 130:3,8 139:19,24 140:5 146:9 150:8,15 159:15,20 160:1,5,9, 12,13 161:18 162:20 165:9 169:19 172:14 173:3,7 176:3 178:5 184:8,13,20 186:6 193:4, 22 194:5 196:7 201:14,21

210:5,13 211:1 214:3, 8,22 219:24 220:23 228:13 229:1,3 230:23 231:3,6,17, 22 232:4 233:15,20 234:1 235:1 237:22 238:4 240:11,16 241:3 244:21 249:15,24 250:4,8,13, 21 255:8,13, 19 258:3,8, 17 259:22 263:22 264:2 266:1 270:20 271:3,8,13 274:15 276:1 279:2,12,17, 23 280:3,7, 8,19 282:1, 7,9,16 283:13,20 286:14 287:12 288:20 289:3,11,16, 19 290:22 291:1,16 292:4,21 293:5,24 294:7 295:21 297:18 298:24 299:2,6,14, 19,24 300:3, 5,7,13 304:17 305:13,17 306:6 312:19,25 314:10 319:14,22 323:22 324:13,18 326:23 327:7 328:22 329:18 336:1 340:17,24 341:4 343:10,22 349:25 350:5 352:4 353:20,25 354:9 357:13 359:2 371:18,23 372:13 376:8 381:2,8,16 384:24 389:12,22 393:17,25 394:1,8,12, 20 395:7

**nine** 163:5,13 264:15,17

**ninefold** 308:24

**nitrate** 96:1 226:8 231:24 234:15 235:20 236:11,21,25 237:8

**nitrates** 204:13 219:20 233:8

**nitrite** 125:19 127:4,12 128:8 149:14 231:24 234:15 235:20 236:11,21,25

**nitrites** 219:20 233:8

**nitrogen** 209:12

**nitrosamine** 22:8,21,22 231:24 233:22

**nitrosamines** 22:11,13,14 23:1,3,12 184:15 185:1 194:11 205:17 207:11

**nitrosodimethylamine** 187:2

**nizatidine** 258:11 259:7 260:24

**NOEL** 386:21

**non-active** 278:16 304:14

**non-alcoholic** 369:3

**non-cancer** 47:22 48:3 49:6 50:2 51:9

**non-dietary** 234:14

**non-differential** 198:8 218:5 225:6

**non-genetic** 380:23

**non-human** 366:18

**non-identical** 182:2

**non-neoplastic** 49:16

**non-ranitidine** 273:4,23 274:1,19

**non-significant** 176:21 177:20 178:15,19 179:2 269:5

**non-statistically** 173:10 268:22

**non-users** 272:21 274:11 306:23

**nonactive** 275:16 304:11

**nonclinical** 76:4

**nonhuman** 365:25

**nonresponsive** 228:14

**Nordisk** 11:2,3

**normal** 88:4,9

**Notably** 128:4

**Notary** 8:14

**note** 164:23 321:15

**noted** 52:8 67:18 78:11 272:1 395:12

**notice** 324:1 341:13

**noticed** 273:24 323:1

**noting** 165:7 177:19

**notion** 257:2 390:14

**Novartis**
152:5,12,18 157:24 158:6,21
**Novo**
11:2,3
**null**
56:7,14,25 57:6,7 58:3, 16,18,24 59:1,2,13, 19,24 164:22,25 173:19 174:14,18, 20,21 175:2, 4,8,9,13,18, 25 177:11 179:14 181:14,16,19 198:20 200:9,10 201:3 203:8 212:13 213:5 215:9 216:12 223:8 225:8 298:6
**number**
4:9 15:12 22:25 25:1 36:16 38:16 44:19 54:12 58:6,7 61:24 91:4 99:19 102:4 113:23 131:18 132:9,10 137:12 138:20,24 148:25 159:18 161:23 162:6 171:25 177:16 184:21 228:7 238:24 254:8 260:9 272:23 273:7,22 275:18 277:9 289:14 324:2 331:20,24 344:16 360:9 364:12 366:16 369:9 370:8 373:24 374:3,7 377:9,11,13 378:2,12 385:3 387:15 391:5 392:23 393:12
**numbers**
55:1,9 97:7 102:22 109:18 120:14 164:24 165:16,20 166:9,15 167:7,22 168:9 174:11 180:12 212:8 213:11 308:4,15 309:10 310:11 311:25 330:14 331:22 343:5
**numerical**
165:8 173:14 174:10 185:20
**numerically**
164:24
**numerous**
55:3 206:9 267:3 277:4 356:15 358:11 364:1,6 365:13
**nutrient**
205:11 221:5
**nutrients**
204:17 205:9
**nutrition**
24:12 207:25 208:12 209:8 285:14 286:13
**nutritional**
24:10,11 202:3,17 220:7 226:16
**nutritious**
222:14

**O**

**oath**
8:2
**obese**
295:3 331:8
**obesity**
225:25 226:1 297:24
**object**
83:21 219:9 300:1
**objection**
8:8 22:6 23:23 24:18 25:13,25 27:10,24 28:23 29:20 31:5,16 32:2,10,15, 21 33:12 34:3,8,21 37:6 38:1 39:14,25 40:6,11 41:7,23 48:4,23 50:3 51:11 53:10, 19 54:1,7, 14,21 56:15 57:9 58:9,19 59:4,14,25 61:19 63:22 68:7 69:15 70:9,25 71:9,19 73:8,20 75:25 76:16 77:24 79:4, 18 80:22 81:10 82:1, 19 84:20 85:7 89:4, 12,19 90:4, 20 91:10,17 95:13 96:13 97:6 99:6 100:8,18 101:21 102:3 103:5 104:3, 11,21 105:5 106:18,25 107:12 108:10 109:7,17,25 110:12,22 111:20 112:8,15,24 113:5,18 114:9,22 115:3,21 116:20 117:21 119:19 120:9 122:21 123:20 125:1,21 129:2,9 134:18 139:8 142:19 143:25 153:23 156:18 161:4,15 162:9 163:8, 24 164:16 166:6 167:15 168:10 169:1,8,15 170:18 171:21 173:12 174:23 175:10 177:6 178:24

179:19
181:21
182:21 186:1
188:9,20
191:23 192:3
195:12,20
197:4,7,24
198:10,21
199:25
200:4,12,21
201:5 203:9,
15 206:2
211:11 212:7
213:10
214:15
215:11
216:13
217:18
218:18
221:14
222:22
223:10 225:9
227:6 228:24
229:11
235:15 237:4
238:9 239:6
240:5 242:2
244:2,18
246:13
247:3,13,21
248:19 256:9
257:5 259:12
260:6 261:9
262:1 263:19
268:25
272:16
274:13
276:23 278:9
296:10
298:21,25
300:8,25
303:8 304:24
305:8 307:18
311:13
312:11
315:19
317:12,21
318:15 319:7
320:19
321:22
322:3,11,20
323:4 324:23
325:21 326:7
328:2,11,19,
21 329:9
331:19
332:10,22
333:15
334:12 335:7
337:1,21
338:9,22
339:20
340:14
342:11 343:3
344:14,25
346:5,15,23
348:7 349:9
356:17
358:13,18
362:10 363:4
364:8
365:15,24
366:4,14
367:10
370:5,13,18
373:14 377:3
378:11
379:21 380:8
383:11
385:18
386:25
388:3,12
389:20
390:12
392:1,15

**objections**
8:10 30:3,7,
21 31:4
81:14 299:9

**observation**
166:9

**observed**
127:18
135:15 164:7
165:23 166:5
176:22
354:19

**observers**
347:10

**Observing**
209:7

**obtainable**
315:6,12

**obtained**
19:9 304:22

**obverse**
382:3

**obviously**
43:2 123:7
157:5 312:13
382:12

**occupational**
25:8,11
64:10 68:22
79:3,16,22
80:1,4,20
81:1 82:22
83:1,6 85:21
100:25 344:6
351:16

**occupationall
y**
351:1,10

**occur**
28:5 47:20
48:1,21
49:4,25 51:7
109:21
141:19,22
142:12

**occurred**
109:9 243:3
249:3 317:1

**occurrence**
171:8

**occurring**
146:19

**occurs**
108:20

**October**
202:8

**odd**
306:22

**odds**
29:11 188:6,
13 189:22
190:15,17,
20,24 191:2,
3,16 192:2
233:10 234:5
237:9 267:18
268:19
269:7,8,10,
12,16 270:11
286:23
296:21
306:17
307:9,13,21
308:2 309:14
310:7

**offered**
372:21

**offhand**
23:24 131:22
271:24
334:23

**office**
9:5

**offices**
19:12

**oftentimes**
172:5 261:24
364:6

**okay**
9:2,14 10:6,
20 12:5,10
13:1,4,18
14:5,11,15,
22 15:5
21:17 23:15
31:3 42:8
48:8 52:25
60:16 65:8
67:24 71:25
72:10 78:9
81:5 83:14
85:2,15,25
86:16 88:24
92:1 93:24
104:8 105:8,
12,23 110:3

113:1 118:1 129:16,20 130:20 131:15 132:5,18 133:1,13,20 135:4 137:25 139:12 140:23 145:10 158:17,25 159:2,7 160:7 170:3 172:15 173:3 174:4 184:7 185:24 186:5 187:5,21 188:5 193:21 194:18 206:5 210:4 212:18 214:8,16 219:23 229:13 233:14 235:19 237:21 251:14 255:7 259:2,20 267:17 272:1 274:21 279:12 280:7,18 281:25 284:22 287:11,24 289:2,6,17 290:11,21 291:15 294:17 304:16 309:22 314:3 319:3,13 323:15,17 324:17 326:23 342:6 349:25 357:18 372:6 390:3 393:17 394:7,18,20

**older**
238:23 294:14,19

**omeprazole**
12:15,17 13:3,14 257:1 273:14,16 275:4,6,9 276:5,7,22, 25 277:2,14 293:12,14 296:3 304:12,15 319:25

**once**
369:23 383:14 393:3

**oncogenesis**
28:16

**oncology**
314:21

**one**
10:25 14:7 17:7 26:8 28:3 31:11 36:25 57:20 65:10 77:21 83:5 84:19 88:11 93:14 95:17 100:13 119:25 123:2,3 125:13 132:19 133:1,7 134:2,9 148:25 163:19 171:4 175:12 180:18 185:7 187:17 189:4,13 194:20 195:22,23 199:2,4 202:1 203:14 210:12 213:3,21 214:10 224:9 231:1 235:3 237:22 238:1 244:4 250:8 266:13 269:12,21 270:3 273:1, 13 275:18,22 278:5 285:4, 7 292:17,25 293:15 313:4 317:9 318:11 325:13,16,18 332:25 339:3,9 340:5 343:11 345:24 348:12 349:7,21 351:19 352:2 354:16 363:15 364:23,24 367:3,12 369:18 372:5 383:22 393:1

**one's**
170:8

**one-third**
352:21

**one-to-ten-year**
293:10

**one-year**
324:22 325:2,7,9,23

**ones**
78:5 209:10 240:9 309:13 345:25

**ongoing**
12:13 135:8 327:19

**online**
290:10

**onset**
238:6 251:5, 11,19 252:20 253:6,15 255:5

**Open**
125:9

**open-ended**
154:7

**opened**
107:11

**opening**
107:24

**operates**
210:18

**opine**
160:25

**opined**
128:22 207:18

**opines**
125:17,18

**opinion**
16:10 21:2 50:12,17 68:4 69:12, 25 70:7,22 74:15 75:21 76:12 88:1 102:25 103:21 215:8 251:21 310:22 311:3 318:2,7 329:15 355:12 368:5

**opinions**
16:9

**Opportunities**
220:6

**opposed**
14:10 223:4 298:5 316:5 380:7

**optimize**
385:7

**optional**
85:9 86:7 101:11

**OR1**
236:7
**OR2**
235:21
236:7,11,25
**OR3**
235:21
236:25
**oral**
347:13
**order**
17:24 89:9
247:18 248:1
385:13
390:19
**orders**
87:22 102:16
**organ**
354:17
**organism**
26:14
**organization**
40:23 42:5,
17 44:10,16
45:4 46:2,6
47:25 61:18
62:24 63:13
66:8 242:21
**Organization's**
66:1
**organizations**
100:2 206:9
277:9 347:21
**organs**
37:20
**original**
52:2 170:7
171:16,18,22
**originally**
283:2
**ORS**
186:10
232:11
237:14
**outcome**
7:14 16:18
17:4 38:24
171:2 178:9,
14 183:1
217:17
218:7,10
317:20
318:14
**outcomes**
17:1 18:16
161:25
162:7,14,24
164:6
166:20,22
167:1,6,12,
18 168:7
171:1 218:2
252:23
253:10
**outlier**
307:3,6
**outline**
29:2 368:21
**outlined**
76:5 273:1
368:19
**output**
90:2
**outside**
6:10 164:25
**over-the-counter**
339:24
340:9,11
342:4,10
343:6
**overcome**
393:6
**overestimation**
46:12 360:15
**overlap**
180:1,6
**overly**
72:9
**overshoot**
224:25
**overshooting**
225:22
**overstate**
383:18
**overstatement**
353:16
360:15
362:19 365:4
**overwhelming**
44:24
**owe-**
168:8
**owing**
65:14 161:21
167:7 168:9

**P**

**P-R-E-N-T-I-C-E**
199:8
**p-trend**
196:19
**p-value**
56:10 60:2
163:14 180:7
192:25 193:2
233:1,2,5
235:6
237:16,17,20
269:1,3
276:13
294:20,25
295:4,7,12,
18 296:2
297:17
298:10
301:18
**p-values**
269:3,4
**p.m.**
395:12
**page**
4:4,9,25
43:17 47:3
60:18 62:6
84:12 85:15,
25 86:17
87:4,9,10
92:16,24
105:10,14
107:7 118:24
126:17
127:16
133:20 135:5
140:24 141:2
146:6 159:14
161:19
162:21,23
166:17
169:20,21
176:4,6
184:21,23,24
186:4,7
196:8 206:7
208:21 220:2
235:1 241:4
250:22
255:19
258:18
264:11
269:20
270:17 271:2
272:6 306:5
307:8 313:2,
3 314:11
323:23
324:12
326:25
329:19
341:5,6
350:20 352:5
357:14 376:9
381:5,17
**pages**
26:2 305:25
**paid**
317:11
318:12
**pancreatic**
78:17 86:10
238:15
239:16,23
334:9 369:17

**panel**
88:15,24
**panelists**
88:25 104:10
**Papantonio**
3:23
**paper**
144:23
180:17
202:11,12
203:3 220:13
251:25
252:5,19
253:13
259:17 298:2
305:10 314:7
315:1,24,25
316:6,16,19
318:17,18,
19,20 323:11
336:18,25
354:21
355:10
357:3,9,12
359:10
361:16
372:6,11
373:16,21
374:6 377:22
378:18
384:25
**papers**
23:16 24:1
26:23 125:9
254:17 272:4
273:2 288:24
304:22
311:15
316:12 321:8
338:4 368:6
**paragraph**
43:21 47:4
50:15,19
60:25 62:5,
17 65:9,12
87:11 107:16
127:17
130:24
133:23
146:10
150:12 164:4
166:18 176:7
178:7 186:3
202:14
208:22
210:6,7,9
220:25
250:24
255:21,22
258:19
270:21
283:19 294:1
297:21 336:2
352:7 359:4
360:19
372:15
376:10
381:18
**Paralegal**
3:22
**parameters**
190:11 237:6
**Park**
329:1
**parroted**
355:8
**part**
6:22 15:20
29:2 50:11,
12,17 63:6,
17 64:17
66:22 67:14
119:13 146:9
148:8 164:17
208:17 215:7
252:17
289:21
318:2,7
333:25
336:14
338:16
368:12 379:7
**participants**
6:3,19
162:25 163:1
329:25
**participating**
7:21
**particular**
33:15 35:21
46:11 52:5,
11 71:11
74:14 91:22
95:15,25
123:22
148:25
157:14
162:17
176:21
177:20 183:1
189:21
190:18
211:16,18
212:15
213:14
214:19
235:17
238:15 239:8
249:1 267:2
285:10
311:20 312:7
318:17
322:15
330:23
337:13
348:12
366:23 374:6
389:8
**parties**
8:6
**parts**
119:13 121:8
122:19
132:22
217:16,21,24
345:4
**party**
7:13
**pass**
347:14
**passed**
371:12
**passive**
28:14
**past**
22:2 282:12,
22 287:7
**pathogenic**
369:15
**pathway**
349:12
**pathways**
40:8 67:17,
23
**patient**
19:13 167:21
189:18
301:24
308:12
321:3,4
330:24
333:9,13,17
334:21,25
335:3,16
370:23
371:1,2,3,8
**patient-based**
370:25
**patients**
18:18 19:15
20:8 101:7,
13 117:2
140:10 141:5
145:18
157:10
161:17
165:18
227:21
238:22
239:13
257:10
260:9,14,16
262:14,16
263:2,13,16
267:12 273:8
277:12,18,20
282:23 284:1
286:18 292:9
293:6,9
294:19
296:19,24
297:2 302:4,

15 303:21,25 330:20 331:15 339:5 340:1 375:4, 11
**pause** 49:23
**pay** 162:16
**paying** 288:19
**PCCIU** 271:1 276:8
**peak** 243:14
**penalty** 8:5
**Pennsylvania** 3:4
**people** 8:25 18:25 20:20 204:15 208:7 219:5 227:2,3 228:20,21 229:7,8 264:16 285:25 324:2 326:4,13 330:16 332:1,7,20 345:14 346:1,11 356:21 374:17 376:2 377:13 380:21
**per-** 158:19
**percent** 20:6,13 56:12 58:16 119:8 122:14 163:5,13 166:24 178:16,18 179:3 182:12,19 183:6 212:4, 5 230:11 242:5,13 252:2 259:9 260:3 261:6 265:16 302:24,25 303:16,17 330:5,9,12 331:18,21 332:3,9,11, 15 341:19 342:16,19,21 360:21 373:3,12 387:8,10
**percentage** 218:22 334:16,17 340:10 341:14 342:1
**percentages** 342:7,9 376:18 379:4
**percentile** 94:16 95:10 98:17,23
**perfect** 17:17 20:7 375:22 379:9
**perfectly** 71:4,14
**performed** 176:13 291:21
**period** 145:19 153:16 156:22 158:9,12 159:1 170:1 171:13 216:10 239:2 240:2 241:13 242:6 251:2, 4,9,11 252:3,8,12 253:3,5,12, 15 255:4,25 256:6 257:11,12,20 258:1 261:11 328:5
**periods** 156:10 241:19 242:22 262:17,18
**perjury** 8:5
**person** 8:3 19:22 74:2 218:16 325:12,14, 17,18
**personally** 203:17
**Persons** 264:5
**Perspective** 381:11
**persuasive** 382:3
**pertains** 222:19
**pet-** 133:21
**petition** 113:7,9,20 131:3,7 133:22,25 134:4,8,23 135:3
**Peto** 52:6,20 53:1,23 54:17 56:24 57:8 58:5
**Pfizer** 11:9,10,15, 17,18,24
**Pharma** 113:2 114:7 130:14 131:4,16
**Pharma's** 113:6,8,12, 19 133:22 134:16,23
**pharmaceutical** 11:5,17,18 13:7 146:14 147:21 148:4,23 149:8 152:11 155:12,13 314:21 317:16 328:10
**Pharmaceuticals** 3:1 146:15 149:5,13 150:2 151:1
**pharmacoepidemiologic** 265:3
**pharmacy** 261:14 315:5
**phenylimid** 186:19
**Philadelphia** 3:4
**Phip** 186:12,15 187:6,7,12, 20,23 188:13 190:20,24 191:5,12,15, 20 192:1 228:8 286:1
**phone** 9:18
**phonetic** 368:2
**phrased** 154:20
**physically** 7:22
**physiologic** 39:18,22

125:10
**physiological**
128:15
**physiology**
88:5 125:13
**piece**
97:14 351:22
**pigs**
364:1,2
365:18
**pill**
73:19 105:17
106:4,5,7,9,
10 107:18,24
125:20
128:25
**pills**
106:20
108:2,12
110:20 111:8
112:19
117:13
**Pino**
390:23,24
**PIPER**
3:13
**place**
112:21
288:16
**places**
109:23
**plaintiff**
7:4
**plaintiffs**
8:20 13:19,
23 129:7,11
**plaintiffs'**
69:1 133:7
**plant**
345:10
**plasma**
90:18 91:2
**plausible**
326:1 382:21
383:5
**please**
7:17 8:22,23
30:5,18
97:22 119:21
299:13
300:16 370:8
**plethora**
167:25
**pneumonia**
277:7
**Pobel**
232:2
**PODSIADLO**
3:11
**point**
30:12,13
36:7 45:9
64:11 77:1
101:2 114:24
115:18
120:13 140:7
163:19,20
167:16
171:17
174:10
203:11
205:4,23
217:10
219:17
222:12 223:1
224:4 244:12
301:25
309:12
318:17 379:4
388:18
390:19
393:11,16
**pointed**
61:23 96:4
101:12
109:12
173:9,17
174:12
177:18
243:19
278:17
301:9,15
303:18 308:7
366:17
378:20
388:23
390:23
**pointing**
64:7,8 309:8
**points**
121:9
**policy**
242:21
**pollutant**
347:23,24
348:3,9,21
349:1,3,7,8,
11,20
**popped**
214:6
**population**
98:13 99:4
141:3,10
252:6 272:8,
15 294:4
296:8,9
303:1,14,17,
23 304:4,8
306:10,16,22
307:1,16,24
308:12,23
309:16 310:7
311:9 330:6,
12 331:11
343:2
**population-based**
140:2 266:9
**populations**
359:8
**pork**
93:20
**PORTER**
3:9
**portion**
210:10
341:21
**position**
64:24
**positive**
200:18,19
223:9 356:23
**possibility**
20:7 64:25
66:5 124:2
151:23 152:2
183:5
**possible**
29:17 30:12,
16 31:13,20
46:15 66:19
69:22 70:3,
18 71:2 72:1
147:5 161:23
167:7,14
168:8,9
180:5 205:5
209:16
230:9,14
254:14
278:10 322:2
356:9 367:17
**possibly**
71:10,15
229:23
362:16 371:8
384:1
**post**
170:4,5,14
171:20 172:1
**postdocs**
254:6,9,18
**poster**
290:5
**potassium**
209:11,20,21
212:21
213:11,17
**potent**
61:13
**potential**
66:12 68:17
81:6,21
82:15 177:9
221:7 235:20
237:15
273:21
336:5,13
352:11 358:4
384:1 389:10

**potentially**
46:17,24
207:19
336:19 352:3
**Pottegard**
149:24
150:6,9
159:12
167:10
170:17 173:6
183:16,19
**poultry**
93:20
**powders**
118:19
**power**
161:14,16
202:24
214:21,24
215:1,4,10
385:13,17
386:22
**powered**
167:19 168:3
**powerful**
275:6
**PPI**
266:14,20
267:5,23
269:23 273:6
330:12 332:8
**PPIS**
260:17
267:13 273:8
274:22,25
276:4,20
277:3,19
278:13,21
303:22
330:17,21,25
332:2,20
333:1 340:13
**ppm**
109:13 110:5
119:24 123:3
**Preamble**
241:1
**preceded**
354:19
**precise**
102:23 370:7
**precisely**
122:3
**predefined**
170:6
**predict**
359:7
**predicted**
98:12 100:16
102:8
**predicting**
358:4
**prediction**
353:6
**predictions**
223:14
**predictive**
353:9 355:13
356:6
**predictor**
352:16
**predisposing**
369:5
**predispositio n**
374:18
**predispositio ns**
351:14
**predominantly**
176:17
**preliminary**
131:8 134:2
135:10,19
136:17
314:14
**premise**
219:10
**premium**
369:20
**Prentice**
199:3,7,8
220:8 221:10
**preparation**
158:6
**preparations**
32:13 123:24
**prepared**
394:3
**prescribed**
277:18
342:25 343:1
**prescript-**
342:6
**prescription**
331:14
340:11
341:10,22
342:2,8,16
**prescriptions**
141:6 341:23
**presence**
6:10 32:8
38:21
**present**
3:17 7:23
128:5,10
283:22,24
334:24
**presented**
93:3 288:11,
14 290:6,18
296:13
382:24 383:9
394:3
**presenting**
46:10
**preservative**
188:3
**preservatives**
207:11
**preserve**
389:10
**preserved**
204:12
**President**
130:13
**prespecified**
170:14,17,23
172:6,10
**presumably**
393:4
**presume**
108:22
141:22 142:8
186:24
**pretty**
21:8 55:12
115:8 129:17
143:5 144:5
177:11 189:9
224:16
257:18,21
265:11
302:14
331:21 337:6
342:20
344:15
386:4,16
387:11
**Prevalence**
295:25
**prevalent**
168:25
169:7,14
171:11
245:13
246:19,25
247:2,11
339:19
**prevent**
208:6 369:9
370:1
**preventable**
367:20,22
**prevented**
368:9,14,19
369:7,17
**preventing**
222:3 369:24
**prevention**
208:1 221:7
350:24
368:11,15
**previous**
10:25 68:23
148:6 195:23
337:7,17

**previously**
4:13 44:7 104:8 126:5, 8 133:14 159:20 173:5 178:17 317:11 362:15
**primarily**
22:15 24:22 25:2 40:24 41:12,20 66:23 70:13 74:8 83:10 84:2 85:13 152:10 204:4 222:3 225:19 238:20 314:22 320:25 347:19 351:13 368:23,25 369:1 375:2, 8,17 378:23 380:16
**primary**
170:25 171:1,4,15 178:9,13 204:24 225:19 239:12 269:24 271:1 332:25 347:1 348:24 350:23 358:3
**primate**
38:8,11,19 44:6 367:11
**primates**
33:1,7,9 34:5,9,14,15 35:25 38:22 39:1 40:17 62:2 364:17, 22 366:18 367:4
**principle**
27:3 58:15 178:6
**principles**
16:15
**printed**
25:18 155:20
**prior**
21:20,22 22:3,10 23:8 35:22 36:5, 15 151:19 153:15,25
**Private**
6:8
**probability**
23:16,22 24:2,4,5 335:14,22 336:8 338:3, 6,20,25 385:8
**probable**
40:20 41:1, 5,9,10,18,22 70:8,11,12, 19 131:11
**probably**
14:4 24:21 32:5 37:12 99:19 102:20,22,25 103:22 115:23 116:22 143:6 157:9 203:4 205:20 218:20 230:12 243:8 252:14,16 253:8,9 254:7,14,25 265:12,20 273:17 297:1,3 298:9 307:6 323:9 331:8 332:16 347:10 351:11 356:10 363:11 364:15 375:16,23 385:22 387:9
**problem**
52:13 55:24 160:12 210:13 214:10 217:4 280:3 315:18 328:22 351:24
**problems**
216:2 320:17
**procedures**
281:7
**proceed**
238:17
**proceeding**
6:4
**proceedings**
7:18
**process**
26:23 28:9 29:1,8 115:23 116:3 147:2,15 148:9,10,16, 21 149:15 150:3 151:3, 8,12 238:24
**processed**
73:18 176:10 187:18 188:1 194:10
**processes**
26:4 39:18 45:15
**produced**
146:14
**producers**
284:24
**product**
106:13,15 107:9 109:14,22,24 110:9,18,21 111:8 112:22 113:14 114:3 124:24 128:6,24 136:20 137:1,12 138:16 140:19 152:14,19 153:1,4,9,21 154:4 155:21 156:1 159:3
**products**
7:8 76:21 108:16 117:18 134:17 135:12,15,22 136:3,16 137:8,13,19, 22 139:9 146:14 149:25 150:18,25 152:6 155:24 159:4 176:9 182:15 250:16 284:24
**Program**
350:10
**progress**
312:2
**promise**
300:17
**promotes**
26:12,15
**promotion**
26:5
**prompt**
121:22
**prompts**
121:25
**prone**
176:14

198:1,5
199:17
220:16
222:24
223:18
**pronounce**
280:25
**pronounced**
8:25 92:13
**proof**
64:16 151:24
205:18
223:23 228:1
229:25
**propensity**
336:6
**proportion**
92:9 341:8
378:15
**proportions**
376:14 377:1
378:8
**proposition**
360:7
**prospective**
18:11 218:23
283:8
284:10,14
340:2
**prospectively**
281:12
284:2,11
286:25
**prostate**
376:15
377:11
**protect**
351:8,18
**protecting**
66:9
**protection**
350:24
**protective**
226:7
**protein**
209:7,20,21
211:18
212:24
**protocol**
35:15 170:7
171:16,19,23
172:3
**protocols**
382:1
**Proton**
266:7
**prove**
59:7 60:5,8,
10 217:5
230:10
251:22 252:2
337:19 338:7
349:12 361:7
365:7
**proved**
182:3
**proven**
58:18 59:2,
13,24 64:2
248:8,9
353:14 387:7
**proves**
60:9
**provide**
19:16 110:1,
14 224:11
241:21
249:18 328:9
372:25
373:15
**provided**
19:12 327:19
373:10
**providers**
19:16
**provides**
157:8 176:19
**providing**
265:13
374:12
**proving**
66:7 223:25
**prudent**
382:21
383:6,23
**public**
8:14 134:11
170:21
206:17,25
350:25 351:8
**publically**
281:21
**publication**
170:24 184:1
253:16 306:1
312:10
315:1,11
331:10 337:7
357:11
**publications**
21:1,4
168:21 184:6
320:16 329:8
339:17 357:7
**publish**
337:18 338:4
**published**
22:25 23:15
24:1,9 25:7
27:6,7 44:4
170:21,22
180:18 201:9
202:8
253:13,23
254:2,12
265:12
298:15
309:19,20
316:13
319:17
328:17
335:19
336:24
350:17
**pull**
15:6 34:24
35:8 42:9
84:13 97:10
98:4 118:7
126:3 130:3
140:25 150:9
159:16 173:4
184:8,9
231:17
279:13 282:1
287:14
288:20
291:16
304:19
324:24
326:25 327:2
393:25
**pulled**
222:15
**pulling**
35:2
**pump**
266:7
**purchase**
106:15
110:20
112:20
113:14 114:2
**purchased**
106:14
108:15
124:25
**purchases**
109:21
110:18
**purpose**
6:12 347:23
**purposely**
69:9
**purposes**
70:18 242:23
**pushed**
374:2,8
**put**
60:17 77:1
87:15 121:17
154:17 170:5
181:10
237:22
252:17
288:21
292:21
315:22

**putting**
21:2 229:24 230:20
**puzzling**
204:22
**pylori**
26:10,21 204:21,24 205:21 206:1 239:12,14 264:5 368:25 375:2 379:11

## Q

**qualification**
168:13
**qualify**
162:1
**qualifying**
265:19
**qualitative**
65:19 67:12 354:14 355:2
**qualitatively**
45:9,10,17
**quality**
208:6 316:1
**quantified**
210:16
**quantify**
100:6 103:4 104:2
**quantifying**
104:19 105:3
**quantitation**
47:7
**quantitative**
41:15 70:16
**quantitatively**
93:23 372:22
**quantity**
346:20
**quartile**
188:6,11,12, 13,18
190:13,21 191:1 197:2 237:10
**quenching**
149:14
**queried**
324:21 325:1,6
**query**
19:14 340:1
**question**
11:13,22 14:17,18,19 16:23 17:24 19:4 20:25 23:19 25:23 29:5,24,25 30:5,8,10,15 31:7,9 38:20 40:12 43:7 44:18,20 48:9 50:6 54:17,24 56:20 58:1 59:21 60:1,5 61:22 64:14 69:8,10 71:16 72:7 74:7,19,20 75:17,20 76:1,10 79:8 81:18,20 82:14 83:14 85:1 87:6 101:2,3 103:19 104:5 109:13 110:9,24 112:2 116:23 117:24 120:5,14,23 121:9,22 122:10 124:21 142:21 143:8 144:1 145:4, 9 147:12,24 148:1,6
150:5 153:19 155:9 156:23 157:11 158:8 171:10 174:6 177:1,5 179:8,17,21 185:15 187:16 191:24 204:15 214:9 218:7,8,13 219:10 220:22 222:20 228:3,18 229:5 236:1 257:6 269:6 274:7,8 299:14,15 300:6,9,15 307:20 311:7,12,15, 16,17 318:5 322:9 323:12 326:18 332:5 334:1,20 335:11 336:17 338:15 339:15,21 347:16 353:4,10,15 355:20 358:21 359:5 363:8 372:7 379:24 380:1,20,22 383:13 385:25 387:7 388:7,8 389:14 390:4,6 391:8,20,21 392:4,6,10, 17
**question's**
79:19 147:10
**questioning**
81:16
**questionnaire**
176:12 281:6,12,14 283:1,9,10 284:10,15 285:22
**questionnaires**
203:13 217:3 218:16 223:17 285:23,24 286:5
**questions**
16:14 18:22 25:22 30:13 31:8 43:4,6 64:18 101:15 116:12 157:16 205:24 219:1 246:3 294:10 310:16 394:13,16 395:5
**quick**
235:24
**quickly**
170:20 238:12
**quince**
149:14
**quintile**
195:2,4,8, 16,25 196:15 197:14,16, 17,22 198:3
**quite**
29:12 45:21 70:5 73:16 129:5 205:22 261:12 390:16
**quote**
33:2
**quoted**
220:15

**quotes**
199:12
**quoting**
33:5 52:3,24

**R**

**rabbit**
32:24
**rabbits**
40:15 61:25 66:25
**race**
321:20
**raise**
52:11 64:14 116:6,11 177:21 205:16 383:24
**raised**
51:14 100:23,25 101:17,19 135:11
**raises**
64:18 310:16
**raising**
18:19 100:21 122:5 158:8 178:1
**Rall**
350:11
**Ramazzini**
350:9
**ramr**
368:2
**random**
59:7 199:13 221:2,11
**randomize**
229:7
**randomized**
226:9,19 227:2 228:20 229:16
**range**
15:4 39:20 49:19 93:22 96:17,18 97:22 102:18,22 179:22 188:11 212:1 237:13 242:7 259:8 264:14 309:8 334:5
**ranging**
127:4
**ranit-**
117:10
**ranitidine**
7:8 21:23 22:2 68:12, 13,16 69:6 74:17,22 75:2,22 76:2,3,7,10, 13,18,19,21 77:2,8,12, 16,19,23 78:12 79:21, 23,25 80:1, 6,7,11,13,14 81:1,7,9,21, 22,25 82:5, 15,18 83:11, 16 84:2,7 86:20,23 87:14 101:4, 7,13 105:11, 17,20 106:1 108:19 109:4 111:17 112:5 117:2,11 118:18 119:1,5 120:25 122:11 123:24 128:6,10,12 131:9 134:20 135:1,8,12 136:16,20 137:1,6,16 138:8,16 143:7,8,16, 18 227:12, 15,19,21 228:3,17 249:6,22 250:16 255:14 256:25 257:3 258:10 259:6 260:24 261:4,7 262:22,23,24 263:17 264:4,22 265:16 268:6,11,15 269:15 270:10 271:14 272:7,14,21 273:15 274:11,18 275:3 287:23 290:1,13 292:10,16, 19,24 293:11,16, 20,23 294:3, 6,9,12,14, 19,24 295:3, 12,17 296:1, 9,16,20,25 297:13 298:1,18,20 300:24 301:8,11,17, 19 302:3,9, 25 303:5,11, 13,16 304:3, 6,7,12 305:19 306:9,15,20, 21,25 307:15,24 308:13,24 309:15 310:6,8,24 311:8 314:8 315:7,14 317:6 319:5, 25 327:9,18, 25 328:4 330:5 332:2, 8 333:19 334:3,17 340:12 341:18,20,23 342:18,25
**ranitidine-containing**
76:11
**rarely**
386:12 387:17,18
**rat**
32:24 52:4,9 69:23
**rate**
28:11 35:7 77:22 192:7 301:7 353:6 356:19
**rates**
101:7,9,13 189:4,5 243:8,14,15 244:9 245:3, 4,10,12,15 273:7,11 300:21,22 301:17 303:24 317:4
**ratio**
163:2 164:1, 14 166:23 170:1 188:7, 13 189:22 190:15,17, 20,24 191:2, 16 192:2 196:18 233:10 237:9 267:18,19 268:19 269:7,8,10,

12,16 270:12 273:17 296:21 306:17 307:9,13,22 308:2 309:14 310:7

**rationale**
315:23 316:20 348:9

**ratios**
163:11 190:11 191:3,4 196:11 234:6 286:23

**rats**
40:14 50:24 61:25 66:25 70:14 352:14 353:3,14 355:22 364:21 385:5 391:4

**re-analyze**
374:6

**reach**
17:17 167:20 204:3 326:8 348:23 358:25

**reached**
167:1 204:10 347:21

**reaching**
65:4 379:2

**reacting**
373:22

**read**
21:7,15 31:7,8 48:6 49:2,20 52:4,6 68:25 83:1 104:9 112:9 115:6 119:4 125:25 132:21 137:20 164:18 178:25 183:20,22 190:12 199:1 201:13 230:15 272:3 293:2 312:4 315:20 316:14,21 321:8 323:5 336:21 357:2 361:16 362:14 372:5 377:22

**readers**
181:2

**readership**
316:2

**reading**
21:17 62:7 100:10 102:19 104:12 194:23 307:4 310:19 311:15 336:10

**reagent**
118:18

**real**
59:10 96:4 114:25 115:5,10 117:1 145:1, 17 257:9 260:22 261:1 291:8

**realize**
99:21 158:14 183:15 312:8 315:17

**realized**
204:20 288:18

**realizes**
218:17

**realtime**
30:4

**rearranging**
205:3

**reason**
20:19 32:7 66:14 101:3 137:5,16 144:13,15 169:11 198:12 315:10 316:4 386:15

**reasonable**
58:12 70:5 71:5,14 101:2 102:12 252:11 256:11,17 265:24 285:5,20 351:25

**reasons**
75:6 100:13 308:14 349:19

**recalcitrant**
368:16

**recall**
13:17 21:16, 17,19 22:9 32:13 33:16 35:1,2,7 38:2 50:16 52:17,19 86:18 88:20 89:5,13,21 91:4,23 100:10 104:6,12,16, 22,24,25 105:6 106:19,24 107:3 112:16,25 114:13,17,23 117:24 125:15 131:17 134:10,24 147:18 148:18,24 168:20 173:8 186:2 199:1 201:24 202:12 209:10 215:17 216:2,11,19 217:3 218:21 226:21 229:20 266:21 271:24 279:19 280:10 281:18 282:11 285:25 286:17 287:7 288:8 305:1, 11 310:1 333:6 345:7, 19 357:9 366:9

**recalled**
31:25 32:5,7 134:17 283:25

**recalling**
125:11 283:1

**recalls**
146:12,19 149:3

**received**
57:23,24 129:11 131:4

**recent**
10:25 206:19 265:3 296:11

**recently**
12:3 21:15 26:21 135:10 147:17 343:5 377:6,13 380:13

**receptor**
140:1 260:22

266:8
**recess**
72:25 129:24 172:24 231:13 279:8 343:18 393:21 394:24
**recipients**
313:11
**recognize**
17:11 100:19 101:5 124:6 142:10 153:17 206:8 217:2 290:5 353:18
**recognized**
127:23 352:20
**recommendation**
221:4
**record**
6:2,7 7:19 18:13 72:24 73:3 129:23 130:2 172:20,23 173:2 184:1 231:9,12,16 279:7,11,24 343:17,21 393:20,24 394:19,23 395:2,11
**recorded**
6:4,6 284:16
**recording**
6:13
**records**
291:9 333:5
**red**
189:13 383:25
**redacted**
313:12
**reduce**
211:15,25
**reduced**
211:16,19
**reduction**
202:24 211:21 212:12,16,21 213:7,16,22 214:12,14,18 215:10
**refer**
25:21 27:25 49:22 83:11 105:18 249:9 275:23
**reference**
51:13,23,25 52:21 89:5 95:19 126:1 145:2 201:25 305:9 335:18 336:11,20 337:11 365:25
**referenced**
95:17 222:16 337:9
**references**
305:2 358:14,17,19
**referred**
38:12 227:16 322:5 335:11,15 376:3
**referring**
36:23 37:1 49:18,24 89:6 103:7,16 104:15,23 105:7 107:14,15 111:23 117:10 125:22 146:3 157:23 158:7 159:8 247:22
260:8 332:24 370:15
**refers**
48:11 51:21 99:14 163:20 314:19
**reflect**
27:7 221:6
**reflecting**
179:7,16
**reflects**
117:16 254:15
**reflux**
368:24
**refresh**
42:23
**regard**
55:5 382:21 383:6
**regarding**
24:10 81:8,23 82:16 83:18 101:4 152:4 317:23 360:16
**regions**
189:3,11,15
**registry**
145:15 331:14 333:9,13,17 334:25
**regression**
210:18 215:25 236:6
**regular**
272:7
**regulated**
384:16,22 389:4
**regulatory**
105:1 150:24
**reinforces**
222:25 257:2
**reject**
56:13 58:16,
25 175:9,25 179:14 181:16 298:6
**rejected**
181:19
**rejecting**
181:14 315:11,24
**rejection**
316:3
**relate**
378:22
**related**
7:12 13:2 38:19 50:7 147:1,14 149:3 150:2 151:2,22 182:11 228:10 248:23 315:7,13 351:16 367:9 368:23,25 369:1 375:8,11,18 378:21 388:22
**relates**
218:6 393:4
**relation**
187:24 188:1 231:24
**relationship**
78:8 317:15 346:11 373:24
**relationships**
319:1,4
**relative**
119:9 122:14 202:23 209:17 210:21 211:3 212:3 213:8,23 214:12 216:12 261:3
**relay**

19:18
**relevance** 37:13 216:4
**relevant** 16:23 27:18 84:5,8 95:25 121:3 202:23 212:22 227:13 261:2 266:22 267:1
**reliability** 199:18 220:17
**reliable** 83:3 352:15
**reliably** 202:16
**relied** 90:17 305:6
**rely** 19:15 88:12
**relying** 304:21
**remain** 136:20 137:2 138:16 208:16
**remains** 44:21 151:20 359:5
**remark** 164:13
**remember** 50:18 68:11 91:3,11,13 95:16 107:1 112:10 124:17 125:2 126:1 139:15 149:8 159:13 178:17 217:15,19 261:20 272:25 307:4 310:3 340:15
**remembering** 373:16
**remind** 145:3
**remote** 6:11 7:1,10, 18
**Remotedepo** 6:25
**remotely** 7:25
**remove** 6:17
**removed** 134:20
**repair** 39:2,6,13,24 40:4,5
**repeat** 11:22 19:3 150:5 173:21 174:5 185:14 191:24 195:13 197:9 200:16 214:9 229:4 307:19 318:4 332:4 392:4
**rephrase** 239:21
**replication** 28:7
**report** 12:11,12,23 13:11,16 15:10,21 16:4,11 25:15,17,19, 21 26:1,3,16 27:5,22 29:3 33:13,15 37:8 38:3,4 52:7 76:6 77:9,11 78:3,11,14 79:6 81:11 82:2,20,21 84:13 90:14 91:22 95:16, 18,19 102:11 105:15 108:19 109:1 110:2,14 111:4 116:13 118:10 123:15,22 124:3,19 125:5,8,22 126:12,15,18 128:5 129:3, 14 132:13 133:11,16, 17,19 159:12,14 162:5,10 168:5,11 185:9,16,22 199:4 208:5 220:12 222:17 224:5 249:18 259:3,5 273:25 277:2 287:18 305:10 321:15,17 322:24 323:3 327:17,24 328:3 341:14 367:23 368:19
**reported** 47:22 48:2 49:6 50:2 51:9 83:6 85:13 152:20 277:3 283:2 360:20
**reporter** 7:15,20 14:8 82:7,11 173:16,20 174:4,8 372:9
**reporting** 7:24 8:9 140:13 282:12,22 287:7 307:14,22 327:24 338:19
**reports** 69:1 103:6 104:5,6,22 111:22 112:10 115:6 305:1,2
**represent** 8:20 11:10 127:22 157:24 158:2
**represents** 76:24
**reproducibili ty** 285:11
**reproducible** 113:23
**reputation** 183:18
**request** 6:6 134:16, 23 276:3
**requests** 133:25 134:9
**require** 134:11 230:3 242:6 391:12
**required** 55:9 177:23 393:5
**requires** 29:8,13 215:16 367:12 389:5 393:14
**research** 21:22 22:3, 8,10,11,12 24:24,25 25:4,10 27:12,19 32:17 55:6 68:8 206:14

207:24 208:4,18 243:4 320:23 321:1,5 360:12 363:3 368:12 382:18
**researched** 339:12,21
**researcher** 24:22,23 311:19 313:22,24,25
**researchers** 321:1 368:7 374:2
**researches** 285:13
**reserve** 394:14
**residence** 190:7
**residual** 266:25
**respect** 33:21 82:23 134:9 227:19
**respectfully** 315:3
**respond** 144:9
**responds** 131:2
**response** 14:10 33:18, 24 47:8 113:8 131:16 133:21 135:2 304:22 377:15 385:9
**responses** 39:22 385:14
**responsible** 348:16
**responsive** 85:1
**rest** 62:17 147:25 252:19
**restate** 40:13
**restated** 60:14
**restricted** 169:25 171:11 251:3,10 253:4
**restricting** 171:9
**result** 28:15,22 29:7,18 31:14 45:23 128:9,12 144:3 223:7
**resulted** 74:3 151:25 226:13
**resulting** 98:11
**results** 88:4 98:9 120:4 122:23 134:2 136:17 157:20,22 160:16 162:2,21,22 166:2 181:18 184:4 224:15 227:5 228:23 229:10 232:9,17,21 233:1,13 258:18 264:12 265:11,19 267:10 271:15 292:8 293:25 300:18,19 305:19 310:16 314:9 322:10 349:3
352:13 357:21 358:1
**retained** 11:15 13:4, 19,20,22 21:21 111:8
**retrieved** 335:1
**retro-** 284:2
**retrospective** 18:10,14 281:4 283:9 285:11,21 340:3
**retrospectively** 281:13 284:4,12 287:1
**revealed** 108:24 109:19
**reveals** 247:6
**reverse** 75:10 226:18 266:25 273:10 277:12 308:9 311:1 353:13
**review** 37:23 50:10 68:3 69:3,11 77:7 88:22 89:16 113:1, 6 118:1 119:20 120:18 121:17 132:12 145:8 198:24 199:3 200:24 216:9 331:16 343:25 344:5 365:20 366:1
**reviewed** 21:11 36:19
52:5 69:19 88:24 103:1, 24 126:14 131:15,17, 18,23,25 133:10 139:15 152:4 169:4 171:6 250:1 253:19 266:19,23 314:14 332:18 343:23 344:2
**reviewing** 17:21 104:16,25 120:10
**revisit** 390:2
**reword** 11:13 95:1 272:18
**reworded** 323:13
**rich** 96:1 228:5
**right** 6:24 9:5,9 14:1,7 15:5 16:7 31:4,8 34:6 38:8 43:10,20 48:14,22 53:8 60:20 65:11 97:13 98:8 103:11 108:9 109:5 114:11 117:12 120:24 123:5 138:3 140:25 146:7 157:21 158:16 169:21 174:7 178:23 181:24 186:20 191:18

206:12 211:1 218:11 219:8 220:2,18,21, 24 222:21 223:9 232:5 233:3,10 255:22 257:25 259:19 267:10 268:14,18 271:4 281:2 289:6,22 290:12 296:19 298:9 300:15,24 307:17 309:2,13 313:3 329:20 341:6 342:14 381:18 385:19

**rightly**
374:8

**ring**
23:24 24:8

**rise**
55:25 116:1 123:17 386:13

**risk**
16:25 47:8 52:11 74:17, 23,24 75:9, 14,23 76:7, 14 77:6,14, 17 78:7 80:5,12 82:6 83:5,6 87:12 94:6 139:25 156:7 160:17,23 161:1,7,9 163:21 164:2,7,14 165:3,10,14, 15,18,22 166:2,5,8,14 173:10 176:15,21 177:2 178:16,20 179:3 181:6 182:13 183:6 184:15,16 185:1,13,17 188:17 189:20,23 190:4 192:14,19,23 194:12,20,21 195:10,17 196:2,5 198:19 200:10,18,19 202:23 205:6 206:12,23 207:20 209:17 210:21 211:3,8,9, 16,21,25 212:3,4,5, 13,17,22 213:7,8,18, 23 214:12,14 216:12 218:4 224:17 232:11 233:22 243:25 244:16 245:25 246:7,10,18, 19 247:1,12, 20 248:2 250:15 252:4,6 255:15 256:24 257:3 258:9 261:3 265:5,15 266:8 267:14,22 268:23 269:24 271:15 272:9,13,20 274:4,10,17, 23 276:21,22 278:8 280:23 289:25 290:14 292:15 293:20,22 295:25 296:15,25 297:2,3,8, 13,23,25 298:16,19 301:14 302:2,11,16 306:11 307:16,25 308:2,8,25 310:8 325:13,16 327:10 335:3,17 369:8 370:11,16, 20,25 371:4, 6,7,15,25 372:23 373:1,11,25 375:7 376:13 377:1 378:8, 15 379:18 382:25 383:9 389:1

**risks**
166:22 246:22 339:18 389:10

**Roberts**
248:24

**rodent**
45:6 360:11, 16 363:21

**rodents**
352:13 353:3 365:12

**role**
66:9 154:25 204:17 374:17

**room**
7:23 9:8,15 10:4,10,11 106:22 135:13

**Ross**
221:18

**rough**
198:1 199:17 220:16

**rounded**
323:2 324:4, 9,15

**rub**
346:13

**rubber**
344:13,16, 19,22,23 345:10,22 346:3,8,14 347:3,5,16

**RUBENSTEIN**
3:4

**rubenstein@ gtlaw.com**
3:5

**Rudy**
92:12

**rule**
15:21 265:16

**rules**
14:2

## S

**S------------ --**
4:7

**safe**
230:12

**salt**
170:11

**salted**
187:13 204:12

**sameness**
181:15
298:5,12
**sample**
141:10
337:16
**samples**
142:1 337:18
338:5
**Sanofi**
3:7 327:17,
20,25 328:4
**Sanofi-avertis**
3:8
**saying**
36:8 47:1
50:5 60:13
64:17,20,22
85:2 99:11,
13 129:4
138:25
144:1,10
158:10
165:16,19,20
166:15
175:14
177:21
182:24
211:13
224:10
265:19
301:23 307:5
316:5 342:12
345:6 351:17
362:16
384:19
**says**
15:21 43:8,
10,21,22
44:23 45:22
46:16 47:5,
18 48:10
50:21 60:19,
22 61:3,11
62:13 63:5
64:17 65:13
92:9 93:1,7,
17 94:6
98:16 118:16
119:4
126:11,23
127:17
128:3,17
130:24,25
133:23,24
134:7 135:6,
9,18 136:8,
14 139:25
140:9 141:4
147:3,4
150:16,22
160:15
161:5,8,10,
20 164:5,19
166:20 167:5
178:12 182:9
186:9
194:10,19
196:11
197:10,17
202:21
208:22
210:15,24
212:19
214:25 221:1
232:19 233:1
234:3,10
236:4 241:7,
11,18 250:14
255:23 270:1
272:11
280:21
281:17
282:18
283:21
286:16,22
287:5 289:25
290:12
291:6,20
294:2 295:24
297:16 298:3
314:6,24
320:12
323:8,10
324:25
328:24 330:8
335:9 336:4
340:25 341:7
350:21 352:8
354:12
355:24
357:24
359:19
360:19
372:17
376:11
382:11,16
385:2
**scale**
245:18
**scant**
112:12
**scenarios**
114:1
**Schaffalitzky**
333:3,4
**SCHMITZER**
3:25
**SCHOLER**
3:9
**School**
206:16,25
**science**
254:10
**Sciences**
329:1
**scientific**
3:19 66:15
275:8 328:16
329:8 382:19
393:14
**scope**
248:20
**score**
236:9,16
**scores**
336:7
**SCOTT**
3:15
**screen**
6:23 9:23,24
10:4,15
97:11 302:23
389:9 394:5
**screened**
280:24 281:3
**Screening**
282:21 283:3
**screens**
6:15 9:20
**seafood**
93:16,17
**seal**
107:11
109:22
110:19
112:20
113:15 114:3
**search**
69:4 153:8,
20,24 154:1
279:19
280:10 291:7
**second**
14:13 31:11
84:19 141:2
159:24
188:6,12,18
194:21
208:21
210:12
214:10
232:12,23
272:6 289:14
293:7 307:8
313:2 314:11
323:5 336:2
359:4 384:25
**secondary**
172:5,8,9
**secondhand**
371:11
**seconds**
214:7
**secretory**
21:25
**section**
33:15 38:10
79:5,13
91:22 127:9

291:2,4
**see**
10:9,17 15:20,23 30:4,14 34:19 35:22 36:10 38:10, 11,18 42:15, 18,25 43:11, 18 44:2 45:1 47:9 48:10 51:3,12,17 53:14,23 57:10 60:18, 20 61:1,9,15 62:7,21 63:4,10,21, 23 65:23 79:1,15 87:10,16,24 88:6 90:17 91:6 92:8, 15,16 93:1, 5,6,7,9 94:6,9,13,21 95:18,20 98:14,21 99:10,16 106:4 110:6 111:2,7 113:10 118:16,19,21 119:3,14,22 120:24 126:11,21 127:8,9,25 128:19 129:3 130:9,12,18 131:5,13,21 132:1 134:5, 13 135:16, 17,24 136:12,22 137:19 140:4,9,15, 17 141:1,11 144:18,21 145:4 146:11,17 150:16,20 151:5,10 153:8,20 160:11,19 161:7,20 162:1 163:3 164:9 165:11,24 167:3,8 170:20 171:8,22 175:23 176:5,23 178:8,10 179:11,14 180:11 182:16,17 184:18 185:5 186:13,23 188:14 189:17 191:10 194:7,14,19, 23 195:5 196:13,18,25 197:10,12, 14,19 199:20 200:25 202:5,19,20 203:1,2 209:13,14,22 210:14,22 211:5 213:1, 4,7,11,24 214:13 215:5,6 220:9 221:1, 8,9,19 232:14 233:24 234:8,9,16, 17,21 235:6 236:3,12 240:17,21,22 241:5,9,16, 23 245:19 247:19 250:14,23,25 251:1,6 253:20 255:17 256:3 258:9,15,20, 22 259:17,25 260:18 264:11,20 265:8 266:5, 16 267:15 268:8,9,16 272:8 273:17 276:4,7,11, 15,18 279:21 280:12,16 281:9,23 283:5 284:6, 7 285:9 286:20 287:3,9,22 288:23,25 289:24 290:8 291:6,10,20, 24 292:7,8, 13 293:6,13 294:2 296:4 301:18 302:23 305:9,22,25 306:2,12,17 307:9,11 311:4 313:4, 5,6,17 314:3,4,5,16 315:8,15 317:7,8 319:23 320:4,5 324:8,10,12, 25 325:3,5 326:11 327:15,21 330:1,4,7,8, 10,11,13 334:23 335:2,8 336:4,9 338:18 340:25 341:2,11,18 342:15,18,23 343:12 350:12,13,18 351:2 352:23 354:1,4,7,22 355:4 357:18,22,23 358:8,10 359:17,23 360:3 361:1, 11 362:23 363:23 372:6 373:5 376:20,21 381:14,21 382:9,14 383:1 384:2, 6 385:10 386:8 394:5
**seeing**
90:6 99:15 106:9 107:25 112:25 172:3 245:20,21 261:1 310:3 312:13 340:15 362:5
**seeks**
208:5
**sees**
393:1
**selenium**
204:15 226:6,11
**self-administered**
282:25
**selling**
152:7
**sending**
130:21
**senior**
368:10
**sense**
48:22 60:15 64:4 79:24 181:24 330:15 342:13

345:23 348:14 369:25
**sensitivity** 171:14
**sentence** 48:14,25 49:2,3,10, 21,24 50:8, 21 51:5,6,12 62:3 83:2 98:8,16 99:14 126:19 137:20 141:4 162:17 164:17,19 182:9,17 194:21 256:10 264:24 283:23 293:7,8 336:11 351:7 385:1
**sentences** 87:18 194:2 354:10 362:14
**separating** 198:7
**sequence** 28:7,13,14, 18
**sequencing** 28:19
**series** 238:18 339:4
**serious** 202:16
**seriously** 383:22
**Services** 3:7
**set** 10:3 21:2 26:16 124:7 175:23 176:1 296:12 311:24,25
**setting** 6:17 17:25 60:10 247:4
**settings** 57:15
**seven** 237:13 251:3,10 252:11 253:4,11
**seven-fold** 123:8 232:17
**several** 10:24 14:4 18:6 26:23 27:25 28:21 29:18 31:14 32:23 35:17 37:10 38:13 61:5 62:19 77:10 167:16 206:24 239:14 267:7 358:5,14 365:16 366:12 367:23 372:24
**severe** 215:2,3
**sex** 190:7 236:7, 15 237:7 385:4
**shaking** 14:11
**sharp** 207:7
**Sheehan** 9:11 10:2,7, 16 12:22 22:6 23:23 24:18 25:13, 25 27:10,24 28:23 29:20, 23 30:9,16, 19,22 31:1, 16 32:2,10, 15,21 33:12 34:3,8,21 37:6 38:1 39:14,25 40:6,11 41:7,23 42:21 48:4, 23 50:3 51:11 53:10, 19 54:1,7, 14,21 56:15 57:9 58:9,19 59:4,14,25 61:19 63:22 68:7 69:15 70:9,25 71:9,19,25 72:11,17 73:8,20 75:25 76:16 77:24 79:4, 18 80:22 81:10,15 82:1,9,19 83:21 84:19 85:7 89:4, 12,19 90:4, 20 91:10,17 92:18 95:13 96:13 97:6 99:6 100:8, 18 101:21 102:3 103:5 104:3,11,21 105:5 106:18,25 107:12 108:10 109:7,17,25 110:12,22 111:20 112:8,15,24 113:5,18 114:9,22 115:3,21 116:20 117:21 119:19 120:9,17,19 121:12 122:4,21 123:20 125:1,21 129:2,9,20 134:18 139:8 142:19 143:25 145:7 147:23 153:23 156:18 159:18 161:4,15 162:9 163:8, 24 164:16 166:6 167:15 168:10 169:1,8,15 170:18 171:21 172:11,16,19 173:12,25 174:23 175:10 177:6 178:24 179:19 181:21 182:21 186:1 188:9,20 191:23 192:3 195:12,20 197:4,7,24 198:10,21 199:25 200:4,12,15, 21 201:5 203:9,15 206:2 211:11 212:7 213:10 214:1,5,15 215:11 216:13 217:18 218:18 219:9 221:14 222:22 223:10 225:9

227:6 228:24 229:2,11 230:25 231:5,8 235:15 237:4 238:9 239:6, 19 240:5 242:2 244:2, 18,22 246:13 247:3,13,21 248:5,19 256:9 257:5 259:12 260:6 261:9 262:1 263:19 268:25 272:16 274:13 276:23 278:9 279:5,25 283:16 296:10 298:21 299:4,10,18, 20 300:1,10, 16,25 303:8 304:24 305:8 307:18 311:13 312:11 315:19 317:12,21 318:15 319:7 320:19 321:22 322:3,11,20 323:4 324:23 325:21 326:7 328:2,11,19 329:9 331:19 332:10,22 333:15 334:12 335:7 337:1,21 338:9,22 339:20 340:14 342:11 343:3,7 344:14,25 346:5,15,23 348:6 349:9 356:17 358:13,18 362:10 363:4 364:8 365:15,24 366:4,14 367:10 370:5,13,18 373:14 377:3 378:11 379:21 380:8 383:11 385:18 386:25 388:3,12 389:20 390:12 392:1,15 394:18 395:3

**shelf**
105:22 108:5

**shelves**
106:14,16 108:7,16

**shipping**
109:15 110:10 113:4 116:18 117:19

**short**
66:6 257:4 361:13 374:12

**short-term**
61:7 160:17, 22 161:7 182:13 183:6 215:16 257:7,15

**shortcoming**
90:8 349:2

**shortcomings**
18:1

**shorten**
391:3

**shorter**
241:20 243:23 244:14 247:6 249:13 260:10

**show**
53:2,6,7 62:20 75:2, 4,8,12 88:22 96:12 123:4, 12 139:3,5 143:2 175:22 176:1 181:23,25 182:1 204:16 211:9,15 215:21 216:10 217:13 226:19 227:1,9,14 228:19 229:6 233:13 242:15 244:14 246:6 265:14 284:8 296:15 298:10,12 338:2 358:6 360:20 391:4,13 393:15

**showed**
38:21 92:20 96:22 123:7 169:18 178:18 244:25 267:17 297:7 301:11 310:7 326:12 367:7 375:3

**showing**
74:24 99:17 156:3 165:22 189:19 195:7,15 211:7 256:23 301:7 375:22 383:16,20

**shown**
32:17,22,25 33:3 40:14, 16 44:19,22 45:5 61:12, 24 62:1 67:21 127:7 155:24 177:16 217:8,12 244:8 245:3 302:9 352:14,21 353:8,12,13 359:13 360:5 361:7,10,25 363:10,13,15 366:20 382:4 384:20 391:2

**shows**
33:25 42:16 45:8 93:11 94:16 112:18 127:10 141:1 145:24 146:25 152:5 155:6,16,20 156:8 162:24 178:23 183:10 184:25 192:17 196:16 203:5 214:20 235:8 237:12,17 260:1,22 264:21 267:21 268:14,15,22 270:17,23 271:5 290:1 292:10 297:22 298:16,18 306:8 329:23

330:5,11 340:9 373:22
**shut**
10:8
**sibling**
378:13 379:6
**sic**
131:4 201:1 240:24 258:12
**sick**
277:12
**sicker**
273:9 277:20 303:22 308:13
**side**
43:20 60:20 65:11 140:25 146:7 176:5 180:5 208:21 210:8,9 220:2,21,24 232:5 288:4, 22 289:21,22 290:12 291:3,17 292:6 293:24 381:18
**sign**
180:9 181:5
**signal**
181:4 182:7 242:9,11,15 245:8,24 247:8 249:19 252:13 265:15,17
**signature**
16:6 377:21
**signatures**
376:19 377:7,18
**significance**
39:8 54:5 56:1,6 57:1 58:17 59:12, 23 167:2 177:10 243:25
**significant**
36:4 39:6 45:19 53:6, 14,17 54:11 55:2,8 56:8 58:2,24 67:19 77:21 116:4 131:11 138:23 163:7,12,22 164:13 166:4 173:10 174:13 180:11 188:8 192:18 196:17,20 213:18 232:22 233:6,12 234:24 235:22 237:1,12 244:8 245:4 247:19 248:2 252:22 256:21 267:22 268:22 269:9,17 270:15 272:13,20 274:9 276:13,17 298:19 300:22 301:21 330:25 387:24 388:1,10 389:18 390:10 391:4,19,24 392:8,13
**significantly**
60:11 73:10 173:18 297:12
**signs**
36:6 75:14 281:18
**similar**
20:5 34:13 45:11,16,17, 18 60:13 93:22 114:2 141:25 143:6 145:16 191:2 265:2 286:18 331:7
**simple**
28:24 31:19 123:1 148:9 215:18
**simpler**
348:10
**simplified**
56:22
**simply**
25:23 37:19 39:3 41:18 107:23 120:5 156:3 165:16 166:15 183:2 207:10 222:23 223:22 224:8 274:7 284:17 356:4 367:25 368:2,15 374:4 384:21
**simulate**
113:2 114:21,25 116:18 139:7
**simulated**
125:10,12 128:11,13
**simulations**
89:18,21 90:8,9 129:1
**single**
28:20 29:6, 17 31:13,22 74:2 77:18, 21 161:24 162:7,13 164:6 166:19,21 167:1,12,17, 24 173:15 174:11 205:10,11 252:23 324:1 347:23,24 348:9,20 349:1,11,16, 20 355:10 375:24
**sipt**
335:6,10,14 336:14 337:13,19 339:9,13
**siren**
173:21
**site**
354:17
**situation**
143:7
**sixfold**
306:24
**skimmed**
132:22
**skyrocket**
245:13
**slight**
213:15 273:11
**slightly**
211:16,19
**slip**
361:11
**slow**
97:8 108:20 115:22
**slows**
368:4
**small**
76:23 148:24 167:20 168:3

176:10 180:18 207:2 221:6 265:17 351:12
**smaller** 135:15 210:20
**smoke** 243:11 247:12 371:11 377:19
**smoker** 334:19
**smokers** 294:24
**smoking** 243:7,13,19, 25 244:5,10 245:6,10,13 246:5,15,18, 20,23 248:9 297:24 334:21 335:4 375:19
**SNOMED** 320:8,11 321:12,14, 16,18 322:1, 18,22
**SNOMED-CT** 320:13
**sodium** 127:12 149:14
**Solco** 146:15 149:5
**sold** 32:1 76:22 152:12 341:9,22 342:16
**solid** 73:13 226:15,23 238:14 252:24
265:21 380:24
**solvent** 149:19
**someone's** 356:24
**sort** 18:12 26:13 27:12 28:10, 14 35:23 46:6 52:3 56:18,21 57:21 59:16 64:12,18 66:9,14 67:4 70:12 74:7 80:2 97:21 100:11 108:1 112:13 114:7,15 123:7 138:4 151:20 165:6 181:9 189:24 191:12 192:10 201:6 204:2,4 205:2,4 206:19 207:7 215:25 221:17 222:25 228:6 242:20 248:23 251:25 252:25 261:14 275:18 278:1 284:13 285:8,15,17, 21 308:19 309:8 310:19 314:22 315:21,25 319:10 339:6 342:13 349:14,15,24 351:25 363:3 364:16
369:7,13 373:16 380:18 383:13,14,24 386:18 387:16
**sorts** 17:22 20:3 27:13 28:12 35:16 55:15 57:18 80:10 101:14 116:10 207:6 218:9 223:21 227:23 229:19 261:22,23 278:1,17 279:1 285:17 286:5 308:6 316:10,22 336:24 339:5 340:3 348:22 370:7 393:8
**sound** 171:17 172:1
**sounds** 72:21 118:5 123:25 186:19 208:10 325:25
**source** 18:6
**sources** 19:10,14 68:10 84:8 88:3 102:14 106:19
**South** 3:9,14 189:3 250:17 253:19
**space** 337:7
**Spalding** 3:20
**speak** 177:12
**speaker** 6:15
**speaking** 9:17 30:2,6, 20 81:14 86:24 98:1 246:2 298:25 299:9 318:16
**Specialist** 3:19
**species** 32:23 36:18 40:16,18 43:24 44:12, 20 61:5,14, 25 65:16 66:22 67:19 354:17 364:1,6,11, 13 365:13,16 366:1 367:2, 8 382:6 385:4
**species-specific** 65:19 67:12
**specific** 40:8 50:6 51:25 57:14 58:21 59:20 74:13 79:5 88:21 90:6, 11 104:6 111:23 112:1 121:23 124:20 148:17 149:21,25 150:25 152:23 175:1 204:17 205:9 215:15 218:25 222:8 224:18 256:8 305:3 320:21 321:8 322:21

325:19
335:16
347:17
363:20
372:21
377:16,17
387:15
**specifically**
21:8 22:4,7
37:9 38:6,12
41:4,13
50:19 52:9
57:13,20
76:9 78:16
84:4 85:10,
11,22 133:25
134:22
145:13,20
153:3 162:11
164:5 173:18
188:16 210:1
219:21
225:11
228:15 268:6
305:1 307:7
318:16
326:14 331:6
336:14
345:19
357:19
371:17
**specificity**
309:9
**specifics**
222:10 286:7
**specify**
286:10 370:9
**speculation**
248:20 262:2
382:3
**speculative**
183:12
**spell**
8:22 383:14
**spend**
206:10
**spending**
224:23
**spent**
15:1 132:19,
22 206:9
**spills**
248:23
**spontaneous**
387:19
**spot**
87:7
**spotlight**
6:17
**spotlighted**
6:14 10:5
**squamous**
49:17
**stability**
106:17,22
107:9 108:1,
15,17 111:9,
14 112:3,13
115:2 119:10
121:4 122:15
124:6,8
134:12
135:11,19,20
136:6,17
137:9 138:1,
7,9,22
139:11
**stabilize**
336:7
**stabilized**
338:3,6,20,
25
**stable**
131:9 136:20
137:2 138:17
**Stage**
368:16
**stages**
238:18
**standard**
22:18 135:20
284:3 286:13
337:6,15,23
338:12,19
339:11
**standards**
338:24
339:13
**stands**
43:13 95:24
186:15
259:16
299:15
**start**
62:6 82:13
85:3 118:25
146:19
149:19
171:12 286:6
**started**
113:9 243:8,
14
**starting**
15:12 115:18
188:5 255:23
372:17
**starts**
87:11 126:19
130:16
142:16
166:19
341:18
**state**
8:22 42:6
157:17
168:22 176:8
179:1 199:11
209:15
383:17
**stated**
41:13 62:24
134:22 154:3
167:11
338:11
**statement**
7:18 44:15
45:3,13
46:1,19
47:11 48:5
52:16 61:18
63:25 64:21
66:1,4 71:7
72:5 90:5
101:23 128:1
136:24
138:15,20
154:5,9,13,
18 157:1,18
159:9 161:5
162:4 195:13
198:4 203:2
212:19 215:6
220:20
221:1,19
222:9,25
239:17,19,24
242:1,18
251:9,18
252:18 253:3
266:24
351:5,24
355:4,5,8
356:25
358:10,17
359:25 383:4
388:19
**statements**
65:6 103:2,
25 104:9
134:3 353:1
354:25
**states**
18:24 21:5,
14 106:24
134:17
149:24
152:13
154:10,11
202:14
204:7,8
232:7,8
234:18
245:12,16
262:25
263:16
316:23
319:23
357:16,19
359:4
**stating**
49:3

**statistic**
56:5
**statistical**
53:6,17,20 54:5,8,10,11 55:6 56:1,6, 7 57:1 58:17,23 59:12,19,22 95:25 98:10 167:2 200:6, 7 202:24 214:21,23 215:1,4,10 243:24 335:9,25 336:2 388:1, 10 389:18 390:10 391:13,24 392:7,13 393:15
**statistically**
55:2,8 58:1 77:20 163:6, 22 164:12 166:3 174:13 176:20 178:15,19 179:2 180:10 188:7 192:17 196:17 232:22 233:6,11 234:24 235:21 237:1 247:19 248:1 267:22 269:9,17 270:15 272:12,19 274:9 276:12,17 297:12 298:19 300:22 301:12,21
**statistics**
56:23 57:14 58:13 59:5 175:21
**stats**
234:25
**status**
190:7
**stayed**
280:5
**steady**
342:20
**steam**
115:9
**Stefani**
185:4
**stem**
373:24 374:7 375:23
**step**
356:2
**steps**
28:22 29:18 31:14
**Steve**
92:11
**stick**
126:6 356:8
**stochastic**
368:2
**stomach**
194:12,20,21 195:1,10,18 196:6,11 239:16,22 334:8 368:24 376:17,22 377:25 378:9 379:9,15 380:4 386:10
**stop**
120:20
**storage**
118:18
**store**
109:23 112:20,21 113:15 114:3,4
**stored**
119:7 121:1 122:12 135:12
**stores**
109:22
**straightforward**
165:7
**Street**
3:3,9,14
**strength**
41:11,19
**strengths**
348:20
**strike**
87:6 95:1 103:18 220:21 228:13 272:18 312:18 320:8 333:11 364:2
**strong**
39:2 46:24 66:15 72:9 224:11 225:17,23 242:11 249:18,21 364:7 372:25 373:10,19 374:10
**stronger**
169:24 221:7 228:3
**strongest**
226:2
**strongly**
360:23 361:13
**struck**
323:12 364:17
**structure**
73:14,23
**struggle**
321:2
**studied**
32:19 40:19 61:14 219:12 242:8 311:11 347:6 350:7 354:13 355:1 366:10 381:25
**studies**
16:17,20,21, 25 17:5,8, 11,14,22 18:2,7,10,11 20:3,5,11,16 21:6 22:2 24:9,13,15, 16,20 25:1, 3,5,8 35:17, 20 36:13,20 37:11,23 38:8,11,19, 21 41:12 43:22,23 44:11 47:13, 15 49:19 51:21 52:2, 5,9 55:4,15, 18 56:19 57:18 62:15, 25 63:14 64:8,9 67:10 68:22 70:15 74:21 75:4, 11,12,18,19 76:4 77:8,12 78:2,4 79:2, 3,15,16,22 80:4,8,10, 14,20 81:1 82:22 84:6 88:7,11 89:18,22 91:12 96:7 99:22 101:1

117:11 125:13 140:20 141:25 144:24 145:2 157:14 168:2 170:12,22 171:25 176:11,14,19 177:4,16,18, 24 184:4 185:8,25 189:1,7 195:22 198:18 199:19,24 201:9,13 202:4,18 203:4,13,19, 23 204:2,23 205:8 206:1 207:6 208:16 216:5,9,15, 20,23 217:11 218:4,10,15, 21,22,25 220:18 222:18,24 223:16 224:5,14,15 225:21 226:5 227:8,12,15, 24 229:20 230:16,18 239:1,25 241:7,12 243:22 244:5,6,8,14 245:2 246:6, 9,12 248:2, 3,16 249:6, 8,16 257:21 261:23 265:3,5,14, 20,21,22 266:10 267:3,8 272:2 275:13 276:20 277:15 278:7,18,20 279:1 285:17 288:4 292:1 293:19 296:12,24 297:6 301:2, 4,6 303:24 306:20,21,23 307:4 308:6, 17,20 309:11 310:17 316:10 319:6 322:16 326:12 328:17 337:17,24 338:1 339:23 344:2,6,7 345:12 346:10,25 348:22 353:3,8 355:19 356:15 357:8 358:12,24 360:17 362:21 367:24 375:3 376:2,4 378:6,13,14 379:1,6,7 385:24 386:8,9 387:5,16 388:16 389:2,16,17 390:8,9 391:16,23 392:12,23

**study**
16:16 18:13 22:8 24:16 33:2,5,10,20 34:7,13,16, 18,23,24 35:2,8,14 44:6,7 50:25 51:25 52:17, 21,23 53:11, 13,23 54:17 55:7 56:17, 21,24 57:4, 8,22 58:5,13 59:16 60:10 74:9,13 75:1 76:2 77:4, 16,18 79:25 80:1,17,20 83:1,6 84:15,16 85:5,17 86:3 88:12 89:8 90:11,13,17, 22,23,24,25 91:3,15,18, 24 92:17 94:1 95:8,15 100:14 102:1,9 118:2 119:21 123:22 124:16,17 125:3,11 128:7,14 131:8 139:17,18 140:2 141:2, 14 142:20,25 143:1,4,12, 13 144:18 145:5,8,15, 17 146:5 147:11 149:24 150:7,9 156:3,8,15, 20,21 157:5 158:10,13 159:12 161:12,13,17 162:3,18 163:17 164:3,11 165:3,12,20 166:18 167:11,19 168:6,12,14, 18,22 169:4, 18,25 170:22 171:12,13 173:6,9 175:12,14,20 176:1,7,22, 25 177:11,13 178:18,22 179:8,17 180:7,14,19, 20,21 181:11,22 183:9,10 184:14,16 185:2,18 187:10,11,14 188:22 190:6 192:21 195:11,19 198:25 199:4 201:22 209:8,16,19 211:17 214:19 215:13,16,18 217:16,17, 21,25 220:6, 12 222:15 224:24 231:23,25 233:9 238:16 249:12 250:2,7,9,17 251:17,19 252:14,25 253:10 255:24 256:5,17,19, 23 257:1,9, 11 259:10 260:11,21 261:18 262:7 264:18,21,25 266:5,18,23 267:2,9 268:5 270:4, 17 271:19 272:5 275:25 277:14

279:18,20
280:9,11,22
282:19,21
283:3 284:16
285:10
287:25
290:12,24
291:12
292:7,15
293:16
295:23,24
296:7
301:10,13,16
302:10 303:7
304:5,15
305:20 306:1
308:21
309:1,15
312:7 314:9
315:3,17
317:10
318:11
319:17
321:25
322:10,15,
19,22,24
323:6 324:24
325:4 327:3
331:13
333:3,20
334:2,19
336:15
340:2,9,16
343:9,24
344:1,9
345:13 350:6
356:16
357:15
362:23
367:3,4,6
372:3 373:8
374:5 376:9
381:10 389:8
390:23,24

**study's**
195:7,15

**studying**
144:25 240:1
356:21

**stuff**
10:19

**stuffs**
103:12

**subgroup**
302:1

**subject**
354:21

**subjected**
139:10

**subjects**
234:4 282:24
284:1 286:19
297:23 302:1
333:20 334:3

**submission**
312:1

**submit**
13:10

**submitted**
12:13 13:15
15:10 131:3
312:9,15

**subpoenas**
304:23

**subset**
302:3

**substance**
46:11 65:20
67:14 363:13

**substances**
136:16
344:17
360:22

**substantial**
202:22
212:25
213:22
214:11,17
371:24,25
376:13,25
378:7

**substantially**
119:12 121:7
122:18
199:14
221:3,12
241:20

**sufficient**
382:22 383:7
393:6

**suggest**
33:5,20
35:25 63:16
74:22 88:8
103:2,25
115:13
138:23
143:22 164:2
169:4 182:25
189:23
192:10
211:13
222:17
229:18
296:24 315:4
337:17 342:1
365:2 367:7

**suggested**
78:6 229:15
322:17
346:18
347:10 368:6
389:1

**suggesting**
36:9 115:8,
16 148:17
163:15 182:7
189:24
226:6,16
229:15,19
347:18 353:5

**suggestive**
62:16 63:1
64:11,19
77:13,17

**suggests**
46:24 67:21
77:5 102:19
124:12
136:10
144:19 145:5
147:13 165:3
178:14 179:1
192:21 256:6
341:23
388:18,20

**suitable**
315:2

**Suite**
3:3,14

**suited**
315:4

**summarize**
75:1

**summary**
43:18 58:12
94:16 118:24
194:1,19
202:14 234:2
280:20
282:8,17
286:15
354:10
362:14
372:14

**sunlight**
28:11

**supervising**
171:24

**supplemental**
336:25
340:18
341:1,2,7

**Supplementary**
341:8

**supplied**
108:8

**supply**
109:15
110:10 113:4
116:18
117:19

**supplying**
149:4

**support**
7:12,17 51:5
176:19
327:19
358:17,20
359:10

**supporting**
285:18
**supports**
347:19
**suppose**
316:20
**suppressant**
275:7
**suppressive**
303:21
**sure**
9:25 11:25 17:6,20 45:14 47:12 48:5,13,25 49:20 50:5 52:6 57:4 69:24 78:23 79:10 83:22 92:12 95:22, 24 99:7,18 103:14,17 104:14 107:13 108:11 113:22 114:10 116:23 124:3 131:22,25 142:3 143:4 151:17 157:22 172:4 187:8 195:22 198:11,23 203:10 219:13 243:5 246:14 247:22 251:15,16 261:12 279:5 298:7 310:3 325:22,24 326:9 328:20 332:23 337:22 342:14 351:6 353:2,7 355:10,25 361:20 362:17 365:9 366:25 371:16 372:4 373:20 377:4 387:1 391:17
**surprise**
181:7
**surprised**
142:10 260:13 262:11 345:21
**surprising**
364:19
**survival**
35:7,18 208:1
**swath**
260:23
**swear**
8:11
**Swedish**
194:12
**sweeping**
357:5
**swine**
365:14
**switch**
20:20 105:8 129:19 139:13
**switches**
19:22
**switching**
20:21
**sworn**
8:14
**symbol**
130:10
**symptomatic**
308:14
**symptoms**
332:14
**synergistic**
191:11
**syntax**
255:2
**system**
39:2,5 140:13
**systematic**
68:3 69:11
**systematically**
287:2

**T**

**tab-**
341:7
**table**
92:24 93:6 96:21 97:24 186:8 188:10,14 190:24 192:9 193:3,5,6,7, 17 196:9,11 235:2,3,4,7 259:23 269:20,21,22 270:1,7,9 273:17 276:3 306:5,7 323:22 324:8,14 329:19,22,23 341:8 383:16
**tables**
99:17 309:7 334:22
**tablet**
119:6,7 122:12 123:2,4,6 127:20
**tablets**
105:21 117:6 118:19 119:1,5 120:25 122:11,25 128:10
**take**
6:22 14:8,15 17:12 33:14 47:2 60:18 62:16 64:23 65:8 68:1 72:13,14,18 84:12 92:2 93:25 96:7 97:8 101:7 105:13 118:23 120:3 129:18 133:20 134:1 135:4 139:12 140:23 147:9 154:18 159:11,24 166:17 170:10 172:15 175:4 176:3 178:5 180:16 181:3 186:6 187:21 188:21 193:4,22,23 194:18 196:7,8 199:6 201:14 206:5 219:24 220:1,23 230:23 231:3 233:15 235:24 238:1 240:11 241:6 248:15 249:15,24 250:8,21 252:12 255:8 258:3,17 259:21,22 263:6,8,11, 13,22 264:10,24 266:1 268:9 269:19 271:8,9 275:24 279:4

282:2
283:11,16,18
287:13,15
290:11
295:22
297:18
302:18
304:17
308:14
312:19,20,21
314:10
319:14,16
323:5
324:11,18
326:24 327:1
329:18
340:17 341:4
343:14
350:1,20
352:4 353:20
357:13,14
359:2 360:18
367:6 371:18
372:13
381:2,4,9,16
383:22
384:24
385:15
389:12
390:22
393:18

**taken**
7:3 73:1
75:13 84:10
129:7,25
132:12 156:9
172:25
231:14 279:9
302:7,18
343:19
393:22
394:25

**takes**
29:1 238:6,
12,24

**taking**
224:9 227:21
252:18
257:10
263:16
303:25
308:13
330:17
332:1,20
333:1

**talk**
68:24 105:23
107:16
139:14 147:6
166:3 194:8
204:23
218:12,25
228:16

**talked**
68:12 70:14
97:16 152:8
158:5 217:15
221:20
248:25 386:4

**talking**
36:22 51:16
54:4 57:5
73:21 80:5
90:22 103:14
138:5,8
139:5,9
141:20
165:17 200:5
209:2
221:15,18,
21,25 222:2,
6 223:4
239:20
318:18
320:21
323:17 360:2
361:5,20
362:3,11
377:5 392:7

**talks**
268:1

**target**
262:13

**teaching**
238:12

**team**
314:15

**teasing**
379:7

**technician**
3:25 7:11
210:11
289:13

**tell**
49:3 131:22
132:24
179:22
203:20,25
219:21 244:4
263:21
331:23

**telling**
120:18

**temperature**
106:23
123:10
135:13

**Temperature-dependent**
118:17

**temperatures**
111:17,18
112:6 131:10

**ten**
27:1,8
72:16,17,18,
19 214:7
231:5,6
243:10,12,
15,23 244:9,
15 245:5
247:8 263:9,
12,17,21
324:4,9,15
325:1,6
343:14

**tend**
189:5 238:23
260:17 273:8
275:15,17
277:13,20
303:22

**tenfold**
310:8

**tens**
323:3 385:16

**term**
46:3 55:24
66:17 70:11,
18,19 71:21
72:8 166:7
212:16
248:15 257:4
260:10

**terminology**
27:8 71:24
166:4 174:17
370:24

**terms**
16:21 21:20
25:3 26:2
27:14 39:20
44:21 46:25
47:15 52:14
66:8 74:21
76:2 77:12
82:6 90:11
91:1 93:20
95:9,22
98:24 102:24
103:20,21
105:19,25
110:3 114:1
125:14
141:14
157:11 159:2
161:10
175:5,20
189:7,10
192:16 200:5
212:12
214:20
219:1,13
222:7 224:16
226:3 236:6
242:14
245:7,15,25
259:20
260:19
263:11 267:9

285:11 286:9 306:19 312:5 316:15 320:23 321:1 330:3,15 335:8 338:19 339:10,11 341:20 346:20,24 347:3 360:4 368:22 369:19 370:7,10,12, 17 373:8 379:16 380:22 386:19

**tertile**
232:12,16 233:11 234:5,7,20 235:10,11, 16,22

**test**
14:13 56:7, 8,11 58:24 59:19 111:23 115:9 158:17 175:7,8 179:13 181:13,14, 16,18,25 385:3

**tested**
56:25 57:8 58:4 106:3 108:4,13 122:23 137:12 152:19,25 153:3 157:25 225:4

**testified**
8:15 10:23, 24 11:8 12:9 14:3 305:6

**testify**
11:14,20,23

**testimony**
8:4 126:1 132:14 163:23 365:10

**testing**
56:6,17,24 58:23,24 105:24 106:3,8,15, 17,22 107:6, 9,23,24 108:1,6,7,8, 9,15,18,23, 24 109:11, 19,20 110:4, 8,16 111:1, 4,7,9,13,15 112:14,17,22 113:1,16 114:8,15,16, 18,20,24 115:2,4,7 116:17 123:19 134:2 135:11,19,20 136:7,9,15, 18 137:9 138:7,9,11, 22 139:11 151:19 152:23 153:6 157:19,22 158:19,21,25 159:2 175:23

**tests**
54:11 107:2 112:3

**Teva**
3:1

**text**
284:7

**textbook**
183:20

**Thakkar**
314:7

**thank**
9:2 14:16 15:16 65:11 184:24 235:5 323:15 329:22 383:15 394:17 395:3,7,8

**theme**
359:10

**theoretical**
30:17

**theoretically**
28:20 29:16 31:12

**theories**
226:8

**theory**
20:22 157:13 374:8

**therapeutics**
314:21

**therapy**
325:10 377:15

**thing**
17:7 37:17 77:3 204:22 206:18 230:13 245:15 269:21 292:24 324:12 327:8 361:6

**things**
16:23 35:17 60:13 103:13 144:13 189:14 204:18 217:22,23 218:3 222:4 225:25 228:7 273:7 310:2, 19 313:7 329:16 361:23 371:8 375:19 391:6

**think**
11:25 12:24 13:12 15:2 17:10,17 18:11,20 20:1 22:7,20 27:17,25 28:24 31:19 32:4 34:22 37:12,14 38:22 40:7, 24 41:8,17, 24 44:17 45:18 46:9, 11,20,23 47:16 48:11, 18 51:20 52:1,22 54:24 57:12 58:12 59:15 60:4,7,13 61:21,23 62:2 64:2,3, 7 66:4,14,17 67:16,20,21 68:14 69:17 70:2,4,11, 17,18 71:3, 10,12 72:8, 15 74:19 75:1 76:6,24 79:21 80:5, 9,13,16 81:11 82:5 83:22,25 84:9,23 95:19,23 96:8,17 97:21 99:9, 11,13 101:1, 3 102:6,7, 10,17 103:11,14 104:4,23 108:18,25 110:23 114:16 115:10,14 116:2,21,24

117:1,4,7,10 118:5,9 120:10 121:14,18, 19,20 122:1, 4 123:4,13, 14,21 124:18 129:17 131:24 133:4 134:25 138:5,19 139:2 143:3 144:21 145:15 146:2 148:6,16 149:9 151:19,24 153:14 155:9 156:12,19,22 157:1,15 158:5 162:14 164:18 165:5,6 167:21 168:11 170:4 171:25 172:3,18 177:7,10,12 179:21,23 180:3,6,8,24 181:4,24 183:8 192:21 200:22 205:16,17 207:5 212:14,17 213:12,21 214:17 215:17,20,23 216:20 217:7 218:24 221:15 222:2,6,7 223:13,18,20 224:4,20,22, 25 225:25 227:9,11,13, 14,18,19,22, 23 228:2,6,9 229:14,24,25 230:2,5,6,7, 12,17,18,19 240:6 242:12,17, 18,23 243:10 245:8,14,23, 24 246:1 247:4 249:3, 17,20 250:6 251:21,22,23 252:1,7,10, 15,17,24,25 253:7 254:14 256:10,16,19 257:1,16 259:18 260:11 261:1,18 262:7,12 264:19 265:10,23 266:24 267:1 272:17,24,25 273:12,19 274:1 275:1, 7,12,20,22 276:24 277:17 278:15,17, 18,24 279:2 285:19 298:8,9 301:3,6 303:2,18 307:2 308:3, 4 310:23,25 312:3 316:16,21 323:9 332:15,24 333:4 335:11 336:16 344:15,18 346:24 347:1,3,6,9, 12,20 348:5 349:10,20 351:6,19,21, 24 353:2 356:1,3,6 357:3 358:21,25 362:18 363:16 365:1,3 367:11,16,22 368:8,20 369:6,25 371:5 373:15,19 374:5,8,22, 25 375:10,21 378:20,23 379:8,23 380:9 383:12,15, 16,23,24 384:2,8,15, 18 387:9,12 388:15,17,18 389:24,25 390:1 391:14 395:5

**thinking**
33:22 95:9 144:23

**third**
232:12,16 233:11 235:10,11,22 237:5 250:25 251:2 255:21 264:10

**Thorgeirsson**
33:4 367:4

**Thornburg**
3:21

**thorough**
20:2

**thought**
76:20 331:22

**thousand**
132:6

**thousands**
385:15,16,22

**three**
29:10,11 134:10 146:14 149:7 152:10,11 176:15 212:5 237:14,19 257:16 332:14

**threshold**
386:3,5,6, 14,21,24 387:2,4,17, 23 388:2,9, 14,16,21 389:16 390:1,7,8,15 391:8,11,15, 22 392:11,18 393:3,4,10

**Thursday**
7:5

**ties**
319:9,12

**Tim**
10:5

**Tim's**
10:12

**time**
7:6,15 12:1 14:25 21:18 29:13 72:22 73:3 89:3 107:1 108:21,25 109:5 115:24 116:8 119:20 129:18,21 130:2 135:13 137:10 140:8,18 144:6,14 145:19 149:16 156:9,14,21 172:18,21 173:2 186:10 219:13,16

224:23
231:10,16
238:6,13
239:10
242:22
257:11
261:11
262:17,19
265:2
271:22,24
275:14,17
279:4,6,11
283:16
288:12
298:15
312:12 328:5
343:15,21
362:7
393:18,19,24
394:14,21
395:2,4,9,12

**times**
28:1 95:5
123:18
167:16 316:3
332:14 376:3

**Timothy**
4:3 7:2
15:21

**tissue**
373:25

**tissues**
393:8

**Titanic**
205:3

**title**
118:16
139:25
184:14
194:8,10
196:10
197:17 202:2
220:5 233:21
255:14 258:9
269:22
271:14
289:20
290:12
305:18 327:9
350:6 354:1
371:24
381:10

**titled**
231:23 264:3
279:18 280:9
282:10

**titles**
290:23

**tobacco**
190:7
244:11,13,
19,25 247:12
321:20
377:19

**today**
7:5 202:10
309:25 395:4

**told**
388:14

**Tom**
9:10 30:1
120:12
298:24

**Tomassetti**
373:21

**tool**
360:11

**tools**
210:12

**top**
60:19 93:7
124:9 130:10
146:7 176:6
195:2,25
196:10
269:22
282:17
289:20

**topic**
129:19

**total**
54:5 92:9
95:4 102:13
190:8 196:24
234:13
236:10,17
282:23 293:9
366:16
376:18
377:12,21

**totality**
83:25

**totally**
115:14,17
243:16 252:4
285:8 297:5
308:17

**town**
371:11

**toxic**
33:11 34:2,7
35:11,13
36:1 61:4
248:23 367:5
393:8

**toxicologists**
355:6

**Toxicology**
350:9

**track**
16:22

**tract**
380:25

**traditional**
63:7,18

**Tran**
266:5,10
271:19
275:25

**transcript**
253:20

**transition**
393:10,15

**translate**
254:20,21

**translating**
251:24

**translation**
251:23

**translational**
24:23

**transparency**
337:25
338:14

**TRAURIG**
3:2

**treat**
368:16
369:23

**treated**
101:13
330:20

**treatment**
23:16,22
24:2,5 208:1
335:14,23
336:8 338:3,
6,20,25

**treats**
262:14

**trend**
163:15
192:16,18
233:2,5
237:17

**trial**
226:20
227:2,4
228:20,23
229:7,9,16

**trials**
226:10

**Tribute**
350:10

**tricky**
101:11

**tripling**
191:16

**trouble**
48:24 49:10

**true**
20:14,18
54:16 58:14
59:13,24
101:24
116:22
142:13 143:3
169:9 182:23

200:11 208:19 210:18 211:3 212:3 213:8, 23 215:17 216:1 218:20 223:2 225:5, 12 229:23 239:18,24 243:13,21 246:8 258:1 261:22 262:21,23,24 277:19 307:5 312:17 324:8 329:12 333:18 337:14 342:5 362:17 363:24 364:4 376:23 377:24 378:5 380:2 382:4 385:12

**truth**
386:2

**try**
89:9 181:23 191:8,10 254:18 335:21 339:2,8 340:1

**trying**
14:8 16:16 27:16 45:16 46:5 47:13 48:25 51:22 57:17 66:11 88:15 100:5 101:8 165:6 175:22 177:9,12 180:17,24 242:19 254:5,24 255:6 257:17 284:22 363:7 365:2 368:15 378:14 383:17

**tumor**
49:13 65:18 67:7

**tumorigenic**
50:22 51:13, 15

**tumors**
23:12 35:12 43:24 44:12 47:20 48:1, 21 49:4,14, 22,23,25 50:23 51:7, 17 52:11 53:2,7,8,15, 24 54:3,6,18 55:1,17,24 56:2 57:19 58:6,7 377:8 379:4,10 391:5 393:1, 2,10,12

**turn**
10:18 43:16 60:16 184:20 235:1 305:24 376:9

**turned**
204:19

**Twenty**
239:9 331:21

**twin**
378:6,14 379:6

**two**
13:12 16:15, 23 26:25 30:13 31:8 44:5 53:2 60:3,6,8,11 87:18,21 91:12 93:3 102:16 111:6 119:1,5,11, 24 120:25 122:11,24 125:9 134:10 135:23 136:3 137:22 138:3 175:11 182:1 187:11 188:25 189:2,11,22 192:12 215:14 217:16,21, 22,25 218:1, 2 223:11 224:5 257:15 266:9 288:4, 9,25 302:7, 12,13,16,18 313:15 332:13 335:16 339:3 341:6 343:11 354:9 356:15 357:7 362:14 385:4

**two-way**
70:5 71:4,13

**twofold**
194:22 195:1 196:5 245:5

**type**
12:19 90:12 200:2,3,6,8, 13,17,23 201:2,3,11 223:7,8,14 239:8 245:19 249:2 256:8 268:14 276:5 311:17

**types**
20:11 49:23 80:8 103:12 111:6 223:11 240:1 246:10,20 277:5 371:10,15 377:2 378:24 379:19

**typical**
102:12 187:14 189:3

**typically**
28:6 47:22 48:2 49:5 50:1 51:9 57:21 200:8 238:25 239:14

**U**

**U.S.**
3:7,8

**UC**
267:11

**Uh**
98:3

**uh-huh**
14:10

**UK**
267:10 270:8,9,19, 21,25 271:15,18 272:6 274:24

**ultimate**
90:2

**umbrella**
361:17

**unable**
314:25 317:3

**unacceptable**
135:14

**unadjusted**
269:2

**unavoidable**
373:1,10

**uncertainties**
100:20

**uncertainty**
101:16,19,25 167:17 256:16

**unclear**
216:5 296:13
**under-**
218:14
**underestimate**
222:5 223:2
**underestimating**
217:7 222:13
**underestimation**
202:23
215:22 216:8
**undergoes**
108:19
**underline**
165:9 199:23
**underlying**
208:8 330:3
**undermine**
199:23
**undermines**
199:18
220:17
**underneath**
60:22 93:11,
14 264:12
**undershoot**
224:24
**undershooting**
225:22
**understand**
17:7 23:18
32:3 33:16
36:7 39:7
46:4 66:7,13
67:22 74:20
78:23 79:10
88:19 99:25
100:1 113:21
143:14 148:5
155:10 159:5
166:2 171:17
180:15 181:9
203:11
209:24 217:9
218:1,14
221:20 223:6
248:22
284:22
285:12
300:13
302:20
320:7,10,22
321:6 325:23
330:15
339:24
342:12 345:6
348:8 349:19
363:7 365:9,
11 367:1
386:15 389:7
391:15,17
**understanding**
24:3 32:11
82:6 108:3
141:25
143:11 148:7
193:11
200:23 208:8
310:20
**understood**
14:12,19,21
136:5 137:5
155:18
160:10
214:16
309:23
**undertaken**
281:8
**undoubtedly**
181:10
**unequivocally**
382:5
**unethical**
209:25
**unexposed**
162:25
**uniformly**
74:24
**unimportant**
28:15
**uninformative**
156:16
**Unit**
269:25 271:2
**United**
18:24 21:5,
14 106:24
134:17
152:13
204:6,8
245:12,16
262:25
263:16
**unity**
354:15
355:3,25
365:3
**University**
9:6 23:5,7
216:23
**unknown**
151:20
**unnecessary**
10:12
**unpublished**
304:21
305:2,7,12
**unreasonable**
242:20
**unreliability**
104:18 105:2
222:18
**unreliable**
89:3 100:5
103:4 104:2
133:15
**unreliably**
88:17
**unsure**
99:14
**unsurprising**
317:1
**untrue**
365:7
**unusual**
172:1 324:5
**upper**
6:24 105:19
179:9,17
180:5
182:18,22
327:10
**urban/rural**
190:7
**urinary**
209:11,12
**urine**
90:18 91:2
**Uruguay**
184:17 185:3
**Uruguayan**
187:12
**usage**
235:22
340:10,11,12
**useless**
285:19
**user**
168:23
169:5,12
170:16
273:14
**users**
140:19
141:15
142:17 144:7
160:18 161:2
168:18,19,25
169:7,14,25
171:4,9,12,
13 259:10
260:4,24
261:3,6
272:14,21
273:4,15,16,
23 274:1,11,
18,19 275:16
292:10,11,
20,24,25
294:3,5,11,
13,23,24
295:2,3,6,
10,12,15,17
303:4,6,11,
13 304:11
305:19
306:15,25

307:15 308:24 310:6,9 314:8 332:8 334:17
**UTC**
7:6 72:23 73:3 129:22 130:2 172:22 173:2 231:11,16 279:7,11 343:16,21 393:20,24 394:22 395:2,10
**uterine**
165:4 166:11,25 167:13
**utility**
90:11 285:21
**utilize**
292:1
**utilized**
89:25 271:22 322:7 344:8
**utilizing**
18:3 21:12 261:23 272:5 278:6 298:15 320:18

## V

**Vague**
247:21
**valid**
33:19 115:8
**validate**
285:15 322:7,17
**validated**
226:25
**validates**
226:20
**validation**
230:3,22 321:11,14, 16,18 322:1, 13
**validity**
283:25 322:9
**Valisure**
134:4
**valsartan**
68:25 69:7 139:14 140:1,10,18 141:6,8,15, 19,21 142:1, 4,5,11,15, 18,23 143:5, 12,16,17,23 144:3,8,12, 20 145:6,18, 24 146:13,21 147:20,21 148:3,4,8 150:17 151:13 152:13 153:10,12, 15,22 154:3, 22,23 155:1, 3,7,22,24 156:2,4,6,9, 13,24 157:15,21 158:15 160:18 161:2 168:1 171:12 177:1 180:21 182:14
**value**
360:16
**values**
91:8
**variability**
39:17,19,21 187:8
**variable**
115:23 137:11
238:10 239:9 260:9
**variations**
100:15
**variety**
17:15 19:10, 13 25:1 170:7 278:19 371:14
**various**
19:1 101:6 103:12 261:24 312:9 317:4,16 344:24 345:1 346:12 371:10
**vary**
16:21 189:14 249:11
**vast**
204:25 239:13 379:10
**Vecchia**
233:23
**veg-**
284:19
**vegetables**
96:2 284:25
**verbal**
14:10
**verbally**
8:3
**verses**
380:23
**version**
25:18 56:22
**versus**
57:20 58:7 76:19 86:23 143:16 144:16 201:3 227:3 228:21 229:8 258:11 263:12 284:1,10,11
288:6 298:20 306:9 307:15,24 308:23 340:11,12 342:25 344:23 379:2,17 380:10,17
**Victoza**
11:1,7 12:2, 6 13:13
**video**
6:13,15,20, 22 7:11 9:23 10:15,16 122:1,4 280:6
**video-recorded**
7:1
**VIDEOGRAPHER**
3:24 6:1 15:11,16 72:22 73:2 129:21 130:1 159:22 160:7,10 172:21 173:1 231:10,15 279:6,10 280:5 289:17 343:15,20 393:19,23 394:21 395:1,9
**view**
6:16,24 174:16 175:2 278:1 382:19 388:14
**VII**
92:24 93:6
**VIII**
96:21
**virtually**
127:1

**vitamin**
204:14
226:6,7,12
236:10
**vitamine**
236:17
**vitro**
103:16
**Vogelstein**
368:7
373:21,22
**Vogelstein's**
372:11
**voice**
122:6
**Volatile**
92:10
**volume**
329:10
**voluntary**
146:12
**volunteers**
209:9 210:1
**vulcanizing**
345:14,18,
20,24 346:2

**W**

**W-A-N-G**
8:24
**waiting**
23:17,22
24:2,6,7
**waive**
8:7
**wall**
9:25
**Wang**
4:3 7:2 9:1,
2 15:22
42:22 57:11
92:19 119:21
120:10
283:17 395:3
**wanna**
72:13 94:15
**want**
6:21 16:13
18:12 30:14,
22 31:1
34:24 35:8
37:8 42:24,
25 50:6
57:13 68:25
72:17 78:23
79:10 80:12
86:16 88:22
92:23 111:22
124:20
133:18 140:7
154:17
159:15
172:11,14
194:8 208:20
223:23
228:16
242:12
285:15 299:8
321:3 357:3
365:9 366:25
388:25
389:14
390:22
391:19
392:4,6
**wanted**
335:20
**water**
92:9 209:10
**way**
41:14 49:8
60:15 96:9
101:5,14
144:14
152:15
157:4,18
158:11
175:20 181:1
193:18
242:9,16
302:17,19
311:19 321:4
326:19 342:3
351:17 365:3
378:17
**ways**
175:11
187:18 191:3
207:9 208:5
224:8 227:9
230:4,6
369:25
370:21,23
**weak**
36:12 67:2
**weakness**
286:10
**weaknesses**
316:13
**week**
332:14
**weeks**
119:11 120:3
121:6 122:17
123:12
124:1,5
135:23 136:4
137:23 138:3
257:16
**Wei**
372:4
**weigh**
99:5
**weighed**
84:9 97:18
100:2
**weighs**
94:23 95:3
**weight**
51:1 61:7
94:18,20
170:5 229:24
230:21
242:14
315:22
**weighting**
338:7
**weights**
335:14,23
336:8 338:21
339:1
**Weinberg**
29:9
**well-cited**
356:15
**well-known**
183:16
**well-outlined**
37:7
**well-published**
183:23 184:3
**went**
76:9 89:14
136:6 137:9
301:22
329:10
**whited**
313:7
**wide**
100:15
164:20,21
180:3 260:23
**widely**
16:21 20:15,
24 21:8
382:18
**wildly**
311:9
**window**
293:11
**withdraw**
135:1 137:16
**withdrew**
137:5
**witness**
4:3 6:13,14,
16,20 8:3,
11,13 10:14
92:20 120:21
121:14 122:6
160:3 172:17
174:5 213:25
395:8
**witness's**
6:21
**women**
194:13

195:2,10,18 280:24
**wonder**
361:3
**wondering**
157:15
**Wong**
8:25
**word**
24:4 30:12 41:21 46:10, 14,25 49:13 71:15 127:24 175:5 187:21 240:25 259:15
**worded**
103:19
**wording**
175:1,5 254:15 361:3
**words**
19:1 29:25 73:11 88:2 165:10,12 182:1 253:21 254:22 361:8 391:18
**work**
9:6 21:20 26:9 132:12 207:16 209:4 266:19 312:1 352:1 370:19 377:6
**worked**
21:25 22:24 254:6 328:8
**worker**
350:24
**working**
210:12 345:9 347:16
**works**
328:15,25
**world**
40:22 42:5, 16 44:9,16 45:4 46:2,6 47:24 61:18 62:23 63:12 65:25 66:8 115:1,5,10 117:1 145:2, 17 208:3 257:9 260:22 261:1 291:8
**worse**
20:10
**worst**
102:13
**worth**
218:3 224:23
**worthy**
208:10
**would've**
36:5 50:16 80:9,17 81:2 209:25 213:8 264:17 266:19 331:22 356:3
**wrap**
395:6
**write**
132:13 254:18,25 259:5 316:3
**writer**
360:8
**writing**
251:25 254:6
**written**
26:23 48:6 63:23 179:4 189:7 249:18 252:9 254:17 277:10 315:20
**wrong**
41:9 87:7 97:23 103:19 225:14
**wrote**
38:10,18 178:25 254:14 266:21
**Wu**
372:2

X

**X------------------**
4:2

Y

**Y.D.**
320:2
**YD**
288:1,6 290:15,17
**yeah**
11:5 15:3 20:22 22:12 24:7 42:25 43:2 48:16 49:7,20 50:4 52:15 55:17, 23 57:12 61:21 69:3, 17 70:10 72:19 84:22 92:20 95:2, 6,18 96:15 97:5 99:1,7 104:23 106:6 113:9,20,25 115:6 123:13 125:12 129:3 138:2 145:19 146:9 148:14 154:17 160:5 161:10 162:16 163:9 164:18 172:14,17 174:5 178:2, 11 180:13 184:23 187:13,15 189:18 191:18 192:15 195:21 211:24 214:3,10,16 231:6 270:1 293:4 297:16 304:15 308:1 312:6 313:8, 9 320:12 324:5 331:1 341:2,25 342:17 345:25 348:8 361:2 377:4 379:23 384:7 387:12 388:4
**year**
29:1 263:6, 12 325:13, 14,17,18
**years**
29:1 143:9 154:4,6,12 209:5 219:20 225:14 238:13,25 239:5,9 240:4,7 241:15,20 242:9,12,25 243:9,10,12, 15,24 244:9, 15 245:5 247:8 251:3, 10 252:11 253:4,11 257:18 258:21,25 259:7,8 262:20 263:9,12,18, 21 264:12, 13,14,15,18 270:18,24,25

271:6 294:7 325:1,6 333:20,22 334:10 342:21 374:24
**yeas** 243:15
**yell** 121:13
**yelling** 122:1,3
**yellow** 149:11
**Yoon** 250:1,9,19
**York** 9:4,6 11:6 174:1
**young** 94:18 98:19

## Z

**Z-E-I-L-M-A-K-E-R** 91:19
**Zantac** 7:7 31:24 32:4,7,9,12 106:24 129:8 134:16
**Zeilmaker** 91:15,19 94:1,12 97:3,15,25 98:5 99:24
**zero** 125:18
**Zhejiang** 148:22 149:12 150:1 151:1
**ZHP** 152:14
**Zhu** 372:5
**zoom** 214:22 283:14

# EXHIBIT 43

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_______________________________/

VIDEO RECORDED DEPOSITION OF

JOHN S. WITTE, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Thursday, May 19, 2022

TIME: 12:08 p.m. - 10:56 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6137219-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

ANAPOL WEISS
One Logan Squire
130 N. 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
BY: JAMES RONCA, ESQ.
CATELYN McDONOUGH, ESQ.
TRACY A. FINKEN, ESQ.
E-MAIL: jronca@anapolweiss.com
cmcdonough@anapolweiss.com
tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC:
MAY LIGHTFOOT, PLLC
3200 Martin Luther King Jr. Avenue S.E.
Third Floor
Washington, D.C. 20032
BY: JE YON JUNG, ESQ.
E-MAIL: jjung@maylightfootlaw.com

Appearing on behalf of the Defendant,
Chattem Inc., Sanofi U.S. Services, Inc.
Sanofi-Avertis U.S. LLC:

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
BY: AARON H. LEVINE, ESQ.
E-MAIL: aaron.levine@arnoldporter.com

-and-

DLA PIPER LLP (US)
1900 N. Pearl Street
Suite 2200
Dallas, Texas 75201-2482
BY: DANNY TOBEY, M.D., J.D., ESQ.
E-MAIL: danny.tobey@dlapiper.com
-and-



A P P E A R A N C E S: (Continued)

DLA PIPER LLP (US)
One Liberty Place 1650 Market Street
Suite 5000
Philadelphia, Pennsylvania 19103-7300
BY: BRENNA D. KELLY, ESQ.
E-MAIL: brenna.kelly@dlapiper.com
-and-
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
BY: BRADLEY JENNINGS, ESQ.
E-MAIL bradley.jennings@dlapiper.com

Appearing on behalf of the Defendant,
Boehringer Ingelheim:

KING & SPALDING
1185 Avenue of the Americas
34th Floor
New York, New York 10036
BY: EVA CANAAN, ESQ.
E-MAIL: ecanaan@kslaw.com

Appearing on behalf of the Defendant,
Pfizer, Inc.:

WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
BY: PAUL E. BOEHM, ESQ.
TYLER INFINGER, ESQ.
E-MAIL: pboehm@wc.com
tinfinger@wc.com



A P P E A R A N C E S: (Continued)

Appearing on behalf of the Defendant,
Perrigo:
GOODELL, DeVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
BY: JEFFREY J. HINES, ESQ.
E-MAIL: jjh@gdldlaw.com

Appearing on behalf of the Defendant,
Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com
-and-
BOWMAN and BROOKE, LLP
317 George Street
Suite 320
New Brunswick, New Jersey 08901
BY: CHRISTOPHER R. CARTON, ESQ.
E-MAIL: chris.carton@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Walmart, Inc.:
SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com



A P P E A R A N C E S: (Continued)

Appearing on behalf of the Defendant,
Teva Pharmaceuticals:
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue
Miami, Florida 33131
BY: ALEXANDRA B. LAGOS, ESQ.
E-MAIL: lagosa@gtlaw.com

Appearing on behalf of the Defendant,
Mylan Pharmaceuticals, Inc.:

PIETRAGALLO, GORDON, ALFANO,
BOSICK & RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
BY: JASON M. REEFER, ESQ.
E-MAIL: jmr@pietragallo.com

Appearing on behalf of the Defendant,
Strides Pharma, Inc.:

LINKLATERS LLP
1290 Avenue of the Americas
New York, New York 10104
BY: ELLEN GONG, ESQ.
E-MAIL: ellen.gong@linklaters.com

ALSO PRESENT:

NICOLE A. COSTELLO, Scientific Specialist
KING & SPALDING LLP

STEVE ROTMAN, ESQ.
COLLEEN RYF, ESQ.
HAUSFELD
One Marina Park Drive
Suite 1410
Boston, Massachusetts 02210

------------------I N D E X------------------
WITNESS: JOHN S. WITTE

| EXAMINATION BY | PAGE |
|---|---|
| MR. RONCA | 8 |

----------------E X H I B I T S--------------

| NUMBER | PAGE |
|---|---|
| Exhibit 6397 (Previously marked) | 24 |
| Exhibit 6458 | 58 |
| Exhibit 6420 (Previously marked) | 69 |
| Exhibit 6399 (Previously marked) | 90 |
| Exhibit 6410 (Previously marked) | 101 |
| Exhibit 6457 (Previously marked) | 114 |
| Exhibit 6401 (Previously marked) | 162 |
| Exhibit 6459 | 202 |
| Exhibit 6460 | 202 |
| Exhibit 6400 (Previously marked) | 206 |
| Exhibit 6461 | 233 |
| Exhibit 6406 (Previously marked) | 237 |
| Exhibit 6423 (Previously marked) | 249 |
| Exhibit 6440 (Previously marked) | 274 |
| Exhibit 6462 | 289 |
| Exhibit 6404 (Previously marked) | 301 |
| Exhibit 6403 (Previously marked) | 306 |
| Exhibit 6447 (Previously marked) | 335 |
| Exhibit 6456 (Previously marked) | 338 |
| Exhibit 6463 | 346 |
| Exhibit 6445 (Previously marked) | 353 |
| Exhibit 6405 (Previously marked) | 363 |




THE VIDEOGRAPHER: We are now on the record for the remote video deposition of Dr. John S. Witte. The time is 12:08 p.m., New York time, on Thursday, May 19, 2022 in the matter of In Re Zantac (Ranitidine) Products Liability Litigation. The court reporter is Candida Borriello, the videographer is Steve Decanio, and both are representatives of US Legal Support.

The court reporter will enter the statement for remote proceedings into the record and swear in the witness.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.



The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

J O H N W I T T E,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. RONCA:

Q. Morning, Dr. Witte. My name is Jim Ronca. I'm an attorney representing the plaintiffs in this case. I said good morning. It's good afternoon for a lot of the other people on the call. But you're fresh and early in the morning.

So, can you just state your name for the record?

A. My name is John Witte.

Q. And would it be fair to say that you are a genetic epidemiologist?

A. I'm a cancer genetic methodological



epidemiologist.

Q. So when we take the deposition today, if I ask a question and you don't understand my question for any reason, would you please tell me and I'll try to repeat it or rephrase it?

A. Yes. Thank you.

Q. By the same token, if you answer a question, is it fair for me to assume that you felt that you understood it and you could answer it?

A. Of course.

Q. All right. Are you alone where you're presently located?

A. No, I'm not.

Q. Who's with you?

A. Danny Tobey is with me and Bradley Jennings.

MR. TOBEY: Mr. Ronca, we have an associate in the room. He's happy to be on camera if you want. It's completely up to you.

MR. RONCA: Okay. So with these remote proceedings, Danny, you know the concern is that there will be,

like, hand signals or things like that to the -- to the witness. I'm not proposing that you would do that or that your associate would do that, but I think everybody needs to be on camera.

MR. TOBEY: He's already flipped it on. No problem.

MR. RONCA: Great. Okay. And no pejorative thoughts there. Okay?

MR. TOBEY: Of course.

MR. RONCA: Just sometimes you can't resist, like this or --

BY MR. RONCA:

Q. Okay. So, have you been deposed before?

A. Yes, I have.

Q. How many times?

A. Once.

Q. So you understand that you're under oath and that the testimony you give today is the same as the testimony you would give in court?

A. Yeah. I understand that.

Q. And has the same force and effect?



A. Yes.

Q. Okay. It's important that you give a verbal answer to your questions. Although we can see you nod, the court reporter can't take that down, okay?

A. Understood.

Q. Sometimes it will happen. I'll try to remind you, okay?

A. Okay.

Q. It's important that we're not talk over each other. Sometimes you might get anxious to answer or I might get anxious to ask a question. We have to try to avoid doing that to the extent we can, all right?

A. Agreed.

Q. If I jump in 'cause I think you've finished an answer and you haven't, would you just please tell me?

A. Yes, I will.

Q. Great. And I'll try not to jump in so we'll see what happens.

Do you have any other communication devices with you in the room?

A. No. I have no communication devices with me.



Q. So I want to establish some baseline items.

So, would you agree that epidemiology is a science that studies disease occurrence and in health states and human populations? And I'll leak to you that I took that right out of the textbook latest edition of Modern Epidemiology.

A. Yes. I would agree with that as a -- one of the many definitions of epidemiology.

Q. It's a broad definition. Can we agree on that?

A. Yeah.

Q. And would you agree that epidemiology assesses exposure disease burden in humans?

A. That is a primary focus of epidemiology, yes.

Q. Would you agree that in cancer epidemiology the focus is on trying to determine if certain exposures change the risk of developing a certain cancer?

A. The -- the focus is on, in epidemiology, is assessing the potential



association between certain exposures and generally disease outcomes.

Q. And when you say "association," often that's characterized in the nature of risk?

A. It's often characterized in the nature of a relative risk estimate for a given study.

Q. And so sometimes when you have a relative risk greater than one, that's considered a positive association, is that right?

A. It -- it is above one so yes, it is a positive association although that does not mean that it's a causal association.

Q. Understood. I'm just asking about association now.

Numbers above one in a risk assessment are considered positive, and numbers below one are considered negative, is that right?

A. I think in an -- in a -- in a strict definition of greater than one is positive and less than one is -- is negative, yes. But I don't think that someone, I mean,

would necessarily conclude that there is a clear, unbiased association just because a relative risk is greater than or less than one.
Q. Yeah. I didn't ask you that. That's coming, but you're getting a little ahead of us.
Just establishing that one is the dividing line between positive and negative regardless of whether we have yet determined the strength or the association or whether it's a valid association or what the biases is or what the compounders are or any of those additional factors which determine whether -- how much weight you put on association, okay? So I'm just want to find out.
If it's greater than one, it's a positive association, correct?
MR. TOBEY: Objection. Form.
A. Yeah. I think that the reason that I explained that it's -- well, so greater than one is greater than one. I don't know necessarily that we'd have to define it. I mean, it's -- greater than one. You have an



association that's above the value of 1.0.
Q. The reason I'm asking the question is because sometimes when you see in the many articles that we all have looked at related to this case, or any other case, it is sometimes referred to as positive.
So the definition when you see that word "positive association" is that, for whatever reason and with whatever strength, the number was higher than one.
A. I'm not sure exactly what examples you're talking about from the literature on ranitidine. But usually, when an epidemiologist uses that language that it's a positive association, they don't mean necessarily that it's just above one. They're looking at the confidence in a role, whether there's potential bias and compounding.
Q. So your definition is above one but a judgment call by the epidemiologist that it's a legitimate above one.
Is that what you're saying?
MR. TOBEY: Objection. Form.
A. I don't think I'm saying that it's



a judgment call. I think I was referring to you said that the literature had many examples of people using the language "positive association," and I think that epidemiologists generally use that not in an anything goes manner whereby, in -- in a manuscript, they would say there's a positive association when it's clearly basically a no finding.
Q. So can it be a positive association and a no finding at the same time?
A. Sure. Well, I mean in your definition, not my definition.
Q. Got it.
A. Your definition of positive of 1.00001 is positive, then that could very well -- I would assume that -- that depending on the 95 percent interval if it ranged from .1 to 10, that would be, in your definition, a positive association. I'm not sure anyone who would report that result would say we found a positive association.
MR. TOBEY: Doctor, just a reminder to take a little pause before your answer just in case I have an



objection.
THE WITNESS: Sorry.
BY MR. RONCA:
Q. So, have you in studies where you were an author ever stated that there's a positive association where the confidence interval --
(Court Reporter clarification.)
Q. -- confidence interval included one?
A. I am not -- I'm not sure if anywhere in my over 250 publications we said that. I think that the -- that there could very well be, especially if it was an association that was replicating a previously strong result.
Q. Do you know if you've ever said that?
MR. TOBEY: Sorry. Mr. Ronca, we -- it was an audio issue, but we just lost the last half of your question.
THE COURT REPORTER: I'm having that issue as well.
Q. Do you know if you've ever done

that, if you've ever said that in one of your 250 published papers?

A. Whether I've said that a association that was above 1.0 was positive when the 95 percent confidence interval included the null value of 1.0. Again, I can't remember whether I did.

Q. Have you ever done it the other way? Have you ever said it was a negative association when the number -- the risk number was below one but the confidence interval included one?

A. Again, I -- I can't remember whether -- whether we said that in a paper in my -- in my career.

Q. Okay. If the principles that you told us earlier were 100 percent correct, then you would have followed those principles in 100 percent of your papers, right?

MR. TOBEY: Objection. Form.

A. If by principals you mean that I said that epidemiologists generally use -- would reserve the term "positive association" to be something that had convincing evidence because it's not believed to be subject to



bias or confounding, or I also gave the example where they're replicating a previously reported result and, let's say, your confidence interval crosses the null value, then no, I would disagree.

I think I never said anything about people restricting the term positive or negative to being having a 95 percent confidence interval that didn't cross the null.

Q. So you can see that, depending on the circumstances, a risk that is above one could be considered a positive risk even if the confidence interval included one, depending on the circumstances.

MR. TOBEY: Objection. Form.

A. I think we're talking about associations, not --

Q. All right. Association. I will reask the question.

A. Okay.

Q. Can we agree that, depending on the circumstances, a risk ratio greater than one could show an association even though the confidence interval included number one?



MR. TOBEY: Objection. Form.

A. Well, I think that the depending on -- you know, depending on the situation, again, I gave a couple of examples; for example, where you have a very strong, clear-cut, reliable valid association and then a follow-up study detects effectively the exact same risk ratio but the confidence bound just barely crosses 1.0, then I would agree that -- that that suggests kind of a -- a replicated association.

I should point out in this situation looking at the 16 published ranitidine studies, that's not the situation we have.

Q. That's not what I asked you though, but it's fine.

I'm only asking you if, in certain circumstances, a qualified epidemiologist could look at the results of a study where the risk ratio was greater than one and find a positive association even though the confidence interval included one. And I think what you're saying is that can happen.

MR. TOBEY: Objection. Form.



A. I think I would need to look to the specific example.

Q. You're saying it can't happen?

A. No. I'm saying that -- that you're asking me for a specific answer to a very -- to a very general question.

Q. I'm only asking if it can happen under the right circumstances. You gave an example.

A. Yeah. I think that -- that let's say the lower bound of the confidence interval was .99 and the relative risk was, you know, 1.5 and the upper bound were two, some epidemiologists -- and that was replicating a previous study that showed a relative risk of 1.5 before and had a very narrow confidence bound.

-- some epidemiologists, they say that -- well, that is a -- a similar association as what we saw in the previous study.

Q. So it can happen?

MR. TOBEY: Objection. Form.

A. I -- yeah. I think that there's -- yeah. It can -- it can happen. I think I

would need to look at specific examples to see instead of making a general statement.
Q. Sure. I mean, I don't want you to get the idea these are trick questions, okay? We'll get to specific examples.
I'm just trying to find out in general principles that you can find a positive association, depending on the circumstances, even though the confidence interval includes one.
MR. TOBEY: Objection. Form. Asked and answered.
A. Yeah. I would -- I would say again it would be helpful to see the specific examples we're talking about.
Q. Well, you gave a specific example. So in that circumstance it's true, right?
MR. TOBEY: Objection. Form.
A. Again, I think it would be good to a see specific empirical example that you're talking about here.
Q. So you won't answer?
MR. TOBEY: Objection. Form. Asked and answered.
A. I'm trying to answer. Again, it



would be good to see a specific example.
Q. Is the example you gave specific enough?
A. Well, we didn't actually identify what the -- what the specific 95 percent confidence interval was for the initial finding.
Q. You identified it in your example, didn't you?
A. I think I identified it for the first -- for the second follow-up finding, not for the first one.
Q. So can you define genetic epidemiology?
A. Yeah. So -- so genetic epidemiology, like epidemiology in general, is the study of determinants of health and disease, but with the addition of not only environmental information, but also genetic information. So more specifically, like ranitidine exposure or other non-genetic exposures, we use very similar methods, study designs and just treat DNA as another exposure.
MR. RONCA: Let's -- can we bring



up Dr. Witte's report, Exhibit 6397?
(Exhibit 6397 was previously marked for identification.)
BY MR. RONCA:
Q. Dr. Witte, I just want to identify this as the report that you prepared for this litigation.
A. Yes, that's correct.
Q. And you did so at the request of the lawyers for the brand defendants?
A. I was retained by the lawyers to write an independent report, yes.
Q. And -- and you charged for doing that work, right?
A. Yes.
Q. And how much did you charge per hour for that work?
A. $700 per hour.
Q. So is -- we review this report. You have a physical copy there with you?
A. I do, yes.
Q. Okay. So you have a narrative report consisting of 39 pages, correct?
A. That's correct.
Q. Then you have on pages 40 to 44 in



the PDF, but not marked on the pages -- oh, I think it is on this copy -- you have a list of 98 references.
A. That's correct.
Q. These are the references to statements that you made in the narrative report, right?
A. Yeah. These are the citations that -- that I cited in the report.
Q. Okay. Then you have Appendix 1, which is 10 pages, pages 45 to 54. Is that right?
A. Yeah. They're not numbered anymore but...
Q. They're numbered on the PDF. Trust me, it's ten.
A. Okay.
Q. All right. And in page 1, you describe the observational studies of ranitidine and cancer?
A. That's correct.
Q. And in that segment of ten pages, you review 14 studies; seven are listed on page 45 as active comparative studies and seven are listed on page 50 as use versus

non-use studies.
A. I think I'm seeing eight under the Active Comparator.
MR. RONCA: Can we go to page 45 in the PDF, please?
Q. Adami, Cardwell, Iwagami, Kim, Kumar, Norgaard and Yoon; that's seven. Is there another one?
A. Kantor.
Q. Kantor. So eight, and the active comparator studies and seven on the use versus non-use studies, is that right?
A. There's eight in the non-use versus use as well.
MR. RONCA: Let's go to page 50. Can we go to 50? Go down a little bit, please. Next page. Next page. Next page. Next page, please. All right.
Q. So what's the eighth study that I didn't count, 'cause I count seven listed there?
A. Starts at -- so Habel's one, Kim's two -- can we scan down? Kim S is number two.



Q. Yeah. I'm looking at your list at the top.
A. Oh. One, two, three, four, five, six, seven. Yeah. So that list, I see why you're -- so, that's, yeah, that's why you only counted seven for the active comparator because I had listed the ranitidine versus others and the ranitidine versus PPI was its own section.
And here, Pottegard is left out. That's -- it's -- it's actually in this list and it's used throughout my study. It's just not in that list right there.
Q. Okay. So it's tagged on to the back of this?
MR. TOBEY: Objection. Form.
A. No. It's not tagged on. It's actually -- it was in the report. There was just this list starting with Habel in parentheses should've had Pottegard listed in there. If we scan down, you'll see Pottegard is -- is written about and it's cited -- it's included throughout my report.
MR. RONCA: Okay. Can we go down a page? Another page. Another page,



another -- there it is. Okay.
Q. So what it is it's there, but it's not listed, is that right?
A. Exactly.
MR. TOBEY: Objection. Form. Go ahead.
Q. Then you have Appendix 2, which is two pages, which is your correspondence with Dr. Cardwell, right?
A. Yes, that's correct.
Q. And then you have Attachment A, which is a List of Materials Considered from PDF pages 57 to 66 and lists 135 items.
A. Yes, that's correct.
Q. Okay. And then, finally, Attachment B is your curriculum vitae. It's the rest of the report?
A. Yeah, that's correct.
Q. Okay. So in terms of what you consider in making up this report, can we find that on your List of Materials Considered, which is Attachment A?
A. Yes. I did have an addition of like four items that I think were provided.
Q. That were provided before you made



this report?
A. I think were just provided recently.
Q. And what are those four items?
A. So, it's number 136 is the McDowell 2021a Excel results spreadsheet shared by Cardwell from that e-mail correspondence. Titled PCCIUR Final Results For Circulation on Request.XLS. So that's the first.
137 is Rule 26 Rebuttal Report of Patricia G. Moorman rebuttal report. Sorry --
138 is the Rebuttable Report of Anne McTiernan, and 139 is FDA Food and Drug Administration Laboratory Test Ranitidine.
Q. Okay. So, you didn't have any of those, though, when you made this report that we're looking at as Exhibit 6397, right?
A. No. I did have -- I didn't have the rebuttal reports, of course, so Moorman and McTiernan. I did have the McDowell information, and that's actually included in my report.
Q. And the FDA information?
A. So I did have that when I was

preparing my report, yes.
Q. So that's a correction to your materials considered list, right?
A. It's an update. It's just providing additional materials considered.
Q. But you had that information and considered it at the time this report was created?
A. That's correct.
Q. And it's not listed?
A. No. It wasn't listed in the original doc of the report.
Q. Okay. Did you make up this List of Materials Considered?
A. I didn't make this up?
Q. Yes.
MR. TOBEY: Objection. Form.
A. When you say did I make it up, did I create it myself?
Q. Yes.
A. So this list, it was -- yeah, it was part of my report that I put together.
Q. You created a list yourself?
A. Attachment A.
Q. Okay. Is that the answer, you



created it yourself?
A. I think that for Attachment A, this was created in consultation with -- with counsel. For the references that we talked about, that was all created entirely by myself.
Q. Okay. So the list of 98 references was created by Dr. Witte, and the List of Materials Considered was created by the lawyers and then you reviewed it, is that right?
A. That's correct. And I reviewed everything that's in the document. And --
Q. And in the review you missed that you had these FDA test results, right?
A. Yeah. It was provided as an update.
Q. No. It was provided to us as an update. You said you had it at the time you created this report, didn't you?
A. Uhm, yes, I did. I think that, uhm -- well, the -- the Excel spreadsheet provided by Cardwell directly to me is -- is mentioned in my report.
It's a little bit -- you know,



we're talking about, that one we're talking about an Excel spreadsheet. Wasn't exactly clear to me how that is supposed to be referenced.
Q. Did you ask the lawyers?
A. Did I ask lawyers?
Q. How that should be referenced?
A. Well, I think that's --
MR. TOBEY: Objection to the extent this is asking for conversations with counsel, the content of the conversations with counsel.
MR. RONCA: I'm not asking the content.
Q. I'm just asking if you asked the lawyers should I include this or not?
A. Well, I was writing this report independently. And so when I wrote the report, I did exactly what I would do in my epidemiology research, which was I provided all of the conversations with Cardwell, and the fact that he was providing me with this.
I then included that information in my report and cited to the paper. This is



effectively supplemental information from McDowell 2021a.
So it's -- it's cited correctly to that publication. I was just trying to make sure that everyone was aware that there was an additional supplementary material that went along with that publication.
Q. But you didn't include it on your List of Materials Considered.
MR. TOBEY: Objection. Form.
A. Well, just to clarify.
McDowell 2021a is included in materials considered, and this is part of that paper.
Q. Dr. Witte, try to listen to my question.
The spreadsheet of information that you got from Dr. Cardwell is not listed on your list of matters considered, is it?
MR. TOBEY: Objection. Form. Asked and answered.
A. Again, that -- that information is noted in the McDowell 2021a paper, and that's listed in my materials considered.
Q. So the spreadsheet is in the

McDowell paper?
A. It's mentioned as -- as that -- so that's -- that spreadsheet gives the information that the study -- all the study results.
Q. Yeah. So --
MR. TOBEY: I don't think the witness was done answering.
Q. Go ahead.
A. In the field what -- what is done, and we can pull up McDowell if you like, where he mentions that -- you know, that this is not the whole -- they're not presenting all of the results so you can specifically look at them.
So to actually undertake a comprehensive evaluation of the literature, one had to get that information. It was basically anyone who is reading this paper who wanted to understand all the results in that paper had to get this information from Cardwell.
Q. Okay.
A. It was a necessary piece of information to actually review the paper and



that paper is noted as information included, that publication.
Q. Okay. Try to listen to my question.
Is the spreadsheet that you got from Dr. Cardwell listed on the List of Materials Considered?
MR. TOBEY: Object to form.
A. Again, I would say that the reason it initially wasn't listed was because it was part of that publication. Citing to McDowell, anyone in the field -- if I were writing a scientific paper that presented results from that spreadsheet from Cardwell from that paper, I wouldn't actually have a separate citation to the spreadsheet. I would just have a citation to the paper in which -- which is based on those results. Because they looked at over 5,000 comparisons, one needed to actually see the spreadsheet to fully evaluate the data on ranitidine and the five cancers of concern here.
Q. I'm not asking about your reference section. I'm asking about this List of



Materials Considered, which is required under the rules of procedure, that you give to us and that it list everything that you considered. This is the list you made up with the lawyers.
And what I'm understanding is you will not answer the question about whether that spreadsheet is listed on this document.
MR. TOBEY: Objection. Form.
A. Again, the -- the -- what I'm trying to answer is that that spreadsheet is effectively subsumed by item number 11 in the attachment.
Q. Okay. It's clear that you're not going to answer the question so just stop. All right? Let's go to a different question.
MR. TOBEY: Objection. Move to strike. Argumentative.
Q. Okay. Are the FDA testing results listed on your list of matters considered?
A. On this list that we're looking at right now?
Q. It's the only list of matters considered that we've talked about.
A. No. They're not included in this



list.
Q. And does the list of matter considered and only list the matter considered, not any other part of your report, just Appendix -- Attachment A, does Attachment A mention the spreadsheets that you got from Dr. Cardwell?
MR. TOBEY: Objection. Form. Asked and answered.
A. Again, insofar as that spreadsheet is part of the publication, then yes, it's listed there because it's part of that paper.
Q. I see. So did you have correspondence with Dr. Adami?
A. No.
Q. Did you get Dr. Adami's spreadsheets?
A. I got his supplemental. I believe there was supplemental information.
Q. What about his spreadsheets?
A. Not sure what you mean, what about his spreadsheets?
Q. Well, you wrote to Dr. Cardwell asking about the -- you know, this is backup information, right?

A. No. Well, okay. I'm not sure exactly what you mean about, what you mean by -- the point you mean by backup information is supplemental material that was required to evaluate the publication.
Q. You --
MR. TOBEY: I think the witness was still answering.
Correct me if I'm wrong, Doctor.
A. No. I was still answering.
So is it okay if I look at the McDowell paper?
Q. Sure.
A. So there's a section on page 15 of McDowell 2021 that I think may help clarify the -- the -- as what you're calling the spreadsheet. So it's a supplemental information.
So there's a section titled Availability of Data and Materials. And in that, they actually state specifically:
...[a]ccess to results for medicines not published in this paper should be directed to the corresponding author: Dr. Chris Cardwell.



So what they mean is that they looked at, you know, over 5,000 drug cancer comparisons, one of which was ranitidine, because they only had 16 pages to present their results. They only presented certain findings that passed a certain level of what they deemed to be interesting for the publication. And the other over 5,000 comparisons, you need to ask them for those data.
Q. So these are -- these are the non-published results?
MR. TOBEY: Objection. Form.
A. No. I was -- I -- sorry. I thought I clarified that.
These are the results that aren't listed in the paper but are part of this study. I mean they talk about how many comparisons they made. But they couldn't -- they didn't have space in the paper to list 5600 different drug cancer health cons.
Q. Okay. My question is -- I mean, your e-mail to Dr. Cardwell literally asks for the non-published results, right?
A. So they were considered for this



publication. They weren't put in the published version of it because they didn't pass the criteria that they set for magnitude of effect and -- and p-value to make it into that paper.
Q. You're not listening to me.
You asked in your e-mail for non-published results, is that right?
MR. TOBEY: Objection. Form.
A. In my e-mail I've said specifically, Would you mind sharing the complete set of non-published results that you referenced in your paper?
Q. Okay.
A. So these are -- these are the results -- so if we look back at their paper.
Q. I don't need you to look back at the paper, Doctor. You already explained that.
Did you ask Dr. Adami for any non-published results?
A. I just -- okay.
No. I didn't ask Dr. Adami for -- I didn't ask anyone for anything except for Cardwell because he specifically said in this



paper that the results that didn't make it into the limited length hard copy of this paper are available on request.
Q. Okay.
(Cross-talk.)
A. Just to clarify.
These are part of this paper. He talks about the 5600 results. They just didn't make it into the version that he presented, and so they're -- I mean these were results that they evaluated for this publication. It's not like this is some other set of data.
Q. Did you take that data and do any calculations from that?
A. No. I just looked directly at it.
Q. All right. So let's go back to page 1 of your report.
I think you said in there:
I provide here a detailed report on the observational studies investigating the potential association between the use of the histamine type-2 receptor agonist (H2RA) ranitidine (also known as Zantac) and cancer.
So that's what your report's about?

A. Well, I -- I provide a detailed report on those studies, yes.
Q. Okay.
A. I --
Q. And you also said:
I developed my opinion after performing an independent search and review of the literature and reviewing material provided to me.
MR. TOBEY: Mr. Ronca, can you blow up the sections you're reading, it's -- on the screen? It's very small.
Q. Starts here at -- after Patheon Manufacturing Services. Okay.
I developed my opinion after performing an independent search of the literature and reviewing material provided to me.
Right?
A. That's -- that's exactly what it says.
Q. Okay. And would it be fair to say that the independent search and review of the literature, all those things are listed in



your references or your List of Materials Considered?
A. Yes.
Q. And all material provided to you, is that listed on your List of Materials Considered?
A. I'm not sure that -- that I -- whether I considered in this report everything that was provided to me.
Q. Well, what other material was provided to you?
A. I'm just -- I'm not entirely sure whether -- whether the material provided to me was actually incorporated into this -- into this report.
Q. That doesn't matter.
What other material was provided to you that's not on your List of Materials Considered?
A. I -- I'm not entirely sure.
Q. Who provided it to you?
A. Well, so, some of the material was provided by counsel for me to determine whether it was relevant to my report.
Q. Yeah. Relevant is not the issue.



You reviewed material provided to you by counsel and it was not on your List of Materials Considered, isn't that true?
MR. TOBEY: Objection. Form. Misstates prior testimony.
A. I think what -- what I'm trying to say is there may have been something I didn't consider that was provided to me.
Q. I want to know, I want you to identify the material that you reviewed that was provided to you by anyone, including the lawyers, in preparing this report that is not on your List of Materials Considered?
A. Everything for -- that I used for this report is in the materials considered.
Q. You're still not understanding my question. Try real hard, okay?
Please identify for us any material you reviewed that were provided to you by anyone, including the lawyers.
MR. TOBEY: Objection. Form. Argumentative.
A. Everything that I considered is noted in my report.
Q. Yeah. That's not what I asked you.



You said in this sentence that you reviewed material provided to me. You've said that some of that material is not on the List of Materials Considered.
I'm asking you to identify for us the material you reviewed that came to you from anyone, including the lawyers, whether you think in your mind you considered it or not.
MR. TOBEY: Objection. Form.
A. Again, everything that I considered in this report is listed. I'm not --
Q. I'm asking you what you reviewed.
A. Well, everything that I reviewed is listed in the report. What I was -- yeah.
Q. Did you get any material from the lawyers that is not listed on the List of Materials Considered?
A. Well, I may have that I didn't actually incorporate it, but I don't -- I don't actually know exactly. I'd have to -- yeah. Everything that's relevant to my report that was considered for my report is listed here.
Q. Okay. But are there things that

you reviewed that were provided to you by the lawyers that are not listed?
A. No.
Q. So everything that you reviewed is listed?
A. That's correct. I think we need to differentiate between reviewed versus provided and --
Q. I didn't write this sentence, Doctor. You wrote it. It says:
I developed my opinion after...
And then you said:
...reviewing material provided to me.
Correct?
A. That's correct.
Q. I asked you if all the material that was provided to you was on the List of Materials Considered, and you said there was additional items.
MR. TOBEY: Objection. Form. Misstates prior testimony.
A. Says: ...review of the literature and reviewing material provided to me.
It doesn't say reviewing every



single thing that may have crossed my desk.
Q. It doesn't matter. I want to know what material was provided to you.
MR. TOBEY: I'm not sure if there's a question.
Q. Can you tell us the material that was provided to you?
A. The material that is relevant to my report that I base my report on is noted in my report.
Q. Okay. Are there anything that you deem not relevant that was provided to you?
A. Again, everything that I reviewed is noted in my report.
Q. So there -- you're saying under oath that there's nothing that was provided to you that you reviewed and it's not in the report?
MR. TOBEY: Objection. Form.
A. Everything that's relevant -- that is relevant to my review is noted in the report.
Q. Were you provided with any documents from any of the defendants?
A. You mean the defendants' --



Q. -- hired you?
A. -- reports?
Q. Were you provided internal documents from GSK or Sanofi?
A. Gosh. I -- I don't recall.
Q. Were you provided the GSK hazard assessment?
A. I don't -- I did not review that for my report.
Q. Did you receive it?
A. I don't recall.
Q. Do you have a file of all these materials that were provided to you?
A. Yeah. It was -- those materials were provided as a file.
Q. And you still have this file?
A. Yeah. I assume so.
Q. So we could recreate it if we needed to, right?
MR. TOBEY: Objection. Form.
A. I'm sorry. Can you repeat the question?
Q. If we needed to recreate a list of all the things you were provided, it's possible, right?



A. Again, everything that I reviewed for my report is listed in my report.
Q. Yeah. You -- you keep missing the question.
MR. TOBEY: Objection. Form.
Q. What was provided to you, can we recreate that list?
A. I assume so.
Q. Good. So, Doctor, would you say that none of the studies included in your 98 references or in your materials considered are studies that involve genetic epidemiology?
A. These studies are focused on -- primarily on ranitidine H2As and cancer. I'm just looking. I -- I don't know that any of these would be discussing with genetics because that's, you know, looking at DNA as an exposure, where we're focused here more on ranitidine as an exposure.
Q. Sure. Can you agree that none of the studies in your 98 references or on your List of Materials Considered discuss genetics?
A. I would have to look at them. To

say with certainty, I would have to look at them article by article. But in general, the report is focused on cancer epidemiology.

Q. And the 16 studies that you cited in your Appendix 1, none of those are focused on genetic epidemiology, right?

A. That's correct. It's focused on potential association between ranitidine and the five cancers of concern here.

Q. Part of preparing this report, is it true that none of your research involved ranitidine and cancer?

A. That's correct.

Q. None of your prior research has involved nitrosodimethylamine, also known as NDMA, correct?

A. That's correct. None of my prior research looked at -- has looked at NDMA. Although, I should -- although, I am an expert in cancer epidemiology and methodological epidemiology. Insofar as the methods used here in the epidemiologic research goes, I have extensive research experience.

Q. Yes. But none of your prior



research involved NDMA?

MR. TOBEY: Objection. Form. Asked and answered.

A. None of my prior research has focused on NDMA; although, I do have expertise in cancer epidemiology and methodological epidemiology, which is directly relevant to the studies and how they were designed, analyzed and interpreted.

Q. But you have not applied any of that knowledge to the study of NDMA yourself?

MR. TOBEY: Objection. Form. Asked and answered.

A. Again, I have not undertaken a study looking at NDMA; however, my expertise in epidemiologic methods and cancer epidemiology is applicable to the question at hand and the studies that were undertaken here.

Q. None of your prior research involved nitrosamines?

MR. TOBEY: Objection to form. Asked and answered three times, Mr. Ronca. Is there a different question?



MR. RONCA: It's a different question. I asked about nitrosamines, not NDMA.

MR. TOBEY: Okay. You can answer, Dr. Witte.

A. No. None of my research has looked -- actually, can I look at my CV for a second here?

Q. Go ahead. I searched it, but you can look through it.

MR. TOBEY: Objection to attorney commentary.

A. So, yeah, none of my research has looked directly at nitrosamines. Again, my expertise is in cancer epidemiology and epidemiology methods, which would be used for an observational study to evaluate that potential association, whether it's the design, analysis or interpretation of results.

Q. You keep telling us that. Okay.

MR. TOBEY: Mr. Ronca, I'm just gonna -- I've been letting this go a little bit, but your tone and the content of these questions is



bordering on abusive, if not already abusive. I would ask you to please ask more courteous questions of the witness.

MR. RONCA: Danny, the witness is being totally evasive and you know it, so that's --

(Cross-talk.)

MR. RONCA: -- the response he's getting. If we just get straight answers to obvious questions, we wouldn't have this problem.

MR. TOBEY: Mr. Ronca, you're using phrases like "try real hard." I mean, that's just -- I will ask you to use a little bit more courtesy in your questions.

MR. RONCA: And I'll ask the witness to use more courtesy in his answers.

MR. TOBEY: I think he's been --

MR. RONCA: All right?

MR. TOBEY: -- very, very professional towards you and patient. Why don't we take a break? We've

been going about an hour.
MR. RONCA: Can I just finish a couple more questions before we get there?
(Cross-talk.)
MR. RONCA: Can I finish my line? Okay.
BY MR. RONCA:
Q. Do any of your published papers use inverse probability of treatment waiting?
A. Sorry. I'm just -- I'm looking through my CV. (Document review.)
I'm not entirely sure. I think that there -- there are some projects where whether it's been made it into the papers, I'm going to say no right now.
Q. Do any of your published studies involve occupational epidemiology?
A. No. Insofar as occupational epidemiology, the methodology falls under the rubric of epidemiology methods and it focused on cancer -- cancer epidemiology methods, then that is an area that I've extensively published on but not occupational epidemiology.



Q. Have you ever done an exposure matrix for an occupational study?
A. I have not, though I have for nutritional epidemiology.
Q. In the textbook that we mentioned, Modern Epidemiology, 2021 edition, there are various chapters on the different types of epidemiology, right?
A. Yeah. There's chapters on different types of epidemiology and different methodologies in epidemiology.
Q. You wrote the chapter, along with a co-author, on genetic epidemiology, right?
A. That's correct.
Q. But there are other listed branches of epidemiology, including occupational epidemiology. That's one, right?
A. If what you mean is that there's a chapter on occupational epidemiology, yes, that's correct.
Q. There's a chapter on nutritional epidemiology, correct?
A. That's correct. There is a chapter on nutritional epidemiology.
Q. And there's a chapter on pharmacal



epidemiology?
A. I believe so. It would be helpful to see the table of contents.
Q. Can I share my screen?
A. Yes.
MR. TOBEY: Dr. Witte, you don't need to answer that.
Mr. Ronca, who was that directed to? I'm sorry.
MR. RONCA: That was directed to Steven I think. No. John. John.
DOCUMENT TECHNICIAN: Counselor, you can share your screen.
MR. TOBEY: I'm sorry. Are we marking this and putting this into evidence? I'm confused what we're doing.
MR. RONCA: Yeah. What we'll do is screenshot this, and we'll put it into evidence.
Can you do that, John?
DOCUMENT TECHNICIAN: I can. It will be blurry. You can screenshot your screen and it will be clearer.
MR. TOBEY: Mr. Ronca, since



you're going to do just a couple more questions --
MR. RONCA: Also still in the same line. This question is pending.
MR. TOBEY: Well, I do want to put an exhibit in. I'm not sure if we're screenshotting or what.
MR. RONCA: Yeah. He asked me to show him this to respond to his question. That's the only -- I didn't show it. He asked me to show is.
(Cross-talk.)
MR. RONCA: Answer this question. Then you can have your break, okay?
MR. TOBEY: Let me just get a little something on the record here.
You're asking him to remember details about a document, and he asked if he could see the document. If you don't have the exhibit ready, we're happy to take a break, go off record. It's been an hour and something anything way, and you can get your exhibits ready.
MR. RONCA: He's looking at it.

We're all looking at it. I just want to ask him. He said he wanted to see the table of contents. Here it is.
(Cross-talk.)
MR. TOBEY: Mr. Ronca, I do object to just sharing your web page. I don't know what that accomplishes.
But you can try and ask him a question if you want.
MR. RONCA: Sure.
(Exhibit 6458 was marked for identification.)
BY MR. RONCA:
Q. Does the textbook Modern Epidemiology, to which you're a contributor, list separate sections on infectious disease epidemiology, reproductive epidemiology, psychiatric epidemiology, clinical epidemiology, molecular epidemiology, genetic epidemiology, injury and violence epidemiology, social epidemiology, environment epidemiology, occupational epidemiology, nutritional epidemiology, and pharmacal epidemiology?
MR. TOBEY: Objection. Lack of



foundation. Reference to an unauthenticated website.
Q. Is that true?
A. I'm sorry. The -- the question is what you're sharing there is the list of Chapters 32 to 43 in the most recent Modern Epidemiology?
Q. Yes.
MR. TOBEY: Same objection. And document -- whatever this document is speaks for itself.
A. That's what -- what the website that you've gone to says.
Q. Okay. I mean this is the E-copy of the book. You have a copy?
A. I do.
Q. Okay. Well, maybe during break you could check. We're going on a break now.
THE VIDEOGRAPHER: The time is 1:16 p.m., and we're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time is 1:29 p.m., and we're back on the



record.
BY MR. RONCA:
Q. Dr. Witte, during the break, did you have any discussions regarding substance with the lawyers?
A. Well, they told me not to take anything personally.
MR. TOBEY: You don't -- you don't have to get into what we said. But he's asking you about, like, substance.
A. Oh, no.
Q. Good. All right.
So Dr. Witte, what is a carcinogen?
A. A carcinogen is a -- something that causes cancer, simplest sense.
Q. And what is a mutagen?
A. Mutagen is something that impacts -- well, impacts DNA which cause -- can cause cancer.
Q. Theoretically, would a single exposure to a mutagen -- strike that. Let me ask it again.
Theoretically, can a single expose sewer to a mutagen, after several steps,



result in cancer in a human?
MR. TOBEY: Objection. Outside the scope of the report.
Q. You can answer though, Doctor.
A. Oh. I think I would need a more specific example. And again, I'm an epidemiologist, expertise in epidemiology methods, cancer epidemiology.
Q. So you don't have the expertise to answer this question?
A. Well, I would need a -- a very specific example.
Q. Give me a mutagen that you've studied.
A. So, well, again, in epidemiology, we're generally studying things like diet that aren't necessarily themselves considered mutagens.
Q. But you're a genetic epidemiologist, so I assuming that includes the study of genes and DNA.
Am I right?
A. So I do study DNA. This is generally the DNA that -- that you're born with, your germ line genetics.

Page 62
J. Witte

Q. And isn't part of what you study whether those genes might be prone to certain exposures and, therefore, prone to developing cancer from those exposures?
A. If what you mean is looking at kind of gene environment interactions between DNA and environmental things, yes, I -- we do look at that.
Q. Okay. So you do understand the process by which a mutagen alters a DNA and that can lead to cancer, right?
A. Yeah. In a general sense, of course.
Q. Of course. I mean you wouldn't be a genetic epidemiologist and not understand that, right?
MR. TOBEY: Objection. Form.
A. Again, our work is primarily focused on germ line genetics and how it interacts -- I mean the environment could be physical activity for example.
Q. But the environment could be exposure to a carcinogen too, right?
A. That's -- that's correct.
Q. And some of your studies, in fact,

Page 63
J. Witte

have looked at that, right?
A. Yes.
Q. I don't need any specific ones but some have, right?
A. We have looked at the interaction between, say, dietary items that -- that may contain potential carcinogens.
Q. So is a process something like this: A mutagen can alter the DNA and, therefore, change the inheritance of these cells as they divide and that could end up, after several steps, with a neoplasm?
MR. TOBEY: Objection. Form.
A. Could you restate the question? There was...
Q. Please re- -- let me read it back myself.
You said: We have looked at the interaction between -- it's not typed right. I will restate the question. How's that? Okay.
Does the process work like this: A cell is exposed to a mutagen, the mutagen alters the DNA of the cell -- in other words, the cell mutates -- and after the mutation,

Page 64
J. Witte

the cell could then go on to divide and form other mutated cells and that could, ultimately, in the right circumstances, end up being a cancerous tumor, is that right?
MR. TOBEY: Same objection as to scope of the report.
You can answer if you can.
A. Yeah. I -- if you give me a specific example, I think what you're asking -- well, I shouldn't say what you're asking.
So if what you mean is that a -- well, again, I'm not an expert in mutagenesis, but I think that cancer is caused by alterations in DNA and there's a multi-step hypothesis. I don't think that anyone would argue in this case that a single dose of -- or a single exposure to -- I don't -- I shouldn't get into a specific examples maybe.
But yeah. I would say that that's -- I don't, in general, in human immunologic data, I don't think that the understanding from humans is that a single dose of a mutagen will cause cancer in a

Page 65
J. Witte

general sense. But I think if you want to talk about specific examples, present those.
Q. Okay. But a mutagen causes a cell to mutate, is that fair?
A. A mutagen can cause an alteration in the DNA, but I don't -- it's not like a -- a light switch that's just on or off.
Q. Not what I'm asking, okay?
It can happen. A mutagen can cause an alteration in DNA.
MR. TOBEY: Objection. Form. Asked and answered.
Q. Is that right?
MR. TOBEY: Objection. Form.
A. The -- I'm -- I'm -- I don't think a single -- yeah. I don't think the four epidemiologic studies that we considered that a single mutagen causes cancer.
Q. Not my question.
The way a mutagen causes cancer is that it alters the DNA and causes the cell to mutate.
MR. TOBEY: Objection. Form.
Q. As a general statement, is that correct?

MR. TOBEY: Same objection.
A. I think that -- that a single dose of a mutagen -- again, I'll just go back to an epidemiology.
We don't anticipate that a single dose of something that has a mutagen in it would cause cancer.
Q. Yeah. That's not what I asked you.
I'm asking you: The way that a mutagen can cause cancer, not limited to a single dose, is that the mutagen causes a change in the DNA in a cell and the cell mutates.
MR. TOBEY: Same objection. And just, Mr. Ronca, so I cannot interrupt you on every one of these, I'll just ask for a running objection that this is all outside the scope of the report.
MR. RONCA: You have it. You have it.
MR. TOBEY: Yeah.
Q. Can you answer it?
MR. TOBEY: Objection to that.
A. Yeah. I will just say that's



outside of my report and what I'm -- what my expert report touches on here.
Q. So as an expert in genetic epidemiology, you can't answer that question?
A. I think it's outside the scope of my report.
Q. Yeah. Is it outside the scope of your expertise is my question.
A. Well, I don't think I've undertaken any mutagenicity studies.
(Cross-talk.)
Q. Do you know what a mutagen is?
A. What's that?
Q. Do you know what a mutagen is?
MR. TOBEY: Objection. Harassing.
Q. 'Cause if you do, just explain it to us.
A. I guess we discussed it's something that alters DNA which causes -- can cause under certain circumstances uncontrolled cell growth.
Q. And that uncontrolled cell growth can start with a single cell being mutated, correct?
A. Yeah. I think, you know, again,



I'm not a cancer biologist.
Q. So you don't know the answer?
A. I think I would prefer to defer to other experts.
Q. 'Cause it's not within your expertise?
MR. TOBEY: Objection. Form. Asked and answered.
A. I think that -- that you're -- that I would defer to experts in cancer biology.
Q. So if the plaintiffs had experts in this case in cancer biology or toxicology or pathology or any of those things, they would be better able to talk about that than you.
Is that what you're saying?
MR. TOBEY: Objection. Form.
A. Again, my -- my focus here is on the observational epidemiologic studies.
Q. Yeah. I'm asking about your general expertise. Because you told us several times that you're an expert in cancer, so that's why I'm asking you these questions.
MR. TOBEY: Objection.
Q. So my question is coming.



Can you answer the question I asked you, which is: Can cancer start by a single cell being mutated?
A. So again, I would defer to an expert in that field. And just to clarify, my expertise is in cancer epidemiology and epidemiology methods and genetic epidemiology, so observational studies.
Q. Yeah.
MR. RONCA: Let's bring up Exhibit 6420. Pull up the top of it. Blow it up a little bigger so we can see the top.
(Exhibit 6420 was previously marked for identification.)
MR. TOBEY: And let me just ask the witness, since I think this is the first new exhibit in the Box.
Can you see it?
THE WITNESS: Yep.
MR. TOBEY: And you're able to open it okay and look at it?
THE WITNESS: Yep.
MR. TOBEY: Okay.
BY MR. RONCA:

Page 70
J. Witte

Q. Can you identify this?
A. Yeah. This is my National Institutes of Health biosketch -- biographical sketch.
Q. Right. Good through 2/28/2023?
A. Well, that's not -- these are updated monthly. This is the form -- the unfilled form is good through that date.
Q. Okay.
A. The format is set by the National Institutes of Health.
Q. Sure.
MR. RONCA: So can we look at the next section, please.
Q. So you say here:
I have extensive experience designing and undertaking large-scale genetic epidemiologic studies such as supposed here. My research program encompasses a synthesis of applied and methodological work, with the overall aim of deciphering the mechanism underlying complex diseases and traits.
That's your statement, right?
A. That's what it says on my biosketch, yes.

Page 71
J. Witte

Q. Right. And so those mechanisms underlying complex diseases, that include cancer?
A. The complex diseases include cancer, yes.
Q. And you understand and decipher the mechanisms underlying cancer?
A. Yeah. I think that -- I mean that's what it says there. But my overall -- the overall aim is deciphering the mechanisms underlying complex diseases and traits.
Q. Wouldn't you need to understand the mechanisms in order to decipher it?
A. Well, mostly in -- in the large-scale studies that we undertake, we're looking for associations.
Q. Okay. And then it says you're ongoing projects include -- go back. Go back. I'm sorry.
My research is focused on evaluating pleiotropy, polygenic risk scores, and prostate cancer in large-scale cohorts of diverse populations.
That's your statement?
A. Yeah. I'm not --

Page 72
J. Witte

(Cross-talk.)
Q. My question is, is that your statement?
A. That's my statement. I should say I'm not sure exactly where this -- this was written.
The first sentence:
I have the appropriate scientific background and initiative for this project.
So this was specific to a -- a -- I don't know where this -- for a particular application to the National Institutes of Health.
Q. Right. You're telling them what you're good at so you can get the project, right?
A. Well, it says relevant to my role in that project.
Q. Right. Your research has been focused on --
MR. TOBEY: You have a copy that you can scroll through if you need more than just what this little box is showing you if that's what you're asking.

Page 73
J. Witte

Q. You ready for a question?
A. Yes.
Q. Okay. So, pleiotropy is understanding the shared genetic basis of different cancers and diseases?
A. The pleiotropy is the relationship between different genes that cause multiple different outcomes.
Q. These are the same genes where the DNA is located?
MR. TOBEY: Objection. Form.
A. Could you restate the question?
Q. Sure.
A. So I understand.
Q. As I understand what you wrote here in trying to get a grant, understanding the shared genetic basis of different cancers and diseases, that's the definition of pleiotropy.
MR. TOBEY: Objection. Form.
Q. Right?
A. The definition of pleiotropy is the shared genetic basis of any diseases. It's not just specific to cancer.
Q. Yeah. It says different cancers

and diseases. I read that.
MR. TOBEY: Objection.
Q. That what it is? What you wrote there, is that what it is?
MR. TOBEY: Mr. Ronca, this is the tone is abusive and attacking the witness.
MR. RONCA: Yeah. All the witness has to say is that's what it says and then we won't have this problem.
MR. TOBEY: No, sir.
MR. RONCA: He's always searching for an angle to get out of the question, which is an obvious question.
MR. TOBEY: Mr. Ronca, you're berating him and I think that is having an effect on his ability to answer. I mean just ask him actual questions and give him a chance to answer.
Q. Here's an actual question.
Did you write understanding the shared genetic basis of different cancers and diseases is pleiotropy?


A. That's -- so that is one of my ongoing projects at the time this biosketch was written.
Q. That's not what I asked you. See, this is what the problem is, Dr. Witte.
I asked you did you write that in this document. And you answered with some other answer.
Did you write that in this document?
MR. TOBEY: Objection to the mischaracterization of the testimony.
A. So, yes, I wrote that in this document. I was just reading the very start of this, which was this is a list of the projects currently underway.
Q. Yeah. The only question pending, sir, did you write the highlighted sentence?
A. Yes.
MR. TOBEY: Objection. Asked and answered.
Q. And when you wrote it, is it true?
A. Is it true that ongoing projects include understanding --
Q. No. No. Is it true that


pleiotropy is understanding the shared genetic basis of different cancers and diseases?
A. Pleiotropy, the formal definition -- the simplest definition is, is one gene that can cause more than one outcome, whether it's cancer or another disease or any other trait like height -- height and something else, so it's that there are particular genes --
Q. That can cause particular cancers and diseases, right?
A. Well, the key is more than one.
Q. Okay.
A. So -- sorry.
Q. So each cell has genes in it?
A. That's correct.
(Cross-talk.)
Q. And gene has DNA in it?
MR. TOBEY: Objection. Form.
A. Yeah. That's what comprises a gene.
Q. Right. And when a mutagen alters a gene, it could cause the cell to mutate, is that right?


A. I think that is the definition of a mutagen.
Q. And when that happens, sometimes that ends up being cancer, right?
MR. TOBEY: Doctor, were you done with your prior answer? I think you were trying to talk.
A. Yeah. So I think a mutagen causes a change in the DNA, right? Whether or not that leads cells to mutate depends on the situation.
Q. Sure. And in some situations, that mutation can result in cancer.
MR. TOBEY: Objection. Form. Asked and answered.
A. I think that's -- that's a general statement.
Q. Right. And it can start with one cell mutating?
A. Again, I would defer to the cancer biologist and -- and other experts as my report is focused on the -- the epidemiology and observational data.
Q. But I'm not asking you about your report. I'm asking you about your expertise

as a genetic epidemiologist.
One cell that mutates could be the beginning of cancer.
MR. TOBEY: Objection. Form.
Q. Depending on the circumstances.
A. Again, it's -- in cancer, there's the general understanding is that multi-hit hypothesis in which multiple hits -- multiple things are altered and causing carcinogenesis.
So what we focus on in genetic epidemiology is what you're born with and --
Q. So what you're born with sometimes is more susceptible to developing into cancer than what some other people are born with?
A. That's what we focus on in general epidemiology, whether it's cancer or any other outcome.
Q. And it can all start with one gene, right?
MR. TOBEY: Objection. Form.
A. Well, again, we're talking about genes that you're born with. That's the --
Q. We can talk about multiple hits. But if one of those genes gets hit and



mutates, it could develop into cancer.
That's the general understanding, right?
A. Again, I'll defer to the cancer experts.
Q. You don't have sufficient expertise to answer that question?
A. Well, I think that it's a generalization that I'm not really prepared to -- to answer right now.
Q. Because you don't have the expertise to answer it?
MR. TOBEY: Objection. Form.
A. Cancer is a very complex process. And you're breaking it down to a single mutation in a single cell causing cancer, and I think that's a generalization that I would defer to a -- a -- an expert who's focused on mutagenesis.
Q. Would you agree that it's possible after multiple hits that one gene mutates and that gene then divides and divides and divides and ultimately becomes a cancerous tumor?
MR. TOBEY: Objection.



Q. After going through several steps.
(Cross-talk.)
MR. TOBEY: Objection.
Q. -- that's possible?
MR. TOBEY: Asked and answered multiple times. Can we get to a new line of questioning?
MR. RONCA: No.
MR. TOBEY: I mean at some point I'm just going to instruct him not to answer. He's said he's not a cancer biologist, and you're not asking about epidemiology.
MR. RONCA: You do that your risk. I'll read back the question.
Q. Would you agree that it's possible after multiple hits that one gene mutates and that gene then divides and that cell divides and divides and ultimately becomes a cancerous tumor? Do you agree that that's possible?
MR. TOBEY: Objection. Asked and answered multiple times.
A. I'll defer to a cancer biologist.
Q. So you can't answer?



MR. TOBEY: I'm going to instruct you not to answer. This is getting abusive again.
MR. RONCA: You can take down the exhibit.
Let's bring up the report again. It's 6397, page 1. I'm looking for the sentence, No major medical or scientific organization.
There it is. The last one under the first bullet. The last sentence of the first bullet.
BY MR. RONCA:
Q. Dr. Witte, you wrote:
No major medical or scientific organization has added prior ranitidine use to the list of cancer risk factors.
Is that what you wrote?
A. That is what I wrote.
Q. Okay. You'll agree, though, that the FDA has with -- caused the product to be recalled and withdrawn from the market because of the presence of a carcinogen in the pills?
MR. TOBEY: Objection. Form.

A. The FDA has -- did recall ranitidine due to the presence of NDMA. To the best of my knowledge, neither they or any other scientific organization has added that use to the list of cancer risk factors.
Q. Yeah. I understand.
It's not a risk factor anymore, but it's off the market, right?
MR. TOBEY: Objection. Form. Mischaracterizes prior testimony.
Q. Right?
A. Yes. It's off the market.
Q. So it's not a risk to anybody right now, right?
MR. TOBEY: Objection. Form.
A. It's -- it's been removed from the market. And again, no major scientific organization or any epidemiologist I know has said that apart from the plaintiffs' experts has said that ranitidine use is causal for cancer.
Q. But the FDA ordered it be pulled from the market, right?
MR. TOBEY: Objection. Form. Asked and answered.



A. Yes. It has been removed from the market.
Q. Because of its cancer risk potential?
MR. TOBEY: Objection. Form.
A. It was removed from the market due to the potential of NDMA.
Q. Which is a cancer-causing agent?
MR. TOBEY: Objection. Form.
A. NDMA has been ruled by International Agency for Research on Cancer to be a probable carcinogen type-2A based largely on animal data.
Q. Okay. So probably means more likely than not?
MR. TOBEY: Objection. Form.
A. I am not sure that IARC quantifies it that way, but it has been quantified as -- reported as a potential carcinogen, probable carcinogen, excuse me, based largely on animal studies.
Q. How do you define probable?
MR. TOBEY: Objection. Form.
A. I think that -- I mean I think my definition is irrelevant to what IARC has



defined it as. It's a probable carcinogen based on animal studies, which means they had insufficient human evidence.
Q. I'm allowed to ask you what your definition of probable is, and I'd appreciate an answer.
MR. TOBEY: Objection. Form.
A. I think I would -- I mean I would return to IARC has defined this as a probable carcinogen. I am not exactly sure whether -- how they're determining probable carcinogens. I mean, like, your question about more likely than not.
Q. So the Merriam Webster definition of probable is: Supported by evidence strong enough to establish a presumption.
Is that your definition of probable?
MR. TOBEY: Objection. Form. Assumes facts not in evidence.
A. I think that it's kind of a -- a situation specific.
Q. How about likely to be true or --
(Cross-talk.)
Q. Is that your definition of



probable?
MR. TOBEY: Mr. Ronca, he was trying to get his answer out when you spoke over him.
Q. Go ahead.
A. That's okay. That's fine.
Q. All right. I mean another definition is: Likely to become true or real.
Do you agree with that definition of probable?
MR. TOBEY: Objection. Form.
A. I think that, again, I don't know. It's a very general statement. You'd have to consider it in a specific situation.
Q. What about the Collins dictionary definition? If you say that something is probable, you mean it's likely to be true.
Do you agree with that?
MR. TOBEY: Objection. Form.
A. Again, it depends on the situation. I don't think -- again, it's NDMA has not been labeled a Type-1 carcinogen. And ranitidine use hasn't been defined by anyone but the plaintiffs' experts as a cause of

Page 86
J. Witte

cancer.
Q. Okay. I'm asking you NDMA, probable, you can't -- what you're saying to us is you don't have a definition of probable?
MR. TOBEY: Objection. Misstates prior testimony.
A. No. I'm saying that -- that -- that it's situation specific, and I don't know what IARC is using when they are coming up with the terminology probable carcinogen.
Q. Didn't you spend some time working at IARC?
A. I did. I had a sabbatical there.
Q. Like six months?
A. It was a year.
Q. A year sabbatical?
A. Uh-huh.
Q. In your time in the sabbatical, did you ever have an understanding what IARC means by its classification "probable human carcinogen"?
A. I think that for NDMA -- NDMA it has been labeled a probable carcinogen based on animal data. I was -- on my sabbatical I

Page 87
J. Witte

was not in the monographs group, which undertakes these evaluations.
Q. Okay. When did IARC do the full review of NDMA and make its determination that it was Category 2A, probable human carcinogen?
A. The original report was in 1987.
Q. And has IARC done a full review of NDMA since then?
A. Not to my knowledge.
Q. So if there is any additional human data that may have occurred between 1987 and 2022, that would [sic] not considered in the 1987 designation, right?
A. It would -- it couldn't be in 1987 because it -- you know.
Q. It happened afterwards.
MR. TOBEY: Objection. Form.
Q. They couldn't have -- when they said it was based on animal data in 1987, there was human data that has been studied since that time that they could not possibly have because it hadn't happened yet, right?
MR. TOBEY: Objection. Form. Asked and answered.

Page 88
J. Witte

A. Yes. They couldn't include something in 1987 that happened after 1987.
Q. I mean they didn't even have the PETA rat study in 1987, correct?
MR. TOBEY: Objection. Form.
A. Anything that was not in -- done after 1987 wouldn't have been done before 1987.
Q. Have you ever seen the PETA rat study?
MR. TOBEY: We're doing my running objection. Outside the scope of the expert report.
A. I'm superficially aware -- I didn't even consider it here.
Q. Yeah. Was it in that book of documents, that file of documents that you got?
MR. TOBEY: Objection. Form.
A. Again, I'm not sure whether it was in that or not 'cause I didn't --
Q. How are you generally familiar with it?
A. Just from the field of cancer epidemiology. So it's not part of my expert

Page 89
J. Witte

report.
Q. You just generally know about it from the field even though none of your studies in all this time has involved nitrosamines or NDMA?
A. I mean, I'm aware that PETA undertook study -- animal studies with I believe -- well, I shouldn't speculate, but looking at carcinogens. But it's not something --
Q. Was it a particularly large study?
MR. TOBEY: Hold on.
Do you want to finish your answer?
A. Yeah. It's not something that I've looked at at any time recently.
Q. Did you look at it in connection with this case?
A. No.
Q. Was it -- is the reason you know about it because it's a particular large and well done study?
MR. TOBEY: Objection. Form.
A. I would have to go back and look at the study, but it's not something that I considered here. Again, I'm -- I'm

evaluating the epidemiologic evidence of a potential association between ranitidine and cancer, not animal studies.
MR. RONCA: Give me a second, please.
So what do I do if I have an exhibit -- oh, no. I see it here. Can you bring up 6399?
(Exhibit 6399 was previously marked for identification.)
BY MR. RONCA:
Q. I'll represent to you, Dr. Witte, that this is the WHO Concise International Chemical Assessment Document for N-nitrosodimethylamine.
Have you ever seen this before?
MR. TOBEY: Mr. Ronca, hang on one second. Let's just make sure he has it in the Box so he can look at it.
A. I have it.
Q. Have you ever seen this before?
A. Yes.
Q. Was it in the file that was provided to you by the lawyers?
A. I would have to go and -- and



check.
Q. Well, why else would you have this in your possession, can you explain?
MR. TOBEY: Objection. Form. Misstates prior testimony.
Q. Why else would you have seen this document on NDMA that's stamped that it comes from GSK's internal documents? Why would you have seen this other than getting it from the lawyers?
A. Well, there's the possibility that I came across it in my own -- in my own research and --
(Cross-talk.)
Q. Do you know the answer?
MR. TOBEY: Objection. Form.
A. No. I'm not exactly sure.
Q. Was this on your List of Materials Considered or in your references?
A. I don't think that I considered it in my report, so I don't think it's referenced.
Q. It's not on the list; it's not in your references, correct?
A. That's correct. Sorry. I'm just



glancing.
Q. I assure you it's not there.
A. Okay.
MR. TOBEY: If you want to take your time to look at the document, that's your right.
A. (Document review.) I don't see this in my references for material considered.
Q. Okay.
MR. RONCA: Can we go do page 6 of this document? It's sixth page of the PDF I think it is. I'm sorry eight. I'm sorry eight. It's my astigmatism.
Yeah. Can we blow up that red box? That's good enough I think. There you go.
Q. So Doctor, in this WHO, that stands for World Health Organization, right?
A. That's correct.
Q. And IARC's part of the World Health Organization, right?
A. Yes, that's correct.
Q. Okay. So based on this WHO assessment, let's read what the first



sentence says there:
Based upon laboratory studies in which tumors have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic.
Did I read that correctly?
A. You did. I assume by all species, they mean all animal, non-human animals.
Q. Okay. Do you agree that NDMA is clearly carcinogenic?
MR. TOBEY: Objection. Form.
A. Well, I agree with the IARC's report that in animal studies that it's a probable carcinogen based largely on animal studies.
Q. Yeah. That was 1987. This is 2002, so I'll ask the question again.
MR. TOBEY: Objection. Form.
Q. Based on seeing this, do you agree that NDMA is clearly carcinogenic?
MR. TOBEY: Objection. Form. Asked and answered.
A. I think under the specific laboratory conditions in which these experiments were undertaken, that animal

studies -- animal -- non-human animal studies have -- have -- I don't know about -- you know, so it's a probable carcinogen based on IARC.
MR. RONCA: Let's highlight the next sentence.
Q. I'll read it. You tell me if I read it correctly:
There is overwhelming evidence that NDMA is mutagenic and clastogenic.
Did I read it right?
A. Yes, that's correct.
Q. Do you agree that there's overwhelming evidence that NDMA is mutagenic?
MR. TOBEY: Objection. Form.
A. I didn't review the -- the cancer biology of NDMA, and I'm not -- usually you would have citations that would be supporting this statement.
But again, I'm focused on the observational studies in -- in humans looking at ranitidine and cancer.
Q. I'm asking you about NDMA.
MR. TOBEY: Sorry. Is there a question?


MR. RONCA: Yes.
Q. Do you agree that there's overwhelming evidence that NDMA is mutagenic?
MR. TOBEY: Objection. Form.
A. I think based on the animal studies and the doses that they undertook there, again, I -- I haven't evaluated this because it's not part of my expert report.
Q. Is NDMA the contaminant that's in ranitidine?
A. Yes, it is. NDMA has been detected in ranitidine.
Q. And is it fair to say that because ranitidine degrades into NDMA and, therefore, there's NDMA in every pill, the FDA, European Union, United Kingdom, Japan, Canada, Australia, India, and every other country took ranitidine off the market?
MR. TOBEY: Objection. Form. Misstates facts. Miss -- assumes facts not in evidence and is largely attorney argument.
A. All right. Could you repeat the first part of that question?
MR. RONCA: Please read it back.


(Referred to portion of the record was read back by the court reporter.)
MR. TOBEY: Same objection.
A. I don't think any -- not sure anyone knows whether NDMA is in every pill of ranitidine. It was removed from the market because of NDMA detected.
Q. And was that because there's overwhelming evidence that NDMA is mutagenic and clastogenic?
MR. TOBEY: Objection. Form.
A. I'm not sure if that was the determining factor. No one has concluded that ranitidine causes cancer except for the plaintiffs' experts.
Q. What's a DNA adduct?
MR. TOBEY: Objection. Form.
A. This is outside of my report and my general expertise in epidemiology methods, cancer epidemiology and genetic epidemiology.
MR. RONCA: Let's highlight the last sentence, please.
Qualitatively, the metabolism of NDMA appears to be similar in humans and animals. As a result, it is


considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure.
Q. Did I read that correctly?
A. Yes, you did.
Q. Do you agree with that statement?
MR. TOBEY: Objection. Form.
A. There were a lot of qualifying aspects of this sentence, including appears likely, potentially.
I think, again, based on the observational data in ranitidine, focused on ranitidine and the five cancers of concern here, there's no evidence from epidemiologic data that ranitidine causes those cancers.
Q. There's no evidence?
A. No convincing -- no reliable or valid evidence.
Q. But there is evidence, right?
A. Well, I think we should -- we could talk about specific studies.
Q. Is it your opinion that there is no evidence of an association between ranitidine use and the five cancers that the plaintiffs have claimed may be caused by ranitidine?

A. It's, as stated in my report, it's my assertion that there's no reliable evidence.
Q. Is there some evidence?
A. Taken as a whole, there's no reliable evidence that ranitidine causes cancer.
Q. Is there evidence?
MR. TOBEY: Objection. Form.
A. No. I'd say there's no reliable evidence that ranitidine causes cancer.
Q. You said taken as a whole there's no reliable evidence.
But is some of that whole evidence showing an association?
A. Not a reliable, valid association that's not due to bias or compounding.
Q. In your opinion?
A. Based on the data.
Q. In your opinion based on the data?
MR. TOBEY: Objection. Form.
A. In my expert opinion looking at the data.
Q. Okay. Do you have the expertise to comment on the first part of this sentence:



Qualitatively the metabolism of NDMA appears to be similar in humans and animals.
A. I don't know what papers they're referring to, so I would have to defer to another expert.
Q. Well, had you reviewed this document, you would see the references at the end.
MR. TOBEY: Objection. Form. And I guess that wasn't a question.
Move to strike attorney argument and badgering.
Q. Do you agree with the World Health Organization that it is highly likely that NDMA is carcinogenic to humans potentially at relatively low levels of exposure?
MR. TOBEY: Objection. Form. Asked and answered.
A. I think, as I've stated, from the observational data looking directly at the question at hand here, whether or not ranitidine causes cancer, there have been 16 published papers and there's no valid, reliable association arising from that work.



Q. Should people be taking ranitidine that has NDMA in it?
MR. TOBEY: Objection. Form.
A. I don't think that's for me to determine. It's been removed from the market as a -- by the FDA. But again, I have not -- the epidemiologic studies that have looked at specifically this question do not show an association, let alone a causal relationship, between ranitidine and the cancers of interest here.
Q. So is it your opinion it should just go back on the market?
MR. TOBEY: Objection. Form.
And also we have been going about an hour. You want to finish this line, Mr. Ronca, and take a break?
MR. RONCA: Sure. Sure.
A. No. I think as I said the FDA has removed ranitidine from the market.
Q. Do you agree the FDA was right to remove it from the market?
MR. TOBEY: Objection. Form.
A. I think -- again, my expert testimony here is focused on the



observational studies that have looked at the potential association between ranitidine and the five cancers.
Q. So if there's no association between ranitidine and the five cancers, the FDA should just put it back on the market, right?
MR. TOBEY: Objection. Form.
A. That's -- I think that the FDA has made that decision and, as a policy decision, I'm not going to opine on the validity of that decision. My focus here is on the observational studies looking at ranitidine and cancer.
Q. Okay. So I have a couple more questions, but they're on a different exhibit but right down this same line.
MR. RONCA: Can you bring up 6410?
(Exhibit 6410 was previously marked for identification.)
BY MR. RONCA:
Q. Dr. Witte, Exhibit 6410 is the Hazard Assessment Report.
MR. TOBEY: Hang on just a sec. Let's make sure that it's in the Box

and make sure that the witness has a chance to review -- Dr. Witte, do you see it in the Box?
THE WITNESS: I do, yeah.
MR. TOBEY: Okay. Take your time and look at it and when you're ready, let us know.
A. (Document review.)
Q. Ready, Doctor?
A. No. I'm still looking through the document. (Document review.) Okay.
Q. Have you seen this before?
A. No. I didn't consider it in my evaluation.
Q. Yeah. That's not what I asked you. Please listen.
Did you -- have you ever seen this before today?
A. No. I haven't looked at this document.
Q. Never seen it?
MR. TOBEY: Objection. Asked and answered.
Q. Was it provided to you and you just didn't look at it?



A. So I haven't actually seen this document or incorporated it into my report.
Q. Okay. That's fair. All right.
So this is a Hazard Assessment Report done by GSK?
MR. TOBEY: Objection. Lack of foundation.
A. It's titled Hazard Assessment Report and it says, Company Name GSK.
Q. It's one of the companies that hired you in this case?
MR. TOBEY: Objection. Form.
A. Yes, that's correct.
Q. Okay. And this is from 2019? Fifth box down, right?
A. Uh-huh.
Q. So right. And it's a Hazard Assessment Report of NDMA.
MR. TOBEY: Objection. Form.
A. That's what it says, Hazard Assessment Report.
Q. Okay?
MR. RONCA: Next page, please. Let's put a box around the top thing. Right there. Yeah.



Q. So in this hazard assessment, GSK determined that NDMA is positive for genotoxicity?
MR. TOBEY: Objection. Form. Lack of foundation.
A. I'm sorry. Was that a question or --
Q. Yes. Is that what it says?
MR. TOBEY: Objection. Same objection.
A. Yeah. So there's an X in the box that says: Yes, positive genotoxicant.
Q. And the comment is that it's both a mutagen and a clastogen, right?
MR. TOBEY: Same objection.
A. That is what it says in the Box.
Q. So were you aware prior to today that GSK designates NDMA as a genotoxin that's both a mutagen and a clastogen?
MR. TOBEY: Objection. Form.
A. Again, I focused on the epidemiology observational human studies in my report.
Q. That's not what I asked you.
I asked you if you were aware that



GSK had classified NDMA as a genotoxin that is both a mutagen and a clastogen. You either were aware or you weren't aware.
MR. TOBEY: Objection. Form.
A. So I -- I didn't use this particular document in my report.
Q. So you were not aware?
A. I was not familiar and does not -- did not consider this document in my report.
Q. Do you agree with the assessment that NDMA is a genotoxin that's both mutagenic and clastogenic?
MR. TOBEY: Objection. Form.
A. I would have to look more specifically at this report. I'm assuming that it's based on studies in laboratory animals, non-human data.
Q. Doctor, you know what happens when we assume.
Do you know if that's the response?
MR. TOBEY: Mr. Ronca, you're asking him about a document he said he's never seen before, and then you're chastising him for assuming.
I mean, which is it? Do you want

him to speculate about a document he's never seen --

(Cross-talk.)

MR. RONCA: He can simply say he doesn't know. He doesn't have to assume.

(Cross-talk.)

Q. If you look down lower, there is human studies in there. But I'm just saying don't assume, Doctor.

I'm asking if you agree or disagree.

MR. TOBEY: And if you don't know, it's a fine answer.

Q. If you don't know, it's a fine answer.

A. I'm sorry. I was trying to read through this. And the section just below the box talks about animal studies.

But I don't know if that was the genotoxicant, but I'm assuming it is animal studies. But I don't know for sure because I haven't read this document.

Q. Okay.

MR. RONCA: Can we go to page 6



of 9? The top box.

Q. This GSK hazard assessment says:

NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.

Do you agree with that statement?

MR. TOBEY: Objection. Form.

A. Sorry. Can -- can I see what -- I can't see the entire sentence because the red box is actually covering.

MR. TOBEY: So, Doctor, that's why we have the Box.

THE WITNESS: It's on that one too.

MR. TOBEY: It is on -- sorry. Should we just state for the record --

(Cross-talk.)

Q. You said it begins with the word -- with the initials NDMA. I wasn't reading before that.

A. Oh, I'm sorry.

MR. TOBEY: Hold on.

Mr. Ronca, you're interrupting the witness repeatedly. Now you're interrupting me when I'm trying to get



objections and clarifications on the record.

Did you guys modify this document that you have marked and put into evidence? And if so, would you please state that for the record.

MR. RONCA: I don't know what you mean by modify. We put a red box.

MR. TOBEY: Well, I mean, is that a modification to the original document?

MR. RONCA: It's an emphasis on part of the original document. The original document is not modified. The sentence is not modified.

Put your objection on the record, and let's go.

MR. TOBEY: Okay. Objection. Because apparently you have marked up this document in ways where he can't read the sentence in full, and you have not said so on the record.

I mean I'm fine if you want to emphasize things. Just be straightforward about it.



MR. RONCA: I asked him about the last sentence, which begins with the letters NDMA.

MR. TOBEY: And the witness --

MR. RONCA: NDMA is --

(Cross-talk.)

MR. RONCA: -- and exposures should be reduced to the extent possible.

MR. TOBEY: Mr. Ronca, you're asking a witness about a document he's never seen and pulling one sentence out of context, and he said he would like to see the language before that one sentence, which your markup has obscured.

Would you like to produce him a clean copy so that he can at least know the context of the out-of-context sentence you're asking him about?

BY MR. RONCA:

Q. Do you need to see the preceding sentence, Doctor, now that the lawyer's told you that you need to?

MR. TOBEY: Actually, he was the

Page 110
J. Witte

one who asked to see that.
MR. RONCA: Please -- please take that down. I'm going to share my screen and show it without the box.
THE WITNESS: Thank you.
BY MR. RONCA:
Q. My question is the sentence reads:
NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.
Doctor, do you agree with that statement?
MR. TOBEY: Objection. Form.
A. Sorry. I'm just trying to read the -- the whole paragraph so I can put it into context.
MR. TOBEY: Mr. Ronca, we're way over an hour. Why don't we take a break and --
MR. RONCA: I have a question pending.
MR. TOBEY: You can give the witness a clean copy to look at, at the break.
MR. RONCA: He's looking at it.

Page 111
J. Witte

A. So this is -- it appears, again, and this is the first time I've seen this document, that this is looking at hepatic tumors in rats and inhalation or drinking water, I think.
So I think that -- that in animal studies it appears that they -- that they are concluding that it is a genotoxic carcinogen at doses relevant to -- in the narrow laboratory conditions in which the animal studies were undertaken.
Again, I will return to my report is focused on observational epidemiologic data and whether or not there's an association between ranitidine and cancer in which there's no clear, valid association reported. So --
MR. RONCA: Let's take a break.
MR. TOBEY: I think, can we have that break now? We've let you do quite a bit of --
MR. RONCA: That's literally what I just said.
MR. TOBEY: Okay. Great.
THE VIDEOGRAPHER: Are you ready

Page 112
J. Witte

for the break, Counsel?
MR. RONCA: Yeah.
THE VIDEOGRAPHER: The time is 2:42 p.m., and we're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time is 3 p.m., and we're back on the record.
BY MR. RONCA:
Q. Ready to go, Dr. Witte?
A. Yes.
Q. Talk about any substance during of the break?
A. No.
MR. TOBEY: Okay. Let me just get in an objection. I let it go last time.
I don't think you're entitled -- you know, you're not entitled to ask the attorney-client -- attorney-expect conversations. That's work product.
MR. RONCA: So there's a dispute about this because in the deposition of Dr. Zeiger, which I don't think you

Page 113
J. Witte

were on, they were asking Dr. Zeiger, which I defended, the same question.
And I said, I don't think you're entitled to know that.
So we can have an agreement across the board as to what the rule is. Then I'm good with it. I don't care which way it goes. Either no conversations or yes, conversations; but what's good for the goose is good for the gander.
MR. TOBEY: Sure. But because I haven't discussed this with any other counsel, let's do this.
Subject to my objection and if you agree I'm not waiving anything, he can answer it this time around. But then I want to talk to the other lawyers and see if they're amenable to a, you know, a universal rule one way or another.
MR. RONCA: Okay.
MR. TOBEY: Okay, so you --
MR. RONCA: Which would've avoided the whole problem of the question what

we were talking about in the first place.
Okay. So let's bring up Exhibit 6457, please.
(Exhibit 6457 was previously marked for identification.)
BY MR. RONCA:
Q. Dr. Witte, you're familiar with this, study by you entitled Risk of Cancer Following the Use of N-Nitrosodimethylamine (NDMA) Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea.
You're familiar with this, right?
A. I am. I don't think I'm seeing it in my Box.
MR. TOBEY: Try hitting refresh if that helps.
THE WITNESS: Okay.
MR. TOBEY: It just popped up for me.
A. Okay. There it is.
Q. Okay. I mean you reviewed this as part of your report?
A. That's correct.
Q. This is one of the eight active


comparative studies you talk about in Appendix 1?
A. Yes, that's correct.
Q. Okay.
MR. RONCA: I'd like to go straight to page 7. I've already highlighted a sentence. Can you pull that out?
Q. Now, this sentence was in the section which talked about the limitation of the study, is that right?
A. Yeah, it is. I think the version that's in my Box has highlights on it.
Q. Yeah, it does.
A. I can't read it.
Q. You can't read the -- you can't read what's on the screen?
A. I'm sorry. The version of -- that I've been shared, the highlight has actually covered all the text.
MR. TOBEY: Let me take a look. I didn't notice that. Oh, yeah. Okay.
So it's odd. It -- it's just yellow with no text, James.
MR. RONCA: What am I supposed to


do about that? This is the exhibit that we uploaded.
MR. TOBEY: You're not asking me that, are you? I don't know the answer to that question.
MR. RONCA: Why can't we just use the one on the screen?
MR. TOBEY: I think he'd like to opportunity to review the whole document is what he was saying.
Q. Dr. Witte, haven't you reviewed this document in detail in order to write your report?
MR. TOBEY: Well, he's entitled to look at a copy --
MR. RONCA: I am entitled to ask him that question.
Q. Have you reviewed it?
A. Yes. I have reviewed it. But if you're gonna pull out part of it, it's very helpful for me to be able to look at the context and -- and the actual report that you're referring to.
MR. RONCA: All right. Bring down the call out. And can you call out


that whole paragraph which discusses limitations?
MR. TOBEY: No, no. I'm going to object here. He has the right to have the entire document from first page to last page and be able to look through it if you're going to ask him about it.
MR. RONCA: Let's take a break. He can look at it for as long as he wants.
MR. TOBEY: I don't want to be here all night.
Is there a way for you guys to provide exhibits that don't obscure the text?
MR. RONCA: This is the exhibit I prescribed -- that we provided, and it doesn't obscure the text.
Let's go off the record. Stay on the stenographic record.
THE VIDEOGRAPHER: The time is 3:05 p.m., and we're going off the record.
***FOLLOWING DONE OFF THE VIDEO RECORDING***

MR. TOBEY: Are we on the record or off the record?
MR. RONCA: On the stenographic record.
MR. TOBEY: As opposed to?
MR. RONCA: The video record.
MR. TOBEY: Why -- why are we turning off video? I don't understand.
MR. RONCA: So we don't have this colloquy on video.
BY MR. RONCA:
Q. Do you have a copy handy, Dr. Witte?
A. This is Yoon, right?
Q. Yeah.
A. Yeah. I have a hard copy of it.
Q. Can you use that instead of the Box?
A. Yeah.
MR. TOBEY: I'm -- I'm fine with that.
MR. RONCA: Let's go back on the video record.



MR. TOBEY: Mr. Ronca, I'm fine with that for any exhibit where he has a copy handy, but we're not -- I just want to give your team a chance to put clean copies of the exhibit or I don't mind highlights as long as you can read the words.
MR. RONCA: Okay. Clearly the one that's in the folder you can read, so I don't know why his Box is doing that and that's not on our end.
MR. TOBEY: I am looking at it as well and seeing the same thing.
MR. RONCA: Okay. That's on your end.
MR. TOBEY: No. I don't think that's been established.
MR. RONCA: Well, when I call up the document, it comes up and you can read it.
MR. TOBEY: Let's talk to the technical people from --
THE COURT REPORTER: Are we staying on the record --
MR. TOBEY: Hey, John, you want to



weigh in on this? We're looking on Box and seeing --
THE COURT REPORTER: Are we staying on the record for this?
MR. RONCA: Yes. On the stenographic record.
MR. TOBEY: I don't understand the distinction. Is time running?
MR. RONCA: No, not for this colloquy.
MR. TOBEY: Okay.
DOCUMENT TECHNICIAN: Yeah. I think the issue is Box, anything that's highlighted. Because it's happening on my end also, and I have more privileges in Box than you guys have.
MR. TOBEY: Well, again, happy to proceed with this particular exhibit because he has a paper copy in front of him. But we're just -- I mean we're entitled to readable copies of exhibits that you're putting into evidence. That's just basic.
So you know, if there's an issue,



you guys can upload clean copies instead of highlighted copies and then highlight on the Zoom version, which is fine, but he'll have a clean version to read it.
MR. RONCA: I'm gonna ask somebody to do that.
(Off-the-record discussion.)
DOCUMENT TECHNICIAN: Mr. Tobey, unless you have credentials that you can give the witness, then that's the only ability. But US Legal sets up so that in an in-person deposition the witness doesn't leave with documents, so we don't give the witness permission to download documents to his or her computer.
MR. TOBEY: I -- I was told at the last US Legal deposition that there's a PTO that says there's no downloading for Box, so I don't think that's an option.
MR. RONCA: Right. Well, anyway, let's go back on the video record.
THE VIDEOGRAPHER: The time is

3:09 p.m., and we're back on the record.

MR. RONCA: All right. So we can bring up Exhibit 6457 again. Just leave it like that for now.

Q. Dr. Witte, this is the limitations section of the Yoon study?

A. Okay. Page 7 of 8, right?

Q. Yes.

A. Yes. I see this. Yeah.

Q. Okay. In the highlighted portion Dr. Yoon writes:

Third, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer.

You see that?

A. I do see that.

Q. Do you agree with that?

A. No, I don't. I think that obviously this study has cancer cases in it so the follow-up period was long enough to assess the onset of some cancer. I think that -- well, I don't want to hypothesize what they meant.



But clearly cancer -- there's been cancer onset that happened in this study, so I'm not sure exactly what they mean.

Q. Isn't what they mean that most often it's thought that cancer development takes 20 to 30 years. In order to really see an effect in a population, you need to follow them for that period?

MR. TOBEY: Objection. Form.

A. I don't know what they mean actually.

Q. Okay. So you disagree that the -- you think the follow-up period is long enough at seven years?

A. I think that -- that for some people, you know, the length of time that it takes to develop cancer is a distribution. It's not like a single number. So for some people that length of time -- or that distributional length of time observed in this study should be sufficient. And I don't know exactly what they mean by this statement.

MR. TOBEY: I think -- hold on.

Q. Go ahead. Finish up.



A. All right. Just because, obviously, in this study they assess the onset of cancer.

Q. So you do not agree that this study has a limitation defined by the study authors that the follow-up period is restricted to seven years, thus, the overall follow-up period is not long enough to assess the onset of cancer?

A. Again, in this study, they have assessed the onset of cancer. I think all epidemiologic studies have limitations. And -- I mean clearly, they assessed cancer onsets. I think that -- so I would agree that, that a limitation of the study is how long the follow-up was, sure.

But you could probably say that about any epidemiologic study almost with cancer. And I disagree with the statement the overall follow-up period is not long enough to assess the onset of the cancer because they've done that in this study.

Q. All right.

MR. RONCA: And can we highlight the last paragraph, the concluding



paragraph? Yes.

Q. And so it says:

To conclude we found no association between probable NDMA exposure through ranitidine and short-term risk of cancer. However, further reach is needed to assess the long-term risk -- the long-term cancer risk.

So, do you interpret that that the authors are saying, yeah, we had seven years so we can make some comments on the short-term risk of cancer, but we can't comment on a longer term risk of cancer?

A. Yes. So I would agree that -- that, you know, that they didn't find any association in their study design, which limited the follow-up period for the development of cancer to the seven years.

I think that it's -- you know, there's no evidence of an association in this study or other observational studies of -- between ranitidine and cancer, whether it's short-term or long-term, when you look at the whole body of evidence.

Q. So, it's your opinion that seven

Page 126

J. Witte

years is long enough to assess the offset -- onset of cancer?

A. Well, I think that -- that I don't know exactly what they mean by assess the onset of cancer or -- so it's my opinion that within seven years in this particular study they did --

THE COURT REPORTER: I hear someone speaking but it's low.

A. I think someone -- sorry. Can you repeat the question?

MR. RONCA: Please read back the question.

(Referred to portion of the record was read back by the court reporter.)

MR. TOBEY: Objection. Form.

A. I think that -- that this one study, that's how long they followed up for and they observed the onset of cancer. So I'm not making the statement that any study just needs to follow up for seven years. Certainly --

SPEAKER: (Indiscernible.)

MR. TOBEY: I'm sorry. I think someone's not on mute. Mr. Heinz

Page 127

J. Witte

maybe?

Sorry. Can we restate the question?

Q. Your last answer was, quote, I think that this one study, that's how long they followed up for and they observed the onset of cancer. So I'm not making the statement that any study just needs to follow up for seven years certain.

Was that the end of your answer?

A. I think that -- that I would add, you know, this is what they've done in this observational study. And they're concluding no association between ranitidine and cancer.

And I would agree with their assessment; that in their study, they found no association.

Q. Would you agree that the shorter to follow-up time the less chance you have of finding cancers if you're looking at a large group of individuals?

A. Certainly the longer you follow a population, the more events you would observe.

Q. Is there a period of time that is

Page 128

J. Witte

too short that you wouldn't observe any cancers that are related to the exposure that you're examining?

MR. TOBEY: Objection. Form.

A. I think it -- it depends. If what you mean is will you see -- yeah. I think that -- not sure that -- that I know exactly what too short of a period. Because wait and see period with time to develop cancer varies from person to person, right?

It's a distribution. It's not a single value or suddenly at seven years everyone develops cancer. It varies a lot.

Q. And do you recall what the IARC preamble says about this?

A. I don't recall what that says.

Q. Do you think IARC would be a pretty good source for determining the latency period for studies that might try to find associations between exposures and cancer?

MR. TOBEY: Objection. Form.

A. I think -- I mean IARC is considered a -- a very highly reputable institution.

Q. And if IARC says that you really

Page 129

J. Witte

need a latency period of 20 to 30 years to find all the cancers, you disagree with that?

MR. TOBEY: Objection. Form.

A. I think I'd be interested to see that statement. It would be helpful for me to see that statement and take it, and so I can put it into context.

But again, cancer latency is a -- is a distribution and you'll have some people who develop cancer faster than others. It's not -- there's not an absolute number.

I should say that -- that in looking at meats and cancer outcomes, the follow-up periods were a similar distribution as what we've seen for ranitidine and cancer. And those follow-up periods were sufficient to detect associations between red meat and processed meat and colorectal cancer.

Q. Yeah. But the -- the Yoon authors didn't think seven years was long.

MR. TOBEY: Objection. Form.

A. They list a limitation that the follow-up period is restricted to seven years.

Q. And say: ...the overall follow-up

period is not long enough to assess the onset of cancer.

A. Again, I don't know exactly what they mean by assess the onset of cancer, because they did assess the onset of cancer. And they had many cancer cases that were detected in their follow-up period and were able to evaluate the potential association between ranitidine and cancer and concluded that they found no association in their study.

Q. We agree that the -- can we call it a latency period, this follow-up period?

MR. TOBEY: Sorry. Was that the question?

Q. Yeah. Can we call it that so we make sure we're talking about the same thing?

A. Yeah. Although, I think the language is used differently in -- in different papers. And so the follow-up period sometimes is -- is from when they started looking for cases occurring; whereas, the latency period is from exposure to -- to outcome.

Q. Okay.



(Cross-talk.)

Q. Follow-up period then.

MR. TOBEY: Just want to make sure the reporter got the end of his answer.

A. Those are -- those are two different things as -- and they're used differently in the literature.

Q. All right. Let's use follow-up period.

MR. TOBEY: Use follow-up period for what? I'm not understanding.

Q. For my question. I'm going -- I'm going to ask a question. Just want to make sure I can use -- we'll agree to use follow-up period as for the question, okay?

So if you were designing a study and you want to define cancer outcomes, would you want the follow-up period to be as long as possible?

A. I'm assuming by follow-up period you mean the time during which they were looking for cases occurring, right, because as -- as opposed to between when -- as opposed to the latency period. But I think



as a general sense, sure, longer follow-up is good because you have more cases observed.

That doesn't mean that you can't assess the onset of cancer or evaluate potential association between an exposure and an outcome because people develop cancer at all different rates.

Q. But if you're looking at a group, you -- you want to find out how many cancers are formed in that group whether they are people that develop cancer fast or people that develop cancer slow, right?

MR. TOBEY: Objection. Form.

A. I think if you're looking at the potential association between an exposure and an outcome, you can assess that without having -- without having followed people through their entire lifetime.

Q. But the longer period of time you have, the better, right?

MR. TOBEY: Mr. Ronca, just seeing a pattern here. I think Dr. Witte is soft spoken and you're kind of jumping on the end of his answers. If you could just give him a little room to



finish the answer.

He's -- you can tell he's thinking as he answers. Just give him a little time to get the answer out and then ask the next question.

Q. The longer period of time you have, the better?

A. The longer period of time you have the more cases that will occur. Does that mean that you can't detect an association with a shorter follow-up? No.

And that's what's shown in the study of red and processed meat where associations are detected with shorter follow-up.

So from a statistical standpoint it's not a requirement that you evaluate the entire population for their entire lives before you can actually assess a potential association.

Q. So, the following studies that you refer to in your report and your Appendix 1 had follow-up periods of less than seven years. Iwagami, 2.4 years; Kumar, 4.4 years; Kantor, 6.7 years; S Kim [sic], 5 years; and

Tran, 5.6 years.
Am I right about that?
A. I'm assuming you're listing the average or the median follow-up?
Q. Median follow-up.
A. And by follow-up, you mean from when they started looking at the -- at cancer cases as opposed to the time between when they first assessed ranitidine exposure. Remember, those are two different numbers and you need to put those two together to look at the latency period.
Q. Yeah. I'm aware of that. Some of these you actually commented on and use the words -- word follow-up.
So I'm asking you am I right that the follow-up time for Iwagami, Kumar, Kantor, S Kim and Tran were all less than seven years?
MR. TOBEY: Objection. Form.
A. So, again, I'm -- I think we go -- need to go through study by study, but I'm not sure. I'm assuming that you mean the median follow-up or the average follow-up. And again, that's the time from when they



started assessing cancer outcomes, not the total time when they look back at pharmacy records, which is what you would consider the latency period that was evaluated.
Q. Yes. My question was, in the Iwagami, Kumar, Kantor, S Kim and Tran studies, the follow-up time was less than seven years, isn't that true?
MR. TOBEY: Objection. Form. The witness has already said that he would like to go study by study.
Q. Yeah. Well, I'm just asking him if he can answer this question.
MR. TOBEY: I think he already answered it.
But subject to the objection, go ahead again.
A. Yeah. I do think we should go through study by study. If what you mean is the time period during which cancer was assessed, as opposed to the time period from between when they first took ranitidine or other H2RAs, let's say, and the outcome of cancer, those are -- are different numbers. And I would have to look specifically at each



study to assess whether -- again, whether is that the maximum follow-up is less seven years or the mean or the median?
Q. In the following studies, the median follow-up period was less than seven years: Iwagami, Kumar, Kantor, S Kim and Tran.
Do you know the answer?
MR. TOBEY: Same objection. He's asked to look at the studies you are asking him about.
MR. RONCA: Stop making speaking objections.
MR. TOBEY: I mean --
MR. RONCA: You're just giving the witness a hint to avoid my question again.
MR. TOBEY: No. This --
MR. RONCA: I have been chastised multiple times about speaking objections, which I may do.
Just say objection, form, and then we'll go on.
MR. TOBEY: Mr. Ronca, I object to your characterization.



In the two instances you have made that accusation, I think if you go back and look at the record, in both cases the witness made that request first, which you ignored. And I followed up by saying would you please listen to the witness's request.
MR. RONCA: My question is, can you answer the question?
MR. TOBEY: Same objection.
A. So the question was slightly different I think this time because you added the word "median" to it, I believe.
And again, I would like to look at the papers themselves and, you know, we need to differentiate between follow-up and the potential latency period that's evaluated in those studies.
Q. I hear you. I'm just asking if you know the answer, or if you can't answer without looking at each study as you sit here?
MR. TOBEY: Same objection.
A. Yeah. I think that -- that it would be helpful to me to look at the actual

papers before I answer. Thank you.
Q. You can't answer without looking?
MR. TOBEY: Objection. Form.
A. I don't want to misstate anything, so I would --
Q. Let me ask you this: Other than --
MR. TOBEY: Okay. Were you finished answering, Dr. Witte?
A. I was just going to add on that I -- that it -- I would appreciate being able to see the papers so that we can confirm. And you're asking me for a hard quantitative number, and I just want to make sure that that -- that I don't misstate something.
Q. Sure. You can check during the break.
So, did you comment in your report on the follow-up time in the Iwagami, Kumar, Kantor, or Tran studies?
A. Is it okay if I take a minute to look at my report?
Q. Sure.
A. Okay. (Document review.) Okay.
And the specific studies what Iwagami, Kantor.



Q. Kumar and Tran.
A. (Document review.) Okay.
So in -- in each of the tables that I present, I actually list the time period over which the study was undertaken. So that's the time period from when the earliest possible exposure to ranitidine or other H2RAs all the way up to the last follow-up period.
Looking through my appendix, when I discuss each of those different studies, I'm not seeing a specific comment. I do have a general comment in my report about the follow-up periods of the -- of the totality of the 16 studies reported on here.
Q. Yeah. This is what I want to talk about.
So you said that in your tables you gave the time from the first exposure to ranitidine to the last cancer, or to the end of the study?
A. To the end of the follow-up period.
Q. To the end of the follow-up period. So the longest possible period?
A. Well, it's -- yeah. I labeled it



the time period over which the study was covered.
Q. Right. So it's not the median follow-up, is it?
A. No. It's the range.
Q. It's the range. What you reported on was the range, not the median?
A. That's correct.
Q. Okay. And you did that for each of the active comparative studies that included Iwagami, Yoon -- let me look at my list, Kumar, Kantor, S Kim, Tran, Norgaard and Adami, right?
A. I listed it for all -- all studies.
Q. Okay. But you didn't list the median for any study?
A. No. I don't believe that's included in my report.
Q. Okay.
A. I should -- I should point out that this follow-up is similar to what's seen in other -- in a standard for cancer epidemiology studies and has been used in studies and detected an association, for example, between processed and red meat and



colorectal cancer.
Q. Okay. Thank you for the editorial.
But what I'm asking you is --
(Cross-talk.)
MR. TOBEY: Mr. Ronca.
(Cross-talk.)
Q. What you put in your report was the greatest range of time from very first exposure to end of follow-up period.
MR. TOBEY: Okay. Pause. I would like to get an objection on the record, Mr. Ronca.
You are being abusive and harassing to this witness. It's bordering on intimidation. We're not going to let this keep going on.
Comments like, Try real hard and thank you for the editorial, the sarcasm is not professional. It's not warranted.
He's trying to answer your questions. You're jumping all over him and barking at him. We would appreciate a little courtesy.
MR. RONCA: And from our

perspective, the witness is being evasive, not answering simple questions, adding on long discussions about things that are not relevant forcing me to ask the same question over and over again because he's not interested in answering the question I ask.
Now, you know, it can go both ways. So if the witness wants to be more specific in the answers, then there'll be no editorial comments. And I understand sometimes there needs to be explanation or sometimes I might ask a question in a way that's not appropriate. And the witness needs to school me on that. I get that. That's not what I'm saying.
BY MR. RONCA:
Q. What I'm saying is when I ask you, sir, in your report what you reported on in terms of the time was the very first exposure to the very end of the follow-up period, is that right?
MR. TOBEY: Objection. Form.



A. For the time period listed, that is what I reported because I was reporting the time period over which the study was -- was taken.
Q. And you did not report the median follow-up period?
MR. TOBEY: Objection. Asked and answered.
A. Not in -- not in the tables, no. But again, follow-up is a distribution. And the follow-up that we've had in these studies is not unlike what we're seeing in general cancer epidemiology studies that have been able to detect an association between an exposure and an outcome. So...
Q. So what you gave us was the longest time period and not the median time period, right?
MR. TOBEY: Objection.
A. That's correct. In my table -- and I specifically labeled it time period.
Q. Good.
MR. RONCA: Can we go to the 6397 again, please? And go to page -- and make sure you have your own personal



copy there that I asked you to have, okay?
THE WITNESS: Yes.
MR. RONCA: And go to page 48 of 124 and bring out the Yoon, please. And see this word "limitations," highlight that sentence please. In the discussion section, the word "limitations" on the right, the sentence.
Q. Dr. Witte, you wrote: Limitations include a follow-up period of only seven years and lack of information about some potential confounders, for example, lifestyle factors.
A. Yes, that's correct.
Q. And that's not in quotes, that's what you wrote?
A. Yeah.
Q. And the lifestyle factors in this study included smoking?
A. That's -- let me look at the paper again. (Document review.) Yeah. So that's correct.
Q. Good.



MR. RONCA: Now, let's go to page 50 of the report, please.
And can you just move that up we see the full S Kim there. Move up the page. Can you move up the page part way? Oh, you can't do that, huh? All right. Just enlarge the page, please.
Please enlarge the page. Okay. Just leave it like that.
Q. You see the portion that is about S Kim?
A. Yes.
MR. RONCA: Please go to the next page. Enlarge at the top that says Discussion.
Q. On the right-hand side under H. pylori where it says only five years of follow-up.
Do you agree what you wrote here was the limitations included only five years of follow-up?
A. I agree that's what I wrote there. That doesn't mean -- I mean limitations are limitations. It doesn't mean that the results are invalid.

Q. Okay. That's what you wrote, correct? Because that's what I asked you.
MR. TOBEY: Objection. Form.
A. Yes. That is what I wrote.
Q. And it's not in quotes. That was your assessment, right?
A. That's correct.
Q. Okay?
MR. RONCA: Take that down please.
A. Again, it doesn't mean that the study is somehow disqualified; otherwise, every epidemiologic study has some limitations.
MR. RONCA: Okay. Now bring up 6397 again. Go to page -- we're on page 1, and I'd like you to go in the second bullet point about the seventh or eighth line down. It says confounding bias, and highlight that sentence.
Q. Dr. Witte, please read what you wrote.
A. Confounding bias may also occur due to the separate association between the use of these drugs and other cancer risk factors,



for example, smoking.
MR. RONCA: Okay. Now, please go to page 19. And bring up the part about ranitidine versus non-use at the bottom.
Now, I want you to highlight the second sentence, please. No. I'm sorry. In the bottom paragraph after discuss -- there you go. Okay.
Q. So this is your summary of the Cardwell study?
A. This is my summary of the known active comparator studies.
Q. Okay. And you emphasize here that smoking is important because it's the strongest known risk factor for bladder cancer?
A. That's correct. Smoking is an important potential confounder actually for all five cancers studied here.
Q. Okay. And then you go on to say: ...smoking is associated with heartburn and GERD.
A. Uh-huh.
Q. You have to give a verbal answer.



She can't take --
A. Sorry. Yes, that's what that says.
Q. Okay. What's the reference for that?
A. I think that -- yeah. I didn't cite anything there. But that's my understanding that -- that nicotine relaxes the esophogeal sphincter and releases stomach acid.
Q. Are you a medical doctor?
A. No, I'm not.
Q. Have you ever seen a patient?
A. No, I haven't.
Q. Have you ever treated a patient for GERD?
A. No. I'm not a medical doctor.
Q. You made a statement that smoking is associated with heartburn and GERD without a reference.
So is that just based on your assumption?
MR. TOBEY: Objection. Form.
A. Well, I would have to check my -- my report to see if I mention that and cite it anywhere else. But at this point, there's



no reference cited for that statement.
Q. Do you know that that statement is controversial?
MR. TOBEY: Objection. Form.
A. I believe that -- well, no, I'm not familiar -- I'm not aware that that is a controversial statement.
Q. Do -- do -- sorry. Let me start that again.
Are you aware that the most recent studies indicate that there is no connection?
MR. TOBEY: Objection.
A. I would need to see the specific studies.
Q. This a situation where you put something in your report without checking?
MR. TOBEY: Objection. Form.
A. Again, I would have to check my entire report to see whether or not I have a citation somewhere else.
Q. Isn't the purpose of a citation to tell us where you got information from, particularly if you're not a doctor and you don't treat patients with GERD?
MR. TOBEY: Objection. Form.

A. The purpose of citing something is to reference a particular statement, yes.
Q. To give --
(Cross-talk.)
Q. I'm sorry. I'm sorry. I'm sorry. Please finish.
A. I should say the question of whether or not smoking may be a potential confounder is -- is of the potential association between ranitidine and bladder cancer is -- is not a question. I mean I think every article that's looked at this potential association brings up the fact that smoking needs to be taken into consideration, if possible.
Q. I'm not asking about smoking and bladder cancer. I'm asking about smoking and GERD.
Do you -- in this paragraph where you make this statement, do you have a reference that supports your statement that smoking is associated with heartburn and GERD?
A. I'd have to look to see if I cite it somewhere else but it -- there's no



citation to that statement. I would add that -- that there is certain that smokers -- that smoking may confound the potential association, and that's discussed in the studies that look specifically at the relationship between ranitidine and bladder cancer.
MR. RONCA: So let's go to page 32 of your report and bring up the paragraph: This is methodologically incorrect.
Highlight the -- no. Don't highlight that sentence. Highlight the second sentence. My mistake, third sentence beginning with, Moreover.
Q. What did you write? Can you read that for us?
A. Moreover, smoking leads to gastroesophageal reflux: nicotine relaxes the lower esophageal sphincter, which can allow reflux into the esophagus and cause heartburn.
Q. What's the reference for that statement?



A. I don't have a reference cited here.
Q. That's two instances where you make this statement and have no reference, right?
A. Yes, that's correct.
Q. Okay. And as you sit here today, do you know if that's a true statement?
A. Whether nicotine relaxes the lower esophogeal sphincter?
Q. Yes.
A. I believe so.
Q. Based on what?
A. I'm sorry. Was there a question?
Q. Yes. Based on what?
MR. TOBEY: Objection. Form.
A. Yeah. So I didn't actually cite a paper there.
Q. Do you know there have been studies where they use the nicotine patch to see if the exposure to nicotine would allow the lower esophogeal sphincter to be relaxed and allow reflux? Do you know they've had those studies?
MR. TOBEY: Objection. Form.
A. The nicotine patch? No. I'm not



familiar with those studies.
Q. And do you know what the result of those studies were?
MR. TOBEY: Objection. Form.
A. No. I'd have to see the papers.
Q. Okay. So you make these statements but you have no reference for them.
Is that what happened?
MR. TOBEY: Objection. Form.
A. Again, I -- I didn't provide a reference to this statement, that's correct. But there's I think --
Q. And -- and part of the reason for -- for saying that is to try to connect smoking with GERD, right?
A. I think it's to point out that the potential confounding by smoking as discussed by all of the authors here is -- is important thing to control for.
Q. And, but the reason you wanted to bring up smoking and GERD is because you wanted to show that even in the studies that didn't account for smoking there must have been smoking if the people had GERD.
Wasn't that what you were trying to

do?
MR. TOBEY: Objection. Form.
A. Can you restate that question?
Q. Yeah. Yeah.
See, two of the studies that you strongly rely on are Adami and Norgaard, right?
A. They are two of the sixteen studies that I have -- that have looked at the potential association.
(Cross-talk.)
Q. I'm sorry. I'm sorry.
A. Ranitidine and the five cancers considered here.
Q. And you thought they were good studies?
A. This is Adami and Norgaard?
Q. Yeah.
A. Yeah. I didn't discount any of the observational studies of ranitidine and cancer.
Q. And Norgaard and Adami didn't have any information on smoking, did they?
A. So I -- I believe that's the case. I mean, to save time -- I could go look



through each of those papers, but I'm going to take your word for it that they didn't have any information on smoking, which meant a couple of things.
Number one, that using an active comparator study was a better design than comparing users to non-users because of similarities in use of the drugs.
But number two, not controlling for smoking leads to positive confounding which would bias the estimates away from the null. So leaving smoking out of analysis -- an analysis has the potential to give you an even larger relative risk than if you controlled for it.
Q. But the point you want to make is that in a case of Norgaard and Adami it was better to not have smoking information.
A. No. That's not what I said whatsoever.
Q. Isn't it always better to have smoking information?
A. Yeah. What I said was that those studies used in active comparator design, which can help control for potential



confounding, one.
Number two, smoking -- for the relationship between ranitidine and cancer, smoking is a positive confounder which would mean that not adjusting for cancer -- not adjusting for smoking is more likely to give you an association that's biased away from the null.
So I'm not saying that you shouldn't have information about smoking. Certainly that's a -- you know, the more information the better. What I am saying is that lack of control for smoking leads to a biased result away from the null.
Q. And the Cardwell study did have information on smoking, right?
A. They did, yes.
Q. And so did all the other Scottish studies from the -- I'm not going to remember that acronym that begins with P.
A. The PCCIU.
Q. IUR?
A. Yeah.
Q. All those studies had information on smoking, right?



A. That's correct.
Q. Because those studies came from a general practice background?
MR. TOBEY: Objection. Form.
A. Well, they came from -- they were based on the database the PCCIU database.
Q. But it's a general practice database?
A. Yeah. I mean PC is Primary Care, Clinical Informatics Unit so that's what that stands for. So yes, I think that's from a general practice database.
Q. And that -- that database had more lifestyle information than the database used in Denmark by Adami and Norgaard, right?
A. I think if we're talking about lifestyle factors in general, we probably need to line them up next to each other and -- and, you know, agree with what we mean by lifestyle factors and we check that off.
But they did have information on smoking in the Scottish databases. Somewhat crude information I should say. Kind of what they adjusted for in their models was former, ever -- sorry, current, former or never

smokers.
Q. But that's better than no information at all?
A. Well, it depends on the study design, right? I mean, are we talking about an active comparator design or a user versus non-user.
Q. If smoke something a strong confounder, is it better to have information about smoking or not have information about smoking?
MR. TOBEY: Objection. Form.
A. Again, it depends in part on the study design. But I think that what's interesting about the Scottish studies is that there was no association when undertaking the active comparator's design, right? So the user -- all the analyses adjusted for smoking.
Q. Yeah. Well, we'll look at those -- those associations in a minute.
My question to you was, is it better to have information about smoking or not information about smoking?
MR. TOBEY: Objection. Asked and



answered.
A. I think if -- are you comparing within the same study? Would you rather have more information on a potential confounder or are you comparing one study to another study?
Q. Any cancer study of the five cancers we're talking about in this case, is it better to have information about whether the members of the cohort or the member -- or the cases are controlled, whether they smoked or didn't smoke, or any information, not smoke, is that better or is it better to have no information whatsoever?
A. Again, I'm -- it's unclear to me whether you're asking about comparing one study to another or within a given study, is it better to have --
Q. I'm comparing one database to another, and you're gonna use the database to determine, let's say, bladder cancer.
Is it better to have information about smoking or no information about smoking?
A. I think, again, it depends on the study design that was used. Are we talking



an active comparator or a non-user design?
MR. TOBEY: Mr. Ronca, we have been going over an hour. I want you to finish this line, but just flagging we might take a break soon.
MR. RONCA: Okay.
Q. So in the -- in the Norgaard and Adami studies, where did they get the information from for the codes?
A. Is it okay if I look at the papers?
Q. Sure.
MR. RONCA: You can take down the exhibit.
A. So you're asking about the ICD-10 codes?
Q. Yeah. Where -- where do they come from, what type of practice?
A. Where do the ICD-9 codes come from, what type of practice?
Q. Yeah. Where do -- where do they get their information about the -- the patients?
A. So in Adami, they used some registries, the data Cancer Registry and the dater -- Danish Register of Causes of Death.



Sorry. The Danish Cancer Registry. And also looks like the Danish National Patient Registry.
Q. Yeah. But did it come from hospitals, or did it come from general practices?
A. Well, so with regard to the ICD codes, which is what I think you're asking about, came from the Danish Cancer Registry. Looks like they also used the Danish Register of Causes of Death. It's unclear to me whether in Denmark whether cancer is reportable, you know, what's going into that registry.
Q. Did you look into that at all?
MR. TOBEY: Objection. Form.
I'm not sure we can hear the last word of that, Mr. Ronca.
Q. Did you look into that at all?
MR. TOBEY: At all.
A. Did I look into where the source of data for the Danish Cancer Registry is, whether it's from hospitals or general practitioner offices?
Q. Yes.

A. Was that the question?
Q. Yes.
A. No. But just to read you from the report. This is from Adami:
If all members of three cohorts starting one year after the index date for an incident diagnosis of cancer recorded in the Danish Cancer Registry that has recorded cancer diagnoses since 1943 with accurate and nearly complete case ascertainment.
Q. That's from Adami?
A. Yeah, that's from Adami.
MR. RONCA: Okay. Can we bring up Exhibit 6400? And that's the Adami paper, so you can hang onto it.
MR. TOBEY: The Adami supplementary material. I'm not sure if that's what you meant.
MR. RONCA: No. I want 6401.
(Exhibit 6401 was previously marked for identification.)
Q. Dr. Witte, we identified this as the Adami paper we've been talking about?
A. Yes, it is.
Q. This is the corrected version of



March 2022. Do you recall there was an error?
A. Yes, I do.
Q. Did you report on the error in the expert report you submitted in this case?
A. I did mention it in my expert report, yes.
Q. Please go to second page, last paragraph on the left. Please read that to us, Doctor.
A. The Danish National Patient Registry has recorded all inpatient admissions to all Danish hospitals since 1977, and hospital outpatient clinic emergency room visits since 1995.
Q. Continue.
A. Okay.
We retrieved all diagnoses of gastrointestinal disease, indicating H2RB treatment, including Barrett's esophagus, gastroesophageal reflux disease, and peptic ulcers, recorded before or on the index date, with a 10-year look-back period.
Do you want me to continue?
Q. Stop for a second.



A. Okay.
Q. Barrett's esophagus, gastroesophageal reflux disease, and peptic ulcers, they are all increased risk factors for esophogeal and stomach cancer?
MR. TOBEY: Objection. Form.
A. Yes, that's my understanding.
Q. Yes. And it would be important to know that information so you could balance your comparative groups between ranitidine, other H2RAs and PPIs?
A. What -- could you clarify -- sorry. If by balance you mean to statistically adjust for these conditions?
Q. You need to be aware of these potentially -- these potential confounders, don't you?
A. Yeah. I mean I think that -- the concern, of course, with any H2RB study is that there's potential confounding by indication and reverse causality due to these diseases which increase the use of H2R betas.
Q. Would you agree it would be important to know the incidence of Barrett's esophagus, gastroesophageal reflux disease,



and peptic ulcers to come to any conclusions in this study because of their relationship to some of the cancers that were studied?
MR. TOBEY: Doctor, before you answer, you were still speaking when Mr. Ronca started this question. I just want to make sure you have a chance to finish.
THE WITNESS: Yeah. Thank you. That's okay.
A. Okay. Sorry. Could you repeat the question?
Q. Yeah. If you're going to do a study like this, is it important to know how many of the patients have Barrett's esophagus, gastroesophageal reflux disease and peptic ulcers?
A. Sorry. Let me just look at the paper for a second.
MR. TOBEY: While he's looking, we've been going about an hour and 15 minutes. Are you close to a stopping point, Mr. Ronca?
MR. RONCA: Sure.
A. Yeah. So I would agree that that's

information that can be useful to the study.
Q. Okay.
A. I don't think not having that information makes the study invalid.
Q. Okay.
MR. RONCA: Next page, please. Can you call out underlying gastrointestinal disease? I think it's four lines there. Good enough.
Q. So, this Table 1 is a table of the basic -- baseline characteristics of the cohort participants?
A. That's correct. That's what the --
Q. In column one is --
(Cross-talk.)
Q. I'm sorry. Go ahead.
A. I was just gonna say that's what the table legend says.
Q. Okay.
A. Baseline --
Q. Go ahead.
A. Just says: Baseline characteristics of cohorts participants by type of acid-suppressive drug: ranitidine, other H2R beta blockers and --



(Court Reporter clarification.)
A. Sorry. The -- I was confirming that the header of Table 1 says: Baseline characteristics of cohort participants by type of acid-suppressive drug: ranitidine, other H2RBs, and PPIs.
Q. Okay. And so the -- as the -- just helped us out here, they labeled the first column as ranitidine users, the second column is other H2RB users, and the third column is PPI users?
A. Yes, that's correct.
Q. Now, will you agree with me that the number of people in the ranitidine cohort who had a diagnosis of gastroesophageal reflux disease is 2.6 percent?
A. Yes, that's what the table says.
Q. And for other H2RBs, 1.2 percent?
A. Yes, that is what the table says.
Q. And for PPIs, 2.5 percent?
A. Yes.
Q. And for those with a diagnosis of Barrett's esophagus, .3 percent for ranitidine?
A. Yes, correct.



Q. And for gastric or duodenal ulcer, 2.9 percent for ranitidine?
A. Yes, that's correct.
Q. Okay. So that amounts to about 5.8 percent for ranitidine?
A. You're assuming no overlap?
MR. TOBEY: Objection. Form.
Q. Let's assume no overlap.
MR. TOBEY: Objection. Form.
Q. Did I add it up right?
A. Yes. You added up those three percentages, which I'm -- I'm guessing there's overlap.
Q. Okay.
A. That these aren't individual people.
Q. So what were the other 94 percent of the ranitidine users taking ranitidine for?
MR. TOBEY: Objection.
A. I wouldn't -- I don't know. I wouldn't be able to say.
Q. Apparently Adami didn't know either, right?
MR. TOBEY: Objection. Form.



A. I'm -- I'm not sure whether he talked about that in the paper.
Q. So what is the rate of gastroesophageal reflux disease in the general population in Denmark? Did you look at that? It's not in the paper.
A. Oh, it's not in the paper? No, I did not look at that.
Q. Didn't this puzzle you when you saw this? That they couldn't explain why these people were taking acid-suppressing drugs?
MR. TOBEY: Objection. Form.
A. Sorry. I'm just looking at the paper.
I think that -- I think the data are the data. And the reason for why they're taking it, I mean I was interested in the comparison whether or not ranitidine was associated with cancer.
Q. Aren't you interested in whether the numbers are valid?
MR. TOBEY: Objection. Form.
A. When you say "the numbers," do you mean underlying gastrointestinal disease or --

Q. Let's just look at those numbers. Do they look valid to you?
MR. TOBEY: Objection. Form.
A. I -- it's hard for me to know.
Q. You didn't check though, right?
A. I had no contact with Adami about the data that's presented in the paper.
Q. But can't you, when you're evaluating these studies, look at other papers that use the same database and find out where this is coming from and why there might be problems? Did you do any of that?
MR. TOBEY: Objection. Form.
A. You mean specifically the underlying gastrointestinal disease data?
Q. The data from where they got this patient data from that we just went over a minute ago.
MR. TOBEY: Objection. Form.
A. I evaluated the association between ranitidine and cancer in my report. I didn't -- I didn't dig into --
Q. You didn't dig into the underlying data?
MR. TOBEY: Okay. Hold on. He



was still answering, Mr. Ronca. And we've also been going almost an hour and a half.
(Cross-talk.)
MR. RONCA: We have to finish this part.
MR. TOBEY: Do you want to finish your answer or...
A. I was going to say I didn't dig into the underlying gastrointestinal disease rates in this paper.
Q. Let's go down on the same page to diabetes.
MR. TOBEY: Is this the last question or so, Mr. Ronca? I can use a break if no one else can.
MR. RONCA: We'll see.
Q. So once again we have this characteristics of the cohort participants, diabetes type one for ranitidine users, 1 percent, diabetes type-2, 2 percent.
Do those numbers sound accurate compared to what you know about the amount of diabetes in western societies?
A. I think that you're -- I don't want



to opine on the rates of diabetes. I think the -- I mean, I would refer back to the Cancer Registry, which seems like that's the relevant outcomes data that we're evaluating here.
Q. I'm not asking about outcomes. I'm asking you about variables.
Baseline characteristics of the cohort. It's reported here. It's important, isn't it?
A. Sorry. Can you ask the question again? I wasn't sure.
Q. Yes. Aren't baseline characteristics of the cohort participants important to doing this study?
MR. TOBEY: Objection. Form.
A. Well, I think that -- that -- that the Cancer Registry data has complete -- you know, accurate and nearly complete case ascertainment, right?
Q. Dr. Witte, no. Don't stop me.
Dr. Witte, I'm not asking you about the Cancer Registry at all, and you know that. I'm asking you about the baseline characteristics of the cohort participants,



which came from I different source.
And I'm asking you whether those numbers for diabetes are wildly out of whack with what we all know the incidence of diabetes is in society.
MR. TOBEY: Objection. Form.
Also, objection to yelling at the witness.
A. So I was referring to the -- the cancer rates presented in this table because those are the data that the outcomes are based on. Now, the Danish National Patient Registry was used to assess these different outcomes, and so those are two different sources.
Q. I'm only asking you about the second source. I'm asking about the baseline characteristic source. I'm not asking you about cancer outcomes.
Can I make that any clearer?
MR. TOBEY: Objection to form.
Objection to screaming.
Q. You keep referring back --
(Cross-talk.)
MR. RONCA: You're making a

speaking objection.
Q. You keep referring to the Cancer Registry. I am not asking you about the Cancer Registry. Do you understand that?
MR. TOBEY: Objection. Form.
And you don't have to answer questions where he's screaming at you.
Q. Do you understand that?
A. I do. And I guess my -- my point was that the National Patient Registry, which I think that you're referring to specifically, is based on hospital visits, right? Where the Cancer Registry, which is the data that -- that we're most interested in, is based on this complete Cancer Registry.
Q. I'm asking about baseline characteristics that are out of whack with what you would expect to see.
Did you notice that when you looked at this study and did your critical expert evaluation?
MR. TOBEY: Objection. Form.
A. Again, I think the explanation is that that registry, the patient registry, is



inpatient admissions and hospital outpatient clinic and emergency room visits.
Q. So we don't know how many people in any of these cohorts had Barrett's esophagus or GERD or erosive gastritis, which isn't even listed.
All risk factors for the cancers that they're looking for, right?
MR. TOBEY: Objection. Form.
A. These are the data that are -- that came from the Danish National Patient Registry, which is inpatient and outpatient. I think that this is exactly why you do an active comparator analysis.
Q. And if you have bad data, you can get bad results, right?
A. I think that's why --
MR. TOBEY: Objection -- objection. Form.
But go ahead and answer.
And then can we please take a break? It's been an hour and a half. I gave you leeway 15 minutes ago, but I think we all deserve a break. It's lunchtime here. It's past lunchtime.



A. I think that's why I kept referring back to the Cancer Registry, which is the outcome that we're interested in here. That's not bad data. That's --
MR. TOBEY: Let him finish the answer to the question first.
A. That's, as noted here, accurate and nearly complete case ascertainment of cancer.
Q. Did you check the validation of that patient registry?
MR. TOBEY: Objection. Asked and answered.
Q. The answer is no, right?
MR. TOBEY: Objection. Form. Asked and answered.
A. And I should say the Danish National Prescription Registry complains -- contains complete data on prescription medications.
Q. Yeah. We're gonna get to that. I'm asking you about the patient registry. You keep talking about other things.
Did you check the validation of the patient registry that forms the basis for this baseline characteristic of cohort



participants' table? Did you check it?
MR. TOBEY: Objection. Form.
Q. Did you check it?
MR. TOBEY: Objection. Form. Asked and answered.
A. Yeah. I didn't do an independent evaluation of this patient registry.
Q. Thank you. Right. Right.
THE VIDEOGRAPHER: It's 4:30 p.m., and we're going off the record.
(Whereupon, a lunch recess was taken.)
THE VIDEOGRAPHER: The time is 5:09 p.m., and we're back on the record.
MR. RONCA: I want to make a statement on the record first.
Several times earlier in the deposition Mr. Tobey has said that I was yelling at the witness. My colleagues told me that, and their impression is, I wasn't yelling at all. But I do speak firmly sometimes, which is my personality. I have not raised my voice and I have not yelled

at the witness.
So my view of that is that those are overstatements. I'm sure Mr. Tobey has the opposite impression. Not sure what Dr. Witte has, but I have not raised my voice in a nature of yelling in this deposition. And the video will -- will verify who's right on that.
MR. TOBEY: That -- that was my comment. We have a videotape, so we'll let it speak for itself.
MR. RONCA: Great. Okay. Let's go back to the Adami paper, and that is 6401.
BY MR. RONCA:
Q. And, Doctor, you have your paper copy there?
A. Yes, I do.
Q. Several things.
MR. RONCA: You could take that down, that -- that call-out, okay?
And I would like you to go to the next page and call out the top of the -- the -- of the figure. There



you go.
Q. Dr. Witte, will you agree that this top table here is the stabilized inverse-probability-of-treatment-weighted number of cancers per person-years of follow-up for ranitidine versus other two H2RBs?
A. Yes.
MR. RONCA: Please put a highlight adenocarcinoma over to the end at 1.68.
Q. Dr. Witte, will you please read the findings in Figure 1 from the stabilized inverse probability of treatment results?
A. So --
Q. Not all of them. Just adenocarcinoma of the esophagus.
A. Okay. So you want me to read the numbers from this table?
Q. Yeah.
A. Across the board?
Q. Just the highlighted part?
A. Just the highlighted cart -- part.
Okay.
So it says for adenocarcinoma there



were -- so I have to move my -- the headers are blocked on my screen, so I'm just going to read it from my paper.
The first column is ranitidine versus other H2RBs; events person-years; comparison events person-years; and then the hazards ratio, 95 percent confidence interval. So it says 105 events out of 1,522,808 person-years. And then comparison events is 133 out of 2,534,288. And then the hazard ratio reported for adenocarcinoma is 1.30, 1.01, 1.68.
Q. Does the confidence interval include one?
A. No. No. The confidence interval does not include one.
Q. Now, I want to ask you about the person-years, 1,522,653.
In this paper, Adami started counting people from the first prescription, is that correct?
A. I think so. I just want to confirm in the paper.
MR. TOBEY: Jim, you said 653 is the last three numbers. Are you



meaning to go to esophogeal or adenocarcinoma?
MR. RONCA: Any of those numbers in that first column.
MR. TOBEY: Okay.
Q. It's on page 45 of your report also, Doctor, if you can't find it in the study.
A. Yeah. So looks like the index date was the first prescription.
Q. Okay. Now, is it true that the Norgaard study came from the same dataset?
A. Yeah. It's from the same registries.
Q. Okay. And in the Norgaard study to which Dr. Adami is a co-author, right?
A. Yes, that's correct.
Q. Then he compared new uses of ranitidine who redeemed at least two prescriptions?
A. Wait. Let me correct that. Adami is not a co-author of Norgaard.
Q. Okay.
A. Yeah. Sorry. That's incorrect.
Q. Are Adami and Norgaard from the

Page 182
J. Witte

same university?
A. Sorry. Adami reports three different universities, yeah. No. They're not from the same university. Even their -- so Adami's reporting Harvard, Karolinska Institute and University of Oslo; whereas, Norgaard is reporting Aarhus University. So no, they're not from the same university.
Q. Okay. Let me start over because I got myself down a rabbit hole, and now I want to come out.
In Adami, they started counting from the first prescription of each of the three kinds of drugs, right?
A. So they did define the index date as the date of the first prescription, and then used various, you know, lag times in their analyses.
Q. Norgaard, using the same dataset, started at the second prescription, is that right?
A. Sorry. Taking a minute to look at the -- at the paper.
Index date was date of the second prescription. It's at -- that's on Norgaard.

Page 183
J. Witte

Q. So in the Adami situation, they started counting from first prescription, and in Norgaard they started counting from the second prescription, is that fair?
A. Yeah. That's what both of the papers say; that the index date was at the time of the first prescription or the time of the second prescription.
Q. And is it true that Adami had a lot more people in his cohort than Norgaard had in her cohort?
A. In each of their baseline characteristics tables, their Table 1s for each study, the initial -- and at the start of the study from which their cohort was -- for their cohorts was larger in Adami than Norgaard, yes.
Q. By how much?
A. Let's see. So ranitidine --
Q. Just give it to us for ranitidine.
A. Okay. Looks like it was somewhere on the order of three times larger, Adami.
Q. So both studies were looking at ranitidine users from the same dataset, right?

Page 184
J. Witte

A. Yeah, from the -- the Danish registries.
Q. And why was Adami's numbers so much higher than Norgaard's?
MR. TOBEY: Objection. Form.
A. I don't know why.
Q. Let's see if we could figure it out, okay?
So, Norgaard only counted people who had at least two prescriptions, right?
A. That's when their index date started, yeah.
Q. And Adami counted everybody who even had only one prescription?
A. That's right. That's when the index date started.
Q. Right. So would the difference be people whoever only ever had one prescription?
MR. TOBEY: Objection. Form.
A. I wouldn't be able to answer that. I don't know what other potential differences there are between the two different cohorts.
Q. I mean, if everybody with two or more prescriptions is one number and

Page 185
J. Witte

everybody with one prescription is another number, wouldn't the difference between the two be the fact that in that larger group there's a large number of people who only have one prescription?
A. Again, I wouldn't -- I wouldn't know -- I wouldn't be able to ascribe it to anything. I should note that Adami did restrict their analysis to individuals with at least ten prescriptions.
Q. That was a sub-analysis, right?
A. Well, it was a -- a analysis restricting to people with higher doses, since I think that's the question here.
Q. That's not my question. You can raise all the questions you want with your -- with the lawyers, okay? That's not my question. All right?
A. I was just --
MR. RONCA: Go back and read back my question, please.
A. I was just -- can I complete my -- what I was going to say?
MR. RONCA: Read back the question. You could start over.

Page 186
J. Witte

(Referred to portion of the record was read back by the court reporter.)
MR. TOBEY: Objection. Form.
Q. I didn't ask about ten prescriptions.
So can you answer the question?
A. Right. So I was saying I don't know why there's a difference. However, it was worth noting that when looking at ten prescriptions or more the relative risk that you had me read off was now .97 in Adami with a 95 percent confidence interval .53 to 1.76 indicating no association.
Q. Yeah. I know you wanted to throw that out there, but let's get back to where I'm going, okay, with my questions.
So is it fair to say that Adami had a much larger group because Adami started with one prescription?
MR. TOBEY: Objection. Form.
A. I don't know. But I think it is relevant to look at, since this question is being raised, what happens when the analysis is restricted to people with ten or more prescriptions.

Page 187
J. Witte

Q. And doesn't what Adami did dilute the pool of people in the cohort by adding two-thirds of the number who only ever had one prescription?
MR. TOBEY: Objection. Form.
A. Again, I don't know why they only had one prescription. But in the analysis restricted to ten or more prescriptions, Adami, there's no association for adenocarcinoma.
Q. So did you notice that difference when you looked at the two studies?
MR. TOBEY: Objection. Form.
A. The -- the difference in the index date?
Q. Yeah. No. The index prescription, number of prescriptions.
A. Yeah. I did notice that difference. And again, I think --
Q. Did you comment on it in your report?
A. No. I didn't comment it on my report because I don't think that it was something that would change the overall conclusions of my report; that is, that

Page 188
J. Witte

there's no association between ranitidine and cancer in these observational studies.
Q. And you don't think that putting two-thirds of your cohort -- putting in -- let me start again.
You don't think that with two-thirds of your cohort only having one prescription of ranitidine that that wouldn't dilute the number of cancers and that wouldn't dilute the -- the risk ratios?
MR. TOBEY: Objection. Form.
A. I have -- I don't know about any dilution of the number of cancers. I think, you know, the reality is when they undertook an analysis that restrict it to ten or more prescriptions, there was no association for adenocarcinoma.
Q. All right. Well, we'll get to that. I didn't forget about that.
So what -- looking back at our chart here, what Adami has done is vastly increased the denominator on all these numbers, right, by only going with one prescription?
MR. TOBEY: Objection. Form.

Page 189
J. Witte

A. I mean I would say that -- that they increased the numerators and the denominators. And whether or not there's any difference between those two, we don't know.
Q. Do you really think that the plaintiffs in this case are claiming that if you take one prescription of ranitidine you're gonna have a cohort-wide increase in cancer?
MR. TOBEY: Objection form.
A. I believe the claim is that ranitidine causes cancer.
Q. How much ranitidine is claimed causes cancer in the Complaint, which was part of your matters considered list?
A. I'm not entirely sure. I thought that it was any amount of ranitidine.
Q. Okay. Let's go on.
MR. RONCA: Now, let's take out this call-out and call out the bottom half of that chart. And highlight adenocarcinoma, just halfway across.
Q. And Dr. Witte, would you read the results for ranitidine versus PPIs for esophogeal cancer of the adenocarcinoma type?

A. Would you like me to read all the numbers again all the way across?
Q. Yes. Yes.
A. So adenomacarcinoma ranitidine events divided by person-years is 1.3 divided by 1,290,945; comparison events divided by person-years is 716 divided by 9,630,580; and the hazard ratio is 1.27 with a 95 percent confidence interval of 1.04 to 1.56.
Q. And confidence interval does not include the number 1, correct?
A. That's correct. It does not include the number 1. And just for completion's sake, since we're talking about index dates and number prescriptions, in their next table where they look at ten or more prescriptions, the hazards ratio for this exact comparison in that analysis, which I -- you know, the more doses of ranitidine the better, the hazards ratio is .62 with a 95 percent confidence interval of .38 to 1.0.
(Court Reporter clarification.)
A. So, the hazards ratio is .62 with a 95 percent confidence interval of .3 to 1.0.
So in the analysis where they



looked at higher doses, we're actually seeing a hazard ratio that's less than 1 with a 95 percent confidence interval that just touches the null value of 1.0.
Q. Not what I asked you but that's fine.
MR. RONCA: So we can take down --
A. I'm sorry. I think that it's important to put this into perspective.
I realize you just asked me to read this off, but I think you need -- you know, you're asking me about index date and how many prescriptions and arguing that Adami had inflated their denominators by using only the first prescription, and so I think it's relevant to look at what happens with ten prescriptions. And what happens with ten prescriptions is no association.
Q. Finish -- finish with that comment that was not responsive to any question I asked?
MR. TOBEY: Objection. Move to strike attorney argument.
Q. Are you finished?
A. Yes. I'm finished. Thank you.



Q. Good. Thank you.
MR. RONCA: Take down the call-out, please.
Let's go down to the next page. And on discussion on the right, you'll see smoking and alcohol use. Why don't you highlight those? Just smoking and alcohol use.
You can just do the call-out is fine.
Q. Is it fair to say that the Adami study did not have any information for this cohort regarding smoking or alcohol?
A. I'm just double-checking the paper. But you were specifically asking about smoking and alcohol, correct?
Q. I am specifically asking about smoking and alcohol.
A. (Document review.) So I am not seeing any information about controlling for smoking and alcohol. However, by using a active comparator design, this study is indirectly controlling for that.
And as I mentioned earlier, smoking is a positive confounder; therefore, not



fully adjusting for smoking should give you a larger association. Not a bias toward the null, but a bias away from the null. So the fact they're not seeing any association here is not explained by smoking confounding.
That would explain seeing a false positive association. Not an association that is negative because it's a positive confounder.
And this is a fairly straightforward epidemiology methodological issue. If you have a positive confounder, the bias is away from the null. So --
Q. That's assuming it's non-differential, right?
A. That's not confounding. That's measurement error, misclassification you're talking about.
Q. Okay. So if --
(Cross-talk.)
Q. -- if there's a difference between the groups in the number of smokers, that could affect it, right?
A. If there's confounding due to smoking, right, this isn't -- this isn't

Page 194
J. Witte
misclassification of ranitidine. We're talking about confounding of any potential association between ranitidine and cancer by smoking. That's a positive confounder, right?
There's no -- and what that leads to is bias away from the null. So if you're seeing a result that's null, which is what they're reporting in this study, going to smoking and not having information about smoking being a confounder, wouldn't bias the results to the null. This bias results away from the null because it's a positive confounder.
Q. Aren't you comparing two groups?
A. Yes. For example, I have two comparator, H2R users to non-H2R users.
Q. Right. What if one of the groups had more smokers?
A. Then you could have confounding due to smoking leading to a false positive result.
Q. What if -- what if it leads it the other way. What --
A. It doesn't. That's my point. This

Page 195
J. Witte
is a positive confounder.
Q. No. It's only a positive confounder if it's in both groups.
A. No. I mean this is -- confounding happens because you've got an association between the risk factor, here's smoking is a risk factor for cancer -- for the cancers we're considering here. It's also associated with ranitidine use.
That leads to a positive association of bias -- potentially bias positive association between ranitidine use and cancer. The beauty of this study is that they use an active comparator design.
Now, any potential bias due to smoking is going to be much smaller in an active comparator design than in a study that compares ranitidine users to non-users. Those are further apart with regard to potential confounders. This is exactly why people use active comparator studies.
Now, yes, could there be someone unmeasured residual confounding? Of course there could. And that could still exist in an active comparator study. However, that's

Page 196
J. Witte
going to lead to a bias away from the null, right?
So if you're seeing a null result, like we're seeing here and in all of the other studies, smoking as a confounder doesn't explain that.
Q. Your testimony is that regardless of the difference between the number of smokers between, let's say, the ranitidine group and the other H2RA group, that it always biases away from the null?
MR. TOBEY: Objection. Form.
A. I'm saying that smoking a confounder of the association.
Q. Now, you --
(Cross-talk.)
Q. Say it again. Let's get the question right. Let's get the question right, then he can answer for as long as he wants, okay?
MR. TOBEY: Let him finish the answer to the last question.
A. So what you're describing right here is one of the confounding -- one of the arms of confounders; that you're saying that

Page 197
J. Witte
smokers are different in the exposed and unexposed groups, right? That smokers are -- are more likely to take H2RA, let's say.
Q. That's not what I'm saying.
A. I thought you were saying there's a difference between those two groups.
Q. No. Let me try it again, okay?
You got two groups. One group takes ranitidine, right?
A. Uh-huh.
Q. Is that right?
A. Yeah. That's your example.
Q. No. In this study one group takes ranitidine.
A. Yes, that's correct.
Q. And one group takes other H2RAs.
A. Yes, that's correct.
Q. All right. If the other H2RA group has more smokers than the ranitidine group, what does that do to the numbers?
A. So your hypothetical is that the other ranitidine users have a higher -- so you're at -- well, in that case, I mean in that hypothetical situation, you could see bias in either direction. That doesn't mean

that active comparators aren't getting you much closer to controlling for confounding than nonactive comparators.

Q. Okay.

MR. RONCA: Let's go to the next page, please. Can you take that top group of -- there you go. Thank you. We'll call that out.

Q. All right. Dr. Witte, tell us what's going on in this table. I called it a table. This figure.

A. So this --

Q. Figure 3.

A. Well, when I look at this table, what's going on with it is that there's -- if I just look at the figure on the right-hand side, the one result that jumps out at me is pancreatic cancer being negative in association between ranitidine and other H2RBs.

I don't know if you want -- do you want me to read all the results?

Q. No. I don't want you to read the results. I want you to tell me what this table is about.



Let's say esophogeal cancer. Is this diagnosis within ten years and diagnosis after ten years? What -- what is this?

MR. TOBEY: Objection. Form.

A. Yeah. So basically, the -- for each cancer, the results are stratified by within or after ten years and within or after ten years of -- within follow-up.

Q. Thank you.

MR. RONCA: Now, will you take that down for a minute. And I want to share my screen, which I have a marked-up version of the same table.

Q. You see that, Doctor?

A. I do.

Q. We're looking at the same table?

A. Yes.

Q. Okay. Now, the one you pointed out in the top half here, ranitidine versus other H2RBs, was pancreatic cancer, right?

A. That's correct.

Q. And pancreatic cancer, what you can see is the -- the dot for within ten years, and it's kind of right on the "1" line, and the dot for after ten years goes further to



the left or below "1."

Did I interpret that correctly?

A. Yes, that's correct. I mean, you could -- arrows going in the opposite direction for both -- both of those bottom.

Q. No. I'm not talking about -- I'm talking about pancreatic.

A. That's what I mean. You -- if you're drawing arrows, you would have an arrow going to the left.

Q. Going the other way. Yeah.

MR. RONCA: Let's draw that arrow. Now, we're going to take a screenshot of this when we're done.

Doesn't want to let me draw.

Q. So this one goes this way, right?

A. That's right.

Q. Not that way. PDFs are so hard to work in.

Do I have the arrow right now?

A. Yep.

Q. That's the one you chose to point out, correct?

MR. TOBEY: Objection. Form.

A. You asked me to interpret this, and



I looked at the right-hand side and that was the one that jumped out at me as not crossing the null value of 1.0.

Q. These two other ones up here, esophogeal cancer and stomach cancer, they do cross the null value, don't they?

A. Yes, they do. You can see that from the wide 95 percent confidence intervals.

Q. Yes.

A. The lower bound for esophogeal is .66 and lower bound for stomach cancer is .79.

Q. And down versus PPIs, stomach cancer moves in the same direction, right?

A. You mean from the left to the right? Yes.

Q. And it crosses as "1," right?

A. That's correct.

Q. And remember it gives that example before with that .99 so close to 1 that you might consider that an association?

MR. TOBEY: Objection. Form.

A. Remember, that -- that was assuming that there was a very strong result that had

already been reported. That was the example that I gave; not as a single -- a single result from a sub-analysis.
Q. Right. Okay?
MR. RONCA: And so can we take a screenshot of this? And we'll call this Exhibit 6459.
(Exhibit 6459 was marked for identification.)
BY MR. RONCA:
Q. Now, another way to look at this might be to look at it this way, so that the arrows show either an increase or decrease from the line that indicates "1."
Would that be fair?
A. I think either way you turn it, it's the arrow's going from one side to the -- you know, yeah.
Q. All right.
MR. RONCA: And can we take a screenshot of that? And we'll call that Exhibit 6-4 -- must be up to 6-0. We get that?
DOCUMENT TECHNICIAN: I did.
(Exhibit 6460 was marked for



identification.)
MR. RONCA: Great. Thank you. Let's move on. All right.
Now, go back to the exhibit we were using 6410, right? No. No, no, no. 6401.
Great. Okay. Now lower part of that page, the very last paragraph, if you'll just highlight the first sentence, please.
Q. So Dr. Witte, you want to read that for us?
A. I would be happy to.
Our study also has limitations. Because malignant transformation of cancer may take longer than 20 years, the most severe shortcoming of our study is the limited number of participants with long-term follow-up.
MR. RONCA: Can you unhighlight that and highlight the second sentence, please?
Q. Doctor, would you read that for us?
A. Second, the Prescription Registry provides no information about drugs removed



from the Danish market, nor about compliance with prescriptions or use of drugs sold over-the-counter.
Q. So those two statements I asked you to read, that's what the author said about this study?
MR. TOBEY: Dr. Witte, when you read you might need to go just a tad slower just so the court reporter can capture it.
THE WITNESS: I'm sorry.
THE COURT REPORTER: Thank you.
Q. The two things you just read, Dr. Witte, those were the statements of the study authors, right?
A. That's correct. That's from Adami.
Q. Okay.
MR. RONCA: Next page, please. So in that -- bring out that first paragraph. Thank you.
Q. And start -- see where it says supplemental table 3?
A. Yep.
Q. Starting after that with "over" and to the end of that sentence.



A. Okay.
Q. Doctor, will you read that?
A. Do you want me to read Supplementary Table 3 or --
Q. No. Just start with "over-the-counter."
A. ...over-the-counter use inevitably led to underestimation of ranitidine exposure, as well as exposure to other H2RBs, in more recent years.
Q. From your review of this study, over time from when ranitidine and the other H2RAs came on the market, more and more and more they were available and purchased over-the-counter, right?
MR. TOBEY: Objection. Form.
A. I think in this population, I think Supplementary Table 2 shows that ranitidine proportion by prescription decreased at a similar rate between ranitidine and cimetidine and famotidine combined.
Q. Yeah. So let's take a look at that supplemental table 2.
MR. RONCA: Will you bring up Exhibit 6400? Yeah. Now, go down a

page. Stop there. Thank you. Just leave it like that.

(Exhibit 6400 was previously marked for identification.)

Q. So the data we were just talking about came from this table, right?

A. Do you mean the changes in prescription?

Q. Yeah.

A. Yes. So this is the annual -- titled, The annual proportion of defined daily doses of medication sold by prescription in Denmark.

Q. Of course when you did your review, you carefully examined supplemental table 2, right?

A. Yes, I did.

Q. And did you look at any other supporting information, like where this came from?

A. No, I didn't.

Q. So, what is cimetidine and famotidine?

A. So I would assume that it's those two drugs combined.



Q. In one drug?

A. No.

MR. TOBEY: Objection. Form.

A. Sorry. That would mean that looking at each of those two drugs; not combined in one drug, but the prescriptions for individuals of one of the other.

Q. Then why is the cimetidine and famotidine numbers over here from 2006 to 2009 different?

MR. TOBEY: Objection. Form.

Mr. Ronca, I don't know if you meant to have a cursor or highlight when you said "over here," but we can't see what "over here" is.

Q. Oh. From 2006 to 2009, is what I said.

A. Okay. So can you ask the question again?

Q. Sure. Look at 2007.

A. Okay.

Q. Cimetidine and famotidine, 58 percent?

A. Right.

Q. Cimetidine, 52 percent; famotidine,



nothing.

What does that mean?

A. I think it means -- I'm assuming it means they didn't have information on those years.

Q. Look at the table down below. From 2010 to 2018, they don't have any information on cimetidine and famotidine at all.

A. Yeah, that's correct. But you can see the patterns up to -- from 1999 to 2008 are very similar.

Q. So you're assuming that it's gonna with the same without any data? Is that what you do in your studies, Doctor?

MR. TOBEY: Objection. Form.

A. I'd say up to 2008, it looks like the changes in the proportion of defined daily doses are -- are paralleling each other between ranitidine and cimetidine and famotidine or cimetidine.

Q. What are the defined daily doses of ranitidine versus cimetidine and famotidine from 2010 to 2018?

A. That information is not in this table.



Q. Only ranitidine is in this table?

MR. TOBEY: Objection. Form.

Q. And PPI?

A. That's correct.

Q. Okay. So the authors didn't know how much cimetidine, famotidine for nine of the years of this study, right?

A. Yeah. For the data that they have, we just look across starting at 1999, the patterns are very similar. And so I don't think -- well, the data is not in the table for the following years. But I have no reason to assume that those are -- are erratically different or that they would change the results of their study.

Q. Yeah. Really need to listen to the question.

Is it true that they had no data on cimetidine or famotidine from 2010 through 2018?

MR. TOBEY: Objection. Form.

A. That's true. But I don't -- I don't think that that would change the results of their study.

I have never -- I haven't seen a

sensitivity analysis that assumed, for example, that those data for cimetidine and famotidine were radically different and that the results would change.

Q. Explain this to me. Let's look at 2003.

How is it 96 percent of famotidine is by prescription, 65 percent of cimetidine is by prescription, and 60 percent of the combined is by prescription?

MR. TOBEY: Objection. Form.

Q. How does that work?

MR. TOBEY: Objection. Form.

A. Well, I would assume it's because fewer people are using famotidine.

Q. Did you -- did you check in the statistics, which are available online, as to why that is that way?

MR. TOBEY: Objection. Form.

A. No, I didn't. But looking at this table, it looks like the cimetidine and famotidine trend is being driven by cimetidine.

Q. Yeah. It looks like. But you know, can you -- well, let me ask you.



Did you look at the medstat.dk?

A. Did I look at the what?

Q. Medstat.dk.

A. No, I didn't.

Q. This is it where this data comes from. Did you look at it at all?

MR. TOBEY: Objection. Form.

A. No, I didn't.

Q. To validate these numbers or figure out why so many numbers are missing?

A. No, I didn't.

Q. Okay.

MR. RONCA: Can you take that down for a second?

A. But I will add I don't think that's going to change the results of their study.

Q. Yeah. You can add whatever you want, okay?

So looking at the medstat.dk, it has all the information from 1996 to 2021. Even -- even I can look it up.

MR. TOBEY: I'll move to strike that last sidebar.

But is this an exhibit? I mean we're looking at --



(Cross-talk.)

MR. RONCA: It's the medstat.dk. Anybody can look at it. You can look at it right now on your computer.

MR. TOBEY: I'm just trying to understand --

MR. RONCA: I'm just asking the doctor so he can see it.

Q. Did you look at the med stats to check why there were such gaps in the data?

MR. TOBEY: Before you answer.

I move to strike any reference to that website that was pulled up and pulled down. You can ask him that question though.

Q. Did you?

A. I think that's, as I said before, I didn't look at the med stat. However, I don't think that that data is gonna change the results of the study or the overall conclusions of my own.

I should say, you know, while we have been talking, I've been thinking I little bit more about your question about confounding and smoking. And --



Q. There's no question pending, sir. Your lawyers can ask questions later.

A. Okay.

Q. Okay? Now, let's go back to Exhibit 6400.

Okay. Now, for the pills -- now this information is the annual proportion of defined daily doses of medication sold by prescription in Denmark.

So these are just percentages, right?

A. That's correct.

Q. This doesn't tell you how much any particular patient is getting?

A. This is summary data of the population --

Q. Right.

A. -- of the data.

Q. Right. So if we go back to the study itself --

MR. RONCA: So let's go back to 6401 and go up a couple pages. Back to I think it's Table 1. Up. Up. Up. Yeah. Make the top of that big.

Q. See the 103,565 ranitidine users?

A. Yes.
Q. How much -- they only know the number of prescriptions they got, right?
A. That's correct. They obtained the information on exposure from pharmacy -- from prescription records.
Q. Prescriptions were for how much? How much ranitidine? Because it comes in 75, 150 and 300.
A. Is it okay if I look at the paper again?
Q. Knock yourself out.
A. Thank you.
All right. Looks like they -- they don't specify in here what doses the prescriptions are for. But again --
Q. I'm sorry. So somebody who is getting 300 as opposed to 150, they're getting twice as much, right?
MR. TOBEY: Dr. Witte, were you finished with your prior answer?
A. No. I was still answering.
So I don't think that that would materially change the results of the study or from my analysis that showed no association



between ranitidine and cancer in the 16 published observational study.
I mean, I think we're focusing in on really narrow aspects without looking at the totality of the evidence, which is what my report is focused on.
Q. Yeah. My question was, do you know or did the study authors report, whether these people were getting 50 -- I'm sorry 75, 150, or 300 milligrams per pill?
A. I don't know. And the study authors didn't note that -- what prescriptions they were giving.
Q. And if I took a pill that's 150 milligrams and then if I took, separately, a pill that's 300 milligrams, the second time I'd be getting twice as much, right?
MR. TOBEY: Objection. Form.
A. Twice as much ranitidine?
Q. Twice as much of whatever is in the pill.
MR. TOBEY: Objection. Form.
A. I think that that means that the pill is twice the size, right?



Q. Yeah. I don't think you're gonna fight me on that, right?
Twice as much, correct?
MR. TOBEY: Objection. Form.
A. The pill is -- is twice the size, the ranitidine pill is twice the size. I don't think we know necessarily -- I mean, yeah.
Q. You can't tell me that there's twice -- how about this question?
In a 300-milligram pill, is there twice as much ranitidine as there is in 150-milligram pill?
A. I hope so.
Q. Good. All right. We agree on something.
All right. So in these prescriptions, each prescription, even though we don't know the dose, do we know how many pills were in the prescription?
A. I don't think that they have reported that here. Sorry. I'm going to have to look at this again. (Document review.)
I'm not seeing that information in



the paper. Again, I don't think that would change the overall conclusions of the study or my -- my conclusions because there's -- I know of no sensitivity analysis that's actually looked at this and evaluated how much measurement error there would have to be to actually change the results.
Q. You didn't do any such calculation yourself though, right?
A. No.
Q. And did you know that in Denmark these prescriptions come in anywhere from 10 to 90 pills in one prescription?
MR. TOBEY: Objection. Form.
A. I would -- it would be helpful to see a citation to that.
Q. Sure. Medstat.dk. Look it up.
MR. TOBEY: Okay.
Q. For purpose of my question --
MR. TOBEY: No. No, Mr. Ronca.
Q. -- assume --
MR. TOBEY: Mr. Ronca, that is abusive. We can mark it on the video. You are intimidating or at least trying to intimidate this witness.

I'm going to ask you to cut out the sidebar, the commentary, the attacking and sneering, snide comments. Just ask questions.

MR. RONCA: As soon as you instruct the witness to stop non-answers or answers that are not the question that I asked or reasserting his position -- his general position every time I ask a question about a simple subject.

How long did it get me -- how long did it take me to get the witness to admit that a 300-milligram pill has twice as much stuff in it as 150-milligram pill?

I mean we -- look. You've been observing this too, and this is also on the video.

Now, I will withdraw my comment -- that last comment and apologize to the witness. But the abuse is going both ways, Mr. Tobey. And --

MR. TOBEY: No --

MR. RONCA: -- anyone who watches



this video will understand that. But let's move on.

(Cross-talk.)

Q. I want you to assume --

MR. TOBEY: I have to respond to what you just said.

MR. RONCA: No. No, you don't. You're only -- first of all, you started a speaking objection and didn't say, Objection, form.

MR. TOBEY: It's not a form objection.

MR. RONCA: Like I was instructed by your colleagues a hundred times -- not a hundred times, I only did it four times -- but each time not to do, and you've been doing it throughout the -- the deposition, and you're taking up my time.

I have withdrawn what I said. I have apologized. I'll try to avoid those comments in the future. Let's move on.

MR. TOBEY: Mr. Ronca, no. I need to speak on the record.



And objection as to harassing or intimidating a witness is not a form objection and is not limited to objection, form. I can instruct him not to answer if you continue to treat him this way. I've a given you a lot of latitude that's going to end.

And you just mischaracterized his testimony when you asked a clean question about whether the milligrams of ranitidine were doubled. He answered it immediately.

It's your questions that are not clear, and he's being very precise. So please don't put that on the witness. He's trying.

MR. RONCA: Okay. That's in the eyes of the beholder, but let's just move on, okay?

BY MR. RONCA:

Q. So I want you to assume for purpose of my question that an individual prescription of ranitidine could come in anywhere from 10 to 90 pills, okay?

If that's the case, as a measure



there are ten prescriptions, that could be anywhere from 100 to 900 pills. Is my math correct?

A. Yeah. That's the right -- I think the right math. I have no idea what the distribution is of use of 10 versus 90 pill prescriptions.

Q. My point exactly. But --

MR. TOBEY: Objection. Form.

Q. But the -- so when you're measuring a prescription, it's possible, assuming that the prescription can be from 10, on the low end, to 90, on the high end, assuming that's correct, one person taking it could get nine times what another person has from one prescription.

Assuming I'm right, isn't that the case?

A. Well, I would -- I would agree that 10 is -- you know, 90 is nine times as much as 10. Again, I don't know what the distribution is of these different prescriptions, and I don't -- again, I don't think that that would change the interpretation of these results 'cause we're

looking at a population level and using statistics to see whether or not there's an association between ranitidine and cancer.
Q. Right. Isn't there an old saying exposure makes the poison? Do you know?
A. I'm -- I'm familiar with that saying.
Q. And -- and the point of that is for certain things, if you have a little bit of it, it doesn't matter but if you have a lot it does, right?
A. Again, I don't know the reference to this.
Q. I take the aspirin that comes in a pill for a headache, small chance of having an adverse event. If I take a bottle of aspirin, there's a large chance I can have an adverse event.
That's what I'm talking about. Is that -- is that true in real life?
MR. TOBEY: Objection. Form.
A. I think this is a very general statement that certainly, if you took one aspirin as opposed to an entire bottle of aspirin, presumably the second dose would be



much higher than you should have taken and you may suffer side effects from it.
Q. So in that sense, when you're trying to figure out exposure, doesn't the amount of the exposure matter?
MR. TOBEY: Objection. Form.
A. Certainly the -- the amount of exposure is important. But I would, again, don't think that that would change the general finding of no association between ranitidine and cancer. That's being seen not just in this study but across effectively all of the studies.
All 16 of the studies are not reporting any valid association between ranitidine and cancer. So we can pick at this one study as much as you want but, when we look at the totality of the evidence, there is no support for a causal association -- a causal relationship between ranitidine and cancer or an association.
Q. You couldn't even tell us in any way how much ranitidine a person who got ten prescriptions was exposed to in this study.
MR. TOBEY: Objection. Form.



A. Sorry. Was that a question or a statement?
Q. Yes. You can't tell you us -- isn't it true that you can't tell us how much ranitidine one of these subjects in this study was exposed to at their tenth prescription?
A. Well, we could probably look at the distribution of the population to get a sense of what that looked like. So not looking at just an individual, but what does the overall population look like -- and that's effectively what's being compared back to the other H2RAs.
Q. How much ranitidine did people in the ten prescription group get?
MR. TOBEY: Objection. Form.
A. Sorry. That's -- that's a question to me again?
Q. Yeah. How much?
A. So at an individual level, we don't know exactly how much anyone got. But we know who's exposed -- who received a prescription for ranitidine and who didn't.
Q. That's all we know, right?



MR. TOBEY: Objection. Form.
Q. With respect to exposure.
A. Well, we know the -- the number of prescriptions.
Q. That's all we know, right? We know the number of prescriptions generally for the group.
A. For -- that's right. So we know the number of prescriptions. And when you look at higher numbers of prescriptions, the results that you've called out basically are null associations.
Q. Follow me on this question.
I want you to assume that somebody with five prescriptions got 90 pills of prescription and somebody with ten prescriptions got ten pills per prescription.
Who got more exposed?
MR. TOBEY: Objection. Form.
A. So we know that one got more prescriptions than the other.
Q. No, no, no. One got more prescriptions, right. Continue.
A. And the -- you know, while the absolute number could vary, I think that the

general distribution in the population would...
Q. Would what?
A. Sorry. I was thinking.
The -- by looking at a population level analysis, that the results here wouldn't change nor would the results that these replicate from all the other studies.
So I think that -- that you're kind of hypothesizing this information, but I -- I don't think that it's going to actually change the results of this study and --
Q. I hear you. That's -- you just avoided my question again.
MR. TOBEY: That's --
Q. I'll try to again. I'm going to try it again.
I want you to assume that a patient that got five prescriptions and in each prescription there were 90 150-milligram pills and the second patient got ten prescriptions of 150-milligram pills but that there were only 10 pills in each prescription.
And I just want you to tell me in



this hypothetical question, which I am permitted to ask, who had more exposure, the five prescription person or the ten prescription person?
MR. TOBEY: Objection. Form.
A. So the number of pills would be higher in the one case than the other, right? But again, I'm -- I'm arguing that I don't think that's going to change the results of the study.
Q. Of course. All right.
Now, all this that we're talking about, the prescriptions and how many pills and what was the dosage and all that, the same is true for Norgaard also, right?
A. Could I take a break for a minute just to use the restroom?
Q. Sure. How long, five minutes?
A. Yeah. Just five minutes.
Q. Yeah. So it's 6:16.
THE VIDEOGRAPHER: The time is 6:17 p.m., and we are off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time is



6:26 p.m., and we're back on the record.
BY MR. RONCA:
Q. Dr. Witte, just to show that I'm not all bad, I broke the first rule of lawyers which is you don't let a witness leave the room while a question is pending, but I did it anyway because you had to use the facilities. So I don't want you to think of me being a hundred percent bad.
A. Thank you. I appreciate that.
Q. So, and if there's another time you need, just let us know. All right.
Now the question was that I left pending was, now, all this that we're talking about, the prescriptions and how many pills and what was the dosage and all that, the same is true for Norgaard also, right?
A. So just so I understand the question, the concerns that you've raised about Adami with regard -- well, maybe we could -- let's expand on the question a little bit so that I'm --
Q. Sure.
A. Yeah. Thanks.



Q. In the Adami study, they didn't know how much over-the-counter use there was in the cohort, correct?
MR. TOBEY: Objection. Form.
A. Yes. I believe that's correct.
Q. They didn't know the dosage that any other members of the cohort received in individual pills?
MR. TOBEY: Objection. Form.
A. They don't -- I'm not seeing any information about the -- the dosage, individuals. They have total numbers of prescriptions, right, but not...
Q. How much was in the prescriptions?
A. What the -- what the ranitidine dosage was.
Q. Yeah. And those two things, the same is true in Norgaard, right?
A. Yes. That's what we discussed about -- sorry. You mean the same was true in Adami?
Q. Oh, did I ask about Norgaard? I'm sorry.
A. Yeah.
Q. I thought I started with Adami.

Yeah. The same is true between Adami and Norgaard regarding those two things?

A. Yes, that's correct.

Q. And in both Norgaard and Adami, they didn't know how many pills were in each prescription?

MR. TOBEY: Objection. Form.

A. No. They didn't know how many pills. They did do a similar analysis where they restricted to people who received more prescriptions and had longer time since index date.

Q. But they didn't know how many pills were in each prescription in either study, right?

MR. TOBEY: Objection. Form.

A. No. That information is not provided in the paper.

Q. They didn't have information on smoking in either Norgaard or Adami, correct?

MR. TOBEY: Objection. Form.

A. Yes, that's correct.

Q. They didn't have information on alcohol use in either Norgaard or Adami, is



that right?

A. That's correct.

Q. Now, you didn't criticize neither Norgaard or Adami for not having information on alcohol or smoking, is that correct?

A. Sorry. I'm going to have to look at my report, see what I said there.

MR. RONCA: While the doctor is looking, please bring up Exhibit 6397. Go to page 45 of 124. There you go.

Q. Doctor, with this is your discussion of Adami in your Appendix A.1.1, Active Comparator Studies.

Does the word "smoking" appear anywhere in that?

A. No. The word "smoking" does not.

Q. All right. Let's go down to the next page.

Here is your discussion of Iwagami. Does the word "smoking" appear in Iwagami?

A. No. The word "smoking" does not appear in Iwagami.

Now, I should say that these are all active comparator studies, which, you know, by comparing users of one drug to



another helps adjust for potential confounding by design. That's the real strength of the active comparator approach.

Q. Understood.

Let's go to page 48 -- 47. See Norgaard? Look at this part and when you're done looking at this part, let us go to 48.

A. Okay.

Q. Let's go to 48, top. See the word "smoking" anywhere?

A. No. I don't see the word "smoking" anywhere.

Q. Let's go to page 46. Let's start on 45.

See discussion of Cardwell listed under Active Comparator Studies, right?

A. Yep.

MR. RONCA: Let's go to the next page. Highlight that top part.

Q. The last sentence, read it aloud for us.

A. Also, there was extensive missing information on smoking, suggesting that there may have been residual confounding.

MR. RONCA: Can I get a screenshot



of that one and make it the next exhibit number?

(Exhibit 6461 was marked for identification.)

Q. How extensive was that missing information?

A. There was somewhere in the order of -- well, I can confirm it, but let me look at the paper -- 20 to 24 percent missing in the cases and controls.

Q. So between 75 and 80 percent smoking information?

A. Never, former or current; yes, that's correct.

Q. So on three studies that show no association but had no information on smoking, you didn't mention that at all. But on the one study that does show an association and had some smoking information, you point out that there was a, quote, extensive missing information on smoking.

Is that what you did?

A. Well, I did write that there's extensive missing information on smoking in this study. So it's -- it's an interesting

study because I would point out that this didn't find a positive association because in the active comparator analysis, there is no association.

Not only that, in the study that gave rise to this study, the McDowell study, once in their analysis, when they controlled for smoking looking across drugs and cancers, they found a positive association that was even larger than their non-comparator analysis between nicotine and bladder cancer.

So this indicates that they were unable to fully control for smoking even though they included their smoking variable in that analysis.

Q. So for three studies you like, no mention of smoking as a factor even though they had no data. And one study that you don't like, you have a whole sentence there out about the missing smoking data?

A. So just to --

MR. TOBEY: Brief second.

Objection to form.

You can answer.

A. Just to clarify, I don't not like



this study. I actually think that this is a great study because it shows why active comparison -- comparator analyses are so important.

So unlike these hypotheticals that we've been talking about, about amount of prescriptions received, what was in those prescriptions, they actually undertook two sensitivity analyses and two very clear analyses in this paper that I think are -- are very available.

Number one, the active comparator analysis shows no association. Number two, when they looked at nicotine, even after adjusting for smoking, there was an association between nicotine and bladder cancer that was stronger than the non-active user design.

So I actually think that this is a great study because it highlights the argument that I've been making all along, that there is no valid, reliable association between ranitidine and cancer. So I like this study.

Q. You don't think this is



cherry-picking though, by you?

MR. TOBEY: Objection. Form.

A. Could you explain more what you mean by cherry-picking?

Q. Pointing things out on a selective basis.

A. You mean with what I just said about the active comparator showed no analysis and then looking at nicotine still showed an association when adjusted for smoking --

Q. No.

A. -- which indicates that their crude measure of smoking wasn't able to fully adjust.

Q. No. I'm not commenting on -- not commenting on lack of information about smoking on three studies; but commenting on it in -- with the Cardwell study, the Habel study and the Hidajat study. You don't think that's selective?

A. Yeah. I -- I think that what we're seeing right here is that when you use an active comparator analysis you move away from this potential bias due to uncontrolled



confounding due to smoking. And all the previous studies that you mentioned are all active comparator studies.

Remember Cardwell is -- is the most clear evidence in this one study of why you need an active comparator analysis.

MR. RONCA: Let's go to Exhibit 6406. Go to the last page.

(Exhibit 6406 was previously marked for identification.)

MR. TOBEY: That --

MR. RONCA: Sorry, what?

MR. TOBEY: I don't have it yet in the Box. I have the paper. It just came up.

MR. RONCA: All right. One page before that. The last sentence at the bottom of the left column toward the end of the -- up to the end of the sentence at the top where it says, of bladder cancer.

And highlight that sentence that starts with, In this large population-based study.

BY MR. RONCA:

Q. Dr. Witte, would you read that sentence for us?
A. Certainly.
In this large population-based study, the use of ranitidine particularly long-term use was associated with an increased risk of bladder cancer.
Q. Was that the conclusion of the authors?
A. Yes. That was written by the authors.
Q. Thank you.
MR. RONCA: Take down that exhibit, please.
Q. So when I asked you about cherry-picking, that's a term you used in your report, right?
A. That's correct. When I was talking about the -- the plaintiffs' experts' selective reporting and reporting results in methodologically incorrect manner, just giving a point estimate and not the 95 percent interval, interpreting results in a selective manner. Yes, that's a term I used.



Q. And then you didn't do any of that cherry-picking yourself, right?
A. No. Again, I think that in this example of Cardwell, we have what's called -- I mean they called it a sensitivity analysis to see how sensitive their results were when comparing ranitidine to non-users. And what they found was their results were sensitive.
And when they, at that point, and they mention it in their discussion also that the association could be explained by confounding by indication, right? So --
Q. And after all that discussion and also e-mail --
MR. TOBEY: Mr. Ronca, he was in the middle of a sentence.
A. So, the -- the Cardwell study undertook a sensitivity analysis to see how sensitive their results comparing ranitidine to non-users were to the assumption that that was a reasonable comparison group. And that their -- their assumption was found to be false because the results were null when undertaking the active comparator analysis.
Moreover, again, the -- when that



group looked at nicotine, controlling for smoking, they found an association with bladder cancer.
Q. Now are you finished?
A. Yes. Thank you.
Q. But nevertheless, knowing all that, the conclusion of the authors is what you read to us, right?
A. That was the end of their paper. I mean they had one more sentence: Further studies are necessary to attempt to replicate this finding.
Q. All right. And now, you had an e-mail exchange with Dr. Cardwell before the study was published, right?
A. Yes. Well, after the -- his initial study was published, McDowell.
Q. But before --
(Cross-talk.)
Q. -- Cardwell study was published, right?
MR. TOBEY: Objection. Form. And he was still answering.
A. So Cardwell is the senior author on the McDowell paper. Right.



Q. We're referring to the Cardwell study, which is the bladder cancer study. All right?
Do you know what I'm talking about? The one we just had up on the screen or should I put it up again?
A. No. I do know what you're talking about. But I just wanted to clarify that that study came from McDowell 2021a that I had e-mailed him about.
Q. Yeah. So he said to you -- well, let's start at the beginning.
You e-mailed him to ask for the non-published results, but you didn't reveal that you were doing so on behalf of the manufacturers for litigation, is that right?
MR. TOBEY: Objection. Form.
A. No. I think I was pretty clear with him about --
Q. Upfront?
A. Well, what do you mean "upfront"?
Q. Your first e-mail.
A. Let's look at the exact e-mail exchange.
Q. Exhibit 6397, page 55.

A. Okay.
Q. Did you reveal to Dr. Cardwell that you were seeking this information for litigation purposes in your initial e-mail?
A. In my first e-mail, I just asked him directly, as they indicated in the paper, that the full set of results that the paper was based on were available by request.
Q. My question was, did you reveal that it was for purposes of litigation?
MR. TOBEY: Objection. Form.
A. This is -- this is the e-mail that I wrote at -- at -- when this e-mail was sent, I asked him basically exactly what they said; that we should -- and I put a quote in here, access to results.
I mean I say exactly what he said. Direct, if you want the results from this study, the full results -- not just the ones that had a P less than .01 or a relative risk above 1.25 -- that you should ask him directly for those data.
Q. Okay. I'll ask the question again.
Did you reveal to Dr. Cardwell that you were seeking this information for



purposes of information?
MR. TOBEY: Objection. Form.
A. In this first e-mail that you pulled out, no. But if we go to the next e-mail, then it's -- it becomes clear.
Q. Well, this is after Dr. Cardwell said to you that there was concern about making this public, right?
MR. TOBEY: Objection. Form.
A. Well, I -- he kind of asked me what was I use them for. That's correct. I mean I think --
Q. And then you told him?
MR. TOBEY: Were you finished with the answer?
THE WITNESS: Yeah, that's fine.
A. I certainly did tell him exactly why I was requesting the data, and he didn't share those with me until after that.
Q. Okay. Now let's go to the next page.
So Dr. Cardwell wrote to you on March 30, 2021, before the Cardwell paper was published, the bladder cancer paper. He said:



I'm keen to avoid patients being unnecessarily worried about increased risk based upon non-sensible interpretation of the results.
Is that what he wrote?
A. That's exactly what he wrote.
Q. And after he wrote that, they published the Cardwell paper which had the conclusion in it that you read before, right?
A. That's correct.
Q. So despite his concern about making patients unnecessarily worry, he published a report that said there is an increased risk especially after long-term use.
Isn't that the way it happened?
A. Well, he did say that he was concerned about patients being unnecessarily worried about increased risk based upon non-sensible interpretation of the results. That's correct.
Q. And he did publish information that would make people worry after that, right?
MR. TOBEY: Objection.
A. Well, I don't know. I mean, he did say further studies are necessary to attempt



to replicate this finding. And --
Q. Done?
A. Yeah, that's fine.
Q. Dr. Cardwell is not involved in this litigation, is he?
A. No, not to my knowledge.
Q. He's an independent researcher who's got no axe to grind in this case, right?
MR. TOBEY: Objection. Form.
A. Not -- again, I wouldn't know.
Q. Now, Dr. Adami is different, right?
MR. TOBEY: Objection. Form.
A. Again, I wouldn't know.
Q. Dr. Adami was a consultant for the defendants in this litigation.
Did you know that?
A. Yes. He cited that in his paper.
Q. Right in the paper. So was that other author, right? Chang.
A. That's correct.
Q. Did you know that Dr. Adami, since 2012, out of over 200 papers with his name on it, only 12 has his name as first author?
Did you know that?

A. I didn't know that.
Q. And of the 12 that he is the first author, 11 are like editorials, not research papers, but only one is a research paper.
A. Okay.
MR. TOBEY: Objection. Form.
Q. Did you know that?
A. No. I didn't know that.
Q. And the one research paper is the Adami paper we've been discussing in this case.
A. Okay.
Q. The one paper that he's the lead author on in ten years, that's a research paper, and he is a paid consultant of the defendants in this case.
MR. TOBEY: Objection. Form.
Q. Were you aware of that?
A. No. I didn't dig into his CV to see what papers he had published.
Q. I didn't think so.
MR. TOBEY: Objection. Form. Move to strike commentary.
THE WITNESS: James, I'm going to ask for another break. I had too much


caffeine at lunch. Is that okay?
MR. RONCA: You know something? Yes.
THE WITNESS: Okay. Thank you.
THE VIDEOGRAPHER: The time is 6:54 p.m., and we're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time is 6:59 p.m., and we're back on the record.
MR. RONCA: Can we bring Adami up one more time? 6401. Yeah, 6401.
BY MR. RONCA:
Q. Yes. I -- I want you to look at the top there, Dr. Witte. I had it backwards.
It's that Norgaard is a co-author on the Adami.
A. Understood.
Q. Is that correct?
A. That's correct.
Q. Okay. Yeah. I had it backwards when I said it before.


MR. RONCA: You can take that down. All right.
Can we bring up exhibits -- no, no, no. Don't take it down. Don't take it down. One more question.
Go to Table 1, please. All right. And can you just blow up part of it? I don't care which part. That's good.
Q. So Dr. Witte, I want you to look at these numbers here with me. See, they all end with odd numbers. Almost none of them -- I don't even see one -- here's one that ends in zero. But almost all of them end with 5, 2, 3, 4, 8, 2, 1; you see what I'm saying?
A. Okay. So like under ranitidine for the total number 103,565?
Q. Right.
A. So that ends with a 5, and the next one over ends with a 7, and then ends with a 5.
Q. Yeah. They're actual number counts of actual people, right?
A. That's correct, yeah. That's why the digits --
Q. Are different. That's why


they're -- they're counting individual people.
You got -- in the ranitidine group, you got 55,934 unhappy married people -- no, I'm kidding -- married people, right? That's an exact number based on their data.
A. Yeah. So when they say in the top ranitidine, N percentage, so it's the count of individuals.
Q. Right. Okay.
MR. RONCA: Now let's go to 6423. Doesn't seem right. 6423. There you go. All right. So let's leave it like that for now.
(Exhibit 6423 was previously marked for identification.)
Q. This is the -- I'm not sure how to pronounce it. It could be Yeseong Kim study. Ronnie Fass as senior author.
You're familiar with this one, right?
A. Yes.
Q. And so we've been calling it Y Kim. You know, like, not W-H-Y, but Y, the letter Y Kim. Okay. So can we agree to call it

that?
A. Yes, of course.
Q. And this is one of the active comparator studies you discuss in your report, right?
A. Yes.
MR. RONCA: Okay. So I would like you to go to Table 1, which is on the fifth page, I think. Go all the way down to the next blue. All the way down, down, more. There you go. Thanks.
Q. Dr. Witte, I want you to look carefully at this and what you will see is for the N number in each of these columns, every single number ends with a zero.
Do you see that?
A. I do see that.
Q. Did you notice that when you were reviewing this study and doing a careful evaluation and putting it --
MR. TOBEY: Objection. Form.
Q. -- in your report.
A. Yes. That's -- for this study, it makes perfect sense.



Q. Right. Because this is an aggregate study, right?
A. Well, samples in clumps of ten.
Q. Right. No individual data within the clump of ten?
A. For the clump of ten is -- is comprised of ten individual people.
Q. Right. But you don't know which individual in the ten gets cancer, do you?
MR. TOBEY: Objection. Form.
A. Well, I think that -- that the group of individuals that in the -- in the set of ten have whatever -- you know, indication that we're talking about here.
Q. All ten?
A. Yeah. I think the counts here are so -- so for esophogeal cancer at the top end, 180, that's ten people with esophogeal cancer -- sorry, 180 people all with esophogeal cancer. Gastric cancer, 170.
Q. So all -- every single one of them came out even?
A. Well, they're all in clumps of ten because that's how the data -- the data from the Explorys dataset is shared. But you can



actually undertake the same kind of analyses using data that comes in groups versus data that comes at the individual level.
Q. So, this is what they call aggregate data?
A. In the paper they call it that?
Q. Yes. Four different places.
MR. TOBEY: Objection. Form.
A. Okay.
Q. Do you want to look?
MR. TOBEY: Objection. Form.
A. No. I -- I think I recall that. They call that aggregate data, yes.
Q. Show us where in your report that you mention that this is aggregate data.
A. I don't think I do mention that it is aggregate data in my report because that wasn't a major concern of mine for these analyses. You can -- epidemiologic studies, you can look at the data in a similar fashion using aggregate data.
Q. Show us where in your report you explain what aggregate data is.
MR. TOBEY: Objection. Form.
A. I -- I didn't actually discuss



aggregate data in my report. But again, you can undertake methodologically appropriate epidemiologic data using datasets such as this. And, in fact, there have been quite a few peer-reviewed publications using this Explorys dataset.
So the scientific community is accepting of this dataset as a source of undertaking observational studies.
Q. So isn't a study that uses aggregate data often called an ecological study, EC?
A. No. This isn't an ecologic study. An ecologic study is where you actually are looking for trends, and you wouldn't have it grouped into sets of ten people. It would be an entire pop -- you know, an entire kind of rate of disease in a population.
So, for example, you could undertake a study of ranitidine and cancer by seeing whether or not the rates of ranitidine use track with rates of cancer without actually getting sets of ten or individual level data. That would be an ecologic study.
You would just say in United States

this is the rate of ranitidine use and here's the rate of cancer. Now, let's look at another country. That would be ecologic study.

So this groups of ten for confidentiality reasons, but it's not looking at -- they're not saying here's this one population so that -- that is an ecologic study.

Q. So out of all the people in this study, exactly 180 people got esophogeal cancer who were taking ranitidine?

A. Right. I think that, again, the data came out in groups of ten.

Q. And exactly 170 got gastric cancer?

A. Again, the data were provided in groups of ten; although, you can see for IBD, if it was less than ten, they just said it was less than ten for cirrhosis and IBD, down further on the table.

Q. And you don't think the fact that there's no individual data, that this is aggregate data, has any impact on the results at all, right?

A. Well, I think that -- that this is



using this database in exactly this manner, I mean it has been used in quite a few studies, observational studies. It was used here in a peer-viewed publication.

And so certainly, as we've talked about with effectively all the studies we discussed here, there are strengths and limitations. And so we can -- we can go through and pick it, the study, and -- and point out things.

But I -- this -- this wasn't concerning to me sufficiently whereby I would've dismissed this study and removed it. It's one of the 16 observational studies that have looked at the potential association between ranitidine and cancer.

Q. What is the average stay for a person that's in this database?

MR. TOBEY: Objection. Form.

A. The average hospital stay?

Q. No. How long does the average person remain in this database before they move on and go to -- out of the database and their data is no longer recorded?

And you can look in the study, but



you'd have to go to a separate study to find the answer to that question.

A. So I'm not going to find it in this study?

Q. No. You'd have to have looked somewhere else.

MR. TOBEY: Objection. Form.

Q. Now, did you look?

A. Did I look for how long the average stay for an individual in this database is? No, I didn't.

I should point out that this database has medical record data from over 360 and over 73 million individual patients in the United States. This is a big database.

Q. How long was the follow-up period here?

A. So the study took part, the time period, I know we -- is -- was from 2009 to 2018.

Q. So ten years?

A. From, again, this is, you know, remember, I'm calling it the time period. It's the range.



Q. Ten years. Now, if there's a person and they're in this Explorys database because they have insurance through one company and then they move to a different insurance or a different health system and they go out of the system, what happens to that person over that ten-year period? Are they still counted or not counted?

A. Sorry. I'm just trying to make sure that I look at the methods for this paper. (Document review.)

So I'm not seeing in the paper what specifically happens to an individual who, I think your example is changed health plans and were no longer included in a health plan that was evaluated by this dataset by the Explorys?

(Court Reporter clarification.)

A. Let me start over.

I'm not seeing in this paper indication of what happens with individuals if they moved outside of the Explorys -- outside of the systems. Remember, this is kind of a nationwide system.

They moved out of being in that

system. Again, it's a very large sample size, and it's a database that's been used extensively for -- for research exactly like this.
Q. Uh-huh. Yeah.
A. Peer-reviewed publications.
Q. Are there other peer-reviewed publication or publications by the Explorys people that could give you the information about how long people stay in this system?
MR. TOBEY: Objection. Form.
A. I don't know.
Q. Did you simply assume that all of these patients stayed in this system for the entire time?
MR. TOBEY: Objection. Form.
A. So I should point out that they did do a data validation to compare the incidence of the five cancers that they studied here, and the -- whether the rates were similar with rates reported in the literature and for suggesting the search strategy utilized and the cohorts generated contained accurate data. But --
Q. I know, but I didn't ask you about



that. We're gonna get to that.
I asked you about whether people moved in and out of this database over the ten-year period. And is the answer you don't know?
MR. TOBEY: Objection. Form.
A. Yeah. I don't think that information is provided in the -- in the peer-reviewed publication.
Q. And did you look for it elsewhere?
A. No, I didn't.
Q. Okay. Now, what would be the effect if the median stay in this database was 1,280 days or approximately three-plus years?
MR. TOBEY: Objection. Form.
A. So I think that the -- the stay is going to have its distribution, right? People coming in and out of the database. Well, I don't know. In and out being the -- the average stable range from some -- some level -- some point to some other point.
What would be the effect on -- well, I don't want to put words into your mouth, like -- the question is what would be



the effect on?
Q. Let me give you an example.
A. Okay.
Q. Person number one is there on day one. Three years later goes out of the system.
What happens to person one's data?
MR. TOBEY: Objection. Form.
A. Well, so looks like they used -- they looked at one-year intervals, so presumably the person at year three would be included up to year three.
Q. Okay. I was going to ask you about the one-year intervals. We'll put them on a shell. I'll come back to them.
What if person one stays in the system three years, leaves the system and then gets cancer?
MR. TOBEY: Objection. Form.
Q. How does that affect the outcomes?
A. The outcomes being the?
Q. Cancer.
A. What's that?
Q. Cancer.
A. You mean the -- the resulting



findings from the study, how does that affect that or --
Q. They get counted as three person-years, no cancer, right?
A. Right.
Q. But they did get cancer. They just weren't in the system when they got the cancer. Cancer diagnosed that is, when they knew they had the cancer.
A. I think --
Q. They don't get counted?
MR. TOBEY: The witness was answering and then Mr. Ronca provided his own answer.
A. So I think this is not unlike the discussions we have had about epidemiologic studies in general.
Once either the follow-up time or someone leaves the system happens, then any event that happens after that time is not included in the numerator.
Q. Exactly.
A. I still think that, you know, the overall conclusion of myself and the scientific community is that there's not an

association from these 16 studies and ranitidine.
Q. But my question to you is, did you discuss the length of time that the individuals in the study stay within the system?
Did you discuss that parameter of this particular study when you were explaining in your report how this study worked and why this study should be trusted?
A. No. I didn't discuss that parameter. But I still think that this study should be trusted. I don't think that it should be given a weight of zero and excluded from -- from consideration.
This is a very large study that's in the peer-reviewed literature.
Q. I forgot to ask you before.
How many times did the Norgaard study get rejected by journals before it was finally accepted?
A. I would have no idea.
Q. How about three?
(Cross-talk.)
Q. -- rejected, were you aware of



that?
A. Again, that would be information that I didn't -- wouldn't have.
Q. And which journal accepted it?
A. We're talking about the Norgaard or Adami?
Q. Norgaard.
A. So that was accepted in Cancer Epidemiology, Biomarkers & Prevention. So I should clarify.
Many of my papers are rejected from journals. In fact, because what you always do in -- in the field is that you write a paper and then you think, well, maybe I can get it into Nature Communications or one other Nature family journals. So you send did there, and you hope it gets sent out for review. But sometimes it doesn't. Sometimes it does.
Even when it gets sent out to review, it can be rejected. And then you're sending it to the next. I have papers that have been rejected many more times than three before they were finally found a place that was a suitable site for it to be published.



Q. And the place that it was published is a journal where you're a senior editor, right?
A. That's correct.
Q. Now, let's talk about Nature Communications now that you bring it up.
Is that a journal where you have to pay a fee to get the article published?
A. It's a journal -- yes. It's a -- a -- all of the major journals are starting this open source journal system whereby you pay to make the -- it's not pay to have it published. It's pay to make it freely available to anyone, even if -- so it's not a subscription base model anymore. It's a have the author fund it up front.
Still undergoes extensive peer-review evaluation. Nature Communication is not an -- not an easy journal to get a paper published in.
Q. Is Nature Communications actually associated with the journal Nature?
A. Yes, it is.
Q. And -- and what's the impact of the journal Nature?



A. It's high.
Q. And what's the impact factor of journal Nature Communications?
A. It's also relatively high but not -- I mean Nature is extremely high.
Q. Like 50?
A. Yeah.
Q. And Nature Communications is like five?
A. I'd have to look up to see exactly. I would think it's at least five.
Q. You should know enough by now you know I looked.
MR. TOBEY: Objection to form.
A. I should say the impact factors change every year as well.
Q. Sure.
A. Yeah.
Q. Has Nature Communications ever been higher than six?
A. I -- I don't know.
Q. And you published a number of things in Nature Communications, right?
A. That's correct.
Q. So, let's get back to the Kim

study. All right.
So you mention that they check the data once a year?
A. They checked the data once a year. They -- make sure I got the right -- okay.
Q. Let me put it a different way before you answer.
Analysis was conducted on a yearly basis because the incident data was on a yearly basis, is that right?
MR. TOBEY: Objection. Form.
A. The abstract states incidence data of new malignancies were obtained in one-year intervals for up to ten years.
Q. Okay. Now, let's explain how that works.
If I come into the database on January 1st, then I'm in the database 365 days in that year cycle, right? So that's patient one.
If patient two comes into the database on December 31st, they're in the database for one day.
But they both count as a person-year, correct?


MR. TOBEY: Objection. Form.
A. I think that's correct; although, they did use a lag time of one year.
Q. That was in the beginning, right?
MR. TOBEY: Objection. Form.
Q. So there's no way to know exactly how many years are covered by the person-years that are listed in the data 'cause you don't know how many actual days each individual person was in the system.
A. Yeah. But I don't think that's that different than, you know, lots of epidemiologic studies aren't counting individual days when they calculate person-years.
Q. Yeah. I mean in a longitudinal study, you would know everybody at day one and follow them all for ten years, right?
A. Yeah. But the question is how is a study treating someone who only lasts part of a year?
I think that's your -- the hypothetical example that you're giving. And I think that's gonna vary from study to study. So --


Q. Isn't this one of the -- you know, if you were to study to get an article about the problems with these big insurance databases that are not designed for research, isn't there a whole list of problems that are associated with this databases?
Not that they can't be used for some purposes. But there's a whole list of problems, isn't that right?
A. I think these types of databases have been shown to be very powerful for research. And as we spent most of today discussing, there's a whole list of problems with every observational study. That's why you can only assess association and not causation within epidemiologic studies.
Q. So did the database have any mortality data?
A. So I'm just double-checking the paper.
Q. Yeah. I don't know what version you have there, but you can look on page 614. That might be a different study. No. That's right. That's it, 614. I don't know if that's the page numbers you have on your


copy.
A. No. Mine starts with page 1.
Q. Okay. Yeah. I have the same one.
Yeah. You can look on -- under number four, Discussion, sixth page in the bottom paragraph. No, that's the wrong one. Let me see.
Yeah. No. It's on page -- it's on the fifth -- on the eighth page, right at the bottom on the right side under Limitations.
A. Yeah. So it says, Several population [sic] data points, such as mortality rates, et cetera, were not available at the population level.
Q. So what happens in a database like this when someone dies?
A. Presumably there are follow-up period, their follow-up ends.
Q. How would they know that? They have no mortality data.
A. Because they would no longer -- I would think they would no longer be in the database that's refreshed.
Q. How would the database know if there's no mortality data?

MR. TOBEY: Objection. Form.
A. I think that just like your example of someone who leaves one of the hospitals, one of the hospitals that's included in this database, when they would do their queries, the billing inquiries, EHRs and laboratory systems would no longer be updated.
Q. Do you even know how a dead patient is treated in this database?
MR. TOBEY: Objection. Form.
A. No. I don't think that they discussed that in this.
Q. But there could be other sources where you could've found out if you had looked, right?
A. I don't know. Possibly.
Q. What about medical compliance? They didn't have any of that data either, right?
A. With regard to whether?
Q. Medication compliance. Same sentence.
A. Yeah. I think that like anything in particular with regard to any prescription database, you know about prescriptions.



Q. You don't know if they're filled?
MR. TOBEY: Objection. Form.
Were you still answering the first question?
THE WITNESS: No. That's okay.
A. Well, I don't think you know whether they were taken.
Q. You don't even know if the prescription was filled.
A. I should say that these prescription record databases that have that limitation have been extremely powerful and valuable in the evaluation like ranitidine and cancer here. And I would say that -- that the potential for errors, like what we're discussing here, are actually limited by using these types of databases because the other options often self-recall, usually at a single point in time of, you know, maybe or what did you take on average within the last month or X days or something like that.
And that's, in epidemiology, that is subject to -- to lots of bias. So pharmacy record studies are actually considered quite powerful and valuable to



research.
Q. Is this a pharmacy record or just prescription record?
MR. TOBEY: Objection. Form.
A. You mean this specific study?
Q. We're talking about the Kim study in the Explorys database. We're not talking general stuff.
MR. TOBEY: Objection. Form.
Q. They had no information on medication compliance. Do you agree?
A. Yeah. And my point was that that pharmaceutical-type studies are still very valuable even without that -- without knowing exactly whether someone took --
Q. And they don't know of any information about over-the-counter use of these medications?
MR. TOBEY: Objection. Form. Go ahead.
A. So that's correct. Over-the-counter use is not recorded in the prescription databases.
Q. So someone could have been taking omeprazole and ranitidine at the same time?



MR. TOBEY: Objection. Form.
A. Yes. We know that, and I should point out that the concern here with ranitidine and cancer is really about bias due to confounding. HRA studies have discussed this at extensive length; that comparing users to non-users is susceptible to -- to bias.
And I think that that is a much more major source of potential bias than the hypothetical measurement errors that we're discussing here.
(Cross-talk.)
MR. TOBEY: Can he finish his answer?
A. No one -- the concerns raised by all -- the concerns raised by the authors who have been published in this area were more focused on confounding bias in a general sense than misclassification error.
Q. Yeah --
A. And that's because H2RAs are notoriously difficult to evaluate due to the potential for confounding by implication. There is a large amount of literature

discussing this. And, in fact, it's an example -- it's kind of like a prototypical example of potential bias is studying the potential relationship between H2RAs and cancer.

Q. Well, let's discuss this a little.

Did you do an evaluation of what the indications are for, let's say, ranitidine versus famotidine?

A. Did I -- did I personally do an evaluation of the indications of those two?

Q. Yeah.

A. No, I didn't.

Q. Are they different?

A. But I don't think that, you know, the -- the breadth of all the data across different datasets, different populations are showing no clear association between ranitidine and any of the five cancers that are being evaluated here.

MR. RONCA: Let's go to Exhibit 6440.

(Exhibit 6440 was previously marked for identification.)

MR. TOBEY: Is it already in the



Box? I'm not seeing it popping up.

MR. RONCA: I don't see anything yet on the screen, so. 6440.

MR. TOBEY: It just came up for me.

Do you have it, Dr. Witte in the Box?

MR. RONCA: I don't see it. I still see Kim on the screen.

BY MR. RONCA:

Q. All right. Dr. Witte, I'll represent to you that on the left are the indications from the FDA's access data website for famotidine and on the right for ranitidine.

MR. TOBEY: Just one second. Dr. Witte, do you have your own copy on Box.

THE WITNESS: Yeah. I see the copy now.

MR. TOBEY: Okay.

Q. Okay. Now, what I did -- go down a page please -- is copy the indications and blew them up and put them side by side.

Do you see that, Doctor?



A. Yeah. I can -- yep.

Q. The Pepcid or famotidine on the left. Zantac and ranitidine is on the right.

MR. TOBEY: Mr. Ronca, are you -- this is a demonstrative I assume.

Are you representing this is a copy-and-paste from the label? Or can you just explain?

MR. RONCA: Yes. Exactly. That's exactly what it is, Danny.

Q. So what I did -- next slide, please -- is I -- I lined up the ones that were the same.

So short-term treatment of active duodenal ulcer on the left, short-term treatment of active duodenal ulcer on the right.

Do you see that?

A. Yes, I do. Where the blue arrow is pointing?

Q. Yeah. So I did that.

And then next slide, please.

I eliminated the one that maxed. And then I did it for the next one:

Maintenance therapy for duodenal



ulcer patients have reduced doses after healing active ulcer.

It's the same on both sides. You see that?

A. Yes.

Q. So next slide.

Short-term treatment of benign active gastric ulcer.

Same on both sides?

A. Yeah. And just to clarify.

This is famotidine versus ranitidine? Not cimetidine?

Q. Yeah. Famotidine.

Trust me I also do it for cimetidine.

Next slide.

Short-term treatment of gastroesophageal reflux disease. The other one says treatment of GERD, systematic relief occurs within 24 hours, right? That's treatment of GERD.

Next slide.

Short-term treatment of the endoscopically diagnosed erosive esophagitis -- esophagitis. Those two are

Page 278
J. Witte

the same.
Next slide.
Treatment of pathological hypersecretory conditions like Zollinger-Ellison syndrome.
Next slide.
What does that leave? It leaves two indications for ranitidine that don't exist for famotidine.
Were you aware of this? Were you aware of this?
A. No, I -- I was not aware of this.
Q. And notice that the two things are maintenance.
Do you know what maintenance means in an indication?
MR. TOBEY: Objection. Form.
A. Well, I would -- I would assume that it means ongoing.
Q. Ongoing, long-term use indicated for Zantac or ranitidine, not indicated for famotidine.
MR. RONCA: Let's go to the next slide.
MR. TOBEY: Was that last part a

Page 279
J. Witte

question?
Q. That's what the slide shows, right, Doctor?
MR. TOBEY: Objection. Form.
A. I think what this slide says is Zantac is indicated in five and eight written out.
Q. And notice that they did placebo-controlled trials; in one case for a year, and the other case for 48 weeks.
You see that? Do you see that was the question?
A. Oh, yes. I see that.
Q. And then you don't know this and I don't have it here, but in the Warning section it says that it hasn't been tested beyond a year. Basically they weren't people taking it for more than a year.
But let me ask you this question.
Are you generally aware that there are many patients who take this drug, ranitidine, for many years?
MR. TOBEY: Objection. Form.
A. Yes. You can see that in the epidemiologic data.

Page 280
J. Witte

Q. Next slide.
A. Sorry. I'm still -- I'm still back at the first part before you removed things.
So did it say for both of them that there was maintenance therapy for duodenal ulcer patients?
Q. Yeah. You good?
A. Yes.
Q. You're good?
A. What's that?
Q. We good for another question? Is that why you're nodding at me?
A. Yes.
Q. Next slide.
I didn't go through that whole process again with cimetidine. But if you go through the same process, you come up with the next slide.
Once again, maintenance therapy for ranitidine and not for cimetidine. Were you aware of that?
A. Can we go back and see where -- sorry. This is all -- the first time I've seen -- I've seen this and the -- can we look back at the --

Page 281
J. Witte

MR. RONCA: Back one. So the highlighted ones are the ones that were gone.
A. Well, how come GERD is number four?
Q. Yeah. I didn't see that. No, no.
See number six, I didn't see a matching one for six on the cimetidine side. So that appears on the next slide.
A. Right. Isn't number four?
Q. Yeah. Number four is missing on the next slide. Five, six and eight are on the next slide.
A. But isn't four on the left-hand side? GERD?
Q. Well, it says, erosive, diagnosed by endoscopy. Look at 7, endoscopically diagnosed erosive esophagitis.
So seven matches four, okay?
MR. TOBEY: Can I ask a question? Are you -- are you representing that this the tablet, comparing tablet to tablet?
MR. RONCA: Yeah.
THE WITNESS: It says oral solution at the top.

MR. TOBEY: Yeah.
MR. RONCA: Okay.
MR. TOBEY: Object to that. I think this is a misleading comparison I'm not saying it was intentional. I just --
MR. RONCA: I think --
MR. TOBEY: I --
MR. RONCA: -- are the same, but let's -- we'll just use famotidine, how's that?
MR. TOBEY: I actually didn't check famotidine for that same issue, but --
MR. RONCA: You did not?
MR. TOBEY: I just noticed it here.
MR. RONCA: Go back to the first slide, please.
BY MR. RONCA:
Q. So Pepcid is not oral. Zantac is not an oral solution, right?
MR. TOBEY: Do you have the larger document that these were taken from --
(Cross-talk.)



MR. RONCA: I have no more questions on this. You have it in your Box. Please take it down.
MR. TOBEY: I'll just get on the record a running objection to the lack of foundation of these documents, but we can move on.
MR. RONCA: Okay. So let's go back to Exhibit 6423, and I want to go too -- where is it -- I want to go to page 7 of 10. I didn't realize that was marked. Okay. Well we'll work with it.
Can you draw out that whole big table, Table 2? Okay.
Q. Doctor, you see where I have it highlighted up there? Table 2 shows the significance of difference among ranitidine, famotidine and omeprazole cohorts, right?
A. Yes, that's correct.
Q. And so what they did was look at these various pieces of information. So at the top, age, sex, race.
And at the bottom, just under the blue line which I added to differentiate the



two, tobacco use, alcohol use, diabetes, obesity, cirrhosis, irritable bowel syndrome, atropic gastritis, and Barrett's esophagus.
Did I get that right?
A. Yes, that's correct.
Q. Okay. And in this first area here is ranitidine versus famotidine, right?
A. Yes, that's correct.
Q. And famotidine is a other H2RA?
A. (Audio distortion.)
THE COURT REPORTER: I'm sorry?
Q. It's one of the other H2RAs, right?
A. That's correct.
Q. Okay. And in these calculations, they're looking at the ranitidine group versus the famotidine group, but they're trying to determine if there's significant difference between the two groups.
Is that what they're trying to do here?
MR. TOBEY: Objection. Form.
A. In the header that you highlight says, Significance of differences between ranitidine, famotidine and PPI cohorts.
Q. Okay. So in this first column at



the bottom, under Tobacco use, ranitidine versus famotidine, it gives the difference between the two cohorts, right?
A. It gives the average percent.
Q. Right. But there's a p-value there, right?
A. That's correct.
Q. And the p-value is a calculation done by the author to determine whether this difference was significant?
A. Yes, that's correct.
Q. And the difference between ranitidine and famotidine -- in other words, famotidine had more smokers -- was significant, right?
A. Yes. It looks like that that is a statistically significant difference between those two groups.
Q. And tobacco use is a risk factor for plenty of cancers, including the cancers that were in this study, right?
A. That's correct.
Q. All right. Now, let's look at the difference between ranitidine and famotidine for diabetes.

Diabetes is a risk factor for pancreatic cancer, liver cancer, is that right?
MR. TOBEY: Objection. Form.
Q. Is that right?
A. So, diabetes is a risk factor for -- for some cancers.
Q. Okay. And in this case, again, was the difference between the ranitidine group and famotidine group where famotidine had 45 percent with diabetes and ranitidine had only 37.67 percent, was that significant?
A. That had a p-value of less than .0001.
Q. In your parlance, significant, right?
A. That would be considered statistically significant with P less than .05.
Q. Okay. Let's go to the next column, Obesity.
Obesity is associated with stomach cancer, esophogeal cancer, liver cancer, is that right?
A. Obesity is -- is associated with



some of the cancers, that's correct. I --
Q. Is it -- now, again, looking at this calculation done by the authors, once again, statistically significant; more famotidine users were obese than ranitidine users, right?
A. That's correct. I don't think any of these differences are going to change the results of this study in a material way whereby you're suddenly going to see a positive association between ranitidine and cancer.
The magnitude of -- sorry.
The magnitude of the differences between these groups, say 30 versus 37 percent, is not sufficient to flip these relative risks from less than 1 to greater than 1.
Q. Okay. Are you done?
My only question was, that this -- that the authors determined this was a significant difference?
MR. TOBEY: Objection. Form.
A. Yeah. And my answer was yes. But I don't think that's going to change the



results of the finding because the differences here are of a magnitude that wouldn't be -- wouldn't be sufficiently large to take a result as presented in this paper and turn it into a positive association.
Q. Did you calculate that?
A. No, I didn't. But in my expertise as a -- an epidemiologist to actually have a variable with this type of difference resulting in changing something from a negative association to a positive association, I've never actually seen that happen.
Q. But you did --
A. But --
Q. -- you didn't' calculate it, right?
A. No. But neither did any -- neither did the plaintiffs' experts.
Q. And neither did the authors, right?
MR. TOBEY: Mr. Ronca, while he's looking, when you finish with this row of the chart, we've been going for an hour from that little mini break and an hour and a half from the start of this session. If we could take a



break.
MR. RONCA: Sure. As soon as I finish with this.
And while the doctor is looking, can we talk a screenshot of this and make it the next exhibit number?
(Exhibit 6462 was marked for identification.)
Q. Can we go to cirrhosis now?
A. Yes.
Q. So cirrhosis was also statistically significant?
A. That's correct.
MR. TOBEY: Objection. Form.
Q. And in both cirrhosis and obesity, the famotidine group had 80 percent more than the ranitidine group approximately?
MR. TOBEY: Objection. Form.
A. I don't think that's 80 percent for obesity.
Q. Close? 70 percent? Higher? You know 32.2 divided by 23.97.
MR. TOBEY: Objection. Form.
Q. Here. I'll do it quick. I mean the difference is about nine. We can

calculate it later. All right.
And then the last one is atropic gastritis. Now, that is a strong risk factor for stomach cancer, right?
MR. TOBEY: Objection. Form.
A. If by strong, I'm not sure, you know, what you mean by strong, but it's a risk factor.
Q. And that was also significant?
A. At P at .05, yes, that's statistically significant.
Q. Now, show us where in your report you discussed any of this.
MR. TOBEY: Objection. Form.
A. Where I discuss these differences?
Q. Yeah.
A. So in my appendix, I listed -- I noted that ranitidine users will have a lower prevalence of conventional risk factors, i.e., tobacco, alcohol use, viral hepatitis, cirrhosis, inflammatory bowel disease --
(Court Reporter clarification.)
A. So okay. From the top:
Ranitidine users also had a lower prevalence of conventional risk factors



(i.e., tobacco/alcohol use, viral hepatitis cirrhosis, inflammatory bowel disease, atropic gastritis, Barrett's esophagus, diabetes mellitus, and obesity).
Q. Can you explain what that means?
MR. TOBEY: Objection. Form.
A. I was highlighting the fact of what we just went through here, that those ranitidine users all had lower prevalence of those conventional risk factors.
Q. Did you say that they were statistically significant?
MR. TOBEY: Objection. Form.
A. No. I just said users had a lower prevalence of conventional risk factors.
Q. Did you criticize the plaintiffs' experts for putting in numbers that were not statistically significant?
A. I criticized them for using incorrect methodology in epidemiology, for putting in results not only -- I mean, one concern was that they were putting in point estimates with no 95 percent confidence interval. The other was the assumption that anything different than zero was a -- a 1.0



was an increased risk regardless of the width of the 95 percent confidence interval.
And that that kind of methodology -- also leaving, you know, picking out certain results and emphasizing certain results. For example, when talking about the low study, the dietary study, the fact that the plaintiffs' experts said that that indicated an increased risk of gastrointestinal cancer from the dietary study, when actually it was rectal cancer as clearly stated by the authors. So that's what was driving that result.
Q. Okay. But you didn't -- anybody who read your report would not know that this prevalence of conventional risk factors you refer to here was statistically significant. They'd have to look at the study itself, right?
MR. TOBEY: Objection. Form.
A. I don't think I used statistical significance throughout my report really unless that's all that was reported.
But remember, we're not talking about the main -- you know, you're -- the



criticisms I had about the methodology used by the plaintiffs' experts had to do with looking at the main exposure, ranitidine, and the outcome of interest; not about theoretical confounders and other variables that are kind of ancillary to what we're talking about here.
Q. You think that these risk factors are theoretical?
A. Well, the impact of them on -- on the estimates of effect of association are unclear.
MR. RONCA: Let's take our break.
THE VIDEOGRAPHER: The time is 8:06 p.m., and we are going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time is 8:23 p.m., and we're back on the record.
BY MR. RONCA:
Q. Dr. Witte, what's a defined daily dose?
A. A defined daily dose is, as it

sounds like, the dose -- it's a kind of a summation of the total number of doses an individual may take.
Q. That's the defined daily dose?
A. What's that?
Q. The defined daily dose is a sum for the total amount that an individual may take over a period of time.
Is that what you're saying?
A. Sorry. I was thinking in observational studies they were looking at the summation of defined daily doses. And isn't it just as it says, it's the daily dose of the drug?
Q. Isn't it a specifically defined measure that the WHO, the World Health Organization, puts out?
A. I'm not entirely sure. Can you share that with me? More details of the document?
Q. You just don't know generally what a defined daily dose is?
A. I had -- I had said that I thought it was the summation of daily doses across a population, among the individuals in that



population.
Q. What's the World Health Organization definition?
A. I don't know what the World Health Organization definition is.
Q. Was the defined daily dose as a term of art used to tell us what the dose was in any of these studies that you reviewed?
A. Yes, it was.
Q. Which study was that?
A. So one was the Liu PCCIU, where they categorized individuals in their dose response analysis based on the number of defined daily doses.
Q. Any others?
A. Yeah, Cardwell.
Q. Any more?
A. I'm just checking. So the others that looked at -- at some measure of dose response, we're looking at kind of number of prescriptions.
Q. But not defined daily dose?
A. No.
Q. 'Cause they didn't have the data, right?



MR. TOBEY: Objection. Form.
A. Well, they had the prescription information.
Q. They didn't have the data on the dose, right?
MR. TOBEY: Objection. Form.
A. Well, they had information on the number of prescriptions.
Q. But they didn't know how many pills or what the dosage was or any of that, did they?
MR. TOBEY: Objection. Form.
A. They -- they may not have, but they still were able to look for trends by looking at the number of prescriptions.
Q. But Cardwell and McDowell and Liu actually had the defined daily dose, didn't they?
A. Yes, they did.
Q. And they measured it by days and did their dose response measurement by number of days with the defined daily dose, isn't that true?
MR. TOBEY: Objection. Form.
A. Yeah. So in their -- in their dose



response, they looked at -- at different categories of defined daily doses.
MR. RONCA: Now, let's look at one more aspect of the Y Kim case and let's go to exhibit -- I feel like I'm missing something here. Give me a second, Doctor.
Is there a way for me to upload a document? I just don't know where it is. John?
DOCUMENT TECHNICIAN: Correct. You can upload it to your private folder in Box.com and then I'll have access.
MR. RONCA: Now I have to find out where Box.com is.
MR. ROTMAN: What if Jim just e-mails it to you, can you do it for him?
DOCUMENT TECHNICIAN: That's fine. First initial, last name, jschmitzer@uslegalsupport.com.
MR. RONCA: So, J, is it just S-M or S-C-H-M?
DOCUMENT TECHNICIAN:

Page 298

J. Witte

S-C-H-M-I-T-Z-E-R.
MR. RONCA: At US Legal?
DOCUMENT TECHNICIAN: Support.com.
MR. RONCA: Okay. Sent. I don't know how long that will take, so I'll move on to something else and come back to it.
So let's bring up Dr. Witte's report, 6397, again and go to page 29.
You there? All right. Now, I want to go into the section on Non-Standard Interpretation of Results, and I would like you to enlarge the second paragraph.
BY MR. RONCA:
Q. And this second paragraph says, Dr. Witte, and you wrote this, right?
A. Yes. I wrote my entire report.
Q. In particular, the American Statistical Association's President's Task Force recently published their unanimous view that "p-values and significance tests, when properly applied and interpreted, increase the rigor of the conclusions drawn from data and the last part of that from p-values to

Page 299

J. Witte

data."
And the last part of that from p-values was in quotes.
Did I read that right?
A. Yes. You read that correctly.
Q. And you wrote:
In other words, properly applied and interpreted p-values and significance tests bolster a study's findings.
Then you wrote:
The Task Force also highlighted that statistical significance, quote, thresholds are helpful when actions are required, end quote.
And then you put in parentheses: For example, in courts of law.
Did I read that part right?
A. Yes. You read that correctly.
Q. Then you wrote:
While some other statisticians have argued that one should not assess associations using statistical significance testing, they also are not advocating for an anything goes situation, in which weak evidence suddenly becomes credible.

Page 300

J. Witte

You wrote that too, right?
A. Yes, I did. With quotations in the last part of it. The not advocating anything goes situation was a direct quote from -- from citation 69.
Q. Okay. Now, is it true that the American Statistical Association issued an official statement of the organization in 2016 regarding statistical significance?
A. No, that's false. In fact, that's why the American Statistical Association's President's Task Force was found, was -- was pulled together and they formed a panel of eminent statisticians in response specifically to the concern that this -- the paper, the earlier paper that was written by a staff member of the American Statistical Association and other statisticians was being misinterpreted as official ASA policy.
(Cross-talk.)
Q. I'm sorry. I thought you were done.
A. In the -- in the President's Task Force at the very beginning of that -- that document they state, we have formed this task

Page 301

J. Witte

force because people are incorrectly assuming that this is ASA policy when it's not.
Q. Okay. And did they also say in the beginning of that that they're putting out this statement for comment?
A. And which -- which document?
Q. The task force document.
A. I -- well, I'd have to go back and look at it to confirm.
Q. Yeah. So let's look at it.
MR. RONCA: 6404, please.
(Exhibit 6404 was previously marked for identification.)
Q. What does that sentence say that's highlighted?
MR. RONCA: Please bring that out.
MR. TOBEY: Just a second. It's not in Box yet.
MR. RONCA: Well, you can bring it out while we're waiting.
MR. TOBEY: No. Before you start questioning, I'd like to be able to look at the whole document.
MR. RONCA: I just want the -- him to bring out -- what he did. I'm not

talking to Dr. Witte. I'm sorry.
MR. TOBEY: Okay. I understand.
It just came up by the way.
BY MR. RONCA:
Q. So read that sentence, Doctor?
MR. TOBEY: Dr. Witte, do you have the version you can look at it?
A. Yeah, I have it. I'm just glancing over the whole version. Just one second.
Q. Sure. And I will put the question out and you can answer when you're ready.
This is the task force document that you were referring to?
A. Yes, it is.
Q. And read this sentence.
A. This document is the statement of the task force, and the ASA invited us to publicize it.
Q. So it's not a statement of the ASA. It's a statement of the task force, is that right?
A. That's right. And that's exactly what I wrote in my report.
Q. And did you mention in the report that there is an actual statement, official



statement of the American Statistical Association on statistical significance? Did you mention that?
A. Well, I cited the report and I do have -- I say, While some other statisticians have argued that one should not assess associations using statistical significance testing, and then I cite to the -- the two articles that you're referring to that were authored in part by a staff member of the ASA.
(Cross-talk.)
Q. So you can?
A. Sorry.
Q. You mean the Wasserstein article?
A. That's right. And it's referred to in this -- in the editorial, the Wasserstein in the task force. The task force was to address concerns that a 2019 editorial in The American Statistician, an ASA journal, might be mistakenly interpreted as official ASA policy.
The other interesting thing is at the very top of this introduction, the first sentence is: Over the past decade, the



sciences have experienced elevated concerns about replicability of study results.
There is an enormous concern in the scientific community of false positive findings that are not replicated across studies.
Q. Okay.
A. Which is very relevant to the study at hand.
Q. Okay.
MR. RONCA: Can you close down that call-out, please?
Q. So you reference the -- let me ask you this.
Who is Wasserstein? He's a staffer?
A. Yeah. He works in the -- at the American Statistical Association.
Q. Is he the executive director?
A. I'm not sure exactly what his title is.
Q. Are you a member of the American Statistical Association?
A. At the current point in time, I'm not a member of the American Statistical



Association.
Q. Do you know that Wasserstein has been the -- the director of the American Statistical Association for many years?
A. Yes. I do know that.
Q. And --
A. That doesn't mean that --
Q. Wait a minute.
And still is?
A. Yes. But that --
Q. And --
A. -- doesn't mean that the papers he wrote were official policy of the American Statistical Association.
Q. Okay. And --
A. That's why they were being misinterpreted and that's why, as this says, you know, we're concerned about this is -- basically, if we look at this first statement, We're worried about false positive results. People falsely -- falsely interpreting results, like what we're seeing in ranitidine and cancer, as being true associations when they're clearly not.
And then they talk about the task

force -- they had to establish a task force because the statement that was published was being misinterpreted as being official ASA policy. And that's just wrong. It's not ASA policy.
Q. Okay.
A. Whatever position he is in the organization.
MR. RONCA: So let's go to Exhibit 6403, please.
(Exhibit 6403 was previously marked for identification.)
Q. What's the title there? Read that.
A. The ASA Statement on p-Values: Context, Process, and Purpose.
MR. RONCA: Let's go down to -- let's see. That's the editorial. Keep going down. Another page.
Q. Now, when you get past the editorial, you get to a document called the ASA Statement on statistical significance and p-values.
Now, what you're testifying to today is that this is not the statement of the --



A. It's not.
Q. -- American Statistical Association.
A. As it said directly in the article that we were just previously talking about, the president of the American Statistical Association established a task force to address concerns that a 2019 editorial in the American Statistician might be mistakenly interpreted as official ASA policy.
Q. That's what that task force said. But has the ASA withdrawn this statement?
A. I believe that there has been discussion where people have clarified that this isn't a formal ASA policy.
Q. Really? Were you involved in these discussions?
A. No. Sorry. Discussions that were made online and -- and elsewhere.
But, I mean again, I'm just referring back to what the president of the American Statistical Association who then formed a task force of some of the most preeminent statisticians in the world to actually evaluate this.



Q. And aren't some of the most preeminent statisticians and epidemiologists in the world want to retire the term "statistical significance"?
A. Yeah. I think that that's the P less -- should we retire P less than .05?
Q. Right. Isn't, for example, Sandler Greenland one of those people?
A. Yes, he is.
Q. Isn't Rothman one of those people?
A. Yes.
Q. Isn't Norgaard one of those people?
A. I wouldn't know about Norgaard.
Q. Did you know there was a statement signed by 854 eminent epidemiologists and statisticians supporting the idea of retiring the concept of the statistical significance? Are you aware of that?
A. Yes, I am. I --
Q. You're aware of it because you tweeted about it on your Twitter account, right?
MR. TOBEY: Hold on.
Mr. Ronca, he was in the middle of his answer.



A. Yeah. So I -- I am aware about this. And it's a very nuanced position between -- the examples that are given often are like what I gave this morning of a highly statistically significant result that's followed up by something that has a P of .051 and that, I think most people agree, that that .051 is not qualitatively different than .049.
Q. Okay. Well, let's see, okay?
MR. RONCA: Let's look at it more carefully.
Can you call out number 2 of the ASA statement on statistical significance and p-values?
Q. So the bolded statement is: P-values do not measure the probability that the studied hypothesis is true, or the probability that the data were produced by random chance alone.
Do you agree with that?
A. Yes, I do.
MR. RONCA: Next, please.
Q. Scientific conclusions and business or policy decisions should not be based only

on whether a p-value passes a specific threshold.
Do you agree with that?
A. Sorry. Is there a way to scan down? I'm -- in this document so I can read the top?
MR. TOBEY: Do you not have your own copy in the Box? Just make sure you have that.
THE WITNESS: No, I don't.
Q. Can you see it now?
A. It's not in the Box.
MR. TOBEY: It should be 6403. I do have it.
THE WITNESS: Oh, okay. I have to refresh it.
MR. TOBEY: Yeah.
THE WITNESS: Okay. There we go.
Q. Scientific conclusions and business or policy decisions should not be based only on whether a p-value passes a specific threshold.
Do you agree with that?
A. Yeah. I think that you want to look at the overall group of -- set of



evidence. And I think that we need to point out that the concern, as pointed out in the very first sentence of the President's Task Force, there's a serious concern that people who see a P less than .05 then conclude that that's a causal association or even a valid association that is then never replicated.
So it's -- it's a concern that people are -- that -- that scientific studies are hard to reproduce and that there's a reproducibility crisis, and that people are over interpreting things with small p-values; just as there's a certain if you are replicating a finding that has a P just on the other side of the interval with a -- again, I gave the example of .051, the -- so -- the statement justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision-making is both with assuming that there is an association -- I mean, could be that there is the concern with false positive results.
Q. Yeah. I hear you.
So do you agree with number 3?
A. Yes. Again, I would give the



example of when someone --
Q. First, do you agree? Then you can give all the examples you want.
MR. TOBEY: Look at the transcript. He opened with a yes or no, and then he tried to explain it.
MR. RONCA: Let me look -- let me look. Yeah. I mean I will be honest.
Q. It sounded to me like -- is the answer yes and then you have more to explain? Is that it, Dr. Witte? Your answer is yes, but you want to explain.
Is that the truth?
A. Yes. I think that I wanted to contextualize my answer.
Q. Right. So the answer is yes. Now you want to contextualize it. Go ahead.
A. Okay. So yes. And the concern is that P less than .05 is -- you know, that -- that we can have lots of false positive findings in the literature. And this is such a man or concern that it was the opening sentence in the President's Task Force.
They didn't open their sentence saying we're concerned with P greater than



.05 being misinterpreted as a false negative.
They said, we're concerned that too many people are using P less than .05 to conclude that there is an association.
Q. Yeah. Did you explain any of that context and anything about this statement in your report?
A. I -- I certainly tried to. So, in my report in the section you had just pulled up where I talked about the task force and I also talked about the ASA publications -- and again, I was quoting the task force, thresholds are helpful when actions are required.
So they're saying thresholds are helpful, right? But I point out the fact that Dr. McTiernan in her report, her expert report, said, Any relative risk other than 1.0 indicates an association, whether positive or negative, regardless of the results of statistical tests used with the relative risk.
And then this is exactly what the authors of citation 69 were saying. We're not advocating for an anything goes approach.

We're not advocating for an approach where someone just says, It's 1.01, therefore, it's a positive association, without looking at the 95 percent confidence interval and the p-value.

And then I went on to show an example of what Dr. McTiernan was doing when she looked at the Rademacher paper and she concluded risk of stomach cancers increased by 50 percent.

And the authors themselves said, now this risk that she said, risk was increased by 50 percent. That's -- that's a big increase, right? That's sounds pretty -- pretty big. That's like a real finding. 50 percent increase in risk.

Well, just to -- to clarify, that paper had a relative risk reported in observation of 1.5 with a 95 percent confidence interval of .12 to 18.25. And the authors themselves concluded that these results did not indicate an increased risk of gastric cancer at any level.

So I did try to put that into context saying there are different opinions



here, and there's concerns with false positives, there's concerns with false negatives. But no one is saying that we should have this anything go approach like McTiernan use -- McTiernan used whereby any relative risk different than 1 suggested an increased risk just as the point estimate alone, without looking at the 95 percent confidence interval.

Q. Yeah. But did she report the 95 percent confidence interval right in that sentence?

A. She did. But she still said risk of stomach cancer was increased by 50 percent, where the authors correctly interpreted it that these results do not indicate an increased risk of gastric cancer.

So she didn't say the estimated relative risk was 1.5. She said the risk -- the risk, which is very causal language -- was increased by 50 percent. And then in parentheses gave that relative risk.

Q. And then --

A. Where the authors correctly interpreted that and said there's no increase



in risk because you look at those confidence intervals, this is getting into the everything is associated with everything else realm. Anything goes. Unless the --

Q. So --

A. -- unless you have a relative risk of 1.0 exactly, everything else is increasing or decreasing risk, which is exactly going against what the President's Task Force started with, saying there's a concern that people are reporting things as being real when they're not.

And that's my concern here as an epidemiologist, that the results for ranitidine and the five cancers are not showing an association in the human epidemiologic data in the 16 published studies.

Q. Are you finished now?

A. I am. Sorry I went on. You asked me to contextualize, so...

Q. You asked -- you said you wanted to, so I let you. Are you finished?

A. Yes. I'm finished.

Q. Okay. So didn't Dr. McTiernan say



that instead of using the term "statistical significance," what you should do is report the risk estimate, the confidence interval, and then everybody who understands what it is knows what -- exactly what you're talking about? Didn't she say that?

A. We would have to go back and look at her report to see exactly what she said.

I should point out that the President's Task Force did indicate that p-values are -- are -- I mean it's more information, right? And in some of those 16 papers you will see p-values. Other times you won't, right, that are presented.

But what McTiernan did in her report wasn't that, and that's what I called out as incorrect methodology. Very many -- many of her results were only a point estimate, and then went on to say this is a 13 percent increase in risk of gastrointestinal cancer, when the realty was -- is that estimate of relative risk with a confidence interval of that was driven by rectal cancer.

Q. And do you -- do you think that

Dr. McTiernan was relying on Rademacher for her opinions?
A. I think that -- I mean this was a study -- I mean I think that it may have folded into her opinions, but I'm not sure exactly how she weighted it. But it was more a methodological approach. That was just one example.
She was definitely pulled out and highlighted below it all dietary studies throughout in her report, and that was the example where the result that was presented was misinterpreted or mis-presented -- represented as reflecting an overall risk in gastric cancer where the authors themselves state specifically gastrointestinal cancer, specifically rectal cancer.
Q. Didn't Dr. McTiernan review all the studies that she could find and report on all the studies she could find and make a table results of the confidence intervals, and then make conclusions based on the totality of the evidence, whether the confidence interval was .12 to 18.25 or the confidence interval was 2 to 4? She reported on everything.



MR. TOBEY: Objection. Form.
Q. Right?
MR. TOBEY: Objection. Form.
A. In her text of her report --
Q. She reported on everything?
MR. TOBEY: Let the witness answer.
Q. That's the question.
A. In the --
MR. TOBEY: Hold on, Dr. Witte. You asked a question. He got about two words out and then you yelled over him. That's not the way this works, and you know that.
A. So in her report -- in her written report, she highlights estimated relative risks without giving in her report 95 percent confidence intervals and indicates that the -- that those indicated a specific increase in risk as though it was a kind of -- as though it wasn't an estimate with some width of confidence interval around it.
Q. She reported the confidence interval, didn't she? It's right there.
A. Oh, in the tables at the back of



the report?
Q. No. It's in the quote that you took out of her report on page 29 of your report. Let's look at it.
A. She does --
Q. Look at it. Let's look at it. Let's go to the --
A. She doesn't --
Q. Go to the first exhibit, 6397.
A. So she does in that example. But maybe we should pull up her whole report and look at the way it reads. And the fact that she's giving point estimates as though they're causal increases in risk without a confidence interval around it.
So one example, she does --
Q. Page 29.
A. If we go and look at her report, you'll see exactly what I'm talking about.
Q. Yeah. But I'm going by your report, okay?
MR. RONCA: Page 29, please blow up the paragraph that says, As one example, down at the bottom left.
MR. TOBEY: Mr. Ronca, I just want



to clarify.
You were asking him a second ago about her whole report, and he's asking to see it.
Are you now not talking about her whole report?
MR. RONCA: I am not asking a question about her whole report. I am asking what Dr. Witte quoted from that report in his example.
Q. Is this -- is this in quotes? This came right out of Dr. McTiernan report, quote?
A. That's right. So this example, she gives a 95 percent confidence interval, but she's interpreting it completely opposite; risk of stomach cancer was increased by 50 percent.
Q. Is that without the risk estimate in Rademacher?
A. Rademacher's conclusion was these results did not indicate an increased risk of gastric cancer at any level.
Q. You're afraid of the question.
MR. TOBEY: He's answered your

question. You don't like his answer.
Q. No, no.
MR. TOBEY: And --
(Cross-talk.)
Q. -- parentheses, was that report in Rademacher just like that?
MR. TOBEY: Objection. Asked and answered.
A. So Dr. McTiernan had said there's no level of relative risk other than 1.0 that indicates lack of association.
MR. RONCA: Read back the question, please.
(Referred to portion of the record was read back by the court reporter.)
MR. TOBEY: Objection. Form.
MR. RONCA: I will restate the question.
Q. Didn't the words in the parentheses, 1.5, 95 confidence interval, 0.12 to 18.25, didn't that appear exactly like that in the Rademacher paper?
That's the question.
MR. TOBEY: Objection. Form. Asked and answered.



A. So that is in Rademacher. My issue that I tried to explain here was that -- twofold. And this is where she's making methodological assumptions that are incorrect in epidemiology.
First of all, that the risk of stomach cancer was increased by 50 percent. That statement right there is a problem.
And then the other point I made was that in her written report, and we can look at it if you want, in the text, she talks about just point estimates, all right? And interprets anything that's different than 1.0 is indicating an increased risk.
And so the concern that I have, that the ASA President's Task Force has is this -- and even that the statisticians who wrote the article in the American Statistician saying we should get rid of p-value less than .05 are concerned with, and that is an anything goes approach. That is in stating the risk of stomach cancer was increased by 50 percent.
Q. So you picked out one example, and it was the example where Dr. McTiernan lifted



the exact numbers out of the -- out of the study with the exact confidence interval and she didn't hide anything about that.
That was your example, right?
MR. TOBEY: Objection. Misstating --
Q. On a 300-plus-page report.
MR. TOBEY: Hold on.
Objection. Form. Asked and answered multiple times. And also misstating his testimony that he's answered the question twice now.
MR. RONCA: Okay. Fine.
MR. TOBEY: He's telling you, you conflated two different things. And he's told you that twice and you're doing it a third time. It's misleading.
MR. RONCA: I'm not -- I'm not conflating anything.
Q. The bottom line is that in a 300-plus-page were you picked out one example and no others.
MR. TOBEY: Objection. Form.
Q. Is that right?



A. This -- I give one specific example here. But if we looked at her report, you'll see that -- that there's many relative risks that are given that say the risk is this without taking into consideration the width of the confidence interval and the fact that -- so if we break this apart, risk of stomach cancer was increased by 50 percent. That was the statement she made.
Whatever she put in the -- in the parentheses, she put in the relative risk. She didn't say the relative risk estimate from the study was 1.5 with a really wide confidence interval. And that's what epidemiologists do.
They don't say the risk was increased by 50 percent. Because as the authors of the paper themselves say, these results did not indicate an increased risk of gastric cancer at any level.
Q. Doctor, I'm not an epidemiologist. But even I know that that's a wide confidence interval. So certainly anybody of science reading this would know that.
A. That's my -- that's exactly my

point. That her interpretation of this was that the risk was increased by 50 percent.

Q. Wasn't the risk -- wasn't, as reported, 1.5?

MR. TOBEY: Objection.

A. That's the --

MR. TOBEY: Objection. Form.

Go ahead and answer.

A. That's the estimated relative risk. It's not the risk of stomach cancers increased by 50 percent.

Q. It was the estimated relative risk of what in the paper?

A. It was the estimated relative risk of stomach cancer that was --

Q. See, who's cherry-picking now, Doctor?

A. No. I'm actually --

(Court Reporter clarification.)

Q. Who's cherry-picking now, Doctor?

MR. TOBEY: Okay. Wait. No, no.

Objection. Move to strike as abusive and harassing.

You don't have to answer that.

A. I just return to the authors of the



study correctly interpreted this. These results do not indicate an increased risk of gastric cancer at any level.

Q. All right.

MR. RONCA: Let's take that down. Let's go back to the statement which was the ASA statement, 6403. All the way down to where the statement is, further. There. Okay. Bring out that paragraph again.

Q. It says:

Practices that reduce data analysis or scientific inference to a mechanical 'bright-line' rules (such as 'P less than 0.05') for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making.

Do you agree with that statement?

MR. TOBEY: Objection. Form. Asked and answered.

A. I think, as I said, that having a P less than .05 doesn't mean that you have a real association.

As stated in the first sentence of the President's Task Force, there's a serious



concern in the scientific community of non-replicable results, okay?

Now, if you also have a P of .051, that doesn't necessarily mean that that's a false association, especially -- and this is usually what people do. Is they give an example, like I said, showed this morning, where you have one result that shows a very clear-cut, valid association, and then a follow-up result that has a small p-value that's just above .05 and then dismissing that second result when it's actually replicating the first finding as -- as being not informative.

Q. You finished?

A. Yes.

Q. Do you agree with that first sentence there?

MR. TOBEY: Objection. Asked and answered so many times I've lost count.

MR. RONCA: He didn't answer that.

MR. TOBEY: He has.

MR. RONCA: I just read this sentence. He didn't say whether he



agreed or disagreed. He launched with a discussion.

Q. Do you agree with the first statement?

MR. TOBEY: Objection --

Q. Practices that reduce data analysis or scientific inference to mechanical 'bright-line' rules (such as P less than 0.05) for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making.

My only question was, do you agree with that? You gave us all the explanation.

Now, can we just have the answer to that part of the question?

MR. TOBEY: Objection. Form. Asked and answered multiple times.

We're getting to the point where I'm going to instruct him not to answer.

You can answer again.

A. As I indicated, having a P less than .05 does not indicate that an association is true. Having a P greater than .05, slightly greater, in a situation

that's usually the example given where you have an initial finding that's highly statistical significant and another finding that replicates that, that the P is just above .05, shouldn't be dismissed.

Now, I should add this is not the situation that we have here for ranitidine and cancer. We don't have a situation where we're seeing P of .0001 and then another p-value of .051. That's not the saying here.

We're not in a situation where we're talking about results that are replicating each other. You know, when you look at the overall body of evidence, as I've done in my report, there is no reliable, valid association between ranitidine and the five cancers in human data.

Q. Okay. Let's look at the last sentence:

The widespread use of 'statistical significance' (generally interpreted as P is less than or equal to 0.05) as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.



Do you agree or disagree with that statement?

A. I agree that using P less than .05 to just say whether that something is statistically -- that something is validly associated is not an appropriate approach. And, in fact, that agrees with the ASA President's Task Force whose opening sentence was, We're concerned about the lack of replication.

MR. RONCA: Next -- take that down. Next page. Number 5.

Q. A p-value, or statistical significance, does not measure the size of an effect or the importance of a result.

Do you agree with that?

A. Yeah. So the -- the size of an effect would be estimated from the relative risk with certain confidence bounds around it.

Q. How about the importance of a result?

A. Yes. As I -- as I pointed out, you can certainly have things with P less than .05 that aren't true associations that



are due to invalid biased results.

Q. The next sentence:

Statistical significance is not equivalent to scientific human or economic significance.

Do you agree with that?

A. Yes. I think the -- the term statistical significance is very specifically applied to a particular Alpha level threshold and whether or not you pass that threshold.

Q. The next sentence:

Smaller p-values do not necessarily imply the presence of larger or more important effects, and larger p-values do not imply a lack of importance or even lack of effect.

Do you agree with that?

A. Yeah. I think that this agrees entirely with what I've been saying; that having a small p-value doesn't necessarily mean that you have a true, unbiased association. And having a p-value that's just above the threshold of .05, especially in a situation where you're actually have already seen a p-value that's substantially



less than .05, doesn't indicate a lack of effect.

Again, I just want to clarify here.

The situation that we're talking about here isn't in the realm of the examples that are given in the ASA statements. For example, saying, oh, we did a study and there was a p-value of .01 and then another study with a p-value of .06.

Right? That's not the situation we're in here.

Q. Any of those examples in this statement?

MR. TOBEY: Objection. Form.

A. I don't think there's an example of that in this statement.

Q. Okay.

MR. RONCA: Take that down, please. Next one.

Number 6:

By itself, a p-value does not provide a good measure of evidence regarding a model or hypothesis.

Do you agree with that?

A. Yeah. I mean I think that -- I was

just reading what they say below that statement:

Researchers should recognize that a p-value without context or other evidence provides limited information.

And yes, I agree with that.

Q. Okay. Good. So you have a Twitter account, right?

A. That's right. I'm not very active, but yes.

Q. I looked at it. That might be debatable.

MR. TOBEY: Objection. Form. Move to strike commentary.

MR. RONCA: I'll strike it myself.

MR. TOBEY: I think we've been going about an hour. If you're switching topics, should we take a quick break?

MR. RONCA: I'm still on this topic. Let's stay with it for a little bit.

Q. So do you recall -- I'll try -- I'll to make this shorter.

Do you recall referring in your



Twitter in 2020 to an article by Sander Greenland?

MR. TOBEY: Objection. Form.

A. I don't recall replying to that in Twitter, so...

MR. RONCA: Let's look at it then. Exhibit 6447.

(Exhibit 6447 was previously marked for identification.)

Q. There's a tweet -- you actually re-Tweeted. Sander Greenland responding to Andy Grieve.

Do you have any recollection of this? That was a question.

A. Sorry. I was just looking it over.

Yeah. So it looks like I re-Tweeted this statement by Sander Greenland in 2020.

Q. All right. So let's look at the next slide, which is the thread.

So in the Sander Greenland's tweet, he refers to this article, Statistical tests, p-values, confidence intervals, and something else in the European Journal of Epidemiology.

Do you have any recollection of



this?

MR. TOBEY: Can you call out where you're looking? I'm not tracking you.

MR. RONCA: I'm at the bottom in the box that says, link.springer.com.

MR. TOBEY: Okay.

Q. Do you have any recollection of this?

A. Yeah. This looks familiar.

Q. Yeah.

MR. RONCA: So let's take a look at that. Yeah, 6409. No, that's not the right one. Sorry.

Give me a second here, folks. Late in the day.

You know, let's take a break now so I can find this instead of just sitting here.

THE VIDEOGRAPHER: The time is 9:18 p.m., and we're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: The time is 9:47 p.m., and we're back on the



record.

BY MR. RONCA:

Q. Dr. Witte, I'd like to draw your attention to the study authored by Kumar for a second. Just have a couple of general questions. Let's see if you can answer them.

You can look at it if you want. But let me see if you can answer them.

That was a study where all the subjects had H. pylori?

A. Yes, that's correct.

Q. And H. pylori is a Class 1 carcinogen?

A. H. pylori is a risk factor for cancer.

Q. I think it says right in the paper that it's a Class 1 carcinogen.

A. Yes.

Q. And the exposure to ranitidine was 30 days?

A. So from their Method section, we included patients -- we included patients, those who had been prescribed an acid-suppressing medication for at least 30 days.

Q. Did they have a measure of how long any of these patients actually took the medication?
A. Sorry. I'm just looking over the paper now.
They do state they're unable to determine the amount of NDMA count consumed or a particular does-response relationships.
But your question was specifically about ranitidine and how long they took it for, right?
Q. Yes.
A. Okay. (Document review.) So I'm not seeing -- sorry. That took a while.
I'm not seeing mention of the length of time that they were taking the ranitidine for.
Q. To your knowledge, ranitidine is not indicated for H. pylori, right?
A. To my knowledge, no.
MR. RONCA: All right. Can we bring up Exhibit 6456, please?
(Exhibit 6456 was previously marked for identification.)
BY MR. RONCA:



Q. And Doctor, we're going to return with a couple questions about Kim.
So do you know what SEER is, S-E-E-R?
A. Yep. Yes, I do.
Q. What is it?
A. Surveillance epidemiology -- surveillance epidemiology and something research. So that's what it standards for.
Q. So it's -- I'm sorry. Explain what it is.
A. So, it's a -- a database that is -- you know, estimates age-adjusted rates of cancer.
Q. And it's part of the National Cancer Institute, right?
A. That's right.
Q. So, what we did on this chart, and we're only going to look at one because of the time, pancreatic cancer, is we looked at the SEER rates per 100,000 and the rates in the Kim study in the Explorys Database.
And the SEER rates are represented by all those converging lines at the top. And Y Kim rates is the green line



substantially lower.
Can you explain why the Explorys Database had so many fewer pancreatic cancer cases per hundred thousand than the SEER statistics?
MR. TOBEY: Objection. Form.
A. Yeah. I'd have to go back to Kim and look at whether or not they also -- average incidence ratios.
So these were the -- not from their own data, is that correct? These are just what they presented as being the average incidence ratios?
Q. You tell me. You're the expert.
MR. TOBEY: Objection. Form.
A. Okay. I think, again, it's a little bit hard out of context. So the Y Kim quote that you have, that's directly from their paper?
Q. Yeah. And references Table 5.
A. What's the Rawla, et al., that has a rate that's very close to Kim?
Q. That's information regarding Europe and North America.
A. Yeah. So whenever -- you know,



when I'm looking at data like this and I see there's two articles that have similar estimates and then the SEER that's different, you know, that gives more evidence about what might be going on.
So basically Kim and Rawla match up, correct, 7.8 and 7.6 where SER [sic] doesn't. So that's -- I just look at that as a -- as a clue. I'm not saying that something's wrong with the SE -- the SEER data.
Q. Yeah. I don't know that Rawla is pancreatic only?
MR. TOBEY: Objection. I don't know if that's a presentation or a question.
MR. RONCA: Well, I think the doctor asked me. Rawla is overall cancer rate.
MR. TOBEY: Well, but Doctor, you don't need to ask him questions. He'll ask you questions.
THE WITNESS: Yeah. Sorry.
A. So --
MR. TOBEY: Is there an open

question? I'm sorry. I just want to know where we are.
Q. I don't think he finished his answer actually. He asked me a question as part of his answer.
A. So I think the question was why is the green line below the rest of the other lines.
Q. Yeah.
A. I think that's the -- that's the crux of your question.
And I'm guessing that everyone doesn't want me to sit here for ten minutes to try to figure this out. But I mean one thought is maybe that the Y Kim -- I'm not sure whether it's age adjusted. It is, you know, and it's interesting that it's actually matching up with Rawla -- Rawla.
I would say that seeing this difference in the rates doesn't actually change my interpretation of the overall data; that there's no relationship between -- no clear association has been observed before -- between ranitidine and any of the five cancers. And I -- it feels like we're kind



of nitpicking at little bits and pieces of every paper to try to explain what is an overall body of evidence that clearly shows there's no association.
And so we're trying to pick at each paper or shifting over, like the plaintiffs' experts have done, to nutritional and occupational studies because there's no evidence in the 16 studies that have been peer reviewed and published looking at ranitidine and cancer, no one, except for the plaintiffs' experts, has come to the conclusion that ranitidine causes cancer.
Q. Except Cardwell?
A. Cardwell does not say that. He does not say ranitidine causes occasion.
Q. Okay.
A. Clearly --
Q. We're way off the question now.
MR. TOBEY: He was halfway through a sentence. I mean --
A. You said Cardwell so --
(Cross-talk.)
Q. -- editorial that has nothing to do with the original question.



MR. TOBEY: Mr. Ronca, you said, except Cardwell. And he's responding.
I think it's more than fair he gets to respond to your comment or question, whatever it was.
Just please, finish, Doctor.
A. So Cardwell, as I said before, is a great paper because it identifies the fact that their sensitivity analysis showed that when you undertake an active comparator analysis that there's no longer any association whatsoever. Moreover, their sensitivity analysis or their additional analysis looking at nicotine showed an association when they adjusted for smoking between nicotine and bladder cancer.
Now, the only reason I can think of why, why nicotine would still be associated with bladder cancer is because smoking wasn't adequately controlled for in the analysis that did not use an active comparator. But when an active comparator was used, there is no association anymore.
So their sensitivity analysis worked. That's -- that should have been a



red flag for them to say, oh. And, in fact, they do mention that results in their suggestion session. And they say, well, this could be due to confounding by indication because an active comparator analysis didn't show an association.
Q. You done now?
A. Yes. Thank you.
Q. Did you do any kind of check of the statistics in Explorys against the national statistical background rate?
A. No, I -- I didn't. But again, I don't think that this one study is going to change anyone's opinion in the -- in the -- about the fact that there's no association, no clear, valid association between ranitidine and any of the cancers.
MR. RONCA: Okay. You can take that down.
Did you get that exhibit yet?
DOCUMENT TECHNICIAN: Yes. It is marked as Exhibit 6550.
(NOTE: Exhibit 6550 was numbered in error and was later changed to Exhibit 6463.)

(Exhibit 6463 was marked for identification.)
MR. RONCA: Okay.
Q. Doctor, you wrote -- you were co-author with Robert S. White a book called Statistics. I'm holding it.
A. I think we pulled up a different one. Sorry.
MR. RONCA: Thank you for taking it down. I'll get to that in a minute or two.
Q. You're a co-author of a book called Statistics?
A. Yes, with my father. Dr. Witte, both of us.
Q. Right. So you did note in your report that this book was cited in a US Supreme Court case?
A. That's correct.
Q. Was that a gerrymandering case?
A. That's -- that it was a gerrymandering case, yes.
Q. And it was cited for the proposition that .8 wasn't substantially different than 1.0 for purposes of racial



diversity in a congressional district?
A. Oh, boy. I'd have to go back and look at the actual case.
Q. And it was in the dissenting opinion. It wasn't in the majority opinion, right?
A. That's correct. It was used as a -- for a meth -- statistical methodology. It had nothing to do with which side it was used for.
Q. Yeah. And this -- this is a book for undergraduate students and statistics, right?
A. That's right. This is a book that my father initially wrote the first edition. You'll notice that's like the 11th edition, I think.
Q. It is.
A. It is. So my father wrote the first few editions before I received my Ph.D. And he taught for many years undergraduate statistics in the social sciences, so nursing students, psychology students. And this book was used in -- in that type of classroom.
Q. So we established earlier you were



charging $700 an hour for your time?
A. Yes, that's correct.
Q. I almost hate to ask you these questions, but they asked our experts these questions so I'm going to ask the same questions to you.
A. That's fine.
Q. I added up the invoice that you sent us. Came to $339,150, is that right?
A. That sounds about right. I'm not exactly sure to be honest.
Q. And how long have you been working for the defense lawyers in this case?
A. For over two years.
Q. Who is your present employer?
A. Sorry. Who is my what?
Q. Employer.
A. Who's my present employer? Oh Stanford University.
Q. And how much does Stanford University pay you?
A. My salary is approximately in the high $300,000 a year.
Q. Okay. Done with that?
MR. RONCA: Now, we can go to that



exhibit, 6550 I think.
(Exhibit 6550 was later marked as Exhibit 6463.)
Q. So this is going back to your Twitter and you re-Tweeted Sander Greenland's response, which referenced this article.
Are you familiar with this article? It's entitled Statistical tests, p-values, confidence intervals and power, A guide to misinterpretations.
MR. TOBEY: Can we pause one second? I don't think it's in the Box yet.
THE WITNESS: No. I think it was 'cause it went up -- it's 6550 I think.
(Exhibit 6550 was later marked as Exhibit 6463.)
MR. TOBEY: Okay. I see. Yes. I have it now. Sorry. Thank you.
Q. Is this the article you re-Tweeted?
MR. TOBEY: Objection. Form.
A. I'm actually going back. So I'm looking back at the Twitter reference because I'm trying to understand. It's kind hard to

tell because it looks like the top part of this thread. But it says John Witte re-Tweeted Sander Greenland -- a statement by Sander Greenland.
I don't -- in the screenshot that you have, I don't see that I was re-Tweeting a particular article. I thought it was a statement. But, again, I --
Q. Yeah. No. In the -- in the thread, you have to open the thread which is on the next slide?
A. Okay. So -- so I re-Tweeted.
Q. You re-Tweeted this thread with a reference to --
A. Well --
Q. -- Springer.com and this article.
A. I think --
MR. TOBEY: Sorry. Objection. Form.
You can answer.
A. I think I re-Tweeted the first statement in the thread, right? I don't -- I don't know that I re-Tweeted -- I'm, it's -- again, it's hard for me to tell. Because it looks like when we get down, I'm thinking at



the very bottom of the thread, where he says:
That's wrong too in yet another way of not seen. Try this.
And there's one person who -- from what I can tell here one person had re-Tweeted that. But, yeah. Again, I don't -- I don't know exactly which -- which statement in this that I re-Tweeted. The way it looks to me it looks like I re-Tweeted the top part. But that's fine.
Q. Yeah. I mean -- I mean, well, all I do was go to your Twitter on that first one and hit, Show this thread. And then what's when this popped up.
A. Okay.
MR. TOBEY: Objection. Form.
A. Again, it's -- it's -- that's fine. It's unclear to me, though, whether I -- what part I re-Tweeted.
Q. Okay. Well, let me just ask you.
Are you familiar with?
A. Yes, I am.
Q. Okay.
A. Yeah.
Q. And some of the authors are --



MR. RONCA: Can you make the top big?
Q. Sander Greenland, Kenneth Rothman, Steven Goodman, Douglas Altman.
Are these all well-recognized experts in epidemiology and statistics?
A. You know, I don't know Steven Senn. I think you skipped over his name as well, but I know the rest of them.
Q. I don't recognize his name either.
A. Yeah.
Q. I recognize the others though.
I mean they're all top people in this field, right?
A. In epidemiology, yes.
Q. And -- and you've done articles with Greenland, right?
A. That's correct.
Q. And if you're familiar with this article, do you think that this is an authoritative discussion on a statistical test p-values, confidence intervals and power?
Not the authority but an authoritative review?



MR. TOBEY: Objection. Form.
A. I'm looking over the article. There's a long list of items in here.
Q. Yeah. Want to go through them?
A. It's up to you.
Q. I just want to find out if you think that the concepts of this article are valid.
MR. TOBEY: Objection. Form.
A. This is gonna take me a while. There's 25 points made in this article, so...
Q. Let me do this.
MR. RONCA: Can we bring up Exhibit 6445? Do you have that one?
Why don't we test some of this?
(Exhibit 6445 was previously marked for identification.)
Q. I'm going to take this statement. Tell me if you think this is true or not true:
The p-value is the probability that the test hypothesis is true; for example, if a test of the null hypothesis gave P equal 0.01, the null hypothesis only has a 1 percent chance of being true; if instead it

gave P equals 0.40, the null hypothesis has a 40 percent chance of being true.
Do you agree or disagree with that statement?
MR. TOBEY: Mr. Ronca, can you please explain what we were looking at and if there's context to this?
It's like a white piece of paper with a -- just a random quote. No attribution.
MR. RONCA: No. He either it, not answer it or say he doesn't know.
A. No. No. This is -- this is incorrect. And I think in my report I actually give a definition of a p-value, which I think matches up with what Greenland was saying in that tweet.
Q. Okay. Next question?
MR. RONCA: Next slide, please.
Q. Is this true or not true:
The p-value for the null hypothesis is the probability that chance alone produced the observed association; for example, if the p-value for the null hypothesis is 0.08, then there is an 8 percent probability that chance



alone produced the association.
MR. TOBEY: Objection. Form. Same as before. Lack of foundation and context.
Q. True or not true?
A. It's not true, and it's not the definition that I used. If you want to look at -- I mean if you want to go through all 25 of these --
(Cross-talk.)
A. Look at what I wrote. What I wrote --
(Cross-talk.)
A. -- what I wrote in my report will actually kind of short-circuit all of this.
Q. Okay. But I want to do it this way, and I get to ask the questions. So let's go to the next one.
True or not true:
A null hypothesis p-value greater than 0.05 means that no effect was observed, or that absence of an effect was shown or demonstrated.
MR. TOBEY: Same objection.
A. So I think, as I mentioned earlier,



in the -- in the epidemiologic literature people commonly use an example of P .051 or .06 and it's generally tied into another example of a p-value that's substantially less than .05 to show that -- that an association that -- that the .051 does not mean that there was no effect observed.
Q. So this statement is not true?
MR. TOBEY: Objection. Form.
A. I think that -- that, yeah. But as the authors of -- which I think as the authors of one of the articles that we cited when we discussed this said, it's not an anything goes situation, where everything's associated with everything else.
Q. Okay.
A. And again --
Q. True or not true?
MR. TOBEY: Objection. Form.
A. Okay. I think I said yes. And there's a particular situation where you have a replicated data and you initially see a small p-value and then you replicate it, that that's -- even if the P is .07 or something like that.



Now, just to clarify, this is not the situation we're talking about here. And I don't -- apart from the plaintiffs' experts, no one has concluded that based on the results in the studies of ranitidine and cancer that there's a valid association in human -- in human data, let alone a causal association.
MR. RONCA: Next slide.
Q. True or not true:
Statistical significance indicates a scientifically or substantially important relation has been detected.
MR. TOBEY: Same objection. No context. No attribution.
Q. True or not true?
MR. TOBEY: Objection. Same objection.
A. I think that -- I think this is addressing the concern I raised that was the very first sentence of the ASA President's Task Force, and that is false positive associations and the replication crisis.
So I agree with that. So seeing something with a P less than .05 doesn't

indicate that it's scientifically or substantively important relation has been detected.

Because we have seen so many results that weren't replicated that -- that were -- basically they had a P less than .05 in an initial finding, and that false positive was never further confirmed in other studies.

Q. So this is not true?

MR. TOBEY: Objection. Form.

A. That's correct. As I just said, P less than .05 doesn't necessarily mean that that's a real association.

MR. RONCA: Next slide.

Q. True or not true:

Lack of statistical significance indicates that the effect size is small.

MR. TOBEY: Objection. Form.

A. Again, I'll return to the example I gave.

Let's say a very small p-value and a -- a relative risk of 3 and then a follow up study that has the same relative risk and the fact that it may not have -- may not be



statistically significant. I think I gave an example of a lower bound being .99, but obviously with a wide confidence interval.

Q. So this statement is not true?

MR. TOBEY: Objection. Form.

A. No. I think -- I think I just gave an example of -- you know, now, again, I will return to the fact that that's not the situation we're talking about here in this case with -- with the ranitidine and cancer, right?

Q. But the statement is not true?

MR. TOBEY: Objection. Form. Asked and answered.

Q. You agree, right, it's not true?

MR. TOBEY: Objection. Form.

A. I think that the -- that any epidemiologist is going to look at all the data and they're not going to say, Here's a whole bunch of weak evidence. They're not statistically significant, therefore, that that somehow indicates an association.

MR. RONCA: Next slide.

Q. True or not true:

Statistical significance is a



property of the phenomenon being studied, and thus statistical test detect significance.

MR. TOBEY: Objection. Form. Lack of foundation. Lack of context.

Q. True or not true?

MR. TOBEY: Same objection.

Q. Answer?

MR. TOBEY: Was that a command?

Q. If you have an answer. If you don't have an answer, just tell us. We've been sitting a long time waiting for you to respond?

MR. TOBEY: Objection. Form. Move to strike commentary.

A. So the -- so I would say that's not true. That statistical -- statistical significance is kind of whether or not your p-value is on one side of an Alpha level or not.

MR. RONCA: Take down exhibit, please.

Q. Isn't it true the whole controversy about statistical significance is the word "significance"?

And what the reformers want to do



is say these are statistical tests, and what you should do is report the point estimates and the p-values or confidence intervals or both, and not have a cut point of significance and non-significance.

Isn't that the whole controversy wrapped up in a few sentences?

MR. TOBEY: Objection. Form.

A. Yeah. And it's -- it's, as we saw in the ASA President's Task Force, I mean those statisticians unanimously agreed that P less than .05 in certain situations is valuable.

Give you in genetic research, we use statistical significance testing all the time. And the reason for that is because the literature is full of false positive findings that didn't use a strict off-the-level threshold that the p-value had to be less than.

So, in that case, we use a -- we don't even use .05 we use .05 divided by a million. So we are using statistical significance in that case to distinguish genetic associations that are statistically

significant but are less than .05.
So, yes, the -- the controversy is whether or not something below .05 is true so as people will say that, or something just above .05 is false, right? But the -- the reality is that there are times like in my own work with genetic epidemiology where using a statistical significance threshold is very important for avoiding false positive results. And again, that was the very first statement of the ASA President's Task Force.
And then again, statement by those who are arguing to retire that p-value less than .05 is we are not advocating for an anything goes approach, right? They're not saying any relative risk different than 1 shows a positive risk, right? And the examples that are most commonly use are a small p-value followed up with a p-value at just about .05.
So in -- that's an example of why and where the concern is with using a threshold of P less than .05.
Q. Finished?
A. Yes. Thank you.



Q. Good.
MR. RONCA: Let's go back to 6397, page 10.
Q. In section, looks like Roman numeral I.E. Factors Considered in Exploring Causation.
You refer to the -- what have been called the Bradford Hill viewpoints or criteria for causality, is that right?
A. That's right.
Q. And you have a quote there from Dr. Hill? At the top --
A. At the very -- sorry. Are you at the very top?
Q. Yeah. Reference 51.
A. Okay. Yeah. So that reference 51 is to Bradford Hill's seminal paper.
Q. Right.
MR. RONCA: So let's go to Exhibit 6405. Go to the next page.
(Exhibit 6405 was previously marked for identification.)
Q. Wait. First of all, is this Bradford Hill's seminal paper?
MR. TOBEY: Objection. Form.



Q. Reference 51?
A. Yep, that's it.
Q. Yeah.
MR. RONCA: So let's go to the second page. See the part that I've highlighted? Can we pull them both up?
MR. TOBEY: What's the exhibit number? I'm sorry.
MR. RONCA: Yes, it's 6405.
MR. TOBEY: It just popped up. Sorry. I got it now.
BY MR. RONCA:
Q. So I'll quote Dr. Hill:
In thus putting emphasis upon the strength of an association we must, nevertheless, look at the obverse of the coin. We must not be too ready to dismiss a cause-and-effect hypothesis merely on the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so.
Did I read that correctly?
A. Yes. You did read that.
Can you point me to where it is in



the article? Bottom of -- okay. I found it. Thank you.
Q. Yes. Did you quote this in your report, this quote?
A. This specific quote?
Q. Yeah. This specific quote.
A. I think -- the -- no. I didn't quote that. I believe this quote is talking about the effect size, which we discussed at length. So strength of association is often considered the magnitude of the relative risk.
And in the second sentence he talks about the grounds that the observed association appears to be slight. So I think we're talking about p-values or statistical significance.
This is the magnitude of the association. And so I think what he's saying is that even if you detect a clear-cut association, if that's only 1.2 but it's a clear-cut association, don't dismiss that just because it's only 1.2, right?
Q. Okay. I got it. We're done with that exhibit.

Page 366
J. Witte

Let's go to page 5 of your report. That's Exhibit 6397. You'd think I'd remember it at this point.
In your section on confounding and bias, you talked about the coffee and cancer episode?
A. That's correct.
Q. So that episode was from 1981?
A. Yes.
Q. I have copies of it. You want me to go through it with you?
A. No. I was just going to say it's still -- I mean people are still writing about this. They're not still but in the just more recent time. But yeah, go ahead. Sorry.
Q. Okay. And so this is 33 years ago -- no, 40 years ago, right?
A. The initial paper. And -- and the amazing thing is that people are still disentangling this false association today. I mean there's papers being written discussing this, well, I mean today in the 21st century.
Q. But this was debunked in 2002 as

Page 367
J. Witte

indicated in your reference number 28, right?
A. That's right.
Q. And where do you think the authors referenced in number 28 are from?
A. Of 28?
Q. Yeah.
A. So, they're from, I believe they're currently the Imperial College of London?
Q. How about University of Bristol?
A. University of Bristol, yeah.
Q. That's right. And who else is from University of Bristol?
MR. TOBEY: Objection. Form.
Q. Dr. Hidajat?
A. Okay.
Q. And all those studies from McElvenny and de Vocht and Hidajat and that team, they're all from the epidemiology department at that same university, right?
A. I would -- I'll take your word for that. I'm not entirely sure whether they're all in the same division, department.
Q. Trust me. And --
MR. TOBEY: Objection. Form.
You don't have to take his word

Page 368
J. Witte

for it. If he wants to make a representation, you can rely on it for the purpose of a question.
Is that -- is that what's happening here?
MR. RONCA: No. We're having a -- a little thing, he and I -- we're tired and it's been a long day.
MR. TOBEY: Okay. I don't want to make an objection and move to strike the thing, but go ahead.
MR. RONCA: Sure. Sure.
Q. And you would think that the people who revealed this problem would know about it so they wouldn't repeat the error, right?
MR. TOBEY: Objection.
A. So I think that -- so you're saying that George Davey Smith is a co-author on the occupational epidemiology studies.
Are you saying that just because he's in the same department he's somehow is involved with that project?
Q. No. I'm saying isn't there an implication that the people at University of Bristol know what they're doing and wouldn't

Page 369
J. Witte

fall into the coffee and confounding conundrum that you talk about on page 5 of your report?
MR. TOBEY: Objection. Form.
A. I -- that's a -- a broad generalization that I think if we want to go and talk about each person in that department, I'm happy to. But I think...
Q. I'm sure you would be.
Can we think of another --
MR. TOBEY: Move to strike the side comment.
MR. RONCA: I'll strike it myself.
Q. Okay. Let's -- can we think of an example, a more recent example where an active comparator study failed spectacularly? Can you think of one?
MR. TOBEY: Objection. Form.
A. I'm not entirely sure what you mean by "failed spectacularly." But off the top of my head, I -- I can't think of one.
Q. How about the Vioxx study versus Naproxen?
A. I think looking at -- if you'd like to refer to that study, maybe we should pull

it up and talk about it.
Q. You never heard of the VIGOR study of Vioxx versus naproxen?
MR. TOBEY: Objection. Form.
Q. Randomized control trial?
MR. TOBEY: Objection. Form.
A. I thought you'd asked me about an active comparator study.
Q. Wouldn't naproxen be a COX-1 and 2 inhibitor and Vioxx a COX-2 inhibitor, wouldn't they be active comparators as antiinflammatory drugs?
MR. TOBEY: Objection. Form.
A. I'm just saying you asked me for an example of an active comparator study, which is not a randomized controlled trial, right? It's an attempt --
Q. No. Any study. Any study. Any study where there was active comparators and it failed spectacularly.
MR. TOBEY: Objection. Form.
A. Okay. So you're not asking me about an active comparator study, which we will agree is a particular study design that is considered a very appropriate method to



control for potential confounding from any study that was comparing two different things?
Q. No. Any study with active comparators because they wanted to control the different things.
MR. TOBEY: Objection. Form.
Q. They wanted to do exactly what you're saying. They wanted to see if you took a COX-2 inhibitor instead of an NSAID, which is a COX-1 and COX-2 inhibitor, they wanted to see if you got ulcers. And they wanted to flatten everything else out --
(Court Reporter clarification.)
Q. They wanted to take all the other effects out so they compared two antiinflammatories as active comparators to each other.
You have no recollection of this? 'Cause it was all over the news, and one of the biggest drugs in the world went off the market.
MR. TOBEY: Objection. Form.
A. So, yes, I -- I am aware of that. But I think if we're going to talk about it



it would be good to look at the paper you're specifically -- the randomized control trial that you're specifically looking at. I don't think that that's analogous to the situation here where the active comparator studies are seeing no association.
And even Cardwell's sensitivity analysis, which I mean they did that for a reason, and that was that they were concerned that the results were sensitive but for to potential well-known bias in looking at H2RAs and cancer. So they undertook a sensitivity analysis and showed that the results were null.
Q. So this was an act -- VIGOR was an active comparator study where they completely missed the adverse outcome and --
MR. TOBEY: Objection.
Q. Let me finish.
MR. TOBEY: I thought that was a question.
Q. And then they did a follow-up study, but this time they added a placebo on. In other words, an arm of non-users, and then they saw the outcome.



Do you recall this episode?
MR. TOBEY: Objection. Form. Assumes facts not in evidence.
A. I think, as I said before, it would be good to look at the specific study that you're talking about. And I think you're -- you're pulling out a single example of a randomized control trial, which the relevance to the study at hand is the active comparator study -- not a randomized control trial, these are observational studies -- did not detect any association between ranitidine and cancer in humans.
Q. So it's okay for you to pull out a 40-year old specific example, but it's not okay for me to pull one out that's 15 years ago?
A. Well, if you -- this is in my discussion about different properties of confounding and bias. I wasn't making any inference about the particular studies at hand here. But it wasn't -- it doesn't have anything to do with the -- with the timing of how old that study is.
MR. RONCA: You're going to be

glad to hear my next words: No further questions. I reserve the remainder of my time for after rebuttal.

MR. TOBEY: Thanks, Mr. Ronca. Can I just take, let's say, five minutes max just to go over my notes and then we'll come back on?

MR. RONCA: No. You can have six minutes.

THE WITNESS: Thank you.

MR. TOBEY: Thank you. Appreciate you.

THE VIDEOGRAPHER: The time is 10:47 p.m., and we're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: The time is 10:56 p.m., and we're back on the record.

MR. TOBEY: Thank you.

Defendants have no questions, so we can close the deposition and adjourn.



MR. RONCA: Thank you, Dr. Witte. I'm sorry if I got a little forceful at times. And have a good rest of your day.

Tobey -- I'm going to call you Tobey because I have a friend who's Toby. Thanks.

MR. TOBEY: Thanks, James. Have a good night.

MR. RONCA: Everybody, have a good night. Bye-bye.

THE VIDEOGRAPHER: This concludes today's testimony for the remote video deposition of Dr. John S. Witte. The time is 10:56 p.m. and we're going off the record.

(Time noted: 10:56 p.m. Eastern Time)



J U R A T

I, JOHN S. WITTE, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 19, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

_______________________

JOHN S. WITTE

Subscribed and sworn to before me

This _______ day of __________, 20__.

___________________________________

NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, JOHN S. WITTE, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of May, 2022.

Candida Borriello

CANDIDA BORRIELLO

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 19, 2022
Deponent: JOHN S. WITTE

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |

_________________________
JOHN S. WITTE

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

Exhibits

**EX 6458 John S. Witte, Ph. D. 051922** 6:11 58:11
**EX 6459 John S. Witte, Ph. D. 051922** 6:14 202:7,8
**EX 6460 John S. Witte, Ph. D. 051922** 6:15 202:25
**EX 6461 John S. Witte, Ph. D. 051922** 6:16 233:3
**EX 6462 John S. Witte, Ph. D. 051922** 6:18 289:7
**EX 6463 John S. Witte, Ph. D. 051922** 6:20 345:25 346:1 349:3, 18

$

**$300,000** 348:23
**$339,150** 348:9
**$700** 24:18 348:1

0

**0.01** 353:24
**0.05** 329:9 330:22 355:21
**0.05'** 327:15
**0.08** 354:24
**0.12** 322:21
**0.40** 354:1
**0001** 286:14 330:9
**01** 242:20 333:8
**049** 309:9
**05** 286:19 290:10 308:6 311:5 312:19 313:1,3 323:20 327:22 328:11 329:23,25 330:5 331:3, 25 332:23 333:1 356:5 357:25 358:6,13 361:12,22 362:1,3,5, 14,20,23
**051** 309:6,8 311:16 328:3 330:10 356:2,6
**06** 333:9 356:3
**07** 356:24

1

**1** 16:19 25:10, 18 41:18 50:5 81:7 115:2 133:22 146:16 166:10 167:3 171:21 179:13 190:11,13 191:2 199:24 200:1 201:18,21 202:14 213:23 248:6,14 250:8 269:2 287:17,18 315:6 337:12,17 353:25 362:16
**1,280** 259:14
**1,290,945** 190:6
**1,522,653** 180:18
**1,522,808** 180:9
**1.0** 15:1 18:4,6 20:9 190:21, 24 191:4 201:3 291:25 313:19 316:7 322:10 323:13 346:25
**1.00001** 16:16
**1.01** 180:12 314:2
**1.04** 190:9
**1.2** 167:18 365:21,23
**1.25** 242:21
**1.27** 190:8
**1.3** 190:5
**1.30** 180:12
**1.5** 21:13,16 314:19 315:19 322:20 325:13 326:4
**1.56** 190:9
**1.68** 179:11 180:12
**1.76** 186:12
**10** 16:19 25:11 217:12 220:24 221:6,12,20, 21 226:23 283:11 363:3
**10-year** 163:23
**100** 18:17,19 221:2
**100,000** 339:21
**103,565** 213:25 248:16
**105** 180:8
**10:47** 374:15
**10:56** 374:20 375:15,17
**11** 36:12 246:3
**11th** 347:16

**12**
245:24 246:2 314:20 318:24
**124**
144:5 231:10
**12:08**
7:4
**13**
317:20
**133**
180:10
**135**
28:13
**136**
29:5
**137**
29:10
**138**
29:13
**139**
29:14
**14**
25:23
**15**
38:14 165:22 175:23 373:16
**150**
214:9,18 215:10,15
**150-milligram**
216:13 218:16 226:20,22
**16**
20:13 39:4 50:4 99:23 139:15 215:1 223:14 255:14 262:1 316:17 317:12 343:9
**170**
251:20 254:15
**18.25**
314:20 318:24 322:21
**180**
251:18,19 254:11
**19**
7:5 147:3
**1943**
162:9
**1977**
163:14
**1981**
366:8
**1987**
87:7,12,14,15,20 88:2,4,7,8 93:16
**1995**
163:15
**1996**
211:20
**1999**
208:10 209:9
**1:16**
59:20
**1:29**
59:25
**1s**
183:13
**1st**
266:18

**2**

**2**
28:7 171:21 205:18,23 206:15 248:14 283:15,17 309:13 318:25 370:9
**2,534,288**
180:10
**2.4**
133:24
**2.5**
167:20
**2.6**
167:16
**2.9**
168:2
**2/28/2023**
70:5
**20**
123:6 129:1 203:16 233:9 243:23
**200**
245:23
**2002**
93:17 366:25
**2003**
210:6
**2006**
207:9,16
**2007**
207:20
**2008**
208:10,16
**2009**
207:10,16 256:20
**2010**
208:7,23 209:19
**2012**
245:23
**2016**
300:9
**2018**
208:7,23 209:20 256:21
**2019**
103:14 303:19 307:8
**2020**
335:1,18
**2021**
38:15 55:6 211:20 243:23
**2021a**
29:6 33:2,12,23 241:9
**2022**
7:5 87:13 163:1
**21st**
366:24
**23.97**
289:22
**24**
233:9 277:20
**25**
353:11 355:8
**250**
17:12 18:2
**26**
29:10
**28**
367:1,4,5
**29**
298:9 320:3,17,22
**2:42**
112:4
**2A**
87:5

**3**

**3**
112:9 167:23 190:24 198:13 204:22 205:4 248:14 311:24 358:23
**30**
123:6 129:1 243:23 287:15 337:20,25
**300**
214:9,18 215:10,16

**300-milligram**
216:11
218:14
**300-plus-page**
324:7,22
**31st**
266:22
**32**
59:6 151:8
**32.2**
289:22
**33**
366:17
**360**
256:14
**365**
266:19
**37**
287:16
**37.67**
286:12
**38**
190:21
**39**
24:23
**3:05**
117:23
**3:09**
122:1

**4**

**4**
248:14
318:25
**4.4**
133:24
**40**
24:25 354:2
366:18
**40-year**
373:15
**43**
59:6
**44**
24:25
**45**
25:11,24
26:4 181:6
231:10
232:14
286:11
**46**
232:13
**47**
232:5
**48**
144:4 232:5,
7,9 279:10
**4:30**
177:9

**5**

**5**
133:25
248:13,18,20
331:12
340:20 366:1
369:2
**5,000**
35:19 39:2,8
**5.6**
134:1
**5.8**
168:5
**50**
25:25 26:15,
16 145:2
215:9 265:6
314:10,13,16
315:15,21
321:18
323:7,23
325:8,17
326:2,11
**51**
363:15,16
364:1
**52**
207:25
**53**
186:12
**54**
25:11
**55**
241:25
**55,934**
249:4
**5600**
39:21 41:8
**57**
28:13
**58**
207:23
**5:09**
177:14

**6**

**6**
92:11 106:25
333:20
**6-0**
202:22
**6-4**
202:22
**6.7**
133:25
**60**
210:9
**614**
268:22,24
**62**
190:20,23
**6397**
24:1,2 29:18
81:7 143:23
146:15 231:9
241:25 298:9
320:9 363:2
366:2
**6399**
90:8,9
**6400**
162:14
205:25 206:3
213:5
**6401**
162:19,20
178:15 203:6
213:22
247:14
**6403**
306:10,11
310:13 327:7
**6404**
301:11,12
**6405**
363:20,21
364:10
**6406**
237:8,9
**6409**
336:12
**6410**
101:18,19,22
203:5
**6420**
69:11,14
**6423**
249:11,12,15
283:9
**6440**
274:22,23
275:3
**6445**
353:14,16
**6447**
335:7,8
**6456**
338:22,23
**6457**
114:4,5
122:4
**6458**
58:11
**6459**
202:7,8
**6460**
202:25
**6461**
233:3
**6462**
289:7
**6463**
345:25 346:1

349:3,18
**65**
210:8
**653**
180:24
**6550**
345:22,23 349:1,2,15,17
**66**
28:13 201:12
**69**
300:5 313:24
**6:16**
227:20
**6:17**
227:22
**6:26**
228:1
**6:54**
247:6
**6:59**
247:11

**7**

**7**
115:6 122:8 248:19 281:16 283:11
**7.6**
341:7
**7.8**
341:7
**70**
289:21
**716**
190:7
**73**
256:14
**75**
214:8 215:9 233:11
**79**
201:13

**8**

**8**
122:8 248:14 346:24 354:25
**80**
233:11 289:16,19
**854**
308:15
**8:06**
293:15
**8:23**
293:20

**9**

**9**
107:1
**9,630,580**
190:7
**90**
217:13 220:24 221:6,13,20 225:15 226:20
**900**
221:2
**94**
168:17
**95**
16:18 18:5 19:8 23:5 180:7 186:12 190:8,21,24 191:3 201:8 238:23 291:23 292:2 314:4,19 315:8,11 319:17 321:15 322:20
**96**
210:7
**97**
186:11
**98**
25:3 31:7 49:10,22
**99**
21:12 201:21 359:2
**9:18**
336:20
**9:47**
336:25

**A**

**A.1.1**
231:12
**a]ccess**
38:22
**Aarhus**
182:7
**ability**
74:18 121:12
**able**
68:14 69:21 116:21 117:6 130:8 138:10 143:14 168:22 184:21 185:7 236:14 296:14 301:22
**above**
13:13,18 15:1,16,20,22 18:4 19:12 242:21 328:11 330:5 332:23 362:5
**absence**
355:22
**absolute**
129:11 225:25
**abstract**
266:12
**abuse**
218:22
**abusive**
53:1,2 74:6 81:3 141:13 217:23 326:23
**accepted**
262:21 263:4,8
**accepting**
253:8
**access**
242:16 275:13 297:14
**accomplishes**
58:7
**account**
153:23 308:21 334:8
**accurate**
162:9 171:22 172:19 176:7 258:23
**accusation**
137:2
**acid**
148:9
**acid-suppressing**
169:11 337:24
**acid-suppressive**
166:24 167:5
**acknowledge**
7:17,21
**acronym**
156:20
**across**
91:12 113:5 179:21 189:22 190:2 209:9 223:12

234:8 274:16 294:24 304:5
**act**
372:15
**actions**
299:13 313:13
**active**
25:24 26:3, 10 27:6 114:25 140:10 147:13 155:5,24 158:6,17 160:1 175:14 192:22 195:14,17, 21,25 198:1 231:13,24 232:3,16 234:3 235:2, 12 236:8,24 237:3,6 239:24 250:3 276:14,16 277:2,8 334:9 344:10,21,22 345:5 369:16 370:8,11,15, 19,23 371:4, 17 372:5,16 373:9
**activity**
62:21
**actual**
74:19,22 116:22 137:25 248:21,22 267:9 302:25 347:3
**Adami**
26:6 37:14 40:20,23 140:13 154:6,17,22 155:17 157:15 160:8,23 162:4,11,12, 14,16,23 168:23 170:6 178:14 180:19 181:16,21,25 182:2,12 183:1,9,16, 22 184:13 185:8 186:11,17,18 187:1,9 188:21 191:13 192:11 204:16 228:21 229:1,21,25 230:2,5,21, 25 231:4,12 245:12,15,22 246:10 247:13,20 263:6
**Adami's**
37:16 182:5 184:3
**add**
127:11 138:9 151:1 168:10 211:15,17 330:6
**added**
81:16 82:4 137:12 168:11 283:25 348:8 372:23
**adding**
142:3 187:2
**addition**
23:18 28:23
**additional**
14:14 30:5 33:6 46:20 87:11 344:13
**address**
303:19 307:8
**addressing**
357:20
**adduct**
96:16
**adenocarcinoma**
179:10,17,25 180:11 181:2 187:10 188:17 189:22,25
**adenomacarcinoma**
190:4
**adequately**
344:20
**adjourn**
374:25
**adjust**
164:14 232:1 236:15
**adjusted**
157:24 158:19 236:10 342:16 344:15
**adjusting**
156:5,6 193:1 235:15
**administered**
7:22
**Administration**
29:15
**admissions**
163:13 175:1
**admit**
218:14
**adverse**
222:16,18 372:17
**advocating**
299:23 300:3 313:25 314:1 362:14
**affect**
193:23 260:20 261:1
**afraid**
321:24
**afternoon**
8:17
**afterwards**
87:17
**age**
283:23 342:16
**age-adjusted**
339:13
**Agency**
83:11
**agent**
83:8
**aggregate**
251:2 252:5, 13,15,17,21, 23 253:1,11 254:23
**ago**
170:18 175:23 321:2 366:18 373:17
**agonist**
41:23
**agree**
12:3,9,13, 15,20 19:22 20:10 49:21 79:20 80:16, 20 81:20 85:10,19 93:9,12,19 94:13 95:2 97:6 99:14 100:21 105:10 106:11 107:6 110:11 113:16

122:19
124:4,14
125:14
127:15,18
130:12
131:15
145:19,22
157:19
164:23
165:25
167:13 179:2
216:15
221:19
249:25
272:11
309:7,21
310:3,23
311:24 312:2
327:18
328:17
329:3,12
331:1,3,16
332:6,17
333:24 334:6
354:3 357:24
359:15
370:24

**agreed**
11:15 329:1
361:11

**agreement**
113:5

**agrees**
331:7 332:18

**ahead**
14:7 28:6
34:9 52:9
85:5 123:25
135:17
166:16,21
175:20
272:20
312:17 326:8
366:15
368:11

**aim**
70:21 71:10

**alcohol**
192:6,8,13,
16,18,21
230:25 231:5
284:1 290:20

**allow**
151:22
152:20,22

**allowed**
84:4

**aloud**
232:20

**Alpha**
332:9 360:18

**alter**
63:9

**alteration**
65:5,10

**alterations**
64:15

**altered**
78:9

**alters**
62:10 63:24
65:21 67:19
76:23

**Altman**
352:4

**amazing**
366:20

**amenable**
113:19

**America**
340:24

**American**
298:19
300:7,11,17
303:1,20
304:18,22,25
305:3,13
307:2,6,9,22
323:18

**amount**
171:23
189:17
223:5,7
235:6 273:25
294:7 338:7

**amounts**
168:4

**analogous**
372:4

**analyses**
158:18
182:18
235:3,9,10
252:1,19

**analysis**
52:19
155:12,13
175:14
185:9,12
186:23 187:7
188:15
190:18,25
210:1 214:25
217:4 226:6
230:10
234:3,7,11,
15 235:13
236:9,24
237:6 239:5,
18,24 266:8
295:13
327:12 329:6
344:9,11,13,
14,20,24
345:5 372:8,
13

**analyzed**
51:9

**ancillary**
293:6

**Andy**
335:12

**angle**
74:13

**animal**
83:13,21
84:2 86:25
87:20 89:7
90:3 93:8,
13,14,25
94:1 95:5
106:19,21
111:6,10

**animals**
93:8 96:25
99:3 105:17

**Anne**
29:14

**annual**
206:10,11
213:7

**answer**
9:8,11 11:3,
12,17 16:25
21:5 22:22,
25 30:25
36:7,11,15
52:4 56:7
57:13 61:4,
10 64:7
66:23 67:4
68:2 69:1
74:19,21
75:8 77:6
79:7,10,12
80:11,25
81:2 84:6
85:3 89:13
91:15
106:14,16
113:17 116:5
127:4,10
131:5 133:1,
4 135:13
136:8 137:9,
20 138:1,2
141:21
147:25 165:5
171:8 174:6
175:20
176:6,13
184:21 186:6
196:19,22
212:11
214:21 220:5
234:24
243:15 256:2
259:4 261:14
266:7 273:15
287:24

302:11 308:25 312:10,11, 15,16 319:7 322:1 326:8, 24 328:22 329:14,20,21 337:6,8 342:4,5 350:20 354:12 360:7,9,10
**answered** 22:12,24 33:21 37:9 51:3,13,23 65:12 68:8 75:7,21 77:15 80:5, 23 82:25 87:25 93:22 99:19 102:23 135:15 143:8 159:1 176:12,15 177:5 220:12 321:25 322:8,25 324:10,12 327:20 328:20 329:17 359:14
**answering** 34:8 38:8,10 138:8 142:2, 7 171:1 214:22 240:23 261:13 271:3
**answers** 53:11,20 132:24 133:3 142:11 218:7
**anticipate** 66:5
**antiinflammatories** 371:17
**antiinflammatory** 370:12
**anxious** 11:12
**anybody** 82:13 212:3 292:14 325:23
**anymore** 25:13 82:7 264:15 344:23
**anyone** 16:21 34:19 35:12 40:24 44:11,20 45:7 64:17 85:24 96:5 218:25 224:22 264:14
**anyone's** 345:14
**apart** 82:19 195:19 325:7 357:3
**apologize** 218:21
**apologized** 219:21
**apparently** 108:19 168:23
**appears** 96:24 97:9 99:2 111:1,7 281:8 364:20 365:15
**appendix** 25:10 28:7 37:5 50:5 115:2 133:22 139:10
231:12 290:17
**applicable** 51:17
**application** 72:12
**applied** 51:10 70:20 298:23 299:7 332:9
**appreciate** 84:5 138:10 141:24 228:11 374:12
**approach** 232:3 313:25 314:1 315:4 318:7 323:21 331:6 362:15
**appropriate** 72:8 142:16 253:2 331:6 370:25
**approximately** 259:14 289:17 348:22
**area** 54:23 273:18 284:6
**argue** 64:17
**argued** 299:21 303:6
**arguing** 191:13 227:8 362:13
**argument** 95:22 99:12 191:23 235:21
**Argumentative** 36:18 44:22
**arising** 99:25
**arm** 372:24
**arms** 196:25
**around** 103:24 113:17 319:22 320:15 331:19
**arrangement** 8:2
**arrow** 200:10,12,20 276:19
**arrow's** 202:17
**arrows** 200:4,9 202:13
**art** 295:7
**article** 50:2 150:12 264:8 268:2 303:15 307:4 323:18 335:1,22 349:6,7,21 350:7,16 352:20 353:2,7,11 365:1
**articles** 15:4 303:9 341:2 352:16 356:12
**ASA** 300:19 301:2 302:17,19 303:11,20,21 306:3,4,14, 21 307:10, 12,15 309:14 313:11 323:16 327:7 331:7 333:6 357:21

361:10
362:11
**ascertainment**
162:10
172:20 176:8
**ascribe**
185:7
**asked**
20:16 22:12,
24 32:16
33:21 37:9
40:7 44:25
46:17 51:3,
13,23 52:2
57:8,11,18
65:12 66:8
68:8 69:1
75:4,6,20
77:15 80:5,
22 82:25
87:25 93:22
99:19
102:15,22
104:24,25
109:1 110:1
136:10 143:7
144:1 146:2
158:25
176:11,15
177:5 191:5,
10,21 200:25
204:4 218:8
220:9 238:15
242:5,14
243:10 259:2
316:20,22
319:11
322:7,25
324:9 327:20
328:19
329:17
341:18 342:4
348:4 359:14
370:7,14
**asking**
13:16 15:2
20:18 21:5,7
32:10,14,16
35:24,25
37:24 45:5,
13 57:17
60:10 64:10,
11 65:8 66:9
68:19,22
72:25 77:24,
25 80:12
86:2 94:23
105:22
106:11
109:11,20
113:1 116:3
134:16
135:12
136:11
137:19
138:12 141:3
150:16,17
159:15
160:14 161:8
172:6,7,22,
24 173:2,16,
17,18 174:3,
17 176:21
191:12
192:15,17
212:7 321:2,
4,7,9 370:22
**asks**
39:23
**aspect**
297:4
**aspects**
97:9 215:4
**aspirin**
222:14,17,
24,25
**assertion**
98:2
**assess**
122:15,23
124:2,8,21
125:6 126:1,
4 130:1,4,5
132:4,16
133:19 136:1
173:13
268:15
299:21 303:6
**assessed**
124:11,13
134:9 135:21
**assesses**
12:16
**assessing**
12:25 135:1
**assessment**
13:19 48:7
90:14 92:25
101:23
103:4,8,18,
21 104:1
105:10 107:2
127:16 146:6
**associate**
9:20 10:4
**associated**
147:22
148:18
150:22
169:19 195:8
238:6 264:22
268:6
286:22,25
316:3 331:6
344:18
356:15
**association**
13:1,3,11,
14,15,17
14:2,11,12,
16,19 15:1,
8,15 16:4,8,
10,20,22
17:6,15
18:4,10,23
19:19,24
20:6,11,22
21:20 22:8
41:22 50:8
52:18 90:2
97:23 98:15,
16 99:25
100:9 101:2,
4 111:15,16
125:3,16,20
127:14,17
130:8,10
132:5,15
133:10,20
140:24
143:14
146:24
150:10,13
151:4 154:10
156:7 158:16
170:20
186:13 187:9
188:1,16
191:18
193:2,4,7
194:3 195:5,
11,12 196:14
198:19
201:22
214:25 222:3
223:10,15,
20,21
233:16,19
234:2,4,9
235:13,16,22
236:10
239:11 240:2
255:15 262:1
268:15
274:18
287:11
288:5,11,12
293:11
300:7,18
303:2
304:18,23
305:1,4,14
307:3,7,22
311:6,7,20
313:4,19
314:3 316:16
322:11
327:23
328:5,9
329:24
330:16
332:22
342:23 343:4

344:12,15,23 345:6,15,16 354:23 355:1 356:6 357:6, 8 358:14 359:22 364:16,20 365:10,15, 19,21,22 366:21 372:6 373:12

**Association's**
298:20 300:11

**associations**
19:18 71:16 128:20 129:17 133:14 158:21 225:12 299:22 303:7 305:24 331:25 357:23 361:25

**assume**
9:9 16:17 48:17 49:8 93:7 105:19 106:6,10 168:8 206:24 209:13 210:14 217:21 219:4 220:21 225:14 226:18 258:13 276:5 278:18

**assumed**
210:1

**assumes**
84:20 95:20 373:3

**assuming**
61:20 105:15,24 106:21 131:21 134:3,23 168:6 193:14 201:24 208:3,12 221:11,13,17 301:1 311:20

**assumption**
148:21 239:20,22 291:24

**assumptions**
323:4

**assure**
92:2

**astigmatism**
92:14

**atropic**
284:3 290:2 291:3

**attachment**
28:11,16,22 30:24 31:2 36:13 37:5,6

**attacking**
74:6 218:2

**attempt**
240:11 244:25 370:17

**attention**
337:4

**attorney**
8:15 52:11 95:22 99:12 191:23

**attorney-client**
112:21

**attorney-expect**
112:21

**attorneys**
7:15

**attribution**
354:10 357:15

**audio**
17:20 284:10

**Australia**
95:17

**author**
17:5 38:24 204:5 240:24 245:20,24 246:3,14 249:19 264:16 285:9

**authored**
303:10 337:4

**authoritative**
352:21,25

**authority**
352:24

**authors**
124:5 125:10 129:19 153:18 204:15 209:5 215:8,12 238:9,11 240:7 273:17 287:3,21 288:19 292:12 313:24 314:11,21 315:15,24 318:15 325:18 326:25 351:25 356:11,12 367:3

**Availability**
38:20

**available**
41:3 205:14 210:17 235:11 242:8 264:14 269:14

**average**
134:4,24 255:17,20,21 256:9 259:21 271:20 285:4 340:9,12

**avoid**
11:13 136:16 219:21 244:1

**avoided**
113:24 226:14

**avoiding**
362:9

**aware**
33:5 88:14 89:6 104:17, 25 105:3,7 134:13 149:6,10 164:15 246:18 262:25 278:10,11,12 279:20 280:21 308:18,20 309:1 371:24

**axe**
245:8

**B**

**back**
27:15 40:16, 17 41:17 59:25 63:16 66:3 71:18, 19 80:15 89:23 95:25 96:2 100:13 101:6 112:9 118:24 121:24 122:1 126:12,15 135:2 137:3 172:2 173:23 176:2 177:14 178:14 185:20,24

186:2,15 188:20 203:4 213:4,19,21, 22 224:13 228:1 247:11 260:15 265:25 280:2,22,25 281:1 282:18 283:9 293:20 298:7 301:8 307:21 317:7 319:25 322:12,15 327:6 336:25 340:7 347:2 349:4,23,24 363:2 374:8, 20

**background**
72:9 157:3 345:11

**backup**
37:24 38:3

**backwards**
247:18,24

**bad**
175:15,16 176:4 228:5, 10

**badgering**
99:13

**balance**
164:9,13

**barely**
20:9

**barking**
141:23

**Barrett's**
163:20 164:2,24 165:15 167:23 175:4 284:3 291:3

**base**
47:9 264:15

**based**
35:18 83:12, 20 84:2 86:24 87:20 92:24 93:2, 14,19 94:3 95:5 97:11 98:19,20 105:16 148:20 152:12,14 157:6 173:12 174:12,15 242:8 244:3, 18 249:6 295:13 309:25 310:20 318:22 357:4

**baseline**
12:2 166:11, 20,22 167:3 172:8,13,24 173:17 174:17 176:25 183:12

**basic**
120:24 166:11

**basically**
16:8 34:19 199:5 225:11 242:14 279:17 305:19 341:6 358:6

**basis**
73:4,17,23 74:24 76:2 176:24 236:6 266:9,10

**beauty**
195:13

**beginning**
78:3 151:15 241:12 267:4 300:24 301:4

**begins**
107:18 109:2 156:20

**behalf**
241:15

**beholder**
220:18

**beliefs**
311:19 327:16 329:10

**believe**
37:18 56:2 89:8 137:13 140:17 149:5 152:11 154:24 189:11 229:5 307:13 365:8 367:7

**believed**
18:25

**below**
13:20 18:11 106:18 200:1 208:6 318:10 334:1 342:7 362:3

**benign**
277:7

**berating**
74:17

**best**
82:3

**beta**
166:25

**betas**
164:22

**better**
68:14 132:20 133:7 155:6, 18,21 156:12 158:2,9,23 159:8,12,17, 21 190:20

**bias**
15:18 19:1 98:17 146:19,23 155:11 193:2,3,13 194:7,11,12 195:11,15 196:1 197:25 236:25 271:23 273:4,8,10, 19 274:3 366:5 372:11 373:20

**biased**
156:7,14 332:1

**biases**
14:12 196:11

**big**
213:24 256:15 268:3 283:14 314:14,15 352:2

**bigger**
69:12

**biggest**
371:21

**billing**
270:6

**biographical**
70:4

**biologist**
68:1 77:21 80:12,24

**biology**
68:10,12 94:17

**Biomarkers**
263:9

**biosketch**
70:3,25 75:2

**bit**
26:17 31:25 52:24 53:16 111:21 212:24 222:9

228:23 334:22 340:17
**bits** 343:1
**bladder** 147:16 150:10,17 151:6 159:20 234:11 235:16 237:21 238:7 240:3 241:2 243:24 344:16,19
**blew** 275:24
**blocked** 180:2
**blockers** 166:25
**blow** 42:11 69:12 92:15 248:7 320:22
**blue** 250:10 276:19 283:25
**blurry** 56:23
**board** 113:6 179:21
**body** 125:24 330:14 343:3
**bolded** 309:16
**bolster** 299:9
**book** 59:15 88:16 346:5,12,17 347:11,14,23
**bordering** 53:1 141:15
**born** 61:24 78:12, 13,15,23
**Borriello** 7:8
**bottle** 222:16,24
**bottom** 147:5,8 189:20 200:5 237:18 269:6,10 283:24 285:1 320:24 324:21 336:4 351:1 365:1
**bound** 20:9 21:11, 13,17 201:11,12 359:2
**bounds** 331:19
**bowel** 284:2 290:21 291:2
**box** 69:18 72:23 90:19 92:16 101:25 102:3 103:15,24 104:11,16 106:19 107:1,10,12 108:8 110:4 114:15 115:13 118:20 119:10 120:2,13,16 121:21 237:14 275:1,7,18 283:3 301:18 310:8,12 336:5 349:12
**Box.com** 297:13,16
**boy** 347:2
**Bradford** 363:8,17,24
**Bradley** 9:17
**branches** 55:15
**brand** 24:10
**breadth** 274:16
**break** 53:25 57:14, 21 59:17,18 60:3 100:17 110:19,24 111:18,20 112:1,14 117:9 138:16 160:5 171:16 175:22,24 227:16 246:25 288:23 289:1 293:13 325:7 334:19 336:16
**breaking** 79:15
**brief** 59:22 112:6 227:23 234:22 247:8 293:17 336:22 374:17
**bright-line** 327:14 329:8
**bring** 23:25 69:10 81:6 90:8 101:18 114:3 116:24 122:4 144:5 146:14 147:3 151:9 153:21 162:13 204:19 205:24 231:9 247:13 248:3 264:6 298:8 301:16,19,25 327:9 338:22 353:13
**brings** 150:13
**Bristol** 367:9,10,12 368:25
**broad** 12:12 369:5
**broke** 228:5
**bullet** 81:11,12 146:17
**bunch** 359:20
**burden** 12:16
**business** 309:24 310:19
**Bye-bye** 375:11

## C

**caffeine** 247:1
**calculate** 267:14 288:6,16 290:1
**calculation** 217:8 285:8 287:3
**calculations** 41:15 284:14
**call** 8:18 15:21 16:1 116:25 119:18 130:12,16

166:7 178:24 189:20 198:8 202:6,21 249:25 252:4,6,13 309:13 336:2 375:5
**call-out**
178:22 189:20 192:3,9 304:12
**called**
8:8 198:10 225:11 239:4,5 253:11 306:20 317:16 346:5,12 363:8
**calling**
38:16 249:23 256:24
**camera**
9:21 10:6
**Canada**
95:16
**cancer**
8:25 12:20, 23 25:20 39:2,21 41:24 49:15 50:3,12,20 51:6,16 52:15 54:22 60:16,20 61:1,8 62:4, 11 64:14,25 65:18,20 66:7,10 68:1,10,12, 22 69:2,6 71:3,5,7,22 73:24 76:7 77:4,13,20 78:3,6,14,17 79:1,4,14,16 80:11,24 81:17 82:5, 21 83:3,11 86:1 88:24 90:3 94:16, 22 96:14,20 98:7,11 99:23 101:14 111:15 114:9 122:16,21,23 123:1,2,5,17 124:3,9,11, 13,19,21 125:5,7,12, 13,18,22 126:2,5,19 127:7,14 128:9,13,20 129:8,10,13, 15,18 130:2, 4,5,6,9 131:18 132:4,6,11, 12 134:7 135:1,20,24 139:20 140:22 141:1 143:13 146:25 147:17 150:11,17 151:7 154:21 156:3,5 159:6,20 160:24 161:1,9,12, 22 162:7,8,9 164:5 169:19 170:21 172:3,18,23 173:10,19 174:2,4,13, 15 176:2,8 188:2 189:9, 12,14,25 194:3 195:7, 13 198:18 199:1,6,20, 22 201:5,12, 15 203:15 215:1 222:3 223:11,16,21 234:11 235:17,23 237:21 238:7 240:3 241:2 243:24 251:9,17,19, 20 253:20,22 254:2,12,15 255:16 260:18,22,24 261:4,6,8,9 263:8 271:14 273:4 274:5 286:2,23 287:12 290:4 292:10,11 305:23 314:23 315:14,17 317:21,24 318:15,16,17 321:17,23 323:7,22 325:8,20 326:15 327:3 330:8 337:15 339:14,16,20 340:3 341:19 343:11,13 344:16,19 357:6 359:10 366:5 372:12 373:13
**cancer-causing**
83:8
**cancerous**
64:4 79:23 80:20
**cancers**
35:22 50:9 73:5,17,25 74:24 76:2, 11 97:13,15, 24 100:10 101:3,5 127:20 128:2 129:2 132:9 147:20 154:13 159:7 165:3 175:7 179:5 188:9, 13 195:7 234:8 258:19 274:19 285:20 286:7 287:1 314:9 316:15 326:10 330:17 342:25 345:17
**Candida**
7:8
**capture**
204:10
**carcinogen**
60:14,15 62:23 81:23 83:12,19,20 84:1,10 85:23 86:11, 22,24 87:6 93:14 94:3 107:3 110:8 111:8 337:13,17
**carcinogenesis**
78:10
**carcinogenic**
93:5,10,20 97:2 99:16
**carcinogens**
63:7 84:11 89:9
**Cardwell**
26:6 28:9 29:7 31:23 32:22 33:18 34:22 35:6, 14 37:7,23 38:25 39:23

40:25 147:11 156:15 232:15 236:19 237:4 239:4,17 240:14,20,24 241:1 242:2, 24 243:6,22, 23 244:8 245:4 295:16 296:16 343:14,15,22 344:2,7

**Cardwell's**
372:7

**care**
113:7 157:9 248:8

**career**
18:15

**careful**
250:20

**carefully**
206:15 250:14 309:12

**cart**
179:23

**case**
8:16 15:5 16:25 64:17 68:12 89:17 103:11 154:24 155:17 159:7 162:10 163:5 172:19 176:8 189:6 197:23 220:25 221:18 227:7 245:8 246:11,16 279:9,10 286:8 297:4 346:18,20,22 347:3 348:13 359:10 361:21,24

**cases**
122:21 130:6,22 131:23 132:2 133:9 134:8 137:4 159:10 233:10 340:4

**categories**
297:2

**categorized**
295:12

**Category**
87:5

**causal**
13:15 82:20 100:9 223:19,20 311:6 315:20 320:14 357:7

**causality**
164:21 363:9

**causation**
268:16 363:6

**cause-and-effect**
364:19

**caused**
64:15 81:21 97:25

**causing**
78:9 79:16

**cell**
63:23,24,25 64:1 65:3,21 66:12 67:20, 22,23 69:3 76:16,24 77:19 78:2 79:16 80:18

**cells**
63:11 64:2 77:10

**century**
366:24

**certain**
12:22,23 13:1 20:18 39:5,6 62:2 67:20 127:9 151:2 222:9 292:5,6 311:13 331:19 361:12

**certainly**
126:22 127:22 156:11 222:23 223:7 238:3 243:17 255:5 313:8 325:23 331:24

**certainty**
50:1

**cetera**
269:13

**chance**
74:20 102:2 119:4 127:19 165:8 222:15,17 309:20 353:25 354:2,22,25

**Chang**
245:20

**change**
12:22 63:10 66:12 77:9 187:24 209:15,23 210:4 211:16 212:19 214:24 217:2,7 221:24 223:9 226:7,12 227:9 265:16 287:8,25 342:21 345:14

**changed**
257:14 345:24

**changes**
206:7 208:17

**changing**
288:10

**chapter**
55:12,19,21, 23,25

**chapters**
55:7,9 59:6

**characteristic**
173:18 176:25

**characteristics**
166:11,23 167:4 171:19 172:8,14,25 174:18 183:13

**characterization**
136:25

**characterized**
13:4,6

**charge**
24:16

**charged**
24:13

**charging**
348:1

**chart**
188:21 189:21 288:22 339:18

**chastised**
136:19

**chastising**
105:24

**check**
59:18 91:1 138:15 148:23 149:18 157:20 170:5 176:9,23

177:1,3 210:16 212:10 266:2 282:13 345:9
**checked** 266:4
**checking** 149:16 295:18
**Chemical** 90:14
**cherry-picking** 236:1,4 238:16 239:2 326:16,20
**chose** 200:22
**Chris** 38:25
**cimetidine** 205:21 206:22 207:8,22,25 208:8,19,20, 22 209:6,19 210:2,8,21, 23 277:12,15 280:16,20 281:7
**Circulation** 29:8
**circumstance** 22:17
**circumstances** 19:12,15,23 20:19 21:8 22:9 64:3 67:20 78:5
**cirrhosis** 254:19 284:2 289:9,11,15 290:21 291:2
**citation** 35:16,17 149:20,21 151:1 217:16 300:5 313:24
**citations** 25:8 94:18
**cite** 148:6,24 150:24 152:16 303:8
**cited** 25:9 27:22 32:25 33:3 50:4 149:1 152:1 245:18 303:4 346:17,23 356:12
**citing** 35:11 150:1
**claim** 189:11 330:23
**claimed** 97:25 189:13
**claiming** 189:6
**claims** 311:18 327:15 329:9
**clarification** 17:8 167:1 190:22 257:18 290:22 326:19 371:14
**clarifications** 108:1
**clarified** 39:15 307:14
**clarify** 33:11 38:15 41:6 69:5 164:12 234:25 241:8 263:10 277:10 314:17 321:1 333:3 357:1
**Class** 337:12,17
**classification** 86:21
**classified** 105:1
**classroom** 347:24
**clastogen** 104:14,19 105:2
**clastogenic** 94:10 96:10 105:12
**clean** 109:18 110:23 119:5 121:1,4 220:9
**clear** 14:2 32:3 36:14 111:16 220:14 235:9 237:5 241:18 243:5 274:18 342:23 345:16
**clear-cut** 20:6 328:9 365:20,22
**clearer** 56:24 173:20
**clearly** 16:8 93:5, 10,20 119:8 123:1 124:13 292:12 305:24 343:3,18
**clinic** 163:14 175:2
**clinical** 58:18 157:10
**close** 165:22 201:21 289:21 304:11 340:22 374:24
**closer** 198:2
**clue** 341:9
**clump** 251:5,6
**clumps** 251:3,23
**co-author** 55:13 181:16,22 247:19 346:5,12 368:18
**codes** 160:9,15,18 161:8
**coffee** 366:5 369:1
**cohort** 114:12 159:9 166:12 167:4,14 171:19 172:9,14,25 176:25 183:10,11,15 187:2 188:4, 7 192:13 229:3,7
**cohort-wide** 189:8
**cohorts** 71:22 162:5 166:23 175:4 183:16 184:23 258:23 283:19 284:24 285:3
**coin** 364:18

**colleagues** 177:21 219:14
**College** 367:8
**Collins** 85:16
**colloquy** 118:12 120:10
**colorectal** 129:18 141:1
**column** 166:14 167:9,10 180:4 181:4 237:18 284:25 286:20
**columns** 250:15
**combined** 205:21 206:25 207:6 210:10
**come** 160:16,18 161:4,5 165:1 182:11 217:12 220:23 260:15 266:17 280:17 281:4 298:6 343:12 374:8
**comes** 91:7 119:19 211:5 214:8 222:14 252:2,3 266:21
**command** 360:8
**comment** 98:25 104:13 125:13 138:17 139:12,13 178:11 187:20,22 191:19 218:20,21 301:5 344:4 369:12
**commentary** 52:12 218:2 246:23 334:14 360:14
**commented** 134:14
**commenting** 236:16,17,18
**comments** 125:11 141:17 142:12 218:3 219:22
**commonly** 356:2 362:18
**communication** 11:22,24 264:18
**Communications** 263:15 264:6,21 265:3,8,19, 23
**community** 253:7 261:25 304:4 328:1
**companies** 103:10
**company** 103:9 257:4
**comparative** 25:24 115:1 140:10 164:10
**comparator** 26:3,11 27:6 147:13 155:6,24 158:6 160:1 175:14 192:22 194:17 195:14,17, 21,25 231:13,24 232:3,16 234:3 235:3, 12 236:8,24 237:3,6 239:24 250:4 344:10,21,22 345:5 369:16 370:8,15,23 372:5,16 373:9
**comparator's** 158:17
**comparators** 198:1,3 370:11,19 371:5,17
**compare** 258:18
**compared** 171:23 181:18 224:13 371:16
**compares** 195:18
**comparing** 155:7 159:2, 5,15,18 194:15 231:25 239:7,19 273:7 281:21 371:2
**comparison** 169:18 180:6,9 190:6,18 235:3 239:21 282:4
**comparisons** 35:20 39:3, 9,19
**complains** 176:17
**Complaint** 189:14
**complete** 40:12 162:10 172:18,19 174:15 176:8,18 185:22
**completely** 9:22 321:16 372:16
**completion's** 190:14
**complex** 70:22 71:2, 4,11 79:14
**compliance** 204:1 270:17,21 272:11
**compounders** 14:13
**compounding** 15:19 98:17
**comprehensive** 34:17
**comprised** 251:7
**comprises** 76:21
**computer** 121:17 212:4
**concept** 308:17
**concepts** 353:7
**concern** 9:25 35:22 50:9 97:13 164:19 243:7 244:11 252:18 273:3

291:22 300:15 304:3 311:2,4,8,21 312:18,22 316:10,13 323:15 328:1 357:20 362:22
**concerned** 244:17 305:18 312:25 313:2 323:20 331:9 372:9
**concerns** 228:20 273:16,17 303:19 304:1 307:8 315:1, 2
**Concise** 90:13
**conclude** 14:1 125:3 311:5 313:4
**concluded** 96:13 130:9 314:9,21 357:4
**concludes** 375:12
**concluding** 111:8 124:25 127:13
**conclusion** 238:8 240:7 244:9 261:24 321:21 343:13
**conclusions** 165:1 187:25 212:21 217:2,3 298:24 309:24 310:19 311:18 318:22
327:16 329:10
**conditions** 93:24 111:10 164:14 278:4
**conducted** 266:8
**confidence** 15:17 17:6,9 18:5,11 19:4,9,14,25 20:8,23 21:11,17 22:9 23:6 180:7,13,15 186:12 190:9,10,21, 24 191:3 201:8 291:23 292:2 314:4, 20 315:9,11 316:1 317:3, 23 318:21, 23,24 319:18,22,23 320:15 321:15 322:20 324:2 325:6,14,22 331:19 335:23 349:9 352:22 359:3 361:3
**confidentiality** 254:6
**confirm** 138:11 180:22 233:8 301:9
**confirmed** 358:8
**confirming** 167:2
**conflated** 324:15
**conflating** 324:20
**confound** 151:3
**confounder** 147:19 150:9 156:4 158:9 159:4 192:25 193:9,12 194:4,11,14 195:1,3 196:5,14
**confounders** 144:14 164:16 195:20 196:25 293:5
**confounding** 19:1 146:19, 23 153:17 155:10 156:1 164:20 193:5,16,24 194:2,20 195:4,23 196:24 198:2 212:25 232:2,24 237:1 239:12 273:5,19,24 345:4 366:4 369:1 371:1 373:20
**confused** 56:16
**congressional** 347:1
**connect** 153:14
**connection** 89:16 149:11
**cons** 39:21
**consent** 8:2
**consider** 28:20 44:8 85:15 88:15 102:13 105:9 135:3 201:22
**considerable** 330:24
**consideration** 150:14 262:15 325:5
**considered** 13:11,19,20 19:13 28:12, 22 30:3,5,7, 14 31:9 33:9,13,19, 24 35:7 36:1,4,20,24 37:3,4 39:25 43:2,6,8,19 44:3,13,15, 23 45:4,8, 11,18,23 46:19 49:11, 23 61:17 65:17 87:13 89:25 91:19, 20 92:9 97:1 128:23 154:14 189:15 271:25 286:17 363:5 365:11 370:25
**considering** 195:8
**consisting** 24:23
**consultant** 245:15 246:15
**consultation** 31:3
**consumed** 338:7
**contact** 170:6
**contained** 258:23
**contains** 176:18

**contaminant** 95:9
**Contaminated** 114:11
**content** 32:12,15 52:25
**contents** 56:3 58:3
**context** 109:13,19 110:16 116:22 129:7 306:15 313:6 314:25 334:4 340:17 354:7 355:4 357:15 360:4
**contextualize** 312:15,17 316:21
**continue** 163:16,24 220:5 225:23
**contributor** 58:15
**control** 153:19 155:25 156:13 234:13 370:5 371:1,5 372:2 373:8, 10
**controlled** 155:15 159:10 234:7 344:20 370:16
**controlling** 155:9 192:20,23 198:2 240:1
**controls** 233:10
**controversial** 149:3,7
**controversy** 360:22 361:6 362:2
**conundrum** 369:2
**conventional** 290:19,25 291:10,15 292:16
**converging** 339:24
**conversations** 32:11,12,22 112:22 113:9
**convincing** 18:24 97:17
**copies** 119:5 120:22 121:1,2 366:10
**copy** 24:20 25:2 41:2 59:15 72:21 109:18 110:23 116:15 118:14,18 119:3 120:20 144:1 178:18 269:1 275:17,20,23 310:8
**copy-and-paste** 276:7
**correct** 14:19 18:17 24:8,23,24 25:4,21 28:10,14,18 30:9 31:12 38:9 46:6, 15,16 50:7, 13,16,17 55:14,20,22, 23 62:24 65:25 67:24 76:17 88:4 91:24,25 92:20,23 94:12 103:13 114:24 115:3 140:8 143:20 144:16,24 146:2,7 147:18 152:5 153:11 157:1 166:13 167:12,25 168:3 180:21 181:17,21 190:11,12 192:16 197:15,17 199:21 200:3,23 201:19 204:16 208:9 209:4 213:12 214:4 216:3 221:3,14 229:3,5 230:4,21,23 231:2,5 233:14 238:18 243:11 244:10,20 245:21 247:22,23 248:23 264:4 265:24 266:25 267:2 272:21 283:20 284:5,8,13 285:7,11,22 287:1,7 289:13 297:11 337:11 340:11 341:7 346:19 347:7 348:2 352:18 358:12 366:7
**corrected** 162:25
**correction** 30:2
**correctly** 33:3 93:6 94:8 97:4 200:2 299:5, 18 315:15,24 327:1 364:23
**correspondence** 28:8 29:7 37:14
**corresponding** 38:24
**could've** 270:14
**counsel** 8:1 31:4 32:11,13 43:23 44:2 112:1 113:14
**Counselor** 56:12
**count** 26:21 249:8 266:24 328:21 338:7
**counted** 27:6 184:9, 13 257:8 261:3,11
**counting** 180:20 182:12 183:2,3 249:1 267:13
**country** 95:17 254:3
**counts** 248:21 251:16
**couple** 20:4 54:3 57:1 101:15 155:4 213:22 337:5 339:2

**course**
9:12 10:11 29:20 62:13, 14 164:19 195:23 206:14 227:11 250:2
**court**
7:7,12,15 10:23 11:4 17:8,23 96:2 119:23 120:3 126:8,15 167:1 186:2 190:22 204:9,12 257:18 284:11 290:22 322:15 326:19 346:18 371:14
**courteous**
53:3
**courtesy**
53:16,19 141:24
**courts**
299:16
**covered**
115:20 140:2 267:7
**covering**
107:10
**COX-1**
370:9 371:11
**COX-2**
370:10 371:10,11
**create**
30:19
**created**
30:8,23 31:1,3,5,8, 9,20
**credentials**
121:10
**credible**
299:25
**crisis**
311:11 357:23
**criteria**
40:3 363:9
**critical**
174:21
**criticisms**
293:1
**criticize**
231:3 291:16
**criticized**
291:19
**cross**
19:9 201:6
**Cross-talk**
41:5 53:8 54:5 57:12 58:4 67:11 72:1 76:18 80:2 84:24 91:14 106:3, 7 107:17 109:6 131:1 141:4,6 150:4 154:11 166:15 171:4 173:24 193:20 196:16 212:1 219:3 240:19 262:24 273:13 282:25 300:20 303:12 322:4 343:23 355:10,13
**crossed**
47:1
**crosses**
19:4 20:9 201:18
**crossing**
201:2
**crude**
157:23 236:13
**crux**
342:11
**current**
157:25 233:13 304:24
**curriculum**
28:16
**cursor**
207:13
**cut**
218:1 361:4
**CV**
52:7 54:12 246:19
**cycle**
266:19

**D**

**daily**
206:12 208:18,21 213:8 293:23,25 294:4,6,12, 13,22,24 295:6,14,22 296:17,22 297:2
**Danish**
160:25 161:1,2,9, 10,22 162:8 163:11,13 173:12 175:11 176:16 184:1 204:1
**Danny**
9:17,24 53:5 276:10
**data**
35:21 38:20 39:10 41:13, 14 64:23 77:23 83:13 86:25 87:12, 20,21 97:12, 15 98:19,20, 23 99:21 105:17 111:14 160:24 161:22 169:15,16 170:7,15,16, 17,24 172:4, 18 173:11 174:14 175:10,15 176:4,18 206:5 208:13 209:8,11,18 210:2 211:5 212:10,19 213:15,18 234:18,20 242:22 243:18 249:6 251:4,24 252:2,5,13, 15,17,20,21, 23 253:1,3, 11,24 254:14,16, 22,23 255:24 256:13 258:18,24 260:7 266:3, 4,9,12 267:8 268:18 269:12,20,25 270:18 274:16 275:13 279:25 295:24 296:4 298:24 299:1 309:19 316:17

327:12 329:6 330:17 340:11 341:1,11 342:21 356:22 357:7 359:19
**database** 157:6,8,12, 13,14 159:18,19 170:10 255:1,18,22, 23 256:10, 13,16 257:2 258:2 259:3, 13,19 266:17,18, 22,23 268:17 269:15,23,24 270:5,9,25 272:7 339:12,22 340:3
**databases** 157:22 268:4,6,10 271:11,17 272:23
**dataset** 181:12 182:19 183:24 251:25 253:6,8 257:16
**datasets** 253:3 274:17
**date** 70:8 162:6 163:22 181:9 182:15,16,24 183:6 184:11,16 187:15 191:12 230:13
**dater** 160:25
**dates** 190:15
**Davey** 368:18
**day** 260:4 266:23 267:17 336:15 368:8 375:4
**days** 259:14 266:19 267:9,14 271:21 296:20,22 337:20,25
**de** 367:17
**dead** 270:8
**Death** 160:25 161:11
**debatable** 334:12
**debunked** 366:25
**decade** 303:25
**Decanio** 7:9
**December** 266:22
**decipher** 71:6,13
**deciphering** 70:21 71:10
**decision** 101:10,12 327:17 329:11
**decision-making** 311:19
**decisions** 309:25 310:20
**declare** 7:24
**decrease** 202:13
**decreased** 205:19
**decreasing** 316:8
**deem** 47:12
**deemed** 39:7
**defendants** 24:10 47:24 245:16 246:16 374:23
**defendants'** 47:25
**defended** 113:2
**defense** 348:13
**defer** 68:3,10 69:4 77:20 79:4, 18 80:24 99:5
**define** 14:24 23:13 83:22 131:18 182:15
**defined** 84:1,9 85:24 124:5 206:11 208:17,21 213:8 293:23,25 294:4,6,12, 15,22 295:6, 14,22 296:17,22 297:2
**definitely** 318:9
**definition** 12:12 13:23 15:7,20 16:13,15,20 73:18,22 76:5 77:1 83:25 84:5, 14,17,25 85:8,10,17 86:4 295:3,5 354:15 355:7
**definitions** 12:10
**degrades** 95:14
**demonstrated** 355:23
**demonstrative** 276:5
**Denmark** 157:15 161:12 169:5 206:13 213:9 217:11
**denominator** 188:22
**denominators** 189:3 191:14
**department** 367:19,22 368:21 369:8
**depending** 16:17 19:11, 15,22 20:2,3 22:8 78:5
**depends** 77:10 85:21 128:5 158:4, 13 159:24
**deposed** 10:15
**deposition** 7:3,16,18,20 9:2 112:24 121:13,19

177:19 178:7 219:18 374:24 375:14
**describe** 25:19
**describing** 196:23
**deserve** 175:24
**design** 52:19 125:16 155:6,24 158:5,6,14, 17 159:25 160:1 192:22 195:14,17 232:2 235:18 370:24
**designates** 104:18
**designation** 87:14
**designed** 51:9 268:4
**designing** 70:17 131:17
**designs** 23:23
**desk** 47:1
**detail** 116:12
**detailed** 41:20 42:1
**details** 57:18 294:19
**detect** 129:17 133:10 143:14 360:2 365:20 373:12
**detected** 95:11 96:7 130:7 133:14 140:24

357:13 358:3
**detects** 20:7
**determinants** 23:17
**determination** 87:4
**determine** 12:22 14:14 43:23 100:5 159:20 284:17 285:9 338:7
**determined** 14:10 104:2 287:21
**determining** 84:11 96:13 128:18
**develop** 79:1 123:17 128:9 129:10 132:6,11,12
**developed** 42:6,16 46:11
**developing** 12:23 62:3 78:14
**development** 123:5 125:18
**develops** 128:13
**devices** 11:23,25
**diabetes** 171:13,20, 21,24 172:1 173:3,5 284:1 285:25 286:1,6,11 291:4
**diagnosed** 261:8 277:24 281:15,17
**diagnoses** 162:9 163:18

**diagnosis** 162:7 167:15,22 199:2
**dictionary** 85:16
**didn't'** 288:16
**dies** 269:16
**diet** 61:16
**dietary** 63:6 292:7, 10 318:10
**difference** 184:17 185:2 186:8 187:11,14,19 189:4 193:21 196:8 197:6 283:18 284:18 285:2,10,12, 17,24 286:9 287:22 288:9 289:25 342:20
**differences** 184:22 284:23 287:8,14 288:2 290:15
**different** 36:16 39:21 51:24 52:1 55:7,10 73:5,7,8,17, 25 74:24 76:2 101:16 130:20 131:7 132:7 134:10 135:24 137:12 139:11 173:1,13,14 182:3 184:23 197:1 207:10

209:14 210:3 221:22 245:12 248:25 252:7 257:4,5 266:6 267:12 268:23 274:14,17 291:25 297:1 309:8 314:25 315:6 323:13 324:15 341:3 346:7,25 362:16 371:2,6 373:19
**differentiate** 46:7 137:16 283:25
**differently** 130:19 131:8
**difficult** 273:23
**dig** 170:22,23 171:9 246:19
**digits** 248:24
**dilute** 187:1 188:9, 10
**dilution** 188:13
**direct** 242:18 300:4
**directed** 38:24 56:8, 10
**direction** 197:25 200:5 201:15
**directly** 31:23 41:16 51:8 52:14 99:21 242:6, 22 307:4 340:18

**director**
304:19 305:3
**disagree**
19:5 106:12 123:12 124:19 129:2 331:1 354:3
**disagreed**
329:1
**discount**
154:19
**discuss**
49:23 139:11 147:9 250:4 252:25 262:4,7,11 274:6 290:15
**discussed**
67:18 113:13 151:4 153:17 229:19 255:7 270:12 273:6 290:13 356:13 365:9
**discusses**
117:1
**discussing**
49:17 246:10 268:13 271:16 273:12 274:1 366:23
**discussion**
121:8 144:8 145:15 192:5 231:12,19 232:15 239:10,13 269:5 307:14 329:2 352:21 373:19
**discussions**
60:4 142:3 261:16 307:17,18
**disease**
12:5,16 13:2 23:18 58:16 76:8 163:19, 21 164:3,25 165:16 166:8 167:16 169:4,24 170:15 171:10 253:18 277:18 290:21 291:2
**diseases**
70:22 71:2, 4,11 73:5, 18,23 74:1, 25 76:3,12 164:22
**disentangling**
366:21
**dismiss**
364:18 365:22
**dismissed**
255:13 330:5
**dismissing**
328:11
**dispute**
112:23
**disqualified**
146:11
**dissenting**
347:4
**distinction**
120:8
**distinguish**
361:24
**distortion**
284:10 330:25
**distribution**
123:17 128:11 129:9,14 143:10 221:6,22 224:9 226:1 259:18
**distributional**
123:20
**district**
347:1
**diverse**
71:23
**diversity**
347:1
**divide**
63:11 64:1
**divided**
190:5,6,7 289:22 361:22
**divides**
79:22,23 80:18,19
**dividing**
14:9
**division**
367:22
**DNA**
23:23 49:18 60:19 61:21, 23,24 62:6, 10 63:9,24 64:15 65:6, 10,21 66:12 67:19 73:10 76:19 77:9 96:16
**doc**
30:12
**doctor**
16:23 38:9 40:18 46:10 49:9 61:4 77:5 92:18 102:9 105:18 106:10 107:11 109:23 110:11 148:10,16 149:23 163:10 165:4 178:17 181:7 199:14 203:23 205:2 208:14 212:8 231:8,11 275:25 279:3 283:16 289:4 297:7 302:5 325:21 326:17,20 339:1 341:18,20 344:6 346:4
**document**
31:13 36:8 54:12 56:12, 22 57:18,19 59:10 75:7, 10,14 90:14 91:7 92:5,7, 12 99:8 102:8,11,20 103:2 105:6, 9,22 106:1, 23 108:3,11, 13,14,20 109:11 111:3 116:10,12 117:5 119:19 120:12 121:9 138:23 139:2 144:23 192:19 202:24 216:23 257:11 282:24 294:20 297:9,11,20, 25 298:3 300:25 301:6,7,23 302:12,16 306:20 310:5 338:13 345:21
**documents**
47:24 48:4

88:17 91:8 121:14,16 283:6
**does-response** 338:8
**doing** 11:14 24:13 56:17 88:11 119:10 172:15 219:17 241:15 250:20 314:7 324:17 368:25
**dosage** 227:14 228:17 229:6,11,16 296:10
**dose** 64:18,25 66:2,6,11 216:19 222:25 293:24,25 294:1,4,6, 13,22 295:6, 7,12,19,22 296:5,17,21, 22,25
**doses** 93:4 95:6 111:9 185:13 190:19 191:1 206:12 208:18,21 213:8 214:15 277:1 294:2, 12,24 295:14 297:2
**dot** 199:23,25
**double-checking** 192:14 268:19
**doubled** 220:11
**Douglas** 352:4
**download** 121:16
**downloading** 121:20
**draw** 200:12,15 283:14 337:3
**drawing** 200:9
**drawn** 298:24
**drinking** 111:4
**driven** 210:22 317:23
**driving** 292:13
**drug** 29:14 39:2, 21 166:24 167:5 207:1, 6 231:25 279:21 294:14
**drugs** 146:25 155:8 169:11 182:14 203:25 204:2 206:25 207:5 234:8 370:12 371:21
**due** 82:2 83:6 98:17 146:23 164:21 193:24 194:20 195:15 236:25 237:1 273:5,23 332:1 345:4
**duly** 8:9
**duodenal** 168:1 276:15,16,25 280:5

**E**

**E-COPY** 59:14
**e-mail** 29:7 39:23 40:7,10 239:14 240:14 241:22,23 242:4,5,12, 13 243:3,5
**e-mailed** 241:10,13
**e-mails** 297:18
**earlier** 18:17 177:18 192:24 300:16 347:25 355:25
**earliest** 139:6
**early** 8:19
**Eastern** 375:17
**easy** 264:19
**EC** 253:12
**ecologic** 253:13,14,24 254:3,8
**ecological** 253:11
**economic** 332:4
**edition** 12:8 55:6 347:15,16
**editions** 347:20
**editor** 264:2
**editorial** 141:2,18 142:12 303:17,19 306:17,20 307:8 343:24
**editorials** 246:3
**effect** 10:25 40:4 74:18 123:7 259:13,23 260:1 293:11 331:15,18 332:16 333:2 355:21,22 356:7 358:18 365:9
**effectively** 20:7 33:1 36:12 223:12 224:13 255:6
**effects** 223:2 332:14 371:16
**EHRS** 270:6
**eight** 26:2,10,13 92:13,14 114:25 279:6 281:11
**eighth** 26:20 146:18 269:9
**either** 105:3 113:8 168:24 197:25 202:13,16

230:15,21,25 261:18 270:18 352:10 354:11
**elevated** 304:1
**eliminated** 276:23
**emergency** 163:15 175:2
**eminent** 300:14 308:15
**emphasis** 108:12 364:15
**emphasize** 108:24 147:14
**emphasizing** 292:5
**empirical** 22:20
**employer** 348:15,17,18
**encompasses** 70:19
**end** 63:11 64:3 99:9 119:11, 15 120:15 127:10 131:4 132:24 139:20,22,23 141:9 142:23 179:10 204:25 220:7 221:13 237:19 240:9 248:11,13 251:18 299:14
**endoscopically** 277:24 281:16
**endoscopy** 281:16
**ends** 77:4 248:12, 18,19 250:16 269:18
**enlarge** 145:7,8,14 298:14
**enormous** 304:3
**enter** 7:12
**entire** 107:9 117:5 132:18 133:18 149:19 222:24 253:17 258:15 298:18
**entirely** 31:5 43:12, 20 54:13 189:16 294:18 332:19 367:21 369:19
**entitled** 112:19,20 113:4 114:9 116:14,16 120:22 349:8
**environment** 58:22 62:6, 20,22
**environmental** 23:19 62:7
**epidemiologic** 50:22 51:16 65:17 68:18 70:18 90:1 97:14 100:7 111:13 124:12,18 146:12 252:19 253:3 261:16 267:13 268:16 279:25 316:17 356:1
**epidemiologist** 8:24 9:1 15:14,21 20:19 61:7, 20 62:15 78:1 82:18 288:8 316:14 325:21 359:18
**epidemiologists** 16:5 18:22 21:14,18 308:2,15 325:15
**epidemiology** 12:4,8,11, 16,19,21,25 23:14,16 32:21 49:13 50:3,6,20,21 51:6,7,17 52:15,16 54:18,20,21, 22,25 55:4, 6,8,10,11, 13,16,17,19, 22,24 56:1 58:15,17,18, 19,20,21,22, 23,24 59:7 61:7,8,15 66:4 67:4 69:6,7,8 77:22 78:12, 17 80:13 88:25 96:19, 20 104:22 140:23 143:13 193:11 263:9 271:22 291:20 323:5 335:24 339:7,8 352:6,15 362:7 367:18 368:19
**episode** 366:6,8 373:1
**equal** 330:22 353:23
**equals** 354:1
**equivalent** 332:4
**erosive** 175:5 277:24 281:15,17
**erratically** 209:14
**erroneous** 311:18 327:16 329:10
**error** 163:2,4 193:17 217:6 273:20 345:24 368:15
**errors** 271:15 273:11
**esophageal** 151:21
**esophagitis** 277:25 281:17
**esophagus** 151:22 163:20 164:2,25 165:16 167:23 175:4 179:17 284:3

291:3
**esophogeal**
148:8 152:9, 21 164:5 181:1 189:25 199:1 201:5, 11 251:17, 18,20 254:11 286:23
**establish**
12:1 84:16 306:1
**established**
119:17 307:7 347:25
**establishing**
14:8
**estimate**
13:7 238:22 315:7 317:3, 19,22 319:21 321:19 325:12
**estimated**
315:18 319:16 326:9,12,14 331:18
**estimates**
155:11 291:23 293:11 320:13 323:12 339:13 341:3 361:2
**et**
269:13
**et al**
340:21
**Europe**
340:23
**European**
95:15 335:24
**evaluate**
35:21 38:5 52:17 130:8 132:4 133:17 273:23 307:25
**evaluated**
41:11 95:7 135:4 137:17 170:20 217:5 257:16 274:20
**evaluating**
71:21 90:1 170:9 172:4
**evaluation**
34:17 102:14 174:22 177:7 250:21 264:18 271:13 274:7,11
**evaluations**
87:2
**evasive**
53:6 142:2
**event**
222:16,18 261:20
**events**
127:23 180:5,6,8,10 190:5,6
**everybody**
10:5 184:13, 24 185:1 267:17 317:4 375:10
**everyone**
33:5 128:13 342:12
**everything's**
356:14
**evidence**
18:24 56:16, 20 84:3,15, 20 90:1 94:9,14 95:3,21 96:9 97:14,16,18, 19,23 98:3, 4,6,8,11,13, 14 108:5 120:24 125:20,24 215:5 223:18 237:5 299:25 311:1 318:23 330:14 333:22 334:4 341:4 343:3, 9 359:20 373:3
**exact**
20:8 190:18 241:23 249:6 324:1,2
**exactly**
15:11 28:4 32:2,20 38:2 42:21 45:21 72:5 84:10 91:17 123:3, 22 126:4 128:7 130:3 175:13 195:20 221:8 224:22 242:14,17 243:17 244:6 254:11,15 255:1 258:3 261:22 265:10 267:6 272:15 276:9,10 302:22 304:20 313:23 316:7,8 317:5,8 318:6 320:19 322:21 325:25 348:11 351:7 371:8
**EXAMINATION**
8:12
**examined**
8:10 93:4 206:15
**examining**
128:3
**examples**
15:11 16:3 20:4 22:1,5, 15 64:20 65:2 309:3 312:3 333:5, 12 362:18
**Excel**
29:6 31:22 32:2
**exchange**
240:14 241:24
**excluded**
262:14
**excuse**
83:20
**executive**
304:19
**exhibit**
24:1,2 29:18 57:6,20 58:11 69:11, 14,18 81:5 90:7,9 101:16,19,22 114:4,5 116:1 117:17 119:2,5 120:19 122:4 160:13 162:14,20 202:7,8,22, 25 203:4 205:25 206:3 211:24 213:5 231:9 233:2, 3 237:8,9 238:14 241:25 249:15 274:22,23 283:9 289:6,

7 297:5 301:12 306:10,11 320:9 335:7, 8 338:22,23 345:20,22, 23,25 346:1 349:1,2,3, 17,18 353:14,16 360:20 363:20,21 364:8 365:25 366:2

**exhibits** 57:24 117:15 120:23 248:3

**exist** 195:24 278:9

**expand** 228:22

**expect** 174:19

**experience** 50:24 70:16

**experienced** 304:1

**experiments** 93:25

**expert** 50:20 64:13 67:2,3 68:21 69:5 79:18 88:13,25 95:8 98:22 99:6 100:24 163:5,6 174:21 313:17 340:14

**expertise** 51:6,15 52:15 61:7,9 67:8 68:6,20 69:6 77:25 79:6,12 96:19 98:24 288:7

**experts** 68:4,10,11 77:21 79:5 82:19 85:25 96:15 288:18 291:17 292:8 293:2 343:7, 12 348:4 352:6 357:4

**experts'** 238:19

**explain** 67:16 91:3 169:10 193:6 196:6 210:5 236:3 252:23 266:15 276:8 291:5 312:6, 10,12 313:5 323:2 339:10 340:2 343:2 354:6

**explained** 14:22 40:18 193:5 239:11

**explaining** 262:9

**explanation** 142:14 174:24 329:13

**Exploring** 363:5

**Explorys** 251:25 253:6 257:2,17,22 258:8 272:7 339:22 340:2 345:10

**expose** 60:24

**exposed** 63:23 197:1 223:24 224:6,23 225:18

**exposure** 12:16 23:21, 24 49:19,20 55:1 60:22 62:23 64:18 97:3 99:17 107:4 110:9 125:4 128:2 130:23 132:5,15 134:9 139:7, 19 141:9 142:22 143:15 152:20 205:9 214:5 222:5 223:4,5,8 225:2 227:2 293:3 337:19

**exposures** 12:22 13:1 23:22 62:3,4 109:7 128:20

**extensive** 50:23 70:16 232:22 233:5,21,24 264:17 273:6

**extensively** 54:23 258:3

**extent** 11:14 32:10 107:4 109:8 110:9

**extremely** 265:5 271:12

**eyes** 220:18

**F**

**facilities** 228:9

**fact** 32:23 62:25 150:13 185:3 193:4 253:4 254:21 263:12 274:1 291:7 292:8 300:10 313:16 320:12 325:6 331:7 344:8 345:1,15 358:25 359:8

**factor** 82:7 96:13 147:16 195:6,7 234:17 265:2 285:19 286:1,6 290:3,8 337:14

**factors** 14:14 81:17 82:5 144:15, 20 146:25 157:17,20 164:4 175:7 265:15 290:19,25 291:10,15 292:16 293:8 363:5

**facts** 84:20 95:20, 21 373:3

**failed** 369:16,20 370:20

**fair** 8:23 9:9 42:23 65:4 95:13 103:3 183:4 186:17 192:11 202:15 344:3

**fairly** 193:10

**fall** 369:1

**falls** 54:20

**false** 193:6 194:21

239:23 300:10 304:4 305:20 311:22 312:20 313:1 315:1,2 328:5 357:22 358:7 361:17 362:5,9 366:21
**falsely**
305:21
**familiar**
88:22 105:8 114:8,13 149:6 153:1 222:6 249:20 336:9 349:7 351:21 352:19
**family**
263:16
**famotidine**
205:21 206:23 207:9,22,25 208:8,20,22 209:6,19 210:3,7,15, 22 274:9 275:14 276:2 277:11,13 278:9,22 282:10,13 283:19 284:7,9,16, 24 285:2,13, 14,24 286:10 287:5 289:16
**fashion**
252:20
**Fass**
249:19
**fast**
132:11
**faster**
129:10
**father**
346:14 347:15,19
**FDA**
29:14,24 31:15 36:19 81:21 82:1, 22 95:15 100:6,19,21 101:6,9
**FDA's**
275:13
**fee**
264:8
**feel**
297:5
**feels**
342:25
**felt**
9:10
**fewer**
210:15 340:3
**field**
34:10 35:12 69:5 88:24 89:3 263:13 352:14
**fifth**
103:15 250:9 269:9
**fight**
216:2
**figure**
178:25 179:13 184:7 198:11,13,16 211:9 223:4 342:14
**file**
48:12,15,16 88:17 90:23
**filled**
271:1,9
**Final**
29:8
**finally**
28:15 262:21 263:24
**find**
14:16 20:21 22:6,7 28:21 125:15 128:19 129:2 132:9 170:10 181:7 234:2 256:1,3 297:15 318:19,20 336:17 353:6
**finding**
16:9,11 23:7,11 127:20 223:10 240:12 245:1 288:1 311:14 314:15 328:13 330:2,3,23 358:7
**findings**
39:6 179:13 261:1 299:9 304:5 312:21 361:17
**fine**
20:17 85:6 106:14,15 108:23 118:22 119:1 121:4 191:6 192:10 243:16 245:3 297:20 324:13 348:7 351:10,17
**finish**
54:2,6 89:13 100:16 123:25 133:1 150:6 160:4 165:8 171:5, 7 176:5 191:19 196:21 273:14 288:21 289:3 344:6 372:19
**finished**
11:17 138:8 191:24,25 214:21 240:4 243:14 316:19,23,24 328:15 342:3 362:24
**firmly**
177:23
**first**
23:11,12 29:9 69:18 72:7 81:11, 12 92:25 95:24 98:25 111:2 114:1 117:5 134:9 135:22 137:5 139:19 141:8 142:22 167:8 176:6 177:17 180:4,20 181:4,10 182:13,16 183:2,7 191:15 203:9 204:19 219:8 228:5 241:22 242:5 243:3 245:24 246:2 271:3 280:3, 23 282:18 284:6,25 297:21 303:24 305:19 311:3 312:2 320:9 323:6 327:24 328:13,17 329:3 347:15,20 350:21 351:12 357:21

362:10 363:23
**five**
27:3 35:22 50:9 97:13, 24 101:3,5 145:17,20 147:20 154:13 159:6 225:15 226:19 227:3,18,19 258:19 265:9,11 274:19 279:6 281:11 316:15 330:17 342:24 374:6
**flag**
345:1
**flagging**
160:4
**flatten**
371:13
**flip**
287:16
**flipped**
10:7
**focus**
12:18,21,24 68:17 78:11, 16 101:12
**focused**
49:14,19 50:3,5,7 51:5 54:21 62:19 71:20 72:20 77:22 79:18 94:20 97:12 100:25 104:21 111:13 215:6 273:19
**focusing**
215:3
**folded**
318:5
**folder**
119:9 297:13
**folks**
336:14
**follow**
123:7 126:21 127:8,22 225:13 267:18 358:23
**follow-up**
20:7 23:11 122:13,15,22 123:13 124:6,7,16, 20 125:17 127:19 129:14,16, 23,25 130:7, 13,20 131:2, 9,11,16,19, 21 132:1 133:11,15,23 134:4,5,6, 15,17,24 135:7 136:2, 5 137:16 138:18 139:8,14,22, 23 140:4,21 141:9 142:23 143:6,10,11 144:12 145:18,21 179:6 199:8 203:19 256:17 261:18 269:17,18 328:10 372:22
**followed**
18:18 126:18 127:6 132:17 137:6 309:6 362:19
**following**
114:10
117:25 133:21 136:4 209:12
**follows**
8:11
**Food**
29:14
**force**
10:25 298:21 299:11 300:12,24 301:1,7 302:12,17,20 303:18 306:1 307:7,11,23 311:4 312:23 313:10,12 316:9 317:10 323:16 327:25 331:8 357:22 361:10 362:11
**forceful**
375:2
**forcing**
142:5
**forget**
188:19
**forgot**
262:18
**form**
14:20 15:24 18:20 19:16 20:1,25 21:23 22:11, 18,23 27:16 28:5 30:17 33:10,20 35:8 36:9 37:8 39:13 40:9 44:4,21 45:10 46:21 47:19 48:20 49:5 51:2, 12,22 62:17 63:13 64:1 65:11,14,23
68:7,16 70:7,8 73:11,20 76:20 77:14 78:4,21 79:13 81:25 82:9,15,24 83:5,9,16,23 84:7,19 85:12,20 87:18,24 88:5,19 89:22 91:4, 16 93:11,18, 21 94:15 95:4,19 96:11,17 97:7 98:9,21 99:10,18 100:3,14,23 101:8 103:12,19 104:4,20 105:4,13 107:7 110:13 123:9 126:16 128:4,21 129:3,21 132:13 134:20 135:9 136:22 138:3 142:25 146:3 148:22 149:4,17,25 152:15,24 153:4,9 154:2 157:4 158:12 161:16 164:6 168:7,9,25 169:12,22 170:3,13,19 172:16 173:6,21 174:5,23 175:9,19 176:14 177:2,4 184:5,20

186:3,20
187:5,13
188:11,25
189:10
196:12 199:4
200:24
201:23
205:16
207:3,11
208:15
209:2,21
210:11,13,19
211:7
215:19,23
216:4 217:14
219:10,11
220:2,4
221:9 222:21
223:6,25
224:17
225:1,19
227:5 229:4,
9 230:8,17,
22 234:23
236:2 240:22
241:17
242:11
243:2,9
245:10,13
246:6,17,22
250:22
251:10
252:8,11,24
255:19 256:7
258:11,16
259:6,16
260:8,19
265:14
266:11
267:1,5
270:1,10
271:2 272:4,
9,19 273:1
278:17
279:4,23
284:21 286:4
287:23
289:14,18,23
290:5,14
291:6,13
292:20
296:1,6,12,
24 319:1,3
322:16,24
324:9,24
326:7 327:19
329:16
333:14
334:13 335:3
340:6,15
349:22
350:19
351:16
353:1,9
355:2 356:9,
19 358:11,19
359:5,13,16
360:3,13
361:8 363:25
367:13,24
369:4,18
370:4,6,13,
21 371:7,23
373:2

**formal**
76:4 307:15

**format**
70:10

**formed**
132:10
300:13,25
307:23

**forms**
176:24

**found**
16:22 125:3
127:16
130:10 234:9
239:8,22
240:2 263:24
270:14
300:12 365:1

**foundation**
59:1 103:7
104:5 283:6
355:3 360:4

**four**
27:3 28:24
29:4 65:16
166:9 219:16
252:7 269:5
281:4,9,10,
13,18

**freely**
264:13

**fresh**
8:19

**friend**
375:6

**front**
120:20
264:16

**full**
87:3,8
108:21 145:4
242:7,19
361:17

**fully**
35:21 193:1
234:13
236:14

**fund**
264:16

**future**
219:22

**G**

**gander**
113:11

**gaps**
212:10

**gastric**
168:1 251:20
254:15 277:8
314:23
315:17
318:15
321:23
325:20 327:3

**gastritis**
175:5 284:3
290:3 291:3

**gastroesophageal**
151:20
163:21
164:3,25
165:16
167:15 169:4
277:18

**gastrointestinal**
163:19 166:8
169:24
170:15
171:10
292:10
317:21
318:16

**gave**
19:1 20:4
21:8 22:16
23:2 139:19
143:16
175:23 202:2
234:6 309:4
311:16
315:22
329:13
353:23 354:1
358:21
359:1,6

**gene**
62:6 76:6,
19,22,24
78:19 79:21,
22 80:17,18

**general**
21:6 22:2,7
23:16 50:2
62:12 64:22
65:1,24
68:20 77:16
78:7,16 79:2
85:14 96:19
132:1 139:13
143:12
157:3,7,12,
17 161:5,23
169:5 218:10

222:22 223:10 226:1 261:17 272:8 273:19 337:5
**generalization**
79:9,17 369:6
**generally**
13:2 16:5 18:22 61:16, 24 88:22 89:2 225:6 279:20 294:21 330:21 356:3
**generated**
258:23
**genes**
61:21 62:2 73:7,9 76:10,16 78:23,25
**genetic**
8:24,25 23:13,15,19 49:12 50:6 55:13 58:19 61:19 62:15 67:3 69:7 70:17 73:4, 17,23 74:24 76:2 78:1,11 96:20 361:14,25 362:7
**genetics**
49:17,24 61:25 62:19
**genotoxic**
107:3 110:8 111:8
**genotoxicant**
104:12 106:21
**genotoxicity**
104:3
**genotoxin**
104:18 105:1,11
**George**
368:18
**GERD**
147:23 148:15,18 149:24 150:18,23 153:15,21,24 175:5 277:19,21 281:4,14
**germ**
61:25 62:19
**gerrymandering**
346:20,22
**getting**
14:6 53:10 81:2 91:9 198:1 213:14 214:18,19 215:9,17 253:23 316:2 329:18
**give**
10:21,22 11:2 36:2 61:13 64:8 74:20 90:4 110:22 119:4 121:11,15 132:25 133:3 147:25 150:3 155:13 156:6 183:20 193:1 258:9 260:2 297:6 311:25 312:3 325:1 328:6 336:14 354:15 361:14
**given**
13:8 159:16 220:6 262:14 309:3 325:4 330:1 333:6
**giving**
136:15 215:13 238:22 267:23 319:17 320:13
**glad**
374:1
**glancing**
92:1 302:8
**goes**
16:6 50:23 113:8 199:25 200:16 260:5 299:24 300:4 313:25 316:4 323:21 356:14 362:15
**going**
36:15 54:1, 16 57:1 59:18,20 80:1,10 81:1 100:15 101:11 110:3 112:4 117:3, 7,23 131:13, 14 138:9 141:16 155:1 156:19 160:3 161:13 165:13,21 171:2,9 177:10 180:2 185:23 186:16 188:23 194:9 195:16 196:1 198:10,15 200:4,10,11, 13 202:17 211:16 216:22 218:1,22 220:7 226:11,16 227:9 231:6 246:24 247:6 256:3 259:18 260:13 287:8,10,25 288:22 293:15 306:18 316:8 320:20 329:19 334:17 336:20 339:1,19 341:5 345:13 348:5 349:4, 23 353:18 359:18,19 366:12 371:25 373:25 374:15 375:5,15
**good**
8:16,17 22:19 23:1 49:9 60:13 70:5,8 72:15 92:16 113:7, 10 128:18 132:2 143:22 144:25 154:15 166:9 192:1 216:15 248:8 280:7, 9,11 333:22 334:7 363:1 372:1 373:5 375:3,9,10
**Goodman**
352:4
**goose**
113:10
**Gosh**
48:5
**grant**
73:16

**great**
10:9 11:20 111:24 178:13 203:2,7 235:2,20 344:8
**greater**
13:10,23 14:3,18,22, 23,25 19:23 20:21 287:17 312:25 329:24,25 355:20
**greatest**
141:8
**green**
339:25 342:7
**Greenland**
308:8 335:2, 11,17 350:3, 4 352:3,17 354:16
**Greenland's**
335:21 349:5
**Grieve**
335:12
**grind**
245:8
**grounds**
364:20 365:14
**group**
87:1 127:21 132:8,10 185:3 186:18 196:10 197:8,13,16, 18,19 198:7 224:16 225:7 239:21 240:1 249:3 251:12 284:15,16 286:9,10 289:16,17 310:25
**grouped**
253:16
**groups**
164:10 193:22 194:15,18 195:3 197:2, 6,8 252:2 254:5,14,17 284:18 285:18 287:15
**growth**
67:21,22
**GSK**
48:4,6 103:5,9 104:1,18 105:1 107:2
**GSK's**
91:8
**guess**
67:18 99:11 174:9
**guessing**
168:12 342:12
**guide**
349:9
**guys**
108:3 117:14 120:16 121:1

**H**

**H2as**
49:15
**H2r**
164:22 166:25 194:17
**H2ra**
41:23 196:10 197:3,18 284:9
**H2ras**
135:23 139:8 164:11 197:16 205:13 224:14 273:22 274:4 284:12 372:11
**H2rb**
163:19 164:19 167:10
**H2rbs**
167:6,18 179:7 180:5 198:20 199:20 205:9
**Habel**
27:19 236:19
**Habel's**
26:23
**half**
17:21 171:3 175:22 189:21 199:19 288:24
**halfway**
189:22 343:20
**hand**
10:1 51:18 99:22 304:9 373:9,22
**handy**
118:14 119:3
**hang**
90:17 101:24 162:15
**happen**
11:7 20:24 21:3,7,22,25 65:9 288:13
**happened**
87:17,23 88:2 123:2 153:8 244:15
**happening**
120:15 368:5
**happy**
9:20 57:21 120:18 203:13 369:8
**harassing**
67:15 141:14 220:1 326:23
**hard**
41:2 44:17 53:14 118:18 138:12 141:17 170:4 200:18 311:10 340:17 349:25 350:24
**Harvard**
182:5
**hate**
348:3
**hazard**
48:6 101:23 103:4,8,17, 20 104:1 107:2 180:11 190:8 191:2
**hazards**
180:7 190:17,20,23
**he'll**
121:4 341:22
**head**
369:21
**headache**
222:15
**header**
167:3 284:22
**headers**
180:1
**healing**
277:2
**health**
12:5 23:17 39:21 70:3,

11 72:13 92:19,21 99:14 257:5, 14,15 294:16 295:2,4
**hear** 126:8 137:19 161:17 226:13 311:23 374:1
**heard** 370:2
**heartburn** 147:22 148:18 150:22 151:23
**height** 76:8,9
**Heinz** 126:25
**help** 38:15 155:25
**helped** 167:8
**helpful** 22:14 56:2 116:21 129:5 137:25 217:15 299:13 313:13,16
**helps** 114:17 232:1
**hepatic** 111:3
**hepatitis** 290:20 291:1
**Hey** 119:25
**Hidajat** 236:20 367:14,17
**hide** 324:3
**high** 221:13 265:1,4,5 348:23
**higher** 15:10 184:4 185:13 191:1 197:22 223:1 225:10 227:7 265:20 289:21
**highlight** 94:5 96:21 115:19 121:3 124:24 144:7 146:19 147:6 151:12,13 179:9 189:21 192:7 203:9, 21 207:13 232:19 237:22 284:22
**highlighted** 75:18 115:7 120:14 121:2 122:11 179:22,23 281:2 283:17 299:11 301:15 318:10 364:6
**highlighting** 291:7
**highlights** 115:13 119:6 235:20 319:16
**highly** 97:1 99:15 128:23 309:4 330:2
**Hill** 363:8,12 364:14
**Hill's** 363:17,24
**hint** 136:16
**hired** 48:1 103:11
**histamine** 41:23
**hit** 78:25 351:13
**hits** 78:8,24 79:21 80:17
**hitting** 114:16
**hold** 89:12 107:22 123:24 170:25 308:23 319:10 324:8
**holding** 346:6
**hole** 182:10
**honest** 312:8 348:11
**hope** 216:14 263:17
**hospital** 163:14 174:12 175:1 255:20
**hospitals** 161:5,23 163:13 270:3,4
**hour** 24:17,18 54:1 57:22 100:16 110:18 160:3 165:21 171:2 175:22 288:23,24 334:17 348:1
**hours** 277:20
**how's** 63:20 282:11
**HRA** 273:5
**human** 12:6 61:1 64:22 84:3 86:21 87:5, 11,21 104:22 106:9 316:16 330:17 332:4 357:7
**humans** 12:17 64:24 94:21 96:24 97:2 99:2,16 373:13
**hundred** 219:14,15 228:10 340:4
**hypersecretory** 278:4
**hypothesis** 64:16 78:8 309:18 333:23 353:22,23,24 354:1,21,24 355:20 364:19
**hypothesize** 122:24
**hypothesizing** 226:10
**hypothetical** 197:21,24 227:1 267:23 273:11
**hypotheticals** 235:5

## I

**i.e** 291:1
**i.e.** 290:20 363:5

**IARC**
83:17,25 84:9 86:10, 13,20 87:3,8 94:4 128:14, 17,22,25
**IARC's**
92:21 93:12
**IBD**
254:17,19
**ICD**
161:7
**ICD-10**
160:14
**ICD-9**
160:18
**idea**
22:4 221:5 262:22 308:16
**identification**
24:3 58:12 69:15 90:10 101:20 114:6 162:21 202:9 203:1 206:4 233:4 237:10 249:16 274:24 289:8 301:13 306:12 335:9 338:24 346:2 353:17 363:22
**identified**
23:8,10 162:22
**identifies**
344:8
**identify**
23:4 24:5 44:10,18 45:5 70:1
**ignored**
137:5
**immediately**
220:12
**immunologic**
64:23
**impact**
254:23 264:24 265:2,15 293:10
**impacts**
60:19
**Imperial**
367:8
**implication**
273:24 368:24
**implied**
330:24
**imply**
332:13,15
**importance**
331:15,21 332:15
**important**
11:2,10 147:15,19 153:18 164:8,24 165:14 172:9,15 191:9 223:8 235:4 332:14 357:12 358:2 362:9
**impression**
177:22 178:4
**in-person**
121:13
**incidence**
164:24 173:4 258:18 266:12 340:9,13
**incident**
162:7 266:9
**include**
32:17 33:8 71:2,4,18 75:24 88:1 144:12 180:14,16 190:11,13
**included**
17:9 18:6,12 19:14,25 20:23 27:23 29:22 32:24 33:12 35:1 36:25 49:10 140:10,18 144:21 145:20 234:14 257:15 260:12 261:21 270:4 337:22
**includes**
22:10 61:20
**including**
44:11,20 45:7 55:16 97:9 163:20 285:20
**incorporate**
45:20
**incorporated**
43:14 103:2
**incorrect**
151:11 181:24 238:21 291:20 317:17 323:4 354:14
**incorrectly**
301:1
**increase**
164:22 189:8 202:13 298:23 314:14,16 315:25 317:20 319:20
**increased**
164:4 188:22 189:2 238:7 244:2,13,18 292:1,9 314:9,13,22 315:7,14,17, 21 321:17,22 323:7,14,23 325:8,17,19 326:2,11 327:2
**increases**
320:14
**increasing**
316:7
**independent**
24:12 42:7, 17,24 177:6 245:7
**independently**
32:19
**index**
162:6 163:22 181:9 182:15,24 183:6 184:11,16 187:14,16 190:15 191:12 230:12
**India**
95:17
**indicate**
149:11 314:22 315:17 317:10 321:22 325:19 327:2 329:23 333:1 358:1
**indicated**
242:6 278:20,21 279:6 292:9 319:19

329:22
338:19 367:1
**indicates**
202:14
234:12
236:13
313:19
319:18
322:11
357:11
358:18
359:22
**indicating**
163:19
186:13
323:14
**indication**
164:21
239:12
251:14
257:21
278:16 345:4
**indications**
274:8,11
275:13,23
278:8
**indirectly**
192:23
**Indiscernible**
126:23
**individual**
168:15
220:22
224:11,21
229:8 249:1
251:4,7,9
252:3 253:23
254:22
256:10,14
257:13
267:10,14
294:3,7
**individuals**
127:21 185:9
207:7 229:12
249:9 251:12
257:21 262:5
294:25
295:12
**induced**
93:3
**inevitably**
205:7
**infectious**
58:16
**inference**
327:13 329:7
373:21
**inflammatory**
290:21 291:2
**inflated**
191:14
**Informatics**
157:10
**information**
23:19,20
29:22,24
30:6 32:24
33:1,17,22
34:4,18,21,
25 35:1
37:19,25
38:4,18
144:13
149:22
154:23
155:3,18,22
156:10,12,
16,24
157:14,21,23
158:3,9,10,
23,24 159:4,
8,11,13,21,
22 160:9,21
164:9 166:1,
4 192:12,20
194:10
203:25
206:19
208:4,7,24
211:20 213:7
214:5 216:25
226:10
229:11
230:18,20,24
231:4 232:23
233:6,12,16,
19,21,24
236:17
242:3,25
243:1 244:21
258:9 259:8
263:2
272:10,17
283:22
296:3,7
317:12 334:5
340:23
**informative**
328:14
**inhalation**
111:4
**inheritance**
63:10
**inhibitor**
370:10
371:10,11
**initial**
23:6 183:14
240:17 242:4
297:21 330:2
358:7 366:19
**initially**
35:10 347:15
356:22
**initials**
107:19
**initiative**
72:9
**injury**
58:20
**inpatient**
163:12
175:1,12
**inquiries**
270:6
**instances**
137:1 152:3
**Institute**
182:6 339:16
**Institutes**
70:3,11
72:12
**institution**
128:24
**instruct**
80:10 81:1
218:6 220:4
329:19
**instructed**
219:13
**insufficient**
84:3
**insurance**
257:3,5
268:3
**intentional**
282:5
**interaction**
63:5,19
**interactions**
62:6
**interacts**
62:20
**interest**
100:11 293:4
**interested**
129:4 142:7
169:17,20
174:14 176:3
**interesting**
39:7 158:15
233:25
303:23
342:17
**internal**
48:3 91:8
**International**
83:11 90:13
**interpret**
125:9 200:2,
25
**interpretatio
n**
52:19 221:25
244:3,19
298:12 326:1
342:21
**interpreted**
51:9 298:23

299:8 303:21 307:10 315:16,25 327:1 330:21
**interpreting** 238:23 305:22 311:12 321:16
**interprets** 323:13
**interrupt** 66:15
**interrupting** 107:23,25
**interval** 16:18 17:7,9 18:5,12 19:4,9,14,25 20:23 21:12 22:10 23:6 180:8,13,15 186:12 190:9,10,21, 24 191:3 238:23 291:24 292:2 311:15 314:4,20 315:9,11 317:3,23 318:23,24 319:22,24 320:15 321:15 322:20 324:2 325:6,14,23 359:3
**intervals** 201:9 260:10,14 266:14 316:2 318:21 319:18 335:23 349:9 352:22 361:3
**intimidate** 217:25
**intimidating** 217:24 220:2
**intimidation** 141:15
**introduction** 303:24
**invalid** 145:25 166:4 332:1
**inverse** 54:10 179:14
**inverse-probability-of-treatment-weighted** 179:4
**investigating** 41:21
**invited** 302:17
**invoice** 348:8
**involve** 49:12 54:18
**involved** 50:11,15 51:1,21 89:4 245:4 307:16 368:22
**irrelevant** 83:25
**irritable** 284:2
**issue** 17:20,24 43:25 120:13,25 193:12 282:13 323:1
**issued** 300:7
**item** 36:12
**items** 12:2 28:13, 24 29:4 46:20 63:6
353:3
**IUR** 156:22
**Iwagami** 26:6 133:24 134:17 135:6 136:6 138:18,25 140:11 231:19,20,22

**J**

**James** 115:24 246:24 375:8
**January** 266:18
**Japan** 95:16
**Jennings** 9:18
**Jim** 8:14 180:24 297:17
**John** 7:3 8:22 56:11,21 119:25 297:10 350:2 375:14
**journal** 263:4 264:2, 7,9,11,19, 22,25 265:3 303:20 335:24
**journals** 262:20 263:12,16 264:10
**jschmitzer@uslegalsupport.com.** 297:22
**judgment** 15:21 16:1
**jump** 11:16,20
**jumped** 201:2
**jumping** 132:23 141:22
**jumps** 198:17
**justifying** 311:17 327:15 329:9

**K**

**Kantor** 26:9,10 133:25 134:18 135:6 136:6 138:19,25 140:12
**Karolinska** 182:5
**keen** 244:1
**keep** 49:3 52:21 141:16 173:23 174:2 176:22 306:18
**Kenneth** 352:3
**kept** 176:1
**key** 76:13
**kidding** 249:5
**Kim** 26:6,24 133:25 134:18 135:6 136:6 140:12 145:4,11 249:18,23,25

265:25 272:6 275:9 297:4 339:2,22,25 340:7,17,22 341:6 342:15
**Kim's**
26:23
**kind**
20:10 62:5 84:21 132:23 157:23 199:24 226:9 243:10 252:1 253:17 257:24 274:2 292:3 293:6 294:1 295:20 319:20 342:25 345:9 349:25 355:15 360:17
**kinds**
182:14
**Kingdom**
95:16
**knew**
261:9
**Knock**
214:12
**know**
9:24 14:23 17:17,25 20:3 21:13 31:25 34:12 37:24 39:2 44:9 45:21 47:2 49:16, 18 53:6 58:7 67:12,14,25 68:2 72:11 82:18 85:13 86:10 87:16 89:2,19 91:15 94:2,3 99:4 102:7 105:18,20 106:5,13,15, 20,22 108:7 109:19 112:20 113:4,20 116:4 119:10 120:25 123:10,16,22 125:15,19 126:4 127:12 128:7 130:3 136:8 137:15,20 142:9 149:2 152:7,18,22 153:2 156:11 157:19 161:13 164:9,24 165:14 168:21,23 170:4 171:23 172:19,23 173:4 175:3 182:17 184:6,22 185:7 186:8, 14,21 187:6 188:12,14 189:4 190:19 191:11 198:21 202:18 207:12 209:5 210:25 212:22 214:2 215:7,11 216:7,19 217:4,11 221:20,21 222:5,12 224:22,23,25 225:3,5,8, 20,24 228:13 229:2,6 230:6,9,14 231:25 241:4,7 244:24 245:11,14, 17,22,25 246:1,7,8 247:2 249:24 251:8,13 253:17 256:20,23 258:12,25 259:5,20 261:23 265:12,13,21 267:6,9,12, 17 268:1,21, 24 269:19,24 270:8,16,25 271:1,6,8,19 272:16 273:2 274:15 278:15 279:14 289:22 290:7 292:4,15,25 294:21 295:4 296:9 297:9 298:5 305:2, 5,18 308:13, 14 312:19 319:14 325:22,24 330:13 336:16 339:3,13 340:25 341:4,12,15 342:2,17 350:23 351:7 352:7,9 354:12 359:7 368:14,25
**knowing**
240:6 272:14
**knowledge**
51:11 82:3 87:10 245:6 338:18,20
**known**
41:24 50:15 147:12,16
**Korea**
114:12
**Kumar**
26:7 133:24 134:17 135:6 136:6 138:18 139:1 140:12 337:4

**L**

**label**
276:7
**labeled**
85:23 86:24 139:25 143:21 167:8
**laboratory**
29:15 93:2, 24 105:16 111:10 270:6
**lack**
58:25 103:6 104:5 144:13 156:13 236:17 283:5 322:11 331:9 332:15 333:1 355:3 358:17 360:4
**lag**
182:17 267:3
**language**
15:14 16:3 109:14 130:19 315:20
**large**
89:11,20 127:20 185:4 222:17 237:23 238:4 258:1 262:16 273:25 288:3
**large-scale**
70:17 71:15, 22

**largely**
83:13,20
93:14 95:21
**larger**
155:14
183:16,22
185:3 186:18
193:2 234:10
282:23
332:13,14
**lasts**
267:20
**Late**
336:15
**latency**
128:18
129:1,8
130:13,23
131:25
134:12 135:4
137:17
**latest**
12:7
**latitude**
220:7
**launched**
329:1
**law**
299:16
**lawyer's**
109:23
**lawyers**
24:10,11
31:10 32:5,
6,17 36:5
44:12,20
45:7,17 46:2
60:5 90:24
91:10 113:18
185:17 213:2
228:6 348:13
**lead**
62:11 196:1
246:13
311:18
327:16
329:10
**leading**
194:21
**leads**
77:10 151:19
155:10
156:13
194:6,23
195:10
330:24
**leak**
12:6
**leave**
121:14 122:5
145:9 206:2
228:7 249:13
278:7
**leaves**
260:17
261:19 270:3
278:7
**leaving**
155:12 292:4
**led**
205:8
**leeway**
175:23
**left**
27:10 163:9
200:1,10
201:16
228:14
237:18
275:12
276:3,15
320:24
**left-hand**
281:13
**Legal**
7:10 121:12,
19 298:2
**legend**
166:18
**legitimate**
15:22
**length**
41:2 123:16,
19,20 262:4
273:6 338:16
365:10
**let alone**
100:9 357:7
**letter**
249:24
**letters**
109:3
**letting**
52:23
**level**
39:6 222:1
224:21 226:6
252:3 253:24
259:22
269:14
314:23
321:23
322:10
325:20 327:3
332:9 360:18
**levels**
97:3 99:17
**Liability**
7:7
**license**
330:22
**lieu**
7:22
**life**
222:20
**lifestyle**
144:14,20
157:14,17,20
**lifetime**
132:18
**lifted**
323:25
**light**
65:7
**limitation**
115:10
124:5,15
129:22
271:12
**limitations**
117:2 122:6
124:12
144:6,9,11
145:20,23,24
146:13
203:14 255:8
269:10
**limited**
41:2 66:10
125:17
203:18 220:3
271:16 334:5
**line**
14:9 54:6
57:4 61:25
62:19 80:7
100:17
101:17
146:18
157:18 160:4
199:24
202:14
283:25
324:21
339:25 342:7
**lined**
276:12
**lines**
166:9 339:24
342:8
**link.springer.com.**
336:5
**list**
25:2 27:1,4,
11,13,19
28:12,21
30:3,13,21,
23 31:7,8
33:9,19
35:6,25
36:3,4,20,
21,23 37:1,
2,3 39:20
43:1,5,18
44:2,13
45:4,17
46:18 48:23
49:7,23

58:16 59:5 75:15 81:17 82:5 91:18, 23 129:22 139:4 140:11,15 189:15 268:5,8,13 353:3

**listed**
25:23,25 26:21 27:7, 20 28:3 30:10,11 33:18,24 35:6,10 36:8,20 37:12 39:17 42:25 43:5 45:12,15,17, 24 46:2,5 49:2 55:15 140:14 143:1 175:6 232:15 267:8 290:17

**listen**
33:15 35:3 102:16 137:7 209:16

**listening**
40:6

**listing**
134:3

**lists**
28:13

**literally**
39:23 111:22

**literature**
15:12 16:2 34:17 42:8, 18,25 46:23 131:8 258:21 262:17 273:25 312:21 356:1 361:17

**litigation**
7:7 24:7 241:16 242:4,10 245:5,16

**little**
14:6 16:24 26:16 31:25 52:24 53:16 57:16 69:12 72:23 132:25 133:3 141:24 212:24 222:9 228:23 274:6 288:23 334:22 340:17 343:1 368:7 375:2

**Liu**
295:11 296:16

**liver**
286:2,23

**lives**
133:18

**located**
9:14 73:10

**London**
367:8

**long**
117:10 119:6 122:15,22 123:13 124:8,16,20 126:1,18 127:5 129:20 130:1 131:19 142:3 196:19 218:12 227:18 255:21 256:9,17 258:10 298:5 338:1,10 348:12 353:3 360:11 368:8

**long-term**
125:7,23 203:18 238:6 244:14 278:20

**longer**
125:13 127:22 132:1,19 133:6,8 203:16 230:12 255:24 257:15 269:21,22 270:7 344:11

**longest**
139:24 143:16

**longitudinal**
267:16

**look**
20:20 21:1 22:1 34:15 38:11 40:16, 17 49:25 50:1 52:7,10 62:8 69:22 70:13 89:16, 23 90:19 92:5 102:6, 25 105:14 106:8 110:23 115:21 116:15,21 117:6,10 125:23 134:11 135:2,25 136:10 137:3,14,25 138:21 140:11 144:22 150:24 151:5 154:25 158:20 160:10 161:15,19,21 165:18 169:5,8 170:1,2,9 182:22 186:22 190:16 191:16 198:14,16 202:11,12 205:22 206:18 207:20 208:6 209:9 210:5 211:1,2,6,21 212:3,9,18 214:10 216:23 217:17 218:17 223:18 224:8,12 225:10 231:6 232:6 233:8 241:23 247:16 248:9 250:13 252:10,20 254:2 255:25 256:8,9 257:10 259:10 265:10 268:22 269:4 280:24 281:16 283:21 285:23 292:18 296:14 297:3 301:9,10,23 302:7 305:19 309:11 310:25 312:4,7,8 316:1 317:7 320:4,6,12, 18 323:10 330:14,18 335:6,19 336:11 337:7 339:19 340:8 341:8 347:3

355:7,11 359:18 364:17 372:1 373:5
**look-back**
163:23
**looked**
15:4 35:19 39:2 41:16 50:18 52:7,14 63:1,5,18 89:15 100:7 101:1 102:19 150:12 154:9 174:20 187:12 191:1 201:1 217:5 224:10 235:14 240:1 255:15 256:5 260:10 265:13 270:15 295:19 297:1 314:8 325:2 334:11 339:20
**looking**
15:17 20:13 27:1 29:18 36:21 49:16,18 51:15 54:11 57:25 58:1 62:5 71:16 81:7 89:9 94:21 98:22 99:21 101:13 102:10 110:25 111:3 119:12 120:1 127:20 129:13 130:22 131:23 132:8,14 134:7 137:21 138:2 139:10 165:20 169:13 175:8 183:23 186:9 188:20 199:16 207:5 210:20 211:19,25 215:4 222:1 224:10 226:5 231:9 232:7 234:8 236:9 253:15 254:6 284:15 287:2 288:21 289:4 293:3 294:11 295:20 296:14 314:3 315:8 335:15 336:3 338:4 341:1 343:10 344:14 349:24 353:2 354:6 369:24 372:3,11
**looks**
161:2,10 181:9 183:21 208:16 210:21,24 214:14 260:9 285:16 335:16 336:9 350:1,25 351:9 363:4
**lost**
17:21 328:20
**lot**
8:17 97:8 128:13 183:9 220:6 222:10
**lots**
267:12 271:23 312:20
**low**
93:4 97:3 99:17 126:9 221:12 292:7
**lower**
21:11 106:8 151:21 152:8,21 201:11,12 203:7 290:18,24 291:9,14 340:1 359:2
**lunch**
177:11 247:1
**lunchtime**
175:25

**M**

**made**
25:6 28:25 29:17 36:4 39:19 54:15 101:10 137:1,4 148:17 307:19 323:9 325:9 353:11
**magnitude**
40:3 287:13,14 288:2 365:11,18
**main**
292:25 293:3
**maintenance**
276:25 278:14,15 280:5,19
**major**
81:8,15 82:17 252:18 264:10 273:10
**majority**
347:5
**make**
30:13,15,18 33:4 40:4 41:1,9 87:4 90:18 101:25 102:1 125:11 130:17 131:3,14 138:13 143:25 150:20 152:3 153:6 155:16 165:7 173:20 177:16 213:24 233:1 244:22 257:9 264:12,13 266:5 289:6 310:8 318:20,22 334:24 352:1 368:1,10
**makes**
166:4 222:5 250:25
**making**
22:2 28:20 126:20 127:7 136:12 173:25 235:21 243:8 244:11 323:3 327:17 329:11 330:23 373:20
**malignancies**
266:13
**malignant**
203:15
**man**
312:22
**manner**
8:3 16:6 238:21,24 255:1
**manufacturers**
241:16
**Manufacturing**
42:15
**manuscript**
16:7

**March**
163:1 243:23
**mark**
217:23
**marked**
24:3 25:1 58:11 69:15 90:10 101:20 108:4,19 114:6 162:21 202:8,25 206:4 233:3 237:10 249:16 274:24 283:12 289:7 301:13 306:12 335:9 338:24 345:22 346:1 349:2,17 353:17 363:22
**marked-up**
199:13
**market**
81:22 82:8, 12,17,23 83:2,6 95:18 96:6 100:5, 13,20,22 101:6 204:1 205:13 371:22
**marking**
56:15
**markup**
109:15
**married**
249:4,5
**match**
341:6
**matches**
281:18 354:16
**matching**
281:7 342:18
**material**
33:6 38:4 42:8,18 43:4,10,13, 17,22 44:1, 10,18 45:2, 3,6,16 46:13,17,24 47:3,6,8 92:8 162:17 287:9
**materially**
214:24
**materials**
28:12,21 30:3,5,14 31:9 33:9, 13,24 35:7 36:1 38:20 43:1,5,18 44:3,13,15 45:4,18 46:19 48:13, 14 49:11,23 91:18
**math**
221:2,5
**matrix**
55:2
**matter**
7:5,25 37:2, 3 43:16 47:2 222:10 223:5
**matters**
33:19 36:20, 23 189:15
**max**
374:7
**maxed**
276:23
**maximum**
136:2
**Mcdowell**
29:5,21 33:2,12,23 34:1,11 35:12 38:12, 15 234:6 240:17,25 241:9 296:16
**Mcelvenny**
367:17
**Mctiernan**
29:14,21 313:17 314:7 315:5 316:25 317:15 318:1,18 321:12 322:9 323:25
**mean**
13:15,25 14:25 15:15 16:12 18:21 22:3 37:21 38:2,3 39:1, 18,22 41:10 47:25 53:15 55:18 59:14 62:5,14,20 64:12 71:8 74:19 80:9 83:24 84:8, 12 85:7,18 88:3 89:6 93:8 105:25 108:8,9,23 114:22 120:21 123:3,4,10, 22 124:13 126:4 128:6, 22 130:4 131:22 132:3 133:10 134:6,23 135:19 136:3,14 145:23,24 146:10 150:11 154:25 156:5 157:9,19 158:5 164:13,18 169:17,24 170:14 172:2 184:24 189:1 195:4 197:23,25 200:3,8 201:16 206:7 207:4 208:2 211:24 215:3 216:7 218:17 229:20 236:4,7 239:5 240:10 241:21 242:17 243:11 244:24 255:2 260:25 265:5 267:16 272:5 289:24 290:7 291:21 303:15 305:7,12 307:20 311:21 312:8 317:11 318:3,4 327:22 328:4 332:21 333:25 342:14 343:21 351:11 352:13 355:8 356:7 358:13 361:10 366:13,22,23 369:19 372:8
**meaning**
181:1
**means**
83:14 84:2 86:21 208:3, 4 215:24 278:15,19 291:5 355:21
**meant**
122:25 155:3 162:18

207:13
**measure**
220:25 236:14 294:16 295:19 309:17 331:14 333:22 338:1
**measured**
296:20
**measurement**
193:17 217:6 273:11 296:21
**measuring**
221:10
**meat**
129:17,18 133:13 140:25
**meats**
129:13
**mechanical**
327:13 329:7
**mechanism**
70:21
**mechanisms**
71:1,7,10,13
**med**
212:9,18
**median**
134:4,5,24 136:3,5 137:13 140:3,7,16 143:5,17 259:13
**medical**
81:8,15 148:10,16 256:13 270:17
**medication**
206:12 213:8 270:21 272:11
337:24 338:3
**medications**
176:19 272:18
**medicine**
364:22
**medicines**
38:23
**medstat.dk**
211:1,19
**medstat.dk.**
211:3 212:2 217:17
**mellitus**
291:4
**member**
159:9 300:17 303:10 304:22,25
**members**
159:9 162:5 229:7
**mention**
37:6 148:24 163:6 233:17 234:17 239:10 252:15,16 266:2 302:24 303:3 338:15 345:2
**mentioned**
31:24 34:2 55:5 192:24 237:2 355:25
**mentions**
34:12
**Merriam**
84:14
**metabolism**
96:23 99:1
**meth**
347:8
**method**
337:21 370:25
**methodological**
8:25 50:21 51:7 70:20 193:11 318:7 323:4
**methodologically**
151:10 238:21 253:2
**methodologies**
55:11
**methodology**
54:20 291:20 292:4 293:1 317:17 347:8
**methods**
23:22 50:22 51:16 52:16 54:21,22 61:8 69:7 96:19 257:10
**middle**
239:16 308:24
**milligrams**
215:10,15,16 220:10
**million**
256:14 361:23
**mind**
40:11 45:8 119:6
**mine**
252:18 269:2
**mini**
288:23
**minute**
138:20 158:21 170:18 182:22 199:11 227:16 305:8 346:10
**minutes**
165:22 175:23 227:18,19 342:13 374:7,10
**mis-presented**
318:13
**mischaracterization**
75:12
**mischaracterized**
220:8
**Mischaracterizes**
82:10
**misclassification**
193:17 194:1 273:20
**misinterpretations**
349:10
**misinterpreted**
300:19 305:17 306:3 313:1 318:13
**misleading**
282:4 324:18
**missed**
31:14 372:17
**missing**
49:3 211:10 232:22 233:5,9,21,24 234:20 281:10 297:6
**misstate**
138:4,14
**Misstates**
44:5 46:22 86:6 91:5 95:20
**misstating**
324:6,11

**mistake**
151:14
**mistakenly**
303:21 307:9
**model**
264:15
333:23
**models**
157:24
**Modern**
12:8 55:6
58:14 59:6
**modification**
108:10
**modified**
108:14,15
**modify**
108:3,8
**molecular**
58:19
**monographs**
87:1
**month**
271:21
**monthly**
70:7
**months**
86:15
**Moorman**
29:11,20
**morning**
8:14,17,19
309:4 328:7
**mortality**
268:18
269:13,20,25
**mouth**
259:25
**move**
36:17 99:12
145:3,4,5
180:1 191:22
203:3 211:22
212:12
219:2,23
220:19
236:24
246:23
255:23 257:4
283:7 298:6
326:22
334:14
360:14
368:10
369:11
**moved**
257:22,25
259:3
**moves**
201:15
**multi-hit**
78:7
**multi-step**
64:16
**multiple**
73:7 78:8,24
79:21 80:6,
17,23 136:20
324:10
329:17
**mutagen**
60:17,18,22,
25 61:13
62:10 63:9,
23 64:25
65:3,5,9,18,
20 66:3,6,
10,11 67:12,
14 76:23
77:2,8
104:14,19
105:2
**mutagenesis**
64:14 79:19
**mutagenic**
94:10,14
95:3 96:9
105:12
**mutagenicity**
67:10
**mutagens**
61:18
**mutate**
65:4,22
76:24 77:10
**mutated**
64:2 67:23
69:3
**mutates**
63:25 66:13
78:2 79:1,21
80:17
**mutating**
77:19
**mutation**
63:25 77:13
79:16
**mute**
126:25

**N**

**N-NITROSODIMETHYLAMINE**
90:15 114:10
**name**
8:14,20,22
103:9
245:23,24
297:21
352:8,10
**naproxen**
369:23
370:3,9
**narrative**
24:22 25:6
**narrow**
21:17 111:9
215:4
**national**
70:2,10
72:12 161:2
163:11
173:12
174:10
175:11
176:17
339:15
345:10
**nationwide**
114:12
257:24
**nature**
13:4,7 178:6
263:15,16
264:5,18,21,
22,25 265:3,
5,8,19,23
**NDMA**
50:16,18
51:1,5,11,15
52:3 82:2
83:7,10
85:22 86:2,
23 87:4,9
89:5 91:7
93:4,9,20
94:10,14,17,
23 95:3,9,
11,14,15
96:5,7,9,24
97:1 99:2,16
100:2 103:18
104:2,18
105:1,11
107:3,19
109:3,5
110:8 114:11
125:4 338:7
**necessarily**
14:1,24
15:16 61:17
216:7 328:4
332:12,20
358:13
**necessary**
34:24 240:11
244:25
**need**
21:1 22:1
39:9 40:17
46:6 56:7
61:5,11 63:3
71:12 72:22
109:22,24
123:7 129:1
134:11,22

137:15 149:13 157:18 164:15 191:11 204:8 209:16 219:24 228:13 237:6 311:1 341:21

**needed**
35:20 48:19, 23 125:6

**needs**
10:5 126:21 127:8 142:13,16 150:14

**negative**
13:20,24 14:9 18:9 19:8 193:8 198:18 288:11 313:1,20

**negatives**
315:3

**neoplasm**
63:12

**never**
19:6 102:21 105:23 106:2 109:12 157:25 209:25 233:13 288:12 311:7 358:8 370:2

**news**
371:20

**nicotine**
148:7 151:20 152:8,19,20, 25 234:11 235:14,16 236:9 240:1 344:14,16,18

**night**
117:13

375:9,11

**nine**
209:6 221:14,20 289:25

**nitpicking**
343:1

**nitrosamines**
51:21 52:2, 14 89:5

**nitrosodimethylamine**
50:15

**nod**
11:4

**nodding**
280:12

**non-active**
235:17

**non-answers**
218:7

**non-comparator**
234:10

**non-differential**
193:15

**non-genetic**
23:21

**non-h2r**
194:17

**non-human**
93:8 94:1 105:17

**non-published**
39:12,24 40:8,12,21 241:14

**non-replicable**
328:2

**non-sensible**
244:3,19

**non-significance**
361:5

**Non-standard**
298:12

**non-use**
26:1,12,13 147:4

**non-user**
158:7 160:1

**non-users**
155:7 195:18 239:7,20 273:7 372:24

**nonactive**
198:3

**Norgaard**
26:7 140:12 154:6,17,22 155:17 157:15 160:7 181:12,15, 22,25 182:7, 19,25 183:3, 10,17 184:9 227:15 228:18 229:18,22 230:2,5,21, 25 231:4 232:6 247:19 262:19 263:5,7 308:12,13

**Norgaard's**
184:4

**North**
340:24

**Notary**
8:9

**note**
185:8 215:12 345:23 346:16

**noted**
33:23 35:1 44:24 47:9, 14,21 176:7 290:18 375:17

**notes**
374:7

**notice**
115:22 174:20 187:11,18 250:19 278:13 279:8 347:16

**noticed**
282:16

**noting**
186:9

**notoriously**
273:23

**NSAID**
371:10

**nuanced**
309:2

**null**
18:6 19:4,10 155:11 156:8,14 191:4 193:3, 13 194:7,8, 12,13 196:1, 3,11 201:3,6 225:12 239:23 353:23,24 354:1,21,24 355:20 372:14

**number**
15:10 18:10, 11 19:25 26:24 29:5 36:12 123:18 129:11 138:13 155:5,9 156:2 167:14 179:5 184:25 185:2,4 187:3,17 188:9,13 190:11,13,15 193:22 196:8

203:18 214:3 225:3,6,9,25 227:6 233:2 235:12,13 248:16,21 249:6 250:15,16 260:4 265:22 269:5 281:4, 6,9,10 289:6 294:2 295:13,20 296:8,15,21 309:13 311:24 331:12 333:20 364:9 367:1,4

**numbered**
25:13,15 345:23

**numbers**
13:18,20 134:10 135:24 169:21,23 170:1 171:22 173:3 179:19 180:25 181:3 184:3 188:23 190:2 197:20 207:9 211:9, 10 225:10 229:12 248:10,11 268:25 291:17 324:1

**numeral**
363:5

**numerator**
261:21

**numerators**
189:2

**nursing**
347:22

**nutritional**
55:4,21,24 58:23 343:7

**O**

**oath**
7:22 10:21 47:16

**obese**
287:5

**obesity**
284:2 286:21,22,25 289:15,20 291:4

**object**
35:8 58:5 117:4 136:24 282:3

**objection**
8:3 14:20 15:24 17:1 18:20 19:16 20:1,25 21:23 22:11, 18,23 27:16 28:5 30:17 32:9 33:10, 20 36:9,17 37:8 39:13 40:9 44:4,21 45:10 46:21 47:19 48:20 49:5 51:2, 12,22 52:11 58:25 59:9 61:2 62:17 63:13 64:5 65:11,14,23 66:1,14,17, 24 67:15 68:7,16,24 73:11,20 74:2 75:11, 20 76:20 77:14 78:4, 21 79:13,25 80:3,22 81:25 82:9, 15,24 83:5, 9,16,23 84:7,19 85:12,20 86:6 87:18, 24 88:5,12, 19 89:22 91:4,16 93:11,18,21 94:15 95:4, 19 96:3,11, 17 97:7 98:9,21 99:10,18 100:3,14,23 101:8 102:22 103:6,12,19 104:4,9,10, 15,20 105:4, 13 107:7 108:16,18 110:13 112:17 113:15 123:9 126:16 128:4,21 129:3,21 132:13 134:20 135:9,16 136:9,22 137:10,23 138:3 141:11 142:25 143:7,19 146:3 148:22 149:4,12,17, 25 152:15,24 153:4,9 154:2 157:4 158:12,25 161:16 164:6 168:7,9,20, 25 169:12,22 170:3,13,19 172:16 173:6,7,21, 22 174:1,5, 23 175:9,18, 19 176:11,14 177:2,4 184:5,20 186:3,20 187:5,13 188:11,25 189:10 191:22 196:12 199:4 200:24 201:23 205:16 207:3,11 208:15 209:2,21 210:11,13,19 211:7 215:19,23 216:4 217:14 219:9,10,12 220:1,3,4 221:9 222:21 223:6,25 224:17 225:1,19 227:5 229:4, 9 230:8,17, 22 234:23 236:2 240:22 241:17 242:11 243:2,9 244:23 245:10,13 246:6,17,22 250:22 251:10 252:8,11,24 255:19 256:7 258:11,16 259:6,16 260:8,19 265:14 266:11 267:1,5 270:1,10 271:2 272:4, 9,19 273:1 278:17 279:4,23

283:5 284:21 286:4 287:23 289:14,18,23 290:5,14 291:6,13 292:20 296:1,6,12, 24 319:1,3 322:7,16,24 324:5,9,24 326:5,7,22 327:19 328:19 329:5,16 333:14 334:13 335:3 340:6,15 341:14 349:22 350:18 351:16 353:1,9 355:2,24 356:9,19 357:14,17,18 358:11,19 359:5,13,16 360:3,6,13 361:8 363:25 367:13,24 368:10,16 369:4,18 370:4,6,13, 21 371:7,23 372:18 373:2

**objections** 8:5 108:1 136:13,21

**obscure** 117:15,19

**obscured** 109:16

**observation** 314:19

**observational** 25:19 41:21 52:17 68:18 69:8 77:23 94:21 97:12 99:21 101:1, 13 104:22 111:13 125:21 127:13 154:20 188:2 215:2 253:9 255:3,14 268:14 294:11 373:11

**observe** 127:24 128:1

**observed** 123:20 126:19 127:6 132:2 342:23 354:23 355:21 356:7 364:20 365:14

**observing** 218:18

**obtained** 214:4 266:13

**obverse** 364:17

**obvious** 53:11 74:14

**obviously** 122:21 124:2 359:3

**occasion** 343:16

**occasions** 364:21

**occupational** 54:18,19,24 55:2,16,19 58:22 343:8 368:19

**occur** 133:9 146:23

**occurred** 87:12

**occurrence** 12:5

**occurring** 130:22 131:23

**occurs** 277:20

**odd** 115:23 248:11

**off-the-level** 361:18

**off-the-record** 121:8

**offices** 161:24

**official** 300:8,19 302:25 303:21 305:13 306:3 307:10

**offset** 126:1

**okay** 9:23 10:9, 10,15 11:2, 5,8,9 14:16 18:16 19:21 22:4 24:22 25:10,17 27:14,24 28:1,15,19 29:16 30:13, 25 31:7 34:23 35:3 36:14,19 38:1,11 39:22 40:14, 22 41:4 42:3,15,23 44:17 45:25 47:11 52:4, 21 54:7 57:14 59:14, 17 62:9 63:21 65:3,8 69:22,24 70:9 71:17 73:3 76:14 81:20 83:14 85:6 86:2 87:3 92:3, 10,24 93:9 98:24 101:15 102:5,11 103:3,14,22 106:24 108:18 111:24 112:16 113:22,23 114:3,18,21, 22 115:4,22 119:8,14 120:11 122:8,11 123:12 130:25 131:16 138:7,20,23 139:2 140:9, 15,19 141:2, 10 144:2 145:8 146:1, 8,14 147:2, 9,14,21 148:3 152:6 153:6 160:6, 10 162:13 163:17 164:1 165:10,11 166:2,5,19 167:7 168:4, 14 170:25 178:13,22 179:18,24 181:5,11,15, 23 182:9 183:21 184:8 185:17 186:16 189:18 193:19 196:20 197:7 198:4 199:18

202:4 203:7 204:17 205:1 207:18,21 209:5 211:12,18 213:3,4,6 214:10 217:18 220:17,19,24 232:8 242:1, 23 243:20 246:5,12 247:1,4,24 248:15 249:10,25 250:7 252:9 259:12 260:3,13 266:5,15 269:3 271:5 275:21,22 281:18 282:2 283:8,12,15 284:6,14,25 286:8,20 287:19 290:23 292:14 298:4 300:6 301:3 302:2 304:7, 10 305:15 306:6 309:10 310:15,18 312:18 316:25 320:21 324:13 326:21 327:9 328:2 330:18 333:17 334:7 336:6 338:13 340:16 343:17 345:18 346:3 348:24 349:19 350:12 351:15,20,23 354:18 355:16 356:16,20 363:16 365:1,24 366:17 367:15 368:9 369:14 370:22 373:14,16

**omeprazole**
272:25 283:19

**once**
10:19 171:18 234:7 261:18 266:3,4 280:19 287:3

**one**
12:10 13:10, 13,18,20,23, 24 14:4,8, 18,23,25 15:10,16,20, 22 17:10 18:1,11,12 19:12,14,23, 25 20:21,23 22:10 23:12 26:8,23 27:3 32:1 34:18 35:20 39:3 55:17 66:16 75:1 76:6,13 77:18 78:2, 19,25 79:21 80:17 81:10 90:17 96:13 103:10 107:13 109:12,15 110:1 113:20 114:25 116:7 119:8 126:17 127:5 155:5 156:1 159:5, 15,18 162:6 166:14 171:16,20 180:14,16 184:14,18,25 185:1,5 186:19 187:4,7 188:7,23 189:7 194:18 196:24 197:8,13,16 198:17 199:18 200:16,22 201:2 202:17 207:1,6,7 217:13 221:14,15 222:23 223:17 224:5 225:20,22 227:7 231:25 233:1,18 234:18 235:12 237:5,16 240:10 241:5 246:4,9,13 247:14 248:5,12,19 249:20 250:3 251:21 254:7 255:14 257:3 260:4,5,16 263:15 266:20,23 267:3,17 268:1 269:3, 6 270:3,4 273:16 275:16 276:23,24 277:19 279:9 281:1,7 284:12 290:2 291:21 295:11 297:3 299:21 302:9 303:6 308:8, 10,12 315:3 318:7 320:16,23 323:24 324:22 325:1 328:8 333:19 336:13 339:19 342:14 343:11 345:13 346:8 349:11 351:4,5,12 353:14 355:18 356:12 357:4 360:18 369:17,21 371:20 373:16

**one's**
260:7

**one-year**
260:10,14 266:13

**ones**
63:3 201:4 242:19 276:12 281:2

**ongoing**
71:18 75:2, 23 278:19,20

**online**
210:17 307:19

**onset**
122:16,23 123:2 124:3, 8,11,21 126:2,5,19 127:7 130:1, 4,5 132:4

**onsets**
124:14

**open**
69:22 264:11 312:24 341:25 350:10

**opened**
312:5
**opening**
312:22 331:8
**opine**
101:11 172:1
**opinion**
42:6,16
46:11 97:22
98:18,20,22
100:12
125:25 126:5
345:14 347:5
**opinions**
314:25
318:2,5
**opportunity**
116:9
**opposed**
118:6
131:24,25
134:8 135:21
214:18
222:24
**opposite**
178:4 200:4
321:16
**option**
121:22
**options**
271:18
**oral**
281:24
282:21,22
**order**
71:13 116:12
123:6 183:22
233:7
**ordered**
82:22
**organization**
81:9,16
82:4,18
92:19,22
99:15 294:17
295:3,5
300:8 306:8
**original**
30:12 87:7
108:10,13,14
343:25
**Oslo**
182:6
**out-of-context**
109:19
**outcome**
76:7 78:18
130:24
132:6,16
135:23
143:15 176:3
293:4
372:17,25
**outcomes**
13:2 73:8
129:13
131:18 135:1
172:4,6
173:11,14,19
260:20,21
**outpatient**
163:14
175:1,12
**outside**
61:2 66:18
67:1,5,7
88:12 96:18
257:22,23
**over-the-counter**
204:3 205:6,
7,15 229:2
272:17,22
**overlap**
168:6,8,13
**overstatements**
178:3
**overwhelming**
94:9,14 95:3
96:9

**P**

**p-value**
40:4 285:5,8
286:13
310:1,21
314:5 323:20
328:10
330:10
331:13
332:20,22,25
333:8,9,21
334:4 353:21
354:15,21,24
355:20
356:4,23
358:22
360:18
361:19
362:13,19
**p-values**
298:22,25
299:3,8
306:14,22
309:15,17
311:12
317:11,13
332:12,14
335:23 349:8
352:22 361:3
365:16
**p.m.**
7:4 59:20,25
112:4,9
117:23 122:1
177:9,14
227:22 228:1
247:6,11
293:15,20
336:20,25
374:15,20
375:15,17
**page**
25:18,24,25
26:4,15,17,
18 27:25
38:14 41:18
58:6 81:7
92:11,12
103:23
106:25 115:6
117:5,6
122:8 143:24
144:4 145:1,
5,7,8,14
146:15,16
147:3 151:8
163:8 166:6
171:12
178:24 181:6
192:4 198:6
203:8 204:18
206:1
231:10,18
232:5,13,19
237:8,16
241:25
243:21 250:9
268:22,25
269:2,5,8,9
275:23
283:11 298:9
306:18
320:3,17,22
331:12
363:3,20
364:5 366:1
369:2
**pages**
24:23,25
25:1,11,22
28:8,13 39:4
213:22
**paid**
246:15
**pancreatic**
198:18
199:20,22
200:7 286:2
339:20 340:3
341:13
**panel**
300:13
**paper**
18:14 32:25

33:14,23 34:1,19,21, 25 35:1,13, 15,17 37:12 38:12,23 39:17,20 40:5,13,16, 18 41:1,3,7 120:20 144:22 152:17 162:15,23 165:19 169:2,6,7,14 170:7 171:11 178:14,17 180:3,19,23 182:23 192:14 214:10 217:1 230:19 233:9 235:10 237:14 240:9,25 242:6,7 243:23,24 244:8 245:18,19 246:4,9,10, 13,15 252:6 257:11,12,20 263:14 264:20 268:20 288:4 300:16 314:8,18 322:22 325:18 326:13 337:16 338:5 340:19 343:2,6 344:8 354:8 363:17,24 366:19 372:1

**papers**
18:2,19 54:9,15 99:4,24 130:20 137:15 138:1,11 153:5 155:1 160:10 170:10 183:6 245:23 246:4,20 263:11,22 305:12 317:13 366:22

**paragraph**
110:15 117:1 124:25 125:1 147:8 150:19 151:10 163:9 203:8 204:20 269:6 298:14,16 320:23 327:10

**paralleling**
208:18

**parameter**
262:7,12

**parentheses**
27:20 299:15 315:22 322:5,20 325:11

**parlance**
286:15

**part**
30:22 33:13 35:11 37:4, 11,12 39:17 41:7 50:10 62:1 88:25 92:21 95:8, 24 98:25 108:13 114:23 116:20 145:5 147:3 153:13 158:13 171:6 179:22,23 189:15 203:7 232:6,7,19 248:7,8 256:19 267:20 278:25 280:3 298:25 299:2,17 300:3 303:10 329:15 339:15 342:5 350:1 351:10,19 364:5

**participants**
166:12,23 167:4 171:19 172:14,25 203:18

**participants'**
177:1

**participating**
7:16

**particular**
72:11 76:10, 11 89:20 105:6 120:19 126:6 150:2 213:14 262:8 270:24 298:19 332:9 338:8 350:7 356:21 370:24 373:21

**parties**
8:1

**pass**
40:3 332:10

**passed**
39:6

**passes**
310:1,21

**past**
175:25 303:25 306:19

**patch**
152:19,25

**Patheon**
42:14

**pathological**
278:3

**pathology**
68:13

**patient**
53:24 148:12,14 161:2 163:11 170:17 173:12 174:10,25 175:11 176:10,21,24 177:7 213:14 226:18,21 266:20,21 270:8

**patients**
149:24 160:22 165:15 244:1,12,17 256:14 258:14 277:1 279:21 280:6 337:22 338:2

**Patricia**
29:11

**pattern**
132:22

**patterns**
208:10 209:10

**pause**
16:24 141:10 349:11

**pay**
264:8,12,13 348:21

**PC**
157:9

**PCCIU**
156:21 157:6 295:11

**PCCIUR**
29:8
**PDF**
25:1,15 26:5
28:13 92:13
**PDFS**
200:18
**peer**
343:10
**peer-review**
264:18
**peer-reviewed**
253:5 258:6,
7 259:9
262:17
**peer-viewed**
255:4
**pejorative**
10:10
**penalty**
7:25
**pending**
57:4 75:17
110:21 213:1
228:7,15
**people**
8:18 16:3
19:7 78:15
100:1 119:22
123:16,19
129:9 132:6,
11,17 153:24
167:14
168:16
169:11 175:3
180:20
183:10
184:9,18
185:4,13
186:24 187:2
195:21
210:15 215:9
224:15
230:11
244:22
248:22
249:2,4,5
251:7,18,19
253:16
254:10,11
258:9,10
259:2,19
279:17 301:1
305:21
307:14
308:8,10,12
309:7 311:4,
9,11 313:3
316:11 328:6
352:13 356:2
362:4
366:13,20
368:13,24
**Pepcid**
276:2 282:21
**peptic**
163:21 164:3
165:1,17
**percent**
16:18 18:5,
17,19 19:8
23:5 167:16,
18,20,23
168:2,5,17
171:21 180:7
186:12
190:8,21,24
191:3 201:8
207:23,25
210:7,8,9
228:10
233:9,11
238:23 285:4
286:11,12
287:16
289:16,19,21
291:23 292:2
314:4,10,13,
16,19 315:8,
11,15,21
317:20
319:17
321:15,18
323:7,23
325:8,17
326:2,11
353:25
354:2,25
**percentage**
249:8
**percentages**
168:12
213:10
**perfect**
250:25
**performing**
42:7,17
**period**
122:13,15,22
123:8,13
124:6,8,20
125:17
127:25
128:8,9,19
129:1,23
130:1,7,13,
21,23 131:2,
10,11,16,19,
21,25 132:19
133:6,8
134:12
135:4,20,21
136:5 137:17
139:4,6,9,
22,23,24
140:1 141:9
142:23
143:1,3,6,
17,21 144:12
163:23
256:17,20,24
257:7 259:4
269:18 294:8
**periods**
129:14,16
133:23
139:14
**perjury**
7:25
**permission**
121:16
**permitted**
227:2
**person**
7:23 128:10
221:14,15
223:23
227:3,4
255:18,22
257:2,7
260:4,7,11,
16 267:10
351:4,5
369:7
**person-year**
266:25
**person-years**
179:5 180:5,
6,9,18
190:5,7
261:4 267:8,
15
**personal**
143:25
**personality**
177:24
**personally**
60:7 274:10
**perspective**
142:1 191:9
**PETA**
88:4,9 89:6
**Ph.d.**
347:20
**pharmacal**
55:25 58:24
**pharmaceutical-type**
272:13
**pharmacy**
135:2 214:5
271:24 272:2
**phenomenon**
360:1
**phrases**
53:14
**physical**
24:20 62:21
**physically**
7:17

**pick**
223:16 255:9 343:5
**picked**
323:24 324:22
**picking**
292:5
**piece**
34:24 354:8
**pieces**
283:22 343:1
**pill**
95:15 96:5 215:10,14, 16,22,25 216:5,6,11, 13 218:14,16 221:6 222:15
**pills**
81:24 213:6 216:20 217:13 220:24 221:2 225:15,17 226:21,22,23 227:6,13 228:16 229:8 230:6,10,14 296:9
**place**
114:2 263:24 264:1
**placebo**
372:23
**placebo-controlled**
279:9
**places**
252:7
**plaintiffs**
8:16 68:11 97:24 189:6
**plaintiffs'**
82:19 85:25 96:15 238:19 288:18
291:16 292:8 293:2 343:6, 12 357:3
**plan**
257:15
**plans**
257:14
**please**
9:5 11:18 26:5,17,18 44:18 53:2 63:16 70:14 90:5 95:25 96:22 102:16 103:23 108:5 110:2 114:4 126:12 137:6 143:24 144:5,7 145:2,7,8,13 146:9,21 147:2,7 150:6 163:8, 9 166:6 175:21 179:9,12 185:21 192:3 198:6 203:10,22 204:18 220:15 231:9 238:14 248:6 275:23 276:12,22 282:19 283:3 301:11,16 304:12 306:10 309:23 320:22 322:13 333:19 338:22 344:6 354:6,19 360:21
**pleiotropy**
71:21 73:3, 6,19,22
74:25 76:1,4
**plenty**
285:20
**point**
20:12 38:3 80:9 140:20 146:17 148:25 153:16 155:16 165:23 174:9 194:25 200:22 221:8 222:8 233:20 234:1 238:22 239:9 255:10 256:12 258:17 259:22 271:19 272:12 273:3 291:22 304:24 311:1 313:16 315:7 317:9,18 320:13 323:9,12 326:1 329:18 361:2,4 364:25 366:3
**pointed**
199:18 311:2 331:23
**pointing**
236:5 276:20
**points**
269:12 353:11
**poison**
222:5
**policy**
101:10 300:19 301:2 303:22 305:13 306:4,5 307:10,15 309:25
310:20
**polygenic**
71:21
**pool**
187:2
**poor**
311:19 327:17 329:11
**pop**
253:17
**popped**
114:19 351:14 364:11
**popping**
275:1
**population**
123:7 127:23 133:18 169:5 205:17 213:16 222:1 224:9,12 226:1,5 253:18 254:8 269:12,14 294:25 295:1
**population-based**
237:24 238:4
**populations**
12:6 71:23 274:17
**portion**
96:1 122:11 126:14 145:10 186:1 322:14
**position**
218:9,10 306:7 309:2
**positive**
13:11,14,19, 24 14:9,19 15:6,8,15 16:4,7,10, 15,16,20,22

17:6 18:4,23 19:7,13 20:22 22:8 104:2,12 155:10 156:4 192:25 193:7,8,12 194:4,13,21 195:1,2,10, 12 234:2,9 287:11 288:5,11 304:4 305:20 311:22 312:20 313:20 314:3 357:22 358:8 361:17 362:9,17

**positives**
315:2

**possession**
91:3

**possibility**
91:11

**possible**
48:25 79:20 80:4,16,21 107:5 109:9 110:10 131:20 139:7,24 150:15 221:11

**possibly**
87:22 270:16

**potential**
12:25 15:18 41:22 50:8 52:18 63:7 83:4,7,19 90:2 101:2 130:8 132:5, 15 133:19 137:17 144:14 147:19 150:8,9,13 151:3 153:17 154:10 155:13,25 159:4 164:16,20 184:22 194:2 195:15,20 232:1 236:25 255:15 271:15 273:10,24 274:3,4 371:1 372:11

**potentially**
97:2,10 99:16 164:16 195:11

**Pottegard**
27:10,20,21

**power**
349:9 352:23

**powerful**
268:11 271:12,25

**PPI**
27:8 167:11 209:3 284:24

**PPIS**
164:11 167:6,20 189:24 201:14

**practice**
157:3,7,12 160:17,19

**practices**
161:6 327:12 329:6

**practitioner**
161:24

**preamble**
128:15

**preceding**
109:22

**precise**
220:14

**preeminent**
307:24 308:2

**prefer**
68:3

**prepared**
24:6 79:9

**preparing**
30:1 44:12 50:10

**prescribed**
117:18 337:23

**prescription**
176:17,18 180:20 181:10 182:13,16, 20,25 183:2, 4,7,8 184:14,19 185:1,5 186:19 187:4,7,16 188:8,24 189:7 191:15 203:24 205:19 206:8,13 210:8,9,10 213:9 214:6 216:18,20 217:13 220:23 221:11,12,16 224:7,16,24 225:16,17 226:20,24 227:3,4 230:7,15 270:24 271:9,11 272:3,23 296:2

**prescriptions**
181:20 184:10,25 185:10 186:5,10,25 187:8,17 188:16 190:15,17 191:13,17,18 204:2 207:6 214:3,7,16 215:13 216:18 217:12 221:1,7,23 223:24 225:4,6,9, 10,15,17,21, 23 226:19,22 227:13 228:16 229:13,14 230:12 235:7,8 270:25 295:21 296:8,15

**presence**
81:23 82:2 332:13

**present**
7:18 39:4 65:2 139:4 348:15,18

**presentation**
341:15

**presented**
35:13 39:5 41:10 170:7 173:10 288:4 317:14 318:12 340:12

**presenting**
34:13

**presently**
9:14

**president**
307:6,21

**President's**
298:20 300:12,23 311:3 312:23

316:9 317:10 323:16 327:25 331:8 357:21 361:10 362:11
**presumably** 222:25 260:11 269:17
**presumption** 84:16
**pretty** 128:17 241:18 314:14,15
**prevalence** 290:19,25 291:9,15 292:16
**Prevention** 263:9
**previous** 21:15,20 237:2
**previously** 17:15 19:3 24:2 69:14 90:9 101:19 114:5 162:20 206:3 237:9 249:15 274:23 301:12 306:11 307:5 335:8 338:23 353:16 363:21
**primarily** 49:15 62:18
**primary** 12:18 157:9
**principals** 18:21
**principles** 18:16,18 22:7
**prior** 44:5 46:22 50:14,17,25 51:4,20 77:6 81:16 82:10 86:7 91:5 104:17 214:21
**private** 297:12
**privileges** 120:16
**probability** 54:10 179:14 309:17,19 353:21 354:22,25
**probable** 83:12,19,22 84:1,5,9,11, 15,18 85:1, 11,18 86:3, 5,11,21,24 87:5 93:14 94:3 125:4
**probably** 83:14 124:17 157:17 224:8
**problem** 10:8 53:12 74:10 75:5 113:25 323:8 368:14
**problems** 170:12 268:3,5,9,13
**procedure** 36:2
**proceed** 120:19
**proceedings** 7:13 9:24
**process** 62:10 63:8, 22 79:14 280:16,17 306:15
330:25
**processed** 129:18 133:13 140:25
**produce** 109:17
**produced** 309:19 354:22 355:1
**product** 81:21 112:22
**Products** 7:6 114:11
**professional** 53:24 141:19
**program** 70:19
**project** 72:9,15,18 368:22
**projects** 54:14 71:18 75:2,16,23
**prone** 62:2,3
**pronounce** 249:18
**properly** 298:23 299:7
**properties** 373:19
**property** 360:1
**proportion** 205:19 206:11 208:17 213:7
**proposing** 10:3
**proposition** 346:24
**prostate** 71:22
**prototypical** 274:2
**provide** 41:20 42:1 117:15 153:10 333:22
**provided** 28:24,25 29:2 31:16, 18,23 32:21 42:9,18 43:4,9,11, 13,17,21,23 44:1,8,11,19 45:2 46:1,8, 13,18,24 47:3,7,12, 16,23 48:3, 6,13,15,24 49:6 90:24 102:24 117:18 230:19 254:16 259:8 261:13
**provides** 203:25 334:5
**providing** 30:5 32:23
**psychiatric** 58:18
**psychology** 347:23
**PTO** 121:20
**public** 8:9 243:8
**publication** 33:4,7 35:2, 11 37:11 38:5 39:8 40:1 41:12 255:4 258:8 259:9
**publications** 17:12 253:5 258:6,8 313:11

**publicize**
302:18
**publish**
244:21
**published**
18:2 20:13 38:23 40:2 54:9,17,24 99:24 215:2 240:15,17,20 243:24 244:8,12 246:20 263:25 264:1,8,13, 20 265:22 273:18 298:21 306:2 316:17 343:10
**pull**
34:11 69:11 115:7 116:20 320:11 364:6 369:25 373:14,16
**pulled**
82:22 212:13,14 243:4 300:13 313:9 318:9 346:7
**pulling**
109:12 373:7
**purchased**
205:14
**purpose**
149:21 150:1 217:19 220:21 306:15 368:3
**purposes**
242:4,10 243:1 268:8 346:25
**put**
14:15 30:22 40:1 56:19 57:5 101:6 103:24 108:4,8,16 110:15 119:4 129:7 134:11 141:7 149:15 179:9 191:9 220:15 241:6 242:15 259:24 260:14 266:6 275:24 299:15 302:10 314:24 325:10,11
**puts**
294:17
**putting**
56:15 120:23 188:3,4 250:21 291:17,21,22 301:4 364:15
**puzzle**
169:9
**pylori**
145:17 337:10,12,14 338:19

**Q**

**qualified**
20:19
**qualifying**
97:8
**qualitatively**
96:23 99:1 309:8
**quantified**
83:18
**quantifies**
83:17
**quantitative**
138:12
**queries**
270:5
**question**
9:3,4,9 11:13 15:2 17:22 19:20 21:6 33:16 35:4 36:7, 15,16 39:22 44:17 47:5 48:22 49:4 51:17,25 52:2 57:4, 10,13 58:9 59:4 61:10 63:14,20 65:19 67:4,8 68:25 69:1 72:2 73:1,12 74:14,15,22 75:17 79:7 80:15 84:12 93:17 94:25 95:24 99:11, 22 100:8 104:6 110:7, 20 113:2,25 116:5,17 126:11,13 127:3 130:15 131:13,14,16 133:5 135:5, 13 136:16 137:8,9,11 142:5,7,15 150:7,11 152:13 154:3 158:22 162:1 165:6,12 171:15 172:11 176:6 185:14,15, 18,21,25 186:6,22 191:20 196:18,22 207:18 209:17 212:15,24 213:1 215:7 216:10 217:19 218:8,11 220:10,22 224:1,18 225:13 226:14 227:1 228:7,14,20, 22 242:9,23 248:5 256:2 259:25 262:3 267:19 271:4 279:1,12,19 280:11 281:19 287:20 302:10 319:8,11 321:8,24 322:1,13,18, 23 324:12 329:12,15 335:14 338:9 341:16 342:1,4,6,11 343:19,25 344:5 354:18 368:3 372:21
**questioning**
80:7 301:22
**questions**
11:3 22:4 52:25 53:3, 11,17 54:3 57:2 68:23 74:20 101:16 141:22 142:3 174:7 185:16 186:16 213:2 218:4 220:13 283:2 337:6 339:2 341:21,22 348:4,5,6 355:17 374:2,23

**quick**
289:24
334:19
**quite**
111:21 253:4
255:2 271:25
**quotations**
300:2
**quote**
127:4 233:20
242:15
299:12,14
300:4 320:2
321:13
340:18 354:9
363:11
364:14
365:3,4,5,6,
8
**quoted**
321:9
**quotes**
144:17 146:5
299:3 321:11
**quoting**
313:12

**R**

**rabbit**
182:10
**race**
283:23
**racial**
346:25
**Rademacher**
314:8 318:1
321:20
322:6,22
323:1
**Rademacher's**
321:21
**radically**
210:3
**raise**
185:16
**raised**
177:25 178:6
186:23
228:20
273:16,17
357:20
**random**
309:20 354:9
**randomized**
370:5,16
372:2 373:8,
10
**range**
140:5,6,7
141:8 256:25
259:21
**ranged**
16:18
**ranitidine**
7:6 15:13
20:14 23:21
25:20 27:7,8
29:15 35:22
39:3 41:24
49:15,20
50:8,12
81:16 82:2,
20 85:24
90:2 94:22
95:10,12,14,
18 96:6,14
97:12,13,15,
23,25 98:6,
11 99:23
100:1,10,20
101:2,5,13
111:15
114:11
125:5,22
127:14
129:15 130:9
134:9 135:22
139:7,20
147:4 150:10
151:6
154:13,20
156:3 164:10
166:24
167:5,9,14,
24 168:2,5,
18 169:18
170:21
171:20 179:6
180:4 181:19
183:19,20,24
188:1,8
189:7,12,13,
17,24 190:4,
19 194:1,3
195:9,12,18
196:9 197:9,
14,19,22
198:19
199:19
205:8,12,18,
20 208:19,22
209:1 213:25
214:8 215:1,
20 216:6,12
220:11,23
222:3
223:11,16,
21,23 224:5,
15,24 229:15
235:23 238:5
239:7,19
248:15
249:3,8
253:20,21
254:1,12
255:16 262:2
271:13
272:25 273:4
274:9,19
275:15 276:3
277:12
278:8,21
279:22
280:20
283:18
284:7,15,24
285:1,13,24
286:9,11
287:5,11
289:17
290:18,24
291:9 293:3
305:23
316:15
330:7,16
337:19
338:10,17,18
342:24
343:11,13,16
345:17 357:5
359:10
373:12
**rat**
88:4,9
**rate**
169:3 205:20
253:18
254:1,2
340:22
341:19
345:11
**rates**
132:7 171:11
172:1 173:10
253:21,22
258:20,21
269:13
339:13,21,
23,25 342:20
**ratio**
19:23 20:8,
21 180:7,11
190:8,17,20,
23 191:2
**ratios**
188:10
340:9,13
**rats**
111:4
**Rawla**
340:21
341:6,12,18
342:18
**re-**
63:16
**re-tweeted**
335:11,17
349:5,21
350:3,12,13,
21,23 351:6,

8,9,19
**re-tweeting**
350:6
**reach**
125:6
**read**
63:16 74:1 80:15 92:25 93:6 94:7,8, 11 95:25 96:2 97:4 106:17,23 108:21 110:14 115:15,16,17 119:7,9,20 121:5 126:12,15 146:21 151:17 162:3 163:9 179:12,18 180:3 185:20,24 186:2,11 189:23 190:1 191:10 198:22,23 203:11,23 204:5,8,13 205:2,3 232:20 238:1 240:8 244:9 292:15 299:4,5,17, 18 302:5,15 306:13 310:5 322:12,15 328:24 364:23,24
**readable**
120:22
**reading**
34:19 42:11 75:14 107:19 325:24 334:1
**reads**
110:7 320:12
**ready**
57:20,24 73:1 102:6,9 111:25 112:11 302:11 364:18
**real**
44:17 53:14 85:9 141:17 222:20 232:2 314:15 316:11 327:23 358:14
**reality**
188:14 362:6
**realize**
191:10 283:11
**realm**
316:4 333:5
**realty**
317:21
**reask**
19:20
**reason**
9:4 14:21 15:2,9 35:9 89:19 153:13,20 169:16 209:13 344:17 361:16 372:9
**reasonable**
239:21
**reasons**
254:6
**reasserting**
218:9
**Rebuttable**
29:13
**rebuttal**
29:10,11,20 374:4
**recall**
48:5,11 82:1 128:14,16 163:1 252:12 334:23,25 335:4 373:1
**recalled**
81:22
**receive**
48:10
**received**
224:23 229:7 230:11 235:7 347:20
**recent**
59:6 149:10 205:10 366:15 369:15
**recently**
29:3 89:15 298:21
**receptor**
41:23
**recess**
59:22 112:6 177:11 227:23 247:8 293:17 336:22 374:17
**recognize**
334:3 352:10,12
**recollection**
335:13,25 336:7 371:19
**record**
7:2,14 8:21 57:16,21 59:21 60:1 96:1 107:16 108:2,6,16, 22 112:5,9 117:20,21,24 118:2,3,5,7, 25 119:24 120:4,6 121:24 122:2 126:14 137:3 141:12 177:10,15,17 186:1 219:25 227:22 228:2 247:7,12 256:13 271:11,24 272:2,3 283:5 293:16,21 322:14 336:21 337:1 374:16,21 375:16
**recorded**
162:7,8 163:12,22 255:24 272:22
**RECORDING**
117:25
**records**
135:3 214:6
**recreate**
48:18,23 49:7
**rectal**
292:11 317:24 318:17
**red**
92:15 107:9 108:8 129:17 133:13 140:25 345:1
**redeemed**
181:19
**reduce**
327:12 329:6
**reduced**
107:4 109:8 110:9 277:1
**refer**
133:22 172:2 292:17 363:7 369:25

**reference**
35:24 59:1
148:3,19
149:1 150:2,
21 151:24
152:1,4
153:7,11
212:12
222:12
304:13
349:24
350:14
363:15,16
364:1 367:1
**referenced**
32:4,7 40:13
91:22 349:6
367:4
**references**
25:3,5 31:4,
7 43:1
49:11,22
91:19,24
92:8 99:8
340:20
**referred**
15:6 96:1
126:14 186:1
303:16
322:14
**referring**
16:1 99:5
116:23
173:9,23
174:2,11
176:1 241:1
302:13 303:9
307:21
334:25
**refers**
335:22
**reflecting**
318:14
**reflux**
151:20,22
152:22
163:21
164:3,25
165:16
167:16 169:4
277:18
**reformers**
360:25
**refresh**
114:16
310:16
**refreshed**
269:23
**regard**
161:7 195:19
228:21
270:20,24
**regarding**
60:4 192:13
230:2 300:9
333:23
340:23
**Register**
160:25
161:10
**registries**
160:24
181:14 184:2
**registry**
160:24
161:1,3,9,
14,22 162:8
163:12
172:3,18,23
173:13
174:3,4,10,
13,16,25
175:12
176:2,10,17,
21,24 177:7
203:24
**rejected**
262:20,25
263:11,21,23
**related**
15:4 128:2
**relation**
357:13 358:2
**relationship**
73:6 100:9
151:6 156:3
165:2 223:20
274:4 342:22
**relationships**
338:8
**relative**
13:7,10 14:3
21:12,16
155:14
186:10
242:20
287:17
313:18,22
314:18
315:6,19,22
316:6 317:22
319:16
322:10
325:3,11,12
326:9,12,14
331:18
358:23,24
362:16
365:11
**relaxed**
152:21
**relaxes**
148:7 151:20
152:8
**releases**
148:8
**relevance**
373:8
**relevant**
43:24,25
45:22 47:8,
12,20,21
51:8 72:17
111:9 142:4
172:4 186:22
191:16 304:8
**reliable**
20:6 97:17
98:2,6,10,
13,16 99:25
235:22
330:15
**relief**
277:19
**rely**
154:6 368:2
**relying**
318:1
**remain**
255:22
**remainder**
374:3
**remember**
18:7,13
57:17 134:10
156:19
201:20,24
237:4 256:24
257:23
292:24 366:3
**remind**
11:8
**reminder**
16:24
**remote**
7:2,13 9:24
375:13
**remotely**
7:20
**remove**
100:22
**removed**
82:16 83:1,6
96:6 100:5,
20 203:25
255:13 280:3
**repeat**
9:5 48:21
95:23 126:11
165:11
368:15
**repeatedly**
107:24
**rephrase**
9:6
**replicability**
304:2
**replicate**
226:8 240:11

245:1 356:23
**replicated**
20:11 304:5
311:7 356:22
358:5
**replicates**
330:4
**replicating**
17:15 19:2
21:15 311:14
328:13
330:13
**replication**
331:10
357:23
**replying**
335:4
**report**
16:21 24:1,
6,12,19,23
25:7,9
27:18,23
28:17,20
29:1,10,11,
13,17,23
30:1,7,12,22
31:20,24
32:18,20,25
37:5 41:18,
20 42:2
43:8,15,24
44:12,15,24
45:12,15,23
47:9,10,14,
18,22 48:9
49:2 50:3,10
61:3 64:6
66:19 67:1,
2,6 77:22,25
81:6 87:7
88:13 89:1
91:21 93:13
95:8 96:18
98:1 101:23
103:2,5,9,
18,21 104:23
105:6,9,15
111:12
114:23
116:13,22
133:22
138:17,21
139:13
140:18 141:7
142:21 143:5
145:2 148:24
149:16,19
151:9 162:4
163:4,5,7
170:21 181:6
187:21,23,25
215:6,8
231:7 238:17
244:13
250:5,23
252:14,17,22
253:1 262:9
290:12
292:15,22
298:9,18
302:23,24
303:4 313:7,
9,17,18
315:10
317:2,8,16
318:11,19
319:4,15,16,
17 320:1,3,
4,11,18,21
321:3,6,8,
10,12 322:5
323:10 324:7
325:2 330:15
346:17
354:14
355:14 361:2
365:4 366:1
369:3
**report's**
41:25
**reportable**
161:13
**reported**
19:3 83:19
111:17
139:15 140:6
142:21 143:2
172:9 180:11
202:1 216:22
258:21
292:23
314:18
318:25
319:5,23
326:4
**reporter**
7:8,12,15
11:4 17:8,23
96:2 119:23
120:3 126:8,
15 131:4
167:1 186:2
190:22
204:9,12
257:18
284:11
290:22
322:15
326:19
371:14
**reporting**
7:19 8:4
143:2 182:5,
7 194:9
223:15
238:20
316:11
**reports**
29:20 48:2
182:2
**represent**
90:12 275:12
**representation**
368:2
**representatives**
7:10
**represented**
318:14
339:23
**representing**
8:15 276:6
281:20
**reproduce**
311:10
**reproducibility**
311:11
**reproductive**
58:17
**reputable**
128:23
**request**
24:9 41:3
137:4,7
242:8
**Request.xls.**
29:9
**requesting**
243:18
**required**
36:1 38:5
299:14
313:14
**requirement**
133:17
**research**
32:21 50:11,
14,18,23
51:1,4,20
52:6,13
70:19 71:20
72:19 83:11
91:13 246:3,
4,9,14 258:3
268:4,12
272:1 339:9
361:14
**researcher**
245:7
**Researchers**
334:3
**reserve**
18:23 374:2
**residual**
195:23
232:24
**resist**
10:13

**respect**
225:2
**respond**
57:9 219:5 344:4 360:12
**responding**
335:11 344:2
**response**
53:9 105:20 295:13,20 296:21 297:1 300:14 349:6
**responsive**
191:20
**rest**
28:17 342:7 352:9 375:3
**restate**
63:14,20 73:12 127:2 154:3 322:17
**restrict**
185:9 188:15
**restricted**
122:14 124:6 129:23 186:24 187:8 230:11
**restricting**
19:7 185:13
**restroom**
227:17
**result**
16:21 17:16 19:3 61:1 77:13 96:25 153:2 156:14 194:8,22 196:3 198:17 201:25 202:3 288:4 292:13 309:5 318:12 328:8,10,12 331:15,22
**resulting**
260:25 288:10
**results**
20:20 29:6,8 31:15 34:5, 14,20 35:14, 18 36:19 38:22 39:5, 12,16,24 40:8,12,16, 21 41:1,8,11 52:20 145:25 175:16 179:14 189:24 194:12 198:22,24 199:6 209:15,24 210:4 211:16 212:20 214:24 217:7 221:25 225:11 226:6,7,12 227:9 238:20,23 239:6,8,19, 23 241:14 242:7,16,18, 19 244:4,19 254:23 287:9 288:1 291:21 292:5,6 298:13 304:2 305:21,22 311:22 313:21 314:22 315:16 316:14 317:18 318:21 321:22 325:19 327:2 328:2 330:12 332:1 345:2 357:5 358:5 362:10 372:10,13
**retained**
24:11
**retire**
308:3,6 362:13
**retiring**
308:16
**retrieved**
163:18
**return**
84:9 111:12 326:25 339:1 358:20 359:8
**reveal**
241:14 242:2,9,24
**revealed**
368:14
**reverse**
164:21
**review**
24:19 25:23 31:14 34:25 42:7,24 46:23 47:21 48:8 54:12 87:4,8 92:7 94:16 102:2, 8,11 116:9 138:23 139:2 144:23 192:19 205:11 206:14 216:24 257:11 263:18,21 318:18 338:13 352:25
**reviewed**
31:10,12 44:1,10,19 45:2,6,13,14 46:1,4,7 47:13,17 49:1 99:7 114:22 116:11,18,19 295:8 343:10
**reviewing**
42:8,18 46:13,24,25 250:20
**rid**
323:19
**right**
9:13 11:14 12:7 13:12, 21 18:19 19:19 21:8 22:17 24:14 25:7,12,18 26:12,19 27:13 28:3,9 29:18 30:3 31:11,15 36:16,22 37:25 39:24 40:8 41:17 42:20 48:19, 25 50:6 53:22 54:16 55:8,13,17 60:13 61:22 62:11,16,23 63:1,4,19 64:3,4 65:13 70:5,23 71:1 72:14,16,19 73:21 76:12, 23,25 77:4, 9,18 78:20 79:3,10 82:8,11,13, 14,23 85:7 87:14,23 92:6,19,22 94:11 95:23 97:19 100:21 101:7,17 103:3,15,17, 25 104:14 114:13 115:11 116:24 117:4

118:16
121:23
122:3,8
124:1,23
128:10
131:9,23
132:12,20
134:2,16
140:3,13
142:24
143:18 144:9
145:7 146:6
152:4 153:15
154:7
156:16,25
157:15
158:5,18
168:10,24
170:5 172:20
174:13
175:8,16
176:13 177:8
178:9 181:16
182:14,21
183:25
184:10,15,17
185:11,18
186:7
188:18,23
192:5
193:15,23,25
194:5,18
196:2,18,19,
23 197:2,9,
11,18 198:9
199:20,24
200:16,17,20
201:15,17,18
202:4,19
203:3,5
204:15
205:15
206:6,16
207:24 209:7
212:4
213:11,17,19
214:3,14,19
215:18,25
216:2,15,17
217:9 221:4,
5,17 222:4,
11 224:25
225:5,8,23
227:7,11,15
228:13,18
229:13,18
230:16
231:1,17
232:16
236:23
237:16
238:17
239:2,12
240:8,13,15,
21,25 241:3,
16 243:8
244:9,22
245:9,12,19,
20 248:2,6,
17,22 249:5,
10,12,13,21
250:5 251:1,
2,4,8
254:13,24
259:18
261:4,5
264:3 265:23
266:1,5,10,
19 267:4,18
268:9,24
269:9,10
270:15,19
275:11,14
276:3,17
277:20 279:2
281:9 282:22
283:19
284:4,7,12
285:3,5,6,
15,21,23
286:3,5,16,
24 287:6
288:16,19
290:1,4
292:19
295:25 296:5
298:10,17
299:4,17
300:1
302:21,22
303:16
308:7,22
312:16
313:16
314:14
315:11
317:12,14
319:2,24
321:12,14
323:8,12
324:4,25
327:4 333:10
334:8,9
335:19
336:13
337:16
338:11,19,21
339:16,17
346:16
347:6,13,14
348:9,10
350:22
352:14,17
359:11,15
362:5,15,17
363:9,10,18
365:23
366:18
367:1,2,11,
19 368:15
370:16

**right-hand**
145:16
198:16 201:1

**rigor**
298:24

**rise**
234:6

**risk**
12:23 13:5,
7,10,18 14:3
18:10 19:12,
13,23 20:8,
21 21:12,16
71:21 80:14
81:17 82:5,
7,13 83:3
114:9 125:5,
7,8,12,13
146:25
147:16
155:14 164:4
175:7 186:10
188:10
195:6,7
238:7 242:20
244:2,13,18
285:19
286:1,6
290:3,8,19,
25 291:10,15
292:1,9,16
293:8
313:18,22
314:9,12,16,
18,22 315:6,
7,13,17,19,
20,22 316:1,
6,8 317:3,
20,22 318:14
319:20
320:14
321:17,19,22
322:10
323:6,14,22
325:4,7,11,
12,16,19
326:2,3,9,
10,12,14
327:2 331:19
337:14
358:23,24
362:16,17
365:12

**risks**
287:17
319:17 325:3

**Robert**
346:5

**role**
15:17 72:17

**Roman**
363:4

**Ronca**
8:13,15 9:19,23 10:9,12,14 17:3,19 23:25 24:4 26:4,15 27:24 32:14 42:10 51:24 52:1,22 53:5,9,13, 18,22 54:2, 6,8 56:8,10, 18,25 57:3, 8,13,25 58:5,10,13 60:2 66:15, 20 69:10,25 70:13 74:5, 8,12,16 80:8,14 81:4,13 85:2 90:4,11,17 92:11 94:5 95:1,25 96:21 100:17,18 101:18,21 103:23 105:21 106:4,25 107:23 108:7,12 109:1,5,7, 10,21 110:2, 6,17,20,25 111:18,22 112:2,10,23 113:22,24 114:7 115:5, 25 116:6,16, 24 117:9,17 118:4,7,11, 13,24 119:1, 8,14,18 120:5,9 121:6,23 122:3 124:24 126:12 132:21 136:12,15, 19,24 137:8 141:5,12,25 142:19 143:23 144:4 145:1,13 146:9,14 147:2 151:8 160:2,6,12 161:18 162:13,19 165:6,23,24 166:6 171:1, 5,15,17 173:25 177:16 178:13,16,21 179:9 181:3 185:20,24 189:19 191:7 192:2 198:5 199:10 200:12 202:5,10,20 203:2,20 204:18 205:24 207:12 211:13 212:2,7 213:21 217:20,22 218:5,25 219:7,13,24 220:17,20 228:3 231:8 232:18,25 237:7,12,16, 25 238:13 239:15 247:2,13,15 248:1 249:11 250:7 261:13 274:21 275:2,8,10 276:4,9 278:23 281:1,23 282:2,7,9, 15,18,20 283:1,8 288:20 289:2 293:13,22 297:3,15,23 298:2,4,15 301:11,16, 19,24 302:4 304:11 306:9,16 308:24 309:11,23 312:7 320:22,25 321:7 322:12,17 324:13,19 327:5 328:22,24 331:11 333:18 334:15,20 335:6 336:4, 11 337:2 338:21,25 341:17 344:1 345:18 346:3,9 348:25 352:1 353:13 354:5,11,19 357:9 358:15 359:23 360:20 363:2,19 364:4,10,13 368:6,12 369:13 373:25 374:5,9 375:1,10

**Ronnie**
249:19

**room**
7:18 9:20 11:23 132:25 163:15 175:2 228:7

**Rothman**
308:10 352:3

**ROTMAN**
297:17

**row**
288:21

**rubric**
54:21

**rule**
29:10 113:6, 20 228:5

**ruled**
83:10

**rules**
36:2 327:14 329:8

**running**
66:17 88:11 120:8 283:5

## S

**S-C-H-M**
297:24

**S-C-H-M-I-T-Z-E-R**
298:1

**S-E-E-R**
339:4

**S-M**
297:23

**sabbatical**
86:14,17,19, 25

**sake**
190:14

**salary**
348:22

**sample**
258:1

**samples**
251:3

**Sander**
335:1,11,17, 21 349:5

350:3,4
352:3
**Sandler**
308:7
**Sanofi**
48:4
**sarcasm**
141:19
**save**
154:25
**saying**
15:23,25
20:24 21:3,4
47:15 68:15
86:3,8 106:9
116:10
125:10 137:6
142:18,20
153:14
156:9,12
186:7
196:13,25
197:4,5
222:4,7
248:14 254:7
282:5 294:9
312:25
313:15,24
314:25 315:3
316:10
323:19
330:10
332:19 333:7
341:9 354:17
362:16
365:19
368:17,20,23
370:14 371:9
**says**
42:22 46:10,
23 59:13
70:24 71:9,
17 72:17
73:25 74:9
93:1 103:9,
20 104:8,12,
16 107:2
121:20 125:2
128:15,16,25
145:14,17
146:18 148:2
166:18,22
167:3,17,19
179:25 180:8
204:21
237:20
269:11
277:19
279:5,16
281:15,24
284:23
294:13
298:16
305:17 314:2
320:23
327:11 336:5
337:16 350:2
351:1
**scan**
26:24 27:21
310:4
**school**
142:17
**science**
12:4 325:23
**sciences**
304:1 347:22
**scientific**
35:13 72:8
81:9,15
82:4,17
253:7 261:25
304:4 309:24
310:19
311:9,17
327:13,15
328:1 329:7,
9 330:23,25
332:4
**scientifically**
357:12 358:1
**scope**
61:3 64:6
66:18 67:5,7
88:12
**scores**
71:21
**Scottish**
156:18
157:22
158:15
**screaming**
173:22 174:7
**screen**
42:12 56:4,
13,24 110:4
115:17 116:7
180:2 199:12
241:5 275:3,
9
**screenshot**
56:19,23
200:14
202:6,21
232:25 289:5
350:5
**screenshotting**
57:7
**scroll**
72:22
**search**
42:7,17,24
258:22
**searched**
52:9
**searching**
74:12
**sec**
101:24
**second**
23:11 52:8
90:4,18
146:17 147:7
151:14
163:8,25
165:19 167:9
173:17
182:20,24
183:4,8
203:21,24
211:14
215:17
222:25
226:21
234:22
275:16 297:7
298:14,16
301:17 302:9
321:2 328:12
336:14 337:5
349:12 364:5
365:13
**section**
27:9 35:25
38:14,19
70:14 106:18
115:10 122:7
144:8 279:16
298:11 313:9
337:21 363:4
366:4
**sections**
42:11 58:16
**see**
11:4,21
15:3,7 19:11
22:2,14,20
23:1 27:4,21
35:20 37:13
56:3 57:19
58:2 69:13,
19 75:4 90:7
92:7 99:8
102:3 107:8,
9 109:14,22
110:1 113:19
122:10,17,18
123:6 128:6,
9 129:4,6
138:11 144:6
145:4,10
148:24
149:13,19
150:24
152:19 153:5
154:5 171:17
174:19
183:19 184:7
192:6 197:24

199:14,23 201:7 204:21 207:15 208:10 212:8 213:25 217:16 222:2 231:7 232:5, 9,11,15 239:6,18 246:20 248:10,12,14 250:14,17,18 254:17 265:10 269:7 275:2,8,9, 19,25 276:18 277:4 279:11,13,24 280:22 281:5,6 283:16 287:10 306:17 309:10 310:11 311:5 317:8,13 320:19 321:4 325:3 326:16 337:6,8 341:1 349:19 350:6 356:22 364:5 371:9, 12

**seeing**
26:2 93:19 114:14 119:13 120:2 132:21 139:12 143:12 191:1 192:20 193:4,6 194:8 196:3, 4 216:25 229:10 236:23 253:21 257:12,20 275:1 305:22 330:9 338:14,15 342:19 357:24 372:6

**seeking**
242:3,25

**SEER**
339:3,21,23 340:4 341:3, 10

**segment**
25:22

**selective**
236:5,21 238:20,24

**self-recall**
271:18

**seminal**
363:17,24

**send**
263:16

**sending**
263:22

**senior**
240:24 249:19 264:2

**Senn**
352:7

**sense**
60:16 62:12 65:1 132:1 223:3 224:9 250:25 273:20

**sensitive**
239:6,8,19 372:10

**sensitivity**
210:1 217:4 235:9 239:5, 18 344:9,13, 24 372:7,12

**sentence**
45:1 46:9 72:7 75:18 81:8,11 93:1 94:6 96:22 97:9 98:25 107:9 108:15,21 109:2,12,15, 20,23 110:7 115:7,9 144:7,10 146:20 147:7 151:13,14,15 203:10,22 204:25 232:20 234:19 237:17,20,22 238:2 239:16 240:10 270:22 301:14 302:5,15 303:25 311:3 312:23,24 315:12 327:24 328:18,25 330:19 331:8 332:2,11 343:21 357:21 365:13

**sentences**
361:7

**separate**
35:16 58:16 146:24 256:1

**separately**
215:16

**SER**
341:7

**serious**
311:4 327:25

**Services**
42:15

**session**
288:25 345:3

**set**
40:3,12 41:13 70:10 242:7 251:13 310:25

**sets**
121:12 253:16,23

**seven**
25:23,25 26:7,11,21 27:4,6 122:14 123:14 124:7 125:10,18,25 126:6,21 127:9 128:12 129:20,23 133:23 134:19 135:8 136:2,5 144:12 281:18

**seventh**
146:17

**several**
60:25 63:12 68:21 80:1 177:18 178:20 269:11

**severe**
203:17

**sewer**
60:25

**sex**
283:23

**share**
56:4,13 110:3 199:12 243:19 294:19

**shared**
29:6 73:4, 17,23 74:24 76:1 115:19 251:25

**sharing**
40:11 58:6 59:5

**shell**

260:15
**shifting**
343:6
**short**
128:1,8
**short-circuit**
355:15
**short-term**
125:5,12,23 276:14,15 277:7,17,23
**shortcoming**
203:17
**shorter**
127:18 133:11,14 334:24
**should've**
27:20
**show**
19:24 57:9, 11 100:8 110:4 153:22 202:13 228:4 233:15,18 252:14,22 290:12 314:6 345:6 351:13 356:5
**showed**
21:15 214:25 236:8,10 328:7 344:9, 14 372:13
**showing**
72:24 98:15 274:18 316:16
**shown**
133:12 268:11 355:22
**shows**
205:18 235:2,13 279:2 283:17 328:8 343:3

362:17
**sic**
87:13 133:25 269:12 341:7
**side**
145:16 198:17 201:1 202:17 223:2 269:10 275:24 281:7,14 311:15 347:9 360:18 369:12
**sidebar**
211:23 218:2
**sides**
277:3,9
**signals**
10:1
**signed**
308:15
**significance**
283:18 284:23 292:22 298:22 299:8,12,22 300:9 303:2, 7 306:21 308:4,17 309:15 317:2 331:14 332:3,5,8 357:11 358:17 359:25 360:2,17,23, 24 361:5,15, 24 362:8 365:17
**significance'**
330:21
**significant**
284:17 285:10,15,17 286:12,15,18 287:4,22

289:12 290:9,11 291:12,18 292:17 309:5 330:3 359:1, 21 362:1
**similar**
21:19 23:22 96:24 99:2 129:14 140:21 205:20 208:11 209:10 230:10 252:20 258:20 341:2
**similarities**
155:8
**simple**
142:2 218:11
**simplest**
60:16 76:5
**simply**
106:4 258:13
**single**
47:1 60:21, 24 64:17,18, 24 65:16,18 66:2,5,11 67:23 69:2 79:15,16 123:18 128:12 202:2 250:16 251:21 271:19 373:7
**sir**
74:11 75:18 142:21 213:1
**sit**
137:21 152:6 342:13
**site**
263:25
**sitting**
336:18 360:11

**situation**
20:3,13,14 77:11 84:22 85:15,21 86:9 149:15 183:1 197:24 299:24 300:4 329:25 330:7,8,11 332:24 333:4,10 356:14,21 357:2 359:9 372:4
**situations**
77:12 361:12
**sixteen**
154:8
**sixth**
92:12 269:5
**size**
215:25 216:5,6 258:2 331:14,17 358:18 365:9
**sketch**
70:4
**skipped**
352:8
**slide**
276:11,22 277:6,16,22 278:2,6,24 279:2,5 280:1,14,18 281:8,11,12 282:19 335:20 350:11 354:19 357:9 358:15 359:23
**slight**
364:21 365:15
**slightly**
137:11

329:25
**slow**
132:12
**slower**
204:9
**small**
42:13 222:15 311:12 328:10 332:20 356:23 358:18,22 362:19
**smaller**
195:16 332:12
**Smith**
368:18
**smoke**
158:8 159:11,12
**smoked**
159:10
**smokers**
151:2 158:1 193:22 194:19 196:9 197:1,2,19 285:14
**smoking**
144:21 147:1,15,18, 22 148:17 150:8,14,16, 17,22 151:3, 19 153:15, 17,21,23,24 154:23 155:3,10,12, 18,22 156:2, 4,6,10,13, 16,25 157:22 158:10,11, 19,23,24 159:22,23 192:6,8,13, 16,18,21,24 193:1,5,25 194:4,10,11, 21 195:6,16 196:5,13 212:25 230:21 231:5,14,16, 20,21 232:10,11,23 233:12,17, 19,21,24 234:8,13,14, 17,20 235:15 236:11,14,18 237:1 240:2 344:15,19
**sneering**
218:3
**snide**
218:3
**social**
58:21 347:22
**societies**
171:24
**society**
173:5
**soft**
132:23
**sold**
204:2 206:12 213:8
**solution**
281:25 282:22
**someone's**
126:25
**something's**
341:10
**sound**
171:22
**sounded**
312:9
**sounds**
294:1 314:14 348:10
**source**
128:18 161:21 173:1,17,18 253:8 264:11 273:10
**sources**
173:15 270:13
**South**
114:12
**space**
39:20
**speak**
177:23 178:12 219:25
**SPEAKER**
126:23
**speaking**
126:9 136:12,20 165:5 174:1 219:9
**speaks**
59:11
**species**
93:3,7
**specific**
21:2,5 22:1, 5,14,16,20 23:1,2,5 61:6,12 63:3 64:9,19 65:2 72:10 73:24 84:22 85:15 86:9 93:23 97:21 138:24 139:12 142:11 149:13 272:5 310:1,21 319:19 325:1 365:5,6 373:5,15
**specifically**
23:20 34:14 38:21 40:11, 25 100:8 105:15 135:25 143:21 151:5 170:14 174:12 192:15,17 257:13 294:15 300:15 318:16,17 332:8 338:9 372:2,3
**specify**
214:15
**spectacularly**
369:16,20 370:20
**speculate**
89:8 106:1
**spend**
86:12
**spent**
268:12
**sphincter**
148:8 151:21 152:9,21
**spoke**
85:4
**spoken**
132:23
**spreadsheet**
29:6 31:22 32:2 33:17, 25 34:3 35:5,14,16, 21 36:8,11 37:10 38:17
**spreadsheets**
37:6,17,20, 22
**Springer.com**
350:16
**stabilized**
179:3,13
**stable**
259:21
**staff**
300:17 303:10

**staffer**
304:16
**stamped**
91:7
**standard**
140:22
**standards**
339:9
**standpoint**
133:16
**stands**
92:18 157:11
**Stanford**
348:19,20
**start**
67:23 69:2 75:14 77:18 78:19 149:8 182:9 183:14 185:25 188:5 204:21 205:5 232:13 241:12 257:19 288:24 301:21
**started**
130:22 134:7 135:1 165:6 180:19 182:12,20 183:2,3 184:12,16 186:18 219:9 229:25 316:10
**starting**
27:19 162:6 204:24 209:9 264:10
**starts**
26:23 42:14 237:23 269:2
**stat**
212:18
**state**
8:20 38:21 107:16 108:6 300:25 318:16 338:6
**stated**
17:5 98:1 99:20 292:12 327:24
**statement**
7:13 22:2 65:24 70:23 71:24 72:3,4 77:17 85:14 94:19 97:6 107:6 110:12 123:23 124:19 126:20 127:8 129:5,6 148:17 149:1,2,7 150:2,20,21 151:1,25 152:4,7 153:11 177:17 222:23 224:2 300:8 301:5 302:16,19, 20,25 303:1 305:20 306:2,14,21, 24 307:12 308:14 309:14,16 311:17 313:6 323:8 325:9 327:6,7,8,18 329:4 331:2 333:13,16 334:2 335:17 350:3,8,22 351:8 353:18 354:4 356:8 359:4,12 362:11,12
**statements**
25:6 153:6 204:4,14 333:6
**states**
12:5 253:25 256:15 266:12
**stating**
323:22
**statistical**
133:16 292:21 298:20 299:12,22 300:7,9,11, 17 303:1,2,7 304:18,23,25 305:4,14 306:21 307:2,6,22 308:4,17 309:14 313:21 317:1 330:3,20 331:13 332:3,8 335:22 345:11 347:8 349:8 352:21 357:11 358:17 359:25 360:2,16,23 361:1,15,23 362:8 365:16
**statistically**
164:13 285:17 286:18 287:4 289:11 290:11 291:12,18 292:17 309:5 331:5 359:1, 21 361:25
**Statistician**
303:20 307:9 323:19
**statisticians**
299:20 300:14,18 303:5 307:24 308:2,16 323:17 361:11
**statistics**
210:17 222:2 340:5 345:10 346:6,13 347:12,22 352:6
**stats**
212:9
**stay**
117:20 255:17,20 256:10 258:10 259:13,17 262:5 334:21
**stayed**
258:14
**staying**
119:24 120:4
**stays**
260:16
**stenographic**
117:21 118:4 120:6
**steps**
60:25 63:12 80:1
**Steve**
7:9
**Steven**
56:11 352:4, 7
**stomach**
148:8 164:5 201:5,12,14 286:22 290:4 314:9 315:14 321:17 323:7,22 325:8 326:10,15

**stop**
36:15 136:12 163:25 172:21 206:1 218:6
**stopping**
165:23
**straight**
53:10 115:6
**straightforward**
108:25 193:11
**strategy**
258:22
**stratified**
199:6
**strength**
14:11 15:9 232:3 364:16 365:10
**strengths**
255:7
**strict**
13:23 361:18
**strike**
36:18 60:22 99:12 191:23 211:22 212:12 246:23 326:22 334:14,15 360:14 368:10 369:11,13
**strong**
17:16 20:5 84:15 158:8 201:25 290:3,6,7
**stronger**
235:17
**strongest**
147:16
**strongly**
154:6
**students**
347:12,23
**studied**
61:14 87:21 147:20 165:3 258:19 309:18 360:1
**studies**
12:4 17:4 20:14 25:19, 23,24 26:1, 11,12 41:21 42:2 49:10, 12,14,22 50:4 51:8,18 54:17 62:25 65:17 67:10 68:18 69:8 70:18 71:15 83:21 84:2 89:4,7 90:3 93:2,13,15 94:1,21 95:5 97:21 100:7 101:1,13 104:22 105:16 106:9,19,22 111:7,11 115:1 124:12 125:21 128:19 133:21 135:7 136:4,10 137:18 138:19,24 139:11,15 140:10,14, 23,24 143:11,13 147:13 149:11,14 151:5 152:18,23 153:1,3,22 154:5,8,16, 20 155:24 156:19,24 157:2 158:15 160:8 170:9 183:23 187:12 188:2 195:21 196:5 208:14 223:13,14 226:8 231:13,24 232:16 233:15 234:16 236:18 237:2,3 240:11 244:25 250:4 252:19 253:9 255:2,3,6,14 261:17 262:1 267:13 268:16 271:24 272:13 273:5 294:11 295:8 304:6 311:9 316:18 318:10,19,20 343:8,9 357:5 358:9 367:16 368:19 372:5 373:11,21
**study**
13:8 20:7,20 21:15,21 23:17,22 26:20 27:12 34:4 39:18 51:11,15 52:17 55:2 61:21,23 62:1 88:4,10 89:7,11,21, 24 114:9,12 115:11 122:7,21 123:2,21 124:2,4,5, 10,15,18,22 125:16,21 126:6,18,20 127:5,8,13, 16 130:11 131:17 133:13 134:22 135:11,19 136:1 137:21 139:5,21 140:1,16 143:3 144:21 146:11,12 147:11 155:6 156:15 158:4,14 159:3,5,6, 16,25 164:19 165:2,14 166:1,4 172:15 174:21 181:8,12,15 183:14,15 192:12,22 194:9 195:13,17,25 197:13 203:14,17 204:6,15 205:11 209:7,15,24 211:16 212:20 213:20 214:24 215:2,8,11 217:2 223:12,17,24 224:6 226:12 227:10 229:1 230:15 233:18,25 234:1,5,6,18 235:1,2,20, 24 236:19,20 237:5,24 238:5 239:17 240:15,17,20

241:2,9 242:19 249:18 250:20,24 251:2 253:10,12, 13,14,20,24 254:4,9,11 255:9,13,25 256:1,4,19 261:1 262:5, 8,9,10,12, 16,20 266:1 267:17,20, 24,25 268:2, 14,23 272:5, 6 285:21 287:9 292:7, 11,18 295:10 304:2,8 318:4 324:2 325:13 327:1 333:7,8 337:4,9 339:22 345:13 358:24 369:16,22,25 370:2,8,15, 18,19,23,24 371:2,4 372:16,23 373:5,9,10, 24

**study's** 299:9

**studying** 61:16 274:3

**stuff** 218:15 272:8

**sub-analysis** 185:11 202:3

**subject** 18:25 113:15 135:16 218:11 271:23

**subjects** 224:5 337:10

**submitted** 163:5

**subscription** 264:15

**substance** 60:4,11 112:13

**substantially** 332:25 340:1 346:24 356:4 357:12

**substantively** 358:2

**subsumed** 36:12

**suddenly** 128:12 287:10 299:25

**suffer** 223:2

**sufficient** 79:6 123:21 129:16 287:16

**sufficiently** 255:12 288:3

**suggested** 315:6

**suggesting** 232:23 258:22

**suggestion** 345:3

**suggests** 20:10

**suitable** 263:25

**sum** 294:6

**summary** 147:10,12 213:15

**summation** 294:2,12,24

**superficially** 88:14

**supplemental** 33:1 37:18, 19 38:4,17 204:22 205:23 206:15

**supplementary** 33:6 162:17 205:4,18

**support** 7:11 223:19

**Support.com.** 298:3

**Supported** 84:15

**supporting** 94:18 206:19 308:16

**supports** 150:21

**supposed** 32:3 70:18 115:25

**Supreme** 346:18

**sure** 15:11 16:12, 21 17:11 22:3 33:5 37:21 38:1, 13 43:7,12, 20 47:4 49:21 54:13 57:6 58:10 70:12 72:5 73:13 77:12 83:17 84:10 88:20 90:18 91:17 96:4, 12 100:18 101:25 102:1 106:22 113:12 123:3 124:16 128:7 130:17 131:3,15 132:1 134:23 138:13,15,22 143:25 160:11 161:17 162:17 165:7,24 169:1 172:12 178:3,5 189:16 207:20 217:17 227:18 228:24 249:17 257:10 265:17 266:5 289:2 290:6 294:18 302:10 304:20 310:8 318:5 342:16 348:11 367:21 368:12 369:9,19

**surveillance** 339:7,8

**susceptible** 78:14 273:7

**swear** 7:14 8:6

**switch** 65:7

**switching** 334:18

**sworn** 8:9

**syndrome** 278:5 284:2

**synthesis** 70:19

**system** 257:5,6,24 258:1,10,14 260:6,17 261:7,19 262:6 264:11

267:10
**systematic**
277:19
**systems**
257:23 270:7

**T**

**table**
56:3 58:3 143:20 166:10,18 167:3,17,19 173:10 177:1 179:3,19 183:13 190:16 198:10,11, 14,25 199:13,16 204:22 205:4,18,23 206:6,15 208:6,25 209:1,11 210:21 213:23 248:6 250:8 254:20 283:15,17 318:20 340:20
**tables**
139:3,18 143:9 183:13 319:25
**tablet**
281:21,22
**tad**
204:8
**tagged**
27:14,17
**take**
9:2 11:5 16:24 41:14 53:25 57:21 60:6 81:4 92:4 100:17 102:5 110:2, 18 111:18 115:21 117:9 129:6 138:20 146:9 148:1 155:2 160:5, 12 175:21 178:21 189:7,19 191:7 192:2 197:3 198:6 199:10 200:13 202:5,20 203:16 205:22 211:13 218:13 222:14,16 227:16 238:13 248:1,4,5 271:20 279:21 283:3 288:4,25 293:13 294:3,7 298:5 327:5 331:11 333:18 334:18 336:11,16 345:18 353:10,18 360:20 367:20,25 371:15 374:6
**taken**
59:23 98:5, 12 112:7 143:4 150:14 177:12 223:1 227:24 247:9 271:7 282:24 293:18 336:23 374:18
**takes**
123:6,17 197:9,13,16
**taking**
100:1 168:18 169:11,17 182:22 219:19 221:14 254:12 272:24 279:18 325:5 338:16 346:9
**talk**
11:10 39:18 65:2 68:14 77:7 78:24 97:21 112:13 113:18 115:1 119:21 139:16 264:5 289:5 305:25 369:2,7 370:1 371:25
**talked**
31:4 36:24 115:10 169:2 255:5 313:10,11 366:5
**talking**
15:12 19:17 22:15,21 32:1 78:22 114:1 130:17 157:16 158:5 159:7,25 162:23 176:22 190:14 193:18 194:2 200:6,7 206:5 212:23 222:19 227:12 228:15 235:6 238:18 241:4,7 251:14 263:5 272:6,7 292:6,24 293:7 302:1 307:5 317:5 320:19 321:5 330:12 333:4 357:2 359:9 365:8,16 373:6
**talks**
41:8 106:19 323:11 365:13
**task**
298:20 299:11 300:12,23,25 301:7 302:12,17,20 303:18 305:25 306:1 307:7,11,23 311:3 312:23 313:10,12 316:9 317:10 323:16 327:25 331:8 357:22 361:10 362:11
**taught**
347:21
**team**
119:4 367:18
**technical**
119:22
**TECHNICIAN**
56:12,22 120:12 121:9 202:24 297:11,20,25 298:3 345:21
**tell**
9:5 11:18 47:6 94:7 133:2 149:22 198:9,24 213:13 216:9

223:22 224:3,4 226:25 243:17 295:7 340:14 350:1,24 351:5 353:19 360:10
**telling** 52:21 72:14 324:14
**ten** 25:16,22 185:10 186:4,9,24 187:8 188:15 190:16 191:16,17 199:2,3,7,8, 23,25 221:1 223:23 224:16 225:16,17 226:21 227:3 246:14 251:3,5,6,7, 9,13,15,18, 23 253:16,23 254:5,14,17, 18,19 256:22 257:1 266:14 267:18 342:13
**ten-year** 257:7 259:4
**tenth** 224:6
**term** 18:23 19:7 125:13 238:16,24 295:7 308:3 317:1 332:7
**terminology** 86:11
**terms** 28:19 142:22
**test** 29:15 31:15 352:22 353:15,22,23 360:2
**tested** 279:16
**testified** 8:10
**testifying** 306:23
**testimony** 7:24 10:21, 22 44:5 46:22 75:12 82:10 86:7 91:5 100:25 196:7 220:9 324:11 375:13
**testing** 36:19 299:23 303:8 361:15
**tests** 298:22 299:9 313:21 335:22 349:8 361:1
**text** 115:20,24 117:16,19 319:4 323:11
**textbook** 12:7 55:5 58:14
**thank** 9:7 110:5 138:1 141:2, 18 165:9 177:8 191:25 192:1 198:7 199:9 203:2 204:12,20 206:1 214:13 228:11 238:12 240:5 247:4 345:8 346:9 349:20 362:25 365:2 374:11,12,22 375:1
**Thanks** 228:25 250:12 374:5 375:7,8
**theoretical** 293:5,9
**Theoretically** 60:21,24
**therapy** 276:25 280:5,19
**there'll** 142:12
**thing** 47:1 103:24 119:13 130:17 153:19 303:23 366:20 368:7,11
**things** 10:1 42:25 45:25 48:24 61:16 62:7 68:13 78:9 108:24 131:7 142:4 155:4 176:22 178:20 204:13 222:9 229:17 230:3 236:5 255:10 265:23 278:13 280:3 311:12 316:11 324:15 331:24 371:3,6
**think** 10:5 11:16 13:22,25 14:21 15:25 16:1,4 17:13 19:6,17 20:2,24 21:1,10,24, 25 22:19 23:10 25:2 26:2 28:24 29:2 31:2,21 32:8 34:7 38:7,15 41:19 44:6 45:8 46:6 53:21 54:13 56:11 61:5 64:9,14,16, 23 65:1,15, 16 66:2 67:5,9,25 68:3,9 69:17 71:8 74:17 77:1,6,8,16 79:8,17 83:24 84:8, 21 85:13,22 86:23 91:20, 21 92:13,16 93:23 95:5 96:4 97:11, 20 99:20 100:4,19,24 101:9 111:5, 6,19 112:19, 25 113:3 114:14 115:12 116:8 119:16 120:13 121:21 122:20,23 123:13,15,24 124:11,14 125:19 126:3,10,17, 24 127:5,11 128:5,6,17, 22 129:4,20 130:18 131:25 132:14,22 134:21

135:14,18 137:2,12,24 148:5 150:12 153:12,16 157:11,16 158:14 159:2,24 161:8 164:18 166:3,8 169:15 171:25 172:1,17 174:11,24 175:13,17,24 176:1 180:22 185:14 186:21 187:19,23 188:3,6,13 189:5 191:8, 11,15 202:16 205:17 208:3 209:11,23 211:15 212:17,19 213:23 214:23 215:3,24 216:1,7,21 217:1 221:4, 24 222:22 223:9 225:25 226:9,11 227:9 228:9 235:1,10,19, 25 236:20,22 239:3 241:18 243:12 246:21 250:9 251:11,16 252:12,16 254:13,21,25 257:14 259:7,17 261:10,15,23 262:12,13 263:14 265:11 267:2,11,22, 24 268:10 269:22 270:2,11,23 271:6 273:9 274:15 279:5 282:4,7 287:7,25 289:19 292:21 293:8 308:5 309:7 310:24 311:1 312:14 317:25 318:3,4 327:21 332:7,18 333:15,25 334:16 337:16 340:16 341:17 342:3,6,10 344:3,17 345:13 346:7 347:17 349:1,12,14, 16 350:17,21 352:8,20 353:7,19 354:14,16 355:25 356:10,11,20 357:19 359:1,6,17 365:7,15,19 366:2 367:3 368:13,17 369:6,8,10, 14,17,21,24 371:25 372:4 373:4,6

**thinking**
133:2 212:23 226:4 294:10 350:25

**third**
122:13 151:15 167:10 324:17

**thought**
39:15 123:5 154:15 189:16 197:5 229:25 294:23 300:21 342:15 350:7 370:7 372:20

**thoughts**
10:10

**thousand**
340:4

**thread**
335:20 350:2,10,13, 22 351:1,13

**three**
27:3 51:23 162:5 168:11 180:25 182:2,14 183:22 233:15 234:16 236:18 260:5,11,12, 17 261:3 262:23 263:23

**three-plus**
259:14

**threshold**
310:2,22 332:9,10,23 361:19 362:8,23

**thresholds**
299:13 313:13,15

**throw**
186:14

**Thursday**
7:5

**tied**
356:3

**time**
7:4 16:11 30:7 31:19 59:19,24 75:2 86:12, 19 87:22 89:4,15 92:5 102:5 111:2 112:3,8,18 113:17 117:22 120:8 121:25 123:16,19,20 127:19,25 128:9 131:22 132:19 133:4,6,8 134:8,17,25 135:2,7,20, 21 137:12 138:18 139:4,6,19 140:1 141:8 142:22 143:1,3,17, 21 154:25 177:13 183:7 205:12 215:17 218:10 219:16,19 227:21,25 228:12 230:12 247:5,10,14 256:19,24 258:15 261:18,20 262:4 267:3 271:19 272:25 280:23 293:14,19 294:8 304:24 324:17 336:19,24 338:16 339:20 348:1

360:11
361:16
366:15
372:23
374:3,14,19
375:15,17
**times**
10:18 51:23
68:21 80:6,
23 136:20
177:18
182:17
183:22
219:14,15,16
221:15,20
262:19
263:23
317:13
324:10
328:20
329:17 362:6
375:3
**timing**
373:23
**tired**
368:8
**title**
304:20
306:13
**titled**
29:8 38:19
103:8 206:11
**tobacco**
284:1 285:1,
19 290:20
**tobacco/ alcohol**
291:1
**Tobey**
9:17,19
10:7,11
14:20 15:24
16:23 17:19
18:20 19:16
20:1,25
21:23 22:11,
18,23 27:16
28:5 30:17
32:9 33:10,
20 34:7 35:8
36:9,17 37:8
38:7 39:13
40:9 42:10
44:4,21
45:10 46:21
47:4,19
48:20 49:5
51:2,12,22
52:4,11,22
53:13,21,23
56:6,14,25
57:5,15
58:5,25 59:9
60:8 61:2
62:17 63:13
64:5 65:11,
14,23 66:1,
14,22,24
67:15 68:7,
16,24 69:16,
21,24 72:21
73:11,20
74:2,5,11,16
75:11,20
76:20 77:5,
14 78:4,21
79:13,25
80:3,5,9,22
81:1,25
82:9,15,24
83:5,9,16,23
84:7,19
85:2,12,20
86:6 87:18,
24 88:5,11,
19 89:12,22
90:17 91:4,
16 92:4
93:11,18,21
94:15,24
95:4,19
96:3,11,17
97:7 98:9,21
99:10,18
100:3,14,23
101:8,24
102:5,22
103:6,12,19
104:4,9,15,
20 105:4,13,
21 106:13
107:7,11,15,
22 108:9,18
109:4,10,25
110:13,17,22
111:19,24
112:16
113:12,23
114:16,19
115:21
116:3,8,14
117:3,12
118:2,6,8,22
119:1,12,16,
21,25 120:7,
11,18 121:9,
18 123:9,24
126:16,24
128:4,21
129:3,21
130:14
131:3,11
132:13,21
134:20
135:9,14
136:9,14,18,
24 137:10,23
138:3,7
141:5,10
142:25
143:7,19
146:3 148:22
149:4,12,17,
25 152:15,24
153:4,9
154:2 157:4
158:12,25
160:2
161:16,20
162:16 164:6
165:4,20
168:7,9,20,
25 169:12,22
170:3,13,19,
25 171:7,14
172:16
173:6,21
174:5,23
175:9,18
176:5,11,14
177:2,4,19
178:4,10
180:24 181:5
184:5,20
186:3,20
187:5,13
188:11,25
189:10
191:22
196:12,21
199:4 200:24
201:23 204:7
205:16
207:3,11
208:15
209:2,21
210:11,13,19
211:7,22
212:5,11
214:20
215:19,23
216:4
217:14,18,
20,22
218:23,24
219:5,11,24
221:9 222:21
223:6,25
224:17
225:1,19
226:15 227:5
229:4,9
230:8,17,22
234:22 236:2
237:11,13
239:15
240:22
241:17
242:11
243:2,9,14
244:23
245:10,13
246:6,17,22
250:22
251:10

252:8,11,24 255:19 256:7 258:11,16 259:6,16 260:8,19 261:12 265:14 266:11 267:1,5 270:1,10 271:2 272:4, 9,19 273:1, 14 274:25 275:4,16,21 276:4 278:17,25 279:4,23 281:19 282:1,3,8, 12,16,23 283:4 284:21 286:4 287:23 288:20 289:14,18,23 290:5,14 291:6,13 292:20 296:1,6,12, 24 301:17,21 302:2,6 308:23 310:7,13,17 312:4 319:1, 3,6,10 320:25 321:25 322:3,7,16, 24 324:5,8, 14,24 326:5, 7,21 327:19 328:19,23 329:5,16 333:14 334:13,16 335:3 336:2, 6 340:6,15 341:14,20,25 343:20 344:1 349:11,19,22 350:18 351:16 353:1,9 354:5 355:2, 24 356:9,19 357:14,17 358:11,19 359:5,13,16 360:3,6,8,13 361:8 363:25 364:8,11 367:13,24 368:9,16 369:4,11,18 370:4,6,13, 21 371:7,23 372:18,20 373:2 374:5, 12,22 375:5, 6,8

**Toby**
375:7

**today**
9:3 10:21 102:18 104:17 152:6 268:12 306:24 366:21,23

**today's**
375:13

**token**
9:8

**told**
18:17 60:6 68:20 109:23 121:18 177:21 243:13 324:16

**tone**
52:24 74:6

**top**
27:2 69:11, 13 103:24 107:1 145:14 178:24 179:3 198:6 199:19 213:24 232:9,19 237:20 247:17 249:7 251:17 281:25 283:23 290:23 303:24 310:6 339:24 350:1 351:10 352:1,13 363:12,14 369:20

**topic**
334:21

**topics**
334:18

**total**
135:2 229:12 248:16 294:2,7

**totality**
139:14 215:5 223:18 318:22

**totally**
53:6

**touches**
67:2 191:4

**toxicology**
68:12

**track**
253:22

**tracking**
336:3

**trait**
76:8

**traits**
70:22 71:11

**Tran**
134:1,18 135:6 136:7 138:19 139:1 140:12

**transcript**
312:5

**transformation**
203:15

**treat**
23:23 149:24 220:5

**treated**
148:14 270:9

**treating**
267:20

**treatment**
54:10 163:20 179:14 276:14,16 277:7,17,19, 21,23 278:3

**trend**
210:22

**trends**
253:15 296:14

**trial**
370:5,16 372:2 373:8, 10

**trials**
279:9

**trick**
22:4

**true**
22:17 44:3 50:11 59:3 75:22,23,25 84:23 85:8, 18 135:8 152:7 181:11 183:9 209:18,22 222:20 224:4 227:15 228:18 229:18,20 230:1 296:23 300:6 305:23 309:18 329:24 331:25 332:21

353:19,20, 22,25 354:2, 20 355:5,6, 19 356:8,18 357:10,16 358:10,16 359:4,12,15, 24 360:5,16, 22 362:3
**Trust** 25:15 277:14 367:23
**trusted** 262:10,13
**truth** 312:13 330:24 364:22
**try** 9:5 11:7,13, 20 33:15 35:3 44:17 53:14 58:8 114:16 128:19 141:17 153:14 197:7 219:21 226:16,17 314:24 334:23 342:14 343:2 351:3
**trying** 12:21 22:6, 25 33:4 36:11 44:6 73:16 77:7 85:3 106:17 107:25 110:14 141:21 153:25 212:5 217:25 220:16 223:4 257:9 284:17,19 343:5 349:25
**tumor** 64:4 79:24 80:20
**tumors** 93:3 111:4
**turn** 202:16 288:5
**turning** 118:9
**tweet** 335:10,21 354:17
**tweeted** 308:21
**twice** 214:19 215:17,20, 21,25 216:3, 5,6,10,12 218:15 324:12,16
**Twitter** 308:21 334:7 335:1,5 349:5,24 351:12
**two** 21:13 26:24, 25 27:3 28:8 131:6 134:10,11 137:1 152:3 154:5,8 155:9 156:2 173:14 179:6 181:19 184:10,23,24 185:3 187:12 189:4 194:15,16 197:6,8 201:4 204:4, 13 206:25 207:5 229:17 230:2 235:8, 9,13 266:21 274:11 277:25
278:8,13 284:1,18 285:3,18 303:8 319:12 324:15 341:2 346:11 348:14 371:2,16
**two-thirds** 187:3 188:4, 7
**twofold** 323:3
**type** 160:17,19 166:24 167:5 171:20 189:25 288:9 347:24
**Type-1** 85:23
**type-2** 41:23 171:21
**type-2a** 83:12
**typed** 63:19
**types** 55:7,10 268:10 271:17

**U**

**Uh-huh** 86:18 103:16 147:24 197:10 258:5
**uhm** 31:21,22
**ulcer** 168:1 276:15,16 277:1,2,8 280:6
**ulcers** 163:22 164:4 165:1,17 371:12
**ultimately** 64:3 79:23 80:19
**unable** 234:13 338:6
**unanimous** 298:21
**unanimously** 361:11
**unauthenticated** 59:2
**unbiased** 14:2 332:21
**unclear** 159:14 161:11 293:12 351:18
**uncontrolled** 67:20,22 236:25
**underestimation** 205:8
**undergoes** 264:17
**undergraduate** 347:12,21
**underlying** 70:22 71:2, 7,11 166:7 169:24 170:15,23 171:10
**understand** 9:4 10:20,24 34:20 62:9, 15 71:6,12 73:14,15 82:6 118:10 120:7 142:13 174:4,8 212:6 219:1 228:19 302:2

349:25
**understanding** 36:6 44:16 64:24 73:4, 16 74:23 75:24 76:1 78:7 79:2 86:20 131:12 148:7 164:7
**understands** 317:4
**understood** 9:10 11:6 13:16 232:4 247:21
**undertake** 34:16 71:15 252:1 253:2, 20 344:10
**undertaken** 51:14,18 67:9 93:25 111:11 139:5
**undertakes** 87:2
**undertaking** 70:17 158:17 239:24 253:9
**undertook** 89:7 95:6 188:14 235:8 239:18 372:12
**underway** 75:16
**unexposed** 197:2
**unfilled** 70:8
**unhappy** 249:4
**unhighlight** 203:20
**Union** 95:16
**Unit** 157:10
**United** 95:16 253:25 256:15
**universal** 113:20
**universities** 182:3
**university** 182:1,4,6,7, 8 348:19,21 367:9,10,12, 19 368:24
**unlike** 143:12 235:5 261:15
**unmeasured** 195:23
**unnecessarily** 244:2,12,17
**update** 30:4 31:17, 19
**updated** 70:7 270:7
**upfront** 241:20,21
**upload** 121:1 297:8, 12
**uploaded** 116:2
**upper** 21:13
**user** 158:6,18 235:18
**users** 155:7 167:9, 10,11 168:18 171:20 183:24 194:17 195:18 197:22 213:25 231:25 273:7 287:5,6
290:18,24 291:9,14
**utilized** 258:22

**V**

**valid** 14:12 20:6 97:18 98:16 99:24 111:16 169:21 170:2 223:15 235:22 311:6 328:9 330:16 345:16 353:8 357:6
**validate** 211:9
**validation** 176:9,23 258:18
**validity** 101:11
**validly** 331:5
**valuable** 271:13,25 272:14 361:13
**value** 15:1 18:6 19:5 128:12 191:4 201:3, 6
**variable** 234:14 288:9
**variables** 172:7 293:5
**varies** 128:9,13
**various** 55:7 182:17 283:22
**vary** 225:25 267:24
**vastly** 188:21
**verbal** 11:3 147:25
**verbally** 7:23
**verify** 178:8
**version** 40:2 41:9 115:12,18 121:3,5 162:25 199:13 268:21 302:7,9
**versus** 25:25 26:12, 13 27:7,8 46:7 147:4 158:6 179:6 180:5 189:24 199:19 201:14 208:22 221:6 252:2 274:9 277:11 284:7,16 285:2 287:15 369:22 370:3
**video** 7:2 117:25 118:7,9,12, 25 121:24 178:8 217:23 218:19 219:1 375:13
**videographer** 7:1,9 59:19, 24 111:25 112:3,8 117:22 121:25 177:9,13 227:21,25 247:5,10 293:14,19 336:19,24

374:14,19 375:12
**videotape** 178:11
**view** 178:2 298:21
**viewpoints** 363:8
**VIGOR** 370:2 372:15
**violence** 58:20
**Vioxx** 369:22 370:3,10
**viral** 290:20 291:1
**visits** 163:15 174:12 175:2
**vitae** 28:16
**Vocht** 367:17
**voice** 177:25 178:6

**W**

**W-H-Y** 249:24
**wait** 128:8 181:21 305:8 326:21 363:23
**waiting** 54:10 301:20 360:11
**waive** 8:2
**waiving** 113:16
**want** 9:21 12:1 14:16 22:3 24:5 44:9 47:2 57:5 58:1,9 65:1 89:13 92:4 100:16 105:25 108:23 113:18 117:12 119:4,25 122:24 131:3,14,18, 19 132:9 138:4,13 139:16 147:6 155:16 160:3 162:19 163:24 165:7 171:7,25 177:16 179:18 180:17,22 182:10 185:16 198:21,22, 23,24 199:11 200:15 203:11 205:3 211:18 219:4 220:21 223:17 225:14 226:18,25 228:9 242:18 247:16 248:9 250:13 252:10 259:24 283:9,10 298:11 301:24 308:3 310:24 312:3,12,17 320:25 323:11 333:3 337:7 342:1, 13 353:4,6 355:7,8,16 360:25 366:10 368:9 369:6
**wanted** 34:20 58:2 153:20,22 186:14 241:8 312:14 316:22 371:5,8,9, 12,13,15
**Warning** 279:15
**warranted** 141:20
**Wasserstein** 303:15,17 304:15 305:2
**watches** 218:25
**water** 111:5
**way** 18:9 57:23 65:20 66:9 83:18 110:17 113:8,20 117:14 139:8 142:15 145:6 190:2 194:24 200:11,16,18 202:11,12,16 210:18 220:6 223:23 244:15 250:9,10 266:6 267:6 287:9 297:8 302:3 310:4 319:13 320:12 327:8 343:19 351:2,8 355:17
**ways** 108:20 142:10 218:23
**weak** 299:24 359:20
**web** 58:6
**website** 59:2,12 212:13 275:14
**Webster** 84:14
**weeks** 279:10
**weigh** 120:1
**weight** 14:15 262:14
**weighted** 318:6
**well-known** 372:11
**well-recognized** 352:5
**went** 33:7 170:17 291:8 314:6 316:20 317:19 349:15 371:21
**western** 171:24
**whack** 173:3 174:18
**whatsoever** 155:20 159:13 344:12
**white** 346:5 354:8
**wide** 201:8 325:13,22 359:3
**widespread** 330:20
**width** 292:1 319:22 325:5

**wildly**
173:3
**withdraw**
218:20
**withdrawn**
81:22 219:20 307:12
**witness**
7:14,23 8:6, 8 10:2 17:2 34:8 38:7 53:4,5,19 69:17,20,23 74:7,8 102:1,4 107:13,24 109:4,11 110:5,23 114:18 121:11,14,15 135:10 136:16 137:4 141:14 142:1,10,16 144:3 165:9 173:8 177:20 178:1 204:11 217:25 218:6,13,22 220:2,16 228:6 243:16 246:24 247:4 261:12 271:5 275:19 281:24 310:10,15,18 319:6 341:23 349:14 374:11
**witness's**
137:7
**Witte**
7:3 8:14,22 24:5 31:8 33:15 52:5 56:6 60:3,14 75:5 81:14 90:12 101:22 102:2 112:11 114:8 116:11 118:15 122:6 132:22 138:8 144:11 146:21 162:22 172:21,22 178:5 179:2, 12 189:23 198:9 203:11 204:7,14 214:20 228:4 238:1 247:17 248:9 250:13 275:6,11,17 293:23 298:17 302:1,6 312:11 319:10 321:9 337:3 346:14 350:2 375:1, 14
**Witte's**
24:1 298:8
**word**
15:8 107:18 134:15 137:13 144:6,8 155:2 161:18 231:14,16, 20,21 232:9, 11 360:23 367:20,25
**words**
63:24 119:7 134:15 259:24 285:13 299:7 319:12 322:19 372:24 374:1
**work**
24:14,17 62:18 63:22 70:20 99:25 112:22 200:19 210:12 283:12 362:7
**worked**
262:10 344:25
**working**
86:12 348:12
**works**
266:16 304:17 319:14
**world**
92:19,21 99:14 294:16 295:2,4 307:24 308:3 371:21
**worried**
244:2,18 305:20
**worry**
244:12,22
**worth**
186:9
**would've**
113:24 255:13
**wrapped**
361:7
**write**
24:12 46:9 74:23 75:6, 9,18 116:12 151:17 233:23 263:13
**writes**
122:12
**writing**
32:18 35:13 366:13
**written**
27:22 72:6 75:3 238:10 279:6 300:16 319:15 323:10 366:22
**wrong**
38:9 269:6 306:4 341:10 351:2
**wrote**
32:19 37:23 46:10 55:12 73:15 74:3 75:13,22 81:14,18,19 144:11,18 145:19,22 146:1,4,22 242:13 243:22 244:5,6,7 298:17,18 299:6,10,19 300:1 302:23 305:13 323:18 346:4 347:15,19 355:11,12,14

**Y**

**yeah**
10:24 12:14 14:5,21 21:10,24,25 22:13 23:15 25:8,13 27:1,4,5 28:18 30:21 31:16 34:6 43:25 44:25 45:15,22 48:14,17 49:3 52:13 55:9 56:18 57:8 62:12 64:8,21 65:16 66:8, 22,25 67:7, 25 68:19

Case 9:20-md-02924-RLR Document 6164-7 Entered on FLSD Docket 12/30/2022 Page 368 of 400


69:9 70:2 71:8,25 73:25 74:8 75:17 76:21 77:8 82:6 88:16 89:14 92:15 93:16 102:4,15 103:25 104:11 112:2 115:12,14,22 118:17,18,21 120:12 122:10 125:10 128:6 129:19 130:16,18 134:13 135:12,18 137:24 139:16,25 144:19,23 148:5 152:16 154:4,18,19 155:23 156:23 157:9 158:20 160:16,20 161:4 162:12 164:18 165:9,13,25 176:20 177:6 179:20 181:9,13,24 182:3 183:5 184:1,12 186:14 187:16,18 197:12 199:5 200:11 202:18 205:22,25 206:9 208:9 209:8,16 210:24 211:17 213:24 215:7 216:1,8 221:4 224:20 227:19,20 228:25 229:17,24 230:1 236:22 241:11 243:16 245:3 247:14,24 248:21,23 249:7 251:16 258:5 259:7 265:7,18 267:11,16,19 268:21 269:3,4,8,11 270:23 272:12 273:21 274:12 275:19 276:1,21 277:10,13 280:7 281:5, 10,23 282:1 287:24 290:16 295:16 296:25 301:10 302:8 304:17 308:5 309:1 310:17,24 311:23 312:8 313:5 315:10 320:20 331:17 332:18 333:25 335:16 336:9,10,12 340:7,20,25 341:12,23 342:9 347:11 350:9 351:6, 11,24 352:11 353:4 356:10 361:9 363:15,16 364:3 365:6 366:15 367:6,10

**year**
86:16,17 162:6 260:11,12 265:16 266:3,4,19 267:3,21 279:10,17,18 348:23

**yearly**
266:8,10

**years**
122:14 123:6,14 124:7 125:10,18 126:1,6,21 127:9 128:12 129:1,20,24 133:24,25 134:1,19 135:8 136:3, 6 144:13 145:17,20 199:2,3,7,8, 23,25 203:16 205:10 208:5 209:7,12 246:14 256:22 257:1 259:15 260:5,17 266:14 267:7,18 279:22 305:4 347:21 348:14 366:17,18 373:16

**yelled**
177:25 319:13

**yelling**
173:7 177:20,22 178:7

**yellow**
115:24

**Yeseong**
249:18

**Yoon**
26:7 118:16 122:7,12 129:19 140:11 144:5

**York**
7:4

## Z

**Zantac**
7:6 41:24 276:3 278:21 279:6 282:21

**Zeiger**
112:25 113:1

**zero**
248:13 250:16 262:14 291:25

**Zollinger-ellison**
278:5

**Zoom**
121:3

# EXHIBIT 44

# THE FORMATION OF N-NITROSODIMETHYLAMINE FROM RANITIDINE AND OTHER MARKETED DRUGS

Mr. D.W. Darkin

Dr. A. Gribble

Mr. N.J. Viney

June 1, 1982

Smith Kline and French Research Ltd.
Welwyn, England

# Formation of N-Nitrosodimethylamine from Ranitidine and Other Marketed Drugs

## Introduction

The principle product from tertiary amines containing a dimethylamine group reacted with nitrous acid is expected to be nitrosodimethylamine (NDMA). We undertook a study to determine the extent to which N-nitrosodimethylamine is formed from the interaction of sodium nitrite with Ranitidine and other marketed drugs which incorporate a tertiary amino group. The conditions for nitrosation used were the W.H.O. standard conditions, namely

| | |
|---|---|
| concentration of t-amine | : 0.01M |
| concentration of sodium nitrite | : 0.04M |
| pH | : 3.0 |
| temperature | : 37°C |
| reaction times | : 1 hr., 4 hr. and 24 hrs. |
| solution | : aqueous |

## Methods

A solution containing the compound (final concentration 0.01M) and sodium nitrite (final concentration 0.04M) was adjusted to pH 3 by addition of glacial acetic acid, stoppered and placed in a water bath at 37°C ±0.5°C. Blank reference solutions were prepared in parallel containing identical components, but without the compound. At reaction times of 1 hr., 4 hr., and 24 hr.; a 10 ml. aliquot of the solution was removed, hydrazine sulphate (0.13 g., 1mmol) added to destroy excess nitrous acid, and this left to stand for 5-10 minutes. The solution was extracted with redistilled dichloromethane (3x10 ml.). The combined extracts were washed with aqueous 5% potassium bicarbonate solution (1x10 ml.), saturated sodium chloride solution (1x10 ml.) and slowly evaporated to a volume of 1-2 ml. in a Kuderna-Danish flask placed in a water bath at 45°- 7°C. This dichloromethane solution was analyzed for NDMA by gas-liquid chromatography, on a 10% carbowax +2% KOH on chromosorb W column, isothermally at 80°C, using a Thermal Energy Analyser for detection (G.C./T.E.A). Identification of the product as NDMA was based on the combination of retention time and nitrosamine specific detection, and in some cases confirmed by spiking with authentic material. The G.C./T.E.A. System was calibrated using standard solutions of NDMA obtained from commercial sources (Thermo-Electron Corporation or Sigma). The blank reference solutions in which ranitidine was omitted, were treated in an identical manner, and in all cases no NDMA was detected.

The samples of amines used were as follows:

- SK&F 93391, Ranitidine, 81-6003-1 (prepared by SK&F) base used, with 1 equivalent of HCl added in solution

- Ranitidine hydrochloride solid, Ref. Standard Batch C267/270/2 (prepared by Glaxo)

- Commercially available Zantac injection in ampoules, lot P001 (aqueous solution of ranitidine hydrochloride)

- Chlorpromazine (hydrochloride), commercial sample labeled lot 73-3T2

- Chlorpheniramine (maleate) commercial sample labeled lot 76-PD22

- Oxytetracycline hydrochloride (Chung Kun Dang Corp., Batch OTH-DS-82 manufactured in September 1977) was recrystallized from methanol to remove ascorbic acid if present, 179-527A.

## Results

Table 1 lists the yields of NDMA obtained from the interaction of 0.01M t-amine and 0.04M sodium nitrite, at pH3 and at 37°C, after 1 hr., 4 hr., and 24 hr. The effect of reduced nitrite concentration on the formation of NDMA from raniditine has also been studied. Table 2 lists the yields of NDMA obtained from interaction of equimolar concentrations (0.01M) of ranitidine hydrochloride (Zantac solution, ampoules) and sodium nitrite, at pH3 and 37°C, after 1 hr., 4 hr. and 24 hr.

Table 1

Formation of NDMA from Tertiary Amines (0.01M) and Sodium Nitrite (0.04M) at pH3 and at 37°C

| tertiary amine | Molar % NDMA After 1 hr. | 4 hr. | 24 hr. |
|---|---|---|---|
| SK&F 93391 - Raniditine (prepared by SK&F) | 1.3 | 2.7 | 3.8 |
| Ranitidine (hydrochloride - solid) | 1.3 | 2.4 | 3.8 |
| Ranitidine (hydrochloride - solid) (repeat) | 1.4 | 2.4 | 3.8 |
| Ranitidine (hydrochloride - solution) (ampoule) | 1.8 | 2.7 | 3.9 |
| Chlorpromazine (hydrochloride) | 0.0007 | 0.005 | 0.03 |
| Chlorpheniramine (maleate salt) | 0 | 0.004 | 0.02 |
| Oxytetracycline (hydrochloride) | 0.8 | 3.3 | 7.9 |

Table 2

Formation of NDMA from Ranitidine (0.01 M) and Sodium Nitrite (0.01 M) at pH 3 and at 37°C

| Form of Ranitidine | Molar % NDMA after | | |
|---|---|---|---|
| | 1 hr. | 4 hr. | 24 hr. |
| Ranitidine Hydrochloride Solution (Ampoule) | 0.007 | 0.04 | 0.12 |

/sh
226

# EXHIBIT 45

TRUE COPY
Digitally signed by Sue Holway
Date: 2019.11.20 08:50:29 Z

# GLAXO GROUP RESEARCH LIMITED

Report No: WBP 82:011

Confidentiality CONFIDENTIAL

No. of Pages: 7

Title:

THE DETERMINATION OF N-NITROSODIMETHYLAMINE FORMED BY THE REACTION OF RANITIDINE HYDROCHLORIDE WITH SODIUM NITRITE.

Report to: DR. L. E. MARTIN

Authors: DR. R.J.N. TANNER

Division/Department BIOCHEMICAL PHARMACOLOGY

Site: WARE

Distribution (*denotes summary only):

| Copy No. | | Copy No. | |
|---|---|---|---|
| 1 | Central File, Data & Documentation Services ✓ | | |
| 2 | DR. R. T. BRITTAIN | | |
| 3 | DR. B. J. PRICE | | |
| 4 | DR. D. GATEHOUSE | | |
| 5 | DR. J. A. BELL | | |

Approved by: L. E. Martin Date of Issue: 6th April 82

All additional copies of this report or any part of it must be issued from Data and Documentation Services, Science Information.
**NO OTHER COPYING IS PERMITTED**

## Authorisation of use statement.

Indicate any restriction on the use of the report or its contents using the following statements:

* This report was prepared specifically for ........................................................ It is not to be submitted to any other party or regulatory authority without my approval.

* The data in this report must not be used in whole or in part in any other publication, patent application or drug submission, or in any other way disclosed to a third party without approval of the Head of Division or Department from which this report was issued.

* A draft copy of any document in which any data from this report are reproduced must be shown to the appropriate Divisional or Departmental Head before publication.

Signed ...........................................................................

Date ...............................................................................

* delete any of the above sentences that do not apply.

## SUMMARY

Experiments were carried out to determine whether nitrite reacted with ranitidine hydrochloride to form N-nitroso-dimethylamine (NDMA).

NDMA was formed in 3.1% yield, based on ranitidine hydrochloride, in the WHO NAP test, (40mM nitrite, 10mM ranitidine, 6% acetic acid). The yield decreased to 0.74% when the test conditions were modified by increasing the drug concentration to 40mM.

Further in vitro incubations were carried out in gastric juice at pH 3 and in 6% acetic acid. These reactions simulated the concentrations of ranitidine (1mM) and nitrite (0.3mM) expected in the human stomach after oral administration of 150mg drug and ingestion of a nitrite rich meal. Analyses of the extracts of these incubations gave a weak signal similar to that observed from a control incubation without drug.

## INTRODUCTION

The dimethylamino groups of aminopyrine and oxytetracyclin react with nitrite under certain conditions to yield N-nitrosodimethylamine (NDMA), (Lijinsky et al 1972; Mirvish et al 1974). The mechanism of nitrosation of tertiary amines has been discussed, (Singer 1980).

Ranitidine hydrochloride contains a dimethylamino group therefore experiments were carried out to determine whether NDMA could be formed from the drug in the presence of nitrite. Ranitidine hydrochloride (10mM or 40mM) and nitrite (40mM) were incubated in 6% acetic acid at 37°C using conditions similar to those described for the WHO Nitrosation Assay Procedure (NAP test), (Coulston and Dunne 1980). Further incubation experiments simulated the drug and nitrite concentrations anticipated in the human stomach after ingestion of a nitrite rich meal and 150mg ranitidine (Bell and Smith 1981). In these reactions ranitidine hydrochloride (1mM) and nitrite (0.3mM) were incubated at 37°C in either 6% acetic acid or in gastric juice pH3.

The NDMA content of concentrated extracts of the incubation mixtures was determined by gas chromatography-mass spectrometry, (g.c.m.s.).

## EXPERIMENTAL

### Materials

Ranitidine hydrochloride batch C267/270/2 was used in these experiments.

Analar dichloromethane was redistilled before use.

NDMA for standard solutions was obtained from Sigma London Chemical Co. Ltd.

Pentagastrin stimulated gastric juice was collected from fasted male volunteers attending the Clinical Pharmacology Unit.

### Methods

#### Incubation

Ranitidine hydrochloride was incubated with sodium nitrite in 10ml 6% acetic acid or in 10ml gastric juice, pH3, for four hours at 37°C. The drug and nitrite concentrations used are given in the table. Control incubations, with no drug, were carried out with each experiment. N-nitrosodiethylamine (NDEA, 1µg) was added to the incubates in experiments 4 and 5 as a potential internal standard, however it proved unsatisfactory.

TABLE

Incubation Mixtures

| Experiment No. | Ranitidine HCl mM | Sodium Nitrite mM | Medium |
|---|---|---|---|
| 1 | 1 | 0.3 | 6% Acetic acid |
| 2 | 1 | 0.3 | gastric juice pH3 |
| 3 | 10 | 40 | 6% acetic acid |
| 4 | 40 | 40 | 6% acetic acid |

## EXTRACTION

The extraction procedure was derived from a technique described for food analysis. (Gough and Webb 1978). The incubation mixtures were extracted with dichloromethane (3 x 10ml), the combined extracts were washed with 1M sodium hydroxide (20ml) and dried by passing down a column of anhydrous sodium sulphate (6 x 1cm). The column was washed with dichloromethane (10ml) and the combined extract was evaporated to about 700µl at 50°C under partial reflux, in a Kuderna-Danish flask made from a 50ml round bottomed flask, (Sen 1978). The reflux column used was either a Quickfit adaptor, MF 10/2, packed with silanised glass wool (experiments 1 and 2) or an insulated 2 bubble Snyder column (experiments 3 and 4), (Burke et al 1966). The dichloromethane concentrate was transferred to a 1ml volumetric flask and the solution made up to the mark with a dichloromethane wash of the evaporation flask.

### Recovery Experiment

Acetic acid (6%, 10ml) containing sodium nitrite (40mM) was spiked with NDMA (7.4µg) and the mixture was extracted and concentrated using the QF adaptor as a reflux condenser as described above.

Standard solutions of NDMA were prepared by successive dilutions of NDMA (1g) obtained in a septum sealed 100ml vial (Isopac, Sigma).

### G.C.M.S. Analyses

A Pye 204 gas chromatograph interfaced, via a glass jet separator, to a VG 7070H mass spectrometer was used to determine the NDMA concentration of the dichloromethane concentrates. The mass spectrometer was operated in the selected ion monitoring mode under control of the VG2035 data system. The 1.7m x 4mm glass g.c. column was packed with 5% Carbowax 20M on Chromasorb WAW HP. The carrier gas was helium (30ml/min), the column was maintained at 100°C and the injection port and separator at 200°C. Under these conditions the retention time of NDMA was 190s. The mass spectrometer was operated in the electron

impact mode at 5000 resolving power with a trap current of 200µA at 70V, the amplifier was set to $10^{-7}$A and the filter to 1ms time constant. The ions monitored were m/z 68.9952 ($CF_3^+$, tris-(trifluoromethyl)-s-triazine, lockmass) and m/z 74.04801 ($M^{•+}$ NDMA) with a 500 ms dwell time. The extracts from experiments 3 and 4 also contained NDEA as internal standard which was monitored at m/z 102.0793 ($M^{•+}$ NDEA).

Confirmation of the identity of NDMA in the dichloromethane concentrates from experiments 3 and 4 was obtained by reanalyses of the samples with the mass spectrometer operating in the peak matching mode at 10,000 resolving power, (Gough and Webb 1978). The g.c. and m.s. source parameters were the same as those described above. The reference ion was m/z 68.9952 ($CF_3$+ from tris-(trifluoromethyl)-s-triazine) and the peak match unit was set to a ratio of 1.073234 to focus the molecular ion of NDMA when it eluted from the g.c. into the m.s. source. The ion, m/z 74.0480, was observed as a singlet co-incident with the reference ion at the expected retention time of NDMA, 190s.

## Results and Discussion

NDEA proved to be an unsatisfactory internal standard for the analytical technique used. In order to monitor the molecular ion of NDEA, m/z 102, as well as the Lockmass ion, m/z 69, it was necessary to switch the accelerating voltage from 4KV to 2.9KV. This large voltage jump could not be achieved with sufficient reproducibility with the instrument operating at 5000 resolving power. Therefore quantification was based on the result of an early recovery experiment and on the analyses of standard solutions of NDMA. The NDMA peak height observed in the analysis of the dichloromethane concentrate from the recovery experiment indicated that 62% of the NDMA added to the sodium nitrite-acetic acid solution was recovered.

When ranitidine (10ml, 10mM) was incubated with sodium nitrite (40mM) under the conditions of the WHO NAP test (Experiment 3) 232µg NDMA were formed (corrected for 62% recovery), equivalent to 3.1% yield based on ranitidine. A similar quantity of NDMA, 219µg, was formed in a 10ml incubation mixture when the ranitidine concentration was raised to that of nitrite (40mM). This quantity of NDMA represented a decreased yield (0.74% based on ranitidine) and suggested that other reactions of ranitidine compete for the available nitrite, (Bella and Smith 1981). Peak matching at 10,000 resolving power confirmed the presence of NDMA in these dichloromethane extracts.

In further experiments ranitidine (1mM) and nitrite (0.3mM) were incubated in gastric juice pH3 or in 6% acetic acid. These concentrations simulated those of drug and nitrite anticipated in the human stomach after oral administration of 150mg drug and ingestion of a nitrite rich meal. Analyses of the extracts of these incubations gave a low intensity signal, in the m/z 74 records, that were similar to that observed in the analytical record of an extract of control gastric juice incubated without drug.

## ACKNOWLEDGEMENT

I would like to thank G. Manchee for his technical assistance.

R. Tanner
2 Apr 1982.

REFERENCES

Bell. J.A., and Smith W.P., Nitrosation of ranitidine under simulated stomach conditions. Glaxo Group Research Report, 1981, BIO 81/29.

Burke, J.A., Mills, P.A., and Bostwick, D.C.. Experiments with evaporation of solutions of chlorinated pesticides, J. Assoc. Offic. Anal. Chemists, 1966, 49, 999-1003.

Coulston, F. and Dunne, J.F. (eds). Informal consultation on the potential carcinogenicity of nitrosatable drugs, in 'The potential carcinogenicity of nitrosatable drugs, WHO Symposium Geneva 1978', Ablex, Norwood, New Jersey, 1980, 8.

Gough, T. and Webb, K., Mass spectrometric determination of volatile N-nitrosamines after screening by Coulson electrolytic detector, in 'Environmental carcinogens selected methods of analysis' vol. 1, analysis of volatile nitrosamines in food' IARC scientific publication No. 18, Chief ed. Egan H, IARC, Lyon, 1978, 141-150.

Lijinsky, W., Conrad, E., and Van de Bogart, R., Formation of carcinogenic nitrosamines by interactions of drugs with nitrite, in 'N-nitroso compounds analysis and formation', IARC scientific publication No.3, ed Bogovski P, Preussman R and Walker E.A. IARC, Lyon, 1972, 130-133.

Mirvish, S.S., Gold, B., Eagen, M. and Arnold, S., Kinetics of the nitrosation of aminopyrine to give dimethylnitrosamine. Z. Krebsforsch, 1974, 82, 259-268.

Sen, N.P., Analysis of volatile N-nitrosamines using gas chromatography with Coulson detector:estimation of N-nitrosopyrrolidine by thin layer chromatography with fluorimetric detection, in 'Environmental carcinogens selected methods of analysis, volume 1, Analysis of volatile nitrosamines in food', IARC scientific publication no. 18, chief ed. Egan H, IARC, Lyon, 1978, 119-131.

Singer, G.M., The mechanism of nitrosation of tertiary amines, in 'N-nitroso comounds. Analysis, formation and occurrence', IARC scientific publication no. 31., ed Walker E A, Griciute L, Castegnaro M and Borzsonyi M, IARC, Lyon, 1980, 139-151.

19065 X

# EXHIBIT 46

WORLD HEALTH ORGANIZATION

INTERNATIONAL AGENCY FOR RESEARCH ON CANCER

# ENVIRONMENTAL *N*-NITROSO COMPOUNDS ANALYSIS AND FORMATION

*Proceedings of a Working Conference held at*

*the Polytechnical Institute, Tallinn, Estonian SSR*

*1-3 October 1975*

EDITORS

E.A. WALKER P. BOGOVSKI

L. GRICIUTE

TECHNICAL EDITOR FOR IARC

W. DAVIS

IARC Scientific Publications No. 14

INTERNATIONAL AGENCY FOR RESEARCH ON CANCER

LYON

1976

PUBLIC HEALTH

The International Agency for Research on Cancer (IARC) was established in 1965 by the World Health Assembly as an independently financed organization within the framework of the World Health Organization. The headquarters of the Agency are at Lyon, France, and it has Research Centres in Iran, Kenya and Singapore.

The Agency conducts a programme of research concentrating particularly on the epidemiology of cancer and the study of potential carcinogens in the human environment. Its field studies are supplemented by biological and chemical research carried out in the Agency's laboratories in Lyon and, through collaborative research agreements, in national research institutions in many countries. The Agency also conducts a programme for the education and training of personnel for cancer research.

The publications of the Agency are intended to contribute to the dissemination of authoritative information on different aspects of cancer research.

© International Agency for Research on Cancer 1976

The authors alone are responsible for the views expressed in the signed articles in this publication.

PRINTED IN SWITZERLAND

# NITROSATION OF FOOD AMINES UNDER STOMACH CONDITIONS

C.L. WALTERS, CAROLINE S. DYKE & M.J. SAXBY

*British Food Manufacturing Industries Research Association, Leatherhead, Surrey, UK*

R. WALKER

*Biochemistry Department, University of Surrey, Guildford, Surrey, UK*

The extent of nitrosation *in vivo* of a number of amines and amides has been assessed by Greenblatt et al. (1971) by counting the number of lung adenomas induced following their administration with nitrite. On this basis, formation of nitroso-*N*-methylaniline *in vivo* was only 10% of that predicted from corresponding studies made *in vitro*. A number of explanations have been advanced for this discrepancy between the *in vivo* and *in vitro* situations; e.g., extraction of the non-ionized amine (pKa = 4.85) by fats in ingested food, even at pH 3-4; removal of the amine by precipitation of insoluble salts; and the physiological effects of the amine on gastric secretion and function.

In general, tertiary amines and quaternary ammonium compounds are nitrosated less readily than secondary amines (Fiddler et al., 1972), but the nitroso cleavage involved results in the formation of simple nitrosamines from complex precursors such as the tetracycline antibiotics (Lijinsky et al., 1972). In order to determine, therefore, the availability in foods of amine precursors which could result in nitrosamine formation, Walters et al. (1974) treated foods with relatively high levels of nitrous acid at acid pH, following which the products were fractionated on the basis of their volatility in steam and extractability into dichloromethane. In particular, the four volatile nitrosamines, nitrosodimethylamine, nitrosodiethylamine, nitrosopyrrolidine and nitrosopiperidine were shown by gas chromatography coupled with high-resolution mass spectrometry to arise from the nitrosation of milk products.

Nitrate is widely distributed in vegetables and in water supplies and can readily be reduced to nitrite by bacterial or plant enzymes. By



GSKZAN0000084973

virtue of its greater reactivity, nitrite itself is not as widely distributed but is useful as a food additive in protecting the consumer against *Clostridium botulinum*.

In kinetic studies, thiocyanate can stimulate markedly the nitrosation of an amine, particularly at pH values below 3 (Boyland & Walker, 1974). The anion occurs in the saliva, particularly in that of smokers; an increased thiocyanate concentration in the urine of smokers, in comparison with that of nonsmokers, has also been observed. Since the reaction between nitrite and phenols is independent of pH over a wide range and is much faster than that with many secondary amines, it has been suggested (Challis, 1973) that dietary compounds of this type would inhibit the formation of nitrosamines by scavenging the available nitrite.

More recently, however, it has been noted (Challis & Bartlett, 1975) that readily oxidizable phenols such as 4-methylcatechol can markedly stimulate the conversion of piperidine into its *N*-nitroso derivative. Their observations, made using nitrite levels of 10 and 100 mM in a model system, have been extrapolated to the ingestion of foods in which the legal limit of 2.9 mM is rarely approached.

Nitrite also occurs physiologically in human saliva (Tannembaum, et al., 1974), usually at levels within the range 0.08-0.14 mM (6-10 mg/kg). In some individuals, the nitrite concentration in whole saliva varied little over a matter of months, but in other cases the level varied greatly with time; the ingestion of meals containing various amounts of nitrate had little or no effect on the salivary nitrite concentration one hour afterwards.

The human stomach does not show the distinct anatomical subdivision apparent in rodents. In order to assess the exposure of various populations to nitrosamines produced *in vivo* from dietary nitrite, therefore, it is important to approach the actual situation of the consumer as closely as possible; the opportunity has therefore been taken to examine the interaction of normal foodstuffs, albeit in a comminuted form, during their residence within the human stomach.

## RESULTS

### *Salivary nitrite levels and diet*

Nitrite levels in the saliva of normal individuals have been examined at approximately 1½-hour intervals over two working days. The values observed fell generally within the range 0.0-0.07 mM (0-5 mg/kg), and no significant trends were discernible in individuals. In one subject, a mean value of 0.013 mM nitrite throughout one working day was followed by one of 0.086 mM the following day; but generally the observed variations were less well marked. The group was composed of smokers and nonsmokers, but no differences were apparent between the two habits.

In order to assess the effects of dietary nitrate on salivary nitrite, 70 g lettuce containing 56-91 mg potassium nitrate was consumed by each of a group of volunteers, and their salivary nitrite levels were monitored

immediately afterwards and also after various time intervals of up to six hours. On the following day, the control group of volunteers who had received no lettuce on the first day were fed similar amounts of the vegetable; in this way, the group fed lettuce on the first day became the controls on the second day, and thus the roles of the two groups were reversed from day to day for four days.

Prior to the ingestion of lettuce, the mean level of nitrite in the saliva of all groups was 0.063 mM (4.4 mg/kg), which rose to 0.097 mM (6.8 mg/kg) immediately after the meal (0 hours). The subsequent mean values obtained were 0.076 (5.3 mg/kg), 0.053 (3.7 mg/kg) and 0.044 (3.1 mg/kg) after 2, 4 and 6 hours, respectively; those in the non-lettuce consumers were 0.049 (3.4 mg/kg), 0.026 (1.8 mg/kg), 0.033 (2.3 mg/kg) and 0.026 (1.8 mg/kg), respectively. The differences between the salivary nitrite levels in lettuce consumers and abstainers were significant at 0, 2 and 4 hours with P values of <0.01, <0.001 and <0.05, respectively, but were insignificant after six hours.

*Nitrite levels in gastric juice and their response to dietary intake*

The average value obtained for the nitrite level in the fasting gastric juice of student volunteers was 0.014 mM (0.97 mg/kg, SD = 1.48). In a similar survey at Guys Hospital, London, repeated determinations on the fasting gastric juice of a nonsmoker yielded a mean nitrite level of 0.0093 mM (0.65 mg/kg, SD = 0.66), whilst corresponding observations on a smoker gave a much higher average value of 0.16 mM (11.1 mg/kg, SD = 4.9); the pH values of the fasting gastric juice of the latter subject also tended to be somewhat higher, around 4.0.

Figure 1 shows the effects of consumption of a meal of 410 g containing 80 g luncheon meat, providing nitrite to an overall level of 0.83 mM (58 mg/kg) in the whole meal, on salivary and gastric nitrite and on pH values over a total period of 88 minutes from commencement of the meal. In addition, the meal was composed of one fried egg (40 g), bread (32 g), butter (16 g), cheese (22 g), biscuits (17 g) and milk (200 ml). A rapid rise in both pH and gastric nitrite levels ensued, with maximum values in both occurring approximately 40 minutes after commencement of the meal. Thereafter, the pH fell towards the average fasting value, and the mean nitrite level similarly decreased sharply. Throughout the whole period, the average salivary nitrite did not vary markedly, although it tended to diminish somewhat after ingestion of the meal, presumably due to "dilution" with the dietary intake and to return towards the initial value afterwards.

*Salivary and gastric levels of thiocyanate*

Table 1 illustrates the differences found between the average salivary thiocyanate levels in groups of smokers and nonsmokers, the ratio of the mean levels being 3:1 in favour of the first group; this difference was maintained on repeated determinations throughout a working day. A similar difference has been observed in thiocyanate levels in fasting gastric juice from similar groups; the difference had about the same proportionality, although the absolute levels were reduced in both smokers and nonsmokers, presumably due to dilution.

FIG. 1. EFFECT OF INGESTION OF MEAL OF 410 g CONTAINING 0.83 mM (58 mg/kg) NITRITE ON GASTRIC pH AND GASTRIC AND SALIVARY LEVELS




*Gastric phenol levels in smokers and nonsmokers*

Phenol values, determined with Folin-Ciocalteu reagent, in 19 observations on four nonsmokers, ranged from 1.2-4.3 mM in the fasting gastric juice, with an average of 2.06 mM. The corresponding range for five observations on one smoker was 1.5-3.5 mM, with an average value of 2.64 mM. Thus, no significant difference has been observed in the small numbers of samples so far examined.

*Interaction of nitrite and food amines*

*Procedures.* Incubations at 37°C for three hours were conducted either in a sodium acetate-hydrochloric acid solution at pH 2.0 or in human gastric juice adjusted if necessary to the same pH using hydrochloric acid. The foods investigated included luncheon meat as a source of nitrite, since it has been proved not to contain volatile nitrosamines *per se*; other components of the meals included normal commodities used in corresponding *in vivo* studies.

Table 1. Thiocyanate levels found in whole saliva and fasting gastric juice

| Fluid | Smoker or nonsmoker | No. of observations | Mean thiocyanate level ± SD of mean (mM) |
|---|---|---|---|
| Saliva | NS | 15 | 1.82 ± 0.71 |
| | S | 15 | 5.45 ± 0.77 |
| Gastric juice | NS | 20 | 0.48 ± 0.34 |
| | S | 6 | 1.49 ± 0.23 |

At the conclusion of the incubations, any volatile nitrosamines formed at gastric pH were separated by distillation under reduced pressure from a thermostatically controlled water bath after addition of sodium chloride to 10% and of potassium carbonate to 4%, in the manner of Telling et al. (1974). After extraction from the distillates into dichloromethane and concentration of the extracts with transference into hexane, individual volatile nitrosamines were detected and estimated by gas chromatography coupled with high-resolution mass spectrometry. Alignment of the Hitachi-Perkin Elmer RMU7L mass spectrometer at a resolution of 10 000 was made using an isomer of precisely the same molecular formula as each nitrosamine and yielding adequate proportions of the characteristic molecular ion of the same *m/e* value (Crathorne et al., 1975). The detection limit of each volatile nitrosamine was approximately 1 ng in the volume injected into the gas chromatograph, representing an initial concentration in the stomach contents of less than 1 μg/kg by virtue of the 1 000-fold concentration obtained during the extraction and concentration procedures. Thus, volatile nitrosamines in concentrated extracts were determined by the mass spectrometric response at the molecular ion of each, at its characteristic retention time in gas chromatography, in comparison with the similar response of a standard solution of known concentration.

The distillation residues were extracted initially with dichloromethane to remove nonvolatile *N*-nitroso compounds soluble in that solvent at the alkaline pH used. Finally, the food residues were freeze-dried to dryness prior to estimation of nonvolatile nitrosamines. Initially, the group-specific denitrosation procedure of Eisenbrand & Preussman (1970) was employed; however, this method is particularly susceptible to inhibition of response by lipid components of foods which are easily extractable into dichloromethane. The method subsequently employed is based on that of Lunt et al. (1973) in which nonvolatile nitrosamines are denitrosated to a volatile product which can be swept over in a stream of nitrogen and trapped in alkali for estimation. Table 2 illustrates the rate constants

Table 2. Rate constants for the denitrosation of nitrosamines

| Nitrosamine | Denitrosating agent | Concentration $BF_3$[a] (mM) | Temperature (°C) | Rate constant[b] $K_2$ (l/m/s) |
|---|---|---|---|---|
| Nitroso-morpholine | oxalyl chloride | | 21 | too small to measure |
| | oxalyl chloride | | 83 | $7.9 \times 10^{-4}$ |
| | oxalyl chloride + CuCNS[c] | | 83 | $3.2 \times 10^{-3}$ |
| | oxalyl chloride + $BF_3$ | 90 | 83 | $7.7 \times 10^{-3}$ |
| | hydrogen chloride | | 21 | $2.1 \times 10^{-3}$ |
| | hydrogen bromide | | 21 | $4.5 \times 10^{-3}$ |
| | acetyl chloride | | 21 | $1.1 \times 10^{-3}$ |
| | acetyl chloride | | 83 | $3.1 \times 10^{-3}$ |
| | thionyl chloride | | 83 | $8.8 \times 10^{-4}$ |
| Nitroso-sarcosine | oxalyl chloride | | 21 | $1.3 \times 10^{-3}$ |
| | oxalyl chloride | | 83 | $1.15 \times 10^{-2}$ |
| | oxalyl chloride + $BF_3$ | 90 | 21 | $9.9 \times 10^{-3}$ |
| | oxalyl chloride + $BF_3$ | 90 | 83 | too fast to follow |
| | oxalyl chloride + $BF_3$ | 0.18 | 21 | $9.5 \times 10^{-4}$ |
| | $BF_3$ | 92 | 83 | $1.1 \times 10^{-2}$ |
| | hydrogen bromide | | 21 | $3.5 \times 10^{-3}$ |
| | hydrogen bromide | | 83 | $2.05 \times 10^{-1}$ |
| Nitroso-diphenylamine | oxalyl chloride | | 21 | $1.10 \times 10^{-2}$ |

[a] Boron trifluoride concentrations (added in glacial acetic acid) either in excess of that of oxalyl chloride (39 mM) or only in catalytic amounts; since the rate is dependent upon the $BF_3$ concentration, $K_2$ will not be a true rate constant under these conditions.

[b] Rate constant determined as pseudo-first order plot, using excess denitrosating agent, divided by its concentration to give $K_2$.

[c] Addition of solid cuprous chloride and potassium thiocyanate.

Case 9:20-md-02924-RLR Document 6164-7 Entered on FLSD Docket 12/30/2022 Page 394 of 400



for decomposition of three nitrosamines by a variety of halogenated reagents, sometimes with the addition of boron trifluoride as well. The rate of denitrosation by oxalyl chloride at 21°C is apparently dependent upon the basicity of the parent amine, upon which the stability of the nitrosamine depends greatly. In refluxing dichloroethane, however, all three nitrosamines were denitrosated at measurable velocity. Boron trifluoride enhanced the rate of denitrosation of nitrososarcosine by oxalyl chloride.

In terms of total volatile nitrogen released, however, the denitrosation reagent of choice proved to be oxalyl chloride in either refluxing benzene or dichloroethane. Previously, the major product of denitrosation, nitrosyl chloride, was determined as nitrite by trapping in alkali. However, nitrosyl chloride has been reported to produce not only nitrite but also nitrate and nitric oxide (Beckham et al., 1951), the yield of nitrite increasing with the strength of alkali. For this reason, alkaline hydrogen peroxide has been used as a trapping system, to oxidize any nitric oxide to nitrite and/or nitrate. Excess hydrogen peroxide was subsequently destroyed by boiling in the presence of cupric sulfate before reduction of nitrate to nitrite by incubation with hydrazine in the presence of copper (Sawicki & Scaringelli, 1971) and determination of nitrite formed. Blank determinations were made by collecting any nitrogenous compounds volatile in a stream of nitrogen and emanating from the food matrices prior to addition of the denitrosating agent; these determinations also showed the availability of nitrate in the reagents employed, which should be restricted to an absolute minimum.

In vitro *studies*. The predominant volatile nitrosamines arising from deliberate drastic nitrosation of foods, and particularly those of dairy origin, at acid pH under conditions atypical of those relevant to the human consumer are nitrosopiperidine and nitrosopyrrolidine. The maximum levels of each, as detected by gas chromatography coupled with high-resolution mass spectrometry, were, respectively, 0.73 (83 μg/kg) and 0.42 (42 μg/kg) μmol/kg.

Table 3 records the effect of thiocyanate, up to a concentration in excess of that found in the fasting gastric juice of a smoker, on the average formation of nitrosopiperidine and nitrosopyrrolidine in incubations in sodium acetate-hydrochloric acid buffer at pH 2.0 for 3 hours at 37°C of a whole meal containing an overall nitrite concentration of 0.46 mM (32 mg/kg). No formation of nitrosopyrrolidine was detected in the absence of thiocyanate, and at all levels its formation was only a very small proportion of the maximum obtained at the much higher nitrite level typical of the "drastic" conditions employed. Some formation of nitrosopiperidine was noted in the absence of thiocyanate; its production was markedly enhanced even at the lowest level employed and was increased even further at the highest level of thiocyanate used.

In the presence of 1.2 mM thiocyanate, incubation of a slurry of luncheon meat (containing nitrite to an overall concentration of 30 mg/kg), egg and milk at pH 2.0 with human gastric juice formed both volatile and nonvolatile *N*-nitroso compounds (Table 4).

GSKZAN0000084979

Table 3. Effect of thiocyanate concentration on average formation of volatile nitrosamines from food amines during incubation at pH 2.0 and 37°C

| Thiocyanate concentration (mM) | Formation of volatile nitrosamine (μmol/kg) | |
|---|---|---|
| | Nitrosopiperidine | Nitrosopyrrolidine |
| 0.0 | 0.07 | 0.00 |
| 0.2 | 0.32 | 0.02 |
| 0.6 | 0.26 | 0.01 |
| 1.2 | 0.33 | 0.01 |
| 3.0 | 0.45 | 0.01 |

It is apparent that the somewhat restricted diet which was chosen to permit its removal in a homogenized form from the human stomach has given rise to less nitrosopiperidine, as estimated by gas chromatography coupled with high-resolution mass spectrometry, than the whole meal examined previously. No explanation can be advanced for the apparent diminution in nitrosopiperidine production after 30 minutes, which could have arisen from a change in the equilibrium of the reversible nitrosation process but is more likely to be insignificant. The important finding, however, is that the *in vitro* formation of nitrosamines is comparatively rapid.

Table 4. Formation of volatile and nonvolatile nitrosamines during *in vitro* incubations in human gastric juice at pH 2.0 in the presence of 1.2 mM thiocyanate

| Incubation period (min) | Mean formation of volatile nitrosamines (μmol/kg) | | Mean formation of nonvolatile nitrosamines (μmol/kg)[a] | |
|---|---|---|---|---|
| | Nitroso-piperidine | Nitroso-pyrrolidine | Dichloromethane-extractable | Residue fraction |
| 15 | 0.059 | 0.002 | 0.60 | 13 |
| 30 | 0.018 | 0.000 | 0.85 | 37 |
| 180 | 0.045 | 0.003 | 0.70 | 22 |

[a] On basis of one nitrosatable group per molecule.

In addition, nonvolatile nitrosamines of both the types extractable into dichloromethane and those remaining within the aqueous phase were detected in greater amounts on a group specific basis.

In vivo *studies*. Initial *in vivo* studies were carried out using Ryle's nasal tubes, which allow food to be ingested whilst the tubes are in position. However, their narrow bore permits recovery of only small volumes of gastric juice, and, furthermore, they are subject to blockage by particulate matter. As a result of the small recoveries of ingested foods from the stomach *via* Ryle's tubes, it was decided to make use of foods homogenized sufficiently to permit both their entry into and their removal from the stomach, after a requisite time interval, through an oral tube of larger bore. In addition, this has permitted more effective sampling of the contents of the whole stomach, as distinct from a localized area. Through the use of phenol red, which is not absorbed from the stomach, as a marker, it was found that an average of 85% of food slurries could be recovered after residence times of up to 30 minutes in the stomach.

Table 5 presents the results of analyses of the various fractions of food samples recovered after a residence time of 30 minutes in the human stomach. The homogenized meals contained luncheon meat, egg and milk, the overall levels of nitrite being within the range 0.46-0.56 mM (32-39 mg/kg). No evidence was obtained for formation of nitrosopyrrolidine, but trace amounts of nitrosopiperidine were detected by gas chromatography coupled with high-resolution mass spectrometry in three meal homogenates out of four after residence within the human stomach; in only one instance were nonvolatile nitrosamines observed, which were extractable into dichloromethane from the distillation residue at alkaline pH.

Table 5. *N*-Nitroso compounds in food samples recovered after 30 min residence in the human stomach

| Subject | Concentration detected (μmol/kg) | | | Nitrite level in residue fraction (mg/kg) |
|---|---|---|---|---|
| | Nitroso-piperidine | Nonvolatile nitrosamines[a] | | |
| | | Dichloromethane-extractable | Residue fraction | |
| Nonsmoker | 0.004 | 0.0 | 9.0 | 35 |
| Nonsmoker | 0.000 | 0.0 | 7.1 | 19 |
| Smoker | 0.006 | 0.0 | 17.0 | 14 |
| Smoker | 0.003 | 0.4 | 20.0 | 57 |

[a] On basis of one nitrosatable group per molecule.

However, the greatest response to the denitrosation procedure adopted was observed in the water-soluble "residue" fractions. While this method has not yet been thoroughly evaluated with respect to *S*-nitrosothiols, alkyl nitrites, etc., nevertheless, the response of these residues has been found to be negative after pretreatment with hydrobromic acid in glacial acetic acid, as would be anticipated for *N*-nitroso compounds.

## DISCUSSION

Whilst Tannenbaum et al. (1974) found no effect of dietary nitrate on salivary nitrite, their observations were limited to two determinations, one before and one after various meals of different compositions. On the other hand, Schuller & Nieuwenhuys[1] induced much higher nitrite concentrations in the saliva than those reported in this paper after the ingestion of large amounts of vegetables very rich in nitrate; from their results, it is apparent that the duration of enhanced salivary nitrate levels as well as the magnitude of the rise in concentration are dependent upon the intake of dietary nitrate.

Repeated observations of stomach nitrite levels in the limited numbers of volunteers with both low and high fasting gastric pH values show that it is in cases of "subacidity" that the greatest opportunity is presented for the interaction of ingested food amines, etc., to react with the greater amount of nitrite available, in keeping with the concepts of Sander (1974). Whether or not this difference is related to smokers as distinct from nonsmokers has yet to be established with certainty.

The curve relating mean gastric nitrite levels to the period after consumption of a meal containing nitrite as an additive indicates that nitrite utilization does not occur rapidly until hydrochloric acid secretion overcomes the buffering capacity of the ingested food. As the gastric pH level fell below a value of 4.5 or thereabouts, a rapid loss of nitrite commenced due either to its reaction with food components and/or to its absorption or passage into the duodenum. Its rapid absorption was not, however, apparent while the gastric pH was rising due to the ingested food, and the maximum concentration achieved was approximately that to be anticipated for the distribution of a meal of this size in the fasting human stomach.

The enhanced salivary thiocyanate concentration observed in smokers as compared with nonsmokers is in keeping with the observation of Boyland & Walker (1974), although the ratio observed between the mean concentrations is somewhat less than that reported even for light smokers; this is probably because the mean value found for the control nonsmoker group was appreciably higher. The thiocyanate concentration found in the fasting gastric juice of both groups is approximately in accord with, or somewhat higher than, that calculated upon the basis of daily secretions of saliva and gastric juice and intake of food and drink which those authors consider to be highly significant so far as the stimulation of

[1] Personal communication.

nitrosation at pH values of 3.0 and below is concerned. Certainly, for nitrosation at pH 2.0 of food amines 0.2 mM and more thiocyanate are effective in stimulating *in vitro* the production of nitrosopiperidine in particular.

Although in mass spectrometry a resolution of 70 000 is necessary to resolve the molecular ion of nitrosodimethylamine and the *m/e* value for the $^{29}Si\ Me_3$ ion (Gough & Sawyer, 1974), no similar or other ion with a *m/e* value as close to those for the molecular ions of nitrosopiperidine and nitrosopyrrolidine has been reported, and it is considered that the resolution of 10 000 used in the present studies renders their characterization virtually unambiguous.

As far as nonvolatile nitrosamines are concerned, the formation with thionyl chloride of denitrosation products volatile in a stream of nitrogen was restricted to compounds of this type (Lunt et al., 1973), although inorganic nitrite did yield a small response. Hebenbrock & Eiter (1972) have used oxalyl chloride for synthetic purposes in denitrosating a number of complex *N*-nitroso compounds, and in boiling solvent this agent has been the most effective in splitting and volatilization of the nitrogen atom of the *N*-nitroso group. However, detection of the volatile products of denitrosation as nitrite after trapping in alkali is unsatisfactory owing to concurrent formation of nitrate and nitric oxide. Determination of nitrate at low levels through its reduction to nitrite presents considerable difficulties, particularly as far as its content in reagents is concerned; for this and other reasons determination of the denitrosation of nitrosamines *in situ* in freeze-dried food materials is coupled with a modified chemiluminescent analyser.

The evidence derived from studies *in vitro* suggests that the formation of nitrosamines from food amines is quite rapid. The reduced amounts of nitrosopiperidine found in *in vivo* incubations of food slurries in comparison with its formation *in vitro* could therefore be due to their ready absorption from the stomach. Since the pH values of the recovered stomach contents have been found to be within the range of 2-5, it may well be necessary to extend the residence period within the stomach towards the normal total residence period, in order to ensure maximal opportunity for nitrosation *in vivo*. In addition, direct introduction of the food slurries into the human stomach through an oral tube has meant that the inflow of salivary thiocyanate associated with swallowing has been avoided, which may have influenced the course of nitrosation *in vivo*. Attempts are therefore being made to recover meals by oral tubes after thorough mastication and residence within the stomach for longer periods.

Case 9:20-md-02924-RLR Document 6164-7 Entered on FLSD Docket 12/30/2022 Page 399 of 400



## ACKNOWLEDGEMENTS

The financial support of the Cancer Research Campaign and the National Cancer Institute (Contract No. NO1-CP-43337) for various aspects of the research involved is gratefully acknowledged. Part of the practical work involved was undertaken by Ms B.E. Wells and Messrs P.J. Colley and I.G. Jones. We are greatly indebted to Professor J.N. Hunt, of Guys Hospital Medical School, London, and his colleagues Ms M. Fisher and Mr R. Burn-Murdoch for their invaluable assistance in *in vivo* experiments.

## REFERENCES

Beckham, L.J., Fessler, W.A. & Kise, M.A. (1951) Nitrosyl chloride. *Chem. Rev., 48,* 319-396

Boyland, E. & Walker, S. (1974) *Thiocyanate catalysis of nitrosamine formation and some dietary implications.* In: Bogovski, P. & Walker, E.A., ed., N-*Nitroso Compounds in the Environment,* Lyon, International Agency for Research on Cancer (*IARC Scientific Publications* No.9), pp. 132-136

Challis, B.C. (1973) Rapid nitrosation of phenols and its implications for health hazards from dietary nitrites. *Nature (Lond.), 244,* 466

Challis, B.C. & Bartlett, C.D. (1975) Possible cocarcinogenic effects of coffee constituents. *Nature (Lond.), 254,* 532-533

Crathorne, B., Edwards, M.W., Jones, N.R., Walters, C.L. & Woolford, G. (1975) The use of isomers in the detection and estimation of volatile nitrosamines by combined high-resolution mass spectrometry-gas chromatography. *J. Chromat.* (in press)

Eisenbrand, G. & Preussmann, R. (1970) Eine neue Methods zur Kolorimetrischen Bestimmung von Nitrosaminen nach Spaltung der *N*-nitrosogruppe mit Bromwasserstoff in Eisessig. *Arzneimittel-Forsch., 20,* 1513-1517

Fiddler, W., Pensabene, T.W., Doerr, R.C. & Wasserman, A.E. (1972) Formation of *N*-nitrosodimethylamine from naturally occurring quaternary ammonium compounds and tertiary amines. *Nature (Lond.), 236,* 306

Gough, T.A. & Sawyer, R. (1974) *Analysis of volatile nitrosamines: progress in gas chromatography-mass spectrometry techniques.* In:

GSKZAN0000084984

Bogovski, P. & Walker, E.A., ed., N-*Nitroso Compounds in the Environment*, Lyon, International Agency for Research on Cancer (*IARC Scientific Publications* No.9), pp. 18-21

Greenblatt, M., Mirvish, S.S. & So, B.T. (1971) Nitrosamine studies: induction of lung adenomas by concurrent administration of sodium nitrite and secondary amines in Swiss mice. *J. nat. Cancer Inst.*, *46*, 1029-1034

Hebenbrock, K.F. & Eiter, K. (1972) *N*-Substituted 1,3-oxazolidines and *N*-substituted tetrahydro-1,3-oxazines from *N*-nitroso-1,3-oxazolidines and *N*-nitrosotetrahydro-1,3-oxazines. *Liebig's Ann. Chem.*, *765*, 78-93

Lijinsky, W., Conrad, E. & Van de Bogart, R. (1972) *Formation of carcinogenic nitrosamines by interaction of drugs with nitrite.* In: Bogovski, P., Preussmann, R. & Walker, E.A., ed., N-*Nitroso Compounds - Analysis and Formation*, Lyon, International Agency for Research on Cancer (*IARC Scientific Publications* No.3), pp. 130-133

Lunt, T.G., Fueggle, D.G. & Walters, C.L. (1973) The estimation of total non-volatile nitrosamines and nitrosamides in microgram amounts. *Analyt. Letters*, *6*, 369-372

Sander, J. (1974) *Formation of nitroso compounds in man: evaluation of the problem.* In: Krol, B. & Tinbergen, B.J., ed., *Proceedings of the International Symposium on Nitrite in Meat Products, Zeist, 1973*, Wageningen, Pudoc Centre for Agricultural Publishing and Documentation, pp. 251-255

Sawicki, C.R. & Scaringelli, F.P. (1971) Colorimetric determination of nitrate after hydrazine reduction to nitrite. *Microchem. J.*, *16*, 657-672

Tannenbaum, S.R., Sinskey, A.J., Weisman, M. & Bishop, W. (1974) Nitrite in human saliva: its possible relationship to nitrosamine formation. *J. nat. Cancer Inst.*, *53*, 79-84

Telling, G.M., Bryce, T.A., Hoar, D., Osborne, D. & Welti, D. (1974) *Progress in the analysis of volatile* N-*nitroso compounds.* In: Bogovski, P. & Walker, E.A., ed., N-*Nitroso Compounds in the Environment*, Lyon, International Agency for Research on Cancer (*IARC Scientific Publications* No.9), pp. 12-17

Walters, C.L., Newton, B.E., Parke, D.V. & Walker, R. (1974) *The precursors of* N-*nitroso compounds in foods.* In: Bogovski, P. & Walker, E.A., ed., N-*Nitroso Compounds in the Environment*, Lyon, International Agency for Research on Cancer (*IARC Scientific Publications* No.9), pp. 223-228