# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                           MDL NO. 2924
PRODUCTS LIABILITY                                      20-MD-2924
LITIGATION

                                            JUDGE ROBIN L. ROSENBERG
                              MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**


## PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' PUTATIVE EXPERT OPINIONS ON GENERAL CAUSATION UNDER RULE 702[1]


DATED: July 6, 2022

---

[1] This Motion is filed under seal pursuant to the Order at D.E. 5684.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.     NDMA Is a Human Carcinogen. ........................................................................ 2

    A.     An Array of Authorities Have Concluded That NDMA Can Cause Cancer Because Studies Consistently Find That It Does. .................................................. 2

    B.     Defendants Admit NDMA Is a Genotoxic Carcinogen ........................................ 5

    C.     There Is Overwhelming Evidence that NDMA Exhibits the Key Characteristics of a Human Carcinogen ............................................................... 8

        1.     NDMA Acts as an Electrophile after Metabolic Activation ...................... 8

        2.     NDMA Is Genotoxic .................................................................................. 10

        3.     NDMA Alters DNA Repair and Causes Genomic Instability .................. 13

        4.     NDMA Induces Epigenetic Alterations (e.g., DNA Methylation) ........... 13

        5.     NDMA Induces Oxidative Stress .............................................................. 13

        6.     NDMA Stimulates Chronic Inflammation ................................................ 14

        7.     NDMA Is Immunosuppressive ................................................................. 15

        8.     NDMA Causes Immortalization By Transforming Normal Cells Into Cancer Cells. .......................................................................................... 16

        9.     NDMA Alters Cell Proliferation, Cell Death or Nutrient Supply (Angiogenesis) ......................................................................................... 16

II.     Ranitidine Degrades Into NDMA. ................................................................... 17

    A.     NDMA Forms in Ranitidine Tablets at Amounts that Increase the Risk of Human Cancers ................................................................................................ 17

    B.     Ranitidine Forms NDMA Endogenously (After Ingestion) Under Various Conditions ........................................................................................................ 19

        1.     Bacterial nitrosation in the stomach ........................................................ 20

        2.     Nitrite levels in the body .......................................................................... 21

        3.     The role of thiocyanate ............................................................................. 23

III.   Human Epidemiological Studies on Ranitidine Are Consistent with the NDMA
       Evidence.............................................................................................................. 25

       A.   Any Sound Methodology Must Account for Exposure and Follow-Up in a
            Study ...................................................................................................... 25

            1.   Study Exposures Must Match the Plaintiffs for the Results to Apply. ...... 25

            2.   Because Cancer Can Take Years to Develop, Study Follow-Up Is
                 Critical............................................................................................. 26

       B.   The Human Active Comparator Ranitidine Studies Have Limited Exposure,
            Follow-up, and Other Limitations Which Their Authors Forthrightly
            Recognize................................................................................................. 27

            1.   Adami (2021) ................................................................................... 28

            2.   Norgaard (2021)................................................................................ 30

            3.   Cardwell (2021) ............................................................................... 32

            4.   Iwagami (2020)................................................................................ 33

            5.   Kantor (2021)................................................................................... 35

            6.   Kim, Y.D. (2021).............................................................................. 36

            7.   Kumar (2021) ................................................................................... 38

            8.   S. Kim (2021)................................................................................... 39

            9.   Yoon (2021) ..................................................................................... 40

       C.   Dietary and Occupational Epidemiology Fills the Gap Left in the Ranitidine
            Epidemiology............................................................................................ 41

       D.   Considered Together, the Epidemiological Evidence Supports Causation for
            Each Cancer ............................................................................................. 43

            1.   Bladder Cancer - Epidemiologic Evidence for Ranitidine or NDMA
                 Exposure and Bladder Cancer Show Consistent Results of an Increased
                 Risk and Evidence of Dose Response........................................................ 44

            2.   Esophageal Cancer - Epidemiologic Evidence for Ranitidine or NDMA
                 Exposure and Esophageal Cancer Show Consistent Results of an
                 Increased Risk and Evidence of Dose Response ....................................... 48

            3.   Gastric (Stomach) Cancer - Epidemiologic Evidence for Ranitidine or
                 NDMA Exposure and Gastric Cancer Show Consistent Results of an

Increased Risk and Evidence of Dose Response ...................................... 51

4.    Liver Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Liver Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response ......................................................... 53

5.    Pancreatic Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Pancreatic Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response ...................................... 56

IV.    Evaluating the Totality of the Evidence .......................................................... 59

A.    Bradford Hill Methodology for Establishing Causation ...................................... 60

LEGAL STANDARD ............................................................................................. 64

ARGUMENT ........................................................................................................ 65

I.    John Witte ......................................................................................................... 66

A.    Witte Ignored NDMA Science ........................................................................ 66

B.    Witte Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported by the Human Ranitidine Studies ........................................................ 67

1.    Witte Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs ................................................................................................. 67

2.    Witte Ignored How Short His Preferred Studies' Follow-Up Periods Were ....................................................................................................... 68

C.    Witte Ignored Confounding Factors in Studies He Favored ................................ 69

1.    Witte's Approach to Confounders Is Inconsistent ................................... 69

2.    Witte Misrepresents Data He Disagrees with. ......................................... 72

3.    Witte Ignored the Limitations of Aggregate Data ................................... 73

D.    Witte Conducted an Unreliable and Unhelpful Bradford Hill Analysis .............. 74

II.    Andrew Chan ..................................................................................................... 76

A.    Chan Ignored NDMA Science ......................................................................... 76

B.    Chan's Limited Review of the Ranitidine Epidemiology Was Flawed. .............. 78

1.    Chan Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs ................................................................................................. 79

iii

|  |  | 2. | Chan Ignored How Short His Preferred Studies' Follow-Up Periods Were | 81 |

| III. | Mary Beth Terry | 83 |

|  | A. | Terry Ignored NDMA Science | 83 |

|  | B. | Terry Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported by the Human Ranitidine Studies | 83 |

|  |  | 1. | Terry Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs | 83 |

|  |  | 2. | Terry Ignored How Short Her Preferred Studies' Follow-Up Periods Were | 84 |

|  | C. | Terry Ignored Confounding Factors in Studies She Favored | 85 |

|  | D. | Terry's Opinions Are Unreliable Because She Applies Inconsistent Methodology to NDMA Case Control Studies | 86 |

| IV. | Michael Vaezi | 88 |

|  | A. | Vaezi Ignored All NDMA Epidemiology | 88 |

|  | B. | Vaezi's Limited Review of The Ranitidine Epidemiology Was Severely Flawed | 90 |

|  | C. | Vaezi Was Unaware of, and Misrepresented, Basic Science in This Case | 92 |

| V. | Benjamin Hatten | 93 |

|  | A. | The Court Should Exclude Hatten's Opinion that NDMA Has Not Been Established as a Cause of Any Type of Cancer in Humans | 93 |

|  | B. | The Court Should Exclude Hatten's Opinion that Therapeutic Use of Ranitidine Does Not Cause Esophageal, Gastric, Pancreatic, Liver, or Bladder Cancer in Humans | 97 |

| VI. | Michael Porter | 101 |

|  | A. | Porter Overstates Evidence That Agrees with Him | 101 |

|  | B. | Porter Understates Evidence That Disagrees with Him | 102 |

|  | C. | Porter's Bradford Hill Analysis Should Be Excluded. | 103 |

| VII. | Frederick Guengerich | 106 |

A.      Guengerich's Opinions Applying a Threshold and Logarithmic Scale to NDMA, a Genotoxic Carcinogen, Are Not Reliable ......................................... 107

B.      Guengerich's Derivative Opinions Employing a Threshold Dose to NDMA Based Upon Johnson (2021) Are Equally Unreliable ......................................... 110

C.      Disregarding Available Human Epidemiology Renders Dr. Guengerich's Conclusion Fatally Flawed Methodologically .................................................... 111

D.      Guengerich's Adjunct Theory of DNA Repair Is not Reliable.......................... 113

VIII.   Timothy Wang ............................................................................................................... 115

A.      Wang's Opinion that There Is a Minimum Amount of NDMA Required to Cause Cancer Is Unreliable................................................................................... 115

B.      Wang's Calculations Concerning the Amount of NDMA in Ranitidine Are Unreliable.......................................................................................................... 116

C.      Wang Mischaracterizes NDMA Animal Study Results...................................... 117

D.      Wang's Opinions about Valsartan Epidemiological Studies Are Incorrect and Should be Excluded .......................................................................................... 118

E.      Wang's Bradford Hill Analysis is Woefully Deficient....................................... 119

F.      Wang's Opinions Regarding Background Formation of NDMA Are Unreliable.......................................................................................................... 119

IX.     Lewis Chodosh.............................................................................................................. 120

A.      Chodosh's Dose-Response Opinions Should Be Excluded for the Same Reason as Guengerich's................................................................................... 121

B.      Chodosh's DNA Repair Opinion Is Unreliable Because He Considers Just One Mechanism ................................................................................................ 121

X.      Namandjé Bumpus.......................................................................................................... 122

CONCLUSION................................................................................................................ 122

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ................................................................ 113

*Andrade v. Merson*,
  2012 WL 7451931 (S.D. Fla. Dec. 3, 2021) .......................................... 122

*Browder v. General Motors Corp.*,
  5 F.Supp.2d 1267 (M.D. Ala. 1998) ........................................................ 95

*Buland v. NCL (Bahamas) Ltd.*,
  992 F.3d 1143 (11th Cir. 2021) .......................................... 65, 68, 70, 94

*Chapman v. Procter & Gamble Distrib., LLC*,
  766 F.3d 1296 (11th Cir. 2014) ...................................................... 70, 120

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
  402 F.3d 1092 (11th Cir. 2005) ............................................................... 94

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)................................................................... *passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................. 76

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008)................................................................ 111

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) .......................................... 76, 83, 88, 94

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)................................................................ *passim*

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
  299 F. Supp. 3d 1291 (N.D. Fla. 2018) ........................................ *passim*

*In re Accutane Prod. Liab.*,
  511 F.Supp.2d 1288 (M.D. Fla. 2007)........................................ 108, 120

*In re Roundup Prods. Liab. Litig.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) ....................................... 74, 93

*Kessler Dental Assocs., P.C. v. Dentists Ins. Co.*,
   505 F. Supp. 3d 474 (E.D. Pa. 2020) ...................................................................... 101

*McClain v. Metabolife Int'l., Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ................................................................... 109, 121

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
   25 F.4th 1312 (11th Cir. 2022) .......................................................... 64, 74, 94, 102

*Milward v. Acuity Specialty Products Group*,
   639 F.3d 11 (1st Cir. 2011) .......................................................................... 111, 119

*Moore v. Intuitive Surgical, Inc.*,
   995 F.3d 839 (11th Cir. 2021) ............................................................................ 64, 65

*Morrison v. Exxon Mobil Corp.*,
   2007 WL 988862 (M.D. Ga. Mar. 29, 2007) ........................................................ 122

*PODS Enters. v. U-Haul Inter., Inc.*,
   2014 WL 12628664 (M.D. Fla. June 27, 2014) .................................................... 120

*Ponca Tribe of Indians v. Cont'l Carbon Co.*,
   2009 WL 5842041 (W.D. Okla. Jan. 16, 2009) .................................................... 122

*Price v. Carnival Cruise Lines*,
   2022 WL 951318 (S.D. Fla. Mar. 30, 2020) ........................................................... 98

*Rider v. Sandoz Pharms. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ............................................................................ 112

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ..................................................................... *passim*

*Starling v. Union Pac. R. Co.*,
   203 F.R.D. 468 (D. Kan. 2001) ........................................................................... 122

*United States v. Castaneda*,
   997 F.3d 1318 (11th Cir. 2021) .............................................................................. 76

*United States v. Pon*,
   963 F.3d 1207 (11th Cir. 2020) .............................................................. 71, 95, 97

## Other Authorities

Fed. R. Evid. 702 ..................................................................................................... 65

Fla. Admin. Code R. 62-777.170 ............................................................................... 4

Plaintiffs submit this Motion and memorandum of law in support to exclude Defendants' general causation experts, as allowed under PTO 77. [D.E. 5579].

## INTRODUCTION

The Plaintiffs in this litigation consumed ranitidine for many years—often, for decades. They were diagnosed with five kinds of cancers.  The substantive question before the court is general causation.  The procedural question is admissibility of expert opinions on general causation.

The substantive question of general causation will apply to every plaintiff in this MDL, and consequently must be stated as: *could* ranitidine for *any plaintiff* have caused her cancer? There may well be marginal cases in which ranitidine could not have caused the cancer at issue (because of low exposure, for example), but such cases are properly addressed at specific causation.  For general causation, this Court should have in mind the very strongest case: for example, someone who took ranitidine every day since the 1980s, and has few other risk factors. Only if ranitidine could not have caused cancer in even the strongest case could general causation fail.

The procedural question is the familiar standard of Rule 702 as applied to general causation.  The question is whether—under Rule 702—Defendants' expert witnesses have proffered reliable, helpful opinions on the question of whether ranitidine *can cause* cancer in the strongest case.  Applying that standard fairly, Defendants' experts fall short, principally because they misrepresent or ignore the substantive inquiry.

N-Nitrosodimethylamine (NDMA) is widely recognized to cause cancer.  Defendants' experts seek to ignore this fact, but it is all-but-indisputable.  Defendants' own employees have repeatedly acknowledged as much, even if their hired-for-litigation experts will not.  NDMA's potent carcinogenicity has precluded direct human studies on it—since it would be unethical to give human subjects cancer—but the scientific literature widely recognizes it.  Defendants also ignore a second fact: that ranitidine degrades into NDMA.  That fact is also well-established both by scientists, regulators, and Defendants' own studies and admissions.

Given these two facts, whether ranitidine can cause cancer largely turns on *how much* ranitidine each plaintiff has been exposed to, and *how much* NDMA ranitidine produces in the human body.  Defendants' experts do not attempt to reliably answer those questions, but instead substitute a much different one: *assuming each plaintiff is typical of the subjects in the human*

*epidemiological ranitidine studies, did ranitidine cause her cancer*?  They answer that question no, but that answer is doubly unsatisfying because many Plaintiffs are not like the typical ones in the human epidemiological studies and those studies do not measure the long-term effects of ranitidine use.

Many plaintiffs in this litigation took ranitidine daily for decades, and many developed cancer—which has a long latency period—years after their exposure.  The studies Defendants' experts rely on—to the exclusion of all others—analyze users for *short periods of time*, with *low frequency of ranitidine use*, and *low duration of use*, and *too short of follow up time*.  Many studies have other limitations as well, such as incomplete or no information on confounding factors, aggregate data, over the counter (OTC) use, and so forth.  The study authors readily admit these limitations.  But at their depositions, Defendants' experts did not.  That willful blindness is the only reason they could twist the limited results to cover the very different Plaintiffs at issue in this litigation.  By answering the wrong question with the wrong studies, Defendants' experts' opinions are both unhelpful and unreliable.

To understand the full picture, this Court must consider the strong evidence that NDMA is a carcinogen; that ranitidine degrades into NDMA; that NDMA causes cancer in humans at particular doses and durations; and, ultimately, that ranitidine causes cancer in humans at particular doses and durations.  Because Defendants' experts pay scant attention to each point, their methods are unreliable, and they should be excluded.

## I.    NDMA Is a Human Carcinogen

### A.    An Array of Authorities Have Concluded That NDMA Can Cause Cancer Because Studies Consistently Find That It Does

Because NDMA is recognized by the FDA as a Class 1 genotoxic carcinogen,[2,3] there are no randomized control trials (RCTs) in which humans were intentionally exposed to NDMA and compared to a control group.  The Reference Manual on Scientific Evidence was issued by the

---

[2] U.S. Dep't of Health and Human Servs., Food and Drug Admin., Center for Drug Evaluation and Research, *Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry*, at 5, App'x B, (Feb. 2021), https://www.fda.gov/media/141720/download.FDA Center for Drug Evaluation and Research (CDER) ("FDA Nitrosamine Guidance (2021)").

[3] U.S. Dep't of Health and Human Serv., Food & Drug Admin., M7(R1) *Assessment & Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk; Guidance to Industry*, at 10 (Mar. 2018), https://www.fda.gov/media/85885/download.

Federal Judicial Center as a guide for federal judges on issues involving science in the courtroom. It recognized that "[s]uch deliberate exposure [to NDMA] is not possible in humans."[4] Instead, there are over 120 peer-reviewed publications by over 100 different laboratories worldwide over the past 60 years which demonstrate that NDMA causes cancer in a wide variety of animals with over 10 tumor types.[5]   Despite this lockstep consensus, Defendants attempt to put NDMA's carcinogenicity into doubt.  There can be none.

The World Health Organization's (WHO) International Agency for Research on Cancer (IARC) and the National Toxicology Program (NTP) have formal processes to evaluate the weight of the evidence to determine whether an agent causes cancer.[6]  The process involves an evaluation of 1) epidemiological studies, 2) the animal toxicological studies and 3) mechanistic studies. *Id.* Higher credence is given to the likelihood that a chemical is a human carcinogen if there is evidence of the same type of damage to human DNA as found with animal DNA from an agent that is known to cause cancer in animals. *Id.* at 656.

In 1978, IARC determined that NDMA "is carcinogenic ***in all animal species tested***" including "mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs."[7]  It "should be regarded for practical purposes as if it were carcinogenic to humans." *Id.* In 1981, the National Toxicology Program (NTP) classified NDMA as "reasonably anticipated to be a human carcinogen."[8]  In 1987, California's Proposition 65 listed NDMA as carcinogenic.[9]   The EPA also classifies NDMA as a probable human carcinogen.[10]   Florida Administrative Code, Rule Chapter 62-777.170 lists NDMA as a

---

[4]  National Research Council, *Reference Manual on Scientific Evidence: Third Edition*. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163, at 659 (2011) ("*Reference Manual*").

[5]  *See* Ex. 16 (Panigrahy Rep.).

[6]  *Reference Manual*, *supra* note 4, at 655.

[7]  IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, vol. 17. IARC, Lyon, France, 125-75, 1978 ("IARC 1978"); Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42. IARC Monogr Eval Carcinog Risks Hum Suppl. 1987;7:1-440. PMID: 3482203 ("IARC 1987").

[8]  U.S. Department of Health and Human Services, National Toxicology Program (NTP). *Report on Carcinogen*s, (2d ed. 1981) ("NTP 1981").

[9]  State of California, *Chemicals Known to the State of California to Cause Cancer or Reproductive Toxicity*, (Feb. 2022).

[10]   EPA, *Technical Fact Sheet: N-Nitroso-dimethylamine (NDMA)* (Nov. 2017),

carcinogen.[11]  The Agency for Toxic Substances and Disease Registry (ATSDR) states that "it is appropriate to predict NDMA poses a genotoxic threat to humans"[12] and that "the carcinogenicity of NDMA is widely recognized."[13]  The FDA's Nitrosamine Guidance for Industry cited IARC and EPA's classification of NDMA as a mutagenic carcinogen and a probable human carcinogen.[14] The Canadian Environmental Protection Act of 1999 lists NDMA as "highly likely to be carcinogenic to humans."[15] Outside of litigation, GSK recognizes that NDMA is a genotoxic carcinogen and exposure should be avoided.[16]

In 2002, the WHO published a detailed report regarding NDMA.[17]  The WHO noted that "tumours have been induced in all species examined at relatively low doses" and that "NDMA is mutagenic and clastogenic." *Id.* at 4. As a result of its genotoxic and clastogenic properties, the WHO states that "exposure to NDMA should be reduced to the extent possible." *Id.* at 5. The WHO reviewed NDMA dietary epidemiological studies, which defense experts uniformly deemed irrelevant, and determined that these results demonstrated a consistent association with cancer and NDMA. *Id.* at 21. Finally, the WHO also states that due to "the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumour formation, and the apparent lack of qualitative species-specific differences in the metabolism of this substance, *NDMA is highly likely to be carcinogenic to humans*." *Id.* at 23 (emphasis added).

---

https://www.epa.gov/sites/default/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[11] Fla. Admin. Code R. 62-777.170.

[12] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological Profile for n-Nitrosodimethylamine*, at 42 (1989) ("ATSDR NDMA Tox. Profile (1989)").

[13] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological profile for* n-*Nitrosodimethylamine (Draft for Public Comment)* (2022) ("ATSDR NDMA Tox. Profile (2022)").

[14] FDA Nitrosamine Guidance (2021), *supra* note 2.

[15] Ex. 47 (Canadian Environmental Protection Act, *N-Nitrosodimethylamine*, GSKZAN0000620057 (1999)).

[16] Ex. 60 (GSK's Hazard Assessment Report on N-Nitroso-dimethylamine (NDMA), September 25, 2019, GSKZAN0003419540), at 8.

[17] Liteplo RG, Meek ME, Windle W., World Health Organization, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, at 15 (2002).

## B.  Defendants Admit NDMA Is a Genotoxic Carcinogen

Despite their claims in litigation, Defendants admit that NDMA is a known carcinogen in internal documents.  In GSK's Health Hazard Report on NDMA, GSK concludes that "*NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible*."[18]  They also state that "[q]ualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered *highly likely that NDMA is carcinogenic to humans, potentially at relatively low doses of exposure.*" *Id.* (emphasis added). In 2019, GSK states that "NDMA is a known carcinogen" in a confidential internal document.[19]  In another internal communication GSK admits "Nitrosamine diseases can cause cancer and thus represent a serious health hazard."[20]  GSK identifies NDMA is a carcinogenic worker hazard in their ranitidine lab experiments, stating for example, "*Hazard notes: Ranitidine hydrochloride may potential contain < 15 ppm of an impurity N-nitrosodimethlyamine (NDMA) which is designated as OHC5 carcinogen*…."[21]  Further, GSK admits that it has known that ranitidine forms NDMA under certain conditions since 1982.[22]

Likewise, Sanofi's 2019 Health Hazard Evaluation recognizes NDMA to be mutagenic and carcinogenic, stating "NDMA requires metabolic activation to express its mutagenic and carcinogenic effects and this metabolism route exists in rodents and man" and notes that NDMA "should be regarded for practical purposes if it was carcinogenic to humans.[23] In a 2020 follow-up communication, Sanofi describes NDMA as part of the "high potency mutagenic carcinogens referred to as the cohort of concern."[24]

Witness after witness for GSK, Pfizer, BI, and Sanofi admitted at their depositions that NDMA is a known carcinogen.  Defendants' Admissions Regarding NDMA and Defendants' Experts' Admissions.  Examples of Defendants' admissions that NDMA is carcinogenic, include:

a.  **GSK** witness James Harvey, a Director in the Nonclinical Safety Department, agreed

---

[18] Ex. 60 (GSKZAN0003419540) (emphasis added).

[19] Ex. 61 (GSKZAN0000178581, Dated 7/29/2019 in metadata, Internal comms- Ranitidine NDMA Query- 29 July.docx).

[20] Ex. 59 (GSKZAN0000430892).

[21] Ex. 57 (GSKZAN0000389009, GSK Chemistry Experiment AH19065 - Particle imaging of Saraca Grade 1 and grade III processes to convert ranitidine free base to hydrochloride), at 389014 (emphasis in original).

[22] Ex. 30 (Deposition of GSK 30(b)(6) Witness, James Harvey), at 165:16-24.

[23] Ex. 65 (SANOFI_ZAN_MDL_0000206858).

[24] Ex. 66 (SANOFI_ZAN_MDL_0000278477).

that per the FDA's Guidance on Nitrosamines, nitrosamines are potent genotoxic agents and probable human carcinogens.[25]

b. **GSK** admitted that "…NDMA is a carcinogen in animals, and it is -- can be a carcinogen in humans if it is given for a long period of time over acceptable levels."[26]

c. **GSK** admitted that NDMA is a probable carcinogen in man.[27]

d. When conducting experiments with ranitidine, GSK took steps to protect their scientists from NDMA exposure by requiring the use of special safety equipment, including a Class 3 cabinet to prevent worker exposure to the carcinogen.  GSK's Anthony Lynch, Ph.D., Senior Director, Genetic Toxicology & Photosafety, testified "[s]o the purpose of the cabinet is applied to all potential genotoxic carcinogens, not just NDMA.  And when we're working in the laboratory, … *we want to minimize the exposure of the scientists to those potential genotoxic carcinogens, whether it's NDMA or other nitrosamines or other compounds that are labeled hazardous and with potential genotoxicity and/or carcinogenicity labels.*"[28]

e. **Pfizer** regulatory witness, Arthur Ciociola, Ph.D., testified "I'm aware that NDMA is a carcinogen, and…*it makes common sense that no level would be an acceptable level of NDMA.*[29]

f. **BI** Head of Global Patient Safety & Pharmacovigilance, Robert Buchberger, was asked if the amount of NDMA that a person is exposed to determines whether there is a risk of cancer, and answered affirmatively, stating "[l]ike with any carcinogen, it is very important and always has to be considered what is the level of exposure to an individual.  And that really determines whether there is the potential of a risk associated or not" and further that "generally, it is correct that the level of exposure to NDMA or any other carcinogen determines whether there is a risk to an individual or not."[30]

g. **Sanofi** Head of the Analytical Science/Testing Department, Claude Kugel testified that

---

[25] Ex. 30 (Harvey Dep. Tr.), at 53:8-17.
[26] Ex. 29 (GSK 30(b)(6) Driver Dep. Tr.), at 29:7-15.
[27] Ex. 70 (GSK 30(b)(6) Hobbiger Dep. Tr.), at 58:16-21.
[28] Ex. 36 (Lynch Dep. Tr.), at 41:19-42:6 (emphasis added).
[29] Ex. 27 (Ciociola Dep. Tr.), at 171:11-14 (emphasis added).
[30] Ex. 23 (Buchberger Dep. Tr.), at 190:5-17, 191:6-9.

NDMA is "a potent carcinogen."[31]

    h. **Sanofi** admitted NDMA has been recognized as a carcinogen for several decades.[32]

Defendants' experts have also recognized that NDMA is a carcinogen, for example:

    a. Defendants' biochemistry expert, F. Peter Guengerich, Ph.D., published literature on NDMA before being retained in this litigation, and readily admitted in his peer-reviewed research that NDMA is a "potent chemical carcinogen[]"[33] and a "procarcinogen" (i.e., a precursor of an active carcinogen).[34]  In another published study, Dr. Guengerich recognized that "one prominent groups of carcinogens is nitrosamines" and referred to "N-nitrosodimethylamine [N,N-dimethylnitrosamine (DMN)], a carcinogen…."[35]

    b. Former defense expert Craig Lindsley, Ph.D.,[36] testified that it is important not to have NDMA in drug products "[b]ecause it's a probable human carcinogen. And so, obviously, if something is a probable human carcinogen, you want to reduce it to the acceptable intake levels."[37]

    c. Defense epidemiologist, Mary Beth Terry, Ph.D., testified that NDMA is classified as probably carcinogenic.[38]

    d. Defense expert, Timothy Wang, M.D., testified that NDMA is a possible human carcinogen and a "rat carcinogen for sure."[39]

It is undisputed that NDMA is a genotoxic carcinogen and that ranitidine forms NDMA under certain conditions.

---

[31] Ex. 38 (Sanofi 30(b)(6) Kugel Dep. Tr.), at 25:9-13.

[32] Ex. 39 (Sanofi 30(b)(6) Lochstampfor Dep. Tr.), at 234:17-22.

[33] Yamazaki H, *et al.*, *Participation of Rat Liver Cytochrome P450 2E1 in The Activation of N-Nitrosodimethylamine and N-Nitrosodiethylamine to Products Genotoxic in an Acetyltransferase-Overexpressing Salmonella Typhimurium Strain (NM2009)*, 13(6) CARCINOGENESIS 979-85 (1992).

[34] Rendic S, Guengerich FP, *Contributions of Human Enzymes in Carcinogen Metabolism*, 25(7) CHEM RES TOXICOL. 1316-83 (2012).

[35] Chowdhury G, *et al.*, *Oxidation of Methyl and Ethyl Nitrosamines by Cytochrome P450 2E1 and 2B1*, 51(50) BIOCHEMISTRY, 9995-10,007 (2012).

[36] Defendants notified counsel that they were pulling down Dr. Lindsley as an expert on June 24, 2022.

[37] Ex. 35 (Lindsley Dep. Tr.), at 95:13-19.

[38] Ex. 40 (Terry Dep. Tr.), at 255:18-22.

[39] Ex. 42 (Wang Dep. Tr.), at 69:5-24.

**C.      There Is Overwhelming Evidence that NDMA Exhibits the Key Characteristics of a Human Carcinogen**

IARC's 10 key characteristics of human carcinogens establish an objective methodology to identify NDMA's carcinogenicity.[40]  If similar mechanisms in animals and humans exist, this provides strong support for biological plausibility, and therefore cancer causation.[41] Scientists evaluate the key characteristics using evidence from animal cancer bioassays, studies of specific biological mechanisms in tissues and cells derived from humans, studies of specific biological mechanisms in tissues and cells derived from animals, and studies from exposures to humans. The key characteristics are the ability of a substance 1) to act as an electrophile either directly or after metabolic activation, 2) to demonstrate genotoxicity, 3) to alter DNA repair or cause genomic instability, 4) to induce epigenetic alterations, 5) to induce oxidative stress, 6) to induce chronic inflammation, 7) to be immunosuppressive, 8) to modulate receptor-mediated effects, 9) to cause immortalization, and 10) to alter cell proliferation, cell death or nutrient supply.[42]

Carcinogens need not exhibit every key characteristic.  Known carcinogens like Benzene have an average of 3 to 4 key characteristics.  NDMA exhibits 9 out of the 10 key characteristics of carcinogens.  The majority of Defendants' general causation experts do not address this important body of scientific evidence.

*1.      NDMA Acts as an Electrophile after Metabolic Activation*

NDMA can act as an electrophile.  An electrophile is an electron-seeking molecule, which is carcinogenic because electrophiles bind to DNA to form DNA adducts, which are segments of DNA bound to a cancer-causing chemical.[43]  NDMA is not itself an electrophile, but forms them through reactions in the body ("metabolic activation").  Extensive studies in animals demonstrate that the electrophiles generated by metabolically activated NDMA induce DNA adducts in many cell types.[44] The formation of DNA adducts is a key process that initiates carcinogenesis (the

---

[40] Smith, M.T. *et al., Key Characteristics of Carcinogens as a Basis for Organizing Data on Mechanisms of Carcinogenesis* 124 ENVIRON HEALTH PERSPECT., 713-21 (2016); IARC Monographs on the Identification of Carcinogenic Hazards to Humans, Preamble, Amended January 2019.

[41] *Reference Manual*, *supra* note 4, at 604, 680.

[42] Smith 2016, *supra* note 40.

[43] *Reference Manual*, *supra* note 4, at 654.

[44] Swenberg, J. A., Hoel, D. G. & Magee, P. N., *Mechanistic and Statistical Insight Into the Large*

transition from a normal cell to a cancerous cell). The measurement of DNA adducts is one of the most common methods of assessing electrophilic activity.

NDMA has been found to form DNA adducts in the stomach, esophagus, pancreas, liver, and bladder in multiple species including rodents and monkeys,[45] but the same mechanisms apply to humans too. Enzymes in the liver, bladder, lung, and pancreas can metabolically activate

---

*Carcinogenesis Bioassays on N-Nitrosodiethylamine and N-Nitrosodimethylamine*, 51 CANCER RES., 6409-6414 (1991); Nicoll, et al, *Effect of dimethylnitrosamine on persistence of methylated guanines in rat liver and kidney DNA,* 254 NATURE, 261-62 (1975). Archer, M.C., *Mechanisms of action of N-nitroso compounds*, 8 CANCER SURV., 241-250 (1989); Souliotis, *et al.*, *Dosimetry of O6- Methylguanine in Rat DNA after Low-Dose, Chronic Exposure to N-Nitrosodimethylamine (NDMA): Implications for the Mechanism of NDMA Hepatocarcinogenesis*, 16 CARCINOGENESIS, 2381-87 (1995); Nicoll, *supra* note 44.

[45] Magee, *et al.*, *Induction of Kidney Tumours in the Rat with Dimethylnitrosamine (N-Nitrosodimethylamine)*, 84 J. PATHOL. BACTERIOL., 19-31 (1962); Lawley, P.D., *Some Chemical Aspects of Dose-Response Relationships in Alkylation Mutagenesis*, 23 MUTAT. RES. 283-95, (1974); O'Connor, *et al.*, *Comparative Studies of the Hepatocarcinogen N,N-Dimethylnitrosamine In Vivo: Reaction Sites in Rat Liver DNA and the Significance of Their Relative Stabilities*, 27 BR. J. CANCER, 153-166 (1973); Pegg, A.E., *Formation and Metabolism of Alkylated Nucleosides: Possible Role in Carcinogenesis by Nitroso Compounds and Alkylating Agents*, 25 ADV. CANCER RES., 195-269 (1977); Hard, *et al.*, *Cellular Analysis of Renal Neoplasia: Light Microscope Study of the Development of Interstitial Lesions Induced in the Rat Kidney by a Single Carcinogenic Dose of Dimethylnitrosamine*, 30 CANCER RES., 2806-15 (1970); Devereux, *et al.*, *Role of Ras Protooncogene Activation in the Formation of Spontaneous and Nitrosamine-Induced Lung Tumors in the Resistant C3H Mouse*, 12 CARCINOGENESIS, 299-303 (1991); Fadlallah, S. *et al.*, *O6-Methylguanine-DNA Adducts in Rat Lymphocytes After in Vivo Exposure to N-Nitrosodimethylamine (NDMA)*, 16 INT. J. IMMUNOPHARMACOL., 583-91, (1994); Margison, *et al.*, *Methylated Purines in the Deoxyribonucleic Acid of Various Syrian-Golden-Hamster Tissues After Administration of a Hepatocarcinogenic Dose of Dimethylnitrosamine*, 157 BIOCHEM, J., 627-34 (1976); Anderson, *et al.*, *N-Nitrosodimethylamine-Derived O(6)- Methylguanine in DNA of Monkey Gastrointestinal and Urogenital Organs and Enhancement by Ethanol*, 66 INT. J. CANCER, 130-34, (1996); Chimpanzee Sequencing & Analysis Consortium, *Initial Sequence of the Chimpanzee Genome and Comparison with the Human Genome*, 437 NATURE, 69-87 (2005); Czygan, P. *et al.*, *Microsomal Metabolism of Dimethylnitrosamine and the Cytochrome P-450 Dependency of Its Activation to a Mutagen*, 33 CANCER RES., 2983-86 (1973); Argus, *et al.*, *Dimethylnitrosamine-Demethylase: Absence of Increased Enzyme Catabolism and Multiplicity of Effector Sites in Repression: Hemoprotein Involvement*, 13 CHEM. BIOL. INTERACT., 127-140, (1976); Chhabra, *et al.*, *O6-Methylguanine DNA Adduct Formation and Modulation by Ethanol in Placenta and Fetal Tissues After Exposure of Pregnant Patas Monkeys to N-Nitrosodimethylamine*, 55 CANCER RES., 6017-20 (1995); Souliotis, *et al.*, *Intra-and Intercellular Variations in the Repair Efficiency of O6-Methylguanine, and Their Contribution to Kinetic Complexity*, 568 MUTAT. RES., 155-70, (2004).

NDMA,[46] and NDMA has been demonstrated to induce DNA adducts in **human tissues** including liver, lung, bladder, pancreas, esophagus, and placenta.[47] A study of a human who suffered from acute NDMA poisoning found DNA adducts in his liver, which provided clear evidence that NDMA is metabolically activated in humans.[48] There is overwhelming evidence that NDMA is metabolically activated via the formation of DNA adducts to cause cancer with convincing evidence that the biological activity of NDMA in humans does not differ from that in animals.[49]

### 2. NDMA Is Genotoxic

The term "genotoxic" refers to an agent that induces DNA damage, but this damage may or may not necessarily be processed by the cell into a mutation. If the agent also induces mutations in a mutagenicity assay, it is a mutagen.[50] A clastogen is a mutagen that results in sections of chromosomes being deleted, added, or rearranged. The link between genotoxicity and cancer is well-established.[51] Genotoxicity can arise from DNA strand breaks, DNA adducts, DNA-DNA crosslinks, and DNA-protein crosslinks, as well as from oxidative damage to DNA.[52]

---

[46] Nishimura, *et al.*, *Tissue Distribution of MRNA Expression of Human Cytochrome P450 Isoforms Assessed by High-Sensitivity Real-Time Reverse Transcription PCR*. 123 YAKUGAKU ZASSHI, 369-75 (2003).

[47] Annola, K. *et al., Transplacental Transfer of Nitrosodimethylamine in Perfused Human Placenta*. PLACENTA 30, 277-283, (2009); Montesano, *et al.*, *Metabolism of Diethylnitrosamine by Human Liver Slices in Vitro*, 228 NATURE 173-74, (1970); Herron, *et al.*, *Methylated Purines in Human Liver DNA After Probable Dimethylnitrosamine Poisoning*, 40 CANCER RES., 3116-17 (1980); Bartsch, *et al.*, *Relevance of Nitrosamines to Human Cancer*, 5 CARCINOGENESIS, 1381-93 (1984); Autrup, *et al.*, *Metabolism of Chemical Carcinogens by Cultured Human and Rat Bladder Epithelial Cells*, 2 CARCINOGENESIS, 763-68 (1981); Autrup, *et al.*, *Metabolism of Acyclic and Cyclic N-Nitrosamines by Cultured Human Colon*, 159 PROC. SOC. EXP. BIOL. MED., 111-115 (1978); Harris, *et al., Metabolism of Benzo(A)Pyrene, N-Nitrosodimethylamine, and N-Nitrosopyrrolidine and Identification of the Major Carcinogen-DNA Adducts Formed in Cultured Human Esophagus*, 39 CANCER RES., 4401-06 (1979); Zaidi, *et al., Normal Human Breast Xenografts Activate N-Nitrosodimethylamine: Identification of Potential Target Cells for an Environmental Nitrosamine*, 66 BR. J. CANCER, 79-83 (1992).

[48] Herron, *supra* note 47.

[49] Liteplo, *supra* note 17.

[50] Smith, M.T. *et al.*, *The Key Characteristics of Carcinogens: Relationship to the Hallmarks of Cancer, Relevant Biomarkers, and Assays to Measure Them*, 29 CANCER EPIDEMIOL. BIOMARKERS PREV, 1887-1903 (2020).

[51] Cimino, M.C., *Comparative Overview of Current International Strategies and Guidelines for Genetic Toxicology Testing for Regulatory Purposes,* 47 ENVIRON. MOL. MUTAGEN, 362-90 (2006).

[52] Smith (2016), *supra* note 40.

There is overwhelming evidence that NDMA is genotoxic, mutagenic and clastogenic.[53] This is true both *in vivo* (in living creatures) and *in vitro* (in laboratory dishes); increased frequencies of gene mutations, chromosomal damage, sister chromatid exchange and unscheduled DNA synthesis have been observed in a wide variety of cell types and assays.[54] Evidence of DNA damage has been observed in many human tissues throughout the body including liver, kidneys and lungs.[55]

---

[53] IARC 1978, *supra* note 7; Ex. 60 (GSKZAN0003419540).

[54] Tates, *et al.*, *Micronucleus Technique for Detecting Clastogenic Effects of Mutagens/Carcinogens (DEN, DMN) in Hepatocytes of Rat Liver in Vivo*, 74 MUTAT RES., 11-20, (1980); Tates, *et al.*, *The Induction of Chromosomal Damage in Rat Hepatocytes and Lymphocytes*, 107 MUTAT RES., 131-151, (1983); Tates, *et al., Persistence of Preclastogenic Damage in Hepatocytes of Rats Exposed to Ethylnitrosourea, Diethylnitrosamine, Dimethylnitrosamine and Methyl Methanesulphonate. Correlation with DNA O-Alkylation*. CARCINOGENESIS 7, 1053-1058, (1986); Bauknecht, *et al.*, *Comparative in Vivo Mutagenicity Testing by SCE and Micronucleus Induction in Mouse Bone Marrow*, 35 HUM. GENET., 299-307, (1977); Wild, D., *Cytogenetic Effects in the Mouse of Chemical Mutagens and Carcinogens Evaluated by the Micronucleus Test*, 56 MUTAT. RES., 319-327 (1978); Neft, *et al.*, *Induction of Sister Chromatid Exchange in Multiple Murine Tissues in Vivo by Various Methylating Agents*, 9 TERATOG. CARCINO. MUTAGEN., 219-37 (1989); Mehta, R. *et al., Micronucleus Formation Induced in Rat Liver and Esophagus by Nitrosamines*, 35 CANCER LETT., 313-20 (1987); Robbiano, *et al.*, *An in Vivo Micronucleus Assay for Detecting the Clastogenic Effect in Rat Kidney Cells*, 390 MUTAT. RES., 51-57 (1997); Cliet, *et al.*, *In Vivo Micronucleus Test Using Mouse Hepatocytes*, 216 MUTAT. RES., 321-26 (1989); Odagiri, *et al.*, *Detection of the Cytogenetic Effect of Inhaled Aerosols by the Micronucleus Test*, 170 MUTAT. RES., 79-83 (1986); Inui, *et al.*, *Transplacental Action of Sodium Nitrite on Embryonic Cells of Syrian Golden Hamster*, 66 MUTAT. RES., 149-58 (1979); Bolognesi, *et al., A New Method to Reveal the Genotoxic Effects of N-Nitrosodimethylamine in Pregnant Mice*, 207 MUTAT. RES., 57-62 (1988).

[55] Laishes, *et al.*, *Organ-Specific DNA Damage Induced in Mice by the Organotropic Carcinogens 4-Nitroquinoline 1-Oxide and Dimethylnitrosamine*, 149 PROC. SOC. EXP. BIOL. MED., 978-82 (1975); Petzold, *et al.*, *Detection of DNA Damage Induced in Vivo Following Exposure of Rats to Carcinogens*, 38 CANCER RES., 1589-94 (1978); Abanobi, *et al.*, *Persistence of DNA Damage During Development of Liver Angiosarcoma in Rats Fed Dimethylnitrosamine*, 39 CANCER RES. 39, 1592-1596 (1979); Mirsalis, *et al.*, *Detection of Unscheduled DNA Synthesis in Hepatocytes Isolated From Rats Treated with Genotoxic Agents*, 1 CARCINOGENESIS, 621-25 (1980); Brambilla, *et al.*, *Quantitative Correlation Among DNA Damaging Potency of Six N-Nitroso Compounds and Their Potency in Inducing Tumor Growth An Bacterial Mutations*, 2 CARCINOGENESIS, 425-29 (1981); Brambilla, *et al.*, *Dose-Response Curves for Liver DNA Fragmentation Induced in Rats by Sixteen N-Nitroso Compounds as Measured by Viscometric and Alkaline Elution Analyses*, 47 CANCER RES., 3485-91 (1987); Bermudez, *et al.*, *Detection of DNA Damage in Primary Cultures of Rat Hepatocytes Following in Vivo and in Vitro Exposure to Genotoxic Agents*, 4 ENVIRON. MUTAGEN., 667-79 (1982); Cesarone, *et al.*, *DNA Repair Synthesis in Mice Spermatids After*

Importantly, NDMA is such a potent genotoxic carcinogen that it does *not* exhibit a no-observed-adverse-effect level (NOAEL) as demonstrated by Peto *et al.*[56] The NOAEL is defined by the level of exposure at which there is no increase in the frequency or severity of any adverse effects (*e.g.*, cancer incidence). Peto *et al.* confirmed that there is no threshold for tumor induction. Indeed, GSK has recognized that "NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible," and it is "highly likely that NDMA is carcinogenic to humans potentially at low levels of exposure."[57]

NDMA also causes genotoxicity in large animals like monkeys.[58] There is evidence that suggests humans may be more sensitive to the carcinogenicity of NDMA than some animal

---

*Treatment with N-Methyl-N-Nitroso-Urea and N-N-Dimethyl-Nitrosamine: Preliminary Results*, 12 TOXICOL., 183-86, (1979); Barbin, *et al.*, *Evaluation of DNA Damage by the Alkaline Elution Technique in Liver, Kidneys and Lungs of Rats and Hamsters Treated with N-Nitrosodialkylamines*, 4 CARCINOGENESIS, 541-545 (1983); Doolittle, *et al.*, *Measurement of Genotoxic Activity in Multiple Tissues Following Inhalation Exposure to Dimethylnitrosamine*, 141 MUTAT. RES., 123-127 (1984); Kornbrust, *et al.*, *Pretreatment Effects on DNA Repair in Rat Hepatocytes Elicited by in Vivo or in Vitro Exposure to Various Chemicals*, 7 ENVIRON. MUTAGEN., 857-70 (1985); Pool, *et al.*, *Employment of Adult Mammalian Primary Cells in Toxicology: in Vivo and in Vitro Genotoxic Effects of Environmentally Significant N-Nitrosodialkylamines in Cells of the Liver, Lung, and Kidney*, 15 ENVIRON. MOL. MUTAGEN., 24-35 (1990); Brendler, *et al.*, *in Vivo and in Vitro Genotoxicity of Several N-Nitrosamines in Extrahepatic Tissues of the Rat*, 13 CARCINOGENESIS, 2435-41 (1992); Jorquera, *et al.*, *Effects of Age and Ethanol on DNA Single-Strand Breaks and Toxicity Induced by 4-(Methylnitrosamino)-1-(3-Pyridyl)-1-Butanone Or N-Nitrosodimethylamine in Hamster and Rat Liver*, 74 CANCER LETT., 175-81 (1993); Asakura, S. *et al.*, *Effects of Dietary Restriction on Induction of Unscheduled DNA Synthesis (UDS) and Replicative DNA Synthesis (RDS) in Rat Liver*, 322 MUTAT. RES., 257-64, (1994); Webster, *et al.*, *Protective Effect of Rutin, a Flavonol Glycoside, on the Carcinogen-Induced DNA Damage and Repair Enzymes in Rats*, 109 CANCER LETT., 185-91, (1996); Mirsalis, J.C. *et al.*, *Induction of Hepatic Mutations in Laci Transgenic Mice*, 8 MUTAGENESIS, 265-71 (1993); Tinwell, *et al.*, *Mutation Studies with Dimethyl Nitrosamine in Young and Old Lac I Transgenic Mice*, 307 MUTAT. RES., 501-08 (1994); Butterworth, B. E. *et al.*, *Long-Term Mutagenicity Studies with Chloroform and Dimethylnitrosamine in Female Laci Transgenic B6C3F1 Mice*, 31 ENVIRON. MOL. MUTAGEN., 248-56 (1998); Pool-Zobel, B. L. *et al.*, *Systemic Genotoxic Effects of Tobacco-Related Nitrosamines Following Oral and Inhalational Administration to Sprague-Dawley Rats*, 70 CLIN. INVESTIG., 299-306 (1992); Diaz Gomez, *et al.*, *Administration of N-Nitrosodimethylamine, N-Nitrosopyrrolidine, Or N'-Nitrosonornicotine to Nursing Rats: Their Interactions with Liver and Kidney Nucleic Acids From Sucklings*, 76 J NAT'L CANCER INST., 1133-36 (1986).

[56] Peto, *et al.*, *Effects on 4080 Rats of Chronic Ingestion of N-Nitrosodiethylamine or N-Nitrosodimethylamine: A Detailed Dose-Response Study*, 51 CANCER RES., 6415-51 (1991).

[57] Ex. 60 (GSKZAN0003419540).

[58] Anderson (1996), *supra* note 45.

models.[59] The genotoxicity of NDMA has been extensively proven in animal models as well as in human tissue and cells.

### 3.     NDMA Alters DNA Repair and Causes Genomic Instability

Carcinogens can act not only by producing DNA damage directly but also by altering the processes that control normal DNA replication. Different susceptibilities of organs to carcinogens may be determined by the ability to repair alterations in DNA produced by the agent.[60] Markers of genomic instability include chromosome aberrations, gene mutations, microsatellite instability, and apoptosis.[61] NDMA alters DNA replications and promotes subsequent DNA damage, inducing genomic instability.[62]

### 4.     NDMA Induces Epigenetic Alterations (e.g., DNA Methylation)

Epigenetic alterations are changes in gene expression including DNA methylation.[63] Epigenetic changes initiate and mediate cancer progression. *Id.* NDMA has been shown to induce epigenetic alterations (DNA methylation) in animal studies.[64]

### 5.     NDMA Induces Oxidative Stress

Reactive oxygen species (ROS) are compounds that cause oxidative damage to cellular biomolecules. Oxidative stress causes cancer progression by carcinogens.[65] An imbalance between

---

[59] Hakura A., *et al.*, *Advantage of the Use of Human Liver S9 in the Ames Test*, 438 MUTAT. RES., 29-36 (1999); Hakura, A. *et al.*, *Use of Human Liver S9 in the Ames Test: Assay of Three Procarcinogens Using Human S9 Derived from Multiple Donors*, 37 REGUL. TOXICOL. PHARMACOL., 20-27 (2003).

[60] Nicoll, *supra* note 44.

[61] Smith (2016), *supra* note 40.

[62] Souliotis (2004), *supra* note 45.

[63] *Reference Manual*, *supra* note 4, at 681.

[64] Hecht, *et al.*, *Comparative Tumorigenicity and DNA Methylation in F344 Rats by 4-(Methylnitrosamino)-1-(3-Pyridyl)-1-Butanone and N-Nitrosodimethylamine*, 46 CANCER RES., 498-502 (1986); Dai, *et al., DNA Methylation in Specific Cells of Rat Liver by N-Nitrosodimethylamine and N-Nitrosomethylbenzylamine*, 12 CARCINOGENESIS, 1325-29 (1991); Chung, *et al., Effects of Dietary Indoles and Isothiocyanates On N-Nitrosodimethylamine and 4-(Methylnitrosamino)-1-(3-Pyridyl)-1-Butanone Alpha-Hydroxylation and DNA Methylation in Rat Liver*, 6 CARCINOGENESIS, 539-43 (1985); Hong, *et al.*, *The Nature of Microsomal N-Nitrosodimethylamine Demethylase and Its Role in Carcinogen Activation*, 6 CARCINOGENESIS, 1805-09 (1985).

[65] Kay, *et al.*, *Inflammation-Induced DNA Damage, Mutations and Cancer*, 83 DNA REPAIR (AMST) 102673 (2019); Meira, *et al., DNA Damage Induced by Chronic Inflammation Contributes to Colon Carcinogenesis in Mice*, 118 J. CLIN. INVEST., 2516-25 (2008).

formation of reactive oxygen and/or nitrogen species and their detoxification is commonly referred to as oxidative stress. Oxidative stress leads to oxidative damage to DNA and is directly related to many other key characteristics of carcinogens.[66] Oxidative stress is also a common occurrence in cancer and oxidative damage is a major factor in DNA mutations, cancer initiation and promotion with more than 100 types of oxidative DNA damage identified to date. *Id.*

NDMA induces oxidative stress via oxygen radical-induced cellular injury including oxidative damage to DNA.[67]

### 6. *NDMA Stimulates Chronic Inflammation*

Chronic inflammation from tissue injury stimulates the proliferation of cells leading to cancer.[68] Inflammation triggers latent and dormant tumors.[187] Inflammation can synergize with DNA damage to promote cancer growth. Chronic inflammation also acts as a tumor promoter in various malignancies such liver, prostate, pancreatic, colorectal (CRC), gastric, gallbladder, and

---

[66] Klaunig, *et al.*, *Oxidative Stress and Oxidative Damage in Chemical Carcinogenesis*, 254 TOXICOL. APPL. PHARMACOL., 86-99 (2011); Smith (2016), *supra* note 40.

[67] Ahotupa, *et al.*, *Rapid Oxidative Stress Induced by N-Nitrosamines. Biochem Biophys*, 146 RES. COMMUN., 1047-54 (1987); Kiziltas, H. *et al.*, *Antioxidant Properties of Ferulago Angulata and Its Hepatoprotective Effect Against N-Nitrosodimethylamine-Induced Oxidative Stress in Rats*, 55 PHARM. BIOL., 888-97 (2017).

[68] Balkwill, *et al.*, *Inflammation and Cancer: Back to Virchow*?, 357 LANCET, 539-45 (2001); Sulciner, M. L. *et al.*, *Resolvins Suppress Tumor Growth and Enhance Cancer Therapy*, 215 J. EXP. MED., 115-40 (2018); Gartung, A. *et al.*, *Suppression of Chemotherapy-Induced Cytokine/Lipid Mediator Surge and Ovarian Cancer by A Dual COX-2/Seh Inhibitor*, 116 PROC. NAT'L ACAD. SCI. USA, 1698-03 (2019); Gilligan, *et al.*, *Aspirin-Triggered Proresolving Mediators Stimulate Resolution in Cancer*, 116 PROC. NAT'L ACAD. SCI. USA, 6292-97 (2019); Panigrahy, D. *et al.*, *Preoperative Stimulation of Resolution and Inflammation Blockade Eradicates Micrometastases*, 129 J. CLIN. INVEST., 2964-79 (2019); Chang, J. *et al.*, *Chemotherapy-Generated Cell Debris Stimulates Colon Carcinoma Tumor Growth Via Osteopontin*, 33 FASEB J., 114-25 (2019); Fishbein, *et al.*, *Carcinogenesis: Failure of Resolution of Inflammation*?, 218 PHARMACOL. THER., 107670 (2021); Mantovani, *et al.*, *Cancer-Related Inflammation*, 454 NATURE, 436-44, (2008); Guerra, C. *et al.*, *Chronic Pancreatitis Is Essential for Induction of Pancreatic Ductal Adenocarcinoma by K-Ras Oncogenes in Adult Mice*, 11 CANCER CELL., 291-302 (2007); Bogen, K. T. *Inflammation as a Cancer Co-Initiator: New Mechanistic Model Predicts Low/Negligible Risk at Noninflammatory Carcinogen Doses*, 17 DOSE RESPONSE, 1559325819847834 (2019); Coussens, *et al.*, *Inflammation and Cancer*, 420 NATURE, 860-67 (2002); Wang & Dubois, *et al.*, *Eicosanoids and Cancer*, 10 NATURE REV. CANCER, 181-93 (2010); Fishbein, A. *et al.*, *Resolution of Eicosanoid/Cytokine Storm Prevents Carcinogen and Inflammation-Initiated Hepatocellular Cancer Progression*, 117 PROC. NAT'L ACAD. SCI. USA, 21,576-87 (2020).

esophageal cancers.[69]

NDMA induces chronic inflammation in animal tissues and cells.[70] NDMA administration in rats induces chronic inflammation and liver tumors.[71] NDMA can also induce liver fibrosis in rodents that is similar to fibrosis observed in humans. NDMA also stimulates inflammation in human cells, in the process promoting tumors.[72]

   7. *NDMA Is Immunosuppressive*

Immunosuppression is a reduction in the capacity of the immune system to respond

---

[69] Wang, & Dubois, *supra* note 68; Fishbein (2020), *supra* note 68; De Cock, *et al., Inflammation Triggers Zeb1-Dependent Escape from Tumor Latency*, 76 CANCER RES., 6778-84 (2016). Aggarwal, *et al.*, *Inflammation and Cancer: How Hot Is the Link*?, 72 BIOCHEM. PHARMACOL., 1605-21 (2006); Espinoza, *et al., The Inflammatory Inception of Gallbladder Cancer*, 1865 BIOCHIM. BIOPHYS. ACTA., 245-254 (2016); Sulciner, *et al., Resolvins Suppress Tumor Growth and Enhance Cancer Therapy*, 215 J. EXP. MED., 115-40 (2018); Gartung, A. (2019), *supra* note 68; Gilligan (2019), *supra* note 68; Panigrahy (2019), *supra* note 68; Chang (2019), *supra* note 68; Fishbein (2020), *supra* note 68.

[70] Wongsena, *et al., Melatonin Suppresses Eosinophils and Th17 Cells in Hamsters Treated with A Combination of Human Liver Fluke Infection and A Chemical Carcinogen*, 70 PHARMACOL. REP., 98-105 (2018); Dangtakot, *et al., Caga(+) Helicobacter Pylori Infection and N-Nitrosodimethylamine Administration Induce Cholangiocarcinoma Development in Hamsters* HELICOBACTER, e12817, (2021); Yang, *et al., Targeting Inflammation Driven by HMGB1*, 11 FRONT. IMMUNOL., 484 (2020); Thamavit, *et al., Level of Opisthorchis Infestation and Carcinogen Dose-Dependence of Cholangiocarcinoma Induction in Syrian Golden Hamsters*, 54 VIRCHOWS ARCH. B. CELL. PATHOL. INCL. MOL. PATHOL., 52-58 (1987); Boonjaraspinyo, *et al., Indirect Effect of a Turmeric Diet: Enhanced Bile Duct Proliferation in Syrian Hamsters with A Combination of Partial Obstruction by Opisthorchis Viverrini Infection and Inflammation by N-Nitrosodimethylamine Administration*, 108 PARASITOL. RES., 7-14 (2011); Boonjaraspinyo & Boonmars, *et al., Effect of Fingerroot On Reducing Inflammatory Cells in Hamster Infected with Opisthorchis Viverrini and N-Nitrosodimethylamine Administration*, 106 PARASITOL. RES., 1485-89 (2010); George, *et al., Dimethylnitrosamine-Induced Liver Injury in Rats: the Early Deposition of Collagen*, 156 TOXICOLOGY, 129-38 (2001); George & Tsutsumi, *et al., MMP-13 Deletion Decreases Profibrogenic Molecules and Attenuates N-Nitrosodimethylamine-Induced Liver Injury and Fibrosis in Mice*, 21 J. CELL. MOL. MED., 3821-35 (2017).

[71] Peto, *et al., Dose and Time Relationships for Tumor Induction in the Liver and Esophagus of 4080 Inbred Rats by Chronic Ingestion of N-Nitrosodiethylamine or N-Nitrosodimethylamine*, 51 CANCER RES., 6452-69 (1991); George, *et al., Dimethylnitrosamine-Induced Liver Injury in Rats: The Early Deposition of Collagen*, 156 TOXICOL., 129-38 (2001); George, *et al., MMP-13 Deletiondecreases Profibrogenic Molecules and Attenuates N-Nitrosodimethylamine-Induced Liver Injury and Fibrosis in Mice*, 21 J. CELL. MOL. MED., 3821-35 (2017).

[72] Kim E-M *et al.*, *Connexin 43 Plays an Important Role in the Transformation of Cholangiocytes with Clonochis Sinensis Excretory-Secretory Protein and N-Nitrosodimethylamine*, 13(4) PLOS NEGL. TROP. DIS. 13 (2019).

effectively and is associated with an increased cancer risk[24] NDMA induces immunosuppression in animal tissues and cells.[73]   In addition to experimental animal evidence, human studies also support adverse effects of NDMA on certain immune functions.[74]

        8.     *NDMA Causes Immortalization By Transforming Normal Cells Into Cancer Cells*

Cancer cells are "immortal" in that they have unlimited replicative potential and can divide continuously.  Healthy cells have a limited lifespan and will stop dividing. The more rapidly cancer cells divide, the more aggressive the cancer, leading to faster growth. The opposite of immortalization is cellular senescence, in which cells stop dividing. NDMA reacts with rapidly proliferating cells forming DNA adducts, which induces cell transformation from normal cells to cancer cells.[75] In human cells, NDMA can also induce and immortalize the transformation of normal cells to cancer-like cells.[76]

        9.     *NDMA Alters Cell Proliferation, Cell Death or Nutrient Supply (Angiogenesis)*

NDMA alters cell proliferation, cell death, or nutrient supply in animal tissues and cells.[77]

---

[73] Desjardins, *et al.*, *Immunosuppression by Chronic Exposure to N-Nitrosodimethylamine (NDMA) in Mice*, 37 J. TOXICOL. ENVIRON. HEALTH, 351-61 (1992).

[74] Ratajczak-Wrona, W. *et al.*, *PI3K-Akt/PKB Signaling Pathway in Neutrophils and Mononuclear Cells Exposed to N-Nitrosodimethylamine*, 11 J. IMMUNOTOXICOL., 231-37 (2014).

[75] Kim E-M, *supra* note 72; Sharma, *et al.*, *Attenuation of N-Nitrosodimethylamine Induced Hepatotoxicity by Operculina Turpethum in Swiss Albino Mice*, 17 IRAN. J. BASIC. MED. SCI., 73-80 (2014); Wang & Qin, *et al.*, *Genotoxicity of a Low-Dose Nitrosamine Mixture as Drinking Water Disinfection Byproducts in NIH3T3 Cells, 14* INT'L J. MED. SCI., 961-69 (2017); Dangtakot (2021), *supra* note 70; Potten, *et al.*, *A Possible Explanation for the Differential Cancer Incidence in the Intestine, Based On Distribution of the Cytotoxic Effects of Carcinogens in the Murine Large Bowel*, 13 CARCINOGENESIS, 2305-12 (1992); Li, *et al.*, *Target Cells for the Cytotoxic Effects of Carcinogens in the Murine Small Bowel*, 13 CARCINOGENESIS, 361-68 (1992).

[76] Wang HY, *supra* note 75; Thomas, *et al., The Effect of Dimethylnitrosamine on Host Resistance and Immunity*, 77 TOXICOL. APPL. PHARMACOL., 219-29; Potten (1992), *supra* note 75.

[77] Boonjaraspinyo (2011), *supra* note 70; Krytopoulos, *DNA Adducts in Humans After Exposure to Methylating Agents*, 405 MUTAT. RES., 135-43 (1998); Souliotis, *et al.*, *DNA Adducts, Mutant Frequencies and Mutation Spectra in Lambda Lacz Transgenic Mice Treated with N-Nitrosodimethylamine*, 19 CARCINOGENESIS, 731-39 (1998); Lin, *et al.*, *N-Nitrosodimethylamine-Mediated Cytotoxicity in a Cell Line Expressing P450 2E1: Evidence for Apoptotic Cell Death*, 157 TOXICOL. APPL. PHARMACOL., 117-24 (1999); Lin, *et al.*, *N-Nitrosodimethylamine-Mediated Formation of Oxidized and Methylated DNA Bases in A Cytochrome P450 2E1 Expressing Cell Line*, 14 CHEM. RES. TOXICOL., 562-66 (2001).

NDMA also increases cell proliferation in human cells and induces cell death.[78] Sustained cellular proliferation is a factor in cancer progression. More frequent cell division during development can result in enhanced fixation of mutations because of the reduced time available for repair of DNA lesions, while clonal expansion of a mutated cell produces a larger population of mutant cells.[79] Cell death releases pro-inflammatory signals into the surrounding tissue microenvironment, resulting in recruitment of inflammatory cells of the immune system that can participate in tumor promotion through their influence on cancer cell proliferation. Angiogenesis, in which new blood vessels grow into a tumor, provides nutrients to the cancer which is required for tumor growth.[80]

## II.     Ranitidine Degrades Into NDMA

Ranitidine has been demonstrated to degrade into NDMA in two ways—exogenously (outside the body) and endogenously (inside the body).

### A.     NDMA Forms in Ranitidine Tablets at Amounts that Increase the Risk of Human Cancers

NDMA forms exogenously, inside the ranitidine pill, as a result of heat, humidity and time, as Defendants admit. Emery Pharma's Citizen's Petition demonstrated that ranitidine would breakdown into NDMA within a couple weeks at room temperature.[81]   In its April 2, 2020, response to Dr. Najafi at Emery Pharma, FDA wrote that the amount of NDMA forming in ranitidine stored at room temperature would result in excessive amounts of NDMA and that the "FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date."[82]   GSK's root cause analysis found that NDMA was forming inside ranitidine

---

[78] Kim E-M, *supra* note 72; Iwaniuk, *et al.*, *Expression of Selected Proteins of the Extrinsic and Intrinsic Pathways of Apoptosis in Human Leukocytes Exposed to N-nitrosodimethylamine*, 34 HUM. EXP. TOXICOL., 591-600 (2015).

[79] United States Environmental Protection Agency, *Guidance Assessing Risk of Cancer from Early-Life Exposures* (EPA 2005).

[80] Folkman, J., *Angiogenesis: An Organizing Principle for Drug Discovery*?, 6 NAT. REV. DRUG DISCOV., 273-86 (2007).

[81] *See* Emery Pharma, *Ranitidine Citizen Petition* (Jan. 2020) https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

[82] *See* Janet Woodcock, FDA, Response to Emery Pharma Citizen Petition, (Apr. 1, 2020), https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.

due to heat, humidity and time.[83] Other defendants have echoed these findings.[84]

Defendants and the FDA mostly[85] measured the amount of NDMA forming inside ranitidine pills under pristine conditions on retained product. The FDA and Defendants conducted baseline testing on ranitidine pills and found between 0 to 420 ng of NDMA per 150mg in the pills.[86] The FDA explained that this amount of NDMA would be similar to the amount of NDMA found in grilled or smoked meats,[87] which has been demonstrated to increase the risk of cancer.[88]

The testing from Defendants and the FDA substantially underestimates the amount of NDMA in ranitidine Plaintiffs consumed. At a critical March 2021 FDA Expert Workshop on Nitrosamines, Dr. Keire, the FDA Director of Division of Pharmaceutical Analysis, stressed the importance of testing in "real world conditions" like the "hot mailbox" "glovebox in the car" and the "human bathroom" and a "truck in the middle of summer in the southern U.S."[89] Although the defense experts do not even consider the import of this, Dr. Keire of the FDA recognized that it was essential to collect data that was predictive of stability under a variety of actual conditions.

---

[83] *See* King, *et al.*, *Ranitidine – Investigations into the Root Cause for the Presence of N-Nitroso-N, N-dimethylamine in Ranitidine Hydrochloride Drug Substances and Associated Drug Products*, 24 ORG. PROCESS RES. DEV., 2915-26 (2020), https://doi.org/10.1021/acs.oprd.0c00462; *see also* Ex. 62 (GSKZAN0000052019).

[84] *See* Ex. 67 (SANOFI_ZAN_MDL_0000033849); Ex. 69 (PATHEON_MDL_00021264); Ex. 64, (SANOFI_ZAN_MDL_0000497401) at 58.

[85] The FDA tested some product that it purchased from retailer shelves but this product was likely used for the stability testing that they discussed in their April 2020 response to Emery Pharma and not the initial baseline testing that they reported in November, 2019. *See* FDA Response to Emery Pharma Citizen Petition, *supra* note 82.

[86] Ex. 18 (Salmon Rep.), at 212.

[87] FDA, *Statement on New Testing Results* (Nov. 1, 2019), https://www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs.

[88] Song P, Wu L, Guan W., *Dietary Nitrates, Nitrites, and Nitrosamines Intake and the Risk of Gastric Cancer: A Meta-Analysis*, 7 NUTRIENTS, 9872-95 (2015); Rogers MA, Vaughan TL, Davis S, Thomas DB, *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cancer* 4 CANCER EPIDEMIOL. BIOMARKERS PREV. 29-36 (1995); Ronco, A.L., *et al.*, *Meat Consumption, Animal Products, and the Risk of Bladder Cancer: A Case-Control Study in Uruguayan Men*, 15 ASIAN PAC. J. CANCER PREV., 5805-09 (2014); Pobel D, Riboli E, Cornée J, *et al.*, (1995). *Nitrosamine, Nitrate and Nitrite in Relation to Gastric Cancer: A Case-Control Study in Marseille, France*, 11 EUR. J. EPIDEMIOL., 67-73 (1995); Michaud, *et al.*, *Meat Intake and Bladder Cancer Risk in 2 Prospective Cohort Studies*, 84 AM. J. CLIN. NUTR., 1177-83 (2006).

[89] Ex. 49 (FDA Working Group Transcript, Day 2) at 129:6-21.

These factors are substantial.  The Abe study demonstrated that at only 40° Celsius / 75% relative humidity for only eight weeks, the amount of NDMA that forms in ranitidine increased up to 60-fold.[90]  Plaintiffs' testing by Emery Pharma was partly on product that had been returned by consumers (and so went through the supply chain), and Emery Pharma simulated an array of different realistic scenarios (a medicine cabinet, a glove compartment) to test the amount of NDMA.  Defendants have disclosed no such testing of ranitidine.  Emery Pharma's testing revealed that NDMA increased by as much as 20-fold when ranitidine was stored in the bathroom medicine cabinet for 50 cycles (with each cycle simulating one 30-minute shower).[91]

Dr. Salmon, an expert in toxicology, demonstrated that at the baseline levels tested by defendants and the FDA, plaintiffs could consume enough NDMA to reach the lifetime cumulative exposures of NDMA that were associated with statistically significant increased risk of cancer in Dietary Studies and in Hidajat.[92]  Dr. Salmon also demonstrated that for all five cancers, after considering the additional amount of NDMA formed due to real-world conditions, it would take less time to reach these lifetime cumulative exposures. *Id.*

## B.     Ranitidine Forms NDMA Endogenously (After Ingestion) Under Various Conditions

Ranitidine also forms NDMA in the human body.  In 1982, GSK conducted *in vitro* experiments demonstrating this phenomenon with simulated gastric fluid.[93]  This testing was never disclosed to the FDA or any other regulatory body.  The GSK study by Tanner, et al.,"The Determination of N-nitrosodimethylamine Formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite" was an *in vitro* experiment where ranitidine was combined with sodium nitrite.  GSK found NDMA and never disclosed this to the FDA until recently.  Additionally, in 1981, Smith Kline and French (SKF) also conducted *in vitro* experiments with ranitidine and varying levels of sodium nitrite and also found it formed NDMA.[94]  With an equal amount of

---

[90] Abe, *et al.*, *Temperature-Dependent Formation of N-Nitrosodimethylamine during the Storage of Ranitidine Reagent Powders and Tablets*, 68 CHEM. PHARM. BULL. (TOKYO), 1008-12 (2020) PMID: 32779580.

[91] Ex. 13 (Najafi Rep.), at 118.

[92] Ex. 18 (Salmon Rep.).

[93] *See* Ex. 45 (Tanner, *et al.*, The Determination of N-nitrosodimethylamine Formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite (1982), GSKZAN0000084994).

[94] Ex. 44, (Darkin, *et al.*, The Formation of N-Nitrosodimethylamine from Ranitidine and Other Marketed Drugs (1982), GSKZAN0003535392).

ranitidine and sodium nitrite, formation was significant. This was clear evidence that ranitidine was capable of forming NDMA endogenously in the stomach when ingested under certain conditions.

There are two proven ways that ranitidine can form NDMA endogenously.  The first involves a direct chemical reaction with nitrite.[95] The second involves bacterial overgrowth in the gut due to decreased acidity.[96]

### 1.    *Bacterial nitrosation in the stomach*

Because stomach acid kills bacteria, and because H2RAs reduce stomach acid, there is substantial evidence that H2RAs, including ranitidine, significantly increase the bacterial counts in gastric juice.[97] [98] [99] [100] [101] Bacterial catalysed nitrosation of drugs has been demonstrated to yield carcinogenic nitroso compounds like NDMA.[102] [103]  Evidence of increased mutagenicity of gastric juice in patients who have taken ranitidine demonstrates this mechanism and it has been suggested that the mutagenic activity in gastric juice is transient in the hours immediately following ingestion of the drug.[104] Glaxo conducted a study in 1981 to measure the effect on gastric bacterial flora in

---

[95] Yeomans ND, *et al.*, *Effects of Acid Suppression on Microbial Flora of Upper Gut*, 40 DIGESTIVE DISEASES AND SCIENCES, 815-95 ((Feb. 1995 Supp.).

[96] IARC, *Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 94, Ingested Nitrate and Nitrite, and Cyanobacterial Peptide Toxins (2010).

[97] Ruddell, *et al.*, *Effect of Cimetidine on the Gastric Bacterial Flora*, 1 LANCET, 672-74 (1980).

[98] Thomas J, *et al.*, *Effect of One Year's Treatment with Ranitidine and of Truncal Vagotomy on Gastric Contents*, 28 GUT, 726-38 (1987).

[99] Garcia Del Risco F, *et al.*, *The Effect of Ranitidine Over a 24-Hour Period on the Content of Nitrites, Nitrates, Nitrosamines and on the Bacterial Flora of The Gastric Juice in Healthy Subjects*, 8 GASTROENTEROL. CLIN. BIOL., 749-53 (1984).

[100] Ex. 54 (Glaxo Group Research Report, CP:16:81, Effect of Administration of Ranitidine for Four Weeks on Gastric Bacterial Flora in Healthy Volunteers, (Nov. 1981), GSKZAN0000990147).

[101] Ex. 55 (Glaxo Group Research Report, CP:42:80, Effect of Administration of Ranitidine and Cimetidine on Gastric Bacterial Flora (1980), GSKZNDAA0000066967).

[102] Mirvish, *et al.*, *Role of N-Nitroso Compounds (NOC) and N-Nitrosation in Etiology of Gastric, Esophageal, Nasopharyngeal and Bladder Cancer and Contribution to Cancer of Known Exposures to NOC*, 93 CANCER LETTERS, 17-48 (1995).

[103] Calmels, *et al.*, *Nitrosamine Formation by Denitrifying and Non-Denitrifying Bacteria: Implication of Nitrite Reductase and Nitrate Reductase in Nitrosation Catalysis*, 134 J. GEN. MICROBIOL., 221-26 (1988).

[104] O'Connor HJ, *et al.*, *Effect of Histamine H2-Receptor Antagonist Therapy on the Mutagenic Activity of Gastric Juice*, 188 MUTAT. RES. 201-08 (1987); Morris DL, *et al.*, *Mutagenicity in Gastric Juice*, 7 GUT, 723-27 (1984).

healthy volunteers after ranitidine was administered for four weeks. Glaxo found that pH and bacteria content increased in the gastric juice of ranitidine users.[105]   One-third of the samples contained bacteria which reduced nitrate to nitrite.  *Id.*

> 2.    *Nitrite levels in the body*

The second mechanism of endogenous NDMA formation from ranitidine involves a direct chemical reaction between a tertiary or secondary amine, the dimethylamine in the ranitidine molecule, and nitrite. The scientific community sounded the alarm almost 50 years ago that NDMA, a genotoxic carcinogen, may form when you have a tertiary or secondary amine like ranitidine combined with nitrite. This reaction is pH dependent but is also dependent upon the amount of nitrite.

When people eat food containing nitrates, the nitrate is reduced to nitrite by oral bacteria. About 80% of gastric nitrite is formed when ingested or endogenous nitrate is reduced to a nitrite. The remaining 20% of gastric nitrite is from ingested nitrite in nitrite-preserved foods.[106] Gastric nitrosation can also be catalyzed by thiocyanate which is in saliva. When gastric nitrosation occurs, it can produce nitroso compounds, including NDMA, that induce cancer at other sites. *Id.*

Numerous in vitro and in vivo studies have attempted to analyze nitrite levels in the stomach. The majority have been performed ***under fasting conditions with an empty stomach which is not reflective of the real-world conditions for ranitidine use***.  Based upon the labeled directions, Zantac would not typically be taken on a completely fasting stomach as Zantac is generally taken 30 to 60 minutes before or after meals or at bedtime.[107] Therefore, data for nitrite levels when fasting is irrelevant and not reflective of how Zantac is used.

Nitrite concentration in an individual's gastric juice during a 24-hour period varies significantly and highly depends on the food consumed and pH levels.[108]  Studies demonstrate that

---

[105] Ex. 54 (GSKZAN0000990147).

[106] Mirvish (1995), *supra* note 102.

[107] *See* Zantac prescribing information, https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/018703s068,019675s035,020251s019lbl.pdf; Zantac OTC prescribing information, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/021698Orig1s031lbl.pdf.

[108] Barnard J, *et al.*, *Gastric Juice, Nitrite, and Nitroso Compounds*, 12 BANBURY REPORT 369-77 (1982); Hall, *et al.*, *Evaluation of the nitrosamine hypothesis of gastric carcinogenesis in precancerous conditions*, 27 GUT, 491-98 (1986); Walters CL, *et al.*, *Nitrite Sources and Nitrosamine Formation* in Vitro *and* in Vivo, 17(5) FOOD AND COSMETICS TOXICOLOGY, 473-79

gastric nitrite levels rise rapidly after meals with a maximum rise in nitrite levels about 40 minutes after consuming a meal with a sharp decrease in gastric nitrite levels after about 60 minutes.[109] Naturally, non-fasting intragastric nitrite measurements taken 60 minutes or longer after a meal are not reflective of peak nitrite concentrations in the stomach.[110]  Scientists have concluded that intragastric N-nitrosation with significantly higher N-nitroso compounds concentrations occur at both low pH range (1.13-2.99) and high pH range (6.00-8.42),[111] and that there is pronounced variability in intragastric nitrite and nitrosamine concentrations. Individual variables that must be considered are the bacterial species in the mouth and stomach, exposures to nitrosatable compounds (such as ranitidine), nitrite, nitrate, n-nitrosation catalysts like thiocyanate and inhibitors such as vitamins C and E as well other physical conditions such as achlorhydria or hypochlorhydria.  Therefore, single fasting gastric samples do not represent an individual's long term intragastric N-nitrosation potential and will not show the acute or intermediate influence of ingested meals or nitrosatable drugs like ranitidine.

In 1984, Garcia Del Risco[112] conducted a double-blind, randomized study with 4 healthy men to determine how 24 hours of ranitidine treatment impacted gastric bacterial flora and n-nitroso compound formation. The study demonstrated a mean increase in NDMA in ranitidine users versus placebo. NDMA formed rapidly with ranitidine under certain conditions as was demonstrated previously by other studies and that NDMA was metabolized rapidly.[113]  As a result, the numbers found were not reflective of the peak NDMA concentrations.[114]

Thomas[115] conducted a study looking at 15 patients with peptic ulcer disease during their ranitidine use. Patients were studied both on and off ranitidine and their pH, nitrate and nitrite concentrations, N-nitroso compounds, bacterial counts and 24-hour pH were measured. Although

---

(1979); Xu GP, *et al.*, *N-Nitroso Compounds in Fresh Gastric Juice and Their Relation to Intragastric pH and Nitrite Employing an Improved Analytical Method*, 14 CARCINOGENESIS, 2547-51 (1993).

[109] Walters (1979) *supra* note 108, at 473-79.

[110] *Id.*

[111] Xu *supra* note 108

[112] Garcia Del Risco, *supra* note 99.

[113] Ex. 45 (Tanner), *supra* note 93.

[114] Krul, *et al.*, *Intragastric Formation and Modulation of N-Nitrosodimethylamine in a Dynamic in Vitro Gastrointestinal Model Under Human Physiological Conditions*, 42 FOOD & CHEM. TOXICOL., 51-63 (2004).

[115] Thomas (1987), *supra* note 98.

gastric juice samples were collected, no ranitidine samples were collected until 3 hours after the ranitidine was consumed to prevent aspiration of unabsorbed ranitidine. These later taken gastric juice samples did not contain ranitidine, which was confirmed by radioimmunoassay, as the ranitidine was already absorbed and metabolized and therefore no longer in the stomach.  Notably, the authors state that "the assays were restricted to ranitidine free samples because the presence of ranitidine in gastric juice may result in falsely high concentrations of N-nitroso compounds being recorded. Unlike cimetidine, the ranitidine molecule contains a C-terminal nitro group which was shown in preliminary studies to liberate nitrogen oxide under conditions of the assay, thus responding as if it were an N-nitroso compound." GSK, the sponsor of this study, was aware that ranitidine formed NDMA under certain conditions before they did this study.

N-nitroso compounds were measured but as the authors stated, because of the "overriding need to be certain that ranitidine present in the gastric juice would not be assayed as if it were an N-nitroso compound, aspirates of gastric juice were only used for N-nitroso compound analysis when ranitidine was absent and therefore results were based on assay of approximately 1/3 of the samples that were measured." Thomas found that during ranitidine treatment, there was a statistically significant increase in median 24-hour intragastric pH, nitrate concentration and counts of total and nitrate reducing bacteria regardless of dietary nitrate content.  Notably, one month after stopping ranitidine treatment, all variables returned to pretreatment levels. The statistical analysis that was conducted was outlined in an internal Glaxo report.[116]

Additional studies conducted evaluating ranitidine and pH, bacterial content, n-nitroso compounds, nitrite and nitrate found increased bacteria counts, increased nitrite and intra-gastric n-nitroso compounds with ranitidine.[117]  These are all conditions that will lead to NDMA formation after ranitidine is ingested.

### 3.    The role of thiocyanate

Thiocyanate can catalyse the nitrosation of dimethylamine in human gastric juice which

---

[116] Ex. 53 (Glaxo Group Research Limited Report No. WCS/84/004, Protocol 26-RAN-316, Author listed as JK Forster, GSKZAN000319263-GSKZAN0003199302).

[117] Houben GM, *et al.*, *Are Intragastric N-Nitroso Compounds Elevated After Short-Term Acid Suppression*, 1996 Supp. 1 EUR J CANCER PREV., 83-87 (1996); Matsuda J, *et al.*, *N-Nitrosamines in Gastric Juice of Patients with Gastric Ulcer Before and During Treatment with Histamine H2-Receptor Antagonists*, 25 GASTROENTEROL. JAP., 162 (1990).

results in an increase in formation of NDMA.[118] Thiocyanate has been found in normal human gastric juice at levels ranging from 1 to 4 mg/100ml.[119] Thiocyanate shifts the optimal pH for nitrosation to approximately 2.5.[120] Thiocyanate acts as a powerful catalyst for nitrosation[121] including with nitrosation of ranitidine.[122]

It has also been well established that urine and plasma are not reliable indicators for how much NDMA is formed in the human stomach because N-nitrosamines are rapidly and almost completely metabolised.[123] Defendants' expert, Dr. Guengerich, even admitted during his deposition that only a very small fraction of ingested NDMA would be found in the urine or the plasma.[124] FDA agrees.[125]

*** 

The evidence is consistent, overwhelming and unrefuted: ranitidine breaks down into NDMA; the quantity of NDMA formed under unrealistic, pristine conditions is sufficient to cause

---

[118] Lane, *et al.*, *The Effect of pH on dimethylnitrosamine formation in Human Gastric Juice*, 11 FD COSMET. TOXICOL., 851-54 (1973).

[119] Boxer GE, *et al.*, *Studies on the Metabolism of the Carbon of Cyanide and Thiocyanate*, 39 ARCH. BIOCHEM. BIOPHYS. 7-26 (1952).

[120] Lane, *supra* note 118.

[121] Boyland E, *et al.*, *The Catalysis of Nitrosation by Thiocyanate from Saliva*, 9 FOOD & COSMETICS TOXICOL., 639-43 (1971); Ruddell WSJ, *et al.*, *Nitrite and Thiocyanate in the Fasting and Secreting Stomach and in Saliva*, 18 GUT, 73-77 (1977); Krul, *supra* note 114; Groenen PJ, *et al.*, *Formation of N-nitrosamines and N-nitrosamino Acids from Food Products and Nitrite Under Simulated Gastric Conditions*, 31 IARC SCI. PUBL., 215-29 (1980).

[122] Ex. 56 (Glaxo Group Research Report No. PATH-80-235 Nitrosation of ranitidine: further mutagenicity studies, GSKZAN0000986964) (experiments were also conducted with vitamin E (a-tocopherol) which was found to be an effective inhibitor of nitrosation of ranitidine).

[123] Groenen, *supra* note 121; Spiegelhalder, *et al.*, *in Vivo Nitrosation of Amidopyrine in Humans: Use of 'Ethanol Effect' for Biological Monitoring of N-Nitrosodimethylamine in Urine*, 6(4) CARCINOGENESIS 545-48 (1985); Spiegelhalder, *et al., In-Vivo Formation of N-Nitrosodimethylamine in Humans after Amidopyrine Intake*, 57 IARC Sci. Publ. 179-83 (1984); Florian, *et al.*, *Effect of Oral Ranitidine on Urinary Excretion of N-Nitrosodimethylamine (NDMA): A Randomized Clinical Trial*, 326 JAMA 240-249 (2021).

[124] Ex. 32, (Guengerich Dep. Tr.), vol 2., at 443:8-25; *see also id.* at 463.

[125] Ex. 48 (FDA Working Group Transcript, Day 1), at 62-63:17-5 )"Based on the concentrations of NDMA that have been found in blood or in urine and some estimates of the toxicokinetics of NDMA and having in mind that it is a very small fraction of NDMA that is actually excreted in the urine, people have tried to come up, and they have come up with estimates as we have previously of hundreds to thousands of micrograms of total throughput of NDMA through endogenous formation. I can say a little bit more about the third approach towards the same question." - Dr. Kryptopoulos).

many plaintiffs' cancer given their consistent, long-term use; and the quantity of NDMA formed in real-world conditions, both in the pill and in the human body, is even greater, sweeping in more plaintiffs with less exposure. Analyzing general causation to gauge if ranitidine *could* have caused *any* plaintiffs' cancer, the answer is definitive: yes.

## III. Human Epidemiological Studies on Ranitidine Are Consistent with the NDMA Evidence

There are three sources of human epidemiologic evidence supporting general causation in this case: (1) observational studies evaluating ranitidine users as compared to non-users (use vs. non-use) or compared to other acid suppressants (active comparator studies), (2) observational studies evaluating dietary exposure to NDMA and cancer, and (3) observational studies evaluating occupational exposure to NDMA. Defendants rely exclusively on the first category and entirely ignore the other two. That is improper and renders their opinions unreliable.

### A. Any Sound Methodology Must Account for Exposure and Follow-Up in a Study

NDMA evidence suggests ranitidine would cause cancer after high exposure over long time periods, possibly with long latency. To falsify that thesis, human ranitidine studies *would be* ideal, but *only* if the studies test high exposure over the long-term, with many years of follow-up. No study does that, leaving a yawning gap between Defendants' conclusions and their evidence.

#### 1. *Study Exposures Must Match the Plaintiffs for the Results to Apply.*

According to the Zantac MDL claims registry data as of June 2022, 59.24% of plaintiffs allege they used ranitidine for more than ten years. Basic statistics and common sense confirm that any relevant study must evaluate users with similar levels of exposure to answer the general causation question for *these* sorts of plaintiffs. The scientific community confirms this conclusion. For instance, IARC's Preamble (p. 15),[126] recognized that assessing exposure frequency and duration is "universally relevant," stating: "Regardless of the agent, all exposures have two principal dimensions: intensity (sometimes defined as concentration or dose) and time. Time considerations include duration (time from first to last exposure), pattern or frequency (whether

---

[126] IARC has issued numerous reports (called Monographs) on different agents, which "assess the strength of the available evidence that an agent can cause cancer in humans." IARC, *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: Preamble*, World Health Organization, at 2 (amended 2019). The Preamble is "a statement of the general principles and procedures used in developing a Monograph." *Id.*

continuous or intermittent), and windows of susceptibility." The *Reference Manual* (p.505) says the same thing: "The need to understand exposure is a central topic in the reference guides in this publication on epidemiology and toxicology." And "many negative epidemiological studies must be considered inconclusive" for exposures to low doses …" *Ref. Man*, p. 660, n. 74.

The upshot is simple: Any reliable interpretation of the results of an epidemiologic study must heed the exposure limitations (both duration and frequency of use). If there is data in a study about exposure for "at least ten prescriptions" or "most days of the week for the past 4 weeks," (with no detail beyond that), then the relative risks in that study do not simply apply one-to-one for a population with daily use for five or ten years. *No plaintiff* argues that four weeks of daily use more likely than not caused her cancer.

       2.       *Because Cancer Can Take Years to Develop, Study Follow-Up Is Critical*

A human epidemiological study of human cancer is based on assessing two principal elements: exposure and outcome. Consider smoking. Studies look at exposure (smoking for a certain number of years) and outcome (lung cancer). Both are critical. A study with limited exposure will miss outcomes that *do not occur* absent higher exposures (few people get lung cancer from one year of smoking, for example). And a study with limited *follow-up* will miss outcomes that *do happen*, just outside the study window. For example, a study of 20-year smokers that checks, as of year 5, whether the smoker has lung cancer will miss the majority of lung cancer cases—the 20-year smokers who get lung cancer in the subsequent years. Analogously, human epidemiological studies assessing whether an exposure to ranitidine is associated with bladder cancer that follow patients exposed to ranitidine for four years will not detect cancers that take longer than four years to be detected. Such a study simply does not answer the question about the cancer risk beyond the period of time the patients are followed.

This matters because cancer is a slow-moving disease that primarily afflicts older people who have been exposed to risk factors for many years—even decades. As defense expert Porter acknowledges in his report "…cancer develops over a long period and may not be diagnosed immediately following onset." Ex. 17 (Porter Rep.) at 26. And defense expert Chodosh states in his report that "[c]onsistent with the long period of time required for the development of human cancers, human cancers with a discernable cause are usually diagnosed years or decades after the inferred causal event." Ex. 3 (Chodosh Rep.) at 5. IARC recognizes the importance of adequate follow-up for evaluating cancer causation, stating:

> Experience from studies of cancer in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years; therefore, latency periods substantially shorter than about 30 years cannot provide evidence of lack of carcinogenicity.[127]

IARC also stated that adequate follow-up is one of the "key determinants" as to "whether a study is able to show a true association if there is one, between exposure to an agent and cancer, and the lack of an association, if no association exists."[128]

FDA agrees, stressing how "important" the "window of time after discontinuation" is, "during which the events of interest might still be attributed to the drug."[129]  Regarding exposure and follow-up, the FDA guideline also states: "It is important for investigators to ensure that the data source(s) contain a sufficient number of patients or patient follow-up time to ascertain outcomes of interest based on the hypothesized *exposure risk window.*"[130] (emphasis in original). The FDA Guidance defines "exposure risk window" as incorporating both relevant exposures and adequate follow up:  "… in a cohort study, the time window defines the period after the beginning of exposure during which the occurrence of an event (safety outcome) of interest will be attributed to the exposure."

The epidemiology textbook *Epidemiology in Medicine*[131] notes, "[i]n any cohort study… the ascertainment of outcome data involves tracing or following all study participants from the point of exposure into the future, to determine whether they develop the disease of interest. Failure to obtain such information on every subject…could render the results of a study uninterpretable." The authors added: "The length of the required period of follow-up…will be related to the *length of the latency period for the outcome of interest*." (emphasis added).  Here, cancer is the outcome of interest, and its latency period can be many years.

## B.    The Human Active Comparator Ranitidine Studies Have Limited Exposure, Follow-up, and Other Limitations Which Their Authors Forthrightly Recognize

Plaintiffs agree, in principle, that ranitidine studies investigating long-term risk at high exposures with long follow-up could be highly probative.  But, as the authors of the extant studies

---

[127] IARC Preamble 2019, at 22.
[128] *Id*. at 19-20.
[129] FDA Electronic Healthcare Guidance, *supra* note 151, at 19.
[130] *Id*. at 10.
[131] Hennekins & Buring, *Epidemiology in Medicine* 167 (1987).

acknowledge, no such study has been published.  The existing literature is fully consistent with Plaintiffs' theory because their results largely speak to limited, and inapposite, questions.

       *1.*    *Adami (2021)*[132]

The Adami cohort study used data from the Danish National Prescription Registry to identify individuals who used ranitidine, famotidine, cimetidine, or proton pump inhibitors for the first time between 1996 and 2008 and used a Danish cancer registry to identify cancer cases. The authors reported a statistically significant increased risk for esophageal adenocarcinoma comparing ranitidine users to other H2RA users (HR 1.30, 95% CI 1.01-1.68) and to PPI users (HR 1.27, 95% CI 1.04-1.56).  In analyses restricted to individuals with at least 10 prescriptions, ranitidine users had non-significantly elevated risk for esophageal cancer (1.32, 95% CI 0.66-2.62) and stomach cancer (1.53, 95% CI 0.79-2.99) as compared to other H2RA users after 10 years of follow-up, based on small numbers of exposed cases.  Similarly, there was elevated risk of stomach cancer among ranitidine users as compared to PPI users after 10 years of follow-up (1.62, 95% CI 0.99-2.66).  Increased risks with ranitidine use were not observed for hepatocellular or pancreatic cancer in either the comparisons with other H2RAs or PPIs.

       a)    Duration of Exposure

In the Adami study, approximately half of ranitidine users had only one prescription.  The remainder of use was measured as only less than or more than 5 or 10 prescriptions with no further quantification or analysis. This exposure is nothing like the daily-or-weekly use for 5-20+ **years** that typifies Plaintiffs in this litigation.

Exposure is limited in another way: Adami did not report the number of pills per prescription.  There is no way to know if 10 prescriptions is 300 pills (assuming that a prescription is for 30 days), or less, nor the dose (75, 150, or 300 mg) in each prescription.  Ten prescriptions—the highest exposure category—is likely equivalent to just 10 months of use.

The Adami study compared the risk for ranitidine users with 5 prescriptions to users with 10 prescriptions, which defense experts call a dose-response analysis.  Plaintiffs do not claim that 5 *or* 10 prescriptions of ranitidine cause cancer, and so would not expect any meaningful difference between them.  To consider an analogy, one would not expect a study comparing the risk from

---

[132] Adami HO, Trolle Andersen I, Heide-Jørgensen U, Chang ET, Nørgaard M, Sørensen HT, *Ranitidine Use and Risk of Upper Gastrointestinal Cancers*, 12 CANCER EPIDEMIOL. BIOMARKERS PREV. 2302-08 (2021, corrected Mar. 2022).

smoking a total of 5 vs 10 packs of cigarettes to show an increased risk or "dose-response."

b)      Follow-up

The study had a median follow-up, when follow up occurred, of 14 years. But few participants had long-term follow-up. The authors identified this as a "severe shortcoming," stating "because malignant transformation of cancer may take longer than 20 years, the most severe shortcoming of our study is the limited number of participants with long-term follow-up."

c)      Other Study Aspects that Affect Interpretation of Results

The Adami authors have serious conflicts of interest.  Both Ellen Chang and Hans-Olav Adami were consulting experts for Sanofi in this litigation.  Chang still is, and is employed by Exponent Inc., the largest provider of defense scientific experts in the world.  In 2014, Chang was the lead author (with Adami as a co-author) of a review paper (no new research) which concluded that there was no significant increase in prostate cancer for veterans exposed to Agent Orange. This review was funded by Dow Chemical and Monsanto.

In the early 2000s, Adami wrote papers asserting that Dioxin was not carcinogenic, even though Dioxin was classified as an IARC Group 1 known carcinogen. Adami gave presentations supporting Dioxin with expenses paid by the Chlorine Chemistry Council. [Adami, 2001;Trichopoulos, 2001; Mandel, 2001a]. Exponent had hired Adami and coordinated the presentations on behalf of an unnamed client [Mandel, 2001b]. While Mandel appeared as an employee of Exponent, Adami only quoted his academic affiliations, feigning independence.

Beyond the conflict of interest, the study has other limitations.  The dataset had no information on OTC use, and this inevitably led to underestimation of ranitidine exposure as well as exposure to other H2RA's.  As reported by the authors, nearly all PPIs and famotidine sold in Denmark during the study was by prescription, yet the proportion of ranitidine sold by prescription ranged from 84% in 1999 to 17% in 2017.  That 83% of the market was hidden either as non-users, or users of other H2RAs or PPIs, skewing the results.

Also, the study had no information on smoking and alcohol use and incomplete information on medical conditions.  This is critical, since all agree smoking is linked to various cancers, and studies show smoking can vary between users of ranitidine and other H2RAs or PPIs.  If a study is comparing one group to another, the results would be confounded if one group had more smokers.  If non-ranitidine H2RA users smoked more, that would result in relatively higher cancer incidence in the non-ranitidine group (i.e., a *downward* bias in the relative risk for ranitidine).

29

    2.    *Norgaard (2021)*[133]

Norgaard has many of the same authors as Adami (2021), and was based on the same Danish data sources.  This study included adults (18 years or older), who between 1996 and 2008 filled at least two prescriptions for ranitidine (rather than one) compared to patients with at least two prescriptions for other H2-receptor antagonists or PPIs. The three cohorts were followed from the date of the second prescription and continued to the date of cancer or through 2018, whichever occurred first. After a median 14 years follow-up, the crude relative risks of developing bladder or kidney cancer were 1.33 and 1.13, respectively, in ranitidine users vs other H2 blocker medications. When data were inverse probability of treatment weighted, the relative risk was 1.11 for bladder cancer. Compared with PPI users, the relative risks of bladder cancer associated with ranitidine use was 1.24.

    a)    Duration of Use

Norgaard has the same limitations as the Adami study, except that Norgaard required that each subject have two prescriptions, whereas Adami considered anyone with one prescription.

    b)    Follow-Up

Median follow up ranged from 11 to 14 years. The study would therefore have the same "severe shortcoming" as acknowledged by the Adami authors.

    c)    Other Study Considerations that Affect Interpretation of Results

The study has the same limitations as Adami (no information on OTC use or smoking/drinking/obesity, and the data begins in 1995, limiting the follow-up period.

Four of the co-authors of the Norgaard study, including Norgaard herself, are also co-authors of the Adami/Chang study. The Norgaard study was rejected by three journals before finally being accepted. The *Lancet* rejected the paper on April 21, 2021;[134] the *Journal of the National Cancer Institute* on May 6, 2021;[135] and the *Journal European Urology* on June 3, 2021.[136] The reviewers' main objections were

---

[133] Nørgaard M, Andersen IT, Heide-Jørgensen U, Erichsen R, Rees JR, Karagas MR, Sørensen HT, *Ranitidine and Risk of Bladder and Kidney Cancer: A Population-Based Cohort Study*, 31 CANCER EPIDEMIOL. BIOMARKERS PREV., 45-50 (2022) (Epub 2021); PMID: 34649959.

[134] Ex. 72 (DARTMOUTH000279), at 283.

[135] Ex. 73 (DARTMOUTH000284), at 286.

[136] Ex. 74 (DARTMOUTH000292), at 294.

> 1. Ranitidine users had higher risks of Diabetes. Could this reflect other differences that are not apparent in table 1. 2. Smoking data are not known or not shown. This is key, given that it accounts for 50% of BCs. 3. Do the authors have any dose/duration and exposure data for either drug? Any dose response seen?[137]

The study was initially rejected by the *Journal Cancer Epidemiology, Biomarkers and Prevention*, but was finally accepted on October 21, 2021. Notably, John S. Witte, an expert for Defendants in this case, is a "senior editor" of that journal. The journal invoiced the authors for a publication fee.

A draft of the paper shows the graphs reproduced below. The graphs show an increased risk with long term follow up. The note, in Danish, in the margin says:

> Agree it can be interpreted as if there is a signal– but the graph is zoomed in a lot - so the difference in absolute numbers is less than 0.1% and we only see a signal after 15 years when compared to other H2 blockers.[138]

This graph shows a signal for increased risk with ranitidine compared to other H2RAs at 15 years. These graphs do not appear in the final published version, nor do we have any evidence they were submitted to the journal editors.

---

[137] Ex. 71 (DARTMOUTH000202), at 216.
[138] *Id.*



**Figure 2** Stabilized inverse probability of treatment weighted cumulative incidence of bladder cancer with death as a competing risk. Panel A shows ranitidine initiators versus initiators of cimetidine or famotidine. Panel B shows ranitidine initiators versus initiators of protone pump inhbitors.

3.    *Cardwell (2021)[139]*

The Cardwell (2021) study is a nested case-control study within the Primary Care Clinical Informatics Research database in Scotland. This study compared users to non-users for the main analysis, but also compared ranitidine users to users of other acid suppressants. This study had the longest duration of use and the longest follow up of all of the studies, and found a statistically significant increased risk of bladder cancer with dose-response. A total of 3,260 bladder cancer cases diagnosed between 1999 and 2011 were matched with five controls. Exposure to ranitidine, other H2-blockers and PPIs was ascertained from the prescription database beginning in 1993. Information was also available on many important confounders including smoking, alcohol intake

---

[139] Cardwell CR, et al, *Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case-Control Study*, 116 AM. J. GASTROENTEROL., 1612-1619 (2021).

and comorbidities. Dose-response analyses were performed based on the number of defined daily doses and the number of prescriptions. The analyses compared ranitidine users to non-users as well as to users of other acid-suppressing drugs. There were significant dose-response trends with increasing number of prescriptions, with an OR of 1.44, 95% CI 1.01-2.04 for >36 prescriptions (P-trend, 0.003). There was no significant increase in risk with use of other H2RAs (OR 1.04, 95% CI 0.87-1.24) or PPIs (OR 0.98, 95% CI 0.88-1.11). The main analysis for ranitidine vs non-users showed OR 1.22 (1.06-1.40); other analyses showed: Other H2RAs vs non-users: OR 1.04 (0.87-1.24); PPI vs non-users: OR 1.02 (0.85-1.23); Ranitidine vs other H2RAs; OR 1.05 (0.86-1.28); ranitidine vs PPIs: OR 1.20 (1.04-1.39).  When evaluating Ranitidine vs other H2RAs with >1095 DDD's (defined daily doses), the adjusted OR increased to 1.27 (0.91-1.75) and with Ranitidine vs PPI with >1095 DDD's, the adjusted OR increased to 1.45 (1.08-1.94) demonstrating a dose-response. The authors concluded that "the use of ranitidine particularly long-term use was associated with an increased risk of bladder cancer."

a)      Duration of Use:

The study evaluated dose by defined daily doses (DDDs: (1-182; 182-365; 365-1095; >1095) and # of Rx (1-6; 7-12; 13-36; >36)

b)      Follow-up

Study participants were followed for up to 18 years (1993-2011)

*4.      Iwagami (2020)*[140]

The Iwagami active comparator study compared ranitidine users *combined with* nizatidine users to users of other H2RA's and assessed the risk of "all cancers" as a group, and of gastric cancer alone. It also compared ranitidine-only users to users of other H2RA's for risks of "all cancers." The all-cancer Hazard Ratio was elevated (1.09, 0.96-1.24) but not statistically significant. Nizatidine users comprised 56.46% of the combined nizatidine/ranitidine group. Users of both drugs comprised just 2.42%.

---

[140] Iwagami M, Kumazawa R, Miyamoto Y, Ito Y, Ishimaru M, Morita K, Hamada S, Tamiya N, Yasunaga H., *Risk of Cancer in Association with Ranitidine and Nizatidine vs Other H2 Blockers: Analysis of the Japan Medical Data Center Claims Database 2005-2018*, 44(3) DRUG SAF. 361-371 (2021) (Epub 2020). PMID: 33247391.

a)      Duration of Exposure

The study did not provide any information on duration of use. Instead, the usage data was based on "defined daily doses" (DDD), which is a measure of cumulative exposure. The largest category of users was 1-180 DDD which could be either 300 mg for up to ½ year or 150 mg for up to 1 year, or 75 mg for up to 2 years.

Table 3 presented usage data for ranitidine combined with nizatidine, and for the percentage attributable to each medication. Approximately .2% of the study participants were users of ranitidine with more than 730 Defined Daily Doses (DDD) and there were no risk assessments reported in the study for that small group. 730 DDD would be equivalent to taking 150 mg of ranitidine for four years—even that highest category (for which they did not have enough data for any analysis) is not much compared to most Plaintiffs in this litigation. The study authors acknowledged this limitation, stating: "…whether an even higher cumulative dose of ranitidine/nizatidine is associated with an increased risk of cancer remains unknown mainly because of the limited sample size and statistical power," and also stated that "[o]ne possible explanation of the lack of association in the current study may be that few people were exposed to a high enough level of NDMA to increase the risk of cancer."

b)      Follow-up

The study authors also reported an extremely brief follow-up period (reporting "median follow-up 2.4 years") and concluded that "[r]epeat assessment with longer follow-up, especially among those with a high cumulative dose, may be warranted."

c)      Other Study Aspects that Affect Interpretation of Results

As defense expert Wang acknowledges, it "is not appropriate to rely on findings for cancer as a group in causation analyses to draw conclusions about specific cancers."[141] Yet the dose-response assessment was only for overall cancers combined.

Beyond that problem, Table 1 of the Iwagami study reports the age distribution of study participants, revealing that 21% were under age 30, 46% were under age 40 and over 70% were under age 50. Cancer mostly occurs in older people, which is why the Yoon study authors excluded young people. The result of including so many young people is "wash-out" or "dilution" of any

---

[141] Ex. 21 (Wang Rep.), at 43.

effect, as noted in the INEP Position Statement.[142]

### 5. Kantor (2021)[143]

The Kantor study compared ranitidine use to non-users, and to users of the PPI omeprazole, and assessed the risk of all cancers as a group, and liver and bladder cancer. The study reported increased risk for liver and bladder cancer when comparing ranitidine use to non-use. (Liver: 1.91 (1.09-3.36); Bladder: 1.22 (0.74-2.01), and when comparing ranitidine use to omeprazole (Liver: 1.15 (0.58-2.26); Bladder: 1.30 (0.69-2.46).

### a) Duration of Exposure

The Kantor study investigators gathered exposure information by asking study participants if they were taking ranitidine "most days of the week for the past 4 weeks,"[144] noting that because the data was "captured at 1 timepoint; secular changes in exposure could lead to measurement error, attenuating results."[145] Defense epidemiology expert Dr. Terry acknowledges in her report that the study was "unable to account for change in medication use if that occurred after baseline."[146] The study researchers therefore appropriately acknowledged that the study was "unable to examine associations by dose or distinguish long- vs short-term use," and for that reason, the study reported no results for ranitidine long-term use, or, for that matter, for any duration of exposure.[147]

---

[142] International Network for Epidemiology in Policy, *Position Statement on Conflict-of-Interest and Disclosure in Epidemiology*, at 34-37 (2020) (techniques used to manipulate epidemiologic findings). INEP's membership includes 24 organizations across 5 continents, including: American College of Epidemiology; American Public Health Association, American Academy of Pediatrics (Section on Epidemiology), Canadian Society for Epidemiology and Biostatistics, European Society for Environmental and Occupational Medicine, and German Society of Epidemiology. INEP Position Statement, at 7. INEP's mission statement states that INEP was "founded in 2006 as the International Joint Policy Committee for the Societies of Epidemiology (IJPC-SE), is an international non-profit organization (US 501c3) that brings together national and international volunteer professional societies and associations of epidemiologists. We promote integrity, equity, and evidence in policies impacting health in order to inform rational policy development by governments and non-governmental organizations. We do this to better protect the health of the whole community of life."

[143] Kantor, *et al.*, *Ranitidine Use and Cancer Risk: Results from UK Biobank*, 160 GASTROENTEROL. 1856-59 (2021).

[144] *Id.* at 1857.

[145] *Id.* at 1859.

[146] Ex. 19 (Terry Rep.), at 40.

[147] *Id.* at Table 1 and Supp. Table 2.

b)      Follow-up

The Kantor study "baseline" was 2006-2010 and "[p]articipants were followed until date of cancer diagnosis, death, loss to follow-up, or end of study (October 31, 2015); *i.e.*, a maximum of nine years of follow-up for the study participants who started taking the medications in 2006, and five years of follow-up for participants who started in 2010. This resulted in a median follow-up of 6.7 years. The authors acknowledged: "We did not capture long-term outcomes; some data suggest longer latency between NDMA exposure and cancer."

6.      *Kim, Y.D. (2021)[148]*

This study used a commercial database (IBM Explorys) to obtain and link data on prescriptions for ranitidine, famotidine, and omeprazole to diagnoses of several cancers including esophagus, stomach, liver, and pancreas. The study reported decreased risks for each cancer.

a)      Duration of Exposure

There is no information in the published paper regarding duration of exposure, dose, or frequency of exposure to ranitidine or any acid suppressant comparator. Tables 3 and 4 of the study paper report the study results as "Odds Ratios" but none of the Odds Ratios specify any duration of exposure associated with the risk assessments. The authors state (page 9): "…Figure 2…shows a decreasing cancer incidence in cohorts more temporally removed from the index event" (that is, cancer rates *uniformly went down* with time). "This phenomenon is most likely due to that there are less patients on continuous anti- reflux therapy for prolonged time periods, rather than an absolute reduction in cancer incidence." The study also has no individualized exposure (or outcome) data: all the data and results are based on aggregate data; there is no individual participant data in the study as acknowledged by the study authors at p. 2 of the paper ("Explorys … provides aggregated and deidentified electronic medical record data") and can be seen by looking at Table 1 (where every data point ends with zero).

Through discovery, Plaintiffs obtained the correspondence between the lead author of another study, Dr. Mohy-ud-din, and a journal that was considering a paper based on the same database. In the exchange, the lead author Dr. Nabeeha Mohy-ud-din stated that the Explorys data

---

[148] Kim Y.D., *et al.*, *No Association Between Chronic Use of Ranitidine, Compared with Omeprazole or Famotidine, and Gastrointestinal Malignancies*, 54(5) ALIMENT PHARMACOL. THER. 606-15 (2021); doi: 10.1111/apt.16464. PMID: 34251045.

does not provide any information about duration of use. She wrote: "I think we should exclude mentioning time period altogether because we don't know how long these people were on ranitidine for (and there is no way to find out)."[149] One of the journal editors wrote to the authors, stating "There is insufficient information obtainable from the database related to the duration of ranitidine use…it is unsurprising - even if the contaminant does act as a carcinogen - that you were unable to find any increased rates of various cancers among individuals who had been exposed to ranitidine."[150] Given these limitations, FDA has long recognized that databases developed for insurance and billing, not epidemiologic research, entail potential limitations that require special attention.[151]

b)      Follow-up

The study authors stated that the study had a "ten-year maximum follow up"[152] The study was entirely patients diagnosed with gastrointestinal cancers, including esophagus, stomach, liver, pancreas, colon and rectum who were taking acid-suppressing drugs at the time of cancer diagnosis, where diagnosis occurred between 2009-2018. So, a patient diagnosed in 2010 could only have a 1-year follow-up. A patient diagnosed in 2018 could have between 1-and-10-year follow-up—but as shown in Fig. 2 of the study, very few patients had 10 years of follow-up.

c)      Other Study Aspects that Affect Interpretation of Results

The Explorys database is aggregate and is only updated once a year, regardless of how much of that year the individual was in the database. It contains no mortality information, and the average length of time an individual was in the database was 3.5 years.

This study collected information about ranitidine users and users of other H2RAs and PPIs (most studies simply assumed—relying on the active comparator design—that the groups were similar). In this study, "the ranitidine cohort consistently displayed lower prevalence of common

---

[149] Ex. 52 (Mohy-ud-din subpoena).

[150] *Id.* at 32 of 32.

[151] FDA, *Guidance for Industry and FDA Staff Best: Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data*, at 7 (2013) ("FDA Electronic Healthcare Guidance"). The FDA recognized that these data sources were increasingly being used in epidemiologic studies but that these data sources "are generated to support payment for care," and "were generated for purposes other than drug safety investigations." *Id.* at 9. FDA, therefore, recognized that "it is important that investigators understand their potential limitations and make provisions to use the data systems appropriately." *Id.*

[152] Kantor, *supra* note 143, at 8.

risk factors for gastrointestinal malignancies." In fact, ranitidine users smoked and drank less, meaning any cancer association would be swamped by the confounding effects of the healthier population.

There was no information on OTC use, meaning many patients who were counted as famotidine and omeprazole users probably took OTC ranitidine at some point.

### 7. Kumar (2021)[153]

The Kumar cohort study was based on data from VA Health Administration and was limited to patients with a diagnosis of *Helicobacter pylori* infection, a Class 1 carcinogen and an established cause of gastric cancer. The study compared risk of gastric cancer among cohort members who had been prescribed at least 30 days of an acid-suppressant medication. During a median follow-up of 4.4 years, 367 gastric cancer cases were diagnosed among the ranitidine group, 49 among the other H2RA group and 1106 among the PPI group. As compared to ranitidine users the Hazard Ratio for gastric cancer was 1.83, 95% CI 1.36-2.48 for users of other H2RAs and 0.92, 95% CI 0.82-1.04 for users of PPIs. The cohort of other H2RA's was less than one-tenth the size of the ranitidine cohort and about 1/30 the size of the PPI cohort. In addition, over 80% of the patients in the other H2RA cohort were censored when they switched to another drug, resulting in a very small cohort of users for assessing cancer risk.[154]

### a) Duration of Exposure

The Kumar study included participants with at least one month of use of ranitidine or other acid suppressant prescriptions. The authors called this "long-term" use, but, whatever the terminology, the study included many who used ranitidine for just a month, and did not break out a sub-analysis of anyone who used it longer.

### b) Follow-up

The authors wrote that "Median follow-up was 4.4 years" and acknowledged that "longer follow-up was needed." There was a substantial amount of switching between classes of acid-suppressant drugs. Based on data in Table 3 of the 5243 ranitidine users, 4037 switched to PPIs (4037/5243=77%). Of the other H2RA users, 103/305=34% switched to ranitidine, and

---

[153] Kumar, *et al.*, *Ranitidine Use and Gastric Cancer Among Persons with Helicobacter pylori*, 67 DIG. DIS. SCI., 1822-1830 (2022) (Epub 2021) PMID: 33856609.
[154] Kumar, *supra* note 153; Ex. 12 (Moorman Rep.), at 209.

149/305=49% switched to a PPI. Additionally, the authors truncated follow-up once the patients switched to another drug, resulting in limited information on the risks for ranitidine users who switched to another drug.

<ul><li></li></ul>

c)      Other Study Aspects that Affect Interpretation of Results

As with several other studies, Kumar had no information about OTC usage, meaning many in the non-ranitidine group may well have been taking OTC ranitidine previously.

8.      *S. Kim (2021)*[155]

This cohort study used data from the Korea National Health Insurance Service to identify patients who were prescribed H2RAs for more than 30 days between 2002 and 2008. They constructed cohorts of ranitidine/nizatidine users, other H2RA users, and controls. The cohorts were followed for 5 years through 2013. A similar incidence of gastric cancer was observed in the three cohorts. This study used the same Korean database and same endpoint as the Yoon study. No information was provided on how cancer outcomes were determined.

a)      Duration of Use

The study did not measure duration or exposure except by requiring that patients were prescribed ranitidine for more than 30 days.

b)      Follow-Up

The study authors acknowledged "this study had a 5-year follow-up period, which may not be long enough to detect gastric cancer development."[156]

c)      Other Study Considerations that Affect Interpretation of Results

The study had no information on OTC ranitidine use. The study grouped ranitidine and nizatidine users into a single exposure category, which makes evaluating outcomes for ranitidine alone impossible.

According to Table 1, 67% of the study population was under age 45. This age group is at low risk of cancer, and so including them will understate the risk. A follow-up period of several decades would be needed to measure any effect (which the study did not have).

---

[155] Kim S, *et al.*, *Effect of Ranitidine Intake on the Risk of Gastric Cancer Development*, 20 HEALTHCARE (BASEL) 1071 (2021).
[156] Kim S, *supra* note 155.

### 9.     Yoon (2021)[157]

The Yoon active comparator cohort study compared ranitidine to famotidine and assessed the risk of liver, stomach, and bladder cancer and cancer as a group. The study found that ranitidine was associated with an increased risk (not statistically significant due to sample size) of bladder cancer 1.41 (0.88-2.24), and stomach cancer 1.06 (0.86-1.31), but not liver cancer 0.85 (0.69-1.05).

#### a)     Duration of Exposure

Those who used ranitidine for "more than one year" were included in the study. Table 2 indicates that 74.2% of study participants used ranitidine for less than 30 months. There is no information about whether the ranitidine users were taking ranitidine daily or "as needed" and no information about the dose (75mg, 150mg, or 300 mg).

The authors did not report any Hazard Ratios for the different durations of use for the individual cancers. There were no reported HR's for "≥30 months." The reported HR's were for all durations combined. With 45.9 percent of users at less than 17 months, this study population is nothing like Plaintiffs in this litigation. Yoon agreed: "To conclude, we found no association between probable NDMA exposure through ranitidine and *the short-term risk of cancer*. However, further research is needed to assess the *long-term cancer risk*."[158]

#### b)     Follow-up

The study investigators stated that "the follow-up period is restricted to seven years; thus, the overall follow-up period *is not long enough to assess the onset of cancer*."[159] (emphasis added). The defense epidemiology experts disagree with Yoon.

#### c)     Other Study Aspects that Affect Interpretation of Results

The study lacked "information about potential confounders of cancer, such as smoking and underlying diseases other than DM." The study had no information on OTC use.

***

Defendants' epidemiology experts rely exclusively on human ranitidine studies. They cannot overcome the limitations described in each. They do not even bother to try. The

---

[157] Yoon, *et al.*, *Risk of Cancer Following the Use of N-Nitrosodimethylamine (NDMA) Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea*, 10 J. CLIN. MED. 153 (2021).
[158] *Id.* at 7.
[159] *Id.* at 7.

fundamental problem is that none of the studies are designed to answer the relevant question here: whether *long*-term, *high*-exposure users of ranitidine face increased risk of the five designated cancers. The studies are complicated. What Defendants are doing is not. They seek to mislead the trier of fact by blithely ignoring the limitations—acknowledged by most of the studies' authors— that prove that the studies address the wrong question for this litigation. That is not an "opinion" over which reasonable experts in the field can disagree. It is the rigid defense of a legal conclusion advantageous to Defendants. Willfully ignoring or casting aside glaring evidence that undermines a conclusion is not an accepted scientific methodology.

### C.   Dietary and Occupational Epidemiology Fills the Gap Left in the Ranitidine Epidemiology

Despite the low exposure, short duration, and short follow-up, seven ranitidine epidemiologic studies reported that ranitidine is associated with increased risks for bladder cancer, three for liver cancer, five for gastric cancer, three for pancreatic cancer, and four for esophageal cancer. However, the results were mixed, and, as expected given their design, most found little association at low-exposures with short follow-up. Human epidemiological evidence from dietary and occupational studies on NDMA fills the gap left by the ranitidine studies, showing what a long-term, high-exposure, long-follow-up study would find.

The largest and most important occupational study is Hidajat, et al,[160] which had *decades* of follow-up, validated cancer diagnoses, and detailed NDMA exposure information allowing for a dose-response analysis for multiple cancers. In the absence of any ranitidine studies that even approach the exposures and follow-up, Hidajat fills a key gap.

There are far more dietary studies on NDMA, many of which also have exposure and follow-up that the ranitidine studies lack. If dietary studies of NDMA cover exposures and follow-up periods not addressed by the ranitidine studies, they can answer the crucial question left largely open by the ranitidine studies: whether the NDMA in ranitidine Plaintiffs consumed can cause cancer. This approach should be no surprise to Defendants, who have repeatedly told the Court that ranitidine has NDMA levels at amounts "like grilled or smoked meats." D.E. 1580 at 8. The logical question to ask is: does ranitidine cause cancer just like the NDMA in those foods does?

---

[160] Hidajat, M., *et al.*, *Lifetime Exposure to Rubber Dusts, Fumes and N-Nitrosamines and Cancer Mortality in a Cohort of British Rubber Workers with 49 Years Follow-Up*, 76 OCCUP. ENVIRON. MED., 250-58 (2019).

Despite the defense experts' disregard of the NDMA diet studies, nutritional epidemiology is a well-established science. The National Institutes of Health ("NIH") makes critical public health recommendations based on the results from nutritional epidemiology. The American Cancer Society and the World Cancer Research Fund International rely on dietary studies.[161] And IARC has a Nutrition and Metabolism Branch, which has as its goal, to "provide robust scientific evidence on the role of nutrition, obesity, and metabolic dysfunction in cancer development…."[162] Several authoritative scientific bodies evaluate dietary NMDA studies to analyze carcinogenicity:

- The WHO's 2002 NDMA assessment reviewed NDMA dietary epidemiology and stated that in almost all the studies there was an association between certain cancers and NDMA.[163] The WHO's 2008 Guidelines for Drinking-water Quality reiterated that NDMA diet studies support an association between certain cancers and NDMA.[164]
- In its 2021 15th Report on Carcinogens, the National Toxicology Program classified NDMA as reasonably anticipated to be a human carcinogen and reviewed dietary NDMA studies, reporting several case-control studies with dose-related association, including stomach and esophageal cancer.[165]
- Finally, in its draft for public comment early this year, the Agency for Toxic Substances and Disease Registry reviewed NDMA diet studies and stated that "[e]pidemiological studies of general population exposure showed associations between dietary intake and cancers of the gastrointestinal tract, especially the stomach[.]"[166]

Outside of litigation, Defendants have relied on this same literature. In its 2019 Hazard Assessment for NDMA, GSK reported that the "relevant epidemiological studies"—citing dietary studies—showed dose-response relationships between NDMA and certain cancers.[167] GSK stated "[i]n almost all studies, associations between the cancers of interest and [] NDMA were examined; results were relatively consistent in this regard, with there being as association with cancer most commonly with NDMA[.]"[168]

Many of the dietary NDMA epidemiological studies are large, well-designed studies, that

---

[161] *See* https://www.aicr.org/research/ (accessed June 16, 2022)
[162] *See* https://www.iarc.who.int/branches-nme/ (accessed June 16, 2022)
[163] Liteplo, *supra* note 17, at 21.
[164] WHO/HSE/AMR08.03/8 WHO, *N-Nitrosodimethylamine in Drinking-water* (2008), at 12-13.
[165] NTP (National Toxicology Program), U.S. Department of Health and Human Services, *15th Report on Carcinogens* (2021); https://ntp.niehs.nih.gov/go/roc15 ("NTP 15th Report").
[166] ATSDR NDMA Tox. Profile (2022), *supra* note 12, at 4.
[167] Ex. 60 (GSK Hazard Assessment Report: N-Nitroso-dimethylamine (NDMA)/GR1405, September 25, 2019, GSKZAN0003419540), at 6-7.
[168] *Id.* at 7.

use validated methods, and included large cohorts across different populations.[169] They are all peer-reviewed and have been published in reputable journals. Most of the studies measured dietary intakes via a questionnaire administered by a trained interviewer.[170] A common concern of food frequency questionnaires is the potential for recall bias; however, in its recent draft for public comment Toxicological Profile for NDMA (January 2022), the ASTDR indicates that this will bias the findings toward null (no association) of intake of NDMA and cancer.[171] That means the studies may *understate* the risk that the studied agent causes the subject disease.

Yet many of the diet studies found an association with NDMA and cancer nevertheless.[172]

### D.      Considered Together, the Epidemiological Evidence Supports Causation for Each Cancer

There is evidence in the ranitidine studies, the dietary studies, and the occupational studies, that ranitidine use is associated with an increased risk of each of the five cancers at issue in this litigation. There is an overall consistency, and there is evidence of dose-response. There also is abundant epidemiological evidence from diet and limited but important evidence from occupational exposure, consistently reporting that NDMA is associated with increased risk for bladder, esophageal, gastric, liver, and pancreatic cancer, with consistent evidence of a dose response, confirming the decades of accumulated animal study evidence, and human cell line evidence that led FDA to conclude that NDMA is a probable human carcinogen.

Forest plots have been charted for bladder, esophageal, stomach, liver, and pancreatic cancer to demonstrate the findings of the ranitidine, dietary, and occupational studies. For NDMA dietary studies and occupational studies, only studies that quantified NDMA and assessed whether

---

[169] Keszei, *et al.*, *Dietary N-Nitroso Compounds, Endogenous Nitrosation, and the Risk of Esophageal and Gastric Cancer Subtypes in the Netherlands Cohort Study*, 97 AM. J. OF CLINICAL NUTRITION, 135-46 (2013); Larsson, *et al.*, *Processed Meat Consumption, Dietary Nitrosamines and Stomach Cancer Risk in a Cohort of Swedish Women*, 119 INT'L J. CANCER 915-19 (2006); La Vecchia et al., *Nitrosamine Intake and Gastric Cancer Risk*, 4 EUR. J. CANCER PREV. 469 (1995);, Pobel (1995), *supra* note 88.

[170] De Stefani, *et al., Dietary Nitrosamines, Heterocyclic Amines, and Risk of Gastric Cancer: A Case-Control Study in Uruguay*, 30 NUTRIENTS 158-62 (1998); La Vecchia, *supra* note 169. Pobel *supra* note 88, Zheng, *et al.*, *Dietary N-Nitroso Compounds and Risk of Pancreatic Cancer: Results from A Large Case-Control Study*, 40 CARCINOGENESIS, 254-62 (2019); Zheng, *et al.*, *Dietary N-Nitroso Compounds and Risk of Hepatocellular Carcinoma: A USA-Based Study*, 74 HEPATOL., 3161-73 (2021) PMID: 34233041.

[171] ATSDR NDMA Tox. Profile (1989), *supra* note 12, at 2.

[172] *Id.*

43

cancer was associated with increased exposure to NDMA have been included in the forest plots. The Keszei study was not included because it assessed cancer subtypes only (*i.e.*, squamous cell, adenocarcinoma) and not the overall cancer type (*i.e.*, Esophageal). Also, meta-analyses were not included. The highest quartile (tertile or quintile) of exposure was compared to the lowest quartile (tertile or quintile) of exposure. For the Loh dietary study, increased cancer risk was measured per standard deviation of NDMA exposure. For ranitidine studies, studies that did not assess risk of ranitidine and specific cancer types were not included (*i.e.*, studies that measured only class risk of H2RAs or studies like Michaud and Iwagami that presented a combined analysis of ranitidine and another H2RA were not included). Because there are multiple findings reported in studies, the Forest Plots focused on the main analyses of each selected study. These forest plots demonstrate visually the overall consistent evidence in the human epidemiologic studies of an association with an increased risk of each of the five designated cancers.

     *1.*     *Bladder Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Bladder Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response*

The totality of the evidence demonstrates overwhelming evidence that consumption of NDMA in ranitidine causes bladder cancer.

     a)     Ranitidine Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Bladder Cancer and Evidence of Dose Response

There were four epidemiologic studies of ranitidine and bladder cancer,[173] one cohort that assessed risk of bladder and kidney cancer combined,[174] and one cohort that examined risk of bladder cancer in relation to use of cimetidine or ranitidine.[175] The bladder cancer forest plot below shows *every result* reported by Defendants' bladder cancer expert Porter. Every result exceeds the 1.0 null hypothesis and therefore each result shows an increased risk.[176] These results are from

---

[173] Norgaard *supra* note 133; Yoon *supra* note 157; Kantor s*upra* note 143; Cardwell *supra* note 139.

[174] Habel, *et al.*, *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, 9 PHARMACOEPIDEMIOL DRUG SAF., 149-55 (2000).

[175] Michaud, D.S., *et al.*, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPIDEMIOL. BIOMARKERS PREV., 250-54 (2004).

[176] The results plotted are from Ex. 17 (Porter Rep.) at 13-18. In his deposition testimony, Porter confirmed that exhibit 6585 to that deposition contained every result contained in his report. *See* Ex. 75 (Porter Dep. Tr.), at 54-56 & slide 6 to exhibit 6585.

four different studies, with different populations, different methods, different exposures and different limitations. Still, all study results reported by Porter had an increased risk. The pattern is obvious.



**BLADDER CANCER**
Forest Plot based on Defense Expert Porter Report, pp. 13-18

| Study | HR/RR/OR | Description |
|---|---|---|
| Habel 2000 | 1.56 | Kidney/Bladder |
| Kantor 2020 | 1.22 | vs. Non-Users |
| Yoon 2021 | 1.41 | vs. Famotidine |
| Cardwell 2021 | 1.22 | vs. Non-Users |
| Cardwell 2021 | 1.20 | vs. PPIs |
| Cardwell 2021 | 1.05 | vs. Other H2RAs |
| Norgaard 2021 | 1.11 | vs. other H2RAs |
| Norgaard 2021 | 1.24 | vs. PPIs |

Overall, the study limitations bias the results toward showing less association than a study of the population of Plaintiffs would, but they nevertheless provide consistent evidence of an increased risk for bladder cancer among ranitidine users whether compared to non-users[177] or to users of other acid-suppressing drugs.[178] A cross-sectional analysis of patients at Memorial Sloane Kettering hospital found an increased reporting ratio of bladder cancer for ranitidine users compared to other acid-suppressing drug users.[179] There is also evidence of a dose-response (also called biological gradient) in most studies where it was evaluated.[180]

Despite the limitations of these studies, each study reported that ranitidine was associated with an increased risk of bladder cancer, with a relative risk greater than 1.0, whether the comparison group was non-users of ranitidine or users of other acid-suppressing drugs. As noted in the *Reference Manual*, if the relative risk exceeds 1.0, "the risk in exposed individuals is greater

---

[177] Kantor *supra* note 143; Habel (2000) *supra* note 174; Cardwell *supra* note 139.
[178] Norgaard *supra* note 133, Yoon *supra* note 157; Kantor *supra* note 143.
[179] Braunstein, *et al.*, *Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production and Variations in Cancer Diagnoses*, JAMA Network Open (2021).
[180] Cardwell *supra* note 139; Norgaard *supra* note 133.

than the risk in unexposed individuals. There is a positive association between exposure and disease which could be causal." *Ref. Man.* at 567. There are several well-established causal relationships, where the magnitude of the risk is between 1.0 and 2.0. The magnitude of risk for passive smoking and lung cancer and between smoking and heart disease are well-known examples.

<blockquote>

b) Dietary Epidemiological Studies Demonstrate an Increased Risk of Bladder Cancer and Evidence of Dose Response

</blockquote>

Studies of NDMA from dietary exposure provide important and consistent evidence of increased risk for bladder cancer. One cohort[181] and one case-control study[182] evaluated bladder cancer risk in relation to estimated NDMA intake from dietary sources. A dose-response trend of increasing risk with increasing NDMA intake was reported in the case-control study,[183] and a non-statistically significant increase in risk was reported in the cohort study.[184] Also according to a group of scientists at the National Cancer Institute, dietary cohort studies tend to understate risk ("Dietary measurement error …. causes substantial underestimation of relative risks and reduction of statistical power for detecting associations.").[185]

As summarized in a 2018 meta-analysis of 11 studies,[186] there was a significant dose-response relationship between intake of processed meats (which are a major dietary source of NDMA) and bladder cancer. Two reports were published after the 2018 meta-analysis. An increased risk of bladder cancer was found in a cohort study,[187] but a pooled analysis did not find increased risk.[188] The dietary studies assessing processed meat exposure also found significant

---

[181] Jakszyn, P., *et al.*, *Red Meat, Dietary Nitrosamines, and Heme Iron and Risk of Bladder Cancer in the European Prospective Investigation into Cancer and Nutrition (EPIC)*, 20(3) CANCER EPIDEMIOL. BIOMARKERS PREV., 555-59 (2011).

[182] Ronco (2014), *supra* note 88.

[183] *Id.*

[184] Jakszyn, *supra* note 181.

[185] Freedman, et al, *Dealing with Dietary Measurement Error in Nutritional Cohort Studies*, 103 J. NAT'L CANCER INST., 1086-92 (2011).

[186] Crippa, A., *et al.*, *Red and Processed Meat Consumption and Risk of Bladder Cancer: A Dose-Response Meta-Analysis of Epidemiological Studies*, 57 EUR. J. NUTR., 689-701 (2018).

[187] Xu, X., *Processed Meat Intake and Bladder Cancer Risk in the Prostate, Lung, Colorectal, and Ovarian (PLCO) Cohort*, 28 CANCER EPIDEMIOL. BIOMARKERS PREV., 1993-97 (2019).

[188] Dianatinasab, M., *et al.*, *The Association Between Meat and Fish Consumption and Bladder Cancer Risk: A Pooled Analysis of 11 Cohort Studies*, 36 EUR. J. EPIDEMIOL. 781-92 (2021).

dose-response relationships.   The dose-response meta-analysis by Crippa, et al.[189] reported an increased risk for each 50g/day increase in exposure (RR 1.20, 95% CI 1.06-1.37).  The Xu cohort study reported a significant test for trend with increasing quintile of processed meat intake.[190] A dose-response analysis by Dianatinasab, et al.[191] reported relative risks greater than 1.0 across all levels of processed meat consumption.

> c)   Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Bladder Cancer and Evidence of Dose Response

Both occupational cohort studies[192] reported increased risks for bladder cancer, which was statistically significant in the larger study by Hidajat et al., which also reported a significant dose-response trend of greater risk with higher exposure to NDMA.

> d)   Totality of the Evidence Demonstrates Overwhelming Evidence that Consumption of NDMA in Ranitidine Causes Bladder Cancer

There is overall consistency in the epidemiologic evidence.



---

[189] Crippa, *supra* note 186.

[190] Xu, *supra* note 108.

[191] Dianatinasab, *supra* note 188.

[192] Hidajat, s*upra* note 160; *Vlaanderen, J., et al., Extended Cancer Mortality Follow-Up of a German Rubber Industry Cohort*, 55(8) J. OCCUP. ENVIRON. MED., 966-72 (2013).

Each type of study—ranitidine (green in the forest plot above), dietary (blue), and occupational (red)—demonstrate consistent[193] evidence of an increased risk of bladder cancer. Coupled with the animal studies and human cell studies discussed previously, the evidence is overwhelming that consumption of NDMA in ranitidine causes bladder cancer.

2. *Esophageal Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Esophageal Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response*

The totality of the evidence is clear: consumption of NDMA in ranitidine causes esophageal cancer.



a)    Ranitidine Epidemiological Studies Demonstrate Some Results of Increased Risk of Esophageal Cancer

Despite the significant limitations noted above, the ranitidine epidemiology still shows an increased risk of esophageal cancer. For instance, Habel compared ranitidine users to non-users, and reported a significantly increased risk for esophageal and gastric cancers combined (RR 2.42).

---

[193] "Consistency refers to whether similar results are observed in studies that are conducted in different study populations, with different study designs and across different times. When considering the consistency of studies, it is important to keep in mind that there is rarely perfect consistency across all studies, even with exposure/disease relationships that are generally accepted as causal within the scientific community." Ex. 12 (Moorman Rep.), at 109.

And the dietary and occupational studies fill the design-based gaps to address the question of general causation. The Adami study reported a statistically significant, 30% increased risk for esophageal adenocarcinoma compared to other acid suppressants, but not for esophageal cancer overall. A study of data in the FDA's voluntary reporting system performed an evaluation of adverse events reported to the FDA and found that the proportional reporting ratio for esophageal cancer was substantially elevated and statistically significant (3.56; 2.54-4.98) for ranitidine users compared to other acid-suppressing drug users.[194]

> b) Dietary Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Esophageal Cancer and Evidence of Dose Response

Multiple studies assess the risk of esophageal cancer associated with exposure to NDMA through the diet. Evidence of increased risk of esophageal cancer with NDMA exposure was found in studies that estimated total dietary NDMA intake,[195] and processed meat.[196] The two cohort studies (Loh (2011) and Keszei (2013)) and one case-control study (Rogers (1995)) that evaluated dietary NDMA intake, reported increased risk of esophageal cancer from NDMA exposure.

The esophageal cancer risk associated with processed meat intake has been studied extensively. Increased risk for esophageal cancer associated with processed meat intake has been reported in both case-control and cohort studies, as summarized in a 2017 meta-analysis of cohort studies (Vingeliene (2017) and a 2020 systematic review,[197] with stronger associations for squamous cell carcinoma than for adenocarcinoma.

A meta-analysis of cohort studies (Vingeliene 2017) provides evidence of a dose-response relationship between processed meat intake and esophageal cancer risk, reporting a RR of 1.44 for each 50 g/day increase in consumption. Numerous case-control studies of processed meat intake

---

[194] McGwin G. *The Association between Ranitidine Use and Gastrointestinal Cancers*, 13 CANCERS (BASEL) 24 (2020).

[195] Loh, Y.H., *et al.*, *N-Nitroso Compounds and Cancer Incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study*, 93 AM. J. CLIN. NUTR. 1053-61 (2011); Keszei, *supra* note 169; Rogers (1995), *supra* note 88.

[196] Vingeliene, S., *et al.*, *An Update of the WCRF/AICR Systematic Literature Review and Meta-Analysis on Dietary and Anthropometric Factors and Esophageal Cancer Risk.* 28 ANN. ONCOL., 2409-19 (2017).

[197] Jakszyn, *et al.*, *Nitrosamine and Related Food Intake and Gastric and Oesophageal Cancer Risk: A Systematic Review of the Epidemiological Evidence*, 12 WORLD J. GASTROENTEROL., 4296-303 (2006).

and esophageal cancer have also reported significant trends of increased risk with higher consumption of processed meats.[198]

Regarding the dose-response evidence in the dietary studies, dose-response analyses were reported in three studies assessing dietary NDMA intake in relation to esophageal cancer risk. Loh, et al.[199] in their cohort study with 55 cases reported a modest increase in risk (RR 1.13) with each standard deviation increase in intake. Keszei, et al.[200] reported statistically significant associations with each 0.1 μg/day increase in NDMA intake for both men and women for esophageal squamous cell carcinoma, (RR 1.15 and 1.34, respectively). The case-control study by Rogers et al.[201] showed increasing risk in the second and third tertile of NDMA intake (OR 1.31 and 1.86, p-trend 0.063).

There is also evidence of dose response in the processed meat studies. A meta-analysis of cohort studies (Vingeliene 2017) provides evidence of a dose-response relationship between processed meat intake and esophageal cancer risk, reporting a RR of 1.44 for each 50 g/day increase in consumption. Numerous case-control studies of processed meat intake and esophageal cancer have also reported significant trends of increased risk with higher consumption of processed meats.[202]

   c)   Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Esophageal Cancer and Evidence of Dose Response

Workers with NDMA exposure in the rubber industry were at increased risk for esophageal cancer, with a particularly strong association in the cohort that estimated individual NDMA exposure levels, with a 3-fold increased risk for those in the highest exposure category.[203] The

---

[198] Rosato, V., *et al.*, *Processed Meat and Risk of Selected Digestive Tract and Laryngeal Cancers*, 73 EUR. J. CLIN. NUTR., 141-149 (2019); De Stefani, E., *et al.*, *Processed Meat Consumption and Risk of Cancer: A Multisite Case-Control Study in Uruguay*, 107 BR. J. CANCER, 1584-88 (2012); Brown, L.M., *et al.*, *Dietary Factors and the Risk of Squamous Cell Esophageal Cancer Among Black and White Men in the United States*, 9 CANCER CAUSES CONTROL, 467-74 (1998); Yu, M.C., *et al.*, *Tobacco, Alcohol, Diet, Occupation, and Carcinoma of the Esophagus*, 48 CANCER RES., 3843-48 (1988); Levi, F., *et al.*, *Processed Meat and the Risk of Selected Digestive Tract and Laryngeal Neoplasms in Switzerland*, 15 ANN. ONCOL. 346-49 (2004).
[199] Loh *supra* note 195.
[200] Keszei (2013), *supra* note 169.
[201] Rogers, *supra* note 195.
[202] Rosato, *supra* note 198; De Stefani 2012, *supra* note 170; Brown, *supra* note 198; Yu, *supra* note 198; Levi, *supra* note 198.
[203] Hidajat, *supra* note 160; Vlaanderen, *supra* note 192.

Hidajat 2019 occupational study provided important evidence of dose response with increasing exposure to NDMA, reporting increasing risk within quartiles of increasing exposure to NDMA: 1.7 for quartile II, 2.43 for quartile III, and 3.04 for quartile IV.

          d)       Totality of the Evidence Demonstrates Clear Evidence that Consumption of NDMA in Ranitidine Causes Esophageal Cancer

Altogether, these three bodies of epidemiological studies in combination with the animal studies and human cell studies discussed previously, demonstrate clear evidence that consumption of NDMA at levels that have been detected in ranitidine can cause esophageal cancer.

          *3.*       *Gastric (Stomach) Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Gastric Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response*

There is evidence from the human ranitidine, dietary and occupational studies that ranitidine and NDMA is associated with an increased risk of gastric (stomach) cancer, and evidence of a dose-response effect in the studies that assessed it.



          a)       Ranitidine Epidemiological Studies Demonstrate Some Results of Increased Risk of Gastric Cancer and Some Evidence of Dose Response

Despite the design limitations noted above, the ranitidine studies assessing gastric cancer

still show some evidence of increased risk and some evidence of dose response. Two studies, Liu[204] and Habel, showed increased risk of stomach cancer. Liu also found evidence of dose response. A study of data in the FDA's voluntary adverse event reporting system found that the proportional reporting ratio for stomach cancer was elevated and statistically significant for ranitidine users compared to other acid-suppressing drug users.[205]

> b)   Dietary Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Gastric Cancer and Evidence of Dose Response

A large body of literature addresses the association between NDMA dietary exposure and gastric cancer. Ten studies report an increased gastric cancer risk in relation to increased dietary NDMA intake. A 2015 published meta-analysis (Song 2015) includes eight of these studies.[206] The Song (2015) meta-analysis findings include an overall, increased ranitidine-gastric cancer relative risk, 1.34. The findings additionally exhibit clear evidence of dose-response, showing increased risk with increased NDMA intake.

A major NDMA dietary source is processed meat. As such, several dozen studies and multiple meta- and pooled analyses have assessed NDMA-human cancer risk by measuring processed meat intake. In the most recent meta-analysis (2019), twenty-eight studies were considered, whereby the highest NDMA intake levels were associated with an overall 1.57 relative risk.[207] A 2020 pooled analysis, including 30 case-control and nested case-control studies, similarly identified an NDMA-gastric cancer association, reporting a 1.23 relative risk.[208] Dose-response additionally is evident: The relative risk reported for each 50 grams of NDMA per day is 1.72 for the 2019 meta-analysis and 1.38 for the 2020 pooled analysis.

The dietary NDMA studies similarly demonstrate a dose-response association: The Song (2015) meta-analysis, for instance, shows increased gastric cancer risk with increased NDMA intake. The Kim, S.R. (2019) meta-analysis and Ferro (2021) pooled analysis consistently

---

[204] The Liu study also found an increased risk among PPI users (RR 1.49) and other H2RA users (1.44).

[205] McGwin G. (2020), *supra* note 194.

[206] Song (2015), *supra* note 88.

[207] Kim, S.R., *et al.*, *Effect of Red, Processed, and White Meat Consumption on the Risk of Gastric Cancer: An Overall and Dose(-)Response Meta-Analysis*, 11(4) NUTRIENTS, 826 (2019).

[208] Ferro, *et al.*, *Meat Intake and Risk of Gastric Cancer in the Stomach Cancer Pooling (StoP) Project*, 147 INT'L J CANCER, 45-55 (2020).

demonstrate dose-response, with 1.72 relative risk, 95% CI 1.36-2.18 and 1.28 relative risk, 95% CI 1.28-1.49, respectively, for each 50 g/day consumption increase. The risk for gastric cancer from exposure to NDMA in the diet and consumption of processed meats has been described in *several dozen* studies that have been summarized in various meta- and pooled analyses.[209] Each of the meta- and pooled analyses *consistently* report increased gastric cancer risk at highest NDMA consumption levels, as well as evidence of dose response.

> c)  Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Gastric Cancer and Evidence of Dose Response

Two occupational studies of rubber industry workers assessed cancer mortality among industry workers and their cohorts. The large Hidajat 2019 cohort study, discussed above, found increasing gastric cancer risk with increasing levels of NDMA exposure. Additionally, among industry workers in the highest exposure quartile, the authors calculated a 1.72 hazard risk. In a second, smaller cohort study (Vlaandaren 2013), with questionable power, the authors reported an elevated, but not statistically significant, risk, 1.13 among men and 1.17 among women. The Hidajat 2019 study demonstrated increasing gastric cancer mortality with increasing NDMA exposure (1.32, 95% CI 1.10-1.57 for quartile II, 1.62, 95% CI 1.32-1.98 for quartile III, and 1.72, 95% CI 1.41-2.10 for quartile IV, p-trend 0.01).

> d)  Totality of the Evidence Demonstrates Clear Evidence that Consumption of NDMA in Ranitidine Causes Gastric Cancer

The three bodies of epidemiological studies in combination with the animal studies and human cell studies demonstrate clear evidence that consumption of NDMA in ranitidine causes gastric cancer. Even the ranitidine studies demonstrate evidence of an increased risk of gastric, while the better designed dietary and occupational studies demonstrate consistent evidence of an increased risk of gastric cancer with NDMA consumption and consistent evidence of dose response.

> 4.  *Liver Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Liver Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response*

The human epidemiologic studies (all categories) provide overall evidence of an increased

---

[209] Ex. 12 (Moorman Rep.) at 219 (*citing* Song (2015); Kim (2019); Zhao (2017); Ferro (2020), *supra* note 208).

risk of liver cancer and of a dose-response effect in the studies that assessed dose-response.



a)      Ranitidine Epidemiological Studies Demonstrate Some Results of
Increased Risk of Liver Cancer

Despite the limitations by design, the ranitidine studies assessing liver cancer show some evidence of increased risks. Two studies of ranitidine and liver cancer compared users to non-users, both with reported relative risks of 1.41 and 1.91.[210] A study of data in the FDA's voluntary adverse event reporting system found that the proportional reporting ratio for liver cancer was substantially elevated and statistically significant comparing ranitidine users to other acid-suppressing drug users.[211]

b)      Dietary Epidemiological Studies Demonstrate Consistent Results
of an Increased Risk of Liver Cancer and Evidence of Dose
Response

The better designed dietary studies show that NDMA exposure, including through processed meat intake, increases risk of liver cancer with evidence of dose-response. Most of the dietary studies reported elevated risk for liver cancer with higher consumption of NDMA or

---

[210] Tran, *et al.*, *Proton Pump Inhibitor and Histamine-2 Receptor Antagonist Use and Risk of Liver Cancer in Two Population-Based Studies*, 48 ALIMENT. PHARMACOL. THER., 55-64 (2018); Kantor, *supra* note 143.
[211] McGwin G., (2020), *supra* note 194.

processed meats. A significantly increased risk of liver cancer was observed for individuals in the highest quartile of NDMA intake from plant sources, while a smaller, non-significant increase in risk was observed for NDMA intake from animal sources.[212] Among the studies evaluating processed meat intake, a meta-analysis of six large cohort studies reported a relative risk of 1.17,[213] which is likely to be an underestimate of the true relative risk given the non-differential misclassification of diet that is inherent in cohort studies of diet and cancer. This is the conclusion reached by scientists at the National Cancer Institute.[214] The case-control studies that evaluated processed meat intake and liver cancer risk reported higher relative risks ranging from 1.64[215] to 2.56[216] for the highest level of processed meat consumption.

Four studies reported increased risk with greater consumption of NDMA in processed meats, although[217] no dose-response trend was reported in other processed meat studies.[218]

c)  Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Liver Cancer and Evidence of Dose Response

The Hidajat 2019 occupational study that estimated NDMA exposure among workers in the rubber industry found increasing risk of liver cancer with increasing exposure to NDMA (i.e.,

---

[212] Zheng (2021), *supra* note 170.

[213] Farvid, M.S., *et al.*, *Consumption of Red Meat and Processed Meat and Cancer Incidence: A Systematic Review and Meta-Analysis of Prospective Studies*, 36(9) Eur. J. Epidemiol. 937-51 (2021).

[214] Freedman (2011), *supra* note 185, at 1086 ("Dietary measurement error creates serious challenges to reliably discovering new diet-disease associations in nutritional cohort studies. Such error causes substantial underestimation of relative risks and reduction of statistical power for detecting associations.")

[215] Rosato (2019), *supra* note 198.

[216] Phukan, R.K., *et al.*, *Association of Processed Food, Synergistic Effect of Alcohol and HBV with Hepatocellular Carcinoma in a High Incidence Region of India*, 53 Cancer Epidemiol. 35-41 (2018).

[217] Rosato, *supra* note 198; Ma, Y., *et al.*, *Meat Intake and Risk of Hepatocellular Carcinoma In Two Large U.S. Prospective Cohorts of Women and Men*, 48 Int. J. of Epidemiol., 1863-71 (2019); Rizk, M., *et al.*, *Dietary Components Modulate the Risk of Hepatocellular Carcinoma in Cirrhotic Patients*, 61 Nutr. Res., 82-94 (2019); Phukan *supra* note 217.

[218] Cross, A.J., *et al.*, *A Prospective Study of Red and Processed Meat Intake in Relation to Cancer Risk*, 4 PLoS Med., e325 (2007); Fedirko, V., *et al.*, *Consumption of Fish and Meats and Risk of Hepatocellular Carcinoma: the European Prospective Investigation into Cancer and Nutrition (EPIC)*, 24 Ann Oncol., 2166-73 (2013); Talamini, R., *et al.*, *Food Groups and Risk of Hepatocellular Carcinoma: A Multicenter Case-Control Study in Italy*, 119 Int'l J. Cancer, 2916-21 (2006).

evidence of dose response), with a relative risk of 2.86, 95% CI 1.78-4.59 for individuals in the highest quartile of exposure. Vlaanderen (2013) was a much smaller occupational cohort of workers in the rubber industry, with more substantial limitations in its study design, and did not find increased risk of liver/ gallbladder cancer.

> d)      Totality of the Evidence Demonstrates Clear Evidence that Consumption of NDMA in Ranitidine Causes Liver Cancer

The ranitidine studies demonstrate some evidence of an increased risk of liver cancer with ranitidine use. The dietary studies demonstrate consistent evidence of an increased risk of liver cancer with NDMA consumption and consistent evidence of dose response. The occupational studies demonstrate consistent evidence of an increased risk of liver cancer with NDMA exposure and evidence of dose response. Altogether, these three bodies of epidemiological studies in combination with the animal studies and human cell studies discussed previously, demonstrate clear evidence that consumption of NDMA in ranitidine causes liver cancer.

> 5.      *Pancreatic Cancer - Epidemiologic Evidence for Ranitidine or NDMA Exposure and Pancreatic Cancer Show Consistent Results of an Increased Risk and Evidence of Dose Response*

The epidemiologic studies that evaluated whether ranitidine use or NDMA exposure increased pancreatic cancer risk varied in their overall study design and methodology but there was overall consistency across different study designs in different populations in finding an increased risk. Across the case-control and cohort studies, and across studies of various NDMA exposure, the association between NDMA and risk of pancreatic cancer was apparent in most studies. The studies included cohort, population-based, and hospital-based case-control studies from a diverse geographic area across the U.S., as well as Asia and Europe.



a)      Ranitidine Epidemiological Studies Demonstrate Some Results of
        Increased Risk of Pancreatic Cancer

Despite their design limitations, the ranitidine studies assessing pancreatic cancer show some evidence of increased risks. Two studies found elevated relative risks for pancreatic cancer in ranitidine users compared with nonusers, and both were statistically significant.[219] A study of data in the FDA's voluntary adverse event reporting system found that the proportional reporting ratio for pancreatic cancer was substantially elevated and statistically significant comparing ranitidine users to other acid-suppressing drug users.[220]

b)      Dietary Epidemiological Studies Demonstrate Consistent Results
        of an Increased Risk of Pancreatic Cancer and Evidence of Dose
        Response

A substantial body of evidence from dietary studies assessed pancreatic cancer risk in

---

[219]McDowell RD, *et al.*, *The Effect of Medications Associated with Drug-Induced Associated Pancreatitis on Pancreatic Cancer Risk: A Nested Case-Control Study of Routine Scottish Data*, 71 CANCER EPIDEMIOL. 101880 (2021); Habel (2000) *supra* note 174.
[220] McGwin G. (2020), *supra* note 194.

relation to NDMA intake[221], nitrosamine intake[222], and processed meat intake.[223] Increased risk of pancreatic cancer was reported for estimated dietary intake of NDMA from plant sources but not animal sources and for nitrosamine intake.[224] More than twenty studies examined processed meat, a major dietary source of NDMA exposure, in relation to pancreatic cancer risk. A 2017 meta-analysis[225] (Zhao (2017)), reported increased risks for pancreatic cancer when comparing highest to lowest level of intake for both case-control and cohort studies, although the risk was statistically significantly elevated only in the case-control studies. In more recently published studies, increased risk of pancreatic cancer with processed meat intake has been reported in 2 of 4 studies. An earlier meta-analysis reported a significant increase in risk with increasing consumption of processed meat.[226] While the findings from dietary studies showed some inconsistency in results, as is to be expected given the challenges of measuring nutritional variables, the overall body of evidence supports that increased dietary intake of NDMA can cause pancreatic cancer.

In the two dietary studies that estimated NDMA or nitrosamine intake, increasing risk of pancreatic cancer with increasing nitrosamine exposure was observed in the Baghurst 1991 study and for plant sources of NDMA in the Zheng 2019 study. Dose-response trend was also reported for one meta-analysis (Larsson 2012) that evaluated processed meat intake on a continuous scale (RR 1.19, 95% CI 1.04-1.36 for each 50 g/day increase in processed meat intake).

      c)    Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Liver Cancer and Evidence of Dose Response

An occupational cohort of individuals with exposure to NDMA reported increased risk with increasing NDMA exposure in the larger cohort (Hidajat 2019). A much smaller cohort of tire workers found increased risk of pancreatic cancer among women but not among men (Vlaandaren 2013).

---

[221] Zheng 2019, *supra* note 170.
[222] Baghurst, *et al.*, *A Case-Control Study of Diet and Cancer of the Pancreas*, 134(2) AM. J. EPIDEMIOL. 167-79 (1991).
[223] Zhao, Z., *et al.*, *Association Between Consumption of Red and Processed Meat and Pancreatic Cancer Risk: A Systematic Review and Meta-analysis*, 15(4) CLIN. GASTROENTEROL. HEPATOL 486-93 (2017) ("Zhao (2017)").
[224] *Id.*
[225] *See* Zhao (2017), *supra* note 223.
[226] Larsson (2012), *supra* note 169.

The large occupational cohort in the Hidajat 2019 study did report increasing risk for pancreatic cancer with increasing NDMA exposure, with relative risks for the 2nd, 3rd and 4th quartiles of exposure of 1.59, 2.19 and 2.6 as compared to the lowest quartile.

> d)     Totality of the Evidence Demonstrates Clear Evidence that Consumption of NDMA in Ranitidine Causes Pancreatic Cancer

Evidence from different types of studies, including studies comparing ranitidine users to non-users, occupational studies of NDMA exposure, and dietary studies of estimated NDMA intake or processed meat, indicate an increased risk of pancreatic cancer with exposure to ranitidine or NDMA. These three bodies of epidemiological studies in combination with the animal studies and human cell studies demonstrate clear evidence that consumption of NDMA in ranitidine causes pancreatic cancer.

***

More studies on ranitidine and NDMA continue to come out. A new study was recently presented at the American Gastroenterology Association's (AGA) Digestive Disease Week (DDW) Conference. *See* Wang, et al., *Pharmacoepidemiological Research on N-Nitrosodimethylamine Contaminated Ranitidine Use and Long-Term Cancer Risk: A Population-Based Longitudinal Cohort Study*, DDW 2022 Poster Presentation. This study demonstrated statistically significant increased risks of hepatocellular carcinoma (liver cancer) HR 1.22, 95% CI 1.09 to 1.36 (p<0.001), gastric cancer HR 1.26, 95% CI 1.05 to 1.52 (p=0.012), and pancreatic cancer HR 1.35, 95% CI 1.03-1.77 (p=0.030). The authors concluded the long-term use of NDMA-contaminated ranitidine was associated with an increased risk of hepatocellular carcinoma, pancreatic cancer, and gastric cancer.

## IV.    Evaluating the Totality of the Evidence

Scientists believe that assessing causation requires considering and evaluating the totality of the evidence. As noted in the *Reference Manual*[227] :

> [M]any of the most well-respected and prestigious scientific bodies (such as the International Agency for Research on Cancer (IARC), the Institute of Medicine, the National Research Council, and the National Institute for Environmental Health Sciences) **consider all the relevant available scientific evidence, taken as a whole**, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence. **In applying the scientific**

---

[227] *Reference Manual*, *supra* note 4.

> **method, scientists do not review each scientific study individually** for whether by itself it reliably supports the causal claim being advocated or opposed. (Emphasis added)

The *Reference Manual* (pp. 19-20) also states that "[s]cientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention." The IARC Preamble states that it considers "all pertinent epidemiological studies," and that "[e]ligible studies include all studies in humans of exposure to the agent of interest with cancer as an outcome."[228]

This case aptly demonstrates the wisdom of that approach. The limitations posed by ranitidine specific epidemiology render it unsuited to answer the question of general causation. By consulting additional sources, the inquisitive expert can fill analytical gaps and arrive at sound, scientifically grounded conclusions.

## A.        Bradford Hill Methodology for Establishing Causation

Sir Austin Bradford Hill's writings on causal inference provide an accepted methodological framework for assessing whether a given exposure is a cause of a specific outcome.[229] The factors to assess in evaluating an observed association to determine causation that Hill described are: Strength, Consistency, Specificity, Temporality, Biological Gradient, Plausibility, Coherence, Experiment and Analogy. These factors should be taken into account when assessing causality but are not to be considered absolute criteria and not all must be present to make a conclusion of a causal relationship.[230] The assessment and determination of whether there is a causal risk factor for a given disease or condition involves scientific judgment that is made by considering and weighing the evidence.[231] Given the epidemiological evidence in the peer-reviewed literature of an association between NDMA/ranitidine and bladder, pancreatic, liver, esophageal and stomach cancers, an accepted methodology to determine whether there is a causal relationship is to weigh the evidence by applying the Bradford Hill factors.

The first two aspects of the causal relationship described by Bradford Hill, strength and

---

[228] IARC Preamble, *supra* note 7, at 2, 16-17.

[229] Bradford Hill, A., *The Environment and Disease: Association or Causation?*, 108 J.R. Soc'y Med., 32-37 (1965).

[230] *Reference Manual*, *supra* note 4, at 600, in reference to Bradford Hill guidelines: "There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal relationship exists."

[231] *Id.*

consistency of association, are deeply intertwined. If consistent findings are demonstrated across a variety of locations, populations and methods, it is strong evidence of a causal association. There is consistent evidence of an increased risk with exposure to NDMA and bladder, liver, stomach, esophageal and pancreatic cancer across multiple buckets of evidence including human epidemiological studies involving dietary[232] and occupational[233] exposure to NDMA. Even despite the significant flaws and limitations in the design of the ranitidine human epidemiological studies, there still exists evidence of an increased risk of bladder[234], liver,[235] pancreatic,[236] esophageal[237] and stomach[238] cancer with exposure to ranitidine.

Temporality is the only consideration that is an absolute criterion when making a judgment of causality. This means that an exposure must occur before the disease develops. Without an exposure before the disease, causation cannot exist.[239]

Evidence of a biological gradient or a dose response relationship between exposure and the disease "is strong, but not essential, evidence that the relationship between an agent and disease is causal."[240] A dose response relationship has been observed between exposure to NDMA and cancer in human epidemiological studies as well as animal studies.[241]

---

[232] Song, *supra* note 88; Ronco, *supra* note 88; Keszei, s*upra* note 169; Rogers, *supra* note 195; Zheng 2019 *supra* note 170, Zheng 2021 *supra* note 212, DeStefani *supra* note 170, Larsson, *supra* note 169; Palli, *et al.*, *Dietary Patterns, Nutrient Intake and Gastric Cancer in a High-Risk Area of Italy*, 12 CANCER CAUSES CONTROL, 163-72 (2001); Pobel s*upra* note 88, La Vecchia, *supra* note 169; Gonzalez, *et al.*, *Nutritional Factors and Gastric Cancer in Spain*, 139 AM. J. EPIDEMIOL. 466-73 (1994).

[233] Hidajat, *supra* note 160.

[234] Cardwell, *supra* note 139; Kantor, *supra* note 143; Michaud, *supra* note 88; Habel (2000) *supra* note 174.

[235] Kantor, *supra* note 143; Tran *supra* note 210.

[236] McDowell, *supra* note 219; Habel (2000) *supra* note 174.

[237] Habel (2000) *supra* note 174; Tan, *et al.*, *Acid Suppression Medications Reduce Risk of Oesophageal Adenocarcinoma in Barrett's Oesophagus: A Nested Case-Control Study in US Male Veterans*, 48 ALIMENT. PHARMACOL. THER., 469-77 (2018).

[238] Pottegard, *et al.*, *Use of N-Nitrosodimethylamine (NDMA) Contaminated Valsartan Products and Risk of Cancer: Danish Nationwide Cohort Study*, 362 BMJ 3851 (2018); Liu, et al, *Use of Proton Pump Inhibitors and Histamine-2 Receptor Antagonists and Risk of Gastric Cancer in Two Population-Based Studies*, 123 BR. J. CANCER, 307-15 (2020); Habel (2000) *supra* note 174.

[239] *Reference Manual*, *supra* note 4, at 601.

[240] *Id*. at 603.

[241] Cardwell, *supra* note 139, Hidajat, *supra* note 160, Ronco, *supra* note 88, Gonzalez, *supra* note 232, La Vecchia, *supra* note 169, Rogers, *supra* note 195, Pobel, *supra* note 88, Larsson, *supra* note 169 , Keszei, *supra* note 169, DeStefani, *supra* note 170, Peto, *supra* note 71.

Biological plausibility refers to a reasonable biological mechanism through which the exposure could lead to the disease. "When biological plausibility exists, it lends credence to an inference of causality."[242] As discussed previously, there are several biologically plausible mechanisms demonstrated in animal and in vitro studies whereby NDMA causes cancer. This has been established by considerable *in vitro* and *in vivo*, animal and mechanistic evidence including the application of the 10 key characteristics of carcinogens[243] discussed *supra*.

As described by Bradford Hill, if specificity exists between an exposure characteristic and disease, it provides strong evidence of causality. However, Hill also notes that "multi-causation of disease is generally more likely than single causation." Further, "lack of specificity does not necessarily undermine a case for causation when there is a good biological explanation for its absence."[244] NDMA can cause bladder, pancreatic, liver, stomach and esophageal cancer. This is consistent with other known carcinogens such as tobacco smoke which is known to cause lung, bladder, esophageal, mouth, larynx, throat, pancreas, liver and stomach cancers[245] or asbestos which can cause mesothelioma, lung, larynx, and ovarian cancers.[246]

Biologic plausibility depends on the current state of biological knowledge. Coherence, as described by Bradford Hill, means that, even if the knowledge of the biology of the disease is not well-defined, the "data should not seriously conflict with the generally known facts of the natural history and biology of disease." The postulated mechanisms by which NDMA exposure leads to cancer do not conflict with the current state of knowledge regarding carcinogenesis. In addition, the histopathological evidence demonstrating carcinogenic effects of NDMA in animals and humans greatly strengthens the coherence of the generally known facts of the natural history and biology of the disease.

In relation to experimental data upon which a causal relationship can be based, it would be

---

[242] *Reference Manual*, *supra* note 4, at 604.

[243] Smith 2016, *supra* note 40.

[244] *Reference Manual*, *supra* note 3, at 606.

[245] National Cancer Institute, *Harms of Cigarette Smoking and Health Benefits of Quitting*, https://www.cancer.gov/about-cancer/causes-prevention/risk/tobacco/cessation-fact-sheet#what-are-some-of-the-health-problems-caused-by-cigarette-smoking.

[246] National Cancer Institute, *Asbestos Exposure and Cancer Risk*, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/asbestos/asbestos-fact-sheet#what-are-the-health-hazards-of-exposure-to-asbestos.

unethical to conduct human experimental studies on exposure to NDMA.[247] The clinical trials that were conducted with ranitidine were not designed to assess whether or not the use of ranitidine was causally associated with cancer.[248] However, there is substantial experimental *in vitro* and *in vivo* animal and human evidence which demonstrates that NDMA can cause cancer and it has been established through experimental evidence that there is no qualitative difference between animals and humans in the way that NDMA is metabolized.[249] The *in vitro* human and animal experimental evidence lend strong support to the causal association between NDMA and cancer.

The final Bradford Hill criteria is analogy whereby evidence of an association with one risk factor, would suggest that a similar risk factor could also plausibly be associated with the disease. There are multiple examples of carcinogens which lead to cancer in multiple sites. One such example is asbestos or cigarette smoke, discussed *supra*.

Hill stated these are "nine different viewpoints from of which we should study association before we cry causation," however we cannot "lay down some hard and fast rules of evidence that *must* be obeyed before we accept cause and effect." As Hill explained, none of the "nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required *sine qua non*."[250]

The Defendants' experts have failed in applying the Bradford Hill criteria and methodology in analyzing the question of whether the NDMA in ranitidine can cause bladder, pancreatic, liver, esophageal and stomach cancer. First, the defense experts disregard the associations that have been found in multiple observational studies and ignore the conclusions of the study authors themselves. The experts unanimously argue that there is no observed association and therefore the application of the Bradford Hill factors is unwarranted. This is simply not true and is a misapplication of Bradford Hill's methodology. Second, the defense experts do not undertake a Bradford Hill analysis looking at the entirety of the relevant evidence but limit the analyses to the flawed ranitidine epidemiological studies while ignoring a large body of relevant evidence demonstrating an association between different exposures to NDMA and cancers. This is a fatal flaw in

---

[247] *See* Ex. 41 (Vaezi Dep. Tr.), at 182:1-17; Ex. 32 (Guengerich Dep. Tr.), Vol 1, at 138:16-21; Ex. 40 (Terry Dep. Tr.), at 227:4-9; Ex. 26 (Chodosh Dep. Tr.) at 173:5-23; 175:15-24; Ex. 42 (Wang Dep. Tr.) at 209-210:24-3.
[248] Ex. 41 (Vaezi Dep. Tr.), at 60:13-19; 61:5-8.
[249] Liteplo, *supra* note 17, at 27.
[250] Hill *supra* note 229, at 299.

methodology and requires that putative experts Witte, Terry, Vaezi, Wang, Chan, Hatten, Guengerich and Porter be excluded due to the unreliability of their opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert opinions. Under that rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he purpose of the expert admissibility rules is to enlist the federal courts as 'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The Eleventh Circuit has "distilled the expert admissibility inquiry into the following three factors:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* The qualification prong is not onerous, and in this MDL, the parties challenge few, if any, of the experts' qualifications. *Cf. Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (vacating the exclusion of an expert on qualifications grounds because the standard was "too high"). Instead, the chief questions are the reliability of the experts' methodology, and the helpfulness of their analysis.

The gatekeeping role is at its zenith in assessing reliability. The Court must scrutinize an experts' methodology for fatal flaws, but the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (quoting *Daubert*, 509 U.S. at 595). Still, where "opinion evidence [] is connected to

existing data only by the *ipse dixit* of the expert," courts "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. An important, but "unsupported assumption [can] ma[ke expert] testimony unreliable." *Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1151 (11th Cir. 2021) And because result-oriented methodologies are not reliable, "a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 (11th Cir. 2005).

The helpfulness prong "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Even a reliable methodology will not be helpful if it (reliably) addresses the wrong question.

On every prong, district courts have considerable discretion, and "the rejection of expert testimony is the exception rather than the rule." *Moore*, 995 F.3d at 850 (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments). Admissible experts on opposite sides may well contradict each others' opinions, which is by itself a reason to exclude neither. *Id.* (where "a trial court … rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable" because Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.").

## ARGUMENT

To avoid the simple fact that ranitidine degrades into NDMA, and NDMA causes cancer, Defendants strive mightily to make the entire case come down to a narrow band of epidemiology: active comparator studies of ranitidine. The strategy appeals to them because long-term studies on ranitidine on populations with high exposure to ranitidine have not been performed, and the short, low-exposure studies that have been conducted predictably show less of an effect (though far more of an effect than Defendants pretend). Following that strategy, Witte, Chan, Terry, Vaezi, Hatten, and Porter duly ignore NDMA epidemiology, and each one woodenly applies ranitidine epidemiology conducted on short-term, low-exposure populations to *all* ranitidine users, even those who consume long-term, at high exposure. Even within the human ranitidine epidemiology, each expert favors studies with less effect over studies with more of one, even in the face of obvious problems. For example, though each expert emphasizes that controlling for smoking is critical, they inexplicably denigrate studies that *control for* smoking (Cardwell, for example), and extol studies *that do not control for* smoking (Adami, for example). These consistent, one-way errors render each expert's methodology unreliable.

Guengerich, Wang, and Chodosh focus on arguing, for various reasons, that NDMA has a threshold below which it cannot cause cancer, and that ranitidine falls below that threshold. This "threshold" opinion is contrary to the considered views of every established scientific authority in this field, because genotoxins like NDMA simply do not have any safe threshold. All should follow Defense Experts Lindsley and Bumpus—out of this litigation.

## I.    John Witte

John Witte is a professor at Stanford University focused on "cancer genetic methodological epidemiolog[y]." Ex. 43 (Witte Dep. Tr.), at 8:25-9:1. None of the studies he relied on or considered for his expert opinions relate to genetic epidemiology. Ex. 43 (Witte Dep. Tr.), at 49:9-50:9. He has not previously researched ranitidine or NDMA. Ex. 43 (Witte Dep. Tr.), at 50:10-18. Witte examined only human epidemiological studies, not dietary studies, occupational studies, animal studies, or anything else. Within human epidemiological studies, he again excluded studies that compare ranitidine-users to non-users, only relying on studies that compared ranitidine users to users of similar drugs (active comparators). The rationale for this choice was a fear of confounders, but he entirely ignored obvious confounders (such as smoking) and other flaws (such as short follow-up) in his preferred studies that were *controlled for* in the studies he criticized. Even within active comparators, he largely excluded comparisons of PPIs, focusing on H2RAs. Last, giving weight principally—even exclusively—to the H2RA comparator studies, he concluded there is no association between ranitidine and cancer. His methodology and choices are inexplicable unless one remembers a crucial fact: he knew which studies showed an association, and which did not, *before* writing the report, and he thus shaped his methodology to exclude studies he knew would help Plaintiffs and include only those that help Defendants. "[A] district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293. Witte's results-driven methodology is unreliable and should be excluded.

### A.    Witte Ignored NDMA Science

Even an expert applying unimpeachable methods will come to unreliable conclusions if he considers only partial evidence, which is what Witte did here. In discussing his methodology, Witte explains that "the key question is whether there is reliable evidence from human studies to indicate that ranitidine use can cause specific cancer(s)." Ex. 22 (Witte Rep.), at 4. He did not consider animal studies of ranitidine, nor any studies—whether in animals or humans—of NDMA. Later,

he discusses why he ignored studies of NDMA, explaining that while he could have "approximate[d] NDMA levels in ranitidine," he did not because "the observational studies undertaken by the scientific community following detection of NDMA in ranitidine have focused directly on use of ranitidine." Ex. 22 (Witte Rep.), at 11. But this is nonsensical. There is no basis to infer from the existence of studies on ranitidine that the scientists *considered*, but *decided not* to study NDMA. Witte does not cite any authority for his conclusion, and no study says that.

The FDA obviously did not consider only studies focused on ranitidine in deciding to pull Zantac from the market. While one can understand a Defense expert's reluctance to engage with the human NDMA studies given their uniform findings, *that* is not a permissible reason for an expert witness to ignore relevant evidence.

### B.     Witte Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported by the Human Ranitidine Studies

Plaintiffs' general causation theory in this litigation is for *long-term* use of ranitidine. The claim is not that ranitidine causes cancer after one dose, or even a year's worth, but over many years of regular use. Quite apart from the extent of exposure to ranitidine, cancer could take time to develop. For example, a plaintiff may well be exposed to ranitidine for 7 years, but develop cancer from it 10 years later. To be helpful to the jury, Witte's opinion must address *that* question: whether ranitidine can cause cancer when consumed regularly over multiple years. The sources Witte relies on demonstrate he has not answered that question.

#### 1.     *Witte Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs*

In the Adami study, for example, more than *half* of the participants had just one ranitidine prescription.[251] The highest amount studied was *ten* ranitidine prescriptions.[252] But no plaintiff in this litigation will assert her cancer was caused by *ten* prescriptions of ranitidine—none. The Norgaard study included anyone with *two* prescriptions. Consider the analogy of a study on beer and weight gain in which, over a ten-year period, *most* of the study participants consumed just one six-pack of beer, but, at the high end, some consumed *ten* six-packs. No one would think the study is probative of the effect of beer on weight, because, assuming the mechanism for weight gain is consuming calories, drinking ten six packs over a few years is a rounding error. It is no answer to

---

[251] Adami (2021), *supra* note 132.
[252] *E.g.*, *Id.* at Figure 3.

look to the difference between the one-pack person and a ten-pack person in search of dose-response, because the expected effect is indistinguishable from 0 for both—any effect would be catching a behavioral difference.

    2.    *Witte Ignored How Short His Preferred Studies' Follow-Up Periods Were*

Witte did not acknowledge the short duration of follow-up in the studies he relied upon. Many of the study authors themselves acknowledge it. Adami admitted that a "severe shortcoming of our study is the limited number of participants with long-term follow up." Adami (2021), *supra* note 132. Kantor acknowledged: "We did not capture long-term outcomes; some data suggest longer latency between NDMA exposure and cancer." Kantor, *supra* note 143.[253] Yoon says the study's seven year "period is not long enough to assess the onset of cancer." Yoon *supra* note 157, at 7.

When asked if he agreed with the limits the study's own authors admitted, Witted doubled down: "No, I don't. I think that obviously this study has cancer cases in it so the follow-up period was enough to assess the onset of some cancer." Ex. 43 (Witte Dep. Tr.), at 122:20-23. But this is a non sequitur. A study of a single week would be "enough to assess the onset of some cancer" if the population was large enough—but obviously all of them would be causally unrelated to anything being studied. Yoon understood this. So did S. Kim, who noted the study had "a 5-year follow-up period, which may not be long enough to detect gastric cancer development." Iwagami said the same thing. The only one who disagrees is Witte. Under *Daubert*, the requirement to "testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the [*Daubert*] factors renders the expert's testimony inadmissible." *Buland*, 992 F.3d at 1151. Misunderstanding the scope of the studies is a critical, and faulty, step.

The studies Witte relies on say, at most, that low doses of ranitidine do not cause cancer within a few years. Witte obscures this in his report by listing not the median period, but "the time period from when the earliest possible exposure to ranitidine or other H2RAs all the way up to the last follow-up period." Ex. 43 (Witte Dep. Tr.), at 139:6-9; *see also* Ex. 22 (Witte Rep.), at 14 n.2 (same). But the overall length of when the *first* person took ranitidine and the *last* person got cancer is not probative at all. Its only purpose is to obscure the sharp limitations on the studies. Saying

---

[253] Witte agreed he was "not seeing a specific comment" in his report about Kantor's follow-up period. Ex. 43 (Witte Dep. Tr.) at 138:17-139:12.

that low doses do not cause cancer within a few years would not help the jury, and must be excluded. To the extent Witte seeks to extrapolate to say longer exposures and longer durations also do not cause cancer, he has a substantial "analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. He does not address or explain that gap, but pretends it does not exist—contradicting each study's authors in the process. That the gap is wholly unexplained renders his ultimate opinion unreliable.

### C.    Witte Ignored Confounding Factors in Studies He Favored

Much like the fabled sharpshooter who fires at a barn then draws the target later around the biggest cluster of shots, Witte's methodology conveniently excludes studies that associate ranitidine with cancer and includes those showing no effect. Both at his deposition and in his report, Witte repeatedly insisted that the *only* reliable study methodology is an active comparator study comparing ranitidine and H2RAs—studies of anything else, Witte claimed, do not show a valid association. A number of factors show that this selection was litigation driven and post-hoc, and therefore unreliable.

#### 1.    Witte's Approach to Confounders Is Inconsistent

Witte's approach to confounding factors shows the inconsistency of his methodology. Take smoking, for example. Witte mentions smoking more than fifty times in his report, usually as a cardinal example of a confounding factor. The argument goes that smoking "is associated with heartburn and GERD, which may prompt use of ranitidine or other H2RAs." Ex. 22 (Witte Rep.), at 19. He argues, therefore, that studies comparing cancer risk for ranitidine with an H2RA avoids the confounding effect of smoking, since, he presumes, smoking will be the same in both, allowing one to detect the true association.

At his deposition, counsel asked whether H2RA active comparator studies could be biased by smoking:

> Q. Right.· What if one of the groups had more smokers?
> A. Then you could have confounding due to smoking leading to a false positive·result.
> Q. What if -- what if it leads it the·other way.· What—
> A. It doesn't.· That's my point.· This is a positive confounder.
> Q. No.· It's only a positive confounder if it's in both groups.
> A. No.· … The beauty of this study is that they use an active comparator design. …
> Q. Your testimony is that regardless of the difference between the number of smokers between, let's say, the ranitidine group and the

> other H2RA group, that it always biases away from the null?
> A. I'm saying that smoking a confounder of the association….
> Q. No.· Let me try it again, okay? You got two groups.· One group
> takes ranitidine, right? … And one group takes other H2RAs. … If
> the other H2RA group has more smokers than the ranitidine group,
> what does that do to the numbers?
> A. So your hypothetical is that the other ranitidine users have a
> higher – so you're at -- well, in that case, I mean in that hypothetical
> situation, *you could see bias in either direction*.[254]

Ex. 43 (Witte Dep. Tr.), 194:18-197:25 (emphasis added).

But this situation was *not* hypothetical: Witte had evidence that *smoking rates between ranitidine and other H2RAs were not the same*. He read and relied on the Y. Kim study, which said smoking was almost 25% higher among famotidine users compared to ranitidine (30% versus 38%, rounded).[255] He said nothing about this in his report, and appeared surprised in his deposition. *See* Ex. 43 (Witte Dep. Tr.), at 285. If users of ranitidine and other H2RAs have *different* smoking rates, the principal rationale for trusting active comparator studies is illusory. That H2RAs and ranitidine *are the same with respect to confounders* is a necessary premise of his entire expert report, but almost entirely unsupported. An "unsupported assumption ma[k]e[s] his testimony unreliable." *Buland*, 992 F.3d at 1151.

Smoking is the most salient example, but other differences matter too: nearly 20% higher diabetes rates for famotidine (38% versus 45%); 35% higher obesity (24% versus 32%); almost double the rate for liver cirrhosis (6.5% versus 11.4%); on and on for irritable bowel syndrome and atrophic gastritis. Perhaps Witte believes the Y. Kim study is wrong, or that the numbers are different for H2RAs other than famotidine, or that there is no difference in Denmark or other places with studies—but to be reliable, he needed to at least explain the inconsistency in his methodology.[256] "Without a baseline, any incidence may be coincidence." *Chapman*, 766 F.3d at

---

[254] What Witte meant by "either direction" is mysterious. He repeatedly stated that populations with more smokers will have higher cancer incidence. The *only* time he suggested the effect could go in "either direction" was when he sensed his answer might imply a bias *toward the null* for ranitidine.

[255] Y. Kim (2021) *supra* note 148, at Table 2 (p value lower than .0001, indicating a high confidence).

[256] Interestingly, the proton-pump inhibitor omeprazole was closer to ranitidine in some ways than the H2RA famotidine (within a few percentage points on smoking, for example), but further in others (3.5% versus 10.4% for cirrhosis; double for Barrett's Esophagus). If Witte were truly concerned about smoking as a confounder, this might suggest that sometimes a PPI comparator

1307-08. Witte did not determine a baseline.

That matters because many of the studies Witte chiefly relied upon—Adami, Norgaard, Yoon,[257] and Iwagami, for example—had no information about smoking or other confounders, and did not control for them. Witte said nothing about this failure in his report, supposedly on the theory that an active comparator design would eliminate any smoking-related confounding.[258] Ex. 43 (Witte Dep. Tr.), at 231-33. But studies that actually adjusted for smoking showed this is not true. In the Cardwell study: "Associations were similar … when adjusting for smoking[ and] when additionally adjusting for alcohol." Cardwell *supra* note 139, at 5. For users who consumed more than 1,095 daily defined doses, that study showed an RR for ranitidine and bladder cancer in a tight band between 1.43 and 1.45 in the main analysis, the PPI comparator, the smoking-adjusted numbers (two methods), and the alcohol-and-smoking-adjusted numbers. *Id.* at 6.[259] Nonetheless, Witte repeated his unfounded hypothesis that the H2RA comparator—*not actual smoking numbers*—better adjusted for smoking, even though he admitted he did not check the smoking rates among H2RA users. "Instead of properly bridging that gap, [Witte] tried to ipse dixit over it; but a bald assertion cannot carry the *Daubert* burden." *United States v. Pon*, 963 F.3d 1207, 1221 (11th Cir. 2020). Here, Witte is beyond *ipse dixit*, and into ostrich-head-in-the-sand territory.

Other confounders apply too. FDA has explained that researchers employing an active comparator methodology should use a "comparator group taking a drug used to treat the same disease, with the same level of disease severity, and from the same time period as the exposed

---

would be better on that specific confounder (though, as he noted, it would be biased toward the null because of the link between *PPIs* and cancer). But when discussing the Cardwell study, which found an association between ranitidine and bladder cancer both when comparing users and nonusers, and when comparing ranitidine users and PPI users, Witte inexplicably favored the H2RA active comparator sub-analysis, and blamed the positive association finding on "confounding (e.g., by smoking)," because "individuals who use ranitidine or other H2RAs may be more similar in their potential confounders (e.g., smoking) than those who use PPIs." Ex. 22 (Witte Rep.), at 19. This claim—that ranitidine users and other H2RA users *both* smoke about the same amount, *and more than* PPI users and non-users—is contrary to the only evidence on the point that he reviewed, which said the *H2RA* has heightened smoking, with ranitidine and PPIs lower. The very confounder Witte pointed to would cause a bias to the *null* for the H2RA comparator, which is precisely what occurred.

[257] *Cf.* Ex. 17 (Porter Rep.), at 27 ("Yoon did not adjust for smoking.").

[258] *But see* Ex. 17 (Porter Rep.) at 27 ("Norgaard did not adjust for smoking.").

[259] Notably, even the H2RA comparator showed a 1.27 RR for users who consumed more than 1,095 daily defined doses, which long-term ranitidine users in this litigation would easily reach.

cohort. For example, when selecting a comparator group, investigators should consider the impact that formulary status (e.g., medication tiering or prior authorization issues) could have on the level of disease severity of the exposed group and the comparator group."[260] Witte does not apply this methodology. He does not mention that the indications for ranitidine and other H2RAs are different in that ranitidine—but not other H2RAs—is indicated for maintenance therapy.[261] He does not consult or mention formulary status, or whether ranitidine is reimbursable (it appears not to be). And he does not note when studies are comparing populations at different times.[262]

In short, Witte cherry-picks, ignores inconsistent data, and fails to follow standards set forth by the FDA.

### 2. *Witte Misrepresents Data He Disagrees with.*

Reviewing Witte's approach to Bladder cancer gives a powerful illustration of his result-oriented approach. Witte begins by saying the "four active comparator studies did not report a valid association between ranitidine use and bladder cancer." Ex. 22 (Witte Rep.), at 19. This is astounding, since, even in his own chart, Witte shows bladder cancer going five-for-five: RRs of 1.05, 1.11, 1.41, 1.3, and 1.56. *Id.* at 21. Apparently, none of those associations are "valid," but Witte does not explain why.

Digging into the data renders his opinion even more inexplicable. The Norgaard study he reported first as 1.11 (versus other H2RAs) has another analysis versus PPIs which had an RR of 1.24; the Cardwell study has a PPI comparator with an RR of 1.2. Witte prefers H2RAs as comparators, "due to different patterns and indications of use and potential hypotheses regarding PPIs and cancer." *Id.* at 9. The "potential hypotheses" are that PPIs may well cause cancer; the "patterns and indications" are that people with *more severe* conditions take PPIs. These are both excellent reasons not to use PPIs as an active comparator, but *both* bias toward the null. In other

---

[260] FDA Electronic Healthcare Guidance, *supra* note 151.

[261] Ex. 43 (Witte Dep. Tr.), at 276-281. Beyond the indication, Kumar explained that "among ranitidine users who switched to a second antacid suppressant ... 97.4% switched to a PPI. Among non-ranitidine H2RB users who switched, only 52.2% switched to a PPI. Given these findings, we believe there is some inherent difference in those patients who were prescribed non-ranitidine H2RBs." Kumar (2021)) *supra* note 153, at 7. An "inherent difference" defeats the purpose of an active comparator study.

[262] For example, in the Adami data set, H2RAs other than ranitidine stopped being sold appreciable numbers in 2007, dropping to 0 in 2010. The study is comparing ranitidine users post-2008 with H2RA users pre-2008.

words, in comparing ranitidine users to sicker PPI users, one might expect that if ranitidine *does not* cause cancer, the study should show worse outcomes in PPIs, while if ranitidine *does* cause cancer, the effects might balance out. Either way, one would not expect to see the *ranitidine* side of the study with higher risk. Here, Witte acknowledged that the PPI comparators showed ranitidine was *more associated* with bladder cancer, but still disregarded the result as invalid. That would be like saying that a high school basketball team should not play a middle school team because the teams are not comparable, then, after the teams play and the *middle schoolers win*, saying that win does not show anything about their skill level because the teams were not comparable.

Apart from the general illogic, Witte's opinion directly contradicts Cardwell's. The authors of that study said: "In this large population-based study, the use of ranitidine particularly long-term use was associated with an increased risk of bladder cancer."[263] Witte disagreed, calling it invalid.[264]

### 3.    *Witte Ignored the Limitations of Aggregate Data*

Similarly, Witte said nothing about the infirmities of the Explorys database (the studies by Kim 2021 and Mohy-ud-din 2020 relied on Explorys). That data was aggregated, containing no individual data. Researchers using Explorys cannot discern when an individual left the database (whether by dying, leaving his health system, or another reason). Data was accumulated annually, meaning whether an individual was in the database for 1 day or 365 days, it all counted as one person-year. Witte says not one word on the aggregate nature of the studies and its effects.[265]

---

[263] Cardwell (2021) *supra* note 139.

[264] Witte also failed to notice strange features of the Adami data. He acknowledged that the data in that study show GERD in 2.6% of ranitidine users and ulcers in 2.9%. Ex. 43 (Witte Dep. Tr.), 169:16-170:24. "So, what were the other 94 percent of the ranitidine users taking ranitidine for? A. I wouldn't – I don't know. I wouldn't be able to say. Q. Apparently Adami didn't know either, right? … Q. Didn't this puzzle you when you saw this? … I think that the data are the data. And the reason for why they're taking it, I mean I was interested in the comparison whether or not ranitidine was associated with cancer." *Id.* at 170:23-171:19. This frankly impossible statistic casts doubt on the other data in that study, and should have prompted Witte to "attempt to independently verify the accuracy of those figures." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1360 (N.D. Fla. 2018)

[265] The dataset has counter-intuitive implications. For example, Figure 2 of the Y. Kim study shows that the incidence per 10,000 persons for all cancers goes down each year as the database increases in size each year. Even Defendants' other expert witnesses *discussed* the limitations inherent in the aggregate data. Not Witte.

### D.    Witte Conducted an Unreliable and Unhelpful Bradford Hill Analysis

There is no question that "consideration of the Bradford Hill factors is a reliable method for determining causation." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1130 (N.D. Cal. 2018). Witte's report claims that he performed a Bradford Hill analysis, but the extent of that analysis is one-and-a-half pages of conclusory analysis. Ex. 22 (Witte Rep.), at 27-28. He mentions no particular cancer in this analysis, apparently conducting Bradford Hill analysis *en masse*. Whether considered factor-by-factor or all together, Witte's Bradford Hill analysis is unreliable because of the considerable "analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. A reader cannot discern how he applies each factor, or even what data he is considering in applying them. Without those basics, the jury and Court is left with "nothing but his word and own *ipse dixit*" that applying Bradford Hill leads to the conclusions he proposes. *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1329 (11th Cir. 2022). A few examples show the facial unreliability of his analysis:

**Temporality**: the report correctly defines temporality as "exposure preced[ing] the disease outcome," Ex. 22 (Witte Rep.), at 27, but his 8-line analysis lumps all studies together then blasts *all* of them with shotgun attacks. He says only that "[m]any of the observational studies assessed ranitidine intake prior to a formal cancer diagnosis," while "[s]ome studies" "used lag times." Ex. 22 (Witte Rep.), at 27. The reader is left to guess which studies he means and how long the lag times must be. By addressing all cancers together, he fails to consider whether reverse-causality makes any sense for each of them—for example, while one can imagine taking ranitidine to alleviate gastric cancers, there is little reason to think people with undiagnosed bladder cancer would take ranitidine to alleviate symptoms (since ranitidine does not treat any bladder cancer symptoms).

**Consistency**: On this criterion, Witte says only: "RRs substantially vary with some being below, equal, or greater than 1." Ex. 22 (Witte Rep.), at 27. Bradford Hill said, "I would myself put a good deal of weight upon similar results reached in quite different ways,"[266] but Witte departs from that wisdom. He says *only* to look at H2RA active comparator studies, and entirely discounts NDMA-specific studies, dietary studies, occupational studies, and animal studies—it is no surprise, then, that in evaluating this criterion he says nothing about different kinds of evidence,

---

[266] Bradford Hill (1965), *supra* note 229.

but gestures vaguely at "RRs" for unspecified studies for unspecified cancers.

**Specificity**: After deciding to embark on an all-cancer Bradford Hill analysis, Witte attacks that choice on the specificity prong because "cancer is not a single disease." Ex. 22 (Witte Rep.), at 27. No one required Witte to conduct an analysis on all cancer.

**Plausibility**: Witte knows that ranitidine degrades into NDMA, and NDMA is a "probable carcinogen," Ex. 22 (Witte Rep.), at 27, but resists acknowledging the conclusion: it is surely *plausible* that the NDMA in ranitidine is also carcinogenic. The analysis skips around from deferring to "other expert reports" to criticizing the "very narrow laboratory conditions" of animal studies, and concludes "[i]f there exist potential human exposures [to NDMA] via ranitidine, these *may be* at a much lower level or overshadowed by NDMA exposures from … other sources." Ex. 22 (Witte Rep.), at 28 (emphasis added). This section is self-professed speculation and does not engage with the biological mechanisms that render causation plausible, which is the point of this criterion.

**Coherence**: Witte correctly states that coherence is about "substantive knowledge," but then conflates it with consistency, reducing the criterion to "agreement among different studies." Ex. 22 (Witte Rep.), at 28. But Bradford Hill gave the examples of "histopathological evidence from the bronchial epithelium of smokers and the isolation from cigarette smoke of factors carcinogenic for the skin of laboratory animals"[267]—in other words, *substantive knowledge* about what is *in* smoke and *in* a smoker's lungs, unrelated to observational studies, that make the evidence of smoking causing cancer cohere. Here, that might mean, for example, evaluating whether NDMA causes only cancer type x, but ranitidine causes only cancer type y (i.e., the evidence is not coherent)—or vice versa (the cancers are aligned, showing coherence). Witte simply parroted his "no-association" claim again.

**Analogy**: Rather than consider any analogies, Witte disagrees with the methodology he purports to apply: "This criterion may have limited value since it can be applied in a speculative manner." Ex. 22 (Witte Rep.), at 28.

Apart from the unreliability of Witte's drive-by assessment, it should be excluded under *Daubert* because it will not help the jury. On helpfulness, courts determine "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in

---

[267] Bradford Hill (1965), *supra* note 229.

resolving a factual dispute." *United States v. Castaneda*, 997 F.3d 1318, 1330 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 591). A Bradford Hill analysis of all cancers will not be tied to the facts of any bellwether trial, because the jury will be evaluating one specific cancer. The failure to break out Bradford Hill criteria per-cancer infects the entire analysis, since it allows Witte to conflate what he claims are deficiencies in "some" studies or "many" studies, and tar every cancer with that brush, even if the same critiques would not apply to studies conducted for that cancer.

## II.     Andrew Chan

Andrew Chan offered one opinion: that "the epidemiological evidence does not support a conclusion that ranitidine has a true association, let alone a causal relationship, with any type of cancer, including cancers of the stomach, esophagus, pancreas, liver, and bladder." Ex. 2 (Chan Rep.) at 162.

### A.     Chan Ignored NDMA Science

The key question in this case is whether NDMA in ranitidine caused Plaintiffs' cancer. Even though Defendants admit their ranitidine degrades into NDMA, Chan testified that there was originally "no basis [for him] to review" NDMA epidemiology studies. Ex. 25 (Chan Dep. Tr.) at 34:1-15; Ex. 2 (Chan Rep.) at 4 (same). Why? According to him, those studies were "not relevant[,]" Ex. 25 (Chan Dep. Tr.) at 119:17-19, and he lacked "the specific expertise to do that sort of review[.]" *id*. at 41:3-4. NDMA is not "relevant"—according to Chan—even though Chan himself testified that a "reasonable degree of scientific certainty" requires an expert to consider "the totality of the evidence[.]" *Id*. at 29:13:17. Because Chan ignored the NDMA epidemiology, he offers no opinion on the carcinogenicity of NDMA, even though NDMA is crucial to the causation analysis and biological plausibility. *See id*. at 45:13-15 ("[C]ertainly there is no specific section in my report I devoted to that topic [*i.e.*, the biological plausibility evidence regarding NDMA in human cancer].")". But Chan cannot, and this Court cannot, merely accept Chan's conclusion that NDMA epidemiology is "irrelevant": rather, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). *See also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("[T]he expert's bald assurance of validity is not enough."). In ignoring this wide swathe of epidemiology, Chan erred.

Chan erred even further, however. In his deposition, Chan demonstrated a lack of rudimentary understanding of NDMA's danger. Specifically, he misrepresented IARC's position:

> [I]n my review of what's been stated in IARC's report, they have
> made their opinion that there is evidence in the animal literature,
> specifically rodents, that NDMA at high doses in [] rodent models
> can be genotoxic. I don't believe, however, [that IARC] have stated
> anywhere that there is evidence in human studies that [] NDMA is
> genotoxic in humans.

Ex. 25 (Chan Dep. Tr.) at 115:22-116:4. This is wrong twice over. As early as 1978, IARC found
that NDMA "is carcinogenic in all animal species tested" including "mice, rats, Syrian golden,
Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and
frogs."[268] NDMA induces "malignant tumours following its administration by various routes,
including ingestion and inhalation, in various organs in various species" including tumours "of the
liver, kidney and respiratory tract." *Id*. Moreover, the World Health Organization determined that
"[b]ased upon laboratory studies in which tumours have been induced in all species examined at
relatively low doses, NDMA is clearly carcinogenic."[269] The NTP has found that NDMA "caused
tumors in numerous species of experimental animals, at several different tissue sites, and by
several different routes of exposure" including liver, kidney, lung, ovary, digestive glands,
hematopoietic system, blood vessels, and nasal cavity.[270]

Maybe most egregiously misleading was Chan's remark that IARC has not "stated
anywhere that there is evidence in human studies [] NDMA is genotoxic in humans." Ex. 25 (Chan
Dep. Tr.) at 116:2-4. IARC has classified NDMA as a "probable human carcinogen."[271] As early
as 1981, NTP classified NDMA as "reasonably anticipated to be a human carcinogen."[272] NTP
further concluded that several human epidemiological studies have "reported dose-related
associations, some statistically significant," between NDMA "and oropharyngeal cancer, stomach
cancer, esophageal cancer, or colorectal cancer."[273] Similarly, in 2002 WHO concluded that the

---

[268] IARC 1978, *supra* note 7, at 151.

[269] Liteplo, *supra* note 17, at 4.

[270] NTP 15th Report, *supra* note 165, at 7.

[271] IARC, List of Classifications, https://monographs.iarc.who.int/list-of-classifications.

[272] NTP 1981, *supra* note 8.

[273] NTP, *2021 Report on Carcinogens, Fifteenth Edition, N-Nitrosodimethylamine*,
https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf (citing De Stefani et al., *supra*,
note *165* (for oropharyngeal cancer); La Vecchia, *supra* note 169; Pobel et al., *supra* note 88;
Larsson (2016), *supra* note 169 (for stomach cancer); Lu et al., *Determination of N-nitrosamines
in Gastric Juice and Urine and a Comparison of Endogenous Formation of N-Nitrosoproline and
Its Inhibition in Subjects from High- and Low-Risk Areas for Oesophageal Cancer*, 84 IARC Sci.

human epidemiological "data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer" and "[t]he weight of evidence of the carcinogenicity of NDMA in mammalian species is consistent and convincing" therefore "NDMA is highly likely to be carcinogenic to humans." World Health Organization (2002) at 23.

What's more, Chan's failure to account for NDMA contradicts his past practice: in Chan's previous studies, he took great care to account for the biological plausibility of the various illnesses he studied.[274] Indeed, Chan admitted that addressing biological plausibility is "standard practice in the field" of epidemiology. Ex. 25 (Chan Dep. Tr.) at 42:10. Chan nonetheless failed to abide by that standard practice: his report is devoid of any detailed discussion of NDMA as a biological mechanism for cancer.

In sum, the FDA found NDMA in Defendants' ranitidine—yet Chan devoted no time to researching the epidemiology of NDMA for the initial draft of his report. *See* Ex. 2 (Chan Rep.) at 5 ("Nonetheless, because Plaintiffs' experts have selectively cited studies (and findings from studies) related to an association between dietary or occupational NDMA and cancer outcomes, I have systematically reviewed the entire body of epidemiological literature on NDMA[.]"). Rather, he only reviewed the NDMA epidemiology for his report after Plaintiffs' experts did so. In other words, Chan was biased from the start. By refusing to review a single NDMA epidemiology study at the beginning, and by blindly deferring to a (factually inaccurate) position of IARC, Chan ignored a huge swath of the scientific literature relevant to causation. His opinion lacks reliability as a result.

### B.    Chan's Limited Review of the Ranitidine Epidemiology Was Flawed.

After tossing aside all the NDMA epidemiology, Chan then undertook a flawed review of

---

Publ. 538 (1987); Rogers et al., *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cancer*, 4 CANCER EPIDEMIOL. BIOMARKERS & PREV. 29 (1995) (for esophageal cancer); Knekt P et al., *Risk of Colorectal and Other Gastro-intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: a Follow-up Study*, 80 INT'L J. CANCER 852 (1999) (for colorectal cancer)).

[274] *See* Kwon *et al.*, *Association Between Aspirin Use and Gastric Adenocarcinoma: A Prospective Cohort Study*, Am. Ass'n Cancer Res. at 270 (2022) ("Our findings are biological plausible."); Nguyen *et al.*, *Antibiotic use and the Development of Inflammatory Bowel Disease: a National Case/Control Study in Sweden*, LANCET GASTROENTEROL. HEPTAOL. (2021) at 8 ("Our primary findings are biologically plausible."); Andrew T. Chan, *et al.*, *Long-term Use of Aspirin and Nonsteroidal Anti-inflammatory Drugs and Risk of Colorectal Cancer*, JAMA (2005) at 9 ("Finally, our findings have strong biological plausibility[.]").

the ranitidine epidemiology. Chan summarized his methodology as follows:

> I applied my understanding of the principles that were used in the studies and their results and was able to come up with my own opinion as to the validity of each study. Taking all those studies together in aggregate, I was then able to reach [my opinion].

Ex. 25 (Chan Dep. Tr.) at 31:22-32:2. Put simply, Chan employed a two-step methodology: (1) he evaluated the human ranitidine studies (and *only* the human ranitidine studies) one at a time, and then (2) he assessed the signal that the studies showed, in aggregate. Under this method, however, Chan will only reach an accurate conclusion if he evaluates the totality of the relevant underlying studies, and if he evaluates that totality of studies effectively. As previously noted, Chan did not evaluate the totality of the relevant underlying studies: he ignored the NDMA epidemiology. His end conclusion is thus spoiled from the start.

But, even if Chan could effectively render an opinion based on human ranitidine epidemiology alone, Chan still failed to effectively evaluate the few studies he did consider. Indeed, in the studies that he evaluated, Chan failed to account for (1) frequency and duration of exposure to ranitidine, (2) latency. In doing so, Chan routinely violated his own professed methodology and past practices.

### 1.   Chan Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs

IARC has described frequency of exposure as a "universally relevant" factor to account for in any study. *See* IARC Preamble, *supra* note 126, at 15. During his deposition, Chan repeatedly acknowledged that, for an epidemiology study to be valid, it must accurately capture exposure. *See, e.g.*, Ex. 25 (Chan Dep. Tr.) at 99:8-13 ("In an epidemiological study . . . if you're able to adequately differentiate someone who's exposed versus unexposed, that's the critical question."). IARC has also described duration of exposure as a "universally relevant" factor to account for in any study. *See* IARC Preamble, *supra* note 126, at 15. Similarly, the Reference Manual notes that "[t]he need to understand exposure is a central topic in . . . epidemiology[,]" Federal Judicial Center & National Research Council, *Reference Manual on Scientific Evidence* (2011) at 505, and that, to reliably draw a conclusion, an epidemiologist needs "suitably large groups of individuals exposed for a sufficient period of time," *id*. at 660 n.74. In his deposition, Chan also acknowledged the significance of this factor. *See, e.g.*, *id*. at 66:17-19 ("[Y]ou would want to assess whether [] there was sufficient duration of exposure and follow-up to plausibly connect the two things.").

And throughout his own published studies, Chan has also repeatedly emphasized the importance of accurately measuring frequency and duration of exposure.[275]

Yet despite IARC's acknowledging the importance of frequency and duration of exposure in its monograph, Chan's acknowledging the importance of frequency and duration of exposure in his deposition, and Chan's acknowledging the importance of frequency and duration of exposure in his own published work, Chan failed to account for study participants' frequency and duration of exposure to ranitidine when he evaluated the human ranitidine epidemiology studies. He testified that "the studies that are looking at the exposure of interest, in this case ranitidine, may have different ability to assess that exposure[.]" Ex. 25 (Chan Dep. Tr.) at 78:1-4. But in fact, "[i]n the case of ranitidine, I don't really understand how exposure levels would be defined." Ex. 25 (Chan Dep. Tr.) at 103:13-14. Pressed further, Chan fell back on the Adami study, relying on the assumption that "the number of prescriptions" (*i.e.*, ten prescriptions) might "give[] us a very good indicator of intensity of exposure and duration of dose." *Id*. at 104:5-9; *see also* Adami (2021), *supra* note 132. He assumed that the Adami study participants who had filled ten prescriptions had "used [ranitidine] two or three times a day on a daily basis" for ten years at least. *Id*. at 127:11-13. He even went so far as to describe the Adami study as the "gold standard" of epidemiology. *Id*. at 173:11-14.

But Chan's many assumptions about the Adami study go unsupported: Chan himself

---

[275] *See* Chan *et al.*, *supra* note 274, at 8 (describing a five-year duration of aspirin treatment as "short"); Kwon *et al.*, *supra* note 274, at 270 ("[W]e had detailed information for aspirin use including dose, duration, and consistency of use."); Nguyen *et al.*, *supra* note 274, at 7 ("[T]his possible risk association appeared greater with more frequent use of broad-spectrum antibiotics[.]"); Babic *et al.*, *Acid-suppressive medications and risk of colorectal cancer; results from three large prospective cohort studies*, British Journal of Cancer (2020) at 850 ("This study has several limitations. Since the questionnaire asked about 'regular use' of the acid-suppressive medications in the previous 2-year cycle, without specifying the dose or frequency, we were not able to investigate a more precise dose-response relationship between acid-suppressive medication use and colorectal cancer.); Eva S. Schernhammer *et al.*, *A Prospective Study of Aspirin Use and the Risk of Pancreatic Cancer in Women*, J. NAT'L CANCER INST. (2004) at 27 ("Furthermore, multiple measures of aspirin use minimize the potential impact of such error and allow us to assess the effects of duration of aspirin use on pancreatic cancer risk."); Khalili *et al.*, *Use of proton pump inhibitors and risk of hip fracture in relation to dietary and lifestyle factors: a prospective cohort study*, BMJ (2012) at 2-3 ("In 2000, a supplemental questionnaire that inquired about the frequency, severity, and duration of heartburn and acid regurgitation was sent to 11,080 participants…. We considered the possibility that women who reported use in 2000 had probably used PPIs for varying durations.").

admitted that the Adami study did not "specif[y] the number of pills in each prescription[,]" *id*. at 127:5-6, and that it did not "have any specific information on the number of pills or the frequency [of use]," *id*. at 130:5-7. Moreover, by relying on prescription count alone, Adami fails to account for switching between H2 blockers or PPIs—something that Chan acknowledged. *See id*. at 81:21-24 ("It depends on how long, [] how often people switch, what drugs they're switching to, you know, [] what's the plausible association that you're trying to study."); *id*. at 180:5-9 ("I think there are well-established studies that have shown that PPI use has increased over time, and H2RB use has decreased over time, and that's probably . . . the possibility that some people on H2RBs do switch over to PPIs, particularly during the last decade or so when PPIs, you know, have become available more broadly[.]"). Even if one assumes that the ten prescriptions were for 30-days each, Defendants' other experts reluctantly admit that the maximum exposure measured in the Adami study would equate to just 10 months of exposure to ranitidine and the NDMA within it. *See* Ex. 40 (Terry Dep. Tr.) at 350:6-20. There is no basis to assume that a patient who fills ten ranitidine prescriptions took ranitidine for ten years. As Chan admitted, the Adami study does not even quantify the length of the prescriptions—whether they were 10-day, 30-day or 90-day prescriptions (nor whether patients consumed the drugs).

And, to further underscore Chan's error on the "duration of use factor," he also misrepresented another one of the key studies he relied upon in forming his opinion: Chan testified that Kantor was a study that "report[ed] a relative risk for ranitidine use of five or more years[,]" *id*. at 105:4-13—yet that report itself stated that "[e]xposure was self-reported and we were unable to examine associations by dose or distinguish long- vs short-term use[,]" Kantor, *supra* note 143, at 1859. Put simply, none of the human ranitidine studies that Chan considered examined exposure duration or frequencies like that of Plaintiffs in this litigation. Indeed, the longest duration of use measured in a study was 3 years—and that study showed a statistically significant association between bladder cancer and ranitidine consumption. *See* Cardwell *supra* note 139. By reflexively applying the studies anyway with no explanation of the gap, Chan erred.

2.    *Chan Ignored How Short His Preferred Studies' Follow-Up Periods Were*

Chan also needed to account for the follow-up period of each study that he reviewed. On this point, IARC has concluded that "[e]xperience from studies of cancer in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years; therefore, latency periods substantially shorter than about 30 years cannot provide evidence

of lack of carcinogenicity." IARC Preamble, *supra* note 126, at 22. The Reference Manual, again, agrees. *See* Reference Manual at 660 n.74 (noting that one of "the difficulties in conducting cancer epidemiology studies" is the "long latency periods between exposure and manifestation of disease"). This makes sense: a person who smokes a pack of cigarettes is not going to contract lung cancer a month later. It takes time to contract cancer from a toxin. Chan, again, emphasized the importance of latency at his deposition. *See, e.g.*, Ex. 25 (Chan Dep. Tr.) at 67:1-5 ("[Y]ou would want to ensure that the participants . . . were followed for a time period in which cancers [] could be expected to be developed as a result of that exposure."). And he, again, emphasized the importance of latency in his past work.[276]

Nonetheless, Chan failed to account properly for latency when he formed his opinion. In fact, he admitted that "I don't know that we have any data to go on to define what th[e] latency is, either the minimum or [] maximum of that latency period" for "the context of ranitidine[.]" And this tracks: no one yet knows the latency period for ranitidine because studies with the recommended follow-up time have not yet been conducted. By hand-waving away this significant factor, Chan erred.

***

NDMA epidemiology is fundamental to this case. And frequency of exposure, duration of exposure, and latency are three of the most important factors to consider when evaluating epidemiological literature. And yet, at every turn, Chan failed to account for these things when he

---

[276] *See* Chan *et al.*, *supra* note 274, at 8 ("[O]ur present study suggests that a statistically significant benefit against cancer is evident only after a decade of use, consistent with other studies. . . . Taken together, these data are consistent with our present understanding of the latency underlying the adeno-carcinoma pathway[.]"); *see also* Babic *et al.*, *supra* note 275, at 844 (emphasizing that "a potential biological link between acid-suppressive medications and colorectal cancer" had "not been sufficiently investigated in epidemiological studies" because "previous studies had important limitations" like "a relatively short duration of follow-up."); *id.* at 847-49 ("Colorectal cancer has a long latency period of 10 or more years, and a long latency period was required to observe the protective effect of aspirin in prospective cohort studies."); Xuehong Zhang *et al.*, *Calcium intake and colorectal cancer risk: Results from the nurses' health study and health professionals follow-up study*, International Journal of Cancer (2016) at 2241 ("This finding suggested that the latency for CRC associated with calcium intake is about 10 years, which is similar to the progression time of adenomas that develop into cancers."); Mingyang Song *et al.*, *Nutrients, Foods, and Colorectal Cancer Prevention*, Gastroenterology (2015) at 2 (noting the "prolonged latency period required for carcinogenesis"); Schernhammer *et al.*, *supra* note 275, at 22 ("We conducted a prospective study in a large cohort of women with 18 years of follow-up and detailed period assessment of aspirin use[.]").

evaluated studies. Chan offers the (unequivocal) opinion that ranitidine does not cause cancer—and yet, by failing to consider the NDMA epidemiology and by failing to consider fundamental epidemiology factors, Chan failed to base that opinion on sound epidemiology. His opinion is unreliable and the Court should therefore deem it inadmissible. *See Frazier*, 387 F.3d at 1260.

## III.   Mary Beth Terry

Dr. Mary Beth Terry's opinions are conclusion-driven. She relied upon only the data that supported the Defendants' case, and ignored the data that supported Plaintiffs' case. Terry ignored the totality of the science involving NDMA, and misquoted study authors of the science she relied on (ranitidine studies). Those authors acknowledge important limitations that bear upon their findings, but Terry either disagrees or misrepresents what the authors say. Terry's opinions are based upon unreliable methods and should be excluded.

### A.   Terry Ignored NDMA Science

Like Defendants' other experts, Terry reviewed the human ranitidine epidemiology to the exclusion of the studies on NDMA. Terry agreed that an expert must review the totality of the evidence to make a causal inference relating cancer to an exposure:

> For potential carcinogenic effects of a medication, *determining causality requires reviewing the totality of the epidemiological evidence* [and] determining the quality of the individual studies ….

Ex. 19 (Terry Rep.) at 20 (emphasis added). A multitude of studies show that NDMA causes cancer in humans (and, indeed, nearly all animals). Yet Terry did not consider any studies on NDMA. So by her own admission, her opinions do not reflect her stated methodology.

### B.   Terry Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported by the Human Ranitidine Studies

#### 1.   Terry Extrapolated Beyond the Low Exposure in Ranitidine Studies to Plaintiffs

Terry's methods disregard missing data on dose and long-term use. For example, Terry admitted that the Explorys Database contains *no* information "on the duration that these people or groups of ten people used the actual drug," Ex. 40 (Terry Dep. Tr.), at 182:19-24, and she admits that Explorys contains *no* information "on what the dose was that these people were taking in groups of ten," *id.* at 182:25-183:18. Terry testified that the database "doesn't do any analyses by duration or by…intensity of the exposure," *id.* at 184:8-15, nor does it include *any* information regarding "number of prescriptions," *id.* at 182:25-183:18. Nonetheless, Terry validates the studies

relying on the database: "[T]he database actually has valid capture of those cancer outcomes[.]" *Id.* at 190:1-11. So, in Terry's view, cancer outcomes can be determined without measuring the exposure to the cancer causing agent. She ignores the lack of exposure data, and gives considerable weight to the Explorys studies. This is a leap of faith with no scientific basis.

For example, Terry relies heavily on the Adami and Norgaard studies—which, for the reasons already addressed, are fundamentally flawed. She admits that the Adami authors also did not measure ranitidine exposure duration but that approximately 50% of the subjects had only one prescription. She acknowledged that the Norgaard authors required subjects to have only taken "two prescriptions of ranitidine." Ex. 40 (Terry Dep. Tr.), at 294:3-8. Adami and Norgaard also do not account for over-the-counter use (OTC), yet Terry dispatches the OTC concern in two sentences, one on page 51 and one on page 53 of her report, without ever mentioning whether she looked at the supplemental tables. Terry rationalizes the lack of exposure data by saying "the power of this design is that *it doesn't have to state* [prescription use duration] to look at whether or not there's correlation between regular use and the cancers that are being assessed," *id.*, however there is no reliable, scientific or mathematical basis for such *presumption*. Assigning great weight to studies with little exposure information yields unreliable results.

Further, Terry admits that the Iwagami study, which measured ranitidine and nizatidine combined, has *no* separate data on the duration that subjects took ranitidine. *Id.* at 301:1-22. She ignores the fact that, in Iwagami, *only* 0.4% of the ranitidine or nizatidine users took ranitidine or nizatidine for more than two years, while more than 96% took one of the drugs for six months or less. *See* Adami (2021), *supra* note 132; Ex. 40 (Terry Dep. Tr.), at 344-345, 347. Terry testified that the Kantor study considered regular exposure for no more than four weeks. Ex. 40 (Terry Dep. Tr.), at 293:7-15. Terry devalues more robust studies on NDMA, in favor of studies with little information—one of which (Adami) had two authors who were consultants for one of the Brand defendants in this litigation.

2.      *Terry Ignored How Short Her Preferred Studies' Follow-Up Periods Were*

Terry reports that there is a "long induction time"—"sometimes *a decade or more*"— between exposure and cancer onset. Ex. 19 (Terry Rep.), at 19. She acknowledged at her deposition familiarity with the IARC preamble, which states that "follow-up periods for cancer sometimes need to be 20 or 30 years." Ex. 40 (Terry Dep. Tr.), at 154:12-155:3. Referring to cancer studies, she testified that "it's always better to have longer follow-up time." *Id.* at 158:24-159:16. Despite

this recognition, Terry applies inconsistent methods in her review of the ranitidine versus active comparator studies. Terry *only* acknowledges short follow-up as an actual limitation in *one* post-2019 active comparator study, although nine of the eleven post-2019 active comparator studies had follow-ups *less than* ten years.

Terry's reference to *Yoon* is a clear example of her creative editing. Terry states in her report: "The overall cohort was followed for 7 years, which the authors noted may not be sufficient to assess the onset of cancer." Ex. 19 (Terry Rep.), at 39. But the *Yoon* authors did not hedge their evaluation of follow-up time. Rather, they stated, categorically, that "the overall follow-up period is not long enough to assess the onset of cancer. Yoon *supra* note 157, at 7. Terry further mischaracterized the Yoon authors' discussion of the limitations of their study. The Yoon authors thought their study suffered from a "lack of information about potential confounders of cancer, such as smoking and underlying diseases other than DM." *Id.* But Terry never mentions this concern. Instead, she highlighted the Yoon authors' concerns that "[they] were not able to specifically quantify NDMA content, and medication compliance was not known." Ex. 19 (Terry Rep.), at 40. Terry thus ignored the concerns that hurt her opinion, and emphasized the concerns that helped her opinion. Terry's report is replete with similar subtle evidentiary misrepresentations.

Terry's best rationale is that it is possible for "some cancers" to occur in shorter time periods, though others have "a latency time of ten or 20 years" and she "doe[sn't] know" "exactly what the latency is for any individual cancer." Ex. 40 (Terry Dep. Tr.), at 159:6-16. Terry does not opine that longer follow-up times would *not* detect more cancers. Terry assumed, without any basis, that longer follow periods would not show increased risks. Terry's best rationale for applying significant weight to the comparator studies amounts to pure speculation and *ipse dixit*, with err on the side of Defendants.

### C.   Terry Ignored Confounding Factors in Studies She Favored

In her report, Terry is inconsistent in the way she considers important confounders like smoking. In her deposition she testified:

> Q. You mentioned several times in your report how important it is to account for smoking in these studies, right? …
> A. Yes, absolutely.· In fact, we often teach that in cancer epidemiology agent smoking are the most important things to adjust for ….

Ex. 40 (Terry Dep. Tr.), at 161-62. The Yoon study was one of the studies Terry relied on as a

basis for her opinion. The Yoon study has no information on smoking. Terry does not even mention this absence of information on smoking, despite the importance of smoking as a confounder. Ex. 40 (Terry Dep. Tr.), at 171. The Yoon authors themselves state that the lack of smoking data is an important confounder not accounted for. Ex. 40 (Terry Dep. Tr.), at 161-164. Two other studies that Terry cites to support her opinions, Adami and Norgaard, had no information on smoking. Ex. 40 (Terry Dep. Tr.), at 223. Terry admitted that the word "smoking" was not mentioned in her summary of Adami. Ex. 40 (Terry Dep. Tr.), at 224. When asked at her deposition whether the Norgaard authors had "information on smoking," Terry avoided the question, pointing to the study having used "propensity score matching," Ex. 40 (Terry Dep. Tr.), at 223:2-224:14. Norgaard has no information on smoking. Propensity score matching, alone, does *not* control for confounding: While propensity score matching is a tool used to minimize confounding, information must be available concerning possible confounders for effective matching to be possible.

Contrast the above with how Terry treated the Cardwell study. Cardwell had smoking information on 75-80% of the study subjects, and did sensitivity analyses regarding both smoking and alcohol use. Cardwell *supra* note 139. Yet in her discussion of Cardwell, Terry said, "Further, the incomplete information on smoking history may have impacted the study's findings. Smoking is a known risk factor, estimated to account for approximately 50% of bladder cancer cases in adults (Islami 2018)." Ex. 19 (Terry Rep.) at 44.

Why the disparate treatment? Why not call out Yoon, Norgaard and Adami for their lack of information on smoking, probably the most important confounding factor. Terry consistently avoids or minimizes the weaknesses and limitations of the studies that support her opinions. When it comes to studies like Cardwell that show exposure to ranitidine increases risk, she devalues them for having "incomplete" smoking information, even though the authors had 75-80% smoking history and did sensitivity analysis to assure the missing 20-25% did not affect the results. There can be only one reason for this disparate treatment. To reach her opinions Terry had to promote the studies that support her opinion and degrade those that don't. If studies that support her opinions lack smoking data, no problem. If a study runs against her opinions, then smoking "could have impacted the study's finding."

**D.    Terry's Opinions Are Unreliable Because She Applies Inconsistent Methodology to NDMA Case Control Studies**

In 2017, Terry gave a lecture entitled "population based approaches to studying cancer."

*See* Ex. 68. In that lecture Terry said:

> There's many situations where obviously population based approaches are really completely sufficient and case control studies, in particular, are, the hallmark feature is they are the most efficient kind of design and in many ways if they can be executed really are sort of the best design because they capture the complete exposure period throughout life which sometimes cohorts are incomplete when capturing exposures moving forward and backward and so the design itself is a very useful design in particular when we want to generalize to all cases and case control studies do have that advantage that they really do have complete capture of all cases if designed that way whereas cohorts really by design are picking up the earlier cases first. *Id.*

This portion of the lecture had a slide presentation which was captioned: "In many situations, population-based studies are sufficient and efficient." *Id.* Terry also provided a list of some commonly known cancer-causing agents including tobacco, asbestos, HPV, DES and vinyl chloride. She stated:

> Nobody would debate, most of these, if not all of these, the main evidence came from case control studies, and most of these, well all of these actually , were all observational studies that found those and they were all done in average risk populations.

Ex. 40 (Terry Dep. Tr.), at 83. Yet despite cheering on case control studies earlier, Terry degrades the value of them in her report. She describes the NDMA dietary case-control studies as limited and subject to "selection bias" and "recall bias," requiring validation by cohort studies. Ex. 19 (Terry Rep.) at 83. With respect to ranitidine studies, Terry's new tune is "[T]he case-control studies are not consistent with the cohort studies, and therefore recall bias cannot be ruled out as an explanation for [NDMA-cancer associated] findings." *Id.* Instead of looking carefully at each study to determine its strengths and weaknesses Terry dismisses or devalues a class of evidence to meet her predetermined outcome.

The same inconsistency applies to design of the study (case-control versus cohort), lack of exposure information, and short follow up period. If the study results do not support her opinions, Terry downgrades the studies. But if the study results support her opinions, Terry ignores limitations and weaknesses. Terry's inconsistency raises the serious concern that her methodology was "contrived to reach a particular result." *Rink*, 400 F.3d at 1293. That renders it unreliable and inadmissible.

IV.     **Michael Vaezi**

Michael Vaezi offered two opinions: (1) that ranitidine "is a safe and effective medication" and (2) that the "epidemiological evidence does not support a reliable association or causal relationship between ranitidine and any type of cancer[.]" Ex. 20 (Vaezi Rep.) at 61. Although Defendants emphasize Vaezi's qualifications, "under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1260. Indeed, Vaezi's qualifications "are by no means a guarantor of reliability." *Id*. For the foregoing reasons, Vaezi committed multiple errors that render both of his opinions unreliable. The Court must therefore exclude those opinions.

A.     **Vaezi Ignored All NDMA Epidemiology**

Despite the obvious significance of NDMA to this litigation—and despite admitting that the FDA found NDMA in Defendants' ranitidine, *see* Vaezi Dep. Tr. at 263:5-10—Vaezi testified under oath that he never once reviewed a single NDMA epidemiology study. Why? According to him, those studies were "irrelevant, so [he] didn't pursue [them] any further[.]" *See* Vaezi Dep. Tr. at 77:25-78:1. *See also id*. at 260:19-22 ("My answer would be again it's irrelevant."). When pressed, Vaezi tried to justify his decision by appealing to authority. Per Vaezi, he did not need to review any NDMA epidemiology because IARC, the EPA, and the National Toxicology Program ("NTP") had already reviewed the carcinogenicity of NDMA *for* him. *Id*. at 67:18-22. Further review would therefore "waste [his] time[.]" *Id*. at 69:22-25.

But Vaezi did not actually defer to those authorities. Vaezi lacked even a rudimentary understanding of the policies that IARC, EPA, or NTP employ. He did not know the last time IARC undertook a peer review to classify NDMA as a carcinogen, Ex. 41 (Vaezi Dep. Tr.) at 249: 19-25, the last time NTP classified NDMA as a carcinogen, *id*. at 250:8-11, nor the process by which NTP classifies carcinogens (and whether that process even involves peer review), *id*. at 250:15-16, 19-22. What's more, Vaezi misrepresented the positions of these agencies. He repeatedly stated that IARC, EPA, and NTP had only found NDMA to cause liver cancer in rats at high doses. *See, e.g.*, *id*. at 76:12-17. This is wrong twice over. As early as 1978 IARC found that NDMA "is carcinogenic in all animal species tested" including "mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and

frogs."[277] NDMA induces "malignant tumours following its administration by various routes, including ingestion and inhalation, in various organs in various species" including tumours "of the liver, kidney and respiratory tract." *Id*. Moreover, the World Health Organization determined that "[b]ased upon laboratory studies in which tumours have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic."[278] The NTP has found that NDMA "caused tumors in numerous species of experimental animals, at several different tissue sites, and by several different routes of exposure" including liver, kidney, lung, ovary, digestive glands, hematopoietic system, blood vessels, and nasal cavity.[279]

Vaezi erroneously testified that these three organizations had concluded, definitively, that NDMA does not cause cancer in humans. *See* Vaezi Dep. Tr. at 67:18:22 ("IARC, EPA, [NTP], they've looked at this data, and they've all landed on the same thing that I'm talking about, that in humans, no [cancer], but again – definitely no, but in animals, only liver at high doses in rodents."). Vaezi is, *completely* wrong. IARC has classified NDMA as a "probable human carcinogen."[280] As early as 1981, NTP classified NDMA as "reasonably anticipated to be a human carcinogen."[281] NTP further concluded that several human epidemiological studies have "reported dose-related associations, some statistically significant," between NDMA "and oropharyngeal cancer, stomach cancer, esophageal cancer, or colorectal cancer." *Id*.[282] Similarly, in 2002 WHO concluded that the human epidemiological "data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer" and "[t]he weight of evidence of the carcinogenicity of NDMA in mammalian species is consistent and convincing" therefore "NDMA is highly likely to be carcinogenic to humans." World Health Organization (2002) at 23.

In sum, the FDA and Defendants' own testing found NDMA in Defendants' ranitidine— Vaezi knew this, yet devoted no time to researching the epidemiology of NDMA. He justified this methodological decision by claiming that authoritative bodies had concluded NDMA does not cause cancer in humans, but only causes "liver cancer in rats at high doses." That is, to understate

---

[277] IARC 1978, *supra* note 7, at 151.
[278] NTP 15th Report, *supra* note 165, at 7.
[279] NTP, *2021 Report on Carcinogens, Fifteenth Edition, N-Nitrosodimethylamine*, at 7 (2021) https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf.
[280] IARC, List of Classifications, https://monographs.iarc.who.int/list-of-classifications.
[281] NTP 1981, *supra* note 8.
[282] *See* sources cited *supra* note 273.

matters, *not* what those authorities say, and so Vaezi's decision to ignore the NDMA studies is unsupported, and unsupportable. By refusing to review a single NDMA epidemiology study, and by blindly deferring to (factually inaccurate) positions of IARC, EPA, and NTP, Vaezi ignored a huge swathe of the scientific literature relevant to causation. His opinions lack reliability as a result.

### B.     Vaezi's Limited Review of The Ranitidine Epidemiology Was Severely Flawed

After tossing aside all the NDMA epidemiology, Vaezi then undertook a flawed review of the ranitidine epidemiology. He committed key errors.

Vaezi failed to account for the fact that all the ranitidine studies in humans (*i.e.*, the only studies he relied upon) measured ranitidine exposure for overly short time periods. Vaezi admitted that "all cancers" have variable latency periods (the time between exposure and diagnosis). Ex. 41 (Vaezi Dep. Tr.), at 140:25. And he admitted that a study must effectively define exposure to a toxin in terms of "timing, dose and duration of use[.]" *Id*. at 231:8-14. Yet, after admitting all this, every study Vaezi relied upon had a short window of exposure time. Indeed, the longest exposure of any such study was 3 years—and that study showed a statistically significant association between bladder cancer and ranitidine consumption. *See* Cardwell *supra* note 139.[283] By relying exclusively on studies with short exposure time—and ignoring the rest of the relevant epidemiology—Vaezi's analysis violated his own professed methodology.

In evaluating the ranitidine epidemiological studies Vaezi further erred by confusing the follow up time with the exposure period.[284] When asked if he could "identify a single ranitidine

---

[283] Vaezi also admitted that the Cardwell study authors reported an association between ranitidine and bladder cancer, however he disagreed with the authors' conclusion. Ex. 41 (Vaezi Dep. Tr.) at 204:6-13. In disagreeing, Vaezi testified that Cardwell did not show a dose-response between ranitidine and bladder cancer, *id*. at 203:1-3, even though Cardwell said that "the use of ranitidine" was "associated with an increased risk of bladder cancer" especially for those with "long-term use," Cardwell *supra* note 139 at 1.

[284] *Compare* National Cancer Institute, *follow-up*, available at https://www.cancer.gov/publications/dictionaries/cancer-terms/def/follow-up (last visited June 23, 2022) ("Monitoring a person's health over time after treatment. This includes keeping track of the health of people who participate in a clinical study or clinical trial for a period of time, both during the study and after the study ends."), *with* National Cancer Institute, *cumulative exposure*, available at https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cumulative-exposure (last visited June 23, 2022) ("The total amount of a substance or radiation that a person

epidemiological study that quantified the amount of NDMA in the ranitidine pills," Vaezi emphatically responded six times that it was "irrelevant." *See* Ex. 41 (Vaezi Dep. Tr.) at 91:7-8, 92:7-9, 93:9, 93:11, 93:13, 93:20. Vaezi asserted that it was irrelevant because the ranitidine epidemiological studies looked at ranitidine exposure for 14-16 years and determined that there was no risk of cancer. *See id.* at 94:10:15 ("I'm a clinician. I have ranitidine. I have no idea how much NDMA is in there, and I'm giving it to you. You're the patient. Well, the question then is, if that's been done over 14, 15, 16 years and no signal emerges at whatever level..."). However, this statement is simply not true. As previously mentioned, the longest exposure measured in any ranitidine study conducted and evaluated by Vaezi was 3 years. Vaezi fully displayed his ignorance when he was then asked "[w]hich ranitidine epidemiological studies evaluated ranitidine use over 14, 15 or 16 years to determine whether or not there was a signal of cancer[,]" *id.* at 94:22-25, and "What's the longest time frame of ranitidine exposure that was studied in the ranitidine epidemiological studies that you evaluated[,]" *id.* at 96:5-7. Vaezi pointed to the Adami and Yoon studies stating that "Yoon looked at it at 10 years" and "You have the Danish studies that—Adami. You have 10 to 18 years." *Id.* at 96:20-23. This is just plain wrong. While Adami followed patients for 10 to 18 years to see if they developed cancer, the maximum amount of exposure to ranitidine that was measured in Adami was only 10 prescriptions. Similarly, Yoon had a follow up time of 10 years to see if patients developed cancer, and the maximum amount of exposure to ranitidine measured in Yoon was "more than one year" between 2009 and 2011. There was no further quantification of length of ranitidine use beyond "more than 10 prescriptions" in Adami and "more than 1 year" in Yoon. *See* Adami (2021), *supra* note 132; Yoon *supra* note 157. In short, Adami and Yoon did not do what Vaezi claimed they did: he either misrepresented them, or he misunderstood them. Either way, he fundamentally erred.

Third, Vaezi made a further untenable assumption when interpreting the Adami 2021 study: namely, that if a patient fills ten ranitidine prescriptions, then they ingested ranitidine for the entire ten year follow-up period. *See* Ex. 41(Vaezi Dep. Tr.) at 246:14-23 ("[T]hey're going to be on [ranitidine] long term"—"they have chronic disease."); *see also id.* at 103:11-25 (same). By making this assumption, Vaezi unjustifiably supercharged his conclusion that Adami found no relationship between ranitidine and cancer. Nothing supports that assumption. Even if one assumes

_____

is exposed to over time. Cumulative exposure to a harmful substance or radiation may increase the risk of certain diseases or conditions.").

that the ten prescriptions were for 30 days each, Defendants' other experts reluctantly admit that the maximum exposure studied in the Adami study would equate to just 10 months of exposure to ranitidine and the NDMA within it. *See* Ex. 40 (Terry Dep. Tr.) at 350:6-20.

It errs to assume that a patient who fills ten ranitidine prescriptions took ranitidine for ten years. Even if the prescriptions were 90-day prescriptions, at most, it would mean the person was exposed to ranitidine and its NDMA for 2.5 years. And the Adami study does not even go that far: *there is nothing in it that quantifies the length of the prescriptions*—whether they were 10-day, 30-day or 90-day prescriptions.

Put simply, no one study can precisely measure how much NDMA in ranitidine any population ingested—which is why more studies are needed with much longer exposure periods (and why Vaezi needed to look at more than just human ranitidine epidemiology). In sum, Vaezi reviewed a scant number of studies, those studies all had very short exposure windows, and Vaezi loaded the dice in favor of ranitidine exposure based on flawed assumptions. Vaezi therefore erred when he categorically ruled out any association between ranitidine and cancer.

### C.      Vaezi Was Unaware of, and Misrepresented, Basic Science in This Case

Finally, Vaezi demonstrated a lack of familiarity with the basic foundational facts of this case and/or epidemiological principles. Vaezi testified that an ecological study is a study "looking at potentially ecologic exposures" for example "environmental factors that would potentially be a factor." Ex. 41 (Vaezi Dep. Tr.), at 174:15-20. This is just wrong. An ecological study is merely one which collects and looks at data in the aggregate as opposed to individual data.[285] As previously mentioned, he incorrectly testified that studies had only found NDMA to cause liver cancer, he incorrectly testified that studies had only found NDMA to cause cancer in rats, and he incorrectly testified that regulatory bodies held the position that NDMA ***definitively*** does not cause cancer in humans. On top of this, however, Vaezi also demonstrated a lack of awareness about NDMA formation itself. He wrongly testified that "there is nothing endogenous" in ranitidine that produces NDMA, even though the FDA repeatedly found NDMA in various Defendants' ranitidine and Defendants' scientists have concluded that the ranitidine molecule internally degrades[286] to form NDMA. *Id*. at 88:19-20. He was unaware that NDMA in ranitidine can increase based upon normal storage conditions, *see id*. at 248:18-19, or that NDMA in ranitidine can

---

[285] National Research Council, *supra* note 4, at 561.
[286] King (2020), *supra* note 83.

increase with time, *see id*. 248:23. And, when asked whether heat and humidity increases NDMA in ranitidine, Vaezi responded vaguely that "[t]here was a mention of that" in one study that he had read—implying, again, that he had failed to research yet another issue at the core of causation. Vaezi's lack of awareness of these foundational facts impugns the reliability of his opinions. His opinions are thus inadmissible.

## V.     Benjamin Hatten

Dr. Benjamin Hatten is an Associate Professor at the University of Colorado School of Medicine with a primary appointment in the Section of Medical Toxicology in the Department of Emergency Medicine. Epidemiology does not fall within the scope of any of his employment at any point throughout his career. He has neither conducted nor published any original research in epidemiology, on carcinogenesis, on ranitidine, or on NDMA and other nitrosamines. Ex. 33 (Hatten Dep. Tr.), at 26. Hatten nonetheless offers several striking opinions that are unsupported by sound and reliable scientific methodology. First, his opinion that NDMA has not been established as a cause of any type of cancer in humans conflicts with the unanimous consensus of expert organizations. Second, his opinion that therapeutic ranitidine use does not cause any of the designated cancers relies on a methodology that is flawed at every level.

### A.     The Court Should Exclude Hatten's Opinion that NDMA Has Not Been Established as a Cause of Any Type of Cancer in Humans

Hatten's core conclusion with respect to NDMA is that it is "not established" to cause any human cancer. Ex. 7 (Hatten Rep.) 3; Ex. 33 (Hatten Dep. Tr.), at 52. That opinion is based on an unsound and unreliable methodology and therefore should be excluded.

First, Hatten based his conclusion on a mere "ad hoc" assessment, admitting that he failed to conduct any formal epidemiological analysis to support it. The foundational methodology in epidemiology is the Bradford Hill analysis. There is no question that "consideration of the Bradford Hill factors is a reliable method for determining causation." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1130 (N.D. Cal. 2018). But Hatten performed no such formal analysis. When asked whether he "conduct[ed] a Bradford Hill analysis relating to whether or not NDMA itself is a cause" of the designated cancers, he conceded that "I think I evaluated the literature and informally applying those criteria . . . but I did not formalize an analysis within my report." Ex. 33 (Hatten Dep. Tr.), at 176. Instead, he "kind of . . . perform[ed] an ad hoc review." *Id.* at 180. *See also id.* at 166 ("I reviewed the literature, but I didn't do a specific separate causation analysis of

NDMA and bladder cancer, so I don't have a structured analysis available.").

His purported basis for failing to perform the fundamental formal analysis the field of epidemiology uses to assess causal relationships was that "performing a Bradford-Hill analysis is not necessary." *Id.* at 220. The reason he did not do that standard analysis was that, in his view, "the exposure of interest in this situation or this causal relationship is ranitidine exposure with an outcome of the five cancers of interest in this case." *Id.* at 180. He merely "think[s] there's a summary that includes the same or not all of the information," because he "didn't feel like it was additionally informative to include that in the report." *Id.* at 180-81. *See also id.* at 166 ("I reviewed the NDMA epidemiology literature, but I think the most appropriate exposure and the exposure that's of interest in this discussion is exposure to NDMA via ranitidine, and so whatever exposure occurs via ranitidine . . . is captured in these ranitidine epidemiologic studies.").

Hatten's reasoning defies both standard scientific methodology and elementary logic. He asserted a conclusion that denied *NDMA*'s causal connection to the designated cancers. He then attempted to justify his failure to conduct any sort of rigorous analysis to support that conclusion by shifting focus to the question whether *ranitidine* causes cancer—what, in his view, is really "of interest in this case." *Id.* at 180. Hatten may think that the question of NDMA's carcinogenicity is not the true focus of the case (although that too is legally and scientifically confused), but he is not free to nonetheless offer an opinion on NDMA's carcinogenicity without utilizing reliable scientific methodologies. The requirement to "testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the [*Daubert*] factors renders the expert's testimony inadmissible." *Buland*, 992 F.3d at 1151. An "expert must be able to adequately explain how the data he relied on led him to his conclusions." *MidAmerica C2L Inc.*, 25 F.4th at 1328.

Here, the only logic that supports Hatten's conclusion on NDMA's cancer-causing properties is that he did not need to use a sound scientific methodology because he did not think (in his decidedly non-expert legal view) that the conclusion he was asserting was legally important. But that inferential leap exposes a yawning "analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. The Court should "exclude [such] expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004)). "Instead of properly bridging that gap,

[Hatten] tried to ipse dixit over it; but a bald assertion cannot carry the *Daubert* burden." *United States v. Pon*, 963 F.3d 1207, 1221 (11th Cir. 2020). *See also Browder v. General Motors Corp.*, 5 F.Supp.2d 1267, 1283 (M.D. Ala. 1998) ("Without an underlying basis of support, the 'expert's' opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence.").

Compounding his lack of any reliable methodology for reaching his conclusion, Hatten's opinion conflicts with the conclusions of every major organization to have addressed the issue, and he provides no sound basis for rejecting that consensus. Hatten stated that "kind of every other body that has looked at this question has also not identified NDMA as a -- as a human carcinogen or a cause of cancer in humans and I don't think what I'm saying here is different than that, but I relied on my own evaluation of the evidence to reach that conclusion." Ex. 33 (Hatten Dep. Tr.), at 176-77. That is false.

To start, his statement directly contradicts the findings of GSK, the Defendant in this case on whose behalf he offers his opinion.[287] And it contradicts the conclusions of numerous scientific and regulatory bodies, including IARC, the EPA, the National Toxicology Program, the FDA, and the World Health Organization, all of which have recognized with some high degree of certainty that NDMA causes cancer. Hatten does not provide a coherent explanation for his divergent view, which misstates and misunderstands both the content and the evidentiary foundation for those organizations' conclusions.

For example, Hatten misunderstood IARC's purpose and processes. IARC is a specialized cancer agency of the World Health Organization. Its mission as a scientific organization is to identify the causes of cancer in humans, which it publishes in Monographs. "IARC's process for developing Monographs, which has evolved over several decades, involves the engagement of international, interdisciplinary Working Groups of expert scientists, the transparent synthesis of different streams of evidence (exposure characterization, cancer in humans, cancer in experimental animals, and mechanisms of carcinogenesis), and the integration of these streams of evidence into an overall evaluation and classification according to criteria developed and refined by IARC." IARC Preamble, *supra* note 126, at 1-2. IARC makes "no recommendations . . . in the Monographs with regard to regulation, legislation, or other policy approaches, which are the responsibility of

---

[287] Ex. 60 (GSK Hazard Assessment Report, GSKZAN0003419540).

individual governments or organizations." *Id.* at 3. After its extensive scientific evaluation, IARC classified NDMA as a "probable human carcinogen."[288]

Confronted with IARC's determination (of which he was apparently ignorant) Hatten suggested it constituted a policy recommendation rather than a scientific determination that NDMA is a probable human carcinogen:

> I think it's important to understand the context of IARC that they're not performing a -- or the statement is not opining that the general causation question of can NDMA cause cancer or is NDMA a cause of cancer in humans, they're not answering that question affirmatively. However, for regulatory purposes or public health purposes, out of caution, it is -- it may be useful to employ that. That is how I would read -- or to treat it as potential -- NDMA as potentially carcinogenic to humans and structure any protections for humans based on that. Oftentimes, public health bodies or regulatory agencies are rightly very conservative in attempt to protect the public. And even though there may not be sufficient evidence of causality, those regulations may -- may treat it practically as a cause of cancer."

Ex. 33 (Hatten Dep. Tr.) at 71-72.

This statement directly contradicts the stated purpose of IARC, as embodied in its preamble. Moreover, Hatten committed a similar error with the WHO. In 2002, the WHO concluded that there was "considerable evidence of carcinogenicity of NDMA in laboratory species," and that "NDMA is [therefore] highly likely to be carcinogenic in humans."[289] Hatten, however, could only concede that "it's possible [WHO] reached th[e] conclusion[]." Ex. 33 (Hatten Dep. Tr.) at 197. Hatten's misunderstanding both of these organization's conclusions that NDMA is a carcinogen, and the scientific basis of their determinations, renders his rejection of them unreliable.

In sum, Hatten offered an opinion that NDMA is not an established human carcinogen based on an "ad hoc" perusal of the evidence, falsely stated that his view was consistent with "every other body that has looked at this question," and, when confronted with his inaccurate statements about that consensus, attempted to explain it away as a policy rather than science. This slapdash, motivated reasoning is unreliable and should be excluded.

---

[288] *See* IARC, List of Classifications, https://monographs.iarc.who.int/list-of-classifications (last visited June 22, 2022).
[289] Liteplo, *supra* note 17.

**B.    The Court Should Exclude Hatten's Opinion that Therapeutic Use of Ranitidine Does Not Cause Esophageal, Gastric, Pancreatic, Liver, or Bladder Cancer in Humans**

Hatten's opinion that ranitidine use does not cause any of the designated cancers suffers from a cascading series of methodological errors that render it wholly unreliable. It should therefore be excluded.

First, Hatten again failed to include a formal Bradford Hill analysis in his report. With respect to his opinion regarding NDMA, Hatten conceded he never actually conducted any formal analysis. *See supra*. With respect to ranitidine Hatten *might* claim that he conducted a Bradford Hill analysis for each of the five cancers (although even that is unclear), but for some reason neglected to include it in his report:

> Q: When you looked at the Bradford-Hill criteria in the context of your opinions in this case, did you conduct a separate analysis for each cancer type under Bradford-Hill or did you do one Bradford-Hill analysis to cover all five cancer types?
> A: No. I did one for each cancer type separately or I—I evaluated the literature for each cancer type separately.
> Q: Okay. And where is the separate Bradford-Hill analyses for each cancer type articulated in your report?
> A They're embedded in the discussion of the literature.

Ex. 33 (Hatten Dep. Tr.) at 133 (emphasis added).

Hatten's waffling about whether he actually conducted a formal Bradford Hill analysis "or I—I [merely] evaluated the literature for each type of cancer" illustrates why his *ipse dixit* fails to pass muster. The Court and the jury are left to wonder what the substance of that analysis might contain, if it even exists. That, like his opinion regarding NDMA, fails to "properly bridg[e] that [analytical] gap, [thus] tr[ying] to ipse dixit over it; but a bald assertion cannot carry the *Daubert* burden." *Pon*, 963 F.3d at 1221.

Second, even to the extent that Hatten conducted any analysis "embedded in the discussion of the literature," that too is fatally flawed. Hatten concedes that in his "review" of the "literature," he failed to consider the robust epidemiological literature regarding NDMA. He recognized that Plaintiffs allege (and Defendants have admitted) that ranitidine contains and degrades into NDMA. *See* Ex. 33 (Hatten Dep. Tr.) at 166 ("the exposure of interest in this discussion is *exposure to NDMA via ranitidine*") (emphasis added). But in forming an opinion about whether the NDMA *in ranitidine* causes any of the designated cancers, he disregarded the epidemiological studies about

97

whether NDMA *in general* causes cancer. *See id.* at 166 ("whatever exposure occurs via ranitidine occurs -- is captured in these ranitidine epidemiologic studies. That's where we should be putting our focus on. That's where I put my focuses and that's the appropriate exposure outcome analysis in this assessment.").

That is nonsensical. As Hatten concedes, there is no reason to believe that the NDMA molecule in ranitidine is different than the NDMA molecule in other sources. If a brand of hot dogs is alleged to be poisonous because it contains arsenic, it is plainly relevant to consider studies on whether arsenic itself is poisonous, in what doses, with what frequency of exposure, and so on. A scientific methodology that turns on weighing the totality of the evidence is reliable only if "the expert considers all available evidence carefully and explains how the relative weight of the various pieces of evidence led to his conclusion." *In re Abilify (Aripiprazole) Product Liability Litigation*, 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018). Hatten admits he failed to do so, and accordingly his opinion on ranitidine should be excluded. *See Price v. Carnival Cruise Lines*, No. 1:20-cv-20621-BLOOM/Louis, 2022 WL 951318, at *3-4 (S.D. Fla. Mar. 30, 2020) (excluding expert opinion for failure to consider all of the available evidence).

Hatten's failure to consider the robust epidemiological evidence regarding NDMA in forming his opinion about ranitidine is especially egregious in light of the dramatic limitations of the ranitidine epidemiology on which he did rely. Those studies are severely limited in both the levels of exposure they examined an in the length of follow-up they observed. The length of follow-up is critical in understanding these studies because cancer formation lags behind exposure to a carcinogenic toxin, usually by years. That lag is referred to as the "latency period." Hatten concedes that long latency periods can conceal a causal relationship if the study follow-up period is too short:

> "Q: Would you agree that if an outcome has a long latency period, an increase in risk would not be observed in a study with too short of a follow-up time?"
> "A: It is possible not to see an outcome of interest if the latency period is long and the observation time is short."

Ex. 33 (Hatten Dep. Tr.) at 120.

But he failed to apply that principle to the ranitidine studies on which he relied. As IARC explains:

> Experience from studies of cancer in humans indicates that the period from first exposure to the development of clinical cancer is

> sometimes longer than 20 years; therefore, *latency periods substantially shorter than about 30 years cannot provide evidence of lack of carcinogenicity*.

IARC Preamble, *supra* note 126, at 22 (emphasis added).

Not a single epidemiological study of ranitidine has accounted for a latency period even approaching 30 years. Accordingly, by Hatten's own reasoning and IARC's determination of the appropriate weight to afford such studies, the ranitidine epidemiological studies on which he relied "cannot provide evidence of lack of carcinogenicity."

Third, Hatten's analysis of the ranitidine studies on which he did rely was itself fundamentally flawed. He concluded that "there is *no evidence* in the human epidemiology data of an association – a consistent association between *any* ranitidine exposure and *any* cancer outcomes." Ex. 33 (Hatten Dep. Tr.) at 125 (emphases added). Contrary to that conclusion, *every* human epidemiology study of ranitidine shows a positive association with bladder cancer. Hatten nonetheless testified that "in [his] evaluation of the bladder cancer epidemiology literature[,] I discuss two studies that are kind of minimally informative and really hypothesis generating, Habel and Michaud. However, *neither showed any positive evidence for an association*." Ex. 33 (Hatten Dep. Tr.) at 134 (emphasis added). That is plainly false, as both studies reported increased risk of bladder cancer. In contradiction of the American Statistical Association, Hatten conflates the lack of statistical significance in the reported results with the lack of an effect.

Hatten disregards the studies that show a non-statistically significant association, *see* Ex. 33 (Hatten Dep. Tr.) at 136 (Habel); 138-39 (Michaud); 139-40 (Yoon); 140-41 (Kantor), even though he himself recognizes that such an inference is improper:

> Q: Would you agree with the general principle that a lack of statistical significance of individual studies should not be taken as implying that the totality of the evidence supports no effect?
> A: There are times where a meta-analysis combine a number of studies and demonstrate an effect each though some of the individual – some or most of the individual studies do not demonstrate a statistical significant effect. That may cause reevaluation of the individual studies or the body of literature."

Ex. 33 (Hatten Dep. Tr.) at 128-29.

That statistical principle, moreover, is accepted by the most respected authorities in epidemiology. The authoritative text Modern Epidemiology, by Kenneth J. Rothman and others, explains in its second chapter, on "causal inference and scientific reasoning," that using statistical

significance to determine "whether or not there is an effect" is particularly problematic and can lead to absurdities. It suggests that P = 0.04 implies there is an effect, whereas P = 0.06 implies there is no effect. But the P-value is in fact a continuous measure of evidence, and there is no appreciable difference between P = 0.04 and P = 0.06." Hatten himself recognizes that Rothman is "a very prominent epidemiologist and one of the leaders in this field," Ex. 33 (Hatten Dep. Tr.) at 129, but nonetheless failed to follow the principle that Rothman (and Hatten himself) accept.

Finally, Hatten cherry-picked active comparator data to support his pre-chosen conclusion even within the studies he deems most informative. According to Hatten, Cardwell's study is an "elegant analysis" of the Scottish population data. *Id.* at 147. In forming his opinion that ranitidine use does not cause cancer, Hatten weighed heavily the Cardwell study's adjusted odds ratio of 1.05 comparing ranitidine users to users of cimetidine with respect to bladder cancer. *Id.* at 26. But Hatten entirely ignored the actual study conclusion of the study's authors: "In this large population-based study, the use of ranitidine particularly long-term use was associated with an increased risk of bladder cancer." He also ignored the Cardwell study's active comparator analysis that showed an increase in risk that also undermines his ultimate conclusion. For example, his report ignores the Cardwell study's adjusted odds ratio of 1.27 comparing ranitidine users with users of other histamine-2 receptor agonists for daily defined doses of greater than 1,095. *Id.* at 152 ("Q: And did you report that adjusted odds ratio with more than 1,095 DDDs in your report? A: I do not list that there."). That omission is particularly unjustifiable because a carcinogen with a dose response relationship would tend to show a stronger association at higher levels of exposure—so Hatten failed to consider precisely the data point that would most powerfully undermine his conclusion.

Hatten provided no coherent justification for that cherry picking. Instead, he asserted without further explanation that "I think all of that is likely noise that's seen due to variations in the study population." *Id.* 152. But simply *assuming* that the data which contradicts his conclusion is noise is not methodologically sound science. It is classic "*ipse dixit.*" And indeed, the Cardwell study—which naturally considered *all* of the data, rather than just a single hand-picked data point—itself determined that there *is* in fact an association between ranitidine use and an increased risk of bladder cancer that Hatten denies. Hatten's opinion that ranitidine does not cause the designated cancers, which relies on such an unsupported and results-driven assumption, should therefore be excluded.

## VI.    Michael Porter

Dr. Porter is a professor of urology at the University of Washington. Despite every study finding an association between ranitidine and bladder cancer, his opinion is that there is no association. Unsurprisingly, he can only say so by using unreliable methods.

### A.    Porter Overstates Evidence That Agrees with Him

Porter vastly overreaches in claiming that the Florian study "conclusively refute[s] the proposed biologically plausible mechanism of an increased risk of bladder cancer with ranitidine as there is no reliable evidence showing an increase in urinary excretion of NDMA in persons taking ranitidine." Ex. 17 (Porter Rep.) at 3. The Florian study itself says nothing like this, and in any case, his analysis fails to address studies such as Spiegelhalder's,[290] which shows that NDMA metabolizes rapidly in rats and humans, such that precious little is left in urine when excreted. In fact, Spiegelhalder concluded that NDMA would not be detectable in urine unless it was "on the order of hundreds of micrograms." In the Florian study, 73% of the data points were below the limits of quantitation, suggesting Spiegelhalder was right. If a person ingests a measured amount of NDMA in a ranitidine pill, and the amount that comes out in the urine is zero or a very tiny fraction of what was ingested, then what happened to the NDMA? The obvious answer supported by science is the NDMA is metabolized in the body. That excess NDMA was not detectable at excretion does not mean it does not break down into cancer causing adducts in the body, including in the bladder.

Porter briefly suggests that NDMA may not be carcinogenic, citing the 2018 WCRF/AICR report. Ex. 17 (Porter Rep.) at 12. This suggestion contradicts IARC, the EPA, the FDA, and Defendants' own internal documents. In fact, given the Defendants' statements to the FDA, regulatory estoppel precludes Defendants from claiming that NDMA does not cause cancer. "A plaintiff must set forth two elements to prove regulatory estoppel: (1) a party made a statement to a regulatory agency; and (2) afterward, the party took a position opposite to the one presented to the regulatory agency." *Kessler Dental Assocs., P.C. v. Dentists Ins. Co.*, 505 F. Supp. 3d 474, 479 (E.D. Pa. 2020) (internal quotation marks omitted).

With respect to the Yoon study, Porter inexplicably deems a *strength* that it "evaluated long-term use (≥ 1 year)," Ex. 17 (Porter Rep.) at 132. One year is *far too short* to be expected to

---

[290] Spiegelhalder (1984), and Spiegelhalder (1985), *supra* note 123.

show much of an effect from ranitidine. When *this* study failed to control for smoking, Porter argued the active comparator study "mitigates the effect." Ex. 17 (Porter Rep.) at 15. The same is true of Norgaard, which has "no information on smoking," but nonetheless gets a pass. Ex. 17 (Porter Rep.) at 18. Norgaard also lacked information about *dose*, but Porter did not notice this. To be admissible, an "expert must be able to adequately explain how the data he relied on led him to his conclusions." *MidAmerica C2L Inc. v. Siemens Energy Inc*., 25 F.4th 1312, 1328 (11th Cir. 2022). Porter cannot do so because he uses a double-standard.

### B.    Porter Understates Evidence That Disagrees with Him.

Where studies show a strong association, Porter stridently demands more controls than existed in Yoon or Norgaard. For example, he accuses the Cardwell study of confounding bias for failing to control smoking even though it was one of the only studies *to control for smoking*.[291] Cardwell himself believed they had adequately controlled for smoking. Yoon and Norgaard did not control for smoking because they had *no information on smoking at all.* Moreover, Porter provides no explanation of why the PPI active comparator was not sufficient in Cardwell, or, especially the H2RA active comparator, which still showed a strong effect: "The observation that longer term ranitidine use was associated with a higher risk of bladder cancer in the non H2 blocker comparator may just be a reflection of longer-term smoking exposure that was poorly adjusted for (since PUD and GERD are smoking related diseases)." Ex. 17 (Porter Rep.) at 17. There is no way to reconcile Porter's opinion on Cardwell (adjusting for smoking is not enough; PPI active comparator is not enough; H2RA comparator is not enough) with his lax views on Norgaard and Yoon.

Porter attacks Habel for combining kidney and bladder cancer together, but the confounding here goes all in one direction: *bladder* cancer ups the *kidney* cancer rates. Porter provides no reason to think that any of the effect is caused by kidney cancer. The Kantor study does not show an association according to Porter because it compares ranitidine to a PPI, but, as always, Porter made no attempt to show that the ranitidine group was a *sicker* or more-proned-to-smoke population.

Porter lodges six quick attacks on the Hidajat study then asserts that the entire study is "irrelevant to the question of whether ranitidine use or oral consumption of NDMA is associated

---

[291] Cardwell *supra* note 139.

with an increase in bladder cancer." Ex. 17 (Porter Rep.) at 26. No adequate methodology supports this attack. First, Porter says the authors inappropriately assumed that workers remained in the same factory work area for their entire career, but as Hidajat's rebuttal report explains, the authors considered this critique, but resolved it because job mobility was low in general at the time, and extremely so for this group of workers. Ex. 8 (Hidajat Rebuttal Rep.) at 20. In any case, the authors performed a sensitivity analysis to address this, and found that its results "supported the main analysis." *Id.*

Next, Porter suggests that there was no measurement of individual exposure, and NDMA was inhaled, but the exposure matrix included both personal and stationary samples. Ex. 8 (Hidajat Rebuttal Rep.) at 11. Porter provides no reason to think exposure varied, and no reason to believe inhalation versus ingestion is different (especially in light of the consistent dietary studies). Porter also notes other exposures such as asbestos and rubber dust, but, again, Dr. Hidajat explained these occurred in separate areas of the plant, and so could be tracked separately. Last, he argues that smoking was confounding, as Hidajat explains, the authors conducted a sensitivity analysis based on the amount of lung cancer and other factors. Hidajat concluded that for the study to be biased even 10%, the workers would need to smoke 12-14% more, which is quite unlikely. Ex. 8 (Hidajat Rebuttal Rep.) at 21.

### C.    Porter's Bradford Hill Analysis Should Be Excluded.

Porter went through the motions of a Bradford Hill analysis, but at every stage simply restated the same criticisms of each study. Ex. 17 (Porter Rep.) at 27.

**Temporality**: Porter acknowledges that "exposure to ranitidine appeared to occur prior to the diagnosis of bladder cancer" but nonetheless declined to recognize this criterion because "cancer develops over a long time" meaning "it is *possible* that ranitidine exposure began after the onset of cancer." Ex. 17 (Porter Rep.) at 27 (emphasis added). Plaintiffs certainly agree that cancer develops over a long time—which is why long-term studies are crucial—but Porter appears to be speculating rather than applying expertise. He examined studies that *for this reason* incorporated a lag time, such as Cardwell. He does not mention those studies, nor provide any reason to think the authors' attempts to eliminate this bias were futile.

**Consistency**: This criterion should be easy, because *every single study of ranitidine showed an association with bladder cancer*. In his seminal lecture, Bradford Hill warned, "far too often we deduce 'no difference' from 'no significant difference.' Like fire, the chi-squared test is an

excellent servant and a bad master."[292] Somehow, Porter ignores both the uniform studies and his methodological commitment to Bradford Hill, concluding there is "no consistent statistically significant association." Ex. 17 (Porter Rep.) at 27. The authors themselves disagree,[293] and as for the demand for statistical significance, experts in statistics tenaciously decry a blind genuflection to the 95th percentile.

Porter also ignores Bradford Hill's suggestion to "put a good deal of weight upon similar results reached in quite different ways."[294] That is exactly what happened here: a variety of different studies, with different methodologies using different data sets and different comparators all found an association. Unlike Bradford Hill, Porter puts *no* weight on results "reach in quite different ways"—he puts weight only on *one* way: an H2RA active comparator study, and nothing else. Such dogmatism is without basis in sound science.

Finally, Porter appeals to "random chance," but fails to quantify the odds statistically, even though doing so is possible. The odds of more than five studies lining up all on one side by chance is infinitesimal. In any event, experts "will not be permitted to testify that the Bradford Hill factor of consistency can only be satisfied by the existence of multiple epidemiological studies because this opinion is not supported by the scientific literature." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 n.1 (N.D. Fla. 2018). Appealing to the mere *possibility* of "chance" in effect allows a witness to demand multiple studies, when that is not a supportable methodological choice.

**Strength of Association**: Porter claims that because risk estimates were less than 1.5, this factor is not met, but cites no authority for his position.

**Consideration of Alternative Explanations**: Again, Porter returns to his smoking thesis without analyzing any facts. He hypothesizes that "ranitidine users *may be* more likely to be smokers given that smoking is a risk factor for chronic kidney disease." Ex. 17 (Porter Rep.) at 28 (emphasis added). There was no need to guess—Porter could have looked at evidence on this point, such as the Y Kim study showing that famotidine had *higher* smoking than both ranitidine and PPIs. He did not look at that paper, or, indeed, any paper that also involves asking how many

---

[292] Bradford Hill (1965), *supra* note 229.
[293] *E.g.*, Cardwell (2021), *supra* note 139 ("In this large population-based study, the use of ranitidine particularly long-term use was associated with an increased risk of bladder cancer.").
[294] *Id.*

people smoke in different groups.

**Dose-response**: Porter claims there is no dose-response, but that is not true. One would not expect to find any effect at one-year's worth of ranitidine, for example, but might *begin* to at four years. That is what Cardwell shows: in all analyses, a low cancer risk in the 182-365 daily defined dose group, a higher risk in the 365-1,095 group, and an even higher risk in the 1,095 and higher group—which is essentially all Plaintiffs in this action. Even the active comparator H2RA analysis shows a 1.27 RR with 1,095 DDD.

**Plausibility**: Obviously it is *plausible* that the NDMA in ranitidine also causes cancer— Porter comes close to admitting that in saying "biological plausibility by itself cannot support or prove causation." Ex. 17 (Porter Rep.) at 29. No doubt plausibility cannot "by itself" prove it, but that is true of every Bradford Hill Factor. Yet Porter uses that segue to parade his favorite reasons for finding supposedly "no association"—essentially counting that factor again here, and shortchanging what biological plausibility is supposed to mean.

**Coherence**: Porter takes another opportunity to restate his "no association" claim, but this is not the right factor for that. He claims an example of this factor is that "increased cigarette consumption has been found to track closely with increased incidence in lung cancer in both men and women." Ex. 17 (Porter Rep.) at 29. This is simply "association" or "consistency" in new garb—now triple-counting the same factor. Bradford Hill gave the examples of "histopathological evidence from the bronchial epithelium of smokers and the isolation from cigarette smoke of factors carcinogenic for the skin of laboratory animals"[295]—in other words, *substantive knowledge* about what is *in* smoke and *in* a smoker's lungs, unrelated to observational studies, that make the evidence of smoking causing cancer cohere. Here, Porter should have looked to some fact about bladder cancer that makes it possible, plausible (or unlikely) that ranitidine causes it. For example, the fact that non-ranitidine-based NDMA also causes bladder cancer is coherent, or the fact that ranitidine is excreted from the bladder, and also that is where cancer occurs. Porter's "no-association" claim is not helpful.

Porter is merely using Bradford Hill to smuggle in his "no-association" theory. That is not a proper purpose under *Daubert*, is unreliable, and will not help the jury.

---

[295] Bradford Hill (1965), *supra* note 229.

## VII.    Frederick Guengerich

Dr. Guengerich is a professor of biochemistry at Vanderbilt University Medical Center. He opines upon a number of subjects, including that a nonlinear threshold model should apply to NDMA, a genotoxic chemical.[296] This is contrary to the linear dose response approach applied by authoritative and regulatory bodies. Guengerich's opinion—that a threshold (not a linear dose response) applies to a known genotoxic carcinogen like the NDMA in Ranitidine is methodologically flawed.

Guengerich incorrectly asserts that there is a "safe dose" of NDMA that people can be exposed to, a "threshold" amount. Guengerich proclaims it is okay to expose our bodies to more NDMA, multiples greater than the FDA acceptable daily limit (ADI) of 96 nanograms, because our bodies' DNA repair mechanisms will correct any damage caused by this NDMA exposure. Understandably, no authoritative or regulatory body has adopted this controversial approach.

NDMA is a "highly potent mutagenic carcinogen[]" and therefore the FDA mandates "strict controls to limit the amount" of NDMA exposure because the end result may be cancer.[297] GSK agrees and that is why in its Hazard Assessment it concluded that NDMA exposure should be reduced to the extent possible. Ex. 60 (GSK Hazard Assessment Report, GSKZAN000341950), at 7. Logically, you would not want to intentionally expose people to more NDMA, yet Guengerich, in the minority, advocates otherwise. Even a former defense expert calls that opinion "a mistake."[298] Outside litigation, this methodology has been roundly criticized because it "essentially forces, rather than demonstrates, a threshold."[299]

Guengerich also opines that levels of NDMA in ranitidine cannot plausibly cause cancer in humans based upon his extrapolation of data from an animal study. Yet, the very author of that

---

[296] Although Dr. Guengerich tiptoes around the subject by focusing only on ranitidine (and not the NDMA in found in ranitidine), GSK readily admits that NDMA is a genotoxic carcinogen. Ex. 60 (GSKZAN0003419540), at 3419545. Dr. Guengerich defines such chemicals as "DNA-reactive." Ex. 6 (Guengerich Rep.), at 24.

[297] FDA, *Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public Workshop*, at 3 (March 29-30, 2021) (emphasis added), available at https://www.fda.gov/media/150932/download. *See also* Ex. 50 (GSKZAN0003505669).

[298] Ex. 35 (Lindsley Dep. Tr.), at 135:12-136:4. This candid testimony acknowledging the fallacy of a threshold approach to NDMA likely explains why Dr. Lindsley has been withdrawn as an expert witness by the Defendants.

[299] J.K. Haseman, *An Alternative Perspective: A Critical Evaluation of the Waddell Threshold Extrapolation Model in Chemical Carcinogenesis*, 31 TOXICOL. PATHOL., 468-70 (2003).

study, Dr. Richard Peto, concluded otherwise and found that there was "no indication of any 'threshold.'"[300] The FDA utilizes a non-threshold linear dose-response methodology, based on the Peto data, to calculate an acceptable daily limit (ADI) for NDMA of 96 nanograms/day.[301]

Accepting Dr. Guengerich's flawed and untested hypothesis that there is a threshold for NDMA carcinogenicity is a requirement for Dr. Guengerich's subsequent untested and flawed hypothesis that there is a dose of NDMA below which there is no cancer risk for all individuals exposed to this genotoxic carcinogen. Dr. Guengerich's conclusions are only reached by disregarding these important facts, the available human epidemiology studies, and critical information about DNA repair mechanisms including individual differences in susceptibility due to genetic variability, which are methodologically improper. His opinions should be excluded.

A.   **Guengerich's Opinions Applying a Threshold and Logarithmic Scale to NDMA, a Genotoxic Carcinogen, Are Not Reliable**

While all substances may be toxic at some level, there are some carcinogenic substances for which no safe exposure level has been established.[302] Non-litigation experts such as Dr. Nohmi acknowledge that there may be a "threshold of toxicological concern" ("TTC") for some carcinogens, but the ICH M7 guidelines specifically exclude NDMA because it is a genotoxic carcinogen in the "cohort of concern," and so "outside of the application of the TTC approach."[303] In assessing dose-response and TTCs, Dr. Nohmi emphasizes that "DNA-reactive genotoxic carcinogens have no threshold[.]" Nohmi (2018) at 286. Moreover, the ICH M7 guidelines require a linear extrapolation where carcinogenicity data for the subject chemical is known, as it is with

---

[300] R. Peto, *et al.*, *Effects on 4080 Rats of Chronic Ingestion of N-Nitrosodiethylamine or N-Nitrosodimethylamine: A Detailed Dose-Response Study*, 51 CANCER RESEARCH, 6415-6451 (1991).

[301] *See* FDA Nitrosamine Guidance (2021), *supra* note 2.

[302] *See* Takehiko Nohmi, *Thresholds of Genotoxic and Non-Genotoxic Carcinogens*, 34 TOXICOLOGICAL RESEARCH 281 (2018) ("The principle of Paracelsus cannot be applied to the regulation of genotoxic chemicals[]"). Dr. Nohmi is the Scientist Emeritus at Japan's National Institute of Health Sciences Biological Safety Research Center and the immediate past president of the International Association of Environmental Mutagenesis and Genomics Societies, an organization comprised of scientific societies dedicated to mutagenesis and genotoxicity research. *See* International Association of Environmental Mutagenesis and Genomics Societies, *Past Officers of IAEMGS*, IAEMGS (Apr. 25, 2022 10:40 AM), iaemgs.org/pastofficers.asp. *See also* Ruth J. Bevan & Paul T.C. Harrison, *Threshold and Non-Threshold Chemical Carcinogens: A Survey of the Present Regulatory Landscape*, 88 REG. TOX. AND PHARMACOL. 291, 292 (2017).

[303] *See M7(R1) Assessment and Control of DNA Reactive (Mutagenic)* Impurities in Pharmaceuticals to Limit Potential Carcinogenic, *supra* note 3, at 6; Nohmi (2018) *supra* note 302.

NDMA. Even GSK's, Global Director of the Target Systems Safety group in the Non Clinical Safety organization and toxicologist, James Harvey, agrees that thresholds are only to be used in the absence of carcinogenicity data. Ex. 30 (James Harvey Dep. Tr.) at 73:6-74:8.

Guengerich's opinion that "there is overwhelming evidence of a threshold for the hepatocarcinogenic effect of NDMA," is whimsically his own. Ex. 6 (Guengerich Rep.) at 128. The scientific and medical community do not accept the methodology leading to this conclusion, but rather apply a linear dose to genotoxic carcinogens like NDMA. "An expert's methodology must be consistent with the 'methods and procedures of science' rather than being founded on 'subjective belief or unsupported speculation.'" *In re Accutane Prod. Liab.*, 511 F.Supp.2d 1288, 1290-91 (M.D. Fla. 2007) (quoting Daubert, 509 U.S. at 592). Where "a known technique which has been able to attract only minimal support within the community" it "may properly be viewed with skepticism." *Daubert,* 509 U.S. at 594 (internal citations omitted). The opinion should be excluded because it fails all of the enumerated *Daubert* factors.

Guengerich has offered no evidence to support his lone opinion, or any way to test it. As Guengerich correctly states, "it is not ethical" to attempt to test his opinion by administering NDMA to humans for the purposes of studying the body's response to a carcinogen. Ex. 6 (Guengerich Rep.) at 33.

Guengerich's opinion that a nonlinear threshold model can be applied to NDMA, a genotoxic carcinogen found in ranitidine, has been written solely for litigation purposes. He has not presented and does not intend to present his report for peer-review scrutiny.

The published studies he relies upon do not support the use of a threshold dose for NDMA. He contends that NDMA must have a threshold of toxicological concern based on plotting its dose-response curve on a logarithmic scale of molecules-per-kilogram of body mass and extrapolating the curve to extremely low doses. Ex. 6 (Guengerich Rep.), at 129, fig. 48. Guengerich purports to rely on Waddell, whose methodology has been harshly criticized by the scientific community.[304] Waddell re-plotted the data relating to NDEA from the Peto (1991) study, after converting doses administered to molecules-per-kilogram and using a logarithmic scale for the x-axis doses. However, because of the way the logarithmic scale on the x-axis increases, it is impossible to visualize dose response for any dose below the purported threshold. The scientific community,

---

[304] *See* Waddell WJ, *et al.*, *Concordance of Thresholds for Carcinogenicity of N-nitrosodiethylamine*, 80(6) ARCH TOXICOL. 305-309 (2006).

spearheaded by Dr. Joseph Haseman, the former chief statistician for the National Toxicology Program (NTP) at the U.S. Department of Health and Human Services, responded forcefully and conclusively: "It would be a serious mistake for the scientific community to adopt Waddell's log linear extrapolation model for chemical carcinogenesis risk assessment."[305]

Toxicologists who are not paid to defend Big Pharma and industry watchdogs, such as FDA, only use linear dose analyses in assessing NDMA. Guengerich's methodology is well outside the mainstream of generally accepted practice in the public health arena. "[W]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique that has been able to attract only minimal support within the community may properly be viewed with skepticism.'" *Daubert*, 509 U.S. at 594. No public health agency accepts the principle that a non-linear threshold can be generally applied to a genotoxic carcinogen, or specifically applied to NDMA. Even Dr. Lindsley exposed the error of this approach. Dr. Guengerich's opinion in this regard is singular and unsupported by any authority. Such "scientific guesswork" has no place in this court. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005).

All of this is not to say that there is no place in toxicology for a threshold or the logarithmic scale. Certainly, the logarithmic scale and threshold dose may be employed properly to assess and determine the threshold dose of non-genotoxic substances. But scientists in this field do not employ the same logarithmic scale or a threshold for a genotoxic carcinogen like NDMA. Not even the Draft ICH Consensus Guideline of FDA Guengerich relies upon supports his thesis. *See M7(R1) Addendum to ICH M7* at 4.[306] This approach is rejected by the major agencies responsible for public health protocols addressing genotoxic carcinogens such as NDMA, including the EPA, FDA, and WHO.[307] In citing studies using the logarithmic dose response scale or a threshold, Dr. Guengerich leaves a yawning analytical gap between his sources and this case, which involves

---

[305] J.K. Haseman (2003), *supra* note 299.

[306] *Id.* ("This threshold approach was considered appropriate in the compound-specific assessments for carcinogens with modes of action (Section 2.1) that lack human relevance at low doses, based upon their association with a non-linear dose response for tumor induction.").

[307] EPA, *Guidelines for Carcinogen Risk Assessment*, (2005); EPA Integrated Risk Information System (IRIS). 1987. "Chemical Assessment Summary N-Nitrosodimethylamine; CASRN 62-75-9"; FDA Nitrosamine Guidance (2021), *supra* note 2, at App'x B; World Health Organization. Regional Office for Europe. (2000). Air quality guidelines, 2nd ed. Chapter 2: Criteria used in establishing guideline values World Health Organization. Regional Office for Europe.

NDMA, a genotoxic carcinogen.

### B. Guengerich's Derivative Opinions Employing a Threshold Dose to NDMA Based Upon Johnson (2021) Are Equally Unreliable

Guengerich's analysis based on Johnson (2021) is no better.[308] That study improperly reanalyzed data from the Peto Study (the largest and most reliable animal study on NDMA).[309] FDA recently debunked Guengerich's litigation-driven opinion. FDA explained:

> Reference was made to the Peto rat mega-bioassay (>4000 rats), in which the dose response curve at low doses was linear with no threshold. This linearity was supported by the levels of DNA adducts. Therefore, cancer bioassay and adduct formation results produced a linear dose response *without evidence of a threshold* and so a NOEL was not identified. These findings were obtained in rodents; whether the paradigm holds in human is unclear.[310]

Guengerich completely ignores this finding.

Guengerich's reliance on Johnson (2021) suffers from a further defect. Johnson (2021) was conducted by a team of 12 largely industry-backed scientists, mostly current or former pharmaceutical industry employees, including five GSK and Pfizer scientists, as well as current Sanofi, AbbVie, Hoffman-La Roche employees. Lead author George Johnson has received substantial payments from GSK for work related to NDMA, mutations, and DNA repair. Ex. 30 (Harvey Dep. Tr.), at 60:11-62:12. Co-author Bhaskar Gollapudi, formerly of Dow Chemical, is employed by Exponent, *see* Johnson (2021), as is the editor-in-chief of ENVIRONMENTAL AND MOLECULAR MUTAGENESIS, the journal in which Johnson (2021) was published. Ex. 30 (Harvey Dep. Tr.), at 64:2-65:1. In fact, the only author of Johnson (2021) without any readily apparent conflict is Ryan Wheeldon, a student affiliated with Johnson. Against the backdrop of ongoing NDMA litigation, including the present ranitidine MDL, Johnson (2021) is a highly suspect source.

Indeed, before Johnson conducted the requisite research for the study and published it in May 2021, GSK's internal documents from December 2020 had already reached the conclusion that the permissible daily exposure it was going to push for was 6 mcg/day—the same dose the

---

[308] George E. Johnson, et. al., *Permitted Daily Exposure Limits for Noteworthy N-nitrosamines*, 62 ENVIRON. AND MOLECULAR MUTAGENESIS 293 (2021) ("Johnson (2021)").

[309] *Id.*; Ex. 30 (Harvey Dep. Tr.), at 67:14-68:1.

[310] Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public Workshop at 11 (FDA March 29-30, 2021) (emphasis added), available at https://www.fda.gov/media/150932/download. *See also* Ex. 50 (GSKZAN0003505669).

Johnson study arrived at. In December 2019, Dr. James Harvey stated that GSK "need[s] to generate data to improve the SAR and we need to hook up with George [Johnson] to support the BMD work that will be inevitable for the ranitidine and established products."[311]

Despite the backdrop of the FDA's recall of all ranitidine products in April 2020 due to the presence of NDMA, none of the GSK and Pfizer authors disclosed any conflicts of interest while they purported to extrapolate a safe daily exposure to NDMA that is 64 times the 96-nanogram current standard. Johnson (2021) at 302. Moreover, to arrive at his conclusion Johnson ignored the FDA's applicable standards which require use of linear dose extrapolation based on ICH M7 guidelines to derive an acceptable daily limit for NDMA. Guengerich's failure to recognize the possibility of bias in Johnson (2021) and Johnson's failure to use the correct standard to derive an acceptable daily intake for NDMA is dubious at best. Both Guengerich's opinion, and the Johnson study itself are unreliable because they were "contrived to reach a particular result." *Rink*, 400 F.3d at 1293. The Supreme Court has flagged industry-funded research as dubious. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 n.17 (2008) ("Because this research was funded in part by Exxon, we decline to rely on it[]"). This Court should do the same.

### C.   Disregarding Available Human Epidemiology Renders Dr. Guengerich's Conclusion Fatally Flawed Methodologically

Guengerich erred by ignoring human epidemiology in opining that the NDMA in ranitidine cannot cause cancer. General causation opinions that take into consideration a range of epidemiological studies, toxicology studies, and other peer-reviewed publications to support their conclusions, known as the "weight-of-the-evidence" methodology, employ a reliable methodology under *Daubert*.[312] But Guengerich's methodology was quite different. Guengerich concludes that:

---

[311] Ex. 58 (GSKZAN0002771972).

[312] *See Milward v. Acuity Specialty Products Group,* 639 F.3d 11, 20 (1st Cir. 2011) ("Dr. Smith explained that taking into account all of the evidence described above--the fact that benzene causes AML as a class, that all subtypes of AML likely have a common etiology, that benzene is known to cause the general types of cellular damage that are known to cause APL, that benzene is known to inhibit an enzyme whose inhibition is known to cause APL, and that APL has been reported in benzene-exposed workers in a number of epidemiological studies-he reached the opinion that the weight of the evidence supports the conclusion that benzene exposure is capable of causing APL. Dr. Smith's opinion rests on a scientifically sound and methodologically reliable foundation, as is required by Daubert."). *See also In re Abilify (Aripiprazole) Products Liability Litigation*, 299 F.Supp.3d 1291, 1311 (N.D. Fla. 2018) (This methodology "can be considered reliable, provided the expert considers all available evidence carefully and explains how the relative weight of the various pieces of evidence led to his conclusion.").

> The trace levels of NDMA found in ranitidine products are several orders of magnitude lower than the lifetime NDMA doses associated with liver tumors in rodents, and exposure to potential NDMA in ranitidine has occurred for substantially less than a lifetime. Therefore, even if NDMA were an established human carcinogen, any achievable dose of NDMA from ranitidine use is too low to plausibly cause cancer because repair mechanisms will reverse any potential DNA damage from NDMA. Ex. 6 (Guengerich Rep.) at 217.

To reach this extraordinary opinion, Guengerich did not consider the totality of the available evidence causally associating the NDMA in ranitidine to cancer in humans nor did he consider exactly the maximum amount of NDMA that forms in ranitidine in a variety of conditions. Ex. 32 (Guengerich Dep. Tr.), at 173:20-177:6; 174:25-175:6; 268:20-269:8; 287:12-289:6; 302:21-303:2; 304:19-25. He did not consider—or even mention—any diet or occupational NDMA studies. He did not even mention GSK's own Hazard Assessment, which itself considers diet studies. Ex. 60 (GSK Hazard Assessment Report, GSKZAN0003419540) at 6-7. Incredibly, and unlike Defendants' other experts, Guengerich did not even mention the *ranitidine* epidemiological studies that show an association with ranitidine and an increased risk of cancer.[313]

Rather than any of these sources, Guengerich focused upon extrapolations from the Peto animal study, Peto R, *supra* note 56, where the levels of NDMA he calculated were lower than the doses given to cause liver tumors in rats. Ex. 6 (Guengerich Rep.) at 123, Table 4. Ignoring any evidence is poor methodology, but ignoring epidemiological evidence entirely is egregious since epidemiology "is generally considered the best evidence of causation in toxic tort actions," *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).

Ironically, Guengerich agrees stating "[t]he most informative data on whether a substance causes cancer in humans, and particularly at the doses humans are exposed to, is evidence on that substance in humans (i.e., epidemiology)" yet he does not evaluate or analyze any epidemiological evidence, something that he readily does outside of this litigation in his published peer reviewed literature.[314] Far from being "genuinely scientific," this opinion is merely "unscientific speculation

---

[313] *See e.g.,* Cardwell (2021), *supra* note 139; McDowell, R.D., *et al.*, *The Effect of Medications Associated with Drug-Induced Pancreatitis on Pancreatic Cancer Risk: A Nested Case-Control Study of Routine Scottish Data*, 71 CANCER EPIDEMIOL. 101880 (2021).

[314] *See* Ex. 6 (Guengerich Rep.) at 32; Ex. 32 (Guengerich Dep. Tr.), at 199:6-19; 201:8-16; 207:3-16; 245:19-246:19; Kelly JD, Eaton DL, Guengerich FP, Coulombe RA Jr. Aflatoxin B1 activation

offered by a genuine scientist." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999). Because he is not employing the methodology he uses in his actual work, his opinion is unreliable and should be excluded.

### D.    Guengerich's Adjunct Theory of DNA Repair Is not Reliable

Guengerich proposes that the NDMA in ranitidine cannot cause cancer due to DNA repair mechanisms, but this opinion is unsupported and unreliable. The NDMA in ranitidine is genotoxic and clastogenic. The World Health Organization has stated that there is "overwhelming evidence that NDMA is mutagenic and clastogenic" and causes "[i]ncreased frequencies of gene mutations, chromosomal damage, sister chromatid exchange and unscheduled DNA synthesis have been observed in a wide variety of cell types".[315] DNA exposed to NDMA will become damaged and form adducts.[316] These adducts can be repaired through DNA repair mechanisms.[317] But this DNA repair system is imperfect and does not prevent all DNA damage from becoming cancer.[318] DNA adducts that are not repaired lead to gene mutations which can replicate and cause cancer.[319] The primary methylated DNA adducts resulting from exposure to NDMA, in order of declining prevalence, are N7-methylguanine, O6-methylguanine, N3-methyladenine, and O4-methylthymine.[320]

In his report, Guengerich only considered the O6-methylguanine adducts and the imperfect DNA repair mechanism to address it, AGT or MGMT. Guengerich did address the multiple other DNA adducts caused by NDMA or even attempt to address the repair mechanism for each, which can also lead to cancer. Guengerich admitted at his deposition that $N^7$ methyl guanine can cause mutations, Ex. 32 (Guengerich Dep. Tr.) 413:22-414:2, but failed to address how they will be adequately repaired before resulting in a mutation. Similarly, Guengerich admitted that his report's

---

in human lung. TOXICOL. APPL. PHARMACOL. 1997 May;144(1):88-95, p. 88 ("Because circumstantial epidemiological evidence suggests that AFB1 inhalation may cause primary lung cancer, we investigated AFB1 activation by human lung microsomes."); Ex. 32 (Guengerich Dep. Tr.) at 251:2-252:2; Guengerich FP, *The Environmental Genome Project: functional analysis of polymorphisms*, 106 ENVIRON HEALTH PERSPECT. 365-68 (1998).
[315] Liteplo, *supra* note 17, at 17.
[316] *Id.*
[317] *Id.* at 20.
[318] Ex. 32 (Guengerich Dep. Tr.), 417:6-13.
[319] Basu, A. K., *DNA Damage, Mutagenesis and Cancer*, INT. J. MOL. SCI. 19 (2018).
[320] *Toxicological Profile for N-Nitrosodimethylamine (Draft for Public Comment)*, *supra* note 13, at 88.

calculations fail to address the damage done by the $O^4$ methyl guanine adduct. *Id.* 419:16-24. Despite these acknowledgements and his incomplete calculations and failure to consider other DNA adducts, Guengerich unreliably advocates that our bodies will reverse any damage from NDMA. Ex. 6 (Guengerich Rep.) at 130.

Additionally, there are polymorphisms that render the DNA repair response variable amongst the human population and cause some individuals to be more susceptible to cancer relative to other people.[321] Yet, like his omission of the other DNA adducts, Dr. Guengerich's report failed to even mention that such variations exist, let alone account for such differences. Ex. 32 (Guengerich Dep. Tr.) 423:10-21. Although Guengerich admitted that NDMA can cause chromosomal aberrations in animals, he neither mentioned nor accounted for this in his report. *Id.* 406:16-18. Chromosomal aberrations involve breaks in chromosomes that can lead to sections of the chromosomes being added to, deleted, or rearranged, which can lead to cancer.[322] Due to the "lack of knowledge on the sources of these adducts," the FDA Expert Working Panel called the DNA repair theory Guengerich espouses "controversial" in assessing the risks posed by NDMA.[323] Indeed, Guengerich admitted during his testimony that he was unaware of any regulatory agency or authoritative body that performed similar calculations to derive NDMA exposure limits based on DNA repair mechanisms. Ex. 32 (Guengerich Dep. Tr.) 426:7:12. In assessing similar circumstances where an expert witness employs a novel method of data transposition, extrapolation, and calculation from an existing data set, the Eleventh Circuit held that "the data [the expert witness] produced was driven by the methodology he used," rendering it unreliable. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 (11th Cir. 2005). The Eleventh Circuit affirmed the District Court's decision to grant the motion to exclude that expert's testimony and any derivative opinions from any experts using the same, unreliable methodology. *Id.* at 1294. As Guengerich's opinion overreaches those of the authors he relies upon, his opinion is unreliable.

Guengerich advocates this theory without addressing the various factors that make DNA

---

[321] Du L, et al, *The Polymorphisms in the MGMT Gene and the Risk of Cancer* 34 TUMOR BIOL. 3227 (2013); Pegg AE, *Multifaceted Roles of Alkyltransferase and Related Proteins in DNA Repair, DNA Damage, Resistance to Chemotherapy and Research Tools*, 24 CHEM RES TOXICOL. 618-39 (2011).

[322] "Chromosome Aberrations," R.J. Preston, Encyclopedia of Toxicology (Third Ed.), 2014, www.sciencedirect.com/topics/pharmacology-toxicology-and-pharmaceutical-science/chromosome-aberration.

[323] Ex. 50 (GSKZAN0003505669), *supra* note 310.

repair response an imperfect system, including the other DNA adducts formed with NDMA exposure, polymorphisms and chromosomal aberrations. Therefore, his conclusion that "any achievable dose of NDMA from ranitidine use is too low to plausibly cause cancer because repair mechanisms will reverse any potential DNA damage from NDMA" is unreliable and baseless.

Guengerich's opinions are based on flawed methodology in multiple respects and should be excluded.

## VIII.   Timothy Wang

Dr. Wang's report starts with a faulty premise that the animal studies establish a threshold amount of NDMA required to cause cancer. This false premise serves as the tottery foundation for the rest of his opinions that ingesting NDMA in ranitidine does not cause cancer. His opinion is based on too low of an amount of NDMA ingested by ranitidine users, because he ignores data demonstrating that ranitidine breaks down into NDMA in the supply chain, after the consumer purchases the product, and inside the body. In addition, he mischaracterizes NDMA animal studies as demonstrating that tumors are not formed inside of primates after ingestion of NDMA, when the animal studies actually demonstrate that NDMA induces tumors in all laboratory animals studied. He further mischaracterizes valsartan epidemiological studies as providing support of his opinion that ingesting NDMA in drugs does not cause cancer, when these studies do not support that finding at all. Finally, in reaching his conclusions, Dr. Wang chose not to assign any weight to decades of epidemiological literature demonstrating that exposure to NDMA causes cancer in humans. Because his opinions rest on incomplete and unreliable information, his opinions should be excluded from trial.[324]

### A.   Wang's Opinion that There Is a Minimum Amount of NDMA Required to Cause Cancer Is Unreliable

Wang's opinions are built upon the premise that there is a threshold amount of NDMA required to cause cancer. Ex. 21 (Wang Rep.) at 5. For the same reasons that Guengrich's opinion

---

[324] According to the invoices produced by Dr. Wang, he billed a total of 73.5 hours in advance of submitting his expert report, including 18.5 hours reviewing documents. Somehow, in those 18.5 hours, he claims to have reviewed 582 documents, most of which are dense medical journal articles. That means he spent less than two minutes per document (according to his deposition, it was more than one minute, Ex. 42 (Wang Dep. Tr.), at 131:24-132:25). Even cursory review is not possible in mere seconds per-page, meaning Wang simply took Defendants' spoon-fed theory, using literature to bolster citations.

on a minimum threshold dose of NDMA is unreliable, so too should is Wang's. Wang's opinions directly contradict the conclusions reached by the FDA, EPA, and WHO that there is no threshold amount established for NDMA. *See, e.g.*, Ex. 42 (Wang Dep. Tr.), at 44:9-47:17; 63:23-64:65:7.

Wang also disregarded critical principles of statistics, misinterpreting the findings of the Peto study. As Defendants' biostatistics expert asserts, the failure to show a statistically significant result does not prove the null hypothesis. Ex. 5 (Gibbons Rep.) at 11. While Wang conceded that the rats in the ranitidine group in that study demonstrated non-statistically significant increased number of tumors in the bottom four levels compared to the control group, Ex. 42 (Wang Dep. Tr.), at 53:22-54:54:16, he then mischaracterizes these results as proof of establishing a threshold level for NDMA. In the Peto study, the null hypothesis is that there is no difference between the number of tumors for rodents ingesting NDMA compared to the control group. A lack of statistical significance on that proposition does not prove that there is no difference in the number of tumors at lowest concentration. Yet that is what Wang assumes. Any testimony based on this misunderstanding is unreliable.

### B.      Wang's Calculations Concerning the Amount of NDMA in Ranitidine Are Unreliable

Beyond his erroneous opinion that there is a threshold level of NDMA necessary to cause cancer, Wang's opinions are based on unreliable estimates of the amount of NDMA in ranitidine. Wang concludes that the Plaintiffs in this MDL were not exposed to enough NDMA to cause cancer based on his faulty assumption that the levels of NDMA to which Plaintiffs were exposed is fully captured by Defendants' or FDA's baseline testing data. *See* Ex. 21 (Wang Rep.) at 19. However, this baseline testing data only tells part of the story. It fails to consider testing data that demonstrates the additional NDMA formed due to heat and humidity in the supply chain or after the consumer opens the bottle, and it fails to consider the evidence of additional endogenous formation of NDMA after the tablet is ingested. Ex. 42 (Wang Dep. Tr.), at 108:14-111:04, 115:16-116:13. Wang concedes that NDMA forms in ranitidine due to heat and humidity over time. *Id.* at 108:14-111:04, 115:16-116:13; Ex. 21 (Wang Rep.) at 19. Therefore, the amount of NDMA to which a consumer was exposed at ingestion necessarily includes *more* than the amount present at manufacture. Any NDMA levels measured before that point only tell part of the story. Dr. Wang acknowledges that ranitidine could (and did) continue to degrade after the time in which both GSK and the FDA performed baseline testing on the pills. Ex. 42 (Wang Dep. Tr.) 108:14-111:04,

115:16-116:13. Dr. Wang further admitted that his report did not confront the issue of what levels of NDMA might be in Zantac pills after they went through the distribution chain. *Id.* at 110:8-15. Indeed, he acknowledged that he had not seen *any* testing conducted by Defendants that showed how much NDMA would form in Zantac pills after it went through the full distribution chain or from conditions similar to the consumer experience (i.e. opening the pill bottle and storing in a bathroom medicine cabinet or in a car). *Id.* at 112:02-112:25.

In reaching his opinion that the amount of NDMA ingested from ranitidine would not cause cancer, Dr. Wang failed to consider a number of critical pieces of data which were readily available to him. First, Dr. Wang was only aware of some of the FDA testing. While he was aware of the initial testing levels, he was not aware that the FDA had subsequently conducted stability studies and had found much higher levels of NDMA. *Id.* at 106:21-108:13; 109:11-110:2.[325] Dr. Wang was further unaware that it was this stability testing that actually prompted the FDA recall in April 2020. *Id.* at 106:21-108:13. Dr. Wang also testified that he was unaware of any testing performed by anyone outside of Plaintiffs' expert, Dr. Najafi, who had performed testing with the aim of understanding what happens to the NDMA levels in ranitidine *after* the consumer has purchased the product. *Id.* at 113:1-113:13. In other words, Dr. Wang has no basis whatsoever on which to base an opinion about the levels of NDMA in Plaintiffs' pills.

Ultimately, while Dr. Wang acknowledges that he has no idea how much NDMA was truly in the pills ingested by consumers across the country, he baldly asserts that whatever the amount is, it is insufficient to cause cancer. However, he fails to consider an entire body of epidemiological studies that demonstrate increased cancer risks due to exposure to NDMA. As discussed previously, these NDMA epidemiological studies demonstrate increased cancer risks even at the lower baseline NDMA testing levels demonstrated by the FDA. In addition, despite their substantial limitations, the ranitidine epidemiology studies also support increased cancer risks from ingestion of short-term exposure of ranitidine. Dr. Wang's opinions about the levels of NDMA in ranitidine should be excluded, as well as his opinions that these allegedly low levels of NDMA are not capable of causing cancer.

### C.    Wang Mischaracterizes NDMA Animal Study Results

Wang admits that NDMA is known to be carcinogenic in several animal species, including

---

[325] *See* FDA Response to Emery Pharma Citizen Petition, *supra* note 82.

rat, rabbit, and mouse, but he opines that NDMA was demonstrated not to be carcinogenic in primates. Ex. 42 (Wang Dep. Tr.), at 32:22-33:3. Wang conveniently declined to acknowledge in his expert report that the primates administered NDMA in the study he relied upon all died from toxic effects before the study could be concluded. *Id.* at 33:4-34:16.[326] In other words, this primate study did not go on long enough to provide measurable data on the *carcinogenic* effects of NDMA, because it killed them first. The World Health Organization disagrees with Wang's opinion that the Thorgeirsson study demonstrates that NDMA is not carcinogenic in primates. Nearly 15 years after the Thorgeirsson study was published, the WHO stated that NDMA has induced tumors in every animal study.[327] Because Wang mischaracterizes NDMA animal study results, his opinions regarding the NDMA animal studies should be excluded.

### D.    Wang's Opinions about Valsartan Epidemiological Studies Are Incorrect and Should be Excluded

Wang lacks an understanding about the contamination in Valsartan, which he tries to compare to Zantac. Specifically, Wang relies upon the 2022 Chan study to opine that epidemiological evidence demonstrates that there was no increased cancer risk among patients who took NDMA-contaminated valsartan. Ex. 21 (Wang Rep.), at 21. However, in his deposition, Wang conceded that he was unaware of the time period during which Valsartan was contaminated. Ex. 42 (Wang Dep. Tr.), at 141:18-142:14. He was also unaware that the contamination in Valsartan in large part resulted from a change in the manufacturing process. *Id.* at 149:12-149:22. He was further unaware that while the Chan study included only patients who took Valsartan from January 1, 2003 to June 30, 2010, Valsartan *was not contaminated before 2011*. *Id.* at 149:12-149:22.[328] In other words, the Chan study covered a time period in which Valsartan was not demonstrated to be contaminated with NDMA, meaning the study cannot say whether ingestion of NDMA contaminated Valsartan would increase the risk of cancer. Ex. 42 (Wang Dep. Tr.), at 156:01-157:06. Because it is clear Dr. Wang failed to reliably apply the Valsartan studies to the facts of this case—or even understand them on their own terms—his unreliable opinions on how Valsartan NDMA studies apply here should be excluded.

---

[326] *See also* Thorgeirsson UP, Dalgard DW, Reeves J. *et al.*, *Tumor Incidence in a Chemical Carcinogenesis Study of Nonhuman Primates*, 19 REGUL. TOXICOL. PHARMACOL. 130-151 (1994).
[327] Liteplo, *supra* note 17.
[328] *See also* Anton Pottegard (2018), *supra* note 238.

### E.       Wang's Bradford Hill Analysis is Woefully Deficient

Determining whether an association is causal is a matter of scientific judgment, and scientists reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal inference may be drawn. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018); *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 18 (1st Cir. 2011); *see also* Ref. Man. at 553, 600. However, Wang's Bradford Hill analysis was not performed reliably. He failed to consider non-ranitidine epidemiology. *See* Ex. 21 (Wang Rep.), at 45-50. Indeed, the only place even mentioning non-ranitidine epidemiology is the analogy section. *See* Ex. 42 (Wang Dep. Tr.), at 80:19-81:4. Wang chose to hang his hat solely on ranitidine-specific epidemiology, which is far too limited to apply straightforwardly to Plaintiffs. Wang's failure to consider dietary and occupational epidemiological studies was inappropriate and renders his Bradford Hill analysis unreliable and inadmissible.

### F.       Wang's Opinions Regarding Background Formation of NDMA Are Unreliable

In flat contradiction to the extensive NDMA scientific literature and the urgent concern regulators worldwide have shown to the discovery of NDMA in various drugs, Wang opines that the background amounts of NDMA that form inside human bodies are so high that any additional amount of NDMA ingested from ranitidine would be inconsequential. Ex. 21 (Wang Rep.), at 20. Wang relied on the Hrudey and Fristachi studies but failed to consider other studies on endogenous formation, which estimate background levels of endogenous NDMA at far lower numbers. When questioned on the subject, Dr. Wang conceded that background levels of endogenous NDMA are difficult to calculate. Ex. 42 (Wang Dep. Tr.), at 88:14-23. The studies Wang cherry-picked stand against the great weight of the larger body of available evidence. For example, the Zeilmaker study[329] estimated the ninety-fifth percentile of the study population would only consume approximately 20 nanograms of NDMA per day. *See* Ex. 42 (Wang Dep. Tr.) at 99:3-99:20. Similarly, the European Medicines Agency stated that studies attempting to estimate the background amount of endogenous formation of NDMA were highly variable and unreliable.[330]

---

[329] Zeilmaker MJ *et al.*, *Risk Assessment of N-Nitrosodimethylamine Formed Endogenously After Fish-With-Vegetable Meals*, 116 Toxicol. Sci. 323-35 (2010).
[330] European Medicines Agency, Committee for Medicinal Products for Human Use (CHMP), *Ranitidine          Assessment          Report*,          13          (2020)

Where an expert fails to review all the evidence in a data set and fails to do his own independent testing of that data, but, nonetheless, opines generally on the entire data set, that testimony should be excluded. *See PODS Enters. v. U-Haul Inter., Inc.*, No. 8:12-cv-01479-T-27MAP, 2014 WL 12628664, at *3-4 (M.D. Fla. June 27, 2014). This is because the Court must consider the reliability of the proffered expert's sources and methods. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). Because Wang cherry-picked the only two studies that were favorable to him and did not consider the rest, his opinions about background endogenously formed NDMA should be excluded.

## IX.    Lewis Chodosh

A central premise of Dr. Chodosh's opinions on "whether ranitidine is carcinogenic" is that "[t]he existence of DNA repair mechanisms, along with basic biochemical considerations, result in thresholds for NDMA exposures below which mutations do not occur."[331] But Chodosh follows the same methodology Lindsley called a "mistake,"[332] claiming that "DNA repair results in a non-linear dose-response for both mutagenesis and carcinogenesis for NDMA." Ex. 3 (Chodosh Rep.) at 35. With respect to a DNA-reactive genotoxic carcinogen, such as NDMA, Chodosh's opinion that the existence of DNA repair mechanisms means that there are thresholds of NDMA exposure below which mutations do not occur is not accepted within the relevant scientific community. And just like Guengerich, Chodosh's opinions compound upon this error by claiming that such a threshold—if it existed—would be non-linear, likewise in conflict with the global scientific consensus that known genotoxic carcinogens have no threshold in assessing dose-response and TTCs. *See id.* Accordingly, Chodosh's opinions are nothing more than junk science disguised as expert analysis, and should be excluded. *See In re Accutane Prod. Liab.*, 511 F. Supp. 2d at 1290-91 (quoting *Daubert*, 509 U.S. at 592) ("An expert's methodology must be consistent with the 'methods and procedures of science' rather than being founded on 'subjective belief or unsupported speculation.'").

---

https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-assessment-report_en.pdf.

[331] Ex. 3 (Chodosh Rep.) at 35; *see also* Ex. 26 (Chodosh Dep. Tr.) at 142:23-144:17 (similarly testifying that "[g]iven the existence of DNA repair mechanisms… thresholds will exist below which there is not a detectable mutagenic or carcinogenic effect of a compound like NDMA.").
[332] Ex. 35 (Lindsley Dep. Tr.), at 135:12-136:4.

### A.     Chodosh's Dose-Response Opinions Should Be Excluded for the Same Reason as Guengerich's

As already discussed at length, NDMA undisputedly is genotoxic and clastogenic. *See Nohmi, supra* note 302. Even Defendants' own documents acknowledge this. *E.g.*, Ex. 60 (GSKZAN0003419540 at 3419545). But Chodosh does not, and instead deflects, claiming that "low levels of NDMA-induced DNA damage that can be repaired prior to DNA replication will not result in mutations and there cannot result in carcinogenesis." Ex. 3 (Chodosh Rep.), at 57.[333] Chodosh reaches this conclusion by claiming that "DNA repair results in a non-linear dose response for both mutagenesis and carcinogenesis for NDMA." *Id.* at 92.

Like Guengerich, Chodosh's methodology here is well outside the mainstream of generally accepted practice in the public health arena. No toxicologist or public health agency accepts the claim that a non-linear threshold can be generally applied to a genotoxic carcinogen, or specifically applied to NDMA. As such, this opinion should be excluded, as "widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique that has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Chodosh's opinions in this regard are singular and unsupported by any authority (at least outside of Guengerich). Such "scientific guesswork" has no place in this Court. *McClain*, 401 F.3d at 1247.

### B.     Chodosh's DNA Repair Opinion Is Unreliable Because He Considers Just One Mechanism

Chodosh's opinions are even further afield when considering that there are multiple ways by which NDMA causes multiple types of DNA adducts, but he only studied *one* such repair mechanism of *one* such adduct in opining that the body's DNA repair mechanisms are sufficient to repair *all* NDMA-damaged DNA. *See* Ex. 26 (Chodosh Dep. Tr.) at 155:24-159:11. Chodosh admitted that NDMA causes N7-methylguanine, O6-methylguanine, N3-methyladenine, and O4-methylthymine adducts, but was unable to provide an answer as to the process by which those other NDMA-caused adducts were repaired. *See id.* Since each adduct can cause cancer, each would need to be repaired by some specific mechanism for Chodosh's methodology to be reliable.

---

[333] But whether DNA "can" be repaired by DNA repair mechanisms begs the question, because mutations and carcinogenesis occur when DNA repair mechanisms fail, and Defendants' other experts acknowledge that the body's DNA repair system is imperfect and does not prevent DNA damage from becoming cancer every time. *See, e.g.*, Ex. 32 (Guengerich Dep. Tr.) at 415:6-13.

But Chodosh had no specific explanation on this point, merely asserting that the body's DNA repair mechanisms were sufficient to repair "NDMA-induced DNA damage" such that it "will not result in mutations and there cannot result in carcinogenesis." This mere scientific guesswork that should be excluded. Chodosh's methodology regarding the use of a threshold dose for a genotoxic carcinogen is unsupported and not reliable. Accordingly, his opinions should be excluded.

## X.      Namandjé Bumpus

Dr. Bumpus is a pharmacology professor. *See* Ex. 1 (Bumpus Rep.) at 1. She was retained to offer an opinion that ranitidine does not convert to NDMA inside the human body. *See* Ex. 24 (Bumpus Dep. Tr.) 18:02-05. Her opinion is premised on the findings of two recent studies, one involving simulated gastric conditions (Gao) and the other measuring plasma and urinary excretion in a healthy population of users (Florian). Dr. Bumpus maintains these two studies—to the exclusion of all others—reflect the "clinically relevant conditions" necessary to support her conclusion that NDMA could not have formed endogenously (i.e., within the body) among the ranitidine users at issue in this litigation. *See* Ex. 1 (Bumpus Rep.) at 4.

Bumpus' opinions are flawed, and Plaintiffs would move to exclude them, but were notified on July 5th by Defendants that she will no longer be testifying. Because Bumpus will no longer be testifying, her opinions will not be admitted in any trial, and so any motion to exclude her testimony would be moot. *See, e.g.*, *Andrade v. Merson*, Case No. 21-cv-60563, 2012 WL 7451931, *4 (S.D. Fla. Dec. 3, 2021) (denying *Daubert* motion lodge against withdrawn expert as moot). Defendants cannot rely on opinions that have not undergone *Daubert* scrutiny. *See* *Morrison v. Exxon Mobil Corp.*, Case No. 1:03-cv-140, 2007 WL 988862, at *5 (M.D. Ga. Mar. 29, 2007) (refusing to allow party to rely on previously withdrawn expert because breadth of allowable testimony had not been fully developed). Similarly, Defendants' other experts should not be allowed to offer evidence that relied on any of Dr. Bumpus' opinions in this case. *See* *Starling v. Union Pac. R. Co.*, 203 F.R.D. 468, 479-80 (D. Kan. 2001) (expert testifying at trial cannot bring in expert opinions of expert who has been withdrawn, which would otherwise allow "end around"); *Ponca Tribe of Indians v. Cont'l Carbon Co.*, No. CIV-05-445, 2009 WL 5842041, *4 (W.D. Okla. Jan. 16, 2009) (same).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' putative expert witnesses on general causation be excluded under Rule 702.

Dated: July 6, 2022                           Respectfully submitted,


*/s/ Tracy A. Finken*                         By: */s/ Robert C. Gilbert*
Tracy A. Finken                               Robert C. Gilbert, FBN 561861
Email: tfinken@anapolweiss.com                Email: gilbert@kolawyers.com
ANAPOL WEISS                                  KOPELOWITZ OSTROW FERGUSON
One Logan Square                              WEISELBERG GILBERT
130 North 18th Street, Suite 1600             2800 Ponce de Leon Boulevard, Suite 1100
Philadelphia, PA 19103                        Coral Gables, FL 33134
Tel: (215) 735-1130                           Tel: (305) 384-7270


*/s/ Michael L. McGlamry*                     */s/ Adam Pulaski*
Michael L. McGlamry                           Adam Pulaski
Email: efile@pmkm.com                         Email: adam@pulaskilawfirm.com
POPE McGLAMRY, P.C.                            PULASKI KHERKHER, PLLC
3391 Peachtree Road NE, Suite 300             2925 Richmond Avenue, Suite 1725
Atlanta, GA 30326                             Houston, TX 77098
Tel: (404) 523-7706                           Tel: (713) 664-4555


*Plaintiffs' Co-Lead Counsel*


Rosemarie R. Bogdan                           Mark J. Dearman, FBN 0982407
Email: Rosemarie.bogdan@1800law1010.com       Email: mdearman@rgrdlaw.com
MARTIN, HARDING & MAZZOTTI                     ROBBINS GELLER RUDMAN & DOWD
1 Wall Street                                 120 East Palmetto Park Road, Suite 500
Albany, NY 12205                              Boca Raton, FL  33432
Tel: (518) 862-1200                           Tel: (561) 750-3000


Elizabeth A. Fegan                            Marlene J. Goldenberg
Email: beth@feganscott.com                    Email: mjgoldenberg@goldenberglaw.com
FEGAN SCOTT, LLC                              GOLDENBERG LAW, PLLC
1456 Sycamore Rd.                             800 LaSalle Avenue, Suite 2150
Yorkville, IL 60560                           Minneapolis, MN  55402
Tel: (312) 741-1019                           Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

127

**Motion to Seal/Sealed and Exparte Filings:**

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

## U.S. District Court

## Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered by Gilbert, Robert on 7/6/2022 at 10:34 PM EDT and filed on 7/6/2022

**Case Name:**        IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION
**Case Number:**      9:20-md-02924-RLR
**Filer:**            Zantac (Ranitidine) Products Liability Litigation
**Document Number:** 5841

**Docket Text:**
**Plaintiff's SEALED MOTION** *Plaintiffs Motion to Exclude Defendants Putative Expert Opinions on General Causation Under Rule 702* **by Zantac (Ranitidine) Products Liability Litigation. (Gilbert, Robert)**

**9:20-md-02924-RLR** No electronic public notice will be sent because the case/entry is sealed.

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=7/6/2022] [FileNumber=22352532-0
] [7b7573f84ca57fefc1cd1d3a1132a6409c2b050e3058c66c2d578d1ddc8722a7637
fbc06130361087a4496a28bc90fbe4c2c5468da08dc8cc94db8e19cdec2c4]]