# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

______________________________/

| | |
|---|---|
| REMOTE VIDEOTAPED DEPOSITION OF: | ARTHUR CIOCIOLA, PH.D. (Pfizer, Inc.) |
| DATE TAKEN: | March 24, 2021 |
| TIME: | 10:30 a.m. to 7:12 p.m. |
| PLACE: | Witness appeared remotely from Tarrant County, Texas |
| BEHALF OF: | The Plaintiff(s) |
| REPORTER: | Michelle R. Hordinski, RMR, CRR, appearing remotely from Lee County, Florida |

______________________________________

U.S. LEGAL SUPPORT
Registered Professional Reporters
2271 McGregor Boulevard, Second Floor
Fort Myers, Florida 33901
Phone: (239) 332-7443 FAX: (239) 332-4066
Offices in Naples * South Fort Myers * Punta Gorda

REMOTE APPEARANCES:

Appearing on behalf of the Zantac PSC:

RICARDO MARTINEZ-CID, ESQ.
Podhurst Orseck, P.A.
1 SE 3rd Avenue -- Suite 2300
Miami, Florida 33131
rmartinez-cid@podhurst.com

Appearing on behalf of the Zantac PSC:

BRET STANLEY, ESQ.
Pulaski Kherkher, PLLC
2925 Richmond Avenue, Suite 1725
Houston, Texas 77098
Bstanley@pulaskilawfirm.com

Appearing on behalf of the Zantac PSC:

FRANK WOODSON, ESQ.
Beasley Allen Law Firm
218 Commerce Street
Montgomery, Alabama 36104
Frank.woodson@beasleyallen.com

Appearing on behalf of the Plaintiffs:

COURTNEY MOHAMMADI, ESQ.
Pope McGlamry
3391 Peachtree Road NE, Suite 300
Atlanta, Georgia 30326
Courtneymohammadi@pmkm.com

Appearing on behalf of the Defendant, Pfizer, Inc.:

M. ELAINE HORN, ESQ.
ANNIE E. SHOWALTER, ESQ.
Williams & Connolly, LLP
725 Twelfth Street NW
Washington, DC 20005
Ehorn@wc.com
Ashowalter@wc.com

Appearing on behalf of the Defendants, Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc.:

PAIGE H. SHARPE, ESQ.
MOHAMED AL-HENDY, ESQ.
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Paige.sharpe@arnoldporter.com
Mohamed.al-hendy@arnoldporter.com

Appearing on behalf of the Defendant, Boehringer Ingelheim:

JULIA ZOUSMER, ESQ.
King & Spalding
110 N. Wacker Drive, Suite 3800
Chicago, Illinois 60606
Jzousmer@kslaw.com

Appearing on behalf of the Defendants, GlaxoSmithKline LLC and GlaxoSmithKline PLC:

CAROLINE POWER, ESQ.
DECHERT
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
Caroline.power@dechert.com

Appearing on behalf of the Defendant, Perrigo:

MATTHEW H. TRANTER, ESQ.
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
Mtranter@gdldlaw.com

Appearing on behalf of the Defendant, Par Pharmaceutical:

CHRISTIAN W. SAUCEDO, ESQ.
Reed Smith, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
Csaucedo@reedsmith.com

Appearing on behalf of the Defendants, AmerisourceBergen Corporation and Amerisource Health Services, LLC:

LAUREN E. O'DONNELL, ESQ.
Blank Rome, LLP
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
Odonnell@blankrome.com

Appearing on behalf of the Defendant, Sandoz:

ANN MARIE DUFFY, ESQ.
Hollingsworth, LLP
1350 I Street, NW
Washington, DC 20005
Aduffy@hollingsworthllp.com

Appearing on behalf of the Defendants, Albertsons Companies, Inc., Amazon.com, Inc., BJ's Wholesale Club Holdings, Inc., Costco Wholesale Corporation, CVS Pharmacy, Inc., Duane Reade, Inc., Giant Eagle, Inc., Publix Super Markets, Inc., Rite Aid Hdqtrs. Corp., Safeway Inc., ShopRite Supermarkets, Inc., Southeastern Grocers, Inc., Walgreen Co., Walgreens Boots Alliance, Inc., Wakefern Food Corporation, H-E-B Grocery Company, LP, and Winn-Dixie Stores, Inc.:

ALICE J. SPRINGER, ESQ.
Barnes & Thornburg, LLP
201 S. Main Street
Suite 400
South Bend, Indiana 46601
Alice.springer@btlaw.com

Appearing on behalf of the Defendant, Nostrum Laboratories, Inc.:

DREW M. LEVIN, ESQ.
Conroy Simberg
3440 Hollywood Boulevard
Second Floor
Hollywood, Florida 33021
Dlevin@conroysimberg.com

Appearing on behalf of the Defendant, Novitium Pharma:

AMY L. BAKER, ESQ.
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 North Orange Avenue, Suite 1200
Orlando, Florida 32801
amy.baker@wilsonelser.com

THE VIDEOGRAPHER and DEPO TECHNICIAN: John Schmitzer, US Legal Support

ALSO PRESENT: Caroline Herter, Law Clerk, Podhurst Orseck

---

# I N D E X


| | Page |
|---|---|
| Direct Examination By Mr. Martinez-Cid | 10 |
| Cross-Examination By Ms. Horn | 227 |
| Cross-Examination By Ms. Power | 234 |
| Redirect Examination By Mr. Martinez-Cid | 243 |
| Recross-Examination By Ms. Horn | 247 |


# E X H I B I T S


| No. | Description | Page |
|---|---|---|
| 277 | Curriculum Vitae Bates No. PFI00594067 - 00594088 | 16 |
| 278 | 1998 Document Bates No. BOE_ZAN_MDL_0000018137 - 0000018153 | 44 |
| 279 | Document 10/19/1998 Bates No. BOE_ZAN_MDL_0000018254 - 0000018264 | 61 |
| 280 | Glaxo Wellcome Memo FDA Trip Report 10/28/1998 Bates No. BOE_ZAN_MDL_0000018299 - 0000018301 | 73 |
| 281 | 11/25/1998 Letter from Ciociola to Talarico Bates No. BOE_ZAN_MDL_0000018336 - 0000018413 | 75 |
| 282 | Chr&D Performance Evaluation Process Bates No. Pfi00276870 - 00276889 | 91 |
| 283 | Pfizer Consumer Healthcare Medical & Regulatory Affairs Record of FDA Contact Bates Nos. Pfi00361308 - 00361317 | 137 |
| 284 | Project Zantac 150 R&D Strategy Bates No. PFI00276752 | 158 |
| 285 | 12/16/1981 Glaxo Document Bates Nos. Gskzan0000386852 - 0000386854 | 160 |

| | | |
|---|---|---|
| 286 | Hazard Assessment Report Dated 9/25/2019 Bates Nos. GSKZAN0000245717 - 0000245726 | 164 |
| 287 | Tanner Study Dated April 6th, 1982 Bates Nos. GSKZAN0000084994 - 0000085003 | 174 |
| 288 | Glaxo Report March 1986 Bates Nos. GSKZAN0000369313 - 0000369342 | 194 |
| 289 | Journal of the Polish Pediatric Society Monthly Publication Bates Nos. GSKZAN0000235261 -0000235271 | 199 |

REPORTED REMOTELY FROM LEE COUNTY, FLORIDA

THE REPORTER: Will the witness please present his government-issued identification and hold it up to the camera for verification?

(Witness presents his Texas-issued ID and identity verified.)

MR. SCHMITZER: We are now on the record. Participants should be aware that this proceeding is being recorded, and, as such, all conversations held will be recorded unless there's a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside of the presence of the remote interface. For the purposes of creating a witness-only video recording, the witness is being locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who does not want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the remote depo interface.

This is the remote video recorded deposition

of Arthur Ciociola being taken by counsel for the plaintiff. Today is Wednesday, March 24, 2021, and the time is now 1435 UTC.

We are here in the matter of In Re: Zantac (Ranitidine) Products Liability Litigation. My name is John Schmitzer, remote video technician on behalf of U.S. Legal Support. I'm not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter on behalf of U.S. Legal Support please enter the statement for remote proceedings into the record.

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order No. AOSC20-32.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting unless an objection is stated at this time.

Testimony taken before Michelle R. Hordinski, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Florida at Large in the above cause.

Thereupon,

ARTHUR CIOCIOLA, PH.D.,

having been first duly sworn or affirmed, was examined and testified as follows:

THE REPORTER: Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

DIRECT EXAMINATION

BY MR. MARTINEZ-CID:

Q. Good morning, sir.

A. Good morning, Mr. Martinez.

Q. Could you please state your full name for the record?

A. Yes. Full name, Arthur A. Ciociola.

Q. Dr. Ciociola, have you ever been deposed before?

A. I have, Mr. Martinez, many years ago.

Q. Just as a refresher, really the most important

rule is please make sure you understand my question. So if at any time you're not sure you do, I am happy to repeat it or rephrase it. If you do answer, as you are under oath, we're going to assume you understood it and are answering truthfully and completely.

Is that fair?

A. Yes. Thank you, Mr. Martinez.

Q. Please. And, also, sooner or later almost all of us fall into the habit of doing things that -- forgetting that Michelle has to take down everything we're saying. And so we'll answer with a nod or with a way we might do in normal conversation that doesn't come out clearly on the record. And I might ask you to repeat yourself. Please don't find me rude. It's just to get a clean record.

If you need a break at any time, please let me know, and I'll be happy to do that if there's no question pending.

A. Great. Thank you, Mr. Martinez. I may ask for a break every now and then. I'll do my best.

Q. No, please, don't hesitate to.

Sir, are you represented by any attorney today?

A. I've been -- other than Elaine, who's on the call, as well, and that is all.

Q. And is Ms. Horn your attorney for the purposes of this deposition? Maybe I should ask Elaine that question.

MS. HORN: Yeah. Let me clarify. I am representing Pfizer, and so to the extent he's appearing as a former employee of Pfizer, that's the interest that I'm here representing.

MS. DUFFY: Yes, and this is Ann Marie Duffy. I represent the witness's current employer, Novartis. So I'm here appearing on behalf of Novartis that is not a party to the MDL or any ranitidine Zantac litigation.

MR. MARTINEZ-CID: Okay, thank you, Ms. Duffy.

BY MR. MARTINEZ-CID:

Q. So, Dr. Ciociola, you don't have any personal counsel for this deposition; am I correct?

A. That's correct. I do not have any personal counsel.

Q. And is there anyone in the room with you today?

A. No, sir. There's no one else in the room.

Q. Where are you located?

A. [redacted]

Q. And just so that you understand, during the

deposition you are not permitted to communicate with anyone else while there's questioning. Of course, on a break you can do what you like, but that includes, you know, text messages or emails or other messaging systems during the course of the deposition.

Is that understood?

A. Yes, that's understood, Mr. Martinez. In fact, I do not have my cell phone with me or -- it's in the other room.

Q. Great.

And, sir, you mentioned that you had been deposed before. What was the last time you had given a deposition?

A. Yeah. The last time, Mr. Martinez, I gave a deposition was when I was with Pfizer Consumer Group regarding some products that we were involved in at that point in time. There was some legal action in that regard at that point in time.

Q. And do you recall approximately what date that would have been?

A. Oh, Mr. Martinez -- Mr. Martinez, I'm sorry. I do not know the answer to that.

Q. Please. And I'm not -- and I'm not looking for an exact date. And I understand that even -- even getting the year right might be wrong. But what's your

best estimate?

A. I was involved --

Q. Let me back you up. What product did it involve?

A. Yes, that I know. Nix. It was for head lice treatment. It was a Pfizer consumer product.

Q. And do you know what the nature of the legal action was?

A. The nature of the legal action was loss of efficacy of the product.

Q. I'm sorry. I interrupted your thinking when you were going to try to give us a ballpark year.

A. Yes, Mr. Martinez, I was at the Pfizer Consumer Group between 1998 and 2002, and it certainly was between that time period.

Mr. Martinez, I'd be guesstimating if I guessed at any one of those years, so I hope you can understand.

Q. Absolutely.

Any other depositions you've given?

A. No.

Q. And what is your current employer?

A. My current employer is Novartis Pharmaceuticals.

Q. And what do you do at Novartis?

A. Yes, Mr. Martinez. My title is I'm vice president and head of regulatory for pharmaceuticals in the ophthalmic division.

MR. MARTINEZ-CID: I'm going to ask John to mark tab 1 in our Box that is Bates-numbered PFIZER361728. And I'll go ahead and share my screen to make sure we're all looking at the same thing.

BY MR. MARTINEZ-CID:

Q. Dr. Ciociola, are you able to see what I have up on the screen?

A. Yes, Mr. Martinez, I can see it now. Mr. Martinez, I'm going to move your document in this -- to my larger monitor, and it will help me be able to see your screen.

Q. And, actually, I am already -- I'm showing you the wrong document and I'm telling John the wrong document. It's actually tab number 2, and it's Bates-numbered 594067, is actually what I meant to put up and will hopefully make more sense to you.

Let me share that now.

A. So, Mr. Martinez, just to describe for you, I have my camera, and then I have a larger screen to the right. And now I can see -- see the document much better. Thank you.

Q. Sure.

And I wanted you to take a look and see if you could confirm for me that this is the most current version of your curriculum vitae.

A. Yes.

Mr. Martinez, can you -- there's a version at the bottom of that document. First page, I can see it. And the date is January 20th (sic), 2020, and that is the current version.

Q. Great. Thank you.

And I think you'll probably have trouble seeing it because it's so faint. I think that's a 29, 2020. Does that sound familiar?

A. Yes, Mr. Martinez. It's just a little bit difficult for me to read.

Q. Totally understand.

I wanted to go through a little bit of your background. I thought this might be helpful for us. And just to confirm, we've marked this as Exhibit 277 to your deposition.

(Exhibit 277 was marked for identification.)

THE WITNESS: Mr. Martinez, can I make this document any larger? Is that something I can do?

MR. MARTINEZ-CID: So, John, are you putting -- once the exhibits are moved into

evidence, are you putting them in a Box that Dr. Ciociola can manipulate as he will?

MR. SCHMITZER: Yes. That is correct. He just needs to refresh his Internet browser.

MR. MARTINEZ-CID: Okay. Perfect.

BY MR. MARTINEZ-CID:

Q. So, Doctor, if you go to that Box that you had set up ahead of time, the document should be sitting right in there as Exhibit 277. And that would give you full control of it.

A. Okay. I am clicking on it right now. Oh, I see it, 0277. Thank you, Mr. Martinez.

Q. Great. Let me know when you're set up and comfortable with it.

A. Okay. One more second. It's loading now, Mr. Martinez. Much -- much better. Thank you.

Okay, Mr. Martinez. I'm prepared.

Q. Great. Looking at your educational background, I see that you got your bachelor of science in biochemical pharmacology at SUNY in Buffalo; is that correct?

A. Yeah, that is correct, Mr. Martinez. My bachelor's degree is in biochemical pharmacology.

Q. Can you tell us a little bit about what that entails, biochemical pharmacology?

A. Yes. Biochemical pharmacology is the study of the impact of drugs on the human body, and also with a particular focus, Mr. Martinez, on the biochemical aspects of it and how the body deals with drugs and the impact of those drugs on the body.

Q. And, sir, I see that you earned a master's in pharmacology from Temple University afterwards, correct?

A. Yes, that's correct. I did earn a master's in pharmacology from Temple University.

Q. And then a doctorate in pharmacology, as well, correct?

A. That's correct, a doctorate in pharmacology at Temple University, as well.

Q. The dissertation that you did, I see it. I won't pretend to understand what teratogenic and behavioral anomalies induced by acute exposure of mice to ethanol and their relation to DNA synthesis is specifically, but I understand that it is a study that you did or a research paper that you did looking at exposure of mice to ethanol. That much I got.

A. Yes, Mr. Martinez, you are absolutely correct.

Q. And is it -- it's common, isn't it, to study the effects of the drugs or different chemicals to animals to gain an understanding of how they might -- how humans might react to the same substances?

A. Yes. That's correct, Mr. Martinez. It is common to study animal species and attempt to extrapolate the results and observations in animals to humans.

Q. And from my reading of your CV, it says you've been with Novartis since 2016; is that correct? No. I'm sorry. 2012.

A. Yes.

Q. Go ahead.

A. I'm so sorry, Mr. Martinez. Yeah, I was just going to correct you.

Yes, 2012 was when I joined Alcon, which is a division -- was, Mr. Martinez, a division of Novartis, and you can see that I had two different roles while at Alcon Novartis.

Q. And until 2016 -- well, I see one of those roles was that you worked in global research and development for Alcon and Novartis?

A. Yes, Mr. Martinez, that's correct in that I did work and continue to work in global research and development.

Q. And that's -- global research and development, is that something that you worked on for virtually most of your career?

A. Yes, Mr. Martinez. I have worked most of my

career in research, in the development area.

Q. I'd like to take you back to your time with Pfizer. I see you were with Pfizer until 2007; is that correct?

A. Yes, Mr. Martinez. I was with Pfizer until 2007.

Q. I'm looking at page 6 of your CV. Sorry. I'm just scrolling there. And I just want to ensure that I have an accurate picture of what you did with Pfizer. I see from November 2003 to April of 2007 working as a vice president. It says you served as a site leader overseeing the worldwide regulatory affairs and quality assurance activities of all early and full development projects, including oncology, neurosciences, metabolic diseases, infectious diseases, and ophthalmology therapeutic areas; is that correct?

A. Yes, Mr. Martinez, that's correct. I was in the regulatory affairs and quality assurance group during that time of 2003 to 2007 while at Pfizer, and the activities at that particular site at Pfizer included areas of oncology, neurosciences, metabolic diseases, infectious diseases, and ophthalmology.

Q. And oncology, that would be the study of cancer?

A. Yes, Mr. Martinez, oncology is indeed the

study of cancer.

Q. And so you had responsibility for many years in overseeing activities in dealing with that area, correct?

A. Yes. That's correct, Mr. Martinez. I was responsible for the regulatory affairs portions associated with the development of oncology drugs.

Q. And if I understood -- let me take you back quite a bit. As you know, we're here about Zantac and ranitidine, and you had quite a bit of involvement with that with your time at Pfizer; is that correct?

A. Mr. Martinez, I was heavily involved with ranitidine during my time while I was with the over-the-counter or the consumer products group at Pfizer.

And, Mr. Martinez, if you scroll a bit down, you'll see that I was at that particular group from 1998 through 2002.

Q. I'm looking at page 9 of your CV. Is that where you would start your involvement with ranitidine?

A. I'm scrolling a bit, Mr. Martinez. Hold on one second.

Q. Sorry. And, actually, I think it bleeds out onto page 10.

A. As it says, Mr. Martinez, I joined the Pfizer

Consumer -- so sorry -- Pfizer Consumer -- Warner-Lambert Consumer Group, which ultimately became the Pfizer Consumer Group in September of 1998, and then I was with the consumer products group, Mr. Martinez, through 2002 when I left that particular group.

Q. Sir, I think when you -- before you were at Warner-Lambert, which became Pfizer, you were at Glaxo, correct?

A. Yes, that's correct, prior to my joining the Warner-Lambert consumer products group, I was indeed with Glaxo.

Q. And had responsibility overseeing Zantac at Glaxo, as well, correct?

A. I had responsibility for overseeing Zantac as far as its Rx-to-OTC during those years. Mr. Martinez, as you can see from my CV, I joined that over-the-counter group in 1996, and you'll see that I was responsible for the Rx-to-OTC switch of Zantac 150.

Q. And what was involved in overseeing that switch from prescription to an over-the-counter medication?

A. Mr. Martinez, a whole host of actions. My role during those years of 1996 was essentially to act as a -- I'll use this term, Mr. Martinez -- project sponsor, so my job was to oversee the activities of a

whole series of line functions, experts in various areas, Mr. Martinez, not only things like manufacturing, but clinical research, statistics, patient safety, and a whole series of experts, if you will, who supported those particular projects and project teams that were looking to develop ranitidine, Zantac for over-the-counter use in the U.S.

Q. Research and patient safety go hand-in-hand; would you agree?

A. Oh, yes, Mr. Martinez. I think, along with many other key functional experts. And I use functional -- Mr. Martinez, I define that as individuals who have specific line functions such as manufacturing, chemistry, statistics, Mr. Martinez. So, hence, I do use that word "function."

Q. And I think with respect to your particular training and background, it would be in the areas of research that -- that you were most equipped to deal with; is that correct?

MS. HORN: Objection. Form.

You can answer.

THE WITNESS: You know, Mr. Martinez -- so sorry, Elaine, I couldn't quite hear you.

Mr. Martinez, I really would like to have that question rephrased.

BY MR. MARTINEZ-CID:

Q. Sure. And I am -- let me -- let me do that. And perhaps I am wrong, but in looking at your background and your experience, it seems to me that of the areas that you mentioned, it would be in the research and development area that your particular focus would be, as opposed to in manufacturing or other areas that you discussed.

A. Mr. Martinez, let me -- let me just clarify.

In my field, if you will, we have research and development, as you described. And development is really the focus on developing drugs for human use, so my -- as you can see from my publications, the various roles that I've served over the years, my focus really has been on the clinical aspects, clinical development.

Q. And tell me about that. What does that mean when you say "clinical aspects"?

A. Clinical aspects, Mr. Martinez, as I was describing, is overseeing the conduct of clinical studies. And, as you can see from my publications, I have been involved in many clinical studies over the years.

Q. And that includes many such studies on Zantac and -- well, ranitidine, correct?

A. Yes. I was involved in a number of clinical

studies involving ranitidine. As you can see, Mr. Martinez, I was involved in a product called Tritec, ranitidine bismuth citrate. I was also, as I shared earlier, involved in clinical studies looking at the use of ranitidine for over-the-counter use.

Q. And you also had responsibility while you were at Pfizer to oversee teams of clinical research scientists and product development chemists that were working on ranitidine, as well, correct?

MS. HORN: Objection. Form.

BY MR. MARTINEZ-CID:

Q. Sorry, Doctor. You can answer. When -- the objections are made just for the record, but unless you hear someone specifically ask you not to answer a question, you can just go ahead and answer the question.

A. Thank you for clarifying, Mr. Martinez.

Mr. Martinez, could you -- could we scroll up to the particular area of my CV where you're asking me to clarify? And I apologize.

Q. Sure. No. I'd be happy to. And there's a number of different areas, but to pick one, I'll go to page 8, and I'll look at the description that you have written here while you were vice president, global gastroenterology at Pfizer Consumer Healthcare.

And looking at the second paragraph, the

second sentence says you supervised the activities of nine directors, assigned to oversee 60 staff, consisting of pharmaceutical product development chemists, manufacturing process engineers, clinical research scientists, and project managers.

Do you see that, sir?

A. Yes. Yes, Mr. Martinez, I can see that. I have it open in front of me, Mr. Martinez.

Q. Okay. Great.

A. Just go ahead.

Q. No. And so -- and so what I was just confirming in putting it together, that your responsibility was for all the current marketed products in gastroenterology like Zantac, that you were overseeing the clinical research scientists and project managers on Zantac for Pfizer, as well, correct?

A. Yes. Mr. Martinez, I had line responsibility -- line management responsibilities for formulation efforts, manufacturing, process development, clinical research, medical affairs, and project management, as well.

Q. I'm just -- I'm just looking now. I guess your -- your involvement with Zantac would have begun at Glaxo, if -- I'm looking at the bottom of page 10. Let's see. I thought I saw -- I was looking for the

first mention of Zantac, and I thought it was -- I think it may be at the top of page 10, but you can confirm that with me.

Was it -- was your first involvement at Zantac in your role that's described at the bottom of page 9 -- I'm sorry, top of page 10, director of international over-the-counter clinical development, gastrointestinal products, Glaxo, August 1996 to November 1996?

A. Yes. That was -- Mr. Martinez, I just want to be clear. That was my first involvement with Zantac in that role of over-the-counter products.

As I described for you earlier, Mr. Martinez, that was my role at the time, was the -- oversee the efforts to change the registration status from Zantac from Rx to over-the-counter status.

Q. And did you have any involvement with Zantac before your involvement in trying to get it approved for over-the-counter use?

A. Very little involvement with Zantac.

As you can see, Mr. Martinez, if you scroll down on the page there, while I was involved with ranitidine as -- ranitidine as in a drug called Tritec, ranitidine bismuth citrate, as I stated earlier to you, Mr. Martinez.

Q. So with ranitidine being -- and ranitidine is

a generic name for the Zantac drug, correct?
A. Yes, Mr. Martinez. Ranitidine is the generic name for Zantac.
Q. And if we look at your involvement with ranitidine, does that begin in 1991? I'm looking at page 11.
A. Yes -- hold on, Mr. Martinez, before I say yes.
Q. Take your time.
A. Prior to 1991, Mr. Martinez, I was involved in a program called Zofran. Zofran was ondansetron. You can see that on page 11 where I led the clinical activities for the approval of this particular product, which is for nausea and vomiting associated with chemotherapy.
And in 1991, I then joined the gastroenterology group and was the clinical project leader, Mr. Martinez, for the development of a new antiulcer compound called Tritec, which was ranitidine bismuth citrate.
Q. Actually, let me take you back to when you first joined Glaxo in 1987. It says that you were involved in studies involving peptic ulcer disease. It looks like there was Zantac and ranitidine involved in those studies, as well.

Do you see that?
A. Yes, I do, Mr. Martinez.
Q. Can you tell me a little bit about what you were doing at that time?
A. Yes. Mr. Martinez, my -- my role in 1987, as you described, was a clinical research scientist. Clinical research scientist, Mr. Martinez, is a clinical monitor, and clinical monitors are responsible for traveling to various hospitals, clinics, and ensuring that the studies are conducted properly, making sure they're documenting those activities.
My focus during those years was on a drug called Zofran. As you can see later in time, I took over the -- I was the clinical lead for Zofran. This was ondansetron. This was the drug for -- as I described to you, Mr. Martinez, just a moment ago, was for the prevention of nausea and vomiting associated with chemotherapy. It was a fantastic drug, Mr. Martinez.
And so my involvement in those studies for ranitidine was quite minimal and only happened at clinical sites where these hospitals may have been conducting both studies of Zantac and Zofran at that time.
Q. But you'd agree with me that your involvement

with these ranitidine studies was significant enough that it's worthy of mention in your -- in your CV as something that you did in your -- in your daily business?

A. I wouldn't call it significant, Mr. Martinez. I cited it in my CV for completeness and full transparency and honesty.

Q. So you really would begin your involvement with ranitidine in earnest in 1991?

A. That's correct, Mr. Martinez. My -- my involvement really was 1991.

And if you wish to use the term "significant involvement," Mr. Martinez, my -- there I was, indeed, in 1991, August of 1991, I was focused on ranitidine bismuth citrate, a new antiulcer product for the treatment of helicobacter-associated disease.

Q. And until what year were you significantly involved with overseeing any activities relating to ranitidine? Would it be until you left Pfizer?

A. I would say until I left the Pfizer Consumer Group, which would have been June of 2002, Mr. Martinez.

Q. And when you left the Pfizer Consumer Group, tell me how your role at Pfizer changed.

A. Yes, Mr. Martinez.

My role changed significantly. Prior to 2002,

and, if you will, from 1998 through 2002, I was involved in the consumer products activities. When I left the consumer products group in 2002, I moved to the Pfizer prescription side of the business. And there I was no longer responsible for any -- any interactions regarding gastroenterology.

And, as you can see from page -- Mr. Martinez, I'm scrolling, if you don't mind. As you can see, my focus was in other therapeutic areas, and it did not include gastroenterology or ranitidine.

Q. You talked to me about the work that you did on the -- on the over-the-counter application of Zantac from prescription to over the counter, I'm sorry, the switch from prescription to over the counter, and we also talked about your work with ranitidine on -- on Tritec.

Can you recall any other significant projects or undertakings or anything else that focused your work on -- as it relates to ranitidine?

A. I'm just thinking, Mr. Martinez.

In general, no. My focus at those years, particularly from -- during my time working on Tritec, that was the sole focus on working on that drug.

And then after leaving that group, Mr. Martinez, my focus was on, as you described,

ranitidine over-the-counter steps.

Q. And you were involved, though, in many different aspects of -- well, actually, let me make sure I don't misspeak.

A. Where are you looking, Mr. Martinez?

Q. That's a good question. I am -- I am looking at -- so on -- on page 6 and 7 of your CV and just looking at some of the descriptions of the work that you did.

As a senior regulatory person, you were responsible for representing Pfizer during regulatory inspections by the FDA, and you represented Pfizer in appropriate scientific or regulatory activities to influence the regulatory environment; is that accurate?

A. Yes. That's accurate, Mr. Martinez.

My job in the regulatory field was to be involved in regulatory interactions with regulatory agencies. And I attend a number of meetings at the time for -- as needed by Pfizer to represent Pfizer.

Q. And there were a number of times that you represented Pfizer at such meetings with the FDA with regard to Zantac, correct?

A. That's correct, Mr. Martinez.

I did represent Pfizer at a variety of FDA meetings regarding ranitidine. That's correct,

Mr. Martinez.

Q. And --

MS. HORN: Ricardo, are you still on page 6?

MR. MARTINEZ-CID: I'm sorry. I am not on a particular page at the moment. If you were looking at where I read from, I had not scrolled to it. I should have done that so that you could follow on the screen. I apologize.

But I -- that was -- so that you could see now, hopefully, at the -- I read from -- I think that's the -- I read from the bottom of page 6 and from the top of page 7.

THE WITNESS: Mr. Martinez, could I -- I just want to make a clarifying statement, if I could.

I -- as I shared with you just a moment ago, I represented Pfizer at health authority meetings, but only for ranitidine through 2002.

When I left Pfizer Consumer in 2002, I did not represent Pfizer, Warner-Lambert, or anyone regarding the use of ranitidine.

BY MR. MARTINEZ-CID:

Q. Sure.

And one of the things that you represented Pfizer for was working with the -- working to get the FDA to approve pediatric exclusivity extensions for

Pfizer; is that correct?

A. Yes, Mr. Martinez.

During my time with the Pfizer, if you will, Warner-Lambert Consumer Group from 1998 through 2002, I did, indeed, represent those particular groups, Warner-Lambert/Pfizer, in gaining pediatric exclusivity for ranitidine.

Q. And as part of your work trying to get pediatric exclusivity -- well, first, let me back up.

What does that mean, pediatric exclusivity?

A. Yes, Mr. Martinez. Let me -- let me expand just a bit on what pediatric exclusivity is. The FDA, in an effort to increase the amount of research that's conducted in pediatric patients established a process by which FDA would grant a six-month patent exclusivity to pharmaceutical manufacturers provided they studied, as requested by FDA, various aspects of the use of that particular drug in pediatric patients.

And, Mr. Martinez, FDA's requirements to gain such exclusivity is quite variable across the particular product, the particular therapeutic area. But it is at FDA's discretion and request to conduct research. And, thereby, if that is conducted, they would potentially grant a six-month patent extension to the manufacturer.

Q. And while you were working for Pfizer, one of

the things that you would oversee was pitching to the FDA additional studies or work that Pfizer could accomplish in order to gain that pediatric exclusivity extension, correct?

MS. HORN: Object to form.

THE WITNESS: Mr. Martinez, let me -- I -- let me clarify. I wouldn't call it pitching. I would call it, Mr. Martinez, negotiating with FDA what would be the most appropriate studies that should be done in pediatric patients to gain that particular six-month patent exclusivity.

BY MR. MARTINEZ-CID:

Q. But when I used the term "pitching," I guess the -- would you agree with me that Pfizer would be suggesting the studies that it felt it could and wanted to undertake in order to get the exclusivity rather than just asking the FDA to provide them with a study?

A. So, Mr. Martinez, as I shared earlier, FDA is the one who issues the request for the type of research that it, FDA, believes is most needed to allow a manufacturer to gain that six-month exclusivity.

Q. But isn't it -- wasn't it a practice at Pfizer at times to meet with the FDA and suggest that a different study would be better suited to get that exclusivity, or their own study, even if not a different

one altogether, to propose a study on its own?
A. So, Mr. Martinez, I'll clarify.
So there were scientific interactions with FDA about study designs, the types of studies that should be done or could -- could be done, and you are correct in that perspective in that there were interactions with FDA about the types and designs of studies.
Q. And do you recall having met with the FDA to propose particular studies for pediatric exclusivity for Zantac that were not accepted by the FDA?
A. I have to be careful in how I respond to this, Mr. Martinez. I -- I only recall those interactions having my memory refreshed during preparations for this deposition.
Q. Let me take a step back, then.
And please tell me about what you did to prepare for the deposition.
A. I had a number of discussions with Pfizer legal representatives, and, Mr. Martinez, please -- please remember many of these meetings/discussions occurred over 20 years ago. Mr. Martinez, I say this with a smile. I don't remember what I had for lunch yesterday, so 20 years ago is a difficult time period for me to -- to remember.
So I was shown a number of documents and which

refreshed my memory from some of those actions, as I shared that I did participate in interacting with FDA.

Q. About how many of these phone conversations did you have with attorneys from Pfizer?

MS. HORN: I'm sorry. You cut out there a little bit. What was the question, Ricardo?

BY MR. MARTINEZ-CID:

Q. About how many of these conversations did you have with the attorneys from Pfizer?

A. I would say -- Mr. Martinez, I -- four, Mr. Martinez. Approximately four, Mr. Martinez. I don't want to -- I don't want you to hold me to that exactly four, but I'll say approximately four.

Q. And other than the attorneys from Pfizer and yourself, anyone else involved in those conversations?

A. No, other than Ann Marie, who's on the call as well, there were no other individuals involved in these conversations.

Q. The Ann Marie that you mentioned is counsel for Novartis, your current employer, correct?

A. That's correct, Mr. Martinez.

Q. And were these telephone conversations or some other kind of meeting?

A. They were video calls, Mr. Martinez, which is pretty -- you know, in the COVID era, we don't use

phones anymore, Mr. Martinez. We use video calls.

Q. So these approximately four video calls, about how long did they last? And if it varied, please let me know.

A. It could -- it could vary, Mr. Martinez. Two -- two to three hours, Mr. Martinez, and it would vary.

Q. So would you say in total you probably spent somewhere between eight and twelve hours on these calls?

A. Yes, Mr. Martinez. That's an approximate estimate.

Q. And were you sent any documents to review?

A. No, Mr. Martinez. I have not been sent any documents.

Q. And so the only documents that you reviewed were those that were -- were they shared on the screen during these calls?

A. That's correct, Mr. Martinez. The only documents that I saw were those shared on the screen. That's all.

Q. And what kinds of documents did you review?

A. The types of documents I reviewed, Mr. Martinez, included -- included internal documents, included minutes of meetings, FDA meetings, and that's what I was sharing with you earlier, that that document

refreshed my memory of some of the health authority meetings that we -- we had in that regard.

But I can assure you, Mr. Martinez, I'd long forgotten about those meetings.

Q. So when you mentioned internal documents, that would be internal to Pfizer?

A. Some documents were internal to -- to Pfizer. They could have -- others were documents that would have been issued by FDA, minutes of meetings between FDA, Pfizer, Warner-Lambert, which would have been, of course, you know, official FDA documents.

MS. HORN: Just for the record, I want to say that Mr. -- I'm sorry, Dr. Ciociola was only shown documents that have been produced in this litigation.

MR. MARTINEZ-CID: Thank you, Ms. Horn.

BY MR. MARTINEZ-CID:

Q. The internal documents as opposed to any FDA or other kinds of documents, can you tell me a little bit about those categories of documents, if there are any subcategories you can give me?

A. That's -- that's a difficult one to answer, Mr. Martinez. They were all, of course, associated with ranitidine.

And beyond that, it would be difficult for me

to describe any subcategories. And I'd really hate to sort of guess.

Q. Doctor, you have to forgive me. My colleagues get mad if I don't ask any difficult questions.

A. Uh-ha.

Q. I've gotta give you some tough ones. Maybe this is as tough as it gets, though, so -- what can you tell me about -- what did -- what did you learn or what memories were refreshed through the review of those documents?

A. Yes, Mr. Martinez.

What was refreshed was some of my activities and discussions that -- that I had participated in that time, if you will, from 1998 to 2002 when I was at Warner-Lambert/Pfizer Consumer Products, and there were documents that I was shown that refreshed my memory.

As you can see on my CV, Mr. Martinez, I served as the project sponsor for some of these ranitidine projects, and in there, there was refreshment of interactions with the various team members who were experts, and that was the type of information that was shared with me. And those were my recollections.

And, as I said, my memory refreshed from those interactions.

Q. Can you tell me a little bit about those

activities that your memory was refreshed about?

A. Yes, Mr. Martinez.

As I -- as I just shared with you, my role during those years was -- was really what I would call a project sponsor. In fact, I think I even call that out, Mr. Martinez, in my CV. And I can't -- I can show it to you if you give me a minute. And -- and I think that is a very accurate description of my role at the time. And I say in there, Mr. Martinez -- and I say, served as project sponsor.

And, Mr. Martinez, give me, if you don't mind, one second to refresh that. And I'll direct you, Mr. Martinez, if you don't mind -- I -- I literally just saw it, and I think that is a very good example, Mr. Martinez, of how -- what my role was during that -- during that time.

And hold on, Mr. Martinez. All I need to do is look for project sponsor. I literally just saw the paragraph when you were scrolling through. Hold on, Mr. Martinez. Mr. Martinez, I'm struggling to find it. I literally just saw it. Served as project sponsor, and I'm trying to give you the page.

Q. It's okay. I mean, if you need it, I'm happy to wait for it, but my -- my question is really going towards I'm hoping that the review of documents that you

did refreshed your recollection as to sort of more specifics as to some of those projects or some of those activities related to ranitidine rather than the general description.

MS. HORN: Counsel, objection. Any documents that we collected to show the witness, as you know, would be attorney work product. If he recalls a specific document that refreshed his recollection, he could identify that, but otherwise the documents as a whole are work product.

THE WITNESS: Mr. Martinez, the only document that I can specifically recall during our discussions was in regards to the type of study that was to be conducted as per requests by FDA for the Zantac exclusivity, and that's all I -- the only document that I can specifically recall from that perspective.

BY MR. MARTINEZ-CID:

Q. Sure.

And I want to -- what I'd like to ask you about, Doctor, is, putting aside any specific documents, did your review of the documents and your conversations that you had with counsel for Pfizer help you recollect any particular activities, projects, issues, events related to ranitidine or Zantac at all?

So, in other words, something, you know, more specific than the general job descriptions and titles we've already talked about?

MS. HORN: Any conversations that he had with counsel -- conversations that he had with counsel would be -- in his capacity as a former employee of Pfizer, and those would be protected by attorney-client privilege.

So can you rephrase that question?

MR. MARTINEZ-CID: So I think my question is phrased okay, but let me do it this way to make sure we don't run afoul.

BY MR. MARTINEZ-CID:

Q. Doctor, when I ask you whether your memory has been refreshed, whether you can now recollect any particular issues, I want to make sure that -- that you don't say, well, Ms. Horn said A, B, or C.

So I'm not asking for what the attorneys told you. I'm asking for what you can recollect as to your time at Pfizer. I know you've spent, you know, 10 or 12 hours talking about this and looking at things and refreshing the memory banks.

And so other than -- I think -- I think you said that you hadn't really remembered the pediatric exclusivity issues between the FDA and Pfizer until

those conversations. Are there any other things like that, any other activities, any other projects, any other issues or involvement with Zantac or ranitidine that you are able to recall now?

A. In general, Mr. Martinez, that's a pretty general -- it's a pretty general question. I would say, in general, no. I mean, that's -- I would say no.

As I shared with you, specifically that particular document that I described for you earlier was the one that I recall.

MR. MARTINEZ-CID: I am going to mark as Exhibit 278 -- John, it's tab 9. It's with a Bates number BOE18137, is the first number. I can put it up on the screen, if I can find it. Let's see.

THE WITNESS: Now, Mr. Martinez, should I be exiting this CV document?

BY MR. MARTINEZ-CID:

Q. Sure.

There should be, if you refresh your Box, a new -- an Exhibit 278.

A. Okay. Hold on, Mr. Martinez.

(Exhibit 278 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. And it should be shared up on the screen, but feel free to pull up your own version of the document if

you want to be able to drive.

A. Okay, Mr. Martinez. I have the document. It's just come up now. I know I'm not looking at you, but I'm looking at the document.

Q. Sure.

And this is a 1998 document from Glaxo to the FDA regarding the -- a request for pediatric studies.

Can you see that?

A. Yes, Mr. Martinez, I can see the letter dated October 5th, 1998. I can see it's signed by Thomas A. Gerding, Director of Regulatory, regarding proposed changes and requests for pediatric studies.

Q. And if we scroll down a little further, we get some minutes of a September 28th, '98 meeting. It starts on Bates number 18142. And you can see here that you are listed as attending on behalf of Warner-Lambert.

Do you see that?

A. Yes, Mr. Martinez, I see the Memorandum of Conference. I see my name cited as on behalf of Warner-Lambert, OTC Clinical Development.

Q. And do you recall this conference?

A. I do not recall this conference, Mr. Martinez.

Q. I'll scroll you down to the Bates 18144 where the agency's position is summarized.

Do you see that there?

A. Yes, Mr. Martinez. I'm almost there. Yes, I'm now looking at page 18144, and it says -- entitled, agency's position is as follows, Mr. Martinez.

Is that where you are?

Q. Yes.

And do you recall the agency asking for a ranitidine syrup study in neonates from zero to six months of age? And --

A. I do recall, Mr. Martinez, a request from FDA for a neonate study in ranitidine with a ranitidine syrup. I do recall that, Mr. Martinez.

Q. And Glaxo and Warner-Lambert were working together to try to get the FDA to accept a different study in children 4 to 11 years of age instead; is that correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I -- according to this letter here, I -- and I do recall that there was a request on behalf of Glaxo that this particular study in 4- to 11-year-olds would have been a need, a need for information, that would have -- obviously it would have qualified for the patent exclusivity.

BY MR. MARTINEZ-CID:

Q. And do you recall why Pfizer and Glaxo -- or

I'm sorry, Warner-Lambert that became Pfizer -- it was Warner-Lambert at that time -- and Glaxo wanted to perform the tablet study rather than the ranitidine syrup study that the FDA was asking for?

A. The -- to the best of my recollection, was that this particular study, Zantac 75 -- and I'm reading this last line here, Mr. Martinez. Zantac 75 tablet study in 4- to 11-year-old subjects was based on the use of an over-the-counter product in children, which was a potential use of that particular product in that patient population.

And so the basis of the Glaxo position was that this could potentially be used, Mr. Martinez, by children, right? A parent could have purchased this product for the use of their child 4 to 11 years of age, and this type of information would have been of -- the position of Glaxo, it would have been of great value to FDA and, of course, to the scientific literature, which was the basis for this particular study design. The use of the product Zantac 75 in children who potentially could have been exposed to Zantac in an over-the-counter situation.

MS. POWER: Apologies for the late objection, but objection to form on the last question. This is Caroline Power on behalf of GSK.

BY MR. MARTINEZ-CID:
Q. And, Dr. Ciociola, you recall that it was Glaxo and Pfizer's position that they would perform the syrup study that the FDA wanted in zero to six months' age, but they needed to have a guarantee that they would be getting six months' exclusivity on the Zantac 75 tablet, as well, correct?
MS. HORN: Objection. Form.
THE WITNESS: Mr. Martinez, I don't recall a requirement of a guarantee. And let me say this, Mr. Martinez.
FDA is the one who makes the final decision as to what study or data would qualify for patent exclusivity.
BY MR. MARTINEZ-CID:
Q. Let me point you down to the next page that has the overview. And if you look at -- I'm looking specifically at the last two bullet points.
A. Hold on, Mr. Martinez.
Q. Sure.
A. Hold on, Mr. Martinez.
I see overview -- I got it.
Q. And I'm sharing my screen here for you, just to see if I can get this to work. Apparently not. I'm not able to highlight.

But, in any event, I am looking at the two bullet points here at -- at the bottom.

Do you see those?

A. Yes, Mr. Martinez.

Q. And this is what I was referring to, so it says Glaxo and Warner-Lambert are prepared to conduct the Zantac syrup study and the Zantac 75 study, but there is no commercial value to conduct the syrup study unless the FDA agrees on granting a six-month exclusivity for Zantac 75 study.

Do you see that?

A. Yes, I can see that, Mr. Martinez.

Q. And does that refresh your recollection that that was the position of Glaxo and Warner-Lambert at the time that, in order to do the syrup study that the FDA was asking for, you needed to have agreement on the Zantac 75 tablet study also granting an exclusivity, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, let me -- let me rephrase in that what this bullet point was referring to was Glaxo Wellcome/Warner-Lambert asking FDA if, indeed, the conduct of the study would meet FDA's expectations and requests for the six-month exclusivity.

So the wording is slightly different in that the discussion was involved and would this qualify, would this Zantac syrup study qualify to meet the FDA's expectation to qualify that study for granting of the six-months' exclusivity of the ranitidine molecule.

BY MR. MARTINEZ-CID:

Q. I think, Doctor, that the FDA wanted the syrup study, and the syrup study would have qualified for an extension, but Glaxo and Warner-Lambert wanted an extension to apply to tablet, as well, not just to syrup, and so wanted the FDA to accept an additional study to provide that exclusivity rather than -- and that Glaxo/Warner-Lambert were not willing to perform the FDA's requested study just on the Zantac syrup because it wasn't of enough commercial value to the companies.

Does that refresh your memory?

MS. HORN: Objection. Form.

THE WITNESS: The paragraph above says that Glaxo/Warner-Lambert were prepared to conduct the study, the Zantac syrup study zero to six months in neonates, so I'm struggling just a bit to understand your -- to answer your question.

When -- to conduct the study. I'm so sorry.

I didn't mean to talk over --

MS. HORN: I don't know who that was.

THE WITNESS: Michelle, was that you? I'm sorry if I was talking over you.

THE REPORTER: That was not me.

MR. MARTINEZ-CID: Doctor, don't worry. That was just someone whose mute came off for a moment. No issue there.

THE WITNESS: I'm sorry, Mr. Martinez. I was trying to say that -- I'll just repeat myself, Mr. Martinez.

The paragraph above says that Glaxo Wellcome and Warner-Lambert were prepared to conduct the Zantac syrup study in neonates.

BY MR. MARTINEZ-CID:

Q. Yes, but the -- what -- the reason that that didn't just occur is because Glaxo and Warner-Lambert told the FDA that there's just no commercial value in them simply conducting that study because that pediatric exclusivity of the Zantac syrup for zero to six months was not going to be a valuable thing for the companies. And so they were pitching, if you recall now -- what they were pitching was, if you also grant us an exclusivity extension on Zantac 75 tablets for 4- to 11-year-olds, we will do this additional study. But we

need that study also approved for a pediatric exclusivity in order to do both of them.

Do you recall?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, what I'm struggling to recall is the wording. It says -- Mr. Martinez, I'm just going to read it back to you. The third bullet point that I'm reviewing here, the last sentence fragments is obtain six months' exclusivity on the Zantac 75 tablet study.

The six months' exclusivity, Mr. Martinez, as you know, refers to the molecule that is ranitidine, and so, hence, I'm struggling with the wording as it's being described, unless we reach agreement to obtain six months' exclusivity on the Zantac 75 study.

So the two -- Mr. Martinez, what I'm trying to say is the two bullet points, the second one that starts with Glaxo Wellcome are prepared and the third bullet point, no commercial value, are not congruent in that Glaxo has already agreed that says, will do the study, Zantac syrup, and then the third bullet point says, no commercial value. We've already said we're going to do -- we, Glaxo Wellcome -- so sorry -- we reached agreements that

we would do that to obtain the exclusivity, and hence, this third bullet point, which was the Zantac 75 study.

BY MR. MARTINEZ-CID:

Q. And, Doctor, maybe -- maybe I can help you.

So this -- what we were looking at was, they're prepared to conduct both the Zantac syrup study and the Zantac 75 tablet study.

Do you see that second bullet point? That's what that's saying?

A. Yes, Mr. Martinez, and that's what I was referring to earlier.

Q. Right.

A. I was trying to describe for you both the syrup and the tablet 75 study in 4- to 11-year-olds.

Q. And so let me -- let me bring you back up to the document here. And this might help you remember. And let me see if I can zoom in a little bit.

A. Okay, Mr. Martinez. Hold on one second here. Where are you going?

Q. I am -- I am on the page Bates-numbered 18143.

A. 18143.

Q. And I'm just going to zoom in a little bit so that it's easier to see.

A. Mr. Martinez, I don't see your screen.

Q. Am I not sharing the screen?
A. No.
Q. Well, then that's a very good reason why this makes no sense to you.
A. I'm just following your verbal direction, Mr. Martinez.
Q. Well, I apologize for that. This will not be my only mistake in this screen sharing as we go, but I hope that you'll bear with me. But thank you for letting me know while everyone else was just laughing at me behind their cameras.
So, Doctor, looking at now what should be on your screen, which is 18143 --
A. Yes. I see it, Mr. Martinez.
Q. Sure. I'd direct you to the first paragraph to see if that helps you make a recollection. And, in fact, the FDA had requested the zero to six-month age syrup study, and that was counter to a proposal that Glaxo wanted to conduct a 4- to 11-year-old study.
So the meeting was held because Glaxo and Warner-Lambert were trying to get the FDA to reconsider its position and entertain the prospect of issuing a second letter to invite Glaxo to conduct the 75-tablet study, in other words, saying, you've asked for -- you've asked for a syrup study in zero to six months; we

want you to ask us for the following study for 4- to 11-year-olds.

Do you recall that now?

A. Now that you -- thank you, Mr. Martinez.

Now that you share that, I now recall FDA's request for zero to six months, and I now recall the proposal by Glaxo to conduct the pediatric study in the 4- to 11-year-olds with, I believe, Zantac 75 milligrams.

So, yes, Mr. Martinez, now that you've shared that with me, I do recall that.

Q. Great.

And it was -- and does that help you, I guess, make sense of those bullet points later? I think it does, that what Glaxo and Warner-Lambert were telling the FDA is saying, hey, we're willing to do the syrup study you want, but we need to get approval for the tablet 4- to 11-year-old study that we want to do, as well, in order to make this commercially viable because just doing the syrup study is just not going to be commercially viable for us. We're not -- it's not -- it's not going to be a business we want to do. It's not going to make us enough money.

Does that make sense?

MS. HORN: I'm sorry. Go ahead. If that's

the end of your question, objection, form.

THE WITNESS: So, Mr. Martinez, I'm going to -- if -- so thank you, Mr. Martinez, for sharing that paragraph with me on page 18143 in that first paragraph.

Could we please just jump back down, Mr. Martinez -- I apologize for the grammar -- go, please, to where you were showing me on the overview, which is page 118 -- I'm sorry, 18145.

And, Mr. Martinez, I'm going to restate my -- my -- my response again. Mr. Martinez, FDA has said to Glaxo/Warner-Lambert, if you conduct Zantac 75 syrup study, we'll grant you six months' exclusivity.

And so, hence, I'm struggling to recall or understand your questioning, Mr. Martinez, about the relevance of the Zantac 75 study in 4- to 11-year-olds.

BY MR. MARTINEZ-CID:

Q. Sure.

And the whole purpose of the meeting that was held on September 4th, '98, was for Glaxo and Warner-Lambert to try to get the FDA to agree to reconsider its position and agree to send a letter requesting the Zantac 75 study that's being put here.

So this Zantac 75 tablet study was not one that the FDA had asked for. It is one that the companies were proposing. And the reason that it is tied at all to the Zantac syrup study -- because I can see why you're struggling to see what one has to do with the other, but the reason it was tied is because the companies are telling the FDA, you would like this zero to six-month syrup study. We are prepared to do it, but it's not -- it doesn't have enough commercial value to us. It's not going to make us enough money, so we don't want to do it unless if you also ask for this study that would get us an additional six months of exclusivity on the 75 tablet for 4- to 11-year-olds, at that point we could do both of the studies and it would make sense. It would be a commercially viable endeavor.

Does that make sense to you now?

MS. HORN: Object to form.

MS. POWER: Object to form.

THE WITNESS: Mr. Martinez, I'll try to -- I apologize if I'm being dense, Mr. Martinez. The ultimate objective -- and that was -- I was clearly part of that, Mr. Martinez -- was to gain six months' exclusivity on the product, on ranitidine. And so I'm struggling with if FDA has said -- and clearly it's now documented, well-known, FDA has

decreed -- decided, my apologies -- decided that the Zantac syrup study in neonates was the requirement to gain six months' exclusivity.

If the ultimate goal, Mr. Martinez, is to gain the six months' exclusivity, the conduct of one or both studies is irrelevant. You can see how I'm struggling with the logic, Mr. Martinez. FDA said, do the syrup study. Glaxo Wellcome, slash, Warner-Lambert says, we'll do the study and you'll get the six months' exclusivity.

Mr. Martinez, I'm struggling to link it with the Zantac 75.

BY MR. MARTINEZ-CID:

Q. Right.

And I guess my understanding was that the exclusivity that was offered for the syrup study would only be as to syrup that would be for neonates, you know, in that age group and would not apply to this tablet.

But your understanding is different?

A. Yes, Mr. Martinez.

And, Mr. Martinez, I'll speak clearer. I am not an expert in exclusivity, in patent law by any means, Mr. Martinez. And so my understanding, Mr. Martinez, was that patent exclusivity would apply to

the molecule of ranitidine.

And, Mr. Martinez, I don't want to expand beyond that just because I'm not knowledgeable about patents, patent law, and would prefer to end my statement there.

Q. So as you sit here today, you can't -- you can't make sense of the statement that there was no commercial value to Glaxo and Warner-Lambert to conduct the Zantac syrup study that the FDA wanted unless they could reach an agreement on the Zantac 75 tablet study, as well?

You don't have an explanation for that?

A. Mr. Martinez --

MS. HORN: Object to form.

THE WITNESS: -- I cannot explain -- I'm so sorry, Elaine.

I cannot explain the third bullet point to you, as I shared with you. The objective was to gain six months' exclusivity, and I was intimately part of that. And six months' exclusivity, as I understand it, was for the ranitidine molecule. And, hence, FDA had asked for the Zantac syrup study, and Glaxo/Warner-Lambert said -- they had in there in writing, said, we're prepared to conduct that particular study to gain the exclusivity.

BY MR. MARTINEZ-CID:

Q. And looking at the agency's position again --

A. Hold on, Mr. Martinez.

Q. Sure.

A. Give me one second. You are on page -- I got it.

Q. It should be on your screen. 144, ending in 144.

A. Okay, Mr. Martinez. Go ahead, please.

Q. Sure.

You see, looking at point 2 of the agency's position, the FDA is saying it must remain consistent in its approach. The standard will be the same for all companies. There will be no exceptions for individual companies.

Do you -- can you recall what it was that Glaxo and -- and Warner-Lambert were asking for, what deviation from the standard or what exception was being argued for?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, just give me a second to think.

BY MR. MARTINEZ-CID:

Q. Take your time.

A. I'm just reading the statement, Mr. Martinez.

Mr. Martinez, I do not recall what the standard was being referred to that the agency was -- is stating they must be consistent, nor do I recall the exception that's being discussed.

Mr. Martinez, I do not recall at all. Mr. Martinez, I don't recall.

Q. Sure. No problem.

Let me go ahead and mark tab number 10, which begins with Bates number 18254 as Exhibit 279.

(Exhibit 279 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. And I will put that up on the screen, as well.

A. Mr. Martinez, I'm going to do the same thing. I'm going to exit this. I'm going to refresh.

Okay, Mr. Martinez. I have the document dated October 19th, 1998.

Q. And this is a follow-up letter -- this is October 19th, '98, as you said -- on the same issue. And this is because Glaxo is asking the FDA to reconsider the pediatric study that would qualify for exclusivity -- the pediatric exclusivity that we've been talking about.

Do you see that?

A. Yes, Mr. Martinez. I can see the title there. It talks about the background information from the

October 28th meeting, and then the first paragraph, Mr. Martinez, as you said, talks about the pediatric study that would qualify for exclusivity under the provisions of it.

Q. Just generally, I'll give you a chance just to look through this document. And just let me know if this has refreshed your recollection as to the specifics that -- of this debate between Glaxo and Warner-Lambert on one side as to the studies that they would like to do and the one that the FDA would like.

A. Okay. Just give me one more second here, Mr. Martinez. Let me go through this.

Q. And, Doctor, if this doesn't, you know, jog your memory on these issues, we can move on, so don't -- don't feel that you need to become expert in this area from this document if -- if it's not something you can recall.

A. Mr. Martinez, I do not specifically recall. Obviously I'm reading it, and I recall the summary of the -- I'm reading here. There's a summary of the literature, and I -- I can see that I was attending the meeting as well on behalf of Warner-Lambert. There were consultants.

Mr. Martinez, I -- I don't recall the letter, and, I mean, obviously I can read the words,

Mr. Martinez. I can read -- it's a summary of the literature reiterating Glaxo's positions as to the clinical use of this Zantac 75 study in 4- to 11-year-old subjects.

Q. And, Doctor, you mentioned -- sorry. Let me take you back for a moment when we were talking about documents that had refreshed your recollection for the deposition.

I take it that these two documents were not such documents?

A. That's correct, Mr. Martinez. I have not seen this document, and obviously my name was there, Mr. Martinez. I don't -- so clearly I saw this document 20 years ago, but I don't recall -- this -- I did not see this document recently, Mr. Martinez.

Q. As part of your preparation for this deposition, did you review any studies or medical literature on the meeting?

A. No, I did not, Mr. Martinez, no. I definitively did not.

Q. How about on NDMA?

A. I did not, Mr. Martinez. I'm even -- I know what NDMA stands for, but I did not review any literature associated with such.

Q. Looking at the medical literature and

references that were included in -- in this Exhibit 279 that we've been looking at --
A. Okay. Hold on, Mr. Martinez.
Q. Sure.
A. I'm scrolling.
Q. It should be the last two pages of the exhibit, 10 and 11 --
A. Okay.
Q. -- are the references.
A. I am now there, Mr. Martinez.
Q. Sure.
And I noticed that a number of these references are from foreign journals.
Do you see that?
A. I -- reference number 1 is clinical trails (sic), Mr. Martinez. I'm making a joke, Mr. Martinez. I know I'm not supposed to do that. Obviously that's a typo.
I do see an Italian -- what appears to be an Italian journal, number 4. I see what is likely a non-U.S. journal in number 7.
Q. I think number 6 is the European Journal of Clinical Pharmacology, but I could be wrong.
A. Yes, yes, Mr. Martinez, agreed. European Journal of Clinical Pharmacology is clearly non-U.S.

Q. I think number 13 is a Thai journal?
A. Yes, Mr. Martinez. I'm just -- Journal of the Medical Association of -- I'll say Thailand.
Q. And is it accepted practice in your field to rely on foreign medical journals?
MS. HORN: Object to form.
THE WITNESS: Mr. Martinez, I wouldn't say an accepted practice to solely rely on medical publications from outside the U.S. Clearly there are many medical journals outside the U.S. that are well known in the field, Mr. Martinez.
And I'll use an example. Lancet. Lancet is a non-U.S. journal and is quite well known, respected. And I'm sure there are many other journals outside the U.S. that are well respected.
So I wouldn't say solely relied upon.
BY MR. MARTINEZ-CID:
Q. Sure, and I didn't mean to -- to suggest that.
So, I mean, we can agree that foreign scientific literature may be more reliable than some U.S. sources, and sometimes it's vice versa, that the U.S. source is more reliable than a foreign source. It depends on the particular journal and publication, correct?
A. Yeah, Mr. Martinez. Again, I'll rephrase

that. In concept, I agree. There can be variability in both the quality of publications in both U.S. and non-U.S. journals.

So, Mr. Martinez, I think, as you and as I, as a scientist, we rely on the totality of the data, Mr. Martinez. And that's how I believe science has evolved over many years. The totality of the data, and that's how we make step-by-step improvements in our understanding of science.

Q. And certainly in researching the safety of a drug, that a prudent scientist is going to look at gathering as much data as reasonably can be gathered, be it U.S. data or foreign data, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I think that the key to your question here is what's reasonably possible, and in theory I would agree that one should be knowledgeable of the medical literature.

And in my case, I focused on clinical research and recent journals in what I'll call, Mr. Martinez, peer-reviewed journals. I think that's a critical aspect, is peer-reviewed journals, as well.

BY MR. MARTINEZ-CID:

Q. And I think we can agree that in carrying out

those responsibilities responsibly, you would look at the relevant medical literature in peer-reviewed journals both in the U.S. and abroad that you had access to, correct?

MS. HORN: Objection. Form.

THE WITNESS: I think, Mr. Martinez -- and now that you're -- you're referring to me specifically, as I shared with you, the literature that I reviewed during my time, I kept up with key gastroenterology journals, gastroenterology and the American Journal of Gastroenterology -- I'm sorry, American Journal of Gastroenterology, which I reviewed on a regular basis and was a member of both of those societies.

And, as I shared, Mr. Martinez, you struggle with the breadth of information. If you don't mind, Mr. Martinez, I'll use this term that we use in today's world, "information overload." There's a limit to how many journals that you can read on a regular basis, and as I shared with you earlier, Mr. Martinez, I served as the project sponsor, and I used those words earlier, and I identify that in my CV.

As a project sponsor, Mr. Martinez, I had, if you will, reporting to me experts in their

respective fields, so that includes, as I shared and we've discussed earlier -- it's identified in my CV -- clinical research experts, M.D.s, Ph.D.s, individuals who were experts in patient safety, knowledgeable about safety, toxicologists, engineers, statisticians who can understand the strength of the data.

And all of those, Mr. Martinez -- I used this earlier -- are line functions who were experts in their fields, they were the, if you will, on-the-ground team members of the project who interpreted literature, who reviewed literature, who were responsible for the conduct of studies. And they were the experts, Mr. Martinez, that I -- I relied on.

But, as I shared with you, Mr. Martinez, I did review what I'll call key gastroenterology journals, and I shared that with you, the American Journal of Gastroenterology and Gastroenterology. I was a member of those two societies a long time ago. And, hence, those were the journals that I was key to review.

BY MR. MARTINEZ-CID:

Q. And, Doctor, I want to -- I want to thank you for -- for bringing up a difference in -- that I do want

to explore a little bit.

One is you kept up with these key gastroenterology journals on a regular basis, and that's -- that's sort of different than if you are conducting a bit of research or a study. That's a different deep dive that you would do, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm just reflecting on your -- your question.

And my position is, Mr. Martinez, if you are an expert in any one of the functional therapeutic areas that I described for you, be it patient safety or statistics or any of the other functions that we talked about, my expectation is, is that you -- you as the, if you will, Mr. Martinez, functional expert would be responsible and knowledgeable about the latest thinking in statistics or the latest thinking, if you will, Mr. Martinez, in law.

I think the analogies would be the same. So, hence, staying up with the current literature would be key, as I shared. Of course, as you know, Mr. Martinez, with information overload, you can't read every single medical journal published in the entire world on a regular basis. It's just simply

impossible.

BY MR. MARTINEZ-CID:

Q. And I think -- and I think that's what I'm getting at, is that -- so, for example, for the purposes of this exhibit that we are looking at, Exhibit 279, so I don't expect that the clinical research folks at -- at Glaxo or Warner-Lambert, Pfizer, would have been regularly keeping abreast of every entry into every one of these journals that is listed here, you know, including Italian journals, the Thai journal.

So while they have been keeping abreast of current thought with some of the major journals when putting together a letter like this, or when putting together a particular study in an area, the -- certainly your clinical researchers were able to what I call take a deeper dive or research particular journals worldwide that might address the particular issue that they're looking at; is that fair?

MS. HORN: Objection. Form.

THE WITNESS: Yeah, I'll -- I'll just rephrase my response, Mr. Martinez. Obviously the citing of all of these various journals, some of whom, of course, I'm quite unfamiliar with, would be that there was obviously a focused effort in identifying journals that were published that would reference

the use of ranitidine in these various populations.
So -- and, Mr. Martinez, as in all, I mean, we now have the wisdom of the ability to search journals and the electronic means and so on. So, hence, this was clearly an effort to identify all of the relevant evidence that -- for the use of ranitidine in these various pediatric patient populations.
BY MR. MARTINEZ-CID:
Q. And as someone who was involved with clinical research at Glaxo and, of course, spent so much time supervising research at Pfizer, certainly you understood the capabilities that Glaxo and Warner-Lambert/Pfizer had for conducting that kind of proper scientific research for these -- for these sources, correct?
MS. HORN: Objection. Form.
THE WITNESS: Mr. Martinez, I don't want to -- to suggest that I understood all of the capabilities. Was I aware of certain capabilities that were available to me at the time at, like, Glaxo and of course at -- later Warner-Lambert and Pfizer? I was aware of some of those capabilities certainly.
Mr. Martinez, for many years we certainly had libraries which could do information searches for

us. So, yes, was I aware of that capability? Were there other capabilities? Obviously, Mr. Martinez, I can't comment on that.

But as far as literature, yes, I was aware that the companies that I worked for did have the capability of doing literature searches, yes, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. And certainly none of the clinical researchers that you supervised complained to you at Pfizer of an inability to access the scientific literature they needed to conduct their work, did they?

A. I don't recall that, Mr. Martinez. I don't recall having anyone complain to me and saying, Art, I don't have access to such and such to allow me to get my job done.

Q. And you feel comfortable from your experience at Glaxo and at Pfizer/Warner-Lambert that you did have the capability of pulling up the relevant scientific literature that you needed to do your work appropriately, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'll respond just by being -- perhaps clarifying your question a bit.

And my response is, Mr. Martinez, I don't

recall having issues or problems at -- while I was at Glaxo working on ranitidine or Pfizer Consumer Products with the ability to look for or have access to published scientific literature.

MR. MARTINEZ-CID: I am now going to ask John if you would mark for us under tab 12 as Exhibit 280.

(Exhibit 280 was marked for identification.)

MS. HORN: Before you jump in there, Ricardo, we've been going for about two hours. Do you have a thought about when we're going to take a break?

MR. MARTINEZ-CID: Whenever you guys would like. So if you guys would like a short break now we can, or if you'd prefer to break for lunch, I am -- I am at the witness's leisure.

THE WITNESS: Thank you, Mr. Martinez.

Elaine, Michelle, I would love to take a -- could we take a seven-minute break, Mr. Martinez, now?

MR. MARTINEZ-CID: I just need to warn you that lawyers take ten minutes for seven, maybe more, so -- but -- but we can certainly attempt to.

THE WITNESS: I would -- I would appreciate that, Mr. Martinez. I have had two cups of coffee today, and we'll leave it at that.

MR. MARTINEZ-CID: Well, please.

And, Michelle, you're okay with just ten minutes off here?

THE REPORTER: Yes. Thank you.

MR. MARTINEZ-CID: And please, Doctor, when you feel you need a break or say, man, I'm hungry for lunch, let's get out of here, you know, let me know.

THE WITNESS: Okay.

MR. MARTINEZ-CID: And obviously, Elaine, if you need a break, you know how to speak up, as well.

All right, folks.

THE WITNESS: All right. Thank you.

MR. SCHMITZER: We are going off the record. The time is 1626 UTC.

(A short recess was taken.)

MR. SCHMITZER: We are back on the record. The time is 1643 UTC. Please proceed.

BY MR. MARTINEZ-CID:

Q. I'm going to put up on the screen tab 13, which begins with Bates BOE18336.

A. Mr. Martinez, I'm going to go back into the Box. I'm refreshing, Mr. Martinez. Hold on.

Q. Take your time. In the meantime, I'm going to

go ahead and mark this November 25th, 1998 letter as Exhibit 281.

(Exhibit 281 was marked for identification.)

MS. HORN: Which one are we looking at, 280 or 281?

MR. MARTINEZ-CID: This is Exhibit 281. It should be on the screen, Bates number 18336. Let me know if it's not up there, please.

BY MR. MARTINEZ-CID:

Q. Doctor, let me know when you're ready.

A. Okay, Mr. Martinez. I'm ready. I have the document in front of me dated November 25th, 1998, Lilia Talarico.

Q. Yes. And this is a letter that you wrote Ms. Talarico of the FDA.

Do you recall this letter?

A. I do not recall this letter until I -- until you've shown me the document in front of me, Mr. Martinez.

Q. I am wondering if -- now that you've had a chance to take a look at it -- and you'll see from the first line it was following up on an October 28th meeting to discuss the use of Zantac in the pediatric population.

Does this refresh your recollection or is it

possible that this has something to do with the previous exhibits we were looking at in trying to achieve the pediatric exclusivity from the FDA on behalf of Glaxo and Warner-Lambert?

A. Mr. Martinez, as -- I'm reading it as I'm speaking to you. This is a summary of the published data regarding the use of intravenous and syrup ranitidine use in neonates less than one month of age, and, as is stated in this first paragraph here, Dr. Botstein states, I should send this information to Dr. Talarico for her review, and then, Mr. Martinez, as I scroll through this, it looks to be a brief summary with the references.

And, Mr. Martinez, I can't confirm if those references were the same that you had previously shown me, for example, Thailand and so on. And so I can't confirm that. But it appears that I am summarizing on a high level these publications on the use of ranitidine in neonates, preterm neonates.

Mr. Martinez, I'm just scrolling through this as I look at it. So it appears as that I am submitting to FDA publications that were indeed discussed during that meeting of October 28th on the use of ranitidine in neonates of less than one -- one -- one month of age, Mr. Martinez.

Q. Sure.

And, Doctor, my question to you was, does this summary of this medical literature have anything to do with the effort that Glaxo and Warner-Lambert were making to have the FDA approve their suggested tablet study rather than just do the syrup study for zero to six-month-old neonates?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'll respond to your question. This letter, while I don't recall it until you just showed it -- showed this document to me just now, is a summary of all of the literature that -- on the use of ranitidine in subjects zero to one month of age.

And, Mr. Martinez, typically, as I shared with you previously in the deposition, that FDA requests sponsors, manufacturers, to conduct studies to gain this exclusivity for information that's not -- not known, and so this was my -- appears to be my effort to summarize for FDA all of the known information on the use of ranitidine in neonates from zero to one month of age, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. And who is Dr. Botstein who had suggested you send that information? Do you recall?

A. Mr. Martinez, I do recall. And let me just share, please, Dr. Talarico, who's the recipient of -- Mr. Martinez, I'm not pointing -- pointing at the document, if you will -- Lilia Talarico was the FDA division director, and Dr. Paula Botstein -- and I do recall this -- was the director of the office.

And, Mr. Martinez, within FDA there are divisions, the review division -- and you'll likely see references to the review divisions, which are the divisions responsible for reviewing an application. And then the management is what we call office level, and that would be Dr. Botstein, Paula -- Dr. Paula Botstein, who would have been essentially Dr. Talarico's boss, if you will, manager.

Q. And based on your review of the literature and the studies that you were able to provide the FDA, you represented to the FDA that the studies clearly showed the efficacy and safety of ranitidine in infants less than one month of age, correct?

A. As I refer to this -- I was scrolling, Mr. Martinez, as you were sort of going through this, and I say -- I state in paragraph -- in each of the paragraphs here, I conclude the output of each of those. In fact, Mr. Martinez, I conclude under Fontana, et al., I talk about 30 neonates, and the authors conclude,

Mr. Martinez, that doses of ranitidine used in that study, Mr. Martinez, are safe and effective. Goyal, et al. has a similar conclusion, Mr. Martinez. Doses of ranitidine are safe and effective during their one- to four-year follow-up. In the next paragraph, Mr. Martinez, Maki as well concludes that -- no side effects in these patients.

And, Mr. Martinez, as it states here, the authors do indeed conclude that there are no side effects and that ranitidine improved the various lesions -- Mr. Martinez, I'm reading Kuusela, reference number 8. Ranitidine concluded significantly prevented gastric mucosal lesions in newborn patients under stress, and the last one, Mr. Martinez, talks about Fontana, and those authors indeed conclude serum concentrations inhibiting 50 percent of gastric acid output.

So the answer is I really made an effort to conclude for each of what the authors have stated relative to the effects of ranitidine in patients -- in neonate patients.

Q. And you concluded and represented to the FDA that you felt that these studies were sufficient to show the efficacy and safety of ranitidine in infants less than one month of age, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yeah. Mr. Martinez, as I -- as I stated here in this last paragraph, Mr. Martinez -- I'm reading it, and I'm stating that these nine studies, based on, if you will, external authors, outside investigators -- and I'll read it to you, Mr. Martinez -- clearly show efficacy and safety of ranitidine in infants less than one year of age and are consistent with the American College of Gastroenterology recommendations for use in pediatric patients, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. Sure.

And I think -- and I'm just following up because I think that implies -- I think -- I think it's what you meant -- that these studies are sufficient to show the efficacy and safety of ranitidine in infants less than one month of age, not just that these nine show it. And there might be another nine that don't show it that I'm not sharing with you.

But do you understand my distinction?

A. Yeah. Let me just clarify, Mr. Martinez.

When I summarize -- and I'm convinced I did it in this manner, in that I would have shared all studies,

both pro and con showing the benefits of ranitidine and if there were studies that showed there were not benefits.

Mr. Martinez, my approach even today is to share all information, and -- but you're correct in that there's possible -- there's nine other studies that I did not see that were unknown to me at the time.

But my approach, Mr. Martinez, absolutely was to share the totality of the data on the use of ranitidine in this patient population.

Q. I appreciate that, Doctor, and I -- I was not -- was not suggesting that you -- that you hadn't shared anything. So we're on the same page.

I am -- I am looking at this -- you also were able to conclude from your research that you felt there was sufficient data that -- to support that the use of 5 to 10 milligrams a day for children from one month to 16 years of age would be safe, correct?

MS. HORN: Object to form.

THE WITNESS: Yeah. I just want to be clear on the dosing, Mr. Martinez. What I'm stating here, Mr. Martinez -- I'm pointing at the screen here -- is that for the doses that were studied, these nine published studies, you know, just reading the summaries that I've written -- and I'll

just say that clearly these studies show the safe and effective use of ranitidine in infants less than one year of age.

I don't want to quote you the -- because of the way the dose is being administered, some are IV, and they do vary in milligrams per kilogram basis.

So, in general, I'm concluding that these nine studies show the safe and effective use of ranitidine in infants less than one year -- one month of age.

BY MR. MARTINEZ-CID:

Q. Right.

And my question, Doctor -- I don't want to get caught up too much on the words used, but you also concluded that it was safe and effective to use 5 to 10 milligrams daily in children one month to 16 years of age, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, could you help me understand where that 5 to 10 milligrams?

BY MR. MARTINEZ-CID:

Q. I'm looking at -- sure, I can put it back up. I just don't want to get caught up in wording, but I will put it back up and show you where -- where I'm

reading it.
Do you see the last line that you sent, that these data are consistent with the American College of Gastroenterology recommendation of ranitidine in 4 to 8 milligrams used -- a day used in pediatric patients and the FDA's approvable use of ranitidine 5 to 10 milligrams in children one month to 16 years of age?
A. So this is where you got the 5 milligrams -- 5 to 10 milligrams per kilogram per day.
And, Mr. Martinez, what I'm stating, as I've stated here, is that these data are consistent because the American College of Gastroenterology likely at the time was recommending the use of 4 to 8 milligrams in patients with GERD, gastroesophageal reflux disease, and that FDA has approved the use of ranitidine 5 to 10 milligrams per kilogram in children one month to 16 years of age with reflux disease.
Q. And my question to you, Doctor, was that your review of the literature and what you are representing in your meetings and in your writings to the FDA at that time on behalf of Warner-Lambert was that, in fact, that it was safe to use ranitidine 5 to 10 milligrams a day for GERD in children one month to 16 years of age, correct?
MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, what I'm -- what I'm stating here is that FDA has approved this and that the results that I'm sharing with FDA -- these are the nine studies I'm referring to, Mr. Martinez -- in infants less than one month of age, that these data are consistent with the recommendations of the American College of Gastroenterology, FDA's own conclusion of ranitidine, 5 to 10 milligrams.

So what I'm saying is that these studies show safe and effective use in -- safe and effective use of ranitidine in infants less than one month, and those data are indeed consistent with the American College of Gastroenterology's recommendations and FDA's approved use of ranitidine, 5 -- as you stated, Mr. Martinez, 5 to 10 milligrams per kilogram per day in children one month to 16 years of age.

BY MR. MARTINEZ-CID:

Q. And, Dr. Ciociola, I'd like to not get too caught up in what it was that you said in this letter, so my question is a little bit broader than that. And I just want to make sure that we are on the same page here.

You, in fact, after -- after conducting this

research and putting together these studies and analyzing them, you came to the conclusion that it was safe to use ranitidine, 5 to 10 milligrams a day, for children one month to 16 years of age with GERD?

You felt that it was safe, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I just want to be clear. FDA is the one who reviewed and approved ranitidine, 5 to 10 milligrams per kilogram, in children one month to 16 years of age, and this was the prescription medication.

And, Mr. Martinez, what I'm suggesting in this letter here is that I'm citing for FDA that these nine studies show the safe and effective use.

Now, Mr. Martinez, I just want to be clear. FDA approved the use of ranitidine 5 to 10 milligrams per kilogram. There may well have been many other studies that had been conducted that supported the use of -- use of ranitidine in this patient population.

So what I'm saying, Mr. Martinez -- and I just -- I want to be clear. I'm saying these nine studies are consistent in that this ranitidine is safe and effective use in children less than one month of age.

And I'm just saying, Mr. Martinez, this is consistent with the American College of Gastroenterology's recommendations and FDA's recommendations of the 5 to 10 milligrams per kilogram. I hope I'm being clear, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. Doctor, you're being clear in describing this as the FDA having said it was safe and approved, but you do recognize and understand that the FDA relies heavily on the manufacturer of the medication to provide it with the data supporting the safety and efficacy of the medication, and that it is -- it is Warner-Lambert's responsibility to absolutely bring to the attention of the FDA any safety signal, any issue that would suggest that, in fact, it's not safe, correct?

MS. HORN: Object to form.

THE WITNESS: Mr. Martinez, yes, and I'm going to answer your question.

The manufacturer is accountable, responsible by law, by regulation, to submit data to support the safe and effective use of a drug in a specific patient population, and they are also responsible on an annual basis of reviewing such information and submitting that information to FDA.

So in that perspective, yes, the drug

manufacturer is accountable for providing FDA with information to support safe and effective use of drugs and to provide information on an annual basis to FDA for the continued safe and effective use of that product in the patient population in which it's approved.

BY MR. MARTINEZ-CID:

Q. And you took that responsibility very seriously at your time at Glaxo and at Warner-Lambert/Pfizer, correct?

A. Yes, Mr. Martinez, I took that responsibility very serious. And as I shared with you earlier, we had a discussion about providing information. And, you know, we referred to the nine studies that I have up in front of me now. And, yes, I took that absolutely very seriously.

Q. Sure.

A. That -- it was a key part of my job, Mr. Martinez.

Q. And certainly when you sent this letter supporting the use -- the safety and the efficacy of ranitidine in infants less than one month of age, you had that responsibility well in mind, and if you -- if you knew of anything to suggest that it was not safe, you would have shared that -- or you should have shared

that with the FDA, correct?

MS. HORN: Objection to form.

THE WITNESS: Yes. Mr. Martinez, I would have absolutely shared any studies to the contrary. And, Mr. Martinez, we talked about my CV. You've seen the number of years that I've been involved in drug development. You've seen -- you can probably guess at the number of interactions I've had with FDA and other health authorities over -- over many years before, during the time in which we're discussing, and afterwards.

And, Mr. Martinez, I took very seriously, and part of my, if you will, reputation, my ethics, and how I approached drug development is to be absolutely, Mr. Martinez, transparent in how I share information and that, if I was aware, Mr. Martinez, at the time, I guarantee you I would have submitted all of the studies that I had found or that my team had found, Mr. Martinez -- and let me just be clear -- my team had found showing the efficacy and safety of ranitidine in this patient population, either positive, Mr. Martinez, or negative.

If there were negative studies, I absolutely would have shared that. And to this day, I still

hold to that principle, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. And that's an excellent point. The teams that you were supervising at Warner-Lambert/Pfizer, certainly they all understood, as well, that they had a responsibility to bring to your attention anything that -- that -- any study that questioned the safety and efficacy of ranitidine, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to respond to your question.

I as a manager have held for years, Mr. Martinez, that I expect the truth. I expect transparency. And I have made every effort over many years -- and I'm sure you could speak to individuals who reported to me in this time 20 years ago or people who report to me today, as in my current role, that I demand, that I insist on ethical behavior, transparency, and the truth.

And our focus, Mr. Martinez, is always -- is to focus on the patients. And, Mr. Martinez, if you gave me five minutes, I can show you T-shirts that we've shared, and on the back it says, the patient is waiting.

And, Mr. Martinez, every day when I get up --

and I expect my team to do the same -- our focus is on the patient, bringing medicines to patients to improve their lives.

Mr. Martinez, I've been in this business for 30 years, and you can look at my CV and the various roles that I've held. And I've always held to that principle, and I hold to it today, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. And that is a principle that was shared with your team? They understood the safety of the patient comes first before profits, before approvals, before extensions of exclusivity, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I would say absolutely yes. The patient is at the utmost highest part of what we do.

And, Mr. Martinez, I will share with you that over the years, I have had various roles, as you can see. I was responsible for having town hall meetings, Mr. Martinez. That sounds very old-fashioned in today's environment of video calls and so on. And I would always end every one of my town hall meetings with a photo of patients. And I would always say, the patient is waiting and that I reminded my team that they -- their jobs are to be

transparent and to focus on the patient and the patient's well-being, Mr. Martinez.

MR. MARTINEZ-CID: I am going to ask John to mark tab 15 as Exhibit 282.

(Exhibit 282 was marked for identification.)

THE WITNESS: Mr. Martinez, when you say Exhibit 282, is that a -- help me with that.

BY MR. MARTINEZ-CID:

Q. Don't worry. That is something that we'll -- that Michelle will take care of for us later in providing the transcript. There will be a number of exhibits attached, and this helps us refer to them and keep them in order.

I will share the document with you -- well, John will be putting it in the Box for you. It's got a 15 in front of it. I'm actually not sure. The Box he shared with you may have the exhibit number or it may have the Bates number. It begins with Bates number 276870, and it's a Consumer Healthcare Research and Development Performance Evaluation Process for you regarding your performance in 1999. At least that's my understanding. And you will take a look at that and let me know if I am reading this document correctly or not.

A. Okay, Mr. Martinez. Just give me one second here.

Q. And I shared it on the screen, as well.
Let me know when you're ready, Doctor.
A. Okay. Just one more -- Mr. Martinez, I did a lot of stuff that year.
Q. You were a busy guy. I suspect a lot of your years are busy.
A. You're kind, Mr. Martinez. Thank you.
Okay, Mr. Martinez. I went through it quickly, and I don't -- man, there's a lot of stuff here.
Q. I'll just ask you generally. Am I correct that this is the performance evaluation for your -- for the year 1999 for your work at Pfizer?
A. That's correct, Mr. Martinez. This is a summary of my performance for Warner-Lambert in 1999.
Q. And looking at the page Bates number ending in 71, we've got Goals and Results here. And this is information that you provide as part of this process, correct?
A. Yes, Mr. Martinez. That's correct in that -- I am scrolling up to that page right now, but this is information that I provided to my manager at the time. Mr. Martinez, if I'd just direct you to that first page there, you'll see a reviewer, Randall Yates, who was my manager who was head of R&D for Warner-Lambert at the

time in 1999.

Q. And the goals and results that you provided, one of the goals -- I should say the first one under Gastroenterology talks about aggressively managing private label Zantac 75 cannibalization.

Can you tell us what you meant by that?

A. Help me -- just one more second, Mr. Martinez. Can you just direct me where you're reading?

Q. Absolutely. On the page ending in 871 -- so it should be page 2 of the PDF, of the exhibit -- if you look at Goals and Results, Gastroenterology?

A. Number 3, Mr. Martinez?

Q. No, no, just the paragraph right under gastroenterology.

A. Okay.

Q. And that last sentence says you completed activities consistent with the plan to grow profits for Rolaids and to -- and I'm reading now, to aggressively manage private label Zantac 75 cannibalization.

A. Yes, I see that wording, Mr. Martinez. Sorry. I was looking in the wrong place. Yes, grow profits for Rolaids, which is an antacid, and to aggressively manage private label Zantac 75 cannibalization.

Q. And so that -- can you tell us what private label Zantac 75 cannibalization is?

A. Private label Zantac 75 cannibalization, as you know in the pharmaceutical world and as in any consumer products, you are granted a certain amount of patent exclusivity, and that upon expiry of that particular patent, there are generic companies that will launch private label generic versions of that particular product.

And, as I think about this, I cannot tell you or I don't recall -- I cannot recall what activities were involved in managing this private label cannibalization.

Q. Well, putting -- putting aside the specific activities, am I understanding correctly, then, that what that means is to aggressively fight off the -- generics biting into the market share of ranitidine?

MS. HORN: Objection. Form.

THE WITNESS: Yeah, I would -- I'll just rephrase my response slightly. And when you said to fight off cannibalization, I think our response would have been to -- to manage the Zantac brand appropriately using scientific literature, using promotional activities, just as any consumer products, talking about the nature of the brand, the long-time safe history of the brand, and from that perspective managing the cannibalization, not

necessarily in an effort to prevent competitors from entering into the marketplace.

BY MR. MARTINEZ-CID:

Q. Doctor, and I'm just trying to make sure that we're talking about the same thing.

A. Okay.

Q. When you refer to Zantac 75 cannibalization, I'm understanding that to mean the generic manufacturers eating into the market share of ranitidine.

Is that -- is that true? Am I correct?

A. Yes, Mr. Martinez. You correctly understood what I was stating in that obviously there were at the time competitors, private label competitors, who were seeking to gain market share, and we as the manufacturer of Zantac were making every effort, just as -- in any business, Mr. Martinez, there's competition. And we were being competitive to defend our market share for Zantac.

Q. Sure. And that's -- so what -- so I think we understand each other that aggressively managing the private label Zantac 75 cannibalization is aggressively fighting to keep market share of Zantac 75 and not lose it to generic ranitidine manufacturers, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yeah, Mr. Martinez.

I'm so sorry, Elaine.
Could you say it one more time?
MR. MARTINEZ-CID: I think that was a sneeze. Bless you.
MS. HORN: No. I said, objection. Form.
MR. MARTINEZ-CID: I heard that, too.
MS. HORN: You can answer the question.
THE WITNESS: Okay. So, Mr. Martinez, we are -- we are -- I'm agreeing with your -- that we -- at the time we, the manufacturer of Zantac, were seeking to protect our market share of -- for Zantac 75 as the private labels, if you will, the generics, were coming into the marketplace.
BY MR. MARTINEZ-CID:
Q. And the first thing listed as a result in meeting these goals is that you were able to actually get that -- complete that Zantac 75 pediatric six-month patent extension, correct?
A. Yes, Mr. Martinez, you are correct in that we were able to gain the pediatric exclusivity, the six-month patent extension for -- for Zantac. You're correct, Mr. Martinez.
Q. All right.
And so just in that extension for pediatric, that resulted in a sales increase of 10 to 15 million,

correct?

A. Yes, that's what it states. I don't recall the actual increase in the number, but -- but, yes, I did state that that extension resulted in an estimated sales increase of 10 to 15 million. You're correct, Mr. Martinez, in that statement.

Q. And the second result that was achieved -- that you achieved that year was to oversee a successful Zantac 75 zero-hour NDA submission strategy, NDA being a new drug application, correct?

A. Yes, Mr. Martinez. NDA stands for new drug application. That's correct. It's defined in the FDA's regulations as a process for a new drug application.

Q. And this zero-hour strategy or submission that you were making is to be able to advertise Zantac 75 as something that could be taken at the moment that someone was going to ingest heartburn-inducing food, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes. This application, Mr. Martinez, this NDA, was for the use of Zantac 75 at the time a consumer was to potentially ingest a food that would potentially cause heartburn, and that would have gained the FDA's approval for the use of that.

And as you know, Mr. Martinez, the product

label, the prescribing information, defines how the product should be used to -- not only physicians on the prescription side, but also to consumers on how they should use over-the-counter products.

BY MR. MARTINEZ-CID:

Q. And so this was -- this was a submission that -- that would have allowed for a labeling change and an advertising claim that instead of saying that Zantac has to be taken X hours before or to treat a condition afterwards, that it could be taken as a preventative, you know, with a meal that may produce heartburn, correct?

A. In general, Mr. Martinez, your statement is correct in that this application would have allowed the manufacturer, the sponsor, to not only have a labeling change to direct consumers in how to use the product, but also to be able to promote that use.

Because obviously, Mr. Martinez, as you know, all drug promotion has to be consistent with labeling and would have allowed the sponsor to -- to advertise and promote for the use of that product consistent with the labeling for Zantac 75 for -- for zero-hour use in prevention of heartburn.

Q. And then your Result 3 was to oversee that Zantac 75 is nearly as effective as Zantac 150 for the

relief of heartburn advertising claim.

Am I correct that your role would have been to provide the basis in the scientific literature or, if necessary, conduct the study yourself or with your team in order to provide support for those claims?

MS. HORN: Objection. Form.

THE WITNESS: In -- in general, Mr. Martinez, my team would have been responsible for -- and I -- as I -- I don't recall specifically the data to support this, nor do I even recall this promotional claim.

But you're correct as to the procedure in that my team and myself would have been accountable for generating the data where it says data analysis is successfully completed, and providing that information.

I don't recall the acronym ARC. It probably had something to do with the governance board that would review and approve all promotional pieces.

But, yes, you're correct, Mr. Martinez, in that my team and myself would have been accountable for generating the data that would have supported this particular type of claim.

BY MR. MARTINEZ-CID:

Q. And then looking at the next page, these 4, 5,

6, and 7, are these all -- am I correct that these -- this is your work in developing prototypes or other methods of delivering ranitidine?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm looking at 4, 5, and 6 here, and all of these were projects that were efforts on behalf of Warner-Lambert to create different means by which the consumer could ingest Zantac and with potentially other effective over-the-counter products.

Mr. Martinez, I'll just draw your attention to number 4. It says Zantac Advanced, ranitidine with simethicone. And, Mr. Martinez, as you know, simethicone is a long approved over-the-counter product for the treatment of abdominal gas, and so, hence, these were all efforts on behalf of Warner-Lambert to leverage the Zantac name, the ranitidine product, and combine it with other over-the-counter products for patients who may have -- for example, Mr. Martinez, I'm just going to refer you to number 4 -- patients who have both heartburn and gas.

If you happen to have those two products, you might as a consumer consider Zantac Advanced. And so you're correct from that perspective. And,

Mr. Martinez, you can go through. You can see number 5 talks about a combination with antacid as well as number 6.

And then number 7 is a chewable form.

Mr. Martinez. As you know, lots of patients don't like to take tablets. People don't like to swallow these pills, so, hence, the chewable form is a more acceptable alternative than swallowing a tablet.

BY MR. MARTINEZ-CID:

Q. So in number 9 it says, create and present Zantac 75 pediatric pharmacokinetic/pharmacodynamic study to the American Gastroenterology Association.

Can you tell me a little bit about that study?

A. Mr. Martinez, I'm just thinking for a second. Mr. Martinez, I do not recall which specific Zantac pediatric study. I may need some additional details regarding the specific study that's being referred to here.

Q. You don't recall -- let me see -- I'm going to flip to your CV and maybe look at the data publications to see if something matches up, unless you have a better idea for me.

A. No, Mr. Martinez. I would agree. If you've -- if we -- if you could bring my CV back up, because I have been very transparent over the years of

documenting the types of presentations, and clearly I presented this to the AGA in the 1995 range.

So if you bring up my CV, if you'll give me an opportunity to scroll that, I can perhaps provide you more detail. This is obviously public information and would be known and presented.

Q. I'm in the section of peer-reviewed publications, or should I keep going?

A. Yeah, keep -- yeah, scroll down, Mr. Martinez.

Q. There's abstracts. I'll keep going.

A. You should be in the abstracts --

Q. Okay.

A. -- Mr. Martinez. Could you --

Q. I'll go back up there.

A. -- look for 1999? Just scroll a little bit later, Mr. Martinez. Too fast, Mr. Martinez. I'm looking for something in 1999. Mr. Martinez, I'm looking at number 37. It says Orenstein, Blumer. You can see myself. I'm the last. It says, pediatric gastric pH following ranitidine 75, Gastroenterol 1999. And you can see that it's an abstract that was presented, and this is likely the study that is being referred to in my performance review.

Q. Can you tell us what is meant by pharmacokinetic, pharmacodynamic, the pediatric

pharmacokinetic/pharmacodynamic study?

A. Yes. Pharmacokinetics, Mr. Martinez, refers to what I'll say is blood levels; so, hence, the kinetics. Of course, with all drugs, Mr. Martinez, is that pharmacokinetics are extensively -- extensively researched, in other words, how quickly the drug is absorbed from the site of action, how long it stays in the body, and how long it takes to be excreted.

So, hence, things like -- you'll see in many pharmacokinetic publications half-life. Pharmacodynamics, Mr. Martinez, really talks about the effect of the drug on the body. And, as I referred to you, that particular study that was conducted by that group looked at the gastric pH, and, of course, that would be considered a pharmacodynamic effect.

Ranitidine, as you know, Mr. Martinez, lowers gastric pH, lowers stomach acid -- my apologies -- lowers stomach acid and increases stomach pH. And that is likely the pharmacodynamic effects that were reported at that particular meeting of the American Gastroenterology Association.

Q. And turning back to Exhibit 282, I'm going to ask you about the Result Number 15, oversee technical evaluation of Zantac Efferdose to ensure all technical obstacles with the product are appropriately

investigated.

Sorry. I started reading from two different areas. Strike that mess I just made.

A. Okay.

Q. Looking at number 15, the result listed here is oversee technical evaluation of Zantac Efferdose with Bayer to ensure Glaxo appropriately addresses all technical obstacles.

Can you tell us a little bit about what this was?

A. Mr. Martinez, I'm just -- I'm just thinking.

Q. That's not only allowed but encouraged.

A. Zantac Efferdose was an effervescent dose -- dosage form of Zantac. Mr. Martinez, you'll -- I don't even know if it still exists -- you'll recall -- you'll recall various effervescent versions of antacids, and so when you would drop the fizzy tablet --

Q. Plop plop, fizz fizz?

A. Yes, you're correct, and I'm blanking on the brand and I can't think of it.

Q. Alka-Seltzer.

A. That's it. Alka-Seltzer. So sorry.

Q. To the rescue?

A. Yes, exactly. You remember those commercials.

Q. I do. I do.

A. This was an effervescent version of Zantac. And you'll recall I similarly described in our previous, again, different dosage forms of ranitidine.

And I recall vaguely there was interactions with Bayer, who were potentially interested in this product. I'm struggling to recall the statement here, Glaxo appropriately addresses all technical obstacles. Likely -- let me just read this last paragraph here -- acted as liaison, including attendance to the FDA meeting of September 21.

I'm sure if I reviewed the September 21 FDA meeting minutes, that it would become much more clear to me. Mr. Martinez, I'm struggling to understand what the technical obstacles were. I really don't recall.

Q. And do you recall what Glaxo's involvement was?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez -- and I have to -- for a time period, Glaxo was providing Zantac, the manufactured product, to Warner-Lambert. And I will end my statement there because at some point, that likely changed, and I do not recall the dates nor the specifics.

So, Mr. Martinez, just to be clear, in the early parts of this interaction, Glaxo was

continuing to supply the manufactured product to Warner-Lambert.

BY MR. MARTINEZ-CID:

Q. Let me go down a little further to the general section, if we look at point 2, which is on page 6 of the exhibit ending in Bates 875.

Implement project -- sorry.

A. Yeah. You're looking at number 2, Mr. Martinez? I'm so sorry.

Q. I am. I am. It's implement project GRO or GRO by eliminating unnecessary skill sets within gastroenterology and personal care research and development.

Can you tell us a little bit about that project?

A. I do not recall GRO or the acronym or what it stood for.

Eliminating unnecessary skill sets within gastroenterology and personal care R&D, this was likely downsizing due to budget cuts. And, as it says there, the elimination of two colleagues' positions.

So I don't recall the specifics of Project Gro, but obviously by reading this, you are reminding me of the elimination of two positions within my organization at that point in time.

Q. Do you recall which positions were eliminated?
A. I'm thinking, Mr. Martinez, and I do not recall those positions. I don't recall the names of the individuals. I don't recall.
Q. If these folks were involved in research and development, certainly you would have ensured that you remained appropriately staffed to carry out your responsibility -- or Pfizer's responsibility to ensure the safety of the Zantac drug, correct?
MS. HORN: Objection. Form.
THE WITNESS: Mr. Martinez, I don't think you can make that sort of level of leap between the elimination of these positions -- and, as I shared, I don't recall even what positions they were -- and the continued safe and effective use of ranitidine.
BY MR. MARTINEZ-CID:
Q. Maybe I misstated my question, but I assume that, in making those cuts, you ensured that it would not impair the ability of Pfizer to ensure the safety of the drugs that you were responsible for, including Zantac, correct?
MS. HORN: Objection. Form.
THE WITNESS: Mr. Martinez, I mean, I clearly state here in the line -- I'm just reading in here. It says eliminating unnecessary skill sets within

gastroenterology, and just by reading that statement, one can easily extrapolate -- and I would agree -- in that the elimination of those positions were unfortunately unnecessary at that point in time, 1999, and that I was able to continue to carry out my responsibilities as well as my team in performing the necessary R&D activities to support all of the consumer products, including Zantac.

BY MR. MARTINEZ-CID:

Q. At any time while you were with Glaxo or Warner-Lambert/Pfizer, did you ever feel that you did not have the sufficient resources, budget, team, personnel to carry out all of the necessary tasks that you ever had assigned to you in ensuring the safety and efficacy of Zantac?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to respond to your question. I'm going to respond to it in two sections.

I am sure I -- and there's probably documentation that I complained about lack of resources, lack of budgets.

Mr. Martinez, as you know, and probably in your field as well, there's always a constant

balance between costs and what is needed, and so, hence, those of us who are actually overseeing the work are constantly -- and, as I shared, my job as a project sponsor was to try and get some needed resources for the project teams to be able to do their jobs, and I am convinced I was always arguing with my manager about budgets and count and so on.

Do I ever -- so, hence, I'm sure I never had enough resources to do all of what I thought I needed to do, Mr. Martinez. Do I think that the elimination of those two positions -- do I believe that at any point I did not have adequate resources to ensure the -- that the -- that the regulatory processes of supporting the safe and effective use of Zantac were not being met? I would say the answer is no.

BY MR. MARTINEZ-CID:

Q. I'd like to look at number 5, improve GMP/GCP compliance throughout gastroenterology.

What is GMP/GCP compliance?

A. Mr. Martinez, GMP stands for good manufacturing principles, and GCP, good clinical practices. Those are acronyms that we use throughout, and there are a number of these procedures that are identified through various groups. And FDA is quite

clear about those types of processes that must be followed and ensure that people are indeed compliant with as part of the quality processes that FDA is accountable for and insists on from drug manufacturers.

Q. And so you were involved in implementing corrective and preventative action plans for Pfizer?

MS. HORN: Objection. Form.

THE WITNESS: I was involved -- so, Mr. Martinez, within Pfizer and all organizations, including Warner-Lambert, there's a group called quality, and quality is a key part of any project team. And the quality organization is accountable for ensuring the company's adherence to these good manufacturing, good clinical, good laboratory practices. And as a manager, Mr. Martinez, my job was to ensure not only that my teams were trained in that they had kept up on their training, GMP training, GCP training, as well, and if quality had identified any correct -- any issues that had been identified during their particular audits -- and while I do not recall, but, in general, Mr. Martinez, it's quite standard for a quality organization to audit the respective functions on a regular basis. And if they identify deficiencies, then corrective measures are noted.

And, Mr. Martinez, as a line manager, my job was to ensure that those corrective measures were implemented. So, for example, Mr. Martinez, if a team member had failed to complete their training in GMP in a timely manner, and the SOP within the company was, you must do this on a regular basis, then my job as a manager would have been to ensure that this individual corrected their behavior and completed their training in accordance with the company's standard operating procedures.

Did that help, Mr. Martinez?

BY MR. MARTINEZ-CID:

Q. It did. Thank you.

And it appears from this document that in 1999, quality had seen a need for corrective action for a Project Frost clinical supplies failure.

Do you recall that?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm struggling to remember Project Frost.

BY MR. MARTINEZ-CID:

Q. Yeah, let me back up and make sure that -- in light of that objection.

In my reading of the document, Doctor, it looks like there was a required corrective action for a

Project Frost clinical supplies failure.

My understanding from your answer is that that is likely a corrective action that has been -- that the need has -- for that corrective action is something that is called out by quality in one of their reviews or in some sort of audit.

Is that -- would that be your understanding?

A. That would be my understanding in that this corrective action was identified likely by quality. It doesn't call it out, but, yes, likely by quality for Project Frost.

And, as I shared, I have no clue what Project Frost was.

Q. And, then, so unfortunately, you probably have even less of a clue of what the clinical supplies failure specifically may have been or the corrective action that you oversaw might have been to that?

A. You're correct, Mr. Martinez. I do not recall the Nix clinical supply -- so sorry. I can't even read. I don't recall the Nix clinical study database quality failure, nor do I recall the corrective actions for either of those, Project Frost or the Nix clinical study database.

Q. And I see your point 6 is -- and this is something that every year I assume was something you

took very seriously, was to continue to ensure safety and quality is integral by stressing those objectives at staff meetings and overseeing quarterly laboratory inspections.

Is that correct that this is, I think, as we discussed earlier, sort of the hallmark of your professional career is to always put the safety of the consumer first?

MS. HORN: Object to form.

THE WITNESS: You're correct, Mr. -- I'll answer your question, Mr. Martinez.

As I shared earlier with you in our discussion, safety and quality are paramount to me. To this day, they today are paramount. And I insisted and communicated this on a regular basis -- it was part of our training. It was part of our approach, and so, in general, Mr. Martinez, I agree. Safety and quality, as it states there, were -- if you don't mind, I'll just use that quote, Mr. Martinez -- integral to our R&D efforts.

MR. MARTINEZ-CID: Would now be a good time for you all to break for lunch?

MS. HORN: Yeah.

THE WITNESS: Yeah. I'm good. I think I'm hungry here.

MS. HORN: So it's 1:50. Do you want to go off the record?

MR. MARTINEZ-CID: Sure.

MR. SCHMITZER: We are going off the record. The time is 1752 UTC.

(Luncheon recess was taken from 1:52 p.m. to 3:02 p.m. after which the following proceedings were had:)

MR. SCHMITZER: We are back on the record. The time is 1902 UTC. Please proceed.

BY MR. MARTINEZ-CID:

Q. Doctor, continuing to look at Exhibit 282 -- and I'll put it back on the screen -- there's a list of unplanned accomplishments and special projects. The first one listed is, performed literature reviews and wrote -- I assume the WL is Warner-Lambert?

A. Yes, Mr. Martinez, WL stands for Warner-Lambert. That's correct.

Q. So you wrote, a Warner-Lambert statement to respond to press reports that ranitidine induces sexual dysfunction.

What is a literature review?

A. Mr. Martinez, a literature review would be that my team would do a search of the literature, published literature, peer-reviewed journals, relative

to the subject that's being investigated, of course.

Q. How do you conduct that search review?

A. Typically --

(Cell phone ringing.)

THE WITNESS: Mr. Martinez, is that me beeping?

BY MR. MARTINEZ-CID:

Q. I don't think it's either of us, but it is festive.

A. I know.

Mr. Martinez, unplanned accomplishments. So sorry, Mr. Martinez.

Q. That's okay. We were just -- and my question doesn't specifically relate to this bullet point, so I don't want you -- here, why don't I take it down off the screen?

Literature review, I think you mentioned that your team would -- would do a search for relevant studies, and I was -- my question, sir, is what does that entail? How does -- how does your team go about searching?

A. Typically, Mr. Martinez, what the team would do is they would do a search of, like I said, the relevant literature and focus on, obviously, peer-reviewed journals, major journals.

And typically they likely would have interacted with the library. And the library could have performed a literature search where they'll use certain databases of published information on the relevant topic.

That would be a very usual type approach to doing a literature search.

Q. What databases are those?

A. Just -- I'm just hesitating, Mr. Martinez, and thinking through. There are a number of literature databases, and I will give you one that is well known today.

I cannot cite for you what databases were used 20 years ago. So, for example, Mr. Martinez, PubMed -- so, in other words, it's a Medline search, so hence, those would be the types of databases that one would search.

What was used 20 years ago for these, nor the names of the databases, I'm sorry, I can't recall that.

Q. But you would rely on your team to be able to find the appropriate peer-reviewed journals and literature that they needed to accomplish their task of researching?

A. Yes, Mr. Martinez, I would depend on that team to conduct a literature search, to review the

literature, interpret the literature. Yes, you're correct from that -- in that regard.

Q. And could you use search terms in that -- in pulling up relevant articles or studies?

A. Yes, Mr. Martinez. In general, that typically would have been the way to conduct a literature search, is to identify key search terms.

As you -- as you know, Mr. Martinez, in literature, typically when you publish literature or a manuscript, you will identify key terms. And those are the -- if you will, they use Boolean logic to be able to search and retrieve that type of information.

Q. So -- and excuse me if the question is -- sounds too basic, but is it really something as simple as you could put in ranitidine and pediatric and pull up studies that involve ranitidine and pediatrics?

A. Yes. It would be -- it would be that simple.

Mr. Martinez, you could -- you could search for ranitidine, and you could come up with -- I'm just going to say hundreds and hundreds of manuscripts. You could then search for, you know, pediatric, and where the term "pediatric" was used would eliminate or reduce the numbers of hits, if you will, of literature that had been identified.

Q. And your -- your team would not be the only

folks at Pfizer who were charged with doing research into the medical literature, correct?

A. I would say in general, Mr. Martinez, this type of literature knowledge would have applied to all projects at Pfizer, to all, you know, therapeutic areas.

So, as we've discussed previously, I mean, knowledge of the literature is -- is important, and particularly up-to-date publications.

Q. And certainly pharmacovigilance would be monitoring relevant literature regarding the drugs they were responsible for, as well, right?

MS. HORN: Objection. Form.

THE WITNESS: Yes, I'll -- I'll clarify, Mr. Martinez.

Part of the role of pharmacovigilance -- and that is for today as well as 20 years ago -- is to monitor published literature relative to the safety of products, and those are typically included in -- and I shared this earlier -- annual reports that are required by FDA on an annual basis.

BY MR. MARTINEZ-CID:

Q. Did the research and development team that you would oversee have a responsibility to report any studies or research that -- that questioned the safety of Zantac to the pharmacovigilance folks?

MS. HORN: Objection. Form.

THE WITNESS: Typically -- and I'm going to answer your question, Mr. Martinez -- typically these types of, as it says there, literature searches that were done are done on a cross-functional basis, on a project team basis. So, hence, it's just not a single person, Mr. Martinez, if you will, who would do the literature search and then say, oh, this is what it is, because it would be done on a cross-functional basis.

So it was -- I cannot speak specific to any literature searches that are being referred to here, but, in general, those types of literature searches are shared across the project team, which, as I shared earlier, is cross-functional.

BY MR. MARTINEZ-CID:

Q. So, by way of example, if you were doing research for a study or an article you were writing, and you came across a peer-reviewed journal or any sort of medical literature or study that suggested that -- that Zantac might be -- might not be safe for Zantac customers, is that something that you at Pfizer had a responsibility to report to pharmacovigilance? Did you have to report it elsewhere directly to the FDA? Did

you have to report it to no one and rely on pharmacovigilance to do their own work?

That's what I'm trying to understand.

MS. HORN: Objection. Form.

THE WITNESS: Let me -- let me clarify in my response, Mr. Martinez. And I'm only going to speak for my -- myself.

If I had identified a publication that suggested there was a safety signal for any product -- it could be ranitidine; it could be any product -- and that was under my directorship, I would have ensured that the pharmacovigilance function was aware of this, and I would have said -- please forgive my grammar -- I would have said, hey, are you aware of this publication? And they would have said yea or nay to ensure that they were aware of such.

So, Mr. Martinez, what I'm trying to say is on a personal basis, as I read those journals, if indeed there was a case where a manuscript was published suggesting adverse events, that I would have ensured that our pharmacovigilance colleagues were aware of that information.

BY MR. MARTINEZ-CID:

Q. And I understand the -- Doctor, your approach,

and we talked about earlier that your approach has always been one of transparency and err on the side of sharing additional information rather than risking underreporting -- I got that right, correct?

MS. HORN: Object to form.

THE WITNESS: No, that's correct.

Mr. Martinez, my approach has always been -- and I've shared this with you several times. And I'm sure the listening -- listening audience here has heard it, as well. I have always prided myself on being transparent, honest, straightforward in how I've managed information and data, and, as I shared, if I was aware of a publication -- and I shared with you some of the specific journals that I read -- I would have shared and communicated that information to ensure that they were aware of whatever the manuscript was.

BY MR. MARTINEZ-CID:

Q. And then I'd like to -- I'd like to put your personal practice aside for a moment, but also as a supervisor of a research and development team, including clinical researchers, did you also train the folks that reported to you that that was their responsibility, to -- to escalate that kind of a study or report to make sure that pharmacovigilance was aware of it?

MS. HORN: Objection. Form.

THE WITNESS: Yeah, that's a difficult question, because you use the word "training," Mr. Martinez. And was there any formal training about handling of information? I don't recall that.

As I shared with you my personal approach and my approach that I -- you showed some of the -- my performance reviews from 20 years ago. I made every effort to ensure that my personal, if you will, ethics were instilled and carried out in my team.

Was there any formal training? I can't -- I can't answer that, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. So you don't know whether the clinical researchers that were reporting to you, whether or not they knew they were -- or whether or not -- well, first, whether or not they were required to report an adverse piece of medical literature, something with a safety signal about Zantac, you don't know whether or not they were required to report that to pharmacovigilance or to you?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I -- I do not

recall if there were procedures in place at that time when I was at Pfizer Consumer between 1998 and 2002, if there were standard operating procedures that required clinical research colleagues to report manuscripts as such.

All I can share with you is what my approach has been for decades now.

BY MR. MARTINEZ-CID:

Q. And a little -- a little different question, Doctor.

Regardless of whether it was required or not, did you expect that the people you were supervising, particularly clinical researchers, would report to you any safety signals in the literature regarding the drugs that your team was charged with?

MS. HORN: Objection. Form.

THE WITNESS: I would say, Mr. Martinez, in general the answer is yes, in that my expectation of the members of my team who became knowledgeable about literature publications regarding products that were in our remits, if you will, would have informed me of the existence of such a publication and would have informed our pharmacovigilance colleagues, as well, particularly if it identified safety signals.

BY MR. MARTINEZ-CID:

Q. I'd like to -- I'll put the document back up. I'm sorry. It's Exhibit 282, and we are on page 7 of the exhibit ending in Bates 876.

So the unplanned accomplishment or special project listed is, performed literature review and wrote Warner-Lambert statement to respond to press questions regarding The New England Journal of Medicine article on the relationship between esophageal cancer and the incidence of heartburn.

Do you recall that work?

A. I'm just thinking for a minute, Mr. Martinez. I do not recall the New England Journal article on the relationship of esophageal cancer and incidence of heartburn. Nor do I recall writing a statement responding to press questions.

Q. But certainly as part of that literature review, you would have examined the relationship between esophageal cancer and heartburn, right, generally?

MS. HORN: Objection. Form.

THE WITNESS: In general, Mr. Martinez -- and, again, as I shared, I don't recall the New England Journal article. I'm assuming that that second bullet point is accurate, that the New England Journal article references a relationship between

esophageal cancer and heartburn.

I would have reviewed the literature as such, and obviously I state in that second bullet point that I did write a statement responding to press questions about that particular article.

BY MR. MARTINEZ-CID:

Q. And specifically you would have wanted to make yourself familiar with any relevant medical literature exploring the relationship between cancer and ranitidine, correct?

MS. HORN: Objection. Form.

THE WITNESS: The article, Mr. -- Mr. Martinez, is about esophageal cancer and the incidence of heartburn, and so that would have been the focus of the literature search.

And obviously I don't recall the questions from the press. Obviously I can read the words. I'm sure -- and it would only -- it would be common sense that the press is asking Warner-Lambert for some sort of response given the fact that Warner-Lambert is the manufacturer, if you will, is marketing Zantac and, hence, a treatment for heartburn. And I'm sure that there were statements and questions regarding esophageal cancer, incidence of heartburn, and how ranitidine is

potentially involved in the reduction of heartburn, which we demonstrated, Mr. Martinez, in clinical trials, of course.

BY MR. MARTINEZ-CID:

Q. Sure.

And you would have wanted to be aware of any medical literature also establishing a relationship, a potential relationship between incidence of cancer and the use of Zantac, correct?

MS. HORN: Objection. Form.

THE WITNESS: Well, Mr. Martinez, let me just correct.

So I would have wanted to be aware of the literature which references all three, if you will, topics, Mr. Martinez, esophageal cancer, the relationship to heartburn and the use of ranitidine, Zantac.

BY MR. MARTINEZ-CID:

Q. Generally speaking, even moving -- moving beyond this particular New England Journal of Medicine article, because you were in charge of research and development for Zantac, you would have wanted to know of any medical literature out there specifically speaking to a potential relationship between Zantac and cancer full stop, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes, Mr. -- Mr. Martinez. If -- I would have wanted to have been made aware of any publication, particularly in The New England Journal of Medicine, which I -- it's one of the more premier journals, medical journals, in the world, of course, I would have wanted to have been made aware of any publication that suggested a relationship between esophageal cancer and ranitidine.

BY MR. MARTINEZ-CID:

Q. And that's true for other forms of cancer, as well? If there's -- if there's -- if there was peer-reviewed literature out there or a reputable study out there that suggested a relationship between any form of cancer and Zantac, as a person charged with the research and development of Zantac, you would want to know about that literature, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, if -- as I shared earlier, I would have wanted to have known about any publication, as you shared, New England Journal, peer-reviewed, that described or published a relationship between any cancer and any of the products that I was accountable for.

And, as I shared earlier, not only would I have been wanted to be aware of, but also ensured that my pharmacovigilance colleagues, whose responsibility is for the adverse event profile of those products that we manufactured.

So the answer is yes.

BY MR. MARTINEZ-CID:

Q. Thank you, sir.

Taking a step back, when we talk about your responsibilities for research and development, can you tell us a little bit about what is meant by development?

A. Yes. Mr. Martinez, we talked about this a little bit earlier this morning. And the development of a drug, which I was involved in, is essentially the conduct of clinical trials with that particular drug for patients with a specific condition.

And, as the development world has moved, we now use randomized clinical trials, which is, if you will, the gold standard for providing what FDA will call substantial evidence to demonstrate the safety and efficacy of the drug when used for the treatment of a disease. And that essentially is the basis for an NDA, a new drug application, Mr. Martinez, that we talked about earlier. And that would be the application submitted to FDA requesting approval for the use of that

drug for the treatment of this particular disease.

Q. Turning back for a moment to Exhibit 282, near the bottom of this page ending in Bates number 876 -- fourth from the bottom, I believe -- design and initiate Zantac 75 versus Prilosec, 20 milligrams gastric acid rebound hypersecretion study.

Can you tell us a little bit about that work?

A. I can, Mr. Martinez. I just need to think for a moment.

Acid rebound hypersecretion study. Mr. Martinez, I'm just -- I'm struggling to recall the premise and the basis for this study, gastric acid rebound hypersecretion study.

Mr. Martinez, I'm struggling to recall that study.

Q. Do you recall --

A. I cannot give you the pharmacologic basis for it, Mr. Martinez. I'm struggling.

Q. Do you recall what gastric acid rebound hypersecretion is?

A. So I -- yes, Mr. Martinez, I know what the term "gastric acid rebound" means, and essentially what that means is -- that term means that, if -- if gastric acid has been suppressed for a time period, that there's a short time afterwards in which gastric acid can

rebound as it attempts to reach homeostasis, Mr. Martinez. But I am struggling with the obvious comparison of Zantac 25 versus Prilosec 20 milligrams, and I cannot give you the details. I just simply don't recall that study or the basis for that study.

Q. And, Doctor, let me put aside the specific study for a moment, and please be patient with me as I am not as familiar with some of these issues as you are.

Here's my -- my crude understanding of gastric acid rebound hypersecretion, and please let me know if I've got it. So if a patient takes something to reduce their -- their gastric acid, the acid in their stomach, then once they cease using it, sometimes the body will produce more acid than usual; is that correct?

A. Let me just -- let me just clarify your understanding, Mr. Martinez.

You are correct in that if someone, a patient, a human is on an acid-suppressing drug, when they stop their treatment, there is a short-term -- potential for some patients to have a short-term, if you will, rebound or increase in acid secretion for a short time period until the body begins to stabilize.

Because, remember, Mr. Martinez, is that the body attempts to regulate all aspects of it and controls the acid pH. So, hence, if the stomach pH is high for a

while and then allowed to return to normal, you will see a rebound and then stabilization to normal homeostasis.

Q. And is that issue sometimes more acute when a person has been using the acid-reducing medication for an extended period of time?

A. I hesitate to -- I hesitate to answer that question because I do recall there being many publications suggesting some patients have a hypersecretion given duration of exposure, and, to the best of my knowledge, Mr. Martinez, that issue was never truly resolved as to whether long-term suppression of acid would cause an abnormal hypersecretion.

Q. And as you sit here today, you don't recall whether the incidence of gastric acid rebound hypersecretion, whether they were worse or better or the same with Zantac 75 as they were with Prilosec 20?

A. You're correct, Mr. Martinez. I do not recall. I do not recall.

Q. And turning to the final page of Exhibit 282 --

A. Where are you, Mr. Martinez?

Q. Sorry. I'm slowly but surely getting there. And I'm sorry. It's not the final page of the exhibit. It's the final page of this portion of it. It ends in Bates number 877, so it should be page 8 of the exhibit.

And it notes that you successfully negotiated a successful agreement with the American College of Gastroenterology who challenged a Zantac sales advertising piece by leveraging a personal relationship with the executive director of the American College of Gastroenterology, thereby preventing a legal conflict.

Do you see that?

A. Yes, I do. I can read that, Mr. Martinez.

Q. And can you tell us about that incident?

A. I'm just thinking, Mr. Martinez. I'm trying to recall.

I have to say, Mr. Martinez, I do not recall this incident. I don't recall the Zantac sales advertising piece. I don't recall any of the discussions with the executive director of the American College of Gastroenterology. I don't recall the executive director of the American College of Gastroenterology, and nor do I recall how we resolved this situation.

Q. But you have been a member of the ACG for many years, correct?

A. Yes, Mr. Martinez, I have been a member of the American College of Gastroenterology for many years.

Q. And -- and you are still involved with the organization today?

A. I am not, Mr. Martinez. I have not attended the meetings. I have not reviewed the journals.

As you can see from my CV, I've been involved in ophthalmology for the last decade, since I left the Pfizer Consumer Group in 2002. You know, I'm a fellow of the American College of Gastroenterology, which is, if you will, a lifetime member.

But since I left Pfizer Consumer in 2002, I've had no interactions, research on gastroenterology.

Q. But certainly while you were at Pfizer, you were very involved with the organization?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I -- while the time I was at Pfizer Consumer from '98 through -- through 2002, I was indeed an active member of the American College of Gastroenterology. I attended the meetings, and then I previously shared with you, Mr. Martinez, I would read the American Journal of Gastroenterology on a regular basis, if you will.

BY MR. MARTINEZ-CID:

Q. And you would present to them, as well, correct?

A. Yes, Mr. Martinez. Again, if you bring up my CV, you will see -- you will see presentations that I've

made on various topics over the years.

Q. And were other folks at Pfizer also involved with the ACG?

A. In general, the answer is yes.

Mr. Martinez, the American College of Gastroenterology and the American Gastroenterological Association, the two professional societies I referred you to earlier in our deposition, those are probably some of the two major medical society meetings, so, yes, I would say in general, there were others who were also involved in these two predominant gastroenterology medical societies.

Q. Can you think of anyone at Pfizer who had more involvement with the American College of Gastroenterology than you did, or had closer relationships with its leadership?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, that's a difficult question for me to answer. I do not recall anyone else who participated or was involved with the respective societies that I talked about certainly to the extent that I was involved.

BY MR. MARTINEZ-CID:

Q. And can you think of any way or any example of how you may have leveraged a personal relationship with

the executive director at that time to prevent a legal conflict?

A. I do not recall that. I truly don't recall the situation or, you know, the incident or how it was resolved. I -- I do not recall that.

Q. I'm going to direct you to the page ending in Bates number 884. I'll put it on the screen.

I'd ask you to look at the bottom where it says Business Ethics and Compliance. The report states that you maintained high business ethics and compliance by insisting that the Nix clinical database be reopened to meet GCP standards.

Can you tell us what that was about?

A. Mr. Martinez, I can read the words, of course. I can replay it back to you.

I do not recall the situation. Obviously the word states that it has to do with the Nix clinical database, and there were clearly issues with meeting GCP standards.

I do not recall -- actually, I don't recall the Nix clinical database, nor do I recall what GCP standards were not being met.

Q. And I'm sorry. I think you testified that those were -- were good clinical practices? Did I get that right?

A. Oh, yes, Mr. Martinez. GCP -- sorry. Did I use the standard -- good clinical practices, that's correct.

Q. But you can't recall which of those practices -- which good clinical practice was not being met, nor can you tell us anything about what the Nix clinical database was?

A. That's correct, Mr. Martinez. I do not recall the Nix clinical database, nor do I recall what standards were not being met.

Q. And looking at the next line over where you talk about the Nix technical reports, I suspect you're not going to recall what those are, but please correct me if I'm wrong. But I am hoping you do know what -- they were rewritten to comply with ICH guidelines. Can you tell us what those are?

A. So the International Council on Harmonisation, Mr. Martinez. ICH is a group that exists today -- you can Google it -- where a group of health authorities, countries, industry persons have gotten together to sort of agree on various guidelines and various -- in an effort to standardize some of the approaches.

And, for example, I'm just reading the words here, Nix technical reports, and at some point -- there are guidelines, Mr. Martinez, for writing of clinical

study reports, and ICH has issued those guidances. And my assumption is that those technical reports were rewritten to comply with those guidances.

MR. MARTINEZ-CID: John, I'd like for you to pull up tab 17. It is a record of FDA contact dated November 7th, 2001, beginning with Bates number 361308.

Doctor, I'm going to go ahead and mark this record of contact as Exhibit 283.

(Exhibit 283 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. As you can see, Doctor, this is regarding ranitidine 150-milligram tablets for over-the-counter use, and your name is listed as being part of it regarding -- on behalf of Pfizer Consumer Healthcare.

A. Yes, Mr. Martinez. I'm just -- I'm just reading through the executive summary here to refresh my memory.

MS. HORN: Is there a question pending?

BY MR. MARTINEZ-CID:

Q. The question being, do you recall participating -- do you recall this -- this contact at all?

A. Thank you for clarifying, Mr. Martinez. I didn't understand your -- you were asking me a question,

and I'm sorry.

I do not specifically recall this FDA call or this contact. Obviously, Mr. Martinez, I'm reading. I can see my name. I can see that the purpose of the contact, Mr. Martinez -- at the bottom of page 1, I can see it was a pre-NDA meeting for ranitidine 150-milligram tablets for over-the-counter use, and I was just going through the executive summary now.

Were there other questions that you had for me?

Q. Sure. I'll point you specifically to the meeting detail discussion, and here in this paragraph that begins with, Dr. Gallo-Torres, do you see that he stated that previously-submitted studies in support of the over-the-counter treatment of heartburn, 75-milligram and 150-milligram showed no difference in efficacy?

Well, first let me stop there. Do you recall that being the case?

A. I do recall that, Mr. Martinez -- I'm just reading -- in that one of the criteria, Mr. Martinez, at the time was FDA required that the studies differentiate between Zantac 150 milligrams and 75 milligrams.

And the studies that are being cited there -- this would be RANA4006, RANA3016 and 3018 -- showed that

Zantac 150 was superior to placebo, and 75 milligrams was not superior to placebo. And that, Mr. Martinez, as you asked, there was no difference between Zantac 150 milligrams and Zantac 75 milligrams.

Q. And no difference in the treatment of heartburn, and I want to stay there for a moment.

What efforts, if any, do you recall Pfizer undertaking to let consumers know that there would be -- that there was no difference in efficacy for the treatment of heartburn between 75 and 150 milligrams of ranitidine?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I need to be clear because -- so your question is did FDA make efforts to inform the consumer about the fact that --

BY MR. MARTINEZ-CID:

Q. I'm sorry. Pfizer.

A. I'm sorry. Pfizer.

And the reason I'm asking the question, Mr. Martinez, just to clarify, Zantac -- at the time of this memo, Zantac 150 and -- is -- is -- it's 2001 -- is not available to the consumer.

Q. Do you mean without a prescription?

A. Yes, that's correct.

Q. Right, but -- so -- but Pfizer wanted to bring

Zantac 150 to over-the-counter so it would be generally available to consumers without a prescription, correct?

A. Yes, Mr. Martinez, that was a key objective of -- of ours, was to bring Zantac 150 milligrams to the consumer on an over-the-counter basis.

Q. And there would be at least some danger that a consumer that was currently using Zantac 75 would start to use Zantac 150 under the assumption that it would have greater efficacy in treating his or her heartburn, correct?

MS. HORN: Objection. Form.

THE WITNESS: Well, Mr. Martinez, I'll answer your question. That was the -- the concern of FDA, is to -- and the onus was on us, Pfizer Consumer, to show that Zantac 150 was superior -- Zantac 150 was superior to Zantac 75.

And that was the whole basis, and that's why -- as you can see in the previous studies, you'll see that in the additional studies that were done, to -- in an effort to differentiate Zantac 150 milligrams from Zantac 75.

BY MR. MARTINEZ-CID:

Q. And that was by conducting it in a more severe heartburn patient population, correct?

A. That's correct, Mr. Martinez. That's referred

to in those previous two additional studies. You can see there I'm just -- again, I'm reading it from the memo -- RANA3013 and RANA3014 in which those two studies would be conducted in a more severe heartburn population.

Q. And finishing up that paragraph, it does say that the 75-milligram dose of Zantac was not superior to placebo in the prevention of heartburn.

Do you see that?

A. Yes, Mr. Martinez, I can see that statement.

Q. And --

A. You're asking me a question? I'm so sorry.

Q. Sure.

And that does contradict the zero-hour marketing claim that Pfizer was making on Zantac 75 that we talked about earlier, correct?

MS. HORN: Objection. Form.

THE WITNESS: Just -- just remind me again, Mr. Martinez, the marketing claim.

BY MR. MARTINEZ-CID:

Q. Sure.

We talked about how the zero-hour claim for Zantac 75 was to suggest to consumers that they could take the -- the Zantac 75 right with a meal that may provoke heartburn in order to use it as a preventative

measure.

Do you recall that?

A. Yes, I do recall that now, and --

Q. And certainly a finding that the -- that the -- that that dose of Zantac is not superior to a placebo in preventing heartburn would undermine that claim, no?

MS. HORN: Objection. Form.

THE WITNESS: I think the -- really that the key problem or the key part that we need to discuss here is that, I mean, clearly there was a number of studies that were obviously done to support the use of Zantac 75 for -- for prevention of heartburn zero-hour.

These particular studies that were done did not show that difference, and so, you know, every -- every study that's done that uses a different -- potentially a different patient population -- what I'm trying to say is that these studies RANA4006, 3016 and 3018, they were obviously submitted in the NDA and show that Zantac 75 was not superior to heartburn.

But, remember, there were different design studies than the earlier studies that showed that Zantac 75 was effective, which was the basis for it

being approved for over-the-counter use.

So it is difficult to extrapolate between studies because there could be different patient populations, there could be different inclusion, exclusion criteria. The trigger, the food that was used to trigger the heartburn could have been different.

And so it is difficult, Mr. Martinez, without having a discussion about the specifics of the studies that you're referring to and doing a head-to-head comparison of such.

BY MR. MARTINEZ-CID:

Q. But, Doctor, isn't it the case that those previous studies that you say showed Zantac 75 to be effective for heartburn showed it to be effective for the treatment of heartburn, not for prevention of heartburn?

MS. HORN: Objection. Form.

THE WITNESS: So you're correct in that those earlier studies were for the treatment of heartburn, food-induced heartburn, and that, of course, was the -- the basis -- or the design of those initial studies was to -- in an effort to demonstrate that Zantac 150 was superior to Zantac 75. And those studies did not -- did not

show that, as the statement suggests there.

BY MR. MARTINEZ-CID:

Q. Sure.

And, in fact, Pfizer did not push back against the FDA's finding that the -- that Zantac 75 was not superior to placebo in the prevention of heartburn. Pfizer didn't try to defend that zero-hour claim at that time but instead said, well, we will differentiate between 75 and 150, and we'll say 75 is good for treatment, and we will -- we will not mention preventative care on the Zantac 75, correct?

MS. HORN: Objection. Form.

THE WITNESS: Just give me -- before I answer your question, Mr. Martinez, let me just read this next paragraph.

BY MR. MARTINEZ-CID:

Q. And I would ask you specifically -- you can see Dr. Ganley stating that the data in that supplement for Zantac 75 over-the-counter use for the prevention of heartburn when a 75-milligram tablet was taken right before a provocative meal did not support the application.

A. Yes, I can see that, his statement. I'm just reading further, Mr. Martinez, about -- there's a lot of references to additional studies here.

Q. Let me -- maybe I can help you out.

If we go to the bottom of page 4 of 10, you can see, Mr. Kohler -- and you know who Mr. Kohler is?

A. Give me one second here.

Q. Robert Kohler, a regulatory consultant who had attended on behalf of Pfizer.

A. Thank you. I do recall now.

Q. So the regulatory consultant for Pfizer, Mr. Kohler, stated to the FDA that Pfizer plans to include a naming difference so that the name for 75 milligrams would imply treatment and the name for 150 would imply prevention.

Do you see that?

A. Yes, I do. I see the statement, Mr. Martinez.

Q. And does that refresh your recollection that, in fact, by that time Pfizer was abandoning the zero-hour claim for Zantac 75 and instead saying that 75 would be for treatment while pushing for a prevention -- a zero-hour-type claim for Zantac 150?

MS. HORN: Objection. Form.

THE WITNESS: I do recall -- I do recall the strategy moving forward. In fact, ultimately Zantac 150 over-the-counter was approved, and its name was called Maximum Strength.

Mr. Martinez, did I answer your question?

BY MR. MARTINEZ-CID:

Q. I'm sorry. So do you recall that, in fact, then, that -- that there was no -- there was no pushback or contrary view from Pfizer as to the FDA's view that the data did not support a preventative claim for Zantac 75?

MS. HORN: Objection. Form.

THE WITNESS: Yes, I do -- as I've read this, I do recall that, and I do see the discussion that occurred at the time, hence the suggestion for the two additional studies that's referred to in the previous paragraph.

So, Mr. Martinez, you're correct in that there was no pushback on behalf of Pfizer based on the results of those particular -- three particular studies -- and I'm already forgetting the numbers -- RANA4006 and the two other studies, RANA3016 and RANA3018.

BY MR. MARTINEZ-CID:

Q. But, more importantly, Doctor, what I'm getting at is that there was -- that Pfizer was not trying to defend the Zantac 75 zero-hour claim? Instead they said, no, no, we'll differentiate and we'll only say -- we'll say it's for treatment, no more zero-hour, it's for after the fact, and we will have Zantac 150 be

our preventative medication.

Does that square with your recollection?

MS. HORN: Objection. Form.

THE WITNESS: That's -- based on reading this document, that appears to be the direction of the group at the time, yes.

BY MR. MARTINEZ-CID:

Q. Let me direct you to the bottom of what's labeled page 6 of 10 that ends in Bates 313. Dr. Shetty -- and looking at the list, Dr. Shetty is from the division of over-the-counter drug products of the FDA -- questioned whether there was any data in children 12 to 18 years of age. And it says that you responded that there was no efficacy data in this age group available.

Do you recall that?

A. I do not recall that. I do not recall Dr. Shetty. I don't recall my response.

Q. Then it goes on to say, Dr. Shetty was questioning whether there was safety data for the pediatric population at 150.

And you see the document doesn't set out a response from you, but it says in all caps, hopefully we said it would be part of the global safety database.

Do you see that?

A. Yes, I can read the words, Mr. Martinez, and, as I look back on this from a historical perspective, I mean, the answer is, yes, it should have been part of the global safety database.

And I'm -- I can't obviously say whether or not it was, but I don't recall that specific response nor that conversation. But, in general, Mr. Martinez, global safety database would have had such information available.

Q. But you -- but generally -- generally Pfizer would have had efficacy data available, as well, but it didn't for age 12 to 18. I'm wondering whether it did, in fact, have safety data for that age group.

MS. HORN: Objection. Form.

BY MR. MARTINEZ-CID:

Q. Let me -- let me back up in light of that objection.

Doctor, you agree with me that normally for a medication that Pfizer is manufacturing and marketing, they would have efficacy data for all -- that would cover all of the age groups that were being marketed to, correct?

A. Yes. Thank you for clarifying the question, Mr. Martinez, and it's easier for me to respond. Any manufacturer, any sponsor would have both safety and

efficacy data to support the indicated use patient population for that particular drug and for that disease.

If Zantac 150 was indicated for use in children age 12 to 18 years of age, they would have had to have had safety and efficacy data to -- to support that use of that product in those patients.

Q. Right.

And at least at this time on November 7th in 2001, you were letting the FDA know that Pfizer did not have efficacy data for 12 to 18 years of age, and so it is possible that Pfizer did not have safety data for that age group, as well, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yeah, Mr. Martinez, let me just -- let me just clarify.

The discussion -- recall, Mr. Martinez, the discussion in the previous paragraphs here is for efficacy data for the use of ranitidine for the treatment and/or prevention of heartburn.

Now, remember, Mr. Martinez, that's very different than the other Rx prescription indications of use, in other words, ulcer disease, reflux disease, erosive esophagitis and so on.

So what I responded there saying there's no

efficacy data in this group for the use of Zantac 150 for the treatment of heartburn, for the -- and then when I referred to the safety data -- safety data -- remember, Mr. Martinez, safety databases can consist of all sorts of adverse events reports that are reported by physicians, by consumers, on a global basis, of course.

And they are not always in accordance with the approved package insert, so -- and this is where the statement hopefully -- we said it's part of our global safety database and I'm sure there were likely reports of the use of these products, including ranitidine, in the pediatric population. And those events would have been reported in this global safety database.

BY MR. MARTINEZ-CID:

Q. Doctor, you recall earlier we were talking about the pediatric exclusivity, and we were talking about the procedure in which you described the FDA putting out a request for a study that if a manufacturer met, they would be granted an exclusivity extension.

Do you recall that?

A. Yes, I recall our discussion earlier about the types of studies being done to gain the six months'

exclusivity.

Q. And I was suggesting to you that, in fact, the -- Pfizer would sometimes be the organization that would approach the FDA and suggest studies that it would like to do in order to extend their exclusivity, but I'm not sure that you agreed with me on that.

So, I'm sorry. Can you refresh my memory? Can we agree on that, that sometimes it would be Pfizer or any other manufacturer that come -- would come forward to the FDA and say, we would like an extension, and we suggest we'll do a following study to get it?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, as we talked earlier, I mean, as I shared, ultimately FDA has the final say. They're the ones that make the specific request for the study, pediatric study. Sorry.

And typically it's in areas where there's a lack of information, Mr. Martinez, about where FDA feels that a study would provide evidence to practicing healthcare professionals about how to properly use this drug.

And, as I shared, clearly, as you can see from the documentation, there was a negotiation and obviously suggestions on both sides about what

would be the study that would provide the most information on the use of ranitidine in the pediatric population.

And obviously FDA's position at the time was in neonates, and hence the suggestion for study using the ranitidine syrup. And obviously the company had proposed the use of Zantac 75 in children 12 to 18 years of age.

BY MR. MARTINEZ-CID:

Q. Doctor -- and I think maybe what we're getting caught up on is the -- is the language when you say that the FDA makes the specific request.

What I'm trying to get at is, in fact, though, sometimes the -- Pfizer would request that the FDA make a request, a specific request, for a study of them. In other words, this process isn't always -- wasn't always initiated by the Food and Drug Administration, but, in fact, it would be something that Pfizer was -- was looking for if they wanted to extend their exclusivity and would initiate the process themselves, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I just want to clarify, as well. In fact, one of the earlier documents that you showed me -- and you'll recall Dr. Ganley, who was describing the discussions

about the design of the study.

And, in fact, Mr. Martinez, you showed me information -- we can go back through one of those documents that you showed me earlier in which he specifically states that the FDA review division agreed to the design of the study that Glaxo had proposed.

And then Dr. -- Mr. -- that there was a reference to the pediatric group, who then decided that the best study was the Zantac syrup study in the neonates.

And if you'll recall -- and you reminded me of that discussion where Dr. Ganley actually apologized from FDA about, you know, the -- if you will, I think the term that he used was "implementing the new regulatory procedures associated with the pediatric extension."

And at the time -- and this is where I'm going, Mr. Martinez -- is that 20 years ago when this legislation had recently been implemented, both sponsors, manufacturers, and FDA were working and looking to see how the process would work where, as FDA would request, the sponsor would comply to gain this exclusivity.

BY MR. MARTINEZ-CID:

Q. And, Doctor, I want to not get caught up in the specifics of that particular request for pediatric exclusivity, so I'm speaking more in general.

You recall that as part of -- as part of being heavily involved in relationship and in meetings with the FDA that, in fact, it was Pfizer that would approach the FDA, request pediatric exclusivity, and suggest a -- a study, not -- and I'm not saying that that had to happen or happened every time, but what I'm suggesting is that, in fact, Pfizer could and did initiate that process and request -- and -- well, request that FDA make the specific request to them; isn't that right?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, there were obviously documents that you showed me earlier where there was clear involvement and discussions, and I at the time was an employee of Pfizer/Warner-Lambert and was clearly involved in those discussions.

So the -- the answer is yes, at the time with ranitidine and Zantac over-the-counter, there were discussions that I was involved in and negotiations with FDA about the design of that particular pediatric study to gain that exclusivity.

So I'm saying yes, that I was indeed involved.

BY MR. MARTINEZ-CID:

Q. And turning back to Exhibit 283, if I could direct you to page labeled 9 of 10. At the very bottom you see there's a pediatric exclusivity discussion that begins?

A. Yeah. Hold on, Mr. Martinez. Just give me one second.

Q. Sure.

A. Oh, pediatric -- now I see it.

Q. And if you take a look at the discussion on pediatric exclusivity, does that not refresh your recollection, sir, that in November of 2001, in this particular instance, again, it was -- it was Pfizer that had made a specific submission to the FDA requesting to conduct pediatric studies and obtain pediatric exclusivity?

MS. HORN: Objection. Form.

THE WITNESS: Yes, Mr. Martinez, I'm reading it. I'm not sure who this submission was received from.

Dr. Ganley questioned -- I'm reading this now, Mr. Martinez. Dr. Ganley questioned what population was Pfizer interested in studying. Ms. Glass responded 5- to 8-year-olds. I myself

responded Pfizer would be looking at a GERD pediatric population, and that -- obviously it's myself responding that we had received a request from a university and that FDA agrees there's a need to conduct these studies.

And then Pfizer as a new sponsor would obtain additional pediatric exclusivity.

BY MR. MARTINEZ-CID:

Q. If you recall, Ms. Glass was an attorney for Pfizer as the associate director of regulatory affairs?

A. Yes, I do recall Ms. Glass, and she was regulatory within the Pfizer organization.

Q. And so Ms. Glass is following up on Pfizer's request to conduct pediatric studies, and the FDA is asking Pfizer, well, what is it that you're interested in studying? And you and Ms. Glass are providing that information.

And that -- doesn't that refresh your recollection that it was -- it was Pfizer who was proposing this study to the FDA to achieve the exclusivity?

A. Yes.

MS. HORN: Object to form.

THE WITNESS: Yes. Mr. Martinez, I do. And clearly between myself and Ms. Glass, as I read

this document, it refreshes my memory that, if you will, we, Pfizer, were requesting that FDA consider this additional information in an effort to gain the pediatric exclusivity.

BY MR. MARTINEZ-CID:

Q. Thank you, Doctor.

And gaining that exclusivity, that extension, is something that was important to Pfizer, correct?

A. Yes. Gaining that pediatric exclusivity, which was worth six months' additional market exclusivity, was a financial gain. I recall some numbers that you showed in a document, you showed me earlier, and -- but it did result in -- ultimately did result and was representative of a commercial gain.

Q. That was 10 to $15 million from the -- from the six-month extension that you had achieved for Pfizer in 1999, correct?

MS. HORN: Objection. Form.

THE WITNESS: That's the -- I will respond, Mr. Martinez, that that was the number that I had cited in, if you will, one of the earlier documents about documenting my -- my performance accomplishments in 1999.

BY MR. MARTINEZ-CID:

Q. Sure.

And just for the record, I will -- I will say that was Exhibit 282, was your 1999 performance evaluation process?

MR. MARTINEZ-CID: And, John, if you will, could you pull up tab 18? And we will mark that as Exhibit 284.

(Exhibit 284 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. And I will share it on the screen. And what should be up on the screen begins with Bates number -- I see. It's only Bates number 276752, and it's a Project Zantac 150 Research and Development Strategy, Revision Number 1.

Do you see that, Doctor?

A. Yes, I do, dated January 15th, 2002, Zantac 150 R&D Strategy, Revision Number 1.

Q. And if I'm understanding, the goal of this project was to develop a 150-milligram swallowed tablet and gain approval to market Zantac ES for the prevention of heartburn, correct?

A. Yes. That was the mission as identified in this document. Yes, Mr. Martinez.

Q. And one of the critical success factors in this project, if we look below, would be to get the FDA approval of pediatric extension in this proposal, as

well, correct?

A. Yes. That was one of the critical success factors as well as identified in the second bullet point there, FDA approval of pediatric extension study proposal.

MR. MARTINEZ-CID: I think now would be a good time for a ten-minute break, if that works for everyone.

MS. HORN: Sure.

THE WITNESS: Yeah. I would like that, Mr. Martinez. Thank you. I have 3:21 my time, Mr. Martinez. What are you thinking, 3:30 my time, 3:31, 3:32?

MR. MARTINEZ-CID: That works.

THE WITNESS: Okay.

MR. MARTINEZ-CID: If you get delayed, we will not start without you. That I can assure you.

THE WITNESS: Thank you, Mr. Martinez.

MR. SCHMITZER: We are going off the record. The time is 2022 UTC.

(A short recess was taken.)

MR. SCHMITZER: We are back on the record. The time is 2035 UTC. Please proceed.

THE REPORTER: Mr. Martinez, it appears you're still on mute.

MR. MARTINEZ-CID: Oh, it was such a great question, too. I'll never get it out the same way. Wow. I'm sorry about that, guys. I was like, man, Dr. Ciociola is really being thoughtful on this one. He's really thinking this answer through. I'm sorry, folks.

BY MR. MARTINEZ-CID:

Q. Sorry. So, Doctor, I want to go back to your time at Glaxo for a moment. Was it 1996 through 1998 that you were working there? Did I get that right?

A. 19 -- close, Mr. Martinez. I joined -- I joined Glaxo in 1987, and I left Glaxo in 1998, just to be clear.

Q. You're right. I'm sorry. It goes back a lot further.

So from 1987 through 1998 you were with Glaxo?

A. Yes, Mr. Martinez, that's correct.

Q. So about 11 years.

MR. MARTINEZ-CID: Let me ask John if he could put up tab 20 for us. And this has got a Glaxo -- a GSK Bates number 386852, is the first Bates number on it. And I am going to mark this document as Exhibit 285, I believe.

(Exhibit 285 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. And seeing as you worked on ranitidine with Glaxo for many years, please take a moment and look at this document regarding ranitidine studies, and let me know if it looks familiar to you or if it's something that you might have seen. I recognize it is before your time beginning at Glaxo.

MS. HORN: I'm sorry, Ricardo, was your question does he recognize the document?

BY MR. MARTINEZ-CID:

Q. Yes. Do you recall having seen this at any time either during your employment at Glaxo or at any time after?

A. Mr. Martinez, obviously this was before my time of employment, 1981. I obviously didn't join until 1987, some -- some six years later.

I have never seen this letter before. Not at all.

Q. Okay. And if you'll look at the second page, the planned study of nitrosation after maintenance therapy would clearly be important. We will advise you about the detailed design once it is decided upon.

Do you recall ever seeing a study of nitrosation after maintenance therapy with -- with regard to Zantac ranitidine?

A. Mr. Martinez, I do not -- absolutely do not recall seeing anything like this at all. And, as I shared with you, this was some six years before my employment at Glaxo. I absolutely have no recollection at all of any type of planned study as is outlined here, nitrosation after maintenance therapy. Absolutely not, Mr. Martinez.

Q. Do you recall any study regarding nitrosamines and ranitidine from your time at Glaxo?

A. Mr. Martinez, I do not recall any study at all while I was employed at Glaxo or Pfizer about nitrosamines and/or any relationship to ranitidine.

Q. And, Doctor, as someone who has worked in this field for a long time, and works in areas of oncology as well, you understand that nitrosamines are part of the family of very potent carcinogens, correct?

MS. HORN: Objection. Form.

THE WITNESS: I want to clarify. I am aware, Mr. Martinez, that some nitrosamines are considered carcinogenic.

BY MR. MARTINEZ-CID:

Q. And you understand that NDMA is a very -- is understood to be a very potent carcinogen, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I also understand

that nitrosamine NDMA is also considered to be a carcinogen.

BY MR. MARTINEZ-CID:

Q. But -- and not just a carcinogen, but a very potent carcinogen such that it is used -- in many of the pharmaceutical companies that you've worked at, it's used in studies to, in fact, induce cancer, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I cannot comment on the potency of NDMA, nor can I comment that it's used to induce cancers. That is just not an area that I'm familiar with, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. So, Doctor, in all your years of reviewing medical research, some of them in the oncology field, you don't recall a single study in which NDMA was used to induce tumors in any laboratory animals?

MS. HORN: Objection. Form.

THE WITNESS: I do not -- Mr. Martinez, I do not recall any studies, animals, of course, where NDMA was used to induce tumors. And, remember, Mr. Martinez, my background, my interest, my years of service to the pharmaceutical industry was truly in the development of drugs.

I'm not an expert in animal toxicology or

animal pharmacology.

BY MR. MARTINEZ-CID:

Q. I'm going to go ahead and pull up exhibit --

MR. MARTINEZ-CID: It's under tab 19, John.

And this is a hazard assessment report from Glaxo.

And I am going to mark it Exhibit 286.

(Exhibit 286 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. It's dated September 25th, 2019. It begins at Bates number 245717.

I'm sharing it on the screen. Are you able to see it, Doctor?

A. Yes. I see the document, Mr. Martinez, highlighted 25 September, 2019, GSK Hazard Assessment Report, Nitrosodimethylamine.

Q. We can call it NDMA to save ourselves the tongue twister.

A. Okay.

Q. And I understand when I do say and I have said NDMA, it's the N-nitrosodimethylamine; is that fair?

A. Yes, Mr. Martinez. Thank you. I would prefer to use the NDMA myself.

Q. I think we can all agree there. Thank you.

I'm just going to take you down to page 2 of 10 here.

A. I'm scrolling, Mr. Martinez.

Q. We see the -- under point 1, your report lists that NDMA is a semivolatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens.

Do you see that?

A. Yes, I do see that statement. It says N-nitrosamines is a family of potent carcinogens.

Q. Right.

And you have no -- in the research that you've done and your time in the field, you have no reason to dispute that finding by Glaxo, correct?

MS. HORN: Objection. Form.

MS. POWER: Objection to form. Foundation. Mischaracterizes the document.

This is Caroline Power for GSK.

THE WITNESS: Mr. Martinez, before I can provide you my sort of opinion on whether or not it's a potent carcinogen, which is, I know, what we're discussing here, I mean, it would be -- would it be appropriate for me to ask to look at this study? I'm not sure I could provide significant comment, Mr. Martinez, just because, like I said, I'm not an expert in this field. And for me to

tell you whether or not I would agree it's potent
or not is difficult for me to say.
BY MR. MARTINEZ-CID:
Q. Okay. Sir, and of course it is absolutely appropriate for you to look through the document, so you can feel free to do that.
But my -- my question -- I was hoping to keep you from having to do all that. I'm just trying to find out whether you have information to the contrary.
In other words, is there something that says, well, in the back of my mind -- I've gotta read this document to see why they're saying this because I recall study A or Dr. So-and-So saying something once.
In other words, I'm wondering whether you have any reason to believe that that's not true. I'm not asking you to verify whether it is true. I'm asking whether you -- whether there is some reason that you would hesitate -- that you would put up to say, huh, these are reasons I suspect it might not be true?
MS. POWER: Objection. Form. Foundation.
THE WITNESS: I'm so sorry. Could someone --
I didn't quite hear that. I'm so sorry.
MR. MARTINEZ-CID: That was just an objection
to form.
And so were you able to hear my question?

THE WITNESS: Mr. Martinez, would you mind just repeating? I'm so sorry. I just -- there was two voices.

BY MR. MARTINEZ-CID:

Q. That's quite all right.

I am -- my question, Doctor, is, in -- based on your research and your experience with medical literature, I'm asking whether there is some reason why -- do you have any belief that, in fact, that NDMA is not a member of N-nitrosamines?

And I think -- well, I think we can agree on that, correct, that NDMA is a member of N-nitrosamines, correct?

A. Yes. We can -- we can agree on that, Mr. Martinez, that NDMA is considered a nitrosamine class.

Q. I appreciate that.

Now, the second part of it -- and I understand you haven't fully researched whether, in fact, the N-nitrosamine family is a family of potent carcinogens as it says in this GSK report.

My question is, are you aware of anything in your experience and in the literature that you've reviewed that would suggest that it's not a family of potent carcinogens?

A. And thank you for that, Mr. Martinez. Thank you for clarifying the question for me. In my experience and my understanding of the literature, I am not aware of any evidence, publications, conversations to dispute whether or not NDMA is a potent carcinogen.

Q. And where the report states that there appears to be no qualitative difference in the metabolism of NDMA between humans and laboratory animals, and there is no reason to believe that humans would respond qualitatively differently, where the report says that, again, I would ask you the same question.

Do you -- are you aware of any literature, have you come across something that suggests there is a difference in how human and laboratory animals metabolize NDMA?

MS. HORN: Objection. Form.

MS. POWER: Object to form.

THE WITNESS: Yeah, Mr. Martinez. I'm just -- thank you. I'm reading the statement.

I am not aware of any information published or otherwise that would dispute whether or not there's a difference between humans and laboratory animals in how they metabolize NDMA.

BY MR. MARTINEZ-CID:

Q. I'm just going to direct your attention to

page 5 of 10 where it discusses genotoxicity.
What is genotoxicity, Doctor?
A. Hold on one second, Mr. Martinez. Just let me get there.
Q. Sure.
A. You're talking to me about genotoxicity. So sorry.
Q. That's okay. Just in general, my question is, for those of us that do not have your background and experience, could you give us an explanation of what genotoxicity is?
A. Yes. My -- genotoxicity is the study of whether or not a compound, a chemical, a drug could cause gene mutations, could cause -- and I -- I'll just quote you, Mr. Martinez, that third line there, whether or not it can cause chromosomal damage, DNA damage, DNA synthesis damage, which can have, you know, health effects to the species, to the animal species or to humans.
So, Mr. Martinez, just to be clear, it is the assessment of whether or not the chemical or drug could cause gene mutations.
Q. And this GSK report says, there is overwhelming evidence that NDMA is mutagenic and clastogenic.

Can you tell us what mutagenic is, sir?

A. Yes. Let me just define mutagenic for you, in that mutagenic means that it can cause or has the ability to cause gene mutations, which means the actual genes are -- become mutated, potentially causing -- or potentially causing the ability of the gene to have abnormal functions.

Q. And clastogenic, what does that mean, sir?

A. Clastogenic is the study of chromosomal damage, and chromosomes, as you know, are part of the DNA and the backbone, if you will, of the DNA and the protein structure.

And the -- clastogenic is the assessment of whether or not a chemical can have the potential to damage the chromosome.

Q. Direct your attention to the top of page 7 where there's a discussion of carcinogenicity. Can you tell us generally, what does carcinogenicity mean?

A. Yes. In general, Mr. Martinez, carcinogenicity is the study of, as I shared earlier with -- the potential for drugs or chemicals to induce cancer. Cancer is quite a broad term, obviously. And that is typically done, as you'll see in that first line there, in animal species.

Q. And so you've heard of NDMA before, correct?

A. Yes, I've -- yes, Mr. Martinez, I've heard of NDMA before, yes, that's correct.

Q. And you understood that NDMA was a substance that there's really no acceptable level of NDMA that should be present in any of the medications that you have overseen over your many years in the business, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to respond to your question.

I'm aware that NDMA is a carcinogen, and, as I shared earlier, I'm not a toxicology expert, and it makes common sense that no level would be an acceptable level of NDMA. But not being an expert or not knowing what the regulations are or the toxicology limits, I can't comment on whether zero level is the acceptable range, and -- but I'm not aware of NDMA in any drugs that I've ever worked on.

BY MR. MARTINEZ-CID:

Q. And certainly if you had become aware of any literature suggesting that any of the drugs you worked on was contributing to the formation of NDMA in the human body, that would have been something that you would have escalated to pharmacovigilance immediately,

correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'll rephrase your question just a tiny bit.

If I became aware of any publication, information that a drug that I was -- if you don't mind -- accountable for, responsible for in some way, shape, or fashion was -- possessed or had some carcinogenicity component to it, I would absolutely have communicated this to pharmacovigilance.

Mr. Martinez, you and I talked several times earlier this morning about my approach to transparency, to my adherence to ethical behavior and communication, and that would have -- absolutely I would have communicated such information, Mr. Martinez, to my pharmacovigilance colleagues.

BY MR. MARTINEZ-CID:

Q. And I think, sir, we're in agreement, then, that having information that a drug you are responsible for could be producing NDMA or containing NDMA but not reporting that would be a violation of your ethics, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to

respond. As I shared, I just want to make sure I'm answering your question.

If I was aware of any data, evidence, publication that a product that I was responsible for or accountable for contained NDMA or a potential carcinogen, I would have communicated that information. I would absolutely have communicated that information.

BY MR. MARTINEZ-CID:

Q. And I'm trying to ask you a little bit different because I -- Doctor, I understand that you would have done that, and we have talked at length that you operate in a very transparent and have a full disclosure policy, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes, Mr. Martinez, and thank you for sharing that. I do. And my approach has been for years, decades -- I don't want to admit how many decades, Mr. Martinez, but I have been fully transparent with my management, FDA, other health authorities, as well. And we'll leave the -- we'll leave the decades alone, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. Well, Doctor, based on my ability to recall many, many old Alka-Seltzer ads, I've got more decades

than you think, as well, so --

A. And you embarrassed me, Mr. Martinez. You embarrassed me because I couldn't remember that, but thank you.

Q. So -- and -- but my question, sir, is this goes beyond Dr. Ciociola's personal ethics. In fact, it is a -- you understood in your industry that it is a requirement that a safety signal and something like the presence of NDMA or the potential or formation of NDMA in a drug that you're responsible for must be reported up to pharmacovigilance, at the very least, if not the FDA, as well, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez -- and I'm going to answer your question and include NDMA in my response, as well.

Mr. Martinez, any sponsor who identifies a carcinogen or the potential for drug chemical -- Mr. Martinez, this goes for all consumer products that can potentially induce a cancer, would be a reportable event to health authorities, particularly FDA.

MR. MARTINEZ-CID: I'm going to ask John to please mark tab 20 as Exhibit 287.

(Exhibit 287 was marked for identification.)

MR. SCHMITZER: I believe we marked tab 20 as Exhibit 285.

MR. MARTINEZ-CID: I think 19 was 286, though. Did I get that right, John, or did I mess things up?

MR. SCHMITZER: No. That's correct. You said you wanted to mark the next exhibit in order as exhibit --

MR. MARTINEZ-CID: I'm sorry. So I said the wrong tab number. I'm in 21. Tab 21 should be Exhibit 287. Does that make sense?

MR. SCHMITZER: Yes, it does. Thank you.

MR. MARTINEZ-CID: Okay. I'll pull it up. And that's the Tanner study dated April 6th, 1982. Sorry. I'm having a bit of a difficulty pulling it up on my end. There you are.

BY MR. MARTINEZ-CID:

Q. I'm showing you a document that I'll refer to as the Tanner study. You see the author is Dr. Tanner titled, The Determination of N-Nitrosodimethylamine -- I'll say NDMA -- Formed By the Reaction of Ranitidine Hydrochloride With Sodium Nitrate.

Do you see that?

A. Yes, Mr. Martinez, I do see this Glaxo Group Research Limited report as you've described the title,

and from -- the author is a Dr. Tanner. And it appears the date of issue is -- just give me a second -- April 6th, 1982, maybe?

Q. Correct. That's my understanding.

And I understand you joined Glaxo a few years after that, correct?

A. Yes. I didn't join -- I joined Glaxo in 1987, and, Mr. Martinez, I was a member of the U.S. organization at Glaxo. Just I want to clarify for you. The site that conducted this study, the doctor, Dr. Tanner, the site is located in Ware. Ware is located in the UK, just to be clear.

Q. And while you were at Glaxo, Doctor, did you ever have access to studies and reports that Glaxo had from the UK or other parts outside of the U.S.?

A. In general, Mr. Martinez, the answer is yes. The -- while I was in the U.S. organization, we would be supplied with clinical study reports, documentation that we needed to assemble our applications for submission to health authorities, FDA, for example.

So, in general, the answer is yes, Mr. Martinez.

Q. And looking at this report, there's a marking for confidential at the top. There's a stamp at the bottom that no other copying is permitted.

Then there's -- on the second page, there's an authorization of use statement. Have you seen this kind of confidentiality cover sheet, I'll call it, on other reports from your time at Glaxo?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I don't recall seeing any other documents with this type of red lettered, no other copying permitted.

BY MR. MARTINEZ-CID:

Q. Going to the summary of what is -- what this study is about, you'll see that experiments were carried out to determine whether nitrite reacted with ranitidine hydrochloride to form NDMA.

Do you see that?

A. Yes, Mr. Martinez. I'm looking at the summary. I don't see a page number, but it says --

Q. We could call it -- sorry. Just to help you out, Doctor, if you want to refer to the Bates number at the bottom, the one -- we're looking at the one ending in 996.

A. Got it, yes. Now I see it. So sorry. 996.

Yes, Mr. Martinez, I can -- I can see that. The summary states, experiments were carried out to determine whether nitrite reacted with ranitidine hydrochloride to form, if you will, NDMA.

Q. At any time in the years that you were at Glaxo working on ranitidine, did anyone ever tell you about this study or any other about ranitidine potentially forming NDMA?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, as we've talked, this report was issued some six years before I even arrived. It was issued, in fact, one year before Zantac was approved in the U.S. Zantac 150 was approved in the U.S. in 1983.

To answer your question, Mr. Martinez, no one -- I have no recollection, no one discussed with me any information suggesting that ranitidine in some way, shape, or fashion reacted with nitrites to form NDMA.

BY MR. MARTINEZ-CID:

Q. Before today, did you have any idea that Glaxo had a study that suggested that ranitidine could form NDMA back in the '80s?

MS. POWER: Object to form.

THE WITNESS: Mr. Martinez, before this deposition, I was not aware of this information. Specifically, specifically, Mr. Martinez, during my time at Glaxo, I had no information at all about ranitidine, any interactions with nitrites, and/or

the production of NDMA.
BY MR. MARTINEZ-CID:
Q. Is it fair to say that you're surprised that this study existed?
MS. HORN: Objection. Form.
MS. POWER: Objection. Form.
THE REPORTER: Is that Carolyn Power objecting?
MS. POWER: It is.
THE WITNESS: I will answer your question, Mr. Martinez. I was surprised to know that this study was conducted in 1982.
BY MR. MARTINEZ-CID:
Q. And looking at the introduction of the study, it says -- and you'll forgive my butchering of the pronunciation of some of these chemical compounds, but the dimethylamino groups of aminopyrine and oxytetracycline react with nitrite under certain conditions to yield NDMA.
Do you see that?
A. Yes, I can -- I can see that statement, Mr. Martinez, and I, as well -- I'm not a chemist by training, and I cannot confirm whether or not that statement is true. I'm assuming it's true. I'm looking at two publications from Lijinsky and Mirvish from 1974

but I cannot confirm that that statement is true.

Q. Sure. And that's just background information that Dr. Tanner is giving before explaining the purpose of the study, because ranitidine hydrochloride contains a dimethylamino group. Therefore, experiments were carried out to determine whether NDMA could be formed for the drug in the presence of nitrite.

Do you see that?

A. I do see that statement, Mr. Martinez. I have to admit to you I do not recall if ranitidine contains a dimethylamino group. I can describe for you what a dimethylamino group is, but I have long forgotten the structure of ranitidine. But I have no reason to dispute that ranitidine does not contain a dimethylamino group.

Q. I will show you the compound in a bit, and we can come back to that. But for our purposes now, we can agree that Dr. Tanner was correct that -- let's assume Dr. Tanner was correct that ranitidine contains a dimethylamino group, correct? Is that fair?

A. That's fair, Mr. Martinez, and I'm sure Dr. Tanner, who I don't know, was an expert and that ranitidine does contain a dimethylamino group.

Q. And as a result of this, as we saw in the summary, in fact, NDMA was formed at a 3.1 percent

yield --

A. Hold on, Mr. Martinez. Where are you reading? I'm just so sorry.

Q. I was just going back up to the page before in the summary.

A. Oh, got it. Sorry.

Q. We certainly can go down to the results page if you prefer, but -- but you see how there was -- it was formed -- that the findings of Dr. Tanner's study was, in fact, that NDMA was forming with a reaction between ranitidine and nitrites?

MS. POWER: Object to form. This is Caroline Power for GSK.

BY MR. MARTINEZ-CID:

Q. Do you see that?

A. Yes, Mr. Martinez. I do see that paragraph where it says NDMA was -- formed 3.1 percent yield. I do not know the implications of what a 3.1 percent yield is or the impact as such.

I also see, Mr. Martinez, that the yield decreased to 0.74 percent when tested by increasing the drug concentration to 40 millimoles. And, again, I can't comment on the implications of such, of why the yield would decrease when drug concentrations were increased, nor can I comment on the relevance to humans

or animals.

Q. But certainly in -- if you had come across this study in your years working on ranitidine, suggesting that any NDMA was being formed in a reaction in a human body by the presence of -- with the presence of ranitidine, that's something that you would have elevated immediately to pharmacovigilance, correct?

MS. HORN: Objection. Form.

THE WITNESS: In general, yes, Mr. Martinez, that had I been aware of a report, as we discussed earlier, Mr. Martinez -- you asked me a series of questions -- if I was aware in my review of literature, published, peer-reviewed journals that I was aware of carcinogenetic potential, the ability to induce a carcinogen from a product that I was responsible for, I would have elevated this and made sure I communicated this to pharmacovigilance.

And, Mr. Martinez, I'm -- I am being very consistent in my approach, and I will continue to state as such.

BY MR. MARTINEZ-CID:

Q. And in looking at how this -- how Dr. Tanner looked at the NDMA content, if we see the Tanner report and the page ending 997, used gas chromatography mass

spectrometry.

You're familiar with gas chromatography -- jeez. I'm tired. I'm sorry, Doctor.

A. Yes.

Q. Doctor, are you familiar with gas chromatography mass spectrometry?

A. Yes, I am. I am familiar with mass spec as well as -- GC is gas chromatography, as well, so yes. I am familiar with those tests. Those are analytical method tests by which they can assess various compounds and analyze those not only for content, but also -- and identify the specific peaks as far as identifying the chemicals that were injected into that particular column.

So, yes, they are an analytical method that's used by analytical chemists to identify drugs.

Q. And, Doctor, your clinical researchers have certainly had access to gas chromatography mass spec to conduct any research that they needed to, correct?

MS. HORN: Objection. Form.

THE WITNESS: I would say -- Mr. Martinez, I would say no. And let me share with you, please. You know, to run GC mass specs and to interpret these are very sophisticated machines.

I frankly myself have very limited knowledge

or understanding. Mr. Martinez, if you showed me the next exhibit is a mass spec and say, so, Dr. Ciociola, could you explain this to me, I would not be able to interpret that.

So, in general, Mr. Martinez, clinical research scientists do not have access to gas chromatography or mass spec.

BY MR. MARTINEZ-CID:

Q. So if a clinical researcher or anyone in research and development saw a need for a study that involved gas chromatography mass spec, how would -- how would you have gone about getting that done?

MS. HORN: Object to form.

THE WITNESS: For just -- you could take a theoretical example. If for some reason there was a need for GC mass spec to be used to analyze a chemical or an impurity or drug content, that would be handled by our analytical chemistry group. This would be individuals with that type of expertise trained on these machines who were able to interpret the results.

This -- these types of machines are very sophisticated in how they're run and how they're analyzed. And, Mr. Martinez, this is clearly not my level of expertise.

BY MR. MARTINEZ-CID:

Q. But you would have been able to contract or make arrangements to have someone who was expert in running those machines to assist in any study that you needed, correct?

A. In general, the answer would be yes, if there was a need that I, for example, had determined, would I have had the ability to identify individuals who could have supported me in this effort? And the answer is yes.

And, Mr. Martinez, you know, we talked earlier about the experts that were on these project teams. And, Mr. Martinez, there would have typically been an individual from analytical chemistry who would have been on those project teams. And that would have been his or her responsibility to perform such assays, to support whatever study was needed, Mr. Martinez.

Q. And recalling that we are going back to 1982, it certainly wouldn't have been any easier to run these tests, then, correct?

A. Help me --

MS. HORN: Object to form.

THE WITNESS: Maybe just give me a little more clarification about -- I didn't quite understand where you're going about going back to -- yes,

these studies were done in 1982. That's correct.
I didn't arrive at Glaxo until 1987.
BY MR. MARTINEZ-CID:
Q. Sure. And sorry. And I don't mean to suggest you personally conducted any of them.
What I meant to suggest is you've been -- you've told us a little generally that doing gas chromatography mass spec is something that is specialized. It's not something that is -- that you would handle in the usual course of business.
And I'm -- and I'm -- I am imagining and asking you to confirm, as someone who's been around this industry and knows it, that -- that would be just as true or more so in 1982 than it is today, correct?
A. It would -- yes, Mr. Martinez. And thank you for clarifying.
That would be consistent. In other words, the specialization of GC mass spec is -- and the ability, the knowledge and the experience needed to correctly interpret these results and to perform such tests with their positive controls and how they manage the machines and the types of settings and the -- are all -- as I shared earlier, are all done by experts. And that would be the same as done in 1982 as, frankly, it would be done today in 2021.

Q. And we saw in Exhibit 285 that Glaxo had recognized that a planned study of nitrosation after maintenance therapy with ranitidine would clearly be important, and we see in Exhibit 287 a study from 1982 to determine whether a nitrite is reacting with ranitidine to form NDMA.

MS. POWER: Objection to form. Foundation. Mischaracterizes the evidence.

This is Caroline Power for GSK.

MR. MARTINEZ-CID: Sure.

BY MR. MARTINEZ-CID:

Q. And are you with me so far, Doctor?

A. Yes. I'm following, but continue --

Q. Sure.

A. -- with your question, please.

Q. And yet with the years that you have worked on Zantac, sitting in this deposition is the very first time that you have ever seen any study involving ranitidine and nitrosation, correct?

A. Yeah, let me just -- let me just --

MS. HORN: Object to form.

THE WITNESS: Let me rephrase, Mr. Martinez. Yes, during this deposition -- deposition process, this is the first time that I have seen this study that -- and I apologize. I can't quote you the

numbers that you quoted me earlier. I'm just going to use my words, Mr. Martinez, if you don't mind.

This is the first time I've seen this Tanner study, if you will, from April 6th, 1982, and, also, the previous -- it is the first time that I've also seen a previous exhibit that you showed. And it was a -- oh, I'm messing up, Mr. Martinez -- the previous one to a Dr. Weiss, if I get it correctly.

BY MR. MARTINEZ-CID:

Q. Sure. That's the letter -- Exhibit 285.

A. Yes. So sorry. Yes, Exhibit 285 with the -- yes. I got it right now. Exhibit 285. Let me rephrase that again, Mr. Martinez, if you don't mind.

This is the first time that I have seen this letter to -- dated 1981 to a Dr. Peter Weiss in which the author, R.N. Smith, Medical Director, states, planned study, nitrosation maintenance therapy would be important.

This is the first time that I've seen either of these two documents that you've stated in Exhibit 285 and 287.

Q. And, Doctor, it's, in fact, the first time you have ever seen any study involving nitrosation and ranitidine, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes. Mr. Martinez, I was going to answer your question, and the answer is yes.

That -- this is the first time I have ever seen any investigation, whether it's analytical, preclinical, animals, or humans, as I believe -- I don't know if it's Dr. -- Dr. Smith, the medical director is suggesting.

It is the first time that I've seen any evidence of such.

BY MR. MARTINEZ-CID:

Q. And, sir, you would expect that there would have been some follow-up to this Tanner study that had found the formation of NDMA with ranitidine?

You would have expected to be able to find some other studies addressing this concern, correct?

MS. HORN: Objection. Form.

BY MR. MARTINEZ-CID:

Q. In other words, now that you know it exists, now that you know that this happened, that this study actually found the formation of NDMA from ranitidine, you would not have expected that Zantac would have gone to market or been sold over the counter or, you know, applied for pediatric exclusivity. All of the things that you know happened in the history of Zantac after

1982, without -- you would have to assume there would be some other study, some other follow-up to this Tanner study that would have addressed the potential safety signal that the Tanner study is showing, correct?

MS. HORN: Objection. Form.

THE WITNESS: In general, Mr. Martinez, yes. I would have expected a follow-up type of study to confirm, dispute -- I mean, Mr. Martinez, just because a single experiment is conducted, the operator could have had an error. There could have been a mistake. There could have been any host of issues.

But, as you know, our science is based on replication over time. And when you have two different laboratories or two different hospitals who run a study and confirm that finding, that's how our science operates.

And so, to answer your question, I would have expected a follow-up, yes, I would have.

BY MR. MARTINEZ-CID:

Q. And certainly it would be absolutely unacceptable, a violation of your personal ethics, and a violation of your understanding of the legal requirements for the safety signal in the Tanner study just to be hidden, buried, and ignored, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to -- I'm going to respond just slightly differently in that my expectation is that in the 1982 or -- and I apologize. I don't exactly know the year by which the Zantac drug -- NDA, new drug applications were submitted to FDA and to other health authorities. I don't know exactly the dates.

My guess is it was probably in the -- since it was approved in 1983 by FDA, my guess is that that application was submitted probably the year before, approximately, Mr. Martinez.

I would have expected that that report would have been disclosed to FDA and other health authorities. I know this was the various European agencies at the time, and I'll just leave it at that as the global health authority.

Mr. Martinez, I'm just going to say this one more time. I would have expected this information to have been disclosed. It is by regulation to have been disclosed to the health authorities during their review.

I'm -- I cannot confirm, of course, I do not know what was in that application, but I would have expected it to be contained in that application.

BY MR. MARTINEZ-CID:
Q. And you would have expected follow-up information to the regulators with the kinds of information that we were talking about earlier, whether it be a follow-up study confirming it or conflicting with it or explaining it or somehow addressing it, correct?
MS. HORN: Objection. Form.
THE WITNESS: And I'm going to focus on the last part of your question. And the answer is, I would have expected the applications to have addressed this -- the findings from Dr. Tanner. Obviously the letter that I'm looking at, Mr. Martinez, for 285, it says ranitidine studies. I know this is in 1981. I don't know if the study was ever done, frankly.
But given the fact that the Tanner study from 1982 was completed, yes, I would have expected this information to have been disclosed and followed up, as I said, explaining, disputed, or confirmed.
BY MR. MARTINEZ-CID:
Q. Are you familiar with radioisotope studies, Doctor?
A. In general, yes. Radioisotope studies, yes.
Q. And, in fact, radioisotope studies were used

by Glaxo and Pfizer, correct?

MS. HORN: Objection. Form.

THE WITNESS: I would -- Mr. Martinez, I cannot confirm or recall studies that Glaxo or Pfizer conducted radioisotope studies, but, Mr. Martinez, the use of radioisotopes is a relatively common approach to various studies.

So I'm not confirming whether Pfizer and/or Glaxo were able to do these studies, but what I'm trying to say is these are relatively -- is a common tool that is used by pharmaceutical companies.

BY MR. MARTINEZ-CID:

Q. Do you recall at any time while you were at Pfizer a radioisotope study to track ranitidine breakdown?

MS. HORN: Objection. Form.

THE WITNESS: I'm thinking, Mr. Martinez. I do not recall any clinical studies that used radioisotopes to -- to track distribution, degradation of ranitidine.

BY MR. MARTINEZ-CID:

Q. And you agree with me, sir, that that is something that was possible to do while you were at Pfizer?

MS. HORN: Objection. Form.

THE WITNESS: I would be -- yes. Let me answer that question, Mr. Martinez.

In general, as I shared with you, the conduct of radioisotope studies have been available for decades. They're relatively reasonably common studies.

There are obviously means by which you have to adhere to conduct such studies. These are radioactive. You have to have the drug labeled. You have to have the ability to track such studies.

And so I would say, in general, a company such as Glaxo or Pfizer would have the ability to conduct such a study.

MR. MARTINEZ-CID: I'm going to go ahead and mark tab 23 as Exhibit 288. And that has a Bates number 369313 on the first page.

(Exhibit 288 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. Doctor, you'll note this is from the year before you joined Glaxo, so I know you weren't here for this, but this is a radioisotope study to investigate the metabolic disposition of ranitidine in man.

Do you see that?

A. Mr. Martinez, hold on one second. One, I

don't see what you're sharing. And, two, I'm not seeing anything on my end, as well. If you'll just give me one more second --

Q. I should have fixed the problem on my end, so you'll see the date is March 1986, and you could see the title up at the top.

A. Yes. I have it now, Mr. Martinez. Hold on. Radioisotope study to investigate the metabolic disposition of ranitidine in man by Drs. Broom, Thomas, Bell, et cetera, dated March 1986. And this research was deducted by Glaxo Group Research located in Ware, which is, of course, as I stated earlier, in the UK.

Q. And we were talking about ranitidine chemical compensation earlier. I think I can -- I think I've got a better picture down here. Let's see.

Is this it here, Figure 2 in the Bates number ending 320?

A. I am looking at Section 2.3, drugs. I can see Figure 2, which is -- obviously it's highlighting the radiolabeled ranitidine, and it's specifically highlighting the -- a mean group with a star. The position of deuterium and tritium label.

Q. I think earlier you asked to take a look at this diagram to refresh your memory as to whether or not ranitidine contained a dimethylamino group?

A. Yes, I did, Mr. Martinez. Thank you.

Q. And you're able to confirm that, right?

A. Yes. I'm looking at Figure 2 of Section 2.3, drugs, chemicals, and reagents, and can confirm that Mr. Tanner -- Dr. Tanner was indeed correct in his description of ranitidine as containing a diethylamine.

Q. I just wanted to show you. When I told you I would find you a diagram for that later, I was not going to forget and leave you hanging.

A. And thank you, Mr. Martinez.

Q. Looking at these two studies in conjunction, certainly one of the things that could have been done to follow up on the Tanner study was a radioisotope study to further look into the breakdown of ranitidine and the possible formation of NDMA, correct?

MS. HORN: Objection. Form.

MS. POWER: Object to form.

THE WITNESS: I will -- I will answer your question, Mr. Martinez. I'm -- I am -- first of all, I'd like to -- I'll answer your question in general, and then, Mr. Martinez, I'd love to have the opportunity to take a look at this study. I've never seen this study. I don't recall seeing this study.

BY MR. MARTINEZ-CID:

Q. And, Doctor, you are absolutely welcome to look at the study as much as you like. I just want to make clear to you that my question is not specific to this study.

A. Okay.

Q. But just generally speaking, having seen the Tanner study that is suggesting the formation of NDMA due to the reaction of ranitidine to nitrites, as a research and development expert, one of the things that -- that could have been carried out to study that possibility that Dr. Tanner had found is some radioisotope studies, right?

MS. HORN: Objection. Form.

THE WITNESS: I'll answer your question, Mr. Martinez.

In general, this would have been an appropriate study to follow up on the findings of Dr. Tanner to identify the location of these degradants in an effort -- and this is where I'm hesitating, Mr. Martinez, in replicating the findings from Dr. Tanner.

And that's why, if you don't have any further questions about the details, like I said, I haven't read the report, and my assumption is that they're

attempting to replicate this, the study done by Dr. Tanner, although I can't confirm that at this point in time.

BY MR. MARTINEZ-CID:

Q. Please take a look, because I do not see that in this -- in this report, so I do not see any reference to Dr. Tanner or to that potential ranitidine -- I'm sorry, NDMA formation. So my -- my reading of this study in Exhibit 288 was that this is unrelated to the Tanner study, and that's why I was asking, in fact, if a study like this could have been done in relation to the Tanner study.

So, Doctor, I take it by your assumption that this was done in response to Tanner, that the answer to my question is that, yes, a radioisotope study could have been designed directly to address and further follow up on some of the -- the safety signals found in the Tanner study, correct?

MS. POWER: Object to form. Lack of foundation.

MS. HORN: Object to form.

MS. POWER: Misstates the evidence and testimony. This is Caroline Power for GSK.

THE WITNESS: Mr. Martinez, in general such a study could have potentially provided additional

information as a follow-up to Dr. Tanner's study. Like I said, I'm not an expert in drug degradation. I'm not a pharmacokineticist by training. I'm not an analytical toxicologist.

I think a lot of it -- there are many factors, Mr. Martinez, and that's where you get into some of the details of the Tanner study, what were those degradants and the analytical profiles of those. And could a radioisotope study potentially have elicited further information and clarification? I would say in general, the answer is yes.

But, like I said, I even struggle to recall to you the dimethylamino group. But I would have said, in general, such a study would potentially have elicited additional information.

MR. MARTINEZ-CID: I'd like to call up tab 25, which we will mark as Exhibit 289.

(Exhibit 289 was marked for identification.)

BY MR. MARTINEZ-CID:

Q. And begins with Bates number 235261. And you see that's a cover of the Journal of the Polish Pediatric Society monthly publication, Doctor?

Do you see that?

A. I can -- I'm bringing it up right now, Mr. Martinez. Journal -- yes, I can see this is the

Journal of the Polish Pediatric Society. I don't see a date.

Q. I'll represent to you it's from March of 2002.

A. Okay. Yes, thank you.

Q. That's fine.

For the record I can -- I will put in that there is a -- there is a photocopy of the front page of that journal with the March 2002 date that was produced with a Bates number GSK 805446, if anyone wants to take a look at that.

And obviously I can pull it up for you, Doctor, if you want to see it, but if you'll accept my representation it's from March of 2002, we can --

A. I can accept your representation it's from March of 2002.

Q. Thank you, Doctor.

And it's a particular article that I would like to draw your attention to here. It's Krawczynski on the very next page, and it's -- the title -- the translation in English is Nitrosamines in children with chronic gastritis.

Do you see that?

A. Yes. Nitrosamines, I can see the title on this page ending in 262. Nitrosamines in children with -- I'm just bolding it a bit for me -- with chronic

gastritis.

Q. I'm going to go -- direct you to the page ending in 235264. And you'll see there that it says, the present study was designed in relation to the possibility of unfavorable consequences of using medicines, especially H2 receptor antagonists that change parameters of the gastric environment. A significant additive effect of carcinogens and the related risk of cancer induction that increases with time.

Do you see that?

A. Yes, I can read that paragraph, page 264. And the authors talk about the present study and the design of their study looking at the unfavorable consequences of medicines.

Q. And H2 receptor antagonists, when it says that, ranitidine is such a medicine, correct?

A. Yes. Ranitidine is a well-known -- Mr. Martinez, ranitidine is a well-known H2 receptor antagonist, amongst a whole host of other antagonists, as well.

Q. So if we look a little further down, it says, the concentration of nitrosamines in gastric juice and urine was tested by gas chromatography with the use of standard kits supplied by Merck.

Do you see that?

A. Yes, Mr. Martinez. I see it's the one, two, three, fourth paragraph down.

Q. And as part of the study, you see in the second-to-last paragraph, children in group 1 were treated with ranitidine at a dose of 5 milligrams per day for 28 days in combination with amoxicillin at a dose of 50 milligrams a day and nitroimidazole at a dose of 20 milligrams a day for seven days.

Do you see that?

A. Yes, I can see that, and it's describing children in group 1.

Q. Then scrolling down to the results, the following nitrosamines were detected in the analyzed material in the gastric juice and the urine, and the very first one listed is NDMA.

Do you see that?

A. Yes, I can see in the results the following nitrosamines were detected, NDMA, amongst a whole host of others in that paragraph.

Q. And we see in 30 children with gastritis, group 1 -- and this is the group that was given 5 milligrams a day of ranitidine -- a significantly increased nitrosamine concentration in gastric juice was found.

Do you see that?

A. Yes, I can see that paragraph, that statement, Mr. Martinez.

Q. And in the following paragraph, moreover, a ten-fold higher urinary exertion (sic) of nitrosamines after treatment was found, as well.

Do you see that?

A. Oh, wait. Just one more second, Mr. Martinez. Yeah, Mr. Martinez, just give me one more second here. I'm looking at Tables 1-2, and Figures 2 and 3. Okay. I can see that.

Q. Do you see that they found a tenfold higher urinary excretion of nitrosamines?

A. Yes. I can see that the authors are reporting ten times higher rates of nitrosamines in the urine.

Q. You see there in the discussion, nitrosamines belong to the most potent known carcinogens. In biological tests in animals, among more than 130 representatives of this substance class -- approximately 80 percent -- proved to be able to induce carcinogenesis.

Do you see that?

A. Yes, Mr. Martinez, I see the reference to number -- reference number 16. It talks about 80 percent of these nitrosamines are capable of inducing

carcinogenesis.

Q. And referencing that same source, number 16, the document says, no organisms have been found that would be resistant to the harmful effects of nitrosamines. The symptoms of acute poisoning, some of them NDMA, for example, are similar in humans and animals. A wide spectrum of tumors induced by nitrosamines was obtained in studies on animal models.

Do you see that?

A. I'm just getting there now, Mr. Martinez. For those 80 percent that they identified that do induce tumors.

Q. And among those 80 percent that do induce tumors is NDMA, correct?

A. That's what the authors are concluding, yes. Symptoms of acute poisoning with some of them, for example, NDMA, are similar in humans and animals, and that's -- yes, I can see that, Mr. Martinez.

Q. I'm going to the page ending in 235268.

The results of our study indicate that in most children in group 1 -- again, that's the group taking 5 milligrams of ranitidine -- after the end of a four-week treatment with ranitidine, a statistically significant increase in the concentration of a potential carcinogen occurred both in gastric juice as well as in

urine.
Do you see that?
A. No, I don't, Mr. Martinez, just help me.
Q. Sure.
I'm looking at the page ending in 268?
A. 268. I see that.
Q. Go to the -- the second paragraph that begins on that page. The results of our study.
A. Now I see it, yes. Please go ahead. Yes, I'm sorry.
Q. So take a look at the -- can you follow it -- that, in fact, the results of the study, that in most of the children that were treated for four weeks with ranitidine, a statistically significant increase in the concentration of a potential carcinogen occurred both in gastric juice as well as in urine.
Do you see that?
A. Yes, I do see that statement.
Q. And, again, this is -- these -- this group 1 was given 5 milligrams of ranitidine a day when, in fact, as you know, there was approved use of ranitidine in much higher doses than that, correct?
MS. HORN: Objection. Form.
THE WITNESS: Yes. I'm going to clarify,
Mr. Martinez. That's 5 milligrams per kilogram, of

course.

And 5 milligrams, the -- in the previous documentation that we looked at, the FDA had indeed approved the range from 5 to 10 milligrams per kilogram.

BY MR. MARTINEZ-CID:

Q. So, in fact, there was current approval and indication for use of up to 10 milligrams per kilogram a day for children of ranitidine, and this study using just the 5-milligram number was finding this significant increase in concentration of the potential carcinogen, correct?

MS. HORN: Objection. Form.

THE WITNESS: Based on the -- based on the results of this study that I'm looking at published in the Polish Journal of Gastroenterology, the authors are concluding that this dose did increase the concentration of nitrosamines in accordance with their analytical methods, and are suggesting as a group -- and I don't know the size, the sample size, but the authors are indeed concluding they have seen higher levels of nitrosamines in the subjects based on their studies based on their analytical methods and their measurement techniques of how they were extracting samples of gastric

juice as well as in the urines, as well.

BY MR. MARTINEZ-CID:

Q. Sure.

And just to let you know, group 1 was 30 children, 11 girls and 19 boys, age 6 to 18 years. And group 2 of the control group, comprised another 30 children, 16 girls and 14 boys, age 6 to 18 years.

A. Okay. Thank you.

Q. And the study found that the children in the control group 2, if you see -- I'm looking at the paragraph that begins, also the results of tests in children in the control group 2 made it possible to note a few observations. In 30 percent and 43 percent of the study subject in the group, nitrosamine concentration, respectively, was below the limit of quantification.

Do you see that?

A. Yes, I do. I see that statement. So the authors are stating between 30 and 40 percent of the subjects had below level of quantification. And just -- I probably just need a tiny bit of clarification here. The proportion of patients, the 70 percent who were not below the level of quantification, does this summarize what the maximum values were?

Q. There are -- there's -- there's a table above. If you wanted to see that. Sorry. I can -- there's --

so I believe this table of results on 265 would give you more in-depth information than just the discussion.

A. Yeah. That would be -- just give me one.

Q. There's also -- Figures 2 and 3 are on page ending in 266, if you would like to see it, and a bar graph, as well. That might be helpful.

A. I'm trying to interpret, Mr. Martinez. I can see portions of it is in Polish, and other parts is in English.

Figure 2, after ranitidine control, before treatment, after -- I'm -- Mr. Martinez, I'm guessing these are some sort of means.

Q. It's nitrosamine concentration in gastric juice before and after ranitidine treatment and in the control group is Figure 2. Nitrosamine concentration in urine before and after ranitidine treatment in control group also in Figure 3?

A. Yes. And the authors are showing these data that there's increased levels for the group.

Q. Do you see the control group is the dark box on the left?

A. Yes.

Q. And then there's the -- the before treatment box in the center, and then there is the after treatment, the group 1 that was given the 5 milligrams

per kilogram of ranitidine is the tall boxes to the right of each group.

Do you see that?

A. Yes, yes, I can see that. And there's a -- there's a clear difference.

Q. And, actually, further looking into that group 1 that had a statistically significant increase in the concentration of the potential carcinogen, the authors also found that, among those children -- and I'm back at that page ending in 268 where we had looked at the results after the four-week treatment with ranitidine.

A. Yes.

Q. The last sentence in that paragraph says that, among those children, a subgroup may be separated. 36.7, so more than a third of the group given the ranitidine that are particularly sensitive to drug-induced fluctuations in pH of the intragastric environment and thus having an increased risk of carcinogenesis.

Do you see that?

A. Yes, I can -- I can read that statement from the authors.

Q. And this study in March of 2002 was released after you had left Pfizer, correct?

A. Yes. I had left Pfizer in 2002, Mr. Martinez.
Q. And -- well, maybe -- I'm not sure if we -- which month you had left. So if it -- if it was released before you left, it certainly wasn't long before you left; is that fair?
A. That's -- that's correct, Mr. Martinez.
Q. If you had still been at Pfizer and had responsibility for ranitidine and been made aware of this study of the Polish Pediatric Society, you would have certainly elevated that to pharmacovigilance, correct?
MS. HORN: Objection. Form.
THE WITNESS: And as -- again, consistent, Mr. Martinez, with what I've shared before, if I had been made aware of this manuscript published in the Polish Pediatric Society, and with the suggestions that the authors have made here and the conclusions that they've made, I would have ensured that this information and this publication be sent to my pharmacovigilance group.
BY MR. MARTINEZ-CID:
Q. And certainly as someone who was regularly working on pediatric ranitidine and had worked numerous times to get exclusivity extensions to market and continue to use ranitidine with children, it would have

been of particular interest to you to see that this study was -- was focused on the pediatric group and -- and the potential of exposing them to a dangerous carcinogen, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes. You know, I'm going to -- I'm going to answer your question, Mr. Martinez. And this study would have been of significant interest to me and the conclusions that the authors have made.

As I shared with you earlier, the Journal of the Polish Pediatric Society is not a journal that I would have read on a regular basis. In fact, until today, I didn't realize such a journal existed.

But, nonetheless, consistent with my approach of sharing and communicating information, if this manuscript had been published in the American College of -- the American College of Gastroenterology or -- I can guarantee you I would have made sure that our vigilance people were aware of this publication.

BY MR. MARTINEZ-CID:

Q. But to be fair, Doctor, your research as part of research and development into Zantac was not limited

to what you would see in the American College of Gastroenterology. Earlier we even looked at submissions you sent to the FDA with other journals that are also not nearly as well known, other journals that, in fact, you may have forgotten existed until today, as well, correct?

MS. HORN: Objection. Form.

THE WITNESS: You know, Mr. Martinez, again, I'll go back to the statements that I made earlier.

You know, there's information overload. There's a limit to how many journals that one can personally sit down and read. I'm sure you read many law journals, and I'm sure you don't read them all, including the Polish journal of law.

And you rely on your team, Mr. Martinez. You rely on your team -- I'm sure you have associates and so on -- who support you and whose job it is to review cases, case law, and so on. And the same for myself. I have to -- the time I was at Glaxo/Warner-Lambert and Pfizer, I have to rely on the experts on my team.

And I shared with you I'm not an expert in toxicology. I'm not an expert in manufacturing or analytical chemistry. I couldn't read a mass spec if you showed me one in the next five minutes.

So you have to rely on the experts who support you, and that is their jobs, to ensure that they're staying abreast of the literature and aware of this type of information, as you pointed out, not only in pediatric patients but adult patients, as well.

BY MR. MARTINEZ-CID:

Q. And, Doctor, I should -- I should be clear because, you're right, I was -- I was imprecise in using the pronoun you that could go either way. I sort of meant the royal you as someone who was overseeing a large group of experts that were in charge of studying the medical literature and keeping abreast of it.

And so, in fact, when, for example, you were called upon to provide scientific studies and literature to the FDA regarding -- I believe it was the ranitidine -- was it an intravenous that we had talked about earlier? -- you would have relied on your team to help find and pull all the relevant articles, correct?

MS. HORN: Objection. Form.

THE WITNESS: That's correct, Mr. Martinez, that I relied on my team, my team members, my experts, my M.D.s, my Ph.D.s, to assemble this information and to interpret this information. And I can assure you I -- you reminded me of -- you said, well, this is from a Thai journal and Italian

journal. I can assure you this information was found and collected and collated and read by my team, my experts, who were focused on a daily basis on -- that was their job, is supporting the various Zantac projects.

BY MR. MARTINEZ-CID:

Q. Sure.

And similarly, just like they were able to pull up those Thai journals and Italian journals and European journals to support that pediatric exclusivity application, you would have relied on -- on your experts similarly to pull up pediatric ranitidine studies that were relevant and important from Poland, as well, correct?

MS. HORN: Objection. Form.

THE WITNESS: You know, that's -- that's correct. And it's just -- you know, I don't want to -- it's not just Poland. It's, you know, any publications that I would have relied on my team to be aware of and to ensure the organization was aware of this type of information.

And, you know, as I shared with you, Mr. Martinez, I mean, all of us have certain limited amount of time and ability to stay up to date, if you will, on the literature, and hence we

tend to focus on, you know, the larger countries, the U.S., Europe and the major journals because that's the -- it's the impact factor. That's where we can have our greatest impact to ensure that we're staying up to date on current literature.

BY MR. MARTINEZ-CID:

Q. In looking at your CV, Doctor, I am reminded that -- again, I think we talked about it a little -- a little earlier, that it was -- it was in -- just a few months later in 2002 that you left Pfizer altogether, correct, and you had no more responsibility for Zantac?

MS. HORN: Objection. Form.

THE WITNESS: You're correct, Mr. Martinez, that when I left Pfizer Consumer in 2002, I had no further responsibility nor accountability or even supported in any way, shape, or fashion gastroenterology.

And as I shared on my CV -- and I know it's one of the exhibits listed there -- my focus was shifted to the areas of oncology, metabolic diseases, and neurosciences and oncology.

BY MR. MARTINEZ-CID:

Q. I see the date of your departure from Pfizer Consumer Healthcare was June of 2002, so just three months after this study had first been released.

And you don't know of any project or activity that would have called for research in those three months that should have escalated this -- this journal to your attention in those three months, do you?

MS. HORN: Objection. Form.

THE WITNESS: I don't recall -- Mr. Martinez, I don't recall anything in that three-month time period related to this journal or other journals as such.

BY MR. MARTINEZ-CID:

Q. And -- but -- and, again, I think -- I think we've been over this a number of different ways, and so I think I know what your answer is going to be, but if, in fact, you had been working on another pediatric exclusivity extension or any interaction with the FDA in looking at safety studies for ranitidine, then you would -- you would have expected your experts to give you important information, and you would have relied on them to get you all that you needed to be informed in those areas, correct?

MS. HORN: Objection. Form.

THE WITNESS: That's correct, Mr. Martinez. I'm going to be very, very consistent in my responses to you.

As I shared with you on a number of examples

today, it is my expectation of not only myself, but my team members, as well, is to ensure that we shared the relevant information to the health authorities regarding the topic at hand. And we talked earlier, Mr. Martinez, and you showed me, and we discussed the use of IV Zantac in syrup in pediatric patients, neonates, and we talked -- you know, you showed me the letter where -- that I had submitted to health authorities, the nine references that we had discussed with the agency.

And, as I shared with you, I would have shared the totality of the data. And that would have included all of this type of information.

So my answer is the same, Mr. Martinez, and I'm not going to change it. I would have shared that information, and I would have -- I would have insisted that my team share that information with me, as well.

BY MR. MARTINEZ-CID:

Q. And as you sit here today, sir, as someone who advocated for the use of ranitidine in infants and children and the safety of it, certainly if anyone had shown you the Tanner study that we looked at earlier, that's something that would have concerned you and you would have immediately looked into, correct?

MS. HORN: Objection. Form.

MS. POWER: Objection. Form.

THE WITNESS: Mr. Martinez, if we go back to 1982 -- and obviously, you know, this was discussed. And I'm convinced this was submitted to health authorities, as well, as relevant.

If it had been presented to me in 1982, six years before my arrival at -- I'm sorry, five years before my arrival at Glaxo -- I can't even do the math -- yes, I would have expected that this information, this study, would have been addressed. And, as we shared earlier -- and, again, I'm on the record as saying, expected a follow-up study either disputing, confirming, refuting those types of data.

BY MR. MARTINEZ-CID:

Q. Doctor, my question is a little bit different, but let's -- let's -- not talking about 1982, but in 1999, when you were working closely with the FDA on getting pediatric extensions, as you had been working on getting over-the-counter approval for Zantac 150, if during any part of that process anyone had given you a copy of the Tanner study, certainly you would have wanted to know how that was resolved? You would have wanted to know what further studies were done? You

would have had questions that you wanted answered before you walked into the room with the FDA and told them that this was a safe drug, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes. I -- yes, Mr. Martinez. I would absolutely had wanted to know that this had been resolved in some way, shape, or fashion, as I said, and I would have wanted to know that information such that I could, if you don't mind, stand, sit before the FDA and state that I believe that ranitidine is a positive benefit/risk. So I would have liked to have known that information and also known if it had been addressed in future research.

BY MR. MARTINEZ-CID:

Q. And if you had been given that Tanner study in 1999 and there had been no follow-up, no way of addressing it or looking further at it, if there was no further information on it, you -- with regard to your professional method of operation and ethics, you certainly would not have felt comfortable and would never have allowed yourself to go forward to the FDA to discuss to claim that ranitidine was safe without getting more answers, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, I'm going to -- the first, as you described this theoretical scenario, my first response would have been, were these -- I would like confirmation that these data were submitted to the health authorities as material to their review and subsequent approval of Zantac. That would have been the first question that I would have asked and -- because that study -- there could have been follow-up information. There could have been follow-up studies. There could have -- I'm convinced it was discussed with FDA. It was probably likely part of that package. It was part of the investigation.

And so that would have been the first question I would have asked, Mr. Martinez. Was this information -- asking for confirmation. I wouldn't even ask it as, was this information disclosed. I would be asking for confirmation that it was included in the data package for Zantac 150 when it was submitted to health authorities around the world, including FDA, as part of the toxicology and pharmacology package and for the health authorities, including FDA, to have reviewed and opined on that information that was disclosed.

BY MR. MARTINEZ-CID:

Q. And, Doctor, you would have -- you would have wanted to know, even assuming disclosure, what was -- what was the result, right, what was the follow-up, what was -- what was done to follow up this, how was this resolved, in other words, were there further studies, and, if not, why, before you were comfortable that ranitidine was safe or you would be comfortable using -- putting yourself out there and telling the FDA and others that ranitidine was safe, correct?

MS. HORN: Objection. Form.

THE WITNESS: The answer in general, Mr. Martinez, is yes, in that I would have asked for clarification. Was this resolved? Was there further investigation?

And, Mr. Martinez, you could have easily seen where a follow-up study could have done -- Dr. Tanner, when he conducted this research, he had a major mistake in his mass spec analysis of the nitrosamines, and there was the -- the wrong column was used, they couldn't replicate it. Mr. Martinez, you know, that's the whole beauty of research, right? This is -- this is how it's done. It's replicated. It's duplicated by other individuals, by other operators, by other

laboratories.

And there are -- just because a study shows a particular effect, believe me, in the pharmaceutical world, Mr. Martinez, as you know, our failure rates of developing drugs are quite high because they don't show efficacy, and if we had a magic ball, we would get it right every time, but we don't.

So I would have expected some follow-up, some -- some way, shape, or fashion evidence that said -- that would have either disputed, refuted, or confirmed this work. I'm convinced of that, Mr. Martinez.

BY MR. MARTINEZ-CID:

Q. And similarly with the Krawczynski study, even though you were gone from Pfizer Consumer Healthcare shortly after, you would have expected that your successor or someone equivalent in -- with responsibility for Zantac would have ensured that there was some follow-up to this study that would have ensured that there was some answer to the very serious safety signals that were raised before holding out -- continuing to hold out ranitidine as safe, particularly to the pediatric patient group, correct?

MS. HORN: Objection. Form.

THE WITNESS: I'll clarify for you, Mr. Martinez. I would have expected, had I been aware of this information, I would have shared this information with my pharmacovigilance colleagues and -- for them to investigate.

There could have been any number of avenues they could potentially have taken. They could have actually spoken to the investigator themselves and asked various questions, clarifications. There could have been suggestions of replication.

And, you know, Mr. Martinez, you also have to look at it from the perspective of a pharmaceutical company. There are many, many, many publications, many, many laboratories doing the work. And you can have one paper that says, yes, this is negative results, and then there could be 12 other publications that say, oh, no, that's not true; it's just the opposite.

And that's what -- that's the beauty of science, Mr. Martinez. And it's the totality of the data that you have to look at. And I don't know how many times I've been involved in discussions with health authorities and there will be a positive study and a negative study.

Well, you then have to have a discussion and

go forward and look at the totality of the data to make your final decision.

So to answer your question, the answer is, yes, I would have -- I would have expected myself or expected my successor to have followed up on that manuscript and shared and made sure that our pharmacovigilance group was indeed aware of this publication and investigate.

BY MR. MARTINEZ-CID:

Q. And, actually, taking a step back, the primary responsibility to have -- to have seen and investigated the potential safety signal in this publication would actually not have fallen on you and your division primarily, but pharmacovigilance itself had its team of researchers that were -- that were charged with monitoring the science and ensuring that they investigated any serious safety concern like this one, correct?

MS. HORN: Objection. Form.

THE WITNESS: Mr. Martinez, as I shared with you earlier, that is the primary role of the pharmacovigilance organization. They are experts in epidemiology. They are physicians by training. They have expertise in areas that I have no -- minimal knowledge, if you will.

Mr. Martinez, a really, really important point -- and I said this earlier to you. For approved drugs in the U.S., there are annual reports. And we call them NDA annual reports -- and I'm sure you're well aware of those -- in that the sponsor submits a summary of the literature, relevant literature for that particular drug, to the respective health authorities. And that includes, Mr. Martinez, reports of adverse events, et cetera. And that's done on an annual basis, and it's simply one way of FDA, again, you know, staying cognizant, involved and understanding the safety profile of the drugs that it has approved.

So it is an ongoing, annual basis, and it is the remit of our pharmacovigilance group to ensure that the literature is reviewed, and particularly for publications regarding adverse events.

MS. HORN: Can we get a check on the time?

MR. MARTINEZ-CID: I may be on my last question.

MS. HORN: Okay. That's good.

BY MR. MARTINEZ-CID:

Q. And, Doctor, this Exhibit 289 from the Journal of the Polish Pediatric Society that we've been talking about is one of those reports that you would have

expected the pharmacovigilance group to include in that annual report of relevant literature, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes, Mr. Martinez. In the answers I say yes, and I'm reopening -- Mr. Martinez, if you don't mind, I'll go to this -- it's in Polish. Just give me one more second.

Mr. Martinez, I'm just reading you the title of this journal article, and I trust it means in children with chronic gastritis. I realize the bulk of it is in Polish.

But my expectation is that this particular publication would have been included in that annual report if identified by our -- by the organization, Mr. Martinez, and I'll leave it at that.

MR. MARTINEZ-CID: Thank you, Doctor. And I am going to take a short break and confer with my co-counsel and see if we are done for the day, if you will bear with me for a short bit.

MS. HORN: Okay. While we're -- while you're doing that, I'd like for the videographer to give us a count on the time that has elapsed.

MR. SCHMITZER: We are going off the record. The time is 2225 UTC.

(A short recess was taken.)

MR. MARTINEZ-CID: I have no further questions. I don't know if you all want me to do that on the video or --

MS. HORN: Yes, but so if you're -- if you have no further questions, then let's take another five minutes so we can -- I can -- we can both gather our thoughts.

MR. MARTINEZ-CID: Gotcha.

(A short recess was taken.)

MR. SCHMITZER: We are back on the record. The time is 2239 UTC. Please proceed.

MR. MARTINEZ-CID: I've got no further questions. Thank you so much for your time, Doctor.

THE WITNESS: Thank you, Mr. Martinez.

CROSS-EXAMINATION

BY MS. HORN:

Q. Good evening, Dr. Ciociola. I just have a few questions.

First, I wanted to start with the pediatric exclusivity study that you were asked about earlier.

Do you -- do you remember that?

A. Yes, yes, Ms. Horn, of course.

Q. Prior -- you were asked some questions about Pfizer's practice with regards to recommending

particular studies for potential pediatric exclusivity consideration.

Do you -- do you recall that?

A. Yes. Yes, I do, Ms. Horn. I do recall that.

Q. Prior to your work on the pediatric exclusivity study that was used to get the Zantac approval, had you ever worked on any pediatric exclusivity-related study at Pfizer?

A. No, no. No, Ms. Horn, and the reason I say no is because the pediatric exclusivity regulations only went into effect approximately -- I just have to -- in that time period, 1998, approximately, Ms. Horn.

So the regulation for pediatric exclusivity only went into law in and around 1998. And this is what I was discussing with Mr. Martinez. There were numerous discussions between FDA and myself, Ms. Horn.

In fact, Dr. Ganley even said he actually, if you will, in one of the -- one of the -- so sorry. I'm pointing at documents here. He said -- he apologized. There was an agreement with study design. He said, we're working -- FDA is working through the implementation of this pediatric exclusivity law.

So the answer is, no, that was my first and one of the first pediatric exclusivities ever granted by FDA.

Q. And to your knowledge, can a company get more than one six-month extension based on pediatric exclusivity research?
A. To the best of my knowledge, it can only be granted a single six months' exclusivity to the patent for pediatric exclusivity.
Q. Okay. And you were asked some questions about the FDA minutes for a pre-NDA meeting for the 150 Zantac OTC switch. I believe it's Exhibit 283.
A. Ms. Horn, would it be okay if I opened it up?
Q. Yes. Are you able to access it?
Do you see it on your end?
A. I have 283 I'm opening.
Q. Do you have it?
A. Yes. I have it open now.
Q. At the very top where it says -- it says, Record of FDA Contact; is that right?
A. I'm almost there. Yes, FDA -- yes, Ms. Horn, Record of FDA Contact, November 7th, 2001.
Q. Can you tell from the first page of this document who actually prepared the document?
A. The signature is Dolores Fliss. She was in charge of the regulatory, and so she would have prepared the document.
Q. And this document has several pages of

detailed meeting discussion.

Did you actually type up this part of the document?

A. No, Ms. Horn. This would have been -- Ms. Fliss would have typed up this document, and I -- this would have not been my style of recording minutes of an official meeting, including some of the bolded font and underlined messages.

Q. And when you were at this meeting, there was -- there was no one there -- well, today there is a court reporter making a transcript. Was there a court reporter making a transcript of this meeting?

A. No, no, Ms. Horn. Typically at FDA meetings, the minutes of meetings are taken by the respective -- by the sponsor and by FDA, and FDA will issue the minutes, the official minutes, of a meeting.

So this document really was an internal document by Pfizer Consumer Healthcare, as you can see, Record of FDA Contact, November 7th. And this was for internal use and would have not been shared outside of -- to FDA or any outside organization.

Q. And you were asked some questions about a Polish journal article right at the end of your testimony with Mr. Ricardo -- Mr. Martinez.

Do you know how long it takes to translate --

typically it takes to translate a journal article from one language to another?

A. We -- so, Ms. Horn, we do have -- in my past we do have translation services, and it can take -- particularly on the language, it can take some time to do that.

And what's probably important, as well, is a publication in the Polish journal which is not -- in my opinion, not part of a mainstay journal, would take time for it to circulate through, if you will, the community, the scientific community, and begin to cross-reference.

And, Ms. Horn, this is really important, as well. You can look up journals, and you can talk about what I call impact factor, number of references that a publication has.

So this is why all of us want to publish in The New England Journal of Medicine, and that's a -- that's one of my goals, Ms. Horn, is to publish in The New England Journal of Medicine because it has such a huge impact factor. So many countries read this, and they reference it and so on and so forth.

So impact factor also has a lot to do with journals, and hence the Polish Journal of Pediatric Gastroenterology, my opinion probably has a low impact factor and would take some time for it to, if you will,

be referenced and assert itself into the main literature that's being discussed by the gastroenterology community at the time.

Q. And earlier you were asked some questions about prevention claims or Zantac over-the-counter 75 milligrams.

Do you remember that?

A. Yes, yes.

Q. Is the indication for prevention at zero-hour a different indication than the indication for prevention when taken 30 to 60 minutes before a meal?

A. Yes, they are different.

So both -- and this is documents you can look up online. Both Zantac 75 and Zantac 150 are approved for over-the-counter use. You can look in the drug facts label for treatment and prevention of heartburn associated with certain foods. And there are a listing of foods. That's listed, and that's -- you can look that up in the drug facts label.

Q. To your knowledge and recollection, do you know whether the zero-hour supplement that Mr. Martinez asked you about, whether or not that was withdrawn?

A. The zero -- yes. So the zero-hour -- Ms. Horn, could you just repeat that? This is for Zantac 150, right?

Q. No. The zero-hour supplement I believe is for Zantac 75.

A. I'm hesitating. Zantac 75 zero-hour, I don't believe that was withdrawn. I'm struggling a bit with your question.

Q. All right. We can come back to that.

And you were shown some studies from the Glaxo group that were dated 1981 and 1982, and you did not start working at Glaxo until 19 -- Glaxo U.S. until 1988.

Do you know how many studies were conducted by Glaxo between 1981 and 1987?

A. I do not. I hesitate to -- to even estimate a number. I mean, ranitidine was a very important development program for Glaxo at the time, and I'm sure there was a large number of -- of publications with its approval in the U.S. in 1983. And I don't recall the approval dates in other countries, and I would have expected there to be a large number of Zantac clinical studies that were conducted and published and supported all of these additional indications.

Ms. Horn, there are -- Zantac, of course, is approved for prescription, a number of indications: erosive esophagitis, treatment of gastric ulcer disease, treatment of duodenal ulcer disease, treatment of GERD,

gastroesophageal reflux disease. And that's probably only five, and there are probably several others that I've long forgotten.

MS. HORN: I'm going to pass the witness.

THE WITNESS: Ms. Horn, I'm going to close my shade. The sun is now shining in, and it probably looks like I have a halo, so give me two seconds.

MS. HORN: Sure.

THE WITNESS: Working from home. Yes, please, I'm ready to proceed.

MS. HORN: Ms. Power is going to ask you some questions now, so I'm going to turn my video off.

THE WITNESS: Okay.

CROSS-EXAMINATION

BY MS. POWER:

Q. Good evening, Dr. Ciociola. My name is Caroline Power. I represent GlaxoSmithKline. First, I'd like to thank you for your time today.

Now, you've talked today about your experience and your expertise in the field, and I just want to make a few points clear.

You're not an analytical chemist, are you?

A. No, Ms. Power, I'm not an analytical chemist. I tried to make that very clear. I'm not an analytical chemist, never have been, and as I shared with

Mr. Martinez, if you showed me a GC mass spec right now, I wouldn't have a clue how to interpret it.
Q. Dr. Ciociola, you're not an expert on preclinical testing; is that fair?
A. That's correct, Ms. Power. I'm not an expert in preclinical tests. I'm not a toxicologist. I'm not a veterinarian by training. And, as I've shared with others on this call, as well, my focus really has been in clinical research. And my focus with ranitidine really was on the over-the-counter status, not the prescription -- not the development for prescription status.
Q. Dr. Ciociola, you've mentioned today that on your teams, you have various people who have different fields of expertise; is that right?
A. That's correct, Ms. Power. And as I've shared with the group today, that I served -- and I know it's referenced in some of the documents that I saw earlier here. I described myself as the project sponsor, and on the project team were a whole host of experts who supported the project and, as I said, a whole range of functions. And that is how the research was done.
And to be frank, Ms. Power, it continues in most companies to this day.
Q. So if you were confronted with a question, for

instance, on preclinical testing, would you ask your colleagues with expertise in preclinical testing?

A. The quick answer is yes. That would have been my -- my first, if you will, call would have been to my preclinical experts, my toxicology experts, my representative, and said -- if you don't mind, Ms. Power, I would have said something like, hey, what does this mean? Can you walk me through this data? Can you explain this to me? The authors are concluding X. Can you share with me how they reached this conclusion, the validity of the data, was the experiment appropriately designed? What about the sample size?

And you heard me reference sample sizes previously, the statistical methods that were done. And I would have asked that individual to walk me through that.

Q. In general, would you defer to others with more expertise in those fields when reaching conclusions about the validity of a study or its conclusions?

A. In general, Ms. Power, the answer is yes. And that would include not only just, as you talked about, preclinical safety or toxicology, but also I referred -- you've heard me many times refer to pharmacovigilance, epidemiology.

I -- I'm not a physician by training. I'm not

a statistician by training, and, hence, you heard me a number of times say that I would -- had become available information, would have consulted with these experts, and, yes, I would have absolutely done that.

Q. Dr. Ciociola, referring your attention back to Exhibit 287 -- this is the study by Dr. Tanner in 1982 -- can you pull that out?

A. If you'd just give me one second, and I will do that. 282, I have that. I'm bringing it up.

Q. Excuse me. That's -- sorry. It's 287.

A. Oh, my fault. I'm so sorry. That was my performance review, which I hadn't seen in a long time.

Okay. Ms. Power, I have the Tanner report open in front of me.

Q. I'd like you to turn to the third page of the PDF. It's the summary page.

A. Yes. I have that in front of me now. It starts, experiments were carried out.

Q. In the second paragraph there's a reference to a WHO NAP test.

Do you see that?

A. Yes, I do see that.

Q. Do you know what the WHO NAP test is?

A. Ms. Power, I will admit to you I haven't a clue. I have no -- obviously I know what -- I can guess

at what WHO means, the World Health Organization, and that may not necessarily be true. And I have no clue about what this type of test is.

Q. Next, it mentions that the test involves 40 millimolars of nitrate, and the study clarifies that's sodium nitrite; is that right?

A. Help me, Ms. Power. Just -- next paragraph?

Q. Sorry. Just after the reference to WHO NAP test.

A. Yes.

Q. It says 40 millimolars of nitrite?

A. Yes.

Q. And on page 8 of the PDF, the second paragraph -- excuse me, second paragraph clarifies that's sodium nitrite, 40 millimolars.

Do you see that?

A. I see 40 -- hold on one second, Ms. Power. Human stomach after -- is that where you are, in the third paragraph or the second paragraph?

Q. So turning to page 8 of the PDF --

A. Oh, I'm so sorry. The page numbers don't match. Let me just go -- yes, I'm now on page 8 of the PDF, which is page 6, results and discussions, Ms. Power. Am I in the right place, Ms. Power?

Q. Yes, you're with me. Now I'm going to look at

the second paragraph.
A. Yes.
Q. Now, this describes the study as involving incubation with sodium nitrite at 40 millimolars.
Do you see that?
A. Yes, I do.
Q. Dr. Ciociola, do you know what the typical stomach content is in a living human? Strike that. Let me rephrase.
Dr. Ciociola, do you know how much sodium nitrite is contained in a typical human stomach?
A. I do not know the answer to that question.
Q. Do you know whether 40 millimolars of sodium nitrite is physiologically relevant for a study like this?
A. I do not know that, and, Ms. Power, as I referred to that earlier in my discussion with Mr. Martinez, I said, is this relevant to the human condition?
Q. Dr. Ciociola, if I represented to you that this test is not relevant to physiological conditions and is indeed not intended to reflect physiological conditions, would you have any basis of disputing that?
A. I -- I wouldn't have any basis to dispute that, Ms. Power. I would not have any basis to dispute

that.

Q. Dr. Ciociola, you testified earlier today that, in order to fully evaluate this Tanner study, you'd be interested in seeing any other studies regarding nitrosation and ranitidine.

Is that a fair summary of your testimony?

A. Yes, Ms. Power, that is a fair characterization. And as I shared with the group, these types of studies typically would have been, as I shared, potentially replicated, disputed, confirmed, et cetera.

Q. Dr. Ciociola, are you familiar with a study entitled, The Reaction Between Ranitidine and Nitrous Acid and the Mutagenic Potential of the Reaction Products?

A. No. Is that a separate study that I've seen or not seen today?

Q. I don't believe it was an exhibit today and that's, in fact, my next question. Plaintiff's counsel didn't show you that study during this deposition, did they?

A. No. To the best of my knowledge, no, no.

Q. Are you familiar with a study entitled An Interim Report on Tests on Ranitidine, Its Metabolites in Man and Its Nitrosation Products for Mutagenic Activity in Microorganisms?

A. Ms. Power, I'm just thinking, I do not recall this report at all.

Q. Plaintiff's counsel didn't show you that report during today's deposition, did they?

A. To the best of my knowledge, no, they did not. I would have recalled that. I would have recalled that. No.

Q. Dr. Ciociola, you're not familiar with an article published in the Lancet in 1981 entitled Safety of Ranitidine, are you?

A. 1981, Lancet? I don't recall that either, Ms. Power.

Q. Plaintiff's counsel didn't show you that article today, did they?

A. No, they did not. I did not see that Lancet article.

Q. In preparation for today's deposition, did you review the IN -- excuse me, in preparation for today's deposition, did you review the IND for Zantac?

A. Oh, no, Ms. Power. I did not review the IND. Frankly, I wouldn't even have had access to it, Ms. Power.

Q. Dr. Ciociola, IND is an Investigational New Drug application with the FDA; is that correct?

A. That's correct.

Q. That contains a number of preclinical studies regarding a drug?

A. Yes, it would. Typically an IND would contain all of the preclinical studies that were conducted with that particular drug, but an IND is held by the sponsor and FDA, of course.

So, therefore, myself as a nonemployee would have not had access to either FDA's files, nor the company's files.

Q. Dr. Ciociola, you didn't have access nor did you review the NDAs associated with the Zantac products in preparation for today's deposition; is that correct?

A. That's correct, Ms. Power. Similarly, NDAs and -- would have been, again, proprietary information to the respective sponsor and to FDA, and I -- as a nonemployee, I would have not had access to the NDA or the NDA documents.

Q. You would not have access, nor did you review any correspondence between Glaxo, Glaxo Wellcome, or GlaxoSmithKline and the FDA over the 40-year life of Zantac; is that correct?

A. For the prescription product, yes, you're correct. I did not review any of these -- any correspondence in preparation for this deposition.

Q. Dr. Ciociola, did you research for or review

any medical literature regarding Zantac and nitrosation in preparation for this deposition?

A. Ms. Power, I did not. I did not do any research, any Google searching, et cetera, in preparation for this regarding nitrosamines and ranitidine.

Q. Sitting here today, can you provide -- strike that.

Sitting here today, you are not prepared to offer an opinion on whether the 1982 Tanner study was cumulative of other work that GSK had done, are you?

A. No, I'm not at all, Ms. Power. I mean, my understanding of that study in the brief time I had to review the study was that it was a single investigation, and that is consistent with my other comments about additional work, follow-on work, et cetera, as I shared with you just a moment ago, refute, confirm, further elucidate, et cetera.

MS. POWER: Nothing further.

MS. HORN: I have nothing further.

REDIRECT EXAMINATION

BY MR. MARTINEZ-CID:

Q. Doctor, I just have something real brief.

You were asked questions about the difficulties in locating and perhaps in translating the

Polish Pediatric Society's journal earlier.
Do you recall those questions?
A. Yes, Mr. Martinez.
Q. And you told Pfizer's attorney that, in fact, that it could be difficult to translate an article, and, of course, a lesser known foreign journal would be harder to come across than, for example, The New England Journal of Medicine.
Do you recall that?
A. I do recall saying that, Mr. Martinez.
Q. And just if I could draw your attention back to Exhibit 279 --
A. Just help me, Mr. Martinez. Give me a second.
Q. Take your time.
A. You said 279, right?
Q. Yes. And if you'd like me to put it on the screen, just let me know.
A. I have it up, Mr. Martinez. I have -- it is --
Q. Perfect. If you go to, again, the References page, it's the Bates number ending in 263.
A. 262 -- 263. Yes, I have it, Mr. Martinez.
Q. Sure.
And we talked about -- actually, it's on 264. The next page, entry number 12, that was from the

Journal of the Medical Association of Thailand, that very entry, and you see that that's a 1998 article.

Do you see that?

A. Yes, I do see it. It's -- reference number 13. It appears to be the Journal of the Medical Association of Thailand, 1998.

Q. And so certainly Glaxo and -- and Pfizer had no difficulty in locating and using the Thai 1998 article in their October 1998 letter to the FDA in an effort to get a pediatric exclusivity extension, correct?

MS. HORN: Objection. Form.

THE WITNESS: Yes. Mr. Martinez, we obviously found that document and included it in the FDA correspondence, and it's listed as such.

BY MR. MARTINEZ-CID:

Q. And certainly, just like Pfizer or Glaxo could locate that article from Thailand in 1998 right away to use in its application to get exclusivity worth 10- to $15 million, they could also have gotten the Polish Pediatric Society article in an effort to make sure that the product that they're selling to everyone, in particular to pediatric patients, is safe, correct?

MS. HORN: Objection. Form.

THE WITNESS: I would say, Mr. Martinez --

and, again, I'm trying to be fair to the Journal of the Medical Association of Thai and the Polish Journal of Pediatric Gastroenterology.

Neither of these journals I would consider to be top-tier journals, include the Thai and the Polish Society. And I think it's applicable, as well, to the Thai journal in that, to find such journals and to get them to -- interpolate themselves into the mainstream literature does take some time, as such.

And, as you can see here, this was published in 1998, and, of course, you know, our submission as such was in a similar year as such. And so I would say that they were equal. Mr. Martinez, I'd say they were equal, the Thai journal and the Polish journal.

BY MR. MARTINEZ-CID:

Q. Thank you, Dr. Ciociola.

And being equal insofar as the difficulties of accessing them and using them, you would have -- you would not have expected Pfizer's efforts to be any less in their pharmacovigilance and in their ensuring the safety of Zantac users in finding the Journal of the Polish Pediatric Society than Glaxo and Pfizer were in finding the Thai journal in order to make additional

revenues with the pediatric exclusivity, right?
The efforts should have been equal, if not greater, for pharmacovigilance, correct?
MS. HORN: Objection. Form.
THE WITNESS: I would say in general, Mr. Martinez, they would have been equal efforts. And, Mr. Martinez -- and I know I've shared with you and the group repeatedly about the purpose of pharmacovigilance and their annual reports and their efforts to survey the world literature, and I would say it's equal to -- if you don't mind, Mr. Martinez, the work that the team did for me in 1998.
I would say they're similar, Mr. Martinez.
MR. MARTINEZ-CID: Thank you, sir. I don't have any more questions. I appreciate your time today.
MS. HORN: I have just one follow-up question.

RECROSS-EXAMINATION

BY MS. HORN:
Q. Sticking with the same exhibit, with the -- on the References page that you were just looking at -- do you have that here?
A. Yes, Ms. Horn. So sorry. Yes, I've got it.
Q. Do you see entry number 4?

A. Yes, I do.
Q. And it was referencing the Italian journal; is that right?
A. Yes, that's correct.
Q. Do you see the reference in parentheses, in Italian? Do you see that?
A. Yes, I do.
Q. How would you interpret that notation?
A. That -- I would interpret that, Ms. Horn, as the journal is in Italian without translation, and, therefore, was back-translated to English. And so, hence, the reference of number 4 here, if you will, is the -- is the translated version of that Italian journal.
Q. And if you'd scroll down to entry number 13 you were just asked about, the Thai journal, I believe -- yes, 13 -- is there a language notation there?
A. There is not, Ms. Horn, and, you know, my interpretation, the fact that it wasn't would be that the Thai journal was published in English, and which, as you are aware, without the need to translate, it's -- publications such that are in English are much easier to reference because individuals like myself or others who are native English speakers and don't speak Thai nor

Italian nor Polish would be much more adept or easily be able to peruse that type of literature, as well as other authors, Ms. Horn, you know, who may be referencing similar articles such as that.

MS. HORN: I have nothing further. All done?

MR. SCHMITZER: This will conclude today's deposition. The time is 2311 UTC. We are now off the record.

MS. HORN: Thank you so much. You are free to go.

THE WITNESS: Thank you. I hope I answered your questions.

(Deposition concluded at 7:12 p.m.)

WITNESS NOTIFICATION LETTER

March 26, 2021

ARTHUR CIOCIOLA, PH.D.
Novartis Pharmaceuticals Corp.
4800 Overton Plaza, Suite 300
Fort Worth, TX 76109

IN RE: IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION
Remote deposition taken on March 24, 2021
U.S. Legal Support Job No. 341866

The transcript of the above proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

Please complete your review within 30 days.

Sincerely.

....................................
Michelle R. Hordinski, RPR, RMR, CRR
U.S. Legal Support, Inc.
2271 McGregor Boulevard, Second Floor
Fort Myers, Florida 33901
239.332.7443

CC via transcript:
RICARDO MARTINEZ-CID, ESQ.
PAIGE H. SHARPE, ESQ.
MATTHEW H. TRANTER, ESQ.
JULIA ZOUSMER, ESQ.
ANN MARIE DUFFY, ESQ.
CAROLINE POWER, ESQ.
ELAINE HORN, ESQ.

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE: IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

DATE: March 24, 2021

PAGE LINE CHANGE REASON

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

Date Signed ARTHUR CIOCIOLA, PH.D.

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF LEE )

I, Michelle R. Hordinski, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I was authorized to and did stenographically report and electronically record the remote deposition of ARTHUR CIOCIOLA, PH.D.; that a review of the transcript was requested; and that the foregoing transcript, consisting of pages 1 to 253 inclusive, is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated March 26, 2021.



................................

Michelle R. Hordinski, RMR, CRR

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF LEE )

I, the undersigned authority, certify that ARTHUR CIOCIOLA, PH.D. personally appeared before me on the 24th of March, 2021 and was duly sworn.

WITNESS my hand and official seal March 26, 2021.

..............................

Michelle R. Hordinski, RMR, CRR
Notary Public, State of Florida
Commission #GG 196403
Expires 6-5-22

# EXHIBIT 12

**Deposition of Scott Coapman (01/10/2022)**

**Subject to Renewed Motion to Seal Per DE 6124**

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_______________________________________/

VIDEO-RECORDED DEPOSITION OF GLAXOSMITHKLINE, LLC and GLAXOSMITHKLINE, PLC "GSK"
PURSUANT TO FED. R. CIV. P. RULE 30(b)(6)
(Regulatory)

Taken on behalf of the Zantac PSC
(via videoconference)

DEPONENT: LESLIE DRIVER, PharmD

DATE TAKEN: Wednesday, March 3, 2021

TIME: 9:04 a.m. - 4:10 p.m. EST

PLACE: US Legal Support- Remotely

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

PAIGE BOLDT, ESQ. (via Zoom VTC)
Watts Guerra, LLP
4 Dominion Drive
Building 3 - Suite 100
San Antonio, Texas 78257
pboldt@wattsguerra.com

Appearing on behalf of the Zantac PSC,

BRET STANLEY, ESQ. (via Zoom VTC)
KATIE JOLLY MILLER, ESQ. (via Zoom VTC)
Pulaski Kherkher, PLLC
2925 Richmond Avenue -- Suite 1725
Houston, Texas 77098
bstanley@pulaskilawfirm.com

Appearing on behalf of the Zantac PSC,

LEA P. BUCCIERO, ESQ. (via Zoom VTC)
Podhurst Orseck
1 SE 3rd Avenue -- Suite 2300
Miami, Florida 33131
lbucciero@podhurst.com

Appearing on behalf of the Zantac PSC,

ADAM KRAUSE, ESQ. (via Zoom VTC)
Krause & Kinsman Law Firm
4717 Grand Avenue -- Suite 300
Kansas City, Missouri 64112
adam@krauseandkinsman.com

Appearing on behalf of the Zantac PSC,
Plaintiffs,

DAVID J. STANOCH, ESQ. (via Zoom VTC)
Kanner & Whitely, LLC
701 Camp Street
New Orleans, Louisiana 70130
D.stanoch@kanner-law.com

Appearing on behalf of the Plaintiffs,

A P P E A R A N C E S: (cont'd)

ERIC T. CHAFFIN, ESQ. (via Zoom VTC)
ROOPAL LUHANA, ESQ. (via Zoom VTC)
Chaffin Luhana, LLP
600 Third Avenue -- 12th Floor
New York, New York 10016
chaffin@chaffinluhana.com
luhana@chaffinluhana.com

Appearing on behalf of the Plaintiffs,

TRACY A. FINKEN MAGNOTTA, ESQ. (via Zoom VTC)
CATELYN McDONOUGH, ESQ. (via Zoom VTC)
Anapol Weiss
One Logan Squire
130 N. 18th Street -- Suite 1600
Philadelphia, Pennsylvania 19103
tfinken@anapolweiss.com
cmcdonough@anapolweiss.com

Appearing on behalf of the Plaintiffs,

JE YON JUNG, ESQ. (via Zoom VTC)
May Lightfoot, PLLC
3200 Martin Luther King Jr. Avenue S.E.
3rd Floor
Washington, D.C. 20032
jjung@maylightfootlaw.com

Appearing on behalf of the Plaintiffs,

CAROLINE McGLAMRY, ESQ. (via Zoom VTC)
Pope McGlamry
3391 Peachroad Road NE -- Suite 300
Atlanta, Georgia 30326
mmcglamry@popemcglamry.com

Appearing on behalf of the Plaintiffs,

RYAN M. CULLEN, ESQ. (via Zoom VTC)
Goodell DeVries Leech & Dann, LLP
1 South Street -- Suite 2000
Baltimore, Maryland 21202
rcullen@gdldlaw.com

Appearing on behalf of the Defendant, Perrigo,

A P P E A R A N C E S: (cont'd)

LYNDSAY A. GORTON, ESQ. (via Zoom VTC)
Crowell & Moring, LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
lgorton@crowell.com

Appearing on behalf of the Defendant, Cardinal Health, Inc., and Medicine Shoppe International, Inc.,

ROBYN S. MAGUIRE, ESQ. (via Zoom VTC)
Barnes & Thornburg, LLP
1717 Pennsylvania Avenue NW -- Suite 500
Washington, D.C. 20006
robyn.maguire@btlaw.com

Appearing on behalf of the Defendants, Albertsons Companies, Inc., Amazon.com, Inc., BJ's Wholesale Club Holdings, Inc., Costco Wholesale Corporation; CVS Pharmacy, Inc., Duane Reade, Inc., Giant Eagle, Inc., Publix Super Markets, Inc., Rite Aid Hdqtrs. Corp., Safeway, Inc., ShopRite Supermarkets, Inc., Southeastern Grocers, Inc., Walgreen Co.; Walgreens Boot Alliance, Inc., Wakefern Food Corporation, and Winn-Dixie Stores, Inc., H-E-B Grocery Company, LP,

ANNIE E. SHOWALTER, ESQ. (via Zoom VTC)
Williams & Connolly, LLP
725 Twelfth Street N.W.
Washington, DC 20005
ashowalter@wc.com

Appearing on behalf of the Defendant, Pfizer, Inc.,

HEATHER A. RITCH ROCKS, ESQ. (via Zoom VTC)
Reed Smith, LLP
Three Logan Square
1717 Arch Street -- Suite 3100
Philadelphia, Pennsylvania 19103
hritchrocks@reedsmith.com

Appearing on behalf of the Defendant, Par Pharmaceuticals, Inc.,

A P P E A R A N C E S: (cont'd)

KATIE INSOGNA, ESQ. (via Zoom VTC)
MATT HOLIAN, ESQ. (via Zoom VTC)
DLP Piper, LLP
33 Arch Street -- 26th Floor
Boston, Massachusetts 02110
katie.insogna@us.dlapiper.com
matt.holian@dlapiper.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC,

NINA TROVATO, ESQ. (via Zoom VTC)
King & Spalding, LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
ntrovato@kslaw.com

Appearing on behalf of the Defendant, Boehringer Ingelheim,

WILL SACHSE, ESQ. (via Zoom VTC)
CAROLINE POWER, ESQ. (via Zoom VTC)
DECHERT, LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
will.sachse@dechert.com
and
LINDSAY N. ZANELLO, ESQ. (via Zoom VTC)
Dechert, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
lindsay.zanello@dechert.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC,

A P P E A R A N C E S: (cont'd)

DREW M. LEVIN, ESQ. (via Zoom VTC)
Conroy Simberg
3440 Hollywood Boulevard
Second Floor
Hollywood, Florida 33021
dlevin@conroysimberg.com

Appearing on behalf of the Defendant, Nostrum Laboratories, Inc.,

JANE E. THOMAS, ESQ. (via Zoom VTC)
Blank Rome
1825 Eye Street NW
Washington, DC 20006
jthomas@blankrome.com

Appearing on behalf of the Defendant, Apotex Corp.,

LIZA L. ENGLISH, ESQ. (via Zoom VTC)
Shook, Hardy & Bacon, LLP
100 North Tampa Street -- Suite 2900
Tampa, Florida 33602
lenglish@shb.com

Appearing on behalf of the Defendant, Walmart, Inc.,

GEORGIA HATZIS, ESQ. (via Zoom VTC)
Ulmer & Berne, LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113
ghatzis@ulmer.com

Appearing on behalf of the Defendant, Aurobino entities,

A P P E A R A N C E S: (cont'd)

CAITLYN E. HALLER, ESQ. (via Zoom VTC)
Greenberg Traurig
77 West Wacker Drive -- Suite 3100
Chicago, Illinois 60601
hallerc@gtlaw.com

Appearing on behalf of the Defendant, Teva Pharmaceuticals,

AMY L. BAKER, ESQ. (via Zoom VTC)
Wilson Elser Moskowitz Edelman & Dicker, LLP
111 North Orange Avenue -- Suite 1200
Orlando, Florida 32801
amy.baker@wilsonelser.com

Appearing on behalf of the Defendant, Novitium Pharma.

DEPO TECHNICIAN: Michael Hollander with US Legal Support

THE REMOTE VIDEOGRAPHER: Carlos Coello with US Legal Support

ALSO PRESENT: Jessica Szumla
Antonio Suarez-Martinez
John O'Tuel, Esquire

# I N D E X

TESTIMONY OF LESLIE DRIVER, PharmD

Direct Examination by Mr. Chaffin 12
Direct Examination by Mr. Stanoch 231
Direct Examination (cont'd) by Mr. Chaffin 232
Cross-Examination by Mr. Sachse 235

CERTIFICATE OF REPORTER 244

CERTIFICATE OF OATH 245

ERRATA SHEET 246

## E X H I B I T S

Exhibit No. 231 17
(Notice of taking deposition)

Exhibit No. 232 43
(Curriculum vitae)

Exhibit No. 233 101
(Email chain re regulatory reporting obligations for Zantac and Zantac OTC Bates Nos. GSKZAN000014915 - 14919)

Exhibit No. 234 110
(Organizational charts)

Exhibit No. 235 121
(GSK NDA summary information/outline)

Exhibit No. 236 159
(SOP Archiving reg agency submissions) Bates Nos. GSKZAN0000031395 - 31403)

Exhibit No. 237 162
(SOP Mgmt of Questions from Reg Agencies Bates Nos. GSKZAN0000030136 - 30148)

Exhibit No. 238 163
(SOP Mgmt of human safety-related activities Bates Nos. GSKZAN0000030517 - 30538)

Exhibit No. 239 169
(SOP Development, Mgmt of risk evaluation and mitigation strategies for FDA Bates Nos. GSKZAN0000031101 - 31107)

E X H I B I T S (cont'd)


Exhibit No. 240 170
(Email string re Ranitidine/Risk of NDMA
Bates Nos. GSKZAN0000251812 - 251813)

Exhibit No. 241 188
(8/19/19 email from Conner to various
re NDA 18703 Zantac info request
Bates Nos. GSKZAN0000431095 - 431101)

Exhibit No. 242 195
(Response to FDA questions
Bates Nos. GSKZAN0000636549 - 636558)

Exhibit No. 243 204
(Email string re notice of track safety
Bates Nos. GSKZAN0000230085 - 23008)

Exhibit No. 244 232
(Zantac Tablet Indication Approvals

Exhibit No. 245 232
(List of INDs and NDAs)

Exhibit No. 246 235
(GSK's responses and objections to plfs'
third amended depo notice)

Exhibit No. 247 241
(GSK's responses and objections to plfs'
first set of request for admissions)

THE VIDEOGRAPHER: Participants should be aware that this proceeding is being recorded and as such all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the remote depo interface.

This is the remote video-recorded deposition of Leslie Driver being taken by counsel for the plaintiff. Today is Wednesday, March 3rd, 2021. The time is now 2:04 p.m. GMT, 9:04 a.m. EST. We are here in the matter of In re: Zantac (ranitidine) products liability litigation. My name is Carlos Coello, remote video technician on

behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome.

At this time, will the reporter, Laura Landerman, on behalf of US Legal Support please enter the statement for remote proceedings?

THE REPORTER: Yes. The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely pursuant to the recent Florida Supreme Court administrative order.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. If anyone has any objection, state it now. If not, I'll swear in the witness.

Ms. Driver, please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do, so help me God.

- - - - -

DIRECT EXAMINATION

BY MR. CHAFFIN:

Q Good morning. So my name is Eric Chaffin, and I represent the plaintiffs, and I'm just so grateful for you being here this morning certainly on behalf of my clients and I appreciate your time.

At any point today if you don't understand, please just let me know. I know it'll be a long day. Even if it's only a few hours, it's always a long day, so certainly try to be patient with each other and allow each an opportunity to answer questions but also try to keep my questions very direct and succinct, and if, you know, you can do your best to answer them, that will make the day go faster. Does that make sense?

A Yes.

Q Okay. And do you prefer to be referred to as Dr. Driver or Ms. Driver? What's your preference?

A Dr. Driver.

Q Dr. Driver, yes, absolutely. Dr. Driver, in terms of your deposition, have you ever had it taken before?

A No.

Q Okay. So this is your first time ever taking a deposition in any proceeding whatsoever; is that correct?

A That's correct.
Q Okay. Have you ever testified before any regulatory bodies?
A No.
Q Okay. So you've never been under oath and given testimony previously?
A No.
Q Where are you located currently?
A I'm located in North Carolina outside of Raleigh.
Q Okay. You're at your home today, I assume?
A I am at my home.
Q Gotcha. And is anybody else there with you?
A No.
Q And in terms of your attorney, that's Mr. Sachse, is that right?
A That's correct.
Q Okay. And he's at a different location from you today; is that right?
A That's right.
Q And do you have any documents or anything in the room with you that you brought today?
A I do. I have three documents. One is the document regarding responses to the request for admissions. I have that document. I also have a list

of Zantac tablet indication approvals. And then thirdly I have a list of INDs and NDAs for Zantac. I do also --

Q Okay. And do --

A -- have a box of documents that was shipped to me. They are unopened.

Q Got it. And could you just tell us what you mean by INDs, NDAs, briefly?

A Certainly. INDs are investigative new drug applications. So in order for, in the US, for clinical trials to commence, you have to have an IND open.

And then NDAs are new drug applications. Those are the applications that are approved by the FDA. So in this case, Zantac, has several NDAs associated with it because it has different formulations.

Q Okay. And do you have any INDs or NDAs for any products other than Zantac?

A We do at GSK.

Q I meant with you today. Just referring to what -- you said you had a list as well as some other information. I just wanted to see if it covered anything else besides Zantac.

A No, it does not, but -- well, let me correct that. It does include the INDs and NDAs for Tritec, which is a combination ranitidine -- or it's actually a ranitidine bismuth product.

Q And if I remember correctly, that product's not on the market any longer; is that right?

A That's correct.

Q Okay. In terms of today, I mean, just some ground rules. I'm sure that your attorney's gone over this with you, but certainly, you know, in terms of the screen you're using, do you have one or two monitors today for your computer?

A I have one.

Q Okay. And do you have any other applications open besides the Zoom meeting?

A The only other application I have is a browser containing the box of documents.

Q Okay. And besides those two things, anything else you have open on your screen today?

A No.

Q Okay. And I'd ask you to keep it that way. And if you go -- if you need to refer to something else, if you kindly let us know, we certainly can try to figure that out, but I would just ask you not open anything else today. Does that make sense?

A Yes.

Q Okay. Do you have your phone with you?

A I do. It's in the room with me, but it is off.

Q Okay. Gotcha. Perfect. In terms of any other notes or documents, anything else with you besides what you've articulated?

A No.

Q In terms of today -- I'm going to actually ask the tech to bring up for us on the screen the notice of deposition. I assume that you have seen the deposition notice for your -- for the rule 30(b)(6) deposition for today; is that correct?

A That's correct.

Q And you've had an opportunity to go over that with your attorney?

A Correct.

Q Do you recall when you first saw that or some version some of it, I should say? It was probably a number of months ago, I assume.

A Yes. I think I first saw it in September of 2020.

Q Okay. And between September of 2020 and today, could you just tell us generally what you did to prepare for your deposition today?

A I reviewed the GSK regulatory archives. I also reviewed SOPs, reviewed regulations, and reviewed documents that, you know, are associated with this issue.

Q Okay. And in terms of --

MR. CHAFFIN: So we're just going to go ahead and mark this particular deposition as Exhibit 231 for the record.

(Exhibit No. 231 was marked.)

BY MR. CHAFFIN:

Q In terms of the notice of deposition, I know that there were some objections that we received yesterday, and I'm sure that that will be made part of the record later today, but are there any particular topics that you're not prepared to address at all today?

A I believe that I'm prepared to address all of these in the notice.

Q Okay. And do --

MR. SACHSE: Eric, sorry to interrupt, but so the record is clear, subject to those objections that were served over the weekend.

BY MR. CHAFFIN:

Q Okay. And Dr. Driver, you understand that your testimony here today is actually testimony on behalf of your employer, GlaxoSmithKline; is that correct?

A That's correct.

Q And that your answers today are binding on GlaxoSmithKline as if they were given by the company

itself. Do you understand that?

A Yes.

Q Okay. And my understanding is that you may be offered today both as a corporate representative but then also as a fact witness; is that correct? I'll ask that to your attorney.

MR. SACHSE: That's correct. And actually, maybe this is a good time just to make sure I'm communicating clearly with you. Is it okay if at any time I object on scope, what I mean is that she's -- you know, that is a question that goes to something outside of her role as the corporate representative?

MR. CHAFFIN: Yeah, I think if you keep it to scope and then I can follow up with a question, hopefully that doesn't become too burdensome, but, yeah, that -- that's fine.

MR. SACHSE: Yeah, I just wanted to rather than, you know, having to do the whole rigmarole each time, I thought if I said "Objection, scope," we all know what I mean by that.

MR. CHAFFIN: Absolutely. Understood.

BY MR. CHAFFIN:

Q Okay. So Dr. Driver, so I think what in attorney speak trying to translate that, that means that

if you hear Mr. Sachse say that, you know, there is an objection to scope, that he's really then allowing you to testify as a fact witness, and it's outside the scope of what the topics are that you're designated to testify upon. Does that make sense?

A Yes.

Q Okay. In terms of your preparation for today, did you talk to any individuals in preparation for today?

A Yes.

Q And who did you speak with?

A So in addition to counsel, I spoke with individuals within our organization. Do you specifically need to know their names?

Q Please.

A So individuals Kevin Fitzgerald, Andy Gustafson, Dorene Dixon, Susan Boyd, and Tom Kline.

Q And are all those people domestic or are they outside the US?

A They are all within the US.

Q Did you speak to anyone outside the United States?

A I spoke to individuals outside of the US, but not in order to prepare for this deposition.

Q Okay. And you said that you spoke with

counsel. Who all have you spoken to from counsel perspective?

A I've spoken with Will. I've spoken with Lindsey Zanello, John O'Tuel from GSK, Tony, also from our legal department.

Q What's Tony's last name?

A Tony you'll have to -- Will --

Q That's okay. We can get --

MR. SACHSE: It's Suarez-Martinez.

MR. CHAFFIN: Thanks, Will.

BY MR. CHAFFIN:

Q Anybody else?

A Tom Shaheen.

Q Anyone else?

A There was another individual I've spoken with, but I have -- I will need to go back and get her name.

Q And so another female that you don't have the name of right now; is that correct?

A That's correct. I can get that.

Q And just to run back through the GSK people, so Kevin Fitzgerald, Andy -- what was Andy's last name?

A Gustafson.

Q Gustafson. Okay. I've got the others. So there were five individuals internally. Is there anybody else besides those individuals internally?

A I can't think of any additional ones.
Q Okay. And you distinguished between preparing for this deposition and then other things. What other things were you referring to? Is it your document production? Is it about Zantac generally? Help me understand what you were thinking when you distinguished that?
A Zantac generally.
Q And that takes us to so you have some responsibility in your current position over Zantac; is that correct?
A That's correct.
Q And what is your responsibility vis-a-vis Zantac?
A So currently, I am the US regulatory representative with FDA for Zantac. Prior to that, I led or I currently lead the team that has responsibility for Zantac. So prior to me taking over that role, I did serve as the manager of the individual who had that responsibility.
Q And who was the person that had that responsibility previously?
A Jaisri Giridhar.
Q And why did you replace -- is it a him or a her? I apologize.

A Her.
Q Her? And why did you replace her?
A She retired from the company.
Q And when did she retire?
A She retired in March of 2020.
Q And where was she located before she retired?
A At GSK at the Research Triangle Park location.
Q In North Carolina, obviously?
A Yes.
Q And you took over the responsibility at that point in time?
A That's correct.
Q But you had oversight over her during the time that she was doing the regulatory function; is that correct?
A That's correct.
Q Okay. And GSK, as I understand, is the innovator of ranitidine, which has the brand name Zantac; is that correct?
A That's correct.
Q And that's true for both the 150 and 300 milligram tablets?
A Yes.
Q And as I understand it, the regulatory group that you're the director and team lead of covers

products like Zantac, as you just testified; is that correct?

A That's correct.

Q And it's fair to say for regulatory reporting purposes, really all decisions stop with you for Zantac since about 2017; is that correct?

MR. SACHSE: Objection, form.

A So I've had responsibility for the team who's had responsibility for the non-CMC and nonadvertising and promotion activities for Zantac since that time.

Q So leaving aside the advertising and CMC, my initial question is accurate. Would you like me to repeat it?

A So your -- yes, if you don't mind repeating it.

Q Sure. So in terms of the regulatory group that you're the director and team lead of, it covers Zantac, and except for CMC and advertising, really the decisions stop with you as the supervisor of that team on regulatory; is that correct?

MR. SACHSE: Same objection.

A So to clarify, I have US responsibility for the NDAs associated with Zantac in the US. So in terms of regulatory responsibility, yes. However, we do work with our cross-functional teams to make those decisions.

Q Fair enough. And in terms of US responsibility, that will be the responsibility vis-a-vis the FDA, for example, correct?

A That's correct.

Q So domestic regulatory function regarding Zantac here in the United States, that will be your responsibility. You would, of course, report to somebody else outside the United States; is that correct?

A That's correct. I do report to somebody based in the UK.

Q As far as you know sitting here today, is there any developed country in the world where ranitidine is permitted to be sold?

A I would have to go back and review information on that because there might be some areas where it might be medically critical, so I can't say for sure that that's the case.

Q Leaving aside areas or geographic regions where it may be medically critical, is there a worldwide ban on ranitidine or Zantac being sold?

MR. SACHSE: Objection, form.

A What I can say to this is that GSK has decided to recall all of the product in its global markets.

Q So GSK has recalled it, but there was some

discussion as well by GSK about reintroducing the product into the marketplace; is that correct?
A I'm not --
MR. SACHSE: Objection, scope.
A I'm not aware of that from my role.
Q Are you aware of any discussions at GSK to reintroduce Zantac or ranitidine into the US market or any other market in the world?
MR. SACHSE: Objection, scope.
A I am not aware of those discussions.
Q So you're not aware of any consideration, thoughts, contemplation, possibility of Zantac being reintroduced by GSK anywhere in the world?
MR. SACHSE: Same objection.
A I'm not aware of those discussions.
Q Are you privy to the regulatory productions that have been done in this case?
A I have reviewed the US regulatory file.
Q Is there any current intention of GSK to try to reintroduce Zantac or ranitidine in the US?
A There is no --
MR. SACHSE: Objection, scope. I'm sorry, Leslie.
A Based on the, you know, submissions that have been made and what information we have shared with FDA,

we do not have any plans to reintroduce Zantac in the US.

Q And why?

A Well, first of all, we had made a business decision a few years ago to discontinue the product for business reasons, not any safety reasons. And, you know, we have no intention to reintroduce it as there are several generics on the market at the time as well as over-the-counter availability of the product.

Q And what was the reason why it was taken off the market?

A So for a period of time, we did have active pharmaceutical ingredient or API constraints associated with the product, so, again, there was a business decision made to discontinue the product.

Q Okay. And is that true of other markets besides the United States as well? You just made the business decision to take it off because there wasn't a need for it, or was there some other reason why you took it off the market?

MR. SACHSE: Objection, scope.

A Yeah, I'm -- I'm not aware of that in my role. That would -- from a manufacturing perspective, they might have better insight there.

Q But in your role as someone here domestically

in regulatory who's signed off on submissions, for example, to the FDA where there's foreign submissions that are being submitted to the FDA, for example, or answers to questions by foreign regulatory bodies, you'd be familiar with those, correct?

A Not necessarily, because my scope of work is in the US.

Q Okay. But I'm asking you with Zantac, are you familiar with it?

MR. SACHSE: Objection, form.

A Could you be a little bit more specific?

Q Sure. Say, for example, are you familiar with what was happening in Singapore regarding Zantac?

A I may have --

MR. SACHSE: Objection, form. I'm sorry.

A So there may be situations where I might hear information, but because it's not in the scope of my daily work --

Q So I'm not talking hypotheticals now. I'm actually talking specifically. Sitting here today, as the head of US regulatory covering Zantac, are you familiar or have you familiarized yourself with what was happening by regulators in other countries and questions they were asking about ranitidine?

MR. SACHSE: Objection, form. Time period?

Q At any point in time from 2019 to present.
MR. SACHSE: Okay. Thanks for that clarification.
A Yeah, thank you for that. I think at that time there were questions that were starting to come in from regulators during that time period in 2019, so, yes, at that point I did hear about various regulators asking questions about the product.
Q Okay. And in March of 2020, when you took over individual responsibility for Zantac with the FDA, did you go back and familiarize yourself with what was going on in those countries regarding ranitidine?
A I -- I did go back and familiarize on a high level, not necessarily the details associated with that, because Zantac is a product amongst 50 other new drug applications that my team is responsible for, and we had none on the market in the US.
Q I see. So Zantac is one of 50, and you had a lot on your plate?
A I had -- we are responsible for a lot of products on our team, yes.
Q Okay. So you have a facial understanding, not a deeper understanding in terms of Zantac and what was going on in the worldwide market because of the other obligations you had; is that correct?

A At that time, yes, I did not delve into the details, but I did hear about these regulators asking questions.

Q You saw the definition of NDMA in the deposition notice, I assume; is that correct?

A Yes.

Q And you would agree that it's a known carcinogen; is that right?

MR. SACHSE: Objection, scope.

A From a regulatory perspective, it's not, you know, an area of expertise, but what I can say is what the FDA has stated, which is NDMA is a carcinogen in animals, and it is -- can be a carcinogen in humans if it is given for a long period of time over acceptable levels.

Q Understood. And that's a widely accepted position; is that correct?

MR. SACHSE: Objection, scope.

A Yeah, again, I can't say beyond what, you know, the FDA's statement regarding that from a regulatory perspective. That's outside of my area of expertise.

Q Okay. So you just -- you haven't looked at that issue beyond facially understanding what perhaps the FDA has said. Is that a fair statement?

A I have looked at information, but, again, not the expert in that area.

Q Okay. Can you tell us -- do you have an understanding of how the ranitidine molecule breaks down into NDMA based upon various factors? Do you have any understanding of that?

MR. SACHSE: Objection, scope.

A Again, from a regulatory perspective outside of my area of expertise, I would defer to the scientists within the company regarding that.

Q And Doctor, have you reviewed the root cause analysis that was ultimately done by GSK?

A I have taken a look at the root cause analysis.

Q Okay. All right. And if you -- and you've actually submitted that to the FDA on behalf of GSK; is that correct?

A We have submitted information on the root cause analysis to FDA.

Q Okay. And you understand, sitting here today, that the ranitidine molecule breaks down to into NDMA; is that correct?

MR. SACHSE: Objection, scope.

A So, again, not the expert in this area and would defer to our scientific experts on that.

Q Okay. I just want to explore your individual understanding. So I understand that you're not putting yourself forward nor is the company putting you forward as an expert in that area, but do you have an understanding -- as the head of regulatory for GSK responsible for the submissions to the FDA in making sure that this product is safe for consumers, do you have an understanding?

A I have probably a broad understanding of this, but, again, I'm not the expert in this area.

Q Okay. I gotcha. All right. In terms of the Valisure study, are you familiar with it?

A I have heard of -- heard of the Valisure study, but I have not reviewed it in detail.

Q So you haven't reviewed that study at any point in time?

A I'm sure I have reviewed it in the past but not recently.

Q Okay. Have you reviewed any other studies in preparation for today?

A And could you define what you mean by what type of studies or anything?

Q Any studies. Is there any studies that you reviewed in preparation for today?

A I have taken a look at -- it was referred to

as the Tanner study. I have taken a look at the Mitch article or study that was conducted.

Q Yep. Any others?

A There may be others, but I can't remember off the top of my head at the moment.

Q You said that you brought with you today the request for admissions responses; is that right?

A That's correct.

Q Okay. Who prepared those responses?

A So counsel prepared the responses in conjunction with, you know, a cross-functional team.

Q Who was in the cross-functional team that helped prepare them?

A I don't know.

Q Were you involved in it?

A I was involved only in the final review.

Q And how were you involved?

A I just reviewed the information with counsel.

Q Okay. And did you discuss that internally with anybody else?

A Could you repeat that question?

Q Did you discuss the request for admissions internally with anybody outside of counsel?

A No.

Q Did you review the studies that were

referenced in the request for admission?
A The Tanner study, which I had referred to earlier. The other study in the document, I'm not familiar with that one.
Q Okay. There were actually two other studies referenced; is that correct?
A I was of the understanding that these -- they're referred to by two different names, but perhaps I'm not -- I wasn't understanding that.
Q So there's Tanner. Then there's, I believe, a Bell-Smith study?
A Okay. That one, yes.
Q Have you seen that study?
A No.
Q Why?
A I have not -- we've not seen it in the archives.
Q You can't find it, correct?
A I have not been able to locate it in the -- in the regulatory archives, nor has GSK been able to locate it to this point.
Q Okay. And just to be clear in terms of those studies in the archives, that's something that you were actually working on personally; is that correct?
MR. SACHSE: Objection, form.

A Could you clarify what you mean by that?
Q You were involved in the search for those documents; is that correct?
A I have -- we have looked for the documents, yes, in the regulatory file.
Q And it's fair to say you were actually helping kind of heading up trying to find those; is that correct?
A I was part of that.
Q Okay. And in fact, it's now March of 2021. As I understand it, you-all have been looking for those studies since sometime in 2019; is that fair?
A I think that's correct. It was either late 2019, early 2020.
Q Okay. Could you just articulate for us today what is still afoot in terms of looking for those studies and where they might be if they haven't been found over the course of months, if not years at this point?
MR. SACHSE: I'm going to just object and caution the witness not to divulge any conversations with counsel on this question.
A Could you repeat your question again?
Q Yeah, it's -- it's rather straightforward, which is it's been literally months, if not going on

years now, that you guys have been looking for these -- particularly the underlying data, as I understand it, for Tanner, as well as the Bell study. And my understanding from the request for admissions is that there's ongoing searches for those, and I just would like to understand what it is that's being done to still look for those? Where could they possibly be if they haven't been found to date?

A So I can speak from the US archives. We've looked through the regulatory archives and have not located them there. There are other archiving, you know, systems. There are also maybe boxes of information in places. So because this is such an old study, we, you know, have not been able to locate it to this point as outlined in the company document.

Q So you searched the US, and you're fairly certain, sitting here today, it's not in the US. Is that a fair statement?

A Could you clarify that question what you mean by "not in the US"?

Q So you said that you could speak to the US search, and so it's really a question for you. What do you mean by that? And when you mean -- when you refer to that, is that something domestic or you're just saying what you have access to from the United States?

Help me understand that.

A Right. I mean, personally, my team has looked through our regulatory US archives and have not seen to this point that it was submitted to FDA prior to 2019.

Q And when you say "regulatory US archives," help me understand what you mean. Like, is there a name for this? Is it just the FDA communications? Help me understand what you mean.

A So the system that would have been utilized at that time for archiving information is called Cards, and so we reviewed that information.

Q Okay. So Cards was reviewed and nothing in there is showing that it went over to the FDA, for example; is that correct? For Tanner?

A For Tanner, to date, we have not located that.

Q Okay. And the same is true of the Bell study; is that correct?

A That is correct. We've not located that particular study.

Q And what about the Broom study, which is also referenced?

A I have not seen that study, but I have to admit I have not been looking for that specifically in US regulatory archives.

MR. SACHSE: And I'm sorry, Eric. Just for

the record, that's also -- we refer to that as the Manchee study.

BY MR. CHAFFIN:

Q Okay. And does that help you, Dr. Driver, in terms of the Manchee study?

A I don't recall if -- looking for that study.

Q Do you know where the Tanner study was conducted? Was it domestic or was it in the UK or someplace else?

A It was conducted in the UK.

Q And how about the Bell study? Do you know where that was conducted?

A No.

Q Manchee? Same question.

A No.

Q Okay. Is it possible that all three of them were done in the UK?

A It's possible, but I wouldn't want to speculate.

Q And it's fair to say that even the US regulatory group and the domestic people working on Zantac, they weren't aware of these studies as of 2019; is that correct?

MR. SACHSE: Objection, form, foundation.

A Based on our initial review, I'm not -- we in

regulatory weren't -- weren't aware in the year.

Q So it's fair to say that as of the submission to the FDA in August of 2019, that the regulatory people in your group were not aware of these studies, as far as you know; is that correct?

A That's correct.

Q And it's fair to say -- and we'll get into it more later -- that these studies were not part of the risk assessment that the regulatory group or others working with your group would have been considering prior to that time period because it wasn't available to them. Is that a fair statement?

MR. SACHSE: Objection, scope.

A I can say from a regulatory perspective, we weren't aware of them, so it wasn't a part of that assessment.

Q So any assessment of a signal in the marketplace regarding NDMA, for example, that would have not been part of it because you simply weren't aware of it?

MR. SACHSE: Objection, scope.

A We in regulatory weren't aware of it.

Q Okay. And certainly regulatory you didn't receive any risk assessment or analysis after Mitch, for example, that referred to the Tanner studies or the

information there, for example, or the Bell study or Broom, any discussions about risk assessment or potential signal from Mitch, for example; is that correct?

MR. SACHSE: Objection, form and scope.

A Could you repeat the question? I'm not clear.

Q I just want to be clear, and I think -- you know, this at some point will be played for ladies and gentlemen of the jury, and I want them to have an understanding in terms of what the regulatory group knew at GSK. So we first know that these studies the regulatory group was not aware of until at least sometime after August of 2019; is that correct? You agree with that?

A I agree with that.

Q Secondly, if you're not aware of them, it certainly could not be -- it could not be considered for purposes of an evaluation of a potential signal for NDMA coming out of ranitidine, for example; is that correct?

MR. SACHSE: Objection, scope.

A I -- I can't speak to that. I'm not the scientific expert in that area, so that would have to be assessed by --

Q It's not a scientific question, Dr. Driver, and I understand you are a doctor and certainly that's

where you're going to go, but that's not a scientific question. It's a simple question any juror's going to want to know the answer to, which is if you in regulatory are responsible for communicating with the FDA -- and we'll get into it -- about a potential signal, for example, regarding NDMA coming out of ranitidine, that is something that the regulatory group would be responsible for communicating to the FDA about; is that correct?

MR. SACHSE: Objection, scope.

A So what I can say to that is that if the cross-functional team that consists -- that are the experts in that space make a decision that it does demonstrate -- if it were to demonstrate a signal generally, then they would provide that information to regulatory so that we could notify regulators.

Q So what you're saying is that until the other group tells you information, you don't have a responsibility to report something to the FDA; is that correct?

MR. SACHSE: Objection, form, misstates testimony, foundation.

A So as I had just stated in my answer, once the cross-functional team determines that there may be a signal, in general, with any product that is being

evaluated, then that information is conveyed to regulatory so that we could submit information to the FDA, if need be.

Q Okay. We'll circle back to this. Let's -- let's jump into a different area here for a minute. Let's switch gears.

From a regulatory perspective, what does the NDA request represent and what gets approved with an NDA? Can you help us understand that?

A So when you say an NDA request, could you be --

Q Yeah, when -- so, for example, GSK is the innovator for Zantac; is that right?

A That's correct.

Q And so back in the late '70s, early '80s, there was a new drug application submitted by GSK to the FDA for approval of Zantac; is that right?

A For Zantac tablets.

Q Zantac tablets. Thank you. And at that point, what was the milligram dosage?

A At that point, it was 150 mgs.

Q Okay. And so in terms of the request for approval, GSK was asking for approval to market and sell the tablets; is that correct?

A Correct.

Q And it was asking for approval of the labeling, for example; is that correct?

A Correct.

Q And a label would include, for example, the description of what the indication of usage is; is that correct?

A Correct.

Q Include instructions for use?

A Yes.

Q Include instructions for storage temperatures?

A Correct.

Q And maybe also temperatures applied for shipping of the product?

A That may not be stated necessarily in the position labeling.

Q Was it for Zantac at any point in time?

A Could you repeat that? I'm not clear --

Q Was it stated for Zantac at any point in time in terms of the temperature?

A Stability data have always been reported in our labeling --

Q Okay.

A -- packaging for Zantac.

Q And by "stability," you're referring to temperature, for example; is that correct?

A Yes.
Q Humid --
A (Indiscernible) conditions.
Q Humidity as well; is that correct?
A It does say to store in a dry place.
Q Okay. And besides that for stability, you would also include an expiration date; is that correct?
A Expiration dating would be on the packaging of the product.
Q And anything else on stability besides that?
A Not to -- not that I can recall.
MR. CHAFFIN: Just briefly, I want to bring up for a second, if we could have marked as Exhibit 232, Dr. Driver's CV.
(Exhibit No. 232 was marked.)
BY MR. CHAFFIN:
Q Dr. Driver, I know you've seen this before. I assume it's something you prepared at some point in time and you gave to counsel for production for this deposition; is that right?
A Correct.
Q And in terms of your professional background, I'm not going to belabor it, because I think it's outlined in pretty good detail here. You actually have quite a bit of experience in labeling at GSK; is that

correct?
A Yes.
Q And in fact, you actually started originally, you know, in different areas, but then you actually became director of labeling strategy in 2013, '14; is that correct?
A That's correct.
Q Okay. And then your current role you've served, I guess, you have director of US classic and established products from April 2014 to April 2017, and then I understand you were promoted or maybe the title changed to director and team lead; is that correct?
A That's correct.
Q Okay. And what --
MR. HOLLANDER: I'm sorry. I've got the exhibit in the share folder. Do you want me to bring that up on share screen as well?
MR. CHAFFIN: Yeah, why don't we do that. Thank you.
BY MR. CHAFFIN:
Q And could you just help me understand in terms of what is referenced by US classic and established products? What does that mean?
A That means the products that are older products. They are mature products within GSK.

Q And that would be Zantac, for example; is that right?
A Yes.
Q And in terms of the label for Zantac -- you know what? We can actually take that back down. It's fine. Thank you.
In terms of the label for Zantac -- I take that back.
In terms of the NDA for Zantac, you would agree that the request and the approval by the FDA really pertains to both the tablet and the label for the product; is that right?
A When a product is approved, the labeling is approved as part of that approval.
Q Gotcha. And in terms of stability, is there anything else besides temperature, humidity and expiration date that's referenced in terms of stability regarding Zantac in particular that you're aware of?
A I would have to refer to the label just to be -- to be sure.
Q All right. In preparation for your deposition today, did you familiarize yourself with the publicly available information with the FDA related to Zantac?
A Yes. I have reviewed that information on FDA's website.

Q And in preparation for today, did you review and familiarize yourself with any of the Zantac labels during the time that GSK has marketed and sold Zantac, which I guess has been since the beginning?

A I have reviewed the current label as it stands, and I may have reviewed some information in the past.

Q Okay. And the same -- have you reviewed the information pertaining to storage temperature instructions, for example?

A Yes.

Q And you agree that the instructions related to humidity and temperature on the label should be followed throughout the life of the product from the date of manufacture forward; is that correct?

A That's correct.

Q And you agree that from a regulatory standpoint, the product owner has the responsibility to watch for adverse events occurring with a product like Zantac; is that correct?

A That is something that any sponsor of a product approved in the US would do.

Q And that responsibility actually stays with or stayed with GSK, even if it sold the product to somebody else, because it's the NDA holder; is that correct?

A There are situations, for example, Zantac injection was sold to another company throughout -- several years ago, and other formulations have either been discontinued or sold along the way.

Q Okay.

A So we -- I was just going to add on to that. So as for what we are NDA holders for, we have responsibilities.

Q And those responsibilities include, for example, reporting adverse events even if you're just the NDA holder and you've sold the product; is that correct?

A The new NDA holder would actually be responsible for reporting that information to FDA.

Q Okay. And would there be any continuing obligation to report information to the FDA regarding any signals in the marketplace if you're the NDA holder?

A Yes. Generally speaking, yes.

Q So the actual monitoring of the safety of the products stay with the NDA holder. The only way to really release that is to actually release the NDA or to cease carrying it, correct?

A That's correct, unless there are situations in place where you still may be the global manufacturer and you might have to exchange safety information.

Q Help me understand what you mean by that or give me an example.

A So, for example, globally we still manufacture ranitidine inject -- or Zantac injection's a good example where we globally in other countries have that available but in the US we have sold it to another company, so there may be what's called a safety data exchange agreement in place, but ultimately, the NDA holder of Zantac injection in the US would report information to FDA.

Q Gotcha. And from a regulatory standpoint, would the NDA holder have the responsibility to make -- to reasonably ensure that their product consumed by a patient is not contaminated?

A Could you be a little bit more clear what you mean by that?

Q Yeah, so as the NDA holder, would GSK have the responsibility to ensure that consumers are not consuming a product that's been contaminated by a contaminant?

A Yes.

Q And that will be true of the product owner as well; is that correct?

A Correct.

MR. SACHSE: Objection, form.

Q And from a regulatory standpoint, the product owner has the responsibility to make reasonably sure the product to be consumed by consumers is not degrading to the point that it's changing from the approved chemical structure; is that correct?

A That's a --

MR. SACHSE: Objection, form.

A And I would also say that from a regulatory perspective, that I'm not, you know, the expert in that -- in that space.

Q I'm not sure I understand what you mean.

A So, you know, what you're describing in terms of degradation is, you know, a scientific and manufacturing-type matter, so I really couldn't speak to that, so I would defer to our pharm --

Q So if a product is degraded beyond what its chemical structure is supposed to be, what is your understanding, as the head of US regulatory, as to whether or not that product can be sold to consumers?

A So are you -- could you clarify are you talking about a tablet situation or when it's administered in your body? What's --

Q Start with a tablet. If a tablet has degraded to the point that it's no longer the approved chemical structure, is it permitted to be sold in the US from a

regulatory standpoint?

A Again, I would --

MR. SACHSE: Objection, form.

A I would need to defer to our pharmaceutical supply chain as well as our, you know, chemists in that space.

Q Let's make it simple. If someone comes to you at the company and says, "Hey, we have a bunch of ranitidine that is no longer the chemical structure that was approved by the FDA and we want to sell it. Are we allowed to sell it?" What would you tell them?

A I would say the cross-functional team within the company really needs to evaluate that further. And then if there's a determination made at that time that there's an issue, then at that point, it would be something that we would communicate to regulators.

Q So if I understand your testimony -- and I don't want to put words in your mouth. I just want to make sure we're clear. As the head of US regulatory, it's your understanding that GSK could actually change the chemical structure and not be approved by the FDA and then sell that product to consumers without any regulatory problems?

A I don't think that that's what I was describing.

Q Okay. I mean, that's the logical conclusion of what you're describing, so help me understand. I just want to -- you know, I'm trying to understand what the duty is. You know, what does regulatory do? Does it actually have teeth at GSK? Is it able to say, "No, we're not selling that because it's degraded, and we're not allowed to sell that degraded product?" Or are you just "That's someone else's responsibility," and, if so, whose is it?

MR. SACHSE: Objection, form.

A So I would say, again, it's a cross-functional team that would evaluate that and make decisions around what needs to be communicated to regulators.

Q And who would step in and say, "Hey, guys, you can't do that?" Is that you, or is that somebody else?

MR. SACHSE: Objection, form.

A And when you say "do that," could you describe what you're referring to?

Q Yeah, I mean, where -- like, if, you know, who's -- who's watching over things? Is that you, or your job is just "We report stuff to the FDA"? You know, who decides "Can we do this or not do it?" I mean, does anyone maybe the decisions in your department, or you're just there to report to the FDA what they tell you to report to? That's what I'm trying

to understand.

MR. SACHSE: Objection, form and misstates testimony.

A So what I'm trying to describe is that it is a cross-functional group, a cross-functional team that makes decisions like that. We can offer advice. And then we also, if need be, approach FDA and, you know, work with FDA and communicate information about our findings.

Q Okay. But look, I mean, I'm asking you, I think, some rather simple questions and they're not that controversial, and that's, frankly, why we keep going around about this. But discolored pills, for example. You guys, whether domestically or foreign, you guys have pulled them off the market when the pills become discolored, for example, to the extent you're aware of it; is that right?

A I am aware of a situation where that did occur.

Q You recall, then, right? Right? Because there's a concern that the humidity, temperature, whatever it might be, has broken down the chemical structure of those pills and they're not safe for consumers. That's a concern, correct?

MR. SACHSE: Objection, scope.

A Yeah, I don't think that I'm in the position -- the expert in that area to determine whether that was degradation.

Q If you could just tell the ladies and gentlemen of the jury, then, what is the purpose and function of the regulatory department at GSK other than simply reporting information to the FDA? Is there a purpose to it? Is it -- is it there for the safety of a consumer? Is there -- what is it there for? Could you tell us what your mantra is, what your goal is, your focus is? Can you tell us that?

MR. SACHSE: Objection, form.

A I mean, our goal is to interface with the regulators, and it's based on, you know, information from a group of people across the organization from different areas.

Q Okay. So other than interfacing or communicating with regulators, is there any other purpose? Is it -- is it for the safety of the people?

A I would general --

MR. SACHSE: Objection, form.

A In general, I would say that, I mean, the reason that pharmaceutical companies exist is to ensure that their products are safe and effective for patients.

Q And so if a product is degraded to the point

it's no longer in the approved chemical structure, there might be some concern it is not safe for consumers and you wouldn't want to sell that product. Is that a fair statement?

A I'm not sure that's a fair statement because I think there would be more that needs to be investigated in order to come to that conclusion.

Q Okay. So certainly if -- if there's degradation and there's some concern, you'd want to investigate it. That's what you're saying?

A That's correct.

Q And that would certainly be a proper thing to do in order to make sure that the public safety, the consumers are safe in using those products, is to do an investigation, correct?

MR. SACHSE: Objection, form and scope.

A Again, I would defer to my colleagues, my expert colleagues within our organization about making those types of decisions.

Q Yeah, okay. And so, again, if the goal of the pharmaceutical company is to keep people safe, if the goal of the pharmaceutical company interacting with the FDA regulatory is to make sure they're selling safe product, part of that, as you've already said, is to investigate the safety of the product if they see

something that may be of concern; is that correct?
A That's correct.
Q It wouldn't be to hide studies in the UK, for example, correct?
MR. SACHSE: Objection, form.
A Um, I --
Q You agree with that. You wouldn't want anyone in your company hiding studies or keeping them in the UK and not disclosing them to the US; is that right?
A Just in general we would not want anybody hiding information.
Q You would want to make sure that the people, whether it's your group or somebody else in the company, has full access to information regarding ranitidine breaking down into NDMA; is that correct? You'd want that information, right?
MR. SACHSE: Objection, form.
A I would -- I would need to, again, defer that to our scientific experts to make decisions on that information.
Q Okay. Because US regulatory is not your area. That's somebody else; is that right?
MR. SACHSE: Objection, form.
Q I just want to be clear. Dr. Driver, if you're telling me, "Eric, that's not my responsibility,"

I don't have to ask you anymore questions on that. It's somebody else. It's not your responsibility. Is that a fair statement?

A Again, we work as a cross-functional team within the organization, and that information is presented to regulatory if it needs to be submitted to regulators.

Q Okay. And certainly from the regulator standpoint and your standpoint, you only get it if they give it to you, correct? So whoever that is, these people we're going to talk about before you, it's really up to them to do the right thing. Only then can your group do the right thing; is that right?

MR. SACHSE: Objection, form.

A So we work -- we are part of teams, of these cross-functional teams as well, so we may provide advice and guidance in this space as well. But in terms of, you know, the conclusions set forth by the scientific information provided, that goes back to the groups that are responsible for the data.

Q Right, because you have a doctorate degree but you're not a scientist. You rely upon those people to tell you information to then report to the FDA; is that right?

A We do.

Q And you rely upon those people to gather complete information and look for a signal, for example, and report it to you so you can actually have an honest conversation with the FDA. You count on that, don't you?

MR. SACHSE: Objection, form.

Q That's something you want as -- as the head of this group, that's what you count on; is that right?

MR. SACHSE: I apologize. Objection, form.

A So in terms of counting on, yes, I mean, we do have experts in our company and we do rely on those experts to provide information and data because they are the data-generating group.

Q Understood. And so as with any data, you know the saying "garbage in, garbage out," right?

A I've heard the saying.

MR. SACHSE: Objection, form.

Q You know what that means, right? Garbage in, garbage out. Give you garbage data in, you get garbage conclusions coming out, correct?

A Yes.

Q Okay. And incomplete data coming in, incomplete results coming out; is that right?

MR. SACHSE: Objection, form.

A Yes.

Q And only when they realize they missed something do they come running to you; is that right?

MR. SACHSE: Objection, form.

Q Tanner, for example. They can't find it. They come you to, right? They look for the underlying data, they can't find it, they come you to, right?

MR. SACHSE: Objection, form.

A They were looking -- go ahead.

Q Go ahead. They were looking for?

A They were looking to see if we had submitted it previously, yes.

Q Yes, submitted it to the FDA because no one told the FDA since 1982 about the Tanner study until 2019, right?

MR. SACHSE: Objection, form, foundation.

Q Am I right about that?

A Based on our assessment, we have not been able to locate it. But this was an issue in general, the nitrosation issue, that was transparently disclosed to FDA back in, you know, 1980 prior to the approval of this product. And when it was recognized in 2019, when this study was located, we did immediately share that information with both EMA as well as FDA.

Q Okay. So just to be clear, you've been with the company how many years?

A 20.

Q 20 years. And you've been working on the group that oversees Zantac regulatory for how many years?

A I guess seven -- seven years.

Q Seven years, right? And during that entire time, your group has no idea the Tanner study exists, correct?

A That's correct, but we wouldn't have a reason to -- to be involved up until 2019.

Q Gotcha. And you wouldn't have any reason to be involved and you wouldn't have any reason to tell the FDA about it. Just a nonissue from your perspective; is that right?

MR. SACHSE: Objection, form, misstates testimony.

A When it became known to us, then we started, as I mentioned earlier, looking for the study. And when we did locate it, we shared that information with FDA.

Q Just pause for a second. I want you to define "us" when you say that. When you say "when it became known to us," what do you mean by that? Your group or someone else?

A When it became known to us --

Q Who's "us"?

A -- our group and I would say our cross-functional team as well, when that study was located.

Q Okay.

A And I think one important point to note here is that FDA was asking a specific question that related to the data from the Tanner study in 2019, and EMA was also asking a similar question. So we reviewed that information and submitted it to those agencies in response to a question that we had not been able to locate that information previously, so we're being very transparent.

Q So just to be clear, what I heard you to say is if the FDA on August 6, 2019, had not asked the specific question that it did, you guys would have never told the FDA about the Tanner study?

A I would --

MR. SACHSE: Objection, foundation.

A There -- and I would refer to our corporate document on this too about the outlines, the science around this and, you know, the reasons that, you know, it might not have ever gotten submitted previously. But it was an answer to a specific question around the NDMA. We were asked if we specifically had looked at this.

Q And in fact --

A And when we located the information, we shared that.

Q And in fact, what you found out was is that GSK had internally done a study that was published internally secretly in the UK in 1982 that actually mimics the Valisure study that came out in 2019; isn't that right?

MR. SACHSE: Objection, form, foundation, misstates the evidence.

A And I would say here that I'm not the expert in that area in terms of if that mirrors Valisure or not.

Q So if it mimics Valisure, that would be somebody else who would know that information. You wouldn't know anything about that; is that right?

MR. SACHSE: Objection, form, foundation and scope.

A I would not -- I would not know that because I'm not the scientific expert on that study.

Q So just to back up a step, so we have this Tanner study. Your group has no idea it exists. You're asked a specific question in August of 2019. The question gets answered, and that study is not disclosed to the FDA even though it's on point to the question they're asking; is that correct?

A But we had not --

MR. SACHSE: Objection, form, foundation.

Q My only question is at that point in time, GSK had that study because it actually originated the study, correct?

A Yes.

Q It had been around since 1982, correct?

A Correct.

Q Sitting here months later, it was never given to the FDA before 2019, correct?

A Based on our evaluation of the regulatory archive, to date we haven't been able to locate that up until the point of August 2019.

Q And is it fair to say that Dr. Driver in her 20 years at the company as well as her number of years of working on Zantac that she wasn't aware of the Tanner study before 2019; is that correct?

A I was not aware, but I would not have been expected to be aware of that information.

Q And no one else on your team was aware of it; is that correct?

A That's correct.

Q And no one else on that cross-sectional team that we'll go over, no one knew about the study, correct?

A Not to our knowledge.
Q So it's fair to say that that Tanner study from that cross-sectional team to you and everybody around the product with GSK, at least domestically US, didn't know about this Tanner study; is that correct?
A We did not. But when we located the study, as I've mentioned, we pro --
Q I get it. You fixed it once you -- once you learned about it, but you didn't know about it is my point; is that right?
MR. SACHSE: I'm sorry, Eric. Please let her finish answer --
MR. CHAFFIN: I will. I just want to make sure I get the answer to the question I'm asking, though.
MR. SACHSE: Fair enough, but you cut her off.
BY MR. CHAFFIN:
Q You can finish, Dr. Driver.
A Could you repeat the question, please?
Q My question is that, yeah, once you learned about it, you told the FDA. I get that. You fixed the problem. Okay? But my point is you didn't learn about it until sometime September of 2019; is that right?
A That's --
MR. SACHSE: Objection, form, foundation.

A I mean, that's correct. But, again, I just want to reiterate that when we found it, we did submit it to EMA and FDA.

Q Understood. And so you agree with me, Dr. Driver, that certainly in any risk assessment of ranitidine and Zantac being sold in the US, at least during your time at the company, the Tanner study before that time in 2019 when you learned about it was not part of any risk assessment that you saw on the product; is that correct?

MR. SACHSE: Objection, form, foundation.

A I may have not been involved in a risk assessment at any point in time. I don't recall being part of that.

Q So certainly -- you know, you didn't recall seeing a risk assessment and certainly not one where Tanner or these other studies at issue were discussed; is that correct?

A No, I wasn't aware.

MR. SACHSE: Scope objection.

Q And if someone else at the company said that the Tanner study mimics Valisure, you would have no reason to dispute that, would you?

MR. SACHSE: Objection, scope. Sorry. Objection, scope and foundation.

Q Is that correct?
A Well, that would be outside of my expertise.
Q You would defer to the person who made that statement, correct?
A Correct, assuming there was somebody who made that statement.
Q Okay. Fair enough. And Dr. Driver, in terms of -- in terms of the Valisure study, you're certainly familiar with and we're going to go over what happened in 2019 and '20 regarding this product, but you're aware that the Valisure study is a big part of what caused regulators to investigate and eventually led to ranitidine essentially being in a worldwide ban around the United States and around the world, correct?
MR. SACHSE: Objection, form.
A I would -- I would need to again defer to someone else with that expertise.
Q Yeah, but, you know, Dr. Driver, I'm going to let you do that all day on science issues, but on factual issues where the FDA has said to you, has said to your group, "We got a study from somebody and now we're investigating this. It's a private lab," you know that private lab is Valisure, correct?
A Correct.
Q And that's what started all this, right?

MR. SACHSE: Objection, form and foundation.
Objection, form.
Q It's just a factual question, Doctor. I'm not asking you a scientific question. As you understand it, what was the thing that set all this off that's caused you guys can't sell this product anymore? What caused all this to be set off?
A So let me be clear that we had already discontinued the product in the US by --
Q Understood. But what stops you from going back and doing it? What's caused Singapore to stop you from selling it? What started all this? It was Valisure, correct?
MR. SACHSE: Objection, form.
A So I can say that the information that we got from FDA was a -- was a question. They had received information from a private analytical laboratory, and they did ask us questions around that.
Q Exactly. And that's what started all this here in the US with the FDA, correct?
A That's correct.
MR. SACHSE: Objection, form.
A That was the first time we had heard that in August.
Q And if I'm correct, Dr. Driver, if I'm correct

that that Tanner study mimics the Valisure study, it took the FDA --

A I --

Q Let me finish. It took the FDA until 2019 to start something it could have started in 1982 if these other people in the UK or otherwise in GSK had simply told your group about the Tanner study; isn't that correct?

MR. SACHSE: Objection, form. Objection, form, foundation, misstates the evidence.

A So I would say that that's not the case.

Q And why isn't that the case? Love to hear.

A So we have to think going back to the early '80s, as I've mentioned earlier, there was a discussion on several occasions about the nitrosation issue with ranitidine, and ultimately that product was approved in the United States.

Q Okay. So the general discussion about nitrosation is what you're going to hide behind; is that right?

MR. SACHSE: Objection, form, foundation.

A So I'm just stating what -- in review of the regulatory file, nitrosation was something that was communicated and discussed with the FDA on multiple occasions --

Q But nothing about NDMA.
A -- from the early '80s.
Q But not NDMA coming out of the product in the face of gastric flu, for example; is that correct?
A So there was information presented at that time, again, regarding nitrosation, not specifically NDMA.
Q Yeah, they never mentioned it, right? We don't see it mentioned at any point in the NDA process, correct? No mention of NDMA, correct?
MR. SACHSE: Objection, form.
A I didn't see it in my review.
Q You didn't see it and you're not going to see it. I've looked at it too. You didn't see it in the AdComs. There were two AdComs. No mention of NDMA coming out of the product. No mention of Tanner, correct?
MR. SACHSE: Objection, form.
A Based on my review of the transcripts and the files, I did not see NDMA.
Q Nothing, right? You know, I kind of analogize this to, you know, kids going to a party and say, "Oh, yeah," you know, "There may be some drugs there," and they talk about marijuana, but they don't talk about the cocaine that was there. That's how I think of it,

right?

MR. SACHSE: Objection, form. I'm sorry.

Q I'll withdraw it. So you're talking about nitrosation, like, this umbrella sort of nitrosation, but never a discussion of Tanner, never a discussion of NDMA, never a discussion about it at any point in time with the FDA, correct?

A Based on my review of the files, I did not see that information.

MR. CHAFFIN: All right. Why don't we take a break for a minute. Is that good for you, Dr. Driver?

THE WITNESS: Good.

MR. CHAFFIN: All right. Great.

MR. SACHSE: Eric, how long do you want?

MR. CHAFFIN: Let's take ten minutes.

MR. SACHSE: Okay, great. We'll be back at, like, say, 10:25ish?

MR. CHAFFIN: That's perfect. Thanks, Will.

MR. SACHSE: Okay, great.

THE VIDEOGRAPHER: Going off the video record. The time is 3 --

MR. HOLLANDER: Before we go off the record, I just want to make sure. I don't think we officially marked Exhibit 231 as the notice. We

just sort of presented it, so I just want that on the record.

MR. CHAFFIN: Then I just want to be clear. So 231, if we could have it marked -- I'm not sure how you're doing it remotely. I apologize. So 231 marked as the notice, and then I believe 232 would then be the CV.

MR. HOLLANDER: Correct.

MR. CHAFFIN: Thank you.

THE VIDEOGRAPHER: Going off the video record. The time is 3:13 p.m. GMT, 10:13 a.m. EST.

(A 16-minute recess was had.)

THE VIDEOGRAPHER: Going on the video record. The time is 3:29 p.m. GMT, 10:29 a.m. EST.

BY MR. CHAFFIN:

Q Dr. Driver, welcome back. Just to jump into a few things. If GSK had determined that cancer was an adverse event associated with Zantac during the time that it sold Zantac, GSK could have changed the label to warn about that; is that correct?

A If it were something that was identified by our safety department as a safety signal, that would have been evaluated and determined if it would have been appropriate to submit to include in the label.

Q So first you had the evaluation, and then if

the conclusion was that it was associated, then it would have been something GSK could have done, which was change the label; is that correct?

A That's correct, if that were the case.

Q Okay. And if GSK had determined that Zantac was breaking down and forming NDMA when it sold Zantac, GSK could have removed the product from the market, correct?

A If that were evaluated within the company and determined that that was an issue, they could have, you know, moved forward and in partnership with the FDA had those discussions.

Q And ultimately remove it from the market, correct? GSK has that ability to do. We're not selling it because it's associated with NDMA. We're going to stop selling it. GSK had that ability, correct?

MR. SACHSE: Objection, form.

A Could you repeat that question?

Q Sure. Just a simple question, I think. If GSK had determined that Zantac was breaking down and forming NDMA when it sold Zantac, GSK had various options, one of which was to remove the product from the market; is that correct?

A If it was evaluated and determined that there was risk associated with that issue -- again, not the

expert in that area -- but if it was determined to be the case, then they could have taken some sort of action.

Q And the sort of actions is what I'm asking about. One action could be remove the product from the market, correct?

A That could be one action in general with any product.

Q Understood. Second action could be make a label change to warn about the adverse events associated with NDMA, correct?

MR. SACHSE: Objection, form, scope.

A So that's making an assumption that there are adverse events associated with NDMA as it relates to the product so --

Q Okay.

A -- that would need to be evaluated by our safety group to determine if that were the case. And if that was determined, then we could move forward with, you know, negotiation with FDA about a label change.

Q And just to take a step back here for a second here, I just want to be clear because I know you're a doctor and I just want to make clear what opinions you're offering. So you're not offering any opinions about adverse events associated with NDMA, as I

understand it; is that correct?
A That's correct, in terms of Zantac.
Q Are you offering opinions about adverse events associated with NDMA related to another product?
A No.
Q Okay. And so one option, remove the product. Second option is warn about potential adverse events. That's an option, correct?
A That's an option for any product.
Q Okay. And a third option might be a label change to establish recommendations to prevent Zantac from breaking down into NDMA in the first place, correct?
A Again, if there was an evaluation that determined that to be the case, that would be an option.
Q Understood. And so just to put a little bit more meat on the bone with that, that might be, for example, changing the temperature and humidity exposure for the product; is that right?
A If it were evaluated that there needed to be a change, yes, then that would be put in the label.
Q Okay. So changing the stability sort of instructions in labeling; is that right?
A I'm not sure what -- could you repeat that question? I'm not clear what you're asking.

Q So changing a label to establish recommendations to prevent Zantac from breaking down into NDMA, as I understand from the root cause analysis, that could, for example, entail instructions or warnings about temperature and heat; is that right?
A If there were any need to change the stability information that would impact temperature and heat, that is one mechanism, in general, that could be done is change the label.
Q Understood. Thank you. And then in terms of GSK, it had a responsibility to provide truthful and accurate information about ranitidine to the FDA; is that correct?
A That is correct.
Q And it has an obligation to not exaggerate the benefits of the drug to consumers; is that correct?
A That's correct.
Q And it has an obligation not to minimize risks associated with ranitidine; is that correct?
A That's correct.
Q And it has an obligation to warn about risks if a reasonable association is seen with an adverse event; is that correct?
A Again, I would defer to my safety colleagues around that type of evaluation, but if it were

determined that there was an issue, yes, we would notify FDA.

Q Okay. I just want to be clear because, again, it has a duty to warn about risks if there's a reasonable association regarding a particular adverse event or type of adverse event, correct?

MR. SACHSE: Objection, asked and answered.

A Yes. I'll refer to my previous answer.

Q And maybe I didn't understand your previous answer and so I'm asking for clarification. You agree that the standard is if there's a reasonable association between the adverse event and a risk for the product. Do you agree with me on that?

MR. SACHSE: Objection to the extent you're asking for a legal opinion here.

Q I'm just asking for a perspective as, you know, head of regulatory for the US, if she has one. If you don't have an opinion, just tell me you don't have an opinion.

A I would defer that -- that information to my safety colleagues to make that determination.

Q So if they come back and say, "Hey, there's a reasonable association here," do you then say, "Okay, we've got to talk to the FDA and make sure that we warn about this for consumers because that's part of our

obligation," or do you say, "Hmm, that's interesting, there's a reasonable association?" Like, what do you do with that?

MR. SACHSE: Objection, form, and, again, to the extent it calls for a legal conclusion.

Q If anything, for you, like, what do you do?

A So the --

Q The answer is maybe you go talk to legal, but I just want to understand what you did. That's all. I don't want to interrupt you, but I just want to understand what you do.

A So I will refer again back to our safety colleagues and legal might be part of that to help interpret what that means.

Q Okay. So if there's information that comes about that shows a reasonable association with a particular adverse event, your response is talk to legal and talk to the safety folks and then maybe you do something. Is that a fair statement?

MR. SACHSE: Objection, form, misstates testimony.

A What we would do is work as a team, and, again, safety would make that determination as well along with legal to review that information and determine if it rises to the level of needing to inform

FDA.

Q Understood. And so -- but just to be clear in terms of -- and we'll get into this a little bit more -- but in terms of informing the FDA, you know, you obviously have an obligation to provide truthful and accurate information to the FDA, correct? We talked about that. And certainly you want to create transparency about the product, and you have an obligation to report adverse events to them; is that correct?

A That's correct.

Q And so if there is a reasonable association with an adverse event, you'd have an obligation to disclose that to the FDA. Whether a label change or something happens as a result, maybe, but you have an obligation to disclose that to the FDA. Is that a fair statement?

MR. SACHSE: Objection, form, and to the extent it calls for a legal conclusion.

A I would again refer to our safety colleagues, like, Steve Hobbiger, for example, would be able to better answer that question regarding the association piece.

Q Okay. But I guess -- and let me just make sure what you're deferring to Steve -- and is it

Dr. Hobbiger? Is that who it is?

A Correct.

Q -- to Dr. Hobbiger. You know, just -- I'm trying to figure out who at the company makes a decision about what gets communicated to the FDA? Is that you or is it somebody else? I guess that's my question.

A In terms of providing the information to FDA, that would be me. But there are groups of people depending on the topic that, you know, are the data generators or the ones that are responsible for that information. In this case, the safety group within GSK is responsible for making that determination.

Q Okay. So just to be clear, so that safety group makes the determination about whether the information goes to the FDA. You're simply the conduit to it going there is what you're saying to me; is that correct?

A I am the individual who would provide that information to the FDA.

Q Okay. And so this other group, the Hobbiger group people sort of cross-functional team, perhaps, that we haven't gotten into yet, who are they and what do you call them at GSK, if you could take me through that, please?

A So our global safety group, they're

responsible for the safety of all of our products globally, and they do evaluations of all of our products to ensure that they're safe and effective.

Q Okay. And those are separate from the people that interact with the FDA, correct?

A Yes.

Q You're kind of the Chinese wall between the FDA and them. Is that a fair statement?

A I'm the liaison.

Q Liaison.

A Yeah.

Q All right. And so really whether something goes to the FDA is kind of over with them. You're the conduit to go there. And if they don't give it to you, it doesn't go to the FDA; is that right?

A I would say that that's -- that's true.

Q Okay. And I think we went over it before. With Tanner, global safety group, somebody has the Tanner study, never made it to you, never made it to FDA as far as we know sitting here March 3rd, 2021; is that correct?

A Up until 2019, we do not have any evidence that was submitted.

Q And then that global safety group, who's the head of that group?

A Currently, it's Yens, and I have to go back and review his last name.

Q Okay. So why don't we do this in the interest of time. One is I've got some organizational charts, which I think there's, like, 23 pages that your attorney was kind enough to kind of cull out for us which will save us some time, so we'll go through that in a minute. But in the meantime, as to the Zantac product -- excuse me. I'm drinking water as I do this. I should stop.

So as to the global safety product related to Zantac -- scratch that.

As to the global safety group, who was involved with Zantac sort of from the 2019 period forward and then we'll cover the time period before that, if you could walk us through generally?

MR. SACHSE: Objection, scope.

MR. CHAFFIN: Help me out, Will. What's the -- what's the issue because I just want to understand?

MR. SACHSE: Sure. So I think that that's going to be a better question for Dr. Hobbiger in his role as the PD witness.

BY MR. CHAFFIN:

Q Okay. So let me ask it a different way. And I appreciate that, Will. It'll save some time.

MR. SACHSE: Sure.
Q From your perspective, who is it that kind of has the -- who's the puppeteer over there? Who's the person who's in control that you kind of interact with? Who's the person that's going to give you information that you're like, "Hey, I need to talk to the FDA about this," who do you go to over there? Is it Dr. Hobbiger? Is it -- is it Andy Searle? Is it Jim Harvey? Who is it over there?
MR. SACHSE: Objection, form.
A Could you maybe clarify exactly for what topic you're referring to?
Q Zantac (ranitidine). Let's start there.
A It would -- it would depend on the topic.
Q NDMA.
A So could -- could you ask -- I'm not sure of the question. I'm sorry.
Q The risk of NDMA injuring consumers, who would you go to over in the global safety group to have a conversation about what to report to the FDA on that issue? Who answer -- who controls things over there? That's what I'm trying to understand. Like, is it one person? Is it ten? Help me understand who that group is.
MR. SACHSE: Objection, form.

A So in general, when we receive requests from the FDA, we would look at that information and determine who is the appropriate group that would be able to address the request from the FDA. So, you know, in this case, it would be that we could approach our safety group as well as our nonclinical group to address this question. And it would depend what question is being asked. And once that -- we would approach that group with FDA's questions, and once, you know, that's determined what information they're looking for, that is assessed, it is evaluated, and a response is, you know, generated in order for us to respond to FDA.

Q Okay. So let's not talk hypothetically. In terms of what issues have come up since 2019 and certainly 2020 when you were more personally involved, who from the global safety group was involved in the Zantac NDMA issues that have come up?

A So in that case, I would refer to Steve Hobbiger in this group, and I would say he would probably be able to provide more specifics on what individuals within his organization would have been involved.

Q Okay. And what, if anything, can you tell me about Steve's -- excuse me -- Dr. Hobbiger's, you know, title, and was he heading up a committee? Like, help me

understand that, if you could.

A Right. Dr. Hobbiger, I believe, was the head of the safety kind of government -- governance area within safety and for a period of time was the head of global labeling committee.

Q And in terms of this NDMA issue, I understand there was, like, a PIRC created?

A Yes, a product incident review committee, or PIRC.

Q And is that a committee that's been -- let me scratch that.

Is a PIRC something that's been around conceptually at the company for a long period of time?

A Yes, as far as I can remember during my time in regulatory.

Q And any other committees? I think there was a medical review committee as well?

A I'm not familiar with the medical review committee.

Q Okay. Let me just see here for a second. I apologize. The medical response team? Are you familiar with it?

A The MRT I'm not familiar with.

Q All right. Do you know, like, Helen Steel, for example?

A Dr. Steel is within our safety organization.
Q Okay. And Martin Ellis?
A Mr. Ellis was formerly an employee at GSK within regulatory in the UK.
Q Okay. And where is he now?
A He has since passed away.
Q Oh, I'm sorry. Okay. So Mr. Ellis and then Jim Harvey?
A Jim Harvey is within our nonclinical organization.
Q Gotcha. And what's the difference between nonclinical and the global safety group?
A So nonclinical would handle matters such as in vitro investigations associated with drugs. They would also handle animal-type studies, things that are not related to human studies.
Q All right. And then there's a -- I'm going to mispronounce the first name -- Liangfu Chen.
A I believe -- and I don't want to misspeak here, but I believe in our clinical pharmacology organization.
Q And is clinical pharmacology part of the safety group or something else?
A That's another group within our clinical organization.

Q And what do they do?
A Clinical pharmacology evaluates how a drug acts in the body, the pharmacokinetics, pharmacodynamics in humans.
Q Okay. So, like, PK studies, for example, they would be responsible for?
A Yes.
Q And then Katarzyna Swiderek, S-W-I-D-E-R-E-K?
A I do not know that individual.
Q Okay. And in terms of the PIRC, do you know when it was created for the Zantac NDMA issue?
A I don't know the exact timing, but I believe it was probably around the September 2019 time frame.
Q And to your knowledge, had there ever been a PIRC created around Zantac previously?
A I don't know. There is a high possibility just based on the fact the age of the drug, but I don't know for sure.
Q Okay. I just want to shift gears for a minute. So you would agree with me that GSK had a responsibility to monitor the medical literature for risks associated with ranitidine; is that correct?
MR. SACHSE: Objection, scope.
A So in terms of groups with -- inside the company, safety, medical, yes, would monitor those for

sure.

Q Just to pause one second. I know you objected to scope, but I think this is within scope and I just want to be clear, and maybe I just asked an inarticulate question, which I'm very capable of doing.

So in terms of just from your perspective from a regulatory standpoint and for GSK, I believe GSK would agree and you would agree on behalf of the company it had a responsibility to monitor the medical literature for risks associated with ranitidine. That's part of the regulatory obligation for GSK. Do you agree with that?

A It is part of the regulatory obligation in terms of the regulations, but there are certain groups within the company that do that monitoring.

Q Okay. And is your group responsible for ensuring that GSK complies with regulations or not?

A Yes, we -- our group is responsible for complying with the regulations in the US.

Q But I want to understand that. So when you say you're responsible, is it responsible for communicating the issue to the FDA or is it responsible for it getting done, meaning if, you know, someone in the safety group's not doing their job, can you report and say, "I'm not able to comply with the allegations of

GSK related to Zantac because these guys aren't doing their job over there?" Can you do that or that's not something that would be done?

MR. SACHSE: Objection, form.

A So what we do within regulatory is communicate with the FDA and ensure that regulations are being abided by in terms of that communication.

Q And so that global safety group's kind of self-policing is what you're telling me?

A The global safety group is responsible for evaluating safety information for our products.

Q Okay. And if studies, published studies reveal a potential safety signal related to a GSK drug product like Zantac, what is the regulatory responsibility -- regulatory department's responsibility in terms of following up on further research to be done? Does it have any responsibility within GSK or no?

MR. SACHSE: Objection, form.

A So I would defer to safety on this matter in terms of they conduct the evaluations of safety information and literature evaluation within GSK. And then, in turn, that information would get submitted to FDA if it's determined it's appropriate to do so.

Q Okay. So if a -- if a journal article gets published like Mitch, for example, and whether it

revealed a potential safety signal and whether there's follow-up or not -- on it or not is just not something that you're responsible for in the regulatory department. That's another department; is that right?

A Our safety department is responsible for collecting that information.

Q Okay. But if you saw something yourself, like you're doing the annual reports, which you're obligated to submit, correct?

A Yes, we are obligated to submit annual reports.

Q And whether the literature -- well, let me take a step back. Who collects the literature that gets submitted in the annual reports? Is it your department or somebody else?

A It depends on the annual reports. Safety does annual reporting for safety for post-marketing type reports as well as periodic adverse drug event reports. There's a group across the organ -- different groups across the organization that contribute to what's called the NDA Annual Report, and one of those areas is our clinical or medical group does a literature evaluation as well.

Q Okay. So the annual NDA report is something that the clinical/medical would do; is that right?

A That's correct.
MR. SACHSE: Objection -- sorry. Objection, misstates testimony.
A So, you know, in terms of the clinical/medical group for the NDA Annual Report, yes, they would -- they would conduct that literature evaluation and provide that information for the NDA Annual Report, and then we coordinate that report and submit it to FDA.
Q Got it. And then in terms of the regulatory department, I assume you're going to say it doesn't do anything, but I just want to make sure.
Does it have any obligations or does it do work in designing, conducting studies on products related to a potential safety signal?
A So I can say in my area within regulatory, no, we do not. That would be an evaluation by the safety group maybe in conjunction with our clinical department.
Q So that would not be your department, I guess, is the bottom line; is that right?
A That's correct.
Q And certainly to the extent there's a safety signal, reporting that to the FDA, that would be your department's obligation, correct?
A In terms of reporting the information, yes, we would do it. There's also -- our safety department in

some instances will report directly to the FDA, such as post-marketing events such as those periodic adverse event reports.

Q Okay. And you're in the loop on that. It's just they actually do the reporting directly; is that right?

A Correct.

Q Okay. And beyond routine reports and sort of the formal follow-up submissions, is there anything else that your department does in terms of the FDA?

A As you probably have seen from your review, we do address requests from the FDA. We also provide them with information through communications. We also submit supplementary -- supplemental new drug applications, updating the labeling for products as well.

Q Okay. And you would agree with me that GSK has a duty to disclose information to the FDA, whether it's developed in the United States or someplace else in the world, about Zantac or a product that it sells; is that correct?

MR. SACHSE: Objection, form.

A Could you be a little bit more specific?

Q Sure. If a safety signal comes up in Singapore, for example, then GSK would have an obligation to disclose that to the FDA. It doesn't

matter the fact that it's outside the FDA's jurisdiction; is that correct?

A Our safety department is a global group, so they, you know, assess all safety data from all countries.

Q Right. I get that. But I guess my question is they do that, but that's actually part of the obligation of GSK. It's not, well -- and this is a simple thing, so I just want to make sure it's -- it's not complicated or a controversial issue. But, you know, a jury sitting in Florida may say, well, the FDA only governs the United States, and so is that its jurisdiction, or does GSK really have an obligation that goes global because it's a global company to say we know something about Zantac because we're seeing something happen in Singapore and we have an obligation to report that in the LOC which is the United States, is that a fair statement?

MR. SACHSE: Objection, form.

A So what I can say from a safety perspective is the fact that we do report safety information across the globe, it is a global organization, and that would be reported to FDA. But I think Dr. Hobbiger could better speak to what that process looks like and how that information is conveyed to FDA.

Q Understood. Okay. Give me one second. We may have covered a couple of these, but I just wanted to run through them. I think it'll be easy enough.

I have not found anything where GSK reported to Zantac -- excuse me -- reported to the FDA that Zantac could degrade due to high heat before 2019 and '20. Is that your understanding as well?

A I do not know if that's the case or not.

Q Okay. Do you recall sitting here today whether you've seen anything to that effect?

A I have not.

Q Okay. How about regarding high humidity?

A In terms of -- and let me go back and state that earlier -- some -- some of the files that I have reviewed in the past -- I mean, because the stability information relates to the product and then it in turn gets reported or conveyed in the labeling. So there are temperature conditions conveyed in the labeling, as well as, you know, avoid -- keep in a dry place, those sorts of pieces of information.

So based on that information, you know, if you go back into the CMC details of the file, there is information, I'm sure, that relates to, you know, the stability of that and there must be reasons why it shouldn't be stored or it should be stored in a dry

place, rather.

Q And can you tell me if any of those discussions you just referred to in terms of stability, whether it was ever disclosed to the FDA that one of the issues with the stability with NDMA would be created? Was that ever disclosed to the FDA before 2019?

A Based on my review of the file, I did not see anything.

Q Okay. It's fair to say there's nothing on the label to disclose to consumers that NDMA could be coming out of the product, correct?

A There's nothing in the label, no.

Q And there's nothing in the label to disclose to consumers of any potential for Zantac to cause cancer; is that correct?

A Based on my review of the label, there is no information about that.

Q Okay. And you agree that if GSK was aware of that, that it had a duty to disclose it not only to the FDA but to the public as well; is that correct?

MR. SACHSE: Objection, form and foundation.

A So I will go back and defer to some of my earlier answers, which would really, you know, indicate that that information needs to be discussed with our experts or scientific experts in that area and

evaluation would need to be conducted.

Q So, again, just to take a step back for a second, if -- if GSK concluded that ranitidine was breaking down into NDMA, you don't have a position for regulatory as to whether there was an obligation to, one, disclose that to the FDA and, two, to disclose it to consumers who were consuming the product?

MR. SACHSE: Objection, foundation.

Q I'm just asking as the head of US regulatory sitting here in front of this jury whether you can tell them whether you had an obligation to disclose that to the FDA first and secondly to the public. You can't answer that question?

MR. SACHSE: Objection, foundation.

A So, I mean, I will defer to our responses for requests for admission which provides the information around the scientific conclusions regarding that issue. And I'll add -- I'll add to that too that we did disclose that information. In 2019 --

Q Well, let's --

A -- 2020, we were very transparent with FDA.

Q And I'm just -- I'm not talking about Tanner right now. So just let's back up and make sure we're correct what we're talking about.

If GSK determined that Zantac is reasonably

associated with causing cancer in humans, from a regulatory perspective, did it have a duty to warn consumers about that?

MR. SACHSE: Objection, foundation, calls for a legal conclusion, misstates the standard.

A Could you repeat the question, please?

Q Let me go back and read it here. As the head of US regulatory sitting here in front of this jury whether you can tell them whether you had an obligation -- GSK has an obligation to disclose to the FDA and secondly to the public if it knew that Zantac could cause cancer?

MR. SACHSE: Objection, form, foundation.

A So, again, I would defer to my safety colleagues regarding that information. If it was determined just in -- and I'll go back and say, in general, if a product was deemed to cause cancer, then it would need to be discussed with the FDA.

Q So at the very least disclose to the FDA and then -- so that's one. You agree with that, right?

A Yes.

Q And then in terms of a warning about a product, as the head of US regulatory for GSK, can you answer the question of whether you then would have a duty to disclose to the public a very serious adverse

event of cancer? Would you have that obligation or you just don't know whether you would or not?

A So if it was determined from a company position standpoint that that were the case with a product, then, yes.

Q And that's really a company decision as to whether that gets disclosed or not, correct?

A Yes.

MR. SACHSE: Object -- objection, form. Sorry.

Q I'm going to shift gears for a minute. What is API?

A Active pharmaceutical ingredient.

Q Now, I'm going to ask a really naive question, and I'll apologize, but I know you have a doctorate in pharmaceuticals, as I understand it, I mean -- I'm butchering it -- pharmacology.

What is the difference between a product substance and API?

MR. SACHSE: For the record, I'm going to object to scope, but you can go ahead and answer.

MR. CHAFFIN: Thank you. Appreciate the liberty there, Will.

A I'm not the pharmaceutical supply chain or CMC expert, but they should be considered the same, from my

understanding.

Q Yeah, because I'll be honest with you, I keep seeing them interchanged at times with the root cause analysis, and I can't figure out what the difference is, and I'm just trying to see, like, if you have an understanding what the difference is.

A Yeah, based on my review of regulatory information, API and drug substance are used synonymously.

Q I gotcha. Okay. And so if at any point today I use one, you understand I'm referring to the same thing unless you correct me otherwise. Is that a fair statement?

A Yes.

Q And what regulatory departments are involved with API? Is it your group? Somebody else? Who kind of looks over API from GSK's perspective?

A That would be our chemistry manufacturing and controls regulatory area.

Q Wow, that was a mouthful.

A Or CMC.

Q CMC. Okay. And who heads up CMC?

A Within GSK, it's Ben Thompson.

Q Ben Thompson. Okay. And where's he located?

A He's located in the UK.

Q I see. And in terms of API for Zantac, I understand there are many different -- I shouldn't say many -- there are a few different places that API came from for the manufacturing of Zantac tablets or the finished product, I should say?

MR. SACHSE: Objection, scope.

A Yes, that -- that is my understanding based on the review, but, again, I'm not the CMC expert.

Q Understood. Any other departments besides CMC?

A Our pharma supply chain department. They're not part of regulatory, but they are involved in API.

Q You said pharma supply chain?

A That's correct.

Q And do they have a nice little acronym as well? Is it PSC or something else?

A Yes.

Q Okay. Thank you. It makes it a lot simpler. So this PSC, who's in charge of it?

A I would have to go back and review who our current head of that area is.

Q And in terms of Zantac and ranitidine -- excuse me -- and NDMA, is there someone else that you -- or have you interacted with CMC at all from your department?

A Yes, we interact with CMC.
Q Okay. And help me understand the nature of those interactions. Like, what's the dialogue? What's the issue that comes up between you guys? Help me understand that, if you would, please.
A In general, it could be maybe there's a labeling change that needs to occur and it involves a CMC part of the label, so that might be one area. They might let us know that there's a product incident review committee ongoing for a particular product that falls in our area. Those are the two that come to my mind.
Q And does your regulatory involvement have any involvement in the source of the API or no? That's CMC?
A Yeah, I think I would need to defer to CMC, an expert there because I -- I don't know in terms of their involvement in API selection.
Q And who does CMC report to within the organization?
A So they report to the head of regulatory.
Q And forgive me, but does that mean, like, domestically they report to you or it's all international and they report to the global head? Help me understand that.
A They report to the global head.
Q The global head. Okay. So in the old-school

way, they would sort of be dotted line from you and up so you guys report to the same people, or is it different?

A We eventually report to the same individual, our head of regulatory affairs.

Q Okay. Who do you report to directly?

A I report to Susannah Clements.

Q And what is her title?

A Her title is head of regulatory classic and established products.

Q And where is she located?

A In the UK.

Q Do you report to anyone domestically here in the US?

A No. I report directly to Susannah.

Q Okay. Do you know, sitting here today, who manufactured Zantac for GSK over time?

A In my review of the file, I see that there were different places that -- and I'm not sure if you're referring in this case to API or product, but there were different locations for both.

Q Okay. Yeah, and in terms of -- I guess we could probably cut through this relatively quickly just by talking about the supply of Zantac in the US. I know there was an e-mail from you where you pretty succinctly

kind of summarized, I believe, for people in terms of the products coming off the market and stuff. Do you recall that?

A No. I would have to look at the e-mail.

Q Okay. Give me one second.

MR. CHAFFIN: If I could get the tech to bring up -- and this is maybe a slightly different issue but related, so this would be helpful. In terms of -- if I can get -- it's a long one. All these are long, but once you get the beginning phrase of this, it'll be easier. So it's GSKZAN 0000, and then the last digits are key ones, it's 141915. So, Michael, I don't know if you're able to get that or not, hopefully.

MR. HOLLANDER: Give me just a moment to find that for you.

MR. CHAFFIN: And we'll mark this as 233. Just so we can search for it later, this will be Exhibit 233, which is 141915 and it continues through 141919.

(Exhibit No. 233 was marked.)

BY MR. CHAFFIN:

Q Dr. Driver, this is on a slightly different issue, but it will actually help me get to the issue faster and hopefully move things along. And I know this

is a remote deposition and so I don't think you've seen this before. What may be easiest -- and I want to give you a chance to review it, certainly, if Will has any objections, but maybe start at the bottom because it is an e-mail and that kind of works to the top.

MR. CHAFFIN: And I assume, Michael, there's no -- I mean, perhaps she could take control of the screen and kind of scroll through it herself? I don't know if you guys have done that in the past, but that's what I would be inclined to do.

MR. HOLLANDER: Yeah, I can do that. Just a moment.

MR. CHAFFIN: Dr. Driver, do you know how to do that in Zoom in terms of taking control of his screen? It'll allow you to scroll is the point if you want to have an opportunity --

(Off-the-record discussion was had.)

BY MR. CHAFFIN:

Q I'll give you a chance to review it and we'll start.

A (Reviewing document.)

Q All right. And this is on a slightly different issue than I mentioned a minute ago, but it will help cut through things. On page 2, if we could go to that portion of the e-mail, first of all, this is an

e-mail from you on April 2nd, 2020, to some of the individuals that you spoke of previously in the deposition.

Who else -- first of all, with Ms. Conner, what is her title at the company or what is her role?

A She is vice president in regulatory affairs.

Q Okay. And what was the purpose or context for this particular e-mail?

A So they were asking about what the reporting obligations to -- for my particular question for the US, what are our reporting obligations to FDA because we still had two have open NDAs.

Q And here you accurately describe for them some of the reporting obligations in the US; is that right?

A That's correct.

Q And those statements remain accurate today?

A Yes.

Q Okay. And this e-mail I assume was sent in the ordinary course of business and maintained?

A Yes.

Q In terms of the statements here, did you check at any point in time whether there was any API that was perhaps manufactured outside of the US that was coming into the US through another -- another brand or a generic in some way?

A No.

Q Okay. Who would know the answer to that question?

A I would refer to our CMC colleagues.

Q So CMC will be responsible for tracking, for example, whether there was API manufactured by a GSK facility that was then used in some way domestically in the US at this time; is that right?

A Yes. And let me just add here that even though our applications were still open in the US, product had been discontinued, and at that point all product had expired as well in the US.

Q Okay. I gotcha. And when you say "all product," you're talking about the tablets; is that right?

A Tablets, both 150 and 300 mg as well as the syrup formulation.

Q Okay. Understood. And I understand the 150 mg tablet was 2017 and the 300 mg was in April of 2018. Is that what your recollection is?

A That's what my recollection is.

Q Okay. And, you know, despite that, you articulate here that GSK had continued reporting obligations because of the pending NDAs, which, you know, GSK was not releasing even though really other

people -- because other people use or other companies use those NDAs; is that right?

MR. SACHSE: Objection, form and foundation.

A These -- to clarify, these are our NDAs within the US within GSK, and we have reporting obligations with open NDAs.

Q Okay. And was there any particular reason why the NDAs were not closed out?

A Well, we were wait -- we had been waiting for Zantac to expire initially, and we were actually moving towards requesting withdrawal of the NDAs, and we had not done that yet at this point in time.

Q In fact, I believe there also was -- there was also other companies that were referencing NDAs by agreement, is that correct, or you're not aware of that?

A I am not aware. Our CMC colleagues would know that information.

Q So that would be a CMC issue?

A Yes.

Q Is there anybody else over in CMC besides the one person you referenced?

A The person I referenced, Dorene Dixon, is the only one that I interfaced with.

Q And so no others on Zantac in particular was really the focus of my question?

A I can't recall aside from Dorene.
Q Okay. And would CMC be responsible for overseeing manufacturing by third-party sources?
A So I would think that that would actually be something that our pharma supply chain would be responsible for.
Q Okay. And for the pharma supply chain, you don't recall any individuals over there currently; is that right?
A That's correct, I don't.
Q How about for, like, bulk product manufacturing or API? Is that still the same response or a different response?
A That would be the same response.
Q Okay. And what about who would be responsible for overseeing distribution either by GSK or, you know, API products by third parties or third-party finished product?
A It would be the same answer.
Q And how about inspections of manufacturing facilities? Who would be responsible for that?
A That's, I believe, also in our -- our pharma supply chain in our quality organization.
Q I'm sorry. Help me understand that.
A So our pharma supply chain, there's a group of

individuals that are responsible for quality. They -- from what I know, they are responsible for that activity.

Q Okay. Do you know the names of any of those individuals?

A The person I interface with just in general, not specific to Zantac, is Brenda Shafee.

Q Okay. And in terms of if there were an issue with manufacturing or distribution, would then regulatory step in and be responsible for reporting those issues to the FDA?

A Yes.

Q And do they ever interact directly as does, like, global safety or, no, that doesn't happen for those groups?

A Yes, CMC does interact directly with FDA on safety matters.

Q And in terms of the FDA, is it the same particular people or groups at the FDA, or there are different groups within the FDA itself that each of your departments would interact with?

A So typically, CMC will interact with both the quality group or teams within FDA whereas we interact with different the individuals with different teams.

Q Understood. Okay. All right. Give me one

second. Shifting gears. In terms of NDMA, which we covered before, does the regulatory department deal with NDMA, or has it, beyond with Zantac?

MR. SACHSE: Objection, scope.

A Personally, you know, I have not dealt with it, but I have heard of other communications to FDA on this topic.

Q So non-Zantac-related communications with the FDA?

A Yes.

Q And you haven't personally been involved in those; is that right?

A I have seen the communication or one or two communications but not personally been involved in the substance.

Q And what was that related to?

MR. SACHSE: Objection, scope.

A It was related to assessment -- and let me go back. Last year FDA came out with a guidance regarding assessment of NDMA and nit -- NDMA and other nitrosamines in products. So as a result of that, you know, company -- our company went and conducted a root cause analysis or actually did -- it actually looked at the risk/benefit of our products to see would a product potentially have NDMA in it or other nitrosamines. And

so as a result of that, there were some communications to FDA around other products.

Q And what other products were those?

A The only --

MR. SACHSE: Objection, scope.

A The only product that I recall that's within my team is Epivir HBV.

Q And are you aware that NDMA was formally used in the production of rocket fuel?

MR. SACHSE: Objection, scope.

A I was not aware of that.

Q And did the regulatory department at GSK maintain a Material Safety Data Sheet on NDMA?

A I don't know the answer to that.

Q And you're familiar with what an MSDS is?

A Yes, Material Safety Data Sheet.

Q Was there an MSDA on Zantac?

A I don't know.

Q Okay. Who would know the answer to that question?

A I think our environmental group would know that.

Q And who is the environmental group, help me understand that, and who would be in charge of it?

A I don't know who's in charge of it.

Q Besides just the environmental group, is there any other information you can give me if I wanted to get an answer to that question in terms of NDMS for Zantac?

A I wouldn't know.

MR. CHAFFIN: Michael, there should be a collection of documents I referenced earlier that's called "Driver Org Charts." It should be a 23-page document or collection of documents, if you would pull that up for us and mark that as Exhibit 234, that collective group.

(Exhibit No. 234 was marked.)

BY MR. CHAFFIN:

Q I know you've seen these, so we can -- we can walk through them maybe together, if that's okay with you, rather than going through all 23 pages yourself. So Exhibit 234 is a collection of what I understand to be organizational charts for various departments over different time periods. Will was kind enough to -- he and his colleague were kind enough to identify a collection that perhaps you reviewed in preparation for your deposition today, and so I just want to walk through with you, if you could, just explain to us sort of the relevance of these in terms of how they help paint the picture of the organization for us.

And so the first one that's up is January 8,

2012, Global Regulatory Affairs Regulatory Practice Group, if you could tell us what that is and whether it has pertinence to today or sort of over time, help us understand that document.

A So this looks like -- and this was before I joined regulatory affairs, so the terminology has changed over the years. But what this looks to be is the regulatory practice group. We would refer to them as the therapeutic group organization in today's org -- you know, organizational chart, if you will. These individuals primarily look to be UK-based individuals. I don't know who had responsibility for what types of products or assets.

Q I see. Okay. And does this document exist for current day for 2021 or some form of it?

A There are organizational charts.

Q Okay. And of these people, do you interact with any of them or had you historically?

A As I had mentioned, Martin Ellis previously, Alia Quraishi, Lorna Bruce, Linda Gardner. But a few of them are in different types of roles now.

Q And besides Mr. Ellis, who I understand is no longer with the company, was there anybody else on Zantac that you interacted with?

A What time period?

Q Thank you. I appreciate you saying that. Really, I mean, it was my understanding is over the past six or seven years, you've been involved, you know, from a regulatory perspective with the established products, so I would include that time period, but I know that from '19, '20 forward is probably, you know, a more concentrated time period, so just over the six- or seven-year time period was there any interaction with these folks in terms of Zantac?

A Okay. Martin Ellis and then -- that's all from this list.

Q Okay. And before 2019 and '20, did you interact with Mr. Ellis on Zantac or really there wasn't anything that was coming up that you interacted with him about?

A There wasn't anything. We interacted on other products but not Zantac.

Q And then in 2019 and '20, I assume it was all related to the NDMA issue?

A It was related to communications around NDMA.

Q And what would be the nature of your communications with Mr. Ellis? Like, what would be the purpose in communicating with him on this?

A As we've just seen in the previous e-mail, Mr. Ellis was on that e-mail, he is my counterpart or

was my counterpart in the UK, so he handled EU matters related to Zantac. So it was really communication on what was really going on outside of the US.

Q Okay. And does the global regulatory affairs group, did they handle other countries or did other countries have their own LOCs?

A So typically, outside of the US and UK or EU, rather, there are LOCs that have local regulatory groups that handle their submissions. But we have a central model, which does consist of the EU in the US, where those LOCs can consult with or get information.

Q You said a central model? Is that what you said?

A Yes.

Q What is that?

A Really a central group of regulatory affairs which are primarily EU and US based.

Q Okay. And is there an organization chart of that group?

A I have not seen a current organizational chart within this collection.

Q Okay. Is that something you could get for us?

A We could -- we could try to find one.

Q All right. Thank you. That would be much appreciated.

And then in that central group, do you recall who's in it? I assume you are, correct?
A Yes.
Q Anybody else in '19 and '20 that was involved there?
A I mentioned earlier Jaisri Giridhar on my team was involved.
Q Who's now retired, right?
A Who's now retired. And then Dan Hall is my current EU counterpart for Zantac.
Q And Mr. Hall's title?
A Regulatory project manager.
Q So he doesn't carry the same title, but he's your counterpart, essentially?
A For Zantac, yes.
Q Okay. Got it. And anything else you can tell us about this central group?
A You know, the central group also consists -- I mentioned the therapeutic groups, which they deal really with the clinical matters of regulatory. Also, our CMC, I mentioned them a few times, they're a central group as well within regulatory.
Q Okay.
A We have a nonclinical regulatory group as well. We have a labeling group.

Q Okay. Understood. And then in terms of -- if we can go to the second page of this document, of Exhibit 234. We'll have to turn them around. Okay. This is the CMC group that you referenced already or a past version of it; is that right?

A Yes. This looks like a past version from 2014.

Q And other than -- other than Conner, is there anybody else that you interact with? Dorene Dixon, I guess, is there you mentioned, right?

A Dor -- yeah, Dorene Dixon. And I would say she's the primary individual for Zantac.

Q Okay. Anybody else?

A No.

Q So we'll go to the next page of 234, which is Global Post-Approval Registration CMC Therapeutic Group. I know you just mentioned the therapeutic group, so what's this?

A So this is something from 2006, so I'm not as familiar with the setup at that point in time, but this looks like -- I don't know if this meant it was a combination of CMC and therapeutic group as we know it today or if this was strictly CMC.

Q Okay. Understood. And then the next one is CMC Product Expansion, Classic and Established Products.

So what's the difference between that and the therapeutic group?

A So I can't speak -- because this is in 2014, so I think the namings of the groups have changed since that point that we saw earlier, but I think this is the same type of CMC group. Now, this is for the mature products here.

Q I see. And what is the difference, if you know, between what type of issues the mature products versus, like, therapeutic group is looking at, or is there?

A So the CMC mature products group or classic and established products group would be looking primarily at the registrations associated with mature products from a CMC perspective, so drug substance, drug product specifications.

Q Okay. Do you know if anyone in the CMC group ever got a copy of Tanner, for example?

A I'm not aware -- prior to 2019, I'm not aware.

Q All right. And then on the next page, US Labeling?

MR. HOLLANDER: I will just mention if anyone's having issues seeing it, I've got it sort of maximized on my end, so, like, Mr. Chaffin said, you can adjust the Zoom settings. But if that's

not working for you, I'd recommend just downloading it or viewing it from the share folder and that might be a better view.

MR. CHAFFIN: Thank you, Michael.

BY MR. CHAFFIN:

Q So on Exhibit 234, the US Labeling slide that's in front of us, is it just a snapshot of July 2014 labeling? Has that changed dramatically? And who's in charge of it today?

A Yes, this is a snapshot from that point, and it has changed a bit since this point in time.

Q And who's in charge of US labeling today?

A Today, that's -- well, actually, global labeling is Amy Mitchell.

Q So is there US labeling any longer or it's all global labeling?

A It's all global labeling.

Q Gotcha. So this doesn't really exist anymore, the US labeling?

A A lot of these individuals are still in the labeling organization, but it doesn't exist in this structure.

Q Understood. And then the next one is the GRA Labeling US Team, so I don't know if that describes something that was before the previous slide,

it's October of '13, so what's that?

A Yes, so this is the same type of structure prior to that previous one that you just showed.

Q Okay. And we'll keep going and the one next US Regulatory Affairs Strategic Product Labeling, and that's 2010.

A So this is the same type of structure but earlier -- an earlier point in time.

Q All right. I think I'm seeing a pattern to this. This is helpful to understand.

In terms of -- okay. Just skip that. One second. I guess out of all this the one thing I haven't seen, and maybe it's just your department's small, but is there actually an org chart for your domestic regulatory department?

A There -- there should be an org chart, but I haven't seen it in this particular collection.

MR. CHAFFIN: Okay. Will, I don't know if you know where that is or maybe we could find it on our break, but that would be helpful. This is -- the group that we have here is what your colleague was nice enough to send over to us, and certainly my team will look for it as well, but we haven't seen it, and it might be helpful.

BY MR. CHAFFIN:

Q Who all's in your group? How many people are in your group?
A There are six individuals that report to me.
Q And who are those individuals?
A Dawn Adsit, Laura Baycott, Sarah Roberts, Linda Rebar, Tom Kline, Daxa Patel.
Q Okay. And if we could go to the last page of the Exhibit 234 for a minute. This is the CMC we talked about, and it says "Mature Products," so that would actually be Zantac or no?
A Yes.
Q And are any of those people still involved with Zantac that are on here?
A Dorene Dixon. There may be others on her team, but I don't know who.
Q Understood. Okay. We can stop sharing that. Give me one second.
In the legal department, are you designated someone specifically for the regulatory department?
MR. SACHSE: Objection, form.
A I'm not very clear on the question.
Q Yeah, do you have a particular point of contact that you deal with in the legal department for regulatory affairs?
A It depends on the matter according to a

product. We have different legal contacts.
Q And who's the legal contact on Zantac?
A So individuals that -- John O'Tuel is who I've been working with most recently. In terms of a product-specific attorney, I don't -- I don't -- we haven't had one in recent years in terms of needing to contact somebody, so --
Q Okay. So besides more recently, there hasn't been anybody else besides Mr. O'Tuel that you can recall on Zantac. Is that a fair statement?
A There has been Tony as well.
Q Sorry. Say that one more time.
A Tony, who I mentioned earlier.
Q And I forget. Did you give us Tony's last name or you didn't recall that? I remember you said there was a female, but I think you did give us Tony last -- actually, Will gave us the name so we're good.
A Suarez-Martinez.
Q I recall that now. Thank you. So I want to shift gears a minute again. You know, Will and I had worked out to save time today there's a -- what is now a PDF collection of NDAs in different time stamps and stuff. So, Will, I don't know what's the best way to handle this. Maybe we can just mark it as an exhibit. We did a PDF copy. It's a little laborious to go

through, but I believe, Dr. Driver, you had a chance to look at it previously, and, Will, I'm happy to do recommendation or suggestion from you, so --

MR. SACHSE: Are you talking about the NDA, the summary chart and then all of the subcharts?

MR. CHAFFIN: Yeah, the one that Dave had sent over to you and then it's an Excel sheet. We just marked it as -- well, we have it as a PDF collection now is what we did.

MR. SACHSE: Yeah, if you want to just put that up as the next exhibit in order, I think that works.

MR. CHAFFIN: Okay. So why don't we have that marked -- I think it's 235 we're on. And, Michael, if you can't find it, I may have to ask the paralegal to come on and just tell us what the name of it is.

(Off-the-record discussion was had.)

(Exhibit No. 235 was marked.)

BY MR. CHAFFIN:

Q My understanding is we had prepared an outline and then your attorney had gone through, perhaps you or somebody else had gone through and just confirmed some of the NDAs, the description of the product, the original NDA submission date, a number of columns of

information because it's a lot of information over a period of time. And in the interest of time, I was hoping that you could just look at this and see if you had an opportunity to review it and whether it's an accurate depiction of the history of the NDA applications and other material that's contained therein.

A (Reviewing document.)

MR. SACHSE: Eric, while she's looking at that, just so I'm clear, this is the version that we sent back to you over the weekend?

MR. CHAFFIN: Yes, it's that version. And, again, we just did it as a PDF so it's a fixed format, and so we could probably bring up the Excel, if you wanted us to, but we thought it would be easier.

MR. SACHSE: No, I can rely on your representation. Thank you.

MR. HOLLANDER: I can bring up the Excel, if you need.

MR. CHAFFIN: Let's start with this, and then if we need to, we can do the other one. All right?

BY MR. CHAFFIN:

Q Dr. Driver, have you seen this document previously?

A I've seen this.
Q And have you had a chance to review it for accuracy?
A Yes, I've reviewed this information.
Q And sitting here today, as best you can conclude based upon the GKS regulatory group, is the information contained herein accurate?
A Yes.
Q And if we go to the next page of 235, that would be great. And so this one's labeled -- the tab labeled is "NDA 018703 Supplements." What is that referring to?
A So that's referring to the NDA for Zantac tablets, so it's NDA 018703.
Q And that's the one that was approved back in the early '80s and that was on the previous page, correct?
A Correct.
Q If we go to the next page, please. And what are these action dates and references referring to?
A So supplements are submitted to new drug applications during the life cycle of an application, and so this represents the action -- moving from left to right -- the action date taken by FDA, what the supple -- in the second column, what the supplement

number was, and then in the third column what kind of supplement it was. And so, for example, CMC you see a number of CMC supplements, a number of labeling supplements. And then there are, you know, clinical data, like, for instance, pediatric use, new drug regimen, new indication.

Q And so each one of these are actions over a course of time; is that correct?

A That's correct.

Q And you've reviewed, I assume, all these at some point of time and certainly in advance for preparation of your deposition?

A I haven't necessarily reviewed all of these supplements.

Q Well, certainly someone on your team has to look back to see, for example, whether there was any mention of the Tanner study, for example; is that correct?

A Yes.

Q And through all these submissions as well as ones we went over on the first page, there was no mention of Tanner anyplace; is that correct?

A No. Based on our review of the file, no.

Q And the same is true of the Bell study that's referenced in the Tanner; is that correct?

A That's correct.
Q And same is true of the Manchee study as well; is that correct?
A That's correct.
Q And if we would can keep going, please, you can scroll down. And so this document shows supplements from 1987 through -- excuse me, no -- 1984 through 2010; is that correct?
A I would need to confirm the top date, but --
MR. CHAFFIN: Yeah, sorry. If you go back up, Michael, I apologize.
A Yes.
MR. CHAFFIN: And Michael, do you mind if I take over your screen for a minute?
MR. HOLLANDER: That's fine. Just a moment.
BY MR. CHAFFIN:
Q So just a question, and it may be something that we need to -- why does it stop in March of 2010?
A That would indicate that there weren't any supplements that were submitted to FDA.
Q Okay. Is -- was there something that happened with Zantac that it was sold at that time or something else?
A Not to my -- not for the tablets, no.
Q And so there should be another ten years of

history, right, or there just weren't any supplements since 2010 related to Zantac as far as we know?

A Based on this, there were not any additional supplements.

Q Okay. So from 1984 through 2010, when GSK did do supplements, there was no mention of those studies. And from 2010 forward, there weren't even supplements done. Is that a fair statement?

A That's a fair statement.

Q I'm going to keep going down here. And then the next one is the NDA 019675 supplements. Which NDA is this for?

A That one is for -- let me -- I'm referring to my sheet of --

Q Absolutely, yeah.

A -- NDAs and INDs. So 675 is Zantac syrup.

Q And here we have supplements that start -- I have to go all the way down, but -- they end in 2010, but they started in 1989. Does that comport with the time period when there should be supplements or did it start around the time they should be or should there be an earlier time period? I just want to understand for completeness' sake first.

A So these represent the supplements that were submitted.

Q And as far as you can tell, this is the complete universe of supplements; is that right?
A Yes.
Q And, again, do you have any understanding of why it ends in 2010 and there weren't any since then?
A We -- it looks like we did not submit any supplements for this application.
Q And what would be the reason for not submitting supplements?
A Maybe there were no changes to labeling or CMC aspects or no new information that required a supplement to be submitted.
Q Okay. And things like adverse events, for example, those are reported separately; is that right?
A Those would be reported separately in periodic reporting.
Q Okay. And the periodic reporting would be, for example, the annual reports on the NDAs; is that right?
A Well, it could be the post-approval or periodic, rather, adverse drug event report done annually by our safety department.
Q Those are the PADERs, I think, is what they refer to them as?
A Yes.

Q Okay. Is there anything else besides the PADERs that's not represented here in terms of what would be submitted on the drugs?

A Also, as you mentioned, the NDA annual reports. There could be places where information is submitted in an annual report rather than submission of a supplement.

Q Okay. Anything else?

A Not -- not to my knowledge, unless it's general communications.

Q And you've checked the PADERs as well as annual reports, and, again, there's nothing from those where the studies we talked about were disclosed to the FDA, correct?

A I do not see any.

Q We're going to keep going here. The next one is NDA 020251 supplements. Which NDA is this? And feel free to refer to your notes.

A Zantac 150 EFFERdose tablets and granules, as well as Zantac 25 mg. EFFERdose tablets.

Q And there was an NDA for EFFERdose, which I guess you'd have to refer back to the first page which you may have in front of you. When was that one?

A I'm sorry. When was?

Q I apologize. When was the NDA approved for

EFFERdose?

A We would -- yeah, I probably would have to go back to the first page on this document on the screen.

Q I gotcha. Okay. If I represent to you that it was approved sometime around 1998, does that make sense? Actually, let me -- let me back up because I realize the dates are different on this. Let me see if I can pull this up to the top. 251 would be the third line down.

A So it looks like March of 1994, and then the 25 mg. strength would be 2004.

Q And were those under the same NDA?

A Yes.

Q So that's what's throwing me off because if we go back down -- if I can find it again. Let me see here. If we go to the 251 supplements, does that look accurate, or would there be more supplements?

A It looks accurate, but I don't know if you're asking something else.

Q As long as it looks accurate to you, I mean, that was my question. I'm just making sure it seems like we're capturing all the supplements, and it looks like to you we have, correct?

A Correct.

Q And the same question as before. In terms of

studies, you-all have reviewed these supplements. Nothing there about anything regarding the studies that we referenced, correct?

A Correct.

Q I'm going to keep going here. Which NDA is this for? This is probably Tritec, if I remember correctly.

A This is actually Zantac 75 for over-the-counter use or OTC use.

Q Okay. And this one has a very limited number of supplements. How come there's only two years for this one?

A Because if we go back up to the first page of the document, there would have been a time where we would have divested this product.

Q Okay. And who was it divested to?

A Warner-Lambert. Can I go to the first page and confirm that information on the date?

Q Yep, let me pull that up for you. You let me know once you're ready to confirm it.

A It was approved in 1995, and then we transferred it to Warner-Lambert.

Q Okay. Was there any other sales of Zantac to other companies besides the one to Warner-Lambert that we just referenced?

A The Zantac injection.
Q So we have the injection. We have the 75 mg., is that right, OTC?
A Yes.
Q Any others?
A EFFERdose. And then the two Zantac injectable ones. One's a premixed injection. One's regular.
Q And for the injections, who was it sold to?
A I believe that was -- I'm sorry. It's cutting off my screen. It's Covis probably. Yes, Covis.
Q Okay. And the 75 mg. OTC was Warner-Lambert you said?
A Yes.
Q And EFFERdose was who?
A Was also Warner-Lambert but it's the 75 mgs, and that was under a different NDA.
Q And the injectables? Is that Covis you just said?
A Covis.
Q Any others?
A Not to my knowledge, no.
Q So Covis and Warner-Lambert are the ones who purchased it from GSK; is that right?
A Correct.
Q And then it was also sold to others by them;

is that correct?
A I know the OTC one was. I'm not sure who the current -- if Covis still holds the NDA for Zantac injection.
Q Okay. And as far as you know sitting here today, the Tanner study was not given to those companies when they purchased the Zantac; is that correct?
A Not to my knowledge.
Q And the same is true of the Bell and Smith studies; is that correct? Or study, I should say, correct?
A Correct.
Q And the same for Manchee?
A Correct.
Q And so GSK held it to itself perhaps somewhere in the UK or some unknown location at this point in time; is that correct?
MR. SACHSE: Objection, form, foundation.
A The study was not identified in the regulatory archives upon transfer of those files to those companies.
Q And they would have just received the regulatory files, not the underlying studies that weren't part of the regulatory files. Is that a fair statement?

A That's correct, and the safety database and that sort.

Q Okay. All right. I think we're up to -- let me just keep going here. The 019090, which one is that?

A That's the Zantac injection.

Q Okay. And this one actually stops in 2009 and goes back to 1985. And so, again, any -- any insight in terms of why it stopped in 2009 or just there was nothing to supplement or no changes, I should say?

A Well, we had sold it to Covis after that point.

Q And so once the sale happens, that would be their responsibility for these reports, not yours, correct?

A Correct.

Q Understood. And certainly during that time, again, those studies were not in any way disclosed, correct?

A Correct.

Q Okay. And then the next one is the 20095 NDA.

A That's the Zantac Geldose capsules.

Q Okay. And this one we have reports from '94 and then kind of sporadically through 2004, and that would be the complete list, correct?

A Yes. I believe after this point -- we would

need to go back to the first page -- we discontinued.

Q Okay. One second. Sorry. Did I miss something? So that one -- unless I missed something. So 20095 the -- oh, you're saying back up to the first page -- it was discontinued as a product by GSK?

A Right. I just wanted to confirm.

Q I understand. Let me go back for you. There you go. Does that reflect your understanding or does it say something different here for 95?

A Sorry. I'm moving -- moving the -- so discontinued in 11/30/1999.

Q And that comports with what we just looked at. Okay. And then the last one, just in case you need to look at something here, is going to be the 559 NDA. So that's the Tritec 400 mg., and that was discontinued May 16, 2000, right?

A Yes.

Q So we'll go back down real fast to the bottom, and so that's this tab in the Excel sheet, which is now a PDF, and that one shows just two supplements; is that correct?

A Correct.

Q And the same question with that as the other ones. Those studies were not in any way referenced in those materials; is that right?

A Correct.

MR. CHAFFIN: Okay. All right. We can stop sharing this. Give me one second. Will, I think we're at a good place to kind of take a quick lunch break, maybe half an hour, give me a chance to kind of regroup, and I think it will move things faster.

Does that work for everybody? We can take longer, if you guys want. I just know most of us are kind of close, although, Will, you may not be. I'm just going to run downstairs in my kitchen, so we can do whatever you want to do.

MR. SACHSE: I mean, 30 minutes is fine for me, but, of course, Dr. Driver is the boss here, so --

MR. CHAFFIN: Yep.

THE WITNESS: That's fine with me.

MR. CHAFFIN: So I've got 12:03, so maybe 12:35 come back on?

MR. SACHSE: Sounds great.

THE VIDEOGRAPHER: Going off the video record. The time is 5:03 GMT, 12:03 p.m. EST.

(A 36-minute lunch recess was had.)

THE VIDEOGRAPHER: Going on the video record. The time is 5:40 p.m. GMT, 12:40 p.m. EST.

BY MR. CHAFFIN:

Q Dr. Driver, in terms of -- in terms of stability, which we talked about earlier, are you familiar with stability in the context of pharmaceutical development?

MR. SACHSE: Objection, scope.

A So I am familiar with stability, and from a regulatory perspective, we do report information regarding stability in our file, but I do not have the expertise in the area around that topic and would refer to our pharma supply chain.

Q Understood. And just for purposes of regulatory and also generally, what is stability testing, if you could just tell us generally as a doctor and with your background?

A Again, I'm not the expert in this area because I'm not the CMC regulatory expert nor the pharma supply chain expert, but in order to have a -- but generally speaking, in order to have a product approved and on the market, you do have to have stability information as part of that file. In addition to that, you do report stability information throughout the life cycle of the product.

Q And why is stability testing important to the safety of the product?

A Stability testing -- again, I'm not the expert

here in this space -- but it is important so that from a regulatory perspective, it's meeting the specifications that are outlined in the file.

Q And the specifications would be what's approved by the NDA, for example, or any supplements that are approved; is that correct?

A That's correct.

Q And that would be not only, let's say, in the case of tablets, the tablet itself in terms of chemistry and the compound, but then also the labeling would actually describe the stability in some way too potentially; is that right?

A The labeling would reflect the temperature and storage conditions that are demonstrated by the stability data.

Q And just to clarify too or maybe just a point to touch on, I believe you testified earlier that there's stability information and parameters, perhaps, for API, but then also the actual tablets and then also the distribution out to the consumer, or am I misspeaking? I don't want to put anything in -- you know -- am I correct that there's different stages of that stability that might be defined and discussed in a label or not?

A I don't remember --

MR. SACHSE: I'm sorry. Objection, scope.
A Yeah, I don't remember speaking specifically to that, but I would definitely refer to our pharma supply chain experts here to go through that, that framework.
Q Okay. Could you tell me what, if any, obligations your department has for reporting regarding stability to the FDA?
A So, again, don't do that in the course of my every day work as I'm not the CMC regulatory person --
Q Right.
A -- but pharma supply chain, our manufacturing areas would provide that stability data, and then our CMC regulatory professionals would ensure that information is captured in filings and submitted to FDA.
Q Okay. And then at what point would it come on your radar screen? Would it be the point where there needs to be a label change or if there's some safety signal from it? Like, at what point would you actually become involved or become aware for you?
A For me, in my role, I may become aware if, in fact, there's a change in stability that would impact the labeling and storage conditions because that would, you know, involve me needing to work to -- work with the CMC folks to update the labeling.

Q Okay. And so short of that, really the monitoring of the stability, if there is any done, that's really over on the CMC or the pharma supply chain group, not your group?

MR. SACHSE: Objection, form, foundation.

A The stability information is -- the data generating group for that would be the pharma supply chain group, who would report that to our CMC regulatory staff in order that it is captured appropriately in the file and submitted to FDA.

Q Okay. And not your function, correct?

A No.

Q Okay. And you do understand, though, and I think you've said this already, that stability testing is done continuously on products; is that correct?

A It is conducted on -- on products throughout the life cycle, and stability testing is reported in annual reports.

Q Okay. And it's to be done in the normal course of the business too, correct?

A Correct.

Q And stability includes, for example, exposing medications like Zantac to various conditions like heat, cold, humidity and light to determine how it affects the chemical structure of the medication; is that right?

MR. SACHSE: Objection, scope.

A So I would again defer to our pharma supply chain colleagues and CMC colleagues on that matter because they're experts in that area and, you know, Things might depend on the product, so --

MR. CHAFFIN: And I understand and I guess, you know, Will, you're objecting to scope, and I just want to be clear. My understanding is that it would be within the scope of this deposition in terms of, you know, whether there's a regulatory obligation to monitor that, not whether your group's doing it or not. Is that a fair statement, Will, or is there misunderstanding on my part?

MR. SACHSE: I mean, so let me try to be precise with my objection. We obviously are going to have other witnesses, I think, in other 30(b)(6) contexts who will speak about the nature of the stability testing that is done, and I understood your last question really to be going to that. And I think the witness has already testified about the fact that stability testing is a regulatory requirement and it is reported, so that's kind of where I'm kind of drawing the line. Make sense?

BY MR. CHAFFIN:

Q Yeah, let me try a question and see if we can

get it without an objection and just get a clear answer because it will be helpful, I think. There is a general responsibility from a regulatory perspective for manufacturers to monitor the stability of medicinal products or medicines like Zantac; is that -- is that accurate?

A Yes, that is accurate.

Q And as we've covered, I believe, in terms of regulatory development, it's really over in CMC and other places where they're actually doing the stability testing and the monitoring that on a regular basis is not your department; is that right?

A It is the pharma supply chain that's actually generating the data, so our manufacturing teams, and then supplying that information to our CMC regulatory line.

Q Thank you. And is there any other departments who play a role in making sure the stability of the Zantac molecule, for example, remains intact besides those two that you've mentioned?

A I'm not aware of any, but pharma supply chain maybe would be able to address any broader context that might be involved in that.

Q And as far as you know and I believe you testified but will confirm, the pharma supply chain and

CMC folks, as far as you know, did not have, for example, the Tanner study, correct?

MR. SACHSE: Objection, asked and answered.

A Not to my knowledge, no.

Q And the same way with the Bell study that still isn't found; is that correct?

MR. SACHSE: Same objection.

A Correct.

Q And it's the same for the Manchee study; is that correct?

MR. SACHSE: Same objection.

A Correct.

Q Assuming a stability problem is identified such as what's been identified more recently with ranitidine, what other departments get involved at that point in time?

MR. SACHSE: Objection, foundation and scope.

A Could you ask that question again, please?

Q Sure. If -- assuming -- not assuming, actually. When a stability issue is identified and, for example, GSK learns that the ranitidine molecule will break down into NDMA in and of itself, what other departments would get involved from a regulatory perspective besides the pharma supply chain and CMC?

MR. SACHSE: Objection, form. Sorry, Eric,

just to clarify. I think you said what other departments would get involved from a regulatory perspective, and I think you mean what other departments would get involved, right?

MR. CHAFFIN: Yeah, so let me just back up a step. I want to get a clean --

MR. SACHSE: Sorry.

MR. CHAFFIN: No, no, I appreciate it.

BY MR. CHAFFIN:

Q In terms of just a clean question, let's start more broadly. So, you know, at the point that there is a stability issue, what other departments generally at GSK will get involved, if you can describe that to us, to the extent you know? I realize that might be outside the scope of your knowledge, but what departments would get involved from your perspective?

A So as I've already mentioned, pharma supply chain, CMC. Beyond that, it would -- it could potentially evolve into a product incident report committee, which does bring in a lot of different issues or a lot of different groups within the organization.

Q Okay. And does your department have representation on the PIRC?

A There is a possibility. It depends on the

topic, but not necessarily.

Q Was there for NDMA from Zantac, the molecule breakdown?

A For the PIRC for Zantac, there was representation from a colleague in the UK.

Q And who was that?

A That was -- I believe it was Martin Ellis at the time.

Q Okay. Has anyone replaced Mr. Ellis since he left or since he passed?

A Ian Hall, but I'm not sure if he was part of that PIRC.

Q Okay. Besides the PIRC, which might be across different divisions, as I understand it -- I mean, is that a fair statement, first?

A Yes. I mean, because it depends -- again, generally speaking, depending on the topic, it could also involve safety, other groups as well.

Q Okay. And that's that sort of -- I don't know if you used the word "cross-sectional" earlier today, but that's the group you're talking about is who's involved in the PIRC or medical review committee?

A The PIRC. I'm, again, not familiar with the medical review committee, so --

Q Understood. Who at GSK was the primary

liaison to the FDA for the stability issues or for stability issues? Do you know?
A So can you be more specific in terms of a time frame?
Q Yeah, so, let's say, if there were any before 2019 and '20, was there somebody who would have been a liaison of that that you're aware of that name, and maybe it's someone from CMC, but is there a person you know of that would be in charge of that before 2019?
A So it would be CMC in terms of stability. They would probably be that liaison.
Q But in terms of a person, a particular name, you don't know who that would be; is that correct?
A Dorene Dixon is the individual I worked with.
Q And I know you talked about Dorene earlier, so thank you. Okay. And then in terms of '19 and '20, is there a primary person or maybe you're the primary person in terms of discussions or communications with the liaison -- or liaison, I should say, with the FDA regarding the stability after that? Is that right or no?
A So Dorene still is the CMC contact for that product. I am in the contact for non-CMC issues. The questions that were asked by FDA over the course of that time period in many cases involved things outside of CMC

as well, so those documents might have been submitted under my name or Jaisri's name, but Dorene also was involved with that.

Q Okay. So she would have, perhaps, been involved, but it was really your sign-off or signature on those; is that right?

A That's correct. It was my signature and then Jaisri's prior to that.

Q Okay. And then who at GSK was primary liaison to the FDA for Zantac adverse event reporting?

A That would be a question for safety. Steve Hobbiger would be the appropriate person for that.

Q So Steve would know who sort of the -- the market surveillance, that would be something that he would be the one to ask about?

A Right, yes.

Q Got it. And how about the primary liaison for Zantac drug safety issues generally? Is that your department or elsewhere?

A That would also be -- fall under Steve Hobbiger's arena.

Q All right. Let's shift gears for a minute. Have you ever dealt with cold chain supply?

A Did you say cold chain supply?

Q Yeah, C-O-L-D chain supply. Are you familiar

with it?

MR. SACHSE: Objection, scope.

A I am not. I would refer to our pharma supply chain colleagues for that information.

Q Are you familiar that after products are manufactured that some products actually need to be stored and shipped at lower than ambient temperatures to assure their quality and efficacy?

MR. SACHSE: Objection, scope.

A So I would defer to our pharma supply chain on that.

Q All right. One second. Do you know how stability is tracked within GSK? Would that be a CMC question or is that something you could help us shed light on?

A When you say "track," could you be --

Q Yeah, so if we wanted to go back, for example, and look at API or finished product and determine the storage and shipment temperature and humidity, for example, is that contained someplace?

A I would refer to pharma supply chain for something like that.

Q Is there -- do you know if there's, like, a database or something like that that keeps that information so that if there was a question, you would

go back and say to your team like, "Hey, go look at this issue" or anything like that?

MR. SACHSE: Objection, scope.

A That would be a pharma supply chain question. I mean, that would be the group we would reach out to at that point.

Q Okay. And just to ask, and this will be a good point just to follow this out, so I know that you mentioned Cards earlier. What other systems do you use internally at GSK for your data and information? You know, and I mean -- I mean this very broadly. So I know, for example, I've seen what I perceive as SMS messaging between you and team members. I have seen databases you're referencing for regulatory investigation. But just in the general course of your work, what is available to you from a data information standpoint in terms of systems and then also how do you communicate?

MR. SACHSE: And just objection. Are you speaking about the regulatory function?

Q For now, yes, yeah. Anything that, like, regulatory would want to access or look at in some way in terms of serving its regulatory function. Let's start there.

A So I've already mentioned Cards, which is a

system that has provided -- that tracks communications and submissions. Then up to a certain point, it was in 2018, that system -- we moved to another system called GRACE for archiving information.

Q What does GRACE stand for?

A I don't know, to be honest with you.

Q Fair enough.

A It's probably global regulatory affairs something about content. It's really a plotting system for FDA communications.

Q And so Cards would be FDA. GRACE would be the legacy or, you know, the more current version of it?

A Yeah. And then the other system where we can view our electronic submissions to FDA called Rosetta.

Q Any others?

A And we have a third or a fourth system that's called Veeva Vault that we're currently moving into.

Q Viva, V-I-V-A?

A V-E-E-V-A.

Q Vault. Okay. And that's also housing regulatory documents?

A Correct.

Q Anything else?

A That's what I -- in terms of interactions with FDA in terms of archiving information and submitting

information, those are the regulatory -- the main regulatory systems.

Q And is there an SOP or standard operating procedure for what information gets housed in those systems?

A There are SOPs around that.

Q And do you know what SOPs that would be offhand?

A Off the top of my head, no.

Q And is there SOPs regarding what's required to be recorded or not recorded for communications with the FDA?

A We record all communications with FDA in terms of any time we send an e-mail or have a phone call or submit information and then vice versa them back to us, we archive all that.

Q And that would be clear back into the late '70s or early '80s; is that correct?

A I can speak that -- I don't know the scope of those rules, if you will, or SOPs at that point in time, but based on my review of the file, what I saw was consistent with the activity that we do today.

Q So just to clarify or to make sure I understand, I should say, is you reviewed the historical file for the NDAs regarding Zantac and any supplements

or communications to the FDA about Zantac back even before the premarket approval. And what you see from back at that early time period, sort of late '70s, early '80s, is consistent with the archiving that you're seeing more recently, and so that leads you to believe that it's actually complete archive in some way; is that accurate?
A Based on my review of the file, it looks that way.
Q And based upon your review of the file and certainly the review of GRACE, Cards, Rosetta and Veeva Vault, to the extent there's information in there, you can't see where either of the three studies we've referenced earlier today were submitted to the FDA before 2019; is that correct?
A Based upon our review to this point, no, we have not seen those.
Q Is there anyplace else remaining to look, as far as you're concerned?
A I think we have looked where we felt like we needed to look.
Q Okay. Did anyone go to the FDA and say to the FDA, "Hey, by the way, did we ever give this to you?"
A We did not specifically ask that question, but upon recognizing that study based on the specific

question FDA asked in 2019, we went ahead and provided that information.

Q And they didn't come back and say, "Oh, don't worry. We've had it for years." Nothing like that, of course, right?

MR. SACHSE: Objection, form.

A No. They did not respond.

Q And I notice some boxes being found, and I assume the boxes are not GRACE, Cards, Rosetta or Veeva Vault, and so tell me about the boxes you guys have been finding and where are they and what are they, and are they archived electronically? Like, what's the situation there?

A From the US perspective, many of our early documents were scanned and placed into Cards, so they -- a lot of those originated from paper documents, but they're scanned. From the -- and we're talking about the regulatory archives here. Outside of the US, I'm not as familiar with their particular systems, but there could be boxes there.

Q Okay. So in terms of the regulatory files, it sounds like the structure you've spoken of, for the most part till more recently, the interactions with the FDA were really from people domestically here in the US. They simply reported up to the global function; is that

correct?
A Yes, more recently reported up through the global function.
Q And, you know, historically back in, like, the '80s, for example, the UK global people weren't interacting with the FDA. Is that a fair statement?
A I did not see any evidence that the UK regulatory folks were interacting with the FDA. They were US based. But there were, you know, individuals in other functions that were based in the UK.
Q And in terms of the regulatory function, I just -- it leads me to believe, and I think you can confirm, that as far as you know, you wouldn't expect there to be any UK regulatory people that would have communications with the FDA that wouldn't be housed here domestically in some way; is that correct?
A Would you repeat that question?
Q Yeah, I just -- in terms of UK regulatory folks, I assume there isn't somebody over there, a John Doe or a Jane Lanue, that we don't know about, that have been interacting with FDA and somehow would have submitted this material. It really would be domestically through these systems is where we would see it if it were submitted to the FDA; is that correct?
A Our UK colleagues would not have interacted

with the FDA.

Q Okay. That's something that really the domestic US regulatory was in charge of; is that right?

A Yes. In terms of any submissions to FDA, yes.

Q Okay. And you mentioned that there might be some UK people interacting with the FDA historically. Is that the case back in the '70s and '80s, or you just don't know?

A Well, based on my review of the file, it does look like there were individuals based in the UK that were scientific contributors to things.

Q All right. Understood. Okay. And do you know where Tanner was located who did the Tanner study?

A So when you say "located," what do you mean by that?

Q So I assume Tanner is one of the authors; is that right?

A Yes.

Q Do you know where Tanner was located physically? Was it in the UK -- was that person in the UK, or were they domestically here in the US?

MR. SACHSE: Object to scope.

Q Do you know?

A Yeah, from what I understand, they were based in the UK.

Q And that study was done in the UK; is that right?
A Yes.
Q And the same is true of the Bell-Smith study; is that correct?
MR. SACHSE: Object, scope.
A That I wouldn't know. I would have to refer to --
Q And what about the Manchee study? Was it done in the UK? Do you know?
MR. SACHSE: Object, scope.
A I don't know.
Q Give me one second. This may be a supply chain question separate from you, but do you know where I would find the requirements for stability testing for Zantac over the course of its life as a product with GSK?
A So I would refer to pharma supply chain in terms of agreements or requirements for that.
Q Okay. And would you agree with me that part of stability testing is to assess and identify impurities in the product?
MR. SACHSE: Object, scope.
A Yeah, I refer to pharma supply and CMC here, but what I can tell you based on review of the file,

there was information about that in the file.
Q About the impurities?
A Yeah, about testing impurities.
Q Okay. And if I wanted to find the standards on identifying reporting thresholds for impurities or identification thresholds for impurities or degradation of products, do you know where I would look?
MR. SACHSE: Object, form and scope.
A Yeah, again, I would refer to pharma supply chain and my CMC colleagues on that.
Q And I understand, but within regulatory, is there anything you can point to where you'd say, like, "Yeah, if I were to go look, I'd look at the SOP here or these standards"? You don't know anything about that. That's really just separate from you completely is what I'm hearing you say?
MR. SACHSE: Objection, form.
A Right. I mean, I would rely on my CMC colleagues if I had a question like that. There may be FDA guidances around that.
Q And is there someplace in GSK where standard operating procedures are housed? So if you're saying regulatory, and I'm like, "Hey, I wonder what the SOP is over in CMC on a particular issue," could you go and access it or is it -- is there just not a system for it?

Like, I'm just trying to understand.

MR. SACHSE: Object, scope.

A Yeah, I think my first -- if I had a question around that, again, I would first rely -- I'd go to that CMC colleague to ask that question. But in general, we should be able to locate SOPs broadly within the regulatory organization, so if it's a CMC-specific SOP. But, again, to identify that, I'd go to my CMC colleague to do that.

Q And where are the SOPs housed? Is there a name for a system, like, you know, GRACE or Cards or something or is it some other system? Like, help me understand that.

MR. SACHSE: Object, scope.

A So where I look for SOPs is a system called -- another Veeva system, Veeva Quality Docs. There was a historic system called also CPMS, and I don't remember what that stands for.

Q Okay. And for Veeva Quality Docs and CPMS, what type of information would be in there, if you could describe it for us?

MR. SACHSE: Object, scope.

A So from a regulatory perspective, our SOPs would be in that system. And I should add that we have additional written standards that may not be in that

system but may be in another system that's called IMMS I-M-M-S.

Q And what are the IMMS written standards? What do you mean by that?

A So whereas an SOP may provide in general an overarching, you know, process, from a policy, additional written standards such as what we call work instructions might provide a step-by-step way of following a process.

Q And there would be some of those for regulatory within IMMS, if I understand you correctly?

A That's correct. There are written standards located in that system IMMS.

Q Okay. Any other systems besides those?

A We have -- are you speaking of written standards?

Q Yes.

A Those are the ones that come to mind: Veeva Quality Docs, CPMS and IMMS.

Q Give me one second. I'll shift gears for a second. So before I go through and mark things, I just want to ask you a couple of things and sort of cut through some items, perhaps.

One is in terms of regulatory, I have a document that's from 2017, and it's an R&D regulatory

document, and it's an SOP, and it's related to communications with the FDA.

Have you gone back in preparation for your deposition today to review SOPs regarding communications with the FDA?

A I have not reviewed that one specifically.

MR. CHAFFIN: If we could, Michael, if I can get brought up GSKZAN, I think it's five zeros, 31395, and if we can mark that as 236, that would be a good start.

MR. HOLLANDER: Okay. Just a moment.

MR. CHAFFIN: And for the videographer, if you could tell me how much tape we've used so far, that would help give me a sense of timing.

THE VIDEOGRAPHER: Sure, Counselor. Just give me a couple seconds.

(Exhibit No. 236 was marked.)

MR. CHAFFIN: No worries. Take your time.

MR. HOLLANDER: Carlos, I think I can help you out. I've got three hours and 16 minutes on the record so far.

MR. CHAFFIN: Okay. Thank you. I know Will's agreed to -- Will's agreed to ten, so I'm good.

MR. SACHSE: Well, actually, don't worry. I have not agreed to ten. I saw the look on your

face.

MR. CHAFFIN: For the record, I was making a joke, so I should be clear about that because I realize we're still on the record.

BY MR. CHAFFIN:

Q Dr. Driver, I don't know if you can see that or not, hopefully. And I just want to check if you're familiar with this SOP. And we can scroll through it as much as you need to see if you recall looking at it at some point or if you're familiar with it.

A I need you to scroll. (Reviewing document.) Now, I don't know if you have a specific question.

Q So are you familiar with this SOP?

A Yes.

Q And this is something that has been in place or is in place for your department since at least 2017?

A Correct.

Q And is there something similar to that before then?

A Yes. There should have been something -- I would expect there to have been something similar with Cards.

Q And certainly, I guess, my general question is this has been the policy of GSK for as long as you've been there in 20 years is to have SOPs where it's

standard procedure for the filing and tracking of information that's communicated to the FDA; is that correct?

A I can speak for my time in regulatory, which began in 2013, that written standards like this have been in place regarding archiving submissions and correspondence.

Q And also in terms of -- and I think we've covered this, so I don't want to re-cover territory, but I think you've testified too that even leaving aside the SOPs, certainly as a practice, it looks like the file on Zantac, for example, shows a pattern and practice where this was in fact done, correct?

MR. SACHSE: Objection, form.

A Based on my review of the file, it appears this practice was -- was also done at that time.

Q And there's a separate SOP, and I don't think we need to mark it, but there's one on recording telephone contact with regulatory agencies, and I believe it doesn't allow for the recording of conversations. Is that accurate, from your recollection, or no?

A I would have to go back and review that SOP regarding recording, but it's not a typical practice that I have done. I have always documented the

conversation.

Q And is there any particular reason for that policy or no?

A I don't know the rationale for that, whether it's the -- I don't know.

Q Okay. Understood. All right. Give me one second.

MR. CHAFFIN: If I could get you to mark 237. It will be GSKZAN 0000030135.

(Exhibit No. 237 was marked.)

BY MR. CHAFFIN:

Q Dr. Driver, have you seen this SOP? We can scroll through it for you.

A I believe I have seen this SOP. I don't know what time period it is.

Q It looks like it's effective December 5th, 2018. And this is on R&D regulatory, so I don't know if that's you or somebody else.

A And is there a scope section of this SOP?

Q Yeah, I believe it's the "What Does This Cover?" unless you're talking about something else. There's a whole "You should read this part" down below too.

A This is -- where it says "The following table indicates the scope of this SOP," and it says

"Regulatory questions from US FDA," it's, no, this is not -- US FDA responses are not in scope of this particular response to questions SOP.

Q Gotcha. So this does not apply to the FDA or your department is what you're saying; is that right?

A This SOP does not. This SOP refers to a response to questions tracking system. Because we manage our, you know, correspondence the way that we do with FDA, our questions are in an archiving mechanism.

Q Okay. Is there an SOP covering the FDA portion or no?

A The last one that you brought up regarding archiving should cover that.

Q Gotcha. So that's under GRACE and that would apply is what you're saying?

A Correct.

Q Understood. Thank you.

MR. CHAFFIN: We can take that down. If I can get one more document, GSKZAN 0000030517, and that one will be Exhibit 238.

(Exhibit No. 238 was marked.)

BY MR. CHAFFIN:

Q And Dr. Driver, if you would please direct the technician so that you have an opportunity to review that and let me know if this is something you're

familiar with, and then the second question will be does this apply to your department.

A Scroll down, please. And if you could go to page 3, please, of the document so I can look at the scope. Could you go back? I'm sorry. I see this here.

Q You take as much time as you need and don't apologize. We're happy to move it around because it's a little clunky doing this, and I want to make sure you have the full information, so please.

A Okay. If you could scroll down. And if you could continue to scroll down. If you could continue to scroll. So I recognize this is a 22-page document, so this is an SOP that is authored by our -- our safety organization, so this is their particular SOP. Within this SOP, there may be some regulatory responsibilities outlined. I'm not sure which area of this SOP that is.

Q Okay. Is there a way to determine that from this document or no?

A We could continue scrolling down or --

Q You know, if we can go down, actually, it's -- and I only have -- only way to reference is Bates number, which is 529, if we go to that page for a second. And just under the risk management plans, is that something that you're familiar with?

A Yes, as a general concept.

Q And is that -- I notice that it talks about EU RMP and global RMP as examples. Is that also domestic US?

A In the US, we don't necessarily call them risk management plans. There's a separate SOP for what's called a REMS in the US, and --

Q Yeah, in fact, I see REMS is referenced there.

MR. SACHSE: I'm sorry, Eric. Could you let her finish?

Q Yes. I apologize. I wanted to highlight that REMS is referenced there as well. Go ahead. I'm sorry.

A I just want to say that's the US specific, as it says risk evaluation and mitigation strategy program with the FDA, so those are programs that do evaluate risk management.

Q Okay. And I appreciate this. This is insightful. In terms of the SOP, it looks like it's referenced there, 141839?

A Yes.

Q And then there's three references down below, the 141839. Then there's also the 54837 and the 477193. Are all three of those applicable to the US, or do you know?

A So the REMS one, the 839, is applicable to the US. And it's -- I would have to review the other two to

look at the scope of those to see if the US is in scope. Again, this is a safety department SOP. Steve Hobbiger may be better equipped to address these specific questions here.

Q I was trying to look and I don't see a content owner. I guess the only department is R&D late stage development, which is on page 1. I know you can't see that in front of us. But in terms of the REMS, that's something that would be in a different department than yours; is that right?

A So it is managed through safety, but regulatory does have a role in terms of the submissions to FDA regarding REMS programs.

Q And is Zantac a product that's subject to a risk minimization action plan under the FDA Guidance for Industry Development and Use of Risk Minimization Action Plans?

A So that would be a question for safety. I'm not aware that we are in terms of a formalized program, but safety, Steve Hobbiger, specifically, would -- could provide that information.

Q So that as well as the references in terms of their applicability, that would be a Dr. Hobbiger question; is that correct?

A That's correct. But what I can confirm is

that for the FDA, there is no REMS program in place.

Q And there's not one in place because it's not on the market?

A There's never been one in place.

Q Understood. Okay. And then the communication of safety concerns under 5.7, if you would review that for a minute, please. Where does that function sit is my question once you've had a chance to read that paragraph?

A RA labeling is referring to regulatory affairs labeling, so that group has responsibility for updating the US PI to comply with any global PI updates. So the global PI is the company's -- will be Oracle global data sheets, the company's core position.

Q And where does that -- so that would be in the global arena and that's under a separate department labeling or within regulatory?

A It's within regulatory affairs. Global labeling is in that function. As far as the pull through to the US prescribing information, the classic and established products, my team, also has responsibilities for US labeling aspects.

Q Understood. Okay. Thank you. We can take that down.

At no point in time did GSK shorten the

expiration date for its ranitidine-containing products, including Zantac; is that correct?
A That's an answer I would need to defer to pharma supply chain or CMC.
Q Okay. You've reviewed the labels in preparation for today, correct?
A I have reviewed the labels.
Q And in your review of the labels, did you see any changes to that at any point in time?
A It would be difficult to determine that information based on review of the prescribing information because that information has the stability and storage information but not the shelf life information.
Q Understood. Okay. Are you aware today that at no point in time did GSK change or alter the safe shipping and storage temperature for Zantac?
MR. SACHSE: Object, scope.
A I would defer to pharma supply chain on that.
Q Okay. Understood. Give me one second. I just need to get a document here.
(Off-the-record discussion was had.)
MR. CHAFFIN: So I'm going to put up what we're going to mark, as soon as it's dropped into the folder, Exhibit 239. And this should be the

SOP that we were referring to earlier, which is the 141839. And let me just see if I can share this without messing things up. Can you guys see that? It should be a PDF of the 14189.

(Exhibit No. 239 was marked.)

MR. SACHSE: Yep.

BY MR. CHAFFIN:

Q Good? Okay. Let me just enlarge this for you here. Okay. Dr. Driver, please feel free to direct me. I'm happy to just scroll through this for you.

Is this the one that we were talking about that would apply domestically, or did we get the right one?

MR. SACHSE: Objection, form.

A This is the REMS SOP.

Q Yes.

A It's owned by the safety department.

Q I'm having trouble hearing you. I apologize. What's that?

A It is the REMS SOP that's owned by the safety department.

Q Okay. Understood. And then in terms of questions about this document, who would be the most appropriate person to ask questions of on this?

A Steve Hobbiger.

Q Okay. Fair enough. Thank you. Let me just stop this. Look at that. Easy enough. All right. Moving on.

So I'm just going to run through some documents now and kind of shift gears, and it's mostly going to focus on the time period from about August 2019 forward and in particular the, you know, just documents from e-mails in the file regarding the NDMA and ranitidine.

MR. CHAFFIN: So first, Michael, could you bring up GSKZAN 0000251812?

MR. HOLLANDER: Yes, just a moment. This is going to be 240?

MR. CHAFFIN: Yes, it will be Exhibit 240. Thank you.

(Exhibit No. 240 was marked.)

BY MR. CHAFFIN:

Q Dr. Driver, from the records I've looked at, this to me looks to be the earliest communication written to you about the risk of NDMA, as the subject line says, and here it's talking about the formation in vivo.

Do you recall being contacted or discussing this prior to August 2019?

A In terms of internal GSK communication, the

only thing that I can think of is that there was a question that did come from Canada, our Canada LOC, and so Canada was asking the questions, and that might have actually been in July.

Q Okay. So at sometime possibly in July, but certainly, as you can see here -- who's Jenny Owen, first of all?

A She is my -- my counterpart in the UK, so I lead the US team and she leads the UK team.

Q Okay. So by August 1st, 2019, there were inquiries received from a number of regulatory authorities concerning the risk of NDMA formation in vivo in relation to ranitidine, according to her; is that correct?

A Yes. There were inquiries that had come in.

Q Okay. And you were aware at least as of August 1st; is that right?

A Yes, based on this e-mail.

Q And certainly --

A Can I take a moment to read, if you don't mind.

Q Absolutely, please.

A Refresh my memory. Thank you.

Q And you've had a chance to review it?

A Yes.

Q And by August 1st, at this time, no one's reached out to the FDA and said, "Hey, there's an issue with our product," correct?

A At this point in time, we had not had communication with FDA. Also at this point in time, all of our product had expired in the US.

Q You still were the NDA holder, correct?

A We still were the NDA holder for tablets and syrup.

Q And despite being that NDA holder and knowing that there are other people that are relying upon that NDA, GSK did not notify the FDA of any issues in the foreign regulatory bodies that was coming up as this e-mail articulates; is that correct?

MR. SACHSE: Objection, form, foundation.

A So at this time, we had not notified FDA and, in fact, we were all still investigating the question at hand internally and --

Q Sure.

A -- fact finding regarding this matter.

Q Right. Finding old studies that you didn't disclose to the FDA, that kind of stuff, right?

MR. SACHSE: Objection, form. Come on.

A We were, you know, evaluating and understanding -- trying to understand particulars.

Q Okay. And in fact, GSK never actually went to the FDA and said, "Hey, we might have an issue," correct?

MR. SACHSE: Objection, form, foundation.

Q As far as you know.

A So can you -- at what time period?

Q Dr. Driver, as of August 1st, no one had gone to FDA and when it comes to reporting information to the FDA, GSK never actually went to the FDA and said, "Hey, we have all these regulatory bodies asking questions about ranitidine and the formation of NDMA," correct?

MR. SACHSE: Objection.

Q You never told the FDA about that, correct?

MR. SACHSE: Sorry. Objection, form, foundation.

A What I will say is that subsequent to this -- keep in mind we were still investigating the issue to understand ourselves and what the questions were. And then on August 6, the FDA did contact GSK, and we responded to their questions about this.

Q So, again, just to back up. Never said it to the FDA. The FDA had to come and ask you guys about it; is that correct?

MR. SACHSE: Objection, form.

A I think it's fair to say that we were still

investigating the issue.

Q So Dr. Driver, with all due respect, with all due respect, I understand there might be an explanation for it, but I'm just asking the simple first question is did you guys go to the FDA and say, "Hey, we have this issue. Regulators around the world are asking this question," or did the FDA come you to and say, "Hey, we have an issue," and in fact that is what happened and in fact you guys already knew about it, correct?

MR. SACHSE: Objection, form and foundation.

A We -- when FDA approached us on August 6th, yes, we had questions from regulators rest of world.

Q And until the FDA approached you, you guys --

A All of our product had expired in the US, GSK product on the market.

Q So, again, I understand that you might have rationale for it, and we can get into that, but my simple question is you guys never went to the FDA before the FDA came you to and said, "Hey, we have an issue," correct?

MR. SACHSE: Objection, form, foundation.

A We never approached the FDA at this -- about this matter until FDA requested the information.

Q You never approached the FDA and, in fact, they approached you first, correct?

MR. SACHSE: Objection, asked and answered.
A On August 6, FDA reached out to us.
Q They reached out to you guys, and while there's maybe new information in there on August 6, it is certainly an issue that GSK was well aware of by that point, correct?
A We were --
MR. SACHSE: Objection, form, foundation.
A We were aware of the issue based on the questions that were being asked by regulators, but we also needed time to evaluate what this issue was.
Q Okay. By the way, would it surprise you that the safety people internally were saying, "Gosh, I'm surprised we weren't asked these questions before because of the Mitch study back in 2016"?
MR. SACHSE: Objection, form, foundation.
Q Would that surprise you?
A I don't know. I can't speculate.
Q Would that disappoint you as somebody who's obligated to communicate with the FDA that if the internal safety folks at GSK are expressing surprise it took them this long to catch on to it?
MR. SACHSE: Same objections.
A What I can say is our safety department in GSK is -- they are continually monitoring the safety of our

products, and as a company, we always want to ensure that our products are safe and effective.

Q So that's the standard they should be held to; is that right?

A That is the standard.

Q That is. And you agree with me -- I agree with you and you agree with me that's the standard that GSK should be held to in terms of the safety of the people that were consuming Zantac is to continue to monitor the product and the safety of the product. That's the obligation, correct?

A That's correct.

Q And that's what you expect the safety department to be doing, correct?

A That's correct, and I feel that they did.

Q And you feel that they did. And what's that feeling based upon?

A Just because I work with these individuals in these departments every day and I know the framework that's in place to monitor our products to ensure that they're safe and effective.

MR. CHAFFIN: Could we stop the share for a minute, please?

Q Dr. Driver, I mean, you strike me certainly I understand that that's what you would expect in terms of

people that you're working with, correct?
A That's correct.
Q And certainly, as you can tell and you can see, there are certain documents that not even your department was privy to for all these years, correct?
MR. SACHSE: Objection, form.
A I'm not sure what you're referring to.
Q Well, Tanner, for example. It was done in 1982. It took until 2019 for your department to even hear about that document, correct?
MR. SACHSE: Objection, form.
A We -- we would not necessarily have been aware of that particular document within regulatory.
Q Yeah.
A But also to shar -- we did share that document with them once we -- to answer a specific question the FDA had asked.
Q Yeah, and you had an obligation to disclose that, correct?
MR. SACHSE: Objection, form, foundation --
Q I mean, Tan --
MR. SACHSE: -- misstates testimony.
Q Tanner had an obligation to disclose to the FDA particularly when they're asking about it, correct?
MR. SACHSE: Objection, form, foundation,

misstates testimony. Go ahead.

A When FDA had requested information, if we had evaluated it, we did answer their question.

Q So it's pretty clear to me from this as well as Tanner that obviously it's only when the FDA asks that you actually give the information; is that accurate?

MR. SACHSE: Objection, form, foundation and misstates testimony.

A I think that we have to take a look at the regulations and the requirements and, you know, that sort of thing to consider what we submit to FDA.

Q I gotcha. So your position is, for GSK, that it had no obligation to disclose to the FDA the investigations by the foreign regulatory bodies; is that correct?

MR. SACHSE: Objection, form.

A Could you be a little bit more specific in a time frame?

Q Sure, yeah, absolutely. I mean, you know, we're sitting here August 1st, and we're like, "Hey, let's put together an internal committee because we're getting all these inquiries from foreign regulatory bodies," but at any point in time did you or anybody else say, "Well, you know, we should give the FDA a

heads-up that this is going on"?

A As a responsible pharmaceutical company, I think we needed to also evaluate what the information was and understand what that information was in order to respond appropriately or to convey that information to regulatory bodies.

Q They're not mutually exclusive, are they? You could say, "Hey, FDA, just so you know, this is coming up. There's a possible signal here. We've got to do an assessment. There may be adverse events. There could be all kinds of stuff that's going on," giving the FDA the heads-up this is going on at the same time that you're assessing it, correct? There's nothing that prevents the two from happening simultaneously, correct?

MR. SACHSE: Objection, form, foundation, and misstates the evidence and testimony.

A When we approach regulators, we do want to ensure that we have investigated the issue and understand it and have appropriate information that's scientifically valid to provide to them.

Q Bernadette Doyle, who is she?

A That name doesn't ring a bell with me.

Q And how about Andy Searle? Andrew Searle? Are you familiar with him?

A I don't know Andrew Searle.

Q Okay. So it's fair to say if there's communications between those two people, you, one, don't even know who they are. Is that a fair statement?

A I'm not familiar with them. Are they from a particular area within --

Q So I just want to be clear. You as the head of US regulatory don't know who Andrew Searle or Andy Searle is; is that correct?

A His name sounds familiar to me, but I don't -- I don't know who he is.

Q And second person, Bernadette Maria Doyle, you don't know who she is?

A No.

Q And if these two people were saying internally at GSK that "My God, they're going to be looking now because there's stuff coming up in Japan, there's stuff with the Mitch study, and, oh, my gosh, the product's going to be taken off the market," you're not privy to any of that information; is that correct?

MR. SACHSE: Sorry. Can I just stop for a minute? I dropped for a moment, so can I just catch up to that question?

MR. CHAFFIN: I'd like an answer, then. You can just read the transcript, which I think you have it there, Will.

MR. SACHSE: Okay. I'm going to object.
MR. CHAFFIN: You can certainly object. That's fine.
BY MR. CHAFFIN:
Q Are you privy to any of that?
A Well, I think I need a little bit more detail in what you're referring to.
Q Well, one, you don't know who they are, right? You don't know who Andy Searle and Bernadette Doyle is; is that right?
MR. SACHSE: Objection, scope and form.
A I'm not familiar with those individuals.
Q And they're not part of that cross-divisional safety group that's supposed to give you the valid information and then communicate to the FDA; is that right?
A I don't know. Can you share with me who these individuals are so I --
Q It's not my place to testify. I'm just asking you. If you don't know, you don't know, but I just want to understand, you know, like, you know when you -- I just want to make sure that you sitting here, Dr. Driver, Doctor, saying to the ladies and gentlemen of this jury, that you rely upon the safety people at GSK to give you valid information to report to the FDA,

that you don't know who those two people are?

MR. SACHSE: Objection, asked and answered.

A I don't know --

MR. SACHSE: Form.

A -- them.

Q Fair enough. Do you know what role they play in terms of orchestrating information behind the scenes?

MR. SACHSE: Objection, form.

A I don't know them and I don't know their roles, so --

Q Okay. And certainly in terms of -- from your viewpoint, in terms of reporting the safety and efficacy of Zantac to the FDA at any point in time, as far as you're concerned, you know, they didn't play any role from your perspective. You just don't know who they are?

MR. SACHSE: Objection, asked and answered.

A I don't know who they are, so I can't comment.

Q They're not part of that cross-sectional team that you spoke of earlier today, correct?

MR. SACHSE: Objection, asked and answered.

A Again, I don't know who they are.

Q Fair enough. Was it important to GSK to control the story line with the FDA about ranitidine breaking down into NDMA?

MR. SACHSE: Objection, form.

A What I can say it was important for GSK to be complete, transparent with FDA with what -- as we were learning and investigating the issue.

Q And so, for example, in the global regulatory department, which I know that you're a part of on this cross-sectional group that works on Zantac, for example, if there were statements made "Don't give EMA," for example, "the cancer rat studies unless they ask for them," you don't know anything about that or you do?

MR. SACHSE: Objection, form and foundation.

A I don't know anything about that.

Q It certainly wouldn't be complete transparency if they were trying to withhold information, correct?

MR. SACHSE: Objection, form and foundation.

A I don't know anything about that. I don't know the context of it to comment.

Q It certainly would sound like controlling a story line if that's in fact what they were doing, doesn't it?

MR. SACHSE: Objection, form and foundation.

A I don't have any information regarding that.

Q At some point in time there's a response to the questions from the FDA. And in particular, there was a question that prompted you guys to say, for

example, that you hadn't tested NDMA previously in the face of, like, nitric acid or stomach fluid, which then you had to correct because of Tanner. Do you recall that?

A Yes.

Q And at some point -- Ethnie Conner, she's Dr. Conner; is that correct?

A I don't think she has a doctorate.

Q So Ms. Conner, what is her role?

A She is a VP, a vice president within regulatory affairs.

Q Okay. And is she someone that you report to, or is she one of your colleagues? How would you describe her relative to yourself as domestic head of regulatory in the US?

A So --

MR. SACHSE: Objection -- sorry. Just misstates her title, Dr. Driver's title.

Q I'll withdraw the question. So relative to you, Dr. Driver, can you describe what role Ms. Conner plays?

A So up until, I believe it was February of 2020, Ethnie Conner was my manager.

Q So until more recently, Ms. Conner, so she was your supervisor sometime through '19 or '20, you're not

sure when; is that right?

A 2020, early 2020.

Q Okay. So in August of 2019, she would have been your manager; is that correct?

A That's correct.

Q And in fact, there was a process whereby you and others were looking at the response to the FDA, and there was a statement, "The registered specification for both ranitidine hydrochloride and Zantac tablets do not include a test for NDMA. Consequently, GSK has not tested ranitidine hydrochloride or Zantac tablets for presence of NDMA because NDMA has not been reasonably predicted to be present within the product as per response in 3.2. Furthermore, NDMA would not be predicted to be present in ranitidine hydrochloride or Zantac."

Do you recall anything about that in terms of the written statement?

MR. SACHSE: Objection. Are you -- you're reading from the statement. Could you show it to the witness?

Q Do you recall anything about that, Dr. Driver?

MR. SACHSE: Same objection. Are you not going to show this to the witness?

MR. CHAFFIN: Not yet.

BY MR. CHAFFIN:

Q Dr. Driver, do you recall anything about that?

MR. SACHSE: Same objection.

A I recall the information, but I would need to review the document for context.

Q Was it the policy of GSK to not look at whether Zantac tablets should be even tested for NDMA for years because it wasn't part of the registered specification for the product? Was that its policy?

MR. SACHSE: Objection, form and foundation.

A This is -- this is an area I would need to defer to CMC colleagues just because it's not something that I understand was part of the standard to look for just across pharmaceuticals in general.

Q But just to be clear, I mean, you would agree, though, that making that statement would be a wrong statement because that does not -- it's not the only thing to trigger the obligation for conducting an assessment, correct?

MR. SACHSE: Objection, form and foundation.

Q Just because it's not part of the registration that, "Hey, we don't have to check for it, that's not the obligation." You actually have to check based upon external factors. Maybe there's external publications, maybe there's studies, there's signals, then that's what

could cause an assessment. It's not just whether it's part of the registration. You would agree with that, correct?

MR. SACHSE: Objection, form and foundation and scope.

A Yeah, I mean, I think it goes back to each particular situation and what you're evaluating.

MR. CHAFFIN: Michael, if we could get 0000431095.

BY MR. CHAFFIN:

Q Dr. Driver, I assume you'd agree, and maybe the document's not needed, but I assume that you agree that the registered spec is not the only driver, no pun intended, for conducting an assessment; is that correct?

A Be more specific. An assessment for?

Q Assessment for whether ranitidine breaks down into NDMA, for example. Just because it's not in the registered spec doesn't mean you don't have to look at the issue, correct?

MR. SACHSE: Objection, scope.

A Yeah, I mean, again, I would -- I would point to our safety colleagues regarding this as well because it does depend on the issue.

Q All right. We'll bring up Exhibit 241. And I don't think this is a question that's outside the scope

of regulatory in any way, respectfully, Will, as well as Dr. Driver. I think that certainly your boss, someone in regulatory is actually pointing this out, and I'm not sure why it's such a hard question today, but we'll bring up the document that should be able to help us moving forward, so --

MR. HOLLANDER: I'm having some trouble locating the document. Are you sure it's uploaded?

MR. CHAFFIN: Should be 0000431095. If not, Jess, if you would, please, grab it and drop it in there, please.

MR. HOLLANDER: I'm sorry if I'm missing it.

MR. CHAFFIN: No, that's okay. Sometimes it's the zeros. So GSKZAN0000431095.

(Off-the-record discussion was had.)

(Exhibit No. 241 was marked.)

MR. CHAFFIN: I'll share my screen and that will be faster. Hopefully you can see that.

BY MR. CHAFFIN:

Q Dr. Driver, this is going to be the first page, and hopefully we're going to be able to upload this document. It's going to be Exhibit 241. And I just want to look at that paragraph with you, if you would, please.

A Slide it to your left.

Q To my left? Let's see. And I may be going the opposite way because it's --

A Yeah, perfect.

Q This is an e-mail response from Ms. Conner to a group of individuals; is that right?

A Correct.

Q And this is regarding the information request from the FDA; is that right?

A I would have to look at the rest of the e-mail, I think.

MR. CHAFFIN: Yeah, and Michael, if you find it or get it from Jess, let me know, because this is going to be a little clunky.

BY MR. CHAFFIN:

Q Leaving aside the question I just asked and just zero in on the question that I think we were focused on before all this, which is there was a statement that is getting redlined here, and the statement was, "The registered specification for both ranitidine hydrochloride and Zantac tablets do not include a test for NDMA," and that's what was originally written or was going to be written in the response to, as I understand it, the FDA or the European regulatory body. And it's pointed out from Ms. Conner that that isn't the only thing that actually would prompt

conducting an assessment. Do you agree with that or no?
MR. SACHSE: For the record, object that the whole document isn't available to the witness, but go ahead.
A I don't have that -- the full context or the knowledge to know what this is necessarily referring to, so it would be difficult for me to comment, and I'm not the CMC expert in this area.
Q What is CMC?
A Chemistry manufacturing and controls.
Q Okay. And Ms. Conner is?
A She at that time was the head of classic and established products regulatory globally but has a CMC background.
Q Okay. But she's your boss, right?
A At that time she was.
Q And certainly serving in the same capacity as you but on a global level, not just domestic US; is that right?
A Correct.
Q And she certainly is pointing out to the group that, "Hey, by the way, you know, registered specification," is not the only driver for conducting an assessment, meaning a risk assessment; is that right?
A I'm not sure what kind of assessment is being

referred to here without the context.

Q Okay. So I just want to be clear about this. So leaving aside that document, do you agree that there can be other things that prompt a risk assessment of a product besides whether it's in the registration for the product? You would agree with that, right?

A I would agree with that and it would depend on, as I've mentioned earlier, the issue, what the issue was.

Q Fair enough. And I get that you're going to say that and you're going to be behind it and I'm not going to argue with you about it. Okay? We'll leave that aside for a minute.

My point is there are various things that can trigger an assessment needing to be done of a product; is that right?

A That's correct.

Q So we went over some of them, right?

A Yes.

Q Publications can, right? Studies that are published publicly can; is that right?

A Again, I'll go back to saying it depends on the topic, it depends on the issue, whether it relates to safety, efficacy, quality. There are things that can trigger and maybe a -- but there are different types of

assessments, so a benefit/risk assessment, for example.

Q Okay. In terms of risk assessment vis-a-vis whether Zantac is breaking down or producing NDMA, that assessment, that's not something that you were responsible for at GSK; is that correct?

MR. SACHSE: Objection, scope.

A Not specifically, no.

Q Because that sat with other people; is that right?

MR. SACHSE: Objection, scope.

A That and the fact the e-mail earlier, you know, answers that it's a cross-functional team that works across different areas for different topics.

Q And certainly at least for Ms. Conner, what role she was taking on with this group is to at least make sure to get right within the standard they had to meet, which is, "Hey, guys it's not just the registration of the product that can prompt an assessment. There are many things that can prompt an assessment." She was taking that on for the team, right?

MR. SACHSE: Objection, form, foundation and scope.

A Yeah, I'm not -- I'm not going to disagree with Ms. Conner, but it's outside of my area and also

not having the full context of the information.
Q So at least domestically here in the US, if someone made that statement, you wouldn't know to correct them one way or another is what it sounds like because you just don't know the answer to it. Is that a fair statement?
MR. SACHSE: Objection, form.
A In terms of not knowing the answer, again, full context would be appropriate here.
MR. CHAFFIN: Jess and Michael, did we get the document or no?
MS. SZUMIA: The document is in the share folder.
MR. CHAFFIN: Okay. Michael, could we bring it up?
A If you could scroll down -- it looks like it's seven pages long. If we scroll down to page 7 and then we can go up, that might help me follow the e-mail trail. Okay. Okay. If you could scroll down. So I'm not sure what question three was because I can't recall it, but, again, I have no reason to believe or doubt Ms. Conner's assessment here.
Q So first of all, you agree with Ms. Conner that the registered specification's not the only way to drive conducting an assessment; is that correct?

A Well, I think I would need to see question three in the full question and context.

Q So until you see -- I just want to make sure, because we'll take a break and go get the documents, but anything else you need in order to confirm what she's saying here as your boss about when to do an assessment besides I guess you said you want to see what's the response to question three; is that right?

A Well, I'd just like to look at question three and what the response is to get some context because assessment can mean different things, so I just want to be clear with what is being --

Q Sure. So you want context to that. Anything else you need besides that because I want to make sure I get it for you on a break. Anything else?

A The question and the answer.

Q The question and the answer. Which version of the answer do you want?

A I think it would be helpful to have the information that was submitted to FDA.

Q Which time?

A This is the response to around the August, the late August response.

Q Okay. All right. We'll look for that.

MR. CHAFFIN: So why don't we take a break and

go off the record, if that's okay with you, Will, and we'll just stop sharing until we get back, and it'll make it a little bit easier while we're taking a break.

THE VIDEOGRAPHER: Going off the video record. The time is 7:11 p.m. GMT, 2:11 EST.

(A 21-minute recess was had.)

(Exhibit No. 242 was marked.)

THE VIDEOGRAPHER: Going on the video record. The time is 7:33 p.m. GMT, 2:33 p.m. EST.

BY MR. CHAFFIN:

Q Welcome back, Dr. Driver. While we were on break, we actually pulled what's now been marked as Exhibit 242, which is GSKZNDA 0000636549 through 58, and if we could bring that up, Michael, that'd be great.

Dr. Driver, I mean, certainly go through this document if you want to go through all of it. I think what we were talking about before the break was -- it was a response to, I believe, it's in 3.3 is the paragraph. And if we scroll down to 3.3, FDA Question 3, and you'll see the response, which it looks like edited response with the change by Dr., excuse me, by Ms. Conner actually shows up there, and first I just want to make sure. If we need to bring up 241 for you for a minute, we can do that, but this is the response

that officially was submitted.
A (Reviewing document.) That's helpful to know what the question was.
Q And so the question that I was asking you before break, and again, I didn't think it was a very controversial one, but Ms. Conner has suggested to delete the sentence that read "The registered specification for both ranitidine hydrochloride and Zantac tables do not include a test for NDMA. Consequently, comma," that's been deleted. They follow what Ms. Conner said, and she said the reason why is because a registered spec may not be the only driver for conducting an assessment. And do you agree with that statement with -- do you agree with her that that is a correct statement?
A I don't have any reason to disagree with her because she's the CMC expert in this space.
Q And you agree that if anyone at GSK was only doing an assessment based upon a registered specification being present, that that would actually be in error and that wouldn't be proper, correct?
MR. SACHSE: Objection, form and scope.
A Could you repeat that question, please?
Q Yes. As Ms. Conner, I believe, is pointing out, we need to delete that because it's a wrong

statement. We can't limit it to if there's a registered specification for a test for NDMA. That would not be a proper way to handle this. There are other reasons to do assessments.

MR. SACHSE: Objection, form and scope.

A So there could be many reasons to do assessments for many different things. What I believe is being referred to here is specifications in the CMC space, but you could also do assessments for safety, efficacy, et cetera. But for this particular thing, I think she was -- she's talking about, you know, have you tested it in the tablets themselves.

Q Right. So here the FDA asks the question, "Have you tested Zantac tablets, ranitidine hydrochloride tables, for the presence of NDMA?" The first answer was, nope, it's not in the registered spec. Her response is, "Well, there's other reasons potentially to test for it besides it saying in the registered spec to test for the presence of NDMA." Am I correct about that?

A That --

MR. SACHSE: Objection, form.

A I'll go back to what the e-mail stated. But in GSK's response, we did say that GSK has not tested ranitidine hydrochloride or Zantac tablets for the

presence of NDMA.

Q But in fact it did.

A That's true.

MR. SACHSE: Objection. Sorry. Objection, form, foundation.

A So I will say that if we fast-forward to, I believe, it's the December 11th submission to FDA, we did indicate that we had found a study, the Tanner study, that did evaluate -- not in tablets. Let me clarify that. We did go back and say we did a study that looked for NDMA in conditions of gastric acid, but we've not -- in this situation for tablets, we indicated we did not test Zantac tablets for the presence of NDMA.

Q So just to clarify, there are two questions here from the FDA, questions three and four, and responses from GSK. And question four, in particular, asks for in the face of the gastric fluid; is that correct?

A Correct.

Q And question three leaves aside gastric fluid and it just says, "Have you tested Zantac tablets, ranitidine hydrochloride for the presence of NDMA?" is that correct?

A Correct.

Q Tanner actually does both of those, correct?

MR. SACHSE: Objection.

Q You did -- just to be clear -- and you can object. One, you did test whether there are hyd -- ranitidine hydrochloride, which I understand would be the API, the substance, or the tablet -- they asked did you test the tablet or the substance for the presence of NDMA, and the answer from Tanner is, yes, we did. You would have to qualify it and say, yes, we did, but we did it in the face of nitric acid or whatever was the simulated gastric fluid that was being done there. And Bell would actually be an answer to question number three as well potentially, correct?

MR. SACHSE: Objection, form, foundation, misstates the evidence, and also scope.

A So what I will say to the Tanner, which I would point to our scientific experts in that area, is that based on my understanding, that really spoke to question four, which is "Have you tested Zantac tablets in simulated human body conditions?" Based on that study, I'm not aware that we looked at the presence in the tablets themselves, but, again, would refer to our scientific experts.

Q So just to ask, if it's an in-vivo study with simulated acid and the acid is controlled for in terms of NDMA, what else are they testing except for the

tablet itself? Am I missing something here?

MR. SACHSE: Objection, scope.

Q You're the doctor, I'm not, but am I missing something here, Doctor?

MR. SACHSE: Same objection.

A So, I mean, again, I would point to our scientific experts or point to Jim Harvey, for example, who I think you'll be talking with that --

Q That's fine. But Dr. Driver, let's just pause for a second. Let's say FDA never asked question four. Question three Tanner is responsive to, no?

MR. SACHSE: Objection, scope.

Q Just as a factual person sitting here reading this document trying to get transparency to the FDA at least by December when you correct this, you would agree with me that you do actually in Tanner test question number three, no?

MR. SACHSE: Objection, misstates the evidence and scope. She's already said she's not the witness for this.

A I will -- I will defer to Jim Harvey on that within our clinical group who can speak, you know, from a scientific perspective on that particular --

Q We got scope objections, but the reality is you're a fact witness too, Dr. Driver, and so you're the

head of US regulatory. And I'm just asking for the ladies and gentlemen of the jury, for all of my clients and many other thousands of clients who believe that they have developed cancer from Zantac, whether you can sit here and look this jury in the eyes and answer the question of whether Tanner is responsive to question number three if the FDA had never asked question number four. Yes or no?

MR. SACHSE: Same objections.

A I mean, I would agree with the same answers of (indiscernible) to provide context around that study.

Q You cut out so let's start over.

MR. CHAFFIN: Could I get the question read back?

(The record was read back as requested.)

A So my answer to that --

MR. SACHSE: I'm sorry. Same objections.

A So my answer to that would be I would refer to my scientific colleagues in that area to provide information on the context of the science around that.

Q So whatever -- whatever your colleagues say to you you would report to the FDA and you wouldn't actually look at the information to see if it's accurate. Is that a fair statement?

MR. SACHSE: Objection, form and foundation.

A I would look at the information, but in terms of interpretation of that information, I don't necessarily have that training to make an assessment there.

Q Okay. So we have Ms. Conner in August of 2019 before Tanner and the other studies come to light say, "Hey, guys, we can't just make the excuse that we're not looking at NDMA in the product because it's not one of the registered specifications for the product. We actually have an obligation to look beyond that for assessments." She actually says that in August. And then lo and behold you guys weeks later find Tanner from 1982, and you've actually done the very assessment in some way back that long ago and you never reported it to the FDA.

And then you finally correct the record with the FDA in December, months after you know about Tanner, and it takes you months because it's not till December and you've known about it since September, October, just a month or two after that, it takes you that long. Is that a fair --

MR. SACHSE: Ob --

Q Is that a fair characterization of the record, Dr. Driver?

MR. SACHSE: Sorry. Objection. It misstates

the record. It misstates the documents you've been referring to, but go ahead.

A I'll just say I can't answer that adequately because I don't know the timing of when Tanner was discovered --

Q Discovered.

A -- in the archive, so I can't speak to that.

Q Got it. If you had Tanner, that would have been helpful back at this time, correct?

MR. SACHSE: Objection, form and foundation.

A I'll say if Tanner had -- if we were aware of it at this point in time, we would have addressed it as part of question number four. And in fact, when we did find that study, we did go back to FDA and let them know that we located it and we -- we submitted that information to them.

Q Yeah, and it was, I believe, about four months later; is that correct?

A I believe it was in December.

Q December. And you found it by September, if I remember correctly; is that right?

A I don't know when that was found.

Q Yeah, okay. And so at least from a regulatory reporting perspective, it would have been nice to have Tanner so that you could make truthful and accurate and

complete statements to the FDA in response to at least question four and possibly question three; is that right?

MR. SACHSE: Objection, form and foundation.

A We made a complete and accurate response in our follow-up communication to FDA to clarify that that would have been included if we had found the study at that time.

(Exhibit No. 243 was marked.)

MR. CHAFFIN: Okay. Can I get Exhibit 243 which is GSKZAN 0000230085? If you could go to the bottom for her, and this will take a minute, I'm sure, but I just want to give her the opportunity to read through this document. It starts with the Jacqueline Lee e-mail from the FDA to Giridhar.

THE WITNESS: Scroll up. Okay. Okay.

MR. CHAFFIN: If we could go to the bottom of Exhibit 243, please. I think that's what number we're on, right, is 243? That's what we marked it?

MR. HOLLANDER: Yes.

BY MS. CHAF:

Q So, Doctor, first of all, Jacqueline Lee, that was the FDA point of contact as of this time on the NDMA issue?

A Yes. She was the Zantac regulatory project

manager for FDA.

Q And Giridhar is the person who retired whose function you took over later on; is that correct?

A That's correct, in terms of she was the contact with FDA and then I took that on.

Q And she reported to you at this time; is that correct?

A Correct.

Q And so she gets the e-mail, and what does she report that the FDA has done?

A She reports the FDA project manager sent an e-mail indicating that they had determined they identified a track safety issue with ranitidine. And could you scroll up just a moment so I can get their wording, and continue to scroll up. And it was specifically regarding NDMA for ranitidine.

Q In fact, the language used in the e-mail or correspondence was a potential signal that serious risk of an FDA-approved drug; is that correct?

A I believe their wording for creation of a track safety issue is "new safety information" or "a serious event."

Q Okay. In fact, I mean, I'm just reading the document, though, it says, "When a potential" -- bolded -- "signal of a serious risk of an FDA-approved

drug," and it reads on, correct? Second sentence.

A Second sentence. Yes, and it's a potential signal.

Q Yep. So it just has to be a potential signal and there's a serious risk, and the FDA concluded that this NDMA issue presented a serious risk; is that correct?

MR. SACHSE: Objection, form, foundation.

A What they indicated is that when a potential signal of a serious risk occurs, a track safety issue is created.

Q Okay. And that's what happened here, correct?

A Correct.

Q And they were able to conclude this, according to them, as of August 28th, which was just before September 4th when this was communicated; is that right?

MR. SACHSE: Objection, form.

MR. CHAFFIN: What's wrong with the form?

MR. SACHSE: I don't know what you mean by "this"?

BY MR. CHAFFIN:

Q So I'll recharacterize. The track safety event was open on August 28th; is that correct?

A Yes, that's when FDA stated it was communicated.

Q And it was communicated on September 4th to GSK, right?
A Correct, by e-mail.
Q All right. And we then have -- who is Steve McGhie -- scroll up -- M-c-G-H-I-E, who is that?
A Steve McGhie, I believe, is in our pharma supply chain organization.
Q And his response is, if we scroll up a little bit further, "Thanks, Jaisri. This is a worrying development given our response is that there is no or limited risk." Did I read that correctly?
A Yes.
Q As of September 4, 2019, had McGhie or anybody else seen the Tanner study?
A I don't know if he had seen the Tanner study.
Q Had the FDA?
A I don't -- based on a review of our files up until this point, there's no indication FDA had.
Q So at this point the FDA had actually opened a track safety issue and it hadn't seen Tanner yet or the other articles that we've talked about, correct?
A Correct. In our investigation, no.
Q All right. We can set that aside. By the way, there's a discussion in the e-mail about the PIRC, and there was a question about extending the invitation

to people.

Did you actually attend any of those committee meetings?

A I personally did not attend any of those.

Q All right. In terms of Zantac, at some point the company converted it to long-term maintenance. Do you recall that?

MR. SACHSE: Objection, foundation and form.

Q So as I understand it, there was some labeling change that created the use of Zantac from a short-term use product to a long-term maintenance product, and are you familiar with that in any way?

MR. SACHSE: Objection, form.

A So I have a -- I'm referring to my Zantac tablet indication approval document that I stated that I had earlier.

Q Yep.

A And on May 30th, 1986, it was approved for maintenance therapy for duodenal ulcer after healing, and then in '94, maintenance of healing of erosive esophagitis, and in '95, maintenance of healing of gastric ulcers.

Q Okay. Could you do me a favor? Could you hold that up to the camera for us so we can just see what document you're referring to?

A (Witness complies.)
Q Yeah, thank you. And I don't know if we can get -- a little bit over to the other way -- if we can get a picture of this from the videographer in some way, that would be helpful. A little bit -- there we go. Perfect.
MR. CHAFFIN: Videographer, I don't know if we can do that or not. I can try and get it with my screen, actually.
BY MR. CHAFFIN:
Q Is there any other page to that besides that particular page?
A No.
MR. SACHSE: I'm sorry. Just so the record is clear, I think Dr. Driver previously testified there is another sheet that she has that refers to the product history.
MR. CHAFFIN: If you could do the same with that document. Just hold it up for us for a minute.
THE WITNESS: These are the NDA and IND numbers.
MR. CHAFFIN: Great. I see it now. Probably what we'll do is just ask if you'd send a picture of those to the court reporter, perhaps, and we can

just make them part of the record, if that's all right. Is that okay with you, Will?

MR. SACHSE: That's fine, yeah.

MR. CHAFFIN: And we'll save a number for those in a few minutes once I know that I'm done. How's that sound? Look at that. I said the magic word. I'm close to being done, magic phrase.

BY MR. CHAFFIN:

Q Okay. So you said you have a copy of the notice of deposition with you; is that right?

A I don't have it with me.

Q That's right. You have the request for admissions with you; is that right?

A Yes.

Q Okay. I was thinking if you have the notice, if would save us a little bit of time. A couple things I just want to run through.

In terms of documents, your custodial file, you know, there's a lot of back-and-forth on this. My sense is that maybe you met for your witness prep and you found some more documents or you realized that you had more stuff that you need to get out to us, so could you just tell me what, if anything, you know that's been searched for your custodial file for production in this litigation?

MR. SACHSE: I'm just going to object to the extent that calls for communications between the witness and counsel.

BY MR. CHAFFIN:

Q I'll ask it a different way, actually. So sitting here today, if you were me and I wanted to make sure that I had a complete record of what Dr. Driver has access to as a corporate representative on regulatory issues but then also for her personally in her work on regulatory issues regarding Zantac and NDMA and Zantac in particular, what is it that you would say I should look for if we were going to walk through this together and make sure I had a complete record of what it is you have access to in your work?

MR. SACHSE: Objection, form.

A So in terms of my files, I think primarily e-mails, which it appears you have already.

Q And those e-mails, would they just be in your work e-mail, or did you ever have anything in your personal e-mail or a non-GSK account?

A No, I don't recall anything -- sending anything to a personal or from a personal e-mail account.

Q Okay. I know we've been all working remotely, so in the old days, it used to be there would be a PST

local file on a desktop and so, you know, we would end up in situations where maybe the server at the corporate entity is purged but there's some locally saved laptop e-mails.

Is there any chance of that for you, or everything's up in the cloud and it's all good?

A Everything should be up in the cloud.

Q Okay. You seemed a little hesitant there, so is there anything that you -- you have a laptop at home? Do you save some PST files or maybe have an Outlook on your desktop where you have folder structures that you keep things?

MR. SACHSE: Objection, form, foundation.

A No, I don't -- I don't know what a PST file is, so no.

Q Do you have Desktop Mic -- do you use Microsoft Outlook, or what do you use?

A Outlook.

Q Okay. And do you have a laptop at work or a personal laptop or a computer at home that you use like today?

A I'm using my husband's computer today, but I never use it for work normally. I only use my GSK-issued laptop.

Q Okay. And that GSK-issued laptop, does it

have Outlook desktop or is it just Cloud Outlook that you use?

MR. SACHSE: Objection, scope. Go ahead.

A Well, it has -- if you're referring to -- I open an application, not the Cloud-based web base.

Q Fair enough. And so when you open that application, do you have a folder structure within your Outlook that has anything related to Zantac or folders related to Zantac, for example?

A I do have some folders, but I have folders for all of the products I have, and there is a Zantac folder.

Q And so that Zantac folder, do you have a habit or history of saving e-mails, for example, among the team or the groups related to Zantac?

A No. I never save them to a drive or to my --

Q I get that. There's a beautiful thing about Outlook that it kind of does things for us and we don't realize it, and if you have a desktop and have a folder structure, I'm just curious do you drop things into that folder, like, your Zantac folder, for example?

A Sometimes, yes.

Q Okay. And that's something that you've done the last couple of years regarding Zantac?

A Yes.

Q Okay. And in terms of your Outlook, the -- okay. Well, I'll leave that aside, and, Will, I'm sure you'll tell us later that of course you guys have searched these folders and it's not an issue but just something to note that we'd want obviously.

In terms of yourself, I know we went over the electronic systems where communications with the FDA are housed, so we don't have to cover those. But in terms of, like, your personal working papers, do you keep any notebooks, any hard copy documents? I know if you looked around my home office right now, you'd see that I have some hard copy documents, so how about yourself? Do you keep hard copy documents or have reference materials that you keep at home or at your office?

A I don't typically keep reference documents at home. I will say --

Q Have you --

A Mostly --

Q Go ahead. Oh, no. You froze.

A (Indiscernible) for Zantac (indiscernible).

Q If we could take a step back, you cut out there, so for the court reporter and the record, if you could repeat what you just said.

A That I do have -- for my preparation, I did take some notes on hard copies, written notes.

Q Okay. So you have notes on hard copy documents that you took personally while you were working through and preparing for deposition today?

A That's correct.

MR. CHAFFIN: Okay. I would ask to get a copy of those.

MR. SACHSE: We'll take that request under advisement but note that it's going to implicate -- potentially implicate privilege and work product.

MR. CHAFFIN: Okay. Understood. And I'd just ask to be made part of a log, of course, normal course, if that's the case and we'll work through those later.

MR. SACHSE: There's a -- there's a PTO that governs what we would have to log, but we don't have to have this discussion now.

MR. CHAFFIN: Okay. Well, I just want to make sure everyone's aware of it and usually a witness preparing for deposition making notes on documents is fair game and so I want to preserve that and I think we've noted it, so okay.

MR. SACHSE: I've heard your request, I've noted it, and we can talk about it later.

MR. CHAFFIN: Fair enough.

BY MR. CHAFFIN:

Q And besides those documents, Dr. Driver, is there anything else that you have in terms of documents or working papers from communications with the FDA or committees you're on or anything like that?
A No, not that I can think of.
Q Okay. And do you keep any type of notebook for your work for, like, journaling information or notes from calls or anything like that?
A I do, but I can't recall taking anything specific to Zantac.
Q Have you gone back and looked?
A I've not gone back and looked.
Q Okay. So we'll also request that you go back and look there as well in terms of any notes you may have done in terms of your work on Zantac.
MR. SACHSE: We'll take that request under advisement too.
Q And I assume those documents are readily accessible to you at your office or someplace. If you were asked to go back and look for them, it wouldn't be much work to do, I assume, correct?
A Correct, but I doubt they're at the office.
Q Understood. Okay. Anything else in terms of hard copy documents that would be pertaining to your work on Zantac?

A Not that I can think of.
Q Okay. And in terms of -- in terms of yourself, is there any documents you've saved locally or offline or drafts of documents that you worked on that were saved offline in any way?
A Not that I can recall.
Q Okay.
A But I can look.
Q I'm sorry?
A But I can look.
Q Okay. So you'll look for those as well. Okay.
And in terms of -- I know we talked about submissions and certainly the system can track that, but in terms of GSK and doing work, is there, like, a platform where you guys save documents or is it just, like, a share drive? Like, where do you save, like, your working papers in electronic form?
MR. SACHSE: Objection, scope.
A So what I can say is that prior to submission, like, seeing the end submission product, we do a lot of our authoring of our submission documents in a platform called IMMS, and I think I mentioned that one earlier, I-M-M-S.
Q Yep. Okay. And besides IMMS, is there any

place else that you have working documents or would save working documents electronically?

MR. SACHSE: Objection. Are you asking of the witness personally or company or group?

Q That's fair. I think we'll start with you individually. Is there someplace that you have working papers where if you're, like, "Hey, I've got a draft going but I'm not ready to share it with the group yet," is there someplace you have to save those documents?

A No.

Q Okay. And in terms of yourself, if you did want to save something like that, is there a share drive or how is it that -- where would you save stuff like that?

A I would save it on my share drive.

Q Okay. And is that share drive in the cloud? Is it local? How would you describe it?

A A OneDrive, which I guess eventually saves to the cloud.

Q Okay. So it's Microsoft OneDrive, so it's part of your Outlook and calendared and all that integrated into one, right?

A I think so. I'm not positive.

Q Understood. Do you share links with people for those OneDrive documents?

A Sometimes, yes.

Q Okay. Got it. Okay. Anything else in terms of, as I started before, just in terms of documents or electronic communications regarding Zantac that you'd suggest looking at or places that there might be stuff that would be pertaining to Zantac?

A I can go back and look at my desktop. I don't think that I have anything there, but I will look and check.

Q To the extent maybe you downloaded it or saved something locally, there could be something there; is that -- is that fair?

A Yes.

Q Okay. Understood. Okay. I want to shift gears now. In terms of -- in terms of regulatory contractors, I don't think it's something that we really touched on very much, but is there any third-party contractors that GSK works with pertaining to Zantac or historically has worked with pertaining to Zantac as to regulatory compliance, for example?

A Could you be a little bit more specific --

Q I'm trying to be as broad --

A -- as far as -- are you looking for individual and -- when you're talking about compliance, I just want to be clear --

Q Sure.
A -- what you're talking about.
Q Fair question. I don't know that I have any intention but just very broadly, you know, from a regulatory standpoint, do you guys go and contract somebody to do the submissions for you or to do a review of submissions or -- you know, and obviously leaving aside attorneys, I'm not talking about that -- but is there any third parties or individuals, you know, in terms of preparing NDAs, for example, or supplemental NDAs, is there anything historically you've seen regarding Zantac where that was done?
A I haven't seen that historically. I will say I have a contract worker on my team that I referred to.
Q And that contract worker is someone that's doing what for you?
A So he is -- he actually helps me with many products to prepare for submissions, including Zantac.
Q Okay. And is there a particular reason why it's a contractor and not an employee that does that?
A No, no particular reason.
Q Okay. Where's that person located and who is it?
A So that's Tom Kline, and he's located in Pennsylvania.

Q Okay. I recognize the name now that you said it.

MR. SACHSE: It's not -- just for the record, it's not the famous Philadelphia lawyer, Tom Kline.

MR. CHAFFIN: It's not my good friend Tommy Kline? Okay. All right. Give me one second, guys. Why don't we do this? Why don't we go off the record. I just need five minutes, and then I know Dave may have a few questions, and then we'll turn it over to you. Is that fair?

MR. SACHSE: That's fine for me, yeah.

MR. CHAFFIN: We'll just take five minutes.

THE VIDEOGRAPHER: Going off the video record. The time is 8:09 p.m. GMT, 3:09 p.m. EST.

(A 14-minute recess was had.)

THE VIDEOGRAPHER: Going on the video record. The time is 8:23 p.m. GMT, 3:23 p.m. EST.

BY MR. CHAFFIN:

Q All right. Dr. Driver, so we're getting close to being done, at least for my questioning today, and so I appreciate your patience. Just a couple more things to cover here.

First, in terms of long-term maintenance, I know that I raised that and you went to a couple of supplemental NDAs, I believe, on healing of different

issues, and I just want to make sure we covered everything. I know you held up your spreadsheet, but is there any other sort of shift from short-term to long-term maintenance from Zantac that you're aware of?
A I guess the only thing that I would also add here is I was reading the maintenance indications about treatment of gastroesophageal reflux disease. That was also approved in 1982.
Q So for the treatment of GERD; is that right?
A Correct.
Q And is there -- do you have an understanding or can you articulate for us what long-term maintenance would be?
MR. SACHSE: Objection, scope.
A Yeah, I think that really I would, you know, point to our medical and clinical folks to define that a bit more. What I can say is that in our labeling, the studies, the longest studies there are 12 months.
Q Okay. So when you say the longest studies, the longest anyone should be on Zantac is 12 months is what you're saying?
MR. SACHSE: Objection. It misstates the testimony.
A No, that's not what I'm saying. I'm saying that that's the longest studies that are in the label.

Q And what do you mean by that?

A So 12 months is the longest time that are reported in the US prescribing information.

Q Okay. And so -- and you have some history and background. You're formerly the director of labeling strategy for GSK; is that right?

A Yes, I was on that -- in the labeling team.

Q Okay. And just based upon your view of the labels in preparation for your deposition today, you looked at the long-term maintenance issue, and the longest that you can see that anything was evaluated for the use of Zantac was 12 months, according to the label; is that correct?

A According to the --

MR. SACHSE: Sorry. Objection, form and foundation.

A -- label.

Q According to the label; is that correct?

A According to the label.

Q Okay. Understood. And, you know, I believe that we've already covered, you know, the label doesn't say anything about cancer; is that correct?

A There are a couple of places it speaks to cancer in the label. One of those specifically is in the carcinogenicity section, which is covering the

animal data. I believe there's one other place where there's mention.

Q Okay. And there's mention, but there's certainly no warning to consumers or anyone about the potential for Zantac to cause cancer from short- or long-term use; is that correct?

A According to the label, there's not a warning like that.

Q Is there patient information sheets for Zantac?

A I don't believe there's patient information for prescription Zantac.

Q Has there ever been?

A I don't believe so.

Q Okay. My understanding is that there is. How about a patient pamphlet? Is that something that you have seen?

A (Indiscernible) GSK for the prescription product.

THE REPORTER: The beginning of your answer cut out. All I got was "GSK for the prescription product."

A I'm not aware there's a patient information leaflet that comes with that.

Q Give me one second. Can you see this document

in front of me -- in front of us? It's this file type -- I don't know if you see. I want to make sure I have the right PDF in front of guys. Do you have that?
A Yes. I see the word "file type."
Q Okay. Have you seen this document before?
A I've not seen that document before.
Q So it's fair to say it's not something you reviewed in preparation for your deposition today?
A No, I did not review this.
Q Okay. Do you know if GSK had put anything out similar to this?
A I don't know. Can you look at the document in its entirety?
Q Yeah, it's 27 pages long. We can certainly scroll through it. Are you looking for something that would be a GSK mark because, honestly, this is something I'm just seeing as well, but it's something that --
A Yeah, that's what I would be looking for to see if I could tell if it was --
Q Let's go to the bottom for a second.
MR. SACHSE: Could I suggest maybe go the back? There you go.
Q There we go. Glaxo Roche, Research Triangle Park, which is where you are, correct?
A Correct.

Q So this is back from 1994?
A Okay.
Q And that's not something you've seen?
A No, this isn't anything I've seen.
Q Okay. You know, one thing we touched on at the beginning, I think, is I was asking you questions about the scope of your deposition, and I believe that you said something about marketing and that not being within the scope of what you're doing, but I just want to be clear.
First and foremost, marketing is part of the labeling and certainly part of regulatory, correct? Marketing of Zantac I should say.
A I'm not clear what you mean by that.
Q Well, the FDA actually regulates the marketing of Zantac and other prescription and over-the-counter products, correct?
A So are you referring to advertising and promotion?
Q Yes, thank you.
A Okay. Yes, FDA does regulate that.
Q And so things like the patient information sheets, for example, would be something that has to comply with FDA requirements to some degree in terms of what information it holds and what information it

represents, those same sort of duties of care and standards that we've talked about would apply to these as well; is that correct?

MR. SACHSE: Objection, form.

A That is true.

Q Would you be the appropriate person to talk to about those promotional materials from a regulatory perspective or creation perspective, or is that somebody else?

A I have experience --

MR. SACHSE: Objection. There's two questions in there.

A I have past experience in that space. It's not part of my current role.

Q Did you come today prepared to talk about those issues, or is that reserved for somebody else?

A I can try to address these issues.

Q Okay.

MR. SACHSE: And so the record's clear, I mean, I think you asked about the creation of the materials, which is clearly outside the scope. And then I think you also asked about the regulatory perspective, which is something that Dr. Driver, I think, at a high level could discuss.

BY MR. CHAFFIN:

Q On the patient information sheets, having not seen this before today, obviously, I assume that you don't have anything more substantive to offer on it other than, yeah, it would be something that would have to comply with the FDA regulations. Is that a fair statement?

A That's correct.

Q Okay.

A I mean, I would like to clarify because the patient information leaflet that you were showing is a marketing material. It's not a part of the actual US prescribing information, so I just wanted to be clear about that.

Q And why is that significant to you, if it is?

A Well, I just wanted to be clear that some prescribing information for prescription products has a patient information leaflet, and this is consumer promotion or advertising in this case.

Q I get what you're saying. Okay. In terms of healthcare provider letters, I understand there was one for Zantac related to the recall.

Is that something that falls within your department or does it go elsewhere in terms who drafts those and who's responsible for them?

A So what -- what time period are we talking

about?
Q So since 2019. So 2019 and '20, for example.
A So it would -- so usually the Dear Healthcare Professional letters would come from our safety group.
Q Okay. And who decides whether one's issued or not? Is that the safety group or does that fall within regulatory? Where does that come from?
A So it's initiated in safety. It's a global-type assessment, and then it's determined if it needs to be -- what markets it needs to be submitted in.
Q Okay. And what's the standard for determining whether a letter should be issued or not?
A I think what needs to, you know, be considered is it a safety issue or a quality issue or efficacy issue with the product --
Q And who do --
A -- or pose a risk for patients.
Q Okay. And are you the one making those decisions or is that more appropriately questions for somebody else?
A Steve Hobbiger, again, from safety would be able to address that process and framework within GSK.
Q Okay. And specifically as it relates to Zantac, that would have been something also he would be knowledgeable about; is that correct?

A That's correct.

Q Dr. Driver, in closing, I just had a couple follow-up questions I didn't ask you up front. One, thank you for your time. I certainly appreciate it today on behalf of all my clients.

[redacted]

MR. CHAFFIN: All right. Well, I certainly wish you well, and I'm going to reserve, certainly on, the new documents that were produced to us. I think we got through most of them, but honestly, there may be something that comes up I don't anticipate but certainly reserve on that issue, obviously. And I think Dave is ready. We'll both just turn the witness over to you unless, Dave, you have questions. Otherwise, I think it's your call.

MR. STANOCH: I may I have one or two quick questions, if it's okay.

MR. CHAFFIN: Famous last words of all things.

MR. STANOCH: I know, I know. I mean, it though, Dr. Driver.

- - - - -

DIRECT EXAMINATION

BY MR. STANOCH:

Q Dr. Driver, good afternoon. I'm David Stanoch. I'm one of the lawyers for the plaintiffs. I've been listening to your deposition. Again, thank you for your time.

In preparation for today's deposition, Doctor, did you have occasion to review the drug labeling for the Zantac and Tritec products sold by GSK in the United States?

MR. SACHSE: Objection, asked and answered.

A Yes.

Q At any point in time, the labeling for any Zantac or Tritec product sold by GSK would be the same no matter where it was sold in the United States, correct?

A Supplied by GSK, yes.

Q So the labeling for a Zantac product applied by GSK that someone purchased, in, say, California, the label would be the same for someone who purchased the same drug at the same time in North Carolina?

A That's correct, the prescription product.

Q And do you agree that none of the drug labeling for the Zantac and Tritec products sold by GSK in the United States ever mentioned NDMA?
A They did not mention NDMA.
MR. STANOCH: That's all I have. Thank you, Dr. Driver.
MR. SACHSE: Could we actually just maybe go off the record and let me take a look at my notes, and I think I can greatly excise my questioning, make this short.
MR. CHAFFIN: Yeah, absolutely.
MR. SACHSE: Great. Just give me, like, five minutes or so.
MR. CHAFFIN: Yeah, we'll go off the record.
MR. SACHSE: Super. Thanks.
THE VIDEOGRAPHER: Going off the video record. The time 8:36 p.m. GMT, 3:36 p.m. EST.
(A 17-minute recess was had.)
(Exhibit Nos. 244 and 245 were marked.)
THE VIDEOGRAPHER: Going on the video record. The time is 8:53 p.m. GMT, 3:53 p.m. EST.
- - - - -
DIRECT EXAMINATION (cont'd)
BY MR. CHAFFIN:
Q Dr. Driver, I just wanted to pull up on the

screen Exhibit 244 and then 245. My understanding is that this -- so we'll start with this one. This is one of the two documents you have with you at your home today; is that right?

A That's correct.

Q And how was this prepared?

A This was prepared with assistance from counsel.

Q Okay. But you've reviewed the accuracy of it, and this is something that you're using as a cheat sheet for yourself; is that right?

A That's right.

Q Okay. And in terms of the documents, this would actually also be reflected, to some degree, within the earlier NDA documents that we have gone over and the supplements or is this something separate?

A It probably -- it should be reflected in the NDA document just because these would be supplements. Except with the exception of the first approval, everything else would reflect a supplement.

Q Okay. Fair enough. And then if we could bring up 245 as well, that would be great. And same question starting out with this.

Was this prepared with the assistance of counsel or is this something you prepared or somebody

else?

A Assistance of counsel.

Q Okay. And you reviewed it for accuracy?

A Yes.

Q Okay. And would this be contained also within the document that we had gone over earlier today in terms of the NDAs?

A I think -- I think some of them. I'm not sure every single NDA. They may be listed.

Q Okay. So it may be that this -- there may be more NDAs here than what was in that prior document; is that right?

A There may be. I would have to get back and look at that.

Q Understood. And in terms of this document, in completeness, are there any INDs or NDAs that aren't here that were related to Zantac that GSK has had?

A No, these are the ones.

MR. CHAFFIN: Thank you. And Will, obviously, as we -- and we can stop sharing. Obviously, you know, we'll turn over the witness, and as I said earlier, just reserve on the productions that came over. I don't anticipate anything, but at the same time I just want to reserve on that issue, obviously, and with that, we don't have any further

questions today for the witness.

MR. SACHSE: Yeah, and just on -- thank you. And just on that issue, you know, we'll take it under advisement, but I think we've state our position previously, so -- let me -- let me -- before I start my examination, could we just, Lindsay, mark -- have marked as an exhibit, and I guess it would be number 246 in sequence, the GSK objections to the 30(b)(6) notice. And I don't have any questions about this, so if you just want to mark it, we can move on.

MR. HOLLANDER: Is that something you'd like me to take care of or is Lindsay moving it over?

MR. SACHSE: That would be great if you could.

(Exhibit No. 246 was marked.)

MR. HOLLANDER: All right. Exhibit 246 is in the share folder.

\- - - - -

CROSS-EXAMINATION

BY MR. SACHSE:

Q So, Dr. Driver, thank you for taking the time to talk to us today. I will try to be very short so that we can get you out of here. But why don't we start with could you just give us a brief sort of summary of your educational background?

A I have bachelor of pharmacy and doctor of pharmacy degrees from the University of North Carolina at Chapel Hill. And upon completion of those degrees, I did what's called a drug information residency at the University of North Carolina hospitals. Also worked in inpatient pharmacy as well as pediatrics there for a bit of time and stayed on also in the drug information center there for a couple of years.

I joined GSK in 2001. And my first role was in medical communications where we answered calls from healthcare providers and answered calls from patients as well. And then I moved into medical information. And then in 2013, as I said earlier, I joined regulatory affairs first in the labeling space and then in the classic and established products team.

Q And so you mentioned you have a pharmacy degree or two pharmacy degrees. Are you still a licensed pharmacist?

A I am in the state of North Carolina.

Q And now just going back to your career at GSK, I think you told us earlier you're the director for classic and established products in the US; is that right?

A That's correct, in regulatory.

Q For regulatory. Thank you for that

clarification. Could you just briefly describe your duties in that role?

A So I oversee a team of six individuals and we serve as -- as the interface for many products with FDA. We have responsibility for over 50 new drug applications. And then we also have responsibility for coordination of NDA annual reporting, and we also help with submissions of our DSURs or our drug safety reports as well.

Q And how many different products are within classic and established products?

A It's probably -- even though there's 50 new drug applications, I would say there's probably about 30 product families that we support.

Q For as long as you have been in the classic and established products regulatory group, has Zantac been considered a classic and established product?

A Yes.

Q And I'd like to just move briefly to talk about the regulatory affairs group generally. Can you just describe generally the responsibilities of regulatory affairs?

A So regulatory affairs, as I mentioned, that we do serve as the interface between our organization -- between GSK and FDA, and so our role is to basically

communicate with regulators on behalf of the company.

Q And when it comes to a safety assessment of a product, what role does regulatory affairs play vis-a-vis other departments within the company?

A So we would communicate the information that is generated from those groups and put it into a format or they would put it into a format that would be of high quality to communicate to FDA.

Q And so when we see regulatory submissions from GSK that include safety information, what is the -- which group has responsibility for the safety information contained in those submissions?

A The safety group.

Q And I want to now switch gears a little bit and talk about your preparation for today. And I know you touched on this with opposing counsel earlier, but just, again, briefly, I think you told us you reviewed the deposition notice; is that right?

A Correct.

Q And do you understand that you have been designated by GSK to testify regarding the topics in that notice subject to GSK's written objections?

A Yes.

Q And you prepared to testify about those topics today; is that right?

A Yes.
Q And you touched on this earlier, but could you just describe generally what you did to prepare for this deposition?
A I reviewed the regulatory file for these products. I mean, this is a group of products that has over a 40-year history, so reviewed the regulatory file there. Also reviewed some SOPs, regulations. Also, you know, talked with individuals that had expertise in these areas to better educate myself.
Q And when did you start preparing for this deposition?
A Probably in the fall. I would say November I started preparing.
Q You mentioned that you reviewed some documents. Could you estimate approximately how many documents you've reviewed?
A It probably is into the thousands of pages.
Q And I think you testified earlier that you had some meetings with me and other lawyers as well as some GSK -- other GSK folks. Approximately how much time, taking into account the review of documents and the meetings, how much time would you say you have spent to prepare for this deposition?
A I would say it's over a hundred hours.

Q And in addition to the roughly hundred hours you spent specifically preparing for the deposition, did your personal experience at GSK inform your knowledge of the topics in the notice?

A Yes.

Q And is it fair to say that in the course of your 20 years at the company, you've had thousands of conversations that inform your knowledge of GSK's regulatory group and function?

A Yes.

Q So based on all of the work you described, the specific work to prepare as well as your general experience at GSK and the conversations you've had over the years with other GSK employees, were you prepared to address the topics in the deposition notice today?

A Yes.

Q I'd just like to switch gears one more time, and, actually, if we could -- Lindsay, if we could get the RFA responses marked.

MR. HOLLANDER: Is that the document called Responses to Plaintiffs' Request?

MR. SACHSE: It would be -- I think it should be objections and responses to -- yes, request for admissions, something like that.

MR. HOLLANDER: Okay. The one I previously

put in was objections and responses.

MS. ZANELLO: That was the third amended -- yeah, it's the fourth document in our -- in our -- in GSK's responses to plaintiffs' first request for admission, 322021.

MR. SACHSE: And if you just put it up, we can sort of confirm.

(Exhibit No. 247 was marked.)

BY MR. SACHSE:

Q Dr. Driver, can you see on the screen a document entitled "Defendant GlaxoSmithKline, LLC's Responses and Objections to Plaintiffs' First Set of Requests for Admissions and Interrogatory"?

A Yes.

Q And this has been marked now as Exhibit 247. Dr. Driver, earlier I believe you told us that one of the documents you had with you today was the -- was Glaxo's or GSK's responses to requests for admission; is that right?

A That's correct.

Q And is Exhibit 247 the document you were referring to earlier?

A Yes.

Q Now, is there anything that you saw in your review of the -- well, let me ask this: Have you

reviewed Exhibit 247?

A Yes.

Q And is there anything that you saw in your review of the regulatory file to prepare for this deposition inconsistent with GSK's responses to plaintiffs' request for admission?

A No, I did not see anything that was different or not consistent with this response.

Q And is there anything you, Dr. Driver, would change about Exhibit 247, the request for admission responses?

A No, there is nothing I would change.

MR. SACHSE: Okay. We can take that down.

Q And just a couple more questions for you. Dr. Driver, in your role as the authorized representative for Zantac and your role as the GSK regulatory witness in this case, have you had the opportunity to review GSK's responses to regulators' questions about ranitidine and NDMA?

A Yes.

Q And generally, how would you characterize GSK's responses to those questions?

A I would consider them to be complete and transparent and truthful.

Q And as you review the regulatory -- the

responses to regulatory questions, do you have any question in your mind about the promptness of GSK's response to those questions?

MR. CHAFFIN: Objection, form.

Q You can answer.

A I have no problem with the responses in terms of the timing that it took to respond to the requests.

Q And in terms of the thoroughness of the responses, do you have any questions in your mind about the thoroughness of GSK's responses to regulators' questions?

A No, I have no questions about thoroughness.

Q And does GSK stand by its submissions to regulators in response to the ranitidine and NDMA questions?

A Yes.

MR. SACHSE: I have no further questions.

MR. CHAFFIN: All right. I don't have any follow-up, so -- all right. Dr. Driver, thank you so much for your time. Very grateful. Thank you.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Going off the video record. The time is 9:10 p.m. GMT, 4:10 p.m. EST.

(The proceedings were concluded at 4:10 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, R.D.R., C.R.R., F.P.R., do hereby certify that I was authorized to and did stenographically report the foregoing deposition of LESLIE DRIVER, PharmD; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 244 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 5th day of March, 2021.

LAURA J. LANDERMAN, R.D.R., C.R.R., F.P.R.

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, R.D.R., C.R.R., F.P.R., Notary Public, State of Florida at Large, do hereby certify that LESLIE DRIVER, PharmD, remotely appeared before me this 3rd day of March 2021 and was duly sworn/affirmed.

WITNESS my hand and official seal this 5th day of March, 2021.

LAURA J. LANDERMAN, R.D.R., C.R.R., F.P.R.

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

IN RE: In re: Zantac products liability
Leslie Driver, PharmD
03/03/21
USL Job No. 344868

______________________________________________________

PAGE # LINE # CHANGE REASON

------------------------------------------------------

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Dated:______________ Signed:__________________________

# EXHIBIT 14

## Deposition of Dr. Gerda Glanzmann (09/24/2021)

## Subject to Renewed Motion to Seal Per DE 6124

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

______________________________/

VOLUME I

VIDEO RECORDED DEPOSITION OF

FREDERICK GUENGERICH, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Monday, June 6, 2022

TIME: 10:15 a.m. - 6:55 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO

JOB NO. 6153478-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

CHAFFIN LUHANA, LLP
600 Third Avenue
12th Floor
New York, New York 10016
BY: ROOPAL LUHANA, ESQ.
ERIC T. CHAFFIN, ESQ
KENDRA GOLDHIRSCH, ESQ.
COURTNEY GRIFFIN, ESQ.
GEOFFREY SPAULDING, ESQ.
E-MAIL: luhana@chaffinluhana.com
chaffin@chaffinluhana.com
goldhirsch@chaffinluhana.com
griffin@chaffinluhana.com

Appearing on behalf of the Zantac PSC:

LEVIN, SEDRAN & BERMAN, LLP
510 Walnut Street
5th Floor
Philadelphia, Pennsylvania 19106
BY: FREDERICK S. LONGER, ESQ.
E-MAIL: flonger@lfsblaw.com

Appearing on behalf of the Zantac PSC:
ANAPOL WEISS
One Logan Square
130 N. 18th Street, Ste. 1600
Philadelphia, Pennsylvania 19103
BY: TRACY A. FINKEN, ESQ.
E-MAIL: Tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC:
MARTIN, HARDING & MAZZOTTI LLP
One Wall Street
Albany, New York 12205
BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
E-MAIL: rosemarie.bogdan@1800law1010.com



Appearing on behalf of the Zantac PSC:

MAY LIGHTFOOT, PLLC
3200 Martin Luther King Jr. Avenue S.E.
Third Floor
Washington, D.C. 20032
BY: JE YON JUNG, ESQ.
E-MAIL: jjung@maylightfootlaw.com

Appearing on behalf of the Defendant,
Chattem Inc., Sanofi U.S. Services, Inc.
Sanofi-Avertis U.S. LLC:
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
BY: CHRISTOPHER M. MIKSON, M.D., ESQ.
JAE KIM, ESQ.
E-MAIL: christopher.mikson@dlapiper.com
jae.kim@dlapiper.com

Appearing on behalf of the Defendant,
Boehringer Ingelheim:
KING & SPALDING LLP
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
BY: LUKE BOSSO, ESQ.
CARMEN R. TOLEDO, ESQ.
EVA CANAAN, ESQ.
E-MAIL: lbosso@kslaw.com
ctoledo@kslaw.com
ecanaan@kslaw.com
- and -
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, Illinois 60606
BY: JULIA ZOUSMER, ESQ.
E-MAIL jzousmer@kslaw.com



Appearing on behalf of the Defendant,
Perrigo:

GOODELL, DeVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, MD 21202
BY: JEFFREY J. HINES, ESQ.
E-MAIL: jjh@gdldlaw.com

Appearing on behalf of the Defendant,
Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Dr. Reddy's Laboratories, Inc.:

NATHAN A. SCHACHTMAN, ESQ., PC
325 E. 79th Street
Suite 16-D
New York, New York 10075
BY: NATHAN A. SCHACHTMAN, ESQ.
E-MAIL: nathan@schachtmanlaw.com

ALSO PRESENT:
NICOLE A. COSTELLO, Scientific Specialist
KING & SPALDING LLP

JESSICA SZUMLA, Paralegal, Chaffin Luhana

STEVE ROTMAN, ESQ.
HAUSFELD



AMY MICHELAU,
BARNES & THORNBURG

CLARK SUPLEY,
MARTIN, HARDING & MAZZOTTI
CHELSEA FLANAGAN, Summer Associate
STEPHANIE GUMABON-GREAVER, Summer Associate
DLA PIPER LLP

VIDEOGRAPHER: GREG CASSIN

DOCUMENT TECHNICIAN: JOHN SCHMITZER

------------------I N D E X------------------


WITNESS: FREDERICK GUENGERICH

| EXAMINATION BY | PAGE |
|---|---|
| MS. LUHANA | 10 |


----------------E X H I B I T S--------------


| NUMBER | PAGE |
|---|---|
| Exhibit 6821 | 44 |
| Exhibit 6823 | 48 |
| Exhibit 6824 | 61 |
| Exhibit 6825 | 156 |
| Exhibit 6826 | 185 |
| Exhibit 6822 | 198 |
| Exhibit 6481 (Previously marked) | 205 |
| Exhibit 6477 (Previously marked) | 226 |
| Exhibit 6829 | 245 |
| Exhibit 6830 | 251 |
| Exhibit 0834 (Previously marked) | 260 |
| Exhibit 3138 (Previously marked) | 314 |


---------------R E Q U E S T S---------------


| | |
|---|---|
| Updated copy of curriculum vitae | 80 |
| Copy of protocol lab uses for handling NDMA | 109 |
| Copy of confidentiality order on valsartan case | 128 |




THE VIDEOGRAPHER: We're now on the record.

Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is a question and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who does not want the witness' video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.



This is the remote video-recorded deposition of Frederick Guengerich, Ph.D. being taken by counsel for the plaintiff.

Today is Monday, June 6, 2022. The time is now 14:15 UTC. We're here in the matter of In re, Zantac ranitidine products liability litigation.

My name is Greg Cassin, remote video technician on behalf of US Legal Support. I'm not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.



They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

F R E D E R I C K G U E N G E R I C H,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

MS. LUHANA: Counsel, before we get started, I want to put on the record that we received Dr. Guengerich's untimely report late this past Friday night, June 3rd. That's almost three months after his initial report. Plaintiffs believe Dr. Guengerich's report was served untimely. We're not waiving any

rights and we reserve rights to seek whatever relief we believe is necessary at a later date with the court.

MS. TOLEDO: Defendants disagree. The -- the supplemental report was filed as soon as he was able considering the lateness of the production of the Emery data and Dr. Guengerich's other commitments outside of the country. So, it was produced and supplemented in accordance with the rules, and we will just disagree as to your statement.

MS. LUHANA: We both reserve our rights, understood.

EXAMINATION BY
MS. LUHANA:

Q. Good morning, Dr. Guengerich. My name is Roopal Luhana. I'll be asking you questions today on behalf of the plaintiffs.

Can you please state your full name for the record?

A. My name is Frederick Peter Guengerich.



Q. Have you ever been deposed before?

A. Yes, I have.

Q. How many times?

A. Approximately 15.

Q. Have you ever testified at a Daubert hearing?

A. What was the last term?

Q. Have you ever testified live at a Daubert hearing?

A. I'm not sure what a Daubert hearing is.

Q. Okay. Have you ever testified at trial?

A. Yes.

Q. How many times?

A. Three.

Q. And when was that?

A. The first time was in 2010. The second time, I believe, was in either 2016 or 2017, and the last time was in 2018.

Q. And every time you testified, was it on behalf of pharmaceutical companies?

A. In every case it was a patent dispute between two pharmaceutical companies.

Q. Understood.



So, I'll be asking you questions today and if you don't understand a question or need me to repeat it, please ask me to do so, okay?

A. Okay. Bear with me, this is the first time I've used technology in this particular setting at a deposition, so I may have to get used to it at first.

Q. Completely understandable.

If you answer the question, I will assume you understood the question, okay?

A. Fair enough.

Q. Please make sure that you wait until I finish with my question until you answer, and let's do our best not to talk over one another so we have a clear record, okay?

A. I completely agree.

Q. During the deposition, you understand you're not permitted to have any open devices to try to communicate with the attorneys.

Do you understand that?

A. I understand that.

Q. Do you have any other electronic



devices in the room with you?

A. I have a laptop computer and an iPhone, which are in a briefcase, but they're both turned off.

Q. Okay. And then you understand that unless you're on breaks, you can't use that device to communicate with anyone?

A. I understand that.

Q. And so, you're only on one computer right now, correct?

A. Well, yes, I have two screens, but I think I'm only on one computer.

Q. Okay. Do you have any other applications open on the computer, you have the Zoom application? You have the Box application, do you have any other applications open on the computer?

A. I'm not aware that I do. It's actually not my computer, but I don't think there's anything else open.

Q. Okay. And so, Doctor, have you prepared any notes?

A. Excuse me a moment. I think you can hear me, for some reason this indicates I'm muted, but I don't think I really am.

MS. TOLEDO: No, it's on mine.
THE WITNESS: Oh, okay. All right, fine. Thank you.
A. I'm sorry. Go on, Ms. Luhana.
Q. No, that's fine.
Have you prepared any notes that you brought with you?
A. No, I have not.
Q. Do you have any other documents with you?
A. I have some clean copies of several things, which were provided by counsel for the defendants.
Q. And what are those things?
A. I have my report, which is dated March 7th. I have a, let's see, this is Defendant's -- it's entitled Defendant's Responses and Objectives to Plaintiffs' Notice of Oral Videotaped Deposition and Associated Subpoena, duces tecum of Frederick Peter Guengerich Ph.D. I have a copy of invoices to King & Spalding. I have a clean copy of -- it says Boehringer Ingelheim, Zantac exhibits to Guengerich expert report. And I have a folder that's entitled



Boehringer Ingelheim/Zantac select references from the report of Frederick Peter Guengerich, Ph.D.
Q. So, the exhibits to the expert report, those are all printed out for you, every single exhibit that you've cited? Is that what you're stating?
A. No, there appear to be 27 tabs. As I recall there were about 340 total references. So, again, it's select references, that's what was in the title.
Q. So, defense counsel chose those references for you?
A. They were some of the main ones that I've used in developing my report. We agreed together on these.
Q. Okay.
MS. LUHANA: Counsel, we'd like a list of the 20- -- the names of those 27 references, if you can provide them during break, that would be wonderful, okay?
MS. TOLEDO: Not a problem.
Q. And then, is there anything else, so you said exhibits to your expert report



and those were the 27 selected references, anything asides from that?
A. No.
Q. So, I have -- you have your March 7th report, you have Defendant's responses and objections, you have a copy of your invoices and then you have these 27 references; is that correct?
A. Yes, that's correct.
Q. And nothing --
MS. TOLEDO: Sorry, let me just interject. There's also a copy of the supplemental report, it's just inside the other.
MS. LUHANA: Okay. Thank you.
Q. Doctor, where are you located today?
A. Nashville, Tennessee.
Q. And in which building are you located?
A. The building is -- well, I don't know the exact name of the building, it's a new building. It's at 1600 West End Avenue and we're in the offices of the Baker Donelson law firm.



Q. Okay. And is there anyone with you in the room?
A. Yes, Ms. Carmen Toledo and Ms. Nicole Costello.
Q. Anyone else?
A. No.
Q. Doctor, when were you retained as an expert in this case?
A. I recall that it was in August of 2020.
Q. And who first contacted you about being an expert?
A. Ms. Toledo.
Q. And at that time, were you aware about the FDA's findings regarding NDMA in ranitidine?
MS. TOLEDO: Object to form. Vague.
A. Actually, I don't remember.
Q. Doctor, are you aware that the FDA withdrew ranitidine from the market because of NDMA in April 2020?
MS. TOLEDO: Object to form.
A. I can't remember the specific date. I was aware that it was withdrawn.

Q. So, were you aware when you were retained that it was withdrawn at that time?
A. As I said, I don't remember if I was specifically.
Q. When did you become aware?
A. Well, certainly after I saw the information related to the case.
Q. So, sometime possibly after August 2020 when you were retained?
A. Possibly. I might have been aware of this previously. I do read extensively in the world of pharmaceutical industry and I read a lot of things about progress of drugs that are on the market and new potential drugs. I don't remember specifically if I paid attention to that at the time.
Q. Prior to agreeing to work on the case, did you do any research on ranitidine?
A. You said prior to working on the case?
Q. Yes.
A. No, I have -- did not work on ranitidine. I have worked on the related compound famotidine before.
Q. Approximately, how many hours have



you spent working on this case?
A. I really don't know.
Q. You've maintained invoices, correct, Doctor?
A. Yes, I have. You should have a copy of those, I understand.
Q. So, do you know how many hours you billed for your time in this case?
A. I'm not -- I don't know the total.
Q. How many times have you met with defense attorneys to prep for your deposition? And that would include everything, meaning telephone calls, zoom meetings, in-person meetings. So, I'd like to know how many hours you spent meeting with the attorneys to prepare for your deposition?
MS. TOLEDO: Object to form.
A. I'm not sure offhand. We were preparing for the deposition, which was supposed to be on the 18th and 19th of May, as I recall, and spent a fair amount of time getting ready for that. And because the deposition was postponed, spent more time after that again getting ready for today and tomorrow.



Q. Doctor, can you give me an estimate of the time you spent preparing for the deposition when it was scheduled for the 18th, 19th, as well as a general estimate of time thereafter to prepare for today?
MS. TOLEDO: Objection. Asked and answered.
A. Very rough estimate might be 12 hours each time.
Q. Doctor, when you say "12 hours each time," does that mean 12 hours before 18th, 19th to prepare for the deposition and then 12 hours thereafter to prepare for today and tomorrow?
MS. TOLEDO: Objection. Asked and answered.
A. That is what I meant. Again, I'm really not sure, I'm giving you 12 as a very rough estimate.
Q. Sure, I appreciate that, Doctor. I'm just trying to get a general estimate of time you spent to prepare for your depositions.
So, after May 31st, let's -- you know, I assume you have a clear idea of how



many times you've met with the attorneys to prepare for your deposition after May 31st.
So, between June 1st and today, which days did you meet with the attorneys, if any, to prepare for your deposition? So, let's start with June 1st.
MS. TOLEDO: Objection. Asked and answered.
A. I believe June 1st, if I recall, yeah, would be Wednesday?
Q. Correct, yeah.
A. I did not meet with them on Wednesday.
Q. So, you didn't meet with them, speak with them, via phone or Zoom or meet with them in person, correct?
A. Not on Wednesday.
Q. Okay. And how about June 2nd?
A. June 2nd was Thursday, we had a three-hour Zoom session -- not Zoom, whatever they used, Teams meetings or --
Q. Sure. Some equivalent.
A. All right.
Q. And then on June 3rd, which was Friday, did you meet with them?

A. Yes, for three hours.
Q. Okay. And then how about June 4th?
A. June 4th was Saturday, I did not meet.
Q. Okay. And then how about June 5th?
A. I met with Ms. Costello and Ms. Toledo, that was yesterday for five hours in person.
Q. And did you prepare at all for your deposition this morning, did you meet with them?
A. Well, yes. Most of the time was spent getting the equipment to work though.
Q. Sure, okay.
So, between June 1st and today, that would be 11 hours, correct, roughly?
MS. TOLEDO: Object to form. Asked and answered.
A. In terms of the time I was actually meeting with people from King & Spalding?
Q. Yes.
A. That's correct. Well, that's correct, 11 hours.
Q. So, aside from the time you spent preparing with the attorneys, did you prepare



on your own between June 1st and today?
A. Yes, I did.
Q. And so, how many hours did you roughly spend preparing yourself, or actually doing any work on the case? So, let's start with, do you have an idea between June 1st and June 5th how much time you spent?
A. I can't remember every day. I know I spent Saturday morning, which would be the 4th of June and that was four hours. I can't remember beyond that.
Q. And what did you do on June 3rd -- I'm sorry, June 4th you said, Saturday morning?
A. I reviewed my report.
THE WITNESS: By the way, if we can just stop, I'm not sure this mouse is not connected.
MS. TOLEDO: Let's go off the record for one second, please.
THE VIDEOGRAPHER: Counsel, do you want to go off the record?
MS. LUHANA: Sure.
THE VIDEOGRAPHER: The time is 14:32 UTC. We're going off the



record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 14:33 UTC.
BY MS. LUHANA:
Q. Doctor, I was asking you questions in terms of the time that you've spent on this case from June 1st to today.
Asides from meeting with the attorneys to prepare for your deposition, and you had stated that you had worked on June 4th for about four hours to review documents. So, anything else, any other work that you did between June 1st and today for this case, asides from meeting with the attorneys to prepare for your deposition?
MS. TOLEDO: Object to form. Asked and answered.
A. I think I covered most of it. I did read my report again last evening.
Q. And this would be your initial report as well as your supplemental report?
A. Yes.
Q. Doctor, when you met with the



attorneys to prepare for your deposition, was anyone else there -- who was there at those meetings?
A. Which meetings are you asking about?
Q. Just collectively, generally, let's start from the meetings where you were preparing when it was scheduled for May 18th and 19th and thereafter?
A. I can't remember every specific Zoom meeting, but the individuals involved were all from King & Spalding.
Q. And do you recall which attorneys were present at those meetings?
A. Yes, the attorneys present were at most of the meetings, I won't say necessarily all were, Ms. Toledo, who I already mentioned, Mr. Luke Bosso, and Ms. Eva Canaan.
Q. Anyone else?
A. There was staff members from King & Spalding.
Q. Doctor, what did you do to prepare for your deposition?
MS. TOLEDO: Object to form.

Asked and answered.
Q. I'm trying to get an understanding of -- you -- you mentioned that you reviewed, for example, your reports.
Have you done anything else aside -- asides from reviewing your reports and meeting with the attorneys to prepare for your deposition?
A. I've read key references.
Q. Are those the 27 key references that are with you today?
A. I can't say exactly. There may be some of the others that are cited in reports. I could also add that I've actually reviewed some of the transcripts that were provided in this case from other witnesses.
Q. So, which transcripts did you review from other witnesses' depositions?
A. I don't remember all of them.
Q. So, the ones you remember, can you provide to me? I presume -- so, which transcripts do you recall reviewing?
A. I can answer that question. I read the transcript from Dr. Najafi. Let's see, I've read the transcript from Dr. Bumpus.



I've read the transcripts from Dr. Lindsley. Apologize, I'm still thinking. I'm trying to remember others. Can't remember others. If you asked me a specific name, I can probably tell you if I read it or not, but those are the ones that came to mind right now.
Q. Did you ask for these transcripts to be provided for your review?
MS. TOLEDO: I'm going to object on privilege relating to communications between the witness and counsel.
MS. LUHANA: Counsel, if he's relying on those transcripts...
MS. TOLEDO: That's not what you asked.
BY MS. LUHANA:
Q. Doctor, have you reviewed and are you relying on the testimony from those experts to provide your testimony today or have -- what you provided in your reports?
A. You're referring to the three that I specifically mentioned?
Q. Yes.
A. I did rely in part on the Najafi



transcript in preparing my supplemental -- finishing my supplemental report, which deals specifically with Najafi.
Q. And did you ask for that for counsel to provide you with that transcript?
MS. TOLEDO: Object to form based on privilege.
MS. LUHANA: Counsel, he's relying on it. So, if he's relying on it, he provides that testimony.
MS. TOLEDO: You're asking him did you ask for counsel to provide this to you, that's not -- that's not -- you're not asking if he relied on it, you're asking about communications with counsel.
MS. LUHANA: He did rely on it therefore --
BY MS. LUHANA:
Q. Dr. Guengerich, did you ask for the transcript to be provided to you?
MS. TOLEDO: Same objection. And plaintiffs, may I point out, asserted similar objections during Dr. Najafi's deposition and instructed him not to



answer. He's already said he relied on it, so you can ask him about his review of the transcript, not about communications with counsel.
MS. LUHANA: I'm not asking about communications with counsel. I'm asking if he was -- if he asked for the transcript to be provided to him.
MS. TOLEDO: That's a communication with counsel.
MS. LUHANA: So, you're directing him not to answer the question?
MS. TOLEDO: Yes.
BY MS. LUHANA:
Q. Doctor, did you talk to any of the other defense experts in preparing for your deposition?
A. I have not.
Q. Have you spoke to any non-lawyers about the case?
A. Yes, I have. The staff at King & Spalding are not -- are not all lawyers and I've actually spoken to them about that, about the case.
Q. Substantive matters or

non-substantive matters?
MS. TOLEDO: Object to form and objection based on privileged. Communication from staff from defense team are privileged as well.
Q. Which staff have you spoken to about the case?
A. Two people who been involved in the case and I have spoken to are Nicole Costello and also Florenz Cruz, neither of those are attorneys.
Q. Have you spoken to anyone else about the case?
A. No, I don't think I have.
Q. Doctor, are you being paid for your time here today?
A. Yes, I am being paid. I think this is spelled out in my report as well as the other time I've spent working on this case.
Q. And what's your hourly rate, Doctor?
A. It's stated in my report on page 5, my standard rate of $650 per hour.
Q. And do you know the total amount that you have been compensated to date for



your time that you've worked on this case?
A. Not offhand, no, I don't.
Q. Is it over $300,000?
A. I'm not sure.
Q. In preparing your report, did you take any notes?
A. No, I don't generally work with notes. I mean, there were, of course, preliminary drafts, but I don't keep notes for legal cases.
Q. Did you take any notes of the -- on the reference materials that you reviewed for this report -- for your reports?
A. No, I didn't.
Q. Doctor, you've testified in five cases in the past four years and they all involve drug patents on behalf of drug manufacturers, correct?
A. I have to -- let me check before I answer your question. Do I have -- I think I have a list in the exhibits.
Q. You do, you do have a list of prior testimony that's been provided.
A. Yes. What was your question? I have the list here.



Q. So, I was asking, have all those cases involved drug patents on behalf of drug manufacturers?
A. Before I answer your question, could you clarify what you mean by "drug manufacturers"? They are pharmaceutical companies. But when you say "drug manufacturers," does that imply that the drugs were actually being manufactured directly by the company?
Q. No. They're all pharmaceutical manufacturers, pharmaceutical companies, let's call it.
A. Okay, pharmaceutical companies. I would agree, yes, these are pharmaceutical companies. In fact, I guess both the plaintiffs and the defendants are pharmaceutical companies in every case.
Q. I want to go back to something you just testified to earlier. You said you don't take notes for legal cases that you work on.
So, outside of litigation, do you typically take notes on materials you're reviewing?



MS. TOLEDO: Object to form. Vague.
A. It depends.
Q. What does it depend on?
A. How interested I am in the work and also the nature of the work. I sometimes attend seminars and take notes, sometimes I don't. Sometimes I read papers from the scientific literature. Sometimes I take notes, sometimes I don't.
Q. So, what dictates whether you take notes or not, if it's of interest to you?
MS. TOLEDO: Object to form. Vague. Asked and answered.
A. In part. In addition, the question is whether I think they would be useful long-term.
Q. Okay. So, that's a practice you do outside of litigation. Before litigation, you have a different practice, is that correct?
MS. TOLEDO: Object to form. Vague.
A. I don't -- I don't save notes for litigation cases. I don't do that.

Q. Well, no, you had testified that they're drafts. However, you don't take notes otherwise. So, during the course of -- while working on this case, you're saying you took notes and disposed of them?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I don't save any notes in litigation cases.

Q. Sure. I'm not asking about saving, Doctor. In order to save, you would have to have notes that you've taken.

So, my question to you is, for your reports, did you take notes?

MS. TOLEDO: Object to form. Asked and answered.

A. I think I've answered your question. I have no notes in this case.

Q. Doctor, that's not answering my question.

With all due respect, you said you don't save notes and I'm just trying to understand whether you actually took notes. And if you took notes, I understand you may have not saved them, but for your reports and



for the work you've done on this case, have you taken notes?

MS. TOLEDO: Object to form. Asked and answered.

A. I think I've answered your question I don't save notes. There are times when I do actually write things, for instance, if I'm doing calculations, but I don't save those. If they're important, they'll be incorporated into the draft. If they're not, they're discarded.

Q. Doctor, in order for you to -- I don't think you've answered my question and I'm just trying to understand. I'm not talking about generalities now, I understood what you said outside of litigation what you do.

Now, I'm focused on the case here and the reports that you've submitted. So, I am trying to understand for your reports here, did you take any notes outside of your draft reports and your reports, did you take any notes for this case?

MS. TOLEDO: Object to form. Asked and answered.



MS. LUHANA: And Counsel, please keep your objections to form only and stop coaching the witness, okay? I haven't said anything, but you continue to do it. So, I would appreciate the witness' testimony and not yours.

MS. TOLEDO: I'll direct you to read the transcripts of our experts where all of the plaintiffs' counsel have been coaching the witnesses and doing long speaking objections, so...

MS. LUHANA: I disagree with that and it's not every single question, Counsel, which is what you're doing here, okay?

BY MS. LUHANA:

Q. So, Doctor, back to my question --

MS. LUHANA: Candida, can you read it back again?

(Referred to portion of the record was read back by the court reporter.)

A. I told you before, I don't have any notes in this case.

Q. So, are you testifying that you



didn't take any notes for this case?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I said, I don't have any notes, period.

Q. But you just provided testimony earlier that you don't save notes for litigation. So, when you say you don't have any notes, I understand you may not have had any notes because you discarded those notes.

My question is the initial part, did you take notes for this case?

MS. TOLEDO: Object to form. Asked and answered.

Q. And understand, Doctor, you're under oath.

A. I understand that I'm under oath. I appreciate that. And I told you before that I did some calculations, but I discarded the calculations and incorporated the relevant information into the draft.

Q. There are a lot of places in your report where the calculations aren't noted, we can go through that. So, those notes would've been valuable for us to have and for

them to be produced.
Outside of those calculations, are there any other notes you took for this case?
A. I told you there are no other notes and I would submit also that if you want to go through the important calculations, we describe these -- I describe these in detail in footnotes.
For instance, if you go to page 179 of my report, you'll see my calculations where I discount the calculations that your expert, Dr. Najafi, provided as being completely wrong.
Q. I --
A. I also have -- excuse me, I'm not done yet.
I also have -- one of the appendices has some detailed calculations about the number of DNA adducts as well. These are actually in great detail and I think you would have to -- I'll be glad to address those specific calculations if you have any questions about whether my math is correct or not.
Q. Doctor, I appreciate that you may



have provided some information and details on calculations you have done. However, there are many other calculations. For example, the Ozhan paper, you have sodium nitrite levels there and I don't know if they're in the paper or where the calculations are, and there are numerous other calculations like that throughout the report. So, we'll discuss those and get to those, you know, later on.
A. Sorry, I didn't catch the name, the Ozhan paper. What is the Ozhan paper?
Q. It's something you actually cited in your report and you discuss, we can talk about that. And there are calculations you've done in that report for -- for that publication.
A. I'll be glad to do that. I don't recognize I'm seeing this on the realtime, it's O-H space S-O-N, which doesn't make any sense to me.
Q. O-Z-H-A-N, does that refresh your recollection, Doctor?
A. What was it, O-Z-H-E-N?
Q. A-N.



A. O-Z-H-A-N.
Q. You cite it several times in your reports and it's reference 252 and then it's also noted in your table with some numbers.
A. I don't specifically remember the Ozhan, O-Z-H-A-N, paper, but I'll be glad to talk about that if you have specific questions.
Q. So, Doctor, in terms of going back to the patent cases you've testified in, what types of opinions are you generally offering in those patent cases?
MS. TOLEDO: Objection. Vague.
A. I'm not quite sure I understand your questions. You asked what kind of opinions?
Q. Sure. What -- what's usually the dispute in those cases? Are the disputes similar in the cases you've testified in?
A. They've actually been quite different in the different patent cases.
Q. Okay. What's the purpose of a patent on a drug molecule?
A. Well, patents are intended to provide protection and also to encourage



inventions. Patents at least for pharmaceutical products are generally for 20 years in the United States and will provide an available market during that particular time.
Q. So, you said provide protection and encourage invention. What do you mean by provide protection?
A. Protection from other companies selling and marketing the same thing. It's the same way with other kind of patents too, so for instance Ford Motor company probably has a lot of different patents when they build a car and this prevents other companies from actually making the same parts and selling a -- basically a Ford for a lesser price and affecting their market.
Q. So, what does a patent of a molecule signify? Like, if you have a patent on a molecule, what does that signify, what does that mean?
A. Well, that's a complicated issue and I -- although I've actually been involved in cases with patent issues, I'm not a patent lawyer, I'm not a lawyer in general. And so,

it could mean a number of different things. I would say -- and again, I'm not a lawyer, so I'm just speaking in more general terms, in general one doesn't get a patent on a molecule as such, they're usually has to be some intended use for this.

Q. Okay. So, what are patents generally on? And I'm not asking for in terms of legally what a patent signifies, it's more so from the scientific perspective. So, from your perspective, you said it gives you protection.

Does that make that compound or molecule unique than another molecule or compound? So, I'm just trying to get an understanding of scientific patents, what are they issued on? Is it a compound?

A. Some.

MS. TOLEDO: Object to form.

A. Again, I'm not a legal authority and the -- the molecule, in some cases, it's actually patents can be construed -- or developed for new uses or there can be different applications of a molecule that is already on the market or already has another



patent, that's a possibility.

Q. Have you testified in any Par Pharmaceutical cases that involve personal injuries?

A. I have not.

Q. How many cases have you been retained to offer opinions in?

A. In the course of my entire career?

Q. Correct.

A. I could go to my CV and try to give you an exact number or I can give you a rough estimate.

Q. A rough estimate would be fine, Doctor.

A. A rough estimate would be about 20.

Q. And have they all been on behalf of pharmaceutical companies?

A. No.

Q. How many have been on behalf of pharmaceutical companies, if you can recall?

A. The majority have been with pharmaceutical companies. I can't give you an exact number. I can only think of a couple of exceptions.

Q. And what were those exceptions?



It's okay, if you can't recall, that's fine.

A. I can give you an answer, but I can't -- I'm sorry, you were asking what the exceptions were?

Q. It's okay, that question's withdrawn.

A. I can answer if you wish.

Q. It's okay. No, that's fine. It's withdrawn.

Doctor, you reviewed your Notice of Deposition?

A. Yes, I did.

MS. LUHANA: Let's please pull that up, it's been premarked Exhibit 6821.

(Exhibit 6821 was marked for identification.)

BY MS. LUHANA:

Q. So, Doctor, you've seen this document before, correct?

A. Yes, I have what appears to be a hard copy of the same thing I'm looking at.

Q. Okay. And then if you -- let's go to page 4.

Doctor, as you can see, there are a



number of documents that we had requested that your counsel produce.

A. I apologize. I'm -- okay, I'll look at this one on the screen. Yes.

Q. So, there were a number of documents that we requested be produced and we asked for your counsel to provide.

Have you provided counsel with the documents responsive to this notice?

MS. TOLEDO: If you could take off the callout and just go to the next page so he can see the full list.

Q. Doctor, you can look at the hard copy as well, sometimes it's easier, or on the screen, it's up to you.

A. I don't think this -- what I'm looking at what I thought was hard copy isn't the same --

Q. Okay.

A. -- for some reason.

Q. That's fine, then you can look on the screen.

A. I'll look on the screen. Okay, I'm looking at the screen.

What was your question?

Q. So, my question was, have you provided counsel with documents responsive to this Notice?

A. I'm sorry, would you repeat the question again?

Q. So, there are a number of documents that we have requested with this Notice.

And so my question to you is, have you provided responsive documents to counsel?

A. I believe that I have.

Q. And so, what did you provide?

A. Well, all of these materials that are on the list.

Q. So, can you tell me specifically if you provided anything what that was? So, we've have produced -- we have your invoices, so those have been produced and it looks like they were dated from September 2020 to May 31, 2022, so we received those.

Is there -- is there anything else that you provided to counsel to be produced?

A. Yes, you have Item 2 as a copy of the witness's most current curriculum vitae, which you have.

Q. Sure, that was produced, Doctor,



with your report on March 7th. So we did have that.

My question is --

A. I provided -- I'm sorry. I provided a new copy recently. So, you should have that, it hasn't changed.

Q. And do you recall when you provided that new copy?

A. I think it was within May sometime when we were getting ready for the deposition.

MS. LUHANA: Counsel, I don't believe that's been produced to us.

MS. TOLEDO: We'll check. And if it has not, I will send it to you during a break.

MS. LUHANA: Okay.

BY MS. LUHANA:

Q. Doctor, anything else that you've produced responsive to this Notice?

A. Okay. Item 1 we've already discussed, there are no notes.

Would you change the page again? I'm only seeing things that we've talked about. Three. I believe everything else is



there. If I could specifically talk about Item 7, research grants are not relevant in this particular case. Well, no, they're not really relevant here in some -- in a very broad sense. I have had research grants in the past from the National Cancer Institute, not specifically about NDMA or certainly not ranitidine.

I have not in -- Item 8, it says all articles or papers the witness has written, presented, or has participated in writing or presenting that relate to or concern the subject matter of his testimony in the Zantac litigation. There's nothing.

And there's nothing else on Number 9.

MS. LUHANA: Okay, we can take this down.

And let's pull up what's been marked premarked Exhibit 6823.

(Exhibit 6823 was marked for identification.)

BY MS. LUHANA:

Q. And Doctor, I'll represent these are the, I believe, 19 invoices that we have



received for your work in this case and the first invoice is dated September 30, 2020, and the last one is dated May 31, 2022.

A. All right, I have those.

Q. And so, we discussed that asides from the time that you've spent -- well, let's go back -- let's go to -- well, we don't have to go to it yet, but the last invoice is dated May 31, 2022, and we discussed earlier that work that you did post that time was the 11 hours or so you prepared for your deposition with the attorneys between June 1st and today, and then you said you spent four hours or so reviewing your report.

But is there any other time asides from that that was after this May 31, 2022 invoice that you've spent on this case?

MS. TOLEDO: Objection. Asked and answered.

A. So, again, what was your -- let me read it.

Q. I mean, I can explain it to you, Doctor, it's easier -- it's easier than reading the -- the question.

So, the last invoice submitted here is dated May 31, 2022.
Do you understand that?
A. Yes, that's correct.
Q. Okay. And then we spoke earlier about your work from June 1st to today, correct?
A. That's correct.
Q. And you had told me that in terms of the preparation you did, there were several days in June that we discussed where you met with the attorneys to prepare for your deposition and that was approximately 11 hours.
Do you recall that?
A. Yes, I do as a matter of fact.
Q. And then you testified that you had spent four hours or so reviewing your report yesterday, and then sometime before that on Saturday June -- June 4th and you said you spent four hours doing that.
Do you recall that?
A. Yes, I do.
Q. So, asides from those 15 hours, is there any other time that you have spent on



this case post May 31, 2022?
A. Well, let me read that again. I think I already mentioned I read last night about an hour, I think one hour. And I read half an hour this morning, I'm spending time right now on this case.
Q. Sure. So, that's another hour and a half, so 16.5 hours in June. But that's all the time, generally speaking, post May 31, 2022, correct?
A. Well, except for today, the clock started this morning.
Q. Sure, I understand that, correct.
So, asides from that, that's generally 16.5 hours is the time you spent post May 31, 2022 working on this case, correct?
A. Yeah, I agree with that. I think that's a rough estimate, yes.
Q. So, Doctor, based on your CV, it looks like over your career you've done a lot of work for pharmaceutical companies, correct?
MS. TOLEDO: Object to form.
A. I've been a consultant for a number



of pharmaceutical companies, both large and small. I have also been a consultant for a number of other companies, including biotech companies, chemical companies, and also the National Institutes of Health, particularly in the area of grant PPU.
Q. Sure. But looking at your CV, I would say for the last ten years there is consistent consulting work that you were doing with law firms and specifically defense firms, is that -- that accurate?
MS. TOLEDO: Object to form.
A. I wouldn't say that was accurate. It depends, and particularly in patent case, what the issue is. In many cases, I was representing plaintiffs who were actually suing someone who was violating a patent --
THE WITNESS: I'm hearing an echo by the way or something, I'm not sure what it is.
MS. LUHANA: I am as well.
THE VIDEOGRAPHER: There was somebody unmuted, I muted them.
THE WITNESS: Okay, thank you.
Q. Sorry, about that, Doctor.



So, would it be fair to say that the last ten years you have been consulting consistently with firms that represent pharmaceutical companies?
MS. TOLEDO: Object to form.
A. I've been doing various consulting. I've been consulting, I think since the early 1980s for pharmaceutical companies as well as other organizations too. The amount of consulting I do varies with time, including the legal work, basically they're sort of cycles where there's a fair amount of activity, sometimes there's not much activity.
Q. Doctor, do you have a standing retainer, for example, with companies like Boehringer Ingelheim, Pfizer or some of your other clients in this case?
MS. TOLEDO: Object to form.
A. I don't have a direct -- any direct agreements with Boehringer Ingelheim or Pfizer.
Q. So, there isn't any kind of standing agreement that you have with them to consult and do work with them?

MS. TOLEDO: Object to form.
Asked and answered.
A. I have worked in the past for -- I know in one case a legal firm representing Pfizer in a legal case, a patent case.
Q. Okay. The reason I'm asking that question is --
MS. LUHANA: Let's put up Exhibit 8623 again.
Q. And let's look at that first invoice dated September 30, 2020.
So, Doctor, you had testified you were retained in this case August 2020, correct?
A. That's correct.
Q. However, there's a statement here that it says, total hours 17.5 hours. And it says at $600 an hour and it says per agreement of September 10, 2018.
Do you see that?
A. Yes.
Q. What's the agreement that you had dated September 10, 2018?
A. I think it was probably, without doing the math here, I think I meant $650. I



raised my rate. The following invoice does say 650.
Q. No, I understand that. And actually if you do the math, it is -- you are charging $650 for the 17.5 hours because that comes out to 11,375. That's not my question.
In the parentheticals, it says, per agreement September 10, 2018.
What agreement are you referencing there, if you were retained for this case in August 2020?
A. Actually, I'm not sure -- that must be a mistake because the agreement was done in 2020. I have a -- the possibility exists that I was actually using a template letter from another case and neglected to change that.
Q. Are you aware that you were consulting with Pfizer, it's noted on your CV in 2018?
I apologize it's not Pfizer, it's Williams Connolly who represents Pfizer in this litigation, in 2018.
A. Williams & Connolly was a different case. It was not about Pfizer. I appreciate



that Williams & Connolly is involved in this case, but it was totally different.
Q. So, 2018 you had worked with Williams & Connolly who represents Pfizer in this case, but on a different matter in 2018, correct?
A. I recall it was about 2018, yes.
Q. Okay. And so, looking at your invoices, it looks like they're broken down into, I would say, like, different buckets of tasks. There's -- if you can scroll through them, and I know you have a hard copy as well, so you can look at that if that's easier for you. But if you review your invoices, they're broken up into four buckets: a review bucket, a teleconference bucket, a literature search bucket, and a report prep bucket.
Would you agree with that?
A. Those are some of the items, yes I've used, yes, to designate activities.
Q. I mean, all your invoices generally fall into those general categories. So, I'd like you to take a look and see if that's -- that holds true.



A. What were the categories you mentioned?
Q. It's a review category, I saw teleconference category, a literature search category, and a report prep category.
A. There are. There are a few other things too, but those are the main things.
Q. Which other things did you see?
A. Well, let's see. There was an item, I think, in October 2020, literature search and review, and also some literature searches. I don't think those were on the list you mentioned.
Q. No, there were -- it was a review, a teleconference, literature search, and then report prep.
A. Okay, that covers most of it.
Q. Yeah. So, in terms of the review you have here, it's review of documents, review of older papers, review of papers and things like that.
Does that generally mean that you're reviewing -- just reviewing documents?
A. You're referring to new documents or documents?

Q. I mean, it -- it seems like when you say "review," I want to understand what you mean by when you say, reviewing documents, reviewing other things, that means you're just reviewing things, correct?
A. I'm also searching for things.
Q. So, review means searching as well?
A. In some cases, I thought it was simpler. In some cases, I think I did use the term "literature search," sometimes. But that's actually included in review and later categories for simplicity.
Q. Okay. And then anything else that would mean in terms of reviewing things and then reviewing and searching things?
A. I really don't -- that would probably cover it. Again, this is back about a year and a half ago, so I can't remember all the specific details of the documents at that time, but, yes.
Q. Sure, I understand that.
And then teleconference, I'm assuming teleconferences with the attorneys, correct?
A. That's correct. That includes --



well, includes video things, as well as phone calls, yes.
Q. Okay. Anything else?
A. No, I can't think of any other way to talk to people.
Q. No, I'm saying, and -- any other meaning behind that, that's what I -- I assume that was it, but I just wanted to make sure there was nothing else that falls into in terms of your note of teleconference.
A. Teleconferences, it would include audio visual things, as well as some flat out phone calls, yes, that's all.
Q. Okay. And then there's a category called "literature search," and that would mean just what it says, you're searching for literature, correct, in reviewing literature?
A. Yes. And as I said, later, I think I just incorporated that into preparation or reviews and reports, et cetera.
Q. Okay. And then if you turn to -- let's go to the invoice dated March 31, 2022. Okay. And here I know you submitted your report on --
A. Just a moment. Okay.



Q. It's on the screen as well.
MS. TOLEDO: Did you mean 2021 or 2022?
Q. I apologize, I meant 2022.
So, can we go to the 2022 invoice?
A. I have that.
Q. Okay. And here it says there's a lot of report preparation done, several entries here on this invoice of March 31, 2022, and what does report preparation mean?
A. Finalizing the report that was submitted on 7 -- on March, 2022.
Q. Anything else that's meant by report preparation?
A. Well, that would cover -- cover a number of things. So, finalizing some of the references, literature sources, and figures. I actually made most of the figures myself for this report.
Q. Okay. So, any time when you worked on the report in some fashion to finalize it, you would note that you're doing report preparation, correct?
A. I included that, yes, I thought it was a reasonable category to list on the



invoices.
Q. Okay. You can set that aside.
Doctor, the last version of your CV we have was updated on actually March 7, 2022, and that was the CV that was provided with your report.
MS. LUHANA: We can pull it up, it's -- we premarked it and it's Exhibit 6824.
(Exhibit 6824 was marked for identification.)
BY MS. LUHANA:
Q. And I believe you have a hard copy as well with the report, correct?
A. I have a hard copy, yes.
Q. So, yeah. So, as you can see, you testified earlier that you had updated and produced a copy to counsel, we still don't -- we don't have that version yet. However, this CV looks like it was dated March 7, 2022.
Do you see that?
A. Yes, that's the date that it was -- well, not printed, but, you know, the setup -- my CV is set up such that the date

pops up automatically.
Incidentally, I would add, it's not really changed significantly since March, except for maybe one or two additional papers we published.
Q. Okay. So, was your CV updated for this litigation?
A. I don't think it was, that I recall.
Q. Well, do you recall when -- so you submitted your initial report on March 7, 2022 and the CV, dated March 7, 2022, was submitted with it.
So, that's why I'm asking you whether this was updated for the litigation.
A. I don't recall that it specifically was. As I said, my CV's set so that the date that it's actually being -- well, the current date, when you open the file, actually is adjusted to the current date. So, I can't remember specifically when I updated the CV.
Q. Do you recall the last time the version prior to this, when that was done?
A. Not off the top of my head. I updated in general about every two months.



Q. Doctor, you had a LinkedIn profile.
Do you recall that?
A. I really don't use LinkedIn. I'm not even sure what's on the LinkedIn profile. And in fact, I think there are two of these floating around under different names for me.
Q. So, your LinkedIn profile was actually taken down.
Are you aware of that?
A. No, I wasn't aware of that.
Q. So, you don't recall taking your LinkedIn profile down?
A. As I said, I generally don't use LinkedIn. It's kind of like Facebook, I consider it a waste of time.
Q. Do you recall the last time you used LinkedIn?
A. No, I don't.
Q. Okay. Doctor, you received -- you can take this down.
You received your BS in agricultural science, correct?
A. Yes, I did, that's in my CV. It's from the University of Illinois in Champaign-Urbana.



Q. And you received your Ph.D. in biochemistry from Vanderbilt University, correct?
A. That's correct.
Q. And you're not a medical doctor, correct?
A. I am not.
Q. You were -- after you graduated, you were at University of Michigan in the Department of Biological Chemistry from 1973 to '75; is that right?
A. That's correct.
Q. And then you remained at Vanderbilt since 1975 after you got your Ph.D.; is that correct?
A. Yes, I've been a member of the faculty in the Department of Biochemistry since 1975.
Q. And you run a lab at Vanderbilt University called the Guengerich Lab?
A. I don't specifically use that name, but, yes, it is my laboratory.
Q. And what's your focus there, is it -- well, is your focus chemistry enzymology of bioactivation and



detoxification of foreign compounds?
A. It says research interest on my CV on page 2. I -- the words are specifically, mechanisms of activation and detoxication of chemical carcinogens and toxicants; characterization of enzymes involved in these processes. That doesn't cover everything we do in my laboratory, but it continues to be one of the main thrusts.
Q. And it's fair to say that your lab has worked extensively with pharmaceutical companies over the years?
MS. TOLEDO: Object to form.
A. Well, let me ask what you mean when you say my laboratory has worked with pharmaceutical companies.
Q. Well, what do you take it to mean?
A. Well, we can talk about it two different ways. One is that I work as a consultant in some cases, which you've already brought up. The other way I can look at your question is whether I've actually worked on projects from pharmaceutical companies and actually used -- taken money from them to work on these particular

projects.
Q. Well, the focus is working on the projects from pharmaceutical companies, has your lab done that?
A. We have, but it's not very common. I can recall two cases.
Q. And when was that?
A. I don't think that's in my CV. We did we obtain a one-year grant from Pfizer, this is approximately 2004. And also in 2012, I received a one-year grant from Merck Serono, that's a European company, to work on a specific project. I think those are the only two times I can remember actually doing paid work for pharmaceutical companies.
Q. What about unpaid work where you're in some fashion working with the pharmaceutical companies and it's been -- it's paid for by a grant or something else?
MS. TOLEDO: Object to form.
A. Well, that's actually not actually allowed under NIH rules. I can't do work for pharmaceutical companies with the support from the National Institutes of Health unless there would be specific permission and there



would be some sort of a defined role.
I have collaborated occasionally with pharmaceutical companies on projects, but -- but this -- that might qual- -- that might be appropriate. I haven't really done very much of that.
Q. So, asides from the two cases that you reference from 2004 and 2012 where you were working with Pfizer and Merck, what other collaborations have you done with pharmaceutical companies?
A. Well, I'd have to go through my CV and look at the individual papers. I do know that we did a collaborative project on the metabolism of lovastatin with Merck.
And by the way, I'd like to correct the record. Previously you said Pfizer and Merck, actually I said Merck Serono, that's different, that's in Europe, that's different than the Merck you're thinking about in the United States. But the United States Merck, I know I did a collaborative project with my friend Anthony Lu when he was working on Merck and published this work on the enzymes that are involved in the metabolism of



lovastatin. I'd have to go through the entire list of publications to actually see what other ones we might have done in direct collaboration with people in industry, or with pharmaceutical companies.
Q. You don't need to do that right now, I was just trying to search your memory.
Doctor, does your lab submit all experiments you conduct for publication?
A. No, we don't.
Q. So, then it's every experiment you do isn't submitted for peer review?
A. No. Actually, the majority of the experiments we do don't work and you get positive results. Some are actually replicating things that are already in the literature and so there's really no interest in journals and publishing things where we've repeated things. So, a small fraction of what we actually do in my laboratory gets submitted for publication.
Q. So, the experiments that you're conducting that aren't submitted for publication, are they any less rigorously done than ones you do submit for publication?



MS. TOLEDO: Object to form. Vague.
A. The standards are the same for all the work that we do because -- in terms of notebook keeping, recordkeeping, et cetera, and also in terms of using accepted methods. Sometimes, we have to -- I'm sorry. I didn't finish.
In some cases, we actually have to develop our methods ourselves to do things.
Q. So, what are the standards you're speaking of?
A. Standards for what? Standards for --
Q. You said the standards are all the same for the work that we do.
What -- are you complying with specific standards for those experiments?
A. These are general standards that in terms of notebook keeping that are required by the National Institutes of Health for all work done under their auspices.
Q. So, are all your experiments done for the National Institute of Health?
A. Well, essentially everything that's

done in my laboratory is only supported by the National Institutes of Health, and so it's not done for the National Institutes of Health, but it's done with funds that -- grant funds that were obtained from the National Institutes of Health and is -- needs to comply with their guidelines.

Q. And so, these experiments that you conduct that aren't submitted for publication aren't less reliable because you're not submitting them for publication, correct?

MS. TOLEDO: Object to form.

A. No, they're not -- well, let me answer your question this way. We try very hard to use the same standard for everything we do in terms of notebook keeping then and even if things aren't being directly submitted for publication.

Q. So, do you maintain things only in the notebook when you're doing -- when you're conducting experiments or are data maintained electronically as well?

MS. TOLEDO: Object to form.

A. When data are obtained electronically, the files must be



cross-referenced and -- in notebooks in terms of how they're made available. They also have to be backed up preferably more than once in terms of maintaining those files. I believe their requirements for National Institutes of Health now are that all records be kept for at least seven years.

Q. Doctor, in terms of every experiment you conduct, does your -- do you have another lab validate each of those experiments?

A. I'm sorry, let me read the question again.

No, another laboratory doesn't validate all of our experiments, at least not within the university. When work is published in general, other laboratories around the country and around the world will try to replicate that work and extend the work however.

Q. But Doctor, a lot of your work that you do you reference in terms of experiments isn't published, correct?

MS. TOLEDO: Object to form.

Asked and answered.



A. I think I already indicated that in a -- when -- in a previous answer. As I said, a lot of the work we do is actually making things, experiments don't work, experiments may -- well, experiments may only replicate things that are already in the literature and, of course, they really wouldn't be submitted for publication.

Q. Doctor, why are you conducting those experiments if they're already replicated and out there in literature, what's the purpose of that experiment?

MS. TOLEDO: Object to form.

A. Well, let me use an old adage: I think it was Isaac Newton who first said, "If I have seen farther than other people, it's because I've stood on the shoulders of giants." And so, that's really what's going on here. Basically, it's one of the critical things about peer review. And actually, I've, you know, expounded on this in a number of interviews recently, some in connection with my role as a journal editor and some others in the Department of Biochemistry.

Basically, people peer-reviewed



work has to be replicated by other people so that they can build on that. This is a fundamental basis of scientific method, basically, that you build on the work of other people and you're able to repeat what they did and do new things with this then, so that you don't have to start all over again and invent the wheel, so to speak, every time you want to try something new.

This is true in university research and peer research, other peer-reviewed research, and it's also very true in the industrial sector as well.

Q. Doctor, I wasn't talking about your peer-reviewed work. You said you don't submit your experiments for publication, and the two areas where you gave where you don't submit experiments are -- may only replicate things done that are out there or the experiment did not work.

A. No. I also said, we're making things that are new in order to do experiments. I believe I got that in as well. So, there are a number of reasons why we don't publish everything.

Q. Any other reasons?
A. Well, we look at what I said --
Q. You said, may only replicate things that are out there so you won't publish it, either -- or the experiment didn't work or making things to do additional experiments was a third area. Anything else as to why the experiments you're conducting you're not submitting for publication?
MS. TOLEDO: Object to form.
A. I think those are three of the main reasons and, you know, so there are probably other things too that I can think about. But realistic -- you know, and frankly speaking, if we try to publish everything that every single experiment we did, I wouldn't have time to do anything but write papers all day.
Q. So, Doctor, based on your resumé, there are different lines of work that you've done for pharma companies over the years as we've discussed.
In terms of being hired to conduct research for pharmaceutical companies, are there any more instances than the ones you just provided earlier?



MS. TOLEDO: Object to form.
Asked and answered.
A. As I said, I gave you two examples where we were actually, you know, received funding to do things, and you asked me if there was also work I did with pharmaceutical companies that wasn't funded. I told you that I'd have to go through my entire CV or through the publications. I can actually think of something now too, it was work with vinyl chloride with Dow Chemical in the 1970s that we did. But I'd really -- I'll be glad to do that to go through paper by paper and point out the ones in which there was a role of industrial collaboration.
Q. Okay. So, you've been a consulting expert you've testified to for pharmaceutical companies. You've also been a litigation expert for pharmaceutical companies. You testified about the -- the research that you conducted for pharmaceutical companies.
In addition to that, do you also give talks to pharmaceutical companies?
MS. TOLEDO: Object to form.
A. Yes, I have, and I -- yes, I have.



I was gonna say I'm trying to remember when I did last, but, yes, I've done that a number of times over the years.
Q. So, in terms of can you estimate how many times over the years, has it been over a dozen times?
A. Yes, I could give you an exact number. I have a list on my CV. I think I've given a total of something like 450 invited seminars over the years, but I can't tell you exactly how many of those are actually at pharmaceutical companies.
Q. Any other work for pharmaceutical companies than what we've discussed?
A. Well, yes, I'm not sure -- I guess you'd call it work. I've interacted with people from pharmaceutical companies in terms of organizing meetings then. And in fact, I collaborated with Dr. Nicholas Meanwell from the Bristol-Myers Squibb for, I guess, almost 20 years now. He and I have actually been running a symposium every year on drug toxicity at the American Chemical Society meeting once a year.
I also had a major meeting I put on



I think it was about 2006 with Jim McDonald who was at the Schering-Plough at the time also on the subject of drug toxicity. So, those are -- and I also interact with people from the pharmaceutical industry in other venues in terms of scientific societies quite a bit, yeah.
Q. So, can you estimate the percentage of your yearly income that's generated from your work with, you know, being a litigation expert or consulting expert, let's say, for the last two years?
A. It varies considerably from year to year and the -- I'm not really sure what the numbers are. I have other sources of income too which also cycle. I own a farm and that income is variable from year to year as well as the amount of consulting income I do.
I do -- as I indicated before, I probably have been involved in litigation between 15 and 20 times. This goes back to 1994, so this is over a period of, what's that, 28 years. So, it's quite variable and I can't really give you a number in terms of the percentage of income.

I might add also that all of the activity I do in terms of any outside consulting is actually approved by my institution. We actually have conflict of interest forms indicate -- to fill out every year including -- indicating who we're actually working for and the -- whether there's any -- and these are actually reviewed to see if there's any conflict. So, I'm in full compliance with the conflict of interest regulations at Vanderbilt.

Q. Are you aware of the funding that, for example, Boehringer Ingelheim has done on Pfizer to Vanderbilt in the past, let's say, five years?

MS. TOLEDO: Object to form. Assumes facts not in evidence.

A. I have no idea what the -- has been supported at Vanderbilt University. Neither Pfizer or Boehringer Ingelheim have contributed anything to my own laboratory. I don't know. We have a private university and these are private matters.

Q. Sure. Doctor, you've recently read Dr. Lindsley's deposition transcript you



testified to earlier, correct?

A. I did.

Q. Do you recall there being testimony about the funding by pharmaceutical companies such as Boehringer Ingelheim, for example, to Vanderbilt?

MS. TOLEDO: Object to form.

A. I'm aware that Dr. Lindsley's program receives industrial support from the pharmaceutical sector. I don't know which companies and I don't know how much.

MS. TOLEDO: Counsel, if we're getting close to a place where you could -- we could break, we've been going for over an hour and a half.

MS. LUHANA: Sure, we can take a break now.

MS. TOLEDO: Thank you.

THE VIDEOGRAPHER: Time is 15:46 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 15:59 UTC.

BY MS. LUHANA:



Q. Doctor --

MS. TOLEDO: Before we start -- I'm sorry, Counsel, sorry to interrupt you.

Before we start, I just want to clarify that we actually have not received a more recent CV than the one that was attached to his report. I just wanted to clarify that for the record.

MS. LUHANA: Okay. Thank you.

BY MS. LUHANA:

Q. So, Doctor, have you updated your CV since you submitted the last one from May 7, 2022?

A. I checked, I actually have. I thought I passed it on, but apparently it didn't get passed on. I did note the only significant addition is the addition of two more published manuscripts going from, I think, a total of 753 to 755 now.

Q. Okay. Can you just submit your updated CV to counsel then so they can provide it to us?

A. I can do that. I don't have a copy



on my laptop. I have -- I can do that later maybe after the testimony is finished when I get back to my own office.

Q. That's fine, okay. Thank you.

Doctor, before the break, we were trying -- I was trying to get an estimate of the percentage of annual income that is derived from you working as a litigation or consulting expert. And let's focus now on 2021.

So, what percentage of income is generated from you serving as a litigation or consulting expert versus your income otherwise?

A. I told you, I don't really know offhand.

Q. Well, Doctor, how much did you make in 2021?

MS. TOLEDO: Object to form.

A. I don't remember.

Q. You don't recall. Did you file taxes this year, Doctor?

A. Yes, I certainly did, but I don't remember the details.

Q. So, you don't recall how much

income you earned in 2021?
A. Not off the top of my head. It's in different forms, too. As I said, some of it's farm income, some of it's return on investments, some of it is Social Security. Some of it is my salary.
Q. So, I'm focused on your salary from your work at Vanderbilt and the income that is derived from you working as a litigation or consulting expert.
So, how much of that -- what percentage of that is, you know, contributes to your total income?
A. I don't recall.
Q. So, you don't know how much is whether 10 percent is Social Security and your farm income and the rest is from your salary at Vanderbilt and working as a litigation and consulting expert?
A. I don't recall. I'd have to check my tax returns. My salary is confidential information, incidentally.
Q. But you know how much you earned from Vanderbilt last year, correct?
A. I'd have to check the numbers.



Q. You don't know your salary from Vanderbilt at 2021 last year?
A. Not exactly.
Q. Do you know if it's above $250,000?
A. I told you, this is my con- -- my salary -- salary information at our university is confidential. This is a private university and, in principle, no one knows what anyone's salary is except for perhaps the -- well, the -- I think some are public, like, the chancellor and the provost. But otherwise, all salary information is confidential. I was -- I didn't know how much anybody in my department made until I was interim chair and I saw their salaries for the first time. I haven't been interim chair for ten years now and I don't know what anybody else is making in my department.
Q. So, is the percentage of income that you earn from serving as a consultant, a litigation consultant or litigation expert in 2021 greater than the income that you're earning at Vanderbilt?
A. I don't remember.
Q. That's not important to you?



A. Well, money is important, I suppose. It's not what drives my life, but I don't really know the numbers.
Q. Doctor, how much time do you spend -- withdrawn.
Are you personally involved in any fundraising for your lab?
A. Well, the answer is yes, because I'm the one who has to write the grants to the National Institutes of Health to support my laboratory.
Q. In addition to financial compensation, have you received any other types of benefits with your work with industry?
MS. TOLEDO: Object to form.
A. Could you give me an example? I'm not quite sure what you're driving at.
Q. Are there any other benefits you derive outside of financial benefits from your work with the pharma industry?
MS. TOLEDO: Object to form.
A. Well, your question was benefits. In the broad sense, my connections with the pharmaceutical industry have been useful in



terms of establishing possibilities for some -- for employment for some of the individuals who've trained in my laboratory, that's -- of course gives me no direct financial benefit. But from a -- on a personal basis, I find this useful and satisfying when I see some of my trainees doing well in the pharmaceutical industry.
Q. So, it helps your students and postdocs find jobs at these pharmaceutical companies, correct, that's one additional benefit?
A. I would -- yes. As I said, I don't receive any financial compensation and there are no guarantees for people finding jobs, but at least I know some people who they can contact to see if there are jobs available.
Q. Prior to your work in this litigation, you've worked with N-nitrosamines, correct, or nitrosamines?
A. Yes, I have. I've published several papers on nitrosamines.
Q. And NDMA is in the class of nitrosamines, correct?
A. It is. It's -- specifically it's

what we call an N-nitrosamine, that's with a capital N and a hyphen, yes.
Q. And so, what are nitrosamines? What are N-nitrosamines?
A. Nitrosamines are derivatives of amines, they have a nitrogen with a nitrogen bonded tube. They amine nitrogen and then a double bond to an oxygen. So, it's basically N hyphen double hyphen O.
Q. What are N-nitrosamines?
A. That's just what I told you, that's what -- oh, well, yeah. They're -- specifically they're all N-nitrosamines, but, you know, I think if you say nitrosamines, most people -- I'm trying to think -- well, yeah. I don't know if there are other nitrosamines other than N-nitrosamines, but it's something we specifically use to be very specific about nitrosamine chemistry.
Q. Doctor, I'm looking for the distinction. You yourself testified they're N-nitrosamines.
What does N-nitrosamines mean, to be an N-nitrosamine?
A. It means the nitroso group is



bonded to a nitrogen.
Q. And what does that mean, what's the significance of that?
A. (No response.)
Q. Is there any significance to that?
A. Well, they're chemical entities. I'm not quite sure what you're asking about the significance, so that's how you define N-nitrosamines or nitrosamines in general.
Q. Are you aware from your work that NDMA is a potent genotoxic carcinogen?
MS. TOLEDO: Object to form.
A. Your question has several parts and the answer basically depends. The NDMA is genotoxic under certain conditions and in certain assays and in certain concentrations and doses. It is also, in terms of whether it's a carcinogen, it has been shown at relatively high concentrations to be carcinogenic in some organs in some animals, particularly rodents.
Q. So, how long has it been generally known in the scientific community that NDMA is a genotoxic carcinogen?
MS. TOLEDO: Object to form.



Mischaracterizes his testimony.
A. Your question has two parts, one is about the genotoxicity and the other one is about the carcinogenicity. My recollection is that NDMA was the first paper I recall about the carcinogenicity in rats was published by Peter Magee in 1956.
With regard to genotoxicity, I'm not quite sure because the most commonly used assays for the genotoxicity is something called the Ames test which was pioneered by someone I know, Dr. Bruce Ames, and that's described in detail in my report as to how that actually works. Dr. Ames didn't publish his system until 1973 as I recall. There were other bacterial genotoxicity assays before that, but they generally didn't work very well because of the lack of bioactivation. Dr. Ames made the seminal discovery that bioactivation was needed to get bacterial genotoxicity. So, therefore, the Ames test is generally done in the presence of usually liver extracts added to the bacteria to do the activation. I can't specifically remember when the first Ames



test with NDMA was actually published. It does of course require bioactivation, so it must've been after 1973.
Q. So, sometime in the 1970s it was established that NDMA is a genotoxic carcinogen, according to you, in certain circumstances, certain conditions, correct?
MS. TOLEDO: Object to form.
A. Well, again, you have to separate the genotoxicity and the carcinogenicity from each other to -- they're actually -- as I tried to indicate in my previous answer, these are actually separate assays one would do then and I think both of these had -- well, I'm not -- like I say, Magee had done his work on the carcinogenicity in 1956, there was other activity in the 1960s and I guess continuing in the 1970s, by Proyceman (phonetic) in Heidelberg, Germany on the carcinogenicity of a number of different nitrosamines in animal models.
And, again, I'm not totally sure when the first Ames test were done with NDMA. I'm not sure. It was probably done by 1980, but I'm not positive when these first

appeared.
Q. Doctor, have you in all the literature you've reviewed and written, have you seen NDMA defined as a genotoxic carcinogen?
MS. TOLEDO: Object to form. Vague.
A. I'm looking at your question. I'm not sure I understand your question. You said, "In all the literature you reviewed and written, have you seen NDMA defined as a genotoxic carcinogen?" I don't think that all the literature has said that.
Q. Doctor, I'm not saying all the literature. It's in any literature, for example, that you have reviewed and any literature, for example, that you have written, have you ever seen NDMA defined as a genotoxic carcinogen?
MS. TOLEDO: Object to form.
A. I don't recall specifically. You'd have to show me a paper to be sure. I don't -- there probably -- there may be papers that say that, but I'd like to look specifically at one and also see what context



that's been used in.
Q. Doctor, this case is about NDMA, are you aware of that, the NDMA in ranitidine?
MS. TOLEDO: Object to form.
A. I'm aware that it's about ranitidine and NDMA.
Q. And so, my question to you is, you spent significant time, over 500 hours, working on your report, reviewing literature; is this correct?
A. I don't know the specific amount of time. I think I indicated that previously.
Q. Sure. I can represent to you that we've calculated your invoices and that's about how much time you've spent, a little over 500 hours, working on this litigation reviewing, as you said, hundreds of documents. You don't recall whether you've seen NDMA defined as a genotoxic carcinogen in the literature you've reviewed for your work on this case?
MS. TOLEDO: Object to form.
A. Well, you know, since I've spent so much time, I reviewed a lot of papers and



I'd like to see a paper where it's being used and in what context in terms of how it's being defined.
As I said, and I've emphasized this in my report at length, everything really defines -- depends on the dose and the particular situation, the animal species, et cetera. And also, the genotoxicity is also dependent on the system.
Q. Sure. But sitting here today, without looking at a specific document, you don't recall if NDMA is called a genotoxic carcinogen in some of the literature you've reviewed?
MS. TOLEDO: Object to form. Asked and answered.
A. Why don't you pull up a paper and show me where it's been called that and I'll talk about it in what context the meaning is there and what the evidence is.
Q. Doctor, how long have you been a biochemist for?
A. Well, if you count the work I did as an undergraduate, since 1968.
Q. Okay. So, that's over 50 years,



you would say?
A. Yeah, I believe the math comes out to 54.
Q. When did you first start working with nitrosamines?
A. It was either in 1975 or 1976. The -- I'm not sure about 1975. I know it was in 1976, because one of my first major papers published in the Journal of Biological Chemistry in 1977 was actually submitted in 1976 and we actually or I actually, I was a sole author on that paper, I actually did assays of -- on the rate of oxidation of NDMA by a number of different cytochrome P450 enzymes.
Q. So, you actually started working with NDMA, in fact, in the late '70s, correct?
A. 1976 or at least by 1976. It might have been -- I don't know if I did those experiments in 1975 or 1976.
Q. So, you agree you're aware from your work with nitrosamines that the International Conference on Harmonization of technical requirements for registration of

pharmaceuticals for human use, ICH, classifies N-nitrosamines, including NDMA, as drug product impurities that are part of a cohort of concern?
MS. TOLEDO: Object to form.
A. I don't remember that specific ICH document, but I'd like to see it before I agree with you.
Q. Do you recall reviewing ICH documents and citing them for your report?
A. Yes, I -- some of these are actually listed in my -- in the reference list in my report. I think most of these are under FDA, but, yeah, there are quite a few of those actually. So, I don't specifically remember which one, if any, talked about that or used that specific language.
Q. So, sitting here today, you're not aware that N-nitrosamines, including NDMA, are called -- are part of the cohort of concern?
MS. TOLEDO: Object to form.
A. I don't remember that specific term. I'd be glad to look at the document and then answer your question.



Q. Are you aware that the FDA is following ICH guidelines?
MS. TOLEDO: Object to form.
A. I think the FDA works with the ICH. That doesn't mean that all FDA policies are equivalent to what's done in ICH and vice versa.
Q. ICH classifies NDMA as a compound from some structural class of mutagens that can display extremely high carcinogenic potency.
Are you aware of that?
MS. TOLEDO: Object to form.
A. I'm not -- I don't recall that specific language. I'd have to look at the document to -- before I say whether I agree with you or not. And also see what context that is in.
Q. Can you define what a mutagen is?
A. Yes, I can. A mutagen is a compound that produces a mutational change in DNA.
Q. And can you define what a carcinogen is?
A. A carcinogen is a -- either a



chemical or a physical process that causes cancer.
Q. So, a carcinogen can be a chemical that can cause cancer, correct?
A. Yes, we usually use the term chemical carcinogen specifically as opposed to physical carcinogen, such as ultraviolet radiation or solar radiation.
Q. So, you testified that your lab has worked with NDMA or you yourself worked with NDMA in the late 1970s, correct?
A. Yes, that's been published.
Q. Was that your first time working with NDMA?
A. I recall that it was. I don't really recall working with nitrosamines prior to that.
Q. Okay.
A. First year I set up my own laboratory.
Q. So, at that time, did you take precautions when you were working with NDMA?
MS. TOLEDO: Object to form.
Vague.
A. You're talking about safety



precautions or what kind of other precautions.
Q. Yeah, safety precautions, for example.
Did you take any safety precautions when your lab was working with NDMA?
A. We take safety precautions with all chemicals.
Q. I'm focused on NDMA though, Doctor.
So, what kind of safety precautions do you take with NDMA?
A. Well, there -- that's a little hard to answer. There are different aspects of working with NDMA and how much you're working with and exactly what you're doing with it then.
So, we worked with this before in a number of ways. We actually made isotopomers of NDMA, synthesize them ourselves in the laboratory. And then we've also done assays with NDMA in the laboratory as well. So, there are different types of safety precautions one would take in various cases, basically they -- so, it really varies.
Q. So, sitting here today, you don't

Page 98

recall if there are any safety precautions you take and your lab takes when you're working with NDMA?

MS. TOLEDO: Object to form. Misstates his testimony.

A. I think there are general safety precautions we take with all carcin- -- all compounds in the laboratory, including cancer suspected compounds as well and then too these vary.

And then we also -- by the way, these -- everything we do is in line with the chemical safety rules at Vanderbilt University.

By the way, I would add that I'm pretty familiar with what the precautions are in general because I'm actually on the Vanderbilt Chemical Safety Committee. And more recently, my laboratory -- in fact a few weeks ago, our laboratory actually underwent an inspection for chemical safety.

Q. So, fantastic, Doctor, then you should know in terms of working with NDMA what types of safety precautions are taken.

Can you please explain and tell the

Page 99

ladies and gentlemen of the jury what precautions you take when working with NDMA?

MS. TOLEDO: Object to form.

A. I didn't realize I was talking to the jury. But I can tell you, you know, there are standard procedures as with many other chemicals in terms of wearing gloves, disposing of the chemicals properly with large amounts working in fume hoods.

Q. So, there's -- you would use a fume hood, correct, with NDMA?

A. Depends how --

MS. TOLEDO: Objection to form.

A. Sorry.

That depends on how much you're actually working with.

Q. So, is there a certain quantity where you would use a fume hood -- is there above a certain quantity of NDMA that you would use a fume hood?

A. Well --

MS. TOLEDO: Object to form.

A. I'm not sure there's a specific number. We've actually worked with gram quantities of NDMA in the past in terms of

Page 100

synthetic work. If one's working with a nanomole or two, you probably aren't going to need -- you really don't need elaborate safety precautions or to use all your equipment.

Q. Doctor, I'm specifically talking about working with NDMA.

Was there ever a quantity of NDMA you were using at the lab where you didn't use a fume hood?

MS. TOLEDO: Object to form. Misstates his testimony.

A. Well, let me expand on that.

When you say don't -- when we say use of NDMA, what do you mean use NDMA?

Q. Well, when you're working with NDMA, Doctor. When you're working with NDMA at your lab, is there a below a certain quantity where you don't use a fume hood?

MS. TOLEDO: Object to form.

A. Well, the -- I'm still finding this a little vague. When one is working with extremely small volumes or masses of NDMA, one can -- doesn't necessarily have to use a fume hood for that.

Page 101

Q. Doctor, has there ever been a time where you've worked with NDMA at your lab to conduct any experiment where you haven't used a fume hood?

MS. TOLEDO: Object to form. Asked and answered.

A. I think I answered your question. There are actually some experiments we've done with NDMA in solution at very low concentrations. For instance, I recall that we were actually doing spectral assays using a spectrophotometer. I have several spectrophotometers in my laboratory. The one we use the most for using binding assays with cytochrome P450 and its substrates is an Aminco Olis DW2 instrument. That is too large to put into a fume hood, so we did not use that in that particular case. The samples of NDMA wherein dilute solution and were added into the spectrophotometer which is outside of fume hood.

Q. So, that's one exception. Do you know how much NDMA was used in the solution?

A. Well, I'd have to look at the paper to get you the exact numbers, but it was a

relatively -- well, I shouldn't say relatively small amount, it was a small amount. I can't tell you specifically without looking at the paper then.

Q. Sure. So, what's relatively small amount of NDMA for you --

MS. TOLEDO: Objection.

Q. -- you're working with in an experiment?

A. Well --

MS. TOLEDO: Objection.

A. In this -- in a particular experiment like this, a rough number would be a millimolar solution and we would probably be using a few microliters of that. So, I -- you're probably really talking on the level of nanomole.

Q. So, I'm focused on, not the millimolar of solution, Doctor. I'm focused on what's a relatively small amount of NDMA as you're defining it?

A. Well --

MS. TOLEDO: Object to form.

A. I was trying to get at that. I told you on a low nanomolar range, I think I



did. And I can, you know, calculate what that might be. Again, these -- I really don't have the paper in front of me and I can't give you an exact number for that. But like I said, I was just sort of trying to tell you in terms of a few nanomoles. The molecular weight or the formula weight of NDMA is 74, as I recall. So, each nanomole would be 74 nanograms.

Q. So, how much is a relative small amount of NDMA as you testified to, so it -- I'm sorry, let me retract that.

So, a relatively small amount of NDMA to you is 74 nanograms, correct?

MS. TOLEDO: Object to form. Misstates his testimony.

A. I've tried to resist using the term small, which are -- and large, which are rather vague. And you're asking me questions about how much we were actually using. I can't really tell you exactly without looking at the paper.

To me, I will say this, I will say that 74 nanograms would be a very small amount of NDMA. And in fact, this is



actually less than people are -- the FDA level for how much -- current FDA level for how much people can consume in ranitidine each day, which is 96 nanograms, as I recall.

Q. So, when you're working with NDMA you also have to wear protective gear, correct?

MS. TOLEDO: Object to form.

A. Well, what kind of protective gear?

Q. Doctor, you tell me, you're working with NDMA at your lab. Is there any kind of protective gear that you have to wear?

A. Well, there's protective gear and there's protective gear. There are different kinds of protective gear; there are gloves, there are different types of gloves, there's eye protection, there are laboratory coats and other things. Some of these are probably not really necessary for handling NDMA and, of course, it depends on how much one's actually working with.

Q. So, when you're working with more than 74 nanograms of NDMA, what type of protective gear do you have to wear?

MS. TOLEDO: Object to form.



A. I didn't give you a hard number at 74 nanograms, I'm not sure there is a hard number. When one's working with, for instance, one gram, which we have in the past in the couple of the papers we've published when we were doing synthesis, one would be expecting to wear at least protective gloves and some kind of eye protection as well.

Q. So, Doctor, now I'm focused on any time you're working with NDMA, regardless of dose, is there any time when you're working with NDMA that you are not wearing protective gear?

MS. TOLEDO: Object to form. Asked and answered.

A. I think I've answered your question and I told you that the 74 -- 74 nanograms just happens to be one nanomole. I do not consider it critical to be wearing extensive protective gear just because of that. The -- and -- but I can't give you limit as to when it's more critical.

I would mention also that certainly 74 nanograms or 96 nanograms is actually far more -- far less, I'm sorry, far less than

Page 106

people consume in their diets under normal conditions and far, far less as I've indicated in my report than what people actually make in their bodies under normal conditions.

Q. Doctor, I'm focused on your lab working with NDMA. So, I'd really appreciate it if you can answer my question as to what specific protective gear you wear at your lab or anyone wears at your lab when they're working with NDMA --

MS. TOLEDO: Objection.

Q. -- of any quantity?

MS. TOLEDO: Objection. Asked and answered.

A. I think I answered that question. I think for very small amounts, I don't think that the exact nature of the protective gear is really an issue.

Q. Doctor, I'm not asking about small amounts. I'm saying, has there ever been -- so I want to understand the protective gear that is worn when you work with NDMA, period. Not talking about the quantities and then go into if there's a certain quantity where you

Page 107

don't wear protective gear.

So, I'm trying to understand and would like an answer as to what protective gear you wear when your lab is working with NDMA?

MS. TOLEDO: Objection. He's answered this several times and has already said that there -- the dose is important. And you're mischaracterizing his testimony and asking the questions five times in a row.

MS. LUHANA: Counsel, he's not answering my question and I would appreciate if you don't coach the witness.

A. I think I've answered your question. I can't give you an exact amount. I've already put this in context in terms of that there isn't an exact number in terms of what requires more extensive safety protection then. I told -- I think I've tried to make it abundantly clear in my report that toxicology involves doses, this goes back 500 years to a man named

Page 108

Paracelsus, who's often called the father of toxicology, and the dose is everything. He -- this is a lecture you'd get in the first toxicology class on the first day every year, not just from me in my class, but from other people, anybody else teaching toxicology, I hope. The dose is everything. Paracelsus said, the dose makes the poison. That is, everything at some concen-- at some dose is toxic and everything at some low dose is actually safe.

So, the dose distinguishes a poison from a medicine. So, not really talking about NDMA being a medicine here. But, again, it's like everything else in toxicology, the dose is extremely important then.

And I can go through -- I've already elaborated in my report what I think about thresholds for exposure to humans in terms of any potential risk of cancer too.

So, the answer is, I think I've answered your question that there's not a specific dose. I gave you a number of 74 nanograms. That's very low and it's far

Page 109

below the exposure anybody gets in terms of their normal levels of NDMA in the body.

As I pointed out abundantly in my report, NDMA is naturally in people. We make this all the time and it's in our blood, it's in our urine, even if you're not taking ranitidine, even if you're not exposed to NDMA.

Q. Doctor, do you have any protocols about safe handling of NDMA in your lab?

A. Yeah, we get something called material safety sheets with every chemical we buy. We keep these on file.

Q. And so, you have one specifically for NDMA?

A. I think we do, we haven't purchased any NDMA in a while so I haven't looked at that recently.

Q. Sure.

MS. LUHANA: Counsel, I'd like a copy of that protocol that his lab uses in handling NDMA produced.

A. Not sure we have it on hand. As I said, we have -- you get these when you purchase chemicals and I don't know what the

last time we purchased NDMA was in my laboratory.
As I said, we actually made it ourselves and, of course, one doesn't get a sheet then.
Q. So, do different standards apply when you're making it yourself in your lab in terms of precautions that are taken versus what's provided in that safety data sheet?
MS. TOLEDO: Object to form.
A. It depends on the amount that one's handling.
Q. So, Doctor, when you work with NDMA, do you wear gloves?
A. Depends how much.
Q. So, at what quantity, since you're distinguishing, do you wear gloves when you're working with NDMA?
A. You asked me that before and I told you there isn't a defined level.
Q. Well, you just distinguished, you said you wear gloves depending on how much NDMA you're working with. So, you're creating this distinction.
I want to know when you're working



with NDMA, at what quantity do you wear gloves?
A. Well, with gram quantities certainly.
Q. When do you not wear gloves when you're working with NDMA?
MS. TOLEDO: Is it frozen?
THE WITNESS: No, I'm not frozen.
MS. TOLEDO: Counsel, we had an internet blip.
MS. LUHANA: There's a question pending and he's not frozen, Counsel.
MS. TOLEDO: We didn't hear your question is what I'm trying to say.
MS. LUHANA: He heard my question.
Q. When do you not wear gloves when you're working with NDMA?
A. As I said, with a very small amounts, one doesn't necessarily need to wear gloves.
Q. I'm not talking about one, I'm talking about you, Doctor, it's your testimony. You're saying there are times when you don't wear gloves when you're working with NDMA and you said it's a small



quantity.
What is that small quantity when you choose not to wear gloves?
MS. TOLEDO: Object to form and please stop harassing the witness. Please, you know, don't -- don't --
A. When I used the noun "one," I meant any person, okay, not just me, all right? So, let's get that straight.
The -- I told you that I'm not gonna give you a specific amount because there are obviously low concentrations that are far below what people normally have in their bodies, which NDMA is not a particular concern. When one's working with rather relatively large amounts, certainly gram amounts, then I think the protection is much more important.
By the way, this applies not only to NDMA, but to other chemicals as well. In my laboratory, over the years, we've worked with a number of chemicals and some are definitely genotoxic, such as heterocyclic amines and aflatoxins, where some of these, such as the aflatoxins are also established



human carcinogens. We've been able to work with those and handle amounts of those without -- apparently without any problems in my laboratory.
MS. LUHANA: Counsel -- apologize. Withdrawn.
Q. Does OSHA require Vanderbilt to follow protocols when working with hazardous materials or carcinogens?
MS. TOLEDO: Object to form.
A. My understanding is that the OSHA regulations are being followed.
Q. So, do you recall what the OSHA regulations are for working with NDMA?
A. Not off the top of my head.
Q. Do you know you're required to wear gloves when you're working with NDMA, Doctor?
MS. TOLEDO: Object to form.
A. It doesn't -- is there a -- a -- on the information on the amount?
Q. No, there isn't. You're required when working with NDMA to wear protective gear, including gloves.
Does your lab follow OSHA protocol?
MS. TOLEDO: Object to form.

A. I think we do.
Q. Are you sure about that because you made distinctions about the quantities of NDMA you're working with when wearing gloves, did you not?
A. I --
MS. TOLEDO: Object to form.
A. I don't think it's critical to necessarily wear gloves when it's working with very small amount of NDMA. I told you that before. And I don't think this was the intent of the OSHA guidelines.
Q. So, you're choosing when to follow OSHA guidelines on NDMA adherence to safety protocols?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. I'd also like to see the OSHA guidelines if you can provide those before I respond further.
Q. So, you're not familiar with OSHA?
MS. TOLEDO: Object to form.
A. I've heard of OSHA, it's the Occupational Health and Safety Administration.



Q. Doctor, are you careful with how NDMA's disposed of at your lab?
MS. TOLEDO: Object to form.
A. Yes, I am. We have regulations for the disposal of all chemicals. They actually have to be picked up by Vanderbilt personnel in packages where the amounts of or the materials -- the amounts of materials are estimated and they do that, yeah.
Q. So --
A. They're generated, by the way, then to be destroyed.
Q. So, Doctor, you're testifying that NDMA has the same requirements of disposal as all other chemicals at Vanderbilt?
MS. TOLEDO: Object to form.
A. We -- yeah, we dispose of all chemicals. Well, strictly speaking, there are things like sucrose or sugar that we don't dispose of. But all -- basically all solvents and all other chemicals that are waste are returned to the safety office for incineration.
Q. Doctor, I'm focused on NDMA. So, OSHA classifies NDMA as a



carcinogen. So, my question to you is, in terms of Vanderbilt and your labs processes for disposing of NDMA, what are those?
MS. TOLEDO: Object to the form of the question.
A. I think I've already answered that. We basically put it into -- by the way, we haven't worked with NDMA for a number of years now, but -- as I recall. But when we have, we labeled this in containers, including what the solvent is that it's in and an estimate of how much is there, and we call the safety office to pick it up.
Q. So, does Vanderbilt have policies and procedures in place to follow OSHA guidelines when working with carcinogens?
MS. TOLEDO: Object to form.
A. My understanding is that, yes, we do from my experience on the chemical safety committee.
Q. Doctor, you're familiar with OHC?
A. I'm sorry, with what?
Q. Do you know what OHC is, Occupational Hazard Categorization?
A. Actually, I'm not familiar with



that abbreviation.
Q. Well, do you know what an Occupational Hazard Categorization is?
A. The -- I'm not quite sure in that context. Perhaps you could show me something about that.
Q. Well, it's -- are you aware that NDMA is designated as an OHC 5 carcinogen?
MS. TOLEDO: Object to form.
A. I don't think I've heard that term.
Q. Doctor, did you draft your entire report?
A. Yes, I did.
Q. Did you draft your supplemental report?
A. Yes, I did.
Q. Did you draft all the tables in your reports?
A. No, I didn't, some are actually taken verbatim from the literature.
Q. So, all the ones that aren't taken from the literature, did you draft all those other tables in your report?
A. Well, let's go through them. There aren't too many.

Table 1 is from the literature, that's by Stuff et al. indicating the amounts of NDMA in different foods.

Table 2 is Thresholds for Impurities in pharmaceuticals, this is on page 66, that's also taken from documents.

Table 3 is on page 81 and this is also from the FDA updates on ranitidine. This is giving the amount of NDMA in different pharmaceutical preparations.

Q. Did you put those -- did you insert those values in and create this table?

A. No, I think it's actually -- I think this is actually -- it looks like it's actually copied in terms of a screen capture from the literature.

Q. So, you pulled it from the literature, this table?

A. That's -- well, it's from the -- it says here from the FDA updates on ranitidine. And if you don't mind, I'm trying to finish answering your question and going through the tables.

Q. Sure. Doctor, it may make sense for --



(Cross-talk.)

A. I'm still looking at the tables.

Q. Sure, I'm just -- I'm just giving you some direction with the question.

What I think it makes sense to do is, once you review a table and answer it for that particular table, it makes sense for me to follow up with a question there, so then we're clear with the record as opposed to having to go back.

Does that make sense?

A. Well, that will be fine, let's go back to Table 1.

What's your question about that?

Q. Sure. So, where is Table 1, what page are you looking at?

A. It's page 51.

Q. Actually, why don't we do this, let's do it this way, let's start with this Figure 1.

I'm curious in terms of your report, did you pull anything from your course materials?

A. Sorry, we're going back to Figure 1.



Q. Well, not just Figure 1, just generally in terms of your reports, was there anything you pulled from your course materials?

A. Well, I -- I recognize Figure 2 and Figure 5, which I know are in my lecture notes, go through the -- Figure 8 is. I don't lecture on everything related to genotoxicity.

Figure 15 I know is something I generated years ago for my lecture notes. When I say "lecture notes," I'm talking about a course called The Biochemistry 8336, which is called biochemical and molecular toxicology, I've been teaching since, I think, 1980 or at least been the lead instructor on.

Q. So, you said -- let's go back now to -- you said, to Table 1 we were at on page 51.

A. Well, you asked me which figures were used in my lecture notes, I'm still going through the report to see which other ones I have --

Q. Sure.



A. -- recall. I think those are the ones I recognize from my lecture notes, those particular figures.

So, you wanted to go to Table 1 was it?

Q. You said Table 1, yes.

A. Well, you're the one doing the questions.

Q. Start with Table 1 on page 51 that you have there.

A. Yeah.

Q. And you said you put that together?

A. I think I -- yeah, looks like it might -- it might be -- yeah, I think -- yeah, I did. I don't think it's actually a screen capture. The font looks a little bit different but, for some reason.

Q. Okay.

A. What's your question about Table 1?

Q. That's all. I wanted to be on the same, you know, looking at the document as you were looking at it.

And so, on page 66, there's Table 2, you had put that together?

A. Yeah, it's -- comes out of the FDA

ICH materials, yes.
Q. So, does this refresh your recollection on the fact that you reviewed some of these ICH standards?
A. I didn't -- I think I -- I don't think I said I had reviewed ICH standards. I said sometimes they're the same as FDA, but not necessarily the same.
Q. No, I was asking you about the ICH defining nitrosamines, including NDMA as a cohort of concern, and you said you don't recall seeing that language. These are some of the standards that contain that language that you're citing to here were -- they classify NDMA as being in the cohort of concern?
A. Well, I'd like to --
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. Like to see the document before I comment further. Again, these, I think these obviously are in my list of references. They're also 340 other references, and I don't remember all the language from every one of these.


Are there other questions about Table 2?
Q. No. So, did you put together Appendix B?
A. Yeah, this is a list of -- it was actually typed up by King & Spalding, but it's a list of the things that are on my list I submitted.
Q. So, you said this was typed up by the attorneys and provided to you?
A. I didn't say --
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. They did the final typing, I wouldn't say they provided it to me. They did provide the final version and put it together in this binder.
Q. So, when you say they did the typing and provide it to you, what did you do for Appendix B?
A. I provided the list of materials that had been reviewed.
MS. TOLEDO: Counsel, I think he may be looking at Exhibit B instead of Appendix B.


A. Oh, I'm sorry. Where is Appendix B? Oh, I'm sorry, Appendix B. I apologize. Perhaps that's some of the confusion.
Q. Doctor, did you put together Appendix B?
A. Just a moment, I'm trying to find Appendix B.
Q. It's in the back of your report.
A. Oh, yeah. Oh, yes, yes. I definitely -- yeah, I remember this now. Yes. No, I'm sorry, that's Appendix A.
Appendix B is a list of the genotoxicity and mutagenicity results on ranitidine and nitrite.
Q. So, my question is, did you put together Appendix B, Doctor?
A. This is a summary that was actually typed up by King & Spalding based on all of the papers that I reviewed and the documents.
Q. Okay. Is there anything else in your report that King & Spalding has typed up for you?
A. Well, the final typing of the report was finished there and the final


version. We went through several drafts going through track changes, et cetera, things like that. But the final version was printed out and put into this binder by King & Spalding.
Q. Now, I'm asking in terms of the appendices or tables or anything like that you said King & Spalding put Appendix B together for you.
Is there anything else in your report that King & Spalding has put together for you?
A. They did the reference list, the final version of a reference list in putting in the numbers, et cetera.
Q. And did they put together the materials considered list?
A. I think they did the final -- okay. I thought that's what we were talking about before. But, yes, they actually did the final typing and sorting of those references, yes.
Q. Did you review every document on the reliance list?
A. Yes, I did I think, and some in

more detail than others, obviously.
Q. Did you review all the documents that are in your materials considered list?
A. To some extent at least some in more detail than others.
Q. Are there some in your materials considered list that you haven't reviewed?
A. I didn't say that. I said I reviewed all of them more or less different degrees of detail.
Q. So, fair to say you haven't reviewed every word of all the documents on your materials considered list?
MS. TOLEDO: Object to form. Misstates his testimony.
A. I wouldn't use that language. I've read the words, I've skimmed over some of it faster than others.
Q. So, if an item is on your materials considered list, that means you reviewed it, correct?
A. To some extent.
Q. Are there some items that you reviewed or considered for your reports -- so, are there items you reviewed or



considered for your reports that aren't on your reliance list or materials considered list?
MS. TOLEDO: Object to form. Vague.
Q. So, Doctor, I'm just trying to get an idea --
A. I'm --
Q. Let me withdraw the question. Let me withdraw the question.
So, I'm trying to understand. So, if you reviewed something or considered something, it was put on your reference list and -- or your materials considered list, correct?
A. Yes, I will add though as you pointed out, I've been working with nitrosamines since at least 1976 and I have a fair amount of background information, some of this was not actually incorporated into a reference, but I'm using my knowledge of what I know about the nitrosamine field as well.
Q. Of course. That's -- I understand you have that background. But to the extent you reviewed something, relied on it,



considered it, you incorporated, included it either on your reliance list or materials considered list, correct?
A. Yes, I have.
Q. So, you reference some deposition transcripts that you had reviewed. Your materials considered list includes reports from Dr. Panigrahy and Dr. Hecht from MDL 2875.
Do you know what case that is?
A. I think it's a valsartan case.
Q. So, you understand that's a different case, correct?
A. That's correct, but it's about NDMA, but it's about a different drug.
Q. Did you sign a confidentiality order for the valsartan case?
A. I don't remember if I did.
MS. LUHANA: So, Counsel, we'd ask that those reports be produced here 'cause we don't have copies of them.
Q. Doctor, you don't have a formal degree in pharmacology, do you?
A. What do you mean a "formal degree"?
Q. Well, do you have any kind of



degree in pharmacology?
A. My Ph.D. is in biochemistry. I do not have a formal appointment or joint appointment in the pharmacology department. However, I am a member of the pharmacology training grant at Vanderbilt University. Three of my graduate students have actually gotten their degrees in pharmacology. And also, I would submit that I have extensive credentials in the field of pharmacology.
As you'll look in my report, I was the recipient of something called the Abel Award which is given to someone in the field of pharmacology for research done under the age of 36.
I'm also a -- I also received from the American Society of Pharmacology and Experimental Therapeutics, their BB Brodie award in drug metabolism, which is a lifetime type of achievement award in the pharmacology society as well. And I did that at the age of 43, I might add.
I was named a fellow of the American Society of Pharmacology and Experimental Therapeutics in their first --

in their inaugural class of fellows. And although I don't have a degree that says pharmacology, I would submit that I actually have considerable credentials in pharmacology.

Incidentally, my diploma actually doesn't say biochemistry or pharmacology, it just says Doctor of Philosophy, anyway.

(Court reporter clarification.)

A. Anyway. Just says Doctor of Philosophy.

Q. Doctor, I want to jump back to those expert reports from the valsartan case, who provided those reports to you?

A. King & Spalding did, otherwise I wouldn't have it.

Q. Doctor, you're not a biostatistician, correct?

A. I have not claimed to be biostatistician.

Q. And you're not a clinician who treats patients, correct?

A. That would be illegal, I'm not an MD.

Q. You're not a regulatory expert in



FDA drug regulations?

A. I consider myself an expert in the area of risk assessment, and some of this actually does involve FDA regulations.

Q. So, you're claiming you're regulatory FDA expert?

MS. TOLEDO: Object to form. Misstates his testimony.

A. I didn't say that. I don't work for the FDA. I actually have consulted for the FDA before and I've actually given talks at the FDA before as well. I'm not considered a regulatory expert at the FDA as such, however. As I understand your question, that would require employment by the FDA, which I don't have.

Q. Are you an expert in FDA regulation?

A. I know quite a bit about FDA regulations. You can -- I think it would be fair to use the term "expert" at least again relative to a lot of people.

Q. You're not an expert in the valsartan case, are you?

A. I have -- was not hired to work on



valsartan or I did not -- no, I basically am not working on valsartan as an expert.

Q. You're not an expert in drug manufacturing, transport, or shipping?

MS. TOLEDO: Object to form.

A. I know some things about drug manufacturing. I am not a -- don't claim to be an expert in drug transport and shipping.

Q. Do you conduct stability testing, Doctor, for drugs?

A. Let me -- that sort of depends what you really mean. Let me indicate what we do.

Q. Let me -- let me retract the question.

Do you conduct stability testing as defined by the FDA for pharmaceuticals?

A. We do not in that sense. What I was trying to do is answer your question. We do work with certain drugs in my laboratory. We synthesize some drugs. We do extensive studies on the characterization of the purity of those drugs. And in some cases, it's relevant to know how stable they are because we're keeping them around and using them long-term. These are obviously not processed



into pills that people would take, but were interested in the stability of drugs, just was we're interested in the stability of any of the chemicals we work in my lab -- work with in my laboratory.

Q. Sure. And I understand that, but you don't conduct stability testing as defined by the FDA for marketed pharmaceuticals, correct?

A. Not in the sense that this would be information that would be used to establish shelf life and things like that. No, I didn't really say that I did.

Q. I just wanted to have a clear answer, so I was just trying to understand your response, not saying that you didn't.

So, you don't conduct impurity testing for pharmaceutical drugs as defined by the FDA?

MS. TOLEDO: Object to form.

A. We certainly are very interested in impurities in anything that I'm dealing with in my laboratory, including any drugs that -- any impurities that would be particularly relevant to the research that we're doing.

In the sense of actually looking for impure -- small amounts of impurities in manufactured materials that would be on the market, we do not do that, that's not what my laboratory is about. We're a basic research laboratory.

Q. So, you don't consider yourself an expert in FDA drug stability or impurity testing, do you?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I consider myself an expert in the analytical chemistry of searching for and identifying impurities in drugs and other compounds, steroids, other materials as well.

Q. Have you ever looked for NDMA in drugs?

A. Well, since I told you, we synthesized NDMA isotopomers of that. We've, of course, looked for that, that's not in drugs. But, no, we had not specifically looked at other -- at drugs or NDMA.

(Cross-talk.)

A. There's not a good reason for me to be doing that.



Q. Have you participated in any FDA clinical trials for a pharmaceutical candidate that's been approved by the FDA?

MS. TOLEDO: Object to form.

A. I'm not sure I understand your question. First of all, why would there be clinical trials for a pharmaceutical candidate that's already been approved? Clinical trials are done before approval.

Q. Pre-approved by the FDA. So, have you ever participated in any FDA clinical trials for a pharmaceutical drug?

MS. TOLEDO: Object to form.

A. No, not directly. Any of my participation would be in the area of consult -- some of consulting I've done.

Q. Have you ever sat on an IARC expert working group?

A. I have not. I've actually attended a meeting in IARC, but this was not under the guise of being a working group per se, it was actually a meeting. I actually was invited to participate in one on polycyclic hydrocarbons a number of years ago, but because of my schedule, I was unable to



attend. And one of my associates from Japan, he was actually picked an alternate then, but I did not.

Q. Do you know what year that was?

A. Oh, I'm only guessing. It was probably about 15 years ago. It was while Dr. Shamatta was actually working my laboratory, so that would make that roughly in that era.

Q. Prior to being retained as an expert in this case, you haven't published any literature assessing the risk of bladder cancer with NDMA exposure, correct?

MS. TOLEDO: Object to form.

A. I have not.

Q. Have you published any literature assessing the risk of esophageal cancer with NDMA exposure?

MS. TOLEDO: Object to form.

A. No, not specifically.

Q. Have you published any literature assessing the risk of liver cancer with NDMA exposure?

MS. TOLEDO: Object to form.

A. Actually, I have, and I can



elaborate on that.

Q. Have you published any literature with human data assessing the risk of liver cancer with NDMA exposure?

MS. TOLEDO: Object to form.

A. Yes, I have done that and let me elaborate on that. We -- these are not epidemiological studies, but a number of papers my laboratory has published over the years have actually been in vitro with liver enzymes, and we've actually shown that humans have less activity in bioactivating NDMA than do rats.

In addition, the -- well, we've published that, you know, in -- from my own laboratory. I'm also aware, although I didn't actually publish this work, but our collaborator, Dr. Anthony Pegg, has done extensive experiments with a DNA repair protein called -- well, it usually goes by AGT, at least in my report. This is formally called O-6, for the record, O-6-alkylguanine-DNA alkyltransferase, and that enzyme is much more abundant in humans and in nonhuman primates than it is in

rodents.

So, again, we didn't publish that work with AGT, I've done other work in my laboratory with AGT. But, yes, indirectly or at least in vitro, we have done experiments that would be relevant to the risk of liver cancer in humans with NDMA.

Q. Have you published any literature that's in vivo assessing the risk of liver cancer with NDMA exposure?

MS. TOLEDO: Objection. Asked and answered.

A. When you say "in vivo," are you talking about rats or humans or other animals or all of the above?

Q. In -- in vivo human data assessing the risk of liver cancer with NDMA exposure.

A. In vivo. Well, I don't think one can ethically do that experiment, that would require treating people with NDMA, either that or doing epidemiology.

Q. Have you published any literature assessing the risk of gastric cancer with NDMA exposure?

MS. TOLEDO: Object to form.



A. We have not done any research in that particular area.

Q. Have you published any literature assessing the risk of pancreatic cancer with NDMA exposure?

MS. TOLEDO: Object to form.

A. With pancreas this is, you know, this is rather indirect as well. We actually did do a collaborative experiment. I think the first author is Karen Anderson, is it Karen -- but the -- actually we looked at the levels of different cytochrome P450 enzymes in human pancreas, they're actually very low. This information may be relevant to the potential risk of bioactivation of any potential carcinogens in human pancreas.

Q. And that was in vivo, correct -- sorry, in vitro, correct?

A. Yes, that was. That it was with -- well, it was with pancreatic samples from humans.

Q. And so, P450 enzymes were found in the pancreas in that study?

MS. TOLEDO: Object to form.

A. Actually, the upshot of the paper



as I recall was that the enzymes, P450 enzymes, were very, very low.

Q. But they're -- sure, but they were still found in the pancreas, correct?

A. I --

MS. TOLEDO: Object to form.

A. I would have to look at the paper to give you an answer. It was either very low or undetectable.

Q. Did you look at that paper for your report and include it?

MS. TOLEDO: Counsel, while he's looking, about how much longer before we can break for lunch?

MS. LUHANA: I probably just have one more question and we can break.

MS. TOLEDO: Appreciate it.

A. I don't recall that that's actually cited. So, I know I looked at it, but I didn't include that. For some reason I didn't think it was important, that critical.

Q. You didn't think a paper that found that P450 enzymes were in the pancreas based on in vivo -- in vitro human data to be relevant to what you drafted in your report?



A. I think --

MS. TOLEDO: Object to form.

THE WITNESS: Sorry.

A. I think you're misstating my answer. As I said, the point was that the enzyme levels were, as I recall, non-detectible. And in fact, I do think we actually looked at some major cytochrome P450 2E1 in the pancreas which was -- would be the enzyme of interest.

By the way, that reminds me, and this isn't direct research of mine, but it actually is outlined in my report, one of the things that's very important is where these enzymes are located, and although I didn't do the work myself --

Q. Doctor, there isn't a question pending.

MS. TOLEDO: He's completing his response to your prior question.

A. I'm completing -- yeah. Well, let me refer you to Figure 34, and basically this is from the human protein atlas, again, this is not the research I did, but it's something that's widely used by many scientists

including myself, and basically this is really only showing cytochrome P450 2E1 to any extent being in the liver in humans, either as RNA or protein. And you can look at these other tissues including the bladder, pancreas, esophagus, and I forgot the other one, and I don't think you'll find any evidence for expression.

Q. Doctor, you're aware that plaintiffs' allegations in this litigation are that NDMA found in ranitidine causes cancer of bladder, gastric, esophagus, liver, and pancreatic cancer?

MS. TOLEDO: Object to form.

A. I believe those are the allegations. I think that's the correct five tissues that we've been talking about.

Q. Okay.

MS. LUHANA: We can break for lunch. Let's go off the record.

THE VIDEOGRAPHER: Time is 17:19 UTC. We're going off the record.

(Whereupon, a lunch recess was taken.)

THE VIDEOGRAPHER: We are back on



the record. The time is 18:02 UTC.

BY MS. LUHANA:

Q. Doctor, your report is provided on behalf of which defendants?

A. (Document review.)

Q. You're not aware of which defendants you submitted it for without looking at the report?

MS. TOLEDO: Object to form.

A. I'm looking at the report to get the specific language. Page 5 I say I have been retained to provide opinions on behalf of the defendants, Boehringer Ingelheim, GlaxoSmithKline, Pfizer, and Patheon Manufacturer Services.

Q. Doctor, you agree that NDMA is in ranitidine, correct?

MS. TOLEDO: Object to form. Assumes facts not in evidence.

A. I'm aware that there are traces of NDMA in some ranitidine products.

Q. Doctor, you reviewed the root cause analysis, correct?

MS. TOLEDO: Object to form. Vague.



Q. Doctor, you reviewed GSK's root cause analysis from June 2020, correct?

A. I think you're referring to the King et al. 2020 paper.

Q. No, I'm not. I'm referring to GSK's root cause analysis, which is dated June 2020 and not the public -- the King publication.

A. Not sure. Could you direct me to that? I was -- when -- usually when I think of root cause, I'm thinking of the peer-reviewed publication from GSK. Can you refer me to the specific document you're talking about from GSK?

Q. Do you not recall reviewing GSK's June 2020 root cause analysis?

MS. TOLEDO: Object to form.

Q. Doctor, I have a question pending.

MS. TOLEDO: He has to look at his references, please give him time to answer.

MS. LUHANA: My question is, does he recall it without looking at his report.

Q. Do you recall it, Doctor? And if



you need to look at your report, that's fine too. But I'm saying in terms of sitting here today without looking at your report, do you recall reviewing GSK's June 2020 root cause analysis?

MS. TOLEDO: Object to form. He has a right to look through his report.

MS. LUHANA: Counsel, I'm not disagreeing with that. I'm just asking for his recollection without reviewing the report.

A. I'm looking through the materials I have in exhibit, this B, I see about a good 20 or more GSK documents. I don't see one that says root cause analysis. So, could you direct me to that? There are a lot of documents and I don't specifically recall that.

Q. On your report, you reference it as the most comprehensive analysis that you reviewed to date.

Does that refresh your recollection since it was the most comprehensive analysis you reviewed to date?

A. I'm citing both -- I found this on page 82 of my report and it's citing both King, which is the refereed publication and also the GSK root cause analysis. I don't -- I'd like to, you know, I think beyond that it looks like I'm using the most references to King. But if you can pull up the GSK root cause analysis from June 2020, I'll try to answer some questions with that.
Q. Doctor, are you aware that every batch that GSK tested for the root cause analysis of ranitidine had NDMA in it?
MS. TOLEDO: Object to form.
Q. Do you recall that sitting here today?
MS. TOLEDO: Object to form.
A. My recollection is that in all of the analyses done by the FDA in Health Canada and -- well, maybe not Australia, that there was some trace of NDMA found then, but I'd have to look at that specific report to comment on that further or I could look at -- or look at the King et al. paper.
Q. Doctor, you agree that NDMA is reasonably anticipated to be a human



carcinogen?
MS. TOLEDO: Object to form.
A. Could I ask what you mean "reasonably anticipated" and actually whose words are these and in what context?
Q. You included it in your report and you are citing the NTP and say N-nitrosodimethylamine is reasonably anticipated to be a human carcinogen based on evidence of carcinogenicity from studies in experimental animals?
A. Can you refer me to where I say that am I quoting the NTP?
Q. You are quoting the NTP, yes. So, do you agree that NDMA is reasonably anticipated to be a human carcinogen?
MS. TOLEDO: Object to form.
A. Could you tell me where I made that specific quote from the NTP in my report? I don't particularly recall where it is.
Q. Do you agree with that statement without looking at the reference, Doctor?
MS. TOLEDO: Object to form.
A. I need to see a specific quote. The NTP has a way, just like IARC, has a way



of classifying potential carcinogens in terms of different categories, and I can't remember the specific language the NTP uses in terms of where they put different things. So, I'd like to see that before I try to address any further questions about that.
Q. Sure. But, Doctor, you said you had an opportunity actually to review your report the night -- the night before for about four hours and you've drafted your report, correct?
MS. TOLEDO: Object to form.
A. My report is 250 pages long. I have not memorized every sentence and the exact context, but it is in -- in every spot of that. So, I'd like to read before I address the question anymore where I -- how I actually said that and what the NTP actually did say.
Q. Would you agree that NDMA is a potent carcinogen?
MS. TOLEDO: Object to form.
A. What do you mean "a potent carcinogen"? This would depend upon the situation and the dose and the organ site and



the animal and the time of exposure.
Q. 'Cause if you say NDMA is a potent carcinogen, it's very important for you to qualify it, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. Could we back up a minute? Why did I -- where did I say that this was a potent carcinogen?
Q. No. I'm asking, do you agree that NDMA is a potent carcinogen?
MS. TOLEDO: Object to form.
A. Well, I gave you an answer. I'm just reading this from above. What do you mean "a potent carcinogen"? This would depend upon the situation and dose in the organ site and the animal and the time of exposure.
Q. Doctor, do you agree that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?
MS. TOLEDO: Object to form. Asked and answered.
MS. LUHANA: That's a separate question, Counsel.

MS. TOLEDO: Okay.
Q. Doctor, do you agree that NDMA should be regarded, for practical purposes, as if it were carcinogenic to humans?
MS. TOLEDO: Object to form. Vague.
A. I heard your question, I was just thinking about this. This is -- well, let me elaborate on that a little bit more.
When toxicology, there are two things that are really important, they both have to be done. The first is hazard identification, the second is risk assessment. You can use -- we often -- usually in toxicology, we test chemicals at high doses in order to establish whether there is some potential hazard. That does not mean that these are or perhaps in this case, cancer.
The real question is whether this is the real issue at relevant doses and low doses from extrapolation. So, one actually has to put together hazard identification and risk assessment. This is done with all pharmaceuticals, it's done with many



chemicals, and this is how we get to things.
So, when you say for all practical purposes as if it were carcinogenic to humans, this is a rather vague term. And in fact, if you actually look at the IARC classifications and the NTP classifications, these are not intended as such for regulatory assessment, these are just talking about the potential hazards that could, at least in some situations, actually be issues.
Q. Doctor, would you agree that nitrosamines are a prominent group of carcinogens?
MS. TOLEDO: Object to form. Vague.
A. Many nitrosamines, and there are several hundreds of these, have been shown under conditions usually with high doses and with animals to cause some specific tumors.
So, yes, they are a group of carcinogens and they are one of the groups of carcinogens that are considered along with vinyl halides, heterocyclic amines, polycyclic hydrocarbons, aflatoxins and several other things, many of which we've



studied in my own laboratory.
Q. Doctor, I reviewed some of the literature you authored outside of litigation and a couple articles concern NDMA, and it seems one of the things that you offer upfront often in these articles is that NDMA is a potent chemical carcinogen or that it's a carcinogenic compound in those publications.
Are you aware of that?
MS. TOLEDO: Object to form. Mischaracterizes the evidence. Assumes facts not in evidence.
A. I would have to -- I'd like to look at the specific language that we used in each of these publications. Probably -- it's probably in the introduction or the introduction to the discussion and see what it's in the context of whether it's based on animal studies or the potential for extrapolation to humans.
I might add that one of the reasons we have done much of our research with NDMA with human based systems is actually to provide a basis for comparison to animal



studies and perhaps send -- gather some information about the relative risk of humans to cancer relative to the animal models.
Q. So, Doctor, are you aware that you openly, in articles, routinely say NDMA is a potent carcinogen, without any of the qualifications that you're discussing and providing testimony for here? Does that surprise you?
MS. TOLEDO: Object to form. If you have a particular document, please show it to him.
A. I'd have to see the papers to answer your questions on that.
Q. I'm just asking a question. Generally, does that surprise you that in your publications outside of litigation you readily admit that NDMA is a potent chemical carcinogen and here you're not willing to provide that testimony without all the qualifications? Does that -- does that surprise you?
MS. TOLEDO: Object to form. Mischaracterizes the literature. And if you have a particular document in

mind, please show it to him.
A. I'd have to see the specific paper. We published a number of papers on NDMA and other nitrosamines, particularly the tobacco specific nitrosamines over the years. This is a small subset of the -- I think about 750 some papers, original papers we've published and 300 review articles, and I really don't remember the exact language or the context in all of those, whatever they are, 900 or 1,000 papers.
Q. I can represent, they're only a handful focusing on NDMA. You've written other publications, but there are certain ones that focus on NDMA.
And so, did you have a different position on NDMA before you were retained for this litigation than you do now for this litigation?
MS. TOLEDO: Objection. Asked and answered.
A. I'd have to see the papers to answer your question in more detail.
Q. No. I'm curious, if you said that NDMA is a potent carcinogen in things you've



published and you're not willing to provide that testimony here for the case, has your opinion changed along the way pre-litigation versus, you know, after you were retained for the case?
MS. TOLEDO: Objection. Asked and answered.
A. You say that I've said certain things, but you seem to be unwilling to show them to me to see what context they're in.
Q. No, I will show you documents. I'm just curious, does that surprise you?
So, my question is, has your opinion on NDMA changed since you've been retained for this case?
MS. TOLEDO: Objection. Asked and answered. Mischaracterizes his testimony.
A. I really have to see the papers, you're saying, will this surprise me? Well, I don't know if it will surprise me because I have to look at the -- what you claim I said.
Q. That wasn't my question. My question is, has your opinion on NDMA changed since you've been retained for this case?



MS. TOLEDO: Objection. Asked and answered several times.
A. Well, also the opinion -- what you're asking about what my opinion for what, whether it's a human -- whether NDMA is likely to be contributing to human cancer in these five tissues?
MS. LUHANA: Let's pull up what's been premarked Exhibit 8625.
THE VIDEOGRAPHER: I'm sorry, was that 8625 or 6825?
MS. LUHANA: Sorry, 6825.
THE VIDEOGRAPHER: Okay, copy that.
(Exhibit 6825 was marked for identification.)
BY MS. LUHANA:
Q. So, Doctor, this is a paper authored by you, it's called Oxidation of Methyl and Ethyl Nitrosamines by Cytochrome P40 -- P450 E -- 2E1 and 2B1.
Doctor, you're an author on this article, correct?
MS. TOLEDO: Can you wait for a second? He's still pulling it up.



Q. Doctor, do you see it on the screen?
A. Yes. Sorry, please don't rush. It just -- just came up.
Yeah, this is a paper with -- to my postdocs and the technician, Goutam Chowdhury, Wade Calcutt, and Leslie Nagy.
Q. And you're an author on this publication, correct?
A. That's correct, I'm the corresponding author.
Q. And you're the last author noted.
Does that signify anything, Doctor?
A. That I'm the last author noted?
Q. On the publication.
A. It may or may not.
Q. What does it typically signify when you're noted as the last author on a publication? Is there some significance to that?
A. Possibly.
Q. What is that significance?
A. It might mean that I am the corresponding author. However, the -- more to the point, the asterisk actually indicates

that that's usually the convention in the scientific publishing.
Q. So, what does the corresponding author mean?
A. The person who corresponded should be directed to about the manuscript.
Q. So, is it the main author on the publication?
A. What do you mean "the main author"?
Q. In terms of the authors listed here, isn't there some significance with you being the corresponding author asides from just being forwarded correspondence?
MS. TOLEDO: Objection. Asked and answered.
A. Well, the first author is generally in our convention the person who did most of the actual experimental work, in this case this was Dr. Chowdhury. And then in principle, the order of authors on publications should be in the order of who did the most work and then the second most work and so on. And then usually the director of the laboratory is last. In this case, I'm the corresponding author because



there's an asterisk.
So, does that answer your question or what?
Q. So, you're directing -- these students, you're the director at the lab, right, when this publication was authored?
A. I'm the principle investigator, yeah, we use that term instead of director.
Q. So, this -- this article was authored in 2012 before you were retained as an expert in this case, correct?
A. That's correct, it's 2012 -- wait a minute, it's a little fuzzy. Yes, it is 2012.
Q. Okay. And then if we look at the -- at the first sentence there of the abstract. Can you read that out loud?
A. Yes. Cytochrome P450 (P450) 2E1 is the major enzyme that oxidizes N-nitrosodimethylamine or [N,N-dimethylnitrosamine (DMN)], a carcinogen and also a representative of some nitrosamines formed endogenously.
Q. So, DMN and -- DMN represents N-nitrosodimethylamine, correct?



A. Yes. These terms -- these abbreviations have been used differently. There's actually slightly different nomenclature for the same chemical that often happens in chemistry. And in fact, I recall some of our earlier papers also used DMN as well. I think it's more common now to be using NDMA, or certainly it is for the purposes of this case.
Q. So, interchangeably NDMA, DMN both refer to N-nitrosodimethylamine; is that correct?
A. That's correct.
Q. So, how long have you known that NDMA is a carcinogen?
MS. TOLEDO: Objection. Vague and asked and answered.
A. I think we addressed that earlier today. The first report I can recall of NDMA being a carcinogen was work done in rats by Peter Magee in 1956. Now, in 1956, rather obviously, I wasn't aware of this because I was still in grade school, but I understood later that nitrosamines can be carcinogens, at least under some conditions and in some



species and at some doses.
Q. So, when I asked you to define nitrosamines earlier today, your definition was derivatives of amines and they have nitrogen with a nitrogen bonded tube, and I asked you the significance of that and you had raised that they're chemical entities.
You agree nitrosamines are also carcinogens, correct?
MS. TOLEDO: Objection. Mischaracterizes his testimony. Asked and answered.
A. First of all, I think you're missing something in your statement. It says deriv- -- they're derivatives of amines and they have nitrogen with a double bond to oxygen. That's -- somehow that didn't get in there, that's what nitrosamines are.
Q. Sure. And they're also -- can be carcinogens, correct, nitrosamines are potent carcinogens?
MS. TOLEDO: Objection. Asked and answered. Mischaracterizes his testimony.
A. I think I answered that previously.

As I said, there are at least hundreds of different nitrosamines known. Some more relevant than others and some of these nitrosamines can -- have been shown to be carcinogenic in certain animal species, particularly primarily tested in rodents and generally at high doses.

When you use the term "potent carcinogens," this is a rather -- well, it's a vague term. What's potent really mean?

Q. Doctor, in this article where you say NDMA is a carcinogen, you didn't qualify the statement here, right?

MS. TOLEDO: Object to form.

A. Well, let me read more. You have -- we have so far is the abstract, okay.

Q. Sure. But in this statement right here, you didn't -- the opening sentence of the article states NDMA and nitrosodimethylamine DMN is a carcinogen, you didn't qualify the statement here, did you?

MS. TOLEDO: Objection. Mischaracterizes the document. Asked and answered. And he has asked to look at the document, so I would ask



you to allow him to do that.

A. The abstract is a brief synopsis of the paper. Abstracts are generally limited to a certain number of words, I can't remember what the word limit is for this particular journal, which I think -- yes, it's biochemistry, but you really can't say everything. That's why we have longer versions of -- well, the paper itself is much longer than the abstract. So, if you have time, I can -- I'm willing to read through more of the paper itself or if you'd like to point me to specific places in the rest of the paper outside of the abstract, which I mention is actually necessarily limited in its length, then I'll be glad to address that in terms of what the qualifications are in terms -- and caveats are in terms of calling NDMA a carcinogen.

Q. Typically, the abstract contains a summary of the paper, wouldn't you agree with that?

MS. TOLEDO: Object to form.

A. Yes, abstracts are brief summaries, as I mentioned, and they were limited to the



number of words that are permissible.

Q. Sure. Let's turn to the second page under Experimental Procedures in this article.

THE VIDEOGRAPHER: Counsel, when the doctor leans in to that second monitor, his face is completely off screen when he's answering. I just wanted to make sure that was clear for anyone.

A. Sorry, the print's kind of fuzzy, so I --

MS. LUHANA: Can you blow it up, the Experimental Producers, that section right there? And I want to focus on the first statement there.

BY MS. LUHANA:

Q. Doctor, can you please read out loud that section for the ladies and gentlemen of the jury that says -- begins with Caution, exclamation point?

MS. TOLEDO: Excuse me. He needs to be able to look at the document and read the article before you can point him to specific portions of it.



Q. Doctor, do you see that section right there under Experimental Procedures?

A. What section?

Q. The one that says -- I'll read it out loud. It says: Caution, exclamation point, these nitrosamines and nitrosamides are mutagens and carcinogens. All syntheses should be conducted in a fume hood with adequate ventilation and appropriate skin protection should be used.

Do you see that there?

A. Yes, I do.

Q. So, this article discusses NDMA and DEN also.

Did you see that from the abstract? Or you can see it there in the chemical section right there.

A. I'm sorry, what was your question again?

Q. So, this article concerns NDMA, correct?

MS. TOLEDO: Object to form.

A. It concerns both N -- NDMA and what we would -- for these purposes, call NDEA, which is not directly involved in the case

but is relevant.
Q. So, as a scientist here, you're working with NDMA, but not ingesting it, correct?
MS. TOLEDO: Object to form.
A. No, we're not ingesting NDMA.
Q. And in this article about an experiment where you're conducting with NDMA, you're forewarning readers, who are people, right, to take precautions when they're handling NDMA, which you state is a carcinogen, correct?
MS. TOLEDO: Object to form. Mischaracterizes the document.
A. One of the reasons we have the warning statement is relates to something we were talking about this morning. We're talking about synthesizing a large amount -- large amounts of these particular materials --
Q. Doctor, you're off the camera, I apologize. You should say, you know, we want to capture the video. I didn't mean to interrupt you, I apologize, but you have to stay on the screen.



A. Well, I -- I can't see the rest of the paper unless I turn over. I'm sorry, even with my glasses on, I can't read all the fine print and see what the context is of this work. So, I really need to do that.
Q. Doctor, is there any context provided with that caution statement?
A. I'm trying to --
MS. TOLEDO: Object to form.
A. I'm trying to adjust the screen before I answer your question and you keep interrupting me.
There, can you see me now?
Q. I can see you, but the concern is every time you look at the screen, you go off the camera and then the video isn't capturing you unfortunately, and then you're speaking. So, I just want to make sure we have a clear video. So, I just want you to be mindful of that.
A. I'm not trying to hide, I'm trying to read the paper that you're showing me while I'm answering your questions.
Q. Sure. I appreciate that.
So, why don't you take a look at



the caution language and then return to the screen and then you can answer my questions.
A. Oh, all right. What's your question?
Q. So, this article is about an experiment you're conducting with NDMA and you're forewarning readers, who are people, about the precautions to take when handling NDMA, which you state is a carcinogen, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony and the document.
A. The nitrosamines and nitrosamides are known to be carcin- -- are known to be carcinogenic under certain conditions. I'd like to also emphasize, and you're extending this work to all parts of the paper. The word here is "all syntheses," syntheses, the second word in the second sentence is syntheses. These syntheses, as I pointed out this morning, were being done on a gram scale, that's a lot -- and that's a gram, of course, would be, what, a billion nanograms, okay? And so, these were done on a large



scale and that's why we have a warning for a fume hood. I didn't say every single experiment had to be done inside the hood, but the syntheses should be done here. So, I hope that answers your question.
Q. So, you agree that nitrosamines are mutagens and carcinogens, correct, including NDMA?
MS. TOLEDO: Object to form. Mischaracterizes his testimony. Asked and answered.
A. Repeatedly today I told you that nitrosamines, including NDMA, can be mutagenic and carcinogenic under certain conditions as defined by the dose, the animal species, the organ site, the time of exposure, et cetera. So, this is a very general statement. This says nothing about the dose. What this says is basically what it says. All syntheses, and I emphasize syntheses, should be conducted in a fume hood with adequate ventilation and adequate skin protection.
Q. Doctor, do you know how much NDMA you were dealing with here, the quantity?

MS. TOLEDO: Object to form. Mischaracterizes. Asked and answered.

A. I think I told you it was on the order of a gram. We were actually vacuum distilling these samples. You can't vacuum distill much less than a gram.

Q. But you -- as you said, you're working with NDMA here and not ingesting it, correct?

MS. TOLEDO: Object to form. Asked and answered.

A. No, we're not ingesting NDMA.

Q. Doctor, are you aware that ranitidine can contain thousands of nanograms of NDMA?

MS. TOLEDO: Object to form. Assumes facts not in evidence.

A. There are a few samples that I recall had more than 1,000 nanograms in a pill. However -- and I just want to look at this to be sure I answer your question directly. Let's look at pages 81 and 82 of my report.

So, if we're looking at Table 3 and one pill, I see the highest amount of NDMA



being 855, that is not in the thousands. If I go over to the next page and look at Figure 28, not quite sure, this is a little harder to relate to, but this is the Australian analysis and I don't know if there's more than -- not quite sure here, very few samples that would have thousands of nanograms of NDMA.

I'd also like to point out, I think I've already mentioned before, that I really discount any of the analyses that came out of the Emery CRO as being unreliable. So, if those were higher, I don't trust them.

Q. So, you didn't consider the Emery data for your report?

A. Oh, I consider --

MS. TOLEDO: Object to form.

THE WITNESS: Sorry, apologize.

A. Oh, I considered it.

Q. I'm talking about the testing in the NDMA values that -- the NDMA test results from testing ranitidine, did you consider those values in your analysis?

MS. TOLEDO: Object to form. Asked and answered.



A. The values that Emery reported?

Q. Yes.

A. I consider them highly unreliable.

Q. Doctor, if you look at Table 3, it's a handful of samples here, right, you have Cardinal Health with one lot tested, Dr. Reddy's with one lot tested.

You appreciate this drug has been on the market for 40 years, correct?

MS. TOLEDO: Object to form.

A. Ranitidine has been on the market for 40 years, yes.

Q. Okay. And so, GSK's testing, GSK tested hundreds of batches.

Are you aware of that?

MS. TOLEDO: Object to form. Assumes facts not in evidence.

Q. You worded it in your report Doctor?

A. Wait a minute. What's your question again? What did you say? GSK testing -- GSK's testing -- GSK tested hundreds of batches, are you aware of that? Is that your question?

Q. Yes.



A. They -- I don't know if there were hundreds, I think that's in the -- I can't remember the specific number that they tested in the King report or perhaps in the other one you're alluding to today, so I don't know about hundreds.

But I do know that the FDA, as I stated in my report, has tested about 180 ranitidine samples.

And on the next page, page 81, Health Canada, well, they did -- they only did eight, but Austral- -- the Australian analysis was with 135 or at least at that time in 2019.

Q. You said the FDA tested 180 samples?

A. Yeah, in my report, as of April 2020, the FDA has tested approximately 180 ranitidine samples.

Q. Doctor, do you know how these samples were maintained when they were tested and -- do you know how they were maintained when they were tested, before they were tested?

MS. TOLEDO: Objection to form.

A. They were derived from many prescription and OTP manufacturers there. I don't know about every specific sample and I assume that these were handled in the standard way.
Q. What's the standard way, Doctor?
A. Storage at room temperature as recommended by the prescribing information.
Q. What would be room temperature to you?
A. There's a range, I forgot what it is. Room temperature typically is about 23 degrees centigrade.
Q. And what's the humidity that ranitidine is supposed to be maintained at?
A. Normal humidity.
Q. What is normal humidity to you, Doctor?
A. I think what would be typical in someone's house.
Q. What is that to you, Doctor, if -- has -- have the manufacturers told consumers how to maintain ranitidine?
MS. TOLEDO: Object to form.
Q. What's the humidity the



manufacturers tell consumers to maintain ranitidine at?
A. I'm not sure exactly what the specifications are, but I think it's under normal conditions that one would have in a house.
Q. What is that? People's houses vary in terms of humidity. What is normal to you, Doctor?
MS. TOLEDO: Object to form. Asked and answered.
A. Well, I haven't tried to calculate the humidity measurements in my own house and I don't know that most people do.
Q. Doctor, do you appreciate that ranitidine, when exposed to humidity, for example, forms NDMA?
MS. TOLEDO: Object to form.
A. I appreciate that, yes, but I refer you to the King 2020 study in which GSK, who is involved in this, GSK did actually agree that humidity increased the rate of formation of NDMA, but they only did -- reported the experiments that were done at 50 degrees centigrade or higher. I don't recall that



they did a humidity examination at lower temperatures, which are actually more normal.
And I'd like to point out that in the King study, these conditions with varying of the humidity and the heat were actually done under what we call stress conditions, that is, the samples were stressed in order to show what could happen. Stress testing is sort of like what I talked about with toxicology in general before, there's -- what you're trying to do is look at hazard identification, that is, what the worst case scenario could be, and then when you do the risk assessment and dial back to more normal conditions then. I don't think anyone's home would be normally 50 degrees or more.
Q. I wasn't asking about the temperature, I was asking about the humidity.
You said normal humid conditions at home. Since you answered that way, do you know what those normal humid conditions would be?
MS. TOLEDO: Objection. Asked and answered. Mischaracterizes his testimony.



A. I can't give you a specific percentage. If you want to refer to the King paper, and I'll be glad to look that up, they actually did look at the specific humidity conditions and the effect of the humidity at these elevated temperatures, mind you, not --
Q. Are you --
A. -- temperature.
Q. Are you aware if the manufacturers of ranitidine provide a specific humidity to keep the ranitidine at?
MS. TOLEDO: Object to form.
A. Your question, as I read it here, are you aware if the manufacturers of ranitidine provide a specific humidity to keep the ranitidine at, you mean --
Q. The percentage of relative humidity to keep the drug at.
MS. TOLEDO: Object to form.
A. I don't know what you're asking here. Are you meaning that the manufacturers have a specific humidity in their manufacturing operation and storage or a recommendation to people who take this who purchase the drug and use it?

Q. Well, Doctor, you testified that GSK found in its root cause analysis and that we all know now that when ranitidine is exposed to humidity, it forms NDMA, a carcinogen, correct?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. As I indicated, the paper, the King et al. paper doesn't actually start looking at the effective humidity until they get to 50 degree centigrade. They did not look at the affected humidity at a lower temperature, which would be more typical on the order of 23 degrees centigrade at typical room temperature or even 30 degrees, which I recall is about 86 degrees Fahrenheit.

Q. So, you're saying humidity alone, for example, doesn't cause more NDMA to be generated at normal temperatures?

MS. TOLEDO: Object to form.

A. I don't recall a specific expert that was -- that I read about that really reported that. Unless you can actually show me that, I'd be glad to look at it, and if I'm mistaken, I'll be glad to consider



changing my opinion.

Q. Doctor, so, I was asking you previously, ranitidine, you said, some samples do contain more than thousands of nanograms of NDMA, correct?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. As I indicated, looking at pages 80 through 83, and the only samples I see that analyze it might be in that range is one from Australia. Now, you said -- but let me look at your question again. I -- you said --

THE COURT REPORTER: My machine froze. You're not going to be able to read that.

A. Yeah, that's -- what was the question again?

MS. LUHANA: Candida, can you read the question, again?

THE COURT REPORTER: My machine froze. I have to pull apart the steno. It could -- yeah, if we can go off the record, it'll just take me a few minutes. I'm sorry.

MS. LUHANA: I mean, do you to --



you need to fix it, right, before we go back on or...

THE COURT REPORTER: Only if you want me to -- only if you want --

MS. LUHANA: Oh, then that's fine. Then that's fine.

THE COURT REPORTER: I can do that after, yeah.

BY MS. LUHANA:

Q. So, Doctor, what I was raising is you testified earlier that ranitidine can contain thousands of nanograms of NDMA. There were samples that had above thousands of nanograms of NDMA, correct? Not only in your table 'cause that's selective, Doctor.

Have you looked up the master data spreadsheet that was provided with the root cause analysis?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I don't -- I don't recall the Excel spreadsheet.

By the way, I'm looking here when I answered the question about Australia, there was one sample that had 42 nanograms in it.



I think that's the only sample I see in this list there. But no, I don't recall all the numbers in the Excel spreadsheet of GSK. If you'd like to share those with me, I'll be glad to look at that. Moreover, I'm not even that concerned about one pill having a thousand nanograms when, as I've indicated in Table 1, there's far more than that in some simple foods, like, one sausage.

Q. Doctor, are you aware that ranitidine was prescribed to babies and pregnant women and millions of consumers?

MS. TOLEDO: Object to form.

A. I don't know who all the prescriptions were to. No, I don't know exactly how many pregnant women or babies got prescriptions.

Q. I'm not asking if you know how many prescriptions were given.

Are you aware that ranitidine was prescribed to babies and pregnant women?

MS. TOLEDO: Object to form.

A. I don't know specifically about any of the individual prescriptions.

Q. It's not specific. Do you know it

was approved for use to be prescribed to pregnant women and babies, are you aware of that?

MS. TOLEDO: Object to form.

A. Well, first of all, if you have information to show me, that's fine. At this point, I don't have any reason to doubt that it might have been used by them.

Q. Do you know if your clients, some of the manufacturers of ranitidine, gave this kind of warning to ranitidine users who are actually ingesting NDMA in ranitidine?

MS. TOLEDO: Object to form.

A. What kind of warning are you talking about?

Q. That nitrosamines and NDMA are mutagens and carcinogens and contained in ranitidine.

Do you know if the manufacturers of ranitidine gave this type of warning that you've included in your publication that NDMA is a carcinogen, on the label of Zantac?

MS. TOLEDO: Object to form. Mischaracterizes his testimony, mischaracterizes the paper.



A. There were not -- no extensive analyses were done of NDMA levels before the more recent period about three years ago, so there was no reason for the company to actually put literature out there warning people because they didn't have any knowledge of this.

Q. So, it's your testimony that the manufacturers of ranitidine had no knowledge of NDMA potentially being in their drug?

MS. TOLEDO: Object to form.

A. There had not been routine analysis or really any analysis for NDMA except for perhaps the so-called WHO NAP assays which actually show NDMA in most drugs.

Q. So, when was this WHO NAP assays done which showed NDMA in ranitidine, Doctor?

MS. TOLEDO: Object to form. Assumes facts not in evidence.

A. It didn't show -- I think you're misstating, it didn't show NDMA in ranitidine. It showed that under very stressed conditions basically the NDMA could be formed under highly stressed conditions, and this was probably the Tanner 1982 paper.



Q. Was there anything else that showed that?

MS. TOLEDO: Object to form.

Q. Any other tests that the ranitidine manufacturers did that showed NDMA?

MS. TOLEDO: Object to form.

A. I don't remember any. If you have information to the contrary, I'll be glad to look at that.

Q. That's what's important for you to evaluate and provide in your report here?

MS. TOLEDO: Object to form. Argumentative.

A. So, what is the evidence? Are you telling me there's something that I forgot to put in?

Q. No. I'm asking you if you recall if there's anything else, any kind of testing that the manufacturers did that showed NDMA?

MS. TOLEDO: Object to form.

A. Well, ranitidine had been extensively tested for cancer in lots of different animals and everything was negative. Also ranitidine was not being converted to what -- not -- well, let's see,



trying to remember all of the experiments. There was never any evidence that ranitidine was forming NDMA either in people or in the samples prior to ingestion.

MS. LUHANA: Let's pull up what's been premarked 6826.

(Exhibit 6826 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is another publication where you're an author entitled Participation of rat liver cytochrome P450 2E1 in the activation of N-nitrosodimethylamine and N-nitrosodiethylamine to products genotoxic in acetyltransferase-overexpressing Salmonella typhimurium strain, and the parentheticals.

Do you see this here?

A. Yes, I do.

Q. You're an author on this article, correct?

A. I am.

Q. And this was published in 1992, correct?

A. That's correct.

Q. Can you read the first sentence in the introduction?
A. N-nitrosodimethylamine, NDMA and N-nitrosodiethylamine, NDEA, are potent chemical carcinogens found in the environment and known to be activated by liver microsomal P450 enzymes in experimental animals and also in man.
Q. So, you state here that NDMA is a potent chemical carcinogen, correct?
MS. TOLEDO: Object to form. Mischaracterizes the prior testimony and the document.
Please take your time looking at the document.
MS. LUHANA: Counsel, can you please stop coaching the witness? You can have a standing objection to form, how about that?
A. As I talked about, mentioned a number of times during today the words "potent" and "chemical carcinogens" have to be taken into context. I agree that NDMA can be a carcinogen in certain animals at certain doses for certain times and at for certain



organs -- in certain organs.
Q. You didn't qualify all those things in this statement, did you, Doctor, when you wrote this article in 1992?
MS. TOLEDO: Object to form.
A. I'll have to read more of the article if you don't mind. First of all, I'd like to point out before I start reading more, this is about rat cytochrome P450 2E1, this actually doesn't directly relate to humans at all then. But let me read more and I'll try to keep my face in your picture while I'm doing that, but its print is rather small on my copy.
Okay, I've looked at the paper and what was your question or did you have a question?
Q. I said, you didn't qualify that NDMA is a potent chemical carcinogen here in this paper, which is actually the first sentence of your publication, did you?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. That actually wasn't the point of the paper, it was just an introductory



statement and it doesn't say anything about humans. If you read the rest of the paper, all of this work was done with rat enzymes, not humans, incidentally.
Q. Doctor, is this paper for rats or for humans?
MS. TOLEDO: Object to form.
A. What do you mean is it for rats --
Q. What is this paper being done for?
A. Well, I don't think the rats are going to read it.
Q. Right. So, Doctor, you so readily -- you were so ready to state here that NDMA is a potent chemical carcinogen because it's so well-known, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. Well, I'm referencing two papers there, reference one and reference two. Reference one is a general review I wrote about the chemical carcinogens for a journal called Chemical Research -- or Cancer Research in 1988. The second reference is to Peter Magee and his colleague Barnes, a 1967 paper about carcinogenic nitroso compounds



which is apparently a review article.
So, this is to put the con- -- put this in the context of why people might be interested in reading about nitrosamine metabolism.
Q. Doctor, you realize that even though you have a primer section on NDMA earlier in your report, you never mention that NDMA is a carcinogen until about a hundred -- page 120 of your report when you cite to the various designations by IARC, the EPA and the NTP on NDMA being a carcinogen.
Do you find that unusual that in this litigation your report is different than what you independently do when you publish articles?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. You said that I don't say anything about the possibility of NDMA being a carcinogen until page 120?
Q. Yeah. You don't talk about NDMA being a probable human carcinogen or a probable carcinogen anywhere in your report, not even in the primer section, until

page 120. And yet, in your publications, you're readily -- it's the first sentence where you state, NDMA is a potent chemical carcinogen.

So, does that surprise you that you're doing different things differently here for litigation versus what you do when you're independently publishing literature?

MS. TOLEDO: Object to form. Mischaracterizes his testimony. Mischaracterizes the paper.

MS. LUHANA: Counsel, you have a standing objection, no need to coach the witness.

MS. TOLEDO: I do not have a standing objection. I will continue to state objections as necessary as long as your questions continue to be objectionable.

MS. LUHANA: You can just object to form. There's no -- speaking objections, as you know, are not allowed especially with every single question, Counsel.

MS. TOLEDO: I tried that with --



with your colleagues in different depositions and it didn't work. So, I'm just following the rules as set out in this litigation by your peers.

Q. So, it surprises you, right, Doctor, that you don't note about NDMA being even a probable carcinogen until 120 of your -- page 120 of your report in the footnote and here in your publications which you're publishing independently outside of litigation, first thing you note about NDMA being a potent carcinogen, does that surprise you?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. Frankly, Ms. Luhana, I must respectively disagree with you. I'm starting out on page 5 and leading into page 6 and it talks basically very simply there at the top of page 6:

Plaintiffs' experts proposed mechanisms of carcinogenesis from ranitidine is theorized to be due to N-nitrosodimethylamine (NDMA) exposure, both through exogenous formation of the ranitidine



product endogenous formation in the body after ingestion.

So, I come out straightforward and introduce the matter. Then I --

Q. Doctor, you think --

A. I'm not done talking.

Q. Oh, I apologize.

A. You're interrupting me.

Q. I don't mean to interrupt you, Doctor. But I want you to focus -- I really want you to focus on the --

A. You're still interrupting me and I haven't finished.

Q. I want you to focus on the question asked, Doctor.

A. I did focus on the question asked. You told me I didn't talk about cancer and NDMA until page 120. I just told you I did this on page 6.

Q. No, I said NDMA being -- so, focus on the question being asked, Doctor, I think that would help us both.

The question that was asked was you stating that NDMA is even a probable carcinogen, you do not do that until page 120



of your report.

And so, please look for somewhere in your report prior to that where you note that it's a probable carcinogen. That is my question.

MS. TOLEDO: Objection to form. Asked and answered and mischaracterizes his testimony. And if you could please stop interrupting the witness while he is trying to answer your question.

Q. Doctor, I'm just -- I want you to focus on the question that's being asked, that's why, I'm not trying to interrupt you. So, I apologize if I interrupted, but I want you to answer the question that's being posed.

A. Okay. Let me try that and if I get the language mixed up, it's because I'm getting confused by your arguments.

I did mention the whole issue, I raised this on page 5 and 6, okay? This is what the whole report's about, and same way that when I write a paper in the refereed literature, I will introduce something

because -- and tell people why they might be interested in following up on this.

Then as opposed in a some-odd different way than I would normally, at least in a primary paper as opposed to a review, I go through an extensive background dealing with some basic principles of pharmacology, pharmacokinetics, toxicology, ranitidine, ranitidine pharmacology, dimethyl nitrosamine and the sources of that, I go through analytical chemistry. Then I start talking at least on -- if I haven't before and overlooked it, start talking on page 96 about the genotoxicity of ranitidine. And you use the term, I didn't call it a probable carcinogen. This is language that is actually used by IARC, and it's actually not even in the IARC's list of probable carcinogens or known carcinogens, it's a possibility of a carcinogen in the IARC classification.

I hope that answers your question.

Q. Doctor, with all due respect, the references that you just mentioned don't state that NDMA is a carcinogen. You don't



state in your report till page 120 when referencing the designations, and I implore you to go through your report when you have an opportunity, but you don't state as you do upfront in all these publications where you note, NDMA, hey, it's a potent carcinogen. That isn't said here in your report till page 120, and that's when you're referring to the -- when you're referring to IARC and NTP, Doctor.

So, if you look at page 120 of your report and look at the footnote there, that's where the reference is raised. And as you can see, IARC does call it a probable carcinogen to humans and it's designated as a 2A.

Do you see that in your report?

A. Yes.

MS. TOLEDO: Object to the form of the question and counsel's statement of fact.

A. Yes, I see that. It says, Group 2A probable carcinogenic in humans and this is introduced here.

Let me tell you something else



about this report, okay? So, if I'm writing a paper for the refereed literature, I'm sort of inviting people to read my paper and giving them a reason why something would be interesting. Many people would not necessarily be interested in the topic, but perhaps if they know that there are actually concerns about potential carcinogenicity at least in some systems, they might go on and read the paper. This report is entirely different. Nobody's gonna be reading this report unless they're concerned about the issues of ranitidine and NDMA, that's what this whole case is about. I don't have to explain to people why we're talking about these things.

What I've done is provide, first of all, my overall conclusions, which are actually also on page 7, I say, no scientific -- Item 4:

No scientific or regulatory organization has classified NDMA as a known human carcinogen.

So, I have talked about that on page 7 as well. And then I go into the rest



of the material, providing a background for which somebody who is actually willing to have an open mind about reading and making a decision about the issue of NDMA and ranitidine can make an informed decision after evaluating the science.

Q. Doctor, don't you think the court would want to know that you've concluded, at least since the '90s, that NDMA is a potent chemical carcinogen?

MS. TOLEDO: Objection to form. Mischaracterizes his testimony.

A. We have been through this numerous times today. You talked about potent human carcinogen all the time and I keep telling you that, and you can tell the court this too, that basically these terms are very relative, they depend, as everything in toxicology, on the dose, the animal species, the conditions, the time and other factors as well.

So, can't just throw terms around a potent human carcinogen blindly.

Q. Doctor, my question was directed to potent chemical carcinogen as you state in

your paper here, but let's take this document down.

Doctor, in your report you state:

I've been asked to provide an opinion on whether there's reliable non-epidemiological scientific evidence to support that exposure to ranitidine (Zantac) causes cancer.

And that's on page 5 of your report?

Do you see that?

A. Yes, I do. I agree with that.

Q. And we've premarked your report, it's Exhibit 6822.

(Exhibit 6822 was marked for identification.)

BY MS. LUHANA:

Q. So, Doctor, in forming your opinions here in your reports, you haven't reviewed any of the epidemiological evidence, correct?

MS. TOLEDO: Object to form.

A. I'm sorry. What's 6822? Am I missing something?

Q. It's just -- I premarked your



report with that exhibit number, so I was just letting you know when I refer to 6822, I'll reference it later on throughout -- throughout the day.

But setting that aside, my question to you is, you haven't reviewed any of the epidemiological evidence to reach your conclusions here in your reports, correct?

MS. TOLEDO: Object to form.

A. I have not reviewed the epidemiology sections of this case and as I -- you indicated, I -- what you just read, I have been asked to provide an opinion on whether there is reliable non-epidemiological scientific evidence to support the conclusion that exposure to ranitidine causes cancer and so on.

So, the answer is, no, I have not included any epidemiology in my report.

Q. Not that you've included -- you haven't reviewed any epidemiological evidence, correct, to come to the conclusions you have for your report?

MS. TOLEDO: Objection. Asked and answered.



A. I focused on the basic science and the mechanistic information, not the epidemiology. I haven't read the epidemiology or the epidemiology reports of the experts for either the defense or the plaintiffs.

Q. So, can you please describe what you haven't reviewed to come to the conclusions in your reports? So, for example, you haven't reviewed the NDMA diet studies, correct?

MS. TOLEDO: Object to form.

A. Well, I have reviewed some diet studies. I referred you to Table 1 and the paper by Stuff and there are others as well and the Hrudey 2013 paper actually somewhat touches on diet as well. And referring to other dietary stud- --

Q. Yeah, I'm talking about the epidemiology, the relevant -- the epidemiological diet studies, you haven't reviewed those, correct?

MS. TOLEDO: Counsel, please let the witness finish his answer.

MS. LUHANA: Counsel, he had



finished -- he had finished his answer.

MS. TOLEDO: No, he was not. He was in the middle of a sentence.

A. I have not reviewed epidemiology papers related to this. I mentioned the dietary studies that I have looked at.

Q. So, for example, you haven't reviewed the NDMA diet studies to see how much NDMA study participants were exposed to that was associated, for example, with a cancer diagnosis, correct?

MS. TOLEDO: Objection to form.

A. I'm not sure what documents you're referring to. I don't recall anything like that.

Q. Doctor, when the FDA withdrew ranitidine from the market on April 1, 2020 and stated that sustained higher levels of NDMA exposure may increase the risk of cancer in humans, when they stated that you haven't evaluated that statement to assess the levels of NDMA exposure in humans that would increase the risk of cancer, correct?

MS. TOLEDO: Object to form.

Assumes facts not in evidence.
A. Let me read what I do know and what I wrote in my report about what the FDA says about their concerns about ranitidine and cancer.
Q. Doctor, that doesn't address the question. I want to -- I want to know whether you evaluated the statement to assess the levels of NDMA exposure in humans that would increase the risk of cancer. So, that's -- that's my question. You know, if you can answer it -- if that requires reading your report, that's fine, but that's the question I'm focused on.
MS. TOLEDO: And he was answering your question, if you would let him answer and not interrupt.
A. Okay. Let's go to page 68, and this is talking about the FDA and ICH M7 guidance and the guidance discusses, quote, I'm reading starting at the fourth line on page 68:
"These risks -- and they're talking about the calculations of risk.
"These risk levels represent a



small theoretical increase in risk when compared to human overall lifetime incidence of developing any type of cancer, which is greater than 1 in 3. The use of a numerical risk value (1 in 100,000) and its translation into risk-based doses (TTC [threshold of toxicological concern]) is a highly hypothetical concept which should not be regarded as a realistic indication of the actual risk. Exceeding the TTC is not necessarily associated with an increased risk given the conservative assumptions employed in the derivation of a TTC value. The most likely increase in cancer incidence is much less than 1 in 100,000.
Let me go on. I have two other statements here then, the -- that actually, the next one is on page 70, which also comes from the FDA ICH M7 guidance.
Overall the -- the first part is my language.
Overall, the acceptable intake should be viewed in the context of their intended purpose and their limitation, i.e., and here I do quote from the FDA ICH



document, a highly hypothetical concept that should not be regarded as a realistic indication of the actual dose then. Then -- oh, and then one more that I remember.
So, those are some of -- yeah, I'm sorry, one more. I knew it was here on page 80 somewhere.
So, here we're talking also about FDA updates on ranitidine, this is November 1, 2019:
Importantly they have put these levels in context of background exposure asserting the, quote, and these are the words from the FDA, "levels of NDMA in ranitidine are similar to the levels you would expect to be exposed to if you ate common foods like grilled or smoked meats."
And I would refer back to the paper of Stuff 2019, which I copied Table 1.
MS. LUHANA: Move to strike as unresponsive.
Q. Doctor, that didn't answer my question.
MS. LUHANA: Let's pull up what was previously marked as Exhibit 6481.



(Exhibit 6481 was previously marked for identification.)
BY MS. LUHANA:
Q. So, Doctor, have you seen this document before, this is the FDA's removal of NDMA from the market in April of 2020?
A. Okay, I'm trying to get it on my screen.
Q. Are you able to see it on the screen that's before you right now? Can you see it there?
A. Yes, I can, but the problem is I only see it -- when I do that, I only see parts of the document and I'd like to know exactly what context this is in and not looking only at the selected parts of documents.
Q. Have you seen this document before, Doctor?
A. I'm not sure if this is on my list of materials or not. Doesn't look immediately familiar, but that may not be a good indication that I haven't seen it.
Q. Okay, let's turn to the second page of this document.

So, my question was focused on the language by the FDA and what you've done to assess these levels. So, can we go to the next page? Do you see it starts out with, NDMA as a probable human carcinogen there, a substance that can cause cancer, in that first paragraph. In the middle of it, they say:

However, sustained higher levels of exposure, of the first paragraph, may increase the risk of cancer in humans.

Do you see that there?

A. Yes, I do.

Q. So, the FDA is stating that sustained higher levels of exposure of NDMA may increase the risk of cancer in humans. And my question to you is, you haven't evaluated that statement to assess the levels of NDMA exposure in humans that would increase the risk of cancer, correct?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. Actually, I have done that in my report.

Q. Doctor, you haven't reviewed the



epidemiology, have you?

A. I said I didn't.

Q. So, you agree the epidemiological studies are where they've assessed the amount of NDMA, for example, people are exposed to to see if there's an association in cancer, but you haven't looked at that, have you?

MS. TOLEDO: Object to form. Mischaracterizes the evidence.

A. I haven't looked at the -- read the epidemiology. However, I have, as I indicated in my report very clearly, evaluated the available information about what the typical intake of NDMA is in food and also what the endogenous production of NDMA is.

Now, this sentence starts out, this material from the FDA, they use probable human carcinogen, I think they're probably using the IARC nomenclature here. And then it goes on and it says that low levels of NDMA are commonly ingested in the diet, for example, NDMA is present in foods and in water, which I just got done talking about in my report and citing some of the



information.

And further, going on in terms of what I said the FDA said, these low levels would not be expected to lead to an increase in risk of cancer.

Then, I think this is what you're emphasizing, however, sustained higher levels of exposure may increase the risk of cancer in humans. Well, that doesn't really tell me anything. What are higher levels of exposure? Are these exposures that would be on the order of very high concentrations that were used in some of the rat studies? Well, possibly that might cause an increased risk of cancer in humans. However, the -- this doesn't necessarily refer to the amount in ranitidine.

Q. Doctor, my question to you is, have you done anything to evaluate to assess the levels of NDMA exposures in actual human epidemiological studies that would show this increased risk of cancer. That's -- that's my focus here. You haven't done anything -- I understand you looked at literature. My focus is, have you -- you haven't looked at



any human literature that any human epidemiological studies that have assessed the level of NDMA exposure to risk of cancer. You haven't done that, have you?

MS. TOLEDO: Objection. Asked and answered. Mischaracterizes his testimony. Misstates the evidence.

A. As I said before several times now, I was not asked to evaluate the epidemiology. I have not claimed to be an epidemiologist. There are experts for the defense and also the plaintiffs who are arguing about the epidemiology, I'm not going to get into that.

I have looked at human studies in terms of what is in the diet typically. I refer to that time and time again today in Table 1, and I've also referred to a number of studies based on how much -- indicating how much NDMA is actually being formed by normal biological processes in every human.

Q. But, Doctor, the diet studies you reviewed aren't assessing cancer risk, right, in those studies?

MS. TOLEDO: Object to form.

A. I don't recall that they are. I'm

just looking -- I think as I recall, the Stuff and other articles, these are actually talking about what the exposure actually is in some of the common foods. Which I would like to emphasize, again, is actually much higher than people are routinely exposed to in any ranitidine samples.

Q. Doctor, what methodology did you use to reach the opinions you have in your reports?

A. What methodology? What are you asking?

Q. Well, how did you go about -- what methods did you use to reach the conclusions you have in your report?

A. Well, I did use -- first of all, I used my own background information on nitrosamines, which I mention is extensive, it goes back to 1976, so I do have a background on NDMA. I also have a very extensive background on genotoxicity. I've been doing studies on mutations for a number of years now and published some very basic studies. I know a lot about DNA adducts and specifically about 06-methylguanine, which is



the major adduct of a concern here.

In addition to that, I know a lot about nitrosamine metabolism, I actually have known many of the leading figures in nitrosamine metabolism and carcinogenesis for a number of years and have been familiar with their work. In fact, routinely, I do actually read papers on nitrosamines, even when I'm not -- even ones I'm not particularly doing a -- or I'm not doing my own research on just in terms of my knowledge about what the field is going on.

I've also actually reviewed papers in the peer-reviewed literature about nitrosamines and the relevance to a DNA adducts and cancer, at least in experimental animals.

In addition, in this particular case, I also did literature searches on aspects of metabolism. I -- as you might surmise, I've done extensive work with cytochrome P450 2E1 myself and I did further literature searches about cytochrome P450 2E1 and about the metabolism of nitrosamines specifically NDMA.



Q. How did you find the non-epidemiological evidence you reviewed and analyzed for your report?

MS. TOLEDO: Object to form. Vague.

A. How did I find the non-epidemiological evidence?

Q. Yes.

A. Well, I had some of it in my files already. I actually have collections in my end note file by keywords and I have several keywords that incorporate the word "nitrosamines."

In addition, I did literature searches primarily using PubMed and perhaps Cite Finder in some cases too.

Q. What literature searches did you do?

A. Well, I did searches in PubMed.

Q. I know, but what did you search?

A. I used various keywords about nitrosamines, metabolism, cytochrome P450 2A -- 2E1, P450 2E6. I don't have a list of all the keyword searches I use, I don't routinely save these. And as I told you



before this morning, I don't really keep notes in these cases.

Q. So, then how did you proceed to determine what was epidemiological evidence versus non-epidemiological evidence in these searches 'cause it all comes up, correct, when you're doing these searches? So, did you review all of the non- -- the epidemiological evidence and say, let me set that aside and not review it and then focus on, you know, the non-epidemiological evidence?

MS. TOLEDO: Object to form.

Q. Let me retract that and ask it again cleaner.

I'm trying to understand, when you did your literature searches, how did you determine what to review and not review, because when you conducted your searches, obviously, it's gonna pull up everything, including epidemiological stuff and non-epidemiological literature?

So, you reviewed the epidemiological literature and decided to exclude it and then focus on the

non-epidemiological literature?

MS. TOLEDO: Object to form.

A. Well, one -- first of all, I'm using appropriate keywords. When you use things like -- words like metabolism or bioactivation or DNA adducts, you don't necessary -- may not -- you probably won't get too much epidemiological evidence. I did not use the search word "epidemiology" either. And I can probably tell pretty quickly from the title in the abstract of a paper that comes up, whether it's epidemiology or not.

Q. So, then you haven't looked at the totality of the evidence here, correct?

MS. TOLEDO: Object to form. Mischaracterizes his testimony and the scope of his -- it goes beyond the scope of his opinions.

A. I said I didn't -- I told you a number of times now in response to your repeated question, I did not review the epidemiology literature regarding N-nitrosamines and of these five cancers.

Q. Are you familiar with the Bradford



Hill assessment?

MS. TOLEDO: Object to form.

A. I heard of the Bradford Hill, but I'm not familiar -- familiar with it at this particular point.

Q. So --

A. Wait a minute, I'm not done talking.

Q. Doctor, I'm sorry, I thought you were done, you paused and that's why I was gonna ask another question. But please continue.

A. All right. I am vaguely familiar with Bradford Hill. I used to have a lecture included in my toxicology course on biomarkers and I think I had a list there of Bradford Hill criteria, but I really don't remember very much about it. This is basically getting pretty much into -- I think they have -- I vaguely recall that he had one item about biological plausibility, but that was pretty much it for basic science.

Q. So, in your work outside of litigation, have you ever done a Bradford Hill analysis?



MS. TOLEDO: Object to form.

A. I don't recall that I have. No, I really don't recall that I have considered that.

Q. Doctor, to your knowledge is there any human benefit to ingesting NDMA?

MS. TOLEDO: Object to form.

A. Let me answer your question this way: In the world of toxicology and chemical carcinogenesis, which I think I consider myself as expert at, as you can see in my report, the -- there are many carcinogens that are present in our food and in our atmosphere and we are constantly exposed to this -- to these. We cannot absolutely avoid every molecule of every potentially dangerous chemical.

Let me give you an example of aflatoxin. Aflatoxin is a very bad compound, okay. The aflatoxins are produced by molds, they grow on mold -- that grow on corn and peanuts primarily and they're actually fairly carefully analyzed. They are generally acknowledged. They will make the top classification in the IARC classification for



being human carcinogens. There's actually -- in that case there is extensive epidemiology, which I'm not going to review here, but in parts of China and West Africa, these have actually been linked to a lot of liver cancer. And I don't think there's too much question about that, that they're major causing factors.

So, this is a problem for people in those parts of the world who are ingesting corn or peanuts that get moldy and have major problems -- can have major problems because of that. These can also be formed in the United States. And in fact, in the corn crop, when there's a rather dry harvest year, there's an increase incidence of the molds the aspergillus that makes aflatoxin. So, actually, this is monitored actually when farmers deliver their corn, it's actually tested for aflatoxin.

Another issue, aflatoxin is in peanuts, as I mentioned already. Peanut butter is monitored for aflatoxins. The FDA has a limit of -- I think it's either 10 or 20 parts per billion for aflatoxins exposure.

And so, they actually do have a sort of a threshold of -- they can't guarantee that all peanut butter is totally free of aflatoxins, but it can be sold as long as it has something below this limit.

So, to get back to your question, in a roundabout way, there is no taste advantage or nutritional advantage of putting aflatoxins into peanut butter. Can they be completely avoided? No. And the same problem is true with NDMA -- NDM -- I'm sorry, NDMA, there's reverting back to my old abbreviations, NDMA, I don't think it makes anything taste better or has any nutritional advantage and -- but on the other hand, exposure to some is unavoidable.

Another class of chemicals that is of concern, one of I already mentioned earlier this morning, is the heterocyclic amines. Heterocyclic amines are formed whenever you grill meat. So, if you put a hamburger or steak on the grill, that black material is full of heterocyclic amines. Heterocyclic amines are very mutagenic, extremely mutagenic in these sorts of



bacterial and other systems we're talking about. They can, at high doses, induce cancer in laboratory animals. Do they make the food taste any better? Well, no. Would we like to avoid them? Well, yes. But the truth is, any time you pyrolyze food you're going to get heterocyclic amines.

So, again, in my long answer, sounds like a long answer, but the point is that traces of some potentially carcinogenic compounds or at least potentially carcinogenic in animals, traces may not be avoidable, but there are ways of actually looking at these doing educated risk assessment and reducing the risk to people so that people aren't exposed to levels that would actually cause cancer.

I hope that answers your question.

Q. Doctor, what do you consider trace amount of NDMA?

MS. TOLEDO: Object to form.

A. Trace amount of NDMA, well, the FDA says 96 nanograms right now. That number is a very conservative of value by their own admission and I've already read several parts



of my report indicating that they think it is and that this level -- levels about this magnitude really aren't any concern to the public.

There are other people who think and have done other calculations, and I've outlined these at great length in my report in terms of what -- what we call a threshold value should be, people like Johnson have actually calculated using BMDL modeling levels as high as 6,000.

As I pointed out earlier today, the normal ingestion of food is on the order of some thousands of nanograms of NDM per day. And if we go to Hrudey and others, we know that people have NDMA in their bodies, in their -- at least in their urine and their plasma, even if they're not exposed to anything, and Hrudey has calculated that people are actually making on the order of a million nanograms of NDMA per day.

So, what do I consider a small amount of NDMA? That's a good question. I would consider 1,000 or 90, certainly 96 nanograms a very small amount compared to the



part -- the amount that already is present in our bodies.

MS. TOLEDO: Counsel, whenever it's a good time for a break.

MS. LUHANA: Just let me finish up with a couple of questions.

Q. So, Doctor, you're saying having more than 96 nanograms of NDMA in a pharmaceutical drug is not of concern to the FDA?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I said that the FDA has set that limit right now based on what they call a linear no threshold model as a rough calculation based on some rat studies, and they've come up with the 96 of that.

And your question is, do they -- what's your question? The small amount of -- what's a small amount of NDMA? No.

Q. No, Doctor. The question that you were answering was the one I posed which was you're saying that more than 96 nanograms of NDMA in a pharmaceutical drug is not of concern to the FDA?

A. Well, that's --
MS. TOLEDO: Same objection.
A. Well, the regulations is 96 nanograms per day right now. As I said, from the language the FDA has used, they don't think -- they don't seem to think that's a particular cause for concern.
And we would submit to actually the work of Florian and other FDA scientists, they actually show that people routinely have much more than 96 nanograms of NDMA present even if they're not eating canned meats or high nitrate food and this is just in the urine and plasma, so it's actually an underestimate.
Q. Doctor, you're aware FDA withdrew ranitidine from the market because it contained NDMA above the limit and because they found it to be unstable. Are you aware of that?
MS. TOLEDO: Object to form. Mischaracterizes the evidence.
A. I don't know if they used the term "unstable" and I would not characterize ranitidine as being a particularly unstable



molecule. Perhaps we can -- you have more questions about that and we can talk about that, however, then.
The -- what was the other point?
Q. Doctor, are you aware --
A. Let me finish. Let me finish.
They did not withdraw the approval for ranitidine and I think that's very important to note that then.
Q. Doctor, are you aware that in the US that NDMA was previously used commercially to produce rocket fuel?
MS. TOLEDO: Object to form.
A. Yes, I am.
Q. Are you aware that was banned from commercial use in the early 2000s?
MS. TOLEDO: Object to form.
A. I'm aware of that. Mind you, that's a very high use, takes a lot of fuel to get a rocket to the moon. And we're talking about lot of NDMA compared to the amounts we're talking about here in food or in ranitidine and even the gram quantities that we synthesized in my own laboratory.
Q. Doctor, did they put a ban on the



certain amount of quantity to put on NDMA to be used commercially?
MS. TOLEDO: Object to form.
Q. Did they ban saying, above a certain amount of NDMA, you can't use commercially, in the early 2000s?
MS. TOLEDO: Object to form.
A. I'm not sure what the limit is. It's not totally banned because we can still buy it in my laboratory. In fact, you can still buy this.
Q. Doctor, it's only used for research purpose, but commercially otherwise it cannot be used.
Are you aware of that?
MS. TOLEDO: Object to form.
A. I'm not aware that it had any major commercial use except as rocket fuel. Sometimes what are called cutting oils or metal saws, actually that oil was contaminated with NDMA, I know that's another potential exposure. But I don't know what the limits are on that and I don't know what the actual poundage is in terms of the restriction.



Q. Do you know why it was banned?
MS. TOLEDO: Object to form.
A. No, I don't.
Q. So, that wasn't important for you to research for your report when you're writing about NDMA?
A. It was --
MS. TOLEDO: Object to form.
A. It's probably because of the concern about large amounts causing cancer, but that's only speculation, so I think the record should indicate that it was -- that I'm speculating here.
Q. So, it wasn't important for you to find the answer about that when you're writing a report about NDMA?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. I think the amounts used for rocket fuel are so much different than 96 nanograms or even a million nanograms we're talking about here that it's really irrelevant.
Q. Is there any benefit to having NDMA in a pharmaceutical drug above the limit set by the FDA?

MS. TOLEDO: Object to form.
A. I can give you the same answer I did with the aflatoxins and the heterocyclic amines in the food. There's no benefit.
On the other hand, I'm also not concerned about having traces of the mat- -- this material -- particular material in the pharmaceutical products in light of the endogenous exposure that -- and dietary exposure that people already encountered.
MS. LUHANA: Okay, I think now is a good time for a break.
THE VIDEOGRAPHER: The time is 19:50 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 20:04 UTC.
MS. LUHANA: Let's pull up what's been previously marked as Exhibit 6477.
(Exhibit 6477 was previously marked for identification.)
BY MS. LUHANA:



Q. Doctor, have you seen this document before, it's GSK hazard assessment report on NDMA from September of 2019?
A. Just a moment, it's still coming up. Okay, it's up.
Q. Have you seen this document before?
A. Is there a date on this?
Q. Yeah, September 25, 2019.
A. Never mind. That's highlighted.
Q. You could just scroll through the document.
A. Yeah, I can. I'm checking my reference list to see if it's included there and I did.
Q. Let's go to page 7 of the document.
A. Okay, I have that.
Q. So, Doctor, that middle paragraph there, as I said, this is a document, GSK hazard assessment on NDMA. And do you see that last sentence there:
NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.
Do you see that statement there?
A. Yes, I do.



Q. So, do you agree with GSK that NDMA exposure should be reduced to the extent possible?
MS. TOLEDO: Object to form.
A. I agree that -- well, first of all, I agree that NDMA can be a genotoxic -- can be genotoxic, it can be a carcinogen, at least in specific -- specific conditions with regard to dose, animal species, et cetera. And this is kind of a general but vague statement, "exposure should be reduced to the extent possible." That don't really tell me what standard should be reduced to.
Q. Okay. Do you see up top it says -- of the paragraph:
Cancer is clearly the critical endpoint for quantitation of exposure-response for risk characterization of NDMA.
And then it goes on to state:
In addition to it being best characterized, in general, tumors occur at lowest concentrations compared with those typically reported to induce non-cancer effects.



Do you see that there?
A. No, I'm having trouble --
MS. TOLEDO: Objection to form.
A. -- following you here. Where are you reading from? Oh, okay, this paragraph. Yeah, I see the paragraph.
Q. Do you disagree with that statement that in general tumors occur at the lowest concentrations with NDMA and cancer?
MS. TOLEDO: Object to form.
A. I'm not sure what study this is referring to. Is there a citation?
Q. No, there isn't. It's just that statement there that tumors occur at the lowest concentration with NDMA.
And my question is, do you agree with what GSK has stated here?
A. Well, I don't know what they're referring to and have to see the particular study. When it says the lowest concentration, I don't know how low they were tested. So, this actually has to deal with concepts in toxicology with what we call the lowest -- the null effect levels and things like that. So, it really depends what the

Page 230

concentrations are then. When you say tumors occur at the lowest concentration, that really can tell me nothing. They could've all been relatively high concentrations.

Q. Is that what it says there? I mean, it just says, in general, tumors occur at lowest concentration.

Do you agree with that, right, that's what it reads?

MS. TOLEDO: Object to form. Asked and answered.

A. I'm not sure what the study is they're referring to. In fact, I would disagree based on my analysis and others of the so-called Peto 1991 studies that were done which were actually, of course -- well, done -- well, they were done well before this then in which tumors weren't seen in the laboratory animals, in the rats specifically in that particular studies at the low concentrations.

Q. So, if we scroll down, there's a section on human use there and there are a number of epidemiological studies that are referenced here. And as you can see that

Page 231

last sentence there says:

Relevant epidemiological studies include case-control investigations in which the potential risk of cancer of the stomach.

And then goes on to list many other studies.

MS. LUHANA: And let's go to the next page.

Q. And as you can see numerous other studies are discussed here, which are relevant epidemiological studies. And GSK goes on to conclude in the center there after De Stefani 1996, it says:

In almost all studies -- in the center there.

In almost all studies, associations between the cancers of interest and nitrate, nitrite and NDMA were examined results were relatively consistent in this regard with there being association with cancer most commonly with NDMA.

Do you see that statement there?

A. Yes, I see the statement.

Q. So, Doctor, you haven't reviewed any of these studies, correct, because

Page 232

they're epidemiological studies?

MS. TOLEDO: Object to form. Asked and answered.

A. I indicated already that I'm not here to review the epidemiology, I'm not an epidemiologist. There are other experts with far more expertise than I have in epidemiology.

Q. Doctor, you didn't evaluate how much NDMA was, for example, reported in these studies and associated with the cancers of interest in these studies, correct?

MS. TOLEDO: Object to form. Asked and answered.

A. I have no comment. I have read these papers, I'm not commenting on the epidemiology.

Q. I don't -- I don't understand, Doctor. You haven't evaluated how much NDMA was reported in these studies, have you?

MS. TOLEDO: Objection. Asked and answered.

A. I've indicated I have not read these papers, I have not considered the epidemiology or the methodologies that would

Page 233

be used in their epidemiology studies.

MS. LUHANA: You can take this down.

Q. Doctor, in your report, you offer opinions regarding NDMA dose response actually and you state -- it's page 217 of your report, you state:

Even if NDMA were an established human carcinogen, any achievable dose from ranitidine is too low to plausibly cause cancer because the repair mechanisms will reverse any potential DNA damage from NDMA.

Doctor, the repair mechanism data you rely on is largely from rat studies, correct?

MS. TOLEDO: Object to form.

A. No, it isn't -- it's from humans and human primates. This is the work of Pegg which I commented on extensively from the paper. And so, for instance, you can look, oh, it's a very long section, in fact, I went to great lengths here to talk about this in -- largely in humans, begins on page 108, it talks about the location of the enzyme called AGT, it's comparing rats with humans and

monkeys and continues on until page 117.
Q. Sure, I understand those studies, I've reviewed them.
Doctor, you're not here to testify as to how much NDMA can plausibly cause cancer in humans, correct, because you haven't reviewed these epidemiological studies?
MS. TOLEDO: Objection. Mischaracterizes his testimony.
A. I think that once -- in toxicology and in chemical carcinogenesis, people make extrapolations from animal studies to humans based on mechanistic evidence and on basis of dose response relationships and may do risk assessment. This is done all the time. So, one can, for instance, in the development of a new drug, do cancer studies in animals bearing the dose and make extrapolations to humans. One doesn't actually have to put the drug on the market and then see if the humans can do epidemiology studies and see if the humans get cancer later. This is just what we have to do to get drugs to the market in a timely way. It's not just drugs, it's other



things too in terms of -- well, for instance, pesticides, even food flavoring components, things like that because -- so, basically there's a long history of trying to make intelligent risk assessment with the use of animals.
There are moves, you know, away from this in some regard in Europe trying to do more artificial intelligence work, particularly with the testing of cosmetics. But still I think by and large people are going to be using animals to do tests, particularly for cancer or introducing a new chemical entities to the commercial market.
MS. LUHANA: Move to strike as nonresponsive.
Q. Doctor, you don't know what quantity of the NDMA of the human epidemiological study is associated with cancer, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. I told you a number of times, I didn't review any of the epidemiology of literature for this.



Q. And you agree that the most informative data on whether a substance can cause cancer in humans, and particularly at doses humans are exposed to, is evidence on that substance in humans, correct?
MS. TOLEDO: Object to form.
A. I would agree there are two types of evidence or at least two types of evidence. One is the scientific-based or I should say mechanistic-based evidence-based on what we know about biological mechanisms and extrapolation from animal studies to humans. The other is epidemiology. Sometimes one actually may have a more important role than the other, but as I elaborated earlier, I think we are in a position where we have to rely in -- on animal studies and knowledge of mechanisms and of quantitative risk assessment.
Q. Sure, I understand that. But if you have human data, that would be the most informative data on whether a substance causes cancer in humans, in particular that doses humans are exposed to is evidence on that -- of that substance in humans, correct?



MS. TOLEDO: Object to form.
A. In this case, I think we actually do have considerable evidence to how much exposure there is to NDMA. The question is whether a small amount of additional material actually would cause increased risk.
I've already commented on the level of dietary exposure to NDMA and also on the level of NDMA that's actually being produced in the body.
You see, this is somewhat different than many chemicals because we are actually -- we actually make this in our bodies every day. There are few other things like this too. One of these is something called ethylene oxide. Ethylene oxide is used for a number of things, sterilizing things particularly surgical instruments. It's known to be a carcinogen in animals at high doses, but it's extensively used today. And even if it weren't being used today, we would be forming this in our bodies.
The other compound, which I've actually touched on in my report, is formaldehyde. Now, formaldehyde makes the

list as a known carcinogen, it's actually been back in the news again late -- recently, but this is also something that is made in our bodies all the time. It's also made by the metabolism of NDMA. But we're also dealing with formaldehyde in our bodies all the time in terms of the intermediary metabolism, there's formaldehyde groups being passed around between enzymes all the time. And even if you weren't exposed to anything that would generate formaldehyde, you'd be making it in your body.

So, we have to consider the endogenous levels of these chemicals in some of these cases in terms of actually evaluating the risk of what the endogenous or the exogenous contributions are of some amounts.

MS. LUHANA: Move to strike as nonresponsive.

Q. Doctor, in your own report on page 32, you state:

Epidemiology is the most informative data on whether a substance causes cancer in humans, and particularly at



the doses humans are exposed to, there's evidence on that substance in humans.

You conclude that epidemiology is the most informative data, don't you, Doctor?

MS. TOLEDO: Object to form.

A. Well, I made a statement there and I think you didn't read it exactly the way I did -- the way I wrote it. I said, i.e., that is, let -- let -- that is, epidemiology, the most important -- and also, this -- I go on and I say:

In cases in which humans have been exposed to a particular chemical and mixture of chemicals, epidemiology studies can be done to determine the increased risk of a particular cancer in a population then.

But this is not necessarily the case here because we have so much exposure to NDMA without the added NDMA from many drugs.

Q. Doctor, in your report, you note that epidemiology is the most informative data. Yet, by your own account, you haven't assessed if NDMA can cause cancer in humans because you haven't evaluated that epidemiological data, correct, here?



MS. TOLEDO: Object to form. His characterizations his testimony.

A. I haven't -- the epidemiology is beyond the scope of what I've written. I've already written 250 pages here on the basic mechanisms.

Epidemiology, there are several experts in this case on epidemiology and the -- I haven't -- and they can give you their own testimonies about this then.

I have not considered -- I am not done talking yet.

I haven't considered the epidemiology, I told you, I wasn't going to consider the epidemiology. It's not that I don't think it's important, but that's not what I was asked to do, that's not my field of expertise.

Q. Doctor, you didn't consider the most informative data, by your own account, in your report here under the section of study of chemical carcinogenesis, you did not consider the most informative data and you limited your review to only the non-epidemiological evidence in this



litigation.

Why did you do that?

MS. TOLEDO: Object to form. Argumentative and mischaracterizes his testimony.

A. Why did I do that? Because my expertise is not in epidemiology, it's in basic science and in mechanisms of cars -- chemical carcinogenesis.

Q. Did the lawyers direct you to only look at the non-epidemiological evidence?

MS. TOLEDO: Object to form and objection based on privilege as to communications between counsel and the expert.

MS. LUHANA: Counsel, if he relied on those facts in forming his opinion and only reviewing the non-epidemiological evidence, we can inquire about that.

MS. TOLEDO: Your question was, did the lawyers direct you. You're talking about communications, not about what he relied on.

MS. LUHANA: And communications

which identify facts through data that you have provided that he relies on or considers in forming his opinions is open territory, per Rule 26, Counsel.
MS. TOLEDO: Counsel, you are asking about privileged communications. We've been through this in other depositions where your colleagues have instructed the witness not to answer when talking about what were you directed to do, what were you given, all of these things we've gone through before in other depositions. You can ask him about what he relied upon and what he reviewed, but not communications with counsel.
MS. LUHANA: Counsel, you're aware of Rule 26. I'm allowed to ask about communications that concern opinions that he's offering here and if he's relied on facts for data that you've provided, I can ask about it. We're not discussing these other depositions, I don't know the -- you know, what went on there, I know here.



BY MS. LUHANA:
Q. Doctor, were you directed to only review the non-epidemiological evidence for your report?
MS. TOLEDO: Objection. Asked and answered. And objection based on privilege. Besides, you were in the Najafi deposition where your colleague instructed the witness not to answer as to any communications.
MS. LUHANA: This is specifically about identifying facts for data that have been provided to him that he has considered in forming his opinions.
MS. TOLEDO: And he has testified about what he reviewed and what he's relying upon and what the scope of his testimony and opinions is in this case.
BY MS. LUHANA:
Q. Doctor, why did you only focus on the non-epidemiological evidence for your reports?
MS. TOLEDO: Objection. Asked and answered.



A. I think I've told you ad nauseam, I am not an epidemiologist, I did not review the epidemiology. And I think I've answered that question enough times this afternoon and maybe this morning.
Q. Once again, Doctor, I find it interesting because, outside of this litigation, you published many papers where you routinely review and analyze epidemiological evidence.
Are you aware of that?
MS. TOLEDO: Objection. Mischaracterizes the evidence.
A. I'm not aware that I published an epidemiology paper. Perhaps we've referenced something that was done in epidemiology in a review, but I certainly don't claim to be an epidemiologist.
Q. Sure.
A. If you can show me a paper where I've been doing epidemiology, I'll consider that, but I don't think you can.
Q. Doctor, I'm not saying that you published an epidemiological paper. I am saying that you've published literature where



you have routinely reviewed and assessed and analyzed epidemiological evidence.
Are you aware of that?
MS. TOLEDO: Objection to form. Mischaracterizes his testimony. And if you have a document to show him, please do so.
Q. Doctor, there's a question pending.
A. What's your question? I think I asked you already, if you have a document where I'm doing epidemiology, please show it to me. I don't really recall any. If we mention any epidemiology, there were references to something before, but I don't really remember that.
Q. Okay.
MS. LUHANA: Let's pull up what's been premarked Exhibit 6829.
(Exhibit 6829 was marked for identification.)
BY MS. LUHANA:
Q. We were talking about aflatoxin previously. This is an article that you're an author on and it's Aflatoxin B1 Activation in Human Lung.

A. Yes, I remember this paper.
Q. You're an author on this study, Doctor?
A. Yes, I am the prime -- the corresponding author is Roger Coulombe.
Q. And if you look at that second column right there it starts, epidem- -- not starts, but, you know, fourth sentence down:
Epidemiological data suggesting that AFB1 is a cause of pulmonary cancers is tenuous and even contradictory.
Then you go on to discuss a couple of studies that are discussing it and a link and you talk about a retrospective epidemiology study that showed no excess of respiratory cancers of workers at livestock processing plants.
Do you see that there?
A. Yes, I do.
Q. So, Doctor, you're evaluating epidemiology here, aren't you, in this article?
MS. TOLEDO: Object to form. Mischaracterizes the paper.
A. I'm not evaluating epidemiology



here. This is -- first of all, this is based -- a basic study. This is a question of what's going on in human lung and liver microsomes, that's the only experimental work here. And basically, this presentation of the epidemiology relevant to aflatoxin, particularly lung induced -- lung aflatoxin induced cancers in the lung is actually all background information. I might also add in regard to this paper and particularly in the previous papers that you brought up that I published, for instance, with Dr. Yamazaki and Shamatta that basically these are different papers than what I have in the -- the writing is different than is in the report. These are meant for scientists, the report is not intended necessarily for a scientific audience because this is a legal proceeding. So, if a paper we published in the open literature is going to be read by scientists, scientists will look up the papers and evaluate those in part.
This report is intended more to be really standing on its own and actually to inform and instruct and, I should emphasize,



teach the litigants about what's really going on in this whole case.
Q. So, you've employed a different standard for literature that you're publishing where you're assessing actually epidemiological studies. If you look at these studies, Doctor, you cite to them in the back of your publication, they're all epidemiology, that you're reviewing and assessing, analyzing, and coming to conclusions about. However, you haven't done that for this litigation. You haven't reviewed the epidemiological evidence, correct, as you've testified to numerous times today?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. I'm not using a different standard for the report than I would for my own scientific papers. I think the approach is just different because of the different audience. I write review articles in a different way than I do original papers. But nevertheless the review articles and the original papers are intended for a scientific



audience. That doesn't mean that this report has to be done in the same way.
Further, I would emphasize that this paper with Dr. Coulombe -- published with Dr. Coulombe and Eaton and others is really not about epidemiology. We're just giving some background as to why there's any consideration of aflatoxin contribution to lung cancer then, to give the reader some background in terms of why we're actually analyzing the enzyme in -- these enzymes in human lung.
Q. Doctor, the focus isn't the audience here. I understand you've used a different narrative for your reports and the audience here for your reports than you do in the literature.
The question is with this study, you felt equipped and had the expertise to assess and analyze epidemiological evidence here, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. We are not passing, you know, we and with this I will include Dr. Coulombe, we

are not really evaluating the epidemiology literature here, we are just using this as background information. In fact, as you can see, if you actually look at the language here, epidemiology data suggesting that AFD1 is a cause of pulmonary cancer is tenuously and even contradictory and then we give some references here to particular studies, but we don't really reach a conclusion. We leave this pretty open, finally getting down toward the bottom it says -- or in the middle of the first paragraph on the right-hand column of page 1:

The presence of the dust-contaminated AFB1 may pose an occupational risk for carcinogenesis.

So, I'm not -- we're not evaluating particularly epidemiological studies, we're saying that there's actually interest in this area and what we've done we've used that as a spring board to go on and do some basic studies about the enzymes in human lung and the potential for aflatoxin activation.

MS. LUHANA: Let's take this down and put up what's been marked --



premarked Exhibit 6830.

(Exhibit 6830 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is another article that you individually authored called The Environmental Genome Project: Functional Analysis of Polymorphisms. You authored this in 1998.

Do you see that?

A. Yeah, I think I actually wrote it in '97, it was published in 1998. This was the invitation from the National Institute of Environmental Health Sciences.

Q. And here again there's a whole section on the right-hand side of Use of Epidemiology and the Strengths and Weaknesses of Epidemiology.

Do you see that there?

A. Yes, I do.

Q. Okay. So, if you review it, you'll see that you're evaluating the strengths and weaknesses and then evaluating the epidemiological studies and analyzing them.

Do you see that?



MS. TOLEDO: Object to form.

A. Yes, I do.

Q. So, outside of this case, you review epidemiological studies, but didn't do so for this litigation, correct?

MS. TOLEDO: Object to form. Asked and answered.

A. Well, let's look at the references I've cited here, I don't know -- let me see what 11 and 12 are on my copy there. I'm citing -- okay. These are general things about failures of epidemiology, References 11 and 12, if you want to look at those. I just didn't --

Q. Why don't you look at -- sorry, go ahead.

A. I just -- you know, if -- you're welcomed to look at those. I just indicated some of the problems that others identified. And then I state:

For these reasons, it is unlikely that epidemiology alone will be sufficient to establish the significance of polymorphisms.

Now, that is not in contrast to what I stated previously, I didn't say in the



either place that epidemiology was useless.

However, I did -- and what I'm talking about here in this paper is really about genetic polymorphism and this is -- or genetic variation in a broader sense. The -- okay.

So, basically epidemiology -- I'm talking about applying epidemiology to polymorphisms then and the paper is really about polymorphisms. We talked about molecular epidemiology, that's somewhat a different term. This is actually involving biomarkers, things like that, DNA adducts and other things as well and not pure epidemiology. I think the main point was this paper is really about genetic polymorphisms and their contribution to issues in environmental health. And what I'm doing here is just giving some background in terms of epidemiology, but I'm not reviewing epidemiology results per se in this work.

Q. You are actually, if you look at Reference 15, it is a perspective epidemiological study. You cite to it here and there are other studies in the paper that

you're reviewing and you're analyzing.
A. I'm not analyzing these. The -- basically what I'm saying here is if we still looking at this boxed section, I said, the effects of the low level electromagnetic radiation on cancer or pesticides on breast cancer remain controversial at best. And what we're doing is sum- -- I'm doing is summarizing some studies that actually aren't reaching their conclusions in this regard for which there's still information.
I guess the point is, this is all about the human genome project and why it's important and why it's important to actually know the human genome and its contribution to things in addition to just pure epidemiology.
MS. TOLEDO: And I want to state an objection to that question, I didn't want to interrupt the doctor. Argumentative. Mischaracterizes his testimony.
Q. So, you're capable of citing and reviewing some epi studies that -- epidemiological studies that you have included in this paper, but you didn't feel



capable in this case to provide and review that evidence, correct?
MS. TOLEDO: Objection. Asked and answered. Mischaracterizes his testimony and argumentative.
A. As I said before, I'm not commenting on the specific epidemiological studies. I'm using them as examples of uncertainties that exist even after people have done pure epidemiology really haven't gotten to the answer and that's why I elaborated further on the role of the human genome project and the analysis of genetic polymorphism.
Q. Doctor, you're familiar with the term "acceptable daily limit," right?
A. Yeah, that's one of the terms that people have used to describe limits or some even thresholds. There are a number of different terms depending on the different kind of analysis.
Q. So, the FDA has set the acceptable daily limit, the ADI, for NDMA at 96 nanograms, correct?
A. Well, not exactly. They have set



the acceptable daily limit for NDMA from a specific pharmaceutical product at 96 nanograms. They're not talking about the total exposure of a human via -- well, I guess either other drugs or other roots or endogenous exposure.
Q. Sure. So, based on the FDA standard drug manufacturers of ranitidine were required to maintain levels of NDMA below that amount, correct?
MS. TOLEDO: Object to form.
A. Well, my understanding is that ranitidine is -- the current limit is 96 nanograms and currently ranitidine is actually not on the market in the United States and although I think in Canada it actually is available. But their current limit is -- for this particular drug is 96 nanograms.
Now, I don't know how the -- well, the FDA doesn't say that you can't be taking two drugs that both have low limits in every day. I don't know how common that would be.
Q. So, we talked about this previously you're aware the FDA withdrew all ranitidine



products from the market in April 2020 because it found levels of NDMA in ranitidine above the ADI, correct?
MS. TOLEDO: Object to form.
A. I don't remember the specific timing on the dates, but they did establish a level of 96 nanograms for the daily limit of this as I mentioned before was based on a pretty conservative linear no threshold dose extrapolation based on rat liver cancer studies, that's questionable as to how valid that is. But that's what the basis was for doing that.
Q. Do you know what liver cancer studies the linear dose response was taken from?
A. I think it was from the Gold, whatever you call it, repository run by Louis Gold formally, I think it's run by Lawson now.
Q. So, do you know what the Gold repository, what studies it had evaluated to come up with that 96 nanogram ADI?
A. I'm actually not totally sure about where the Gold number came from. I actually

address this issue on page 69 of my report. This actually -- I'm pretty sure this came from the gold -- well, it came from the Gold Carcinogenicity Potency Database. I'd like to point out, though, as I indicate on page 69, there's an updated Lhasa Carcinogenicity Database. By the way, Lhasa is basically it's a software company in the United Kingdom that does things like that. They actually come up with a TD value which comes out to be twice as high, 177 nanograms per day for the same -- for the -- well, for using the same linear no threshold dose extrapolation.

So -- oh, I'm sorry. Here, I do read this. On page 69 of the first full paragraph and the first -- second sentence:

The 96 nanogram per day allowable intake limit was calculated from the TD value published by the now retired Carcinogenicity Potency Database and so on, and then I read about the Lhasa. So, that's what I can tell you about that without trying to look up further information.

Q. Are you aware it was derived from



the Peto studies?

A. I didn't specifically remember that. There are a number of different ways of analyzing the Peto studies as I've outlined in extensive detail in my report.

Q. But the FDA has derived a 96 ADI and linear dose respond no threshold from the Peto studies.

Are you aware of that?

MS. TOLEDO: Object to form.

A. I wasn't aware that the FDA was using the term "threshold" until you mentioned it.

Q. Well, no linear dose response, no threshold, there is no threshold?

A. I thought you said that was a threshold.

Q. No. Linear dose respond no threshold based on the Peto studies?

A. I think I -- then I misunderstand -- stood what you said. The -- okay. So, what was your question?

Q. I said, are you aware that the FDA derived a 96 ADI linear dose response with no threshold from the Peto studies?



MS. TOLEDO: Object to form.

A. I think this was via -- excuse me, via the carcinogenicity potency database. So, that's a, you know, intermediate step there.

MS. LUHANA: So, let's pull up what's been previously marked as Exhibit 834.

(Exhibit 0834 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you seen this before?

THE VIDEOGRAPHER: Counsel, sorry, I dropped in 6834, I see there is an 834. I am switching that now in Box.

MS. LUHANA: It's up.

THE VIDEOGRAPHER: In the Box, in Box, so I'll change that now.

MS. LUHANA: Sure.

Q. Doctor, this is a letter from the FDA in response to Emery Pharma citizens petition. And do you see based on Emery Pharma's citizen petition and FDA's own preliminary testing, the FDA decided to withdraw ranitidine from the market?



A. I'm confused. There's one article showing on this screen, but then there's 6834, which is on the other screen. What are you talking about?

THE VIDEOGRAPHER: This the videographer. 6834 has been deleted. You should just see 834 if you refresh your screen. 834 only in Box if you refresh your screen.

A. Okay, I apologize for the -- that. What was your question?

Q. I was asking you, have you seen this -- this document previously?

A. I have.

Q. Okay, let's turn to page 3.

Doctor, do you see that last sentence there where the FDA says:

NDMA has been classified as a probable carcinogen by IARC.

And then goes on to state that last part of that sentence:

NDMA should be regarded for practical purposes as if it were carcinogenic, and if you see the next page, to humans.

Do you see that there?
A. Yes, I do.
Q. Let's turn to page 9. And that last paragraph, do you see:
Test results from industry and from samples obtained and tested by FDA showed that NDMA was consistently detected in ranitidine, and in many instances, NDMA was detected above the ADI.
Do you see that there?
A. Yes, I do.
Q. And the next sentence, the FDA goes on to explain that it issued a notice on December 4, 2019 asking manufacturers to expand testing and if any test results for any lots that show NDMA above the ADI limit to recall the product if distributed.
Do you see that there?
MS. TOLEDO: Object to form.
A. Sorry, what page are you on?
Q. It's page 9, the -- the paragraph that's called out right in front of you on the screen.
A. I'm checking the other screen for this too. All right. What's your question?



Q. I'm just asking, you see that there, correct?
A. Yes.
Q. Okay, let's turn to page 11. The second paragraph, the last sentence, based on. So, do you see:
Based on the data from NDMA testing in ranitidine drug products and drug substances, the preliminary results from FDA's stability testing and other information available to the agency, FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date?
Do you see that there?
A. Yes.
Q. And so, the FDA has concluded that ranitidine will not remain stable through its expiration date, correct?
MS. TOLEDO: Object to form.
A. Well, it doesn't really. It says stable, but this doesn't tell you anything about whether it's going to turn into NDMA.
Q. Well, that's the concern, right, Doctor? They're saying that the stability



testing that it's conducted on ranitidine and based on the information that is available, they -- FDA is no longer confident that ranitidine will remain stable through its labeled expiration date because they are concerned about the amount of NDMA that will be generated, correct?
MS. TOLEDO: Object to form. Mischaracterizes the document.
A. That is what is stated here in this. They are -- there's a lot of other things too here, this is actually directed -- this letter is being sent to Dr. Najafi in response to his role in the partition -- petition and there's some other information in here too. You picked out several points here, but I don't -- I can't disagree with these, although they must be considered in context.
I told you already that if we go to the documents, that the FDA has also issued and I quote on pages I think 68, 70, and 80 of my report, the FDA is not unusually concerned about the levels that actually are observed in terms of a general risk.



Q. Doctor, ranitidine is no longer available for sale in the US and has been withdrawn from the market because of unacceptable NDMA levels, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. But it has not been disapproved either by the FDA, and what I'm understanding is that the ranitidine incidentally is being sold in Canada, by the way.
Q. Doctor, in the US, which is where we are based here, where the litigation is, ranitidine is no longer available for sale because of the concern of NDMA levels being above the ADI, correct?
MS. TOLEDO: Object to form.
A. The -- yes. The -- I understand that ranitidine is not currently available on the market in the United States.
Q. If you look at that last paragraph on this page, it starts, in the petition.
You request that the FDA provide information to the public regarding the high temperature instability of ranitidine products. And the FDA states that they're

granting the request.
And then goes on to say:
Today, FDA is announcing that the agency's laboratory tests indicate that temperature and time contribute to an increase in NDMA levels in some ranitidine products.
Do you see that there?
A. Yes, I do. And I might say that this goes on to say some other things too and basically -- yeah, it's -- it says:
Our preliminary stability tests under accelerated conditions, which to me mean stress conditions, which I mentioned before, one of which was conducted at 40 degrees C, 40 degrees Celsius that is, and 45 percent humidity indicated that elevated temperatures can lead to the presence of NDMA in the drug market in the drug product.
Q. Doctor, have you seen the results from the FDA where they've done this stability testing at 40 degrees Celsius with 75 percent relative humidity?
A. I don't recall that I have. I do recall the work by King et al. from GSK, but



I don't -- I think that was all at starting at 50 degrees, and they didn't consider any lower temperatures.
Q. So, let's go on to the fifth request where they're asking about stability testing where it says:
The petition asked the FDA require manufacturers of ranitidine products to conduct a thorough stability assessment of ranitidine and the formation of NDMA in both drug substance and drug product.
And then it goes on to state that the FDA is granting that request.
And then it goes on to also state:
The purpose of stability testing is to provide evidence on how the quality of a drug product or drug -- drug substance or drug product varies over time under the influence of the variety of environmental factors such as temperature, humidity and light. And that's to ensure the shelf life of the product as well as the recommended storage conditions.
Do you see that there?
A. Yes, I do.



Q. Do you know if any of your clients, GSK, Pfizer, BI, have tested finished-dose products per the ICH stability standards as cited in this footnote here which is Footnote 46 which is citing the ICH guidance?
MS. TOLEDO: Object to form. This goes beyond the scope of this stage we are at in the litigation.
A. I'm not aware of specific -- all the specific assays that have been done at all the companies. I am aware of the published work that GSK did in the King et al. document in which they did look at some -- well, they looked at a number of samples from different sources and they also looked at this stress testing of samples as well. But I'm not aware of any work at Pfizer, Boehringer Ingelheim, or other people involved. I guess Sanofi is involved too.
Q. So, you haven't seen any stability studies that have been conducted under these conditions at 40 degrees Celsius and 75 percent relative humidity of ranitidine to see how much NDMA is generated, correct?
MS. TOLEDO: Object to form.



A. I've seen studies in the King 2020 paper at 50 degrees at two different -- at least two different humidity concentrations, but I don't specifically remember anything about 40 and I don't know perhaps -- I don't know if any of the other companies actually have done other testing, I'm not aware of their results if they have.
Q. So, Doctor, this is what the FDA required these manufacturers to do, even after the product was removed from the market to conduct specific stability assessments at these conditions, 40 degrees Celsius and 75 percent relative humidity, to see how much NDMA is generated, but you haven't seen those results, correct?
MS. TOLEDO: Object to form.
A. Well, let's take this sentence, this paragraph a little bit. Okay. So, let's go to the -- near the bottom of page 11. It says:
In the petition -- and this is replying to Najafi.
It says:
You request that the FDA provide

information to the public regarding high temperature instability of ranitidine products. We are granting that request. Today, the FDA is announcing that the agency's laboratory test indicate the time and temperature contribute to an increase in NDMA levels in some ranitidine products. Our preliminary stability test under accelerated conditions, one of which is -- was conducted at 40 degrees Celsius, 75 percent humidity indicated that elevated temperatures can lead to the presence of NDMA and the drug product.

And then finally, if we get down to the -- skip down to the paragraph that starts out:

In the fifth request, the petition -- this is from, I guess -- I don't know if it's from Najafi or Valisure or who exactly sent the petition in, asked the FDA to require manufacturers of ranitidine products to conduct a thorough stability assessment of ranitidine information of NDMA in both drug substance and drug product.

FDA is granting that request by asking manufacturers to withdraw ranitidine



products from the market and to conduct specific stability assessments for FDA to review and approve before their ranitidine products can return to the market. The purpose of stability testing is to provide evidence on how the quality other drug substance or drug product varies over time under the influence of a variety of environmental factors such as temperature, humidity, and light.

So, stability -- I'll read on.

Stability testing is also used to establish a retest period for the drug substance or shelf life for the drug part -- product and recommended storage conditions. Stress testing of drug substance can help identify the likely degradation products that the drug substance forms as it breaks down. Knowing what these degradation products are can help scientists understand how ranitidine degrades and can help to confirm that the analytical procedures used to measure stability were appropriate. The nature of the stress testing will depend on the drug substance and the type of drug product



involved. The protocol to app- -- provided to applicants today was designed to elicit the appropriate information on the stability of ranitidine.

So, this -- have I answered your question? I forgot what your question was.

MS. LUHANA: Move to strike as nonresponsive.

Q. My question was, have you seen these defendants do stability testing at these conditions at 40 degrees Celsius and 75 percent relative humidity?

MS. TOLEDO: Object to form. Beyond the scope of this stage of the litigation.

A. As I recall -- I recall telling you earlier I have seen the King report, which was published in the open literature, which was done at 50 degrees, not 40 degrees at varying humidity. I am not aware of any documents or any information provided in this case by Boehringer Ingelheim, Pfizer, Sanofi, or anyone else to date.

Q. Doctor, did --

A. That may or may not mean it's been



done, but I haven't seen it.

Q. Doctor, did all your clients manufacture ranitidine?

MS. TOLEDO: Object to form.

A. I'm not exactly sure if they all manufactured ranitidine. They all sold ranitidine. In some cases, the manufacturing was done by contract laboratories.

Q. So, you'd agree as manufacturers or sellers of ranitidine, your clients, whether it's GSK, Pfizer, BI, Patheon, would be the most knowledgeable about ranitidine's properties, correct?

MS. TOLEDO: Object to form.

A. What properties?

Q. Would they be familiar -- the most familiar with the -- with ranitidine, right?

A. Well --

Q. The compound ranitidine, the molecule.

MS. TOLEDO: Object to form.

A. Well, it depends what aspects. I would also -- I don't disagree that they should be very familiar with ranitidine, now particularly an organization such as GSK that

had many years of experience with the molecule. However, there are different aspects here and that I would also submit that the scientists at the FDA are also aware or have been very knowledgeable about ranitidine as well at least in terms of some of the aspects or at least the biological aspects of how ranitidine is handled in the body.

Q. Doctor, do you think the FDA is more knowledgeable about ranitidine than let's say the manufacturers of ranitidine?

MS. TOLEDO: Object to form. Argumentative.

A. Perhaps they are, in some aspects they may be, they were in a position to do a clinical study. It's a somewhat difficult question to answer because the work at the FDA is intended for the open publication, whereas the work may or may not be at individual companies, it may be designed to address specific questions, these specific questions raised by FDA.

Q. Doctor, you'd agree that the ranitidine manufacturers are the ones who are



doing the testing and the submissions to the FDA and other regulatory bodies for approval, correct?

MS. TOLEDO: Object to form.

A. I don't know that necessarily. That is -- they may have the contracting of the analyses to another laboratory.

Q. Doctor, you'd agree that safety would be a pharmaceutical manufacturer's highest priority?

MS. TOLEDO: Objection to form. Argumentative.

A. Safety is a high priority of a drug manufacturer.

Q. Do you think it's the highest priority?

MS. TOLEDO: Object to form. Asked and answered.

A. The -- it's a very high priority in the pharmaceutical industry. The pharmaceutical industry is basically trying to get good drugs out on the market that will actually benefit people. Safety is one of the issues that's involved. And again, I think the safety testing is quite extensive.



In fact, if we go back with ranitidine, ranitidine had been tested very extensively in animal models, I've outlined all the preclinical studies that were done with a multitude of different animals that were extensive mutagenicity tests as well as cancer and other assays with a variety of animals. So, I would submit that certainly GSK was very interested in safety in bringing ranitidine to the market and marketing this.

MS. LUHANA: Let's pull up -- take this down. And let's pull up again Exhibit 6481. And let's turn to the second page.

Q. And I want you to review that second paragraph where it says:

New FDA testing and evaluation prompted by information from third-party laboratories confirmed that NDMA levels increase in ranitidine even under normal storage conditions. And NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by



consumers.

Doctor, do you see that there?

A. Yes, I do.

Q. Do you see that the FDA testing and evaluation was prompted by third-party laboratories?

MS. TOLEDO: Object to form. Mischaracterizes the document.

A. That's what the sentence says. I don't know who the third-party laboratories are. I suspect that depending on the timing of this document, it actually might have been Emery.

Q. Sure. But it's -- it's not the manufacturers that we spoke about, your four clients, for example, that would be some of the most knowledgeable in the mix. They're not the ones that brought this issue about NDMA being in ranitidine from all that testing, they didn't bring it to the FDA's attention, did they?

MS. TOLEDO: Objection to form. This is beyond the scope of this witness's expertise.

A. My understanding is that the

original petition was actually based on gas chromatography data provided by Emery and Valisure, which we now know is erroneous, but this was actually led to further testing by more appropriate methods.

Q. Doctor, Emery didn't do GCMS, do you recall Emery doing GCMS which as you saw from the prior exhibit was what the impetus was for the withdrawal of ranitidine, the FDA provided a letter to Dr. Najafi in the other exhibit stating that it was recall -- withdrawing ranitidine based on his petition as well as preliminary testing that the FDA had done.

So, in terms of that testing that Emery did in citizen's petition, you're testifying they used GCMS?

MS. TOLEDO: Objection to form. Mischaracterizes his testimony and mischaracterizes the evidence.

A. My recollection is that the initial assays provided to the FDA were based on gas chromatography and that subsequently the FDA found a better method, a more accurate method using liquid chromatography to do the



analyses.

Q. Sitting here today, do you recall what method Emery used in its citizen petition?

A. I recall they were using gas chromatography at the time of the initial citizens petition.

Q. What are you basing that on? Did you review their citizens petition?

A. I can't remember specifically. I thought they did -- I thought I did, but I'm not sure I can remember for sure.

Do you have that? Could I look at that?

Q. Well, did you review it in submitting your report?

A. I told you, I can't recall if I did or not.

Q. So, once again, the manufacturers in all their testing, they didn't bring this issue to the attention of the FDA, it was in fact third-party laboratories, correct?

MS. TOLEDO: Objection. Asked and answered. Outside the scope.

A. There's a long history of -- all



of which I'm aware of, it really -- some of this -- much of this started with Valisure and another issue of valsartan and contamination there and somehow this was extended to analyses of ranitidine, metformin and I think some other drugs, too, perhaps rifampicin.

MS. LUHANA: Move to strike as nonresponsive.

Why don't we take a ten-minute break now.

THE VIDEOGRAPHER: The time is 21:17 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 21:32 UTC.

BY MS. LUHANA:

Q. Doctor, in your report and your CV it's noted that --

A. If I can interject, I'd like to correct something I said in the previous session, if you could just give me a couple of minutes.



Q. There's no question pending. What do you want to correct?

A. You asked me some questions about the citizen's petition.

Q. Right, yes.

A. Okay. I actually did do -- deal with that, it's actually on page 87 of my report and I've actually looked up the citizen's petition and I erroneously said that Emery was submitted gas chromatography based data. That's not true. It was actually Valisure who did that. And Emery actually used LC mass spectrometry data in their citizen's petition. So, I wanted to correct the record.

And the -- I'm also looking at the actual citizen's petition. In their work, they found -- they had USP ranitidine at 25 degrees and that only -- that was a level at 25 degrees, it went from 18 nanograms of NDMA up to 25 or 12 days. They also did some work at 70 degrees and then -- and 70 degrees after 12 days, these pills got up to a hundred -- looks like 142 nanograms.

So, I stand corrected by the

Page 282

analytical method that was used on the citizens petition. So, unless you have any questions about that, we can go on with your further questioning.

Q. Doctor, they didn't use any humidity, correct, when they exposed those pills to heat?

A. Well, let's see.

Q. Well, you reviewed it during the break and you provided all this testimony, you don't recall looking for that and seeing if they used humidity?

MS. TOLEDO: Object to form.

A. I don't see any mention of humidity. I might also point out and I didn't do this before that --

Q. No, Doctor. That's -- your counsel -- no, no. Your -- listen, you've corrected the record. Your counsel has her own time where she can ask questions, let's move forward with my questions, okay?

So, you served as an editor in a number of journals and on editorial boards, correct?

A. That's correct.

Page 283

Q. Okay. So --

A. My editorial experience was an important part of my career and I still continue to be involved in peer review.

Q. So, Doctor, what is generally the time period from when publications are submitted for -- are submitted -- are submitted to the peer review process to the approval process, generally speaking?

A. Well, that varies. In my most recent role at --- as the Deputy Director at the Journal of Biological Chemistry, I know that our mean time to first review was 17 days. Now, the problem is that that's the first review, so the manuscripts go back to the authors and then the authors have to submit revisions that can vary in terms of time. It could be a couple of days or it could be several months, and then the papers -- if they're accepted are -- go into review and further review with the general office and the images are all examined in detail.

So, the overall process can vary, you know, on the average of probably takes

Page 284

about two or three months.

Q. Okay. And can go much longer as you had said about some of your publications, you had submitted them the year before, but they got published the year after. So, sometimes it can take a longer period of time, correct?

MS. TOLEDO: Object to form.

A. Yeah, I would add though that that was -- I think those were back in the 1990s before we had electronic submissions, et cetera, that, you know, back in those days when all these were handled by mail, it usually took two months on the average to get your first review and now we've cut that down to 17 days. So, it's changed over the years. And also, I think in some particular cases things -- well, publishing's faster, electronics has changed the world a lot.

Q. Okay. Doctor, you've offered opinions in this case that low levels of NDMA were found in the ranitidine drug products, correct?

MS. TOLEDO: Object to form.

A. Well, I've outlined some of the

Page 285

levels on, you know, on pages 80 through 82. There are different agencies and I just mentioned what Emery found in their first analysis that they submitted.

Q. But in your report, you specifically say, low levels of NDMA were found.

And so, my question to you is, how do you define low levels? I know you've included a chart, but I want to understand if you can quantify those low levels of NDMA for me?

MS. TOLEDO: Object to form.

A. Well, I'm not sure I understand your question. When you say "quantify," that has a scientific meaning. That means that we actually make a measurement and identify specifically how much is there then.

What I think you're asking me -- perhaps what you're asking me to do is tell you what I consider a low level --

Q. Yeah.

A. -- is that correct?

Q. Yes. In ranitidine drugs, what's a low level?

A. Well, a low -- well, the FDA has a standard of 96, I would submit that certainly anything less than 96 is low. However, as I've pointed out before, I think the 96 is a very conservative value, so drugs could be -- or ranitidine could be higher and I would still consider that a relatively low level.

We have to remember also, let's put this into perspective, and I tried to do that in my report, the 96 nanograms in a 300 mill or -- yeah, 300 mill dose corresponds to .32 parts per million. That's less than -- well, it's a third of one part per million, and I gave some examples there of how little one part per million is, it's about a drop of water within a whole bathtub, for instance, then. So, it's very small amount. These are low amounts and you can do the math yourself in terms of what the percentages are, but parts per million are pretty small.

Q. What amount of NDMA can be generated from ranitidine?

MS. TOLEDO: Object to form. Calls for speculation.

A. What amount of NDMA can be



generated from ranitidine?

Q. Yeah, that's the question.

MS. TOLEDO: Same objection.

A. Well, under what we call stress conditions or basically the conditions of the World Health Organization, so-called NAP assay, which is very extreme. I think as I recall in my report the yield can be as high as 4 percent dimethylnitrosamine, but these are extremely unusual conditions with 40 millimolar nitrite and heat.

Q. I'm not talking about, you know, adding sodium nitrite. I'm talking about in terms of ranitidine pills, for example, when exposed to different temperatures, different humidity during shipping and transport or when, for example, maintained by consumers in their homes, in their bathrooms or in the sun, do you have any idea of the amount of NDMA that can be generated or the maximum amount of NDMA that can be generated in any of those conditions?

MS. TOLEDO: Object to form. Calls for speculation.

A. Well, let me see if I can try to



answer your question. You talk -- you say different temperatures. Are you talking about temperatures that -- and humidities that are physically possible or could be encountered during shipping and transport or anything more extreme in a laboratory?

Q. Well, what's encountered in shipping and transport as well as maintaining ranitidine in people's home, whether it's in the hot humid bathroom or whether it's in a car, do you have any idea of how much NDMA can be generated in those conditions?

MS. TOLEDO: Objection. Calls for speculation.

A. I don't know that. I'm not aware that anybody's actually done this under real life conditions and looked at the effect of storing it in a bathroom or a -- shipping and done this in a systematic way.

Q. Doctor, have you conducted your own testing to assess the levels of NDMA that can be generated for ranitidine in these various conditions?

A. You mean in my own laboratory?

Q. Yes.



A. No, I haven't. My laboratory is funded by the National Institutes of Health. I'm supposed to be working on specific projects and not looking at the levels of NDMA in ranitidine, that would not be ethical.

Q. Doctor, you're routinely hired as a consulting and litigation expert, correct?

MS. TOLEDO: Objection to form. Mischaracterizes his testimony.

A. I wouldn't use the word "routinely." I do some litigation work.

Q. So, you can be retained to conduct testing, for example? I don't know if it would be the Vanderbilt lab or another lab, but you can -- you are capable of conducting testing on ranitidine, for example, to assess on NDMA levels, correct?

MS. TOLEDO: Object to form.

A. In principle, I could, but I'd have to use my equipment which was purchased by the National Institutes of Health for this purpose, which would not be -- which actually would be a conflict of interest.

In addition, it's very complicated

to do work like that for a litigation. I've never done that. In fact, I've never even considered doing that.

Q. So, what have you done to assess what amount of NDMA, for example, is achievable from ranitidine?

MS. TOLEDO: Object to form.

A. I read the literature and looked at the assays that people have done, including the FDA, other government agencies around the world and also, let's see, oh, and GSK.

Q. So, are you aware if the FDA or any of these other governmental agencies placed ranitidine in these various conditions to assess the levels of NDMA like, for example, simulating a bathroom or a car or ranitidine in the sun? Are you aware if these governmental agencies have assessed the levels of NDMA in those conditions by exposing it to ranitidine?

MS. TOLEDO: Object to form.

A. I'm not aware that anybody's ever put ranitidine in a car or in a bathroom in a systematic way and done an analysis. In fact, I think I already mentioned that. GSK



in the King et al. 2020 paper actually did use elevated temperatures, 50 degrees, which I don't think is terribly -- and higher, which are not terribly realistic in terms of an environment that's good for humans, and did report their results then. But the other -- what was -- see what else did you ask.

And, again, I'm not aware that anybody's actually ever done this with a car. There have been reports from Emery of elevated testing at these temperatures, but as I think I pointed out earlier, I find the results of the work from Emery uncredible and highly skeptical about any of their results and what they really are.

Q. Doctor, in your report, you state that the root cause analysis, this is the June 2020, you mentioned the King paper, but the root cause analysis from June 2020 is the most comprehensive analysis you reviewed to date.

Do you recall stating that?

A. I don't think I did state that. As I recall, I referred to both the King paper



and the -- actually GSK document.

Q. You say GSK undertook a root cause analysis to investigate the presence of NDMA in ranitidine. I apologize, the first sentence in your report, page 82, with respect to the root cause analysis on ranitidine and NDMA, the most comprehensive evaluation I have reviewed to date was conducted by GSK.

And then you go on to cite the King article, but specifically the GSK root cause analysis from June 15, 2020, correct?

A. Why do you say "specifically"? I cited both of these.

Q. Sure. But you cited the GSK root cause June 2020 analysis as well?

A. Yes, but I didn't specific -- I mentioned -- I cited two references, but you said that I specifically cited one.

Q. So, I'm saying you cited -- yes, okay.

So, you also state that GSK tested API and that the API NDMA values were the maximum that could be reached in the pills.

So, if you turn to page 85 of your



report --

MS. LUHANA: Let's actually pull it up, it's been -- it was premarked as Exhibit 6822.

A. Oh, you're looking at my report. Sorry. Yeah. What was the question?

Q. Well, you stated in the first paragraph there if we turn to page --- it's page 88 of the PDF, 85 of the report. Perfect, yeah.

So, the first paragraph there you say:

A greater range of NDMA was detected in drug substance and it was observed that once a drug substance was formulated into drug product, the rate of NDMA formation decreased or ceased.

Do you see that there?

A. Yes.

Q. What's your basis for that statement?

A. I have to go to the King -- I recall that that's what King -- King paper said.

Q. But you didn't look at the root

cause analysis, which had all the testing and reported the results to do a comparison of the values for the API and the finished-dose to see if the statement was accurate?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I referenced King for the variability. I didn't put a reference in for the matter of the formulation -- the effect of the formulation. I can't remember if that was in King or in the GSK document off the top of my head.

Q. So, Doctor, sitting here, you don't recall what you did to assess the values between the API and the drug supp- -- drug product to conclude that the rate of NDMA actually deceased or ceased to form?

MS. TOLEDO: Object to form. Misstates his testimony.

A. As I said, I didn't put in a specific reference and I don't really remember that detail as to where that statement was, if it was in the King document or in the other one.

Q. Well, did you do anything to



investigate? So, for example, did you review the GSK master data spreadsheet?

MS. TOLEDO: Object to form. Asked and answered.

A. I recall that I did, but I don't remember the exact details. You're pulling one set out of a 250-page document and asking me about the details.

Q. It's a fairly important point, Doctor, when you're saying that the range of NDMA ceases or decreases when the drug substance is formulated into a drug product. As you've concluded, there are low values of NDMA forming, so that's a fairly important point and I'm trying to understand what your basis is for this statement.

Doctor, did you review GSK's lab notebooks?

A. There were some of the lab notebooks. I have not reviewed all of the GSK lab notebooks on ranitidine. That's an impossible task I think for me to do. Remember that this drug was developed in the 1970s, it was approved in the early 1980s and I'm sure there are an awful lot of laboratory



notebooks including the ones in the more recent data then.

So, no, I did not review every laboratory notebook. I recall that there were some notebook entries in the GSK documents I did get.

Q. No. I'm focused right now on the root cause analysis from 2019, not the history of the 40 years.

Did you review the lab notebooks related to GSK's June 2020 root cause analysis which you concluded was the most comprehensive analysis done to date?

MS. TOLEDO: Object to form.

A. I have -- I don't know if I reviewed a lab notebook in that period. However, I would also submit that the King work was -- the King 2020 paper was actually a peer-reviewed document, it's American Chemical Society Journal and the peer reviewers and the editor would've had any questions about the authenticity of the work they could have requested original data, including notebooks.

Q. Doctor, you agree that the King



publication is a short publication and doesn't cover everything in GSK's root cause analysis?

MS. TOLEDO: Object to form.

A. Why you call it a "short publication"?

Q. Doctor, have you seen the root cause analysis?

A. Just because it's longer doesn't mean that this is a short publication. I'm putting this in the context of publications that I see as a journal editor and author myself. These very considerably -- sometimes we've actually had very important papers appear as communications with two pages.

Q. Doctor, I'm focused on the length of the GSK root cause analysis and the accompanying notebooks and things like that.

Do you believe that the King publication encompasses all of that?

MS. TOLEDO: Object to form. Mischaracterizes his testimony.

A. I believe that it encompasses most of many of the important parts. As we talked about earlier today, I don't publish

everything that everybody in my laboratory does. If we -- everybody did that, there wouldn't be enough, well, room in the -- well, wouldn't have been enough room in the libraries for all the journals that the space would've taken up. And it wouldn't be very efficient for most of the readers of our papers to actually figure anything out either. I'm not --

Q. Doctor, did you --

A. I'm not done talking.

I'm not surprised that there's more material available than was put into the paper. In fact, for all I know, it's possible that the reviewers suggested shortening the paper, perhaps it was longer, perhaps it wasn't.

Q. Doctor, did you review the materials GSK submitted to the journal where the King article was published?

A. No, I did not. Manuscripts were submitted under -- understanding that they're confidential information and were published.

Q. Doctor, did the King publication tell you how the root cause analysis samples,



for example, were stored prior to testing?

A. I don't recall that it did.

Q. Did it tell you how they were chosen to be tested?

A. How they were chosen? You're talking about the particular samples that were used?

Q. Correct. How did they decide what to test?

MS. TOLEDO: Object to form.

A. I think the emphasis though was not on what the endogenous levels or the original levels of NDMA were, but how much they could change and this was the point of the study.

Q. Doctor --

A. Most of the study -- I'm not done yet.

Most of the study, the other part of the analysis was of the survey of the different samples that were provided by GSK and as I recall, two other suppliers.

And if you want me to ask -- answer any more questions about the King, why don't we actually take a look at that? You're asking me to remember everything in the King



article off the top of my head.

Q. I'm not asking you to remember everything off the top of your head. I'm just trying to get an understanding because these are some of the things that you raised in your report about Emery testing. And I want to make sure you considered that for GSK's testing. And it seems that, for example, how the samples were chosen what was tested by GSK was not included in the King publication.

Do you recall seeing -- if that was included, do you recall any reference to that in terms of how those samples were chosen to be tested?

MS. TOLEDO: Object to form. Argumentative. Misstates his testimony.

A. I would like -- if I'm gonna answer any more questions about the King paper, I'd like to see it. I'm making a distinction between the work of King and the work from Emery. The Emery work was very uncredible for a number of reasons, including the basic chromatography and as well as the



recordkeeping there. It wasn't just a matter of selecting samples.

Q. Did you look at the recordkeeping that was done with GSK's root cause analysis in their lab notebooks?

MS. TOLEDO: Object to form. Asked and answered.

A. As I mentioned before, I recall there was -- there might -- there were some laboratory notebooks, but I don't recall seeing all of these. As I said, this was peer-reviewed material. So, if the reviewers had any questions or the editor had any questions about the authenticity of the data that was collected, they could do that. This is not the case with Emery work. The Emery work is not peer-reviewed and I don't think it could ever be published in a credible journal.

Q. Doctor, did you -- I'll represent for your root cause analy- -- I'll represent for your materials considered list, none of GSK's lab notebooks are included in the materials that you reviewed for your reports.

Did you compare and contrast the

King article with the root cause analysis to assess its accuracy?
MS. TOLEDO: Object to form.
A. I don't remember that I did this specifically.
Q. Did you do it generally?
A. What do you mean "generally"?
Q. Well, you said not specifically you didn't do that. So, did you do it in any general fashion in terms of comparing GSK's root cause analysis to the King article?
MS. TOLEDO: Object to form.
A. The King -- well, the King article actually is a summation of what's in their root cause analysis. And so, there's actually a conversion of the original data files into other things too. So, it's actually not trivial to follow that, but it can be done. I did not do that in great detail, but I trust their data.
Q. Doctor, do you have a maximum amount of NDMA reported for the API that was reported by the GSK manufacturers? Do you know what that level is?
MS. TOLEDO: Object to form.



A. I don't know specifically about GSK manufacturers. I do report in my report on page 85, and I'm referring to the King paper, I would say this is at the top of page 85, GSK reported a wide variability in the NDMA levels of 230 tested ranitidine products with a range of 72 to 2,280 nanograms per 300 milligrams. That is .24 to a maximum of 7.6 parts per million. We've already discussed parts per million and what those -- what that really means in the real world.
Q. Doctor, do you know the highest amount of NDMA reported for actually baseline testing by GSK was 41.4 micrograms per gram, but that wasn't cited in the King article, correct?
MS. TOLEDO: Object to form.
A. I'd have to look at the King article. You've declined to show this to me.
Q. Well, no. You reported the values from the King article and that -- that's not reported there in what you provided to me right now.
Are you aware that GSK did testing of API that was stored under their conditions



and the highest amount tested was 41.4 micrograms per gram? Are you aware of that?
MS. TOLEDO: Object to form. You are citing to the report, mischaracterizing, comparing two different things. You're trying to -- you're complaining about what he didn't say here, but he's given results of ranitidine product and you're asking about API. You're mischaracterizing the evidence and --
MS. LUHANA: Counsel, please do not testify for the witness. I asked specifically about the maximum level of API, he provided this response, okay?
BY MS. LUHANA:
Q. So, Doctor, sitting here today, do you know the maximum amount of NDMA reported for the API that was tested by GSK?
MS. TOLEDO: Object to form.
A. You're asking me, you gave me a value of 41.4. I can't agree or disagree with that. I actually have to see the



documentation. Can you bring that up?
Q. Well, wasn't it important to you to assess those values that were reached in terms of the maximum levels of NDMA generated from ranitidine products when you were -- when you were concluding that low levels of NDMA were generated from ranitidine, wouldn't you look to see how much NDMA was generated from the testing, for example, by GSK and include that in your report?
MS. TOLEDO: Object to form. Argumentative.
A. You're pulling up a number and there are many things that are actually important here. You're pulling up a number asking if I agree with it, but you're refusing it -- to show it to me. I need this information perhaps I can reevaluate -- evaluate it again here to try to answer your question.
Q. Doctor, 41.4 microgram per gram, if that is what was calculated, let's say for a 300 milligram pill, how much would that be in terms of nanograms?
A. I'm sorry. What was -- okay. Let

me look at this.
So, 41 --
MS. TOLEDO: Object to form.
A. Sorry. 41.4, I believe this means micrograms per microgram, this would be 41,000 nanograms.
Q. But for 300 milligram pill, that would be 12,000, a little over 12,420 nanograms, correct?
A. I apologize. I didn't see your per gram in there. I thought it was per 300 grams.
So, I would be -- yeah, it would be about a little over 12,000 nanograms.
Q. Do you know what the highest --
A. I am not done yet.
Which I might add is not that much more than eating a sausage and it's far less than the million nanograms it's estimated we produce every day within our bodies. Just to put that into context.
MS. LUHANA: Move to strike that answer.
Q. Do you know the highest NDMA values from Emery's baseline testing?



A. Not off the top of my head. Frankly, I don't really find any of their numbers very credible as I've indicated in detail in my supplementary report.
Q. Doctor, do you know if they were similar to, for example, GSK's comprehensive analysis that was done whether the values found by Emery's testing was similar, for example, to the values found by GSK's comprehensive analysis? Is that not important to you to assess and compare some of those results?
MS. TOLEDO: Object to form. Argumentative. Mischaracterizes his testimony.
A. Frankly, I really don't find any of the values Emery came up with very credible and I've given you some examples of how bad the analysis was in my supplementary report.
MS. LUHANA: Move to strike as nonresponsive.
Q. Doctor, are you aware that the FDA held a two-day workshop on nitrosamines in March 2021?
A. Yes, as a matter of fact, I listed



it on this.
Q. Were you invited -- the FDA invited international and national experts on nitrosamines to discuss the chemistry and toxicology of nitrosamines in the environment and those recently identified as contaminants in pharmaceuticals.
Are you aware of that?
A. You have two questions there, I -- you're asking me if I was invited.
Q. No, I withdrew that.
Are you aware the FDA invited these international and national experts on nitrosamines to discuss chemistry and toxicology?
A. Yes, I was aware that they issued invitations to a number of people around the world. I actually know some of the participants personally.
Q. Were you invited to participate as a panelists?
A. I just told you I was not.
Q. Are you aware that the FDA addressed questions identifying the gaps in knowledge and the research needed to address



and mitigate the drug contamination issue to ensure the safety of the drugs that are available to the American public?
MS. TOLEDO: Object to form. Mischaracterizes the evidence.
A. I can't remember the exact title or what they -- the FDA actually said. I don't know if they used those words, but they did address the issue of nitrosamines in drugs, several issues of nitrosamines in drugs.
Q. And you said you listened in to the workshop?
A. Yes, I did.
Q. Did you review the transcripts afterwards?
A. Can't remember if I did or not.
Are they in my evidence?
Q. Wouldn't you know if they're included in your materials considered list? That's okay. Withdraw that, Doctor.
Are you aware that Dr. David Keire, who's the office director for the Division of Pharmaceutical Analysis at the FDA, said it's important to test drugs in various real world conditions?

A. I never --
MS. TOLEDO: Object to form.
A. I don't remember that specific statement. This was a two-day meeting, I don't remember the exact words that everybody used.
Q. Sure. Are you aware that he discussed specific conditions to assess the stability of drugs and see in terms of NDMA forming and to model the human bathroom, the hot mailbox, the truck in the middle of the southern US, a glove box in a car, all to get appropriate data that can be predictive of stability under a variety of these conditions?
Do you recall that?
MS. TOLEDO: Object to form.
A. I don't specifically recall that and I don't know if the FDA is making an effort to do that or not.
Q. Do you know what conditions are provided in the ICH documents to test -- to assess stability?
A. Stability of what?
Q. Drugs.



A. Of drugs in general?
Q. Of pharmaceutical drugs expose them to certain environmental conditions, do you know what the ICH documents require manufacturers of drugs -- what kind of conditions to expose pharmaceutical drugs to?
MS. TOLEDO: Object to form.
A. I don't -- specifically I don't remember that that document is actually in my materials considered either.
Q. I'll represent that the ICH documents are in your materials considered list.
However, are you aware that Emery tested ranitidine according to the zone conditions established by the ICH?
MS. TOLEDO: Object to form. Mischaracterizes the evidence.
A. Frankly, regardless of the zone and I believe one of our other experts has commented on the appropriateness of what they did, frankly, I don't believe the analytic -- any of the values in the analytical work that Emery did can be trusted.
MS. LUHANA: Move to strike as



nonresponsive.
Q. Doctor, listen to my question please.
My question is, are you aware if Emery tested ranitidine according to the specific zone conditions that are established by the ICH?
MS. TOLEDO: Object to form.
A. I don't recall. Again, as I've pointed out before, I discount all of the data coming out of Emery.
MS. LUHANA: Move to strike everything after "I don't recall."
Q. Any reason to disagree with the specific zone conditions that were utilized by Dr. Najafi?
MS. TOLEDO: Object to form.
A. I don't remember the details of the zone conditions. If you could bring up a document, I'll be glad to look at those. Again, it doesn't really matter because the analytical work was so poor that any analysis coming out of Emery can't really be trusted.
MS. LUHANA: Move to strike everything after the first sentence.



Q. Doctor, do you know if GSK tested ranitidine per the ICH standardized conditions?
A. Tested -- I'm sorry. Tested ranitidine for NDMA?
Q. Yes.
A. Under the zone conditions?
Q. Correct.
A. I'm not aware of that. It wasn't in the King document. I'm not sure -- there were a number of conditions about temperature and humidity in the King report, but I don't know if we were, what you call, the zone conditions.
Q. Doctor, do you know, sitting here today, how many batches of finished-dose pills GSK tested under any type of accelerated conditions? And obviously this is the same analysis that you found the most comprehensive.
MS. TOLEDO: Object to form.
A. I'm not sure about the pills as opposed to the drug substance itself in terms of the numbers.
Q. So, sitting here today, you don't

know how many batches of finished-dose pills were tested under accelerated conditions?
MS. TOLEDO: Object to form. Asked and answered.
A. I recall that the accelerated condition or what I call the stressed conditions used by GSK and the King 2020 paper, as I recall, these were actually not done with pills, but with a finished -- with a product itself before it was put into pills.
Q. Doctor, I'll represent that GSK only tested two finished-dose batches under accelerated conditions.
MS. LUHANA: And let's pull that up right now. Can we pull up what's been previously marked as Exhibit 3138?
And let's turn to Table 39 which is on page 79 and 80.
(Exhibit 3138 was previously marked for identification.)
MS. TOLEDO: He's still pulling up the document, if you could give us a minute.



MS. LUHANA: Sure.
BY MS. LUHANA:
Q. So, Doctor, do you see that before you?
A. Just a minute, I am still -- what did you say 79 and 80?
Q. Uh-huh. Doctor, do you see that table there?
A. Hang on, I'm still looking over here for the table. It's Table 38.
Q. Well, there's two. So, the first table is Table 38 and then --
A. No, the Box copy here.
Q. So, the first table, these are the two batches and you see Details of Input tablet batches used for ASM, that's the accelerated stability monitoring, as it says up there, study. And what they did is they utilized these two batches and they exposed it to accelerated conditions which is on Table 39.
MS. LUHANA: So, can we go back to Table 31?
Q. So, Doctor, do you see the batches are noted there as well as the strength, the



API source, the API NDMA content and then the tablet NDMA content.
Do you see that there?
A. Yes, I do.
Q. So, there's several batches noted, for example, for the first row there, FA8E.
Do you see that --
A. Yeah.
Q. -- under the API source?
A. Yeah.
Q. Do you know if these pills that were ultimately tested were they formed from all those batches?
MS. TOLEDO: Object to form.
A. I'm not sure offhand. I'd have to read more about in the paper, it's quite long though. But, no, I don't know offhand.
Q. Do you know how these specific batches were selected to do testing on?
A. I'd have to read more of the document to know that.
Q. I'll reference, this is all there is about these -- these tablets that were -- it's this section and then the next page, so you can review it.



A. So, what was your question or what is your question?
Q. My first question is, do you know how these -- these -- these batches were selected?
A. Well, they're -- if I'm trying to relate these two on an earlier part of the document, it appears that the Jurong samples were actually low at the start, if I'm not mistaken. And the Saracas are quite variable. I don't know which of the Saracas were actually being analyzed here in this particular case.
Q. But how are these specific batches from Jurong and Saraca chosen, do you know; does it say?
A. I don't think -- well, the ones from Jurong actually started out with extremely low levels of NDMA present, and it looks like there were about six to eight of those, so somehow three were picked. They actually started out with the same amount of NDMA. I'm not sure about the Saracas because a lot of those -- because there were a lot of those.

Q. So, Doctor, my question is, do you know how these specific batches were picked and then ultimately what was used for the pills here?
MS. TOLEDO: Object to form. Asked and answered.
A. From what I'm seeing in the rest of the document, I'm not sure that I know exactly how these were picked. There was actually -- there is actually information about storage samples, et cetera, and drug product data, but I don't see a specific procedure that leads to a selection of these anyway.
However -- I'm not done yet.
The point is that this is a stability monitoring and what we're looking for here is changes. So, in that sense, it's not that relevant as to what the starting amounts of NDMA are, it's what the changes are with time.
MS. LUHANA: Move to strike as nonresponsive from however.
Q. Doctor, you said the storage conditions. Where do you see how these pills



were maintained prior to testing?
A. I didn't say anything about the storage conditions.
Q. So, is it noted how these pills were stored prior to testing?
A. I didn't see any information.
Again, I'd like to make a point that it's not how they were stored, it's what or what the --
Q. Doctor, I'll move to strike you right now.
(Cross-talk.)
Q. But you're not answering -- I have a limited -- Doctor, your counsel is going to have an opportunity to ask you questions, okay, on her time. I want -- I have limited time with you and I want to focus you to answer the questions I'm asking, not everything thereafter. So, you've answered my question, let's move on.
MS. TOLEDO: I'm going to object to counsel's speech, and please allow the witness to answer your questions, and don't interrupt him while he's talking.



Q. Doctor, do you know how many pills were tested from these batches?
A. It says two batches of tablets detailed in Table 38 from retained samples were selected from the batches that had been previously tested. I have that information to go on.
Q. Doctor, my question was, do you know how many pills were tested here, whether it was two pills, five pills, ten pills? Do you know how many pills were tested here for this ASM test?
MS. TOLEDO: Object to form.
A. When you say "pills," you mean tablets, right?
Q. Tablets, correct?
A. I don't see that information here.
Q. Do you know how GSK chose these specific temperatures and relative humidity percentages?
MS. TOLEDO: Object to form.
A. These are -- appear to be -- I'm looking at Table 39, these appear to be the ones that were used in the King paper, King et al. 2020 paper. I don't know exact -- I



think they just selected these because these were typical stress conditions. I don't know if these corresponded to anything from ICH or not. But basically they go from 50 to 70 degrees with varying relative humidities to cover a range.
Q. Okay. And you see in terms of these batches, you noted that the NDMA tablet content was low to start with, right, in the Jurong batch, it's .24 micrograms over gram initially and then .32 for the Saraca batches. And then it goes slightly higher for Day 0 study results, do you see that, .31 micrograms per gram for the Jurong batch, then .38 for the Saraca batch.
Do you see that there?
MS. TOLEDO: Object to form.
A. Yes, I understand the table.
Q. And let's go now to Table 38.
MS. TOLEDO: You mean 39?
MS. LUHANA: I'm sorry, 39. Thank you.
Q. So, Doctor, there's a significant difference and see when it's exposed to this conditions between the initial NDMA levels

and the ones here when it's exposed to these varying conditions, correct?

MS. TOLEDO: Object to form.

A. I'm not sure I understand the question. Could you repeat that? I'm not following it on the screen, it seems confusing.

Q. If you look at Day 0 and the NDMA content of the tablets, it's represented there, and as you can see it increases when the tablets were exposed to these varying conditions, correct?

MS. TOLEDO: Object to form.

A. It increase -- well, in general, yes, but there are some exceptions. For instance, if the temperature is 60 degrees and 55 relative humid- -- 65 percent relative humidity of the temperature -- or the NDMA content goes up after seven days and then decreases with time, the same thing is happening with 70 degrees centigrade and 50 percent humidity.

However, I would agree that there are increases in some cases, not that much in some cases. For instance, if we look at the



FA8E, then the increase is actually not really significant and the tablet is intact.

Q. Doctor, GSK didn't test above 65 percent relative humidity here, did it?

A. No, that was the highest, that was only done at 50 and 60 degrees.

By the way, I tried to make this point earlier that the humidity and the heat are actually not independent variables. Actually, as you change the temperature, you can actually change the humidity and vice versa.

Q. Doctor, are you aware of the Teraoka 1993 publication that states that critical degradation of ranitidine takes place above 67 percent relative humidity?

MS. TOLEDO: Object to form. If you're going to ask him about a document, can you please show it to him?

MS. LUHANA: Counsel, please keep your objections to form only and stop coaching the witness. He can ask for the document if he'd like to see it.

MS. TOLEDO: He has been asking



for documents and --

MS. LUHANA: Counsel, please stop coaching the witness, please.

Q. There's a question pending, Doctor.

Are you aware of the Teraoka 1993 article that states critical degradation of ranitidine takes place above 67 percent relative humidity?

MS. TOLEDO: Object to form.

A. That references my reference list. If you'd like that, I don't remember many of the details, but if you'd like to get me to answer questions, I'd like to see the document before I do that.

Q. Doctor if you look at Table 39, you see values of 178.2 on date 14, for example, of tablets that were exposed to 50 degrees Celsius and 65 percent relative humidity.

Do you see that there 178.2?

A. I see a value, yeah, for 50 degrees -- you said 50 degrees and 65 percent, yeah, it says 178.2.

Q. Sure. And then you see values of over 200 when you look at 70 degrees Celsius, 50 percent relative humidity, on Day 7 you



see 283.2, 263.6, correct.

A. Yes, and then it goes down.

Q. So, Doctor, previously I represented to you that the API that was tested by GSK, the maximum amount, which is noted actually in this root cause analysis if you look earlier at it, is 41.4 micrograms per gram that was measured in the API. These values are greater than 41.4 micrograms per gram that you're seeing here, correct?

MS. TOLEDO: Object to form.

A. I'm not quite sure why you're making that comparison.

Q. Well, because you made a statement in your report greater range of NDMA was detected in drug substance and it was observed that once the drug substance was formulated into drug product, the rate of NDMA formation decreased or ceased and therefore if GSK's reporting their API, the maximum amount reached in the root cause analysis as 41.4 micrograms per gram and you're seeing these finished-dose tablets exposed to these conditions and they're reaching far greater than 41.4 micrograms per

gram, then that means the amount of NDMA isn't decreasing or ceasing to form when it's in tablet form, correct?

MS. TOLEDO: Object to form. Compound. Misstates his testimony and mischaracterizes the document.

A. This is -- these are all stressed conditions and I don't think this has any bearing on what GSK concluded about the ability of the packaging to retard the degradation under normal conditions.

Q. Doctor, that's not what you stated in your report. You didn't qualify it. You're very good with qualifications as you've shown, you know, with your testimony today. However, in your report you didn't qualify under normal conditions, you concluded a greater range of NDMA was detected in drug substance, and it was observed that once the drug substance was formulated into drug product, the rate of NDMA formation decreased or ceased, and that's on page 85 of your report.

MS. TOLEDO: Move to strike counsel's speech. Object to the



mischaracterization of the witness' testimony and the opinions stated in his report.

Is there a question?

Q. Doctor, you didn't qualify and state that this was under normal conditions, did you?

MS. TOLEDO: Object to form. Mischaracterizes his testimony and his opinions.

A. No, I did not at -- under normal conditions, I didn't really see the point of doing that.

Q. Well, Doctor, you're saying that the maximum amount of NDMA is what's achieved in the API, and that the amount, once it's formulated into a tablet, stops forming NDMA, either it ceases or decreases. And based on this table, that is not an accurate statement, correct?

MS. TOLEDO: Object to form. Mischaracterizes his testimony and misstates the evidence.

A. What we're talking about here is also the rate, I must emphasize, and not just



the total amount. And so, it's actually -- we can see that in the -- some of the pills, that's actually the case. I'm still not quite sure I understand your question.

Q. Doctor, on page 86 of your report, can you please review the last paragraph there. I'd like to ask you some questions about it, so please take a look at it.

MS. TOLEDO: Counsel, while we're waiting, we've been a little over an hour since we last spoke and you have said we would re-assess then as to how much time longer you wanted to go today.

MS. LUHANA: Sure, I would have to -- let's take a break after some of these questions and then I will let you know.

MS. TOLEDO: I would like to say that, you know, the witness -- can we take a quick break, please?

MS. LUHANA: I would like to finish this line of questioning, so I don't want to break yet. So, let's go a few minutes longer and then we can



break.

MS. TOLEDO: Okay.

MS. LUHANA: Doctor, is that okay with you?

MS. TOLEDO: It's been a long day for the Doctor, is what I'm trying to say.

BY MS. LUHANA:

Q. Doctor, did you have a chance to review that paragraph?

A. I haven't finished yet.

Q. Okay.

A. I'm doing that in the context of this table.

Q. I haven't posed a question yet, but you're looking at Exhibit 8622, your initial report, correct, on page 86?

A. I am. I'm also looking at Table 39 on the GSK document.

All right. I'll be glad to try to answer your questions.

Q. So, Doctor, in your report, you note that some of these pills have turned brown and how it illustrates a clear example of unrealistic conditions and that these

aren't samples that would be ingested by a consumer.
Do you see that there on page 86 of your report?
A. Yes, at the bottom.
Q. And so, it's your position that stress pills will degrade, and so consumers will know not to consume them, correct, that's what you're saying here?
MS. TOLEDO: Object to form.
A. Well, stressed pills, I'm not -- stressed means something that's done in the laboratory and not actually -- we don't call -- really call that stress in terms of a consumer doing the stressing.
The point, I guess, is that the -- when pills turn brown or just quite discolored, I would assume most patients would avoid taking them.
Q. Doctor, so, you see here in Table 39 there are several tablets which are intact and contain large amounts of NDMA.
Do you see that?
You see 70 degrees Celsius at 25 percent relative humidity and at 28 days



the pill contains 278.2 micrograms per gram and the pill is still intact.
Do you see that?
MS. TOLEDO: Object to form.
A. Yeah, I do. But I'd like to make the point that it's not really the amount here so much as the rate. Let's compare the --
Q. Doctor, I'm gonna have to move to strike everything, yeah, I do --
A. I am trying to answer your question, you're not giving me a chance to do it.
Q. Doctor, you're not answering my question. I'm asking you a --
A. I have barely opened my mouth and you interrupted again.
Q. My focus is not the rate -- Doctor, what's gonna happen is we're gonna go to the court because you have been unable to answer my questions and I'm gonna have to ask for more time. I don't want to do that for your deposition, Doctor, so please stay focused.
My question is not about the rate of NDMA. My question to you specifically



here is, Table 39 is showing pills that are intact that are generating large quantities of NDMA.
Do you see that here?
MS. TOLEDO: I'm going to object to counsel lecturing the witness and harassing the witness and being rude and disrespectful and not allowing the witness to answer. And this is taking a long time because the witness is trying to answer the questions that you're asking and it -- you're being rude and interrupting him.
Q. Doctor, I am really not trying to interrupt you. I'm trying to stay focused here so we can move along. I understand it's been a long day, I'm tired, you're tired.
I just would like you to answer my question that there are pills here that you see on Table 39 that are intact and have large quantities of NDMA, correct?
MS. TOLEDO: Object to form.
A. Looking at -- I'm looking at my report, and basically if you look at that last paragraph on page 86, I'm talking about



the rate in two different sentences. The first one says:
Due to the observed variability in NDMA levels for baseline testing, GSK conducted extensive testing under stress conditions to elucidate factors that may affect the rate, that's rate R-A-T-E, of NDMA formation. They concluded that elevated temperature and humidity were factors to be associated with the faster rate of NDMA formation.
As I look at this table, you will see that in every case, the rate of formation of NDMA is much slower when the film coat isn't there compared to the intact pills.
MS. LUHANA: Move to strike as nonresponsive.
Q. Doctor, in the last paragraph of your report, you note that there are samples a consumer would not ingest because they have degraded and turned brown. Here in Table 39 you see tablets that are intact that have 278 micrograms per gram of NDMA in the tablet.
Do you see that?

Page 334

A. Yes, I do.
MS. TOLEDO: Object to form.
Q. So, Doctor, can you please tell the ladies and gentlemen of the jury how many nanograms is 278 micrograms per gram for 150 milligram pill?
MS. TOLEDO: Object to form.
A. Doing -- what did you say, 278, well, that would be 278,000 in nanograms and you said 150 milligram pill?
Q. Yes.
A. Well, 278, that's roughly about 50,000. Mind you, these are under unusual stress conditions.
And the other point I'd like to make is that this is -- this table in itself is not telling me anything about the color of the pills, by the way.
MS. LUHANA: Strike everything after 50,000, starting with mind you, as not responsive.
Q. So, Doctor, consumers could unknowingly take these pills with close to 50,000 nanograms of NDMA in them, correct?
MS. TOLEDO: Object to form.

Page 335

Mischaracterizes his testimony.
A. Well, I think this would be highly unlikely, Ms. Luhana, because the temperature would have to be at 70 degrees for an entire month to get up there.
Q. Doctor, I'm not just focused on --
(Cross-talk.)
A. -- places on earth were -- that are quite that inhospitable.
Q. However, GSK didn't test anything above 65 percent relative humidity here, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. They did not, that's what the table says.
MS. LUHANA: Okay, why don't we take a break now?
THE VIDEOGRAPHER: Time is 22:45 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 22:55 UTC.
MS. LUHANA: Doctor, at the

Page 336

request of your counsel, we are going to adjourn for the day and we're gonna start again tomorrow at 10 a.m. Eastern.
THE WITNESS: Okay, I won't argue.
MS. LUHANA: Wonderful.
THE VIDEOGRAPHER: The time is 22:55 UTC. We're going off the record.
(Time noted: 6:55 p.m. Eastern Time)

Page 337

J U R A T

I, FREDERICK GUENGERICH, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on JUNE 6, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

________________________
FREDERICK GUENGERICH

Subscribed and sworn to before me

This _______ day of __________, 20__.

____________________________________
NOTARY PUBLIC

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, FREDERICK GUENGERICH, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of June, 2022.

Candida Borriello
_______________________
CANDIDA BORRIELLO



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: JUNE 6, 2022
Deponent: FREDERICK GUENGERICH

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |

________________________
FREDERICK GUENGERICH

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

# VIDEO-RECORDED DEPOSITION OF GLAXOSMITHKLINE LLC, and GLAXOSMITHKLINE PLC PURSUANT TO FED. R. CIV. P. RULE 30(b)(6)

(Preclinical and Clinical Trials)

Taken on behalf of the Zantac PSC
(via videoconference)

DEPONENT: JAMES S. HARVEY, Ph.D.

DATE TAKEN: Wednesday, September 29, 2021

TIME: 5:40 a.m. - 5:05 p.m. EST

PLACE: US Legal Support - Remotely

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

MIKAL C. WATTS, ESQ.
JERRY WHITE, ESQ.
Watts Guerra, LLP
4 Dominion Drive
Building 3 - Suite 100
San Antonio, Texas 78257
mcwatts@wattsguerra.com
jwhite@wattsguerra.com

Appearing on behalf of the Zantac PSC,

TRACY A. FINKEN MAGNOTTA, ESQ.
CATELYN McDONOUGH, ESQ.
Anapol Weiss
One Logan Squire
130 N. 18th Street -- Suite 1600
Philadelphia, Pennsylvania 19103
cmcdonough@anapolweiss.com
tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC,

ROOPAL LUHANA, ESQ.
KENDRA GOLDHIRSCH, ESQ.
Chaffin Luhana, LLP
600 Third Avenue -- 12th Floor
New York, New York 10016
luhana@chaffinluhana.com
kgoldhirsch@chaffinluhana.com

Appearing on behalf of the Zantac PSC,

ASHLEY ALLEN CARR, ESQ.
DLA Piper
303 Colorado Street -- Suite 3000
Austin, Texas 78701
Ashley.carr@dlapiper.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. PLLC,

A P P E A R A N C E S: (cont'd)

ANDREW CHINSKY, ESQ.
King & Spalding, LLP
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
achinsky@kslaw.com

Appearing on behalf of the Defendant, Boehringer Ingelheim,

WILL SACHSE, ESQ.
CAROLINE POWER, ESQ.
Dechert, LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
caroline.power@dechert.com
will.sachse@dechert.com
and
JULIE WITHAM, ESQ.
Dechert, LLP
160 Queen Victoria Street
London, UK EC4V 4QQ
julie.witham@dechert.com
and
THOMAS J. SHEEHAN, ESQ.
KIMBERLY S. PENNER, ESQ.
Shook, Hardy & Bacon, LLP
1325 Avenue of the Americas -- 28th Floor
New York, New York 10019
tsheehan@SHB.com
kpenner@SHB.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC.

THE DEPO TECHNICIAN: Erik Thorsnes

THE REMOTE VIDEOGRAPHER: Carlos Coello

INDEX


TESTIMONY OF JAMES S. HARVEY, Ph.D.

Direct Examination by Ms. Finken 7
Cross-Examination by Mr. Sheehan 237
Redirect Examination by Ms. Finken 275

CERTIFICATE OF REPORTER 288

CERTIFICATE OF OATH 289

ACKNOWLEDGMENT 290

ERRATA SHEET 291

E X H I B I T S


| | |
|---|---|
| Exhibit No. 4641 | 120 |
| Exhibit No. 4642 | 201 |
| Exhibit No. 4643 | 156 |
| Exhibit No. 4643-A | 196 |
| Exhibit No. 4649 | 79 |
| Exhibit No. 4678 | 13 |
| Exhibit No. 4684 | 107 |
| Exhibit No. 4708 | 103 |
| Exhibit No. 4713 | 111 |
| Exhibit No. 4714 | 50 |
| Exhibit No. 4715 | 207 |
| Exhibit No. 4716 | 227 |
| Harvey Defense Exhibit No. 1 | 247 |
| Harvey Defense Exhibit No. 2 | 255 |
| Harvey Defense Exhibit No. 3 | 259 |
| Harvey Defense Exhibit No. 4 | 262 |
| Harvey Defense Exhibit No. 5 | 264 |

THE VIDEOGRAPHER: Good morning. We are now on the record. Participants should be aware that this proceeding is being recorded and as such all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

This is the remote video-recorded deposition of James Harvey being taken by counsel for the plaintiff. Today is Wednesday, September 29th, 2021. The time is now 9:37 UTC, 5:37 a.m. EDT.

We are here in the matter of In re: Zantac (ranitidine) Products Liability Litigation. My name is Carlos Coello, remote video technician on behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome.

At this time will the reporter, Laura Landerman, on behalf of US Legal Support, please enter the statement for remote proceedings into the record?

THE REPORTER: Yes. The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room

and that I will be reporting the deposition remotely as well as administering the oath remotely. The parties and their counsel consent to this arrangement and waive any objections to the manner of reporting. Hearing no objections, I'll go ahead and swear in the witness.

Dr. Harvey, do you consent to my swearing you in remotely?

THE WITNESS: I do.

THE REPORTER: Please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

DIRECT EXAMINATION

BY MS. FINKEN:

Q Good morning, Dr. Harvey. My name's Tracy Finken. I'm here to ask some questions on behalf of plaintiffs in this litigation today. I understand that you just underwent a deposition with Mr. Watts prior to the deposition that we're going to conduct right now, and so you understand some of the ground rules, but I'm just going to go over them with you briefly. Okay?

Do you understand that you can't communicate with your lawyers during the deposition testimony?

A I do, yeah.
Q And when I use the term "communicate," I'm referring to verbal and nonverbal communication. Do you understand that?
A Yes, I do.
Q And you will agree that you will not communicate with your lawyers while I'm asking you questions today?
A I will -- I agree to that, yes.
Q And I would just like to tell you if you don't understand one of my questions, please just let me know, and I'll do my best to rephrase it so that you do understand it. Is that fair?
A Ah, yes, okay.
Q And if you do answer one of my questions, I'm going to assume that you do understand it. Is that fair?
A Yes.
Q If you need to take a break at all, just let me know, and we can take a break as long as there's not a question pending on the record. Okay?
A Okay.
Q And who's in the room with you today?
A I have Julie Witham from Dechert, Tom Sheehan, and Will that I can never pronounce his second name.

Sorry, Will.
MR. SACHSE: Nobody can. It's okay.
MS. FINKEN: I can't either. Don't worry about it.
MR. SHEEHAN: We all know who Will is.
BY MS. FINKEN:
Q Will Sachse is in the room with you as well?
A Yes, that's right. Will Sachse, yes.
Q Is there anybody else?
A No.
Q Do you have any other computers or telephone or anything like that in front of you?
A No, I don't, no.
Q Do you have any notes in front of you for your deposition?
A I don't have any notes. I have a copy of one of the EMA responses here.
Q And which EMA response is that?
A It is D 209 -- 20 -- sorry. D 2019-6640.
Q And is there a date on that document?
A 24th of October 2019.
Q And is there what we refer to as a Bates number? It's a number on the bottom right-hand corner of the document?
A Yes. It's GSK_ZAN_0002467055.

Q Do you have any other documents in front of you?
A No.
Q Did you prepare any notes for your deposition today?
A No.
Q Okay. Dr. Harvey, can you just state your name for the record?
A My name is James Harvey.
Q And where are you presently located?
A In London.
Q And are you --
A In Dec --
Q Sorry. Go ahead.
A In the Dechert offices.
Q And you're being represented by counsel today?
A I am, yeah.
Q What is your understanding of why you are here to testify?
A I'm here to represent GSK in relation to the nonclinical and clinical development of ranitidine.
Q And you understand that GSK's a defendant in this case?
A I do.
Q And do you understand that there are lawsuits

pending in the United States relating to Zantac?
A I do.
Q And do you understand that you are here to give -- to testify under oath as if you were in front of a jury?
A I do, yeah.
Q And do you understand that your testimony may be played at some point in front of a jury or a judge in this case?
A Yes, I do.
Q What did you do to prepare for your deposition today?
A Well, I've read documents -- I mean, to back up, I guess I was part of the team that responded to questions from regulatory agencies on ranitidine. And in the process of that, I read a lot of documents around ranitidine's nonclinical development, and I was familiar with its clinical development as well. And as this activity got underway, I've reread some of those documents. I've read other documents provided by the counsel as well. But in terms of generally, documents I've read around ranitidine's development at GSK.
Q Did you conduct any -- strike that.
Did you have any conversations with anyone at GSK relating to the depositions that they have provided

in this case?

A I haven't had discussions with them about their depositions. I was told not to talk about their depositions.

Q Did you speak to anyone at any other pharmaceutical companies about the depositions that they have given in this case?

A No.

Q Have you ever had your deposition taken before?

A No, no.

MR. SHEEHAN: Other than just -- other than just, you know, ten minutes ago.

THE WITNESS: Yeah, the one this morning.

BY MS. FINKEN:

Q Sorry, of course. Other than the deposition that you sat through this morning, you've never had your deposition taken before, correct?

A That's correct.

Q And you were never designated as a witness to testify on behalf of GSK in any other pharmaceutical litigation that it was involved with in the United States, correct?

A That's correct.

Q And you've never been designated as an expert

witness by GSK in other litigations that GSK was involved with in the United States, correct?

A That's correct.

(Exhibit No. 4678 was marked.)

Q Let's pull up what's been marked as your 4678. And Dr. Harvey, what we've marked as Exhibit 4678 to your deposition is the deposition notice requesting that you -- that GSK designate a witness to testify today.

Have you seen this document before?

A I have.

Q And you're not a lawyer, correct?

A That's correct.

Q You understand that as part of the legal rules in the United States, that you're here today to testify as a representative of your company, GlaxcoSmithKline, correct?

A That's correct.

Q And you had indicated that you understand you're here to testify on behalf of GSK regarding the preclinical studies that were conducted in relation to Zantac, correct?

A That's correct.

Q And you understand that you have been designated by GSK to testify on its behalf regarding the clinical studies that were conducted in relation to

Zantac, correct?
A That's correct.
Q And looking at the deposition topics in this notice, which start on page 9, I believe, do you see that?
A Yes, I see it.
Q Did you review these deposition topics prior to your deposition today?
A I -- I have read them, yeah. It was a while ago, but yes.
Q And you're prepared to speak about these topics?
A As -- as -- as I can, yeah.
Q What is your title?
A I'm a -- I am a director in the nonclinical safety department -- director in the nonclinical safety department. I head up a group called Targets and Systems Safety in the organization. It's in the R&D part of GlaxoSmithKline.
Q Is it correct that you're not a medical doctor?
A That's correct.
Q Not a practicing gastroenterologist?
A That's correct.
Q Do you have any training in gastroenterology?

A No, I don't.
Q And you're not a pathologist, correct?
A That's correct.
Q Have you ever conducted preclinical studies?
A I conducted them personally?
Q And what do you mean you conducted them personally?
A No, sorry. I didn't understand the question. Have I ever conducted studies personally --
Q Have you ever conducted -- have you ever personally conducted preclinical studies?
A Yes, I have. I've assisted with the conduct of preclinical studies.
Q And when I use the term "preclinical studies," can you explain to the jury what a preclinical study is referring to?
A Yes. I actually call them nonclinical studies because preclinical almost confers that they're all done prior to the clinic. The nonclinical studies, they would be -- there's a whole array of studies that we do, but broadly speaking you could describe them as in silico studies, so studies that you would do with a computer, computational predictions; in vitro studies, the studies that we would do in flasks and test -- test tubes is a bit of a misnomer, but in cell culture. And

then there's in vivo studies where we do studies with whole animals, so that's broadly the industry.

Q And have you conducted animal studies?

A I -- I have participated -- well, I've contributed to the conduct of those studies, yes.

Q And how have you contributed to the conduct of animal studies within GSK?

A Well, very early on in my career I worked in a department called the genetic toxicology department where I did -- practically I worked in the lab and did in vitro studies and also assisted with in vivo studies. In vivo studies are complicated. They require many personnel, so I contributed in that sense.

Q Were any of the preclinical studies that you were involved with involving ranitidine?

A No, I -- I can't recall ever working on ranitidine, no, not in my career.

Q So just so it's clear, when you are using the term "nonclinical studies," you are using that term interchangeably with preclinical studies as it's related to this notice of deposition topics?

A Yes, yes, I am. We can call them preclinical studies. That's fine. Sure.

Q I just want to make sure it's clear that we're referring to the same thing when we use the term

"nonclinical" and "preclinical"; is that fair?
A Yes, that's fair.
Q And have you ever been involved in conducting carcinogenicity studies in animals?
A No, I haven't actually been involved in that conduct.
Q Have you designed any carcinogenicity studies involving animals for any products that have been marketed by GSK?
A No, I haven't. That would be done by a different part of the nonclinical safety organization.
Q So is it fair to say that your involvement in nonclinical studies on behalf of GSK is limited to in vitro studies?
A In the work I did in the genetic toxicology department, I did do in vitro studies. I also participated in the conduct of the in vivo studies. One person doesn't do an in vivo study. There's a study director. There's lots of people that support it and I've supported it, but it would be -- those studies were genetic toxicology studies, so, yeah, that would be an accurate description.
Q So when you're conducting toxicology studies, you're trying to assess the risk of a product, correct? Is that fair to say?

MR. SHEEHAN: Objection.

A Well, risk is a bit of a, I'd say, generic word. When we're -- I would describe it as when we're doing so in silico, in vitro, in vivo studies, we're trying to characterize the toxicity of that molecule in those nonclinical species, and then, of course, the next piece of that is trying to translate the relevance of those findings to humans.

Q And just so we're clear, when you're assessing the risk of that particular product, you're trying to determine whether you can extrapolate the data from animals to see if it's relevant to humans. Is that what you're saying?

MR. SHEEHAN: Objection.

A Again, you used the phrase "risk." It's not a phrase that we use in sort of isolation because it can be -- it's kind of -- like I said, it's a very generic word. But the second part of your sentence about trying to understand the relevance of the nonclinical findings to the clinical part is correct.

Q Is it fair to say you're not doing toxicology studies to see if it's toxic just for the animal, right?

MR. SHEEHAN: Objection.

A No, you're correct. We're doing it to understand the potential toxicity of a molecule in

mammals, and then we're translating it -- you know, translating it to humans is the challenging part.

Q So the ultimate goal, though, is to see if the toxicity is relevant to humans when you conduct these types of studies, correct?

A Yeah, that would be a reasonable piece of the translation of those nonclinical findings to the clinical setting.

Q Who is responsible for designing toxicology studies within GSK?

A Well, it depends on the nature of the study. Toxicology's a huge area of science, and the way it's structured, and I think this would be in any company, is that we have different disciplines depending on the nature of the -- of the -- of the area of toxicology. So for example, we will have safety pharmacology department, who studies effects on the CNS, central nervous system, the heart, the lung, and so they would design safety pharmacology studies.

There would be a genetic toxicology department that looks at compounds, their capacity to damage DNA. That group would define the design of the studies and so on, and general toxicology for general toxicology.

And the design of the studies is very much -- it's defined already. It's an area called regulatory

toxicology and is defined in a series of guidelines called ICH guidelines, and so they, you know, provide guidance for the design of toxicology studies. There's a whole series of additional documents, guidelines, et cetera, that are followed. But ultimately it's a study director that will design or conduct a study and tailor the design, if necessary.

Q So the study director would ultimately be responsible for designing a study, for example, in relation to animal studies to assess the risk of carcinogenicity of a product, correct?

A Well, they would be accountable for conducting a study. I guess as part of that accountability there would be consultation with other experts to perhaps modify the design, if necessary, additional time points, recovery groups, so there'd be changes. But the study director is accountable for the conduct of the study. To say that they design it may be a little bit misleading. The designs, as I said, are kind of predefined. We have set guidelines for that. They're certainly accountable for the conduct, and if there are any additions or changes, they would be the person that would invent those in the conduct of the study.

Q So when GSK is designing an animal study to assess the risk of a product, how would it determine

which would be the appropriate species to use to inform them of the risk assessment?
A So, I mean, typically we do studies in rodents and non-rodents, rodents being primarily rats in R&D, in research and development. Occasionally, we do studies in mice. And then non-rodents there's actually several animals species that we use. They may be mini pigs. It may be dogs, maybe the nonhuman primate. The selection of those species there's a lot of decisions that go into quite what species are used and why. There's guidance on it. We have external guidance. We have internal guidance. But it very much relates to the biology of the molecule -- the biology that the molecule is designed to deter.
Q Within each species, there are different strains, correct?
MR. SHEEHAN: Objection.
A That would be correct.
Q So, for example, there are different strains of rats that can be used for animal studies, right?
A That's correct.
Q And there are different strains of mice that can be used for animal studies?
A That's correct, yeah.
Q And who is responsible at GSK for determining

which strain of the species is used for purposes of the animal studies?

MR. SHEEHAN: Objection.

A Well, I think I would -- the decision -- so we work in a nonclinical safety department, and I expect for different areas they may use different animal species, but the general toxicology department would be responsible for providing a decision on what animal species was used. That will be a decision that would involve multiple subject matter experts from general toxicologists to pathologists.

And I think over the years what I've seen is -- at least I'm aware of -- there's been some harmonization of a choice of what species to use for various reasons relating to the biology of that species that will be used.

Q What is a GLP study?

A GLP study, it stands for good laboratory practice, so those studies -- we do -- in research and development, we do discovery studies, discovery studies which are non-GLP. And then GLP -- we do studies to GLP, good laboratory practice, for the regulatory toxicology studies that we do to support the transition of a molecule from preclinical to the clinical setting.

So the regulatory toxicology studies we do

support clinical administration of a new drug they're to GLP typically. And GLP means that the study is done a particular way. It's audited. There are some set criteria about what's an expectation within a GLP study, but it's primarily about the rigor, the veracity of the study.

Q So when GSK's conducting preclinical or nonclinical studies on animals in relation to a specific pharmaceutical product, what is GSK trying to look at? Are they looking at efficacy, or are they looking at safety, or are they looking at both?

MR. SHEEHAN: Objection.

A It depends on what part of the R&D organization it is. In the, I'd say, discovery units, research units, they tend to be focused on animal studies looking at efficacy of the molecule. And it's very difficult because trying to translate efficacy in an animal species to humans is challenging. And then the nonclinical safety department and other parts of GSK would conduct toxicology and safety studies.

Q Just going back to -- going back to what we've marked as Exhibit 4678 to your deposition, which is the deposition notice, looking on page 9 under number three, one of the topics that's identified under the preclinical studies relate to protocols, procedures,

investigator brochures, manuals, contracts, agreements or guidance documents relating to the planning, execution, conduct, monitoring and reporting for preclinical studies of ranitidine-containing products. Do you see that?

A I do.

Q Have you reviewed any guidance document to prepare for your deposition today?

A I'm not quite sure I understand the question. Guidance documents of what nature?

Q Well, have -- let me rephrase that.

Have you reviewed any internal standard operating procedures as they relate to preclinical studies that GSK conducts in relation to their products?

A I'm aware of the -- so we have SOPs and we have guidance documents. Obviously I'm aware of the guidance documents we have in GSK relating to impurities. I've read those. I've assisted with writing the guidance and SOP within the R&D organization, but I've certainly reviewed those. The other --

Q And the -- sorry.

A The other protocols, procedures for the other areas of toxicology it's an enormous space, so I haven't really read the SOP or guideline for the conduct of,

say, a one-month tox study recently. I'm familiar with that type of study, but I've certainly looked at the procedures or SOPs, if you like, and the guidance documents related to impurities.

Q Have you reviewed any internal GSK guidance documents relating to the conduct of animal studies when investigating a pharmaceutical product?

MR. SHEEHAN: Objection.

A Could you repeat the question? I just want to understand the scope of the guidance.

Q Sure. I just wanted to know if you've reviewed any internal GSK guidance documents pertaining to the conduct of animal studies when GSK's investigating pharmaceutical products?

MR. SHEEHAN: Objection.

A I mean, I don't -- I'm not quite sure I've read anything specifically for this deposition, but, I mean, I'm familiar with, say, the ICH M3 guidance, which is related to the conduct of nonclinical studies throughout a compound's development, but not for this deposition. The only -- any guidance document that I recall reading specifically for this relates to those guidances around impurity control. I may be wrong, but I can't specifically remember reading a guidance document pertaining to the conduct of GLP's -- GLP tox

studies, so --
Q Do you have familiarity generally with regulatory guidance documents pertaining to the conduct of carcinogenicity studies conducted in animals?
MR. SHEEHAN: Objection.
A I'd say I'm familiar or I've read the ICH that I think it's S1 guidance document. It's quite some time since I've read it. It's not an area I've had to focus on. I'm more familiar with, say, the impurity guidances.
Q So in relation to ranitidine, GSK conducted studies on animals to assess whether there were any toxic effects on the animals when given ranitidine, correct?
A That's correct.
Q And did they also conduct studies to assess at what dosage you would see toxic effects in animals given ranitidine?
A That's my understanding, yes, they did.
Q And is it standard for toxicity studies to conduct gross pathology and histopathology?
MR. SHEEHAN: Objection.
A Depending on the study. So for general toxicology and, say, carcinogenicity studies, it would be done.

Q And what is the purpose of histopathology?

A Histopathology, as I understand it, is that they're examining the -- after the conduct of the study, they're examining the tissues or organs of an animal for -- to see if the molecule has induced toxicity. I mean, histopathology, again, is a huge space. For example, they might look at the liver to see if the molecule has induced necrosis or cell damage in the liver. They might look at the central nervous system for the same thing.

So histopathology there's a whole array of findings that can be -- the exact -- that are looked for by pathologists using microscopes, et cetera, and various techniques.

Q And within GSK, are there pathologists that conduct those type of examinations within the animal studies?

MR. SHEEHAN: Objection.

A GSK certainly has pathologists and certainly has histology groups as well, so we do have the capacity to do it. We tend to do -- right now we tend to do those studies -- that histopathology is done on early toxicology studies, non-GLP studies. What tends to happen now is that the conduct of those general toxicology studies or carcinogenicity studies are

outsourced to a third party and they conduct the study. So we do have the capacity, but generally it's outsourced. But when it's outsourced, there's peer review of the study and interactions with the study directors as well to ensure the rigor of the study.

Q Who does GSK outsource those types of studies to?

A Right now?

Q Yes.

A There's a mixture of CROs that do those studies. It varies throughout the years, which is why I ask right now. Currently, our provider -- the main provider we work with is a CRO called -- contract research organization called Charles River, but we also work with another CRO called Covance. I think they may have just changed its name. There's a lot of reorganizations ongoing with those third parties, but we've used others in the past.

Q What was the name of the Covance organization previously?

A I don't know what Covance was previously. I know there was another CRO called Huntingdon Life Sciences as well. I think they may have merged with Covance. I don't keep up. It's not really a narrative that I follow that closely.

Q And GSK has contracted with Huntingdon Research to do animal studies in the past, correct?

A That is correct, yeah.

Q And do you know GSK's policies in relation to study documents for animal studies that were conducted by Huntingdon Research?

MR. SHEEHAN: Objection.

A I'm not an expert in the area. I think there are certainly people that are in GSK, but it's my understanding we have records retention policies for particular studies, and I think that actually applies to the CRO that conducts the studies. And I think we have a records retention policy about the study itself, the final report as well. So the accountability falls to the organization that has done the study. I mean, that's my understanding. I may be wrong, but I think that's generally good practice that we follow.

Q When GSK outsources animal carcinogenicity studies to contract research organizations like Huntingdon, who maintains the histopathology and path -- the histopathology slides related to those studies?

A I'm not entirely sure. I don't know if they get sent to us for archive or if they're archived at the CRO itself. There'll be a records retention policy on it. I do know that we keep slides from older studies,

and that will be -- they'll be kept in line with the records retention for those study materials. So there will be a policy on it somewhere and it will be defined. I don't want to guess on what it is. I don't want to get it wrong.

Q Does GSK -- does GSK currently have slides relating to animal studies that were conducted with ranitidine?

A I don't know, the honest answer. I expect that if the study -- they'll be a records retention policy in place for that study and that will be followed. So if it's within that time frame, I would expect there would be.

Q Has anyone from GSK reanalyzed or rereviewed these slides from the animal studies that were conducted on ranitidine in the late 1970s, early '80s?

A Not --

MR. SHEEHAN: Objection.

A Not to my knowledge, no.

Q And you understand that there were also study -- animal studies that were conducted with ranitidine in the '90s, correct?

A Yes, that's correct.

Q Has anyone looked at or reanalyzed the slides from the studies that GSK conducted on ranitidine on

animals in the '90s?
MR. SHEEHAN: Objection.
A Not to my knowledge, no. Not to my knowledge.
Q Since the product has been globally recalled, has anyone from GSK conducted any type of analysis on the histopathology that was performed on animals in the carcinogenicity studies?
MR. SHEEHAN: Objection.
A No, not to my knowledge. No, they haven't.
Q You've also been designated to testify on behalf of GSK regarding clinical studies relevant to Zantac, correct?
A That's correct.
Q And have you conducted any human clinical trials?
A I haven't, no, I haven't. Not personally, no.
Q Were you involved with any human clinical trials involving Zantac during your time at GSK?
A No, I wasn't. No.
Q Have you been involved in any capacity with any human clinical studies at GSK?
A No. That's not -- no, that's not the accountability of the nonclinical safety line I work in.
Q For purposes of your deposition today, though, you've been designated to testify in relation to the

human clinical studies that were conducted by GSK in relation to Zantac, correct?
A That's correct.
Q And you're prepared to testify to that today?
A To the best of my ability.
Q What conditions was Zantac indicated to treat?
A There were a range of gastrointestinal disorders. And there was also a specific disorder called Zollinger-Ellison syndrome initially, but it's been ulcers, peptic ulcers.
Q Are you aware of any third parties or outsourcing of human clinical trials that GSK did? Do you understand my question?
You have mentioned some contract research organizations that GSK typically used for animal studies. Are you aware of any similar contract research organizations that GSK has outsourced human clinical trials to?
A I do know the studies were done by a series of investigators, clinical investigators, but I don't -- I don't think that would be equivalent to a third party like Covance, for example, to conduct a clinical study. Certainly GSK worked with clinical subject matter experts externally to GSK.
Q Are you aware that certain clinical studies

that were conducted by GSK had published medical literature associated with those studies?

MR. SHEEHAN: Objection.

A So if I just could play the question back. Am I aware that the outcomes of certain clinical trials were published --

Q Yes.

A -- by investigators? I'm aware that they have been. I'm not familiar with all of them. There were a lot of studies conducted with ranitidine. I am aware that some have been published.

Q Who would make the decision within GSK as to whether or not clinical study results were published?

MR. SHEEHAN: Objection.

A Are you talking about today?

Q Sure.

A GSK has a policy that was introduced several years ago about publishing clinical trial data, and so I think, you know, that's the -- it's the sort of default is to publish the results of our clinical trials. So I think that would be done -- when that announcement came in, I think it was the head of R&D that, you know, created -- will make that decision and initiated that activity.

Q Who was the head of R&D that initiated the

decision that GSK clinical trials would be published?
A My recollection it was within Patrick Vallance's time when he was head of R&D. That's my recollection.
Q When did the GSK policy change that all clinical studies would be published?
MR. SHEEHAN: Objection.
A I -- I'd be -- estimate. I'm trying to think of when Patrick Vallance was head of R&D. I don't -- I would estimate that it was somewhere from 2010 upwards, sometime around that time. I think that's when he was in charge. It may have been earlier, might have been a bit later, but right around there.
Q Was there any event that precipitated GSK's change in internal policy that all human clinical trials would be submitted for publication?
MR. SHEEHAN: Objection.
A I don't re -- I don't recall why that decision was made. I just -- I just recall it was made. I don't know the background to it.
Q Prior to 2010, what was GSK's policy in relation to publishing human clinical trial results?
A Well, I expect it was different from a default being to publish them, and so I expect it would have been based on the individual project team and the said

drug in development. So, I mean, I guess it would have been down to the lead medic on the team.

Q How did GSK determine which clinical studies that were conducted on Zantac would be submitted to regulatory agencies?

MR. SHEEHAN: Objection.

A I mean, from what I've seen from the summary basis of approval, they conducted a series of clinical studies that were submitted to the FDA. I'm not quite sure what decision was made. I haven't read a document related to that. It would have been the studies conducted to support those initial proposals/the ranitidine initial indications. So I don't know quite why that, you know, who made that decision or why. I've just seen the documents from the studies they've submitted.

Q You're aware that there were clinical studies that were conducted in humans in relation to Zantac after the summary basis of approval, correct?

A That's correct.

Q And how did GSK determine which clinical studies that were conducted after the summary basis of approval were provided to the FDA?

MR. SHEEHAN: Objection.

A Well, I can -- again, I can -- I think this is

a reasonable assumption. As they introduced different -- they applied for amendments or addendums to the original SBA -- NDA, sorry -- that they would have done the necessary clinical studies to support the indication in question. So I think I can only assume that they -- for example, if they were looking at maintenance therapy, they would have submitted studies that supported maintenance therapy. So, I mean, to me the logic would have been the studies that support the said indication.

Again, I haven't seen a document that decides and defines what clinical studies will be submitted. I'm just following the logic that I would have in mind.

Q So if GSK conducted human clinical trials that ultimately did not support the indication that they were seeking, would it have not submitted those studies to the regulatory agency?

MR. SHEEHAN: Objection.

A I expect more generally, if you did clinical studies to support a particular indication and the data didn't support that that medicine treated the disease, you wouldn't apply for the said NDA treating that condition. I mean, that would be generically across the board. We have lots of medicines we develop where we don't achieve the efficacy that we thought the molecule

was going to provide, and so we don't submit those studies and we don't submit the NDAs.

Q So just going back to publication of human clinical trials before 2010, did GSK utilize medical writing companies?

MR. SHEEHAN: Objection.

A Sorry. I don't know the answer to that question. Sorry.

Q You're not aware of GSK using medical writing companies during your tenure at GSK?

A No. It's not an area that I'm familiar with. I have worked with medical medics before and been on projects where clinical trials have been conducted. The publications that I've seen have involved those GSK employees and a whole extent of medics as well, so that's my experience. I'm not familiar that we use third parties to right papers.

Q So sitting here today, you have no knowledge of GSK ever using medical writing companies to write publications in relation to its products?

MR. SHEEHAN: Objection.

A That -- yeah, no, I have no knowledge of that.

Q If you were looking to evaluate the raw data from clinical studies, where would you go?

MR. SHEEHAN: Objection.

A By the raw data, you mean related to the efficacy endpoints or the safety endpoints?

Q Correct.

A So the efficacy -- I mean, so when they conduct a clinical trial, it will be -- it's very similar to conducting a nonclinical study in that there'll be a set protocol with defined endpoints, and those endpoints will be measured and written up as a report, so that report will have the data in it.

I think as well what happens -- so that individual clinical study will be self-contained, as it were, so I would look to the report and that should have the data in it. And then in certain cases, certainly safety data is accrued in different databases, safety databases.

Q Are there specific safety databases that you would go to if you were looking to assess the raw data from clinical trials?

A I wouldn't go to them, those databases. That's an area that we would call pharmacovigilence. So there's a very -- a very set framework in place for recording of safety events in a clinical trial and safety events post-approval as well. It's sort of owned, if you like, by a different part of the organization. So I couldn't go and look into the GSK

safety database because I'm not an expert in pharmacovigilence, so that's the accountability.

Q What is GSK's policy in relation to maintaining the raw data from its clinical studies that were conducted on Zantac?

MR. SHEEHAN: Objection.

A So there -- again, and this is -- I'm being sort of logical, if you were -- as it were. Sorry. They would have accrued the safety data for the ranitidine product. It would have gone into a safety database. And that safety database I think has been updated over the years as GSK, you know, over the decades. My understanding is that the database gets updated. The underlying data doesn't change.

My recollection from I think one of the summary basis of approvals for the over-the-counter ranitidine product is there's a section there about the clinical data, clinical data safety database they've accrued. So that's my understanding is it's stored, as it were, and the databases grow, and they may change in some of their -- in the sense of the platform or software that holds the data.

Q Does GSK retain the raw data from all of the clinical studies it conducts through the lifecycle of the product?

MR. SHEEHAN: Objection.

A I'm not quite sure I understand what you mean by raw data. If it's relating to the safety events in a clinical trial and subsequent to approval, my understanding is we keep that information in a -- I think it's a worldwide safety database. Generically I think that's what it's been called. It's got various names, different names over the years.

Q Does GSK differentiate whether or not a study was submitted to the FDA in relation to whether it retains the data, the safety data on the studies that it conducted?

MR. SHEEHAN: Objection.

A I don't know the answer to that question. I'm sorry. I couldn't be accurate. I just -- my understanding is that we track and we accrue safety data on a product's lifetime.

THE WITNESS: Could we take a break?

MR. SHEEHAN: Sure.

THE WITNESS: Restroom break.

MR. SHEEHAN: Tracy, do you mind if we break for five minutes to --

MS. FINKEN: Sure, that's fine. We can go off for five minutes.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We are now going off the video record. The time is 10:28 UTC, 6:28 a.m. EDT.

(A 17-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 10:45 UTC, 6:45 a.m. EDT.

BY MS. FINKEN:

Q Dr. Harvey, are you familiar with the different phases of clinical trials?

A I am familiar with it.

THE WITNESS: I can't see you, I'm afraid. I can just see Julie.

MR. SHEEHAN: Yeah, we've got that video problem again. Hold on one second.

(Off-the-record discussion was had.)

BY MS. FINKEN:

Q Can you just briefly describe to the jury the differences between the phases for clinical trials, phase 1 through 4, right?

A Yes. So phase 1 will be, depending on the indication, but it will be -- typically phase 1 is conducted in healthy volunteers where we're examining the various properties of a new medicine, and so that will be primarily pharmacokinetics and pharmacodynamics

and safety endpoints as well. It will be trying to establish what dose we can go to in humans as well, very carefully controlled.

Phase 2, I mean, generically, it's -- phase 2 would be starting to examine efficacy endpoints as well to a smaller group of individuals. And then phase 3, again, is -- phase 2 will be efficacy and there'll always be safety components to it as well, but typically phase 2 and phase 3 we're starting to look for efficacy, so treatment of the disease in mind. The difference, typically, between phase 2 and phase 3 is phase 3 studies tend to be larger, although we do get large phase 2 studies. Sometimes they're called phase 2A, phase 2B. But primarily the majority of the time there's no efficacy endpoint in the phase 1 trials. Phase 2 and phase 3 have efficacy and safety.

And then phase 4 would be postmarketing where we continue to sort of accrue safety data, primarily.

Q You mentioned the term "endpoints." Can you explain to the jury what you are referring to when you use the term "endpoints" in relation to a clinical study?

A There'll be different endpoints. So, for example, in the phase 1 study, there will be endpoints related to the ingestion of the drug but related to the

metabolic phase of the drug. So what happens to the drug when it's absorbed, where does it go, how is it excreted, how it's metabolized, so those would be endpoints. There will be pharmacodynamic endpoints as well, so we're looking to see if the drug modulates a particular target as well.

And then as we go through development, typically what we look for is a marker of efficacy. And that can be measurement of an endpoint related to the disease to see if the disease is progressing or to see if the disease is being treated. And then safety endpoints, there's a whole category of safety endpoints that will be tracked. Again, it's clinical discipline, so there's a whole system of terms called metra, which defines all of the terms a bit like you define all the terms for histopathology.

So there are just multiple endpoints through the development. Some are related to safety, very specific clinical terms and events, and some are related to efficacy that would be specific to the medicine in development.

Q Who is responsible for selecting the endpoints for clinical studies?

MR. SHEEHAN: Objection.

A Well, I've never designed or I've never

conducted a clinical study, but I could imagine it's a complex task that would involve multiple individuals. There will be a lead investigator, clinical investigator. So someone will have oversight of everything, but there'll be subject matter experts that will contribute to what is measured exactly.

Q Are there committees or working groups within GSK that collectively decide when to conduct clinical studies?

A Committees? Well, I would say yes. I'm not sure I could name them because they'll be -- they change quite frequently. A company undergoes many reorganizations. But there will always be some sort of governance board related to the initiation or the proposal for a clinical trial. And then, again, there will be governance boards. Is there sufficient data? Is there sufficient safety data, et cetera? And then, of course, ultimately, there's a -- there's a regulatory review of the conduct of the study as well.

Q What is the process within GSK to getting a clinical study approved?

MR. SHEEHAN: Objection.

A Did you mean clinical study -- the design of a clinical study?

Q Correct. Is there a process within GSK that

has to be undertaken to move forward with the clinical study?

A Yes, yes, there will be. So from my perspective and the safety perspective, that process would be -- so I spoke before, I think, about the discipline of toxicology. There's lots of studies we will do that I would define them as regulatory toxicology studies, so that they're very set in their nature. They will be done to GLP. We will get a package of -- a package that describes the nonclinical profile of the said drug.

We will also then -- any findings in those studies we would then relate to particular exposures in the animal as well, so the systemic exposure of the drug in the animal. And then we go to -- there's a board called the global safety board where they would review the package of data with the intended clinical trial design in mind. And that intended clinical design -- clinical trial design would have details of the dose of the drug that we're going to plan to dose into healthy volunteers or patients. So it's the global safety board that would review that package.

Q And would it be the global safety board that would have to approve the package prior to a clinical study being initiated?

A My understanding is yes because I know they disapprove certain packages as well, so it's the governance board around that piece.
Q What is a data safety monitoring board?
A A data safety monitoring board?
Q Are you familiar with that term?
A I mean, there are a lot of acronyms. DSMG. I'm not familiar with -- I'm not familiar with that board, but I can only assume if it's data safety monitoring board, it would be some sort of clinical safety or pharmacovigilence board.
Q Are you aware if there are specific areas of a clinical trial that would warrant use of a data safety monitoring board?
MR. SHEEHAN: Objection.
A I'm not familiar with that particular board. I'm familiar with the global safety board, but I can -- I'm assuming it's something to do with recurring data -- data that's reported out of a clinical trial. I'm not familiar with the board, but I'm assuming it's related to clinical safety and the analysis of that said data that comes out of the clinical trials.
Q Would GSK need to obtain approval from an ethics committee before conducting clinical trials?
A I think the answer to that is yes. I think

there's ethics committees. There's lots of committees that one would have to go to in order to conduct a clinical trial.

Q What would --

A I'm more familiar with the global safety board, but there will be a design component and there will some sort of ethical review of the clinical design review. Sorry to talk over you. Sorry.

Q No, that's -- I apologize. I interrupted you, and I didn't mean to. And sometimes that happens in the course of natural conversation, and I'm going to try to avoid doing that, and I'd appreciate it, you know, if you're conscious of that as well.

You had mentioned there are different types of ethics committees. What types of ethics committees exist within GSK as it pertains to clinical trials?

A I'm not actually familiar with those ethics boards. I've not -- because it would be a clinical accountability. I have not personally had experience of going to an ethics board related to a clinical trial. It's not something I'm familiar with. I've been to global safety board before as a nonclinical representative on projects, but the clinical design and that peer review, which must occur, I'm not familiar with that process. Sorry.

Q Have you been involved in any discussions with any ethics boards within GSK in relation to Zantac?

A No, not to my knowledge, no. I haven't spoken to any ethics board.

Q Have you been involved in any ethics boards within GSK in relation to nitrosamines in drug products?

A No, I'm not -- no, I'm not aware of any conversations with any ethics boards. We've certainly spoken to members of global safety boards about nitrosamines, yeah, by virtue of the projects we're working on but not holistically as a topic.

Q Are you aware of any -- any discussions with any ethics committee over the ability of certain drugs within the GSK portfolio to nitrosate?

MR. SHEEHAN: Objection.

A No. I mean, again, I'm not quite sure I understand what you mean by ethics committees. As I said before, I described something called global safety boards. I don't know if you would consider that an ethics committee. I call it global safety boards. And certainly members of global safety boards are familiar with nitrosamine impurities in drug products because we've worked on specific projects and engaged with those members.

Q Are there specific SOPs that relate to the

global safety boards and GSK products?
MR. SHEEHAN: Objection.
A There will be SOPs related to global safety board, yeah.
Q Does GSK have an obligation to publish clinical trial data regardless of the results?
MR. SHEEHAN: Objection.
A I think we discussed that earlier. I certainly know that -- I don't know -- I really struggle with the word "obligation." I can tell you what I know is I know that certainly within the time that Patrick Vallance was head of R&D there was a -- and I don't know if it was instituted by Patrick or if was the previous CEO, I think Andrew Witty -- there was definitely a shift in publishing the outcome of the clinical trials, so I think that I know.
I don't know about the obliged or obligated piece. That's what I know. And so prior to that date, I don't know what dictated where the publication -- open publication of the clinical data. I don't know. I'm not familiar. All I know is that from that point on it was an expectation.
Q How many human clinical trials has GSK conducted using ranitidine?
A GSK in terms of partnership with those

external academics, so clearly not -- there must be -- I don't know the exact figure, but I expect it would be in the double, if not triple figures. I think it's -- there are a huge number of clinical studies that were done I think relative to the programs I've worked on. I may be wrong about triple figures, but I certainly think it's in the double figures. 50 plus, maybe, I think, I would hazard an estimate.

(Exhibit No. 4714 was marked.)

Q Do you know how many -- strike that.

Let's take a look at your CV that was produced in advance of your deposition, and we're going to mark that as Exhibit 4714. Doctor, while your CV is being pulled up, I just have a couple of questions for you about it. And if you need to actually have the CV up in front of you to answer them, we can wait, but just -- I notice here that you're listed as the global director of computational toxicology from 2010 to 2019; is that correct?

A That's correct.

Q What is computational toxicology?

A Earlier on I spoke about the nonclinical sort of discipline, if you like, clinical, nonclinical, and I described three areas relating to in silico, in vitro and in vio. In silico is computational prediction, so

we employ computational models to assess the safety of new drug molecules and the associated impurities. So computational toxicology was a group that was formed to try and invent those procedures in our R&D process, so that's the name of the group.

Q And I noticed on your CV you have indicated that you were research scientist for safety assessment at GSK from 1999 to 2006; is that correct?

A I take your word for it. I can't see the document on my screen, but that sounds about right, yeah.

THE DEPO TECH: I'm sorry for the interruption, Counsel. Is the screen sharing not showing?

MS. FINKEN: It's not showing, no. I just assumed you were still pulling it up.

(Off-the-record discussion was had.)

BY MS. FINKEN:

Q What product did you work on as a research scientist involved in safety assessment at GSK from 1999 to 2006?

MR. SHEEHAN: Objection.

A I mean, it would have been multiple projects. I recall -- I recall one of them was a compound called gemifloxacin. It was an antibiotic. But there would

have been multiple products. The way it works, when I was working in the genetic toxicology department, is that you worked on multiple assets, so all stages of research and development, so it would have been lots, whatever was in the portfolio at that time.

Q Did you conduct any research on Zantac during your time as a research scientist and safety assessment from 1999 to 2006?

A From a practical perspective in vitro work I think we were doing at the time in the labs. I don't recall, however, ever working on ranitidine. We tend to get molecules sent to us with numbers, so we -- a lot of time we didn't actually know what the molecule was. It was simply a number. So we worked on multiple assets. If we ever did any work on ranitidine, I don't recall it. So I think I'd be comfortable my answer is no in that period as a research assistant.

THE DEPO TECH: Excuse me, Counsel. Is it up yet?

MS. FINKEN: It is.

BY MS. FINKEN:

Q Dr. Harvey, did you -- are you familiar with the term "histamine-2 receptor antagonist"?

A Yes, I am, yeah.

Q And you're familiar with the term "H2RA"?

A Yes.
Q And H2RA is a shorthand for the term histamine-2 receptor antagonist, correct?
A Yes, that's correct.
Q Do you understand that that's the class of medications of which Zantac is one?
A Yes, I do.
Q And there are other medications that are contained within the class of H2RAs, correct?
A That's correct.
Q And are you familiar with some of the other H2RAs within that class of medications, such as Tagment?
A Cimetidine, yeah. Yes, I am, yes.
Q Have you done any work on cimetidine during your time in the research toxicology department at GSK?
A It's a -- I mean, it's a long time ago and I don't -- honest answer is I don't know. We may -- I don't know. We may have done studies on it, but I don't think they -- I can't recall, basically, because we did a lot of work and we did work on lots of molecules. Certainly if we did do any work on that, they wouldn't have been GLP studies, to my recollection. We screen molecules that are sent to us, so it's possible, but I think it's unlikely that I would have looked at ranitidine or cimetidine.

Q Did you do work on any other potential H2RAs in development?

A Not to my recollection. In that role as research assistant, we may have been asked questions related to ranitidine. We may have been asked questions on lots of different medicines. I can't recall. It was, you know, a long time ago. But I don't recall doing any specific work on ranitidine or cimetidine.

Q Did you do any work on any potential H2RAs that were being developed by GSK that ultimately were not brought to market?

A Honest answer is I don't know. I don't recall ever specifically working on projects. I remember some of the projects that we did work on, but, I mean, we've screened so many molecules that I wouldn't be able to tell if any of those were ranitidine or cimetidine or any other H2 blocker.

Q Did you do any type of research for -- strike that.

Did you do any type of work on any compounds in development that ultimately were not brought to market because of nitrosation potential?

MR. SHEEHAN: Objection.

A I don't recall ever doing anything specific on nitrosation of the nature -- of the study -- comparable

to the studies that were done with ranitidine. It's not -- nitrosation -- I think we were aware of publications about nitrosation because they're part of the -- sort of the field of genetic toxicology, if you like. It's a very early piece of history of genetic toxicology. I don't recall ever doing any work about nitrosation of drug substances, drug products. I may be wrong, but I don't recall doing anything specific.

I know that we experienced impurities to projects or products where we've had nitrosamine impurities, but that's slightly different, I think.

Q Okay. Can you explain to the jury what nitrosation means?

A Yes, sorry. So when you have a chemical structure, say a new drug molecule, sometimes those molecules can have nitrogens in them, so the drug molecule can have nitrogens in them. And if that nitrogen -- so drug molecules are typically made up of carbons, hydrogens, nitrogens, oxygens, sulfer sometimes, chlorines, lots of different molecules, but together they form the drug.

In certain configurations, depending on the structure of the molecule, they contain a nitrogen -- it's called a secondary amine or tertiary amine -- that if you have an excess of nitrites, which is nitrogen and

oxygen combined, under certain conditions that nitrogen in the drug can be nitrosated to form something called a nitrosamine. That's probably the easiest way I can describe it, I think.

Q Thank you. And you also indicated that there were -- was work that you had conducted during your time at GSK that related to nitrosamines within drug products, correct?

A Yes, correct.

Q And you're differentiating nitrosamines within drug products from nitrosation, correct?

A I am in the sense -- let me just make sure I understand the question because I think if the impurity -- I can't recall the project that had the nitrosamine impurity, but I'm assuming that that nitrosamine would have occurred via a process of nitrosation, a chemical reaction. I don't know the specifics. But, I mean, it's nitrosation of an amine, an oxygen in a drug molecule that would lead to the formation of a nitrosamine.

So I'm not quite sure I can answer the question. I don't see them as -- nitrosation is most likely the driver to form the nitrosamine impurity for that particular product.

Q And there can be nitrosamines within a product

due to things like contamination, correct?
A There -- so, again, I just want to play back that question. Sorry. You're really small on the screen. Sorry.
MS. FINKEN: You can take down the CV, if that's helpful. There we go.
MR. SHEEHAN: It doesn't help, but no worries.
THE WITNESS: Could you repeat the question again? Sorry.
MS. FINKEN: Sure. Laura, can you read it back, please?
(The record was read back as requested.)
A Contam -- I mean, nitrosamines can form as impurities in drug substances in drug products. I'm not quite sure if I would call that contamination, so -- I mean, I would call them impurities. So I would say that nitrosamines can be present in drug product as impurities. I mean, you know, the origin of how they get there is still chemical. It's still a chemical process.
Q So nitrosamines can be present in drug products for different reasons, correct?
A Yes, that's correct.
Q And the chemical reaction to form nitrosamines can occur from things like contamination, correct?

MR. SHEEHAN: Objection.
A Again, I'm struggling to understand what we mean by contamination, I'm afraid.
Q Okay. Well, let me ask you this: Nitrosamines can also be present in drug products as a -- as an impurity from a degradation process, correct?
A Yeah, that -- that's correct.
Q Doctor, just going back to your CV for just a moment, what type of research did you do when you were a research assistant at Swansea University?
A I did a -- I did a Ph.D. there in -- it was examining DNA damage and then also we were looking at mutation as well, so -- it's hard to describe it. We were looking at how chemical entities can damage DNA. They can damage DNA by causing something called DNA adduct, so the chemical binds to the DNA. And then that adduct can be removed and repaired, but sometimes it can be misrepaired. It can lead to something called mutation. I did a series of projects related to those topics there.
Q Okay. You also indicate here on your CV that you were a Lhasa Limited board member, is that correct, 2003 to present?
A That's correct.
Q I mean 2016 to present. I'm sorry.

A Yeah, that's correct.
Q And what is Lhasa Limited?
A Lhasa Limited is a not-for-profit organization. It's a -- it's an organization that their sort of mission statement is about improving knowledge of or techniques and platforms to understand chemical safety, if you like. So it's a -- yeah, it's a not-for-profit organization that aims to build our knowledge and build our capacity to predict the toxicity of chemical entities. It's not necessarily just drugs. It could be any chemical entity. It could be environmental chemicals. But they produce software platforms that support that in silico component of drug discovery and drug development.
Q You indicate on the first page of your CV under your key achievements that one of your key achievements was being appointed as director or trustee at the charity Lhasa Limited and currently acting as a coach and mentor to Lhasa scientists in their mission to embed advanced analytics in the life sciences sector. Do you see that?
A I do.
Q How is Lhasa Limited funded?
A It's funded -- I mean, it would be on their website, but it's funded by -- it has a -- a financial

structure where people pay to be members of the organization, so there's an annual fee, membership fee. And then, of course, it's funded by software platforms itself, right? But it's -- there's obviously a financial framework where it's not for profit, so whatever revenue they get they put back into research.

Q Is Lhasa Limited paid by pharmaceutical companies to conduct studies?

MR. SHEEHAN: Objection.

A I don't -- not to my knowledge. To conduct studies? Of what nature? Sorry. Could you explain?

Q Well, in any nature. Is there -- is there ever a circumstance where Lhasa Limited is paid by pharmaceutical companies to conduct research?

A Not to my knowledge. I think they -- right now they don't have a consultancy arm. It's possible that they would introduce a consultancy arm in the future. And if they were to do that, then that would be, I guess, someone paying Lhasa to do research.

I mean, obviously companies work with Lhasa, and we -- we can often fund projects to develop a particular platform. We've done that in the past. So we might provide funding to Lhasa in relation to the development of a specific platform. Sometimes that works. Sometimes we make progress with a particular

platform. Sometimes it doesn't.

But I think what you're describing I think would be more, at least in my mind, related to consultancy, and to my knowledge, Lhasa doesn't do that at the moment.

Q Has GSK ever consulted with Lhasa in relation to nitrosamines in their drug products?

A Could you define what you mean by "consulted"?

Q Have they ever partnered with Lhasa in relation to nitrosamines within drug products?

A Do you mean paid consultancy, or do you just mean discussed?

Q Discussed.

A Yeah, I think -- yeah, companies have discussed the matter with Lhasa, yeah, because they're subject matter experts in the area of impurity control. They've got databases with large amounts of data in them related to the ICH M7 framework. So, yes, of course we've discussed this issue with them.

Q In order to partner with Lhasa to do any type of research work, does the company have to pay Lhasa for their involvement?

MR. SHEEHAN: Objection.

A So if we work on a specific project and we have a specific project ongoing at the moment, we're

paying to be part of that particular project and there might be other companies as well, so that would be set up and defined within a contract.

We also discuss the platforms they develop with them on regular occasions because we're interested in applying those platforms to the R&D process. So it's probably a mixture of both.

Q Is it fair to say that Lhasa Limited is largely funded by the pharmaceutical industry?

MR. SHEEHAN: Objection.

A I -- I don't know the exact specifics of how they're funded. I know they have members from across industries involved in the manufacturing of chemical substances and that would be agrichemicals as well and other companies. I don't know what proportion comes from pharmaceutical companies. I don't know the specifics.

Q What's a specific project that you have ongoing with Lhasa currently?

A Right now we have two projects we've got agreements on that end this year related to two bits of software called CAPTUS and EFRUS (ph). They're related to trying to -- the former is related to trying to create a predictive framework around particular toxicity endpoints. So what that means is given the dates that

we have on an asset, at a certain point in development can we predict potential toxicities of that molecule. That's CAPTUS.

EFRUS is something slightly different. EFRUS is a way -- is a project where we're trying to build predictive models, predictive models for a certain molecule and target interactions so we can understand whether a new molecule might modulate that specific target. So those are the two programs we have ongoing. We have other projects planned with them, but that's all subject to contracts and approvals.

And I want to be completely clear. They have existing platforms. They have metabolism platforms. They have degradation platforms. They have SAR platforms, we would say, so platforms where we could look at a chemical structure and try and predict its toxicity. We talk to Lhasa about those platforms. So it's a defined project. We purchased that platform from them.

Q Do you --

A And then we also have. Sorry.

Q No, no. Go ahead. Go ahead. I didn't meant to interrupt.

A And then we also -- again, I just want to be completely clear. We also have projects where we have a

data sharing project as well where we share data on common chemical intermediates.

Q What percentage of Lhasa's funding comes from platform fees versus membership fees?

MR. SHEEHAN: Objection.

A I'm sorry. I don't know the answer to that.

Q How much does GSK pay for Lhasa membership? Do you know?

A I don't remember the specifics of what the membership fee is, but I've got an idea how much the various software platforms cost.

Q So GSK pays for the software platforms, and they also pay a membership fee, correct?

A I think that's correct. I'm fairly sure we still pay a membership fee. It might be part of the software license. It might be included as part of that will be defined.

Q As a board member for Lhasa Limited, you're unaware of what the membership fee is for a pharmaceutical company?

MR. SHEEHAN: Objection.

A Yes, I am. As to the financial part of Lhasa, I'm not fully -- I don't fully understand all the ins and outs of Lhasa's financial contracts. It's been quite some time since I've looked at the actual

underlying membership and software contracts that -- the payments get arranged by a different part of the organization.

Q Has GSK paid a membership fee to Lhasa in excess of a hundred thousand dollars?

MR. SHEEHAN: Objection.

A What do you mean? Over years or in one go or what do -- what do you mean? Sorry.

Q Is the membership fee paid annually?

A I -- so, again, I don't know the exact details. I -- I think that we pay a membership fee. I don't think it's a large amount. I would have to get the specifics. I don't know what they are offhand. And I certainly don't -- I'm not aware that the membership fee would be that high, an annual membership of that, because I would know about it because someone would challenge me as to that cost.

Q So sitting here today, you don't know what the annual fees are that GSK pays to Lhasa Limited, correct?

A I don't know the exact details, no.

Q Okay. One of the other key achievements that you have here on your CV in the very last line was evaluating the potential genotoxicity and carcinogenicity risk associated with new medicines. Do you see that?

A I do.
Q And what do you mean by the term "genotoxicity"? Can you define that for the injury?
A Genotoxicity is a field of toxicology. I mentioned earlier there is safety pharmacology that looks at cardiovascular and heart effects. There's general toxicology that looks at liver and other tissues like kidney and stomach, et cetera.
Genetic toxicology is the study of compounds that can damage genetic material, so DNA and chromosomes, and so genotoxicity is the study of that area. It's very complex. There's lots of different mechanisms that can result in damage to your DNA. So that's what genetic toxicity broadly would be is the study of molecules that can damage DNA.
Q And do you agree that a new medicine that would be considered genotoxic wouldn't be a good thing, right?
MR. SHEEHAN: Objection.
Q You don't want to take a medicine that's genotoxic, correct?
MR. SHEEHAN: Objection.
A It would -- it depends. It depends because, I mean, some medicines are designed to be genotoxic. Some medicine -- some treatments that we have, chemotherapy,

they are genotoxic. But those aside where the pharmacology, that genotoxicity is desired, you know, it's a desired property of the molecule, I think the drugs -- many of the drugs that we use to treat cancer are genotoxic.

The field of genetic toxicology is quite -- it's quite complicated in the sense that a compound can be genotoxic in an in vitro study and it wouldn't be genotoxic in an in vivo study. So it may be genotoxic if we do studies in, say, a test tube, but then those findings don't translate to the in vivo setting, so it's not genotoxic in vivo in rats or mice.

And also -- it is quite complicated. What we're doing with genetic toxicology is compounds can actually be genotoxic and not be carcinogenic as well. So often compounds that are genotoxic can damage DNA and can induce cancer in animals but not all of the time. So different -- we have different measurements within genetic toxicology, different genotoxicity measurements. Some of them are better correlated with, say, carcinogenicity than others. They don't always translate to in vivo genotoxicity. So it's not as black and white as genotoxic compounds, no, nongenotoxic compounds, yes, if that explains it.

Q It's fair to say, though, if a compound is

genotoxic in in vitro studies, the company has a duty to investigate further in relation to its potential toxicity in humans, correct?

MR. SHEEHAN: Objection.

A So if we have a new medicine and we conduct in vitro studies on it and we get a positive in those studies, depending on the nature of that finding in vitro, there's a certain -- sometimes you get positives that are what we call false positives. But if we think that the in vitro signal is relevant, we would do in vivo studies accordingly to understand. Of course, we would follow that up. Yeah, that's an expectation in those regulatory guidelines I described before, the ICH regulatory guidelines. It's all defined in these guidelines. Yes, we would.

Q So it would be the responsibility of the pharmaceutical company, the drug manufacturer, to do the follow-up work to evaluate compounds that are genotoxic in in vitro studies, correct?

MR. SHEEHAN: Objection.

A So I think -- I think I -- sorry if I wasn't clear. I think I just answered the question. If we had a new medicine that was genotoxic in our in vitro tests, we would determine the relevance of those in vitro findings in subsequent studies, so in vivo studies, and

ultimately we also do carcinogenicity studies, so we do long-term carcinogenicity studies in animals. So, of course, we follow them up. I think that's my previous answer.

Q And it would be important when you're designing the follow-up studies to assess the risk in humans to make sure that that's done in a way that the risks can be fully evaluated, correct?

MR. SHEEHAN: Objection.

A I want to make sure we're talking about the same thing. I'm talking about in vitro genotoxicity studies. We would -- and let's say we have a compound that's genotoxic in a test tube containing mammalian cells. We would understand at what concentration that occurred and then do in vivo studies to understand whether the same concentration or lower concentrations, higher concentrations induce genotoxicity in vivo.

And so the in vivo study we do in rats there's is a model that we use. It's a model system. All our animals are effectively model systems to try and determine the relevance of the molecule's genotoxicity to humans. So, yeah, we would do additional studies to understand the relevance to humans.

Q So the purpose of the additional studies would be to understand the relevance to humans, correct?

A Yeah, that's correct. Again, it's established. It's in those ICH guidelines I mentioned.

Q And you certainly wouldn't want to do -- strike that.

You certainly wouldn't want to design the follow-up in vivo studies in animals in such a way that it would mask any potential risk to humans, correct?

MR. SHEEHAN: Objection.

A I'm not quite sure if I follow what you're saying by mask. I mean, all of the animal systems are effectively model systems. They all have their limitations, but they are the model systems that we use. And so, I mean, we would certainly ensure to the best of our knowledge those are systems that can represent the -- or systems that we can use to translate the relevance of findings to humans. I'm not quite sure what you mean by mask, I'm afraid. Sorry.

Q Well, you certainly wouldn't design the clinical study so that it would hide the risk to humans, right? I mean, that wouldn't be something that GSK would do, would it?

MR. SHEEHAN: Objection.

A Design the nonclinical studies to hide. No, I -- no, we wouldn't do that intentionally. Not to my knowledge, no.

Q So you would want to find out whether or not the product that is genotoxic in in vitro studies is also carcinogenic in animals, correct? That would be important information. Would you agree?

MR. SHEEHAN: Objection.

A Well, I mean, so step one would be is it genotoxic in vivo. So we have lots of -- we have lots of different assays we can do to understand whether a compound is genotoxic in vivo in a short-term study. So these studies we look at the chromosomes -- we dose the said drug to an animal. Then we may look at the chromosomes of the said animal to see if they're damaged. There are other assays we can do as well, so we'd certainly look at that.

Depending on the indication, of course, we would do carcinogenicity studies in animals. Again, that's a very -- also a very complicated area, carcinogenicity in rodent species. But, yeah, I mean, typically, if you're -- it depends on the indication, the nature of the indication, but typically we would do carcinogenicity studies on molecules. There are exceptions.

Q And is it fair to say that the reason that a pharmaceutical company like GSK conducts these types of studies is because they want to ensure the safety of the

products that they're ultimately marketing to the public?
MR. SHEEHAN: Objection.
A I -- I would say that of all the studies that we do in terms of a molecule's development. It's all defined in ICH M3. I mean, it's the same of every study -- the first study we do in safety pharmacology to the last study we would do. It's regulatory toxicology. It's what we do, yeah.
Q Okay. Doctor, I want to talk to you a little bit about the clinical studies that Glaxo or GSK conducted in relation to Zantac over the years. We've had some difficulty obtaining a large number of the clinical studies that Glaxo conducted.
Have you undertaken any type of search for human clinical studies that were conducted by GSK over the lifecycle of the product?
MR. SHEEHAN: Objection to the clarification.
A No, I haven't. I'm familiar with the clinical trials that were submitted as part of the NDA applications.
Q Are you aware that there are several hundred human clinical trials that GSK has conducted which GSK lawyers have represented to the Court and to us that they cannot locate?

MR. SHEEHAN: Objection, mischaracterizes.
A I mean, I could tell you what I do know about the clinical trials. I know about the studies that were submitted as part of the NDA applications, and I think we mentioned the processes in place for the safety databases. I haven't done any searches around clinical trials. My understanding of clinical trial conduct will be very much the same as nonclinical study conduct it's that there'd be records and reports, et cetera, of the studies we've conducted.
Q Have you undertaken any search for documents relating to the long-term clinical trials conducted in this case? Strike that. Let me rephrase that.
Have you undertaken any search for documents relating to long-term clinical trials conducted by Glaxo in relation to Zantac for purposes of this case?
MR. SHEEHAN: Objection.
A No. I'm familiar with the studies they did, which were approximately a year, when they were submitting the SBAs for the maintenance therapy. I'm aware that there are publications in the literature about long-term treatment with ranitidine by GSK authors. That's the data I'm familiar with.
Q Let's look at some of the clinical studies that GSK has produced in this case. You indicated that

GSK conducted studies to seek approval for an indication for the maintenance use of Zantac, correct?
A Yes, that's correct.
Q And what is your understanding of the term "indication"?
A Indication would be the treatment of a particular disease.
Q So to obtain an indication for maintenance use, GSK would have had to conduct long-term trials in humans to determine whether it's safe and whether it's efficacious, correct?
MR. SHEEHAN: Objection.
A Were you going to show something on the screen? Sorry. I don't -- if not.
Q No.
A Okay. Sorry.
Q I am but not yet. I will.
A Okay. My understanding is that the maintenance therapy clinical trial was of a set duration, and I think it was under a year, that went to support the NDA for that maintenance therapy, so that was the duration of the study to support that maintenance therapy NDA.
Q Okay. So GSK, though, had to conduct clinical trials in humans to determine whether Zantac was safe

and efficacious for the maintenance therapy indication, correct?

A Yes, and that clinical trial was submitted in the NDA.

Q And for the jury's benefit, when we refer to the term "efficacious," it means that it works for the condition for which it is being prescribed, correct?

A That would be a reasonable description, yeah, yeah.

Q So for -- for example, in a context so the jury could understand, an example would be whether or not vaccines work in preventing COVID or reducing symptoms of COVID, correct?

A Sorry. Could you repeat that again? Sorry. I wasn't quite sure I follow.

Q So, for example, putting it in the context of present day, an example would be that a pharmaceutical company would have to do studies to determine whether or not the vaccines that it markets for COVID-19 were actually efficacious and worked in preventing COVID-19?

A Yeah, of course, yeah, yeah, of course. Sorry.

Q So for purposes of Zantac, GSK had to conduct clinical trials on humans to determine whether or not it was safe and whether it was efficacious for maintenance

therapy, correct?
A Yes. And those studies were -- as I said, they were less than a year, my understanding.
Q And also you had indicated that for purposes of Zantac, GSK conducted clinical trials on animals to determine whether Zantac was safe, right?
MR. SHEEHAN: Objection.
A They -- we did a series of toxicology studies to define the toxicity profile of ranitidine. If you want to describe that as safe, that's -- I guess that's reasonable. I mean, I just want to say that it's -- we do a package of studies and we assess the outcomes, and we spoke about the translation of those outcomes, et cetera. It's not -- I don't -- I don't really look at a nonclinical package and say the drug is safe. I think that's a nonclinical package. There's a bit more to it than just saying it's safe.
Q GSK conducted animal studies evaluating whether Zantac was carcinogenic, correct?
A That's correct.
Q And when the term "carcinogenic" is used in relation to animal studies, it means that GSK was looking at whether Zantac caused cancer in the animals, right?
A That's correct.

Q And back in the late '70s, when GSK was developing Zantac, it conducted some animal studies to look at whether or not Zantac was carcinogenic in rats and also in mice, right?
A That's correct.
Q And in fact, GSK conducted two studies to determine whether or not Zantac was carcinogenic in mice, right?
A That's my understanding, yeah.
Q And the first study that GSK conducted in relation to carcinogenicity in mice was study CAR 009, right?
A That -- that sounds familiar. I think -- I think that would be correct.
Q And the second study that GSK conducted in relation to whether or not Zantac was carcinogenic in mice was CAR 010, correct?
A That sounds familiar, yeah.
Q And GSK also conducted a study in rats to look at carcinogenicity as well, right?
A That's correct, yeah.
Q And GSK has represented that these three studies are evidence that Zantac is not carcinogenic, correct?
MR. SHEEHAN: Objection.

A Yes, it's not -- certainly not carcinogenic in rats and mice, based on those studies.

Q So GSK -- now going back to the human clinical studies. We had talked a little bit about some of the clinical studies that GSK conducted in relation to an indication for maintenance use.

When we refer to the term "maintenance use," can you explain to the jury what that means?

A My understanding of maintenance use is to -- after an ulcer, a gastric ulcer has healed, ranitidine dosing can change the physiology of the stomach and the ulcer can heal and the patient is effectively -- the ulcer is gone and so the medicine's worked. But in certain cases it can reoccur. I'm not quite sure about all the parameters where that can happen, but the effect can reoccur so the ulcers could come back.

But the maintenance therapy, as I understand, it would be if you take the medicine for a specific period, it can control the factors that could result in the ulcer coming back. So it's kind of -- you can reverse the ulcer and heal the ulcer with a set dose, and then the maintenance therapy would be, well, if you take it at this dose for this time, then it could prevent the ulcer from reoccurring.

Q So do you understand that when the term

"maintenance therapy" is used in relation to Zantac, it's typically referring to long-term use?

MR. SHEEHAN: Objection.

A Maintenance therapy I -- I would expect and I think it's reasonable to assume the maintenance therapy and the duration would be a -- dose of treatment would be patient specific, and that would be accountability or the responsibility of the doctor that prescribes the medicine. So I don't -- it would be patient specific.

Q Did you review any of the GSK long-term clinical trials conducted on Zantac?

MR. SHEEHAN: Objection.

A So as I said, I've certainly read the NDA submissions related to the maintenance therapy. It was some time ago, but I have read them. I wouldn't say I've reviewed the entire contents of the clinical study.

Q And which clinical study are you referring to that you reviewed in relation to the NDA submission for maintenance therapy?

A I can't recall -- I can't recall the specifics, the actual numbers of the clinical studies. I recall the duration was under a year. I think there were two such studies, different maintenance therapies.

(Exhibit No. 4649 was marked.)

MS. FINKEN: Let's mark as Exhibit -- let's

pull up -- Erik, if you could pull up what's been premarked as Exhibit 4649 to the deposition.
BY MS. FINKEN:
Q Dr. Harvey, we have up on the screen a study report for a protocol number RAN-X03, and the Bates number is GSK_ZAN_0002639348, and we're marking this as an exhibit, 4649, to your deposition.
Have you seen this document before?
A I don't recall looking at this specific document, no.
Q And this is titled, "Report GGL/91/011, Continuous Treatment with Ranitidine in the Long-term Management of Duodenal Ulcer Disease." Do you see that?
A I do, yes.
Q And you didn't review this document to prepare for your deposition today?
MR. SHEEHAN: Objection.
A No, I -- I don't recall reviewing this document, no.
Q Let's look at the second page of this document ending in Bates number 349. This particular report indicates that it was authored by Dr. J.S. Dixon. Do you see that?
A I do.
Q Do you know Dr. Dixon?

A No, I don't.
Q Do you know if Dr. J.S. Dixon still works at GSK?
A No, I don't. Sorry.
Q The report was addressed to a J. Mills, correct?
A That's correct.
Q And are you familiar with a Jane Mills that worked at GSK?
A I don't -- no, I don't -- I don't know Ms. Mills. There was a publication by a Mills on ranitidine that I recall, but I don't know who -- I don't know if it's the same Mills. I don't know.
Q Let's turn to page -- oh, and just for the record, at the bottom of the page, it looks like the report on page 2 there was signed by Jane Mills. Do you see that signature?
A Yeah, that -- that looks like Jane Mills.
Q Okay. Just let's turn to page ending in 351 of this exhibit. And Dr. Harvey, this is a summary report of the clinical trial that was conducted regarding the continuous treatment with ranitidine in the long-term management of duodenal ulcer disease. Do you see that?
A I do, yeah.

Q Do you see where it lists the objectives of the study? And we're zooming in on the screen there. Do you see that?
A Yeah. Can I just take a second to read it?
Q Sure.
A (Reviewing document.) I've read those, yes.
Q And the objective of the study was to establish the efficacy and safety of long-term ranitidine therapy in the management of duodenal ulcer disease, correct?
A That's correct.
Q And one of the objectives of the study was to look at the symptomatic recurrence rate over eight years of continuous therapy. Do you see that?
A I do, yes.
Q It lists several other objectives of the study in relation to efficacy, correct?
A Yes, it does, yeah.
Q And at the very bottom of the objectives list, it also indicates that the purpose of the study was to evaluate the safety of long-term ranitidine therapy. Do you see that?
A I do, yeah.
Q Now, looking down at the bottom of that page, it indicates that -- it lists the methodology that was

used for purposes of this study. Do you see that section, the methods?

A Yes, I do, yeah.

Q And it indicates that the data or the case notes of 630 [sic] patients with ulcer disease had been previously inspected and data from 573 of these patients who remained on H2-receptor antagonist therapy for varying periods were extracted on to summary cards or patient records forms. Do you see that?

A I do.

Q Are you familiar with the term "patient record form"?

A Well, I mean, I can -- it's not something that I've done or been involved in at GSK, but I can understand it would be a record of the patient in the clinical trial and sounds reasonable to me.

Q That's information that would have been collected by GSK in relation to the patients that were part of the study, correct?

A That would be a reasonable assumption, yes.

Q And it indicates here that the information that was gathered included the data at initial presentation of gender, smoking habit, alcohol intake, if you turn to the next page, it also includes concurrent therapy, disease duration, previous

complications, clinical features at presentation, and some other clinical information, correct?

A Yeah, that's correct.

Q And if you look down -- let's go to page ending in 359. This is the introduction of the actual study report. And it indicates here in the third paragraph, "There are few studies which have investigated the use of ranitidine therapy in duodenal ulcer for longer than one year." Do you see that?

A Yes, I do.

Q And it lists several studies that had been conducted using ranitidine for certain periods of time in the past. Do you see that?

A I'm just reading it. Sorry. (Reviewing document.)

Q Sure.

A Yeah, I've read it. Yeah, I see it, yeah.

Q And if you look at the second paragraph in the introduction section, it indicates that the value and safety of maintenance treatment with ranitidine 150 mgs for 12 months is well established. Do you see that?

A Yes, I do.

Q So this particular report or study was being conducted to evaluate whether or not ranitidine was efficacious for the maintenance treatment of duodenal

ulcer disease, correct?

MR. SHEEHAN: Objection.

A I don't want to make a mistake. Could you repeat the question again for this particular report?

Q Well, let's turn to page 360, the next page over. And again it lists the objectives of the study, and it was to establish the efficacy and safety of long-term ranitidine therapy in the management of duodenal ulcer. Do you see that?

A Yeah, I do, thanks.

Q And the study design on this page indicates that this was an open, retrospective, case-note investigation of patients with duodenal ulcer disease who received periods of continuous long-term ranitidine, and it lists 150 mgs nocte or 150 mgs bd. Do you see that?

A I do.

Q So this was evaluating a 150 mg dose of ranitidine once a day or a 150 mg dose of ranitidine twice a day, correct?

A Yeah, that would be correct, yeah.

Q So essentially it's evaluating 150 mgs of ranitidine per day versus 300 mgs of ranitidine per day, correct?

A It -- that would be a reasonable assessment,

yeah.
Q Okay. And if you look down at the bottom of that page, it indicates the methods for data collection. Do you see that?
A I do, yeah. I can see it. Do you want me to read it?
Q Nope. Well, you can read it, but I'll just direct you. There's a question I have about the bottom of that paragraph that indicates that the PRFs, or the patient record forms, and their updates are retained on file in the central archives at Glaxo Group Research Limited, Greenford. Do you see that?
A I do.
Q Is the Glaxo Research Group Limited at Greenford facility still in use?
A I don't believe it is. I believe the Greenford site was -- was closed several years ago. I don't know if there's any GSK employees still there, but officially my understanding was it was closed.
Q Was the clinical study data that was archived at the Glaxo Group Research Limited in Greenford transferred to Glaxo's central archives?
A Well, I -- I think it would be reasonable to assume that they would have been transferred to the central archives --

Q And that --
A Yeah, of course.
Q Sorry. I didn't mean to interrupt you.
Looking at the bottom of this paragraph, it indicates that the data were transferred from the PRFs, or the patient record forms, into a flat CMS file on an IBM mainframe. Do you see that?
A I do.
Q So the information from the patient record forms was transferred from a hard copy into an electronic file, correct?
A That would be, yeah, the case, I think.
Q And if you can turn to the next page, it indicates that there was a data check and the file was held by Parexel International Limited in London. Do you see that?
A I do.
Q Who is Parexel?
A I think -- I think I've had it heard described as Parexel. I think they're a company that -- I'm not quite sure what their scope is, but I think it's a company, a third party, a contract research organization that assists with various aspects of pharmaceutical development. I don't think we've ever interacted with Parexel in the nonclinical space, so I can only assume

that they are an organization that supports other areas and clinical by the looks of it, I think.

Q What was Parexel's role in relation to the clinical trials conducted by Glaxo?

MR. SHEEHAN: Objection.

A Well, I don't know beyond what you're showing me today other than they obviously received a file from this clinical study, so that's the extent of my knowledge of that.

Q Let's turn to the page that ends in Bates number 362. Now, at the bottom of this page, there's a section about statistical analyses, section 5.4. Do you see that?

A I do.

Q And it says "For analysis, the data were loaded into a SAS dataset and the following analyses were done using this software." Do you see that?

A I do.

Q What is a SAS dataset?

A I can't remember what the acronym stands for, SAS. I believe it's a piece of software that we use to do statistical analysis -- I mean, sorry. It sounds a bit simplistic, 5.4, statistical analysis. My understanding is we have a statistical department at GSK, we have statisticians, and SAS was a -- I believe

it's a piece of software that we use to assess datasets. I don't think we use it in nonclinical. I think it -- it must be there for primarily clinical.

Q So is SAS data still available relating to clinical studies that were performed with ranitidine?

A I don't know because I don't work in that department, but I would expect just like we in nonclinical safety have a records retention policy, there'll be some sort of records retention. My understanding with safety data is the safety data -- and let's assume this is the safety data -- that the safety data is kept throughout a compound's development. So they will have a records retention strategy or policy, and so I don't know what it is for -- for the statistics department.

Q And when you say it would be kept for the course of the compound's development, are you referring to the product lifecycle?

MR. SHEEHAN: Objection.

A I -- I need to understand what you mean by product lifecycle.

Q Yeah.

A So postmarketing?

Q Yes.

A Yeah, my understanding is that safety data --

I mean, again, we're going into the area called pharmacovigilence here, but my understanding is that all of this safety data that we get into a particular medicine is kept and accrued and it goes into some sort of safety database. I say some sort of because I don't know the name of the actual database. It changes over the years. But that's my understanding. We keep that data. It's important data. And so my understanding is we do keep that data.

Q And that would include safety data that was accumulated from clinical studies that were conducted on the product, correct?

MR. SHEEHAN: Objection.

A I'm not quite sure of the complete processes. They have different software, different names, but I would fully expect the safety data to be stored from the clinical studies, of course, as well as the postmarketing studies.

Q Okay. So let's look at the page ending in Bates number 368. There's a section 6.12 relating to medical events. Do you see that?

A I do see it now, yeah.

Q And it's discussing certain medical adverse events that were collected in relation to ranitidine use in the study. Do you see that?

A I'm sorry. Which page -- could you read that out again? Sorry. I'm reading it and then listening to you. Sorry.
Q No problem. Let me -- let me withdraw that question and I'll ask some additional questions.
So if you look at this particular section of 6.12, Medical Events, from this long-term study that was conducted by Glaxo, it indicates here at the bottom of the second paragraph that cases of prostate carcinoma arose more frequently than expected. Do you see that?
A I do, yeah.
Q And it indicates that -- in the next paragraph down, it indicates that large bowel cancer was observed more frequently in the study population than would be expected; is that correct?
MR. SHEEHAN: Objection.
A In both cases there are additional pieces. So the prostate carcinoma was more frequent than expected, but the five observed cases were in elderly men. And then large bowel cancer they talk about confounding factors that it's not possible to offer a clear explanation for this observation, and then I think it describes the confounding factors.
So there's extra additional text there. But, yeah, you're reading -- the text you've read was

correct, but there's more text as well.
Q I'm going to just move to strike the rest of your answer. But going back to my question, it indicates here in the first sentence of the third paragraph that large bowel cancer was observed more frequently in the study population than would be expected. Do you see that?
MR. SHEEHAN: Objection, asked and answered.
A I do see that, but that's part of the sentence.
Q And I'll get to the rest of it. What does large bowel cancer refer to?
A It would be, sounds odd, cancer of the large bowel, but it will be cancer of the GI tract, so the large bowel would be the colon -- the end of the sort of GI, gastrointestinal tract.
Q And looking at this third paragraph here under section 6.12, in reference to large bowel cancer observations, it indicates that there's -- it indicates an observed versus expected ratio. Do you see that?
A I do.
Q And it indicates that the relative risk of large bowel cancer as it relates to this particular study was 3.03. Do you see that?
MR. SHEEHAN: Objection.

A It says observed/expected ratio, and then there is 7 divided by 2.31 equals 3.03. I didn't see the relative risk, but, yeah, I understand what you're talking about.
Q And looking at -- so the number 3.03 was determined by looking at the observed number of events versus the expected number of events, correct?
A That would be correct, yeah.
Q The report then states that it was not possible to offer clear explanation for this observation, correct?
A That's correct.
Q What follow-up did GSK do in relation to these findings of increased rates of large bowel cancer that were observed in this study?
MR. SHEEHAN: Objection.
A I -- I don't know the answer to that. I don't know if there's something else in the final report that talks to that. I haven't read the report, so I don't know the answer to that.
Q Okay. Going back up and looking at the discussion about the increased cases of prostate carcinoma that were found in this study in paragraph 2, it indicates that five of the observed cases were in elderly men, correct?

A That's correct.
Q But for purposes of prostate carcinoma, it doesn't provide a relative risk or a total incident rate, correct?
A Could I just take a moment to read it?
Q Sure.
A You're correct. The malignant disease is the number of malignant disease in general as far as the large bowel cancer, but I can't see any numbers specific to prostate carcinoma, you're correct.
Q Dr. Harvey, isn't it true that this study was never provided to the FDA?
MR. SHEEHAN: Objection.
A I don't know if it was provided to the FDA. That would be a question for our regulatory division. I don't want to -- I don't know the procedure for the disclosure of this type of study.
Q And you didn't review this particular study when you were reviewing the long-term maintenance therapy studies that had been submitted as part of the NDA, correct?
MR. SHEEHAN: Objection.
A That's correct. I haven't reviewed this study.
Q How did GSK determine which clinical studies

it provided to the FDA and which clinical studies it did not provide to the FDA?

MR. SHEEHAN: Objection.

A I can only talk about my understanding of the NDAs, and they disclosed the said clinical studies for the said indication that we spoke about before, so maintenance therapy would be a study of said duration. I know as well there was another discussion about the clinical data and the safety data as part of the over-the-counter NDA submission.

I don't know what the decision process is. We spoke about it earlier. Certainly since I've been at GSK I saw that shift to publish the results of the clinical trials. I don't know how it operated before that. I don't work in the clinical division, so I don't know what the decision process is. I just know that what I've reviewed as part of the summary basis of approval in NDA applications.

Q If GSK provided a clinical study to the FDA, it will be kept as part of the IND or NDA, correct?

MR. SHEEHAN: Objection.

A Well, based on -- well, again, based on my reading of the NDA applications, new drug applications, NDA, there's details of the clinical trials for those particular indications. So certainly the NDAs I've read

there's records of the clinical trials that we were -- that we conducted and we submitted it to support that indication.

Q Why would GSK conduct clinical trials and withhold them from the FDA?

MR. SHEEHAN: Objection, and object to the extent that it infers that this is a clinical trial.

A Could you repeat the question? Why would we --

Q Yeah, I'm going to repeat the question, and I would object to the coaching of the witness with the objections.

Doctor, why would GSK conduct studies and withhold them from the FDA?

MR. SHEEHAN: Objection.

A Well, I don't know why we would do that. Sorry. I don't -- I don't fully understand the question. I don't know why we would do that.

Q What is GSK --

A I mean -- sorry. Again, I -- I kind of want to go back to what I know, and that's the procedure that we disclose clinical trials that support the proposed indication in the NDA. Sorry. I just want to make sure I reemphasize that.

Q Okay. What is GSK's policy relating to retention of clinical study documents and data that were not provided to the FDA as part of the IND or NDA?

MR. SHEEHAN: Objection.

A I think I spoke about this before. Every department will have a records retention policy. I'm familiar with what they are for -- for nonclinical safety, and, again, I have to remind myself because they're extensive, when I'm involved in the area. But I don't know what the retention record process is for the clinical organization, I'm afraid. I expect it would be good practice to retain the records related to the clinical trials and the safety events.

Q Are you aware of whether or not GSK destroyed clinical trial documents relating to Zantac that were not provided to the FDA?

MR. SHEEHAN: Objection.

A No, I -- I have no awareness of such an event at all, no.

MR. SHEEHAN: Tracy, any time you're ready, we're about -- we're about there.

MS. FINKEN: Let me finish up with this exhibit and then we can take a break for lunch. Does that work? I'm almost done. Okay.

BY MS. FINKEN:

Q Doctor, would you have an expectation that GSK would do further due diligence if it conducted a study such as this that had an observed increased rate of certain types of cancers during the course of the study?

MR. SHEEHAN: Objection.

A I think -- I mean, I think the question you're asking is one of pharmacovigilence and the recording of adverse event reporting that happens postmarketing. So, again, I'm not a pharmacovigilence expert and I don't want to give that impression, but my understanding is that as we develop medicines and if they get approved, we gather data on it in the postmarketing phase, so there's an expectation we would do that, and there's procedures in place to do that.

Q And just going back to the objectives of this particular study, it was also -- one of the objectives was also to establish efficacy of long-term ranitidine therapy in the management of duodenal ulcer disease. We talked about that. Do you recall that?

A I do. It was in the objectives, I think, of this study, right?

Q Let's look at page Bates number ending in number 369. Now, looking at the first paragraph, last sentence in the first paragraph, it indicates that the results of the present study indicate that more than 80

percent of patients with duodenal ulcer disease remain free from symptomatic recurrence of ulcer during nine years of therapy with ranitidine, correct? Do you see that?

A I do. That's correct, yeah.

Q However, it also indicates that it was perhaps surprising that ranitidine 300 mg daily selections did not show a benefit over ranitidine 150 mg daily. Do you see that?

A Yes, I do.

Q Now, GSK conducted other clinical trials that found there was no benefit of 300 mg dose of ranitidine over the 150 mg dose of ranitidine, correct?

MR. SHEEHAN: Objection.

A So I'm just reading the rest of this paragraph. So there's a -- sorry. The piece on the screen there's an explanation of sorts about the differences of why the patients got 150 and 300. I do recall a discussion I think it was at the first NDA application about that 150 mg and 300 mg dose. I think there was some discussion about it. And I think the conclusion was that the 300 mg dosing regime had a prolonged effect in some circumstances, that reduction of acidity in the stomach. I'd have to see the document again. But I know it was discussed before, and I think

the end conclusion of the review was the 300 mg dose was appropriate.

MS. FINKEN: I'm going to move to strike your answer as nonresponsive.

Q My question was simply has GSK conducted other clinical trials that found that there was no benefit of 300 mg dose over the 150 mg dose of ranitidine?

MR. SHEEHAN: Objection.

A Well, I'm not quite sure this is -- this is such a study. There's comparisons of two dosing regimes, and the patients were on different dosing regimes for different reasons and I know they compared that dosing before, so I -- that's my understanding of it.

Q Okay.

A I don't know how to answer your question. Sorry.

Q You'll agree, though, that it says right here on paragraph 2, you're not disputing what it says here that the 300 mg dose did not show a benefit over the 150 mg dose in this particular study, right?

MR. SHEEHAN: Objection.

A Well, it certainly says it was perhaps surprising in the rest of the sentence you just said, yeah, it says that. And there is an explanation as to

why people may have been on that 300 mg dose for different reasons for different symptoms.

Q GSK had a problem establishing that ranitidine was efficacious for long-term use for other indications, didn't it?

MR. SHEEHAN: Objection.

A Can you repeat the question? Did you say GSK had a problem, did you say? Sorry.

Q Yes. Are you aware that GSK had a problem conducting studies that showed efficacy for long-term use of ranitidine for certain indications?

MR. SHEEHAN: Objection.

A I -- I'm not aware of that. Sorry. I can't comment. I'm not familiar with that. Sorry.

Q And are you aware that GSK conducted other clinical trials besides the one that we just looked at that determined that there was no benefit of the 300 mg dose over the 150 mg dose of ranitidine for certain indications?

MR. SHEEHAN: Objection to the extent this is characterized as a clinical trial.

A I'm sorry. I don't -- I'm not familiar with that area that you're discussing, these other clinical trials that you're mentioning.

Q So is it your testimony, Doctor, that you're

unaware that GSK had conducted clinical studies that showed a lack of efficacy for the 350 -- for the 300 mg dose as compared to the 150 mg dose of ranitidine?

MR. SHEEHAN: Objection.

A I'm aware of the clinical studies that were conducted to support the various NDA applications. Those are the studies I'm familiar with that relate to clinical development of ranitidine for the indications that were approved. I'm not familiar with the clinical studies that you're describing.

MS. FINKEN: Why don't we take a break. Let's go off the record.

THE VIDEOGRAPHER: We are now going off the video record. The time is 12:21 UTC, 8:21 a.m. EDT.

(A 57-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1317 UTC, 9:17 a.m. EDT.

BY MS. FINKEN:

Q Good afternoon, Dr. Harvey. Before the break, we were talking a little bit about one of the long-term clinical studies that had been conducted on ranitidine. I'd like to talk to you about some additional studies that were also conducted by GSK on ranitidine.

MS. FINKEN: Erik, if you can pull up what has

been marked as Exhibit 4708.

(Exhibit No. 4708 was marked.)

Q Okay. Dr. Harvey, what we've just marked as Exhibit 4708 to your deposition is a clinical study report listed as GGA/88/017, Protocol RAN-362. Do you see that?

A I do, yeah.

Q What is the significance of the way that these reports are named in terms of the first prefix, the GGA? What does that stand for? Do you know?

A No, I don't know, I'm afraid. Sorry. No, I don't.

Q Okay. If we can turn to what's Bates-numbered ending in 861, which is the next page over, it indicates that the title of this study is a "Double-Blind Placebo-Controlled Trial to Assess the Efficacy of Maintenance Therapy with Ranitidine 300 mgs in the Prevention of Relapse of Reflux Esophagitis." Do you see that?

A I do.

Q What is reflux esophagitis?

A It's a -- it's a gastrointestinal disorder. I think it involves acid reflux into the esophagus and it can cause inflammation. That's my understanding of it.

Q And you're not a gastroenterologist, correct?

A That's correct.
Q And you don't have any training as a medical doctor, correct?
A No, I don't, that's correct.
Q Okay. Let's turn to what ends in Bates label 863, and this gives the abstract of the study. And it indicates that this study was evaluating the safety and efficacy of one year's maintenance therapy with ranitidine 300 mgs compared with placebo in the prevention of relapse of reflux esophagitis.
So this study, similar to the last one, was looking at both safety and efficacy, correct?
MR. SHEEHAN: Objection to the characterization of the last exhibit as a clinical trial.
A I can talk about this study because I've got the abstract and the design, so I don't know how to compare the two.
Q But looking at this in relation to this study that's in front of you right now, it was assessing the safety and the efficacy of one year's maintenance therapy. Do you see that?
A I do, yeah.
Q And this was a clinical study that was conducted by GSK, right?

A Yes, I believe it was, from previous report number.

Q And the abstract indicates that 104 patients entered this study following successful acute treatment with either 300 mgs or 150 mgs b.i.d. dosing, correct?

A Yeah, that's correct.

Q Okay. And then the last line of number two indicates that a hundred -- I'm sorry. Strike that.

The last line of number two indicates that eligible patients were randomly allocated to receive maintenance therapy with ranitidine 300 mgs or placebo for up to 12 months, correct?

A That's correct, yeah.

Q What does the term "placebo" mean when used in the context of a clinical trial such as this?

A Well, if we -- could we go back to the title, I think this was a double-blind clinical design, so the placebo would be resembling the active, the ranitidine, but it won't contain the active. So the placebo is a -- placebo alone is a control. It has no active medicine in it. There's no ranitidine in it.

Q So essentially people are given in a capsule or tablet, but it contains no drug, correct?

A Yeah, that would -- that would be a description of placebo, yeah.

Q So this study as a placebo-controlled study was designed to measure the effect of ranitidine on people versus the effect of no ranitidine, correct?
A Yes, that's correct.
Q In looking at number three, it indicates that after four months' treatment, 16.2 percent of the patients receiving ranitidine 300 mgs were estimated to have relapsed compared with 15.6 percent receiving placebo. Do you see that?
A I do.
Q And after eight months' treatment, the cumulative relapse rates had increased to 24.6 percent with ranitidine and 30.5 percent. Do you see that?
A Yes. I'm just reviewing the paragraph because it says "respectively." Let me just read the whole thing again. Sorry. (Reviewing document.)
Q That's fine. It goes on to state that after 12 months, the ranitidine arm had a relapse rate of 30.2 percent compared to a 30.5 percent relapse rate with placebo. Do you see that?
A Yeah, I'm assuming that the word "respectively" continues the ranitidine compared to the placebo. Yes, I can see that.
Q And now under number four, the study found that the two treatment groups were found to have no

significant differences with respect to the incidence or severity of reflux symptoms, correct?

A That's correct.

Q Did you review this study to prepare for your deposition today?

A I can't recall if I -- I don't remember reviewing this document itself, unless it was referred to in an NDA submission. I don't remember -- don't recall reviewing this exact document.

Q If you can turn to the page that ends in Bates number 868, and I'll direct your attention to the conclusion of the study, if you want to take a moment to read that.

A (Reviewing document.)

Q This study concluded that the results of the study show that one year's maintenance therapy with ranitidine 300 mgs is no more effective than placebo maintenance therapy in reducing or preventing relapse of reflux esophagitis. Do you see that?

A I do, yes.

Q Did GSK market 300 mg ranitidine tablets in the United States?

A I -- I don't know if we marketed that dose. I'm not familiar with the marketing strategy.

(Exhibit No. 4684 was marked.)

Q Well, let's pull up what has been premarked as Exhibit 4684 to your deposition. And Doctor, what this is is the prescribing information for Zantac that was issued by GSK in the United States. And if you can turn to the last page of that document, page 15, you can see that it's dated April of 2009. Do you see that?
A Yes, I do, yeah.
Q And this is the most recent label that had been issued in the United States as it relates to Zantac. Do you understand that?
A Well, I'll take your word for it that this is the most up-to-date one, yes. Okay.
Q Okay. So going back to the first page of this document, this particular label or prescribing information includes Zantac 150 mg tablets, Zantac 300 mg tablets, Zantac 25 EFFERdose tablets, and Zantac syrup. Do you see that?
A Yes, I do.
Q And if we can turn to page 8 of this document, it provides the indications and usage for Zantac that was approved in the United States. Do you see that?
A I do.
Q And looking at the indications for Zantac that are listed in this label, you can see that there are several indications for maintenance therapy, and we'll

go through them quickly. Under number two, it indicates that there's an indication for maintenance therapy for duodenal ulcers -- for duodenal ulcer patients at reduced dosage after healing of acute ulcers. Then it goes on to state that no placebo-controlled comparative studies have been carried out for periods of longer than one year. Do you see that?

A I do.

Q And under number five, it indicates that the second maintenance therapy indication was maintenance therapy for gastric ulcer patients at reduced dosage after healing of acute ulcers. Placebo-controlled studies have been carried out for one year. Do you see that?

A I do.

Q And the last maintenance indication, maintenance therapy indication for Zantac in the United States is listed at number eight. And it indicates that it's -- Zantac is indicated for maintenance of healing of erosive esophagitis, and it indicates placebo-controlled trials have been carried out for 48 weeks. Do you see that?

A I do.

Q So there were several indications in the United States for which Zantac was approved for

maintenance therapy in patients, right?
A That's correct.
Q And let's just look, while we have this label out, on page 10 of the label, under Carcinogenesis, Mutagenesis and Impairment of Fertility section, it indicates there was no indication of tumorigenic or carcinogenic effects in lifespan studies in mice and rats at dosages up to 2,000 milligrams per kilogram per day. Do you see that?
A Yes, I do.
Q It also states that ranitidine was not mutagenic in standard bacterial tests, salmonella, E. coli, for mutegenecity at concentrations up to the maximum recommended for these assays. Do you see that?
A Yes, I do.
Q Now, looking at page 14 of this document, it lists the storage recommendations for Zantac for the different types of formulations. Do you see that?
A Yes, I do, yes.
Q For the Zantac tablets, it indicates that it should be stored between 15 and 30 degrees Celsius, which is 59 and 86 degrees Fahrenheit, in a dry place protected from light. Do you see that?
MR. SHEEHAN: Objection, scope.
A Yeah, I can see that on the screen. I can see

that part on the document that showing.

Q It does not advise that Zantac should be refrigerated, correct?

MR. SHEEHAN: Objection to scope.

A I'm just reading the document, but I think -- I think it -- store between 4 and 25. It doesn't say refrigerated. Obviously, there are ranges of temperature there, but, yeah, they wouldn't -- they wouldn't be applicable to refrigerated conditions, that's correct.

Q And going back to page 10 of this document where we looked at the carcinogenicity statement, there's nothing under this section of the label on page 10 to indicate that Zantac generates NDMA under certain conditions, correct?

A No, there isn't anything in that section about that. That's correct.

(Exhibit No. 4713 was marked.)

Q Let's -- quickly I just want to cover --

MS. FINKEN: You can take that down. Thanks, Erik.

Q Let's pull up what has been previously marked as Exhibit 4713 to your deposition. And this is an e-mail dated July 24, 2019 from an Natalie -- I'm sorry -- from an Anup Pingle to Natalia Karkoszka. Do

you see that?
A I do, yeah.
Q And who is Anup Pingle? Do you know?
A Anup, I believe, is a physician, a doctor, a medical doctor, and he works at GSK. I think he works in the global health organization now, but I know Anup from working with him on the responses to the EMA questions on ranitidine that we received.
Q If you can zoom out of that e-mail, down at the bottom of that page it actually lists in Dr. Pingle's signature line that he is -- is that a he? Anup Pingle is a gentleman?
A Yes. Anup is, yes, he is.
Q I just want to make sure I'm referring to him accurately. So Dr. Pingle is the global medical head of classic and established products at GSK, correct?
A Yes. That's what the document says, yeah.
Q And in what context did you work with Dr. Pingle?
A I worked with Anup when we were responding to the questions raised by the EMA around ranitidine. So there was a -- when we received those questions, there was something called a PIRC, P-I-R-C, and that's the Product Instant Review Committee, and given the nature of the questions from the European Medicines Agency, the

EMA, there were several different lines within GSK to contribute to the response to EMA, and Anup was one of those individuals. Obviously he was working in supporting the clinical aspects of the -- of those responses, so I was working with him as part of that team.

Q And if you can -- the way these e-mail strings work, you have to start reading from the bottom up to get the full context of the e-mail. So if you can turn to the second page of that document, Dr. Pingle was responding to an e-mail from Natalia Karkoszka dated Monday, July 22nd, 2019, regarding the ranitidine eTrack data and it lists the importance of this e-mail as high. Do you see that?

A Yes. Give me a moment -- I can see that what you've highlighted, importance high. Can I just read the e-mail?

Q Sure thing.

A (Reviewing document.) Thank you. I've read the e-mail.

Q So are you aware that Natalia Karkoszka is an individual who is in the pharmacovigilance department at GSK?

A I know that she was working -- she was in the clinical department. I don't know if that was

pharmacovigilence. I know she was working with a lady called Helen Steel. It's a clinical group. She may well have been pharmacovigilence, I don't know, but she was certainly in the clinical line.

Q Did you have an understanding that GSK was evaluating the adverse events that had been reported in relation to cancer and ranitidine when it was doing its investigation in the summer of 2019?

MR. SHEEHAN: Objection, scope.

A I'm not familiar with what that clinical team was doing in the summer of 2019. I know that they prepared part of the response to EMA around the clinical safety data accrued for ranitidine, I'm aware of that part, of that submission back to EMA to address this specific question. I don't know what other ancillary activities they were doing prior to that.

Q Well, Natalia Karkoszka was reporting to Dr. Pingle that during the analysis of cases from the GSK safety database, they noticed that a significant proportion of reports of cancer associated with ranitidine was from the clinical trials. Were you aware of that?

MR. SHEEHAN: Objection, scope.

A I wasn't aware of it. It sounds to me -- again, I can't see what they're focusing on from the

e-mail. I don't know what they're tracking here. But it sounds very much like a pharmacovigilence activity, and that's, again, a different area of GSK.

Q Okay. So looking at this e-mail, though, it's fair to say that Natalia was asking Dr. Pingle if he would be able to retrieve information from eTrack regarding the studies she highlighted below in yellow. Do you see that?

MR. SHEEHAN: Objection, scope.

A I mean, I can follow the e-mail. I can see Natalia is asking Anup for some information from something called eTrack, but I don't know what eTrack is. Sorry. Again, it's a pharmacovigilence area.

Q So you don't have an understanding of what eTrack is as you sit here today?

A No, I don't. I'm assuming it's something to do with pharmacovigilence and clinical trials, so I don't -- so I don't know what eTrack is.

Q Okay. So Natalia attaches a list of study ID numbers and adverse event reports that were associated with those study ID numbers. Do you see that?

MR. SHEEHAN: Objection, scope.

A Well, I mean, I -- sorry. It sounds like I'm being difficult. I can see the study IDs and I can see there's numbers in the column next to it. I don't know

what they relate to.
Q Fair enough. Regardless, she is asking Dr. Pingle to retrieve information relating to those studies from eTrack, correct?
MR. SHEEHAN: Objection, scope.
A She is. She's asking to retrieve studies that are highlighted in yellow that aren't yellow on the screen, but, yes, she's asking Anup whether he can retrieve information from something called eTrack.
Q Now, going back to the first page of that document, Dr. Pingle responds to Natalia and indicates that the data from eTrack gets captured in clinical Prism. Do you see that? And he notifies Natalia that there are no results -- that no results show for any of the studies on her list, correct?
A Yeah, I can read that text. I can't see what's on the Prism dashboard, but --
Q Yeah, and you're referring to he attaches a screenshot of the Prism dashboard relating to a clinical study, ID number RAN-570Z, where there's no information in the data fields, correct?
A Yeah, that's what Anup is saying. He's referring to that screenshot, yes.
Q What is clinical Prism?
A I don't know what clinical Prism is. I know

that there was a database called Prism that tracked details of projects. Different people had different access to Prism. My experience of Prism is it contained details of projects and their stage of development within GSK. It was very much project level information, so it was when the project started, when the anticipated GLP toxicology studies were going to finish, when the anticipated IND, investigative new drug application -- it was very much a project management tool.

I wasn't aware that there was a Prism -- clinical Prism that seemingly has details of clinical trials, and so I'm not familiar with clinical Prism. But I am aware of the Prism software in GSK, which I don't think it's in place anymore.

Q How long was the Prism software in use at GSK?

MR. SHEEHAN: Objection.

A That's a really difficult question. I -- I would estimate at least ten years, I'd like to think, at least ten years, possibly longer. I'm not exactly sure, but I'm certainly familiar with using it recently. I'd be guessing, but I'm thinking it would be at least ten years.

Q Okay. Looking at the screenshot that he included in the e-mail, there are some tabs at the top of the Prism study viewer screenshot. Do you see those?

A Yeah, they're a bit blurry, but, yeah, I can see them. Study identifiers and descriptions. I can see them, yeah.

Q And it indicates here that there are tabs that presumably capture information relating to the study protocol amendments, the study targets, the study country. Do you see that?

MR. SHEEHAN: Objection, scope.

A I can see those tabs on the dashboard, as we would call it, in front of me, yeah.

Q Do you know if the Prism study viewer is still accessible within GSK?

MR. SHEEHAN: Objection, scope.

A I don't know. I don't know if -- the bit of Prism I was familiar with I'm not quite sure whether that's still available in this Prism format. I expect that the data that was in -- certainly the version of Prism I used would have been transferred to the new system, but I'm talking about the Prism I know. I'm not familiar with the clinical aspects, the clinical Prism as it's called here, so I don't know the answer to the clinical Prism piece.

Q Were you involved in any discussions with Dr. Pingle or anybody else from the global pharmacovigilence team regarding the significant

proportion of cancer adverse events that were found from the clinical trials on ranitidine?

MR. SHEEHAN: Objection, scope.

A No, it's -- while pharmacovigilence is a really interesting area, it's not an area that I'm familiar with at all. I understand there's a lot of training and expertise you need to be in it. So, no, I -- I know that they completed a section that contained that pharmacovigilence data, but that was very much driven by Helen Steel -- did I mention that name -- and an individual Steve Hobbiger and Natalia as well, who was on that e-mail.

Q Okay. Let's just change focus now. You can take that down.

Dr. Harvey, I want to talk to you a little bit about the animal studies that Glaxo conducted on ranitidine that we touched on briefly earlier. And specifically, I'd like to talk to you about the carcinogenicity studies that were conducted in the late '70s to obtain the initial approval for Zantac. Okay?

Those -- when we looked at the product label a few minutes ago, under the carcinogenicity section, it had indicated that there were no tumorigenic or carcinogenic effects on lifespan studies in mice and rats at dosages up to 2000 mgs per kilogram per day. Do

you recall that testimony?
A I do remember the document, yeah, and that statement, yeah.
Q And the studies that would have been referenced there were referring to the carcinogenicity studies that were conducted by GSK for the initial approval, correct?
MR. SHEEHAN: Objection.
A That would be correct, yeah.
Q Okay. So let's look at the rat carcinogenicity study that we briefly touched on earlier. That was study AH 88-801075, correct?
A I -- I'm sorry. I can't -- I can't recall. I haven't got anything on the screen. Are you going to show it yet?
Q You don't have those numbers memorized?
A No, I don't. I remember the 009 and 0010 that you mentioned earlier, but that's about it.
Q Okay. I'm just teasing you. I don't expect that you would have them memorized.
Dr. Harvey, we're going to pull up what has been marked as Exhibit 4641 to your deposition.
A Yep, okay.
(Exhibit No. 4641 was marked.)
MS. FINKEN: Let's go off the record for just

one minute.
THE VIDEOGRAPHER: We are now going off the video record. The time is 1349 UTC, 9:49 a.m. EDT.
(A 4-minute recess was had.)
THE VIDEOGRAPHER: We are now back on the video record. The time is 1353 UTC, 9:53 a.m. EDT.
BY MS. FINKEN:
Q So Dr. Harvey, I'm going to ask you some questions about what we've marked as Exhibit 4641 to your deposition. As I do so, I will refer to Bates numbers at the bottom of the -- right-hand bottom of the page. I understand that you now have the hard copy of this document in front of you. You are welcome to refer to the hard copy or look at the digital copy on screen. It's up to your preference. Okay?
The first page of this study which we've marked as Exhibit 4641 indicates that this was a ranitidine AH 19065 hydrochloride potential tumorigenicity in long-term dietary administration to rats study. Do you see that?
A I do.
Q And up at the top right-hand corner, the study number is A&H 88/801075; is that correct?
A Yes, that's correct.
Q Just housekeepingwise, I wanted to ask you a

question about the digital signature that's in the middle of that page there. It indicates that this is a true copy, it's stamped, and it's digitally signed by Sue Holway. Do you see that?

A I do, yes.

Q And it was signed digitally on November 19th, 2019. Do you see that?

A I do.

Q Can you explain to me the significance of that digital signature on a document like this?

A I think my understanding is if -- so Sue Holway works in the GSK archives in the UK. My understanding of that true copy is that if a report is taken from the archive, so hard copy of the report is taken from the archive and digitized so it can be uploaded in a system called PIER. PIER is our electronic archive system. So if someone like Sue or one of her colleagues take a hard copy and makes a digital copy, that digital copy comes with this symbol. That's my understanding of it because I see it when -- I've only ever seen that when Sue has loaded a hard copy into digital format in PIER.

Q So would this digital signature indicates that Sue Holway loaded a hard copy of that document into PIER on December 19th, 2019?

A No. It would -- it would indicate that Sue loaded a digital copy of the hard copy, so they would have been scanned, digitized and then uploaded. And so if they archived through that, I think it comes with this piece of true copy. And I think that means that the PDF -- sorry -- that the document itself is still contained in a way. It means that it can't be edited or altered.

Q Okay. Thank you for that explanation. I appreciate it. So looking at this first page, at the bottom right-hand corner, it indicates that the author of this particular report, which is listed as Volume 1 of the final report, was Brian Hunter, Owen Green, Ralph Heywood, David Prentice, Chirukandath Gopinath, Susan Harling and William Gibson. Do you see that?

A I do.

Q And all those individuals are listed as part of the Huntingdon Research Center in Huntingdon, Cambridgeshire; that is correct?

A That is correct, yes.

Q And is that the same facility, the contract research organization that you were referring to earlier in relation to animal studies that were conducted on behalf of GSK?

A Yeah, yeah, I think it would have been -- it's

gone through various times over the years. Yeah, that would expect to be the Huntingdon CRO that we discussed.

Q And it looks like this report was directed to a Dr. D. Poynter at Glaxo Group Research Limited. Do you see that?

A I do, yeah.

Q And are you familiar with a Dr. D. Poynter at Glaxo?

A I'm familiar with the name because Dr. Poynter appears on various documents and --

Q And is Dr. -- sorry.

A Sorry, no. I was going to say I've not met Dr. Poynter. I think it was before my time at the company.

Q And is Dr. D. Poynter referring to Dr. Desmond Poynter, to your understanding?

A I don't know if it's Desmond or David or I can't recall. I know that Dr. Poynter -- D. Poynter was on these documents, sorry.

Q And he no longer works at GSK?

A Not to my understanding, no. I don't think he works there. I don't know who he is or where he works, no.

Q So you don't know if he's still alive or not at this point?

A No, sorry. No, I don't. I don't know that. Sorry.
Q And the report is dated March 18th, 1981. Do you see that?
A I do, yeah.
Q All right. So let's turn to what's -- the next page of that report, which there's a sheet that lists the dates of study inspections. Do you see that?
A Yes, I do.
Q And it indicates here at the top that the inspections were made by the quality assurance unit of the various phases of the study and in the case of repetitive operations at the intervals required by the US FDA Good Laboratory Practice Regulations. Do you see that?
A I do, yeah.
Q And when it's referring to Good Laboratory Practice Regulations, does that indicate that it is considered a GLP study as we've discussed earlier in your deposition?
A Yes, that would be a reasonable assumption, yes.
Q Let's turn to what ends in Bates number 238, and there's a statement on this page from the study director, Brian Hunter, who is the director of rodent

toxicology. Do you see that?
A Yep.
Q Do you know Brian Hunter?
A No, I don't. I don't know Brian Hunter's name.
Q Well, the statement indicates that "The study began prior to the issue of Good Laboratory Practice Regulations. However, during the study, Huntingdon Research Center implemented Good Laboratory Practice Regulations as set forth in the US Code of Federal Regulations." Do you see that?
A I do.
Q And he's indicating there that, to the best of his knowledge, this study was conducted according to the principles of good laboratory practice, correct?
A Yeah, that's correct.
Q Let's turn to the page that ends in 244, please. This is a summary of the study that was conducted. And just at the top it indicates that the test compound that was used was AH 19065 hydrochloride, and in parentheses it indicates ranitidine. Do you see that?
A Yes, I do.
Q Is AH 19065 the internal GSK compound number associated with ranitidine?

A Yeah, that's my understanding, yeah. That's its internal number, yeah.

Q And this study was utilized using Sprague-Dawley rats of the CD strain from the USA. Do you see that?

A I do, yeah.

Q And it consists of a control group of a hundred males and 100 females and three treatment groups of 50 females and 50 males; is that correct?

A Yeah, that's correct.

Q And it lists the route of administration of the test compound in this particular study by admixture with the diet. Do you see that?

A Yes, I do.

Q And if you look at the dosage levels for this particular study, it indicates that Group 1 was the control group, so there was zero ranitidine provided to that group, correct?

A Yeah, that's correct.

Q And that's the group that would have consisted of 100 male rats and 100 female rats, correct?

A Yeah, that -- that's correct, yeah.

Q And then Group 2 was given 50 mgs per kilogram per day of ranitidine from weeks 1 through 16 and 100 mgs per kilogram per day from weeks 17 until

termination. Do you see that?
A Yes, I do.
Q So there was a change in the study dose at week 17, correct?
A That's what it looks like from the document, yeah.
Q And the Group 3 rat group received 300 mgs per kilograms per day of ranitidine from weeks 1 through 16, which was increased to 450 at week 17, correct?
A That's correct, yeah.
Q And the Group 4 group received 2,000 mgs per kilograms per day the entirety of the study, correct?
A That's correct.
Q Now, did you review this study prior to your deposition today?
A I haven't reviewed the entirety of it. It's huge. It's thousands of pages long, I think, or at least hundreds of pages. I'm sorry. I'm familiar with the summary of it, and I'm familiar with how it was written up as part of the initial marketing authorization applications.
Q Okay. So if you look on what's been Bates labeled ending in 243, there's a conclusion there at the front of the study, and it indicates, "As a result of administering ranitidine orally to rats at levels of

2,000 mgs per kilogram per day for their normal lifespan, it was concluded that the compound is neither tumorigenic nor carcinogenic," correct?

A That's correct.

Q And it further indicates that, "As ranitidine is an H2 antagonist, particular attention was given to the stomach. Detailed examination showed that ranitidine produced no toxic or neoplastic response. Further, no metaplastic or dysplastic changes were observed." Do you see that?

A I do see it.

Q And that was the conclusion that was provided on Bates number ending page 243, correct?

A That's correct, yeah.

Q And this is -- this is consistent with the information that was provided in the 2009 Zantac label that I showed you earlier, correct?

A That is correct, yeah.

Q Are there different polymorphic forms of ranitidine?

A I don't -- I don't know the answer to that. That's a chemistry question, I think. I don't know.

Q Do you -- are you aware that there is what's considered a form 1 polymorphic form of ranitidine and what's referred to as a form 2 polymorphic form of

ranitidine?

MR. SHEEHAN: Objection, scope.

A I'm not aware of the different forms of ranitidine, no. It's a chemistry -- area of chemistry. It's a chemistry aspect.

Q So sitting here today you were unaware that there are two different forms -- polymorphic forms of ranitidine?

MR. SHEEHAN: Objection, scope.

A Again, it's a chemistry aspect, so I'm not familiar with the different polymorphs, no.

Q So you have no knowledge that there were two polymorphic forms of ranitidine as you sit here today?

MR. SHEEHAN: Objection, scope.

A No. It may have been in documents. I don't recall ever reading about polymorphs specifically. As I said, it's a chemistry aspect.

Q So during your analysis of ranitidine since 2019, you haven't had any discussions with any scientists about the different polymorphic forms of ranitidine. Is that your testimony?

A Yeah, that's --

MR. SHEEHAN: Objection. Hold on. Objection, scope.

A Yeah, I don't recall any conversations about

polymorphs specifically. It's possible that it's been mentioned in e-mails. I don't recall it specifically to my recollection.

Q So sitting here today, do you know what polymorphic form of ranitidine was used for this particular carcinogenicity study that was conducted in rats?

MR. SHEEHAN: Objection.

A No. I imagine if it's -- not imagine. It would be described in the materials and methods if it's a component of the study, but I don't know, no. The answer is, no, I don't know.

Q Going to where it ends in Bates number 248, the product that was used for this study was derived from specific batch numbers listed on this page of the study. Do you see that?

A Yeah, I can see that, yeah.

Q Okay. And it gives the information relating to those batch numbers in terms of the date that the batch was received, the date it was first fed to the animals, and the date it was last fed to the animals. Do you see that?

A I do, I do. I see that, yeah.

Q So, for example, batch number C 289/270 was received on March 16, 1978, and first used on March

22nd, 1978, correct?
A Yeah, that's correct, yes. As an example, yes.
Q And that batch was last used on April 12th, 1978, according to this chart, correct?
A Yes, that's correct.
Q And looking at this chart or this table -- looking at this table that's on page 5 of the study report ending in Bates number 248, is it fair to say that most of the batches of ranitidine for this particular study were used shortly after they were received?
MR. SHEEHAN: Objection.
A Let me just take -- just take a quick look, if you give me a moment.
Q Sure. Take your time.
A I mean, I think it's a reasonable conclusion that they were used within weeks, if not months of receipt of all those batches, yeah.
Q So most of the ranitidine was used for the animals within 60 days of receipt. Is that fair to say?
A I mean, without going through each day by day, it looks that way, I think. It looks like within weeks and months, yeah, I think so.
Q And in fact, some of the batches were used in

an even shorter time frame, correct? For example, batch 314/136 was received on October 2nd and last used on October 25th. Do you see that?

A I -- I do, yeah. I see that, yeah.

Q So is it fair to say that this was relatively fresh product that was used in this study?

MR. SHEEHAN: Objection, mischaracterizes the document.

A I mean, I -- I can see what's in the table, the date received and the date first fed. I don't know how old those batches are. The fact that they were received and then dosed, as we've just discussed in weeks, if not months, is correct. I don't know how old those batches of drug are.

Q Those batches were manufactured by Glaxo, correct?

A Well, I would assume so. In the course of Glaxo's development, we were synthesizing the drug substance.

Q Which Glaxo facility manufactured the products used in the original carcinogenicity studies?

MR. SHEEHAN: Objection, scope.

A I don't know, but it may be in the report. I mean, it's hundred of pages long. There's normally a section on the test material. If it had been

manufactured by GSK, it would have come from one of our manufacturing sites.

Q Do you know if any other manufacturers were manufacturing ranitidine in 1978?

A Well, I wouldn't have thought so because -- again, I'm assuming that because it was an R&D asset and it would have been an asset that GSK were developing so GSK would have been -- you know, it's their product, so it wouldn't be in the public domain, per se, for other people to synthesize it, at scale, anyway. So I would assume that GSK provided this material, and I'm assuming that because it's an R&D asset and it would have been supplied by GSK.

But, again, I don't know in 19-, this was '78, '79, whether we were using third parties to manufacture drug substance. I don't think so. I don't know. I couldn't be a hundred percent certain. But certainly I don't know how old those batches are, but certainly when they receive it at Huntingdon, they dose it within a matter of weeks and months.

Q And were you -- if you wanted to find out how old those batches were at the time that they were received at Huntingdon, you would be able to find that information within the Glaxo archives, correct?

MR. SHEEHAN: Objection.

A Possibly. I mean, it depends on the records. It's possible we would have that batch information. It's possible there might be information on the batches in the report. That's typically what we would have today, some sort of certificate of analysis for the batches of material. It's possible. I couldn't be a hundred percent certain we could find them. It's a long time ago.

Q Were any -- when Glaxo would outsource animal studies to organizations like Huntingdon Research Center, were any of the Glaxo scientists involved in the day-to-day management of the studies?

A I don't -- I can certainly talk about current practice that if we're conducting studies at a CRO, then we have study monitors who interact with the CRO, the contract research organization, so they interact on a regular basis with the CRO, e.g., Huntingdon, depending on the point of the study. So there's always a point person interacting. At certain points pathologists may also interact with the CRO. Depending on the nature of the findings, they may do peer review. There's also QA inspections. So there is interaction, certainly today.

I don't know what they were doing in 1978 and '80. I would imagine there was interactions with them. It wouldn't be something you would just hand over to

Huntingdon and come back in several years time. You would of course interact with them.

Q So looking at what ends in Bates number 247, page 4 of the report, and specifically I want to draw your attention to the second paragraph. It states that there was an issue with the dosing that was discovered early on in the study. Do you see that?

A I do, yeah.

Q And it indicates that the diet was changed after ten weeks, correct?

A Yes, that looks like -- I was just reading the paragraph. Yeah, that looks correct.

Q So the diet was changed from Spratt's Laboratory Diet No. 2 to BP R&M No. 1, correct?

A That looks -- yeah, that looks correct from that sentence, yes.

Q And why does it indicate that the diet was changed at the ten-week mark?

A It talks about in that paragraph improving the homogeneity of ranitidine hydrochloride. So they're administering ranitidine in the diet, so I think what they were doing there was changing the way the drug were administered to the rats in an attempt to increase the actual exposure of ranitidine to the said rats.

Q And on this particular page of the report, it

indicates that after 16 weeks' treatment the dose of ranitidine was increased in the low and intermediate dose groups, correct?

A That's correct.

Q And the reason that the dose was increased was because the circulating blood levels in the majority of the rats in the low dose group were below the limits of detection, correct?

A That's what the paragraph says here, correct.

Q Can you explain to the jury what it means when it says the circulating blood levels were below the levels of detection?

A So when we conduct a toxicology study, any toxicology study, we will also measure the exposure of the test compound, the new drug, for example, in the circulating blood. And that's to verify that we have exposure to the said entity. So obviously we were administering the drug orally. We want to ensure the drug is getting into the systemic circulation, into the blood so you get distribution of the molecule around the animal's body.

It's important we use those circulating levels to understand what exposure -- so we have a dose and then we also have an exposure. We use that to understand what exposures we achieve in the animal and

that way we can associate the findings with exposures and not just the dose. So it's a more accurate way of determining events to a specific internal exposure, if you like.

Q The report also indicates on this page that the test compound was supplied in powder form as a hydrochloric salt of AH 19065. Do you see that?

A Yes, I do.

Q So it was supplied in powder form as the hydrochloride salt of ranitidine, correct?

A Yes, that's correct.

Q And then it indicates some calculations that were conducted to determine dosing, right?

A Yes, it does. That's correct.

Q Why was it necessary to adjust the administered concentration so that the dosage level was equivalent to base times 1.12?

A I --

MR. SHEEHAN: Objection.

THE WITNESS: Sorry, sorry.

A I suspect that that took some -- I think it spoke about it in the earlier section. It's ranitidine hydrochloride. So ranitidine is a salt, so it's the ranitidine molecule and then there's a hydrochloride entity, which is the salt. And so what we're doing

there is that when we dose ranitidine hydrochloride, most of it is ranitidine but some of it is the hydrochloride. So I think that calculation is adjusting so we know the exact dose of ranitidine the animal's received as opposed to the exact dose of ranitidine hydrochloride that the animal received. So I think that would -- may slightly be that adjustment.

Q The report refers to AH 19065 base and AH 19065 hydrochloride, correct?

A That's correct.

Q Okay. So it's referring to ranitidine base and ranitidine hydrochloride, right?

A Yeah, that's correct.

Q Can you explain to the jury what the difference is between those two references?

A I think -- sorry if I wasn't clear. That's what I was trying to explain before. So the dose of ranitidine hydrochloride, so take Group 2 and 112, that has 100 mgs of ranitidine in it because that 112 was ranitidine hydrochloride. And of that 112 mgs per kg a day, a hundred mgs per kg a day would be actually ranitidine. That's my understanding of it. I haven't checked these numbers, but that would be a good example. So we're adjusting so we measure the dose in terms of the actual ranitidine molecule.

Q Was this API that was provided for purposes of this study?
A That's active pharmaceutical ingredient. That would be my understanding of this study. That's the drug substance.
Q So it wasn't -- it wasn't in finished dose form, right? It was in powder form, correct?
A Yeah, it wasn't the drug product. It wasn't the tablet. It wasn't a syrup. It was the drug substance, so the active entity, yeah. The hydrochloride salt of the active entity.
Q Now, looking at what ends in Bates number 250, specifically when it talks about the administration of the test compound, it indicates that ranitidine was made available to the rats in their diet, right?
A Yeah, sorry. Where are we? 250.
Q It indicates that ranitidine was made available to the rats in their diet, correct?
A Yes, that's correct.
Q And the dietary concentrations of ranitidine mixed with the rodent feed was prepared fresh each week and was requested from HRC dietary formulation department, correct?
A Yes, that's correct.
Q And it gives the details of how the diet was

prepared further down that page. Do you see that?
A Yes, yes, I can see that. Just taking a second to read it, if that's okay.
Q Go right ahead. Yeah, okay.
A (Reviewing document.) I've -- I've read it.
Q And looking at the way the diet was prepared, it indicates that initially the diet was prepared one way for the first nine weeks of treatment but then it was changed. Do you see that?
A Yes, I can see that.
Q And it indicates that the concentrations of the test compounds were changed at regular intervals throughout the study to preserve the required dosage levels for the subsequent weeks. Do you see that?
A Yes, I do.
Q And why was that?
A I mean, I would expect it to be adjusted as the rats grew and they added more weight. As the animals age, they would get heavier, so I'm expecting they would have adjusted the dose to account for the increase in weights of the animals so we get a consistent milligram per kilogram dose. That would be my assumption on that adjustment of the dose.
Q Looking further down that page, it indicates that samples of the diet concentrations were prepared

and were sent to the sponsor for analysis. Do you see that?
A I do, yeah.
Q And what type of analysis would Glaxo have performed on the dietary samples that were prepared during the course of this study?
A Well, I expect they would be looking for ranitidine concentrations parts per million. There may be something in the actual study itself that talks to that dietary analysis. It may be -- there's certainly a table about it, but a -- it's a reasonable assumption they would be looking for concentrations of ranitidine in the -- in the diet.
Q Now, if Glaxo had conducted analyses of the dietary samples that were sent to them by the Huntingdon Research Center, that information would have been recorded by Glaxo, correct?
MR. SHEEHAN: Objection.
A I would expect if they had been sent for analysis, an analysis would have been conducted. It may not have been. It's possible that they've sent samples and we -- GSK didn't analyze them. It depends what analysis the CRO had done. I don't know. I mean, it may be in the report. I know there's a section later on that talks about dietary analysis on page 54. It's

not -- it's not a given that we would have looked at it, but I could certainly see that they were sent for analysis so it's reasonable to assume that they were analyzed.

Q If Glaxo conducted analyses of the dietary samplings as it lists here in this particular study report, how would that information have been maintained within Glaxo's document repository?

MR. SHEEHAN: Objection.

Q Do you understand my question?

A Yeah, I understand. If we did some analysis, where would the results of that analysis be?

Q Correct.

A So this is 1980 -- no, 1978. Is that -- I don't remember the date of the study.

Q The date of the report was 1981.

A '81. So it's possible the results of that analysis were written into a lab notebook. That's why I asked the date. I don't know when electronic documentation was introduced at GSK. It's possible that it would be written in a lab notebook recorded somewhere. It's -- if we did do it, I think it would be -- would have been sent back to Huntingdon, so it may be in this report. I don't know if it's in this report. There's certainly is a section that talks about it and

there's a whole series of appendices.

But I'd imagine at the time people were using lab notebooks, and so there would be a lab notebook pertaining to the analysis if it was done. I think that's a reasonable assumption of my knowledge of GSK back in '81.

Q And what is GSK's retention policy as it relates to original laboratory notebooks that were maintained in relation to carcinogenicity studies that were conducted and submitted as part of an IND for a product?

MR. SHEEHAN: Objection, scope.

A I -- I don't know what the exact record retentions are. There are different ones for different records. I think that if it's a study pertaining to a drug, an active drug, I think there's a retention record of around 30 years, possibly. It might be longer if the drug is approved, but that is something that springs to mind. I know I should know it, but there is a lot of record retention categories for different documents, but I think if it's study documentation, it may be around 30 years. It may be longer, though, depending on the circumstances.

Q Okay. Let's look at some of the findings of this particular study. If you can turn to page what

ends in Bates number 260. And specifically, midway down this page, it indicates that "Among the macroscopic findings of the rats dying or killed during the study, there was a dose-related higher incidence of pale/pale gray areas/foci on the lungs of both male and female rats when compared to the controls." Do you see that?

A I do, yes.

Q Do you know whether or not the slides that were prepared in relation to this rat carcinogenicity study and ranitidine are still available?

A I don't know if they're still available. Sorry. I don't know.

Q If I wanted to determine whether or not the slides were still available from the three carcinogenicity studies that were done for the original application, how would I find that out?

MR. SHEEHAN: Objection.

A I would -- I would see if there was any supplementary I'll call it data files or files associated with this study. I know certainly in more recent experience that slides from particular studies can be archived alongside the study details. I think it's possible that they're archived at the third party. It depends on the terms and conditions of the study itself.

But if they were to exist, they would be in an archive either at Huntingdon or the equivalent company it is today or an archive at GSK. But it's -- I'm not saying that they would exist because there may well be retention policies around slides, et cetera, study details, et cetera, that are in place. So I don't -- that's where I would look if I was looking for them, if that answers your question.

Q If we could turn to page ending in Bates number 264, it indicates at the top of this page that "Samples of dietary concentration administered during the study were analyzed by the sponsors's analytical research department by an HPLC method for levels of ranitidine hydrochloride following pre-extraction of the diet with petroleum ether to remove fat, extraction of ranitidine into methanol and the concentration of the methanol to a small volume." Do you see that?

A I do, yes.

Q So it indicates here that GSK -- GSK was the sponsor of this study, correct?

A Yeah, yeah, GSK was the sponsor, yes.

Q So GSK did actually conduct analyses of the dietary samples as had been previously represented at the beginning of the study, correct?

A Yeah, yeah, that's correct, yeah.

Q In looking down at the samples that they actually tested, it indicates here -- and I'm just -- I'm hoping you can help me with this -- on week 78 of the study, in the untreated group, there was approximately 20 ppm of ranitidine recovered. Do you see that?

A Yes, I do.

Q So does that indicate to you that there was ranitidine in the diet given to the control rats as -- as it was tested at week 78 of that study?

MR. SHEEHAN: Objection.

A It would certainly look like there was some ranitidine in that control arm. There should probably be a comment on it at some point in the report.

Q So just looking at this table that's provided here on Bates number ending in 264, can you tell how long the diet of the control group contained ranitidine?

MR. SHEEHAN: Objection.

A I can't tell exactly because the exact -- I know they used different batches, as we covered earlier on. So you could -- based on the table, you could assume that it's 78 weeks to 91, so that's, what, 13 -- 13 weeks?

Q So looking further down the page, it indicates that dietary samples from preparations in weeks one,

three, four and ten, were not analyzed because of known problems. And these are the problems that we discussed previously that were in the study summary up front. It was problems with how the diet was -- I'm sorry. Strike that.

It was problems with how the test compound was mixing within the Spratt's laboratory food, correct?

MR. SHEEHAN: Objection.

A Yes, that's correct.

Q So they did not analyze the dietary samples from those weeks of the study, weeks one, three, four and ten, because of the problem, correct?

MR. SHEEHAN: Objection.

A I mean, they spoke about problems with homogeneity, I think. I forget which page it was on.

Q And that's what --

A I'm not sure --

Q And that's what they're referencing here on page ending in 264, correct? If you can look, it's called out on the screen so you can see it easily.

A Yeah, yeah, yeah. Problems with homogeneity, yeah.

Q And there's some explanation about that specific issue in the paragraph underneath that beginning with "The poor yields." Do you see that?

I'll give you a moment to read that paragraph.
A (Reviewing document.) Yeah, I can see the explanation.
Q Okay. So essentially, what they were finding in the low and intermediate dose groups, that they were not finding the requisite or expected levels of ranitidine in those diets, correct?
MR. SHEEHAN: Objection.
A No, I don't think we're saying it was necessarily levels of ranitidine in diet. I think this relates to the, I think, exposure, I think. Sorry. I just -- I want to play back the question again because I was looking at the table. So we're talking about ppms in the -- well, levels of ranitidine in the diet.
Q I'm looking at this paragraph that's called out on the screen where it begins "The poor yields."
A Yeah, so what they're saying is that they -- I'm not sure if there's a combination of two things so that's why I stopped -- so the analysis is demonstrating lower levels of ranitidine than I think they were expecting, but also I think previously they spoke about the levels of ranitidine in those -- in those first weeks, few weeks being below the limit of quantification.
So either way, if it's -- if there was

ranitidine in the diet, they couldn't demonstrate it was there by this analytical procedure, and the ranitidine wasn't getting into the system to exposure of the animal to the extent that they thought. It's two things. Sorry. I'm confused by your question. Sorry.

Q No, I appreciate that response. So Dr. Harvey, looking at this paragraph, it indicates that when they changed the diet at the beginning of week eleven to diet BP R&M No. 1, they continued to have some issues with the percentage of recovery at the low level. Do you see that?

A Yep, I can see that.

Q And these issues are what led to them increasing the dose of ranitidine beginning at week 17 of the study, correct?

MR. SHEEHAN: Objection.

A Yeah, I mean, I can -- I know that they increased the dose and that it sounds like the -- and that increase of the dose of ranitidine and the change in the diet was to, you know, to ensure that we could measure ranitidine in the blood of the animals. I think that's what my take home from this part of the document is, yes.

Q Now, moving on. We talked a little bit about some of the pulmonary findings that were found in the

treated groups relating to the pale gray areas. Do you recall that?

A I recall the table you put up. I forget which page it was on.

Q Well, just turning to page Bates ending in 266, it also indicates that there was an increased incidence -- under lung, in the area where it says lung.

A Yeah, yeah.

Q It indicates that there was an increased incidence of foamy cells in the lungs seen among rats treated with ranitidine at all dose levels compared to the controls. Do you see that?

A I do, yeah.

Q What is the significance of that finding?

A Foamy cells in the lungs? Foamy cells I think it relates to something called foamy macrophages. It's the change in the morphology of macrophages in the lung. It's very much a pathologist's area of expertise, but sometimes it's indicative of something called phospholipidosis. And that's my -- when I've encountered foamy cells in the lung, foamy macrophages in the lung, it's sometimes indicative of a process called phospholipidosis that can occur with certain molecules.

Q One moment. Let's turn to Bates number 269 of

this study, and it indicates at the top of that page that pituitary and mammary tumors were the most frequent type seen. Do you see that?

A Yes, I do.

Q And the incidence of these two types of tumors were greater among females than in male rats. Do you see that?

A I do, yeah.

Q And then it goes on to state, "There was no deviation from the spontaneous tumor profile of the strain of rat employed in the study"; is that correct?

A That's correct.

Q And it indicates at the top of that page that no treatment-related changes were therefore seen. Do you see that?

A Yes, that's correct.

Q And if you look down at the bottom of that page, it indicates "Pituitary neoplasms and mammary tumors were among the factors which contributed to the majority of spontaneous deaths or sacrifices, especially among female rats from both control and treated groups." Do you see that?

A I do, yeah, I see that.

Q And I don't -- I may have asked you this before, and if I did, I apologize, but has anybody

undertaken a reanalysis of the findings in this particular rat carcinogenicity study in light of this information and focus of the investigation in 2019 about NDMA in ranitidine?

MR. SHEEHAN: Objection.

A Has anybody in GSK conducted a reanalysis?

Q Right.

A Say, a pathologist? Not to my knowledge, no, they haven't. I mean, I would just like -- when you say "reanalysis," I want to be clear on what you mean by reanalysis. Do you mean re-examination of slides, et cetera, or --

Q Re-examination of the study results and the slides?

A No, no -- no one's -- not to my knowledge, no.

Q So nobody has conducted a peer review of the findings that were found in this original study?

MR. SHEEHAN: Objection.

A I mean, certainly a peer review was done at the time and it's been peer-reviewed at the time of the agencies. In the preparation of the EMA response on these carcinogenicity studies, people read them, but, no, no one's done a specific peer review of the entire study and reexamined slides.

Q Okay. Have anyone -- has anyone at GSK

conducted a revised or updated statistical analyses of the findings of this particular rat study since -- since the information and investigation was opened relating to NDMA findings in ranitidine?

A Not to my knowledge --

MR. SHEEHAN: Objection.

THE WITNESS: Sorry, sorry.

A Not to my knowledge, no.

Q And now the information pertaining to the diet that was utilized in this study, is that information that would have been kept on file in the Glaxo archives as it relates to the animal study?

A The information on the diet? What type of information? Sorry.

Q Well, the specification sheets relating to the diet, would that information have been retained in the Glaxo archives as it relates to the diets that were used in the animal studies?

A I -- the answer is I don't know. I think the contents or the specifications of the diet should be described in the report I would have thought.

Q And I saw some references in some of these reports to the nitrite and nitrate levels in the diet in the particular animal feed that was provided to the animals in these carcinogenicity studies that Glaxo

sponsored or conducted in the early days of Zantac.
Is that information that would have been gleaned from the manufacturer certificate of analysis of the animal feed?
MR. SHEEHAN: Objection.
A I would have expected -- expect so, if they're making a statement about nitrite in the diets, that there would have been reference to -- in order to do that, there would have had to have been a reference to the rodent diet, right, the rat diet.
Q And is it fair to say that Glaxo would have maintained the information about the contents of the diet in the feed that was used in these studies because it's important to know what was being provided to the animals so that they could assess the control versus the treated groups, correct?
MR. SHEEHAN: Objection.
A I would expect the details of the diet to be part of the reports. I do know what you're talking about in that the discussion around nitrite levels in the diet. Again, I'm thinking, well, as this is a study that the details of the diet would be in the study report, study file. I don't know about specific documents related to the diet itself. My expectation is it would be part of this study, but I don't know if we

kept specific records relating to it.

MS. FINKEN: Let's just take a very short break, if we can, just so I can grab my next exhibit. Let's go off the record.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1450 UTC, 10:50 a.m. EDT.

(A 19-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1509 UTC, 11:09 a.m. EDT.

BY MS. FINKEN:

Q Okay. Dr. Harvey, we just got finished talking about the rat carcinogenicity study that was conducted by Glaxo in the late '70s, early '80s. And earlier we had talked about briefly that there were two mouse carcinogenicity studies that were conducted by Glaxo as well. Do you recall that?

A I do, yes.

(Exhibit No. 4643 was marked.)

Q So I'd like to talk to you a little bit about one of the mouse studies, and we're going to enter this as Exhibit 4643 to your deposition.

MS. FINKEN: And Tom, once again, there's a hard copy if --

MR. SHEEHAN: Yeah, I'll track it down.
MS. FINKEN: -- you want to dig it out. There's no A or B. It's 4643. It should be labeled as that.
BY MS. FINKEN:
Q Dr. Harvey, we put up on the screen here what we are marking as Exhibit 4643 to your deposition, and this is a report that looks like it was submitted to the FDA on February 3rd, 1981. Do you see that?
A I do, yeah.
Q And if you could turn to what ends in Bates number 916, the title of this report is "AH 19065, Hydrochloride (ranitidine) 114-week oral tumorigenicity study in mice (CAR 010)." Do you see that?
A I do, yeah.
Q And can you tell from this title page who authored this document?
A No, I can't, actually.
Q It looks like it's signed at the bottom of the page by an N.W. Spurling. Do you see that?
A Yes, I do.
Q And N.W. Spurling was a Glaxo scientist who was involved in some of the early animal toxicity studies that were conducted on ranitidine, correct?
A Well, I mean, if -- it certainly looks like

Spurling has signed the report and he's listed as some of the -- well, I don't know if they're authors or if Spurling is an employee of GSK. I can see the study was conducted at GSK, so that sounds like a reasonable assumption, yeah.

Q Do you know if N.W. Spurling is still alive?

A No, I don't. Sorry.

Q And the report's dated January of 1981, correct?

A That's correct.

Q And it looks like, if you turn back to the first page of that exhibit, that the report -- this particular report was sent to the FDA by Peter J. Wise, M.D., vice president of new product development. Do you see that?

A I do.

Q And do you know -- well, strike that.

Let's go back to page 916 for a moment. It looks like it lists several individuals on the cover page of this document, including Dr. D. Poynter again. Do you see that?

A I do.

Q And the report number at the top is listed as P-A-T-H or PATH/80/247. Do you see that?

A I do, yes.

Q What would be the purpose of GSK's -- strike that.

What would be GSK's purpose for conducting a study like this?

A I'm not sure I understand the question. The purpose to conduct a carcinogenicity study is part and parcel of the research and development process for a drug of this nature, so as I said right at the start, we do a whole series of toxicology studies and carcinogenicity studies as part of that program of work we do to study the molecule, so that's why we would do the carcinogenicity studies.

Q If we can turn to the page that ends in Bates number 926.

A 926?

Q Correct. It's provides the introduction for the study report, and it indicates that AH 19065 hydrochloride, which, again, is ranitidine hydrochloride, correct?

A That's correct.

Q And for purposes of this discussion, I'm going to refer to that compound number as ranitidine. Is that fair?

A Yes, that's fair.

Q It's easier than reciting the compound number

every time it's included here.

So looking at that particular page, it indicates that ranitidine hydrochloride was administered orally as this will be the principal route used clinically in man. Do you see that?

A Yes, I do.

Q And the particular strain of mouse used in this particular study is listed under the description 5a on that page ending in 926. Do you see that?

A I do see that, yeah.

Q And it lists the specific strain of mouse as the C57BL/10ScSn, specific pathogen free inbred strain of pigmented mice. Do you see that?

A I do.

Q Are you familiar with that strain of mouse?

A I may not -- I've heard of C57 before but not -- I'm not overly familiar with it. I'm not an expert in the different strains of rodents that we use.

Q The report indicates that this particular strain was well suited for this kind of study as its general health is good and the incidence of spontaneous tumors is low, approximately 15 percent at 23 months. Do you see that? It's paragraph 2 under 5a.

A I see that, yes.

Q And it also notes that this particular strain

of mouse that are sensitive to known carcinogens including nitrosamines, correct?

A Yes, that's correct. It's in the next paragraph, yes.

Q And it indicates nitrosamines administered by such different routes as topical application, subcutaneous and intraperitoneal injection, inhalation, gavage and in the diet, correct?

A That's correct. That's what the paragraph says, yeah.

Q Are there any guidelines that GSK followed to determine which strains of mice it used in its carcinogenicity studies?

MR. SHEEHAN: Objection.

A I'm not sure what guidelines were in place back in the 1980s, but, again, it would be -- it would be a consideration like we've seen here in this paragraph. So it would be considerations about the strain, precedented results in the strain, the control background. So it'd be a consideration by subject matter experts of the appropriateness of the strain. I don't think there was any -- I don't know if there was an ICH S1 guidance in place in 1980, so --

Q Does the National Cancer Institute recommend using any particular mouse strain when evaluating

carcinogenicity?

MR. SHEEHAN: Objection.

A I don't know the answer to that question, so I don't know.

Q Are you aware that the National Cancer Institute conducted studies demonstrating that the B6C3F1 hybrid mouse was a more effective strain at identifying carcinogenic chemicals?

MR. SHEEHAN: Objection, scope.

A Well, I wasn't -- again, I don't know what chemicals that relates to. I don't know what report that is. All I can see here is that justification around the use of the mouse related to the spontaneous tumor incidences rate and the sensitivity of the strain. Again, this study was conducted and submitted, so some --

Q Are you aware --

A -- of the agencies are peer reviewed, so there is a justification there. I'm not aware with an NCI paper.

Q Are you aware that historically the B6C3F1 mouse was the default mouse for use by the National Cancer Institute and cancer bioassay programs?

MR. SHEEHAN: Objection.

A I wasn't aware, but then I don't know what

work they were doing and why. What I do know is this strain was selected for these studies, and these studies were conducted, lifetime studies, and they were subsequently recorded to the FDA where they were reviewed for their robustness. So in terms of the development of ranitidine, the peer review of the acceptability of the strains would have been conducted and reviewed by the FDA and the equivalent European agency. It's possible the NCI was doing specific studies. These are strains to be used for our specific studies.

Q Are you aware that the National Toxicology Program also historically used B6C3F1 mice for carcinogenicity purposes?

MR. SHEEHAN: Objection.

A I'm not aware of that, but it's a similar response to last time, it's that these are the animals that were used certainly by GSK for these studies, and these studies were then reviewed by the FDA. So the National Toxicology Program is working in one area. NCI is working one area. In this area, these were the species used, the strains used, sorry, of mice, and that gets subject to review by a different agency as the FDA and what was the equivalent of the EMA in Europe.

Q Okay. Did GSK conduct any rodent

carcinogenicity studies with ranitidine using the B6C3F1 mouse?

A Not to my knowledge. This is the strain that they used. I think we discussed there were two studies. I'm assuming they were both in the same strain. But this is the study that I'm familiar with. It's the complete study that was submitted to the agency.

Q Is the C57BL mouse considered to be resistant to tumor induction?

A I'm not sure I understand the question. Resistant to tumor induction? I think I could go back to what I said a moment ago. These mice were selected for the studies. The study's conducted and clearly there's a rationale as to why the mouse was -- this strain was selected. Again, that's subject to review within GSK, but also reviewed by the agencies when the studies are submitted. So I don't know the answer to your question, but I think I look at this and see a suitable strain used for the studies in the assessment of ranitidine.

Q Are you aware that the C57BL mouse is considered to be resistant to liver tumors?

MR. SHEEHAN: Objection.

A I'm not aware of that. But, again, as I said before, the selection of the strain and the studies that

we submitted, if there was an issue with a particular strain and its sensitivity to particular tumor types, I would have thought that would have come up in the review of the overall nonclinical toxicology package with ranitidine. So it's been subject to peer review internally and externally by multiple different agencies.

Q Did -- strike that.

This study started in May of 1978, correct?

A I'd have to check when the study start date was.

Q Well, if you'd look at the bottom of page 926, it indicates that 500 28-day-old mice arrived on May 2nd, 1978. Do you see that?

A Yeah, I do see that. Thank you.

Q And at this point in time in May of 1978, was Glaxo aware that ranitidine was capable of forming NDMA under certain conditions?

MR. SHEEHAN: Objection.

A So the understanding about ranitidine forming NDMA under certain conditions, my understanding of the documentation within GSK is that understanding was in 1981, '82, the date of the Tanner study. This is prior to that, so I -- my answer would be no. Certainly I know that GSK was aware of the potential nitrosation of

ranitidine, but specific to NDMA, I think that knowledge is post-1978.

Q So turning to page ending in Bates number 928 of this study, it indicates at the bottom of the page that the mice had free access to tap water and powdered laboratory diet, correct?

A That's correct.

Q And it also indicates that the test substance or the ranitidine was incorporated in the diet, correct?

A That's correct, yeah.

Q Turning to the page ending Bates 929, the diet used in the study was S.Q.C. Rat and Mouse No. 1 expanded diet supplied by BP Nutrition. Do you see that?

A Yes, I do, yeah.

Q It says that the manufacturer of the diet provided an analytical certificate for each batch of the diet used, correct?

A Correct.

Q And that's something that you would have expected based upon our discussion earlier, before we went off the record, about certificates of analysis and certifications of the diets used in the animal studies, right?

MR. SHEEHAN: Objection.

A Just to double-check, an expectation there would be an analytical statement for that -- that supports that statement?

Q No. Let's just strike that. I'll move on.

It indicates here that each batch was analyzed for its nitrite content. Do you see that?

A Yes, I do.

Q And the nitrite content was estimated to range between 1 and 5.4 ppm, correct?

A That's correct.

Q And is that considered a small amount of nitrite in a mouse diet?

MR. SHEEHAN: Objection.

A I don't know. I don't know how to define small. All I know is they've measured an amount.

Q Well, how would you --

A It's a parts per million.

Q I'm sorry. Go ahead.

A Sorry. It's a parts per million value. So, of course, it's -- ppm would relate to parts per million, so it's an amount. It's a low -- a low amount because it's parts per million, but I don't know if it's a typical dietary amount in a rodent diet.

Q So you would not -- strike that.

Would you be able to characterize for the jury

the amount of nitrite in the diet in this particular study?

A I'm sorry. I'm not sure I understand the question. I thought -- I thought the answer to that question is here. They've analyzed the batch for the nitrite content, the batches of food, and there's a range of 1 to 5.4 parts per million of nitrite.

Q Besides the amounts that are listed here on the study report, are you able to characterize for the jury whether this is considered to be a small or moderate or significant amount of nitrite that was in the diet that was being provided to these mice?

MR. SHEEHAN: Objection.

A Well, I think you'd have to -- you'd have to extrapolate what that parts per million value equated to in a mg per kg dose because I think that the -- you know, there is a certain amount of the diet eaten every day. You'd have to equate that to a mg per kg dose and then extrapolate that to what typical dietary nitrite would be.

Q Did you say -- did you say mg/kg dose? Is that -- I don't know if I misheard you. Were you referring -- did you say mg/kg dose?

A Milligram per kilogram dose.

Q Okay. That's what I thought you said.

A Daily dose.
Q I just wanted to make sure I heard you.
It also indicates here that the nitrate levels in the water were not determined regularly but three batches were -- strike that. Hold on one second.
It also indicates that the nitrate levels were not determined regularly in the feed but three batches were specially analyzed and less than one ppm of nitrate was found in each batch. Do you see that?
A I do see that, yes.
Q And at the top of the page it indicates that the nitrate levels in the water were also measured, and the content varied between 19 and 37 ppm in the water. Do you see that?
A I do, yes. So what they're saying is the nitrate content was from the water and nitrite was from the diet.
Q Now, let's turn to the page Bates ending 932. Table 3 indicates the different -- the different dosage levels per group during the course of the study, correct?
A That's correct.
Q And there were three treatment groups: the low, intermediate and high, right?
A Yes.

Q And group one was considered the control, and they received no ranitidine in the diet, correct?

A That -- that would be my understanding from this table, yep.

Q And it indicates here that the amount of ranitidine or the dosage levels of ranitidine for the low, intermediate and high groups was increased over time during the course of this study, correct?

A Yes. It looks that way, yes. That's correct.

Q If we could go back to the summary of findings that's Bates number ending in 919, it indicates at the top of that page that ranitidine hydrochloride was administered to mice for 114 weeks and there was no evidence of tumorigenicity found; is that right?

A Yeah, that's correct.

Q I'm sorry. What did you say, sir?

A I think you read out the first sentence, right?

Q Right.

A And you asked me -- sorry. Do you want -- sorry. I thought you read out the first sentence and asked me if that was correct.

Q Yes, and did you respond because my Internet cut out?

A Yes, sorry. I said that that's correct, yes.

Q Okay, great. So now looking at the second paragraph here, it notes that different concentrations of the test substance were incorporated in the diet and progressively increased until week four to give daily dosage levels. Do you see that?

A Yes, I do, yeah.

Q And then at week seven it was found that the dosage could not be detected in the plasma of the mice receiving the 50 mg dose, correct?

A That's correct, yeah.

Q And the 50 mg dose group was the low dose group, correct?

A Yes, that's correct.

Q And would you agree that there would be an expectation to see ranitidine in the plasma of the mice if they were receiving a sufficient dose of the drug?

MR. SHEEHAN: Objection.

A I mean, this is an experiment, a study, and so when I see this paragraph and a discussion about increasing the dose, they've seen at the low dose that they can't detect ranitidine in the plasma of mice. I think that you're certainly seeing it with the medium and high doses. And so what they're addressing is increasing that dose in the low dose.

I mean, to me that's -- what I'm saying is

that it's sort of good scientific practice, if you like. They're increasing the dose because they want to be sure they're getting systemic exposure. That's what I see when I read this.

Q Sure. There's no point of conducting a study if you're not finding the drug in the plasma of the mice, right? That's why they increased the dose.

MR. SHEEHAN: Objection.

Q Would you agree with that?

A I'm not quite sure I'd say that it's no value as a study. What we do is that we -- certainly in this case we want to confirm exposure. We use exposure in all of our nonclinical studies, exposure of the active entity, we use that to -- to -- to extrapolate the translation of findings in nonclinical species to the clinic that we discussed right at the start of this deposition. So it's, you know, something that we -- we generate to understand the therapeutic index, if you like, of the actual active entity.

Q So because of this finding, the dose levels were increased in the low and intermediate dose groups at week 12, correct?

A Let me just read the summary again so I am fully understanding what they did.

Q Second paragraph.

A Yeah. (Reviewing document.) Yeah, they did increase it in the low and the medium group, but obviously it's the low and the medium group, so they could detect it in the high dose group.

Q So looking at the bottom of page 919, it indicates that age-related changes were found in a number of different tissues, and the most prominent were amyloidosis, cardiomyopathy, nodular hyperplasia of the liver, eye lesions and cases of slight dilatation of the gastric glands. Do you see that?

A I do.

Q If you turn to Bates page ending in 920, the next page, it indicates in this report that there was no evidence found to suggest that ranitidine hydrochloride is tumorigenic in mice. In particular, no gastric neoplasia was seen. This is the conclusion on page 920 of the summary, correct?

A Yes, that's correct.

Q And this information that was reported in this report on page 920 is consistent with the information that Glaxo put in its label for Zantac that I showed you earlier, right?

MR. SHEEHAN: Objection.

A I'm trying to recall the label. I think it would contain the results from the mouse and the rat

studies. I think that would be accurate. That's what typically it would contain that information.

Q And Dr. Harvey, you --

MS. FINKEN: I am echoing all of a sudden. That's better.

(Off-the-record discussion was had.)

BY MS. FINKEN:

Q Dr. Harvey, do you know whether or not polymorphic form 1 ranitidine was used for this study?

A I don't -- there should be a description of the drug substance that was used in the report, but, no, I don't know.

Q So going to what ends in Bates number 924, this is a study director statement that was signed by the study supervisor, P.A. Fluck, the senior pathologist, R.A. Harcourt, and the study directors, N.W. Spurling and J.J. Hyde. Do you see that?

A I do, yes.

Q And the statement indicated that there were some errors during the course of this study relating to the concentration of ranitidine to be incorporated into the diet, right?

A Yes, that's correct.

Q And first it indicates that from weeks 34 to 36 the male high dose group was only receiving 38

percent of the intended dose of ranitidine, correct?
A Yeah, for two weeks, yeah, okay.
Q And the authors categorize this as gross misdosage, correct?
A That's what the -- yeah, that's what's written there, yeah.
Q And then the male low dose group received diet containing only 87 percent of the intended dose from weeks 57 through 59. Do you see that?
A I do. I do see that.
Q And this is the same group of mice that was provided with such a low dose of ranitidine in the first 12 weeks of the study that it could not be detected in the plasma of the mice, correct?
MR. SHEEHAN: Objection.
A Yeah, but that's still 87 percent of the intended level, and these are all still very high doses.
Q The --
A And so -- sorry. I'm just commenting on they're still nevertheless very high mg per kg doses in the animals. And I can see that there was the dosing errors on certain occasions for brief periods and that there's an 87 percent of the intended level. I recognize there's some dosage errors here, but it's still -- it's still very high doses. And I think, as I

said before when we were talking about the mouse strains, it's -- obviously this happened here.

The subject's been written up -- the study's been written up and peer reviewed and also subject to further peer review by the FDA and other regulatory agencies, so -- so I guess what I'm saying is that it's still as a complete study still considered valid.

Q So I'm going to move to strike your response after the words, "yeah, but that's still 87 percent" as nonresponsive. Dr. Harvey, just moving on -- and I just do this because we have limited time and I want to get through. I have a lot of material to cover yet and a limited amount of time to do it. So if you could just respond to the questions that I ask, I would appreciate it.

Looking at the study director statement, it also looks like there was a miscalculation in the group total body weights in week five which resulted in small errors in the concentration of ranitidine in the diets for all groups, correct?

A That's correct.

Q It doesn't indicate here, at least in this portion of the study director statement, how long that miscalculation resulted in the wrong dosage being given to the mice, correct?

MR. SHEEHAN: Objection.
A I mean, it doesn't specify the period, but, again, I would assume that would be covered elsewhere in the report.
Q Okay. So let's look at the product used in this study. And if we could turn to what ends in Bates number 930, the product that was used for the study was derived from specific batch numbers listed in table 1 on this page. Do you see that?
A I do, yeah.
Q And there were 17 batches of ranitidine hydrochloride used during the study with analysis carried out at the time of the issue of each batch, correct?
A You're counting the number of batches there as 17?
Q Well, I'm just looking at the top of the page where it talks about the details of the --
A Oh, sorry, sorry. Yeah, you're correct. Sorry.
Q Okay. Are you able to conclude from looking at table 1 how old the batches of ranitidine were that were used for purposes of this study?
A I'm not. It has a batch number. I don't -- I haven't got the date of manufacture there.

Q You can determine from table 1 how long each batch was used for this particular study, correct? And I'm looking at the left-hand column of that table.
A Correct, yeah, say -- yeah, that batch was used for week X, Y, yeah, I can see that.
Q Okay. And it's fair to say that the batches of ranitidine for this particular study were used in a short period of time, right? Generally over two to three weeks. Would you agree with that?
A Yeah, two to three, five weeks I'm looking at, and six weeks, eight weeks, but, yeah, weeks, months.
Q Okay. And, again, this would have been API that was provided for purposes of this study, correct?
A That would be correct, yeah, drug substance, yeah.
Q And do you know which Glaxo facility manufactured the product used in this study?
A I do not, but I would expect that to be in the report somewhere about the drug substance used.
Q Let's turn back to what ends in Bates number 921. And looking at this paper of the study, this study was conducted at the Glaxo Group Research facility in England, correct?
A Yeah, that's the test facility, yeah.
Q So the Glaxo scientists would have been

involved in the day-to-day management of this particular study, right?

A Yeah, that would be correct.

Q And turning to the page ending in 933, it indicates that the ranitidine product was mixed in the diet, correct?

A Sorry. Which paragraph are we looking at?

Q Just generally at this page on 933 it indicates that the ranitidine was mixed in the diet that was fed to the animals, right? It might be easier to look at page ending in 932. At the top of the page, it indicates that ranitidine hydrochloride was administered to mice by incorporation --

A Yeah, yes, sorry. Yes.

Q Now, going back to 933, according to the report, fresh batches were prepared weekly in the early stages of the study and at least every four weeks throughout the study, correct? And I'm just referring to the second paragraph.

A Yeah, I can see that, yeah.

Q And again it shows some calculations that were conducted to determine dosing, right?

A On this page, so are you referring to anything specifically? Sorry.

Q Well, it shows some calculations in the first

paragraph and in the third paragraph what they utilize to determine the dosing of the -- for the animals, right?

A Yeah, I mean, the discussion of the diets and dose groups, et cetera.

Q And looking specifically at the top of the third paragraph, why was it necessary to adjust the administered concentration to achieve nominal dose levels?

A Just give me a moment to read it. Sorry. Thank you. I mean, there's a discussion here about body weight and the -- it says on the basis of body weight, recent body weight changes. So they're adjusting the dose and -- the dose in the diet to match the body weight so we can get a correct mg per kg per day dose. Is that what you're asking?

Q So would you agree that it's important to adjust the administered concentration to achieve nominal dose levels to ensure that the animals were actually getting a therapeutically equivalent dose of ranitidine?

MR. SHEEHAN: Objection.

A Well, I think -- I mean, we discussed earlier about young animals getting the body weight, the dose being adjusted depending on the body weight of the animal, young animals versus older animals. What

they're doing here is tracking the body weight of the animals and adjusting the diet accordingly to try and keep a consistent exposure to ranitidine via the diet. That's how I understand it. It's aiming to get that consistent exposure to ranitidine, consistent dose of ranitidine to get a consistent exposure.

Q And if the dose levels weren't therapeutically equivalent, it doesn't really give you adequate information on safety, right?

MR. SHEEHAN: Objection.

A Well, when -- when we're looking at an active molecule, we -- in terms of toxicology -- what we do is we dose low, medium, high doses, but what we're trying to do there is go to multiples of the predicted therapeutic exposure. That low dose might be very close to the predicted therapeutic exposure. The medium dose might be a factor above it and the high dose may be factors above that. So it really depends on the actual entity. It depends on the indication. But I think typically in toxicology studies we're aiming to go to doses above the predicted therapeutic exposure.

Q Okay. So let's look at the page ending in Bates 934, and the study report provides the details of how the diet was prepared, correct, at the top of the page?

A Yeah, I'm just reading it, yeah.
Q And it indicates -- it indicates here -- sorry. I lost my thought for a moment.
It indicates here in paragraph 2 that the diets were supplied to the mice by means of hopper-fed feeder troughs. Do you see that?
A I do. I do see it.
Q And so -- strike that.
Essentially, the mice in this study had free access to the feed and the study drug, correct?
A That's my understanding of a design like this, yes.
Q And given the fact that the study drug was being provided through the diet, it allows for some variability on how much study drug each mouse ingested in its food, correct?
A Yeah, that would be correct.
Q And the content of the study drug in the feed is not necessarily uniform throughout, right?
MR. SHEEHAN: Objection.
A Well, I can't say either way. I think there is a section on homogeneity, which I think we spoke about in the rat study, so I think there would be -- the aim would be to get homogeneity to avoid that issue that you just described.

Q So if you can turn to page 938, ending in 938, table 6 demonstrates for you the variability of ranitidine found in the diet, right?

A Yeah, I can see the theoretical ppm and the ppm found by assay, yep.

Q And will you agree with me that there are other ways in which study drugs can be provided to animals?

MR. SHEEHAN: Objection.

A I can -- I mean, obviously you could administer drugs -- experimental drugs in many ways to animals. You could administer to them via oral gavage. You could administer them via intravenous -- through intravenous route or topical. But the carcigenicity studies, I mean, the dietary exposure I've seen this before in other carcinogenicity studies.

Q Can you explain to the jury what it means to dose an animal via oral gavage?

A Yeah, I can. It's when we would administer a drug via a -- would formulate the drug in a particular vehicle or a particular liquid and we would then -- and that would be in a syringe and it would have a small tube on the end of it, flexible tube. And then it's placed into the animal's esophagus and into the animal's stomach directly. It's -- it's a way of administering

the drug that we use.

Q Isn't it true, Dr. Harvey, that dosing animals via oral gavage ensures that they get a certain prescribed amount of test substance?

MR. SHEEHAN: Objection.

A The oral gavage route is a route of administration that we use, and it -- it provides you with a dose of the drug substance.

Q Well, administering a test substance or a drug substance by oral gavage removes the variability of the amount of test substance that each animal's consuming, correct?

A It does, but it comes with other complications on a long-term study because you'd be handling the animals every day and doing that oral gavage, which is invasive to the animals in a way. You're handling them and dosing the entity to them via that syringe and via that tube. It comes with other complications, oral gavage, on a long-term study. I think what we're seeing here is an assessment of the actual exposure of ranitidine in the diet.

Q Now, with rodents, is there anything unique with the way that they feed that should be taken into consideration when designing carcinogenicity studies?

MR. SHEEHAN: Objection.

A I'm not quite sure I understand the question.
Q Well, isn't it true that rodents feed by nibbling during the day and consuming approximately 75 to 80 percent of their feed in frequent, small meals over a 12-hour period during the dark cycle?
A I'm not an expert on the dietary cycles. I know that they're nocturnal animals, but I do know that we examine them in the day as well, so there's adjustments on the light cycles. I -- the honest answer is I don't know the exact feeding cycles of rats and how they change when we're doing chronic studies on it -- on them.
Q Does the eating pattern of rodents have any bearing on how much sodium nitrite is in the stomach?
MR. SHEEHAN: Objection.
A I'm not quite sure. I don't know the answer. Sorry. I don't know the answer to that question.
Q So we briefly discussed some of the findings in the study that were contained on page 919 as well as the conclusion. And one of the findings, as you recall, that was listed as prominent were nodular hyperplasia of the liver. Do you recall that?
MR. SHEEHAN: Objection.
A I -- 919.
Q Correct.

A Yes, that's correct. I do recall that, yeah.
Q Can you please explain to the jury what nodular hyperplasia of the liver is referring to?
A Well, hyperplasia is an increase in the number of cells of a particular part of the liver, so it's a -- hyperplasia. It's -- yeah, it's -- it's an increase in the number of cells in the liver, hyperplasia.
Q And this particular finding is associated with hepatotoxic injury in rodents, right?
MR. SHEEHAN: Objection.
A I'm not a pathologist and so I wouldn't speculate. I know that hyperplasia is an increase in the growth of the number of cells.
Q And when I use the term "hepatotoxic," you understand that I mean harmful to the liver, correct?
A Yeah, I can understand that's hepatotoxicity. I'd say -- I'm not quite sure I would use the term "harmful." I would say hepatotoxicity is toxicity in the liver.
Q Dr. Harvey, isn't it concerning that there were findings of nodular hyperplasia of the liver in mice in a strain that are typically resistant to liver tumors?
MR. SHEEHAN: Objection.
A I can only take the conclusions of this study

as -- and we've gone over the summary conclusions as well. I mean, the findings are discussed in here. They're written down. They're in the summary along with a conclusion. And so I can't give you a personal opinion of whether they're concerning. It's part of the study. They've been assessed, they've been discussed, and there's a conclusion there. And that's been subject to peer review within GSK and subsequent peer review outside of GSK.

Q Okay. Let's look at the statistical report that GSK prepared relating to study CAR 010 beginning on Bates page ending in 966. Are you with me, Doctor?

A Yeah, I've got the page up. I'm on page 966, yep.

Q So this statistical analysis found a statistically significant positive dose-related trend in tumor rates for pulmonary tumors in female mice, correct?

A Just give me a second to read it.

Q Sure.

A (Reviewing document.)

Q Doctor, I'm just referring to the first paragraph in the summary in the statistical analysis.

A Yeah, I was just reading it to see the introduction and the statistics and the results. Yeah,

I can read the summary, yeah.

Q So the statistical analysis found a statistically significant positive dose-related trend in tumor rates for pulmonary tumors in female mice, correct?

A Yes, I can see that, the sentence you've highlighted, that's correct.

Q And it also notes there was no positive trend for male mice because there were as many tumors in the control group as in the high and intermediate dose groups. Do you see that?

A Yes, I can see that.

Q So looking at the next page ending in Bates 967, under number two, it sets forth the methodology relating to how the statistical analysis was conducted. Do you see that?

A I do see it. I'm just reading it.

Q Okay. And, Doctor, it indicates here that tumors classified as fatal or probably fatal were analyzed using the death rate method. Do you see that?

A I do.

Q What is the death rate method?

A I don't know. I don't know what that is. Obviously, that's a statistical method that's used. I think I said before I'm not a statistics expert, but it

would have been a method that they used in the study.

Q So turning to the next page ending in Bates 968, the tumors classified as incidental or probably incidental, including those found at scheduled sacrifice, are analyzed using the prevalence method, correct?

A Yeah, I can see that, yep.

Q What is the prevalence method? Do you know?

A There's a description of the method later on, but I'm not -- again, like I said before, I'm not an expert in statistics. I don't -- I'm not familiar with the prevalence method of statistical analysis. There is some additional text later on that refers to a method. That's what I'm saying is there is a description in the report, but I'm not a statistician. I don't know the details.

Q So approximately midway down the page, there's some discussion, and it looks like for each tumor type, the totals of observed and expected frequencies were added over fatal and incidental tumors and a statistical calculation was performed to test for positive trend with respect to dose, correct?

A Sorry. That's what the text says, yes.

Q And that analysis can be used to determine whether there is a dose-dependent response, right?

MR. SHEEHAN: Objection.
A I'm sorry. I'm not sure where you're reading that from. Sorry.
Q I'm not reading it. I'm asking you.
A Oh, okay.
Q Do you agree that that analysis can be used to determine whether there is a dose-dependent response?
A Well, as I said before, I'm not a statistician, and this is a very specific area of statistics supplied in carcinogenicity studies, so I can't answer the question. I'm not familiar with that statistical approach.
Q So it was noted, as we discussed earlier in the summary, that there was a positive dose-dependent response for pulmonary tumors in the female mice that was considered statistically significant. Do you recall that?
A Could we get the text back up so I could see it because I think there was some other text around it as well?
Q Well, we're actually going to move to a different section of the report. There are a number of tables that are provided in this statistical analysis relating to different tumor types. Actually, strike that.

Looking at page 969 and going back to my previous question about the statistically significant findings of pulmonary tumors in female mice, if you look at the bottom of that page, it indicates that there was a significant positive dose-related trend found for pulmonary tumors in females, but there were no other trends significant at the one-sided 5 percent level. Do you see that?

A Yes, that's correct. But as -- as I said before, when we spoke about a bit of text before that added some context around that, but here the text you're saying on the screen is correct.

Q Okay. So let's look at page ending in 978.

A Sorry. 978?

Q 978. And this is table 24 that looks at the findings of pulmonary tumors in female mice in this study. Do you see that table?

A Yes, I do.

Q And on the far right-hand side of this table, there's a column that's labeled O/E. Do you see that?

A I do.

Q And does that demonstrate the relative risk of pulmonary tumors associated with each ranitidine dose group in this study?

MR. SHEEHAN: Objection.

A Again, this is part of the statistical analysis, and it's not my area of expertise. I think I've explained that. I think it says observed and expected on that particular table. But, again, it's not my area of expertise, so I can't really answer --
Q In looking --
A Sorry.
Q I thought you were finished. In looking at this table, the control group means the group that was not given any ranitidine, right?
A Yes.
Q And there was zero tumors in the control group, correct?
A That's correct.
Q And if you look at the low dose group, there were no pulmonary tumors as well, right?
A That's correct.
Q And the intermediate group had one finding of pulmonary tumor, right?
A That's correct.
Q And looking at the high dose group, there was a finding of three pulmonary tumors, and it demonstrated a relative risk of 3.03, correct?
MR. SHEEHAN: Objection.
A Yes, that's correct.

Q And for context, let's look at some other tables in this study. Table 18 on page 972. This is looking at the pulmonary tumors in males, right?
A Yes, that's correct.
Q And there were three pulmonary tumors in the control group, three in the intermediate group, and three in the high dose group, correct?
A That's correct.
Q So overall in the male mice, there were six pulmonary tumors in the treated groups and three in the control, correct?
MR. SHEEHAN: Objection.
A Yeah, but there were six in the -- three -- there's three treated groups. Sorry. There are three treated groups and there are six in those three treated groups. So I think -- I was going back to the summary that you showed me at the start that talks about these various values, and it talks about no positive trend test in the male mice.
Q Yes, Doctor. We talked about that previously, and I would ask that you please wait for me to ask you a question because we are on limited time. I would appreciate that.
So if we can turn to page -- or table 19, which is on the next page of this study -- and just so

we're clear, your counsel will get the opportunity to ask you questions at the end of this, and you can speak as much as you want about anything that you want to, but I have limited time and I need to get through all this other material.

MR. SHEEHAN: Also to be clear, to the extent that you need to provide context to one of your answers, feel free to do so.

BY MS. FINKEN:

Q Looking at table 19, Dr. Harvey, on page ending in 973, this is looking at liver tumors in male mice. Do you see that?

A I do. I do see that.

Q And we already discussed that this particular strain of mouse is resistant to liver tumors. Do you remember that?

MR. SHEEHAN: Objection.

A I'm not familiar with that statement and I don't know what it's based on. I think I said at the time that I think the species selection was -- you put up a document that had the justification for it, and there would have been subsequent peer review of that.

Q Okay. So Doctor, looking at table 19, which identifies the liver tumors found in male mice in this study, it indicates that there was one liver tumor found

in the control group. Do you see that?
A Yes, I see that.
Q And that resulted in a relative risk of .46; is that correct?
MR. SHEEHAN: Objection.
A I can see that's an observed and expected ratio, the .46.
Q So looking at the rest of the findings, in the intermediate and high group, there were seven liver tumors found collectively, correct?
A That's correct.
Q And so there were seven liver tumors in the treated groups compared to one in the control group in the male mice, correct?
MR. SHEEHAN: Objection.
A Yeah, so that -- those numbers are correct. They are -- you're reading the numbers in the table correctly.
Q So Dr. Harvey, did there come a point in time subsequent to this report when GSK prepared an amended study report relating to this study?
A I -- I'm trying to remember. I recall there was an additional statistical analysis done on one of the nonclinical studies. I can't be entirely sure which one it was. It may have been this study. It may have

been another study, but I do recall an initial statistical analysis. I can't recall the exact details.

(Exhibit No. 4643-A was marked.)

Q Okay. So we're going to pull up what has been marked as Exhibit 4643-A.

MR. SHEEHAN: Did you say 4643-A?

MS. FINKEN: I believe so, yes. Okay. Sorry. Tom, I've been advised that it's not in your box because it's less than a hundred pages, so we'll put it on the screen and mark it as Exhibit 4643-A today.

BY MS. FINKEN:

Q Doctor, this is the amended statistical analysis of the mouse study we just looked at, CAR 010, correct? You can see it on the title of the report that it's a revised statistical analysis and then gives the number. Do you see that?

A Yes, I do.

Q And it's dated July 1981, correct, signed by N.W. Spurling?

A That's correct.

Q And if we can turn to page ending in Bates number 834 of this report, it indicates that in the statistical report of the original tumorigenicity study located at page 47 to 64, animals which had been

cannibalized or which were too autolyzed to allow a proper histological exam were included in the non-tumor bearing animals in the analysis of tumor incidence whereas they contributed no information, correct?

A That's correct.

Q Could you explain to the jury what autolyzed means in the context of an animal study and histopathology?

A Again, I'm not a pathologist, but my understanding is that if an animal were to die and it's left for a period of time, the tissues can start to break down and decompose, they can start to lyse, and so that would be that description. So once that occurs, then it's very difficult to make an accurate histological examination.

Q So essentially -- strike that.

Essentially, in the original report, it included these animals in the groups identified as having no tumors even though they were not properly or completely examined for tumors; is that correct?

MR. SHEEHAN: Objection.

A Could you repeat the question? Sorry. I want to make sure I understand it properly.

Q And I'm just -- I'm just -- you know, based upon the statement here in this amended statistical

report, it appears that the original report included these animals in the groups identified as having no tumors, even though they were not properly or completely examined for tumors, correct?

A Well, again, I'm not quite sure I followed, so this is saying that -- I understand what this paragraph is saying, and I'm saying, well, this initial report included those animals which have been cannibalized or autolyzed and they were included as tumor-bearing animals whereas -- I mean, I'm just reading the paragraph. Sorry. I wasn't quite sure I understood your question.

Q Doctor, they were included as non-tumor bearing animals, correct?

A Okay. Okay. That's what it says in the paragraph.

Q And they were included as non-tumor bearing animals even though whether or not they had tumors could not be determined from the animals themselves, right?

A I think what they're saying is they were too autolyzed to allow proper histological examination.

Q Okay. So this statistical analysis purportedly corrected that error in their original statistical analysis, correct?

MR. SHEEHAN: Objection.

A Well, I'm not sure if it's a statistical error. It talks about an improved statistical -- an improved analysis of tumor incidence.

Q Well, the revised statistical analyses purportedly corrected the original report, right?

MR. SHEEHAN: Objection.

A Again, you're saying "corrected." This is saying it's an improved analysis. It's slightly different things.

Q Did it amend the original report?

A If we -- I think if we could pull this section of text down and go back to the slide, I think it was an amended.

Q Yeah, it's a revised statistical analysis per the title of the document, correct?

A Yeah, so it's an amendment to the report --

Q So let's turn --

A -- so it's a revised.

Q I apologize, Doctor. Let's turn to page ending in 839. And in the middle of the page in the paragraph beginning with "Animals," it indicates that "Animals which were cannibalized or too autolyzed for any postmortem exam were omitted from the denominators used in calculating tumor incidence and prevalence rates," correct?

A That's correct.
Q And turning just quickly back to page 834, this analysis was carried out by J.K. Forster. Do you see that, third paragraph?
A Yes, I do, yeah.
Q Do you know J.K. Forster?
A No, I don't.
Q Has GSK done any additional analysis of this animal study given the global recall of all ranitidine products due to the presence of NDMA?
MR. SHEEHAN: Objection.
A We haven't done a reanalysis -- a reanalysis, sorry, of this study since the questions came in from the EMA on ranitidine in relation to NDMA.
Q Has any pathologist conducted a peer review of the slides from these studies since the global recall?
MR. SHEEHAN: Objection.
A Not to my understanding, no. There's been no such reanalysis of the study.
Q Has GSK conducted an analysis to determine whether these original carcinogenicity studies conducted on rats and mice were adequate to determine whether there was a risk of carcinogenicity?
A No. The assessment would have been done at the time of the marketing authorization application and

an assessment by GSK who did the studies and an assessment by the associated regulatory agencies.

MS. FINKEN: How much time do we have on the record?

MR. SHEEHAN: You want to go off, Tracy, real quick? It's been about an hour and 15 anyways since we last --

MS. FINKEN: That's what I thought. Let's take a quick break now and then we can come back and knock the rest of this out. Maybe ten minutes. Does that work?

MR. SHEEHAN: That's fine. Can we get that time check, though?

THE VIDEOGRAPHER: We are now going off the video record. The time is 1625 UTC, 12:25 p.m. EDT.

(A 35-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1710 UTC, 1:10 p.m. EDT.

(Exhibit No. 4642 was marked.)

BY MS. FINKEN:

Q Okay. Dr. Harvey, I'm just going to pull up and mark Exhibit 4642 to your deposition. And I believe this is in the hard copy, but you don't need it. I have one question about it, so I don't want to send Tom on a

scavenger hunt digging through pile of documents we sent him.

Doctor, looking at what we marked as Exhibit 4642, this is the two-year oral tumorigenicity study in mice (CAR 009), which was the second tumorigenicity study conducted in mice by GSK that we discussed earlier, correct?

A Yes, that's -- that's my understanding, yes, that's correct.

Q And this study report is dated March of 1981 and signed by N.W. Spurling at the bottom of that first page. Do you see that?

A I do, yes.

Q And just looking at, very briefly, what ends at page 142 or Bates 142 of this particular study, it indicates here in the last paragraph, "In view of the necessity to change the dosage levels four months after the start of the study, a second study was initiated during May 1978 and completed during August of 1980," and refers to CAR 010. Do you see that?

A Yes, I see that.

Q And CAR 010 is the mouse study we just discussed, correct?

A That's correct, yeah.

Q So is it your understanding from reviewing

this part of the report that the reason Glaxo undertook CAR 010, the second mouse tumorigenicity study, was because there was issues with the dose levels during the first four months of the original mouse study CAR 009?
A Could we take the big text off the screen so I could just see the whole page?
Q Sure. It's just in the last paragraph there. That's -- the big text was the whole page.
A Okay. Sorry.
Q We're just zooming in so it's easier for you to see.
A Could we go to the page before, please?
Q My question relates to your understanding of that last paragraph on page ending in 142 as to why the second mouse tumorigenicity study was initiated by Glaxo in the late '70s. Do you see that? It was --
A Yeah, I do. Sorry. I was reading the first page. Sorry.
Q And this isn't a trick question. I'm not going to dive into the study because I don't have the time. But the reason that Glaxo undertook the second study was because there were issues with the dosing levels during the first four months of the study CAO 009, correct?
A Well, that's what it states, yeah, but I

haven't had a chance to read the first page, but that's what it states in the end paragraph here.

Q Okay. So let's just put that aside for now. Doctor, we briefly discussed this earlier during your deposition. GSK did conduct studies back around the same general time frame of these animal studies to evaluate the nitrosation potential of ranitidine, correct?

A Yes, that's correct.

Q And you're familiar with those studies, right?

A I'm -- yeah, I'm familiar with the studies, yes.

Q And GSK was aware that ranitidine nitrosated when combined with sodium nitrite, right?

MR. SHEEHAN: Objection.

A GSK were aware that the -- that ranitidine can nitrosate under specific conditions and it was sodium nitrite that was the nitrosating agent, specific conditions, yeah.

Q Now, GSK also conducted studies that demonstrated --

MS. FINKEN: I'm sorry. One second. Erik, are you still screen sharing? You can -- because there's a big black screen for me. Awesome. Thank you. Okay. I just wanted to be able to see

Dr. Harvey.
BY MS. FINKEN:
Q GSK also conducted studies that demonstrated that when you combine ranitidine with certain vitamins, it completely inhibited nitrosation, correct?
MR. SHEEHAN: Objection.
A I recall there was some -- some studies where they looked at ascorbic acid, I think, I can't remember the exact details of them, which would be a vitamin, I think so -- I think there was -- I think I recall reading something about that. I can't recall the exact details I'm afraid.
Q And when I say that it inhibited nitrosation, you understand that I mean that ranitidine did not form nitrosamines or NDMA when combined with certain vitamins, correct?
MR. SHEEHAN: Objection.
A No, sorry, that's not as I understand it. I recall the actual studies around the nitrosation of ranitidine that were conducted and the concentrations of nitrite that led to that nitrosation. It was a quite complex set of reactions there and lots of studies to understand it, and that was published in the literature. I don't recall study -- I don't recall the exact details of studies with vitamins. I certainly don't recall

anything related to NDMA and vitamins.
Q Well, GSK knew that ranitidine when combined with vitamin E inhibited nitrosation, correct?
MR. SHEEHAN: Objection.
A As I said before, I can't recall the exact details of such study, so all I know in detail is about the nitrosation reaction itself.
Q Have you reviewed GSK's internal studies that demonstrated that ranitidine combined with vitamin E prevented nitrosamines from forming?
MR. SHEEHAN: Objection.
A I don't recall looking at that report specifically.
Q And are you aware that GSK conducted internal studies in the early '80s that demonstrated when ranitidine was combined with vitamin E it prevented nitrosation even when combined with sodium nitrite?
MR. SHEEHAN: Objection.
A Sorry. I think I said I understood the studies that they did that related to the nitrosation of ranitidine and how that happened in concentrations of sodium nitrite and nitrite that were considered supraphysiological, and those are the studies I'm familiar with and the studies that they published.
I'm not -- as I said before, I'm not for sure

certain I've read things around vitamin E. Sorry. I can't recall that. I know about the nitrosation reaction.

(Exhibit No. 4715 was marked.)

Q Okay. So let's mark Exhibit 4715 to your deposition. And while Erik is pulling that up, Doctor, you just indicated that you were aware of studies that GSK conducted regarding nitrosation of ranitidine that was -- that were published. Did I hear that correctly?

A Yeah, I'm referring to the Britain publication in The Lancet that spoke about nitrosation.

Q So you aren't testifying that GSK published the Tanner study that indicated that NDMA was formed under certain conditions from ranitidine, correct? That study was --

MR. SHEEHAN: Objection.

Q -- not published?

MR. SHEEHAN: Objection.

A I referred to the publications about nitrosation of ranitidine, and that was the Britain study in The Lancet and the details of that, that the nitrosation occurs and what was described as supraphysiological conditions of nitrite.

Q You would agree that the Tanner study was never published, right, relating to NDMA formation from

ranitidine?

MR. SHEEHAN: Objection.

A The -- pardon me, sorry. The Tanner study was never published in the open literature do you mean?

Q Yes.

A Not to my knowledge it was not published in the open literature.

Q Now, let's go back to what's been marked as Exhibit 4715 to your deposition, and this is a report titled, "Nitrosation of Ranitidine: Further Mutagenicity Studies," and it's dated September 1980. Do you see that?

A I do, yeah.

Q And it appears that this was signed and approved by D. Poynter. Do you see that?

A I do.

Q And did you review this document in preparation for your deposition?

A I -- I think I did. I think it's -- because it's related to a mutagenicity study, so I would say yes. I can't recall the exact details of it because they did a whole series of mutagenicity studies, but I think I did, yes.

Q The report number in the top right-hand corner of this particular study is PATH/80/235. Do you see

that?
A I can see it. It's quite blurry, but I'm assuming that 80/225, yeah.
Q Let's turn to page ending Bates number 966, and this is a summary of the report. Do you see that?
A I can see the summary. I can't read it. It's very small.
Q And the summary of the report discusses several different experiments that were conducted involving the nitrosation of ranitidine, correct?
A That's correct.
Q And the first experiment that it discusses is related to dinitroso-ranitidine compound AH 23729X; is that correct?
A That's correct.
Q And it indicates that that compound, AH 23729X, or dinitroso-ranitidine, is a direct acting bacterial mutagen of the nitrosamidine type. Do you see that?
A Yes, I do see that, yeah.
Q What is dinitroso-ranitidine?
A It's -- the molecule that they're describing is a -- is a product -- when ranitidine is incubated in excess of nitrites, a series of nitrosation reacts -- it undergoes a series of nitrosation reactions. The first

reaction product is something called a C-nitroso compound. And then if you have a sustained excess of nitrite, it can get converted to this dinitroso-ranitidine, which is a nitrous ranitidine as described there, and that is the direct acting mutagen.

So it's a reaction product. My understanding is that it's -- it's quite unstable, and it needs that sustained level of nitrite to form.

Q Can you explain to the jury what a mutagen is?

A Yeah. So DNA -- the DNA in your cells is composed of a series of what we call bases. GCAT are the four main bases, so our genes are encoded by these series of bases, all of the genes, like, proteins, et cetera, that make us who we are.

A mutation is what can happen if you change the sequence of those letters. So it might be GCAT and a mutation could occur that changes that to GCTT, so it changes the order of the base. Mutations happen all the time. Mutation's happening in us now. It's an event that occurs constantly.

Q And can a mutation ultimately lead to cancer?

A It depends. It depends. So we do know that if you change the DNA sequence of certain genes, that -- well, so if that DNA gets damaged, it can be repaired. If that DNA gets damaged, sometimes it can be

misrepaired and so compounds induce mutations. If the mutations are in a specific place, they can lead to changes in the function of a gene.

So not all mutations would necessarily lead to a change in a gene's function, but, I mean, mutations happen all the time. It's a very complex process, mutagenicity and then associated carcinogenicity. But theoretically, a mutation -- a mutation in a place in a gene could change its function that could then lead to a change in cell proliferation, but it's not that simple.

Q Okay. When it states that it's a direct acting bacterial mutagen of the nitrosamine type, why is that significant?

A It means that it's a compound that can bind to -- well, it can -- it's damaging DNA directly, so it's not requiring any obvious metabolism to be mutagenic. So it's acting directly on the DNA.

Q So moving to number two, it indicates that this report finds that formation of dinitroso-ranitidine when combined with nitrite is enhanced by both potassium thiocyanate and ascorbic acid. Do you see that?

A I do see that, yes.

Q What is potassium thiocyanate?

A It's a -- it's a compound. It's a -- sorry. It's potassium thiocyanate, so it's sulfur and a cyanate

group. It's a -- it's a chemical.
Q Is potassium thiocyanate found in human saliva?
A I think -- I think it may be. We haven't got the whole report here. I'm sure they'll be a section on potassium thiocyanate and there will be an explanation as to its relevance to this study.
Q And what is ascorbic acid?
A So that's actually the thing that I recalled and I didn't get it wrong about ascorbic acid. I remember a study where they mentioned it. So ascorbic acid is vitamin C, I think. I think it's vitamin C. Sorry. It's been a long day.
Q Okay. I understand. Trust me.
So essentially ascorbic acid is vitamin C, just for the record, right?
A I think -- you're saying that. Are you confirming that?
Q Yes. Are you agreeing that ascorbic acid is vitamin C?
A I think -- I think so. Sorry. It's been a long day.
Q Yes, okay. So this summary indicates that the nitrosation of ranitidine is enhanced by potassium thiocyanate at a lower pH of 1.0 to 1.6. Do you see

that? It's under number two.
A I do see that.
Q And it also indicates that vitamin E is an efficient inhibitor of the nitrosation process, correct?
A It -- it does say that, but the first sentence there is important. It's about these reactions -- you're talking about reactions where you've got an excess of nitrite.
Q So vitamin E, as it's stated in this report, is an efficient inhibitor of the nitrosation process, correct? That's what it says?
MR. SHEEHAN: Objection.
A In the context of that statement of the nitrosation process which relates to a process where there's an excess nitrite -- an excess of nitrite.
Q Okay. Let's turn to page 974 of this report, Bates number ending 974. Now, there's a discussion here -- this is the discussion section regarding GSK's finding in these studies. Do you see that?
A Yeah, I do. It's very small. Can you blow it up?
Q Sure. So if you can go, Erik, under subsection (a), the first portion of the report deals with the mutagenicity of dinitroso-ranitidine, and it indicates that the mutagenic effect was dose-related and

significant down to approximately three to ten -- is that micrograms per milliliter?

A Yes, that looks like micrograms, yes.

Q What does the term "dose-related" mean in this context?

A Well, they're talking about a -- the S. typhimurium is a type that they use in a test. It's called a bacterial mutagenicity test, or an Ames test. And in that study they'll do -- they assess different doses of the -- of the material. So if we were to test -- I don't know the context of this particular study, but what we would typically do is test an entity at different concentrations in the Ames test because those different doses can give us more evidence about a biological effect, if you like, because it allows you to understand if there's a dose response.

Q So in the context of this paragraph, does -- is it concluding that the more dinitroso-ranitidine generated the more mutagenic it became?

MR. SHEEHAN: Objection.

A I don't think it's about it being generated. Can I -- I just want to take an opportunity to read the whole paragraph because when we talk about a compound and dose-related effect, we're normally testing an entity in itself, and so we'd be testing an individual

entity, so there wouldn't be a generation of an entity, so we'd be testing 729 itself. If you just give me a moment to read it --

Q Sure.

A -- because I haven't read the report. I just need to understand the paragraph.

Q Dr. Harvey, please read the paragraph, and I just want to focus your attention on the second sentence in that paragraph where it says, "The mutagenic effect was dose-related significant down to approximately three to ten micrograms per milliliter," and I'd like to understand what the term "dose-related" means in the context of this paragraph?

A So I am assuming from the first sentence they've tested AH 23729X as an individual entity in the salmonella, typhimurium strain, TA 1535, and they've tested different concentrations of 23729X, and the response they saw was dose-related.

Q So the more exposure to dinitroso-ranitidine, the increase in the mutagenic effect. Is that a fair statement?

A To be clear, we're talking about the -- the increase in the concentration of 729 induced a more -- well, induced a dose-related increase in mutagenicity.

Q Okay. So let's look at subsection (b) on this

page regarding the catalytic effects of potassium thiocyanate, and if you can zoom in on that Erik, please. I'll just give you a minute. Hopefully, your counsel won't hold it against me on my time, but I'll give you a minute to read that paragraph to make it easier to respond to my questions. Okay?

A Okay. (Reviewing document.) I've read the last paragraph.

Q I'd like to draw your attention to the last three sentences of that page. It indicates, "At the lower pH, thiocyanate did have a catalytic effect on the nitrosation process and this was inferred by the detection of significant mutagenic activity at nitrite concentrations as low as 7.5 micromoles. It seems likely that increased AH 23729X production was occurring at these lower nitrate concentrations as a result of thiocyanate catalysis." Do you see that?

MR. SHEEHAN: Tracy, I think you said micromole concentrations. It says --

MS. FINKEN: I can't find it. Is it millimoles?

THE WITNESS: Yeah, it says 7.5 millimoles, 500 micrograms per ml.

MS. FINKEN: I apologize for that. I misread. Thanks for that correction. So let me try this

again.
BY MS. FINKEN:
Q Looking at the last three sentences of that page, it indicates, "At the lower pH, thiocyanate did have a catalytic effect on the nitrosation process, and this was inferred by the detection of significant mutagenic activity at nitrite concentrations as low as 7.5 millimolar, and it seems likely that increased AH 23729X production was occurring at these lower nitrite concentrations as a result of thiocyanate catalysis." Do you see that?
A I do see that, the 7.5 millimolar, yes.
Q And looking at the top of that paragraph, does this refresh your recollection that thiocyanate is secreted in the saliva?
A Yes, yeah, it does now. Thank you.
Q Have you seen this study before?
A I think I've -- sorry. I think I've read this study, yeah. And as I said before, it's a mutagenicity study, and so it's something that I would have read.
Q And let's look at page 977, which is subsection (c) of the discussion section. And you had indicated earlier that -- or maybe you hadn't. Strike that.
This particular section is looking at the

effects of ascorbic acid and vitamin E, correct?

A Yes, I think that's correct.

Q So let's turn to page 978 of this study, and I'd like to focus your attention midway down the page where it starts "Unlike ascorbic acid." It's down further, Erik. Right there.

It says, "Unlike ascorbic acid, vitamin E was found to be an effective inhibitor of ranitidine nitrosation under aerobic conditions," correct?

A That's correct, yeah.

Q Okay. Were these studies relating to thiocyanate, vitamin C and vitamin E in combination with ranitidine and sodium nitrite ever provided to the FDA?

MR. SHEEHAN: Objection, scope.

A So I don't know if they were disclosed. I can't recall the exact date when they were, but the disclosure would be a -- disclosure of the reports and those updates to the FDA would be the accountability of another department in GSK.

Q Did GSK ever evaluate whether ranitidine could be combined with vitamin E to ensure that nitrosation would not occur in the human body?

MR. SHEEHAN: Objection.

A Again, I'm going to have to try and unpack that question because these studies are still talking

about an excess of nitrite and so --
Q I'm not referring to these particular studies. Generally, did GSK -- to your knowledge, did GSK ever evaluate whether ranitidine could be combined with vitamin E to ensure that nitrosation would not occur in the human body?
MR. SHEEHAN: Objection.
Q Was that ever done?
MR. SHEEHAN: Objection.
Q If you know.
A I -- I don't know if such studies were done, but my understanding about that nitrosation reaction is that it only occurs in what was called supraphysiological levels of nitrite, so that would be -- that was what was discussed and submitted and published in the literature, so I wouldn't understand why those studies would be done.
Q Okay. So we looked at the label from earlier today, and you would agree that GSK did not advise patients or physicians that they could take ranitidine with vitamin E to inhibit nitrosation, correct?
MR. SHEEHAN: Objection.
Q That wasn't contained in that label, was it?
MR. SHEEHAN: Objection.
A I can't -- I'm not going to agree to the

sentence -- or the question. Sorry. I just discussed how these studies were in a particular setting and about vitamin E having an effect when you've got an excessive nitrate, and so they're very specific to this setting in this study. And so I don't -- again, as I said before, I don't understand the rationale as to the inclusion of vitamin E to ranitidine.

Q Okay. So Doctor, my question, though, was did GSK ever advise patients or physicians in the label that ranitidine could be combined with vitamin E to ensure that nitrosation did not occur? Was that in the label?

MR. SHEEHAN: Objection, asked and answered and scope.

A And I think, as I said before, the nitrosation reaction and the conditions under which it occurs were discussed at length as part of the NDA, as part of the AdCom, and it was published in the literature, and so those conditions -- as I said, there's a term supraphysiological. They weren't considered to be logically relevant, so that was the position around the nitrosation.

Q The GSK -- and when you're referring to the AdCom, you're referring to the advisory committee where GSK testified to the FDA about ranitidine, correct? Is that what you're referring to?

A I don't know if testify is the right word, but certainly the AdCom is that you go to a meeting and you discuss the profile of the medicine that's under a review process.

Q In fact, GSK actually attended multiple advisory committee meetings with the FDA in relation to ranitidine where nitrosation was discussed, right?

MR. SHEEHAN: Objection.

A I'm only familiar with one AdCom. I think it was the first AdCom. I don't know if they had multiple AdComs. Sorry.

Q And are you aware, Doctor, that during those advisory committee meetings, GSK never advised the FDA that it conducted studies that demonstrated that vitamin E would inhibit nitrosation of ranitidine?

MR. SHEEHAN: Objection.

A The vitamin -- so the vitamin E question you keep coming back to, you're talking about inhibition of a reaction, a nitrosation reaction, that they discussed and discussed at length and published on, were very clear about it only occurred under what they call as supraphysiological levels of nitrite.

Q And you're aware -- you're not suggesting, Dr. Harvey, that GSK published this study that we're discussing right here about the ability of vitamin E to

inhibit nitrosation of ranitidine. That's not what you're suggesting, right?
MR. SHEEHAN: Objection.
A No, that -- I'm sorry if I wasn't clear. What I was talking about was the nitrosation of ranitidine itself under the conditions under which that can occur and the studies that GSK did at the time during ranitidine's development and the data demonstrating that ranitidine can be nitrosated only when you have an excess of nitrites. And that excess would be described as concentration of nitrites. That wouldn't be considered physiologically relevant, so supraphysiological levels of nitrite.
Q This report that we're looking at that we've marked as an exhibit to your deposition was dated September of 1980, right? It's on the cover.
A I'm sorry. I can't remember the first -- I can't -- I haven't got the first page in front of me.
Q So going back to the first page, Erik can highlight it for you, it's dated, you can see at the bottom, September 1980, correct?
A That's correct.
Q And we spent a lot of time today looking at several carcinogenicity studies that were used to support the approval of Zantac for the US market,

correct?
A That's correct, yeah.
Q And in fact, GSK still to this day points to those animal studies that we discussed as evidence of safety of ranitidine, correct?
MR. SHEEHAN: Objection.
A We talked about today's studies that are described in the label, and we described the outcome of those studies in relation to the testing of ranitidine for potential carcinogenicity, yes.
Q Okay. And you're aware that in response to the FDA relating to the findings of NDMA in ranitidine that GSK stated that the lack of carcinogenicity findings in the animal studies demonstrate that ranitidine does not have the carcinogenic effect on humans. Are you aware of that?
MR. SHEEHAN: Objection.
A Yes. And that's in the context of ranitidine as an entity in those studies.
Q Well, GSK was aware that there was vitamin E contained in the feed of the animals in each one of its carcinogenicity studies, wasn't it?
MR. SHEEHAN: Objection.
A I don't know the answer to that question.
Q Well, it's recommended that laboratory rats

and mice receive 60 mgs of vitamin E from the diet, right?

A I don't know. I don't know the answer to that question.

Q Okay. Well, if the standard in the industry was to include vitamin E in the diet of rats and mice in the laboratory studies, do you have any reason to believe that GSK would not have followed those industry guidelines?

MR. SHEEHAN: Objection.

A I -- I don't know what was in the feeds, but if it was an industry standard, I would assume that would be in there. You're talking about vitamin E, and I've discussed vitamin E with you as well before. These are conditions and there's an excess of nitrite in there.

Q So sitting here today, you're not aware that the levels of vitamin E in the diet that was fed to the rats and mice with ranitidine contained higher levels of vitamin E than what's contained in the human diet. You're not aware of that, correct?

MR. SHEEHAN: Objection.

A I'm not familiar with that part of that study and the diet contents.

Q Given -- strike that.

Did GSK ever advise the FDA that the animal studies that were conducted would actually mask any nitrosation potential because the vitamin E content was so high in the animal diet that it would inhibit the ability of ranitidine to form NDMA?

MR. SHEEHAN: Objection.

A I don't recall a discussion about the diets in the carcinogenicity studies related to vitamin E and nitrosation reaction.

Q And you would agree that GSK never advised anyone that a simple step such as taking a vitamin E supplement with Zantac could prevent the formation of a carcinogen, right?

MR. SHEEHAN: Objection.

A Again, that -- that question is a quite generic question. I know the study that you've put on the screen talks about the effects of vitamin E on a specific reaction with an excess of nitrite, and we spoke about that excess of nitrite being supraphysiological, and so that's the data we have.

As I said before, when we talk about the nitrosation of ranitidine, the data I've seen and the data that GSK presented and published about the nitrosation of ranitidine was always talking about a reaction -- excess concentrations of nitrite that you

wouldn't achieve physiologically.
Q Dr. Harvey, are you aware that there are infants and children in the United States who have developed cancer from taking Zantac?
MR. SHEEHAN: Objection, mischaracterizes evidence and assumes facts not in evidence.
A I'm not aware of the clinical data related to ranitidine. That would be a pharmacovigilence subject area.
Q Don't you think that it would have been a responsible course of action for GSK to advise doctors and patients that a simple act like taking vitamin E would keep them from being exposed to a carcinogen in Zantac?
MR. SHEEHAN: Objection, scope, assumes facts not in evidence.
A I mean, I'm going to keep referring back to the nitrosation reaction, it was understood at the time about how it only occurs in an excess of nitrite, and these conditions weren't considered to be physiologically relevant.
Q GSK never conducted animal studies evaluating the carcinogenicity of ranitidine where the diet didn't include vitamin E, did they?
MR. SHEEHAN: Objection.

A I -- I don't know the answer to that question. What I do know is what we've discussed about the diet that was administered and you've spoken about vitamin E levels in diets. That's what I know.

Q Now, Dr. Harvey, I've asked you some questions today about the two different polymorphic forms of ranitidine several times, correct?

A That's correct.

Q And you had testified that you're unaware which forms GSK manufactured, correct?

A I'm not familiar with those polymorphic forms.

(Exhibit No. 4716 was marked.)

Q I'd like to enter what we've marked as Exhibit 4716 to your deposition. And Doctor, just so you're aware, this is a press release that was prepared by GSK in relation to patent litigation that they were involved in regarding ranitidine.

Were you aware that GSK was involved in patent litigation regarding ranitidine?

MR. SHEEHAN: Objection, scope.

A No, I'm not aware of it. I can't read the document on the screen. Sorry. It's very faint and it's very small.

Q Okay. Well, we'll zoom in.

MS. FINKEN: If you can turn -- Erik, if you

can zoom in to the question starting with "What is the difference between form 1 and form 2 ranitidine hydrochloride?" please.

BY MS. FINKEN:

Q Now, Doctor, are you able to read that on the screen?

A I am now. Thank you.

Q And it indicates here that the difference -- it indicates here the difference between form 1 and form 2 ranitidine hydrochloride, correct?

A Yes, that's correct. That's the question, yes.

Q And it indicates that form 2 of ranitidine hydrochloride is essentially different to form 1 and has all the ingredients of patentability. Do you see that?

MR. SHEEHAN: Objection, scope.

A I can see that first sentence, yeah.

Q And it indicates that the differences lie in the crystal structure as determined by infrared spectroscopy and by X-ray powder diffraction methods. Do you see that?

MR. SHEEHAN: Objection.

A I do see it.

Q And it indicates that form 2 ranitidine hydrochloride has been found generally to have larger

crystals than form 1 and exhibits more favorable filtration and drying characteristics. Do you see that?
MR. SHEEHAN: Objection, scope.
A I do see it, yes.
Q And it indicates that form 2 absorbs and retains moisture less readily. Do you see that?
MR. SHEEHAN: Same objection.
A I also see that.
Q Were you aware of these differences between form 1 and form 2 ranitidine hydrochloride prior to reading it on this press release that we've entered as Exhibit 4716 to your deposition?
MR. SHEEHAN: Objection, scope.
A I've never seen this document before. It's a chemistry -- it's a very specific aspect of chemistry manufacturing. It's -- yeah, I've not seen this before.
Q Okay. So going down the page -- Erik, if you can zoom in on the question where it says, "Were any of the clinical studies carried out with form 1 as the form 2 patent wasn't filed until 1980?" do you see that?
MR. SHEEHAN: Scope.
A Yes, I can see that.
Q And the response from GSK was, "Yes, some clinical work was carried out with form 1." Do you see that?

MR. SHEEHAN: Scope.
A I do see that.
Q And if you can go down the page where the next question or two questions down, it says, "Has Glaxo ever manufactured form 1 ranitidine hydrochloride?" do you see that?
A Sorry. Yeah, I can see that.
Q And GSK's response was "Form 1 was manufactured for the supply of early clinical trial material. The ranitidine hydrochloride that is commercially manufactured and marketed by Glaxo has always been form 2." Did I read that accurately?
A Yes, you did.
Q So Dr. Harvey, if the animal studies utilized a different polymorphic form of ranitidine than what was marketed, it isn't the best effort of safety, is it?
MR. SHEEHAN: Objection.
A I -- I don't know how to answer that question. I don't know the differences between form 1 and form 2. I also don't know what materials we used in the -- in the animal toxicology studies.
Q Okay. So looking at the press release that was issued by GSK in relation to the patent litigation, they indicate that there were differences between polymorphic form 1 and form 2 ranitidine hydrochloride,

right? We just went over that. Do you recall that?
A There were specific chemical differences. I think that they were described in that paragraph. I'm not a chemist. I don't know what that means. I don't know -- it's not wording that's familiar to me.
Q Did GSK ever do toxicity or carcinogenicity studies evaluating form 2 of ranitidine?
MR. SHEEHAN: Objection.
A I don't know the answer to that. I'd have to understand what the material -- the material that we used in the studies, which is well documented, as you know, what form 1 or form 2 was. I'd also need to understand what the consequence of using form 1 or form 2 was.
Q In support of its safety profile, if GSK relied upon animal studies conducted using a different polymorphic form of ranitidine than what was ultimately marketed, wouldn't you consider that a bait and switch?
MR. SHEEHAN: Objection.
A I'm sorry. I don't understand the question or the phrase. Sorry.
Q Well, you're conducting studies that you're representing evidence safety of ranitidine that's using a completely different polymorphic form of ranitidine than what you're ultimately selling to the public. Do

you understand that?
MR. SHEEHAN: Objection, mischaracterizes the evidence.
A So as I said before, I don't know what form 1 -- or I don't know what form is used in the nonclinical toxicology studies. I don't know the consequences of the use of form 1 or form 2 in those toxicology studies.
What I do know and we've discussed this today is that we did get exposure to ranitidine. We've seen that in those nonclinical toxicology studies. And ranitidine is an active entity. So I don't understand what this form 1, form 2 means, and I don't understand the implications of it to the nonclinical toxicology studies. I'm unable to answer your question.
Q Doctor, I'll ask my question again. If GSK used a different form, a different polymorphic form of ranitidine as evidence of safety in animal studies they conducted -- strike that. Let me start over. I'll ask that again.
If GSK used as evidence of safety and GSK relied upon animal studies that were conducted using a different polymorphic form of ranitidine than what was marketed, would you consider that to be actions of a transparent pharmaceutical company?

MR. SHEEHAN: Objection, asked and answered.
A Again, I don't -- I don't understand the question. I'm looking at this saying I don't necessarily understand the -- what that form 1, form 2 difference is. What I do know is that we've conducted a whole battery of tests on ranitidine, and in those studies we know we got exposure to ranitidine.
Q Okay. Is the --
A So I don't --
Q The battery of tests that we've discussed today utilized polymorphic form 1 of ranitidine hydrochloride, which according to GSK's own press release was different than polymorph form 2 of ranitidine hydrochloride which was ultimately sold to the American public. Do you understand that?
MR. SHEEHAN: Objection.
A Again, as I said before, I mean, we know that when we dose ranitidine, we get systemic exposure to ranitidine in those nonclinical toxicology studies. So I don't understand the -- I don't understand the influence form 1, form 2 would have in relation to ranitidine exposure.
Q Doctor, just -- I just have a couple of additional questions and then I'll pass to your counsel. I know he has -- he said an hour of questioning for you.

There is some indication within your documents that have been provided to us by counsel that you were searching for a study that was conducted in the 1980s involving simulated gastric fluid that was conducted by an Angus Bell. Do you recall that, searching for that study?

MR. SHEEHAN: Objection.

A I do recall looking for that study in our electronic archive system.

Q Were you ever able to locate that study report?

A No, I wasn't. I wasn't able to locate it.

Q Were you ever able to locate any of the underlying study data from that study? Laboratory notebooks or anything like that?

A Well, I don't know what was in the study. I wasn't able to locate the primary study, so I don't know what dates would have been in it. I have the title of it. But, no, I -- I couldn't find that primary report and without knowing that, what was in that report, it'd be difficult to find any underlying notebooks.

Q Have you ever reviewed any additional material related to the Tanner study other than what was contained in the report?

A I was -- when we had the Tanner study, I think

you can see from the Tanner study that there isn't an appendix with data in it. We did go to the archive to try and look to see if we could see -- we could find a notebook with such data in it. We were unable to locate that -- any notebooks relating to that Tanner study.

MS. FINKEN: Let me just -- let's go off the record for just one second, please.

THE VIDEOGRAPHER: Going off the video record. The time is 1802 UTC, 2:02 p.m. EDT.

(A 7-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1809 UTC, 2:09 p.m. EDT.

BY MS. FINKEN:

Q Dr. Harvey, are you aware of any clinical studies conducted by GSK that demonstrated an increased risk of any type of cancer other than the long-term clinical trial that we discussed earlier today?

MR. SHEEHAN: Objection, mischaracterizes evidence.

A I can't see you either. Sorry. Can you repeat the question and I'll just try and focus.

Q Sure. Are you aware, Dr. Harvey, of any studies conducted by GSK that demonstrated increased rates of any type of cancer, other than the study that we discussed earlier today during your deposition?

A So I think --

MR. SHEEHAN: Just let me get in my objection. Same objection, mischaracterizes evidence, scope as it relates to a pharmacovigilence activity.

A I was going to say that the question's a pharmacovigilence question about that type of study that you're describing or studies as you're describing, so it's not an area that I'm an expert in. I think we discussed this earlier on.

MS. FINKEN: Okay. I thank you for your time, Dr. Harvey. I may have some additional questions after counsel questions you, but I understand he wants to go off the record and take a break now, so we will go off the record.

MR. SHEEHAN: Did you reserve any time, Tracy?

MS. FINKEN: Do I have to reserve time?

MR. SHEEHAN: We can go off -- we can go off the record.

THE VIDEOGRAPHER: We're now going off the video record. The time is 1811 UTC, 2:11 p.m. EDT.

(A 59-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1912 UTC, 3:12 p.m. EDT.

- - - - -

CROSS-EXAMINATION

BY MR. SHEEHAN:

Q Dr. Harvey, good evening. My name is Tom Sheehan, and I represent GSK. We've met before, correct?

A That's correct.

Q Okay. I just wanted to thank you for sticking -- staying with us this long day. I've got a number of questions I'd like to ask you, so we'll just get into it.

Can you just reintroduce yourself to the jury and explain your current position at GSK?

A Yes. My name's James Harvey. I work in the nonclinical safety department in the research and development part of GlaxoSmithKline.

Q Okay. And what is nonclinical safety?

A Nonclinical safety is the -- it describes the department where we conduct or commission tests, nonclinical studies to understand the safety of new medicines, understand their toxicological profile, if you will, of a new medicine.

Q Okay. And you were asked some questions today about impurities in medications, in particular, ranitidine. What is an impurity in a medication?

A An impurity is a -- it would typically be an

entity that isn't the active drug substance or drug product. So it would be something maybe related to it. It might be a part of a synthetic -- synthetic process. But it would be a chemical entity that's not the active drug -- active drug substance.

Q And do all medications have some level of impurity?

A My understanding is that, yes, they would be -- they would have impurities in them.

Q Does the presence of an impurity make a medication unsafe?

A No. No, it doesn't.

Q And just relating this to ranitidine, does the presence of NDMA in ranitidine mean that ranitidine is unsafe?

A No, it doesn't.

Q Now, are there guidances that are -- that govern the assessment of impurities in medications?

A Yes. There's -- sorry. There's a whole series of guidances that are called ICH guidelines. There's ICH Q3 A, B, C, D, E, and there's also a guideline called ICH M7.

Q What is ICH?

A It's the -- it stands for the International Committee for Harmonization. It's an organization --

well, it's an organization that develops ICH guidelines, and it brings together subject matter experts from academia, from industry and regulators as well, to create guidelines that companies follow with respect to medicine's development.

Q So, for example, does the FDA participate in the development of ICH guidances?

A My understanding is that they do, yeah.

Q Does FDA endorse and implement ICH guidances when they are released?

A Yes, they do, yeah, yeah.

Q You mentioned the ICH Q guidances. When did ICH Q3 come into effect, to your recollection?

A So Q3 is -- Q3A, did you say?

Q Yeah.

A So Q3A is the drug substance guideline -- drug substance impurity guideline. I think that came into place in the late 1990s to early 2000s, so around that time.

Q And does that govern the detection levels of impurities in drug substance?

A Yes, that's -- that's what the guidance details, yes.

Q Can you give a broad understanding of what that guidance requires?

A Yes. It's primarily a quality guideline, so it's a chemistry guideline, but there's components that are relevant to, say, nonchemical safety. It talks about impurity reporting limits, impurity identification limits. So that would be when you've seen an impurity, you record an impurity, there would be a limit where impurity -- you actually identify what the impurity was, the structure.

And then there's also another limit called a qualification limit as well, which talks about a percentage limit that if you're over that, there would be an expectation that you would characterize that impurity in some way. It's a little bit nuanced and complicated, but that's predominantly the Q3A framework.

Q And to your understanding, would GSK have implemented the ICH Q3A guidance when it was issued?

A Yeah, that would be an expectation that once that was adopted by agencies and finalized, that that's the working standard.

Q Okay. And the subsequent ICH Q3 guidance B, C, D, E and what they were related to when they were issued, would GSK have implemented those guidances?

A Yes, we would. B, C, D, certainly E is just in draft format now at the moment, so it would be B, C, D, yeah.

Q And those guidances were not available or not issued until -- well, the first one was not issued until late 1990s I think you said; is that right?
A That's my understanding from the ICH website that contains all this content, yeah, that was --
Q Prior to ICH Q3A, did GSK assess the impurity profile of its drug substance and drug products?
A Yeah, it would have been a part of that chemistry manufacturing process.
Q And did GSK assess the impurity profile of ranitidine, to your knowledge?
A Yes, they did.
Q Did they assess the impurity profile of ranitidine at the time of development?
A Yes, they -- sorry. They conducted an assessment of the synthetic impurities that they identified, and they also did a -- a degradation study as well.
Q And what did those studies -- well, actually, let me ask this first: Did GSK continue to assess the impurity profile of ranitidine through 2019?
A Well, yeah, there'd be specifications in place for impurities within ranitidine that would be aligned with that Q3A guidance for drug substance and the Q3B guidance for drug product.

Q Was there any -- would the -- would the Q3A guidance require the identification of NDMA at the levels that were identified in 2019 in ranitidine drug substance?

A Sorry. The Q3A guidance has a reporting identification threshold which is a percentage level. It's .1 percent of the drug substance is the identification limit. The levels of NDMA that we saw in ranitidine product were much lower than that. They would be referred to as trace levels of NDMA in the drug substance or drug product.

Q So would they be required to be reported and identified under ICH Q3A?

A No, they wouldn't be. They're below the reporting and identification thresholds.

Q Counsel for plaintiffs asked you about a number of studies -- a number of questions about the nitrosation of ranitidine. Do you recall that? Do you recall that?

A Yes, I do.

Q What is nitrosation?

A I -- I'm sorry. I tried to explain earlier. It's when your -- let's say a -- in this particular case, it's a drug molecule. And it could be any molecule. It could be any chemical. It could be acid

in your body. It's a molecule when it contains a nitrogen, and it's a nitrogen flanked by carbon so it's called a secondary amine or a tertiary amine. And nitrosation is when nitrites, which is NO2, can react with that nitrogen under specific conditions to form what is called a nitrosamine, so your molecule is nitrosated to form a nitrosamine.

Q And what is -- what is the concern around nitrosamines?

A Well, as a -- as a chemical class, they've been studied quite extensively. There are different types of nitrosamines. They're broadly categorized as nitrosamines. But as a whole, they have a potential to damage DNA and induce mutations in our tests that we conduct to study that area of toxicology. And many of the nitrosamines have been shown to be carcinogenic in nonclinical species.

Q And the fact that a nitrosamine is shown at a certain level to be carcinogenic in animal species, can that necessarily be related to humans?

A In what sense? Sorry? Could you repeat the question?

Q Do you extrapolate from the animal findings and say that a nitrosamine will in fact be carcinogenic in humans?

MS. FINKEN: Object to form.
THE WITNESS: Sorry?
MS. FINKEN: I just put an objection on the record. You can go ahead and answer.
THE WITNESS: Sorry. Sorry.
A Well, the way that the nitrosamine class has been characterized is that they're -- and it's been characterized by various bodies -- is that they're predicted to be carcinogenic in humans or probable human carcinogens. But certainly the nitrosamine that we're talking about, NDMA, is defined like that, but it's not known to be a human carcinogen.
Q Why did GSK investigate the nitrosation of ranitidine when it was being developed?
A When it's being developed, so this is back in the '80s, early '80s. So as I said a moment ago, nitrosamines have been studied as a chemical class. A lot of those studies were done in the 1970s and '80s. I think there was a large amount of research done on them. People were interested about nitrosamines. They were interested about how they formed, exposure to nitrosamines given those toxicological properties that I mentioned.
One of the areas that came up for discussion was about nitrosation of medicines that people take.

That was one particular area of research. So my understanding would be that GSK examined nitrosation in relation to that area of research about nitrosamines in general.

Q Okay. And what kinds of studies did GSK conduct to assess the nitrosation of ranitidine?

A So what GSK did, as we discussed earlier, there was a series of studies about the nitrosation of ranitidine and the conditions under which it can occur. They did several studies, and they characterized the nitrosation products that could occur. But they did a specific set of conditions. Those conditions were primarily related to a test called the Hunak test, but it related to a test where you added a level of nitrite just to primarily see if your molecule would nitrosate, so it was an excessive concentration of nitrite.

Q And what did GSK's nitrosation studies reveal or show?

A They demonstrated that if you add an excess of nitrite to ranitidine under certain conditions that it will be nitrosated and you can form nitrosamines. And excess of nitrite for the purpose of this discussion was a concentration of 40 millimolar sodium nitrite. But they also demonstrated that concentrations of nitrite that are more indicative of physiologically levels of

nitrite that the nitrosation reaction doesn't occur.

Q So you mentioned physiologically relevant conditions, physiologically relevant nitrite levels. What do you mean by that?

A What I mean is the levels that you would encounter typically under this normal functioning of your body.

Q And just stepping back, from a safety perspective, from a nonclinical safety perspective, what is the interpretation of the nitrosation studies that GSK performed in the actual development of ranitidine?

MS. FINKEN: Object to the form.

A The interpretation is that you can nitrosate ranitidine if you add enough nitrite levels that wouldn't be considered physiologically relevant and that that nitrosation reaction, in general, doesn't occur at what we would call physiological levels of nitrite.

Q Would it be fair to say that that -- that those findings are reassuring from a safety perspective?

MS. FINKEN: Objection to form.

A So I would -- what I would take away from those experiments, and they're in vitro experiments, is that that reaction wouldn't occur under physiological conditions. And by that I mean the physiological levels of nitrite that we experienced.

Q How does that relate to the clinical use of the drug?

A I -- could you just expand on your question and elaborate on your question?

Q Sure. When you're talking about physiological levels of nitrite and the ability of ranitidine to nitrosate, how do the in vitro studies inform the clinical use of the product with respect to whether somebody would reasonably expect nitrosation to occur after ingestion of ranitidine?

A Well, it wouldn't be expected to occur.

Q Has the FDA evaluated the nitrosation studies that Glaxo performed in connection with the development of ranitidine?

A Yes, they have. They have. It was part of that summary basis of approval, so the NDA submission and the eventual review.

Q So I'd like to show you the summary basis of approval.

MR. SHEEHAN: I think it's in the box. I don't know who's controlling it, but it's probably just under summary basis of approval or NDA. We'll mark this as Defense Harvey 1.

(Defense Harvey Exhibit No. 1 was marked.)

BY MR. SHEEHAN:

Q What you've been handed, Dr. Harvey, is the summary -- FDA Summary Basis of Approval for NDA 18-703. The Bates number at the bottom right-hand corner of the beginning of this document is GSK_ZAN_0000012672. Do you have that document?

A I do.

Q Okay. And when you mentioned summary basis of approval, is this the document that you were talking about?

A Yes, it was.

Q And is this the FDA summary basis of approval for the original NDA application for ranitidine?

A Yeah, that was my -- that's my understanding, yes.

Q Okay. And just directing your attention to page 6 of the document, do you see the paragraph on that page -- and you can blow this up -- beginning, "although" --

A Yes, I can.

Q -- "N-nitroso? Okay. If you could just blow that up so that it can be seen. It states, quote, "Although N-nitroso-nitrolic acid is a potent mutagen, it is not likely to be formed in the stomach of a patient ingesting ranitidine as an unrealistically large amount of nitrite needs to be present to form and

maintain the nitrosamine. For this reason, and also because ranitidine was not carcinogenic in lifespan studies of rodents, in vitro nitrosation of ranitidine to a mutagenic nitrosamine does not seem to have practical clinical significance." Did I read that correctly?

A Yes, you did.

Q How did the FDA evaluate and interpret the nitrosation studies that were performed in connection with the development of ranitidine?

MS. FINKEN: Object to form.

A I'm struggling to understand in what sense because this is part of the FDA review. There is also another review at the end of the document, I think.

Q Understood. I'm just -- I guess I can simplify this for you. Is FDA's evaluation of the nitrosation of ranitidine consistent with your interpretation of those studies?

MS. FINKEN: Objection to form and characterization of the document.

A I mean, I think that the summary at the end is what I was -- what I was explaining a moment ago about I'm describing it as the reaction wouldn't occur normal physiological conditions, and I think that last sentence there about the in vitro nitrosation of nitrosamine does

not seem to have practical clinical significance, so I think they're the same thing.

Q In that paragraph, they also describe that ranitidine was not carcinogenic in lifespan studies in rodents, correct?

A That's correct.

Q Directing your attention to the previous page, page 5 of the document, do you see in the second paragraph on that page there's a description of the carcinogenicity studies? Would you blow that up?

FDA states that, quote, "The carcinogenicity studies did not give any indication that ranitidine was tumorigenic. Specifically, the drug did not produce any neoplasia, intestinal metaplasia, or dysplasia of the gastric mucosa, effects seen with some other H2-receptor antagonists, nor did it increase the frequency of Leydig cell tumors, as does cimedatine." Did I read that correctly?

A Yes, you did.

Q Based on this, can you describe FDA's interpretation of the lifetime carcinogenicity studies that were done in connection with development of ranitidine?

A I don't have --

MS. FINKEN: Objection, form, and objection,

mischaracterizes the document.
THE WITNESS: Sorry for interrupting you.
Sorry.
A It's in that first sentence that carcinogenicity studies did not give an indication that ranitidine was tumorigenic.
Q Is that consistent with your interpretation of carcinogenicity studies?
A Yes, and that's consistent with the summary of those studies in the NDA that GSK submitted.
Q Two paragraphs below do you see a description of the mutagenicity studies?
A I do, yes.
MR. SHEEHAN: Would you just blow that up?
Q Would you just read that to yourself, Dr. Harvey? Let me know when you're done.
A (Reviewing document.) Yes, I've read it.
Q Can you describe in simple terms how the FDA is interpreting the mutagenicity studies that were done in connection with the development of ranitidine?
MS. FINKEN: Objection to form and objection to it mischaracterizes the document.
A I mean, in summary what they're saying is that the ranitidine isn't mutagenic if we -- if we use the recommended test concentrations in the assay.

Q Is that consistent with your understanding of the mutagenicity testing that was performed in connection with the development of ranitidine?
A Yes, that is consistent with it.
Q Now, I'd like to direct your attention to -- if we can go using the same -- same document here, if you can go to Bates ending in 12786. Can we do that on the screen and just blow up the top of the screen there?
Dr. Harvey, this is a pharmacologist review of NDA 18-703 dated July 6 of 1982. Do you see that?
A I do.
Q Okay. I'll represent to you that this is the pharmacology -- that this is the FDA pharmacologist review of the original NDA application for ranitidine. If we can now go to page 12812 -- we're trying to get to page 12812. Are we there? Doctor, are you with me?
A Yes, I am, yeah.
MR. SHEEHAN: Can you just blow up the last paragraph on page 12812?
Q Counsel for plaintiffs asked you a number of questions with respect to a finding in a mouse carcinogenicity study about a potential increase in pulmonary tumors in female mice. Do you recall that, Dr. Harvey?
A Yes, I do.

Q Is that finding described in this paragraph?
A Yes, it is, pulmonary tumors in females.
Q Okay. And despite that finding, what is the conclusion that's represented in the first sentence of the paragraph?
MS. FINKEN: Objection to form.
A I mean, the sentence reads, "Concerning carcinogenicity, the chronic studies in rats and dogs and the lifespan carcinogenicity studies in mice and rats indicated that R," which is ranitidine, "was not carcinogenic in the three species tested."
Q And so the carcinogenicity or potential carcinogenicity of ranitidine was tested in three species; is that correct?
A Yes.
Q And pursuant to the FDA pharmacology review dated July 6, 1982, those studies did not show any carcinogenicity, correct?
MS. FINKEN: Objection to form and objection to mischaracterizing the document.
A As I said before, that's the summary of the reports, and it was in the NDA submission, and now it's -- it's also described by the pharmacology reviewer too.
Q Okay. And just to -- just to sort of sum this

up in a way that's not leading, what is your understanding of the FDA's interpretation of the lifetime carcinogenicity studies performed by Glaxo in connection with the development of ranitidine?

A Well, it's not carcinogenic in the species tested.

Q And what is your understanding of the FDA's interpretation of the mutagenicity studies done in connection with development of ranitidine?

MS. FINKEN: Objection to form.

A That ranitidine was not mutagenic. Ranitidine itself --

Q And what was --

A I'm sorry. Ranitidine itself was not mutagenic.

Q And what is your understanding of the FDA's evaluation of the nitrosation studies done in connection with development of ranitidine?

A There was a recognition that ranitidine can be nitrosated but under conditions that wouldn't be physiologically relevant.

Q And is that --

MS. FINKEN: Just insert my objection to the last question. I didn't get it out quickly enough. Thanks.

MR. SHEEHAN: Am I speaking loud enough, Tracy?

MS. FINKEN: You are. Dr. Harvey, I might have objections to some of these questions, so if you could just pause a sec before you answer so I get it out, I would really appreciate it so I don't interrupt you.

THE WITNESS: Of course, sorry.

MS. FINKEN: Thank you.

MR. SHEEHAN: You can pull this document down. Thanks.

(Harvey Defense Exhibit No. 2 was marked.)

BY MR. SHEEHAN:

Q Counsel for plaintiff asked you some questions about a study called the Tanner study. Do you recall that?

A I do.

MR. SHEEHAN: Let's bring that up, actually. Let's bring it up so that we've got it. That is probably just under Tanner study. There you go, pops right up.

BY MR. SHEEHAN:

Q Dr. Harvey, what is the Tanner study?

A The Tanner study -- and there's a title there so I'm going to read out, "The determination of

N-nitrosodimethylamine formed by the reaction of ranitidine hydrochloride with sodium nitrite."

Q And when was this study performed?

A This study -- the date of the study is 1982, so that's the date it was issued, the report.

Q And what was Dr. Tanner evaluating in this?

A He was -- he was evaluating whether ranitidine could be nitrosated to form NDMA.

Q And what were the findings from this study?

A So this is an in vitro study, and -- it's in vitro study so it's -- you know, it -- yeah, in vitro, I think we went through that. What they were doing is some incubation of ranitidine with different concentrations of nitrite, one that resembles a physiological concentration of nitrite and one that represented an excess of nitrite. And the study was conducted to understand if ranitidine reacts to form NDMA under those specific conditions.

Q And what did Dr. Tanner find?

A Dr. Tanner found that, as the previous studies have shown, that under excess concentrations of nitrites that ranitidine could be nitrosated to form nitrosamines. In this case, the nitrosamine was NDMA. And that under physiological concentrations of nitrite, as described in the report, that that reaction didn't

occur.
Q Do you know why Dr. Tanner was evaluating NDMA specifically?
A My understanding was that GSK were informed by a different company that ranitidine could be nitrosated to NDMA -- to form NDMA, but I think that's what they were told by this other company, and so GSK were following up on that information and doing their own studies.
Q Okay. And what was the other company?
A The other company was a company called SmithKline and French.
Q And have you seen that company's evaluation of the nitrosation of ranitidine?
A I've seen a report that describes that SmithKline and French study with ranitidine at different concentration of nitrite.
Q And what did the results of that evaluation show?
A It's consistent with the Tanner study that you, of course, can nitrosate ranitidine in an excess of nitrite to form NDMA, low levels of NDMA, in terms of chemical yield, and that that reaction can occur.
Q And how do those studies -- by those studies meaning the SmithKline French study and Tanner study --

relate to the previous work that had been done evaluating nitrosation of ranitidine?

MS. FINKEN: Objection to form.

A So, again, it -- it shows that you can nitrosate ranitidine if you have an excess of nitrite, an excess of nitrite in these studies was some 40 millimolar of nitrite, and that reaction can occur. But they're not concentration of nitrite that you would experience physiologically.

Q Was the evaluation of the nitrosation of ranitidine performed by Glaxo a robust evaluation?

MS. FINKEN: Objection to form.

A Could you repeat the question?

Q I'm trying to get a sense of how you interpret the robustness, the reliability, the validity of the data that was generated in connection with the evaluation of the nitrosation of ranitidine.

How would you describe that -- those studies, that body of data?

MS. FINKEN: Objection, form.

A Well, they -- obviously they did a lot of studies to understand that nitrosation reaction and what can occur to nitrosation reaction and what could occur in terms of nitrosamine formation. It was -- it was done. I've seen the reports. It was published as well,

that nitrosation reaction and the discussions around the nitrite concentrations. So from what I can see, quite an unusual study to see, but they look thorough to me.

Q Have any additional in vitro studies evaluating the nitrosation of ranitidine come out since the evaluation that GSK performed in 2019 in connection with the EMA responses?

MS. FINKEN: Objection to form.

A My understanding is there have been a series of studies conducted that have been published in the literature.

Q Okay. I'd like to show you the Gao study.

MR. SHEEHAN: It's in there as well, if we could just pull that one out. And can you just blow up the title? Did we mark the Tanner study? We can call that Harvey Defense Exhibit 2. We'll call this Harvey Defense Exhibit 3.

(Harvey Defense Exhibit No. 3 was marked.)

BY MR. SHEEHAN:

Q This is a study. The first named author is -- I'm not going to try to pronounce the first name, but the last name is Gao. The title is, "In Vitro Analysis of N-nitrosodimethylamine (NDMA) Formation From Ranitidine Under Simulated Gastrointestinal Conditions." Have you seen this study before, Dr. Harvey?

MS. FINKEN: Object to form and scope.
A I have seen this study before.
Q Can you just describe at a high level what the findings of this study show?
A Can we come off the title and go to the conclusions?
Q Just blow up the conclusions and relevance.
A It says that the short summary of that last line that the findings of this in vitro study suggest that ranitidine is not converted to NDMA in gastric fluid at physiological conditions.
Q Do you have an understanding as to what institution published this study?
A Yes. The institution is the FDA, the Food and Drug Administration.
Q Are the findings from the FDA's evaluation of the nitrosation of ranitidine consistent with the data generated by Glaxo?
MS. FINKEN: Objection, form.
A Yes, they are.
Q How so?
A I think that Gao and the other authors, the Gao study demonstrates that you can indeed nitrosate ranitidine if you have an excess of nitrite and that reaction can occur and you can form NDMA. But under

concentrations of nitrite that you would experience under physiological conditions, that reaction doesn't occur, which is similar to the nitrosation studies that GSK did with ranitidine.

Q Now, all the studies that we've been discussing about the nitrosation of ranitidine are what you've described as in vitro studies, correct?

A That's correct.

Q Okay. Do you have an understanding as to whether any studies in humans have been conducted to evaluate whether NDMA forms after ingestion of ranitidine?

A Yes. There's at least two studies that I'm aware of, two studies that --

Q What two studies are you thinking of?

A There's a study by some authors called Zeng and Mitch that spoke about the presence of NDMA in the urine of humans dosed with ranitidine. And there's been a subsequent study conducted by the FDA on -- it was a clinical study where people were administered ranitidine, and they examined urine and plasma for the presence of NDMA.

Q When was the Zeng and Mitch study published?

A I think that was 2016.

Q And do you know what the current status of

that study is today?
A It's -- my understanding is the study has been retracted.
MR. SHEEHAN: Okay. Why don't we go ahead and mark that as well as Harvey Defense Exhibit 4. It should probably just be under 2016 or something like that.
(Harvey Defense Exhibit No. 4 was marked.)
BY MR. SHEEHAN:
Q What's shown on your screen here, Dr. Harvey, is the retraction notice for the Zeng study 2016. If you could just go to the next page, please, just get the title of the study. This is a study entitled, "Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine," study author is Teng Zeng and William A. Mitch.
Is this a study that you were referencing earlier, Dr. Harvey?
MS. FINKEN: I'm just going to object to form and scope.
A Yes. This is the Zeng and Mitch study from 2016.
Q In connection with your evaluation and responding to regulatory requests in 2019, did you evaluate this study?

A Yes. It was evaluated by several people in the US and UK.
MS. FINKEN: Objection to scope.
Q What was your assessment of the study at that time?
A Well, we couldn't quite understand the outcomes of the -- the reported outcomes of the study.
Q And do you have a sense of why you couldn't understand the reported outcomes of the study?
A Well, because -- because we didn't understand how there could be that level of NDMA in the urine of patients taking ranitidine based on our understanding of that nitrosation we actually discussed.
Q And as you said, this study has now been retracted, correct?
MS. FINKEN: Objection form, scope.
A That's correct.
Q And if we could just go to the retraction notice. Dr. Harvey, what is your understanding as to why the Zeng and Mitch 2016 study was retracted?
A It's something to do with the analytical method that was used in the study. It's an analytical chemistry area. I'm not an analytical chemist. It's related to the use of the technique they adopted to examine -- well, to measure NDMA in the urine of the

patients that are taking ranitidine.
Q In your assessment, is the Zeng-Mitch study a reliable evaluation of the potential for NDMA to form after ingestion of ranitidine?
MS. FINKEN: Objection to form and scope.
A Again, I'm not an analytical chemist, but from my understanding, and it's outlined there, is that the authors have informed that their NDMA measurements are not reliable, but, you know, that's the retraction notice. I'm not -- I don't know the ins and outs of the actual analytical procedures, but that's the outcome and the rationale for the retraction.
Q You mentioned another study assessing whether or not NDMA is increased after somebody takes ranitidine. What was the name of that study?
A That study I believe the author's name is Florian.
MR. SHEEHAN: Okay. You can take this one down. Let's bring up Florian. And if we could blow up the title. We'll call this Harvey Defense Exhibit 5.
(Harvey Defense Exhibit No. 5 was marked.)
BY MR. SHEEHAN:
Q This is a study entitled, "Effect of Oral Ranitidine on Urinary Excretion of

N-nitrosodimethylamine (NDMA) A Randomized Clinical Trial." Did I read that correctly?

A Yes, you did.

Q And the first named author is Jeffry Florian; is that correct?

A That's correct.

Q Do you have an understanding of what institution published this study, Dr. Harvey?

MS. FINKEN: Object to form and scope.

A My understanding is it was the FDA, the US FDA again.

Q And what were they evaluating in this study?

A I mean -- sorry. It's -- the title on the screen is that they were looking to see whether, or as was reported with the Zeng and Mitch study whether oral ranitidine administration results in urinary excretion of NDMA.

Q Do you know whether they looked at any other outcomes besides urinary excretion of NDMA?

A I recall they also looked at the plasma for NDMA as well, but I think they call it a primary outcome was the urine, a urine excretion of NDMA.

Q So a secondary outcome would be plasma concentrations of NDMA?

A I think that's how they described it, primary,

secondary outcomes. I think there's some tables in the publication.

Q And what is your understanding of the results of this study?

A If we could go off the title and we could go to the conclusion because I don't want to -- I don't want to misphrase it. So, again, that last -- for the same reason, that last line, that the findings do not support that ranitidine is converted to NDMA in a general healthy population.

Q Dr. Harvey, just focusing on the conclusions and relevance here, what -- what dose of oral ranitidine was used in this study?

A It was 300 mgs.

Q And was this a placebo-controlled trial?

A Yes, it was.

Q And were dietary considerations taken into account?

A Yes, they were. There's a distinction there about noncured and cured -- noncured meats and cured meats diet, which would relate to a level of nitrite, which is all described in the publication.

Q And what would be the purpose of giving somebody a cured meats diet?

A It would -- it would be to provide a high

nitrite diet.
Q Are the results of the FDA's clinical trial of NDMA formation after ingestion of ranitidine consistent with the FDA's in vitro study of the nitrosation of ranitidine?
MS. FINKEN: Objection, form, scope.
A They're consistent in the sense that the conclusions are the conclusions being that under physiological concentrations of nitrite that you don't get that nitrosation reaction occurring to form NDMA.
Q And is that consistent with GSK's evaluation of the nitrosation of ranitidine performed in connection with development of their product?
MS. FINKEN: Objection, form, scope.
A Yes, it is consistent with those previous studies I've described.
Q Dr. Harvey, in your assessment, did GSK perform a thorough and robust evaluation of the nitrosation potential on ranitidine?
MS. FINKEN: Objection.
A Yes, they did, and it was -- there were several studies. They were submitted to agencies. Some of them were published in the literature. But, yes, the assessment would be robust.
Q How would you describe the scientific

robustness of the carcinogenicity evaluation of ranitidine that Glaxo performed in connection with development of the product?

MS. FINKEN: Objection, form.

A Again, there was a -- there was a series of studies, lifespan studies in rats and mice and there was chronic studies in dogs of three species. We just discussed that a moment ago. They were all studies that are considered robust. They were all reviewed within -- internally within GSK and then subsequently reviewed by multiple regulatory agencies, so they would be considered robust.

Q And how would you describe the same question as it relates to the mutagenicity studies performed by GSK or Glaxo in connection with the development of ranitidine?

MS. FINKEN: Objection, form.

A It's the same position. The studies are robust for the same reasons.

Q Dr. Harvey, do you stand by the work that GSK performed in evaluating the nonclinical safety of ranitidine?

MS. FINKEN: Objection, form.

A Yes, I do. It's a thorough evaluation.

Q Was there any evidence in the nitrosation

studies, the mutagenicity studies or the carcinogenicity studies that we've discussed or that you've reviewed in connection with your preparation for this deposition that suggest a carcinogenic potential of ranitidine?

MS. FINKEN: Objection, form.

A No, there isn't.

Q And why do you say that?

A Well, for the reasons we've discussed and the studies -- there were comprehensive mutagenicity studies conducted, comprehensive carcinogenicity studies conducted and a thorough evaluation of the conditions under which ranitidine would nitrosate.

Q Now, counsel for plaintiff asked you some questions about cancer outcomes in humans in a postmarketing setting. Do you recall that?

A I know there was a discussion about a document that was described as a clinical study relating to cancer outcomes, yeah, I do recall that earlier. It's been a long day, but I recall that study.

Q And is that something that the pharmacovigilence department would review and evaluate?

MS. FINKEN: Objection, form.

A Well, if it's a clinical study related to -- if it's in that phase 4 stage, so it's postmarketing, that -- in my understanding, that would come under the

pharmacovigilance area unless there was a specific clinical study we were asked to do subsequent to approval, but I don't know if that's something that occurs. It's not something I'm familiar with. So to me, that postmarketing piece would be pharmacovigilence.

MR. SHEEHAN: Can we bring up what was previously marked as Exhibit 4649?

Q This is a document previously marked by counsel for the plaintiffs, and I believe it was Exhibit 4649. It's protocol RAN-X03 report number GGL/91/011. Do you recall discussing this document with counsel for plaintiffs?

A Yes, I do, yes, yes.

MR. SHEEHAN: If you could go to the abstract, please. It's on the third page of the document, I believe. If you could just blow that up.

Q The abstract indicates that "This study is an open, retrospective, case-note investigation of patients with duodenal ulcer disease who received periods of continuous long-term ranitidine (150 mgs nocte or 150 mgs bd, twice daily) therapy." Did I read that correctly, Dr. Harvey?

A Yes, you did.

Q Would you describe this as a clinical trial, Dr. Harvey?

A I don't know is the answer. It looks to me like a -- certainly it's a clinical study of sorts, but I'm not quite sure about the distinction. It's a -- it's a clinical study. It's an investigation of patients. But as I said, it looks to me like a clinical study. It looks to me like a pharmacovigilence study.

Q Okay. Let me ask it this way. Is there any -- does the abstract indicate that there's any control arm in this study?

MS. FINKEN: Objection, form.

A No. The abstract doesn't talk about a control. No, it doesn't.

Q Okay. After having reviewed this study and discussed it with counsel for plaintiffs, would this be the type of data that would be evaluated by the pharmacovigilence department at GSK?

A I was just looking at the authors to see what department it was. It -- it looks to me like a clinical study that is related to pharmacovigilence, so yes.

Q And I believe you testified earlier that adverse event data in connection with postmarketing reports will be incorporated into the worldwide pharmacovigilence database; is that correct?

A I say and I said before I'm not a pharmacovigilence expert. That is my understanding that

GSK tracks safety data from clinical trials and that they track it and they store it and they database it. It's an area that I'm not overly familiar with. I think earlier on we spoke about or I spoke about how it's a particular discipline, it's a clinical discipline, but my understanding is that we would track such data.

Q Do you have an understanding that the pharmacovigilence department conducted a review of the potential carcinogenicity of ranitidine in humans in 2019?

A Sorry. I -- that particular group, and we discussed it earlier on today, they conducted an assessment that was part of our response to the European Medicines Agency, yes.

Q What was the conclusion of that assessment?

MS. FINKEN: Objection, form, scope.

A I have the conclusion here because I don't want to misquote it. It's the document, the EMA response that I had earlier in the day. And it says, "Review of the GSK safety database and the clinical literature indicated no evidence that ranitidine therapy is causally associated with carcinogenesis." So they did an assessment as part of that EMA response, and that is -- I think that's the summary of that position.

Q And is that conclusion consistent with your

assessment of the nonclinical data for ranitidine that we've discussed today?

MS. FINKEN: Objection, form, scope.

A Well, certainly we've discussed that nonclinical data and we've discussed the nitrosation. We've discussed the mutagenicity, and we've discussed the carcinogenicity. So that would be consistent with that, yes.

Q Now, counsel for plaintiffs asked you some questions about whether GSK hid clinical data, hid safety data. Do you recall those questions?

MS. FINKEN: Objection, form.

A Not exactly, no, I don't, but I -- I recall them asking me about the Bell report, Angus Bell.

Q In your experience, has GSK ever intentionally hidden safety data for any of its products?

A I mean, not -- in my experience, no, absolutely not, no.

Q And why not?

A I mean, we could -- well, you wouldn't do it. It's hard to explain why you would. Of course we generate data. We -- we generate the data. We -- we report the data. That's just -- that's the way the company works.

Q Does GSK take the safety of its medications

seriously?

A Yes, of course it does, yes. It's part of our code of conduct. It's a top priority, patient safety, yes.

MR. SHEEHAN: Tracy, can we take five? I might have another question or two, but if we could jump off the record for five minutes, that would be appreciated.

MS. FINKEN: Okay.

THE VIDEOGRAPHER: We're now going off the video record. The time is 2011 UTC, 4:11 p.m. EDT.

(A 15-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 2025 UTC, 4:25 p.m. EDT.

MR. SHEEHAN: Dr. Harvey, thank you so much for your time. I don't have any further questions at this time.

MS. FINKEN: Let's go off the record for one minute.

THE VIDEOGRAPHER: We are now going off the video record. The time is 2025 UTC, 4:25 p.m. EDT.

(A 20-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 2045 UTC, 4:45 p.m. EDT.

- - - - -

REDIRECT EXAMINATION

BY MS. FINKEN:

Q Hi, Dr. Harvey. I just have a couple of follow-up questions based on some of the questions your counsel asked you just a little while ago, and I'm going to jump around a little bit, so just bear with me and we'll get you out of here.

Your counsel asked you some questions about the cancer adverse events that were reported and studied, RAN-X03. Do you recall that?

A Sorry. I can't see you again, but the RAN-X03 study, I have the hard copy of it in front of me.

Q Okay. And your counsel asked you some questions about adverse events from studies that were conducted by GSK and their being evaluated by the pharmacovigilence department. Do you recall that?

A I do remember that conversation.

Q Okay. Do you know whether the adverse events related to cancer that were reported in study RAN-X03 were logged into the global safety database?

A I don't know. It's a pharmacovigilence area, so it's not an area I'm an expert on. It's their area, so I don't know the answer to your question.

Q Do you know for a fact sitting here today whether or not the GlaxcoSmithKline pharmacovigilence

department evaluated those adverse events of cancer that were reported in RAN-X03?

MR. SHEEHAN: Objection.

A I don't know because it's a different department. It's the pharmacovigilence department, and that's not my department, my area.

Q Just very quickly, there was an exhibit that we entered previously, Exhibit 4713, that was an e-mail between Natalia Karkoszka and Anup Pingle relating to adverse events from clinical trials that they were investigating in the summer of 2019. Do you recall that?

A I do recall it, yes.

Q And I'm going to request that Erik pull that e-mail up. Starting on the second page, Natalia Karkoszka lists specific study IDs with numbers of cancer adverse events that had been recorded in those studies. I'd like you to take a look at this list, Doctor, and just confirm for me that the study RAN-X03 is not actually contained on this list that was provided by Natalia Karkoszka in July of 2019.

A I'm sorry. RAN-X03. I can't see RAN-X03 there, but, again, it's related to pharmacovigilence. I can't see RAN-X03 on that list. But I don't know what that list is. I think from Natalia's e-mail it's about

clinical trials, so I'm assuming that relates to clinical trial data, if we could zoom back out.
Q Doctor, that's okay. I just wanted to make sure I wasn't missing that study number contained on the list provided by Natalia in July of 2019, and you confirmed that it is not contained on there, so thank you for that. And just for the sake of efficiency, I'm going to move on.
Dr. Harvey, you had been asked about the summary basis of approval by your counsel. Do you remember that?
A I do.
Q And do you understand that the summary basis of approval is drafted by GlaxoSmithKline, not by the FDA?
MR. SHEEHAN: Objection.
A So there may be a draft, but certainly there's a -- the review at the end that we looked at was the review of the pharmacology reviewer.
Q Okay. But are you -- were you aware until I just mentioned it that the summary basis of approval is actually drafted by GlaxoSmithKline?
MR. SHEEHAN: Objection.
A I -- I wasn't aware that we drafted it, but I'm assuming if we drafted it, then there's a draft that

goes to the FDA, and then they will then edit it or review it and modify it. But, I mean, certainly in the back of that summary basis of approval there appears to be a review by the FDA reviewer. The pharmacology reviewer. Sorry.

Q No, that's okay. One of the questions that your counsel asked you about was N-nitroso-nitrolic, and would you agree with me, Dr. Harvey, that N-nitroso-nitrolic acid is not NDMA? It's not the same thing as NDMA, correct?

A N-nitroso-nitrolic acid is a different entity, yes, to NDMA, yes.

Q And is it a different nitrosamine?

A Well, they're both nitrosamines, so they're different molecules, but they both share that common N-nitroso group.

Q But NDMA is a different nitrosamine than N-nitroso-nitrolic acid, correct?

A Yes, that's correct.

Q Okay. And your counsel asked you some questions about the Mitch-Zeng study, the Florian study and the Gao study. Do you recall that?

A I do, yes.

Q Would you agree with me that those three studies were not preclinical or clinical studies

conducted or sponsored by GlaxoSmithKline?
A So neither of them -- so none of those studies were studies commissioned by GlaxoSmithKline, that's correct.
Q And none of them were conducted by GlaxoSmithKline, correct?
A No, that's correct.
Q When did SmithKline French merge with Glaxo to form GSK?
A Well, I think -- I think SmithKline -- I don't know the exact history, but I was actually -- I started at SmithKline Beecham, so it was SmithKline French before it was SmithKline Beecham. And then -- I'm trying to recall when it merged. Was it 2001? 2002? I can't -- it was around then, I think. It was quite recent -- it was quite soon after I joined SmithKline Beecham.
Q So the companies have been merged for roughly 20 years, correct?
A I would say that's a reasonable estimate, yeah, I would have thought so. I don't know the technical pieces about when they officially merged, but that would seem about right, yeah.
Q So after SmithKline merged with Glaxo to form GSK, did anybody ever request that the SmithKline French

NDMA study be retracted?

MR. SHEEHAN: Objection.

A I'm sorry. I'm not sure I understand -- understand the question. Sorry. Could you repeat it or rephrase it?

Q Did anybody at GlaxoSmithKline request that the SmithKline French NDMA ranitidine study be retracted?

A Be -- sorry. Be retracted in what sense? Sorry. I don't follow you. Sorry.

Q Okay. Let me ask you this: When did you first review the SmithKline French study relating to NDMA being formed in ranitidine?

A It was relatively recent, actually. It was -- I knew that SmithKline French had done a study because that was the rationale for the conduct of the study known as the Tanner study, but I'd only seen the SmithKline French study relatively recently.

Q When did you become aware that SmithKline French had conducted a study evaluating ranitidine's ability to form NDMA?

A I don't know the exact date of when it -- when that -- when I found out. It was -- there was a Tanner study and then there was a six monthly report, I think it was called. I think that's the title of it. It was

some sort of departmental report that spoke about SmithKline French having done a study. I can't recall when that was with accuracy, sorry, but it was within the last -- well, it was post-September 2019, so it was sometime in the last two years, approximately.

Q And that holds true for the Tanner study as well. The first time that you became aware that the Tanner study had been conducted was post-September of 2019, correct?

A Yeah, yeah, that's correct.

Q Dr. Harvey, you have been asked some questions about impurity levels and impurity thresholds. Do you recall that?

A I do. In relation to Q3A, yes, I do.

Q And is it fair to say that not all impurities are created equally?

MR. SHEEHAN: Objection.

A In what sense? In the -- in the levels or --

Q Correct.

A Yeah, different impurities will form at different levels, that's correct.

Q The impurity threshold does not apply to genotoxic carcinogens like NDMA, correct?

MR. SHEEHAN: Objection.

A So the impurity threshold in Q3A that we

described was in place before the introduction of ICH M7, which was introduced in around 2016, I think. It's that second guidance that talks about thresholds or acceptable intakes for genotoxic carcinogens.

Q Dr. Harvey, would you agree that the threshold levels for reporting genotoxic impurities or genotoxic carcinogens like NDMA -- strike that.

Dr. Harvey, would you agree that there is no threshold for reporting genotoxic carcinogens like NDMA?

MR. SHEEHAN: Objection.

A Again, I'm not quite sure I understand the question. A threshold in what sense? An analytical threshold do you mean?

Q Shouldn't all genotoxic carcinogens that are found as impurities in drug products be reported regardless of the level?

MR. SHEEHAN: Objection.

A We have -- we follow the ICH M7 guidance that you know, we discussed earlier, and that talks about the impurity control framework for mutagenic or genotoxic carcinogens, mutagenic carcinogens.

Q And isn't it true that impurities that are genotoxic carcinogens should be avoided in drug products?

MR. SHEEHAN: Objection.

A I don't -- I don't think it's as simple as that. It's the -- the M7 guidance, if you read it, there's a recognition that when you synthesize a drug substance, that you use entities that are reactive, and some of those are DNA reactive. Some of those entities are carcinogens.

There's also a recognition about the use of carcinogens in other guidances of QC3 guidance. You use entities -- by the nature of the chemistry, you're using reactive entities, and in ICH M7 it describes the control framework that was adopted for the control of these impurities. So they're there. They're part of the chemistry of drug discovery and development, and that's why the M7 framework was introduced to provide a -- a framework for managing them.

Q Okay. Dr. Harvey, let me ask you another question. Has GSK conducted any studies to determine how quickly NDMA is metabolized?

MR. SHEEHAN: Objection.

A Not to my knowledge. I don't believe we have done any NDMA metabolism studies.

Q And you have no expertise in pharmacokinetics, correct?

A We have a separate department, and there's a DMPK department that would look at pharmacokinetics, and

there would also be a clinical department that would look at that as well.

Q And you have no expertise in ADME studies as they relate to ranitidine, correct?

MR. SHEEHAN: Objection.

A It's not my area of expertise. I have a colleague who's an expert in that area.

Q And when I refer to ADME, you understand that I'm referring to absorption, distribution, metabolism and excretion studies, correct?

A That's correct, yes.

Q And Dr. Harvey, you had indicated that -- strike that.

You were working at GSK in 2012, correct?

A 2012, yes, that's correct.

Q At that time did you know that GSK pled guilty and paid a three billion dollar fine to resolve fraud allegations and failure to report safety data?

MR. SHEEHAN: Objection, scope.

A I -- I don't recall that event. I'm not familiar with it. I'm not sure if -- no, I don't recall it. It's not something I remember.

Q Okay. Dr. Harvey, do you know that NDMA was banned from commercial use in the early 2000s?

MR. SHEEHAN: Objection.

A I'm sorry. I don't understand what commercial use means.

Q Okay. So do you have an understanding sitting here today, one way or the other, that NDMA was banned for purposes of commercial use in the early 2000s in the United States?

MR. SHEEHAN: Objection, scope.

A I don't know what you mean by commercial use. Sorry. Could you explain that component?

Q Well, for example, do you understand that NDMA -- strike that.

Let me -- let me ask you another question. You had stated earlier that -- during your questioning by counsel -- that NDMA is safe for use in ranitidine. Do you recall that?

MR. SHEEHAN: Objection.

A I don't recall saying those exact words. I think we were talking about NDMA as an impurity in ranitidine.

Q Can you purchase ranitidine or Zantac on the market now?

A I don't know, to be honest. It's my understanding that it's been recalled as a drug product.

Q Correct. So wasn't it globally recalled because it contains NDMA?

MR. SHEEHAN: Objection, scope.
A My understanding is that we -- we did a recall of the drug product, yes, that's correct. GSK did a recall of its products.
Q And why did GSK recall ranitidine and Zantac globally?
MR. SHEEHAN: Objection, scope.
A Well, because there was NDMA in the drug product, and that was a new finding, and that was the action that we took.
Q So let me just look through my notes very quickly. And just so we're clear, I just want to revisit one question I asked you.
Do you know, sitting here today, one way or the other whether NDMA was banned for use in commercial products in the United States?
MR. SHEEHAN: Objection, scope.
A I'm sorry. I don't -- I don't understand the question about commercial products. I'm not quite sure what you mean by that.
Q So, for example, NDMA had been used as a byproduct in rocket fuel. Do you know that?
MR. SHEEHAN: Objection, scope.
A As a byproduct in rocket fuel? No, I don't know about the uses of NDMA in other areas.

Q So you don't have any knowledge as you sit here today as to whether or not NDMA was banned for commercial use in the United States, correct?

MR. SHEEHAN: Objection, scope.

A Again, it's not an area that I'm familiar with about the commercial uses of NDMA in engineering or as you've described it. It's not something I'm familiar with.

MS. FINKEN: Dr. Harvey, I thank you for your time. I don't have any further questions for you this evening. I know it's late.

MR. SHEEHAN: We can wrap up.

THE WITNESS: Thank you.

MS. FINKEN: Go off the record.

THE VIDEOGRAPHER: We are now going off the video record. The time is 2105 UTC, 5:05 p.m. EDT.

(The proceedings were concluded at 5:05 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of JAMES S. HARVEY, Ph.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 287 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 4th day of October, 2021.

________________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, Notary Public, State of Florida at Large, do hereby certify that JAMES S. HARVEY, PH.D. remotely appeared before me this 29th day of September 2021 and was duly sworn/affirmed.

WITNESS my hand and official seal this 4th day of October, 2021.

Identification: British passport

________________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C

A C K N O W L E D G E M E N T

I, JAMES S. HARVEY, Ph.D., certify that I have read the foregoing transcript of my deposition given under oath on September 29, 2021; and that the transcript is a true, complete and correct record, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any attached on a separate sheet herewith.

______________________________

JAMES S. HARVEY, Ph.D.

Sworn and subscribed before me,

this _____ day of _____________, 2021.

________________________________

Notary Public, State of ______________

ERRATA SHEET - USL Job No. 374133

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

I, JAMES S. HARVEY, Ph.D., do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record with the exception of the corrections listed below:

PAGE # LINE # CORRECTION
-------------------------------------------------------

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

________ ______________________

DATE SIGNATURE OF WITNESS

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO-RECORDED DEPOSITION OF JAMES S. HARVEY, Ph.D.

Taken on behalf of the Zantac PSC
(via videoconference)

DATE TAKEN: Thursday, September 30, 2021

TIME: 5:03 a.m. - 4:32 p.m. EST

PLACE: US Legal Support - Remotely

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

MIKAL C. WATTS, ESQ.
JERRY WHITE, ESQ.
Watts Guerra, LLP
4 Dominion Drive
Building 3 - Suite 100
San Antonio, Texas 78257
mcwatts@wattsguerra.com
jwhite@wattsguerra.com

Appearing on behalf of the Zantac PSC,

TRACY A. FINKEN MAGNOTTA, ESQ.
CATELYN McDONOUGH, ESQ.
Anapol Weiss
One Logan Squire
130 N. 18th Street -- Suite 1600
Philadelphia, Pennsylvania 19103
cmcdonough@anapolweiss.com
tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC,

ROOPAL LUHANA, ESQ.
KENDRA GOLDHIRSCH, ESQ.
Chaffin Luhana, LLP
600 Third Avenue -- 12th Floor
New York, New York 10016
luhana@chaffinluhana.com
kgoldhirsch@chaffinluhana.com

Appearing on behalf of the Zantac PSC,

ADAM PULASKI, ESQ.
BRET STANLEY, ESQ.
Pulaski Kherkher, PLLC
2925 Richmond Avenue -- Suite 1725
Houston, Texas 77098
Bstanley@pulaskilawfirm.com
adam@pulaskilawfirm.com

Appearing on behalf of the Zantac PSC,

A P P E A R A N C E S: (cont'd)

ADAM M. KRAUSE, ESQ.
Krause & Kinsman Law Firm
4717 Grand Avenue -- Suite 300
Kansas City, Missouri 64112
adam@krauseandkinsman.com

Appearing on behalf of the Zantac PSC,

MATTHEW SCARVIE, ESQ.
Arnold Porter Kay Scholer, LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
matthew.scarvie@arnoldporter.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. PLLC,

MICHA NANDARAJ GALLO, ESQ.
King & Spalding, LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
mnandarajgallo@kslaw.com

Appearing on behalf of the Defendant, Boehringer Ingelheim,

A P P E A R A N C E S: (cont'd)

WILL SACHSE, ESQ.
CAROLINE POWER, ESQ.
Dechert, LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
caroline.power@dechert.com
will.sachse@dechert.com
and
JULIE WITHAM, ESQ.
Dechert, LLP
160 Queen Victoria Street
London, UK, EC4V 4QQ
julie.witham@dechert.com
and
THOMAS J. SHEEHAN, ESQ.
KIMBERLY S. PENNER, ESQ.
Shook, Hardy & Bacon, LLP
1325 Avenue of the Americas -- 28th Floor
New York, New York 10019
tsheehan@SHB.com
kpenner@SHB.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC.

ALSO PRESENT: Peiyuan Guo - GSK
John O'Tuel, Esq. - GSK
Regina Carmony - Watts Guerra
Jessica Szumla - Chaffin Luhana

THE DEPO TECHNICIAN: Erik Thorsnes

THE REMOTE VIDEOGRAPHER: Carlos Coello

I N D E X

TESTIMONY OF JAMES S. HARVEY, Ph.D.

Direct Examination by Ms. Luhana 9
Direct Examination by Mr. Watts 115
Cross-Examination by Mr. Sheehan 244
Redirect Examination by Mr. Watts 269

CERTIFICATE OF REPORTER 300

CERTIFICATE OF OATH 301

ACKNOWLEDGMENT 302

ERRATA SHEET 303

E X H I B I T S

Exhibit No. 4714 12

Exhibit No. 3155 (previously marked) 290

Exhibit No. 3157 (previously marked) 154

Exhibit No. 3383 (previously marked) 182

Exhibit No. 3946 234

Exhibit No. 4157 213

Exhibit No. 4158 142

Exhibit No. 4162 156

Exhibit No. 4163 175

Exhibit No. 4164 178

Exhibit No. 4171 158

Exhibit No. 4174 144

Exhibit No. 4175 147

Exhibit No. 4177 149

Exhibit No. 4181 127

Exhibit No. 4186 152

E X H I B I T S (cont'd)


| | |
|---|---|
| Exhibit No. 4187 | 129 |
| Exhibit No. 4190 | 181 |
| Exhibit No. 4191 | 185 |
| Exhibit No. 4192 | 131 |
| Exhibit No. 4193 | 166 |
| Exhibit No. 4198 | 168 |
| Exhibit No. 4200 | 186 |
| Exhibit No. 4202 | 164 |
| Exhibit No. 4203 | 189 |
| Exhibit No. 4205 | 134 |
| Exhibit No. 4206 | 171 |
| Exhibit No. 4207 | 200 |
| Exhibit No. 4209 | 204 |
| Exhibit No. 4211 | 206 |
| Exhibit No. 4212 | 208 |
| Exhibit No. 4216 | 193 |
| Exhibit No. 4218 | 215 |
| Exhibit No. 4224 | 135 |
| Exhibit No. 4225 | 116 |
| Exhibit No. 4226 | 191 |
| Exhibit No. 4229 | 229 |
| Exhibit No. 4231 | 120 |
| Exhibit No. 4233 | 217 |
| Exhibit No. 4235 | 217 |

E X H I B I T S (cont'd)


| | |
|---|---|
| Exhibit No. 4236 | 220 |
| Exhibit No. 4238 | 150 |
| Exhibit No. 4240 | 224 |
| Exhibit No. 4241 | 194 |
| Exhibit No. 4243 | 125 |
| Exhibit No. 4244 | 231 |
| Exhibit No. 4248 | 172 |
| Exhibit No. 4250 | 240 |
| Exhibit No. 4252 | 174 |
| Exhibit No. 4921 | 16 |
| Exhibit No. 4922 | 23 |
| Exhibit No. 4923 | 25 |
| Exhibit No. 4924 | 38 |
| Exhibit No. 4926 | 41 |
| Exhibit No. 4927 | 52 |
| Exhibit No. 4928 | 60 |
| Exhibit No. 4930 | 78 |
| Exhibit No. 4956 | 85 |
| Exhibit No. 4958 | 85 |
| Exhibit No. 4959 | 107 |
| Exhibit No. 4960 | 110 |
| Exhibit No. 4936 | 228 |
| Harvey Defense Exhibit No. 1 | 258 |
| Harvey Defense Exhibit No. 2 | 261 |

THE VIDEOGRAPHER: Good morning. We are now on the record. Participants should be aware that this proceeding is being recorded and as such all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

This is the remote video-recorded deposition of James Harvey being taken by counsel for the plaintiff. Today is Thursday, September 30th, 2021. The time is now 9:03 UTC, 5:03 a.m. EDT.

We are here in the matter of In re: Zantac (ranitidine) products liability litigation. My name is Carlos Coello remote video technician. I am not related to any party in this action nor am I financially interest in the outcome. At this time will the reporter, Laura Landerman, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE REPORTER: Yes. The attorneys participating in this deposition acknowledge I am not physically present in the deposition room and that I will be reporting the deposition remotely as well as administering the oath remotely. The

parties and their counsel consent to this arrangement and waive any objections to the manner of reporting. Assuming there's no objections, I'll go ahead and swear in the witness.

Dr. Harvey, please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

DIRECT EXAMINATION

BY MS. LUHANA:

Q Good morning, Dr. Harvey. How are you?

A Good. Thank you.

Q I'm Roopal Luhana, and I'll be asking questions today on behalf of the plaintiffs, and my colleague, Mikal Watts, will be asking questions later. Okay?

A Okay.

Q Will you please state your full name for the record?

A My name's James Stephen Harvey.

Q And we went through deposition ground rules yesterday. Ms. Finken covered them. And so I don't think there's a need to run through them again. Did you understand all the ground rules she went through

yesterday?
A This is about pausing, not talking over each other, right? Yeah.
Q Things like that. If you don't understand a question, please let me know you don't understand it, and I'll rephrase it. And in terms of communicating with your counsel, please make sure not to do it during the deposition. Don't use your cell phone or anything like that during the deposition. What she had covered yesterday, just the deposition ground rules. I want to be clear that you understand those ground rules.
A Yeah.
Q And you understand that you're under oath?
A Yes.
Q Dr. Harvey, we talked about your resumé some yesterday, and I believe when you grad -- after you graduated, after you got your Ph.D., you worked as a research assistant for about five years at Swansea University, correct?
A Yes, that's correct.
Q And thereafter you joined GSK, and that was about in 1999?
A Yeah, that's correct, yeah.
Q So you've been at GSK since 1999, so you've been there for over 20 years correct?

A Yeah, that's correct, yeah.
Q And so would you be considered a GSK-lifer?
A A GSK-lifer?
Q Yes, a lifer?
MR. SHEEHAN: Objection.
A Well, I -- I don't know. I mean, I've considered other jobs in my time at GSK, but, I mean, I've worked here 20 years or 21 years.
Q Understood.
MR. SHEEHAN: There's a little background noise, I guess.
(Off-the-record discussion was had.)
BY MS. LUHANA:
Q And Dr. Harvey, currently what's your title at GSK?
A I work in the nonclinical safety division -- nonclinical safety department, division, and I head up a group called targets and systems safety.
Q And you're the global director currently?
A Of that group, yeah. There's just one group, so it's director of that group.
Q And would you consider yourself an expert in nonclinical toxicology?
A It's such a big discipline. I think I know about toxicology, but then there's a new area I don't

know anything about. So I don't think that anyone's truly really an expert in it. I've got experience in clinical toxicology, but there are certain parts of that I'm just not an expert in at all.

Q Understood. I believe that's what was written on your resumé, Exhibit 4714, and that's why I'm asking the question.

(Exhibit 4714 marked for identificaton.)

When did you prepare this resumé?

A Why did I prepare it?

Q No, no, when did you prepare it.

A Oh, sorry. I think it was in about -- well, it was in summer of 2019 because I was applying for a new job.

MR. SHEEHAN: One second, Roopal. We're still getting that background. I don't know where that's coming from. Let's go off real quick.

THE VIDEOGRAPHER: We are now going off the video record. The time is 9:08 UTC, 5:08 a.m. EDT.

(A 10-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 9:16 UTC -- I'm sorry -- 9:18 UTC, 5:18 a.m. EDT.

BY MS. LUHANA:

Q Dr. Harvey, before we broke, we were talking about your CV, and you had referenced that you had put

it together the summer of 2019, correct?
A That was my recollection, yeah.
Q What job were you applying for then?
A The target -- the role of a target systems safety job.
Q Okay. Yesterday when we -- also on your resumé, you list Lhasa as a charity, correct?
A That's correct.
Q You're a director and trustee at Lhasa?
A Yes, that's correct.
Q Okay. And we've discussed that GSK has contracted Lhasa to do project-specific work, correct?
A Yes, that's correct.
Q And we also spoke about GSK being a member of Lhasa, correct?
A Yes, that's correct.
Q And there were a lot of other pharmaceutical companies who are also members of Lhasa, correct?
MR. SHEEHAN: Objection.
A I mean, there are other pharmaceutical companies. I don't know how many there are, but there are.
Q Do you know if Boehringer Ingelheim is a member of Lhasa?
A I don't know for certain, but I'd expect that

they would be.

Q What about Sanofi?

MS. GALLO: Let me object to form on that.

Q Is Sanofi a member of Lhasa?

A I don't know -- I don't know for certain, but I expect so.

Q Is Pfizer a member of Lhasa?

A I think they are, yes.

Q Why do you expect that they are, BI and Sanofi?

A Because Lhasa sells software for the prediction of mutagenicity of chemicals, and that software -- they actually have generated two types of software that we use as part of the ICH M7 process to assess impurities. I say they're likely to be because I also know there's another vendor that sell both type of tools, so I don't actually know what decision they actually have made. But, I mean, that's why I'm saying it's likely because there's predominantly three vendors of software, and Lhasa is one of them.

MS. GALLO: Sorry. Object to form.

Q Dr. Harvey, I understood your testimony yesterday to state that there was a separate fee to be a member of Lhasa versus a separate fee to access the software, the platform, correct?

A I think that's the case. I don't know if they put the membership fee as part of the software cost. I can't recall the exact details.

Q And you stated Lhasa is a not-for-profit, correct?

A Yes, that's correct.

Q Would you consider Lhasa a neutral entity?

A A neutral entity in what sense?

Q How do -- what do you perceive to be a neutral entity, meaning not partial to the pharmaceutical industry? That's how I'm defining it.

MR. SHEEHAN: Objection.

A Partial -- okay. So I need to understand it. Are you saying that Lhasa has pharmaceutical companies that are members and use their software, so that is their sort of customers, if you like, right? Is that what you're saying?

Q No. Software you would have access to. I understand that. I'm saying in terms of contractual work when you're partnering with Lhasa, are you pursuing the same agenda or is Lhasa an impartial, unbiased party?

MR. SHEEHAN: Objection.

A I would say that Lhasa is impartial and unbiased in terms of data analysis, data assessment.

They have their own scientists.

Q What about aside from data assessment? What else does Lhasa provide?

A When, I mean, data assessment, they -- I mean, they write papers. They write papers. That's what is in my mind when we talk about bias.

Q Okay. And you view them to be unbias and impartial, correct?

A As data scientists, I would say that.

Q Okay. Let's mark as Exhibit 4921 your deposition notice.

(Exhibit No. 4921 was marked.)

MS. LUHANA: Erik, do you have it? Can you please put it up?

THE DEPO TECH: This was previously marked as 4255.

MS. LUHANA: Oh, okay. It was premarked.

THE DEPO TECH: Yeah, in Mr. Watts' package. And just as an FYI, this one does show the 4:00 a.m. start time versus the 5:00.

MS. LUHANA: Great.

BY MS. LUHANA:

Q Dr. Harvey, have you seen this before?

A Yes, I have, yeah.

Q You understand that you're here testifying

pursuant to this deposition notice?

A Yeah, yes.

Q What do you understand the allegations to be in this case?

MR. SHEEHAN: Objection.

A Allegations in what sense? It's a product liability litigation in regards to Zantac and the presence of NDMA.

Q Correct. But why are plaintiffs bringing a lawsuit against GSK, to your knowledge?

MR. SHEEHAN: Objection.

A It's related to the potential concerns around the safety of the ranitidine molecule.

Q And what are the plaintiffs alleging, to your knowledge, about NDMA in Zantac?

MR. SHEEHAN: Objection.

A Well, I don't know the details of all of cases brought forward, but it would be related to the presence of NDMA and the potential carcinogenicity of that component.

Q And a number of the plaintiffs in this litigation are alleging that they are suffering from cancer as a result of using Zantac which contains NDMA, then. Is that what you understand the allegations to be?

MR. SHEEHAN: Objection.
A That's a broad understanding of the allegation. Allegations, sorry.
MS. LUHANA: You can take this notice down.
Q Dr. Harvey, do you agree that NDMA is a genotoxic carcinogen?
A I'd certainly say that NDMA is genotoxic in our tests that we do in genetic toxicology, so that would be genotoxic. And I certainly know that it's carcinogenic in multiple nonclinical species, so it would be a genotoxic carcinogen in that context, yeah.
Q What other context would there be?
MR. SHEEHAN: Objection.
A Well, genotoxic carcinogen, so that's the data that we would use to define that description.
MR. SHEEHAN: Objection.
Q So you would agree with me that NDMA is a genotoxic carcinogen, correct?
MR. SHEEHAN: Objection, asked and answered.
A I think I just gave my answer. It's genotoxic in our test and they're nonclinical species, typically. And then there's been shown to be carcinogenic in nonclinical species, so I accept that it's a genotoxic carcinogen.
Q Doctor, do you agree with me that the linear

dose model is used for NDMA risk assessment, correct?
MR. SHEEHAN: Objection.
A If you're -- if you're referring to the linear dose model in ICH M7 and that impurity control framework, I understand that it is a linear dose -- did you say linear dose response model?
Q That's correct.
A I understand that encompassed in ICH M7, yes.
Q And have you seen a linear dose model used by a number of other regulatory agencies?
MR. SHEEHAN: Objection.
A Well, the linear dose model that you're referring to is part of ICH M7, so, of course, I've seen it in place because ICH M7 is in place.
Q And do you understand the linear dose model to extend a straight line from a point at the lower end of the observed range of effect, cancer in this case, to zero?
MR. SHEEHAN: Objection.
A So my understanding of that linear -- sorry -- linear dose response model on M7 is that we have a dose that effectively induces genes in one in two animals, and then there's a linear extrapolation to a theoretical dose. And also that first -- I shouldn't say theoretical dose. It's a calculate dose -- calculated

dose. And there's a linear extrapolation to a dose that would be theoretically associated with a one in a hundred thousand lifetime excess cancer risk.

Q And this is a model that's used because the thought is that genotoxic carcinogens have effects that are irreversible and can accumulate over a lifetime, correct?

MR. SHEEHAN: Objection.

A It's certainly the model that's been deployed within the ICH M7 guidance and that framework. It's -- it's the linear model in ICH M7, and that's the framework we use for the control of mutagenic impurities. That's the use case that I'm familiar with.

Q And to protect public health, regulatory bodies have concluded that DNA damage in a single cell can be assumed to be the point of origin of cancer, correct?

MR. SHEEHAN: Objection.

A I mean, I don't think it's that simple. I think we know that cancer is a multifactorial process, and gene mutation and the mutations that lead to a change in the activity of a protein are one of the components. But, I mean, it certainly is a multistage process. It's very complicated. There's huge amounts of research on it, but mutation is one component of it.

Q Would you agree at the conservative end of the theory that one molecule of a carcinogen is capable of causing one adduct, creating one mutation, and one mutated cancer-related gene that finally leads to cancer?

MR. SHEEHAN: Objection.

A So that is the most conservative sort of -- I don't know how to describe it -- most conservative default starting point. I think -- I think the field has certainly moved beyond that as we've learned more about the hallmarks of cancer.

And to give some context is that our DNA is mutated all the time. It's mutated every time it replicates. It mutates every time there is gene transcription, expression. It mutates all the time. So there's mutations, there's adducts, and so there's a huge volume of mutation in our cells in everyday life. And so I think conceptually while that linear adduct mutation gene, I understand that pathway, it's more complicated than that.

Q Understood. But do you agree with the words that I just -- I just detailed in my question?

MR. SHEEHAN: Objection.

A I think -- I'm saying conceptually, theoretically, there's that linear pathway. But what

I'm saying is it's more complicated than that because our DNA is mutated all the time.

Q Dr. Harvey, didn't you author an article with George Johnson entitled, "Permitted Daily Exposure Limits for Noteworthy N-nitrosamines," that was published in May of 2021?

A I did. I'm aware of that paper.

Q Those were actually your words from that paper. We'll go to the paper later on, but I just wanted to let you know what I had read was verbatim from what was stated in your paper as to the one molecule of a carcinogen that's capable of causing one adduct, creating one mutation, and one mutated cancer-related gene that finally leads to cancer. Does that now sound familiar to you? Does it ring a bell?

MR. SHEEHAN: Objection to the speech.

A Again, in that -- in the context of that paper, it also talks about DNA repair and it talks about other processes, and that paper is saying it's not that simple. But it's recognizing what you discussed. It's recognizing that, in theory, if you want to draw it out, that is -- conceptually that is what can happen. However, it's way more complicated than that.

Q Understood. Are you familiar with the International Agency for Research on Cancer, IARC?

A I am, yes.
Q You're familiar with the IARC monogram -- monograph program on the evaluations of carcinogenic risk to humans?
A I am, yeah, yeah.
Q Have you ever served on an IARC working group?
A I don't think I have, no, no. No, I don't think -- I haven't. I've read the documents. No.
Q Are you familiar with the IARC classification system?
A I -- I am, yeah, yeah.
Q Are you aware that NDMA is classified by IARC as a group 2A, as a probable human carcinogen?
A I am, yeah. I am.
(Exhibit No. 4922 was marked.)
Q Okay. Let's go and put up Exhibit Harvey 4922. It's the WHO document "N-nitrosodimethylamine in Drinking Water Background," and it was a document for the development of the WHO guidelines for drinking water dated March 8th, 2008.
A I'm sorry. I can't see anything on the screen.
MS. LUHANA: Would you please -- that's not it. Oh, I'm sorry. It is. Go to page 18. Yeah, that's not the drinking water. That's just a fact

sheet. Can you take this document down? This isn't it. It's a larger document. Go ahead, Jessica.

THE DEPO TECH: What was it titled in your folder?

MS. LUHANA: I believe it's --

MS. SZUMLA: It's titled Exhibit 4922.

MS. LUHANA: You're having a tough time pulling the document up?

THE DEPO TECH: Yeah, hold on.

MS. LUHANA: And can you please go to page 18? Right there, and the first paragraph under guideline value. Can you pull that out?

BY MS. LUHANA:

Q Mr. Harvey, can you please read the first sentence out loud?

A Sorry. You want me to read the first sentence?

Q Correct.

A "There is conclusive evidence that NDMA is a potent carcinogen in experimental animals by several routes of exposure, including through ingestion of drinking water."

Q Go on. Can you read the rest of the paragraph, that sentence also?

A "NDMA has been classified by IARC in group 2A 'probably carcinogenic to humans,' (IARC 1987), which was upgraded from its previous classification of group 2B, 'possibly carcinogenic to humans,' (IARC 1978)."

Q Dr. Harvey, do you have any reason to dispute that NDMA is probably carcinogenic to humans?

MR. SHEEHAN: Objection.

A IARC have classified it in that way. I understand why they've classified it that way.

Q Okay. Can you please go to the third paragraph there? It also notes that there's also ample evidence that NDMA is genotoxic both in in vivo and in vitro. The third paragraph there.

A Yeah, I can see that paragraph.

Q And you have no reason to dispute that? There's ample evidence that NDMA is genotoxic both in vivo --

A That's my understanding, yes, it's positive in the in vivo and in vitro genotoxicity tests that we conduct, yeah.

Q Okay. Wonderful.

MS. LUHANA: You can take this document down. And could you please put up Harvey 4923?

THE DEPO TECH: Yeah, it will be just one moment. It's downloading right now. Sorry.

(Exhibit No. 4923 was marked.)

BY MS. LUHANA:

Q And that's going to be WHO chapter 2, the criteria used in establishing air quality guidelines. Could you turn to page 8 and pull up the qualitative assessment of carcinogenicity?

Dr. Harvey, are you aware that the general rules for carcinogens such as NDMA, which is classified as a 2A, for quantitative risk assessment is to do the low-dose risk extrapolation?

MR. SHEEHAN: Objection.

A So this is a document about drinking water, is it?

Q Correct.

A So in the context of drinking water -- is there something about low-dose extrapolation here?

Q Yes, in dealing -- it's the second sentence. In dealing with carcinogens, a general rule and the exceptions from this were defined. The general rule states that compound in IARC groups 1 and 2A, which is what NDMA falls within, are proven human carcinogens and carcinogens with at least limited evidence of human carcinogenicity, guideline values are derived with the use of quantitative risk assessment with low-dose risk extrapolation. Do you see that there?

A I do see it, and I understand it's in the context of drinking water here. So I'm not familiar with what they do with low-dose risk extrapolating in drinking water. I think we -- I'm only discussing what the framework we would use for NDMA as an impurity is we would look to the M7 guidance.

Q The other document I showed you, the WHO document, 4922, defines NDMA as falling into class 2A, and this is the standard that applies for NDMA regardless if it's in drinking water, in the air, or otherwise. Do you know that to be true?

MR. SHEEHAN: Objection.

A Like I said, I just -- I don't know about the water approaches. I don't know about the air quality. I know about the M7 framework that we apply to impurities in pharmaceutical drug products.

Q Understood. So you're unfamiliar with this IARC standard applying to NDMA generally?

A I understand the classification, but I don't -- it's not my -- this to me is -- it's environmental, sort of health and safety. This is about water and air quality. I haven't read everything there is to know about all of the carcinogens that are controlled under that framework. I primarily focused on the impurity framework.

Q Understood. But do you disagree with IARC's assessment of NDMA as a class 2A carcinogen?

A The class 2A carcinogen category, the IARC, I understand that categorization, yeah, I do. I understand that categorization.

Q Okay. And then the next paragraph says, "In case of sufficient scientific evidence, one may be justified in deviating from the general rule. First, a compound classified in group 1 or 2A may be assessed with the use of uncertainty factor methodology provided that there is strong evidence it is not genotoxic as judged from the battery of short-term test systems for gene mutation, DNA damage, et cetera."

You would agree, as we've discussed, NDMA is a genotoxic carcinogen, correct?

MR. SHEEHAN: Objection.

A I think we discussed this a moment ago. I recognize that NDMA is genotoxic in our test. I recognize that NDMA is carcinogenic in nonclinical species. So that definition I understand. And I understand what you've put in front of us here, but I spoke about the fact that this is applicable to water or quality, I don't know, that this classification system in this text you're highlighting would be -- I assume would be specific to that because the framework, sorry,

we would follow would be the one in ICH M7.

Q Understood. But you follow ICH M7, but you also follow the FDA, you also follow the EMA, correct?

A Well, the ICH M7 is the guidance that we follow for the control of mutagenic carcinogenic impurities of any nature in drug products, and that ICH guidance is adopted by the agencies EMA and FDA. So in the area that we're discussing would be ICH M7 -- I mean, the FDA works in other areas, foods as well, but in terms of impurities in drug products, it would be ICH M7.

Q Doctor, Zantac was put on the market in 1983, correct?

A That's my understanding, yes.

Q When was the ICH M7, when was that guideline, when did that come about?

A I think it was conceived as an idea in the -- sometime -- some point onwards from 2010, but it didn't come into effect till 2016, I think. Yeah, I think 2016.

Q So what governed between 1983 to 2016 in terms of regulating NDMA, for example?

MR. SHEEHAN: Objection.

Q What was -- what was GSK following at that time?

MR. SHEEHAN: Objection.

A Could you be clearer about regulating NDMA? Are you talking about NDMA as an impurity in drug products?

Q NDMA is a genotoxic carcinogen. What regulations govern that GSK was complying with from 1983 to you said, what, 2010, when IARC came about? You continue to cite -- not IARC. You continue to cite ICH M7 guidelines. However, those came into effect in 2010. So let's talk about before that time period.

What standards governed and what did GSK have to comply with as to genotoxic impurities?

MR. SHEEHAN: Objection.

A So the guidance that was in place before M7 was a guidance called ICH Q3A, B and C, and they -- and now there's a D and there's soon to be an E. So ICH Q3A I think was in place in about 19 -- I think it was 1999, 2000, I think. Q3B was in place around there. So from that point to 2016, it would have been Q3B. That was the guideline that was followed for the control of impurities.

Prior to that, from 1983 to 2000 -- say to 1999, I don't know what was in place, but I expect that -- well, ICH Q3A I think that's the industry practice, so I expect that the methods that were being

used to control impurities would have been used to Q3A, so I would expect the practices to be similar. But I'm not a chemist, so I'm not an expert in that area and I didn't work it during those times and I'm not a chemist, but that would be my expectation.

Q Dr. Harvey, I'm focused on this litigation right now. I'm focused on Zantac and NDMA specifically. So if you could tailor your responses to that, that would be helpful.

So with ICH Q3A, B, C, D, you reference impurities. I'm focused on NDMA and it being a genotoxic carcinogen. Can you tell me what guideline applied to that during that time frame from 1999 to 2016?

MR. SHEEHAN: Objection, asked and answered.

A Your control framework for pharmaceuticals was Q3A, and so Q -- well, it was Q3A, B, C -- Q3A, B and C is what it would have been.

Q So what did it say about genotoxic carcinogens at that time?

A Well, it doesn't -- ICH Q3A talks about a qualification process for impurities. It talks about a reporting process, an identification process, a qualification process. There was discussions around qualifying impurities in genotoxicity tests, so that's

the extent of ICH Q3A. But it's really the reporting identification thresholds and qualification thresholds which are all slightly different that were in place. That's what would have been in place, Q3A.

Q Were you allowed to have genotoxic carcinogens such as NDMA in drug products at that time?

MR. SHEEHAN: Objection.

A Well, there's a solvent guidance, a solvent guidance, Q3C, that has solvents in, and some of those are known carcinogens and some of those are genotoxic in our tests, so that's the extent of what I can understand about the control of genotoxic carcinogens. But these are solvents that we know we're using in the synthesis. So, yeah, it would be a combination of Q3A, B and C and the practices defined there.

Q It's not only solvents. It's things that come out, byproducts as well, that's formed in the manufacturing process as well, correct?

A That's correct. That would be --

Q If there are solvents in NDMA would it be considered --

MR. SHEEHAN: Hold on. Let him -- let him answer, Roopal. I know you want to jump to your next question. We're doing this remotely. Just let him answer. You'll get to ask your question.

BY MS. LUHANA:
Q I apologize for interrupting, Dr. Harvey.
A Yeah, I'm sorry.
Q And we're having a conversation sometimes, and, you know, I forget this is a deposition format. Go ahead. Finish what you were saying.
A I thought you'd finished. Sorry. I was saying it would be the impurity to come out of the manufacturing or the degradations, that would be -- degradation products would be Q3A and B and the solvents would be Q3C.
Q So what was NDMA classified as per that guideline? Wasn't it a genotoxic carcinogen that should be avoided?
MR. SHEEHAN: Objection.
A I think -- sorry if I'm getting confused, but Q3A guidance would have been about identification of impurity -- reporting of impurities at a certain percentage level and then identification of those said impurities if they get higher. So they would be at .1 percent, I think, is the identification limit, .05 percent would typically be the reporting limit, so that's what was reported and identified. So it's the impurities that they had, you know, physically identified using the practices at the time.

So my understanding is that NDMA wasn't a reasonably anticipated impurity. It wasn't an impurity that was recorded in the drug substance or drug product, so it would have been at trace levels, which would have been below the limits and thresholds used in Q3A and B.

Q So you believe the guideline for NDMA genotoxic carcinogen was .1 percent at that time?

MR. SHEEHAN: Objection.

A No, that's not what I'm saying. Sorry if I'm not being clear. What I'm saying is -- let's talk about ranitidine. So when they developed ranitidine, they looked at the synthetic group and the likely impurities from that synthetic group. They looked at the potential degradation products of ranitidine. And the capacity they had at the time was to measure those impurities at those .1 percent of active, maybe .05 if it was reporting. So that's the capability they had. They were using thin layer chromatography, and I think they may have used HPLC. So that's the process for the identification of impurities.

Q So what was the standard for NDMA at that time? Can you please tell me how much NDMA were you allowed to have in your product post-1983 before the IHC M7 [sic] guidelines came about?

MR. SHEEHAN: Objection.

A I -- I'm not sure I understand the question or I can answer it. I don't --

Q What was the allowable limit of NDMA in a drug product in 1983 per the ICH Q3 guidelines you were saying for residual solvents?

A So the Q3A, B, C guidance came in in 1991. They weren't in place in 1983, and so I don't know what the acceptable limit would have been because ICH M7 and the framework we discussed wasn't in place, so I don't know.

Q So from 19 -- let's focus on 1983, then, to 1991. What was the acceptable limit of NDMA, a genotoxic carcinogen at that time, in a drug product?

MR. SHEEHAN: Objection.

A Well, I don't know what it would have been because the M7 framework wouldn't have been in place.

Q Before the M7 -- so you're saying GSK didn't have to comply with any standards at that time to avoid genotoxic carcinogens being in their drugs post-1983?

MR. SHEEHAN: Objection, mischaracterizes testimony.

A What I'm saying is -- and I think I tried to answer earlier -- I think -- so what I'm saying is the impurity control frameworks are in place, have been established, you know, since 1999, as I understand it,

and they've evolved into drug substance, drug product, and then ultimately to M7. And so I -- they are the frameworks that we have in place. So anything I would say about 1983 would just be speculation. I don't know what the answer would be.

Q So you don't know what the frame --

MS. LUHANA: Can you take this document down, Erik? Thank you.

Q So Dr. Harvey, you don't know what the framework was before ICH M7 came about in 1999? Is that what you're saying?

MR. SHEEHAN: Objection.

A Well, as I say, my job at GSK has always been related to ICH M7. Certain times it's been related to Q3A, B, C. I don't know what framework was in place in 1983 about impurities that were potential carcinogens or rodent carcinogens. It's -- it's -- I would call that a chemistry manufacturing and control side, area. I don't know what framework was in place. I'm sorry. I just simply don't know.

Q Was it acceptable to have NDMA in a drug that GSK was selling -- was it acceptable to have NDMA in Zantac in 1983?

MR. SHEEHAN: Objection.

A Again, it's -- it would just be speculation.

I don't -- I don't know what the framework would be. I can -- I can expect that if people -- I'm trying to think of a way to answer your question about acceptable. I mean, clearly the presence -- we've got a framework, that's the best way to answer it. So we have a framework, it's M7, that defines a control limit for mutagenic carcinogens. And that's all printed. It's all reviewed. It's all in the literature. So that framework is what we work to today, and, you know, that's the framework we've adopted. And that's what I'm knowledgable about

Q But the drug's been on the market for 27 years before that framework came about, and the documents I just showed you, Dr. Harvey, they were from IARC, and I'm going to show you some documents from the EPA, that was regulating NDMA at that time in the early '80s when Zantac was put on the market, which said NDMA is a genotoxic carcinogen and should be avoided.

So my question to you is what framework applied to the regulation of NDMA at the time when Zantac was put on the market by GSK in 1983?

MR. SHEEHAN: Objection, asked and answered.

A I don't -- I don't know what framework would be in place. All -- I mean, I'm trying to think of a way to answer your question. I mean, again, if I think

about Q3C, so that was closer to 1983, there was an assessment of those solvents and the toxicology data on those solvents and an acceptable permissible daily exposure or acceptable intake was defined for those solvents, and so I would expect that similar activity would have been done if in the event that we, you know, a company was using a genotoxic carcinogen. There would be a justification as to the limit in the drug substance and drug product, which is effectively what Q3C is.

Q I'm just trying to get an understanding when Zantac was put on the market by GSK in 1983 whether you believe it was acceptable to have a genotoxic carcinogen like NDMA in a product?

MR. SHEEHAN: Objection, asked and answered.

A Well, again, I need to go back to M7. Even today there's -- there's limits for genotoxic carcinogens, and those limits are called acceptable intakes. So it would have involved an assessment of the data on the molecule to define an acceptable intake. And I can only just take that framework from M7 today to do that and perhaps relate it to Q3C, which is a similar -- a similar, I don't know, similar area in response to your question.

(Exhibit No. 4924 was marked.)

MS. LUHANA: Okay. Let's put up Exhibit 4924.

It's the EPA tech sheet on NDMA. Let's go to the second -- third page of the document?

THE DEPO TECH: This shows as a single page.

MS. LUHANA: It's not a single page, but -- there should be more pages to it. It's the third page. It's not there. Okay. Take it down.

BY MS. LUHANA:

Q Dr. Harvey, do you know that the EPA classifies NDMA as B2, a probable human carcinogen?

A Again, I am familiar with the IARC category -- categorization, but I -- I can't remember all of the categorizations. But I accept that you have probably -- you said probable human carcinogen so it's similar to IARC, right?

Q Yeah, it's not IARC. It's EPA, correct.

A Yeah, so I am not a hundred percent certain of how they classify it, but I wouldn't be surprised if it was aligned with IARC.

Q And then are you aware that the EPA applies a low-dose extrapolation for risk assessment for NDMA?

MR. SHEEHAN: Objection.

A Again, so EPA is Environmental Protection Agency, and my understanding of the EPA is they relate it to water or air quality, and I think we discussed that before. So if the EPA adopts that model, they

adopt that model. I think it's slightly different from the one in ICH M7, but I've not -- I'm not completely familiar with the EPA's calculations. I am familiar with M7.

Q And you agree the EPA is an authoritative body on carcinogens?

MR. SHEEHAN: Objection.

A I certainly know that the EPA is a respected organization, as is IARC, and the World Health Organization.

Q Would you agree they're authoritative bodies on carcinogens?

MR. SHEEHAN: Objection.

A I certainly know they've examined carcinogens and they've published on carcinogens and ways to calculate the acceptable intake. They're not setting of environment -- environmental health I think would be the description of it.

Q So you would agree they're an authoritative body for carcinogens?

MR. SHEEHAN: Objection, asked and answered.

A I think I'm struggling with "authoritative body for carcinogens" the way you're phrasing it. I'd accept they're an authoritative body, and that encompasses carcinogenic and also defines limits, et

cetera, for various carcinogens.

(Exhibit No. 4926 was marked.)

Q Okay. Let's put up exhibit Harvey Exhibit 4926. It's the European Medicines Agency Assessment Report. Can you please turn to page 31 and let's go to 2.4.1, that first sentence or first paragraph is fine.

Dr. Harvey, can you read that first sentence?

A Yes. "N-nitrosamines are considered as a serious health risk in all products with consumer/patient exposure and remaining levels in these are limited by the ALARA or ALARP principles."

Q Can you please tell the ladies and gentlemen of the jury what ALARA or ALARP are?

A I know what ALARP is. I don't know what ALARA is. ALARP is as low as reasonably -- as low as reasonably possible, I think, it is.

Q Practicable. Yeah, and --

A Practicable. Sorry.

Q And ALARA is as low as reasonably achievable. Do you know what that means? Do you know what that means?

A Yeah, I can understand that it was -- it's effectively saying you need to work continually to remove this nitrosamine from whatever product it is and

continue to reduce it and continue to reduce it and continue to reduce it and continue to reduce it. It's kind of a -- yeah, that's what ALARP would be.

Q And why is that for a genotoxic carcinogen like NDMA?

MR. SHEEHAN: Objection.

A Well, this is talking about exposure to exogenous nitrosamines, so I don't know if this is talking about the EPA document that we were -- not document, the EPA position you were just describing. As a genotoxic carcinogen in terms of impurities in drug products, again, I would -- I would refer to the ICH M7 principles that are in place.

Q Do you know whether these EMA principles were in effect before the ICH guidelines?

MR. SHEEHAN: Objection.

A Sorry. In what sense? Which EMA principles?

Q The EMA guidelines on genotoxic carcinogens such as NDMA, do you know if they were accessible and available before the ICH guidelines came into place?

A The ICH M7 guidelines?

Q Correct.

A Okay, sorry. Yeah, I think EMA created a draft document that was then edited and reviewed by FDA and others before it became M7, so I think EMA had a

sort of working draft. That was my understanding of it.

Q Are you aware that Zantac ranitidine forms NDMA exogenously as well?

MR. SHEEHAN: Objection.

A Sorry. Could you describe exogenously? In what context?

Q Outside the body when it's exposed to heat and humidity it forms NDMA, are you aware of that?

MR. SHEEHAN: Objection.

A I understand NDMA can form as a degradation product of ranitidine in ranitidine drug product, if that's what you mean by exogenous.

Q Well, you said -- you said exogenous which you didn't know if this regulation would apply to NDMA, and I'm just asking if you're aware that NDMA forms outside the body when Zantac ranitidine degrades?

MR. SHEEHAN: Objection.

A Sorry. So when I'm looking at this document, I'm reading 2.4.1 that is talking about background exposure to nitrosamine, so when I see exogenous here, I'm thinking about exogenous exposure to nitrosamines like the diet or other sources, or air or water, as we've discussed. You're talking about exogenous exposure in terms of it forming in ranitidine under specific conditions as a degredant, and that you're

describing that as exogenous, so I think I'm getting the two blurred. Sorry.

Q Understood. Can you please turn to page 43 and that first paragraph there, the second sentence, if you can read that out loud, Dr. Harvey.

A "As outlined in the CHMP Art 31 referral on sartans, the generic and internationally agreed methodology for calculation of excess risk is the linear extrapolation using the TD50 calculated of animal cancer studies as a point of departure as described in ICH M7 (R1)."

Q Dr. Harvey, you agree that the EMA uses linear extrapolation framework for NDMA, correct?

MR. SHEEHAN: Objection.

A This is referring to M7. M7 describes that TD50 calculation, and as they say, it's a generic and internationally agreed method. There are other methods to calculate limits for NDMA, and I think this document, it may be this document, describes other methods to do that. And the linear extrapolation is used because it's a relatively straightforward calculation, but the caveats around that straightforward calculation and the theoretical nature of it are all in ICH M7. So it's not a simple calculation, but it's a bit more straightforward, I think, to do.

Q Do you agree that EMA had guidelines for the regulation of genotoxic carcinogens in products like NDMA before the ICH M7 guidelines even came about, correct?
MR. SHEEHAN: Objection.
A I know there was a working draft of ICH M7, and if you're referring to that, I'm familiar with that document.
Q No, I'm talking about the EMA's governance of genotoxic carcinogens in drug products like NDMA prior to the ICH M7 guidelines even coming about.
MR. SHEEHAN: Objection, asked and answered.
A Are you referring to the EMA guidance that was about?
Q Correct.
A Yeah, okay. Sorry. I was referring to that as the working draft because it was that EMA guidance that then was reviewed and then redrafted that became M7. So I am -- I do recall those EMA guidelines.
Q Can you please turn to page 78? You see paragraph 3 it says, "When a nitrosamine has been detected, a limit based on the above-mentioned ICH M7(R1) principles for 'cohort of concern' substances considering a lifetime daily exposure should be calculated," and it says the limit for NDMA is 96

nanograms, correct, below there?

A That's the lifetime limit based on that TD50 extrapolation we discussed earlier, so that's -- yeah, lifetime -- a lifetime daily limited associated with a theoretical one in a hundred thousand excess cancer risk, yes.

Q Correct. And this is the EMA's application of ICH M7(R1) principles, correct?

A It is EMA discussing M7. EMA discussed other approaches as well in other documents around this time. Those other approaches are also in M7.

Q Here this guidance is actually fairly new. It's from June 25th, 2020. And it says where a nitrosamine has been detected, a limit based on the above-mentioned ICH M7(R1) principles for 'cohort of concern' substances considering a lifetime daily exposure should be calculated and sets the limit for NDMA at 96 nanograms per day, correct?

MR. SHEEHAN: Objection.

A I understand that. But in previous documents they also spoke of other ways you can use the data and model that data -- pardon me -- and model that data to define limits. The EMA publishes lots of documents and they come to a sort of consensus position, which is the one here, but it's still referring to M7, and this is an

extrapolation that's defined in M7.
Q So you're disagreeing with the EMA's application of ICH M7 here?
MR. SHEEHAN: Objection, mischaracterizes testimony.
A I'm not disagreeing with it. What I'm saying is that the EMA are talking about applying ICH M7, and the principles -- this specific principle is defined in M7.
Q But the EMA has set a guidance in applying ICH M7 for NDMA of 96 nanograms, correct?
A Yeah, I think -- I think we're saying the same thing. I'm saying that EMA is describing M7 and M7 describes how to calculate a lifetime limit of NDMA of 96 nanograms that's associated with a theoretical cancer risk.
Q You referred to other guidelines that the EMA is using. Have they defined a different limit greater than 96 nanograms for NDMA that's permissible per day?
A No, I didn't -- sorry if I said guidelines. I said documents. There was another document they published which was related to the sartans, I think. I can't remember the number. It was a big review. And they spoke about the various ways that can be used, including this linear extrapolation and also other

approaches. So that's what I meant, sorry.
Q So my question is, is there any other approach where the EMA's application of ICH M7 has led to a greater limit that's allowable for NDMA beyond 96 nanograms per day?
A So one of the approaches they discuss, which is in the ICH M7, is something called benchmark dose modeling, which is a way where when you have sufficient data in a compound instead of doing a linear extrapolation, there's another way to take into consideration the dose response you're seeing in the rodent carcinogenicity studies. They did discuss that in this sartans document, and it is something, another approach. But I can see in this document, as I said, EMA discussed these, and it's a good scientific discussion, but where they've arrived at more recently is use of the linear approach that's defined in M7.
Q Is there a different standard --
MR. SHEEHAN: Roopal, just so you know, the background noise is back. It just popped up again. I don't know whether the court reporter can hear that or not.
THE REPORTER: Oh, yeah, I hear it.
THE DEPO TECH: Yeah, and Roopal, I can see when Dr. Harvey's talking, your microphone starts

going up, so it's definitely a loop happening.

MR. SHEEHAN: Hey, we've been going about an hour, Roopal. I don't know when -- do you want to take a short break?

MS. LUHANA: Sure. Let me just finish with this line of questioning here on the EMA.

MR. SHEEHAN: Sure.

BY MS. LUHANA:

Q Dr. Harvey, is there another -- you're referencing other documents for the EMA. My question to you currently, the standard for the EMA for NDMA and its application in use of ICH M7(R1), is there's a daily limit that's acceptable of NDMA at 96 nanograms per day, correct?

MR. SHEEHAN: Objection.

A I think it's the same thing I've said that EMA has published there, and there's been a scientific discussion, and they've spoken about other methods that can be used, and at the moment they're deferring to this linear extrapolation and this 96-nanogram-a-day figure. I'm not disagreeing with you that that's where EMA have got to in this document. I'm just saying that there are other approaches. They were discussed by EMA, and they're there, but this is the position EMA has taken.

Q Dr. Harvey, you'd agree with me that

discussion of certain approaches is different than adoption of an approach, and so that's -- that's where I think you're conflating the two. While the EMA has discussed benchmark dose, it has adopted the linear dose extrapolation here and taken the conservative approach of having a limit of NDMA which is 96 nanograms per day, and that's what they've adopted and that's been their application of ICH M7 as they see it today. Is that not true?

MR. SHEEHAN: Objection, mischaracterizes testimony.

A I mean, again, they discussed the benchmark dose modeling. This is the decision they made. So there -- I mean, we're talking about science here is that that benchmark dose modeling approach has been discussed. The datasets for NDMA, as you know, are quite extensive and they allow that benchmark base modeling. And that's the approach in M7. They're defining M7.

I take this as right now the D4 approach is that linear approach and that's 96 nanograms a day. So I'm agreeing with you that that is the EMA position today. What I'm saying is that there's other approaches that have been discussed by the EMA and that those approaches are in ICH M7 as well.

MS. LUHANA: We can take a break now. Let's go off the record.

THE VIDEOGRAPHER: We're now going off the video record. The time is 10:16 UTC, 6:16 a.m. EDT.

(A 33-minute recess was had.)

THE VIDEOGRAPHER: We're now back on the video record. The time is 10:49 UTC, 6:49 a.m. EDT.

BY MS. LUHANA:

Q Dr. Harvey, you appreciate you're still under oath?

A Yes.

(Exhibit No. 4927 was marked.)

Q Can you please put up Exhibit 4927? It's the FDA Control of Nitrosamine Impurities in Human Drugs Guide for Industry, and it's dated February of 2021, and could you please turn to page 5.

A Is there a way to --

MR. SHEEHAN: Yeah, I don't know why that is. Okay. It for one reason or another, Roopal, the camera sometimes picks you, sometimes it picks somebody else. It's fine.

THE DEPO TECH: Tom and Will, if you guys both mute your camera for a moment and then turn yourself back on.

BY MS. LUHANA:

Q Can we look at the first paragraph there? Dr. Harvey, it says nitrosamines are potent genotoxic agents and probable human carcinogens here. Do you agree with that?

MR. SHEEHAN: Objection to the characterization.

A I think we discussed it before, yeah, they're certainly genotoxic agents. They're genotoxic in our tests. And they are -- genotoxic in several classes, I suppose, and they're known to be carcinogenic in animal species, yes.

Q Actually, some are classified as probable or possible human carcinogens, correct?

A Yeah, we discussed that earlier, that IARC definition, yeah.

Q This is the FDA guidance adopting the IARC designation. So I just wanted you to confirm that it does say nitrosamines are potent genotoxic agents and probable human carcinogens, and do you agree with that?

MR. SHEEHAN: Objection.

A They're referencing IARC, right, yes, so I agree that they're referencing IARC in their document, yes.

Q No. I'm asking if you agree with the

statement put here by the FDA that nitrosamines are potent genotoxic agents and probable human carcinogens?

MR. SHEEHAN: Objection, asked and answered.

A Yeah, sorry. I am agreeing with you that there's a document here by the FDA, and in that document the FDA has written that statement and referenced IARC, yes, I am.

Q My question to you is are you agreeing with the statement about nitrosamines being potent genotoxic agents and probable human carcinogens. I understand what this document states. It's the FDA guidance on nitrosamines. And my question to you is do you agree that nitrosamines are potent genotoxic agents and probable human carcinogens?

MR. SHEEHAN: Objection.

A Yeah, as defined in the document and they reference IARC, yes, I agree.

Q Okay. If you look at the third sentence, I believe it says, "The guidance recommends control of any known mutagenic carcinogen such as nitroso-compounds at or below a level such that there would be a negligible human cancer risk associated with the exposure to potentially mutagenic impurities." Do you see that language there?

A I do, yes.

Q And if you go to page 10, the guidance defines the standard. There in that chart it says the FDA -- in terms of the acceptable intake limit, the FDA recommends 96 nanograms per day is the acceptable daily limit for NDMA, correct?

MR. SHEEHAN: Objection.

A Yes, it does, and footnote one talks about how that value is derived. We've discussed that, yes.

Q Correct. But that's the current standard by the FDA, correct?

MR. SHEEHAN: Objection.

A Sorry. It's the -- sorry. It's the M7 standard that they cite in this FDA document, so, yes, yes.

Q Let's turn to the last page, which is the appendix B, the last paragraph there, the summary of the AI derivation for NDMA.

Dr. Harvey, can you please review it and let me know if you disagree with that statement there which provides that the TD50 standard is followed and a linear extrapolation is utilized to set the AI for NDMA 96 nanograms?

A Yes. That's the ICH M7 process, yeah, yeah.

Q You continue to reference the ICH M7 process. However, the FDA's interpretation of the ICH M7 process

and guidelines are that there's an NDMA acceptable intake limit of 96 nanograms, correct?

MR. SHEEHAN: Objection.

A Yes, a lifetime daily intake of 96 nanograms, which is associated with that theoretical risk we discussed. But what they've written there is the framework in ICH M7, so the FDA have adopted the M7 framework, yes.

Q Okay. They've adopted the M7 framework and they've applied the M7 framework, and what's their conclusion here as to the standard acceptable intake limit for NDMA?

A Well, it said the daily lifelong intake, so it's the lifetime intake of 96 nanograms a day, which is based on that linear extrapolation, and that corresponds to a theoretical excess cancer risk of one in a hundred thousand.

Q Correct. So the FDA has set a standard of an acceptable intake limit of 96 nanograms per day for NDMA, correct?

MR. SHEEHAN: Objection, asked and answered multiple times now.

A I mean, you keep saying FDA setting a standard. Maybe you understand this slightly different. As I look at this and say, yes, the FDA are adopting in

their document the approach defined in M7. So if that's described as a standard, I would agree that's the standard.

Q But importantly, you've referenced a number of documents, a number of different approaches, and the FDA's interpretation and application of the ICH M7 is to do a linear extrapolation to come up with this 96-nanogram number for NDMA, correct?

MR. SHEEHAN: Objection.

A Yes, that's one of the approaches in M7, and that's the approach that they're adopting now, yes.

Q And that's the approach also that the EMA adopted, correct?

A Yes. And as we discussed before, the EMA discussed different approaches that are in M7, and they right now have concluded that the 96-nanogram-a-day lifetime intake is what they're putting in their documents and what the FDA is putting in their documents as well.

MS. LUHANA: Erik, you can take this down.

Q Doctor, despite the current standard for NDMA that we've seen with the FDA, with the EMA and others, you authored the George Johnson article from 2021 and other people in the industry. It's titled, "Permitted daily exposure limits for noteworthy N-nitrosamines,"

which was published in May 2021, asserting a makeshift approach to come up with a permissible daily exposure limit for NDMA that in fact hasn't been adopted by any regulatory body and in fact just has recently been rejected by the FDA, correct?

MR. SHEEHAN: Objection.

A I mean, there are several questions there. I recall the publication, and what that publication is about is the components of M7 about the alternatives to that linear extrapolation we've discussed. I don't know if the FDA has rejected it. But certainly that paper is about M7 and the -- there are two sections in M7 that talk about benchmark dose modeling and permissible daily exposures, and that's what that paper is about.

Q However, you applied the ICH M7 guidelines and you come to a different conclusion than the FDA, EMA did with interpreting those guidelines, correct?

MR. SHEEHAN: Objection.

A When you say "you applied," what do you mean? In that paper, there's a discussion around those alternative approaches.

Q Correct. You --

A And based on M7, and -- I mean, yeah, that's what's in the paper.

Q Isn't it true that you published this paper

because GSK along with others in the industry was concerned about complying with regulatory safety standards and their impact on GSK's bottom line?

MR. SHEEHAN: Objection.

A No. There's a discussion in M7 about alternative approaches to define acceptable intakes of mutagenic impurities, mutagenic carcinogens. That's what the paper's about.

Q Right. And you come to a different conclusion, right? What do you come up with as the permissible daily exposure limit of NDMA in that paper?

A I can't recall what the value is off the top of my head, but I think -- I understand the EMA's position and I understand FDA's position and their adoption of the linear position. This paper is about alternative modeling approaches to define acceptable intakes. It's not been accepted as a standard. It's a discussion of those alternative approaches.

Q So why did you write that paper knowing the current standards as they are right now as we ran through them?

A It's about the other sections of M7 and what -- what a case example would look like in those other examples, those other sections. So there's a section on benchmark base modeling, and there's a

section on defining permissible daily exposures.

Q And so you think that was -- your paper was an actual application of the ICH M7 guidelines?

A It's -- what the paper's about is examining those two alternative approaches in ICH M7.

Q Okay. Let's actually mark that. It's Exhibit 4928, the Johnson paper.

MS. LUHANA: Erik, can you attach the supplemental documentation?

MR. SHEEHAN: I'm just going to open up the package you sent, Roopal.

MS. LUHANA: Correct. It has a hard copy of the paper, I believe.

THE DEPO TECH: Roopal, what do you mean by attachment?

MS. LUHANA: It should be at the end of it. Could you see if the supporting information is included in the back of the document? Just have Jessica incorporate that in. It's the supporting information for this paper, and that will all be 4928, Exhibit 4928. And can you go just to the top page? Tom, does he have a copy of it?

MR. SHEEHAN: He's got a copy.

THE DEPO TECH: Will Jessica be sending me whatever I need to attach?

MS. SZUMIA: Yes, I will get those over to you.

(Exhibit No 4928 was marked.)

BY MS. LUHANA:

Q Dr. Johnson -- not Johnson. Dr. Harvey, can we run through who the authors are of this paper and can you just give me a brief description of who everyone is on this paper?

A George Johnson, he's an academic at Swansea University.

Q And in terms of George Johnson, has GSK paid him to work as a consultant for them as it relates to NDMA and nitrosamines?

MR. SHEEHAN: Objection.

A We haven't paid him as a consultant to work on nitrosamines. We do have a project with him, but we're not paying him as a consultant.

Q How are you paying him and/or Swansea University and for what?

A So there's -- that project is managed by a different group, and the individual is Anthony Lynch, but it relates to a project examining DNA repair.

Q Anything else?

A That's my understanding of the details of the project. That's -- like I say, that contract was set up

by Anthony Lynch. He heads up the genetic toxicology department, so that's the nature of that collaboration.

Q And you're not aware of any other work that GSK is doing with George Johnson other than DNA repair work?

A Not specifically on nitrosamines. I don't think there's anything specific.

Q What about general?

A Not on nitrosamine work.

Q No, not just to nitrosamines, but in addition to the DNA repair, is there any other work that George Johnson is doing for GSK?

MR. SHEEHAN: Objection.

A Not that I'm aware of. The project that we have engaged George about is DNA repair related to nitrosamines.

Q And what about DNA repair?

A I'm sorry?

Q What about DNA repair?

A Well, to see if --

Q What is he doing?

A To see if certain -- to see if -- when you treat particular cells, whether -- it's all to do with if you treat particular cells whether you can measure the repair of -- of DNA lesions and mutation. It's a

particular area of genetic toxicology that George and Anthony have expertise in.

Q How much is he being compensated for this work?

A I -- I don't know the exact details of the project. I know -- I think -- I'm fairly sure that there's some staged payments, but it's an academic project. I recall there was a budget. It might have been 90,000 -- or might have been 90,000 pounds over a set of period. It might have gone up. Contracts always go up. They never go down. Around that figure, I would have thought.

Q Are you doing any work with Lhasa and George Johnson or work through Lhasa with George Johnson?

A No, we're not. We haven't done any work with Lhasa in this space yet, any sort of paid consultancy work with Lhasa.

Q And Krista Dobo. She is at Pfizer, correct?

A That's correct.

Q And she's been there for about 23 years. She's a senior director of the genetic toxicology department?

A I don't know how long Krista's worked there. Sorry.

Q Yeah, it was in her LinkedIn profile, so I

presume that to be accurate.

In terms of she's also director and trustee in Lhasa with you?

A Yes, she is.

Q She's an active member of Pharma. Do you know what Pharma is?

A Yeah, Pharma is a trade organization similar to, say, EFPIA. It's -- yeah, it's a trade organization in the US, pharmaceutical trade organization, yes.

Q Would it be considered a pharma lobbying group?

MR. SHEEHAN: Objection.

A Well, I don't consider them as lobbying groups. They're certainly groups where companies come together to work on particular issues. I believe Pharma and EFPIA groups contribute to the -- to the ICH guidelines.

Q Are you aware that it's often referred to in the media, Pharma, as one of the largest pharmaceutical lobbying groups --

MR. SHEEHAN: Objection.

Q -- that spends millions in the industry pushing pharma agenda?

MR. SHEEHAN: Objection.

A I did not know that, no, I don't. I don't

know that.

Q Bhaskar Gollapudi. He previously worked for Dow for 31 years. Did you know that?

A Yeah, I think -- I think I recall Bhaskar -- well, I didn't know where he was, actually, but at Dow rings a bell, yes.

Q And do you know he's also employed at Exponent Consulting?

A I didn't know he was consulting, no.

Q You didn't know he worked at Exponent?

A No, I -- well, I mean, I do, but remember, I don't pay attention to where Bhaskar's working.

Q Are you aware that Exponent Consulting has been accused of working for the industry to shave outcomes to benefit big pharma and it clients?

MR. SHEEHAN: Objection.

A No, I wasn't aware of that.

Q He's also the editor-in-chief of this journal where this article was published. Are you aware of that?

A No, I wasn't.

Q Do you know if he recused himself on reviewing this article?

MR. SHEEHAN: Objection.

A No, I don't know. I don't -- I don't know

that, no.
Q Then there's Julia Kenny, and she's been at GSK for 32 years, correct?
A That sounds about right, yes.
Q She's the head of capability and project research for genetic toxicology at GSK?
A She was. I think she's moved roles recently.
Q And then there's Michelle Kenyon. She's been at Pfizer for over 20-plus years. Did you know that?
A I don't know how long Michelle's been at Pfizer, but I know she's been at Pfizer, yes.
Q And she's also -- you referenced the other group, EFPIA. She's also involved with EFPIA. What is EFPIA?
A EFPIA is another trade organization, a European one, equivalent to Pharma, I guess.
Q Is it also -- is it a lobbying group for big pharma? Have you heard that before?
MR. SHEEHAN: Objection.
A No, I haven't.
Q Then there's Anthony Lynch. What's Anthony Lynch's title at GSK?
A He heads up the genetic toxicology department at GSK.
Q And he's been there for over ten years?

A Yeah, yeah.
Q He's also a professor at Swansea University, correct, and that's where George Johnson is at?
A I believe he's, yeah, what they call an associate professor. I don't -- again, I don't know -- I -- I assume so.
Q All right. And then there's Sheroy Minocherhomji, and she's at Amgen, correct?
A Correct?
Q And then there is John Nicolette, and he's -- I believe he's at AbbVie and was at Abbott before that and Pfizer before that. Are you aware of that?
A Yep.
Q And Veronique Thybaud. She's at Sanofi?
A Yes.
Q And then Ryan Wheeldon is also at Sanofi, correct?
A Well, Ryan, it looks like he's at Swansea.
Q And in terms of Andreas Zeller, she's at Hoffmann-La Roche, correct?
A He is, yeah.
Q Oh, I'm sorry. Andreas, yes, he's at Hoffmann-La Roche, yes.
Okay. In terms of this article, Dr. Harvey, it asserts a permissible daily exposure for NDMA,

correct?
A Yeah, it's a document -- it's an article that proposes levels for NDMA and NDEA using the approaches defined in ICH M7.
Q And in the Johnson paper, you used the Peto carcinogenicity data, correct?
A Yes, that was my recollection.
Q Actually, before we start going through the paper, do you have any corrections to make to the paper?
A I'm not sure what you mean.
Q Are there any mistakes that you found after the fact in reviewing this article?
A Not to my recollection.
Q You see that the Peto study is the most extensive carcinogenicity dose-response data for NDMA, correct?
A That's the biggest study that's been conducted on NDMA to my knowledge.
Q And you agree Peto is a robust carcinogenicity study?
MR. SHEEHAN: Objection.
A Yeah, it's -- it's a pretty extensive carcinogenicity study.
Q You would agree it's robust, correct?
A Yeah, it's a big -- it's a very big study,

yeah.

Q And you also use mutagenicity data, specifically in vivo TGR gene mutation to calculate dose response in the Johnson paper, correct?

A Correct. That's correct.

Q All right. Dr. Harvey, can you provide me with any examples of any regulatory body where they've applied TGR mutagenicity data to calculate dose-response and to set a permissible daily exposure for genotoxic like NDMA?

MR. SHEEHAN: Objection.

A No, I can't. In an earlier version to M7, there were discussions about the sort of in vivo genotoxicity studies that you could do, and in the earlier -- well, in that version of M7 it spoke about the results of those studies could be used to define acceptable intakes of impurities. And then -- so we thought -- well, actually, so we're talking about using in vivo TGR, transgenic rodent data, to set those thresholds. That's the approach that we were examining.

I think in a recent Q&A, there was a discussion about whether that approach is applicable. This is a proposal around that approach. So it was part of M7. We explored whether that could be obliged. It's a proposal.

Q It's an exception to the standard, correct? It hasn't been used previously ever, and you can't provide any example of where a regulatory body has adopted something like this, correct?
MR. SHEEHAN: Objection.
A I think there was a precedent set certainly in the literature about the use of that type of data, transgenic data, to derive a sort of permissible daily exposure for another impurity in another product, and that's the framework that we're proposing here. But you are correct. It hasn't been accepted.
Q And what was that other example? Do you recall?
A Yes, I do. It was an impurity called ethyl methanesulfonate in a product called Viracept.
Q EMS, correct?
A Yeah, yeah, that's correct.
Q And so in terms of EMS, was there robust carcinogenicity data like we have available here with NDMA?
A That's not my recollection, no. There wasn't data for EMS.
Q And was the mode of action known for EMS at the time when they used this approach?
A Yes. It's a mutagen, yeah, yeah.

Q Correct. Is it known currently the mode of action for NDMA? Is that known?

A Yes, we -- well, there's a good consensus on how it's -- how it's genotoxic and how it's mutagenic, yes.

Q If you turn to page 296, second column, first paragraph, and the sentence where it says "In the absence" -- "In the absence of carcinogenicity" --

A Yep, I can see that.

Q -- "data or when such data are not sufficiently robust, the generation and analysis of in vivo mutagenicity dose-response data provides a pragmatic means for a determination of a compound-specific AI/PDE." Did I read that correctly?

A Yes, you did.

Q So in terms of your application here to apply these principles and use PDE to -- come up with a PDE for NDMA, it's unheard of, right, because it's only done when there's an absence of carcinogenicity data, and here, as you just testified, Peto provides robust carcinogenicity data, correct?

MR. SHEEHAN: Objection.

A Yeah, but I think I need to explain some context. What we're doing here is we've got data about the carcinogenicity of these molecules and we've got

data about, some data about the mutagenicity of those modes, and we know, we discussed, they're related. So what we're trying to understand is how those endpoints relate and how or whether they can be used to define limits that are different from that linear extrapolation.

So there's going to be cases, and I think we saw them in the guidance earlier with the FDA, where we have nitrosamines where we don't have carcinogenicity data, so what we are going to do is generate most likely transgenic data on them, transgenic rodent data, so we're going to need to try and understand the outcomes of those studies and whether we can use those to derive acceptable intakes.

What we're doing here is we've got, you know, datasets that cover carcinogenicity and mutagenicity, so it's about the science of the compounds and the endpoints that we measure.

Q But I frankly don't appreciate or understand why you're using the TGR mutagenicity data when there is robust carcinogenicity data to derive the AI currently. Do you believe the ICH M7 guidelines allow you to do so?

MR. SHEEHAN: Objection.

A What we're -- what we're looking at here -- I understand what we've discussed. I understand that the

default is the linear extrapolation. But in M7 it also talks about different approaches that include this benchmark dose modeling. That's a component of the paper. There's also an understanding that what we're doing here is trying to understand the relationship between mutation and carcinogenicity, so that's a component of the paper.

And there's going to be situations where we have nitrosamines, and they're on the list from the FDA, but we don't have carcinogenistic data. So what we're trying to do is understand the science of -- understand the biology of those molecules in terms of in vivo mutation and that relationship to in vivo carcinogenicity.

Q Aren't you trying to carve out an exception that doesn't exist for NDMA with this paper?

MR. SHEEHAN: Objection.

A No. I don't -- I don't see it like that. So I'm looking at this and saying we have data that allows us to examine different approaches to derive an acceptable intake. And the M7 guidance -- and I understand it's tiring that I keep talking about M7 -- it talks about that linear extrapolation pathway, and it talks about it being incredibly conservative and theoretical and it's not indicative of real risk. And

what we're trying to do here is understand the science of the area.

It's a proposal. I recognize that the ICH M -- sorry, the FDA and EMA have adopted that 96 nanograms a day. This is the science that we would do.

Q So let's look at the ICH guidelines. The first column of this paper at the bottom carves out the options that are specified in ICH M7. So if we can just pull that up, and then it's going to continue to the next page. So first do the first column, bottom paragraph, and the last sentence says, "Indeed the current position on nitrosamines in drug product do not utilize ICH M7 guideline options for instances when DNA repair mechanisms are well documented."

So you're claiming this here in this article, and then you go on to define the options, right? The options specified in ICH M7(R1) guideline are to one, "(a), carry out linear extrapolation from the TD50 to calculate an AI," so that's one option and that's what the FDA, EMA say is the standard for NDMA, correct?

A That's correct, yeah. Yeah, it was in the FDA document.

Q Right, so that's one option. Let's go to the other options, and that's the second column, so the top paragraph. Then it says, "(b) apply the threshold of

toxicological concern (TTC) when suitable carcinogenicity data are not available." And so we've already established that I'll focus on NDMA, not NDEA. We've established with NDMA there is sufficient carcinogenicity data available, correct?

A Yeah, to -- there's sufficient carcinogenicity data to use -- to derive that acceptable intake via linear extrapolation, yeah.

Q Correct. Or the option is to "utilize available information about compensatory responses, DNA repair, to justify derivation of a PDE, the term used in ICH guidelines when nonlinear dose response is accepted."

And here, as we have gone through, linear dose response is what is utilized by all the regulatory bodies for NDMA, correct?

A So I understand we've discussed the EPA. I understand we've discussed -- I forget the other -- was it the World Health Organization? I understand the approaches they've taken.

What we're doing here -- and I understand what the FDA and EMA have written about the ICH M7 guidance and using that linear extrapolation. What we're talking about here is what does M7 -- M7 has paragraphs in it about alternative approaches, and this is a paper that

discusses those alternative approaches. It's a proposal.

Q And so you understand with this paper there is no regulatory framework that allows you to use this approach as you did for NDMA, correct?

MR. SHEEHAN: Objection.

A I'm not sure that I'd agree with that. ICH M7 talks about various approaches. All we're trying to do here is experimentally define what that looks like.

Q Dr. Harvey, in fact, it's unheard of to use mutagenicity data for dose response when you have robust carcinogenicity data where your -- the actual endpoint you're looking at is criteria and that's the endpoint of concern -- when that's available, you're supposed to use that data to extrapolate linear dose response versus doing what you did here, correct?

MR. SHEEHAN: Objection.

A No, I think -- there's a lot in that sentence, but I'm going to go back to M7. M7 talks about alternative approaches to that linear extrapolation, which is incredibly conservative and I accept as adopted in the FDA/EMA guidance. But it talks about alternative approaches. It talks about benchmark dose modeling. It talks about, you know, taking into account the dose response. And it also talks about mechanisms where

there may be a threshold, which is the example related to EMS.

I think we might be talking cross-purposes. I look at this and think this is a reflection of what isn't written in ICH M7. It's a proposal. I recognize it's not adopted. It's a proposal of what would -- it would look like based on M7.

Q Doctor, didn't some of your colleagues have to be convinced to get on board and, quote, unquote, "follow the science" to use positive in vivo genotoxicity data to define the limits per ICH M7 as you've done here in the Johnson paper?

MR. SHEEHAN: Objection.

A I'm talking about -- in terms of follow the science, what I'm talking about is ICH M7 has a framework for defining acceptable intakes for mutagenic carcinogens. And what I'm saying is that that -- and that framework takes into account potency, potency of the actual carcinogenic potency in rodents of the entity. And what I'm saying to project teams internally to GSK is that M7 is the framework that we have and M7 is the framework that we will apply for novel nitrosamines. So when I say "novel nitrosamines," it would be nitrosamines unrelated to NDMA or NDEA.

So when I say "follow the science," what I'm

saying is ICH M7 defines the science that we apply in this area. That's what I mean. And it's been very difficult to explain to people that M7 is the framework that we're adopting.

Q M7 is the framework that you're adopting, but you're not applying it how it should be applied as TGR mutagenicity data has never been used for a genotoxic carcinogen to derive dose response, has it?

A So I --

MR. SHEEHAN: Let me just -- I wasn't sure that was a question or not, so let me just get my objection in. Go ahead.

A What I -- what I would say is ICH M7 has two sections in it. One talks about benchmark dose modeling of carcinogenicity data, and there's another section that talks about when you understand the biology of a compound and you can understand whether there's a threshold there. They're both in M7. I accept the approaches. Okay?

There's EMS and Viracept is one of the approaches that was published. I accept that's in the literature, but it's in M7, this type of approach. I accept it hasn't been adopted. There's no precedent for it, and I accept that EMA and FDA are defaulting to the 96-nanograms-per-day linear extrapolation, but EMA

certainly in their sartans documents spoke about benchmark dose modeling.

Q I appreciate your response, but the question is, is with TGR -- TGR mutation data is not used to derive a dose response when you have robust carcinogenicity data, correct?

MR. SHEEHAN: Objection, asked and answered.

A Yeah, I think I'm just repeating the same thing. I'm saying that in this paper there's a discussion around using benchmark dose modeling as well, and there's also an element about using -- defining whether there's a threshold mechanism in terms of the entity's biological mechanism of action.

(Exhibit No. 4930 was marked.)

MS. LUHANA: Let's put up Exhibit 4930, which should be -- it's the Harvey e-mail dated February 25, 2021, and it's to George Johnson. And there should be an attachment as well, which is 3504606. Is that behind it?

THE WITNESS: Okay.

THE DEPO TECH: No, that's not behind it.

MS. LUHANA: Okay. That should be. Could we add that to Exhibit 4930? It's GSK_ZAN_0003504606 and it goes to 3504646.

BY MS. LUHANA:

Q Dr. Harvey, this is an e-mail from you to George, and you're apologizing about your late submission of your redlines to the paper. And you state here -- can you read what you state in the body of the e-mail?

A "One of the reasons I was late I was trying to convince some colleagues to follow the science regarding an impurity in the drug product, specifically why ICH M7 is wrong to assume we cannot use positive in vivo genotoxicity data to define limits for impurities; i.e., what is written here."

Q So by quote, unquote, "follow the science," do you mean GSK result's driven science here?

MR. SHEEHAN: Objection.

A Well, I -- I think I said about follow the science, you mentioned a minute ago, what I was saying to that particular project team is that we have ICH M7. And in that ICH M7, the document -- and that's the framework we're working to at the moment in research and development -- there are sections that talk about where you could use positive in vivo genotoxicity data to define levels for impurities. So that is in a section. It's a section about PDEs and thresholds in in vivo toxins.

Q But isn't that interesting your colleagues

thought you were wrong to use positive in vivo genotoxicity data and believed the ICH M7 didn't permit you to do that here? Isn't that what's being said?

MR. SHEEHAN: Objection.

A I'm explaining it to chemists that aren't necessarily -- sorry -- I don't know if it was chemists or who I was explaining it to. What I was saying is I was explaining what M7 says. Not everyone is an expert is in M7 in GSK. There's a section in M7. That's what I'm talking about.

Q Doctor, we just discussed that. This has never -- positive in vivo genotoxicity data has never been used to derive limits for impurities or dose response when there is robust carcinogenicity data. This is an exception and unheard of, frankly, in terms of the application of ICH M7. Wouldn't you agree?

MR. SHEEHAN: Objections.

A Well, that's not what I've written. That's not what I'm saying. I'm saying there's a section in M7 that talks about if you get positive in vivo genotoxicity data, you can use that to define an acceptable intake. And we have done it before on a different impurity in a different product.

Q Can we turn to -- that different product didn't have, as you already testified to, didn't have

robust carcinogenicity data, correct?
A That particular project that impurity didn't have carcinogenicity data, that's correct.
Q Correct. Can you turn to the last Bates, the attachment, it's ending in 4615? And this is a redline copy of the paper here.
MS. LUHANA: 4615. Right there. Can you pull that comment up in that paragraph? Can you pull it out, Erik?
BY MS. LUHANA:
Q Dr. Harvey, the last sentence there is talking about regulatory submissions adopting this approach, and your question and comment here is "Has it? Who else has done this? I know we would plan to if we can get the MutaMouse positive."
Did you ever get an answer to this question?
A I can't recall. I had a discussion with George about it, so I can't -- I can't recall, to be frank. I can't remember. Sorry.
Q So were there any other regulatory submissions, you know, creating this carve-out exception, this make-shift approach for genotoxic compounds previously used?
MR. SHEEHAN: Objection to the characterization.

A Again, I don't think -- I wouldn't consider this a makeshift approach. There's a discussion in there about M7, about using this approach. Again, I'm struggling with that.

Q Okay. So were you able to get examples from George about these regulatory submissions? That's my question.

A I can't recall. I can't recall that -- I can't recall that conversation with George. All I can say and I've said it before is that this is about two sections in the ICH M7 that talk about alternative approaches to the linear extrapolation.

Q What is the MutaMouse study?

A The MutaMouse study, it's called -- it's a transgenic rodent -- it's transgenic, so it's a rodent that's been adapted and so it has a gene in and that's why it's called transgenic. And in that there's a particular gene where we can measure mutation, and so it's called a MutaMouse study because you can measure mutation in vivo in that study.

Q Is that being done currently for ranitidine or NDMA?

A We're currently doing a MutaMouse study on NDMA, yes.

Q Okay. And is it complete?

A I don't know if it's completed yet. I think the end-life stage might be complete, so that's the dosing of NDMA.
Q When is it expected to be complete?
A In terms of the results?
Q Yeah, the study, when is the --
A I don't -- I don't know when the results read out. Sorry. I know that there was delays to the start of the study. We've got another MutaMouse study ongoing. And I -- I don't actually know the details. It's being managed by the genetic toxicology group.
Q Is Mr. Lynch managing it?
A It's his group that's coordinating the conduct of the study, yeah.
Q So currently you said there's two MutaMouse studies?
A We've got one ongoing MutaMouse study, and I think we've got another one planned.
Q And who's doing that study for you, the MutaMouse study?
A A CRO called -- well, I think it's called Covance at the moment, but I'm not quite sure if it's recently changed its name.
Q And the expected complete date would you say is sometime next year?

MR. SHEEHAN: Objection.
A Sorry. I don't -- I don't know. I think -- maybe, yes. Maybe.
Q Who would know that?
A Anthony Lynch would know that.
Q Are you doing any other studies on NDMA or ranitidine?
A We're doing some studies with George Johnson that we mentioned about DNA repair.
Q And when's that expected to be completed?
A I -- I don't know. That project's being managed by Anthony Lynch's group.
Q Any other studies?
A On NDMA?
Q Correct, or ranitidine.
A Not to my knowledge, no.
MS. LUHANA: You can take this down. Can we put up Exhibit 4928 again?
Q Mr. Harvey, in your paper, we established that you used Peto carcinogenicity data for benchmark dose analysis, correct?
A That's correct.
Q And we concluded it's the most suitable carcinogenicity data for BMD analysis. That's what you conclude in your paper?

A That's what -- yeah, that's the -- that paper -- sorry. That dataset is quite extensive, yeah.

Q And you agree that the analysis of available data for all combined cancer types for a given carcinogen would inform the dose response assessment process, right, and characterization of a risk?

MR. SHEEHAN: Objection.

A Well, I think for the purposes of this exercise, they used the Peto study. It's seemingly the go-to study. It's a very extensive, very large study, and I'm also -- that's the study data we used in the paper.

Q So you didn't use any other carcinogenicity data. You only focused on the Peto study, correct?

A That was my recollection, yeah.

(Exhibit Nos. 4956 and 4958 were marked.)

Q Okay. Let's have marked -- it's Harvey 4958, and that's the Peto study. You can keep this up right now, actually, but I'm going to go to that document, so we're going to go back and forth between Peto, which is 4956, and this paper. Can we turn to page 297, and it's that top paragraph there?

You say, "The liver was the most sensitive tissue and was defined as the most relevant tissue for the present analysis," correct?

A Yep, that's correct, yes.

Q Doctor, you're working on a textbook as well with George Johnson and some other industry folks, correct?

A I've worked on a textbook with -- I'm trying to think of the textbook now that I've been working on. I don't know -- I don't feel that I've been working specifically with George Johnson on anything in that text. There's a textbook ongoing with some chapters involved about impurities that I've been working on, yeah.

Q Doctor, you're an author on it with George Johnson, so that's why -- we'll -- we'll discuss that later on.

The chapter is called "Compound and Class-Specific Limits for Common Impurities in Pharmaceuticals."

A Okay.

Q That's the chapter I'm referring to that you've authored also with George Johnson. You state there that to assess carcinogenicity effects, you have to review the available carcinogenicity studies and evaluate and summarize each study and consider adequacy of experimental design and conduct, and you discuss a number of other factors.

So in terms of your chapter that you're drafting that's being published shortly, on the standards to assess carcinogenicity studies, you didn't do that here with this stu -- this paper, did you?

MR. SHEEHAN: Objection.

A I'm fairly sure that the liver is the target organ used for the derivation of the 96 nanograms a day. I might be wrong. But the focus has always been on the liver for NDMA. But, no, we didn't do that, that's correct.

Q So you didn't do that. And then if you look at page -- we're on 297 still, and you reference -- that last sentence you reference, "For our analyses, malignant cancer data" -- and it says, "see table 7 of Peto, were used to assess the extra risk at the time of sampling," correct?

A That's correct.

MS. LUHANA: And so I don't know if we can do a split between, but I want to go to Peto, 4956, and take a look at table 7., page -- it's going to be kind of complicated because you have to flip it. There you go. Perfect. And can you cull out table 7 there?

BY MS. LUHANA:

Q So as you can see with Peto, Dr. Harvey, he

had looked at liver tumors in males and females, correct?

A Yes, that's correct.

Q And you see the doses on the left-hand side and then you see all the numbers and the tumors that -- the tumors that developed in these male and female rats, correct?

A That's correct, yeah.

Q However, in your paper, you only focused on the liver tumor data, correct?

MR. SHEEHAN: Objection.

A That's my recollection, yes.

Q And so did you include the bile duct, the mesenchyme, the Kupffer cell, did you include all that data in your analysis?

A I can't recall if we included that. That was -- George is the expert in the actual analysis. That's why we work with an expert like George.

Q Doctor, you authored this paper with George, correct?

A That's correct. That doesn't necessarily mean that I would follow every aspect of the modeling. That's why I would defer to George.

Q Understood. But you would think it was important to assess and include and evaluate all the

data, correct?

MR. SHEEHAN: Objection.

A Yes, but as I said, I would defer to George's expertise in this area.

Q Okay. So in this paper, you didn't include any of the other cancer tumors. So the Johnson paper focused only on liver cell, and in fact only focused on middle liver cell. It didn't focus on bile duct. It didn't focus on mesenchyme. It didn't focus on Kupffer cell. When I say "focus," it didn't include any of that data for analysis. Are you aware of that?

MR. SHEEHAN: Objection.

A Again, I would defer to George's expertise in this area, but I think -- I mean, the point being about the benchmark dose modeling is just that it's a very different approach. It takes into account the dose response, and the dose response of that study with tumors, it's not linear. And so I accept your point, but I would defer to George. It's his area of expertise. It's not mine.

Q Wouldn't you want to assess all the data here and in addition to not including all the tumors that I just mentioned to derive dose response? He excluded all the female tumors completely. Do you think that's an appropriate approach when you're assessing

carcinogenicity data, Dr. Harvey?

MR. SHEEHAN: Objection.

A So, again, the paper is about the proposal. There's a piece in ICH M7 that talks about use of benchmark dose modeling. It talks about threshold -- thresholds for mutagenic carcinogens. This publication is about what that would look like. And so you've discussed it before and I've confirmed it. It's not been adopted. It's a proposal. How would we go about doing this with the data we have? And it's a very complicated area, and that's why I would defer to George about this -- about this particular component of it.

Q Dr. Harvey, we just discussed that this is an exception to the rule, and when you're coming up with an exception, isn't it important to review at least the data you're evaluating to assess this benchmark dose, which is a novel approach for NDMA and is not the accepted standard, isn't it important to evaluate all the data here?

What would be the basis for excluding the bile duct, the mesenchyme, the Kupffer cell, and in addition to that, excluding all the female tumors completely from your analysis to derive your PDE for NDMA?

MR. SHEEHAN: Objection.

A So as I said before, this is the first paper

that we're trying to write about what does it look like. The data that we have for those papers are going to change. We're going to get more transgenic data on NDMA. We discussed that study. We're going to understand DNA repair thresholds with further studies. That data would change the paper as well. We'll continue to build on this framework. This to me is a first attempt to say what it would look like to adopt those alternative approaches in M7.

Q Have you --

A Sorry. Go on.

Q Have you heard the saying "Garbage in, garbage out," Dr. Harvey?

A Have I heard the phrase "Garbage in, garbage out"?

Q Correct.

MR. SHEEHAN: Objection. Go ahead.

A I've heard of that phrase, yeah.

Q Okay. So is that what this is? Do you understand the PDE that this paper concludes should be acceptable for NDMA is something, like, 6200 nanograms of NDMA per day as the acceptable limit, and currently it's 96 nanograms, are you aware that that's the conclusion this paper reached?

MR. SHEEHAN: Objection.

A Yes. But as I said, it's -- the 96 nanograms a day is exceptionally conservative. It's a linear extrapolation. We've discussed this. It's a theoretical framework. This is actually saying if you examine the data and the dose response in the data, you get different values.

You yourself have spoken to me about what has been adopted. The 96-nanogram-a-day figure has been adopted. This is about what happens if you look at the dose response in the data. We'll continue to generate more data to understand the relationship between mutagenicity and carcinogenicity.

Q So you believe appropriately looking at the data and extrapolating a dose response is actually excluding 104 bile duct tumors from the dataset and excluding all the female tumors from the dataset to come up with your self-serving conclusion? You think that's appropriate?

MR. SHEEHAN: Objection.

A No, I don't -- I don't agree with that statement. And I think I answered the question. There's parts in ICH M7 that talk about the approaches you can take, and this is an attempt to apply those approaches with the data that we have. We will generate new data and it will be updated. It's the alternative

to that linear extrapolation that we've described. And we've also discussed how this hasn't been accepted. It's a proposal of what it would look like under M7, and currently, EMA and FDA are adopting that 96-nanograms-a-day figure.

Q Doctor, what would be the rationale to exclude all these tumors when you're trying to extrapolate a dose response for NDMA?

A I would defer to George on that. He's the expert in that area. As I said before, what we're trying to do here is take a look at why -- take a look at what would the values look like, what would the approach resemble if we applied those alternative approaches defined in ICH M7.

Q Doctor, you cited Zeilmaker in your paper here that also assessed this data and included the liver and bile duct cancers. Is that surprising to you?

MR. SHEEHAN: Objection.

A Again, I can't recall that, and I would defer to George. That's his area of expertise.

Q Are you aware that they also derived the benchmark dose, as you have in this paper, but it was significantly different, three times less than what you came up with? Are you aware of that?

A No, I'm not familiar with that, but again,

it's the area that I would defer to George on.

Q Wouldn't you think it's appropriate to include all the data when you're coming up with a dose response for NDMA?

MR. SHEEHAN: Objection.

A I mean, it's -- the paper explains what we're trying to do. We're trying to examine what it would look like if we apply those different approaches in ICH M7. As I said, we'll get more data. We're going to generate more transgenic data on NDMA, so we're going to further understand the biology, so -- and, again, I feel like I'm repeating myself. This is an approach as defined in ICH M7. We have attempted to apply the data we have and come up with some alternative values. It will continue to be improved upon as we get more data, and I'm accepting it's not been adopted by FDA or EMA. They're adopting the 96-nanograms-a-day value.

Q Doctor, but you're assessing incomplete data, correct, to derive a conclusion? You're trying to calculate PDE on data that you're excluding, correct, and cherry-picking? Isn't that what's being done here?

MR. SHEEHAN: Objection.

A No, I wouldn't say we were cherry-picking. And, again, I would defer to George, George's area of expertise in the modeling.

Q What would you call it if you're only including one subset of tumors and excluding all the other tumors? You know, Mr. Johnson is concluding that the female tumors do not matter at all, and then all the male tumors but for liver cell are all he's going to include for his analysis to come up with a PDE.

What would be the intention there of doing so, doing that?

MR. SHEEHAN: Objection.

A Again, it's -- it's what does it look like. It's a proposal. And, you know, what would it look like applying those principles of M7 to this compound, and that includes the mutation data, includes the carcinogenicity. I'll defer to George on the selection of the data. But it's a proposal, and it's not been adopted, as you've said. But nevertheless, that position is in ICH M7, and we'll continue --

Q But where does ICH M7 say --

A We'll continue --

MR. SHEEHAN: He's still answering.

A Sorry. We'll continue to generate data to explore it.

Q Are you really trying to influence regulators and agencies to increase the limits on carcinogens in drug products so GSK can sell more drugs?

MR. SHEEHAN: Objection to the characterization.

A No, we're not -- we're not doing that. We're exploring the options outlined in ICH M7.

MS. LUHANA: Okay. You can take this down.

Q Dr. Harvey, where in ICH M7 does it say to only include a subset of carcinogenicity data when you're coming up with a benchmark dose or PDE?

MR. SHEEHAN: Objection.

A It doesn't say that. Of course, it doesn't say that. It's talking about benchmark dose modeling, and George is an expert in benchmark dose modeling. As I said, I would defer to George on that area.

MR. SHEEHAN: Roopal, we've been going for about -- for a while. You want to take another break?

MS. LUHANA: Sure. We can take a ten-minute break.

THE VIDEOGRAPHER: We're now going off the video record. The time is 11:53 UTC, 7:53 a.m. EDT.

(A 54-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 12:47 UTC, 8:47 a.m. EDT.

BY MS. LUHANA:
Q Dr. Harvey, before the break, we were discussing the Johnson paper, and I want to go through it some more.
We talked about the TGR gene mutation data. And you have testified and we established that using mutagenicity data for a genotoxic carcinogen like NDMA that has robust carcinogenicity data is really a leap. It's an exception, correct?
MR. SHEEHAN: Objection, mischaracterizes testimony.
THE WITNESS: I'm sorry. Can we turn the volume up? I'm really struggling to hear. Could you repeat the question?
(Off-the-record discussion was had.)
BY MS. LUHANA:
Q We were talking about the Johnson paper, and we were talking about what I was referencing was your prior testimony where we talked about TGR gene mutation data or just mutagenicity data actually generally isn't typically used for dose response for a genotoxic carcinogen when you have robust carcinogenicity data, correct?
MR. SHEEHAN: Objection, mischaracterizes testimony.

A I -- sorry. I'm just recapping the question in my head. So I know that in ICH M7 it talks about the different methods and approaches for deriving acceptable intakes. And there's also a section that has when you would do an assay like the in vivo MutaMouse. And the results of both of those studies could be used to define an acceptable intake from an impurity. I think certainly with the MutaMouse data alone, it's suppressed and set by EMS and Viracept that we discussed. It's an approach. It's described in M7.

Q Okay. It's an approach, but is it an accepted approach that's been utilized for a genotoxic carcinogen when you have robust carcinogenicity data to derive a dose response?

MR. SHEEHAN: Objection.

A Well, to derive an acceptable intake or dose response? Sorry.

Q Yes.

A What we do and then what's described in M7 is if you have carcinogenicity data, you could use the linear extrapolation. You could use the benchmark dose modeling approach. And both of those approaches will give you different acceptable intakes.

In this publication, the mutation data actually gives you a lower permissible daily exposure

than that derived by the carcinogenicity data if you do the benchmark dose modeling. And I think we discussed it before. There is a benchmark dose modeling. It's a linear extrapolation, the carcinogenicity data, you can do benchmark dose modeling on in vivo mutation assay data.

In vivo mutation assay data, if there's a threshold mechanism, you can use a different approach described in M7. None of the approaches have been adopted by EMA or the FDA. They've adopted the linear extrapolation method, the 96-nanogram-a-day method.

Q So you use mutagenicity data for the Johnson 2021 paper, correct?

A Well, mutagenicity is the mechanism of carcinogenicity. What we were looking at is the relationship between mutagenicity in vivo in rats and carcinogenicity in vivo in rats. That's the relationship we were examining.

As I said before, there's a position here about the next nitrosamine that's not NDMA or NDEA, and we have other nitrosamines where we don't have a limit, we're defaulting to a limit, and if we were to generate NDMA -- sorry -- if we were to generate transgenic data on that, we may be able to understand its biology in a way that would help us define an acceptable intake.

Q All right. I'm just focused right now on the Johnson 2021 paper and the exercise you utilized to derive the PDE using mutagenicity data. So in using that, did you review all available mutagenicity data for NDMA for the Johnson 2021 paper to derive PDE?

MR. SHEEHAN: Objection.

A Well, I think for NDMA, they used the Gollapudi that was in rats is my recollection. You could look up the paper. We're doing additional studies as well because the MutaMouse study or the transgenic study design is sort of -- has evolved in a sense that there's a different set of parameters now. So as I said before, this is an approach. We're going to generate new data, and we'll rerun the assessment based on that new data.

It's -- you know, that was the data that was available of the longest duration that we had, I think it was five days or something like that, in rats.

Q So you're saying you didn't review all the available mutagenicity data. You just looked to the Gollapudi data, correct?

MR. SHEEHAN: Objection, mischaracterizes testimony.

A I believe the Gollapudi data was selected because it's the study with the most doses in it.

Obviously, we would like more doses than that, but that is the data that we have. Much of the data on the NDMA in MutaMouse is single-dose data.

Q Do you know what TGR gene mutation data is available for NDMA?

A I believe there's a summary of it somewhere in an OECD document. That's the summary I think that I'm aware of.

Q I'm focused, Dr. Harvey, on the 2021 paper to see what you ultimately reviewed and what you concluded was appropriate to include for your assessment for PDE. So that's my focus right now. So when I'm looking at the paper, I don't see a list of what was considered, what was reviewed to ultimately conclude to only include the Gollapudi paper for the mutagenicity analysis.

A So I --

MR. SHEEHAN: Wait, wait. Hold on. Is there a question? Just make sure there's a question before you start answering something.

Q Yeah, the question is I'm trying to understand where I would find the information, including the studies or the papers they looked to, to come up with their assessment of the mutagenic TGR data and only include to review Gollapudi.

MR. SHEEHAN: Objection.

A Okay. So I would defer to George on the selection of that data. I have a sense that that Gollapudi data is the data of the longest duration of NDMA exposure that we have and I think that's why I was selected, but ultimately I would defer to George in the selection of that study data.

Q Doctor, you're an author on the study, correct?

A That's correct.

Q You reviewed this study. You provided comments on the study. But you didn't analyze the data that was being included in the study to come up with the conclusion?

MR. SHEEHAN: Objection.

A As I said before, George is an expert in benchmark dose modeling. It says that in the discussion. George is the primary author. He has the expertise. We -- I contributed to the paper, to the manuscript, to the concept that's in there. But George -- I would defer to George in terms of the expertise and the modeling and the selection of the data groups associated with that. What we were looking for is to examine that relationship between mutagenicity and carcinogenicity, and that would have dictated datasets that were selected.

Q Right. But wouldn't you want the complete dataset to review to compare and analyze to come up with a PDE for NDMA?

MR. SHEEHAN: Objection.

A A complete dataset. We work with the data that we have.

Q We went over the carcinogenicity data for Peto. It was available. It was just chosen by you and Mr. Johnson not to include it in your assessment to come up with the PDE; is that correct?

MR. SHEEHAN: Objection.

A Again, I would defer to George that there'll be a reason as to why George focused on the male rat liver cells. I think the data's in the paper, but I would defer to George on that. It's his area of expertise. But I assume it's something to do with the relationship between mutagenicity and carcinogenicity, so for that I would defer to George. It's his area of expertise.

Q But sitting here today, you don't have an answer for me as to why that other data for -- the other carcinogenicity data was excluded for analysis in this paper?

MR. SHEEHAN: Objection.

A I expect it would be something to do with

comparing the endpoints of mutagenicity and carcinogenicity in the same tissue.

Q Explain to me how that makes sense to exclude all these different data points which show tumors in rats exposed to NDMA to come up with a PDE based on that data? Why would you be excluding those data points?

MR. SHEEHAN: Objection.

A So, again, I would defer to George on the selection, but it's no doubt it's something to do with -- I assume it's something to do with the comparison of the mutagenicity endpoint in the male rat liver that Gollapudi measured and the carcinogenicity endpoint that was measured in the Peto study.

Q Let's put up Exhibit 4928 and go to page 297, third column, second paragraph, if you can pull that up. Dr. Harvey, can you just please review that paragraph?

A (Reviewing document.)

Q So in terms of the TGR mutagenicity data, as it says here, only the sampled liver was included, right, for analysis?

A Yeah, the Gollapudi it says here about -- sorry. I think I read it.

Q I mean, the first statement says, "TGR gene mutation data for both nitrosamines were reviewed to identify studies that had sampled liver," correct?

A Yeah.
Q So you didn't look at any other TGR gene mutation data for any other organs, right, for liver, for spleen, for lung, for NDMA?
MR. SHEEHAN: Objection.
A So liver is the target organ, right, and so that -- I think I was trying to get to this point earlier. So there's a comparison here of mutation in the liver and carcinogenicity in the liver, that's what's being compared, but, yes, it's the liver being examined, yes.
Q Sure. And you state that there were numerous studies identified but none that met the OECD 488 recommendations, correct? That's what it says here?
A That's correct.
Q Were there any studies that did meet the OECD 488 recommendations for NDMA?
A I -- I don't think there was because that's a one-month treatment duration, and the one-month treatment duration, it was relatively recent in terms of its introduction, so a lot of legacy data that we have on compounds in the MutaMouse is from shorter term duration. That's not to say it isn't valid. It's just that the OECD for a guideline, I think that that one recommends a longer duration of exposure.

Q Let's pull up what's already been marked as Harvey 4958. That is the OECD guidelines for the testing of chemicals. And if you could go to page 5, bottom paragraph that says "Administration Period."

Dr. Harvey, you're aware that the OECD guidelines require an administration period of 28 days where the mutation assays need to be given daily treatment for a period of 28 days consecutively? Are you aware of that?

A Yeah, I think I just -- that's what I was just discussing, right.

Q So do you know the purpose behind it? It says here --

A Sorry. The continual dosing? The 28-day dosing?

Q Yes. It's to ensure to produce sufficient mutations by weak mutagens and provide exposure time adequate for detecting mutations in slowly proliferating organs, correct?

A That's correct.

Q And you in this Johnson paper stated that the Gollapudi was the most suitable even though it didn't meet the OECD standards, correct?

A It's the data that we have, and as I said before, we're doing additional studies on NDMA as well

aligned to this guideline.

Q But you excluded every other study from review because it didn't meet OECD standards but included the Gollapudi study. What was the basis for that?

MR. SHEEHAN: Objection.

A I think I was mistaken about it before. It wasn't a single-day study. There were several days. It went out to 12 days, and there were different dose groups in it, and I think that's in the Johnson paper.

Q And were there any other studies that met similar parameters that were excluded for review?

A I would defer to George on that. I don't have a recollection of that.

(Exhibit No. 4959 was marked.)

Q Let's put up Exhibit 4959, which is the Gollapudi paper. And turn to page 132, and it's the first column under 2.1, if you could pull that paragraph up.

So the Gollapudi paper here states that there were four doses that were given, right? Dose levels of 0, 0.2, 0.6, 2.0 and 6.0 mgs per kilogram per day. And that was over -- it was for rats that were 12 weeks old, and they received a total of nine doses over a period of 12 days, correct? Isn't that what it says there?

MR. SHEEHAN: If you need time to review the

paper, feel free, Dr. Harvey.

A Yes, that's what in that paragraph.

Q And can we return to table 1, which is on the next page. And if you look, there are four animals per dose with daily doses on test days one through five and eight through eleven, right, so it's nine doses over twelve days, correct? The prior paragraph I read reflects what's in this table.

MR. SHEEHAN: Take your time to review the table, if you want to, Doctor.

A I mean, I understand the doses and the description of the earlier paragraph.

Q Right. And Gollapudi looked at hepatic -- is that cII and lacI mutations, correct?

A Yeah, that's correct.

MS. LUHANA: And can we go now back to the Johnson paper, which is 4928, and if you could just split screen, that would be great. And split screen you can go to page 302. And can you pull up the PDE mutation right there for NDMA?

THE DEPO TECH: I'm sorry. Pull what?

MS. LUHANA: Can you -- table 1, NDMA, do you see the PDE that's in that table? Yeah, pull it up. Perfect.

BY MS. LUHANA:

Q And so for NDMA, you see the PDE mutations and endpoint model says increase in lacI MF for Big Blue rats, and that's the liver.

Dr. Harvey, sitting here today, do you know why the other mutations weren't included from the Gollapudi paper?

A Can we go back to -- I'm not sure if we need to go back to the Gollapudi paper. I think what we're talking about here is comparing those two endpoints which relate to mutagenicity and carcinogenicity in the same tissue. And that's quite clear in the paper with George Johnson. We're looking at liver. We're looking at mutation in the liver cells, and we're looking at carcinogenicity in the liver cells. So the focus is on the liver.

Q The Peto study was focused on the liver as well, but four different areas of the liver, correct?

MR. SHEEHAN: Objection.

A That is correct.

Q And are you aware that the bile duct tumors were far greater than the liver cell tumors in the Peto carcinogenicity studies?

MR. SHEEHAN: Objection.

A Can we -- I -- I can only assume it's something to do with -- and I should defer to George on

it because I don't want to get it wrong. It's George -- but it must be the fact that we can measure a mutation in the liver cell in the MutaMouse study and we've measured carcinogenicity in the liver cell in the Peto study. So it's trying to find that mutation endpoint and that carcinogenicity endpoint in the similar part of the liver. But I would defer to George. I should say I would defer to George because George is the expert in benchmark case modeling. I am very familiar with the MutaMouse assay, but I would defer to George on that.

Q Okay. And so you have said Gollapudi, who's also an author on the Johnson 2021 paper, the Gollapudi study, which we have up --

MS. LUHANA: Erik, can you put that back up, the Gollapudi study?

Q You said that was chosen because they were dosed for over -- for 12 days, correct, and it was the longest that you found for --

A I --

Q -- NDMA administration was given? Sorry. Go ahead.

A Just give me a moment to look at the George Johnson paper. I think it was combination of duration and number of doses, and there were four doses.

Q Sure.

(Exhibit No. 4960 was marked.)

MS. LUHANA: Can you take this down and put up what's been marked as Harvey 4960?

Q It's the article titled, "NDMA" -- "DNA adducts, mutant frequencies and mutation spectra in transgenic mice treated with NDMA." And this is one of the papers --

MR. SHEEHAN: Hold on a second, Roopal. We're not seeing this.

MS. LUHANA: I'm not talking about it yet.

Q This is one of the papers that was excluded by the Johnson paper.

MR. SHEEHAN: Are you asking a question?

MS. LUHANA: Yeah, I'm waiting for the paper to come up.

MR. SHEEHAN: Oh, I see.

THE DEPO TECH: It keeps giving an error. One second.

THE VIDEOGRAPHER: Would you like to go off the record for this, Counsel?

MS. LUHANA: Yes, please. I thought we were going off record.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1311 UTC, 9:11 a.m. EDT.

(A 17-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1328 UTC, 9:28 a.m. EDT.
BY MS. LUHANA:
Q Dr. Harvey, is it appropriate to say that you're not the expert as to the 2021 Johnson paper and those questions should be addressed with George Johnson?
MR. SHEEHAN: Objection.
A I think -- I understand the area, of course, and it discusses a potential framework around using mutagenicity and carcinogenicity data. But many of the questions you've asked today I have deferred to George Johnson and his expertise.
Q So you don't have expertise as to the data that forms the foundation and the basis really of the 2021 Johnson paper, correct?
A That --
MR. SHEEHAN: Objection.
THE WITNESS: Sorry. I can't say see again.
MR. SHEEHAN: Yeah, we can't -- Roopal, we can't see you at all. There we go.
A We've spoken about the selection of data. I understand the MutaMouse data. We've spoken about the Gollapudi data. We've spoken about the Peto data. And we've spoken about the comparison of the mutagenicity and carcinogenicity endpoint in the same tissue. But

the modeling is George's area. He's the expert in that.

Q Well, it's not only the modeling. It's actually the data that is being utilized to derive the PDE in the paper. And so my questions have been about the data and what was included, what was -- what was reviewed, what was considered, what was included and what was excluded ultimately to come up with that PDE for NDMA. So every time I've asked those questions, you've said you are not the expert and those are more appropriate for George Johnson, correct?

MR. SHEEHAN: Objection.

A We've spoken about the MutaMouse data, and we've spoken about the doses and the duration, and my understanding is that that's the longest duration MutaMouse study we have. We're doing additional MutaMouse studies along with that OECD protocol that you defined. We will remodel the data. The PDEs will change. They may be lower. They may be higher. They may be the same. So we're doing the science to address some of the questions you've asked.

I've spoken repeatedly about -- you've asked me about selection of specific datasets. I've given you what I think is the rationale as in I think it's mutagenicity and carcinogenicity in the same tissue, but I would defer to George to confirm that and ask for his

input.

Q Do you know if Mr. Johnson is going to be testifying in this matter as an expert?

MR. SHEEHAN: Objection.

A I don't know. In this matter, I don't know.

Q Do you know if he's testifying in any other matters?

MR. SHEEHAN: Objection.

A I don't know if George is involved in this discussion.

Q Well, you just said "not this matter" indicating there are other matters that Mr. Johnson's testifying in. Do you know what matter that would be?

A No, I don't. I don't know.

MS. LUHANA: I'm going to turn it over now to my colleague, Mr. Watts, for questioning. Thank you so much for your time, Dr. Harvey.

THE WITNESS: Thank you.

MR. WATTS: Are you ready to proceed or would you like a break?

MR. SHEEHAN: We couldn't hear you. Did you say something?

MR. WATTS: Are you ready to proceed or would you like to take a short break before I begin?

THE WITNESS: I would very much like to take a

short break, please.

MR. WATTS: We'll give you that break.

THE WITNESS: Just a short one, five minutes.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1332 UTC, 9:32 a.m. EDT.

(A 8-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1340 UTC, 9:40 a.m. EDT.

- - - - -

DIRECT EXAMINATION

BY MR. WATTS:

Q What is your name, please?

A My name's James Harvey.

Q Mr. Harvey, I'm Mikal Watts. I'll be asking you questions today. You work for GlaxcoSmithKline?

A That's correct.

Q And your resumé's been marked as 4714, and I just want to put that up on the screen. At the very top of your resumé, it says that you have over 20 years of experience in the pharmaceutical industry, and that you're currently global director of the target systems safety group at GlaxcoSmithKline; is that correct?

A I'm sorry. Yeah, the target systems safety group, yes.

Q It says that you're a UK registered

toxicologist with extensive knowledge of the R&D process and experience in determining the potential safety liabilities of new targets and molecules in the early discovery and late stages of development respectively; is that right?

A That's correct.

Q In that role, what is the date when you first worked on ranitidine?

A In that role, it would have been -- in that specific role, it would have been the EMA responses in September.

Q September of 2019?

A 2019. Sorry, yeah, yeah.

Q You said EMA responses. You mean the European Medicines Agency sent requests for information to Glaxo asking about NDMA that it had located in ranitidine-containing products sold by GSK; is that right?

A Yes, that's correct.

Q And what is NDMA?

A NDMA is N-nitrosodimethylamine.

(Exhibit No. 4225 was marked.)

Q Okay. And let me show you Exhibit 4225, which is a document which you helped to review. And this is a document entitled, "Hazard Assessment Report for NDMA,"

and it's a GlaxcoSmithKline document; is that right?
A That's correct.
Q And if we go down the page, you're not the author, but you are one of the reviewers of this document; is that right?
A Yes.
Q And in addition to yourself, we have Angela White and William Hawkins; is that right?
A That's correct.
Q And William Hawkins is the manager of occupational toxicology; is that right?
A That's correct. He was, yeah.
Q Now, as we look at this document that you helped review, if we go to the second page, Bates page 061, we see that NDMA is a member of the N-nitrosamines, a family of potent carcinogens. Do you see that?
A Yes, I do see that.
Q And the document that you helped review says it's a positive genotoxicant; is that right?
A Yes, that's correct.
Q And if we go to page 4 of the document, on Bates page ending 063, we'll see that it says, "NDMA is not currently produced in pure form or commercially used except for research purposes;" is that right?
A That's correct.

Q In other words, NDMA is not sold on the open market. It's used in research labs to formulate cancerous tumors, right?
MR. SHEEHAN: Objection.
A It's used as a research chemical, yeah, that would be correct, to study mutagenicity and carcinogenicity, yeah.
Q It says it was formally used in production of liquid rocket fuel, antioxidants, additives for lubricants and softeners for copolymers; is that correct?
A That's correct.
Q And when you reviewed this document, what did you understand that it was used for in the production of liquid rocket fuel?
A I don't know. I don't know the components of liquid rocket fuel.
Q Okay. It says, "NDMA can be unintentionally produced in and released from industrial sources through chemical reactions such as those that involve alkylamines with nitrogen oxides, nitrous acid and nitrite salts"; is that right?
A That's correct.
Q Down at the bottom it says, "NDMA is also an unintended byproduct of the chlorination of wastewater

and drinking water at treatment plants that use chloramines for disinfection"; is that right?

A Yes, that's correct.

Q This is all information that's contained in a GSK hazard assessment report with respect to NDMA that you reviewed and signed off on; is that right?

A Could we go back to -- could we zoom back so I can look at the --

Q Front page?

A Front page, please. Thank you. So I certainly reviewed it, and Kamila authored it. That's correct.

MR. SHEEHAN: Mikal, just so it's clear, this appears to be a draft of some form with some comments on it and that, and I just want the record to reflect that.

MR. WATTS: Okay. Fair enough.

BY MR. WATTS:

Q And let's go to page 10 of this draft, 069, and we can (inaudible) shown there we can see comments (inaudible) along the way; is that right?

MR. SHEEHAN: We're -- it is starting to fade in and out again. Dr. Harvey, can you understand what Mikal is saying?

THE REPORTER: It cut out.

MR. WATTS: Let me try again.
BY MR. WATTS:
Q On page 10, 069 under Conclusions, it says, "Although no permissible exposure limits or other occupational exposure limits have been established by the Occupational and Safety Health Administration (OSHA) and the National Institute for Occupational Safety and Health (NIOSH) or ACGIH, NDMA is regulated along with 13 other chemicals as a potential occupational carcinogen." Do you see that, sir?
A I do.
Q It says that it requires the use of engineering controls, work practices and personal protective equipment to control the exposures of workers to NDMA; is that right?
A That's correct.
Q Now, the reason I bring this up is because the Occupational Safety and Health Administration restricts exposure to NDMA because of its potential occupational carcinogen effect; is that right?
MR. SHEEHAN: Objection.
A Well, I'm not an expert in these regulations you described. Kamila Gromek and William Hawkins are. But I can understand the general sense of what you're saying is that it's controlled for a reason.

(Exhibit No. 4231 was marked.)

Q All right. And the reason I ask that question is as we go to Exhibit 4231, after the issue of NDMA in ranitidine became (inaudible) this document ended up in your custodial file. It's entitled, "Concerns for Fitters, (inaudible) Manufacturers, Operators --

MR. SHEEHAN: Mikal, you're really -- you're fading in and out. Is there a way that we can solve this problem?

(Off-the-record discussion was had.)

THE VIDEOGRAPHER: We're now going off the video record. The time is 1348 UTC, 9:48 EDT.

(A 4-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1351 UTC, 9:51 a.m. EDT.

BY MR. WATTS:

Q Dr. Harvey, I want to show you Exhibit 4231, which is a document GSK produced to me, entitled, "Concerns for the Fitters, Electricians, Manufacturers, Operators, Cleaners, Quality, Micro, Production Management and Staff." Do you see that, sir?

A I do.

Q Now, this came from your custodial file. You understand that before you were tendered as a witness in this case, your files were swept for matters dealing

with ranitidine; is that right?
A That's my understanding, yes.
Q And the top says, "In response to your e-mail regarding Zantac (ranitidine), what is the risk of exposure for employees in our manufacturing and packaging sites for the production of Zantac ranitidine products?" Do you see that?
A I do.
Q And down at the bottom, it says -- under Our History of this Product, there are a number of bullet points, and the second bullet point says, "Employees were constantly exposed to ranitidine dust as there was not ventilation on the packing lines. There were also many instances where the employees were exposed to ranitidine hydrochloride being burned inside heat tunnels and underneath sealing plates where the smell of burning Zantac would engulf the packing hall." Do you see that, sir?
A I do, yes.
Q And then the next highlighted one says, "There were no safety instructions, precautions for us to follow. One common instance was when the Zantac blender would block up and fans would be reversed and blow ranitidine hydrochloride dust into the atmosphere. Another instance was when the Zantac blender caught fire

exposing the employees to ranitidine hydrochloride being burned. It is only recently that the adverse effects associated with ranitidine hydrochloride have been discovered, and as there are many staff that have had exposure to this drug, we believe these staff members past and present should be notified and offered advice of any health concerns." Do you see that, sir?

A I do.

Q Were you involved in the decision on whether or not employees present during the manufacture of ranitidine hydrochloride should be offered health advice?

A No, I was not. I -- no, I wasn't, no.

Q Do you know why this was in your custodial file?

A I think it most likely related to the previous document about the OHC, Occupational Health -- sorry -- it's called EHS, Employee Health and Safety. It would have been related to that. It would have been related to the manufacturing of ranitidine and any considerations that would have need to -- need to be made given the new information on ranitidine. So I think this was a topic that William Hawkins maybe had worked on. He was the reviewer of that previous document.

Q And the new information on ranitidine is that NDMA, a probable human carcinogen, had been found inside of ranitidine, right?

MR. SHEEHAN: Objection.

A Well, I mean, I'm assuming that this document -- I mean, I don't know about Boronia and I don't know about the actual details here. William Hawkins I remember was working on this. I'm assuming the adverse effects, but I don't know the date of this document, but I'm assuming the adverse effects was something related to the EMA response. I'm assuming, though. I don't know of any other adverse --

Q Now --

A -- adverse -- well, it's described as adverse effects. I'm not quite sure that that's the language taht I would use, but I'm not familiar with anything else associated with ranitidine, so assuming it's something to do with NDMA.

Q Dr. Harvey, when NDMA was found in ranitidine, you were first advised of that fact by Swiss Medica, which is the Swiss version of the Food and Drug Administration; is that right?

A I believe it was Swiss Medic. There was another agency, but I think it was Swiss Medic as well, I think.

Q And within weeks regulatory agencies across the world were asking GSK to test for NDMA in ranitidine products that it manufactured, correct?

MR. SHEEHAN: Objection.

A My recollection is that there were further questions about ranitidine and NDMA. I couldn't be exact about who was contacted -- who was contacting us and why. That would be an area for regulatory colleagues.

Q Did GSK endeavor to commission testing on its ranitidine-containing products to see whether or not its testing would show the presence of NDMA?

A My understanding is that there was the -- there was something called a PIRC set up, which is a multidisciplinary team, the Product Incident Review Committee, to examine the data that we'd received. And a consequence of that PIRC was that GSK commissioned some tests with ranitidine.

Q And in order to get testing on ranitidine, you had to have ranitidine shipped to the testing labs, right?

A I wasn't part of that exercise, but I'm assuming that -- I'm assuming the logistics of what you described is correct.

(Exhibit No. 4243 was marked.)

Q Let me show you an e-mail that you were a part of. Exhibit 4243 is a two page e-mail, and I'll ask you first about an e-mail on the bottom of the first page, the top of the second. This is from a Jennifer Chung at Pfizer. And she says, "Hi all. When I ordered NDMA today, I received an e-mail from the Pfizer EHS telling me that they will not approve the order as we are not set up to handle NDMA." Do you see that, sir?

A I do.

Q And as we go to the next e-mail on the middle of the first page, Dean Thomas of GSK is writing an e-mail to several individuals, including yourself, and says, "We are also running into issues with NDMA." Part of what he told you was the unformulated version is forbidden to be shipped by air, and we're unable to find a supplier closer to home. Do you see that?

A I do.

Q NDMA is a product that is restricted in terms of who can handle it and how it's transported; is that right?

MR. SHEEHAN: Objection.

A Well, obviously there's some restrictions in place that Dean was alluding to, right, yeah.

Q And the reason for that is it is a mutagenic impurity that is a probable human carcinogen, right?

MR. SHEEHAN: Objection.

A There'll be restrictions related to it and there'll be restrictions for many compounds mutagenic and carcinogenic, but it doesn't -- you know, there's compounds that we purchase and use for research purposes that are mutagenic and carcinogenic. It's part of the way of working in genetic toxicology.

(Exhibit No. 4181 was marked.)

Q Now, let me ask you about another e-mail that you're part of, Exhibit 4181, and this is an e-mail that you wrote to a Mike Urquhart on December the 7th of 2018, and you attach a PDF with slides from Andrew Teasdale, and you tell Mr. Urquhart "Some interesting chemistry in here around nitrosation formation. Perhaps we can discuss. My slides attached"; is that right?

A That's correct.

Q One of the slides you attach is Bates number 964, and I want to ask you about this slide. With respect to N-nitrosodimethylamine, which is NDMA; is that right?

A Yes, that's correct.

Q And it says it's a known animal carcinogen, right?

A Yes, that's correct.

Q It says it's part of a cohort of concern as

defined in ICH M7; is that right?
A That's correct.
Q And it says TTC not applicable. What does that mean?
A What that means is -- and it's described in the ICH M7 guidance. And so the TTC is something called the threshold of toxicological concern, and it's a value that was derived that constitutes a control level for a mutagen, so something that's DNA reactive. So you may not know about its carcinogenicity, in which case you can use the TTC, and this is 1.5-microgram-a-day limit.
What this is saying -- and I don't know if this is detailed on this slide -- is that when you have carcinogenicity data here, that you would use that -- so you have carcinogenicity data on NDMA. And in this case, it's from the CPD database. You would use that data to derive a specific limit for NDMA called an acceptable intake, and that would be using a linear extrapolation method that's described in M7. So he's saying that you can't use the default and you have to use the carcinogenicity to derive a value.
Q And I notice there's an arrow to data from rat and mouse studies. Do you see that?
A Yes, I do.
Q And NDMA is a carcinogen that is known to

cause cancer in rat and mouse studies; is that right?

MR. SHEEHAN: Objection.

A I certainly know that it's been tested in multiple species, and I know that most of the data is in rats and mice. It was also tested in rhesus monkeys as well, but --

Q And it causes --

A -- yeah, those study are in rats and mice.

Q Sure. And it causes cancer to those different animals that it was tested in that you just mentioned, right?

MR. SHEEHAN: Objection.

A Well, it induced tumors. It didn't induce tumors in rhesus monkeys, but it certainly induced tumors in those multiple species, multiple -- I think it was called nonclinical species, but in a variety of species.

(Exhibit No. 4187 was marked.)

Q Dr. Harvey, I want to talk to you about the different species in which it induced tumors. Let's look at Exhibit 4187, which is an e-mail that you wrote on July 19, 2019, to Anthony Lynch. And part of what you told Anthony Lynch with respect to ranitidine two times 150 mgs a day, it's got a section NDMA carcinogenicity, and it says, "NDMA caused tumors in

numerous species of experimental animals at several different tissues sites and by several different routes of exposure. Tumors were observed in all species tested, including mice, rats, hamsters, guinea pigs, multimammate mice (genus Mastomys), rabbits, frogs, newts and various fish. NDMA caused tumors primarily of the liver, respiratory tract, kidney and blood vessels." Did I read that correctly?

A Yes, you did.

Q And because it had induced tumors in every species tested, NDMA is reasonably anticipated to be a human carcinogen based on this sufficient evidence of carcinogenicity from studies in experimental animals, right?

MR. SHEEHAN: Objection.

A Well, different agencies define it differently. It's probable human carcinogen reasonably be anticipated. I mean, on the previous slide, there was something about the nonhuman primate, but the majority of the studies show that it induces tumors in those nonclinical species. But, yeah, there's a different definition, but, yes, yeah, what you said is correct.

Q All right. And some of these studies are produced in the United States by the National Institute

for Health, for example, right?
A I -- I don't know the exact details of where the studies were done. There's a lot of studies on NDMA.
(Exhibit No. 4192 was marked.)
Q Let me show you one that you sent to Steve Parker on July 26 of 2019, Exhibit 4192. And do you see how at 1629 in the afternoon, you forward a URL that is a National Institute for Health Profile of Nitrosamine; is that right?
A Yes, that -- that's correct. That's the NTP -- Yeah, NIS. Sorry, yeah.
Q And nitrosamine is this family of substances of which NDMA is a part; is that right?
A Yeah, it's a chemical class, if we'd call it that, yeah.
Q Let's go to page 7 of what you sent to Mr. Parker. Mr. Parker is a GSK employee, right?
A He was, yeah.
Q And you send him something with respect to N-nitrosodimethylamine. That's NDMA; is that right?
A Yes, that's correct, yeah, yeah.
Q And it says, "Reasonably anticipated to be a human carcinogen," right under the title there, right?
A That's correct.

Q And under Carcinogenicity, it says, "NDMA is reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in experimental animals"; is that right?

A Yes, that's correct.

Q Okay. And as we look at what you sent to Mr. Parker and we go down to Cancer Studies in Experimental Animals, it says, "NDMA caused tumors in numerous species of experimental animals at several different tissue sites and several different routes of exposures. Tumors were observed in all species tested, including mice, rats, hamsters, guinea pigs, multimammate mice, rabbits, frogs, newts and various fish." That's the same language you talked about before, right?

A Yes, that's correct, yeah.

Q And then it says, "NDMA caused tumors primarily of the liver, respiratory tract, kidney and blood vessels." We talked about that before, right?

A I -- I think so, yeah, yeah. Yeah, it was the IARC reference, right.

Q And the new language is "Benign and malignant tumors of the liver (hepatocellular adenoma and carcinoma) or bile duct (cholangioma or cholangiocellular tumors) were observed following oral

administration in mice, rats, hamsters, rabbits, guinea pigs and fish; inhalation exposure in mice; prenatal exposure in mice; subcutaneous administration in hamsters, Mastomys and newborn and suckling mice and rats; intraperitoneal injection in adult and newborn mice and in newts; intramuscular injection in rats, and exposure via tank water in frogs and fish"; is that right?

A That's correct.

Q Now, as we go up from there just for a second, it says that NDMA was first listed in the Second Annual Report on Carcinogens in 1981. Do you see that?

A Yes. Yeah, I do.

Q Now, the first full paragraph on the second column of what you sent Mr. Parker says, "Since NDMA was listed in the Second Annual Report on Carcinogens, additional studies in experimental animals have been identified which reported that NDMA caused tumors at additional tissue sites and in additional species. Tumors of the digestive gland, hematopoietic system were observed in mollusks exposed to NDMA in the tank water and ovarian tumors (granuloscell tumors) in female hamsters by subcutaneous injection. Liver tumors were observed in foxes after dietary exposure and in female toads after subcutaneous injection. And lung and liver

tumors were observed in rats after a single intraperitoneal injection"; is that right?

A Yeah, that's correct.

Q Now, all of these different animals that got cancer caused GSK to recognize that N-nitroso structural class chemicals like NDMA can display extremely high carcinogenic potency, right?

MR. SHEEHAN: Objection.

A Certainly the -- in terms of carcinogenicity in rodents, they're more potent than most carcinogens that have been tested in animals. They're certainly, I would say, potent in terms of carcinogenicity as compared to other carcinogens.

(Exhibit No. 4205 was marked.)

Q That's fair enough. Dr. Harvey, let me show you a document that comes out of your custodial file. Exhibit 4205. It's a GSK document dated August 28, 2019, and it's an "NPS Board Review - Update on Emerging Draft Regulatory Expectations: Request to assess the risk of N-nitrosamine impurities in human medicinal products containing chemistry synthesized APIs."

What is an NPS board review?

A NPS board stands for New Product Supply Board, so it's a --

Q Okay. And as we look --

A Sorry.
Q No, that's okay. I didn't mean to interrupt you. Go ahead.
A No, it's NPS board. It's a board within GSK.
Q Good enough. Now, let's go to page 7 or Bates page 725 and look at part of the briefing paper that was provided to this board within GSK. And it says, "Additional Product Information: Situation. It is recognized that certain compounds from the N-nitroso structural class can display extremely high carcinogenic potency," and it cites IARC, the NIH and the US EPA; is that right?
A Yes, that's correct. That's what I was referring to earlier about the carcinogenic potency in the species that have been tested.
(Exhibit No. 4224 was marked.)
Q Let's go to Exhibit 4224, which is a worker hazard summary for ranitidine, and you are a reviewer of this worker hazard study for ranitidine; is that right?
A Yeah, a reviewer in the sense of a person who knows about NDMA.
Q And let's go to Bates page 658 and look at part of this worker hazard study that talks about NDMA as a potential impurity in ranitidine. And does the first sentence say that "NDMA is reasonably anticipated

to be a human carcinogen based on sufficient evidence of carcinogenicity from animals in experimental -- from studies in experimental animals"?

A That's correct. "Reasonably anticipated" is a phrase that IARC -- I think IARC used, I think.

Q Now, going back to Exhibit 4225, which was this draft of the hazard assessment report, if we could look at page 2 of this draft again, again it says it's a positive genotoxicant and a positive carcinogen; is that right?

A Yeah, potential carcinogen, yeah, yeah.

Q And part of what's said as the basis for the PDL or OEL is -- the last line says, "There appear to be no qualitative differences in metabolism of NDMA between humans and laboratory animals, and there is no reason to believe that humans would respond qualitatively differently"; is that right?

A That's what that sentence says.

(Exhibit No. 4242 was marked.)

Q Now, you mentioned something about rhesus monkeys, and I want to show you Exhibit 4242. Why do we test rhesus monkeys as part of pharmaceutical research?

A There are a number of reasons that we would use them. It's most likely related to whether the other nonrodent species such as a dog or mini pig aren't

suitable. It might be related to a target -- the presence of a particular target.

Q Sure. And I don't want to get into the politics of creation versus evolution, but when we look into monkeys, we see ourselves, don't we?

MR. SHEEHAN: Objection.

A Yeah, it's -- I understand what you just said. I think there's several considerations about what would be used as second -- a nonrodent species. It's guidance written by pathologists. There's a lot of expertise that goes into the selection of that second species, so I don't --

Q Sure.

A -- think it's as straightforward as that. Sorry.

Q No, it's okay. Let's go to 989. And as part of this document -- it's a risk assessment of NDMA acceptable intake, and does it say "NDMA is a potent mutagenic carcinogen in a number of different animal species. On the basis of animal data (rat being the most sensitive species), NDMA is classified by IARC as, quote, probably carcinogenic to humans, closed quote, or a class 2A carcinogen. This classification is used by IARC when there is 'limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in

experimental animals.' Other long-term effects such as severe hepatotoxicity have also been observed in rhesus monkeys with this class of nitrosamines."

Did I read that right?

A Yes, you did.

Q Now, as we look at this document and go to the next page, it says, "NDMA belongs to the N-nitroso compounds, which are part of the so-called cohort of concern described in the ICH guideline M7(R1). For such compounds, the generic TTC of 1.5 micrograms per day is an acceptable intake for mutagenic impurities is not considered applicable and a compound specific AI needs to be derived from compound specific carcinogenicity data"; is that right?

A That's correct.

Q Now, with respect to these animal studies, it would be a violation of clinical studies ethics to inject human beings or to allow them to ingest NDMA, right? We're not able to do that?

MR. SHEEHAN: Objection.

A I'm not an expert in that area, but I can -- I understand the sense of what you're saying. I couldn't comment on that, though.

Q Okay. Well, are you allowed to do human studies by giving people NDMA on purpose?

MR. SHEEHAN: Objection.

A I don't -- I don't know. I don't know. I know there have been studies done in the past, but that's the past. I don't know what the considerations would be, but I -- I don't know the answer. That's my answer.

Q What's your suspicion?

A Well --

MR. SHEEHAN: Objection, calls for speculation.

A I suspect it would depend on the actual levels of NDMA. I mean, I understand what you're saying, but I know studies have been done in the past and I know that they've mentioned NDMA, but I couldn't comment. It would just be speculation.

Q Okay. During the time that you've worked at GSK, have you ever put NDMA into the human body on purpose to test?

A No, we haven't done that, no.

Q Let's go to Bates page number 993 of this document, and the document says, "The impact of NDMA on human health is currently only extrapolated from animal studies." Do you see that?

A Yes.

Q That's because we don't do human studies with

a probable carcinogen and a mutagenic impurity like NDMA, right?

MR. SHEEHAN: Objection.

A I mean, we've just spoken about that, right? It's -- it's a speculative-like statement. The data we have is about the data in the animal studies.

Q Okay. So after it says, "The impact of NDMA on human health is currently only extrapolated from animal studies." It says, "However, as the DNA damage mechanisms documented in these studies are also relevant to humans and in vitro data in human cells are not significantly different from those in animal cells, it is prudent to assume that affects seen in animals may also occur in humans after exposure to sufficiently large amounts of nitrosamine." Did I read that right?

A Yeah, you did.

Q Now, Dr. Harvey, when this document ended up in your custodial file, its title, as we go back to the page, is the "CHMP Rapporteur's Updated Assessment Report." If you could, explain for an American jury what the CHMP rapporteur means within the European regulatory structure.

A The CHMP is -- I'm trying to remember what the acronym is. It's Committee -- I've forgotten what the H stands for, but it's Medicinal Products. Sorry.

It's -- it's a group of experts that would write a document like this and give it considered opinion. There's a safety working party within the CHMC.

Q Sure.

A So they are a group of experts with EMA.

Q If I told you that CHMP stands for the Committee for Medicinal Products for Human use, which is an EMA committee responsible for adjudicating the safety of human medicines, would you agree with that statement?

A Yeah, I mean, that sounds right. It's the subject matter -- subject matter experts of EMA.

Q Okay. And so this is the updated assessment report for the CM -- I mean, the CHMP committee. What's a rapporteur?

A The rapporteur, as I understand it -- I'm not an expert in this area. It's regulatory. But my understanding of a rapporteur would be a particular country or maybe two countries would take the lead on writing a report, and I think they would be the rapporteur. But I may be wrong about that. That's not really -- that's my recollection of the rapporteur procedure.

Q Okay. And if the dictionary said that a rapporteur is a person appointed by an organization to report on the proceedings of its meetings, would that

make sense?

MR. SHEEHAN: Objection.

A Yeah, in the sense I thought it was a country, so maybe countries have individuals in it, but that would be, yeah, the person that takes the lead on a particular subject or a country was my understanding.

Q Yes, sir. Now, I want to ask you about NDMA. When it is handled, personal protective equipment has to be utilized by the people handling NDMA; is that right?

MR. SHEEHAN: Objection.

A I would expect so, but it's not -- again, it's not an area that I've worked in. It's not -- you know, I haven't done studies with it.

(Exhibit No. 4158 was marked.)

Q Okay. Let me show you Exhibit 4158. And this is from the Environmental Protection Agency, and it's a technical fact sheet with respect to NDMA. Can you see that, sir?

A I can see it, yeah.

Q And on the second page with respect to physical properties -- down at the bottom, if we could blow that up -- part of it is that NDMA is a yellow oily liquid that is very soluble in water and NDMA has a faint characteristic odor. Do you see that, sir?

A Yes, yes, I do.

Q And with respect to documents that you have seen, let me show you again 4192. And this is the e-mail that you sent to Steve Parker on July 26 of 2019, transmitting this report from the National Institute of Health, right?

A Yeah.

Q And on page 7 again, down at the bottom, we can see that NDMA is a nitrosamine compound that exists at room temperature as a yellow liquid with a faint characteristic odor. Do you see that, sir?

A I do, yeah.

Q In your investigation of the NDMA issue with respect to ranitidine, were you provided with customer complaints made to GSK with respect to the clear product ranitidine discoloring into a yellow liquid and putting off an odor?

MR. SHEEHAN: Objection.

A I -- I -- I can't recall exactly, but I do know that there was -- before I had the role that I have prior to 2019, there was an incident or some questions came up about ranitidine that I think we supported that assessment. I don't know if that -- I don't know the details or I can't recall the details of that, but that's the other example of, that I know of, when we worked on ranitidine.

Q And that would have been back in 2013 when there was a Zantac discoloration investigation done at GSK, right?

MR. SHEEHAN: Objection.

A That -- that would be the other time that I recall working on ranitidine.

(Exhibit No. 4174 was marked.)

Q And let me show you Exhibit 4174. This is an e-mail that you sent to Derek Newall on October the 18th of 2013. And if we go to the top, we can see that your e-mail attached some LIC minutes with respect to Zantac discoloration. What is the LIC within GSK?

A My understanding of LIC is it's a local incident committee.

Q As we go down to the bottom of the page, a Hwee Yee Yong sent you an e-mail on the 18th of October in 2013 attaching the documents which record the decision made in our local incident meeting that no PIRC is required for the Zantac discoloration investigation; is that right?

A Yes, that's what it says.

Q And if we go to Bates page ending 690, we can see the local incident meeting minutes from GlaxcoSmithKline's facility in China; is that right?

A That looks -- that's correct, yeah.

Q And on the next page, the background of this LIC meeting says, "During the period from 2005 to July of 2013, a number of complaints were received by GSKT on the Zantac tablet manufactured at GSKT. This includes 27 complaints, 16 from the Australia market, on Zantac tablet disintegration and discoloration, as well as eight stability out of specifications at 30 degrees Celsius/65 percent relative humidity on tablet discoloration." Did I read that right?

A Yes, you did.

Q Now, with respect to the discoloration that was occurring, if we go to Bates page 694, in the middle, it talks about disintegrated tablets, if we could blow that up. With respect to patient safety, it says, "While for the potential disintegrated tablets or dark brown tablets caused by inappropriate storage of the product, the apparent difference in tablet appearance and color will be visually alarming for patients before consumption." Do you see that?

A Yes, I do.

Q And somebody made the decision in China that because it would be visually alarming, the risk for patients to consume these kind of tablets by accident is very low; is that right?

A Yeah -- well, I don't know who made the

decision, but --

Q You didn't make the decision, did you?

A I don't recall this -- no, I don't recall this. I don't think that -- if this is an LIC meeting -- I don't recall this -- this project.

Q Dr. Harvey, when ranitidine tablets discolored by virtue of what's caused here, inappropriate storage of the product, did GSK test the degradate byproducts that were created during that discoloration?

A I can't recall if we did. I think if there's -- certainly periodically there's incidence about drug products like this and the product supply chain organization may set up a LIC or a PIRC and there'll be further studies done. I can't recall the outcome of this particular incident. It may be the incident that I recall about assessing the impurities in ranitidine on that occasion mentioned. I don't know. I can't remember.

Q Did GSK perform any assay testing for the brown tablets at the time?

MR. SHEEHAN: Objection.

A I can't recall it. It's possible, and it's possible that I may have been involved in the assessment. I don't know. I can't remember from 2013. And it would be something that's managed by that LIC and

PIRC.

(Exhibit No. 4175 was marked.)

Q Dr. Harvey, let me show you Exhibit 4175, an e-mail that you -- an e-mail that was sent on July 3rd, 2015, on Bates page 497, and then I'll work up to the top where you're referenced.

You know who Syna Guo is, the head of quality at the GSK China manufacturing plant, right?

A I don't know. Sorry. I don't know.

Q It's okay. She writes an e-mail to several people regarding the risk assessment on Zantac brown tablets from GSKT. It says, "Unfortunately, she didn't perform the assay testing for the single brown tablets at the time so only the impurity result (26.93 percent) can be provided to you for the assessment." Do you see that?

A I do, yeah.

Q Now, Derek Newall is one of the people copied on this e-mail; is that right?

A That's correct.

Q And two days after this e-mail dated July 3rd of 2015, he writes an e-mail on the first page of the document to a number of people, including you, on July the 5th of 2015 regarding the risk assessment on Zantac brown tablet from GSKT; is that right?

A I mean, I can see -- have I got an opportunity to read it?

Q Go ahead. It's right there on the page, but what I'm going to ask you about is the yellow highlighted "with respect to the unknown impurities while they exceeded -- while they exceed acceptable levels in ICH Q3B and it is therefore not possible to provide a definitive risk assessment." Do you see that?

A Yes, I do.

Q Now, here's my question: With respect to this issue back in 2013 that's being looked at again in 2014, can you tell me whether or not GSK ever tried to determine via testing what impurities were created when Zantac was discolored?

MR. SHEEHAN: Objection.

A I -- I can't recall the exact details. I do know that we did certain studies. I don't know if it was this case or a different one where they characterized some of the impurities in more details. But you can see here what's happening is Derek is relating it to the Q3B guidance, which is the guidance that was in place at the time for drug product degradation. I -- I can't recall the exact details of --

Q Okay. Let me show you --

A -- this particular case.

(Exhibit No. 4177 was marked.)

Q Let me show you a document that has been marked as 4177, and this is dated July the 5th of 2016, and we found it in your custodial file. On page 1, you see the title is "Risk Assessment for Impurities in Discolored Zantac Tablets"; is that right?

A Yeah, that's the title, yeah.

Q And the first sentence says, "There is an incidence of Zantac tablets showing brown discoloration." Is that the first sentence?

A That's correct, yeah.

Q And then on page 106, there's a paragraph that references unknown impurities. And if we blow up that paragraph, the last sentence of it says, "In the absence of structures, it is not possible to make any statements regarding risk." Can you see that?

A Yes, that's correct, yeah.

Q But what we know is the level of impurities in table 5 exceed the ICH M7 acceptable daily intake for a mutagenic impurity with carcinogenic potential for up to 30 days, which was 0.12 mgs; is that right?

A Yeah, let me just read it and just understand the context. (Reviewing document.) Yeah, that was -- there is a reference to Q3B and M7, yeah.

Q Sure. And then as we look at table 5 on the next page, we have a list of all of the unknown impurities that were found in the discolored Zantac tablets, right?

A Yeah, that's correct, yeah.

Q And that is the table 5 where the text above says that the levels of impurities in table 5 exceed the ICH M7 acceptable daily intake for a mutagenic impurity with carcinogenic potential, right?

MR. SHEEHAN: Objection.

A Yes, sir, that's correct.

Q Did GSK test discolored Zantac for the presence of NDMA at any time prior to September of 2019?

MR. SHEEHAN: Objection.

A It's not my area, but I -- I don't know everything that the CMC organization does but not -- to the best of my knowledge, no, we haven't.

(Exhibit No. 4238 was marked.)

Q Let's go to Exhibit 4238, and I want to talk to you about your work in 2019 to figure out how NDMA was being formed.

First of all, is Exhibit 4238 an e-mail that you sent to Patrick Wier on December the 17th of 2019?

A Yeah, that is correct, yes.

Q And in the text at the bottom half of the

page, it says there's a proposed list for outstanding issues for adoption by CHMP in December of 2019 that has four different things; is that right?

A Yeah, that is correct, yeah.

Q And blowing that up, the first one is the possible pathways for the formation of NDMA from ranitidine should be investigated. The second is there is an uncertainty whether NDMA can be formed in vivo from ranitidine. Third is all market authorization holders who have not tested their drug products for NDMA content so far should test their drug products for NDMA content. And the last paragraph says, "Drug substance manufacturers should adopt their manufacturing processes for ranitidine to reduce the NDMA content in the drug substance and to improve the stability of the drug substance. Where necessary, the storage conditions for the drug substance should be amended to improve the stability of the drug substance, i.e., reduce the formation of NDMA on storage"; is that right?

A That's correct. I think these are bullet points from the CHMP, right?

Q Yes, sir. Now, I want to talk to you about your involvement from the late summer of 2019. Who first called you and asked you to get involved in this investigation of NDMA formation in ranitidine?

A NDMA in ranitidine. The -- and so this would be related to Swiss Medic, that initial data.
Q Yes, sir. And who first -- who first informed you about that and notified you?
A I -- I can't remember. I think was there a PIRC commissioned, a Product Incident Review Committee? I think that would be the way of working in GSK. So that's a multidisciplinary team, so I think I would have been asked to go to that.
Q But before you had involvement in the PIRC, you had a conversation with a gentleman by the name of Gary Collins. Can you tell us who Gary Collins is?
A Gary Collins is a colleague of mine who works in the DMPK organization.
Q What is the DMPK organization?
A That's the department of metabolism and pharmacokinetics, so it's disposition metabolism and pharmacokinetics.
(Exhibit No. 4186 was marked.)
Q Yes, sir. And let me show you Exhibit 4186. And this is a conversation between you and Gary Collins on July 19, 2019. Do you see that, sir?
A I can, yeah.
Q And we can see that every time you write something, there's a time beginning at 9:48 and this

sequence ends at 10:00 a.m. We can blow the whole thing up.

A Yep.

Q And what -- what device are you using to communicate with Mr. Collins as you're talking back and forth here?

A I don't know if it was Skype at this time.

Q Okay. And we know that this conversation's happening on July 19, 2019. And you say at 9:48 a.m., "So it seems to me that we will not be able to make an estimate for NDMA formation from ranitidine in humans other than assuming we have an excess of all of the cofactors, dimethylamine, nitrite, et cetera, et cetera." Is that what you said?

A Yes, that's correct. Could I just zoom out for a second?

Q Of course. Highlighted further down at 9:54 you tell Mr. Collins, "There are two mechanisms of NDMA formation. One is pH dependent and one isn't"; is that right?

A That -- that's correct.

Q And further down Mr. Collins asks, "Does this form bacterial formation in the intestine?" You write, "One pathway is for dimethylamine formation that will get nitrated. One is for nitrosation and direct NDMA

formation"; is that right?
A I'm sorry. I thought you were going to say something. Well, sorry. You got to one -- yeah, yeah, I can follow the text, yeah.
Q Now, here's my question: As we go back up to the top, it's clear you're talking about NDMA formation in ranitidine in humans, right?
MR. SHEEHAN: Objection.
A Yep, yeah.
Q And you're having that discussion on July the 19th, 2019; is that right?
A Yeah, yeah, that's correct.
Q That is before Swiss Medica informed GSK that it had found the presence of NDMA in ranitidine; isn't that true?
A I can't recall the exact date, but I think this conversation related to a different request.
Q And the request related to NDMA formation in ranitidine in humans, right?
A I think it relates to a publication known as the Zeng and Mitch publication. I can't think of any other reason why we would be speaking about this.
Q Well, Zeng and Mitch came out in 2016, and you're talking about this in July of 2019, right?
A That's correct.

Q Now, another Skype conversation is shown in Exhibit 3157, and you're having a conversation on November the 27th of 2019, with Mike Urquhart. And what was Mike Urquhart's role again within GSK, up at the top?

A He's a chemist.

Q And you see how you're having a conversation with him on November the 27th of 2019?

A Yes, I do.

Q And if we go to the second page of this Skype conversation on November 27, at 10:33, you have a long thing that you write, and let me just reference this. It says, "An additional report (WBP 82:011) describing the study conducted in 1982 titled, 'The determination of NDMA formed by the reaction of ranitidine hydrochloride with sodium nitrite,' has been identified from archive. The author's summary of the study was as follows: Experiments were carried out to determine whether nitrite reacted with ranitidine to form NDMA. NDMA was formed in 3.1 percent yield based on ranitidine hydrochloride in the WHO NAP test"; is that right? Is that what you said?

A All right. I'm looking at the WHO NAP -- you said WHO NAP test and I lost the text there. Sorry. Which statement were you reading out? "Based" -- I'm

sorry. "Based on ranitidine hydrochloride in the NAP test," yeah.

Q And I've highlighted something else you wrote. You said, "These reactions simulated the concentrations of ranitidine 1" -- what is that? A millimole?

A That's correct.

Q "One millimole and nitrite 0.3 millimole expected in the human stomach after oral administration of 150 mg drug and ingestion of a nitrite-rich meal"; is that right?

A Yes, that's correct.

(Exhibit No. 4162 was marked.)

Q Now, if I could show you Exhibit 4162, this is an internal Glaxo Group Research Limited document entitled, "The Determination of NDMA Formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite"; is that right?

A Yes, that's correct.

Q And it says WBP 82:001, right?

A Yes, that's the report number. That's correct.

Q And the author is listed to be a Dr. R.J.N. Tanner, right?

A That's correct.

Q And this report was approved by Dr. L.E.

Martin, as we go down the page, on April the 6th of 1982; is that right?

A That's my understanding, yeah. That's correct. That's in front of us.

Q And if we go to page 3 of this document, in the summary, the first paragraph in -- the first line of the second paragraph says, "Experiments were carried out to determine whether nitrite reacted with ranitidine hydrochloride to form NDMA. NDMA was formed in 3.1 percent yield based on ranitidine hydrochloride in the WHO NAP test"; is that right?

A Yeah, that's correct.

Q And if we could -- this is the same document you're referencing in your Skype conversation on November the 27th of 2019, with Mr. Urquhart; is that right?

A That's correct, yeah.

Q And on page 4 of this document that you were referring to, in the introduction, second full paragraph begins, "Ranitidine hydrochloride carries a dimethylamino group, therefore, experiments were carried out to determine whether NDMA could be formed from the drug in the presence of a nitrite"; is that right?

A That is correct.

Q Now, going back to your Skype conversation, we can deduce by these two documents that you had possession of the Tanner study from 1982 by the time that you're Skyping with Mr. Urquhart about it on November the 27th of 2019. Would that be fair?

A Yeah, could we go through this again?

MR. WATTS: Go back to page 1 --

A What was the date of --

MR. WATTS: -- so he can see the date.

A 27th of November, yeah, 2019, yeah.

Q Do you know who pulled it out of archives for you?

A Is it Sue -- Sue Holway? It may have been -- it might have been Sue. I can't recall. It might have been Sue Holway.

(Exhibit No. 4171 was marked.)

Q Now, I want to ask you about Exhibit 4171. And as we look at the top of the first page --

MR. WATTS: Hey, Erik, for some reason, this is smaller on the screen than it normally is. Do we have a reason why? Okay.

Q Exhibit 4171 is an e-mail from you to Amanda Giddings and Angela White on February 19, 2012; is that right?

A That's correct.

Q And who was Amanda Giddings?
A Amanda Giddings used to work in computational toxicology and toxicoinformatics.
Q And who was Angela White?
A Angela White used to work in that computational toxicology and toxicoinformatics department as well.
Q Okay. And you say, "See attached of interest," and then we can see what you're forwarding. There's an e-mail from Sheila Galloway to a whole bunch of people; is that right?
A Yeah.
Q And what she begins is, "I attach a draft of the manuscript, which is expanded from just the description of the DEREK alert classes common to synthetic pathways to an outline of many of the LDKIT positions for M7."
And with respect to potential mutagenic impurities, it says, "Analysis of structural classes and carcinogenic potencies of chemical intermediates in pharmaceutical synthesis supports alternative methods to the default TTC for calculating safe levels of impurities." Did I read that right?
A Yes, you did.
Q And on Bates page 251, there's a paragraph

that talks about types of mutagenic alerts typically found in synthetic routes, and the last sentence says, "N-nitroso compounds make up the class of COCs and are highly potent carcinogens"; is that right?
A Yeah, that's correct.
Q And COCs is the cohort of concern, right?
A Yes, that's correct.
Q And N-nitroso compounds are the family of compounds of which NDMA is a part; is that right?
A Yeah -- yes, that's correct, yeah.
Q Now, going back to your conversation with Gary Harvey [sic], Exhibit 4186, at 9:48 up at the top, if we could blow up the first thing that he says, "Mr. Harvey," you wrote, "So it seems to me that we will not be able to make an estimate for NDMA formation from ranitidine in humans other than assuming we have an excess of all the cofactors, dimethylamine and nitrite"; is that right?
A Yeah, that's correct.
Q What did you -- what did you mean by the cofactors, dimethylamine and nitrite?
A Obviously I'm assuming this has to do with the Zeng and Mitch study, and I think this would be related to how could we understand the results of that Zeng and Mitch study because how would NDMA form from ranitidine?

So I think this was -- I'm -- it has to do with the Zeng and Mitch study.

It has to be with the fact that in that study they're reporting formation of NDMA in the urine, and the question is really how could that happen? Could it be dimethylamine combining with nitrite, so is ranitidine forming diamethylamine, or is ranitidine itself being nitrosated? So it has to be referring to Zeng and Mitch, and that to me is what could be happening in that study.

Q Dr. Harvey, Zeng and Mitch is not referenced in your conversation with Mr. Collins here, is it?

A Well, it's not, but I'm assuming that because --

Q And --

A -- that was around the time that we were told about the Zeng and Mitch study in July --

Q July three years after --

A -- of 2019.

Q Three years after it was published was the first time you were told about it?

MR. SHEEHAN: Objection.

Q Dr. Harvey, were you first told about a study that related to ranitidine three years after it was published?

A That --

MR. SHEEHAN: Objection.

A Sorry. That is when that publication came to my -- I became aware of it, that's correct.

Q Does GSK have a process where when one of its products is the subject of published literature that it is provided to you inside of three years so that you could work on it sooner?

MR. SHEEHAN: Objection.

A So I was sent that paper by the project rep for ranitidine, Steve Parker, at the time, and I believe he would have been sent it by someone else. I think it might have been someone in Japan, GSK Japan. That's how I became aware of it. We do have a process for assessing publications. We certainly have a process for assessing publications in the nonclinical safety department so the nonclinical data.

Q Okay. What was --

A There'll be a process --

MR. SHEEHAN: Just let him finish his answer.

Q Go ahead. I looked down. Go ahead, Doctor.

A There'll be a process for the clinical equivalent. I don't know the details of that process.

Q That's fair enough. Who was Steve Parker in 2019 again?

A He was the project rep for ranitidine. So each compound has a project representative and there's a project group, and Steve Parker was --

Q And where did --

A Steve Parker was one of the individuals who looked after some of the -- I say looked after. He was the project rep for the established product, so he was the point of contact --

Q Where --

A -- within nonclinical safety for ranitidine.

Q Where did he physically work?

A Oh, sorry. He worked in the UK.

Q Okay, fair enough. And by the way, Dr. Harvey, it's obviously not my intent to interrupt you, and I did that last time. I apologize. One of the downsides of Zoom is I'll look down while you're talking. You'll pause for a second, and I'll think you're done and then I'll bulldoze right over you. When that happens, either counsel or you let me know, and of course, it's not my, you know, intention to have interrupted you.

A It's perfectly fine. While we're just talking, is there a time for a break coming up soon because it's pretty intense here listening.

MR. WATTS: Sure. Let's do one document

and --

MR. SHEEHAN: If you need a break, let's take a break. I mean --

MR. WATTS: Hold on just a second. Let me finish with Steve Parker and then we'll be at a good breaking spot.

(Exhibit No. 4202 was marked.)

BY MR. WATTS:

Q Exhibit 4202. In August of 2019, you send an e-mail to Steve Parker, about whom we were just discussing ranitidine, on August the 8th of 2019; is that right?

A That's correct, yeah.

Q And you say, "Steve, my comments, Jim," right?

A Yeah.

Q And this is in reaction to an e-mail from Helen Steel to a number of people, including yourself, "Dear All, could you please take a look at the attached first draft of the document for comments to use in the event of any inquiries," right? Or any queries.

A Yeah, that's correct.

Q Okay. And just two quick questions, then we'll take that break. On Bates page 253, this is your comments in pink. If we go to the second full paragraph, you've highlighted "Ranitidine decomposes to

form NDMA," and then your comment says, "I appreciate that this is what is in the FDA e-mail. However, as we know, NDMA formation may not occur via degradation of ranitidine." Do you see that?

A I mean, I do.

Q Okay. And to be fair to you, you're not saying that it doesn't occur. You're just saying we don't know yet, right?

A It's difficult to think about what I actually meant. Yeah, so we don't -- I think -- I'm looking at it now, you know, two years later. I think I was being a bit more circumspect. I was saying, well, okay, we're saying it decomposes to form NDMA. Do we actually know that?

Q Sure.

A So I think that's what I was getting to. It's a long time ago.

Q Yeah, and Dr. Harvey, in fairness to you, you learned later that NDMA forms from degradation of ranitidine, but your point is we don't know this at this time when you gave this answer, right?

A I -- I assume that's what I'm getting at, yeah. It's not -- we don't have definitive data yet, I think.

Q Sure. And one other comment that I wanted to

ask you about on Bates page 254. There's a statement at the top of the page, "It is possible that NDMA could increase as a result of the pharmacological effects of H2-receptor antagonists, including ranitidine, such as the blocking of stomach acid under certain conditions," and then you highlight "under certain conditions"; is that right?

A Yes. Let me just read that through.

Q And your comment is, "If we must define it, quote, 'in the presence of nitrate, nitrite and dimethylamine,' closed quote"; is that right?

A Yeah, that's correct.

MR. WATTS: Okay. Let's take that break.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1456 UTC, 10:56 a.m. EDT.

(A 18-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1514 UTC, 11:14 a.m. EDT.

BY MR. WATTS:

Q Dr. Harvey, within GSK, who is Richard Lloyd?

A Richard Lloyd is a person who works in the computational sciences department.

(Exhibit No. 4193 was marked.)

Q And let me show you Exhibit 4193, which is a record of a Skype conversation you had with Richard Lloyd on July 29th of 2019. At 1644, you say, "Hi," and you ask the question, "40 percent NDMA." Richard Lloyd writes back, "Ranitidine was found to be one of the most important NDMA precursors with a molar conversion of up to 90 percent at pH 7.0 during chloramination." He cites the Zeng and Andrews study in 2013. And then he says, "Nucleophilic substitution between ranitidine and monochloramine led to intermediates formed from the decomposition of methylfuran moiety of ranitidine which involved the formation of NDMA," and he cites a Roux study in 2011. He sends a third URL, and you says, "Thanks," and he says, "Do you want me to get you a copy?" Is that right?

A That's correct. That's from Richard. I think this is talking about -- I'm not a chemist. I think Richard is a chemist as well as a modeler. I think this is related to monochloramine. I think it's a particular type of chemistry, chloramination. It's not -- wouldn't -- I wouldn't be able to comment on it.

Q What's a molar conversion of up to 90 percent? What does that mean "molar conversion"?

A Again, it's a chemistry question. I'd prefer someone like Mike Urquhart or someone like that to talk

about that. I know the basics of chemistry. It would be a conversion, instead of a weight basis, it would be the number of moles of a molecule, so it's a chemistry equation.

Q So you would defer to Richard Lloyd, who said to you that ranitidine was found to be one of the most important NDMA precursors, right?

A I mean, well, I defer to a chemist. Richard's a modeler who's worked on drug product deposition before, so I think that's more of a chemistry question.

(Exhibit No. 4198 was marked.)

Q Fair enough. Let's go to 4198, which is a Skype conversation that you had with Steve Parker on August the 1st of 2019, and you've already told me this and I apologize. What was Steve Parker's role at this time again? He was the rep for ranitidine?

A Yeah, he was the -- what we call the safety assessment project representative for established products. I think ranitidine was one of his products.

Q Now, in the middle you say, "in summary," and then you talk a bunch of stuff, but you say, "It's not possible to completely rule out that NDMA could increase as a result of the pharmacological effects of H2-receptor antagonists, including ranitidine, in combination with other factors under certain

conditions." Did I read that right?

A Yeah, let me just read the paragraph. Sorry. Yeah, that last piece, yeah, under conditions. I think that's related to that Zeng and Mitch publication of August 2019, and I think that --

Q Dr. --

A -- certain conditions -- sorry.

Q That's okay.

A The certain conditions I'm thinking in that Zeng and Mitch paper they obviously had in vivo data, clinical data that spoke about urine and NDMA, and they also had an in vitro study that spoke about ranitidine and incubation, so that was that Zeng and Mitch study.

Q Now, by this time you had received information with respect to which you say it's Zeng and Mitch but you do not have the Tanner study available to you yet. You didn't get that until November; is that right?

A That -- that would be about right. So these certain conditions, I think that last sentence that came up before, would be about that in vitro work that was in the Zeng and Mitch study, which as you know has been retracted, right. But the -- this certain conditions -- we didn't have the Tanner study, you're right. This was August. We weren't aware of the Tanner study in August 2019.

Q Okay. So in August you say that you can't rule out that NDMA could increase as a result of the pharmacological effects of H2-receptor antagonists, including ranitidine, in combination with other factors under certain conditions.

With respect to other factors, were you involved in the analysis as to whether NDMA degraded by virtue of its exposure to heat and humidity while being stored?

MR. SHEEHAN: Objection.

A So broadly I think you're talking about something known as the root cause analysis that was conducted by the chemistry organization. That's not a piece of work I was involved in. Naturally I was interested in it and the outcome, but it's not something -- it's very much a chemistry manufacturing project.

Q And to be fair, GSK's a large organization. You've got things you're working on. Giuseppe Whelan's working on other stuff. And so the answer to my question is he was doing the root cause analysis, you weren't, but you were interested in it; is that right?

MR. SHEEHAN: Objection.

A Yeah, of course I'm interested in it. They're doing work on ranitidine, right? But I don't -- I don't

know the ins and outs of it. It's very nuance, chemistry, to me.

(Exhibit No. 4206 was marked.)

Q Okay. Let's go to Exhibit 4206 a month later after this Skype exchange with Mr. Parker, and this is a ranitidine brainstorm that takes place in September of 2019. And if we go to Bates page number 574, the key messages, one of them is that GSK is currently unclear how ranitidine might be breaking down to produce the nitrosamine NDMA.

Is that the state of GSK's knowledge as of September of 2019? You were unclear as to how this was happening?

A September 2000 --

MR. SHEEHAN: Let me just get the objection in. Objection. Go ahead.

A September 2019, I'm sorry, you said, right?

Q Yeah.

A Yeah, I think it was at that time that we were unclear as to how it was happening. There was certainly -- we're talking about ranitidine maybe breaking down. I'm assuming this is -- and I think this -- this brainstorming was a chemistry exercise. I'm thinking that -- I'm thinking they're talking about the drug product.

(Exhibit No. 4248 was marked.)

Q Okay. And if we could go to Bates page 4248 -- I'm sorry. If we could go to Exhibit 4248, Bates page number 782. I want to ask you about an e-mail string that ends with you, but it begins with an e-mail from an Anil Kulkami to a Paul Trusty with respect to ranitidine hydrochloride nitrosamines. And Anil says, "Hi, Paul. I'm from GSK Nashik in India. We were manufacturing Zantac tablets on-site. However, now have stopped manufacturing of this product. We are now in the process of decontaminating process equipment. We will ensure that equipment will be free from API. Do you think we shall verify presence of nitrosamines during decontamination? What are your views on this?" Do you see that, sir?

A Yeah, that's the text that you have just read out, yeah, from the e-mail, yeah.

Q Now, as we go to page 1 of this document, the next day you get an e-mail from Andrew Searle further up this string. It says, "I have looked at the testing data we obtained for Nashik Zantac batches last year. A total of 26 batches were tested. The range of NDMA content was between 0.3 and 3 parts per million." Do you see that?

A I mean, I'm just reading it, so I am looking

at the testing data. Yeah, I can see the text.

Q Yeah, after it says the range of the test results was between 0.3 and 3 parts per million in the 26 batches that were tested, it says, "The only" -- "The level in the tablets should represent the level present in the drug substance at the point of the drug product manufacture. The only factor that could increase this would be if the equipment were exposed to elevated temperature and humidity for an extended period of time. This results in extensive degradation of ranitidine, and we have seen NDMA content increase to around 200 parts per million." Did I read that right?

A So, yeah, you've read that part. There's another sentence after that, but yeah, this is Andy Searle talking about manufacturing conditions, yeah.

Q And then you at the top of the page send that to Anil, who started this, and says, "William Hawkins is EHS person to connect with regard to the cleaning standard operating procedure"; is that right?

A That's right. And it talks about a reference to a standard, and then I defer it to William Hawkins because he's the -- he's the expert in the area, yeah.

Q Yes. And NDMA is formed in ranitidine because of a degradation reaction that is influenced by temperature, right?

MR. SHEEHAN: Objection.
A I'm not a chemist, but obviously I've seen the root cause analysis. I believe that's one of the factors that leads to the formation of NDMA.
(Exhibit No. 4252 was marked.)
Q And let me show you Exhibit 4252, which is an e-mail in the middle of the page that you sent to an Agnieszka Roguska and Andrew Searle on August the 12th of 2021. And let's just use the first page for now. And at the bottom of the first page, you reference a report by Abe in 2020 and say, "The findings of Abe, et al., 2020 are consistent with the root cause analysis conducted and published by GSK regarding the presence of NDMA in ranitidine hydrochloride drug substance and associated drug products, (King, et al., 2020) that demonstrated that NDMA is formed in ranitidine drug substance because of an intramolecular degradation reaction that is influenced by both temperature and relative humidity."
That's what your e-mail says on August the 12th of 2021; is that right?
MR. SHEEHAN: Objection.
A Yeah, you've read the text now. Could we just zoom back out so I can read the e-mail? I do remember this. This is in relation to the PBRER in 2021, so I

was getting mixed up with 2020.

Q That's okay.

A This is a publication that they asked -- Agnieszka asked us to comment on. It's a chemistry question. I sent it to Andy, yeah, and Andy -- I asked Andy to confirm it, yeah.

Q Who's Craig --

A It's a chemistry -- it's a chemistry position. Yeah, sorry. There's a lot in there. Sorry.

Q I'm sorry. Who's Craig?

A I don't know. I saw Craig here, right, if we can scroll back out.

Q Yeah.

A "Answer to Craig's comments." Craig Hartford, Craig Hartford.

Q Who's Craig Hartford? Good. We found him. Thank you.

A Craig Hartford works at GSK in the clinical line, and so there's a -- he -- their group was coordinating the PBRER response.

(Exhibit No. 4163 was marked.)

Q Got it. I want to take you to Exhibit 4163. And this is a report that was found in your custodial file by Havu. It was published in Digestion back in 1990, volume 45, pages 185 to 195,

"Enterochromaffin-like cell carcinoids in the rat gastric mucosa following long-term administration of ranitidine." Do you see that, sir?

A Yeah, I can see that's the text -- that's the title of the paper, yes, that's correct.

Q And it says in the abstract, "Long-term administration of some long-acting inhibitors of the gastric acid secretion has been associated with the development of gastric enterochromaffin-like (ECL) cell carcinoids in the rat." And you can --

A That's correct.

Q -- see in that study a hundred rats were treated for two years with ranitidine and 19 in the carcinoids -- I mean in the ranitidine arm had rat carcinoids and no carcinoids were found in the control animals. Do you see that, sir?

A Yeah, can we -- can I just read the abstract? Sorry. I'm trying to read it and you're reading it as well. It's -- sorry. It's making my head jump. Can I please have minute? I'm reading it. I know the Havu study.

Q Do you remember when it first got into your possession? I know it's in your custodial file, but do you know how long you've known about it?

MR. SHEEHAN: He's just trying to read for a

moment, Mikal.
A (Reviewing document.) Yeah, sorry. Thank you for letting me read it.
Q It's okay. How long --
A I'm familiar with Havu study and the abstract.
Q How long has it been in your file -- how long has it been in your file, if you know?
A I -- I don't know. I think -- in my file? You mean in my records?
Q Yes, sir.
A I -- I don't know. I think there was a --
Q I don't want you -- go ahead.
A Yes, I'd be guessing in answering this.
Q I was asking in case you knew, but I don't want you to guess. Let's go to Bates page 014. In the lower right-hand corner, it says, "The ranitidine administered to rats in the diet produced significantly elevated gastrin levels for about 10 to 12 hours each day. This alone would appear sufficient to provide the necessary trophic stimulus for gastric carcinoid formation in the rat when present over a long period of time." Do you see that?
A Yeah, can we zoom out, please? This is -- you're reading from the conclusion, right, well, the end? Yeah, I can see that text. So this is the Havu

study conducted by what was Astra -- what is AstraZeneca, right, on ranitidine, and to --

Q Do you know how this got in your file? I'm sorry. Go ahead. I was looking down again. Do you know how it got in your file?

A I do know. So when -- when we initially wrote to the EMA, we compiled a response about ranitidine in answer to their questions related to the information that was submitted as part of the marketing -- original marketing authorization applications. Subsequent to that, we found out that there had been additional studies, long-term animal studies done on ranitidine by Astra, AstraZeneca now, and by GSK, which is very unusual to do long-term -- to have long-term toxicology studies done by a competitor compound and then repeated.

We found -- we became aware of that at a later date, and when we found out, we submitted that information as an addendum to the EMA. We were unaware of this study. It's really unusual for a study like this to have been done. Typically when you submit a market use authorization, that's the studies that we've done up to file.

(Exhibit No. 4164 was marked.)

Q So let me show you Exhibit 4164, which is a study by Matsuda entitled, "N-nitrosamines in gastric

juice of patients with gastric ulcer before and during treatment with histamine-2 receptor antagonists." Now, this also is in your custodial file. Do you remember when it got there, this study in 1990, by Matsuda?

A I can't recall how I got the study. I may have been sent it. It may have been sent to me by Natalia, who we mentioned earlier, or Helen Steel. Certainly we looked at this paper with that clinical line, and there was a specific piece I think that -- it was captured in some of the texts that we looked at earlier about the nitrosamines in the gastric juice here being related to the pharmacology and not necessarily one molecule or another, so that was my recollection of this publication, but it's in the EMA response.

Q Now, as we look at the introduction of this Matsuda study that was in your custodial file, it starts, "NDMA and NDEA are representative n-nitrosamines, NAs." And it says it's available in different sources. "Since NAs induce liver necrosis at high dosages and liver carcinoma with long-term administration in animals, nitrosamines have been also implicated in human carcinogenesis." Did I read that right?

A Yeah, you've read two highlighted sentences. It also talks about where they were detectable in the

environment and food, et cetera, et cetera, and then endogenous formation as well, right.

Q Now, on the next paragraph or the next column, it says, "The stomach is an important site of nitrosation since the acidity of gastric juice may contribute to nitrosation and also the stomach is a transient storage area for foods being mixed by peristalsis"; is that right?

A That's what that sentence in that introduction says, yes, that particular sentence, yeah.

Q If we go to Bates pages 044 and 045, it says, "Nonetheless, we showed that patients with gastric ulcers, particularly those who were given H2 blockers, had higher concentrations of intragastric NDMA and NDEA compared with healthy controls. Since endogenous nitrosation is a primary source of gastric nitrosamines, the present results indicated that the stomachs of patients with gastric ulcer had more favorable conditions for nitrosation than those of healthy subjects." Did I read that right?

A Yeah, can we pull out, please, and just let me read around it because my recollection of this study -- I mean, it's a clinical study, right, so I definitely defer to Natalia or Helen for their position on it. But my recollection was what we -- what we discussed,

Natalia and I explained it to Helen about the cimetidine -- sorry -- roxatidine and famotidine and ranitidine all being different chemical structures.

So what this was reporting was the potential for the change in gastric flora that would be associated with the pharmacology, not necessarily anything to do with the chemistry, if that -- if that follows. So it's kind of -- it's not molecule independent in the sense that they all need to be H2 blockers, but it was to do with the pharmacology, which is something that I think was discussed probably early on with ranitidine. But the text you read is right. It's just -- I'm just recalling the context.

(Exhibit No. 4190 was marked.)

Q Okay. Fair enough. Exhibit 4190, this is a conversation that you had with somebody named Huan Wang. Who was Mr. Wang?

A Huan is an individual that works in the chemistry division in research and development. Huan works with Mike on coordinating the genotoxic impurity risk assessment process in GSK or mutagenic impurities, so if Mike's out of the office and I have a question, which obviously I had an urgent question on the 25th of July, I didn't want to second-guess chemistry, I would go to an expert like Huan, and that's Huan, and that's

why I'm e-mailing him or Skying him.
Q You say, "Hi, Huan. I have a big favor to ask. I'm dealing with a question on ranitidine and its nitrosation. Mike has done the prework and is now out of the office. I have a simple question. Mike unearthed two schemes that could release NDMA, nitrosodimethylamine. One is acid dependent. One I don't think is pH dependent"; is that right?
A Yeah, that's the text I've written in that Skype message. And I guess that, as I said, I'm reflecting my lack of knowledge about the chemistry that Mike -- the schemes that Mike proposed.
Q Now, that happened on July 25th, and I want to show you a PIRC meeting minute from October the 10th, if we could look at Exhibit 3383.
Now, the PIRC is the Product Incident Review Committee; is that right?
A Yeah, that's correct, yeah.
Q And these are the minutes for a number of meetings. If we can go right below this, Erik, and you see all those different dates and the attendance at the top? We can see the dates of meetings one through nine?
A Yep, that's -- yeah, I can see them, yeah.
Q And if we could keep that up and just go to Bates page 019 down at the bottom, you participated in

meetings two through nine of the PIRC, didn't you?

A Yeah, that --

MR. SHEEHAN: Could you move it up?

A That was my -- let me just check. I mean, that's very -- yeah, they -- you know, they track the attendance of the PIRCs, right? That's part of the procedure. Yeah, I attended those because it was an emerging issue related to impurities in ranitidine.

Q Sure. And even though Erik's got it too big to line up, we can see that you didn't participate in the first meeting on August the 19th, but you were participating in the rest of the PIRC meetings two through nine, right?

A Yeah, that's what it looks like, yeah, yeah, of course, yeah.

Q And then let's go to Bates page 021, and we'll pull up the same attendance list. You can get rid of these two. And we see the attendance for meetings 10 through 16. And keep that handy and go to 023. We can see you attended meetings 10, 11, 13 and 16. Right there in the middle under Jim Harvey, ranitidine core. There we go. Now put it right under the previous one.

We see you attended meetings 10, 11, 13 and 16?

A Yeah, they would line up to that effect, I

would expect, yeah.

Q All right. Now, I want to ask you about something that happened at PIRC meeting number 13 on August the 10th of 2019, which you attended. Go to Bates page 037. It says, "PIRC number 13 agreed that the gastric fluid studies should proceed to understand whether NDMA increases in vivo"; is that right?

A That's -- that's certainly what the PIRC statement says, yes.

Q Did you conduct the gastric fluid studies?

A What was the date of that meeting?

Q October 10, 2019.

A Yeah, so October 10th, did you say, 2019?

Q Yes, sir.

A First of all, I'd say that that's -- that's incorrect, that text. It should say gastric fluid studies would be in vitro, so it shouldn't be in vivo. That's -- that's a mistake. That would be my understanding of a gastric fluid study. It would be --

Q Would -- did you conduct those gastric fluid studies, sir?

A The in vitro gastric fluid studies, no. I think it's pretty soon after this that we became aware of the Tanner study that we discussed earlier, which is in vitro gastric fluid studies. But certainly it was

discussed, and if the PIRC was saying we should consider doing these studies, then obviously we'd go to the relevant departments for discussion in order to commence the studies. But I think this position was slightly surpassed by the Tanner study, which is -- it's in vitro, I know the Tanner study, but this -- I look at that and think it's gastric fluid studies, that would be in vitro.

(Exhibit No. 4191 was marked.)

Q Now, Doctor, on July the 25th of 2019 -- I want to show you Exhibit 4191, which is a record of a meeting involving ranitidine risk of NDMA formation in vivo requesting for information, and we can see all the meeting participants that participated in this meeting, right?

A Yeah, yeah, I can see that, yeah. What was the date of it again? Sorry.

Q July 25 --

A July?

Q I'm trying to give it to you. July 25, 2019. And if you will go --

A Thank you.

Q -- to the second page, you were a participant in this meeting. Do you see your name up at the top?

A I do, yeah.

Q And in terms of description, part of what's said is "GSK has been asked to furnish comprehensive review and evaluation on concerns of potential ranitidine use and high levels of NDMA, a probable human carcinogen." Did I read that right?

A Yeah, it talks about how the GSK QPPV, so that's the clinical pharmacovigilence office, has received a request from EMA, and on the back of that then we've been asked to do this review. I think this was, like, the first review, and then we were asked to do another review as well. So, yeah, that's correct. That's the executive summary.

(Exhibit No. 4200 was marked.)

Q Let me -- let me show you Exhibit 4200 so we can see the EMA, the European Medicines Agency's request. This is a two-page document. If we go to the second page, we can see that the EMA has asked you to provide this information with two weeks -- within two weeks with respect to whether there's any potential for NDMA to be present in Zantac tablets or ranitidine hydrochloride API; is that right?

A Yeah, let me read up. So -- sorry. I think you said EMA. I think the person was Dr. Giridhar from the FDA.

Q Okay. So EMA had already requested the

information and now the FDA is making a similar request; is that right?

A Yes, yeah, they're asking -- sorry. Because you said it's about are you aware of the above information, but I can't see the above information. Could we zoom out? Yeah, okay. Yeah, okay. The FDA are referring to what I believe is a study by a company called Valisure, and they're again asking us to comment, you know, comment on those findings.

Q Okay. So the Food and Drug Administration on August the 6th, number two was asking within two weeks is there any potential for NDMA to be present in the Zantac tablets or ranitidine hydrochloride active pharmaceutical ingredient, right? Is that what number two says in the first sentence?

A Yeah, it's saying are you aware of the information we just discussed, is there potential for NDMA in the tablets and drug substance, yeah, yeah, I can see that.

Q You send that at the top of the first page to Patrick Wier, Joe Oliver and Steve Parker. You say, "FYI, similar requests regarding ranitidine from the FDA two-week turnaround," right?

A That's correct.

Q When I say "similar request," you're saying by

request to the one that was already made by the European Medicines Agency, right?

A Well, similar -- I said similar because I think they're slightly different. I think one -- the one from EMA I think -- it was a while ago, but I think the -- my understanding from interacting with Steve and what we first discussed with EMA was about a Zeng and Mitch publication. This request from the e-mail that you allowed me to read was related to the Valisure data, so from the external company, and it's slightly different. Valisure was about drug product and also an in vitro simulated gastric fluid study, and EMA's was about, from my recollection, it was more about Zeng and Mitch, but then the EMA scope expanded, as you know, right?

Q Okay. So let me see if I can get our sequence right. Valisure comes out with its citizens petition. The FDA asks you for information within two weeks as to whether or not NDMA is in your product, and then you learned a week later that FDA itself had tested and found NDMA in the active pharmaceutical ingredient for Zantac, correct?

MR. SHEEHAN: Objection.

A I'm not sure -- I'm not sure. That's what I said, I have to play it back. It's quite intense, so I

think what --

Q Understand that --

A My recollection -- sorry. Say again.

(Exhibit No. 4203 was marked.)

Q I asked a bad question. Let me take you to 4203, and then I'll talk about the chronology because I meant to show you both documents when I asked you to tie it up. Go to 4203. I don't mean to interrupt you, but I think it will help us.

This is a conversation between you and Fiona King on August 14, and Andy Searle in the middle of that conversation -- actually, this is a conversation between Fiona King and Andy Searle on August the 14th.

Do you see where Andy Searle says, "There is another twist. FDA have just reported to us they tested the active pharmaceutical ingredient batches and found NDMA and nitrites"?

A I can see you're showing me the transcript from Fiona and Andy, so, again, I mean, as a -- just to pick up from where we were, my recollection was EMA was asking us about Zeng and Mitch which spoke about -- and that's the study we've spoken about that's been retracted. EMA did subsequently ask us about NDMA in the drug product, but in July it was about Zeng and Mitch. That was my recollection.

This FDA request seems to be focused on the Valisure piece and the data about the drug products and possibly -- possibly the simulated gastric conditions and the nitrites, et cetera, which was also part of Zeng and Mitch. So it's similar, but to me they're a little bit different, but eventually they all become part of a larger response.

Q Doctor, with all due respect, I'm going to object nonresponsive. And I know you're trying. I'm not trying to be critical.

My question was simple. By August 14, you-all learned that the FDA itself had tested active pharmaceutical ingredient batches and found NDMA in it, right?

A Well --

MR. SHEEHAN: Objection.

A Sorry. Well, GSK learned. I mean, this is a transcript between Fiona and Andy, right, so I don't know what information Andy was privy to, but no doubt it would be part of the PIRC, so I can't recall --

Q Yeah. The reason I --

A -- I can't recall --

Q The reason I ask --

A I can't recall back in August -- sorry, sorry. I can't recall exactly what happened on the 14th of

August in 2019, but my recollection was it was different data.

Q Let me try again. This document comes from your custodial file, which is why I'm asking you about it. And so my question -- it's a simple one and you either remember or you don't.

Did you know by August 14 that the FDA had tested batches of the active pharmaceutical ingredient for Zantac and found NDMA in it?

A Well, I can't recall exactly whether I knew, but clearly GSK knew from the transcript based on what Andy Searle is saying.

(Exhibit No. 4226 was marked.)

Q All right. Now, let's go to a conversation you had with Andy Searle on October the 10th, Exhibit 4226. And this occurred on October the 10th of 2016 via Skype, right?

A Yeah, yeah, that's correct. It would be Skype again, yeah.

Q Okay. And then beginning at 11:58, "Andy, Hi. Jim, Hi. Steve Hobbiger is asking to proceed with an SGF study. I explained that we would typically do that after the forced degs study as they are running out. Andy Searle tells you that I know Mike said I think we should skip forced degs and move to the SGF first.

Current view is that forced degs might not really tell us much anyway. We seem to see degradation with just heat. Some of the forced degs will just chew ranitidine up." You ask, "Is there a study ongoing now?" And he responds, "We are running ASM study which is looking at temperature and humidity on the active pharmaceutical ingredient." Did I read that right?

A Yeah, so we're talking about -- we discussed in the statement in the PIRC, and we're talking about simulated gastric fluid study. What we're saying here is typically we would understand the results of a forced degradation study first before we do the SGF, but there was a discussion around doing that SGF study, which as we discussed a moment ago was superseded by the knowledge of the Tanner study.

Q Okay. Now, when Andrew Searle told you that the forced degradation studies will just chew ranitidine up, did you understand that to mean that it would lead to the degradation of ranitidine?

A Well, I mean, it's a -- I don't know what chew means in chemistry. I know that we've done forced deg studies before, so I'm assuming that forced deg studies will result in a degree of degradation. I don't know what he means in Andy's language there.

Q Now, in your forced degradation studies, did

you learn that the presence and the levels of NDMA is related to the duration of exposure to heat and humidity?

A I think I would defer to the chemist on that. We're talking about chemistry, degradation chemistry. It's not my area of expertise. Obviously I've seen the forced -- sorry -- root cause analysis piece. I know temperature and humidity is described there, but it's a chemistry question.

(Exhibit No. 4216 was marked.)

Q Before the root cause analysis, you sent an e-mail that's 4216 on September the 16th of 2019 to Steve McGhie. What was Mr. McGhie's role?

A Steve McGhie was the PIRC secretary, I think, he was. He's a director in PIRC.

Q And part of what you told the PIRC secretary on September the 16th of 2019, is, "That said, there is also a recognition at both agencies that the perceived risk of these types of nitrosamines impurities in drug products is related to duration of exposure"; is that right?

A Yes, that's correct. That's -- that would have been a reflection of whatever EMA document was available at the time.

Q Now, Dr. Harvey, by April of 2020, the FDA had

put out a notice to everybody that it was not going to allow the sale of any ranitidine-containing product in the United States because of the fact that NDMA increased over time through exposure to heat and humidity, right?

MR. SHEEHAN: Objection.

A I -- I can't recall the exact date of when the FDA made the announcement. There's been continual announcements about nitrosamines, and some of those have been related to ranitidine. I can't remember the exact dates --

Q Sure.

A -- I'm afraid. Sorry.

(Exhibit No. 4241 was marked.)

Q Anyway, I'll just ask you to assume that I'm not lying to you when I say the FDA announcement was April the 1st, but let me move on and ask you to go to the next day, which is Exhibit 4241, because you sent an e-mail. If we could go to Exhibit 4241, we can see up on the top you write an e-mail to Nick McMahan. The re is 04, dot, 01, dot, 20, that's April 1st, 2020. FDA yanks Zantac off the market. Do you see that?

A Yeah, could we zoom out? Yeah, okay. So Nick McMahan has sent me an e-mail relating to Zantac, yeah.

Q Okay. So FDA yanks Zantac off the market on

April the 1st of 2020. You write an e-mail to Nick McMahan the next day. "Thanks, Nick. Seems the FDA were stuck on the over-the-counter aspects. No way to control its storage and use." Did I read that right?

A Yeah, "and nevertheless a quality issue and not one related to in vivo formation." Yeah, yeah, you read it right.

Q Now, when you say there is no way to control its storage and use, you're referencing over-the-counter Zantac, right?

A Well, so I'm saying it seems that the FDA were focusing on the over-the-counter aspects, and I think what I'm getting at there is that it's the duration of use. And so the FDA came out with a position, as I recall, saying it's 96 nanograms a day is the limit for the nitrosamine. And that's the lifetime limit.

So I -- I -- what I'm reflecting here is I don't understand why they're just proposing a lifetime limit and not the less than lifetime limit, which are M7. And so what I'm assuming -- and I'm saying it seems the FDA -- is that for some reason they're saying, "No, that's the lifetime. You have to apply the lifetime limits." And I'm assuming that that's related to the over-the-counter use where they -- you can't control the prescription of the medicine, right? So it was -- it

was an assumption of mine. It says "seems the FDA," but it was related to that 96-nanogram-a-day limit.

Q Doctor, does your e-mail say any thing about lifetime limit and 96 nanograms a day, or does it say no way to control its storage and use with respect to over-the-counter Zantac?

MR. SHEEHAN: Objection.

A Yeah, it's -- it's bad -- it's loose wording by me, but that's what I'm getting at, the FDA coming out with 96 and 96 is a lifetime limit, and I'm assuming it's because it's not a prescription medicine where you can -- the practicing medic would prescribe it for a set duration. So it's bad wording, but that's what my recollection of that would be.

Q Okay. But the wording that you chose that day, as opposed to your recollection today in a lawyer's office, is it "seems the FDA were stuck on the OTC aspects, no way to control its storage and use." That's what on the paper, right?

MR. SHEEHAN: Objection to the characterization. He's doing his best to give you an answer here, Mikal. Come on.

MR. WATTS: I know, but, look, I've got so much time, and I don't need a big speech that doesn't respond to my question. What I need is an

answer to this question.

BY MR. WATTS:

Q Does your e-mail, the text of it, the words that you chose on April the 2nd, 2020, start with "Seems the FDA were stuck on over-the-counter aspects, no way to control its storage and use"? Yes or no?

A Well --

MR. SHEEHAN: Objection, asked and answered.

A Yeah, and I can't remember what the FiercePharma article was about. It might have been the storage of ranitidine. It was an over-the-counter medicine, so I can't remember that without seeing the FiercePharma article. But it's related to the 96 nanograms and the lifetime limit that the FDA were applying.

Q Dr. Harvey, is that a yes or a no?

MR. SHEEHAN: Objection.

A Well, I mean, the sentence is "No way to control its storage and use," but it doesn't -- doesn't particularly relate to -- ranitidine -- I'm sure that the FDA spoke about, when they announced this position, they spoke about applying that 96-nanogram-a-day limit, which could only mean to me that they were applying a lifetime limit, which would have applied to the OTC. So, yeah, the text is badly worded. It's -- I don't

really know how to explain it. That's my recollection of what I was getting at.

Q Is that a yes?

MR. SHEEHAN: Objection, asked and answered.

A Just -- I think I've answered the question as best I can. Without seeing the FDA announcement, I can't recall what I was getting at.

Q Is that a yes?

MR. SHEEHAN: He's told you he's answered the question to the best of his ability, Mikal.

A And I think if you read the next sentence, we're talking about nevertheless a quality issues, so I'm talking about a quality issue in the drug product.

Q Are you going to answer the question yes or no or not?

MR. SHEEHAN: Mikal, he's answered the question a number of times now to the best of his ability.

Q Yes or no, Doctor? Did you write "There's no way to control its storage and use with respect to over-the-counter Zantac"?

MR. SHEEHAN: Objection, asked and answered multiple times.

A Yeah, I think I've answered it and I've provided the context of what I was getting at when the

FDA proposed a set limit of 96 nanograms a day.

Q Dr. Harvey, if that's the best answer you choose to give an American jury, we'll let them decide what to think about it. Okay?

Let's go to the next document, Exhibit 4161. I'm sorry. Strike that. Let's go Exhibit 4216. No's, I'm sorry. We did that. Strike that.

Let's go to 4242. This is the rapporteur's updated assessment report, the date of circulation of the updated document is April the 8th of 2020; is that right?

A Yes, that's correct, yeah.

Q And if we could go to Bates page 982, in the middle it says, "Many companies have so far not tested their drug products for the content of NDMA and fully relied on testing of the drug substance. From the results of the drug substance, it is known that NDMA concentration may increase over time possibly due to instability of the drug substance."

Is that the rapporteur's statement as of April the 8th?

A Yeah, that statement you've highlighted is correct, yeah.

Q And then further down the page, it says, "Based on the results received thus far, it appears that

NDMA is formed over time from ranitidine." Do you see that?

MR. SHEEHAN: Objection.

A I mean, it's part of the sentence and there's another piece that says, "However, no clear mechanism is available so far," but, yeah, it's chemistry -- it's description of the chemistry of ranitidine.

Q And do you agree that NDMA is formed over time from ranitidine?

A Well -- sorry. Do I agree? So it's the chemistry reaction that where under specific conditions that have been described in the root cause analysis by chemists that certainly NDMA forms. I know that there's temperature and humidity and there's another thing about the chemistry. I don't know the time scale piece. I don't know.

(Exhibit No. 4207 was marked.)

Q Now, Doctor, if you look at 4207, this is a communication between you and Mike Urquhart on September the 3rd of 2019. And at the bottom, Mr. Urquhart writes, "Ranitidine," beginning at 8:14. "I think we are at the stage where we will need to do some testing. Seems to me that GSK can't be looking that great now given all the correspondence and third parties telling us their results, and we are not in a position to

provide anything other than a high-level view." Do you see that, sir?

A I can see that Mike -- that's Mike's opinion, yeah.

Q And if we keep going -- that was said by Mr. Urquhart on September the 3rd of 2019; is that right?

A On September the -- yeah, that's correct, yeah.

(Exhibit No. 4236 was marked.)

Q And if we could go to Exhibit 4236, which is three months later on December the 10th of 2019, you and Mr. Urquhart --

MR. WATTS: 4236. You've got 423 up. There you go.

Q As we look at 4236, this is another communication between you and Mr. Urquhart on December the 10th of 2019; is that right?

A Yeah, if we could just read -- could I read the whole thing before he highlights it?

Q Sure.

MR. WATTS: Put both pages up so he can read the string?

A (Reviewing document.) Yeah, the text -- Thanks for letting me read it. The text that's

highlighted in yellow?

Q And by the way, there's a third page, so let's get to the third page real quick. It's just one line but I meant to show you that as well.

A Yeah, if we could scroll back up to the other page as well. Thank you. I can read it. Thank you.

Q All right. Now, on the second page, at 1537, you tell Mr. Urquhart, "So in short, we don't have enough information to do anything." He says, "No, not really." "We don't know if it affects all batches, and they haven't provided levels in drug substance/product." Mr. Urquhart says, "Got it. Need more information and unlikely to get this done before the product is out of shelf life"; is that right?

MR. SHEEHAN: Objection.

A Yeah, but if we -- can we zoom out? I just wanted to check the date on this. I mean --

Q Dr. --

A -- clearly, Mike and I are having a discussion about -- about this. I think -- I mean, the actual decisions about ranitidine and what to do were all governed by the PIRC, right, that we discussed earlier. So, I mean, obviously Mike's got opinions and we're having a conversation, but that whole piece is being overseen by the PIRC.

Q But, Mr. Harvey, my question is on December the 10th at 1537 in the afternoon you wrote, "So in short, we don't have enough information to do anything." He agrees, "Not really." You say, "We don't know if it affects all batches, and they haven't provided levels in drug substance/product," and Urquhart responds, "Got it, need more information and unlikely to get this before the product is out of shelf life." That's what it says, right?

A Yeah, it does, but you have to understand that this is -- Mike and I are not in the loop of every decision that's been made on ranitidine, and so I -- I mean, we're having a conversation here about what we understand to be going on. It may not be correct. It's just our understanding of it.

Q And your conversation ends at 1330 the next day where Mr. Urquhart writes you at the bottom of page 2, the top of page 3, "Still a work in process" -- "Still a work in progress, then, to influence the regulators"; is that right?

A Yeah, that --

MR. SHEEHAN: Go ahead.

A So, yeah, that's correct. So, I mean, again, you have to understand that we're getting these questions about NDMA and we're getting data about NDMA

in ranitidine. The only thing we have to work to is ICH M7, and so we're not -- the dialogue between the agencies isn't really focusing on ICH M7, so that's what we talk about -- we're talking about in terms of the regulators is are we working to ICH M7 here.

Q Well, when he says, "Still a work in progress, then, to influence the regulators," you are a member of GSK's NDMA core team that attends the PIRC meetings, right?

A Yeah, I attended the PIRC meetings, yeah.

Q You were also given the authority to edit communications out to the general public with respect to NDMA in ranitidine, right?

MR. SHEEHAN: Objection.

A I was asked to review the text -- the general communications for accuracy. I didn't write the content. I was certainly asked to review them to ensure that we'd got the description of the event and the impurities, et cetera, correct, right.

(Exhibit No. 4209 was marked.)

Q Let me show you -- let me show you two of them. Exhibit 4209, dated September the 13th of 2019, and we have an e-mail in the middle of the page, and you're writing an e-mail to Joe Oliver forwarding a safety position with respect to NDMA. You say, "All, I

was contacted to see if we were okay to include this in a European Medicines Agency and FDA US Food and Drug communication to go tonight. I said no."

Did you have veto power over communications between GSK and the EMA and the FDA?

MR. SHEEHAN: Objection.

A I don't -- I don't think I've got veto powers about communications. I think what this would have been about is there was a lot of intensity in the team at the moment to communicate back to agencies. And what I've said here was I -- what I'm saying is we cannot rush it. We need the adequate data integrity review to any agency. So what I was saying was, no, we need to check. I don't want to send something that's incorrect.

So it's not like I've got the power of veto. It's -- it's -- anyone could say, no, we're rushing it. We need to check the data integrity components. So that's what this e-mail is getting to. It's about rigor and ensuring what we communicate is correct. It's not a power of veto.

Q Well, when you say "no," you suggest by your language with respect to, well, it's a negligible risk to plaintiffs, I mean, to patients; is that right?

A That text you've highlighted is talking about the levels that we had reported to us of NDMA in the

drug product as aligned with the ICH M7 framework. And so we're talking about two things. We're talking about the communication, and the team saying that we must send it, we must send it, and we're saying no. And then we're talking about an assessment we did as part of that EMA response related to the levels in the ICH M7 framework.

(Exhibit No. 4211 was marked.)

MR. WATTS: Now, put that on the right side and put Exhibit 4211, third page, on the left.

THE WITNESS: Can I ask if we can have an opportunity for a break in a minute?

MR. WATTS: Yeah, right after this document. Switch them, Erik. One on the left needs to be on the right and vice versa. 4211 third page is the reason it didn't come up. There ya go.

BY MR. WATTS:

Q Okay. Now, 4211 is an e-mail from an Olayinka Osereme to a number of people including --

MR. WATTS: Erik, highlight the top. There ya go.

Q All right. 4211, the top of the third page is an e-mail dated September 13th at 1528 in the afternoon; is that right?

A Yeah, that's correct, yeah, yeah.

Q And you're a recipient of this e-mail. Who is Ms. Osereme?

A Who is -- sorry. Oh, Olayinka. She works in GSK. I think she works in the GSK communications department.

Q And she's sending an e-mail to you and others that's important. The statement is, quote, "Based on the current data and risk assessments available to GSK at this stage, we do not believe there's a quality or safety risk to patients," closed quote. It's in several places in the document. Someone just needs to take a call on if we should take it out. That would be my recommendation."

Is that what she told you at 3:28 in the afternoon on the 13th of September?

A Yes. And as I said, Olayinka is in GSK communications.

Q And then on the right side, five hours later, we have Exhibit 4209, where at 2002 on the same day, you recommend language that says the levels of NDMA in Zantac are associated with a, quote, "negligible risk to patients," right? That's your language?

MR. SHEEHAN: Objection.

A Yes, and what I -- again, I'd like to add some context. So at that time, the data we that had

demonstrated that the NDMA levels in ranitidine, that the trace levels of NDMA were -- could be placed into context with the ICH M7 framework, and that's what that sentence that's highlighted is describing.

Q Who is Stephen Hermitage that's copied on this document?

A Yeah, Steve Hermitage works in chemistry. I think he may have been Mike Urquhart's manager at the time.

Q Now, he's copied on this proposed language you gave at 8:02 in the evening on the 13th of September, right?

A Yes, he is.

(Exhibit No. 4212 was marked.)

Q And before you wrote that proposed language, you had a communication with Mr. Hermitage earlier in the afternoon, Exhibit 4212, and then we'll take our break.

A Yeah, and I think, if I recall this, because looking at the time now and I'm looking at this being 8:00, was it? And if it was Steve -- and you may have jogged my memory. I may be incorrect. But my understanding is that we had been asked to verify levels in the batches of drug substance and drug products that we'd been given and work out the nanogram amounts and

then understand whether they were aligned with the ICH M7 framework.

And I think it was very late and that relates to the let's slow down and submit it and it all relates to this communication. So I think that's when I remember Steve and Fiona being part of that conversation, and they helped me do the DI review, if that's what this is referring to.

Q Doctor, before Ms. Osereme says, "We should take the statement out," you had a conversation with Mr. Hermitage -- and let's put it up as 4212 on the left side -- and at 1459 in the afternoon, you say, "I urgently need a second opinion on a document I've just written on ranitidine in NDMA. I cannot find anyone to review it." Do you see that?

A Yes, I do, yeah, I do see it. And this was the afternoon where I asked for help from Steve and Fiona and I think Mike to help me review that document which placed the levels of NDMA that we knew about --

Q And --

A -- in the ranitidine drug product to place them into context with the ICH M7 framework.

Q And after you asked for that second opinion on the document you'd just written, at 1511, you say, "Could you come to me. Sorry, but I'm frazzled."

A Yeah, I --

Q Right?

A Yeah, I do, and if it's the day I remember, it was a very difficult day. There were a lot of people trying to contact me. It was a very intense time. And I -- I needed a second opinion. I needed that data integrity check because I was pretty stressed.

Q Well, right after you tell them you were pretty stressed and you wanted a data integrity check, Ms. Osereme 17 minutes later says you should take the language out.

MR. WATTS: Go back to 4211, third page at the top. Put it on the right side now.

A Okay. So Olayinka is a comms expert, and that group of people who are doing that peer review are the scientists at GSK who understand what the data we had was and our ability to place it into context. So the knowledge we knew then, the data was the data we had and it was aligned with the M7 framework. So, I mean, we were being asked to prepare a document and do a data integrity assessment.

So I know Olayinka was in comms, I get it, I get she's entitled to her opinion, but what we were doing was explaining the data to explain -- preparing a document to explain the data we had.

Q So you're frazzled. There's a statement that it's a negligible risk to patients. She says take it out. Five hours later it's still in there saying no safety problem, right?

MR. SHEEHAN: Objection, mischaracterizes the document and the testimony.

A Yeah, and I think I've explained it because it was a very intense period and I was under a lot of stress. However, that's why I reached out to my chemistry colleagues for assistance because we were essentially aligning the amount of NDMA in this Zantac drug substance or drug product, I can't recall, to the M7 framework, and so it asked for help. I took some time out and we read that and we prepared it. So what you're describing is me asking for support and these individuals gave it to me.

Q And as we look at 4209, which is the statement that you signed off on later that evening --

MR. SHEEHAN: Mikal, is this a new exhibit now? You said two exhibits. I mean, the witness asked for a break.

MR. WATTS: Hold on. We're going back to the same -- Tom, we're trying to finish this up. Let me finish.

BY MR. WATTS:

Q Exhibit 4209, the statement that you made later in the evening after you were frazzled and after you were asked to take it out is "I've told them we should use a statement for any submissions to EMA and FDA along the lines of the reported levels of NDMA in the very Zantac ranitidine formulations that are associated with a negligible risk to patients." That was your language, right?

MR. SHEEHAN: Objection, asked and answered multiple times now.

A Yeah, and I think I have answered it, yeah.

Q How long after you put that as your language on September the 13th was it before GSK recalled ranitidine worldwide?

MR. SHEEHAN: Objection.

A I -- so, again, this is context. This is about the data we had on September the 13th, and so --

Q What's the answer to my question?

A -- my understanding is that several weeks later, I think it may have been the first or second week of October, that we initiated a recall. But this is the position we had with the data at that time, and it's -- it's aligned with the M7 framework. That language is from M7.

Q Do you know when the recall was, sir?

A My recollection, and it's been some time, is it was in -- I think it was in October, early October there was a decision to make that recall, but I may be incorrect, but that was my sense that it was around October.

MR. WATTS: Let's take our break.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1623 UTC, 12:23 p.m. EDT.

(A 1-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1654 UTC, 12:24 p.m. EDT.

MR. WATTS: Let's go back off the record.

THE VIDEOGRAPHER: Going off the video record, the time is 1555 UTC, 12:55 p.m. EDT.

(A 1-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1655 UTC, 12:55 p.m. EDT.

(Exhibit No. 4157 was marked.)

BY MR. WATTS:

Q Dr. Harvey, are you familiar with GlaxcoSmithKline's code of conduct?

A Yes, I am.

Q Let me show you Exhibit 4157. And I'd like to take you to the fifth page of this, if we could put the cover on the left and the fifth page on the right.

Now, as part of what it says, if we blow that up right, is that employees of GlaxcoSmithKline should operate with transparency and be clear, be honest and be authentic. Do you agree with that?

A Yes, I do.

Q And as part of that code of conduct, information about product safety should be timely communicated to regulatory authorities. Agree?

A Well, yeah, of course, yeah, product safety, yeah, of course.

Q And as we go to 3383, the PIRC minutes of meeting number four, which you attended, if we go to Bates page number 048, part of what happened is that the Swiss Medica authorities were taking the position that there had been a clear violation of the reporting obligation because "nitrosamine diseases can cause cancer and thus represent a serious health hazard. Accordingly, there is a potential deposition class I or II deficiency. The notification period for such cases is a maximum of three calendar days." And they are saying that when you submitted documents to the European Medicines Agency and the Food and Drug Administration,

you needed to also provide those to the Swiss Medica authorities, who brought the issue to your attention in the first place, right?

MR. SHEEHAN: Objection.

A Are you talking about point 68, right, about Swiss Medic?

Q 69 is where they're saying there's been a clear violation of reporting.

A I can read that, yeah.

Q You were in the PIRC meeting when this failure to provide information to Swiss Medica was brought up, right?

A Well, I was in that meeting, but that piece about the reporting is a regulatory matter. It's a regulatory communication. It's not my area.

Q Sure. But it's your company?

A Yes, sure, it's -- it's GSK, yeah, of course.

Q When this happened at PIRC meeting number four on September the 6th, you were also dealing with the HSA in Singapore, who had done testing with respect to finding NDMA in ranitidine there, right?

A They -- I did -- I recall that Singapore with the other agency were doing testing, that's correct.

(Exhibit No. 4218 was marked.)

Q And 13 days after PIRC meeting number four had

talked about Swiss Medica alleging a clear violation of GSK's reporting obligation, you had a conversation in Exhibit 4218 with a Yasuto Nakata, and I want to visit with you about that. Do you see that this an e-mail from you to Yasuto Nakata which has got your communications over Skype?

A Yes.

Q What you told Yasuto Nakata is "We cannot share the data from the Singapore authority"; is that right?

MR. SHEEHAN: If you need to see the whole text, you can take the time to --

A So that -- that is correct what you've read. But, again, there'll be context to it. It would be probably something to do with not being allowed to share the data from the Singapore authorities, so there'll be context around it. Yasuto was asking me -- Yasuto asked me about impurity issues, so there'd be context to it. I don't have the context to it.

Q Well, what about your own testing information about NDMA in Zantac? Are you free to share that data with regulatory authorities?

A Well, I mean, again, if we generated data, then of course that would be appropriate to share with regulatory authorities, and my understanding is that we

did share that data.

(Exhibit No. 4233 was marked.)

Q Let's go to Exhibit 4233, and this is a November 23rd Skype conversation between you and Andy Searle; is that right?

A That's correct, yeah.

Q And in this conversation at the top, you tell Mr. Searle, "I heard that one of the batches of ranitidine drug substance had NDMA at 22.2 parts per million"; is that right?

A That's -- that's correct.

Q And Mr. Searle responds, "Yes, came from Encore. All of their active pharmaceutical ingredient batches are higher than we've seen - was Saraca active pharmaceutical ingredient"; is that right?

A Yes, that's what Andy's saying, came from Encore API, yeah.

Q And two minutes later Mr. Searle tells you at 2:31 p.m., "Encore is a site in India. The highest result I have seen is 24.07 parts per million," and he gives the batch number RH01 20190109, which is Saraca active pharmaceutical ingredient substance, right?

A Yeah, that's correct. That's what Andy's written, yeah.

Q And then Andy says, "Also seen 20 parts per

million from GSKT stored active pharmaceutical ingredient from, I assume, Dr. Reddy's based on the dates," right?

A Yeah, that's correct. That's what's written.

Q And so at 2:31 we've got one batch of API that's tested for NDMA at 24.07 parts per million, and you're made aware of a second batch that's tested at 20 parts per million; is that right?

MR. SHEEHAN: Objection.

A Well, yeah, there's different batches of API, I think, right?

Q And let's look at what happened two minutes later on the next page at 2:33. Did Mr. Searle tell you that the official result will be reported as greater than 9.9 parts per million?

A That's right, and it related to the method that hadn't been validated and not to use the high levels, so can't really be quoting the data. So it's an analytical caveat around that information, so Andy's saying the official result from the validated assay is 9.9 ppm.

Q Well, instead of telling them 9.9 when it's 24.07 and 20, why not tell just them 24.07 and 20 and put a star next to it and say it's not been validated for higher levels?

MR. SHEEHAN: Objection.

A I don't know -- I don't know the answer to that. It's analytical. They provide the information, and that's what Andy was feeding back to me.

Q Well, you say, "Okay. I get it."

A Yeah.

Q "We will add that caveat." And then Andy says, "Okay. Best to or I will be in trouble, exclamation point," right?

A That's correct, yeah. He's referring to those -- the ppms and the validated method.

Q Now, as we look at this reporting of data, we're on November the 23rd of 2019, if we go back to the first page, right?

A Yeah, that's correct, yeah.

Q Now, at this point there's been a voluntary withdrawal of ranitidine while you-all are doing your testing, right?

A That was my understanding, it was recalled in early October of 2019.

Q But you knew that if the testing showed NDMA limits, I mean, NDMA levels above ICH M7 limits, there would be a probable recall due to nitrosamine, right?

MR. SHEEHAN: Objection.

A I -- sorry. I'm not quite sure I understand

the question. Could you ask it again, please?
Q Sure. You knew that if your testing showed NDMA levels above ICH M7 limits, that would force a probable recall of ranitidine worldwide?
MR. SHEEHAN: Objection.
A Well, so, again, I'm trying to understand the question so I can answer it. So at this point the product had been recalled, okay, and it got recalled in October. The communications we sent to EMA we spoke about the levels we'd seen and levels that had been reported to us and those levels relative to the ICH M7 framework. So I'm not quite sure what the question is. Sorry.
(Exhibit No. 4235 was marked.)
Q Okay. Let me show you Exhibit 4235, which is the nitrosamine risk assessment dated December the 9th of 2019, which was in your custodial file and which you transmitted to Helen Steel.
Were you present when this nitrosamine risk assessment was created?
A I -- I'd have to be reminded with what's in the slides. Thank you. I can't -- I can't recall.
Q Let's go to page 2 and see if we can show you what's in some of the slides. Nitrosamine Background, it says that nitrosamines discovered in sartans in June

of 2018 and ranitidine medications in August of 2019 and the EMA published stringent nitrosamine management requirements on September 26 of 2019; is that right?

A That -- yeah, you're certainly reading it right. That's what the slide says.

Q And on Bates page 975, after the EMA publishes stringent nitrosamine requirements on the 26th of September, that created a business risk to GSK that they would have to do an immediate reporting of any nitrosamines detected with preliminary root causes. If above ICH M7 limits, a probable recall, right?

MR. SHEEHAN: Objection.

A Yeah, the ICH M7 limits, yeah. I can read that.

Q And your position was the EMA's nitrosamine requirements was functionally ordering a recall of ranitidine because you couldn't put it below those requirements; isn't that true?

MR. SHEEHAN: Objection.

A Again, I don't have the context, yeah, so when was the date of this presentation again? Could we go to the first slide? 9th of December.

Q December 9th, 2019.

A Thank you. Sorry to talk over you. Could we go to the next slide, please? And this is talking about

nitrosamine project risks.

Q Yeah.

A So we're talking about the M7 limits, probable recall, below possible interruption to supply. Yeah, so I understand what's in the slide. And so now we're talking --

Q The only way you -- go ahead. I'm sorry.

A What I was saying was the fact that we're referring to M7 and the limits, the appropriate limits, and the actions.

Q So go back to the second page for a second. When the EMA came out with these stringent nitrosamine management requirements, they were requiring that NDMA formation from ranitidine as an impurity has to be less than 96 nanograms a day, right?

MR. SHEEHAN: Objection.

A So at that point we were still trying to understand what framework to apply, M7. We're talking about EMA applying the 96-nanogram-a-day lifetime limit and not the less than lifetime limits for nitrosamines, which they had discussed in one of their sartan documents. So --

Q Now, what --

A -- what we're --

Q Go ahead. I'm sorry.

A So I'm talking about M7 limits, and I'm talking about the M7 framework that is applicable to mutagenic carcinogens. And what we've seen is the EMA initially spoke about applying the less-than-lifetime approach, and they'd certainly published in one of their Q&As. And then they moved to a position where they wanted us to adopt or they wanted industry to not do the 96-nanograms-a-day limit, the lifetime limit, and so this was very much an evolving situation.

Q So Dr. Harvey, your position was that when the EMA said that NDMA formation from ranitidine as an impurity has to be less than 96 nanograms a day, that they were effectively removing ranitidine from the market because that was an impossible standard for GSK to meet; isn't that right?

MR. SHEEHAN: Objection.

A I don't -- I'm not quite sure -- quite sure I understand that -- well, I understand what you said. I'm not quite sure I agree with what you're saying.

As this evolved, clearly the EMA were using the ICH M7 framework by the proposal of the 96-nanograms-a-day limit. They also referred to the less-than-lifetime approach in a Q&A document, and they'd also referred to it in a sartans document. And what we were doing was trying to establish what ICH M7

framework to apply.

It's now clear that the regulatory agencies are looking for us to adopt those lifetime limits. However, there's also a piece about applying that less-than-lifetime limit in certain situations.

(Exhibit No. 4240 was marked.)

Q Dr. Harvey, you said you couldn't understand what I was saying, so let's look at Exhibit 4240 to look at what you said. This is a conversation between Anthony Lynch and yourself on February the 24th of 2020. Can you see that, sir?

A Yes, I can.

Q And at the bottom of the first page of 1429, you say, "Basically, the EMA are saying total NDMA formation from ranitidine as an impurity and as an in vivo degradant in total has to be less than 96 nanograms a day," and up at the top you said, "Pretty much impossible"; is that right?

A Yeah, and I need to add some context here because we'd been in discussions about it with EMA and there was communications coming backwards and forwards. And the EMA all of a sudden started applying ICH M7 to the in vivo situation. So quite clearly, at that point they were under the impression that the Zeng and Mitch paper was accurate and there was some potential for NDMA

formation in ranitidine, and so they were setting new standards to talk about a measurement, almost an in vivo measurement from an impurity in a drug product and potential endogenous formation of ranitidine. Pretty much impossible means I don't know how we would do this. I don't know how we would meet this new standard set by EMA.

Q Dr. Harvey, as we go down the page at 1433, you say, "The EMA are effectively removing ranitidine from the market as that spec is not possible," right?

A Yeah, it's not even a spec. I think they're saying right now we're convinced by the Zeng and Mitch paper -- well, they're taking that content as valid, and they're obviously looking at the levels of the impurity in the Zantac drug product and, as I said, setting a new precedent, and I don't know how to meet such a specification, and so it was a new position.

Q So you were, as you said here, "I think any future work we will do will be to support the legal case," you're talking about the lawsuits like the one you're being deposed in today, right?

MR. SHEEHAN: Objection.

A Yeah, so, we're -- we're doing further scientific work to understand how nitrosamines -- so right now nitrosamines are being treated separately from

ICH M7. And because of that, we have various legal cases and additional control limits for nitrosamines, i.e., the lifetime nitrosamine impurity limits that are being applied. The further work we're doing is to understand how we move nitrosamine impurities back into the ICH M7 framework.

Q Doctor, what you're trying to do is do work so you can talk to regulators into changing the limit from 96 nanograms to 6 micrograms a day; isn't that true?

MR. SHEEHAN: Objection.

A No. What we're doing is further science to -- so nitrosamines are part of the ICH M7 guideline, and so they're a chemical class within that framework. And we've seen EMA use aspects of ICH M7, the 96 nanograms a day, the benchmark dose modeling, they've spoken about threshold in DNA repair, they've used the less-than-lifetime approach, and so what we're doing is studies to move it back -- move that nitrosamine -- those nitrosamines back into the M7 framework.

Q And you want it to be 6 micrograms a day instead of 96 nanograms a day, right?

MR. SHEEHAN: Objection.

A I don't want anything. You're saying "you want." What we are doing is we are examining data to determine whether nitrosamines should be treated

separately as mutagenic carcinogens or should be treated alongside other chemicals that are mutagenic carcinogens.

Q Well --

A We're doing studies that I discussed earlier -- we're doing studies, and those limits we discussed, the benchmark dose modeling, we're doing studies and we will let the science lead us where those -- where that data takes us.

Q So Doctor, after you said the EMA are effectively removing ranitidine from the market, you know now that on April the 1st of 2020, the Food and Drug Administration removed ranitidine from the market as well, right?

A But for a different reason.

Q Okay. And that reason is NDMA, right?

MR. SHEEHAN: Objection.

A It's a different reason. So what I'm saying here is that EMA is setting a new precedent of combining in vivo formation, an impurity in the drug product, and stipulating effectively a specification that can't -- that type of spec doesn't even exist. The FDA removed ranitidine from the market because of the presence of NDMA in the drug product. It wasn't the combination of the in vivo formation and the nitrosamine levels in the

drug product.

Q And every test that the FDA did on the drug product had a level above 96 nanograms per day once you did the calculations, right?

MR. SHEEHAN: Objection.

A Again, they're adopting that lifetime daily intake of 96 nanograms a day that's associated with that theoretical excess cancer risk.

Q And after the FDA ordered the worldwide recall of FDA [sic] or at least the recall in the United States of -- strike that.

After the FDA ordered that there would be no ranitidine sold in the United States on April the 1st, you were part of a proposal within GSK to do further research to address regulatory expectations relating to nitrosamine impurities, right?

A I was, yes. That's correct.

Q And let me show you Exhibit 4936. 4936.

(Exhibit 4936 marked for identification.)

MR. WATTS: Okay. Roopal, help me out here. The one document you gave me, you gave me that number. Do you want to give me another number?

MS. LUHANA: Sure. You can use this. It's the next page, I believe. That's what you're looking at. It's the same document. It's just --

MR. WATTS: Start with 062 as the Bates number. All right. Forget it. We're going on to the next document. If you guys can find the document, just let me know and I'll do it.

BY MR. WATTS:

Q Doctor, I want to go back to 4240, second page, 1433, you said, "I think any future work we will do will be to support the legal case." Do you see that, sir?

A I do, yes.

Q Now, by this time, in 2020, you had been obtaining checks from the legal department for anything before it was sent out, right?

MR. SHEEHAN: Objection.

A In what sense? Sorry.

(Exhibit No. 4229 was marked.)

Q Well, in the sense of 4229, which is dated October the 19th of 2019. See how it says "Privileged and Confidential"? You see that, sir?

A Yes, yes, I do.

Q And it's a ranitidine article 31 referral questions six through nine. Those are the EMA questions to GSK, right?

A Yes, I -- yeah, that's -- I can see that.

Q And you say, "Hi, Ethnie. If it's possible, I

think we should get another legal check before it gets to the EMA"; is that right?

A Yeah, but my under -- my recollection is that there was -- in the PIRC meeting, there's legal representation my recollection was.

Q And so is the science communicated to the regulatory authorities by GSK governed by what the legal team says is permitted or by the science team?

MR. SHEEHAN: Objection.

A Well, I mean, it's a multidisciplinary team, right? I mean, certainly the activities I was involved in in the PIRC, they were activities about NDMA in Zantac drug product and their -- sorry -- and their limit -- the levels as -- in reference to the ICH M7 framework.

Q Did you do calculations at the request of the legal team to help the legal case?

MR. SHEEHAN: Objection. You don't need to answer that. Instruct the witness not to answer.

Q Well, have you wondered whether your calculations are helpful to the legal team?

MR. SHEEHAN: Objection.

A I -- I'm not quite sure how to answer the question.

(Exhibit No. 4244 was marked.)

Q Well, let's answer it by looking at Exhibit 4244. Is this an April 30 communication that you had with Liangfu Chen on April the 30th of 2020?

A Yes, that's correct, yeah.

Q At the bottom of 1501 you say, "Hi. Sorry to bother you. I was wondering whether that calculation was helpful to the legal team." You say, "Tony has a call with him today. I mentioned this calculation, but I said I wanted to check in with you."

A Could we go back to the context of the message? So this is related to the Zeng and Mitch publication, and the Zeng and Mitch publication was still -- at this point I think was still a valid publication, and it was -- again, as you know, we still didn't understand it.

Q Did you ask whether your calculation was helpful to the legal team?

A Yes, I did, yeah. It's there.

Q Dr. Harvey, without the Zeng and Mitch study, did your root cause analysis team at GSK conclude that NDMA was in Zantac by virtue of its exposure to heat and humidity over time?

MR. SHEEHAN: Objection.

A Sorry. I want to replay the question back. So you're saying aside from Zeng and Mitch, you're

saying did GSK -- sorry. Could you repeat the question? Sorry.

Q Did GSK's root cause analysis team conclude that the NDMA that was being found in test samples of Zantac and ranitidine hydrochloride was formulating from the ranitidine molecule itself as a byproduct of degradation that occurred when the molecule was exposed to heat and humidity over time?

MR. SHEEHAN: Objection.

A So the GSK root cause analysis, as you know, you're familiar with it, I think the summary is that it's heat, humidity, and there's other chemistry considerations. But also I think the -- I'm not quite sure they fully understand it because my understanding from it is that it's not -- it's an unusual reaction. It's not a reasonably anticipated reaction. So you're correct in a sense, but it's a root cause analysis, it's chemistry -- it's really a chemistry question.

Q Well, how did the NDMA get into the Zantac that GSK developed and sold?

MR. SHEEHAN: Objection.

A Well, I -- I mean, they -- they know that there's a -- there's a degradation pathway that occurs that they describe, the chemists, that's not reasonably predicted or anticipated I think the wording is.

Q And Dr. Harvey, that degradation pathway has resulted in levels of NDMA that are above 96-nanograms-per-day limit from the US and European regulatory authorities. Agree?

MR. SHEEHAN: Objection.

A They're about the 96-nanogram-a-day limit that we discussed, which is the lifetime daily limit associated with a one in a hundred thousand theoretical excess cancer risk, as you know, that's defined in the ICH M7 framework. It's a very conservative limit, but, yes, that's my understanding, yes.

Q And so after the FDA said on April the 1st that ranitidine will not be sold in the United States anymore, you set about to do research to address these regulatory expectations and to change the limit from 96 nanograms a day to 6,000 nanograms a day; isn't that right?

MR. SHEEHAN: Objection, mischaracterizes evidence.

A No, that -- that's not correct. As I said, there are studies. We're commissioning studies. We've discussed that earlier. We're doing in vivo mutation assays as well to further understand the biology, if you like, of nitrosamines and their mutagenicity and that relationship to carcinogenicity.

(Exhibit No. 3946 was marked.)

Q I want do show you a document that the metadata says was created on June the 8th, 2019 -- strike that.

I want to show you a document that the metadata says was created on June the 8, 2020. It's Exhibit 3946. And this is a proposal for further research to address regulatory expectations related to N-nitrosamine impurities in development and established products. Do you see that, sir?

A Yes, I can.

Q And the executive summary begins, "New regulatory focus on N-nitrosamine impurities in established medicines has resulted in several drug product recalls from the global markets. EU and US regulatory agencies are now imposing strict new manufacturing requirements for the control of N-nitrosamine impurity that in GSK's view are not fully aligned with existing ICH M7 regulatory guideline"; is that right?

A That's correct. At the time people were -- there were agencies that were advocating certain parts per billion limits, so they weren't aligned with ICH M7 at all as well, and they're --

Q And so --

A -- not fully aligned with the existing ICH M7 guideline.

Q So what you're saying is, "We need to embed the principles of ICH M7 into short-term work less than 12 months and long-term work less than 30 months"; is that right? Go to Bates 064.

A Yeah, that's there.

Q And yet in this document, the metadata says is June 8, 2020, the work hasn't begun yet, right? This a proposal.

MR. SHEEHAN: Objection. Can you -- can you read the document?

THE WITNESS: I can. Sorry.

Q This is a proposal, right?

A It's a proposal.

Q And the last three lines of this page and the top line of the next page, "And if a threshold mechanism of action was demonstrated for NDMA, an exemplar N-nitrosamine that is an extremely potent carcinogen in rats, the predicted lifetime impurity limit based on the PDE modeling approach would be about 6 micrograms per day as opposed to the current default lifetime limit of 96 nanograms a day currently based on a linear extrapolation and TD50 modeling methods." Did I read that correctly?

A Yeah, yeah, that's correct. That's referring to the benchmark dose --
Q Now --
A -- modeling approach that we discussed. Sorry to talk over you. And you said about the studies haven't started. One of the elements of this proposal was doing an additional in vivo study on NDMA. That is underway. We discussed that earlier. It was very difficult to get the work done. MutaMouse studies are quite challenging to do. There's not many places in the world that can do them, so it's -- but this is a proposal, and it's about nitrosamines as a chemical class and about ICH M7.
Q Doctor, 6 micrograms a day is 6,000 nanograms, right?
A Yes, that -- that's correct.
Q And 6,000 nanograms is 62 and a half times the present regulatory limits of 96 nanograms, right?
MR. SHEEHAN: Objection.
A I can't do the math at this time of day, sorry, but it's clearly higher than 96 nanograms a day.
Q Well, let me do this. May I have the screen share for a second?
If we take Bill Gate's Excel machine and divide 6,000 nanograms into 96, that would be a new

standard that is 62 and a half times greater than the present standard being employed by the European Medicines Agency and the United States Food and Drug Administration. Am I right?

A Yes, that's correct. Sorry. But they're two very different values based on two very different approaches. One, as we've spoken about, is described in M7. It's that linear extrapolation from a predicted one in two cancer instance to a predicted one in a hundred thousand. It's extremely conservative. That's all defined in ICH M7.

This relates to alternative approaches that are also defined in ICH M7. What we're doing is further research to understand whether that -- that approach is robust, and we discussed some of that work earlier.

Q Ranitidine will meet this GSK proposed standard of 6,000 nanograms today. It just won't meet the Food and Drug standard of 96 nanograms a day, right?

MR. SHEEHAN: Objection.

A Well, there's -- in that work, there's -- there's -- there's values for carcinogenicity. There's also values for mutagenicity. The values based on the mutagenicity, you know, the event associated -- the mechanism associated with nitrosamine toxicity and carcinogenicity is lower than 6,000 micrograms. I think

it's 600 nanograms, if I recall. It could be even lower, if we do -- when we finish that one-month MutaMouse study.

So we're doing scientific studies, and it's about nitrosamines as well as a class, so we also are trying to understand if we can use in vivo mutagenicity data. These are very complicated studies. They're very -- you know, they're -- there is a lot of content in those in vivo mutagenicity studies, and we're trying to determine whether we can use those studies to perform our risk assessments as per ICH M7. So the work is aligning nitrosamines back to ICH M7 alongside other mutagenic carcinogens.

MR. WATTS: Objection, nonresponsive.

Q What was my question?

A Well, you were asking me -- we were talking about 6,000 nanograms being -- I think you said something along the lines of a new standard, and that's not what we're doing, and that's why I was explaining.

Q Is 6,000 nanograms 62 and a half times greater than the present regulatory requirement of 96 nanograms?

MR. SHEEHAN: Objection, asked and answered.

A I think I've answered the question. They're different values based on different datasets and different extrapolations.

Q Does 96 nanograms divide into 6,000 nanograms 62 and a half times?

MR. SHEEHAN: Objection.

A Well, again, so 96 is the standard that you've discussed as being adopted by the agencies. 6,000 is 62.5 times it. But as I said --

Q Thank you.

A -- they're different values -- they're different values based on different data and different extrapolation procedures. So it's --

Q Doctor --

A They're just different values.

Q Has the European Medicines Agency pulled back its requirement that NDMA levels be less than 96 nanograms a day?

A Not at present, but, you know, they have -- they've adopted ICH M7 in the sense that they've adopted that 96-nanograms-a-day limit. We're still trying to understand how they're applying that to new medicinal products as well, not 96 nanograms, but still trying to understand what framework they're applying for nitrosamines.

Q Has the European Medicines Agency said, "Dr. Harvey, I agree with you. Put ranitidine back on the market. You were right"?

MR. SHEEHAN: Objection.

A Well, certainly the earlier document we saw about the -- a spec being based on in vivo formation of NDMA, I don't know if they've discussed that. But no. The answer to your question is EMA is still proposing 96 nanograms a day for NDMA, which is a lifetime limit aligned with ICH --

Q What about FDA?

A -- M7, but it's not fully aligned with ICH M7.

Q What about FDA? Have they said, "Dr. Harvey, you were right. Put ranitidine back on the market"?

MR. SHEEHAN: Objection.

A I -- I can't recall exactly what FDA has said, but I think there's an announcement about the issue being related to NDMA in drug products, and if -- and, you know, and controlling NDMA to those 96-nanogram-a-day limit, so again they're using those lifetime limits. So they haven't said what you've said, but they're both adopting parts of ICH M7.

(Exhibit No. 4250 was marked.)

Q I want to show you Exhibit 4250, which is an editorial by Michael White entitled, "Ranitidine and risk of NDMA formation," and I'm asking you about it because it was in your custodial file.

A Yes, I -- yeah, okay.

Q Do you remember reading this?
A Yeah, I do.
MR. WATTS: Go to the second page, last paragraph, and blow it up.
Q Now, part of what this editorial that was in your custodial file says is, "Even with reassuring data from these two studies, patients and clinicians should not expect the return of ranitidine to the market any time soon. Ranitidine is not needed when other similarity effective H2 antagonists exist without the ability to form NDMA as they degrade in the medicine cabinet or enter the water supply." Do you see that, sir?
A I -- I can see the text you've read, yes, yeah.
MR. WATTS: You can take that down.
Q Dr. Harvey, what I would like to know is what H2 antagonists in the medicine class of ranitidine also form NDMA.
MR. SHEEHAN: Objection.
A I -- I need -- could you elaborate on the question? Sorry. I'm not quite sure. Are you talking about the Matsuda paper or form in what way?
Q No, I'm asking you a simple question. Do any other H2 antagonists in the same class as ranitidine

reformulate into NDMA, a probable human carcinogen?
MR. SHEEHAN: Objection.
A So you mean reformulate, you mean degrade in some way? Sorry. Is that correct?
Q Yep.
A Well, I don't know all of the H2 blockers. I know the ones in the Matsuda paper. I -- I don't know if any of those form NDMA, but I -- I don't think cimetidine does. And I think there's another H2 blocker that's still on the market as well that doesn't form it. I'd have to check the structures. And I'm not quite sure if there was another H2 blocker where they checked for NDMA. But there are others. The answer to your question, there are other H2 blockers that, from my understanding, don't form NDMA.
Q Okay. My question was the inverse of that. Are there any other H2 antagonists or H2 blockers, as you say, outside of ranitidine that do form NDMA?
A I -- I'm not sure so I can't be definitive. I don't know if there was another H2 blocker that was also examined for NDMA formation. I can't recall exactly.
Q Of all of the market entries in the H2 antagonists market, ranitidine sold as Zantac stands alone as the only one that forms NDMA, a probable human carcinogen. That is true, isn't it?

MR. SHEEHAN: Objection.
A I -- I think I just said I'm not a hundred percent certain of the answer, so I couldn't -- I'd be -- I'd be guessing. Sorry.
Q Yeah, you're about 99 percent true, right?
MR. SHEEHAN: Objection.
A Sorry. I didn't understand what you said. Sorry.
Q Yeah, you're not a hundred percent sure, but in your heart you're about 99 percent sure that --
A No, no, it's not about -- it's not about in my heart. I --
MR. SHEEHAN: Hold on.
THE WITNESS: Sorry. Sorry.
MR. SHEEHAN: Let me get an objection in as to the improper question. Go ahead.
A I know other products they found NDMA in them. I can't recall the exact details. What I do remember about the Matsuda paper, certainly, there were different H2 blockers of different chemical structures and there was data associated with those. But I'm not a hundred percent certain of all of the H2 blockers. That's my answer.
Q But the only one that you can say causes NDMA is ranitidine, right?

A Well, clearly I know that ranitidine does because that is an asset of GSK. It's a GSK drug product.

MR. WATTS: Dr. Harvey, let me take a break and confer with my colleagues, and I'll get back with you. Okay? Let's take a break.

THE WITNESS: How long are we talking?

MR. WATTS: Five minutes.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are now going off the video record. The time is 1743 UTC, 1:43 p.m. EDT.

(A 57-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 1840 UTC, 2:40 p.m. EDT.

MR. WATTS: Dr. Harvey, those are all of my questions for now. I'll reserve the rest of my questions till after your counsel's had a chance to ask questions of you, so I pass the witness. Thank you.

- - - - -

CROSS-EXAMINATION

BY MR. SHEEHAN:

Q Dr. Harvey, good evening. Thank you for taking the time to speak with us today. My name is Tom Sheehan. I represent GlaxcoSmithKline. You and I have

met prior to today, correct?
A That's correct.
Q I know it's been a long day. I don't want to take up a lot more of your time, but I do have a few questions to ask you in response to some of the questions that you were asked by counsel for the plaintiffs.
I'd like to start with what you described as the root cause analysis. Can you just describe what the root cause analysis was evaluating?
A The root cause analysis was an activity conducted by the chemistry organization, it was R&D individuals and individuals in product supply chain, to understand, you know, why NDMA was forming in ranitidine drug product.
Q And counsel for plaintiffs asked you a series of questions with respect to the testing and the results of GSK's root cause analysis. Do you recall that?
A Yeah, I do. I recall that.
Q Did Mr. Watts ever show you the results of the root cause analysis?
A No, no. We were talking about certain values for certain batches.
Q Okay. You did not -- you were not responsible for conducting the testing in connection with GSK's root

cause analysis, correct?
A No, no, I wasn't. As I explained, it was individuals in the chemistry organization.
Q Okay. Would you defer to the individuals in the chemistry organization that were responsible for conducting that testing in connection with what the findings were and how to interpret those findings?
A Yeah, yeah. Of course, of course.
Q When Mr. Watts represented that GSK's root cause analysis showed all GSK ranitidine tested above the regulatory threshold, he didn't show you all the test results, did he?
MR. WATTS: Objection, form.
A No. Sorry. I'll pause. Sorry. No. We were talking about specific values and specific batches.
Q Dr. Harvey, are you aware that there were numerous batches of ranitidine drug substance manufactured by GSK that tested below the regulatory threshold of 96 nanograms for a lifetime daily limit of NDMA?
A No. I'm not completely familiar with the results of all those studies. That conversation was about a particular batch and particular values.
MR. WATTS: Objection, form, speculation.
MR. SHEEHAN: If we could bring up

Exhibit 3157, previously marked as Exhibit 3157.

UNIDENTIFIED FEMALE VOICE: Carlos, can you pull that from the Dechert-only file, please?

THE DEPO TECH: This is the one I loaded from your Dechert folder.

MR. SHEEHAN: Okay, great.

BY MR. SHEEHAN:

Q Dr. Harvey, what you're seeing on your screen is Exhibit, I guess we're calling this redirect, Exhibit 3157. This is a conversation between you and Mike Urquhart dated November 27th, 2019, that counsel for plaintiffs asked you about earlier today. Do you recall this document?

A Yeah, yes, I recall it, yeah.

Q If we could just go to the next page and take a look at the description. When counsel for plaintiffs asked you about this document, he had you read into the record certain yellow highlighted portions of the description of a particular study. Do you recall that?

A Yes, I do, yeah.

Q Can you just describe what -- what is -- I think this is a description of an additional report titled "WBP 82:011"; is that right?

A Yes, that's correct.

Q And what is that study report?

A The title of it is "The determination of N-nitrosodimethylamine formed by the reaction of ranitidine hydrochloride with sodium nitrite." It's also known the Tanner study.

Q Are you familiar with this study?

A Yes, I am.

Q Can you just describe for the jury at a high level what the results of this study showed?

A Yes. It was an in vitro study that GlaxcoSmithKline did where they looked at the nitrosation of ranitidine again under specific nitrite concentrations. And these nitrite concentrations were 40 millimolar, an excess of nitrite, so a concentration that you wouldn't experience in the human body, nonphysiologically relevant concentrations.

And then they also did some other incubations with lower levels of nitrite that would be more indicative of the concentrations that you experience in the human stomach. So it was a nitrosation study with different levels of nitrite.

Q And counsel for plaintiffs -- just directing your attention to the last sentence in the description of this study beginning with "However," counsel for plaintiffs only highlighted a certain portion of that study, correct? The yellow highlighting?

A Yes, the page that reads "These reactions."
Q Actually, I'm down below, the last sentence.
A Okay. Yes, sorry. Okay.
Q Could you just read the full sentence into the record beginning with "However given."
A Yes. "However, given that an equivalent analytical method was used for the analysis of all samples, there is a clear qualitative difference in the levels of NDMA formed from ranitidine under the conditions anticipated in the stomach after digestion of a nitrite-rich meal (drug 1 millimolar, nitrite .3 millimolar) when compared to conditions considered to be in excess of this (drug 10 to 40 millimolar, nitrite 40 millimolar) that would not be anticipated considering the standard use of the product."
Q Thank you. Counsel for plaintiffs did not highlight the portion that the formation of NDMA would not be anticipated considering the standard use of the product, correct?
MR. WATTS: Objection, form.
A That's correct.
Q Can you just describe what is your understanding of that phrase, "not anticipated considering the standard use of the product"?
A Well, what it's saying is -- I mean, that's

physiological levels, et cetera. What it's saying is this study is -- it's an in vitro study. It's demonstrating that ranitidine wouldn't be nitrosated under normal physiological conditions to form NDMA.

Q I'm going to ask you a little bit more about that topic in just a moment, but first -- you can take this document down. I'd like to bring up redirect Exhibit 4233. If you could just blow up the "from," the "send," the "to" -- no, no, up at the top. Okay.

Okay. This is another conversation between you and Andy Searle on November 23, 2019, correct?

A Yes, that's correct.

Q Okay. And counsel for plaintiffs asked you about this document, correct?

A Yes, they did, yeah.

Q Let's take a look at the message from 2:31, Andy Searle. Do you recall that Mr. Watts had you read that into the record?

A Yes. Yes, I do, yeah. I recall that.

Q And Mr. Watts had you read the next highlighted yellow section, correct? If you could go to the next highlighted yellow section on the next page. Perfect. And counsel for plaintiffs asked you to read that into the record as well, correct?

A I don't know if he asked me to read it. I

think he read it and asked me whether I -- he read it correctly, but I think, yes, that was what happened.

Q Okay. And he didn't show you -- we have a little red line here. He didn't show you what's below the red line, correct?

A I don't -- I don't recall. I just remember it being read and being asked if that was correct text.

Q And he didn't blow up what's below this red line and have you read that to the jury, did he?

A I -- I don't think so. I remember the 9.9 and the discussion about validated method.

MR. SHEEHAN: Can we just go ahead and blow up what's below the red line?

Q Okay. Can you just read that into the record, Dr. Harvey?

A "The upper end of the range of NDMA in ranitidine drug substance using a validated analytical method reported within GSK is 11.6 ppm (Batch AEJH000916,) which is consistent with the upper end of the range of NDMA reported in drug substance (Batch AEKH001806) reported externally by Swiss Medic of 13.8 ppm," and there is a reference to document D2019-6482, version 2.0.

There is another sentence that starts, "Note that the upper end of the range of NDMA in ranitidine

drug substance using an unvalidated analytical method reported within GSK is 24.7 ppm (Saraca drug substance Batch RH01 2019 0919.) These NDMA levels are below the 625 ppm levels of NDMA in ranitidine drug substance equivalent to the GSK PDE for NDMA of 0.3 micrograms per day."

Q Thank you very much. Dr. Harvey, the Tanner --

MR. SHEEHAN: You can pull this down.

Q The Tanner study that you described earlier was assessing the conditions under which ranitidine may nitrosate, correct?

A That's correct, yeah.

Q And that's what we refer to as an in vitro study; is that right?

A Yes. The study's in vitro so it's done -- yeah, it's not in vivo. It's in vitro. It's done in the lab.

Q Counsel for plaintiffs asked you some questions about the responses to the EMA that GSK prepared in 2019. Do you recall that?

A Yes, yes, I do, yeah.

Q The EMA inquired about certain issues relating to NDMA in ranitidine in 2019, correct?

A Yes, yes, that's correct.

Q Can you just describe at a high level what -- what areas of inquiry the EMA was asking about?

A We touched on it earlier. I think there were discussions about NDMA forming in drug product. There was a discussion -- well, there were questions about NDMA forming in drug product. There was a question about NDMA forming ranitidine in vivo, so inside the human body. And there was an additional question about the ramifications of those events relating to safety of the ranitidine drug product.

Q And the investigation into ranitidine and drug substance, drug product, that related to the analyses that GSK was conducting in connection with its root cause analysis; is that right?

A Yes, that's correct. It's the chemistry one, the NDMA drug product.

Q And I think you testified before that you were not responsible for that piece, correct?

A No, that's correct.

Q Of those three buckets of inquiry, which one were you most heavily involved?

A Well, I mean, we just discussed that nitrosation -- obviously there's a component of the chemistry piece relating to the levels of the NDMA in the drug product in the ICH M7 guideline. There was the

questions about the in vivo -- questions about in vivo formation, which included questions around in vitro formation because there was a publication around in vitro formation under simulated gastric fluids similar to the Tanner study.

And then there was -- the safety piece question, there was a question around nonclinical safety information, but there was also a question around clinical safety data as well. So there was a small component of each piece relating to impurities, relating to in vitro, simulated gastric condition type studies, and then a discussion of the nonclinical data that was accrued on ranitidine as part of its development.

Q Let's start with the in vitro nitrosation piece of it. Did you evaluate data in connection with your responses to the EMA on that topic?

A I did. So there was -- early in ranitidine's development, there was discussion about nitrosation of the molecule, which was a sort of scientific area of research and it still is. There was a discussion about nitrosation of the ranitidine molecule. I think it was raised as a question. And GSK did a whole series of studies relating to something that was referred to as the WHO NAP test, World Health Organization Nitrosation Assay Procedure, to see if ranitidine could be

nitrosated. So they did those studies very early on and they examined the products of that nitrosation reaction.

But they also -- and they published on this. They also clearly defined the conditions under which that reaction would occur and also define -- and those reactions conditions are ones that have the high levels of nitrite in nonphysiologically relevant that we discussed, the 40 millimolar. But they also examined concentrations that were more indicative of physiological conditions of nitrite. So that was all done as part of ranitidine's development.

Q And what was -- what were the results of that series of experiments?

A Sorry. In short summary is that, of course, ranitidine can be nitrosated if you have an excess of nitrites, but that is a specific condition or a specific set of conditions that you wouldn't experience under physiological conditions.

Q So I just want to just understand that wouldn't experience under physiological conditions. I take that to mean, and you tell me if I'm wrong, I take that to mean that based on those experiments, you would not anticipate that somebody taking the product would experience nitrosation of ranitidine after ingestion of the drug.

MR. WATTS: Objection, form.
Q Is that correct?
A Yeah, that's correct. And that position was discussed and it was published at the time around the same time as the marketing authorization applications and discussed in other regulatory submissions.
Q And did GSK do a thorough evaluation of that issue in connection with responding to the EMA in 2019?
A Well, yes. We obviously discussed that data that was generated on ranitidine and the nitrosation of ranitidine, and it also included those original nitrosation studies that actually led to a particular nitrosamine. And then we also disclosed the results of the Tanner study that we just discussed to the EMA as well.
Q Fair to say that you were transparent with the EMA in connection with evaluating that issue?
A Yes, yes.
Q And those were all in vitro experiments that you were just describing, correct?
A Yes, in vitro. They're done in a test tube or flask.
Q Have any -- are you aware of any additional in vitro studies that have been published looking at the nitrosation of ranitidine?

A Yes. There was a component in a publication by Zeng and Mitch that spoke about in vitro nitrosation of ranitidine. There was also several publications from maybe last year or this year. Braunstein was the name of the author there. And there was more recently another publication by an author called Gao from the US FDA.

Q And I think you just -- we discussed earlier that the Zeng and Mitch publication's been retracted, correct?

A That's correct.

Q And what does it mean for a study to be retracted?

A Well, the authors have summarized -- I don't want to misquote them -- but I think, in essence, what they -- they determined was that their measurements of NDMA when forming from ranitidine in that study were invalid. There was an issue with the analytical method. I'm not an expert in analytical chemistry, but that broadly describes the explanation of the retraction.

MR. SHEEHAN: Okay. Could we bring up the Gao study? I think it's in the defense box.

THE VIDEOGRAPHER: Will you be marking this as an exhibit, Counsel?

MR. SHEEHAN: Yeah, yeah, if you could, that

would be great. And we'll call this -- I guess we'll call it Harvey Defense 1.

(Harvey Defense Exhibit No. 1 was marked.)

BY MR. SHEEHAN:

Q You had mentioned a study by Gao. What you're seeing now is Defense Exhibit 1, Dr. Harvey, a study entitled, "In vitro analysis of N-nitrosodimethylamine (NDMA) formation from ranitidine under simulated gastrointestinal conditions." Did I read that correctly?

A Yes, you did.

Q Do you have an understanding as to the institution that published this study?

A Yes. This was the Gao study. That individual works at the US FDA.

Q And, again, just so it's very clear, this is an in vitro study, correct?

A Yes, in vitro analysis.

Q And what was FDA looking at in this study?

MR. WATTS: Objection, form.

A Well, it's in the title. In vitro analysis of NDMA formation from ranitidine under simulated gastrointestinal conditions.

Q And what did the study find?

MR. SHEEHAN: If we could just actually blow

up the conclusion and relevance.
A I mean, the last sentence sums it up. It says, "These findings suggest ranitidine is not converted to NDMA in gastric fluid at physiologic conditions."
Q What does that mean in laymen's terms?
A As we've discussed before, it's saying that this in vitro data indicates that under normal use of ranitidine, it won't nitrosate to form NDMA.
MR. SHEEHAN: If we could go to page 7 of this document, and if you could just highlight and blow up the last two sentences in the top paragraph and just highlight "and other pH values."
BY MR. SHEEHAN:
Q Now, you had mentioned a study by Braunstein earlier. Do you recall that, Dr. Harvey?
A Yes, yes, I do.
Q Is the Braunstein study that's being referenced in Gao 2021 the Braunstein study that you were thinking of in connection with in vitro evaluation of the nitrosation of ranitidine?
A Yes, it is.
Q Could you read what's been highlighted into the record?
MR. WATTS: Objection, form.

A Yes. "At other pH values, Braunstein, et al., used 50,000 micromolar per liter nitrite, which is approximately 88,000-fold greater than the 95th percentile of fasting nitrite at pH levels between 2 and less than 3 and approximately 3,500-fold greater than combined fed and fasting, Figure 1 and Figure 2 in the supplement. None of the experiments in the study by Braunstein, et al., included physiological conditions."

Q Have you reviewed the study by Dr. Braunstein?

A I've certainly read it. It's been a long time since I've read it.

Q Do you have an understanding as to whether any of the experiments that were performed and studied by Dr. Braunstein included physiological conditions?

A Well, my understanding was similar to this, that they were excess con -- the incubations were in excess concentrations of nitrite.

Q Again, just in laymen's terms, what does that mean in terms of predicting what might happen when the product is used clinically?

A It's similar to the Gao conclusion. It's that under typical physiological conditions, that you wouldn't get NDMA forming following dosing of ranitidine.

Q And are the results of Braunstein and Gao

consistent with the earlier nitrosation studies that you describe in connection with your responses to the EMA?

A I mean, yes, in the sense that if you put an excess of nitrite in -- I mean, here Braunstein used the 50,000 micromolar, 50 millimolar -- is that you can get nitrosation of ranitidine. We know that can happen. But that reaction is specific to those conditions, an excess of nitrite, and that it doesn't occur with lower nitrite concentrations that are indicative of physiological nitrite levels.

Q Do you have an understanding as to whether any clinical trials were performed evaluating nitrosation of ranitidine?

A Yes. There's another study by an author named Florian, I think.

MR. SHEEHAN: If we could just bring up -- we can get rid of this and bring up Florian and call it Harvey Defense Exhibit 2.

(Harvey Defense Exhibit No. 2 was marked.)

BY MR. SHEEHAN:

Q Dr. Harvey, what we're looking at in Harvey Defense Exhibit 2 is a study entitled, "Effect of oral ranitidine on urinary excretion of N-nitrosodimethylamine (NDMA), a randomized clinical trial." Did I read that correctly?

A Yes, that's correct.
Q And it's published by -- the first named author is Florian and there are a number of other authors, correct?
A That's correct, yeah.
Q Do you have an understanding as to where the authors of this study are employed?
A Yes. It's the same organization. It's the FDA.
Q And do you have an understanding of what this study found?
A Yeah, it'd be good if we could see the conclusion.
Q Sure.
MR. SHEEHAN: You can take that down and just highlight the conclusions.
A I mean, again, they summarized in the last line that the findings do not support that ranitidine is converted to NDMA in a general healthy population.
Q Are the findings from this human clinical trial consistent with the data from the in vitro studies that you've evaluated and that we've discussed?
A Well, yes, in the sense that they -- they're not seeing ranitidine converting to NDMA in vivo.
Q Are you aware of any evidence supporting or

demonstrating that NDMA is increased after ingestion of ranitidine?

A Well, no. What we have got is in vitro data that simulates the gastric conditions, and we've discussed those. And we have this study, this data -- this clinical data that indicates that that doesn't happen.

Q Did FDA evaluate other parameters besides the urinary excretion of NDMA in this study?

A They looked at urine as the primary outcome. I think they looked at plasma as a secondary outcome.

Q And to your understanding, was there any evidence that NDMA in plasma was increased after ingestion of ranitidine?

A No. And I think if you went to the results, it would probably describe it, but that was my understanding was the primary outcome --

MR. SHEEHAN: If we go to table 2 -- I think it's table 2. There we go. If you just want to blow up table 2.

Q And you can take your time and take a look at this, Dr. Harvey, but let me just ask, is there any evidence in the -- well, in the pri -- you mentioned that the primary outcome was urinary excretion, correct?

A Yeah, that's correct, yeah.

Q Okay. And that's the -- that's the first outcome in which data is recorded in this table, correct?
A Yes, that's correct.
Q And is there any evidence that ingestion of ranitidine increased NDMA in the urine that's presented in this table?
A No, there isn't. And I should caveat that this is a clinical study. I'm nonclinical, but, you know, I've read the results and conclusions, but that's the table saying there's no statistically significant difference between the groups.
Q Same question for plasma, which is under the exploratory outcomes. Is there any evidence that ingestion of ranitidine increased NDMA in plasma of patients who took ranitidine?
A No. I'm looking at that last column as well. There was no statistically significant difference, and that's reflected in the results and conclusions. I'm not an expert in clinical trial design, and obviously I've seen this study and I'm aware of the context of all the data around ranitidine.
Q And in the context of all the data around ranitidine, would you characterize it as consistent?
A Yeah, yeah.

Q Consistent in what sense?
A I mean, I think we touched on it before, that the in vitro data and this in vivo data isn't showing evidence that ranitidine is converted to NDMA in vivo, in humans. Sorry.
MR. SHEEHAN: You can take this down. Could we bring up what was previously marked as Plaintiffs' Exhibit that, I believe, is 4928? It's the Johnson study. I have a couple questions about that, if I could find it here.
BY MR. SHEEHAN:
Q Do you recall counsel for plaintiffs asked you some questions about this study titled, "Permitted daily exposure limits for noteworthy N-nitrosamines," first named author George E. Johnson?
A Yes, I do. Yeah, I remember the conversation.
Q And you're a co-author of this paper, correct?
A That's correct.
Q And I believe you indicated that Dr. Johnson was an expert in the modeling aspects that were indicated or explored in this paper, correct?
A That's correct, yeah.
Q Counsel for plaintiffs represented to you that data from female rats that were collected and studied by an author named Peto were ignored for purposes of

publishing this study. Do you recall that?
A Yeah, yeah, I do. I do remember that conversation.
Q Have you had an opportunity to review this study since that -- since those questions by counsel for plaintiffs?
A Yes, I've reread it.
MR. SHEEHAN: Could we go to page 299 of this study, please, and if we could just blow up the capture under figure 2 there.
Q Dr. Harvey, was the data from female rats in the study by Peto ignored in connection with the evaluation that was done by George Johnson and the co-authors in this paper?
A No. It says, "For completeness, analysis of the female dose-response data resulted in BMD CI bounds of BMDL 10 of .283 and .367 mgs per kg."
MR. SHEEHAN: Can we just highlight that sentence that begins "For completeness"? It's the middle -- there you go.
Q And just as a matter of interest, seeing the results for the female rats that are represented in this paper, do you have an understanding of what would happen to the calculations for the benchmark dosing levels for permissible daily exposure to NDMA if the data for

female rats were included in the calculation?
A Yeah, the values would be higher, so as I said -- as I said, George is the subject matter expert in it, and he selected the data that he did, and so it would look like he selected the male data because it was -- it was at a lower value so it would end up providing a lower PDE value. So the male data provides a more conservative assessment.
Q Okay. In other words, if the female data were included, the permissible daily exposure calculation would go higher for NDMA, correct?
A Yeah, yeah. In essence, that's correct.
Q Dr. Harvey, you were asked about GSK's code of conduct. Do you recall that?
A I do, yeah.
Q In your 20 years of employment at GlaxcoSmithKline, is GlaxcoSmithKline a science-driven company?
A Yes, it is, yeah.
Q And what do you mean by that?
A I mean, it's an R&D organization, certainly the area I work in. We're there to conduct science, the science that contributes to the development of new medicines.
Q And has that commitment to science ever

resulted in hiding relevant data related to one of its products?

A Not to my knowledge. Certainly not in my experience in nonclinical safety, no.

Q How would you characterize GSK's commitment to patient safety?

A As I said, it's a top priority. It's in our code of conduct as well.

Q In your 20 years of experience at GSK, has anybody ever questioned your integrity?

A No, no.

Q Do you consider that GSK conducted a robust and transparent assessment of issues around NDMA in ranitidine?

A Yes, I do. We answered those questions that we got to the best of our ability and with the data that we had. Yes, I do.

Q Do you consider that GSK conducted a robust transparent assessment of issues around potential carcinogenicity of ranitidine?

A Yes, I do, yeah.

MR. SHEEHAN: Thank you very much for your time, Dr. Harvey. I don't have any further questions at this point.

MR. WATTS: Dr. Harvey, I do, but I need about

five minutes, so if we could take a five-minute break, I would appreciate it.

THE VIDEOGRAPHER: We are now going off the record. The time is 1918 UTC, 3:18 p.m. EDT.

(A 21-minute recess was had.).

THE VIDEOGRAPHER: We are now back on the video record. The time is 1939 UTC, 3:39 p.m. EDT.

- - - - -

REDIRECT EXAMINATION

BY MR. WATTS:

Q I want to ask you about five issues that counsel for GSK just asked you about. The first issue was he said that some of the test results showed NDMA levels above the limit and some below. Do you recall that?

A Yes, I do, yeah.

Q How many NDMA test results has GSK either performed itself, commissioned, or seen from third parties?

A I don't know. I don't know the results of that full analysis. It's an activity being governed by our chemistry organization.

Q What percentage of the tests on ranitidine showed NDMA levels above 96 nanograms, the regulatory limit?

A I -- I think I've answered that. I don't know the answer to that, so -- you disappeared from the screen. Sorry. I don't know the answer to that. I said that in the answer.

Q Well, do you know whether the total number of NDMA tests done on ranitidine is more or less than 25?

A I don't know. I don't know what lots they've analyzed, what drug substance, drug products they've analyzed.

Q How did you know that some are below?

MR. SHEEHAN: Objection. I think I asked would it surprise him to learn that.

Q I'm not asking about surprises and learning. I'm asking what you know. My question is very specific.

How do you know that some of the test results of ranitidine show NDMA levels below the regulatory limit?

MR. SHEEHAN: Objection.

A I said that I didn't know the outcome of that root -- that document root cause -- the outcome of that analysis. I don't know the answers. We spoke about particular lots. I don't know the full scale of it. It's not an activity that I'm totally familiar with.

Q Do you know whether or not the majority of all

the tests done on ranitidine show a level above the regulatory limit?

MR. SHEEHAN: Objection.

A No, I don't -- I don't know. I don't know the outcomes of those studies.

Q If you took a test and missed more than half the answers, you'd get an F, wouldn't you?

MR. SHEEHAN: Objection.

A I don't know the answer to that question. I know it's related to I don't know the outcome of all the analyses.

Q Okay. So you're not asking for a blue ribbon for test results that you haven't looked at yet, are you?

MR. SHEEHAN: Objection.

A I'm sorry. I don't know -- I don't know what that means.

Q Blue ribbon means you did good.

A Okay. Sorry. Okay. No. I'm saying I don't know the outcome of all of those assessments.

Q And the people that do know the outcome of all of those assessments initiated a worldwide recall of ranitidine, right?

MR. SHEEHAN: Objection.

A Well, that was initiated by the PIRC -- the

PIRC team.
Q And the PIRC team had access to all the test results, right?
A Well, I think that we continued to test and get information as part of that PIRC activity, then a recall --
Q And as --
A -- occurred -- sorry.
Q I'm sorry. Go ahead.
A I said I think that recall occurred in October of 2019. I don't think we had all the analytical data there. I don't -- I don't know. I mean, there was an action to recall the product.
Q Based on --
A I don't know the outcome of that assessment.
Q Okay. Well, there was a -- and your point's a good one. There was a decision to recall the product based on test results up to that time frame, right?
MR. SHEEHAN: Objection.
A There was a decision to recall the product, yeah, based on the data we were getting I think.
Q And as the testing was continuing and months and months went by, was there a decision based on the subsequent testing to put the product back on the market?

A No, there was no such decision.
Q Okay. Second issue. Let's put up Exhibit 3157, second page. You're talking about the Tanner study, and I believe that the last three lines under my yellow highlighting were blue highlighting and said, well, the 40 millimolars is not what would be considered the standard use of the product, right?
A Which part of the section are you referring to?
Q The bottom of the blowup, the last three lines --
A Okay. Yeah, yeah, I see that.
Q To be clear, it was GlaxcoSmithKline's Dr. Tanner who decided what levels of millimoles to use in this testing back in 1982, right?
MR. SHEEHAN: Objection.
A Well, in this particular study, they were referring to values either related to the WHO NAP test, that 14 millimolar value or that .3 millimolar value for nitrite, yes, Dr. Tanner did the study.
Q Actually, Dr. Tanner did the study on .3 millimolars and 40 millimolars, right, not 14?
A Sorry if I said 14. 40, yeah.
Q And when he used 40 millimolars of nitrite for the test that he did for GSK in 1982, what was the yield

of NDMA that was formed in nanograms?
A I don't recall what they were in nanograms. I remember the 3.1 percent yield. I think it was in the hundred -- hundred nanograms, hundred-plus, hundred and -- maybe 160 or something like that. I can't recall exactly.
Q Would you feel more comfortable estimating based on looking at his report?
A Yes. Sorry.
Q Let's go to --
A That would be helpful. Thank you.
Q Let's go to page 6 of the Tanner report. Show the cover page first of 4162. That's the Tanner report you're referring to, right?
A That's correct.
Q And if we go to page 6, we can see the quantity of NDMA that was formed.
MR. WATTS: That's page 4. We need to go to page 6. One more. There we go. Now, blow up the second paragraph.
Q When ranitidine was incubated with sodium nitrite 40 millimolars under the condition, 232 micrograms of NDMA were formed. Do you see that?
A I -- I do see that text.
Q And 232 micrograms is the same as 232,000

nanograms, right?
A It is when it's incubated with that 40 millimolar sodium nitrite, yeah.
Q Okay. So 40 millimolars together with 10 milliliters of ranitidine created 232,000 nanograms of NDMA, right?
MR. SHEEHAN: Objection.
A It was -- the 10 millimolar ranitidine and 40 millimolar nitrite, yeah, that's correct.
Q And, again, the daily limit for NDMA, according to the EMA and the FDA, is 96 nanograms, not 232,000, right?
MR. SHEEHAN: Objection.
A That's the daily limit for NDMA as an impurity in a drug product. That's a lifetime limit, as we've discussed. And this is a value that is occurring under that 40 millimolar nitrite, yes.
Q Sure. 232,000 is a lot more than 96. You'd give me that, right?
MR. SHEEHAN: Objection.
A 232 micrograms is more than 96 nanograms, but as I've said, that 96 nanograms is a limit for NDMA in the drug product, a lifetime limit. And this is a value that's -- well, an amount of NDMA that's forming under these in vitro conditions that we discussed.

Q Yeah, this is forming in a single day, right?

MR. SHEEHAN: Objection.

A Well, it's forming in an excess of nitrite in an in vitro study.

Q In a single day.

A Well, it's occurring in the realms of this study, but it's still occurring in excess of nitrite. It's that chemical reaction, so it's an excess of nitrite.

Q So if you multiply 232,000 nanograms times 365 days, that would be 84,680,000 nanograms formed in a year if you took ranitidine with this nitrite condition every day, right?

A I think -- I understand the math that you've done, but this is talking about levels of NDMA formed in these in vitro -- in this in vitro setting with an excessive nitrite that isn't considered physiologically relevant.

Q That's not my question. My question is if you multiply 232,000 nanograms produced with a nitrite-rich level right here and ranitidine and you do that for 365 days, you end up with 84,680,000 nanograms; right? That's what the math would say.

MR. SHEEHAN: Objection.

A I mean, I understand what you're saying, and

if you repeated this study for 365 times, then I could understand that math. It's very much in the context of this study.

Q Sure. And if you repeated this study not only 365 times but you did it for 70 years, that would give you 5,927,000,000 nanograms over the course of one's life, right?

A I can't do the math that quickly, but I think --

Q Is that more than --

A -- we're talking -- sorry. We're talking about the levels of NDMA that's forming in this in vitro study under these set conditions?

Q Is 5,927,000,000 nanograms more than 96 nanograms allowed by the regulatory authorities over a lifetime?

MR. SHEEHAN: Objection.

A You're talking about a chemical yield in vitro studies relating ranitidine -- involving ranitidine and nitrite, and you're equating that chemical yield in that in vitro setting to a lifetime limit for NDMA in a drug product. So I can't draw the two together, so I can't answer your question.

Q Let's draw together the results that Dr. Tanner gave us when he used the .3 millimolars of

nitrite in his further experiments. If we go to the bottom paragraph, explain for me from Dr. Tanner's report how much NDMA was produced in the .3 millimolars experiment?

A Well, my understanding from this -- and again, it's an analytical biochemistry question -- is the summary that he's saying is that in those incubations with .3 millimolar nitrite, the incubations -- I'll read it -- "gave a low intensity signal, in the n/z 74 records, that were similar to that observed in the analytical record of an extract of control gastric juice incubated without drugs." What he's saying in the analysis between that incubation and the control without drug, without ranitidine were the same.

MR. WATTS: Objection, nonresponsive.

Q My question is how much NDMA was produced when he used .3 millimolars of nitrite? Do you know?

A Well --

MR. SHEEHAN: Objection.

Q Did he quantify it?

A No, he didn't quantify it, but I can't take a quantification from this summary. Effectively what this is this saying is that the incubation is the same as the control.

Q So Doctor, last time, do you know the level of

NDMA produced in the .3 millimolar nitrite test, or do you not know because he never revealed it in his report?

MR. SHEEHAN: Objection.

A Well, I'm not quite sure about the word "reveal." I can just read the conclusion of the study, and what that study is saying is that that incubation, .3 millimolar nitrite and ranitidine, were the same as that of the control without the drug.

Q Didn't ask that. I asked how much NDMA was produced. Can you tell me that by looking at this report or not?

MR. SHEEHAN: Objection, asked and answered.

Q How many nanograms?

A There isn't a nanogram value.

Q Thank you.

A We know that. It's saying that it's the same as the control.

Q Now, if we look at the first test with 40 millimolars and the second test with .3 millimolars, the first test has 133 times the amount of nitrites as the second; is that fair?

A So just give me a moment. If we're looking at first experiment --

Q 40 millimolars dividing into .3, which is second experiment, that's 133.33 times the amount of

nitrite between the two tests, right?

A Yeah, I'll take your word for it. It is about that right. That sounds about right, 133.

Q Now, if you divide 232,000 by 133.33, that yields 1,740 nanograms of NDMA if this is a linear relationship, right?

MR. SHEEHAN: Objection.

A You're talking about a chemical reaction here. It's chemistry you're describing. I'm not a chemist. I don't know if it's appropriate to do that extrapolation, so I can't really comment on your extrapolation either way.

Q Can you comment on my math, that 232,000 divided by 133.33 yields 1,740 nanograms?

MR. SHEEHAN: Objection.

A I don't know if that's an accurate extrapolation to make, so I can't really comment on it.

MR. WATTS: Let me see the screen share, please.

Q If you divide 133.3 into 232,000, it yields 1740.4 nanograms, doesn't it?

MR. SHEEHAN: Objection.

A Well, I mean, you've done this calculation. I don't know if that extrapolation you're doing is appropriate. It's a chemistry calculation.

Q But the math is the math, right? It shows that, right?

MR. SHEEHAN: Objection.

A I mean, if you're following your Excel table, I can understand if you divide that number -- the 232,000 by 133.3 that you get that result. But I don't know if that is a relevant calculation to apply to the Tanner study.

Q Sure. It's no less relevant than not putting a figure down in your report. You'd give me that, right?

MR. SHEEHAN: Objection.

A Well, I don't know how to compare those two statements.

Q Well, let me ask you this: Is 1740 more or less than 96 nanograms?

MR. SHEEHAN: Objection.

A Again, you're taking values, extrapolated values from an in vitro study and then extrapolating that to a limit that others used to define -- well, you're extrapolating it to a number that's used to define a number for NDMA in drug products. So, again, you're comparing things. I'm struggling to follow the comparison.

Q Before Mr. Sheehan asked you to comment on the

Tanner study, did he ask you to read the deposition that I took of Dr. Tanner?

A I've seen that deposition, yeah.

Q And you've seen the portion of the deposition where we talked about what the World Health Organization NAP test protocol actually requires versus what he did and did not do, right?

MR. SHEEHAN: Objection.

A Well, so, he's taken some aspects of the WHO NAP test, yeah, the 40 millimolar.

Q Yeah. And for example, he took his samples after four hours, not after one hour and four hours as the NAP test requires, right?

A Well, the WHO NAP test is a test and it defines different limits. I'm sure that you're aware of the -- the experimental outline that's been defined in the various documents, and he's done an assessment at four hours.

Q Yep, and not at one with hour as is called for by the World Health Organization NAP test protocol, right?

MR. SHEEHAN: Objection.

A Well, there's -- the WHO -- I don't think they're doing a WHO NAP test. They're doing a nitrosation assay of ranitidine. What they're doing is

a study to see if ranitidine nitrosates.

MR. WATTS: Put Exhibit 4162, page 6, back up on the screen. Blow up the first three lines of the second full paragraph.

Q In his report, he said he did it under the condition of the World Health Organization NAP test, right?

A Yeah, that's correct. That's what's written.

Q And you read where I showed him the World Health Organization NAP test protocol that requires a draw after one hour and after four hours, right?

A That's correct.

Q And he only did it after four hours and did not do it after one hour, right?

A Yeah, that -- that's correct, yeah.

Q How long does it take the body to metabolize NDMA? Is it less than one hour or more than one hour?

A I -- I don't know the exact answer to that. So are you referring to this -- this may have been metabolized in this study?

Q Doctor, I'm just asking you the question do you know how long it takes for NDMA to metabolize in the human body?

A My understand -- my understanding is that it can be metabolized by cytochrome P450s in the body. I

don't know the exact times of how quickly it is.

Q Is it more or less than 15 minutes?

MR. SHEEHAN: Objection.

A I don't know. I just -- I don't know how quickly it gets metabolized.

Q Let's go to topic number three, which is Braunstein, Gao and Florian. Were you involved in any of those three tests?

A No, no, I wasn't.

Q When was the Braunstein test published?

A Was it in -- I can't remember if it was 2020 or 2021. Sorry.

Q Well, let's go to Defense Exhibit 1, which is the Gao study, and let's go to page 9 of 11 where Braunstein is referenced in footnote seven.

A Okay.

Q So it was reported in 2021 well after this litigation was underway, right?

A Okay.

Q The Gao study was reported in July of 2021, well after this litigation was underway, right?

MR. SHEEHAN: Objection.

A That's correct.

Q And --

A As far as I understand it.

Q And the Florian study was published on June 28, 2021, well after this litigation was underway, right?

A That's my understanding, yeah.

Q When the Braunstein study was published in early 2021, did the FDA change course and permit the commercialization of ranitidine in the United States?

A No, not to -- no -- no, they didn't.

Q When the Florian study came out on June 28th of 2021, did the Food and Drug Administration change course and permit the commercialization of ranitidine in the United States?

A No, no. They didn't, no.

Q When the Gao study came out on July 20th of 2021, did the Food and Drug Administration of the United States change course and allow ranitidine to be sold in the United States?

A No. No, they didn't, no.

Q Doctor, you were asked about female rats and what's more conservative and what's not. When you had a look at the study that excluded the female rats, were you able to determine for the jury how many cancerous tumors were excluded by that choice?

MR. SHEEHAN: Objection.

A No, no. No, I can't recall that, no.

Q Do you have the study in front of you?
A I do, yes, here.
Q Does Johnson ever say that he excluded female rats from his analysis?
A No. I think what -- what we're saying is that he includes an assessment of the female rat data, but the associated BMDL10s would be higher than those of the males, so he's using the male data to be more conservative.
Q Yeah, Doctor, that really wasn't my question. My question was did Johnson ever say that he excluded a certain number of female rat tumors from his analysis?
A Oh, sorry. No, I don't recall that, no. But I would defer to George on that, as I said before.
Q You and George go by first-name basis now, huh?
A George Johnson, that's the guy's name.
Q Yeah. Did George ever tell James, "Hey, in this study that I've already published, I excluded a bunch of female rat tumors from the analysis"? Did you know that before -- did you know that before Ms. Luhana pointed it out to you this morning?
MR. SHEEHAN: Objection.
A I think what I was covering was there's a comparison here of a mutagenicity endpoint and a

carcinogenicity endpoint and that the selection of those issues were to relate those two endpoints in the same tissue type. That was -- that's the understanding.

MR. WATTS: Objection, nonresponsive.

Q My question was did you know before Ms. Luhana pointed out to you this morning that George, meaning George Johnson, had excluded female rat tumors from his analysis?

MR. SHEEHAN: Objection.

A Earlier on I deferred -- that discussion I was deferring to George Johnson about that particular aspect.

Q I know you're deferring to him, but you guys were co-authors on this work that you're doing right now, right?

A Yeah, and as I said before, it's George's expertise in the modeling aspects, and this is a -- this is -- what this study's about is a potential framework for analyzing in vivo mutagenicity data and carcinogenicity data and modeling and extrapolating from that data in a different way to that linear extrapolation.

Q Mr. Harvey, did you know before this morning that he'd excluded female tumors? Yes or no?

MR. SHEEHAN: Objection.

A Well, as I said, I would defer to George about the selection of the tissue types because we're trying to compare specific tissue types.

Q I didn't ask that. I want to know whether you knew before this morning that he excluded female cancerous tumors from his analysis?

MR. SHEEHAN: Objection.

A Well, so --

Q Did you know?

MR. SHEEHAN: Objection.

A We had that discussion this morning. There's a decision about the tissues that were selected and George is the expert there.

Q That wasn't my question. Did you know that George excluded the female tumors from the analysis before this morning? Did you know that?

MR. SHEEHAN: Objection.

A I mean, there was -- we've been through this this morning. There was a discussion about it. This is a description of an approach to model and extrapolate mutagenicity data and carcinogenicity data, and we're trying to get those endpoints in the same part of the tissue, so --

Q Dr. Harvey, the way that American litigation works is you're not permitted not to answer my question.

You can't just dodge the question and refuse to answer it. So let me try again for the last time and then you can live with whatever answer you want to give.

Before Ms. Luhana pointed it out to you this morning, did you know that George Johnson had excluded female tumors from his analysis? Yes or no?

MR. SHEEHAN: Objection both to the preamble and to the mischaracterization of the document. Go ahead, Doctor.

A So George has selected a particular tissue, and so, yeah, okay, that was a discussion that was had this morning. So that was explained to me, and the answer is I didn't -- I didn't know exact details of why George selected those tissues.

Q I mean, you didn't understand that he deselected the tissues that showed tumors, right?

MR. SHEEHAN: Objection, mischaracterizes the document.

A He -- yeah, he's -- you're saying he deselected. I'm saying he selected a particular aspect of the data, so, yeah.

Q He had access to both piles of the data, the males and the females, right?

A Yes, he did.

Q Okay. And he excluded one with tumors and

included one without tumors, right?

MR. SHEEHAN: Objection, mischaracterizes the document.

A And, again, he selected a particular type of carcinogenistic data to put into this particular framework that he's worked on.

Q Dr. Harvey, fifth topic, the code of conduct. The whole time you've ever been at GSK you've never seen them withhold safety data. That was your testimony 30 minutes ago, right?

A Yeah, that's my experience of working in nonclinical safety.

Q Now, I want to show you Exhibit 3155. And this is a press release from the United States Department of Justice, Office of Public Affairs published on July the 2nd of 2012, and its title is "GlaxcoSmithKline to plead guilty and to pay 3 billion dollars to resolve fraud allegations and failure to report safety data. Largest healthcare fraud settlement in United States history." Do you see that, sir?

A I do, yeah.

Q And as we look at the first paragraph, it says, "Global healthcare giant, GlaxcoSmithKline LLC, (GSK) agreed to plead guilty and to pay 3 billion dollars to resolve its criminal and civil liability

arising from the company's unlawful promotion of certain prescription drugs, its failure to report certain safety data, and its civil liability for alleged false price reporting practices, the Justice Department announced today. The resolution is the largest healthcare fraud in United States history and the largest payment ever by a drug company." Did I read that correctly?

A Yes, you did read that correctly.

Q And in the second paragraph, "GSK agreed to plead guilty to a three-count criminal information, including two counts of introducing misbranded drugs, Paxil and Wellbutrin, into interstate commerce, and one count of failing to report safety data about the drug Avandia to the Food and Drug Administration. Under the terms of the plea agreement, GSK will pay a total of 1 billion dollars, including a criminal fine of 956,814,400 dollars and a forfeiture in the amount of 43,185,600 dollars." Do you see that, sir?

A Yes, I do see it, yeah.

Q And the third paragraph it says, "GSK will also pay 2 billion dollars to resolve its civil liabilities with the federal government under the False Claims Act, as well as the states. The civil settlement resolves claims related to Paxil, Wellbutrin and Avandia, as well as additional drugs and also resolves

pricing fraud allegations." Do you see that, sir?
A I do see it, yeah.
Q Now here's my question: When the company that you work for -- and you worked at GSK in 2012, just so we're clear, right?
A Yes, I did, yeah.
Q When the company pled guilty to a federal criminal information for failing to report safety data, am I to understand that you never even heard about it?
A I -- I -- I don't recall this. I don't recall this event. I'm assuming it's related to clinical safety data, but it's --
Q Dr. -- go ahead. I'm sorry.
A No, I'm assuming this is relating to clinical safety data. As you know, I work in nonclinical safety, and that's the area I've worked in and I was working there in 2012. I -- I don't really -- I didn't interact with the clinical safety organization in 2012. So I can read what you're saying, right. I can read what's on the screen.
Q Dr. Harvey, as an employee of GSK in 2012, do you recall receiving at least a memo from the management of GSK that says, "We're now a convicted felon. We really don't want this to happen again, therefore, you should change your conduct." Did you get any memo like

that?

A I --

MR. SHEEHAN: Objection. Hold on.

THE WITNESS: Sorry.

MR. SHEEHAN: Objection. Go ahead.

A So I -- I recall there was -- there's been various initiatives over the years about code of conduct and ways of working at GSK and that's been rolled out. I suspect that one of those code of conduct -- code of conduct training pieces was related to this. It's 2012. It's -- it's -- yeah, it's a long time ago. But, I mean, there's certainly code of conduct that took place. I'm almost certain it would be related to this in some way.

Q When GSK agreed to pay a total of a billion dollars, including a criminal fine of 956,814,400 dollars, were you informed about it by the management at GSK?

A I -- I expect that we were informed. It's something that we should be transparent about to our internal employees. I don't recall it exactly, but I --

Q Okay. And do you recall when GSK agreed to pay an additional 2 billion dollars to resolve its civil liabilities with the federal government under the False Claim Act? Do you recall being told --

A No, I -- no, I don't recall this exactly. I know we've had code of conduct and I know there has been various practices in the past and that code of conduct's in there to address it. I know very much about my -- the world of nonclinical safety. But, yeah, I can read what you're saying. This is not great. You know, it's very serious stuff. I can see that.

Q Mr. Harvey -- I'm sorry. Go ahead. I apologize.

A No. I mean what you're saying is very important, and it's -- it's not good practice. But, yeah, I read it and I understand what you're saying.

Q Dr. Harvey, when you say it's not good practice, you would agree it's not good practice to fail to report safety data, right?

MR. SHEEHAN: Objection.

A Yes. That's the case here, yeah.

Q And if you've got an efficacy study that shows no efficacy of a drug and you fail to report it, that's not good practice, right?

A Well, I --

MR. SHEEHAN: Objection.

A I don't work in the clinical space, so I'm not familiar with that. What I do know is about the practices in place in nonclinical safety.

Q Well, whether it's clinical or nonclinical, if you run studies to prove the efficacy of your drug and they show no efficacy, it's not good practice to fail to report that data. Would you agree?

MR. SHEEHAN: Objection.

A I can't talk to that area. It's clinical safety. What I do know, and I think we've discussed it at some point, is this piece about the initiative to publish the data from clinical trials now at GSK.

Q Well, let me just refine my question. If it's specific to nonclinical data and you get a result that GSK doesn't like, is it good practice to bury the study and not report it?

MR. SHEEHAN: Objection.

A No, of course not, if we generate nonclinical safety data on a -- in my experience of working at GSK, if we're working on an active project and it's in development, we disclose the data on that asset, the nonclinical data.

Q And if the nonclinical data shows a safety issue, you absolutely should report it. It would be bad practice not to. Agree?

MR. SHEEHAN: Objection.

A Well, I can only talk about my experience at GSK since I've been there, and that's the -- that's the

approach that's in place.

Q Well, let's talk about your experience. You were first told about the Tanner study in November of 2019, 37 years after it was run, right?

A Yes, that would be correct, yeah.

Q Are you aware that the company that you work for has admitted in sworn papers in this lawsuit that they failed to disclose the Tanner study to the FDA before 2019?

MR. SHEEHAN: Objection.

A Again, that area is a regulatory area. It's about disclosure of documents. It's not an area that I'm an expert in.

Q Have you been told whether or not they disclosed that before you first saw it 37 years after that research was done?

A I don't know the answer to that question. I know that we disclosed it to the FDA and EMA after we located it.

Q Sure. And that should be -- something like the Tanner study should be disclosed to the US FDA and the European Medicines Agency. You agree?

MR. SHEEHAN: Objection.

A Well, we disclosed it in the context of the questions being asked by EMA, so it is pertinent to that

question.

Q And it should have been disclosed because it relates to NDMA, a probable human carcinogen, right?

MR. SHEEHAN: Objection.

A Well, we disclosed it as part of our EMA response --

Q And it should have been.

A -- which was relevant to NDMA.

Q Yeah. And when the federal regulatory scheme says that when you're in the midst of a new drug application, that you have to submit all the information, what makes it okay to bury a study with respect to NDMA for 37 years?

MR. SHEEHAN: Objection, mischaracterizes the record.

A I don't know the decision process that's in place at GSK in 1982. I can only talk about today, and I can talk about what we did when we found that Tanner study and we disclosed it --

Q When you --

A -- to EMA and FDA relating to EMA's question.

Q Yeah, when you disclosed the Tanner study to the Food and Drug Administration for the first time in 2019, GSK was no longer selling Zantac in the United States; is that right?

A I don't know about the commercial aspects of it. I'm sorry. I don't know. I don't know what we were selling in what country. I know that we disclosed it as part of our EMA response.

Q If you stopped selling Zantac in the United States in 2016, the disclosure of the Tanner study 37 years after it was done was not provided to the United States Food and Drug Administration until after GSK had stopped selling the drug in the United States; isn't that right?

A I don't know. I told you I don't know about that particular aspect of the regulatory submissions and disclosures. I know that we submitted it when we found it in response to the EMA questions.

Q Doctor, it's been almost two full years since the recall of ranitidine by GSK, right?

A Yes, that's correct.

Q At any time during those two years, has ranitidine -- has ranitidine been available for sale anywhere in the world?

A I don't know because I don't know about the commercial aspects. My understanding is that GSK commissioned a recall in October 2019.

Q And based on all the work you've done since October of 2019, have you written a memo to anybody at

GSK stating that you believe the recall should be reversed and ranitidine should be sold again by GSK?

A I don't recall writing a memo like that, no.

MR. WATTS: Those are all my questions. Thank you, sir.

MR. SHEEHAN: Give us just two minutes, Mikal.

THE VIDEOGRAPHER: We're now going off the video record. The time is 2019 UTC, 4:19 p.m. EDT.

(A 14-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the video record. The time is 2032 UTC, 4:32 p.m. EDT.

MR. SHEEHAN: Dr. Harvey, thank you so much for your time today. I don't have any further questions.

MR. WATTS: Dr. Harvey, thank you. It's nice to meet you, sir.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We are now going off the video record. The time is 2032 UTC, 4:32 p.m. EDT.

(The proceedings were concluded at 4:32 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of JAMES S. HARVEY, Ph.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 299 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 4th day of October, 2021.

Laura J. Landerman

LAURA J. LANDERMAN, RDR, CRR, FPR-C

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, Notary Public, State of Florida at Large, do hereby certify that JAMES S. HARVEY, PH.D. remotely appeared before me this 30th day of September 2021 and was duly sworn/affirmed.

WITNESS my hand and official seal this 4th day of October, 2021.

Identification: British passport

__________________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C

A C K N O W L E D G E M E N T

I, JAMES S. HARVEY, Ph.D., certify that I have read the foregoing transcript of my deposition given under oath on September 30, 2021; and that the transcript is a true, complete and correct record, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any attached on a separate sheet herewith.

______________________________

JAMES S. HARVEY, Ph.D.

Sworn and subscribed before me,

this _____ day of _____________, 2021.

________________________________

Notary Public, State of ______________

ERRATA SHEET - USL Job No. 384129

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

I, JAMES S. HARVEY, Ph.D., do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record with the exception of the corrections listed below:

PAGE # LINE # CORRECTION

------------------------------------------------------------

_________ __________________________

DATE SIGNATURE OF WITNESS

# EXHIBIT

# 17

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY
LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

______________________________/

VIDEO-RECORDED DEPOSITION BENJAMIN HATTEN, M.D., M.P.H.

Taken on behalf of the Zantac PSC
(via videoconference)

DATE TAKEN: Tuesday, May 17, 2022

TIME: 10:30 a.m. - 8:50 p.m. EST

PLACE: US Legal Support - Remotely

%

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

TRACY A. FINKEN MAGNOTTA, ESQ.
CATELYN McDONOUGH, ESQ.
Anapol Weiss
One Logan Square
130 N. 18th Street -- Suite 1600
Philadelphia, Pennsylvania 19103
cmcdonough@anapolweiss.com
tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC,

COURTNEY GRIFFIN, ESQ.
Chaffin Luhana, LLP
600 Third Avenue -- 12th Floor
New York, New York 10016
griffin@chaffinluhana.com

Appearing on behalf of the Zantac PSC,

THOMAS J. SHEEHAN, ESQ.
PEIYUAN GUO, PH.D., ESQ.
Shook, Hardy & Bacon, LLP
1325 Avenue of the Americas -- 28th Floor
New York, New York 10019
tjsheehan@shb.com
PGuo@shb.com
and
MARIHAM YAFT, ESQ.
Shook, Hardy & Bacon, LLP
1660 17th Street -- Suite 450
Denver, Colordo 80202
myaft@shb.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC,



A P P E A R A N C E S: (cont'd)

ASHLEY ALLEN CARR, ESQ.
DLA Piper LLP (US)
303 Colorado Street -- Suite 3000
Austin, Texas 78701
Ashley.carr@dlapiper.com
and
SETH YOST, ESQ.
DLA Piper LLP (US)
1900 North Pearl Street -- Suite 2200
Dallas, Texas 75201
seth.yost@dlapiper.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC,

ALEXANDRA BACH LAGOS, ESQ.
Greenberg Traurig, LLP
333 SE 2nd Avenue -- Suite 4400
Miami, Florida 33131
lagosa@gtlaw.com
and
JAMES R. BROWNING, ESQ.
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE -- Suite 2500
Atlanta, Georgia 30305
browningj@gtlaw.com

Appearing on behalf of the Defendant, Teva Pharmaceuticals,

PATRICK F. TOOHEY, ESQ.
Goodell, DeVries, Leech & Dann
1 South Street -- Suite 2000
Baltimore, Maryland 21202
ptoohey@gdldlaw.com

Appearing on behalf of the Defendant, Perrigo,



A P P E A R A N C E S: (cont'd)

FRANK H. STOY IV, ESQ.
JASON M. REEFER, ESQ.
Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP
One Oxford Centre
301 Grant Street -- 38th Floor
Pittsburgh, Pennsylvania 15219
fhs@pietragallo.com
jmr@pietragallo.com

Appearing on behalf of the Defendants, Ranbaxy Inc. and Sun Pharmaceutical Industries, Inc.

THE VIDEOGRAPHER: Carlos Coello
THE DEPO TECHNICIAN: Greg Cassin
ALSO PRESENT: Krystal Kelly with Anapol Weiss
Florenz Cruz with King & Spalding



I N D E X

TESTIMONY OF BENJAMIN HATTEN, M.D., M.P.H.

| | |
|---|---|
| Direct Examination by Ms. Finken | 7 |
| Cross-Examination by Mr. Sheehan | 226 |
| Redirect Examination by Ms. Finken | 233 |
| Recross-Examination by Mr. Sheehan | 239 |
| CERTIFICATE OF REPORTER | 242 |
| CERTIFICATE OF OATH | 243 |
| ACKNOWLEDGEMENT | 244 |
| ERRATA SHEET | 245 |

E X H I B I T S

| | |
|---|---|
| Exhibit No. 6332 | 37 |
| Exhibit No. 6334 | 37 |
| Exhibit No. 6335 | 21 |
| Exhibit No. 6337 | 79 |
| Exhibit No. 6338 | 67 |
| Exhibit No. 6341 | 234 |
| Exhibit No. 6343 | 25 |
| Exhibit No. 6344 | 24 |
| Exhibit No. 6346 | 215 |
| Exhibit No. 6348 | 156 |
| Exhibit No. 6355 | 144 |
| Exhibit No. 6358 | 150 |
| Exhibit No. 6361 | 169 |
| Exhibit No. 6365 | 198 |

THE VIDEOGRAPHER: We are now on the record. Participants should be aware that this proceeding is being recorded and as such all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.

This is the remote video-recorded deposition of Benjamin Hatten, M.D., M.P.H., being taken by counsel for the plaintiff. Today is Tuesday, May 17th, 2022. The time is now 1438 UTC, 10:38 a.m. EDT.

We are here in the matter of In re: Zantac



(ranitidine) Products Liability Litigation. My name is Carlos Coello, remote video technician on behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome.

At this time will the reporter, Laura Landerman, on behalf of US Legal Support please swear in the witness?

THE REPORTER: Doctor, do you consent to my swearing you in remotely?

THE WITNESS: I do.

THE REPORTER: Please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

DIRECT EXAMINATION

BY MS. FINKEN:

Q Good morning, Dr. Hatten. My name's Tracy Finken. We were briefly introduced off the record. I'm going to be taking your deposition today.

Can you state your name for the record, please?

A Benjamin Hatten.

Q And where are you located today?



A Denver, Colorado.

Q And are you at your offices or a law office?

A It's the Shook, Hardy & Bacon office in Denver.

Q Okay. And who is present with you in the room today?

A Just Tom.

Q And you're referring to Mr. Sheehan?

A Correct.

Q Is there anybody else in the room with you today?

A No.

Q Do you have anything in front of you for this deposition? Notes or documents at all?

A I have a printed out copy of my report, but that's the only physical item I have.

Q Do you have a computer other than the computer that you're doing the Zoom on? Do you have a tablet or access to a phone or any other computer?

A No. It's just the one I'm doing the Zoom on, but I have a second monitor with the exhibit share access on that.

Q Do you have any other applications open on the computer in front of you?

A Just Zoom and the Box account for the exhibit



share.

Q And do you have a cell phone or iPhone or anything like that in front of you?

A Not in front of me. It's put away.

Q And other than your report, do you have any other documents?

A No.

Q And is your report annotated at all? Are there notes or anything like that in it?

A There were two typos that I had not -- or minor errors I had noticed reading through the report again in preparation for the deposition, so I made a note just in case that came up and that those needed to be addressed.

Q Okay. And what were those typos?

A One was in the discussion of -- on page 63, in the discussion of Dr. Salmon's analysis, at the bottom of the middle paragraph, it says -- I'll wait a moment till you get there. It says NDMA from exhalation and that should say inhalation or dietary sources.

Q Okay. And what was the other?

A The other was the discussion of the bladder cancer human epidemiology -- let me get to the page -- page 26, when looking at the Norgaard study, the confidence interval was incorrectly entered. When

compared to users of PPI, there was a slight increased risk of bladder cancer, relative risk 1.24, 95 percent confident interval. It should be 1.04 to 1.48 rather than 0.72 to 1.10.
Q And you said it should be 1.14 to --
A 1.04 to 1.48.
Q Were there any others?
A Those were the only notes I made.
Q Okay. Dr. Hatten, during the course of the deposition, do you agree not to communicate with anyone while we're on the record, including your counsel that's in the room with you?
A Yes, I agree.
Q And when I say "communicate," do you understand that I mean also e-mail or text communications?
A Yes.
Q Have you ever had your deposition taken before?
A Yes.
Q How many times?
A I don't have an exact number, but roughly ten.
Q And so you've been down this road before. Have you ever had your deposition taken by Zoom?
A I think one -- one time, I believe. I've done



it once at least. I don't recall if it's been more than that, though.
Q Okay. So just I'll give you some general instructions. I know you've done this before, but just like we discussed off the record, if you can just let me get my question out before you respond, and if your counsel objects, let him get his objection out on the record before you respond so that the court reporter can take down everything that we're saying.
It's especially difficult for her to do that when we speak over each on Zoom. It's hard enough when we're in a regular room together, but when we're on Zoom, it completely blocks out the sound from somebody else speaking, so she can't pick up the two of us talking at once or if we speak over each other. Do you understand that?
A Yes.
Q And if you need to take a break at all, we can certainly take a break. I would just ask that if there's a question pending, that you answer the question first, and then we can go off the record and take a break. Just, you know, let me know if you need one. Okay?
A Okay.
Q And just try to keep all of your answers



verbal today. The court reporter can't take down a nod of the head or an "uh-huh" or "huh-uh." It needs to be yes or no or verbal answers. Do you understand that?
A Yes.
Q And if you don't understand any of my questions, just let me know, and I'll do my best to rephrase them and make sure that you understand them. However, if you answer my question, I'm going to assume you understood that; is that fair?
A Yes.
Q And if at any time, I know I said this before, that you can't hear me or the technology, you know, starts to glitch or anything like that, just let me know so we can go off the record and we can get it situated before we continue. Okay?
A Yes.
Q Who retained you in this case?
A Shook, Hardy & Bacon is currently the firm I'm engaged with.
Q Have you ever done any work with Shook, Hardy & Bacon prior to this case?
A I can't recall if I have or not. I just don't -- I don't remember.
Q And who reached out to directly?
A I believe it was Kim Penner was the initial



person.
Q Do you know how Ms. Penner came to find your name?
A I don't. I don't know the details.
Q And when did Ms. Penner first reach out to you?
A I believe it was the fall of 2019, but I don't recall the exact date.
Q And had you ever spoken to Ms. Penner before?
A No. That was the first time I'd spoke with her -- I had ever spoken with her.
Q You have indicated that you've had your deposition taken approximately ten times before. What types of cases were those?
A It's a variety of case, always as a medical toxicology expert. Aside from one case that was a medical-legal case where I also testified as to standard of care for opioid prescribing, but all the other cases have been as a causation or interpretation of toxicology information or pharmacology testimony.
Q Were these cases civil cases or were they criminal cases?
A I believe every case I've had my deposition taken has been a civil case. There's a chance that I am not recalling one, but to the best of my recollection.

Page 14

Q Out of the cases where you have provided testimony before, how many of those were on behalf of plaintiffs?
A I don't recall, but I would estimate a third to half probably.
Q And when you said that you -- one of the cases that you testified in was a medical-legal case testifying to the standard of care, was that a medical malpractice case?
A Correct.
Q And for that case, were you testifying on behalf of plaintiffs or defendants?
A Plaintiffs in that case.
Q How many times have you provided an expert report in a case where you did not testify? I know we talked about you had testified approximately ten times. Can you estimate for me how many times you've provided a report but you didn't actually testify?
A I would have a hard time giving you an exact number. Definitely more than ten times, but I don't know an exact number.
Q That's okay. Do you have an approximate number?
A Maybe 25 to 50 times over the course of my career, but I don't -- that is a very rough estimation

Page 15

and I don't know how accurate that is.
Q And can you give me any type of breakdown as to what discipline that you were testifying -- or strike that.
Can you give me a breakdown as to what those cases involved? Were they mostly as a medical toxicology expert or were there any other types of cases that you provided a written expert report?
A I believe all of those were as a medical toxicology expert.
Q Did any of those cases involve nitrosamines or NDMA?
A None of those cases involve nitrosamines or NDMA.
Q Did any of them involve ranitidine or Zantac?
A No.
Q Have you ever testified -- strike that.
Have you ever provided expert opinion regarding carcinogenicity of certain agents?
A Yes, I have, although I don't -- I would have a hard time giving you exact details, but I have provided medical toxicology testimony as to carcinogenicity.
Q Do you recall the agents or agent?
A I can't recall the details at the moment, so I

Page 16

don't want to give you incorrect information.
Q Okay. Do you -- well, strike that.
Did you -- were the majority of the cases where you provided expert opinion involving acute events? Do you understand what I mean by "acute events"?
MR. SHEEHAN: Objection.
A If you mean by -- or I guess my understanding of an acute event is a short-term exposure or a brief episode of harm or pathology, and my testimony has not been limited just to acute events. It also has involved chronic exposures and long-term disease processes.
Q What type of chronic exposure cases have you provided expert opinion on?
A I've provided expert opinion a number of times with respect to asbestos or talc and medical device -- concerns over chronic toxicity related to medical device implants and formaldehyde exposure. I would -- that's -- that's not the -- a comprehensive list, but those are some representative examples.
Q Thank you. When you provided expert testimony in relation to asbestos exposure, was that on behalf of plaintiffs or defense?
A That has always been defense.
Q And do you have an opinion one way or the

Page 17

other as to whether or not asbestos is a carcinogen?
MR. SHEEHAN: Objection.
A I believe asbestos is recognized as a carcinogen given sufficient exposure.
Q And in relation to talc, were you testifying on behalf of plaintiffs or defense?
A Defense.
Q Do you recall the lawyers that retained you in relation to expert opinions you provided in asbestos cases?
A I -- I don't, and it has been -- different firms have -- or firms have changed names and cases have moved, so I don't have a good handle on exactly who -- what names to associate with which cases.
Q Okay. When you provided -- well, strike that.
Does the same hold true for your opinions that you provided in talc cases, or can you identify any of the firms that you did work for in relation to talc?
A I think the most recent firm was Arnold Porter, but that is just the most recent case that I can recall having been engaged on.
Q And you said that was on behalf of defense, correct?
A Correct.
Q You had indicated that you also provided

expert opinion in relation to medical device implant cases; is that correct?
A Correct.
Q Okay. And what types of medical device implant cases did you provide expert opinion on?
A This was with respect to a coating on -- that was developed by, I believe, Atrium Pharmaceuticals, and the question was related to chronic exposure to a component of that coating. I don't recall the exact details of the case. It was a few years ago. So I don't know that I could provide additional substantive information at the moment.
Q Was that on behalf of plaintiffs or defense?
A That was on behalf of the defense.
Q Do you have an opinion as to whether or not talc is a carcinogen?
A Again, I would -- I would have to review the exact context of the question you're asking it in, but in general, I do not believe that cosmetic talc is a carcinogen.
Q And you had also indicated that you had provided an expert opinion relating to formaldehyde exposure; is that right?
A Yes.
Q And what was the context of formaldehyde



exposure?
A It was related to excess formaldehyde in new construction homes and a number of homeowners who had alleged exposure to formaldehyde.
Q And were you testifying -- or strike that.
Were you providing expert opinion on behalf of plaintiffs or defense in that case?
A Plaintiffs.
Q And what was the substance of your opinion in relation to formaldehyde exposure?
A That a number of the health effects that the plaintiffs were alleging were likely related to their formaldehyde exposure and --
Q And what type of effects were they alleging?
A It was primarily local symptoms in the upper airway, some respiratory -- additional lower respiratory symptoms and mucosal irritation, and I believe there were some headache claims as well. That may not be comprehensive and that's just to the best of my recollection at the moment.
Q And do you have an opinion as to whether or not formaldehyde is a carcinogen?
MR. SHEEHAN: Objection.
A I believe there's likely sufficient evidence for formaldehyde as a cause of nasopharyngeal cancer.



Again, just to qualify the answer -- and, again, as a function of the appropriate exposure, but -- or a sufficient exposure, but there is human evidence to support that.
Q Were the plaintiffs in the case that you provided expert opinion in relation to the effects of formaldehyde, were they alleging any type of carcinogenic effect?
A My understanding of the complaint was that the -- the allegation was primarily related to local effects following exposure. However, there was -- there was a -- there were conversations about potential risk of cancer. I do not know how that fit into the actual -- the formal complaint.
Q Were you providing any type of opinion on the risk of cancer associated with formaldehyde exposure in that case?
MR. SHEEHAN: Objection. Let me just caution you don't need to disclose any conversations that you may have had with attorneys that did not result in an expert opinion, you know. To the best of your recollection, you can answer.
A To the best of my recollection, it was -- I don't recall if it was discussed in the deposition, but in either a report or a rebuttal report I discussed the



inability to quantify potential risk of cancer, but that there was an exposure to a -- a -- a compound that is known to be associated with cancer -- causally associated with cancer in humans.
Q Okay. Are any of these cases that we just discussed still ongoing?
A Not -- none of -- the Atrium case and formaldehyde case are not. I believe I've been contacted regarding a talc case, but I don't know the status of those cases at the moment. So I may -- I may be actively involved, but I don't know how -- what the situation is at the moment, so --
(Exhibit No. 6335 was marked.)
Q Okay. Understood. Let's pull up and mark your report in this case as Exhibit 6335. Doctor, can you see that okay?
A Yes. I have it pulled up on the exhibit share box as well.
Q And do you recognize this as the expert report that you produced in this case?
A It appears to be the identical to the expert report that I produced.
Q And is that your signature on the front page there?
A Yes.

Q And it's dated March 7th, 2022?
A Yes.
Q And does this expert report contain all of your opinions you intend to offer in this case?
MR. SHEEHAN: Objection.
A Yes, based on the questions that were asked at the time I submitted the report.
Q Which defendants hired you to prepare this expert report?
A I was engaged by an attorney firm that my understanding represents GSK.
Q Did you write this report yourself?
A Yes.
Q Did you use a research assistant or resident or a fellow or anything of that nature to assist?
A No.
Q How much time did you spend writing your report?
A I don't -- I don't recall, but it was an extensive amount of time. But I don't recall the exact number of hours.
Q And who selected the documents on which you relied to draft your report?
MR. SHEEHAN: Objection.
A I -- I selected all documents that I relied



upon in drafting this report.
Q Did you ask your counsel for any documents?
MR. SHEEHAN: Objection.
A There were -- there were times I had asked for, I believe, company studies and manuscripts that I did not have access to on publicly available -- in the publicly available peer-reviewed literature.
Q When you reviewed the documents in preparing your report, did you annotate them or take any notes?
A No. I just keep a running draft as I draft a report, and so there's only a final product at the end.
Q And have you submitted your Zantac expert report in this case for peer review or publication?
A No.
Q Are you offering your opinions on behalf of all of the named defendants in this case or just GSK?
A I'm offering my opinion as a toxicology expert related to the matter at hand. I don't know that it's tied -- it's not intended to be tied to a single defendant or anything like that. It's my assessment of the science in the case.
Q Along with your expert report, you provided a materials considered list, I believe, which you've marked as Exhibit B to your report.
MS. FINKEN: Let's mark that as -- hold on one



second. Let's mark that as Exhibit 6344 to your deposition.
(Exhibit No. 6344 was marked.)
BY MS. FINKEN:
Q Do you see we pulled up the Exhibit B to your expert report, which we marked as Exhibit 6344 to your deposition, which is the materials that you indicated you considered in preparing your expert report. Do you see that?
A Yes.
Q Did you prepare this document or did your counsel?
MR. SHEEHAN: Objection.
A I compiled the list. I don't know if I did the formatting for this.
Q In looking at -- bear with me for one second. If you can take a moment to look at that, we tallied up the material that's on your materials considered list, and it appears there are 489 references on that materials considered list in total. Does that sound about right to you?
A That sounds correct.
Q And did you review all of these documents to prepare your report?
A Yes.



Q Have you reviewed any deposition transcripts from this case to prepare your expert report?
A I believe -- it's marked on the materials considered. There's a deposition of Lior Braunstein on page 25.
Q Did you review any others?
A I believe that was the only one that was available at the time I -- or that I reviewed at the time I submitted the report.
Q And you also submitted a copy of your curriculum vitae when you submitted your expert report; is that right?
A Yes.
(Exhibit No. 6343 was marked.)
Q And we're going to mark your curriculum vitae as Exhibit 6343 to your deposition. And Dr. Hatten, is this CV that's attached to your report a true and correct copy of your current professional qualifications, credentials and publications?
A Yes, as of November of 2021. I typically update my CV every six months or so, and so this was the -- that was the last time I updated it.
Q And have you had any articles published since November of 2021 when you last updated this CV?
A I'm not aware of any pertinent to this case.

I believe there is a clinical policy, an emergency medicine clinical policy that I'm not sure if it's actually in press yet or not but sometime around now will have been published.

Q And is that a peer-reviewed publication?

A Yes. Those are publications in the Annals of Emergency Medicine. I serve on one of the emergency medicine or the American College of Emergency Physicians Clinical Policies Committee, and they are all published in Annals of Emergency Medicine, kind of the leading emergency medicine journal.

Q I just taking a look at your CV briefly, it looks like you -- it looks like up until 2013 you practiced as an emergency room physician; is that correct?

A I was -- I graduated from medical school in 2006 and then did an emergency medicine residency, which is four years -- or the program I was in was a four-year residency program, so I finished that in 2010. And then I worked for a year as an academic attending emergency medicine physician in Denver, and then began a medical toxicology fellowship and a master's in public health program in 2011. Those extended from 2011 to 2013. Since 2013, I have worked as both an emergency physician and medical toxicologist.



Q So from 2000 -- so you are still currently working as both an emergency -- emergency department physician and a medical toxicologist?

A Correct.

Q And where do you work as an emergency department physician?

A The university of Colorado hospital.

Q And can you at all quantify how much time you spend working in the emergency department versus working as a toxicologist?

A Yeah, I probably work two -- half to two-thirds of the time as a medical toxicologist and about a third of the time as an emergency physician, although there is some overlap because some of my emergency medicine faculty duties, teaching duties -- I will teach emergency medicine trainees or medical students rotating in the emergency department. I typically focus on medical toxicology topics, although not exclusively. So there's some variability, but it's roughly half and half or maybe slightly tilted toward or tilted a little bit towards toxicology in a breakdown of my time.

Q You've used the term "medical toxicologist" several times now. How do you -- what is -- strike that.



What is a medical toxicologist?

A A medical toxicologist is a subspecialist, so it's a recognized subspecialty by the American Board of Medical Specialties that is -- it's physicians who have specific expertise on toxic exposures, both acute and chronic exposures, withdrawal syndromes and kind of anything that has to do with chemicals, chemical or other foreign exposures in humans.

It's not -- doesn't mean that medical toxicologists don't have expertise in animal toxicology or laboratory toxicology, but the ultimate goal of the specialty is examining the health effects in humans and providing care for those patients.

Q Looking at your list of publications that begin on page 29 of your curriculum vitae -- if we can turn to page 29. Thanks. It's page 29 of the actual report, not 29 of the PDF. Thank you. There we go. And if you can just scroll down a little bit to publications. There we go.

You have a listing here that's titled "Original Research." Do you see that?

A Yes.

Q And if you -- it continues on to the next page, onto page 30, and there are eight publications listed as original research. Do you see that?



A Yes.

Q Is that the extent of the publications -- well, strike that.

Are these all peer-reviewed publications, these eight?

A Yes. All of those are peer-reviewed publications.

Q And it goes on to list that systematic review evidence-based practice guidelines, beginning with number 9 and continuing to page 32, number 28. Do you see that?

A Yes.

Q And then it also lists a medical education publication as number 29, establishing an emergency medicine education research network.

A Yes.

Q Do you see that? And what type of publication is that?

A That was the work product of a consensus conference that was associated with an academic meeting, and it was published in a peer-reviewed publication, but it was not a -- it was not original research and not anything hypothesis -- it didn't test any hypothesis or anything like that. It was a reporting or a description of the work at the conference and kind of suggestions

for steps going forward.
Q It also indicates here at the bottom of page 32 a subheading of case reports and then there is a listing of it looks like six case reports there. Do you see that?
A Yes.
Q And these are published case reports that were published in peer-reviewed journals?
A Yes, although the MMWR publication is kind of its own -- those publications are reprinted or at least at the time were reprinted in JAMA and then MMWR is directly released by the CDC. So it is reviewed, but it is slightly different than a typical journal. That's number 32.
Q I see that. Thank you. And then there's another subheading "Editorials and Letters," and you have one publication listed there; is that correct?
A Yes.
Q And then there's a book which is titled, "The Critical Care Toxicology, 2nd Edition"; is that right?
A Yes.
Q Is that a textbook?
A Yes, that's a medical toxicology textbook.
Q And then there's some book chapters in nonpeer-reviewed publications listed from pages 33 to



34; is that right?
A Yes.
Q And I looked through your publications that are on pages 29 through 34 of your -- of your curriculum vitae, and did you publish at all on -- have you been published at all on NDMA or nitrosamines?
A Not -- no, not specifically on those topics in the peer-reviewed literature.
Q And have you published any peer-reviewed articles relating to carcinogenesis?
A No.
Q Have you conducted any research pertaining to NDMA or nitrosamines?
MR. SHEEHAN: Objection.
A No original research.
Q And when you say "original research," what do you mean by that?
A Typically, the methodology I use when generating an expert report is the same as I would use in performing a systematic review. So it's not an original study or anything like that, but it uses -- I use the same methodology when I generate a report that I would when I was doing a systematic review for publication.
Q So aside from the research that you conducted



for purposes of generating the expert report in this case, have you conducted any other research separate and apart from analyzing the literature and the research that you conducted to prepare your expert report in relation to NDMA or nitrosamines?
A No additional research.
Q Have you ever conducted any type of epidemiological studies relating to NDMA and cancer?
A No.
Q Have you ever conducted any epidemiological studies relating to nitrosamines and cancer?
A No.
Q Have you ever conducted any epidemiological studies relating to dietary or nutritional factors in cancer?
A No.
Q Have you ever conducted any epidemiological studies relating to cancer at all?
MR. SHEEHAN: Objection.
A Not -- not -- none that have been published. I have -- during my public health training, I did some evaluation of databases with cancer outcomes within the field of toxicology, but nothing that was ever published.
Q Did you -- was the work that you did



evaluating databases with cancer outcomes submitted for publication at all?
A No.
Q What was -- what was the purpose of that work?
A It was all within the context of epidemiology and statistical training.
Q Was a part of the coursework that you -- well, let me back up for a minute.
You have a master's in epidemiology; is that correct?
A I have a master's in public health with an emphasis or the track that I entered for that degree is epidemiology and biostatistics. Curriculum is roughly similar to a master's in epidemiology, but it also included the core M.P.H. courses that are required for an M.P.H. degree, so it's granted as an M.P.H. rather than an M.S. in epi or anything like that.
Q So was that -- the work that you did evaluating databases with cancer outcomes part of the coursework and training that you undertook as part of that master's program, or was it --
A It was within that program. I don't recall if it was specific to a certain course or if it was working with a mentor on a project. I just recall examining or doing work with some of those cancer outcome databases.

Q Which databases did you work with?
A I don't recall which ones. It was decades ago.
Q Okay. Fair enough. It also indicates in your CV that you have some board certifications; is that correct?
A Correct.
Q And what are you board certified in?
A Emergency medicine and medical toxicology.
Q You had indicated before in your practice of emergency medicine, I believe you said it was for the University of Colorado; is that correct?
A Correct. I'm associate professor at University of Colorado School of Medicine.
Q Do you teach any courses on toxicology?
A Yes. I teach both in the school of public health, the medical -- and the medical school, and then am an instructor or faculty for the emergency medicine residency program and the medical toxicology fellowship here in Denver.
Q Do you consider yourself to be an expert in cancer causation?
MR. SHEEHAN: Objection.
A I'm considered to be an expert in medical toxicology, which includes cancer causation with respect



to toxicological exposures or exposures to potential toxins in humans.
Q Do you consider yourself to be an expert in pharmaceutical regulatory matters?
A I'm familiar with some regulatory -- pharmaceutical regulatory matters, but I don't hold myself out as an expert in pharmaceutical regulation.
Q Have you conducted any original epidemiological research?
A On any topic or --
Q On any topic.
A Yes.
Q And what topics?
A Primarily medical toxicology-related research. If you look at my publications, we can discuss in detail -- whichever ones you want in detail.
Q Have you designed epidemiological studies?
A Yes.
Q Have you conducted any type of animal toxicology studies in your career or during the time frame that you were being trained in toxicology?
A I have not personally conducted animal toxicology studies.
Q Are you a risk assessment expert?
MR. SHEEHAN: Objection.



A I would say I'm familiar with the principles of risk assessment, but I don't purport to be a risk assessment expert within the context of formal risk assessments as offered in this case.
Q And you're not an oncologist, correct?
A That's correct. I'm not an oncologist.
Q And you're not a pharmacologist?
A Medical toxicologists and pharmacologists have a -- are sometimes -- sometimes share the same job roles, but typically a pharmacologist is a Ph.D. or a master's in pharmacology, and there's a large degree of overlap between our knowledge base and expertise. But the kind of distinction is that a medical toxicologist is a physician who treats and cares for patients at the bedside and is in addition to the kind of mechanism and pharmacology is also an expert in the disease processes in humans.
Q And it's fair to say, though, you don't have a Ph.D. or master's in pharmacology, correct?
A Correct. Can I qualify? I do have an appointment in clinical pharmacology at the University of Colorado School of Medicine within the -- my primary appointment is in emergency medicine, but I have a secondary appointment in internal medicine and clinical pharmacology.



(Exhibit No. 6332 was marked.)
Q Let's mark the notice of deposition as Exhibit 6332. Doctor, have you seen this document before?
A Yes. I believe my counsel e-mailed it to me.
Q And in response to this document, you produced some invoices; is that correct?
A I believe so. I have sent all invoices to the firm, and I believe they provided copies of those.
Q And did you produce any other documents to your counsel in response to this document?
A I don't -- I don't believe so.
Q You understand that you're giving testimony today just as you would be if you were giving testimony in a courtroom?
A Yes.
Q And do you understand that your testimony today is being videotaped and that it may be shown to a judge and/or jury at trial?
A Yes.
Q Is there any reason that you cannot testify truthfully or accurately today?
A No.
(Exhibit No. 6334 was marked.)
Q Okay. Let's mark your invoices as

Page 38

Exhibit 6334 to your deposition. And Doctor, for the sake of ease in scrolling through these, we combined all of the invoices that you provided to us into one PDF document that we're going to attach as Exhibit 1 to your deposition. Okay?
A Okay.
Q And looking at your invoices, it looks like the first invoice is dated November 30 of 2020; is that correct?
A I believe so.
Q Okay. And if you look at -- there's a listing on the right upper hand corner that it's attention, Erik M. Krause, Esquire. Do you see that?
A Yes.
Q And who is Mr. Krause?
A I believe he is an attorney at Phillips Lytle that -- I don't know if he was a partner of Kim Penner or what the relationship was, but I think -- I assume that's where I was told to send the invoice at the time.
Q He's in charge of the bills, I guess; is that right?
A That's my understand -- or I don't know for sure, but that's where the bills were sent.
Q Okay. And does this refresh your recollection at all as to when you were first retained in this case

Page 39

or do you still believe it was in 2019?
A I think I had been contacted prior to this, but I don't know if I -- that I necessarily had performed any work. I don't recall the exact timing of things.
Q Did you sign a retainer agreement prior to engaging in the work that you conducted in this case?
A I don't recall. I don't typically sign a retainer, but I don't recall.
Q Did you sign any type of confidentiality order or anything of that nature prior to engaging in the work that you did in this case?
A I don't recall if I did or not.
Q And if you want to take a moment to look through this exhibit, I just want to know if these invoices fairly and accurately depict your time spent and the bills that you submitted for your work from 2020 through the present day.
A (Reviewing documents.) That looks consistent.
Q Do you have a practice of when you typically submit invoices to your lawyer?
A Could you clarify what question you're --
Q Yeah, I guess -- that was a bad question. Are you -- do you typically submit them monthly or is there, you know, a typical practice that you engage in on how

Page 40

you submit your invoices to your lawyers?
A Typically, I send my assistant billing, hours billed each month, and my assistant typically sends out a bill every month, although occasionally it'll be two months lumped together or something like that, but typically it's every month.
Q And it looks like the last -- if you can scroll down to the last page of this exhibit -- you have to go up a little bit. Okay. It looks like the last invoice that was submitted in dated April 10th, 2022. Do you see that?
A Yes.
Q Have you submitted any invoices since that date?
A I don't believe my assistant has submitted any additional invoices to date.
Q And this invoice dated April 10th, 2022, encompasses work that was done in the month of March, correct?
A Correct.
Q So would you have conducted any work or submitted any hours in relation to work in the month of April?
A I believe I have turned those billing notes over to my assistant, but I don't know if she has sent

Page 41

out any bills yet.
Q Do you know how many hours you would have submitted for the month of April?
A I don't know off the top of my head, but I can -- I could look, if that's helpful.
Q And we've tallied up the amount of the invoices that you've been paid from what has been produced to us and is marked here as an exhibit, and it totals approximately 230,000 dollars. Does that sound about right?
A That -- that may be correct. I know I've worked on this case for a number of years, so --
Q What did you do to prepare for your deposition today?
A I reviewed my report and -- or rereviewed my report and a number of the accompanying articles. I had also reviewed a number of the plaintiffs' expert reports or rereviewed a number of plaintiffs' expert reports and the rebuttal reports.
Q Did you speak to anyone about your deposition today?
MR. SHEEHAN: Objection. Do you mean other than attorneys, Tracy, or what are you --
MS. FINKEN: We can do it that way. Sure.
BY MS. FINKEN:

Q Did you speak to anyone other than attorneys to prepare for your deposition today?
A No.
Q And you've had -- I'm assuming that you spoke to your attorneys to prepare for your deposition today?
A Yes.
Q And how many times did you speak with your attorneys to prepare for your deposition today?
A I believe three times.
Q Did you meet with them at all?
A Yes.
Q And were those meetings in person or on Zoom or some other teleconference?
A It was a combination.
Q And in total, you believe that you met with them three times?
A I believe so.
Q And how long were those meetings?
A Anywhere from an hour to four hours, roughly.
Q When was the first time that you met with your lawyers to prepare for your deposition?
A It was, I think, the beginning of May, but I don't recall the exact date.
Q And who was present?
A Just attorneys from the firm. I don't have access to the rosters.



Q How many other people were present besides yourself?
A It depended on the meeting. One to three.
Q And I'm assuming one of those individuals was Mr. Sheehan?
A Yes.
Q And did you meet with Ms. Penner as well?
A I don't believe during those conversations.
Q Do you recall the names of any of the other individuals that were present when you met to prepare for your deposition?
A Peiyuan, I think his last name is Guo. And then I don't recall the names of other persons who were on or available or involved.
Q Was there anyone present during those meetings that is not a lawyer?
A Not -- not that I'm aware of.
Q Did you review any transcripts from depositions to prepare for your deposition today? I know you justed previously reviewing the Braunstein deposition transcript, but in addition to that, did you review any transcripts to prepare for your deposition?
A Not specifically to prepare, although I was provided a couple of deposition transcripts that I would have to look through my notes to see -- or through my file to see the specific names. I've skimmed through those depositions, but they weren't specific for preparation for this deposition.



Q The depositions of other experts in this case?
A Correct.
Q Were they plaintiffs' experts or defense experts?
A I believe plaintiffs' experts.
Q Did you review any video to prepare for your deposition today?
A No.
Q Did you have any conversations with anyone from your current practice about your deposition today?
A You're ask -- are you asking about my toxicology practice?
Q Yes.
A No.
Q Did you have any conversations, I should say, with anybody about your deposition today besides your lawyers?
A No.
Q Do you have any training in pathology?
A Just as part of the core medical school curriculum and with respect to unique pathologic findings that are involved in medical toxicology training, but I don't practice as a pathologist.



Q Okay. Are you familiar with IARC?
A I'm familiar with their publications.
Q And when I refer to IARC, do you understand that I mean the International Agency for Research on Cancer?
A Yes.
Q And just for ease of reference, I'm going to refer to it as IARC during the course of this deposition. Is that fair?
A Yes.
Q Have you ever sat on an IARC working group panel?
A I have not.
Q Were you ever invited by IARC to act as an expert on a working group panel to assess carcinogenicity of an agent?
A I don't know that I ever personally have been asked or specifically asked to do that. There have been opportunities through some of the medical toxicology organizations where they will have members who participate or they solicit members to participate, but I have not volunteered for that and have not specifically had a targeted invitation.

Q Have you ever sat on an expert panel for the National Toxicology Program to assess carcinogenicity of an agent?
A No.
Q And I may refer to the National Toxicology Program as NTP. Do you understand that NTP and National Toxicology Program are in the same -- one in the same?
A Yes.
Q Were you ever invited to sit on an expert panel for the NTP to assess the carcinogenicity of an agent?
A It's the same situation as the -- your question about IARC. Some of the toxicology organizations will solicit members for NTP or there'll be an opportunity that is disseminated to members, but I haven't had a specific targeted invitation.
Q Have you ever sat as an expert on an FDA working group panel of the carcinogenicity of an agent?
A No.
Q And same question have you ever been invited to sit on an FDA working group panel relating to the carcinogenicity of an agent?
A I have not specifically been targeted for that.
Q Okay. What is your understanding of what this



case is about?
A My understanding is that the plaintiffs are alleging that ranitidine exposure is a cause of cancer in humans with five specific types of cancers alleged as being the result of ranitidine exposure.
Q And why there -- strike that.
Why would there be a question of whether or not ranitidine exposure causes cancer?
MR. SHEEHAN: Objection.
A My understanding of the plaintiffs' theory of the case is that some samples of ranitidine have been identified or NDMA has been detected in some samples of ranitidine, and the allegation is that NDMA exposure via ranitidine use is a cause of cancer, and that's the issue at hand.
Q And what is NDMA?
A It's a nitrosamine that's found in air, water, food, various food stuff, as well as has been detected in a few pharmaceuticals.
Q And what is ranitidine?
A It's an H2RA or a histamine-2 receptor antagonist. It's typically used for acid suppression and treatment of gastritis or reflux disease in humans. It was widely used since the '80s, late '80s, early '90s.



Q Did you ever prescribe ranitidine in your clinical practice?
A Yes.
Q And how often would you prescribe ranitidine?
A I would typically prescribe H2RAs weekly, typically, in clinical practice in the emergency department. I don't know that those are necessarily always ranitidine.
Q And when you refer to H2RAs, you're referring to a class of medications known as histamine receptor antagonists; is that correct?
A Correct.
Q And ranitidine is in that class of medication, correct?
A Correct.
Q For purposes of preparing your report, were you asked by counsel to make any assumptions?
MR. SHEEHAN: Objection.
A Not -- not that I can recall.
Q Were you asked to assume that ranitidine finished dose products could form NDMA?
MR. SHEEHAN: Objection.
A As I've just stated, I haven't -- I don't recall being asked to assume anything when drafting my report.



Q When you were retained to provide an expert opinion in this litigation, what was the question that you researched?
A The primary question was the question of is ranitidine exposure a cause of cancer in humans kind of the general causation question of whether that is a valid hypothesis or if there's evidence to support that causal association. I was also asked to, as a secondary question, to review NDMA -- isolated NDMA exposure as a cause of cancer in humans.
Q And what did you do to --
MS. FINKEN: Give me one second. My realtime just shut down.
Q Going back to the hypothesis that you indicated as to whether or not there is evidence to support that ranitidine exposure causes cancer in humans, what did you do to test that hypothesis?
A I reviewed the peer-reviewed human epidemiology literature with respect to ranitidine exposure and cancer outcomes and evaluated that evidence as kind of the -- the most appropriate body of literature to answer the question that was raised, which is is ranitidine exposure a cause of cancer in humans.
In addition, I reviewed the ranitidine animal literature and in vitro literature to evaluate the --

primarily to evaluate the biological plausibility or the plausibility that this was a -- ranitidine was a potential carcinogen or a cause of cancer in humans and assess the body of literature within a causation framework.

Q So was that body of literature provided to you by counsel or did you -- did you research that body of literature yourself?

MR. SHEEHAN: Objection.

A I researched the human epidemiol -- epidemiological literature myself and all peer-reviewed animal and in vitro studies I could find. I also requested from counsel any -- any studies conducted by GSK that have not -- had not been published or any other studies that they were aware of during the drug development process or that had been submitted to the FDA in conjunction with the drug development process and any regulatory filings to attempt to have a comprehensive picture of the ranitidine literature.

Q Did you test the hypothesis of whether NDMA can cause human cancer?

MR. SHEEHAN: Objection.

A That was not the primary question I was asked to address, although I did review that given that it was an issue raised by the plaintiffs in this case.



Q And what did you review to test the hypothesis of whether NDMA can cause human cancer?

A I conducted a parallel search similar to the search I conducted for ranitidine but specific to NDMA oral exposures in humans and as well as animal and in vitro cancer outcome data, and again applied an evaluation of that literature in the context of the question can -- assuming there is some degree of NDMA exposure associated with ranitidine use, would that NDMA exposure be sufficient to be a cause of cancer in humans.

If I can add to that, I would just add that, in addition, as a medical toxicologist, this is a topic, nitrosamines and cancer outcomes, that is kind of a core part of the medical toxicology curriculum. So I didn't go into the search blind. I also had kind of an understanding of the underlying toxicologic principles that are related to this case or to this issue.

MS. FINKEN: You can take down those invoices, please. Thank you. I forgot that they were still up there.

Q So you indicated that the topic of nitrosamines in cancer outcomes is a core part of the medical toxicology curriculum; is that right?

A Yes.



Q And what -- what do you learn about nitrosamines in cancer outcomes as part of the core medical toxicology curriculum?

A I think it's a question that has been evaluated for decades primarily related to either occupational or dietary exposures as well as kind of an environmental -- potential environmental exposures, either atmospheric or drinking water exposures. And -- sorry. Could -- I may have lost the question that you were asking, but if you can clarify or remind me exactly what your -- what your question was.

Q Yeah, I was just asking what you've learned about nitrosamines and cancer outcomes as part of the core medical toxicology curriculum.

A Yeah, so I think it's kind of one of the exposures that has a substantial body of literature related to it and so it's something that we review during the -- I review during my fellowship when I review with the fellows and pharma -- or pharmacy students fairly regularly. Oftentimes, the IARC 1 and 2A carcin -- or potential carcinogens or recognized carcinogens are topics that we review regularly during the -- during the course of study and teaching.

Q Let's break that down a little bit. First of all, what are nitrosamines?



A They're organic compounds with the nitroso group. I think the name is somewhat self-explanatory, but they're found in smoked meats, processed foods, some vegetables, beers, as well as they occur naturally in the human body and in the environment. The question or I think that with respect to cancer is whether those chronic exposures are a cause of various cancer outcomes.

Q Are there nitrosamines in tobacco smoke?

A Yes.

Q How many nitrosamines are there?

A I don't -- I don't know how many nitrosamines there are. I assume you can infinitely add molecules to generate more. There are typically four or five that are discussed frequently, so --

Q If I represented that there were approximately 300 nitrosamines, does that sound about right to you?

A I -- I doubt that that is comprehensive, but there are probably approximately 300 that have been evaluated in that context.

Q Are all nitrosamines carcinogenic?

MR. SHEEHAN: Objection.

A I haven't performed a complete literature search to answer that question, but in my experience, I'm not aware that all are carcinogenic.

Page 54

Q Why are some of them carcinogenic?
MR. SHEEHAN: Objection.
A I think it depends on the exact mechanism or the exact compound you're discussing. With respect to NDMA, which I think is the nitrosamine of interest in this case, the concern is that a metabolite, the methyldiazonium ion is damaging to DNA or human cells or cells in both humans and animals is the concern that's been raised.
Q How are nitrosamines formed?
A Typically, it's --
MR. SHEEHAN: Objection.
MS. FINKEN: Tom, you faded out. I don't know if --
MR. SHEEHAN: I just said objection. That's all.
MS. FINKEN: Sorry. I wanted to make sure it was preserved for you. I'm looking out for you, Tom. I wanted to make sure it was preserved.
MR. SHEEHAN: I appreciate that, Tracy. I'll try to speak up.
BY MS. FINKEN:
Q So if we can just go back to that question, and I don't know if it was even picked up. Oh, yeah.
How are nitrosamines formed?

Page 55

A Could you provide more context for that? Are you talking about in the human body or in experimental testing?
Q Let's start within the human body.
A Typically, a nitroso group is added to an organic chain with an amine group on one end of it.
Q And would that include NDMA?
MR. SHEEHAN: Objection.
A Yes, that can include NDMA.
MS. FINKEN: Okay. You know what? We've been going a little bit over an hour. Is now a good time to take a quick break?
MR. SHEEHAN: That's fine with me.
THE WITNESS: Yeah, we can keep going or take a break, whichever you prefer.
MS. FINKEN: Let's take a five-minute break. Let's go off the record.
THE VIDEOGRAPHER: We are now off the record. The time is 1600 UTC, 12:00 p.m. EDT.
(A 18-minute recess was had.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1618 UTC, 12:18 p.m. EDT.
MS. FINKEN: Are you all set, Doctor?
THE WITNESS: Yes.
BY MS. FINKEN:

Page 56

Q One of the things I wanted to follow up with you about, you had indicated that you testified previously about asbestos, correct, on --
A Yes.
Q -- behalf of the defense?
A Yes.
Q And what was the substance of those opinions?
MR. SHEEHAN: Objection.
A I would have to review the specific case you're discussing to be able to tell you.
Q Were you testifying that asbestos did not cause somebody's injury?
MR. SHEEHAN: Objection.
A Not that I recall. I believe it was in the context of a possible -- in the context of talc exposure as well, but there was also a concern for additional asbestos exposures from various sources.
Q Okay. So the asbestos opinions that you gave were in the context of the talc litigation; is that correct?
A That's my recollection, but there may have been a time where I have discussed asbestos alone. But the majority of the times it was in the cont -- that I've discussed it, it's been in the context of talc litigation.

Page 57

Q Were you -- for purposes of the talc litigation, were you retained to give an opinion as to general causation or were you giving an opinion in a case-specific context, if you know?
A Both. I've been asked to give both opinions.
Q And in the context of a case specific, did you assess patient exposure at all?
MR. SHEEHAN: Objection.
A I assessed exposure based on the information provided to me in those cases.
Q Okay. Just going back to your expert report, which we've previously marked as Exhibit 6335 to your deposition, what opinions are you offering in this case?
A I think it's the opinions that are stated on page 3. If you look below the summary of my opinions, there are three tabs. First is therapeutic use of ranitidine is not a cause of esophageal, gastric, pancreatic, liver or bladder cancer in humans. The second is NDMA exposure in humans via ranitidine is limited to exogenous formation without evidence to support endogenous formation. At most, the exposure to NDMA from ranitidine is similar to exposure in a western diet. And the third is based on current evidence, NDMA exposure has not been established as a cause of any type of cancer in humans.

Page 58

Q Are you providing any other expert opinions in this case?
MR. SHEEHAN: Objection.
A I think those adequately char -- or adequately summarize my opinions.
Q Okay. Looking at the first opinion that you give, which is therapeutic use of ranitidine is not a cause of esophageal, gastric, pancreatic, liver or bladder cancer in humans, what is therapeutic use of ranitidine?
A It's use in the -- patient use of ranitidine in kind of real-world exposure in the setting of taking a medication as a therapy for a medical condition, so that it's not the same as an overdose or an experimental super therapeutic dose.
Q And is the term "therapeutic use of ranitidine" your term or is that a term that was provided to you by your lawyers?
MR. SHEEHAN: Objection.
A No, that's my terminology.
Q Okay. What was ranitidine indicated for?
A I believe -- I don't know -- I can't speak to what it is formally approved for. I would have to review the package insert. I would say it's used in practice or was used in practice widely for acid

Page 59

suppression related to gastritis, gastric and peptic ulcer disease and reflux primarily with a secondary usage at times for allergic reactions.
Q What was the indicated dosing of ranitidine?
A I believe it's up to 300 mgs twice a day.
Q And does the dose of ranitidine depend on the indication?
A It may differ on the package insert. I would say in practice, it is not -- it doesn't differ based on the indication.
Q So you testified previously that it can -- the dosing can be up to 300 mgs twice a day; is that correct?
MR. SHEEHAN: Objection.
A Yes. I believe that's what I just said.
Q Okay. So that means that people would take up to 600 mgs per day; is that fair?
A Yes.
MR. SHEEHAN: Objection.
Q Okay. In your report, you talk a little bit about -- well, strike that.
In your summary of opinions here, number two, you talk about endogenous formation -- an exogenous formation of NDMA. Do you see that?
A Yes.

Page 60

Q What is exogenous formation?
A It's formation outside of the body.
Q And what is endogenous formation?
A Formation within the body.
Q Do you have an understanding as to how NDMA forms from ranitidine exogenously?
MR. SHEEHAN: Objection.
A My understanding is that it's not completely clear. The theory is that under conditions of extreme heat and moisture -- or extremes of heat and moisture, the ranitidine molecule can degrade to form NDMA or can result in NDMA formation.
Q Okay. And just going back to NDMA for just a moment, is NDMA an organic chemical?
A Yes.
Q And what does it mean to be an organic chemical?
A It's a carbon-containing molecule.
Q And is it semi-volatile?
A Yes.
Q Do you have an understanding that NDMA is not currently produced or commercially used in the United States except for research purposes?
MR. SHEEHAN: Objection.
A I haven't comprehensively examined the

Page 61

availability, but I'm not aware of commercial applications for it.
Q Do you know how it's used for research purposes?
A I don't, other than what is in the published literature where there's experimental data employing -- or experiments employing NDMA.
Q And is it your understanding that those experiments employing NDMA are used to promote cancer?
MR. SHEEHAN: Objection.
A I believe in some experimental models, NDMA typically at very high or much higher concentrations than are seen or than we've been discussing in this case are used to examine cancer for toxicity.
Q Okay. And do you have an understanding of whether NDMA is used in experimental models to induce cancer in animals?
A My understanding is there are experiments that have employed NDMA that have resulted in cancer in experimental animals. There are also experiments where NDMA has been or animals have been exposed to NDMA that do not show cancer outcomes?
Q And what animal experiments have you reviewed where NDMA exposure has not resulted in cancer outcomes?
A I believe both pig and dog and nonhuman

primate studies that have not resulted in cancer outcomes as well as some rodent studies and --
Q And -- sorry. I didn't mean to interrupt you. Go ahead, Doctor.
A No, you can go ahead.
Q Were you finished with your response?
A Yes, that's sufficient.
Q Okay. I didn't mean to interrupt you, so if you weren't, I want to give you the opportunity to finish.
Does one potential industrial source of NDMA include byproducts from rubber and tire manufacturing?
MR. SHEEHAN: Objection.
A My understanding is that rubber tire manufacturing -- or NDMA is detected in workspaces in rubber and tiring manufacturing operations.
Q And what is the molecular weight of NDMA?
A I would have to look it up. I don't know it off the top of my head.
Q Okay. How would you describe the size of the NDMA molecule?
MR. SHEEHAN: Objection.
A It's -- again, I'd have to look up the molecular weight, but it's kind of a small to moderate size molecule.


Q It's my understanding the molecular weight is 74.08. Does that sound about right?
A If that's correct, then that's consistent with a small molecule.
Q In your report you refer to nanograms of NDMA, I believe, at times. Would I be able to see a nanogram of NDMA with the naked eye?
MR. SHEEHAN: Objection.
A I would not anticipate that you could see a nanogram. That's very, very small.
Q Do you agree that NDMA is carcinogenic?
MR. SHEEHAN: Objections.
A I believe there is experimental evidence in -- particularly in rats that at high doses -- higher doses than we have been discussing in this case that we see an excess of tumors. That's been seen sporadically in other species but not across all of the species. And I am not aware that there's definitive evidence that that holds true for humans.
Q What does it mean when a chemical is carcinogenic?
MR. SHEEHAN: Objection.
A Typically, the term "carcinogenic" means something that causes or promotes or -- exposure that causes or promotes cancer. There's a difference,


though, whether this is carcinogenic to experimental animals or carcinogenic -- exposure is carcinogenic to humans.
Q Do you agree that NDMA is mutagenic?
MR. SHEEHAN: Objection.
A At high doses, there is some in vitro data that there is -- NDMA interacts with DNA and can potentially cause damage to DNA but that is within the context of in vitro experiments that are not physiologic and are not similar to conditions that we encounter in the -- in real world exposures related to ranitidine use.
Q Do you agree that NDMA is genotoxic?
MR. SHEEHAN: Objection.
A That question is essentially the same as the question you've asked before, although genotoxic just means damage to genes and so it doesn't always result in a mutation. But, again, there is evidence that in nonphysiologic conditions in in vitro studies that there is DNA damage that is -- there's evidence of DNA damage, but that is in specific experimental conditions and not necessarily seen in real world conditions. There's humans and higher -- or primates and other larger animals typically have DNA repair mechanisms that are able to assist in mitigating any -- any potential damage


from exposures.
Q So you indicated previously that NDMA is mutagenic at high doses. Is that a fair accurate -- is that a fair characterization of your testimony?
MR. SHEEHAN: Objection.
A I think I said it was within the context of experimental or experiments that are non -- with nonphysiologic conditions.
Q So when you refer to high doses of NDMA, can you quantify that for me?
A We would have to -- I'd have to look at the individual studies. I think the lowest dose that has any reasonable evidence is in the Peto study. And I don't want to quote it inaccurately, so if you want to discuss exact levels -- or exact exposure levels in that study, then I'd like to look at the actual study.
Q Okay. But it's your understanding that Peto -- the Peto study has the lowest evidence of dose that's mutagenic of NDMA; is that fair?
MR. SHEEHAN: Objection.
A In animals in non -- non -- or in animals with exposures that are still much higher than anything alleged to be associated with ranitidine.
Q We talked a little bit about IARC previously. Do you know when it was first recognized that NDMA was a

probable human carcinogen by IARC?
A It's decades ago. I don't recall the exact year that it was evaluated. But, again, this is -- it's evaluated by IARC as a probable human carcinogen but not as a recognized human carcinogen. That's based on animal data and some in vitro data. But I think even IARC says there's not -- or has not raised it to the level of a recognized human carcinogen.
Q Do you know when the last time was that IARC evaluated NDMA as part of an IARC working group?
A I don't know the exact year. I would have to look at their last update.
Q Do you know whether IARC has evaluated the classification of NDMA as a probable human carcinogen since 1987?
A I know they've had the opportunity to. I don't know if they have -- whether they have chosen to reevaluate.
Q Okay. When you say that they've had the opportunity to, are you -- what do you mean by that?
A I think IARC sets their agenda and my understanding of their process is that they constantly monitor the literature, and if they feel like there's enough new literature to reevaluate an exposure, they will. For example, I think this year they just raised


H. pylori infections for gastric cancer to a recognized human carcinogen, which is one of the cancers we're talking about in this case. And so they're constantly reevaluating exposures.
Q Do you know when the last time was that they had evaluated H. pylori?
A I don't know the last time before that.
Q Okay. Do you know whether or not IARC has evaluated any literature relating to NDMA and its carcinogenicity recently and elected not to undertake a reclassification review?
MR. SHEEHAN: Objection.
A I don't have access to their internal processes.
Q Okay. Just going back to -- let's pull up what we're going to mark as Exhibit 6337 to your deposition.
MS. FINKEN: Can you scroll down for just a second, please. Can you pull that down for a minute? I think I might have the exhibit wrong. Can you pull up 6338, please?
(Exhibit No. 6338 was marked.)
BY MS. FINKEN:
Q So we're going to mark -- we're going to mark Exhibit 6338 to your deposition, and this is the IARC


Monograph volume 17 from 1978. Do you see that?
A Yes.
Q Okay. And if we can turn -- have you evaluated this for purposes of preparing your expert report in this case?
A I reviewed this document as well as the 1987 document that -- in connection with this case.
Q And this is an IARC Monograph that's evaluating the carcinogenic risk of chemicals to humans and specifically N-nitroso compounds. Do you see that?
A Yes.
Q Okay. And if we can turn to page 125.
THE DEPO TECH: Do you want page 125 of the document or the PDF?
MS. FINKEN: Of the document, please.
THE DEPO TECH: All right. Stand by.
BY MS. FINKEN:
Q And starting on page 125 of the document, it's the evaluation that is evaluating N-nitrosodimethylamine. Do you see that?
A Yes.
Q And N-nitrosodimethylamine is NDMR, correct?
A Yes. NDMA is an abbreviation for N-nitrosodimethylamine.
Q And it indicates that the IARC working group


had previously evaluated NDMA in December 1971. Do you see that?
A I see that written.
Q And they indicate that since that time, new data have become available and these have been incorporated into the monograph and taken into account in the present evaluation. Do you see that?
A Yes, I see that.
Q Can we turn to page 151, please? Under section 4.1, Experimental Data, it provides a summary of the data reported in the evaluation. Do you see that midway down the page?
A I do.
Q And it indicates that N-nitrosodimethylamine or NDMA is carcinogenic in all animal species tested, mice, rat, Syrian golden, Chinese and European hamsters, guinea pigs, rabbits, ducks, mastomys, various fish, newts and frogs. Do you see that?
A I see that as written.
Q And do you disagree with this statement?
A I believe that IARC reviewed evidence from those species. However, that sentence doesn't provide any context with respect to the exposure dose or what sort of experimental conditions were undertaken in those -- in those testing procedures.

Page 70

Q Have there been mechanistic studies conducted that show that NDMA works differently in the bodies of these animals rather than humans?
MR. SHEEHAN: Objection.
Q Strike that. Let me rephrase that.
Have there been mechanistic studies showing that NDMA works differently in the bodies of these animals compared to humans?
MR. SHEEHAN: Objection.
A I don't know that -- that question is hard to answer because I think each species physiology is somewhat unique. However, they also share a number of physiologic processes with humans. And, again, I'll bring it back to my previous statement that there's -- I believe all of those animal studies are with exposures that are dramatically greater than anything we are discussing in this case with respect to potential exposure via ranitidine.
There are also differences particularly within rodent hepatic blood flow and first-pass metabolism that kind of alters the distribution of NDMA in the body. So I would say they're not completely identical, but they do share a number of physiologic processes, those species do.
Q Do you consider IARC to be an authoritative

Page 71

resource when it comes to the carcinogenicity of an agent?
MR. SHEEHAN: Objection.
A I think IARC is well respected as an international body that attempts to evaluate potential carcinogens, but I wouldn't consider any -- any body authoritative. The data should be evaluated as the data, and that's what is important rather than statements from any organization.
Q Do you know how the IARC working group evaluates the carcinogenicity of an agent?
A They -- they have a published methodology that I think if -- if you want to discuss details of it, it's most appropriate to examine -- to review their methodology and we can discuss any specific points.
Q Have you reviewed the methodology of how the IARC working group determines the carcinogenicity of an agent?
A Yes.
Q And just going back to this paragraph here under 4.1 of this exhibit, it indicates in the second sentence, "It induces" -- referring to NDMA -- "it induces benign and malignant tumors following its administration by various routes, including ingestion and inhalation in various organs in various species."

Page 72

Did I read that accurately?
A Yes, I believe you read that accurately.
Q Okay. And do you agree or disagree with that statement?
A Again, I think my answer is similar to the prior one that there are some animal studies, particularly with exposures that are much different than what we're discussing in this case, that have demonstrated some tumor formation. I think it's also important to point out that benign and malignant tumors are very different and they're not just two forms of the same thing. They're different biological conditions or pathophysiologic conditions with malignant tumors being cancerous and benign not.
Q The IARC Monograph also states that NDMA produces tumors mainly of the liver, kidney and respiratory tract. Do you see that?
A I see that.
Q Do you agree or disagree with that statement?
A Again, similar to my prior answer, this is in the context of experimental testing at exposures much higher than what we're discussing in this case in nonphysiologic conditions in various animal species, but there are published data with tumor outcomes in some animals.

Page 73

Q The IARC Monograph further case indicates that it's carcinogenic, referring to NDMA, that NDMA is carcinogenic following its administration prenatally and in single doses. Do you see that?
A I see where that is written.
Q And it says, "In several studies, dose response relationships were established." Do you see that?
A I see where that is written.
Q Would you agree that in several studies, dose response relationships have been established between NDMA and certain cancers?
A Again, those dose response relationships are all, at least by my reading of the data, at exposures much, much higher than what we are discussing in the context of ranitidine use, a potential exposure related to ranitidine use, and it's unclear whether that dose response relationship occurs at the exposure levels we're discussing in this case.
Q Have you conducted a comparison of the levels of NDMA in ranitidine versus the levels of NDMA that were -- the levels of NDMA exposure that can be found in the NDMA human epidemiological studies?
MR. SHEEHAN: Objection.
A Could you repeat -- either repeat or rephrase

the question? Sorry. I just got lost a little bit in it.

Q Sure. Have you conducted a comparison of the levels of NDMA found in ranitidine versus the levels of NDMA exposure that can be found in the NDMA human epidemiological studies?

MR. SHEEHAN: Objection.

A I've examined both the lit -- the NDMA human epidemiologic literature and the reported estimates in those -- in that literature as well as NDMA measured in ranitidine samples. I didn't perform my own experimental testing on ranitidine. Fortunately, the FDA has done that and has provided reported estimates or reported measure amounts from ranitidine samples.

Q Have you reviewed NDMA testing on ranitidine samples completed by anybody else besides the FDA?

A I reviewed Dr. Najafi's report and his reported testing.

Q Did you review any of the NDMA testing that was conducted by the manufacturer defendants in this case?

A Yes. I believe as part of their root cause analysis, they conducted their own NDMA assays, but I don't -- I would have to re -- I would have to look back to see exactly which manufacturers did their own



testing.

Q Okay. When you're referring to the root cause analysis, are you referring to the root cause analysis conducted by GSK?

A That was the one that or that is the one that I was thinking of in that case. There may have been other manufacturers that have conducted root cause analyses, but I have reviewed the GSK root cause analysis.

Q And what is the range of NDMA, to your understanding, that was found in ranitidine samples?

MR. SHEEHAN: Objection.

A In which testing? Do you mind clarifying?

Q In any testing. What's the upper limit range of NDMA that has been found in samples of ranitidine that have been tested?

MR. SHEEHAN: Objection.

A Yeah, my understanding it's -- that it's been relatively low. I think the Florian study examined whether there was actually any NDMA found in humans after ranitidine exposure, which is really a better marker of NDMA exposure, but the -- the levels identified have been in the -- very similar to the -- would result in very similar exposures to a 96 nanogram per day permissible exposure limit that the FDA set.



Q How much NDMA was in the ranitidine samples that were provided in the Florian study?

A I would prefer to look at the manuscript to describe -- to examine their methodology if you're asking a specific question about that.

Q Okay. So you don't know off the top of your head. Is that fair?

A Not off the top of my head.

Q Okay. Let's just turn to page -- the next page of this -- oh, strike that. Go back to 151. I'm sorry.

Going down to the section labeled "Human Data," it indicates at this point in time in 1978 there were no case reports or epidemiological studies available to the IARC working group. Do you see that?

A I see that.

Q Okay. If you can turn to the next page of that document, please. And on this page, on page 152 of the 1978 monograph, it indicates that there is sufficient evidence of a carcinogenic effect of NDMA in many experimental animal species. Do you see that?

A I see that.

Q And it indicates that similarities in NDMA metabolism by human and rodent tissues have been demonstrated. Do you see that?



A I see that.

Q And it indicates that, "Although no epidemiological data were available (and efforts should be directed towards this end) NDMA should be regarded for practical purposes as if it were carcinogenic to humans." Did I read that accurately?

A Yes. I believe you read that accurately.

Q Do you agree with the statement by IARC in 1978 that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?

A I think it's important to understand the context of IARC, that they're not performing a -- the statement is not opining that the general causation question of can NDMA cause cancer or is NDMA a cause of cancer in humans, they're not answering that question affirmatively.

However, for regulatory purposes or public health purposes it out of caution is -- it may be useful to employ that. That is how I would read -- or to treat it as potentially car -- NDMA as potentially carcinogenic to humans and structure any protections for humans based on that.

Oftentimes, public health bodies or regulatory agencies are rightly very conservative in attempt to protect the public. And even though there may not be

sufficient evidence of causality, those regulations may -- they may treat it practically as a cause of cancer.

So I think those are different questions. One is how do you set up a regulatory framework to protect the public, and the other is is there sufficient evidence that NDMA is a cause of cancer. And those are different questions, but they may be based on the same body of literature.

Q Is IARC a regulatory agency?

A They are not, but they -- their recommendations are often taken up by regulatory agencies as a basis for regulations.

Q Okay. So you would agree with me, though, that IARC's recommendation -- or strike that.

You would agree with me in 1978 that IARC indicated that NDMA should be regarded for practical purposes as if it were carcinogenic to humans; is that fair?

MR. SHEEHAN: Objection.

A IARC states that -- and again, I think as I said before, it may be appropriate from a regulatory standpoint or a public health standpoint. That is much different than establishing a causal connection in humans. And I think even IARC's methodology has not



reached that same conclusion.

And I'll also point you toward the beginning of that sentence where it says "no epidemiologic data were available and efforts should be directed towards this end," that's an indication that there is a gap in knowledge that makes it essentially impossible to establish causation for this exposure.

Q So IARC indicated in 1978 that there was no human epidemiological studies available for their review, correct?

A Correct.

MS. FINKEN: Okay. You can take that down.

(Exhibit No. 6337 was marked.)

Q Let's mark as Exhibit 6337 to the deposition the IARC Monograph from 1987. Dr. Hatten, this is the IARC Monograph Supplement 7 from 1987. If you scroll down a little bit, you can see the date. Do you see that?

A Yes.

MS. FINKEN: Okay. Are you able to maximize that screen or, like --

THE DEPO TECH: Yeah, if I maximize it, that's still -- do you want me to zoom in on --

MS. FINKEN: That's better. Okay. Great. You don't have to zoom in that far. Thank you.



You can go back a little bit just so we can see the whole page. There we go.

BY MS. FINKEN:

Q So this is an IARC Monograph on the evaluation of the carcinogenic risk to humans, and it's an update of the IARC Monographs volumes 1 to 42. Do you see that?

A Yes.

Q Okay. If we can turn to page 67 of this monograph, and if you can scroll down just a little bit, and you can see N-nitrosodimethylamine is the second to last on that page. Do you see that?

A Yes.

Q And it indicates that it had been evaluated in monograph 17 in 1978. Do you see that?

A Yes. I believe that's what the numbers in brackets indicate.

Q And if you look to the far right of that document, it indicates that it's labeled 2 -- category 2A. Do you see that?

A Yes.

Q And what is category 2A under the IARC classifications?

A My understanding of their classification scheme is that 2A is reasonably anticipated or a



probable human carcinogen. I can't remember their exact wording.

Q Well, I'll represent to you that group 2A is a probably carcinogenic to humans. Does that sound about right?

A I believe that wording is accurate.

Q What does the term "probable" mean to you?

MR. SHEEHAN: Objection.

A I think within the context of the IARC recommendations, it's saying that there is enough evidence from nonhuman data that it is an exposure that deserves additional study in humans. It's not something that we should reject the -- or that we should continue to consider as a possible human carcinogen and continue efforts to evaluate. As I said before, it may be used by regulatory or public health agencies out of caution to avoid potential exposures, but it differs from IARC class 1, which is an established human carcinogen or a known or recognized human carcinogen.

Q Do you have an understanding that probable generally means likely?

MR. SHEEHAN: Objection.

A I think it's used very specifically in this classification scheme to say that it's -- it's not able to be established as a human carcinogen, but there is

concern that it is a human carcinogen.
Q So in -- strike that.
Let's turn to page 18 of this document, please. In the second paragraph on page 18 of this monograph, it indicates that these monographs may assist national and international authorities in making risk assessments and in formulating decisions concerning any necessary preventive measures. No recommendation is given for regulation or legislation since such decisions are made by individual governments and/or other international agencies.
Did I read that accurately?
A I believe you read that accurately.
Q Okay. And it goes on to state that the IARC Monographs are recognized as an authoritative source of information on the carcinogenicity of chemicals in complex exposures. Do you see that?
A I see that IARC states that about their own publication.
Q Okay. So do you disagree with that statement that the IARC monographs are recognized as an authoritative source of information on the carcinogenicity of chemicals in complex exposures?
A I think as I said before that they're well respected kind of worldwide and are frequently used as a



resource, but I don't know that saying that your own publication is authoritative makes that the case. And I'm not sure really how to interpret that language, if that's the question you're driving at in this case.
Q Okay. Let's turn to page 22 of this document, please. Okay. I'm just looking under section 9, Evidence for Carcinogenicity in Experimental Animals. Do you see that section?
A I see that section.
Q And it indicates second sentence in that first paragraph that "Information compiled from the first 41 volumes of the IARC Monographs shows that of the 44 agents for which there is sufficient or limited evidence of carcinogenicity to humans, all 37 that have been tested adequately experimentally produce cancer in at least one animal species." Do you see that?
A Yes, I see that.
Q And it goes on to state, "Although this association cannot establish that all agents that cause cancer in experimental animals also cause cancer in humans, nevertheless, in the absence of adequate data on humans, it is biologically plausible and prudent to regard agents for which there is sufficient evidence of carcinogenicity in experimental animals as if they presented a carcinogenic risk to humans." Do you see



that?
A I see that.
Q And did I read that accurately?
A I believe you read that accurately.
Q Do you agree or disagree with this statement by IARC?
A Again, I think this is similar to the discussion we've just had where it may be from a public health or regulatory standpoint it may fit with goals of reducing or eliminating potential harms to humans to treat an exposure that has evidence of carcinogenicity in animals as if they're carcinogenic in humans. That is not the same as performing a causation evaluation on an exposure to determine whether it's -- such an exposure is truly a cause of cancer in humans.
Q Would you expect NDMA to cause cancer in humans?
MR. SHEEHAN: Objection.
A I don't know that it's necessary to expect one way or another. I think you can evaluate human epidemiologic data which has occurred after this and is very mixed -- or some studies have been after this monograph, but it's been very mixed as to whether there is any association between NDMA exposure and cancer in humans.



Again, this is also removed from the question in this case, which is is ranitidine exposure a cause of cancer in humans, and that's the primary exposure that is alleged in this case or exposure of concern in this case.
Q Okay. So just going back to this statement, would you agree that IARC is stating that it's biologically plausible that NDMA can cause cancer in humans?
MR. SHEEHAN: Objection.
A I believe that IARC is stating that -- well, this sentence is not specific to NDMA. However, your question is specific to NDMA; is that correct? I just want to clarify the question.
Q Well, thank you for that, and I'll break it up. Would you agree with the statement that IARC is stating that it's biologically plausible that group 2A agents can cause cancer in humans?
MR. SHEEHAN: Objection.
A I think they are stating that animal data provides evidence of biologic plausibility for -- for an exposure to potentially cause cancer in humans. However, that is also oftentimes not the case, and many, many times experimental data that shows an association between an exposure and a cancer outcome in animals is

then not borne out in human testing. And so it's not as if the animal data gives you a sneak preview into what the human data's going to show. It's not directly correlated. Those studies have to be done in humans to know whether or not it's -- such an exposure is truly a cause of cancer in humans.

Q Can you give me examples of group 2A carcinogens that were found not to cause cancer in humans?

A I -- I don't have the entire history of the IARC 2A group in front of me. I can think of -- I can't remember if coffee was a -- at one point was a 2A or a 2B and has since been moved to a 3 based on additional human data. But I think that's an example of an exposure where there was inadequate human data or some even preliminary data that demonstrated potential concerns for cancer and then additional testing or studies have demonstrated a lack of association. But I don't have a -- I don't have a comprehensive file of all the 2A agents and then their subsequent development through time or evolving recommendations through time.

Q What is a group 2B carcinogen?

A I believe those are possible human carcinogens or based on weaker evidence, but I would have to look at their -- the monograph to make sure I'm accurately



describing what IARC uses as their classification scheme.

Q So you would agree, though, that 2A is probable human carcinogens and 2B is possible human carcinogens?

A Can we -- can I or can we look to just verify the exact wording that IARC uses? I don't want to mischaracterize their --

Q Their classifications?

A Yeah.

Q Yes. We can look at --

A Yeah, 2B is, at least based on page 32, is -- B agent is possibly carcinogenic to humans and group 3 is not classifiable. That's based on -- that is IARC's assessment --

Q And you're looking at page 32 of this document?

A Correct.

MS. FINKEN: Can we turn to page 32, please? There we go. And can you scroll up to 31 so we can see all of the classifications? Great.

Q So looking at the overall IARC classification system -- go back one page, please. Thank you -- group 1's listed as the agent is carcinogenic to humans. Group 2 is broken down into group 2A and group 2B,



correct?

A Correct.

Q And group 2A indicates that the agent is probably carcinogenic to humans, correct?

A That's what the document states, correct.

Q And let's go to the next page, please. Group 2B indicates that the agent is possibly carcinogenic to humans; is that correct?

A That's what the IARC document states.

Q Okay.

A I would also point out that group 1 under the agent is carcinogenic to humans, IARC explicitly states that this category is used only when there is sufficient evidence of carcinogenicity in humans. It implies the other categories do not demonstrate sufficient evidence of carcinogenicity in humans. So 2A does not have sufficient evidence of carcinogenicity in humans.

Q So let's go back up to group 2A. It indicates that "This category is used when there is limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in experimental animals. Exceptionally an agent may be classified into this category solely on the basis of limited evidence of carcinogenicity in humans or if sufficient evidence of carcinogenicity in experimental animals strengthened by



supporting evidence from other relevant data." Did I read that accurately?

A Yes, you read that accurately.

Q Okay. And it's your understanding that NDMA has been classified as a group 2A carcinogen by IARC as of 1987, correct?

A That's my understanding.

Q And do you disagree with the experts at IARC as to this group 2A classification as of 1987?

A I don't disagree the -- or based on my reading of the document, they followed their internal methodology in placing NDMA as a group 2A, but that is according to their internal methodology and it's based on carcinogenicity data in experimental animals.

Q And 1987 was the last time that IARC classified NDMA as part of its IARC working group, correct?

A That's my --

MR. SHEEHAN: Objection.

A That's my understanding, but I don't know if they've had internal discussions.

Q Do you know when the first epidemiological human studies were published involving NDMA and evidence of any type of cancer?

A I don't know the specific year.

Page 90

Q Do you know whether or not as of 1987 there were human epidemiological studies involving NDMA and any type of cancer?
A If I recall correctly, I believe there were some dietary or estimated exposures from environmental source studies, but I don't recall the details and would have to look at the actual manuscripts.
Q Okay. You believe that there were human epidemiological studies as of 1987 involving NDMA and human cancers?
MR. SHEEHAN: Objection.
A Again, I would have to look at the dates of early dietary and environmental exposure studies to see whether it was -- whether they were available in 1987.
Q Okay. And let's -- if you want to take a moment, Dr. Hatten, and take a look at your expert report in this case, can you identify any human epidemiological NDMA studies that existed -- well, strike that.
Can you take a look at your expert report in this case and identify for me if you evaluated any human epidemiological studies involving NDMA and cancer risks dated 1987 or before?
A I don't believe there are any specific to NDMA. There are some nitrite and nitrosamine studies

Page 91

that are not explicitly referenced in here prior to the studies in the '90s and 2000s. I don't know that they explicitly analyzed NDMA separately.
Q Okay. And when you're referring to nitrosamine studies, are you referring to epidemiological studies that evaluated nitrosamines as a class versus specific nitrosamines individually?
A Correct, or even nitrite heavy diets or waters -- water sources.
Q Okay. So just going back to --
MS. FINKEN: You can take this down. Thank you.
Q Going back to your report for a moment, you indicated that one of the three opinions listed in your summary of opinions was that the therapeutic use of ranitidine is not a cause of esophageal, gastric, pancreatic, liver or bladder cancer in humans, correct?
A Correct.
Q And to reach your conclusion that therapeutic use of ranitidine does not cause esophageal, gastric, pancreatic, liver or bladder cancer in humans, did you undertake a review of the clinical trial data in relation to ranitidine?
A Yes.
Q What specifically did you review in relation

Page 92

to the clinical trial data?
A I believe the toxicology data related to ranitidine. When you -- or can you clarify, when you say clinical trial, are you talking about experimental trials that were conducted in the process of drug development and approval?
Q I'm referring to human clinical trials that were conducted either pre- or postmarketing of ranitidine?
A Yeah, I believe I reviewed the toxicology-related trials associated with drug development and approval and then in addition the body of epidemiologic literature that has occurred since then related to ranitidine exposure and cancer outcomes.
Q Did you review any of the long-term ranitidine human clinical trial data?
A I don't -- I think it depends on what you mean by long term. Do you have a specific study in mind or a specific amount of time in mind for follow-up that you're thinking of.
Q Well, do you understand that ranitidine has an indication for maintenance therapy?
A Yes.
Q And do you understand maintenance therapy to consist of long-term use of ranitidine in patients?

Page 93

A It can, correct.
Q And did you review any of the human clinical trial data related to the maintenance therapy indications?
MR. SHEEHAN: Objection.
A I can't -- I reviewed the clinical trial data, but I can't recall a long-term follow-up -- a clinic -- an experimental trial that assessed follow-up beyond a time-limited exposure.
Q Okay. What's the longest time limited exposure that you're aware of involving ranitidine human clinical trial data?
A I would have to review the files again to give you a specific answer. I don't know that I can tell you off the top of my head. Unfortunately, we have human epidemiologic data that provides additional information for longer term exposure.
Q What's the longest term exposure that the human ranitidine epidemiological data evaluated?
A I don't want to give you an incorrect answer.
Q Take your time, Doctor.
A If I recall, it was somewhere between 10 and 20 years for mean follow-up, but I don't -- I would have to look back through the individual studies to find a specific number for you.

Q Okay. And you're referring to the follow-up to look at whether or not there was a diagnosis of cancer; is that correct?

A Yes, follow-up -- yes, as a follow-up period. There's also exposure periods that extend up to roughly a decade depending on the study.

Q Okay. What study specifically looked at ranitidine use up to a decade?

A Just a second. I think the -- some of the studies, the Scottish database, the PCCIU included exposures up to -- or median exposures of eight to ten years roughly.

Q Are you looking at a specific study in your report?

A Yeah, I'm just trying to flip through to remember. So Cardwell is one and Tran and Lu. Each one had a slightly different exposure period, but I didn't include the exposure periods explicitly in my report, the median or mean exposure period, so I'd have to look back at the individual manuscripts to tell you the exact numbers.

Q Going back to what you reviewed in reaching your conclusions that therapeutic uses of ranitidine do not cause esophageal, gastric, pancreatic, liver or bladder cancer in humans, did you consider any



metanalyses of ranitidine observational studies?

A Not -- I'm not aware of a published analysis of ranitidine occupational -- or sorry. You said occupational studies or --

Q No, observational.

A Observational. I'm not aware of a published metanalysis of ranitidine observational studies.

Q Did you conduct a metanalysis of ranitidine observational studies in preparation of your report?

A I did not.

Q Did you consider the experimental animal evidence that is available in relation to ranitidine?

A I did. Sorry. My Zoom window got minimized somehow. Okay. It's back now.

Q Is it okay?

A Yeah.

Q Okay. So you said that you did review the experimental animal evidence that was available in relation to ranitidine, correct?

A Yes.

Q Did you consider biologically plausible mechanisms whereby NDMA can cause cancer?

MR. SHEEHAN: Objection.

A I considered within the context of ranitidine exposure whether NDMA -- any NDMA exposure resulting



from ranitidine use would -- whether there was biological plausibility that that could cause cancer.

Q Did you consider any other biologically plausible mechanisms whereby ranitidine could cause cancer besides the mechanism of NDMA exposure and ranitidine?

MR. SHEEHAN: Objection.

A I considered it in the sense that looking for an -- any reason an exposure to ranitidine could cause cancer I think is important given that the allegation in this case or the exposure of interest in this case is ranitidine as a cause of cancer -- specific cancers in humans. Does that answer your question? Sorry. I don't know if that --

Q I think so. Did you review -- strike that.

When you considered or when you conducted your analysis and reached your conclusions that you list in your summary of opinions on page 3 of your report, did you consider the universe of NDMA observational studies that exist?

MR. SHEEHAN: Objection.

A I considered those within the context of how informative they would be to NDMA exposures related to -- potential NDMA exposures related to ranitidine use.



Q Did you conduct your own search for NDMA observational studies relating to NDMA and cancer risk?

A Yes.

Q And how did you go about conducting that search?

A I typically do a structured PubMed search for an exposure, NDMA, writing out N-nitrosodimethylamine. And then I believe I also searched nitrosamine and then cancer and then each of the cancers in particular, and then reviewed the bibliographies of relevant papers to make sure to try and make sure I didn't miss any additional papers.

MR. SHEEHAN: Tracy, we've been going about another hour or so. When you get to a break, if we could take five, that will be great.

MS. FINKEN: Let me just ask two more questions and then we can take a break. Is that okay?

MR. SHEEHAN: That's fine.

BY MS. FINKEN:

Q Did you consider H2RA observational studies in relation to any cancer risk posed by that class of medication?

A I reviewed a number of those or I reviewed studies that included H2RAs as a class as an exposure.

However, I think the most appropriate exposure in this case is ranitidine itself and as that was the -- that's the alleged exposure or the causal -- causation question at hand in this case.
Q So would you agree that the H2RA observational study data would be less informative to answer the question of whether or not the NDMA in ranitidine could cause human cancers?
MR. SHEEHAN: Objection.
A I think given that the body of literature employing ranitidine as the exposure of interest is at least as robust as the body of literature that evaluates H2RAs as a class, that using ranitidine as the exposure of interest, those studies are the most informative.
Q Okay. And did you -- I might have asked this before, and if I did, I apologize, but did you consider the experimental animal evidence that's available in relation to NDMA and cancer?
A Yes.
Q And how did you go about conducting -- well, strike that.
Did you conduct a search of that experimental animal evidence yourself or was that information provided to you by counsel?
MR. SHEEHAN: Objection.



A No. I conducted a search myself as well as reviewing documents such as the IARC Monograph and the NTP publication and ATSDR publications to comb through their bibliography and make sure that I was able to review appropriate studies.
MS. FINKEN: Okay. All right. Let's take a break.
THE VIDEOGRAPHER: We are now off the record. The time is 1736 UTC, 1:36 p.m. EDT.
(A 14-minute recess was had.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1750 UTC, 1:50 p.m. EDT.
BY MS. FINKEN:
Q Dr. Hatten, I think we're -- the plan is we're going to try to push through for another 45 minutes or so and then take a break -- a little bit of a longer break for lunch. Is that okay with you?
A Yes.
Q Okay. So just going back to -- actually, strike that. Let's move on to a different area.
You had indicated in your report in the summary of opinions that NDMA exposure in humans via ranitidine is limited to exogenous formation without evidence to support endogenous formation; is that correct?



A Correct.
Q Okay. And you go on to state, "At most, the exposure to NDMA from ranitidine is similar to exposure in a Western diet"; is that correct?
A I believe I stated that, correct.
Q Okay. In reaching those conclusions in relation to whether or not the NDMA in ranitidine can cause cancer, did you review dietary studies evaluating whether a Western diet is linked to certain types of cancer?
A I reviewed the studies that specifically broke out estimates of NDMA within diets and cancers. I don't know that I reviewed all Western diet epidemiologic studies.
Q Did you -- to support your opinion that there's no evidence of NDMA exposure in humans via ranitidine from endogenous formation, how did you come to that conclusion?
A I mean, I think the most robust body of evidence or most robust study evaluating that is Florian, which attempted to evaluate whether there is endogenous formation of ND -- measurable NDMA in study subjects.
Q Dr. Hatten, typically how long does food remain in the gut after you eat a meal?



MR. SHEEHAN: Objection.
A Typically less than an hour in the stomach, and then it takes hours to transit the rest of the intestine.
Q What types of variables affect how long food remains in the gut?
MR. SHEEHAN: Objection.
A It can be both individual factors, dietary factors and other exposures that may cause decreased gut motility or mechanical obstruction. So there are both patient and environmental factors that affect that.
Q Does ranitidine affect the gastric emptying rates?
MR. SHEEHAN: Objection.
A My understanding is somewhat, but -- or it has some effect.
Q Does ranitidine affect gastrin levels in the stomach?
A I would have to review the basic science literature on that to give you an accurate statement because I don't recall exact quantifications of gastric -- gastrin levels.
Q Does ranitidine affect the pH in the stomach?
A Yes.
Q How does it affect the pH in the stomach?

Page 102

A Typically, it raises the pH.
Q What are the consequences of raising the pH in the stomach?
MR. SHEEHAN: Objection.
Q Strike that. What are potential consequences of raising the pH in the stomach?
MR. SHEEHAN: Objection.
A I think the therapeutic rationale for raising the pH is to reduce or minimize acidic -- the acidic environment and irritation related to gastric acidity. It can also impact the bacterial flora in the gut, changing the pH can.
Q And when you say impact bacterial flora, do you mean increase bacterial flora?
MR. SHEEHAN: Objection.
A It can change it -- change the flora, the makeup of the flora. That also may affect the amounts of bacteria that are found.
Q Okay. And can ranitidine also increase nitrite levels in the stomach?
A I don't know that ranitidine itself increases nitrite levels in the stomach.
Q Dr. Hatten, are you aware that there's nitrite in saliva?
MR. SHEEHAN: Objection.

Page 103

A Yes.
Q Are salivary nitrite levels variable dependent upon certain factors?
MR. SHEEHAN: Objection.
A I would have to review the physiology of salivary nitrite levels becauses I can't provide a specific answer to that question without looking a little more closely at that topic.
MS. FINKEN: Okay. And just so the record's clear, I was saying salivary nitrite levels with an "I," not nitrate. I'm just saying that for Laura's benefit because it's picking it up at nitrate, and I want to make sure that the record's accurate. I know sometimes it sounds the same.
BY MS. FINKEN:
Q So going back to your answer, you said you would are to review the salivary nitrite levels before you could provide a specific answer to that question; is that correct?
A Yeah, if --
MR. SHEEHAN: Objection.
A I believe that's what I said to be able to tell you with any degree of confidence what -- how those vary and what factors.
Q Does diet affect gastric nitrite levels?

Page 104

A Yes, diet can affect gastric nitrite levels.
Q Dr. Hatten, do you -- can you tell me what thiocyanate is?
A Yeah, it's a -- it's a product typically produced by bac -- in the context of the human body, it's produced by bacteria.
Q And is thiocyanate found in saliva?
A I'm not positive whether it's found in saliva or not. I'd have to review the literature.
Q Is thiocyanate found in the gut?
A My understanding is, yes, there is thiocyanate that's detectable in the gut.
Q Are thiocyanate levels in the gut variable dependent upon certain factors?
MR. SHEEHAN: Objection.
A Again, I would have to review the literature to be able to tell you with any degree of confidence what the -- what factors influence that.
Q Okay. Are you aware without, you know, undertaking a review of the literature, sitting here today, are you aware of any types of factors that influence the levels of thiocyanate in the saliva or the gut?
MR. SHEEHAN: Objection.
A I mean, not without reviewing the literature

Page 105

to provide an informed response.
Q Do you have an opinion one way or the other as to how thiocyanate levels influence the NDMA formation from ranitidine?
MR. SHEEHAN: Objection.
A I don't have an opinion at the moment.
Q You indicated previously that you did prescribe ranitidine at times in your work as an emergency room physician, correct?
A Correct.
Q During the time frame that you prescribed ranitidine, did it ever carry a warning that it contained a carcinogen?
A Not that I was aware of.
Q During the time that you prescribed ranitidine, did it ever carry a warning that it could cause cancer?
MR. SHEEHAN: Objection.
A Not that I was aware of.
Q During the time frame that you prescribed ranitidine, did it ever carry a warning that it contained NDMA?
MR. SHEEHAN: Objection.
A Are you talking about the package insert or marketing materials or --

Q Yes, either.
A Not that I'm aware of with respect to those documents.
Q And when you refer to the package insert, you're referring to the labeling that comes with the product, correct?
A Correct.
Q And that's labeling that's provided by the manufacturers, correct?
MR. SHEEHAN: Objection.
A Yes, that's -- that's labeling provided by the manufacturers.
Q During the time that you prescribed ranitidine, did it ever carry a warning that it should be refrigerated?
MR. SHEEHAN: Objection.
A I don't know if the liquid forms carry that. I don't believe any of the solid forms did, but I can't tell you definitively about the liquid forms.
Q And when you say the solid forms, you're referring to the tablet, the pills?
A Correct.
Q During the time that you prescribed ranitidine, did it ever carry a warning that it should be taken with vitamin C or vitamin E?



MR. SHEEHAN: Objection.
A Not that I am aware of.
Q Do you have an understanding as to what impact refrigeration would have on the formation of NDMA from ranitidine?
A I don't have --
MR. SHEEHAN: Objection.
A I don't have a good understanding on how that would impact exogenous NDMA formation from ranitidine. I'm also not aware of reliable literature that quantifies how that would impact -- impact it.
Q During the time that you were prescribing ranitidine, did it ever contain a warning that it could form a carcinogen if it was stored in the bathroom?
MR. SHEEHAN: Objection.
A Not that I am aware of.
Q When you prescribe medications for your patients, do you undertake a risk-benefit analysis?
A Yes.
Q So you weigh the risks of the medication versus the benefits of the medication before prescribing medication to your patients?
A Yes.
Q And if ranitidine had carried a warning that it contained a carcinogen, is it fair to say that you



would have factored that into your risk-benefit analysis for your patients?
MR. SHEEHAN: Objection.
A I think hypothetically I would have factored that in, but I don't know that that was the case, and I don't know that there's any evidence that ranitidine is associated with cancer. I mean, both my daughters took Zantac as infants and I would give it to them again. Even based on the stuff I know now, I'd still prescribe it to patients if it were back on the market. No, I don't -- I don't know that there's any compelling evidence to suggest that it's a cause of cancer.
Q So you would be comfortable prescribing ranitidine for your infant daughters containing NDMA?
A I'd be comfortable prescribing ranitidine the liquid forms that were delivered to me as a father of a newborn, and I would be comfortable administering it to my daughters even now after being -- having evaluated all the literature related to it.
Q Even though it contains NDMA?
MR. SHEEHAN: Objection.
A Yeah, I think there's no good evidence that the exposures from ranitidine are a cause of cancer, even if there is a small amount of NDMA exposure associated with it, it would cause any sort of



meaningful excess risk of cancer.
Q Do you understand that the NDMA contained in ranitidine is variable?
MR. SHEEHAN: Objection.
A I mean, my understanding is that any time you sample anything, you'll get variable results, so I don't know that that -- using the term "variable" has a real meaning without any context as to what you're talking about.
Q Are you aware that the NDMA levels in ranitidine increase over time?
MR. SHEEHAN: Objection.
A I am aware that there are concerns that older product has been identified as potentially demonstrating higher or demonstrating higher amounts of NDMA than new product. I don't -- I don't have a good way of verifying the reliability of that testing, though.
Q Are you aware that the NDMA levels in ranitidine increase when it's subjected to heat or humidity?
MR. SHEEHAN: Objection.
A That's similar to the prior answer where I'm aware that there are allegations or some testing procedures of uncertain reliability that have suggested higher quantification of NDMA in ranitidine at extremes

of conditions, including heat and humidity.
Q Are you aware that ranitidine, when it comes into contact with thiocyanate, it acts as a catalyst for nitrosation?
MR. SHEEHAN: Objection.
A I'm -- I'm not aware of data that verified that in humans -- verified that occurrence in humans.
Q Are you aware that -- of any published data that indicates that vitamin C or vitamin E inhibit the formation of nitrosamines from ranitidine?
MR. SHEEHAN: Objection.
A I'm aware of data that super -- within superphysiologic conditions or nonphysiologic conditions where extremes of nitrites in pH can be affected by massive doses of vitamin C and E, but I'm not aware of typical dietary factors that contain vitamin -- assessment of vitamin C or vitamin E having a substantial impact on that -- on nitrosamine formation from ranitidine.
Q Are you aware of a substantial body of medical -- or strike that.
Are you aware that there's a substantial body of scientific literature that demonstrates the impact vitamin C has on nitrosation?
MR. SHEEHAN: Objection.


A I'm aware there's a body of literature on vitamin C impact on nitrosation.
Q And are you aware that there's a substantial body of scientific literature that demonstrates that vitamin C inhibits nitrosation?
MR. SHEEHAN: Objection.
A At -- I'm aware that at certain experimental -- within certain experimental conditions. I'm not aware that kind of daily practice or daily dietary factors are substantial enough to have any impact on potential -- any impact on nitrosation in humans taking ranitidine.
Q Putting ranitidine aside for the moment, are you aware that there's a substantial body of scientific and medical literature that demonstrates that vitamin C or vitamin E inhibits nitrosation?
MR. SHEEHAN: Objection.
A Again, I think similar to what I just said, I think that literature is primarily experimental data not necessarily representative of conditions in normal dietary -- with normal dietary habits that there's any substantial impact on nitrosation.
Q Have you evaluated any of the in vivo literature or literature that's evaluating the effect of vitamin C or vitamin E in vivo and its inhibition of


nitrosation?
A I have evaluated some of that literature. I can't -- I don't know that I've evaluated -- or I can't confidently say that I've evaluated all of the literature.
Q But you're aware that there is scientific and medical literature that exists that demonstrates that vitamin C or vitamin E inhibits nitrosation in vivo?
MR. SHEEHAN: Objection.
A Again, my understanding is that those are extremes of either diet or forced pH changes -- or extremes of supplements to diet or forced pH changes oftentimes in experimental animals and are not necessarily reflective of real world dietary conditions. I'm not aware of literature that suggests that persons eating a typical diet have a significant impact on nitrosation.
Q Doctor, we talked a little bit about epidemiology earlier. What is epidemiology?
A It's the study of disease in populations.
Q So you agree that epidemiologists investigate whether an agent can cause a disease, correct?
A That's one component of epidemiology, but, again, it's in the context of population, so more than, like, an individual experimental subject, which differs


from clinical trials that are designed to control all other factors whereas epidemiologists typically take data from real world exposures and real world outcomes.
Q So it's fair to say that epidemiology does not determine whether an agent can cause a specific individual's disease, correct?
A There is -- there are applications of epidemiology to determining -- making a specific causation determination where you're asked -- as a treating physician or as an expert, you're maybe asked to evaluate whether a specific outcome is associated with an exposure in a specific individual. However, epidemiologic research deals with populations, so more than one person.
Q What are different types of epidemiological studies?
A Typically, it consists of observational studies, and those most often are either cohort or case-control studies. That's kind of -- those are the majority of epidemiological studies. There are lower levels of epidemiologic studies such as ecologic studies or case-control studies, but typically, the bulk of epidemiologic studies are observational cohort or case-control studies.
Q And what's the difference between a cohort or

a case -- and a case-control study?
A A cohort study is where you examine outcomes following an exposure, so the determination of -- the division of the population to an exposed group and an unexposed group is kind of the key characteristic of a cohort study, and then those are followed for an outcome. It can also be done retrospectively where you pretend you have divided them into two groups and then looked at the outcomes but you only approach the dataset after everything has already happened whereas a case-control study is you divide the population based on outcome, so whether people have the disease or don't have the disease, and look back at what risk factors to try to see and what were different risks or different exposures for -- that are associated with the disease of interest.
Q And you had indicated that there are lower levels of epidemiological studies such as I believe you said ecologic studies; is that correct?
A Correct.
Q And what is an ecologic study?
A It's typically where you will look at or where the investigator will look at -- not at individual outcomes but outcomes divided by geographic areas or classes, so it's pooling of multiple subjects into a


group.
You may see it with change in a law, so at one geographic area a law will be different than another and you can compare outcomes in a state that requires motorcycle helmets and a state that doesn't would be an example of an ecological study, but that pools all the people in that state together into a single -- it's called a unit of analysis or a single group that is treated all the same for the purposes of the study.
Q Are there specific limitations in evaluating an ecologic study?
A Typically, they are much lower levels of evidence because the -- all the subjects are grouped together and there's not a way to identify who truly was at risk when you're looking at outcomes. So all the people who don't ride motorcycles, they're also included in all the outcome studies in each state, and those groups may not be the same -- those populations may not be the same in one state or another or one unit of analysis or another. It makes it much more difficult to control for baseline var -- or variability between the populations.
Q What are the strengths -- well, strike that.
What are the strengths and limitations of cohort studies, potential?


MR. SHEEHAN: Objection.
A Yeah, potential strengths is you're looking at the population divided by the exposure and then following them for an outcome. That can also be refined to a quasi experimental approach where it's almost set up as a virtual randomized controlled trial, though it's never truly possible to completely randomize, but attempting to make the groups equal based on whatever known risk factors or potential confounders and probably provides probably the most robust data available. If there is not a true experimental data in humans, typically cohort studies are the next best thing that we have most of the time.
Q Would you agree that performing a randomized controlled trial evaluating NDMA giving NDMA to one arm of the study versus placebo to the other arm of the study would be unethical?
A I think it would depend on the purpose and the -- the design and the purpose of the study, so --
Q Fair enough. Do you think it would be unethical to give NDMA as part of a randomized controlled trial long term to assess cancer risk?
A Again, I think it would depend on the design and the purpose of the study, so I can't -- I can't based on -- without more information as to what


we're looking at, I don't know that -- that there's a way to adequately answer that question.
Q Are there ever times where you think it's unethical to conduct a randomized control trial in a study population evaluating a carcinogenic effect of an agent?
MR. SHEEHAN: Objection.
A I mean, again, it would depend on the specifics of the trial. I would say those -- a trial such as that would undergo extensive scrutiny before it was approved for -- to be conducted in humans, but I can't say definitively one way or another whether it would be unethical.
Q So when you say "approved," are you referring to by the Institutional Review Board?
A Yes, and any funding agency and any -- and as well as, I guess, improved in a generic term by an investigator's own kind of personal ethical codes.
Q Do you think it would be ethical to provide exposure to asbestos to one group of individuals against the control long term to assess cancer risk?
MR. SHEEHAN: Objection.
A I think that would be an unethical study, yes, in humans. If it gets -- it's done in animals or at times it's done in animals in a situation like where --

if there was a concern, but there's an established carcinogen or a human car -- established human carcinogen. Typically, those cases are instances where it's generally seen as unethical to conduct a study like that.

Q Do you think it would be unethical to conduct a study, a randomized controlled trial providing formaldehyde to a group versus a control long term to assess carcinogenicity?

MR. SHEEHAN: Objection.

A I think it would depend on the -- the specific purpose and design. Formaldehyde's linked to a very specific type of cancer, primarily nasopharyngeal with inhalational exposure. If the exposure is a different route of exposure or very limited amounts, it may be ethical to conduct a low-level oral exposure assessment, a randomized oral exposure assessment. And, again, without knowing the details of a proposed study, it's difficult to say definitively.

Q So you indicated that if there's an established human carcinogen, that in those instances, it will be unethical to conduct a randomized controlled clinical trial, correct?

MR. SHEEHAN: Objection.

A I think your question was about asbestos, and



I was saying that that's an example of an established human carcinogen where I think it would be unethical.

Q As a general rule, do you think it would be unethical to conduct a randomized controlled trial establishing the carcinogenicity of group 1 carcinogens long term in humans?

MR. SHEEHAN: Objection.

A Again, I think it depends on the specific design and the purpose of the study, so I can't say one way or another without knowing -- without more details.

Q Okay. So going back to just types of epidemiological studies, is an ecological study appropriate to assess causal inference?

MR. SHEEHAN: Objection.

A There are times when it may provide supporting evidence, but it's not typically possible to -- to drive a causation determination based on an ecological study one or many alone. There is a very clear hierarchy of evidence when you're examining causation, and an ecological study is on the low end of what is potentially informative from the human epidemiologic data but may provide some information whereas case series and case reports are typically not informative and really just hypothesis generating. So it may be -- it may provide some contribution, but it's not



sufficient independent or alone to drive a causation determination.

Q And when -- I just want to make sure I understand. When you are referring to an ecological study, you're referring to -- and correct me if I'm wrong. I'm not -- this is not a trick question. I just want to make sure I understand what you're referring to. You're referring to a study that is pulling aggregate data, not individual data; is that correct?

A Yes. Typically, it is pooled geographically, although not -- that's not always the case but traditionally that has been the case. So you compare outcomes in one city to another or one county to another. So the unit of analysis is not the individual patient or even a subgroup of very similar patients. It's a mixed population within a defined geographic area.

There are times where that is actually helpful if the question at hand is do law changes or do public policy changes have an impact on general public outcomes. So for that question, it may be appropriate, but in a case where there is an exposure outcome relationship very rarely are ecological studies substantially informative.

Q What does it mean to conduct an active



comparator study?

A So that's typically instead of either using a placebo in a randomized controlled trial or comparing to nonexposed, as in not exposed to anything, an active comparator study is one where you use another medication or another exposure to compare the exposure of interest to a similar group that is exposed to something that is not inert and ideally it will be prescribed or exposed for similar indications as the exposure you're interested in.

For example, in this -- in the case we've been -- we're doing this deposition on, an active comparator to ranitidine would be famotidine or cimetidine, another H2RA. Another option for active comparators are PPIs, although other H2RAs will probably the closest active comparator or the most similar active comparator and kind of minimize the differences between the -- the baseline differences between the group that is exposed to ranitidine and the group that is not.

Q Is it fair to say that for an active comparator study to be effective, the comparator must not also be associated with the outcome?

MR. SHEEHAN: Objection.

A That -- ideally, an active comparator is not

Page 122

associated with the same outcome of interest. If the associations are different enough, it may be -- it may be informative to have an active comparator that is also associated with that outcome of interest.
Q Okay. Would you agree just as a general proposition that a well-designed observational study may provide better information than a poorly designed randomized control trial?
A I think it depends on what information you're asking for, so it's difficult to answer that question without knowing exactly -- exactly what you're asking for. However, it's typically better to simply reject a very poorly designed randomized control trial as not -- as fatally flawed or not informative if it is -- if it is performed in a fashion that raises significant concerns for bias or confounding or methodologic flaws that make it not interpretable or informative.
So, in general, a randomized controlled trial that is not fatally flaw will provide more information on a question in hand, but if it's poorly done, it should probably be rejected wholesale and doesn't have a lot of value.
Q Is it fair to say that you'd have to evaluate the design of each study in order to reach some conclusion about that? I think that's what you're

Page 123

saying in less words, but I just want to be clear.
A Yes, it --
MR. SHEEHAN: Object -- hold on. Just let me get an objection in. Objection.
Q That's fine. I'm just trying to understand. I think what you were attempting to say, and correct me if I'm wrong, is that you have to evaluate the design and whatnot of each study in order to properly assess the conclusions about that study, correct?
A Well, I was answering a little bit different question because I think the question you asked me was whether an observational study could be more informative -- a well-conducted observational study could be more informative than a poorly conducted randomly controlled trial. And the point I was making is you should just ignore everything from a randomized controlled trial as being not informative.
It's not as if the well-conducted observational study design is study is suddenly trumping or moving above a poorly conducted randomized controlled trial on a hierarchy of evidence. It's more that you should just reject the randomized control trial wholesale.
However, your second question about whether you should evaluate methods of a study, yes, I agree you

Page 124

should evaluate methods of any study that you're considering and critically evaluate methods of any study you're studying.
Q Okay. Thank you.
MS. FINKEN: It's 2:34 our time. Is this a good time to break?
THE WITNESS: Sure.
MR. SHEEHAN: Fine with me.
MS. FINKEN: Okay. Let's go off the record.
THE VIDEOGRAPHER: We are now off the record. The time is 1834 UTC, 2:34 p.m. EDT.
(A 60-minute lunch recess was had.)
THE VIDEOGRAPHER: We're now back on the record. The time is 1932 UTC, 3:32 p.m. EDT.
BY MS. FINKEN:
Q Good afternoon, Dr. Hatten. Are you ready to proceed?
A Yes.
Q Okay. So going back to -- I just have some additional questions about epidemiology generally.
A Sure.
Q In the context of epidemiology, what is an association?
MR. SHEEHAN: Objection.
A It's typically an observed correlation between

Page 125

an exposure and an outcome.
Q And would you agree -- well, strike that.
Do you know what the latency period is for stomach cancer?
MR. SHEEHAN: Objection.
A You would have to be more specific because I don't -- you haven't expressed an exposure. Typically the latency period there will be an exposure, and then a certain amount of time after the exposure there will be an outcome, and that's the latency period.
Q Okay. So that's your -- that is your understanding of the term "latency period," correct, what you just expressed?
MR. SHEEHAN: Objection.
A There's an exposure and then at a certain time at a later date, an outcome will manifest and that -- that interval is the latency period.
Q Okay. And what is the latency period from an exposure to the development of gastric cancer or stomach cancer?
MR. SHEEHAN: Objection.
A Again, as I said before, you'd have to tell me what the exposure is. I don't know that I will necessarily be able to tell you what the latency period is, but it's not identical for each type of exposure.

Q So the latency period -- is it your testimony that the latency period varies depending upon what the exposure is to?
MR. SHEEHAN: Tracy, we're not -- we're not hearing you.
THE WITNESS: You're breaking up.
MS. FINKEN: Oh, boy. Let's go off the record.
(Off-the-record discussion was had.)
BY MS. FINKEN:
Q Let me just see where I was on that question. Okay. Is it your testimony that the latency period can vary depending upon what the exposure is?
A Yes. Latency periods can differ depending on the exposure, even with the same outcome of interest.
Q Okay. So cancer that's caused, for example, by H. pylori might differ from a cancer caused by asbestos?
A Correct.
Q Okay. So when you're evaluating a cancer risk from a particular agent, without -- how do you determine what the latency period is?
A Typically, it's -- well, I guess to back up. You don't always know what the latency period is. It's not always a known value. But typically it's based on


cohort studies that follow a cancer -- or follow exposed patients for a certain period of time and you evaluate how long it takes for a subject to develop the outcome of interest.
There is always individual variation too, so it's not as if you can predict accurately exactly how long that latency period will be for any one individual, but given robust population data, you can identify a -- a mean or an estimate for the population what the latency period would be.
Q Would you agree that if an outcome has a long latency period, an increase in risk would not be observed in a study with too short of a follow-up time?
MR. SHEEHAN: Objection.
A It is possible to not see an outcome of interest if the latency period is long and the observation time is short. It also depends on the kind of strength of association because, as I said, it varies by individual, so some people will be much shorter than the average latency period and some will be much longer. And even if you have a truncated follow-up, those kind of early presenters will still be caught in the follow-up period of the study.
So it's not as if you may not see all cases of an outcome of interest, but you may not -- or it's not


as if you may not see any cases of the outcome of interest. You just may not see as many as if you had a longer follow-up period.
Q And would you agree with me that when evaluating an outcome such as cancer, that information about the dose and the duration of the exposure are essential?
MR. SHEEHAN: Objection.
A Those aspects may be informative. It depends on the exposure, though, to know whether that is essential or not. Oftentimes that would play into a threshold model or a threshold understanding of cancer development. So if you -- if someone's exposed to or if you only include persons exposed to those or to intens -- or that have intensities of exposure above a threshold, then, yes, it is very important to know -- to ensure that you're only categorizing the exposed as those who have met that exposure intensity criteria.
It may also be informative to know dose, though, in general, but not necessarily essential.
Q Dr. Hatten, are you aware of any ranitidine-specific observational studies assessing the risk of cancer where they quantified the amount of NDMA in the ranitidine?
A I am not aware of any studies that quantify


the amount of NDMA in ranitidine. However, those epidemiologic studies are studies of real world use of ranitidine, which includes whatever ranitidine there may be associated with ranitidine use either -- or from whatever sort of storage conditions the patients kept their pills in or the manufacturer transported it in, it necessarily includes all of that because it's real world use of the -- of the drug.
Q How do you weight -- strike that.
How informative are use versus nonuse studies in your assessment of whether the NDMA in ranitidine can cause cancer?
A They can potentially be informative, use versus nonuse, if the groups are properly adjusted or controlled for potential confounders. However, I think as we talked about earlier, it's ideal to have an active comparator in a situation where ranitidine is likely being used for a specific purpose. So you would ideally compare to other patients who are using a similar medication for the same purpose, and that way -- and that's particularly true if the outcome of interest may be related to the indication for use.
So, for example, with respect to ranitidine, you may be taking ranitidine because you have a gastric or a stomach discomfort and that may be an early sign of

gastric cancer, and so ideally you would compare to another group of patients who are also taking medication that is used for epigastric discomfort.

Q So if it's a study that's evaluating -- strike that.

If it's a study that's defining the exposure as ever use of ranitidine, it's impossible for you as somebody who's evaluating the publication to determine how long those individuals were actually taking the drug, correct?

MR. SHEEHAN: Objection.

A Unless the authors in some way quantify or describe the use patterns, it's not possible to determine if it's solely a binary variable on a yes or no.

Q And is it fair to say that the length of exposure and the amount of exposure to a carcinogen is what will ultimately determine whether or not somebody gets cancer?

MR. SHEEHAN: Objection.

A That is one factor. It's also dependent on an individual's unique ability to repair any DNA damage or to deal with any tumor-promoting effects that may occur from an exposure. So it's not -- for most cancers, an exposure isn't clearly predictive -- or it's not



precisely predictive of a -- of whether someone will develop cancer or not solely based on the exposure amount.

There are some -- particularly some doses of ionizing radiation that if you reach a certain threshold, that the likelihood of cancer's exceedingly high. There's some things like asbestos where if you truly are exposed to a sufficient quantity, then the risk of cancer is exceedingly high. But even in those case -- even in cases of asbestos exposure, it's not a guarantee that if you have an exposure of X amount, that you will develop mesothelioma.

Q Is it fair that if a study does not adequately assess the exposure to the carcinogen, that the most that study could tell you is that short-term exposure doesn't raise the risk of cancer?

MR. SHEEHAN: Objection.

A Can you -- can you define or explain what you mean by "adequately" in your question?

Q Well, in order to -- in terms of an epidemiological study, in order to look at a population and determine whether there's an increased risk of cancer associated with the exposure, you would need to adequately assess the exposure, correct?

MR. SHEEHAN: Objection.



A Ideally you would characterize the exposure fully.

Q So you would want to quantify -- well, strike that.

You would want to look at long-term exposure, correct?

MR. SHEEHAN: Objection.

A Most -- most likely. However, I don't think there's a -- it says speaking in generalities, and specifically in this instance, we don't have any -- there's no evidence in the human epidemiology data of an association between -- a consistent association between any ranitidine exposure and any cancer outcomes. So it's kind of -- it's impossible to really say what is an adequate assessment of an exposure without -- given that there's not an outcome that has been demonstrated related to any of those exposures.

Q Dr. Hatten, do you believe that a statistically nonsignificant finding provides evidence of no association?

MR. SHEEHAN: Objection.

A It -- it's different than providing evidence of no association. It is saying that the likelihood that this is a -- this finding may due to chance is not able to be ruled out. Conventionally and most study



designs are set up only reject the null hypothesis, to only say, you know, this -- there is a true association here or the association we're observing is actually real if the finding is statistically significant. And that may seem like semantics, but it is kind of the way that statistical significance is treated in study design and in evaluation of evidence for causation.

Q Can you -- and I'm just looking at your last response here on the realtime, but you indicated it may seem like semantics, but it is kind of the way in that statistical significance is treated in study design and in evaluation of evidence for causation.

Is there a certain authoritative text that you would point to for that proposition?

A Not an authoritative text. I mean, a -- with respect to the study design, that's typically spelled out in each study's methods. When they -- when they put forth the study proposal, they designate a certain P value or confidence interval that will lead to rejection of the null hypothesis and recognition of a point estimate as an association -- a true association in the population that's being studied.

With respect to causation evaluations, I don't think there's an authoritative text, but I think most modern or all modern valid causation frameworks tend to

employ some variation. The Bradford-Hill criterion chance is one of the major components of that that has to be assessed, and statistical testing is a tool for helping to assess chance as a component of evaluating the literature.

Q Is there an authoritative text that you point -- strike that.

Is there an authoritative text that you consult for general epidemiologic principles?

A There's not an authoritative text that I consult, no.

Q Is there any published literature that you consult in relation to just general epidemiological principles?

A I mean, I have a big file from my epidemiology coursework and I keep kind of a running file of interesting epidemiology and methods articles I find, but I don't consider any one to be authoritative. They may be informative. So I can't tell you that I consulted any specific article for -- in preparing this report, though.

Q Would you agree with the general principle that a lack of statistical significance of individual studies should not be taken as implying that the totality of the evidence supports no effect?



MR. SHEEHAN: Objection.

A Could you repeat that? Sorry. You warbled a little in your voice.

Q Yeah, I hear that you're kind of going in and out a little bit and I don't know if it's my connection or if it's your connection, but I'll repeat -- I'll repeat the question.

Would you agree that lack of -- well, strike that.

Would you agree with the general principle that a lack of statistical significance of individual studies should not be taken as implying that the totality of the evidence supports no effect?

MR. SHEEHAN: Objection, vague.

A I think you have to evaluate each study individually and determine whether the findings are contributory. However, it is difficult to -- to take a large body of literature that consistently shows no association or no statistically significant association and then reach an opp -- or reach a conclusion that identifies a true association or a true causal association based on literature that is exclusively or predominantly showing no effect and really clustered around the null -- with pointed estimates clustered around the null.



There are times when a metanalysis may combine a number of studies and demonstrate an effect even though some of the individual -- some or most of the individual studies do not demonstrate a statistically significant effect. That may cause reevaluation of the individual studies or the body of literature. I'm not aware of a metanalysis that has been performed of the literature in -- relevant literature in this case.

Q Are you familiar with Kenneth Rothman?

A Yes, the statistician and epidemiologist.

Q Do you consider Kenneth Rothman to be one of the preeminent epidemiologists when it comes to methods for the design of observational studies?

MR. SHEEHAN: Objection.

A I consider him a very prominent epidemiologist and one of the leaders in this field. Any one person's authority is not a substitute for evaluating evidence that's available.

Q Would you agree that the majority of epidemiologic methodologists would consider Modern Epidemiology by Rothman and Greenland to be the most authoritative text on epidemiological methods?

MR. SHEEHAN: Objection.

A Personally, I would be concerned if any epidemiologist said that they thought a text was



authoritative when it comes to causation. They should I think -- I would hope Dr. Rothman would say the same thing, that each epidemiologist should evaluate the literature and take the opportunity to evaluate the literature themselves. However, I have great respect for Dr. Rothman and think his work in epidemiology is excellent.

Q You had mentioned previously the Bradford-Hill criteria. Do you recall that?

A Yes.

Q And you conducted -- well, strike that.

Did you conduct a Bradford-Hill analysis in your -- in the context of your report?

A Yes. I employed components of the Hill criteria in evaluating the literature.

Q What are the Bradford-Hill criteria used for in the context of epidemiology?

A They're typically used as a framework for evaluating a causation discussion. So there's a proposed causal association, and it's a way to organize and critically appraise the literature and evaluate whether there is sufficient evidence to identify an exposure as causally related to an outcome.

Q And what are the nine factors to consider when you're assessing causality under the Bradford-Hill

analysis?
A Yeah, so I think if you go to page 62 in my report, they're spelled out here. So I think we've discussed that as far as the deposition today, there's really no human experimental data that is -- answers the question of whether ranitidine exposure is a cause of cancer.
The other issues are consistency, which is whether you see the same results in different populations or within different -- between different subgroups that are analyzed within populations, looking for dose response effects in humans, whether there is a potential for reverse causation such that the effect you see or the outcome of interest is actually the cause of whatever the exposure of concern is, so you have the causal chain backwards.
There is also question of biological plausibility, whether the -- whether what you're proposing even makes sense from a biological perspective. Do we have animal data or in vitro data to support that? Whether it's similar to other exposure outcome relationships that have been demonstrated. And then kind of a big picture view of coherence.
Before you do that, though, it's exceedingly important to examine whether chance, bias and



confounding can cause -- cause a misidentification of a proposed association. So typically I try and evaluate the studies on the methodologic merits first, and then assuming they're not rejected, try to put them into the picture -- the bigger picture of how that fits into the causation argument that I just went through.
Q So just to break that down a little bit, you said before you do that, it's exceedingly important to examine whether chance, bias and confounding can cause a missed identification of a proposed association. Is that correct? That's what you said?
A Correct.
Q Okay. And what -- can you cite to any source that states that you must assess the association in the context of chance, bias and confounding before you go through and look at the Bradford-Hill criteria?
A I don't know if there's a specific source that says that. That is, I think, fairly well accepted as standard causation methodology. If your proposed association, like, if there's no good evidence to go through a causation exercise, it's really kind of moot. There's no evidence base for the remainder of the causation exercise, then, if all of the data that you're examining is -- should be rejected because of severe bias or high likelihood that this is a chance finding or



inability to adjust for any confounders that are known to be related to the outcome of interest.
Q So when you conducted or when you -- strike that.
When you looked at the Bradford-Hill criteria in the context of your opinions in this case, did you conduct a separate analysis for each cancer type under Bradford-Hill or did you do one Bradford-Hill analysis to cover all five cancer types?
A No. I did one for each cancer type separately -- or I -- I evaluated the literature for each cancer type separately.
Q Okay. And where is the separate Bradford-Hill analyses for each cancer type articulated in your report?
A They're embedded in the discussion of the literature, and it doesn't typically require a separate sheet for each one. It's done as a -- it's making sure that you evaluate each exposure -- specific exposure outcome relationship separately according to the methods in the studies that have been conducted on those exposure outcome relationships.
Q So looking at, for example, bladder cancer, did you -- what did you evaluate to determine whether or not there's consistency in accordance with the



Bradford-Hill methodology?
A Yeah, so I think it's most important to say is are we seeing similar findings in different populations, variable populations in studies conducted by different investigators or different databases to ensure that this is a finding that's not limited to a small subgroup, or is this something that is a general cause-effect relationship? If it's isolated to a small subgroup, it may be that there's a genetic difference in that subgroup or a different exposure in the -- that is only isolated to that subgroup that is not accounted for in the methodology.
So, for example, if you turn to -- page 24 is the kind of the start of the evaluation of the bladder cancer epidemiology literature. I discuss two studies that are kind of minimally informative and really hypothesis generating, Habel and Michaud. However, neither showed any positive evidence for an association, but they also were -- neither were particularly well designed to answer the question that we're concerned about in this case.
The additional studies from different cohorts, and that includes Yoon, Kantor, McDowell, and McDowell and Cardwell are really -- essentially are studying the same population just analyzed slightly differently, and

then Norgaard do not demonstrate consistent findings across different populations. So Yoon is a Korean study. Kantor is the UK biobank, which shares likely some degree of similarity to the McDowell and Cardwell papers. And then Norgaard is an entirely different cohort with a Danish population.

It's also helpful if those -- or it provides more substantive evidence if the various subgroups that are identified within each study demonstrate similar measures of association. That is, again, not -- not seen regularly here. And particularly when you look at the kind of most relevant literature, which I think is isolating to kind of longer -- longer follow-ups and more intense therapies, you see really just a clustering around the null and not a definitive or consistent outcome exposure relationship that is -- that demonstrates findings that are -- that suggest a true association as present in all these populations.

I realize that was a long answer, so let me know if there's stuff you'd like me to clarify or you want to go into more detail.

Q Yep, I'm just going to go through it a little bit -- in a little bit more detail. So going back to page 24 of your report --

THE DEPO TECH: Do you want that up on the



screen? Sorry to interrupt you.

MS. FINKEN: Yeah, if you could put that up on the screen.

THE DEPO TECH: 6335, page 24?

MS. FINKEN: Yes, please.

BY MS. FINKEN:

Q So we have your report up on the screen, and I just want to go through this a little bit in more detail.

You had indicated on this first page, on page 24, that Habel and Michaud were two of the studies that you looked at to assess whether or not ranitidine was associated with an increased risk in bladder cancer, correct?

A Correct.

Q And looking at the analysis you have on page 24, is it fair to say that Habel demonstrated an increased risk of bladder cancer with ranitidine use albeit not statistically significant?

MR. SHEEHAN: Objection, mischaracterizes.

A I think it is fair to say there is a point estimate of 1.56 and a very wide confidence interval. The study was also not designed to identify that specific exposure, that single exposure outcome relationship. It was kind of an analysis of a bunch of



different cancer types and the -- and was really designed to assess cimetidine association with ranitidine used as a comparator.

And so it both didn't -- ranitidine use and bladder cancer as outcome was not the primary study design -- it wasn't what the study was designed for and is not -- makes it so it is not incredibly informative. However, it does -- does not show a -- or the confidence interval is very wide and crosses the null in this case, which provides pretty little confidence that there is any true association between ranitidine and bladder cancer that isn't due to chance.

Q So going back to the Habel study, what type of study is that?

A I believe -- can we pull up the manuscript? I just want to make sure that it is --

Q Do you have the studies available to you there or do you need me to have it pulled up on the screen?

A If you can pull them up on the screen, that would be helpful or at least put them in the exhibit --

Q We'll pull them up on the screen. It's easier probably. So let me just find it.

MS. FINKEN: We'll pull up what we'll mark as Exhibit 6355.

(Exhibit No. 6355 was marked.)



BY MS. FINKEN:

Q Is this the Habel study you were referencing in your report?

A I believe so. Let me just see if I can pull it up in the share file. Yes, that appears to be the study.

Q And what type of study is this?

A It was a cohort study.

Q And what was the exposure -- what was the exposure -- the amount of exposure to ranitidine that was evaluated?

MR. SHEEHAN: Objection.

A I'm just reminding myself.

Q Take your time.

A I believe it was having at least one prescription of ranitidine but not also cimetidine.

Q And you had previously indicated based upon your study report that it demonstrated a rel -- I believe you said relative risk of 1.56, is that correct, going back to page 24 of your report?

A I think that is what I wrote in my report. And that's not what I found. That's what investigators in this study found.

Q And a relative risk of 1.56 -- strike that.

Let's go down to Michaud (2004), which is the

Page 146

next study that you have listed on page 24 of your report. And is it fair to say that this study also demonstrated an increased risk of bladder cancer with ranitidine use albeit not statistically significant?

MR. SHEEHAN: Objection, mischaracterizes the findings of the study.

A I think, again, similar to the answer I gave with respect to the point estimate table, this shows a point estimate of 1.46, the Y confidence interval that crosses the null, so the confidence interval here is .85 to 2.50.

Q Okay. And turning to page 25 of your report, the next study you listed that you evaluated in relation to ranitidine and bladder cancer is Yoon (2021); is that correct?

A Yes.

Q And that's a cohort study, you indicate here?

A Yes.

Q Okay. And you list the hazard ratio with ranitidine and bladder cancer as 1.41; is that correct?

A Correct. That's the author's reported point estimate of the hazard ratio of 1.41 with, again, a similarly wide confidence interval that crosses the null. It's .88 to 2.24.

Q So is it fair to say that this Yoon study also

Page 147

demonstrates an increased risk of bladder cancer albeit not statistically significantly?

MR. SHEEHAN: Objection.

A I would say that it demonstrates a point estimate that is higher than one but with a very wide confidence interval. And this study also, if you look at the next sentence, they reanalyze the data according to duration of exposure to ranitidine, and again there was no association, which you would expect to see -- or not necessarily expect, but for a true causal relationship based on increasing intensity of exposure generating increasing rates of outcome, you would expect to see some difference if the rest of the study is designed appropriately.

Q And the next study that you looked at is Kantor (2021); is that correct?

A Yes.

Q And is this a cohort study as well?

A Correct, that's a cohort study.

Q And comparing ranitidine users to nonusers, there's an adjusted odds ratio of 1.22; is that correct?

A The authors report the point estimate of 1.22 with, again, a wide confidence interval that crosses one that goes from .74 to 2.01.

Q Okay. And is it fair to say that that also

Page 148

demonstrates an increased risk of bladder cancer with ranitidine as compared to nonusers albeit not statistically significant?

MR. SHEEHAN: Objection.

A I don't think that I agree with that -- with that statement, and I don't think that's what my report says.

Q Why don't you agree with that statement?

A This is a study that was designed to -- to evaluate this question and to appropriately reject the assumption of no association requires a finding, per the author's design, with -- for a finding where the confidence interval does not cross one. So authors don't typically set out to say we'll -- we'll identify this as a true association unless the confidence interval excludes one, unless it is a study that is exploratory in nature where you're generating hypotheses for additional testing, in which case you typically do not -- the point estimate is not particularly helpful in those situations because it's not trying to appropriately describe the popula -- underlying population. It's intended to -- such an analysis is intended to just generate hypotheses for an additional study.

Q Was the exposure in the Kantor (2021) study,

Page 149

the exposure to ranitidine defined as taking ranitidine for most days of the week for the past four weeks?

A That's my understanding of how the authors defined it.

Q In looking at your findings here on page 25, it indicates that there was another analysis done where they looked at ranitidine versus omeprazole, correct?

A Correct.

Q And omeprazole is a proton pump inhibitor?

A Yes.

Q And it's also commonly referred to as Prilosec; is that correct?

A I tend to use the generic name, so I don't recall what the brand name is.

Q That's fine. So looking at the findings of Kantor (2021) in relation to the comparator analysis with omeprazole, it -- you have listed here an adjusted odds ratio of 1.3, correct?

A That's the point estimate that Kantor reports in the study.

Q And what does -- just for purposes of further questioning, the lower case A, capital O-R, stands for what?

A Adjusted odds ratio. I think you just said that.

Q Okay. I just wanted to make sure it was clear. So looking at Kantor in its evaluation of ranitidine versus omeprazole, do you agree that it does show an increased risk of bladder cancer as compared to omeprazole albeit not statistically significant?

MR. SHEEHAN: Objection.

A I would agree that the point estimate is not one or less than one, but it has a very wide confidence interval, and I have -- I don't agree that it demonstrates an increased risk based on the findings compared to omeprazole in these studies.

Q Okay. Going back to the Yoon study for just a moment, what was the exposure to ranitidine that was measured in the Yoon study?

A Can we pull up the manuscript so I can ensure that I accurately describe it because I don't know that I listed it.

MS. FINKEN: Okay. So we'll pull up and mark as Exhibit 6358 Yoon (2021).

(Exhibit No. 6358 was marked.)

BY MS. FINKEN:

Q Is this the Yoon study that you were referencing in your report?

A Yes.

Q And if you can take a moment and look at that,



Doctor, and tell me what the exposure -- what exposure to ranitidine that they used in the study?

A So they enrolled ranitidine users with a cumulative dose over the course of at least one year, so they had to have used it for at least one year, with a cumulative dose exceeding 10,800 mgs. That was the ranitidine exposure.

Q And let's move down the page to McDowell, which is -- you have listed here as McDowell 2021b; is that correct? That's on page 25 of your report. Sorry to keep flipping back and forth.

A It's okay.

Q Do you see McDowell 2021b?

A Yes.

Q In this particular study, it lists an adjusted odds ratio of 1.26. That is statistically significant, correct?

A In this study, the adjusted odds ratio is 1.26. It's comparing ranitidine users to nonusers only adjusting for comorbidities in smoking but didn't use an active comparator analysis.

Q It also indicates that it used a one-year lag. What is a one-year lag?

A It's only looking for the outcome after waiting a year so that -- and the rationale for that is



to -- if for some reason the prescription is or the exposure occurs due to an undiagnosed outcome, that gives a window of time for that to be discovered. So ideally, any outcomes that occur or that are measured were not preexisting or eminent at the time the exposure occurred.

Q And Dr. Hatten, what is protopathic bias?

A It's typically a bias where the use of the exposure is due to the outcome that you're concerned about.

Q And do you use that term interchangeably with reverse causality?

A They're similar and for practical purposes they essentially can be used interchangeably, but it's slightly different in that the outcome in reverse causation is truly a direct cause of the exposure whereas the outcome in protopathic bias makes it more likely that the exposure will occur but isn't necessarily a direct cause in the causal chain. But for purposes of critical analysis, it essentially can be used interchangeable?

MS. FINKEN: My Zoom link cut out for a moment there. Let me just read your answer on the realtime. One second.

Q So using a one-year lag or -- strike that.



Using a lag period, is that meant to -- is that -- strike that.

Okay. Using a lag period in a study such as this, is that meant to avoid protopathic bias having a role in the outcome?

A It is -- that's typically to -- it's typically used for that as well as to attenuate any confounding by indication that may occur where if there is an outcome that is known at the time of exposure, it may influence the exposure characteristics. But primarily, it's used to account for protopathic bias or to minimize protopathic bias.

Q What is an appropriate lag time to account for protopathic bias in a study evaluating cancer?

MR. SHEEHAN: Objection.

A Ideally it would be less than the latency period for most of the population but greater than the -- but at a sufficient period of time that any imminently diagnosable cancers are found. So it would depend on the type of cancer and the exposure of interest to -- there's not a single number to give you that says this is an appropriate lag time or this isn't.

Q Okay. Going back down to McDowell (2021), it indicates here in your report that this is a nested case-control study, correct?

A Correct.
Q And it's using the PCCIU. What is the PCCIU?
A It's a Scottish primary care database.
Q And this McDowell study 2021 did adjust for smoking, correct?
MR. SHEEHAN: Objection.
A The authors report that it was adjusted for smoking. I would note, though, that a better or a more sophisticated analysis of the same study or the same population in the same dataset was performed as an -- in conjunction with McDowell's study by Cardwell, and that is a -- a more elegant analysis of that same database.
McDowell was really set up as a screening study, which is difficult to draw any true conclusions about associations from when you are screening a number of exposures and outcomes of interest. That type of design is meant primarily for hypothesis generation, and to refine the exposure outcome relationships deserve more study, and that additional study was then performed by Cardwell.
Q Okay. So that brings me to my next set of questions. Cardwell's the next study that you have listed on page 25 of your report, assessing the risk of bladder cancer with ranitidine use, correct?
A Yes.



Q And this is a nested case-control study of the PCCIU, which is you indicated the Scottish database?
A Correct.
Q And the Cardwell study utilized a one-year lag, correct?
A Yes.
Q And it indicated that ranitidine is associated with an increased risk of bladder cancer and adjusted odds ratio of 1.22 that was statistically significant compared to nonuse, correct?
A Correct, when you're comparing only to nonusers.
Q Okay. And you indicate here that when comparing ranitidine to PPI use, that the adjusted odds ratio was 1.2, again statistically significant increased risk, correct?
A Yes. That's a similar finding as compared to nonusers. It also suggests, if you look at the next sentence as well, which includes a -- because Cardwell actually compared to -- we've talked earlier in this deposition about active comparators. And Cardwell compared not only to PPIs, which is one active comparator, but even a more robust active comparator, which is cimetidine, and that observed statistically significant association was not present when conducting



that analysis.
And unless there is an additional class effect that's common to other H2RAs not mediated by NNDA, then -- or NDMA, then it would be more likely that there's an unmeasured confounder that is common to H2RAs but not to PPI or nonusers that may be responsible for the observed association when you looked at nonusers or PPI users.
Q Did Cardwell evaluate whether or not there is a dose response relationship with the risk of bladder cancer in ranitidine use?
MR. SHEEHAN: Objection.
A I don't believe so, but I would need to look at the manuscript to confirm that there wasn't a separate analysis.
MS. FINKEN: Okay. Let's pull up Cardwell and mark it as Exhibit 6348. Bear with me one minute.
(Exhibit No. 6348 was marked.)
BY MS. FINKEN:
Q Okay. Doctor, looking at Cardwell that's up on the screen, is this the Cardwell study that you referenced in your report?
A Yes.
Q And that we've marked as Exhibit 6348 to your deposition?



A Yes.
Q Okay. And did you have a moment to look at that and determine whether or not they assessed whether there was a dose-response relationship between ranitidine use and bladder cancer?
MR. SHEEHAN: Objection.
A They conducted an analysis up to -- and strata of prescriptions up to a 1,095 I think it's defined dose or daily defined dose -- I'm trying to remember what the abbreviation stands for -- defined daily dose, which is essentially roughly three years of use.
Q Okay. I'm trying to find -- hold on one second.
MS. FINKEN: Let's go off the record for just a moment.
THE VIDEOGRAPHER: Sure. We are now off the record. The time is 2037 UTC, 4:37 p.m. EDT.
(A 11-minute recess was had.)
THE VIDEOGRAPHER: We're now back on the record. The time is 2048 UTC, 4:48 p.m. EDT.
BY MS. FINKEN:
Q Okay. Dr. Hatten, now turning back to the Cardwell study for just a moment, would you agree with me that they did conduct a dose-response analysis regarding the risk of bladder cancer and ranitidine use?

A I think they conducted a dose analysis of various dosing ranges, which is in both the form of various defined daily doses and number of prescriptions that I think was intended as a dose-response analysis in this study.
Q Okay. And you had indicated that I should -- excuse me. You had indicated that I should look at page 26 -- at the top of page 26 of your report where there's a measurement of ranitidine versus cimetidine and the risk of bladder cancer. Do you see that?
A Yes.
Q Okay. And you have listed the adjusted odds ratio of 1.05; is that right?
A Yes.
Q And you're taking that, if you look back at the study itself on page 6, I believe -- yes, page 6, on table 3, if you look at the comparison of ranitidine users versus users of other histamine-2 receptor antagonists, do you see that on the left-hand column?
A Correct.
Q Okay. And when you look at the adjusted -- the line where they adjusted, it looks like the odds ratio that you were referring to is user versus nonuser, the 1.05. Do you see that?
A Yes.



Q And if you -- if you follow that analysis down to the far right column where they're looking at greater than 1,095 DDDs versus nonuser, do you see that?
A Yes.
Q And the adjusted odds ratio comparing ranitidine to other users of histamine-2 receptor antagonists was 1.27, albeit not statistically significant, correct?
MR. SHEEHAN: Objection.
A That's what they report as the point estimate is 1.27 with a confidence interval that crosses one. It's 0.91 to 1.75.
Q And did you report that adjusted odds ratio with more than 1,095 DDDs in your report?
A I do not list that there. I reviewed this study, but likewise, I didn't report the adjusted odds ratio for 182 to 365 DDDs where the odds ratio -- adjusted odds ratio was .94. I wouldn't propose that that is a protective finding, that using a moderate amount of ranitidine is protective for bladder cancer but using more than a certain amount is a problem. I think all of that is likely noise that is seen just due to variations in the study population, and so I reported the primary finding for that analysis, which was the user versus nonuser.



Q So Dr. Hatten, how did they define DDDs in this study methodology?
A I believe it was per 150 mg dose, but let me confirm. They used a WHO definition of DDD that I would have to remind myself what the WHO definition is.
Q Okay. And just for clarity sake, the DDD refers to defined daily dose?
A Correct.
Q And you're referring to page 2 of the study itself under the exposure; is that correct?
A Correct.
Q Okay. If you can scroll down. And when you say that they calculated the defined daily dose or the DDD from the quantity of tablets and dose as defined by the World Health Organization, is that what you were referring to there?
A Yes.
Q Okay. So the more DDDs the more exposure to ranitidine, correct? Is that a fair assessment?
A Assuming that they're accurately assessing exposure using that metric.
Q Okay. And if you look at page 7 of this report or this study -- if you can just Zoom out a little bit so we can see the whole page. And you go down to the bottom of the left-hand column on page 7, it



indicates, "In this large population-based study, the use of ranitidine, particularly long-term use, was associated with an increased risk of bladder cancer." Do you see that?
A I see that statement. I think you also need some context because they discuss the -- there's a potential confounding magnification for H2RAs at the end -- at the end of the first full paragraph on the left-hand column. They say, "Associations were attenuated when comparing ranitidine users with users of other H2RAs suggesting a reduction in power and a cause/effect of H2RAs."
So the first is a statistical issue where you're just not seeing a -- an effect because the numbers are too small or there is a class -- an H2RA class effect, which would be explained by a non-NDMA mediated association with cancer that applies to all H2RAs, or it could be explained by confounding by indications for H2RAs. And I don't know which is most likely, but my suspicion is it's the latter.
Q And where specifically are you reading that from in the study itself?
A It's on page 7, left-hand column, end of the first full paragraph. So their statement is not inaccurate, the one that you read to me in the last

Page 162

paragraph, but I do think it's important to put it in context that when they analyze it with the most robust active comparator, that finding is attenuated or goes away.

Q So looking at the conclusion, the author's conclusion, which is what my question was referring to, it states, "In this large population-based study, the use of ranitidine, particularly long-term use, was associated with an increased risk of bladder cancer. Further studies are necessary to attempt to replicate this finding." Did I read that accurately?

A You read that accurately, but, again, I'll refer you back to my last answer where I think the authors even put their findings in context that that finding is seen in a crude analysis and it's seen in comparison to PPIs, but that effect is attenuated or goes away or is not found when compared to other H2RAs, and the authors discuss it. So I don't -- I think it's important to put the entire body of the study or the entire set of findings for the study into context, but the primary outcome is as you stated.

Q Okay. So my -- all my question was did I read that accurately, those two sentences?

A Yes, you read that accurately.

Q Okay. And do you disagree with the author's

Page 163

conclusion that there was an association between ranitidine and bladder cancer?

A I'll repeat my answer. I think it's not really changed from the last two times I gave it. I think that the crude association comparing users to nonusers or users to PPI users is present and found in this study, but when comparing to other H2RAs, the most appropriate active comparator, you don't see that same association, which suggests that there is a -- the findings are -- are likely due to confounding by indication because we see essentially no difference between other H2RAs and ranitidine.

Q Okay. And I just want to follow up on something that you said there because you're referring to it that there's a crude association comparing users to nonusers or users to PPI users found in this study. But there's also an association, a statistically significant association found when comparing -- I'm sorry. Strike that.

There's also a statistically significant association found when adjusting for confounders, correct?

A Correct, although -- and, again, this is particularly important if you look at the last sentence in the last full paragraph in the left-hand column, the

Page 164

sentence starts with, "Finally," and it says, "Finally, smoking and alcohol were incomplete and did not capture detailed information when the extent of exposure and consequently there remains the possibility of residual confounding."

So it was an adjusted analysis, but it may -- the authors acknowledge that they may not have fully adjusted for smoking and alcohol.

Now, that said, as you stated, the analysis comparing users to nonusers and users to PPI users did demonstrate a significantly elevated odds ratio both unadjusted and adjusted. However, that same finding was not seen when compared to an active control -- the most appropriate active control, which are H2RAs. So I don't want to completely dismiss the study. I think it's an appropriate study, but it's not -- it should be understood in the context of what comparisons are being performed.

Q So Doctor, what is misclassification bias?

A It's where a subject is placed into the wrong group, the exposed or unexposed or exposed to one agent versus the other and that it's not the correct exposure.

Q Does the Cardwell study account for over-the-counter use of ranitidine?

A My understanding is that it does not, although

Page 165

it -- the authors state that in the UK, it's only available over-the-counter for short-term use in low doses, which, so people taking it chronically, which is the group we're most concerned about, would likely be captured by this because they would have prescription records. And in the UK, it's a nationalized health service, so most -- most people get all their prescriptions through the health services.

Q Would misclassifying individuals who took OTC ranitidine as nonusers bias -- would that result in -- strike that.

How would misclassifying ranitidine OTC users as nonusers bias the results of this study?

MR. SHEEHAN: Objection.

A So if there's any true relationship between exposure to OTC ranitidine, so short-term low-dose use, those were misclassified as nonusers, it would potentially bias toward the null because there would be occasional cases of bladder cancer in those -- that was due to that exposure or in that subgroup that had an exposure that were misclassified as nonexposed.

Q Putting Cardwell aside for just a moment, the next study that it looks like you evaluated in relation to ranitidine and bladder cancer risk is the Norgaard (2021) study; is that correct?

A Yes.
Q I'm looking at page 26 of your report.
A Yes.
Q Now, this is one of -- and I just want to make sure I'm accurate on this. This is one of the areas where you had pointed out a typographical error in your report, correct?
A Correct.
Q What was that type?
A I had the incorrect confidence interval associated with the -- about halfway down where it says, "When ranitidine users were compared to users of PPIs, there was a slight increased risk of bladder cancer," I had a confidence interval that crossed one, and that was an inappropriate confidence level. It should be 1.04 to 1.48 associated with the relative risk of 1.24.
Q So it's a statistically significant increased risk of bladder cancer comparing ranitidine users to users of PPIs?
A Correct, in the Norgaard study. However, that was not seen, if you look at the sentence before, when compared to other H2RAs. And we've discussed that comparison is the most appropriate active comparator, although comparison study PPIs may be informative as well.



Q Did you undertake any type of research or evaluation as to whether or not other H2RAs have been associated with any of the five types of cancers that you evaluated here?
MR. SHEEHAN: Objection.
A I didn't perform a specific structured search for that question, but I have reviewed some of the literature.
Q And is it fair to say looking at page 26 of your report, that that's the extent of the ranitidine-specific epidemiological studies that you evaluated in relation to ranitidine use and bladder cancer risk?
A Yes, although I think it's also important to note that Norgaard performed a subgroup analysis of the most -- the longest lag time and the most intense set of prescriptions, so ten or more prescriptions and a follow-up of ten or more years, so a very lengthy follow-up period -- sorry -- and an intense set of prescriptions and again did not find an association between H2RAs and bladder cancer and importantly didn't find an association between PPIs and bladder cancer. And so this gave a long opportunity for cancers to develop postexposure and limited to the most intense set of exposures.



And I would not consider these results significant or to mean anything, but your questions before asked about marginally elevated hazard ratios and odds ratios and whether those were indications of an association. By the same token, these hazard ratios of .57 and .73 I don't think are considered protective given that the cross -- the confidence interval crosses one.
But if we're going to consider relative risks group DDA from one as evidence of an association, then you should also consider these as protective associations. And I just don't think -- I think they're more evidence of just scattering around the null that you see with no relationship between the exposure of interest and bladder cancers and outcome.
Q Are you finished, Doctor?
A Yes.
Q Okay. I'm going to just move to strike everything after the term "yes."
My question was just whether or not that was the last ranitidine epi study that you evaluated in relation to bladder cancer risk associated with ranitidine. Is that the last ranitidine -- we've gone through all of the ranitidine-specific epi studies that you evaluated looking at the risk of bladder cancer with



ranitidine?
MR. SHEEHAN: Objection, asked and answered.
A Yes, although I was continuing to discuss the last study that you pointed out and wanted to make sure that adequately captured my opinion.
Q I understand, Doctor, and I will have additional questions for you about some of these studies, but just for the sake of time because we're getting close to, you know, running out of time with the deposition, if you could just listen and respond to the question that I ask, I would really appreciate it.
So going back to the Norgaard study for just a moment, what was the maximum exposure that was evaluated to ranitidine in that particular study?
A Can we pull up the study? I believe it was ten prescriptions, but I don't know if they define -- I can't recall if they define that more granularly.
Q So if we can pull up what we will mark as Exhibit 6361 to your deposition. That's Norgaard (2021).
Doctor, is this the Norgaard study that you were referring to in your report?
(Exhibit No. 6361 was marked.)
A Yes.
Q Do you want to take a moment to review that

and let me know if ten or more prescriptions is the most granular that they define the exposure to ranitidine in this study.

A Yes. I believe that is the most granular and the highest intensity definition in this study.

Q Okay. So the maximum exposure that is defined in this study is ten prescriptions, correct?

MR. SHEEHAN: Objection.

A It's at least ten prescriptions.

Q But it doesn't define a back end of that exposure, correct?

MR. SHEEHAN: Objection.

Q Meaning at least ten prescriptions, but you have no way of knowing if it's eleven prescriptions or if it's a hundred prescriptions, correct?

A Correct, I don't have a way to tell that.

Q Does it define what one prescription -- strike that.

Is there a definition of how they're defining one prescription? Do you understand my question? Is it a 30-day prescription?

A I do not recall a definition of how substantial each prescription was.

Q And do you see anything in the study itself that you're looking at right now?



A I do not see anything that describes the number of doses in the prescriptions.

Q Now --

A Total milligrams.

Q I'm sorry. I didn't mean to cut you off. What did you say? Total --

A Total milligrams or total amount consumed.

Q Okay. You're saying it does not account for the total milligrams or the total amount consumed; is that correct?

MR. SHEEHAN: Objection.

A Not that I'm aware that it's reported in this study. I believe they just report number of prescriptions.

Q Okay. I just cut you off, and I wanted to make sure that your answer was recorded accurately because I think that we were speaking over each other, and I apologize for that.

Dr. Hatten, now going back to your Bradford-Hill analysis, looking at the consistency factor, besides the ranitidine-specific epi -- epidemiological studies that relate to bladder cancer risk, what else did you evaluate in terms of specific to bladder cancer risk?

A With respect to consistency in particular



or --

Q Just with respect to your analysis of whether or not ranitidine and the NDMA in ranitidine can cause bladder cancer?

A Well, I think the primary driver is the epidemiology. Here we have two large studies in different populations, both Cardwell and Norgaard, that when using an active comparator, an appropriate -- a robust active comparator, other H2RAs do not -- there is no evidence of an association.

That is further supported by much smaller studies have shorter follow-up times or less well-defined exposures, and that would be Yoon and Kantor, again, do not see a -- an association. So there's no -- or the consistency that we see is no association between bladder cancer and H2RAs particularly when compared to other H2RAs -- or bladder cancer and ranitidine particularly when compared to other H2RAs.

And that's also supported by a difficulty in understanding the pathophysiology or the biological plausibility that underlies this theory, the kind of -- the idea that diverse sites that are far away from the liver are being affected by the methyldiazonium ion is difficult to square. That would be a different story if



we had a number of studies here that consistently showed an elevated or a consistent association between ranitidine use and bladder cancer but not other H2RA use and bladder cancer, that would make me say, you know, we may have this model wrong. We may not understand completely how NDMA is metabolized to methyldiazonium. But that is not what we see in here.

Yes, there are some scattered findings with elevated odds ratios, but when you use an appropriate active comparator, that association is not -- is not evident. I think that's kind of a summary of my understanding of causation discussion surrounding or my take on the causation discussion surrounding bladder cancer and ranitidine use.

Q Did you review any NDMA epidemiological studies that looked at whether or not NDMA is associated with an increased risk of bladder cancer?

A I reviewed the NDMA epidemiologic literature, but I think the most appropriate exposure and the exposure that's of interest in this discussion is exposure to NDMA via ranitidine. And so whatever exposure occurs via ranitidine occurs -- is captured in these ranitidine epidemiologic studies. That's where we should be putting our focus on. That's where I put my focus, and that's the appropriate exposure outcome

analysis in this assessment.
There's not a way to substitute or throw away this ranitidine literature. It's not perfect, but it's not fatally flawed, and we should believe the published literature around it.
Q What NDMA epidemiological studies did you evaluate to determine whether or not NDMA is associated with an increased risk of bladder cancer in humans?
A I reviewed that literature, but I didn't do a specific separate causation analysis of NDMA and bladder cancer, so I don't have a structured analysis available. I'm happy to look through any of the epi study -- NDMA epi studies if you want to review those, but that's not the exposure that is of interest in this case. It's not dietary NDMA or occupational NDMA exposure. It's NDMA exposure via ranitidine, and that's captured in these studies.
Q Did you -- so if you look at your report, did you engage in a discussion anywhere within the body of the report regarding NDMA epidemiological studies specifically looking at the risk of -- excuse me. I'm choking. Strike that. Just give me one second.
Did you -- if you look at your report, did you engage in any discussion anywhere within the body of your report regarding NDMA epidemiological studies



specifically looking at the risk of bladder cancer with exposure to NDMA?
A If you look on page 52, there's a discussion of NDMA epidemiologic studies.
Q And looking at these NDMA epidemiological studies on page 52, the only study that I can see there that you -- that you evaluated in relation specifically to bladder cancer is Jackson (2011); is that correct?
A I think I also discuss --
Q I don't mean --
A -- the question of whether the valsartan, which is presumed to be a similar exposure to NDMA as ranitidine and whether that may be informative. And so I believe Gomm evaluated valsartan exposure related to bladder cancer, and Chan -- I'm sorry. Chan did not include bladder cancer. And then -- I think those were the oral epidemiologic studies that I reviewed in detail.
Q When you're referring to the oral epidemiological studies, are you -- what are you referring to?
A The route of exposure is ingestion.
Q Did you review any inhalational epidemiological studies that evaluated the risk of NDMA exposure in bladder cancer?



A I reviewed the Hidajet study as well.
Q And are you referring to the bottom of page 53 in your report?
A Correct.
Q And did Hidajet evaluate -- specifically evaluate bladder cancer and the risk -- strike that.
Did Hidajet specifically evaluate the risk of bladder cancer associated with the NDMA exposure?
A Can we pull up the study so I can be sure I'm accurately answering your question?
Q Sure. We can pull up Hidajet and mark it as Exhibit -- you know, we'll come back to that because I don't have it pulled up. I thought that I did, but we'll come back to that after a break and get that pulled up on the screen for you.
At any rate, in the body of your report here on page 53 where you discuss Hidajet, there's no specific discussion as it relates to bladder cancer, correct?
A Correct. I don't believe that Hidajet is substantially informative for the question at hand, which is is ranitidine exposure associated with the cancers of interest. And right now we're talking about bladder cancer, but I don't know that it differs for bladder cancer than other cancers -- the other cancers



of interest in this case.
Q Have you evaluated whether the levels of NDMA in ranitidine products are the same or similar to the exposures from other sources of NDMA such as in the Hidajet study or in the dietary studies that we've discussed?
MR. SHEEHAN: Objection.
A Well, again, I think this goes back to the fundamental question, which is the exposure of interest is NDMA via ranitidine. And so examining ranitidine epidemiology or exposures where ranitidine is measured as the exposure of interest is really the informative body of literature.
It's not as if we don't have those studies available. We've just spent an hour and a half or two hours talking about studies that directly address exposure that we're concerned about in this case, so there's not a reason to turn to other bodies of literature unless we think that -- that that exposure is identical or nearly identical.
Q Have you done a comparison as to whether or not the levels of NDMA that have been found in ranitidine, how they compare to the levels of NDMA in the NDMA epidemiological studies that show an increased risk of cancer?

Page 178

MR. SHEEHAN: Objection.
A I reviewed the papers, but I'm not sure if there's an additional question you're asking.
Q I'm asking if you've taken -- if you've looked at the amounts of NDMA that's been found in ranitidine and compared it to the amount of NDMA reported in the NDMA epidemiological studies that show an association with an increased risk of cancers?
MR. SHEEHAN: Objection.
A I have reviewed that, but, again, I don't know that that is particularly informative. And I'll point you back to the answer I just gave where we had a real world assessment of whatever NDMA is in ranitidine -- may or may not be in ranitidine that's captured by the ranitidine epidemiology. There's not a need to do -- to say, well, this is roughly equivalent and so we should examine this literature as well. We have exposure data directly from ranitidine exposures.
Q So just putting it in the context of bladder cancer, looking at the ranitidine-specific epidemiological studies that we just discussed, do any of those ranitidine-specific epidemiological studies that discuss the increased risk of bladder cancer with ranitidine evaluate exposures greater than three years?
MR. SHEEHAN: Objection.

Page 179

A It's unclear because the Norgaard study did a subgroup analysis of at least ten prescriptions which may or may not be greater than three years.
Q Are you suggesting that ten prescriptions equates to three years of use of ranitidine?
A I just said may or may not. I'm saying we don't -- we don't know what those ten prescriptions -- what duration those ten prescriptions were prescribed over.
Q Okay. So is it fair to say that you cannot point to any studies that assess -- any ranitidine specific studies that assess the increased risk of bladder cancer associated with ranitidine where they define the exposure to ranitidine as greater than three years, correct?
MR. SHEEHAN: Objection.
A There's not an explicit definition of greater than three years. That doesn't necessarily mean that -- or that doesn't mean that those patients were not included. However, there's not a specific subgroup analysis of only greater than three years of exposure.
Q Okay. In going back through those particular studies that we just discussed, the only study that assessed exposure greater than three years is the Cardwell study, correct?

Page 180

MR. SHEEHAN: Objection.
A Cardwell defined it as -- defined daily doses, which is likely three years or greater or roughly three years or greater.
Q And did any other studies assess the exposure to ranitidine for the same or similar amount of time as the Cardwell study?
A Well, again --
MR. SHEEHAN: Objection, form.
A Again, the Norgaard study performed a subgroup analysis of at least ten prescriptions, presumably some of those were more than three years, although I don't have a way to verify that, and then followed for an extensive period of time.
Q Well, the Cardwell study actually assessed use greater than 36 prescriptions; isn't that correct?
A They also included greater than 36 prescriptions as a separate analysis. These are different populations and databases, and I don't know that those are necessarily equivalent saying 36 prescriptions in Scotland is the same as 10 in Denmark.
Q Are you suggesting that 10 prescriptions in Denmark is the same as 36 prescriptions in Scotland?
MR. SHEEHAN: Objection.
A That wasn't what I said.

Page 181

Q So do you have any reason to believe that 10 prescriptions in Denmark are equivalent to 36 prescriptions in Scotland?
A I don't have a way to assess one way or another.
Q Okay. Doctor, did you review any dietary NDMA studies that evaluated specifically NDMA and an increased risk of bladder cancer besides Jackson (2011)?
A I don't recall specific studies, but if there's one you'd like to discuss, I'm happy to take a look at it and see if I can familiarize my -- or refamiliarize myself with if it's relevant.
Q Would all of the dietary studies that you evaluated to assess whether or not NDMA is associated with certain types of cancers be included in either your reference list or your materials considered list?
MR. SHEEHAN: Objection.
A Yes. There are -- there may have -- or I reviewed the plaintiffs' expert reports and rebuttal reports, and I don't recall if there were any additional studies in those reports that I reviewed in connection -- in connection to it that would be relevant to this question. But that would be the only other place that there might be an additional reference that I reviewed.

Q Dr. Hatten, you're aware that ranitidine has been globally recalled because it contains the genotoxic carcinogen NDMA, correct?
MR. SHEEHAN: Objection.
A I'm aware that NDMA has been recalled, and that occurred after concerns over NDMA were raised.
Q You would agree that you can't currently prescribe or purchase ranitidine in the United States, correct?
A That's my understanding that it's not available in the United States.
Q Are you offering an opinion regarding the amount of NDMA contained in different ranitidine products?
A No, other than to say that however much is or is not there is -- is contained within the exposures that we are assessing in the ranitidine epidemiology. That's -- again, coming back on this, and I don't mean to be redundant, but that is a real world evaluation of NDMA exposures related to or via ranitidine.
Q Okay. So looking at -- strike that.
Are you offering an opinion on whether the levels of NDMA contained in ranitidine products are equivalent to the amounts of NDMA that has been associated with certain cancers in the published medical



literature?
MR. SHEEHAN: Objection.
A I'm not offering an opinion other than to say that the exposures via ranitidine that have been assessed in the epidemiologic literature do not demonstrate an association between however much NDMA is -- may be in ranitidine and those outcomes in the real world.
Q Let's go --
MS. FINKEN: Let's go off the record for a moment.
THE VIDEOGRAPHER: We are now off the record. The time is 2137 UTC, 5:37 p.m. EDT.
(A 24-minute recess was had.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2204 UTC, 6:04 p.m. EDT.
BY MS. FINKEN:
Q Okay. Dr. Hatten, I apologize for that. I thank you for accommodating my break. If we can go to page 66 of your report. There we go. And at the top of -- actually, it's midway through the first paragraph on page 66 of your report beginning with "Moreover." It says, "Moreover, there is a lack of evidence to justify identification of NDMA itself as a cause of esophageal, gastric, pancreatic, liver or bladder cancer in humans."



Do you see that?
A Yes.
Q Okay. And did you undertake -- well, strike that.
Did you conduct a Bradford-Hill analysis relating to whether or not NDMA itself is a cause of esophageal, gastric, pancreatic, liver or bladder cancer in humans?
A I think I evaluated the literature, and informally applying those criteria that's I think just my standard methodology when asked a question like this, but I did not formalize an analysis within my report. I would point out that there's -- kind of every other body that has looked at this question has also not identified NDMA as a -- as a human carcinogen or a cause of cancer in humans. And I don't think what I'm saying here is different than that, but I rely on my own evaluation of the evidence to reach that conclusion.
Q Okay. And when you say that every other body that has looked at this question has not identified NDMA as a human carcinogen or a cause of cancer in humans, can you identify a single regulatory agency or a scientific authority that has reviewed -- has conducted a full peer review evaluation of the scientific evidence assessing whether NDMA causes cancer in humans in the



last five years?
MR. SHEEHAN: Objection.
A I think there's an NTP update from 2019 or 2021 is the last evaluative body that I have seen that reviewed NDMA.
Q Do you have -- strike that.
Is it your understanding that the NTP conducted a full peer-reviewed assessment of the body of evidence relating to NDMA in cancer when it issued its NTP report on carcinogenicity in 2021?
A I'm not -- I was not involved in their search or review and I'm not confident of exactly what they include -- or what their process was in choosing to include or not include specific literature.
Q Do you know whether or not the NTP evaluated the classification of NDMA as reasonably anticipated to be a human carcinogen in its 2021 report on carcinogenicity?
A I believe that was the language that they used, which is consistent with prior assessments but is not the same as identifying NDMA as a human carcinogen.
Q Do you know the process that the NTP undertakes to evaluate whether an agent is classified as a carcinogen?
A I'm familiar with the methodology from reading

multiple -- multiple publications put out by the NTP, but I think as I said earlier in the deposition, I haven't been involved in any of the actual working groups.

Q Do you know when the last time was that the NTP conducted a working group to assess the classification of NDMA?

MR. SHEEHAN: Objection.

A I do not know the last time they conducted a full working group.

Q If I told you it was in the 1980s, would that surprise you?

MR. SHEEHAN: Objection.

A I don't -- I don't know how to respond to that. It doesn't surprise me or not surprise me. If that's correct, then that's what it is.

Q You have no reason to dispute that the NTP last undertook an evaluation of the classification of NDMA in the 1980s, do you?

MR. SHEEHAN: Objection.

A I think they put out an update with additional literature. I don't -- I don't have a way to speculate as to their motivation as whether it's -- they felt like it was important to reconvene a full working group.

Q Did you -- do you know one way or the other



whether an individual who -- who updates the literature in an annual NTP report can unilaterally change the classification of NDMA?

A I do not -- or it would be speculation for me to purport to know their inner process, but I would be skeptical that a single one individual can change the classification.

Q I'd asked you about whether or not you conducted a Bradford-Hill analysis in relation to whether or not NDMA can cause any type of cancer. Can you direct me to where the Bradford -- oh, strike that.

You have indicated that you did not conduct a formal -- I believe you said formal Bradford-Hill analysis in relation to the question of whether NDMA can cause any type of cancer; is that correct?

A I think I said I didn't formalize it within my report. Typically when I'm asked to evaluate an exposure outcome relationship, I -- I kind of -- I perform an ad hoc review and apply those same criteria to the assessment, but I don't always write a structured brief in the form of a Bradford-Hill analysis.

Q Okay. So is it fair to say that you did not articulate in the Bradford-Hill analysis in relation to whether NDMA can cause any type of cancer within the body of your report?



MR. SHEEHAN: Objection.

A Not in the same format as I did for ranitidine. But, again, I'll bring it back to the exposure of interest in this situation or this causal question is ranitidine exposure with an outcome of the five cancers of interest in this case.

Q So if I wanted to assess your analysis of the Bradford-Hill criteria as it relates to NDMA and its ability to cause different human cancers, how would I do that if it's not articulated in your report?

MR. SHEEHAN: Objection.

A I think there's a summary that includes the same -- or not all of the information but when I discussed the NDMA epidemiology, that there's no consistent exposure outcome relationship between NDMA and any of the cancers of interest, particularly oral exposures to NDMA and the cancers of interest. And so I'm happy to answer any questions and we can go through any of the specific studies that you'd like, but I didn't feel like it was additionally informative to include that in the report.

Q Did you assess whether or not NDMA can cause any other types of cancers besides the five?

A I reviewed additional literature, but I don't recall the -- the degree of detail in that as the



question was narrowed to those five cancers while writing my report.

Q And did you undertake a review of any of the ranitidine literature in relation to causing cancer other than the five that you articulate in your report?

A Yes. I reviewed ranitidine literature related to additional cancers.

Q And what types of cancers did you review besides the five?

A I believe it was lung, breast, kidney, prostate and colorectal. I believe those were the other cancers that were potentially of interest that I reviewed.

Q And did you find any evidence in your review that ranitidine is causally associated with any of those additional types of cancers that you reviewed?

A I did not.

Q Did you find any evidence in your review of the literature that NDMA is causally associated with any of those additional types of cancers that you reviewed?

A I didn't find sufficient evidence to indicate causation for NDMA ex -- oral NDMA exposure in any of those cancers of interest.

Q Okay. So is it your testimony that NDMA does not cause cancer in humans?

Page 190

MR. SHEEHAN: Objection.
A I think it is accurate to state that there is not sufficient evidence that exposure to NDMA is a cause of any of those cancers in humans rather than to say that definitively that NDMA does not cause cancer. From a scientific perspective, we assume that there is no association, assume that the null hypothesis is correct, and it's the burden of the evidence to prove that that is an incorrect assumption.
When you're assessing causation, the assumption isn't that there is a cause and it's a burden to prove that that cause -- that that causal association is there. The assumption is that there is no cause and the burden is to prove that that causation link is true. And there's just not sufficient evidence for ranitidine or NDMA as a cause of those cancers in humans.
Q Did you review any epidemiological studies evaluating the risk of pediatric cancers associated with exposure to NDMA?
A Not that I can recall specifically, although I can't say that I have not reviewed that. I just don't recall specifically if I have or have not.
Q Doctor, I'm just going to go through some questions I have about specific statements that you've made in the context of your report. Going to page 10 --

Page 191

A Yes.
Q -- there's a discussion here about the Florian study and the Gao study. Do you see that?
A Yes.
Q How long does it take to convert nitrate to nitrite after a mean?
MR. SHEEHAN: Objection.
A I don't recall the specific amount of time.
Q Have you ever heard of the term "bacterial nitrosation"?
A Yes.
Q And what is bacterial nitrosation?
A It's when bacteria convert or nitrosate a susceptible molecule, and it can happen enzymatically within a bacteria.
Q Okay. And do you differentiate bacterial nitrosation from antacid catalyzed nitrosation reaction?
A Could you clarify the question, I guess?
Q Yeah, hold on one second. Yeah, so do you have an understanding -- well, what other types of nitrosation besides bacterial nitrosation are you familiar with?
A I mean, there is a pH-dependent nitrosation, which is in an acidic environment, but -- and then bacterial are the two that I think are relevant in this

Page 192

case.
Q Okay. Do you have an understanding as to whether or not all acid-suppressant medications have the ability to cause bacterial nitrosation?
MR. SHEEHAN: Objection.
A I think they can -- all acid-suppressing medication can change your bacterial flora, and some of those changes might impact nitrosation, but -- does that answer your question?
Q Yes. Do you have an understanding as to whether bacterial nitrosation is common to all histamine-2 receptor antagonists or HR2As?
MR. SHEEHAN: Objection.
A My understanding is it would occur with any H2RA or that those changes in bacterial flora would occur with any H2RA.
Q And do you -- you cite to a study called Matsuda at the bottom of page 10. Do you see that?
A Yes.
Q Do you know whether or not the measurements, gastric juice measurements that were taken or gastric juice samples that were taken in the Matsuda study were done fasting or nonfasting?
A I don't recall. We can look at the study if you think it would be helpful for me to answer.

Page 193

Q Do you think it makes a difference on what levels of nitrosamines you would see in the stomach depending upon whether you take the sample fasting versus nonfasting?
MR. SHEEHAN: Objection.
A Typically, fasting generates -- or results in a more acidic environment and optimizes conditions for nitrosation.
Q Have you ever conducted any type of study where you've measured the intragastric pH or nitrosamine compounds in the stomach?
A No.
Q What -- okay. If you can turn to page 14 of your report, please. At the top of page 14, you indicate that plaintiffs' experts relied on Valisure's unpublished, quote, "computer modeling," closed quote, to opine that the enzyme dimethylarginine dimethylaminohydrolase, in parens, DDAH-1, liberates the DMA group from ranitidine.
I know I butchered the pronunciation of the DDAH-1, but did I read that accurately otherwise?
A Yes.
Q Okay. Which experts -- which of plaintiffs' experts are you contending relied on Valisure's unpublished computer modeling relating to DDAH-1?

Page 194

A I don't recall. However, I discussed Dr. Melnick's report following this, so that may be relevant or not.
Q Doctor, do you have an understanding that Dr. Melnick specifically stated he did not rely upon Valisure's computer modeling study to reach his conclusions?
MR. SHEEHAN: Objection.
A I -- I don't recall hearing one way or another whether Dr. Melnick said that.
Q Are there any other plaintiffs' experts besides Dr. Melnick that you contend relied on Valisure's unpublished computer modeling regarding DDAH-1 to support their conclusions?
A I would have to review the plaintiffs' expert reports to provide you with a substantive response. I'm happy to do so if you want to pull them up.
Q Dr. Hatten, did you write this specific part of your report?
A Yes.
Q You also indicated at the bottom of page 14 in a discussion regarding the FDA testing of 180 product samples, you indicate that none of the samples tested were manufactured by GSK. Do you see that? It's the last sentence in that paragraph.

Page 195

A Correct.
Q Do you have an understanding as to why the FDA did not test any samples of ranitidine that was manufactured by GSK?
A I -- I don't have a -- I don't have a substantive opinion on that. I don't know what FDA's decision was.
Q Let's turn to page 16 of your report.
A Okay.
Q In the middle of that page, you're discussing some of the findings of Dr. Najafi. Do you see that?
A Yes.
MS. FINKEN: Okay. And I want to start with the sentence that begins "Furthermore." Are you able to highlight that on the screen?
THE DEPO TECH: Specifically, the "Dr. Najafi" or how far?
MS. FINKEN: No, starting with "Furthermore" -- it's --
THE DEPO TECH: I see it. Till the end of the paragraph?
MS. FINKEN: Till the end of the paragraph, please.
THE DEPO TECH: Stand by. That's the version of highlighting on here.

Page 196

BY MS. FINKEN:
Q So you say here that, "Furthermore, the data generated by Dr. Najafi even if true do not change my opinion that there is no reliable evidence to support the biological plausibility of NDMA exposure from ranitidine use causing specific cancers in humans." Did I read that correctly?
A Yes.
Q And what exactly did you do to analyze whether or not it was biologically plausible that NDMA exposure from ranitidine could cause specific human cancers?
A Again, I think as we've discussed before, the NDMA -- the proposed pathway for NDMA causing cancer is NDMA transformation to the methyldiazonium ion causing DNA damage at the site where that transformation occurs. That requires CYP2E1, for the most part, a liver enzyme that is almost exclusively expressed in the liver in humans and is not present in the other remote sites in the body that are proposed as specific cancers in humans.
The potential for low-dose NDMA or lowish-dose NDMA, even if we assume that Dr. Najafi is correctly analyzing the ranitidine samples, is still not sufficient evidence of a cause of liver cancer, and then there is no other biologically plausible mechanism for

Page 197

that to occur in other sites, at least based on the current body of literature.
Like I said before, I think the human epidemiologic data was not coherent and suggested there was a dramatically increased risk at other sites. It may require more investigation into our understanding of cancer biology and NDMA exposures, but the current understanding of how NDMA is metabolized in humans fits with the human epidemiologic data. And there is -- there's no -- that's completely coherent with human epidemiologic data that there is no relationship between NDMA exposure from ranitidine and cancer outcomes in humans.
Q Okay. Doctor, did you undertake any type of comparison looking at the amount of NDMA found in Dr. Najafi's experiments with ranitidine versus the amount of NDMA in the NDMA dietary epidemiological studies showing an association with an increased risk of certain types of cancers?
MR. SHEEHAN: Objection.
A I evaluated the literature, and I don't think there's a consistent finding that NDMA is associated with specific kinds of cancers even with respect to the dietary studies. But I just looked at the assessments that were reported in those studies in context with

Page 198

Dr. Najafi's reported quantification.
Q You discuss at the bottom of page 16 a cancer -- you use the term a "general cancer promoter." What is the difference between a cancer promoter and a cancer initiator?
A Typically, a pro -- or my understanding is that a promoter is a compound or exposure that causes cancer to grow increasing -- increasingly to grow or grow out of control whereas a cancer initiator is the exposure or insult or error that actually generates the initial cancer cells. We pretty -- I think -- in the past, we understood cancer as kind of a single disease where there was a single insult that caused it to develop and grow, but it's likely it requires multiple components, and substances can act as one or the other or both.
Q Okay. Let's pull up what's -- hold on. I might have to phone a friend for the exhibit number.
MS. FINKEN: Katie, what is the WHO 2002 NDMA evaluation marked as, premarked as?
MS. McDONOUGH: 6365.
MS. FINKEN: If we can pull up Exhibit 6365 and mark that to the deposition.
(Exhibit No. 6365 was marked.)
BY MS. FINKEN:

Page 199

Q Do you see here this is the World Health Organization 2002 Concise International Chemical Assessment Document 38 regarding N-nitrosodimethylamine or NDMA?
A Yes, I see that.
Q And if you can turn to page 22 of that document, and at the top if you can zoom in at the top left-hand corner where -- yeah, there we go. The sentence where it begins "There appears."
It says, "There appears to be no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA." Do you see that?
A I see those words.
Q Okay. And what are DNA adducts?
A Those are products of DNA repair typically where there's damaged DNA or portion -- fragments of DNA that are -- at times there'll be fragments of DNA that are bound to other proteins.
Q And what is formation of DNA adduct -- what is formation of DNA adducts indicative of?
A It indicates there was a substance that interacts with DNA and can potentially cause damage to DNA.
Q Do you disagree with the World Health

Page 200

Organization's statement here where it says that there's no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA?
MR. SHEEHAN: Objection.
A I don't think there's a qualitative difference in the sense that similar adducts are formed. O-methylguanine is what you see frequently after exposure to NDMA. That's not the same as saying that there is equivalent cancer risk or a cancer development in humans and rodents.
Q And it states here in this same paragraph on page 22 that, "In a case that suspected NDMA poisoning in the human male, methylation of liver DNA was evident at both the N7 and O6 positions of guanine," and it cites to Herron & Shank, 1980. Do you see that?
A I see that.
Q Have you evaluated that -- that piece of literature in relation to NDMA poisoning in human male and the methylation of liver DNA that was evident at both N7 and O6 positions?
MR. SHEEHAN: Objection.
A I don't recall whether I reviewed that specific study or not, but I'm happy to look at it if you want to throw it up and we can discuss.
Q Do you disagree with the statement in this

Page 201

2002 World Health Organization report that indicates that there was evidence of methylation of liver DNA at both the N7 and O6 positions in the Herron & Shank article?
A Again, I don't have a recollection of the specifics in that study. I don't have a basis for disagreeing, but I also can't affirm it.
Q And looking at the bottom of page 22, where it says, "Section 11.1.1.1, Carcinogenicity," do you see that?
A I do.
Q And it indicates that "Information relevant to the assessment of the carcinogenicity of NDMA has been derived from epidemiological (case-control studies) of the general population, carcinogenesis bioassays involving laboratory animals, and supporting data related to the genotoxicity, metabolism and interaction of this compound with biological macromolecules." Did I read that accurately?
A I believe so.
Q And it goes on to state, "Although the database is rather limited, data from epidemiological studies are at least suggestive of an association between exposure to NDMA and several forms of cancer, (i.e., gastric and lung), with some consistency of

Page 202

evidence for gastric cancer and for exposure response for lung cancer, the latter in studies in which matching or control for confounders was most extensive." Did I read that accurately?

A You read that accurately, but I'm not -- from a scientific perspective, I don't know what suggestive of an association is intended to mean.

Q Did you find evidence -- when you reviewed the NDMA epidemiological studies, did you find evidence that suggested an association between exposure to NDMA and gastric cancer?

A I think the evidence is mixed, but there is some evidence in the NDMA literature.

Q Going down to the next paragraph in this document that begins with "The exception," the second sentence in that paragraph states, "The weight of the evidence of the carcinogenicity of NDMA in mammalian species is consistent and convincing." Do you see that?

A I see that.

Q Do you agree or disagree with that statement by the World Health Organization?

A I -- I don't agree with that statement.

Q Why not?

A I think there's evidence in a number of mammalian species that have been exposed to NDMA without

Page 203

suggestion of carcinogenicity. So I think it is not consistent nor convincing, but it is appropriate to continue to study this question.

Q Okay. Going further down that paragraph, it says, "Moreover, the pattern of tumor development is characteristic of that for a mode of action of carcinogenesis involving direct interaction with genetic material." Did I read that accurately?

A Yes, you read that accurately.

Q Do you agree or disagree with that statement by the World Health Organization?

A I don't have an opinion on their conclusions, so I'm not sure what -- what more to say on that. I don't know that it's -- I'm not sure that there's anything more substantive to say.

Q Okay. It goes on to state, "In available studies, NDMA has induced tumors in all species examined (mice, rats, hamsters) at relatively low doses in some cases, irrespective of the route of exposure (oral inhalation). Tumors were induced in a wide range of tissues, including the liver, Leydig cells, lungs, kidney and nasal cavity, in the absence of significant nonneoplastic effects in the limited number of studies in which these were well examined." Did I read that accurately?

Page 204

A You read that accurately, although I don't know that the NDMA literature is accurately reflected in that statement.

Q Let's go down to the next paragraph of the World Health Organization document from 2002. It begins with, "NDNA has been consistently mutagenic and clastogenic in human and rodent cells exposed in vitro." Did I read that accurately?

A You read that accurately.

Q What does clastogenic mean?

A Destructive or damaging.

Q It indicates that, "Clear evidence of genetic effects has also been observed in a number of tissues from animals exposed to the substance. Notably, genotoxic effects have been observed in tissues, i.e., liver, kidney lung, where tumors commonly arise following experimental exposure to NDMA and in germ cells." Did I read that accurately?

A Yes, you read that accurately.

Q Do you disagree with those findings of the World Health Organization in 2002?

A I think -- I don't know that those findings are from the World Health Organization. They're reporting experimental data that is all in vitro, so studies performed in cell lines. Those effects are

Page 205

often seen or I would say the literature that I'm aware of that demonstrate those types of effects are related to nonphysiologic conditions and are not necessarily reflective of anything approaching real world conditions.

Q Let's look at the top of page 23 starting with the paragraph "Therefore." The World Health Organization in 2002 concludes the section stating, "Therefore, owing to the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumor formation and the apparent lack of qualitative species-specific differences in the metabolism of this substance, NDMA is highly likely to be carcinogenic in humans." Did I read that accurately?

A You read that correctly.

Q Do you agree or disagree with this statement from the World Health Organization in 2002?

MR. SHEEHAN: Objection.

A It's possible their analysis reached that conclusions. What that should do, though, is prompt additional epidemiologic studies in humans both of NDMA and in the context of this causation question whether ranitidine exposures that contain some amount of NDMA are causes of cancers in humans.

Fortunately, that has been done. It's appropriate probably to do more studies, but we have a fairly robust body of literature that we've discussed already a portion of today. And those are -- that's the evidence that should be driving any conclusions or regarding whether NDMA contained ranitidine is a cause of cancer, not in vitro studies of NDMA. We have human studies of ranitidine.
Q After reviewing the World Health Organization's conclusion on carcinogenicity of NDMA in 2002 and the fact that they concluded that it was highly likely to be carcinogenic in humans, do you still feel comfortable prescribing ranitidine containing NDMA to your children?
A Yes. I would prescribe it again.
Q And you would prescribe it long term?
A Yes.
Q Containing NDMA?
A Whatever NDMA is in ranitidine I would prescribe it.
MS. FINKEN: You can pull that down.
Q Doctor, let's move to page 29 of your report, and you can pull that back up on the screen, please. So on this page of your report, you're discussing some of the carcinogenicity animal studies that were conducted


by GSK in the late '70s and early '80s, correct?
A Yes.
Q Have you ever conducted any animal studies yourself?
A No.
Q Have you ever conducted any carcinogenicity studies?
A Not -- I think we discussed earlier today about cancer database research, but I have not conducted any experimental carcinogenicity studies.
Q And I might have asked you this before. If I did, I apologize. Have you ever used NDMA in a laboratory setting to induce cancer in laboratory animals?
A No.
Q And if we can turn to page 31 of your report, beginning with the paragraph second, you indicate that "Plaintiffs' experts speculated that while the polymorphic form 1 of ranitidine was used in early clinical trials, form 2 was marketed by GSK suggesting that form 1 was also used in these three carcinogenicity studies." Did I read that accurately?
A Yes.
Q Why do you believe that plaintiffs' experts are speculating that polymorphic form 1 ranitidine was


used in the early animal and clinical studies and form -- polymorphic form 2 was ultimately what was marketed by GSK?
A Could you repeat the question -- rephrase the question?
Q Yeah. Why do you believe that it's speculation, that plaintiffs' experts are speculating that polymorphic form 1 ranitidine was used in early clinical trials and polymorphic form 2 was the form that was ultimately marketed by GSK?
A I don't --
MR. SHEEHAN: Objection.
A I was not -- I am not aware of any confirmation of which form was used in the early trials.
Q Well, did you ask your clients whether or not they used form 1 in the early clinical trials or form 2?
A If I recall correctly, I was told that that information wasn't available, although that may be an incorrect -- or I don't have a way to verify that.
Q Okay. Are you a chemist?
A Only in the context of how it relates to medical toxicology. So if there's specific chemical features that -- or specific aspects of chemical structures that are necessary to evaluate and treat potentially poisoned or toxic exposed patients, and I


perform -- occasionally perform simple chemistry that's used for diagnostic purposes.
Q Have you ever conducted mass spectrometry?
A Yes, but not in years.
Q In what setting have you conducted mass spectrometry studies?
A Not mass spectrometry studies. I've done it in chemistry labs and in relation to drug identification.
Q Have you ever conducted gas chromatography?
A Yes.
Q In what setting?
A The same thing. In practical laboratories for -- in chemistry training and then in the context of toxicologic laboratories with drug identification.
Q Have you conducted any mass spectrometry or gas chromatography evaluation of ranitidine?
A No.
Q Have you evaluated polymorphic form 1 ranitidine compared to polymorphic form 2 ranitidine?
MR. SHEEHAN: Objection.
A I'm not -- I haven't personally performed any physical analysis on form 1 or form 2.
Q Have you ever reviewed any documents or analysis of the differences in crystal structure between

polymorphic form 1 ranitidine and polymorphic form 2 ranitidine?
MR. SHEEHAN: Objection.
A Just as listed in this document -- as listed with the references in this document.
Q Have you reviewed any NDMA testing of polymorphic form 1 ranitidine?
A Not -- not outside of what's listed in my report.
Q If we can turn to page 32 of your report. At the top of that page, the sentence actually begins on 31, you say, "Third, plaintiffs' experts allege that because exogenous NDMA formation from ranitidine increases over time, GSK's carcinogenicity studies are inadequate in assessing the carcinogenic potential of ranitidine due to the use of 'fresh' batches." Did I read that accurately?
A Yes.
Q Which of plaintiffs' experts are you quoting there?
A I don't recall at the moment.
Q Okay. I'll submit to you I've searched all of the plaintiffs' expert reports, and I could not find any reference to the use of fresh batches of ranitidine in the context of evaluating the GSK carcinogenicity



studies.
Are you certain that you are accurately quoting plaintiffs' experts in that paragraph?
MR. SHEEHAN: Objection.
A I don't know if that is a quote or a summary of my understanding of an opinion that the concern was that there -- it was only newer or fresher batches.
Q Did you write this portion of your report?
A Yes.
Q Did you rely on any assistance from your lawyers in drafting this portion of your report?
MR. SHEEHAN: Objection.
A Only in providing material, the GSK analysis of batch timing.
Q Well, you go on to say, "Once again, this opinion is without merit. The description that only, quote, fresh, closed quote, batches were used is not accurate."
So again it appears that you're quoting one of plaintiffs' experts there, correct?
MR. SHEEHAN: Objection.
A I don't know if I am quoting or not quoting there. I would have to look back through all the reports to see if -- whether that was a summary of my understanding of their opinions or if that was a direct



quote.
Q Can you point me to any expert that indicated that the GSK carcinogenicity studies were inadequate because it used fresh batches of ranitidine?
A I think I just answered that question. Again, I don't recall. I would have to look back through the reports to be able to verify.
Q Okay. Going down that page, you indicate here -- let me just find the right spot. Okay.
At the second paragraph, in the beginning, you're talking about the results in rodents were replicated in two dog studies conducted by GSK, and you reference WPT/89/196 and WPT/89/306 that were both published in Spurling (1989). Do you see that?
A Yes.
Q And you go down and indicate midway through that paragraph that, "There was no evidence of toxicologically significant findings including tumors in any organ was identified." Did I read that correctly?
A Yes.
Q Did you -- are you aware that there were evidence of mammary tumors in those studies?
MR. SHEEHAN: Objection.
A Can we review the study to confirm that?
Q Yeah, we can pull that up in just a moment,



but sitting here today, are you aware that there were mammary tumors?
A I don't recall one way or the other. Again, I just asked to review the study, so I'd like to do that before I provide an answer.
Q Okay. Fair enough. I don't have it handy so we'll pull it up on a break and we can look at it after our next break.
Just moving to the next paragraph, you indicate that there are several additional rodent studies of the carcinogenic potential of ranitidine use, and you list several studies there: WPT/93/122, WPT/93/201, WPT/93/096, WPT/94/381 and Havu 1990. Do you see that?
A Yes.
Q I believe you testified earlier that you are unaware of the effect that refrigeration would have on the formation of NDMA from ranitidine, correct?
MR. SHEEHAN: Objection.
A I believe I testified to that effect.
Q Are you aware that all of those studies that you mention there refrigerate the ranitidine that they use in that studies -- in those studies?
A I don't recall the details of it. I would have to look back at the specific study and methodology.

Q At the bottom of this page, you start going through some ranitidine genotoxicity studies, and you do that over the course of the next it looks like 18 pages from page 32 to 50; is that correct?
A Yes, that's correct, or -- yeah, the individual study details go through page 50.
Q And did you do a similar analysis of the NDMA genotoxicity studies?
A I did a much -- I reviewed the literature but did a much more limited evaluation.
Q And where did you evaluate the NDMA genotoxicity studies in your report?
A I think I specifically reviewed the DNA adduct studies, but I didn't do a -- I didn't lay out a comprehensive review of the NDMA genotoxicity studies.
Q Dr. Hatten, I want to draw your attention to page 37 of your report. And this is in -- specifically in relation to Martelli (1983), which you discuss halfway down the page. Do you see that?
A Yes.
Q And you indicate here that ranitidine 3.3 millimoles, I believe, by itself was weakly positive only in one of the three experiments. Do you see that?
A Yes.
Q Did you actually evaluate the results of those



studies or are you relying upon what it states in the publication?
MR. SHEEHAN: Objection.
A I would have to look back at the manuscript to see how much detail was in it. I don't recall.
(Exhibit No. 6346 was marked.)
Q Let's pull up Martelli 1983, which I believe we premarked as Exhibit 6346. Is this the Martelli (1983) study that you're referencing on page 47 of your report?
A Yes, I believe so.
Q If you could take a few moments and look over this study, and my question is I'd like to know if you still have the opinion that ranitidine 3.3 millimoles by itself was weakly positive only in one of the three experiments?
A (Reviewing document.) It appears it's in experiment one it was positive, weakly positive.
Q Are you looking at a specific part of the publication?
A Table 1.
MS. FINKEN: Can you go to table 1, please? Thank you. I think it's on page 3.
Q Can you tell me if looking at this today whether or not experiment two and experiment three would



be judged as positive ranitidine only?
A Per the -- the --
Q Let me strike that and ask it a different way because that was a poorly worded question.
Looking at the experiments, experiment one, two and three with ranitidine only, can you tell me looking at this today whether or not experiment two and experiment three would be considered positive for ranitidine and genotoxicity?
MR. SHEEHAN: Objection.
A Per the methods, if you look at the paragraph above, at the bottom of the paragraph above, the authors state that when they increase in the number of grains, nucleus exceeded five as compared with the corresponding control. DNA repair induction was taken to be positive. So experiment one compared to the control is 8.1. Experiment two is 2.4. Experiment three is 4 point -- or is 3.5. So experiment one is the only one that is considered positive based on the methodology reported in the study.
Q And under today's standards, would experiment one be the only one considered weakly positive?
MR. SHEEHAN: Objection.
A I would have to review the methodology or current standards for this type of study. I am not



positive how that has changed without having a little bit more context for current standards.
Q Okay. If we can turn to page 55 of your report, please. And at the bottom of this page, second to last paragraph, you talk about some tumor incidents in nonhuman primate studies. Do you see that?
A Yes.
Q And you indicate here that the monkeys were dosed with NDMA biweekly through intraperitoneal injection; is that correct?
A Correct.
Q And you indicate that the observation periods ranged from 8 to 118 months; is that correct?
A Yes.
Q And you further indicate that all of the monkeys died of cirrhosis or hepatitis but none developed liver tumors; is that right?
A Yes.
Q Do you know how many studies lived past -- strike that.
Do you know how many monkeys lived past the six-month mark in those studies?
MR. SHEEHAN: Objection.
A I don't recall, but we can look at those studies if you think it's helpful.

Page 218

Q You further indicate that all the monkeys died of cirrhosis or hepatitis. And is -- cirrhosis or hepatitis is referring to injury to the liver, correct?
A Hepatitis is inflammation of the liver cells, and cirrhosis is scarring or permanent damage to the liver.
Q Are you aware of human studies that indicate that NDMA is associated with liver toxicity in humans?
MR. SHEEHAN: Objection.
A I don't recall specific studies, although I am aware that that is a concern related to exposure --
Q Do you know --
A -- of high-does exposure.
Q I'm sorry. Were you finish with your answer?
MS. FINKEN: Did you catch all of that, Laura?
THE REPORTER: I was just -- I was on mute. "Concern related to exposure -- of high exposure? I wasn't sure of the last part.
THE WITNESS: High-does exposure.
MS. FINKEN: Sorry about that. I didn't mean to interrupt you.
BY MS. FINKEN:
Q Are you aware of any human ranitidine studies that indicate that ranitidine is associated with hepatotoxicity in humans?

Page 219

A I'm not aware of specific studies, although drug-induced liver injury can occur with basically any drug. But I'm not a -- I can't recall a specific study at the moment that indicates -- that quantifies risk of liver injury in humans.
Q Did you undertake an evaluation of the NDMA literature relating to hepatoxicity in humans and compare it to the ranitidine literature associating ranitidine with hepatotoxicity in humans?
MR. SHEEHAN: Objection.
A I did not perform that specific analysis.
Q Just going down to page 59 of your report, you talk about -- about the Johnson study in the second paragraph on this page. Do you see that?
A Yes.
Q And Johnson, I believe, was advocating for a benchmark dose of NDMA in that study, correct?
MR. SHEEHAN: Objection.
A My understanding of my reading of the study is that Johnson set forth an alternative proposed model that used or that employed a benchmark dose.
Q Are you aware of any scientific authority or regulatory agency that has adopted a benchmark dose approach for genotoxic carcinogens?
A I do not know if there are any agencies that

Page 220

have adopted that.
Q Okay. Doctor, going to the next paragraph in that document on page 59 there where it starts with "The assumption of no threshold," do you see that?
A Yes.
Q You cite to certain articles in this paragraph, Thomas (2013) -- I'm probably butchering pronunciation -- but Nohmi (2018), Calabrese (2019) and Kobets (2019). Do you see that?
A Yes.
Q Doctor, I could not find those citations in your references --
A Hmm.
Q -- or in your materials considered list. Is this are these studies you reviewed and evaluated in drawing your conclusions in this case?
A Yes, yes. That was an oversight if they are not listed.
Q And I would just ask that if you would provide the references for those studies so that we can take a look at them, I would appreciate it, because we had no way of evaluating which studies those were because they're in your references list.
A Yes, I understand.
MS. FINKEN: Let's go off the record for a moment.

Page 221

THE VIDEOGRAPHER: We're now off the record. The time is 2312 UTC, 7:12 p.m. EDT.
(A 23-minute recess was had.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2335 UTC, 7:35 p.m. EDT.
BY MS. FINKEN:
Q Dr. Hatten, I'm going to try to be brief. I have a few more questions for you, and then I'm going to pass you over to your counsel, and I will reserve the rest of my time for follow-up questions if I need to. Okay?
A Very good.
Q So we've talked briefly about the Bradford-Hill analysis that you discussed in -- on page 62 of your report. Do you recall that?
A Yes.
Q And those involve nine factors to consider when determining causality. And those nine factors include experimental data, consistency, dose response -- let's see. Where are we? Okay. You have listed here reverse causation as well. Do you see that as well?
A Yes.
Q Okay. That's not an actual Bradford-Hill criteria, is it?

Page 222

A I think it's applicable and I use it in my analysis as a -- as a factor that has to be considered. I can't recall whether that was included in the original Bradford-Hill address in the 60s, but it's oftentimes assumed that people will account for that and so it's not included, but I think in this case there is some concern.
Q So looking at reverse causation as part of your analysis in addition to the Bradford-Hill criteria as well, correct?
A Correct.
Q Okay. And the other Bradford-Hill criteria that you've listed are biological plausibility, analogy, and coherence, correct?
MR. SHEEHAN: Objection.
A Correct. And then up higher there's a discussion of chance, bias and confounding in the paragraph above.
Q Okay. And those are not Bradford-Hill criteria, though, are they?
MR. SHEEHAN: Objection.
A Yeah, those are part of the Bradford-Hill criteria.
Q I'm sorry. You said that they are part of the Bradford-Hill criteria?

Page 223

A Yeah.
Q Okay. So looking at your Bradford-Hill analysis that's on page 62 of your report, did you conduct an analysis of the specific Bradford-Hill factors pertaining to each separate cancer in the body of your report?
A Are you asking if I conducted a separate analysis for each cancer or if I conducted one for each cancer in the body of my report?
Q I'm asking if you conducted a separate Bradford-Hill analysis for each cancer within the body of your report?
A It's summarized here in a summary paragraph, but I performed each one independently.
Q So if I wanted to assess the outcome of your analysis of the nine Bradford-Hill factors in relation to bladder cancer, where in your report can I find that assessment of those nine factors specific to bladder cancer?
A I think there's a -- you first look at the discussion of the epidemiologic literature that we discussed before, and then the effects are summarized below because the -- or the considerations are summarized below because they're not substantially different for each type of cancer of interest that I was

Page 224

asked to address.
Consequently, I didn't, like, redundantly write the same paragraph over and over again or a similar paragraph over and over again as the lack of evidence was -- for a causal association was pretty -- or was not substantially different between the different cancers.
Q Is it fair to say, though, that the evidence that you evaluated was specific to each cancer?
A Correct.
Q But you don't do a Bradford-Hill analysis specific to each cancer in the body of the report, correct?
MR. SHEEHAN: Objection, asked and answered.
A I think I just explained how I presented it in the report. I would note that the Bradford-Hill criterion is not meant to be a formula that you need to put everything in for each cancer and then you get an answer out. It's a framework for a -- for considering the evidence, and I believe this paragraph summarizes the supporting evidence. I separated out each set of epidemiologic literature in the -- earlier in the body of the report to distinguish each type of cancer, but those considerations occurred for each type of cancer when examining the other components of the literature.

Page 225

Q Okay. So did you separate out your evaluation of the literature relating to biological plausibility for each cancer?
A I did while -- while evaluating the literature, but I summarized it here as there's not significant evidence to support biological plausibility that differed between the different cancers.
Q Okay. Is it fair to say that your report contains only one cumulative analysis of the Bradford-Hill criteria for all five cancers?
MR. SHEEHAN: Objection.
A No, I would not agree with that.
Q Okay. If I wanted to find where you did an analysis of the literature relating to biological plausibility of NDMA causing pancreatic cancer, where would I find that in your report?
A I think you'd find a summary of it in this paragraph saying that there isn't supporting evidence for that. The studies are discussed in detail in the body of the report, though. And I don't know that -- like I said before, I didn't think that adding redundant paragraphs would be informative for the readership.
Q Did you assess dose response separately for each cancer in the body of your report?
A In each of the sets of epidemiologic studies

when that was available.
MS. FINKEN: I don't have any further questions, Dr. Hatten. I thank you for your time. I might have a few questions, like I said, after your attorney questions you.
THE WITNESS: Sure.
MR. SHEEHAN: All right. So we're going off the record.
THE VIDEOGRAPHER: We are now off the record. The time is 2344 UTC, 7:44 p.m. EDT.
(A 24-minute recess was had.)
THE VIDEOGRAPHER: We are back on record the time is 008 UTC 8:08 p.m. EDT.
- - - - -
CROSS-EXAMINATION
BY MR. SHEEHAN:
Q Dr. Hatten, good afternoon. My name is Tom Sheehan. We met obviously. I represent GSK, and I'm going to ask you some questions in connection with some of the questions that Ms. Finken asked you earlier today.
Dr. Hatten, you testified earlier today regarding the maximum daily dose of ranitidine that's used therapeutically. Do you recall that?
A Yes.



Q What is your understanding of the maximum daily dose of ranitidine?
A My understanding for short-term use is 300 mgs twice a day. That's for specific severe conditions such as erosive esophagitis or a bleeding gastric ulcer. However, the long-term dosage is 150 mgs twice a day or less depending on what is effective for people.
Q You also testified earlier today regarding your assessment of dietary NDMA studies and cancer outcomes. Do you recall that?
A Yes.
Q What was your study of that assessment?
A My conclusion was that while there are a few studies that report an elevated point estimate when assessing risk of -- or cancer outcomes and dietary estimations of NDMA, that evidence is not -- is in no way consistent and does not provide sufficient evidence of a true causal relationship between dietary NDMA and cancers of interest in this case.
Q I believe you testified in response to a question that there was some evidence reported for stomach cancer. Do you recall that?
A Yes.
Q And what did you mean by that?
A The same thing that I just said about kind of



all the cancer literature in association with dietary NDMA studies, that there is not consistent evidence of gastric cancer related to dietary estimates of NDMA, and there is not sufficient evidence to demonstrate a causal relationship between dietary NDMA and gastric cancer.
Q In your opinion, have chance, bias and confounding been sufficiently ruled out in dietary NDMA studies to establish a valid association between dietary NDMA and any specific cancer?
MS. FINKEN: Objection to form.
A Just to reiterate, the studies are -- methodology was very mixed and the -- the design is not sufficient to rule out those considerations in evaluating the relationship between dietary NDMA and any other cancers of interest.
Q I think you also testified that you did not formalize a Bradford-Hill assessment of dietary NDMA studies in cancer outcomes. Do you recall that testimony?
MS. FINKEN: Objection to form.
A Yeah, I believe I stated that.
Q And why did you not formalize a Bradford-Hill assessment for dietary NDMA studies and cancer outcomes?
A I think first it was not the exposure of interest in this case. In this case, we're discussing



ranitidine as the exposure of interest and cancers as outcomes.
In addition, as I just stated, there is not sufficient evidence of a reliable association between dietary NDMA and the cancers of interest, and if there's no real association, the performing a Bradford-Hill analysis is not necessary. I think as I stated earlier, I reviewed the supporting literature just to ensure I wasn't inappropriately dismissing such a potential relationship, but I did not find evidence of a true causal association.
Q Dr. Hatten, are you aware of any regulatory body that has determined that the human epidemiologic evidence is sufficient to establish NDMA as a cause of human cancer of any type?
MS. FINKEN: Objection to form.
A I'm not aware of anybody that has determined that NDMA is a -- is identified as a cause of cancer in humans.
Q Are you aware of any scientific organization that has determined that exposure to NDMA has sufficient human evidence to establish NDMA as a cause of human cancer of any type?
A I am not.
MS. FINKEN: Just insert my objection to form,

please. Thanks.

Q Dr. Hatten, you were questioned by Ms. Finken about your use of the word, quote, unquote, "fresh" at page 32 of your report in connection with a description by the plaintiff -- by a plaintiff expert of the GSK animal carcinogen. Do you recall that testimony?

A Yes.

Q Okay. And Ms. Finken represented that she had searched the plaintiffs' expert reports and could not find the word "fresh" in connection with a description of the ranitidine animal carcinogenicity studies. Do you recall that?

A Yes.

MS. FINKEN: Objection to form.

Q I will represent to you that I did my own word search, and at page 59 of Dr. Melnick's report, he describes the use of, quote, unquote, "fresh" samples of ranitidine in connection with his criticism of GSK's lifetime animal carcinogenicity studies.

Does that refresh your recollection of why the word "fresh" may appear in quotes in your report?

MS. FINKEN: Objection, form.

A That would be consistent and my belief is that I was using fresh in quotations in direct response to Dr. Melnick's report.



Q Dr. Hatten, can you describe for me the methodology that you employed in reaching the causation opinions that you are offering in this litigation?

A Yes. I first defined a very clear exposure outcome relationship that is of interest in this case, and that is ranitidine exposure in humans and outcome of each of the cancers of interest, so esophageal, gastric, pancreatic, liver and bladder cancers.

I searched the scientific literature for human studies related to those expo -- that exposure and those outcomes and evaluated each cancer outcome separately based on the body of literature. That literature consistently fails to show an association between ranitidine exposure and cancer outcomes of interest, but to be -- to ensure that I didn't inappropriately dismiss an association, I also reviewed the ranitidine animal and in vitro toxicology data, the -- and given the plaintiff's theory of the case that NDMA associated with ranitidine use was the culprit for cancer outcomes, I also reviewed the NDMA human and animal and in vitro toxicology to ensure that there wasn't a causal association that I was inappropriately dismissing.

It's very clear in medicine that there is a hierarchy of evidence in medicine and science and that when it comes to human toxicology, that human data takes



primacy over any experimental animal data or in vitro data. And so I use the human epidemiology as the primary basis of my opinion, evaluated that according to principles laid forth by Bradford-Hill and did not find evidence of an association much less a causal association between ranitidine exposure and any of the cancers of interest in this case.

That's particularly important because the ranitidine -- defining ranitidine -- ranitidine exposure as the exposure of interest encompasses all of the potential NDMA that may -- that may be contained within any ranitidine exposure. That data is already there, and over the past year, there have been an increasing number of studies that fail to demonstrate consistent association between ranitidine exposure and any of these outcomes of interest.

So science is doing its job. Scientists are doing their job in looking at this potential hazard that necessitated ranitidine being taken off the market, and they've evaluated it in humans and have not found a concerning association between ranitidine exposure and any of these cancer outcomes. As I stated before, I would take ranitidine and I'd prescribe ranitidine to my children without any reservations.

Q Dr. Hatten, is the methodology that you employ



in reaching your causation opinions in this case the same methodology that you employ as a scientist and medical toxicologist?

A Yes. It's the same methodology I use as a practicing physician, as an epidemiologist and as a medical toxicologist, and it's widely accepted in those fields.

Q And you've described that methodology in the body of your expert report; is that correct?

A Yes.

MR. SHEEHAN: I don't have anything further right now. Thank you so much.

MS. FINKEN: Let's go off the record for one minute.

THE VIDEOGRAPHER: We are now off the record. The time is 021 UTC, 1:21 p.m. EDT.

(A 10-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the record the time is 031 UTC, 8:31 p.m. EDT.

- - - - -

REDIRECT EXAMINATION

BY MS. FINKEN:

Q Dr. Hatten, Mr. Sheehan had asked you whether you were aware of any regulatory body that has determined that human epidemiological evidence is

sufficient to establish NDMA as a cause of human cancer of any type. Do you recall that?
A Yes.
Q Are you aware that OSHA has classified NDMA as a carcinogen and it's codified in the Code of Federal Regulations?
MR. SHEEHAN: Objection.
A I would have to see the context for it to know exactly how it's established in the -- by OSHA.
Q Do you have familiarity with the Code of Federal Regulations and OSHA's classification as 13 -- of 13 agents as carcinogens?
MR. SHEEHAN: Objection.
A I'm vaguely familiar with it, but I would need to see the actual Code of Federal Regulations to confirm.
Q Okay.
A I'm also not certain what the scientific underpinnings of that is, whether it's a policy decision or a -- based on robust scientific -- they're an OSHA specific robust scientific analysis.
MS. FINKEN: Can we pull up Exhibit 6341 or mark that as an exhibit to your deposition?
(Exhibit No. 6341 was marked.)
BY MS. FINKEN:



Q Okay. Dr. Hatten, this is a hazard assessment report relating to NDMA that was provided to us by GSK. Do you see that?
A I do.
Q Have you reviewed this hazard assessment report relating to NDMA previously?
A I was shown it, but I have not received a copy of it.
Q Okay. If you can turn to page 7 of this document, please. Do you see where it assesses the carcinogenicity of NDMA at the top of that page?
A I see where it says carcinogenicity, yes.
Q Okay. And if you can look at the bottom of that section of carcinogenicity, the very last sentence of the second paragraph there, it says, "NDMA is a genotoxic carcinogen. Any exposure should be reduced to the extent possible." Do you see that?
A I see that.
Q Do you agree or disagree with that statement by GSK?
A I think the basis for that statement is that it's -- that tumors have been demonstrated in rats. That's directly above in that same paragraph. And notice that it doesn't say NDMA is a human carcinogen. My reading of that would be that it is with respect to



animal -- the animal toxicology data that's quoted above. However, I did not develop this document and that would just be my interpretation of reading it.
Q In looking at the first paragraph, under the carcinogenicity analysis, midway through that paragraph, starting out with "Qualitatively," do you see that?
A Yes.
Q It says, "Qualitatively, the metabolism of NDMA appears to be similar in humans and animals. As a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure." Did I read that accurately?
A Yes, you read that accurately.
Q All right. Do you agree or disagree with GSK's statement as it's stated here in this paragraph?
MR. SHEEHAN: Objection.
A I think this is similar to a conversation we had earlier, a question you asked earlier when reviewing another document. And I agree that metabolism NDMA is similar in humans and animals with the -- and I think we discussed before how rat livers are -- NDMA exposure in rats undergo much greater first-pass metabolism.
It is possible that NDMA is carcinogenic to humans. I don't know that I would say highly likely -- or if I can revise that. I don't know that I would say



that it's highly likely that NDMA is carcinogenic to humans at low levels of exposure. However, this document, if I have reviewed -- if this is the same one I've reviewed before, is a worker safety document that as we've discussed before oftentimes public health and regulatory agencies will err on the side of caution, and I don't believe that this is intended to be an assessment of causation or a causal association between NDMA exposure and any of the cancer outcomes that we are interested in this case. So I don't know that I agree with the statement as written.
Q If we can turn to the next page of this document, please. Page 7, please. I'm sorry. Page 8. You were right the first time.
Just looking at the top paragraph of page 8 that I believe starts at the bottom of page 7, it looks like they're assessing NDMA epidemiological studies, correct?
A They're -- that's my understanding is they're discussing NDMA epidemiologic studies.
Q And if you can go midway down that paragraph, it begins with the sentence "In almost all studies."
MS. FINKEN: I don't know if you can highlight that, please. You might want to zoom --
THE DEPO TECH: Yeah, I'm looking for it. I'm

going to zoom "In almost all studies." Am I close with the cursor?

MS. FINKEN: Hold on. Let me find it. Okay. If you go down see where it says "Goodman, et al. 1992, De Stefani, et al., 1996." Yeah, you're right there. It starts "In almost all studies."

THE DEPO TECH: Okay. The way this was saved, I can't highlight. I can do this, though.

BY MS. FINKEN:

Q Okay. So do you see there, Doctor, where it says, "In almost all studies associations between the cancers of interest and nitrate, nitrite and NDMA were examined with results relatively consistent in this regard with there being an association with cancer most commonly with NDMA." Do you see that?

A I see that statement.

Q Do you disagree with that statement?

A Yes. I don't believe that the body of the epidemiologic literature is relatively consistent.

Q And do you know who drafted this document within GSK?

A I do not. Like I said, I've looked at it once but have not even had a copy of it to review.

Q But you disagree with the statement by GSK that in almost all studies associations between the



cancers of interest and nitrate, nitrite and NDMA were examined with results relatively consistent in this regard with there being an association with cancer most commonly with NDMA. You disagree with that, correct?

MR. SHEEHAN: Objection, asked and answered.

A Yes, I disagree with that.

MS. FINKEN: Okay. I don't have any further questions. Thank you.

MR. SHEEHAN: All right. Give us -- you want to just go off the record real quick?

MS. FINKEN: Sure.

THE VIDEOGRAPHER: We are now off the record. The time is 041 UTC, 8:41 p.m. EDT.

(A 3-minute recess was had.)

THE VIDEOGRAPHER: We are now back on the record. The time is 044 UTC, 8:44 p.m. EDT.

- - - - -

RECROSS-EXAMINATION

BY MR. SHEEHAN:

Q Dr. Hatten, you just discussed a hazard assessment report with Ms. Finken; is that correct?

A Yes.

Q Was that hazard assessment report a hazard assessment report of ranitidine?

A No. It was solely NDMA.



Q Are you aware of any investigation of or assessment of cancer outcomes with ranitidine exposure that has been performed by the FDA?

A I believe in the Florian study, they describe a process of reviewing the ranitidine epidemiologic literature and not identifying any association between ranitidine exposure and outcomes of interest. And that body of literature has continued to grow since then given the awareness of cancer researchers over a possible exposure source related to ranitidine contamination.

MS. FINKEN: Just note my objection to the form of that last question. I didn't want to interrupt.

Q When -- when was the assessment of cancer outcomes with ranitidine exposure done by the FDA?

MS. FINKEN: Objection to form.

A I don't know exactly when they did it, but I believe the Florian study was published in 2019. Let me make sure. I'm sorry. 2021. Florian was published in 2021, but I don't know when they performed their search.

MR. SHEEHAN: Thank you so much, Dr. Hatten. I don't have any further questions.

MS. FINKEN: I don't have any further questions either, Dr. Hatten. Thank you for your



time.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We are now off the record. The time is 047 UTC, 8:47 p.m. ETD.

(The proceedings were concluded at 8:47 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of BENJAMIN HATTEN, M.D., MPH; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 241 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 19th day of May, 2022.

____________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C



CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, Notary Public, State of Florida at Large, do hereby certify that BENJAMIN HATTEN, M.D., M.P.H. remotely appeared before me this 17th day of May 2022 and was duly sworn/affirmed.

WITNESS my hand and official seal this 19th day of May, 2022.

Identification: Professionally known

____________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C



A C K N O W L E D G E M E N T

I, BENJAMIN HATTEN, M.D., M.P.H., hereby certify that I have read the foregoing transcript of my deposition given under oath on May 17, 2022; and that the transcript is a true, complete and correct record, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any attached on a separate sheet herewith.

________________________________

BENJAMIN HATTEN, M.D., M.P.H.

Sworn and subscribed before me,

this _____ day of _____________, 2022.

________________________________

Notary Public, State of ______________



ERRATA SHEET - USL Job No. 6133374-001

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

I, BENJAMIN HATTEN, MD, MPH, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record with the exception of the corrections listed below:

PAGE # LINE # CORRECTION

__________ ______________________

DATE SIGNATURE OF WITNESS

**Exhibits**

**EX 6332 Benjamin Hatten, M.D., M.P.H. 051722**
5:10 37:1,3
**EX 6334 Benjamin Hatten, M.D., M.P.H. 051722**
5:11 37:24 38:1
**EX 6335 Benjamin Hatten, M.D., M.P.H. 051722**
5:11 21:13, 15 57:12
**EX 6337 Benjamin Hatten, M.D., M.P.H. 051722**
5:12 67:16 79:13,14
**EX 6338 Benjamin Hatten, M.D., M.P.H. 051722**
5:12 67:22, 25
**EX 6341 Benjamin Hatten, M.D., M.P.H. 051722**
5:13 234:22, 24
**EX 6343 Benjamin Hatten, M.D., M.P.H. 051722**
5:13 25:14, 16
**EX 6344 Benjamin Hatten, M.D., M.P.H. 051722**
5:14 24:1,3, 6
**EX 6346 Benjamin Hatten, M.D., M.P.H. 051722**
5:14 215:6,8
**EX 6348 Benjamin Hatten, M.D., M.P.H. 051722**
5:15 156:17, 18,24
**EX 6355 Benjamin Hatten, M.D., M.P.H. 051722**
5:15 144:24, 25
**EX 6358 Benjamin Hatten, M.D., M.P.H. 051722**
5:16 150:19, 20
**EX 6361 Benjamin Hatten, M.D., M.P.H. 051722**
5:16 169:19, 23
**EX 6365 Benjamin Hatten, M.D., M.P.H. 051722**
5:17 198:22, 24

**(**

**(1983)**
214:18 215:9
**(1989)**
212:14
**(2004)**
145:25
**(2011)**
175:8 181:8
**(2013)**
220:7
**(2018)**
220:8
**(2019)**
220:8,9
**(2021)**
146:14 147:16 148:25 149:16 150:19 153:23 165:25 169:20

**0**

**0.72**
10:4
**0.91**
159:12
**008**
226:13
**021**
233:16
**031**
233:19
**041**
239:13
**044**
239:16
**047**
241:4

**1**

**1**
38:4 52:20 80:6 81:18 88:11 119:5 207:19,21,25 208:8,16 209:19,23 210:1,7 215:21,22
**1's**
87:24
**1,095**
157:8 159:3, 14
**1.04**
10:3,6 166:15
**1.05**
158:13,24
**1.10**
10:4
**1.14**
10:5
**1.2**
155:15
**1.22**
147:21,22 155:9
**1.24**
10:2 166:16
**1.26**
151:16,19
**1.27**
159:7,11
**1.3**
149:18
**1.41**
146:20,22
**1.46**
146:9
**1.48**
10:3,6 166:16
**1.56**
143:22 145:19,24
**1.75**
159:12
**10**
93:22 180:21,22

181:1 190:25 192:18
**10,800** 151:6
**10-minute** 233:17
**10:38** 6:23
**10th** 40:10,17
**11-minute** 157:18
**11.1.1.1** 201:9
**118** 217:13
**125** 68:12,13,18
**12:00** 55:19
**12:18** 55:22
**13** 234:11,12
**14** 193:13,14 194:21
**14-minute** 99:10
**1438** 6:23
**144** 5:15
**150** 5:16 160:3 227:6
**151** 69:9 76:10
**152** 76:18
**15219** 4:5
**156** 5:15
**16** 195:8 198:2
**1600** 55:19
**1618** 55:22
**169** 5:16
**17** 68:1 80:15
**1736** 99:9
**1750** 99:12
**17th** 6:23
**18** 82:3,4 214:3
**18-minute** 55:20
**180** 194:22
**182** 159:17
**1834** 124:11
**1932** 124:14
**1971** 69:1
**1978** 68:1 76:13, 19 77:9 78:16 79:8 80:15
**198** 5:17
**1980** 200:15
**1980s** 186:11,19
**1983** 215:7
**1987** 66:15 68:6 79:15,16 89:6,9,15 90:1,9,14,23
**1990** 213:13
**1992** 238:5
**1996** 238:5
**1:21** 233:16
**1:36** 99:9
**1:50** 99:12

**2**

**2** 80:19 87:25 160:9 207:20 208:2,9,16 209:20,23 210:1
**2.01** 147:24
**2.24** 146:24
**2.4** 216:17
**2.50** 146:11
**20** 93:23
**2000** 27:1
**2000s** 91:2
**2002** 198:19 199:2 201:1 204:5, 21 205:8,18 206:11
**2006** 26:17
**2010** 26:19
**2011** 26:23
**2013** 26:13,23,24
**2019** 13:7 39:1 185:3 240:19
**2020** 38:8 39:17
**2021** 25:20,24 154:4 185:4, 10,17 240:20,21
**2021b** 151:9,13
**2022** 6:23 22:1 40:10,17
**2037** 157:17
**2048** 157:20
**21** 5:11
**2137** 183:13
**215** 5:14
**22** 83:5 199:6 200:12 201:8
**2204** 183:16
**226** 5:3
**23** 205:6
**23-minute** 221:4
**230,000** 41:9
**2312** 221:3
**233** 5:4
**2335** 221:6

**234**
5:13
**2344**
226:10
**239**
5:4
**24**
5:14 141:13 142:24 143:4,11,17 145:20 146:1
**24-minute**
183:14 226:11
**242**
5:5
**243**
5:6
**244**
5:7
**245**
5:8
**25**
5:13 14:24 25:5 146:12 149:5 151:10 154:23
**26**
9:24 158:8 166:2 167:9
**28**
29:10
**29**
28:15,16,17 29:14 31:4 206:22
**2:34**
124:5,11
**2A**
52:21 80:20, 22,25 81:3 85:17 86:7, 11,12,20 87:3,25 88:3,16,18 89:5,9,12
**2B**
86:13,22 87:4,12,25 88:7
**2nd**
30:20

**3**

**3**
57:15 86:13 87:13 96:18 158:17 215:23
**3-minute**
239:14
**3.3**
214:21 215:14
**3.5**
216:18
**30**
28:24 38:8
**30-day**
170:21
**300**
53:17,19 59:5,12 227:3
**31**
87:20 207:16 210:12
**32**
29:10 30:3, 14 87:12,16, 19 210:10 214:4 230:4
**33**
30:25
**34**
31:1,4
**36**
180:16,17, 20,23 181:2
**365**
159:17
**37**
5:10,11 83:14 214:17
**38**
199:3
**38th**
4:4
**3:32**
124:14

**4**

**4**
216:17
**4.1**
69:10 71:21
**41**
83:11
**42**
80:6
**44**
83:12
**45**
99:15
**47**
215:9
**489**
24:19
**4:37**
157:17
**4:48**
157:20

**5**

**50**
14:24 214:4, 6
**52**
175:3,6
**53**
176:2,17
**55**
217:3
**57**
168:6
**59**
219:12 220:3 230:16
**5:37**
183:13

**6**

**6**
158:16
**60-minute**
124:12
**600**
59:17
**60s**
222:4
**62**
138:2 221:16 223:3
**63**
9:16
**6332**
5:10 37:1,3
**6334**
5:11 37:24 38:1
**6335**
5:11 21:13, 15 57:12 143:4
**6337**
5:12 67:16 79:13,14
**6338**
5:12 67:21, 22,25
**6341**
5:13 234:22, 24
**6343**
5:13 25:14, 16
**6344**
5:14 24:1,3, 6
**6346**
5:14 215:6,8

**6348**
5:15 156:17, 18,24
**6355**
5:15 144:24, 25
**6358**
5:16 150:19, 20
**6361**
5:16 169:19, 23
**6365**
5:17 198:21, 22,24
**66**
183:20,22
**67**
5:12 80:9
**6:04**
183:16

**7**

**7**
5:3 79:16 160:22,25 161:23 235:9 237:13,16
**70s**
207:1
**73**
168:6
**74**
147:24
**74.08**
63:2
**79**
5:12
**7:12**
221:3
**7:35**
221:6
**7:44**
226:10
**7th**
22:1

**8**

**8**
217:13 237:13,15
**8.1**
216:16
**80s**
47:24 207:1
**85**
146:10
**88**
146:24
**8:08**
226:13
**8:31**
233:19
**8:41**
239:13
**8:44**
239:16
**8:47**
241:4,5

**9**

**9**
29:10 83:6
**90s**
47:25 91:2
**94**
159:18
**95**
10:2
**96**
75:24

**A**

**a.m.**
6:23
**abbreviation**
68:23 157:10
**ability**
130:22 188:9 192:4
**able**
56:10 63:6 64:25 79:20 81:24 99:4 103:22 104:17 125:24 132:25 195:15 212:7
**above**
123:20 128:15 216:12 222:18 235:23 236:2
**absence**
83:21 203:22
**academic**
26:20 29:20
**accepted**
139:18 233:6
**access**
8:19,22 23:6 43:1 67:13
**accommodating**
183:19
**accompanying**
41:16
**accordance**
140:25
**account**
8:25 69:6 153:11,13 164:23 171:8 222:5
**accounted**
141:11
**accurate**
15:1 65:3 81:6 101:20 103:13 166:5 190:2 211:18
**accurately**
37:22 39:16 72:1,2 77:6, 7 82:12,13 84:3,4 86:25 89:2,3 127:6 150:16 160:20 162:11,12, 23,24 171:16 176:10 193:21 201:19 202:4,5 203:8,9,25 204:1,2,8,9, 18,19 205:15 207:22 210:17 211:2 236:12,13
**acid**
47:22 58:25
**acid-suppressant**
192:3
**acid-suppressing**
192:6
**acidic**
102:9 191:24 193:7
**acidity**
102:10
**acknowledge**
164:7
**ACKNOWLEDGEMENT**
5:7
**across**
63:17 142:2
**act**
45:16 198:15
**action**
7:4 203:6
**active**
120:25 121:4,12,14, 16,21,25 122:3 129:16 151:21 155:21,22,23

162:3 163:8 164:13,14 166:23 172:8,9 173:10
**actively** 21:11
**acts** 110:3
**actual** 20:14 28:16 65:16 90:7 186:3 221:24 234:15
**acute** 16:4,5,9,11 28:5
**ad** 187:19
**add** 51:12 53:13
**added** 55:5
**adding** 225:21
**addition** 36:15 43:22 49:24 51:13 92:12 222:9 229:3
**additional** 18:11 19:16 32:6 40:16 56:16 81:12 86:13,17 93:16 97:12 124:20 141:22 148:18,23 154:19 156:2 169:7 178:3 181:20,24 186:21 188:24 189:7,16,20 205:22 213:10
**additionally** 188:20
**address** 50:24 177:16 222:4 224:1
**addressed** 9:14
**adduct** 199:20 214:13
**adducts** 199:12,15,21 200:3,6
**adequate** 83:21 132:15
**adequately** 58:4 83:15 117:2 131:13,19,24 169:5
**adjust** 140:1 154:4
**adjusted** 129:14 147:21 149:17,24 151:15,18 154:7 155:8,14 158:12,21,22 159:5,13,16,18 164:6,8,12
**adjusting** 151:20 163:21
**administering** 108:17
**administration** 71:24 73:3
**adopted** 219:23 220:1
**advocating** 219:16
**affect** 101:5,11,12,17,23,25
102:17 103:25 104:1
**affected** 110:14 172:24
**affirm** 201:7
**affirmatively** 77:16
**afternoon** 124:16 226:17
**agencies** 77:24 78:13 81:16 82:11 219:25 237:6
**agency** 45:6 78:10 117:16 184:22 219:23
**agenda** 66:21
**agent** 15:24 45:18 46:3,11,18,22 71:2,11,18 87:13,24 88:3,7,12,22 112:22 113:5 117:6 126:21 164:21 185:23
**agents** 15:19,24 83:13,19,23 85:18 86:20 234:12
**aggregate** 120:8
**ago** 18:10 34:3 66:2
**agree** 10:10,13 63:11 64:4,13 72:3,19
73:10 77:8 78:14,16 84:5 85:7,16 87:3 98:5 112:21 116:14 122:5 123:25 125:2 127:11 128:4 134:22 135:8,10 136:19 148:5,8 150:3,7,9 157:23 182:7 202:20,22 203:10 205:17 225:12 235:19 236:14,19 237:10
**agreement** 6:5 39:6
**ahead** 62:4,5
**air** 47:17
**airway** 19:16
**albeit** 143:19 146:4 147:1 148:2 150:5 159:7
**alcohol** 164:2,8
**Alfano** 4:3
**allegation** 20:10 47:13 96:11
**allegations** 109:23
**allege** 210:12
**alleged** 19:4 47:4 65:23 85:4

98:3
**alleging**
19:12,14 20:7 47:3
**allergic**
59:3
**alternative**
219:20
**alters**
70:21
**American**
26:8 28:3
**amine**
55:6
**amount**
22:20 41:6 92:19 108:24 125:9 128:23 129:1 130:17 131:3,12 145:10 159:20,21 171:7,9 178:6 180:6 182:13 191:8 197:15,17 205:24
**amounts**
74:14 102:17 109:15 118:15 178:5 182:24
**analogy**
222:13
**analyses**
75:8 140:14
**analysis**
9:17 74:23 75:3,9 95:2 96:17 107:18 108:1 115:8, 20 120:14 137:12 138:1 140:7,8 143:16,25 148:22 149:6,16 151:21 152:20 154:9,12 156:1,15 157:7,24 158:1,4 159:1,24 162:15 164:6,9 167:15 171:20 172:2 174:1,10,11 179:2,21 180:11,18 184:5,12 187:9,14,21, 23 188:7 205:20 209:23,25 211:13 214:7 219:11 221:15 222:2,9 223:3,4,8, 11,16 224:11 225:9,14 229:7 234:21 236:5
**analyze**
162:2 196:9
**analyzed**
91:3 138:11 141:25
**analyzing**
32:3 196:23
**Anapol**
4:12
**and/or**
6:6 37:19 82:10
**animal**
28:10 35:19, 22 49:24 50:12 51:5 61:23 66:6 69:15 70:15 72:6,23 76:21 83:16 85:20 86:2 95:11,18 98:17,23 138:20 206:25 207:3 208:1 230:6, 11,19 231:16,20 232:1 236:1
**animals**
54:8 61:17, 20,21 64:2, 24 65:21 70:3,8 72:25 83:7,20,24 84:12 85:25 88:21,25 89:14 112:13 117:24,25 201:16 204:14 207:14 236:9,20
**Annals**
26:6,10
**annotate**
23:9
**annotated**
9:8
**annual**
187:2
**answer**
11:20 12:8 20:1,22 49:22 53:24 70:11 72:5, 20 93:14,20 96:13 98:6 103:7,16,18 109:22 117:2 122:10 141:20 142:19 146:7 152:23 162:13 163:3 171:16 178:12 188:18 192:9,25 213:5 218:14 224:19
**answered**
169:2 212:5 224:14 239:5
**answering**
77:15 123:10 176:10
**answers**
11:25 12:3 138:5
**antacid**
191:17
**antagonist**
47:22
**antagonists**
48:11 158:19 159:7 192:12
**anticipate**
63:9
**anticipated**
80:25 185:16
**anybody**
8:10 44:20 74:16 229:17
**anyone**
6:15 10:10 41:20 42:1 43:16 44:13
**apart**
32:3
**apologize**
98:16 171:18 183:18 207:12
**apparent**
205:12
**Appearing**
4:7
**appears**
21:21 24:19 145:5 199:9, 10 211:19 215:17 236:9
**applicable**
222:1

**applications** 8:23 61:2 113:7
**applied** 51:6
**applies** 161:17
**apply** 187:19
**applying** 184:10
**appointment** 36:21,23,24
**appraise** 137:21
**appreciate** 54:20 169:11 220:21
**approach** 114:9 116:5 219:24
**approaching** 205:4
**appropriate** 20:2 49:21 71:14 78:22 98:1 99:5 119:13 120:21 153:13,22 163:8 164:14,16 166:23 172:8 173:9,19,25 203:2 206:2
**appropriately** 147:14 148:10,21
**approval** 92:6,12
**approved** 58:23 117:11,14
**approximate** 14:22
**approximately** 13:13 14:16 41:9 53:16, 19
**April** 40:10,17,23 41:3
**area** 99:20 115:3 120:17
**areas** 114:24 166:5
**argument** 139:6
**arise** 204:16
**arm** 116:15,16
**Arnold** 17:19
**around** 26:3 135:24, 25 142:15 168:13 174:5
**article** 134:20 201:4
**articles** 25:23 31:10 41:16 134:17 220:6
**articulate** 187:23 189:5
**articulated** 140:14 188:10
**asbestos** 16:16,22 17:1,3,9 56:3,11,17, 18,22 117:20 118:25 126:18 131:7,10
**asked** 22:6 23:4 45:20 48:17, 20,24 49:8 50:23 57:5 64:16 98:15 113:9,10 123:11 168:3 169:2 184:11 187:8,17 207:11 213:4 224:1,14 226:20 233:23 236:18 239:5
**asking** 18:18 44:15 52:10,12 76:5 122:10, 11 178:3,4 223:7,10
**aspects** 128:9 208:23
**assays** 74:23
**assess** 45:17 46:2, 10 50:4 57:7 116:22 117:21 118:9 119:13 123:8 131:14,24 134:4 139:14 143:12 144:2 179:11,12 180:5 181:4, 14 186:6 188:7,22 223:15 225:23
**assessed** 57:9 93:8 134:3 157:3 179:24 180:15 183:5
**assesses** 235:10
**assessing** 128:22 137:25 154:23 160:20 182:17 184:25 190:10 210:15 227:15 237:17
**assessment** 23:20 35:24 36:2,3 87:15 110:17 118:16,17 129:11 132:15 160:19 174:1 178:13 185:8 187:20 199:3 201:13 223:18 227:9,12 228:17,23 235:1,5 237:8 239:21,23,24 240:2,15
**assessments** 36:4 82:7 185:20 197:24
**assist** 22:15 64:25 82:5
**assistance** 211:10
**assistant** 22:14 40:2, 3,15,25
**associate** 17:14 34:13
**associated** 20:16 21:3,4 29:20 51:9 65:23 92:11 108:7,25 113:11 114:15 121:23 122:1,4 129:4 131:23 143:13 155:7 161:3 162:9

166:11,16 167:3 168:22 173:16 174:7 176:8,22 179:13 181:14 182:25 189:15,19 190:18 197:22 218:8,24 231:18

**associating** 219:8

**association** 49:8 83:19 84:24 85:24 86:18 124:23 127:18 132:12,20,23 133:2,3,21 135:19,21,22 137:20 139:2,10,14, 20 141:18 142:10,18 144:2,11 147:9 148:11,15 155:25 156:7 161:17 163:1,5,9, 15,17,18,21 167:20,22 168:5,10 172:10,14,16 173:2,10 178:7 183:6 190:7,12 197:18 201:23 202:7,10 224:5 228:1, 8 229:4,6,11 231:13,16,22 232:5,6,15, 21 237:8 238:14 239:3 240:6

**associations** 122:2 154:15 161:9 168:12 238:11,25

**assume** 12:8 38:18 48:20,24 53:13 190:6, 7 196:22

**assumed** 222:5

**assuming** 42:4 43:5 51:8 139:4 160:20

**assumption** 148:11 190:9,11,13 220:4

**assumptions** 48:17

**atmospheric** 52:8

**Atrium** 18:7 21:7

**ATSDR** 99:3

**attach** 38:4

**attached** 25:17

**attempt** 50:18 77:24 162:10

**attempted** 100:21

**attempting** 116:8 123:6

**attempts** 71:5

**attending** 26:20

**attention** 38:12 214:16

**attenuate** 153:7

**attenuated** 161:10 162:3,16

**attorney** 22:10 38:16 226:5

**attorney-client** 6:6

**attorneys** 20:20 41:23 42:1,5,8,25

**author's** 146:21 148:12 162:5,25

**authoritative** 70:25 71:7 82:15,22 83:2 133:13, 15,24 134:6, 8,10,18 136:22 137:1

**authorities** 82:6

**authority** 136:17 184:23 219:22

**authors** 130:12 147:22 148:13 149:3 154:7 162:14,18 164:7 165:1 216:12

**availability** 61:1

**available** 23:6,7 25:8 43:15 69:5 76:15 77:3 79:4,9 90:14 95:12,18 98:17 116:10 136:18 144:17 165:2 174:11 177:15 182:11 203:16 208:18 226:1

**average** 127:20

**avoid** 81:17 153:4

**aware** 6:2 25:25 43:18 50:15 53:25 61:1 63:18 93:11 95:2,6 102:23 104:19,21 105:14,19 106:2 107:2, 10,16 109:10,13, 18,23 110:2, 6,8,12,15, 20,22 111:1, 3,7,9,14 112:6,15 128:21,25 136:7 171:12 182:1,5 205:1 208:13 212:21 213:1,21 218:7,11,23 219:1,22 229:12,17,20 233:24 234:4 240:1

**awareness** 240:9

B

**bac** 104:5

**back** 33:8 49:14 54:23 55:21 57:11 60:13

67:15 70:14 71:20 74:24 76:10 80:1 85:6 87:23 88:18 91:10, 13 93:24 94:20,22 95:14 99:11, 19 103:16 108:10 114:13 119:11 124:13,19 126:23 142:23 144:13 145:20 150:12 151:11 153:23 157:19,22 158:15 162:13 169:12 170:10 171:19 176:12,14 177:8 178:12 179:22 182:18 183:15 188:3 206:23 211:23 212:6 213:25 215:4 221:5 226:12 233:18 239:15

**backwards**
138:16

**Bacon**
8:3 12:18,21

**bacteria**
102:18 104:6 191:13,15

**bacterial**
102:11,13,14 191:9,12,16, 21,25 192:4, 7,11,15

**bad**
39:23

**base**
36:12 139:22

**based**
22:6 57:9,23 59:9 66:5 77:22 78:8 86:13,24 87:12,14 89:10,13 108:9 114:11 116:8,25 119:17 126:25 131:2 135:22 145:17 147:11 150:10 197:1 216:19 231:12 234:20

**baseline**
115:21 121:18

**basic**
101:19

**basically**
219:2

**basis**
78:13 88:23 201:6 232:3 235:21

**batch**
211:14

**batches**
210:16,24 211:7,17 212:4

**bathroom**
107:14

**bear**
24:16 156:17

**becauses**
103:6

**bedside**
36:15

**beers**
53:4

**began**
26:21

**begin**
28:15

**beginning**
29:9 42:22 79:2 183:22 207:17 212:10

**begins**
195:14 199:9 202:15 204:5 210:11 237:22

**behalf**
4:7 7:3,7 14:2,12 16:22 17:6, 22 18:13,14 19:6 23:15 56:5

**belief**
230:23

**believe**
10:25 12:25 13:7,23 15:9 17:3 18:7,19 19:17,24 21:8 23:5,23 25:3,7 26:1 34:11 37:5, 8,9,12 38:10,16 39:1 40:15, 24 42:9,15, 17 43:9 44:9 56:14 58:22 59:5,15 61:11,25 63:6,13 69:21 70:15 72:2 74:22 77:7 80:16 81:6 82:13 84:4 85:11 86:23 90:4, 8,24 92:2,10 97:8 100:5 103:22 106:18 114:18 132:18 144:15 145:4,15,19 156:13 158:16 160:3 169:15 170:4 171:13 174:4 175:14 176:20 181:1 185:19 187:13 189:10,11 201:20 207:24 208:6 213:16,20 214:22 215:7,11 219:16 224:20 227:20 228:21 237:7,16 238:18 240:4,19

**below**
57:15 223:23,24

**benchmark**
219:17,21,23

**benefit**
103:12

**benefits**
107:21

**benign**
71:23 72:10, 14

**Benjamin**
5:2 6:21 7:24

**besides**
43:2 44:20

74:16 96:5 171:21 181:8 188:23 189:9 191:21 194:12
**best** 12:6 13:25 19:19 20:21, 23 116:12
**better** 75:21 79:24 122:7,12 154:8
**bias** 122:16 138:25 139:9,15,25 152:7,8,17 153:4,11,12, 14 164:19 165:10,13,18 222:17 228:6
**bibliographie s** 97:10
**bibliography** 99:4
**big** 134:15 138:23
**bigger** 139:5
**bill** 40:4
**billed** 40:3
**billing** 40:2,24
**bills** 38:20,23 39:17 41:1
**binary** 130:14
**bioassays** 201:15
**biobank** 142:3
**biologic** 85:21
**biological** 50:1 72:12 96:2 138:17, 19 172:21 196:5 201:18 222:13 225:2,6,14
**biologically** 83:22 85:8, 17 95:21 96:3 196:10, 25
**biology** 197:7
**biostatistics** 33:13
**bit** 27:21 28:18 40:9 52:24 55:11 59:20 65:24 74:1 79:17 80:1, 10 99:16 112:18 123:10 135:5 139:7 142:23 143:8 160:24 217:2
**biweekly** 217:9
**bladder** 9:22 10:2 57:18 58:9 91:17,21 94:25 140:23 141:14 143:13,18 144:5,11 146:3,14,20 147:1 148:1 150:4 154:24 155:8 156:10 157:5,25 158:10 159:20 161:3 162:9 163:2 165:19,24 166:13,18 167:12,21,22 168:15,22,25 171:22,24 172:4,16,17 173:3,4,13, 17 174:8,10 175:1,8,15, 16,25 176:6, 8,18,24,25 178:19,23 179:13 181:8 183:25 184:7 223:17,18 231:8
**bleeding** 227:5
**blind** 51:16
**blocks** 11:13
**blood** 70:20
**board** 28:3 34:5,8 117:15
**bodies** 70:2,7 77:23 177:18
**body** 49:21 50:4, 6,7 52:16 53:5 55:2,4 60:2,4 70:21 71:5,6 78:9 92:12 98:10, 12 100:19 104:5 110:20,22 111:1,4,14 135:18 136:6 162:19 174:19,24 176:16 177:13 184:13,19 185:4,8 187:25 196:19 197:2 206:3 223:5, 9,11 224:12, 22 225:20,24 229:13 231:12 233:9,24 238:18 240:8
**book** 30:19,24
**borne** 86:1
**Bosick** 4:3
**bottom** 9:17 30:2 160:25 176:2 192:18 194:21 198:2 201:8 214:1 216:12 217:4 235:13 237:16
**bound** 199:19
**box** 8:25 21:18
**boy** 126:7
**brackets** 80:17
**Bradford** 187:11
**Bradford-hill** 134:1 137:8, 12,16,25 139:16 140:5,8,13 141:1 171:20 184:5 187:9, 13,21,23 188:8 221:15,24 222:4,9,12, 19,22,25 223:2,4,11, 16 224:11,16

225:10 228:17,22 229:6 232:4
**brand** 149:14
**Braunstein** 25:4 43:21
**break** 11:18,19,22 52:24 55:12,15,16 85:15 97:14,17 99:7,16,17 124:6 139:7 176:14 183:19 213:7,8
**breakdown** 15:2,5 27:21
**breaking** 126:6
**breast** 189:10
**brief** 16:9 187:21 221:8
**briefly** 7:20 26:12 221:14
**bring** 70:14 188:3
**brings** 154:21
**broke** 100:11
**broken** 87:25
**bulk** 113:22
**bunch** 143:25
**burden** 190:8,11,14
**butchered** 193:20
**butchering** 220:7
**button** 6:17
**byproducts** 62:12

**C**

**Calabrese** 220:8
**calculated** 160:13
**called** 115:8 192:17
**cancer** 9:23 10:2 19:25 20:13,16 21:1,3,4 32:8,11,15,18,22 33:1,19,25 34:22,25 45:7 47:3,8,14 49:5,10,16,20,23 50:3,21 51:2,6,10,14,23 52:2,13 53:6,7 57:18,25 58:9 61:9,14,17,19,22,24 62:1 63:25 67:1 77:14,15 78:3,7 83:15,20 84:15,16,24 85:3,8,18,22,25 86:6,8,17 89:24 90:3,22 91:17,21 92:14 94:3,25 95:22 96:2,5,10,12 97:2,9,22 98:18 100:8,10 105:17 108:7,12,23 109:1 116:22 117:21 118:13 125:4,19,20 126:16,17,20 127:1 128:5,12,23 129:12 130:1,19 131:2,9,16,23 132:13 138:7 140:7,9,10,12,14,23 141:15 143:13,18 144:1,5,12 146:3,14,20 147:1 148:1 150:4 153:14,20 154:24 155:8 156:11 157:5,25 158:10 159:20 161:3,17 162:9 163:2 165:19,24 166:13,18 167:13,21,22 168:22,25 171:22,24 172:4,16,18 173:3,4,14,17 174:8,11 175:1,8,15,16,25 176:6,8,18,24,25 177:25 178:20,23 179:13 181:8 183:25 184:7,15,21,25 185:9 187:10,15,24 189:4,25 190:5 196:13,24 197:7,12 198:3,4,5,8,9,11,12 200:9 201:24 202:1,2,11 206:7 207:9,13 223:5,8,9,11,17,19,25 224:9,12,18,23,24 225:3,15,24 227:9,15,22 228:1,3,5,9,18,23 229:15,18,23 231:11,14,19 232:22 234:1 237:9 238:14 239:3 240:2,9,15
**cancer's** 131:6
**cancerous** 72:14
**cancers** 47:4 67:2 73:12 90:10 96:13 97:9 98:8 100:12 130:24 153:19 167:3,23 168:15 176:23,25 178:8 181:15 182:25 188:6,9,16,17,23 189:1,7,8,12,16,20,23 190:4,16,18 196:6,11,19 197:19,23 205:25 224:7 225:7,10 227:19 228:15 229:1,5 231:7,8

232:7 238:12 239:1
**capital** 149:22
**capture** 164:2
**captured** 165:5 169:5 173:22 174:16 178:14
**car** 77:20 118:2
**carbon-containing** 60:18
**carcin** 52:21
**carcinogen** 17:1,4 18:16,20 19:22 50:3 66:1,4,5,8, 14 67:2 81:1,14,18, 19,25 82:1 86:22 89:5 105:13 107:14,25 118:2,3,21 119:2 130:17 131:14 182:3 184:15,21 185:17,21,24 230:6 234:5 235:16,24
**carcinogenesis** 31:10 201:15 203:7
**carcinogenic** 20:8 53:21, 25 54:1 63:11,21,23 64:1,2 68:9 69:15 73:2,3 76:20 77:5, 10,21 78:18 80:5 81:4 83:25 84:12 87:13,24 88:4,7,12 117:5 205:14 206:12 210:15 213:11 236:11,23 237:1
**carcinogenicity** 15:19,23 45:18 46:2, 10,18,22 67:10 71:1, 11,17 82:16, 23 83:7,14, 24 84:11 88:14,16,17, 20,21,24,25 89:14 118:9 119:5 185:10,18 201:9,13 202:17 203:1 205:10 206:10,25 207:6,10,21 210:14,25 212:3 230:11,19 235:11,12,14 236:5
**carcinogens** 52:21,22 71:6 86:8,23 87:4,5 119:5 219:24 234:12
**Cardwell** 94:16 141:24 142:4 154:11,20 155:4,19,21 156:9,16,20, 21 157:23 164:23 165:22 172:7 179:25 180:2,7,15
**Cardwell's** 154:22
**care** 13:18 14:8 28:13 30:20 154:3
**career** 14:25 35:20
**cares** 36:14
**Carlos** 4:10 7:2
**carried** 107:24
**carry** 105:12,16,21 106:14,17,24
**case** 9:13 12:17, 21 13:15,16, 17,23,24 14:7,9,11, 13,15 17:20 18:10 19:7 20:5,17 21:7,8,9,15, 20 22:4 23:13,16,21 25:2,25 30:3,4,7 32:2 36:4 38:25 39:7, 12 41:12 44:5 47:1,11 50:25 51:18 54:6 56:9 57:6,13 58:2 61:13 63:15 67:3 68:5,7 70:17 72:8, 22 73:1,19 74:21 75:6 76:14 83:2,4 85:2,4,5,23 90:17,21 96:11,12 98:2,4 108:5 114:1 119:22,23 120:11,12,22 121:11 131:10 136:8 140:6 141:21 144:9 148:18 149:22 174:14 177:1,17 188:6 192:1 200:12 220:16 222:6 227:19 228:25 231:5,18 232:7 233:1 237:10
**case-control** 113:19,22,24 114:1,11 153:25 155:1 201:14
**case-specific** 57:4
**cases** 13:14,18,21, 22 14:1,6 15:6,7,11,13 16:3,13 17:10,12,14, 17 18:2,5 21:5,10 57:10 118:3 127:24 128:1 131:10 165:19 203:19
**Cassin** 4:11
**catalyst** 110:3
**catalyzed** 191:17
**catch** 218:15

**categories**
88:15
**categorizing**
128:17
**category**
80:19,22
88:13,19,23
**caught**
127:22
**causal**
49:8 78:24
98:3 119:13
135:21
137:20
138:16
147:10
152:19 188:4
190:12 224:5
227:18 228:4
229:11
231:21 232:5
237:8
**causality**
78:1 137:25
152:12
221:19
**causally**
21:3 137:23
189:15,19
**causation**
13:19 34:22,
25 49:6 50:4
57:3 77:13
79:7 84:13
98:3 113:9
119:17,19
120:1 133:7,
12,23,25
137:1,19
138:13
139:6,19,21,
23 152:16
173:12,13
174:10
189:22
190:10,14
205:23
221:22 222:8
231:2 233:1
237:8
**cause-effect**
141:7
**cause/effect**
161:12
**caused**
126:16,17
198:13
**causing**
189:4 196:6,
13,14 225:15
**caution**
20:18 77:18
81:16 237:6
**cavity**
203:22
**CDC**
30:12
**cell**
9:2 204:25
**cells**
54:7,8
198:11
203:21
204:7,18
218:4
**Centre**
4:4
**certain**
15:19 33:23
73:12 100:9
103:3 104:14
111:7,8
125:9,15
127:2 131:5
133:13,18
159:21
181:15
182:25
197:19 211:2
220:6 234:18
**certainly**
11:19
**CERTIFICATE**
5:5,6
**certifications**
34:5
**certified**
34:8
**chain**
55:6 138:16
152:19
**Chan**
175:15
**chance**
13:24 132:24
134:2,4
138:25
139:9,15,25
144:12
222:17 228:6
**change**
102:16 115:2
187:2,6
192:7 196:3
**changed**
17:12 163:4
217:1
**changes**
112:11,12
120:19,20
192:8,15
**changing**
102:12
**chapters**
30:24
**char**
58:4
**characteristic**
114:5 203:6
**characteristics**
153:10
**characterization**
65:4
**characterize**
132:1
**charge**
38:20
**chemical**
28:7 60:14,
17 63:20
199:2
208:22,23
**chemicals**
28:7 68:9
82:16,23
**chemist**
208:20
**chemistry**
209:1,8,14
**children**
206:14
232:24
**Chinese**
69:16
**choking**
174:22
**choosing**
185:13
**chosen**
66:17
**chromatography**
209:10,17
**chronic**
16:12,13,17
18:8 28:6
53:7
**chronically**
165:3
**cimetidine**
121:14 144:2
145:16
155:24 158:9
**cirrhosis**
217:16
218:2,5
**citations**
220:11
**cite**
139:13
192:17 220:6
**cites**
200:15

**city** 120:13
**civil** 13:21,24
**claims** 19:18
**clarify** 39:22 52:10 85:14 92:3 142:20 191:18
**clarifying** 75:13
**clarity** 160:6
**class** 48:10,13 81:18 91:7 97:22,25 98:13 156:2 161:15,16
**classes** 114:25
**classifiable** 87:14
**classification** 66:14 80:24 81:24 87:1, 22 89:9 185:16 186:7,18 187:3,7 234:11
**classifications** 80:23 87:9, 21
**classified** 88:22 89:5, 16 185:23 234:4
**clastogenic** 204:7,10
**clear** 60:9 103:10 119:18 123:1 150:2 204:12 231:4,23
**clearly** 130:25
**click** 6:17
**clients** 208:15
**clinic** 93:7
**clinical** 26:1,2,9 36:21,24 48:2,6 91:22 92:1,4,7,16 93:2,6,12 113:1 118:23 207:20 208:1,9,16
**close** 169:9 238:1
**closed** 193:16 211:17
**closely** 103:8
**closest** 121:16
**clustered** 135:23,24
**clustering** 142:14
**coating** 18:6,9
**Code** 234:5,10,15
**codes** 117:18
**codified** 234:5
**Coello** 4:10 7:2
**coffee** 86:12
**coherence** 138:23 222:14
**coherent** 197:4,10
**cohort** 113:18,23,25 114:2,6 115:25 116:12 127:1 142:6 145:8 146:17 147:18,19
**cohorts** 141:22
**College** 26:8
**Colorado** 8:1 27:7 34:12,14 36:22
**colorectal** 189:11
**column** 158:19 159:2 160:25 161:9,23 163:25
**comb** 99:3
**combination** 42:14
**combine** 136:1
**combined** 38:2
**come** 100:17 176:12,14
**comes** 71:1 106:5 110:2 136:12 137:1 231:25
**comfortable** 108:13,15,17 206:13
**commercial** 61:1
**commercially** 60:22
**Committee** 26:9
**common** 156:3,5 192:11
**commonly** 149:11 204:16 238:15 239:4
**communicate** 10:10,14
**communications** 10:16
**comorbidities** 151:20
**company** 23:5
**comparator** 121:1,5,13, 16,17,22,25 122:3 129:17 144:3 149:16 151:21 155:23 162:3 163:8 166:23 172:8,9 173:10
**comparators** 121:15 155:21
**compare** 115:4 120:12 121:6 129:19 130:1 177:23 219:8
**compared** 10:1 70:8 148:2 150:4, 11 155:10, 17,20,22 162:17 164:13 166:12,22 172:17,18 178:6 209:20 216:14,16

**comparing**
121:3 147:20 151:19 155:11,14 159:5 161:10 163:5,7,15, 18 164:10 166:18
**comparison**
73:20 74:3 158:17 162:16 166:23,24 177:21 197:15
**comparisons**
164:17
**compelling**
108:11
**compiled**
24:14 83:11
**complaint**
20:9,14
**complete**
53:23
**completed**
74:16
**completely**
11:13 60:8 70:22 116:7 164:15 173:6 197:10
**complex**
82:17,23
**component**
18:9 112:23 134:4
**components**
134:2 137:14 198:15 224:25
**compound**
21:2 54:4 198:7 201:18
**compounds**
53:1 68:10 193:11
**comprehensive**
16:19 19:19 50:19 53:18 86:19 214:15
**comprehensively**
60:25
**computer**
8:17,19,24 193:16,25 194:6,13
**concentrations**
61:12
**concern**
54:6,8 56:16 82:1 85:4 118:1 138:15 211:6 218:11,17 222:7
**concerned**
136:24 141:20 152:9 165:4 177:17
**concerns**
16:17 86:17 109:13 122:16 182:6
**Concise**
199:2
**concluded**
206:11 241:5
**concludes**
205:8
**conclusion**
79:1 91:19 100:18 122:25 135:20 162:5,6 163:1 184:18 206:10 227:13
**conclusions**
94:23 96:17 100:6 123:9 154:14 194:7,14 203:12 205:21 206:5 220:16
**condition**
58:13
**conditions**
60:9 64:10, 19,21,22 65:8 69:24 72:12,13,23 110:1,13 111:8,20 112:14 129:5 193:7 205:3, 5 227:4
**conduct**
95:8 97:1 98:22 117:4 118:4,6,16, 22 119:4 120:25 137:12 140:7 157:24 184:5 187:12 223:4
**conducted**
31:12,25 32:2,4,7,10, 13,17 35:8, 19,22 39:7 40:21 50:13 51:3,4 70:1 73:20 74:3, 20,23 75:4,7 92:5,8 96:16 99:1 117:11 123:14,20 137:11 140:3,21 141:4 157:7 158:1 184:23 185:8 186:6, 9 187:9 193:9 206:25 207:3,6,9 209:3,5,10, 16 212:12 223:7,8,10
**conducting**
97:4 98:20 155:25
**conference**
29:20,25
**confidence**
9:25 103:23 104:17 133:19 143:22 144:8,10 146:9,10,23 147:6,23 148:13,15 150:8 159:11 166:10,14,15 168:7
**confident**
10:3 185:12
**confidentiality**
39:10
**confidently**
112:4
**confirm**
156:14 160:4 212:24 234:16
**confirmation**
208:14
**confounder**
156:5
**confounders**
116:9 129:15 140:1 163:21 202:3
**confounding**
122:16 139:1,9,15 153:7 161:7, 18 163:10 164:5 222:17 228:7
**conjunction**
50:17 154:11

**connection**
68:7 78:24 135:5,6 181:22 226:19 230:4,10,18
**consensus**
29:19
**consent**
7:9
**consequences**
102:2,5
**conservative**
77:24
**consider**
34:21 35:3 70:25 71:6 81:14 94:25 95:11,21 96:3,19 97:21 98:16 134:18 136:11,15,20 137:24 168:1,9,11 221:18
**considerable**
205:9
**considerations**
223:23 224:24 228:13
**considered**
23:23 24:8, 18,20 25:4 34:24 95:24 96:8,16,22 168:6 181:16 216:8,19,22 220:14 222:2 236:10
**considering**
124:2 224:19
**consist**
92:25
**consistency**
138:8 140:25 171:20,25 172:15 201:25 221:20
**consistent**
39:19 63:3 132:12 142:1,15 173:2 185:20 188:15 197:22 202:18 203:2 205:11 227:17 228:2 230:23 232:14 238:13,19 239:2
**consistently**
135:18 173:1 204:6 231:13
**consists**
113:17
**constantly**
66:22 67:3
**construction**
19:3
**consult**
134:9,11,13
**consulted**
134:20
**consumed**
171:7,9
**cont**
56:23
**cont'd**
4:1
**contact**
110:3
**contacted**
21:9 39:2
**contained**
105:13,22 107:25 109:2 182:13,16,23 206:6 232:11
**contains**
108:20 182:2 225:9
**contamination**
240:11
**contend**
194:12
**contending**
193:24
**context**
18:18,25 33:5 36:3 51:7 53:20 55:1 56:15, 19,24 57:4,6 64:9 65:6 69:23 72:21 73:16 77:12 81:9 95:24 96:22 104:5 109:8 112:24 124:22 137:13,17 139:15 140:6 161:6 162:2, 14,20 164:17 178:19 190:25 197:25 205:23 208:21 209:14 210:25 217:2 234:8
**continue**
12:15 81:13, 14 203:3
**continued**
240:8
**continues**
28:23
**continuing**
29:10 169:3
**contribution**
119:25
**contributory**
135:17
**control**
113:1 115:21 117:4,21 118:8 122:8, 13 123:22 164:13,14 198:9 202:3 216:15,16
**controlled**
116:6,15,22 118:7,22 119:4 121:3 122:18 123:15,17,20 129:15
**Conventionally**
132:25
**conversation**
236:17
**conversations**
6:3,6 20:12, 19 43:9 44:13,19
**convert**
191:5,13
**convincing**
202:18 203:2
**copies**
37:9
**copy**
8:15 25:10, 18 235:7 238:23
**core**
33:15 44:24 51:14,23 52:2,14
**corner**
6:18 38:12 199:8
**correct**
8:9 14:10 17:23,24 18:2,3 24:22 25:18 26:15 27:4 30:17

33:10 34:6, 7,12,13 36:5,6,19,20 37:7 38:9 40:19,20 41:11 44:6 48:11,12,14, 15 56:3,20 59:13 63:3 68:22 79:10, 11 85:13 87:18 88:1, 2,4,5,8 89:6,17 91:8,17,18 93:1 94:3 95:19 99:25 100:1,4,5 103:19 105:9,10 106:6,7,9,22 112:22 113:6 114:19,20 118:23 120:5,9 123:6,9 125:12 126:19 130:10 131:24 132:6 139:11,12 143:14,15 145:19 146:15,20,21 147:16,19,21 149:7,8,12, 18 151:10,17 153:25 154:1,5,24 155:3,5,10, 11,16 158:20 159:8 160:8, 10,11,19 163:22,23 164:22 165:25 166:7,8,20 170:7,11,15, 16 171:10 175:8 176:4, 19,20 179:15,25 180:16 182:3,9 186:16 187:15 190:7 195:1 207:1 211:20 213:18 214:4,5 217:10,11,13 218:3 219:17 222:10,11, 14,16 224:10,13 233:9 237:18 239:4,21

**correctly** 90:4 196:7, 22 205:16 208:17 212:19

**correlated** 86:4

**correlation** 124:25

**corresponding** 216:14

**cosmetic** 18:19

**counsel** 6:22 10:11 11:7 23:2 24:12 37:5, 11 48:17 50:7,13 98:24 221:10

**county** 120:13

**couple** 43:25

**course** 10:9 14:24 33:23 45:10 52:23 151:4 214:3

**courses** 33:15 34:15

**coursework** 33:7,20 134:16

**court** 11:8 12:1

**courtroom** 37:15

**cover** 140:9

**creating** 6:9

**credentials** 25:19

**criminal** 13:22

**criteria** 128:18 137:9,15,16 139:16 140:5 184:10 187:19 188:8 221:25 222:9,12,20, 23,25 225:10

**criterion** 134:1 224:17

**critical** 30:20 152:20

**critically** 124:2 137:21

**criticism** 230:18

**cross** 148:13 168:7

**Cross-examination** 5:3 226:15

**crossed** 166:14

**crosses** 144:9 146:10,23 147:23 159:11 168:7

**crude** 162:15 163:5,15

**Cruz** 4:13

**crystal** 209:25

**culprit** 231:19

**cumulative** 151:4,6 225:9

**current** 25:18 44:14 57:23 197:2, 7 216:25 217:2

**curriculum** 25:11,15 28:15 31:4 33:13 44:25 51:15,24 52:3,14

**cursor** 238:2

**cut** 152:22 171:5,15

**CV** 25:17,21,24 26:12 34:5

**CYP2E1** 196:16

**D**

**daily** 111:9 157:9, 10 158:3 160:7,13 180:2 226:23 227:2

**damage** 64:8,17,20, 25 130:22 196:15 199:23 218:5

**damaged**
199:17
**damaging**
54:7 204:11
**Danish**
142:6
**data**
51:6 61:6 64:6 66:6 69:5,10,11 71:7,8 72:24 73:14 76:13 77:3 79:3 81:11 83:21 84:21 85:20, 24 86:2,14, 15,16 89:1, 14 91:22 92:1,2,16 93:3,6,12, 16,19 98:6 110:6,8,12 111:19 113:3 116:10,11 119:22 120:9 127:8 132:11 138:5,20 139:23 147:7 178:17 196:2 197:4,9,11 201:16,22 204:24 221:20 231:17,25 232:1,2,12 236:1
**data's**
86:3
**database**
94:10 154:3, 12 155:2 201:22 207:9
**databases**
32:22 33:1, 19,25 34:1 141:5 180:19
**dataset**
114:9 154:10
**date**
13:8 40:14, 16 42:23 79:17 125:16
**dated**
22:1 38:8 40:10,17 90:23
**dates**
90:12
**daughters**
108:7,14,18
**day**
39:18 59:5, 12,17 75:25 227:4,6
**days**
149:2
**DDA**
168:10
**DDAH-1**
193:18,21,25 194:14
**DDD**
160:4,6,14
**DDDS**
159:3,14,17 160:1,18
**De**
238:5
**deal**
130:23
**deals**
113:13
**decade**
94:6,8
**decades**
34:2 52:5 66:2
**December**
69:1
**decision**
195:7 234:19
**decisions**
82:7,9
**decreased**
101:9
**defendant**
23:20
**defendants**
4:7 14:12 22:8 23:16 74:20
**defense**
16:23,24 17:6,7,22 18:13,14 19:7 44:7 56:5
**define**
131:18 160:1 169:16,17 170:2,10,17 179:14
**defined**
120:16 149:1,4 157:8,9,10 158:3 160:7, 13,14 170:6 180:2 231:4
**defining**
130:6 170:19 232:9
**Definitely**
14:20
**definition**
160:4,5 170:5,19,22 179:17
**definitive**
63:18 142:15
**definitively**
106:19 117:12 118:19 190:5
**degrade**
60:11
**degree**
33:12,16 36:11 51:8 103:23 104:17 142:4 188:25
**delivered**
108:16
**demonstrate**
88:15 136:2, 4 142:1,9 164:11 183:6 205:2 228:4 232:14
**demonstrated**
72:9 76:25 86:16,18 132:16 138:22 143:17 145:18 146:3 235:22
**demonstrates**
110:23 111:4,15 112:7 142:17 147:1,4 148:1 150:10
**demonstrating**
109:14,15
**Denmark**
180:21,23 181:2
**Denver**
8:1,4 26:21 34:20
**department**
27:2,6,9,17 48:7
**depend**
59:6 116:18, 23 117:8 118:11 153:20
**depended**
43:4
**dependent**
103:2 104:14 130:21
**depending**
94:6 126:2, 13,14 193:3 227:7

**depends**
54:3 92:17
119:8 122:9
127:17 128:9
**depict**
39:16
**DEPO**
4:11 68:13,
16 79:22
142:25 143:4
195:16,20,24
237:25 238:7
**deposition**
6:13,20 7:21
8:14 9:12
10:10,18,24
13:13,23
20:24 24:2,7
25:1,4,16
37:2 38:1,5
41:13,20
42:2,5,8,21
43:12,20,22,
23,25 44:4,
11,14,20
45:11 57:13
67:17,25
79:14 121:12
138:4 155:21
156:25
169:10,19
186:2 198:23
234:23
**depositions**
43:20 44:3,5
**derived**
201:14
**describe**
62:20 76:4
130:13
148:21
150:16 231:1
240:4
**described**
233:8
**describes**
171:1 230:17
**describing**
87:1
**description**
29:24 211:16
230:4,10
**deserve**
154:18
**deserves**
81:12
**design**
116:19,23
118:12 119:9
122:24
123:7,19
133:6,11,16
136:13 144:6
148:12
154:17
228:12
**designate**
133:18
**designed**
35:17 113:1
122:7,13
141:20
143:23
144:2,6
147:14 148:9
**designs**
133:1
**Destructive**
204:11
**detail**
35:16
142:21,23
143:9 175:18
188:25 215:5
225:19
**detailed**
164:3
**details**
13:4 15:21,
25 18:10
71:13 90:6
118:18
119:10
213:24 214:6
**detectable**
104:12
**detected**
47:12,18
62:15
**determination**
113:9 114:3
119:17 120:2
**determine**
84:14 113:5
126:21
130:8,14,18
131:22
135:16
140:24 157:3
174:7
**determined**
229:13,17,21
233:25
**determines**
71:17
**determining**
113:8 221:19
**develop**
127:3 131:2,
12 167:24
198:14 236:2
**developed**
18:7 217:17
**development**
50:16,17
86:20 92:6,
12 125:19
128:13 200:9
203:5
**device**
16:16,17
18:1,4
**diagnosable**
153:19
**diagnosis**
94:2
**diagnostic**
209:2
**died**
217:16 218:1
**diet**
57:23 100:4,
9,13 103:25
104:1
112:11,12,16
**dietary**
9:20 32:14
52:6 90:5,13
100:8 101:8
110:16
111:10,21
112:14
174:15 177:5
181:6,13
197:17,24
227:9,15,18
228:1,3,5,7,
8,14,17,23
229:5
**diets**
91:8 100:12
**differ**
59:8,9
126:14,17
**differed**
225:7
**difference**
63:25 113:25
141:9 147:13
163:11 193:1
198:4 199:11
200:2,5
**differences**
70:19
121:17,18
205:13
209:25
**different**
17:11 30:13
72:7,11,12
78:4,8,24
94:17 99:20
113:15
114:14 115:3
118:14 122:2
123:10
132:22
138:9,10

141:3,4,5, 10,22 142:2, 5 144:1 152:15 172:7,25 180:19 182:13 184:17 188:9 216:3 223:25 224:6 225:7

**differentiate**
191:16

**differently**
70:2,7 141:25

**differs**
81:17 112:25 176:24

**difficult**
11:10 115:20 118:19 122:10 135:17 154:14 172:25

**difficulty**
172:20

**dimethylamino hydrolase**
193:18

**dimethylargin ine**
193:17

**direct**
5:3 7:17 152:16,19 187:11 203:7 205:11 211:25 230:24

**directed**
77:4 79:4

**directly**
12:24 30:12 86:3 177:16 178:18 235:23

**disagree**
69:20 72:3, 19 82:20 84:5 89:8,10 162:25 199:25 200:25 202:20 203:10 204:20 205:17 235:19 236:14 238:17,24 239:4,6

**disagreeing**
201:7

**discipline**
15:3

**disclose**
20:19

**discomfort**
129:25 130:3

**discovered**
152:3

**discuss**
35:15 65:15 71:13,15 141:15 161:6 162:18 169:3 175:9 176:17 178:23 181:10 198:2 200:24 214:18

**discussed**
11:5 20:24, 25 21:6 53:15 56:22, 24 138:4 166:22 177:6 178:21 179:23 188:14 194:1 196:12 206:3 207:8 221:15 223:22 225:19

236:21 237:5 239:20

**discussing**
54:4 56:10 61:13 63:15 70:17 72:8, 22 73:15,19 195:10 206:24 228:25 237:20

**discussion**
9:16,17,22 84:8 126:9 137:19 140:16 173:12,13,20 174:19,24 175:3 176:18 191:2 194:22 222:17 223:21

**discussions**
89:21

**disease**
16:12 36:16 47:23 59:2 112:20,22 113:6 114:12,13,15 198:12

**dismiss**
164:15 231:15

**dismissing**
229:9 231:22

**dispute**
186:17

**disseminated**
46:15

**distinction**
36:13

**distinguish**
224:23

**distribution**
70:21

**diverse**
172:23

**divide**
114:11

**divided**
114:8,24 116:3

**division**
114:4

**DMA**
193:19

**DNA**
54:7 64:7,8, 20,24 130:22 196:15 199:12,15, 16,17,18,20, 21,23,24 200:3,13,19 201:2 205:11 214:13 216:15

**Doctor**
7:9 21:15 37:3 38:1 55:23 62:4 93:21 112:18 151:1 156:20 164:19 168:16 169:6,21 181:6 190:23 194:4 197:14 206:22 220:2,11 238:10

**document**
24:11 37:3, 6,11 38:4 68:6,7,14, 15,18 76:18 80:19 82:3 83:5 87:17 88:5,9 89:11 199:3,7 202:15 204:5 210:4,5 215:17 220:3

235:10
236:2,19
237:3,4,13
238:20
**documents**
8:14 9:6
22:22,25
23:2,8 24:23
37:10 39:19
99:2 106:3
209:24
**dog**
61:25 212:12
**doing**
8:18,20
31:23 33:25
121:12
232:17,18
**dollars**
41:9
**dosage**
227:6
**dose**
48:21 58:15
59:6 65:12,
18 69:23
73:6,10,13,
17 128:6,19
138:12
151:4,6
156:10
157:8,9,10
158:1 160:3,
7,13,14
219:17,21,23
221:20
225:23
226:23 227:2
**dose-response**
157:4,24
158:4
**dosed**
217:9
**doses**
63:14 64:6
65:3,9 73:4
110:15 131:4
158:3 165:3
171:2 180:2
203:18
**dosing**
59:4,12
158:2
**doubt**
53:18
**draft**
22:23 23:10
**drafted**
238:20
**drafting**
23:1 48:24
211:11
**dramatically**
70:16 197:5
**draw**
154:14
214:16
**drawing**
220:16
**drinking**
52:8
**drive**
119:16 120:1
**driver**
172:5
**driving**
83:4 206:5
**drug**
50:15,17
92:5,11
129:8 130:10
209:8,15
219:3
**drug-induced**
219:2
**ducks**
69:17
**due**
132:24
144:12
152:2,9
159:22
163:10
165:20
210:16
**duration**
128:6 147:8
179:8
**duties**
27:15

**E**

**e-mail**
10:15
**e-mailed**
37:5
**earlier**
112:19
129:16
155:20 186:2
207:8 213:16
224:22
226:20,22
227:8 229:7
236:18
**early**
47:24 90:13
127:22
129:25
207:1,19
208:1,8,14,
16
**ease**
38:2 45:9
**easier**
144:21
**eat**
100:25
**eating**
112:16
**ecologic**
113:21
114:19,21
115:11
**ecological**
115:6
119:12,17,20
120:4,23
**Edition**
30:20
**Editorials**
30:16
**EDT**
6:24 55:19,
22 99:9,12
124:11,14
157:17,20
183:13,16
221:3,6
226:10,13
233:16,19
239:13,16
**education**
29:13,15
**effect**
20:8 76:20
101:16
111:24 117:5
134:25
135:13,23
136:2,5
138:13 156:2
161:14,16
162:16
213:17,20
**effective**
121:22 227:7
**effects**
19:11,14
20:6,11
28:12 130:23
138:12
203:23
204:13,15,25
205:2 223:22
**efforts**
77:3 79:4
81:15
**eight**
28:24 29:5
94:11
**either**
20:25 52:5,8
73:25 92:8
106:1 112:11
113:18 121:2
129:4 181:15
240:25

**elected** 67:10
**elegant** 154:12
**elevated** 164:11 168:3 173:2,9 227:14
**eleven** 170:14
**eliminating** 84:10
**embedded** 140:16
**emergency** 26:1,7,8,10, 11,14,17,20, 24 27:2,5,9, 13,15,16,17 29:14 34:9, 11,18 36:23 48:6 105:9
**eminent** 152:5
**emphasis** 33:12
**employ** 77:19 134:1 232:25 233:2
**employed** 61:19 137:14 219:21 231:2
**employing** 61:6,7,9 98:11
**emptying** 101:12
**encompasses** 40:18 232:10
**encounter** 64:10
**end** 23:11 55:6 77:4 79:5 119:20 161:8,23 170:10 195:20,22
**endogenous** 57:21 59:23 60:3 99:24 100:17,22
**engage** 39:25 174:19,24
**engaged** 12:19 17:21 22:10
**engaging** 39:7,11
**enrolled** 151:3
**ensure** 128:17 141:5 150:15 229:8 231:15,21
**entered** 9:25 33:12
**entire** 86:10 162:19,20
**entirely** 142:5
**environment** 53:5 102:10 191:24 193:7
**environmental** 52:7 90:5,13 101:11
**enzymatically** 191:14
**enzyme** 193:17 196:16
**epi** 33:17 168:21,24 171:21 174:12,13
**epidemiol** 50:10
**epidemiologic** 74:9 79:3 84:21 92:13 93:16 100:13 113:13,21,23 119:21 129:2 134:9 136:20 173:18,23 175:4,17 183:5 197:4, 9,11 205:22 223:21 224:22 225:25 229:13 237:20 238:19 240:5
**epidemiologic al** 32:8,10,13, 17 35:9,17 50:11 73:23 74:6 76:14 77:3 79:9 89:22 90:2, 9,18,22 91:6 93:19 113:15,20 114:18 119:12 131:21 134:13 136:22 167:11 171:22 173:15 174:6,20,25 175:5,20,24 177:24 178:7,21,22 190:17 197:17 201:14,22 202:9 233:25 237:17
**epidemiologis t** 136:10,15,25 137:3 233:5
**epidemiologis ts** 112:21 113:2 136:12
**epidemiology** 9:23 33:5,9, 13,14 49:19 112:19,23 113:4,8 124:20,22 132:11 134:15,17 136:21 137:6,17 141:15 172:6 177:11 178:15 182:17 188:14 232:2
**epigastric** 130:3
**episode** 16:10
**equal** 116:8
**equates** 179:5
**equivalent** 178:16 180:20 181:2 182:24 200:9
**Erik** 38:12
**erosive** 227:5
**err** 237:6
**ERRATA** 5:8
**error** 166:6 198:10
**errors** 9:11
**esophageal** 57:17 58:8 91:16,20 94:24 183:24

184:7 231:7
**esophagitis**
227:5
**ESQ**
4:2
**Esquire**
38:13
**essential**
128:7,11,20
**essentially**
64:15 79:6 141:24 152:14,20 157:11 163:11
**establish**
79:7 83:19 228:8 229:14,22 234:1
**established**
57:24 73:7, 11 81:18,25 118:1,2,21 119:1 234:9
**establishing**
29:14 78:24 119:5
**estimate**
14:4,17 127:9 133:21 143:22 146:8,9,22 147:5,22 148:19 149:19 150:7 159:10 227:14
**estimated**
90:5
**estimates**
74:9,13 100:12 135:24 228:3
**estimation**
14:25
**estimations**
227:16
**et al**
238:4,5
**ETD**
241:4
**ethical**
117:18,19 118:16
**European**
69:16
**evaluate**
49:25 50:1 71:5 81:15 84:20 100:21 113:11 122:23 123:7,25 124:1,2 127:2 135:15 137:3,4,21 139:2 140:19,24 148:10 156:9 171:23 174:7 176:5,6,7 178:24 185:23 187:17 208:24 214:11,25
**evaluated**
49:20 52:5 53:20 66:3, 4,10,13 67:6,9 68:4 69:1 71:7 80:14 90:21 91:6 93:19 108:18 111:23 112:2,3,4 140:11 145:11 146:13 165:23 167:4,12 168:21,25
169:13 175:7,14,24 177:2 181:7, 14 184:9 185:15 197:21 200:17 209:19 220:15 224:9 231:11 232:3,20
**evaluates**
71:11 98:12
**evaluating**
33:1,19 68:9,19 100:8,20 111:24 115:10 116:15 117:5 126:20 128:5 130:4,8 134:4 136:17 137:15,19 153:14 190:18 210:25 220:22 225:4 228:14
**evaluation**
32:22 51:7 68:19 69:7, 11 80:4 84:13 133:7, 12 141:14 150:2 167:2 182:19 184:17,24 186:18 198:20 209:17 214:10 219:6 225:1
**evaluations**
133:23
**evaluative**
185:4
**event**
16:9
**events**
16:5,6,11
**evidence**
19:24 20:3 49:7,15,20 57:20,23 63:13,18 64:18,20 65:13,18 69:21 76:20 78:1,7 81:11 83:7,13,23 84:11 85:21 86:24 88:14, 15,17,20,21, 23,24 89:1, 23 95:12,18 98:17,23 99:24 100:16,20 108:6,12,22 115:13 119:16,19 123:21 132:11,19,22 133:7,12 134:25 135:13 136:17 137:22 139:20,22 141:18 142:8 168:10,13 172:10 183:23 184:18,24 185:9 189:14,18,21 190:3,8,15 196:4,24 201:2 202:1, 8,9,12,13, 17,24 204:12 205:9,10 206:5 212:17,22

224:5,8,20, 21 225:6,18 227:16,17,21 228:2,4 229:4,10,14, 22 231:24 232:5 233:25
**evidence-based** 29:9
**evident** 173:11 200:13,19
**evolving** 86:21
**ex** 189:22
**exact** 10:22 13:8 14:19,21 15:21 18:9, 18 22:20 39:4 42:23 54:3,4 65:15 66:2,11 81:1 87:7 94:20 101:21
**exactly** 17:13 52:10 74:25 122:11 127:6 185:12 196:9 234:9 240:18
**Examination** 5:3,4 7:17 233:21
**examine** 61:14 71:14 76:4 114:2 138:25 139:9 178:17
**examined** 60:25 74:8 75:19 203:17,24 238:13 239:2
**examining** 28:12 33:24
119:19 139:24 177:10 224:25
**examples** 16:20 86:7
**exceeded** 216:14
**exceeding** 151:6
**exceedingly** 131:6,9 138:24 139:8
**excellent** 137:7
**exception** 202:15
**Exceptionally** 88:22
**excess** 19:2 63:16 109:1
**excludes** 148:16
**exclusively** 27:19 135:22 196:17
**excuse** 158:7 174:21
**exercise** 139:21,23
**exhalation** 9:19
**exhibit** 5:10,11,12, 13,14,15,16, 17 8:21,25 21:13,15,17 23:24 24:1, 3,5,6 25:14, 16 37:1,3,24 38:1,4 39:15 40:8 41:8 57:12 67:16, 20,22,25 71:21 79:13, 14 144:20,
24,25 150:19,20 156:17,18,24 169:19,23 176:12 198:18,22,24 215:6,8 234:22,23,24
**exist** 96:20
**existed** 90:18
**exists** 112:7
**exogenous** 57:20 59:23 60:1 99:23 107:9 210:13
**exogenously** 60:6
**expect** 84:16,19 147:9,10,12
**experience** 53:24
**experiment** 215:18,25 216:5,7,8, 16,17,18,21
**experimental** 55:2 58:14 61:6,11,16, 20 63:13 64:1,21 65:7 69:10,24 72:21 74:12 76:21 83:7, 20,24 85:24 88:21,25 89:14 92:4 93:8 95:11, 18 98:17,22 111:8,19 112:13,25 116:5,11 138:5 204:17,24 207:10
221:20 232:1
**experimentally** 83:15
**experiments** 61:7,9,18, 20,23 64:9 65:7 197:16 214:23 215:16 216:5
**expert** 13:16 14:14 15:7,8,10,18 16:4,14,15, 21 17:9 18:1,5,22 19:6 20:6,21 21:19,21 22:3,9 23:12,17,22 24:6,8 25:2, 11 31:19 32:1,4 34:21,24 35:3,7,24 36:3,16 41:17,18 45:17 46:1, 9,17 49:1 57:11 58:1 68:4 90:16, 20 113:10 181:19 194:15 210:23 212:2 230:5,9 233:9
**expertise** 28:5,10 36:12
**experts** 44:5,7,8,9 89:8 193:15, 23,24 194:11 207:18,24 208:7 210:12,19 211:3,20

**explain**
131:18
**explained**
161:16,18
224:15
**explicit**
179:17
**explicitly**
88:12 91:1,3
94:18
**exploratory**
148:17
**expo**
231:10
**exposed**
61:21 114:4
121:4,7,8,19
127:1
128:13,14,17
131:8 164:21
202:25
204:7,14
208:25
**exposure**
16:9,13,18,
22 17:4
18:8,23
19:1,4,10,13
20:2,3,11,16
21:2 47:3,5,
8,13 49:5,9,
16,20,23
51:9,10
56:15 57:7,
9,19,21,22,
24 58:12
61:24 63:24
64:2 65:15
66:24 69:23
70:18 73:16,
18,22 74:5
75:21,22,25
79:7 81:11
84:11,14,15,
24 85:2,3,4,
22,25 86:5,
15 90:13
92:14 93:9,
11,17,18
94:5,17,18,
19 95:25
96:5,9,11
97:7,25
98:1,3,11,13
99:22 100:3,
16 108:24
113:12 114:3
116:3 117:20
118:14,15,
16,17 120:22
121:6,9
125:1,7,8,9,
15,19,23,25
126:3,13,15
128:6,10,15,
18 130:6,17,
24,25 131:2,
10,11,14,15,
23,24 132:1,
5,13,15
137:23
138:6,15,21
140:19,22
141:10
142:16
143:24
145:9,10
147:8,11
148:25 149:1
150:13
151:1,7
152:2,5,9,
16,18 153:9,
10,20 154:18
160:10,18,21
164:3,22
165:16,20,21
168:14
169:13
170:2,6,11
173:19,20,
21,22,25
174:14,15,16
175:2,12,14,
22,25 176:8,
22 177:9,12,
17,19 178:17
179:14,21,24
180:5 187:18
188:4,5,15
189:22
190:3,19
196:5,10
197:12
198:7,10
199:12
200:3,8
201:24
202:1,10
203:19
204:17
218:11,13,
17,19 228:24
229:1,21
231:4,6,10,
14 232:6,9,
10,12,15,21
235:16
236:12,21
237:2,9
240:2,7,10,
16
**exposures**
16:12 28:5,
6,8 35:1
51:5 52:6,7,
8,16 53:7
56:17 64:11
65:1,22 67:4
70:15 72:7,
21 73:14
75:24 81:17
82:17,23
90:5 94:11
96:23,24
101:9 108:23
113:3 114:15
132:17
154:16
167:25
172:13
177:4,11
178:18,24
182:16,20
183:4 188:17
197:7 205:24
**expressed**
125:7,13
196:17
**extend**
94:5
**extended**
26:23
**extensive**
22:20 117:10
180:14 202:3
**extent**
29:2 164:3
167:10
235:17
**extreme**
60:9
**extremes**
60:10 109:25
110:14
112:11,12
**eye**
63:7

**F**

**fact**
206:11
**factor**
130:21
171:21 222:2
**factored**
108:1,4
**factors**
32:14 101:8,
9,11 103:3,
24 104:14,
18,21 110:16
111:10 113:2
114:13 116:9
137:24
221:18,19
223:5,16,18
**faculty**
27:15 34:18
**faded**
54:13

**fail**
232:14
**fails**
231:13
**fair**
12:9 34:4 36:18 45:11 59:17 65:3, 4,19 76:7 78:19 107:25 113:4 116:20 121:21 122:23 130:16 131:13 143:17,21 146:2,25 147:25 160:19 167:9 179:10 187:22 213:6 224:8 225:8
**fairly**
39:16 52:20 139:18 206:3
**fall**
13:7
**familiar**
35:5 36:1 45:3,4 136:9 185:25 191:22 234:14
**familiarity**
234:10
**familiarize**
181:11
**famotidine**
121:13
**far**
79:25 80:18 138:4 159:2 172:23 195:17
**fashion**
122:15
**fasting**
192:23 193:3,6
**fatally**
122:14,19 174:4
**father**
108:16
**FDA**
46:17,21 50:17 74:13, 16 75:25 194:22 195:2 240:3,16
**FDA's**
195:6
**features**
208:23
**Federal**
234:5,11,15
**feel**
66:23 188:20 206:12
**fellow**
22:15
**fellows**
52:19
**fellowship**
26:22 34:19 52:18
**felt**
186:23
**fhs@ pietragallo. com**
4:5
**field**
32:23 136:16
**fields**
233:7
**file**
44:2 86:19 134:15,16 145:5
**files**
93:13
**filings**
50:18
**final**
6:14 23:11
**Finally**
164:1
**financially**
7:4
**find**
13:2 50:12 93:24 134:17 144:22 157:12 167:20,22 189:14,18,21 202:8,9 210:23 212:9 220:11 223:17 225:13,16,17 229:10 230:10 232:4 238:3
**finding**
132:19,24 133:4 139:25 141:6 148:11,12 155:17 159:19,24 162:3,11,15 164:12 197:22
**findings**
45:1 135:16 141:3 142:1, 17 146:6 149:5,15 150:10 162:14,20 163:10 173:8 195:11 204:20,22 212:18
**fine**
55:13 97:19 123:5 124:8 149:15
**finish**
62:10 218:14
**finished**
26:19 48:21 62:6 168:16
**Finken**
5:3,4 7:18, 20 23:25 24:4 41:24, 25 49:12 51:19 54:13, 17,22 55:10, 16,23,25 67:18,23 68:15,17 79:12,20,24 80:3 87:19 91:11 97:16, 20 99:6,13 103:9,15 124:5,9,15 126:7,10 143:2,5,6 144:23 145:1 150:18,21 152:22 156:16,19 157:14,21 183:10,17 195:13,18,22 196:1 198:19,22,25 206:21 215:22 218:15,20,22 220:25 221:7 226:2,20 228:10,20 229:16,25 230:2,8,14, 22 233:13,22 234:22,25 237:23 238:3,9 239:7,11,21 240:12,17,24
**firm**
12:18 17:19 22:10 37:9 42:25

**firms**
17:12,18
**first**
11:21 13:5, 10 38:8,25 42:20 52:24 57:16 58:6 65:25 83:10, 11 89:22 139:3 143:10 161:8,13,24 183:21 223:20 228:24 231:4 236:4 237:14
**first-pass**
70:20 236:22
**fish**
69:17
**fit**
20:13 84:9
**fits**
139:5 197:8
**five**
47:4 53:14 97:15 140:9 167:3 185:1 188:6,23 189:1,5,9 216:14 225:10
**five-minute**
55:16
**flaw**
122:19
**flawed**
122:14 174:4
**flaws**
122:16
**flip**
94:15
**flipping**
151:11
**Floor**
4:4
**flora**
102:11,13, 14,16,17 192:7,15
**Florenz**
4:13
**Florian**
75:19 76:2 100:21 191:2 240:4,19,20
**flow**
70:20
**focus**
27:18 173:24,25
**follow**
56:1 127:1 159:1 163:13
**follow-up**
92:19 93:7, 8,23 94:1,4 127:13,21,23 128:3 167:18,19 172:12 221:11
**follow-ups**
142:13
**followed**
89:11 114:6 180:13
**following**
20:11 71:23 73:3 114:3 116:4 194:2 199:12 200:3 204:17
**food**
47:18 100:24 101:5
**foods**
53:3
**forced**
112:11,12
**foreign**
28:8
**forgot**
51:20
**form**
48:21 60:11 107:14 158:2 180:9 187:21 207:19,20, 21,25 208:2, 8,9,14,16 209:19,20,23 210:1,7 228:10,20 229:16,25 230:14,22 240:13,17
**formal**
20:14 36:3 187:13
**formaldehyde**
16:18 18:22, 25 19:2,4, 10,13,22,25 20:7,16 21:8 118:8
**Formaldehyde's**
118:12
**formalize**
184:12 187:16 228:17,22
**formally**
58:23
**format**
188:2
**formation**
57:20,21 59:23,24 60:1,2,3,4, 12 72:9 99:23,24 100:17,22 105:3 107:4, 9 110:10,18 199:11,20,21 200:3 205:12 210:13 213:18
**formatting**
24:15
**formed**
54:10,25 200:6
**forms**
60:6 72:11 106:17,18, 19,20 108:16 201:24
**formula**
224:17
**formulating**
82:7
**forth**
133:18 151:11 219:20 232:4
**Fortunately**
74:12 206:1
**forward**
30:1
**found**
47:17 53:3 73:22 74:4,5 75:11,15,20 86:8 102:18 104:7,8,10 145:22,23 153:19 162:17 163:6,16,18, 21 177:22 178:5 197:15 232:20
**four**
26:18 42:19 53:14 149:2
**four-year**
26:18
**fragments**
199:17,18
**frame**
35:21 105:11,20
**framework**
50:5 78:5 137:18 224:19

**frameworks** 133:25
**FRANK** 4:2
**frequently** 53:15 82:25 200:7
**fresh** 210:16,24 211:17 212:4 230:3,10,17, 21,24
**fresher** 211:7
**friend** 198:18
**frogs** 69:18
**front** 8:13,24 9:3, 4 21:23 86:11
**full** 161:8,24 163:25 184:24 185:8 186:10,24
**fully** 132:2 164:7
**function** 20:2
**fundamental** 177:9
**funding** 117:16

**G**

**gallery** 6:17
**Gao** 191:3
**gap** 79:5
**gas** 209:10,17
**gastric** 57:17 58:8 59:1 67:1 91:16,20 94:24 101:12,22 102:10 103:25 104:1 125:19 129:24 130:1 183:25 184:7 192:21 201:25 202:1,11 227:5 228:3, 5 231:7
**gastrin** 101:17,22
**gastritis** 47:23 59:1
**gave** 56:18 146:7 163:4 167:23 178:12
**general** 11:3 18:19 49:6 57:3 77:13 119:3 120:20 122:5,18 128:20 134:9,13,22 135:10 141:7 198:3 201:15
**generalities** 132:9
**generally** 81:21 118:4 124:20
**generate** 31:22 53:14 148:23
**generated** 196:3
**generates** 193:6 198:10
**generating** 31:19 32:1 119:24 141:17 147:12 148:17
**generation** 154:17
**generic** 117:17 149:13
**genes** 64:17
**genetic** 141:9 203:7 204:12
**genotoxic** 64:13,16 182:2 204:15 219:24 235:16
**genotoxicity** 201:17 214:2,8,12, 15 216:9
**geographic** 114:24 115:3 120:16
**geographicall y** 120:10
**germ** 204:17
**get all** 165:7
**getting** 169:9
**give** 7:13 11:3 15:2,5 16:1 49:12 57:2,5 58:7 62:9 86:7 93:13, 20 101:20 108:8 116:21 153:21 174:22 239:9
**given** 17:4 50:24 82:9 96:10 98:10 127:8 132:15 168:7 231:17 240:9
**giving** 14:19 15:21 37:13,14 57:3 116:15
**glitch** 12:13
**globally** 182:2
**goal** 28:11
**goals** 84:9
**God** 7:15
**goes** 29:8 82:14 83:18 147:24 162:3,17 177:8 201:21 203:16
**going** 7:21 12:8 25:15 30:1 38:4 45:9 49:14 55:11, 14 57:11 60:13 67:15, 16,24 71:20 76:12 85:6 86:3 91:10, 13 94:22 97:13 99:15, 19 103:16 119:11 124:19 135:4 142:22,23 144:13 145:20 150:12 153:23 168:9,18 169:12 171:19 179:22

190:23,25 202:14 203:4 212:8 214:1 219:12 220:2 221:8,9 226:7,19 238:1
**golden** 69:16
**Gomm** 175:14
**good** 7:19 17:13 55:11 107:8 108:22 109:16 124:6,16 139:20 221:13 226:17
**Goodman** 238:4
**Gordon** 4:3
**governments** 82:10
**graduated** 26:16
**grains** 216:13
**Grant** 4:4
**granted** 33:16
**granular** 170:2,4
**granularly** 169:17
**great** 79:24 87:21 97:15 137:5
**greater** 70:16 153:17 159:2 178:24 179:3,14,17, 21,24 180:3, 4,16,17
236:22
**Greenland** 136:21
**Greg** 4:11
**group** 45:13,17 46:18,21 53:2 55:5,6 66:10 68:25 71:10,17 76:15 81:3 85:17 86:7, 11,22 87:13, 23,25 88:3, 6,11,18 89:5,9,12,16 114:4,5 115:1,8 117:20 118:8 119:5 121:7, 19 130:2 164:21 165:4 168:10 186:6,10,24 193:19
**grouped** 115:13
**groups** 114:8 115:18 116:8 129:14 186:4
**grow** 198:8,9,14 240:8
**GSK** 22:11 23:16 50:14 75:4,8 194:24 195:4 207:1,20 208:3,10 210:25 211:13 212:3,12 226:18 230:5 235:2,20 238:21,24
**GSK's** 210:14 230:18 236:15
**guanine** 200:14
**guarantee** 131:11
**guess** 16:8 38:20 39:23 117:17 126:23 191:18
**guidelines** 29:9
**guinea** 69:17
**Guo** 43:13
**gut** 100:25 101:6,9 102:11 104:10,12, 13,23

**H**

**H2ra** 47:21 97:21 98:5 121:14 161:15 173:3 192:15,16
**H2ras** 48:5,9 97:25 98:13 121:15 156:3,5 161:7,11,12, 18,19 162:17 163:7,12 164:14 166:22 167:2,21 172:9,16,17, 19
**Habel** 141:17
143:11,17 144:13 145:2
**habits** 111:21
**half** 14:5 27:11, 20 177:15
**halfway** 166:11 214:19
**hamsters** 69:16 203:18
**hand** 7:12 23:18 38:12 47:15 98:4 120:19 122:20 176:21
**handle** 17:13
**handy** 213:6
**happen** 191:14
**happened** 114:10
**happy** 174:12 181:10 188:18 194:17 200:23
**hard** 11:11 14:19 15:21 70:10
**Hardy** 8:3 12:18,20
**harm** 16:10
**harms** 84:10
**Hatten** 5:2 6:21 7:19,24 10:9 25:16 79:15 90:16 99:14 100:24

102:23 104:2 124:16 128:21 132:18 152:7 157:22 160:1 171:19 182:1 183:18 194:18 214:16 221:8 226:3,17,22 229:12 230:2 231:1 232:25 233:23 235:1 239:20 240:22,25
**Havu** 213:13
**hazard** 146:19,22 168:3,5 232:18 235:1,5 239:20,23
**head** 12:2 41:4 62:19 76:7,8 93:15
**headache** 19:18
**health** 19:11 26:22 28:12 32:21 33:11 34:17 77:18,23 78:23 81:16 84:9 160:15 165:6,8 199:1,25 201:1 202:21 203:11 204:5,21,23 205:7,18 206:9 237:5
**hear** 12:12 135:4
**heard** 191:9
**hearing** 126:5 194:9
**heat** 60:10 109:19 110:1
**heavy** 91:8
**held** 6:4,7
**helmets** 115:5
**help** 7:15
**helpful** 41:5 120:18 142:7 144:20 148:19 192:25 217:25
**helping** 134:4
**hepatic** 70:20
**hepatitis** 217:16 218:2,3,4
**hepatotoxicit y** 218:25 219:9
**hepatoxicity** 219:7
**Herron** 200:15 201:3
**Hidajet** 176:1,5,7, 11,17,20 177:5
**hierarchy** 119:18 123:21 231:24
**high** 61:12 63:14 64:6 65:3,9 131:7,9 139:25 218:17
**high-does** 218:13,19
**higher** 61:12 63:14 64:23 65:22 72:22 73:15 109:15,25 147:5 222:16
**highest** 170:5
**highlight** 195:15 237:23 238:8
**highlighting** 195:25
**highly** 205:14 206:11 236:10,24 237:1
**Hill** 137:14
**hired** 22:8
**histamine** 48:10
**histamine-2** 47:21 158:18 159:6 192:12
**history** 86:10
**Hmm** 220:13
**hoc** 187:19
**hold** 17:16 23:25 35:6 123:3 157:12 191:19 198:17 238:3
**holds** 63:19
**homeowners** 19:3
**homes** 19:3
**hope** 137:2
**hospital** 27:7
**hour** 42:19 55:11 97:14 101:2 177:15
**hours** 22:21 40:2, 22 41:2 42:19 101:3 177:16
**HR2AS** 192:12
**huh-uh** 12:2
**human** 9:23 20:3 49:18 50:10, 21 51:2 53:5 54:7 55:2,4 66:1,4,5,8, 14 67:2 73:23 74:5,8 76:12,24 79:9 81:1, 14,18,19,25 82:1 84:20 86:1,3,14, 15,23 87:4 89:23 90:2, 8,10,17,21 92:7,16 93:2,11,15, 19 98:8 104:5 118:2, 21 119:2,21 132:11 138:5 184:15,21 185:17,21 188:9 196:11 197:3,9,10 200:13,18 204:7 206:7 218:7,23 229:13,15,22 231:9,20,25

232:2 233:25 234:1 235:24
**humans**
21:4 28:8,12 35:2 36:17 47:4,23 49:5,10,17, 23 50:3 51:5,11 54:8 57:18,19,25 58:9 63:19 64:3,23 68:9 70:3,8,13 75:20 77:6, 10,15,21,22 78:18,25 80:5 81:4,12 83:14,21,22, 25 84:10,12, 15,17,25 85:3,9,18,22 86:4,6,9 87:13,24 88:4,8,12, 14,16,17,20, 24 91:17,21 94:25 96:13 99:22 100:16 110:7 111:12 116:11 117:11,24 119:6 138:12 174:8 183:25 184:8,16,21, 25 189:25 190:4,16 196:6,18,20 197:8,13 199:11 200:2,10 205:15,22,25 206:12 218:8,25 219:5,7,9 229:19 231:6 232:20 236:9,11,20, 24 237:2
**humidity**
109:20 110:1
**hundred**
170:15
**hypotheses**
148:17,23
**hypothesis**
29:23 49:7, 14,17 50:20 51:1 119:24 133:1,20 141:17 154:17 190:7
**hypotheticall y**
108:4

**I**

**i.e**
201:25
**i.e.**
204:15
**IARC**
45:3,5,10, 13,16 46:13 52:20 65:24 66:1,4,7,9, 10,13,21 67:8,25 68:8,25 69:21 70:25 71:4,10,17 72:15 73:1 76:15 77:8, 12 78:10,16, 21 79:8,15, 16 80:4,6,22 81:9,17 82:14,18,21 83:12 84:6 85:7,11,16 86:11 87:1, 7,22 88:9,12 89:5,8,15,16 99:2
**IARC's**
78:15,25 87:14
**idea**
172:23
**ideal**
129:16
**ideally**
121:8,25 129:18 130:1 132:1 152:4 153:16
**identical**
21:21 70:22 125:25 177:20
**identificatio n**
139:10 183:24 209:9,15
**identified**
47:12 75:23 109:14 142:9 184:14,20 212:19 229:18
**identifies**
135:21
**identify**
17:17 90:17, 21 115:14 127:8 137:22 143:23 148:14 184:22
**identifying**
185:21 240:6
**ignore**
123:16
**imminently**
153:19
**impact**
102:11,13 107:3,9,11 110:18,23 111:2,11,22 112:16
120:20 192:8
**implant**
18:1,5
**implants**
16:18
**implies**
88:14
**implying**
134:24 135:12
**important**
71:8 72:10 77:11 96:10 128:16 138:25 139:8 141:2 162:1, 19 163:24 167:14 186:24 232:8
**importantly**
167:21
**impossible**
79:6 130:7 132:14
**improved**
117:17
**inability**
21:1 140:1
**inaccurate**
161:25
**inaccurately**
65:14
**inadequate**
86:15 210:15 212:3
**inappropriate**
166:15
**inappropriate ly**
229:9 231:15,22
**incidents**
217:5
**include**
55:7,9 62:12 94:18 128:14 175:16

185:13,14 188:21 221:20
**included** 33:15 94:10 97:25 115:16 179:20 180:17 181:15 222:3,6
**includes** 34:25 129:3, 7 141:23 155:19 188:12
**including** 10:11 71:24 110:1 203:21 212:18
**incomplete** 164:2
**incorporated** 69:6
**incorrect** 16:1 93:20 166:10 190:9 208:19
**incorrectly** 9:25
**increase** 102:14,19 109:11,19 127:12 216:13
**increased** 10:1 131:22 143:13,18 146:3 147:1 148:1 150:4, 10 155:8,15 161:3 162:9 166:13,17 173:17 174:8 177:24 178:8,23 179:12 181:8 197:5,18
**increases** 102:21 210:14
**increasing** 147:11,12 198:8 232:13
**increasingly** 198:8
**incredibly** 144:7
**independent** 120:1
**independently** 223:14
**indicate** 69:4 80:17 146:17 155:13 189:21 193:15 194:23 207:17 212:8,16 213:10 214:21 217:8,12,15 218:1,7,24
**indicated** 13:12 17:25 18:21 24:7 34:10 49:15 51:22 56:2 58:21 59:4 65:2 78:17 79:8 91:14 99:21 105:7 114:17 118:20 133:9 143:10 145:17 155:2,7 158:6,7 187:12 194:21 212:2
**indicates** 30:2 34:4 68:25 69:14 71:21 73:1 76:13,19,23 77:2 80:14, 19 82:5 83:10 88:3, 7,18 110:9 149:6 151:22 153:24 161:1 199:22 201:1,12 204:12 219:4
**indication** 59:7,10 79:5 92:22 129:22 153:8 163:11
**indications** 93:4 121:9 161:19 168:4
**indicative** 199:21
**individual** 65:12 82:10 93:24 94:20 101:8 112:25 113:12 114:23 120:9,14 127:5,7,19 134:23 135:11 136:3,4,6 187:1,6 214:6
**individual's** 113:6 130:22
**individually** 91:7 135:16
**individuals** 43:5,11 117:20 130:9 165:9
**induce** 61:16 207:13
**induced** 203:17,20
**induces** 71:22,23
**induction** 216:15
**industrial** 62:11
**Industries** 4:8
**inert** 121:8
**infant** 108:14
**infants** 108:8
**infections** 67:1
**inference** 119:13
**infinitely** 53:13
**inflammation** 218:4
**influence** 104:18,22 105:3 153:9
**informally** 184:10
**information** 13:20 16:1 18:12 57:9 82:16,22 83:11 93:16 98:23 116:25 119:22 122:7,9,19 128:5 164:3 188:13 201:12 208:18
**informative** 96:23 98:6, 14 119:21,23 120:24 122:3,14,17 123:13,14,17 128:9,19 129:10,13 134:19 141:16 144:7 166:24

175:13
176:21
177:12
178:11
188:20
225:22
**informed**
105:1
**ingestion**
71:24 175:22
**inhalation**
9:20 71:25
203:20
**inhalational**
118:14
175:23
**inhibit**
110:9
**inhibition**
111:25
**inhibitor**
149:9
**inhibits**
111:5,16
112:8
**initial**
12:25 198:11
**initiator**
198:5,9
**injection**
217:10
**injury**
56:12 218:3
219:2,5
**insert**
58:24 59:8
105:24 106:4
229:25
**instance**
132:10
**instances**
118:3,21
**Institutional**
117:15
**instructions**
11:4
**instructor**
34:18
**insult**
198:10,13
**intend**
22:4
**intended**
23:19
148:22,23
158:4 202:7
237:7
**intens**
128:15
**intense**
142:14
167:16,19,24
**intensities**
128:15
**intensity**
128:18
147:11 170:5
**interaction**
201:17 203:7
205:11
**interactions**
6:6
**interacts**
64:7 199:23
**interchangeab le**
152:21
**interchangeab ly**
152:11,14
**interest**
54:5 96:11
98:11,14
114:16 121:6
122:1,4
126:15
127:4,16,25
128:2 129:21
138:14 140:2
153:21
154:16
168:15
173:20
174:14
176:23
177:1,9,12
188:4,6,16,
17 189:12,23
223:25
227:19
228:15,25
229:1,5
231:5,7,14
232:7,10,16
238:12 239:1
240:7
**interested**
7:5 121:10
237:10
**interesting**
134:17
**interface**
6:8,19
**internal**
36:24 67:13
89:11,13,21
**international**
45:6 71:5
82:6,11
199:2
**interpret**
83:3
**interpretable**
122:17
**interpretatio n**
13:19 236:3
**interrupt**
62:3,8 143:1
218:21
240:14
**interval**
9:25 10:3
125:17
133:19
143:22 144:9
146:9,10,23
147:6,23
148:13,16
150:9 159:11
166:10,14
168:7
**intestine**
101:4
**intragastric**
193:10
**intraperitone al**
217:9
**introduced**
7:20
**investigate**
112:21
**investigation**
197:6 240:1
**investigator**
114:23
**investigator' s**
117:18
**investigators**
141:5 145:22
**invitation**
45:25 46:16
**invited**
45:16 46:9,
20
**invoice**
38:8,19
40:10,17
**invoices**
37:7,8,25
38:3,7
39:16,21
40:1,13,16
41:7 51:19
**involve**
15:11,13,15
221:18
**involved**
15:6 16:11
21:11 43:15
45:1 185:11
186:3
**involving**
16:4 89:23
90:2,9,22
93:11 201:16

203:7
**ion**
54:7 172:24 196:14
**ionizing**
131:5
**iphone**
9:2
**irrespective**
203:19
**irritation**
19:17 102:10
**isolated**
49:9 141:8, 11
**isolating**
142:13
**issue**
47:15 50:25 51:18 161:13
**issued**
185:9
**issues**
138:8
**item**
8:16
**IV**
4:2

**J**

**Jackson**
175:8 181:8
**JAMA**
30:11
**JASON**
4:2
**jmr@pietragallo.com**
4:6
**job**
36:9 232:17, 18
**Johnson**
219:13,16,20
**journal**
26:11 30:13
**journals**
30:8
**judge**
37:19
**judged**
216:1
**juice**
192:21,22
**jury**
37:19
**justed**
43:21
**justify**
183:23

**K**

**Kantor**
141:23 142:3 147:16 148:25 149:16,19 150:2 172:14
**Katie**
198:19
**keep**
11:25 23:10 55:14 134:16 151:11
**Kelly**
4:12
**Kenneth**
136:9,11
**kept**
129:5
**key**
114:5
**kidney**
72:16 189:10 203:22 204:16
**Kim**
12:25 38:17
**kind**
26:10 28:6 29:25 30:9 36:13,15 49:5,21 51:14,16 52:6,15 58:12 62:24 70:21 82:25 111:9 113:19 114:5 117:18 121:17 127:17,21 132:14 133:5,10 134:16 135:4 138:23 139:21 141:14,16 142:12,13 143:25 172:22 173:11 184:13 187:18 198:12 227:25
**kinds**
197:23
**King**
4:13
**know**
11:4,22 12:6,11,12, 13 13:2,4 14:15,21 15:1 18:11 20:13,21 21:9,11 23:18 24:14 38:17,22 39:3,15,25 40:25 41:2, 4,11 43:21 45:19 48:7 53:12 54:13, 24 55:10 57:4 58:22 61:3 62:18 65:25 66:9, 11,13,16,17 67:5,7,8 70:10 71:10 76:6 83:1 84:19 86:5 89:20,22,25 90:1 91:2 93:14 96:14 100:13 102:21 103:14 104:19 106:17 108:5,6,9,11 109:7 112:3 117:1 125:3, 23 126:24 128:10,16,19 133:2 135:5 139:17 142:20 150:16 161:19 169:9,16 170:1 173:4 176:12,24 178:10 179:7 180:19 185:15,22 186:5,9,14, 25 187:5 192:20 193:20 195:6 202:6 203:14 204:2,22 211:5,22 215:13 217:19,21 218:12 219:25 225:20 234:8 236:24,25 237:10,23 238:20 240:18,21
**knowing**
118:18 119:10 122:11

170:14
**knowledge**
36:12 79:6
**known**
21:3 48:10
81:19 116:9
126:25 140:1
153:9
**Kobets**
220:9
**Korean**
142:2
**Krause**
38:13,15
**Krystal**
4:12

**L**

**labeled**
76:12 80:19
**labeling**
106:5,8,11
**laboratories**
209:13,15
**laboratory**
28:11 201:16
205:10
207:13
**labs**
209:8
**lack**
86:18 134:23
135:8,11
183:23
205:12 224:4
**lag**
151:22,23
152:25
153:1,3,13,
22 155:5
167:16
**laid**
232:4
**Landerman**
7:7
**language**
83:3 185:19
**large**
6:16 36:11
135:18 161:1
162:7 172:6
**larger**
64:23
**late**
47:24 207:1
**latency**
125:3,8,10,
12,17,18,24
126:1,2,12,
14,22,24
127:7,10,12,
16,20 153:16
**Laura**
7:6 218:15
**Laura's**
103:11
**law**
8:2 115:2,3
120:19
**lawyer**
39:21 43:17
**lawyers**
17:8 40:1
42:21 44:21
58:18 211:11
**lay**
214:14
**lead**
133:19
**leaders**
136:16
**leading**
26:10
**learn**
52:1
**learned**
52:12
**left-hand**
158:19
160:25
161:9,23
163:25 199:8
**Legal**
7:3,7
**legislation**
82:9
**length**
130:16
**lengthy**
167:18
**Letters**
30:16
**level**
66:8 166:15
**levels**
65:15 73:18,
20,21,22
74:4 75:22
101:17,22
102:20,22
103:2,6,10,
17,25 104:1,
13,22 105:3
109:10,18
113:21
114:18
115:12
177:2,22,23
182:23 193:2
236:12 237:2
**Leydig**
203:21
**Liability**
7:1
**liberates**
193:18
**lifetime**
230:19
**likelihood**
131:6 132:23
139:25
**likewise**
159:16
**limit**
75:14,25
**limitations**
115:10,24
**limited**
16:11 57:20
83:13 88:19,
23 93:10
99:23 118:15
141:6 167:24
201:22
203:23
214:10
**line**
158:22
**lines**
204:25
**link**
152:22
190:14
**linked**
100:9 118:12
**Lior**
25:4
**liquid**
106:17,19
108:16
**list**
16:19 23:23
24:14,18,20
28:14 29:8
96:17 146:19
159:15
181:16
213:12
220:14,23
**listed**
28:25 30:17,
25 87:24
91:14 146:1,
13 149:17
150:17 151:9
154:23
158:12
210:4,8
220:18
221:21
222:13
**listen**
169:10
**listing**
28:20 30:4
38:11

**lists**
29:13 151:15
**lit**
74:8
**literature**
23:7 31:8 32:3 49:19, 22,25 50:4, 6,8,11,19 51:7 52:16 53:23 61:6 66:23,24 67:9 74:9,10 78:9 92:13 98:10,12 101:20 104:9,16,20, 25 107:10 108:19 110:23 111:1,4,15, 19,24 112:2, 5,7,15 134:5,12 135:18,22 136:6,8 137:4,5,15, 21 140:11,17 141:15 142:12 167:8 173:18 174:3,5,9 177:13,19 178:17 183:1,5 184:9 185:14 186:22 187:1 188:24 189:4,6,19 197:2,21 200:18 202:13 204:2 205:1 206:3 214:9 219:7, 8 223:21 224:22,25 225:2,5,14 228:1 229:8 231:9,12 238:19 240:6,8
**litigation**
7:1 49:2 56:19,25 57:2 231:3
**little**
27:21 28:18 40:9 52:24 55:11 59:20 65:24 74:1 79:17 80:1, 10 99:16 103:8 112:18 123:10 135:3,5 139:7 142:22,23 143:8 144:10 160:24 217:1
**lived**
217:19,21
**liver**
57:18 58:8 72:16 91:17, 21 94:24 172:24 183:25 184:7 196:16,17,24 200:13,19 201:2 203:21 204:16 217:17 218:3,4,6,8 219:2,5 231:8
**livers**
236:21
**LLP**
4:3
**local**
19:15 20:10
**located**
7:25
**long**
42:18 92:18 100:24 101:5 116:22 117:21 118:8 119:6 127:3, 7,11,16 130:9 142:19 167:23 191:5 206:16
**long-term**
16:12 92:15, 25 93:7 132:5 161:2 162:8 227:6
**longer**
93:17 99:16 127:20 128:3 142:13
**longest**
93:10,18 167:16
**look**
24:17 26:12 35:15 38:11 39:14 41:5 44:1 57:15 62:18,23 65:11,16 66:12 74:24 76:3 80:18 86:24 87:6, 11 90:7,12, 16,20 93:24 94:2,19 114:13,22,23 131:21 132:5 139:16 142:11 147:6 150:25 155:18 156:13 157:2 158:7,15,17, 21 160:22 163:24 166:21 174:12,18,23 175:3 181:11 192:24 200:23 205:6 211:23 212:6 213:7,25 215:4,12 216:11 217:24 220:21 223:20 235:13
**looked**
31:3 94:7 114:9 140:5 143:12 147:15 149:7 156:7 173:16 178:4 184:14,20 197:24 238:22
**looking**
9:24 24:16 28:14 38:7 54:18 58:6 83:6 87:16, 22 94:13 96:8 103:7 115:15 116:2 117:1 133:8 138:11 140:23 143:16 149:5,15 150:2 151:24 156:20 159:2 162:5 166:2 167:9 168:25 170:25 171:20 174:21 175:1,5 178:20 182:21 197:15 201:8 215:19,24 216:5,7 222:8 223:2 232:18 236:4 237:15,25
**looks**
26:13 30:4

38:7 39:19 40:7,9 158:22 165:23 214:3 237:16
**lost** 52:9 74:1
**lot** 122:22
**low** 75:19 119:20 165:2 203:18 236:11 237:2
**low-dose** 165:16 196:21
**low-level** 118:16
**lower** 19:16 113:20 114:17 115:12 149:22
**lowest** 65:12,18
**lowish-dose** 196:21
**Lu** 94:16
**lumped** 40:5
**lunch** 99:17 124:12
**lung** 189:10 201:25 202:2 204:16
**lungs** 203:21
**Lytle** 38:16

**M**

**M.D.** 5:2 6:21
**M.P.H.** 5:2 6:21 33:15,16
**M.S.** 33:17
**macromolecules** 201:18
**made** 9:12 10:8 82:10 190:25
**magnification** 161:7
**maintenance** 92:22,24 93:3
**major** 134:2
**majority** 16:3 56:23 113:20 136:19
**make** 12:7 48:17 54:17,19 86:25 97:11 99:4 103:13 116:8 120:3,7 122:17 144:16 150:1 166:4 169:4 171:16 173:4 240:20
**makes** 79:6 83:2 115:20 138:19 144:7 152:17 193:1
**makeup** 102:17
**making** 82:6 113:8 123:15 140:18
**male** 200:13,18
**malignant** 71:23 72:10,13
**malpractice** 14:9
**mammalian** 202:17,25
**mammary** 212:22 213:2
**manifest** 125:16
**manufactured** 194:24 195:4
**manufacturer** 74:20 129:6
**manufacturers** 74:25 75:7 106:9,12
**manufacturing** 62:12,15,16
**manuscript** 76:3 144:15 150:15 156:14 215:4
**manuscripts** 23:5 90:7 94:20
**March** 22:1 40:18
**marginally** 168:3
**mark** 21:14 23:25 24:1 25:15 37:2,25 67:16,24 79:14 144:23 150:18 156:17 169:18 176:11 198:23 217:22 234:23
**marked** 21:13 23:24 24:3,6 25:3,14 37:1,24 41:8 57:12 67:22 79:13 144:25 150:20 156:18,24 169:23 198:20,24 215:6 234:24
**marker** 75:22
**market** 108:10 232:19
**marketed** 207:20 208:3,10
**marketing** 105:25
**Martelli** 214:18 215:7,8
**mass** 209:3,5,7,16
**massive** 110:15
**master's** 26:22 33:9,11,14,21 36:11,19
**mastomys** 69:17
**matching** 202:2
**material** 24:18 203:8 211:13
**materials** 23:23 24:7,18,20 25:3 105:25 181:16 220:14
**Matsuda** 192:18,22
**matter** 6:25 23:18

**matters**
35:4,6
**maximize**
79:20,22
**maximum**
169:13 170:6 226:23 227:1
**Mcdonough**
198:21
**Mcdowell**
141:23 142:4 151:8,9,13 153:23 154:4,13
**Mcdowell's**
154:11
**meal**
100:25
**mean**
10:15 16:5,8 28:9 31:17 41:22 45:6 60:16 62:3,8 63:20 66:20 81:7 92:17 93:23 94:19 100:19 102:14 104:25 108:7 109:5 117:8 120:25 127:9 131:19 133:15 134:15 168:2 171:5 175:10 179:18,19 182:18 191:6,23 202:7 204:10 218:20 227:24
**meaning**
109:8 170:13
**meaningful**
109:1
**means**
59:16 63:23 64:17 81:21
**meant**
153:1,4 154:17 224:17
**measurable**
100:22
**measure**
74:14
**measured**
74:10 150:14 152:4 177:11 193:10
**measurement**
158:9
**measurements**
192:20,21
**measures**
82:8 142:10
**meats**
53:3
**mechanical**
101:10
**mechanism**
36:15 54:3 96:5 196:25
**mechanisms**
64:24 95:22 96:4
**mechanistic**
70:1,6
**median**
94:11,19
**mediated**
156:3 161:17
**medical**
13:15 14:8 15:6,9,22 16:16,17 18:1,4 26:16,21,25 27:3,12,16, 18,23 28:1, 2,4,9 29:13 30:23 34:9, 17,19,24 35:14 36:8, 13 44:24 45:1,21 51:13,15,24 52:3,14 58:13 110:21 111:15 112:7 182:25 208:22 233:3,6
**medical-legal**
13:17 14:7
**medication**
48:13 58:13 97:23 107:20,21,22 121:5 129:20 130:2 192:7
**medications**
48:10 107:17 192:3
**medicine**
26:2,7,8,10, 11,17,21 27:15,16 29:15 34:9, 11,14,18 36:22,23,24 231:23,24
**meet**
42:10 43:8
**meeting**
29:20 43:4
**meetings**
42:12,18 43:16
**Melnick**
194:5,10,12
**Melnick's**
194:2 230:16,25
**members**
45:22,23 46:14,15
**mention**
213:22
**mentioned**
137:8
**mentor**
33:24
**merit**
211:16
**merits**
139:3
**mesothelioma**
131:12
**met**
42:15,20 43:11 128:18 226:18
**metabolism**
70:20 76:24 201:17 205:13 236:8,19,22
**metabolite**
54:6
**metabolized**
173:6 197:8
**metanalyses**
95:1
**metanalysis**
95:7,8 136:1,7
**methodologic**
122:16 139:3
**methodologist s**
136:20
**methodology**
31:18,22 71:12,15,16 76:4 78:25 89:12,13 139:19 141:1,12 160:2 184:11 185:25 213:25 216:19,24 228:12 231:2 232:25 233:2,4,8
**methods**
123:25

124:1,2 133:17 134:17 136:12,22 140:20 216:11
**methylation** 200:13,19 201:2
**methyldiazonium** 54:7 172:24 173:6 196:14
**metric** 160:21
**mg** 160:3
**mgs** 59:5,12,17 151:6 227:3,6
**mice** 69:16 203:18
**Michaud** 141:17 143:11 145:25
**middle** 9:18 195:10
**midway** 69:12 183:21 212:16 236:5 237:21
**milligrams** 171:4,7,9
**millimoles** 214:22 215:14
**mind** 75:13 92:18,19
**minimally** 141:16
**minimize** 102:9 121:17 153:11
**minimized** 95:13
**minor** 9:11
**minute** 33:8 67:20 156:17 233:14
**minutes** 99:15
**mischaracterize** 87:8
**mischaracterizes** 143:20 146:5
**misclassification** 164:19
**misclassified** 165:17,21
**misclassifying** 165:9,12
**misidentification** 139:1
**missed** 139:10
**mitigating** 64:25
**mixed** 84:22,23 120:16 202:12 228:12
**MMWR** 30:9,11
**mode** 203:6
**model** 128:12 173:5 219:20
**modeling** 193:16,25 194:6,13
**models** 61:11,16
**moderate** 62:24 159:19
**modern** 133:25 136:20
**moisture** 60:10
**molecular** 62:17,24 63:1
**molecule** 60:11,18 62:21,25 63:4 191:14
**molecules** 53:13
**moment** 9:18 15:25 18:12 19:20 21:10,12 24:17 39:14 60:14 90:16 91:13 105:6 111:13 150:13,25 152:22 157:2,15,23 165:22 169:13,25 183:11 210:21 212:25 219:4 221:1
**moments** 215:12
**monitor** 8:21 66:23
**monkeys** 217:8,16,21 218:1
**monograph** 68:1,8 69:6 72:15 73:1 76:19 79:15,16 80:4,10,15 82:5 84:23 86:25 99:2
**monographs** 80:6 82:5,15,21 83:12
**month** 40:3,4,6,18,22 41:3
**monthly** 39:24
**months** 25:21 40:5 217:13
**moot** 139:21
**morning** 7:19
**motility** 101:10
**motivation** 186:23
**motorcycle** 115:5
**motorcycles** 115:16
**move** 99:20 151:8 168:18 206:22
**moved** 17:13 86:13
**moving** 123:20 213:9
**mucosal** 19:17
**multiple** 114:25 186:1 198:14
**mutagenic** 64:4 65:3,19 204:6
**mutation** 64:18
**mute** 218:16

N

**N-NITROSO**
68:10
**N-NITROSODIMETHYLAMINE**
68:20,22,24 69:14 80:11 97:7 199:3
**N7**
200:14,20 201:3
**Najafi**
195:11,16 196:3,22
**Najafi's**
74:17 197:16 198:1
**naked**
63:7
**name**
7:2,22 13:3 43:13 53:2 149:13,14 226:17
**name's**
7:19
**named**
23:16
**names**
17:12,14 43:10,14 44:2
**nanogram**
63:6,10 75:24
**nanograms**
63:5
**narrowed**
189:1
**nasal**
203:22
**nasopharyngeal**
19:25 118:13
**national**
46:2,5,6 82:6
**nationalized**
165:6
**naturally**
53:4
**nature**
22:15 39:11 148:17
**NDMA**
9:19 15:12,14 31:6,13 32:5,8 47:12,13,16 48:21 49:9 50:20 51:2,4,8,9 54:5 55:7,9 57:19,22,23 59:24 60:5,11,12,13,14,21 61:7,9,11,16,19,21,24 62:11,15,17,21 63:5,7,11 64:4,7,13 65:2,9,19,25 66:10,14 67:9 68:23 69:1,15 70:2,7,21 71:22 72:15 73:2,12,21,22,23 74:4,5,8,10,15,19,23 75:10,15,20,22 76:1,20,23 77:4,9,14,20 78:7,17 84:16,24 85:8,12,13 89:4,12,16,23 90:2,9,18,22,25 91:3 95:22,25 96:5,19,23,24 97:1,2,7 98:7,18 99:22 100:3,7,12,16,22 105:3,22 107:4,9 108:14,20,24 109:2,10,15,18,25 116:15,21 128:23 129:1,11 156:4 172:3 173:6,15,16,18,21 174:6,7,10,12,15,20,25 175:2,4,5,12,24 176:8 177:2,4,10,22,23,24 178:5,6,7,13 181:6,7,14 182:3,5,6,13,20,23,24 183:6,24 184:6,15,20,25 185:5,9,16,21 186:7,19 187:3,10,14,24 188:8,14,15,17,22 189:19,22,24 190:3,5,16,19 196:5,10,13,14,21,22 197:7,8,12,15,17,22 198:19 199:4,12 200:3,8,12,18 201:13,24 202:9,10,13,17,25 203:17 204:2,17 205:10,14,22,24 206:6,7,10,13,18,19 207:12 210:6,13 213:18 214:7,11,15 217:9 218:8 219:6,17 225:15 227:9,16,18 228:2,3,5,7,9,14,17,23 229:5,14,18,21,22 231:18,20 232:11 234:1,4 235:2,6,11,15,24 236:9,10,19,21,23 237:1,9,17,20 238:12,15 239:1,4,25
**NDMR**
68:22
**NDNA**
204:6
**necessarily**
39:3 48:7 64:22 111:20 112:14 125:24 128:20 129:7 147:10 152:19 179:18 180:20 205:3
**necessary**
82:8 84:19 162:10 208:24 229:7
**necessitated**
232:19
**need**
11:18,22 20:19 131:23 144:18 156:13 161:5 178:15 221:11 224:17

234:14
**needed**
9:13
**needs**
12:2
**nested**
153:24 155:1
**network**
29:15
**never**
116:7
**newborn**
108:17
**newer**
211:7
**newts**
69:18
**nine**
137:24
221:18,19
223:16,18
**nitrate**
103:11,12
191:5 238:12
239:1
**nitrite**
90:25 91:8
102:20,22,23
103:2,6,10,
17,25 104:1
191:6 238:12
239:1
**nitrites**
110:14
**nitrosamine**
47:17 54:5
90:25 91:5
97:8 110:18
193:10
**nitrosamines**
15:11,13
31:6,13
32:5,11
51:14,23
52:2,13,25
53:9,11,12,
17,21 54:10,
25 91:6,7
110:10 193:2
**nitrosate**
191:13
**nitrosation**
110:4,24
111:2,5,11,
16,22 112:1,
8,17 191:10,
12,17,21,23
192:4,8,11
193:8
**nitroso**
53:1 55:5
**NNDA**
156:3
**nod**
12:1
**Nohmi**
220:8
**noise**
159:22
**non-ndma**
161:16
**nonexposed**
121:4 165:21
**nonfasting**
192:23 193:4
**nonhuman**
61:25 81:11
217:6
**nonneoplastic**
203:23
**nonpeer-reviewed**
30:25
**nonphysiologic**
64:19 65:8
72:23 110:13
205:3
**nonsignificant**
132:19
**nonuse**
129:10,14
155:10
**nonuser**
158:23
159:3,25
**nonusers**
147:20 148:2
151:19
155:12,18
156:6,7
163:6,16
164:10
165:10,13,17
**Norgaard**
9:24 142:1,5
165:24
166:20
167:15
169:12,19,21
172:7 179:1
180:10
**normal**
111:20,21
**Notably**
204:14
**note**
9:13 154:8
167:15
224:16
240:12
**notes**
8:14 9:9
10:8 23:9
40:24 44:1
**notice**
37:2 235:24
**noticed**
9:11
**November**
25:20,24
38:8
**NTP**
46:6,10,14
99:3 185:3,
7,10,15,22
186:1,6,17
187:2
**nucleus**
216:14
**null**
133:1,20
135:24,25
142:15 144:9
146:10,24
165:18
168:13 190:7
**number**
10:22 14:20,
21,23 16:15
19:3,11
22:21 29:10,
14 30:14
41:12,16,17,
18 59:22
70:12,23
93:25 97:24
136:2 153:21
154:15 158:3
171:2,13
173:1 198:18
202:24
203:23
204:13
216:13
232:14
**numbers**
80:16 94:21
161:15
**nutritional**
32:14

**O**

**O-METHYLGUANINE**
200:7
**O-R**
149:22
**O6**
200:14,20
201:3
**OATH**
5:6
**Object**
123:3

**objection**
11:7 16:7 17:2 19:23 20:18 22:5, 24 23:3 24:13 31:14 32:19 34:23 35:25 41:22 47:9 48:18, 22 50:9,22 53:22 54:2, 12,15 55:8 56:8,13 57:8 58:3,19 59:14,19 60:7,24 61:10 62:13, 22 63:8,22 64:5,14 65:5,20 67:12 70:4,9 71:3 73:24 74:7 75:12, 17 78:20 81:8,22 84:18 85:10, 19 89:19 90:11 93:5 95:23 96:7, 21 98:9,25 101:1,7,14 102:4,7,15, 25 103:4,21 104:15,24 105:5,18,23 106:10,16 107:1,7,15 108:3,21 109:4,12,21 110:5,11,25 111:6,17 112:9 116:1 117:7,22 118:10,24 119:7,14 121:24 123:4 124:24 125:5,14,21 127:14 128:8 130:11,20 131:17,25 132:7,21 135:1,14 136:14,23 143:20 145:12 146:5 147:3 148:4 150:6 153:15 154:6 156:12 157:6 159:9 165:14 167:5 169:2 170:8, 12 171:11 177:7 178:1, 9,25 179:16 180:1,9,24 181:17 182:4 183:2 185:2 186:8,13,20 188:1,11 190:1 191:7 192:5,13 193:5 194:8 197:20 200:4,21 205:19 208:12 209:21 210:3 211:4,12,21 212:23 213:19 215:3 216:10,23 217:23 218:9 219:10,18 222:15,21 224:14 225:11 228:10,20 229:16,25 230:14,22 234:7,13 236:16 239:5 240:12,17

**Objections**
63:12

**objects**
11:7

**observation**
127:17 217:12

**observational**
95:1,5,6,7,9 96:19 97:2, 21 98:5 113:17,23 122:6 123:12,13,19 128:22 136:13

**observed**
124:25 127:13 155:24 156:7 204:13,15

**observing**
133:3

**obstruction**
101:10

**obviously**
226:18

**occasional**
165:19

**occasionally**
40:4 209:1

**occupational**
52:6 95:3,4 174:15

**occur**
53:4 130:23 152:4,18 153:8 192:14,16 197:1 219:2

**occurred**
84:21 92:13 152:6 182:6 224:24

**occurrence**
110:7

**occurs**
73:18 152:2 173:22 196:15

**odds**
147:21 149:18,24 151:16,18 155:9,14 158:12,22 159:5,13,16, 17,18 164:11 168:4 173:9

**off-the-record**
126:9

**offer**
22:4

**offered**
36:4

**offering**
23:15,17 57:13 182:12,22 183:3 231:3

**office**
8:2,3

**offices**
8:2

**oftentimes**
52:20 77:23 85:23 112:13 128:11 222:4 237:5

**okay**
8:5 9:15,21 10:9 11:3, 23,24 12:15 14:22 16:2 17:15 18:4 21:5,14,16 34:4 37:25 38:5,6,11,24 40:9 45:3 46:25 55:10 56:18 57:11 58:6,21 59:16,20 60:13 61:15 62:8,20 65:17 66:19 67:8,15

68:3,12 72:3 75:2 76:6,9, 17 78:14 79:12,20,24 80:9 82:14, 20 83:5,6 85:6 88:10 89:4 90:8,15 91:4,10 93:10 94:1,7 95:14,15,17 97:18 98:15 99:6,17,19 100:2,6 102:19 103:9 104:19 119:11 122:5 124:4,9,19 125:11,18 126:12,16,20 139:13 140:13 146:12,19 147:25 150:1,12,18 151:12 153:3,23 154:21 155:13 156:16,20 157:2,12,22 158:6,12,21 160:6,12,18, 22 162:22,25 163:13 168:18 170:6 171:8,15 179:10,22 181:6 182:21 183:18 184:3,19 187:22 189:24 191:16 192:2 193:13,23 195:9,13 197:14 198:17 199:15 203:4,16 208:20 210:22 212:8,9 213:6 217:3 220:2 221:12,21,24 222:12,19 223:2 225:1, 8,13 230:8 234:17 235:1,9,13 238:3,7,10 239:7

**older**
109:13

**omeprazole**
149:7,9,17 150:3,5,11

**once**
11:1,15 211:15 238:22

**oncologist**
36:5,6

**one**
4:4 8:20 9:16 10:25 11:22 13:16, 25 14:6 16:25 23:25 24:16 25:7 26:7 30:17 38:3 43:4,5 46:7 49:12 52:15 55:6 56:1 62:11 67:2 72:6 75:5 78:4 83:16 84:19 86:12 87:23 91:14 94:16 105:2 112:23 113:14 115:2,19 116:15 117:12,20 119:9,18 120:13 121:5 127:7 130:21 134:2,18 136:11,16 140:8,10,18 145:15 147:5,23 148:13,16 150:8 151:4, 5 152:24 155:22 156:17 157:12 159:11 161:25 164:21 166:4,5,14 168:8,10 170:17,20 174:22 181:4,10 186:25 187:6 191:19 194:9 198:15 211:19 213:3 214:23 215:15,18 216:5,16,18, 22 223:8,14 225:9 233:13 237:3

**one-year**
151:22,23 152:25 155:4

**ones**
34:2 35:16

**ongoing**
21:6

**open**
8:23

**operations**
62:16

**opine**
193:17

**opining**
77:13

**opinion**
15:18 16:4, 14,15,25 18:1,5,15,22 19:6,9,21 20:6,15,21 23:17 49:2 57:2,3 58:6 100:15 105:2,6 169:5 182:12,22 183:3 195:6 196:4 203:12 211:6,16 215:14 228:6 232:3

**opinions**
17:9,16 22:4 23:15 56:7, 18 57:5,13, 14,15 58:1,5 59:22 91:14, 15 96:18 99:22 140:6 211:25 231:3 233:1

**opioid**
13:18

**opp**
135:20

**opportunities**
45:21

**opportunity**
46:15 62:9 66:16,20 137:4 167:23

**optimizes**
193:7

**option**
121:14

**oral**
51:5 118:16, 17 175:17,19 188:16 189:22 203:19

**order**
39:10 122:24 123:8

131:20,21
**organ**
212:19
**organic**
53:1 55:6 60:14,16
**organization**
71:9 160:15 199:2 201:1 202:21 203:11 204:5,21,23 205:8,18 229:20
**Organization's**
200:1 206:10
**organizations**
45:22 46:14
**organize**
137:20
**organs**
71:25
**original**
28:21,25 29:22 31:15, 16,21 35:8 222:3
**OSHA**
234:4,9,20
**OSHA's**
234:11
**OTC**
165:9,12,16
**outcome**
7:5 33:25 51:6 85:25 113:11 114:7,12 115:17 116:4 120:22 121:23 122:1,4 125:1,10,16 126:15 127:3,11,15, 25 128:1,5 129:21 132:16 137:23 138:14,22 140:2,20,22 142:16 143:24 144:5 147:12 151:24 152:2,9,15, 17 153:5,8 154:18 162:21 168:15 173:25 187:18 188:5,15 223:15 231:5,6,11
**outcomes**
32:22 33:1, 19 49:20 51:14,23 52:2,13 53:8 61:22,24 62:2 72:24 92:14 113:3 114:2,9,24 115:4,15 120:13,21 132:13 152:4 154:16 183:7 197:12 227:10,15 228:18,23 229:2 231:11,14,19 232:16,22 237:9 240:2, 7,16
**outside**
6:7 60:2 210:8
**over-the-counter**
164:24 165:2
**overdose**
58:14
**overlap**
27:14 36:12
**oversight**
220:17
**owing**
205:9
**Oxford**
4:4

**P**

**p.m.**
55:19,22 99:9,12 124:11,14 157:17,20 183:13,16 221:3,6 226:10,13 233:16,19 239:13,16 241:4,5
**package**
58:24 59:8 105:24 106:4
**page**
9:16,23,24 21:23 25:5 28:15,16,24 29:10 30:2 40:8 57:15 68:12,13,18 69:9,12 76:9,10,17, 18 80:2,9,12 82:3,4 83:5 87:12,16,19, 23 88:6 96:18 138:2 141:13 142:24 143:4,10,16 145:20 146:1,12 149:5 151:8, 10 154:23 158:7,8,16 160:9,22,24, 25 161:23 166:2 167:9 175:3,6 176:2,17 183:20,22 190:25 192:18 193:13,14 194:21 195:8,10 198:2 199:6 200:12 201:8 205:6 206:22,24 207:16 210:10,11 212:8 214:1, 4,6,17,19 215:9,23 217:3,4 219:12,14 220:3 221:15 223:3 230:4, 16 235:9,11 237:12,13, 15,16
**pages**
30:25 31:4 214:3
**paid**
41:7
**pancreatic**
57:18 58:8 91:17,21 94:24 183:25 184:7 225:15 231:8
**panel**
45:14,17 46:1,10,18, 21
**papers**
97:10,12 142:5 178:2
**paragraph**
9:18 71:20 82:4 83:11 161:8,24

162:1 163:25 183:21 194:25 195:21,22 200:11 202:14,16 203:4 204:4 205:7 207:17 211:3 212:10,17 213:9 216:11,12 217:5 219:14 220:2,7 222:18 223:13 224:3,4,20 225:18 235:15,23 236:4,5,15 237:15,21

**paragraphs** 225:22

**parallel** 51:3

**parens** 193:18

**part** 6:16 33:7, 19,20 44:24 51:15,23 52:2,13 66:10 74:22 89:16 116:21 194:18 196:16 215:19 218:18 222:8,22,24

**participants** 6:2,14

**participate** 45:23

**particular** 97:9 126:21 151:15 169:14 171:25 179:22

**partner** 38:17

**party** 7:4

**pass** 221:10

**past** 149:2 198:12 217:19,21 232:13

**pathologic** 44:25

**pathologist** 45:2

**pathology** 16:10 44:23

**pathophysiologic** 72:13

**pathophysiology** 172:21

**pathway** 196:13

**patient** 57:7 58:11 101:11 120:15

**patients** 28:13 36:14 92:25 107:18,22 108:2,10 120:15 127:2 129:5,19 130:2 179:19 208:25

**pattern** 203:5

**patterns** 130:13

**PCCIU** 94:10 154:2 155:2

**PDF** 28:17 38:3 68:14

**pediatric** 190:18

**peer** 23:13 184:24

**peer-reviewed** 23:7 26:5 29:4,6,21 30:8 31:8,9 49:18 50:11 185:8

**Peiyuan** 43:13

**pending** 11:20

**Penner** 12:25 13:2, 5,9 38:17 43:8

**Pennsylvania** 4:5

**people** 43:2 59:16 114:12 115:7,16 127:19 165:3,7 222:5 227:7

**peptic** 59:1

**percent** 10:2

**perfect** 174:3

**perform** 74:11 167:6 187:19 209:1 219:11

**performed** 39:4 53:23 122:15 136:7 154:10,19 164:18 167:15 180:10 204:25 209:22 223:14 240:3,21

**performing** 31:20 77:12 84:13 116:14 229:6

**period** 94:4,17,19 125:3,8,10, 12,17,18,24 126:1,2,12, 22,24 127:2, 7,10,12,16, 20,23 128:3 153:1,3,17, 18 167:19 180:14

**periods** 94:5,18 126:14 217:12

**permanent** 218:5

**permissible** 75:25

**person** 13:1 42:12 113:14

**person's** 136:16

**personal** 117:18

**personally** 35:22 45:19 136:24 209:22

**persons** 43:14 112:15 128:14

**perspective** 138:20 190:6 202:6

**pertaining** 31:12 223:5

**pertinent** 25:25

**Peto**
65:13,18
**ph**
101:23,25
102:1,2,6,9,
12 110:14
112:11,12
193:10
**ph-dependent**
191:23
**Ph.d.**
36:10,19
**pharma**
52:19
**pharmaceutica
l**
4:7 35:4,6,7
**pharmaceutica
ls**
18:7 47:19
**pharmacologis
t**
36:7,10
**pharmacologis
ts**
36:8
**pharmacology**
13:20 36:11,
16,19,21,25
**pharmacy**
52:19
**Phillips**
38:16
**phone**
8:19 9:2
198:18
**physical**
8:16 209:23
**physician**
26:14,21,24
27:3,6,13
36:14 105:9
113:10 233:5
**physicians**
26:8 28:4
**physiologic**
64:9 70:13,
23
**physiology**
70:11 103:5
**pick**
11:14
**picked**
54:24
**picking**
103:12
**picture**
50:19 138:23
139:5
**piece**
200:17
**Pietragallo**
4:3
**pig**
61:25
**pigs**
69:17
**pills**
106:21 129:6
**Pittsburgh**
4:5
**place**
181:24
**placebo**
116:16 121:3
**placing**
89:12
**plaintiff**
6:22 230:5
**plaintiff's**
231:18
**plaintiffs**
14:3,12,13
16:23 17:6
18:13 19:7,
8,12 20:5
47:2 50:25
**plaintiffs'**
41:17,18
44:7,9 47:10
181:19
193:15,23
194:11,15
207:18,24
208:7
210:12,19,23
211:3,20
230:9
**plan**
99:14
**plausibility**
50:1,2 85:21
96:2 138:18
172:22 196:5
222:13
225:2,6,15
**plausible**
83:22 85:8,
17 95:21
96:4 196:10,
25
**play**
128:11
**please**
7:7,12,23
51:20 67:19,
21 68:15
69:9 76:18
82:4 83:6
87:19,23
88:6 143:5
193:14
195:23
206:23
215:22 217:4
230:1 235:10
237:13,24
**point**
72:10 76:13
79:2 86:12
88:11 123:15
133:14,20
134:7 143:21
146:8,9,21
147:4,22
148:19
149:19 150:7
159:10
178:11
179:11
184:13 212:2
216:17
227:14
**pointed**
135:24 166:6
169:4
**points**
71:15
**poisoned**
208:25
**poisoning**
200:12,18
**Policies**
26:9
**policy**
26:1,2
120:20
234:19
**polymorphic**
207:19,25
208:2,8,9
209:19,20
210:1,7
**pooled**
120:10
**pooling**
114:25
**pools**
115:6
**poorly**
122:7,13,20
123:14,20
216:4
**popula**
148:21
**population**
112:24
114:4,11
116:3 117:5
120:16
127:8,9
131:21
133:22
141:25 142:6
148:22
153:17
154:10
159:23
201:15

**population-based** 161:1 162:7
**populations** 112:20 113:13 115:18,22 138:10,11 141:3,4 142:2,18 172:7 180:19
**Porter** 17:20
**portion** 199:17 206:4 211:8,11
**posed** 97:22
**positions** 200:14,20 201:3
**positive** 104:8 141:18 214:22 215:15,18 216:1,8,15, 19,22 217:1
**possibility** 164:4
**possible** 56:15 81:14 86:23 87:4 116:7 119:16 127:15 130:13 205:20 235:17 236:23 240:10
**possibly** 87:13 88:7
**postexposure** 167:24
**postmarketing** 92:8
**potential** 20:12 21:1 35:1 50:3 52:7,21 62:11 64:25 70:17 71:5 73:16 81:17 84:10 86:16 96:24 102:5 111:11 115:25 116:2,9 129:15 138:13 161:7 196:21 210:15 213:11 229:9 232:11,18
**potentially** 64:8 77:20 85:22 109:14 119:21 129:13 165:18 189:12 199:23 208:25 236:11
**power** 161:11
**PPI** 10:1 155:14 156:6,8 163:6,16 164:10
**PPIS** 121:15 155:22 162:16 166:12,19,24 167:22
**practical** 77:5,9 78:17 152:13 209:13
**practically** 78:2
**practice** 29:9 34:10 39:20,25 44:14,16 45:2 48:2,6 58:25 59:9 111:9
**practiced** 26:14
**practicing** 233:5
**pre-** 92:8
**precisely** 131:1
**predict** 127:6
**predictive** 130:25 131:1
**predominantly** 135:23
**preeminent** 136:12
**preexisting** 152:5
**prefer** 55:15 76:3
**preliminary** 86:16
**premarked** 198:20 215:8
**prenatally** 73:3
**preparation** 9:12 44:4 95:9
**prepare** 22:8 24:11, 24 25:2 32:4 41:13 42:2, 5,8,21 43:11,20,23, 24 44:10
**preparing** 23:8 24:8 48:16 68:4 134:20
**prescribe** 48:1,4,5 105:8 107:17 108:9 182:8 206:15,16,20 232:23
**prescribed** 105:11,15,20 106:13,23 121:8 179:8
**prescribing** 13:18 107:12,21 108:13,15 206:13
**prescription** 145:16 152:1 165:5 170:17,20, 21,23
**prescriptions** 157:8 158:3 165:8 167:17,20 169:16 170:1,7,9, 13,14,15 171:2,14 179:2,4,7,8 180:11,16, 18,21,22,23 181:2,3
**presence** 6:7
**present** 4:12 8:5 39:18 42:24 43:2,11,16 69:7 142:18 155:25 163:6 196:18
**presented** 83:25 224:15
**presenters** 127:22
**preserved** 54:18,19
**press** 26:3
**presumably**

180:11
**presumed** 175:12
**pretend** 114:8
**pretty** 144:10 198:11 224:5
**preventive** 82:8
**preview** 86:2
**previous** 70:14
**previously** 43:21 56:3 57:12 59:11 65:2,24 69:1 105:7 137:8 145:17 235:6
**Prilosec** 149:12
**primacy** 232:1
**primarily** 19:15 20:10 35:14 50:1 52:5 59:2 111:19 118:13 153:10 154:17
**primary** 36:22 49:4 50:23 85:3 144:5 154:3 159:24 162:21 172:5 232:3
**primate** 62:1 217:6
**primates** 64:23
**principle** 134:22 135:10
**principles** 36:1 51:17 134:9,14 232:4
**printed** 8:15
**prior** 12:21 39:2, 6,11 72:6,20 91:1 109:22 185:20
**Private** 6:5
**pro** 198:6
**probable** 66:1,4,14 81:1,7,20 87:4
**probably** 14:5 27:11 53:19 81:4 88:4 116:9, 10 121:15 122:21 144:22 206:2 220:7
**problem** 159:21
**procedures** 69:25 109:24
**proceed** 124:17
**proceeding** 6:2
**proceedings** 241:5
**process** 50:16,17 66:22 92:5 185:13,22 187:5 240:5
**processed** 53:3
**processes** 16:12 36:16 67:14 70:13, 23
**produce** 37:10 83:15
**produced** 21:20,22 37:6 41:8 60:22 104:5, 6
**produces** 72:16
**product** 23:11 29:19 104:4 106:6 109:14,16 194:22
**products** 7:1 48:21 177:3 182:14,23 199:16
**professional** 25:18
**professor** 34:13
**program** 26:18,19,23 33:21,22 34:19 46:2, 6,7
**project** 33:24
**prominent** 136:15
**promote** 61:9
**promoter** 198:3,4,7
**promotes** 63:24,25
**prompt** 205:21
**pronunciation** 193:20 220:8
**properly** 123:8 129:14
**proposal** 133:18
**propose** 159:18
**proposed** 118:18 137:20 139:2,10,19 196:13,19 219:20
**proposing** 138:19
**proposition** 122:6 133:14
**prostate** 189:11
**protect** 77:25 78:5
**protections** 77:21
**protective** 159:19,20 168:6,11
**proteins** 199:19
**proton** 149:9
**protopathic** 152:7,17 153:4,11,12, 14
**prove** 190:8,12,14
**provide** 18:5,11 49:1 55:1 69:22 103:6,18 105:1 117:19 119:15,22,25 122:7,19 194:16 213:5 220:19 227:17
**provided** 14:1,14,17 15:8,18,22 16:4,14,15, 21 17:9,15, 17,25 18:22

20:6 23:22 37:9 38:3 43:25 50:6 57:10 58:18 74:13 76:2 98:24 106:8, 11 235:2
**provides** 69:10 85:21 93:16 116:10 132:19 142:7 144:10
**providing** 19:6 20:15 28:13 58:1 118:7 132:22 211:13
**prudent** 83:22
**public** 26:22 32:21 33:11 34:16 77:17,23,25 78:6,23 81:16 84:8 120:19,20 237:5
**publication** 23:13 26:5 29:14,17,21 30:9,17 31:24 33:2 82:19 83:2 99:3 130:8 215:2,20
**publications** 25:19 26:6 28:14,19,24 29:2,4,7 30:10,25 31:3 35:15 45:4 99:3 186:1
**publicly** 23:6,7
**publish** 31:5
**published** 25:23 26:4,9 29:21 30:7,8 31:6,9 32:20,24 50:14 61:5 71:12 72:24 89:23 95:2,6 110:8 134:12 174:4 182:25 212:14 240:19,20
**Pubmed** 97:6
**pull** 21:14 67:15, 19,21 144:15,19, 21,23 145:4 150:15,18 156:16 169:15,18 176:9,11 194:17 198:17,22 206:21,23 212:25 213:7 215:7 234:22
**pulled** 21:17 24:5 144:18 176:13,15
**pulling** 120:8
**pump** 149:9
**purchase** 182:8
**purport** 36:2 187:5
**purpose** 6:9 33:4 116:18,19,24 118:12 119:9 129:18,20
**purposes** 32:1 48:16 57:1 60:23 61:4 68:4 77:5,9,17,18 78:18 115:9 149:21 152:13,20 209:2
**push** 99:15
**put** 9:4 133:17 139:4 143:2 144:20 162:1,14,19 173:24 186:1,21 224:18
**putting** 111:13 165:22 173:24 178:19
**pylori** 67:1,6 126:17

**Q**

**qualification s** 25:19
**qualify** 20:1 36:20
**qualitative** 199:10 200:2,5 205:12
**Qualitatively** 236:6,8
**quantificatio n** 109:25 198:1
**quantificatio ns** 101:21
**quantified** 128:23
**quantifies** 107:11 219:4
**quantify** 21:1 27:8 65:10 128:25 130:12 132:3
**quantity** 131:8 160:14
**quasi** 116:5
**question** 11:6,20 12:8 18:8,18 39:22,23 46:13,20 47:7 49:2,4, 6,9,22 50:23 51:8 52:4,9, 11 53:5,24 54:23 64:15, 16 70:10 74:1 76:5 77:14,15 83:4 85:1, 13,14 96:13 98:3,7 103:7,18 117:2 118:25 120:6,19,21 122:10,20 123:11,24 126:11 131:19 135:7 138:6,17 141:20 148:10 162:6,22 167:7 168:20 169:11 170:20 175:11 176:10,21 177:9 178:3 181:23 184:11,14,20 187:14 188:5 189:1 191:18 192:9 203:3

205:23 208:4,5 212:5 215:13 216:4 227:21 236:18 240:13
**questioned** 230:2
**questioning** 149:22
**questions** 12:6 22:6 78:4,8 97:17 124:20 154:22 168:2 169:7 188:18 190:24 221:9,11 226:3,4,5, 19,20 239:8 240:23,25
**quick** 55:12 239:10
**quotations** 230:24
**quote** 65:14 193:16 211:5,17 212:1 230:3, 17
**quoted** 236:1
**quotes** 230:21
**quoting** 210:19 211:3,19,22

**R**

**rabbits** 69:17
**radiation** 131:5
**raise** 7:12 131:16
**raised** 49:22 50:25 54:9 66:7,25 182:6
**raises** 102:1 122:15
**raising** 102:2,6,8
**Ranbaxy** 4:7
**randomize** 116:7
**randomized** 116:6,14,21 117:4 118:7, 17,22 119:4 121:3 122:8, 13,18 123:16,20,22
**randomly** 123:15
**range** 75:10,14 203:20
**ranged** 217:13
**ranges** 158:2
**ranitidine** 7:1 15:15 47:3,5,8,11, 13,14,20 48:1,4,8,13, 20 49:5,16, 19,23,24 50:2,19 51:4,9 57:17,19,22 58:7,10,11, 17,21 59:4,6 60:6,11 64:11 65:23 70:18 73:16, 17,21 74:4, 11,12,14,15 75:11,15,21 76:1 85:2 91:16,20,23 92:3,9,14, 15,21,25 93:11,19 94:8,23 95:1,3,7,8, 12,19,24 96:1,4,6,9, 12,24 98:2, 7,11,13 99:23 100:3, 7,17 101:12, 17,23 102:19,21 105:4,8,12, 16,21 106:14,24 107:5,9,13, 24 108:6,14, 15,23 109:3, 11,19,25 110:2,10,19 111:12,13 121:13,19 128:24 129:1,3,4, 11,17,23,24 130:7 132:13 138:6 143:12,18 144:3,4,11 145:10,16 146:4,14,20 147:8,20 148:2 149:1, 7 150:3,13 151:2,3,7,19 154:24 155:7,14 156:11 157:5,25 158:9,17 159:6,20 160:19 161:2,10 162:8 163:2, 12 164:24 165:10,12, 16,24 166:12,18 167:12 168:21,23 169:1,14 170:2 172:3, 18 173:3,14, 21,22,23 174:3,16 175:13 176:22 177:3,10,11, 23 178:5,13, 14,15,18,24 179:5,11,13, 14 180:6 182:1,8,13, 17,20,23 183:4,7 188:3,5 189:4,6,15 190:15 193:19 195:3 196:6,11,23 197:12,16 205:24 206:6,8,13, 19 207:19,25 208:8 209:17,20 210:1,2,7, 13,16,24 212:4 213:11,18,22 214:2,21 215:14 216:1,6,9 218:23,24 219:8,9 226:23 227:2 229:1 230:11,18 231:6,14,16, 19 232:6,9, 12,15,19,21, 23 239:24 240:2,5,7, 10,16
**ranitidine-specific** 128:22

167:11
168:24
171:21
178:20,22
**rarely**
120:23
**Raspanti**
4:3
**rat**
69:16 236:21
**rate**
176:16
**rates**
101:13
147:12
**ratio**
146:19,22
147:21
149:18,24
151:16,18
155:9,15
158:13,23
159:5,13,17,
18 164:11
**rationale**
102:8 151:25
**ratios**
168:3,4,5
173:9
**rats**
63:14 203:18
235:22
236:22
**reach**
13:5 91:19
122:24 131:5
135:20
184:18 194:6
**reached**
12:24 79:1
96:17 205:20
**reaching**
94:22 100:6
231:2 233:1
**reaction**
191:17
**reactions**
59:3
**read**
72:1,2 77:6,
7,19 82:12,
13 84:3,4
89:2,3
152:23
161:25
162:11,12,
22,24 193:21
196:7 201:19
202:4,5
203:8,9,24
204:1,8,9,
18,19
205:15,16
207:22
210:17
212:19
236:12,13
**readership**
225:22
**reading**
9:11 73:14
89:10 161:21
185:25
219:19
235:25 236:3
**ready**
124:16
**real**
64:11,22
109:7 112:14
113:3 129:2,
7 133:3
178:12
182:19 183:8
205:4 229:6
239:10
**real-world**
58:12
**realize**
142:19
**realtime**
49:12 133:9
152:24
**reanalyze**
147:7
**reason**
37:21 96:9
152:1 177:18
181:1 186:17
**reasonable**
65:13
**rebuttal**
20:25 41:19
181:19
**recall**
11:1 12:22
13:8 14:4
15:24,25
17:8,21 18:9
20:24 22:19,
20 33:22,24
34:2 39:4,8,
9,13 42:23
43:10,14
48:19,24
56:14 66:2
90:4,6 93:7,
22 101:21
137:9 149:14
169:17
170:22
181:9,20
188:25
190:20,22
191:8 192:24
194:1,9
200:22
208:17
210:21 212:6
213:3,24
215:5 217:24
218:10 219:3
221:16 222:3
226:24
227:10,22
228:18
230:6,12
234:2
**recalled**
182:2,5
**recalling**
13:25
**received**
235:7
**recent**
17:19,20
**recently**
67:10
**receptor**
47:21 48:10
158:18 159:6
192:12
**recess**
55:20 99:10
124:12
157:18
183:14 221:4
226:11
233:17
239:14
**reclassificat ion**
67:11
**recognition**
133:20
**recognize**
21:19
**recognized**
17:3 28:3
52:21 65:25
66:5,8 67:1
81:19 82:15,
21
**recollection**
13:25 19:20
20:22,23
38:24 56:21
201:5 230:20
**recommendatio n**
78:15 82:8
**recommendatio ns**
78:12 81:10
86:21
**reconvene**
186:24

**record**
6:1,5 7:20, 22 10:11 11:5,8,21 12:14 55:17, 18,22 99:8, 12 124:9,10, 14 126:8 157:14,17,20 183:10,12,16 220:25 221:2,6 226:8,9,12 233:13,15,19 239:10,12,16 241:3
**record's**
103:9,13
**recorded**
6:3,4 171:16
**recording**
6:10
**records**
165:6
**Recross-examination**
5:4 239:18
**Redirect**
5:4 233:21
**reduce**
102:9
**reduced**
235:16
**reducing**
84:10
**reduction**
161:11
**redundant**
182:19 225:21
**redundantly**
224:2
**REEFER**
4:2
**reevaluate**
66:18,24
**reevaluating**
67:4
**reevaluation**
136:5
**refamiliarize**
181:12
**refer**
45:5,10 46:5 48:9 63:5 65:9 106:4 162:13
**reference**
45:9 181:16, 24 210:24 212:13
**referenced**
91:1 156:22
**references**
24:19 210:5 220:12,20,23
**referencing**
145:2 150:23 215:9
**referred**
149:11
**referring**
8:8 48:9 71:22 73:2 75:2,3 91:4, 5 92:7 94:1 106:5,21 117:14 120:4,5,7,8 158:23 160:9,16 162:6 163:14 169:22 175:19,21 176:2 218:3
**refers**
160:7
**refine**
154:18
**refined**
116:4
**reflected**
204:2
**reflective**
112:14 205:4
**reflux**
47:23 59:2
**refresh**
38:24 230:20
**refrigerate**
213:22
**refrigerated**
106:15
**refrigeration**
107:4 213:17
**regard**
83:23 238:14 239:3
**regarded**
77:4,9 78:17
**regarding**
15:19 21:9 157:25 174:20,25 182:12 194:13,22 199:3 206:6 226:23 227:8
**regular**
11:12
**regularly**
52:20,22 142:11
**regulation**
35:7 82:9
**regulations**
78:1,13 234:6,11,15
**regulatory**
35:4,5,6 50:18 77:17, 23 78:5,10, 12,22 81:16 84:9 184:22 219:23 229:12 233:24 237:6
**reiterate**
228:11
**reject**
81:13 122:12 123:22 133:1 148:10
**rejected**
122:21 139:4,24
**rejection**
133:19
**rel**
145:18
**relate**
171:22
**related**
7:3 16:17 18:8 19:2,12 20:10 23:18 51:18 52:5, 17 59:1 64:11 73:16 92:2,14 93:3 96:23,24 102:10 108:19 129:22 132:17 137:23 140:2 175:14 182:20 189:6 201:17 205:2 218:11,17 228:3 231:10 240:10
**relates**
176:18 188:8 208:21
**relating**
18:22 31:10 32:8,11,14, 18 46:21 67:9 97:2 184:6 185:9 193:25 219:7 225:2,14 235:2,6
**relation**
16:22 17:5, 9,18 18:1

19:10 20:6 32:5 40:22 91:23,25 95:12,19 97:22 98:18 100:7 134:13 146:13 149:16 165:23 167:12 168:22 175:7 187:9,14,23 189:4 200:18 209:8 214:18 223:16

**relationship** 38:18 73:18 120:23 140:20 141:8 142:16 143:25 147:11 156:10 157:4 165:15 168:14 187:18 188:15 197:11 227:18 228:5,14 229:10 231:5

**relationships** 73:7,11,13 138:22 140:22 154:18

**relative** 10:2 145:19, 24 166:16 168:9

**released** 30:12

**relevant** 89:1 97:10 136:8 142:12 181:12,22 191:25 194:3 201:12

**reliability** 109:17,24

**reliable** 107:10 196:4 229:4

**relied** 22:23,25 193:15,24 194:12

**rely** 184:17 194:5 211:10

**relying** 215:1

**remain** 100:25

**remainder** 139:22

**remains** 101:6 164:4

**remember** 12:23 81:1 86:12 94:16 157:9

**remind** 52:10 160:5

**reminding** 145:13

**remote** 6:7,20 7:2 196:18

**Remotedepo** 6:18

**remotely** 7:10

**remove** 6:12

**removed** 85:1

**repair** 64:24 130:22 199:16 216:15

**repeat** 73:25 135:2, 6,7 163:3 208:4

**rephrase** 12:7 70:5 73:25 208:4

**replicate** 162:10

**replicated** 212:12

**report** 8:15 9:5,8, 11 14:15,18 15:8 20:25 21:15,19,22 22:3,7,9,12, 18,23 23:1, 9,11,13,22, 24 24:6,8,24 25:2,9,11,17 28:17 31:19, 22 32:1,4 41:15,16 48:16,25 57:11 59:20 63:5 68:5 74:17 90:17, 20 91:13 94:14,18 95:9 96:18 99:21 134:21 137:13 138:3 140:15 142:24 143:7 145:3,18,20, 21 146:2,12 147:22 148:6 150:23 151:10 153:24 154:7,23 156:22 158:8 159:10,13, 14,16 160:23 166:2,7 167:10 169:22 171:13 174:18,20, 23,25 176:3, 16 183:20,22 184:12 185:10,17 187:2,17,25 188:10,21 189:2,5 190:25 193:14 194:2,19 195:8 201:1 206:22,24 207:16 210:9,10 211:8,11 214:12,17 215:10 217:4 219:12 221:16 223:3,6,9, 12,17 224:12,16,23 225:8,16,20, 24 227:14 230:4,16,21, 25 233:9 235:2,6 239:21,23,24

**reported** 69:11 74:9, 13,14,18 146:21 159:23 171:12 178:6 197:25 198:1 216:19 227:21

**reporter** 5:5 7:6,9,12 11:8 12:1 218:16

**reporting** 29:24 204:24

**reports** 30:3,4,7 41:17,18,19 76:14 119:23 149:19 181:19,20,21 194:16

210:23 211:24 212:7 230:9
**represent** 81:3 226:18 230:15
**representative** 16:20 111:20
**represented** 53:16 230:8
**represents** 22:11
**reprinted** 30:10,11
**request** 6:4
**requested** 50:13
**require** 140:17 197:6
**required** 33:15
**requires** 115:4 148:11 196:16 198:14
**rereviewed** 41:15,18
**research** 22:14 28:21, 25 29:15,22 31:12,15,16, 25 32:2,3,6 35:9,14 45:6 50:7 60:23 61:3 113:13 167:1 207:9
**researched** 49:3 50:10
**researchers** 240:9
**reservations** 232:24
**reserve** 221:10
**residency** 26:17,19 34:19
**resident** 22:14
**residual** 164:4
**resource** 71:1 83:1
**respect** 16:16 18:6 34:25 44:25 49:19 53:6 54:4 69:23 70:17 106:2 129:23 133:16,23 137:5 146:8 171:25 172:2 197:23 235:25
**respected** 71:4 82:25
**respiratory** 19:16 72:17
**respond** 11:6,8 169:10 186:14
**response** 37:6,11 62:6 73:7,11,13, 18 105:1 133:9 138:12 156:10 194:16 202:1 221:20 225:23 227:20 230:24
**responsible** 156:6
**rest** 101:3 147:13 221:11
**result** 20:20 47:5 60:12 64:17 75:24 165:10 236:10
**resulted** 61:19,24 62:1
**resulting** 95:25
**results** 109:6 138:9 165:13 168:1 193:6 212:11 214:25 238:13 239:2
**retained** 12:17 17:8 38:25 49:1 57:2
**retainer** 39:6,9
**retrospectively** 114:7
**reverse** 138:13 152:12,15 221:22 222:8
**review** 18:17 23:13 24:23 25:6 29:8 31:20, 23 43:19,23 44:10 49:9 50:24 51:1 52:17,18,19, 22 56:9 58:24 67:11 71:14 74:19 79:10 91:22, 25 92:15 93:2,13 95:17 96:15 99:5 100:8 101:19 103:5,17 104:9,16,20 117:15 169:25 173:15 174:13 175:23 181:6 184:24 185:12 187:19 189:3,8,14, 18 190:17 194:15 212:24 213:4 214:15 216:24 238:23
**reviewed** 23:8 25:1,8 30:12 41:15, 17 49:18,24 61:23 68:6 69:21 71:16 74:15,17 75:8 92:10 93:6 94:22 97:10,24 100:11,13 159:15 167:7 173:18 174:9 175:17 176:1 178:2,10 181:19,21,25 184:23 185:5 188:24 189:6,13,16, 20 190:21 200:22 202:8 209:24 210:6 214:9,13 220:15 229:8 231:16,20 235:5 237:3, 4
**reviewing** 39:19 43:21 99:2 104:25 206:9 215:17 236:18 240:5
**revise** 236:25

**ride**
115:16
**right**
6:18 7:12
18:23 24:21
25:12 30:20
31:1 38:12,
21 41:10
51:24 53:17
63:2 68:16
80:18 81:5
99:6 158:13
159:2 170:25
176:23 212:9
217:17 226:7
233:12
236:14
237:14 238:6
239:9
**rightly**
77:24
**risk**
10:2 20:12,
16 21:1
35:24 36:2,3
68:9 80:5
82:6 83:25
97:2,22
109:1 114:13
115:15
116:9,22
117:21
126:20
127:12
128:23
131:9,16,22
143:13,18
145:19,24
146:3 147:1
148:1 150:4,
10 154:23
155:8,16
156:10
157:25
158:10 161:3
162:9 165:24
166:13,16,18
167:13
168:22,25
171:23,24
173:17
174:8,21
175:1,24
176:6,7
177:25
178:8,23
179:12 181:8
190:18
197:5,18
200:9 219:4
227:15
**risk-benefit**
107:18 108:1
**risks**
90:22 107:20
114:14 168:9
**road**
10:23
**robust**
98:12
100:19,20
116:10 127:8
155:23 162:2
172:9 206:3
234:20,21
**rodent**
62:2 70:20
76:24 204:7
213:10
**rodents**
199:11
200:2,10
212:11
**role**
153:5
**roles**
36:10
**room**
8:5,10 10:12
11:12 26:14
105:9
**root**
74:22 75:2,
3,7,8
**rosters**
43:1
**rotating**
27:17
**Rothman**
136:9,11,21
137:2,6
**rough**
14:25
**roughly**
10:22 27:20
33:13 42:19
94:5,12
157:11
178:16 180:3
**route**
118:15
175:22
203:19
**routes**
71:24
**rubber**
62:12,14,16
**rule**
119:3 228:13
**ruled**
132:25 228:7
**running**
23:10 134:16
169:9

**S**

**safety**
237:4
**sake**
38:2 160:6
169:8
**saliva**
102:24
104:7,8,22
**salivary**
103:2,6,10,
17
**Salmon's**
9:17
**sample**
109:6 193:3
**samples**
47:11,12
74:11,14,16
75:11,15
76:1 192:22
194:23 195:3
196:23
230:17
**sat**
45:13 46:1,
17
**saved**
238:7
**saying**
11:9 81:10
83:1 103:10,
11 119:1
123:1 132:23
171:8 179:6
180:20
184:16 200:8
225:18
**says**
9:18,19 66:7
73:6 79:3
132:9 139:18
148:7 153:22
164:1 166:11
183:23
199:10 200:1
201:9 203:5
235:12,15
236:8 238:4,
11
**scarring**
218:5
**scattered**
173:8
**scattering**
168:13
**scheme**
80:25 81:24
87:2
**school**
26:16 34:14,
16,17 36:22
44:24

**science**
23:21 101:19 231:24 232:17
**scientific**
110:23 111:4,14 112:6 184:23,24 190:6 202:6 219:22 229:20 231:9 234:18,20,21
**scientist**
233:2
**Scientists**
232:17
**Scotland**
180:21,23 181:3
**Scottish**
94:10 154:3 155:2
**screen**
6:17 79:21 143:1,3,7 144:18,19,21 156:21 176:15 195:15 206:23
**screening**
154:13,15
**screens**
6:11
**scroll**
28:18 40:8 67:18 79:16 80:10 87:20 160:12
**scrolling**
38:2
**scrutiny**
117:10
**search**
51:3,4,16 53:24 97:1, 5,6 98:22 99:1 167:6 185:11 230:16 240:21
**searched**
97:8 210:22 230:9 231:9
**second**
8:21 24:1,16 49:12 57:19 67:19 71:21 80:11 82:4 83:10 94:9 123:24 152:24 157:13 174:22 191:19 202:15 207:17 212:10 217:4 219:13 235:15
**secondary**
36:24 49:8 59:2
**section**
69:10 76:12 83:6,8,9 201:9 205:8 235:14
**see**
21:16 24:5,9 28:21,25 29:11,17 30:5,15 38:13 40:11 44:1,2 59:24 63:6,9,15 68:1,10,20 69:2,3,7,8, 11,18,19 72:17,18 73:4,5,7,9 74:25 76:15, 16,21,22,25 77:1 79:17 80:1,6,11, 12,15,20 82:17,18 83:8,9,16, 17,25 84:2 87:21 90:13 114:14 115:2 126:11 127:15,24 128:1,2 138:9,14 142:14 145:4 147:9,13 151:13 158:10,19,24 159:3 160:24 161:4,5 163:8,11 168:14 170:24 171:1 172:14,15 173:7 175:6 181:11 184:1 191:3 192:18 193:2 194:24 195:11,20 199:1,5,12, 14 200:7,15, 16 201:9 202:18,19 211:24 212:14 213:14 214:19,23 215:5 217:6 219:14 220:4,9 221:21,22 234:8,15 235:3,10,12, 17,18 236:6 238:4,10,15, 16
**seeing**
141:3 161:14
**selected**
22:22,25
**self-explanatory**
53:2
**semantics**
133:5,10
**semi-volatile**
60:19
**send**
38:19 40:2
**sends**
40:3
**sense**
96:8 138:19 200:6
**sentence**
69:22 71:22 79:3 83:10 85:12 147:7 155:19 163:24 164:1 166:21 194:25 195:14 199:9 202:16 210:11 235:14 237:22
**sentences**
162:23
**separate**
32:2 140:7, 13,17 156:15 174:10 180:18 223:5,7,10 225:1
**separated**
224:21
**separately**
91:3 140:11, 12,20 225:23 231:11
**series**
119:23
**serve**
26:7

**service**
165:7
**services**
165:8
**set**
55:23 75:25 78:5 116:5 133:1 148:14 154:13,21 162:20 167:16,19,24 219:20 224:21
**sets**
66:21 225:25
**setting**
6:12 58:12 207:13 209:5,12
**several**
27:24 73:6, 10 201:24 213:10,12
**severe**
139:24 227:4
**Shank**
200:15 201:3
**share**
8:21 9:1 21:17 36:9 70:12,23 145:5
**shares**
142:3
**Sheehan**
5:3,4 8:8 16:7 17:2 19:23 20:18 22:5,24 23:3 24:13 31:14 32:19 34:23 35:25 41:22 43:6 47:9 48:18,22 50:9,22 53:22 54:2, 12,15,20 55:8,13 56:8,13 57:8 58:3,19 59:14,19 60:7,24 61:10 62:13, 22 63:8,12, 22 64:5,14 65:5,20 67:12 70:4,9 71:3 73:24 74:7 75:12, 17 78:20 81:8,22 84:18 85:10, 19 89:19 90:11 93:5 95:23 96:7, 21 97:13,19 98:9,25 101:1,7,14 102:4,7,15, 25 103:4,21 104:15,24 105:5,18,23 106:10,16 107:1,7,15 108:3,21 109:4,12,21 110:5,11,25 111:6,17 112:9 116:1 117:7,22 118:10,24 119:7,14 121:24 123:3 124:8,24 125:5,14,21 126:4 127:14 128:8 130:11,20 131:17,25 132:7,21 135:1,14 136:14,23 143:20 145:12 146:5 147:3 148:4 150:6 153:15 154:6 156:12 157:6 159:9 165:14 167:5 169:2 170:8, 12 171:11 177:7 178:1, 9,25 179:16 180:1,9,24 181:17 182:4 183:2 185:2 186:8,13,20 188:1,11 190:1 191:7 192:5,13 193:5 194:8 197:20 200:4,21 205:19 208:12 209:21 210:3 211:4,12,21 212:23 213:19 215:3 216:10,23 217:23 218:9 219:10,18 222:15,21 224:14 225:11 226:7,16,18 233:11,23 234:7,13 236:16 239:5,9,19 240:22
**sheet**
5:8 140:18
**Shook**
8:3 12:18,20
**short**
127:13,17
**short-term**
16:9 131:15 165:2,16 227:3
**shorter**
127:19 172:12
**show**
61:22 70:2 86:3 144:8 150:4 177:24 178:7 231:13
**showed**
141:18 173:1
**showing**
70:6 135:23 197:18
**shown**
37:18 235:7
**shows**
83:12 85:24 135:18 146:8
**shut**
49:13
**side**
237:6
**sign**
39:6,8,10 129:25
**signature**
21:23
**significance**
133:6,11 134:23 135:11
**significant**
112:16 122:15 133:4 135:19 136:5 143:19 146:4 148:3 150:5 151:16 155:9,15,25 159:8 163:18,20 166:17 168:2 203:22 212:18 225:6
**significantly**
147:2 164:11
**similar**
33:14 51:3 57:22 64:10 72:5,20

75:23,24 84:7 100:3 109:22 111:18 120:15 121:7,9,16 129:19 138:21 141:3 142:9 146:7 152:13 155:17 175:12 177:3 180:6 200:6 214:7 224:4 236:9,17,20
**similarities** 76:23
**similarity** 142:4
**similarly** 146:23
**simple** 209:1
**simply** 122:12
**single** 23:19 73:4 115:7,8 143:24 153:21 184:22 187:6 198:12,13
**sit** 46:9,21
**site** 196:15
**sites** 172:23 196:18 197:1,5
**sitting** 104:20 213:1
**situated** 12:14
**situation** 21:12 46:12 117:25 129:17 188:4
**situations** 148:20
**six-month** 217:22
**size** 62:20,25
**skeptical** 187:6
**skimmed** 44:2
**slight** 10:1 166:13
**slightly** 27:20 30:13 94:17 141:25 152:15
**small** 62:24 63:4, 10 108:24 141:6,8 161:15
**smaller** 172:11
**smoke** 53:9
**smoked** 53:3
**smoking** 151:20 154:5,8 164:2,8
**sneak** 86:2
**solely** 88:23 130:14 131:2 239:25
**solicit** 45:23 46:14
**solid** 106:18,20
**somebody's** 56:12
**someone's** 128:13
**sophisticated** 154:9
**sort** 69:24 108:25 129:5
**sound** 11:13 24:20 41:9 53:17 63:2 81:4
**sounds** 24:22 103:14
**source** 62:11 82:15, 22 90:6 139:13,17 240:10
**sources** 9:20 56:17 91:9 177:4
**Spalding** 4:13
**speak** 11:11,15 41:20 42:1,7 54:21 58:22
**speaker** 6:11
**speaking** 11:14 132:9 171:17
**Specialties** 28:4
**specialty** 28:12
**species** 63:17 69:15, 22 70:11,24 71:25 72:23 76:21 83:16 202:18,25 203:17 205:10
**species-specific** 205:13
**specific** 28:5 33:23 44:2,3 46:16 47:4 51:4 56:9 57:6 64:21 71:15 76:5 85:12, 13 89:25 90:24 91:7 92:18,19 93:14,25 94:13 96:12 103:7,18 113:5,8,11, 12 115:10 118:11,13 119:8 125:6 129:18 134:20 139:17 140:19 143:24 167:6 171:23 174:10 176:18 179:12,20 181:9 185:14 188:19 190:24 191:8 194:18 196:6,11,19 197:23 200:23 208:22,23 213:25 215:19 218:10 219:1,3,11 223:4,18 224:9,12 227:4 228:9 234:21
**specifically** 31:7 43:24 45:20,25 46:23 68:10 81:23 91:25 94:7 100:11 132:10 161:21 174:21 175:1,7 176:5,7

181:7
190:20,22
194:5 195:16
214:13,17
**specifics**
117:9 201:6
**spectrometry**
209:3,6,7,16
**speculate**
186:22
**speculated**
207:18
**speculating**
207:25 208:7
**speculation**
187:4 208:7
**spelled**
133:16 138:3
**spend**
22:17 27:9
**spent**
39:16 177:15
**spoke**
13:10 42:4
**spoken**
13:9,11
**sporadically**
63:16
**spot**
212:9
**spotlight**
6:12
**spotlighted**
6:10
**Spurling**
212:14
**square**
172:25
**Stand**
68:16 195:24
**standard**
13:17 14:8
139:19
184:11
**standards**
216:21,25
217:2
**standpoint**
78:23 84:9
**stands**
149:22
157:10
**start**
55:4 141:14
195:13 214:1
**starting**
68:18 195:18
205:6 236:6
**starts**
12:13 164:1
220:3 237:16
238:6
**state**
7:22 82:14
83:18 100:2
115:4,5,7,
17,19 165:1
190:2 201:21
203:16
216:13
**stated**
48:23 57:14
100:5 162:21
164:9 194:5
228:21
229:3,7
232:22
236:15
**statement**
69:20 70:14
72:4,19
77:8,13
82:20 84:5
85:6,16
101:20
148:6,8
161:5,24
200:1,25
202:20,22
203:10 204:3
205:17
235:19,21
236:15
237:11
238:16,17,24
**statements**
71:9 190:24
**states**
60:23 72:15
78:21 82:18
88:5,9,12
139:14 162:7
182:8,11
200:11
202:16 215:1
**stating**
85:7,11,17,
20 205:8
**statistical**
33:6 133:6,
11 134:3,23
135:11
161:13
**statistically**
132:19 133:4
135:19 136:4
143:19 146:4
147:2 148:3
150:5 151:16
155:9,15,24
159:7
163:17,20
166:17
**statistician**
136:10
**status**
21:10
**Stefani**
238:5
**steps**
30:1
**stomach**
101:2,18,23,
25 102:3,6,
20,22 125:4,
19 129:25
193:2,11
227:22
**storage**
129:5
**stored**
107:14
**story**
172:25
**STOY**
4:2
**strata**
157:7
**Street**
4:4
**strength**
127:18
**strengthened**
88:25
**strengths**
115:23,24
116:2
**strike**
15:3,17 16:2
17:15 19:5
27:24 29:3
47:6 59:21
70:5 76:10
78:15 82:2
90:19 96:15
98:21 99:20
102:5 110:21
115:23 125:2
129:9 130:4
132:3 134:7
135:8 137:11
140:3 145:24
152:25 153:2
163:19
165:11
168:18
170:17
174:22 176:6
182:21 184:3
185:6 187:11
216:3 217:20
**structure**
77:21 209:25
**structured**
97:6 167:6
174:11
187:20
**structures**
208:24

**students**
27:17 52:20
**studied**
133:22
**studies**
23:5 32:8, 11,14,18 35:17,20,23 50:12,13,15 62:1,2 64:19 65:12 70:1, 6,15 72:6 73:6,10,23 74:6 76:14 79:9 84:22 86:4,18 89:23 90:2, 6,9,13,18, 22,25 91:2, 5,6 93:24 94:10 95:1, 4,7,9 96:19 97:2,21,25 98:14 99:5 100:8,11,14 113:16,18, 19,20,21,22, 23,24 114:18,19 115:17,25 116:12 119:12 120:23 127:1 128:22,25 129:2,10 134:24 135:12 136:2,4,6,13 139:3 140:21 141:4,15,22 143:11 144:17 150:11 162:10 167:11 168:24 169:8 171:22 172:6,12 173:1,16,23 174:6,13,17, 20,25 175:4, 6,17,20,24 177:5,14,16, 24 178:7,21, 22 179:11, 12,23 180:5 181:7,9,13, 21 188:19 190:17 197:18,24,25 201:14,23 202:2,9 203:17,23 204:25 205:22 206:2,7,8,25 207:3,7,10, 22 208:1 209:6,7 210:14 211:1 212:3,12,22 213:11,12, 21,23 214:2, 8,12,14,15 215:1 217:6, 19,22,25 218:7,10,23 219:1 220:15,20,22 225:19,25 227:9,14 228:2,8,11, 18,23 230:11,19 231:10 232:14 237:17,20,22 238:1,6,11, 25
**study**
9:24 31:21 52:23 65:13, 16,18 75:19 76:2 81:12 92:18 94:6, 7,13 98:6 100:20,22 112:20 114:1,2,6, 11,21 115:6, 9,11 116:16, 17,19,24 117:5,23 118:4,7,18 119:9,12,17, 20 120:5,8 121:1,5,22 122:6,24 123:8,9,12, 13,19,25 124:1,2 127:13,23 130:4,6 131:13,15,21 132:25 133:6,11,16, 18 135:15 142:3,9 143:23 144:5,6,13, 14 145:2,6, 7,8,18,23 146:1,2,6, 13,17,25 147:6,13,15, 18,19 148:9, 16,24,25 149:20 150:12,14,22 151:2,15,18 153:3,14,25 154:4,9,11, 14,19,22 155:1,4 156:21 157:23 158:5,16 159:16,23 160:2,9,23 161:1,22 162:7,19,20 163:7,16 164:15,16,23 165:13,23,25 166:20,24 168:21 169:4,12,14, 15,21 170:3, 5,7,24 171:13 174:12 175:6 176:1,9 177:5 179:1, 23,25 180:7, 10,15 191:3 192:17,22,24 193:9 194:6 200:23 201:6 203:3 212:24 213:4,25 214:6 215:9, 13 216:20,25 219:3,13,17, 19 227:12 240:4,19
**study's**
133:17
**studying**
124:3 141:24
**stuff**
47:18 108:9 142:20
**subgroup**
120:15 141:6,8,10, 11 165:20 167:15 179:2,20 180:10
**subgroups**
138:11 142:8
**subheading**
30:3,16
**subject**
112:25 127:3 164:20
**subjected**
109:19
**subjects**
100:23 114:25 115:13
**submit**
39:21,24

40:1 210:22
**submitted**
22:7 23:12
25:9,10,11
33:1 39:17
40:10,13,15,
22 41:3
50:16
**subsequent**
86:20
**subspecialist**
28:2
**subspecialty**
28:3
**substance**
19:9 56:7
199:22
204:14
205:14
**substances**
198:15
**substantial**
52:16
110:18,20,22
111:3,10,14,
22 170:23
**substantially**
120:24
176:21
223:24 224:6
**substantive**
18:11 142:8
194:16 195:6
203:15
**substitute**
136:17 174:2
**suddenly**
123:19
**sufficient**
17:4 19:24
20:3 51:10
62:7 76:20
78:1,6
83:13,23
88:13,15,17,
20,24 120:1
131:8 137:22
153:18
189:21
190:3,15
196:24
227:17
228:4,13
229:4,14,21
234:1
**sufficiently**
228:7
**suggest**
108:12
142:17
**suggested**
109:24 197:4
202:10
**suggesting**
161:11 179:4
180:22
207:20
**suggestion**
203:1
**suggestions**
29:25
**suggestive**
201:23 202:6
**suggests**
112:15
155:18 163:9
**summarize**
58:5
**summarized**
223:13,22,24
225:5
**summarizes**
224:20
**summary**
57:15 59:22
69:10 91:15
96:18 99:22
173:11
188:12
211:5,24
223:13
225:17
**Sun**
4:7
**super**
58:15 110:12
**superphysiolo gic**
110:13
**Supplement**
79:16
**supplements**
112:12
**support**
7:3,7 20:4
49:7,16
57:21 99:24
100:15
138:21
194:14 196:4
225:6
**supported**
172:11,20
**supporting**
89:1 119:15
201:16
224:21
225:18 229:8
**supports**
134:25
135:13
**suppression**
47:22 59:1
**sure**
12:7 26:2
38:23 41:24
54:17,19
74:3 83:3
86:25 97:11
99:4 103:13
120:3,7
124:7,21
140:18
144:16 150:1
157:16 166:5
169:4 171:16
176:9,11
178:2
203:13,14
218:18 226:6
239:11
240:20
**surprise**
186:12,15
**surrounding**
173:12,13
**susceptible**
191:14
**suspected**
200:12
**suspicion**
161:20
**swear**
7:8,13
**swearing**
7:10
**symptoms**
19:15,17
**syndromes**
28:6
**Syrian**
69:16
**system**
87:23
**systematic**
29:8 31:20,
23

**T**

**table**
146:8 158:17
215:21,22
**tablet**
8:18 106:21
**tablets**
160:14
**tabs**
57:16
**take**
6:16 11:9,
18,19,21
12:1 23:9
24:17 39:14
51:19 55:12,
14,16 59:16
79:12 90:15,
16,20 91:11
93:21 97:15,

17 99:6,16 113:2 135:17 137:4 145:14 150:25 169:25 173:13 181:10 191:5 193:3 215:12 220:20 232:23
**taken**
6:21 10:18, 24 13:13,24 69:6 78:12 106:25 134:24 135:12 178:4 192:21,22 216:15 232:19
**takes**
101:3 127:3 231:25
**taking**
7:21 26:12 58:12 111:12 129:24 130:2,9 149:1 158:15 165:3
**talc**
16:16 17:5, 17,18 18:16, 19 21:9 56:15,19,24 57:1
**talk**
59:20,23 217:5 219:13
**talked**
14:16 65:24 112:18 129:16 155:20 221:14
**talking**
11:15 55:2 67:3 92:4

105:24 109:8 176:23 177:16 212:11
**tallied**
24:17 41:6
**targeted**
45:25 46:16, 23
**teach**
27:16 34:15, 16
**teaching**
27:15 52:23
**TECH**
68:13,16 79:22 142:25 143:4 195:16,20,24 237:25 238:7
**technician**
4:11 7:2
**technology**
12:12
**teleconferenc e**
42:13
**tell**
56:10 93:14 94:20 103:23 104:2,17 106:19 125:22,24 131:15 134:19 151:1 170:16 215:24 216:6
**ten**
10:22 13:13 14:16,20 94:11 167:17,18 169:16 170:1,7,9,13 179:2,4,7,8 180:11
**tend**

133:25 149:13
**term**
27:23 58:16, 17 63:23 81:7 92:18 93:17,18 109:7 116:22 117:17,21 118:8 119:6 125:12 152:11 168:19 191:9 198:3 206:16
**terminology**
58:20
**terms**
131:20 171:23
**test**
29:23 49:17 50:20 51:1 195:3
**tested**
69:15 75:16 83:15 194:23
**testified**
13:17 14:7, 16 15:17 56:2 59:11 213:16,20 226:22 227:8,20 228:16
**testify**
14:15,18 37:21
**testifying**
14:8,11 15:3 17:5 19:5 56:11
**testimony**
5:2 7:13 13:20 14:2 15:22 16:10, 21 37:13,14, 17 65:4 126:1,12

189:24 228:19 230:6
**testing**
55:3 69:25 72:21 74:12, 15,18,19 75:1,13,14 86:1,17 109:17,23 134:3 148:18 194:22 210:6
**text**
10:15 133:13,15,24 134:6,8,10 136:22,25
**textbook**
30:22,23
**thank**
16:21 28:17 30:15 51:20 79:25 85:15 87:23 91:11 124:4 183:19 215:23 226:3 233:12 239:8 240:22,25 241:2
**Thanks**
28:16 230:1
**theory**
47:10 60:9 172:22 231:18
**therapeutic**
57:16 58:7, 9,15,16 91:15,19 94:23 102:8
**therapeutical ly**
226:24
**therapies**
142:14
**therapy**
58:13 92:22, 24 93:3

**there'll**
46:14 199:18
**thing**
72:12 116:12 137:3 209:13 227:25
**things**
39:5 56:1 131:7
**think**
10:25 17:19 38:18 39:2 42:22 43:13 52:4,15 53:2,6 54:3, 5 57:14 58:4 65:6,12 66:6,21,25 67:20 70:11 71:4,13 72:5,9 75:19 77:11 78:4, 21,25 81:9, 23 82:24 84:7,20 85:20 86:11, 14 92:17 94:9 96:10, 15 98:1,10 99:14 100:19 102:8 108:4, 22 111:18,19 116:18,20,23 117:3,19,23 118:6,11,25 119:2,3,8 122:9,25 123:6,11 129:15 132:8 133:24 135:15 137:2,6 138:2,3 139:18 141:2 142:12 143:21 145:21 146:7 148:5,6 149:24 157:8 158:1,4 159:22 161:5 162:1,13,18 163:3,5 164:15 167:14 168:6,12 171:17 172:5 173:11,19 175:9,16 177:8,19 184:9,10,16 185:3 186:2, 21 187:16 188:12 190:2 191:25 192:6,25 193:1 196:12 197:3,21 198:11 200:5 202:12,24 203:1 204:22 207:8 212:5 214:13 215:23 217:25 222:1,6 223:20 224:15 225:17,21 228:16,24 229:7 235:21 236:17,20
**thinking**
75:6 92:20
**thiocyanate**
104:3,7,10, 11,13,22 105:3 110:3
**third**
14:4 27:13 57:23 210:12
**Thomas**
220:7
**thought**
136:25 176:13
**three**
42:9,16 43:4 57:16 91:14 157:11 178:24 179:3,5,14, 18,21,24 180:3,12 207:21 214:23 215:15,25 216:6,8,17
**threshold**
128:12,16 131:6 220:4
**throw**
174:2 200:24
**tied**
23:19
**till**
9:19 195:20, 22
**tilted**
27:20,21
**time**
6:23 7:6 10:25 12:11 13:10 14:19 15:21 22:7, 17,20 25:8, 9,22 27:8, 12,13,22 30:11 35:20 38:19 39:16 42:20 55:12, 19,22 56:22 66:9 67:5,7 69:4 76:13 86:21 89:15 92:19 93:10, 21 99:9,12 105:11,15,20 106:13,23 107:12 109:5,11 116:13 124:5,6,11, 14 125:9,15 127:2,13,17 145:14 152:3,5 153:9,13,18, 22 157:17,20 167:16 169:8,9 180:6,14 183:13,16 186:5,9 191:8 210:14 221:3,6,11 226:3,10,13 233:16,19 237:14 239:13,16 241:1,4
**time-limited**
93:9
**times**
10:21 13:13 14:14,16,17, 20,24 16:15 23:4 27:24 42:7,9,16 56:23 59:3 63:6 85:24 105:8 117:3, 25 119:15 120:18 136:1 163:4 172:12 199:18
**timing**
39:4 211:14
**tire**
62:12,14
**tiring**
62:16
**tissues**
76:24 203:21 204:13,15
**titled**
28:20 30:19
**tobacco**
53:9
**today**
6:22 7:21,25 8:6,11 12:1

37:14,18,22 41:14,21 42:2,5,8 43:20 44:11, 14,20 104:21 138:4 206:4 207:8 213:1 215:24 216:7 226:21,22 227:8
**today's** 216:21
**token** 168:5
**told** 38:19 186:11 208:17
**Tom** 8:7 54:13,19 226:17
**tool** 134:3
**top** 41:4 62:19 76:6,8 93:15 158:8 183:20 193:14 199:7 205:6 210:11 235:11 237:15
**topic** 35:10,11 51:13,22 103:8
**topics** 27:18 31:7 35:13 52:22
**total** 24:20 42:15 171:4,6,7,9
**totality** 134:25 135:13
**totals** 41:9
**toxic** 28:5 208:25
**toxicity** 16:17 61:14 218:8
**toxicologic** 51:17 209:15
**toxicological** 35:1
**toxicologically** 212:18
**toxicologist** 26:25 27:3, 10,12,23 28:1,2 36:13 51:13 233:3, 6
**toxicologists** 28:10 36:8
**toxicology** 13:16,19 15:7,10,22 23:17 26:22 27:18,21 28:10,11 30:20,23 32:23 34:9, 15,19,25 35:20,21,23 44:16 45:1, 21 46:2,5,7, 13 51:15,24 52:3,14 92:2 208:22 231:17,21,25 236:1
**toxicology-related** 35:14 92:11
**toxins** 35:2
**track** 33:12
**tract** 72:17
**Tracy** 7:19 41:23 54:20 97:13
126:4
**traditionally** 120:12
**trained** 35:21
**trainees** 27:16
**training** 32:21 33:6, 20 44:23 45:2 209:14
**Tran** 94:16
**transcript** 43:22
**transcripts** 25:1 43:19, 23,25
**transformation** 196:14,15
**transit** 101:3
**transported** 129:6
**treat** 77:19 78:2 84:11 208:24
**treated** 115:9 133:6, 11
**treating** 113:10
**treatment** 47:23
**treats** 36:14
**trial** 37:19 91:22 92:1,4,16 93:3,6,8,12 116:6,15,22 117:4,9 118:7,23 119:4 121:3 122:8,13,18 123:15,17,
21,22
**trials** 92:5,7,11 113:1 207:20 208:9,14,16
**trick** 120:6
**true** 17:16 25:17 63:19 116:11 129:21 133:2,21 135:21 142:17 144:11 147:10 148:15 154:14 165:15 190:14 196:3 227:18 229:10
**trumping** 123:19
**truncated** 127:21
**truth** 7:14,15
**truthfully** 37:22
**try** 11:25 54:21 97:11 99:15 114:14 139:2,4 221:8
**trying** 94:15 123:5 148:20 157:9,12
**Tuesday** 6:22
**tumor** 72:9,24 203:5 205:11 217:5

**tumor-promoting**
130:23
**tumors**
63:16 71:23 72:10,13,16 203:17,20 204:16 212:18,22 213:2 217:17 235:22
**turn**
28:16 68:3, 12 69:9 76:9,17 80:9 82:3 83:5 87:19 141:13 177:18 193:13 195:8 199:6 207:16 210:10 217:3 235:9 237:12
**turned**
40:24
**turning**
146:12 157:22
**twice**
59:5,12 227:4,6
**two**
9:10 11:14 27:11 40:4 59:22 72:11 97:16 114:8 141:15 143:11 162:23 163:4 172:6 177:15 191:25 212:12 215:25 216:6,7,17
**two-thirds**
27:12
**type**
15:2 16:13 19:14 20:7, 15 29:17 32:7 35:19 39:10 57:24 89:24 90:3 118:13 125:25 140:7,10,12, 14 144:13 145:7 153:20 154:16 166:9 167:1 187:10,15,24 193:9 197:14 216:25 223:25 224:23,24 229:15,23 234:2
**types**
13:14 15:7 18:4 47:4 100:9 101:5 104:21 113:15 119:11 140:9 144:1 167:3 181:15 188:23 189:8,16,20 191:20 197:19 205:2
**typical**
30:13 39:25 110:16 112:16
**typically**
25:20 27:18 31:18 36:10 39:8,20,24 40:2,3,6 47:22 48:5,6 53:14 54:11 55:5 61:12 63:23 64:24 97:6 100:24 101:2 102:1 104:4 113:2, 17,22 114:22 115:12 116:12 118:3 119:16,23 120:10 121:2 122:12 124:25 125:7 126:23,25 133:16 137:18 139:2 140:17 148:14,18 152:8 153:6 187:17 193:6 198:6 199:16
**typographical**
166:6
**typos**
9:10,15

**U**

**uh-huh**
12:2
**UK**
142:3 165:1, 6
**ulcer**
59:2 227:5
**ultimate**
28:11
**ultimately**
130:18 208:2,10
**unadjusted**
164:12
**unaware**
213:17
**uncertain**
109:24
**unclear**
73:17 179:1
**undergo**
117:10 236:22
**underlies**
172:22
**underlying**
51:17 148:21
**underpinnings**
234:19
**understand**
10:15 11:16 12:3,5,7 16:5 37:13, 17 38:22 45:5 46:6 77:11 92:21, 24 109:2 120:4,7 123:5 169:6 170:20 173:5 220:24
**understanding**
16:8 20:9 22:11 46:25 47:2,10 51:17 60:5, 8,21 61:8, 15,18 62:14 63:1 65:17 66:22 75:11, 18 80:24 81:20 89:4, 7,20 101:15 104:11 107:3,8 109:5 112:10 125:12 128:12 149:3 164:25 172:21 173:12 182:10 185:7 191:20 192:2,10,14 194:4 195:2 197:6,8 198:6 211:6, 25 219:19 227:1,3 237:19
**understood**
12:9 21:14 164:17

198:12
**undertake** 67:10 91:22 107:18 167:1 184:3 189:3 197:14 219:6
**undertaken** 69:24
**undertakes** 185:23
**undertaking** 104:20
**undertook** 33:20 186:18
**undiagnosed** 152:2
**unethical** 116:17,21 117:4,13,23 118:4,6,22 119:2,4
**unexposed** 114:5 164:21
**unilaterally** 187:2
**unique** 44:25 70:12 130:22
**unit** 115:8,19 120:14
**United** 60:22 182:8, 11
**universe** 96:19
**university** 27:7 34:12, 14 36:21
**unmeasured** 156:5
**unpublished** 193:16,25 194:13
**unquote** 230:3,17
**update** 25:21 66:12 80:5 185:3 186:21
**updated** 25:22,24
**updates** 187:1
**upper** 6:18 19:15 38:12 75:14
**usage** 59:3
**user** 158:23 159:25
**users** 10:1 147:20 151:3,19 156:8 158:18 159:6 161:10 163:5,6,15, 16 164:10 165:12 166:12,18,19
**UTC** 6:23 55:19, 22 99:9,12 124:11,14 157:17,20 183:13,16 221:3,6 226:10,13 233:16,19 239:13,16 241:4
**utilized** 155:4

**V**

**vague** 135:14
**vaguely** 234:14
**valid** 49:7 133:25 228:8
**Valisure's** 193:15,24 194:6,13
**valsartan** 175:11,14
**value** 122:22 126:25 133:19
**var** 115:21
**variability** 27:19 115:21
**variable** 103:2 104:13 109:3,6,7 130:14 141:4
**variables** 101:5
**variation** 127:5 134:1
**variations** 159:23
**varies** 126:2 127:18
**variety** 13:15
**various** 47:18 53:7 56:17 69:17 71:24,25 72:23 142:8 158:2,3
**vary** 103:24 126:13
**vegetables** 53:4
**verbal** 12:1,3
**verified** 110:6,7
**verify** 87:6 180:13 208:19 212:7
**verifying** 109:17
**version** 195:24
**versus** 27:9 73:21 74:4 91:7 107:21 116:16 118:8 129:10,14 149:7 150:3 158:9,18,23 159:3,25 164:22 193:4 197:16
**video** 6:10,11,14, 16 7:2 44:10
**video-recorded** 6:20
**VIDEOGRAPHER** 4:10 6:1 55:18,21 99:8,11 124:10,13 157:16,19 183:12,15 221:2,5 226:9,12 233:15,18 239:12,15 241:3
**videotaped** 37:18
**view** 6:11,17 138:23
**virtual** 116:6
**vitae** 25:11,15 28:15 31:5
**vitamin** 106:25 110:9,15,16, 17,24 111:2, 5,15,16,25

112:8
**vitro**
49:25 50:12 51:6 64:6,9, 19 66:6 138:20 204:7,24 206:7 231:17,20 232:1
**vivo**
111:23,25 112:8
**voice**
135:3
**volume**
68:1
**volumes**
80:6 83:12
**volunteered**
45:24

**W**

**wait**
9:18
**waiting**
151:25
**want**
6:15 16:1 35:16 39:14, 15 62:9 65:14 68:13 71:13 79:23 85:14 87:7 90:15 93:20 103:13 120:3,7 123:1 132:3, 5 142:21,25 143:8 144:16 163:13 164:15 166:4 169:25 174:13 194:17 195:13
200:24 214:16 237:24 239:9 240:13
**wanted**
54:17,19 56:1 150:1 169:4 171:15 188:7 223:15 225:13
**warbled**
135:2
**warning**
105:12,16,21 106:14,24 107:13,24
**water**
47:17 52:8 91:9
**waters**
91:9
**way**
16:25 41:24 84:20 105:2 109:16 115:14 117:2,12 119:10 129:20 130:12 133:5,10 137:20 170:14,16 174:2 180:13 181:4 186:22,25 194:9 208:19 213:3 216:3 220:22 227:17 238:7
**weaker**
86:24
**weakly**
214:22 215:15,18 216:22
**week**
149:2
**weekly**
48:5
**weeks**
149:2
**weigh**
107:20
**weight**
62:17,24 63:1 129:9 202:16
**Weiss**
4:12
**well-conducted**
123:13,18
**well-defined**
172:13
**well-designed**
122:6
**went**
139:6
**western**
57:22 100:4, 9,13
**whatnot**
123:8
**whichever**
35:16 55:15
**wholesale**
122:21 123:23
**wide**
143:22 144:9 146:23 147:5,23 150:8 203:20
**widely**
47:24 58:25 233:6
**window**
95:13 152:3
**withdrawal**
28:6
**witness**
6:10,12,15 7:8,11,16 55:14,24
124:7 126:6 218:19 226:6 241:2
**witness's**
6:16
**witness-only**
6:9
**word**
230:3,10,15, 21
**worded**
216:4
**wording**
81:2,6 87:7
**words**
123:1 199:14
**work**
12:20 17:18 27:5,11 29:19,25 32:25 33:4, 18,25 34:1 39:4,7,11,17 40:18,21,22 105:8 137:6
**worked**
26:20,24 41:12
**worker**
237:4
**working**
27:2,9 33:23 45:13,17 46:18,21 66:10 68:25 71:10,17 76:15 89:16 186:3,6,10, 24
**works**
70:2,7
**workspaces**
62:15
**world**
64:11,22 112:14 113:3 129:2,7

160:15
178:13
182:19 183:8
199:1,25
201:1 202:21
203:11
204:5,21,23
205:4,7,18
206:9
**worldwide**
82:25
**WPT/89/196**
212:13
**WPT/89/306**
212:13
**WPT/93/096**
213:13
**WPT/93/122**
213:12
**WPT/93/201**
213:13
**WPT/94/381**
213:13
**write**
22:12 187:20
194:18 211:8
224:3
**writing**
22:17 97:7
189:2
**written**
15:8 69:3,19
73:5,9
237:11
**wrong**
67:20 120:6
123:7 164:20
173:5
**wrote**
145:21

**Y**

**yeah**
27:11 39:23
52:12,15
54:24 55:14
75:18 79:22
87:10,12
92:10 94:15
95:16 103:20
104:4 108:22
116:2 135:4
138:2 141:2
143:2 191:19
199:8 208:6
212:25 214:5
222:22 223:1
228:21
237:25 238:5
**year**
26:20 66:3,
11,25 89:25
151:4,5,25
232:13
**years**
18:10 26:18
41:12 93:23
94:12 157:11
167:18
178:24
179:3,5,15,
18,21,24
180:3,4,12
185:1 209:4
**Yoon**
141:23 142:2
146:14,25
150:12,14,
19,22 172:13

**Z**

**Zantac**
6:25 15:15
23:12 108:8
**zoom**
8:18,20,25
10:24 11:11,
13 42:12
79:23,25
95:13 152:22
160:23 199:7
237:24 238:1

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT.
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE), PRODUCTS LIABILITY LITIGATION

Docket NO. MDL NO. 2924
20-MD-2924

DEPOSITION UNDER 30(b)(6) ORAL EXAMINATION OF

GlaxosmithKline, LLC, GlaxoSmithKline, PLC

BY: DR. STEPHEN HOBBIGER

Tuesday, June 15, 2021

Reported by:

Melissa Ann Mormile, CCR, CRR, RDR

Job No. 360798

TRANSCRIPT of the remote videotaped testimony as taken of the above-named witness, called for Oral Examination in the above-entitled matter, said deposition being taken pursuant to the Federal Rules of Civil Procedure, by and before MELISSA A. MORMILE, a Certified Realtime Shorthand Reporter and Notary Public of the States of New Jersey and New York, License No. 30X100223800, commencing at 913 UTC.

A P P E A R A N C E S:

BEASLEY ALLEN LAW FIRM
BY: FRANK WOODSON, ESQ.
218 Commerce Street
Montgomery, Alabama 36104
800-898-2034
For Zantac PSC
frank.woodson@beasleyallen.com

ANAPOL WEISS
BY: TRACY A. FINKEN MAGNOTTA, ESQ.
One Logan Squire
130 N. 18th Street - Suite 1600
Philadelphia, Pennsylvania 19103
215-929-8822
For Zantac PSC
tfinken@anapolweiss.com

CHAFFIN LUHANA, LLP
BY: ERIC T. CHAFFIN, ESQ.
ROOPAL P. LUHANA, ESQ.
KENDRA GOLDHIRSCH, ESQ.
COURTNEY GRIFFIN, ESQ.
GEOFFREY SPAULDING, ESQ.
MICHAEL A. SWEET, ESQ.
600 Third Avenue - 12th Floor
New York, New York 10016
888-480-1123
For Zantac PSC
chaffin@chaffinluhana.com
luhana@chaffinluhana.com
goldhirsch@chaffinluhana.com
griffin@chaffinluhana.com
spaulding@chaffinluhana.com
sweet@chaffinluhana.com

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: ANGELIQUE A. CILIBERTI, ESQ.
601 Massachusetts Avenue, NW
Washington DC 20001
202-942-5000
For Defendant Chatthem, Inc.,
Sanofi US Services, Inc., Sanofi-Avertis, US, LLC

Continued...

A P P E A R A N C E S:

KING & SPALDING, LLP
BY: DIONDRA K. HICKS, ESQ.
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
404-572-4600
For Defendant Boehringer Ingelheim
dhicks@kslaw.com

JOHN O'TUEL, ESQ (GSK in-house counsel)

DECHERT, LLP
BY: CAROLINE POWER, ESQ.
WILL SACHSE, ESQ.
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
215-994-4000
For GlaxoSmithKline, LLC, GlaxoSmithKline, PLC
caroline.power@dechert.com
will.sachse@dechert.com

And

DECHERT, LLP
BY: JULIE WITHAM, ESQ.
160 Queen Victoria Street
London, UK ECV4 4QQ
44-20-7184-7394
For GlaxosmithKline, LLC, GlaxoSmithKline, PLC
julie.witham@dechert.com

GOODELL DEVRIES LEECH & DANN
BY: RICHARD M. BARNES, ESQ.
1 South Street - Suite 2000
Baltimore, Maryland 21202
410-783-4004
For Defendant Perrigo
rbarnes@gdldlaw.com

Continued...

A P P E A R A N C E S:

REED SMITH
BY: JULIA A. LOPEZ, ESQ.
506 Carnegie Center - Suite 300
Princeton, New Jersey 08540
609-987-0050
For Defendant Par Pharmaceuticals
jalopez@reedsmith.com

SHOOK, HARDY & BACON, LLP
BY: THOMAS J. SHEEHAN, ESQ.
KIMBERLY S. PENNER, ESQ.
1325 Avenue of the Americas - 28th Floor
New York, New York 10019
212-759-4888
For Defendants Walmart
tjsheehan@shb.com
kpenner@shb.com

PIETRAGALLO, GORDON, ALFANO
BOSICK & RASPANTI, LLP
BY: MATTHEW D. SCHERBARTH, ESQ.
One Oxford Centre
301 Grant Street - 38th Floor
Pittsburgh, Pennsylvania 15219
412-263-2000
For Defendant Mylan Pharmaceuticals, Inc.
mds@pietragallo.com

ULMER & BERNE, LLP
BY: EMILY S. PREM, ESQ.
600 Vine Street - Suite 2800
Cincinnati, Ohio 45202
513-698-5000
For the Defendant PAI Holdings, Inc.
eprem@ulmer.com

Continued...

A P P E A R A N C E S:

BARNES & THORNBURG, LLP
BY: LAUREN V. NOTTOLI, ESQ.
11 South Meridian Street
Indianapolis, Indiana 46204
317-236-1313
For Defendants Albertsons Companies, Inc., Amazon.com, Inc., BJ's Wholesale Club Holdings, Inc, Costco Wholesale Corporation; CVS Pharmacy, Inc., Duane Reade, Inc., Giant Eagle, Inc., Publix Super Markets, Inc., Rite Aid Hdqtrs. Corp., Safeway, Inc., ShopRite Supermarkets, Inc., Southeastern Grocers, Inc., Walgreen Co.; Walgreens Boot Alliance, Inc., Wakefern Food Corporation H-E-B Grocery Company, LP, and Winn-Dixie Stores, Inc.
lauren.nottoli@btlaw.com

CONROY SIMBERG
BY: DREW M. LEVIN, ESQ.
3440 Hollywood Boulevard - Second Floor
Hollywood, Florida 33021
954-961-1400
For Defendant Nostrum Laboratories, Inc.
dlevin@conroysimberg.com

GREENBERG TRAURIG, LLP
BY: CAITLYN E. HALLER, ESQ.
77 West Wacker Drive - Suite 3100
Chicago, Illinois 60601
312-456-8400
For Defendant Teva Pharmaceuticals
hallerc@gtlaw.com

ALSO PRESENT:

Jessica Szumla, Paralegal (Chaffin Luhana)
Katelyn Nardi, Paralegal (Chaffin Luhana)
John Schmitzer - U.S. Legal Support Videographer

I N D E X


| | | PAGE |
|---|---|---|
| WITNESS NAME: | DR. STEPHEN HOBBIGER | |
| EXAMINATION BY MR. CHAFFIN | | 10 |
| EXAMINATION BY MR. SHEEHAN | | 327 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 2624 | Deposition Notice | 31 |
| 2625 | CV | 89 |
| 2626 | GSKZAN30517 | 225 |
| 2627 | GSKZAN37872 | 226 |
| 2628 | GSKZAN33735 | 226 |
| 2629 | GSKZAN48372 | 227 |
| 2630 | GSKZAN27379 | 227 |
| 2631 | GSKZAN27415 | 227 |
| 2632 | GSKZAN27431 | 227 |
| 2633 | GSKZAN28950 | 228 |
| 2634 | GSKZAN26534 | 228 |
| 2635 | 7/12/15 Graham Carey Email Chain | 267 |
| 2636 | GSKZAN167442 | 282 |
| 2637 | GSKZAN166425 | 315 |


C E R T I F I E D   Q U E S T I O N S

PAGE LINE

(No questions certified.)

THE VIDEOGRAPHER: Please stand by for recording.

We are now on the record.

Participants should be aware that this proceeding is being recorded, and as such, all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside of the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition, as it may cause other participants to appear on the final video rather than just the witness.

For anyone who does not want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the remote depo interface.

This is the remote video-recorded deposition of Dr. Stephen Hobbiger being taken by counsel for the plaintiff.

Today is Tuesday, June 15, 2021. The time is now 913 UTC.

We are here in the matter of In Re:

Zantac Ranitidine Products Liability litigation.

My name is John Schmitzer, remote video technician, on behalf of U.S. Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time will the reporter, on behalf of U.S. Legal Support, please enter the statement for remote proceedings into the record.

MR. CHAFFIN: Just to pause, John, you said 913.

Is that what time you said it was?

THE VIDEOGRAPHER: Correct.

MR. CHAFFIN: And where is that located? I didn't catch where you said because it is 1013 where they are, I believe, and 513 where I am. So, I just wanted to check what time that is.

THE VIDEOGRAPHER: It is UTC, Universal Time Coordinate.

MR. CHAFFIN: Got you. Thank you. I didn't hear what you said. I was, like, okay.

All right. Thanks.

MR. SHEEHAN: It is a -- it is a time where none of us happen to be.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not

physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and agreement on the record.

MR. CHAFFIN: Yes. This is Eric Chaffin. I -- I consent on behalf of the plaintiffs.

MR. SHEEHAN: And this is Tom Sheehan. I consent on behalf of GSK.

THE WITNESS: And this is Steve Hobbiger, and I am in agreement.

STEPHEN HOBBIGER, SWORN:

EXAMINATION BY MR. CHAFFIN:

Q. Good morning, Dr. Hobbiger.

A. Good morning.

Q. Could you state your full name for the record, please?

A. Yes.

I'm Dr. Stephen Franz Hobbiger.

Q. Where are you currently sitting for your deposition?
A. I am sitting in the London offices of the Dechert law firm.
Q. Okay. And -- and the Dechert law firm is located where?
A. Very close to Brack -- Black Fries Bridge in London.
Q. Okay. Do you know the address?
A. I don't, but I'm sure someone could tell me.
Q. That's fine. No. I just wanted to see if you do.
So, who is in the room with you currently?
A. So, I've got three lawyers around me. There's Julie Witham from -- from Dechert and Tom and Kimberly, who you were speaking to earlier.
Q. Okay. What's Tom's full name?
A. Tom Sheehan.
THE WITNESS: Is that correct?
BY MR. CHAFFIN:
Q. Okay. And Kimberly?
MS. PENNER: Penner.
THE WITNESS: Penner.

BY MR. CHAFFIN:

Q. Penner. Okay. Got you.

And are three of them U.S. attorneys or -- or are they based in London?

A. Julie is based in London, and Tom and Kimberly have come from the U.S.

Q. Okay. Got it.

And you understand that while you are being deposed today that -- that you shouldn't be communicating with them. They are in the room, obviously. I am, obviously, in the U.S. I am taking it remotely, but you understand that you shouldn't be communicating with them during the deposition or off breaks.

Do you understand that?

A. I do.

Q. Perfect.

A. I understand that.

Q. And certainly about the substance of the deposition off breaks, obviously, so...

Okay. What, if any, notes do you have in front of you today?

A. Well, I've just been handed these two because you said you were going to talk about them first, the deposition --

Q. Absolutely.
Besides those, do you have any other notes or anything with you?
A. I have a blank sheet of paper and a pen really only if you ask me a complicated question, and I have to remind myself what it is that I am being asked to answer. So, there is nothing written on it.
Q. Well, I -- certainly, I may ask you some unintentionally complicated questions today, but, certainly, feel free to ask me to simplify them if -- if I do.
So, you've testified previously; is that right?
A. I have had -- I have been in four depositions previously.
Q. Okay. So, you have been deposed four times, and you have also testified at a trial, I believe, as well; right?
A. That's correct, in Philadelphia.
Q. How many times have you testified in front of a jury at trial?
A. Just -- just that one.
Q. Just one.
That was in a Paxil case, as I recall?
A. That was, yes.

Q. Okay. And that case involved birth defects with children; is that right?
A. Yes, it did, sir.
Q. Okay. What, if any, devices do you have in the room with you today?
A. I've got my phone.
Q. Okay. And --
A. But it's -- but it's -- but it's face down.
Q. Okay. You have got it turned off and off to the side for us?
A. I've got it turned off, so there is no sound coming from it, yes.
Q. Understood.
And do you have any other computers or anything in the room with you today?
A. In my bag, which is behind me.
Q. And do you -- do you have a laptop or something you use for -- for work on this case?
A. I -- I am no longer employed by GSK, as you know, so I have a personal laptop, but I have no work laptop, no.
Q. Understood.
You notice I said for your work on this case. I didn't mean your work for GSK.

A. Right.
Q. Okay.
A. Well --
Q. So, for your work on this case, do you have anything on that laptop?
A. I have access to an electronic repository called kiteworks --
Q. Okay.
A. -- but that's all.
Q. Okay. And what is kiteworks?
A. It's an electronic repository where my lawyers have placed documents for me to look at.
Q. Okay. Is that a GSK repository or is that a law firm repository, to your knowledge?
A. To my knowledge, it was created by the law firm.
Q. Okay. Got you.
And so, currently, do you have access to any GSK databases or documents as a company employee, for example?
A. I -- all my access has been removed, so I no longer -- I -- I stopped working for GSK on the 3rd of May and at that point, my account was terminated.
Q. Got you.
That was May 3rd of 2020?

A. 2000 -- we are in 2021. It was May --
Q. It was --
A. -- of this year.
Q. Yes. Thank you so much. May 3, 2021. Okay. Got you.
And so you stopped being employed by GSK then. And then currently, are you being paid by the lawyers or are you being paid by GSK?
A. I submit the invoices of my time to GSK.
Q. Okay. Who at GSK do you submit them to?
A. To John O'Tuel.
Q. And who is John O'Tuel?
A. A GSK lawyer.
Q. Okay. So, he is in the legal department at GSK; is that correct?
A. He is, yes.
Q. Okay. And are you being paid as a consulting expert? How are you being paid? What is your understanding?
A. I'm being paid for my time as -- as -- as someone who worked in the pharmacovigilance department to be a witness.

Q. Okay. So, you are being paid to be a fact witness in the case?

A. I -- that's my understanding, yes.

Q. Okay.

A. Well, I say a fact witness. I think I'm down here as an expert witness, aren't I? I'm not familiar with the difference in terminology in the U.S. Forgive me.

MR. SHEEHAN: And, Eric, just so you know, we -- we're compensating him --

MR. CHAFFIN: Tom, you are -- you are welcome to tell me another time, but I'm just going to do the deposition for now, and you can -- you can feel free to tell me a separate time.

BY MR. CHAFFIN:

Q. Doctor, in terms of yourself, so you're also, from your understanding, being paid as an expert in the case?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

BY MR. CHAFFIN:

Q. Just using your words, you said that you understood you might be paid as an expert. I just want to understand.

A. I thought I was being deposed as a

company expert.

Q. Okay. Are -- have you been retained in any way by the lawyers or by GSK in some way? Is there a contract between you and them for your work on this case?

A. Yes, sir, there is.

Q. Okay. Where is that contract currently?

A. Well, I have a copy at home.

Q. Okay.

A. I don't know where GSK are keeping it.

Q. Okay. Approximately, how many pages is it?

A. One and a half.

Q. Okay. And what is the -- if you could, just describe for us what your compensation is under that document.

A. I'm paid at an hourly rate of 400 pounds.

Q. Okay. And how much have you been paid so far on that contract?

A. I haven't received any monies yet.

Q. How many hours have you billed to that contract so far?

A. Two days.
Q. And could you describe for us what you did in those two days?
A. I reviewed the documentation that the lawyers had provided for me through the kiteworks' repository.
Q. Okay. And when did you perform that two days of work?
A. Well, after I finished the GSK on the 3rd of May but prior to this deposition, so towards the -- the end of -- yeah, the end of -- the end of May, the last couple days of May.
And then, obviously, I've reviewed some stuff since, but that hasn't been billed.
Q. Okay. And did you -- did you also spend some time working with the lawyers on preparation for your testimony today?
A. Yes, sir, I did.
Q. Okay. And are you billing that time under that contract as well?
A. Yes, I am.
Q. Okay. And is that part of the two days or separate?
A. There was an element, a part of the two days, and then there is more subsequent to that

time frame.

Q. Okay. And how many hours would you estimate it at so far to date under that contract?

A. I think I've probably done ten days' worth of reading and reviewing and -- and meeting with the lawyers.

Q. Ten days or ten hours?

A. Ten days.

Q. Ten days.

So, ten days of reading, reviewing and working with lawyers, how many hours total?

A. Well, it's a seven-hour day. So, that would be 70 hours.

Q. Okay. So, you spent 70 hours at 400 pounds per hour on the contract so far?

A. Correct.

Q. Okay. And where did you sign the contract?

A. At -- at my home office.

Q. At your home office.

So, it was sent to you, and you signed it remotely?

A. I signed it remotely, yes.

Q. Okay. And that contract, who did you negotiate it with at the company?

A. I talked to the lawyers, so John O'Tuel is my contact at GSK.

Q. Okay. Now, you retired from the company; is that correct?

A. Yes, I did.

Q. And is there an HR department or someone you worked with in terms of your retirement?

A. There is a big HR department, but I have a named contact, yes.

Q. And who is that?

A. It's a lady called Satty Kenth --

Q. Okay.

A. -- K-e-n-t-h.

Q. And Ms. Kenth, you didn't talk with her about this contract; is that right?

A. I didn't discuss the nature of the contract, no. The company was aware that -- that they wanted to retain me in that capacity after --

Q. Understood.

A. -- after I retired, but I didn't discuss it in particular, no.

Q. Okay. So, this wasn't a Ms. Kenth issue in HR. This was a legal department with Mr. O'Tuel contract; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: Yes.

BY MR. CHAFFIN:

Q. And in terms of the work that you've done, you haven't -- I understand from your testimony, so far -- you haven't gone back and worked subsequently with anybody at GSK on the 70 hours of work that's been done; it's only been with the lawyers; is that right?

A. In truth, it's been mostly reading materials, but it's only -- it's reading materials and then a small amount of time with the lawyers, yes.

Q. Understood.

So, you spent time, since you left on May 3rd, under this contract with the legal department, about 70 hours, reviewing documents related to the litigation and then working exclusively with the lawyers but no other substantive fact witnesses from the company; is that correct?

A. That is correct.

Q. Okay. Dr. Hobbiger, how long did you work at GSK before you became a retained legal expert?

MR. SHEEHAN: Objection. Mischaracterizes testimony and facts.

THE WITNESS: I started with the Welcome Foundation, one of GSK's Heritage companies, in 1989. I worked for Welcome and then Glaxo Welcome for

ten years. Then I left for a couple of years to work for another company. I returned to GlaxoSmithKline as it was now in 2001, and I retired in 2021.

So, that's a total of 30 years.

BY MR. CHAFFIN:

Q. In the two years that you left, who -- which company was that that you worked with?

A. I went to work for a company called Napp Pharmaceuticals, N-a-p-p.

Q. Okay. And was Napp acquired by GlaxoSmithKline or no?

A. No.

Q. Okay. So, for two years you went and worked with them separately, and then you went back to -- to SmithKline; is that correct?

A. To GlaxoSmithKline --

Q. Yes.

A. -- it was, yes.

So, I never worked for SmithKline.

I worked for Welcome, Glaxo Welcome and GlaxoSmithKline.

Q. Okay. Now, Dr. Hobbiger, you understand that you have been designated as a company witness for this deposition; is that right?

A. Yes.

Q. And you understand that even though you are no longer an employee of GSK, that you are actually being designated to speak and bind the company with your answers today; is that correct?
A. That's my understanding, yes.
Q. Okay. Have you ever given a -- what we refer to as a corporate representative deposition previously?
A. I refer back to the answer I gave earlier. I am not necessarily that familiar with the difference. So, when I did the other four depositions, in truth, I don't know in what context I was being deposed. So, the answer is maybe. I just don't know.
Q. Understood.
And you said you testified previously four times at deposition and one time -- one time at trial; is that correct?
A. That's correct, yes.
Q. And one of the litigations was Paxil litigation in which the drug produced by GSK was alleged to have caused birth defects in children; is that correct?
A. It was a trial of paroxetine and -- and the question of birth defects, yes.
Q. Okay. And that trial, it was in

Philadelphia State Court; is that correct?
A. Yes, sir.
Q. And you flew over and testified personally in front of the jury in that case; is that right?
A. Yes, I did.
Q. And what was the verdict in that case?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: So, my understanding is that the -- that the judgment at the time was not in favor of the company. I can't tell you precisely what the judgment was because I -- I'm not a lawyer.
BY MR. CHAFFIN:
Q. Understood.
So --
A. But that's -- that was my understanding.
Q. -- it was a jury trial in front of a number of jurors in state court; is that right?
MR. SHEEHAN: Objection. Same objection. Scope.
THE WITNESS: Yes, sir. That was correct.
BY MR. CHAFFIN:

Q. And the jury returned a verdict about $2 and a half million against the company; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I don't know the sums involved specifically. I -- I know I turned up, gave my evidence and -- and -- and I know what the outcome was, but I don't know subsequent to that.

BY MR. CHAFFIN:

Q. Understood.

And as I understand from your testimony in that case, you actually gave a causation opinion; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I was asked for my opinion on the -- the role of paroxetine in -- in birth defects, yes.

BY MR. CHAFFIN:

Q. And you took the position in that case that paroxetine could not cause birth defects in children; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Yes, that -- that is my -- that is and remains my view.

BY MR. CHAFFIN:

Q. Okay. And are you going to offer a causation opinion in this case involving Zantac?
A. I don't know what questions you are going to ask me, sir, but I will try an honest -- answer them as honestly as I can.
Q. Have you been retained to offer a causation opinion in the Zantac litigation?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: My understanding was I was here to talk to you about how we do pharmacovigilance --
BY MR. CHAFFIN:
Q. So --
A. -- at GSK.
Q. -- I understand that that's what you are here today for, but I'm asking as of today, to your knowledge, have you been retained to offer a causation opinion in Zantac?
A. Not to my knowledge.
Q. Understood.
What other litigations have you testified -- and, by the way, if -- if at some point in time you are retained and are going to offer a causation opinion, I assumed you would feel free to certainly tell us that you are going to and give me an opportunity to question you about that.

Is that -- is that a fair assumption on my part, that you would give us an opportunity to ask you questions if at some point you want to offer an expert opinion about causation in this case?

MR. SHEEHAN: Objection. I -- I -- objection. Scope. Objection to disclosing expert witnesses prior to --

MR. CHAFFIN: I just -- I just want to be sure with Dr. Hobbiger, who is sitting here today.

BY MR. CHAFFIN:

Q. Dr. Hobbiger, in fairness, the ladies and gentlemen of the jury, my intention today is to question you as a PV witness and offer your opinion as a legal expert for the company, but my understanding is you are not being offered today as a causation opinion on Zantac. I just want to be clear and if at some point that changes, I'd just like to have notice and opportunity to question you about that; is that fair?

MR. SHEEHAN: Objection. Same objection.

THE WITNESS: So, I -- I'm a little confused by what you are asking me, sir.

I was the head of a pharmacovigilance department. We formed a view on the evaluation of the data. I signed off on that view. I continue to hold that

view. I can share that view with you and will do so happily, but I don't quite understand. As I say, I'm not familiar with the U.S. legal system in the way that you are, and, therefore, I don't fully understand the question that you are asking me, but if you said to me, Dr. Hobbiger, your department did an evaluation. You reached this conclusion. Could you tell me what it was and do you agree with that conclusion, I am very happy to state that.

BY MR. CHAFFIN:

Q. Okay. Fair enough.

Doctor, what other litigations besides Paxil have you testified in? What were the other three?

A. So, I was asked to testify as the chair of the company's global labeling committee, which is the committee that oversees, governs the prescribing information that the -- that the company has for its products.

I was asked to -- I spoke -- I was deposed for Avandia, and I was also deposed for ropinirole.

Q. And for the labeling committee, which litigation was that in, which -- which drug was at issue or product?

A. If I'm truly honest, I can't

remember. It -- I think it was in relation to one of the other two -- either Avandia or ropinirole, but I haven't looked back at that deposition, and -- and I, obviously, have no -- no longer have access to any of that information, so I can't be sure.

Q. Understood.

And I believe the Paxil testimony at trial was in around 2009.

Do you recall when approximately by year the other depositions were?

MR. SHEEHAN: Scope.

THE WITNESS: They were subsequent to the paroxetine litigation, if I remember correctly. I think ropinirole was second and Avandia was third, and there were maybe a few years between them, but I can't be sure.

BY MR. CHAFFIN:

Q. Okay.

A. I have access to certain things.

Q. And -- and just working back, since it's 2021, when's the last time you can recall sitting for testimony?

MR. SHEEHAN: Scope.

THE WITNESS: In a courtroom or in terms of deposition?

BY MR. CHAFFIN:

Q. Either one.

A. Well, the -- the deposition would have probably been -- I don't know -- 2014, 2013, somewhere around about there, but I -- I -- I -- it's plus or minus a year or two. I -- I can't be sure.

Q. Okay. And but just to be clear -- you may have answered this, but I just want to make sure -- besides Paxil, are there any other litigations where you testified at a -- in a courtroom in any way, in front of a judge or a jury?

MR. SHEEHAN: Scope.

THE WITNESS: That is the one and only time I have ever been in a courtroom, so...

BY MR. CHAFFIN:

Q. Understood.

Okay. Doctor, shifting gears here, you should have in front of you, I think it was one of the documents you pointed to, we are going to have it marked as Exhibit 2624, which is the deposition notice in this case.

MR. CHAFFIN: And let me just see if I can...

(Exhibit 2624, Deposition Notice, marked for identification.)

MR. CHAFFIN: John, may I share my screen? I think I can; right?

Yeah.

John, you can mark it. I just -- I have the notice up here in the screen as 2624, which is the notice.

BY MR. CHAFFIN:

Q. And, Doctor, you have it in front of you.

Have you had a chance to previously review this deposition notice?

A. So, yes, sir. I do have it in front of me as shown on the screen. I am not seeing the full document.

Q. Understood.

And you know what? Unfortunately, with an Elmo there is really no way for me to show you the whole screen.

A. Okay.

MR. CHAFFIN: But, certainly, you know, Tom, maybe we can stipulate.

But it is a 21-page -- excuse me -- 22-page document. It's the notice with the attachments, and I'm sure we all have the same document, but it will be Exhibit 2624.

THE WITNESS: Yes, Mr. Chaffin, I -- I can see the document and I have seen it before, yes.

BY MR. CHAFFIN:

Q. Okay. I'm just going to stop sharing because I think it's a little bit easier to have you up on the screen.

As we discussed a few minutes ago, you are designated as a company witness for this particular deposition notice, and I understand that you are going to provide testimony today that will be binding on behalf of the company to the questions within this exhibit.

Is that your understanding?

MR. SHEEHAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: That is my understanding, sir.

BY MR. CHAFFIN:

Q. And are you the person most knowledgeable, I guess, formally at GSK or currently at GSK on all topics listed here?

A. From a pharmacovigilance perspective, I think probably the time that I have been in the company and the role that I had gives me as much breadth of understanding as everyone. Clearly, I won't have all

the fine detail either because I was not present in the company at the time or because I'm not the person that does the hands-on work, but in terms of breadth and, therefore, the ability to answer the range of questions you have answered, I would humbly submit that I am as good as anyone, sir.

Q. Okay. And -- and, Doctor, just -- and I appreciate that, and that will make things productive today, hopefully.

Is there any topics that you look through and you are like you know what, there -- there probably is someone more qualified or better equipped to answer these questions, but I think I can make a go of it? Is there anything like that that you saw in terms of the topics?

A. The ones --

MR. SHEEHAN: Objection.

THE WITNESS: -- that stick in my mind, because, obviously, this is U.S. based litigation.

BY MR. CHAFFIN:

Q. Right.

A. -- and some of the questions that you have asked relate to commercial considerations with the U.S. sales force.

I think those were some of the questions

towards the end, and I have -- I work within research and development. I have no connection to the sales force in the United States, so I'm not sure that I can specifically speak to that.

And there may be some elements of U.S. practice, and I know you have already spoken to someone from GSK about regulatory practice in the U.S., I may not have as much detail information, but I have a general understanding, and, hopefully, that will suffice for your purposes.

Q. Okay. And certainly in terms of regulatory practices, I mean, part of your work was to -- to oversee regulatory worldwide, not just in the U.S. but just everywhere; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: That's incorrect, sir.

BY MR. CHAFFIN:

Q. Okay. So, help me understand what role, if any, you had in terms of regulators.

A. So, we have a regulatory body. So, we have a regulatory group within GSK. So, the accountability for regulatory worldwide is held by someone different, one of my former colleagues.

My role is in pharmacovigilance and the central function of pharmacovigilance. We work closely

with regulatory, but, often, the submission of documentation is done through regulatory colleagues. So, we work as a partnership, but I am not accountable for regulatory. That's not my role.

Q. Understood.

A. Or what -- or what -- or, indeed, it certainly isn't now, and it wasn't in the past.

Q. Okay. And who was the former colleague that's -- was in charge of regulatory interface?

A. Currently, it is a lady called Helen Fitton.

Q. And that is not Helen Steel by a different name; correct? Because I have seen Helen Steel around a lot.

A. It's a different Helen. Helen Steel worked for me in pharmacovigilance. So, she was one of my direct reports when I was head of drug safety at GSK. Helen Fitton is a -- is a different person entirely.

Q. Thank you.

And just in terms of safety regulatory filings, do you sign off on them or approve them in any way? Did you, I should say.

A. So -- so, I will sign off on documentation that comes from the safety function or I

would delegate, because, clearly, I'm not signing off on every single piece of documentation. So, where the head of safety had to sign off, I would do it. Where the -- where one of my reports could sign off, they would do it. Documentation submitted to regulators may contain my signature, but may also have a covering note signed by someone from the regulatory function.

Q. Okay. And then in terms of things like recall of Zantac, that's something you personally approved; is that correct?

MR. SHEEHAN: Objection. Vague.

THE WITNESS: I held several roles within GSK, one of those was as a member of the global recall board, and we, as a group, signed off on the -- on the recall of Zantac. So, it wasn't just me.

BY MR. CHAFFIN:

Q. Understood.

But you gave your approval; is that right?

A. I gave my approval; correct.

Q. Understood.

And in terms of sales, you said there were some questions regarding sales in particular, and that's something you may be less qualified for; and if I understand correctly from your testimony in Paxil,

that's because your focus is and should only be on safety, not sales. Is that correct?

A. My role at GSK was safety and medical governance, and I had no role in the commercial side of the organization or in sales.

Q. Okay. So, your concern should not be with sales. It should really be on safety, as I understand your testimony in Paxil; is that correct?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: Sir, I am a doctor. I would hazard the view that my concern is for the patient.

BY MR. CHAFFIN:

Q. Okay. And, Doctor, it's needless to say, I mean, you understand that while you are sitting in London and you are giving testimony remotely, that this testimony is being given for purposes of playing in front of a jury here in the United States.

Is that your understanding?

MR. SHEEHAN: Objection.

THE WITNESS: Yes, sir. I understand that this -- some elements of this or all of it could be shown to a jury.

BY MR. CHAFFIN:

Q. Could you tell me what, if anything,

more you did besides what you described already to prepare for your deposition today?

A. Other than read the documentation provided to me and talk to my lawyers, that -- that's all I've done. Clearly, I was involved when I was still a GSK employee in -- in running the safety department, but that was -- that was different to what I've done subsequent.

Q. Okay.

A. I'm no longer employed.

Q. And did you do work in preparation for your deposition today before May 3rd, whenever you had the contract with the company?

A. Yes, I did.

Q. Okay. And what is it you did before --

A. Very -- very much what we have done now --

Q. Okay.

A. -- by reading -- reading of documentation, talking to lawyers, asking -- you know, responding to questions about what the practices of the safety department were and how we --

MR. SHEEHAN: I would just advise the witness to the extent you are commenting on any substantive

discussions with lawyers, you don't need to do that.

And to the extent -- obviously, Eric, I know you're not trying to ask questions about the discussions with lawyers, but --

MR. CHAFFIN: Well, just to --

MR. SHEEHAN: -- just had to go there.

MR. CHAFFIN: -- just to pause for a second, I'm going to press on this issue, Tom, so you are not surprised, but to the extent that the lawyers have given you anything that you are relying upon for offering your testimony, I absolutely will ask about that, and I think I have a right to ask about it.

MR. SHEEHAN: No. To the -- to the extent that you want to ask him if he's seen a document in preparation for the deposition, sure, of course. I think what Dr. Hobbiger was referring to are discussions by -- between him and lawyers, and I don't think that's an appropriate area for testimony.

MR. CHAFFIN: Yeah. Again, as long as the lawyers aren't saying to you, "Hey, assume the following for purposes of testimony," then -- then we will be okay, but we'll -- certainly, if we get around the edges of that, we will deal with it, but that would be the exception in my mind.

THE WITNESS: Can I interject here,

please, because I think there is a misunderstanding.
I was not referring to discussions with lawyers. I was referring to discussions with work colleagues at GSK.

BY MR. CHAFFIN:

Q. Okay. Understood.
Who did you discuss preparation of your testimony with at GSK besides lawyers?

MR. SHEEHAN: Objection.

THE WITNESS: I was not talking about preparation of testimony. I was talking about when I was employed by GSK and the discussions we had around ranitidine.

BY MR. CHAFFIN:

Q. Okay.

A. So, the preparation for the testimony absolutely has been done with lawyers. Discussions around ranitidine, the scientific evidence, what we made of the scientific evidence were done with peers within the organization.

Q. Okay. And, Doctor, could you -- can you tell us what your understanding is of the Zantac lawsuit?

A. That there is a claim or a series of claims in the United States, and maybe in other

countries, alleging that Zantac or an impurity in Zantac was responsible for harming patients.

Q. And what is the claim that it's responsible -- what is the claim that it's responsible for harming? What is the cause?

MR. SHEEHAN: Objection.

BY MR. CHAFFIN:

Q. What is your understanding?

A. The cause is -- is a nitrosamine in the product.

Q. Can you be more descriptive?

A. A specific nitrosamine called N-Nitrosodimethylamine is my understanding --

Q. And that's --

A. -- so ND -- NDMA is the abbreviation.

Q. Okay. And when did you first become aware that there was NDMA in the product?

A. At the time that GSK first received information, which was 2019, I think. So, around the time -- so there were -- there was an inquiry that came from regulatory authorities following the publication of the Zeng and Mitch paper, which was provided to us through the periodic safety update report mechanism. And then, subsequently, there were questions related to the Valisure information that was put into the public

domain. So, it was around the time of, as I say, 2018, 2019 when that information came to the company.

Q. And just to clarify, what was your title at that time?

A. So, in 2018, as it says in my CV, I was senior vice president and head of safety and medical governance of GSK, reporting to the chief medical officer.

Q. And was that still your title in 2019?

A. In -- and as part of that, I was the qualified person for pharmacovigilance, which you may be familiar with but may not be a term known to you.

In Europe, we need to have a specific named individual as accountable for pharmacovigilance on behalf of the company. I was the QPPV through March of 2019, so that was part of my job title. I relinquished that role in March of 2019 because of the Brexit process in Europe, because you have to have a residential qualification to be a QPPV. And then in March of 2020, in the run up to my retirement, I handed over my role as head of safety to a colleague, and I remained as an advisor through 2020 until I left in 2021.

Q. And did you have a title for your advisory role?

A. I did -- I was the senior vice president, and that was -- that was all.

Q. Okay. And is it --

A. There's no official title.

Q. Is it fair for discussions in the 2019, 2020 time period to refer to you as the head of safety?

A. Through March of 2020, yes, absolutely.

Q. And post March 2020, you would be an advisor is what you said; is that right?

A. Yes.

Q. Okay.

A. Correct.

Q. And then more recently, it shifted to that contract on May 3rd; is that correct?

A. Subsequent to leaving GSK, I have done two things -- well, I have done three things. I've, obviously, done private stuff as well, but I have become a vaccinator for the COVID program in the United Kingdom. So, I spend two or three days a week vaccinating UK individuals against the -- the coronavirus, and I've spent some of my time supporting GSK as well in this -- this litigation, ten days in the last -- since I retired, as we spoke about.

Q. Yeah. And I just want to be clear. I just want to make sure we are on the same page.
So, you were an advisor and then more recently, this is the contract with the legal department you are working under. That's all I was trying to clarify.
A. Yes, correct.
Q. Understood.
Okay. So, in terms of -- and it was a global head of safety or head of safety? How would you refer to it as?
A. It was global head of safety. So, I had worldwide accountability.
Q. Okay. Now, Doctor, I want to be clear about this because I think you answered in your personal capacity. I want to make sure that I get a binding answer for GSK upfront right now, and I don't want it to change later on. Or if you need to, please clarify.
I asked you when did you first learn, and I will specifically say "GSK," that there was NDMA coming out of Zantac? And I believe you said September of '19 is when you, the global head of safety, first learned of this.
MR. SHEEHAN: Objection.

Mischaracterizes. Testimony.

BY MR. CHAFFIN:

Q. Did I understand that correctly?

MR. SHEEHAN: Vague and ambiguous.

THE WITNESS: So, I was speaking in the capacity of when did I understand.

BY MR. CHAFFIN:

Q. Right.

A. Subsequent to preparing for this deposition, I am aware that questions were asked earlier in the history of the product, but my personal knowledge came about at the time of PSUR assessment report and -- and the subsequent regulatory action.

Q. Can you say, sitting here today, when GSK become -- became aware of NDMA coming out of Zantac?

MR. SHEEHAN: Objection. Vague. Ambiguous.

THE WITNESS: Sir, I think that's a question for the chemistry and manufacturing witness that I'm sure you will be talking to. I -- I can tell you what I know, but I'm the head of human medicine safety, which is different to the chemistry question you are asking me.

BY MR. CHAFFIN:

Q. I just want to be clear.

So, what period of time were you the

global head of safety? Could you tell us when the begin date was on that?

A. So, I started in January of 2018.

Q. Okay. So, from January of '18 through March of 2020, you were the global head of safety covering all products, including Zantac, for GSK; is that correct?

A. That -- so, the way GSK is organized, I was global head of safety, but there are separate heads that reported into me that looked after consumer healthcare and vaccines, but for all pharma products, which is material to the conversation we are having, yes, I was global head.

Q. Okay. So, covering Zantac, you were the global head of safety from '18 through March of 2020; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: That's correct, sir.

BY MR. CHAFFIN:

Q. And sitting here today, the first time that you learned about NDMA coming out of Zantac, according to you, was September of '19?

MR. SHEEHAN: Objection. Vague.

BY MR. CHAFFIN:

Q. Or was it earlier than that?

A. It was at the time that we received the questions from the European Medicines Agency, which is -- which is around about that, the time frame --

(Simultaneous crosstalk.)

BY MR. CHAFFIN:

Q. And if -- we will get into documents, but I believe it was sometime in the summer.

(Reporter clarification.)

BY MR. CHAFFIN:

Q. So, Dr. Hobbiger, just for sake of -- I just want to put a pin in this. We will get into it later, but it's -- in or about the summer of 2019 is what you understand, you know, the M -- EMA or Swissmedic or whoever was notifying the company at that time; right?

MR. SHEEHAN: Objection.

THE WITNESS: Yes, Mr. Chaffin, that's correct.

BY MR. CHAFFIN:

Q. Okay. And since then, have you learned that GSK, in fact, had information that predated that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Since then as preparing for the deposition, I am aware that there were discussions

way back at the time of first approval about the possibility of nitrosamine formation.

BY MR. CHAFFIN:

Q. And when you say "first approval," that would have been the early 1980s?

A. Yes, sir.

Q. Okay. And the first time that you became aware of that was during preparation for your deposition?

MR. SHEEHAN: Objection.

THE WITNESS: That's correct, sir.

BY MR. CHAFFIN:

Q. And do you know when it was approximately that you started preparing for your deposition?

A. When did I start preparing for my --

Q. Yes.

A. -- deposition?

Q. Correct.

When was that approximately? What month and year was it?

A. It was at the beginning of this year. I was involved in the response to the European Medicines Agency prior to that, obviously. So, my -- my time looking at ranitidine spans 2019, '20, '21, but I think

in terms of deposition preparation, substantively from this year.

THE WITNESS: Can I just ask the stenographer? Am I leaving enough pause for you now or not?

THE COURT REPORTER: Yes. Thank you.

THE WITNESS: Thank you. I try and count to three before I answer.

MR. CHAFFIN: Had some practice at this.

THE WITNESS: I've had four deposition, but I have never done one remotely like this before. So --

MR. CHAFFIN: Fair enough. Fair enough.

BY MR. CHAFFIN:

Q. So, just to clarify, so you said that as the global head of safety, you did not know that NDMA was coming out of Zantac, but you since learned in preparation for your deposition that there was earlier consideration of that issue back in the 1980s; is that correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony. Vague and ambiguous.

THE WITNESS: I -- I don't believe that's what I said, sir.

BY MR. CHAFFIN:

Q. Okay. Then what is it you're trying

to say, sir?

A. Because what you said was NDMA is coming out of ranitidine. The understanding --

Q. Okay. What did you say?

A. So, the understanding I have was about whether treatment with ranitidine changed the immure of the gastrointestinal system, so that ranitidine -- so that nitrosamines might be formed. One possibility was that it came from ranitidine, but there were others as well that were considered.

Q. So, what are the possibilities?

We have in vivo, which is the one in the body; correct?

MR. SHEEHAN: Objection.

THE WITNESS: I consider three possibilities, and I have certainly seen publications to that effect. One coming from within the drug substance itself or, indeed, the drug product. One as a result of in vivo action, which is the one that you have just described. And the third is related to the change in the intestinal flora, which may have a role as a result of the changing acid pH in the stomach.

BY MR. CHAFFIN:

Q. Okay. And in terms of the NDMA coming from ranitidine itself, when did you first learn

of that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: When we received notification from regulatory authorities and, obviously, subsequently that was looked at by my colleagues in the manufacturing group.

BY MR. CHAFFIN:

Q. And how about for in vivo, when was the first time that you had information about that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, the studies that were done were -- I became aware of as part of preparing for the deposition. Actually, in truth, probably prior to that as part of the conversations the company had about the regulatory questions and the work that was ongoing in manufacturing because there was a project team that were discussing the findings, and, obviously, I was -- I was involved in that.

BY MR. CHAFFIN:

Q. And the studies earlier that you are talking about, is that studies like Tanner?

A. Tanner would be one of them. The publication by Britain would be another. There was some reports also by the Central Middlesex Group involving Meryick Thomas and Ms. Visiewicz., and then more

recently, I think, a Matsuda publication that I'm aware of. So, there are a series of publications in and around that time, some of which I have seen and, obviously, the results of which I'm -- I'm familiar with.

Q. And for intestinal flora, when was the first time for that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I think as a doctor, as a medically qualified person, I am fully aware of the physiology of the human body and the question of changing gastric pH and what that means to intestinal flora, would have known -- been known by me since I qualified in 1985. But in terms of the question specifically related to ranitidine and in the context of this litigation, I have seen subsequent information as part of preparing for the deposition.

BY MR. CHAFFIN:

Q. Okay. But sitting here as a doctor of medicine, that's something that would have been an obvious point to look at is, I think, what you were saying to me; is that right?

MR. SHEEHAN: Objection. Same.

THE WITNESS: I was -- I was taught about the importance of -- of pH, stomach pH, as a medical

student and prior to that, actually, as a physiology student.

BY MR. CHAFFIN:

Q. So, the answer to my question is yes?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: Can you restate the question, please.

MR. CHAFFIN: Can I have it read back, please, Melissa.

(Record Read.)

MR. SHEEHAN: Same objection.

BY MR. CHAFFIN:

Q. I'm -- I'm referring to the intestinal flora.

A. So, the -- the role of gastric acid in maintaining the intestinal flora, yes, would have been known to me as a medical doctor.

Q. And something that would have been obvious to look at; is that right?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: It would have been an obvious question, yes, sir.

BY MR. CHAFFIN:

Q. Okay. Doctor, GSK understands that

when a drug passes a clinical study, it doesn't mean that the drug is safe; correct?

MR. SHEEHAN: Objection.

THE WITNESS: I think that is correct, sir, yes.

BY MR. CHAFFIN:

Q. Okay. And you have to continue to monitor the drug; is that correct?

A. That is the practice -- the science of pharmacovigilance, continuing monitoring of medicines for their safety profile, yes.

Q. And, certainly, for a drug like Zantac, for example, GSK understands that -- that potential side effects, such as cancer, can be difficult to pick up in clinical studies; is that right?

A. Yes, sir --

MR. SHEEHAN: Objection.

THE WITNESS: -- that's correct.

BY MR. CHAFFIN:

Q. And as a doctor, you understand the concept of latency; is that right?

A. I do, sir.

Q. And it means that some adverse reactions take time to develop.

Is that a fair statement?

MR. SHEEHAN: Objection.
THE WITNESS: Yes, sir.
BY MR. CHAFFIN:
Q. And your company certainly understands that certain cancers are, in fact, latent?
A. Sir, I would argue that all cancers take time to develop.
Q. And so they develop over a course of years?
MR. SHEEHAN: Objection.
THE WITNESS: The -- the specific time frame is variable, but, yes, I think years is a reasonable assumption.
BY MR. CHAFFIN:
Q. Okay. Prior to this deposition, did you attempt to educate yourself on the characteristics of NDMA?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: Only in the context of the ongoing conversations we had had in preparation for answering the response of the European authorities, other authorities, and the -- the information that was sent to FDA, and I did appear before the European Medicines Agency to answer questions as part of the ongoing Article 31 Review. So, I participated in that with colleagues, worked

in chemistry and manufacturing, and, yes, I am -- I'm not a chemist. I would never profess to be a chemist, but I have some understanding.

BY MR. CHAFFIN:

Q. And you said you appeared; is that correct? I just want to be clear with what you said.

A. So, the European Medicines Agency does allow for oral hearings as they review the data. This is very different from an Ad Comm. in the U.S. This is just the company appearing in front of the European regulators to have a discussion, and, yes, I did appear in order to answer questions.

Q. Okay. And when did you appear for that?

A. So, that was late in 2019, I think.

Q. Okay. And have you seen a transcript of your testimony from that?

A. The Europeans don't work in that way, sir. We don't have transcripts as you do in these proceedings. There were -- there were some minutes issued, and they published their findings on the website. So, you can read those, but we don't -- we don't get a report as such --

Q. Okay.

A. -- or something to check for.

Q. Yeah. Just, there -- so to your knowledge, there is no recording or anything like that. It would just be minutes from the appearances; is that correct?

A. That's correct, sir, yes.

Q. Okay. And so the question I had asked is: Prior to your depositions today, did you do anything to educate yourself for -- about NDMA, and as I understood your response, you educated yourself in the 2019 and after time period for responses to regulators as well as this deposition; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: As part -- and as part of doing the evaluation, yes, sir.

BY MR. CHAFFIN:

Q. Okay. And, certainly, you would agree that GSK is aware that NDMA is a probable human carcinogen?

MR. SHEEHAN: Objection.

THE WITNESS: The classification of NDMA is as a probable carcinogen in man, yes.

BY MR. CHAFFIN:

Q. And do you have anything, sitting here today, to dispute that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I have no evidence that it is.

BY MR. CHAFFIN:

Q. I am asking you do you have any evidence that it's not, to disagree with those guidelines?

A. Sir, I am giving you my answer. I have no evidence that NDMA causes cancer in man.

Q. Okay. So --

A. I accept an -- I accept an international statement as written.

Q. Okay. So, you -- you accept the international statement that it is a probable human carcinogen, and you haven't done anything to look at or research whether it, in fact, is.

Is that a fair statement?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I think there is a distinction between probable and proven. I am saying that I don't believe there is data to show that it is proven. It is a substance presence in -- in -- in many food stuffs, water and so on and so forth.

Have I researched all the data about NDMA? No, I haven't.

Have I looked for outcomes in human beings

suggesting cancer in -- in patients taking ranitidine? Yes, extensively.

Have I found any evidence of that? No, I haven't.

BY MR. CHAFFIN:

Q. So, Doctor, I just want to be clear and maybe I'm misunderstanding.

So, in terms of NDMA, you recognize that the standards say that it is a probable human carcinogen.

Is that a fair statement?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Yes. I recognize that statement.

BY MR. CHAFFIN:

Q. And, I guess, I'm asking you are you offering an opinion today that it is not a probable human carcinogen?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: Sir, I am not an environmental toxicologist. I am a medical doctor concerned with patient safety for patients taking medicines and specifically the medicines of GlaxoSmithKline, who was my employer. I have not studied NDMA in the setting of

environmental toxicology. I have studied ranitidine in the setting of human use.
BY MR. CHAFFIN:
Q. Okay. So, you would not be someone qualified to offer an opinion as to whether NDMA is a human carcinogen.
Is that a fair statement?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
THE WITNESS: So, I refer back to the statement I gave you before. I am not an environmental toxicologist. If NDMA were present in ranitidine and causing human cancer, I believe that I would have seen it in the studies that I have looked at. I have not seen evidence.
BY MR. CHAFFIN:
Q. Other that --
A. And you said right at the start this is a deposition about the presence of NDMA and ranitidine. So, that's what I am referring back to.
Q. So, sir, I am just asking you, sitting here today, in terms of NDMA, leaving aside ranitidine, do you have an opinion as to whether it is a probable human carcinogen and what have you done to prepare to offer an opinion on that, if anything?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: So, my understanding is that I am here to talk about the pharmacovigilance practices of GlaxoSmithKline, specifically in the context of ranitidine. You said to me at the start of this that the question is about ranitidine and the presence of NDMA. I focused on human outcomes. I have looked extensively at the safety data. I am here to answer practices on how we did pharmacovigilance and what we found in the context of ranitidine. I am not a chemist. I am not an environmental toxicologist, and I am not an expert in NDMA. What I am is an expert in human outcomes in the setting of pharmacovigilance.

BY MR. CHAFFIN:

Q. Sir, you made the statement to me a few minutes ago that you believe it's a probable human carcinogen but not a proven one, if I understood your word correctly.

So, I am just asking you are you offering an opinion as to whether NDMA is, in fact, a human carcinogen? That's all I am asking, and if you say, "I haven't looked at that issue. I haven't researched NDMA independently. I am not offering an opinion about that. I'm only answering in the context

of ranitidine," that's fine, but I just want to be clear because I don't want to get a different answer later and have to take your deposition again.

MR. SHEEHAN: Objection. Scope. Asked and answered. Compound.

THE WITNESS: I am not sure what I can say above and beyond what I have already said to you.

BY MR. CHAFFIN:

Q. I understand that you said you are not an environmental toxicologist, and you're not offering an opinion on whether NDMA is, in fact, a human carcinogen. Is that accurate?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: I am saying that in the context of ranitidine, I have found no evidence that NDMA, if it's present in the formulation, has resulted in human cancer.

BY MR. CHAFFIN:

Q. Okay. And besides looking at it in the context of ranitidine, you never -- or have you educated yourself on whether NDMA is, in fact, a human carcinogen; is that correct?

MR. SHEEHAN: Objection. Scope. Asked and answered.

THE WITNESS: So, my response to that question goes back to something we seem to be going round and round in circles about. I accept the statement, the internationally accepted statement that it is probable. I don't believe that statement says it is proven. In the setting of ranitidine, I have found no evidence of cancer. Above and beyond in the setting of ranitidine, I cannot offer an opinion because as I said at the beginning, I am not an environmental toxicologist. I have not extensively studied NDMA in other settings.

BY MR. CHAFFIN:

Q. And is there any setting you have studied -- excuse me. Is there any setting where you have studied NDMA besides with ranitidine?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: If I can refer you back to the 2015 Zeng and Mitch paper, which preceded the 2016 paper that we -- that led to some of the questions, there was quite an extensive discussion there of NDMA, what it is present in, so-called gray water and black water. As I say, I'm not -- I'm not -- I'm not an expert in that field, but I've read the information that was provided to me in the food stuffs that it was present in, and that is -- that, to be honest, is the -- is pretty much the limit of my knowledge about the environmental exposure.

BY MR. CHAFFIN:

Q. And as I understand it, you read that in the context of looking at ranitidine; is that correct?

A. In the context of looking at ranitidine, and that first paper actually had two people who were taking ranitidine mentioned, referred to it, yes.

Q. Okay. And so outside ranitidine, you haven't looked at the NDMA issue; is that correct?

A. I have looked at it only in the context of the ranitidine issue, yes.

Q. Okay. And in terms of your preparation for your deposition, did you educate yourself on the characteristics of ranitidine?

A. Insofar as I understand the nature of the molecule, how it works, the efficacy data, the indications, the safety profile, yes.

Q. You understand that --

A. But not -- but not specifically in relation to the deposition because I have not been qualified for long enough that ranitidine was new. I remember ranitidine when I qualified in '85. So, I used it in clinical practice at that time, and, obviously, I have been familiar with it because I have been working

with the company for the last 30 years. So, it's not -- I'm -- what -- what I'm trying to point out is ranitidine didn't suddenly hit me between the eyes in 2019 as a new product. I have known about it for a long time.

Q. I understand.

But what did hit you between the eyes and was new to you was the NDMA issue; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: It was the regulatory referral, yes.

BY MR. CHAFFIN:

Q. Okay. And you understand that ranitidine is an H2RA blocker; is that correct?

A. It is an antagonist, competitive antagonist, yes.

Q. And it's an --

A. A blocker to me is irreversible, you see. That's a difference in terminology.

Q. Is -- if the use of the word "blocker" is in the documents, is that an improper use of the term?

A. I -- I'm -- I'm happy to go with it. I just want to be clear that that's what I understand the mechanism of action to be.

Q. So, if it's a blocker, it is a temporary blocker is what your point is?

A. Correct.

MR. SHEEHAN: Objection.

BY MR. CHAFFIN:

Q. Okay. You understand that ranitidine is capable of breaking down into NDMA; correct?

MR. SHEEHAN: Objection. Vague. Ambiguous. Scope.

THE WITNESS: So, I know that my colleagues in manufacturing and pharmaceutical development, in light of the questions that came from the regulators, have done extensive work in looking at the presence of NDMA in ranitidine drug substance and drug product, and they have formulated a hypothesis as to how it might form, yes.

BY MR. CHAFFIN:

Q. Is Dr. Searle, Andrew Searle, in manufacturing?

A. Either in manufacturing or in pharmaceutical development, it's that side of the business, yes. He certainly is not in pharmacovigilance or in medical.

Q. And in preparation for the recall of Zantac, you had the opportunity to review the root cause analysis; right?

A. So, I have read the root cause analysis, yes, and, indeed, it was discussed with the European Medicines Agency when we went to present to them in late 2019.

Q. Okay. And you understand certainly from the root cause analysis that ranitidine is capable of breaking down into NDMA; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: My understanding is that we have identified a mechanism by which it could break down, yes.

BY MR. CHAFFIN:

Q. And, certainly, GSK was aware that ranitidine is capable of breaking down into NDMA prior to September of 2019; is that correct?

MR. SHEEHAN: Objection. Scope. Vague and ambiguous.

THE WITNESS: So, I cannot speak on behalf of my manufacturing or pharmaceutical development colleagues, but my understanding is that we had not identified a mechanism by which ranitidine could break down.

BY MR. CHAFFIN:

Q. So, your position is Tanner does not tell us that?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, Tanner was a setting that was nonphysiological providing rich sources of nitrite that were over and above what could be conceivably consumed by man. So, that is not a study in the real life use of the product, but, again --

BY MR. CHAFFIN:

Q. From a chemical --

A. -- you -- you are going to have to talk to them about that particular question.

You can't ask me to offer an opinion on manufacturing of pharmaceutical development. My understanding is that if super physiological concentrations were provided, the results were different to when physiological concentrations were provided.

BY MR. CHAFFIN:

Q. Okay. So, just sitting here today and, certainly, in 2018, '19 and '20, as head of global safety, your position was we didn't know that ranitidine could break down into NDMA; is that correct?

MR. SHEEHAN: Objection. Asked and answered. Scope.

THE WITNESS: My position was that I was and continue to be reassured by the safety profile of ranitidine, and we had no findings that would lead us to

investigate the production of NDMA or anything else for that matter.

BY MR. CHAFFIN:

Q. Okay. So, just so we're clear and so since, according to you, you didn't have any basis to look at the issue, it's fair to say that you just ignored the issue; it wasn't something you -- you were focused on?

MR. SHEEHAN: Objection.

THE WITNESS: Sir --

MR. SHEEHAN: Hold on one second there, Steve.

Mischaracterizes testimony.

THE WITNESS: Sir, I think it's quite important at this stage that we talk about the science of pharmacovigilance because the science of pharmacovigilance is focused on human outcomes.

So, it is the science of monitoring for the side effects of medicines. If we see an outcome, whatever that may be, whether it be a rash or diarrhea or anything like cancer, then it is the practice of pharmacovigilance to look back and say if that is real, what is the cause? Because we had not seen any adverse outcomes, there was no reason for us to look back at, in this case, NDMA.

So, I work from the end game backwards as a pharmacovigilance professional.

BY MR. CHAFFIN:

Q. Okay. And that's the only way you work, is from the end game backwards?

MR. SHEEHAN: Objection.

THE WITNESS: So, we look for signals, and, yes, we may see signals in animal species as part of preclinical testing. We may see signals as a result of inquiries coming to us from regulators, and we would evaluate those just as we did when NDMA was pointed out to us. But at the end of the day, I'm focused -- I'm a patient. You're a patient. I want to see you receive the best medicines you can, and my way of understanding that is looking at how those medicines behave when you take them.

BY MR. CHAFFIN:

Q. I'm just asking the -- the question that you led to, which is, is there another way besides end game backwards to look at the issues from a signaling perspective?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: And as I say, signals can arise from a variety of sources.

BY MR. CHAFFIN:

Q. Okay. So, a signal could be there's a mechanism of action potentially that would have to be evaluated considered during the life of a drug; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: You would look in the development -- and as you know, I'm sure, it's very common to look in the development phase to see whether there are any off-target effects, for example, of a mechanism of action, whether there are any findings in animal studies that would -- would be signals, whether there are any findings in comparative drugs that would be signals. So, signals could come from a variety of ways, but the fundamental practice of pharmacovigilance is to look at patients and understand how the drug behaves in patients, and that's why we monitor adverse events.

BY MR. CHAFFIN:

Q. Understood.

Going back to where we were before in terms of the breakdown of ranitidine into NDMA, the first time that the company, according to you, looked at that was after regulators tipped them off in the summer of 2019?

MR. SHEEHAN: Objection. Asked and answered. Vague and ambiguous as to the term "breakdown."

THE WITNESS: So, my understanding is that the root cause analysis was done in response to the questions that we had received from regulators in order to look at the possibility that ranitidine could form NDMA and that that -- to my knowledge, that was when that question was looked at and answered.

BY MR. CHAFFIN:

Q. And to your knowledge, that was the first time that GSK went and evaluated product that had been manufactured at various facilities to see if NDMA was breaking down in the ranitidine itself?

MR. SHEEHAN: Objection. Vague and ambiguous. Scope.

THE WITNESS: Sir, I think those, as I said before, are questions for manufacturing and pharmaceutical development and, certainly, the questions at the time of first approval in the early '80s when I was not an employee of the company, so it's outside my field of expertise. It is outside the time frame when I was within the company. So, I can't speak to what conversations were had in the early '80s.

But my understanding, as I say, is that the root cause analysis was done in response to the regulators and that that was the point at which the company talked about the possibility of NDMA being formed from

ranitidine.
BY MR. CHAFFIN:
Q. Sir, I just want to be clear as the head of global safety.
Is -- the Zeng and Mitch articles came out 2015 and '16; is that right?
MR. SHEEHAN: Same objection.
THE WITNESS: 2015, 2016 --
MR. SHEEHAN: Hold on. Let me get my objection.
Objection. Scope.
BY MR. CHAFFIN:
Q. 2015 to '16; is that correct?
THE COURT REPORTER: Hold on. Hold on. Hold on.
(Simultaneous crosstalk.)
THE COURT REPORTER: Hold on. Hold on. I did not hear the response, I am sorry, because I was getting the objection.
Can I have your response, Doctor, the articles came out in 2015 to '16...
THE WITNESS: Correct.
THE COURT REPORTER: Thank you.
I'm sorry, Mr. Chaffin.
MR. CHAFFIN: That's okay.

BY MR. CHAFFIN:
Q. And then in terms of the regulators, they contacted the company in 2019; is that correct?
A. You remember I said we had an inquiry from the regulators in the time frame of 2018, '19 in response to the periodic safety update report that was submitted in 2018. I can't tell you for sure what month it was. I haven't checked that, but it was prior -- but it was prior to the subsequent questions that came from the European Medicines Agency, and the --
Q. In --
A. -- team -- and the team were getting ready to respond to those, which was requested in the time frame of the next periodic safety update report.
Q. In the summer of 2019, there were questions about NDMA forming from ranitidine that was then tested for the first time; is that correct?
MR. SHEEHAN: Objection. Mischaracterizes testimony. Scope.
THE WITNESS: Sorry. I lost track of that train of thought.
BY MR. CHAFFIN:
Q. Then --
A. Can you say it again?
Q. Then in the summer of 2019, after the

question from the regulators for the first time, to your knowledge, ranitidine breaking down into NDMA was tested for product that was out of the marketplace?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, my understanding is that the metabolism or -- or, indeed, the stability of ranitidine was tested at the time of first approval back in the '80s. The presence of NDMA and everything I have read was not spoken to or referenced, but further analysis was done in 2019, which is the topic that we're talking about now. As I say, I'm not manufacturing. I'm not pharmaceutical development. I am a pharmacovigilance scientist. So, this is -- this is not an area I would have expertise in.

BY MR. CHAFFIN:

Q. So, I just want to be clear, and I appreciate your candor, and, certainly, we can move on if you don't have an area of expertise in it, but my understanding is -- is that according to your testimony as well -- is that NDMA is a probable human carcinogen. So, if it, in fact, is in ranitidine, that would raise a human potential safety issue; is that correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

THE WITNESS: I would refer you back to

the answer I gave before, and I will keep giving the answer because it's what I do. We look at patient outcomes. We look at events. If we see something, we then work backwards. If that isn't good enough for you, then I don't know what to do.

BY MR. CHAFFIN:

Q. I am just asking a simple question.

If NDMA is in ranitidine, is that something you would want to know from a human safety perspective?

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: If --

BY MR. CHAFFIN:

Q. These are jurors that are going to be listening to this.

A. Yes, I know.

Q. They are common sense people like me. I am not a complicated scientist. I am just trying to understand.

If NDMA is in ranitidine and breaking down, my understanding is the first time that was tested was in 2019 after approach from the regulators.

That was my first question.

MR. SHEEHAN: Is that a question?

All right. Well, objection to the --

BY MR. CHAFFIN: That's my -- that my --

MR. SHEEHAN: Objection to the soliloquy, but if you want to ask an actual question, go for it.

BY MR. CHAFFIN:

Q. The first time that GSK, to your knowledge, looked at whether NDMA was in ranitidine, according to your testimony, was after the regulators contacted them in 2019; is that correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony. Scope.

THE WITNESS: And I don't think that's what I said, sir.

BY MR. CHAFFIN:

Q. Okay.

A. I said it may well have been a topic of discussion in the early '80s. I am not in chemistry or manufacturing or in pharmaceutical development. I am under oath here to speak truthfully. I genuinely don't know the answer. So, I can't guess.

Q. Okay. So, as the head of global safety, you did go back and say, "What did we know when, and did we have something that caused us to actually look for the" -- "the NDMA to come out of ranitidine?"

Is that a fair statement?

MR. SHEEHAN: Objection. Vague and ambiguous.

THE WITNESS: So, I would like to go back to the answer I have given about six times now, and maybe I can just refer to my previous answer.

I have said that the practice of pharmacovigilance is looking at how medicines behave in human beings, safety, collecting experience around those safety findings, whatever they may be, and then evaluating those safety findings to understand the cause, so that medicines can be used as safely and effectively as possible in human beings. So, my focus is human safety. I'm not preclinical safety. I am not manufacturing. I'm not chemistry, and that's what I have been trained to do in my 20 years in safety and, indeed, in my ten years before in clinical research.

BY MR. CHAFFIN:

Q. So, as I understand your testimony and just real world terms, until we see cancer, we don't look for it?

MR. SHEEHAN: Objection. Vague and ambiguous.

THE WITNESS: So, we look for cancer at the time of the initial development phase. That's what all

of those animal studies are for. That's why the carcinogenic studies are done. If they raise any concerns, then either the product wouldn't be licensed or that would raise some sort of concern within the company, and we could look in a different way at the safety data. But, in general, in the absence of a single -- a signal, in the absence of any concern from the animal studies, we would monitor outcomes in patients and we would extensively -- and I think this is the point you are getting to -- monitor the literature and the epidemiology because you referred to the latency period, and I fully recognize that we need additional sources of data, which is why we would look back at observational datasets as part of our routine pharmacovigilance practice. So, we don't just ignore cancer. We are very attuned to it for all products.

BY MR. CHAFFIN:

Q. So -- and I think I understand your answer, and I just want to be sure.

So, information that ranitidine is breaking down into NDMA is not something that was of concern for you?

MR. SHEEHAN: Objection.

BY MR. CHAFFIN:

Q. Because -- because according to you, you didn't see a signal of cancer.

Is that a fair statement?

MR. SHEEHAN: Objection. Objection. Compound. Asked and answered.

THE WITNESS: So, I did not see a signal for cancer, and, therefore, I was and remain reassured about the safety profile of ranitidine in use in human beings, and the presence of NDMA, which came to light as a result of the investigations done two or three years ago, made us redouble our efforts to look at the human safety profile, and we still did not observe anything. So, I continue to remain confident in the safety profile of ranitidine to the point where I or my family would be happy to take the product.

Maybe I shouldn't speak for my family, but I will speak for me in person.

BY MR. CHAFFIN:

Q. Okay. Understood.

So, Doctor, and, again, maybe you are just getting ahead of me, and I understand that you have the stronger of arching opinion, but I am just asking about the building blocks to it, which is what I have been trying to ask; okay?

And so I am just asking about if NDMA is coming out of ranitidine, is that something you would have wanted to know and evaluate? That's all I was

asking.

MR. SHEEHAN: Objection. Asked and answered.

THE WITNESS: I think if something was outside the registered specification for the product and had -- and -- and was over and above what had been evaluated by the company, either explicitly or implicitly, and had been discussed and agreed with regulators, then, yes, that would be something I would look at.

BY MR. CHAFFIN:

Q. Okay. So, for --

A. But in trials preclinically in discussion with FDA would have included drug product that may -- may have contained NDMA and did not show anything in the -- in the preclinical safety studies.

Q. I see.

So, your position is, is that to the extent NDMA is an impurity that was in the drug, it was there before and, therefore, it's okay?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

THE WITNESS: I'm saying I don't know whether it was there before, but what I do know is that in the animal studies there was no evidence of mutagenesis carcinogenicity. Moving forward to human studies, I have

no evidence of carcinogenicity either. Therefore, my reassurance that there isn't an issue here and my -- my willingness and my -- my stated, you know, willingness too take the product because I'm convinced by its safety stands.

BY MR. CHAFFIN:

Q. Understood.

So, again, in terms of reaching the conclusion that from your perspective the product is still safe to consume, my question is more so even if it's on the market still, what would provide a signal to look at the issue?

And so my understanding is just really simple, as I have asked a number of times now and maybe you've answered the way you are going to and we can just move on, -is that what prompted that was in September of 2019, the regulators asking about Zeng and Mitch -- and you started looking at the issues more closely. You looked at three different ways it could be coming out of the product, one of which would be the NDMA breaking down from the ranitidine itself, and that's when you started doing testing around that.

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I practice

evidence-based medicine, and I, as a result of the questions by the regulators in 2019, re-reviewed all the evidence we had, and our conclusions from the years before post those regulatory inquiries remain unchanged.

BY MR. CHAFFIN:

Q. Okay. And I -- and I appreciate that you are giving me an answer, but it is an answer to a different question that I am asking. And if you simply refuse to answer the question I am asking, that's fine.

I am just asking in terms of ranitidine breaking down into NDMA, as I understand it, the first time you guys looked at that issue was in the summer of 2019 or thereafter when the regulators raised the concern or question; is that correct?

MR. SHEEHAN: Objection. Asked and answered. Scope. Vague and ambiguous.

BY MR. CHAFFIN:

Q. The first time -- to be clear --

A. Sir -- sir --

(Simultaneous crosstalk.)

BY MR. CHAFFIN:

Q. I will withdraw the question.

The first time that you went back and tested product or batch out in the marketplace for NDMA and breakdown of NDMA from ranitidine was after the

regulators contacted in 2019; is that correct?

MR. SHEEHAN: Eric, just to the extent you keep saying you, I --

MR. CHAFFIN: GSK.

MR. SHEEHAN: -- you are referring to the company GSK, and he's told --

MR. CHAFFIN: GSK.

MR. SHEEHAN: -- you a million times that he is a pharmacovigilance witness, not a chemistry and manufacturing witness.

I don't know what you want him to say, but --

MR. CHAFFIN: Okay, Tom.

MR. SHEEHAN: -- you can keep asking the question.

Objection. Scope.

THE WITNESS: The -- the question you asked me the second time, sir, was not the same as the question you asked me the first time, sir. You rephrased it, and I --

BY MR. CHAFFIN:

Q. Okay.

A. -- I understand that, and the answer is I can't tell you because I'm not in the manufacturing or the chemistry or pharmaceutical development group.

You asked me about the testing. There was testing done as a result of the inquiry from the European Medicines Agency and, indeed, from FDA. That is true. Whether there was any testing done previously, I'm not the right witness to speak to that because, as I said, I wasn't around in the early '80s, and I am not around in the right function.

Q. Okay. And my question is simply: And you as the head of global safety, you weren't aware, no one brought to your attention any testing of the breakdown before that time period in 2019; is that correct?

MR. SHEEHAN: Objection. Asked and answered. Vague and ambiguous.

THE WITNESS: No one brought that to me prior to the questions. Remember, I was not in the safety department in the early '80s, and the questions may have been raised there, but in my time as head of safety, no, that was not a question that was brought to me.

BY MR. CHAFFIN:

Q. Okay. And is it my -- it's my understanding from other witnesses that I have deposed and other witnesses in the case that, for example, Tanner and another study, I think -- believe Broom, was discovered only after reg ulators started asking

questions and you made submissions. Then you went back -- someone went back and found in the files the Tanner study.

Is that your understanding?

MR. SHEEHAN: Objection. Scope. Vague and ambiguous.

THE WITNESS: So, my understanding is that the Tanner study, which was a follow-up to the Britain publication, which was submitted to regulators, was found as part of the 2019 review and submitted at that point.

BY MR. CHAFFIN:

Q. Okay. And is that true of the Broom study as well?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Sir, I'm not familiar with the Broom study. If you want me to look at it, could you put it on screen, please?

BY MR. CHAFFIN:

Q. Understood.

You know, we are going to shift gears for a minute. I'm going to get -- if you would, I know you -- actually, are you familiar with Manchee? Do you know --

A. Not in great -- not in great detail. I think I know the name.

Was Manchee a GSK employee?

Q. Yes, I believe so.

A. Okay.

Q. Okay. So, was that another one that was also discovered when you guys looked back in 2019?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: As I say, I'm not familiar with Manchee. There are quite a few publications, as you know, and I don't know all of them. And if you are asking me have I read all multiple thousand pages of the submission in the early '80s, no, I haven't either.

BY MR. CHAFFIN:

Q. Understood.

A. So, if Manchee was referenced in that, I -- you know, show it to me, and I will give it a view.

Q. Understood.

Dr. Hobbiger, we are going to ask John to mark your CV as Exhibit 2625, and that was previously provided from your counsel, and I believe you have a copy of it in front of you, and I don't think I'm going to go through it in any detail, but I just want to confirm that that is a complete and accurate, most recent copy of your -- your CV.

A. Yes, it is. It is dated the 7th of

May. So, it's not bang up to date, but it reflects my CV at the time that I left GSK, yes.

Q. Okay. Fair enough.

(Exhibit 2625, CV, marked for identification.)

MR. SHEEHAN: And -- and, Eric, we can't see it on the screen, but this is just the CV that we provided to you a number of days ago; is that correct?

MR. CHAFFIN: Yeah. It's -- John, if you want to bring it up, you can, but, yeah, that -- that is it. That is the one that you provided by email, Tom.

MR. SHEEHAN: Okay.

THE WITNESS: This one?

MR. CHAFFIN: Yeah. It has -- it has a cover on it. Let me just -- I will bring it up real fast, but it's --

THE WITNESS: Yes.

MR. CHAFFIN: Let me just share mine if I can get it.

BY MR. CHAFFIN:

Q. This is the same one John has.

A. Yes.

Q. This is a hard copy. I marked it myself here for my own personal thing, but, yeah, it's this one, and --

A. Yeah.
Q. -- it's not numbered by pages, but it ends with, I guess, your personal information on the back is the last page --
A. Right.
Q. -- right?
A. The number of children -- the number of children I have, yes.
Q. That hasn't changed since May, I assume?
A. That has not changed since May, no.
Q. All right. Fair enough.
MR. CHAFFIN: All right. Good. I will stop sharing that.
There we go.
All right. Why don't we take two minutes and give Melissa a break, a much needed break, I'm sure, as well as you, Dr. Hobbiger, and we will take five minutes and we will be back; all right?
THE WITNESS: Okay.
MR. SHEEHAN: Sure.
Do you want to just take -- it's -- it's -- what is it? It's 6:30 there?
MR. CHAFFIN: It is.
MR. SHEEHAN: Do you want to just say

6:40, ten minutes?

MR. CHAFFIN: Sounds good, Tom.

MR. SHEEHAN: Okay.

MR. CHAFFIN: Thanks.

THE VIDEOGRAPHER: We are going off the record. The time is 1031 UTC.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 1047 UTC.

Please proceed.

BY MR. CHAFFIN:

Q. Dr. Hobbiger, welcome back.

Did you have any substantive discussions about the case when we were off the record?

MR. SHEEHAN: Objection and instruct the witness not to answer.

MR. CHAFFIN: Well, I assume that you are not talking with him substantively off the record?

MR. SHEEHAN: I believe that discussions between counsel and the witness are privileged, and that's the position that we're taking.

MR. CHAFFIN: Okay. Well, I would ask again, as I did at the outset with the ground rules, that there not be substantive discussions about the testimony today with the attorneys off the record; okay? And if you

are not willing to abide by that, I just want to know on the record that you are not abiding by that; okay?

BY MR. CHAFFIN:

Q. Is that fair, Dr. Hobbiger?

MR. SHEEHAN: Our understanding -- our understanding is that we can discuss with the witness in a privileged setting the topics that are subject -- the subject of this deposition during breaks.

MR. CHAFFIN: Okay.

MR. SHEEHAN: That's -- that's --

MR. CHAFFIN: As long as --

MR. SHEEHAN: Those are -- those are subject to -- those are not properly the subject of questioning.

MR. CHAFFIN: So, I have a different understanding, but, in any event, I just want the record to be clear that it sounds as though there are substantive conversations with the three lawyers or some of them off the record, and I just want that noted for the record; okay?

MR. SHEEHAN: And let me just clarify. We haven't, but the -- there have been no substantive discussions, but our position is to the extent there are, those are protected conversations.

BY MR. CHAFFIN:

Q. Okay. So, when I asked the question, Dr. Hobbiger, did you have any substantive conversations since we were on the record last, I think that's a fair question.

MR. SHEEHAN: Objection and instruct the witness not to answer.

THE WITNESS: So, the only thing I would say we talked about substantively was how to make the coffee machine work, and that was the sum total of our conversation.

BY MR. CHAFFIN:

Q. Thank you. I appreciate that. I didn't think it was that difficult. Thank you.

Dr. Hobbiger, in terms of Zantac, I know that the company, GSK, decided to withdraw the product from the market; is that accurate?

A. Yes, that's correct, sir.

Q. And separate from GSK's withdrawal, did regulators anywhere in the world make a decision to preclude the product from being on the market?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Yes, sir. They did after GSK's decision, there were regulator authorities that recalled the product from the market.

BY MR. CHAFFIN:

Q. Okay. And which regulatory authorities were those, if you recall?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: The European authorities reached a decision on the product and in the U.S. as well, and -- and there will be others in other parts of the world, I'm sure, but I couldn't come up with a long list of names.

BY MR. CHAFFIN:

Q. Okay. And those regulator decisions were in response to the potential for Zantac to cause cancer in patients; is that correct?

MR. SHEEHAN: Objection. Mischaracterizes record. Scope.

MR. CHAFFIN: Okay. Tom, I am just going to stop you for a minute.

The only thing that's allowed is for you to say "Objection. Form." There is no other objections that are permitted under the court order. So, I would ask you to stop. It will speed things along. I have seven hours with this witness. I have committed to try and do it as quickly as possible, but I think if you keep your objections to what's allowed, it's certainly going to allow us to keep the frame that we have. Otherwise, it's just going to drag on; okay? So, just let me take my

deposition.

MR. SHEEHAN: I am aware -- I am aware of the -- I am aware of the orders that are in place, but to the extent that you deliberately mischaracterize the record, I -- I would ask that you --

MR. CHAFFIN: Tom, Tom, you don't -- you don't -- I'm going to stop now. We will go to the magistrate or Jamie. You don't get to coach the witness. The witness can tell me if I'm mischaracterizing something. You don't get to do that; okay? You don't.

MR. SHEEHAN: Just ask -- ask your questions.

MR. CHAFFIN: I'm going to, but if you keep objecting, we are going to stop and we are going to ask for intervention from Jamie and then to the magistrate judge.

MR. SHEEHAN: To the extent you feel that's necessary, when we get to that point, then you can make that decision.

MR. CHAFFIN: Okay. And I want to be clear that you just said -- and if you don't, we will stop and get the order, but you are clear on what the order is. The order is clear. You know what you are permitted to do and not do. You are doing something you are not permitted to do by court order, and I asked you to stop, okay, so we

can move things along; all right?

MR. SHEEHAN: You can ask your questions.

BY MR. CHAFFIN:

Q. Dr. Hobbiger, the regulators recalled the product after the investigation of Zantac potentially causing cancer; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: They recalled the product after the evaluation, yes.

BY MR. CHAFFIN:

Q. Okay. And you understand, as a doctor, that cancer can lead to hospitalization, death and disability; is that correct?

A. Yes, sir, that's correct.

Q. And those are serious events; correct?

A. They are serious events, sir.

Q. Okay. Prior to 2019, did GSK know that ranitidine breaks down into NDMA in high heat?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, the question you are asking about temperature is, again, a question I think for manufacturing, chemistry, and pharmaceutical development. The product labeling is clear that the product should not

be stored at high temperature.

BY MR. CHAFFIN:

Q. And do you know, as the global head of safety, whether ranitidine can breakdown in the face of high temperatures?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, as the head of safety, that is not my purview. That is a different department.

Do I know as an individual that it can? Yes, I do.

BY MR. CHAFFIN:

Q. Okay. But as global head of safety, as I understand it, if the -- according to your testimony, if ranitidine is breaking down into NDMA in the face of heat, that's not something that would be important to you?

MR. SHEEHAN: Objection.

THE WITNESS: I go back to the answer I gave to you earlier, which is that I practice evidence-based medicine, and I practice outcome-based medicine, and I'm looking for the consequences in human beings who take the medicine.

The question about the stability of the product in temperature, humidity, or light is a consideration for chemistry, pharmaceutical development,

and manufacturing.
BY MR. CHAFFIN:
Q. So --
A. And if the product does not meet specification, then it is recalled.
Q. Okay. And, Doctor, I just want to be clear.
So, is part of your formulation of your opinion that Zantac cannot cause cancer, you have not taken into consideration then that ranitidine can breakdown into NDMA in the face of heat?
MR. SHEEHAN: Objection.
THE WITNESS: My decision and my view on whether ranitidine with NDMA can cause cancer is based upon experience in human beings, results in human beings, published literature, epidemiology studies and the only information that we have available to us from our safety database.
BY MR. CHAFFIN:
Q. Okay. But I just want to be clear.
In forming that opinion, have you taken into consideration that ranitidine can breakdown into NDMA in the face of heat?
MR. SHEEHAN: Objection.
THE WITNESS: Those findings --

BY MR. CHAFFIN:

Q. And I am asking have you taken that into consideration in forming your opinion? That's all my question is.

MR. SHEEHAN: Object.

THE WITNESS: So, those findings were considered as part of redoing the evaluation, and we looked ever more closely to see whether we had -- whether there was anything there, and we didn't find anything.

BY MR. CHAFFIN:

Q. Okay. So, your position is that ranitidine cannot breakdown into NDMA in the face of high heat?

MR. SHEEHAN: Objection.

THE WITNESS: I don't think that's what I said. I said those are questions for chemistry, manufacturing. It is not -- I'm not the head of chemistry or manufacturing. I am aware that it can as an individual. Whether it does or not, my focus is on the outcome in human beings and the safety profile of the product in human beings, and that's what I focused on.

Did I look, again, at the data because of that information? Absolutely, we looked at the data again. Did we find anything that we hadn't seen the first time around? No, we didn't.

BY MR. CHAFFIN:

Q. Okay. So, in forming your opinion, you did take into consideration that ranitidine can breakdown into NDMA in the face of heat?

A. Sir, I -- we faced inquiries from regulatory authorities, which documented the presence of NDMA. We had intensive discussions about that, one of those conversations was around pharmacovigilance and the safety in human beings. We could not have had that conversation about pharmacovigilance without the knowledge of the original question.

So, yes, we were aware -- I was aware, but, actually, my focus, as a medical doctor and someone who cares about safety in patients, is what happens to patients. And I practice, as I said before, evidence-based medicine. So, I looked for evidence of harm.

BY MR. CHAFFIN:

Q. Okay. So, again, I just -- I just want to understand what you took into consideration in forming your opinion, which you've expressed.

And so you did take into consideration that ranitidine can breakdown into NDMA in the face of heat; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I will refer you back to the answer I have given multiple times, and I will keep giving you the same answer. So, I don't know what to do.

The answer is that I practice pharmacovigilance. I am concerned about the safety of medicines in patients. I look at what patients experience when taking medicines. I look at the outcomes in patients and if I see something -- and a signal is a safety observation in human beings worthy of further evaluation. If I see something, I will work back from there to try and understand whether the drug had a causative role, what the mechanism was, what advice we can give to patients, what labeling changes we can make and so on and so forth.

The fact that there was a chemical finding and that that was cited to us in the regulatory inquiries, yes, it made me redouble my efforts to look, but at the end of the day, my focus is still upon what happens in patients. It always will be.

BY MR. CHAFFIN:

Q. Understood.

And did you tell patients at any time that the NDMA was coming out of ranitidine in the face of heat?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I'm not sure that that

is my -- a question for me, to be honest. What is that question -- why is that a question for me?

BY MR. CHAFFIN:

Q. Maybe it's not, sir. Maybe as the head of global safety, that's something that's not of concern for you, but as head of global --

A. So you -- so, you use the word "concern" all the time. I'm trying to -- I -- I think I'm here to be talking to you about what pharmacovigilance does and to be the company expert on pharmacovigilance.

Q. Okay.

A. I'm -- I'm trying all -- I'm trying all the time to bring this back to a conversation about pharmacovigilance --

Q. I know.

A. -- because that's what I'm here for.

Q. Do you -- do you want to argue with -- do you want to argue with me because we can do this all day?

I mean, you made it personal --

A. No, no.

Q. You made it personal, sir, when you said you would personally continue to take the drug and your family would.

A. I would.
Q. Okay.
A. I would.
Q. So, I'm asking you would you -- or did you at any point in time, did GSK tell consumers that NDMA was coming out of ranitidine in the face of high heat?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: Yeah. My understanding is that that information was in the public domain because the FDA put that into the public domain. The European authorities put that into the public domain.
Did GSK alter its labeling for that purpose? No.
BY MR. CHAFFIN:
Q. Okay. And when it was put into the public domain, when was that put into the public domain?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: So, the -- there were a series of web site postings from the FDA. You will know those dates better than I, I'm sure, and the Europeans also published as a result of their ongoing review in the outcome of their review.
BY MR. CHAFFIN:
Q. So, this would have been in --

(Simultaneous crosstalk.)

THE WITNESS: '19, I think.

BY MR. CHAFFIN:

Q. So 2019 or later; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I believe so.

BY MR. CHAFFIN:

Q. Okay. So, certainly, at no time prior to 2019, to your knowledge, did GSK tell consumers that NDMA was coming out of ranitidine in the face of high heat?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: What GSK said in its product labeling was that there were specific requirements for the storage of the product in terms of humidity, light, and temperature.

BY MR. CHAFFIN:

Q. Understood.

But never told consumers that's important because there's potential for NDMA, which is a probable human carcinogen, of coming out of the product; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: There is nothing in the labeling that says that.

BY MR. CHAFFIN:

Q. Thank you, sir.

And the same question, prior to September of 2019, did GSK tell consumers that ranitidine breaks down into NDMA in the face of humidity?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: The labeling says to protect from humidity. It doesn't say anything further than that.

BY MR. CHAFFIN:

Q. Okay. So, it doesn't say that if you don't protect it from humidity, it can breakdown into NDMA, which is a probable human carcinogen; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: There is no such wording to that effect.

BY MR. CHAFFIN:

Q. Thank you.

And, sir, you are aware that over the course of time that GSK actually changed the color of its pills to hide the fact that the pill was breaking down from a stability perspective; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I am not aware.

BY MR. CHAFFIN:

Q. So, are you aware that the color changed of the pills?

A. No, sir.

MR. SHEEHAN: Objection.

BY MR. CHAFFIN:

Q. So, sitting here today as -- as the former head of global safety, it was not brought to your attention that the pills were changed from white to yellow?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: When were the pills changed?

BY MR. CHAFFIN:

Q. I am just asking if you are aware of it, sir.

A. Well, you said as head of safety. I am asking you when the change would have been made, because it wasn't made, as far as I know, in the last couple of years because no one told me about it.

Q. Fair -- fair enough.

It was certainly before your time in 2018. That's not something you were aware of; is that correct?

A. So, it may have been brought to the attention of the head of safety at the time, whoever that may have been, but it was certainly not brought to my attention in the time frame that I was head of safety.

Q. Okay. And, certainly, in terms of forming your opinions, you didn't go back and look at, for example, whether the color of the pill was changed over time by GSK prior to the time that you became involved with Zantac; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I didn't go back and look at the coloring of the pill and any changes in the coloring of the pill, no, sir.

BY MR. CHAFFIN:

Q. Okay. Fair enough.

And it's fair to say that prior to September of 2019, GSK had not notified any customers that they may have been exposed to NDMA from ranitidine use; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I am not aware that the company communicated that information, no.

BY MR. CHAFFIN:

Q. GSK understands that the role of drug

safety -- the drug safety executive is a very important role; is that correct?

A. I think GSK says on its website, and I suspect you've looked, that -- that we place product safety amongst all other considerations -- or above all other considerations, I should say.

Q. And, certainly, from the safety executive standpoint, you are the people that stand between the company who sells the drug and the regulatory authorities who advise the -- the companies; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I'm -- I'm not sure quite what you mean in that context. We are the people with responsibility for monitoring the safety of medicines. We have a regulatory obligation to communicate our findings, and so, yes, we have an interface with the regulators in part with -- with our regulatory colleagues as well, as we discussed earlier, but -- but that is our role under the regulations, yes.

BY MR. CHAFFIN:

Q. Understood.

And it's a nondelegable duty. It is not like you can delegate it and say, "Hey, FDA, you take care of it." The company is responsible for it; is that

right?

MR. SHEEHAN: Objection.

THE WITNESS: So, the regulators have a public health responsibility. The companies have a duty of care, responsibility. And, actually, I would argue that others as well, including prescribers who experience and see adverse events, have a duty of care, responsibility to inform the regulators and the company, for instance. So, I think patient safety is a shared responsibility and the company and the regulators play a key role in that.

BY MR. CHAFFIN:

Q. Okay. And GSK would agree that patient safety should be the No. 1 priority as a pharmaceutical company; is that correct?

A. Yes, sir.

Q. And, certainly, the safety people should be focused on safety, not sales?

A. Absolutely.

Q. And GSK is aware that it must take all steps it can to minimize the risk of harm to patients?

MR. SHEEHAN: Objection --

BY MR. CHAFFIN:

Q. Do you agree?

A. Medicines are about benefit and risk

so to -- to make a blanket statement such as that ignores the indication. So, for example, if you have a cancer treatment and in taking that cancer treatment you are cured but your hair falls out as part of the process, you may conclude that that's an acceptable risk to be treated for cancer. You may.

Whereas, if I gave you a medication for your ingrown toenail and your hair fell out, you may say, "Actually, I don't think that's" -- "that's what I want to do because I don't want my hair to fall out." So, benefit and risk in the context of each and every medicine is a unique consideration, which will be taken by the prescriber and the patient.

Q. Okay. Fair enough.

And -- and, certainly, the context of Zantac, looking at the benefits and the risk and weighing that, you supported the decision to recall the product because of that; correct?

MR. SHEEHAN: Objection.

THE WITNESS: That -- so, that is not correct, sir.

We -- I personally and -- and as a company, we do not believe that the benefit and risk of the product has changed. However, there was an issue with product quality, a deviation from the specification, and

because the product was no longer extensively marketed by GSK, the business decision taken was not to continue with making the product available because alternative treatments are available. So, it was not a benefit and risk consideration. It was a business decision.

BY MR. CHAFFIN:

Q. What was the deviation from specification?

A. Well, the presence of, as you know, the NDMA and the requirements placed on a company to control for that as specified in the European decision as part of the Article 31 response, for instance.

Q. And so that deviation from specification was the new information that the company used and considered in the decision to recall the product; is that correct?

A. So --

MR. SHEEHAN: Objection. Scope.

THE WITNESS: -- the business decision was taken in light of the new requirements placed on the company by the regulators and the fact that alternative treatment options were available. So, a business decision was made.

A medical decision about whether that would disadvantage patients was also taken and in the light

of other H2RAs and PPIs, the view taken by the company was that alternative treatment options were available and the withdraw of product -- the recall of the product happened.

BY MR. CHAFFIN:

Q. So, as I understand what you just said, the benefit to consumers is de minimis, if not important to them, because there is alternative treatments; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: What I said to you was that the -- in my view and in the company's view, the benefit risk profile of ranitidine is unchanged, but there are other treatments available that patients could take as an alternative to ranitidine. And with ranitidine no longer being on the market, those alternatives are what patients will use.

BY MR. CHAFFIN:

Q. Understood.

So, there is other alternatives that provide a similar benefit to Zantac; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: There are, indeed, other alternatives, which are widely prescribed by physicians.

BY MR. CHAFFIN:

Q. Okay. And in light of that as well

as the deviation from specifications and the lack of sales of Zantac by GSK, a decision was made to withdraw the product from the market?

MR. SHEEHAN: Scope.

THE WITNESS: So, lack of sales and alternative treatments being available underpinned the decision to recall product, yes.

BY MR. CHAFFIN:

Q. And, also, deviation from specification, which you already said; correct?

A. Correct, yes.

MR. SHEEHAN: Scope.

THE WITNESS: I'm sorry, sir. I didn't -- yes.

BY MR. CHAFFIN:

Q. You would agree, sir, that a company has a duty to be an expert on the drug it sells; correct?

MR. SHEEHAN: Objection.

THE WITNESS: The company is best placed to understand the medicine that it produces and should be an expert in that medicine, yes, I agree.

BY MR. CHAFFIN:

Q. And it certainly is in a better place than an end consumer to understand the drug fully;

correct?

A. I think that is true, yes, sir.

Q. And they are in a better place than the typical prescribing doctor to understand the drug; correct?

MR. SHEEHAN: Objection.

THE WITNESS: The company provides information to the prescribing doctor in the form of the package insert and that communicates the information required for the appropriate use of the product. The company inevitably will have much more information, you know, running to many millions of pages probably of data collected over the years, but what the package insert does is distill that down into the appropriate information for the use of the product.

BY MR. CHAFFIN:

Q. Understood.

And we've already established that the package insert in -- in no way mentioned NDMA to doctors or consumers; correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: We did establish that, yes, sir.

BY MR. CHAFFIN:

Q. Okay. And then in terms of the

company as an expert, it has or should have more information than the FDA regulators, typically; correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I don't think that is correct, sir, and -- and I will tell you for why.

When a product is newly licensed, the company is the sole manufacturer and, therefore, will have collected information in the development phase and in the marketed phase. They will have shared that with regulators, but it is, essentially, a one-company product.

When you are talking about ranitidine, which had been genericized, there were lots of other manufacturers, as you know, making the product and sharing that information with FDA. Those conversations were privileged to the company and FDA. They weren't a conversation with GSK, and so at the point that the product has been on the market for 40 years, it is entirely possible that FDA will have information from other companies that exceeds what GSK has alone.

BY MR. CHAFFIN:

Q. Understood.

And, certainly, a good pharmacovigilance practice is to monitor competitor information in the marketplace about the drug, too; correct?

A. We monitor competitor information.

We also monitor other sources. So, we look at the WHO database and newsletter, and we also look in the FDA's database.

Q. Understood. Thank you.

A. And -- and incidentally, because I should be global in my context, we also look at the Vigilance database, which is the European safety database.

Q. Understood.

And GSK's responsible, as you've already said, for communicating certain information about the drugs to doctors, vendors, patients, and the FDA, among other regulatory bodies; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Yes, sir.

BY MR. CHAFFIN:

Q. And that information includes, for example, the indications of the drug, you know, what the drug is approved to treat; correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Yes, sir, that --

BY MR. CHAFFIN:

Q. The --

A. -- is correct.

Q. The benefits of the drug?

MR. SHEEHAN: Scope.

THE WITNESS: So, the prescribing information is a scientific and medical document that talks about the approved indication, the data that supports that indication, the safety profile and other things that I'm sure we are going to come to. So, it's not -- it's not a document to make claims around benefit. It is a document to state the scientific and medical facts.

BY MR. CHAFFIN:

Q. Scientific and medical facts about the potential benefits; correct?

A. About the clinical trial results and -- and what is being seen in the clinical studies, yes, sir.

Q. Understood.

And the same is true for potential risks of the drug, that there is a duty to disclose that information, too; correct?

MR. SHEEHAN: Scope.

THE WITNESS: So, the prescribing information is there to include safety information where we think there is a reasonable possibility that the medication is implicated.

BY MR. CHAFFIN:

Q. Got it.

And does GSK understand what -- that without accurate information about these three things -- the indications, the benefits, the potential risks -- patients cannot make informed decisions about whether to take the drugs?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I think that that is a correct statement.

So, you need to use the product appropriately, so what has been licensed. And in order to make a benefit and risk decision, you need to know the known risk associated with the product and the likelihood of benefit.

BY MR. CHAFFIN:

Q. Understood.

And we can agree that there are many ways in which a pharmaceutical company, like, GSK can provide information about the drugs that it sells; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: As a practitioner of pharmacovigilance, my core consideration is the prescribing information and -- and where appropriate risk management actions that -- that have been agreed, but, yes, there are -- there are publications that the company could put

out. There is -- there are -- there are detail aids that the -- the -- that the company may use, for instance. So, yes, there are other ways in which information can be shared, but my consideration is prescribing information.

BY MR. CHAFFIN:

Q. Okay. The label information; is that right?

A. Correct, yes.

Q. Okay. It can also be through dear doctor letters?

A. You can --

MR. SHEEHAN: Objection. Scope.

THE WITNESS: -- send dear doctor letters, yes.

BY MR. CHAFFIN:

Q. Okay. And another way to provide information is through direct-to-consumer advertising through TV, magazines or other advertising; correct?

MR. SHEEHAN: Scope.

THE WITNESS: So, you are asking me about commercial practices in the U.S., I believe. In Europe, direct-to-consumer advertising, as I understand it, is not permitted.

So, I'm not from the commercial organization, and I am really not able to offer too much by

way of -- of answer to your question.

BY MR. CHAFFIN:

Q. Understood.

And, certainly, as you just said, in Europe, it would not be permitted for GSK to provide direct-to-consumer information; correct?

MR. SHEEHAN: Scope.

THE WITNESS: That is my understanding, yes.

BY MR. CHAFFIN:

Q. In the form of TV, magazine or other advertising; correct?

MR. SHEEHAN: Scope.

THE WITNESS: The European approach is changing to an extent, and I am certainly seeing regularly on the British television companies talking about products in general, particularly related to male health --

BY MR. CHAFFIN:

Q. Okay.

A. -- but they are not talking about the specifics of the medicine.

Q. Understood.

So, during the time period before Zantac was withdrawn from the market, there would have been no direct to consumer advertising about Zantac and its

benefits or risk to consumers on TV, magazines or other advertising, correct, in Europe?

MR. SHEEHAN: Scope.

THE WITNESS: In Europe, no.

BY MR. CHAFFIN:

Q. Okay. But there could have been --

A. In the U.S., I can't -- I can't answer because I'm not in the commercial organization.

Q. Okay. And you also would agree with me that GSK, the company, could provide information to the public through medical articles published in medical literature; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: GSK could -- could publish articles as could other practitioners, academics, but information can be communicated through scientific ID peer-review articles, yes.

BY MR. CHAFFIN:

Q. Okay. And, certainly, in terms of salespeople, which are commonly referred to as detailers, they can also provide information to doctors and others about the company's drugs; is that right?

MR. SHEEHAN: Scope.

THE WITNESS: I was going to say this is questions about the -- the way the commercial organization

works, which I have never been in the commercial organization, certainly, never been in the U.S. commercial organization and really don't feel qualified to answer those questions.

BY MR. CHAFFIN:

Q. Understood. Thank you.

And in terms of educational activities, is that something the company can do in order to educate consumers and -- and doctors?

MR. SHEEHAN: Scope.

THE WITNESS: Educational activities are something the companies do, yes.

BY MR. CHAFFIN:

Q. Okay. Including seminars?

MR. SHEEHAN: Scope.

THE WITNESS: Again, I am not in the medical affairs or in the organization. I am in the pharmacovigilance group. So, the specifics of how they go about doing these things, I can't offer much insight.

BY MR. CHAFFIN:

Q. Understood.

And what about informational literature besides the product label, are you familiar with any of those that could be given to consumers for information?

MR. SHEEHAN: Scope.

THE WITNESS: So, that is beyond my area. I am -- I am not in the -- in the -- I am not in medical affairs, and I -- I don't work in the commercial sector.

BY MR. CHAFFIN:

Q. Understood.

You would agree with me that manufacturers are responsible for the contents of its labels at all times; is that correct?

MR. SHEEHAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: So, manufacturers submit information to regulators and the information in the label, is that approved by regulators?

I know we are going to talk about in the U.S. there could be some changes being affected legislation, but, in general, the company does its work. It forms a view. It submits it to regulators and the regulators either agree or, in some cases, choose not to agree.

BY MR. CHAFFIN:

Q. Understood.

A. So, the label is named -- is -- is in the company's name, but that is subject to having been approved by the regulators.

Q. And, certainly, it's up to the company to craft those labels in an adequate way; is that correct?

A. Sir, I don't think craft -- you may be using "craft" in a different context. I would refer back to what I said previously, which is it is a scientific and medical evaluation. So, I wouldn't -- personally, I wouldn't use the word "craft."

Q. Okay. Well, crafting, drafting, they would be responsible for drafting an adequate label, the company would be; correct?

A. So, the company is responsible for writing the draft label, yes --

Q. Okay.

A. -- and submitting it to the regulators for consideration with the evidence that supports what's written down in the draft label.

Q. Okay. And, certainly, the manufacturer's obligation to ensure that its warnings remain adequate as long as the drug is on the market; is that correct?

A. The labels should adequately describe the -- the warnings, yes.

Q. And that's the responsibility of the company; correct?

MR. SHEEHAN: Objection.

THE WITNESS: The company submits the information to the regulators. The regulators approve it, but it's the company's responsibility to submit that information. Although, regulators can, in -- in and of themselves, require companies to make additions to their prescribing information. So, it's not solely down to the company.

BY MR. CHAFFIN:

Q. Understood.

But, certainly, the company must update the label when they become aware of new safety information; correct?

A. When --

MR. SHEEHAN: Objection.

THE WITNESS: So, safety information, as -- as we've talked about before, is the finding that requires further evaluation. So, that's a signal, if you like.

The -- and after the evaluation, then where appropriate that information is included into the label, and -- and, usually, what's included into the label is something where we think we established a reasonable possibility of the link between the drug and -- and -- and the outcome, which I talked so much about earlier.

BY MR. CHAFFIN:

Q. Okay. And so you certainly would agree that labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug and a causal relationship need not have been definitely established.

You would agree with that?

A. So, the criteria that I use personally and have been taught to use is a reasonable possibility.

Q. Okay.

A. So, if I think there is a reasonable possibility that my medical caused this result, then I agree. That information should be submitted for inclusion in the labeling.

Q. So, labeling must be revised to include a warning about a clinically significant hazard as soon as there is a reasonable possibility of a causal association with the drug?

A. So --

MR. SHEEHAN: Objection.

THE WITNESS: I refer back to what I said before, reasonable possibility, and that's the purpose of having done the evaluation, to establish whether there

is reasonable possibility.

BY MR. CHAFFIN:

Q. Understood.

A. And that information is then submitted to regulators, who may agree or disagree with our conclusions.

Q. Understood.

And, certainly, cause and effect did not have to be established definitively in order to add a warning to a label; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Again, I refer back to what I said previously, reasonable possibility.

BY MR. CHAFFIN:

Q. Okay. All right. I want to shift gears now, if we could.

In terms of the structure of GSK for pharmacovigilance, could you describe for us how the products were organized, such as Zantac, and who would have been responsible for covering Zantac, at least, during the time that you were the head of the safety department?

A. I can go back to 1981, if you want.

Q. Why don't we start with the recent -- most recent --

A. I should say it will be -- it will be a long story, but I -- I -- I think -- I think the reason to go back to 1981 is just to draw to your attention, because I know you are talking about GSK in the context of best practice pharmacovigilance.

The people involved in '81 were world leaders. They established a state-of-the-art pharmacovigilance, which I joined in 2001, and I can talk to you about how it existed between 2001 and 2021, if that's what you want.

Q. So, if we could pause for a second. I'm certainly happy to go back, but in terms of 2018 and '19 --

A. Right.

Q. -- and '20, could you just help me understand the general structure?

I understand there is LOCs and then --

A. Okay.

Q. -- how does that work?

If you can help me understand that, and then we can work backwards or go to the bigger story, if we could, please.

A. Absolutely.

So -- so, the practice of safety is really all about the collection of information, often

individual case reports, maybe literature reports coming from anywhere really. That information is collected, put onto a safety database and then the output of the safety database is used to either report those cases to regulators as per regulations or, indeed, to generate signals and -- and do safety evaluations.

So, there are -- there is a case management function, which is the input. There is a safety database function, which is the systems, basically, and then there is a so-called SERM group, or a safety evaluation risk management group, who do -- who do the evaluations that I just talked about.

In GSK, we have groups in the UK and the U.S. and in Poland and in Bangalore in India, who function to do that safety evaluation and risk management. And historically, ranitidine had been looked after by colleagues in America, particularly, in the research triangle part. More recently, the safety evaluations were done by our safety colleagues in Poland.

Q. Who were the people in Poland?

A. So, there's a -- there's a group there with a head of safety there and a group of about 30 people consisting of physicians and scientists with expertise in safety evaluation.

Q. And not all of them would have been involved in Zantac; is that correct?
A. There have been maybe four or five who have been principally involved over -- over that 2018 to 2020 period. And the reason that there have been changes is there have been a couple of maternity leaves, and so the product accountability has -- has moved as a result of maternity leaves.
Q. And who are those four or five people?
A. So, there was a lady called Marta, and I can't remember the name; Marlgozota, again, I'm not entirely sure I can remember the surname. The most recent one whose involved with it is a lady called Agnieszka Robuska.
Q. Okay.
MR. SHEEHAN: I can see the court reporter shaking her head.
THE WITNESS: We'll -- we'll -- we'll sort it out when I review, and I will put the names in correctly.
BY MR. CHAFFIN:
Q. Any others besides those three?
A. There are others involved in the team, but -- but I have to say my -- my recollection of

all of the names, I get very confused by the names in -- in Poland. They -- they all begin with an M or an A, and I lose track of which one is which.

Q. Okay. And who in the U.S. was involved?

A. Historically --

Q. 2019, let's start there, '19 to '20.

A. It is gone to Poland by that stage.

Q. I see.

And anyone in the UK 2019 and 20?

A. Again, this was -- so we -- we -- the assets are looked after by the site, and so it was the Polish site that was looking after ranitidine, doing the day-to-day stuff. And then the management oversight came from the UK, and that is the lady you referred to earlier, which was Helen Steel, which was one of my management team.

Q. I see.

Okay. And in India, anybody involved there?

A. No. India looked after the generic products, so the nonGSK-originated products, and, obviously, ranitidine was GSK-originated. So, that was looked after by Poland, not India.

Q. Okay. Which generic products would

that be?

A. GSK has a whole series of -- of generic products from other companies. At one point, the -- the company acquired, like many pharmaceutical companies, lots of generic products, which it, you know, made part of its commercial business. And so we have, I don't know, 80, 100 different generic products.

Q. In terms of Zantac, was anybody in particular in India that was responsible for the generic Zantac ranitidine?

A. No. They -- we -- we don't do -- it doesn't divide up that way. So, if it's a GSK-originated product, it stays with the GSK-originated team, if you like. We -- we don't have -- we don't split it so that the genericized versions are looked after by India. That would be too confusing, I think.

Q. And before --

A. So, we look after safety. Essentially, it is an accent level. So, ranitidine in its entirety, whether it's genericized or not, is -- is looked after by the same people.

Q. Okay. So, it's looked after in the U.S. and then it switched over to be looked after in Poland; is that right? Did I understand that?

A. That's correct. That's correct, yes.

Q. And when it was looked after in the U.S., was it during the entire time before 2019 that it was looked after in the U.S.?
A. It would have -- when it was originally licensed, it would have been looked after in the UK and the U.S., but over time we consolidated to have single point accountability and at that point, the so-called "classic and established products" were looked after, in the case of Zantac, by the group in North Carolina.
Q. Okay. And do you know what time frame it was converted into the classic -- classic and established mantra in the U.S. versus the UK?
A. I think that the track went to Poland, actually, rather than to UK, but the -- or are you talking about beforehand?
Q. So, let's just back up.
So, as I understand your testimony in the 2019 and '20 time frame, it's in Poland. Before that, it was in the U.S. as a classic and established product and before that --
A. Yes.
Q. -- it was UK was responsible.
A. Well, it was UK/U.S. So, this -- this company has increasingly globalized. So, when I

joined the company in 2001, safety was shared jointly. So, the European data and rest of the world data, if you would like, was looked after in the UK. The U.S. data was looked after in the U.S., but there was a lead function for that, and the group that included gastrointestinal products was based in North Carolina.

Q. Okay. Do you have a general time frame of when the shift happened?

A. The -- when I joined in 2001, products were -- were split between sites. When -- but not -- not -- not globalized in the way I'm talking about. The globalization happened in 2004, '05 with -- with a reorganization.

Q. Okay. And after it was globalized in 2004, '05, help me understand what the U.S. was responsible for. I know you made some reference to terms like "management" and stuff, but help me understand what they were responsible for, for the drug.

A. So, the way we manage drug safety -- and -- and you asked me about the local operating company and so on and so forth. I realize I didn't answer that question. So, maybe now is my chance to -- to -- to talk about that because GSK has a central function of 400, 500 people who do medicine safety, and then we have a network of safety colleagues working

within GSK affiliates who are responsible for collecting safety information rising within their countries. That information is sent into the center. It's entered by the case management team onto the safety database, and then it's evaluated.

The evaluation is done by a scientist/physician pair or for big products maybe more than one scientist and more than one physician. The scientist/physician pair who did the evaluation were based in North Carolina.

Q. Okay. And who was that for Zantac over time?

A. The physician who is now retired from the company was a gentleman called Andrew Schindzielorz. Again, I will spell that for you in the -- in the -- in the transcript. And then there were a variety of scientists involved. You will have seen their names in various papers. Susan Ruane was one of them, I know.

Q. Any others you recall?

A. Well, there was a whole classic and established medicines team based in the U.S., but Susan is -- is -- is the name that I remember.

Q. Okay. And who would have been responsible for monitoring the medical literature?

A. Medical literature is a function of

the safety department insofar as it relates to safety information. So, we are not monitoring the medical literature for efficacy studies or anything like that, but in terms of the safety studies, the scientist and physician pair would do regular searches of Embase and Medline, which are the two standard sources of literature. The case management group would separately review the literature for individual cases. So, the safety evaluation groups were looking for signals. The case management group were looking for individual cases. So, they could actually look -- both look at the same article.

That review changed in about mid-2015'ish, and we started to get specialized review of the literature coinciding to a certain extent with the changing regulations in Europe and now, as of we speak today, the literature review is -- the primary literature review is done by the group in India and then articles of interest are sent to the SERM scientist and physician for their review. So, there is a triage that goes on in India as we speak today, but at the time frame we were talking about, it was the scientist and physician who did their own searches and their own reviews.

Q. And was there a protocol for them to

use for those reviews?

A. There is -- there is a SERM handbook that talks about the review of the literature. There is also a -- a handbook for case management, which will explain the process.

Q. Are those handbooks and case management SOPs, I assume, standard operating procedures, were they housed someplace?

A. So, standard operating procedures are stored on systems, you know, electronic systems, and the SOPs were archived to a database called PIER and the -- the copy that people could access would be on a system called CDMS.

Q. So, CDMS is the active version and PIER is the archived versions?

A. That's -- that's the way I would describe it, yes.

Q. Okay. Got it.

What was the reason the transition from the U.S. to Poland for Zantac?

A. From the U.S. to Poland was a -- a reorganization of the way that we conducted business and a -- and -- and a change in the portfolio.

You will be aware that GSK has taken a considerable interest in oncology products in the last

few years, and we needed to have -- and -- and most of that development is happening in the U.S. So, we needed resource that was available to support those products. The group in North Carolina was reduced in size because the resource for the oncology needed to be in Philadelphia and, therefore, because the group was reduced in size, the product moved to the group in Poland.

Q. Okay. Understood.

And in terms of Zantac leaving aside the LOCs during the time frame leading up to 2018, '19, the central safety responsibility was in the physician and the scientist assigned to the product in North Carolina; is that correct?

A. It -- it's always the responsibility of the scientist and physician, but prior to -- to whenever the transfer was, which is 2017, 2018, it was the group in North Carolina, yes.

Q. Okay. And -- and before them -- there was that globalization that happened. Before them there was sometime in '04, '05 time frame --

A. Yes.

Q. -- that would have looked a little bit different and -- and that would go back to maybe 1981, and I think you were going to start there at the

beginning of this.

If you could, actually take us back to that time frame now.

A. Okay. And -- and -- and, you know, it was part of my deposition notice to have some understanding of what happened in '81. I would just say I wasn't around in '81. I was alive, but I wasn't in employment of GSK. So my --

Q. I appreciate that.

A. -- my understanding is quite high level.

But in 1981 there was a safety department formed -- or renamed in the UK, which was called the adverse reactions unit. It was run by a chap called Myles Stephens.

In those days, pharmacovigilance is not what you see today. The regulations have changed. The volume of data has gone up quite considerably, and they had a safety database called CARES, and Myles Stephens was quite an opinion leader in his time. He published extensively, and he talked about benefit risk evaluation, and he talked about expert panels and so on and so forth, and his -- his textbook is -- is still available today in its sixth edition.

There was a counterpart group in the

U.S., and, remember, I think Glaxo really only established its presence in the '80s in -- in the U.S., so there was a group that was called the U.S. drug surveillance department in North Carolina at that time and the UK group and the U.S. group used to meet and discuss things, but it is my understanding that in those days, the -- the UK group looked after the safety data coming in from the U.S. -- coming in from Europe and the rest of the world and the U.S. group looked after the safety information coming in from the U.S.

Gradually, over time, those groups grew to form one global group and the first reference I know to a global head was probably in about 1996, when Glaxo Welcome was brought together.

Prior to that, Myles Stephens, who was the head of the group in Ware had handed over to a lady called Wynn Castle, who was also very senior and -- and a key -- key opinion in -- in drug safety globally, and she started in Europe and then moved to the U.S. to -- the separate group in the U.S., but you are, obviously, getting someone who knew the UK practice moving to the U.S. So, that helped with the -- with the harmonization, and then Glaxo Welcome became GSK and the global function was -- was truly established.

Prior to that, I think the

North American group was known as Napps and the UK, rest of the world group, was known as IPSP, International Product Surveillance and Pharmacovigilance, I think.

And there was an evolution from databases, which you might want to talk about. CARES we started with. We went to PRAY. We went to Tigers. We went to Oceans, and now we are at ARGUS, which is a commercially available Oracle product.

Q. So, I caught Tigers and Ocean, and then what is the last one?

A. ARGUS.

Q. ARGUS. Okay.

A. If you are -- if you are reading the documentation, and I am sure you are, ARGUS is the safety database itself. The suite of tools around it is known as Oasis. So, if you see Oasis, you have to think ARGUS, because they are, essentially, the same thing.

Q. Got it.

A. So, it was CARES. It was PRAY. It was Tigers. It was Oceans. It's ARGUS.

Q. And what type of safety data would be in those databases?

A. So, all spontaneous reports of marketed product reports and any serious events coming out of clinical trials, so the marketed products would

be serious, nonserious, and the serious clinical trials go in. And then at the end of the clinical trials phase, there is some reconciliation of the data but for purposes of ranitidine, which was approved in the early '80s, the vast majority of the safety data is that coming from spontaneous reporting.

Q. And you mentioned the change to globalization and the accommodation between domestic U.S. and the UK, I believe you said around the time that Glaxo Welcome became GSK.

A. The global -- yes. So -- so, late in the time of Glaxo Welcome, which was '99, 2000, there was reference to global leadership. But, to my knowledge, the first really true global head was appointed with the formation of GlaxoSmithKline, and that was a gentleman called Dean Hudson, who subsequently went on to become head of the Medicines and Healthcare Regulatory Agency in the UK.

Q. Okay. And just to clarify for a minute, as I understand, so Zantac, in 1981, when it came into the market -- and I understand you weren't there -- it was a blockbuster drug; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I think if you were using financial terms, yes, it would be called a blockbuster

product.

BY MR. CHAFFIN:

Q. Okay. It was, obviously, a fairly large success from GSK's standpoint from a business perspective; correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Yes, it was a very successful product.

BY MR. CHAFFIN:

Q. Okay. And when did it change over and become a classic and established product?

A. The way that -- so, the classic and established thinking is a GSK thinking as opposed to a GW thinking. So, the creation of classic and established was probably around -- I don't know -- 2010, 2012 something.

To begin with in GSK or, at least, after the initial sort of company had settled down, we were aligned by therapeutic areas. So, there was a therapeutic area, which looked after gastrointestinal products. That was headquartered in North Carolina, and we changed to early, late phase classic and established products, I would say, around about 2010, 2012.

Q. And during the time that the GI products were organized by area versus classic and

established, was there a difference in personnel who would have been over the safety in terms of the scientist and physician; or was it the same structure, there would the two people?

A. It would be the same two people, and, actually, the -- the group that looked after gastrointestinal products was based in North Carolina. So, when we moved from therapeutically aligned to this classic and established product, it was actually the same people that were carrying on doing the work. It was a change in the way the organization was set up.

Q. Okay. And in terms of the scientist and the physician, how many products would be assigned to them at a given time?

A. So, it depends. For a -- for a brand new product, it would be, perhaps, four or five scientists and maybe one or two physicians because there's a lot of information being collected from a newly marketed product.

With time, it isn't necessary to have that number of people and so for a classic and established product, you would have a scientist/physician pair, and they may be looking after a dozen or more products in total.

Q. Okay. Anything else in terms of

structure that we should talk about? Anything I've left out that you're -- you're ready to talk about today in terms of the structure and -- and organization?

A. I -- I realize that, you know, I have gone very quickly through, you know, 30, 40 years worth of changes. As long as it's clear to you, I -- I don't think there is anything else that -- that I wanted to add.

Q. Okay. Is there anything else in terms of, like -- and maybe this is outside your area, but I know you were in clinical as well.

In terms of clinical, is there like a phase that's clear? Like, it's in clinical. Now the drug is outside of clinical, and when does that shift happen in terms of GSK?

MR. SHEEHAN: Objection. Scope.

BY MR. CHAFFIN:

Q. I'm sorry for the -- I'm not a -- this isn't my area. So, I just -- I'm trying to understand, if you could explain.

MR. SHEEHAN: Same objection.

THE WITNESS: Yeah. I think -- I think there's, essentially, a transition. So, if it's a single product with a single indication, once the drug is approved, then the clinical research guys will hand over to

the medical affairs team, still physicians and scientists, but responsible for preapproval versus postapproval.

If the product has a second indication, a new clinical team will take the second indication through and maybe you will get a new medical affairs team or maybe the same medical affairs team will pick it up once it's approved, but, essentially, clinical research does preapproval. Medical affairs does postapproval.

However, just to be clear, this is not sort of a complete hand off because they both sit on the project team. So, the accountability transitions from one to the other, but it is with knowledge having been acquired by the people who are -- who are going to take the product, the medical affairs team.

BY MR. CHAFFIN:

Q. And is the medical affairs team that science and doctor, or is that somebody else?

A. So, pharmacovigilance is -- is a mixture of scientists and medics, and we assign a pair to each product. Medical affairs is scientists and physicians, more of them than in PV, perhaps, at least to begin with, not later on but when a product is brand new, and there may be two or three scientists. But then for pharmacovigilance, I said to you as well there were two or three scientists, so maybe -- maybe not such

quite a difference as -- as I was implying there.

Q. And when would the medical affairs people come -- become involved in an issue? Or would they stay -- just help me understand, are they -- are they staying actively involved? Or like a classic and established product, they are just -- they are really not involved unless something comes up?

A. So, during early postapproval, they are actively involved because we have something called safety review teams or safety matrix teams led by safety and with membership from clinical research and medical affairs reviewing the safety profile through development and -- and in the early postapproval phase. So, they are very much part of a dedicated team.

As we move to classic and established products, you are right. The primary responsibility now lies with the safety scientists, safety physician, and the medical affairs person is called upon as needed or, indeed, may call upon the -- the -- the physician/scientist as needed, but there isn't a formal safety review team. That would probably start between five and ten years postapproval.

Q. Okay.

A. It's -- you know, it's a function of the way the products are managed and -- and -- and

the -- the -- the volume of information that is -- is looked at.

Q. Got it.

Anything else to add there?

A. Not unless you have other questions.

Q. Okay. Would you tell members of the jury what is pharmacovigilance?

A. There are many different definitions of pharmacovigilance, and there are WHO-accepted definitions. The one that I think is probably best for the jury and the one that I use when people say what do you do for a job is I just talk about pharmacovigilance as the science dedicated to the monitoring of the side effects or potential side effects of medicines.

Strictly speaking, pharmacovigilance, as I'm sure you are aware, is -- is -- is derived from the Latin and Greek; "pharma" being medicine and "vigilance" being watchful, so being watchful over medicines.

Q. Okay. And so, certainly, you would entail from your perspective all scientific and data-gathering activities related to the detection, assessment, understanding of adverse events?

A. Yes, sir.

Q. And that would include the use of pharmacoepidemiologic studies?

A. It would include pharmacoepidemiologic studies. We do have a separate epidemiology department that we work closely with. So, epidemiology is not part of pharmacovigilance in GSK. I know it is in some companies, but it isn't in GSK, but pharmacoepidemiology to contextualize findings is absolutely critical, particularly for -- for products that have been available for -- for sometime. So, published studies, epidemiological studies, literature is really important to the work we do.

Q. And who, if anyone, from the epidemiologic department at GSK was involved from 2019 onwards with the Zantac product?

A. So, the primary lady responsible, and a very good epidemiologist, is a lady called Marianne Cummington, C-u-, double M, -i-n-g-t-o-n.

Q. Okay. Anybody else?

A. She reported in to head of epidemiology by the name of Rob Reynolds, and I know that they discussed the work that they were doing, but Marianne was the primary person, and she sat on the safety review team as part of the ongoing discussions or, at least, the medical team that was reviewing the documentation.

Q. And other protocols at GSK, if

something came out in the medical literature, such as like Zeng and Mitch, would that be something that would need to be reviewed with someone like Mary or Rob?

A. Marianne.

Q. Marianne, I apologize.

A. M-a-r-i-a-, double N, -e.

Q. Got you.

MR. SHEEHAN: Let me just get an objection.

Objection.

Go ahead.

THE WITNESS: Oh. So, yes, I know that there was extensive discussion. And you referred back to previous depositions, and I have been asked the question before, and the epidemiology folks were really important as part of the ongoing evaluation, so working with them is part of regular practice.

BY MR. CHAFFIN:

Q. And you would agree that pharmacovigilance guidance focuses on both premarketing and postmarketing risk management respectively?

MR. SHEEHAN: Objection.

THE WITNESS: There is some debate, and it's purely a terminology debate. So, some people refer to preapproval as clinical safety and postapproval as

pharmacovigilance. I personally think those terms are synonymous, and I prefer to pharmacovigilance to cover both the pre and the post, but if you talk to someone else in the field, they may decide that they want to do it slightly differently. But for your purposes and my purposes, PV is the lot.

BY MR. CHAFFIN:

Q. Okay. And, certainly -- as I understand from your testimony before, certainly, your work in PV, you would want to take into consideration both the -- the pre and the post; correct?

A. Correct. Correct. It's -- it's a continuum in my view.

Q. Okay. And, certainly, part of pharmacovigilance is risk assessment plus risk minimization, which really results in risk management; is that fair?

A. Risk minimization is a tool for risk management, but, yes, I -- I -- I -- I agree with you that -- so, the purpose of the group that we have that was looking after the products was -- their function is so-called SERM, safety evaluation and risk management. So, they do the evaluations. If they find something as a result of doing the evaluations and we establish a reasonable possibility of an association, then we

consider appropriate risk management and risk minimization.

The cornerstone of risk management is, obviously, the product labeling. That's the way -- the primary way of communicating the -- the appropriate use of the medicine.

For some products, there may be additional risk management or, indeed, risk minimization activities. So, for example, if you've got a drug that causes birth defects and you know it causes birth defects, a risk minimization measure might be a negative pregnancy test before you take it.

Q. Okay. And, certainly, one of the risk minimizations could be recalling the product or taking it off the market; correct?

A. So, you could decide that it is no longer appropriate to continue to market the product and the decision could be made to recall the product. That decision would be made by the company's chief medical officer.

That wasn't the case, obviously, for ranitidine where the decision was based on a business consideration.

Q. The CMO did make a decision, though, no?

A. The CMO endorsed the decision.
Q. Okay. And the decision was made by what committee, you said?
A. So -- so, the original discussion was had at the portfolio optimization board. The -- the considerations about the medical use were endorsed by the global safety board, i.e., a decision about whether alternative medicines were available, and then the final decision was taken by a subteam of the corporate executive team, including the CMO and the head of manufacturing.
And once that decision was made, then the global recall board, of which I was part, endorsed the decision to go ahead and recall.
Q. And you were intimately involved in each of these steps?
A. I wasn't sitting on a board level committee, that I wasn't senior enough in the organization for that, but I -- and I wasn't -- I didn't sit on the portfolio optimization board, but I am aware of the discussions, and I was certainly part of the global safety board.
Q. Okay. Were you present during each of these meetings?
A. Well, I wasn't present at the board

meeting, because I wasn't -- I wasn't senior enough in the organization for that. I wasn't sitting on the portfolio optimization board, but the global safety board discussion was done in writing between myself and the then chair of the global safety board, Jens Stegmann, and there is documentation to that effect, I know.

Q. You have to forgive me. I'm a little slow. I just want to make sure I'm catching all of this, so...

A. Yeah.

Q. First, there was a discussion at the portfolio optimization board; correct?

A. Correct.

Q. Then it moved on to the medical safety board?

A. So -- yes. So, it went from POB to GSB, and then the recommend -- so -- so, the role of global safety board in that context, assuming that it's a business decision to withdraw, is to make sure that the product wasn't medically critical, i.e., there is no other treatment available. So, patient consideration is a primary consideration.

So, question was: Are there alternative appropriate treatments available? The answer being yes.

So, then it went to the board subteam, and I don't think there was a name for that. I think it was just the group, and they endorsed the decision knowing what the recommendation from POB had been and that there were no objections from GSB. And then with that endorsement, then global recall board issued the recall decision.

Q. In terms of -- so, as I have it -- I'm just trying to write it down. So, there is the POB that went to the GSB, which I think you first called medical safety board. You are saying it's global safety board, as I understand it.

A. It's the same thing, yes.

Q. Got you.

A. Yes.

Q. Then there was a final decision by executives at some point, but before that happened, there was a subgroup of the global safety board, which signed off on it?

A. So --

MR. SHEEHAN: Objection.

THE WITNESS: -- it never went to global safety board as a constituted committee.

It was handled as a so-called out-of-committee chairman's action, and what I did was I -- I described the situation. I made a recommendation to the

chair. The chair has every right to say, "I want to full" -- "bring together a full board discussion," but they were comfortable that this was a -- a straightforward decision because alternative treatments were available. So, there was written documentation to say they had no objection, and then it went to the executive team for a final decision.

BY MR. CHAFFIN:

Q. Got you.

Who sits on the portfolio optimization board?

A. It's, essentially, run by medical affairs and commercial for classic and established products. So, GSK has new products coming under development all the time. It has existing products that have been genericized, and it's focus will change to the newer products. And so the portfolio optimization board, as in the title, is really looking at the very old products in GSK and making a decision about whether the company still wants to commercialize those products or whether there are sufficient alternatives available that we decide to withdraw from -- from a particular product.

But the really important point is that the global safety board's reading in all of this is to

make sure that the medical decision is that that is also an appropriate thing to do. So, it's not just a business decision.

Q. Who was involved from the POB for a decision to recall Zantac?

A. They didn't make the decision to recall Zantac. They made the decision to discontinue the product.

Q. Understood.

A. The recall was handled by the global recall board.

Q. Okay. So, who made the decision to stop selling the product?

A. The portfolio optimization board.

Q. And who made that decision on the board? Who would have been involved by name?

A. I would have to go back and look at the board constitution, because there have been changes in personnel over time, and I'm not sure exactly who was there at the time. The group is headquartered in Singapore, and I'd -- I'd have to go back and check the names, but we could pull the minutes from the POB if you need to see them. If you have -- may have already seen them. I don't know.

Q. Okay. So, the POB minutes should

cover this issue; correct?
A. They will cover the representation. That will document the decision, yes.
Q. Okay. Then there is the GSB, the global safety board, and who is involved in that board?
A. So, I can tell you exactly who is involved, but the two people that were involved in the decision were myself making the recommendation and Jens Stegmann, who replaced me as head of safety and replaced me as the chair of global safety board.
Q. Okay.
A. The global safety board itself consists of 15 to 20 senior physicians and scientists from within the company to advise on safety issues.
Q. Okay. And so the two of you made the decision without consulting the entire board or was there some consultation of the entire board?
A. No. I made a recommendation. Jen endorsed the recommendation. Some members of the global safety board had been involved in putting the recommendation together because Helen Steel, for instance, and I had been involved, and she sat on the global safety board, regulatory colleagues as well. So, there was no need for it to go to the global safety board.

Q. Anybody else besides Helen Steel that was involved --
A. Well --
Q. -- or part of the decision?
A. Helen Fitton, who was head of regulatory, was involved in considerations.
Q. Anybody else?
A. I think those are the principal players involved in that part of the discussion. Of course, Sabina Lewik, the chief medical officer, was -- was intimately involved in reviewing the recommendations and making the final decision.
Q. Okay. And then you said it went to the executive board from there, and who would have been involved there in the executive board?
A. Well, that's Sabina Lewik, as I -- as I mentioned.
Q. Anybody else?
A. And then there were -- there were three or four other people. So, the head of manufacturing was, I think, nominally the chair, and he was Regis Simard, sits on the corporate executive team, and there would have been one or two other members, but, in truth, the CMO was there, the head of manufacturing was there. Those were the two names that I -- I focused

on.

Q. Okay. Were you present for those meetings?

A. No.

Q. And, so, are there minutes to these meetings?

A. I'm sure there will be electronic communication to say that the corporate team had agreed and endorsed the recommendation.

Q. Do you know if there was a meeting or you just know there was an endorsement?

A. I -- well, the group used -- I mean, clearly, they weren't meeting face-to-face because this was at the time of -- of -- in and around COVID.

Q. Okay.

A. But they were meeting by teleconference or video conference, as I understand it. I was never a participant in any of these meetings, but as I understand it, they would have had discussions.

Q. Okay. So, Sabina Lewik or Regis Simard who would have to talk to to find out what happened during those meetings; is that right?

A. I think that's -- they would be appropriate people to ask the question, yes.

Q. Okay. And who else is on the

executive board, to your knowledge, besides those two?
A. Of the company?
Q. Who would have been involved in this decision to --
A. Oh. In this -- in this decision, well, I think -- I think Regis would have brought to the corporate executive team chaired by the CEO, Emma Walmsley, the decision. That's my understanding that he was -- if you would like, this was a subgroup of the corporate executive team that Regis chaired, and the conclusions were reported back to the full corporate executive team, of which there are 15 or 20 people, and those names are all available on the GSK website because you can look up CET members.
Q. Okay. And you said earlier, maybe I misunderstood, there was a withdrawal, but then they made the decision to recall the product; is that correct?
A. No. The decision -- we -- I think we were talking bout the regulators at that point, weren't we, and we were talking bout the European Medicines Agency and the FDA.
GS -- GSK decided to recall the product prior to the regulatory requirements.
So, we recalled the product, and then

the decision was made not to reintroduce the product to the market, and that was, essentially, to close down the license -- any licenses that were in existence in any countries.

Q. Okay. And the recall and the decision to not re-enter the market are two different decisions; is that correct?

A. So, the recall decision was made in the light of emerging questions and the fact that, actually, in the U.S. we weren't -- we weren't marketing the product at all, although we still had licenses. In other parts of the world, we were marketing the product and until we properly understood the issue, we thought the appropriate thing to do was to recall.

Once we felt that we understood the issue and it was clear what the regulators would require us to do to reintroduce the product into the market, the decision was taken not to do so and, essentially, to terminate the licensing in all markets.

Q. Okay. And as I understand what you just testified to, the first decision about the recall was made by GSK, that was actually based upon new safety information and a risk benefit analysis and the risk was too great and the benefit was minimal in light of the questions at that time, and so you wanted time to

research the issue, and so you recalled the product until that happened; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: No, I don't think that's correct, sir.

You said the benefit was minimal. There was significant risk. I testified, and I will continue to testify that the benefit risk is unchanged.

What I would say was there was uncertainty. This was not a major product for GSK because it was a 40-year-old product and GSK felt that the prudent thing to do at the time was to recall the product and do the evaluation. So, we had -- we had no reason to believe the benefit and risk had changed, but we didn't know. So --

BY MR. CHAFFIN:

Q. But a --

A. -- we recalled the product.

Q. But a recall decision is actually a risk benefit analysis; correct?

MR. SHEEHAN: Objection.

THE WITNESS: In this case, the recall decision. So, recall decisions can be based -- based on a whole variety of things. They can be the fact that the labeling is incorrect.

Now, you could say, well, that's a benefit risk consideration. They could be in relation to new product becoming available, and -- and old product being withdrawn. We withdrew, for instance, the diluent, the flow line, where we introduced a new diluent. So, there are different reasons, but there was -- I accept that there was uncertainty at that time and the company felt the prudent thing to do was to recall the product until we fully understood the issue.

BY MR. CHAFFIN:

Q. And that recall was a risk management decision; correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, I refer you back to the answer I have just given you. There are many different reasons why you may consider a recall. In this case, the reason was there was uncertainty, but we hadn't evidenced that the benefit risk had changed at that time, and we still don't think -- and we still don't think the benefit risk has changed.

BY MR. CHAFFIN:

Q. I just want to be clear, and I'm not splitting hairs, but I think it's an important distinction, and I think you're making the distinction, but I'm not trying to trick you. I am just being

honest.

So, my understanding is, is at the time of the recall, there was a decision made by GSK that looking at the risk management perspective, the assessment was there are unknowns based upon the NDMA issue that we want to research and run to ground and at that time, the decision was made to recall the product until those were done; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, I think that's fair, sir. You used the word "unknowns." There were unknowns. We needed to research them, as you said, and until we had done that research and formed an opinion, the decision was taken, as you said, to recall.

BY MR. CHAFFIN:

Q. Okay. And then there was a second decision later that in light of the EMA response to ranitidine, what they were doing, the minimal amount that's being sold worldwide as well as the -- you know, and then having known the risk assessment at that point, and you made clear that your opinion is, is there really wasn't a risk, despite there not being a risk, you made the decision that you are not going to go back to market with this product?

A. So, that was a business decision,

yes, that's right. The -- the requirements of the regulators in terms of changes to manufacturing process were of a nature that GSK considered that it was not -- not appropriate to implement those, and, therefore, obviously the only option available to it was to discontinue the product.

Q. Understood.

The changes in manufacturing, those were around the concern about NDMA coming out of the product; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: They were to control for the NDMA content to look at longer-term stability data to see the trends over time, which would have required considerable time, if you like, to -- to do the stability testing and -- and similar matters. So, yes, they were. There were chemistry and manufacturing controls, additional chemistry and manufacturing controls that were -- were required in order to reintroduce the product.

BY MR. CHAFFIN:

Q. And the decision made by GSK, as I understand what you're saying, is the cost of doing those controls outweigh the benefits to the company because the sales weren't that great for the product?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I think it was a business decision. To introduce the additional manufacturing and controls was a significant undertaking, and you phrased it in terms of finance. I think also I would phrase it in terms of resource because there's a lot of human endeavor required to change manufacturing processes, and the company's decision was, despite the fact the benefit and risk is unchanged, it is not appropriate and resource was more appropriately dedicated, perhaps, to one of the newer oncology medicines, for instance, or whatever. So, not a benefit and risk decision, a business prioritization decision.

BY MR. CHAFFIN:

Q. Understood.

But the business prioritization, of course, is a finance decision which we can explore with the executives, but my understanding from what you've testified to is this new process for manufacturing and monitoring that's required by the regulators around the NDMA issue was a significant cost and resource issue, and the benefits to the company from the sale of the product was simply outweighed because of the resources and costs of doing this additional work in light of the NDMA issue.

Is that a fair statement?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Well, I was going to say you are asking me to make a business decision that is --

BY MR. CHAFFIN:

Q. I'm not --

A. -- at the end of the day, the responsibility of the CEO.

I am the pharmacovigilance guy. I am the safety guy. I'm here to talk about drug safety.

Q. Understood.

A. But -- but -- but understanding all of that, it was a business decision. It was based upon the -- the product, the resource that would be required to conform to European regulations and whether that was an appropriate use of company resources.

Q. Understood.

And so from my understanding from your perspective, Dr. Hobbiger is saying, "Hey, guys, if we're going to continue to manufacture this product, I and others in safety are telling you this is what the regulators say we have to do, and this is the resources manufacturing is telling us we are going to have to devote in order to do that.

And in light of that, there was a business decision by the board, including the CEO of the

company, that said, "You know what? In light of that, the benefit really to the company is outweighed by the cost and finances of doing this in order to ensure that the product is safe from a regulatory standpoint and what they are putting on us."

Is that a fair statement?

A. I would love to think --

MR. SHEEHAN: Hold on one second. Just let me get my objection in.

Objection. Scope. Mischaracterizes testimony.

THE WITNESS: I -- I would love to think I had that much role in the overall decision-making. My role is in pharmacovigilance, in medicine safety. My role was to evaluate the benefit and risk of the product in light of the safety findings. The requirements of the regulators in terms of quality of manufacture are outside my realm of influence and how those integrated with the benefit and risk decision and the whole product portfolio and everything else is not a decision that was in my hands. I contributed my component, which was the benefit and risk assessment.

BY MR. CHAFFIN:

Q. Understood.

My understanding, though, is you do have

an understanding of what the regulatory body was requiring in -- in terms of continuing to sell this product and when you looked at it, it was quite significant; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, you can, and I am sure you have, read the EMA documentation, and they stipulated requirements for the reintroduction of the product. And while I'm not in manufacturing, I'm not in chemistry, I'm not in pharmaceutical development, it is my understanding and, certainly, what people who were more expert than me say, that these requirements were a significant undertaking.

BY MR. CHAFFIN:

Q. And so these significant undertakings are ones that once the board and the company saw like this is what we are going to have to do, the answer is we are not going to sell this product anymore?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: The company made a business decision based upon a variety of factors to say that it would -- that it would choose to withdraw the product, and it wrote and notified all regulatory authorities to that effect, and we have withdrawn products in the past --

BY MR. CHAFFIN:

Q. Understood.

A. -- for various reasons.

It is part of routine business --

Q. And, sir --

A. -- practice.

Q. -- I think you answered already, but you would agree with me that EMA was setting forth these guidelines because the EMA took the position that that's what was necessary in order to make the product safe; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the EMA concluded, as had GSK, that there was no evidence of a cancer risk and that there was no change in benefit risk. I don't have the words in front of me, but we can find them and quote them to you.

So, the EMA made a decision that there was a product quality issue and the product quality -- and I would agree the product quality issue needed to be rectified. They placed certain stipulations on all companies as to what was necessary to correct the product quality issue. GSK, in light of that and other factors, made a business decision to discontinue the product.

BY MR. CHAFFIN:

Q. And, certainly, from the EMA perspective, in terms of quality issues, it wasn't just the quality. It was also the monitoring required afterwards; isn't that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Monitoring required afterwards, can you explain a little more what you were thinking there?

BY MR. CHAFFIN:

Q. You had testified earlier that EMA not only was requiring the difference in terms of manufacturing, but different ways to monitor the quality of the product to ensure certain issues.

Did I misunderstand your testimony?

A. I talked about stability testing, which is part of manufacturing and controls. So, there was -- there was control about drug substance. Then there was a control about drug product and stability data for drug product out to a -- agreed shelf life period of time. So, there were several requirements about what would go into the product and how you monitored the chemistry of the product over time.

Q. And all of these concerns and issues raised by the EMA and what it said was going to be required going forward was emanating from the NDMA being

in the product; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: The Article 31 referral was triggered by the finding of NDMA in the product and the decisions as a result were a consequence of all the companies -- the information the companies had all submitted, but, yes, it was triggered by -- the initial -- initial Article 31 was triggered by NDMA.

BY MR. CHAFFIN:

Q. And, certainly, the actions taken from that Article 31 was triggered by the NDMA and also for the purpose of trying to minimize the risk to the NDMA in the product; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: The evaluation that we were asked to do was to look at the safety findings, the safety outcomes. NDMA had been found in the product. It was a quality issue that -- that EMA required certain controls to be put in place. They formed the view that the patient safety data that we provided to them had not revealed any evidence of increased risk, but overall in the context of other medicines being available, they took the decision that they took and GSK chose to discontinue the product.

BY MR. CHAFFIN:

Q. And the controls that they were recommending were for the goal of minimizing the risk of the NDMA; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: In the product. They didn't talk anything about human -- the -- the pharmacovigilance practices that I was engaged in, but it was all about the manufacturing.

BY MR. CHAFFIN:

Q. And -- and in light of the minimization controls that the regulators were recommending, GSK made a business decision that the -- that it would no longer sell the product; is that correct?

A. I think GSK made a decision based upon a variety of factors of which that was certainly a major part, but I can't tell you, because I didn't sit on that executive team, what decisions were had and how the -- how the conclusion was reached, but, certainly, the requirements of European Medicines Agency were material to the discussion.

Q. Understood.

And to get out the decision and the reasons for that decision is something we would need to talk to the CEO as well as the other two individuals and

people on the board that you spoke of; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I think, as I say, talking to Regis or to Sabina would be the place to go for the discussion, because the CEO was not sat at that -- that -- that executive team discussion, although, the decision would undoubtedly had been brought to the corporate executive team, which is shared by the CEO.

BY MR. CHAFFIN:

Q. Okay. And, certainly, the -- and you don't know, but, certainly, the CEO and others who ultimately make the decision, they decide, not these other two people; correct?

MR. SHEEHAN: Objection. Calls for speculation.

BY MR. CHAFFIN:

Q. They make a recommendation, but as you said, the CEO makes the top decision, according to what you just testified to.

MR. SHEEHAN: Same objection.

THE WITNESS: So, my understanding of company governance, and I'm sure if I asked Emma Walmsley, she would say, "I have a 100,000 people working for me, but, at the end of the day, I personally take responsibility for the running of this company," just as

I'm sure you do in your own law firm, so...

BY MR. CHAFFIN:

Q. Understood.

MR. CHAFFIN: All right. Let's take a break, if that's convenient for everybody.

MR. SHEEHAN: Do you want to just do lunch? I mean that's -- it's early where you are. It is a quarter after 1:00 where we are.

MR. CHAFFIN: That's fine. If you want to do maybe -- does a half an hour give you enough time? I don't know if you guys are stepping out or not.

MR. SHEEHAN: I -- I -- do you want to -- we've got to -- all right. Yeah. Why don't we -- I think a half our is good. We can keep this thing moving.

MR. CHAFFIN: If you want to -- if you want to go longer, let me know. I only need a half hour.

MR. SHEEHAN: Yeah. I will shoot you -- I will shoot you an email or I will come back in here and talk to people or whatever, but let's plan on half hour.

MR. CHAFFIN: All right. Sounds good. So, that will be --

MR. SHEEHAN: It's -- it's -- it's 20 after 1:00. Why -- why don't we just call it 40 minutes. Why don't we say 2 o'clock here, whatever time that is where you are.

MR. CHAFFIN: Sounds good. Thank you.
MR. SHEEHAN: Okay.
THE VIDEOGRAPHER: Going off the record. The time is 1218UTC.
(Off the record.)
THE VIDEOGRAPHER: Standby.
We are back on the record. The time is 1303UTC.
Please proceed.
BY MR. CHAFFIN:
Q. Dr. Hobbiger, you understand you are still under oath?
A. Yes, I do.
Q. Okay. And have you -- have you had any substantive conversations about the case since we were last on the record?
A. No, I haven't. I had a banana for lunch, and we talked about families and my poor prowess in spring triathlons.
Q. Your poor what?
A. Prowess.
Q. Prowess.
A. Not very good.
Q. You are a triathlete?
A. Well, now and again. I am more of a

cyclist than a runner.

Q. Oh, good. Same here. I cycle a lot myself.

A. Yes. No. I -- I have seen your prowess. I think yours is much greater than mine.

Q. That's -- it is all in the name of health, which is a good thing, so...

A. Absolutely.

Q. Yeah.

So, I meant to ask you earlier and I didn't.

Had you reviewed any testimony from any other witnesses in the Zantac litigation?

A. I haven't seen any, and I haven't reviewed any, no.

Q. Understood. Thank you.

In terms of -- I apologize. I lost my notes here.

I wanted to pick off where we left -- pick up where we left off, I should say.

We were talking about risk management before we got diverted, and would you agree that risk management entails a number of things, including assessing a product's risk benefit balance, which we talked about already?

A. So, to me, risk management is about an understanding of the risk benefit balance and then acting as appropriate, which, as I say, might be just in terms of ensuring that the product labeling is -- is -- is correct or may be, in the context of medicines, additional activities, but, yes, benefit risk evaluation leads to, as appropriate, risk management.

Q. Okay. And some of that risk management would be developing, implementing tools to minimize the risk that's identified while preserving its benefits?

A. It may be appropriate to develop tools. They may not be tools that are developable.

Q. Okay.

A. But, yes, if you can, you will -- you will do what you can, obviously.

Q. And -- and, certainly, also evaluating tools effectiveness and reassessing the risk benefit analysis in light of new information for the tools; is that correct?

A. I would agree with that, sir.

Q. Okay. And making adjustments as appropriate to the risk minimization tools to further improve the benefit risk balance, would you agree with that?

A. Yes. Yes, I would.
Q. Okay. And that's something that -- that starts at the beginning of a product's lifestyle but, certainly, continues throughout the product's lifestyle as well; is that correct?
MR. SHEEHAN: Did you say "lifestyle"?
THE WITNESS: Like cycle, I think, rather than lifestyle, but, yes.
BY MR. CHAFFIN:
Q. I apologize. Yes, absolutely. Let me resay that.
So, that would start and, certainly, continue throughout the product's life cycle; is that correct?
A. It would, yes.
Q. Thank you.
And so PV really, in effect, means keeping an eye on the drug; right?
A. Correct.
Q. You want to be proactive.
You agree with that?
MR. SHEEHAN: Objection.
THE WITNESS: I fundamentally agree with the concept of proactivity. Yes. I want to try and evaluate in real time and respond appropriately.

BY MR. CHAFFIN:

Q. Okay. And, certainly, in the context of PV we're talking about specifically; right?

A. In the context of PV, yes.

Q. Okay. And, certainly, to identify any problems as early as possible is important as well; correct?

A. I agree.

MR. SHEEHAN: Objection.

BY MR. CHAFFIN:

Q. And, certainly, how -- understand how often the problem happens is important as well; correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the -- the -- what I'm looking for is -- is changes in frequency, changes in findings, changing in patents and if I see multiple instances of the same thing, yes, that would -- that would alert me to -- to take a closer look at something --

BY MR. CHAFFIN:

Q. Okay.

A. -- if, in fact, that's what you're talking about.

BY MR. CHAFFIN:

Q. Yes. Thank you.

And, certainly, you agree that PV

involves identification, evaluation of safety signals, obviously, which we have gone over already; correct?

A. Correct.

Q. Okay. And strictly to find safety signals refer to a concern about an excess of adverse events compared to what would be expected to be associated with a product's usage; is that correct?

A. That is one of the sources of signals, yes.

Q. Okay. And what are some other sources of signals?

A. We talked about it earlier. You see something added to a competitor's label, and that may trigger your interest. You may get a question from a regulator that might trigger your interest. You -- you -- you -- you may see -- you may have an unusual preclinical finding, for instance. So, there -- there are multiple sources of signals, but effectively they are all as you said, a safety finding that is worthy of further evaluation.

Q. Understood.

And so, certainly, review of studies of all types could be important; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: All studies fall into the

scope of the evaluation, yes.

BY MR. CHAFFIN:

Q. And what is going on with other drugs in the same class is important as well; correct?

A. An appreciation of the competitor drugs, particularly those with the same mechanism of action, yes, is important.

Q. Okay. And, certainly, as we talked, the adverse events to the company or in the literature; correct?

A. Adverse events reported to the company, adverse events seen in the literature are an important source of information, yes.

Q. And, of course, clinical trials, which we talked about already; correct?

A. Correct.

Q. Okay. And you certainly would agree that not all risks are identified in clinical trials conducted before a drug is marketed; is that correct?

A. I agree with that statement, sir.

Q. Okay. And this can be as a result of a number of things; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: A -- I -- I'm sure we -- there -- there are a variety of -- of reasons why you might

not see something in the clinical trial setting. Clinical trials, by definition, are smaller and, therefore, it's really important to continue to monitor medicines after approval, which is what we said, pharmacovigilance.

BY MR. CHAFFIN:

Q. So, they can come about because of advances in science or understandings of science; is that correct?

A. I think that what we're focused on is looking at the experience of a medicine in patients used in a real world setting and -- and looking at that information and monitoring adverse events and so on and so forth. So, changes in science may lead you to look at outcomes and to think hard about whether there is anything in the data, but changes in science, per se, are only a -- a reason to take a closer look.

Q. And, certainly, changes in how a product is used from when it was initially anticipated could also raise concern or cause a signal to look at; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: They could cause a signal to look at, yes.

BY MR. CHAFFIN:

Q. And, certainly, use of the product in

different populations; correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, we are particularly interested in looking at the way the product is used in the young and the elderly, the way it might be used in -- in pregnancy, and, also, to an extent, we are looking at racial differences as -- as we can, yes, as we have the data.

BY MR. CHAFFIN:

Q. And, also, use of the product for longer periods of time could also cause a signal; isn't that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Use of the product for longer periods of time could generate a signal, yes.

BY MR. CHAFFIN:

Q. Okay. And if your company identifies a signal, it is supposed to investigate that signal; is that correct?

A. That is a fundamental part of the practice of pharmacovigilance, yes.

Q. And it should also take action to communicate its findings to doctors, vendors, patients, the FDA and other regulators; is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: It depends on what the finding is. So, if the signal evaluation is -- reveals nothing new, no -- no new safety information, so the signal is refuted, then that is not a reason for communication of that information.

We look at signals all the time. We are looking at, you know, hundreds of signals in a year or so. Not all of them will turn out to be a valid find.

BY MR. CHAFFIN:

Q. Okay. And we talked a minute ago about the importance of being proactive. It's important to be proactive in both the identifying of the safety signal and then, of course, taking action to get that information out to doctors, if there is something of concern; correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, it is important to be proactive in identifying safety information. The communication to doctors, whether it's immediate or over a period of time, will depend upon the issue. So, the severity of the issue and -- and, also, to be honest, the communication also is dependent upon a regulator's view on that information. So, if you see something and you think it's a true finding and you talk to the regulators about it, they will also express a view on that, and the

communication subsequently is after being informed by regulators in -- in the usual way of things.

BY MR. CHAFFIN:

Q. Well, and -- certainly, the regulators, in the sense of changing the label, that may be a concern, but in terms of publishing medical literature, you can certainly be proactive and publish medical literature without approval of regulators; correct?

A. Correct, and that's GSK's practice too, to publish, yes.

Q. Okay. And what is a product incident review committee?

A. A PIRC, P-I-R-C, the abbreviation is P-I-R-C. So, it is a committee that is chair -- and we run, maybe, I don't know, 3- or 400 of these committees a year. They are chaired by someone from the manufacturing organization, and they are set up in light of a product complaint or, perhaps, a product quality issue. So, the product quality issue could be anything from a defect in the foil blistering of the pack. It could be something related to printing, ink errors on the product labeling, which, clearly, we are going to try and pick up before the product is released, but there are -- issues do arise, and a product issue -- a

product incident review committee could also be set up if there was a -- if there was particular safety finding.

Q. So, the PIRC could be used both for quality issues as well as a safety issue?

A. Well, the medical representation sits on -- so the -- so, the PIRC is really a product quality issue, but there is medical representation to review the findings to consider whether there is a patient issue as a result of those findings.

Q. Okay. So, the PIRC really has twofold purpose, one is to look at the quality issue but then, also, to evaluate whether there is a safety signal, perhaps, would come from it?

MR. SHEEHAN: Objection.

THE WITNESS: A medical evaluation of the finding is -- is done, yes, that's right.

BY MR. CHAFFIN:

Q. Well, when you say "medical," I just want to make sure that we are on the same page. So, a medical finding meaning there could be a finding that says, okay, there is something of concern here from a safety perspective, and there is a potential signal that then gets investigated, or the PIRC actually investigates the signal itself?

A. No. The -- the -- if it's a medical safety issue, then the evaluation would be done by the pharmacovigilance function or in -- in many cases, by the safety review team that I referred to earlier so that there is input from clinical and from the medical affairs clinicians as well.

Q. Okay. So, looking at your CV, it appears that you were senior vice president of the QPPV and had a global medicine governance from 2015 to '18; is that correct?

A. That's correct, sir, yes.

Q. Okay. Is that a safety position?

A. The -- so I -- I have worked in safety since 2001, when I rejoined the company, and in 2009, I took on the role of the qualified person for pharmacovigilance. The qualified person for pharmacovigilance is a statutory role that all companies must have in order to market products in Europe, and it's, basically, the gateway for the regulators in and out of the company for safety issues. So, I host inspections. I have a responsibility to alert them if there are emergent safety findings and so on and so forth.

The -- the QPPV role was deemed to be a stand-alone role. So, I reported into the head of

safety as the QPPV, because I had to be resident and head of safety was in the U.S.

In 2015, that role moved outside of safety and took on a broader governance role reporting into the chief medical officer. So, that's the role that I had from 2015 to 2018.

And then from 2018 onwards, I took on the -- the additional line management as opposed to the governance management of the safety organization.

Q. So, help me understand what you mean by "governance management."

A. Yeah. So, GSK's definition of medical governance is, essentially, regarding medical standards, so doing the right thing medically.

Now, safety is a key component of that because it's -- it's about the right and proper practice of safety, and that's defined by the Europeans in their regulations. So, the QPPV is, essentially, a government's role. It's about doing the right thing by means of drug safety but for GSK, doing the right thing medically involves data disclosure. It involves publication practice. It involve s what we were talking about earlier, scientific exchange of information, and so there's that broad responsibility, which is owned by the CMO. That is the CMO's role in the company, and the

role that I had was in running the group that oversaw, collected the data, provided the information to reassure the CMO that governance was being done in a fit and proper way.

Q. And I think we -- we said this already, but I just want to make sure.

So, a PIRC review of an issue could actually result in a toxicological assessment, for example, that would then be a flag for a signal if the PV department wanted to evaluate; is that fair?

A. That is true.

Q. Okay.

A. Yes.

Q. And did you play a role on signing off on PIRCs back in 2015?

A. I -- so the -- the people who sit on PIRCs are, essentially, the safety scientists, safety physician pair that we talked about before, not the head of department. So, I would not be a representative of the PIRC, but I would review the outputs of the PIRCs in my role as the qualified person for pharmacovigilance.

Q. Okay. And so, for example, if there were a PIRC that was looking at impurities in ranitidine, for example, there would be a scientific and medical person there helping to evaluate whether that

would be a safety signal coming; is that correct?
A. That would be correct, yes.
Q. And you would also play some role to make sure that they are actually taking responsibility in doing those things; is that correct?
MR. SHEEHAN: Objection.
THE WITNESS: As -- as the head of the function, as the senior line manager, yes, absolutely.
BY MR. CHAFFIN:
Q. Okay. And so, certainly, on those roles, the PIRC would be serving two purposes. It would be looking at quality but then also safety; is that correct?
A. The PIRC's primary responsibility is product quality. The secondary consideration is if there is a product quality issue, what implications that has for the appropriate medical use of the product, particularly, whether there is a safety concern.
Q. Okay.
A. But, also, potentially a lack of efficacy. You know, if it's a beyond shelf life, maybe it's not as effective as it was in clinical trials. So --
Q. Understood.
A. So, the PIRC doesn't do the medical

evaluation. The -- the pharmacovigilance specialist in partnership with clinical colleagues would do the medical evaluation and would then report that back to the PIRC. So, it was a -- it was a -- it was an output of a dedicated group, not of the PIRC itself.

Q. And so by nature, certainly, those PIRCs involve both quality as well as safety issues because of how the evaluations were being done by the people from your group that were sitting on those committees.

Is that a fair statement?

A. Well, I think the question you would always ask is if there is a product quality issue, does it have safety implications?

Q. Got it. Okay.

A. You know, if -- if -- if there is a -- if there is an error in some sort of barcode for a product, which is relevant to the way the pharmacy scans it in and out, that is a quality issue that needs rectifying, but it's unlikely to have a patient safety consideration.

Q. Okay. And is there some significance to you in categorizing something as a quality issue versus a safety issue?

A. I think to me, a quality issue --

so -- so when drugs are approved, as -- as you know, certainly, the way that I'm familiar with it -- the considerations are the quality of the product, the manufacturing, the reproducibility, the efficacy or, as you referred to it previously, the benefit and the safety. So, I think you can have quality issues about the product, as I said, maybe an error with the barcode, that doesn't have patient safety implications. So, I think they are -- I think they are different, but they could -- you know, product quality issue could lead to a patient safety issue and, indeed, a patient safety issue may not be down to a product quality issue.

Q. Okay. And, certainly, if there's an impurity such as NDMA in the product, that would present a quality issue but then also a safety concern that needs to be investigated.

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: So, if there was -- if there was NDMA in the product, which was outside of the product specification, absolutely, it's a quality issue. It would certainly -- if NDMA was -- was reported, then we would certainly look to see what the implications were, which, indeed, we did when we -- we re-did our evaluations.

BY MR. CHAFFIN:

Q. Okay. And, certainly, in terms of NDMA, that was not in the specification for ranitidine; is that correct?
A. That's correct.
Q. Okay. So, if NDMA is president -- present, there is a quality issue and, therefore, there is a safety concern which needs to be investigated.
Is that a fair statement?
MR. SHEEHAN: Objection.
THE WITNESS: I think there's a quality issue, and there is a safety concern, which needs to be evaluated.
BY MR. CHAFFIN:
Q. Okay. Are you familiar with a Valisure petition to the FDA?
A. Yes, sir, I am.
Q. When did you first become aware of it?
A. At and around the time of -- well, maybe just before -- but at and around the time that the European Medicines Agency -- I think it was the European Medicines Agency rather than the FDA asked us the questions, but it might be the other way around, but it was at the time that the citizens' petition was put in.
Q. Did anyone from GSK come to you with

concerns about the Valisure petition before the regulatory body did?

A. Not that I remember.

Q. Prior to this petition, did anyone from GSK or any other drug company tell you, as the head of safety, that there was NDMA in Zantac?

MR. SHEEHAN: Objection.

THE WITNESS: Not that I remember other than as I said to you, the referral that we got from the PSUR assessor related to that 2015 Zeng and Mitch publication, but that was not in regard to NDMA and Zantac.

I think it was in regard to the urine in the two patients who took ranitidine, wasn't it?

BY MR. CHAFFIN:

Q. Okay. Are you familiar with mass spectrometry?

A. Insofar as it's an analytical method applied by chemists, but I am not an expert in bioanalysis, and I have not done any laboratory analysis using mass spectrometry.

Q. Okay. Are you familiar with GCMS, which is -- was used in the Valisure petition?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I know what the terminology means, but, again, I'm not a chemist. I'm not

an analyst, and I have never used that technology.

BY MR. CHAFFIN:

Q. And what is your understanding of the purpose of GCMS in terms of impurities?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: It's part of the analytical process for defining, essentially, the -- the contents of something. A chemical -- a chemical, you know, a group of chemicals, it is a way of distinguishing what lies within that -- that mixture.

BY MR. CHAFFIN:

Q. Would you agree that -- would you -- would GSK agree that conducting this type of testing is important part of drug safety?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I am the human safety pharmacovigilance guy. I'm not the -- the analyst here, and so I think I would be going outside of my field of expertise. Clearly, we need to know what's in the medicine. Clearly, there are technologies available, but if you are going ask me the relative merits of GCMS versus any other methodology, I'm afraid I am just not qualified to talk to that.

BY MR. CHAFFIN:

Q. I understand. So, let's take a step

back.

And, certainly, in terms of impurities in a drug, it's certainly important to look for impurities; is that right?

A. Yes. That's part of the product specification.

Q. Okay. And you are aware that there are mutagenic and genotoxic impurities that are fairly small traces of them; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I can't speak to the degree of them within any particular formulation. As I say, I will go back to what I was talking about this morning. I focus very much on outcomes and then work backwards, and I have lots of colleagues who will help me and advise me, those who are preclinical specialists, toxicologists, those who do analytics and so on and so forth. So, my breadth of knowledge -- I play part of a team. My breadth of knowledge doesn't go to the -- to the relative merits of the different analytical methods.

BY MR. CHAFFIN:

Q. So, my -- my question is a little bit broader than that.

So, can you describe for us what GSK's PV was doing, if anything, to monitor the impurities in

drugs, such as ranitidine, for products -- for contaminants like NDMA?

A. So, there were a variety of things that the PV group would do primarily around product quality. So, there is a process in place set up between safety and manufacturing for the exchange of product quality complaints or possible product quality complaints, particularly where there is relevant safety information. So, we've had for many years a process for the exchange of information.

Secondarily, as part of the routine pharmacovigilance practice, we use a tool called Empirica signal or in GSK, it's known as OSM. It originated in GSK and then was commercialized by a third party, and that has a product quality field that the scientists and physicians will look at on a regular basis. So, if there are product quality issues that can be identified either by that tool or manufacturing, they may trigger a PIRC, but they will, if they have safety implications, trigger a review by the safety folks as well.

Q. Sitting here today as the head of global safety -- former head of global safety for -- and, certainly, over PV for GSK, you testified earlier that the nitrosamine issue certainly came up in the

early 1980s around ranitidine.
Is that a fair statement?
A. I -- I believe so, yes. I was at -- the point I made was I wasn't there at the time, by my understanding, having looked at the literature and you referred to Tanner, was that there were discussions at that time.
Q. And in light of the identification of nitrosamine concerns about ranitidine back in the 1980s, what, if anything, did GSK do to monitor any impurities coming out of that until 2019, when the regulators identified the issue for you?
MR. SHEEHAN: Objection.
BY MR. CHAFFIN:
Q. In between that time frame --
(Simultaneous crosstalk.)
MR. SHEEHAN: Same objection.
THE WITNESS: That is beyond my field of expertise or scope. I referred earlier that these are manufacturing pharmaceutical development chemistry questions.
I do want to go to the stenographer, though, because she keeps waving at me, and I think we might be going too fast or something.
BY MR. CHAFFIN:

Q. So --

THE COURT REPORTER: I just -- we need to go one at a time and slow down. Thank you.

BY MR. CHAFFIN:

Q. So, my -- my concern is from 1981 until 2019, as someone who is here to testify on behalf of the company on what PV measures were taken regarding ranitidine, could you identify for us what, if anything, you did to monitor the NDMA coming out of ranitidine issue that was identified in the early 1980s?

MR. SHEEHAN: Objection.

THE WITNESS: So, unfortunately, you didn't let me answer the question. I was partway through when I tried to defer to the stenographer, who is having real difficulty with our conversation, I'm afraid, sir.

If you would let me finish the question, I was going to say that I am not in manufacturing. I'm not in chemistry. I am not in pharmaceutical development, and, therefore, I'm not able to talk to the way in which they look at the product specification. But I am in pharmacovigilance, and we do have established practices to look at patient outcomes, adverse events to evaluate those where we see signals. I have talked about having specific screens to look up product quality issues. I've talked about having an agreement with manufacturing to identify

quality issues. So, proactive pharmacovigilance, which you and I have agreed is really important, was being practiced throughout this period, but the focus, as I've said and I said this morning, is on outcomes and if we see outcomes, then we work backwards.

It is not my responsibility to review the product specifications. That is manufacturing, chemistry, and pharmaceutical development's role.

BY MR. CHAFFIN:

Q. Sir, just so I understand. So, it's not your responsibility to monitor whether these impurities that were identified from the clinical studies and other things in the early 1980s was coming out of ranitidine.

Is that what your testimony is?

MR. SHEEHAN: Objection.

THE WITNESS: As I said this morning on several occasions, the focus of pharmacovigilance is to monitor the way in which patients respond to receiving their medicines, and my particular expertise and -- and role is around patient safety. So, I am looking for experiences that the patient may have while receiving the medicine, specifically ones that -- that are concerned with safety, evaluating those, and making judgments as a result on whether there is a change in the benefit risk balance of

the product.

The practice of pharmacovigilance doesn't go back to looking at the specification of the product and whether we conform to the approved specification. That is a manufacturing concern.

BY MR. CHAFFIN:

Q. So, sir, just to be clear -- and I think I understand your testimony, and this is very helpful -- is someone who has both lectured as well as spent his entire career in PV, your testimony is, is that if there is some issue of a cancerous impurity being in a product, that's not a PV concern, that's someplace else in the company, that's their concern, not yours.

Is that your testimony?

MR. SHEEHAN: Objection.

THE WITNESS: I'm surprised you think I said that, sir, because I clearly didn't.

What I said to you is that I practice in pharmacovigilance, which is about human safety, and what I'm looking for in trying to understand is the way medicines behave in patients and any safety considerations, and -- and -- and I use signaling methodology for that. And one of the primary methods for signals to arise is because of patient reported experience. So, I am very

focused on the outcome in patients, whether they have a rash, whether they have nausea, whether they have diarrhea, whatever it is, if I find an imbalance of safety findings, I will go back and try to understand why that is true.

If someone says to me "I think there may be a problem here, will you take a look at it," which is what happened with the NDMA issue, then I will redouble my efforts to look at the information available to me to see whether I can find a concern, which is what I did.

BY MR. CHAFFIN:

Q. So, you would agree with me that certainly something like Tanner or other studies, which show that ranitidine breaks down into NDMA in different conditions, that could be a potential signal that needs to be evaluated; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the work that was done by Tanner and others in the early '80s showed that there was a finding in super physiological conditions. My belief is that that would have been discussed by the relevant people in the company at the time and would have been discussed with the regulators, as Britain included in his printed article, and subsequent to that -- and whatever decision was reached was received. Subsequent to that, what I and others focused on in pharmacovigilance, was what

happened in patients.

BY MR. CHAFFIN:

Q. So, as I understand what you're saying is from a PV perspective, until you have people developing cancer, you are not going to look back and figure out what could be causing it. You have to see those cancers pop up first.

Is that your testimony?

A. We look at all outcomes, so I know you are particularly focused on cancer but to portray the role of pharmacovigilance department as being a cancer screening function is grossly inappropriate, sir. We spend all our time looking for a range of experiences of adverse events of which cancer is one.

Q. Okay. And, certainly, I don't want to be grossly inappropriate in any way, sir, but the one I am, obviously, focused on is the one that's significantly impacting my clients, and so yes --

A. I understand.

Q. -- cancer is it.

And I don't -- I'm not trying to be gross in any way; okay?

A. Okay.

Q. So, I think -- I think the important thing here is I just want to understand.

So, from a PV perspective, you are looking and saying is there a cancer signal? And if there is, then we start looking backwards and try to figure it out.

I am asking who is looking at the front side of that and saying, "Hold on a second here. We, at least, know from GCMS testing and Tanner that you apply heat, you see NDMA coming out of ranitidine," who has got that on the radar screen and saying let's monitor this from a manufacturing perspective going forward and not wait until 2019 to then do a simple test of products coming out of these facilities to learn there is large amounts at different points of time of NDMA coming out?

That's all I'm asking is you are leading the back side of the dog. Who is on the front side of that dog?

MR. SHEEHAN: Objection.

THE WITNESS: So --

MR. SHEEHAN: -- to the soliloquy.

THE WITNESS: Yeah. So -- so I think -- I think it's a combination of things, sir. I -- so what I would say is that there is -- there was, obviously, all the work done in the early '80s. There was, obviously, debate and consideration. The product information was submitted to the authorities. It was put into the public domain. I

think there was even an advisory committee in those days. So, all of those issues were discussed at the time.

Subsequently, there was an agreed specification. GSK manufacturing would not have released product that did not make the specification. They had not identified NDMA in the formulation until the alert was raised and at that point, they went back, had a look, worked out what the issue was.

Meanwhile, the safety function was continuing to do what it had previously been doing, which is looking at the outcome in patients, and we redoubled our efforts to look at that, and we reached the same conclusions that we had previously reached, which was that the benefit and risk was unchanged by this finding.

BY MR. CHAFFIN:

Q. And is it fair to say that during the period from the early 1980s until 2019, there wasn't anything that was being tracked in the PV to say, "Hey, we particularly have to pay attention or check in some way about NDMA coming out of the product." That just -- that wasn't done; correct?

MR. SHEEHAN: Objection.

THE WITNESS: The really important thing about pharmacovigilance is to have an open mind. So, you must be looking at the totality of the data rather than

focusing on a subset. So, the practice of pharmacovigilance really says, "I will look at everything that is presented to me. I will evaluate everything that is presented to me, and I will draw a conclusion."

BY MR. CHAFFIN:

Q. Understood.

So, when I look at what your PV department had and your successors before you had, I'm going to find something that shows that that PV department had the totality of the information, including Tanner; is that right?

MR. SHEEHAN: Objection. Objection.

THE WITNESS: So, the Tanner report was generated by the company and would sit within the company's archives. The pharmacovigilance group doesn't have its own separate set of archives. That's not the way a large company would work.

BY MR. CHAFFIN:

Q. Right.

So, the Tanner study, as you all know sitting here today, that it wasn't even found until after the submission to the European authorities and the FDA.

So, it's fair to say again that while you are a large company, and I certainly get that

impression from a lot of things in this case, you are a very large company, the reality is that the PV department did not have Tanner and other studies from those earlier time periods; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the way that drug development proceeds is an accumulation of evidence, an evaluation of that evidence and the drawing of conclusions. Tanner relates to 1981, I think, maybe '82. That information would have been the subject of consideration and discussion at the time. Conclusions would have been drawn and then the product was approved and started to be used by prescribers in patients. Pharmacovigilance would then monitor the safety experience in patients from that point on. So, it's -- it's about looking, like you said, proactive. We are trying to look forward, see what safety information is coming and respond appropriately.

BY MR. CHAFFIN:

Q. Yeah. No. I understand that you are trying to be proactive on the back end to watch for cancers.

I am asking who is being proactive on the front end based on the totality of circumstances and all the information collected to identify issues from Tanner. For example, where there is NDMA coming out of

the product? Is there anybody that's doing that sort of bottom up part of it; or is Tanner done, closed off, out of sight, out of mind, is what I understand?

MR. SHEEHAN: Objection.

THE WITNESS: So, what Tanner reported was NDMA in super physiological conditions, so way in excess of the conditions that we would see in human beings. So, the fact that Tanner said we don't see any problem in man at the recommended doses would be reassuring about the use of the product. Yes, in very high doses, you might see an issue, but that's not what we are talking about. We are talking about using of the product in -- at the indication -- at the -- at the doses indicated. Since Tanner didn't find anything, I'm not quite sure what the point that you are making is.

BY MR. CHAFFIN:

Q. Let me help you out then, Dr. Hobbiger, and you are the doctor. I'm not.

One, Tanner was trying to simulate in vivo; is that correct?

A. Tanner was trying to mimic the conditions of gastric acidity, yes.

Q. Okay. But that's not the only thing Tanner tells us; is that right?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: Well, you tell me.
BY MR. CHAFFIN:
Q. Tanner --
A. I mean, I'm not sure what -- what you are asking, but what I would say to you is that --
Q. Let me ask my question, sir. I'm happy to; okay?
A. Yes.
Q. So, Tanner applied GCMS; is that correct?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: Sir, I don't know the methodologies. I am not a chemist. I am not an analyst. I -- I go back to what I said before. I am not a specialist in analytical methodology.
BY MR. CHAFFIN:
Q. Tanner showed that if you apply heat to ranitidine, you -- you produce NDMA; is that correct?
MR. SHEEHAN: Objection. scope.
THE WITNESS: I can't comment on that. I'm not -- I'm not the analyst here.
BY MR. CHAFFIN:
Q. So, it's fair to say that the PV department, during the course of your time, did not consider the fact that Tanner showed that there was NDMA

released from ranitidine when heat is applied?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I think what Tanner showed was that at normal physiological conditions, nitrosamines are not found. I would consider that to be a reassuring piece of advice for patients and prescribers.

BY MR. CHAFFIN:

Q. Could you tell me what is different about the application of testing in GCMS done by Tanner versus what was done in the Valisure petition, for example?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I can only say I'm not a specialist in the field. I am not a chemist. I am not an analyst. I would be guessing if I expressed a view, and clearly that's not what you want me to do.

BY MR. CHAFFIN:

Q. Okay. So, you don't have any opinion one way or the other about the GCMS testing; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: The only view I have is the view that has been given to me by those who are more expert in the field who tell me that GCMS is not a reliable methodology.

BY MR. CHAFFIN:

Q. Understood.

And in terms of the issue we were talking about a minute ago, which is you're looking at human events, cancers produced, and then working backwards. My question was: Who is looking at things that we see early on which is, "Hey, nitrosamine is a concern. How do we check and see if it's coming out of the product or not?" That question is not asked. If that question were to be asked, whose responsibility within the company would that have been? Is it PV? Is it manufacturing? Who would have taken responsibility for that question?

MR. SHEEHAN: Objection. Compound. Scope.

THE WITNESS: So, the specification of the product and the role of nitrosamines, as I understand it, was extensively reviewed and discussed at the time of -- the product was first approved. No issue was identified. And so pharmacovigilance did its practice, which is look for adverse findings in human beings. And if we had found something, we would have gone back and looked at back data and looked at other data as well, but the fact that the issue was discussed, reviewed and -- and not thought to be an issue at the time means that we focused

our work on the proactivity and the outcomes that we talked about before.

BY MR. CHAFFIN:

Q. Okay. And, again, just -- I'm trying to understand.

So, if PV saw something, then they would look at it and how would have PV seen something? It would have been on these PIRC committees where the science and medical person is sitting with quality? Like, where would they have seen it?

A. Seen what?

Q. How would they have seen what we see in Tanner, which is that there is NDMA coming out of ranitidine? Like, whose responsibility is that? Is it -- like you said, is it manufacturing looking for impurities? Is it the PIRC committee? Is there some other action to it? I just want to understand the process, and that's what I'm having trouble with.

MR. SHEEHAN: Objection, scope.

BY MR. CHAFFIN:

Q. But it does it fall through the cracks? I just don't understand.

MR. SHEEHAN: Objection. Mischaracterization.

THE WITNESS: The stenographer wanted to

come in. Sorry.

MR. CHAFFIN: We're good.

MS. SHEEHAN: Is the stenographer okay?

MR. CHAFFIN: She's okay. Let's keep going, please.

MR. SHEEHAN: Eric, I'm asking her. I am asking you. She put her hand up.

Can we just clarify?

THE COURT REPORTER: I -- I just need -- I just need us to slow down a little bit. That's all.

MR. CHAFFIN: That's fine. Let's keep going.

MR. SHEEHAN: Let's slow down as well for the stenographer's sake.

THE WITNESS: So, the focus of the pharmacovigilance department is to look at the safety data in patients and to try and interpret and understand what that means. The product quality, the -- the -- the meeting of the specification is clearly an issue for the manufacturing organization. If there is a defect in product quality, that could or would trigger a PIRC, and then the manufacturing and the medical groups would get together to review the findings and the implication of those findings.

BY MR. CHAFFIN:

Q. Is there any place in the company where it could be housed to say, "Hey, guys, you see NDMA coming out of this product. Be on the watch for it"? Is there anything that would -- place that that would be tracked in some way at the company?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I believe that the question like that would have been asked back in the '80s, and, indeed, GSK published on the first 13 years of safety experience, so in the 1990s. So, at the time -- and this was before my time -- so, at the time, I can anticipate that the people who were involved in the development and the approval would have been looking very carefully at the safety of the marketed product, and they would have been cognizant of the discussions that were held in the early '80s, but me in 2018, I was focused on the outcomes in individual patients and looking very closely at that data to see -- to see what, if any, change there was in benefit and risk.

BY MR. CHAFFIN:

Q. So, two things, I am going to move to strike as nonresponsive. Secondly, you are speculating.

I am just asking you is there a system someplace in the company where you can put information that says, "Hey, manufacturing, watch for NDMA in this

product"? Is there anything like that? Is it Oceans? Is it Piers? Is there anyplace to track these types of issues as potential flags for a drug such as ranitidine where NDMA was coming out of it that you learned in 2019?

MR. SHEEHAN: Objection to the characterization. Objection to scope.

THE WITNESS: Yes.

BY MR. CHAFFIN:

Q. What is that?

A. There is.

So -- and this is -- this is the way pharmacovigilance's practice now. This was -- this was not my -- to my knowledge at the time, but we have something called a benefit risk management plan, which, in turn, drives the creation of a risk management plan, and that is where we document issues, observations, things that we want to understand better. And if we identify and need risk minimization for those, then that will go into the risk management plan that we talked about earlier.

Q. Understood.

A. Now, the concept of risk management plans only came about in the '90s, 2000s. Having said that, what led to the creation of those was the

experience of people monitoring things over the years and as I referred to you, Myles Stephens was very interested in that degree of monitoring back in the early '80s.

But can I point you to a template? Can I point to you as a document? As I say, I could today. I'm not sure I could for that time, but I wasn't there at the time. So, if there was something, I'm just not aware of it.

Q. Is there a risk management plan for Zantac?

A. No.

Q. And so the answer to my question I asked previously, is there someplace where this NDMA issue could be identified and tracked over time as something to keep an eye on, the answer is, yes, there were risk management plans, but there was not one done for Zantac.

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: I think that if it was documented, I don't know where it was and that there were not risk management plans at that time, correct.

BY MR. CHAFFIN:

Q. Well, at the time that Zantac was

created, but, certainly, as you said, there was some in the '90s and 2000s, particularly because the thought leader on this was the person who was running the company at the time -- or PV at the time?

MR. SHEEHAN: Objection.

THE WITNESS: Sorry. I don't follow what you just said.

Can you say that again?

BY MR. CHAFFIN:

Q. So, at no point in time since the inception -- or release, I should say, of -- of Zantac in 1981, has there been a risk management plan for the product; is that correct?

A. Risk management plans are created when a product is first licensed, and they are for -- and many of them are nothing other than just ensuring the appropriate labeling. Some have additional risk minimization measures that we talked about. Zantac, at the time that it was approved in 1980, risk management plan was a concept that didn't exist. We have not subsequently created a risk management plan for ranitidine because there is nothing that I believe would justify creating a stand-alone risk management plan. The labeling, absolutely has been there since 1980. That is a platform, if you like, for -- that's the first

platform for risk management. We have not done anything beyond that.

Q. And is there anyplace else -- because, again, this comes back to my question originally, which is, is there anyplace where the NDMA issue that was flagged or nitrosamine issue that you say was flagged in the early 1980s, where that was tracked and notified to manufacturing or PV, keep an eye out for this issue? Is there anyplace else that was tracked?

MR. SHEEHAN: Objection.

THE WITNESS: As I said before, my -- my -- not that I'm aware of. My understanding was it was all discussed, reviewed, and decisions made at the time.

BY MR. CHAFFIN:

Q. Okay. But, certainly, there was this mechanism available, which was a risk management plan. It just wasn't in place when Zantac was released, and even after it was released, there wasn't one created. Is that correct?

A. The world had not invented the concept of risk management plans, the pharmacovigilance community back in 1980. It only came about in the late '90s as a formalized document supported by ICH, the Internation Conference on Harmonization.

Q. Understood.

And that was over 21 years ago; right?
A. Around about that sort of time, yeah.
Q. In the past 21 years, there hasn't been this type of document created for Zantac or a totality review of the preclinical and clinical information to put in a particular place so that this issue of NDMA could be tracked for that product; is that correct?
MR. SHEEHAN: Objection.
THE WITNESS: So, no risk management plan has been created because no risk management plan is needed. The review of ranitidine is ongoing year on year, which is why we have the periodic safety reports and so on and so forth. That's the way we do pharmacovigilance.
BY MR. CHAFFIN:
Q. Okay. Yeah.
And, again, I just -- this goes back to my question of, you know, it's -- you know, we can use many analogies, but it is sort of like here is a checklist of things to watch for on this drug, and the issue of heat causing ranitidine to produce NDMA was not on a tickler someplace for people to watch for in manufacturing or PV.
That's a fair statement?
MR. SHEEHAN: Objection. Scope.

THE WITNESS: What was on their list was monitor the outcome in patients.
BY MR. CHAFFIN:
Q. Understood.
A. There was nothing -- there was nothing specific to NDMA as far as I am aware and not in the pharmacovigilance department.
Q. Again, there was looking for the cancer, not looking for the NDMA coming out of the product. That was the issues identified; correct?
MR. SHEEHAN: Objection. Scope.
THE WITNESS: The really important thing to do is to understand what is happening to patients.
BY MR. CHAFFIN:
Q. Understood.
So, you were looking for dead bodies, not the loaded murder weapon; correct?
MR. SHEEHAN: Objection.
THE WITNESS: I'm not sure I would stain to comment on that sort of knowledge, sir.
BY MR. CHAFFIN:
Q. I mean, really, you are looking for the cancer. You are not looking for the potential cause of the cancer. Correct?
MR. SHEEHAN: Objection.

THE WITNESS: That's a different statement, sir.

BY MR. CHAFFIN:

Q. When you get the cancer, you want to then look back and see what's causing it, but you are not looking at and tracking Tanner to say, "Hey, there could be a cause of cancer here that's going to take a long time to produce. You have all of those human guinea pigs you get to use over 10, 20, 30 years."

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I don't even respect that comment you have just made, sir. I am a doctor. I am a medical practitioner. To refer to human beings as guinea pigs, I think, is -- is just not worthy of commenting.

BY MR. CHAFFIN:

Q. They're -- they're certainly my clients, and so I don't say that lightly, but that's how it looks to me, and, perhaps, I will look for a jury in whatever state or country we're in, so...

Okay. We will leave it a that.

MR. SHEEHAN: Objection. Characterization.

MR. CHAFFIN: All right. We are going

to move on, and, John, I am going to have some documents now I just want to run through.

So, the first one is going to be -- one, two, three, four -- there is a number of them.

The first one is -- they are all going to have the same prefix, John, so it may be easiest for you just to kind of like type it and have it in the notes, and then we can tag on the last digits, but it's GSKZAN0000030517.

And, Tom, I don't know if you are pulling those or someone else in the room. If you need me to repeat it, just let me know. If not, we will certainly have it up on the screen.

MR. SHEEHAN: Can you tell me what section it is?

MR. CHAFFIN: It should be -- as I understand it, Jess is on the line. They should be sequentially numbered so you can see them in gaps. So 30517 is the -- the number, and they should be in Bates order sequence in your box.

MR. SHEEHAN: 30517?

MR. CHAFFIN: Correct.

THE VIDEOGRAPHER: This will be marked as Exhibit 2626.

MR. CHAFFIN: And I think the screen

will work perfectly fine, but if you want to pull it, that's fine, too. I'm just really going to -- I just want confirm these are SOPs is what they are. There is a series of them, so --

(Simultaneous crosstalk.)

(Exhibit 2626, GSKZAN30517, marked for identification.)

MR. SHEEHAN: You can start with the screen. I mean, it's --

MR. CHAFFIN: Okay.

MR. SHEEHAN: If we need to -- Dr. Hobbiger, I will just say if you need to see a document in hard copy, we can go through to take a look and try and find it. To the extent you need to scroll on the screen, obviously, that's available to you. The way the documents were sent, honestly, numbering, I think would have been easier, but if we need to find something, I can find it.

MR. CHAFFIN: Yeah. Well, Tom, I mean, it's not the protocol, and there's a reason why it's not. We did the best we could, and so, I mean, that's all we can do obviously, so -- yeah, so...

Okay. I can read, John, if you want. We will just go ahead and mark them while you pull that one up and while he is looking at it, and it will make things a lot faster, I think.

So, 2626 we just talked about.

And, John, for you, just so you can go and put them over, if you want, 2627 will be the last digits 37872.

Let me know when you have that marked.

(Exhibit 2627, GSKZAN37872, marked for identification.)

THE VIDEOGRAPHER: That's been marked.

MR. CHAFFIN: 26 --

MR. SHEEHAN: Eric, did you say -- did you say they are meant to go in Bates order?

MR. CHAFFIN: I didn't prepare the box, but that's my understanding. There is sections that are quarantined off in terms of different Bates ranges, and then the numbers should be sequential within those.

MR. SHEEHAN: I see. So, they are not meant to go there --

MR. CHAFFIN: They are not in the order of what I have them, correct.

The next one, 2628 is 33735.

(Exhibit 2628, GSKZAN33735, marked for identification.)

MR. SHEEHAN: Does anybody on the phone know what the first one is and what section it is?

MS. SZULMA: This is Jessica.

Looking at the list of exhibits, the one ending in 3517, I believe, was located or determined to be an exhibit after the box was shipped. I don't think that's in your box.

37872 is in section 2.

MR. SHEEHAN: I see. Okay.

MR. CHAFFIN: John, are you ready for the next one?

THE VIDEOGRAPHER: Yes, sir.

MR. CHAFFIN: So 2629 should be 48372.

(Exhibit 2629, GSKZAN48372, marked for identification.)

MR. CHAFFIN: 2630 is 27379.

(Exhibit 2630, GSKZAN27379, marked for identification.)

MR. CHAFFIN: I'm literally marking them as we go, some -- I'm in the same boat. It's just a lot of documents and stuff.

THE VIDEOGRAPHER: I'm ready.

MR. CHAFFIN: 2631 is 27415.

(Exhibit 2631, GSKZAN27415, marked for identification.)

THE VIDEOGRAPHER: I'm ready.

MR. CHAFFIN: 2632 is 27431.

(Exhibit 2632, GSKZAN27431, marked for

identification.)

THE VIDEOGRAPHER: I'm ready.

MR. CHAFFIN: 2633 is 28950.

(Exhibit 2633, GSKZAN28950, marked for identification.)

THE VIDEOGRAPHER: I am ready.

MR. CHAFFIN: 2634 is 26534.

(Exhibit 2634, GSKZAN26534, marked for identification.)

THE VIDEOGRAPHER: I am ready.

MR. CHAFFIN: That's it, actually. So, if you want to bring up 2626 on the shared screen.

BY MR. CHAFFIN:

Q. So, Doctor, if you -- I don't know if you have that document in front of you now. If you -- if you don't and you want to, I'll wait. If you want to look at the screen, I don't -- whichever you prefer --

MR. SHEEHAN: Eric, I think that's one of the ones that Jessica said would not be in the box.

MR. CHAFFIN: I got you. Fair enough.

BY MR. CHAFFIN:

Q. So, Doctor, if you -- if you're looking at this document, which is, again, Exhibit 2626, which is Bates 30517, and we can --

MR. SHEEHAN: Eric, I'm sorry, just to

the extent the doctor is not on the screen anymore, at least, he is not really on mine, I don't know if that --

MR. CHAFFIN: He is off center. There he is.

MR. SHEEHAN: You know, you can move that monitor.

Yeah. Okay. There you go.

Is that okay?

MR. CHAFFIN: And, certainly, get comfortable, Doctor. I -- and I want to give you enough time. So, please, just let me know, so -- all right?

And John has control of the screen, if you want him to scroll through.

BY MR. CHAFFIN:

Q. I just had a general question of, one, what is this document and, sir, the date of it, sort of what -- what does it have significance, if any, in the PV department and organizationally? I just want to understand what it is from an SOP perspective.

A. The document, so I've worked for central safety, and we referred to local operating companies earlier. This document, or at least the names that I see on it, I recognize as members of the U.S. local operating company, so not the central R & D function. So, this is not a document originating from

the pharmacovigilance department.

If we can scroll on a bit, I can tell you that it is standard operating procedure and management and human safety related activity. So, if I am right, and I probably would have to read this in more detail, but the way that we manage safety is that we expect -- so, a central document is written and then each local company will put that into their own operating procedures. And my understanding is that this is the operating procedure for the safety folks in the U.S. company, not the central pharmacovigilance function.

Q. Understood. Thank you.

Next document is 2627, if we could have that exhibit, please.

And this one probably is in your documents, and I don't know if Tom has been able to pull it. I know it is a little confusing how they are organized. I apologize. I'm trying to do -- trying to do the best we can, but I don't know if you want to use the screen, we can show that, or if you want to use the document.

A. I'm happy to -- to look at the screen, at least, unless I feel reason to look at the document. That would be --

Q. Fair enough.
A. -- easier, I think.
Q. So, same sort of question with this, the title of it, as I understand, is "SCR Handbook Module 1, PostMarketing Signal Handbook."
Is that global or is that for a particular department?
A. So, this was written by the central pharmacovigilance department. I recognize the names of both -- of people here. This was a guidance document.
So, in GSK hierarchy, a policy is at the top. The SOP is a bit more detailed in the middle and then the guidance document sits under that, which is more to do with how you actually do things in practice, and so this guidance document -- oh. I've lost -- can we just scroll on?
So, this is one of three handbooks, guidance documents that made up the day-to-day practice of SERM. So, this is -- this is the Signal Handbook, which is module 1. There was a second module, which related -- so, this is postmarketing signal management. The second one was more to do with how evaluations were done, and then the third one was more to do with how labeling was implemented. So, this is module 1 of 3, and it was written by a lady called Wendy Bruster and

signed off by Ed Pattishall, who was in the central safety department and was based in the U.S. but is now retired.

Q. Okay.

MR. SHEEHAN: And, Eric -- Eric, just so you know, when you introduced this, I think you said something like 227, and I think it --

MR. CHAFFIN: I apologize if I did.

So, 2627 should be the exhibit number and the Bates number --

MR. SHEEHAN: Oh, you were telling the exhibit number. I got you.

MR. CHAFFIN: Right. The Bates --

MR. SHEEHAN: I was looking at the Bates. Okay.

MR. CHAFFIN: Yeah. The Bates number is 37872, so we're on the same page; okay?

BY MR. CHAFFIN:

Q. Doctor, a couple things, and that's really helpful. So, one is you have the policy. Then you have the SOPs, and then you have the guidance, and the guidance here seems to be referred to as a handbook.

Is that typical in terms of what the guidance is referred to or is it also known by a different term?

A. In the case of safety, because there were -- because there were lots of elements that go into the SERM practices, you could have had lots of different guidances for -- for specific elements.

We chose for sake of making sure that people saw the big picture and had the continuum to combine them into a handbook. So, if you scroll through, you can see it goes all the way from a definition of a signal all the way through how you do it, what you need to do with regulators and so on and so forth. So, I think this is somewhat unique to the way pharmacovigilance did -- did things, but a handbook contained -- contained what otherwise would have gone into multiple guidances.

Q. Understood.

If we could just go to page 14 of that document, it says the actual page number on it at the bottom.

A. Yes.

Sorry. Can I just go back and just check either at the front or somewhere? I just want to know what the date of this one is because this -- this might go back a little ways. So it would just --

Q. Yeah.

A. -- help me with the understanding.

Q. The first page, it looks to be --
A. 2010. Okay.
Q. Yeah. It seems to be superseded then.
A. All right.
Q. So, that means there would have been an earlier date it was published. This was superseded in 2010; is that right?
A. Yes. So, we would have created the first handbooks in the mid-2000s probably. So, this would have been version 2 or more. I would have to look at the chronology, but, yes.
Q. Fair enough.
And in terms -- in terms of the changes to this, is there some sort of index which tracks the changes of these documents?
A. You probably find at the end -- I mean, there is, but you probably find at the end that it tells you what the version control was, because these documents went through version control.
Q. Okay. Got it.
If we can now turn to page 14. Perfect.
There is a -- there is guidance here for process. Literature alerts are reviewed monthly, in caps and bold, and ideally synchronized with OSP and

review for marketed products.

What is OSM? You talked about it earlier.

A. Yes. So, the commercial name for that is Empirica signal. OSM is the in-house name, online signal management. It was developed in 2004, '05 by GSK and then commercialized, I think, by Lincoln Technologies, but I -- I may be wrong in that. And it's, basically, our data mining tool for safety data in the GSK database.

Q. Okay. So, for something like cancer, for example, is that something that could be programmed in and then monitored or how would you do it?

A. So, the -- the there are a series of views in here, and there is a data mining tool that sits -- sits -- well, there's -- there's a -- there's an evaluation tool that sits on top of it. So, all the data sits in the safety database. That data is mined monthly to look for new cases by product and to look at the reporting rate for those cases for the -- for as long as the product is being in existence. So, there is a simple DPA score, which I'm sure you are familiar with, which is for the whole dataset, and then there is a look-see at the new cases that have come up.

You can search specifically for the

standardized medDRA query, which would be for neoplasia, for instance, which is what we did at the time of evaluating for the European Medicines Agency. So, we used the same data, did the evaluation around neoplasia, did the search for that, but OSM specifically will bring up cases of bladder cancer, cases of liver cancer. And you will see how many cases, and you will see whether there has been an overreporting of those cases from the beginning of -- of the product license.

Q. Okay. If we can, go on to page 21, please.

Under section 8, if you can review that for me, please.

A. So, this is the conversation that we had earlier. I will take a little bit of time to read it, but this is about my role as the qualified person for pharmacovigilance where European regulations require me to notify them if I become aware of something which has a public health impact that they would not otherwise be aware of.

Q. And, I believe, if you look at the policy here, then onto the next page, the policy of GSK and the guidance was to not just notify the individual authority but to have notified -- excuse me -- to signal the issue or to, you know, give the information to other

regulatory authorities at the same time.

(Simultaneous crosstalk.)

THE WITNESS: Yes. So, certain regulators say if the Europeans become aware of something, we want you to tell us. Israel is an example of a country that -- that has procedure in place. Other countries, it's a little less clear. And in the case of the FDA, obviously, they are doing their own evaluations as well. So, what we do is we -- if we make a notification, we put it out on general distribution to regulatory contacts in all countries, and they then make the decision as to whether or not they need to notify their authorities.

For example, they may not even have the product licensed in their market. So, therefore, it becomes a nonissue for them --

BY MR. CHAFFIN:

Q. Okay.

A. -- or their regulators may have said, "We don't want you to inform us."

Q. If we could just keep reading the section in the second page as -- the next page as well, please.

MR. SHEEHAN: Are you waiting for a question, Eric, or are you --

MR. CHAFFIN: I just want him to have a

chance to review it.

BY MR. CHAFFIN:

Q. If you can let me know when you're done.

MR. SHEEHAN: I got you.

THE WITNESS: Yes. So, I read down to the fourth bullet.

BY MR. CHAFFIN:

Q. Okay. And I understand the top paragraph there says, "It's GSK's policy to provide all agencies with the same safety information." Is that right?

A. Uh-hum -- at where -- where I would be notifying the European authorities, yes.

Q. Well, it says "all non-European agencies"; correct?

A. Yeah. But the point is if I feel, as QPPV, the need to notify the European authorities, then we make that information available to all authorities ex-Europe.

Q. Got you.

So, all countries outside of Europe, if they are notified; is that right?

A. All countries outside Europe, the information will go to the regulatory lead in the

country, who will then make a country-specific decision based on what their regulators require about whether or not that information is -- is -- is sent to the regulators.

Q. Okay.

A. We operate in 160 countries worldwide, and the regulations differ from country to country. So, rather than send it to everyone, we send it to our local regulatory contact and ask them to ensure that it meets what is required by their regulations.

Q. The key messages there, it says, "Adopt a low threshold for notifications to the TA head."

Who is the TA head?

A. So, the TA head is the therapeutic area head, and we've gone through multiple reorganizations. You will remember I said that there was a group in the U.S. that looked after gastrointestinal. That would be the TA head for the -- for the gastrointestinal products.

The reason that they say have a low threshold is that according to European regulations, the QPPV is subject to imprisonment as an individual if they do not provide information to the authorities that has a

big public health impact.

So, in order that the QPPV can do their job properly, the company decision was have a low threshold for letting the QPPV know, so the QPPV can make a decision about whether or not to submit the information.

Q. Okay.

A. In other words, don't withhold it thinking it's not relevant, send it to the QP and then let him make a decision -- or her.

Q. Okay. Give me one second.

If we can, go to page 40 of 68.

If you could, look at section 11.6 there, please.

A. Yeah.

Q. Just let me know when you've had a chance to review it.

A. Yeah. I think that's in line with what we talked about earlier.

Q. Okay. Maybe I misunderstood, but it sounds like a PIRC can actually be developed from a safety issue in and of itself, not just a quality issue by itself; correct?

A. So, medical could ask for a PIRC to be formed, but the PIRC chair would still come from the

manufacturing organization. It would be unusual for medical to form a PIRC, but it's possible. For example, if there were an excessive number of tablets in a bottle, the -- the risks associated with that might be considered to be a safety-related issue, but by and large, as I say in my experience, most PIRCs are called by the manufacturing organization. But in theory, anyone can ask for a PIRC to be formed, anyone in the whole organization.

Q. And there's certainly a cross-sectional group, which is what we spoke of earlier; is that correct?

A. There is a cross-sectional group. Just -- just for clarification, you will see there that it refers to the MDC physician. MDC is the Medicines Development Center. So, that is the medical doctor who for a product preapproval could be the clinical research -- who I referred to as the clinical research physician. Once a product was approved, the -- the medical affairs physician would be the MDC physician.

Q. Okay. Just one thing before we move on, previously, we just talked about the section a moment ago about the QPPV notifying European and non-European regulators on issues.

Was there any issues while you were QPPV

that related to ranitidine that were not given to regulators?

A. There were no issues while I was QPPV relating to ranitidine that I felt needed escalating to the European authorities, and the escalation is not commonplace. It's used for issues that are not sort of routine pharmacovigilance issues. It's used for issues out of the ordinary, and there was nothing related to ranitidine.

Q. Okay. So, you didn't notify them, for example, of Zeng and Mitch?

A. So, Zeng and Mitch was in -- was -- was either referenced in the PSUR or was mentioned by the assessors in the PSUR from 2015/2016. So, the periodic reporting process is very different to the QP process. So -- so, there is a periodic report that has to be produced frequently when a product is newly licensed, less frequently as when it gets to be a more mature product. The pay to process in the U.S. is -- is an equivalent, but the PSUR process is what is used in the rest of the world, and in the PSUR process, there is a section for new literature which has safety -- important safety findings in it. So, I -- I'm not a hundred percent sure that Zeng and Mitch was included in that because we were still evaluating it, but as part of

the PSUR process, we were asked to take a look at it.

Q. So, just to be clear, how long -- how periodic does the PSUR get filed?

A. When the product is newly approved, every six months. When a product sits in the classic and established category, which we talked about earlier, every five years.

Q. Okay. And so your position is, is that it took about two to three years for Zeng and Mitch to get caught up and be signaled to you guys, and, perhaps, it was through the PSUR, but you're not sure?

MR. SHEEHAN: Objection.

THE WITNESS: So, I think the findings from Zeng and Mitch were being evaluated as part of the PSUR process. The findings from Zeng and Mitch 2016, once we became notified of them, were subject to an expedited review and, actually, a European evaluation, which was only a matter of a month or two after the original notification.

BY MR. CHAFFIN:

Q. So, your position is, is that the company was not aware of Zeng and Mitch until about the month before the regulatory investigation?

MR. SHEEHAN: Objection.

THE WITNESS: I can't tell you whether it was on the list of articles that were being reviewed by

the safety scientist/safety physician.

BY MR. CHAFFIN:

Q. Isn't it possible --

A. But it's -- but it's -- it's unusual -- this -- this was a very unusual article. It came out of "Environmental Engineering," if you remember, or, at least, I think "Environmental Engineering" was the title, and, therefore, it was -- it was an unusual -- normally, safety articles come through "Drug Safety" or the "Lancet" or the "New England Journal of Medicine" or the "Ridge Medical Journal" or things like that. So, whether this article was being reviewed by the safety scientist/safety physician at the time, I don't know for sure. I can go away and check, but we do literature screen monthly, as you saw on the previous page, using Embase and Medline, as we talked about before.

Q. Okay. So, just to help me understand here --

A. Yeah.

Q. -- one, is, as we've talked already, there wasn't a system in place for Zantac to flag issues like is there NDMA coming out of the product.

There wasn't a literature search done on a regular basis of the NDMA, and, thirdly, if there was

a search done, it missed, apparently, Mitch and Zeng unless you went back and checked the system and it's in there, because it took the PSUR three years, basically, to catch up from when the study was published -- two years, I should say, before the -- from the time the study was published until, really, it came to a head with regulators.

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: So, the medical review is done at the product level. So, we will look for reports of ranitidine in publications and then review those publications. So, Zeng and Mitch would have been caught -- because they referred to ranitidine in both publications, would have been caught as a result of the literature review process. I can't tell you what time frame the safety scientists and safety physician looked at. I know for sure we were looking at them when the regulators talked to us about it. I can't comment on the period --

Q. I understand.

A. -- of time before that.

BY MR. CHAFFIN:

Q. Thank you.

And if I want to go find out if they found it or not, what system would I look in and who

would I talk with?
A. So, there would be -- so -- so the group in Poland that we talked about earlier would have been reviewing from 2018. Prior to that, it would have been in the U.S. group, but there is a product shared file, an electronic file if you like, which -- which is central, and so the information would sit in that repository, which would sit within the safety function.
Q. And what's the name of that repository?
A. It's a -- it's a file share.
Q. So, it's like a Cloud file share, not like Oceans or Pier or anything like that?
A. So, Pier is where we archive stuff. Oceans is the safety database, where we put the safety data. File shares are where we contain documents that are being worked on at the time, so, part of, you know, day-to-day business.
Q. At what point --
A. And -- and there will be a file share that is called the ranitidine file share.
Q. At what point does literature in that share file get put into a system to say, "Hey, there is a safety issue to track"?
A. If there is a signal identified, then

it goes -- or it used to, and, again, this is because the systems have moved on -- it used to go into a tracking system called ISAPP, which was the Integrated Safety Activity Project Planner, I think is what it stood for, and if a -- a signal was found, either as a result of online signal management, literature, whatever, that needed further evaluation, then it was put into ISAPP and there was a time frame within a week or so to put it into ISAPP and then it was -- it was -- it was tracked through there and teams had three months do the evaluation.

Q. And what was used between 2015 and 2019?

A. ISAPP was available between 2015 and 2019. We had just moved to a new data mining tool called the Commonwealth tool, and that has its own tracking system within it, but that's only within the last six, nine months, maybe a year or so. That's not relevant to this discussion. ISAPP is the tool you need to look at.

Q. Okay. And then individuals who would have put that information there are the two people from Poland and then previous to that, the two people in North Carolina that we would talk to. Is that right?

A. That is correct, yes, sir.

Q. Okay. And so what -- as I understand you, what would happen is, is they would put in the system to do a search in the literature for the articles. Mitch may or may not have shown up because, as you said, it's an obscure journal. Then they would have put it in the share final, and the share file would have been evaluated by them or somebody else to see if it gets escalated into ISAPP?

A. They would make the decision in discussion with the line head or, indeed, the TA head that we referred earlier, whether or not a formal evaluation is required.

Signals sometimes arise for reasons other than safety findings. They may be -- or they may be something that we've already evaluated or was being evaluated at the time. So, there are various reasons. So, the discussion between the scientists and physician would say this clearly needs evaluation, or it may say we're not sure, in which case they discuss it with the line manager or maybe they would say, absolutely, we don't need to do this because we have already just done it. We just completed it.

So, it depends upon the situation, but if they had made the decision, then it would go into ISAPP. They have a time frame to put it in. They have

a time frame to do the evaluation. And I, as the QPPV, would monitor ISAPP because it was my tool for seeing what was going on so that I can fulfill my obligations to the European authorities, if necessary.

Q. And so if wasn't in ISAPP, you wouldn't get it from a QPPV standpoint?

A. I would get it.

Q. If it -- I'm sorry. If it were not in ISAPP, if they didn't put it in ISAPP, you wouldn't get it from a QPPV standpoint in order to report it to European authorities?

A. So, I wouldn't see it as a signal necessarily for further evaluation, and, therefore, I wouldn't see it through that mechanism, but I did have an informal arrangement in place with my TA heads to say please feel free to talk to me if there is anything that you become aware of that you think I should -- need to know about. That is not as formalized a process as in ISAPP, but I did get calls now and then.

Q. Understood.

And then also in terms of the PSUR, that would contain all literature with a fairly extensive review, and so would that also be something you would look at from a QPPV standpoint in terms of notifying authorities?

A. The -- so the -- the requirements of the PSUR process are only to select relevant literature. So, they don't say put everything in. They say put in the most relevant literature articles. I did not read the -- each and every PSUR from the hundreds of products that GSK had. I relied on my line functions to alert me to anything. So, if it was in the PSUR, it would go to the regulator authorities and I would see requests coming back from the regulatory authorities, but I wouldn't have reviewed it in real time, so to speak.

Q. Okay. And, certainly, once Mitch was identified, you certainly understood why the regulators were asking about it because it was related to ranitidine and high amounts of NDMA being found in urine; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Yes, that's correct.

BY MR. CHAFFIN:

Q. Okay. And so, certainly, there is more information now about Mitch. We can get into it, but at the time, that certainly would have been a signal that needed to be evaluated; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: That was a finding that needed to be evaluated, but I don't think it was a pure

safety finding. Yes. The NDMA in the presence of urine was -- was safety, but also an evaluation of the publication in its entirety and understanding the methodology and -- as we just discussed, I'm not an expert in the methodology for -- for analysis, so we involved other people in those discussions as well.

BY MR. CHAFFIN:

Q. Again, I was just asking.

So, it's a potential safety signal that needs to be evaluated; correct?

MR. SHEEHAN: Objection.

THE WITNESS: I hate to be picky, but there's no such thing as a potential safety signal because the safety signal is a finding worthy of further evaluation. You can't have a potential finding. It is either a finding or it isn't. So, it's a safety signal.

BY MR. CHAFFIN:

Q. Okay. So, Mitch was a safety signal; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: The finding of NDMA in urine was something that was being evaluated as part of the PSUR process. The subsequent report in 2016 subsequently retracted, led us to a consideration of what methodologies had been used and at that time, it was caught up in the

process of the European referral as well. So, we did do a full evaluation. We did a broader evaluation of -- of which Mitch was part.

BY MR. CHAFFIN:

Q. So, just taking a step back, Mitch in and of itself, you would agree that that would be a signal, then it had to be evaluated, and you evaluated it in the totality of various circumstances, including the methodology of it; is that right?

A. So, we need to take a close look --

MR. SHEEHAN: Hold on one second, one second, Doc. Just let me get my objection.

Objection.

THE WITNESS: We needed to take a closer look at the findings, and we did so.

BY MR. CHAFFIN:

Q. Because it was a safety signal?

MR. SHEEHAN: Objection.

THE WITNESS: Because it was a finding of -- of -- of -- of interest to a safety department that required further understanding.

BY MR. CHAFFIN:

Q. I'm sorry. You said it was either a safety signal -- there is no such thing as a potential safety signal.

So, I'm just asking, was Mitch a safety signal.

A. And the reason that I used the words I did very carefully was that this was all wrapped up in the European referral at the time. And if I'm honest, I don't know whether this was captured on ISAPP because I was no longer QPPV at that stage. I had moved on. So, my knowledge of it being done was part of the evaluation. But the finding was a regulatory inquiry, and that's what we were responding to.

Q. But let's just take a step back. That's not what I am asking you.

I'm saying to you Mitch 2016 in and of itself would have been a safety signal to be investigated regardless of whether it, in fact, came about because European regulators asked about it or not. The article, in and of itself, if known to the company, would be a safety signal that needed to be investigated; is that correct?

A. So it would have --

MR. SHEEHAN: Objection.

THE WITNESS: -- considered to be a safety alert, which is one step before a safety signal.

We would have looked at the methodologies involved. If we thought that everything was robust, then

we would have gone ahead and -- and called the signal and done an evaluation, yes, sir.

BY MR. CHAFFIN:

Q. Understood.

If we can move on to the next document now, which will be 2628.

MR. CHAFFIN: John, if you can share that. Thank you.

BY MR. CHAFFIN:

Q. I think this is another version of the manual, the previous one we had.

A. Was 2010.

Q. Yeah. It was superseded in 2010.

I don't know if you can tell from this in terms of the dates. Maybe I missed it.

THE WITNESS: Can we scroll? I have gone blank again. Can we scroll up or down? I'm just looking to -- oh. It would be before it, I think.

Can we go back a page or is this the top?

BY MR. CHAFFIN:

Q. You know, that -- that's the top. Just, if it's helpful --

A. Yeah. There should be another page at the front, which was the sign off page that we saw before. It might be at the back end.

Can you scroll right to the -- well, how far -- just scroll down the index a bit for me to where the appendices start.

So -- oh. Well, the contact was Karol LeCroix, and Karol LeCroix took over from Wendy Bruster, so, I think this probably post dates, but if we can scroll right to the bottom, we may be able to see the date.

Q. Yeah. Unfortunately, I don't see it there, but, certainly --

A. Okay.

Q. -- we can see scroll down for you.

A. Okay.

THE WITNESS: You can go right to the end, and then -- and then start scrolling up so we miss the appendices. Keep going.

If there is a nomenclature to the way the filing system is, I'm not sure I know it.

BY MR. CHAFFIN:

Q. It's okay.

If we can --

A. It doesn't look like there is a sign-off page. So, I -- I believe probably, because of when Karol was involved in this it's after Wendy, but I can't be sure for that.

MR. CHAFFIN: John, if we can go back to the top for just a minute, please.

BY MR. CHAFFIN:

Q. Am I reading this correct? It looks like it's version 12. Is that fair or no? And if you don't know, that's fine. I just was wondering if that's what you see. It says GUI519 -- 493 and then 12 in parentheses.

A. I think it's a reasonable assumption that it's version 12.0.

Q. Okay. And there should be one of those cover sheets, is what it sounds like that was on the other document, which would tell us more details about when it was created or superseded; right?

A. I -- I mean, they should all be of the same format, yeah.

Q. Okay. And where did you say the system was that generates these or houses them?

A. Generates?

Q. Is there -- is there a system where these -- these guidance, SOPs and policies are housed?

A. So, they are -- they are created in MIMs, and then they are archived to Pier, and -- and they're -- and they're stored in CDMS, the version that's current, so that people can access it.

Q. Understood.
A. And they are just, you know, electronic repositories, different names for electronic repositories.
Q. Thank you.
So --
A. So, we don't have hard -- people don't have hard copies on their desks. That's the important thing. They -- they view them electronically.
Q. Okay. Thank you.
MR. CHAFFIN: If we could go to 2629, please, John.
BY MR. CHAFFIN:
Q. And this one looks to me like it's guidance related to literature.
Is that what it looks like from the cover page to you?
A. The -- so, case management group, handbook module 5 -- oh, it's gone out. It's disappeared, but that's module five literature.
So, you remember I said there are essentially two components to central safety with the database in the middle. There was the case management group on one side and then there was -- who are putting data in, and then there was the SERM group on the other

side who were extracting data on the other side and doing the evaluations, the risk management and so on and so forth.

What we have just been looking at is the handbook for the SERM folks who were doing the evaluations. This is -- this is one of the handbooks for the case management group who were responsible for data entry. This one refers to literature, but you will remember that I said that there were different literature practices. So, there was scanning of the literature for individual cases, and this will help to explain how that was done, and then there was scanning of the literature for signals related to SERM, which is -- which is a different process. So, this one relates to identifying individual cases to put onto the safety database.

Q. Okay. And if Mitch, for example, reported adverse events and people who were taking ranitidine or NDMA coming out of it, would that be captured here?

A. That --

MR. SHEEHAN: Objection.

THE WITNESS: Sorry.

That -- yes. So -- so, if there was a report of a patient taking ranitidine who was

identifiable -- so, remember there are -- there are criteria. You have to have an identifiable patient and a reporter and an event and a drug, but if there was a patient taking ranitidine who had an adverse event, and there is no report of an adverse event in Mitch -- Zeng and Mitch, I don't believe. There is just a report of -- of -- of the biochemical finding -- so, in the absence of an adverse event, this was not be reportable per -- per regulatory guidance. So, it would not have gone onto the safety database.

BY MR. CHAFFIN:

Q. So, the case management group wouldn't capture it if it wasn't an identifiable drug and an identifiable patient who had an adverse event; is that right?

A. To be reportable. So, we will always try and follow up on cases if it's not clear about the identifier for the individual patient, but if we have a reporter that we can go back to and we have a drug and an event, we will try and establish whether there is a patient.

Q. Understood.

If we go on to 2630, please.

Do you recognize this document?

A. And so this document precedes my time

at GSK by several years. This is 1985. I joined in 1989, but this is -- this is an SOP from the Glaxo Group. I recognize the name of Talbot. I recognize Margaret Seaman in regulatory compliance as someone that I was involved with before.

And if you scroll down, I may recognize some of the names in this -- in this distribution list, but this is a -- this is a new operating procedure to me.

Q. Okay. And I'm going to just go to the next two relatively quickly, 2631, which is another old SOP.

And I assume the same response to this one?

A. So, yeah. The date is smudged or, at least, it's completely disappeared now from my screen and again. Sorry.

Q. It looks like it was signed in 1987, yep.

A. I can't see it at all now.

MR. SHEEHAN: It -- it is not on your screen?

THE WITNESS: No. It was and then -- it's come back again now. No. It's gone again.

MR. SHEEHAN: Is it back on?

THE WITNESS: It's flicking in and off.
Yeah, 1987. So, this is -- this is an SOP from 1987 from the drug safety group, which, in those days, was known as international drug surveillance. I have not seen this one before, but, again, I recognize some of the names mentioned.
BY MR. CHAFFIN:
Q. Okay.
MR. CHAFFIN: And then 2632, if we can have that one.
BY MR. CHAFFIN:
Q. Same response?
A. So, this is 1989. So, I know, as I said earlier, in general terms about the safety practices, but I don't know this particular standard operating procedure.
Q. Okay.
MR. CHAFFIN: 2633, please.
THE WITNESS: So, this comes from the toxicology department, and I am not in toxicology -- or I call it toxicology. In vitro in vivo translation is the GSK terminology for what would commonly be referred to as the toxicology group. So, this is not from pharmacovigilance.
BY MR. CHAFFIN:

Q. So, these are not procedures that you're familiar with?

A. This -- this one is -- is not related to my department.

This screen, I'm afraid, is flicking on and off all the time. So, I can't --

Q. So, just so we have a -- so, guidance of assessment of mutagenic impurities associated with drug substances/products, PTS global, that's a different department than yours; correct?

A. Correct.

Q. Okay.

THE WITNESS: Sorry. I'm blocking the camera.

MR. CHAFFIN: And then if we can go on to 2634, please.

BY MR. CHAFFIN:

Q. This is for SERM staff; correct?

A. This is for SERM staff signed by me referring to the benefit risk management plan that we talked about earlier.

Q. Okay.

A. And, again, it is a guidance document, so not an SOP or policy document. So, it's -- it's instructions about how to go about compiling a

benefit risk management plan.

Q. Okay. So, it's your -- your guide to the group that you work with that you signed off on; correct?

A. Yes. This is the document that will be used by the group in compiling benefit risk management plans.

Q. Okay.

MR. CHAFFIN: One second.

Okay. I want to -- we can stop sharing that. Thank you.

BY MR. CHAFFIN:

Q. I want to shift gears for a minute.

In terms of stability testing, is it part of PV at GSK to ensure that drugs that they -- that GSK sells are quality drugs?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: As an employee of GSK, I would always say I want drugs to be of quality, but it's not the PV group's function to test for quality. We identify quality issues maybe as a result of safety signals. We have discussions with manufacturing quality, but our role is not testing for product quality, no. That is a manufacturing role.

BY MR. CHAFFIN:

Q. Okay. And who is the head of manufacturing that would be in charge of this?

A. Well, the -- the head right at the top is the gentleman we referred to earlier, Regis Simard. He is the head of global manufacturing and supply. The specific -- the specific head in the group that is responsible for the analytical parts is -- is beyond my knowledge, I'm afraid. So, I can't tell you who the specific head of the group is.

Q. And is there a communication bridge or information that flows back and forth between manufacturing and PV and if so, what is it?

A. Related to product quality --

Q. Yes.

A. -- and product quality issues, absolutely.

And if you look at SERM handbook module 2, you will find that that's fully documented at the end of SERM handbook module 2. It runs to five or six pages, and it describes the process.

Q. Okay. And is that information tracked someplace?

A. Between manufacturing and safety, yes, so, it will be tracked at the individual asset level, but manufacturing quality also maintained their

own logs as well.
Q. Okay. All right. Are you familiar with stability testing that was done by GSK of ranitidine?
MR. SHEEHAN: Scope.
THE WITNESS: It's not in my field of expertise. And I'm not, as I said before, really involved in -- in, you know, manufacturing specifications or analysis, so --
BY MR. CHAFFIN:
Q. Okay.
A. -- other than what I might have read in the -- in the RCA.
Q. Okay. You would agree, though, from a PV perspective, stability testing is certainly an ongoing process; correct?
MR. SHEEHAN: Objection.
THE WITNESS: When a drug is licensed, a quality specification is defined and ongoing testing of product is absolutely required to ensure that we continue to meet that quality specification.
BY MR. CHAFFIN:
Q. Okay. And the stability tests are done, as you said, to make sure the ingredients are still what they're intended to be or required to be and

also safe for human consumption; correct?

MR. SHEEHAN: Objection.

THE WITNESS: Stability testing is done for -- in order to meet the specification -- whatever the approved specification is. The suitability for human consumption is done prior to that point. So, that's part of the ongoing evaluation while a drug is in development. It is part of the toxicology that's done. It is part of the information that's submitted to -- to regulators for regulatory approval. If the product meets specification, then that is what has -- what is indicated and agreed for in the license.

BY MR. CHAFFIN:

Q. And from your perspective, as long as it meets those qualifications, it's not a concern to the PV department; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I will keep going back to the article -- the answer I gave earlier. The -- the focus of the pharmacovigilance department is patients and the experiences that patients have when taking our medicines, specifically, safety. So, we are in -- completely focused on making sure that patients receive safe medicines and that that safety profile is well characterized. So, that's our job. The -- the specification side of things is

handled by another part of the organization.

BY MR. CHAFFIN:

Q. Understood.

MR. CHAFFIN: All right. Let's take a five-minute break. I just need to get my other documents, and we can start back again.

MR. SHEEHAN: Okay.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Going off record. The time is 1444 UTC.

(Off the record.)

(Exhibit 2635, 7/12/15 Graham Carey Email Chain, marked for identification.)

THE VIDEOGRAPHER: Please standby for recording.

We are back on the record. The time is 1504UTC.

Please proceed.

BY MR. CHAFFIN:

Q. Dr. Hobbiger, I want to just go back for a minute in terms of we talked about the PSUR and the reporting of literature, and you also spoke of escalation as the QPPV person before Britain had left the European union, and help me understand what -- is there a guideline? Is there something that defines what

the reporting obligation is that you spoke of as a QPPV person?

A. There is no set criteria. It's left to the judgment of the individual QPPV.

Q. And sole discretion?

A. So, the discretion of the QPPV, yes, and, actually, independent of the company. So, if the QPPV wishes to escalate something, then they do that as an -- as an individual in their own right. So, it's not on behalf of the company.

Q. Understood.

MR. CHAFFIN: Okay. All right. If we could get Exhibit 2635, that would be great.

I don't know if you have a hard copy of this or not there. I'm sure it's in the file, but I don't know if that's something that Tom wants to pull or if it's easier to use the screen.

THE WITNESS: I'm happy with the --

MR. SHEEHAN: Yeah. If you need to see something, Dr. Hobbiger, just let me know and I will -- I will find it.

THE WITNESS: Yeah. I've got it.

BY MR. CHAFFIN:

Q. Okay. And these are emails. It's probably easiest to start at the bottom, and -- well,

the next page, I guess, is the top of that section.

An Exhibit 2635 is -- I see is an email from Graham Carey to various people, including yourself, on July 12, 2015, and I will give you a minute to review that.

A. Yeah. So, the -- so the "to" list are the members in 2015 of the global recall board. So, David Tainsh was the -- was in -- was the product quality representative for the company. Frank Pieropan was in GMS. Roger Connor headed GMS. Frank Rockhold was head of safety, and Susanne Mart headed quality in the vaccines organization.

Q. Understood.

And there are CCs to people.

What's that group?

A. So, Regis Simard is the man who subsequently became head of GMS. Roger Connor moved over to head the vaccines organization, and Regis replaced him. George Lam, Marcellus Ting, Syna Guo, Oana Doriana Ghimpau, and Eng Chin Peh, I suspect are related to wherever this recall was happening, but they are not names -- only Regis is -- on the CC list is familiar to me.

Q. Okay. And have you reviewed this document in preparation for your deposition?

A. I haven't, no.

Q. Okay. I will give you a moment to review it. We will start with the bottom section.

MR. SHEEHAN: Do you want to go all the way to the bottom?

MR. CHAFFIN: It's up to Dr. Hobbiger, however he wants to prepare it, because it's just -- it's just -- that is the bottom section of the email, Tom.

THE WITNESS: Okay. So, I'm going to read from dear GRB downwards, and --

(Simultaneous crosstalk.)

THE WITNESS: -- I will just tell you when I get to the right, to the bottom.

If you can, just scroll down a bit to there, and stop there.

Okay. So, I have read that email.

BY MR. CHAFFIN:

Q. And based upon that, do you recall seeing this email previously?

A. I don't remember -- well, I must have seen the email because it was a request to the global recall board to approve the recall. So, I must have seen it at the time because I would have approved it, but in preparation for the deposition, I don't specifically remember looking at this document.

Q. Okay. I know I had asked you earlier in the deposition whether you were familiar with brown pills and discoloration tissues coming up, and I believe you said that you didn't recall knowing about that.

Does this refresh your memory that you are aware of brown-colored pills?

MR. SHEEHAN: Scope.

THE WITNESS: I think the question you asked me was whether I was familiar with the change from white to yellow color of the tablet. I don't remember you asking me about brown discoloration, and I said I wasn't familiar with the change of the color of the tablet, and that remains true. I am not and nothing since afterwards that I recollected.

Brown dispeckling or brown discoloration, I would have been familiar with and would have said yes at the time if that had been your question.

BY MR. CHAFFIN:

Q. Okay. And so you're familiar with the issue of brown pills coming up regarding ranitidine.

Is that a fair statement?

A. I am.

MR. SHEEHAN: Scope.

THE WITNESS: I remember that we recalled in 2015 because of this product quality issue.

BY MR. CHAFFIN:
Q. Was there any other times that it was recalled?
A. As far as I recollect as a member of the global recall board, this was -- this was a single instance.
Q. Okay. And you see where the statement says, "The medical position is inconclusive regarding elevated levels of impurities in brown discolored tablets. Draft is attached and awaiting the final version."
Did I read that correctly?
A. Yes, you did, sir.
Q. Okay.
MR. CHAFFIN: If you could scroll to the top of this page now, John, that would be helpful, of 2635, I should say, the top of this exhibit.
BY MR. CHAFFIN:
Q. And this is an email from you the following day on Monday saying that you would like to see the medical assessment final when it's done; is that correct?
A. Yes, indeed.
Q. Okay.
A. And that would have been a standard

request I would have made because I was the medical representative, along with Frank Rockhold, my colleague on the global recall board. And I always like to review the medical assessment. This was a recall that was done in advance of the medical assessment having been completed. I agreed to that recall but still wanted to see what the medical assessment said.

Q. Understood.

And why would you want to see the medical assessment?

A. Because I want to know what the medical interpretation of the findings was.

Q. And what do you mean by that?

A. Well, the evaluation was being done by the safety scientist/safety physician and -- and the medical folks. Simon Arnold was in the medical affairs organization; and as the medical representative signing off, I absolutely would want to know what the medical conclusions the team had reached were.

Q. Okay. And so the concern was is there might be potentially a patient safety issue in the medical assessment. You want to confirm that there's no problems; is that correct?

A. Absolutely. I would want to understand what the -- you know, what the conclusions

were.

Q. Okay. At the time that this happened, you weren't aware of Tanner, for example; is that right?

A. No, I wasn't, sir.

Q. Okay. And I believe you said you weren't familiar with the changing of the pills from white to yellow; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Correct, yes, that's what I said.

BY MR. CHAFFIN:

Q. Okay. Did you familiarize yourself or become aware that there were multiple issues over time with the quality of the ranitidine and breakdown because of heat and humidity?

MR. SHEEHAN: Scope.

THE WITNESS: So, I have not looked at that, sir. That is a manufacturing issue.

BY MR. CHAFFIN:

Q. Okay.

A. It wasn't -- wasn't part of my preparation for the deposition.

Q. No, I understand. But certainly here in July of 2015, you were asking for the medical

assessment because you are looking at it from a safety, potential signal issue because it was originated in quality but could have a safety patient issue; correct?

A. That's correct. So, this was -- this was the one and only time I remember being told about this issue for Zantac, and I wanted to know what the medical assessment for this issue was. If there were other issues, I'm -- I'm not familiar with those.

Q. Okay. No one informed you, as someone who was in charge of pharmacovigilance, that this was an issue that was recurring over time; correct?

MR. SHEEHAN: Scope.

THE WITNESS: I have vague recollections that -- so -- so, there would have been PIRC minutes, and I have vague recollections of something mentioned in the PIRC minutes, but I can't swear to it. And as far as I was concerned, this was a one-off issue asking for agreement to recall the product, and I approved that.

BY MR. CHAFFIN:

Q. And, certainly, as the person evaluating patient safety at that time, you didn't say, "Hold on a second, guys. We've got to check and make sure there is not NDMA coming out of this product"; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: So, I didn't -- I didn't ask that question, no, and I -- and I wouldn't have asked that question.

What I was interested in, though, is the question you referred to me earlier, which is the medical assessment, which would have said this problem has occurred before, if, indeed, it had, and some -- some understanding of what the medical consequences of the findings were, but, no, I did not specifically ask a question about NDMA.

BY MR. CHAFFIN:

Q. Okay. And, certainly, you weren't equipped with information from your standpoint to ask the question, hey, there could be a -- an issue with NDMA coming out of the product because of its decomposition; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, there was nothing in what I saw that referred to NDMA.

BY MR. CHAFFIN:

Q. Okay. And, certainly, sitting here today with what you know, if you got this email and there was a statement about brown discolorization and there was issues with heat and humidity on the product, one of the things you would say is, "Okay. We need to see if there is NDMA coming out, how much is coming out

of the product."

Is that a fair statement?

A. No. I --

MR. SHEEHAN: Objection.

THE WITNESS: -- don't think that is a fair statement.

So, what I would do would be to go back to the people and say, "Can you characterize what the cause of the brown discoloration is?" I wouldn't prejudge what it might be. And once I knew what had been identified, then, obviously, we would take an appropriate -- we would make an appropriate assessment and make an appropriate decision. At the moment, all I'm faced with is there are brown dots in these tablets. My view is we don't know what it is. We recall it.

BY MR. CHAFFIN:

Q. Okay. But, certainly, one of the impurities now that you would say, Hey, we need to look for is NMDA because we know from studies that when there is heat and humidity on this product, NDMA comes out"; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, I think what I would do is ask a more open question than that, sir, which is, please, can you characterize what the impurities are. And

once those had been characterized, then I would act appropriately.

So, I would -- so, if I go in and say, "I want you specifically only to look for this," I don't think that is -- that is a fair and proper way of approaching it.

BY MR. CHAFFIN:

Q. Okay. And that would be fair and proper -- fair or proper because you really would be presupposing the outcome versus leaving it open ended and evaluating all outcomes.

Is that a fair statement?

A. That would be bayesian in thinking, yes, sir.

Q. What is the word you used?

A. Bayes. It's a statistical approach based on prior knowledge. So, I would be presupposing what the answer was. I prefer to ask an open question.

Q. So, you prefer a non-Bayesian question is what you're saying?

A. Indeed.

Q. A non-leading question?

A. I would --

MR. SHEEHAN: Objection.

THE WITNESS: I would just be saying I want to understand what these impurities are, and then we

can make a medical evaluation of those and the consequences for patients taking the tablets.

BY MR. CHAFFIN:

Q. Okay. And you certainly agree that it would be important to do an evaluation, not simply build arguments about something; is that right?

MR. SHEEHAN: Objection.

THE WITNESS: I think we would have to see what the results were, and they may trigger a proper evaluation or -- or they may not. it depends on what the results are.

BY MR. CHAFFIN:

Q. Okay. But it's really about an evaluation non-Bayesian, objective view, not simply building arguments. Is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: We --

BY MR. CHAFFIN:

Q. You don't want to presuppose the outcome; correct?

A. We -- we -- we would absolutely not presuppose the outcome. We go with an open mind trying to do the best job we can for the patients that we serve, and -- and that's why an open question about what the impurities are and then a response to that depending

upon what the answer is.

BY MR. CHAFFIN:

Q. Okay. And, certainly, from perspective of identifying the impurities, it would be important to understand the impurities including whether NDMA is one of the impurities that's present; is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: I think it would be important, as I say, to ask an open question to find out what the impurities are.

BY MR. CHAFFIN:

Q. Okay. Fair enough.

And -- and, certainly, there can be formaldehyde in it; correct?

A. I have no idea what could be in there, to be honest. As I said, I'm not the chemist. I am not the analyst, so I don't know what the result is, but if you tell me what the result is, then I can look at the implications.

Q. Is there -- if there were formaldehyde in it, would it be of concern?

MR. SHEEHAN: Scope.

THE WITNESS: I am not a preclinical specialist. I am not a toxicologist. The levels of

formaldehyde which are acceptable, I don't know, sir.

BY MR. CHAFFIN:

Q. Okay.

A. So, it depend -- it depends on what was found.

Q. Okay. So, one, there is an impurity from formaldehyde; two, you would say, "Okay, what are the levels?"

Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: I would -- yes. So, as part of the evaluation, you would say we found something, in this case, formaldehyde.

What are the levels of formaldehyde? What do the preclinical studies show? What are the accepted international limits? What was approved as part of the specification? Is this different from what was approved as part of the specification? And then depending upon all of those answers, we may say, actually, this is something that needs to be -- needs us to take action on and the action -- well, you know, we -- we -- we would have to determine at the time.

BY MR. CHAFFIN:

Q. Understood.

And the same process would be if they

came back and said there is an impurity. NDMA is in it. You would want to ask those questions as well; is that fair?

A. Indeed, and I think that's what we did when we recalled the product in 2019.

Q. Fair enough.

And you certainly would want to identify all the imparities so they can be assessed; is that fair?

A. I would like to --

MR. SHEEHAN: Objection.

THE WITNESS: -- understand, as far as the analysts are able, what the impurities are.

BY MR. CHAFFIN:

Q. Understood.

MR. CHAFFIN: Okay. John, if you could mark for me as 2636, GSKZAN0000167442.

(Exhibit 2636, GSKZAN167442, marked for identification.)

BY MR. CHAFFIN:

Q. If we can go to the bottom of this document, and, Dr. Hobbiger, you are not on this document, but I just had a question. We may have just covered it, so I don't know that I need it, but let's go clear to the bottom, please.

I believe this person is an LOC person, but I could be mistaken.

Eng Peh, I'm not sure how to pronounce it, do you recognize that name?

A. So, I would suggest that they are central function because they are part of GMS quality. They might be based in -- I don't know where -- Singapore, for instance, but I think they are part of the central GMS quality function.

Q. Okay. And then if you look at the paragraph there, if you could read that to yourself, please.

THE WITNESS: And just if I may for the stenographer, you remember we referred to Andrew Schindzielorz? I don't know whether you can see this document, but he is the first, second, third, fourth name along. So, he was the product physician if you want to check the spelling.

MR. CHAFFIN: Thank you, Doctor. I'm sure Melissa appreciates that.

THE WITNESS: Yes, I read that.

And so Andrew was the safety person and Peh Eng was the medical affairs person. So, they were the two medical representatives copied in on this.

BY MR. CHAFFIN:

Q. Okay. So, certainly, as to the issue that's come up with the discoloration, the request there to allow medical assessment to be made, we would like to know more about the toxicological profile of Zantac impurities.

Is that a fair request from a safety standpoint?

A. Yes, I think so.

Q. Do you know if that was done or not?

A. So, I know that at the time the analysts were trying to work out what the impurities were. The product was recalled because it had a quality issue. The medical assessment was in draft. I am assuming this is the same incident. I am not reviewing the whole document.

I can't tell you beyond that what happened.

Q. Okay. If we can go on up to Bates No. 449 there, please.

Again --

MR. SHEEHAN: If you need to read more of it, Dr. Hobbiger, please read --

BY MR. CHAFFIN:

Q. Absolutely. If you want to scroll more of it down, that's fine. We will work our way up.

Certainly, I think I will try to certain sections now and point to a couple questions.

A. Okay.

Q. So, in terms of this statement, you see that they are talking about a 2013 off-white pills.

Do you see that?

A. Yes, I do.

Q. And again that's something that you weren't aware of; is that correct?

A. It isn't something that I was aware of. And I'm trying to recall -- I don't know whether I was part of the global recall board at that stage or not, but I don't remember specifically that.

Q. Well, certainly in July of 2015, you were part of the GRB because that was Exhibit 2635 we went over; correct?

A. Correct, yes.

Q. And so that was about seven or eight days after these emails, I believe. And so you would have been part of the GRB at that time; is that correct?

A. I'm sorry. You were talking to me about 2013.

Q. I apologize.

So, in 2015, they are talking about this issue happening back in 2013. And so you still don't

have a recollection of them talking about the off-white pills back at that time, so that there was a pattern of issues over time is my question.

MR. SHEEHAN: Objection.

THE WITNESS: I did say I think in response to an earlier question that I had a vague recollection, but I couldn't speak to specifics. So, you are providing me with more specifics.

BY MR. CHAFFIN:

Q. Okay. And so you still don't recall the issue of earlier generations of discolored pills; is that right?

A. Other than my vague recollection and the fact that you are providing me with more information.

Q. Okay. If we could keep moving up to page 167446, please.

Do you recall the conclusions of the medical assessment? And if not, does this help refresh your memory of what the assessment concluded?

A. So, I am sure that -- I have every reason to believe I would have been sent the final medical assessment. I can't see the bit at the top of the screen.

Q. We can scroll up a little bit more.

A. Okay. Because Andrew Schindzielorz was the safety physician. Susan Ruane was the lady we referred to earlier who was his partner in looking at the -- the scientist physician pair; and Steve Buckley was the line head at the time.

Q. You see the conclusion they draw here about, well, it's just a limited number of brown pills. It's not of concern. Is that a fair summary of what it says?

MR. SHEEHAN: Objection.

THE WITNESS: Can I read the text. Sorry.

BY MR. CHAFFIN:

Q. Yeah.

A. Okay. I read the statement.

Q. And it's fair to say based upon this that they drew a conclusion that this wasn't a concern because a low number of brown pills is what they drew a conclusion to be; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, I think they drew two conclusions. So, the first one is about efficacy and what they were concluding is that if a patient decide -- elects not to take a tablet because of the brown discoloration, that the overall efficacy of the product would be

unaffected. So, that's -- if a single tablet is missed this is not a medical risk because the next dose will bring rapid gastric acid suppression. So, that's the statement around efficacy.

The subsequent statement is around the discoloration in the pill and the amount of pills that have the discoloration and the conclusion that they drew was that there is a very low frequency of the defect, but we are still in the process of trying to understand the analysis. So, at the moment I'm not sure that we know what the abnormality is. And so at the moment they may be speculating.

BY MR. CHAFFIN:

Q. Okay. So, in terms of the abnormality, they are not looking at and determining the full scope of impurities. They are just saying even if there is impurities in there worst-case scenario, it's one or two pills; and therefore, it is not going to be a problem. Is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: So, I don't know what the list of impurities that they are looking at have. If this were me, I would say show me the analysis results, and then I will draw a conclusion.

BY MR. CHAFFIN:

Q. Understood.
From a safety perspective you want to see what all the impurities are as we talked before; correct?
MR. SHEEHAN: Objection.
THE WITNESS: That would be my practice, yes.
BY MR. CHAFFIN:
Q. Okay. And so, if we were going up, Doctor, to page 167444, if John would be kind enough to do that for us. If you could review Derek Newall'S email on Monday July 6th and if you could read those paragraphs there to yourself, please.
THE WITNESS: Can you scroll down a little. Is that the end of it?
BY MR. CHAFFIN:
Q. No, it's not.
MR. CHAFFIN: John, if you could keep going, please.
THE WITNESS: Okay. So, I have read that.
BY MR. CHAFFIN:
Q. So, based upon this email according to Derek, they didn't look at all the impurities even though the some of them exceed acceptable levels because

they drew the conclusion that exposure would be on one occasion only and the likelihood of significant harm to the patient is considerably low. So, they stopped there. Is that a fair statement?

A. So, Derek Newall, now retired, was a very respected member of the toxicology group, and I knew him well. He also sat incidentally on the global labeling committee. And he has qualified the impurities as mostly the known metabolic impurities, so the N-oxide the S-oxide. And he also said that there are other unknown impurities. And I did refer earlier to the fact that the analytical methodology may not be sufficient to detect everything. So, it was dependent upon what the analysts could defect. He has made an assessment as an expert in the field about the implications of those impurities, and I think his wording stands for itself.

Q. Okay. So, again, just as I understand from the email and you -- I think are agreeing -- is they did not test all the impurities. They are still a number of them that were unknown that were outside of acceptable levels and they didn't further investigate them because they saw any potential harm de minimus or nonexistent from a toxicological standpoint, so they stopped there. Is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: So, I am not an analyst as we established. And I would surmise -- I mean, the words are the words. But analytical methodology may not have been sophisticated enough to pick up all the impurities. They may have been at the level below the level of quantification, or we may not have had an appropriate method to pick them up. So, I think to say they stopped looking is probably not a correct characterization. I think they looked. They found what they found and they made an evaluation based on that. And Derek Newall has spoken to that in this email.

BY MR. CHAFFIN:

Q. Okay. But in any event they didn't do as you said you would want to do which is to identify all the impurities. And I understand there are limits of instrumentation, but within the limits of instrumentation you would have to identify all the impurities. They didn't do that here. Is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, when you asked me the question I was very careful in saying I would like to understand all the impurities within the limits of the analytical capability.

BY MR. CHAFFIN:

Q. I understand. You are a very careful

person, Doctor, and I appreciate that very much. I am sure the jury will, too.

Okay. And so as a very careful person, you also told me you are not familiar with GCMS or LCMS or any of these other types of mechanisms to nature impurities. Your expectation, from a PV standpoint, is to the extent they are available I want to know what the impurities are. They didn't major them, for whatever reason, you don't know. You're not going speculate, I get -- they didn't major them here. They stopped because they said the dose isn't big enough to be a concern about. Is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: I think that's going beyond my stated knowledge. What I would say is that Derek Newall was a very respected and experienced toxicologist, and he is someone I would turn to for an evaluation of a finding like this to give his expert opinion.

BY MR. CHAFFIN:

Q. And, Doctor, can you tell me how many times over the course of years that GlaxoSmithKline identified discolored tablets and did not identify all the impurities in the tablets? Do you have any idea sitting here today?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I can't answer that question.

BY MR. CHAFFIN:

Q. Is it one time? Five times? Ten times? Twenty times? What would you say?

MR. SHEEHAN: Scope.

THE WITNESS: It would be pure speculation, so I can't give an answer.

BY MR. CHAFFIN:

Q. So, certainly sitting here as the former head of global safety and a retained, you know, person paid to testify on behalf of GSK, you can't tell us sitting here today how many times GSK looked passed and did not test the pills for impurities, such as NDMA. Is that correct?

MR. SHEEHAN: Objection to the characterization of the witness being paid to testify on behalf of GSK. Objection as to scope.

THE WITNESS: So, sorry. The question again.

MR. CHAFFIN: I will do two things. One is, Tom, you got your objection. So, let's leave it at that. Let me finish my deposition.

BY MR. CHAFFIN:

Q. And, secondly, in terms of yourself,

Doctor, sitting here as the former head of global safety for GSK, as well as somebody who is being paid 400 lbs. per hour to testify, you can't tell us how many times this company identified discolored pills and how many times it tested for impurities, but did not test for NDMA?

MR. SHEEHAN: Objection. Just let me get my objection in --

MR. CHAFFIN: You got your objection -- you have a stand --

(Simultaneous crosstalk.)

MR. SHEEHAN: I need to say scope as well pursuant to the order.

MR. CHAFFIN: I will give you a standing objection, Tom. That's fine. All right. So, you got your objection.

MR. SHEEHAN: I don't want it. I don't want it. I like to voice my objections --

MR. CHAFFIN: You like to coach your witness, and I'm tired of it. Let me finish the deposition.

MR. SHEEHAN: I disagree with that characterization entirely.

MR. CHAFFIN: The record will stand for itself; and at some point, we will stop the deposition and

we will take it to the judge, that's fine.

MR. SHEEHAN: You do what you need to do.

MR. CHAFFIN: Just let me take my deposition. That's it. It's just that simple. Let take my deposition.

MR. SHEEHAN: Eric, ask a question. Go for it.

MR. CHAFFIN: I have asked the question twice. You interjected twice. You have your objection. All right.

So, Melissa, you will have to read it back. I am not going to say it again. Twice now --

THE WITNESS: I heard it the second time.

So, my response to the question is the frequency of product defects is a question that is appropriately asked to the manufacturing and supply chain because as the head of safety what I saw were the product recalls coming through. And I saw an infrequent number of issues such as this in the time that I was on the global recall board.

Now if you ask me to quantify that in terms of number, I can't, but most of what we saw were packaging problems, like problems with the foil. Sometimes

they were problems with the wrong size spoon in. Often, there were printing issues or bar code defects. So, did I frequently see recalls because of discoloration? No. Can I tell you how many we had? No. Can I tell you precisely how many case through to global recall board? With the best of intentions, I can't quantify that.

BY MR. CHAFFIN:

Q. Understood.

And, Doctor, things like a wrinkle in the foil or pinholes in the foil, for example, those examples are ones that allow heat and humidity to get into the product; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: There is the potential for the product to be exposed certainly to humidity. Potentially, heat.

BY MR. CHAFFIN:

Q. And, certainly, Doctor, somebody who has been paid to review the documents in the case, both as a GSK employee and a hired -- excuse me, retained legal consultant -- since then you certainly are reviewed and understand from the root cause analysis that heat and humidity can cause and release NDMA in ranitidine; correct?

MR. SHEEHAN: Objection.

THE WITNESS: Excessive heat and excessive humidity.

BY MR. CHAFFIN:

Q. Okay. And, certainly, excessive heat and excessive humidity can release NDMA and that certainly is an impurity in ranitidine to the extent it exists in ranitidine; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the presence of NDMA as we talked about before is a product quality issue and the required specification we talked about in relation to the European referal in judgment.

BY MR. CHAFFIN:

Q. And, certainly, is an impurity; is that correct?

A. It's an impurity in the product. So, it's a quality issue, yes.

Q. So, certainly as you said before, you would want to identify all impurities to the extent you can from instrumentation; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: In relation to an evaluation of a product recall, yes.

BY MR. CHAFFIN:

Q. Okay. And, certainly, a second ago

you just testified that excessive heat and excessive humidity -- can you define for us what that level is in terms of what is excessive heat and excessive humidity?

A. Again, I would be guessing if I were to talk to you about official definitions of heat and humidity. Certainly outside of the information given in the patient information or the prescribing information, but if I talked about excessive heat maybe I'm talking 50, 60 degrees. But I'm not the expert. I am purely expressing a personal view there. And in terms of humidity, I couldn't give you a factor.

Q. I understand. You are not expressing an opinion on those issues.

In terms of excessive heat and humidity, isn't it a fact, Doctor, NDMA is being released from ranitidine even at levels far below what is actually on the packaging label?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, as you know we did an analysis with a root -- we did an analysis of NDMA. We did a root cause analysis, and I think the facts speak for themselves. There is the presence of NDMA in the formulation.

BY MR. CHAFFIN:

Q. So, it doesn't take excessive heat

and excessive humidity, correct?

A. I think there is a slow production of NDMA, which is accelerated by heat and humidity.

Q. And so certainly heat humidity, not just excessive heat and humidity as you corrected met a few minutes ago, causes NDMA, which is an impurity to be released from the product; correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I really can't express a view. I think you need to talk to others more qualified than I to talk about the formation of NDMA.

BY MR. CHAFFIN:

Q. So, you are not qualified on testifying about the formation of NDMA from ranitidine. Is that a fair statement?

A. So, I've said all along I'm not from the manufacturing side. I am not from the chemistry side. I am not from the pharmaceutical development size. You are asking me about stability data, which was offered by colleagues from the manufacturing and chemistry side. I think it's better to ask the question of them about the role of heat and humidity and of relative heat and humidity in the formation of NDMA.

Q. Okay. And your position about NDMA coming out of ranitidine as a paid witness here today as

well as when you were with GSK is that this a quality issue; not a safety issue. Is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I have not identified a safety issue. Clearly, there is a quality issue which needed to be addressed or needs to be addressed, but in GSK's case, we chose not to reintroduce the product to market. So, the quality issue is for anyone that chooses to do that.

But I agree. Quality issue, I have no evidence and I have looked hard. I have found no evidence that there is a safety issue.

BY MR. CHAFFIN:

Q. Okay. And, Doctor you would agree with me, though, at least I believe, that the root cause analysis showing that ranitidine is breaking down from heat and humidity to form NDMA, that would be a safety signal that has to be evaluated; is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: So, we were asked as part of the referral by the European authorities and others to do an evaluation to understand the implications of NDMA. So, yes, we did a signal evaluation when the NDMA was reported to us, and we drew conclusion s which we responded to authorities with.

BY MR. CHAFFIN:

Q. Okay. So, I just want to understand and maybe you just can't answer this question for me because you are answering a different question than what I was asking.

But what I am asking is that leaving aside what regulatory authorities asked you to do, would you agree with me that a finding such as the studies that are reported in the RCA, that ranitidine is breaking down into NDMA in the face of heat and humidity, would that be a safety signal to the company that would need to be evaluated from a safety signal perspective; or are you just -- that's just a quality issue we don't need to worry about it from a safety perspective? Which would it be?

MR. SHEEHAN: Objection.

THE WITNESS: I don't think I can answer that in a straight yes-or-no answer because that's not the way we practice within the company, so, the results -- and so the reality is an evaluation was done. But had the regulators not asked the question of us, a discussion would have been had about the relevance of those findings of heat and humidity to the product. And if it were concluded it was an appropriate thing to do, then we would have gone ahead and done the evaluation. But if you told me that

ranitidine forms a hundred percent NDMA if you autoclave the product, then I would say that's not relevant to the real world use of the product. And, therefore, that does not merit an evaluation. It depends is the answer.

BY MR. CHAFFIN:

Q. So, I'm asking you based upon what the RCA says, would that have been a safety signal. If you can't answer the question, you can't answer the question. I'm asking: Based upon what you know from the root cause analysis, was there a safety signal that needed to be evaluated or in your judgment and experience on PV you would say you know what, Eric, that wouldn't raise to the level of a safety signal and I feel pretty comfortable telling the ladies and gentlemen of the jury that I'm perfectly happy for them to adjust this. Never know about it, never tell European regulators, never tell the FDA because it doesn't even rise to a level of a safety signal to be evaluated. It's that de minimis of an issue.

Is that what you're saying?

MR. SHEEHAN: Objection.

THE WITNESS: So, with respect to -- I'm not saying other than an evaluation was required. It was triggered by the Europe -- the question from the European authorities. Whether I would have done it or not is a moot

point. We did the evaluation. We drew our conclusions.

BY MR. CHAFFIN:

Q. It's not a moot point, Doctor, because you waited until 2019 to do it. And you didn't do it since 1981 when you had evidence of it. So, it's not a moot point. Maybe to you it is, but it's not to all of my clients and the other people who have cancer from this drug. It is an important point.

And so, you testified earlier today that Mitch would have been a safety signal. Help me understand how Mitch can be a safety signal when, in fact, the RCA itself a not a safety signal. Could you distinguish those for us, Good Doctor?

MR. SHEEHAN: Objection. Objection to the characterization in the soliloquy.

THE WITNESS: So, I think we are mixing up different things here. So, what I said to you when I used the phrase "a moot point" was the conduct of the evaluation in 2019. We talked earlier about signals and where signals can come from and we agree that they can come from a variety of sources. And the signal in this case came from the regulatory authorities. And in response to that, we did the evaluation. The evaluation was done. So, that's why I say -- and the conclusions were drawn. So, that's why I say we can accept signals from various places.

In this place we didn't do -- the root calls analysis came after the evaluation was done. So, the evaluation was done prior to the root cause analysis. So, the root cause analysis wouldn't have triggered a further evaluation because we had already done one.

Whether the presence of NDMA in the product would have triggered an earlier evaluation, I was not aware that NDMA was present in the product. We have already established that in the conversation we had earlier in the day. So, in the absence of NDMA, the first time that we did the evaluation was when the signal appeared. It came as a result of the regulators. The root cause analysis was done after the event and that identified conditions which we knew NDMA might be formed.

BY MR. CHAFFIN:

Q. Doctor, doesn't this simply go back to what we talked about earlier which is you asked the group when you were part of that recall you said, hey, I want to see the medical assessment. And it certainly is also part of the discussion of what impurities are in there and did we evaluate them. That evaluation in and of itself would be a signal to be evaluated. Would it not?

MR. SHEEHAN: Objection.

THE WITNESS: I'm losing you. I am

sorry. You would have to state that again. It's getting late in the day here.

BY MR. CHAFFIN:

Q. Earlier in the deposition just a few minutes ago we talked about the recall of the brown pills in 2015.

A. Yeah. Yeah.

Q. One of the issues that we talked through -- and I believe you and I agreed -- is that you would want to understand to the level of instrumentation available the impurities that are present; correct?

A. Correct.

Q. And then have an understanding of the level of impurities and evaluate them about potential patient safety; is that correct?

A. Correct.

Q. Okay. And certainly taking information from that and seeing, for example, that NDMA was being released from the product and evaluation can be done across the product to see if it's being released in other products -- excuse me -- within the same product in different ways. Is that a fair statement?

MR. SHEEHAN: Objection.

A. My understanding was NDMA was not found in this analysis.

BY MR. CHAFFIN:

Q. I understand. If it had been --

A. We are conflating two findings aren't we.

Q. Look, I understand it wasn't found. I get it. I'm not saying otherwise. But I'm saying if it were found, one of the things that could have been done by the company was to say, okay, we need to evaluate this in the context of the bigger picture here. Is that a fair statement?

MR. SHEEHAN: Objection.

THE WITNESS: So, if Derek -- if NDMA had been found, the conversation I would have had was with Derek Newall -- just as more recently I had with Jim Harvey who was referenced in that as well -- and we would have discussed and agreed or not to doing a formal evaluation.

BY MR. CHAFFIN:

Q. Right --

A. -- and we did a formal evaluation because the regulators had asked us to.

Q. And, certainly, you would have asked the same questions that the regulators in good conscience were asking, which was we need to do an assessment to see is this breaking down into NDMA, is it breaking in and of itself, right? I mean, everyone is

looking in vivo at some points, but that obvious question of "is the product itself breaking down" is one at the point you find the impurities, like you did in the RCA, like one is an obvious question. Like, what is the level this is happening? Those are questions you legitimately wanted to ask and have answered; correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, the simplest question: Is NDMA is being found? We didn't recognize it was there. Where does it come from?

BY MR. CHAFFIN:

Q. Right. Those are questions you would have wanted to ask; correct?

A. Those were the questions that were asked. That was the extensive work that was done as part of the root cause analysis.

Q. I understand. But that was only in 2019 that was done; correct?

A. Correct.

Q. It wasn't done in 1981, correct?

MR. SHEEHAN: Objection.

THE WITNESS: I can't speak to what was done in 1981 by manufacturing, chemistry, or pharmaceutical development. I wasn't in the company and it's not within my function, so I can't tell you.

BY MR. CHAFFIN:

Q. Certainly, based upon all the documents you viewed in preparation for your deposition and talk with whoever you talked with in the 70 hours or more you spent, you haven't seen anything to see that it was done between 1981 and 2019; is that correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: So, I have seen various papers. You referred to Tanner. I referred you to others, including Britain where clearly conversations were had about nitrosamines, and conclusions were drawn about the relevance of nitrosamines to the product. Various studies were done and had been published and submitted to regulatory authorities.

From that period on, the role of NDMA was not something that, as I said in my testimony, was brought to my attention. And at the end of the day my focus is on patient outcome and then working backwards as we've discussed today as well.

BY MR. CHAFFIN:

Q. Okay. And so other than Tanner, there is no other time that you have seen where the company was evaluating whether NDMA was coming out of ranitidine; is that correct?

MR. SHEEHAN: Objection. Scope.

BY MR. CHAFFIN:
Q. Until --
(Simultaneous crosstalk.)
A. Well, I think you will find the Britain publication that preceded Tanner.
Q. Okay. And that certainly preceded before the product came on the market; is that right?
A. It was 1981. It was prior to license in the U.S., but the product may have been licensed in Europe prior to that.
Q. Did you tell the ladies and gentlemen of the jury at what point you formed the opinion that this was a nonconsequential quality issue and not a safety issue for my clients? When did you form that opinion as the head of safety for the company in 2019?
MR. SHEEHAN: Objection. Objection.
THE WITNESS: When I thoroughly had reviewed the signal evaluation and the accompanying information that were the source documents for that.
BY MR. CHAFFIN:
Q. And so --
A. Publications and the like.
Q. What was the word you used earlier whenever I said about leading questionings? Bayesian?
A. I said Bayesian is where you are

coming in with a presupposition.

Q. Okay. And so you wanted to not be Bayesian in your approach in terms of arriving at your conclusion about whether, you know, NDMA could be causing cancer in the population including my clients. Is that fair?

A. I would go with an open question. Absolutely.

Q. Okay. And it's very important to be open and consider all the evidence; is that fair?

A. I think as a scientist the whole point is that you collect the data, you evaluate the data, and you form a judgment.

Q. And --

A. That's the practice of science.

Q. And you testified already that you actually have spent a lot of time over the years, at least on four different occasions, defending GSK in its position in lawsuits; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I have been deposed four times, yes.

BY MR. CHAFFIN:

Q. And, in fact, you have even defended the company where a product was alleged to have caused

birth defects in the heart of children; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, I was deposed in the paroxetine and congenital malformations case.

BY MR. CHAFFIN:

Q. And you were actually put up as the company witness to make the arguments, the arguments on behalf of the company as to why these products did not cause the harm that was alleged in the case. Isn't that true?

MR. SHEEHAN: Objection.

THE WITNESS: So, we talked earlier about whether I was being deposed as a company witness or in the capacity of giving my own opinion, and I said quite honestly I don't know in what capacity because I'm not familiar with the distinctions, but if that's what you say I was, then I was asked to give a description of the way we practice pharmacovigilance, to speak to how we evaluate data and to talk to the conclusions that were drawn. And I did so in good faith.

BY MR. CHAFFIN:

Q. And, certainly, to make arguments for the company; right?

A. Arguments?

Q. To make the argument of the company

-- let me finish.

To make the argument of the company as to why something did not cause the injury that's alleged.

You have done that on behalf of the company many times; isn't that true?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

THE WITNESS: Yeah, I don't think I would choose to use the word "argument." As I say, I'm a scientist. I present the data as I had reviewed it. I talk about the conclusions that I have drawn and I give my honest opinion.

BY MR. CHAFFIN:

Q. Understood. A scientist should not, should not be interested in sales; they should be interest in safety; correct?

MR. SHEEHAN: Objection.

THE WITNESS: A scientist should be interested in the data. And in the case of someone practicing the science of pharmacovigilance, they should be interested in the safety data.

BY MR. CHAFFIN:

Q. And they should not be Bayesian in their approach and have a results-driven approach;

correct?

A. We go in to evaluating data with an open mind, and we draw conclusions based on the results of the data that we see.

Q. And you certainly shouldn't be making arguments about the data; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I said that I don't recognize the word "arguments," and I don't know in what context you are using it, but my practice is to look at the data, to evaluate the data with colleagues and to draw conclusions based upon what the data is telling me.

BY MR. CHAFFIN:

Q. And you would agree that the word "arguments" would be used by Mr. Sheehan and by myself to the ladies and gentlemen of the jury. It's not something you would be using to form scientific opinions; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Sir, I am not arguing with anyone I am just trying to tell you what my opinions are as a scientist.

BY MR. CHAFFIN:

Q. And certainly as a scientist, you wouldn't be making arguments; is that fair?

MR. SHEEHAN: Objection. Vague.
THE WITNESS: I will go back to what I just said. I'm not arguing with anyone. I am just trying to tell you what evidence I looked at, what evaluations I made, and what conclusions I've drawn.
BY MR. CHAFFIN:
Q. Sir, isn't it true that you actually formed an opinion to defend this company long before you had all the evidence in the case?
MR. SHEEHAN: Objection.
THE WITNESS: No.
BY MR. CHAFFIN:
Q. Isn't it true, sir, that you formed opinions and started building your arguments before you even knew about Tanner?
MR. SHEEHAN: Objection.
THE WITNESS: We formed a view based on the evaluation that we did as a result of the questions asked to us by the European Medicines Agency.
BY MR. CHAFFIN:
Q. You formed that view before Tanner. You formed that view before you considered all the evidence. And you started building your arguments for these attorneys; didn't you?
MR. SHEEHAN: Objection.

THE WITNESS: No, sir.

MR. CHAFFIN: Can we get marked as GSKZAN166425. It has some zeros in, there but that should be the last digits, but if we can mark that as 2637, please.

THE VIDEOGRAPHER: I apologize. That was quick.

Can you see them again.

MR. CHAFFIN: Sure, the last digits are 166425.

THE VIDEOGRAPHER: Thank you.

(Exhibit 2637, GSKZAN166425, marked for identification.)

BY MR. CHAFFIN:

Q. Could you remind the ladies and gentlemen of the jury Helen Steel is, who you testified earlier today?

A. Yes. Helen Steel was a direct report who reported to me, and she headed a group called shared safety sciences.

Q. She is somebody who supposed to be a safety officer of the company like you; correct?

A. She was a physician, someone I worked with for many years, and she headed up the group that included the team in Poland that were managing

ranitidine in 2019.

Q. Okay. Let's start at the bottom of the email, please, John. I will just give you a moment to review. This is initially Helen Steel to you. If you can give us the context of what it is that you guys are addressing.

A. Yeah, so this is the preparation of a response to the European Medicines Agency. So, they asked us a series of questions. And if I'm right -- and I have to refer to question 8 to make sure -- I think this looks to me like it's an element of how we were going to articulate our response to question 8.

Q. Okay. And certainly at this point in time you're building the defense for the company of potential lawsuits regarding ranitidine; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I don't think that we were considering lawsuits in any way. What we were trying to do was to evaluate the benefit and risk profile of the product and whether the finding of NDMA had in any way altered the benefit risk of the product. So, what you will see here is an interaction between Helen and I saying how can we best put into context, as we understand the data, both the benefits of ranitidine and any risks.

BY MR. CHAFFIN:

Q. And, Good Doctor, you certainly were formulating your arguments at this point before you had all the information and on the case including Tanner, for example; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: So, we were formulating a response to the European's Medicine's Agency that had given us a time frame for response -- and I can't tell you what the time from was here because I don't remember, but I suspect that this was in a matter of days or weeks because that is the nature of these things. And what we were trying to do was to lay out our understanding of the situation.

And, yes, science is about continuing to collect data, to continue looking for things as we talked about. Pharmacovigilance is about looking at the lifetime of the product. And, yes, further data became available after this point, which I think was Tanner. So, I think that was subsequent to this, but I may be wrong. And the information we had is what we described in the response to question 8.

BY MR. CHAFFIN:

Q. And, certainly, if we scroll up, Good Doctor, you will actually see that you are talk ing with

her about what arguments to make in response to the questions; is that fair?

MR. SHEEHAN: Objection.

THE WITNESS: At the moment --

BY MR. CHAFFIN:

Q. Scroll up --

(Simultaneous crosstalk.)

Q. I'm not either. The top of the email.

A. The top of the email, but yes, Helen and I were discussing how best we should respond to question 8.

Q. And these arguments are the same arguments that are being formed -- formed the defense of GSK in this litigation; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: These arguments -- well, if you give me five minutes, I will read what's here and I will tell you. But just in response to that what we were trying to do was to give a medical view of data as we saw it. I see no reason to believe that the medical view that I gave to the regulators would be different than the views I expressed to you today as a medical doctor. But I can read the question.

BY MR. CHAFFIN:

Q. Certainly, here as you read the question you agree with me that you are making arguments as a scientist; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: I am -- you used the word "arguments" again, I think.

BY MR. CHAFFIN:

Q. It's your word, Doctor. Go ahead and read the document.

A. No, no. What I'm saying -- the question was: Am I being a scientist? The answer is: Yes, I am being a scientist.

Q. If you look at the third bullet point up, Doctor, that word that you say you don't use as a scientist, "it's an important part of the argument," you are making arguments for the company.

MR. SHEEHAN: Objection.

THE WITNESS: So, the third bullet doesn't use the word "argument" in it. It says, "And I agree it's all very repetitive. I would shorten considerably and simply answer the question in much the same way as you did for the question 7."

BY MR. CHAFFIN:

Q. Yeah, I agree it doesn't. The third one from the bottom does, though, which is the one I

just referenced --

A. Third one from the bottom. Sorry. Got the wrong one.

Okay. So, the word "argument" is in there.

I still stand by what I'm saying; I am not trying to argue anything. I am trying to present data and draw conclusions.

Q. And, certainly, as of October 2019, you are already making arguments about the company's position; isn't that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Again, I don't think that that is a true representation. It's really got nothing to do with the company's position. It's got to do with my view as a medical scientist about the role of ranitidine in the treatment of patients with various indications and what the implications of the NDMA finding is in the context of benefit and risk. So, this is a scientific presentation of the data.

The overall conclusions to be drawn -- and we know what the overall conclusion drawn by the European authorities is beyond my role. My role is to be the medical scientist and the safety medical scientist specifically.

MR. CHAFFIN: John, could you stop sharing, please.

BY MR. CHAFFIN:

Q. Doctor, how many times have you made the argument this is a quality issue, not a safety issue?

MR. SHEEHAN: Objection.

THE WITNESS: I can't tell you how many times I've said it, but I believe -- and I continue to believe that the safety data available to me and that I have evaluated -- does not show a risk in patients of NDMA. I think the presence of NDMA in the ranitidine product is a quality issue. And I think that that needs to be resolved by companies who continue to market the product, but I do not genuinely believe that I have seen a safety issue.

BY MR. CHAFFIN:

Q. Doctor, can you tell me is there any in vivo studies evaluating the release of NDMA from patients who were taking ranitidine, to your knowledge?

A. My understanding is that the FDA are currently doing that study, but I don't know what the results are.

Q. And GSK was asked to be a sponsor of that study and you guys passed; correct?

MR. SHEEHAN: Scope.

THE WITNESS: So, GSK was asked about the conduct of such a study, and we said very clearly to the European authorities that if such a study were to be conducted, we needed to be very clear that the regulatory authorities were clear on what questions needed to be asked. Because, as you know, there is a significant background incidence of NDMA exposure. So, questions about controlling for diet, for instance, how long volunteers needed to be viewed for -- they are a whole series of scientific questions in there. If GSK had gone off and done the study tomorrow, say, there was no guarantee that the questions that we answered would be the ones that the regulators asked us. And in doing a human volunteer study -- and that's what we were choosing to do -- we have to be very clear that we understand the scientific question being asked.

So, what GSK said was we don't wish to do the study at this point, but we would like to enter into discussion with you, the regulatory authorities, to understand what such a study would look like. In the meantime, the FDA chose to go ahead and do the study.

BY MR. CHAFFIN:

Q. And it certainly wasn't in GSK's economic interest to do a study, correct?

MR. SHEEHAN: Objection. Scope.

THE WITNESS: I think that's a question about a business decision, which I'm not the right person to address, but GSK chose not to do the study and certainly chose not to do the study until it was very clear what questions needed to be addressed. So, had we completely closed out the option of doing the study? No, I don't think we had.

BY MR. CHAFFIN:

Q. Who made the decision not to fund the study with the FDA?

MR. SHEEHAN: Scope.

THE WITNESS: I was not involved in any discussions about funding the study with the FDA. I didn't even know that there was a question about funding the study with the FDA.

BY MR. CHAFFIN:

Q. Who was involved in the question of GSK not doing an in vivo study?

MR. SHEEHAN: Scope.

THE WITNESS: So, the response team to the European authorities, because the question came to us from -- so, the question didn't come from FDA; it came from the European authorities. And they said it would be interesting to know the results of the in vivo study. So, the team that was discussing that made the decision. And I

was part of that team, as was Helen Fitton from regulatory, and we were very clear in saying if we do such a study we need to understand clearly what the study is, what questions it's trying to address, and what answers we are trying to understand. In other words, what methodology we are using, what analysis we should undertake.

BY MR. CHAFFIN:

Q. This wasn't the first time that GSK made the decision not to fund studies for Zantac; is that correct?

MR. SHEEHAN: Objection.

THE WITNESS: Pharmaceutical companies are faced with requests to fund studies all the time for all products, and Zantac would be no different. And I am sure that there were requests over the years about funding studies, and GSK chose not to do so.

BY MR. CHAFFIN:

Q. And, in fact, you actually refused funding for an epidemiology study about kids developing asthma from Zantac. Isn't that true?

MR. SHEEHAN: Objection.

THE WITNESS: That may be a question for the epidemiology department. It is not something, unless you show me documentation, I recollect.

BY MR. CHAFFIN:

Q. Okay.

And in terms of Zantac generally, it certainly is not today the blockbuster, big drug that it was back in the 1980s and '90s for the company; is that correct? I should say the time leading up to the withdrawal in 2019; is that correct?

MR. SHEEHAN: Scope.

THE WITNESS: The -- all products have a life cycle. New products come along. The use of GSK -- the use of ranitidine -- GSK's ranitidine in the '80s and '90s was significantly greater than it is now.

BY MR. CHAFFIN:

Q. And, certainly, the funding that GSK put into products is far greater in other fronts, not on Zantac; correct?

MR. SHEEHAN: Scope.

THE WITNESS: So, GSK chooses to allocate its resource to, you know, its portfolio in a way that it decides is most appropriate. And there was not a large amount of resource being placed into Zantac in the last few years.

BY MR. CHAFFIN:

Q. Understood.

MR. CHAFFIN: All right. Let's take a break for a minute. Thank you.

THE VIDEOGRAPHER: Going off the record --

MR. SHEEHAN: How long are we talking here when you say break?

MR. CHAFFIN: Yeah, let's take 10 minutes.

MR. SHEEHAN: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 1609 UTC.

(Off the record.)

THE VIDEOGRAPHER: Standby for the recording.

We are back on the record. The time is 1636 UTC. Please proceed.

MR. CHAFFIN: So, Tom, I am going to turn over the witness now to you. I don't have any other questions right now. I am, obviously, going to rule -- excuse me -- rule -- I will reserve on the issue of any Rule 26 disclosure for him, obviously, but otherwise I will turn the witness over to you.

MR. SHEEHAN: Okay. Great. I didn't know that was going to happen, so why don't we take another five, and then we will come right back.

MR. CHAFFIN: I wasn't sure either. I would have done it off the record, but I figured I would

put it on the record. So, all right?

MR. SHEEHAN: Okay. Great. Why don't we say 10 minutes, and then we will come back on.

MR. CHAFFIN: Sounds good.

THE VIDEOGRAPHER: Going off the record the time is 1627 UTC.

(Off the record.)

THE VIDEOGRAPHER: Standby, please.

We are back on the record. The time is 1650 UTC. Please proceed examination.

EXAMINATION BY MR. SHEEHAN:

Q. Dr. Hobbiger, I just wanted to thank you for your time today. I have just a few questions to follow up after your examination by Mr. Chaffin.

Mr. Chaffin asked you a number of questions about your agreement with GSK regarding this deposition.

Do you recall that?

A. Yes, I do.

Q. Is it your understanding that you were asked to address a number of identified topics related to pharmacovigilance in connection with this deposition?

A. Yes.

Q. You mentioned that you are being

compensated.

Do you recall that?

A. Yes, I do.

Q. Why are you being compensated?

A. Because I am retired from the company. I'm coming back to provide my expert opinion and my knowledge of pharmacovigilance --

Q. Are you being compensated for your time today?

A. I'm being compensated for my time.

Q. Is GSK paying you to provide testimony in this case?

A. No.

Q. Is GSK paying for your opinion in this case?

A. No.

Q. Now, you mentioned a few times in your testimony that the pharmacovigilance department at GSK practices evidence-based science.

What do you mean by that?

A. Evidence-based in the way that I'm using the terminology means that we look at the data and we draw conclusions based upon the data.

Q. And do you try to evaluate the totality of relevant data when assessing a potential

safety signal?

A. Yes, we do.

Q. In your decades at the company, have you ever seen an instance where GSK ignores a safety signal?

A. No.

Q. In connection with GSK's safety evaluation of Zantac and cancer risk, can you just describe the process that the company undertook to evaluate any relationship between Zantac and cancer?

A. So, a signal evaluation follows a defined process. It follows a defined approach, which is designed to be inclusive. So, we would have looked at all sources of data available to us. That would have included the preclinical data. It would have included the safety data. It would have included the data in other regulatory authorities databases. For example, we can look at FDA as an example. We would have done a DPA score, so a reporting frequency score as part of all of that evaluation. And, of course, we would have looked extensively at the epidemiology. And, in deed, we involved those epidemiology colleagues in doing that evaluation for us, and we discussed it with them.

Q. How many people would you say, approximately, from GSK were involved in assessing

Zantac and cancer?
A. So, in putting the evaluation together, the team in Poland, which would have been probably three scientists and a physician, plus Helen Steel and myself -- Helen Steel was the line manager, we referred to her earlier, and Marianne Cummington who was the epidemiologist who reviewed for us the epidemiology data and discussed it with us. So, half a dozen or thereabouts.
Q. And was the GSK safety evaluation of Zantac and cancer a robust analysis in your opinion?
A. In my opinion, yes.
Q. And was that evaluation shared with regulators?
A. Yes, it formed part of the response to the questions from the European authorities and then was submitted subsequently to other regulatory authorities around the world.
Q. Okay. And the EMA, for example, did they agree or disagree with GSK's evaluation of Zantac and cancer?
A. I think it's clear from the documentation that they released subsequently that they accepted GSK's evaluation; they didn't come back to us with additional questions and they reached the same

conclusion we did.

Q. And what was that conclusion with respect to Zantac and cancer?

A. That there was no evidence of an increased risk of cancer in patients taking ranitidine.

Q. Do you stand by that conclusion today?

A. I do.

Q. Has Mr. Chaffin showed you anything today to support the claim that ranitidine causes cancer?

A. No, sir.

Q. And did Mr. Chaffin show you anything today that changes the conclusions of the safety evaluation done by GSK?

A. I stand by those conclusions.

MR. SHEEHAN: Thank you very much for your time. No further questions from me.

MR. CHAFFIN: Okay. I think that concludes then.

Tom, I am going to put on the record real fast. Jess is going to send you a FedEx number. If you could just send that box back to us, that would be great. And that will make it easy that way you don't have to carry or lug it.

MR. SHEEHAN: We can just burn it, I mean --

MR. CHAFFIN: No. No, worries. She will send us the FedEx. It will save us paper. We will reuse it anyway. Thank you. I appreciate it.

MR. SHEEHAN: Okay. Fair enough.

THE VIDEOGRAPHER: This will conclude today's deposition. The time is 1655 UTC.

We are now off the record.

-o0o-

(Deposition concluded at 1655 UTC)

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In RE: Zantac (Ranitidine)
Dep. Date: Tuesday June 15, 2021
Deponent: DR. STEPHEN HOBBIGER

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that if offer these changes as if still under oath.

____________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF____________, 2021.

________________________________

(Notary Public)

MY COMMISSION EXPIRES:_______

DEPOSITION ERRATA SHEET:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |
| ___ | ___ | ________________ | ________________ | _______ |

DEPOSITION ERRATA SHEET:

Pg. Ln. Now Reads Should Read Reason

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

___ ___ ________________ ________________ _______

SIGNATURE:_________________ DATE: ________

C E R T I F I C A T E

I, MELISSA A. MORMILE, a Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination of DR. STEPHEN HOBBIGER was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any party in this action and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the event nor outcome of this action.

Melissa Mormile

________________________________________

Melissa Ann Mormile
Certificate No. 30X100223800
6/17/21

**Exhibits**

**EX 2624 Stephen Hobbiger 061521**
7:8 31:20,24 32:5,25
**EX 2625 Stephen Hobbiger 061521**
7:9 88:19 89:4
**EX 2626 Stephen Hobbiger 061521**
7:10 224:24 225:6 226:1 228:12,23
**EX 2627 Stephen Hobbiger 061521**
7:11 226:3,6 230:14 232:9
**EX 2628 Stephen Hobbiger 061521**
7:12 226:20,21 254:6
**EX 2629 Stephen Hobbiger 061521**
7:13 227:10,11 257:11
**EX 2630 Stephen Hobbiger 061521**
7:14 227:13,14 259:23
**EX 2631 Stephen Hobbiger 061521**
7:15 227:20,21 260:11
**EX 2632 Stephen Hobbiger 061521**
7:16 227:24,25 261:9
**EX 2633 Stephen Hobbiger 061521**
7:17 228:3,4 261:18
**EX 2634 Stephen Hobbiger 061521**
7:18 228:7,8 262:16
**EX 2635 Stephen Hobbiger 061521**
7:19 267:12 268:13 269:2 272:16 285:15
**EX 2636 Stephen Hobbiger 061521**
7:20 282:17,18
**EX 2637 Stephen Hobbiger 061521**
7:21 315:4,12

**$**

**$2**
26:2

**-**

**-e**
150:6
**-i-n-g-t-o-n**
149:16
**-is**
83:16
**-o0o-**
332:10

**0**

**04**
138:21
**05**
134:12,15 138:21 235:6

**1**

**1**
109:13 231:5,20,24
**10**
223:9 326:5 327:3
**100**
132:7
**100,000**
175:23
**1013**
9:14
**1031**
91:6
**1047**
91:9
**11.6**
240:13
**12**
256:5,7 269:4
**12.0**
256:10
**1218UTC**
177:4
**13**
216:9
**1303UTC**
177:8
**14**
233:16 234:22
**1444**
267:10
**15**
8:23 158:13 161:12
**1504UTC**
267:17
**16**
74:6,13,21
**160**
239:6
**1609**
326:9
**1627**
327:6
**1636**
326:14
**1650**
327:10
**1655**
332:8,11
**166425**
315:10
**167444**
289:10
**167446**
286:17
**18**
47:4,15 189:9
**19**
45:23 47:22 69:18 75:5 104:2 128:13 131:7 138:11
**1980**
219:19,24 220:22
**1980s**
49:5 50:18 200:1,9 201:10 202:13 207:17 220:7 325:4
**1981**
127:23 128:3 138:25 139:12

142:20 201:5 209:9 219:12 303:5 307:20,23 308:6 309:8
**1985**
53:13 260:1
**1987**
260:18 261:2,3
**1989**
22:25 260:2 261:13
**1990s**
216:10
**1996**
140:13
**1:00**
176:8,23

**2**

**2**
176:24 227:5 234:11 264:18,19
**20**
49:25 69:18 79:16 128:15 131:7,10 133:19 158:13 161:12 176:22 223:9
**2000**
16:1 142:12
**2000s**
217:24 219:2
**2001**
23:3 128:8,9 134:1,9 189:14
**2004**
134:12,15 235:6
**2009**
30:8 189:15
**2010**
143:15,23 234:2,8 254:12,13
**2012**
143:16,23
**2013**
31:4 285:5, 22,25
**2014**
31:4
**2015**
64:17 74:6, 8,13,21 189:9 190:3, 6 191:15 196:10 247:12,14 269:4,7 271:25 274:25 285:14,24 305:6
**2015/2016**
242:14
**2016**
64:17 74:8 243:15 251:23 253:13
**2017**
138:17
**2018**
43:1,5 47:3 69:18 75:5,7 106:24 128:12 130:5 138:11,17 190:6,7 216:16 246:4
**2019**
42:19 43:2, 10,17,18 44:6 48:12 49:25 57:15 58:10 66:4 68:4,15 72:23 75:3, 15,25 76:10 77:23 78:10 83:17 84:2, 13 85:1 86:11 87:10 88:5 96:19 104:4,9 105:4 107:18 131:7,10 133:2,19 149:12 200:11 201:6 206:11 207:17 217:5 247:13,15 282:5 303:4, 19 307:18 308:6 309:15 316:1 320:9 325:6
**2020**
15:25 43:20, 23 44:6,8,10 47:5,16 130:5
**2021**
8:23 16:1,6 23:3 30:21 43:23 128:9
**21**
49:25 221:1, 3 236:10
**21-page**
32:22
**22-page**
32:23
**227**
232:7
**26**
226:9 326:19
**2624**
31:20,24 32:5,25
**2625**
88:19 89:4
**2626**
224:24 225:6 226:1 228:12,23
**2627**
226:3,6 230:14 232:9
**2628**
226:20,21 254:6
**2629**
227:10,11 257:11
**2630**
227:13,14 259:23
**2631**
227:20,21 260:11
**2632**
227:24,25 261:9
**2633**
228:3,4 261:18
**2634**
228:7,8 262:16
**2635**
267:12 268:13 269:2 272:16 285:15
**2636**
282:17,18
**2637**
315:4,12
**26534**
228:7
**27379**
227:13
**27415**
227:20
**27431**
227:24
**28950**
228:3

## 3

**3**
16:5 231:24
**3-**
187:16
**30**
23:4 66:1 129:24 145:5 223:9
**30517**
224:19,21 228:24
**31**
56:24 111:12 173:3,8,11
**33735**
226:20
**3517**
227:2
**37872**
226:4 227:5 232:17
**3rd**
15:23,25 19:10 22:13 39:12 44:16

## 4

**40**
115:17 145:5 176:23 240:12
**40-year-old**
163:11
**400**
18:20 20:15 134:24 187:16 294:2
**449**
284:19
**48372**
227:10
**493**
256:7

## 5

**5**
257:19
**50**
298:9
**500**
134:24
**513**
9:15

## 6

**60**
298:9
**68**
240:12
**6:30**
90:23
**6:40**
91:1
**6th**
289:12

## 7

**7**
319:22
**7/12/15**
267:12
**70**
20:13,14 22:6,14 308:4
**7th**
88:25

## 8

**8**
236:12 316:10,12 317:22 318:12
**80**
132:7
**80s**
73:17,21 76:8 78:18 86:6,17 88:11 140:2 142:5 204:18 206:23 216:8,16 218:4 325:10
**81**
128:6 139:6, 7
**82**
209:9
**85**
65:23

## 9

**90s**
217:24 219:2 220:23 325:4,11
**913**
8:24 9:10
**99**
142:12

## A

**abbreviation**
42:15 187:14
**abide**
92:1
**abiding**
92:2
**ability**
34:4
**able**
119:25 201:19 230:17 255:7 282:13
**abnormality**
288:11,15
**above**
63:7 64:7 69:4 82:6 108:5
**absence**
80:6,7 259:7 304:10
**absolutely**
13:1 40:11 41:17 44:9 99:23 109:18 128:23 149:7 178:8 180:10 192:8 194:21 219:24 248:20 264:16 265:20 273:18,24 279:21 284:24 310:8
**academics**
121:15
**accelerated**
299:3
**accent**
132:19
**accept**
59:10,12 64:3 164:6 303:25
**acceptable**
110:5 281:1 289:25 290:21
**accepted**
64:4 281:15 330:24
**access**
15:6,18,21 30:4,19 137:12 256:25
**accommodation**
142:8
**accompanying**
309:18

**account** 15:23
**accountability** 35:22 45:13 130:7 133:7 146:11
**accountable** 36:3 43:15
**accumulation** 209:7
**accurate** 63:12 88:23 93:16 118:2
**acid** 51:22 54:16 288:3
**acidity** 210:22
**acknowledge** 9:25 10:3
**acquired** 23:10 132:4 146:12
**across** 305:20
**act** 278:1
**acting** 179:3
**action** 9:4 46:13 51:19 66:25 72:2,10 155:24 183:7 185:22 186:13 214:17 281:20
**actions** 118:24 173:10
**active** 137:14
**actively** 147:5,9
**activities** 122:7,11 148:21 152:9 179:6
**activity** 230:4 247:4
**actual** 78:4 233:17
**Ad** 57:9
**add** 127:9 145:8 148:4
**added** 182:13
**additional** 80:12 152:8 166:17 167:2,23 179:6 190:8 219:17 330:25
**additions** 125:6
**address** 11:9 323:3 324:4 327:21
**addressed** 300:6 323:5
**addressing** 316:6
**adequate** 124:2,10,20
**adequately** 124:22
**adjust** 302:15
**adjustments** 179:22
**administered** 10:4
**Adopt** 239:13
**advance** 273:5
**advances** 184:7
**adverse** 55:23 70:23 72:16 109:7 139:14 148:22 182:5 183:9,11,12 184:12 201:22 205:14 213:21 258:18 259:4,5,8,14
**advertising** 119:17,18,22 120:12,25 121:2
**advice** 101:12 212:6
**advise** 39:24 108:10 158:14 198:16
**advisor** 43:23 44:11 45:3
**advisory** 43:25 207:1
**affairs** 122:17 123:3 146:1,5,6,8, 14,16,20 147:2,12,18 156:13 189:6 241:20 273:16 283:23
**affected** 123:16
**affiliates** 135:1
**afraid** 197:22 201:15 262:5 264:8
**afterwards** 172:4,7 271:13
**agencies** 238:11,16
**Agency** 48:2 49:24 56:23 57:7 68:3 75:10 86:3 142:18 161:22 174:20 195:21,22 236:3 314:19 316:8 317:8
**Agnieszka** 130:15
**ago** 33:7 62:17 81:8 89:8 186:10 213:4 221:1 241:23 297:25 299:6 305:5
**agree** 29:8 58:17 109:12,24 113:16,22 118:16 121:9 123:7,19,20 126:3,8,15 127:5 150:19 151:19 171:8,20 178:22 179:21,24 180:21,23 181:8,25 183:17,20 197:12,13 204:11 252:6 265:14 279:4 300:10,14 301:8 303:20 313:14 319:2,20,24 330:20
**agreed** 82:8 118:24 160:8 172:19 202:2 207:3

266:11 273:6 305:9 306:16
**agreeing** 290:19
**agreement** 8:7 10:10, 11,17 201:25 275:17 327:16
**ahead** 81:19 150:11 153:14 225:23 254:1 301:25 319:8 322:21
**aids** 119:1
**alert** 181:18 189:21 207:6 250:6 253:23
**alerts** 234:24
**aligned** 143:19 144:8
**alive** 139:7
**alleged** 24:20 310:25 311:9 312:4
**alleging** 42:1
**allocate** 325:18
**allow** 57:8 94:23 284:3 296:11
**allowed** 94:17,23
**alter** 103:13
**altered** 316:21
**alternative** 111:3,21 112:2,7,14 113:6 153:8 154:24 156:4
**alternatives** 112:15,19,23 156:21
**ambiguous** 46:4,17 50:21 67:9 68:17 72:25 73:13 79:3, 23 84:16 86:14 87:6
**America** 129:17
**American** 141:1
**amount** 22:10 165:18 288:6 325:20
**amounts** 206:13 250:14
**analogies** 221:19
**analysis** 67:25 68:2,6 73:2,23 76:9 162:23 163:20 179:19 196:19 251:5 265:9 288:10,23 296:22 298:20,21 300:16 302:10 304:2,3,4,13 305:25 307:16 324:6 330:11
**analyst** 197:1,17 211:13,21 212:15 280:18 291:1
**analysts** 282:13 284:11 290:14
**analytical** 196:17 197:7 198:20 211:15 264:7 290:12 291:3,23
**analytics** 198:17
**and/or** 8:8
**Andrew** 67:17 135:14 283:15,22 287:1
**animal** 71:8 72:10 80:1,7 82:24
**answer** 13:7 24:9,13 27:4 34:4,13 45:17 50:8 54:4 56:24 57:12 59:7 62:9 63:2 77:1 78:21 79:5,6 80:18 84:7,9 85:23 91:16 93:6 97:18 101:2, 3,4 120:1 121:8 122:3 134:22 154:25 164:15 170:17 201:13 218:13,16 266:19 278:17 280:1 293:1,8 301:3,17,18 302:4,8 319:11,21
**answered** 31:8 34:5 38:10 45:15 54:6 60:20 62:2 63:5, 14,25 69:22 71:22 72:25 73:6 77:12 81:3 82:3 83:15 84:16 86:14 171:7 307:6 322:12
**answering** 56:21 62:25 301:4
**answers** 24:4 281:19 324:4
**antagonist** 66:15,16
**anticipate** 216:11
**anticipated** 184:18
**anybody** 22:6 131:19 132:8 149:17 159:1,7,18 210:1 226:23
**anymore** 170:18 229:1
**anyone** 8:16 34:6 131:10 149:11 195:25 196:4 241:8 300:8 313:21 314:3
**anyplace** 217:2 220:3, 5,9
**apologize** 150:5 178:17 180:10 230:19 232:8 285:23 315:6
**apparently** 245:1
**appearances** 58:3

**appeared**
57:5 304:11
**appearing**
57:10
**appears**
189:8
**appendices**
255:3,16
**application**
212:9
**applied**
196:18 211:9 212:1
**apply**
206:7 211:17
**appointed**
142:15
**appreciate**
34:8 76:17 84:6 93:12 139:9 292:1 332:5
**appreciates**
283:20
**appreciation**
183:5
**approach**
77:23 120:14 278:15 310:3 312:25 329:12
**approaching**
278:5
**appropriate**
40:18 114:10,14 118:23 125:21 152:1,5,17 154:25 157:2 160:24 162:14 166:4 167:8 168:15 179:3,7,12, 23 192:17 219:17 277:11,12 291:6 301:24 325:19
**appropriately**
118:10 167:9 180:25 209:17 278:2 295:18
**approval**
37:18,20 49:1,4 73:17 76:7 184:4 187:8 216:13 266:10
**approve**
36:22 125:3 270:22
**approved**
37:10 116:19 117:4 123:14,25 142:4 145:25 146:7 194:1 203:4 209:12 213:19 219:19 241:19 243:4 266:5 270:23 275:18 281:16,17
**approximately**
18:13 30:9 49:14,20 329:25
**arching**
81:20
**archive**
246:14
**archived**
137:11,15 256:23
**archives**
208:15,16
**area**
40:18 76:13, 18 123:2 143:20,25 145:10,19 239:17
**areas**
143:19
**argue**
56:6 102:19 109:5 320:7
**arguing**
313:20 314:3
**argument**
311:25 312:2,10 319:15,19 320:4 321:5
**arguments**
279:6,15 311:7,22,24 313:6,9,15, 25 314:14,23 317:3 318:1, 13,14,17 319:2,6,16 320:10
**ARGUS**
141:7,11,12, 14,17,20
**arise**
71:24 187:25 203:24 248:13
**Arnold**
273:16
**around**
11:16 30:8 31:5 36:15 40:22 41:12, 18 42:19 43:1 48:3 53:3 79:9 83:22 86:6,7 99:25 100:8 117:7 139:7 141:15 142:9 143:15,23 160:14 166:9 167:19 195:19,20,23 199:4 200:1 202:21 221:2 236:4 288:4, 5 330:18
**arrangement**
10:8 249:15
**arriving**
310:3
**article**
56:24 111:12 136:12 173:3,8,11 204:23 244:5,12 253:17 266:19
**articles**
74:5,21 121:11,15,17 136:19 243:25 244:9 248:4 250:4
**articulate**
316:12
**asked**
13:7 26:15 29:14,19 34:23 38:9 45:20 46:10 54:5 58:7 60:19 62:1 63:4,13,24 69:21 71:21 72:24 77:11 81:3 82:2 83:14 84:15 85:18,19 86:1,13 93:1 95:25 134:20 150:14 173:16 175:22 195:22 213:9,10 216:8 218:14 243:1 253:16 271:1,9 276:2 291:20 295:9,18 300:20 301:7,21

304:17 306:20,21 307:15 311:17 314:19 316:9 321:23 322:1,6,13, 16 327:15,21

**asking**
27:15 28:22 29:5 39:21 46:22 59:4 60:16 61:21 62:20,22 71:17 77:7 81:20,23 82:1 83:17 84:8,9,10 85:14 86:25 88:9 96:23 99:2 103:4 106:16,19 119:20 168:3 206:5,14 209:22 211:5 215:6,7 216:23 250:13 251:8 253:1,12 271:11 274:25 275:17 299:19 301:5,6 302:6,9 306:23

**assessed**
282:8

**assessing**
178:24 328:25 329:25

**assessment**
46:12 148:22 151:15 165:5,20 169:22 191:8 262:8 272:21 273:4,5,7, 10,22 275:1, 7 276:6 277:12 284:3,13 286:19,20,23 290:14 304:19 306:24

**assessor**
196:10

**assessors**
242:14

**asset**
264:24

**assets**
131:12

**assign**
146:19

**assigned**
138:13 144:13

**associated**
118:12 182:7 241:4 262:8

**association**
126:5,20 151:25

**assume**
40:20 90:10 91:17 137:7 260:13

**assumed**
27:23

**assuming**
154:19 284:14

**assumption**
28:1 56:13 256:9

**asthma**
324:20

**attached**
272:10

**attachments**
32:23

**attempt**
56:16

**attention**
86:10 106:10 107:2,4 128:4 207:19 308:17

**attorney-client**
8:8

**attorneys**
9:24 12:3 91:25 314:24

**attuned**
80:15

**authorities**
42:21 52:4 56:21,22 93:23 94:2,4 100:6 103:12 108:10 170:24 206:25 208:22 237:1,12 238:14,18,19 239:25 242:5 249:4,11,25 250:8,9 300:21,25 301:7 302:25 303:22 308:14 320:23 322:3,5,19 323:21,23 329:17 330:16,18

**authority**
236:24

**autoclave**
302:1

**available**
98:17 111:3, 4,22 112:2, 13 113:6 138:3 139:24 141:8 149:8 153:8 154:22,25 156:4,21 161:13 164:3 166:5 173:22 197:20 204:8 220:16 225:15 238:19 247:14 292:7 305:11 317:18 321:10 329:14

**Avandia**
29:20 30:2, 14

**awaiting**
272:10

**aware**
8:4 21:17 42:17 46:10, 15 48:25 49:8 52:12 53:1,10 58:17 68:13 86:9 95:2,3 99:18 100:12 105:21 106:1,3,16, 24 107:22 109:19 125:12 137:24 148:16 153:20 195:17 198:7 218:9 220:12 222:6 236:18,20 237:4 243:21 249:17 271:6 274:3,14 285:9,10 304:8

**B**

**back**
22:5 23:14 24:9 30:3,20 49:1 50:18 54:9 61:10, 20 64:2,16 70:22,24 72:19 76:7, 25 78:23 79:5 80:12 84:23 87:2 88:5 90:4,19 91:8,12 97:18 101:1, 10 102:14 107:7,12 124:6 126:23 127:12,23 128:3,12 133:17 138:24 139:2 150:13 157:17,21 161:11 164:14 165:23 176:18 177:7 191:15 193:3 198:1,13 200:9 203:3 204:4 205:5 206:15 207:7 209:20 211:14 213:22,23 216:8 218:3 220:4,22 221:17 223:5 233:20,23 245:2 250:9 252:5 253:11 254:19,25 256:1 259:19 260:24,25 264:11 266:18 267:6,16,20 277:7 282:1 285:25 286:2 295:13 304:16 314:2 325:4 326:13,23 327:3,9 328:6 330:24 331:23

**background**
322:7

**backwards**
71:1,5,19 77:4 128:21 198:15 202:5 206:3 213:6 308:18

**bag**
14:17

**balance**
178:24 179:2,24 202:25

**banana**
177:17

**bang**
89:1

**Bangalore**
129:14

**bar**
296:2

**barcode**
193:17 194:7

**based**
12:4,5 34:19 98:14 134:6 135:10,21 144:7 152:22 162:22 163:23 165:5 168:12 170:21 174:15 209:23 232:2 239:2 270:18 278:16 283:7 287:16 289:23 291:10 302:6,9 308:2 313:3, 12 314:17 328:23

**basically**
129:10 189:19 235:9 245:3

**basis**
70:5 199:17 244:25

**batch**
84:24

**Bates**
224:19 226:11,14 228:24 232:10,13, 15,16 284:18

**Bayes**
278:15

**bayesian**
278:12 309:24,25 310:3 312:24

**begin**
47:1 131:2 143:17 146:22

**beginning**
49:22 64:8 139:1 180:3 236:9

**behalf**
9:3,6 10:13, 15 33:11 43:16 68:19 201:6 268:10 293:12,18 311:8 312:5

**behave**
71:15 79:8 203:22

**behaves**
72:15

**behind**
14:17

**beings**
59:25 79:9, 13 81:7 97:22 98:15 99:20,21 100:9 101:9 210:7 213:21 223:14

**belief**
204:19

**believe**
9:15 13:18 30:7 45:22 48:7 50:22 59:20 61:13 62:17 64:5 86:24 88:2, 20 91:19 104:6 110:23 119:21 142:9 163:13 200:3 216:7 219:22 227:2 236:21 255:23 259:6 271:3 274:6 283:1 285:19 286:22 300:15 305:9 318:21 321:9,10,15

**below**
291:5 298:16

**benefit**
109:25 110:11,23 111:4 112:6, 12,20 117:7 118:11,13 139:21 162:23,24 163:6,8,14, 20 164:1,18, 19 167:8,11 169:2,15,19, 21 171:15

178:24 179:2,6,19, 24 194:5 202:25 207:14 216:18 217:15 262:20 263:1,6 316:20,22 320:19
**benefits** 110:16 116:25 117:11 118:3 121:1 166:23 167:21 179:11 316:25
**besides** 13:2 29:12 31:9 39:1 41:8 63:20 64:14 71:18 122:23 130:23 159:1 161:1
**best** 71:14 113:20 128:5 148:10 225:20 230:20 279:23 296:6 316:23 318:11
**better** 34:12 103:21 113:24 114:3 217:18 299:21
**big** 21:8 135:7 233:6 240:1 292:11 325:3
**bigger** 128:21 306:9
**billed** 18:24 19:14
**billing** 19:19
**bind** 24:3
**binding** 33:10 45:17
**bioanalysis** 196:19
**biochemical** 259:7
**birth** 14:1 24:21, 24 26:16,20 152:10 311:1
**bit** 33:5 138:24 198:22 215:10 230:2 231:12 236:15 255:2 270:14 286:23,25
**black** 11:7 64:20
**bladder** 236:6
**blank** 13:4 254:17
**blanket** 110:1
**blistering** 187:21
**blockbuster** 142:22,25 325:3
**blocker** 66:14,18,21 67:1,2
**blocking** 262:13
**blocks** 81:21
**board** 37:14 153:5, 7,13,17,20, 22,25 154:3, 4,5,13,16,19 155:1,6,10, 11,17,22 156:2,11,18 157:11,14, 16,18 158:5, 10,12,16,17, 20,23,25 159:14,15 161:1 168:25 170:16 175:1 269:7 270:22 272:5 273:3 285:12 295:22 296:5
**board's** 156:25
**boat** 227:17
**bodies** 116:13 222:16
**body** 35:20 51:13 53:11 170:1 196:2
**bold** 234:25
**bottle** 241:4
**bottom** 210:2 233:18 255:7 268:25 270:3,5,8,13 282:21,25 316:2 319:25 320:2
**bout** 161:20,21
**box** 224:20 226:12 227:3,4 228:19 331:23
**Brack** 11:7
**brand** 144:15 146:22
**breadth** 33:24 34:3 198:18,19
**break** 68:10,21 69:20 90:17 176:5 267:5 325:25 326:4
**breakdown** 72:20,25 84:25 86:11 97:4 98:11, 22 99:12 100:4,23 105:13 274:15
**breaking** 67:7 68:7,14 73:11 76:2 77:21 80:20 83:20 84:11 97:14 105:23 300:16 301:10 306:24,25 307:2
**breaks** 12:14,20 92:8 96:20 105:5 204:13
**Brexit** 43:18
**bridge** 11:8 264:10
**bring** 89:10,15 102:14 156:2 228:12 236:5 288:2
**Britain** 52:23 87:8 204:22 267:23 308:10 309:5
**British** 120:16

**broad**
190:24
**broader**
190:4 198:23 252:2
**Broom**
86:24 87:12, 16
**brought**
86:10,15,19 106:9 107:1, 3 140:14 161:6 175:7 308:16
**brown**
271:2,11,15, 20 272:9 276:22 277:9,13 287:7,18,24 305:5
**brown-colored**
271:6
**Bruster**
231:25 255:5
**Buckley**
287:4
**build**
279:6
**building**
81:21 279:15 314:14,23 316:14
**bullet**
238:7 319:13,18
**burn**
332:1
**business**
67:21 111:2, 5,19,22 132:6 137:22 143:4 152:22 154:20 157:3 165:25 167:2,11,15 168:3,12,25 170:21 171:4,24 174:12 246:18 323:2
**button**
8:18

**C**

**C-U-**
149:16
**call**
147:19 176:23 261:21
**called**
15:7 21:11 23:8 36:11 42:12 130:11,14 135:14 137:11,13 139:14,15,19 140:3,17 142:16,25 147:9,18 149:15 155:9 199:12 217:15 231:25 241:6 246:21 247:3,16 254:1 315:19
**calls**
33:15 123:11 175:14 249:19 304:2
**camera**
262:14
**cancer**
55:14 59:8 60:1 61:13 63:18 64:6 70:21 79:20, 24 80:15,25 81:5 94:12 96:7,13 98:9,14 110:3,6 171:14 205:5,10,12, 14,20 206:2 222:9,23,24 223:4,7 235:11 236:6 303:7 310:5 329:8,10 330:1,11,21 331:3,5,11
**cancerous**
203:11
**cancers**
56:5,6 205:7 209:21 213:5
**candor**
76:17
**capability**
291:23
**capable**
67:7 68:6,14
**capacity**
21:18 45:16 46:6 311:14, 15
**caps**
234:25
**capture**
259:13
**captured**
253:6 258:20
**carcinogen**
58:18,21 59:14 60:10, 18 61:6,24 62:18,22 63:12,23 76:20 104:21 105:14
**carcinogenic**
80:2
**carcinogenicity**
82:25 83:1
**care**
108:25 109:5,7
**career**
203:10
**careful**
291:21,25 292:3
**carefully**
216:13 253:4
**cares**
100:14 139:19 141:5,19
**Carey**
267:12 269:3
**Carolina**
133:10 134:6 135:10 138:4,13,18 140:4 143:21 144:7 247:24
**carry**
331:24
**carrying**
144:10
**case**
13:24 14:1, 19,25 15:4 17:2,18 18:5 25:4,8 26:12,20 27:2 28:4 31:21 70:25 86:23 91:14 129:1,7 133:9 135:4 136:7,10 137:4,6 152:21 163:22 164:16 177:15 209:1 233:1 237:7 248:19 257:18,23 258:7 259:12 281:13 296:5,19 300:7 303:21

311:4,9 312:20 314:9 317:4 328:12,15
**cases**
123:19 129:4 136:8,10 189:3 235:19,20,24 236:6,7,8 258:11,15 259:17
**Castle**
140:17
**catch**
9:14 245:4
**catching**
154:9
**categorizing**
193:23
**category**
243:6
**caught**
141:9 243:10 245:13,15 251:25
**causal**
126:5,6,19
**causation**
26:12 27:2, 7,16,22 28:4,15
**causative**
101:11
**caused**
24:21 78:24 126:14 310:25
**causing**
61:13 96:7 205:6 221:21 223:5 310:5
**CC**
269:22
**CCS**
269:14
**CDMS**
137:13,14 256:24
**center**
135:3 229:3 241:16
**central**
35:25 52:24 134:23 138:12 229:21,24 230:7,11 231:8 232:1 246:7 257:22 283:6,9
**CEO**
161:7 168:7, 25 174:25 175:5,8,11, 18
**certain**
30:19 56:5 116:11 136:15 171:21 172:13 173:18 237:3 285:1
**certainly**
12:19 13:8, 10 27:23 32:20 35:11 36:7 40:22 51:16 55:12 56:4 58:16 67:21 68:5, 13 69:18 73:16 76:17 94:23 104:8 106:23 107:3,6 108:7 109:16 110:15 113:24 115:22 120:4,15 121:19 122:2 124:1,18 125:11 126:2 127:8 128:12 148:19 151:8,9,14 152:13 153:21 170:11 172:1 173:10 174:16,19 175:10,11 179:17 180:4,12 181:2,5,11, 25 182:22 183:8,17 184:17,25 187:4,7 192:10 193:6 194:2,13,22, 23 195:1 198:2,3 199:24,25 204:12 205:15 208:25 219:1 220:15 223:18 224:12 229:9 241:10 250:11,12, 19,21 255:10 265:15 274:24 275:20 276:11,20 277:17 279:4 280:3,14 282:7 284:1 285:1,14 293:10 296:15,18,21 297:4,6,14, 18,25 298:6 299:4 304:19 305:17 306:21 308:2 309:6 311:22 313:5,24 316:13 317:2,24 319:1 320:9 322:23 323:3 325:3,13
**CET**
161:14
**Chaffin**
9:9,13,19 10:12,13,19 11:22 12:1 17:11,15,21 22:2 23:5 25:14,25 26:9,18,25 27:11 28:8, 10 29:10 30:17 31:1, 15,22 32:1, 7,20 33:1,3, 18 34:20 35:17 37:16 38:13,24 40:5,7,19 41:5,14 42:7 46:2,7,23 47:19,24 48:5,9,17,19 49:3,12 50:9,12,13, 24 51:23 52:7,19 53:18 54:3, 9,13,24 55:6,19 56:3,14 57:4 58:15,22 59:3 60:5,15 61:3,16 62:15 63:8, 19 64:11 65:1 66:12 67:5,16 68:12,23 69:7,16 70:3 71:3,16,25 72:17 73:7 74:2,12,24, 25 75:1,22

76:15 77:6, 14 78:2,6,15 79:18 80:16, 23 81:16 82:10 83:6 84:5,17,21 85:4,7,13,21 86:20 87:11, 18 88:12 89:9,14,18, 20 90:13,24 91:2,4,11, 17,22 92:3, 9,11,15,25 93:11,25 94:9,15 95:6,13,20 96:4,11 97:2,11 98:2,19 99:1,10 100:1,18 101:19 102:3 103:15,24 104:3,7,17 105:1,11,19 106:2,7,15 107:15,24 108:21 109:11,23 111:6 112:4, 17,24 113:8, 15,23 114:16,24 115:20 116:16,22 117:9,24 118:14 119:5,15 120:2,10,18 121:5,18 122:5,13,20 123:5,21 125:9 126:1 127:2,14 130:22 143:2,9 145:17 146:15 150:18 151:7 156:8 163:16 164:10,21 165:15 166:20 167:13 168:4 169:23 170:14 171:1,25 172:9 173:9, 25 174:9 175:9,16 176:2,4,9, 15,20 177:1, 10 180:9 181:1,10,19, 23 183:2 184:5,24 185:9,16 186:9 187:3 188:18 192:9 194:25 195:13 196:14 197:2,11,24 198:21 200:14,25 201:4 202:9 203:6 204:10 205:2 207:15 208:5,18 209:18 210:16 211:2,16,22 212:7,17 213:1 214:3, 20 215:2,4, 11,25 216:20 217:9 218:24 219:9 220:14 221:15 222:3,14,21 223:3,17,25 224:16,22,25 225:10,18 226:9,12,18 227:7,10,13, 16,20,24 228:3,7,11, 13,20,21 229:3,9,14 232:8,13,16, 18 237:16,25 238:2,8 243:19 244:2 245:22 250:18 251:7,17 252:4,16,22 254:3,7,9,20 255:19 256:1,3 257:11,13 259:11 261:7,9,11, 18,25 262:15,17 263:9,12,25 265:10,22 266:13 267:2,4,19 268:12,23 270:6,17 271:18 272:1,15,18 274:12,20 275:19 276:10,19 277:16 278:6 279:3,12,18 280:2,12 281:2,23 282:14,16,20 283:19,25 284:23 286:9 287:13 288:13,25 289:8,16,18, 22 291:12,24 292:19 293:3,9,21, 24 294:9,14, 19,24 295:4, 9 296:7,17 297:3,13,24 298:24 299:12 300:13 301:1 302:5 303:2 304:15 305:3 306:1,17 307:11 308:1,20 309:1,20 310:23 311:5,21 312:14,23 313:13,23 314:6,12,20 315:2,9,14 317:1,23 318:5,25 319:7,23 321:1,3,16 322:22 323:8,16 324:7,17,25 325:12,22,24 326:5,15,24 327:4,14,15 331:9,13,19 332:3

**chain**
267:13 295:18

**chair**
29:15 154:5 156:1 158:10 159:21 187:15 240:25

**chaired**
161:7,10 187:17

**chairman's**
155:24

**chance**
32:10 134:22 238:1 240:17

**change**
45:18 51:20 106:19 137:23 142:7 143:10 144:11 156:16 167:6

171:15 202:25 216:18 271:9,12
**changed** 51:6 90:9,11 105:22 106:4,10,14 107:8 110:24 136:13 139:17 143:22 163:14 164:18,20
**changes** 28:17 101:13 107:13 123:16 130:6 145:6 157:18 166:2,8 181:15 184:13,15,17 234:14,16 331:14
**changing** 51:22 53:11 120:15 136:16 181:16 187:5 274:7
**chap** 139:14
**characteristics** 56:16 65:15
**characterization** 217:7 223:24 291:8 293:17 294:23 303:15
**characterize** 277:8,25
**characterized** 266:24 278:1
**charge** 36:9 264:2 275:10
**check** 9:16 57:25 157:21 207:19 213:8 233:21 244:14 275:22 283:18
**checked** 75:8 245:2
**checklist** 221:20
**chemical** 69:8 101:14 197:8
**chemicals** 197:9
**chemist** 57:2 62:11 196:25 211:13 212:14 280:17
**chemistry** 46:19,22 57:1 78:18 79:15 85:9, 25 96:24 97:25 99:16, 17 166:17,18 170:9 172:22 200:20 201:18 202:7 299:17,21 307:23
**chemists** 196:18
**chief** 43:7 152:19 159:10 190:5
**children** 14:2 24:21 26:21 90:7,8 311:1
**Chin** 269:20
**choose** 123:19 170:22 312:10
**chooses** 300:8 325:17
**choosing** 322:14
**chose** 173:23 233:5 300:7 322:21 323:3,4 324:16
**chronology** 234:12
**circles** 64:3
**circumstances** 209:23 252:8
**cited** 101:15
**citizens'** 195:24
**claim** 41:24 42:3,4 331:10
**claims** 41:25 117:7
**clarification** 48:8 241:14
**clarify** 43:3 45:6,19 50:14 92:21 142:19 215:8
**class** 183:4
**classic** 133:8,12,20 135:20 143:11,12, 14,22,25 144:9,21 147:5,15 156:13 243:5
**classification** 58:20
**clear** 28:16 31:7 45:1,15 46:24 57:6 60:6 63:1 66:24 70:4 74:3 76:16 84:18 92:17 95:21,22,23 96:25 98:7, 20 145:6,13 146:9 162:16 164:22 165:21 203:7 237:7 243:2 259:17 282:25 322:4,5,15 323:4 324:2 330:22
**clearly** 33:25 37:1 39:5 160:13 187:23 197:19,20 203:18 212:16 215:19 248:18 300:5 308:10 322:2 324:3
**click** 8:18
**clients** 205:18 223:19 303:7 309:14 310:5
**clinical** 55:1,15 65:24 79:17 117:12,13 141:25 142:1,2 145:11,12, 13,14,25 146:4,7 147:11 150:25

183:14,18 184:1 189:5 192:22 193:2 202:12 221:5 241:17,18
**clinically** 126:4,18
**clinicians** 189:6
**close** 11:7 162:2 252:10
**closed** 210:2 323:6
**closely** 35:25 83:18 99:8 149:3 216:17
**closer** 181:18 184:16 252:14
**Cloud** 246:12
**CMO** 152:24 153:1,10 159:24 190:25 191:3
**CMO's** 190:25
**coach** 95:8 294:19
**code** 296:2
**coffee** 93:9
**cognizant** 216:15
**coinciding** 136:15
**colleague** 36:9 43:22 273:2
**colleagues** 35:23 36:2 41:4 52:5
56:25 67:11 68:20 108:18 129:17,19 134:25 158:23 193:2 198:15 299:20 313:11 329:22
**collect** 310:12 317:16
**collected** 114:13 115:8 129:2 144:18 191:2 209:24
**collecting** 79:9 135:1
**collection** 128:25
**color** 105:22 106:3 107:8 271:10,12
**coloring** 107:13,14
**combination** 206:21
**combine** 233:7
**come** 12:6 72:13 78:25 94:7 117:6 147:3 176:18 184:6 188:14 195:25 215:1 235:24 240:25 244:9 260:24 284:2 303:20 307:10 323:22 325:9 326:23 327:3 330:24
**comes** 36:25 147:7 220:4 261:19
277:20
**comfortable** 156:3 229:10 302:14
**Comm** 57:9
**comment** 211:20 222:20 223:13 245:19
**commenting** 39:25 223:16
**commercial** 34:23 38:4 119:21,24 121:8,25 122:1,2 123:3 132:6 156:13 235:4
**commercialize** 156:20
**commercialized** 199:14 235:7
**commercially** 141:8
**committed** 94:21
**committee** 29:15,16,22 153:3,18 155:22 187:13,15 188:1 207:1 214:16 290:8
**committees** 187:16 193:10 214:8
**common** 72:7 77:18
**commonly** 121:20 261:22
**commonplace** 242:6
**Commonwealth** 247:16
**communicate** 108:16 185:23
**communicated** 107:23 121:16
**communicates** 114:9
**communicating** 12:10,13 116:11 152:5
**communication** 160:8 186:4, 19,22 187:1 264:10
**community** 220:22
**companies** 22:24 108:10 109:4 115:19 120:16 122:12 125:6 132:3,5 149:5 171:22 173:6 189:17 229:22 321:14 324:12
**company** 15:19 18:1 20:25 21:4, 17 22:17 23:2,7,8,23 24:3 25:12 26:2 28:14 29:17 33:8, 11,24 34:2 39:13 43:2, 16 48:14 52:14 56:4 57:10 66:1 72:21 73:18, 20,24 75:3 80:4 82:7 85:6 93:15 102:10

107:23 108:9,25 109:8,10,14 110:23 111:10,14,21 112:1 113:16,20 114:7,11 115:1,7,15 118:17,25 119:2 121:10 122:8 123:17 124:2,11,12, 25 125:2,8, 11 132:4 133:25 134:1,21 135:14 143:18 156:20 158:14 161:2 164:7 166:23 167:21 168:15 169:1,2 170:16,20 175:22,25 183:9,12 185:17 189:14,20 190:25 196:5 201:7 203:13 204:21 208:14,17,25 209:2 213:11 216:1,5,24 219:4 229:24 230:8,11 240:3 243:21 253:17 268:7,10 269:9 294:4 301:11,19 306:8 307:24 308:23 309:15 310:25 311:7,8,13, 23,25 312:2, 6 314:8 315:22 316:14 319:16 325:4 328:6 329:3, 9

**company's** 29:15 112:11 121:22 123:24 125:4 152:19 167:7 208:14 320:10,15

**comparative** 72:12

**compared** 182:6

**compensated** 328:1,4,8,10

**compensating** 17:10

**compensation** 18:17

**competitive** 66:15

**competitor** 115:23,25 183:5

**competitor's** 182:13

**compiling** 262:25 263:6

**complaint** 187:19

**complaints** 199:7,8

**complete** 88:23 146:10

**completed** 248:22 273:6

**completely** 260:16 266:22 323:5

**compliance** 260:4

**complicated** 13:5,9 77:19

**component** 169:21 190:15

**components** 257:22

**Compound** 63:5 81:3 213:14

**computers** 14:15

**conceivably** 69:4

**concentrations** 69:14,15

**concept** 55:21 180:24 217:23 219:20 220:21

**concern** 38:6,12 80:4,7,21 84:14 102:6, 8 166:9 182:5 184:19 186:15 187:6 188:22 192:18 194:15 195:7,11 201:5 203:5, 12,13 204:9 213:8 266:15 273:20 280:22 287:8,17 292:12

**concerned** 60:23 101:5 202:23 275:17

**concerns** 80:2 172:23 196:1 200:9

**conclude** 110:5 332:7

**concluded** 171:13 286:20 301:23 332:11

**concludes** 331:20

**concluding** 287:23

**conclusion** 29:7,8 33:15 83:9 123:11 174:19 208:4 287:6,17,19 288:7,24 290:1 300:24 310:4 320:22 331:1,2,6

**conclusions** 84:3 127:6 161:11 207:13 209:8,11 273:19,25 286:18 287:22 303:1,24 308:11 311:19 312:12 313:3,12 314:5 320:8, 21 328:23 331:14,16

**conditions** 204:14,19 210:6,7,22 212:4 304:14

**conduct** 303:18 322:2

**conducted** 137:22 183:19 322:4

**conducting** 197:13

**conference** 160:17 220:24

**confident** 81:11
**confirm** 88:23 225:3 273:22
**conflating** 306:3
**conform** 168:14 203:4
**confused** 28:22 131:1
**confusing** 132:16 230:18
**congenital** 311:4
**connection** 35:2 327:22 329:7
**Connor** 269:10,17
**conscience** 306:23
**consent** 10:7,13,15
**consequence** 173:5
**consequences** 97:21 276:8 279:1
**consider** 51:15 152:1 164:16 188:9 211:25 212:5 310:10
**considerable** 137:25 166:15
**considerably** 139:18 290:3 319:21
**consideration** 50:18 97:25 98:10,22 99:3 100:3, 20,22 110:12 111:5 118:22 119:4 124:16 151:10 152:23 154:22,23 164:2 192:15 193:21 206:24 209:10 251:24
**considerations** 34:23 108:5, 6 153:6 159:6 194:3 203:22
**considered** 51:10 72:3 99:7 111:15 166:3 241:5 253:22 314:22
**considering** 316:19
**consisting** 129:24
**consists** 158:13
**consolidated** 133:6
**constituted** 155:22
**constitution** 157:18
**consultant** 296:21
**consultation** 158:17
**consulting** 16:21 158:16
**consume** 83:10
**consumed** 69:4
**consumer** 47:10 113:25 120:25
**consumers** 103:5 104:9, 19 105:4 112:6 114:20 121:1 122:9, 24
**consumption** 266:1,6
**contact** 21:2,9 239:9 255:4
**contacted** 75:3 78:10 85:1
**contacts** 237:10
**contained** 82:14 233:13
**contaminants** 199:2
**content** 166:13
**contents** 123:8 197:8
**context** 24:12 53:15 56:19 62:5, 10,25 63:16, 21 65:3,5,12 108:14 110:11,15 116:6 124:5 128:5 154:19 173:22 179:5 181:2,4 306:9 313:10 316:5,24 320:18
**contextualize** 149:6
**continue** 28:25 55:7 69:24 81:11 102:24 111:2 152:17 163:7 168:19 180:13 184:3 265:20 317:16 321:9,14
**continues** 180:4
**continuing** 55:10 170:2 207:10 317:15
**continuum** 151:13 233:6
**contract** 18:4,7,22,25 19:20 20:3, 15,18,24 21:15,17,24 22:13 39:13 44:16 45:4
**contributed** 169:21
**control** 111:11 166:12 172:17,18 229:12 234:19,20
**controlling** 322:8
**controls** 166:17,18,23 167:3 172:16 173:19 174:1,11
**convenient** 176:5
**conversation** 47:12 93:10 100:10 102:14 115:16 201:15 236:14 304:9 306:13
**conversations** 8:6,8 52:14 56:20 73:20 92:18,24

93:2 100:8 115:14 177:15 308:10
**converted** 133:12
**convinced** 83:4
**Coordinate** 9:18
**copied** 283:24
**copies** 257:8
**copy** 18:9 88:21, 24 89:23 137:12 225:13 268:14
**core** 118:22
**corner** 8:18
**cornerstone** 152:3
**coronavirus** 44:23
**corporate** 24:7 153:9 159:22 160:8 161:7,10,11 175:7
**correct** 9:12 11:21 13:19 16:18 20:16 21:4 22:17,18 23:15 24:4, 17,18,22 25:1,24 26:3,13,21 35:14 36:14 37:10,20 38:2,8 44:14,16 45:7 47:7, 16,18 48:18 49:11,19 50:19 51:13 55:2,4,8,18 57:6 58:4,5, 11 63:23 65:4,10 66:8,14 67:3,7 68:7, 15 69:20 72:4 74:13, 22 75:3,17 76:22 78:10 84:14 85:1 86:12 89:8 93:17 94:12 96:7,14,15, 17 100:24 104:4,22 105:15,24 106:25 107:10,20 108:2,11 109:14 110:18,21 111:16 112:8,20 113:10,11,18 114:1,5,20 115:2,5,24 116:13,19,24 117:11,18 118:8 119:8, 18 120:6,12 121:2,12 123:9 124:3, 11,21,25 125:13 127:10 130:2 132:25 138:14 142:22 143:5 151:11,12 152:15 154:13,14 158:1 161:18 162:7 163:2, 5,20 164:12 165:8 166:10 170:4 171:11,22 172:4 173:1, 13 174:3,14 175:1,13 179:5,20 180:5,14,19 181:7,12 182:2,3,7 183:4,10,15, 16,19 184:8, 20 185:1,12, 19 186:15 187:9,10 189:10,11 192:1,2,5,13 195:3,4 198:9 204:15 207:21 209:4 210:20 211:10,18 212:20 218:23 219:13 220:19 221:8 222:10,17,24 224:22 226:19 238:16 240:23 241:12 247:25 250:15,17,22 251:10,19 253:19 256:4 262:10,11,18 263:4 265:16 266:1,16 272:22 273:23 274:8,10 275:3,4,11 276:15 277:21 279:20 280:15 285:9,16,17, 20 287:19 289:4 291:8, 18 293:15 296:12,24 297:7,15,20 299:1,7 300:2 305:11,12, 15,16 307:6, 13,18,19,20 308:6,24 310:19 311:1 312:17 313:1,6,18 315:22 316:16 317:5 318:15 319:3 320:11 321:24 322:24 324:10 325:5,6,15
**corrected** 299:5
**correctly** 30:13 37:25 46:3 62:19 130:21 272:12
**cost** 166:22 167:20 169:3
**costs** 167:23
**counsel** 8:21 10:7 88:20 91:20
**count** 50:8
**counterpart** 139:25
**countries** 42:1 135:2 162:4 237:6, 11 238:22,24 239:6
**country** 223:21 237:5 239:1,7,8

**country-specific**
239:1
**couple**
19:12 23:1 106:21 130:6 232:19 285:2
**course**
40:15 56:8 105:22 159:10 167:16 183:14 186:13 211:24 292:21 329:20
**court**
9:24 25:1,20 50:6 74:14, 17,23 94:19 95:25 130:18 201:2 215:9
**courtroom**
30:24 31:10, 14
**cover**
89:15 151:2 158:1,2 256:12 257:17
**covered**
282:24
**covering**
37:6 47:6,14 127:20
**COVID**
44:20 160:14
**cracks**
214:22
**craft**
124:2,4,5,8
**crafting**
124:9
**created**
15:15 219:1, 14,21 220:18 221:4,11 234:9 256:14,22
**creating**
8:10 219:23
**creation**
143:14 217:16,25
**criteria**
126:9 259:2 268:3
**critical**
149:7 154:21
**cross-sectional**
241:11,13
**crosstalk**
48:4 74:16 84:20 104:1 200:16 225:5 237:2 270:11 294:11 309:3 318:7
**Cummington**
149:16 330:6
**cured**
110:4
**current**
256:25
**customers**
107:18
**CV**
43:5 88:19, 24 89:2,4,7 189:7
**cycle**
178:2 180:7, 13 325:9
**cyclist**
178:1

**D**

**data**
28:25 57:8 59:20,23 62:9 65:17 80:5,12 99:22,23 114:13 117:4 134:2,3 139:18 140:7 141:21 142:3,5 166:13 172:19 173:20 184:15 185:8 190:21 191:2 207:25 213:23 215:16 216:17 235:9,15,18 236:4 246:16 247:15 257:25 258:1,8 299:19 310:12,13 311:19 312:11,20,22 313:2,4,6, 11,12 316:24 317:16,18 318:20 320:8,20 321:10 328:22,23,25 329:14,15,16 330:8
**data-gathering**
148:21
**database**
98:18 116:2, 3,7,8 129:3, 4,9 135:4 137:11 139:19 141:15 235:10,18 246:15 257:23 258:16 259:10
**databases**
15:19 141:5, 22 329:17
**dataset**
235:23
**datasets**
80:13
**date**
20:3 47:2 89:1 229:16 233:22 234:7 255:8 260:15
**dated**
88:25
**dates**
103:21 254:15 255:6
**David**
269:8
**day**
20:12 71:12 101:17 102:20 168:6 175:24 272:20 304:10 305:2 308:17
**day-to-day**
131:14 231:18 246:18
**days**
19:1,3,8,12, 23,25 20:7, 8,9,10 44:21,24 89:8 139:16 140:7 207:1 261:3 285:19 317:11
**days'**
20:4
**de**
112:6 290:23 302:19

**dead**
222:16
**deal**
40:23
**Dean**
142:16
**dear**
119:9,13
270:10
**death**
96:13
**debate**
150:23,24
206:23
**decades**
329:3
**Dechert**
11:4,5,17
**decide**
151:4 152:16
156:22
175:12
287:23
**decided**
93:15 161:23
**decides**
325:19
**decision**
93:19,23
94:5 95:19
98:13 110:17
111:2,5,11,
15,19,22,24
113:2,7
118:11
152:18,19,
22,24 153:1,
2,7,9,12,14
154:20
155:3,6,15
156:4,7,19
157:1,3,5,6,
7,12,15
158:3,8,16
159:4,12
161:4,5,8,
17,19 162:1,
6,8,18,21
163:19,23
164:12
165:3,7,13,
17,23,25
166:21
167:2,7,11,
12,16 168:3,
12,25
169:19,20
170:21
171:18,24
173:23
174:12,15,
23,24 175:6,
12,18 204:24
237:11 239:1
240:3,5,10
248:9,24
277:12
323:2,9,25
324:9
**decision-making**
169:13
**decisions**
94:10 118:4
162:7 163:23
173:5 174:18
220:13
**declare**
10:5
**decomposition**
276:15
**dedicated**
147:14
148:13 167:9
193:5
**deed**
329:21
**deemed**
189:24
**defect**
187:21
215:20 288:8
290:14
**defects**
14:2 24:21,
24 26:16,20
152:10,11
295:17 296:2
311:1
**defend**
314:8
**defended**
310:24
**defending**
310:18
**defense**
316:14
318:14
**defer**
201:14
**define**
298:2
**defined**
190:17
265:19
329:12
**defines**
267:25
**defining**
197:7
**definitely**
126:7
**definition**
184:2 190:12
233:9
**definitions**
148:8,10
298:5
**definitively**
127:9
**degree**
198:12 218:3
**degrees**
298:9
**delegate**
37:1 108:24
**deliberately**
95:4
**department**
16:18,25
21:6,8,23
22:13 28:24
29:6 39:6,23
45:4 86:17
97:8 127:22
136:1 139:13
140:4 149:3,
12 191:10,19
205:11
208:8,10
209:3 211:24
215:16 222:7
229:18 230:1
231:7,9
232:2 252:20
261:20
262:4,10
266:16,20
324:23
328:18
**depend**
186:20 281:4
**dependent**
186:22
290:13
**depending**
279:25
281:18
**depends**
144:15 186:1
248:23
279:10 281:4
302:4
**depo**
8:19
**deposed**
12:9 13:16
17:25 24:13
29:20 86:22
310:21
311:3,13
**deposition**
8:14,21 9:25
10:1,2 11:2
12:13,20,25
17:13 19:10
23:24 24:7,
16 30:3,25
31:3,20,24
32:11 33:9

39:2,12 40:15 46:10 48:25 49:9, 15,18 50:1, 10,17 52:13 53:17 56:15 58:11 61:19 63:3 65:14, 21 92:8 95:1 139:5 269:25 270:24 271:2 274:23 293:23 294:21,25 295:5,6 305:4 308:3 327:17,23 332:8,11
**depositions** 13:15 24:11 30:10 58:7 150:14
**Derek** 289:11,24 290:5 291:10 292:15 306:12,14
**derived** 148:16
**describe** 18:17 19:2 124:22 127:18 137:17 198:24 329:9
**described** 39:1 51:20 155:25 317:21
**describes** 264:20
**description** 311:17
**descriptive** 42:11
**designated** 23:23 24:3 33:8
**designed** 329:13
**desks** 257:8
**detail** 34:1 35:8 87:24 88:22 119:1 230:6
**detailed** 231:12
**detailers** 121:21
**details** 256:13
**detect** 290:13
**detection** 148:21
**determine** 281:21
**determined** 227:2
**determining** 288:15
**develop** 55:24 56:7,8 179:12
**developable** 179:13
**developed** 235:6 240:21
**developing** 179:9 205:5 324:19
**development** 35:2 67:11, 20 68:19 69:12 72:7,8 73:16 76:12 78:19 79:25 85:25 96:24 97:25 115:8 138:2 147:12 156:15 170:10 200:20 201:18 209:7 216:12 241:16 266:7 299:18 307:24
**development's** 202:8
**deviation** 110:25 111:7,13 113:1,9
**devices** 14:4
**devote** 168:23
**diarrhea** 70:20 204:2
**diet** 322:8
**differ** 239:7
**difference** 17:7 24:11 66:19 144:1 147:1 172:11
**differences** 185:7
**different** 35:23 36:14, 16,19 39:7 46:22 57:9 63:2 69:14 80:5 83:19 84:8 92:15 97:8 124:5 132:7 138:24 148:8 162:6 164:6,15 172:12 185:1 194:9 198:20 204:13 206:13 212:8 223:1 226:14 232:25 233:3 242:15 257:3 258:9,14 262:9 281:17 301:4 303:17 305:22 310:18 318:22 324:14
**differently** 151:5
**difficult** 55:14 93:13
**difficulty** 201:15
**digits** 224:8 226:3 315:4,9
**diluent** 164:4,5
**direct** 36:18 120:25 315:18
**direct-to-consumer** 119:17,22 120:6
**disability** 96:14
**disadvantage** 111:25
**disagree** 59:5 127:5 294:22 330:20
**disappeared** 257:20 260:16
**disclose** 117:17
**disclosing** 28:6
**disclosure** 190:21 326:19
**discoloration** 271:3,11,15 277:9 284:2 287:24 288:6,7 296:3
**discolored** 272:10

286:11 292:22 294:4
**discolorization**
276:22
**discontinue**
157:7 166:6 171:24 173:23
**discovered**
86:25 88:5
**discretion**
268:5,6
**discuss**
21:16,21 41:7 92:6 140:6 248:19
**discussed**
33:7 68:2 82:8 108:19 149:20 204:20,22 207:2 213:18,24 220:13 251:4 306:16 308:19 329:23 330:8
**discussing**
52:17 318:11 323:25
**discussion**
57:11 64:19 78:18 82:13 150:13 153:4 154:4,12 156:2 159:9 174:21 175:5,6 209:11 247:19 248:10,17 301:21 304:20 322:19
**discussions**
40:1,4,16 41:2,3,12,17 44:5 48:25 91:13,19,24 92:23 100:7 149:22 153:21 160:19 200:6 216:15 251:6 263:22 323:13
**dispeckling**
271:15
**dispute**
58:24
**distill**
114:14
**distinction**
59:19 164:24
**distinctions**
311:16
**distinguish**
303:13
**distinguishing**
197:9
**distribution**
237:10 260:7
**diverted**
178:22
**divide**
132:12
**Doc**
252:12
**doctor**
17:16 29:12 31:17 32:8 34:7 38:11,14 41:21 45:14 53:9,19 54:18,25 55:20 60:6,22 74:20 81:18 96:13 98:6 100:13 114:4,8 119:10,13 146:17 210:18 223:13 228:14,22 229:1,10 232:19 241:16 283:19 289:10 292:1,20 294:1 296:9,18 298:15 300:14 303:3,13 304:16 317:2,25 318:23 319:8,14 321:4,17
**doctors**
114:19 116:12 121:21 122:9 185:23 186:14,19
**document**
18:18 32:14,23,24 33:2 40:14 117:3,7 158:3 217:17 218:6 220:23 221:4 225:12 228:15,23 229:16,20,22,25 230:7,14,22,25 231:10,13,15 233:17 254:5 256:13 259:24,25 262:24 263:5 269:25 270:25 282:22,23 283:16 284:15 319:9
**documentation**
19:4 36:2,25 37:2,5 39:3,21 141:14 149:24 154:6 156:5 170:7 324:24 330:23
**documented**
100:6 218:22 264:18
**documents**
15:12,19 22:14 31:19 48:6 66:21 224:1 225:15 227:18 230:17 231:18 234:16,20 246:16 267:5 296:19 308:3 309:19
**dog**
206:15,16
**doing**
58:14 83:22 95:24 122:19 131:13 144:10 149:20 151:24 165:18 166:22 167:23 169:3 190:14,19,20 192:5 198:25 207:10 210:1 237:8 258:2,5 306:16 321:21 322:13 323:6,18 329:22
**domain**
43:1 103:10,11,12,17 206:25
**domestic**
142:8

**Doriana**
269:20
**dose**
288:2 292:11
**doses**
210:9,10,13
**dots**
277:13
**double**
149:16 150:6
**downwards**
270:10
**dozen**
144:24 330:8
**DPA**
235:22
329:18
**draft**
124:13,17
272:10
284:13
**drafting**
124:9,10
**drag**
94:25
**draw**
128:3 208:4
287:6 288:24
313:3,11
320:8 328:23
**drawing**
209:8
**drawn**
209:12
303:24
308:11
311:19
312:12 314:5
320:21,22
**drew**
287:17,18,21
288:7 290:1
300:24 303:1
**drives**
217:16
**drug**
24:20 29:23
36:18 51:17,
18 55:1,2,8,
12 67:14
72:3,15
82:13,18
101:11
102:24
107:25
108:1,9
113:17,25
114:4 115:24
116:18,19,25
117:17
124:20
125:24
126:6,20
134:18,19
140:3,18
142:22
145:14,24
152:9 168:9
172:17,18,19
180:18
183:19
190:20 196:5
197:14 198:3
209:6 217:3
221:20
244:10
259:3,13,19
261:3,4
262:9 265:18
266:7 303:8
325:3
**drugs**
72:12 116:12
118:5,18
121:22
183:3,6
194:1 199:1
263:15,16,19
**duty**
108:23
109:4,7
113:17
117:17

**E**

**earlier**
11:18 24:10
46:10 47:25
50:17 52:20
97:19 108:19
125:25
131:16
161:15
172:10
178:10
182:12 189:4
190:23
199:24
200:19 209:4
217:21
229:22 234:7
235:3 236:15
240:19
241:12 243:6
246:3 248:11
261:14
262:21 264:4
266:19 271:1
276:5 286:6,
11 287:3
290:11
303:9,19
304:7,9,17
305:4 309:23
311:12
315:17 330:6
**early**
49:5 73:17,
21 78:18
86:6,17
88:11 142:4
143:22
147:8,13
176:7 181:6
200:1 201:10
202:13
204:18
206:23
207:17 213:7
216:15 218:4
220:7
**easier**
33:5 225:17
231:2 268:17
**easiest**
224:6 268:25
**easy**
331:24
**economic**
322:24
**Ed**
232:1
**edges**
40:22
**edition**
139:24
**educate**
56:16 58:8
65:14 122:8
**educated**
58:9 63:22
**educational**
122:7,11
**effect**
51:17 105:18
127:8 154:7
170:24
180:17
**effective**
192:22
**effectively**
79:12 182:18
**effectiveness**
179:18
**effects**
55:14 70:19
72:9 148:14
**efficacy**
65:17 136:3
192:21 194:4
287:22,25
288:4
**efforts**
81:9 101:16
204:8 207:12
**eight**
285:18

**either**
30:2 31:2 34:1 67:19 80:3 82:7 83:1 88:11 123:19 129:4 199:18 233:21 242:13 247:5 251:16 252:23 318:8 326:24
**elderly**
185:5
**electronic**
15:6,11 137:10 160:7 246:6 257:3
**electronically**
257:9
**elects**
287:23
**element**
19:24 316:11
**elements**
35:5 38:22 233:2,4
**elevated**
272:9
**Elmo**
32:17
**EMA**
48:13 165:17 170:7 171:8, 9,13,18 172:1,10,24 173:18 330:19
**email**
89:11 176:18 267:12 269:2 270:8,16,19, 21 272:19 276:21 289:12,23 290:18 291:11 316:3 318:9,10
**emails**
268:24 285:19
**emanating**
172:25
**Embase**
136:5 244:16
**emergent**
189:22
**emerging**
162:9
**Emma**
161:8 175:22
**Empirica**
199:13 235:5
**employed**
14:20 16:7 39:10 41:12
**employee**
15:19 24:2 39:6 73:18 88:1 263:18 296:20
**employer**
60:25
**employment**
139:8
**end**
19:11 35:1 71:1,5,12,19 101:16 113:25 142:2 168:6 175:24 209:20,23 234:17,18 254:25 255:15 264:19 289:15 308:17
**endeavor**
167:6
**ended**
278:9
**ending**
227:2
**endorsed**
153:1,6,13 155:3 158:19 160:9
**endorsement**
155:5 160:11
**ends**
90:3
**Eng**
269:20 283:3,23
**engaged**
174:7
**Engineering**
244:6,8
**England**
244:10
**ensure**
124:19 169:3 172:13 239:10 263:15 265:20
**ensuring**
179:4 219:16
**entail**
148:20
**entails**
178:23
**enter**
9:7 322:18
**entered**
135:3
**entire**
133:2 158:16,17 203:10
**entirely**
36:19 115:17 130:13 294:23
**entirety**
132:20 251:3
**entry**
258:8
**environmental**
60:22 61:1, 11 62:11 63:10 64:9, 25 244:6,7
**epidemiologic**
149:12
**epidemiological**
149:9
**epidemiologist**
149:15 330:7
**epidemiology**
80:10 98:16 149:3,4,19 150:15 324:19,23 329:21,22 330:7
**equipped**
34:12 276:12
**equivalent**
242:20
**Eric**
10:13 17:9 40:2 85:2 89:6 215:6 226:10 228:18,25 232:5 237:24 295:7 302:12
**error**
193:17 194:7
**errors**
187:22
**escalate**
268:8
**escalated**
248:8
**escalating**
242:4
**escalation**
242:5 267:23
**essentially**
115:10 132:19 141:17 145:23 146:7

156:12 162:2,18 190:13,18 191:17 197:7 257:22
**establish** 114:22 126:25 151:24 259:20
**established** 114:18 125:23 126:7 127:9 128:7 133:8,13,20 135:21 140:2,24 143:11,13, 15,22 144:1, 9,22 147:6, 15 156:13 201:21 243:6 291:2 304:9
**estimate** 20:3
**Europe** 43:14,19 119:22 120:5 121:2,4 136:16 140:8,19 189:18 238:22,24 302:24 309:10
**European** 48:2 49:23 56:21,23 57:7,11 68:3 75:10 86:3 94:4 103:11 111:11 116:7 120:14 134:2 161:21 168:14 174:20 195:21 208:22 236:3,17 238:14,18 239:23 241:23 242:5 243:17 249:4,11 252:1 253:5, 16 267:24 297:12 300:21 302:16,24 314:19 316:8 320:22 322:3 323:21,23 330:16
**European's** 317:8
**Europeans** 57:18 103:21 190:17 237:4
**evaluate** 71:11 81:25 169:15 180:25 188:13 191:10,25 201:22 208:3 304:21 305:14 306:9 310:12 311:18 313:11 316:20 328:24 329:10
**evaluated** 72:3 73:9 82:7 135:5 195:12 204:15 243:14 248:7,15,16 250:22,25 251:10,22 252:7 300:18 301:12 302:11,18 304:22 321:11
**evaluating** 79:10 179:18 202:24 236:3 242:25 275:21 278:10 308:23 313:2 321:18
**evaluation** 28:24 29:6 58:14 96:10 99:7 101:9 124:7 125:18,20 126:25 129:11,15,25 135:6,9 136:9 139:22 150:16 151:22 163:13 173:15 179:6 182:1,20 183:1 186:2 188:16 189:2 193:1,3 209:8 235:17 236:4 243:17 247:7,11 248:12,18 249:1,13 251:2,15 252:2 253:9 254:2 266:7 273:14 279:1,5,10, 14 281:12 291:10 292:17 297:23 300:22,23 301:20,25 302:4,23 303:1,19,23 304:2,3,5,7, 11,21 305:19 306:16,19 309:18 314:18 329:8,11,20, 23 330:2,10, 13,20,24 331:15
**evaluations** 129:6,12,19 151:23,24 193:8 194:24 231:22 237:8 258:2,6 314:4
**event** 92:16 259:3, 4,5,8,14,20 291:13 304:13
**events** 72:16 77:3 96:16,18 109:7 141:24 148:22 182:6 183:9,11,12 184:12 201:22 205:14 213:5 258:18
**everybody** 176:5
**everyone** 33:25 239:8 306:25
**evidence** 26:7 41:18, 19 59:1,5,8 60:3 61:15 63:16 64:6 82:24 83:1 84:3 100:16 124:16 126:5 171:14 173:21 209:7,8 300:11 303:5 310:10 314:4,9,23 331:4

**evidence-based**
84:1 97:20 100:16 328:19,21
**evidenced**
164:17
**evolution**
141:4
**ex-europe**
238:20
**exactly**
157:19 158:6
**examination**
10:19 327:10,11,14
**examples**
296:11
**exceed**
289:25
**exceeds**
115:19
**exception**
40:24
**excess**
182:5 210:7
**excessive**
241:3 297:1, 2,4,5 298:1, 3,8,14,25 299:1,5
**exchange**
190:23 199:6,10
**exclusively**
22:15
**excuse**
32:22 64:13 236:24 296:20 305:21 326:18
**executive**
108:1,8 153:10 156:6 159:14,15,22 161:1,7,10, 12 174:18 175:6,8
**executives**
155:16 167:17
**exhibit**
31:20,24 32:25 33:12 88:19 89:4 224:24 225:6 226:6,21 227:3,11,14, 21,25 228:4, 8,23 230:15 232:9,12 267:12 268:13 269:2 272:17 282:18 285:15 315:12
**exhibits**
227:1
**exist**
219:20
**existed**
128:9
**existence**
162:3 235:21
**existing**
156:15
**exists**
297:7
**expect**
230:7
**expectation**
292:6
**expected**
182:6
**expedited**
243:16
**experience**
79:9 98:15 101:6 109:6 184:10 203:25 209:14 216:10 218:1 241:6 302:12
**experienced**
292:16
**experiences**
202:22 205:13 266:21
**expert**
16:21 17:6, 18,23 18:1 22:20 28:4, 6,14 62:12, 13 64:21 102:10 113:17,22 115:1 139:22 170:11 196:18 212:24 251:4 290:15 292:18 298:9 328:6
**expertise**
73:19 76:14, 18 129:25 197:19 200:19 202:20 265:7
**explain**
137:5 145:20 172:7 258:12
**explicitly**
82:7
**explore**
167:16
**exposed**
107:19 296:15
**exposure**
64:25 290:1 322:7
**express**
186:25 299:9
**expressed**
100:21 212:15 318:23
**expressing**
298:10,12
**extensive**
64:19 67:13 150:13 249:22 307:15
**extensively**
60:2 62:8 64:9 80:8 111:1 139:21 213:18 329:21
**extent**
33:14 39:25 40:2,9,14 82:18 85:2 92:23 95:4, 17 120:15 123:10 136:15 185:6 225:14 229:1 292:7 297:6, 19
**extracting**
258:1
**eye**
180:18 218:16 220:8
**eyes**
66:3,7

**F**

**face**
14:9 97:4,15 98:11,23 99:12 100:4, 23 101:22 103:6 104:10 105:5 301:10
**face-to-face**
160:13
**faced**
100:5 277:13 324:13

**facilities**
73:10 206:12
**fact**
17:2,5 22:16 48:21 56:5 59:15 62:21 63:11,22 76:21 101:14 105:23 111:21 162:9 163:24 167:7 181:21 210:8 211:25 213:23 253:15 286:14 290:11 298:15 303:12 310:24 324:18
**factor**
298:11
**factors**
170:21 171:23 174:16
**facts**
22:22 117:8, 10 298:21
**fair**
28:1,18 29:11 44:5 50:12 55:25 59:16 60:11 61:7 70:6 79:1 81:1 83:23 89:3 90:12 92:4 93:3 106:22 107:16,17 110:14 151:17 165:10 167:25 169:6 185:24 191:10 193:11 194:17 195:8 200:2 207:16 208:24 211:23 218:19 221:24 223:10 228:20 231:1 234:13 245:8 256:5 271:21 277:2,6 278:5,7,8,11 279:15 280:7,13 281:9 282:3, 6,9 284:6 287:8,16 288:19 290:4,24 292:12 299:15 300:18 305:22 306:10 310:6,10 313:25 318:2 332:6
**fairly**
143:3 198:8 249:22
**fairness**
28:11
**faith**
311:20
**fall**
110:10 182:25 214:21
**falls**
110:4
**familiar**
17:7 24:10 29:3 43:13 53:4 65:25 87:15,22 88:7 122:23 194:2 195:14 196:15,21 235:22 262:2 265:2 269:23 271:2,9,12, 16,19 274:7 275:8 292:4 311:16
**familiarize**
274:13
**families**
177:18
**family**
81:12,14 102:25
**far**
18:22,25 20:3,15 22:5 106:20 222:6 255:2 272:4 275:16 282:12 298:16 325:14
**fast**
89:15 200:24 331:22
**faster**
225:25
**favor**
25:11
**FDA**
56:23 82:13 86:3 103:11, 20 108:24 115:2,14,15, 18 116:12 161:22 185:24 195:15,22 208:23 237:7 302:17 321:20 322:21 323:10,13, 15,22 329:18
**FDA's**
116:2
**Fedex**
331:22 332:4
**feel**
13:10 17:13 27:23 95:17 122:3 230:24 238:17 249:16 302:14
**fell**
110:8
**felt**
162:15 163:11 164:7 242:4
**field**
64:21 73:18 151:4 197:18 199:15 200:18 212:14,24 265:6 290:15
**figure**
205:6 206:4
**figured**
326:25
**file**
246:6,11,12, 16,20,21,23 248:6 268:15
**filed**
243:3
**files**
87:2
**filing**
255:18
**filings**
36:22
**final**
8:15 153:8 155:15 156:7 159:12 248:6 272:11,21 286:22
**finance**
167:4,16
**finances**
169:3

**financial**
142:25
**financially**
9:4
**find**
99:9,24
151:23
160:21
171:16 182:4
186:8 204:3,
9 208:9
210:14
225:14,17
234:17,18
245:24
264:18
268:21
280:10 307:3
309:4
**finding**
101:14
125:17 173:4
182:17,19
186:2,24
188:3,17,21
204:19
207:14
250:24
251:1,14,15,
16,21 252:19
253:9 259:7
292:18 301:8
316:21
320:18
**findings**
52:17 57:21
69:25 72:10,
12 79:10,11
98:25 99:6
108:16 149:6
169:16
173:16
181:16
185:23
188:9,10
189:22 204:3
213:21
215:23,24
242:23
243:13,15
248:14
252:15
273:12 276:8
301:22 306:3
**fine**
11:12 34:1
63:1 84:9
176:9 215:11
225:1,2
256:6 284:25
294:15 295:1
**finish**
201:16
293:23
294:20 312:1
**finished**
19:9
**firm**
11:4,6
15:14,16
176:1
**first**
12:25 42:16,
18 45:20,23
47:20 49:1,
4,7 51:25
52:9 53:7
65:6 72:21
73:9,17
75:17 76:1,7
77:22,24
78:7 84:11,
18,23 85:19
99:24 140:12
142:14
154:12 155:9
162:21
195:17 205:7
213:19 216:9
219:15,25
224:3,5
226:24
234:1,10
283:16
287:22
304:10 324:8
**fit**
191:3
**Fitton**
36:12,19
159:5 324:1
**five**
90:18 130:3,
9 144:16
147:22 243:7
257:20
264:19 293:4
318:18
326:23
**five-minute**
267:5
**flag**
191:9 244:22
**flagged**
220:6,7
**flags**
217:3
**flew**
25:3
**flicking**
261:1 262:5
**flora**
51:21 53:6,
12 54:15,17
**flow**
164:5
**flows**
264:11
**focus**
38:1 79:13
99:19 100:13
101:17
156:16
198:14
202:3,18
215:15
266:19
308:17
**focused**
62:8 70:8,17
71:12 99:21
109:17
159:25 184:9
204:1,25
205:10,17
213:25
216:16
266:22
**focuses**
150:20
**focusing**
208:1
**foil**
187:21
295:25
296:10
**folks**
150:15
199:20
230:10 258:5
273:16
**follow**
219:6 259:17
327:14
**follow-up**
87:8
**following**
40:21 42:21
272:20
**follows**
329:11,12
**food**
59:21 64:23
**force**
34:24 35:3
**forgive**
17:8 154:8
**form**
67:15 73:4
94:18 114:8
120:11
140:12 241:2
300:17
309:14
310:13
313:17
**formal**
147:20
248:11
306:16,19

**formaldehyde**
280:15,22 281:1,7,13, 14
**formalized**
220:23 249:18
**formally**
33:20
**format**
256:16
**formation**
49:2 142:15 299:11,14,23
**formed**
28:24 51:8 73:25 139:13 165:13 173:19 240:25 241:8 304:14 309:12 314:8,13,17, 21,22 318:14 330:15
**forming**
75:16 98:21 99:3 100:2, 21 107:7
**forms**
123:18 302:1
**formulated**
67:15
**formulating**
317:3,7
**formulation**
63:17 98:8 198:12 207:6 298:23
**forth**
59:22 101:13 134:21 139:23 171:8 184:13 189:23 198:18 221:14 233:11 258:3 264:11
**forward**
82:25 172:25 206:10 209:16
**found**
60:3 62:10 63:16 64:6 87:2,9 173:17 208:21 212:5 213:22 245:25 247:5 250:14 281:5,12 291:9 300:11 305:25 306:5,7,13 307:9
**Foundation**
22:24
**four**
13:14,16 24:11,16 50:10 130:3, 9 144:16 159:20 224:4 310:18,21
**fourth**
238:7 283:16
**frame**
20:1 48:3 56:12 73:19 75:5,14 94:24 107:4 133:12,19 134:8 136:22 138:11,21 139:3 200:15 245:16 247:8 248:25 249:1 317:9
**Frank**
269:9,10 273:2
**Franz**
10:25
**free**
13:10 17:13 27:23 249:16
**frequency**
181:15 288:8 295:17 329:19
**frequently**
242:17,18 296:3
**Fries**
11:7
**front**
12:22 13:21 25:4,19 31:11,18 32:8,12 38:18 57:10 88:21 171:16 206:5,15 209:23 228:15 233:21 254:24
**fronts**
325:14
**fulfill**
249:3
**full**
10:22 11:19 32:13 156:2 161:11 252:2 288:16
**fully**
29:4 53:10 80:11 113:25 164:9 264:18
**function**
35:25 36:25 37:7 86:7 129:8,9,15 134:5,24 135:25 140:24 147:24 151:21 189:3 192:8 205:12 207:9 229:25 230:12 246:8 263:20 283:6,9 307:25
**functions**
250:6
**fund**
323:9 324:9, 13
**fundamental**
72:14 185:20
**fundamentally**
180:23
**funding**
323:13,14 324:15,19 325:13

G

**gallery**
8:18
**game**
71:1,5,19
**gaps**
224:18
**gastric**
53:12 54:16 210:22 288:3
**gastrointestinal**
51:7 134:6 143:20 144:7 239:20,21
**gateway**
189:19
**gave**
24:9 26:6,12 37:18,20 61:11 77:1 97:19 110:7 266:19 318:22
**GCMS**
196:21 197:4,21 206:7 211:9

212:9,19,24 292:4
**gears**
31:17 87:20 127:16 263:13
**general**
35:9 80:6 120:17 123:17 128:16 134:7 229:15 237:10 261:14
**generally**
325:2
**generate**
129:5 185:15
**generated**
208:14
**generates**
256:18,19
**generations**
286:11
**generic**
131:21,25 132:3,5,7,9
**genericized**
115:12 132:15,20 156:16
**genotoxic**
198:8
**gentleman**
135:14 142:16 264:4
**gentlemen**
28:12 302:14 309:11 313:16 315:16
**genuinely**
78:20 321:15
**George**
269:19
**getting**
74:19 75:12 80:9 81:19 140:21 305:1
**Ghimpau**
269:20
**GI**
143:25
**give**
27:24 28:2 88:15 90:17 101:12 176:10 229:10 236:25 240:11 269:4 270:2 292:18 293:8 294:14 298:11 311:17 312:12 316:3,5 318:18,20
**given**
24:6 38:17 40:10 79:5 101:2 122:24 144:14 164:15 212:23 242:1 298:6 317:8
**giving**
38:16 59:7 77:1 84:7 101:3 311:14
**Glaxo**
22:25 23:20 140:1,14,23 142:10,12 260:3
**Glaxosmithkline**
23:2,11,16, 21 60:24 62:5 142:15 292:21
**global**
29:15 37:13 45:10,12,23 47:1,5,9,13, 15 50:15 69:18 74:4 78:22 86:9 97:3,12 102:5,6 106:9 116:6 140:12,13,24 142:11,13,14 153:7,13,22 154:3,5,19 155:6,10,17, 21 156:25 157:10 158:5,10,12, 19,23,24 189:9 199:23 231:6 262:9 264:5 269:7 270:21 272:5 273:3 285:12 290:7 293:11 294:1 295:21 296:5
**globalization**
134:12 138:20 142:8
**globalized**
133:25 134:11,14
**globally**
140:18
**GMS**
269:10,17 283:6,9
**goal**
174:2
**goes**
64:2 136:21 221:17 233:8 247:1
**going**
12:24 17:12 27:1,4,22,24 31:19 33:4,9 40:8 64:2 69:9 72:19 77:15 83:15 87:20,21 88:18,21 91:5 94:16, 23,25 95:7, 13,14 117:6 121:24 123:15 138:25 146:13 165:23 168:2,19,22 170:17,18 172:24,25 177:3 183:3 187:23 197:18,21 200:24 201:17 205:5 206:10 208:9 215:5,12 216:21 223:7,25 224:1,3,5 225:2 249:3 255:16 260:10 266:18 267:9 270:9 288:18 289:9,19 292:9,14 295:13 316:12 326:1,8,15, 17,22 327:5 331:21,22
**good**
10:20,21 34:6 77:4 90:13 91:2 115:22 149:15 176:14,20 177:1,23 178:2,7 215:2 303:13 306:22 311:20 317:2,24 327:4

**governance**
38:4 43:7 175:22 189:9 190:4,9,11, 13 191:3
**government's**
190:19
**governs**
29:16
**Gradually**
140:11
**Graham**
267:12 269:3
**gray**
64:20
**GRB**
270:10 285:15,20
**great**
87:24 162:24 166:24 268:13 326:21 327:2 331:23
**greater**
178:5 325:11,14
**Greek**
148:17
**grew**
140:11
**gross**
205:22
**grossly**
205:12,16
**ground**
91:23 165:6
**group**
35:21 37:14 52:6,24 85:25 122:18 129:10,11, 22,23 133:9 134:5 136:7, 10,18 138:4, 6,7,18 139:25 140:3,5,7,9, 12,16,20 141:1,2 144:6 151:20 155:3 157:20 160:12 191:1 193:5,9 197:9 199:4 208:15 239:19 241:11,13 246:3,5 257:18,24,25 258:7 259:12 260:3 261:3, 23 263:3,6 264:7,9 269:15 290:6 304:18 315:19,24
**group's**
263:20
**groups**
129:13 136:9 140:11 215:22
**GS**
161:23
**GSB**
154:18 155:5,9 158:4
**GSK**
10:15 14:20, 25 15:13,19, 22 16:7,9, 11,12,16,18 18:3,11 19:9 21:2 22:6,20 24:2,20 27:13 33:20, 21 35:7,21 36:18 37:13 38:3 39:6 41:4,8,12 42:18 43:7 44:17,24 45:17,21 46:15 47:6,8 48:21 54:25 55:13 58:17 68:13 73:9 78:7 85:4,6, 7 88:1 89:2 93:15 96:19 103:5,13 104:9,13 105:4,22 107:9,18,25 108:3 109:12,19 111:2 113:2 115:16,19 118:1,17 120:5 121:10,14 127:17 128:4 129:13 132:2 134:23 135:1 137:24 139:8 140:23 142:10 143:13,17 145:15 149:4,5,12, 25 156:14,19 161:13,23 162:22 163:10,11 165:3 166:3, 21 171:14,23 173:23 174:12,15 190:20 195:25 196:5 197:13 199:13,14,24 200:10 207:4 216:9 231:11 235:7,10 236:22 250:6 260:1 261:22 263:15,16,18 265:3 293:12,13,18 294:2 296:20 300:1 310:18 318:15 321:23 322:1,10,17 323:3,18 324:8,16 325:9,13,17 327:16 328:11,14,19 329:4,25 330:10 331:15
**GSK's**
22:24 93:18, 23 116:10 143:4 187:10 190:12 198:24 238:10 300:7 322:23 325:10 329:7 330:20,24
**GSK-ORIGINATED**
131:23 132:13
**GSKZAN0000030517**
224:9
**GSKZAN0000167442**
282:17
**GSKZAN166425**
315:3,12
**GSKZAN167442**
282:18
**GSKZAN26534**
228:8
**GSKZAN27379**
227:14
**GSKZAN27415**
227:21
**GSKZAN27431**
227:25
**GSKZAN28950**
228:4
**GSKZAN30517**
225:6

**GSKZAN33735** 226:21
**GSKZAN37872** 226:6
**GSKZAN48372** 227:11
**guarantee** 322:11
**guess** 33:20 60:16 78:21 90:3 269:1
**guessing** 212:15 298:4
**GUI519** 256:7
**guidance** 150:20 231:10,13, 15,18 232:21,22,24 234:23 236:23 256:21 257:15 259:9 262:7,23
**guidances** 233:4,14
**guide** 263:2
**guideline** 267:25
**guidelines** 59:6 171:9
**guinea** 223:9,15
**Guo** 269:19
**guy** 168:8,9 197:17
**guys** 84:12 88:5 145:25 168:18 176:11 216:2 243:10 275:22 316:5 321:24
**GW** 143:14

**H**

**H2ra** 66:14
**H2ras** 112:1
**hair** 110:4,8,10
**hairs** 164:23
**half** 18:15 26:2 176:10,14, 16,19 330:8
**hand** 145:25 146:10 215:7
**handbook** 137:2,4 231:4,5,19 232:22 233:7,12 257:19 258:5 264:17,19
**handbooks** 137:6 231:17 234:10 258:6
**handed** 12:23 43:21 140:16
**handled** 155:23 157:10 267:1
**hands** 169:20
**hands-on** 34:3
**happen** 9:23 145:15 248:2 326:22
**happened** 112:3 134:8, 12 138:20 139:6 155:16 160:22 163:2 204:7 205:1 274:3 284:17
**happening** 138:2 222:13 269:21 285:25 307:5
**happily** 29:2
**happy** 29:8 66:23 81:12 128:12 211:7 230:23 268:18 302:15
**hard** 89:23 184:14 225:13 257:7,8 268:14 300:11
**harm** 100:17 109:20 290:2,23 311:9
**harming** 42:2,5
**harmonization** 140:23 220:24
**Harvey** 306:14
**hate** 251:12
**hazard** 38:12 126:4, 18
**head** 28:23 36:18 37:2 43:6,22 44:6 45:10, 12,23 46:21 47:1,5,9,13, 15 50:15 69:18 74:4 78:22 86:9, 18 97:3,7,12 99:17 102:5, 6 106:9,18 107:2,4 127:21 129:23 130:18 140:13,16 142:14,17 149:18 153:10 158:9 159:5,20,24 189:25 190:2 191:18 192:7 196:5 199:22,23 239:14,15, 16,17,20 245:6 248:10 264:1,3,5,6, 9 269:11,17, 18 287:5 293:11 294:1 295:19 309:15
**headed** 269:10,11 315:19,24
**headquartered** 143:21 157:20
**heads** 47:10 249:15
**health** 109:4 120:17 178:7 236:19 240:1
**healthcare** 47:11 142:18
**hear** 9:20 74:18
**heard** 295:14
**hearings** 57:8

**heart**
311:1
**heat**
96:20 97:15 98:11,23 99:13 100:4, 24 101:23 103:7 104:11 206:8 211:17 212:1 221:21 274:16 276:23 277:20 296:11,16,23 297:1,4 298:1,3,5,8, 14,25 299:3, 4,5,22,23 300:17 301:10,22
**held**
8:6,9 35:22 37:12 216:15
**Helen**
36:12,13,15, 16,19 131:16 158:21 159:1,5 315:16,18 316:4,23 318:10 324:1 330:4,5
**help**
35:18 128:15,20 134:15,17 147:4 190:10 198:15 210:17 233:25 244:18 258:11 267:24 286:19 303:10
**helped**
140:22
**helpful**
203:9 232:20 254:22 272:16
**helping**
191:25
**Heritage**
22:24
**hey**
40:20 108:24 168:18 207:18 213:7 216:2,25 223:6 246:23 276:13 277:18 304:18
**hide**
105:23
**hierarchy**
231:11
**high**
96:20 97:1,5 99:13 103:7 104:11 139:10 210:10 250:14
**hired**
296:20
**historically**
129:16 131:6
**history**
46:11
**hit**
66:3,7
**Hobbiger**
8:21 10:17, 18,20,25 22:19 23:22 28:9,11 29:6 40:16 48:10 88:18 90:18 91:12 92:4 93:2,14 96:5 168:18 177:11 210:18 225:12 267:20 268:20 270:6 282:22 284:22 327:12
**hold**
28:25 70:11 74:9,14,15, 17 169:8 206:6 252:11 275:22
**home**
18:9 20:19, 20
**honest**
27:4 29:25 64:24 102:1 165:1 186:21 253:5 280:17 312:13
**honestly**
27:5 225:16 311:15
**hospitalization**
96:13
**host**
189:20
**hour**
20:15 176:10,16,19 294:3
**hourly**
18:19
**hours**
18:24 20:2, 7,11,13,14 22:6,14 94:21 308:4
**housed**
137:8 216:2 256:21
**houses**
256:18
**HR**
21:6,8,23
**Hudson**
142:16
**human**
46:21 53:11 58:17 59:13, 25 60:9,18 61:2,6,13,24 62:8,13,17, 22 63:11,17, 22 70:17 76:20,22 77:9 79:9,13 81:6,9 82:25 97:21 98:15 99:19,20 100:9 101:9 104:21 105:14 167:6 174:6 197:16 203:20 210:7 213:5,21 223:8,14 230:4 266:1, 5 322:13
**humbly**
34:5
**humidity**
97:24 104:15 105:6,9,13 274:16 276:23 277:20 296:11,15,23 297:2,5 298:2,3,6, 11,14 299:1, 3,4,5,22,23 300:17 301:11,23
**hundred**
242:24 302:1
**hundreds**
186:7 250:5
**hypothesis**
67:15

I

**i.e.** 153:7 154:21
**ICH** 220:23
**ID** 121:16
**idea** 280:16 292:23
**ideally** 234:25
**identifiable** 259:1,2,13, 14
**identification** 31:25 89:5 182:1 200:8 225:7 226:7, 22 227:12, 15,22 228:1, 5,9 267:13 282:19 315:13
**identified** 68:10,21 179:10 183:18 199:18 200:12 201:10 202:12 207:6 213:20 218:15 222:10 246:25 250:12 277:10 292:22 294:4 300:4 304:13 327:21
**identifier** 259:18
**identifies** 185:17
**identify** 181:5 201:8, 25 209:24 217:19 263:21 282:7 291:14,17 292:22 297:19
**identifying** 186:12,18 258:15 280:4
**ignore** 80:14
**ignored** 70:7
**ignores** 110:2 329:4
**imbalance** 204:3
**immediate** 186:19
**immure** 51:7
**impact** 236:19 240:1
**impacting** 205:18
**imparities** 282:8
**implement** 166:4
**implemented** 231:24
**implementing** 179:9
**implicated** 117:23
**implication** 215:23
**implications** 192:16 193:14 194:8,23 199:20 280:20 290:15 300:22 320:18
**implicitly** 82:7
**implying** 147:1
**importance** 53:25 186:11
**important** 70:15 97:16 104:20 108:1 112:7 149:10 150:15 156:24 164:23 181:6,12 182:23 183:4,7,13 184:3 186:11,17 197:14 198:3 202:2 205:24 207:23 222:12 242:23 257:9 279:5 280:5, 10 303:8 310:9 319:15
**impression** 209:1
**imprisonment** 239:24
**improper** 66:21
**improve** 179:24
**impurities** 191:23 197:4 198:2,4,8,25 200:10 202:12 214:16 262:8 272:9 277:18,25 278:25 279:25 280:4,5,6,11 282:13 284:5,11 288:16,17,22 289:3,24 290:8,9,11, 16,19 291:4, 15,18,22 292:6,8,23 293:14 294:5 297:19 304:20 305:11,14 307:3
**impurity** 42:1 82:18 194:14 203:11 281:6 282:1 297:6, 14,16 299:6
**in-house** 235:5
**inappropriate** 205:12,16
**inception** 219:11
**incidence** 322:7
**incident** 187:12 188:1 284:14
**incidentally** 116:5 290:7
**include** 117:21 126:3,18 148:24 149:1
**included** 82:13 125:21,22 134:5 204:22 242:24 315:25 329:15,16
**includes** 116:17
**including** 47:6 109:6

122:14 153:10 168:25 178:23 208:11 252:8 269:3 280:5 308:10 310:5 317:4
**inclusion** 126:16
**inclusive** 329:13
**inconclusive** 272:8
**incorrect** 35:16 163:25
**increased** 173:21 331:5
**increasingly** 133:25
**indeed** 36:6 51:18 68:2 76:6 79:16 86:3 112:22 129:5 147:19 152:8 194:11,24 216:9 248:10 272:23 276:7 278:20 282:4
**independent** 268:7
**independently** 62:24
**index** 234:15 255:2
**India** 129:14 131:19,21,24 132:9,16 136:18,21
**indicate** 10:10
**indicated** 210:13 266:11
**indication** 110:2 117:4, 5 145:24 146:3,4 210:13
**indications** 65:18 116:18 118:3 320:17
**individual** 43:15 97:9 99:18 129:1 136:8,10 216:17 236:23 239:24 258:11,15 259:18 264:24 268:4,9
**individuals** 44:22 174:25 247:21
**inevitably** 114:11
**influence** 169:18
**inform** 109:8 237:19
**informal** 249:15
**information** 29:17 30:5 35:8 42:19, 25 43:2 48:21 52:9 53:16 56:22 64:22 80:19 90:3 98:17 99:23 103:10 107:23 111:14 114:8,9,11, 14 115:2,8, 14,18,23,25 116:11,17 117:3,18,21 118:2,18,23 119:3,4,6,17 120:6 121:10,16,21 122:24 123:13 125:3,5,7, 13,16,21 126:15 127:4 128:25 129:2 135:2,3 136:2 140:10 144:18 148:1 162:23 173:6 179:19 183:13 184:12 186:3,5,14, 18,23 190:23 191:2 199:9, 10 204:8 206:24 208:10 209:10,17,24 216:24 221:6 236:25 238:11,19,25 239:3,25 240:6 246:7 247:22 250:20 264:11,21 266:9 276:12 286:15 298:6,7 305:18 309:19 317:4,21
**informational** 122:22
**informed** 118:4 187:1 275:9
**infrequent** 295:20
**ing** 317:25
**ingredients** 265:24
**ingrown** 110:8
**initial** 79:25 143:18 173:7,8
**initially** 184:18 316:4
**injury** 312:3
**ink** 187:22
**input** 129:8 189:5
**inquiries** 71:10 84:4 100:5 101:15
**inquiry** 42:20 75:4 86:2 253:9
**insert** 114:9,13,19
**insight** 122:19
**inspections** 189:21
**instance** 109:8 111:12 119:2 158:22 164:4 167:10 182:17 236:2 272:6 283:8 322:8 329:4
**instances** 181:17
**instruct** 91:15 93:5
**instructions** 262:25
**instrumentati on** 291:16,17 297:20 305:10
**integrated** 169:18 247:3
**intended** 265:25

**intensive** 100:7
**intention** 28:12
**intentions** 296:6
**interaction** 316:23
**interactions** 8:8
**interest** 136:19 137:25 182:14,15 252:20 312:17 322:24
**interested** 9:5 185:4 218:3 276:4 312:16,20,22
**interesting** 323:24
**interface** 8:9,19 36:10 108:17
**interject** 40:25
**interjected** 295:10
**Internation** 220:24
**international** 59:11,13 141:2 261:4 281:16
**internationally** 64:4
**interpret** 215:17
**interpretation** 273:12
**intervention** 95:15
**intestinal** 51:21 53:6, 12 54:15,17
**intimately** 153:15 159:11
**introduce** 167:2
**introduced** 164:5 232:6
**invented** 220:20
**investigate** 70:1 185:18 290:22
**investigated** 188:24 194:16 195:7 253:15,18
**investigates** 188:25
**investigation** 96:6 243:22
**investigations** 81:8
**invoices** 16:10
**involve** 190:22 193:7
**involved** 14:1 26:6 39:5 49:23 52:18 107:10 128:6 130:2, 4,14,24 131:5,19 135:17 147:3,5,7,9 149:12 153:15 157:4,16 158:5,7,20, 22 159:2,6, 9,11,15 161:3 216:12 251:5 253:25 255:24 260:5 265:7 323:12,17 329:22,25
**involves** 182:1 190:21
**involving** 27:2 52:24
**IPSP** 141:2
**irreversible** 66:18
**ISAPP** 247:3,8,9, 14,19 248:8, 25 249:2,5, 9,19 253:6
**Israel** 237:5
**issue** 21:23 29:23 40:8 50:18 62:23 65:10, 12 66:8 70:6,7 76:22 83:2,12 84:12 110:24 147:3 158:1 162:13,16 163:1 164:9 165:6 167:20,24 171:19,20,23 173:18 186:20,21 187:20,25 188:5,8,9,12 189:2 191:7 192:16 193:13,19, 23,24,25 194:10,11, 12,15,21 195:6,11 199:25 200:12 201:10 203:11 204:7 207:8 210:11 213:3,19,24, 25 215:19 218:15 220:6,9 221:7,21 236:25 240:22 241:5 246:24 271:20,25 273:21 274:19 275:2,3,6,7, 11,17 276:13 284:1,13 285:25 286:11 297:10,17 300:2,5,8, 10,12 301:14 302:19 309:13,14 321:5,6,13, 15 326:18
**issued** 57:21 155:6
**issues** 71:19 83:18 158:14 172:2,13,23 187:25 188:5 189:20 193:7 194:6 199:17 201:24 202:1 207:2 209:24 217:3,17 222:10 241:24,25 242:3,6,7 244:22 263:21 264:15 274:14 275:8 276:23 286:3 295:21 296:2 298:13 305:8

## J

**Jamie** 95:8,15
**January** 47:3,4
**Jen** 158:18
**Jens** 154:6 158:9
**Jess** 224:17 331:22
**Jessica** 226:25 228:19
**Jim** 306:14
**job** 43:17 148:12 240:3 266:25 279:23
**John** 9:2,9 16:14, 15 21:2 32:1,4 88:18 89:9,21 224:1,6 225:22 226:2 227:7 229:12 254:7 256:1 257:12 272:16 282:16 289:10,18 316:3 321:1
**joined** 128:8 134:1, 9 260:1
**jointly** 134:1
**journal** 244:11 248:5
**judge** 31:11 95:16 295:1
**judgment** 25:11,13 268:4 297:12 302:11 310:13
**judgments** 202:24
**Julie** 11:17 12:5
**July** 269:4 274:25 285:14 289:12
**June** 8:23
**jurors** 25:20 77:15
**jury** 13:21 25:4, 19 26:1 28:12 31:11 38:18,23 148:7,11 223:20 292:2 302:15 309:12 313:16 315:16
**justify** 219:23

## K

**K-E-N-T-H** 21:13
**Karol** 255:4,5,24
**keep** 77:1 85:3,14 94:22,24 95:14 101:2 176:14 215:4,11 218:16 220:8 237:20 255:16 266:18 286:16 289:18
**keeping** 18:11 180:18
**Kenth** 21:11,14,22
**key** 109:10 140:18 190:15 239:12
**kids** 324:19
**Kimberly** 11:18,23 12:6
**kind** 224:7 289:10
**Kingdom** 44:21
**kiteworks** 15:7,10
**kiteworks'** 19:5
**knew** 140:21 277:10 290:7 304:14 314:15
**know** 11:9 14:21 17:10 18:11 24:12,13 26:5,6,7,8 27:3 31:4 32:16,20 34:11 35:6 39:21 40:3 46:21 48:13 49:13 50:15 67:10 69:19 72:7 77:5,9, 17 78:21,23 81:25 82:22, 23 83:3 85:11 87:20, 21,23,25 88:9,15 92:1 93:14 95:23 96:19 97:3,9 101:3 102:16 103:20 106:20 111:9 114:12 115:13 116:18 118:11 123:15 128:4 132:5,7 133:11 134:16 135:18 137:10 139:4 140:12 143:15 145:4,5,11 147:24 149:5,19 150:12 152:10 154:7 157:24 160:10,11 163:14 165:19 169:1 175:11 176:11,16 186:7 187:16 192:21 193:16 194:1,10 196:24 197:8,19 205:9 206:7 208:20 211:12 218:22 221:18 224:10,12 226:5,24 228:14 229:2,5,11 230:17,18,20 232:6 233:22 236:25 238:3 240:4,16 244:14

245:17 246:17 249:18 253:6 254:14,21 255:18 256:6 257:2 261:13,15 265:8 268:14,16,20 271:1 273:11,18,25 275:6 276:21 277:14,19 280:18 281:1,21 282:24 283:7,15 284:4,9,10 285:11 288:10,21 292:7,9 293:11 298:19 302:9,12,16 310:4 311:15 313:9 320:22 321:21 322:6 323:14,24 325:18 326:22

**knowing**
155:3 271:4

**knowledge**
15:14,15 27:16,18 46:11 58:2 64:25 73:5,8 76:2 78:8 100:11 104:9 142:14 146:12 161:1 198:18,19 217:14 222:20 253:8 264:8 278:16 292:15 321:19 328:7

**knowledgeable**
33:20

**known**
43:13 53:13 54:18 66:4 118:12 141:1,2,16 165:20 199:13 232:24 253:17 261:4 290:9

## L

**label**
119:6 122:23 123:13,23 124:10,13,17 125:12,22 127:10 182:13 187:5 298:17

**labeling**
29:15,22 96:25 101:13 103:13 104:14,25 105:8 126:3, 16,17 152:4 163:25 179:4 187:23 219:17,24 231:24 290:8

**labels**
123:9 124:2, 22

**laboratory**
196:19

**lack**
113:1,5 192:20

**ladies**
28:11 302:14 309:11 313:16 315:15

**lady**
21:11 36:11 130:11,14 131:15 140:16 149:14,15 231:25 287:2

**Lam**
269:19

**Lancet**
244:10

**laptop**
14:18,21,22 15:5

**large**
8:17 143:4 206:12 208:16,25 209:2 241:6 325:20

**late**
57:15 68:4 142:11 143:22 220:22 305:2

**latency**
55:21 80:11

**latent**
56:5

**Latin**
148:17

**law**
11:4,5 15:14,16 176:1

**lawsuit**
41:23

**lawsuits**
310:19 316:15,19

**lawyer**
16:16 25:13

**lawyers**
11:16 15:12 16:9 18:3 19:5,16 20:6,11 21:1 22:7,10,15 39:4,21 40:1,4,9,17, 20 41:3,8,17 92:18

**lay**
317:13

**lbs**
294:2

**LCMS**
292:4

**lead**
69:25 96:13 134:4 184:13 194:10 238:25

**leader**
139:20 219:3

**leaders**
128:7

**leadership**
142:13

**leading**
138:11 206:14 309:24 325:5

**leads**
179:7

**learn**
45:20 51:25 206:12

**learned**
45:24 47:21 48:21 50:16 217:4

**leave**
223:22 293:22

**leaves**
130:7,8

**leaving**
44:17 50:4 61:22 138:10 278:9 301:6

**Lecroix**
255:5

**lectured**
203:9
**led**
64:18 71:18
147:10
217:25
251:24
**left**
22:12 23:1,6
43:23 89:2
145:1
178:19,20
267:23 268:3
**legal**
9:3,7 16:17
21:23 22:13,
20 28:14
29:3 33:15
45:4 123:11
296:21
**legislation**
123:17
**legitimately**
307:6
**letters**
119:10,14
**letting**
240:4
**level**
132:19
139:11
153:17
245:11
264:25 291:5
298:2
302:13,18
305:10,14
307:5
**levels**
272:9 280:25
281:8,14
289:25
290:21
298:16
**Lewik**
159:10,16
160:20
**Liability**
9:1
**license**
162:3 236:9
266:12 309:8
**licensed**
80:3 115:6
118:10 133:5
219:15
237:14
242:18
265:18 309:9
**licenses**
162:3,11
**licensing**
162:19
**lies**
147:17
197:10
**lieu**
10:3
**life**
69:5 72:3
172:19
180:13
192:21 325:9
**lifestyle**
180:3,5,6,8
**lifetime**
317:17
**light**
67:12 81:7
97:24 104:15
111:20,25
112:25
162:9,24
165:17
167:23
168:24
169:1,16
171:23
174:10
179:19
187:18 200:8
**lightly**
223:19
**likelihood**
118:12 290:2
**limit**
64:24
**limited**
287:7
**limits**
281:16
291:15,16,22
**Lincoln**
235:7
**line**
164:5 190:8
192:8 224:17
240:18
248:10,20
250:6 287:5
330:5
**link**
125:24
**list**
94:7 222:1
227:1 243:25
260:7 269:6,
22 288:22
**listed**
33:21
**listening**
77:16
**literally**
227:16
**literature**
80:10 98:16
121:12
122:22 129:1
135:24,25
136:3,7,8,
15,17,18
137:3 149:9
150:1 183:9,
12 187:7,8
200:5 234:24
242:22
244:15,24
245:15
246:22 247:6
248:3 249:22
250:2,4
257:15,20
258:8,10,11,
13 267:22
**litigation**
9:1 22:15
24:20 27:7
29:23 30:13
34:19 44:24
53:15 178:13
318:15
**litigations**
24:19 27:20
29:12 31:9
**little**
28:21 33:5
138:23 154:8
172:7 198:22
215:10
230:18
233:23
236:15 237:7
286:25
289:15
**liver**
236:6
**loaded**
222:17
**LOC**
283:1
**local**
134:20
229:21,24
230:8 239:9
**located**
9:13 11:6
227:2
**locked**
8:11
**LOCS**
128:17
138:11
**logs**
265:1
**London**
11:3,8 12:4,
5 38:16

**long**
22:19 40:19 65:22 66:4 92:11 94:7 124:20 128:2 145:6 223:8 235:21 243:2 266:14 314:8 322:8 326:3

**longer**
14:20 15:22 24:2 30:4 39:10 111:1 112:15 152:17 174:13 176:16 185:11,15 253:7

**longer-term**
166:13

**look**
15:12 34:10 53:21 54:20 59:14 70:6, 22,24 71:7, 19 72:6,8,14 73:4 77:2,3 78:25 79:21, 24 80:5,12 81:9 82:9 83:12 87:16 99:22 101:6, 7,16 107:7, 13 116:1,2,6 132:18 136:11 157:17 161:14 166:13 173:16 181:18 184:13,16, 19,23 186:6 188:12 194:23 198:3 199:16 201:20,22,24 204:6,8 205:5,9 207:7,12 208:2,7 209:16 213:21 214:7 215:16 223:5,20 225:13 228:17 230:23,24 234:11 235:19 236:21 240:13 243:1 245:11,25 247:20 249:24 252:10,15 255:22 264:17 277:18 278:4 280:19 283:10 289:24 306:5 313:10 319:13 322:20 328:22 329:18

**look-see**
235:24

**looked**
30:3 47:10 52:5 59:25 61:14 62:8, 23 65:10,11 72:21 73:6 78:8 83:19 84:12 88:5 99:7,23 100:16 108:4 129:17 131:12,21,24 132:15,21, 22,23 133:1, 3,5,8 134:3, 4 138:23 140:7,9 143:20 144:6 148:2 170:3 200:5 213:22,23 239:19 245:17 253:24 274:18 291:9 293:13 300:11 314:4 329:13,20

**looking**
49:25 63:20 65:3,5 67:13 71:15 79:8 83:18 97:21 110:16 131:13 136:9,10 144:23 151:21 156:18 165:4 181:15 184:10,11 185:4,6 186:7 189:7 191:23 192:12 202:21 203:3,21 205:13 206:2,3,5 207:11,25 209:15 213:4,6 214:15 216:13,17 222:8,9,16, 22,23 223:6 225:24 227:1 228:23 232:14 245:18 254:18 258:4 270:25 275:1 287:3 288:15,22 291:8 307:1 317:16,17

**looks**
223:20 234:1 256:4 257:14,16 260:18 316:11

**lose**
131:3

**losing**
304:25

**lost**
75:20 178:17 231:15

**lot**
36:15 144:18 151:6 167:5 178:2 209:1 225:25 227:17 310:17

**lots**
115:12 132:5 198:15 233:2,3

**love**
169:7,12

**low**
239:13,22 240:3 287:18 288:8 290:3

**lug**
331:25

**lunch**
176:7 177:18

**M**

**M-A-R-I-A-**
150:6

**machine**
93:9

**made**
41:18 62:16 81:9 87:1 101:16 102:21,23

106:19,20 111:23 113:2 132:6 134:16 152:18,19 153:2,12 155:25 157:7,12,15 158:15,18 161:17 162:1,8,22 165:3,7,21, 22 166:21 170:20 171:18,24 174:12,15 200:4 220:13 223:13 231:18 248:24 273:1 284:3 290:14 291:10 314:5 321:4 323:9, 25 324:9

**magazine**
120:11

**magazines**
119:18 121:1

**magistrate**
95:8,15

**maintained**
264:25

**maintaining**
54:17

**major**
163:10 174:17 292:8,10

**majority**
142:5

**make**
31:8 34:8,13 45:2,16 93:8,19 95:19 101:13 110:1 117:7 118:4,11 125:6 152:24 154:9,20 157:1,6 168:3 171:10 175:12,17 188:20 191:6 192:4 207:5 225:24 237:9,11 238:19 239:1 240:5,10 248:9 265:24 275:22 277:11,12 279:1 311:7, 22,25 312:2 316:10 318:1 331:24

**makes**
175:18

**making**
111:3 115:13 156:19 158:8 159:12 164:24 179:22 202:24 210:15 233:5 266:23 313:5,25 319:2,16 320:10

**male**
120:17

**malformations**
311:4

**man**
58:21 59:8 69:5 210:9 269:16

**manage**
134:19 230:6

**managed**
147:25

**management**
118:23 129:8,11,16 131:14,17 134:17 135:4 136:7,10 137:4,7 150:21 151:16,19,22 152:1,3,8 164:11 165:4 178:21,23 179:1,7,9 190:8,9,11 217:15,16, 20,23 218:10,17,23 219:12,14, 19,21,23 220:1,16,21 221:10,11 230:4 231:21 235:6 247:6 257:18,23 258:2,7 259:12 262:20 263:1,7

**manager**
192:8 248:20 330:5

**managing**
315:25

**Manchee**
87:22 88:1, 8,14

**manner**
10:8

**mantra**
133:13

**manual**
254:11

**manufacture**
168:19 169:17

**manufactured**
73:10

**manufacturer**
115:7

**manufacturer's**
124:19

**manufacturers**
115:13 123:8,12

**manufacturing**
46:19 52:6, 16 57:1 67:11,18,19 68:19 69:12 73:15 76:11 78:19 79:14 85:10,24 96:24 98:1 99:17,18 153:11 159:21,24 166:2,8,17, 18 167:3,6, 18 168:22 170:9 172:12,16 174:8 187:18 194:4 199:6, 18 200:20 201:17,25 202:7 203:5 206:10 207:4 213:12 214:15 215:20,22 216:25 220:8 221:23 241:1,7 263:22,24 264:2,5,12, 23,25 265:8 274:19 295:18 299:17,20 307:23

**Marcellus**
269:19

**March**
43:16,18,20 44:8,10 47:5,15

**Margaret**
260:4

**Marianne**
149:16,21

150:4,5 330:6
**mark**
32:4 88:19 225:23 282:17 315:4
**marked**
31:19,24 89:4,23 224:23 225:6 226:5,6,8,21 227:11,14, 21,25 228:4, 8 267:13 282:18 315:2,12
**market**
83:11 93:16, 20,24 112:15 113:3 115:17 120:24 124:20 142:21 152:15,17 162:2,6,17 165:23 189:18 237:14 300:8 309:7 321:14
**marketed**
111:1 115:9 141:24,25 144:19 183:19 216:14 235:1
**marketing**
162:10,12
**marketplace**
76:3 84:24 115:24
**markets**
162:19
**marking**
227:16
**Marlgozota**
130:12
**Mart**
269:11
**Marta**
130:11
**Mary**
150:3
**mass**
196:15,20
**material**
47:12 174:21
**materials**
22:9
**maternity**
130:6,8
**matrix**
147:10
**Matsuda**
53:1
**matter**
8:25 10:5 70:2 243:18 317:11
**matters**
166:16
**mature**
242:19
**MDC**
241:15,20
**mean**
14:25 35:12 38:15 55:1 102:21 108:14 160:12 176:7 190:10 211:4 222:22 225:9,18,20 234:18 256:15 273:13 291:2 306:25 328:20 332:2
**meaning**
188:21
**means**
53:12 55:23 180:17 190:20 196:25
213:25 215:18 234:6 328:22
**meant**
178:10 226:11,17
**meantime**
322:21
**measure**
152:11
**measures**
201:7 219:18
**mechanism**
42:23 66:25 68:10,21 72:2,9 101:12 183:6 220:16 249:14
**mechanisms**
292:5
**meddra**
236:1
**medical**
38:3 43:6,7 53:25 54:18 60:22 67:22 100:13 111:24 117:3,8,10 121:11 122:17 123:3 124:7 126:14 135:24,25 136:2 146:1, 5,6,8,14,16, 20 147:2,11, 18 149:23 150:1 152:19 153:6 154:15 155:10 156:12 157:1 159:10 187:6,8 188:6,8,16, 19,21 189:1, 5 190:5,13 191:25
192:17,25 193:3 214:9 215:22 223:14 240:24 241:2,16,20 244:11 245:10 272:8,21 273:1,4,5,7, 10,12,16,17, 18,22 274:25 275:7 276:5, 8 279:1 283:23,24 284:3,13 286:19,23 288:2 304:19 318:20,21,23 320:16,24
**medically**
53:10 154:21 190:14,21
**medication**
110:7 117:22
**medicine**
46:21 53:20 84:1 97:20, 21,22 100:16 110:12 113:21,22 120:21 134:24 148:17 152:6 169:14 184:10 189:9 197:20 202:23 244:11
**Medicine's**
317:8
**medicines**
48:2 49:23 55:10 56:23 57:7 60:23, 24 68:3 70:19 71:14, 15 75:10

79:8,12 86:3 101:6,7 108:15 109:25 135:21 142:17 148:14,18 153:8 161:21 167:10 173:22 174:20 179:5 184:3 195:21,22 202:20 203:22 236:3 241:15 266:21,23 314:19 316:8

**medics** 146:19

**Medline** 136:6 244:16

**meet** 98:4 140:5 265:21 266:4

**meeting** 20:5 154:1 160:10,13,16 215:18

**meetings** 153:24 160:3,6,18, 22

**meets** 239:10 266:10,15

**Melissa** 54:10 90:17 283:20 295:12

**member** 37:13 272:4 290:6

**members** 148:6 158:19 159:23 161:14 229:23 269:7

**membership** 147:11

**memory** 271:5 286:20

**mentioned** 65:7 114:19 142:7 159:17 242:13 261:6 275:15 327:25 328:17

**merit** 302:4

**merits** 197:21 198:20

**Meryick** 52:25

**messages** 239:12

**met** 299:5

**metabolic** 290:9

**metabolism** 76:6

**method** 196:17 291:7

**methodologies** 211:13 251:24 253:24

**methodology** 197:22 203:23 211:15 212:25 251:4,5 252:9 290:12 291:3 324:5

**methods** 198:20 203:24

**mid-2000s** 234:10

**mid-2015'ish** 136:14

**middle** 231:12 257:23

**Middlesex** 52:24

**million** 26:2 85:8

**millions** 114:12

**mimic** 210:21

**MIMS** 256:23

**mind** 34:18 40:24 207:24 210:3 279:22 313:3

**mine** 89:18 178:5 229:2

**mined** 235:18

**minimal** 162:24 163:6 165:18

**minimis** 112:6 302:19

**minimization** 151:16,18 152:2,8,11 174:11 179:23 217:19 219:18

**minimizations** 152:14

**minimize** 109:20 173:12 179:10

**minimizing** 174:2

**minimus** 290:23

**mining** 235:9,15 247:15

**minus** 31:6

**minute** 87:21 94:16 142:20 186:10 213:4 256:2 263:13 267:21 269:4 325:25

**minutes** 33:7 57:20 58:3 62:17 90:16,18 91:1 157:22, 25 160:5 176:23 275:14,16 299:6 305:5 318:18 326:6 327:3

**Mischaracterization** 214:24

**mischaracterize** 95:4

**Mischaracterizes** 17:20 22:22 46:1 50:21 61:9 70:13 75:19 76:24 78:12 82:21 94:14 169:10 312:8

**mischaracterizing** 95:9

**missed** 245:1 254:15 288:1

**mistaken** 283:2

**misunderstand** 172:14

**misunderstanding** 41:1 60:7

**misunderstood** 161:16 240:20
**Mitch** 42:22 64:17 74:5 83:17 150:2 196:10 242:11,12,24 243:9,14,15, 21 245:1,13 248:4 250:11,20 251:18 252:3,5 253:1,13 258:17 259:5,6 303:10,11
**mixing** 303:16
**mixture** 146:19 197:10
**module** 231:5,20,24 257:19,20 264:18,19
**molecule** 65:17
**moment** 241:23 270:2 277:13 288:10,11 316:3 318:4
**Monday** 272:20 289:12
**monies** 18:23
**monitor** 55:8 72:16 80:8,9 115:23,25 116:1 172:12 184:3 198:25 200:10 201:9 202:11,19 206:9 209:14 222:2 229:6 249:2
**monitored** 172:22 235:13
**monitoring** 55:10 70:18 108:15 135:24 136:2 148:13 167:19 172:3,6 184:12 218:1,3
**month** 49:20 75:7 243:18,22
**monthly** 234:24 235:19 244:15
**months** 243:5 247:10,18
**moot** 302:25 303:3,6,18
**morning** 10:20,21 198:14 202:4,17
**move** 76:17 83:16 96:1 147:15 216:21 224:1 229:5 241:21 254:5
**moved** 130:8 138:7 140:19 144:8 154:15 190:3 247:2,15 253:7 269:17
**moving** 82:25 140:21 176:14 286:16
**multiple** 88:10 101:2 181:16 182:18 233:14 239:17 274:14
**murder** 222:17
**mutagenesis** 82:24
**mutagenic** 198:8 262:8
**Myles** 139:15,19 140:15 218:2

**N**

**N-A-P-P** 23:9
**N-NITROSODIMETHYLAMINE** 42:13
**N-OXIDE** 290:9
**name** 9:2 10:11,22 11:19 36:14 87:25 123:24 130:12 135:22 149:19 155:2 157:16 178:6 235:4,5 246:9 260:3 283:4,17
**named** 21:9 43:15 123:23
**names** 94:8 130:20 131:1 135:17 157:22 159:25 161:13 229:22 231:9 257:3 260:7 261:6 269:22
**Napp** 23:9,10
**Napps** 141:1
**nature** 21:16 65:16 166:3 193:6 292:5 317:12
**nausea** 204:2
**NDMA** 42:15,17 45:21 46:15 47:21 50:15 51:2,24 56:17 58:8, 17,20 59:8, 23 60:8,25 61:5,12,19, 22 62:7,12, 21,24 63:11, 16,22 64:10, 14,19 65:10 66:8 67:7,13 68:7,14 69:20 70:1, 25 71:11 72:20 73:4, 10,25 75:16 76:2,8,20 77:8,21 78:8,25 80:20 81:7, 23 82:14,18 83:20 84:11, 24,25 96:20 97:14 98:11, 14,23 99:12 100:4,7,23 101:22 103:6 104:10,20 105:5,14 107:19 111:10 114:19 165:5

166:9,13 167:20,24 172:25 173:4,8,11, 13,17 174:3 194:14,20,22 195:2,5 196:6,11 199:2 201:9 204:7,13 206:8,13 207:6,20 209:25 210:6 211:18,25 214:13 216:3,25 217:4 218:14 220:5 221:7, 21 222:6,9 244:23,25 250:14 251:1,21 258:19 275:23 276:9,14,18, 25 277:20 280:6 282:1 293:14 294:6 296:23 297:5,9 298:15,20,22 299:3,6,11, 14,23,24 300:17,22,23 301:10 302:1 304:6,8,10, 14 305:18,24 306:12,24 307:9 308:15,23 310:4 316:21 320:18 321:11,12,18 322:7

**necessarily** 24:10 249:13

**necessary** 95:18 144:20 171:10,22 249:4

**need** 40:1 43:14 45:18 80:11 118:9,11 126:6 150:3 157:23 158:24 174:24 176:16 197:19 201:2 215:9,10 217:19 224:11 225:11,12, 14,17 233:10 237:12 238:18 247:19 248:21 249:17 252:10 267:5 268:19 276:24 277:18 282:24 284:21 294:12 295:2 299:10 301:12,14 306:8,23 324:3

**needed** 90:17 138:1, 2,5 147:18, 20 165:12 171:20 221:12 242:4 247:7 250:22,25 252:14 253:18 300:6 302:11 322:4,5,9 323:5

**needless** 38:14

**needs** 193:19 194:16 195:7,11 204:14 248:18 251:10 281:20 300:6 321:13

**negative** 152:11

**negotiate** 20:25

**neoplasia** 236:1,4

**network** 134:25

**never** 23:19 50:11 57:2 63:21 104:19 122:1,2 155:21 160:18 197:1 302:16,17

**Newall** 290:5 291:10 292:16 306:14

**Newall's** 289:11

**newer** 156:17 167:10

**newly** 115:6 144:19 242:17 243:4

**newsletter** 116:2

**nine** 247:18

**nitrite** 69:3

**nitrosamine** 42:9,12 49:2 199:25 200:9 213:7 220:6

**nitrosamines** 51:8 212:4 213:17 308:11,12

**NMDA** 277:19

**nomenclature** 255:17

**nominally** 159:21

**non-bayesian** 278:18 279:14

**non-european** 238:15 241:24

**non-leading** 278:21

**nonconsequential** 309:13

**nondelegable** 108:23

**nonexistent** 290:23

**nongsk-originated** 131:22

**nonissue** 237:15

**nonphysiological** 69:3

**nonresponsive** 216:22

**nonserious** 142:1

**normal** 212:4

**North** 133:10 134:6 135:10 138:4,13,18 140:4 141:1 143:21 144:7 247:24

**note**
37:6
**noted**
92:19
**notes**
12:21 13:3 178:18 224:7
**notice**
14:24 28:17 31:20,24 32:5,6,11,23 33:9 139:5
**notification**
52:4 237:9 243:18
**notifications**
239:13
**notified**
107:18 170:23 220:8 236:24 238:23 243:16
**notify**
236:18,23 237:12 238:18 242:10
**notifying**
48:14 238:14 241:23 249:24
**number**
25:20 83:14 89:8 90:7 144:21 178:23 183:22 224:4,19 232:9,10,12, 16 233:17 241:3 287:7, 18 290:20 295:20,24 327:15,21 331:22
**numbered**
90:2 224:18
**numbering**
225:16
**numbers**
226:15

**O**

**O'TUEL**
16:14,15 21:2,24
**Oana**
269:20
**Oasis**
141:16
**oath**
10:4 78:20 177:12
**Object**
99:5
**objecting**
95:14
**objection**
17:19 21:25 22:21 25:9, 21,22 26:4, 14,22 27:8 28:5,6,19,20 33:14 34:17 35:15 37:11 38:9,20 41:9 42:6 45:25 46:16 47:17, 23 48:16,23 49:10 50:20 51:14 52:2, 10 53:8,23 54:5,12,21 55:3,17 56:1,10,18 58:12,19,25 59:17 60:12, 19 61:8 62:1 63:4,13,24 64:15 66:9 67:4,8 68:8, 16 69:1,21 70:9 71:6,21 72:5,24 73:12 74:7, 10,11,19 75:18 76:4, 23 77:11 78:1,3,11 79:2,22 80:22 81:2 82:2,20 83:24 84:15 85:16 86:13 87:5,14 88:6 91:15 93:5, 21 94:3,13, 18 96:8,21 97:6,17 98:12,24 99:14 100:25 101:24 103:8,18 104:5,12,23 105:7,16,25 106:6,12 107:11,21 108:12 109:2,22 110:19 111:18 112:9,21 113:19 114:6,21 115:3 116:14,20 118:6,20 119:12 121:13 123:10 125:1,15 126:22 127:11 142:23 143:6 145:16,21 150:9,10,22 155:20 156:6 163:3,21 164:13 165:9 166:11,25 168:1 169:9, 10 170:5,19 171:12 172:5 173:2,14 174:4 175:2, 14,20 180:22 181:9,13 182:24 183:23 184:21 185:2,13,25 186:16 188:15 192:6 194:18 195:9 196:7,23 197:5,15 198:10 200:13,17 201:11 202:16 203:16 204:16 206:17 207:22 208:12 209:5 210:4,25 211:11,19 212:2,12,21 213:14 214:19,23 216:6 217:6, 7 218:20 219:5 220:10 221:9,25 222:11,18,25 223:11,23 243:12,23 245:9 250:16,23 251:11,20 252:12,13,18 253:21 258:22 263:17 265:17 266:2,17 274:9 275:25 276:16 277:4,22 278:23 279:7,16

280:8 281:10 282:11 286:4 287:10,20 288:20 289:5 290:25 291:19 292:13,25 293:16,18,22 294:7,8,9, 15,16 295:10 296:13,25 297:8,21 298:18 299:8 300:3,19 301:16 302:21 303:14 304:24 305:23 306:11 307:7,21 308:7,25 309:16 310:20 311:2,11 312:7,18 313:7,19 314:1,10,16, 25 316:17 317:6 318:3, 16 319:4,17 320:12 321:7 322:25 324:11,21

**objections**
10:8 94:18, 23 155:5 294:18

**objective**
279:14

**obligation**
108:16 124:19 268:1

**obligations**
249:3

**obscure**
248:5

**observation**
101:9

**observational**
80:13

**observations**
217:17

**observe**
81:10

**obvious**
53:21 54:20, 23 307:1,4

**obviously**
12:11,20 19:13 30:4 34:19 40:2 44:19 49:24 52:4,17 53:4 65:24 131:23 140:20 143:3 152:4,21 166:5 179:16 182:2 205:17 206:22,23 225:15,21 237:8 277:11 326:17,19

**occasion**
290:2

**occasions**
202:18 310:18

**occurred**
276:6

**Ocean**
141:9

**Oceans**
141:7,20 217:1 246:13,15

**October**
320:9

**off-target**
72:9

**off-white**
285:5 286:1

**offer**
27:1,6,16,22 28:3,13 61:5,25 64:8 69:11 119:25 122:19

**offered**
28:15 299:20

**offering**
40:10 60:17 62:21,24 63:11

**office**
20:19,20

**officer**
43:8 152:20 159:10 190:5 315:22

**offices**
11:3

**official**
44:4 298:5

**okay**
9:20 11:5,9, 19,23 12:2, 7,21 13:16 14:1,4,7,10 15:2,8,10, 13,17 16:6, 12,17,20 17:1,4 18:2, 7,10,13,16, 21 19:7,15, 19,22 20:2, 14,17,24 21:3,12,22 22:19 23:10, 13,22 24:6, 25 27:1 29:11 30:18 31:7,17 32:19 33:4 34:7 35:11, 18 36:8 37:8 38:6,14 39:9,15,19 40:22 41:6, 15,21 42:16 44:3,13 45:9,14 47:4,14 48:20 49:7 50:25 51:4, 24 53:19 54:25 55:7 56:15 57:13, 16,24 58:6, 16 59:9,12 61:4 63:20 65:9,13 66:13 67:6 68:5 69:17 70:4 71:4 72:1 74:25 78:16,22 81:17,22 82:11,19 84:6 85:13, 22 86:8,21 87:12 88:3,4 89:3,12 90:20 91:3, 22,25 92:2, 9,20 93:1 94:1,10,15, 25 95:10,20, 25 96:12,19 97:12 98:6, 20 99:11 100:2,19 102:12 103:2,16 104:8 105:12 107:6,16 109:12 110:14 112:25 114:25 119:6,9,16 120:19 121:6,9,19 122:14 124:9,14,18 126:2,12 127:15 128:18 130:16 131:4,19,25 132:22

133:11
134:7,14
135:11,23
137:18
138:9,19
139:4 141:12
142:19
143:3,10
144:12,25
145:9 147:23
148:6,19
149:17
151:8,14
152:13
153:2,23
157:12,25
158:4,11,15
159:13
160:2,15,20,
25 161:15
162:5,20
165:16
175:10
177:2,14
179:8,14,22
180:2 181:2,
5,20 182:4,
10 183:8,17,
21 185:17
186:10
187:12
188:11,22
189:7,12
191:12,22
192:10,19
193:15,22
194:13
195:1,5,14
196:15,21
198:7
205:15,22,23
210:23 211:7
212:18 214:4
215:3,4
220:15
221:16
223:22
225:10,22
227:6 229:7,
8 232:4,15,
17 234:2,21
235:11
236:10
237:17 238:9
239:5 240:7,
11,20 241:21
242:10 243:8
244:18
247:21 248:1
250:11,19
251:18
255:11,13,20
256:11,17
257:10
258:17
260:10
261:8,17
262:12,22
263:2,8,10
264:1,21
265:2,11,14,
23 267:7
268:12,24
269:24
270:2,9,16
271:1,19
272:7,14,24
273:20
274:2,6,13,
21 275:9
276:11,20,24
277:17 278:7
279:4,13
280:3,13
281:3,6,7
282:16
283:10
284:1,18
285:3
286:10,16
287:1,15
288:14
289:9,20
290:17
291:13 292:3
297:4,25
299:24
300:14 301:2
305:17 306:8
308:21 309:6
310:2,9
316:2,13
320:4 325:1
326:7,21
327:2 330:19
331:19 332:6

**once**
145:24 146:6
153:12
162:15
170:16
241:19
243:15
250:11
277:10 278:1

**oncology**
137:25 138:5
167:10

**one**
13:22,23
18:15 22:24
24:16,19
30:1 31:2,
13,18 35:23
36:17 37:4,
13 50:11
51:8,12,17,
18,19 52:22
62:18 70:11
83:20 86:10,
15 88:4
89:11,13,21,
25 100:7
106:21
130:14
131:3,16
132:3 135:8,
18 140:12
141:10
144:17
146:11
148:10,11
152:13
159:23
167:10 169:8
182:8 188:12
201:3 203:24
205:14,16,17
210:19
212:19
218:17
220:18
224:3,5
225:23
226:20,24
227:1,8
228:18
229:16
230:16
231:17,22,23
232:20
233:22
240:11
241:21
244:21
252:11
253:23
254:11
256:11
257:14,24
258:6,8,14
260:14
261:5,10
262:3 263:9
275:5,9
276:24
277:17 280:6
281:6 287:22
288:18 290:1
293:4,21
304:5 305:8
306:7 307:2,
4 319:25
320:2,3

**one-company**
115:10

**one-off**
275:17

**ones**
34:16 170:16
202:23
228:19
296:11
322:12

**ongoing**
52:15 56:20, 24 103:22 149:22 150:16 221:12 265:16,19 266:7
**online**
235:6 247:6
**onwards**
149:13 190:7
**open**
207:24 277:24 278:9,17 279:22,24 280:10 310:7,10 313:3
**operate**
239:6
**operating**
134:20 137:7,9 229:21,24 230:3,9,10 260:8 261:16
**opinion**
26:12,15 27:2,7,17,23 28:4,13,15 60:17 61:5, 23,25 62:21, 25 63:11 64:8 69:11 81:20 98:9, 21 99:3 100:2,21 139:20 140:18 165:13,21 212:18 292:18 298:13 309:12,15 311:14 312:13 314:8 328:6,14 330:11,12
**opinions**
107:7 313:18,21 314:14
**opportunity**
27:24 28:2, 18 67:24
**opposed**
143:13 190:8
**optimization**
153:5,20 154:3,13 156:10,17 157:14
**option**
166:5 323:6
**options**
111:22 112:2
**Oracle**
141:8
**oral**
57:8
**order**
57:12 73:3 94:19 95:22, 23,25 118:10 122:8 127:9 166:19 168:23 169:3 171:10 189:18 224:20 226:11,18 240:2 249:10 266:4 294:13
**orders**
95:3
**ordinary**
242:8
**organization**
38:5 41:20 119:25 121:8,25 122:2,3,17 144:11 145:3 153:19 154:2 187:18 190:9 215:20 241:1,7,9 267:1 269:12,18 273:17
**organizationally**
229:18
**organized**
47:8 127:19 143:25 230:19
**original**
100:11 153:4 243:18
**originally**
133:5 220:5
**originated**
199:14 275:2
**originating**
229:25
**OSM**
199:13 235:2,5 236:5
**OSP**
234:25
**out-of-committee**
155:24
**outcome**
9:5 26:7 70:19 99:19 103:23 125:25 204:1 207:11 222:2 278:9 279:20,22 308:18
**outcome-based**
97:20
**outcomes**
59:25 62:8, 13 70:17,24 77:2 80:8 101:7 173:17 184:14 198:14 201:22 202:4 205:9 214:1 216:16 278:10
**output**
129:3 193:4
**outputs**
191:20
**outset**
91:23
**outside**
8:9 65:9 73:18,19 82:5 145:10, 14 169:17 190:3 194:20 197:18 238:22,24 290:21 298:6
**outweigh**
166:23
**outweighed**
167:22 169:2
**overreporting**
236:8
**oversaw**
191:1
**oversee**
35:13
**oversees**
29:16
**oversight**
131:14
**owned**
190:24

**P**

**P-I-R-C**
187:14,15
**pack**
187:21
**package**
114:9,13,19

**packaging**
295:25
298:17
**page**
45:2 90:4
188:20
232:17
233:16,17
234:1,22
236:10,22
237:21
240:12
244:16
254:19,23,24
255:23
257:17 269:1
272:16
286:17
289:10
**pages**
18:13 88:10
90:2 114:12
264:20
**paid**
16:8,9,20,
21,23 17:1,
17,23 18:19,
22 293:12,17
294:2 296:19
299:25
**pair**
135:7,9
136:5 144:23
146:19
191:18 287:4
**panels**
139:22
**paper**
13:4 42:22
64:17,18
65:6 332:4
**papers**
135:18 308:9
**paragraph**
238:10
283:11
**paragraphs**
289:13
**parentheses**
256:8
**paroxetine**
24:23 26:16,
20 30:13
311:4
**part**
8:17 19:22,
24 28:2
35:12 43:11,
17 52:12,14
53:16 56:24
58:13 71:8
80:13 87:10
98:8 99:7
108:18 110:4
111:12
129:18 132:6
139:5 147:14
149:4,22
150:16,17
151:14
153:13,21
159:4,9
171:4 172:16
174:17
185:20
197:6,14
198:5,18
199:11 210:2
242:25
243:14
246:17
251:22 252:3
253:8 263:15
266:6,8
267:1 274:22
281:12,16,18
283:6,8
285:12,15,20
300:20
304:18,20
307:16
319:15 324:1
329:19
330:15
**participant**
160:18
**participants**
8:4,14
**participated**
56:25
**participating**
9:25
**particular**
21:21 33:8
37:23 69:10
132:9 156:22
188:2 198:12
202:20 221:6
231:7 261:15
**parties**
10:7
**partner**
287:3
**partnership**
36:3 193:2
**parts**
94:6 162:12
264:7
**partway**
201:13
**party**
9:4 199:15
**passed**
293:13
321:24
**passes**
55:1
**past**
36:7 170:25
221:3
**patents**
181:16
**patient**
38:12 60:23
71:13 77:2
109:9,13
110:13
154:22
173:20 188:9
193:20
194:8,11
201:22
202:21,22
203:25
258:25
259:2,4,14,
18,21 273:21
275:3,21
287:23 290:3
298:7 305:15
308:18
**patients**
42:2 60:1,23
72:15 80:8
94:12
100:14,15
101:6,7,12,
18,21 109:21
111:25
112:13,16
116:12 118:4
184:10
185:23
196:13
202:19
203:22 204:1
205:1 207:11
209:13,14
212:6 215:17
216:17
222:2,13
266:20,21,23
279:2,23
320:17
321:11,19
331:5
**pattern**
286:2
**Pattishall**
232:1
**pause**
9:9 40:7
50:4 128:11
**Paxil**
13:24 24:19
29:13 30:7
31:9 37:25
38:8
**pay**
207:19
242:19

**paying**
328:11,14
**peer-review**
121:17
**peers**
41:19
**Peh**
269:20
283:3,23
**pen**
13:5
**penalty**
10:5
**Penner**
11:24,25
12:2
**people**
65:6 77:18
108:8,14
109:16 128:6
129:21,24
130:10
132:21
134:24
137:12
144:4,5,10,
21 146:13
147:3 148:11
150:24 158:7
159:20
160:24
161:12
170:11
175:1,13,23
176:19
191:16 193:9
204:21 205:4
216:12 218:1
221:22
231:10 233:6
247:22,23
251:6 256:25
257:7 258:18
269:3,14
277:8 303:7
329:24
**percent**
242:24 302:1
**Perfect**
12:17 234:22
**perfectly**
225:1 302:15
**perform**
19:7
**period**
44:6 46:25
58:10 80:11
86:11 120:23
130:5 172:20
186:20 202:3
207:17
245:19
308:15
**periodic**
42:23 75:6,
14 221:13
242:15,16
243:3
**periods**
185:11,15
209:4
**perjury**
10:6
**permitted**
94:19 95:23,
24 119:23
120:5
**person**
10:4 33:19
34:2 36:19
43:12 53:10
81:15 147:18
149:21
189:15,16
191:21,25
214:9 219:3
236:16
267:23 268:2
275:20
283:1,22,23
292:1,3
293:12 323:2
**personal**
14:21 45:16
46:11 89:24
90:3 102:21,
23 298:10
**personally**
25:4 37:9
102:24
110:22 124:8
126:10 151:1
175:24
**personnel**
144:1 157:19
**perspective**
33:22 71:20
77:10 83:9
105:24 143:5
148:20 165:4
168:18 172:2
188:23 205:4
206:1,10
229:19
265:15
266:14 280:4
289:2
301:13,15
**petition**
195:15,24
196:1,4,22
212:10
**ph**
51:22 53:12,
25
**pharma**
47:11 148:17
**pharmaceutica
l**
67:11,20
68:19 69:12
73:16 76:12
78:19 85:25
96:24 97:25
109:14
118:17 132:4
170:10
200:20
201:18 202:8
299:18
307:23
324:12
**Pharmaceutica
ls**
23:9
**pharmacoepide
miologic**
148:25 149:2
**pharmacoepide
miology**
149:6
**pharmacovigil
ance**
16:24 27:10
28:23 33:22
35:24,25
36:17 43:12,
15 55:10
62:4,10,14
67:21 70:16,
22 71:2
72:14 76:12
79:8 80:14
85:9 100:8,
10 101:5
102:10,11,15
115:22
118:22
122:18
127:18
128:5,8
139:16 141:3
146:18,24
148:7,9,12,
15 149:4
150:20
151:1,2,15
168:8 169:14
174:7 184:4
185:21
189:3,16,17
191:21 193:1
197:17
199:12
201:21
202:1,18
203:2,20
204:25
205:11
207:24

208:2,15
209:13
213:20
215:16
220:21
221:14 222:7
230:1,11
231:9 233:12
236:17 242:7
261:24
266:20
275:10
311:18
312:21
317:17
327:22
328:7,18
**pharmacovigilance's**
217:13
**pharmacy**
193:18
**phase**
72:8 79:25
115:8,9
142:3 143:22
145:13
147:13
**Philadelphia**
13:19 25:1
138:6
**phone**
14:6 226:23
**phrase**
167:5 303:18
**phrased**
167:4
**physically**
10:1
**physician**
135:8,13
136:5,20,23
138:12,16
144:3,13
147:17
191:18
241:15,19,20
244:1,13
245:17
248:17
273:15
283:17
287:2,4
315:23 330:4
**physician/scientist**
147:20
**physicians**
112:23
129:24
144:17
146:1,21
158:13
199:16
**physiological**
69:13,15
204:19 210:6
212:4
**physiology**
53:11 54:1
**pick**
55:15 146:6
178:19,20
187:24
291:4,7
**picky**
251:12
**picture**
233:6 306:9
**piece**
37:2 212:6
**Pier**
137:11,15
246:13,14
256:23
**Pieropan**
269:9
**Piers**
217:2
**pigs**
223:9,15
**pill**
105:23
107:8,13,14
288:6
**pills**
105:23
106:4,10,13
271:3,6,20
274:7 285:5
286:2,11
287:7,18
288:6,18
293:14 294:4
305:6
**pin**
48:11
**pinholes**
296:10
**PIRC**
187:14
188:4,7,11,24 191:7,20,23 192:11,25
193:4,5
199:19
214:8,16
215:21
240:21,24,25
241:2,8
275:14,15
**PIRC's**
192:14
**PIRCS**
191:15,17,20
193:7 241:6
**place**
95:3 108:4
113:24 114:3
173:19 175:4
199:5 216:1,4 220:17
221:6 237:6
244:22
249:15 304:1
**places**
303:25
**plaintiff**
8:22
**plaintiffs**
10:13
**plan**
176:19
217:15,16,20
218:10
219:12,20,21,23 220:16
221:11
262:20 263:1
**Planner**
247:4
**plans**
217:24
218:17,23
219:14
220:21 263:7
**platform**
219:25 220:1
**play**
109:10
191:14 192:3
198:18
**players**
159:9
**playing**
38:17
**please**
8:1 9:7
10:10,23
41:1 45:18
54:8,10
87:17 91:10
128:22 177:9
215:5 229:11
230:15
236:11,13
237:22
240:14
249:16 256:2
257:12
259:23
261:18
262:16
267:14,18
277:25
282:25
283:12
284:19,22
286:17
289:13,19
315:5 316:3

321:2 326:14 327:8,10
**POB**
154:17 155:4,8 157:4,22,25
**point**
15:23 27:21 28:3,16 53:21 66:2 67:2 73:24 80:9 81:12 87:10 95:18 103:5 115:16 132:3 133:7 155:16 156:24 161:20 165:20 200:4 207:7 209:15 210:15 218:5,6 219:10 238:17 246:19,22 266:6 285:2 294:25 303:1,3,6,8, 18 307:3 309:12 310:12 316:13 317:3,19 319:13 322:18
**pointed**
31:19 71:11
**points**
206:13 307:1
**Poland**
129:14,20,21 131:2,8,24 132:24 133:15,19 137:20,21 138:8 246:3 247:23 315:25 330:3
**policies**
256:21
**policy**
231:11 232:20 236:22 238:10 262:24
**Polish**
131:13
**poor**
177:18,20
**pop**
205:7
**population**
310:5
**populations**
185:1
**portfolio**
137:23 153:5,20 154:3,13 156:10,17 157:14 169:19 325:18
**portray**
205:10
**position**
26:19 68:24 69:19,23 82:17 91:21 92:23 99:11 171:9 189:12 243:8,20 272:8 299:24 310:19 320:11,15
**possibilities**
51:11,16
**possibility**
49:2 51:9 73:4,25 117:22 125:24 126:11,14, 19,24 127:1, 13 151:25
**possible**
79:12 94:22 115:18 181:6 199:7 241:2 244:3
**post**
44:10 84:4 151:3,11 255:6
**postapproval**
146:2,8 147:8,13,22 150:25
**postings**
103:20
**postmarketing**
150:21 231:5,21
**potential**
55:14 76:22 94:11 104:20 117:11,16 118:3 148:14 188:23 204:14 217:3 222:23 251:9,13,15 252:24 275:2 290:22 296:14 305:14 316:15 328:25
**potentially**
72:2 96:7 192:20 273:21 296:16
**pounds**
18:20 20:15
**PPIS**
112:1
**practice**
35:6,7 50:9 55:9 65:24 70:21 72:14 79:7 80:14 83:25 97:19, 20 100:15 101:4 115:23 128:5,24 140:21 150:17 171:6 185:21 187:10 190:16,22 199:12 203:2,19 208:1 213:20 217:13 231:14,18 289:6 301:19 310:15 311:18 313:10
**practiced**
202:2
**practices**
35:12 39:22 62:5,9 119:21 174:7 201:21 233:3 258:10 261:15 328:19
**practicing**
312:21
**practitioner**
118:21 223:14
**practitioners**
121:15
**PRAY**
141:6,19
**pre**
151:3,11
**preapproval**
146:2,8 150:25 241:17
**preceded**
64:17 309:5, 6
**precedes**
259:25

**precisely**
25:12 296:4
**preclinical**
71:9 79:14 82:15 182:17 198:16 221:5 280:24 281:15 329:15
**preclinically**
82:12
**preclude**
93:20
**predated**
48:21
**prefer**
151:2 228:17 278:17,18
**prefix**
224:6
**pregnancy**
152:12 185:6
**prejudge**
277:9
**premarketing**
150:20
**preparation**
19:16 39:11 40:15 41:7, 11,16 49:8 50:1,17 56:20 65:14 67:23 269:25 270:24 274:23 308:3 316:7
**prepare**
39:2 61:25 226:12 270:7
**preparing**
46:9 48:24 49:14,16 52:12 53:16
**prescribed**
112:23
**prescriber**
110:13
**prescribers**
109:6 209:13 212:6
**prescribing**
29:16 114:4, 8 117:2,20 118:22 119:4 125:7 298:7
**presence**
8:9 59:21 61:19 62:7 67:13 76:8 81:7 100:6 111:9 140:2 251:1 297:9 298:22 304:6 321:12
**present**
10:1 34:1 61:12 63:17 64:20,23 68:3 153:23, 25 160:2 194:14 195:6 280:6 304:8 305:11 312:11 320:7
**presentation**
320:19
**presented**
208:3,4
**preserving**
179:10
**president**
43:6 44:2 189:8 195:5
**press**
40:8
**presuppose**
279:19,22
**presupposing**
278:9,16
**presuppositio n**
310:1
**pretty**
64:24 302:14
**previous**
79:6 150:14 244:16 247:23 254:11
**previously**
13:12,15 24:8,15 32:10 86:4 88:19 124:6 127:13 194:5 207:10,13 218:14 241:22 270:19
**primarily**
199:4
**primary**
136:17 147:16 149:14,21 152:5 154:23 192:14 203:24
**principal**
159:8
**principally**
130:4
**printed**
204:23
**printing**
187:22 296:2
**prior**
19:10 28:7 49:24 52:13 54:1 56:15 58:7 68:14 75:8,9 86:16 96:19 104:9 105:3 107:9, 17 138:16 140:15,25 161:24 196:4 246:4 266:6 278:16 304:3 309:8,10
**prioritizatio n**
167:12,15
**priority**
109:13
**private**
8:7 44:19
**privileged**
91:20 92:7 115:15
**proactive**
180:20 186:11,12,18 187:7 202:1 209:16,20,22
**proactivity**
180:24 214:1
**probable**
58:17,21 59:13,19 60:9,17 61:24 62:17 64:4 76:20 104:21 105:14
**probably**
20:4 31:4 33:23 34:12 52:13 114:12 140:13 143:15 147:21 148:10 230:5,16 234:10,17,18 255:6,23 268:25 291:8 330:4
**problem**
181:12 204:6 210:8 276:6 288:19
**problems**
181:6 273:23 295:25 296:1
**procedure**
230:3,10 237:6 260:8

261:16
**procedures**
137:8,9
230:9 262:1
**proceed**
91:10 177:9
267:18
326:14
327:10
**proceeding**
8:5
**proceedings**
9:8 57:20
**proceeds**
209:7
**process**
43:18 110:5
137:5 166:2
167:18 197:7
199:5,9
214:18
234:24
242:15,16,
19,20,21
243:1,15
245:16
249:18 250:2
251:23 252:1
258:14
264:20
265:16
281:25 288:9
329:9,12
**processes**
167:7
**produce**
211:18
221:21 223:8
**produced**
24:20 213:5
242:17
**produces**
113:21
**product**
29:24 42:10,
17 46:11
51:18 66:4
67:14 69:6
73:9 76:3
80:3 81:13
82:5,13
83:4,9,20
84:24 93:15,
20,24 94:5
96:6,9,25
97:24 98:4
99:20
104:14,15,21
108:4
110:18,24,25
111:1,3,16
112:3 113:3,
7 114:10,15
115:6,10,13,
16 118:9,12
122:23 130:7
132:13
133:21
138:7,13
141:3,8,24
143:1,8,11
144:9,16,19,
22 145:24
146:3,13,20,
22 147:6
149:13
152:4,14,17,
18 154:21
156:23
157:8,13
161:17,23,25
162:1,11,12,
17 163:1,10,
11,12,18
164:3,8
165:7,24
166:6,9,19,
24 167:22
168:13,19
169:4,15,19
170:3,8,18,
23 171:10,
19,20,22,24
172:13,18,
19,21,22
173:1,4,13,
17,24 174:5,
13 179:4
184:18,25
185:4,10,14
187:12,19,
20,23,24,25
188:1,7
192:15,16,17
193:13,18
194:3,7,10,
12,14,20,21
198:5 199:4,
6,7,15,17
201:20,24
202:7 203:1,
3,12 206:24
207:5,20
209:12
210:1,10,12
213:9,17,19
215:18,21
216:3,14
217:1
219:13,15
221:7 222:10
235:19,21
236:9 237:14
241:17,19
242:17,19
243:4,5
244:23
245:11 246:5
263:23
264:13,15
265:20
266:10 269:8
271:25
275:18,23
276:14,23
277:1,20
282:5 283:17
284:12
287:25
295:17,19
296:12,15
297:10,16,23
299:7 300:7
301:23
302:2,3
304:7,8
305:19,20,22
307:2 308:12
309:7,9
310:25
316:20,22
317:18
321:12,14
**product's**
178:24
180:3,4,13
182:7
**production**
70:1 299:2
**productive**
34:9
**products**
9:1 29:18
47:6,11
80:15 120:16
127:19
131:22,25
132:3,5,7
133:8 134:6,
10 135:7
137:25 138:3
141:25
143:21,23,25
144:7,13,24
147:16,25
149:7 151:21
152:7
156:14,15,
17,19,20
170:24
189:18 199:1
206:11 235:1
239:21 250:5
305:21 311:8
324:14
325:8,9,14
**profess**
57:2
**professional**
71:2
**profile**
55:11 65:18
69:24 81:6,

10,11 99:20 112:12 117:5 147:12 266:24 284:4 316:20
**program** 44:20
**programmed** 235:12
**project** 52:16 146:11 247:4
**prompted** 83:16
**pronounce** 283:3
**proper** 190:16 191:4 278:5,8 279:9
**properly** 92:13 162:13 240:3
**protect** 105:9,13
**protected** 92:24
**protocol** 136:25 225:19
**protocols** 149:25
**proven** 59:19,20 62:18 64:5
**provide** 33:10 83:11 112:20 118:18 119:16 120:5 121:10,21 238:10 239:25 328:6,11
**provided** 19:5 39:4 42:22 64:22 69:14,15 88:20 89:8, 11 173:20 191:2
**provides** 114:7
**providing** 69:3 286:8, 14
**prowess** 177:18,21,22 178:5
**prudent** 163:11 164:8
**PSUR** 46:12 196:10 242:13,14, 20,21 243:1, 3,11,15 245:3 249:21 250:2,5,7 251:23 267:21
**PTS** 262:9
**public** 42:25 103:10,11, 12,17 109:4 121:11 206:25 236:19 240:1
**publication** 42:21 52:23 53:1 87:9 190:22 196:11 251:3 309:5
**publications** 51:16 53:2 88:8 118:25 245:12,13,14 309:22
**publish** 121:14 187:7,11
**published** 57:21 98:16 103:22 121:11 139:20 149:9 216:9 234:7 245:4,6 308:13
**publishing** 187:6
**pull** 157:22 225:1,23 230:17 268:16
**pulling** 224:10
**pure** 250:25 293:7
**purely** 150:24 298:9
**purpose** 8:10 103:14 126:24 151:20 173:12 188:12 197:4
**purposes** 35:10 38:17 40:21 142:4 151:5 192:11
**pursuant** 294:13
**purview** 97:8
**put** 42:25 48:11 87:17 103:11,12, 16,17 118:25 129:3 130:20 173:19 195:24 206:25 215:7 216:24 221:6 226:3 230:8 237:9 246:15,23 247:8,9,22 248:2,6,25 249:9 250:3 258:15 311:6 316:24 325:14 327:1 331:21
**putting** 158:20 169:5 257:24 330:2
**PV** 28:13 146:21 151:5,10 180:17 181:3,4,25 191:10 198:25 199:4,24 201:7 203:10,12 205:4 206:1 207:18 208:7,9 209:2 211:23 213:11 214:6,7 219:4 220:8 221:23 229:18 263:15,20 264:12 265:15 266:16 292:6 302:12

**Q**

**QP** 240:9 242:16
**QPPV** 43:16,20 189:8,24 190:1,18 238:18 239:24 240:2,4 241:23,25 242:3 249:1, 6,10,24

253:7 267:23 268:1,4,6,8
**qualification** 43:20
**qualifications** 266:15
**qualified** 34:12 37:24 43:12 53:10,13 61:5 65:22,23 122:3 189:15,16 191:21 197:22 236:16 290:8 299:10,13
**quality** 110:25 169:17 171:19,20,23 172:2,3,12 173:18 187:19,20 188:5,7,12 192:12,15,16 193:7,13,19,23,25 194:3,6,10,12,15,21 195:6,10 199:5,7,15,17 201:24 202:1 214:9 215:18,21 240:22 263:16,19,20,21,22,23 264:13,15,25 265:19,21 269:9,11 271:25 274:15 275:3 283:6,9 284:12 297:10,17 300:1,5,8,10 301:13 309:13 321:5,13
**quantification** 291:6
**quantify** 295:23 296:6
**quarantined** 226:14
**quarter** 176:8
**query** 236:1
**question** 13:5 24:24 27:25 28:13,18 29:4 46:19,22 53:11,14 54:4,8,23 58:6 62:7 64:2 69:10 71:17 73:5 76:1 77:7,24,25 78:4 83:10 84:8,9,14,22 85:15,17,19 86:8,19 93:1,4 96:22,23 97:23 99:4 100:11 102:1,2 105:3 120:1 134:22 150:14 154:24 160:24 182:14 193:12 198:22 201:13,16 211:6 213:6,9,10,13 216:8 218:13 220:4 221:18 229:15 231:3 237:24 271:8,17 276:2,3,5,9,13 277:24 278:17,19,21 279:24 280:10 282:23 286:3,6 291:21 293:2,19 295:7,9,16,17 299:21 301:3,4,21 302:8,9,24 307:2,4,8 310:7 316:10,12 317:22 318:12,24 319:2,11,21,22 322:15 323:1,14,17,21,22 324:22
**questioning** 92:14
**questionings** 309:24
**questions** 13:9 27:3 28:3 33:11 34:4,13,22,25 37:23 39:22 40:3 42:24 46:10 48:2 52:15 56:24 57:12 64:18 67:12 73:3,15,16 75:9,16 84:2 86:16,17 87:1 95:12 96:3 99:16 121:25 122:4 148:5 162:9,25 195:23 200:21 282:2 285:2 306:22 307:5,12,14 314:18 316:9 318:2 322:5,7,10,12 323:5 324:4 326:17 327:13,16 330:16,25 331:18
**quick** 315:7
**quickly** 94:22 145:5 260:11
**quite** 29:2 64:19 70:14 88:8 108:13 139:10,18,20 147:1 170:3 210:14 311:14
**quote** 171:16

R

**racial** 185:7
**radar** 206:9
**raise** 76:21 80:2,4 184:19 302:13
**raised** 84:13 86:18 172:24 207:7
**range** 34:4 205:13
**ranges** 226:14
**ranitidine** 9:1 41:13,18 49:25 51:3,6,8,9,25 53:15 60:1

61:1,12,20, 23 62:6,7,11 63:1,16,21 64:6,7,14 65:3,6,7,9, 12,15,22,23 66:3,14 67:6,14 68:6,14,21 69:19,25 72:20 73:4, 11 74:1 75:16 76:2, 7,21 77:8,21 78:8,25 80:19 81:6, 12,24 83:21 84:10,25 96:20 97:4, 14 98:10,14, 22 99:12 100:3,23 101:22 103:6 104:10 105:5 107:19 112:12,14 115:11 129:16 131:13,23 132:10,19 142:4 152:22 165:18 191:24 195:2 196:13 199:1 200:1,9 201:8,9 202:14 204:13 206:8 211:18 212:1 214:14 217:3 219:22 221:12,21 242:1,4,9 245:12,14 246:21 250:14 258:19,25 259:4 265:4 271:20 274:15 296:24 297:6,7 298:16 299:14,25 300:16 301:9 302:1 308:24 316:1,15,25 320:16 321:12,19 325:10 331:5,10

**rapid**
288:3

**rash**
70:20 204:2

**rate**
18:19 235:20

**RCA**
265:13 301:9 302:7 303:12 307:4

**re-did**
194:24

**re-enter**
162:6

**re-reviewed**
84:2

**reached**
29:7 94:5 174:19 204:24 207:12,13 273:19 330:25

**reaching**
83:8

**reactions**
55:24 139:14

**read**
39:3 54:9,11 57:22 64:22 65:2 68:1 76:8 88:10 170:7 225:22 230:5 236:15 238:6 250:4 265:12 270:10,16 272:12 283:11,21 284:21,22 287:11,15 289:12,20 295:12 318:18,24 319:1,9

**reading**
20:5,10 22:8,9 39:20 141:13 156:25 237:20 256:4

**ready**
75:13 145:2 227:7,19,23 228:2,6,10

**real**
69:5 70:22 79:20 89:15 180:25 184:11 201:15 250:10 302:3 331:21

**reality**
209:2 301:20

**realize**
134:21 145:4

**realm**
169:18

**reason**
70:24 128:3 130:5 137:19 163:13 164:17 184:16 186:4 225:19 230:24 239:22 253:3 286:22 292:9 318:21

**reasonable**
56:12 117:22 125:23 126:5,10,13, 19,24 127:1, 13 151:25 256:9

**reasons**
164:6,16 171:3 174:24 183:25 248:13,16

**reassessing**
179:18

**reassurance**
83:2

**reassure**
191:2

**reassured**
69:24 81:5

**reassuring**
210:9 212:5

**recall**
13:24 30:9, 21 37:9,14, 15 67:23 94:2 110:17 111:15 112:3 113:7 135:19 152:18 153:13,14 155:6 157:5, 7,10,11 161:17,23 162:5,8,14, 21 163:12, 19,22,23 164:8,11,16 165:3,7,14 269:7,21 270:18,22 271:4 272:5 273:3,4,6 275:18 277:15 285:11,12 286:10,18 295:22 296:5 297:23 304:18 305:5 327:18 328:2

**recalled**
93:24 96:5,9 98:5 161:25 163:1,18 271:25 272:3 282:5 284:12
**recalling**
152:14
**recalls**
295:20 296:3
**receive**
71:13 266:23
**received**
18:23 42:18 48:1 52:3 73:3 204:24
**receiving**
202:19,22
**recent**
88:24 127:24,25 130:14
**recently**
44:15 45:4 53:1 129:18 306:14
**recognize**
60:8,13 80:11 229:23 231:9 259:24 260:3,4,6 261:5 283:4 307:9 313:9
**recollect**
272:4 324:24
**recollected**
271:14
**recollection**
130:25 286:1,7,13
**recollections**
275:13,15
**recommend**
154:18
**recommendation**
155:4,25
158:8,18,19, 21 160:9 175:17
**recommendations**
159:11
**recommended**
210:9
**recommending**
174:2,12
**reconciliation**
142:3
**record**
8:3,7 9:8 10:11,23 54:11 91:6, 7,9,14,18,25 92:2,16,19 93:3 94:14 95:5 177:3, 5,7,16 267:9,11,16 294:24 326:2,8,10, 13,25 327:1, 5,7,9 331:21 332:9
**recorded**
8:5,6
**recording**
8:2,11 58:2 267:15 326:12
**rectified**
171:21
**rectifying**
193:20
**recurring**
275:11
**redoing**
99:7
**redouble**
81:9 101:16 204:7
**redoubled**
207:11
**reduced**
138:4,7
**refer**
24:7,9 44:6 45:11 61:10 64:16 76:25 79:6 101:1 124:5 126:23 127:12 150:24 164:14 182:5 223:14 290:11 316:10
**referal**
297:12
**reference**
134:16 140:12 142:13
**referenced**
76:9 88:14 242:13 306:15 320:1
**referral**
66:11 173:3 196:9 252:1 253:5 300:21
**referred**
65:7 80:10 121:20 131:15 150:13 189:4 194:5 200:6, 19 218:2 229:21 232:22,24 241:18 245:14 248:11 261:22 264:4 276:5,18 283:14 287:3 308:9 330:6
**referring**
40:16 41:2,3 54:14 61:20 85:5 262:20
**refers**
241:15 258:8
**reflects**
89:1
**refresh**
271:5 286:19
**refuse**
84:9
**refused**
324:18
**refuted**
186:4
**reg**
86:25
**regard**
196:11,12
**regarding**
37:23 190:13 201:7 271:20 272:9 316:15 327:16
**Regis**
159:22 160:21 161:6,10 175:4 264:5 269:16,18,22
**registered**
82:5
**regular**
136:5 150:17 199:16 244:25
**regularly**
120:15
**regulations**
108:20 129:5 136:16 139:17 168:14 190:18 236:17 239:7,11,23
**regulator**
93:23 94:10 182:15 250:8

**regulator's**
186:22
**regulators**
35:19 37:5 57:11 58:10 67:12 71:10 72:22 73:3, 24 75:2,5 76:1 77:23 78:9 82:8 83:17 84:2, 13 85:1 87:9 93:19 96:5 108:17 109:3,8,10 111:21 115:2,10 123:13,14, 18,19,25 124:16 125:3,5 127:5 129:5 161:20 162:16 166:2 167:19 168:21 169:17 174:11 185:24 186:24 187:2,5,8 189:19 200:11 204:22 233:10 237:4,18 239:2,4 241:24 242:2 245:7,18 250:12 253:16 266:9 301:21 302:17 304:12 306:20,22 318:22 322:13 330:14
**regulatory**
35:7,12,13, 20,21,22 36:1,2,4,9, 21 37:7 42:21 46:13 52:4,15 66:10 84:4 94:1 100:6 101:15 108:10,16,18 116:13 142:18 158:23 159:6 161:24 169:4 170:1,23 196:2 237:1, 10 238:25 239:9 243:22 250:9 253:9 259:9 260:4 266:10 301:7 303:22 308:14 322:4,19 324:1 329:17 330:17
**reintroduce**
162:1,17 166:19 300:7
**reintroduction**
170:8
**rejoined**
189:14
**relate**
34:23
**related**
9:4 22:14 42:24 51:20 53:14 120:17 148:21 187:22 196:10 230:4 231:21 242:1,8 250:13 257:15 258:13 262:3 264:13 269:21 327:22
**relates**
136:1 209:9 258:15
**relating**
242:4
**relation**
30:1 65:21 164:2 297:11,22
**relationship**
126:6 329:10
**relative**
197:21 198:20 299:23
**release**
219:11 296:23 297:5 321:18
**released**
187:24 207:4 212:1 220:17,18 298:15 299:7 305:19,20 330:23
**relevance**
301:22 308:12
**relevant**
193:18 199:8 204:20 240:9 247:19 250:2,4 302:2 328:25
**reliable**
212:24
**relied**
250:6
**relinquished**
43:17
**relying**
40:10
**remain**
81:5,11 84:4 124:20
**remained**
43:22
**remains**
26:24 271:13
**remember**
30:1,13 65:23 75:4 86:16 130:12,13 135:22 140:1 196:3,8 239:18 244:7 257:21 258:9 259:1 270:20,25 271:10,24 275:5 283:14 285:13 317:10
**remind**
13:6 315:15
**remote**
8:9,19,20 9:2,8
**remotely**
10:2 12:12 20:22,23 38:16 50:11
**remove**
8:13
**removed**
15:21
**renamed**
139:13
**reorganization**
134:13 137:22
**reorganizations**
239:18
**repeat**
224:12

**repetitive**
319:20
**rephrased**
85:19
**replaced**
158:9,10
269:19
**report**
42:23 46:12
57:23 75:6,
14 129:4
193:3 208:13
242:16
249:10
251:23
258:25
259:5,6
315:18
**reportable**
259:8,16
**reported**
47:10 149:18
161:11
183:11
189:25
194:22
203:25 210:5
258:18
300:24 301:9
315:19
**reporter**
9:6,24 48:8
50:6 74:14,
17,23 130:18
201:2 215:9
259:3,19
**reporting**
10:2,9 43:7
142:6 190:4
235:20
242:15
267:22 268:1
329:19
**reports**
36:18 37:4
52:24 129:1
141:23,24
221:13
245:11
**repositories**
257:3,4
**repository**
15:7,11,13,
14 19:6
246:8,10
**representation**
158:2 188:6,
8 320:14
**representative**
24:7 191:19
269:9 273:2,
17
**representatives**
283:24
**reproducibility**
194:4
**request**
8:7 270:21
273:1 284:2,
6
**requested**
75:13
**requests**
250:8
324:13,15
**require**
125:6 162:16
236:17 239:2
**required**
114:10
166:14,19
167:6,19
168:13
172:3,6,25
173:18
239:10
248:12
252:21
265:20,25
297:11
302:23
**requirements**
104:14
111:10,20
161:24 166:1
169:16
170:8,12
172:20
174:20 250:1
**requires**
125:18
**requiring**
170:2 172:11
**resay**
180:11
**research**
35:1 59:15
79:17 129:18
145:25 146:7
147:11 163:1
165:6,12,13
241:18
**researched**
59:23 62:24
**reserve**
326:18
**resident**
190:1
**residential**
43:19
**resolved**
321:13
**resource**
138:3,5
167:5,9,20
168:13
325:18,20
**resources**
167:22
168:15,21
**respect**
223:12
302:22 331:3
**respected**
290:6 292:16
**respectively**
150:21
**respond**
75:13 180:25
202:19
209:17
318:11
**responded**
300:24
**responding**
39:22 253:10
**response**
49:23 56:21
58:9 64:1
73:2,23
74:18,20
75:6 94:11
111:12
165:17
260:13
261:12
279:25 286:6
295:16
303:22
316:8,12
317:8,9,21
318:1,19
323:20
330:15
**responses**
58:10
**responsibility**
108:15
109:4,5,7,9
124:24 125:4
138:12,15
147:16 168:7
175:25
189:21
190:24
192:4,14
202:6,11
213:10,12
214:14
**responsible**
42:2,4
108:25
116:10 123:8
124:10,12

127:20 132:9 133:23 134:16,18 135:1,24 146:2 149:14 258:7 264:7
**rest**
134:2 140:9 141:1 242:21
**restate**
54:7
**result**
51:18,21 71:9 81:8 84:1 86:2 103:22 126:14 130:8 151:24 173:5 183:21 188:10 191:8 202:24 245:15 247:6 263:21 280:18,19 304:12 314:18
**resulted**
63:17
**results**
53:4 69:14 98:15 117:12 151:16 279:9,11 288:23 301:19 313:3 321:22 323:24
**results-driven**
312:25
**retain**
21:18
**retained**
18:2 22:20 27:6,16,22 293:11 296:20
**retired**
21:3,20 23:3 44:25 135:13 232:3 290:5 328:5
**retirement**
21:7 43:21
**retracted**
251:24
**returned**
23:2 26:1
**reuse**
332:5
**revealed**
173:21
**reveals**
186:2
**review**
32:11 56:25 57:8 67:24 87:10 103:22,23 130:20 136:8,13,14, 17,18,20 137:3 147:10,21 149:22 182:22 187:13 188:1,8 189:4 191:7, 20 199:20 202:6 215:23 221:5,12 235:1 236:12 238:1 240:17 243:17 245:10,12,15 249:23 269:4 270:3 273:3 289:11 296:19 316:4
**reviewed**
19:4,13 150:3 178:12,15 213:18,24 220:13 234:24 243:25 244:13 250:10 269:24 296:22 309:18 312:11 330:7
**reviewing**
20:5,10 22:14 147:12 149:23 159:11 246:4 284:14
**reviews**
136:24 137:1
**revised**
126:3,17
**Reynolds**
149:19
**rich**
69:3
**Ridge**
244:11
**right**
8:18 9:21 13:13,18 14:2 15:1 21:15,24 22:7 23:24 25:5,20 32:2 34:21 37:19 40:12 44:11 45:17 46:8 48:15 53:22 54:20 55:15, 21 61:18 67:25 74:6 78:1 86:5,7 90:5,6,12, 13,16,19 96:1 109:1 118:19 119:7 121:22 127:15 128:14 132:24 147:16 156:1 160:22 166:1 176:4,13,20 180:18 181:3 182:23 183:22 188:17 190:14,16, 19,20 198:4 208:11,19 210:24 221:1 223:25 229:11 230:5 232:13 234:5,8 238:12,23 247:24 252:9 255:1,7,14 256:14 259:15 264:3 265:2 267:4 268:9,12 270:13 274:4 275:24 279:6 286:12 294:15 295:11 306:18,25 307:12 309:7 311:23 316:9 323:2 325:24 326:17,23 327:1
**rise**
302:18
**rising**
135:2
**risk**
109:20,25 110:5,11,16, 23 111:4 112:12 118:11,12,23 121:1 129:11,15 139:21 150:21 151:15,16,

18,22 152:1, 3,8,11,14 162:23 163:7,8,14, 20 164:2,11, 18,20 165:4, 20,22 167:8, 11 169:15, 19,21 171:14,15 173:12,21 174:2 178:21,22,24 179:1,2,6,7, 8,10,18,23, 24 202:25 207:14 216:19 217:15,16, 19,20,23 218:10,17,23 219:12,14, 17,19,21,23 220:1,16,21 221:10,11 258:2 262:20 263:1,6 288:2 316:20,22 320:19 321:11 329:8 331:5

**risks**
117:16 118:3 183:18 241:4 316:25

**Rob**
149:19 150:3

**Robuska**
130:15

**robust**
253:25 330:11

**Rockhold**
269:10 273:2

**Roger**
269:10,17

**role**
26:16 33:24 35:19,24 36:4 38:3,4 43:18,21,25 51:21 54:16 101:11 107:25 108:2,19 109:10 154:18 169:13,14 189:15,17, 24,25 190:3, 4,5,19,25 191:1,14,21 192:3 202:8, 21 205:11 213:17 236:16 263:23,24 299:22 308:15 320:16,23

**roles**
37:12 192:11

**room**
10:1 11:14 12:10 14:5, 16 224:11

**root**
67:24 68:1,6 73:2,23 296:22 298:20,21 300:15 302:10 304:1,3,4,12 307:16

**ropinirole**
29:21 30:2, 14

**round**
64:2,3

**routine**
80:13 171:4 199:11 242:7

**Ruane**
135:18 287:2

**rule**
326:17,18,19

**rules**
91:23

**run**
43:21 139:14 156:12 165:6 187:16 224:2

**runner**
178:1

**running**
39:6 114:12 175:25 191:1 219:3

**runs**
264:19

**S**

**S-OXIDE**
290:10

**Sabina**
159:10,16 160:20 175:4

**safe**
55:2 83:10 169:4 171:10 266:1,23

**safely**
79:12

**safety**
36:18,21,25 37:3 38:2,3, 7 39:6,23 42:23 43:6, 22 44:7 45:10,12,23 46:21 47:1, 6,9,15 50:15 55:11 60:23 62:9 65:18 69:19,24 74:4 75:6,14 76:22 77:9 78:23 79:9, 10,11,13,14, 16 80:5 81:6,9,11 82:15 83:4 86:9,16,18 97:4,7,12 98:17 99:20 100:9,14 101:5,8 102:5 106:9, 18 107:2,5 108:1,5,7,15 109:9,13,16, 17 116:7 117:5,21 125:12,16 127:21 128:24 129:3,4,6,9, 11,15,18,19, 23,25 132:18 134:1,19,24, 25 135:2,4 136:1,4,9 138:12 139:12,19 140:7,10,18 141:15,21 142:5 144:2 147:10,12, 17,21 149:22 150:25 151:22 153:7,22 154:3,5,16, 19 155:10, 17,22 156:25 158:5,9,10, 12,14,20,23, 24 162:22 168:9,20 169:14,16 173:16,17,20 182:1,4,19 186:3,12,18 188:2,5,13, 23 189:2,4, 12,14,20,22 190:1,2,4,9,

15,17,20 191:17 192:1,12,18 193:7,14,20, 24 194:6,8, 11,15 195:7, 11 196:6 197:14,16 199:6,8,19, 20,23 202:21,24 203:20,22 204:3 207:9 209:14,16 215:16 216:9,14 221:13 229:21 230:4,6,10 232:2 233:1 235:9,18 238:11 240:22 242:22,23 244:1,9,10, 13 245:16,17 246:8,15,24 247:4 248:14 251:1,2,9, 13,14,16,18 252:17,20, 24,25 253:1, 14,18,23 257:22 258:16 259:10 261:3,14 263:21 264:23 266:22,24 269:11 273:15,21 275:1,3,21 283:22 284:6 287:2 289:2 293:11 294:1 295:19 300:2,5,12, 17 301:11, 12,14 302:7, 10,13,18 303:10,11,12 305:15 309:14,15 312:17,22 315:20,22 320:24 321:5,10,15 329:1,4,7,16 330:10 331:14

**safety-related**
241:5

**sake**
48:10 215:14 233:5

**sale**
167:21

**sales**
34:24 35:2 37:22,23 38:2,5,7 109:17 113:2,5 166:24 312:16

**salespeople**
121:20

**sat**
149:21 158:22 175:5 290:7

**Satty**
21:11

**save**
332:4

**saying**
40:20 53:22 59:19 63:15 82:22 85:3 155:10 166:22 168:18 205:4 206:2,6,9 253:13 272:20 278:19,24 288:16 291:21 302:20,23 306:6 316:23 319:10 320:6 324:2

**says**
43:5 64:5 104:25 105:8 108:3 188:22 204:5 208:2 216:25 233:17 238:10,15 239:12 256:7 272:8 287:9 302:7 319:19

**scanning**
258:10,12

**scans**
193:18

**scenario**
288:17

**Schindzielorz**
135:14 283:15 287:1

**Schmitzer**
9:2

**science**
55:9 70:15, 16,18 146:17 148:13 184:7,13,15 214:9 310:15 312:21 317:15 328:19

**sciences**
315:20

**scientific**
41:18,19 117:3,8,10 121:16 124:7 148:20 190:23 191:24 313:17 320:19 322:10,15

**scientist**
76:13 77:19 135:8 136:4, 19,22 138:13,16 144:3,12 287:4 310:11 312:11,15,19 313:22,24 319:3,11,12, 15 320:16,24

**scientist/physician**
135:7,9 144:23

**scientist/safety**
244:1,13 273:15

**scientists**
129:24 135:17 144:17 146:1,19,20, 23,25 147:17 158:13 191:17 199:16 245:17 248:17 330:4

**scope**
25:9,22 27:8 28:6 30:11, 23 31:12 48:23 52:2, 10 53:8 54:21 56:18 58:12,25 59:17 60:12 63:4,24 64:15 66:9 67:9 68:8,16 69:1,22 73:13 74:11 75:19 76:4 78:12 84:16

85:16 87:5, 14 88:6 93:21 94:3, 14 96:8,21 97:6 101:24 103:8,18 104:5,12,23 105:7,16,25 106:12 107:11,21 111:18 112:9,21 113:4,12 114:21 115:3 116:14,20 117:1,19 118:6 119:12,19 120:7,13 121:3,23 122:10,15,25 143:6 145:16 166:11,25 168:1 169:10 170:5,19 172:5 183:1 196:23 197:5,15 198:10 200:19 210:25 211:11,19 212:2,12,21 213:15 214:19 216:6 217:7 221:25 222:11 263:17 265:5 271:7,23 274:17 275:12 280:23 288:16 292:25 293:6,18 294:12 298:18 299:8 308:7,25 321:25 322:25 323:11,19 325:7,16

**score**
235:22 329:19

**SCR**
231:4

**screen**
8:17 32:2,5, 13,18 33:6 87:17 89:7 206:9 224:13,25 225:9,14 228:12,17 229:1,12 230:21,24 244:15 260:16,22 262:5 268:17 286:24

**screening**
205:12

**screens**
8:12 201:24

**scroll**
225:14 229:13 230:2 231:16 233:7 254:16,17 255:1,2,7,12 260:6 270:14 272:15 284:24 286:25 289:14 317:24 318:6

**scrolling**
255:15

**Seaman**
260:4

**search**
235:25 236:5 244:24 245:1 248:3

**searches**
136:5,23

**Searle**
67:17

**second**
30:14 40:8 70:11 85:18 128:11 146:3,4 165:16 169:8 206:6 231:20,22 237:21 240:11 252:11,12 263:9 275:22 283:16 295:14 297:25

**Secondarily**
199:11

**secondary**
192:15

**section**
224:15 226:24 227:5 236:12 237:21 240:13 241:22 242:22 269:1 270:3,8

**sections**
226:13 285:1

**sector**
123:4

**see**
11:13 31:22 33:2 66:19 70:19 71:8, 9,13 72:8 73:10 77:3 79:20 80:25 81:4 82:16 89:7 99:8 101:8,10 109:7 130:17 131:9,18 139:17 141:16 157:23 166:14 181:16 182:12,16 184:1 186:23 194:23 201:23 202:4 204:8 205:6 206:8 209:16 210:7,8,10 213:7,8 214:12 216:2,18 223:5 224:18 225:12 226:16 227:6 229:23 233:8 236:7 241:14 248:7 249:12,14 250:8 255:7, 9,12 256:7 260:20 268:19 269:2 272:7,21 273:7,9 276:25 279:9 283:15 285:5,6 286:23 287:6 289:3 296:3 304:19 305:20 306:24 308:5 313:4 315:8 316:22 317:25 318:21

**seeing**
32:13 120:15 249:2 270:19 305:18

**select**
250:2

**sell**
170:2,18 174:13

**selling**
157:13
**sells**
108:9 113:17 118:18 263:16
**seminars**
122:14
**send**
119:13 239:8 240:9 331:22,23 332:4
**senior**
43:6 44:1 140:17 153:18 154:1 158:13 189:8 192:8
**sense**
77:18 187:5
**separate**
17:14 19:23 47:9 93:18 140:20 149:2 208:16
**separately**
23:14 136:7
**September**
45:22 47:22 68:15 83:16 105:4 107:18
**sequence**
224:20
**sequential**
226:15
**sequentially**
224:18
**series**
41:24 53:2 103:20 132:2 225:3 235:14 316:9 322:9
**serious**
96:16,18 141:24 142:1
**SERM**
129:10 136:19 137:2 151:22 231:19 233:3 257:25 258:5,13 262:18,19 264:17,19
**serve**
279:24
**serving**
192:11
**set**
144:11 187:18 188:1 199:5 208:16 268:3
**setting**
8:13 60:25 61:2 62:13 64:6,7,12,13 69:2 92:7 171:8 184:1, 11
**settings**
64:10
**settled**
143:18
**seven**
94:20 285:18
**seven-hour**
20:12
**several**
37:12 172:20 202:18 260:1
**severity**
186:21
**shaking**
130:18
**share**
29:1 32:1 89:18 246:11,12, 20,21,23 248:6 254:7
**shared**
109:9 115:9 119:4 134:1 175:8 228:12 246:5 315:19 330:13
**shares**
246:16
**sharing**
33:4 90:14 115:13 263:10 321:2
**Sheehan**
9:22 10:14 11:20 17:9, 19 21:25 22:21 25:9, 21 26:4,14, 22 27:8 28:5,19 30:11,23 31:12 33:14 34:17 35:15 37:11 38:9, 20 39:24 40:6,13 41:9 42:6 45:25 46:4,16 47:17,23 48:16,23 49:10 50:20 51:14 52:2, 10 53:8,23 54:5,12,21 55:3,17 56:1,10,18 58:12,19,25 59:17 60:12, 19 61:8 62:1 63:4,13,24 64:15 66:9 67:4,8 68:8, 16 69:1,21 70:9,11 71:6,21 72:5,24 73:12 74:7,9 75:18 76:4, 23 77:11,25 78:3,11 79:2,22 80:22 81:2 82:2,20 83:24 84:15 85:2,5,8,14 86:13 87:5, 14 88:6 89:6,12 90:21,25 91:3,15,19 92:5,10,12, 21 93:5,21 94:3,13 95:2,11,17 96:2,8,21 97:6,17 98:12,24 99:5,14 100:25 101:24 103:8,18 104:5,12,23 105:7,16,25 106:6,12 107:11,21 108:12 109:2,22 110:19 111:18 112:9,21 113:4,12,19 114:6,21 115:3 116:14,20 117:1,19 118:6,20 119:12,19 120:7,13 121:3,13,23 122:10,15,25 123:10 125:1,15 126:22 127:11 130:17 142:23 143:6 145:16,21

150:8,22 155:20 163:3,21 164:13 165:9 166:11,25 168:1 169:8 170:5,19 171:12 172:5 173:2,14 174:4 175:2, 14,20 176:6, 12,17,22 177:2 180:6, 22 181:9,13 182:24 183:23 184:21 185:2,13,25 186:16 188:15 192:6 194:18 195:9 196:7,23 197:5,15 198:10 200:13,17 201:11 202:16 203:16 204:16 206:17,19 207:22 208:12 209:5 210:4,25 211:11,19 212:2,12,21 213:14 214:19,23 215:3,6,13 216:6 217:6 218:20 219:5 220:10 221:9,25 222:11,18,25 223:11,23 224:14,21 225:8,11 226:10,16,23 227:6 228:18,25 229:5 232:5, 11,14 237:23 238:5 243:12,23 245:9 250:16,23 251:11,20 252:11,18 253:21 258:22 260:21,25 263:17 265:5,17 266:2,17 267:7 268:19 270:4 271:7, 23 274:9,17 275:12,25 276:16 277:4,22 278:23 279:7,16 280:8,23 281:10 282:11 284:21 286:4 287:10,20 288:20 289:5 290:25 291:19 292:13,25 293:6,16 294:7,12,17, 22 295:2,7 296:13,25 297:8,21 298:18 299:8 300:3,19 301:16 302:21 303:14 304:24 305:23 306:11 307:7,21 308:7,25 309:16 310:20 311:2,11 312:7,18 313:7,15,19 314:1,10,16, 25 316:17 317:6 318:3, 16 319:4,17 320:12 321:7,25 322:25 323:11,19 324:11,21 325:7,16 326:3,7,21 327:2,11 331:17 332:1,6

**sheet**
13:4

**sheets**
256:12

**shelf**
172:19 192:21

**shift**
87:20 127:15 134:8 145:14 263:13

**shifted**
44:15

**shifting**
31:17

**shipped**
227:3

**shoot**
176:17,18

**shorten**
319:20

**show**
32:17 59:20 82:14 88:15 204:13 230:21 281:15 288:23 321:11 324:24 331:13

**showed**
204:18 211:17,25 212:3 331:9

**showing**
300:16

**shown**
32:13 38:23 248:4

**shows**
208:9

**side**
14:11 38:4 55:14 67:20 70:19 148:14 206:6,15 257:24 258:1 266:25 299:17,18,21

**sight**
210:3

**sign**
20:17 36:22, 24 37:3,4 254:24

**sign-off**
255:23

**signal**
72:1 80:6,25 81:4 83:11 101:8 125:18 184:19,22 185:11,15,18 186:2,3,13 188:14,23,25 191:9 192:1 199:13 204:14 206:2 231:5,19,21 233:9 235:5, 6 236:24 246:25 247:5,6 249:12 250:21 251:9,13,14, 16,18 252:7, 17,24,25

253:2,14,18, 23 254:1 275:2 300:18,23 301:11,12 302:7,10,13, 18 303:10, 11,12,21 304:11,22 309:18 329:1,5,11

**signaled**
243:10

**signaling**
71:20 203:23

**signals**
71:7,8,9,23 72:11,12,13 129:6 136:9 182:1,5,9, 11,18 186:6, 7 201:23 203:24 248:13 258:13 263:22 303:19,20,25

**signature**
37:6

**signed**
20:21,23 28:25 37:6, 14 155:18 232:1 260:18 262:19 263:3

**significance**
193:22 229:17

**significant**
126:4,18 163:7 167:3, 20 170:4,12, 15 290:2 322:6

**significantly**
205:18 325:11

**signing**
37:1 191:14 273:17

**Simard**
159:22 160:21 264:5 269:16

**similar**
112:20 166:16

**Simon**
273:16

**simple**
77:7 83:14 206:11 235:22 295:5

**simplest**
307:8

**simplify**
13:10

**simply**
84:8 86:8 167:22 279:5,14 304:16 319:21

**simulate**
210:19

**simultaneous**
48:4 74:16 84:20 104:1 200:16 225:5 237:2 270:11 294:11 309:3 318:7

**Singapore**
157:21 283:8

**single**
37:2 80:6 133:7 145:23,24 272:5 288:1

**sir**
14:3 18:6 19:18 25:2, 23 26:5 27:4 28:22 32:12 33:17 34:6 35:16 38:11, 21 46:18 47:18 49:6, 11 50:23 51:1 54:23 55:5,16,22 56:2,6 57:19 58:5,14 59:7 60:21 61:21 62:16 70:10, 14 73:14 74:3 78:14 83:25 84:19 85:18,19 87:15 93:17, 22 96:15,18 100:5 101:1 102:4,23 105:2,21 106:5,17 107:14 109:15 110:21 113:13,16 114:2,23 115:5 116:15,21 117:14 124:4 148:23 163:5 165:11 171:5 179:21 183:20 189:11 195:16 201:15 202:10 203:7,18 205:12,16 206:21 211:6,12 222:20 223:2,12,13 227:9 229:16 247:25 254:2 272:13 274:5,19 277:24 278:13 281:1 313:8,20 314:7,13 315:1 331:12

**sit**
146:10 153:20 174:17 191:16 208:14 246:7,8

**site**
103:20 131:12,13

**sites**
134:10

**sits**
156:10 159:22 188:6 231:13 235:16,17,18 243:5

**sitting**
11:1,3 28:9 30:21 38:15 46:14 47:20 53:19 58:23 61:22 69:17 106:8 153:17 154:2 193:9 199:22 208:21 214:9 276:20 292:24 293:10,13 294:1

**situation**
155:25 248:23 317:14

**sixth**
139:24

**size**
138:4,7 296:1 299:19

**slightly**
151:4

**slow**
154:9 201:3

215:10,13 299:2
**small** 22:10 198:9
**smaller** 184:2
**Smithkline** 23:15,19
**smudged** 260:15
**so-called** 64:20 129:10 133:8 151:22 155:23
**sold** 165:19
**sole** 115:7 268:5
**solely** 125:7
**soliloquy** 78:4 206:19 303:15
**someplace** 137:8 203:13 216:24 218:14 221:22 264:22
**SOP** 229:19 231:12 260:2,12 261:2 262:24
**sophisticated** 291:4
**SOPS** 137:7,11 225:3 232:21 256:21
**sort** 80:4 130:20 143:18 146:10 193:17 210:1 221:2,19 222:20

229:17 231:3 234:15 242:6
**sound** 14:13
**sounds** 91:2 92:17 176:20 177:1 240:21 256:12 327:4
**source** 183:13 309:19
**sources** 69:3 71:24 80:12 116:1 136:6 182:8, 11,18 303:21 329:14
**spans** 49:25
**speak** 24:3 35:4 68:18 73:20 78:20 81:14, 15 86:5 136:17,21 198:11 250:10 286:7 298:21 307:22 311:18
**speaker** 8:12
**speaking** 11:18 46:5 148:15
**specialist** 193:1 211:15 212:14 280:25
**specialists** 198:16
**specialized** 136:14
**species** 71:8

**specific** 42:12 43:14 56:11 104:14 201:23 222:6 233:4 264:6, 9
**specifically** 26:6 35:4 45:21 53:14 60:24 62:5 65:20 181:3 202:23 235:25 236:5 266:22 270:25 276:9 278:4 285:13 320:25
**specification** 82:5 98:5 110:25 111:8,14 113:10 194:21 195:2 198:6 201:20 203:3,4 207:4,5 213:16 215:19 265:19,21 266:4,5,10, 25 281:17,18 297:11
**specifications** 113:1 202:7 265:8
**specifics** 120:21 122:18 286:7,8
**specified** 111:11
**spectrometry** 196:16,20
**speculate** 292:9
**speculating** 216:22

288:12
**speculation** 175:15 293:8
**speed** 94:20
**spell** 135:15
**spelling** 283:18
**spend** 19:16 44:21 205:13
**spent** 20:14 22:12 44:23 203:10 308:5 310:17
**split** 132:15 134:10
**splitting** 164:23
**spoke** 29:19 44:25 175:1 241:11 267:22 268:1
**spoken** 35:6 76:9 291:11
**sponsor** 321:23
**spontaneous** 141:23 142:6
**spoon** 296:1
**spotlight** 8:13
**spotlighted** 8:11
**spring** 177:19
**stability** 76:6 97:23 105:24 166:13,15 172:15,18 263:14 265:3,15,23

266:3 299:19
**staff** 262:18,19
**stage** 70:15 131:8 253:7 285:12
**stain** 222:19
**stand** 8:1 108:8 294:10,24 320:6 331:6, 16
**stand-alone** 189:25 219:23
**standard** 136:6 137:7, 9 230:3 261:15 272:25
**standardized** 236:1
**standards** 60:9 190:14
**standby** 177:6 267:14 326:11 327:8
**standing** 294:14
**standpoint** 108:8 143:4 169:4 249:6, 10,24 276:12 284:7 290:24 292:6
**stands** 83:5 290:16
**start** 49:16 61:18 62:6 127:24 131:7 138:25 147:21 180:12 206:3 225:8 255:3, 15 267:6 268:25 270:3
316:2
**started** 22:23 47:3 49:14 83:18, 22 86:25 136:14 140:19 141:6 209:12 314:14,23
**starts** 180:3
**state** 10:22 25:1, 20 29:8 117:8 223:21 305:1
**state-of-the-art** 128:7
**stated** 83:3 292:15
**statement** 9:7 55:25 59:11,13,16 60:11,14 61:7,11 62:16 64:3, 4,5 79:1 81:1 83:23 110:1 118:8 167:25 169:6 183:20 193:11 194:17 195:8 200:2 218:19 221:24 223:2,10 245:8 271:21 272:8 276:22 277:2,6 278:11 281:9 285:4 287:15 288:3,5 290:4 299:15 305:22 306:10
**States** 35:3 38:18
41:25
**stating** 10:10
**statistical** 278:15
**statutory** 189:17
**stay** 147:4
**staying** 147:5
**stays** 132:13
**Steel** 36:13,15,16 131:16 158:21 159:1 315:16,18 316:4 330:5
**Stegmann** 154:6 158:9
**stenographer** 50:4 200:22 201:14 214:25 215:3 283:14
**stenographer's** 215:14
**step** 197:25 252:5 253:11,23
**Stephen** 8:21 10:18, 25
**Stephens** 139:15,19 140:15 218:2
**stepping** 176:11
**steps** 109:20 153:16
**Steve** 10:17 70:12 287:4
**stick** 34:18
**stipulate** 32:21
**stipulated** 170:7
**stipulations** 171:21
**stomach** 51:22 53:25
**stood** 247:5
**stop** 33:4 90:14 94:16,20 95:7,14,21, 25 157:13 263:10 270:15 294:25 321:1
**stopped** 15:22 16:7 290:3,24 291:7 292:10
**storage** 104:15
**stored** 97:1 137:10 256:24
**story** 128:2,21
**straight** 301:18
**straightforward** 156:3
**strictly** 148:15 182:4
**strike** 216:22
**stronger** 81:20
**structure** 127:17 128:16 144:3 145:1,3

**student**
54:1,2
**studied**
60:25 61:1 64:10,13,14
**studies**
52:11,20,21 55:15 61:14 72:10 80:1, 2,7 82:15, 24,25 98:16 117:13 136:3,4 148:25 149:2,9 182:22,25 202:13 204:12 209:3 277:19 281:15 301:8 308:12 321:18 324:9,13,16
**study**
55:1 69:5 86:24 87:3, 8,13,16 208:20 245:4,6 321:21,24 322:2,3,11, 13,18,20,21, 24 323:3,4, 6,10,13,14, 18,24 324:2, 3,19
**stuff**
19:14 44:19 131:14 134:17 227:18 246:14
**stuffs**
59:21 64:23
**subgroup**
155:17 161:9
**subject**
92:7,8,13 123:24 209:10 239:24 243:16
**submission**
36:1 88:11 208:22
**submissions**
87:1
**submit**
16:10,12 34:5 123:12 125:4 240:5
**submits**
123:18 125:2
**submitted**
37:5 75:7 87:9,10 126:15 127:5 173:7 206:24 266:9 308:13 330:17
**submitting**
124:15
**subsequent**
19:25 26:8 30:12 39:8 44:17 46:9, 13 53:16 75:9 204:23, 24 251:23 288:5 317:20
**subsequently**
22:5 42:24 52:5 142:17 187:1 207:3 219:21 251:23 269:17 330:17,23
**subset**
208:1
**substance**
12:19 51:17 59:21 67:14 172:17
**substances/ products**
262:9
**substantive**
22:16 39:25 91:13,24 92:17,22 93:2 177:15
**substantively**
50:1 91:18 93:8
**subteam**
153:9 155:1
**success**
143:4
**successful**
143:8
**successors**
208:8
**suddenly**
66:3
**suffice**
35:9
**sufficient**
156:21 290:12
**suggest**
283:5
**suggesting**
60:1
**suitability**
266:5
**suite**
141:15
**sum**
93:9
**summary**
287:8
**summer**
48:7,12 72:22 75:15, 25 84:12
**sums**
26:5
**super**
69:13 204:19 210:6
**superseded**
234:3,7 254:13 256:14
**supply**
264:6 295:18
**support**
9:3,7 138:3 331:10
**supported**
110:17 220:23
**supporting**
44:23
**supports**
117:4 124:17
**supposed**
185:18 315:21
**suppression**
288:3
**sure**
11:10 28:9 30:5,16 31:6,9 32:24 35:3 40:15 45:2,16 46:20 63:6 72:7 75:7 80:18 90:17, 21 94:7 101:25 103:21 108:13 117:6 130:13 141:14 148:16 154:9,20 157:1,19 160:7 170:6 175:22 176:1 183:24 188:20 191:6 192:4 210:14 211:4 218:7 222:19 233:5 235:22 242:24

243:11 244:14 245:17 248:19 255:18,25 265:24 266:23 268:15 275:23 283:3,20 286:21 288:10 292:2 315:9 316:10 324:15 326:24

**surmise**
291:2

**surname**
130:13

**surprised**
40:9 203:17

**surveillance**
140:4 141:3 261:4

**Susan**
135:18,21 287:2

**Susanne**
269:11

**suspect**
108:4 269:20 317:11

**swear**
275:16

**Swissmedic**
48:14

**switched**
132:23

**SWORN**
10:18

**Syna**
269:19

**synchronized**
234:25

**synonymous**
151:2

**system**
29:3 51:7 137:12 216:23 244:22 245:2,25 246:23 247:3,17 248:3 255:18 256:18,20

**systems**
129:9 137:10 247:2

**SZULMA**
226:25

**T**

**TA**
239:13,15, 16,20 248:10 249:15

**tablet**
271:10,12 287:24 288:1

**tablets**
241:3 272:10 277:14 279:2 292:22,23

**tag**
224:8

**Tainsh**
269:8

**take**
8:17 55:24 56:7 63:3 71:15 81:13 83:4 90:16, 18,22 94:25 97:22 100:3, 22 102:24 108:24 109:19 112:13 118:5 139:2 146:4, 13 151:10 152:12 175:24 176:4 181:18 184:16 185:22 197:25 204:6 223:7 225:13 236:15 243:1 252:10,14 253:11 267:4 277:11 281:20 287:24 295:1,4,5 298:25 325:24 326:5,22

**taken**
8:21 98:10, 21 99:2 110:12 111:2,20,25 112:1 137:24 153:9 162:18 165:14 173:10 201:7 213:12

**taking**
12:11 60:1, 23 65:7 91:21 101:7 110:3 152:15 186:13 192:4 252:5 258:18,25 259:4 266:21 279:2 305:17 321:19 331:5

**Talbot**
260:3

**talk**
12:24 21:14 27:10 39:4 62:4 69:10 70:15 123:15 128:9 134:23 141:5 145:1, 2 148:12 151:3 160:21 168:9 174:6, 25 176:19 186:24 197:23 201:19 246:1 247:24 249:16 298:5 299:10,11 308:4 311:19 312:12 317:25

**talked**
21:1 73:25 93:8 125:17, 25 129:12 139:21,22 172:15 177:18 178:25 182:12 183:8,15 186:10 191:18 201:23,24 214:1 217:20 219:18 226:1 235:2 240:19 241:22 243:6 244:16,21 245:18 246:3 262:21 267:21 289:3 297:10,11 298:8 303:19 304:17 305:5,8 308:4 311:12 317:16

**talking**
39:21 41:10, 11 46:20 52:21 76:10 91:18 102:9 115:11 120:16,20 128:4 133:16 134:11 136:22

161:20,21 175:3 178:21 181:3,22 190:22 198:13 210:11,12 213:4 285:5, 21,24 286:1 298:8 326:3

**talks**
117:3 137:3

**Tanner**
52:21,22 68:24 69:2 86:24 87:3,8 200:6 204:12,18 206:7 208:11,13,20 209:3,9,25 210:2,5,8, 14,19,21,24 211:3,9,17, 25 212:3,9 214:13 223:6 274:3 308:9, 21 309:5 314:15,21 317:4,19

**taught**
53:24 126:10

**team**
52:16 75:12 130:25 131:17 132:14 135:4,21 146:1,4,5,6, 11,14,16 147:14,21 149:22,23 153:10 156:6 159:22 160:8 161:7,10,12 174:18 175:6,8 189:4 198:19 273:19 315:25 323:20,25 324:1 330:3

**teams**
147:10 247:10

**technician**
9:3

**technologies**
197:20 235:8

**technology**
197:1

**teleconference**
160:17

**television**
120:16

**tell**
11:11 17:12, 14 25:12 27:23 29:7 38:25 41:22 46:20 47:1 68:25 75:7 85:24 95:9 101:21 103:5 104:9 105:4 115:5 148:6 158:6 174:17 196:5 211:1 212:8,24 224:14 230:2 237:5 243:24 245:16 254:14 256:13 264:8 270:12 280:19 284:16 292:20 293:12 294:3 296:4 302:16,17 307:25 309:11 313:21 314:4 317:9 318:19 321:8,17

**telling**
168:20,22 232:11 302:14 313:12

**tells**
210:24 234:19

**temperature**
96:23 97:1, 24 104:16

**temperatures**
97:5

**template**
218:5

**temporary**
67:2

**ten**
20:4,7,8,9, 10 23:1 44:24 79:16 91:1 147:22 293:4

**term**
43:13 66:22 72:25 232:25

**terminate**
162:19

**terminated**
15:23

**terminology**
17:7 66:19 150:24 196:25 261:22 328:22

**terms**
17:16 21:7 22:3 30:24 34:3,14 35:11,19 36:21 37:8, 22 45:9 50:1 51:24 53:14 60:8 61:22 65:13 72:20 75:2 79:20 83:8 84:10 93:14 104:15 107:6 114:25 121:19 122:7 127:17 128:12 132:8 134:17 136:4 138:10 142:25 144:2,12,25 145:3,10,12, 15 151:1 155:7 166:2 167:4,5 169:17 170:2 172:2,11 178:17 179:4 187:6 195:1 197:4 198:2 213:3 226:14 232:23 234:14 249:21,24 254:15 261:14 263:14 267:21 285:4 288:14 293:25 295:24 298:3,10,14 310:3 325:2

**test**
152:12 206:11 263:20 290:19 293:14 294:5

**tested**
75:17 76:2,7 77:22 84:24 294:5

**testified**
13:12,17,20 24:15 25:3 27:21 29:13 31:10 162:21 163:7 167:18

172:10 175:19 199:24 298:1 303:9 310:16 315:16
**testify**
29:14 163:8 201:6 293:12,17 294:3
**testifying**
299:14
**testimony**
10:5 17:20 19:17 22:4, 22 26:11 30:7,22 33:10 37:25 38:8,16,17 40:11,18,21 41:8,11,16 46:1 50:21 57:17 61:9 70:13 75:19 76:19,24 78:9,12 79:19 82:21 91:24 97:14 133:18 151:9 169:11 172:14 178:12 202:15 203:8,10,15 205:8 308:16 312:8 328:12,18
**testing**
71:9 83:22 86:1,2,4,10 166:16 172:15 197:13 206:7 212:9,19 263:14,23 265:3,15,19 266:3
**tests**
265:23
**text**
287:11
**textbook**
139:23
**thank**
9:19 16:5 36:20 50:6,7 74:23 93:12, 13 105:2,20 116:4 122:6 177:1 178:16 180:16 181:24 201:3 230:13 245:23 254:8 257:5,10 263:11 267:8 283:19 315:11 325:25 327:12 331:17 332:5
**Thanks**
9:21 91:4
**theory**
241:7
**therapeutic**
143:19,20 239:16
**therapeutical ly**
144:8
**thereabouts**
330:9
**thing**
89:24 93:7 94:17 141:17 155:12 157:2 162:14 163:12 164:8 176:14 178:7 181:17 190:14,19,20 205:25 207:23 210:23
222:12 241:21 251:13 252:24 257:9 301:24
**things**
30:19 34:8 37:8 44:18 94:20 96:1 117:5 118:2 122:19 140:6 163:24 178:23 183:22 187:2 192:5 199:3 202:13 206:21 209:1 213:6 216:21 217:18 218:1 221:20 225:24 231:14 232:19 233:12 244:12 266:25 276:24 293:21 296:9 303:17 306:7 317:12,16
**think**
17:5 20:4 30:1,14 31:18 32:2 33:5,23 34:13,25 40:12,15,17 41:1 42:19 45:15 46:18 49:25 53:1, 9,21 55:4 56:12 57:15 59:18 70:14 73:14 78:13 80:9,17 82:4 86:24 87:25 88:21 93:3, 13 94:22
96:23 99:15 102:8 104:2 108:3 109:9 110:9 114:2 115:4 117:22 118:7 124:4 125:23 126:13 128:2 132:16 133:14 138:25 140:1,25 141:3,16 142:24 145:7,22 148:10 151:1 155:1,2,9 159:8,21 160:23 161:6,19 163:4 164:19,23,24 165:10 167:1,4 169:7,12 171:7 174:15 175:3 176:14 178:5 180:7 184:9,14 186:23 191:5 193:12,25 194:6,9 195:10,21 196:12 197:18 200:23 203:8,17 204:5 205:24 206:20,21 207:1 209:9 212:3 218:21 223:15 224:25 225:16,25 227:3 228:18 231:2 232:6, 7 233:11 235:7 240:18 243:13 244:7

247:4 249:17 250:25 254:10,18 255:6 256:9 271:8 277:5, 23 278:4 279:8 280:9 282:4 283:8 284:8 285:1 286:5 287:21 290:16,18 291:7,9 292:14 298:21 299:2,10,21 301:17 303:16 309:4 310:11 312:9 316:10,18 317:19 319:6 320:13 321:12,13 323:1,7 330:22 331:19

**thinking**
143:13,14 172:8 240:9 278:12

**third**
30:14 51:20 199:14 231:23 283:16 319:13,18,24 320:2

**thirdly**
244:25

**Thomas**
52:25

**thoroughly**
309:17

**thought**
17:25 75:21 162:13 213:25 219:2 253:25

**thousand**
88:10

**three**
11:16 12:3 29:13 44:18, 21 50:8 51:15 81:8 83:19 92:18 118:2 130:23 146:23,25 159:20 224:4 231:17 243:9 245:3 247:10 330:4

**threshold**
239:13,23 240:4

**tickler**
221:22

**Tigers**
141:6,9,20

**time**
8:23 9:6,11, 16,18,22 16:10,23 17:12,14 19:16,19 20:1 22:10, 12 24:16 25:11 27:22 30:21 31:14 33:23 34:2 42:18,20 43:1,4 44:6, 23 46:12,25 47:21 48:1, 3,15 49:1,7, 24 52:9 53:3,7 55:24 56:7,11 58:10 65:24 66:5 72:21 73:9,17,19 75:5,14,17 76:1,7 77:22 78:7 79:25 84:12,18,23 85:18,19 86:11,18 89:2 91:6,9 99:24 101:21 102:8,14 103:5 104:8 105:22 106:23 107:2,4,9 120:23 127:21 133:2,6,11, 19 134:7 135:12 136:21 138:11,21 139:3,20 140:4,11 142:9,12 143:24 144:14,20 156:15 157:19,20 160:14 162:25 163:12 164:7,18 165:2,7 166:14,15 172:20,22 176:10,24 177:4,7 180:25 185:11,15 186:6,20 195:19,20,24 200:4,7,15 201:3 204:21 205:13 206:13 207:2 209:4,11 211:24 213:18,25 216:10,11 217:14 218:7,8,15, 23,25 219:4, 10,19 220:13 221:2 223:8 229:11 236:2,15 237:1 244:14 245:5,16,21 246:17 247:8 248:16,25 249:1 250:10,21 251:25 253:5 259:25 262:6 267:10,16 270:23 271:17 274:2,15 275:5,11,21 281:22 284:10 285:20 286:2,3 287:5 293:4 295:15,21 304:10 308:22 310:17 316:14 317:9,10 324:8,13 325:5 326:9, 13 327:6,9, 13 328:9,10 331:18 332:8

**times**
13:17,20 24:16 79:5 83:14 85:8 101:2 123:9 272:2 292:21 293:4,5,13 294:3,5 310:22 312:6 321:4,9 328:17

**Ting**
269:19

**tipped**
72:22

**tired**
294:20

**tissues**
271:3
**title**
43:4,9,17,24 44:4 156:18 231:4 244:8
**today**
8:23 12:9,22 13:9 14:5,16 19:17 24:4 27:15 28:9, 12,15 33:10 34:9 39:2,12 46:14 47:20 58:7,24 60:17 61:22 69:17 91:25 106:8 136:17,21 139:17,24 145:2 199:22 208:21 218:6 276:21 292:24 293:13 299:25 303:9 308:19 315:17 318:23 325:3 327:13 328:9 331:7,10,14
**today's**
332:8
**toenail**
110:8
**told**
85:6 104:19 106:21 275:5 292:4 301:25
**Tom**
10:14 11:17, 20 12:5 17:11 32:21 40:8 85:13 89:11 91:2 94:15 95:6 224:10 225:18 230:17 268:16 270:8 293:22 294:15 326:15 331:21
**Tom's**
11:19
**tomorrow**
322:11
**tool**
151:18 199:12,18 235:9,15,17 247:15,16,19 249:2
**tools**
141:15 179:9,13,18, 20,23
**top**
175:18 231:12 235:17 238:9 254:19,21 256:2 264:4 269:1 272:16,17 286:23 318:8,10
**topic**
76:10 78:17
**topics**
33:21 34:10, 15 92:7 327:21
**total**
20:11 23:4 93:9 144:24
**totality**
207:25 208:10 209:23 221:5 252:8 328:25
**toxicological**
191:8 284:4 290:23
**toxicologist**
60:22 61:12 62:12 63:10 64:9 280:25 292:16
**toxicologists**
198:17
**toxicology**
61:1 261:20, 21,23 266:8 290:6
**traces**
198:9
**track**
75:20 131:3 133:14 217:2 246:24
**tracked**
207:18 216:5 218:15 220:7,9 221:7 247:10 264:22,24
**tracking**
223:6 247:3, 17
**tracks**
234:15
**train**
75:21
**trained**
79:15
**transcript**
57:16 135:16
**transcripts**
57:19
**transfer**
138:17
**transition**
137:19 145:23
**transitions**
146:11
**translation**
261:21
**treat**
116:19
**treated**
110:6
**treatment**
51:6 110:3 111:22 112:2 154:22 320:17
**treatments**
111:3 112:8, 13 113:6 154:25 156:4
**trends**
166:14
**triage**
136:20
**trial**
13:17,21 24:17,23,25 25:19 30:8 117:12 184:1
**trials**
82:12 141:25 142:1,2 183:14,18 184:2 192:22
**triangle**
129:18
**triathlete**
177:24
**triathlons**
177:19
**trick**
164:25
**trigger**
182:14,15 199:19,20 215:21 279:9
**triggered**
173:4,7,8,11 302:24 304:4,7
**trouble**
214:18
**true**
86:4 87:12 114:2 117:16 142:14

186:24 191:11 204:4 271:13 311:10 312:6 314:7,13 320:14 324:20
**truth** 22:8 24:12 52:13 159:24
**truthfully** 78:20
**try** 27:4 50:7 94:21 101:10 180:24 187:24 204:4 206:3 215:17 225:13 259:17,20 285:1 328:24
**trying** 40:3 45:5 50:25 66:2 77:19 81:22 102:8,13 145:19 155:8 164:25 173:12 203:21 205:21 209:16,20 210:19,21 214:4 230:19 279:22 284:11 285:11 288:9 313:21 314:3 316:19 317:13 318:20 320:7 324:4,5
**Tuesday** 8:23
**turn** 186:8 217:16 234:22 292:17
326:16,20
**turned** 14:10,12 26:6
**TV** 119:18 120:11 121:1
**Twenty** 293:5
**twice** 295:10,13
**two** 12:23 19:1, 3,8,22,25 23:6,13 30:2 31:6 44:18, 21 65:6 81:8 90:16 136:6 144:4,5,17 146:23,25 158:7,15 159:23,25 161:1 162:6 174:25 175:13 192:11 196:13 216:21 224:4 243:9,18 245:5 247:22,23 257:22 260:11 281:7 283:24 287:21 288:18 293:21 306:3
**twofold** 188:12
**type** 141:21 197:13 221:4 224:7
**types** 182:23 217:2 292:5
**typical** 114:4 232:23
**typically** 115:2

**U**

**U.S.** 9:3,7 12:3, 6,11 17:7 29:3 34:19, 24 35:5,7,14 57:9 94:5 119:21 121:7 122:2 123:16 129:14 131:4 132:23 133:2,3,6, 13,20 134:3, 4,15 135:21 137:20,21 138:2 140:1, 2,3,5,8,9, 10,19,20,22 142:9 162:10 190:2 229:23 230:11 232:2 239:19 242:19 246:5 309:9
**Uh-hum** 238:13
**UK** 44:22 129:13 131:10,15 133:6,13,15, 23 134:3 139:13 140:5,7,21 141:1 142:9, 18
**UK/U.S.** 133:24
**ulators** 86:25
**ultimately** 175:12
**unaffected** 288:1
**uncertainty** 163:10 164:7,17
**unchanged** 84:4 112:12 163:8 167:8 207:14
**underpinned** 113:6
**understand** 12:8,12,15, 18 17:24 22:4 23:23 24:1 26:11 27:14 29:2,4 33:9 35:18 37:25 38:8, 15,21 46:3,6 48:13 55:20 63:9 65:2, 16,19 66:6, 13,24 67:6 68:5 72:15 77:20 79:11, 19 80:17 81:19 84:11 85:23 96:12 97:13 100:20 101:11 112:5 113:21,25 114:4 118:1 119:22 128:16,17,20 132:24 133:18 134:15,18 142:20,21 145:20 147:4 151:9 155:11 160:17,19 162:20 166:22 177:11 181:11 190:10 197:25 202:10 203:8,21

204:4 205:3, 19,25 209:19 210:3 213:17 214:5,17,22 215:17 217:18 222:13 224:17 229:19 231:4 238:9 244:18 245:20 248:1 267:24 273:25 274:24 278:25 280:5 282:12 288:9 290:18 291:15,22,25 296:22 298:12 300:22 301:2 303:11 305:10 306:2,5 307:17 316:24 322:15,20 324:3,5

**understanding**
16:22 17:3, 17 24:5 25:10,18 27:9 28:14 33:13,16,25 35:9 38:19 41:22 42:8, 13 51:3,5 57:3 62:3 68:9,20 69:13 71:14 73:1,22 76:5,19 77:22 83:13 86:22 87:4,7 92:5,6,16 103:9 120:8 139:6,10 140:6 148:22 161:8 165:2 167:17 168:11,17 169:25 170:1,10 175:21 179:2 197:3 200:5 220:12 226:13 230:9 233:25 251:3 252:21 276:7 305:13,24 317:13 321:20 327:20

**understandings**
184:7

**understands**
54:25 55:13 56:5 107:25

**understood**
14:14,23 17:23 21:19 22:11 24:14 25:15 26:10 27:19 30:6 31:16 32:15 36:5 37:17, 21 41:6 45:8 58:9 62:18 72:18 81:17 83:7 87:19 88:13,17 101:20 104:18 108:22 112:18 114:17 115:21 116:4,9 117:15 118:15 120:3,22 122:6,21 123:6,22 125:10 127:3,7 138:9 157:9 162:13,15 164:9 166:7 167:14 168:10,16 169:24 171:2 174:22 176:3 178:16 182:21 192:24 208:6 213:2 217:22 220:25 222:4,15 230:13 233:15 249:20 250:12 254:4 257:1 259:22 267:3 268:11 269:13 273:8 281:24 282:15 289:1 296:8 312:15 325:23

**undertake**
324:6

**undertaking**
167:3 170:13

**undertakings**
170:15

**undertook**
329:9

**undoubtedly**
175:7

**unintentionally**
13:9

**union**
267:24

**unique**
110:12 233:11

**unit**
139:14

**United**
35:3 38:18 41:25 44:21

**Universal**
9:17

**unknown**
290:11,20

**unknowns**
165:5,11

**unusual**
182:16 241:1 244:5,9

**update**
42:23 75:6, 14 125:11

**upfront**
45:17

**upper**
8:18

**urine**
196:12 250:15 251:1,22

**usage**
182:7

**usual**
187:2

**UTC**
8:24 9:17 91:6,9 267:10 326:9,14 327:6,10 332:8,11

**V**

**vaccinating**
44:22

**vaccinator**
44:20

**vaccines**
47:11 269:12,18

**vague**
37:11 46:4, 16 47:23 50:21 67:8 68:16 72:25 73:12 79:2, 22 84:16

86:14 87:5 275:13,15 286:6,13 314:1
**valid** 186:8
**Valisure** 42:25 195:15 196:1,22 212:10
**variable** 56:12
**variety** 71:24 72:13 135:16 163:24 170:21 174:16 183:25 199:3 303:21
**various** 73:10 135:18 171:3 248:16 252:8 269:3 303:25 308:8,12 320:17
**vast** 142:5
**vendors** 116:12 185:23
**verbally** 10:4
**verdict** 25:7 26:1
**version** 137:14 234:11,19,20 254:10 256:5,10,24 272:11
**versions** 132:15 137:15
**versus** 133:13

143:25 146:2 193:24 197:21 212:10 278:9
**vice** 43:6 44:1 189:8
**video** 8:11,12,15, 17 9:2 160:17
**video-recorded** 8:20
**VIDEOGRAPHER** 8:1 9:12,17 91:5,8 177:3,6 224:23 226:8 227:9,19,23 228:2,6,10 267:9,14 315:6,11 326:1,8,11 327:5,8 332:7
**view** 8:12,18 26:24 28:24, 25 29:1 38:12 88:16 98:13 112:1, 11 123:18 151:13 173:19 186:22,25 212:15,22,23 257:9 277:14 279:14 298:10 299:10 314:17,21,22 318:20,21 320:16
**viewed** 308:3 322:9
**views** 235:15

318:22
**vigilance** 116:7 148:17
**Visiewicz** 52:25
**vitro** 261:21
**vivo** 51:12,19 52:8 210:20 261:21 307:1 321:18 323:18,24
**voice** 294:18
**volume** 139:18 148:1
**volunteer** 322:13
**volunteers** 322:8

**W**

**wait** 206:11 228:16
**waited** 303:4
**waiting** 237:23
**waive** 10:8
**Walmsley** 161:8 175:22
**want** 8:16 17:24 28:3,8,16 31:8 40:14 45:1,2,14, 16,18 46:24 48:11 57:6 60:6 63:1,2 66:24 71:13 74:3 76:16 77:9 78:4 80:18 85:11

87:16 88:22 89:10 90:22, 25 92:1,16, 19 95:20 98:6,20 100:20 102:18,19 110:10 127:15,23 128:10 141:5 151:4,10 154:9 156:1 164:22 165:6 176:6,9,12, 15,16 180:20,24 188:20 191:6 200:22 205:15,25 212:16 214:17 217:18 223:4 224:2 225:1, 2,22 226:3 228:12,16 229:10,13,18 230:20,21 233:21 237:5,19,25 245:24 263:10,13,19 267:20 270:4 273:9,11,18, 22,24 278:4, 25 279:19 282:2,7 283:17 284:24 289:2 291:14 292:7 294:17,18 297:19 301:2 304:19 305:10
**wanted** 9:15 11:12 21:18 81:25 145:7 162:25 178:19 191:10

214:25 273:6 275:6 307:6, 13 310:2 327:12
**Ware** 140:16
**warning** 126:3,18 127:10
**warnings** 124:19,23
**watch** 209:20 216:3,25 221:20,22
**watchful** 148:18
**water** 59:22 64:20
**waving** 200:23
**way** 18:3 27:21 29:3 31:10 32:17 36:23 47:8 49:1 57:18 71:4, 14,18 80:5 83:15 114:19 119:16 120:1 121:25 124:2 132:12 134:11,19 137:16,22 143:12 144:11 147:25 152:4,5 185:4,5 187:2 191:4 193:18 194:2 195:23 197:9 201:19 202:19 203:21 205:16,22 207:20 208:16 209:6 210:6 212:19 216:5 217:12 221:14 225:15 230:6 233:8,9,11 255:17 270:5 278:5 284:25 301:19 311:17 316:19,21 319:22 325:18 328:21 331:24
**ways** 72:13 83:19 118:17 119:3 172:12 233:23 305:22
**weapon** 222:17
**web** 103:20
**website** 57:22 108:3 161:13
**week** 44:21 247:8
**weeks** 317:11
**weighing** 110:17
**Wendy** 231:25 255:5,24
**went** 23:8,13,14 68:3 73:9 84:23 87:1,2 133:14 141:6,7 142:17 154:17 155:1,9,21 156:6 159:13 207:7 234:20 245:2 285:16
**when's** 30:21
**whichever** 228:17
**white** 106:10 271:10 274:8
**WHO-ACCEPTED** 148:9
**widely** 112:23
**willingness** 83:3
**wishes** 268:8
**Witham** 11:17
**withdraw** 84:22 93:15 112:3 113:2 154:20 156:22 170:22
**withdrawal** 93:18 161:16 325:6
**withdrawn** 120:24 164:4 170:24
**withdrew** 164:4
**withhold** 240:8
**witness** 8:11,13,15 10:4,16 11:21,25 16:25 17:2, 5,6 22:1,23 23:24 25:10, 23 26:5,15, 23 27:9 28:13,21 30:12,24 31:13 33:1, 8,16 34:18 35:16 37:12 38:11,21 39:25 40:25 41:10 46:5, 18,19 47:18 48:17,24 49:11 50:3, 7,10,22 51:15 52:3, 11 53:9,24 54:7,22 55:4,18 56:2,11,19 58:13,20 59:1,18 60:13,21 61:10 62:3 63:6,15 64:1,16 66:10 67:10 68:9,18 69:2,23 70:10,14 71:7,23 72:6 73:1,14 74:8,22 75:20 76:5, 25 77:13 78:13 79:4, 24 81:4 82:4,22 83:25 85:9, 10,17 86:5, 15 87:7,15 88:7 89:13, 17 90:20 91:16,20 92:6 93:6,7, 22 94:4,21 95:8,9 96:9, 22 97:7,18 98:13,25 99:6,15 101:1,25 103:9,19 104:2,6,13, 24 105:8,17 106:1,13 107:12,22 108:13 109:3

110:20
111:19
112:10,22
113:5,13,20
114:7,22
115:4
116:15,21
117:2,20
118:7,21
119:13,20
120:8,14
121:4,14,24
122:11,16
123:1,12
125:2,16
126:23
127:12
130:19
142:24 143:7
145:22
150:12,23
155:21
163:4,22
164:14
165:10
166:12 167:1
168:2 169:12
170:6,20
171:13 172:6
173:3,15
174:5 175:3,
21 180:7,23
181:14
182:25
183:24
184:22
185:3,14
186:1,17
188:16 192:7
194:19
195:10
196:8,24
197:6,16
198:11
200:18
201:12
202:17
203:17
204:17
206:18,20
207:23
208:13 209:6
210:5 211:1,
12,20 212:3,
13,22 213:16
214:25
215:15 216:7
217:8 218:21
219:6 220:11
221:10
222:1,12,19
223:1,12
237:3 238:6
243:13,24
245:10
250:17,24
251:12,21
252:14,19
253:22
254:16
255:14
258:23
260:23
261:1,19
262:13
263:18
265:6,18
266:3,18
267:8
268:18,22
270:9,12
271:8,24
274:10,18
275:13
276:1,17
277:5,23
278:24
279:8,17
280:9,24
281:11
282:12
283:13,21
286:5
287:11,21
288:21
289:6,14,20
291:1,20
292:14
293:1,7,17,
19 294:20
295:14
296:14
297:1,9,22
298:19
299:9,25
300:4,20
301:17
302:22
303:16
304:25
306:12
307:8,22
308:8 309:17
310:21
311:3,7,12,
13 312:9,19
313:8,20
314:2,11,17
315:1 316:18
317:7 318:4,
17 319:5,18
320:13 321:8
322:1 323:1,
12,20
324:12,22
325:8,17
326:16,20

**witness's**
8:16

**witness-only**
8:10

**witnesses**
22:16 28:7
86:22,23
178:13

**wondering**
256:6

**word**
62:19 66:20
102:7 124:8
165:11
278:14
309:23
312:10
313:9,14
319:5,8,14,
19 320:4

**wording**
105:17
290:16

**words**
17:22 171:16
240:8 253:3
291:2,3
324:5

**work**
14:19,22,24,
25 15:4 18:4
19:8 22:3,6,
20 23:1,8
34:3 35:1,
12,25 36:3
39:11 41:3
52:15 57:18
67:13 71:1,5
77:3 93:9
101:10
123:3,17
128:19,21
144:10
149:3,10,20
151:10
167:23
198:14 202:5
204:17
206:23
208:17 214:1
225:1 263:3
284:11,25
307:15

**worked**
16:24 21:7
22:5,25
23:7,14,19,
20 36:17
56:25 189:13
207:8 229:20
246:17
315:23

**working**
15:22 19:16
20:11 22:15
30:20 45:5
65:25 134:25

150:16 175:23 213:5 308:18
**works** 65:17 122:1
**world** 79:20 93:19 94:7 128:6 134:2 140:9 141:2 162:12 184:11 220:20 242:21 302:3 330:18
**worldwide** 35:13,22 45:13 165:19 239:7
**worries** 332:3
**worry** 301:14
**worst-case** 288:17
**worth** 20:5 145:5
**worthy** 101:9 182:19 223:15 251:14
**wrapped** 253:4
**wrinkle** 296:9
**write** 155:8
**writing** 124:13 154:4
**written** 13:7 59:11 124:17 156:5 230:7 231:8, 25
**wrong** 235:8 296:1 317:20 320:3
**wrote** 170:23
**Wynn** 140:17

**Y**

**yeah** 19:11 32:3 40:19 45:1 58:1 89:9, 10,14,24 90:1 103:9 145:22 154:11 176:13,17 178:9 190:12 206:20 209:19 221:2,16 225:18,21 229:7 232:16 233:24 234:3 238:17 240:15,18 244:20 254:13,23 255:9 256:16 260:15 261:2 268:19,22 269:6 287:14 305:7 312:9 316:7 319:24 326:5
**year** 16:4 30:9 31:6 49:21, 22 50:2 186:7 187:17 221:12 247:18
**years** 23:1,4,6,13 30:15 56:9, 12 66:1 79:16 81:8 84:3 106:21 114:13 115:17 138:1 145:5 147:22 199:9 216:9 218:1 221:1, 3 223:9 243:7,9 245:3,5 260:1 292:21 310:17 315:24 324:15 325:21
**yellow** 106:11 271:10 274:8
**yes-or-no** 301:18
**young** 185:5

**Z**

**Zantac** 9:1 27:2,7, 17 28:16 37:9,15 41:22 42:1 45:22 46:15 47:6,14,21 50:16 55:13 67:24 93:14 94:11 96:6 98:9 107:10 110:16 112:20 113:2 120:23,25 127:19,20 130:2 132:8, 10 133:9 135:11 137:20 138:10 142:20 149:13 157:5,7 178:13 196:6,11 218:11,18,25 219:11,18 220:17 221:4 244:22 275:6 284:4 324:9, 14,20 325:2, 15,20 329:8, 10 330:1,11, 20 331:3
**Zeng** 42:22 64:17 74:5 83:17 150:2 196:10 242:11,12,24 243:9,14,15, 21 245:1,13 259:5
**zeros** 315:3

# EXHIBIT 19

**Deposition of Claude Kugel (09/23/2021)**

**Subject to Renewed Motion to Seal Per DE 6124**

# EXHIBIT

# 20

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY
LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO RECORDED DEPOSITION OF

CRAIG LINDSLEY, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Tuesday, May 24, 2022

TIME: 9:01 a.m. - 9:21 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6133478-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

CHAFFIN LUHANA, LLP
600 Third Avenue
12th Floor
New York, New York 10016
BY: ROOPAL LUHANA, ESQ.
ERIC T. CHAFFIN, ESQ
KENDRA GOLDHIRSCH, ESQ.
COURTNEY GRIFFIN, ESQ.
GEOFFREY SPAULDING, ESQ.
E-MAIL: luhana@chaffinluhana.com
chaffin@chaffinluhana.com
goldhirsch@chaffinluhana.com
griffin@chaffinluhana.com

Appearing on behalf of the Zantac PSC:

LEVIN, SEDRAN & BERMAN, LLP
510 Walnut Street
5th Floor
Philadelphia, Pennsylvania 19106
BY: FREDERICK S. LONGER, ESQ.
E-MAIL: flonger@lfsblaw.com

Appearing on behalf of the Zantac PSC:
ANAPOL WEISS
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
BY: TRACY A. FINKEN, ESQ.
E-MAIL: Tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC:

LEAR WERTS, LLP
103 Ripley Street
Columbia, Missouri 65201
BY: BRADFORD B. LEAR, ESQ.
E-MAIL: lear@learwerts.com

Appearing on behalf of Zantac PSC:

MARTIN, HARDING & MAZZOTTI LLP
One Wall Street
Albany, New York 12205
BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
E-MAIL: rosemarie.bogdan@1800law1010.com

Appearing on behalf of the Defendants,
Walmart, Inc. and GlaxoSmithKline, LLC
GlaxoSmithKline, PLC

SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com

-and-

SHOOK, HARDY & BACON LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: PEIYUAN GUO, PH.D., ESQ.
E-MAIL: pguo@shb.com

Appearing on behalf of the Defendant,
Chattem Inc., Sanofi U.S. Services, Inc.
Sanofi-Avertis U.S. LLC:

DLA PIPER LLP (US)
303 Colorado Street
Suite 3000
Austin, Texas 78701
BY: ASHLEY ALLEN CARR, ESQ.
E-MAIL: ashley.carr@dlapiper.com

-and-

DLA PIPER LLP (US)
550 South Hope Street
Suite 2400
Los Angeles, California 90071
BY: CONNOR SCOTT, ESQ.
E-MAIL: connor.scott@dlapiper.com

Appearing on behalf of the Defendant, Boehringer Ingelheim:

KING & SPALDING
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
BY: LUKE BOSSO, ESQ.
E-MAIL: lbosso@kslaw.com

Appearing on behalf of the Defendant, Perrigo:

GOODELL, DeVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
BY: MATTHEW H. TRANTER, ESQ.
E-MAIL: mtranter@gdldlaw.com

Appearing on behalf of the Defendant, Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

-and-

BOWMAN and BROOKE, LLP
317 George Street
Suite 320
New Brunswick, New Jersey 08901
BY: CHRISTOPHER R. CARTON, ESQ.
E-MAIL: chris.carton@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19103
BY: BRIAN RUBENSTEIN, ESQ.
E-MAIL: rubenstein@gtlaw.com

-and-

GREENBERG TRAURIG, LLP
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
BY: SARA K. THOMPSON, ESQ.
JAMES R. BROWNING, ESQ.
E-MAIL: thompsons@gtlaw.com
browningj@gtlaw.com

Appearing on behalf of the Defendant,
Mylan Pharmaceuticals, Inc.:

PIETRAGALLO, GORDON, ALFANO,
BOSICK & RASPANTI, LLP
301 Grant Street
38th Floor
Pittsburgh, Pennsylvania 15219
BY: FRANK H. STOY, ESQ.
E-MAIL: FHS@pietragallo.com

ALSO PRESENT:

NICOLE A. COSTELLO, Scientific Specialist
KING & SPALDING LLP

JESSICA SZUMLA, Paralegal Chaffin Luhana

VIDEOGRAPHER: MICHAEL HOLLANDER

TRIAL PRESENTATION SPECIALIST:
JOHN SCHMITZER

-------------------I N D E X-------------------


WITNESS: CRAIG LINDSLEY

| EXAMINATION BY | PAGE |
|---|---|
| MS. LUHANA | 10 |
| MR. SHEEHAN | 458 |
| MS. LUHANA | 483 |

----------------E X H I B I T S--------------

| NUMBER | | PAGE |
|---|---|---|
| Exhibit 6474 | | 22 |
| Exhibit 6472 | | 23 |
| Exhibit 6473 | | 25 |
| Exhibit 0834 | (Previously marked) | 101 |
| Exhibit 6477 | | 117 |
| Exhibit 6478 | | 121 |
| Exhibit 4927 | (Previously marked) | 132 |
| Exhibit 6479 | | 157 |
| Exhibit 6481 | | 189 |
| Exhibit 6482 | | 195 |
| Exhibit 6483 | | 200 |
| Exhibit 6484 | | 203 |
| Exhibit 4162 | (Previously marked) | 231 |
| Exhibit 0288 | (Previously marked) | 254 |
| Exhibit 0265 | (Previously marked) | 262 |
| Exhibit 0261 | (Previously marked) | 282 |
| Exhibit 0259 | (Previously marked) | 288 |
| Exhibit 3138 | (Previously marked) | 299 |
| Exhibit 2472 | (Previously marked) | 304 |
| Exhibit 5418 | (Previously marked) | 311 |


(Exhibits continued on next page.)

(Exhibits continued.)


| | | |
|---|---|---|
| Exhibit 3344 | (Previously marked) | 318 |
| Exhibit 3566 | (Previously marked) | 322 |
| Exhibit 3567 | (Previously marked) | 322 |
| Exhibit 6489 | | 326 |
| Exhibit 6490 | | 332 |
| Exhibit 6491 | | 336 |
| Exhibit 6486 | | 348 |
| Exhibit 0084 | (Previously marked) | 352 |
| Exhibit 3126 | (Previously marked) | 354 |
| Exhibit 6488 | | 359 |
| Exhibit 6498 | | 372 |
| Exhibit 6495 | | 402 |
| Exhibit 6496 | | 409 |
| Exhibit 3158 | (Previously marked) | 421 |
| Exhibit 6499 | | 430 |
| Exhibit 3159 | (Previously marked) | 439 |
| Exhibit 6475 | | 451 |

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness only video recording, the witness is being spotlighted or locked on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who doesn't want the witness's video to take up a large part of your screen, you may click the gallery view button in the upper right corner of the Remote Depo interface.

This is the remote video-recorded deposition of Craig Lindsley, Ph.D., being taken by counsel for plaintiff.

Today is Tuesday May 23, 2022. The time is now 1:01 p.m. UTC time. We are here in the matter of Zantac ranitidine products liability litigation.

My name is Michael Hollander, remote video technician, on behalf of US Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in

C. Lindsley

lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

C R A I G L I N D S L E Y,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MS. LUHANA:

MS. LUHANA: Counsel, before we get started, I just want to put on the record that we received Dr. Lindsley's untimely reports this month on May 6th and May 21st. Plaintiffs believe these reports were served untimely. We're not waiving any rights and we reserve our rights to seek whatever

C. Lindsley

relief we believe is necessary at a later date with the court.

MR. SHEEHAN: And let me just respond.

Obviously, we dispute that the reports are untimely. Dr. Lindsley was responding to materials provided by Dr. Najafi that should have been provided in connection with his initial Rule 26 disclosure. Those materials were received late which, of course, necessitated the supplemental reports under the rules. Obviously, we're not gonna agree about the lateness or untimeliness or anything like that, so you guys do what you feel you need to do. We research all our rights and we will respond.

MS. LUHANA: Understood. So, we agree to disagree.

MR. SHEEHAN: Fair enough.

Q. Good morning, Dr. Lindsley. My name is Roopal Luhana and I'll be asking you questions today on behalf of plaintiffs.

A. Good morning.

C. Lindsley

Q. Can you please -- can you please state your full name?

A. Craig William Lindsley.

Q. Doctor, have you previously been deposed?

A. Yes.

Q. How many times?

A. Three.

Q. Okay. And when was the last time you were deposed?

A. Last time was in -- I believe it was 2019, it was the Wyeth Allender case on Bhatzutanev (phonetic).

(Court Reporter clarification.)

A. Bhatzutanev (phonetic) was the matter, it was patent infringement.

Q. And prior to that, when were the two other times?

A. They were much earlier, they were in 2015 and 2016.

Q. Doctor, let's just run through some ground rules. As I said, I'll be asking some questions today and if you don't understand a question, please let me know and I'll do my best to rephrase it, okay?

C. Lindsley

A. Okay.

Q. If you answer my question, I will assume you understood the question; is that fair?

A. That's fair.

Q. Please make sure that you wait until I finish with my question until you answer. And let's both do our best not to talk over one another so we have a clear record.

Understood?

A. Yes.

Q. During the deposition, you understand you're not permitted to have any other devices open to try to communicate with attorneys who are representing you.

Do you understand that?

A. Correct.

Q. Do you have any other electronic devices in the room with you?

A. I have the phone that's turned off, I can move it --

(Court Reporter clarification.)

A. Oh, sorry. I put my phone on the other side of the room.

C. Lindsley

MR. SHEEHAN: Craig, you have a tendency to speak quickly and then fade off at the end. So, maybe if you slow down and just finish it off strong.

A. I moved my phone to the other side of the room and it is turned off. All I have before me is my laptop and this external monitor to my left to look at exhibits.

Q. Okay. You understand that unless on breaks, you can't use that device to communicate with any of the attorneys?

A. Yes.

Q. You're on one computer, correct?

A. Correct.

Q. Are there any other computers you have open with you in the room?

A. The attorney, Tom, has a laptop open.

Q. But you don't, correct?

A. No, I do not.

Q. Are there any other applications other than the Zoom that's open on your computer?

A. I have the Box file open. I have

C. Lindsley

the internet open for Box and then I have the Zoom and that's it.

Q. Okay. Do you have any prepared notes with you today?

A. No.

Q. Doctor, where are you located today?

A. I'm in Nashville, Tennessee.

Q. And whereabouts in Nashville, Tennessee, are you in a conference room?

A. We're in a conference room at Baker, Donelson on West End Avenue.

Q. Is there counsel there with you?

A. Yes, Tom Sheehan is here with me.

Q. Who else?

A. That's it.

Q. Doctor, when were you retained as an expert in this case?

A. When?

Q. Correct, when.

A. Oh, I honestly don't recall the exact date I was -- I was retained, but it was in 2020, I believe.

Q. Was it at the end of 2020?

A. I'm honest, I'm drawing a blank on

C. Lindsley

exactly when I was retained.

Q. Okay. Who first contacted you about being an expert in the case?

A. I believe it was Kimberly Penner who was the first point of contact I received, I believe.

Q. Were you aware of the FDA findings regarding NDMA and ranitidine at that time when you were contacted?

MR. SHEEHAN: Objection.

You can answer. When I say objection, go ahead and answer.

A. No, I had not honestly -- I had not heard anything about that at the time -- I was -- I was contacted.

Q. Prior to agreeing to work on this case, did you do any research on ranitidine?

A. No, I did not.

Q. Did you do any research on NDMA prior to agreeing to work on this case?

A. No, I did not.

Q. Approximately, how many hours have you spent working on this case?

A. I would say probably over the course of the two years, probably 200 or

C. Lindsley

250 hours reviewing literature and writing reports.

Q. How many times have you met with the defense attorneys to prepare for your deposition today?

A. We have one Zoom call last week and then I met with Tom yesterday for a couple of hours here in this conference room.

Q. How long was the Zoom call a week ago?

A. About three hours, I believe.

Q. And who did you meet with?

A. That was with Kimberly Penner, the lead attorney who I've been working with the most, and Lauren Schreiber, also with the law firm.

Q. Anyone else?

A. No.

Q. And then yesterday, who did you meet with?

A. Just Tom.

Q. So, there were no other meetings other than who you've -- no other attorneys present at the meetings other than who you just identified?

C. Lindsley

A. Correct.
Q. Was there anyone else who was not an attorney at the meeting?
A. No. I mean, yesterday was just Tom and I in this room by ourselves. I guess the IT person did come in to help set up the computers, but that would be it.
Q. Okay. Did you spend time preparing for your deposition on your own?
A. Yes.
Q. Tell me everything you did to prepare for your deposition today.
A. Well, went through my expert report and supplemental reports, reread some of the reports from the plaintiffs' experts, reread some key literature that I thought was pertinent and that was about it.
Q. What was the key literature that you thought was pertinent?
A. So, I reread GSK root cause analysis in ROTD and I reread the FDA Florian paper on the clinical trial.
Q. Okay. And when you say GSK's root cause, is it the King article or the actual GSK root cause analysis?

C. Lindsley

A. The last I just -- I just reread the King article.
Q. And you said you reviewed some of the plaintiffs' expert reports?
A. Yes.
Q. Which ones?
A. Marletta, Melnick.
Q. Anyone else?
A. No.
Q. Did you review any deposition transcripts?
A. No, I've not seen any deposition transcripts from anyone.
Q. So, in order to prepare your reports, you haven't reviewed any of the deposition transcripts of, for example, let's say Mr. Andrew Searle?
A. No, I have not.
Q. How about Mr. -- Dr. Adami?
A. No.
Q. Have you talked to any defense experts in preparing for your deposition?
A. Sorry, what was that again?
Q. Did you talk to any defense experts to prepare for your deposition?

C. Lindsley

A. No.

Q. Have you previously spoken to any of the defense experts?

A. No.

Q. Did the attorneys have you review documents to prepare for your deposition today?

A. Sorry, can you repeat that one more time?

Q. Did the attorneys have you review documents to prepare for your deposition today?

A. No.

Q. Doctor, you're being paid for your time here today, correct?

A. Correct.

Q. And what's the total amount that -- how much are you being paid?

A. Consulting rate is $400 an hour.

Q. And what is the total amount of time you've been -- total amount you've been compensated for your time to work on this case to date?

A. I think it's right around, over the two years, right around 100,000 or so because

C. Lindsley

it's around 250 hours, I believe, that's been put in to date.

Q. Do you have a copy of your report with you?

A. Yes, I do.

Q. Okay. And have you made any markings or notes in your report?

A. No, I have not.

Q. Okay. So, which reports do you currently -- I assume you have a hard copy of the report there sitting with you?

A. Yes, hard copy of my --

THE COURT REPORTER: I'm sorry, I'm having trouble with the doctor. Maybe we can go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 1:12 p.m. UTC time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:29 p.m. UTC time.

BY MS. LUHANA:

Q. Doctor, before we took that break,

C. Lindsley

you were saying that you have your expert reports with you.

Can you just identify which reports you currently have a hard copy of with you?

A. Sure. I have my original Rule 26 report, dated March 7th of 2022. And I have my supplemental report dated May 6, 2022. And those are the only documents I have with me.

Q. And then you submitted something on May 21st, you don't have that with you?

A. I don't have that hard copy with me, no.

Q. Okay. So, Doctor, I'll have you know that we've premarked the March -- your March 7th report as Exhibit 6474. So, if you want to note that on the report, that would be great.

(Exhibit 6474 was marked for identification.)

BY MS. LUHANA:

Q. And then in terms of your May 6th report, we've marked that as Exhibit 6475, okay?

A. Okay.

C. Lindsley

MS. LUHANA: Let's pull up what's been premarked as Exhibit 6472, which is, Doctor, your Deposition Notice.

(Exhibit 6472 was marked for identification.)

BY MR. LUHANA:

Q. Doctor, can you see this, this screen?

A. Yes, I can.

Q. Have you seen this Deposition Notice previously?

A. Yes, I have.

Q. And have you provided everything to counsel that was responsive to this notice? You can scroll down. Keep on going. There's a section here where it's asking for documents, including notes, your CV, your time records and numerous other things.

And as you testified, you've reviewed this previously, correct?

A. Yes.

Q. And so, have you provided all these documents to counsel?

A. Counsel has -- yes.

Q. What have you provided to counsel?

C. Lindsley

A. They have an updated CV. They have all the invoices in the matter. I don't take handwritten notes. Any other documents that I have looked at I have sent to counsel prior to this.

Q. Doctor, do you take electronic notes?

A. No.

Q. So, you don't take handwritten notes or electronic notes?

A. No.

Q. Okay. So, you said you've produced invoices to counsel.

How many invoices have you submitted to counsel for payment?

A. That's a very good question. I believe at this point there's been 10 or 12. They weren't submitted monthly sometimes there were lags in the work, so some were submitted quarterly or -- there's different time intervals over the -- over the two years that we worked on the case.

Q. Okay. So, the last invoice you submitted, do you recall when it was dated?

A. That was dated probably for early

C. Lindsley

May I would imagine.

Q. Okay. Dr. Lindsley, I'll represent that counsel have only produced eight invoices to us. So, let's take a look at that, they have been premarked Exhibit 6473.

BY MS. LUHANA:

Q. Doctor, you said you billed over $100,000 in this case?

THE COURT REPORTER: I'm sorry, I can't hear.

A. About $100,000 over two years.

Q. And did you review your invoices carefully before you submitted them to counsel?

I'm sorry, I didn't hear you.

A. Yes.

MS. LUHANA: Can we please pull up Exhibit 6473?

(Exhibit 6473 was marked for identification.)

BY MS. LUHANA:

Q. And if we scroll down to the last invoice. So, this invoice is dated April 25, 2022, Doctor?

Do you see that?

C. Lindsley

A. Yes.

Q. And you're saying you've submitted subsequent invoices after this?

A. No, there have been no invoices after this was submitted.

Q. Okay. And can we scroll up to the invoice dated February 28, 2022 and scroll down a bit. Right there. That one.

Dr. Lindsley, do you see here it says in the time entry and description for February 16th to the 28th that there was a review of extra Najafi data files?

A. Yes.

Q. So, in your May 6th report which was submitted two months after initial report, there were a number of Najafi materials you stated you reviewed in February, including the SEM images, the hundreds of photographs, the five lab notebooks, is that what you're referring to here?

MR. SHEEHAN: Objection.

A. So, it would -- yeah, I don't recall exactly which Najafi files I reviewed at that point 'cause they were -- different

C. Lindsley

data files were being produced at different times. I think some of the earliest data from what I recall, these were some of the images and images -- photographs of containers of drugs and things like that.

Q. Doctor, you represent in your May 6th report that you received a number of these Najafi data files in February.

So, does this include your review of those files here?

MR. SHEEHAN: Objection. Asked and answered.

You can go ahead. Dr. Lindsley, to be very clear, unless I say "do not answer the question," go ahead and answer it.

THE WITNESS: Sure.

A. Well, there's -- there were different data files produced over the course of those few months. And so, the earliest data files that came in were images of lots of photographs and things like this, but it wasn't the analytical data. There were secondary requesting for additional information that was then produced at later

C. Lindsley

time points.
Q. Doctor, I understand that. My -- my question to you is this: In our May 6th report, you represented you had received Najafi data files in February.
And so, my question to you is, did you review those Najafi data files when you received them in February and does this invoice include that review?
MR. SHEEHAN: Objection. Asked and answered.
A. It was like some of the files we got from Najafi, yes.
Q. I am asking about the ones you received in February. You received data files in February, which you state in your May 6th report, did you review those files in February?
MR. SHEEHAN: Objection. Asked and answered.
A. Some data files did come in images and the photographs of drug products and various files and additional files from Najafi did come in in February, I reviewed them in February and March.

C. Lindsley

Q. Okay. Let's look at invoice dated April 25, 2022. It's the last one. Sorry.

So, Doctor, this invoice says that you are -- detailed below, are the hours for the time period from March 10th to April 25, 2022, correct?

A. Yes.

Q. If you look down below to the description it says -- it states, March 1st to 9th.

A. Oh, sorry. That was a -- that's a typographical error.

Q. So, that's a typo. And this is the work that you did for March 10th through April 25th?

A. Correct.

Q. Okay. And at this time, by March 10th, your initial report was already submitted, correct?

A. Correct.

Q. And so, any work that you would have done March 10th to April 25th would have been for your supplemental report?

A. Correct.

Q. Okay.

C. Lindsley

MS. LUHANA: Let's take a look at the invoice dated June 1st to -- June 1, 2021.

Q. Okay. This invoice dated June 1, 2021 provides that you're providing detailed hours consulting for the time period from March 3rd to June 1, 2021, correct?

A. Yes.

Q. And if you look at the detailed time entry it states it's from December 2020 to March 2021.

A. That's again typographical error 'cause I just -- I have the one invoice where you change the -- the dates, so that date was not changed appropriately.

Q. So, this is another error in your invoice which should've reflected the March 3rd to June 1st date, however it reflects incorrect dates, correct?

A. That is correct.

Q. And your testimony is that this is the work that you had done for March 3rd to June 1st that's noted in the description below?

A. Yes, it is.

C. Lindsley

MS. LUHANA: Okay. You can take this down.

Q. Doctor, how much time did you spend on your May 6th report?

A. Oh, over the time -- the year -- the time we were working on it, quite -- quite a bit. It was over multiple invoices, so it's really hard to know that exactly how many hours I spent just on that because there was also literature reviewing other -- other activities ongoing.

Q. Doctor, I'm not focused on your March -- March report, this is your supplemental report.

And so, my question to you is, how much time did you spend on your May 6th supplemental report?

A. Oh, sorry. May 6th of my report. Probably ten hours or so, I would imagine.

Q. Okay. And how much time did you spend on your second supplemental report from May 21st?

A. Drafting of that second supplemental report wasn't very long, so it was very short. The time was really spent

C. Lindsley

looking at the data files we received and looking at the files that the third-party -- when they did the analysis and pulled out the -- all the LC-MS and mastic files, it was really more time looking at the data than necessarily drafting the report because the report was quite brief.

Q. How many hours would you estimate you spent total on your May 21st report?

A. Drafting it was just a few hours, it was much more time looking at the -- looking at the data.

Q. So, how many hours did you spend reviewing the data?

A. I would say probably four or five hours going through all the data files.

Q. And Doctor, so, do you have more time that you've billed post the April 25th invoice?

(Court Reporter clarification.)

A. Sorry. What -- what do you mean by that?

Q. Doctor, you submitted your last invoice on April 25, 2022. My question to you is, do you have more time and more work

C. Lindsley

that you've done in the case post April 25, 2022, asides from the prep for this deposition that you describe, is there additional work that you did?

A. Oh, sure, yes. We -- you know, the third-party did more analysis of the -- some of the data files that Dr. Najafi sent on the hard drive. I've looked at those files, looked at how they were assigning and assessing NDMA levels in the samples. So, we got -- there's a lot of data that was provided since that April 25th date, yes.

Q. So, you just testified that you spent about four to five hours on the May 21st report, including the review of data.

Is there more time asides from that that you spent in this litigation?

A. Yes.

MR. SHEEHAN: Objection.

Q. How many hours?

A. I probably spent another 20 or so hours that I haven't billed for yet.

Q. Okay. Doctor, after your fellowship, you worked for a number of

C. Lindsley

pharmaceutical companies, correct?
A. Yes.
Q. You first worked for Parke-Davis Pharmaceuticals, correct?
A. Correct.
Q. And you worked for them for about a year?
A. Correct.
Q. And then the next pharmaceutical company you worked for was Eli Lilly, correct?
A. That is correct.
Q. And you worked for Eli Lilly for about a year and a half?
A. Correct.
Q. And then you worked for another pharmaceutical company, Merck, for about seven years, correct?
A. Correct.
Q. And what did you do for Merck?
A. I was a group leader, I came in to establish a new group that applied new technology to solving med chem and DMPK problems. So, the -- the whole -- it was kind of an experiment to see if you can

C. Lindsley

deliver clinical candidates with fewer human resources by --

(Court Reporter clarification.)

THE COURT REPORTER: I'm sorry. There's -- it's -- there's just too much muffling.

A. Sorry. I was charged with coming in and building a new group that would apply advances in technology to drug discovery in med chem, DMPK problems with a goal of could we deliver clinical candidates with four to five FTEs versus the standard 20 to 25 that Merck was currently using to drive programs.

Q. And was the drug discovery focused on a specific disease?

A. No, at Merck they brought in medicinal chemists and they assume med chemists can work on any program, any target. We weren't so specialized like the pharmacologists and biochemists. So, my group had programs spanning neuroscience cardiovascular, oncology and the exercise was successful, developed six clinical candidates in the time I was there with reduced FTEs.

Q. And you worked -- you joined

C. Lindsley

Vanderbilt after Merck?

A. Yes.

Q. And you've been in the drug discovery central nervous system, is that what you've been focused on at Vanderbilt?

A. Yeah. So, the -- the goal at Vanderbilt is can you build a small biotech within university infrastructure. And we did focus primarily on neuroscience, but we also have worked on projects in a lot of different indications, metabolic disease, cardiovascular disease, renal, there's been some oncology, there's been epigenetics. But I would say probably 80 percent of the work is focused on schizophrenia, Alzheimer's, Parkinson's, depression, things such as that.

Q. And so, the Lindsley Lab, that's what the lab at Vanderbilt is known as, correct?

A. The academic side, yes, yes.

Q. So, the Lindsley Lab focuses on drug development and medicinal chemistry for schizophrenic drugs, drugs for depression and what else?

A. Alzheimer's, Parkinson's. Again, I

C. Lindsley

can mention we also have a lot of -- a lot of programs targeting other indications. It's just the predominance of what we do at CNS.

Q. But the other indications isn't your focus, is it?

A. No, it is. No, you can see all that work, you can see those publications on my CV as well as patents related --

THE COURT REPORTER: I'm sorry. I didn't get the end of that.

A. Oh, sorry. You can see the different areas we work in by the publications on my CV, as well as published patent applications and issued US patents that reflect the peripheral diseases we work on as well as all the CNS indications.

Q. Are you mainly developing drugs for pharmaceutical companies?

MR. SHEEHAN: Objection.

A. No. Our goal is to work on targets that industry was not successful with and applying new approaches and strategies. So, for example, our goal initially was just to develop tool molecules to provide to the research community to look at -- be able to

C. Lindsley

selectively activate or inhibit families of targets where selectivity historically was impossible to achieve. So, Jeff Kahn and I, we worked together at Merck, he came to Vanderbilt first and then he convinced me to come and we'd been focusing on a platform of allosteric modulation of GPCRs and ion channels. And so, the goal at first take tool molecules and de-risk targets and provide that information to the community.

And then as time went on, we built infrastructure that allowed us to actually develop clinical candidates. And so, we have partnered many programs to pharmaceutical companies now and we've also taken compounds further on our own and done all of the IND-enabling toxicology and CMC filed INDs independently with the FDA. And we've done one phase, one safety assessment trial at Vanderbilt on our own.

Q. Okay. The clinical candidates that you developed, the majority of them would you say are for pharmaceutical companies?

A. Well, eventually because even for us, we can't -- Vanderbilt will allow us to

C. Lindsley

do Phase 1 studies, the sad and mad in healthy volunteers where we're just looking at safety and tolerability. Because of potential conflict of interest, they're not -- we cannot do efficacy trials, so we can't do trials on patients and establish efficacy. So, those have to get partnered with someone to do those -- those more extensive and potentially conflicting human trials.

Q. So, all of the clinical trials past Phase 1 are done for pharmaceutical companies, correct?

A. Well, pharmaceutical companies --

MR. SHEEHAN: Let me get a beat there before you answer. Let me just note my objection.

Go ahead.

A. We don't -- well, we developed them and then we're hoping someone will partner them and carry them forward for the benefit of patients. But we've had other cases where, for various reasons, programs don't get partnered and those end up just becoming really great tool molecules or communing

C. Lindsley

really nice publications.

Q. Sure. But the -- the goal at Vanderbilt is to partner with a pharmaceutical company for these projects past Phase 1, correct?

MR. SHEEHAN: Objection.

A. Correct, 'cause we would love to get much needed treatments to patients.

Q. Doctor, do any pharmaceutical companies fund grants at Vanderbilt for you?

A. Yes.

Q. So, what percentage of the grants at Vanderbilt are funded by -- by pharmaceutical companies?

A. Well, at Vanderbilt in total, I do not know that number. But I know for our center, historically over the 15 and a half years that we've existed here, we used to be about 50 to 65 percent federal funded, so classical NIH grants, a lot of these are larger center grants, U grants, some are basic R01's that all academics have. Lot of foundation support, different foundation grants and awards. And then we have the industrial sponsored research and that really

C. Lindsley

waxes and wanes, it's hard to nail it down, but we've had times where the industry support was maybe 50, 55 percent. We've had times where it was as low as 20, 25 percent. It really varies 'cause we experienced a lot of -- a lot of issues over the years where big pharma would have a change in leadership and they would decide to exit neuroscience, we've had that happen four times.

So, without any warnings, they have a change in leadership, they have a change in strategic direction and they terminate all their projects in CNS so all the programs come back to us and all the intellectual property and so funding stops on a dime and our funding ratios change, so it really depends.

So, we -- we always try to keep a very blended, heterogeneous funding kind of portfolio where we always try to have 40 to 50 percent of funding and the rest of foundation and industrial sponsored research just so that, you know, 'cause we're soft money as well, so we have to pay everything on our own. So, we can't be so independent

C. Lindsley

on any one kind of funding because you never know what can happen.

Q. Sure. So, let's focus on the last four years, for example.

You would say 50 to 60 percent of the grants that have been funded or Vanderbilt have been funded by pharmaceutical companies?

MR. SHEEHAN: Objection. Asked and answered.

Go ahead.

A. I would say that that's probably very fair for last four years. Well, you know, it's hard to say 'cause we did have a lot -- we have several very large federal grants from the DOD and a large HEAL grant. So, the actual dollars and sponsored research, yeah, they're comparable, I'd say probably 50/50 is probably close more 2recently.

Q. Has it been more than 50/50 for the last couple of years?

MR. SHEEHAN: Objection.

A. Again, at any moment in time you could have a lapse in federal funding as

C. Lindsley

you're -- you're putting in a renewal or a supplement, so it could dip as much as 60 percent one way or another for either -- either kind of funding mode.

Q. Doctor, I'll represent to you that your active -- withdraw that.

Doctor, would Vanderbilt -- would Vanderbilt be considered a research institution serving pharmaceutical companies?

MR. SHEEHAN: Objection.

A. I don't think that's an appropriate characterization at all.

Q. Are you aware you testified to that fact in May 2017?

MR. SHEEHAN: Objection.

A. Could you let me know exactly what was said?

Q. "And Vanderbilt would be considered a research institution serving the pharmaceutical companies?" And your response was, "yes"?

MR. SHEEHAN: Objection. Is that a question or...

Q. You disagree with that now?

A. I would not characterize Vanderbilt

C. Lindsley

University in that way. I think there are certain programs and centers where if you're doing translational research, you have to develop -- in order to get these to patients, you have to partner with -- with a larger entity to get -- to get there.

So, Vanderbilt University as a whole, no. Vanderbilt University is academically driven. And even within our own center, our output for the public good in terms of publications and service to the academic community by being editor of journals for outshadows the work we're doing with pharmaceutical companies.

Q. So, Doctor, Vanderbilt would be considered a research institution serving the pharmaceutical companies?

MR. SHEEHAN: Let me get my objection.

Asked and answered.

Go ahead.

A. Yeah, I should not have mis- -- that shouldn't -- that was inappropriate response on my part. It's not Vanderbilt University, it's several centers within the

C. Lindsley

university that have translational goals. Those have to partner with pharmaceutical industries in order to get the compounds into man and to get compounds to the market. Universities can't do that work.

Q. Doctor, does your lab serve pharmaceutical companies?

MR. SHEEHAN: Objection.

A. I wouldn't say serve, I don't think that's the right word. We partner with pharmaceutical companies for the translational aspect to get compounds to patients for unmet medical needs. But serve, that's not a very inappropriate term for -- for how we engage and how we interact and what we actually do.

Q. What percentage of your work at Vanderbilt is done on behalf of pharmaceutical companies?

MR. SHEEHAN: Objection.

A. Well, we -- we've talked about that already. It changes over the 15 years the center's been there. The percentage of work with pharmaceutical companies changes, it's very dynamic. It could be different years,

C. Lindsley

it could've been 25 percent of our work, it could be 50 percent, it could be 60. It really depends on any little epoch in time because funding research is a very fluid unpredictable thing that we do.

Q. Doctor, for that question, I'm focused on your lab specifically.

So, in terms of your lab and the work that's being done, what percentage of that work is being done on behalf of pharmaceutical companies?

MR. SHEEHAN: Objection.

A. Again, the funding for the center and the funding for my lab are almost the same thing. I currently have a lot of federal grants DOD grants and we have industrial partnerships and it's the same effective ratio, it's about 50/50 to anywhere between 40/60, 60/40, 50/50, it all -- it all varies.

Q. Doctor, would you be surprised to learn that on your CV, the active grants by the government, for example, are around 13 million that you've disclosed?

MR. SHEEHAN: Objection.

C. Lindsley

A. Sorry, can you repeat that?

Q. Would you be surprised to hear that the grants, the active grants from the government total approximately 13 million?

A. That's possible.

Q. And do you know the corporate partnerships are far larger than the 13 million that's funded by the government?

MR. SHEEHAN: Objection.

Go ahead.

A. Sorry. I think what you look at is on that -- on our CV, because that's the CV for Vanderbilt, that shows the total amount of funding coming after those industrial partnerships for the lifetime of those partnerships. So, if you look at the dates of the funding, those have been updated as programs get extended and things of that nature. So, some of those may be looking from 2015 to current or they could be looking at 2019 to current, where a lot of the grants are looking in a much more narrow point in time. So, you really have to think about what money is coming in in the current fiscal year.

C. Lindsley
Q. Doctor, do you sit on the board of any pharmaceutical companies?
A. I am on the SAB of a couple pharma- -- biotechs.
Q. By biotech companies are you on the board of?
A. Delix Pharmaceuticals, Escient and Appello Pharmaceuticals which is the startup that's spun out of Vanderbilt.
Q. So, how long have you been on the boards of those companies?
MR. SHEEHAN: Objection. To the extent that it's -- let's just be clear that there's a board of directors and I think he referred to an SAB, which stands for scientific advisory board. So, just so the record's clear, what board we're talking about.
A. So, for Delix and Escient, I joined Delix earlier this year on their SAB, that was announced on their website, I believe in probably March of this year or it might be February.
Escient, I just joined their board,

C. Lindsley

the SAB, so this is just giving scientific advice and reviewing medicinal chemistry strategies and tactics.

Oh, sorry. There's one other one, Septerna, again, just became a member of their board at the end of 2021. And that's a GPCR company, where I know all the founders, which is why they wanted me involved 'cause the expertise in GPCRs.

And then Appello, I'm a founder of that company and I'm also a board observer, so I'm not on the board, I'm a board observer.

Q. Are any of those companies not for profit?

A. Well, at this point, they had no products. They're trying to be profitable at some point, but they're -- they have no marketed products at this point.

Q. But they're not registered as not for profit companies, are they?

A. No.

Q. Doctor, can you please describe the different lines of work that you've done for industry?

C. Lindsley

MR. SHEEHAN: Objection.

A. Well, I mean, it's very broad. We've really done just about anything one could consider under the umbrella of drug discovery. We perform high throughput screens to identify hits for various targets. We developed a cell lines for those screens. We developed multiple cell lines of different receptor reserves and different signaling readouts. We've done the full discovery effort with all the medicinal chemistry, molecular pharmacology, drug metabolism, behavioral pharmacology, imaging modalities, biomarkers, everything leading up to declaration of a candidate, finding --

(Court Reporter clarification.)

A. Clinical candidates, compounds that are suitable to begin IND-enabling studies. And with other organizations, we've been part of the early development teams, we've been able to follow the molecules all the way through IND-enabling studies Phase 1. And there's a couple of programs now that are entering Phase 1B and Phase 2.

Q. Doctor, have you been hired to

C. Lindsley

conduct and publish literature for pharmaceutical companies?

A. No.

MR. SHEEHAN: Objection.

Q. Have you been retained as a consulting expert for pharmaceutical companies?

A. Well, technically that's what -- by being on the SAB, that's what that role is. In the past, I did consult for Amgen and AbbVie and GSK at one point a long, long time ago. But there were complications at one point with Vanderbilt, we had a conflict of interest, committees thought those kind of relationships were something the faculty should avoid, so we terminated all those types of agreements.

Q. Doctor, you've been retained as a litigation expert in the past, correct?

A. Correct.

Q. How many times have you been retained as a litigation expert?

A. I have been retained, let's see, about 28 times, many of these they're very short lived, they're a patent litigation.

C. Lindsley

And I think numerous times when I got into the data and looking at the cases and what the issues were, I didn't feel there was merit. So, some of those cases I may have only been retained and been involved for a couple of months, some even less, because if I don't really -- if I didn't feel there was strong scientific rationale and the argument wasn't sound, I dropped off those cases.

Q. Doctor, you didn't do that here, did you?

A. Do what here?

Q. You didn't review any NDMA materials, any ranitidine materials prior to being hired as a litigation expert here, did you?

A. No.

MR. SHEEHAN: Objection.

Q. The 28 times that you were retained, was it all for pharmaceutical companies?

A. Yes, there's all pharmaceutical, biotech or generic pharmaceutical companies, yes.

Q. Any examples where you've been an

C. Lindsley

expert for an individual plaintiff?
A. One point I was an individual plaintiff for Dr. Smith, who was a -- he developed -- I'm drawing a blank on the name of the drug. Yes, I was -- I was they wanted me to look at patent -- be able to explain patent in timelines and things of that nature.
Q. Any cases where you offered an opinion where a substance was carcinogenic?
A. No. My -- my -- the center of my expertise is really on -- on -- was on the patent litigation and patent infringement.
Q. Have you ever offered any opinions on whether a substance can cause cancer?
A. No.
Q. Ever offered an opinion involving H2RAs?
A. No.
Q. Have you ever been excluded from offering expert opinions by a court either in whole or in part?
A. The case we had with hi-tech, we were looking at supplements, I had been asked to comment on some of the statements made in

C. Lindsley

an expert report and we talked about publication ethics 'cause they mentioned they were ghost writing and they had patents on certain products that were very similar to those under -- under discussion. And so, I made those comments in my expert report and the judge did feel that those were not appropriate. But my scientific -- this -- all my scientific opinions were always upheld.

Q. So, Doctor, you were excluded for offering opinions by that judge that went beyond your area of expertise and where methodologically.

Unreliable?

MR. SHEEHAN: Objection.

A. I wouldn't say that. I have been an editor at the American Chemical Society for 14 years and would we do review the COPE ethics for publishing. So, very familiar with -- with ghost writing and how that is viewed and how that is viewed as unethical and very serious concern. So, I think raising that was appropriate.

But, again, scientific -- even in

C. Lindsley

that case, all my scientific opinions were upheld.

Q. But, Doctor, part of your opinions were excluded by the judge in that case, correct?

MR. SHEEHAN: Objection.

A. Correct.

Q. Can you estimate what percentage of your yearly income is generated from your work as a consulting or litigation expert for pharma versus the work you do for Vanderbilt for pharma?

MR. SHEEHAN: Objection.

A. Obviously that really varies. I would say if we look at, say, this year or if we look at 2021, 2022, around $100,000 from expert witness work versus my income over those two years, it's maybe five, six percent.

Q. How much is your -- of your time is spent teaching versus the research work you do for the pharmaceutical companies versus the litigation expert work you do, if you had to break it down, let's say, for 2021?

A. Well, being in a school of

C. Lindsley

medicine, we don't have to teach. I actually teach for free in the university, I teach a discovery course for undergraduates in the spring. So, that would be your standard three contact hours a week for the 15-week semester. All of my time is really spent doing research and I wouldn't characterize as research for the pharmaceutical companies, it's basic and translational science research. Again, half or more than half is federally funded.

And then expert witness work is when I have a bandwidth taken on and I feel a case is compelling, I'll do it. And it really -- again, it varied. It depends how much information is there to review and how many documents come in. So, it would be very hard to accurately give you an exact percentage on that. But I would say if I had to make a complete guess, I would say teaching is about ten percent effort, research is probably 75, 80. And then if I do expert witness work, it's maybe five to 10 percent of what I do.

Q. Doctor, would you agree that you

C. Lindsley

and your colleagues at Vanderbilt are from industry that you all came from industry?

MR. SHEEHAN: Objection.

A. Not -- not all of it. Some of the leadership in our center came from big pharma. But over the 15 years and having built this in Nashville where there is no biotech industry, more than -- more than half, maybe even upwards of 80 percent of our staff in your center are folks that are home grown. They're Ph.D.s from Vanderbilt, they're BSMS scientists from all over the regional schools and we bring them in and we teach them on a job and train them to be a medicinal chemist or molecular pharmacologist or DMPK scientist. It was very hard to draw people from Nashville for a while.

(Cross-talk.)

Q. Doctor, would it surprise you that that's what you represented to a news outlet in the past and the article was titled Tired of Being Dumped by Pharma Partners, Vanderbilt Neuroscience Team Takes a Bold Claim at the Clinic. And you represented, quote, "we all came from industry," unquote.

C. Lindsley

Does that surprise you that you said that?

A. No, so it was --

MR. SHEEHAN: Objection.

Let me get my objection in, just take a beat.

Objection to the form.

Go ahead.

A. That was reflecting the senior leadership in the center. So, Jeff Kahn, who originally established the center, came from Merck, I came from Merck, our head of the behavioral pharmacology came from Eli Lilly, our head of DMPK came from Pfizer. Now, that's the -- that's the senior leadership which that makes our center work is people understand drug discovery and understand how to work together in big team science, unlike classical academics that work more into silos and are more concerned about themselves only.

The staff of the center, which is 85 FTE, the bulk majority of those are homegrown. I would say probably 15 percent had some industrial training from industry, but the rest are people that we have brought

C. Lindsley

in grain and trained. Or they're post hocs that worked --

(Court Reporter clarification.)

A. So, the bulk of our people are -- are not from industry, they're people we've recruited right out of college or they were post hocs in our center and we retained them as staff scientists as opposed to letting them leave. We offered them the opportunity to stay with us.

Q. But the leadership team that makes the decisions at the helm of the lab in Vanderbilt is from industry, correct?

A. Correct.

Q. Do you or Vanderbilt receive funding from the defendants in this litigation unrelated to this litigation?

MR. SHEEHAN: Objection.

A. Which defendant specifically?

Q. Well, which defendants have you been retained by?

(Court Reporter clarification.)

A. GSK.

Q. You've only been retained by GSK?

A. I think my original retention

C. Lindsley

document that's what it was.

Q. In terms of the opinions in your report, you gave opinions as to more than just GSK, correct, Doctor?

A. Well, data generated by Dr. Najafi and date generated by the FDA, yes.

Q. Doctor, do you know which defendants you submitted your expert report on behalf of?

A. I thought it was GSK.

Q. Anyone else?

A. I don't believe so.

Q. Okay. So, has GSK provided any funding to Vanderbilt unrelated to this litigation?

A. Not to me in my laboratory, no.

Q. What about BI?

A. BI has, yes.

Q. Do you know how much BI has given through the years, let's say, since 2018, 2019?

A. Sure. So, they funded some neuroscience discovery programs, probably at this point 8 million or so.

Q. Would it surprise you that they've

C. Lindsley

given over 16.5 million from 2018 to 2021, 2022?

MR. SHEEHAN: Objection.

A. I'd have to go look at all the numbers.

Q. Would that surprise you?

MR. SHEEHAN: Objection.

A. I don't know if it would surprise me. We had two programs with them, one terminated, one still goes.

Q. Doctor, has Pfizer given to Vanderbilt, given funding to Vanderbilt unrelated to this litigation?

A. Not to me in my laboratory, nor to Pfizer.

Q. What about to Vanderbilt, to your knowledge?

A. I have no idea. At a university, you only are aware of the funding to yourself as a PI or to your collaborating PI, but not aware of what could be going on elsewhere within the university.

Q. Doctor, in your CV, you specifically state that you raise $25 million annually; is that correct?

C. Lindsley

A. Yes, that's our target goal.

(Court Reporter clarification.)

A. That is our target. We try to raise about 20 to 25 million, that's what we need to support all the activities in the center.

Q. Is it a huge undertaking to raise 25 million annually?

MR. SHEEHAN: Objection.

A. Clearly, yeah, it's -- it's a -- it's what we do is -- is very challenging.

Q. And how long has that been your annual goal?

A. That's only been the goal -- I guess -- I guess that's always kind of our target, we don't always quite hit it. Sometimes we're in the 14 to $18 million range, it really depends. Again, the funding is very fluid and unpredictable.

We have some foundations and some friendly folks that always come in and help us. We count on a lot of philanthropy and inter philanthropy to make up the differences.

Q. In terms of the majority of that

C. Lindsley

funding, does that come from corporate partnerships with pharmaceutical companies?

A. Again, it varies. You know, there's been times in the past where it was -- we had a large E54 grant and we were part of the MLPCN by the NIH, I would say NIH fund was probably 75, 80 percent and it's gone as high as probably 65 percent the other way at different times. It really -- it really depends.

Q. So, that example that you just gave, what year was that?

A. So, that was between 2009 and 2013/14 is when I had the MLPCN and that was a very, very large grant that came with milestones every year. And we also had at the same time a year one grant and a variety of B19 grants. So, our total NIH funding was incredibly large during those years.

Q. Doctor, I'm focused on your annual 25 million goal of this past year.

Does the majority of that -- the sourcing of that funding, does that come from pharmaceutical companies?

A. 2022, I would say it's probably

C. Lindsley

more than half of our total funding, which isn't quite 25 million at this point. Again, we offset that with money from an endowment.

Q. Doctor, do your reports contain all the opinions that you intend to offer in this matter?

MR. SHEEHAN: Objection.

A. Well, I think obviously from what I read this or my opinions to date, but I think as we always write in these reports, we reserve the right to -- to add additional opinions as new information comes to light.

Q. Doctor, you understand that the court has imposed deadlines as to when expert reports should be submitted?

MR. SHEEHAN: Objection.

A. Yes.

Q. So, my focus right now is to get a clear understanding of what your opinions and testimony are going to be in this case.

So, do your reports contain all the opinions you intend to offer in this matter?

MR. SHEEHAN: Objection.

A. My supplemental report reports, yes.

C. Lindsley

Q. Which defendants hired you to prepared these reports?

A. I was approached by Kimberly Penner and associates and it was for GSK.

Q. And there are no other defendants, correct?

MR. SHEEHAN: Objection.

A. Well, I think clearly when we were talking, it was in the context of GSK.

Q. Did you write each of your reports yourself?

A. Yes, I did.

Q. There are documents that you cited in your reports as well in your mat- -- as well as in your materials considered list.

Have you reviewed all those documents?

A. Yes.

Q. You've reviewed every word of those documents?

MR. SHEEHAN: Objection.

A. Well, I think any time you're reviewing documents some are more relevant than others. And as you start reading them, you can see which ones you need to spend more

C. Lindsley

time on and which ones really require less time because of the substance. So, I would not say that -- that all articles considered have been considered equivalently. I think that's pretty obvious that, you know, some papers are more -- have more substance and require a lot more time and attention than others. But at least the documents cited are the ones I have looked at.

Q. When you reviewed these documents, you didn't annotate them in any way?

A. No.

Q. You didn't take any notes?

A. No.

Q. How many documents, approximately, have you reviewed for your reports?

A. That's really hard to say. That was -- well, in this case, there were a lot of documents, there's a lot of primary literature, obviously a lot of documents submitted from Dr. Najafi. It would be really hard to -- to give you an exact number because there were just so many things reviewed and looked at. But probably in the orders of hundreds of different documents

C. Lindsley

across all those different flavors.

Q. To the extent you reviewed documents, you've cited them either in your reports or included them in your materials considered list, correct?

A. Correct.

Q. Did you ask counsel to provide you with any documents for your reports?

A. There were some documents provided by counsel and they were in a documents considered that were provided. And then I did a lot of my -- I did a lot of independent literature search and found documents that I provided to counsel myself.

Q. Did counsel provide you more than the internal documents for review? When I say "internal," I mean GSK specific documents, for example, were documents provided by Dr. Najafi, documents you wouldn't have otherwise in the literature, are there documents outside of those internal documents that defense counsel provided to you to review for your report?

A. Yes.

Q. Which documents?

C. Lindsley

MR. SHEEHAN: Objection.

A. There were some primary literature publications they had amassed in any a folder on Box that just says -- labeled as ranitidine material. So, I looked at those and then I -- I did my own search beyond that.

Q. And, how many --

A. So, for example, in the beginning, we looked at the Zeng & Mitch papers, those were ones that they provided to me to review and give my thoughts on the methods and the results from those two -- two publications, that's actually how the consulting started.

Q. And so, how many materials were in the ranitidine materials folder?

MR. SHEEHAN: Objection. And -- and I've let this go a little bit here, Roopal, but I think this is invading the attorney work product protections with respect to the attorney-expert relationship. And so, I'm just gonna go ahead and direct the witness not to answer. To the extent you fight that out, we can do that at

C. Lindsley

another time.

MS. LUHANA: But counsel, to the extent he relied on those documents to form those opinions, we're entitled to know those -- know those answers.

Would you agree with that?

MR. SHEEHAN: Sure, everything that he was provided has been listed in his materials considered list.

MS. LUHANA: Yes, but I would like to know in terms of the methodology employed what he reviewed, you know, with the literature search on his own versus what you provided to him that he relied on to inform his opinions for the report.

MR. SHEEHAN: And what I'm suggesting is that materials that we provided to him are protected by the federal rules and I'm directing him not to answer any -- to the extent you -- you -- you --- actually, let -- I don't even want to get into this. I don't even want to get into this. I'm just gonna direct him not to answer.

C. Lindsley

If you feel like you gotta call the judge, call the judge.

MS. LUHANA: Okay.

BY MS. LUHANA:

Q. Doctor, in terms of your expertise, you assert that you have knowledge, training and experience in the field of medicinal chemistry and drug discovery, correct?

A. Correct.

Q. So, you're not an expert in toxicology?

MR. SHEEHAN: Objection.

A. I would not consider myself an expert in toxicology, no.

Q. You're not an expert in epidemiology?

MR. SHEEHAN: Objection.

THE COURT REPORTER: I didn't get an answer.

A. No.

Q. You're not a biostatistician, correct?

A. Correct.

Q. You're not a clinician who treats patients?

C. Lindsley

A. Correct.

Q. You're not a cancer causation expert?

MR. SHEEHAN: Objection.

A. Correct.

Q. You're not an expert in carcinogenicity?

A. Correct.

Q. You're not a gastro neurologist?

A. Correct.

Q. You're not an oncologist?

A. Correct.

Q. You're not a hepatologist?

A. Correct.

Q. You're not a pathologist?

A. Correct.

Q. You are not a regulatory expert in drug regulations, correct?

A. Correct.

Q. You're not an expert in drug manufacturing transport or shipping?

A. Correct.

Q. You're not a medical doctor, correct?

A. Correct.

C. Lindsley

Q. You don't have any formal degree in drug discovery?

MR. SHEEHAN: Objection.

A. There are no formal degrees in drug discovery.

Q. So, you're not offering an opinion for any of these areas that we just discussed where you're not an expert, correct?

A. Correct, my testimony is about endogenous and exogenous formation of NDMA.

Q. Doctor, you have a Ph.D. correct?

A. Correct.

Q. What was the focus of your Ph.D.?

A. Organometallic --

(Court Reporter clarification.)

A. Organometallic chemistry synthetic methodology and total synthesis. That's the -- that was always the preferred training route to then get hired by big pharma and be taught how to be a medicinal chemist and drug discovery scientist.

Q. Doctor, what is your experience working with HPLC based analytical assays?

A. Oh, extensive. We have 14 of those instruments in our laboratory and they're

C. Lindsley

used daily. We have -- we have various flavors of HPLCs and then there's a work force. All throughout our time in industry, everything was HPLC analysis for purity, for reaction, completion, for high res mass spec to really quantify what species are there, trim quad mass specs in developing analytical methods to have the appropriate sensitivity and limits of quantitation as we're doing drug metabolism and pharmacokinetic studies. And then obviously as we start getting ready and we've already taken -- done some IND applications on our own, we've had to develop and submit all of those efforts to the FDA along with all the raw data to support all of our positions in terms of exposure, minimum effective doses, dose escalation studies, exposures of compounds and all those kind of things. So, I think anyone assuming medicinal chemistry drug discovery is using HPLCs daily.

Q. What kind of detectors have you worked with when using HPLC?

A. All kinds. So, we have triple quad mass specs; we have quadrupoles, we have

C. Lindsley

Orbitraps, we have time of flight, we have ESI, CSI, we have ray detectors, we've used evaporative light-scattering for compounds that don't have strong chromophores or for a series where they may have a large extension coefficient, so they --

(Court Reporter clarification.)

THE COURT REPORTER: I'm sorry. Repeat the end of that. He's still not coming in clear to me, it's very muffled.

A. So, we use all different kinds of detector. We've used the UV --

THE COURT REPORTER: I can't -- I can't hear exactly what he's saying.

A. So, we've used detectors that work on UV, so compounds that have extension coefficients and chromophores. We've used detectors that can identify accurately things by mass and quantity like evaporative light scattering detectors. Clearly, I think most flavors of HPLCs we -- we actually have in use or have had experience with.

Q. Roughly, how many years have you worked with mass spectrometry as a detector?

C. Lindsley

A. Since I entered the pharmaceutical industry, so that would be 1999.

Q. What kind of mass spectrometry assays have you performed?

A. All kinds. We've quantified impurity of molecules. We've looked for impurities. We tried to identify impurities in, say, tox lots that exceed a certain threshold where we would need to quantify, identify metabolites. We've been able to use mass spec to do both microsome and hepatocyte and Met-ID where we look to see how different species of metabolizing enzymes, metabolizing molecule and so use mass spec fragmentation to understand where the metabolic soft spots might be on a molecule. Then we use a combination of triple quad mass spec looking at all the different fragmentations as well as --

THE COURT REPORTER: Maybe we need to go off the record.

THE VIDEOGRAPHER: Okay. Going off the record. The time is 2:27 p.m. UTC time.

(Whereupon, a brief recess was

C. Lindsley

taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:48 p.m. UTC time.

BY MS. LUHANA:

Q. Doctor, you understand you're still under oath?

A. Yes.

Q. When we last -- before we left for break, you were testifying about the kinds of mass -- mass spec assays you performed.

Can you go through that list for us?

A. So, we do things just from assessing reaction completeness to purity of compounds and assessing impurities with multiple detectors. We had things where we can select masses or you can do manual. We do things, quantifying the impurities and materials. We do metabolism assays by mass spec where we look to see how compounds are metabolized, hydroxylated, for example. And those are on triple quad mass specs, so we can actually see fragmentations and try to understand how different species of

C. Lindsley

microsomes and hepatocytes are converting the molecule to other chemical species so that we can understand what metabolites might be present in preclinical species and in human.

And in the context of IND-enabling studies, even when we do our -- our earlier med-chem roster (phonetic) compound, we use very highly sensitive methods with a very low level of quantitation so that we can pull out any possible process impurities in our route and we -- we try to identify those and characterize those and profile them, so as we go to CROs to do the actual IND CMC, they have -- they have some comparison protocols and good mass spec HPLC to protocol to start with as they're doing the same effort with the tox lot or then later on GLP lot.

Q. How long have you been using mass spectrometry?

A. Since I entered the pharmaceutical industry in 1999.

Q. Do you have direct experience working with NDMA or developing and validating any analytical assays for NDMA?

A. No, I do not.

C. Lindsley

Q. Do you have experiencing developing and validating any analytical assays for any nitrosamine compounds or analytes?

A. No, I have not done that personally.

Q. Do you have any experience developing and validating any analytical assays for low molecular weight compounds?

A. Yes.

Q. Anything less than the molecular weight of 80, for example?

A. Yes.

Q. Have you personally used MRM, mass spec to measure nitrosamines?

A. No, I have not.

Q. So, therefore, you wouldn't know what the challenges would -- one would encounter when developing LC-MRM assays with such low molecular to weigh analytes like nitrosamines?

MR. SHEEHAN: Objection.

A. We've had to do the same thing for other volatile low molecular weight processing impurities. So, even though it's not nitrosamine compound that have very

C. Lindsley

similar low molecular weight, some are very polar and some fragment. And so, you have to look for things, not the parent mass. So, while not nitrosamines in particular, but compounds that have some of the same challenges.

Q. So, what -- what are some of the challenges that one might encounter?

A. One of the biggest challenges is co-eluting peaks, especially -- again -- well, co-eluting peaks, depending on your run method, and so you can -- you can have issues with quantitation, like, if you have overlapping co-eluting peaks.

A good example of that was some of the Valsartan work where DMF, an organic solvent co-eluted, so levels of an NDMA in those studies were -- were artificially higher than they were. And, for example, the FDA developed a different method with better spatial resolution and then the levels of an NDMA drop significantly when you weren't co-analyzing the area into the curve for DMF, for example.

And so, that's one of the things we

C. Lindsley

have to do quite often is -- is play around with methods and columns, we have about two-dozen columns we would use and you'd test across different gradients and different methods to just see what the resolving power is and you can pull peaks apart to make sure you don't have overlapping co-eluting peaks.

Q. And in your opinion, that would be ways to overcome those challenges that you just testified about, correct?

MR. SHEEHAN: Objection.

A. Those are some of the ways, but there's a number of different things we also have to do. We may need to change your detection system, you may need to change the voltage on the cone of the mass spec. You made need to go from chemical ionization to ESI to ASI. There's a variety of -- of parameters one has to optimize for any particular separation and quantitation.

Q. But those are options that are available to address the challenges one might encounter with MRM mass spec to measure nitrosamines, correct?

A. Well, again, I've never done the

C. Lindsley

nitrosamines, but for any volatile organic species, yes.

Q. Has your research lab dealt with measuring nitrosamines?

A. No.

Q. So, you wouldn't know that there -- they're special -- withdraw that.

A. Sorry, excuse me?

Q. I withdraw the question.

Are you aware that there are special care instructions that have to be taken in a lab when handling nitrosamines?

MR. SHEEHAN: Objection.

A. In terms of?

Q. Working with nitrosamines, there are special instructions that have to be followed within the lab to deal with nitrosamines.

Are you aware of those?

MR. SHEEHAN: Objection.

A. No.

Q. Have you ever developed and validated an LC-MRM testing method?

A. Yes.

Q. For who?

C. Lindsley

A. For us internally. We have -- we're doing -- within the context of all our work, we're always having developed new methods, every compound is unique.

Q. But I'm specifically talking about an LC-MRM testing method. You've -- for what compound have you developed and validated that for?

A. One of our internal clinical candidates that have some low molecular weight impurities.

Q. Is that method published?

A. Nope, that method has only been submitted to the FDA with the IND.

Q. And you validated it?

A. We validated it. And then when we went to CROs to do the GLP toxicology studies where they quantified the TK and PK, they -- they've independently validated the methods. And that's what got submitted in the IND.

Q. What are the roles of quadrupoles and the triple quad mass spectrometer?

A. That allows us to see various fragmentation patterns, 'cause so many times you don't see the parent mass and so we're

C. Lindsley

looking at different fragmentation patterns and we can assess a fingerprint of all the unique species based on the different fragmentation patterns.

Q. So, what is the role of Q1?

A. I don't know. I haven't really thought about that, I look at just the total output.

Q. What's the role of Q2?

A. Well, same -- same answer.

Q. What about the role of Q3?

A. Same answer.

Q. What is the ionized mass to charge ratio for NDMA?

A. Depending on the ionization source we're using, it could be 74, 75, people detected both, depending on what ionization source we're using --

Q. What is the ionized mass to ratio for ranitidine?

MR. SHEEHAN: Roopal, he wasn't quite done, just give him a -- give him a second to finish.

Q. I apologize, Doctor. Go ahead.

A. And quite often people don't see

C. Lindsley

the --

(Court Reporter clarification.)

A. A lot of the examples, even some of those that Dr. Najafi submitted when they looked at the -- the mass spec techs he was looking at, they didn't see the parent mass-to-charge ratio of 74 to 75, they saw 58.

Q. What is the ionized mass-to-charge ratio for ranitidine?

A. I think the molecular -- ranitidine -- I think it's -- I'll have to look at my report to give the exact molecular weight. I don't recall off the top of my head. 'Cause I've been thinking about in terms of HCL salt, but all you're gonna see is the parent.

Q. That's fine, Doctor. We'll get to that.

So, if by HPLC, NDMA ranitidine were not separated, will they be separated in the process of MRM detection?

MR. SHEEHAN: Objection.

A. Again, I think that would depend on what the -- what the cone temperature is

C. Lindsley

and the voltage is depending on how those gonna -- those are gonna fly and what degradation you see of NDMA -- I mean, sorry, of ranitidine to generate more NDMA. So, I think the big issue is if they co-elute and they're being shot to the mass spec at the same time, you can get conflicting data as to what the actual quantification of NDMA is.

Q. But you personally never done that, correct?

A. Not that -- no, I have not worked with either ranitidine or NDMA.

Q. Do you expect to see ranitidine and NDMA ions in the same MRM transition?

A. If they were spatially recovered on the HPLC or if they were co-eluted?

Q. Either way.

A. I think it would depend on the -- on the source of ionization and again the temperature, depending on whether you'd see both.

Q. So, by that same logic, do you expect to see NDMA and the ranitidine impurities that all have different molecular weights in the same MRM transitions?

C. Lindsley

MR. SHEEHAN: Objection.
A. No.
Q. Have you been retained as an expert in other cases to conduct testing?
A. No.
Q. Prior to being retained as an expert in this case, did you publish anything on ranitidine or Zantac?
A. No.
Q. Have you publish already any literature on nitrosamines, including NDMA?
A. No.
Q. Have you studied anything on ranitidine prior to being retained as app expert in this case?
MR. SHEEHAN: Objection.
A. No.
Q. You understand that the plaintiffs' allegations in this litigation are that NDMA and the NDMA found in ranitidine causes bladder, gastric, esophogeal, liver and pancreatic cancer?
A. I've been made aware of that, yes.
Q. Did you learn about nitrosamines or NDMA in school?

C. Lindsley

A. Not in school, but when I was at Merck that was a topic that came up.

Q. And what did you learn about NDMA then when you were at Merck? What year was that, Doctor? So, let's -- let me -- let me break that down.

What year did you learn about NDMA at Merck?

A. It was 2005 and the only exposure we had was the process chemistry group had been doing some chemical manufacturing overseas in India and some of the potable water that was going for an extraction had nitrosamines and NDMA contamination in it.

So, there was just a discussion of trying to not use those facilities where they can't control the quality of their water.

Q. So, Doctor, the first time you learned about NDMA was in 2005?

A. Yes.

Q. Were you aware of any literature published prior to being retained in this case that indicates that NDMA is mutagenic?

MR. SHEEHAN: Objection.

A. No.

C. Lindsley

Q. Were you aware of any literature published prior to being retained in this case that NDMA is genotoxic?

MR. SHEEHAN: Objection.

A. No.

Q. Were you aware of any literature published prior to being retained in this case that NDMA is a carcinogenic?

MR. SHEEHAN: Objection.

A. No.

Q. So, Doctor, in 2005, while at Merck, what did you learn about NDMA and why didn't they want it in the water?

A. It was just a process impurity they did not want and so that's just -- I was just telling you, that's the only exposure I've had to it and that was basically the context was they were -- they were having to stop the process that was being underway to get a different -- different sources of water.

Q. But you didn't learn about the type of impurity NDMA was in 205?

A. No, that was the sole breadth of discussion at the early development team meeting.

C. Lindsley

Q. Did you investigate it at that time on your own as to what NDMA is?

A. No.

Q. Doctor, what does it mean when a chemical is carcinogen?

MR. SHEEHAN: Objection.

A. Well, again, I'm not an expert on carcinogenesis, but I'd hate to give a definition that's unqualified, so...

Q. Generally speaking, what does it mean to be a carcinogen, Doctor?

A. Oh, it's a --

MR. SHEEHAN: Objection.

A. It's a possible cancer causing agent.

Q. So, it's not that it causes cancer, but it possibly causes cancer, that's the definition of carcinogen?

A. Well, I think what you hear is people use that --

MR. SHEEHAN: Hold on, hold on, hold on, hold on.

First, slow down. Second, give a beat so I can get my objection.

Objection.

C. Lindsley

Go ahead.

A. You see people use those terms very loosely, I think I would imagine in the strictest sense as -- as defined by the FDA or IARC or something, a carcinogen compound known to cause cancer in some species.

Q. Prior to being retained in this case, you've never conducted any vitro -- in vitro studies involving NDMA or nitrosamines, correct?

A. Correct.

Q. Prior to being retained in this case, you never conducted any in vivo studies involving NDMA or nitrosamines, correct?

A. Correct.

Q. Have you ever conducted any in vivo studies and received IRB approval?

MR. SHEEHAN: You said I -- what did you say, IR --

MS. LUHANA: IRB.

MR. SHEEHAN: IRB, okay.

A. Yes, the ion -- the clinical -- the Phase 1 clinical trial work we did at Vanderbilt, we submitted the protocols -- well, obviously as a preclinical scientist, I

C. Lindsley

didn't submit the IRB, my colleague, Paul Newhouse did, but we were involved in reviewing those documents and everything as they got submitted, but we did receive IRB approval to dose humans with a test article.

Q. Was that test article a carcinogen?

MR. SHEEHAN: Objection.

A. No.

Q. In your report, you've opined that the FDA has determined that NDMA from drug products with 96 nanograms is reasonably safe for humans with respect to potential cancer risk; is that accurate?

MR. SHEEHAN: Objection.

A. That's how IARC defines those, it's the lifetime risk of 70 years for the incidence -- the probability of cancer 1 in 100,000 with lifetime daily dose intake, acceptable intake of 96 nanograms, so yes.

Q. So, you agree anything above 96 nanograms of NDMA is not reasonably safe, correct?

MR. SHEEHAN: Objection.

A. I don't think that that's not necessarily so. I think if you even look at

C. Lindsley

the FDA guidance, even drug products where the levels of slightly higher, they're not recalling the drug, they're not withdrawing the drug from the market, they just want manufactures to get the range and the stability in the right place.

And the Australian regulatory agency, the sister to the FDA, they adopted the FDA's protocols, they analyzed all the Zantac, generic Zantac being sold in Australia and some had higher than 96 nanograms, some had less. And their conclusion was that this still presented no real health risk to the population in Australia.

Q. Doctor, is it your testimony that the FDA would allow a drug to be in the market that has more than 96 nanograms of NDMA in it, which -- which you would receive per day?

MR. SHEEHAN: Objection.

A. Well, I mean, I can't speak for the FDA. I mean, I think you have these acceptable intake guidelines and I think what the FDA said was, we need to pull the drugs

C. Lindsley

off the market, off the shelves that have higher than that.

Q. Higher than what?

A. Well, higher than the acceptable daily intake level.

Q. What's the acceptable daily limit for NDMA?

A. 96 nanograms.

Q. So, the FDA is concluding anything above 96 nanograms a day is not acceptable, correct?

MR. SHEEHAN: Objection.

A. Yes, you can say that.

Q. I'm not saying that. That is the FDA's position, correct?

A. Yes.

Q. Anything above 96 nanograms of NDMA a day is not acceptable, you agree with that right, Doctor?

MR. SHEEHAN: Objection.

A. That's the acceptable intake that's.

Q. Do you think you'd be able to conduct an in vivo study with ranitidine by giving patients ranitidine that contained

C. Lindsley

more than 96 nanograms a day above the ADI?
A. Excuse me?
Q. Do you think you would be able to conduct an in vivo study and receive IRB approval giving patients ranitidine that contained more than 96-nanograms of NDMA?
A. That, I can't say for certain. All IRBs look at things very differently. That's not something I could authoritatively comment on.
Q. Doctor, are you aware that NDMA was previously commercially used in the production of rocket fuel and additives for lubricants?
A. Yes, I saw that when I was researching this, yes.
Q. And that in the early 2000s, NDMA was banned from being used commercially in the US?
A. Yes.
Q. Do you know why that is?
MR. SHEEHAN: Objection.
A. The actual reason why it was banned, no.
Q. You didn't research it?

C. Lindsley

A. No, I was focused on other aspects of the case.

Q. So, it wasn't important for you to see why NDMA was banned in the early 2000s commercially for use in the US?

MR. SHEEHAN: Hold on. You're talking over one another, just --

A. I did not say was unimportant. I was focused on more there was so much literature on the exogenous and endogenous formation of NDMA from ranitidine that I was really focused on that literature.

Q. So, why is it important not to have NDMA in drug products, Doctor?

MR. SHEEHAN: Objection.

A. Because it's a probable human carcinogen. And so, obviously, if something is a probable human carcinogen, you want to reduce it to the acceptable intake levels.

Q. Are you aware that NDMA is used in cancer research as a chemical that will initiate cancer in animal studies?

MR. SHEEHAN: Objection.

A. I did see some papers to that affect, but these were -- it's important to

C. Lindsley

point out the doses that were being given that -- for these purposes were exceedingly high. These were chloric quantities of NDMA where the adjusted human dose would be five to six grams a day for weeks at a time, which, you know, I think the overriding or the prevailing theory of drug discovery and pharmacology since its inception is that everything is toxic, it just depends on the dose. And that's the whole premise when we do IND-enabling studies, we try to dose as high as possible, we try to achieve as high an exposure as possible in your preclinical safety species to find toxicity, to see a toxic sign. So, I'm not surprised at all that a -- a small organic molecule when dosed at exceedingly high levels has some adverse event. That is -- that would be completely expected of many, many things. Many of the drugs on the market today that are considered incredible safe when they're dosed very, very high in rats or dogs or non-human primates, they can cause all kinds of different adverse events that are never seen in humans 'cause the human dose is not at those levels.

C. Lindsley

Q. So, your testimony is that everything is a probable human carcinogen, Doctor?

MR. SHEEHAN: Objection.

A. That's not what I said. I said everything is toxic to some degree, depending on its dose. Not necessarily a carcinogen, but one can have all kinds of organ lesioning, blood hemophoresis, all kinds of things can happen if you push the dose of any organic molecule too high.

Q. Sure, Doctor. I'm not focused about everything and every toxin. I'm focused on NDMA which you're testifying about here today and focused on NDMA being a probable human carcinogen, that's my focus for my questions today.

So, Doctor, have you investigated and reviewed the literature comparing the sensitivity of humans to NDMA versus animals to NDMA?

MR. SHEEHAN: Objection. Beyond the scope of his report.

A. Yes, that really is beyond the scope of my report. I was charged with

C. Lindsley

looking at endogenous and exogenous forms of NDMA, I was not charged to look at epidemiology or detailed carcinogenesis across species, that was not what I was asked to look at.

Q. So, do you know who you were charged to do that task for?

MR. SHEEHAN: Objection.

Q. Which defendants were you charged to do that task for? Previously you testified GSK, correct?

A. Yes. So, when I started the case, I was retained by GSK, it was during -- subsequently during the course of the -- the work, the other defendants came in and I think all decided to use the same experts.

Q. So, do you know which defendants you were charged to do that task for today?

MR. SHEEHAN: Objection.

A. Just want to make sure I get it right. So, GSK was the primary when I first started then by Pfizer and Patheon.

Q. Doctor, that's the first paragraph of your report?

A. Yes.

C. Lindsley

Q. The report that you've written, correct?

A. Yes.

Q. So, you were charged to do that task for which defendants?

A. Originally --

MR. SHEEHAN: Objection.

Hold only. I got to get my objection in.

A. So, again, originally when I was first contacted, the lone defendant was GSK. Over time or working, other defendants came in to be part of this. And so then it was BI, Pfizer and Patheon.

Q. So, Doctor, are you aware that NDMA is a chemical used to cause cancer in animal models to study carcinogenesis?

MR. SHEEHAN: Objection.

A. There's one mention of that in my report where I'm talking -- where I -- where we discuss how you get to the 96 nanograms and those were the studies -- the only studies I'm aware of for those were the studies in rats and mice where they determined the exposure leading to toxicity

or carcinogenesis.

Q. Are you aware that the NTP has concluded NDMA is reasonably anticipated to be a human carcinogen?

MR. SHEEHAN: Objection.

A. Which agency?

Q. NTP.

A. I don't believe I looked -- I don't -- that does not sound familiar to me, I was -- you know.

Q. Would you agree that NDMA was designated a probable human carcinogen by IARC in 1987?

A. Yes.

Q. Would you agree that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?

MR. SHEEHAN: Objection.

A. You're not -- when it's a probable human carcinogen, there's as you chance it is and chance it isn't. There's data in animal supporting this, but there's -- there's clearly no strong -- if there were strong human data it would no longer just be considered probable, it would be considered a

C. Lindsley

human carcinogen.

Q. Do you know when -- do you know if IARC has reevaluated NDMA --

MR. SHEEHAN: Objection.

Q. -- for designation?

A. I haven't seen any -- I'm not aware of any update where they changed it from probable to anything else.

Q. So, the last designation by IARC was in 1987, correct?

A. That's the one I have -- I've read.

Q. So, would you agree that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?

MR. SHEEHAN: Objection.

A. I think you have to go with the formal definition of probable based on the animal work.

MS. LUHANA: Let's pull up what's been previously marked Exhibit 834.

(Exhibit 834 was previously marked for identification.)

BY MS. LUHANA:

Q. So, Doctor, this is a letter -- this is the FDA letter which is a response to

C. Lindsley

Emery Pharma citizen's petition.

Have you seen this previously?

A. Let me read it to make sure I've seen it.

(Document review.)

Yes.

Q. Okay. Let's scroll to page 3. So, I want to focus your attention on that last paragraph right there. Perfect, yes.

Do you see based on its review, IARC concluded that there was sufficient evidence of a carcinogenic effect of NDMA in many experimental animals and that despite the lack of epi data, NDMA should be regarded for practical purposes as if it were carcinogen -- carcinogenic --

Can you scroll over to the next page?

-- to humans.

So, do you disagree with that statement, Doctor?

MR. SHEEHAN: Objection.

A. Can you scroll back up?

I guess that's their statement, so I guess you have to agree with the statement

C. Lindsley

they wrote. But I'm not sure what practical purposes means. That seems like they're qualifying their statement.

Q. So, you have no reason to disagree that the FDA has concluded that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?

MR. SHEEHAN: Objection.

Go ahead and answer.

A. Sorry. This is -- this is -- they're just stating what IARC concluded.

Q. So, you're saying IARC has concluded that NDMA should be regarded for practical purposes as if it were carcinogenic to humans?

A. That's what their -- that's what that statement right there says.

Q. Okay. Do you have any reason to disagree with that?

MR. SHEEHAN: Objection.

A. I can't disagree with their statement as it is.

Q. Do you have any reason to disagree with the statement, Doctor? That's the question?

C. Lindsley

A. I haven't seen things change from probable to definitive carcinogen.

Q. But they're saying for all practical purposes, it should be regarded as carcinogenic to humans.

Do you disagree with that?

A. Well, what does practical purposes mean?

Q. It's stated in the document, meaning it should be treated as carcinogenic to humans.

Do you disagree with that?

MR. SHEEHAN: Objection.

Mischaracterizes and beyond the scope.

A. Yeah. Again, this was not what I was charged to look at. I was charged to look at endogenous and exogenous formations of NDMA.

Q. So, whether NDMA is carcinogenic to humans is not important for your testimony or for your reports?

MR. SHEEHAN: Objection.

A. No, I wouldn't say that.

Q. What would you say, Doctor?

A. I think if IARC has concluded these

C. Lindsley

things, I just wonder why IARC has not changed their formal designation.

Q. Doctor, IARC last reviewed NDMA in 1987, correct?

A. Yes.

MR. SHEEHAN: Objection.

Q. Okay. Can you turn to page 12 and I'd like you to look at the paragraph which says, In the fifth request there. You can review it to yourself.

A. (Document review.)

Okay.

Q. Doctor, you agree that the FDA is withdrawing ranitidine from the market and it's asking manufacturers to do stability testing under accelerated conditions, correct?

A. Yes.

Q. Are you aware as to if GSK did that testing according to accelerated conditions?

MR. SHEEHAN: Objection.

A. Well, to get an NDMA and to get FDA approval, all that kind of information has to be submitted with the IND.

C. Lindsley

Q. Doctor, I'm focused on this, which was this letter to the FDA, which was -- I mean, from the FDA, which is dated 2020.

So, I'm saying as you can see here, the FDA is saying the manufacture should do stability testing.

My question to you is, has GSK done stability testing and assessed NDMA levels according to these parameters?

MR. SHEEHAN: Objection.

A. Obviously some of this is in the root cause analysis, some of this was in the ORPD paper. And so, yes, I did think GSK did some of these studies.

Q. Doctor, do you know what the accelerated conditions for stability testing are?

A. They're a couple of variations, some are 40 degrees in 75 percent relative humidity, some are 60 degrees in 75 percent relative humidity. I've seen variations on those as to what different groups do, even in the context of -- of the -- the literature around ranitidine, I've seen various protocols used to mimic that, so...

C. Lindsley

Q. Doctor, are you aware that there are standards -- standard tests that are done for stability testing?

A. Yes.

Q. And do you know those tests include parameters like 40 degrees Celsius and 75 percent relative humidity for stability testing?

A. Yes, I was just commenting that other investigators have gone to higher temperatures and higher humidity as well as lower humidity.

Q. Sure. I'm focused on complying with the FDA -- what the FDA is requesting here of the manufacturers of the ranitidine, that's my focus here.

So, in terms of the stability testing with parameters of 40 degrees Celsius and 75 percent relative humidity, have you seen any tests that GSK has done to test ranitidine under those conditions to assess for NDMA levels?

MR. SHEEHAN: Objection.

A. Well, I have reviewed so much information, I would have to go -- would have

C. Lindsley

to go back and pull up all the data they provided and check for that specifically.

Q. Sure. Sitting here today, do you recall any of that testing being done?

MR. SHEEHAN: Objection. Asked and answered.

A. Honestly, I've looked at so much information, if we're gonna go to a single study within all that bulk of work, it would be great to pull up their files and check for that to be sure.

Q. So -- but you would presume that GSK would comply with what the FDA's requiring here, correct?

MR. SHEEHAN: Objection.

A. I would assume so if they still have drug products available. You know, they had stopped manufacturing ranitidine sometime ago and it was all being produced by generic manufacturers. So, I don't know if -- I don't -- I'm not sure if they had drug products still on the market that they were recalling or if they had adequate representative samples to do these studies on 'cause they had not made -- my understanding

C. Lindsley
is they had not produced Zantac in sometime.
Q. Sure. However, if they did have drug product available, they should have complied with the FDA request to test ranitidine under stability conditions to assess NDMA levels, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. Well, I guess if you look at the way this letter is actually written, you're asking manufacturer withdraw products on the market and to conduct assessment of those marketed products. But if GSK did not have -- longer have marketed products, I don't think you would necessarily be as relevant for them to do the same studies since they are not -- they technically didn't have products on the market to be removed from the shelves.
Q. So, Doctor, you're testifying as to what GSK should've or would've done according to this FDA letter?
MR. SHEEHAN: Objection.
A. No, I'm just reading the sentence.
Q. Doctor, do you know if BI conducted

C. Lindsley

accelerated stability testing of ranitidine to assess NDMA levels?

MR. SHEEHAN: Objection.

A. I do not recall seeing any data from BI to that effect. The only data I recall seeing relevant to -- to BI samples were done by the FDA.

Q. Do you know if Patheon did any testing to assess NDMA levels according to these accelerated stability conditions for ranitidine?

MR. SHEEHAN: Objection.

A. I do not recall.

MS. LUHANA: You can take this down.

Q. Doctor, do you agree that NDMA is a genotoxic carcinogen and that exposure should be reduced to the extent possible?

MR. SHEEHAN: Objection. Beyond the scope.

A. Again, that's outside the area of my expertise, so I should not comment on -- on toxicity.

Q. Doctor, do you recall commenting on that in your report that you wrote?

C. Lindsley

A. In a very superficial, yeah, I'm not an expert on genotoxicity.

Q. But you included it in your initial report, right? You provided test- -- you provided statements about the genotoxicity of NDMA and that exposure should be reduced to the extent possible.

Do you recall writing that in your report?

A. Do you remember what page that's on?

Q. Sure, let's take a look. Let's look at -- it's been previously marked as Exhibit 6474. And if we pull that up here it's, I believe, page 63 of your report?

MS. LUHANA: And can we pull it up?

DOCUMENT TECHNICIAN: The report or the new exhibit?

MS. LUHANA: The report is the exhibit, it's Exhibit 6474 was previously marked -- premarked, sorry.

Q. And let's turn to page 63 and it's paragraph 167. Right there.

So, Doctor, see, you're commenting

C. Lindsley

on Dr. Marletta's statement which states:

The FDA and other regulatory agencies provide that with genotoxic carcinogens, like NDMA, any exposure, even at very low doses is sufficient for tumor formation. GSK agrees. In its September 2019 NDMA Hazard Assessment Report, GSK states, seems to be a quote:

NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.

And you state:

This is a highly erroneous and misleading statement.

Doctor, what's the basis of that?

A. So, again, the -- the -- the reference to genotoxic was literally quote -- taking a quote from Dr. Marletta's report and the problem I have when he says "any exposure even at very low doses is sufficient for tumor formation," that is -- that was not -- that has been borne out even if animal studies.

And again, the exposure that's given to animals, the doses that are given to

C. Lindsley

animals are incredibly high doses. I have not seen studies where they've gone at very low doses, say, like the acceptable daily intake, and shown any liability. There's been numerous, you know -- yeah.

I haven't seen it. So, in my mind, it's a probable human carcinogen, but the -- these high doses in nonhuman studies are just not consistent with very low doses is sufficient for tumor formation. That is a statement I have a problem with because I don't think that data exists.

Q. You haven't reviewed all the animal carcinogenicity data, have you, Doctor?

A. No, I haven't.

Q. So, you're not equipped to testify on that, would you agree with that?

MR. SHEEHAN: Objection.

A. Yeah, I have not reviewed all the data. But if you look at where the acceptable daily intake is set based on rodent and mouse studies, and going with the most sensitive species, those doses in a rat were also very high, that caused the -- the -- where they set that threshold. If --

C. Lindsley

if very, very low doses, the acceptable daily intake would have dropped significantly beyond that.

Q. Doctor, you just testified that you haven't reviewed the animal data and you're not providing testimony here on that topic, correct?

MR. SHEEHAN: Objection.

A. Yes, I'm just trying to give you what my response was on the very low doses.

Q. So, do you disagree with GSK's Hazard Assessment Report from 2019 that says NDMA is a genotoxic carcinogen?

MR. SHEEHAN: Objection.

A. If that's what they said, that's what they said.

Q. Do you disagree with it?

A. I'm not an expert in that area, so I shouldn't -- I'm not gonna -- I can't agree or disagree with that.

Q. So, whether NDMA is a genotoxic carcinogen is not important for your opinions today --

(Cross-talk.)

A. No, I didn't --

C. Lindsley

Q. -- in your report?

A. I didn't say it was not important. I said, as not being an expert in that area, I can't agree or disagree that what their statement is their statement.

Q. But you haven't evaluated whether NDMA is a genotoxic carcinogen?

A. That was not my principal charge in the work I did. I am looking at exogenous and endogenous formations of NDMA.

Q. And you're not disagreeing that exposure should be reduced to the extent possible of NDMA?

MR. SHEEHAN: Objection.

A. I think in general, any process impurities our goal is always to get the process impurities and any kind of degradation impurities to the lowest period possible, doesn't matter what they are.

Q. Doctor, are all processed impurities or degradation impurities genotoxic carcinogens?

A. No.

Q. So, there is a different standard, you're not saying that the standard for

C. Lindsley

process impurities and degradants is the same for genotoxic carcinogens, are you?

MR. SHEEHAN: Objection.

A. I assume there's different criteria for different -- different categories. But, again, I am not an expert on that, so I -- I can't comment further on that.

Q. So, my focus right now once again is NDMA.

It states here:

NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.

You are not disagreeing with that statement, correct, Doctor?

MR. SHEEHAN: Objection. Asked and answered.

A. That's the statement, it's there.

Q. And this is what GSK said in September 2019, correct?

MR. SHEEHAN: Objection.

A. Apparently.

Q. Okay.

MS. LUHANA: Let's pull up that document actually, it's been premarked

C. Lindsley
Exhibit 6477.
(Exhibit 6477 was marked for identification.)
BY MS. LUHANA:
Q. Doctor, have you looked at this document previously?
A. Yes, I did see it.
Q. Okay.
MS. LUHANA: Let's turn to page 8. I apologize, it's not page 8, one second. Let's turn to page 7. Right there, scroll down. It says, Human use. Okay, right there. Scroll - actually scroll up, I apologize. Right there, perfect.
Q. This is GSK's 2019 hazard Assessment Report on NDMA.
Doctor, do you see that last sentence there which says:
NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.
A. Yes.
Q. And then you were providing opinions on tumors forming at low

C. Lindsley

concentrations and how the animal studies have not shown that.

Can you please read out loud for the jury the second sentence there that begins with "in addition"? Actually, start with the first sentence of that paragraph and read the next two sentences there out loud.

A. Sorry, what -- what --

Q. Cancer is clearly the critical.

A. Cancer is clearly the critical end-point for quantitation of exposure-response for risk characterization of NDMA. In addition to it being characterized, in general, tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects.

Q. So, in fact, this hazard assessment is saying that it being best characterized, in general, tumors occur at the lowest concentrations, correct?

MR. SHEEHAN: Objection.

Mischaracterizes the document.

A. Yeah, I can't really comment on this 'cause these -- these are just broad --

C. Lindsley

there's no actual data here. I don't know what they're considering lowest concentration. Could this be the lowest concentration testified? And what is that -- I don't know what that is.

Q. Yet you chose to call it a highly erroneous and misleading statement in your report, but currently you can't testify to it, can you, Doctor?

MR. SHEEHAN: Objection.

A. Again, I go to the IARC data with the exposure from those rodent studies and those were very high exposures with equivalent human doses that were exceedingly high and that's why I said that, 'cause -- when you say "even at the lowest dose," I don't know what that is, even a low concentrations. I just don't know what that is. We need to actually see data and understand a dose response to actually understand that.

But again, I read this document, I've seen some of this, but this was not my mandate, so I didn't spend a lot of time with this 'cause my focus was on the endogenous

C. Lindsley

and exogenous formation of NDMA from Zantac.
Q. Yet Dr. Marletta cited to this document and you chose to include in your report that it's highly erroneous and misleading when that's what this very document states, correct, Doctor?
MR. SHEEHAN: Objection.
A. Well, in too vague of terms.
Q. Doctor, if 96 nanograms of NDMA is the limit and you want to limit exposure, an organization, say, wouldn't push or seek to advocate to increase the amount of NDMA folks were exposed to, let's say, 50 times ADI or of 65 the -- times the ADI, that would be improper, correct, Doctor?
MR. SHEEHAN: Objection.
A. Well --
(Court reporter clarification.)
A. Yes.
Q. Especially with a genotoxic carcinogen when there is no benefit to exposure, correct?
MR. SHEEHAN: Objection.
A. Again, I can't -- I'm not an expert on -- on genotoxic carcinogens, so I can't

C. Lindsley

agree or disagree with that statement.

MS. LUHANA: Okay. Let's pull up Exhibit 6278, what's been premarked as 6278.

THE WITNESS: I do not see 6278.

MS. LUHANA: I apologize, it should be 6478. I'm sorry.

(Exhibit 6478 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is the WHO NDMA Concise International Chemical Assessment document from 2002.

Have you seen this previous?

A. Can you scroll down just a little bit more? Maybe the next page. Yes.

Q. Okay, let's turn to page 4 of this document. Okay. And I'm focused on the column to the right and it's that third paragraph starting with "based." Right there.

Doctor, you agree the WHO has concluded that based upon laboratory studies which tumors have been induced in all species examined in relatively low doses, NDMA is

C. Lindsley

clearly carcinogenic. There is overwhelming evidence that NDMA's mutagenic and clastogenic.

Doctor, do you have any reason to disagree with these statements?

A. Well, it's -- the statement as is is fine. But, again, it's hard to really understand things when there's no quantitation, we're not discussing what a low dose is. That's very subjective and I would need to see -- look at the data that supports that statement with what a low dose is.

Q. Doctor, is it qualifying the low dose here, isn't saying NDMA is clearly carcinogenic, are you disagreeing with the WHO statement here?

MR. SHEEHAN: Objection.

A. I'm not necessarily disagreeing with them, but I think when you say" relatively low doses," that's very non-quantitative and I don't know what that really means. That's -- that's my only issue with that statement is there's no actual data to tell you at what levels you start -- what a low dose is.

C. Lindsley

Q. So, you're questioning the WHO, which is a body of international experts, on their conclusion here about NDMA clearly being carcinogenic at relatively low doses; is that correct, Doctor?

A. No, that's not what I'm saying at all.

MR. SHEEHAN: Objection.

A. What I'm saying is when you don't -- in science everything is quantifiable. Everything in science, everything in drug discovery, everything in terms of determining tox margins, safety margins, therapeutic index, it's all very quantitative science where there's -- there's data and there's numbers. I just don't know -- I mean, I'm -- this is what the WHO feels, I'm fine with what the WHO says here. But when you qualify it with relatively -- relatively low doses, what does that mean? I don't know.

Q. Well --

(Cross-talk.)

A. I don't quantify it.

Q. Doctor, they've qualified it here.

C. Lindsley

Do you have any reason here to disagree with this statement?

MR. SHEEHAN: Objection.

A. I mean, their statement is their statement. I don't -- I can't -- I don't know what relatively low doses means, I don't know what that translates.

Q. Doctor, they further say:

Qualitatively the metabolism of NDMA appears to be similar in humans and animals. As a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure.

Do you have any reason to disagree with this statement based on the work that you've done in this case?

A. Again, this is just full of qual- -- you know, qualitatively, it's not quantitatively, that's very different 'cause for NMDA to be toxic it has to make --

(Court reporter clarification.)

A. In order for NDMA to be toxic or to be a carcinogen, it has to be metabolized lied through CYP2E1 in the liver. It then

C. Lindsley

has to form, go through a hydroxylation and elimination to form the methyl ester ranitidine and that is what the carcinogenic species in rodents, for example. This is the D- -- how you form the DNA additives, it's not NDMA itself.

And so, again, when you say that qualitatively the metabolism in NDMA appears to be similar -- appears to be similar, so they're just -- everything is so highly qualified, it's qualitatively and appears to be.

You know, you qualitatively see some of the same metabolite produced maybe in rat and human or other species, but quantitatively they could be very, very different. We know that rodents are CYP machines 'cause they're scavenging animals, they have such higher levels of CYPs. You know, it's -- you know, and again, it wasn't my charge to go look specifically at an in-depth all these kind of studies. I think there's other folks that are D -- DMPK and metabolism experts.

But as a scientist, and for

C. Lindsley

example, as an editor at JM Kim, I would not accept a paper that had so many qualifying statements in it where data wasn't quantified. It just -- I'm not saying that the WHO is wrong in their statement, this is their statement, but when you make so many qualifiers in a sentence, it's very hard to understand what that is determined by, what the margins are and, you know, what level do you actually start to see these phenomenon, 'cause everything changes. And calling something relatively low levels qualitatively, I don't really know what that means. Those are not scientific terms that scientists talk in.

Q. Doctor, you testified that just in 2020 you have learned about NDMA being a carcinogen, correct?

MR. SHEEHAN: Objection.

A. Yes, when I came on this case, correct.

Q. Okay. And this is a document from the international experts that are evaluating NDMA at the WHO and they're concluding qualitatively the metabolism of NDMA appears

C. Lindsley

to be similar in humans and animals. As a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure.

So, your charge in this case based on the work that you've done, do you have any basis to disagree with this statement?

MR. SHEEHAN: Objection. Asked and answered.

A. Depending on what data they're relying on, this can be a very -- this can be a very fine statement. It is their statement. Again, this sentence is -- is riddled with qualifiers with no quantitation. It is impossible from a scientific point of view to understand exactly what they're talking about.

You know, it would be very differently if they said, quantitatively the metabolism of NDMA is similar or is identical between humans and rodents, and as a result, NDMA is carc- -- will be carcinogenic to humans at a low level of exposure X. You know, that would've been a strong scientifically valid statement. This is so

C. Lindsley

full of qualifiers, it is what it is. It's the statement they wrote. I'm not saying it's wrong. It's -- it's -- the WHO wrote it, but I don't know what data they used. And it -- I'm just surprised they used so many qualifiers along the way in this sentence.

Q. Sure. But you haven't assessed or done the work to disagree with this statement, correct, Doctor?

MR. SHEEHAN: Objection.

A. Well, no. I have not done the work. But again, I can just say as a scientific editor, statements like this would not -- would not fly in a scientific manuscript being submitted for publication because it's so laden with qualifiers, I don't -- you can't -- you don't know what it means.

MS. LUHANA: Sure. Let's take this down and let's put up again Exhibit 6474, which is your report. And let's turn to page 6, let's go to Paragraph 33.

Q. Doctor, please review that

C. Lindsley

paragraph to yourself.

A. (Document review.)

Yes.

Q. So, doctor, you run through the FDA regulatory limit for NDMA here, correct?

A. Yes.

Q. And you're discussing the FDA for -- limit for NDMA and the linear dose response, correct?

A. Yes.

Q. And you state that linear extrapolation from TD50 value is considered appropriate to derive.

Do you see that sentence? In the center, linear extrapolation from a TD50 value?

A. Yes.

Q. Can you read that out loud?

A. Linear extrapolation from a TD50 value is considered appropriate --

(Court Reporter clarification.)

A. Sorry. Linear extrapolation from the TD50 value is considered appropriate to derive a highly conservative AI, acceptable intake, for M7 Class 1 impurities (known

C. Lindsley

mutagenic carcinogens) unless there is evidence demonstrating a threshold mechanism.

Q. Okay. And it seems this paragraph you're citing the FDA Guidance for Industry on Nitrosamines 2021 up top in parentheticals there as a basis?

MR. SHEEHAN: Objection.

A. Sorry. Where are we?

Q. Top of Paragraph 33 where you're discussing the regulatory limit right there and you put FDA Guidance for Industry for Nitrosamines 2021.

A. Yes.

Q. So, is that -- is this your basis for that statement?

MR. SHEEHAN: Objection.

A. As I sit here, I'm not -- I looked at both the IARC and a bunch of other documents, so as I am writing this, I'm not sure which one I relied on completely -- as heavily. I can't recall right now this part of the report was done a long time ago.

Q. Okay. So, do you have a cite for that statement?

A. A cite?

C. Lindsley

Q. What are you citing to for the proposition that linear extrapolation from a TD50 value is considered appropriate to derive a highly conservative AI for M7 Class 1 impurities, unless there is evidence demonstrating a threshold mechanism?

A. Honestly, as I sit here right now, I don't recall where I -- where I pulled that from. We looked at a lot of -- a lot of -- a lot of -- a lot of data getting -- when I was putting this report together.

Q. Who's the we that you're referring to, Doctor?

MR. SHEEHAN: Objection.

A. Me.

MS. LUHANA: Let's pull up exhibit -- what's been premarked 4927. And can we pull that up with this, like, a dual split screen? Is that possible?

DOCUMENT TECHNICIAN: Yes, it'll just take a minute.

MS. LUHANA: Okay. So, let's pull that paragraph, Paragraph -- it's page 6 of his report. Right there, 6.

C. Lindsley

(Exhibit 4927 was marked for identification.)

BY MS. LUHANA:

Q. So, Doctor, we were discussing Paragraph 33 of your report in terms of the FDA regulatory guideline for NDMA.

Do you see that?

A. Yes.

Q. And do you see that you cite the FDA Guidance for Industry on Nitrosamines 2021?

A. Yes.

MR. SHEEHAN: Objection.

Q. And this is the Control of Nitrosamines Impurities in Human Drugs, the Guidance for Industry for FDA 2021.

Have you seen this document before?

A. Yes.

Q. Okay.

MS. LUHANA: Let's scroll to the last page of Exhibit 4927, it's at Appendix B, all the way in the back. Right there.

BY MS. LUHANA:

Q. So, Doctor, take a look at Appendix

C. Lindsley

B, that looks to be where you derive Paragraph 33 from. It talks about the TD50 values and the doses for carcinogenicity.

Do you see that?

A. Yes.

Q. You say:

According to the FDA ICH M7 guidelines, compound specific acceptable intakes can be calculated based on rodent carcinogenicity potency data such as TD50 values.

Do you see to the left of the screen, the FDA guidance has that direct language there?

A. Yes.

Q. And then you go on to state:

Linear extrapolation from a TD50 value is considered appropriate to derive a highly conservative for AI for M7 Class 1 impurities.

Do you see it to the left as well where it says, after that parenthetical:

Limited extrapolation from a TD50 value is considered appropriate to derive an IA for M7.

C. Lindsley

MS. LUHANA: Right there, yes. Can we highlight that? Can we highlight those two sentences, that sentence and the one below up to mechanism? And then highlight in his report right there, that very sentence "linear extrapolation" it begins with, after that parenthetical, little further down. Right there. Yep.

BY MS. LUHANA:

Q. Doctor, do you see those two sentences?

A. Yes.

Q. Do you see the FDA guidance says:

Linear extrapolation from a TD50 value is considered appropriate to derive an AI for M7 1 -- M7 Class 1 impurities, no mutagenic carcinogens with no established threshold mechanism.

However, your language is changed to say "unless there is evidence demonstrating a threshold mechanism"?

Doctor, do you see that?

A. Yes.

Q. That's not what this document

C. Lindsley

states, correct?

MR. SHEEHAN: Objection.

A. Yes.

Q. I'm sorry?

A. I'm sorry. I can't see what I wrote now 'cause it's hidden by all the people.

MR. SHEEHAN: I think you can probably -- can you just minimize it or something?

THE WITNESS: Yeah.

Q. Do you see that there, Doctor? You state "unless there is evidence demonstrating a threshold mechanism," while the FDA says "with no established threshold mechanism"?

Do you see that there?

MR. SHEEHAN: Objection.

A. Yes.

Q. It's actually the opposite of what the FDA guidance is saying, correct?

MR. SHEEHAN: Objection. Mischaracterizes.

You can answer.

A. I'm just -- I'm reading. Yeah, it's -- it's -- what I wrote is different.

C. Lindsley

Q. So, this would be a highly erroneous to you, wouldn't it?

MR. SHEEHAN: Objection.

A. Yeah, that's a mistake.

Q. Like the mistake on your invoices, for example?

A. Yeah, those were copy and paste errors.

Q. Like you not knowing which defendants you submitted your report for?

MR. SHEEHAN: Objection.

A. That was an oversight 'cause when I was retained, it was GSK.

Q. But that's the first paragraph of your report, correct, lays out which defendants you're submitting the report for?

A. It does.

Q. Doctor, can you name one authoritative body or a regulatory body that states that there was a threshold for NDMA?

A. A threshold?

Q. Yes. A threshold for NDMA.

A. Uhm.

Q. Well, you're stating here, there's evidence demonstrating a threshold mechanism.

C. Lindsley

Is there any -- any regulatory body, authoritative body that says there's a threshold mechanism for NDMA or a threshold?

A. I'm not aware of that.

MR. SHEEHAN: Objection.

Q. So, you don't have a cite for the statement, Doctor?

A. No.

Q. Okay.

MS. LUHANA: Take this down.

Q. Doctor, is there any benefit to having NDMA in ranitidine, to your knowledge?

A. Benefit?

Q. Yes.

A. No.

Q. No reason to have, correct?

MR. SHEEHAN: Objection.

A. No.

Q. Doctor, what was your methodology that you used to arrive at your opinions in your reports?

A. Methodology? In terms of -- in my charge is to look at endogenous and exogenous formations of an NDMA for ranitidine. So I looked at all the primary literature where

C. Lindsley

studies like that were done, both in vitro and in vivo.

Q. Doctor, is it laid out anywhere in terms of the method you undertook to arrive at the opinions in your report?

MR. SHEEHAN: Objection.

A. No.

Q. Did you do a systematic review of the totality of the evidence to arrive at the conclusions you did?

MR. SHEEHAN: Objection.

A. Sorry, can you say that again?

Q. Did you do a systematic review of the totality of the evidence to arrive at the conclusions you did?

MR. SHEEHAN: Objection.

A. I'm not sure what that really -- what you mean.

Q. Well, did you review the totality of the evidence to reach the conclusions you have in your report?

MR. SHEEHAN: Objection.

A. Totality of the evidence.

Q. Meaning, did you review all the evidence to come to the conclusions you did

C. Lindsley

in your report?

MR. SHEEHAN: Same objection.

A. Any paper I can find on exogenous or endogenous formations of NDMA, I tried to be as comprehensive as possible in what I found. I did Site Finder searches. Did Google Scholar searches. I was as exhaustive as I could be to find the sources where these -- these things were discussed.

Q. But that's not laid out anywhere in your report in terms of your methods?

A. No.

Q. I wouldn't be able to find them anywhere in your report, correct?

MR. SHEEHAN: Objection.

A. No, I didn't specifically state what I did, no.

Q. Doctor, in your report, you state:

Small amounts of NDMA can form in ranitidine over time as a result of an unusual and slow chemical reaction that occurs primarily in the solid state.

Correct?

A. Yes.

Q. Can you tell me everything you did

C. Lindsley
to arrive at those conclusions?
A. Sure. I looked in the literature for this. I read GSK's root cause analysis. I read the ORPD paper. Even if you look at -- and then some of the data submitted by Dr. Najafi in his expert report looking at those data, and the instance of an NDMA he saw in drug product over time where levels dropped, it all -- it all seemed somewhat consistent that what you're looking at is deliquesce on the surface of the tablets and then some decomposition based on or degradation in the -- in the final product in the solid state once you have heat and humidity.
Q. So, you looked at the GSK root cause analysis, correct?
A. Yes.
Q. You said you looked at the King publication, correct?
A. Correct.
Q. You looked at Dr. Najafi's data, correct?
A. Yes.
Q. What else did you review?

C. Lindsley

A. There are a number of papers, a lot of them -- let me point out some of those -- the key ones where they also took samples of drug product as well as the impurities and did studies with him trying to force degrade. Sorry, drawing a blank on the name of the author himself. I can picture the paper in my head. Just a moment, I got it in here somewhere.

Oh, the Yokoo paper where he is taking all the possible impurities as well as ranitidine and trying out neat forcing heating conditions to -- to generate NDMA looking for other possible nitrosating agents and things in the impurities.

Q. Okay. Is there any other data that you looked at to come to that conclusion about the small amounts of NDMA forming?

MR. SHEEHAN: Objection.

A. Well, obviously there was the -- the reports in the FDA, the Australian agency or what they detected. And then the totality of all the different exogenous and endogenous papers by countless authors.

Q. In terms of the data, you said the

C. Lindsley

GSK root cause analysis, correct, and the King paper, correct?

A. Yes.

Q. So, you rely on the King article?

A. Yes, that's -- 'cause that speaks to this issue specifically.

Q. And you concluded that the methods in King are scientifically valid and reliable?

A. From the data presented and the supplemental materials of the paper, it seemed reliable and it was peer review embedded.

Q. Doctor, that Yokoo paper that you rely on, tell me this, you said they forced testing to assess NDMA levels in ranitidine, correct?

A. Yes.

Q. Did they use humidity?

A. In certain cases, yes. In certain they used sealed vials of different temperatures.

Q. Okay.

A. They used different approaches.

MR. SHEEHAN: Slow down, slow down

C. Lindsley

just a little bit there.

THE WITNESS: Sorry.

Q. Do you recall how much humidity they used?

A. I would have to go back and look specifically at that -- at that paper.

Q. You agree that humidity is an important factor when exposed to ranitidine causes NDMA to form, correct?

A. Yes.

MR. SHEEHAN: Objection.

Q. But you don't recall, sitting here today, how much humidity they used for the Yokoo paper that you relied on?

A. I don't want to quote you the exact number, I would need to look at the paper 'cause, again, in the context of this study, we looked at a lot of -- of different primary literature.

Q. Okay, Doctor, we'll get to that.

Doctor, for the GSK root cause analysis that you relied on, do you know how the tablets were initially maintained before they were testified?

MR. SHEEHAN: Objection.

C. Lindsley

A. Only what was stated in the manuscript.

Q. Sitting here today, was that important to you to see how they were initially stored before they were testified?

A. They comment on the storage conditions in the RCA, so I assume those were how the compound was stored.

Q. So, do you recall how the samples that GSK testified for the root cause analysis were stored before they were testified?

A. I would have to -- I'd have to look at the root cause document again.

Q. Are you aware that GSK represented that it didn't know how the pills were maintained before testing?

MR. SHEEHAN: Objection.

A. Again, I'd have to look at that again.

Q. Well, are you aware that that's GSK represented, that they weren't aware how the pills were stored before they were testified?

MR. SHEEHAN: Before you answer. Objection.

C. Lindsley

A. No.

Q. So, that wasn't important to you to rely on GSK's root cause analysis to see how the pills were stored before they were testified?

MR. SHEEHAN: Objection.

A. I -- I -- I guess I give credibility to the -- to the agencies that know how to store their API and their drug product.

Q. So, you're assuming what storage conditions for those agencies that are storing their API and drug product?

A. I assume they're following their own drug label.

Q. So, how do you assume they're being maintained according to the drug label?

MR. SHEEHAN: Objection.

A. How do I assume they're being maintained?

Q. Yes. You're saying the drug label, what does the drug label say these pills should be maintained according to?

A. Oh, 20, 25 degrees Celsius.

Q. And how much relative humidity?

C. Lindsley

A. It says, guard against humidity.

Q. Oh, really? So, what -- what -- how would you guard against humidity, what percentage relative humidity do the drug manufacturers say to store ranitidine at?

MR. SHEEHAN: Objection.

A. I don't believe there's an -- on the label, I don't think there's a specific humidity cutoff.

Q. So, they don't tell you how to store it -- what -- what percentage to store it as in terms of the humidity, correct?

MR. SHEEHAN: Objection.

A. I did not see that spelled on the label, no.

Q. So, how do you think they stored it? What's the assumption you're using in terms of how these manufacturers store their pills before they were testified?

A. Well, all I can tell you is my experience at Merck when you go to where they have the drug repository for where they have -- after they're doing the -- they're doing the drug product, everything, they're stored in clean rooms and in refrigerated

C. Lindsley

units. So, I would assume GSK follows the same SOPs as Merck.

Q. So, that's an assumption on your part, correct?

A. Yes.

Q. Do you know how the FDA stored the pills before they testified them?

A. No, I haven't seen the complete chain of custody for that.

Q. But it wasn't important to you to rely on those results?

MR. SHEEHAN: Objection.

A. Well, I mean, the FDA is our master regulatory body for all drug -- anything related to therapeutic discovery in drugs. So, I give them some degree of credibility of proper handling because they are the authority. I think that just comes with -- there's some -- there's some degree of reliability and confidence since they are the master regulator of everything we do.

Q. So when the FDA says, for all practical purposes, NDMA is carcinogenic to humans, you'd agree with that statement, right?

C. Lindsley

MR. SHEEHAN: Objection. Asked and answered.

Q. Following that same logic.

A. Well, again, that the -- there are lot of -- these qualifying statements is not quantitative, I can't agree or disagree with non-quantitative statements.

Q. Doctor --

A. -- he has a strong opinion, they typically issue something that is very clear and precise, not qualified.

Q. Doctor, is ranitidine any longer on the market?

A. In Australia.

Q. Ranitidine with NDMA in Australia is on the market?

A. The Arrow --

MR. SHEEHAN: Objection.

A. If you look at the -- the document that was put out by the -- again, the Australian agency that's equivalent to the FDA, they allowed -- the document said they allowed drugs that had less than, I think, most of the Arrow Pharmaceutical batches contained less than .01 PPM or .1 PPM NDMA.

C. Lindsley

They were -- those would be allowed to be on the market, but ones above that they took off.

Q. Okay.

A. But the FDA still hasn't withdrawn the drug, they just -- they just pulled the drug off the shelves and still give the availability of the manufactures to show they can keep the NDMA levels down over long periods of time. They could potentially put the drug back on the market, so the FDA has not recalled the drug.

Q. Doctor, is ranitidine in the United States withdrawn from the market?

A. It has been pulled from the shelves, yes.

Q. And when was it pulled?

A. That's one of the Janet Woodcock FDA releases, I believe it was in 2021.

Q. It was in April 2020, Doctor.

A. Okay.

Q. Doctor, do you know, for the GSK root cause analysis, how they chose the batches to be testified?

A. I think the root -- for them it was

C. Lindsley

the batches they had left 'cause again they had not been manufacturing the drug for some time, so they had the Saraca Grade 1 and 2, the Jurong lots, I think they testified what they physically had available.

Q. No. I'm asking in terms of the batches they had, which API -- which pills they chose to test for the root cause analysis.

Do you know if there was a methodology?

MR. SHEEHAN: Objection.

A. No, I do not know.

Q. But that wasn't important to you for the -- reaching the opinions and relying on the root cause analysis?

MR. SHEEHAN: Objection.

A. Well, again, the work was being peer-reviewed embedded, so the fact that their work appeared in print and having been vetted by expert reviewers, gives it some -- some level of credibility that the right -- the right work was done.

Q. Doctor, are you aware of what was submitted to -- for peer review for the root

C. Lindsley

cause analysis? Do you know if all the lab notebooks, the underlying data, the entire root cause analysis was submitted for peer review?

A. I do not know exactly. As outside, you can only see what they -- what the manuscript supplemental material is, but there's always the opportunity to provide material to the editors, the reviewers, that's not for publication. So, only the editor in chief of ORPD would know that.

Q. But you have no knowledge sitting here today as to what was submitted for the peer review for the King publication, correct?

A. No.

Q. Doctor, did you review all the lab notebooks for the GSK root cause analysis?

A. No.

MR. SHEEHAN: Objection.

Q. They weren't important to you to reach your conclusions about the root cause analysis in your report?

MR. SHEEHAN: Objection.

A. I would -- well -- I guess there's

C. Lindsley

so much documentation I was going through, I didn't get to lab notebooks.

Q. Okay. So, that means if you didn't get to them, they weren't important for you to rely on to come to the conclusions you did for your reports, correct?

MR. SHEEHAN: Objection.

A. Well, once again, when you work in industry, and this is true -- I worked in many -- I worked in three different pharmaceuticals companies and we worked with a variety of other ones, you know, when you do experiments in industry, anything you're doing is being signed and witnessed countersigned by people that read and understood the experiment, and that's standard practice. So, one assumes all these standards practices are in play.

Q. So, you assumed that the lab notebooks were reliable then, correct?

MR. SHEEHAN: Objection.

A. Yeah, to some degree, yes.

Q. Doctor, do you recall what NDMA range was for the pills that GSK testified?

A. From the master spreadsheets,

C. Lindsley

different lots, there are different ranges of NDMA.

Q. Okay. So, you state "small amount" in your report, can you -- since quantity is so important to you, I would like you to quantify what a small amount is of NDMA?

A. Okay. So, for a lot of their lots, they were getting very low microgram per gram of pill. So, they were down in the .2, .3, .4, there were some lots were higher, some were single digits like one. I think there's one or two that might have been a little bit higher than that. But from my recollection looking at the master spreadsheet, the majority, in terms of micrograms per gram, were low.

Q. Doctor, I would like you to quantify that. You talked about quantification being so important and needing it for science. You were saying a low amount of NDMA for ranitidine. I would like you to quantify that low amount for me.

A. Okay.

MR. SHEEHAN: Objection.

A. I mean, typically, you know, I

C. Lindsley

think with the -- the kind of -- .5 and less to me would be something I would consider low.

Q. .5 micrograms per gram for 150 milligram pill?

A. No, for 300.

Q. Okay. So, how much would that be in nanograms?

A. Oh, I have to get a calculator and calculate it.

Q. So, that would be about -- I could represent, that's 50 nanograms.

A. Okay.

Q. So, that's a low amount, a small amount of NDMA to you?

MR. SHEEHAN: Objection.

A. It's above the acceptable intake level, but there's error in measurements, so, you know, most of those were below that, I -- yeah.

Q. Doctor, it's your opinion -- I'm trying to understand in terms of quantification being so important, you didn't quantify the low amount of NDMA in ranitidine. And I would like to know the

C. Lindsley

quantity, what you qual- -- what you consider a small amount. Is it 150 nanograms or is it less?

A. Well, obviously 96 is where we want to be, that's the acceptable intake level.

Q. So, therefore, 96 is the low -- the small amount that you're referencing in your report?

A. Yes.

MR. SHEEHAN: Objection.

Q. So, anything above 96 nanograms would be a larger amount, clearly, right?

MR. SHEEHAN: Objection.

A. Well, yes, it's larger.

Q. And based on the information that you reviewed in this case, do you agree or disagree that there have been a wide range of NDMA levels found in ranitidine that have been testified?

A. Are we talking about all -- all groups that are testified?

Q. Let's start -- yes. I mean, generally, everything that's been testified. There's been a wide range of NDMA that's been generated from ranitidine, correct?

C. Lindsley

A. That's correct, there's been a wide range.

Q. And so, in terms of the small amount of 96 nanograms, that means small amount for endogenous formation and exogenous formation total, correct?

MR. SHEEHAN: Objection.

A. Sorry, can you rephrase it?

Q. Well, you looked at endogenous formation for NDMA in ranitidine as well as exogenous formation, correct?

A. Yes.

Q. So, that small amount, the 96 nanograms applies to both, exogenous and endogenous formation, correct?

A. Yes.

MR. SHEEHAN: Objection.

Just give me a beat before -- before you answer, thank you.

And Roopal, I don't know, we've been going for a while, well over an hour. Do you want take a break here?

MS. LUHANA: Sure, we can do that.

THE VIDEOGRAPHER: We're going off the record. The time is 4:15 p.m. UTC

C. Lindsley

time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:32 p.m. UTC time.

MS. LUHANA: Let's pull up premarked Exhibit 6479. It's GSK's follow-up communication in relation to ranitidine, dated January 14, 2020.

(Exhibit 6479 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you seen this document previously?

A. I'm not sure if I have. Can you scroll down a little bit so I can see more of it?

MS. LUHANA: Can we turn to -- it's Bates ending in 039?

Q. So, Doctor, I'm sure you've seen this Table 1 generally in a number of the documents you've come across laying out the batches that GSK testified?

MR. SHEEHAN: Objection.

C. Lindsley

A. I don't -- I don't recall exactly the table, but the number of batches released drug substance I do recognize.

Q. Okay.

MS. LUHANA: So, can we scroll down to the next page?

Q. Says this is a follow-up communication to regulatory authorities from GSK, and I want to focus your attention to Table 2. As you can see, it's labeled Content Range Observed in Batches testified to Date.

Do you see that?

A. Yes.

Q. Do you see that the -- these are the batches that GSK testified and GSK is providing the range of the test results here, correct?

MR. SHEEHAN: Objection.

A. Yes.

Q. Okay. And you see for drug substance, it has number at .112 greater than 9.9 micrograms per gram.

Do you see that?

A. Yes.

C. Lindsley

Q. And do you know what that would convert to in nanograms?

A. About 3,000.

Q. Okay, correct. So, it would be up to 3,000 for -- well, 2,970 nanograms for a 300 milligram pill, correct?

MR. SHEEHAN: Objection.

A. Yeah, I think that's the correct math.

Q. Okay. And you had done this math previously when you were assessing the levels of NDMA, correct?

A. Correct.

Q. Okay. And do you know how many samples were above that 9.9 micrograms per grams listed here?

A. There's a -- there are multiple master spreadsheets that was provided and -- can I tell you right now exactly how many were above their highest calibration standard? No? I'd have -- we'd have to pull that sheet up and look at it?

Q. Was that important to you to assess what the levels of NDMA generated from ranitidine drug substance were?

C. Lindsley

A. Yes.

Q. So, do you recall -- you don't recall how many samples, correct, were above the 9.9 micrograms per grams?

A. No.

Q. Okay. Do you know how high it went?

A. Well, above this, it's not accurate. So, this is above their limit of quantitation, the highest calibration standard. So, all I can really say is, by greater than nine, you can't give it a definitive number.

Q. But do you recall the master data spreadsheet actually having definitive numbers in there?

MR. SHEEHAN: Objection.

A. Yeah. Just like, you know, the Australian agency did the same thing, but then they said those numbers are not accurate, they're estimates. So, I think those -- if they go above -- anything that's gonna go above your highest level of quantitation or higher than your standard calibration curve, you can provide numbers,

C. Lindsley

but they're qualified as estimate 'cause the method cannot accurately quantify them.

Q. Doctor, I'm not talking about the Australian agency. I'm focused right now on GSK and the master data spreadsheet.

And so, for the master data spreadsheet, do you recall specific quantities of NDMA levels above 9.9 micrograms per gram of drug substance being provided?

A. I do not recall that, but we can look at the file.

Q. So, did it matter to you, were you relying on that information at all? Did you consider it in coming to the conclusions as to the small amounts of NDMA generated from ranitidine?

A. Sure.

MR. SHEEHAN: Objection.

A. Sorry. Again, above a certain level, they're just estimates. So, they could be 9, they could be 10, you don't really know what those numbers are.

Q. Sure.

A. Just greater than -- greater than

C. Lindsley

9.

Q. So, were those estimates, when you're assessing the levels of NDMA being generated from ranitidine drug substance, important to you?

A. Yes.

Q. And do you know how high they went?

A. I don't recall offhand.

Q. Generally speaking, was it above 10 micrograms per gram?

A. Well --

MR. SHEEHAN: Objection.

A. It doesn't matter because whatever number they put is an estimate 'cause it's above the highest standard calibration curve, so those numbers aren't really -- they're not real.

Q. So, those estimates above 9.9 micrograms per gram of NDMA being found in drug substance are of no importance to you you're saying?

A. No.

MR. SHEEHAN: Objection. Asked and answered.

A. I did not say they weren't

C. Lindsley

important at all. I said that you can't -- they're not quantifiable numbers, so you can just assume they're greater than 9.

Q. Doctor, previously you just said quantities and dose were very important to you, correct, you testified to that fact?

A. Yes.

Q. So, therefore, if GSK, in the master data spreadsheet, provided and quantified the amount of NDMA in ranitidine drug substance above 9.9 micrograms per gram, that would be important, correct?

MR. SHEEHAN: Objection.

A. Again, the methods had limitations and above a certain number, it's just an estimate and you just know that it's that number or greater. But you -- but once you're -- once you're so many multiples above the AI, it really -- it's just above the AI.

Q. Okay. So, this would be probably, what, close to 22 times above the AI?

MR. SHEEHAN: Objection.

A. So, that math would work out.

Q. Or actually 30 times above 96 nanograms.

C. Lindsley

So, the -- the amount it was above the AI that was detected in the ranitidine pills was unimportant to you?

MR. SHEEHAN: Objection.

A. I have never said that.

Q. So, I'm trying to understand whether you assessed, you know, number one, how many quantities of drug substance were above the 9.9 microgram per gram NDMA level in ranitidine.

Did you assess that?

A. Yeah, I looked at the -- I looked at those master tables, but I don't recall sitting here with their being hundreds of samples being run, how many were above the certain threshold level. I'm happy to go look the data with you and walk through the Excel sheets and we can quantify exactly how many exceeded different levels and bend them if you'd like to. But right offhand, when there were hundreds and hundreds of samples, I cannot recall how many were in each -- each different level of exposure. So, I can't recall it right offhand. That's way too much data to keep -- to keep in my head.

C. Lindsley

Q. Sure, understood.

So, you don't know the levels of NDMA in the drug substance above 9.9 micrograms per gram or the number of samples that exceeded that level sitting here right now, correct?

A. Well, again, above 9.9, no one knows what that actual number is because it's off the standard curve because, so we don't know what those -- that number is. We just know that it's greater than 9 'cause that's of the limit of quantitation, that's the upper level of their calibration standard. So, above that, we don't know. It's not that it's unimportant. It's not that it's -- that's not what I'm saying. We just -- no one can tell with any accuracy what that number is. A different curve has to be generated to quantify that. And right now, I cannot -- I cannot recall a priority how many samples were in each bin of exposure because there were hundreds and hundreds of data entries. From that table you showed me, there are hundreds of hundreds of samples that were analyzes.

C. Lindsley

So, again, happy to the look at the tables, the Excel file and go through it and look at the individual samples and see how many were in excess.

My recollection from going through it was of a vast -- a large number of the samples had -- had -- were in acceptable ranges.

Q. What is an acceptable range?

A. Again --

Q. 96 nanograms?

A. Yes.

Q. Okay. And so, if GSK quantified the amount of NDMA above 9.9 micrograms milligrams for the drug substance, what would that mean, what does that number represent? Because the master data spreadsheet certainly has GSK specifically quantifying the amount of NDMA in the drug substance above that 9.9 micrograms per gram?

A. Well, again --

MR. SHEEHAN: Just let me get my objection in.

Object to the soliloquy.

Go ahead.

C. Lindsley

A. Well, again, any instrument, any analytical LC-MS instrument, they're computer driven, it's selecting for the mass, it's looking at the mass, it has a standard curve it's calibrating against, it's gonna give you a number. It's gonna try to estimate a number and it is gonna generate a number. How reliable that number is when you exceed the highest calibration standard is an estimate, but the instrument is gonna report a value. It -- all these -- any time we do these kind of studies, you get values reported, but then it's up the analytical scientist to look at their calibration curve and understand what's in their limits of quantitation and what is outside.
Q. Understood.
Doctor, if you take a look at the film coated tablets, it says the NDMA content is .24 to 7.6 micrograms per gram, correct?
A. Yes.
Q. And how much would that be in nanograms?
A. 7.6, we're looking at probably, what is that, 2,700.

C. Lindsley

Q. Okay.

A. On very low levels, 2,700.

Q. To -- correct, okay.

Doctor, and you're aware and you testified to previously that these pills were testified and were in the manufacturers' possession, correct?

A. Yes.

Q. And these weren't pills that were in bottles that were open and, for example, unsealed and maintained in consumer bathrooms, consumer cars or otherwise maintained by consumers, right?

MR. SHEEHAN: Objection.

A. No, I think that both -- well, I don't recall exactly. I thought these were samples directly from the manufacturer.

Q. Doctor, are you aware of what Emery's mean baseline was in terms of how much NDMA it measured in, for example, let's say the 150 milligram pill, unexpired pill?

A. From which manufacturers?

Q. Emery collected -- received samples from a number of the manufacturers. And so my question to you is, do you know Emery's

C. Lindsley

mean baseline for the 150 milligram unexpired pill?

A. Not right off the top of my head.

Q. Can I represent to you it was about 1,096 nanograms?

A. Okay.

Q. So, you would say that's in line with the ranges that you're seeing and I'll represent that the lowest range was about 11 nanograms per pill.

So, this range is consistent with the levels that you're seeing from GSK's root cause analysis, correct?

MR. SHEEHAN: Objection.

A. I'd want to see the data side by side to make sure, but if those are truly accurate numbers you're quoting, then they are within the same range.

Q. Okay.

MS. LUHANA: You can take this down.

Q. Doctor, let's talk about stability.

In your report, you take issue with Dr. Marletta stating that the ranitidine is

C. Lindsley

an unstable molecule.

Do you recall that?

A. Yes.

Q. Your conclusion is that ranitidine is a very stable compound in vitro and in vivo, correct?

A. Correct.

Q. So, what did you do to reach that conclusion, what studies did you review?

A. You know, I reviewed a lot of literature for that and inherently, you know, again, the thing to really consider with all of this is this compound is made on multi kilogram scale by multiple manufacturers if the compound were unstable, you would not be producing kilogram quantities of an unstable molecule. You would never be able to generate the impurity requirements to get -- to the API certified.

Other papers that I reviewed who required -- who acquired commercial Zantac for various studies, their purity of the compound was 99.4 percent pure in multiple instances. And that's after they acquired the compound from various vendors'

C. Lindsley

distributors. So, the compound is inherently stable. It's high -- at high purity with low amount of impurities, that was also shown in the -- in the -- a couple other papers that we are looking at. But, you know, the impurities that were present in the API, all below acceptable levels.

The compound point as well when you administer it in vivo, the compound is quite stable. It is excreted primarily unchanged in urine and feces significantly. There's a very few minor metabolites identified; there's the S-oxide, the N-oxide and N-Desmethyl version and their low level metabolites, low levels of a furoic acid metabolite. It has a profile of what people would consider quite a stable molecule.

In -- in some of the forced degradation studies across various pH ranges, at low pH, the compound was very stable to hydrolysis. At physiological pHs, the compound is very stable. Only at very high non-physiological pH did the compound start to degrade significantly.

So, you know, all these data

C. Lindsley

combined showed that it is a -- quite a stable compound.

Q. Doctor, how are you defining stability? What are the parameters, for example, that the FDA looks at to define stability for a drug?

A. Well, I can -- I can only tell you what we had -- what we had to demonstrate, but, you know, we had to certify the purity of the API. We have to characterize all of the metabolites -- I mean, sorry, all the process impurities below a certain given threshold based on what the estimated human dose is. And, you know, I don't know if there's -- there's a lot of wiggle room sometimes. I don't know if I'd call it wiggle room, but it really depends on a lot of things. But, typically, you know, we're trying to submit things that are 99.234 percent pure where we have trace impurities none greater than .2 percent. That's one thing we submit to the FDA.

We also then submit full characterization of the molecules in terms of metabolite profile across hepatocytes and

C. Lindsley

microsomes across species, so mouse, rat, dog, nonhuman primate human, characterizing and metabolized how much parent remains, what those metabolites are, what their abundance is, 'cause if we had major circulating metabolites, we also have to characterize those. We have to make sure there's coverage from the preclinical species to human.

If there is a major metabolite, we actually have to characterize it in terms of mutagenic potential, we have to characterize ancillary pharmacology as well as on target pharmacology.

And then we do the same thing from the in vivo studies. Once we know what those metabolites are, whatever our pre-clinical safety species are. So, typically, for example --

(Court Reporter clarification.)

A. Sorry. In the IND-enabling studies, we also have to characterize not only the parents in terms of the pharmacokinetics in rat and dog, if those are your two safety species, we have to do the in vivo PK characterization of the metabolites

and try to understand their disposition.

And then we also typically have to make a C14 labeled version of our molecule and do a full mass balance analysis showing that all the compound it can be accounted for and that it's not deep pulling in tissues or there's not some metabolite that's accumulating in any given tissue or organ.

So, quite a bit of work has to be done to assess the stability of the molecule, both from a chemical standpoint and from a biological standpoint. And so, you know, that data has been generated and published around ranitidine.

Q. Doctor, what about physical appearance, is that part of the stability testing?

A. What aspect of physical appearance?

Q. The physical appearance of a drug, is that assessed for ranitidine stability testing?

A. You know, in terms of -- I am unfamiliar with that, that is not something we actually wrote in our -- in the IND we submitted. We didn't real talk much about

C. Lindsley

the appearance of the capsules. I'm unfamiliar of what the FDA regulations on that would be and I don't want to misquote anything there.

And again, I think we're really moving outside the area of where my report and my opinions that were requested, which is on the exogenous and endogenous formation of NDMA.

Q. Sure, Doctor. You concluded that ranitidine is a very stable compound in vitro and in vivo --

A. Yes.

Q. -- that was your conclusion in your report?

A. Yes.

Q. So, in order to come to that conclusion, you're required to review, for example, the stability testing done for ranitidine, correct?

A. Yes.

Q. So, my question to you is, is physical appearance a part of ranitidine's stability testing?

A. Physical appearance. Are you

C. Lindsley

talking the API or the drug product --

Q. Both, both.

A. Both.

Q. I want to know -- I mean, I know you discussed the IND you submitted, but you're providing your opinions here on ranitidine, right? And so, my focus is on ranitidine's stability testing and what's required to pass that stability testing, because you're concluding here that it's very stable and I'm trying to understand what you reviewed to understand that stability.

A. Oh, well, I told you --

MR. SHEEHAN: Hold on, hold on. There's no question pending.

Q. So, Doctor, let me -- let me focus you in. I want to know whether you're aware as to if physical appearance is assessed for ranitidine stability testing?

MR. SHEEHAN: Objection.

A. That, I don't know. I don't know if that was something that was required when the initial NDA was approved.

Q. Not talking about the initial -- I mean, the drug was on the market for

C. Lindsley

40 years. So, when you're concluding that it's stable for those 40 years, I presume you've reviewed the stability testing from when, you know, it was approved to now, correct?

MR. SHEEHAN: Objection.

A. I was not -- I didn't see the IND that was filed, I never saw that document, so I don't know.

Q. Doctor, I'm not asking about the IND. I'm talking about, you're coming to a conclusion about ranitidine being a very stable compound. So, I'm trying to understand whether you've reviewed the ranitidine stability testing for the time it was on the market, did you review that stability testing?

MR. SHEEHAN: Objection.

A. I'm still -- I'm still not clear exactly what data you're talking about.

Q. Ranitidine stability testing, meaning the results of stability testing that are done that's required by the FDA, for example?

A. Done by whom?

C. Lindsley

Q. The manufacturer.

A. Specifically, I really -- I'm not recalling that right now.

Q. Okay. So, you didn't review the stability testing done by the defendants for ranitidine over the course of the 40 years?

MR. SHEEHAN: Objection.

A. I'm just saying I don't recall, I very well may have.

Q. Well, either you did, Doctor, or you didn't. You hold these opinions as you've concluded in your report to a reasonable degree of scientific certainty.

So, my question to you is, did you review stability testing in physical appearance as part of your review in terms of coming to the conclusions you did about the stability of ranitidine?

MR. SHEEHAN: Objection.

A. I don't recall seeing things about physical appearance as in stability. And a really important thing to keep in mind is a little color goes a long way, that's like an old chemistry proverb. In terms of physical appearance, that doesn't necessarily mean

C. Lindsley

there's something chemically wrong with -- with an API or a drug product.

The things I talked to you about already, the people getting samples of ranitidine commercially and they turn out to be 99.4 percent pure. And so, these compounds being manufactured on kilogram scale, they have a high level of purity with the impurities characterized. They've been distributed, other -- other scientists get these, analyze the purity, they're high pursuant. The compound is stable. It's not a reactive compound, it's just spontaneously concerting into other things, you wouldn't expect that level of purity for a highly reactive compound as it was characterized. And then under normal -- a variety of forcing hydrolysis conditions, the molecules is shown to be very stable. In vivo in produces very few metabolites. It's excreted primarily unchanged.

These are all things that would suggest it's a stable compound, not a highly reactive compound.

Q. Doctor, purity is one assessment

C. Lindsley

for the stability testing, there are other assessments.

Do you know for ranitidine, sitting here today, what they are?

MR. SHEEHAN: Objection.

A. Again, that's a very broad question. I'm not sure where you're going.

Q. Well, you're concluding ranitidine is stable, I'm trying to understand in terms of ranitidine stability testing, you continue to mention purity. That's one aspect of ranitidine stability testing that's done by the manufacturer.

What are the other aspects of that stability testing, if you can -- if you can state them?

A. Well, obviously, you know, you have -- you put drugs on -- you put drug product and API on stability, so we're measuring it under low temperature, low humidity conditions. And then you had a mid range and then you have a high kind of forcing conditions where we're using things with high humidity and high heat and you want to see how things -- what happens under all

C. Lindsley

those different conditions.

Q. So, what things are you checking to see what happens, like, that's what I'm trying -- what is being assessed in the stability testing, asides from the impurities and the purity, you've stated those, what else?

A. Well, I mean, some things you do look for. And again, I think this is very general, is especially when your compound is an HCL salt or some salt form, not a freebase. You look for a deliquescence, or you look for water being absorbed on the surface of the API or the -- or the drug product and you look for the fact that the water -- the humidity can create like an oily film on the surface of the com- -- of the drug, it can start to degrade. You know, if you're looking at a pill or a capsule, you can start to degrade the glidants, lubricants, all the other things, the nonactive ingredients in the capsule. You look for those kind of changes.

Q. Doctor, do you understand that pharmaceutical manufacturers are required to

C. Lindsley

conduct stability testing to provide evidence on how the quality of a drug substance or drug product varies with time under influence a variety of environmental factors, such as temperature, humidity and light and establish that it remain stable, for example, with no appearance failure for the shelf life.

Are you aware of that?

MR. SHEEHAN: Objection.

A. I was not aware of the appearance factor, but we do -- I know all the other ones that we look at.

Q. Would you appreciate and agree that forming degradant products that are genotoxic carcinogens above the ADI when a drug is exposed to time, temperature and humidity during the shelf life of a drug -- of the drug would indicate that the drug is unstable, for example?

MR. SHEEHAN: Objection.

A. I wouldn't say -- again, I wouldn't say -- I think that when you're talking about unstable, there's very different meanings to that. I think when a chemist is calling a molecule unstable, they're talking about --

C. Lindsley

like Marletta, he's talking about just -- he's trying to say that the molecule is very, very very unstable.

I think what you're talking about here is the drug product as the HCL salt can absorb water and then that can cause the degradation, which has been shown and agreed to as heat and humidity, that's been demonstrated by -- by the FDA, that's been demonstrated by other investigators, so that doesn't to me say ranitidine is a very unstable compound. The drug product in the presence of excess heat and humidity can be unstable.

Q. So, Doctor, it's your testimony that the drug substance isn't unstable?

A. Well, no. Again, I wouldn't say unstable. It deliquesces in the presence of water, which has been shown. But the impurity of these compounds -- okay. Yeah.

MR. SHEEHAN: Go ahead, Doctor.

If you need to finish, finish your answer.

A. Yeah, okay. Again, I think we're just using two very different descriptors

C. Lindsley

for -- or the same word for very different -- different things, 'cause one thing you can even see from a lot of datasets is only so much water gets absorbed onto the pills and then no more NDMA is produced. Dr. Najafi showed that in some of his charts as well as over time the NDMA levels decreased or -- and then stay constant.

So, there's something just about the surface of the capsules or the surface of the pills that absorbs the water, does its deliquescence and you get a limited amount of reactivity. The whole pill does not degrade. The whole -- the whole drug dose does not degrade and form thousands -- you know, tons and tons of things, so it seems to me it's a very -- from the data I reviewed, it's a -- it's a surface phenomenon.

Q. So, ranitidine API or drug product, for example, being exposed to heat, humidity and time causing it to generate and degrade and form NDMA isn't an indication of ranitidine's instability to you?

MR. SHEEHAN: Objection.

A. Again, there's tons of data

C. Lindsley

suggesting that the drug itself is not generally unstable.

Q. Okay. 4?

MS. LUHANA: Let's pull up Exhibit 834. Let's go to page 9.

BY MS. LUHANA:

Q. Doctor, can you read that first sentence out loud in the first paragraph there, test results from industry?

A. Test results from industry and from samples obtained and testified by the FDA showed that NDMA was consistently detected in ranitidine, and in many instances, NDMA was detected above the ADI.

Q. In fact, if you now turn to page 11.

MS. LUHANA: Can we please turn to page 11? Can you scroll down? I apologize, can you scroll up?

Q. Doctor, can you please review this page to yourself?

A. (Document review.)

Q. And I want to focus on that second paragraph which starts with "based on the data," can you read that out loud, please?

C. Lindsley

A. Sorry, the first sentence?

Q. The second paragraph, last sentence.

A. Second paragraph, last sentence.

Q. Can you read what the FDA concluded here?

A. Based on the data from NDMA testing in ranitidine drug products and drug substances, the preliminary results from FDA's stability testing and other information available to the agency, FDA is no longer confident that any ranitidine product will remain stable through its expiration date -- through it labeled expiration date.

Q. Doctor, the FDA here concluded that it's no longer confident that ranitidine is stable according to the stability testing, correct?

MR. SHEEHAN: Objection.

A. That's what it says, yes.

Q. Do you have any reason to disagree with that?

A. I mean, it's their statement.

Q. Okay. And this is why ranitidine is no longer on the market, correct?

C. Lindsley

MR. SHEEHAN: Objection.

A. Well, hasn't been pulled from the market, it's been pulled from the shelves. It hasn't been withdrawn.

Q. It has been withdrawn from the market, Doctor.

A. Well, I mean -- okay. The FDA guidance still says that they're able to show -- the drug hasn't been fully -- I'm trying to think what the wording is. There's still an option for the drug to come back on the market if -- if manufacturers can show the levels can be maintained for a prolonged period of time.

Q. Doctor, if we --

A. Hasn't been recalled.

Q. Let's turn to page 6 of this.

So, if you look at the FDA's regulation also provide a procedure for product removal, which is called market withdrawal.

Doctor, you'd agree that ranitidine has been withdrawn from the market, correct?

A. Yes.

C. Lindsley

Q. Okay. Okay. Let's scroll to page 11 again and if you look at that last paragraph on page 11 it says:

In the petition, you request that FDA provide information to the public regarding high temperature instability of ranitidine products. And the FDA's stating it's granting the request. And then it continues to say that the agency's lab test indicate that temperature and time contribute to an increase in NDMA levels in some ranitidine products. Our preliminary stability tests under --

MS. LUHANA: Can we go to the next page?

Q. -- under accelerated conditions, one of which was conducted at 40 degrees Celsius/75 percent humidity indicate that elevated temperatures can lead to the presence of NDMA in the drug product. It is important to communicate this information to the public and to share the reasoning behind the agency's actions.

Doctor, do you see that?

A. Yes.

C. Lindsley

Q. Any reason to disagree with this?
A. No.
Q. Okay.
MS. LUHANA: Let's put up Exhibit 6481.
(Exhibit 6481 was marked for identification.)
BY MS. LUHANA:
Q. This has been marked Exhibit 6481 and it's the FDA removal of ranitidine products, it's their notice from April 2020.
Doctor, have you seen this before?
A. Yes.
Q. Okay, let's scroll to the next page. Do you see, Doctor, up top it says:
NDMA is a probable human carcinogen, a substance that can cause cancer.
Any reason to disagree with that, Doctor?
A. A substance that could cause cancer, yes.
Q. No, that's the statement. NDMA is a probable human carcinogen, a substance that could cause cancer.

C. Lindsley

Do you have any reason to disagree with that?

A. No.

Q. Doctor, can you please read that second paragraph out loud starting with "new FDA testing"?

A. New FDA testing and evaluation prompted by information from third-party laboratories confirm that NDMA levels increase in ranitidine even under normal storage conditions, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by customers. The testing also showed that the older a ranitidine product is, or the longer length of time since it was manufactured, the greater the left of NDMA. These conditions may raise the level of NDMA in ranitidine products above the acceptable daily intake limit.

Q. Okay. Doctor, did you do anything to assess the significant increase ranitidine may experience in NDMA levels when stored at

C. Lindsley

temperatures that -- that the product may be exposed to during distribution and handling by consumers?

A. The only thing I looked at with that was -- was Dr. Najafi's report where he was trying to simulate products being left in a hot car. Again, the opinions I was requested to give were related to endogenous, exogenous formations of NDMA, not spending a lot of time on these other issues.

Q. So, you did nothing to assess the significant increase ranitidine may experience in NDMA levels when stored at temperatures that the product may be exposed to during the distribution and handling by consumers, correct?

MR. SHEEHAN: Objection.

Mischaracterizes his opinions.

A. Specifically, no, because this is something too where I don't -- I don't -- I'm not privy to all the conditions that were done during drug distribution and I can't say for certain what all the consumer handling would be, so that was something that was out of my purview for what I was asked to give

C. Lindsley

opinions on.

Q. Did you try to assess what those varying conditions would be?

A. Only in context of what Dr. Najafi said as he was trying to simulate drug being left in a hot car.

Q. Outside of what Dr. Najafi did, did you, on your own at the charge of the defendants, assess any of the conditions ranitidine may be exposed to in the distribution and handling which consumers?

MR. SHEEHAN: Objection.

A. Not specifically, no.

Q. Generally?

A. Well, we looked at the drug label and what the conditions are that the manufacturer said for drug handling. And again, I -- I responded to what was in other folks' reports. But, again, my report was focused on exogenous and endogenous formations of NDMA.

Q. Sure. The exogenous exposure of ranitidine cau- -- I mean, scratch that.

NDMA forms exogenously when ranitidine is exposed to, for example, heat

C. Lindsley

and humidity, correct?

MR. SHEEHAN: Objection.

A. Yes.

Q. So, when you're attempting to quantify the levels of NDMA that is generated by that exogenous exposure, one of the things you would look to is how consumers are -- how ranitidine is being handled and distributed by consumers, correct?

A. No. Again, that was not my charge when I started this, we were looking at the Zeng & Mitch papers and how heat and GC analysis can decompose and degrade the drug in the injection port leading to artificially high levels of NDMA. That's where my work started and my work really focused on, again, all the other forms of endogenous, exogenous NDMA in terms of all the simulated gastric fluid studies, the clinical trial, other in vivo studies. Again, conditions cause -- a consumer -- it's impossible to know what those conditions are, so that's not something I focused on.

Q. Doctor, how can you quantify the amount of NDMA that's generated from

C. Lindsley

ranitidine exogenously without looking at the conditions consumers store the ranitidine at, for example? How can you qualify it as small or large or even assess it when you didn't review those conditions?

MR. SHEEHAN: Objection.

A. Well, I went by the label. The label says, how to store, what temperature to store the drug at, how the drug should be stored. And just like any other medication would take, if I'm told to eat it with food or I'm told to stored it cold or room temperature, that's how I would handle it.

Q. Doctor -- sorry.

(Cross-talk.)

A. That's what I was specifically asked to -- to give opinions on.

Q. Doctor, you testified earlier that the amount of humidity, for example, ranitidine should be maintained at isn't quantified, correct?

A. Yes.

Q. Doctor --

A. The label --

Q. -- does a label state that NDMA can

C. Lindsley

form -- does the label inform consumers that NDMA can form if ranitidine is exposed to heat and humidity?

A. The label does not say that.

MS. LUHANA: You can take this down. Let's put up what's been premarked 6482.

(Exhibit 6482 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is an impact statement from -- that's been produced by Boehringer Ingelheim.

Have you seen this previously?

A. This does not look familiar to me.

Q. So, this wouldn't be a piece of evidence that you evaluated to conclude that defendants had no knowledge pre-2019 that ranitidine would degrade?

A. I'm saying I don't recall seeing this document.

Q. Okay. So, you -- you haven't reviewed this to come to the conclusion that defendants did not have any evidence pre-2019 about ranitidine's degradation, correct?

C. Lindsley

MR. SHEEHAN: Objection.

A. I have no real opinion there. I don't recall seeing this document, so I can't comment on it.

Q. Okay. Doctor, this assessment is from 2015. Can you please read out loud the Product degradation statement?

A. Just bullet point --

Q. I apologize, the statement is there, let's go to the next page under Product degradation.

A. Several studies about the stability of ranitidine hydrochloride have classified it as an unstable drug component. Humidity, high temperatures, light and atmospheric gases (oxygen) modify the essential instruction of the RAN producing degradation characterized as hydrolysis.

Q. Doctor, do you see BI has concluded here that ranitidine is unstable?

MR. SHEEHAN: Objection.

A. That's what it says.

Q. But you didn't review this in coming to the conclusion that ranitidine is a stable drug in vivo and in vitro, correct?

C. Lindsley

A. No, I did not.

Q. Doctor, if you see the Undesirable degradation effects, do you see what it says there in terms of the degradation products and impurities of ranitidine in the solid state?

A. Yes.

Q. It states that ranitidine, when it degrades, produces an unpleasant odor, correct?

MR. SHEEHAN: Objection.

A. That's what that statement says, yes.

Q. Doctor, are you aware that there are dozens and dozens of documents noting degradation issues with ranitidine with appearance failure as in odor complaints?

A. I don't know if I -- I can't say that I've seen all of those, no.

Q. Have you seen some of them?

A. I know I heard -- well, in Marletta's report he talks about the odor being indicative of the NDMA being produced. But the drug itself has an odor just inherently because of the sulfur in the

C. Lindsley

compound. So, the API has an odor on its own. But, you know, NDMA is odorless. So the odor doesn't give any indication that you're producing NDMA.

Q. Doctor, aren't color change and odor an indication of chemical degradation, can they not be an indication of chemical degradation?

A. They can be.

MR. SHEEHAN: Objection.

Q. Okay. Doctor, you mentioned Dr. Melnick's report previously that you reviewed it, correct?

A. Correct.

Q. Did you review the underlying documents he cited in his report which -- where he listed dozens and dozens of documents showing degradation, appearance failures and odor complaints with ranitidine?

A. I can't recall all of them, 'cause you're talking dozens and dozens, I don't know for sure if I looked at all of them. But I know there's at least one or two I looked at to make -- to understand where he was coming from.

C. Lindsley

Q. So, you're aware throughout the product -- the life of this drug there have been numerous degradation issues including appearance failures and odor complaints about ranitidine?

MR. SHEEHAN: Objection.

A. I did see that following the references he cited.

Q. Doctor, if you look at the references here, it references a Jamrogiewicz I'm probably butchering that name right there, that article which says, it's a detection of some volatile degradation products released during photo exposition of ranitidine in the solid state.

Do you recall reviewing that article previously?

A. I do not recall that paper, I don't think I've looked at Journal of Food and Drug Analysis.

Q. Okay. So, you didn't -- this is not one of the papers that you reviewed to come to the conclusion that defendants had no evidence pre-2019 about ranitidine's degradation issues, correct?

C. Lindsley

MR. SHEEHAN: Objection.
A. I have not read that paper.
Q. Okay.
MS. LUHANA: You can take this down.
Let's put up what's been premarked 6483.
(Exhibit 6483 was marked for identification.)
BY MS. LUHANA:
Q. Doctor, Exhibit 6483 is a document called Nitrosamines as Impurities in Drugs, it's a Health Risk Assessment and Mitigation Public Workshop that the FDA held from -- it's a memo from that meeting from March 29-30, 2021.
Have you seen this before?
A. Can you scroll down so I can see some of the content?
Q. Sure.
A. I'm not sure if I read this one or not. I mean, I read so many documents, it's hard to remember, but happy to look at sections of it and --
Q. Sure. Are you aware that the FDA

C. Lindsley

having nitrosamines workshop in March 2021?

A. I was not aware of that.

Q. So, that means you weren't invited as an expert, correct?

A. Correct.

Q. You didn't attend?

A. No.

Q. Did you review the transcripts or the materials from this workshop?

A. No.

Q. As you can see here, Doctor, this is the purpose, the purpose is noted of the goals of the workshop are noted there.

Are you aware that the FDA invited international and national experts on nitrosamines to discuss the chemistry and toxicology of nitrosamines in the environment and those recently identified as contaminants in pharmaceuticals?

Do you see that there?

A. Yes.

Q. Are you aware that they covered two days where they address questions prepared by the FDA, identified gaps in the knowledge and research needed to address and mitigate the

C. Lindsley

drug contamination issue to ensure the safety of the drugs available to the American public?

Do you see that there?

A. I'm seeing that there.

Q. So, this was done to ensure safety of drugs available to the American public. You agree it's necessary to mitigate drug NDMA contamination to ensure public safety, correct?

A. Yes.

Q. You agree that NDMA contamination of drugs presents a health and safety problem?

MR. SHEEHAN: Objection.

A. Depending on the levels.

Q. Well, you agree that detection of unacceptable levels above the ADI of carcinogenic genotoxins are serious concerns?

A. Again, you know, I'm not an expert on genotoxic carcinogens, so offering opinions on that again is not what I was charged to do. We're really swaying outside of my wheelhouse here with the line of questioning.

C. Lindsley

Q. Sure, Doctor. I'm just focused on -- in terms of the NDMA being a genotoxic carcinogen, you included statements about it being a genotoxic carcinogen in your report.

So, my question is, do you agree that the detection of unacceptable levels of NDMA, which means above the ADI, are a serious concern for public safety?

A. The FDA has decided that, yes.

MS. LUHANA: Okay, let's take this down.

Let's pull up what's been premarked Exhibit 6484.

(Exhibit 6484 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, what's been marked as 6484 is an article from the Journal of Medicinal Chemistry, it's called the Critical Analysis of Drug Product Recalls due to Nitrosamine Impurities.

Are you familiar with this article?

A. Yes.

Q. Doctor, you're an editor in chief of this journal, correct?

C. Lindsley

A. Correct.
Q. Okay.
MS. LUHANA: Let's turn to 2925, page -- it's the next page, I believe. Oh, two pages. Perfect, right there.
Q. Do you see the column to the right there where it says:
The nitrosamine class of carcinogens has gained a specific attention of drug regulators in the past two, three years due to its association with several product recalls.
And then it goes on to state that the carcinogenic potential of nitrosamines has a long history.
You agree with that?
A. I'm trying to figure out where you're reading, sorry.
Q. It's that second -- it's the second column right there, the first paragraph:
However, the carcinogenic potential of nitrosamines has a long history.
A. Yep.
Q. You agree with that, Doctor?
MR. SHEEHAN: Objection.

C. Lindsley

A. I mean, that's what the sentence says.

Q. Do you have any reason to disagree with it?

A. No, it's very general.

Q. So, this is not the type of sentence that you would want, for example, in a peer review journal article?

A. No, no, no. You're taking -- you're taking a single sentence out of context. You read the rest of the paragraph and it starts to clarify what they're talking about. You know, when you pull a single sentence out, it's not that -- so, if you -- you know.

Q. Sure, Doctor. It's talking about the long history --

A. Yes.

Q. -- of carcinogenesis of nitrosamines, that's what it's doing?

A. Yes.

Q. Okay.

MS. LUHANA: Let's turn to page 2933. Right there and I'm focused only the column to the left.

C. Lindsley

Q. And you see here, Doctor, that first paragraph "many studies." So, the author of your journal states that there are many studies that have reported the formation of NDMA for ranitidine via the degradation pathway depicted in 14B above.

Do you see that?

A. Well, no, 'cause I'm only seeing of the -- the lower part of the paper.

Q. Sure. I mean we can scroll up. However, that's what that statement says, right? Many studies have reported the formation of NDMA for ranitidine via the degradation pathway?

A. Okay. So, there they're showing chloramination, yes.

Q. That's one degradation pathway, then that's A. Then there's also B there, you see, degradation mechanism of ranitidine leading to the formation of NDMA?

A. I'm only seeing part of the screen.

Q. Well, you're seeing -- sure, go ahead.

A. Okay.

Q. Right, you see there's A and B?

C. Lindsley

A. Yep.

Q. Okay.

MS. LUHANA: Let's scroll down now.

Q. And that last sentence of the paragraph right there, the first paragraph, starting with "the storage conditions," can you please read that out loud what the author states?

A. The storage conditions for ranitidine also likely play a critical role since it's susceptible to degradation. The humidity, elevated temperature, light and oxygen triggers a fast degradation of ranitidine.

Q. NDMA is one of the impurities as well as the degradation product, correct?

A. Yes.

Q. And if you see that article that it's citing to, 92, that's -- it's that same Jamrogiewicz article that the BI assessment cited to in 2013 that you said you didn't review.

MS. LUHANA: If we scroll down we can confirm that. Can we do so?

C. Lindsley

Scroll down to the references and look at number 92, I believe.

Q. Correct, this is the article that was cited in BI's assessment of ranitidine degradation and this is the same article being cited here to note ranitidine's degradation pathway to form NDMA, correct?

MR. SHEEHAN: Objection.

A. Sorry, that's not the same reference we talked about before.

Q. Sure, we can pull it up.

A. This is J. Pharm Biomed and the other was an agricultural or some other -- there was a different journal.

Q. So, we can -- we can pull it up and see. It's the same article, Doctor, but we'll get to that and confirm it.

But this -- did you review this article to come to the conclusion, you said that was no evidence that defendants had pre-2019 a ranitidine degradating -- I mean, degrading, did you review this article to come to the conclusion that there was no evidence that the manufacturers had about ranitidine degrading pre-2019 and to

C. Lindsley

investigate for potentially NDMA?

MR. SHEEHAN: Objection.

A. Again, that wasn't -- okay. I don't recall seeing this article, but this wasn't what I was focused on. Again, I was -- I was looking at exogenous, endogenous formations of NDMA, that's was what I was asked to give opinions on and to research. Chloraminations and other -- other non-physiological ways of degrading the molecule are not what I was asked to look at.

Q. Well, this isn't just focused on that, it's focused on other degradation pathways of ranitidine.

Doctor, didn't you conclude in your report that prior to 2019, GSK and others thoroughly evaluated the chemistry of ranitidine and its degradation products and there was no evidence they had that they should investigate, for example, NDMA?

Do you recall that statement?

A. Yes, I don't think they had any data that NDMA necessarily is being produced. I was unaware of any data they had where they were forming NDMA.

C. Lindsley

Q. Doctor, wouldn't a manufacturer, prudent manufacturer, investigate the degradant products that are formed from exposure to heat and humidity?

MR. SHEEHAN: Objection.

A. Well, again, I think so much of this, it's -- it's -- it's a bit mischaracterized 'cause now we're using hindsight, right? We had groups that went specifically to look for NDMA in a drug product, they developed methods and tried to find it. If you didn't know to look for it, especially when this compound was first developed and where the state -- the state of technology was with HPLC at that time, if he didn't know to look for it, develop a method specifically to separate out those peaks to quantify it, you know, without the benefit of hindsight, you would not know to do that. I think along the way, there -- there was no indication early on that -- or there was no indication that an NDMA was being formed, so you wouldn't know to look for it. We only can say that now 'cause we know what we're looking for and it's a very different

C. Lindsley

proposition.

Q. Doctor, in 2013, do you know that the Jamrogiewicz article stated?

A. No, I didn't read that article.

Q. Well, I'll quote for you:

Detection of some volatile degradation products released during photo exposition of ranitidine in the solid state, they concluded that low molecular mass products, particularly identified in this work, may be responsible for the characteristic odor of ranitidine. Some reports concerning the genotoxicity and carcinogenicity assays constantly performed on ranitidine were published. Nevertheless, further studies are needed to investigate the fate and health hazard of identified and anticipated compounds reported in this work?

Doctor, are you aware if GSK or any of the other defendants testified the degradant products that resulted when ranitidine was exposed to temperature, time and humidity?

MR. SHEEHAN: Objection.

A. At what time points, I don't know.

C. Lindsley

Q. Throughout the time prior to the product being withdrawn from the market, prior to 2019, do you know if they investigated and looked for NDMA when they were investigating the degradant products?

A. The only thing I'm aware of is in the early -- early on was the Tanner study and that was a similar SK -- SKF study where they did the WHO NAP test and the levels -- there was a NDMA produced in those non-physiological conditions and they saw low levels of NDMA produced.

Q. So, your testimony is that GSK saw low levels of NDMA produced per Tanner, correct?

A. Yeah, they did that, but it was -- yeah, yep.

Q. So, GSK saw low levels of NDMA produced via Tanner in 1982, correct?

MR. SHEEHAN: Objection.

A. I believe it was early '80s, yes.

Q. And did they investigate to see if NDMA forms as a degradant product when ranitidine was exposed to heat and humidity post 1982?

C. Lindsley

A. I don't know. Again, that's not what I was asked to look at and give -- offer opinions on.

Q. Okay.

MS. LUHANA: You can take this down.

THE WITNESS: Could you -- before you take it down, could you scroll up to the very top again for me real quick? Just down a little bit. Little bit more. Okay, yeah.

A. Just for the record, I wasn't the editor-in-chief when this paper got submitted. I only became editor-in-chief January 1, 2021. So, just -- just for the record, I wasn't the handling editor for this paper when it got submitted or accepted, 'cause at that point, it was handled by Nick Meanwell?

Q. Sure. Would you have done anything differently with this article when it was submitted?

A. No, no. I'm just saying you were characterizing it as I -- it's my journal. At the time, it wasn't, I'm just correcting

C. Lindsley

the record.

Q. I was just saying you're an editor of this journal, that -- that's my question raised. But thank you for that clarification.

MS. LUHANA: You can take this down.

MR. SHEEHAN: Roopal, it's 12:30, break for lunch.

MS. LUHANA: Yes, sounds good.

THE VIDEOGRAPHER: All right. We're going off the video record. The time is 5:33 p.m. UTC time.

(Whereupon, a lunch recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 6:24 p.m. UTC time.

BY MS. LUHANA:

Q. Doctor, before we broke for lunch, we were discussing a couple of documents and I just wanted to show you them again. One is Exhibit 6482, which was the BI impact assessment showing the degradation of ranitidine and the odor being investigated.

C. Lindsley

And then as well as exhibit -- which was the article here that John has put up, Exhibit 6484. And you were referencing the -- I was referencing the article about the detection of some volatile degradation products released during photo exposition of ranitidine.

So, the bottom site is from the BI impact statement and that top site is actually from the article that we reviewed and I just wanted to show you that it's citing and referencing the same document.

Do you see that there?

A. Yes.

Q. Okay. And so, you didn't review those documents or that latter document that's cited there discussing the degradation of ranitidine, correct?

MR. SHEEHAN: Objection.

A. Yeah. Like I said before, I did not review this paper, I did not look at this.

Q. Okay. And you didn't review the BI impact statement either, correct?

A. I do not recall seeing. Impact

C. Lindsley

statement from BI.

Q. Okay.

MS. LUHANA: You can take that down.

Q. Doctor, in your report, you conclude prior to 2019, GSK and others thoroughly evaluated the chemistry of ranitidine and its degradation products.

And I want to get an idea of what studies you reviewed to come to that conclusion.

And so my question to you is, did you review the stability testing done for physical appearance, for example, any other stability testing done by the defendants for ranitidine over the course of 40 years?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah, I did not see those. I did not review those documents, I was mainly looking in primary literature.

Q. Did you --

A. Which is in my report.

Q. Did you review the degradation testing?

C. Lindsley

A. Which -- which document in particular are you referring to?

Q. Well, the stability testing that does degradation testing, did you review the degradation testing and the results of that testing?

A. From which document?

Q. From the stability testing the manufacturers do over the course of time for ranitidine.

A. I mean, is there a specific document you're talking about with data in it?

Q. There's multiple documents because stability testing is required per the FDA for the manufacturers to do. So, as they do -- the manufacturers conduct stability testing and their degradation results from that stability testing, my question to you is, have you reviewed that?

MR. SHEEHAN: Objection.

A. I reviewed a lot of documents in this case, quite honestly, and I can't remember all of them in exact detail. So, if there's one in particular you want to talk

C. Lindsley

about, let's pull up it and I'll see if it's something I did review and we can walk through it.

Q. Well, if it's not in your materials considered list or cited specifically in your report, that means you didn't review it, correct?

A. Quite likely, yes.

Q. Did you review the BI's TrackWise data with out of specification, out of trend and out of expectation trend -- test results?

A. No, I did not see that document.

Q. So, fair to say you didn't do a comprehensive review of all the evidence to come to this conclusion, correct?

MR. SHEEHAN: Objection.

A. I don't think that's actually a fair characterization. I looked at lot of documents and a lot of data about stability of the compound.

Q. However, you're providing an opinion that there wasn't any evidence prior to 2019, Doctor. So, how can you state that the manufacturers thoroughly evaluated the chemistry when you haven't looked at the

C. Lindsley

deviations and analyze how they assess their failures and what they did in response to those failures?

A. Well, if there's documents and reports I'm not aware of, I can only go with the data I'm aware of and what was done historically and what people from the different companies did do and published. I can't comment on things I'm not aware of.

Q. So, when you're saying there isn't any evidence, you haven't reviewed the entire -- you haven't reviewed all the evidence, correct?

MR. SHEEHAN: Objection.

A. If there's evidence that exists that I haven't been privy to, I don't know how I'm supposed to respond to that because I can't comment on things I haven't seen.

Q. Sure. Have you asked -- have you asked the defendants to provide you all the stability testing and the results through the years that the ranitidine was on the market?

A. No. Because, again, I was requested to go look at what was known about

C. Lindsley

exogenous and endogenous production of NDMA from Zantac and that's what's in my report and that's what I offered opinions on.

Q. Doctor, Paragraph 27 of your report says:

Prior to 2019, GSK and others thoroughly evaluated the chemistry of ranitidine and its degradation products, correct?

A. That's been reported in -- that's been reported in the primary literature.

Q. So, you haven't reviewed internal documents, you've only reviewed any experiment documents?

A. I haven't seen many internal documents.

Q. Okay. Doctor, do you know if any of the defendants ever isolated the degradant products from the accelerated testing and ran HPLC/MS for NDMA?

A. I am unaware of that.

Q. Could they have done that?

MR. SHEEHAN: Objection.

A. I mean, is it possible? Yes. But I don't -- there was no rationale or

C. Lindsley

reasonable expectation to go looking for NDMA.

Q. Do you know if they testified the pills for NDMA based on the results, for example, Tanner, the SKF study, Broom, or Krawczynski?

MR. SHEEHAN: Objection.

A. Those I don't know. But, again, the WHO NAP test is one of these things we were using non-physiological conditions and it's something that even the administrators of the test say should not be translated to a -- a - to the human situation 'cause it's non-physiological. It's just a way to rank order compounds for their propensity to potentially generate nitroso intermediates, not a way to -- not a way to categorize them of risk.

So, I don't know -- the -- the -- very, very low levels and then when you have the ratio in Tanner one-to-one, even under these extreme conditions of excessive nitrate and very acidic pHs, which is not the environment ranitidine is in in vivo, there is almost no -- no differentiation from a

C. Lindsley

baseline vehicle study. So, based on the result of the Tanner study, there was no reason to presume you're going to be producing NDMA from ranitidine.

Q. Doctor, you mentioned the one-to-one ratio, when there was a one-to-one ratio of sodium nitrite and ranitidine, do you recall how much NDMA was produced?

MR. SHEEHAN: Objection.

A. Let me look so I don't quote it incorrectly, .74 percent.

Q. Did you calculate that because quantification is important to you, right, Doctor? Did you calculate how much NDMA that results in?

A. I'm sure I did at one point.

Q. Doctor, is that in your report?

A. No.

Q. Doctor, do you know if .74 percent is above the ADI for NDMA?

MR. SHEEHAN: Objection.

A. I have to do the calculation.

Q. But sitting here today, you don't know?

A. Again, as I just said, I'd have to

C. Lindsley

do the calculation real quick and then -- and figure out what that -- what that actual number is.

Q. Sure. So, the NDMA was quantified in the 1980s as to how much NDMA was generated with a one to one ration ratio of ranitidine and sodium nitrite.

Doesn't that confirm that NDMA is being produced, Doctor?

MR. SHEEHAN: Objection.

Mischaracterizes the document.

A. Well, 'cause the very next step when they do this at a physiological level of nitrite, the NMDA signal was low and comparable to gastric fluid without ranitidine. So, unless you're doing these souped-up non-physiological conditions that aren't really achievable in vivo, there's no real concern.

Q. Really? That's what the WHO NAP's test says?

A. I didn't say that's what the WHO NAP test says, so this is what this data that Tanner generated shows.

Q. Doctor, have you ever conducted a

C. Lindsley

WHO NAP test for nitrosation?

A. No.

Q. Is the WHO NAP test intend to mimic physiological conditions or is it intended to be a screening test for nitrosation?

A. It is not physiologically relevant at all.

Q. Is it intended to be physiologically relevant; is that what the WHO NAP test is being conducted to mimic physiological conditions, Doctor?

A. No.

Q. The purpose of it is to be a screening test for nitrosation, correct?

A. Correct.

MS. LUHANA: Let's pull up what's been marked as --

Q. Before we do, actually, Doctor, do you know the full name of the Tanner article?

A. Full name of the Tanner article?

Q. Yeah, the title of it.

A. I have to look that up. I don't remember.

Q. It's called the Determination of N-nitrosodimethylamine Formed by the Reaction

C. Lindsley

Ranitidine Hydrochloride with Sodium Nitrite.

So, in the title of the document, it's determining and quantifying the amount of NDMA that's formed with ranitidine and sodium and nitrite, correct?

MR. SHEEHAN: Objection. Roopal, if you want to talk about the document, let's just pull it up.

MS. LUHANA: Have a question standing, Tom.

A. Could you repeat that, please?

Q. Doctor, it's called a Determination of N-nitrosodimethylamine, and that's in the title of the document and it's determining and quantifying the amount of NDMA that's formed with ranitidine and sodium nitrite, correct?

MR. SHEEHAN: Objection.

A. Yeah, that's the title.

Q. Doctor, do you agree that if you have a tertiary mean and a nitrite, that there's a potential for nitrosation?

A. You know, that really depends. There are so many drugs on the market that have a tertiary means that have no liability

C. Lindsley

of any kind. So, everything is so context dependent, you can't make broad generalizations. When you look at even how the -- some of the compounds that have gone through the WHO NAP test, pharmaceutical how they rank, some are very high, some are low and some show absolutely nothing. And, you know, chemically they look -- they look the same.

Q. Did you see where ranitidine ranks in terms of yield produced pursuant to the WHO NAP test in other drugs?

A. In which report?

Q. In Tanner, for example, did you -- did you see the yield of NDMA that's produced per the WHO NAP test in Tanner for ranitidine and compare it -- compare the percentages of the results of the WHO NAP test for other drugs?

MR. SHEEHAN: Objection.

A. Well, which -- I'm -- which paper are you referring to where they're listing all the other drugs?

Q. No, Doctor, I'm asking you. You just testified as to it's important to see

C. Lindsley

where NDMA and yield where it ranks per the WHO NAP test for drugs.

Did you check to see where ranitidine lands in terms of the NDMA yield that's produced per the WHO NAP test compared to other drugs?

A. Yes, I looked at some of those, but which study in particular are you talking about, there's multiple reports of this.

Q. Sure, any study. Which any study did you look at which quantified that?

(Cross-talk.)

Q. I would like you to know -- I would like to know where ranitidine landed.

MR. SHEEHAN: Roopal. Roopal, just don't cut him off. We're starting to jump on each other's words here, let's...

Q. Doctor, I apologize. I'm not -- I'm not trying to cut you off. I'm trying to understand the papers you reviewed and I'm trying to understand if you can identify for me which paper you reviewed that rank the results of the WHO NAP test and the NDMA levels.

C. Lindsley

A. I'll have to look again 'cause there are lots of papers.

I did look, I can't remember the data exactly offhand. I need to pull up the exact study to look at the table.

So, I think, you know, I really feel more comfortable if we actually had a discrete paper to pull up and talk about, but I can -- I do recall that in one table in particular, ranitidine was somewhat in the middle of the compounds that they were -- they were profiling. And, you know, I think one of the big caveats that they keep saying in these manuscripts when they -- when they even put these tables together is that again the WHO NAP conditions are not physiologically relevant. They're not designed to actually show risk benefit of an orally administered drug, they're purely a way to rank drugs relative to each other.

Q. WHO NAP test is the screening mechanism for nitrosation, correct?

MR. SHEEHAN: Objection.

A. It -- under -- yeah, under very forcing conditions, it shows the possibility

C. Lindsley

of having nitrosation.

Q. It's to forewarn manufacturers that nitrosation may occur, correct?

MR. SHEEHAN: Objection.

A. I don't -- well, I don't want to agree to that exact statement. I think I need to -- I need to look at the document on the WHO NAP test and what -- what the actual language is around that.

Q. Have you looked at it prior to sitting here today to testify?

A. Yes, I've read -- I have read hundreds of documents. I just don't have -- I just don't -- I can't quote you lines from all the documents I have read.

Q. Doctor --

A. Again, anything you want to talk about, let's -- let's pull it up and look at it.

Q. I'm not asking you to memorize the facts. I'm just trying to understand -- understand what you reviewed.

So, going back to my initial question, do you agree, if you have a tertiary mean and a nitrite, there is a

C. Lindsley

potential for nitrosation?

MR. SHEEHAN: Objection. Asked and answered.

A. There's a possibility.

Q. Do you agree that this has been known since the 1970s?

A. What has been known?

Q. That if you have a tertiary mean and a nitrite, there's a potential for nitrosation.

A. There's a potential for nitrosation and some -- yeah, well, it's potential, not all tertiary means work, not all tertiary means are reactive.

Q. Sure, I'm not disagreeing with that.

The statement is, if you have a tertiary mean and a nitrite, there's a potential for nitrosation and that's been known since the 1970s, correct?

MR. SHEEHAN: Objection.

A. I believe it was the sev- -- late 70s when this was released, yes.

Q. Okay.

MS. LUHANA: Let's take a look at

C. Lindsley

-- we've been talking about Tanner, so let's pull it up, it's Exhibit 4162.

(Exhibit 4162 was marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is what's been marked as Exhibit 61 -- 4162 is the Tanner study dated April 1982 and it's titled The Determination of N-nitrosodimethylamine Formed by the Reaction of Ranitidine Hydrochloride With Sodium Nitrate, correct?

A. Correct.

Q. And you've seen this before?

A. Yes.

MS. LUHANA: Let's turn to page 2. Sorry, it's page 2 of the document, yeah. Right there, perfect.

Q. Do you see the first sentence of the second paragraph there it says:

Ranitidine hydrochloride contains a dimethylamino group therefore experiments were carried out to determine whether NDMA could be formed from the drug in the presence of the nitrite, correct?

A. Correct.

C. Lindsley

Q. So, it's testing to see whether tertiary, you know, dimethylamine and having nitrite, whether nitrosation and NDMA forms, correct?

MR. SHEEHAN: Objection.

A. That is what they're looking for, yes.

Q. Okay. Would you agree that the Tanner study is a relevant example of GSK testing Zantac tablets in simulated gastric conditions and detecting NDMA in 1982?

MR. SHEEHAN: Objection. Mischaracterizes the document.

A. Yeah, that's -- that's not really what they're -- what they're doing here. The NAP test is not looking at any kind of -- anything that's physiologically relevant.

Q. So, you disagree with that statement, Doctor?

A. The NAP test is not physiologically relevant.

Q. So, Doctor, you would say that this study isn't a relevant example of GSK testing Zantac tablets and simulated gastric conditions and detecting NDMA in 1982,

C. Lindsley

correct?

MR. SHEEHAN: Objection.

Mischaracterizes testimony.

A. The last part of this paper, they're looking in gastric juice at pH of 3, which is not the pH once you take ranitidine anyways. It's a hundred fold more acidic than what you would have in vivo. So, this purely isn't a physiological -- physiologically relevant experiment either.

Q. Doctor, are you aware GSK produced the Tanner study to the FDA in response to that very question? The very question was, have you testified Zantac tablets in simulated gastric body condition including -- I'm sorry, let me repeat that.

I'll represent to you that GSK produced the Tanner study to the FDA in response to that very question, have you testified Zantac tablets in simulated human body condition, including gastric conditions? And if you have, have you detected NDMA and asking for the levels that were observed?

And do you believe that GSK produced the Tanner study in response to that

C. Lindsley

very question, are you aware of that?

A. I was not aware of that.

Q. Does that change your opinion?

MR. SHEEHAN: Objection.

A. Well, I've already told you, yes, they're using gastric juice, but the pH is not a very relevant pH.

Q. So, Doctor, is the Tanner study a relevant example of a study where Zantac tablets were testified in simulated human body conditions, including gastric conditions, where they detected NDMA?

MR. SHEEHAN: Objection.

A. Again, the way this is run, it's not really simulating physiological conditions, so... But it's the only -- it's the only time that work was done where they looked in a -- as far as I can tell, I mean, they're using gastric juice. So, I guess on that basis, if that's what they say...

Q. If that's what they say, can you finish your response?

A. If that's what GSK produced in response to that question, then I don't know why they would -- why they would initially

C. Lindsley

had done that because there's caveats to it. But I'm not gonna debate the fact that they submitted this in response to that question.

MS. LUHANA: Let's turn to page 6 of this study.

Q. Doctor, you've reviewed the study before and you're familiar with the conditions, correct?

A. Yes.

Q. It was a simulated gastric study where 10 millimoles of ranitidine with 40 millimoles of sodium nitrate were incubated and they generated 232 micrograms of NDMA, which is equivalent to 3.1 percent yield based on ranitidine, correct?

A. Yes.

Q. Do you know how many nanograms that is?

A. I'll have to do the conversion.

Q. Is it more than the ADI?

A. Again, right now, I'm just not getting the calculation, so...

Q. Can you take your time with it? I would like to know the answer because you evaluated the values in terms of how much

C. Lindsley

NDMA was generated in these studies, so I want to have an idea of the quantity of NDMA that was produced that GSK knew of under the WHO NAP test in 1982.

A. That would be 232,000 nanograms.

Q. Okay. And Doctor, doesn't it say here somewhere, yes, right there, corrected for 62 percent recovery, correct?

A. Yes.

Q. So, that's not even 100 percent of the NDMA that was actually recovered, it was -- it's 62 percent, right?

MR. SHEEHAN: Objection.

A. That's what it says.

Q. Okay.

MS. LUHANA: Can we go to Bates ending in -- yeah, right there, perfect.

Q. Doctor, there was an experiment where .3 millimole of sodium nitrite was incubated with one millimole of ranitidine, correct?

A. Correct.

Q. And it generated a low intensity signal.

C. Lindsley

Do you see that?

A. I do.

Q. So, the amount of NDMA that was generated with that low intensity signal, it's not disclosed there, correct?

MR. SHEEHAN: Objection.

A. It does not, but it was similar to control gastric juice without drug.

Q. Sure. But do you know what the quantity of NDMA was that was generated there?

A. No.

Q. Did you request those documents and information about how much NDMA was generated at that .3 millimole of sodium nitrate mark?

A. No, I did not.

Q. It wasn't important to you?

A. Well, that's not a -- that's not a true statement either. When you look at the fact that the control gastric juice gave the exact same -- exact same analytical record, that's suggesting that there was really nothing produced beyond what is just background and gastric juice.

Q. Do you know what was used as a

C. Lindsley

control for gastric juice?

A. I'm assuming gastric juice.

Q. And it was just gastric juice or do you know if it was something else?

A. I don't know.

Q. So, the Tanner study showed what 232,000 nanograms of NDMA can be generated with the WHO NAP conditions, correct?

MR. SHEEHAN: Objection.

A. That is the value of the -- that they found.

Q. And Doctor, it's your testimony the study that's literally titled The Determination of N-nitrosodimethylamine NDMA, Formed by the Reaction of Ranitidine Hydrochloride with Sodium Nitrite that produced 232,000 nanograms of the NDMA per the WHO NAP conditions provided GSK with no evidence or the other defendants with any evidence that NDMA can potentially form?

MR. SHEEHAN: Objection.

A. Again --

MR. SHEEHAN: Let me get my objection.

Objection. Mischaracterizes the

C. Lindsley

documents.

Go ahead.

A. Again, you gotta look, this is a non-physiologically test and this is what everyone has always said, even the people that derived this test. This is a non-physiological test. Your -- the test is designed to be the super -- super severe conditions to show worst case scenario. It's not a realistic thing, it's not a real world event. You're not gonna -- humans aren't gonna tolerate that level of nitrite on a consistent basis. They're gonna have other health effects if that was their level of nitrite on a routine basis. It's not physiologically relevant. The fact that when you go to a moderate exposure and a physiologically relevant amount of nitrite, you're seeing similar levels to what you see in gastric juice without Zantac added shows under normal conditions, there's not a -- there doesn't appear to be any risk of NDMA formation.

Q. Doctor, there was a 3.1 percent yield of NDMA generated, right, and that was

C. Lindsley

62 percent recovered?

A. Yes.

Q. Do you know what the manufacturer should've done after they received the results of this test?

MR. SHEEHAN: Objection.

A. I do not know those regulatory issues. Again, that's not -- that's not what I am here to talk about, that's not endogenous, exogenous formation of NDMA. I'm not here to offer opinions on regulatory work from the 80s, I don't know.

Q. Doctor, can you tell me what tests could have been done to test for NDMA and ranitidine? Could GSK or the other defendants have ran stability testing, let's say, at 40 degrees Celsius, 75 percent relative humidity for 12 weeks and they isolate the degradant products and run HPLC/MS and test for NDMA, they could've done that, correct?

MR. SHEEHAN: Objection. Are you -- are you -- are you conflating the in vitro simulated fluids with -- with -- with just drug now, Roopal?

C. Lindsley

Is that what you're --

MS. LUHANA: Can we -- can we please take this down, this document down?

Counsel, I'm just asking him about the test that could've been done, I am not conflating anything. It's a separate question.

A. Well, there's a lot of speculation I guess to what could or could not be done at the time. So, I was not at GSK, I was not on these defendant companies at the time. And what the data generated, I don't know what they could've done.

Q. Doctor, I'm asking you. You're a chemist, correct?

A. Yes.

Q. With a Ph.D.?

A. We established that.

Q. You run the Lindsay Lab, which is a state-of-the-art lab, correct?

A. Correct.

Q. I'm asking you, in terms of the test, as a chemist, that could've been done.

So, could the defendants have run,

C. Lindsley

for example, accelerated stability testing, for example, at 40 degrees Celsius, 75 percent relative humidity, for, let's say, 12 weeks and then isolated the degradant products and then could they have run HPLC/MS and looked for NDMA and quantified NDMA?

MR. SHEEHAN: Objection. Calls for speculation.

A. Yeah, I feel the same way, that's a very speculative question. I don't think the WHO NAP test with these non-physiological excessive nitrite, excessive acidity correlate anything to API or drug product stability.

Q. Doctor, who's talking about the WHO -- I'm not talking about the WHO NAP test, Doctor. Let's put the WHO NAP test aside.

I'm saying -- my question is to look for NDMA and what could have been done after the screening test was done.

Could you run accelerated stability testing, let's say at 40 degrees Celsius and 75 percent relative humidity, those are the stability parameters provided by the FDA, run

C. Lindsley

that test for 12 weeks, isolate the degradants and run HPLC/MS and test for NDMA, could you have done that test in the 80s?

MR. SHEEHAN: Objection. Calls for speculation.

A. It's --- it's possible. The thing again -- another thing that really needs to be kept in mind is triple quad mass specs and HPLCs, you know, the first triple quad mass spec was reported in Jackson, 1976. The technology, the resolution power, everything isn't what it is today. So, one could -- one could do that and the limitation on chromatography columns and a lot of other analytical techniques, maybe one could've developed a method to separate things out, maybe one couldn't have.

I mean, your question is very speculative, so a lot of things are possible. And in a big company, I would assume that a lot of things are possible, a lot of things could or could not be done. But my opinion, based on what I saw in that study with the controls is there was no -- in my opinion, I did not see any smoking gun there that would

C. Lindsley

suggest the drug product alone would be degrading and forming NDMA and people should be looking for NDMA in drug products of Zantac.

Q. Doctor, you need a smoking gun for a reasonable manufacturer to act on finding levels a genotoxic carcinogen in their drug?

MR. SHEEHAN: Objection.

A. Maybe that wasn't the right -- right phrase to use. But at what point do you stop looking for -- I mean, how do you know what to look for? Any -- any pharmaceutical company can drive themselves crazy thinking, oh, any possible -- I mean, in any hint of anything you're gonna go develop all these analytical methods and do all these other tests and all these other studies, you know, where does it stop? You know, we have thresholds based on daily doses and impurities in drugs and what you need to identify, quantify, characterize. And I'm assuming that the fact that GSK back in the 80s got an NDA for this -- for this product, they submitted those products to the FDA.

Q. Do you believe that GSK submitted

C. Lindsley

the Tanner study to the FDA?
MR. SHEEHAN: Objection.
Q. You believe they did that in the '80s?
A. I have no idea.
Q. So, you don't have any idea as to whether Tanner was submitted to the FDA in the 1980s?
A. I do not know.
Q. Does that matter to you?
MR. SHEEHAN: Objection.
Q. Let's say they withheld the Tanner study and didn't produce it to the FDA, does that impact your opinion?
A. If they withheld it?
MR. SHEEHAN: Objection.
A. No, it doesn't really impact my opinion, because, again, when you look at the levels that are more physiologically relevant, even though the acidity is wrong, it's too acidic, that would more -- generate more NDMA. Those studies don't show really anything different than the control gastric juices. And there's been a wealth of study since then with NMDA -- sorry, with Zantac

and all these -- these super physiological conditions. And, you know, they're just -- it's not -- I don't see the data there, I don't see the concern that under physiological conditions whether they're doing this exogenous or endogenously with, you know, the FDA clinical trial and a lot of thee other studies have been done that when you ingest NDM -- when you ingest Zantac, you're producing NDMA. I have not seen, in my mind, the documents I reviewed, I've seen no evidence of that.

I do think, and people have shown now, that obviously the FDA has a whole range, you know, they pull -- they pull drug product right off the shelves, they analyze it, there's a range of NDMA in Zantac and, you know, some are low, some are below the level, the AI, some are at the AI, some are above. And, you know, it's my opinion based on all the documents I've seen that the only NDMA produced from Zantac is that is which is ingested.

Q. Doctor, could GSK or the other defendants testified the pills for NDMA

C. Lindsley

previously?

A. Again. That's very speculative and it's possible. But I don't see a reason why they would've done that.

Q. Doctor, you're a Ph.D. with years of experience. And I'm asking you if GSK or the other defendants could've testified the pills for NDMA and quantified it years before. That's not speculation, I'm asking you a question.

Could it have been done, as a biochemist with your experience and your training, running a state-of-the-art lab, could have been done previously?

MR. SHEEHAN: Objection. Asked and answered.

A. Well, once again, anything's possible. In a big lab, people can develop methods and analyze for anything.

Q. So, it could've been done, but it wasn't, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, I think so much of this is with the benefit of hindsight. After the

C. Lindsley

Valisure citizen petition using an unreliable and the wrong analytical method that generate these artificially high levels of NDMA that then sparked -- sparked the issue that there's NDMA in Zantac.

And again, when the FDA goes back and pulls drugs off the -- off the shelves, we know now that the GC -- the whole Valisure thing was blown way, way out of proportion, the -- all the amounts were exaggerated, that led to both Zeng & Mitch papers being retracted and corrected because the levels were incorrect. And that led to a lot of hindsight investigation going let's go -- could they've -- could they've and should they've done all these things. And, you know, without the knowledge of hindsight, I think it's incredibly speculative to say that these things, you know, could or should've been done because there was no strong data to say that they should've been done.

Q. So, only if there was a study determining the levels of NDMA found ranitidine and sodium nitrite, let's say in the 1980s, could GSK have known much NDMA was

C. Lindsley

generated, right?

MR. SHEEHAN: Objection.

Mischaracterizes testimony.

A. That wasn't what I was saying. You cannot correlate a non-physiological test with anything that can happen in a real world scenario or in vivo --

Q. Sure. But --

(Cross-talk.)

A. -- they're reasonably inclusive.

Q. But a reasonable manufacturing company that cared about its consumers when finding genotoxic carcinogen in a pill that's used by millions, including babies, pregnant women and consumers should do their due diligence, wouldn't you agree with that?

MR. SHEEHAN: Objection.

A. I think that's a real strong mischaracterization, so I'm not going to comment on that.

Q. So, in terms of the testing that could've been done, you can't provide any opinion as a chemist as to the capabilities of, for example, labs generally in the 80s or the 90s or 2000s in terms of doing different

C. Lindsley

times of tests, could you provide that testimony?

A. I already did. I already answered that exact question. Those things could be done. Any large pharmaceutical company would have the ability to develop methods. The sensitivity would change over time based on where the analytical techniques were, say, in 1979 versus 1985 versus 1990, the sensitivity, the reliability, the accuracy, the quantitation would change, as the techniques got more sophisticated. But, yes, these things are completely probable, I answered your question.

Q. Doctor, are you aware that there was a method that was validated to measure NDMA levels as low as 10 parts per billion in the '80s?

MR. SHEEHAN: Objection.

A. Which method was that?

Q. Are you aware that there was a method to do so?

A. No.

Q. Doctor, could GSK or the other defendants radiolabel dimethylamine for

C. Lindsley

confirm, for example, if NDMA forms?

A. How would they label it?

Q. I don't know, you tell me. They could've radiolabeled in some fashion what they did, for example, with the root cause analysis, could they have done that isotypical radiolabeling earlier on to detect NDMA?

MR. SHEEHAN: Objection.

A. Again, they didn't know -- there was no reason to go look for NDMA. So, I mean, we just keep putting the cart before the horse here. I think the data suggests relative to reasonably more comparable physiological conditions there was nothing beyond gastric juice control, so there was no rationale to go look for NDMA. But I think back in the late 70s, early 80s, you know, you couldn't really -- making N-15 isotopes wasn't a straightforward thing like it is today. Today it's very straightforward to do those things. There are kits you can buy, so right off the cyclotron you can do this stuff very, very easily.

You know, you can think about

C. Lindsley

treating and labeling the methyl groups or C14 labeling methyl groups. That's wasn't straightforward back then. And since one of the major metabolites has been identified wasn't in the alkylation, you have to be very careful about labeling the carbons because then you could be, you know, who knows where that radiolabeled species would go and would end up being unreliable.

So, one would have to spend quite a bit of time figuring out where on the molecule to put the radiolabel to follow its fate. And then that may or may not give indication as to -- to the formation of any particular metabolite or degradation product.

Q. So, it's your testimony that what was done in root cause analysis with the radiolabeling couldn't have been done in the 1980s?

A. I think it would've been challenging doing it in the 1980s based on availability to do chemistry as well as sensitivity of mass specs to differentiate such small changes in molecular ways.

It could've been done, but the

C. Lindsley

sensitivity of the accuracy and the precision would not been the same as it is today.

Q. Could the defendants have conducted AbbVie studies previously where they radiolabeled on one of the dimethyl carbons to see if NDMA levels form?

A. Again, they could --

MR. SHEEHAN: Objection. Hold on, just let me get my objection.

A. Yes, that's --

THE COURT REPORTER: Doctor, you have to slow down.

MR. SHEEHAN: I knew it was coming.

THE WITNESS: Sorry. I am an auctioneer in a second life, I really am.

A. So, yes, that could've been done, but the risk there, as I mentioned before and since we know that in the alkylation is a primary root of metabolism, it's one of the major metabolites of Zantac, you would lose your radiolabel, then that can go and promiscuously integrate or bind to other things and then you really couldn't trace the

C. Lindsley

fate and you'd have a -- it'd be very complex as to what was going on.

Q. However, you've never done any radiolabeling for ranitidine, correct?

A. I have not.

Q. And you've never done any tests for NDMA, correct?

A. That is correct.

MS. LUHANA: Let's pull up what's been premarked exhibit or was previously marked Exhibit 288.

(Exhibit 0288 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is Exhibit 288, it's the Broom study titled Radioisotope Study to Investigate the Metabolic Disposition of Ranitidine in Man from 1976.

Have you seen this study before?

THE WITNESS: Can we scroll down to another page? Maybe one more. One more.

A. This looks vaguely familiar, I may have looked through this.

Q. Okay. Take a look at the summary.

C. Lindsley

This is a study where four healthy male subjects received ranitidine and fecal and urine samples were taken and metabolites were measured. So, take a look at that summary there.

A. Okay.

(Document review.)

Correct, I see that. Yep.

Q. Did I give an accurate representation of this study?

A. Yes.

Q. Okay.

MS. LUHANA: Let's turn to Table 3, which is on page 18. Yeah, I think it's the next page possibly and you'll have to flip it. That's 16, so keep on going.

Q. Doctor, you saw that the subjects were given via IV as well as oral administration ranitidine, correct?

A. Yes.

MS. LUHANA: I mean, can we turn it?

MR. SHEEHAN: Give us a minute here so we can take a look at what the

C. Lindsley

document actually says.

MS. LUHANA: Is there a way to rotate it? Perfect.

Q. Doctor, do you see that ranitidine was administered and HPLC testing confirmed that N-oxide, S-oxide, desmethyl and furoic acid metabolites of ranitidine were present in the urine?

A. Yes.

Q. And do you see how much furoic acid was found in the urine of these participants?

A. Yes.

Q. And it ranges from .8 to 2.2, correct --

A. Correct.

Q. -- percent?

Would you agree that finding a furoic acid analog metabolite from ranitidine is significant because it confirms that dimethylamine can be released by oxidative deamination from the tertiary mean group, therefore the DMA is free to form to NDMA when exposed to nitrate?

MR. SHEEHAN: Objection. And let me just get my objection that it

C. Lindsley

mischaracterizes the document.

Go ahead.

A. Okay. Well, this is something that Dr. Marletta also pointed out and I would have to say I disagree with that completely. There has been no evidence of any kind quantifying DMA being liberated. The only known metabolite we have in that -- in that pathway is the desmethyl ranitidine. So, it's just as likely there's a second N-dealkylation that liberates methylamine. And that can be going on. I think anything beyond that is really pure speculation.

And besides that, this metabolism is occurring in the liver, not in the gut. So, when you take an oral drug or even the IV drug, it's getting in -- you know, it's getting absorbed, it's getting through the hepatic portal vein, it's being metabolized in the liver and then it's being released back out into systemic circulation. So, this furoic acid is being removed from the liver and extracted into the plasma, then into the urine. If there was DMA present, which we don't know, and no one's ever really

C. Lindsley

confirmed that in any way, shape or form, it would not be in the gut to react with nitrate and do anything. It's in the liver, it's going into systemic circulation now. It's going to the plasma, it's gonna be eliminated in the urine. It's not available in the GI compartment with the parent drug and with any endogenous nitrate that may or may not be present.

I think based on the data that's here and with the known metabolism of other -- some other tertiary mean drugs like Prozac and some other ones, it's more than likely you're seeing this desmethyl ranitidine, then there's a second oxidative dealkylation occurring that then liberates methylamine. This isn't in any way -- there's no data suggesting DMA is formed here at all.

Q. Doctor, have you seen any discussion from the documents about noting that the furoic acid analog showing up in the urine of men given ranitidine is an indication that NDMA is being released?

MR. SHEEHAN: Objection.

C. Lindsley

A. Well, again, no one has shown DMA is being released.

Q. Have you seen documents suggesting that it's an indication that dimethylamine is being released because the furoic acid analog is found in the urine?

A. I think about there's speculation about what possible --

(Court Reporter clarification.)

A. There's -- there's speculation, but there's no data suggesting that you're getting a de -- an oxidative dealkylation that liberates dimethylamine. That hasn't been known as a degradation product or the metabolite in any study that DMA is liberated.

Q. Doctor, it's the furoic acid analog breaking away from the DMA is an indication that the DMA is released because you're finding this in the urine. There are documents stating that.

However, have you reviewed those documents?

A. I've looked at --

MR. SHEEHAN: Objection.

C. Lindsley

Give me a beat.

Objection.

A. I looked at a lot of documents. That's one possibility. But you'd have to have an oxidative dealkylation and then an oxidation of the methyl furo group to make the furoic acid. There's a lot of things going on. There could even be an oxidation of the desmethyl ranitidine that's making that primary amide and then that can get hydrolyzed in the plasma of the urine.

No one's done the conclusive study to show DMA is released. No one has quantified DMA as a metabolite -- metabolite by-product of Zantac. That has never been demonstrated.

Q. So, GSK or none of the other defendants did any studies after the Broom study, correct, to confirm whether the dimethylamine is being released?

A. I have not seen any studies. I have not seen any studies that show DMA has been released. As far as I know, there's been no quantification of NDMA -- of DMA in any -- any study.

C. Lindsley

Q. No. My question to you is, are you aware if GSK or any of the defendants did any studies after the Broom study to confirm if the dimethylamine is being released?

A. I am not aware of any study where DMA is shown to be released.

Q. So, you're not aware whether GSK or any of the defendants did any studies to confirm that dimethylamine is being released, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, I have not read a study that shows me that DMA has been released and quantified in any way.

Q. Doctor, that's not my question.

My question is, are you aware if GSK did any of those studies or defendants did any of those studies to confirm whether dimethylamine is being released?

A. Yeah, I'm not aware of any study --

MR. SHEEHAN: Objection. Hold on, just let me get my objection.

THE WITNESS: Sorry.

MR. SHEEHAN: Go ahead.

C. Lindsley

A. I am not aware of any study by any participant, any person, any group where they've quantified DMA as a metabolite of Zantac.

MS. LUHANA: Okay, you can take this down.

Let's put up what's been previously marked as Exhibit 265.

(Exhibit 0265 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you reviewed the Krawczynski study?

THE WITNESS: Can we go to the next page, please?

Q. This is a polish study from January 2002 where children were given ranitidine.

A. I have not seen this paper or maybe I saw a different version of it, but...

Q. Okay. Well, let's scroll down some to look at nitrosamines in children with chronic gastritis. Can you take -- can you review this?

A. (Document review.)

C. Lindsley

Okay.

Q. So, Doctor, this was a polish study from January 2002 and children were treated with ranitidine and their gastric fluid and urine were analyzed post treatment for nitrosamines, including NDMA.

MS. LUHANA: And let's turn to Bates ending in 235269.

Oh, sorry. I have different version of it. Let's go to --

MR. SHEEHAN: What exhibit number is this?

MS. LUHANA: This is 265.

MR. SHEEHAN: Thank you.

THE WITNESS: Can you scroll back up just a --

MS. LUHANA: Let's go to the last page before the -- sorry.

Did you want to look at something, Doctor?

THE WITNESS: Can I see the end of the abstract 'cause it got cut off, so I wanted to see what the last part of the abstract said.

(Document review.)

C. Lindsley

Q. So, Doctor, if you're done looking at it, I just want to take a last look at the page before the conclusions?

A. Okay.

MS. LUHANA: Right there. Next page. Right there, yes.

Q. So, do you see the last sentence there right before the conclusion says:

The study results presented here demonstrate statistically significant increase in nitrosamine concentration in both gastric juice and urine and children with gastritis and duodenitis after four-week treatment with ranitidine.

Do you see that there?

A. Yes.

Q. So, there is a statistically significant increase in nitrosamines, including NDMA that was found in this study after these kids took it for 28 days.

Are you aware of that?

MR. SHEEHAN: Objection.

A. Again, I'm not -- this study doesn't -- this isn't one I think I looked at. And I think I dis- -- if I did look at

C. Lindsley

it, I know there were a lot of studies when I was looking at them, this one in particular used gas chromatography to quantify everything. And so, we all -- we all know that GC is not a reliable analytical method for determining NDMA in ranitidine and I think when I saw papers when they're using gas chromatography because the thermal decomposition in the artificially elevated levels which the FDA has commented on, the Zeng & Mitch papers -

(Court Reporter clarification.)

THE WITNESS: Sorry. Slow down, okay.

A. These papers where the analytical technique is gas chromatography, we know that that's destructive to Zantac, it degrades the molecule, it ele- -- it creates elevated levels of an NDMA that are artificial. It's creating NDMA in the detector by the thermal decomposition of the drug. This is what the FDA has said and modified their protocols to go to HPLC analysis. This is why one Zeng & Mitch paper was retracted. This is why this other paper was corrected. This is what

C. Lindsley

these authors use as well, they're using GC. And so, by just injecting G -- gastric fluid analytes into a GC where there is still drug present, you can't -- the levels of NDMA that they're detecting here are completely unreliable.

This study would have to be repeated either with extensive extraction protocols to eliminate the Zantac prior to the GC analysis or you'd have to redo the study with HPLC analysis. So, we're not artificially creating higher levels of NDMA.

Q. Doctor, I referenced that the study was done in January 2002, correct?

A. Yes.

Q. In January of 2002, did GSK know that GC-MS caused thermal degradation to ranitidine resulting in NDMA?

MR. SHEEHAN: Objection.

A. Well, okay. Prior to two thousand -- well, okay. I think it's important to understand analytical techniques and when and when not to use them. Ranitidine is not a volatile compound. You could not do -- GC is not the appropriate

C. Lindsley

analytical technique to analyze a non-volatile compound. GC is not the tool to use with a salt, an inorganic salt of organic molecule. It's the inappropriate technique. GSK scientists would know you can't do that, which is why the Tanner study, they had extraction protocols to remove the drug prior to any analysis.

So, here, just injecting raw gastric fluid into a GC, you're gonna be fraught with all kinds of issues and I think the results here would all be highly suspect.

Q. You're saying GSK knew in 2002 not to use GC-MS to assess NDMA in ranitidine because they're aware of thermal degradation?

A. No, that's not what I said.

MR. SHEEHAN: Objection. Mischaracterizes testimony.

Just before you answer, Dr. Lindsley, please just give me a moment. Thank you.

A. No. Based on the molecule -- again, you always have to pick the right analytical technique for the right compound. And then for every compound, you have to

C. Lindsley

develop the right method for both that compound and whatever -- whatever you're trying to analyze, whatever impurities you might be looking for. GC is not the appropriate tool for Zantac. It is an inappropriate tool to analyze and quantify Zantac concentrations. That is what GSK knew a long time ago.

Q. When did they knew that -- know that?

A. I assume during development. I mean, it's just -- so, GCs are rarely used in pharmaceuticals 'cause we're making organic molecules, typically salts. Most pharmaceutical products are not volatile. We use GC only when we're dealing with very volatile low molecular weight compounds.

Pharmaceutical products, the majority, the vast majority, GC would not be an appropriate way to determine anything about pursuant or stability because the molecules don't volatilize. So, when you inject them in an injector port, the volatile solvent they're dissolved in disperses, the API of the drug product sits on a detector

C. Lindsley

that's almost 500 degrees Fahrenheit. The compound just sits and erodes and degrades. And then all that's going, being forced through the capillaries is all kinds of degraded product. Almost like -- just like when you burn sugar and, you know, what does that really tell you about the sugar, really nothing.

So, GC is just not the appropriate tool to do this and pharmaceutical scientists would know that and appreciate that even back in the '70S. HPLC was the appropriate analytical tool to quantify and characterize pharmaceutical APIs.

Q. Doctor, have you seen any documents from GSK that show pre-2019 when the FDA came up with the method to assess NDMA levels of ranitidine that gas chromatography -- a GC-MS was an improper method to assess ranitidine and NDMA levels?

A. I don't think I saw -- I'm not aware right now, to the best of my recollection, any document related to that, no.

Q. So, you're speculating about GSK's

C. Lindsley

knowledge, correct, as to GC-MS?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. Yeah. Again, high molecular weight, high melting, high boiling point compounds are not suitable for GC. Drug discovery scientists know this.
Q. Doctor, that's not my question.
My question is, can you show me a document that you reviewed that's coming to the conclusion that GC-MS was not an appropriate method to measure NDMA levels in ranitidine pre-2019 by GSK?
MR. SHEEHAN: Hold on.
Objection. Mischaracterizes testimony.
A. I already answered that question. I said I was not aware of any document to that effect.
Q. So, you're making assumptions correctly about GSK scientists and their knowledge, correct?
A. No, you're -- you're -- you're --
MR. SHEEHAN: Hold on, hold on.
Objection. Mischaracterizes

C. Lindsley

testimony.

Go ahead, Dr. Lindsley.

A. No, you keep bringing these things -- these things are cross heirs. So, you use just corrected me on the same point that that's not what you're asking.

I'm not talking about detecting NDMA in Zantac prior to 2019. I'm talking that using GC analysis for a molecule such as Zantac was inappropriate and pharmaceutical scientists would not use it. And if they attempted to use it, they would see all kinds of crazy degradation and just -- just all kinds of things that weren't consistent with an API and they would go to HPLC. And HPLC is the gold standard of what we report to the FDA anyways.

Q. Doctor, you didn't include this study which is an in vivo study showing a statistically significant increase in NDMA formation post-ranitidine use in these children, correct?

MR. SHEEHAN: Objection. Mischaracterizes the study.

A. Again, you know --

C. Lindsley

MR. SHEEHAN: If you need to read the study, feel free, Doctor.

A. Yeah. You know, I can read it now, I probably should do that. But, again, as I was going through so much literature, if people use the wrong analytical technique, especially -- again when I joined this case, the first thing that we were looking were the Zeng & Mitch papers and we knew from those works, it was the wrong technique to use, they weren't doing it properly and the levels were -- were artificially high.

And so, this study using GC, if I came across it, I'm sure I discount it 'cause the analytical method would be unreliable to quantify NDMA using this analytical technique.

Q. Doctor, did you include this study in your report and state that in your report?

A. No.

Q. Okay. Let's --

A. I reviewed hundreds of documents potentially relevant to this case and this one didn't make my list of being -- being key.

C. Lindsley

Q. This is -- Krawczynski study is one other piece of evidence showing that NDMA may result as due to ranitidine use, but you didn't include the study in your report, correct?

MR. SHEEHAN: Objection. Mischaracterizes the study.

A. I did not, again, because they used a method that artificially elevates the levels of the NDMA, so the results, in my opinion, are not reliable.

Very similar to the Zeng & Mitch retractions, corrections, and the FDA guidance to not allow GC-MS analysis for NDMA and ranitidine because it is not reliable.

Q. But you didn't include that in your report, correct?

A. No.

MR. SHEEHAN: Objection. Asked and answered.

Q. In drafting your report, Doctor, did you review and consider all available scientific evidence relating to NDMA and the topics you were opining on?

A. You know, I reviewed --

C. Lindsley

MR. SHEEHAN: Hold on, hold on.
Objection. Vague.
Go ahead.
A. I mean, I reviewed an amazing amount of documents for this case. Again, some, like I mentioned before, you know, some were very, very compelling and I thought were really important and I spent a lot of time on them. Some papers, for the way -- either the analytical techniques or the conclusions, I did not see as relevant or reliable, so I did not put those in my report. Some papers got cursory view because, again, the science, the methods, didn't seem reliable. And in the report, I put the studies that I felt were the most -- the most relevant and reliable.
Q. The ones that supported your conclusion, Doctor?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. That is not a true statement. Again, as I told you, if you're using GC analysis and you're injecting raw gastric juice containing Zantac, you're gonna get inconsistent unreliable levels of NDMA. So,

C. Lindsley

that's study as it is it an unreliable study.

Q. However, you cannot cite to any GSK document or any other document which documents that GC-MS was known to be an inappropriate method to assess NDMA levels for ranitidine, correct?

A. I've answered that question as well. I'm not aware of any internal document where they reported that.

Q. Doctor, in your section in your report titled Nitrosation Studies of Ranitidine, you discuss selection of nitrosation studies, correct? You can take a look at your report.

A. There's a variety of nitrosation studies that is discussed in here, yes.

Q. About -- there are a handful. And the purpose of though nitrosation studies was to evaluate ranitidine's potential genotoxic effects, right?

MR. SHEEHAN: Objection.

A. You know, the ones I was looking at were is there anything that's physiological that can liberate NDMA from Zantac. And most of the studies I found where they found

C. Lindsley

things, the levels were so beyond anything physiologically relevant -- well, once again, I don't think it's very relevant to the in vivo situation.

Q. Doctor, wherein your report do you describe the steps in the process by which you gather and assess the relevant nitrosation studies?

A. Oh, I don't have a step in there but, you know, I've been doing drug discovery and development for 23 years, you know, it's all that background knowledge on -- on how to search for things, how to search on topics, how to read and discover the relevant literature, how to parse out things that are -- that are not relevant or unreliable. I rely on 23 years of expertise in this area and success in drug discovery, as well as 14 years of being an editor and having a lot of experience reviewing lots of papers on lots of topics and understanding where there's good science, bad science, reliable science and having to make those decisions on what to reject, what to assign to reviewers, reading reviewer comments and then digesting

C. Lindsley

all of that and deciding whether or not to accept a paper or require revisions.

So, everything that went into the selections of things I'm showing here in this report are just based on all of this experience across so many different domains of industry, academics, scientific publishing. So, the methodology, while not spelled out, is just based on all of that cumulative experience.

Q. Sure. But you didn't include that in your report, correct?

MR. SHEEHAN: Objection.

A. No, I did not.

Q. And Doctor, wouldn't it be a learning curve for you to review studies about nitrosation NDMA, because you testified previously that you really had no experience prior to being engaged as an expert in this litigation, correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, no, I don't think it's that steep of a learning curve. It's actually a lot of the science is fairly straightforward.

C. Lindsley

And again, you know, when you're doing drug discovery over 23 years, you've worked on dozens, if not hundreds of different molecular targets and programs, you've been fraught with having to go do literature searches as issues come up related to the pharmacology, drug metabolism and addressing solutions for them.

And again, as an editor, at ACS Chemical Neuroscience and ACS Pharmacology and Translational Science, I would get papers on disparate topics, things I'm unfamiliar with and I very quickly got up to speed and read the papers and figured out what -- if the science was solid or not, which was reflected in all the journals that we launched, their impact factors today.

And J. Med Kim, every day I get between 12 and 27 papers submitted and that I have to review and decide what to do with them and come up on the curve for the science of the papers and its place relative to prior art.

So, I have spent a lot more time on this over the last two years than I do in

C. Lindsley

just my daily work with all the different things I'm tasked to do.

Q. Doctor, how many hours have you spent on this case?

A. Again, I think we figured that out before, it would be around, let's see, 250 hours or so, I believe.

Q. So, far less than two years worth of work, correct, Doctor?

A. Sure. Well, we all have day jobs, we can't do this full-time.

Q. Sure. So, you haven't -- you haven't published anything on nitrosation, correct?

A. No, we've already covered that part, I have not.

Q. Or NDMA, correct, you haven't published anything on ND --

A. No.

Q. Or ranitidine, you haven't published anything on?

A. I have not.

Q. Okay. Doctor, in your discussion of these nitrosation studies in your report do you provide relevant information from

C. Lindsley

these studies and the study authors to provide a balanced approach?

A. What do you mean by "balanced approach"?

Q. Well, you know, reporting what's concluded in the studies, for example, what's been reported, do you do that or is it just statements that support your ultimate conclusion?

A. Obviously, when you read the papers, you're formulating what your response is gonna be in the opinion of the papers. I mean. You could write an expert report that's 10,000 pages and multiple volumes, but, you know, what these are, these are my -- my final scientific opinions based on all the literature in those studies.

Q. Sure.

MS. LUHANA: Let's pull up some of these studies. Let's -- let's pull up what's been premarked or previously marked as Exhibit 263.

BY MS. LUHANA:

Q. Doctor, this is the De Flora paper from 1981.

C. Lindsley

MS. LUHANA: Can we go to the next page? Hone in on the table there.

THE VIDEOGRAPHER: I'm not sure why it's not going to the next page, one second.

THE WITNESS: I think this is just a one-page article. I think on the right-hand column you're seeing the start of the second page -- second paper.

MR. SHEEHAN: Is this -- is this Britane (phonetic)? I mean, I think this may be --

MS. LUHANA: Yeah, I'm looking for De Flora from 1981.

MR. SHEEHAN: I think this is Dr. Britane's response.

MS. LUHANA: Yeah, no, I know.

Can we take this down? This isn't the right document.

DOCUMENT TECHNICIAN: That's what I have as 263.

MS. LUHANA: Okay, it's the wrong document.

Let's go to 261, it's the Martelli

C. Lindsley

study.

(Exhibit 0261 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, you've seen this previously, correct?

A. Yes.

Q. Okay.

MS. LUHANA: Let's scroll down to the summary. Keep on scrolling down further. Sorry.

Q. Doctor, you see what that last sentence says:

Using the nitrosation assay procedure recommended by the WHO, we found that ranitidine yields Nitroso derivatives which cause a dose-dependent DNA repair and hepatocyte primary cultures.

Do you see that there?

A. I do.

Q. Okay.

MS. LUHANA: And let's go to the end, page 375. Scroll down and it's that last statement.

Q. Doctor, can you read that out loud

C. Lindsley

starting with "together"?

A. Together with the previous evidence for a mutagenic and DNA-damaging activity, the finding that NO-ranitidine is capable of eliciting a dose-dependent DNA repair in HPC indicates the need for more careful and more extensive assessment of its possible formation and genotoxicity in humans.

Q. Doctor, did you include this section in your report?

MR. SHEEHAN: Objection.

THE WITNESS: Can you go back to the top, please? Sorry, the beginning of the paper. Okay. Can we scroll down a little bit more? Okay. Okay. A little bit more. Okay. If you go down one more a little bit, please. Okay. Go back up to that table if you could. Okay.

A. Okay. And your question is?

Q. Doctor, did you include any of the discussions that you read out loud in your report?

A. No.

Q. Do you know if GSK or the other

C. Lindsley

defendants specifically investigated NDMA after Martelli?

MR. SHEEHAN: Objection.

A. I do not know. But, again, this is -- this isn't -- another of these things you really have to consider what the study is. You're doing this in primary hepatocytes, so it's an isolated cellular system and you're adding concentration of the drug as well as a high concentration of ranitidine -- of nitrite and you can even see that these things are toxic to the cells in those doses 'cause these kind of levels of nitrite are -- are toxic.

And so, you know, then you look at some of their texts, not exactly sure where it was, but the quote that came out to me, which is why I didn't go more in depth with it, is it obviously the ratio of nitrite ranitidine presumable occurring in the human stomach is enormously lower than that using our experimental conditions, in that, quote, consequently --

(Court reporter clarification.)

MR. SHEEHAN: Slow down.

C. Lindsley

A. Because the nitrosation rate of the means depends on the square of the concentration of nitrite. In patients treated with this drug, the yield of NO-ranitidine should be minimal or even absent.

And so based on that, I have to say that this study didn't -- didn't carry a whole lot of weight with me, 'cause, again, when you're -- when you're using these kind of excessive concentrations in millimolar, millimolar concentrations of ranitidine and sodium nitrite, I mean, these are -- these are just whopping things, no living cell is ever gonna see concentrations this high.

And so, in my point of view, yes, like I've said before, everything is toxic depends on the dose. You want to find primary cell isolates and you want to expose them to some just incredibly high concentration of chemical species, you're gonna see toxicity, you're gonna see cell cycle arrest, you're gonna see all kinds mitosis, his GM2 kind of -- kind of -- kind of issues, that doesn't necessarily mean that

C. Lindsley

at any kind of relevant physiological concentration this is something that is likely.

Q. Everything is toxic depends on the dose.

Are you saying -- wouldn't you agree that probable human carcinogens, which are used for the very purpose to cause tumors in animals, have more -- more of a likelihood of toxicity than everything, Doctor? We're not talking about everything, we're talking about NDMA here and that's my focus.

So, you would agree that a probable human carcinogen, something that's reasonably anticipated to be a human carcinogen has a greater likelihood of toxicity?

MR. SHEEHAN: Objection.

A. You know, it depends in that cell line what the toxicity is.

(Cross-talk.)

A. -- like in this, what is the cause of the toxicity of the cell death, you would need to understand that.

Q. Doctor, can you look at the last sentence of this paper by Martelli where

C. Lindsley

they're concerned about ranitidine and nitrosation, can you please read to the members of the jury what that says, the last sentence, "meanwhile" it begins with.

MS. LUHANA: Scroll down, it's the last sentence right before "references." There you go.

A. Meanwhile, the concurrent injection of ascorbic acid can be used to hinder the positive nitrosation of ranitidine.

Q. The possible nitrosation of ranitidine, correct?

A. Yes.

Q. So, they were concerned about the possible nitrosation of ranitidine and what to do to hinder that nitrosation, correct?

MR. SHEEHAN: Objection.

A. It's one sentence that's in the paper.

Q. Right, I understand that. But that's what the authors conclude, correct?

A. Is that data in the table?

Q. Why -- what would that matter? My question to you here is, they're advising about the possible nitrosation that could

C. Lindsley

occur with ranitidine and to inhibit it with ascorbic acid, correct?

MR. SHEEHAN: Objection. The document speaks for itself.

A. That's what that sentence says.

Q. Do you know if the defendants did anything to warn consumers after Martelli about the possible nitrosation of ranitidine?

A. I -- I do not know. I can either -- I can't really comment on that, I don't know.

Q. Okay.

MS. LUHANA: Let's take this document down.

Let's go to what's been previously marked as Exhibit 29 -- 259.

(Exhibit 0259 was marked for identification.)

MR. SHEEHAN: Roopal, we've been going a little over an hour. Do you mind if we take five or ten?

MS. LUHANA: Let me just finish with this paper and then -- this exhibit and then we can take a break, okay?

C. Lindsley

MR. SHEEHAN: Okay.

MS. LUHANA: Dr. Lindsley, does that work for you?

THE WITNESS: Uh-huh.

BY MS. LUHANA:

Q. Okay. Doctor, this is the Brambilla paper from 1983?

A. Yep.

Q. Do you recall seeing this?

A. Yes.

MS. LUHANA: Can we go to the last page of the paper right before "acknowledgments"? Right there. Can we zoom in? It's the last paragraph I'm focused on to the left. Perfect.

Q. Doctor, can you please read that last sentence of that paragraph right before "acknowledgments"?

A. Okay, starts what meanwhile?

Q. Correct.

A. Meanwhile, taking into account the probable absence of a no-adverse-effect level of N-nitroso compounds, it could be wise to adopt the following simple measures to hinder the possible nitrosation of ranitidine: (i)

C. Lindsley

to avoid foods rich in nitrites; (ii) to follow dosage schedule assuring the maintenance of a gastric pH sufficiently high until the administration of the successive ranitidine tablet in order to minimize nitrosation reaction; (iii) not to take the drug close to meals and ingest together an inhibitor of nitrosation such as ascorbic acid which has been found to be effective in our experimental conditions.

Q. Doctor, you didn't include any of this in your report, did you?

A. No, I did not, because if you look at the first sentence in this paragraph, it says:

It remains to be established whether ranitidine nitrosation could represent a significant risk in humans. Undoubtedly, the situation of patients taking ranitidine is quite different from the experimental conditions forcefully employed to overcome the limits of sensitivity of the methods used.

I think this speaks back to the -- the insufficiency of the analytical methods

C. Lindsley

at the time to accurately quantify NDMA in any system in their drug product.

And so, again, based on this qualifier here where they're basically saying, ranitidine is incredibly forcing conditions to get high enough levels so that our, at the time, unsophisticated analytical techniques and sensitivity and resolving power, they had to really push the system in a way so they could detect something. And they're saying, this is not relevant to the human condition.

So, these considerations may be relevant to rodent studies or for rodents, but, you know, they start off saying, this is a mock system and we did this just so we can analyze things, which, again, takes away some of the reliability of the study, just like using GC for certain studies, which is destructive.

You know, so any time you read a scientific paper, you can't just focus on one paragraph or one sentence in the report, you have to look at the totality of the whole paper, what is it saying, what are the real

C. Lindsley

data, what are the results, and then what are the qualifiers, what are the caveats to the study in the final conclusions. And this to me in the very first sentence is telling you, we don't think this -- we don't know if this has any -- any -- any link to human risk at all. And the conditions implied were so incredibly forceful to get a signal, that this may not be relevant to anything.

So, then there are cautions at the end, you have to take it with a grain of salt, because they just said, this is not relevant to anything and then they're suggesting there are some -- some possible things one may want to do.

Q. Doctor, I don't think that's what they said. They're concerned about potential nitrosation and the words of the authors and the study in 1983 specifically say, it would be wise to adopt the following simple measures to hinder the possible nitrosation of ranitidine. They are not talking about mice or rats. They are talking about individuals who are taking ranitidine and specific instructions for how to take

C. Lindsley

ranitidine.

Doctor, do you know if GSK or any of the other defendants shared any of these warnings with consumers on the label about nitrosation concerns?

A. Again, I am unaware of anything that may have happened during that time period.

Q. Doctor, do you think it's a reliable methodology for an expert to cherry-pick only favorable data they include in their report?

MR. SHEEHAN: Objection.

A. That's not what I did.

Q. But you would -- if say an expert did do that, that wouldn't be a reliable methodology, correct?

A. Well, I guess it really depends on what you're calling cherry-picking. If there's data to a point that makes it work unreliable, reviewing all the information in an unreliable paper, doesn't really add value to a report either.

Q. Doctor, would you agree that the Brambilla paper is just another red flag in

C. Lindsley

the 1980s that ranitidine could potentially nitrosate?

MR. SHEEHAN: Objection.

A. Well, again, here's something else to consider, if you read the very next sentence, the therapeutic doses of ranitidine are on the body weight basis a hundred times lower and the molar ratio of ranitidine to nitrite --

(Court reporter clarification.)

MR. SHEEHAN: You gotta slow down.

A. Basically, to make a long story short, I'll just say the doses they use in this study were incredibly high. The doses were 175 to 350 milligrams per kilogram per day in these animals where they did this study. It was 80 milligrams per kilogram per day of sodium nitrite, which these studies would then correlate to a human dose of 12.2 to 24.5 grams per day. And this is problem will reliability of a lot of these studies, the -- the -- the analogous human dose is so incredibly high, this would super chloric quantities, this would be someone having to drink a Diet Coke can full of NMDA to

C. Lindsley

recapitulate these data you're seeing in these rodent studies. And so -- and that's also 5.6 grams per day of sodium nitrite. And these are just things that -- it's just so artificially contrived and so unrealistic. So, if you're thinking about 24 and a half grams and the acceptable intake is 96 nanograms, I mean, you're -- you're exponentially -- I mean, it's just -- it's such mock contrived system.

But, again, that removes reliability of the data and then in their conclusion that's what they start off it. I wasn't cherry-picking the data. As you read the papers and you look at the studies, the way they were run, the doses that were being used, it just becomes clear that this is not a reliable study that's gonna relate to anything in a human about exogenous or endogenous formation of NDMA after the ingestion of ranitidine, which is what I was charged to give opinions on.

Q. Doctor, have you ever assessed the amounts given in animal carcinogenicity studies of NDMA? Have you done that

C. Lindsley

previously?
A. No.
Q. So, you don't know what an appropriate amount would be to enhance tumors in animals, correct?
MR. SHEEHAN: Objection.
A. You have the data from IARC which is how they're established in the acceptable daily intake and you can see that the numbers they use here, which, again, when you correlate those to the estimated human dose, they're astronomical.
Q. Doctor, is that something that's typically done, animal doses, do you -- do you know in terms of human sensitivity to NDMA versus animal sensitivity to NDMA, have you evaluated that?
A. Personally, no.
Q. Okay.
A. And honestly, when you look, when I was trying to find some -- I tried to search and find papers on NDMA exposure in humans and NDMA metabolism in humans and things like that, I couldn't find any papers on that because there aren't carefully controlled

C. Lindsley

studies with NDMA other than, you know, as a stand-alone agent.

So, for that, all we have are the rodent studies and then as some other authors have said, qualitatively, there's -- there's -- there's a line in between -- between preclinical species and humans, but there's no quantitative data to that effect with NDMA as a stand-alone agent.

Q. Doctor, why do you think there aren't humans studies where human are given large doses of NDMA? Why do you think you weren't able to find them, Doctor?

A. Well, you're not gonna be able to give incredibly high doses of a probable carcinogen to humans.

Q. Okay. And what would that be? What do you think would be allowed to give pure NDMA to humans? You -- you've talked about quantities and doses. What do you think would be appropriate to give to humans in terms of NDMA quantities?

A. I honestly couldn't tell you because I would have to be in consultation with at FDA to determine what a -- what a

C. Lindsley

human -- first human feasible dose would and what you might be able to dose escalate in a SAD study. I have no idea without consulting with the FDA to get guidance.

Q. It would probably be unethical to give large a quantity of NDMA to a human and study that, right, Doctor?

A. Depends on the doses prescribed and what they were allowed to do. There's -- there's -- there are other examples of drugs that have been used in certain -- in similar -- similar formats to answer specific questions.

Q. So, you weren't able to find NDMA studies where pure NDMA was given recently 'cause those studies aren't done because it's unethical to give people a probable human carcinogen, correct?

MR. SHEEHAN: Objection.

A. Well, again, I shouldn't comment on that because that would be more -- that's -- that's really a question for the FDA.

Q. Okay.

MS. LUHANA: We can take this down.

C. Lindsley

MR. SHEEHAN: We'll take ten?

MS. LUHANA: Sounds good.

MR. SHEEHAN: All right. We're going off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 7:54 p.m. UTC time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 8:07 p.m. UTC time.

MS. LUHANA: Can we please pull up Exhibit 3138? It's GSK's June 2020 root cause analysis.

DOCUMENT TECHNICIAN: 3138, did you say?

MS. LUHANA: Yes. It's been previously marked.

(Exhibit 3138 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, you've reviewed this root cause analysis previously, correct?

A. Correct.

C. Lindsley

Q. And it confirms that heat and humidity cause ranitidine to degrade and more NDMA to form with that degradation?

A. Yes.

Q. Okay.

MR. SHEEHAN: I didn't know whether that was a question or not, so let me just get my objection in after the fact.

MS. LUHANA: Let's go to Bates ending in 1942. And if you scroll down, I want to look at that last bullet point.

Q. Dr. Lindsley, you agree that it says -- that last bullet point says:

NDMA levels increase over time particularly when samples are subjected to stressed conditions of temperature and humidity.

Did I read that correctly?

A. Yes, you did.

Q. Okay.

MS. LUHANA: Let's go to Bates ending in 1947.

Q. And can you read that first

C. Lindsley

sentence beginning with "as these storage conditions"?

A. As these storage conditions involved both higher temperatures and relative humidity and applied in the simple lab trials, higher levels of NDMA were measured than previously determined.

Q. Continue, sorry.

A. In the cases --

Q. The next two sentences, I apologize.

A. In the cases where the relative humidity was greater than 50 percent, it was observed that the samples deliquesced and became dark brown, indicating considerable degradation was occurring, in addition to formation of NDMA.

Q. Okay. And then the sentence below in terms of the section conclusion says:

MS. LUHANA: If we scroll down.

Q. The amount of NDMA present in ranitidine drug substance has been shown to increase in solid samples, when subjected to elevated temperature and humidity, correct?

A. Yes.

C. Lindsley

Q. Doctor, are you generally aware if the average humidity is greater than 50 percent in the United States?

MR. SHEEHAN: Objection.

A. I honestly am not sure what the average humidity in the United States is.

Q. But you're aware that humidity impacts NDMA formation, correct?

MR. SHEEHAN: Objection.

A. That's -- that has been demonstrated.

Q. And you haven't quantified how much NDMA may form as a result of exposure to varying levels of humidity, correct?

A. I haven't?

Q. Yes. You haven't quantified how much NDMA may form as a result of exposing ranitidine to varying levels of humidity, correct?

A. I have not. But, again, I go back to the work by the FDA as well as the Australian regulatory agency where, again, there's a rage of -- there's a range of values and these are drug samples that were exposed to all different forms of heat and

C. Lindsley

humidity, especially when you consider like Australia, for example, is an extreme case. And these levels, they're just -- there's a range of levels, there's levels way below the AI, there's -- there's levels approaching the AI. And in certain supplier samples, they're -- they're above the AI. It's just all across the range. They're probably exposed to variations in -- in heat and humidity.

Q. Doctor, do you know how the Australian authorities had maintained their ranitidine and what they had exposed it to prior to testing the ranitidine?

A. The short document that was provided sounded like they just took things off pharmacy shelves, but there was no real description as to where they pulled the samples from with real detailed protocol.

Q. Okay. With the FDA, do you know how they stored the samples prior to testing them?

A. I don't believe that document described things other than they pulled samples from shelves. So, I would think that

C. Lindsley

that would represent more real world transport.

Q. Doctor, these were conclusions that GSK reached in its root cause analysis in June 2020, correct?

A. I guess that was -- I don't see the date right there, I thought the date was on the top of the document, I thought it was in 2020.

Q. Okay. Let's take a look at what GSK and some of the other defendants' knowledge was about ranitidine degradation earlier on.

MS. LUHANA: Can we please pull up a document that was previously marked Exhibit 2472?

(Exhibit 2472 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you seen this document, it's Zantac's Corporate Plan?

A. I don't. This is not something I'm familiar with.

Q. Okay.

MS. LUHANA: Let's turn to Bates

C. Lindsley

ending in 366.

Q. And I want to draw your attention to that Section 4.1.7 there.

Can you read that first sentence?

A. The hydroscopic nature of the tablets is a constraint the main competitor does not have.

Q. Okay, that's -- that's all. Thank you.

MS. LUHANA: Let's go to Bates ending in 383.

Q. And can you read the Section 4.4.1.2, that first sentence there about the secondary manufacturing process?

A. The secondary manufacturing process for tablets is dominated by the fact that ranitidine hydrochloride absorbs moisture and discolors in conditions of high temperature and humidity. The -- you want me to keep going.

Q. No, that's okay.

Doctor, this is a document from 1981 and it's discussing the discoloration of ranitidine when it's exposed to heat and humidity, correct?

C. Lindsley

A. Yes, that's what it says.

Q. Okay.

MS. LUHANA: Let's take this down.

Q. Doctor, in your report, you take issue with Dr. Marletta's conclusions regarding the degradation of ranitidine. You'd agree that color change in a drug may be an indication that the chemical is degrading or decomposing, correct?

MR. SHEEHAN: Objection.

A. Well, no, not necessarily. You know, depending on the kind of coating on a tablet, it could be the nonactive incipients, excipients that are -- that are having a problem. It's really impossible to know solely based on -- on a slight color change as to what's really going on. Is it the API, is it the nonactive ingredients? It's --

Q. Sure, it could be that, but it could also be the chemical degrading or decomposing, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. Possible.

C. Lindsley

Q. It is possible that if you're seeing color changes, the chemical is degrading or decomposing, right?

MR. SHEEHAN: Objection.

A. That's one of many possibilities.

Q. Sure. And that's why it's important to investigate, right, the source of the color change?

MR. SHEEHAN: Objection.

A. Again, not being privy to all that data, I don't know how significant these things were or to what level these would be -- raise a concern. So, this was not something I -- I was asked to look at or offer opinions on or spend time on or review. So, it really would be inappropriate to levy opinions on this.

Q. Doctor, you agree that odor is an indication that the drug is degrading or decomposing?

A. No. Ranitidine has -- it has an odor. The parent drug has on odor because it's a thioether.

Q. So you're saying odor may not be an indication that a drug is degrading or

C. Lindsley

decomposing?

A. It depends on -- on the drug you're talking about. Some drugs have odors. They do. Based on the chemical nature of the molecules, some drugs have odors.

Q. Sure, Doctor. Do you remember we reviewed the BI impact assessment where they concluded that the odor was a result of ranitidine degrading? Do you recall that document, Doctor?

MR. SHEEHAN: Objection.

A. We looked at that, but it's also it's known that the drug itself has an odor just as -- as pure API has -- has an odor.

Q. Sure. But are you disagreeing with BI's assessment there with ranitidine where it concluded the odor was a result of ranitidine degradation?

A. No. I'm -- I'm not arguing that at all.

The question you asked me was, in general, is odor assigned that a compound is degrading, and I would have to say no.

Q. Sure. But with ranitidine, odor is a sign of degradation, correct?

C. Lindsley

MR. SHEEHAN: Objection.

A. Again, I haven't investigated all that and I don't know what the odor that's produced, how different it is from the inherent odor of the parent compound. And again, you're asking me questions on materials I haven't reviewed extensively and that's not what I was asked to offer opinions on.

I was offered to give opinions on exogenous and endogenous formation of NDMA for ranitidine and we're moving way outside of that with information I haven't reviewed.

Q. Doctor, can you please take a look at your report and page 5 of your report? It's -- it's Exhibit 6474.

And let's look at paragraph 27. And can you please read that out loud?

A. Prior to 2019, GSK and others thoroughly evaluated the chemistry of ranitidine and its degradation products.

Q. Okay. Stop there, Doctor.

So, with that statement, you're saying that GSK and others have thoroughly evaluated the chemistry of ranitidine and its

C. Lindsley

degradation products.

You are opining on that, correct?

A. Yes. Well -- yes.

Q. And I'm asking you questions about degradation because your conclusion here is that there was no evidence for the potential of NDMA formation as a degradation product of ranitidine based on you evaluating in GSK and others thoroughly evaluating the chemistry of ranitidine and its degradation products.

Isn't that your -- isn't that your conclusion here in your report, Doctor?

A. Yes. From the documents that I did review.

Q. So you didn't't' do a review of the totality of the evidence to come to that conclusion, correct?

MR. SHEEHAN: Objection.

A. Well, I only had the data when if -- if these are corporate documents, I didn't have access to all these corporate documents so I couldn't have reviewed them and commented on them.

Q. You couldn't have asked defense counsel for these documents?

C. Lindsley

A. I was focused --

MR. SHEEHAN: Objection.

A. -- I was focused on the things they wanted me to really focus on, which was the exogenous/endogenous formation of NDMA from Zantac.

Q. What you were charged to do, correct?

A. Yes.

Q. Okay.

(Exhibit 5418 was previously marked for identification.)

MS. LUHANA: Let's take this down and go to Exhibit 5418, was previously marked. This is entitled Preliminary Results of an Investigation Into the Thermal Degradation of Ranitidine Hydrochloride.

Q. Doctor, did you review this document previously?

A. Can we scroll down? And can we scroll down one more real quick? And one more.

I don't recall seeing this actual document. I remember seeing a paper by

C. Lindsley

Hayward discussing a lot of work around ranitidine, but I don't think I've actually seen this document.

Q. Okay. Well, this document's from 1984, and GSK was aware that ranitidine decomposed rapidly when subjected to high temperatures. And this is what this document is discussing.

MS. LUHANA: Let's go to page ending in 136.

MR. SHEEHAN: Just objection to the colloquy.

MS. LUHANA: Okay. Can you zoom in on the last paragraph there?

BY MS. LUHANA:

Q. Doctor, you see that last statement there that says, Additionally, as yet unidentified, breakdown products are also produced within the liquid mass formed as a result of very hygroscopic property ranitidine hydrochloride?

A. I do see that.

MS. LUHANA: And let's turn to Bates ending in 137, the next page.

Q. And here it says, After one day at

C. Lindsley

75 percent relative humidity, all the samples have become gums which were not amenable to assay.

Doctor, if something is gummy or difficult to test, could you put it in a solution and run HPLC MS?

A. Again, not -- not actually seeing what -- what happened it's hard to know but that's a possibility.

Q. Okay. Let's go to Bates ending in 138, the next page. Let's look at that first paragraph.

Ranitidine hydrochloride had previously been shown in experiments set up by PRD, GGR where to be highly deliquescent at 30-degree Celsius, 75 percent relative humidity, and also absorb moisture more slowly at 20-degrees and 75 percent relative humidity. It has been shown to be particularly light sensitive in the presence of atmospheric moisture.

Doctor, do you see that there?

A. I do.

Q. And do you if you scroll that third paragraph there, it says:

C. Lindsley

After prolonged periods, about three months, at 30 degrees and 75 percent relative humidity and 37 degrees and 75 percent relative humidity, ranitidine hydrochloride becomes gum-like mass which shows considerable darkening and, as with the experiments, at high RH detailed in Section 1, the resultant material is not amenable to analysis due to difficulties of the sample handling and the gross interferences in the defined HPLC ranitidine.

Doctor, do you know what the expiration date for ranitidine is? Do you know how long it could be on the market before it expires?

A. I know I read that at one point. I read that on the label, but I can't recall right at this moment.

Q. It's more than three months, correct?

A. I can't recall what it was. I'd have to look at the label.

Q. Okay. So you don't recall sitting here whether it's longer than three months?

A. I don't want to say something on

C. Lindsley

the record that I'm not actually certain about. I just need to pull up the label and see what it says.

Q. Okay. Do you know what the average temperatures and humidity are that are reached in the bathroom?

MR. SHEEHAN: Objection.

A. I think that would be very -- that would be very random. I don't -- I don't know.

Q. Have you looked at studies to assess what the levels are in terms of humidity and temperature in a hot bathroom?

A. The only study I saw was the Najafi study where he was trying to mimic samples that would be stored in a bathroom cabinet.

Q. Would it be surprising to learn that a bathroom can easily reach a hundred percent humidity?

MR. SHEEHAN: Objection.

A. I don't know date -- I don't know that data, so I don't know.

Q. We know that ranitidine when exposed to heat and humidity forms NDMA, right, Doctor?

C. Lindsley

MR. SHEEHAN: Objection.

A. That has been demonstrated.

Q. Okay. Let's go to Bates ending in 146. Can you read that last paragraph, Doctor?

A. Ranitidine hydrochloride is highly deliquescent at 75 percent relevant humidity at temperatures greater than 30 degrees C when hydrolytic degradation takes place. The degree of this hydrolytic degradation and consequently the number and quantity of impurities is dependent on the temperature and the time.

Q. Doctor, and you testified you haven't reviewed this study previously?

A. I have not.

MR. SHEEHAN: Objection.

Q. And this confirms ranitidine degrades when it exposed to heat and humidity, correct?

MR. SHEEHAN: Objection.

A. Yes. And this is in agreement with FDA and other -- other folks that have looked at this more recently.

Q. Doctor, this was done by GSK in

C. Lindsley

1984, correct?

A. Well, I haven't -- I'm assuming is that the WAR/84, does that mean it was 1984?

Q. Let's go to the first page of the document so you're clear.

You see where it's signed February 1984?

A. Yes, I see that.

Q. Okay. So GSK knew in 1984 that ranitidine degrades when exposed to heat and humidity, right?

MR. SHEEHAN: Objection.

A. That's -- that's the conclusion they established, yes.

Q. To your knowledge, did GSK or the other defendants ever investigate the -- the ranitidine degradation issue here and try to identify the impurities to look for NDMA?

A. I do not know.

Q. You agree that this is another piece of evidence where the manufacturers knew ranitidine was degrading when exposed to heat and humidity, but they did nothing to bother to test the degradants, correct?

MR. SHEEHAN: Objection.

C. Lindsley

A. Well, I can either --

MR. SHEEHAN: Mischaracterizes the document.

A. -- I can't confirm -- I can't really comment on that. I don't know what other documents may be available prior to this document, what came after this document, what other studies may or may not have been done. Because some -- several of the things you showed me I was unaware of, so I'm not sure what other studies I may not be aware of that GSK or the other defendants have done to that point.

So this is kind of a static image in time for me, and I'm not sure what was done after this.

Q. Okay. Let's go to exhibit -- what's been previously marked as Exhibit 3344.

(Exhibit 3344 was previously marked for identification.)

BY MS. LUHANA:

Q. Okay, Doctor. This is entitled Investigation Into Yellow Impurities and Ranitidine HCI Sterile Injection Formulations

C. Lindsley

from October 2011.
Doctor, have you seen this document previously?
A. I have not seen this.
Q. Okay.
MS. LUHANA: Let's go to the first page. Sorry. The second page -- or it's page 3, the background right there. Yeah.
And can we zoom in on a couple -- the top two paragraphs? Sorry, John. Are you trying to put it back up?
DOCUMENT TECHNICIAN: Yeah. I lost my call-out.
BY MS. LUHANA:
Q. So Doctor, do you see the Background notes that:
There has been a long history of yellow discoloration of ranitidine HCi [sic]?
Do you see that statement?
A. Yes.
Q. And then do you see the statement in the second paragraph where it's talking about batches of the 25 milligrams per milliliter, and they note that the batches

C. Lindsley

failed on stability due to high impurity content and homogenous yellow solution color.
Do you see that?
A. I see that.
Q. And then if we turn to -- let's go to -- are you aware that even though GSK admits to a long history of yellow discoloration, to date, the impurities responsible for the color had not been identified here?
MR. SHEEHAN: Objection.
A. No. I did not know that.
Q. Do you see that there in the document?
A. Yes.
Q. And let's turn to Bates ending in 127. Doctor, can you read that out loud, that paragraph?
A. The overwriting conclusion from this initial study was that the yellow discoloration was a complex phenomenon, caused by a multitude of components. Although it's not possible to quantify these peaks as there was no reference to known impurity at this wavelength, it was estimated

C. Lindsley

that none of the peaks would be present at anything more than low PPM levels. This meant that the isolation of individual components that would be required to obtain further characterization data by NMR was not practical as each ampule would contain at most, submicrogram amounts of any given peak.

Q. Doctor, do you know at this time if GSK or the other defendants investigated and looked specifically for ranitidine?

A. For the parent compound?

Q. For -- I'm sorry. Specifically for NDMA at this time.

A. No. No. I don't know anything about this --

MR. SHEEHAN: Hold on. Hold on.
Just let me get my objection.
Go ahead.

THE WITNESS: Sorry.

A. No. I don't know anything about this study or what they looked for or didn't look for. Based on the masses observed here, they're all much larger molecular weight species.

Q. Because they set the wavelength to

C. Lindsley

only look for color impurities at 400 to 450NM.

Do you know what the wavelength for NDMA is, Doctor?

MR. SHEEHAN: Objection.

A. Right off the top of my head, I don't.

Q. Are you aware that it's lower than that?

A. I would -- it's not as strong of a force, so yes.

Q. Okay.

MS. LUHANA: Let's take this down. Let's put up Exhibit 3566 and 3567. It's back to back. Let's first -- yeah, okay.

(Exhibit 3566 was previously marked for identification.)

(Exhibit 3567 was previously marked for identification.)

BY MS. LUHANA:

Q. So, Doctor, do you -- have you seen these documents before?

A. I have seen no e-mail exchanges of any kind.

C. Lindsley

Q. Okay. This is an e-mail from Andrew Searle. You may be familiar with him. He's the lead author of the root cause analysis?

A. Yes.

Q. Okay. To Matt Popkin.

And can you please read the text of that e-mail at the top? It's from August 30, 2019. And this is around the time that information about NDMA and these recalls were beginning to take place.

So no, not that one. Sorry. It's the top. Yes. Can you read that out loud?

A. This is what was discovered in 2010. Was told not to share today as it might scare people.

Q. Okay, Doctor. And what's attached is the ranitidine-colored impurities knowledge of that investigation that I was showing you that's showing peaks in the LCUV data potentially causing yellow color.

Do you see that there?

A. Very small, but yes.

Q. Doctor, do --

A. Can you make that full screen?

C. Lindsley

That's really hard to see. Sorry. I have bad eyes.

That part, yes; so the actual PowerPoint slide.

Q. Doctor, why do you think he was told not to share it with people as it might scare them at GSK in August of 2019?

MR. SHEEHAN: Objection. Calls for speculation.

A. Yeah. I couldn't comment on that. I mean, I don't know what e-mails happened before or after this; I -- that would be unqualified to give a comment on that.

Q. Is -- is this something of concern to you, this ranitidine colors impurities knowledge from the 2010 investigation?

A. Sorry. Just give me a second to look at everything. Okay.

When I read the bullet points under the ampules derived from the Derong API, it says, acquired MS and MS/MS data on peaks of interest are circled. Found all species to be ranitidine related but no obvious structures. Various additions, losses, partial diameters.

C. Lindsley

I don't quite know what to make of all of that. Some of this is in really small print. It's hard to see what's in that green box.

Q. Did you review this 2011 investigation for your report, Doctor?

A. No. I didn't see this.

Q. Okay. But this was enough to scare the lead author of the root cause analysis, correct?

MR. SHEEHAN: Objection.

A. The e-mail, I mean the e-mail is whatever the e-mail says. But it said scare people. I didn't think it said scared him, but I don't -- I don't want to comment on -- on what might've been implied by that. That would be speculation.

Q. Doctor, this is another example of GSK's and others' knowledge of ranitidine degradation, discoloration.

And do you know if anything was done to identify all these impurities?

MR. SHEEHAN: Objection.

A. Well, again, I've seen this for the first time and this is a high level overview.

C. Lindsley

It's hard to know.

Clearly, some of the peaks in that center figure they've ascribed to certain things. I mean, so I'm seeing this for the first time. So this is what it looks likes. Looks like they've identified some of them but that's all I can tell from the data that is here.

Q. Okay.

MS. LUHANA: Let's take this down and put up what's been marked as Exhibit 6489.

(Exhibit 6489 was previously marked for identification.)

Q. Doctor, this is labeled A Four Week Accelerated Stability Study of Zantac Tablets under Exposed Conditions, and it's dated December 2, 2015.

Have you seen this previously?

A. No. I have not seen this.

Q. Do you see the paragraph below where it says:

Changes in the appearance and color of the tablets and the formation of impurities over the four-week period were

C. Lindsley

tracked and are recorded in this report. Degradation and changes in color were observed for the tablets stored at the most harsh conditions (40-degrees Celsius/75 percent relevant humidity) and no change was observed for those stored at 25-degrees Celsius percent relative humidity and 30-degrees Celsius and 65 percent relative humidity. By comparison with previous studies, it is thought that humidity is the critical factor that controls degradation.

Do you see that, Doctor?

A. Yes, I do.

Q. Okay. And so it was known in 2015 also, again, here with this study that humidity causes ranitidine to degrade, correct?

MR. SHEEHAN: Objection.

A. Yeah. This is what this data says.

Q. Okay.

MS. LUHANA: Let's turn to Bates ending in 005.

Q. In the color of the tablet it says:

Over the four-week period, the

C. Lindsley

color of the core darkened considerably, going from orange/beige to a very dark red brown typically.

Do you see that there, Doctor?

A. I do.

Q. Okay. Evidencing that the discoloration is a sign of the degradation, correct?

A. Sorry. What was that again?

Q. That the discoloration is a sign of ranitidine degrading, correct?

MR. SHEEHAN: Same objection.

A. Well, I don't think -- it doesn't say that. This is just commenting on the color change of the --

(Court Reporter clarification.)

A. It doesn't say anything about ranitidine decomposing. This just says -- this just comments on the color change after the core of the tablets lifts off at 40 degrees and 65 percent relative humidity. And then if the tablets don't change on the outside when they are broken, if there's a core, there's no color, no change in colors observed. And that was consistent with the

C. Lindsley

lack of degradation observed by HPLC.

Q. Sure. The first statement that we read together noted there were changes in the appearance and color of the tablets over the course of the weeks and degradation and changes in color were observed.

Did you see that in what we just first read?

A. Yes.

Q. Okay.

MS. LUHANA: Let's take a look at ending in Bates 014.

Q. And do you see up top -- if you see up top, second sentence there, it says:

It is believed that the increase in humidity rather than the temperature is the predominant factor.

Correct?

A. Sorry. I'm just seeing this for the first time. Give me a moment.

Q. Sure. The second sentence I'm focused on:

It is believed that the increase in humidity rather than the temperature is a predominant factor.

C. Lindsley

A. Yes, I see that.

Q. Okay. And then if we look at the next paragraph there, it says:

The degradation also appears linked to an increase in moisture content of the core which appears to be very hydroscopic and showed some evidence for deliquescence at the end of this study. Since most of the known hydrolytic degradants has been observed as named in Table 2d, it can be asserted that the increase in moisture content is the main trigger for degradation.

Do you see that there?

A. Yes.

Q. And can you read that last sentence which -- I mean the last paragraph that starts -- next paragraph that starts with: The increased degradation is manifest on two ways?

A. The increased degradation is manifest on two ways. The color of the core change from white at the initial time point, through beige/yellow then finally it a dark red brown. This is accompanied by the formation of a large number of impurities.

C. Lindsley

Of these, nine are known degradants formed through the hydrolysis and oxidation --

And sorry can't see the --

-- but across the three strengths, at 28 day time point, there were a total of 16 unknown impurities present at greater than 0.2 percent area.

Q. So Doctor, this is noting the degradation and saying there are color changes, correct, once it's degrading?

MR. SHEEHAN: Objection.

A. The color change they identified, yeah, degradance with -- in association with that color change.

Q. So they note that there's degradation it manifests in two ways.

And the two ways that they note are that the color changes and that the impurities increase, right?

A. Yes.

Q. And then they note that there are 16 unknown impurities, 9 have been identified, correct?

A. Yes.

Q. Do you know if GSK or any others

C. Lindsley
identified all the specific impurities and looked for NDMA?

A. I do not.

MR. SHEEHAN: Objection.

A. I do not know.

Q. Okay.

MS. LUHANA: You can take this down. Okay. Let's pull up 6490.

(Exhibit 6490 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you seen this document from December 22, 2015 titled The Characterization and Toxicological Risk Assessment of Impurities Present in Degraded Zantac Tablets?

A. No. I have not seen this.

Q. Okay. Doctor, this is discussing the prior document that we discussed, and they conclude here that they didn't identify the impurities. So if we turn to page 10, 11, take a look at that.

Page 10. Do you see the first paragraph? It says:

The data from the four-week

C. Lindsley

accelerated stability study...

A. Yes.

Q. Can you review that to yourself?

A. (Document review.) Yes. Read that.

Q. So, they're stating here the two scenarios to represent the degraded tablets in terms of when they may be inadvertently taken. And they ultimately conclude that there are six impurities that are noted, if you look under the section: Tablets following four weeks degradation at 40-degree Celsius and 75 percent relative humidity.

And they don't identify these impurities. Do you see that there?

A. Yeah. Let me -- let me -- hold on. Let me read this.

MR. SHEEHAN: Take your time with it, Doctor, if you need to.

A. Okay.

Q. Do you see there were impurities M, N, O, P that were above the level, however, they did not quantify them?

A. It says.

...M, N, O and P, all

C. Lindsley

characterization impurities were below the level of quantitation (3 mgs per day.)

Q. Sure. But they weren't quantified, correct -- I mean identified. I apologize.

A. Said they were characterized impurities, so I don't know what those are.

Q. So if we look to see M -- scroll up.

So do you see, if you scroll to page 6 -- sorry, scroll up -- ending in 743.

So you believe these impurities were identified?

A. That's -- again, you're showing me this document for the first time. It says they were characterized and they are assigning a chemical structure to them. So they must've done some level of chemical characterization, whether it was higher res mass spec based analysis or NMR, I would assume, if they're calling them characterized.

Q. Sure.

MS. LUHANA: Let's go to the page ending 746. Right there.

Q. Doctor, you notice there are

C. Lindsley

several impurities that aren't identified, correct?

A. Yes.

Q. Do you know if they bothered identifying them?

MR. SHEEHAN: Objection.

A. Well, could you go back to that paragraph where they first described them, where we talked about the M, N, O, P, so I can just read what it says again? Okay.

It was not possible to characterize six impurities -- those I think are the ones in that table that are highlighted -- due to the low levels present and interference with other peaks. However, all were below the threshold of identification (2 mgs per day.)

Q. Doctor, you'd agree that the 2 mgs per day doesn't apply to genotoxic carcinogens like NDA -- NDMA?

MR. SHEEHAN: Objection.

A. Well, yeah. The --

(Court Reporter clarification.)

A. The acceptable intake is 96-nanograms per day for NDMA.

Q. Okay.

C. Lindsley

MS. LUHANA: We could take this down. Let's put up Exhibit 6491.

(Exhibit 6491 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, this is a document titled Pfizer Technical and Quality Review For Zantac 75-Milligram Tablets Physical Appearance, and it's dated from -- it's dated February 14, 2006.

Have you seen this previously?

A. No.

Q. Okay. Let's go to the next page there. I'm sorry. The page after, and focus on the color change paragraph right there, that first paragraph.

Doctor, can you -- can you read that sentence out loud -- the first three sentences there?

A. I'm just going to wait till he finishes highlighting.

Q. Sure.

A. The color changes is observed on surface of the tablets is attributed to the degradation of the ranitidine HCl. The

C. Lindsley

degradation pathway of ranitidine HCl has been reported in the original NDA...in which the sensitivity to evaluated temperature and moisture is discussed and the slow development of a brown color was observed in samples which were exposed to accelerated stability conditions.

Q. And then it says:

In the Zantac 75 mg OTC NDA...there were similar reports of discoloration of the tablets. The low level degradation has been historically observed to occur when the product is exposed to environmental humidity conditions.

Correct?

A. Yes.

Q. This is another piece of evidence that Defendants knew about ranitidine degrading when it's exposed to heat and moisture and causing color changes, correct?

MR. SHEEHAN: Objection.

A. Sorry. What was that -- that -- was that question again?

Q. I said this is another piece of evidence that Defendants knew about

C. Lindsley

ranitidine degrading when it's exposed to heat and moisture and causing color changes, correct?

MR. SHEEHAN: Objection.

A. That's what this -- that sentence says.

Q. Do you know if these degradant products were ever testified to look for NDMA?

A. I do not.

Q. Okay. You can set this aside.

A. I think it's interesting when you look -- if you look at the table above it and you look at the -- the stability and the purity of the compound, the compound is still very pure within label specifications.

Q. Doctor, do these labeled specifications apply to NDMA forming, which is a genotoxic carcinogen?

MR. SHEEHAN: Objection.

A. Well, I'm just -- I'm just making that observation. I don't know if they looked for NDMA.

Q. Sure. But those percentages as to the principal impurities and purity, that

C. Lindsley

does not apply to NDMA, correct?
A. I don't -- I don't know what the current FDA guidance is on that. That would be an FDA question. I would leave that to them.
Q. No. I'm talking about in terms of the percentage of principal impurities, the .5, the .3, the 2 percent total impurities, that doesn't apply to genotoxic impurities, correct?
A. I don't know. Again, I am not an expert on genotoxic impurities, which is why I would leave that question to the FDA. Because a lot of things depend on -- on what it is, so I would leave that to the FDA to -- to make that decision.
Q. It's -- it's not up the FDA, Doctor. You're aware that -- what would be 2 percent of ranitidine 150-milligram pill? How much would that be in terms of milligrams?
A. 3,000.
Q. No, no. 2 percent of 150-milligram pill?
A. Three milligrams, 3,000-nanograms.

C. Lindsley

Q. So are 3,000-nanograms permissible to be in ranitidine?

A. No. But we don't -- these aren't -- this isn't -- again, I'm only seeing this for the first time, so you're asking a lot of questions on information I haven't really had a chance to review.

But they don't know this is -- you're assuming these -- these impurities are related to NDMA, and that hasn't been -- as far as I'm -- I haven't seen where that's -- that's been confirmed.

Q. No. This is related to the stability testing that we were talking about. This is what I was telling you previously.

Ranitidine is -- the manufacturers have to conduct stability testing where they're assessing the appearance and the impurities. And so this is an example where it's failing the accelerated stability testing because of the appearance of the drug, and this is where Pfizer is noting its related to the degradation.

Do you see that there, Doctor?

MR. SHEEHAN: Objection.

C. Lindsley

A. Yeah.
Q. Okay.
MS. LUHANA: You can take this down.
Q. Doctor, are you aware that the FDA in October 2019 issued an update that the testing methods used by a third-party lab which is Valisure, to test ranitidine products for NDMA, used high temperatures and the high temperatures generated very high levels of NDMA from ranitidine products because of the test procedure.
Do you recall that?
A. Yes, I do.
Q. Doctor, to your knowledge, when did the defendants learn that gas chromatography thermally degrades ranitidine to form NDMA?
MR. SHEEHAN: Objection.
A. I -- I do not know. I don't know exactly when that occurred.
Q. Well, can you -- you are opining on the propriety of GC-MS, so I am inquiring about what your knowledge is about what the defendants knew and when.
So when did, to your knowledge, the

C. Lindsley

defendants learn that gas chromatography thermally degrades to form NDMA?

MR. SHEEHAN: Objection. And asked and answered.

A. I haven't -- I don't know. I don't have that information from the defendants. I do not know exactly what point in time they found that out.

Q. But Doctor, in your report, you criticize third-party labs for using GC-MS, right, stating it was not scientifically appropriate to use?

A. Yes.

Q. But you -- but you agree that it became recently known around October 2019 when the FDA disclosed a new method to test ranitidine for NDMA in light of the awareness that heat from gas chromatography can thermally degrade ranitidine to form NDMA, correct?

MR. SHEEHAN: Objection.

A. Again, you're -- you're steering us away from the real point, which we talked about already before.

With a non-volatile organic

C. Lindsley

compound that is a salt, GC analysis is not the appropriate analytic technique to qualify or quantity anything about that chemical species.

GC should not be used with Zantac HCl regardless it just should never been used. It's an inappropriate technique.

The property is not volatile. GC is used for volatile organic compounds that, upon injecting into the injector port 250 to 350 degrees, completely volatilize and can travel down the capillary of the carrier gas.

So just -- using Zantac in the combination with GC for any purpose, any purpose, any level of quantitation analysis is not appropriate. That has been known for a long time.

Q. Doctor, are you aware of what residual solvent testing is?

A. Residual solvent? Yes.

Q. Are you aware that GC was used for residual solvent testing for ranitidine?

A. No.

Q. So you're stating, your testimony that it was known since the '80s, for

C. Lindsley

example, that GC was improper to be used for ranitidine, for example, to test NDMA levels?

A. No. Again, you keep twisting all the words and then putting the wrong statement out. That is incorrect.

What I said was organic -- heavy organic molecules that do not -- are not volatile, at 250 degrees, will not be in the vapor phase are not appropriate for analysis by a GC.

Compounds that are salts, basic amine containing organic molecules that are a salt, whether it's an HCl, a phosphate, a sulfate, doesn't really matter what it is.

Any salt, those compounds do not volatilize. They crash out on the detector. They start to melt and degrade. It's the inappropriate technique for looking organic molecules.

If you're looking for, I guess in of case residual solvents and you have a system with a mass spec geared to look for, say, tetrahydropiperine, dichloromethane residual solvents --

(Court Reporter clarification.)

C. Lindsley

-- if you're looking to quantify residual solvents that are volatile, there's a way to do that with a head space -- there's all different kinds of variations on a theme.

But if you're looking for residual solvents exclusively, you put in those molecular weights into your mass spec so it knows to look for those and quantify those.

That is an appropriate use, but you wouldn't use that in any way to qualify the purity of a molecular like ranitidine HCl because it is not volatile. If you're looking for the volatile components, residual solvent, that's fine.

You can't look at it for NDMA. We all know that now because the drug decomposes under those harsh 500-degree Fahrenheit conditions and degrades to generic NDMA in a way that is not physiological.

Q. So my focus is not the purity in terms of testing GC using GC for ranitidine.

My purpose is asking about NDMA assessments of ranitidine. And when it became known was when the FDA disclosed it, correct, in October 2019 stating that GC-MS

C. Lindsley

is improper to use for assessing NDMA levels in ranitidine at that time.

So my question to you is, when was it known prior to then by the defendants that NDMA assessments can -- of ranitidine can't be done with GC-MS?

MR. SHEEHAN: Object to form, and object to the speech.

A. I do not know. I've answered that already. I do not know if -- if or when they knew about that.

Q. Well, in your report you criticize these third-party labs for using GC-MS stating that was not scientifically appropriate.

But when they used GC-MS, was it known that it was not scientifically appropriate to use it to assess NDMA levels in ranitidine?

A. Again, we keep going back to the same point, and I don't -- I'm not sure how to explain this anymore clearly.

Non-volatile organic compounds cannot be analyzed by GC. It has nothing to do with NDMA. Zantac cannot be analyzed by

C. Lindsley

GC.

It is a non-volatile, organic compound. It's a salt. It melts. These things are known. These kind of compounds are not analyzed by GC.

Q. That residual solvent testing was done for ranitidine with GC previously, correct?

So there was a workaround that was utilized to use GC to assess residual solvents for ranitidine, right?

MR. SHEEHAN: Objection. Asked and answered.

A. Again, I haven't seen that study or understood how they did that. I don't know if they extracted the drug out. I don't know what they may have done to look at that. I haven't seen the study.

But if you're looking for -- and you know what you're looking for. This is really important too.

You have a method that you have developed on a GC to look for residual -- again, you know, it could be any organic solvent that's used in the process chemistry

C. Lindsley

route. It could be THF, dichloromethane, DMF, NNP, anything.

That they're volatile, you're going to get those coming out really early and you'll be able to quantify those I guess even if the parent compound degrades because it's not interfering with artificial levels of solvent. So it's a totally different -- you're comparing apples to oranges here.

Q. Okay. Let's take a look at -- well, the industry, Doctor, prior to October 2019 didn't know that GC-MS couldn't be utilized to assess NDMA levels in ranitidine. And so let's -- let's go through some documents here.

MS. LUHANA: Let's pull up exhibit -- what's been marked 6486.

(Exhibit 6486 was previously marked for identification.)

BY MS. LUHANA:

Q. So this is an article from -- dated December 1980 and it says: Analysis of Volatile N-Nitrosamines in Commercial Drugs.

Do you see that there?

A. Yes.

C. Lindsley

Q. Have you seen this article previously?

A. This does look familiar.

Q. Okay. So the -- can you read the first two sentences of the introduction out loud?

A. The carcinogenicity of a high proportion of N-nitroso compounds, now well established, has been reviewed. Since the discovery 20 years ago that N-nitrosodimethylamine (NDMA) was carcinogenic in rats the methodology used to trace volatile N-nitrosamines in the environment has been considerably improved.

Q. Okay. And this abstract, did you take a look at it if we scroll up?

Have you reviewed that?

A. Give me one second.

Q. Sure.

A. (Document review.) Okay.

Q. And so you see it provides that drugs containing aminopyramine [sic], for example, were analyzed for volatile N-nitrosamines by gas chromatography, correct?

C. Lindsley

A. Correct.

Q. And if we go to the next page and we look at the table there, the next page provides range of NDMA that was detected in these drugs with GCTEA.

Do you see that?

A. Just a second. Trying to -- okay.

Q. And so NDMA was found in 37 samples of aminopyrine based on drugs ranging from 1 to 900 micrograms per kilogram, right? You see that there?

A. I do.

Q. And this was assessed using gas chromatography, correct?

MR. SHEEHAN: Objection.

A. Again, I would need to look at all the -- the whole paper here. You're moving pretty fast.

Q. Okay.

MR. SHEEHAN: Doctor, take your time.

Q. Sure. Review the paper.

THE WITNESS: It's kind of hard to see the whole paper. That's good. Can you go up to the next page,

C. Lindsley

please? Okay. Next page, please.
Okay.
BY MS. LUHANA:
Q. Doctor, you've never used gas chromatography, correct, for assessing NDMA, previously on any drugs?
A. No. Never for NDMA. But in graduate school, we used GC and GC-MS every day with our synthetic methodology works.
Q. Sure. But not for nitrosamines including NDMA, correct?
A. No.
Q. Okay. And you've never published anything on testing with gas chromatography, correct, for nitrosamines?
A. For nitrosamines? No.
Q. Okay.
MS. LUHANA: You can take this down. Let's put up Exhibit 4922. Yeah. And can we scroll down? I don't know if this is the right document, actually.
Can we scroll up? Sorry. Is this Bates 600351? Yeah. It doesn't have -- this isn't the right document.

C. Lindsley

Okay. Let's take that down.

Okay. Let's look at previously marked Exhibit 84.

(Exhibit 0084 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, have you seen this? This is a technical fact sheet for NDMA from the EPA.

A. Yeah. I think I've -- I did go through this at one point.

Q. Okay. And do you see to the left the detection methods for NDMA and what's noted there?

A. Yes.

Q. Can you please read that out loud?

A. Detection methods include solid phase extraction, gas chromatography and liquid chromatography.

Q. And this is the EPA fact sheet and what it says in terms of how to detect NDMA, correct?

A. Yes. In drinking water. Cleanup sites and drinking water; not in terms of pharmaceutical.

C. Lindsley

Q. Sure.

A. And I will say GC and GC-MS is perfectly fine for looking at -- certain nitrosamines and NDMA. It's just not appropriate in the context where you have a sample that also contains ranitidine. Some of the sartans that came out earlier, that were shown to have levels of NDMA. GC in those cases were also appropriate because the drug was volatile and did not decompose.

All we're talking about here is that doing GC with ranitidine in this sample matrix that's being injected is inappropriate. There's been other papers that have come out that I put in my report where they do an extraction first to remove the drug, and then they can quantify NDMA quite well with a nice level of quantitation that is quite accurate.

They can also do various solid phase extraction techniques. One would just have to remove the ranitidine hydrochloride first from the samples before doing GC analysis so that you're not artificially inflating the concentration of the NDMA in

C. Lindsley

that sample.

Q. Sure. And when did that knowledge come about, Doctor?

A. I guess, well, for that exact -- the GC for ranitidine-containing samples wasn't appropriate, that was probably the FDA when they put that guidance out when looked at HPLC methodologies and saw very different results.

Q. So that was in October 2019 when the FDA put up that update, correct?

A. Yes.

Q. Okay.

MS. LUHANA: Let's take this down. Let's pull up what's been previously marked 3126.

(Exhibit 3126 was previously marked for identification.)

BY MS. LUHANA:

Q. This is GSK's guidance on nitrosamines, which is dated April 24, 2013. Do you see that there?

A. Yes.

Q. Okay. And if you look at the purpose it states: N-nitrosamines are

C. Lindsley

considered impurities which add no known functional benefit or purpose to a product formulation.

Do you see that?

A. Yes.

Q. And it says: Nitrosamines are not considered new contaminates. Their potential carcinogenic effects have been studied for over 40 years.

Doctor, did I read that correctly?

A. Yes, you did.

Q. Let's turn to ending Bates ending in 641, so actually just the next page.

Can you read that paragraph starting with, The primary area of toxicological concern?

A. The primary area of toxicological concern associated with nitrosamines relates to their -- sorry. Now I think I -- sorry.

The primary area of toxicological concern associated with nitrosamines relates to their relative genotoxic carcinogenicity potential. A significant number of the carcinogenicity studies have been conducted since the 1970's.

C. Lindsley

Want me to keep going?

Q. Yes.

A. A high percentage of those nitrosamines studied in animal toxicology studies have been identified as carcinogens.

Q. Keep on reading.

A. It is less clear however from the available toxicological studies, the level for which there is no toxicological concern. As it has been shown that the metabolism of nitrosamines in animals is similar to the metabolism in human tissues, the probability is considered high that in N-nitroso compounds may be carcinogenic in humans as well.

Q. Doctor, do you have any reason to disagree with those statements?

A. I mean, sorry. I'm reading this for the first time.

However, so far, there is no conclusive epidemiological evidence that nitrosamines are carcinogenic to humans, however a number of IARC reviews identify a range of nitrosamines as potential human carcinogens.

C. Lindsley

Q. Any reason to disagree with that?

A. No. This is -- this is consistent with what -- what the FDA has said and what other folks have said. IARC has said. Various nitrosamines are possible or probable human carcinogens.

Q. Okay. Let's turn to the page ending in 649.

And do you see up top it says:

The use of GC/MS or HPLC/MS are two additional screening methods which would be used as a screening tool for nitrosamine content.

And they can be used to identify and quantify a known nitrosamine.

Do you see that there?

A. I do.

Q. And it says GC-MS also uses a specific method to detect the representative nitrosamines.

And do you see NDMA is noted below?

A. I do.

Q. Okay. So, 2013, this is a document by GSK where it's saying GC-MS isn't an appropriate method to detect NDMA, correct?

C. Lindsley

MR. SHEEHAN: Objection.

A. This is very general. Yeah. There's no probable with nitrosamines and GC-MS analysis. It depends on the sample. Again, if a sample -- if your sample that you're injecting into the injector port of a GC contains ranitidine HCl, you're going to get degradation and elevated levels of NDMA that aren't really there.

It's all context dependent. The methodology for NDMA is fine as long as you extract the drug product out of the sample prior to analysis.

Q. And you've indicated that there was no knowledge about that until October 2019 with the FDA update, correct?

MR. SHEEHAN: Objection.

Mischaracterizes testimony.

A. I said I am unaware of anything other than that. And at that point that's what led to the Zeng and Mitch retractions and corrections.

Q. Sure.

MS. LUHANA: Let's pull up

Exhibit 6479. I'm sorry. It is 6488.

C. Lindsley

I apologize.

Can you pull that up? And let's scroll down to its 699, the Bates number.

(Exhibit 6488 was previously marked for identification.)

Q. Doctor, I want to direct your attention to the e-mail down below where they're discussing NDMA risk reports and assessments that are being done.

Do you see that they're stating that they're analyzing batches for NDMA content in ranitidine API by validated LC-MS/MS and GC-MS methods? And this is for ranitidine specifically in September 2019.

Do you see that there?

A. I do see that.

Q. So GSK was assessing NDMA levels in ranitidine with GC-MS, correct, in September 2019?

A. What you're not seeing here is -- is the methodology they're using. They may be extracting the API from the samples they're analyzing. I don't know.

If you look at the Tanner study, he

C. Lindsley

did an extraction prior to analysis when he was using the GC study. So it's probable they very well could've extracted out the API prior to analysis so they were more accurately quantifying an NDMA.

From just the e-mail, I don't know how they did this. I don't even know what their validated -- I don't know what each of these methods are.

And this is, again, the first time I'm seeing these e-mails so I don't know how these studies were performed. It really depends on how the studies were performed.

Q. Sure. But you see this e-mail and the plain view of the e-mail and the text states that they assessed NDMA content in ranitidine by validated GC-MS methods, in addition to the LC-MS methods, correct? And that was in September 2019.

MR. SHEEHAN: Objection. Asked and answered.

A. That's the date on the e-mail.

Q. That's the what?

A. That's the date on the e-mail that you're showing me.

C. Lindsley

Q. That's the date on the e-mail? That wasn't my question though.

A. You said in 2019; so yes, the date of the e-mail is 2019.

Q. My question wasn't about the date of the e-mail.

MS. LUHANA: Can you please read back the question.

(Referred to portion of the record was read back by the court reporter.)

MR. SHEEHAN: Objection. Mischaracterizes the document, and asked and answered.

A. Again, the e-mail states they used those two methodologies.

Q. So they used GC-MS to assess NDMA levels in ranitidine in September 2019, correct?

A. That's what the e-mail says.

Q. Okay.

MS. LUHANA: You can take this down.

Why don't we take a ten-minute break?

MR. SHEEHAN: Okay.

C. Lindsley

THE VIDEOGRAPHER: All right. We're going off the video record. The time is 9:19 p.m. UTC time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:35 p.m. UTC.

Q. Doctor, you understand you're still under oath?

A. Correct.

Q. Dr. Lindsley, in your report you discuss the process for testing ranitidine for NDMA. I think you lay it out in pages 10 to 12, and you go through that process.

But you have testified that you haven't testified any ranitidine API or drug product and assessed NDMA levels, correct?

A. Correct. I believe the FDA is a vaster regulator for that, and they did a really extensive job and developed great methods and analyzed lots of different supplies. And I think their data is -- is -- it really kind of speaks for itself.

Q. Sure. Why haven't you testified

C. Lindsley

and assessed the NDMA levels in ranitidine?

A. The FDA's already done that. The FDA has done that in a more comprehensive way than I in my lab could ever do. The Australian agency is on a similar exercise. And other folks have looked at it. There would be no point for me to do the same thing.

Q. So, although you're laying out steps of what should be done to assess NDMA levels in ranitidine, you, yourself, have never testified it, correct?

A. Correct.

Q. Doctor, would you agree that it's important to test ranitidine and assess NDMA levels in a variety of real world conditions, meaning conditions that consumer would store ranitidine in?

MR. SHEEHAN: Objection.

A. I guess the question there is what really would be real world conditions and how subjective that would be to the person developing those assays.

So, you know, this takes me back to the Najafi work where he had also a lot of

C. Lindsley

protocols that he stated would simulate real world situations but there's no references for why he -- how he set these up or how those conditions really mimicked real world situations. And, you know, that work really wasn't vetted.

So in my opinion, I -- again, I go back to the work the FDA did where they pulled samples directly from pharmacies, analyzed them. And I think that's the more relevant and the more objective way to really understand an NDMA content in the drug.

Q. Doctor, you appreciate that NDMA -- or NDMA is generated when the pills are exposed to heat and humidity, correct?

A. That has been demonstrated.

MR. SHEEHAN: Objection.

Q. So you don't think it's important to assess those NDMA levels? For example, when the seal is broken and the pills are maintained and used by consumers, you don't think it's important to assess those levels of NDMA in real world conditions?

A. Well, again --

MR. SHEEHAN: Objection.

C. Lindsley

THE WITNESS: Sorry.

A. I think my -- my concern with this is, again, real world conditions developed by one individual are going to be very subjective and may not truly be representative. It's so hard to mimic what one person might consider real world conditions and then generate a dataset and then use that to argue a point that truly may not be representative of real world conditions.

And so, you know, I don't know where one really goes with that objectively. And so my -- my thoughts, again, go back to the testing by the regulatory agencies where they have done it in a very consistent and methodical way. And we know that levels vary from very low to no NDMA to moderate to, in a couple of cases, high, and I think that's the data we really need to look at and consider because it is the only truly objective datasets we have.

Q. Sure, Doctor. So in terms of varying conditions, what I'm talking about, for example, is assessing the temperature and

C. Lindsley

humidity that's reached, for example, in a hot mail box or a glove box in a car or the human bathroom would be those varying conditions to investigate.

So did you bother doing any kind of search to assess what those conditions would be in those scenarios?

MR. SHEEHAN: Objection.

A. You know, there's -- there's -- I did. I looked at the temperature in a car, and I looked at what was known from colors and sources those are in my report. And the temperatures vary across the car; whether it's in a glove box on the seat, on the floor, on the dashboard what the outside temperature really is.

So again, the -- a lot of the studies that Najafi did, he picked a single temperature which would reflect, in my mind, somewhat of an extreme. It really depends.

So again, real world scenarios, you would have to get a legitimate dataset, you would have to do that across a range of temperatures to simulate a car where the drug may be in various climates and various

C. Lindsley

temperatures. And that's an enormous dataset that is still gonna be random and potentially biased.

I don't really agree with any of these, quote, real world scenarios because they're not. They're artificially contrived in a laboratory, and I don't know how relevant those are to any real world situation.

Q. So your solution is not to test at all versus assessing the levels and actually setting up some models to test those real world conditions to assess how much NDMA is generated in ranitidine.

Is that your testimony?

A. No.

MR. SHEEHAN: Objection.

A. No. What I'm saying is you would have to add a lot more variables to your real world scenarios to have a reliable dataset.

Q. Did you do that? Did you assess real world scenarios, and did you test ranitidine for NDMA?

A. No. We've already talked about that. No, I did not. And you know, it was

C. Lindsley

not my purview to go try to acquire the drug and do studies on it.

Q. Why not?

A. The FDA had already done that.

Q. Why didn't you assess the drug in real world conditions and test for NDMA in ranitidine?

MR. SHEEHAN: Objection. Asked and answered.

A. Well, just like I did with Dr. Najafi, I could -- I could create some artificial conditions that I say are mimicking real world conditions; but what I came up with could be very different Dr. Najafi came up with which could be very different from what the next expert. And then what does that data really mean because they're contrived artificial systems.

They don't truly mimic the real world. They're one person's view of what the real world might be. So I don't have a lot of value with those. I don't think they're reliable. I don't think they provide really consistent, accurate data to inform us of anything.

C. Lindsley

Q. Doctor, is Lindsley Lab a state-of-the-art lab?

A. Yes, it is.

Q. So if you wanted to, you could have testified at different points and assessed the NDMA levels in ranitidine, correct?

MR. SHEEHAN: Organization.

A. I mean -- well, yeah, that's a possibility. But there's no point to do it. The FDA has already done all this testing in a very sophisticated way. And then, you know, if you were going to do this on your own, you're really charged with what samples do I use and where do I get such samples and where -- what have they been exposed to before I got them.

Q. Okay.

A. As well, it would take a lot of time and effort and money to go generate all these standard curves and protocols and procedures and, you know, we're a soft money lab. We just can't go do six months of work and spend hundreds of thousands of dollars, if not millions of dollars, just -- you know, I'm sure Dr. Najafi did not do all this work

C. Lindsley

for free. These studies are expensive and take a lot of time.

Q. Well, no. I was asking if the defendants could've paid you and your lab to conduct this testing to assess different scenarios that ranitidine would be exposed to and test the amounts of NDMA in ranitidine, correct?

MR. SHEEHAN: Objection.

A. I mean that's a possibility. But I still say it's unrealistic because any, quote, real world scenarios you go after, you're modeling them in a lab. It's -- it really reminds me of Monty Python and the Holy Grail when they're looking at Camelot and then, you know, Terry Jones says: It's only a model.

It's a model. It's a contrived model. It's a snapshot in time of a condition and it's not truly representative of real world scenarios.

So again, just like we talked about some of the papers I reviewed, I don't think there's a lot -- there's not a lot to rely on with that because it is not uniform across

C. Lindsley

what the consumer experience may be.

Q. Sure. But you can gauge and assess different points to test that. And, of course, if you're setting the parameters, you can test, for example, at 40-degree Celsius and 75 percent relative humidity as is required by the FDA stability testing, right?

You could test ranitidine in those -- with those stability conditions and assess the NDMA that is generated for ranitidine, correct?

MR. SHEEHAN: Objection.

A. Again, that's possible, yes. But, you know, I think if I were the defendants I would not go to a lab like mine even though we're capable of doing it. I would go to one of the CROs that does this for a living.

Q. Sure. So there could've been a lab that could have been hired that was capable of doing this testing and you could've overseen it, correct, Doctor?

MR. SHEEHAN: Objection.

A. There would be no reason for me to oversee it.

Q. Okay.

C. Lindsley

MS. LUHANA: Let's pull up Exhibit 6498.

(Exhibit 6498 was previously marked for identification.)

BY MS. LUHANA:

Q. And Doctor, we had discussed this earlier. This is the workshop that the FDA held on nitrosamines. It was a two-day workshop from March 29th and 30th, and this is the transcript from March 30, 2021.

Doctor, have you seen this transcript?

A. No, I have not.

Q. Okay. Let's turn to page 129, and I would like you to read out loud what Dr. Keire, who is the office director of the CDER OPQ Office of Testing and Research in the Division of Pharmaceutical Analysis for the FDA.

Can you please read out loud what Mr. Keire -- who -- can you please read out loud what Mr. Keire says here?

A. Yeah. I mean I think there's a big focus on -- you know, real world conditions, right? You know, the hot mailbox, the glove

C. Lindsley

box in the car -- you know, the human bathroom. You know, I mean, if you think about these things -- you know, what does it experience in the truck in the middle of the summer in the southern U.S., right? You know, so -- you know, before it gets to the shelf.

So, you know, I mean, you cannot completely model all those conditions. But you know, you try to get appropriate data that can be predictive of stability under a variety of conditions. And you know -- and those are -- you know, have been, kind of, intentionally harmonized in ICH documents, about -- you know, which conditions are standard conditions that can be used to establish stability.

Q. Doctor, as you said, you didn't collect data on what these real world conditions are that ranitidine could be exposed to, correct?

A. Correct.

Q. You didn't do anything to assess the different conditions consumers store the ranitidine in, right?

MR. SHEEHAN: Objection.

A. No. I have done no testing with ranitidine at all.

Q. Well, this is not the testing. This is just assessing the variety of conditions. You didn't assess what the conditions would be, let's say, in a hot mailbox, did you?

A. Again, you know, it's going to be so random. Is the mailbox in full sun? Is it a black mailbox? Is it a silver mailbox? Is the mailbox one that's made out of brick?

The temperature variations are so extreme, I don't know -- just like they said, it's gonna be so random to model all these conditions, it's -- it's -- the number of variables, the number of experiments you would have to run would just -- would just grow exponentially.

Q. Doctor, they say not to completely model all these conditions, but you get appropriate data. However, you didn't get appropriate data to even assess these conditions, did you, Doctor?

MR. SHEEHAN: Objection.

C. Lindsley

A. When you say you didn't get appropriate data, are you talking from looking in the literature or from doing something experimentally?

Q. Whatever. Did you do anything to get appropriate data that's predictive of stability under a variety of conditions that ranitidine would be exposed to?

A. I'm sorry. That's really, really broad. I'm having a hard time answering that question.

Q. Well, did you -- why are you having a hard time answering the question?

I'm asking you did you get appropriate data that's predictive of stability for ranitidine?

A. I reviewed a lot of data about the stability of ranitidine. You know, the 1987 Haywood study was published, which we talked about earlier, but that was published. And they looked at the stability of the drug at different temperatures and at different pHs. And the compound was very stable across pH ranges until you got to very highly alkaline pHs. Very stable molecule. The impurities

C. Lindsley

in the degradation products that results were characterized. NDMA was never identified as an impurity nor was the dimethylamine moiety lost in any of those degradation products.

And so, you know, what this all keeps going back to is that there was really no evidence and no reason to expect that an NDMA was being generated from the degradation of ranitidine. And so there is no -- I don't see any reason why they would've a priori gone back and looked for it in the API nor would they have had to go and develop particular methods to look and quantify with the appropriately sensitive method to find NDMA in ranitidine.

I think only now that the Valisure and, of course, you know we debunked their testing methods, but the range that the FDA has now found, you know, that really led people to go back and look with hindsight at these things. But at the time when these other studies were run, there was no information generated along the way that any of these impurities in these degradation products could've been NDMA.

C. Lindsley

And then, you know, it really gives me a great comfort with all of this is the fact that so many of the samples that had been analyzed by multiple regulatory agencies, a lot of the samples had very low levels even though they've had various shelf lives. There's very low levels of NDMA below the AI. Some have moderate. Some have -- a few have high. There's a range and that's well known.

But, you know, the FDA did all the appropriate studies to follow that up. You know, not only did they develop the sensitive methods for detection that have now been -- that permeate the field and people are using. But Gau did a very well-controlled gastric fluid study that showed really no risk of NDMA production from ranitidine at physiological concentration.

And then the Florian study in humans in healthy volunteers, you know, with the new sensitive systems, they are able to quantify NDMA levels in both plasma and urine. They did a cured meat diet, a non-cured meat diet and placebo. And

C. Lindsley

effectively, the levels of NDMA production are a wash across all those groups. They're all basically equivalent. Some patients had no detectible NDMA.

So my thought again is, you know, for a long time with the degradation that was reported there was no rationale to go back and look for NDMA. And in my opinion, the work the FDA has done has really driven home the fact that the only NDMA present in ranitidine is that which might be present in the capsules that you take or the pills that you take.

There's no endogenous formation of NDMA I think that has been locked up and sealed. And so we're left with this -- these degradation product -- problems.

But again, getting back to these issues of trying to model real world scenarios, I mean, it would truly be random. I don't know how anyone could generate data, even if they ran dozens of conditions, that would truly mimic all the possible scenarios of a real world consumer experience with NDMA.

C. Lindsley

I just -- it's -- it boggles my mind how many different studies you would have to do, how many different assays you would have to have running, how many different testing scenarios you would have to have running and to do that in a way that would give any reliable data that would inform anyone of anything would take so much time, so much money, I just -- I can't -- and then even once that was done, and you're presented that data, I would guarantee you, you would have lots of people come in and criticize your datasets and say, oh, well, you looked at this and this, but you didn't look at this. Or you modeled this temperature at this humidity, but you didn't do this, which could be in the southwest of the US or what about in the northwest or what about in a really dry environment like Northern California? How is that going to play out there?

So even if you did all the work, I think you're going to get all kinds of criticism about what you didn't do and what you excluded even though these committees are

C. Lindsley

saying we should just get maybe some baseline data even though it may not be completely comprehensive.

Just the community as it is, when you generate data even like with the data that's out there now, people are trying to criticize it and suggest other things that could've been done.

In this case, I really just think -- I don't know where one could reasonably start to do something that would have any -- any reliability or anything that could truly inform the public.

MS. LUHANA: Move to strike as nonresponsive everything before line 361/13.

Q. Doctor, so your answer is to do nothing, correct? Do no assessment and do no testing to see the levels that consumers are actually exposed to of NDMA and have been for 40 years with this product on the market, right?

MR. SHEEHAN: Objection. Asked and answered. Mischaracterizes testimony.

C. Lindsley

A. Once again, that's a complete mischaracterization of what I said.

If you are gonna generate data that could potentially be decision-making data but it's not relevant or potentially not relevant or it's speculative, that can do more harm than just relying on the data the FDA has already produced.

Q. Doctor, you understand this is the transcript from the FDA, and this is an office director of the FDA, Dr. Keire is saying to create -- to produce data and do testing to model a variety of conditions to assess ranitidine and the NDMA levels that are generated in these various scenarios.

Do you understand this is March 2021 when the FDA had this workshop and he is specifically proposing this?

A. Well, again, I'm getting a blurb out of context here. I haven't read this entire document, so I don't know all the context. I don't know what occurs beyond this or before this.

So to have a real conversation about this and give you an opinion, I would

C. Lindsley

have to have some time to read the entire document to make sure everything is in the proper context.

Q. Well, reading this paragraph, he is clearly stating that you try to get the appropriate data that can be predictive of stability under a variety of conditions.

Do you see that there?

MR. SHEEHAN: Objection.

A. Yeah. I see that statement.

Q. Sure. And he refers to the internationally harmonized ICH documents, correct?

A. Yes.

Q. And are you aware that Dr. Najafi used the ICH documents to set the levels for the zone conditions, for example, for the four zones in the accelerated ambient zone? Are you aware of that?

MR. SHEEHAN: Objection.

A. I would have to go back and review that to be -- to be sure.

Q. Well, did you review it before to see when you were criticizing Dr. Najafi whether he used the levels and the conditions

C. Lindsley

that are set forth in the ICH zone testing test?

A. I don't -- I do not recall if I went back and looked at the ICH link to those -- those conditions.

Q. Well, I can represent, Doctor, he used the ICH standards for the varying zones and the conditions provided by the ICH and the FDA to establish zone conditions that the ranitidine was exposed to and then he measured the NDMA levels.

A. Okay.

MR. SHEEHAN: Objection to the speech.

A. Well, I can say --

MR. SHEEHAN: No, no. There's no question.

THE WITNESS: Okay.

Q. So, the Lindsley lab, for example, didn't conduct testing on ranitidine using the conditions established by ICH, for example, and assess NDMA levels, correct?

A. We've covered this. We did no studies with ranitidine whatsoever.

Q. You could have though, Doctor,

C. Lindsley

right?

A. Anything is possible.

Q. No. This is not anything.

Your lab could have conducted the testing used the ICH standards that are established for the different zones and testified ranitidine and assessed the NDMA levels, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. We could've done that.

Q. But you didn't, Doctor, did you?

A. No.

Q. Dr. Emery also conducted simulated gastric fluid studies testing with various parameters that may influence NDMA formation from ranitidine in the human stomach, including different pH levels, different nitrite levels including studies done with food, correct?

A. Correct. Those were done.

Q. Doctor, did you conduct any simulated gastric studies with varying conditions to see how much NDMA is generated in those conditions with ranitidine?

C. Lindsley

A. No. I think those studies have already been comprehensively done by other folks, including the FDA once again.

Q. Oh, really? What study has been done with simulated gastric fluid where they have used food and ranitidine and gastric nitrite with varying pH conditions?

A. Okay. With food, the only study I'm aware of where they tried to mimic the addition of food was the Najafi work.

Q. Okay. So there is no other study that's been conducted.

So my question I'm posing to you is, you could've conducted a simulated gastric fluid study exposing ranitidine to varying conditions including with food and assess the NDMA levels, correct?

MR. SHEEHAN: Objection.

A. That could've been done.

Q. Doctor, but you didn't do that study, did you?

A. No. We've covered that.

Q. Doctor, you've concluded in your report that only a small amount of NDMA forms.

C. Lindsley

And I'm wondering how you could conclude that when you haven't done any of these various tests modeling these different conditions and exposing ranitidine to these conditions and then evaluating the NDMA levels.

So how could you come to the conclusion -

MS. LUHANA: Candida, can you read that again, the question, please?

(Referred to portion of the record was read back by the court reporter.)

A. Well, I think you rely on all the data that's presented to date with simulated gastric fluids, the non-physiological concentration of nitrate that's been used in all of these.

If you look at the -- the conditions that Najafi uses, I mean these are very high. He takes the nitrate levels up far, far beyond what anyone else has used. He sees degradation only at very low pHs, which is not the appropriate pH that ranitidine would form in the stomach. You know we go from pH of 2 to 3 to a pH of 5

C. Lindsley

to 6. And if you look at the charts in his report at those pHs, the NDMA levels are very, very low.

You know, the whole problem with these singular gastric fluid studies, there's quite a few issues with these, is first, you know, for almost all of them, the pH is kept at a very, very low level. You know, a hundred to a thousand to, in certain cases, ten thousand fold more acidic than what the gastric compartment would be after you've taken ranitidine. And on the label you're supposed to take ranitidine with a glass of water and then wait 30 to 60 minutes before adding food. And we know this compound is dissolved and absorbed fairly rapidly.

So the -- the experiments, you know, again, I didn't conduct the experiments. But we conduct a lot of experiments. We design a lot of experiments, and we try to make sure that experiments are relevant so that the data we get is relevant. And you know, as part of that exercise, we were trying to look and see how Dr. Najafi ran those studies.

C. Lindsley

Because if you consider in a real world scenario, you take an encapsulated pill with a glass of water, it's not in solution right away. It's in the gastric compartment. It's slowly the coating is getting dissolved. Then the API is dissolved. Then it's absorbed, and things of this nature.

You know, I don't know, because there is no written description of the experiments, does he fully dissolve the pill in the acidic solution then add the meat by-products, then add the nitrite? How are these studies performed? Does it really mimic physiological conditions?

The food studies, you know, are those heterogeneous mixtures? How is that mixing work? It's very different that the stomach with all the convolutions and the stomach volume and the churning. It's a very different environment than what you could simulate.

And so these models always kind of concern me a little bit that they're -- they're a little contrived because they're regulating the pH to a -- a level that's,

C. Lindsley

again, is not accurate.

And in these current studies as well, we did get to look at the analysis templates that were used to measure NDMA in all these studies. And across the board, as you're looking at the data they used or his technicians used to quantify NDMA levels, some of the samples gave nice, sharp peaks with a very sharp area under the curve.

A nice sharp peak was what you like to see with a nice signal that correlates fairly well with the internal standard. A lot of other samples there was -- there's very little there. And they elevated the baseline and integrated baseline noise kind of with a random slope. And you can see that from how the data was started that they did an operator-determined peak picking versus letting the computer do it based on the mass.

And so as you look through those datasets, the NDMA content in various samples for the datasets he's producing in this report were quite random depending on how they pick the different slope for a different baseline noise in a lot of cases. And there

C. Lindsley

didn't seem to be any consistency with how that was done.

So again, these systems, I really don't know how accurate the NDMA quantitation was. And again, some of the samples he produced, what we saw were varying levels where the -- you know, the first four time points, you had significant NDMA concentrations. Then it would go to zero, then it would come back up. Then another time point, then it would go back down and maintain constant the whole time.

There were just a lot of really strange inconsistencies with some of these synthetic systems he was creating. And then, again, the analysis. And as he tried to match data from his analysts to data in his charts, that was really challenging to do. There was no great correlation between the data in the reports that they had and the data that went to tables. A lot of numbers were transposed.

And it's just -- it was really impossible to really vet that data and to make sure it was consistent.

C. Lindsley

Q. Doctor, have you ever assessed NDMA testing previously?
A. No.
Q. Okay. Doctor, can we agree that Emery has conducted two buckets of testing? And so they conducted testing for the citizens petition, right, pre-litigation. So let's call that one bucket.
And then the other bucket would be the testing they did for the litigations once they were retained by Plaintiffs, okay?
A. Okay.
Q. So now I want to focus on the Emery testing that was done for this litigation, okay? And so my questions are going to be directed to what Dr. Najafi did in this litigation unless I indicate otherwise. All right?
A. Okay.
Q. So, in your supplemental report --
MS. LUHANA: Actually, maybe now is a good time for a break before I start with this section. How long have we been going? Let's go off the record.

C. Lindsley

THE VIDEOGRAPHER: Going off the record. The time is 10:06 p.m. UTC.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:22 p.m. UTC time.

BY MS. LUHANA:

Q. Doctor, in your supplemental report, you state there are certain situations in which CGMP or GLP certification is necessary, correct?

A. Correct.

Q. So does the Lindsley research lab do research outside the work that it does for pharmaceutical companies?

A. Yes.

Q. Okay. So I want to focus on that.

So when the Lindsley lab -- research lab conducts experiments, not for the pharmaceutical industry, are there instances where it does not do a CGMP or GLP certification?

A. Oh, we -- all our work is preclinical. We don't do GLP certification,

C. Lindsley

GLP certification. We just keep accurate laboratory notebooks and just what standard practice is where full written descriptions of the studies are done. All the analytical work is referred to in the report with access to the files. Everything is signed and countersigned by someone who can read -- read and understood the experiment.

You know, the whole hallmark of doing science is that, you know, if you get hit by a bus tomorrow, someone's got to be able to come in and read your notebook and figure out what you did, and be able to replicate your study and get the same results.

Q. Sure. But the lab notebook is utilized with other underlying data, right? For example, raw data, electronic spreadsheets and other things that -- that is for the entire experiment. That's what you're relying on and reviewing, correct?

MR. SHEEHAN: Objection.

A. Yeah. The laboratory notebook describes exactly what happens, what the protocol is, what observations were made,

C. Lindsley

what things look like. Just every -- everything about the study.

And then you have references to all the raw and other analytical data so that you can -- anyone else can follow behind you and see what was done.

Q. So when you're doing experiments like you said for the Lindsley lab, you're not going a CGMP or GLC certificate?

A. No, we're not.

Q. Okay. And are you aware that the defendants also conduct research and developmental that are non-GLP and non-CGMP?

MR. SHEEHAN: Objection.

A. I would assume they do not -- yeah, they're likely not doing, yes.

Q. Okay. Doctor, has the Lindsley lab published every experiment it's conduct and submitted it for peer review?

A. No. It depends what you're -- what you're describing in that paper. But with any given paper, all the data that supports the conclusions of the compounds disclosed in that manuscript, all of that relevant data is submitted.

C. Lindsley

Q. My question is, are there experiments that you conduct at your lab where you don't submit that for peer review?

A. Yes.

Q. Doctor, you've given the opinion that if CGMP -- if you don't do a CGMP or GLP certificate, if that doesn't apply, appropriate documentation is necessary, correct?

A. Correct.

Q. And in your report, in your supplemental report I believe on page 4, you list the appropriate documentation that should be included, that's mandatory, that must be included in a lab notebook for it to be sufficiently reliable to support any scientific conclusion, correct?

A. Correct.

Q. And you give a list -- let's go to your report.

You say:

The necessary documentation includes detailed written descriptions, full analytical details, dates studies were performed, the notebook pages signed dated by

C. Lindsley

investigator second independent scientist as a witness that read and understood the experiment, the purpose of the experiment, the validation of the analytical method, the sequence data for the actual running of the analysis, capture data as analyzed by the scientist, and conclusions drawn from the data.

Doctor, are you saying here that all the data, including the raw and processed data for LC-MS/MS, should be recorded in the lab notebook?

A. No. Not recorded in the lab notebook but it needs to be referenced. The file name needs to be referenced so anyone can access it.

And in our case we now have, and we have for a long time, we have electronic laboratory notebooks and we can append the raw data files and the worked-up datasets to every individual compound record. And so, again, the goal is anyone can repeat our -- repeat our work.

Q. Okay. But here you say a litany of these things should be captured in the lab

C. Lindsley

notebook and are mandatory for the lab notebook to be sufficiently reliable to support any scientific conclusion.

And so my question to you is, what authority are you citing here that all these things are mandatory to be included in a lab notebook?

A. These are --

MR. SHEEHAN: Objection.

Hold on. Let me get my objection.

Objection. Mischaracterizes testimony.

A. Okay. I don't know about these mandate things you're talking about. But just sufficient laboratory practices so anyone can repeat your work, these are what we've always done in both industry and academics. And this is non-GLP related work.

You have to have a sufficient record so that anyone can repeat your work and understands the observations you made during the experiment.

You know, every time we run an expert, it's different. You can't just copy and paste an existing protocol into a

C. Lindsley

notebook, and go, yep, that's what we did. Because every time you run that study, no matter how routine it is, they're going to be very -- there are going to be slight variations and differences that occur, and those need to be recorded as well as the links to the data.

So again, when you're trying to match raw data to experience a run, it's very easy to do. People don't have to try to guess and figure out what was done and what data goes with which study.

Q. Doctor, I'm not disagreeing in terms of repeating your work.

My question to you is, you have a litany of -- a list of nine things that are specific. I want to know if there's an authority or something you're citing for this list. Where is it coming from?

I understand it may be your general experience and it may be your list. But do you have a citation or an authority for this list?

A. There are numerous documents out there about keeping appropriate laboratory

C. Lindsley

notebooks and standards for laboratory notebooks. Almost every university has certain -- where these are spelled out for recordkeeping.

Companies have these spelled out internally. Merck had their own internal documents that we were told to follow on how to keep a lab notebook, what was required. Park Davis had a similar data that was distributed to all the employees on how to keep a notebook. Lilly had this.

And when you first joined a pharma company, you were given that list. And then the people that -- you had senior people coming and signing and witnessing your notebook, and they would check to make sure all these elements were there.

So this really is industry standard but it's also academic standard. This is what we have at Vanderbilt. We get a very similar piece of information on how to keep a laboratory notebook at Vanderbilt.

Q. Sure, Doctor. I understand that completely.

And my question to you is, do you

C. Lindsley

have a site or an authority sitting here today for this specific list of nine things?

MR. SHEEHAN: Objection. Asked and answered.

A. This is just derived from all the other things that are already out there, as well as the NIH guidelines for proper notebook keeping.

Q. Okay. So you can't reference a specific cite for me as to where you came up with these nine specific items that are necessary for a lab notebook and mandatory for the lab notebook to contain?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah. I did answer the question already.

Q. So you don't have a specific cite. I understand you're saying general industry standard, the different, you know, pharma companies you worked at. I am looking for something specific here, Doctor that I can review and assess and confirm where you're getting these points from.

So do you have an authority or a

C. Lindsley

cite for me which would have this list of nine things that you've come up with that you're stating are mandatory for a lab notebook?

A. I guess --

MR. SHEEHAN: Hold on.

Objection. Asked and answered.

Go ahead.

A. I guess the most available public citation to go to is what's listed in my report, Guidelines and Policies For the Conduct of Research in the Intramural Research Program of NIH. And it's NIH guidelines page 2 to 3, which dictates a lot of the same things that I was talking about. There's significant overlap there.

Q. Okay. So I'll find these nine items in these guidelines?

A. Maybe not all those nine. You'll see things very close to those -- those nine items.

Q. Okay. But not necessarily every single item there that you've included as mandatory for a lab notebook?

A. Probably not.

C. Lindsley

MR. SHEEHAN: Let me get my objection. Don't jump on each other.
Objection.
Q. Doctor, you've drawn comparisons between GSK's work on the root cause analysis and the work performed by Emery in your supplemental report, correct?
A. Yes.
Q. Okay. So let's review one of the GSK lab notebooks that you cite to.
MS. LUHANA: Let's pull up what's been marked as Exhibit 6495. This is not 6490 -- well, can we scroll down to ending in 170? Right there, yes.
(Exhibit 6495 was previously marked for identification.)
Q. So Doctor, do you see this is a page from a notebook and it says up top, Continue from page NA and then continued on page at the bottom and it says NA, correct?
A. Uh-huh.
Q. So this page of the lab notebook should stand on its own, correct?
MR. SHEEHAN: Objection.
A. What do you mean "stand on its

C. Lindsley

own"?

Q. Well, you're looking -- it's an individual page that's saying it's not continued from the prior page or continued after, correct?

A. Yes.

Q. Okay. Doctor, there's an instance where you see there's a number that's scratched off and rewritten.

Is that acceptable with GLP and CGMP when there's no initial or date noted to trace who the scientist is who made that modification?

A. That should've been signed and dated.

Q. Okay. And --

A. Initialed and dated. Sorry.

Q. Okay. And then if we look at step 1 here, it says, Evaporated MEOM.

Do you see that there?

A. Yeah.

Q. So, can you tell that step 1 involves evaporation?

A. Yes.

Q. Can you tell what temperature was

C. Lindsley

used for step 1?
A. Well --
(Court Reporter clarification.)
A. If you're evaporating methanol, you're just heating it up to probably 45 degrees to get the methanol to evaporate.
Q. Does that say it there?
A. No, it doesn't.
Q. Okay. Does it tell you what container the material was held in?
A. Nope.
Q. Whether it was covered or uncovered?
A. Nope.
Q. And the second note there says, left material at 60 degrees Celsius in oven, correct?
A. Yes.
Q. Do you know -- do we know when it was put in the over and for how long?
A. No. Does not say.
Q. How much material was left in the oven?
A. Doesn't say.
Q. Doctor, how was it separated? Do

C. Lindsley

we know -- do we know how it was separated?
A. Couldn't tell you.
Q. Was it removed from the oven to separate?
A. I don't know.
Q. For the material in the oven, do we know what type of container was used?
A. No.
Q. Sealed or unsealed?
A. No.
Q. What was done with the material after it was removed from the oven, do we know?
A. No.
Q. Do you see any report of the actual testing parameters for the study?
A. Uhm.
Q. Doctor, did you respond?
A. Yes, I did. I said no.
Q. Okay. Where is the detailed written description here?
A. For this lab page, I don't see one.
Q. Okay. What's the purpose of the experiment, is that noted here?
A. No, it's not.

C. Lindsley

Q. Doctor, this is one of the lab notebooks that you referred to as being reliable. Do you recall that in your report?

MR. SHEEHAN: Objection.

A. Yeah. I thought I said, you know -- so yes. In general, the lab notebooks I felt were reliable. Some of them had very, very exhaustive written description. This one does not.

Q. This is one of the ones that you've cited as being reliable in your supplemental report, Doctor. Do you recall that?

A. This exact notebook page.

Q. Yeah.

A. I don't think I called out notebook pages.

Q. You cited to this document specifically on page 4, and this document is seven pages or six pages, and it starts at 636707. I'm sorry, 767167 and you put it in your report on page 4.

A. Well, what I comment on is that these were signed and countersigned, which they are.

Q. But these are the CGMP GLP

C. Lindsley

notebooks that you held in high regard, correct, Doctor?

MR. SHEEHAN: Objection.

A. The sentence of my report says:

As another example --

(Court Reporter clarification.)

A. As another example, the GSK lab notebooks underline the root cause analysis are countersigned following a CGMP/GLP review.

That is the only comment I made about those notebook pages, and they are signed and countersigned.

Q. Doctor, you've gone on about the CGMP and GLP certification and how it is the appropriate method; yet, without that, you state there are requirements that are mandatory for a lab notebook to contain.

And this is a GSK lab notebook that doesn't contain any of the nine requirements you have listed out in your supplemental report, correct?

MR. SHEEHAN: Objection.

A. Well, it's clear there are some things missing here. But I think, if you

C. Lindsley

look at the date -- or the AH numbers, those are -- those are LC-MS files, so one could still go look at those LC-MS files and find the data.

There is some written description that was -- it's not fully exhaustive. I think if you go to some of the other experiments that are listed in this document, they're very fully detailed experimentals on exactly what was done.

Q. Doctor, you testified this experiment should stand on its own, correct?

MR. SHEEHAN: Objection.

A. In the context of it being continued from page NA to NA, yes.

Q. Doctor, you agree that a lab notebook is one way to document conditions and methods that are used in lab experiments?

MS. LUHANA: You can take this down.

A. Yes.

Q. Okay.

MS. LUHANA: Let's pull up what's been marked as Exhibit 6496, and that is the NIH 2021 Guidelines and

C. Lindsley

Policies for the Conduct of Research.

(Exhibit 6496 was previously marked for identification.)

BY MS. LUHANA:

Q. And let's focus on -- Doctor, this is what you cited in your supplemental report, correct?

A. Yes.

Q. Doctor, let's turn to page -- page 3 -- I mean let's turn to page 3 of this. Okay.

Doctor, do you see up top? It states:

Data may be recorded on different media and different formats.

Correct?

A. What is the sentence before that?

Q. You could look at it. That's what I'm focused on.

A. Okay. Okay. Yes.

Q. Doctor, do you agree that the NIH guidelines specifically provide numerous ways that are scientifically appropriate and reliable to record data, correct?

MR. SHEEHAN: Objection.

C. Lindsley

A. Yes. I mean you can record data on multiple formats. That is correct.

Q. Okay. So the lab notebook is one method of recording what's in an experiment in addition to electronic notebooks, electronic spreadsheets and numerous other ways, correct?

A. Yes.

MS. LUHANA: You can take this down.

Q. Doctor, did you review the five lab notebooks provided by Emery?

A. I looked through quite a bit of the lab notebooks provided by Emery.

Q. Well, you came to an incorrect conclusion stating that they weren't countersigned by witnesses, but you don't provide a cite for that statement in your report.

Can we look at that? It's page -- paragraph 12 of your report. And you say:

Many of the lab notebook pages are not countersigned, witnessed and dated.

Doctor, in terms of the five lab notebooks, you don't provide a cite here.

C. Lindsley

What exactly are you referring to when you made that statement?

A. Well, let's pull some of the lab notebooks up and we'll walk through the pages.

Q. Doctor, have you done that? When you made that statement in your report and concluded it to a reasonable degree of scientific certainty, didn't you already do that? You ran through --

A. Right now I can't tell you exactly which pages I was referring to but let's -- let's pull up the documents.

Q. You didn't provide a cite here, did you?

A. No. Let's pull up the documents.

Q. We can do that during the break. I'd like you to review that and go through the lab notebooks.

MR. SHEEHAN: We're not doing homework on breaks. It's been a long day.

MS. LUHANA: Counsel, he's made the statement all the lab notebooks are signed and countersigned. And

C. Lindsley

there is no cite provided in his report, and there are hundreds of pages.

MR. SHEEHAN: Bring up one of the lab notebooks -- bring up the lab notebooks. Just put them on the screen and let him walk through.

MS. LUHANA: They are hundreds of pages long, counsel. I don't want to waste time running through to show you that, Doctor, they're all signed and countersigned.

BY MS. LUHANA:

Q. So sitting here today, what is the basis of your statement, you didn't provide a cite? Can you -- can you recall what you were referring to?

A. I was referring to -- as I went through the notebooks, there were pages I saw that were not signed and countersigned.

Q. Of the five Emery lab notebooks?

A. They were Emery notebooks relevant to the studies that were performed, yes.

Q. The studies that were performed for this litigation?

C. Lindsley

A. I believe so.

Q. Doctor, I'll represent to you that all the lab notebooks are signed and countersigned.

Doctor, in your supplemental report, you criticize Emery for a lack of documentation regarding storage conditions of testified samples. Do you recall that?

A. Yes.

Q. You claim that:

Without information as to the storage conditions of the samples it is impossible to determine what weight, if any, to give to the NDMA levels reported by Emery.

Do you recall that?

A. Yes.

Q. Are you aware that Emery received samples from the defendants?

A. I believe I was aware that some of the samples are received from defendants. Some mentioned were purchased from eBay, and some from other sources.

Q. Do you recall, sitting here today, which defendants Emery received samples from?

A. I believe they got samples from GSK

C. Lindsley

because they didn't make the drug product from the API. I can't remember all the other ones we had samples from.

Q. Doctor, setting aside the hard drive, did you review all the data provided by Dr. Najafi before reaching the conclusions that you did in your supplemental report, a report that you submitted nearly two months after your initial report?

MR. SHEEHAN: Objection to the colloquy, but go ahead.

A. Well, when you say "all data," what -- can you be a little more specific?

Q. All the data that was produced by Dr. Najafi asides from the hard drive?

A. Yeah. There were -- there were a lot of -- lot of data, a lot of files, a lot of PDFs, a lot of photos, a lot of -- a lot of data -- enormous amount of data was submitted that we had to go through.

Q. When you -- when you were saying "we had to go through," who's that "we"?

A. We meaning me.

Q. Doctor, so you reviewed all that data prior to submitting your supplemental

C. Lindsley

report, correct?

A. Yes.

Q. Did you review the chain of custody documents that were produced by Emery for BI, GSK, Patheon?

A. I'm sure I looked at them. Can we -- if there are specific questions about it, can we pull the documents up?

Q. Well, Doctor, are you aware that the chain of custody forms showed how the samples were stored once they were received from Defendants?

MR. SHEEHAN: Objection.

A. I don't exactly recall. Could we -- could we look at the document?

Q. Doctor, you didn't reference the chain of custody forms in your report.

Are you aware of that?

A. No.

Q. I will represent you didn't reference the chain of custody forms in your report that showed that the ranitidine samples were being maintained at 4 degrees Celsius.

Did you know that?

C. Lindsley

MR. SHEEHAN: Objection.

A. Again, as I've already mentioned, I don't necessarily recall everything I've looked at because we looked at a -- I looked at a lot of things. Can we look at the individual document you're referring to?

Q. Doctor, are you aware that GSK in its root cause analysis concluded that when samples were refrigerated at 5 degrees Celsius there is no further increase in NDMA?

A. Yes. I do recall that.

Q. Okay. So are you aware that Emery had also conducted a long-term refrigeration stability study to test samples at 4 degrees Celsius to confirm that refrigerating ranitidine would stop degradation? Did you know that?

A. Yes.

Q. But you don't recall seeing the chain of custody forms that showed that Emery stored the samples at 4 degrees Celsius upon receipt?

A. Again, I don't remember all the details of every document I saw, which is why I've asked if we could pull it up.

C. Lindsley

Q. Doctor, when you relied on the root cause analysis and some of the other testing that you relied on and included in your report, you provided testimony earlier today that you didn't know how those samples were stored, correct?

MR. SHEEHAN: Objection.

A. Which samples in particular are we -- are we talking about?

Q. I mean any of the samples. You concluded, for example, with the GSK root cause analysis, you're not aware of how GSK stored those samples before they did their testing?

A. Not specifically, no.

Q. Did you review any of the chain of custody forms from GSK or Intertek or LGC that did some of the root cause analysis testing for -- for GSK?

A. I -- I don't recall right now all the details of those documents.

Q. Do you -- do you recall reviewing any of the chain of custody forms?

And if they're not noted in your materials considered list, that means you

C. Lindsley

didn't review them, correct?

MR. SHEEHAN: Objection.

A. More than likely, yes.

Q. Doctor, so how were you able to weigh the -- the test results, determine the weight that you would give them, if you didn't know the storage conditions of those samples and that testing done by GSK?

A. Well, again, the root cause analysis was -- was peer reviewed and published so that gives it a bit more reliability as it was peer-review embedded by -- by other drug discovery and process scientists.

Q. Doctor, does the King publication discussion how the samples were being stored prior to them being testified?

A. No, it does not; not in the text.

Q. Doctor, are you aware you previously already testified that you don't know what was submitted by GSK when the King article was published for peer review, correct?

MR. SHEEHAN: Objection.

A. Again, I wasn't the editor-in-chief

C. Lindsley

of the journal to know what all was submitted in terms of supplemental materials.

Q. So you didn't review any of these types of documents for the defendants and didn't know how they were stored and the samples maintained but that wasn't important for you when you relied on the defendants' testing, correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. Obviously, no. That -- that's not really accurate.

Q. Doctor, GSK said that they couldn't identify the storage conditions; however, not knowing those storage conditions was unimportant for you in weighing that evidence and relying on it, correct?

MR. SHEEHAN: Objection.

A. I think what I relied on is we looked at the -- the extensive Excel files with all the different batches and all the measured quantities of NDMA. They were all very tight data, very consistent across -- across different lots. And so however they were, it just seemed very consistent and

C. Lindsley

reliable data.

Q. Doctor, what does the data have to do with the storage conditions? We went through the NDMA levels and the range. They range from, you know, single digits of NDMA in terms of the nanograms to thousands of nanograms of NDMA.

So how does -- how do the test results give you any idea of how the samples were stored prior to testing?

A. They don't. They don't do any -- there's no relation to storage.

Q. Okay. Doctor, you already testified that you didn't review all of GSK's lab notebooks for the root cause analysis, correct?

A. You know, I don't know if I -- if I completely explored every single notebook. I looked through an awful lot of documentation related to these things.

Q. Doctor, if it wasn't noted in your materials considered list, that means you didn't review it, correct?

A. Yes.

MS. LUHANA: Let's pull up what's

C. Lindsley

previously been marked Exhibit 3158.

(Exhibit 3158 was previously marked for identification.)

BY MS. LUHANA:

Q. And Doctor, this is the -- the King article, which is a short publication, and we said it didn't cover everything, for example, that's covered in -- in the GSK root cause analysis, correct?

A. Correct.

Q. And you already testified that the King publication doesn't tell us how the samples were stored prior to testing, correct?

A. Correct.

Q. And it doesn't tell us how the samples were chosen that were testified, correct?

A. Correct.

Q. And so the King article is peer reviewed, you said it gives you an assurance that the methodology is reliable?

A. It's been vetted by other experts in the field.

Q. Doctor, are you aware that the lead

C. Lindsley

author of the root cause analysis, Mr. Searle, testified that there was no methodology needed for how the samples were chosen to be testified?

MR. SHEEHAN: Objection.

A. No. I was not aware of that.

Q. You didn't review Mr. Searle's testimony, correct?

A. I have not reviewed any -- any testimonies at all.

Q. Okay.

MS. LUHANA: Let's look at Table 4 here. It's on page E.

Okay. And John, I may need you to do the split screen here if possible. So I want to look at Table 4, and then I want to look at Exhibit 3138 and turn to Table 15, which is on page 26 I think -- 27. Okay. Right -- perfect.

Q. Doctor, have you compared the data that's in the -- the final signed root cause analysis, which is Exhibit 3138, and what was provided in the King paper?

A. I looked through those, yes.

C. Lindsley

Q. So you've compared some of the data?

A. Yes. I compared some of the data.

Q. Okay. So, as you can see, there's Table 4 up here from the King article and then Table 15 from the root cause analysis, and both are discussing the comparison of the drug substance isolation processes.

Do you see that?

A. Yes.

Q. Okay. And do you see the solvent composition only mentioned on page 26 and 87 with no other charts there?

A. Sorry. Excuse me?

Q. Sorry. If you look at these two tabs, for example, you don't see the column for re-crystallization, correct?

A. Correct.

Q. And you don't see Dr. Reddy's numbers provided, correct?

A. Correct.

Q. And what you see is GSK Jurong and then Saraca Grade 1, Saraca Grade 3, which I believe is Supplier 2, Process 1 and Supplier 2, Process 2, correct?

C. Lindsley

A. Yes.

Q. So you notice that some of the columns from the root cause analysis are not included in the King publication, right?

A. Yes.

Q. And then you see some of the names are different as well, correct. The root cause 'cause Saraca Grade 1 and the King publication calls it Supplier 2, Process 1, correct?

A. Correct.

Q. And then Saraca Grade 3 versus Supplier 2 and Process 2, right?

A. Correct.

Q. And then you'll notice there is the solvent composition numbers, and they're different for Saraca Grade 1 and Saraca Grade 3 in what's provided in the root cause analysis verses what's provided in the King publication.

Do you see that?

MR. SHEEHAN: Objection.

A. Yes.

Q. And do you see that the number for the total solvent volume that's provided in

C. Lindsley

Table 4 for King for Supplier 2, Process 1 is also different?

MR. SHEEHAN: Objection.

A. Sorry. What are we -- which -- what did you say, again?

Q. Total solvent volume, if you look at it in Table 4 for a Supplier 2, Process 1, it's 3.5. And then you look at it for Saraca Grade 1, the total solvent volume, it's 3.3, correct?

A. Yes.

Q. So any idea why there are these differences that are noted?

A. It would be real speculation; but in certain cases, journals like to see things just round to significant figures so 70/30 and 40/60 versus 73/27 and 38/62. Might be reasonable.

Why they went from 3.3 to 3.5 on total solvent volume, I'm not sure. It's -- it's always possible there were more ends that they ran to tighten up data before they published it so there could've been additional values run and then that would've changed that parameter. It would just be

C. Lindsley

speculation to guess why they -- they did that.

Q. However, the -- the values change from what the final root cause analysis and what was submitted in the King publication, correct?

MR. SHEEHAN: Objection.

A. Yes. There's a very -- very slight difference in the numbers.

Q. So did you carefully review the differences between the King publication and the GSK root cause analysis?

A. Yeah. I looked at these? These -- these are almost on top of each other. These are very consistent numbers.

Q. Okay.

A. And I don't know if for publication they had additional data that they averaged and -- and data changed slightly. I don't know.

Q. Well, you have no basis to indicate one way or the other, correct, Doctor?

A. Oh, no. I already told you it would be speculation, but that's a very minor difference.

C. Lindsley

Q. Sure. I mean they're -- they're just differences noted. We don't know why.

But there is a difference in what was signed in June 2020 with the root calls analysis and actually what was in the King publication, correct?

A. Correct.

MR. SHEEHAN: Objection.

Q. And Doctor, you reviewed the master data spreadsheet for the root cause analysis, correct?

A. Yes.

Q. And so is all the data from that master data spreadsheet incorporated in the King article?

A. I don't -- I don't know.

Q. Well, it's a -- it's a voluminous master data spreadsheet, correct?

A. Yes.

Q. Do you see all that data included in the King article?

A. No. Not all the data, no.

Q. The majority of the data, Doctor, with all the different data points aren't incorporated in the King publication.

C. Lindsley

You'd agree with me there, right?
A. Yes.
MR. SHEEHAN: Objection.
Just give a beat.
Q. Doctor, did you review the master data spreadsheet to assess the accuracy and the reliability of it?
A. In -- in terms of which parameter?
Q. Just the master data spreadsheet in terms of data that was there.
A. Yeah. I mean, I reviewed the data. I looked at the spreadsheet, looked at the concentrations they achieved, and yes.
Q. Okay?
MS. LUHANA: Let's look at page D.
Okay. And I want to focus on Table 1 right there.
Oh, I apologize. So the writing above this table states that it's showing the range -- perfect, thank you.
Q. Table 1 is showing the range of NDMA contents from all batches of drug substances and drug products testified, correct?

C. Lindsley

A. That's what the title of the table says, yes.

Q. Sure. And these are some of the numbers that we had seen previously in one of the documents that notes the drug substance batches and tablets and other things that are testified as well as the NDMA content range, correct?

A. Correct.

Q. I'm sorry. Doctor, did you answer?

A. Yes. I said correct.

Q. Oh, okay. Sorry.

So this goes back to the prior questions I was asking about the master data spreadsheet and the quantities of drug substance that were above the 9.9 micrograms per gram that were testified.

Do you recall, sitting here today, how many samples where GSK actually quantified the amount of NDMA in the drug substance that was above the 9.9 micrograms per gram?

Do you know how many samples there were that were above that number?

A. No. We --

C. Lindsley

MR. SHEEHAN: Objection.

Hold on. Let me get my objection.

Go ahead.

A. No. We discussed this earlier. I didn't -- I can't recall right now. There were -- I mean there were several hundred samples you can see that were analyzed. And again, they weren't quantified to be above 9.9 because that -- above 9.9 is an estimate because it's above the highest calibration standard.

Q. Okay.

MS. LUHANA: Let's review the -- the master data spreadsheet then. It's Exhibit 6499.

Take this down for now.

Okay. Is there any way I can control the spreadsheet? Oh, great.

(Exhibit 6499 was previously marked for identification.)

BY MS. LUHANA:

Q. Doctor, you've seen this master data spreadsheet previously, correct?

A. Yes.

Q. Okay. And so, as you can see, you

C. Lindsley

know there are a number of products that were testified. And then, if we scroll to the right, we'll see column N is the API NDMA content, correct?

A. Correct.

Q. And so if you scroll down, you'll see some numbers where the results are above 9.9, right?

A. Yeah. They're greater than 9.9.

Q. Sure. And then there are others that are actually quantified. So if you look here, for example, at row 66, here, right, you see 20.1, correct?

So it's 20.1 micrograms per gram of NDMA that's being found in the API. Do you see that there?

A. Yes.

MR. SHEEHAN: Objection.

Q. And then you see 20.2, you see 14, you see 20. You see various numbers 14.4, 16.2, 10.6, 20, 14. And it goes on and on and on. If you look, there are numerous samples.

Would it surprise you to know that out of those 134 samples there are over

C. Lindsley

50-plus that are above 9.9 micrograms per gram? Are you aware of that?

A. Yeah. I said --

MR. SHEEHAN: Objection.

Hold on. Hold on. Just give it a beat.

Objection.

Go ahead.

A. Yes. There were quite a few that -- that were above the level of quantitation.

Q. And so, Doctor, the highest amount was 41.4 micrograms per gram. And although you're saying that it's not a reliable number, GSK actually included that 41.1 microgram per gram NDMA content in its root cause analysis and did some analysis with that number. Do you recall that?

A. Sorry. Long day. Can you say that again?

Q. Sure. So the highest amount of API NDMA content that was found in this testing was at 41.1 micrograms per gram of NDMA, okay?

A. Okay.

C. Lindsley

Q. So GSK included that amount in its root cause analysis to do some analysis.

Do you recall them using that number?

A. Right off the top of my head I do not. Is there a specific document that has that in it?

Q. Sure, Doctor. I mean we don't even need to go there.

Doctor, do you recall that you discussed the 41.1 microgram per gram number in your report?

A. I may have. Let me see where that is in my report.

Q. I mean, it may be easier just to go to the root cause analysis.

A. I don't see the 41 number in here.

Q. It's -- I can locate it for you. However --

A. Sorry. Yeah, sorry. Yep.

Q. Okay. So you rely on it and you include it in your report, and GSK does analysis for it in the root cause analysis, right?

And so my question to you is, over

C. Lindsley

50 out of these 134 samples had NDMA levels that were above 9.9 micrograms per gram; yet, it wasn't disclosed in the King publication.

Do you know why that is?

A. Well, again, the limit of quantitation, you can't -- well, instruments can -- can pop out a number 'cause they'll -- they'll fit a curve no matter how good the curve is. It's not a reliable number. So, the highest level of calibration is at that 9.9.

So, again, the only reliable number one can actually put is just greater than 9.9; but an instrument will fit any curve you tell it to try to fit and it will give you a number, but the question is how reliable is that number.

Q. Sure. But GSK did some analysis in the root cause analysis with that number. You chose to include it in your report; however, it wasn't fully disclosed in the King publication. They could have said the limit of detection included over 50-plus samples, which is approximately at least 37 percent of the samples testified,

C. Lindsley

testified for values above 9.9 micrograms per gram; yet, that wasn't disclosed, Doctor.

Are you aware of that?

MR. SHEEHAN: Objection.

A. Yeah. Just like -- looks like other testing that has been reported. There's a range and they reported a range for the different production.

Q. Sure. But they didn't report that high end of the range, which is 9.9 micrograms to 41.1 micrograms per gram, Doctor, did they?

A. No. 'Cause --

MR. SHEEHAN: Objection.

Hold on. Just let me get my objection.

Go ahead.

A. Well, again, what you do, what you report in a scientific paper is just like with significant figures of limits of quantitation. When you purport your analytical method and what your limits, what is your BLQ and your LLQ, you have to report newspapers within that. You can't -- the -- it's -- they're not scientifically, you're

C. Lindsley

not going to be able to report numbers in a scientific paper where your calibration curve can't substantiate the values.

Q. Doctor, were you involved in submitting the GSK root cause analysis for publication?

A. No.

Q. The authors could have included these numbers, as they did in the root cause analysis and as you did in your report, but they chose not to give a complete picture of the data, correct?

MR. SHEEHAN: Objection. Mischaracterizes the study and the testimony on the study.

A. Again, I don't think that's a fair characterization. They -- they discuss what the upper limit of quantitation is for their assay, and they reported values at the level they could quantitate.

Q. Doctor, any reason to believe that the King article is litigation driven?

MR. SHEEHAN: Objection.

A. I have no way to determine that.

Q. Okay.

C. Lindsley

MS. LUHANA: Let's go back to the paper, which is Exhibit 3158, and let's look at paragraph 1, the first paragraph, and let's look at that last sentence there.

Q. Do you see -- I'm sorry.

MS. LUHANA: No. The first paragraph the last sentence, Since the initial marketing.

Q. Doctor, can you read that out loud?

A. Since the initial marketing of ranitidine, advances in analytical technology, especially in mass spectrometry have significantly increased the sensitivity of detection for these trace level impurities which may have precluded their discovery earlier in the product lifecycle.

Q. Doctor, you've included something similar like this in your report as well, correct?

A. Yes.

Q. Doctor, are you aware that a reviewer on the King article suggested removing this very statement but GSK lawyers instructed that it remain in?

C. Lindsley

MR. SHEEHAN: Objection. Mischaracterizes.

A. I have no -- I -- I don't know anything about that.

Q. So you didn't know that, correct, Doctor?

A. No.

MR. SHEEHAN: Objection. Same objection. Mischaracterizes the document.

Q. Does that impact your opinion of the reliability of the paper?

MR. SHEEHAN: Objection.

A. No, 'cause that -- that sentence is relating to these the sartans and the angiotensin receptor antagonist. That's what they're talking about right there.

Q. Since the initial marketing of ranitidine, it states, Doctor.

Do you see that?

A. Yes.

Q. My question to you is, do you find it problematic that a reviewer on the King article suggested removing that statement, the GSK lawyers instructed that it remain?

C. Lindsley

MR. SHEEHAN: Objection. Mischaracterizes.

A. I don't know anything about that. This would be hearsay. I really don't I don't know how accurate those statements are.

Q. Do you find it problematic, Doctor, if it was accurate?

MR. SHEEHAN: Objection.

A. That would be speculation. Once again, I'm not comfortable commenting on that because I don't know all the information related to that point.

Q. So, if it was true, would it impact your opinion, Doctor, as to the reliability of the King paper?

MR. SHEEHAN: Objection. False hypothetical.

A. Yeah. I don't -- I don't like to give opinions on speculation, so I can't comment on that.

MS. LUHANA: Let's pull up Exhibit 3159. I apologize. Yeah, that's it. Correct.

(Exhibit 3159 was previously marked for identification.)

C. Lindsley

Q. So Doctor, this is the draft of the King article that was submitted, and let's turn to the next page, page 2, and let's focus in on that last sentence with the red line there.

Do you see that last sentence?

Since the initial marketing of these drugs, advances analytical technology, especially in mass spectrometry have significantly increased the sensitive of detection for these trace level impurities which may have precluded their discovery earlier in that I product lifecycle.

And the comment states:

Reviewer 3 suggests removing this - but we added this on instruction of the lawyers and Phil.

Do you see that there in the comment?

A. Yes.

Q. Doctor, does this impact your opinion in any way as to the reliability of the King paper?

A. Well, this is a true statement. As we talked about before, analytical technology

C. Lindsley

in the late '70s, the accuracy, precision and resolution power wasn't there to detect very -- very small minor trace levels of impurities. So it's a true statement.

Q. Doctor, we're talking about -- when you say trace impurity, we're talking about thousands of nanograms of NDMA that have been measured.

That to you is a trace impurity, Doctor?

MR. SHEEHAN: Objection.

A. Well, there's not a uniform number. There's a gigantic range. The FDA has shown there's an enormous range of NDMA content. The Australian agency has shown a tremendous range from almost non-detectable, again, up to thousands of nanograms.

So, and then from the root cause analysis, some of the -- some of the samples that GSK had also had very low levels. Some of the levels other people have obtained from commercial sources and looked at also had very low levels.

So, again, if -- so much of this is driven by hindsight. If you know you're

C. Lindsley

looking for NDMA, you can develop a method to find it. If you don't know to be looking for NDMA, if there's no reasonable concern to be looking for it and developing a discrete analytical method in the presence of ranitidine and any process impurities, you know, with the analytical techniques and resolution power we had back in the late '70s, it's quite likely that you would not see it unless you knew to look for it. And, at the time, there was no reason for them to look for it.

Q. Doctor, it doesn't bother you that lawyers were directing what statements --

MR. SHEEHAN: Hold on please, Roopal.

MS. LUHANA: I'm sorry.

MR. SHEEHAN: I said don't cut him off, please, Roopal.

Q. I'm sorry, Doctor I thought you were done?

A. Please go ahead.

Q. I want you to finish. So were you finished with your -- with your response?

A. Yes.

C. Lindsley

Q. Okay. Doctor, you don't find it troubling that lawyers are directing what to incorporate in an article that's going through the peer-review process?

MR. SHEEHAN: Objection.

A. I can't -- I mean again, this one comment, I don't -- I don't know what really was involved with this, and I don't want to speculate on that.

I can tell you when you work in the pharmaceutical industry -- I can even tell you when I worked at Merck, for example, where we published a lot of papers, before we published anything, it had to go through legal. The attorneys looked at our papers and they edit them.

They -- they claim things to take out. They tell you what you can report. That'll talk sometimes about compounds not to include. It's a range of things.

That's very different than academics where, you know, the PI has absolute control over what they do.

Q. Sure. Did it concern current litigation at Merck? Is that that what the

C. Lindsley

peer article was about where Merck was being sued for certain conduct?

A. No. I'm just talking that's the general process. All -- all -- anything disclosed when you work at a pharmaceutical company has to go through the legal division, whether it's a poster, an abstract, a publication, and it has to have IP legal review and attorneys can comment on things. And --

Q. Litigation attorneys -- sorry. Go ahead.

A. And they have to approve things before you release it. And if you don't get approval, you can't -- you can't let it go.

Q. That's different than litigation attorneys, Doctor, correct?

A. Well, I don't know --

MR. SHEEHAN: Objection.

A. I mean, this -- I don't know if these are litigation attorneys. It doesn't say. These could be the intellectual property attorneys, I don't know.

MS. LUHANA: Okay. Let's take this down.

C. Lindsley

Q. Doctor, in your first supplemental report you state that you did not have access to the particular software and that you had been unable to review Dr. Najafi's materials on the hard drive. Do you recall that?

A. Yes.

Q. Doctor, are you aware that there are several non-proprietary freely available options for opening LC-MS data, including from XCMS or Skyline?

MR. SHEEHAN: Objection.

A. No. I had nothing available to me to open the Agilent software so the legal team got it opened a different way.

Q. Did you attempt to do anything to open and access the hard drive yourself?

A. Oh, no. I never had possession of the hard drive myself.

Q. You weren't given access to the hard drive?

A. I didn't physically have in my possession, no.

Q. Okay. When did you receive materials from the hard drive?

A. Oh, it was just recently. Trying

C. Lindsley

to think of that day. It was a couple weeks ago that we finally got access to it and, as we were going through all the LC-MS traces and the mass spec 'tics for their NDMA analysis. That was only recently that we had -- were provided those data.

Q. Do you remember the date?

A. No.

Q. Doctor, in your criticisms in your second supplemental report, you reference sample names being identified in the raw data that you indicate are not utilized in some of the spreadsheets, correct?

A. Yes.

Q. Doctor, isn't it true that you may -- isn't it true that items may be identified differently in a spreadsheet or a report for presentation versus how they're identified in the raw data?

A. I guess it's possible but that's not something we would -- that I would -- our data is fairly consistent so there's no mislabeling of information, but I guess it's possible.

Q. It's not mislabeling. Doctor, we

C. Lindsley

just saw an example of that.

For example, when we looked at the King article and we looked at the root cause analysis, right? There were things that were labeled instead of Saraca, Supplier 1 and 2. Didn't you see that there?

A. Yes.

Q. And there is, for example, in the King publication things will be noted as drug substance verses, as you saw in the master data spreadsheet, it's noted as API?

A. Yes.

Q. Correct?

A. Correct.

Q. So there are times where there's data that shows up in the raw data identified a certain way, but it may be identified differently, for example, in a spreadsheet, correct?

MR. SHEEHAN: Objection.

A. That's -- that's possible.

Q. And obviously, Doctor, for the Emery data, you don't know the basis for these differences so you can't opine one way or the other as to the reason for those

C. Lindsley

differences, correct?

MR. SHEEHAN: Objection.

A. I guess that's a true statement we couldn't correlate the datasets.

Q. Doctor, when you submitted your supplemental report on May 6th lodging your criticisms against Dr. Najafi, you -- you'd agree you did so without reviewing the hard drive, the process data and the raw data, correct?

A. There was -- there was data coming in at different times that we were going on. I haven't written a report discussing the actual LC-MS data, the mass spec 'tics and the way slopes were -- were engineered to quantify baseline noise. That's never been entered into any kind of a report.

Q. Sure. But my point is, is on May 6th when you submitted your criticisms against Dr. Najafi, you did so without looking at the complete dataset. For whatever reason, whether you didn't have access to it, didn't have the software or otherwise, you submitted your criticisms without reviewing the entire dataset,

C. Lindsley

correct?

MR. SHEEHAN: Objection.

A. Well, which things in the dataset are you referring to?

Q. On May 6th, you provided a supplemental data -- supplemental report, and isn't it true you weren't able to access the hard drive and the raw data at that time?

A. I believe that is the case.

Q. So when you -- when you submitted your opinions, you did so without having the law data and access to the hard drive, correct?

A. Well, let's -- let's pull up my second -- second report. I'd like to look at that.

Q. Sure. You don't recall, sitting here, whether you had access to the hard drive when you drafted the -- the second supplemental report?

A. We had access to different pieces of data, but not all the data; so I'd like to look at the report just to make sure exactly what we're talking about.

Q. Doctor, do you know how much data

C. Lindsley

was on the hard drive?

A. In terms it of terabytes or what are you talking about?

Q. Yeah. I mean in terms of you -- you actually didn't ever access the hard drive, correct? You relied on a vendor to print PDFs and you looked at that declaration and those exhibits, correct?

MR. SHEEHAN: Objection.

A. Yes. I looked at a lot of PDFs that a third party pulled off the hard drive that had access to the software.

Q. Do you know how many pages there were?

A. Oh, hundreds and hundreds of pages.

Q. Hundreds and hundreds. And you said you spent four or five hours looking at hundreds and hundreds of pages?

A. Yes.

Q. Okay. And now, Doctor, do you recall on May 6th, when you submitted your supplemental report, that you didn't have -- you hadn't accessed the hard drive at that time? Do you recall that?

A. Again, I'd like to look at my

C. Lindsley

secondary report.

Q. Sure. We can -- we can pull it up.

MS. LUHANA: It's been previously marked as Exhibit 6475. And if we turn to -- scroll down to page 3.

DOCUMENT TECHNICIAN: You said 6475?

MS. LUHANA: Oh, I'm sorry. This is -- this is 6475. Yeah. Is this 64 -- what is --

DOCUMENT TECHNICIAN: That was 6476. My mistake.

MS. LUHANA: Okay. Yeah. So 6475, this is the right one. Can you go scroll to page 3, please?

(Exhibit 6475 was previously marked for identification.)

BY MS. LUHANA:

Q. So Doctor, here you say you reviewed a number of items that were submitted in February, and then you note in paragraph 7 that you weren't able to access the hard drive; is that correct?

A. Correct.

Q. So does this refresh your

C. Lindsley

recollection that when you submitted your May 6 report, you didn't have access to the hard drive or any of the raw data, correct?

A. Correct.

Q. And so you didn't have the entire dataset and you lodged your criticisms in your May 6th report, correct?

MR. SHEEHAN: Objection.

A. Yes. Based on the information I did have access to, that's what that report was based on.

Q. Okay. And then you recently submitted a supplemental report on May 21st, right?

A. Yes.

Q. Where you state you were unable to conduct a comprehensive review of all the available files.

You say:

Despite this, I've been asked by counsel to provide my opinions as to the files I've been able to review in light of my upcoming deposition.

Do you recall that?

A. Yes.

C. Lindsley

Q. And so you testified that there were hundreds of pages of data produced, correct?

A. Correct.

Q. And what percentage of those hundreds of pages did you review?

A. Again, with the deposition coming, I didn't get to go through all the data. I looked a lot of representative data for different runs, for different analyses, and that's -- and you could -- you could clearly see the way the quantitation of NDMA was being manually determines.

Q. So can you give me a rough idea? You said you spent a couple hours reviewing the data previously?

So what percentage would you say of the data did you review?

MR. SHEEHAN: Objection.

A. I didn't really think about it as a percentage of the data I was going through, so I really don't know how to give you an accurate number for that.

Q. Well, if -- you had to answer the question as I'm asking right now, can you

C. Lindsley

give an estimate of the percentage of data you reviewed?

MR. SHEEHAN: Objection.

A. Again, I -- I didn't really think about it as a percentage as I was going through it at the time. I was looking through all the representative datasets.

Q. Well, you agree that it wasn't a complete review, correct?

A. Correct. I did not have time to do the full -- full, exhaustive review because we got the data so late.

Q. So based on your incomplete review of the data, you conclude these data support might previously express opinions that the testing performed by Emery Pharma is insufficiently reliable to support the conclusions and opinions expressed by Dr. Najafi in his report.

Do you recall stating that?

A. Yes.

Q. Doctor, you would agree that this opinion is based on an incomplete review of the data?

MR. SHEEHAN: Objection.

C. Lindsley

A. Yes. But the important point, as I addressed earlier, is when you look at the data, when you start going through the datasets, it -- it's really random as to how NDMA levels are quantitated throughout multiple, multiple runs that correlate with data that's published in his -- in his report.

Some things, some of the datasets, there's a nice sharp peak with a very small and tight retention time in AUC. Other times, there's very little there and they blow up the baseline and they arbitrarily set a slope to baseline noise, and it's random between runs as to what they make that slope and how they're quantifying and determining what to pick.

And the way the Agilent software works, when there's a manual integration, not allowing the machine to do it, you get a little asterisk over the peaks, which shows you in the report that someone has manually gone in and manipulated the system.

And so when I look at that and you look across all the different samples, and

C. Lindsley

if -- you go through a couple hundred runs and you can see this time and time again, it's very inconsistent as to how those levels and quantification of NDMA were determined.

And, you know, while it wasn't a complete exhaustive set of everything, it was enough to give pause to how the data was being generated and the reliability of the data.

Q. Doctor, you've never previously reviewed NDMA data before, correct?

A. No.

Q. And as you stated in your second supplemental report, your opinions are based on an incomplete review of the data, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. I went through a significant part of the data and the analysis was quite random in its selection.

Q. Sure. But it was an incomplete review of the data that you've done to date, correct?

MR. SHEEHAN: Objection. Asked and answered.

C. Lindsley

A. Yes. I did not run through the entire dataset exhaustively.

Q. Okay. You didn't run through the entire dataset completely, as you've put in your report, correct?

A. Yes.

MS. LUHANA: Doctor, actually let's take a -- let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 11:33 p.m. UTC time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:45 p.m. UTC time.

MS. LUHANA: Dr. Lindsley, thank you so much for your time. I'm going to reserve the remainder of my time for any follow-up after, if your counsel has any questions.

MR. SHEEHAN: Let's go off the record.

THE VIDEOGRAPHER: We were going

C. Lindsley

off the record. The time is 11:46 p.m. UTC time.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:35 a.m. UTC time.

EXAMINATION BY
MR. SHEEHAN:

Q. Dr. Lindsley, thanks so much for extending this day a little bit to talk with us a little bit more.

We've met and my name is Tom Sheehan. I'm an attorney representing GSK in the Zantac litigation. And I'm just going to ask you some questions in response to some of the questions that were asked of you by counsel for Plaintiff, okay?

A. Okay.

Q. First, I'd like to just step back a little bit, and could you tell me what were the primary topics on which you opined in connection with your expert report in this litigation?

A. Sure.

MS. LUHANA: Objection to form.

C. Lindsley

A. Sure. I was asked to discuss the chemistry of ranitidine, its stability, its metabolites in relation to the potential formation of NDMA. I was asked to look at both exogenous and endogenous formation of NDMA from ranitidine. I was asked to look at the various analytical methods that have been used to detect NDMA in ranitidine products. And I was asked to review the plaintiffs' expert statements in relation to those topics.

Q. Okay. And is that what is outlined and the bases for your opinions are expressed in the reports that you've submitted in this litigation?

A. That is correct.

Q. And you were asked by counsel for plaintiffs a number of questions about the stability of ranitidine. Do you recall that?

A. Yes.

Q. Okay.

MR. SHEEHAN: If we could go to page 26 of your expert report. I forget what exhibit number that is.

MS. LUHANA: 6474, I believe.

C. Lindsley

MR. SHEEHAN: 6474.

Q. Expert report dated March 7, 2022. And if we go to just page 26 of that report.

Now, at page 26 of your report, you have a section entitled Hydrolysis and Degradation of Ranitidine.

Do you see that, Doctor?

A. Yes.

Q. Can you just describe for -- can you just describe your assessment of the hydrolysis and degradation of ranitidine, the materials that you reviewed in connection with arriving at your opinions and what your overall conclusions were?

A. Sure. So in particular here, I was looking at the Haywood study, which was published in 1987, and this is where they were looking at hydrolytic degradation across different pHs at room temperature and at reflux boiling point, the solvents.

Hydrolytic degradation is almost commonplace things. The FDA wants you to look at, look at stability and look at forced degradation.

Q. Just slow down.

C. Lindsley

A. And so what you do is you're using very strongly acidic solutions, neutral, and then very strongly basic to ionize pendent functional groups and then see how stable those are and what degradation products may result when you force these very harsh acidic, basic and neutral conditions.

And what Haywood found that a neutral pH, a pH around 7, and then actually anywhere between 5 and 8, ranitidine is an incredibly stable compound. At room temperature and at reflux, the compound is incredibly stable.

Hydrolysis occurs at a very slow rate. It's about less than 5 percent after two years of 30 degrees, or 86 degrees Fahrenheit. And even the reflux conditions in that near neutral pH range of 5 to 8, degradation remains very slow, and no NDMA is detected. There's no by-products where DMA is liberated or where NDMA is detected.

I think it's important to note that this is about the pH of the intestine between 67.4, the blood plasma, liver and the urine, as well as almost gastric pH after ingestion

C. Lindsley

of ranitidine where you go from to 2 to 3 to pH --

(Court Reporter clarification.)

A. Gastric pH is somewhere around 2 to 3. And then after you take a Zantac pill, the pH rises to somewhere between 4 to 6. It varies on patients, but it comes closer to neutral after you ingest the drug.

At low pHs, actually, you know, close to one or less than one, the drug is almost completely resistant to hydrolysis. The mean is protonated. This is, again, more reminiscent of what you may get in a very strongly acid GI department, maybe after a meal or you're secreting more gastric enzymes.

And here the compound, again, is quite stable. There were no by-products formed from the loss of DMA. There was no NDMA detected.

And from this, one would assume that the compound is very stable upon ingestion into the gastric compartment and the intestine where most of the absorption into the hepatic portal vein in the liver

C. Lindsley

occurs.

Only when they looked at very high pHs, greater than 9, which is not reminiscent of any human body compartment or organ or tissue, did they start to see rapid hydrolysis. So around four hours of refluxing temperatures of 100 degrees, or 212 degrees Fahrenheit, again, non-physiological, they saw four by-products formed, so they saw some rapid hydrolysis.

In my report --

(Court Reporter clarification.)

Q. You just have to slow down just a touch. Just a touch, Doctor?

A. So -- sorry.

So in my report on Figure 3, compounds 9 through 12 are the four chemical species that were characterization in this study. In none of these is the dimethylamine liberated, and in no instance did they detect NDMA.

And this study of these compounds were fully characterized by NMR and, in certain case, X-ray crystal structures, so a very definitive study on the stability of the

C. Lindsley

compound across a broad range of pHs. And again, these data would provide no cautionary flags that there's a risk of forming NDMA from the force degradation, hydrolytic degradation of the compound under any date range.

Q. Dr. Lindsley, is there anything that you reviewed that would substantiate that ranitidine is a, quote/unquote, inherently unstable molecule?

MS. LUHANA: Objection to form.

A. As I mentioned earlier, no. Most of the data I've seen, the compound is very stable. Again, the API has been produced by multiple manufacturers on multi-kilogram scales. And they're all able to get certificate of analysis of the, you know, the appropriate period. You get approval by the FDA.

And so for that, and then even when you see studies that have been performed in the literature where people get Zantac off the shelf to take pills to do studies with, like the Yokoo study where he looked at the major degradation products, the sample he got

C. Lindsley

off the shelf was still 99.4 percent pure. Even in some of the documents we talked about today where there was some by-products, the pursuant of the API was still very high, 98 to --

(Court Reporter clarification.)

A. -- 98 to 99 percent pure. So it's a very stable compound. It's not inherently unstable.

Q. I forgot to ask you, Dr. Lindsley.

Were you asked to opine on the mutagenicity or carcinogenicity of NDMA?

A. No, I was not.

Q. And were you asked to opine on the mutagen or carcinogenicity of ranitidine?

A. No, I was not.

Q. Now, counsel for Plaintiffs asked you some questions relating to various internal documents, commenting on color changes and odor changes in connection with degraded ranitidine. Do you recall that?

A. Yes, I do.

MS. LUHANA: Objection to form.

Q. Did counsel for Plaintiffs show you any documentation that substantiated that any

C. Lindsley

of the degradation by-products that were identified and evaluated in those documents were, in fact, NDMA?

MS. LUHANA: Objection to form.

A. No. There were no examples, no discrete studies that identified NDMA as a -- as a degradation component.

Q. Did you see any information that would lead you to believe that NDMA is the source of an odor from ranitidine?

MS. LUHANA: Objection to form.

A. No. In fact, NDMA is described as an odorless, pale yellow liquid, so I would not affiliate any odor with NDMA. The parent drug, Zantac, ranitidine, has an odor because it's a bioether. It already has a known odor associated with it, so -- but there's nothing to suggest from an odor that you -- that that is a flag for NDMA.

Q. Now, you mention that NDMA is an odorless, pale yellow in color, correct?

A. Correct.

Q. At the levels of NDMA that have been detected, for example, by FDA in ranitidine, would you anticipate that NDMA

C. Lindsley

would impart any color whatsoever onto a ranitidine tablet?

MS. LUHANA: Objection to form.

A. I can honestly not see any way that a trace quantities of a pale, yellow liquid would cause global color changes in a Zantac tablet.

Q. Dr. Lindsley, you mentioned in your testimony throughout the day that the presence of NDMA that was detected in 2019 in certain ranitidine lots would not have been predicted based on available information prior to 2019; is that correct?

MS. LUHANA: Objection to form.

A. Correct. I would agree with that statement.

Q. Now, why is that?

A. Again, for the major metabolism, there's no indication that NDMA is liberated. There's been no indication from any study that NDMA is liberated from ranitidine. So I'm not aware of any studies or degradation or metabolism studies where NDMA has been shown to be formed.

Q. And is there any metabolite that,

C. Lindsley

in your opinion, would indicate the presence -- the potential presence of NDMA?

MS. LUHANA: Objection to form.

A. To date, the only metabolite that has been even really discussed is furoic acid metabolite. But again, as I discussed, there's never been -- there's been no datas to show DMA is liberated. It's far more likely that you're getting a second oxidative dealkylation of the known N-Desmethyl ranitidine.

Q. Has -- when you say DMA, what are you --

A. Dimethylamine.

Q. Dimethylamine. Has endogenous formation of dimethylamine after ranitidine ingested been investigated?

MS. LUHANA: Objection to form.

A. I haven't seen any analysis for DMA after ranitidine ingesting.

Q. Did you review the Florian study?

A. Yes.

Q. Do you recall that FDA evaluated dimethylamine after --

MS. LUHANA: Objection to form.

C. Lindsley

A. Yeah.

Q. Do you recall what they found?

A. Yeah. No changes in levels at all.

Q. Dr. Lindsley, you testified in response to questions from counsel for Plaintiffs about Dr. Najafi's testing and the opinions that he's offering in this litigation, correct?

A. Correct.

Q. Okay. Can you describe the importance of the chromatograms that you reviewed in assessing the reliability of Dr. Najafi's reported NDMA levels in ranitidine?

A. Yes.

MS. LUHANA: Objection to form.

A. From A, from a scientific point of view, when we finally got access to the files and the PDFs of all the LC-MS analysis were printed out, that is where my feeling of reliability of this data really turned very south very quickly.

I've never seen data presented this way. As I mentioned earlier, certain samples would have a nice sharp peak with computer

C. Lindsley

integration for the mass peak selected. A large abundance of the samples, they were blowing at the baseline manually selecting area under the curve to integrate.

So there were -- there were -- there was no real NDMA present. They were blowing up a baseline flagging where that mass spec -- where the mass of NDMA should be, and they were manually adjusting a baseline to correct for a slope.

So, for example, normally you would have a very sharp peak that was maybe .1 to .2 minutes wide. Some of these baselines were a minute wide. Some were .7 minutes wide. Really huge, huge losses of kind of baseline.

But then the operator -- there's a star I think it's put on the Agilent report when something is manually adjusted.

Q. Slow down.

A. Sorry. And what you would see is on one chromatogram they would generate -- so, for example, you had a peak really broad, kind of like this, they would adjust the baseline to this and it would encompass a

C. Lindsley

much larger area into the curve generating the -- the quantity of NDMA in that sample.

In the next analysis, they pick a curve on this side and it would be much smaller. In the next sample, they would pick another -- another area in the curve that may drop down a significant -- I mean it was just completely random as to the area that they were selecting to integrate and then quantify the NDMA in these samples.

And then, as you're going through the data, you'd see four or five like this and you'd see a nice sharp peak and a good sample. Then you'd see a variety of other samples where, again, they were manually peak picking and adjusting baseline noise and integrating it.

And, you know, that's not reliable scientific data. And there was no -- when you look at the way they are peak picking, it seemed very arbitrary as to how the operator was selecting that slope and then the area under the curve, which has a dramatic impact on the amount of NDMA reported in these samples.

C. Lindsley

And so going through a lot of the data, you know, you can see by the bulk of the data I looked at, you saw these same patterns of really unreliable baseline integration to quantify NDMA, which just made the datasets, in my opinion, very unreliable as to the absolute holes in the NDMA in these samples.

Q. Does the issue that you just described apply to all of the testing that Dr. Najafi performed whether on tablets or in simulated gastric fluid?

MS. LUHANA: Objection to form.

A. Again, I'm not a hundred percent sure because we had a really hard time correlating the file names with the data in the tables and the data in the report. But across large quantities of the data where you go through multiple -- clearly independent samples with blanks in between, it was -- it was rampant through a wide range of samples.

Q. Okay. And I think -- I think you testified that you've not had the opportunity to carefully review every chromatogram that applies to Dr. Najafi's testing; is that

C. Lindsley

correct?

A. That's correct.

MS. LUHANA: Objection to form.

Q. Do you need to assess every single chromatogram produced by Dr. Najafi in order to assess the reliability of the NDMA levels that he reported?

MS. LUHANA: Objection.

A. I would say, in my opinion, and again, as an editor I see all the analytical data for projects all the time, the reporting of so many, such a large amount of samples where it was baseline integration and not a true peak, it throws all the datasets into question in my opinion.

Q. Now, counsel for Plaintiffs also asked you some questions about the NDMA levels reported by Dr. Najafi and the NDMA levels reported by GSK and FDA. Do you recall that?

A. Yes.

Q. Okay. Can you describe the differences in magnitude regarding the NDMA levels reported by Dr. Najafi compared to the NDMA levels reported by GSK and FDA?

C. Lindsley

MS. LUHANA: Objection to form.

A. I would say if you look at the data in his report, his -- the amount of NDMA that he reported for samples was higher than the FDA. In certain cases it was clearly much higher than GSK as well. I think his average was around 11- or 1200-nanograms, which would be much higher than the FDA's average, as well as a lot of the GSK samples.

And again, I think this all goes back to the way they were integrating baseline and artificially creating slopes and the area under the curve as being integrated.

Q. In your assessment, what testing of NDMA in ranitidine drug products represents the most reliable assessment of NDMA levels?

MS. LUHANA: Objection to form.

A. Again, I would always go with the regulatory agencies. They have the ultimate authority and ultimate arbitrator on anything that's with drugs and drug products. I think the -- the way the FDA developed multiple methods to quantify NDMA in samples, the rigor they used, and the fact that other regulatory agency generated very similar

C. Lindsley

data, such as the Australian group, that's what I would go with. Because, again, you know, they pulled drugs right off the shelves that had already gone through the manufacturing, the packaging, the shipping, sitting on a pharmacy shelf for some amount of time before they were pulled by the FDA for analysis.

So I think that's fairly consistent. And I think that is as real world, in my opinion, one can get. I think any of these other real world scenarios, as I mentioned before, you know, it's so hard to describe even with a few number scenarios what really a real world situation will be. It's going to be so random based on the geographical location of the patient and so many variables, I think any data generated in those situations would be highly suspect and biased and potentially unreliable, where I think the FDA data is the one I would definitely go with.

Q. And did you feel the need after reviewing FDA's testing of ranitidine, both with respect to the pill itself and with

C. Lindsley

respect to endogenous formation, did you feel any need to conduct your own testing to assess NDMA levels in connection with ranitidine?

MS. LUHANA: Objection to form.

A. No. There was no reason for me to do any studies at all. The FDA studies were so thorough and quantitative; trying to replicate what they did, I don't know what good that would do. And then in light of the clinical trial they ran, where they were able to quantify NDMA in plasma and urine and when you looked at those data cross the two different diets, as well as placebo, and you saw all the data line up, you know, it's just -- their methods are very -- very sophisticated and very accurate. There's no reason to try to repeat other folks' data.

Q. I want to switch topics here just a little bit.

Dr. Lindsley --

MR. SHEEHAN: If we can pull up the report again and go to page 6. Thank you.

Q. Now, counsel for Plaintiffs asked

C. Lindsley

you about your citation to the FDA guidance for industry on nitrosamines in 2021 that you cite in paragraph 33. Do you recall that?

A. Yes.

Q. And there is a line that begins, Linear extrapolation, about two-thirds of the way down.

Do you see that?

A. Yes.

Q. And you wrote: Linear extrapolation from a TD50 value is considered appropriate to derive a highly conservative acceptable intake for M7 Class 1 impurities (known mutagenic carcinogens) unless there is evidence demonstrating a threshold of mechanisms.

Did I read that correctly?

A. Yes.

Q. Is anything that you've written there in any way materially different from what FDA states in its guidance for industry on nitrosamines from 2021?

MS. LUHANA: Objection to form.

A. Not materially different, and I worded it slightly differently. But the

C. Lindsley

take-home message is this there, in terms of the linear extrapolation is for -- is still accurate when there is no evidence for a threshold mechanism.

Q. Dr. Lindsley, you also testified about lawyers who reviewed Merck publications while you were employed at Merck, correct?

A. Yes. Correct.

Q. Could you describe what the role of the lawyers were in connection with reviewing scientific publications?

A. Sure. So this was just to ensure that, you know, eager scientists that want to get their science out either in abstract, poster or publication form, paper form weren't giving away anything that had yet been patent protected or was potentially a trade secret. And so they were reviewing it strictly from an intellectual property point of view. Not content; they did not edit documents. They just were to ensure that nothing left the company unless it had not already had patent protection.

Q. Dr. Lindsley, in connection with your review, have you seen any evidence that

C. Lindsley

substantiates that NDMA is formed from ranitidine after somebody ingests the product?

MS. LUHANA: Objection to form.

A. No, I have not. And I think the FDA clinical trial by Florian really drives that point home.

And as I mentioned before, you know, whether they're -- they're going with a cured meat diet that should be higher in -- in nitrates or a non-cured meat diet, there was really no increase in NMDA production as measured in plasma and urine. It's a very sensitive method. And in some cases, the placebo looked maybe a tad bit higher actually.

But when you look at the actually, you know, the num- -- the numeric tables is one thing that can be a little bit misleading when you see these ranges. But when you look at the actual individual patient plots, I think it's on Figure 2 or 3, you really see it across all those -- those samples, 'cause it's a crossover design. The outlier patients are the outliers patients, and the

C. Lindsley

data lines up very nicely, independent of whether it's placebo, cured meat or non-cured meat diets.

So, in my mind, the way that study was done, kind of, in my mind, definitively shows that there is no endogenous formation of NDMA from ranitidine.

Q. Dr. Lindsley, there were some questions about a specific page in a GSK lab notebook.

Do you recall that?

A. Yes, I do.

Q. Okay. Did you review the GSK laboratory notebooks that were produced in connection with GSK's root cause analysis?

A. Yes.

MS. LUHANA: Objection to form.

Q. What was your assessment of the lab notebooks that were maintained in connection with GSK's root cause assessment?

MS. LUHANA: Objection to form.

A. Generally, I found it to be very, very good. They were -- obviously, the plaintiff's attorney pulled up one -- an example out of the notebook that -- that

C. Lindsley

was -- was less than ideal. But had you scrolled up a couple of pages, you would've seen another example that was very descriptive, very excellent written description of the experiment and what was going on and how they did the workups and then with the -- the code for their LC-MS. So, our sign/countersign, the continuation page numbers were there, areas that weren't filled in were marked out and -- and signed so that you could add new material later on. Just really proper -- proper laboratory notebook keeping.

Q. Did you see anything in connection with your review of the materials produced in connection with GSK's root cause assessment that would cause you to question the validity of the conclusions drawn in that assessment?

MS. LUHANA: Objection to form.

A. Sorry, can you repeat that?

Q. Did you see anything -- let me ask it this way:

Did you review the -- did you review the materials that were appended to the GSK root cause assessment?

C. Lindsley

A. Yes.

MS. LUHANA: Objection to form.

Q. Did you see anything in your review of those materials that caused you to question the scientific validity of the conclusions that were reached in GSK's root cause assessment?

MS. LUHANA: Objection.

A. No, nothing at the conclusions. The data presented and the root cause analysis agreed well with their final conclusions.

Q. In your opinion, does the King publication accurately reflect the data that was generated by GSK in connection with its root cause assessment?

MS. LUHANA: Objection to form.

A. Yes. And again, that's a -- not every bit of data goes into a publication. This was a review of the root cause analysis and the data presented reflects the body of data generated in the RCA.

MR. SHEEHAN: I don't have any further questions at this time. I will pass the witness back to

C. Lindsley

Ms. Luhana.

EXAMINATION BY

MS. LUHANA:

Q. Doctor, you testified about the Haywood publication that you discussed in your report, correct?

A. Yes.

Q. You said there was no NDMA detected, correct?

A. Correct.

Q. Did they look for NDMA in the Haywood publication?

A. It wasn't spelled out, no.

Q. No, Doctor. The question is, did they investigate and look to quantify NDMA in the Haywood publication?

MR. SHEEHAN: Objection.

A. There is no mention of NDMA at all.

Q. There is no mention of NDMA because they didn't look to identify NDMA in the Haywood publication, correct?

A. At that point in time, I don't think there was any rationale to look for NDMA.

Q. However, you gave testimony that

C. Lindsley

they didn't detect NDMA in the Haywood publication and isn't that disingenuous because they never looked for NDMA in the Haywood publication in the first place, Doctor; isn't that so?

MR. SHEEHAN: Objection.

Mischaracterizes testimony.

Go ahead.

A. Well, I mean, it's not clear from the publication what they did or did not look for.

Q. So, it is disingenuous to say that they didn't detect NDMA when you were unclear if the authors were looking for it, correct, Doctor?

MR. SHEEHAN: Objection.

A. They were looking for all hydrolytic degradation products and they did not identify NDMA as a degradation product.

Q. Doctor, is it your testimony that they looked for NDMA in the Haywood publication?

MR. SHEEHAN: Objection.

A. They looked for degradation products.

C. Lindsley

Q. To your knowledge, sitting here today, are you aware if they looked for NDMA specifically?

A. I do not know.

Q. Doctor, in terms of reviewing chromatograms for NDMA, is this the first time you have ever reviewed chromatograms for NDMA in this litigation?

A. For NDMA, yes.

Q. And this is the first time you've ever analyzed chromatograms for NDMA that's in this litigation?

A. For NDMA in this litigation, yes.

Q. And you've never previously assessed the reliability of chromatograms for NDMA before this litigation, correct, Doctor?

A. Correct.

Q. In terms of the Florian study, Doctor, you reviewed the data in terms of the group that was given the cured meat diet, and ranitidine and looked at those levels of NDMA that were generated versus the levels of NDMA generated in the placebo group and the cured meat diet, correct?

C. Lindsley

A. It was cured, non-cured and placebo.

Q. Well, I'm focused on the cured meat. So, what I'm focused on right now is the two groups, one, cured meat given ranitidine and plasma NDMA levels assessed. The next group is the placebo group given cured meat -- cured meat and their NDMA plasma levels assessed.

Is it your testimony sitting here today that the mean levels of the plasma, the NDMA plasma levels of those two groups were identical?

MR. SHEEHAN: Objection.

A. Yeah, I would say let's -- let's pull that paper up and look at the figure where you see the actual patient plots for the concentration.

Q. Sure, Doctor. You gave testimony previously in terms of the plasma levels being similar, so I'm similarly asking you just the question about the plasma levels, the NDMA plasma levels, between the cured meat ranitidine and cured meat placebo group.

Are you -- are you testifying that

C. Lindsley

those levels were similar?

A. Yes.

MR. SHEEHAN: Objection.

Q. You didn't see an increase in the plasma NDMA levels of the group that was given cured meat and ranitidine versus the group that was the placebo group and given cured meats and ranitidine?

A. Again --

MR. SHEEHAN: Objection.

Mischaracterizes the study go ahead.

A. Let's please pull up the paper and let me show you the figure where this is shown.

Q. Sure. But you don't sit- -- you don't recall sitting here today whether there was a difference, correct, Doctor?

A. No, no. I'm telling you, let's -- let me show you the data in the paper of the actual patient plots and you will see that they line up perfectly.

Q. Doctor, do you recall whether the plasma NDMA levels of the ranitidine cured meat group were nearly double that of the placebo group that received cured meats and

C. Lindsley

ranitidine?

MR. SHEEHAN: Objection.

Mischaracterizes the document.

A. Again, let's look at the paper and let me show you the figure. I'll walk through the figure where this is all explained.

Q. Doctor, do you recall the plasma levels, the NDMA plasma levels of the group that was given the ranitidine cured meat, was that nearly double the levels of the group that was given -- that was given the placebo and the cured -- cured meats?

MR. SHEEHAN: Objection.

Mischaracterizes the study.

A. Again, let's pull up the paper and I will show you exactly what I'm talking about.

Q. Doctor, I want your testimony as you gave it to Mr. Sheehan. I'm trying to remember yours here.

So, sitting here, do you recall whether the levels were nearly double of the group that was given the ranitidine and cured meats in terms of their NDMA plasma levels?

C. Lindsley

MR. SHEEHAN: Objection. Mischaracterizes the study and asked and answered.

A. Please let me pull up the -- pull up the paper and let me show it -- let me just walk you through the data.

Q. I just want your testimony, Doctor.

Do you recall sitting here today what those levels are?

MR. SHEEHAN: Objection.

A. Will you show me the paper and I will walk you through exactly how that data lines up?

Q. That's not my question, Doctor.

My question is comparing the mean plasma levels of NDMA between those two groups.

Do you recall the ranitidine group that was given the cured meats having nearly double the amount of NDMA in their plasma versus the placebo group?

A. The problem is --

MR. SHEEHAN: Hold on. Hold on. Let me get my --

Objection. Mischaracterizes the

C. Lindsley

study. Asked and answered and now just badgering the witness.

A. Again, those mean levels derive from a very large range because of some -- some outlier patients. When you look at the actual individual patient plots and you look at the actual confidence level integration, it's zero and negative one. There's no difference between the groups. If you look at the figure with the patient plotting I can show you the outlier patients that caused this and the groups line up, 'cause it's a crossover study. If you look at the figure, you're gonna see there's no difference.

Q. Doctor, in terms of the mean values of the NDMA plasma levels, is there a difference in the Florian study with those two groups?

MR. SHEEHAN: Objection. Asked and answered several times now.

A. I need to see the document to show you the data.

Q. No, I'm saying, I want your testimony. Sitting here today, do you recall whether there was a difference in those mean

C. Lindsley

plasma NDMA levels of those two groups?

MR. SHEEHAN: Objection. Asked and answered for the seventh time now. He's requested to see the document, you refuse to show it to him and he's answered your question.

MS. LUHANA: Counsel, you asked questions -- you asked questions about the Florian study, he was able to provide you those answers without looking at the document. And I'm asking for, you know, that same memory that he had when he answered your questions. I'm just asking for those plasma NDMA levels that he answered those questions about, counsel.

MR. SHEEHAN: You know exactly what he's talking about. He's happy to walk you through it.

MS. LUHANA: I don't -- I don't --

MR. SHEEHAN: He's offered any number of times to show you exactly what he's talking about. Take him up on his offer.

MS. LUHANA: Counsel.

C. Lindsley

MR. SHEEHAN: Roopal, just take him up on his offer.

MS. LUHANA: Counsel, he didn't need the document previously, I don't think he should need it now. And if you need the document, I understand, coun- --

MR. SHEEHAN: It doesn't matter. He's asked you to see it, you refuse to show it to him.

MS. LUHANA: I don't -- I don't have the document to show him, it hasn't been marked.

MR. SHEEHAN: He's answered your question, Roopal. He's answered it many number of times now.

MS. LUHANA: Counsel, I'm doing the examination and asking a question. I'd like an answer.

MR. SHEEHAN: I --

Q. Doctor --

(Cross-talk.)

MR. SHEEHAN: -- you're asking the question, you've asked it ten times, that's the problem.

C. Lindsley

MS. LUHANA: Right, and he hasn't answered it.

MR. SHEEHAN: He has answered.

MS. LUHANA: He's asked for the document, I'm asking for his recollection of the Florian paper. He answered your questions without needing the document.

MR. SHEEHAN: No statistical difference between those groups, he's just described --

MS. LUHANA: Now you're testifying, counsel.

MR. SHEEHAN: He just described the confidence intervals to you, Roopal. What more do you want him to do?

BY MS. LUHANA:

Q. Doctor, do you recall the plasma NDMA levels between those two groups that we discussed, the ranitidine group, the cured meats group, right, the one that received ranitidine and the one that received the placebo, do you recall the NDMA plasma levels, Doctor?

C. Lindsley

MR. SHEEHAN: Objection. Asked and answered.

A. Again, I told you there's a range from outlier patients, the confidence interval is zero and negative one. There's no difference between these groups. And if you look at the inter -- the actual individual plots of the patients, you're gonna see they're identical.

Q. Sure. Doctor, I -- I understand you're talking about the individual plots of the patient. I'm focused on the mean plasma NDMA levels. And my question to you is about those mean plasma NDMA levels.

And so, is there a difference between those mean plasma NDMA levels with the cured ranitidine group versus the cured placebo group?

MR. SHEEHAN: Objection. Asked and answered 11 times now.

A. When you look at the statistics, there's no difference.

Q. Doctor, is there a difference in the mean plasma NDMA levels, that's all I'm asking.

C. Lindsley

In the Florian study, is there a difference between the mean plasma levels of those two groups?

MR. SHEEHAN: Objection. Asked and answered for 12th time now.

You can give the same answer.

A. Yeah, I mean, the --

MS. LUHANA: Counsel, please stop directing the witness and coaching the witness. I am asking a very spec- --

MR. SHEEHAN: -- a dozen times, Roopal, a dozen times, seriously.

MS. LUHANA: Counsel, I'm asking him a question, a very specific question and he's not providing the answer.

MR. SHEEHAN: He gave a very specific answer and asking to see the study, which you refuse to provide.

MS. LUHANA: Well, I'm asking for his recollection of the study as he was able to answer those questions for you previously without the study, counsel.

MR. SHEEHAN: He's given you his

C. Lindsley

recollection any number of times now
and you know that he has.
BY MS. LUHANA:
Q. Doctor, sitting here today, do you recall if there's a difference between those mean plasma levels with those two groups within the Florian study?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, if you look in the statistics, that's no statistical difference between the two groups.
Q. Doctor, I understand what you're saying, that's not my question. My question is in terms of the mean plasma levels, whether there's a difference between those two groups, that's all I'm asking.
MR. SHEEHAN: Objection. Asked and answered.
A. Statistically there's no difference.
Q. And in the values that were given in the Florian study, was there a difference in terms of the mean plasma levels for the ranitidine cured group and the placebo cured

C. Lindsley

group?

MR. SHEEHAN: Objection. Asked and answered.

A. Statistically there's no difference. When you plot the individual patients, there's no difference.

Q. So, you don't recall there being a difference between the mean plasma levels. I understand you're testifying about statistically there's no difference. And it was a very small study, right? Do you recall how many participants there were?

A. Eighteen.

MR. SHEEHAN: Objection to the characterization it was very small.

Q. Okay. It was 18 participants, correct, Doctor, that would be a small study?

MR. SHEEHAN: Objection.

A. That is the average size of a -- of a Phase 1 SAD study.

Q. Doctor, do you recall the mean plasma NDMA levels? And if you don't, you can say "I don't recall the mean plasma NDMA levels that were described in the Florian study." But my question to you is, is there

C. Lindsley

differ- -- setting aside statistical difference, was there a difference numerically in terms of the NDMA plasma levels in the ranitidine cured group versus the placebo cured group?

MR. SHEEHAN: Objection. Asked and answered.

A. I have to go with the statistics and say there's no difference between the groups. The plots of patient variability, there's -- the individual patients, there's no difference between the groups.

Q. So, you don't recall if there was a difference in the mean plasma levels reported in the Florian study, setting aside statistically?

MR. SHEEHAN: Objection. If you want to set aside science, great. But objection asked and answered 20, it's gotta be 20 times now.

Go ahead, Doctor. You can answer again.

A. Again, statistically there's no difference between the groups.

Q. Doctor, I'm asking a simple

C. Lindsley

question and I'm looking for that answer setting aside the statistical significance. Quantitatively, was there a difference described in terms of the NDMA plasma levels for the ranitidine cured meats group versus -- and the placebo -- placebo cured meats group?

MR. SHEEHAN: Objection. Asked and answered. This is -- this is clearly harassing the witness at this point.

MS. LUHANA: Counsel, I'm not trying to harass the witness. He's not answering my question. He's mentioning the statistical significance and I'm setting that aside and asking for an answer, if he recalls.

MR. SHEEHAN: Bring up the data and the study that you've asked him about. He can't give you some answer that he -- that he doesn't believe in, Roopal, so give me a break. He's interpreting the data. He's provided his answer. He's asked to see the

C. Lindsley

study, you won't show it to him. You've asked him 25 times now. What is this accomplishing?

BY MS. LUHANA:

Q. Doctor, do you have an answer for me or no?

MR. SHEEHAN: Asked and answered.

A. I've answered your question the way that's scientifically relevant.

MS. LUHANA: I have no further questions.

MR. SHEEHAN: Dr. Lindsley, thank you so much for your time. I don't have any further questions.

MS. LUHANA: Thank you, Doctor, for your time. Appreciate it.

THE VIDEOGRAPHER: Anything else before we go off the video record?

MS. LUHANA: No, I don't think so.

THE VIDEOGRAPHER: Okay. All right. We're going off the video record. The time is 1:21 a.m. UTC time.

(Time noted: 9:21 p.m. Eastern Time)

C. Lindsley

J U R A T

I, CRAIG LINDSLEY, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 24, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

_________________________
CRAIG LINDSLEY, PhD

Subscribed and sworn to before me
This _______ day of __________, 20__.

_____________________________________
NOTARY PUBLIC

C. Lindsley

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, CRAIG LINDSLEY, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of May, 2022.

Candida Borriello
___________________________
CANDIDA BORRIELLO

C. Lindsley

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 24, 2022
Deponent: CRAIG LINDSLEY

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |
| ___ | ___ | _______________ | ________________ | _____ |

__________________________
CRAIG LINDSLEY, PhD

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of______________, 20__.

_____________________________________
Notary Public

My Commission Expires:___________

### Exhibits

**EX 6472 Craig Lindsley, Ph.D. 052422** 6:12 23:2,4
**EX 6473 Craig Lindsley, Ph.D. 052422** 6:13 25:5, 18,19
**EX 6474 Craig Lindsley, Ph.D. 052422** 6:12 22:16, 19 111:14,21 128:22 309:16
**EX 6475 Craig Lindsley, Ph.D. 052422** 7:11 22:23 451:4,16
**EX 6477 Craig Lindsley, Ph.D. 052422** 6:14 117:1,2
**EX 6478 Craig Lindsley, Ph.D. 052422** 6:14 121:8
**EX 6479 Craig Lindsley, Ph.D. 052422** 6:15 157:8, 11 358:25
**EX 6481 Craig Lindsley, Ph.D. 052422** 6:16 189:5, 6,9
**EX 6482 Craig Lindsley, Ph.D. 052422** 6:16 195:8 214:23
**EX 6483 Craig Lindsley, Ph.D. 052422** 6:17 200:8, 11
**EX 6484 Craig Lindsley, Ph.D. 052422** 6:17 203:13, 14 215:3
**EX 6486 Craig Lindsley, Ph.D. 052422** 7:6 348:18
**EX 6488 Craig Lindsley, Ph.D. 052422** 7:8 359:5
**EX 6489 Craig Lindsley, Ph.D. 052422** 7:5 326:12, 13
**EX 6490 Craig Lindsley, Ph.D. 052422** 7:5 332:9
**EX 6491 Craig Lindsley, Ph.D. 052422** 7:6 336:2,3
**EX 6495 Craig Lindsley, Ph.D. 052422** 7:9 402:12, 15
**EX 6496 Craig Lindsley, Ph.D. 052422** 7:9 408:24 409:2
**EX 6498 Craig Lindsley, Ph.D. 052422** 7:8 372:2,3
**EX 6499 Craig Lindsley, Ph.D. 052422** 7:10 430:15, 19

### $

**$100,000** 25:8,11 55:16
**$18** 62:17
**$25** 61:24
**$400** 20:19

### (

**(i)** 289:25

### -

**-------------------I** 6:2
**-----------------E** 6:9
**-and-** 5:6

### 0

**0.2** 331:7
**005** 327:23
**0084** 7:7 352:4
**01** 148:25
**014** 329:12
**0259** 6:20 288:17
**0261** 6:19 282:2
**0265** 6:19 262:9
**0288** 6:18 254:12
**039** 157:20
**0834** 6:13

### 1

**1** 30:3,4,7 39:1,12 40:5 50:22 90:23 91:17 129:25 131:5 133:19 134:17 148:25 150:3 157:22 213:15 314:8 350:9 403:19,22 404:1 423:23,24 424:8,9,17 425:1,7,9 428:16,22 437:3 447:5 470:12 477:13 497:20
**1,096** 169:5
**10** 6:5 24:17 56:24 161:22 162:9 235:11 250:17 332:21,23 362:14
**10,000** 280:14

**10.6**
431:21
**100**
236:10 463:7
**100,000**
20:25 91:18
**101**
6:13
**10:06**
392:2
**10:22**
392:6
**10th**
29:5,14,18,22
**11**
169:9 185:16,18 188:2,3 332:22 494:20
**11-**
474:7
**112**
158:22
**117**
6:14
**11:33**
457:11
**11:45**
457:16
**11:46**
458:2
**12**
24:17 105:7 240:18 242:4 243:1 278:19 362:15 410:21 463:17
**12.2**
294:19
**1200-nanograms**
474:7
**121**
6:14
**127**
320:17
**129**
372:14
**12:30**
214:8
**12:35**
458:5
**12th**
495:5
**13**
46:23 47:4,7
**132**
6:15
**134**
431:25 434:1
**136**
312:10
**137**
312:24
**138**
313:11
**14**
54:19 62:17 72:24 157:10 276:19 336:10 431:19,21
**14.4**
431:20
**146**
316:4
**14B**
206:6
**15**
40:17 45:22 57:6 58:23 422:18 423:6
**15-week**
56:5
**150**
154:4 155:2 168:21 169:1
**150-milligram**
339:19,23
**15219**
5:16
**157**
6:15
**16**
255:16 331:6,22
**16.2**
431:21
**16.5**
61:1
**167**
111:24
**16th**
26:11
**170**
402:14
**1717**
5:3
**175**
294:15
**18**
255:14 497:16
**189**
6:16
**19103**
5:4
**1942**
300:11
**1947**
300:24
**195**
6:16
**1970's**
355:25
**1970s**
230:6,20
**1976**
243:10 254:18
**1979**
250:9
**1980**
348:22
**1980s**
223:5 245:8 248:25 252:19,21 294:1
**1981**
280:25 281:15 305:23
**1982**
212:19,25 231:8 232:11,25 236:4
**1983**
289:7 292:19
**1984**
312:5 317:1,3,7,9
**1985**
250:9
**1987**
100:13 101:10 105:4 375:18 460:17
**1990**
250:9
**1999**
75:2 77:21
**1:01**
9:5
**1:12**
21:17
**1:21**
500:22
**1:29**
21:22
**1B**
50:24
**1st**
29:9 30:2,18,23

**2**

**2**
50:24 150:3 153:9 158:10 172:21 231:15,16

326:18
335:16,17
339:8,19,23
386:25
401:14
423:24,25
424:9,13
425:1,7
440:3 447:5
462:1,4
470:13
479:22
**2,700**
167:25 168:2
**2,970**
159:5
**2.2**
256:13
**20**
33:22 35:12
41:4 62:4
145:24
349:10
431:20,21
498:19,20
**20-degrees**
313:18
**20.1**
431:13,14
**20.2**
431:19
**200**
6:17 16:25
**2000s**
94:17 95:4
249:25
**2002**
121:13
262:17 263:3
266:14,16
267:13
**2005**
87:9,19
88:11
**2006**
336:10
**2009**
63:13
**2010**
323:15
324:16
**2011**
319:1 325:5
**2013**
207:22 211:2
354:21
357:23
**2013/14**
63:14
**2015**
12:20 47:20
196:6 326:18
327:15
332:13
**2016**
12:20
**2017**
43:14
**2018**
60:20 61:1
**2019**
12:12 47:21
60:21 112:7
114:12
116:20
117:16
209:16 212:3
216:6 218:23
220:6 271:8
309:19 323:9
324:7 341:6
342:15
345:25
348:12
354:10
358:15
359:15,20
360:19
361:3,4,17
467:10,13
**2020**
15:23,24
30:10 106:3
126:17
149:20
157:10
189:11
299:14
304:5,9
427:4
**2021**
30:3,5,7,11
49:6 55:16,
24 61:1
130:5,12
132:11,16
149:19
200:16 201:1
213:15
372:10
381:17
408:25
477:2,22
**2022**
9:4 22:6,7
25:24 26:7
29:2,6 32:24
33:2 55:16
61:2 63:25
460:2
**203**
6:17
**205**
88:22
**212**
463:8
**21st**
10:22 22:11
31:22 32:9
33:15 452:13
**22**
6:12 163:21
332:13
**23**
6:12 9:4
276:11,17
278:2
**231**
6:18
**232**
235:13
**232,000**
236:5 238:7,
17
**235269**
263:8
**24**
167:20 295:6
354:21
**24.5**
294:20
**2472**
6:21 304:16,
17
**25**
6:13 25:23
29:2,5 32:24
33:1 35:12
41:4 46:1
62:4,8 63:21
64:2 145:24
319:24 500:2
**25-degrees**
327:7
**250**
17:1 21:1
279:7 343:10
344:8
**2500**
5:8
**254**
6:18
**259**
288:16
**25th**
29:15,22
32:18 33:12
**26**
11:10 22:5
422:18
423:12
459:23
460:3,4
**261**
281:25
**262**
6:19

**263**
280:22 281:22
**265**
262:8 263:13
**27**
220:4 278:19 309:17 422:19
**28**
26:7 51:24 52:19 264:20 331:5
**282**
6:19
**288**
6:20 254:11, 15
**28th**
26:11
**29**
288:16
**29-30**
200:16
**2925**
204:3
**2933**
205:24
**299**
6:20
**29th**
372:9
**2:27**
75:23
**2:48**
76:3
**2d**
330:10
**2recently**
42:20

**3**

**3**
102:7 153:9 233:5 236:20 237:15 255:14 319:8 334:2 339:8 386:25 401:14 409:10 423:23 424:12,18 440:15 451:5,15 462:1,5 463:16 479:22
**3,000**
159:3,5 339:22
**3,000-nanograms**
339:25 340:1
**3.1**
235:14 239:24
**3.3**
425:9,19
**3.5**
425:8,19
**30**
163:24 314:2 316:8 323:8 372:10 387:14 461:16
**30-degree**
313:16
**30-degrees**
327:8
**300**
154:6 159:6
**301**
5:15
**30305**
5:8
**304**
6:21
**30th**
372:9
**311**
6:21
**3126**
7:7 354:16, 17
**3138**
6:20 299:14, 16,20 422:17,23
**3158**
7:10 421:1,2 437:2
**3159**
7:11 439:22, 24
**318**
7:3
**322**
7:4
**326**
7:5
**33**
128:24 130:9 132:5 133:2 477:3
**332**
7:5
**3344**
7:3 318:19, 20
**336**
7:6
**348**
7:6
**350**
294:15 343:11
**352**
7:7
**354**
7:7
**3566**
7:4 322:14, 17
**3567**
7:4 322:14, 19
**359**
7:8
**361/13**
380:16
**366**
305:1
**37**
314:3 350:8 434:25
**372**
7:8
**375**
282:23
**38/62**
425:17
**383**
305:11
**3rd**
30:7,18,22

**4**

**4**
121:17 153:10 185:3 395:12 406:18,21 415:23 416:14,21 422:12,16 423:5 425:1, 7 462:6
**4.1.7**
305:3
**4.4.1.2**
305:13
**40**
41:20 106:19 107:6,18 177:1,2 178:6 188:17 216:16 235:11 240:17 242:2,23 328:21 355:9 380:21
**40-degree**
333:12 371:5

**40-degrees**
327:4
**40/60**
46:19 425:17
**400**
5:3 322:1
**402**
7:9
**409**
7:9
**41**
433:17
**41.1**
432:15,23 433:11 435:11
**41.4**
432:13
**4162**
6:18 231:2, 3,7
**421**
7:10
**430**
7:10
**439**
7:11
**45**
404:6
**450NM**
322:2
**451**
7:11
**458**
6:6
**483**
6:7
**4922**
351:19
**4927**
6:15 131:17 132:1,21
**4:15**
156:25
**4:32**
157:5

## 5

**5**
154:1,4 309:15 339:8 386:25 416:9 461:10,15,18
**5.6**
295:3
**50**
40:19 41:3, 21 42:5 46:2 120:13 154:12 301:13 302:3 434:1
**50-plus**
432:1 434:23
**50/50**
42:19,21 46:18,19
**500**
269:1
**500-degree**
345:17
**5418**
6:21 311:11, 14
**55**
41:3
**58**
84:8
**5:33**
214:13

## 6

**6**
22:7 128:23 131:25 187:17 235:4 334:10 387:1 452:2 462:6 476:23
**60**
42:5 43:3 46:2 106:20 387:14 404:16
**60/40**
46:19
**600351**
351:24
**61**
231:7
**62**
236:8,12 240:1
**6278**
121:3,4,5
**63**
111:15,23
**636707**
406:20
**64**
451:10
**641**
355:13
**6472**
6:12 23:2,4
**6473**
6:13 25:5, 18,19
**6474**
6:12 22:16, 19 111:14,21 128:22 309:16 459:25 460:1
**6475**
7:11 22:23 451:4,7,9, 14,16
**6476**
451:12
**6477**
6:14 117:1,2
**6478**
6:14 121:7,8
**6479**
6:15 157:8, 11 358:25
**6481**
6:16 189:5, 6,9
**6482**
6:16 195:7,8 214:23
**6483**
6:17 200:7, 8,11
**6484**
6:17 203:13, 14,17 215:3
**6486**
7:6 348:17, 18
**6488**
7:8 358:25 359:5
**6489**
7:5 326:12, 13
**649**
357:8
**6490**
7:5 332:8,9 402:13
**6491**
7:6 336:2,3
**6495**
7:9 402:12, 15
**6496**
7:9 408:24 409:2
**6498**
7:8 372:2,3
**6499**
7:10 430:15, 19
**65**
40:19 63:8 120:14 327:8 328:21
**66**
431:12
**67.4**
461:24

**699**
359:3
**6:24**
214:17
**6th**
10:21 22:22 26:14 27:7 28:3,17 31:4,16,18 448:6,19 449:5 450:21 452:7

## 7

**7**
117:11 451:22 460:2 461:9 470:14
**7.6**
167:20,24
**70**
91:16
**70/30**
425:16
**70s**
230:23 251:18 269:12 441:1 442:9
**73/27**
425:17
**74**
83:16 84:7 222:11,19
**743**
334:10
**746**
334:24
**75**
56:22 63:7 83:16 84:7 106:19,20 107:7,19 240:17 242:3,24 313:1,16,18 314:2,4 316:7 333:13 337:9 371:6
**75-milligram**
336:8
**767167**
406:20
**7:54**
299:6
**7th**
22:6,16

## 8

**8**
60:24 117:9,10 256:13 461:10,18
**80**
36:14 56:22 57:9 63:7 78:11 294:17
**80s**
212:21 240:12 243:3 244:23 245:4 249:24 250:18 251:18 343:25
**834**
101:20,21 185:5
**84**
352:3
**85**
58:22
**86**
461:16
**87**
423:12
**8:07**
299:11

## 9

**9**
161:22 162:1 163:3 165:11 185:5 331:22 463:3,17
**9.9**
158:23 159:15 160:4 161:9 162:19 163:11 164:9 165:4,7 166:14,20 429:16,21 430:9 431:8,9 432:1 434:2,11,14 435:1,11
**900**
350:10
**90s**
249:25
**92**
207:20 208:2
**96**
91:11,19,20 92:11,18 93:8,10,17 94:1 99:21 120:9 155:4,6,11 156:4,13 163:24 166:11 295:7
**96-nanograms**
94:6 335:24
**98**
465:4,7
**99**
465:7
**99.234**
172:20
**99.4**
170:23 179:6 465:1
**9:19**
362:3
**9:21**
500:24
**9:35**
362:7
**9th**
29:10

## A

**a.m.**
458:5 500:22
**Abbvie**
51:11 253:4
**ability**
250:6
**able**
37:25 50:21 53:6 75:10 93:23 94:3 139:13 170:17 187:8 297:13,14 298:2,14 348:5 377:22 393:12,13 418:4 436:1 449:7 451:22 452:22 464:16 476:11 491:9 495:22
**above**
91:20 93:10,17 94:1 149:2 154:17 155:11 159:15,20 160:3,8,9,22,23 161:8,20 162:9,15,18 163:11,15,18,19,21,24 164:1,9,15 165:3,7,14 166:14,19

182:15 185:14 190:21 202:18 203:7 206:6 222:20 246:20 303:7 333:22 338:13 428:19 429:16,21,24 430:8,9,10 431:7 432:1, 10 434:2 435:1
**absence** 289:22
**absent** 285:6
**absolute** 443:23 472:7
**absolutely** 226:7
**absorb** 183:6 313:17
**absorbed** 181:13 184:4 257:18 387:16 388:7
**absorbs** 184:11 305:17
**absorption** 462:24
**abstract** 263:22,24 349:15 444:7 478:14
**abundance** 173:4 470:2
**academic** 36:20 44:12 399:19
**academically** 44:9
**academics** 40:22 58:19 277:7 397:18
443:22
**accelerated** 105:16,20 106:16 110:1,10 188:16 220:19 242:1,22 326:16 333:1 337:6 340:20 382:18
**accept** 126:2 277:2
**acceptable** 91:19 92:24 93:4,6,10, 18,21 95:19 113:3,21 114:1 129:24 133:8 154:17 155:5 166:7, 9 171:7 190:21 295:7 296:8 335:23 403:10 477:13
**accepted** 213:17
**access** 310:21 393:5 396:16 445:2,16,19 446:2 448:23 449:7,12,18, 21 450:5,12 451:22 452:2,10 469:18
**accessed** 450:23
**accompanied** 330:24
**accomplishing** 500:3
**account** 289:21
**accounted** 174:5
**accumulating** 174:8
**accuracy** 165:17 250:10 253:1 428:6 441:1
**accurate** 91:13 160:9, 21 169:17 255:9 353:19 368:24 389:1 390:4 393:1 419:12 439:5,7 453:23 476:17 478:3
**accurately** 56:18 74:19 161:2 291:1 360:5 482:14
**achievable** 223:18
**achieve** 38:3 96:12
**achieved** 428:13
**acid** 171:15 256:7,10,18 257:22 258:22 259:5,17 260:7 287:9 288:2 290:9 462:14 468:5
**acidic** 221:23 233:7 245:21 387:10 388:11 461:2,7
**acidity** 242:12 245:20
**acknowledge** 9:21,25
**acknowledgments** 289:13,18
**acquire** 368:1
**acquired** 170:21,24 324:21
**across** 67:1 80:4 98:4 157:23 171:19 172:25 173:1 272:14 277:6 303:8 331:4 366:13,23 370:25 375:23 378:2 389:5 419:23,24 455:25 460:18 464:1 472:18 479:23
**ACS** 278:9,10
**act** 244:6
**action** 9:12
**actions** 188:23
**activate** 38:1
**active** 43:6 46:22 47:3
**activities** 31:11 62:5
**activity** 283:3
**actual** 18:24 42:17 77:13 85:8 94:23 119:1 122:23 165:8 223:2 229:8

311:24 324:3 396:5 405:15 448:14 479:21 486:17 487:20 490:6,7 494:7
**Adami** 19:19
**add** 64:11 293:22 355:1 367:19 388:11,12 481:11
**added** 239:20 440:16
**adding** 284:9 387:15
**addition** 118:5,13 301:16 360:18 385:10 410:5
**additional** 27:24 28:23 33:4 64:11 357:11 425:24 426:18
**Additionally** 312:17
**additions** 324:24
**additives** 94:13 125:5
**address** 80:22 201:23,25
**addressed** 455:2
**addressing** 278:7
**adequate** 108:23
**ADI** 94:1 120:13,14 182:15 185:14 202:18 203:7 222:20 235:20
**adjust** 470:24
**adjusted** 96:4 470:19
**adjusting** 470:9 471:16
**administer** 171:9
**administered** 10:1 228:19 256:5
**administration** 255:20 290:4
**administrators** 221:11
**admits** 320:7
**adopt** 289:24 292:20
**adopted** 92:8
**advances** 35:9 437:12 440:8
**adverse** 96:17,23
**advice** 49:2
**advising** 287:24
**advisory** 48:17
**advocate** 120:12
**affect** 95:25
**affiliate** 466:14
**agencies** 112:3 145:8,12 365:15 377:5 474:19
**agency** 92:8 100:6 141:21 148:21 160:19 161:4 186:11 302:22 363:5 441:15 474:25
**agency's** 188:9,23
**agent** 89:15 297:2,9
**agents** 141:14
**Agilent** 445:13 455:18 470:18
**ago** 17:10 51:12 108:19 130:22 268:8 349:10 446:2
**agree** 11:14,20 56:25 69:6 91:20 93:18 100:11,15 101:12 102:25 105:13 110:16 113:17 114:19 115:4 121:1,22 143:7 147:24 148:6 155:16 182:13 187:22 202:8,12,17 203:5 204:16,24 225:20 229:6,24 230:5 232:8 249:16 256:17 286:7,13 293:24 300:14 306:7 307:18 317:20 335:17 342:14 363:14 367:4 391:4 408:16 409:21 428:1 448:8 454:8,22 467:15
**agreed** 183:7 482:11
**agreeing** 16:16,20
**agreement** 8:7 316:22
**agreements** 51:17
**agrees** 112:6
**agricultural** 208:13
**ahead** 16:12 27:13,15 39:18 42:11 44:21 47:10 58:8 68:23 83:24 90:1 103:9 166:25 183:21 206:23 239:2 257:2 261:25 271:2 274:3 321:18 401:8 414:11 430:3 432:8 435:17 442:22 444:12 484:8

487:11 498:21
**AI**
129:24 131:4 133:19 134:17 163:19,21 164:2 246:19 303:5,6,7 377:8
**ALFANO**
5:14
**alkaline**
375:24
**alkylation**
252:5 253:20
**allegations**
86:19
**Allender**
12:12
**allosteric**
38:7
**allow**
38:25 92:17 273:14
**allowed**
38:12 148:22,23 149:1 297:18 298:9
**allowing**
455:20
**allows**
82:23
**Alzheimer's**
36:15,25
**amassed**
68:3
**amazing**
274:4
**ambient**
382:18
**amenable**
313:2 314:9
**American**
54:18 202:2, 7
**Amgen**
51:10
**amide**
260:10
**amine**
344:12
**aminopyramine**
349:22
**aminopyrine**
350:9
**amount**
20:17,20,21 47:13 120:12 153:3,6,20, 22 154:14, 15,24 155:2, 7,12 156:4, 5,13 163:10 164:1 166:14,18 171:3 184:12 193:25 194:19 225:3,15 237:3 239:18 274:5 296:4 301:21 385:24 414:19 429:20 432:12,21 433:1 471:24 473:12 474:3 475:6 489:20
**amounts**
139:19 141:18 161:16 248:10 295:24 321:7 370:7
**ampule**
321:6
**ampules**
324:20
**analog**
256:18 258:22 259:5,17
**analogous**
294:22
**analyses**
453:10
**analysis**
18:21,25 32:3 33:6 73:4 106:12 140:3,17 142:1 143:22 144:11 145:3 149:23 150:9,16 151:1,3,18, 23 169:13 174:4 193:13 199:20 203:19 251:6 252:17 265:23 266:10,11 267:8 271:9 273:14 274:23 299:15,24 304:4 314:9 323:4 325:9 334:19 343:1,15 344:9 348:22 353:24 358:4,13 360:1,4 372:18 389:3 390:16 396:6 402:5 407:8 416:8 417:2, 12,18 418:10 420:15 421:9 422:1,23 423:6 424:3, 19 426:4,12 427:5,10 432:17 433:2,16,23 434:18,19 436:5,10 441:19 446:5 447:4 456:19 464:17 468:19 469:19 471:3 475:8 480:15 482:11,20
**analysts**
390:17
**analytes**
78:3,19 266:3
**analytic**
343:2
**analytical**
27:23 72:23 73:7 77:24 78:2,7 167:2,13 237:21 243:15 244:16 248:2 250:8 265:5, 15 266:22 267:1,24 269:13 272:6,15,16 274:10 290:25 291:7 393:4 394:4 395:24 396:4 435:22 437:12 440:8,25 442:5,7 459:7 473:10
**analyze**
179:11 219:1 246:16 247:19 267:1 268:3,6 291:17
**analyzed**
92:9 263:5 346:24,25 347:5 349:23 362:22 364:10 377:4

396:6 430:7 485:11
**analyzes** 165:25
**analyzing** 359:12,24
**ancillary** 173:12
**and/or** 8:8
**Andrew** 19:17 323:2
**angiotensin** 438:16
**animal** 95:22 99:16 100:21 101:18 112:22 113:13 114:5 118:1 295:24 296:14,16 356:4
**animals** 97:20 102:13 112:25 113:1 124:11 125:18 127:1 286:9 294:16 296:5 356:11
**annotate** 66:11
**announced** 48:22
**annual** 62:13 63:20
**annually** 61:25 62:8
**answer** 13:2,8 16:11,12 27:15,16 39:16 68:24 69:21,25 70:19 83:10, 12 103:9 135:23 144:24 156:19 183:23 235:24 267:19 298:12 380:17 400:16 429:10 453:24 492:19 495:6,16,18, 22 498:21 499:1,17,21, 25 500:5
**answered** 27:12 28:11, 20 42:10 44:20 108:6 109:8 116:17 127:9 148:2 162:24 216:18 230:3 247:16,23 250:3,14 261:12 270:17 273:20 275:7 306:24 342:4 346:9 347:13 360:21 361:13 368:9 380:24 384:10 400:4,15 401:7 456:17,25 489:3 490:1, 20 491:3,6, 13,15 492:14,15 493:2,3,7 494:2,20 495:5 496:9, 19 497:3 498:7,19 499:9 500:7, 8
**answering** 375:10,13 499:14
**answers** 69:5 491:10
**antagonist** 438:16
**anticipate** 466:25
**anticipated** 100:3 211:18 286:15
**anymore** 346:22
**anyone** 8:21 17:17 18:2 19:8,13 60:11 73:19 378:21 379:8 386:21 394:5 396:15,22 397:16,20
**anything's** 247:17
**apart** 80:6
**API** 145:9,13 150:7 170:19 171:6 172:10 176:1 179:2 180:19 181:14 184:19 198:1 242:13 268:25 271:15 306:18 308:14 324:20 359:13,23 360:3 362:17 376:11 388:6 414:2 431:3, 15 432:21 447:11 464:14 465:4
**APIS** 269:14
**apologize** 83:24 117:10,14 121:6 185:19 196:9 227:19 301:11 334:4 359:1 428:18 439:22
**app** 86:14
**Apparently** 116:22
**appearance** 174:16,18,19 175:1,23,25 176:18 178:16,21,25 182:7,10 197:17 198:18 199:4 216:14 326:23 329:4 336:9 340:18,21
**appeared** 150:20
**Appearing** 5:1,12
**appears** 124:10 125:8,9,11 126:25 330:4,6
**Appello** 48:8 49:10
**append** 396:19
**appended** 481:24
**Appendix** 132:22,25
**apples** 348:9
**applications** 14:22 37:14

73:13
**applied**
34:22 301:5
**applies**
156:14
472:25
**apply**
35:8 335:18
338:18
339:1,9
395:7 472:10
**applying**
37:22
**appreciate**
182:13
269:11
364:13
500:16
**approach**
280:2,4
**approached**
65:3
**approaches**
37:22 142:24
**approaching**
303:5
**appropriate**
43:11 54:8,
24 73:8
129:13,20,23
131:3
133:18,24
134:16
266:25
268:5,20
269:9,12
270:12 296:4
297:21
342:12
343:2,16
344:9 345:9
346:15,18
353:5,9
354:6 357:25
373:10
374:22,23
375:2,6,15
377:12 382:6
386:23
395:8,13
398:25
407:16
409:23
464:18
477:12
**appropriately**
30:15 376:14
**approval**
90:17 91:5
94:5 105:24
444:15
464:18
**approve**
444:13
**approved**
176:23 177:4
**approximately**
16:22 47:4
66:15 434:24
**April**
25:23 29:2,
5,15,22
32:18,24
33:1,12
149:20
189:11 231:8
354:21
**arbitrarily**
455:13
**arbitrary**
471:21
**arbitrator**
474:20
**Arch**
5:3
**area**
54:13 79:23
110:21
114:18 115:3
175:6 276:17
331:7
355:15,17,20
389:9 470:4
471:1,6,8,22
474:13
**areas**
37:12 72:7
481:9
**argue**
365:9
**arguing**
308:19
**argument**
52:8
**around**
20:24,25
21:1 46:23
55:16 80:1
106:24
174:14 229:9
279:6 312:1
323:9 342:15
461:9 462:4
463:6 474:7
**arrangement**
10:6
**arrest**
285:23
**arrive**
137:20
138:4,9,14
140:1
**arriving**
460:13
**Arrow**
148:17,24
**art**
278:23
**article**
18:24 19:2
57:21 91:5,6
142:4
199:12,17
203:18,22
205:8
207:19,21
208:3,5,16,
19,22 209:4
211:3,4
213:21
215:2,4,10
224:19,20
281:7 348:21
349:1 418:22
421:6,20
423:5
427:15,21
436:22
437:23
438:24 440:2
443:3 444:1
447:3
**articles**
66:3
**artificial**
265:19 348:7
368:12,18
**artificially**
79:18 193:14
248:3 265:9
266:12
272:12 273:9
295:5 353:24
367:6 474:12
**ascorbic**
287:9 288:2
290:8
**ascribed**
326:3
**ASI**
80:18
**asides**
33:2,17
181:5 414:15
**asked**
27:11 28:10,
19 42:9
44:20 53:24
98:4 108:5
109:7 116:16
127:8 148:1
162:23
191:25
194:17
209:8,11
213:2 216:17
219:19,20
230:2
247:15,22
261:11

273:19 306:23 307:14 308:21 309:8 310:24 342:4 347:12 360:20 361:13 368:8 380:23 384:9 400:3,14 401:7 416:25 452:20 456:16,24 458:16 459:1,4,6,9, 17 465:11, 14,17 473:17 476:25 489:2 490:1,19 491:2,7,8 492:9,24 493:4 494:1, 19 495:4 496:8,18 497:2 498:6, 19 499:8,20, 25 500:2,7

**asking** 11:23 12:22 23:16 28:14 105:15 109:11 150:6 177:10 226:24 229:20 233:23 241:5,15,23 247:6,9 271:6 309:6 310:4 340:6 345:22 370:3 375:14 429:14 453:25 486:21 491:12,14 492:18,23 493:5 494:25 495:10,13, 18,20 496:17 498:25 499:17

**aspect** 45:12 174:18 180:11

**aspects** 95:1 180:14

**assay** 282:14 313:3 436:19

**assays** 72:23 75:4 76:11,20 77:24 78:2, 8,18 211:14 363:23 379:3

**assert** 70:6

**asserted** 330:10

**assess** 83:2 107:21 109:6 110:2, 9 142:16 159:23 164:11 174:10 190:24 191:11 192:2,9 194:4 219:1 267:14 269:17,19 275:5 276:7 315:12 346:18 347:10 348:13 361:16 363:10,15 364:19,22 366:6 367:13,21 368:5 370:5 371:2,10 373:23 374:6,23 381:14 383:22 385:17 400:23 428:6 473:4,6 476:3

**assessed** 106:8 128:8 164:7 174:20 176:18 181:4 295:23 350:13 360:16 362:18 363:1 369:5 384:7 391:1 485:15 486:6,9

**assessing** 33:10 76:15, 16 159:11 162:3 340:18 346:1 351:5 359:18 365:25 367:11 374:5 469:12

**assessment** 38:19 109:12 112:7 114:12 117:17 118:18 121:12 179:25 196:5 200:13 207:21 208:4 214:24 283:7 308:7,16 332:15 380:18 460:10 474:14,16 480:18,20 481:16,18,25 482:7,16

**assessments** 180:2 345:23 346:5 359:10

**assign** 276:24

**assigned** 308:22

**assigning** 33:9 334:16

**associated** 355:18,21 466:17

**associates** 65:4

**association** 204:11 331:13

**assume** 13:3 21:10 35:17 108:16 116:4 144:7 145:14,16,19 147:1 163:3 243:20 268:11 334:20 394:15 462:21

**assumed** 152:19

**assumes** 152:17

**assuming** 73:19 145:11 238:2 244:22 317:2 340:9

**assumption** 146:17 147:3

**assumptions** 270:20

**assurance** 421:22

**assuring** 290:2

**asterisk** 455:21

**astronomical** 296:12

**Atlanta** 5:8

**atmospheric** 196:15 313:21
**attached** 323:17
**attempt** 445:15
**attempted** 271:12
**attempting** 193:4
**attend** 201:6
**attention** 66:7 102:8 158:9 204:9 305:2 359:8
**attorney** 14:18 17:14 18:3 68:20 458:13 480:24
**attorney-client** 8:9
**attorney-expert** 68:22
**attorneys** 9:19 13:16 14:12 17:4, 23 20:5,10 443:15 444:9,11,17, 21,23
**attributed** 336:24
**AUC** 455:11
**auctioneer** 253:16
**August** 323:8 324:7
**Australia** 92:11,15 148:14,15 303:2
**Australian** 92:7 141:21 148:21 160:19 161:4 302:22 303:12 363:5 441:15 475:1
**author** 141:7 206:3 207:8 323:3 325:9 422:1
**authoritative** 136:19 137:2
**authoritatively** 94:9
**authorities** 158:8 303:12
**authority** 147:18 397:5 398:18,22 400:1,25 474:20
**authors** 141:24 266:1 280:1 287:21 292:18 297:4 436:8 484:14
**availability** 149:8 252:22
**available** 80:22 108:17 109:3 150:5 186:11 202:2,7 258:6 273:22 318:6 356:8 401:9 445:8, 12 452:18 467:12
**Avenue** 15:12
**average** 302:2,6 315:4 474:6, 8 497:19
**averaged** 426:18
**avoid** 51:16 290:1
**awards** 40:24
**aware** 8:3 16:7 43:13 61:19, 21 81:10,19 86:23 87:21 88:1,6 94:11 95:20 99:15, 23 100:2 101:6 105:19 107:1 137:4 144:15,21,22 150:24 168:4,18 176:17 182:8,10 197:14 199:1 200:25 201:2,14,22 211:19 212:6 219:5,6,9 233:11 234:1,2 250:15,21 261:2,5,7, 17,21 262:1 264:21 267:15 269:22 270:18 275:8 302:1,7 312:5 318:11 320:6 322:8 339:18 341:5 343:18,21 382:15,19 385:9 394:11 413:17,19 415:9,18 416:7,12 417:12 418:19 421:25 422:6 432:2 435:3 437:22 445:7 467:22 485:2
**awareness** 342:17
**awful** 420:19

**B**

**B19** 63:18
**babies** 249:14
**back** 21:21 41:14 76:2 102:23 108:1 132:22 143:5 149:11 157:4 187:11 214:16 229:23 244:22 248:6 251:18 252:3 257:21 263:15 269:11 283:12,18 290:24 299:10 302:20 319:12 322:15 335:7 346:20 361:8,10 362:6 363:24 364:8 365:14 376:6,11,20 378:7,18 382:21 383:4 386:12 390:10,11 392:5 429:13 437:1 442:8 457:15 458:4,19 474:11 482:25

**background**
237:24
276:12
319:8,17
**bad**
276:22 324:2
**badgering**
490:2
**Baker**
15:12
**balance**
174:4
**balanced**
280:2,3
**bandwidth**
56:13
**banned**
94:18,24
95:4
**based**
72:23 83:3
101:17
102:10
113:21
121:20,23
124:16 127:5
133:9 140:12
155:15
172:13
185:24 186:7
221:4 222:1
235:15
243:23
244:19
246:20 250:7
252:21
258:10
267:22
277:5,9
280:16 285:7
291:3 306:16
308:4 310:8
321:22
334:19 350:9
389:19
452:9,11
454:13,23
456:14
467:12
475:16
**baseline**
168:19 169:1
222:1 380:1
389:15,25
448:16
455:13,14
470:3,7,10,
16,25 471:16
472:4 473:13
474:12
**baselines**
470:13
**bases**
459:13
**basic**
40:22 56:9
344:11
461:3,7
**basically**
88:17 291:4
294:12 378:3
**basis**
112:15 127:7
130:6,14
234:20
239:13,15
294:7 412:15
426:21
447:23
**batches**
148:24
149:24
150:1,7
157:24
158:2,11,16
319:24,25
359:12
419:21
428:23 429:6
**Bates**
157:20
236:16 263:8
300:10,23
304:25
305:10
312:24
313:10 316:3
320:16
327:22
329:12
351:24
355:12 359:3
**bathroom**
315:6,13,16,
18 366:3
373:2
**bathrooms**
168:12
**beat**
39:15 58:6
89:24 156:18
260:1 428:4
432:6
**begin**
50:18
**beginning**
68:9 283:13
301:1 323:11
**begins**
118:5 134:7
287:4 477:5
**behalf**
5:1,12 9:10,
15 11:24
45:18 46:10
60:9
**behavioral**
50:13 58:13
**behind**
188:22 394:5
**beige/yellow**
330:23
**believe**
10:22 11:1
12:11 15:23
16:4,6 17:11
21:1 24:17
48:22 60:12
100:8 111:15
146:7 149:19
204:4 208:2
212:21
230:22
233:24
244:25 245:3
279:7 303:23
334:11
362:19
395:12
413:1,19,25
423:24
436:21 449:9
459:25 466:9
499:22
**believed**
329:15,23
**below**
29:4,8 30:24
134:4 154:19
171:7 172:12
246:18
301:18 303:4
326:21 334:1
335:15
357:21 359:8
377:7
**bend**
164:19
**benefit**
39:21 120:21
137:11,13
210:18
228:18
247:25 355:2
**besides**
257:14
**best**
12:25 13:8
118:19
269:22
**better**
79:20
**Bhatzutanev**
12:13,15
**BI**
60:17,18,19
99:14 109:25
110:5,6
196:19
207:21
214:23

215:8,23 216:1 308:7 415:4
**BI's** 208:4 218:9 308:16
**biased** 367:3 475:20
**big** 41:7 57:5 58:18 72:19 85:5 228:13 243:20 247:18 372:23
**biggest** 79:9
**billed** 25:7 32:18 33:23
**billion** 250:17
**bin** 165:21
**bind** 253:24
**biochemist** 247:12
**biochemists** 35:20
**bioether** 466:16
**biological** 174:12
**biomarkers** 50:14
**Biomed** 208:12
**biostatistician** 70:21
**biotech** 36:7 48:5 52:23 57:8
**biotechs** 48:4
**bit** 26:8 31:7 68:18 121:16 143:1 153:12 157:17 174:9 210:7 213:10,11 252:11 283:15,16,17 388:23 410:13 418:11 458:10,11,20 476:20 479:15,19 482:19
**black** 374:11
**bladder** 86:21
**blank** 15:25 53:4 141:6
**blanks** 472:20
**blended** 41:19
**blood** 97:9 461:24
**blow** 455:13
**blowing** 470:3,7
**blown** 248:9
**BLQ** 435:23
**blurb** 381:19
**board** 48:1,6,14, 17,18,25 49:6,11,12 389:5
**boards** 48:11
**body** 123:2 136:19 137:2 147:14 233:15,21 234:11 294:7 463:4 482:21
**Boehringer** 195:12
**boggles** 379:1
**boiling** 270:5 460:20
**Bold** 57:23
**borne** 112:22
**Borriello** 9:15
**BOSICK** 5:14
**bother** 317:24 366:5 442:13
**bothered** 335:4
**bottles** 168:10
**bottom** 215:8 402:20
**box** 14:25 15:1 68:4 325:4 366:2,14 373:1
**Brambilla** 289:7 293:25
**breadth** 88:23
**break** 21:25 55:24 76:10 87:6 156:22 214:9 288:24 361:24 391:22 411:17 499:23
**breakdown** 312:18
**breaking** 259:18
**breaks** 14:11 411:21
**BRIAN** 5:4
**brick** 374:12
**brief** 21:19 32:7 75:25 157:2 299:8 362:4 392:3 457:13
**bring** 57:13 412:4, 5 499:19
**bringing** 271:3
**Britane** 281:12
**Britane's** 281:17
**broad** 50:2 118:25 180:6 226:2 375:10 464:1 470:23
**broke** 214:20
**broken** 328:23 364:20
**Broom** 221:5 254:16 260:18 261:3
**brought** 35:16 58:25
**brown** 301:15 328:3 330:24 337:5
**BROWNING** 5:9
**browningj@gtlaw.com** 5:10

**BSMS** 57:12
**bucket** 391:8,9
**buckets** 391:5
**build** 36:7
**building** 35:8
**built** 38:11 57:7
**bulk** 58:22 59:4 108:9 472:2
**bullet** 196:8 300:13,15 324:19
**bunch** 130:18
**burn** 269:6
**bus** 393:11
**butchering** 199:11
**button** 8:24
**buy** 251:22
**by-product** 260:15
**by-products** 388:12 461:20 462:18 463:9 465:3 466:1

**C**

**C14** 174:3 252:2
**cabinet** 315:16
**calculate** 154:10 222:12,14
**calculated** 133:9
**calculation** 222:22 223:1 235:22
**calculator** 154:9
**calibrating** 167:5
**calibration** 159:20 160:10,25 162:15 165:13 167:9,14 430:10 434:10 436:2
**California** 379:20
**call** 17:6,9 70:1,2 119:6 172:16 391:8
**call-out** 319:14
**called** 10:12 187:20 200:12 203:19 224:24 225:12 406:15
**calling** 126:11 182:24 293:19 334:20
**calls** 242:7 243:4 324:8 424:9 427:4
**Camelot** 370:15
**cancer** 53:15 71:2 86:22 89:14,16,17 90:6 91:12,17 95:21,22 99:16 118:9,10 189:18,22,25
**Candida** 9:15 386:9
**candidate** 50:15
**candidates** 35:1,11,23 38:13,21 50:17 82:10
**capabilities** 249:23
**capable** 283:4 371:16,19
**capillaries** 269:4
**capillary** 343:12
**capsule** 181:19,22
**capsules** 175:1 184:10 378:12
**capture** 396:6
**captured** 396:25
**car** 191:7 192:6 366:2,10,13,24 373:1
**carbons** 252:6 253:5
**carc-** 127:22
**carcinogen** 89:5,11,18 90:5 91:6 95:17,18 97:2,7,16 100:4,12,20 101:1 102:16 104:2 110:17 112:9 113:7 114:13,22 115:7 116:11 117:20 120:21 124:24 126:18 189:17,24 203:3,4 244:7 249:13 286:14,15 297:16 298:18 338:19
**carcinogenesis** 89:8 98:3 99:17 100:1 205:19
**carcinogenic** 53:10 88:8 100:17 101:14 102:12,16 103:7,14 104:5,10,19 122:1,15 123:4 124:12 125:3 127:3,22 147:23 202:19 204:14,21 349:12 355:8 356:14,22
**carcinogenicity** 71:7 113:14 133:3,10 211:14 295:24 349:7 355:22,24 465:12,15
**carcinogens** 112:4 115:22 116:2 120:25 130:1 134:18

182:15 202:21 204:9 286:7 335:19 356:5,25 357:6 477:14
**cardiovascular**
35:22 36:12
**care**
81:11
**cared**
249:12
**careful**
252:6 283:6
**carefully**
25:13 296:25 426:10 472:24
**carried**
231:22
**carrier**
343:12
**carry**
39:21 285:8
**cars**
168:12
**cart**
251:12
**case**
12:12 15:18 16:3,17,20, 23 20:23 24:22 25:8 33:1 53:23 55:1,4 56:14 64:20 66:18 86:7,15 87:23 88:3,8 90:8,13 95:2 98:12 124:17 126:20 127:5 155:16 217:23 239:9 272:7,23 274:5 279:4 303:2 344:21 380:9 396:17 449:9 463:24
**cases**
39:22 52:2, 4,9 53:9 86:4 142:20 301:9,12 353:9 365:19 387:9 389:25 425:15 474:5 479:14
**categories**
116:5
**categorize**
221:17
**cau-**
192:23
**causation**
71:2
**caused**
113:24 266:17 320:22 482:4 490:11
**causing**
89:14 184:21 323:21 337:20 338:2
**cautionary**
464:2
**cautions**
292:10
**caveats**
228:13 235:1 292:2
**CDER**
372:17
**cell**
50:7,8 285:14,19,22 286:18,22
**cells**
284:12
**cellular**
284:8
**Celsius**
107:6,18 145:24 240:17 242:2,23 313:16 327:7,8 333:13 371:5 404:16 415:24 416:10,15,21
**Celsius/75**
188:18 327:5
**center**
40:17,21 44:10 46:13 53:11 57:5, 10 58:10,11, 16,21 59:7 62:6 129:15 326:3
**center's**
45:23
**centers**
44:2,25
**central**
36:4
**certain**
44:2 54:4 75:8 94:7 142:20 161:20 163:15 164:16 172:12 191:23 291:19 298:11 303:6 315:1 326:3 353:3 387:9 392:10 399:3 425:15 444:2 447:17 463:24 467:11 469:24 474:5
**certainly**
166:17
**certainty**
178:13 411:9
**certificate**
394:9 395:7 464:17
**certification**
392:11,23,25 393:1 407:15
**certified**
170:19
**certify**
172:9
**CGMP**
392:11,22 394:9 395:6 403:11 406:25 407:15
**CGMP/GLP**
407:9
**Chaffin**
5:21
**chain**
147:9 415:3, 10,17,21 416:20 417:16,23
**challenges**
78:17 79:6, 8,9 80:9,22
**challenging**
62:11 252:21 390:18
**chance**
100:20,21 340:7
**change**
30:14 41:7, 11,16 80:14, 15 104:1 198:5 234:3 250:7,11 306:7,17 307:8 327:6 328:15,19, 22,24 330:22 331:12,14 336:15 426:3

**changed**
30:15 101:7 105:2 134:20 425:25 426:19
**changes**
45:22,24 126:11 181:23 252:24 307:2 326:23 327:2 329:3,6 331:10,18 336:23 337:20 338:2 465:20 467:6 469:3
**channels**
38:8
**characteristic**
211:12
**characterization**
43:12 118:12 172:24 173:25 218:18 321:5 332:14 334:1,18 436:17 463:18 497:15
**characterize**
43:25 56:7 77:12 172:10 173:6,10,11,21 244:21 269:13 335:11
**characterized**
118:14,19 179:9,16 196:18 334:5,15,21 376:2 463:23
**characterizing**
173:2 213:24
**charge**
83:13 115:8 125:21 127:5 137:23 192:8 193:10
**charged**
35:7 97:25 98:2,7,9,18 99:4 104:16 202:23 295:22 311:7 369:13
**charts**
184:6 387:1 390:18 423:13
**check**
108:2,10 227:3 399:16
**checking**
181:2
**chem**
34:23 35:10
**chemical**
54:18 77:2 80:17 87:11 89:5 95:21 99:16 121:12 139:21 174:11 198:6,7 278:10 285:21 306:8,21 307:2 308:4 334:16,17 343:3 463:17
**chemically**
179:1 226:8
**chemist**
57:15 72:20 182:24 241:16,24 249:23
**chemistry**
36:22 49:2 50:11 70:8 72:16 73:20 87:10 178:24 201:16 203:19 209:17 216:7 218:25 220:7 252:22 309:20,25 310:9 347:25 459:2
**chemists**
35:17,18
**cherry-pick**
293:11
**cherry-picking**
293:19 295:14
**chief**
151:11 203:24
**children**
262:17,22 263:3 264:12 271:22
**chloramination**
206:16
**Chloraminations**
209:9
**chloric**
96:3 294:23
**chose**
119:6 120:3 149:23 150:8 434:20 436:11
**chosen**
421:17 422:4
**chromatogram**
470:22 472:24 473:5
**chromatograms**
469:11 485:6,7,11,15
**chromatography**
243:14 265:3,8,16 269:18 341:16 342:1,18 349:24 350:14 351:5,14 352:18,19
**chromophores**
74:4,18
**chronic**
262:23
**churning**
388:19
**circled**
324:22
**circulating**
173:5
**circulation**
257:21 258:4
**citation**
398:22 401:10 477:1
**cite**
130:23,25 132:9 137:6 275:2 400:10,18 401:1 402:10 410:18,25 411:14 412:1,16 477:3
**cited**
65:13 66:8 67:3 120:2 198:16 199:8 207:22 208:4,6 215:17 218:5 406:11,17

409:6
**citing**
130:4 131:1 207:20 215:12 397:5 398:18
**citizen**
248:1
**citizen's**
102:1
**citizens**
391:7
**claim**
57:24 413:10 443:17
**clarification**
12:14 13:23 32:20 35:3 50:16 59:3, 22 62:2 72:15 74:7 84:2 120:18 124:22 129:21 173:19 214:5 259:9 265:12 284:24 294:10 328:16 335:22 344:25 404:3 407:6 462:3 463:12 465:6
**clarify**
205:12
**class**
129:25 131:4 133:19 134:17 204:8 477:13
**classical**
40:20 58:19
**classified**
196:13
**clastogenic**
122:3
**clean**
146:25
**Cleanup**
352:23
**clear**
13:9 27:14 48:14,18 64:19 74:10 148:10 177:19 295:17 317:5 356:7 407:24 484:9
**clearly**
62:10 65:8 74:21 100:23 118:9,10 122:1,14 123:3 155:12 326:2 346:22 382:5 453:11 472:19 474:5 499:10
**click**
8:23
**climates**
366:25
**Clinic**
57:24
**clinical**
18:22 35:1, 11,23 38:13, 21 39:11 50:17 82:9 90:22,23 193:19 246:7 476:11 479:6
**clinician**
70:24
**close**
42:19 163:21 290:7 401:20 462:10
**closer**
462:7
**CMC**
38:17 77:13
**CNS**
37:3,16 41:13
**co-analyzing**
79:23
**co-elute**
85:5
**co-eluted**
79:17 85:16
**co-eluting**
79:10,11,14 80:7
**coaching**
495:9
**coated**
167:19
**coating**
306:12 388:5
**code**
481:7
**coefficient**
74:6
**coefficients**
74:18
**Coke**
294:25
**cold**
194:12
**collaborating**
61:20
**colleague**
91:1
**colleagues**
57:1
**collect**
373:19
**collected**
168:23
**college**
59:6
**colloquy**
312:12 414:11
**color**
178:23 198:5 306:7,16 307:2,8
320:2,9 322:1 323:21 326:23 327:2,24 328:1,15,19, 24 329:4,6 330:21 331:9,12,14, 18 336:15,23 337:5,20 338:2 465:19 466:21 467:1,6
**colors**
324:15 328:24 366:11
**column**
121:19 204:6,20 205:25 281:8 423:16 431:3
**columns**
80:2,3 243:14 424:3
**com-**
181:17
**combination**
75:17 343:14
**combined**
172:1
**come**
18:6 28:21, 24 38:6 41:14 56:17 62:21 63:1, 23 138:25 141:17 152:5 157:23 175:17 187:11 195:23 199:23 208:19,23 216:10 218:15 278:6,21 310:16

353:15 354:3 379:12 386:7 390:10 393:12 401:2
**comes**
64:12 147:18 462:7
**comfort**
377:2
**comfortable**
228:7 439:10
**comment**
53:25 94:9 110:22 116:7 118:24 144:6 196:4 219:9, 18 249:20 288:10 298:20 318:5 324:10,13 325:15 406:22 407:11 439:20 440:14,19 443:7 444:9
**commented**
265:10 310:23
**commenting**
107:9 110:24 111:25 328:14 439:10 465:19
**comments**
54:6 276:25 328:19
**commercial**
170:21 348:23 441:22
**commercially**
94:12,18 95:5 179:5
**committees**
51:14 379:25
**commonplace**
460:22
**communicate**
13:15 14:12 188:21
**communication**
157:9 158:8
**communing**
39:25
**community**
37:25 38:10 44:12 380:4
**companies**
34:1 37:18 38:15,23 39:13,14 40:10,14 42:8 43:9,20 44:14,17 45:7,11,19, 24 46:11 48:2,5,11 49:14,21 51:2,7 52:21,23 55:22 56:8 63:2,24 152:11 219:8 241:12 392:16 399:5 400:21
**company**
34:10,17 40:4 49:7,11 243:20 244:13 249:12 250:5 399:13 444:6 478:22
**comparable**
42:18 223:15 251:14
**compare**
226:17
**compared**
118:15 227:5 422:21 423:1,3
473:24
**comparing**
97:19 348:9 489:15
**comparison**
77:14 327:9 423:7
**comparisons**
402:4
**compartment**
258:7 387:11 388:4 462:23 463:4
**compelling**
56:14 274:7
**compensated**
20:22
**competitor**
305:6
**complaints**
197:17 198:19 199:4
**complete**
56:20 147:8 381:1 436:11 448:21 454:9 456:6
**completely**
96:18 130:20 250:13 257:5 266:5 343:11 373:9 374:20 380:2 399:24 420:18 457:4 462:11 471:8
**completeness**
76:15
**completion**
73:5
**complex**
254:1 320:21
**complications**
51:12
**complied**
109:4
**comply**
108:13
**complying**
107:13
**component**
196:14 466:7
**components**
320:22 321:4 345:13
**composition**
423:12 424:16
**compound**
77:7 78:25 82:4,7 90:5 133:8 144:8 170:5,13,15, 23,25 171:1, 8,9,20,22,23 172:2 174:5 175:11 177:13 179:12,13, 16,23,24 181:10 183:12 198:1 210:13 218:20 266:24 267:2,24,25 268:2 269:2 308:22 309:5 321:11 338:15 343:1 347:3 348:6 375:23 387:15 396:21 461:11,12 462:17,22 464:1,5,13 465:8
**compounds**
38:15 45:3, 4,12 50:17 73:18 74:3, 17 76:16,21 78:3,8 79:5 179:7 183:20 211:18

221:15 226:4 228:11 268:17 270:6 289:23 343:9 344:11,15 346:23 347:4 349:8 356:14 394:23 443:19 463:17,22
**comprehensive** 139:5 218:14 363:3 380:3 452:17
**comprehensively** 385:2
**computer** 14:14,24 167:2 389:19 469:25
**computers** 14:16 18:7
**concentration** 118:15 119:3,4 264:11 284:9,10 285:3,21 286:2 353:25 377:19 386:16 486:18
**concentrations** 118:1,21 119:18 268:7 285:11,12,15 390:9 428:13
**concern** 54:23 203:8 223:19 246:4 307:13 324:14 355:16,18,21 356:9 365:2 388:23 442:3 443:24
**concerned** 58:20 287:1, 14 292:17
**concerns** 202:19 293:5
**concerting** 179:14
**Concise** 121:12
**conclude** 195:17 209:15 216:6 287:21 332:20 333:9 386:2 454:14
**concluded** 100:3 102:11 103:5,11,13 104:25 121:23 142:7 175:10 178:12 186:5,15 196:19 211:9 280:6 308:8, 17 385:23 411:8 416:8 417:11
**concluding** 93:9 126:24 176:10 177:1 180:8
**conclusion** 92:13 123:3 141:17 170:4,9 175:14,18 177:12 195:23 196:24 199:23 208:19,23 216:11 218:15 264:8 270:11 274:18 280:9 295:13 301:19 310:5,12,17 317:13 320:19 386:8 395:17 397:3 410:16
**conclusions** 138:10,15, 20,25 140:1 151:22 152:5 161:15 178:17 264:3 274:10 292:3 304:3 306:5 394:23 396:7 414:6 454:18 460:14 481:18 482:6,9,12
**conclusive** 260:12 356:21
**concurrent** 287:8
**condition** 233:15,21 291:12 370:20
**conditions** 105:16,21 106:16 107:21 109:5 110:10 141:13 144:7 145:12 179:18 180:21,23 181:1 188:16 190:11,19 191:21 192:3,9,16 193:20,22 194:2,5 207:7,10 212:11 221:10,22 223:17 224:4,11 228:16,25 232:11,25 233:21 234:11,12,16 235:8 238:8, 18 239:9,21 246:2,5 251:15 284:22 290:10,21 291:6 292:7 300:18 301:2,3 305:18 326:17 327:4 337:7,14 345:18 363:16,17,21 364:4,23 365:3,8,11, 24 366:4,6 367:13 368:6,12,13 371:9 372:24 373:9,12,15, 16,20,24 374:6,7,16, 21,24 375:7 378:22 381:13 382:7,17,25 383:5,8,9,21 384:24,25 385:7,16 386:4,5,19 388:14 408:17 413:7,12 418:7 419:14,15 420:3 461:7, 17
**conduct** 51:1 86:4 93:24 94:4 109:12 182:1 217:17 340:17 370:5 383:20 384:22

387:18,19 394:12,18 395:2 401:12 409:1 444:2 452:17 476:2
**conducted** 90:8,13,16 109:25 188:17 223:25 224:10 253:3 355:24 384:4,14 385:12,14 391:5,6 416:13
**conducts** 392:20
**cone** 80:16 84:25
**conference** 15:10,11 17:8
**confidence** 147:20 490:7 493:15 494:4
**confident** 186:12,16
**confirm** 190:9 207:25 208:17 223:8 251:1 260:19 261:3,9,19 318:4 400:23 416:15
**confirmed** 256:5 258:1 340:12
**confirms** 256:19 300:1 316:18
**conflating** 240:23 241:7
**conflict** 39:4 51:13
**conflicting** 39:9 85:7
**connection** 11:9 458:22 460:12 465:20 476:3 478:10,24 480:15,19 481:14,16 482:15
**consent** 10:6
**conservative** 129:24 131:4 133:19 477:12
**consider** 50:4 70:13 154:2 155:1 161:15 170:12 171:17 273:22 284:6 294:5 303:1 365:7,20 388:1
**considerable** 301:15 314:6
**considerably** 328:1 349:14
**considerations** 291:13
**considered** 43:8,18 44:16 65:15 66:3,4 67:5,11 69:9 96:20 100:25 124:11 127:2 129:12,20,23 131:3 133:18,24 134:16 218:5 355:1,7 356:13 417:25 420:22 477:11
**considering** 119:2
**consistency** 390:1
**consistent** 113:9 140:10 169:11 239:13 271:14 328:25 357:2 365:16 368:24 390:25 419:23,25 426:15 446:22 475:10
**consistently** 185:12
**constant** 184:8 390:12
**constantly** 211:14
**constraint** 305:6
**consult** 51:10
**consultation** 297:24
**consulting** 20:19 30:6 51:6 55:10 68:14 298:3
**consumer** 168:11,12 191:23 193:21 363:17 371:1 378:24
**consumers** 168:13 191:3,16 192:11 193:7,9 194:2 195:1 249:12,15 288:7 293:4
364:21 373:24 380:19
**contact** 16:5 56:5
**contacted** 16:2,9,15 99:11
**contained** 93:25 94:6 148:25
**container** 404:10 405:7
**containers** 27:5
**contains** 231:20 353:6 358:7
**contaminants** 201:18
**contaminates** 355:7
**contamination** 87:14 202:1,9,12
**content** 158:11 167:19 200:19 320:2 330:5,11 357:13 359:13 360:16 364:12 389:21 429:7 431:4 432:16,22 441:14 478:20
**contents** 428:23
**context** 65:9 77:5 82:2 88:17 106:23 143:17 192:4 205:11 226:1

353:5 358:10 381:20,22 382:3 408:14
**continuation** 481:8
**continue** 180:10 301:8 402:19
**continued** 6:23 7:2 402:19 403:4 408:15
**continues** 188:9
**contribute** 188:10
**contrived** 295:5,10 367:6 368:18 370:18 388:24
**control** 87:17 132:14 237:8,20 238:1 245:23 251:16 430:18 443:23
**controlled** 296:25
**controls** 243:24 327:11
**conversation** 381:24
**conversations** 8:5,8
**conversion** 235:19
**convert** 159:2
**converting** 77:1
**convinced** 38:5
**convolutions** 388:18
**COPE** 54:19
**copy** 21:3,10,12 22:4,12 136:7 397:24
**core** 328:1,20,24 330:6,21
**corner** 8:25
**corporate** 47:6 63:1 304:21 310:20,21
**correct** 13:18 14:14, 15,20 15:20 18:1 20:15, 16 23:20 29:6,16,19, 20,24 30:7, 19,20 34:1, 4,5,8,11,12, 15,18,19 36:19 39:13 40:5,7 51:19,20 55:5,7 59:13,14 60:4 61:25 65:6 67:5,6 70:8,9,22,23 71:1,5,8,10, 12,14,16,18, 19,22,24,25 72:8,9,11,12 80:10,24 85:10 90:10, 11,14,15 91:22 93:11, 15 98:11 99:2 101:10 105:4,17 108:14 109:6 114:7 116:15,20 118:21 120:6,15,22 123:5 126:18,21 128:10 129:5,9 135:1,20 136:15 137:16 139:14,23 140:17,20, 21,23 142:1, 2,17 143:9 146:12 147:4 151:15 152:6,20 155:25 156:1,6,11, 15 158:18 159:4,6,8, 12,13 160:3 163:6,12 165:6 167:20 168:3,7 169:13 170:6,7 175:20 177:5 186:18,25 187:24 191:16 193:1,9 194:21 195:25 196:25 197:10 198:13,14 199:25 201:4,5 202:10 203:25 204:1 207:17 208:3,7 212:15,19 215:18,24 218:7,15 219:13 220:9 224:14,15 225:5,17 228:22 229:3 230:20 231:11,12, 24,25 232:4 233:1 235:8, 15 236:8,22, 23 237:5 238:8 240:21 241:16,21,22 247:21 254:4,7,8 255:8,20 256:14,15 260:19 261:10 266:14 270:1,22 271:22 273:5,17 275:6,13 277:12,20 279:9,14,17 282:6 287:12,16,21 288:2 289:20 293:17 296:5 298:18 299:24,25 301:24 302:8,14,19 304:5 305:25 306:9,22 308:25 310:2,17 311:8 314:20 316:20 317:1,24 325:10 327:18 328:8,11 329:18 331:10,23 334:4 335:2 337:15,20 338:3 339:1, 10 342:20 345:25 347:8 349:25 350:1,14 351:5,11,15 352:22

354:11
357:25
358:16
359:19
360:18
361:18
362:11,18,19
363:12,13
364:15 369:6
370:8
371:11,21
373:21,22
380:18
382:13
383:22
384:8,20,21
385:17
392:12,13
393:21
395:9,10,17,
18 402:7,20,
23 403:5
404:17
407:2,22
408:12
409:7,16,24
410:2,7
415:1 417:6
418:1,23
419:8,17
420:16,23
421:9,10,14,
15,18,19
422:8
423:17,18,
20,21,25
424:7,10,11,
14 425:10
426:6,22
427:6,7,11,
18 428:25
429:8,9,11
430:23
431:4,5,13
436:12
437:20 438:5
439:23
444:17
446:13
447:13,14,19
448:1,10
449:1,13
450:6,8
451:23,24
452:3,4,7
453:3,4
454:9,10
456:11,15,23
457:5 459:16
466:21,22
467:13,15
469:8,9
470:10
473:1,2
478:7,8
483:6,9,10,
21 484:14
485:16,18,25
487:17
497:17

**corrected**
236:7 248:12
265:25 271:5

**correcting**
213:25

**corrections**
273:13
358:22

**correctly**
270:21
300:20
355:10
477:17

**correlate**
242:13 249:5
294:19
296:11 448:4
455:6

**correlates**
389:11

**correlating**
472:16

**correlation**
390:19

**COSTELLO**
5:19

**could've**
46:1 240:20
241:6,14,24
243:15
247:7,20
249:22 251:4
252:25
253:18 360:3
370:4
371:18,20
376:25 380:8
384:11
385:14,19
425:23

**coun-**
492:7

**counsel**
9:3 10:5,18
15:13 23:14,
23,24,25
24:4,13,15
25:3,14
67:7,10,14,
15,22 69:2
241:5 310:25
411:23 412:9
452:21
457:22
458:17
459:17
465:17,24
469:5 473:16
476:25
491:7,16,25
492:3,17
493:13
495:8,13,24
499:12

**count**
62:22

**countersigned**
152:15 393:7
406:23
407:9,13
410:17,23
411:25
412:12,20
413:4

**countless**
141:24

**couple**
17:7 42:22
48:3 50:23
52:6 106:18
171:4 214:21
319:10
365:19 446:1
453:15 456:1
481:2

**course**
11:12 16:25
27:19 56:3
98:14 178:6
216:16 217:9
329:5 371:4
376:17

**court**
9:19 11:2
12:14 13:23
21:13 25:9
32:20 35:3,4
37:9 50:16
53:21 59:3,
22 62:2
64:14 70:18
72:15 74:7,
8,14 75:20
84:2 120:18
124:22
129:21
173:19
253:11 259:9
265:12
284:24
294:10
328:16
335:22
344:25
361:10
386:12 404:3
407:6 462:3
463:12 465:6

**cover**
421:7

**coverage**
173:7

**covered**
201:22 279:15 383:23 385:22 404:12 421:8
**Craig**
6:3 9:2 12:3 14:1
**crash**
344:16
**crazy**
244:14 271:13
**create**
181:16 368:11 381:12
**creates**
265:18
**creating**
8:12 265:20 266:12 390:15 474:12
**credibility**
145:8 147:16 150:22
**criteria**
116:4
**critical**
118:9,10 203:19 207:11 327:11
**criticism**
379:24
**criticisms**
446:9 448:7, 19,24 452:6
**criticize**
342:10 346:12 379:13 380:7 413:6
**criticizing**
382:24
**CROS**
77:13 82:17 371:17
**cross**
271:4 476:13
**Cross-talk**
57:18 114:24 123:23 194:15 227:12 249:9 286:20 492:22
**crossover**
479:24 490:13
**crystal**
463:24
**CSI**
74:2
**cultures**
282:18
**cumulative**
277:10
**cured**
377:24 479:10 480:2 485:21,24 486:1,3,5,8, 23,24 487:6, 8,23,25 488:10,13,24 489:19 493:21 494:17 496:25 498:4,5 499:5,6
**current**
47:20,21,24 339:3 389:2 443:24
**cursory**
274:13
**curve**
79:23 160:25 162:15 165:9,18 167:4,14 277:16,24 278:21 389:9 434:8,9,14 436:2 470:4 471:1,4,6,23 474:13
**curves**
369:20
**custody**
147:9 415:3, 10,17,21 416:20 417:17,23
**customers**
190:16
**cut**
227:16,20 263:22 442:18
**cutoff**
146:9
**CV**
23:17 24:1 37:8,13 46:22 47:12 61:23
**cycle**
285:23
**cyclotron**
251:23
**CYP**
125:17
**CYP2E1**
124:25
**CYPS**
125:19

**D**

**D-**
125:5
**daily**
73:1,21 91:18 93:5,6 113:3,21 114:1 190:21 244:19 279:1 296:9
**dark**
301:15 328:2 330:23
**darkened**
328:1
**darkening**
314:6
**dashboard**
366:15
**data**
26:12 27:1, 2,8,19,21,23 28:5,7,15,21 32:1,5,12, 14,16 33:7, 11,16 52:2 60:5 73:15 85:7 100:21, 24 102:14 108:1 110:4, 5 113:12,14, 20 114:5 119:1,11,19 122:11,23 123:16 126:3 127:10 128:4 131:10 133:10 140:5,7,22 141:16,25 142:10 151:2 160:14 161:5,6 163:9 164:17,25 165:22 166:17 169:15 171:25 174:13 177:20 184:17,25 185:25 186:7 209:23,24 217:12 218:10,19

219:6 223:23 228:4 241:13 246:3 248:20 251:13 258:10,18 259:11 287:22 292:1 293:11,20 295:1,12,14 296:7 297:8 307:11 310:19 315:22 321:5 323:21 324:21 326:7 327:20 332:25 362:23 365:20 368:17,24 373:10,19 374:22,23 375:2,6,15, 17 378:21 379:7,11 380:2,5 381:3,4,7,12 382:6 386:14 387:22 389:6,17 390:17,20, 21,24 393:17,18 394:4,22,24 396:5,6,8, 10,11,20 398:7,9,12 399:9 408:4 409:14,24 410:1 414:5, 12,14,17,19, 25 419:23 420:1,2 422:21 423:2,3 425:22 426:18,19 427:10,13, 14,18,20,22, 23,24 428:6, 9,10,11 429:14 430:14,23 436:12 445:9 446:6,11,19, 22 447:11, 16,23 448:9, 11,14 449:6, 8,12,22,25 452:3 453:2, 8,9,16,18,21 454:1,12,14, 24 455:3,7 456:7,9,11, 15,19,22 464:2,13 469:21,23 471:12,19 472:2,3,16, 17,18 473:11 474:2 475:1, 18,21 476:13,15,18 480:1 482:10,14, 19,21,22 485:20 487:19 489:6,12 490:22 499:19,24

**datas** 468:7

**dataset** 365:8 366:22 367:1,20 448:21,25 449:3 452:6 457:2,4

**datasets** 184:3 365:22 379:13 389:21,22 396:20 448:4 454:7 455:4, 9 472:6 473:14

**date** 11:2 15:22 20:23 21:2 30:14,18 33:12 60:6 64:9 158:12 186:13,14 304:7 314:13 315:21 320:8 360:22,24 361:1,3,5 386:14 403:11 408:1 446:7 456:22 464:5 468:4

**dated** 22:6,7 24:24,25 25:23 26:7 29:1 30:2,4 106:3 157:10 231:8 326:17 336:9 348:21 354:21 395:25 403:15,17 410:23 460:2

**dates** 30:14,19 47:16 395:24

**Davis** 399:9

**day** 92:20 93:10, 18 94:1 96:5 278:18 279:10 294:16,18,20 295:3 312:25 331:5 334:2 335:16,18,24 351:9 411:22 432:19 446:1 458:10 467:9

**days** 201:23 264:20

**de** 259:12 280:24 281:15

**de-risk** 38:9

**deadlines** 64:14

**deal** 81:17

**dealing** 268:16

**dealkylation** 258:16 259:12 260:5 468:10

**dealt** 81:3

**deamination** 256:21

**death** 286:22

**debate** 235:2

**debunked** 376:17

**December** 30:10 326:18 332:13 348:22

**decide** 41:8 278:20

**decided** 98:16 203:9

**deciding** 277:1

**decision** 339:16

**decision-making** 381:4

**decisions** 59:12 276:23

**declaration** 50:15 450:7

**declare** 10:3

**decompose**
193:13
353:10
**decomposed**
312:6
**decomposes**
345:16
**decomposing**
306:9,22
307:3,20
308:1 328:18
**decomposition**
140:12
265:9,21
**decreased**
184:7
**deep**
174:6
**defendant**
5:1,12 59:19
99:11 241:12
**defendants**
59:16,20
60:8 65:1,5
98:9,15,17
99:5,12
136:10,16
178:5 192:9
195:18,24
199:23
208:20
211:20
216:15
219:20
220:18
238:19
240:16
241:25
246:25 247:7
250:25 253:3
260:18
261:2,8,18
284:1 288:6
293:3 317:16
318:12 321:9
337:18,25
341:16,24
342:1,6
346:4 370:4
371:14
394:12
413:18,20,24
415:12 419:4
**defendants'**
304:11 419:7
**defense**
17:4 19:21,
24 20:3
67:22 310:24
**define**
172:5
**defined**
90:4 314:11
**defines**
91:15
**defining**
172:3
**definitely**
475:22
**definition**
89:9,18
101:17
**definitive**
104:2
160:13,15
463:25
**definitively**
480:5
**degradance**
331:13
**degradant**
182:14 210:3
211:21
212:5,23
220:18
240:19 242:4
338:7
**degradants**
116:1 243:2
317:24 330:9
331:1
**degradating**
208:21
**degradation**
85:3 115:18,
21 140:13
171:19 183:7
195:25
196:7,11,17
197:3,4,16
198:6,8,18
199:3,13,25
206:5,14,17,
19 207:12,
14,17 208:5,
7 209:13,18
211:7 214:24
215:5,17
216:8,24
217:4,5,18
220:8 252:15
259:14
266:17
267:15
271:13 300:3
301:16
304:12 306:6
308:18,25
309:21
310:1,5,7,10
311:17
316:9,10
317:17
325:20
327:2,12
328:7 329:1,
5 330:4,12,
18,20 331:9,
16 333:12
336:25
337:1,11
340:23 358:8
376:1,4,8,24
378:6,17
386:22
416:16
460:6,11,18,
21,24 461:5,
19 464:4,5,
25 466:1,7
467:22
484:18,19,24
**degrade**
141:5 171:24
181:18,20
184:13,15,21
193:13
195:19 300:2
327:17
342:19
344:17
**degraded**
269:5 332:15
333:7 465:21
**degrades**
197:9 265:17
269:2 316:19
317:10
341:17 342:2
345:18 348:6
**degrading**
208:22,25
209:10 244:2
306:9,21
307:3,19,25
308:9,23
317:22
328:11
331:10
337:19 338:1
**degree**
72:1 97:6
147:16,19
152:22
178:13
316:10 411:8
**degrees**
72:4 106:19,
20 107:6,18
145:24
188:17
240:17
242:2,23
269:1 314:2,
3 316:8
328:21
343:11 344:8
404:6,16
415:23
416:9,14,21
461:16
463:7,8

**deliquesce** 140:11
**deliquesced** 301:14
**deliquescence** 181:12 184:12 330:7
**deliquescent** 313:15 316:7
**deliquesces** 183:18
**deliver** 35:1,11
**Delix** 48:7,20,21
**demonstrate** 172:8 264:10
**demonstrated** 183:9,10 260:16 302:11 316:2 364:16
**demonstrating** 130:2 131:6 134:22 135:13 136:25 477:15
**department** 462:14
**depend** 84:24 85:18 339:14
**dependent** 226:2 316:12 358:10
**depending** 79:11 83:15,17 85:1,20 97:6 127:10 202:16 306:12 389:23
**depends** 41:17 46:3 56:15 62:18 63:10 96:9 172:17 225:23 285:2,18 286:4,18 293:18 298:8 308:2 358:4 360:13 366:20 394:20
**depicted** 206:6
**Depo** 8:25
**deposed** 12:5,10
**deposition** 8:18 9:2,20,22,24 13:13 17:5 18:9,12 19:10,12,16,22,25 20:6,11 23:3,10 33:3 452:23 453:7
**depression** 36:16,23
**depth** 284:18
**derivatives** 282:16
**derive** 129:13,24 131:4 133:1,18,24 134:16 477:12 490:3
**derived** 239:6 324:20 400:5
**Derong** 324:20
**describe** 33:3 49:23 276:6 460:9,10 469:10 473:22 475:14 478:9
**described** 303:24 335:8 466:12 472:10 493:11,14 497:24 499:4
**describes** 393:24
**describing** 394:21
**description** 26:10 29:9 30:23 303:18 388:9 405:21 406:9 408:5 481:5
**descriptions** 393:3 395:23
**descriptive** 481:4
**descriptors** 183:25
**design** 387:20 479:24
**designated** 100:12
**designation** 101:5,9 105:2
**designed** 228:18 239:8
**desmethyl** 256:6 257:9 258:14 260:9
**destructive** 265:17 291:20
**detail** 217:24
**detailed** 29:4 30:5,9 98:3 303:19 314:7 395:23 405:20 408:9
**details** 395:24 416:24 417:21
**detect** 251:7 291:10 352:21 357:19,25 441:2 459:8 463:20 484:1,13
**detected** 83:17 141:22 164:2 185:12,14 233:22 234:12 350:4 461:20,21 462:20 466:24 467:10 483:9
**detectible** 378:4
**detecting** 232:11,25 266:5 271:7
**detection** 80:15 84:22 199:13 202:17 203:6 211:6 215:5 352:13,17 377:14 434:23 437:15 440:11
**detector** 74:13,25 265:20 268:25 344:16
**detectors** 73:22 74:2,16,19,21 76:17
**Determination** 224:24 225:12 231:9 238:14

**determine** 231:22 268:20 297:25 413:13 418:5 436:24
**determined** 91:10 99:25 126:8 301:7 456:4
**determines** 453:13
**determining** 123:13 225:3,14 248:23 265:6 455:16
**develop** 37:24 38:13 44:4 73:13 210:16 244:16 247:18 250:6 268:1 376:12 377:13 442:1
**developed** 35:23 38:22 39:19 50:7,8 53:4 79:20 81:22 82:3,7 210:11,14 243:16 347:23 362:21 365:3 474:22
**developing** 37:17 73:7 77:23 78:1, 7,18 363:23 442:4
**development** 36:22 50:20 88:24 268:11 276:11 337:5
**developmental** 394:13
**deviations** 219:1
**device** 14:11
**devices** 13:15,20
**diameters** 324:25
**dichlorometha ne** 344:23 348:1
**dictates** 401:14
**didn't'** 310:15
**diet** 294:25 377:24,25 479:10,11 485:21,25
**diets** 476:14 480:3
**differ-** 498:1
**difference** 426:9,25 427:3 487:17 490:9,14,17, 25 493:10 494:6,15,22, 23 495:2 496:5,11,16, 21,23 497:5, 6,8,10 498:2,9,12, 14,24 499:3
**differences** 62:24 398:5 425:13 426:11 427:2 447:24 448:1 473:23
**different** 24:20 26:25 27:1,19 36:10 37:12 40:23 45:25 49:24 50:8,9 63:9 66:25 67:1 74:12 75:12,18 76:25 79:20 80:4,13 83:1,3 85:24 88:20 96:23 106:22 115:24 116:4,5 124:20 125:17 135:25 141:23 142:21,24 143:18 152:10 153:1 164:19,23 165:18 181:1 182:23 183:25 184:1,2 208:14 210:25 219:8 245:23 249:25 262:20 263:9 277:6 278:3 279:1 290:20 302:25 309:4 345:4 348:8 354:8 362:22 368:14,16 369:5 370:5 371:3 373:24 375:22 379:2,3,5 384:6,18 386:3 388:17,20 389:24 397:24 400:20 409:14,15 419:21,24 424:7,17 425:2 427:24 435:8 443:21 444:16 445:14 448:12 449:21 453:10 455:25 460:19 476:14 477:20,24
**differentiate** 252:23
**differentiati on** 221:25
**differently** 94:8 127:19 213:21 446:17 447:18 477:25
**difficult** 313:5
**difficulties** 314:9
**digesting** 276:25
**digits** 153:11 420:5
**diligence** 249:16
**dime** 41:15
**dimethyl** 253:5
**dimethylamine** 232:2 250:25 256:20 259:4,13 260:20 261:4,9,20 376:3 463:19 468:14,15, 16,24
**dimethylamino** 231:21
**dip** 43:2
**direct** 68:23 69:25

77:22 133:13 359:7
**directed** 391:16
**directing** 69:20 442:14 443:2 495:9
**direction** 41:12
**directly** 168:17 364:9
**director** 372:16 381:11
**directors** 48:15
**dis-** 264:25
**disagree** 11:20 43:24 102:20 103:4,19,21, 23 104:6,12 114:11,17,20 115:4 121:1 122:5 124:2, 15 127:7 128:9 148:6 155:17 186:21 189:1,19 190:1 205:3 232:18 257:5 356:17 357:1
**disagreeing** 115:11 116:14 122:15,18 230:15 308:15 398:13
**disclosed** 46:24 237:5 342:16 345:24 394:23 434:3,21 435:2 444:5
**disclosure** 11:10
**discoloration** 305:23 319:19 320:8,21 325:20 328:7,10 337:10
**discolors** 305:18
**discount** 272:14
**discover** 276:14
**discovered** 323:14
**discovery** 35:9,14 36:4 50:5,10 56:3 58:17 60:23 70:8 72:2,5, 21 73:20 96:7 123:12 147:15 270:7 276:10,18 278:2 349:10 418:13 437:16 440:12
**discrete** 228:8 442:4 466:6
**discuss** 99:21 201:16 275:12 362:13 436:17 459:1
**discussed** 72:7 139:9 176:5 275:16 332:19 337:4 372:6 430:4 433:11 468:5,6 483:5 493:21
**discussing** 122:9 129:7 130:10 132:4 214:21 215:17 305:23 312:1,8 332:18 359:9 423:7 448:13
**discussion** 54:5 87:15 88:24 258:21 279:23 418:16
**discussions** 283:22
**disease** 35:15 36:11, 12
**diseases** 37:15
**disingenuous** 484:2,12
**disparate** 278:12
**disperses** 268:24
**disposition** 174:1 254:17
**dispute** 11:5
**dissolve** 388:10
**dissolved** 268:24 387:16 388:5,6
**distributed** 179:10 193:8 399:10
**distribution** 190:15 191:2,15,22 192:11
**distributors** 171:1
**division** 372:18 444:6
**DMA** 256:22 257:7,24 258:18 259:1,15,18, 19 260:13, 14,22,24 261:6,14 262:3 461:20 462:19 468:8,12,19
**DMF** 79:16,23 348:2
**DMPK** 34:23 35:10 57:16 58:14 125:23
**DNA** 125:5 282:17 283:5
**DNA-DAMAGING** 283:3
**doctor** 12:4,21 15:6,17 20:14 21:14, 25 22:14 23:3,7 24:6 25:7,24 27:6 28:2 29:3 31:3,12 32:17,23 33:24 40:9 43:5,7 44:15 45:6 46:6,21 48:1 49:23 50:25 51:18 52:10 54:11 55:3 56:25 57:19 60:4,7 61:11,23 63:20 64:4, 13 70:5 71:23 72:11, 22 76:6 83:24 84:18 87:5,18

88:11 89:4, 11 92:16 93:19 94:11 95:14 97:3, 12,18 98:23 99:15 101:24 102:21 103:24 104:24 105:3,13 106:1,15 107:1 109:20,25 110:16,24 111:25 112:15 113:14 114:4 115:20 116:15 117:5,18 119:9 120:6, 9,15 121:11, 22 122:4,13 123:5,25 124:8 126:16 128:10,25 129:4 131:13 132:4,25 134:11,23 135:12 136:18 137:7,11,19 138:3 139:18 142:14 143:20,21 148:8,12 149:13,20,22 150:24 151:17 152:23 153:17 154:21 157:14,21 161:3 163:4 167:18 168:4,18 169:22 172:3 174:15 175:10
176:16 177:10 178:10 179:25 181:24 183:15,21 185:7,20 186:15 187:6,15,22 188:24 189:12,15,20 190:4,23 193:24 194:14,18,23 195:11 196:5,19 197:2,14 198:5,11 199:9 200:11 201:11 203:1,17,24 204:24 205:16 206:1 208:16 209:15 210:1 211:2,19 214:20 216:5 218:23 220:4,17 222:5,14,17, 19 223:9,25 224:11,18 225:12,20 226:24 227:19 229:16 231:6 232:19,22 233:11 234:8 235:6 236:6, 19 238:12 239:24 240:13 241:15 242:15,17 244:5 246:24 247:5 250:15,24 253:11 254:15
255:18 256:4 258:20 259:17 261:16 262:12 263:2,20 264:1 266:13 269:15 270:8 271:18 272:2,18 273:21 274:18 275:10 276:5 277:15 279:3,9,23 280:24 282:5,12,25 283:9,21 286:10,24 289:6,16 290:11 292:16 293:2,9,24 295:23 296:13 297:10,13 298:7 299:23 302:1 303:11 304:3,20 305:22 306:4 307:18 308:6,10 309:14,22 310:12 311:19 312:16 313:4,22 314:12 315:25 316:5,14,25 318:23 319:2,16 320:17 321:8 322:4,22 323:17,24 324:5 325:6, 18 326:15 327:13 328:4 331:8
332:12,18 333:19 334:25 335:17 336:6,17 338:17 339:18 340:24 341:5,15 342:9 343:18 348:11 350:20 351:4 352:7 354:3 355:10 356:16 359:7 362:9 363:14 364:13 365:23 369:1 371:21 372:6,11 373:18 374:20,24 380:17 381:9 383:6,25 384:12,22 385:20,23 391:1,4 392:9 394:17 395:5 396:9 398:13 399:23 400:22 402:4,17 403:7 404:25 405:18 406:1,12 407:2,14 408:11,16 409:5,9,12, 21 410:11,24 411:6 412:11 413:2,5 414:4,24 415:9,16 416:7 417:1 418:4,15,19 419:13 420:2,13,21 421:5,25

422:21
426:22
427:9,23
428:5 429:10
430:22
432:12
433:8,10
435:2,12
436:4,21
437:10,18,22
438:6,19
439:6,14
440:1,21
441:5,10
442:13,20
443:1 444:17
445:1,7
446:9,15,25
447:22 448:5
449:25
450:20
451:19
454:22
456:10 457:7
460:7 463:14
483:4,14
484:5,15,20
485:5,17,20
486:19
487:17,22
488:8,19
489:7,14
490:15
492:21
493:19,25
494:10,23
496:4,13
497:17,21
498:21,25
500:5,15

**document**
60:1 102:5
104:9 105:11
111:18
116:25 117:6
118:23
119:22
120:3,6
121:13,18
126:22 129:2
131:21
132:17
134:25
144:14
148:19,22
157:15 177:8
185:22
195:21 196:3
200:11
215:12,16
217:1,7,12
218:12
223:11
225:2,8,14
229:7 231:16
232:13 241:3
255:7 256:1
257:1 262:25
263:25
269:23
270:10,18
275:3,8
281:20,21,24
288:4,14
299:16
303:15,23
304:8,15,21
305:22
308:10
311:20,25
312:3,7
317:5 318:3,
7 319:2,13
320:14
332:12,19
333:4 334:14
336:6 349:20
351:22,25
357:23
361:12
381:21 382:2
406:17,18
408:8,17
415:15
416:6,24
433:6 438:10
451:6,11
488:3 490:21
491:4,11
492:4,6,12
493:5,8

**document's**
312:4

**documentation**
152:1 395:8,
13,22 413:7
420:19
465:25

**documents**
20:6,11 22:8
23:17,23
24:3 56:17
65:13,17,20,
23 66:8,10,
15,19,20,25
67:3,8,9,10,
13,16,18,19,
21,22,25
69:3 91:3
130:19
157:23
197:15
198:16,18
200:22
214:21
215:16
216:20
217:14,22
218:19 219:4
220:13,14,16
229:13,15
237:13 239:1
246:11,21
258:21
259:3,21,23
260:3 269:15
272:22 274:5
275:4
310:13,20,
22,25 318:6
322:23
348:15
373:14
382:12,16
398:24 399:7
411:13,16
415:4,8
417:21 419:4
429:5 465:2,
19 466:2
478:21

**DOD**
42:16 46:16

**dog**
173:2,23

**dogs**
96:22

**doing**
44:3,13 56:7
73:9 77:16
82:2 87:11
146:23,24
152:14
205:20
223:16
232:15 246:6
249:25
252:21
272:11
276:10 278:1
284:7
353:12,23
366:5
371:16,20
375:3 393:10
394:7,16
411:20
492:17

**dollars**
42:17
369:23,24

**domains**
277:6

**dominated**
305:16

**Donelson**
15:12

**dosage**
290:2

**dose**
73:17 91:5,
18 96:4,10,
11,25 97:7,
10 119:16,20

122:10,12, 14,25 129:8 163:5 172:14 184:14 285:18 286:5 294:19,22 296:11 298:1,2

**dose-dependent**
282:17 283:5

**dosed**
96:16,21

**doses**
73:17 96:1 112:5,20,25 113:1,3,8,9, 23 114:1,10 119:14 121:25 122:20 123:4,20 124:6 133:3 244:19 284:13 294:6,13,14 295:16 296:14 297:12,15,20 298:8

**double**
487:24 488:11,23 489:20

**dozen**
495:11,12

**dozens**
197:15 198:17,21 278:3 378:22

**draft**
440:1

**drafted**
449:19

**drafting**
31:23 32:6, 10 273:21

**dramatic**
471:23

**draw**
57:16 305:2

**drawing**
15:25 53:4 141:6

**drawn**
396:7 402:4 481:18

**drink**
294:25

**drinking**
352:23,24

**drive**
33:8 35:13 244:13 414:5,15 445:5,16,18, 20,24 448:9 449:8,12,19 450:1,6,11, 23 451:23 452:3

**driven**
44:9 167:3 378:9 436:22 441:25

**drives**
479:6

**drop**
79:22 471:7

**dropped**
52:9 114:2 140:9

**drug**
28:22 35:9, 14 36:3,22 50:4,12 53:5 58:17 70:8 71:18,20 72:2,4,20 73:10,20 91:10 92:1, 3,4,17 95:14 96:7 108:17, 21 109:3 123:12 140:8 141:4 145:9, 13,15,17,21, 22 146:4,22, 24 147:14 149:6,7,11, 12 150:2 158:3,21 159:25 161:9 162:4,20 163:11 164:8 165:3 166:15,19 172:6 174:19 176:1,25 179:2 180:18 181:14,18 182:2,3,15, 17,18 183:5, 12,16 184:14,19 185:1 186:8 187:9,11 188:20 191:22 192:5,15,17 193:13 194:9 196:14,25 197:24 199:2,19 202:1,8 203:20 204:10 210:10 228:19 231:23 237:8 240:25 242:13 244:1,3,7 246:15 257:16,17 258:7 265:21 266:3 267:7 268:25 270:6 276:10,18 278:1,7 284:10 285:4 290:7 291:2 301:22 302:24 306:7 307:19,22,25 308:2,13 340:22 345:16 347:16 353:10,17 358:12 362:17 364:12 366:24 368:1,5 375:21 414:1 418:13 423:8 428:23,24 429:5,15,20 447:9 462:8, 10 466:15 474:15,21

**drugs**
27:5 36:23 37:17 92:25 96:20 132:15 147:15 148:23 180:18 200:12 202:2,7,13 225:24 226:12,19,23 227:2,6 228:20 244:20 248:7 258:12 298:11 308:3,5 348:23 349:22 350:5,9 351:6 440:8 474:21 475:3

**dry**
379:19

**dual**
131:19

**due**
203:20 204:11

249:15 273:3 314:9 320:1 335:13
**duly** 10:13
**Dumped** 57:22
**duodenitis** 264:13
**dynamic** 45:25

**E**

**e-mail** 5:5,10,17 322:24 323:1,8 325:12,13 359:8 360:6, 14,15,22,24 361:1,4,6, 14,19
**e-mails** 324:11 360:11
**E54** 63:5
**eager** 478:13
**earlier** 12:19 48:21 77:6 194:18 251:7 304:13 353:7 372:7 375:20 417:4 430:4 437:17 440:13 455:2 464:12 469:24
**earliest** 27:2,20
**early** 24:25 50:20 88:24 94:17 95:4 210:21 212:7,21
251:18 348:4
**easier** 433:15
**easily** 251:24 315:18
**Eastern** 500:24
**easy** 398:10
**eat** 194:11
**ebay** 413:21
**edit** 443:16 478:20
**editor** 44:12 54:18 126:1 128:14 151:11 203:24 213:16 214:2 276:19 278:9 473:10
**editor-in-chief** 213:13,14 418:25
**editors** 151:9
**effect** 102:12 110:5 270:19 297:8
**effective** 46:18 73:17 290:9
**effectively** 378:1
**effects** 118:17 197:3 239:14 275:20 355:8
**efficacy** 39:5,7
**effort** 50:11 56:21
77:16 369:19
**efforts** 73:14
**eight** 25:3
**Eighteen** 497:13
**either** 43:3,4 53:21 67:3 85:12, 17 178:10 215:24 233:10 237:19 266:8 274:9 288:9 293:23 318:1 478:14
**ele-** 265:18
**electronic** 13:19 24:6, 10 393:18 396:18 410:5,6
**elements** 399:17
**elevated** 188:19 207:13 265:9,18 301:24 358:8 389:14
**elevates** 273:9
**Eli** 34:10,13 58:13
**eliciting** 283:5
**eliminate** 266:9
**eliminated** 258:5
**elimination** 125:2
**embedded** 142:13
150:19 418:12
**Emery** 102:1 168:23 384:14 391:5,13 402:6 410:12,14 412:21,22 413:6,14,17, 24 415:4 416:12,20 447:23 454:16
**Emery's** 168:19,25
**employed** 69:12 290:21 478:7
**employees** 399:10
**encapsulated** 388:2
**encompass** 470:25
**encounter** 78:18 79:8 80:23
**end** 14:3 15:12, 24 37:10 39:24 49:6 74:9 252:9 263:21 282:23 292:11 330:8 435:10
**end-point** 118:11
**ending** 157:20 236:17 263:8 300:11,24 305:1,11 312:10,24 313:10 316:3 320:16 327:23

329:12 334:10,24 355:12 357:8 402:14
**endogenous** 72:10 95:10 98:1 104:17 115:10 119:25 137:23 139:4 141:23 156:5,9,15 175:8 191:8 192:20 193:17 209:6 220:1 240:10 258:8 295:20 309:11 378:14 459:5 468:15 476:1 480:6
**endogenously** 246:6
**endowment** 64:3
**ends** 425:21
**engage** 45:15
**engaged** 277:19
**engineered** 448:15
**enhance** 296:4
**enormous** 367:1 414:19 441:14
**enormously** 284:21
**ensure** 202:1,6,9 478:12,21
**enter** 9:16
**entered** 75:1 77:20 448:17
**entering** 50:24
**entire** 151:2 219:12 381:21 382:1 393:20 448:25 452:5 457:2,4
**entitled** 69:4 311:15 318:23 460:5
**entity** 44:6
**entries** 165:23
**entry** 26:10 30:10
**environment** 201:17 221:24 349:14 379:19 388:20
**environmental** 182:4 337:13
**enzymes** 75:13 462:16
**EPA** 352:9,20
**epi** 102:14
**epidemiological** 356:21
**epidemiology** 70:16 98:3
**epigenetics** 36:13
**epoch** 46:3
**equipped** 113:16
**equivalent** 119:14 148:21 235:14 378:3
**equivalently** 66:4
**erodes** 269:2
**erroneous** 112:13 119:7 120:4 136:2
**error** 29:12 30:12,16 154:18
**errors** 136:8
**escalate** 298:2
**escalation** 73:17
**Escient** 48:7,20,25
**ESI** 74:2 80:18
**esophogeal** 86:21
**ESQ** 5:4,9,16
**essential** 196:16
**establish** 34:22 39:6 182:5 373:17 383:9
**established** 58:11 134:18 135:15 241:19 290:16 296:8 317:14 349:9 383:21 384:6
**ester** 125:2
**estimate** 32:8 55:8 161:1 162:14 163:16 167:6,10 430:9 454:1
**estimated** 172:13 296:11 320:25
**estimates** 160:21 161:21 162:2,18
**ethics** 54:2,20
**evaluate** 275:19
**evaluated** 115:6 195:17 209:17 216:7 218:24 220:7 235:25 296:17 309:20,25 337:3 466:2 468:23
**evaluating** 126:23 310:8,9 386:5
**evaluation** 190:7
**evaporate** 404:6
**Evaporated** 403:19
**evaporating** 404:4
**evaporation** 403:23
**evaporative** 74:3,20
**event** 96:18 239:11
**events** 96:24
**eventually** 38:24
**everyone** 239:5
**evidence** 102:12 122:2 130:2 131:5 134:21

135:13 136:25 138:9,14,20, 23,25 182:1 195:17,24 199:24 208:20,24 209:19 218:14,22 219:11,13,15 238:19,20 246:12 257:6 273:2,23 283:2 310:6, 16 317:21 330:7 337:17,25 356:21 376:7 419:16 477:15 478:3,25

**Evidencing**
328:6

**exact**
15:22 56:18 66:22 84:13 143:15 217:24 228:5 229:6 237:21 250:4 354:4 406:13

**exactly**
16:1 26:24 31:8 43:16 74:15 127:16 151:5 158:1 159:19 164:18 168:16 177:20 228:4 284:16 341:20 342:7 393:24 408:10 411:1,11 415:14 449:23 488:17

489:12 491:17,22

**exaggerated**
248:10

**examination**
6:4 10:16 458:7 483:2 492:18

**examined**
10:14 121:25

**examples**
52:25 84:3 298:10 466:5

**exceed**
75:8 167:8

**exceeded**
164:19 165:5

**exceedingly**
96:2,17 119:14

**Excel**
164:18 166:2 419:20

**excellent**
481:4

**excess**
166:4 183:13

**excessive**
221:22 242:12 285:11

**exchanges**
322:24

**excipients**
306:14

**excluded**
53:20 54:11 55:4 379:25

**exclusively**
345:6

**excreted**
171:10 179:20

**excuse**
81:8 94:2 423:14

**exercise**
35:22 363:5 387:23

**exhaustive**
139:7 406:8 408:6 454:11 456:6

**exhaustively**
457:2

**exhibit**
6:12,13,14, 15,16,17,18, 19,20,21 7:3,4,5,6,7, 8,9,10,11 22:16,19,23 23:2,4 25:5, 18,19 101:20,21 111:14,19,21 117:1,2 121:3,8 128:22 131:17 132:1,21 157:8,11 185:5 189:5, 6,9 195:8 200:8,11 203:13,14 214:23 215:1,3 231:2,3,7 254:10,11, 12,15 262:8, 9 263:11 280:22 282:2 288:16,17,24 299:14,20 304:16,17 309:16 311:11,14 318:17,19,20 322:14,17,19 326:12,13 332:9 336:2, 3 348:17,18 351:19

352:3,4 354:17 358:25 359:5 372:2,3 402:12,15 408:24 409:2 421:1,2 422:17,23 430:15,19 437:2 439:22,24 451:4,16 459:24

**exhibits**
6:23 7:2 14:9 450:8

**existed**
40:18

**existing**
397:25

**exists**
113:12 219:15

**exit**
41:8

**exogenous**
72:10 95:10 98:1 104:17 115:9 120:1 137:23 139:3 141:23 156:5,11,14 175:8 191:9 192:20,22 193:6,17 209:6 220:1 240:10 246:6 295:19 309:11 459:5

**exogenous/ endogenous**
311:5

**exogenously**
192:24 194:1

**expect**
85:13,23 179:15 376:7

**expectation** 218:11 221:1
**expected** 96:19
**expensive** 370:1
**experience** 70:7 72:22 74:23 77:22 78:6 146:21 190:25 191:13 247:6,12 276:20 277:6,10,18 371:1 373:4 378:24 398:9,21
**experienced** 41:5
**experiencing** 78:1
**experiment** 34:25 152:16 220:14 233:10 236:19 393:8,20 394:18 396:3 397:22 405:24 408:12 410:4 481:5
**experimental** 102:13 284:22 290:10,21
**experimentally** 375:4
**experimentals** 408:9
**experiments** 152:13 231:21 313:14 314:7 374:17 387:17,19, 20,21 388:10 392:20 394:7 395:2 408:8, 18
**expert** 15:18 16:3 18:13 19:4 22:1 51:6, 19,22 52:15 53:1,21 54:1,6 55:10,17,23 56:12,23 60:8 64:14 70:10,14,15 71:3,6,17,20 72:8 86:3,7, 15 89:7 111:2 114:18 115:3 116:6 120:24 140:6 150:21 201:4 202:20 277:19 280:13 293:10,15 339:12 368:16 397:24 458:22 459:10,23 460:2
**expertise** 49:9 53:12 54:13 70:5 110:22 276:17
**experts** 18:15 19:22, 24 20:3 98:16 123:2 125:24 126:23 201:15 421:23
**expiration** 186:13,14 314:13
**expires** 314:15
**explain** 53:6 346:22
**explained** 488:7
**explored** 420:18
**exponentially** 295:9 374:19
**expose** 285:19
**exposed** 120:13 143:8 182:16 184:20 190:14 191:2,14 192:10,25 195:2 211:22 212:24 256:23 302:25 303:9,13 305:24 315:24 316:19 317:10,22 326:17 337:6,13,19 338:1 364:15 369:15 370:6 373:21 375:8 380:20 383:10
**exposing** 302:17 385:15 386:4
**exposition** 199:14 211:8 215:6
**exposure** 73:16 87:9 88:16 96:13 99:25 110:17 111:6 112:4, 10,19,24 115:12 116:12 117:21 119:12 120:10,22 124:14 127:4,23 164:23 165:21 192:22 193:6 210:4 239:17 296:22 302:13
**exposure-response** 118:12
**exposures** 73:18 119:13
**express** 454:15
**expressed** 454:18 459:13
**extended** 47:18
**extending** 458:10
**extension** 74:5,17
**extensive** 39:9 72:24 266:8 283:7 362:21 419:20
**extensively** 309:7
**extent** 48:13 67:2 68:24 69:3, 21 110:18 111:7 112:10 115:12 116:12 117:21
**external** 14:8
**extra** 26:12

**extract**
358:12
**extracted**
257:23
347:16 360:3
**extracting**
359:23
**extraction**
87:13 266:8
267:7 352:18
353:16,21
360:1
**extrapolation**
129:12,15,
19,22 131:2
133:17,23
134:7,15
477:6,11
478:2
**extreme**
221:22 303:2
366:20
374:14
**eyes**
324:2

**F**

**facilities**
87:16
**fact**
43:14 118:18
150:19 163:6
181:15
185:15 235:2
237:20
239:16
244:22 300:9
305:16
352:8,20
377:3 378:10
466:3,12
474:24
**factor**
143:8 182:11
327:11
329:17,25
**factors**
182:4 278:17
**facts**
229:21
**faculty**
51:15
**fade**
14:3
**Fahrenheit**
269:1 345:17
461:17 463:8
**failed**
320:1
**failing**
340:20
**failure**
182:7 197:17
**failures**
198:19 199:4
219:2,3
**fair**
11:21 13:4,5
42:13
218:13,18
436:16
**fairly**
277:25
387:16
389:12
446:22 475:9
**False**
439:16
**familiar**
54:20 100:9
195:15
203:22 235:7
254:23
304:23 323:2
349:3
**families**
38:1
**far**
47:7 234:18
260:23 279:8
340:11
356:20
386:21 468:8
**fashion**
251:4
**fast**
207:14
350:18
**fate**
211:17
252:13 254:1
**favorable**
293:11
**FDA**
16:7 18:21
38:18 60:6
73:14 79:20
82:14 90:4
91:10 92:1,
8,17,23,25
93:9 101:25
103:5
105:13,23
106:2,3,5
107:14
109:4,22
110:7 112:2
129:4,7
130:4,11
132:6,10,16
133:7,13
134:14
135:14,20
141:21
147:6,13,22
148:22
149:5,11,19
172:5,22
175:2 177:23
183:9 185:11
186:5,11,15
187:7 188:5
189:10
190:6,7
200:14,25
201:14,24
203:9 217:15
233:12,18
242:25
244:24
245:1,7,13
246:7,14
248:6
265:10,22
269:16
271:17
273:13
297:25
298:4,22
302:21
303:20
316:23
339:3,4,13,
15,17 341:5
342:16
345:24
354:6,11
357:3 358:16
362:19 363:3
364:8 368:4
369:10 371:7
372:7,19
376:18
377:11 378:9
381:7,10,11,
17 383:9
385:3 441:13
460:22
464:19
466:24
468:23
473:19,25
474:5,22
475:7,21
476:7 477:1,
21 479:6
**FDA's**
92:9 93:15
108:13
186:10
187:18 188:7
363:2 474:8
475:24
**feasible**
298:1
**February**
26:7,11,18
27:8 28:5,8,
15,16,18,24,

25 48:24 317:7 336:10 451:21
**fecal** 255:2
**feces** 171:11
**federal** 40:19 42:15, 25 46:16 69:20
**federally** 56:11
**feel** 11:17 52:3,7 54:7 56:13 70:1 228:7 242:9 272:2 475:23 476:1
**feeling** 469:20
**feels** 123:18
**fellowship** 33:25
**felt** 274:15 406:7
**fewer** 35:1
**FHS@ PIETRAGALLO. COM** 5:17
**field** 70:7 377:15 421:24
**fifth** 105:9
**fight** 68:25
**figure** 204:17 223:2 326:3 393:13 398:11 463:16 479:22 486:16
487:13 488:5,6 490:10,13
**figured** 278:14 279:5
**figures** 425:16 435:20
**figuring** 252:11
**file** 14:25 161:12 166:2 396:15 472:16
**filed** 38:17 177:8
**files** 26:12,24 27:1,8,10, 19,21 28:5, 7,12,16,17, 21,23 32:1, 2,4,16 33:7, 8 108:10 393:6 396:20 408:2,3 414:17 419:20 452:18,22 469:18
**filled** 481:10
**film** 167:19 181:17
**final** 8:19 140:13 280:16 292:3 422:22 426:4 482:11
**finally** 330:23 446:2 469:18
**financially** 9:13
**find** 96:14 139:3,
8,13 210:12 285:18 296:21,22,24 297:13 298:14 376:14 401:17 408:3 438:22 439:6 442:2 443:1
**Finder** 139:6
**finding** 50:15 244:6 249:13 256:17 259:20 283:4
**findings** 16:7
**fine** 84:18 122:7 123:18 127:12 345:14 353:3 358:11
**fingerprint** 83:2
**finish** 13:7 14:4 83:23 183:22 234:22 288:22 442:23
**finished** 442:24
**finishes** 336:21
**firm** 17:16
**first** 16:2,5 34:3 38:5,8 87:18 89:23 98:21, 23 99:11 118:6 136:14 185:7,8 186:1 204:20 206:2 207:6 210:13
231:18 243:9 272:8 290:14 292:4 298:1 300:25 305:4,13 313:11 317:4 319:6 322:15 325:25 326:5 329:2,8,20 332:23 334:14 335:8 336:16,18 340:5 349:5 353:16,23 356:19 360:10 387:6 390:7 399:12 437:3,7 445:1 458:19 484:4 485:6, 10
**fiscal** 47:24
**fit** 434:8,14,15
**five** 26:19 32:16 33:14 35:12 55:18 56:23 96:4 288:21 410:11,24 412:21 450:17 471:12
**flag** 293:25 466:19
**flagging** 470:7
**flags** 464:3
**flavors** 67:1 73:2 74:22
**flight** 74:1
**flip** 255:16

**floor**
5:15 366:15
**Flora**
280:24
281:15
**Florian**
18:21 377:20
468:21 479:6
485:19
490:17 491:9
493:6 495:1
496:7,23
497:24
498:15
**fluid**
46:4 62:19
193:19
223:15 263:4
266:2 267:10
377:17
384:15
385:5,15
387:5 472:12
**fluids**
240:24
386:15
**fly**
85:2 128:15
**focus**
36:9 37:5
42:3 64:18
72:13 97:16
102:8 107:16
116:8 119:25
158:9 176:7,
16 185:23
286:12
291:22 311:4
336:14
345:20
372:24
391:13
392:18 409:5
428:16 440:4
**focused**
31:12 35:14
36:5,15 46:7
63:20 95:1,
9,12 97:12,
14,15 106:1
107:13
121:18 161:4
192:20
193:16,23
203:1 205:25
209:5,12,13
289:15
311:1,3
329:22
409:19
486:3,4
494:12
**focuses**
36:21
**focusing**
38:6
**fold**
233:7 387:10
**folder**
68:3,16
**folks**
57:10 62:21
120:12
125:23
316:23 357:4
363:6 385:3
**folks'**
192:19
476:18
**follow**
50:21 252:12
290:2 377:12
394:5 399:7
**follow-up**
157:9 158:7
457:21
**followed**
81:17
**following**
145:14 148:3
199:7 289:24
292:20
333:12 407:9
**follows**
10:15 147:1
**food**
194:11
199:19
384:20
385:6,8,10,
16 387:15
388:15
**foods**
290:1
**force**
73:3 141:5
322:11 461:6
464:4
**forced**
142:15
171:18 269:3
460:23
**forceful**
292:8
**forcefully**
290:21
**forcing**
141:12
179:17
180:23
228:25 291:5
**forewarn**
229:2
**forget**
459:24
**forgot**
465:10
**form**
58:7 69:4
125:1,2,5
139:19 143:9
181:11
184:15,22
195:1,2
208:7 238:20
253:6 256:22
258:1 300:3
302:13,17
341:17
342:2,19
346:7 386:24
458:25
464:11
465:23
466:4,11
467:3,14
468:3,18,25
469:16
472:13 473:3
474:1,17
476:5 477:23
478:15 479:4
480:17,21
481:19
482:2,17
**formal**
72:1,4
101:17 105:2
**formation**
72:10 95:11
112:6,21
113:10 120:1
156:5,6,10,
11,15 175:8
206:4,13,20
239:23
240:10
252:14
271:21 283:8
295:20
301:17 302:8
309:11 310:7
311:5 326:24
330:25
378:14
384:16
459:4,5
468:16 476:1
480:6
**formations**
104:17
115:10
137:24 139:4
191:9 192:21
209:7
**formats**
298:12
409:15 410:2
**formed**
210:3,22
224:25

225:4,16
231:10,23
238:15
258:18
312:19 331:1
462:19
463:10
467:24 479:1
**forming**
117:25
141:18
182:14
209:25 244:2
338:18 464:3
**forms**
98:1 192:24
193:17
212:23 232:3
251:1 302:25
315:24
385:25
415:10,17,21
416:20
417:17,23
**formulating**
280:11
**formulation**
355:3
**Formulations**
318:25
**forth**
383:1
**forward**
39:21
**found**
67:13 86:20
139:6 155:18
162:19
190:11
238:11
248:23
256:11 259:6
264:19
275:25
282:15 290:9
324:22 342:8
350:8 376:19
431:15

432:22 461:8
469:2 480:22
**foundation**
40:23 41:22
**foundations**
62:20
**founder**
49:10
**founders**
49:7
**four**
32:15 33:14
35:11 41:9
42:4,13
255:1 326:15
333:12
382:18 390:7
450:17
463:6,9,17
471:12
**four-week**
264:13
326:25
327:25
332:25
**fragment**
79:2
**fragmentation**
75:14 82:24
83:1,4
**fragmentation s**
75:18 76:24
**FRANK**
5:16
**fraught**
267:11 278:5
**free**
56:2 256:22
272:2 370:1
**freebase**
181:12
**freely**
445:8
**friendly**
62:21

**FTE**
58:22
**FTES**
35:12,24
**fuel**
94:13
**full**
12:2 50:10
124:18 128:1
172:23 174:4
224:19,20
294:25
323:25
374:10 393:3
395:23
454:11
**full-time**
279:11
**fully**
187:9 388:10
408:6,9
434:21
463:23
**functional**
355:2 461:4
**fund**
40:10 63:7
**funded**
40:13,19
42:6,7 47:8
56:11 60:22
**funding**
41:15,16,19,
21 42:1,25
43:4 46:4,
13,14 47:14,
17 59:16
60:14 61:12,
19 62:18
63:1,18,23
64:1
**furo**
260:6
**furoic**
171:15
256:6,10,18
257:22

258:22
259:5,17
260:7 468:5

**G**

**gained**
204:9
**gallery**
8:24
**gaps**
201:24
**gas**
265:3,8,16
269:18
341:16
342:1,18
343:12
349:24
350:13
351:4,14
352:18
**gases**
196:16
**gastric**
86:21 193:18
223:15
232:10,24
233:5,15,21
234:6,11,19
235:10
237:8,20,24
238:1,2,3
239:20
245:23
251:16 263:4
264:12 266:2
267:10
274:23 290:3
377:16
384:15,23
385:5,6,15
386:15
387:5,11
388:4 461:25
462:4,15,23
472:12

**gastritis**
262:23
264:13
**gastro**
71:9
**gather**
276:7
**Gau**
377:16
**gauge**
371:2
**gave**
60:3 63:12
237:20 389:8
483:25
486:19
488:20
495:17
**GC**
193:12 248:8
265:5 266:1,
3,10,25
267:2,10
268:4,16,19
269:9 270:6
271:9 272:13
274:22
291:19
343:1,5,8,
14,21 344:1,
10 345:21
346:24
347:1,5,7,
10,23 351:8
353:2,8,12,
23 354:5
358:7 360:2
**GC-MS**
266:17
267:14
269:18
270:1,11
273:14 275:4
341:22
342:10
345:25
346:6,13,16
348:12 351:8
353:2
357:18,24
358:4
359:14,19
360:17
361:16
**GC/MS**
357:10
**GCS**
268:12
**GCTEA**
350:5
**geared**
344:22
**general**
115:15
118:14,20
181:10 205:5
308:22 358:2
398:20
400:19 406:6
444:4
**generalizatio ns**
226:3
**generally**
89:10 155:23
157:22 162:9
185:2 192:14
249:24 302:1
480:22
**generate**
85:4 141:13
167:7 170:18
184:21
221:16
245:21 248:2
365:8 369:19
378:21 380:5
381:3 470:22
**generated**
55:9 60:5,6
155:25
159:24
161:16 162:4
165:19
174:13
193:5,25
223:6,24
235:13
236:1,24
237:4,10,14
238:7 239:25
241:13 249:1
341:10
364:14
367:14
371:10
376:8,23
381:15
384:24 456:8
474:25
475:18
482:15,22
485:23,24
**generating**
471:1
**generic**
52:23 92:10
108:19
345:18
**genotoxic**
88:3 110:17
112:3,9,17
114:13,21
115:7,22
116:2,11
117:20
120:20,25
182:14
202:21
203:2,4
244:7 249:13
275:19
335:18
338:19
339:9,12
355:22
**genotoxicity**
111:2,5
211:13 283:8
**genotoxins**
202:19
**geographical**
475:17
**Georgia**
5:8
**get all**
379:23
**getting**
73:11 131:10
153:8 179:4
235:22
257:17,18
259:12
378:18
381:19 388:5
400:24 468:9
**GGR**
313:15
**ghost**
54:3,21
**GI**
258:6 462:14
**gigantic**
441:13
**give**
56:18 66:22
68:12 83:22
84:13 89:8,
23 114:9
145:7 147:16
149:7 156:18
160:12 167:5
191:8,25
194:17 198:3
209:8 213:2
252:13
255:9,24
260:1 267:20
295:22
297:15,18,21
298:6,17
309:10
324:13,17
329:20
349:18 379:7
381:25
395:19
413:14 418:6
420:9 428:4
432:5 434:15
436:11

439:19 453:14,22 454:1 456:7 495:6 499:21,23
**given**
60:19 61:1, 11,12 96:1 112:25 172:12 174:8 255:19 258:23 262:17 295:24 297:11 298:15 321:7 394:22 395:5 399:13 445:19 485:21 486:5,7 487:6,7 488:10,12,24 489:19 495:25 496:22
**giving**
49:1 93:25 94:5 478:16
**glass**
387:13 388:3
**GLC**
394:9
**glidants**
181:20
**global**
467:6
**glove**
366:2,14 372:25
**GLP**
77:17 82:17 392:11,22,25 393:1 395:6 403:10 406:25 407:15
**GM2**
285:24
**goal**
35:10 36:6 37:20,23 38:8 40:2 62:1,13,14 63:21 115:16 396:22
**goals**
45:1 201:13
**goes**
61:10 178:23 204:13 248:6 365:13 398:12 429:13 431:21 474:10 482:19
**going**
21:16 23:15 32:16 61:21 64:20 75:22 87:13 113:22 152:1 156:21,24 166:5 180:7 214:12 222:3 229:23 248:14 249:19 254:2 255:17 257:12 258:4,5 260:8 269:3 272:5 281:4 288:20 299:4,5 305:20 306:17 328:2 336:20 346:20 348:3 356:1 358:7 362:2 365:4 369:12 374:9 376:6 379:20,23
391:15,24 392:1 394:9 398:3,4 436:1 443:3 446:3 448:12 453:21 454:5 455:3 457:10,19,25 458:14 471:11 472:1 475:16 479:9 481:6 500:21
**gold**
271:16
**good**
11:22,25 24:16 44:10 77:15 79:15 214:10 276:22 299:2 350:24 391:22 434:8 471:13 476:10 480:23
**Google**
139:7
**GORDON**
5:14
**gotta**
70:1 239:3 294:11 498:20
**government**
46:23 47:4,8
**GPCR**
49:7
**GPCRS**
38:7 49:9
**Grade**
150:3 423:23 424:8,12,17, 18 425:9
**gradients**
80:4
**graduate**
351:8
**Grail**
370:15
**grain**
59:1 292:11
**gram**
153:8,15 154:4 158:23 161:9 162:10,19 163:11 164:9 165:4 166:20 167:20 429:17,22 431:14 432:2,13,16, 23 433:11 434:2 435:2, 11
**grams**
96:5 159:16 160:4 294:20 295:3,7
**grant**
5:15 42:16 63:5,15,17
**granting**
188:8
**grants**
40:10,12,20, 21,24 42:6, 16 46:16,22 47:3,21 63:18
**great**
22:18 39:25 108:10 362:21 377:2 390:19 430:18 498:18
**greater**
158:22 160:12 161:25 163:3,17 165:11 172:21 190:19

286:16 301:13 302:2 316:8 331:6 431:9 434:13 463:3

**green**
325:3

**GREENBERG**
5:2,7

**gross**
314:10

**ground**
12:22

**group**
34:21,22 35:8,21 87:10 231:21 256:21 260:6 262:2 475:1 485:21,24 486:7,24 487:5,7,24, 25 488:9,11, 24 489:18,21 493:21,22 494:17,18 496:25 497:1 498:4,5 499:5,7

**groups**
106:22 155:21 210:9 252:1,2 378:2 461:4 486:5,12 489:17 490:9,12,18 491:1 493:10,20 494:6 495:3 496:6,12,17 498:10,12,24

**grow**
374:19

**grown**
57:11

**GSK**
18:20,25 51:11 59:23, 24 60:4,10, 13 65:4,9 67:17 98:11, 13,21 99:11 105:19 106:7,13 107:20 108:13 109:13,21 112:6,8 116:19 136:13 140:16 142:1 143:21 144:10,15,21 147:1 149:22 151:18 152:24 157:24 158:9,16 161:5 163:8 166:13,18 209:16 211:19 212:13,18 216:6 220:6 232:9,23 233:11,17,24 234:23 236:3 238:18 240:15 241:11 244:22,25 246:24 247:6 248:25 250:24 260:17 261:2,7,18 266:16 267:5,13 268:7 269:16 270:13,21 275:2 283:25 293:2 304:4, 11 309:19,24 310:8 312:5 316:25 317:9,15 318:12 320:6 321:9 324:7 331:25 357:24 359:18 402:10 407:7,19 413:25 415:5 416:7 417:11,12, 17,19 418:8, 21 419:13 421:8 423:22 426:12 429:19 432:15 433:1,22 434:18 436:5 437:24 438:25 441:20 458:13 473:19,25 474:6,9 480:9,13 481:25 482:15

**GSK's**
18:23 114:11 117:16 140:3 145:3 157:8 169:12 269:25 299:14 325:19 354:20 402:5 420:14 480:15,20 481:16 482:6

**guarantee**
379:11

**guard**
146:1,3

**guess**
18:5 56:20 62:15 102:24,25 109:9 145:7 151:25 234:19 241:10 293:18 304:6 344:20 348:5 354:4 363:20 398:11 401:5,9 426:1 446:20,23 448:3

**guidance**
92:1 130:4, 11 132:10,16 133:13 134:14 135:20 187:8 273:14 298:4 339:3 354:7, 20 477:1,21

**guideline**
132:6

**guidelines**
92:24 133:8 400:7 401:11,14,18 408:25 409:22

**gum-like**
314:5

**gummy**
313:4

**gums**
313:2

**gun**
243:25 244:5

**gut**
257:15 258:2

**guys**
11:16

**H**

**H2ras**
53:18

**half**
34:14 40:17

56:10 57:9 64:1 295:6
**hallmark** 393:9
**handful** 275:17
**handle** 194:13
**handled** 193:8 213:18
**handling** 81:12 147:17 190:15 191:2,15,23 192:11,17 213:16 314:10
**handwritten** 24:3,9
**happen** 41:9 42:2 97:10 249:6
**happened** 293:7 313:8 324:11
**happy** 164:16 166:1 200:23 491:18
**harass** 499:13
**harassing** 499:10
**hard** 21:10,12 22:4,12 31:8 33:8 41:1 42:14 56:18 57:16 66:17, 22 122:7 126:7 200:23 313:8 324:1 325:3 326:1 350:23 365:6 375:10,13 414:4,15 445:5,16,18, 20,24 448:8 449:8,12,18 450:1,5,11, 23 451:23 452:3 472:15 475:13
**harm** 381:6
**harmonized** 373:14 382:12
**harsh** 327:4 345:17 461:6
**hate** 89:8
**Hayward** 312:1
**Haywood** 375:19 460:16 461:8 483:5,12,16, 21 484:1,4, 21
**hazard** 112:7 114:12 117:16 118:18 211:17
**HCI** 318:25 319:19
**HCL** 84:16 181:11 183:5 336:25 337:1 343:6 344:13 345:11 358:7
**head** 58:12,14 84:15 141:8 164:25 169:3 322:6 345:3 433:5
**HEAL** 42:16
**health** 92:14 200:13 202:13 211:17 239:14
**healthy** 39:2 255:1 377:21
**hear** 25:10,15 47:2 74:15 89:19
**heard** 16:14 197:21
**hearsay** 439:4
**heat** 140:14 180:24 183:8,13 184:20 192:25 193:12 195:3 210:4 212:24 300:1 302:25 303:9 305:24 315:24 316:19 317:10,23 337:19 338:2 342:18 364:15
**heating** 141:13 404:5
**heavily** 130:21
**heavy** 344:6
**heirs** 271:4
**held** 8:5,10 200:14 372:8 404:10 407:1
**helm** 59:12
**help** 18:6 62:21
**hemophoresis** 97:9
**hepatic** 257:19 462:25
**hepatocyte** 75:11 282:18
**hepatocytes** 77:1 172:25 284:8
**hepatologist** 71:13
**heterogeneous** 41:19 388:16
**hi-tech** 53:23
**hidden** 135:6
**high** 50:5 63:8 73:5 96:3, 12,17,22 97:11 113:1, 8,24 119:13, 15 160:6 162:7 171:2, 22 179:8,11 180:22,24 188:6 193:15 196:15 226:6 248:3 270:4, 5 272:12 284:10 285:15,20 290:3 291:6 294:14,23 297:15 305:18 312:6 314:7 320:1 325:25 341:9,10 349:7 356:3, 13 365:19 377:9 386:20 407:1 435:10 463:2 465:4

**higher**
79:19 92:2, 11 93:2,3,4 107:10,11 125:19 153:10,13 160:24 190:13 266:12 301:4,6 334:18 474:4,6,8 479:10,15
**highest**
159:20 160:10,23 162:15 167:9 430:10 432:12,21 434:10
**highlight**
134:2,3,5
**highlighted**
335:13
**highlighting**
336:21
**highly**
77:8 112:13 119:6 120:4 124:12 125:10 127:2 129:24 131:4 133:19 136:1 179:15,23 267:12 313:15 316:6 375:24 475:19 477:12
**hinder**
287:9,16 289:24 292:21
**hindsight**
210:9,19 247:25 248:14,17 376:20
441:25
**hint**
244:15
**hired**
50:25 52:15 65:1 72:19 371:19
**historically**
38:2 40:17 219:7 337:12
**history**
204:15,22 205:17 319:18 320:7
**hit**
62:16 393:11
**hits**
50:6
**hocs**
59:1,7
**hold**
89:21,22 95:6 99:8 176:14 178:11 253:8 261:22 270:14,24 274:1 321:16 333:16 397:10 401:6 430:2 432:5 435:15 442:15 489:23
**holes**
472:7
**Hollander**
5:22 9:9
**Holy**
370:15
**home**
57:10 378:9 479:7
**homegrown**
58:23
**homework**
411:21
**homogenous**
320:2
**Hone**
281:2
**honest**
15:25
**honestly**
15:21 16:13 108:7 131:7 217:23 296:20 297:23 302:5 467:4
**hoping**
39:20
**horse**
251:13
**hot**
191:7 192:6 315:13 366:2 372:25 374:7
**hour**
20:19 156:22 288:20
**hours**
16:22 17:1, 8,11 21:1 29:4 30:6 31:9,19 32:8,10,13, 16 33:14,21, 23 56:5 279:3,7 450:17 453:15 463:6
**HPC**
283:5
**HPLC**
72:23 73:4, 23 77:15 84:20 85:16 210:15 256:5 265:23 266:11 269:12 271:15 313:6 314:11 329:1 354:8
**HPLC/MS**
220:20 240:20 242:5 243:2 357:10
**HPLCS**
73:2,21 74:22 243:9
**huge**
62:7 470:15
**human**
35:1 39:9 77:4 95:16, 18 96:4,25 97:2,16 100:4,12,20, 24 101:1 113:7 117:12 119:14 125:15 132:15 172:13 173:2,8 189:16,24 221:13 233:20 234:10 284:20 286:7,14,15 291:12 292:6 294:19,22 295:19 296:11,15 297:11 298:1,6,17 356:12,24 357:6 366:3 373:1 384:17 463:4
**humans**
91:5,12 96:24 97:20 100:17 101:14 102:19 103:7,15 104:5,11,20 124:10,13 127:1,3,21,

23 147:24 239:11 283:8 290:18 296:22,23 297:7,11,16, 19,21 356:14,22 377:21

**humidity**
106:20,21 107:7,11,12, 19 140:15 142:19 143:3,7,13 145:25 146:1,3,4,9, 12 180:21,24 181:16 182:5,16 183:8,13 184:20 188:18 193:1 194:19 195:3 196:14 207:13 210:4 211:23 212:24 240:18 242:3,24 300:2,19 301:5,13,24 302:2,6,7, 14,18 303:1, 10 305:19,25 313:1,17,19 314:3,4 315:5,13,19, 24 316:7,20 317:11,23 327:5,7,9, 10,17 328:21 329:16,24 333:13 337:13 364:15 366:1 371:6 379:16

**hundred**
233:7 294:7 315:18 387:9 430:6 456:1 472:14

**hundreds**
26:19 66:25 164:14,21 165:22,24 229:13 272:22 278:3 369:23 412:2,8 450:15,16,18 453:2,6

**hydrochloride**
196:13 225:1 231:11,20 238:16 305:17 311:18 312:21 313:13 314:5 316:6 353:22

**hydrolysis**
171:21 179:18 196:18 331:2 460:5,11 461:14 462:11 463:6,10

**hydrolytic**
316:9,10 330:9 460:18,21 464:4 484:18

**hydrolyzed**
260:11

**hydroscopic**
305:5 330:6

**hydroxylated**
76:22

**hydroxylation**
125:1

**hygroscopic**
312:20

**hypothetical**
439:17

## I

**IA**
133:25

**IARC**
90:5 91:15 100:13 101:3,9 102:11 103:11,12 104:25 105:1,3 119:11 130:18 296:7 356:23 357:4

**ICH**
133:7 373:14 382:12,16 383:1,4,7,8, 21 384:5

**idea**
61:18 216:9 236:2 245:5, 6 298:3 420:9 425:12 453:14

**ideal**
481:1

**identical**
127:20 486:13 494:9

**identification**
22:20 23:5 25:20 101:22 117:3 121:9 132:2 157:12 189:7 195:9 200:9 203:15 231:4 254:13 262:10 282:3 288:18 299:21 304:18 311:12 318:21 322:18,20 326:14 332:10 335:16 336:4 348:19 352:5 354:18 359:6 372:4 402:16 409:3 421:3 430:20 439:25 451:17

**identified**
17:25 171:12 201:18,24 211:10,17 252:4 320:10 326:6 331:12,23 332:1 334:4, 12 335:1 356:5 376:2 446:11,17,19 447:16,17 466:2,6

**identify**
22:3 50:6 74:19 75:7, 10 77:11 227:22 244:21 317:18 325:22 332:20 333:14 356:23 357:14 419:14 483:20 484:19

**identifying**
335:5

**ii**
290:1

**iii**
290:6

**image**
318:14

**images**
26:18 27:4,

21 28:21
**imagine**
25:1 31:19 90:3
**imaging**
50:13
**impact**
195:11 214:23 215:9,24,25 245:14,17 278:17 308:7 438:11 439:13 440:21 471:23
**impacts**
302:8
**impart**
467:1
**implied**
292:7 325:16
**importance**
162:20 469:11
**important**
95:3,13,25 104:20 114:22 115:2 143:8 144:4 145:2 147:10 150:14 151:21 152:4 153:5,19 154:23 159:23 162:5 163:1,5,12 178:22 188:21 222:13 226:25 237:17 266:22 274:8 307:7 347:21 363:15 364:18,22 419:6 455:1 461:22
**imposed**
64:14
**impossible**
38:3 127:15 193:21 306:15 390:24 413:13
**improper**
120:15 269:19 344:1 346:1
**improved**
349:14
**impurities**
75:7 76:16, 19 77:10 78:24 82:11 85:24 115:16,17, 18,21 116:1 129:25 131:5 132:15 133:20 134:17 141:4,11,15 171:3,6 172:12,21 179:9 181:5 197:5 200:12 203:21 207:16 244:20 268:3 316:12 317:18 318:24 320:8 322:1 323:18 324:15 325:22 326:25 330:25 331:6,19,22 332:1,15,21 333:10,15,21 334:1,6,11 335:1,12 338:25 339:7,9,10, 12 340:9,19 355:1 375:25 376:24 437:15 440:11 441:4 442:6 477:13
**impurity**
75:6 88:14, 22 170:18 183:20 320:1,25 376:3 441:6, 9
**in-depth**
125:22
**inadvertently**
333:8
**inappropriate**
44:23 45:14 267:4 268:6 271:10 275:5 307:16 343:7 344:18 353:14
**inception**
96:8
**incidence**
91:17
**incipients**
306:14
**include**
27:9 28:9 107:5 120:3 271:18 272:18 273:4,16 277:11 283:9,21 290:11 293:11 352:17 433:22 434:20 443:20
**included**
67:4 111:3 203:3 395:14,15 397:6 401:23 417:3 424:4 427:20 432:15 433:1 434:23 436:8 437:18
**includes**
395:23
**including**
23:17 26:18 33:15 86:11 190:13 199:3 233:15,21 234:11 249:14 263:6 264:19 351:11 384:18,19 385:3,16 396:10 445:9
**inclusive**
249:10
**income**
55:9,17
**incomplete**
454:13,23 456:15,21
**inconsistencies**
390:14
**inconsistent**
274:25 456:3
**incorporate**
443:3
**incorporated**
427:14,25
**incorrect**
30:19 248:13 344:5 410:15
**incorrectly**
222:11
**increase**
120:12 188:11 190:10,12,24 191:12 264:11,18

271:20 300:16 301:23 329:15,23 330:5,11 331:19 416:10 479:12 487:4
**increased** 330:18,20 437:14 440:10
**incredible** 96:21
**incredibly** 63:19 113:1 248:18 285:20 291:5 292:8 294:14,23 297:15 461:11,13
**incubated** 235:12 236:21
**IND** 73:12 77:13 82:14,20 105:25 174:24 176:5 177:7,11
**IND-ENABLING** 38:17 50:18, 22 77:5 96:11 173:20
**independent** 41:25 67:12 396:1 472:19 480:1
**independently** 38:18 82:19
**index** 123:14
**India** 87:12
**indicate** 182:18 188:10,18 391:17 426:21 446:12 468:1
**indicated** 358:14
**indicates** 87:23 283:6
**indicating** 301:15
**indication** 184:22 198:3,6,7 210:21,22 252:14 258:24 259:4,18 306:8 307:19,25 467:19,20
**indications** 36:11 37:2, 4,16
**indicative** 197:23
**individual** 53:1,2 166:3 321:3 365:4 396:21 403:3 416:6 479:21 490:6 494:8, 11 497:5 498:11
**individuals** 292:24
**INDS** 38:17
**induce** 118:16
**induced** 121:24
**industrial** 40:25 41:22 46:17 47:14 58:24
**industries** 45:3
**industry** 37:21 41:2 49:25 57:2, 8,25 58:24 59:5,13 73:3 75:2 77:21 130:4,11 132:10,16 152:9,13 185:9,10 277:7 348:11 392:21 397:17 399:18 400:19 443:11 477:2,21
**inflating** 353:25
**influence** 182:3 384:16
**inform** 69:15 195:1 368:24 379:8 380:13
**information** 27:25 38:10 56:16 64:12 105:24 107:25 108:8 155:15 161:14 186:10 188:5,21 190:8 237:14 279:25 293:21 309:13 323:10 340:6 342:6 376:23 399:21 413:11 439:11 446:23 452:9 466:8 467:12
**infrastructure** 36:8 38:12
**infringement** 12:16 53:13
**Ingelheim** 195:13
**ingest** 246:9 290:7 462:8
**ingested** 246:23 468:17
**ingesting** 468:20
**ingestion** 295:21 461:25 462:23
**ingests** 479:2
**ingredients** 181:22 306:18
**inherent** 309:5
**inherently** 170:11 171:1 197:25 464:10 465:8
**inhibit** 38:1 288:1
**inhibitor** 290:8
**initial** 11:10 26:15 29:18 111:3 176:23,24 229:23 320:20 330:22 403:11 414:9 437:9,11 438:18 440:7
**Initialed** 403:17
**initially** 37:23 143:23 144:5 234:25

**initiate** 95:22
**inject** 268:23
**injected** 353:13
**injecting** 266:2 267:9 274:23 343:10 358:6
**injection** 193:14 287:8 318:25
**injector** 268:23 343:10 358:6
**inorganic** 267:3
**inquiring** 341:22
**instability** 184:23 188:6
**instance** 140:7 403:7 463:20
**instances** 170:24 185:13 392:22
**institution** 43:9,19 44:16
**instructed** 437:25 438:25
**instruction** 196:17 440:16
**instructions** 81:11,16 292:25
**instrument** 167:1,2,10 434:14
**instruments** 72:25 434:6
**insufficiency** 290:25
**insufficiently** 454:17
**intake** 91:18,19 92:24 93:5, 21 95:19 113:4,21 114:2 129:25 154:17 155:5 190:21 295:7 296:9 335:23 477:13
**intakes** 133:9
**integrate** 253:24 470:4 471:9
**integrated** 389:15 474:13
**integrating** 471:17 474:11
**integration** 455:19 470:1 472:5 473:13 490:7
**intellectual** 41:14 444:22 478:19
**intend** 64:5,22 224:3
**intended** 224:4,8
**intensity** 236:24 237:4
**intentionally** 373:14
**inter** 62:23 494:7
**interact** 45:15
**interactions** 8:9
**interest** 39:4 51:14 324:22
**interested** 9:13
**interesting** 338:12
**interface** 8:11,25
**interference** 335:14
**interferences** 314:11
**interfering** 348:7
**intermediates** 221:16
**internal** 67:16,17,21 82:9 220:12, 15 275:8 389:12 399:6 465:19
**internally** 82:1 399:6
**international** 121:12 123:2 126:23 201:15
**internationally** 382:12
**internet** 15:1
**interpreting** 499:24
**Intertek** 417:17
**interval** 494:5
**intervals** 24:21 493:15
**intestine** 461:23 462:24
**Intramural** 401:12
**introduction** 349:5
**invading** 68:20
**investigate** 89:1 209:1, 20 210:2 211:16 212:22 254:17 307:7 317:16 366:4 483:15
**investigated** 97:18 212:4 214:25 284:1 309:2 321:9 468:17
**investigating** 212:5
**investigation** 248:14 311:16 318:24 323:19 324:16 325:6
**investigator** 396:1
**investigators** 107:10 183:10
**invited** 201:3,14
**invoice** 24:23 25:23 26:7 28:9 29:1,3 30:2, 4,13,17 32:19,24
**invoices** 24:2,13,14 25:4,12 26:3,4 31:7 136:5
**involved** 49:8 52:5

91:2 301:4 436:4 443:8
**involves** 403:23
**involving** 53:17 90:9, 14
**ion** 38:7 90:22
**ionization** 80:17 83:15, 17 85:19
**ionize** 461:3
**ionized** 83:13,19 84:9
**ions** 85:14
**IP** 444:8
**IR** 90:19
**IRB** 90:17,20,21 91:1,4 94:4
**IRBS** 94:8
**isolate** 240:19 243:1
**isolated** 220:18 242:4 284:8
**isolates** 285:19
**isolation** 321:3 423:8
**isotopes** 251:19
**isotypical** 251:7
**issue** 85:5 122:22 142:6 148:10 169:24 202:1 248:4 306:5 317:17 472:9
**issued** 37:14 341:6
**issues** 41:6 52:3 79:12 191:10 197:16 199:3,25 240:8 267:11 278:6 285:25 378:19 387:6
**item** 401:23
**items** 400:11 401:18,21 446:16 451:20
**IV** 255:19 257:16

**J**

**Jackson** 243:10
**JAMES** 5:9
**Jamrogiewicz** 199:10 207:21 211:3
**Janet** 149:18
**January** 157:10 213:15 262:17 263:3 266:14,16
**Jeff** 38:3 58:10
**JESSICA** 5:21
**JM** 126:1
**job** 57:14 362:21
**jobs** 279:10
**John** 5:23 215:2 319:11 422:14
**joined** 35:25 48:20, 25 272:7 399:12
**Jones** 370:16
**journal** 199:19 203:18,25 205:8 206:3 208:14 213:24 214:3 419:1
**journals** 44:13 278:16 425:15
**judge** 54:7,12 55:4 70:2
**juice** 233:5 234:6, 19 237:8,20, 24 238:1,2,3 239:20 251:16 264:12 274:24
**juices** 245:24
**jump** 227:17 402:2
**June** 30:2,3,4,7, 18,23 299:14 304:5 427:4
**Jurong** 150:4 423:22
**jury** 118:4 287:3

**K**

**Kahn** 38:3 58:10
**keep** 23:15 41:18 149:9 164:25 178:22 228:13 251:12 255:17 271:3 282:10 305:19 344:3 346:20 356:1,6 393:1 399:8, 11,21
**keeping** 398:25 400:8 481:13
**Keire** 372:16,21,22 381:11
**kept** 243:8 387:7
**key** 18:16,18 141:3 272:25
**kids** 264:20
**kilogram** 170:14,16 179:7 294:15,17 350:10
**Kim** 126:1 278:18
**Kimberly** 16:4 17:13 65:3
**kind** 34:25 41:19 42:1 43:4 51:14 62:15 73:18,22 75:3 105:24

115:17 125:22 154:1 167:12 180:22 181:23 226:1 232:16 257:6 284:13 285:10,24 286:1 306:12 318:14 322:25 347:4 350:23 362:24 366:5 373:13 388:22 389:15 448:17 470:15,24 480:5

**kinds**
73:24 74:12 75:5 76:10 96:23 97:8,9 267:11 269:4 271:12,14 285:23 345:4 379:23

**King**
5:20 18:24 19:2 140:19 142:2,4,8 151:14 418:15,21 421:5,12,20 422:24 423:5 424:4,8,19 425:1 426:5, 11 427:5,15, 21,25 434:3, 22 436:22 437:23 438:23 439:15 440:2,23 447:3,9 482:13

**kits**
251:22

**knew**
236:3 253:13 267:13 268:7,9 272:9 317:9, 22 337:18,25 341:24 346:11 442:10

**know**
12:24 22:15 31:8 33:5 40:16 41:23 42:2,14 43:16 47:6 49:7 60:7,19 61:8 63:3 66:5 69:5, 11,12 78:16 81:6 83:6 94:21 96:6 98:6,17 100:10 101:2 106:15 107:5 108:17,20 109:25 110:8 113:5 119:1, 5,17,18 122:21 123:17,21 124:6,7,19 125:13,17,20 126:9,13 127:18,24 128:4,18 143:22 144:16 145:9 147:6 149:22 150:10,13 151:1,5,11 152:12 153:25 154:19,25 156:20 159:1,14 160:6,18 161:23 162:7 163:16 164:7 165:2,10,11, 14 168:25 170:10,11 171:5,25 172:9,14,16, 18 173:15 174:12,22 176:4,17,21 177:4,9 180:3,17 181:18 182:11 184:15 193:21 197:18,21 198:2,22,23 202:20 205:13,15 210:12,16, 18,19,23,24 211:2,25 212:3 213:1 219:16 220:17 221:3,8,19 222:19,24 224:19 225:23 226:8 227:13,14 228:6,12 232:2 234:24 235:17,24 237:9,25 238:4,5 240:3,7,12 241:13 243:9 244:12,18,19 245:9 246:2, 7,15,18,20 248:8,17,19 251:3,10,18, 25 252:7 253:20 257:17,25 260:23 265:1,4,16 266:16 267:5 268:9 269:6, 11 270:7 271:25 272:3 273:25 274:6 275:22 276:10,11 278:1 280:5, 15 281:18 283:25 284:4,15 286:18 288:6,9,11 291:15,21 292:5 293:2 296:3,15 297:1 300:6 303:11,20 306:12,16 307:11 309:3 313:8 314:12,14,16 315:4,10,21, 22,23 317:19 318:5 320:12 321:8,14,20 322:3 324:11 325:1,21 326:1 331:25 332:5 334:6 335:4 338:7, 22 339:2,11 340:8 341:19 342:5,7 345:16 346:9,10 347:15,16, 20,24 348:12 351:21 359:24 360:6,7,8,11 363:24 364:5 365:12,17 366:9 367:7, 25 369:12, 21,24 370:16 371:14 372:24,25 373:1,2,3,6, 8,10,12,13, 15 374:9,14 375:18 376:5,17,19

377:1,11,13, 21 378:5,21 380:10 381:21,22 386:25 387:4,7,8, 15,18,23 388:8,15 390:4,7 393:9,10 397:13,23 398:17 400:20 404:19 405:1,5,7,13 406:6 415:25 416:17 417:5 418:7,21 419:1,5 420:5,17 426:17,20 427:2,16 429:23 431:1,24 434:4 438:3, 5 439:3,5,11 441:25 442:2,7 443:7,22 444:18,20,23 447:23 449:25 450:13 453:22 456:5 462:9 464:17 471:18 472:2 475:3,13 476:9,15 478:13 479:9,18 485:4 491:12,17 496:2

**knowing**
136:9 419:15

**knowledge**
61:17 70:6 137:12

151:12 195:18 201:24 248:17 270:1,22 276:12 304:12 317:15 323:19 324:16 325:19 341:15,23,25 354:2 358:15 485:1

**known**
36:18 90:6 129:25 219:25 230:6,7,20 248:25 257:8 258:11 259:14 275:4 308:13 320:24 327:15 330:8 331:1 342:15 343:16,25 345:24 346:4,17 347:4 355:1 357:15 366:11 377:10 466:16 468:10 477:14

**Krawczynski**
221:6 262:13 273:1

**L**

**lab**
26:19 36:17, 18,21 45:6 46:7,8,14 59:12 81:3, 12,17 151:1, 17 152:2,19 188:9 241:20,21 247:13,18 301:6 341:7 363:4 369:1, 2,22 370:4, 13 371:15,18 383:19 384:4 392:14,19,20 393:16 394:8,17 395:2,15 396:12,13,25 397:1,6 399:8 400:12,13 401:3,24 402:10,22 405:22 406:1,6 407:7,18,19 408:16,18 410:3,11,14, 22,24 411:3, 19,24 412:5, 21 413:3 420:15 480:9,18

**label**
145:15,17, 21,22 146:8, 15 192:15 194:7,8,24, 25 195:1,4 251:2 293:4 314:17,22 315:2 338:16 387:12

**labeled**
68:4 158:10 174:3 186:14 326:15 338:17 447:5

**labeling**
252:1,2,6

**laboratories**
190:9

**laboratory**
60:16 61:14 72:25 121:23 367:7 393:2, 23 396:19 397:15 398:25 399:1,22 480:14 481:12

**labs**
249:24 342:10 346:13

**lack**
102:14 329:1 413:6

**laden**
128:17

**lags**
24:19

**laid**
138:3 139:10

**landed**
227:14

**lands**
227:4

**language**
133:14 134:20 229:9

**lapse**
42:25

**laptop**
14:8,18

**large**
8:22 42:15, 16 63:5,15, 19 74:5 166:6 194:4 250:5 297:12 298:6 330:25 470:2 472:18 473:12 490:4

**larger**
40:21 44:5 47:7 155:12, 14 321:23

471:1
**late**
11:11 230:22 251:18 441:1 442:8 454:12
**lateness**
11:15
**launched**
278:17
**Lauren**
17:15
**law**
17:15 449:12
**lawyers**
437:24 438:25 440:17 442:14 443:2 478:6,10
**lay**
362:14
**laying**
157:23 363:9
**lays**
136:15
**LC-MRM**
78:18 81:23 82:6
**LC-MS**
32:4 167:2 360:18 408:2,3 445:9 446:3 448:14 469:19 481:7
**LC-MS/MS**
359:14 396:11
**LCUV**
323:20
**lead**
17:14 188:19 323:3 325:9 421:25 466:9
**leader**
34:21
**leadership**
41:7,11 57:5 58:10,15 59:11
**leading**
50:14 99:25 193:14 206:20
**learn**
46:22 86:24 87:3,7 88:12,21 315:17 341:16 342:1
**learned**
87:19 126:17
**learning**
277:16,24
**leave**
59:9 339:4, 13,15
**led**
248:11,13 358:21 376:19
**left**
14:9 76:9 133:12,21 150:1 190:19 191:6 192:6 205:25 289:15 352:12 378:16 404:16,22 478:22
**legal**
9:11,16 443:15 444:6,8 445:13
**legitimate**
366:22
**length**
190:18
**lesioning**
97:9
**letter**
101:24,25 106:2 109:10,22
**letting**
59:8 389:19
**level**
77:9 93:5 126:9 127:23 150:22 154:18 155:5 160:23 161:21 164:9,16,23 165:5,13 171:14 179:8,15 190:20 223:13 239:12,14 246:19 289:22 307:12 325:25 333:22 334:2,17 337:11 343:15 353:18 356:8 387:8 388:25 432:10 434:10 436:19 437:15 440:11 490:7
**levels**
33:10 79:17, 21 92:2 95:19 96:17, 25 106:8 107:22 109:6 110:2,9 122:24 124:13 125:19 126:12 127:4 140:8 142:16 149:9 155:18 159:11,24 161:8 162:3 164:19 165:2 168:2 169:12 171:7,15 184:7 187:13 188:11 190:9,25 191:13 193:5,15 202:16,18 203:6 212:10,12, 14,18 221:20 227:25 233:23 239:19 244:7 245:19 248:3,12,23 250:17 253:6 265:10,19 266:4,12 269:17,20 270:12 272:11 273:10 274:25 275:5 276:1 284:13 291:6 300:16 301:6 302:14,18 303:3,4,5 315:12 321:2 335:14 341:11 344:2 346:1,18 348:7,13 353:8 358:8 359:18 361:17 362:18 363:1,11,16 364:19,22 365:17 367:11 369:6 377:6,7,23 378:1 380:19 381:14 382:16,25

383:11,22 384:8,18,19 385:17 386:6,20 387:2 389:7 390:6 413:14 420:4 434:1 441:3,20,21, 23 455:5 456:3 466:23 469:3,13 473:6,18,19, 24,25 474:16 476:3 485:22,23 486:6,9,11, 12,20,22,23 487:1,5,23 488:9,11,23, 25 489:9,16 490:3,16 491:1,15 493:20,25 494:13,14, 16,24 495:2 496:6,15,24 497:8,22,24 498:4,14 499:4

**levy**
307:16

**LGC**
417:17

**liability**
9:7 113:4 225:25

**liberate**
275:24

**liberated**
257:7 259:16 461:21 463:20 467:19,21 468:8

**liberates**
257:11 258:16 259:13

**lied**
124:25

**lieu**
10:1

**life**
182:7,17 199:2 253:16

**lifecycle**
437:17 440:13

**lifetime**
47:15 91:16, 18

**lifts**
328:20

**light**
64:12 74:20 182:5 196:15 207:13 313:20 342:17 452:22 476:10

**light-scattering**
74:3

**likelihood**
286:9,16

**likes**
326:5

**Lilly**
34:10,13 58:13 399:11

**limit**
93:6 120:10 129:5,8 130:10 160:9 165:12 190:22 434:5,23 436:18

**limitation**
243:13

**limitations**
163:14

**limited**
133:23
184:12

**limits**
73:9 167:15 290:22 435:20,22

**Lindsay**
241:20

**Lindsley**
6:3 9:2 11:6,22 12:3 25:2 26:9 27:13 36:17, 21 267:20 271:2 289:2 300:14 362:12 369:1 383:19 392:14,19 394:8,17 457:18 458:9 464:7 465:10 467:8 469:4 476:21 478:5,24 480:8 500:12

**Lindsley's**
10:20

**line**
169:7 202:24 286:19 297:6 380:15 440:5 476:15 477:5 487:21 490:12

**linear**
129:8,11,15, 19,22 131:2 133:17 134:7,15 477:6,10 478:2

**lines**
49:24 50:7,8 229:14 480:1 489:13

**link**
292:6 383:4

**linked**
330:4

**links**
398:7

**liquid**
312:19 352:19 466:13 467:5

**list**
65:15 67:5 69:9 76:12 218:5 272:24 395:13,19 398:16,19, 21,23 399:13 400:2 401:1 417:25 420:22

**listed**
69:8 159:16 198:17 401:10 407:21 408:8

**listing**
226:22

**litany**
396:24 398:16

**literally**
112:17 238:13

**literature**
17:1 18:16, 18 31:10 51:1 66:20 67:13,20 68:2 69:13 86:11 87:21 88:1,6 95:10,12 97:19 106:23 137:25 140:2 143:19 170:11 216:21 220:11 272:5 276:15 278:5 280:17 375:3

464:22
**litigation**
9:8 33:18 51:19,22,25 52:15 53:13 55:10,23 59:17 60:15 61:13 86:19 277:20 391:14,17 412:25 436:22 443:25 444:11,16,21 458:14,23 459:15 469:8 485:8,12,13,16
**litigations**
391:10
**little**
46:3 68:18 121:15 134:8 143:1 153:12 157:17 178:23 213:10,11 283:15,16,17 288:20 388:23,24 389:14 414:13 455:12,21 458:10,11,20 476:20 479:19
**lived**
51:25
**liver**
86:21 124:25 257:15,20,22 258:3 461:24 462:25
**lives**
377:7
**living**
285:14 371:17
**LLP**
5:2,7,14,20
**LLQ**
435:23
**locate**
433:18
**located**
15:6
**location**
475:17
**locked**
8:14 378:15
**lodged**
452:6
**lodging**
448:6
**logic**
85:22 148:3
**lone**
99:11
**long**
17:9 31:24 48:10 51:11 62:12 77:18 130:22 149:9 178:23 204:15,22 205:17 268:8 294:12 314:14 319:18 320:7 343:17 358:11 378:6 391:23 396:18 404:20 411:21 412:9 432:19
**long-term**
416:13
**longer**
100:24 109:14 148:12 186:11,16,25 190:17 314:24
**look**
14:9 25:4 29:1,8 30:1,9 37:25 47:11,16 53:6 55:15,16 61:4 75:12 76:21 79:3 83:7 84:13 91:25 94:8 98:2,5 104:16,17 105:8 109:9 111:12,13 113:20 122:11 125:21 132:25 137:23 140:4 143:5,16 144:13,19 148:19 159:22 161:12 164:17 166:1,3 167:14,18 181:9,12,13,15,23 182:12 187:18 188:2 193:7 195:15 199:9 200:23 208:1 209:11 210:10,12,16,23 213:2 215:21 219:25 222:10 224:22 226:3,8 227:11 228:1,3,5 229:7,18 230:25 237:19 239:3 242:20 244:12 245:18 251:11,17 254:25 255:4,25 262:22 263:19 264:2,25 275:14 284:15 286:24 290:13 291:24 295:15 296:20 300:12 304:10 307:14 309:14,17 313:11 314:22 317:18 321:22 322:1 324:18 329:11 330:2 332:22 333:11 334:7 338:8,13,14 344:22 345:8,15 347:17,23 348:10 349:3,16 350:3,16 352:2 354:24 359:25 365:20 376:13,20 378:8 379:15 386:18 387:1,24 389:3,20 394:1 403:18 408:1,3 409:18 410:20 415:15 416:5 422:12,16,17 423:15 425:6,8 428:15 431:11,22

437:3,4
442:10,12
449:15,23
450:25
455:2,24,25
459:4,6
460:23
471:20 474:2
479:17,20
483:11,15,
20,23 484:10
486:16 488:4
490:5,6,9,13
494:7,21
496:10

**looked**
24:4 33:8,9
66:9,24
68:5,10 75:6
84:5 100:8
108:7 117:5
130:17 131:9
137:25
140:2,16,19,
22 141:17
143:18 156:9
164:12 191:4
192:15
198:22,24
199:19 212:4
218:18,25
227:7 229:10
234:18 242:6
254:24
259:24 260:3
264:24
308:12
315:11
316:23
321:10,21
332:2 338:23
354:7 363:6
366:10,11
375:21
376:11
379:14 383:4
410:13 415:6
416:4 419:20
420:19
422:25
426:13
428:12
441:22
443:15
447:2,3
450:7,10
453:9 463:2
464:24 472:3
476:13
479:15
484:3,21,24
485:2,22

**looking**
32:1,2,5,11,
12 39:2
47:19,20,22
52:2 53:24
75:17 83:1
84:6 98:1
115:9 140:6,
10 141:14
153:14
167:4,24
171:5 181:19
193:11 194:1
209:6 210:25
216:21 221:1
232:6,16
233:5 244:3,
11 264:1
265:2 268:4
272:8 275:22
281:14
344:18,20
345:1,5,13
347:19,20
353:3 370:15
375:3 389:6
400:21 403:2
442:1,2,4
448:21
450:17 454:6
460:16,18
484:14,17
491:11 499:1

**looks**
133:1 172:5
254:23
326:5,6
435:5

**loosely**
90:3

**lose**
253:22

**loss**
462:19

**losses**
324:24
470:15

**lost**
319:14 376:4

**lot**
33:11 36:10
37:1 40:20,
22 41:5,6
42:15 46:15
47:21 62:22
66:7,18,19,
20 67:12
77:17 84:3
119:24
131:9,10
141:1 143:18
148:5 153:7
170:10
172:15,17
184:3 191:10
217:22
218:18,19
241:9
243:14,19,21
246:7 248:13
260:3,7
265:1 274:8
276:19
277:25
278:24 285:9
294:21 312:1
339:14 340:6
363:25
366:17
367:19
368:21
369:18
370:2,24
375:17 377:5
387:19,20
389:13,25
390:13,21
401:14
414:17,18
416:5 420:19
443:13
450:10 453:9
472:1 474:9

**lots**
27:21 75:8
150:4 153:1,
7,10 228:2
276:20,21
362:22
379:12
419:24
467:11

**loud**
118:3,7
129:18
185:8,25
190:5 196:6
207:8 282:25
283:22
309:18
320:17
323:13
336:18 349:6
352:16
372:15,20,22
437:10

**love**
40:7

**low**
41:4 77:8
78:8,19,23
79:1 82:10
112:5,20
113:3,9
114:1,10
117:25
119:17
121:25
122:9,12,13,
20,25 123:4,
20 124:6,13

126:12 127:4,23 153:8,16,20, 22 154:3,14, 24 155:6 168:2 171:2, 14,15,20 180:20 211:9 212:11,14,18 221:20 223:14 226:6 236:24 237:4 246:18 250:17 268:17 321:2 335:14 337:11 365:18 377:5,7 386:22 387:3,8 441:20,23 462:9

**lower**
107:12 206:9 284:21 294:8 322:8

**lowest**
115:18 118:15,20 119:2,3,16 169:9

**lubricants**
94:14 181:21

**Luhana**
5:21 6:5,7 10:17,18 11:19,23 21:24 22:21 23:1,6 25:6, 17,21 30:1 31:1 69:2,10 70:3,4 76:5 90:20 101:19,23 110:14 111:16,20 116:24 117:4,9 121:2,6,10 128:20 131:16,23 132:3,20,24 134:1,10 137:10 156:23 157:7,13,19 158:5 169:20 185:4,6,17 188:14 189:4,8 195:5,10 200:4,10 203:10,16 204:3 205:23 207:3,24 213:5 214:6, 10,19 216:3 224:16 225:9 230:25 231:5,15 235:4 236:16 241:2 254:9, 14 255:13,22 256:2 262:5, 11 263:7,13, 17 264:5 280:19,23 281:1,14,18, 23 282:4,9, 22 287:5 288:13,22 289:2,5,11 298:24 299:2,13,18, 22 300:10,23 301:20 304:14,19,25 305:10 306:3 311:13 312:9,13,15, 23 318:22 319:6,15 322:13,21 326:10 327:22 329:11 332:7,11 334:23 336:1,5 341:3 348:16,20 351:3,18 352:6 354:14,19 358:24 361:7,21 372:1,5 380:14 386:9 391:21 392:8 402:11 408:19,23 409:4 410:9 411:23 412:8,13 420:25 421:4 422:12 428:15 430:13,21 437:1,7 439:21 442:17 444:24 451:3,8,13, 18 457:7,18 458:25 459:25 464:11 465:23 466:4,11 467:3,14 468:3,18,25 469:16 472:13 473:3,8 474:1,17 476:5 477:23 479:4 480:17,21 481:19 482:2,8,17 483:1,3 491:7,20,25 492:3,11,17 493:1,4,12, 18 495:8,13, 20 496:3 499:12 500:4,10,15, 19

**lunch**
214:9,14,20

**M**

**M7**
129:25 131:4 133:7,19,25 134:17 477:13

**machine**
455:20

**machines**
125:18

**mad**
39:1

**made**
21:6 53:25 54:6 80:17 86:23 108:25 170:13 374:12 393:25 397:21 403:12 407:11 411:2,7,23 472:5

**magnitude**
473:23

**mail**
366:2

**mailbox**
372:25 374:8,10,11, 12

**main**
305:6 330:11

**maintain**
390:12

**maintained**
143:23 144:17

145:17,20,23 168:11,13 187:13 194:20 303:12 364:21 415:23 419:6 480:19
**maintenance** 290:3
**major** 173:5,9 252:4 253:22 464:25 467:18
**majority** 38:22 58:22 62:25 63:22 153:15 268:19 427:23
**make** 13:6 56:20 62:23 80:6 98:20 102:3 124:21 126:6 169:16 173:7 174:3 198:24 226:2 260:6 272:24 276:23 294:12 323:25 325:1 339:16 382:2 387:21 390:25 399:16 414:1 449:23 455:15
**makes** 58:16 59:11 293:20
**making** 251:19 260:9 268:13 270:20 338:21
**male** 255:1
**man** 45:4 254:18
**mandate** 119:24 397:14
**mandatory** 395:14 397:1,6 400:12 401:3,24 407:18
**manifest** 330:18,21
**manifests** 331:16
**manipulated** 455:23
**manner** 10:7
**manual** 76:18 455:19
**manually** 453:13 455:22 470:3,9,19 471:15
**manufacture** 106:5
**manufactured** 179:7 190:18
**manufacturer** 109:11 168:17 178:1 180:13 192:17 210:1,2 240:3 244:6
**manufacturers** 105:15 107:15 108:20 146:5,18 168:22,24 170:14 181:25 187:12 208:24 217:9,16,17 218:24 229:2 317:21 340:16 464:15
**manufacturers'** 168:6
**manufactures** 92:5 149:8
**manufacturing** 71:21 87:11 108:18 150:2 249:11 305:14,15 475:5
**manuscript** 128:16 144:2 151:7 394:24
**manuscripts** 228:14
**March** 22:6,15,16 28:25 29:5, 9,14,18,22 30:7,11,18, 22 31:13 48:23 200:16 201:1 372:9, 10 381:17 460:2
**margins** 123:13,14 126:9
**mark** 237:15
**marked** 6:13,15,18, 19,20,21 7:3,4,7,10, 11 22:19,23 23:4 25:19 101:20,21 111:13,22 117:2 121:8 132:1 157:11 189:6,9 195:8 200:8 203:14,17 224:17 231:3,6 254:11,13 262:8,10 280:22 282:3 288:16,17 299:19,21 304:15,18 311:12,15 318:18,21 322:18,20 326:11,14 332:10 336:4 348:17,19 352:3,5 354:16,18 359:6 372:4 402:12,16 408:24 409:3 421:1,3 430:20 439:25 451:4,17 481:10 492:13
**market** 45:4 92:4,18 93:1 96:20 105:14 108:22 109:12,18 148:13,16 149:2,11,14 176:25 177:16 186:25 187:3,6,12, 20,24 212:2 219:23 225:24 314:14 380:21
**marketed** 49:19 109:13,14

**marketing**
437:9,11 438:18 440:7
**markings**
21:7
**Marletta**
19:7 120:2 169:25 183:1 257:4
**Marletta's**
112:1,18 197:22 306:5
**Martelli**
281:25 284:2 286:25 288:7
**mass**
73:5,7,25 74:20,25 75:3,11,14, 17 76:11,20, 23 77:15,18 78:13 79:3 80:16,23 82:22,25 83:13,19 84:5 85:6 167:3,4 174:4 211:9 243:8,10 252:23 312:19 314:5 334:19 344:22 345:7 389:19 437:13 440:9 446:4 448:14 470:1,8
**mass-to-charge**
84:7,9
**masses**
76:18 321:22
**master**
147:13,21 152:25 153:14 159:18 160:14 161:5,6 163:9 164:13 166:17 427:9,14,18 428:5,9 429:14 430:14,22 447:10
**mastic**
32:4
**mat-**
65:14
**match**
390:17 398:9
**material**
68:5 151:7,9 314:8 404:10,16,22 405:6,11 481:11
**materially**
477:20,24
**materials**
11:7,11 26:17 52:14 65:15 67:4 68:15,16 69:9,18 76:20 142:11 201:9 218:4 309:7 417:25 419:2 420:22 445:4,24 460:12 481:15,24 482:4
**math**
159:9,10 163:23
**matrix**
353:13
**Matt**
323:6
**matter**
9:6 10:4 12:16 24:2 64:6,22 115:19 161:13 162:13 245:10 287:23 344:14 398:3 434:8 492:8
**meal**
462:15
**meals**
290:7
**mean**
18:4 32:21 50:2 67:17 85:3 89:4,11 92:22,23 104:8 106:3 123:17,20 124:4 138:18 147:13 153:25 155:22 166:16 168:19 169:1 172:11 176:4,25 178:25 181:8 186:23 187:7 192:23 200:22 205:1 206:10 208:21 217:11 220:24 225:21 229:25 230:8,18 234:18 243:18 244:11,14 251:12 255:22 256:21 258:12 268:12 274:4 280:3,13 281:12 285:13,25 295:8,9 317:3 324:11 325:12 326:4 330:16 334:4 356:18 368:17 369:8 370:10 372:23 373:2,8 378:20 386:19 402:25 409:10 410:1 417:10 427:1 428:11 430:6 433:8,15 443:6 444:20 450:4 462:12 471:7 484:9 486:11 489:15 490:3,15,25 494:12,14, 16,24 495:2, 7 496:6,15, 24 497:8,21, 23 498:14
**meaning**
104:10 138:24 177:22 363:17 414:23
**meanings**
182:23
**means**
103:2 122:22 124:6 126:14 128:19 152:3 156:4 201:3 203:7 218:6 225:25 230:13,14 285:2 417:25 420:22
**meant**
321:3
**Meanwell**
213:19

**measure**
78:14 80:23 250:16 270:12 389:4
**measured**
168:20 255:4 301:7 383:11 419:22 441:8 479:13
**measurements**
154:18
**measures**
289:24 292:21
**measuring**
81:4 180:20
**meat**
377:24,25 388:11 479:10,11 480:2,3 485:21,25 486:4,5,8,24 487:6,24 488:10
**meats**
487:8,25 488:13,25 489:19 493:22 499:5,7
**mechanism**
130:2 131:6 134:5,19,22 135:14,15 136:25 137:3 206:19 228:22 478:4
**mechanisms**
477:16
**med**
34:23 35:10, 17 278:18
**med-chem**
77:7
**media**
409:15
**medical**
45:13 71:23
**medication**
194:10
**medicinal**
35:17 36:22 49:2 50:11 57:15 70:7 72:20 73:20 203:18
**medicine**
56:1
**meet**
17:12,20
**meeting**
18:3 88:25 200:15
**meetings**
17:22,24
**Melnick**
19:7
**Melnick's**
198:12
**melt**
344:17
**melting**
270:5
**melts**
347:3
**member**
49:5
**members**
287:3
**memo**
200:15
**memorize**
229:20
**memory**
491:12
**men**
258:23
**mention**
37:1 99:19 180:11 466:20 483:18,19
**mentioned**
54:2 198:11 222:5 253:19 274:6 413:21 416:2 423:12 464:12 467:8 469:24 475:13 479:8
**mentioning**
499:15
**MEOM**
403:19
**Merck**
34:17,20 35:13,16 36:1 38:4 58:12 87:2, 4,8 88:12 146:21 147:2 399:6 443:12,25 444:1 478:6, 7
**merit**
52:4
**message**
478:1
**met**
17:3,7 458:12
**Met-id**
75:12
**metabolic**
36:11 75:15 254:17
**metabolism**
50:12 73:10 76:20 124:9 125:8,24 126:25 127:20 253:21 257:14 258:11 278:7 296:23 356:10,12 467:18,23
**metabolite**
125:14 171:16 172:25 173:9 174:7 252:15 256:18 257:8 259:15 260:14 262:3 467:25 468:4,6
**metabolites**
75:10 77:3 171:12,15 172:11 173:4,6,16, 25 179:20 252:4 253:22 255:3 256:7 459:3
**metabolized**
76:22 124:24 173:3 257:19
**metabolizing**
75:13
**methanol**
404:4,6
**method**
79:12,20 81:23 82:6, 12,13 138:4 161:2 210:16 243:16 248:2 250:16,20,22 265:5 268:1 269:17,19 270:12 272:15 273:9 275:5 342:16 347:22 357:19,25 376:14 396:4 407:16 410:4 435:22 442:1,5 479:14
**methodical**
365:17

**methodologically**
54:14
**methodologies**
354:8 361:15
**methodology**
69:11 72:17 137:19,22 150:11 277:8 293:10,17 349:12 351:9 358:11 359:22 421:22 422:3
**methods**
68:12 73:8 77:8 80:2,5 82:4,19 139:11 142:7 163:14 210:11 244:16 247:19 250:6 274:14 290:23,25 341:7 352:13,17 357:11 359:14 360:9,17,18 362:22 376:13,18 377:14 408:18 459:7 474:23 476:16
**methyl**
125:2 252:1, 2 260:6
**methylamine**
257:11 258:17
**mg**
337:9
**mgs**
334:2 335:16,17
**mice**
99:24 292:23
**Michael**
5:22 9:9
**microgram**
153:8 164:9 432:16 433:11
**micrograms**
153:15 154:4 158:23 159:15 160:4 161:9 162:10,19 163:11 165:4 166:14,20 167:20 235:13 350:10 429:16,21 431:14 432:1,13,23 434:2 435:1, 11
**microsome**
75:11
**microsomes**
77:1 173:1
**mid**
180:21
**middle**
228:11 373:4
**might've**
325:16
**milestones**
63:16
**milligram**
154:5 159:6 168:21 169:1
**milligrams**
166:15 294:15,17 319:24 339:21,25
**milliliter**
319:25
**millimolar**
285:11,12
**millimole**
236:20,21 237:15
**millimoles**
235:11,12
**million**
46:24 47:4,8 60:24 61:1, 24 62:4,8,17 63:21 64:2
**millions**
249:14 369:24
**mimic**
106:25 224:3,10 315:15 365:6 368:19 378:23 385:9 388:14
**mimicked**
364:4
**mimicking**
368:13
**mind**
113:6 178:22 243:8 246:11 288:21 366:19 379:2 480:4,5
**mine**
371:15
**minimal**
285:5
**minimize**
135:9 290:5
**minimum**
73:16
**minor**
171:12 426:24 441:3
**minute**
131:22 255:24 470:14
**minutes**
387:14 470:13,14
**mis-**
44:22
**mischaracterization**
249:19 381:2
**mischaracterized**
210:8
**mischaracterizes**
104:14 118:23 135:22 191:18 223:11 232:13 233:3 238:25 249:3 257:1 267:18 270:3,15,25 271:24 273:7 274:20 277:22 318:2 358:18 361:12 380:24 397:11 419:10 436:14 438:2,9 439:2 484:7 487:11 488:3,15 489:2,25
**mislabeling**
446:23,25
**misleading**
112:14 119:7 120:5 479:19
**misquote**
175:3
**missing**
407:25
**mistake**
136:4,5 451:12

**Mitch**
68:10 193:12 248:11 265:11,24 272:9 273:12 358:21
**mitigate**
201:25 202:8
**Mitigation**
200:13
**mitosis**
285:24
**mixing**
388:17
**mixtures**
388:16
**MLPCN**
63:6,14
**mock**
291:16 295:10
**modalities**
50:13
**mode**
43:4
**model**
370:17,18,19 373:9 374:15,21 378:19 381:13
**modeled**
379:15
**modeling**
370:13 386:3
**models**
99:17 367:12 388:22
**moderate**
239:17 365:18 377:8
**modification**
403:13
**modified**
265:22
**modify**
196:16
**modulation**
38:7
**moiety**
376:3
**moisture**
305:17 313:17,21 330:5,11 337:4,20 338:2
**molar**
294:8
**molecular**
50:12 57:15 78:8,10,19, 23 79:1 82:10 84:11, 13 85:24 211:9 252:24 268:17 270:4 278:4 321:23 345:7,11
**molecule**
75:14,16 77:2 96:16 97:11 170:1, 17 171:17 174:3,10 182:25 183:2 209:11 252:12 265:18 267:4,22 271:9 375:25 464:10
**molecules**
37:24 38:9 39:25 50:21 75:6 172:24 179:18 268:14,22 308:5 344:7, 12,19
**moment**
42:24 141:8 267:21 314:18 329:20
**money**
41:24 47:24 64:3 369:19, 21 379:9
**monitor**
14:9
**month**
10:21
**monthly**
24:18
**months**
26:15 27:20 52:6 314:2, 19,24 369:22 414:8
**Monty**
370:14
**morning**
11:22,25
**mouse**
113:22 173:1
**move**
13:22 380:14
**moved**
14:6
**moving**
175:6 309:12 350:17
**MRM**
78:13 80:23 84:22 85:14, 25
**MS/MS**
324:21
**muffled**
74:11
**muffling**
35:6
**multi**
170:13
**multi-kilogram**
464:15
**multiple**
31:7 50:8 76:17 159:17 170:14,23 217:14 227:9 280:14 377:4 410:2 455:6 464:15 472:19 474:22
**multiples**
163:18
**multitude**
320:22
**must've**
334:17
**mutagen**
465:15
**mutagenic**
87:23 122:2 130:1 134:18 173:11 283:3 477:14
**mutagenicity**
465:12
**Mylan**
5:13

**N**

**N-15**
251:19
**N-DEALKYLATION**
257:11
**N-DESMETHYL**
171:14 468:10
**N-NITROSAMINES**
348:23 349:13,24 354:25
**N-NITROSO**
289:23 349:8 356:13
**N-NITROSODIMETHYLAMINE**
224:25 225:13 231:9

238:14
349:11
**N-OXIDE**
171:13 256:6
**NA**
402:19,20
408:15
**nail**
41:1
**Najafi**
11:8 26:12,
16,24 27:8
28:5,7,13,24
33:7 60:5
66:21 67:19
84:4 140:6
184:5 192:4,
7 315:14
363:25
366:18
368:11,15
369:25
382:15,24
385:10
386:19
387:24
391:16
414:6,15
448:7,20
454:19
472:11
473:5,18,24
**Najafi's**
140:22 191:5
445:4 469:6,
13 472:25
**name**
9:9 11:23
12:2 53:4
136:18 141:6
199:11
224:19,20
396:15
458:12
**named**
330:10
**names**
424:6 446:11

472:16
**nanograms**
91:11,19,21
92:12,18
93:8,10,17
94:1 99:21
120:9 154:8,
12 155:2,11
156:4,14
159:2,5
163:25
166:11
167:23
169:5,10
235:17 236:5
238:7,17
295:8 420:6,
7 441:7,17
**NAP**
212:9 221:9
223:23
224:1,3,10
226:5,12,16,
18 227:2,5,
24 228:16,21
229:8
232:16,20
236:4 238:8,
18 242:11,
16,17
**NAP's**
223:20
**narrow**
47:22
**Nashville**
15:8,9 57:7,
17
**national**
201:15
**nature**
47:19 53:8
305:5 308:4
388:7
**NDA**
176:23
244:23
335:19

**NDA...IN**
337:2
**NDA...THERE**
337:9
**NDM**
246:9
**NDMA**
16:8,19
33:10 52:13
72:10 77:23,
24 79:17,22
83:14 84:20
85:3,4,8,12,
14,23 86:11,
19,20,25
87:3,7,14,
19,23 88:3,
8,12,22 89:2
90:9,14
91:10,21
92:19 93:7,
17 94:6,11,
17 95:4,11,
14,20 96:3
97:14,15,20,
21 98:2
99:15 100:3,
11,15 101:3,
12 102:12,14
103:5,13
104:18,19
105:3,23
106:8 107:22
109:6 110:2,
9,16 111:6
112:4,7,9
114:13,21
115:7,10,13
116:9,11
117:17,20
118:13
120:1,9,12
121:11,25
122:14 123:3
124:10,12,23
125:6,8
126:17,24,25
127:3,20,22

129:5,8
132:6
136:20,22
137:3,12,24
139:4,19
140:7
141:13,18
142:16 143:9
147:23
148:15,25
149:9 152:23
153:2,6,21
154:15,24
155:18,24
156:10
159:12,24
161:8,16
162:3,19
163:10 164:9
165:3
166:14,19
167:19
168:20 175:9
184:5,7,22
185:12,13
186:7
188:11,20
189:16,23
190:9,11,19,
20,25 191:9,
13 192:21,24
193:5,15,18,
25 194:25
195:2 197:23
198:2,4
202:9,12
203:2,7
206:5,13,20
207:16 208:7
209:1,7,20,
23,25
210:10,22
212:4,10,12,
14,18,23
220:1,20
221:2,4
222:4,8,14,
20 223:4,5,8
225:4,15

226:15 227:1,4,24 231:22 232:3,11,25 233:22 234:12 235:13 236:1,2,11 237:3,10,14 238:7,14,17, 20 239:22,25 240:10,14,20 242:6,20 243:2 244:2, 3 245:22 246:10,17, 22,25 247:8 248:3,5,23, 25 250:17 251:1,8,11, 17 253:6 254:7 256:22 258:24 260:24 263:6 264:19 265:6,19,20 266:4,12,18 267:14 269:17,20 270:12 271:8,20 272:16 273:2,10,14, 23 274:25 275:5,24 277:17 279:17 284:1 286:12 291:1 295:20,25 296:16,22,23 297:1,9,12, 19,22 298:6, 14,15 300:3, 16 301:6,17, 21 302:8,13, 17 309:11 310:7 311:5 315:24 317:18 321:13 322:4 323:10 332:2 335:19,24 338:9,18,23 339:1 340:10 341:9,11,17 342:2,17,19 344:2 345:15,18,22 346:1,5,18, 25 348:13 349:11 350:4,8 351:5,7,11 352:8,13,21 353:4,8,17, 25 357:21,25 358:8,11 359:9,12,18 360:5,16 361:16 362:14,18 363:1,10,15 364:12,13, 14,19,23 365:18 367:13,23 368:6 369:6 370:7 371:10 376:2,8,15, 25 377:7,18, 23 378:1,4, 8,10,15,25 380:20 381:14 383:11,22 384:7,16,24 385:17,24 386:5 387:2 389:4,7,21 390:4,8 391:1 413:14 416:10 419:22 420:4,5,7 428:23 429:7,20 431:3,15 432:16,22,23 434:1 441:7, 14 442:1,3 446:4 453:12 455:5 456:4, 11 459:4,6,8 461:19,21 462:20 463:21 464:3 465:12 466:3,6,9, 12,14,19,20, 23,25 467:10,19, 21,23 468:2 469:13 470:6,8 471:2,10,24 472:5,7 473:6,17,18, 23,25 474:3, 15,16,23 476:3,12 479:1 480:7 483:8,11,15, 18,19,20,24 484:1,3,13, 19,21 485:2, 6,8,9,11,13, 16,22,23 486:6,8,12, 23 487:5,23 488:9,25 489:16,20 490:16 491:1,15 493:20,24 494:13,14, 16,24 497:22,23 498:3 499:4

**NDMA's**
122:2

**NE**
5:7

**neat**
141:12

**necessarily**
32:6 91:25 97:7 109:15 122:18 178:25 209:23 285:25 306:11 401:22 416:3

**necessary**
11:1 202:8 392:12 395:8,22 400:12

**necessitated**
11:12

**need**
11:17 62:5 65:25 75:9, 20 80:14,15, 17 92:25 119:19 122:11 143:16 183:22 228:4 229:7 244:5, 20 272:1 283:6 286:23 315:2 333:19 350:16 365:20 398:6 422:14 433:9 473:4 475:23 476:2 490:21 492:4,5,6

**needed**
40:8 201:25 211:16 422:3

**needing**
153:19 493:8

**needs**
45:13 243:8 396:14,15

**negative**
490:8 494:5

**nervous**
36:4

**neurologist**
71:9

**neuroscience** 35:21 36:9 41:8 57:23 60:23 278:10
**neutral** 461:2,7,9,18 462:8
**never** 42:1 80:25 85:9 90:8,13 96:24 164:5 170:17 177:8 254:3,6 260:15 343:6 351:4,7,13 363:12 376:2 445:17 448:16 456:10 468:7 469:23 484:3 485:14
**Newhouse** 91:2
**news** 57:20
**newspapers** 435:24
**nice** 40:1 353:18 389:8,10,11 455:10 469:25 471:13
**nicely** 480:1
**Nick** 213:18
**NICOLE** 5:19
**NIH** 40:20 63:6,18 400:7 401:13 408:25 409:21
**nine** 160:12 331:1 398:16 400:2,11 401:2,17,19,20 407:20
**nitrate** 221:22 231:11 235:12 237:15 256:23 258:2,8 386:16,20
**nitrates** 479:11
**nitrite** 222:7 223:7,14 225:1,5,16,21 229:25 230:9,18 231:24 232:3 236:20 238:16 239:12,15,18 242:12 248:24 284:11,14,19 285:3,13 294:9,18 295:3 384:19 385:7 388:12
**nitrites** 290:1
**nitrosamine** 78:3,25 203:20 204:8 264:11 357:12,15
**nitrosamines** 78:14,20 79:4 80:24 81:1,4,12,15,18 86:11,24 87:14 90:9,14 130:5,12 132:10,15 200:12 201:1,16,17 204:14,22 205:20 262:22 263:6 264:18 351:10,15,16 353:4 354:21 355:6,18,21 356:4,11,22,24 357:5,20 358:3 372:8 477:2,22
**nitrosate** 294:2
**nitrosating** 141:14
**nitrosation** 224:1,5,14 225:22 228:22 229:1,3 230:1,10,11,19 232:3 275:11,13,15,18 276:8 277:17 279:13,24 282:14 285:1 287:2,10,11,15,16,25 288:8 289:25 290:6,8,17 292:18,21 293:5
**nitroso** 221:16 282:16
**NMDA** 124:21 223:14 245:25 294:25 479:12
**NMR** 321:5 334:19 463:23
**NNP** 348:2
**no-adverse-effect** 289:22
**NO-RANITIDINE** 283:4 285:5
**noise** 389:15,25 448:16 455:14 471:16
**non-cancer** 118:16
**non-cgmp** 394:13
**non-cured** 377:25 479:11 480:2 486:1
**non-detectable** 441:16
**non-glp** 394:13 397:18
**non-human** 96:22
**non-physiological** 171:23 209:10 212:11 221:10,14 223:17 239:7 242:11 249:5 386:15 463:9
**non-physiologically** 239:4
**non-proprietary** 445:8
**non-quantitative** 122:21 148:7
**non-volatile** 267:2 342:25

346:23 347:2
**nonactive**
181:22
306:13,18
**nonhuman**
113:8 173:2
**nonresponsive**
380:15
**normal**
179:17
190:10
239:21
**Northern**
379:20
**northwest**
379:18
**Notary**
10:13
**note**
22:17 39:17
208:6 319:25
331:15,17,21
404:15
451:21
461:22
**notebook**
393:12,16,23
395:15,25
396:12,14
397:1,2,7
398:1 399:8,
11,16,22
400:8,12,13
401:4,24
402:18,22
406:13,15
407:12,18,19
408:17
410:3,22
420:18
480:10,25
481:13
**notebooks**
26:20 151:2,
18 152:2,20
393:2 396:19
399:1,2
402:10
406:2,7
407:1,8
410:5,12,14,
25 411:4,19,
24 412:5,6,
19,21,22
413:3 420:15
480:14,19
**noted**
30:23
201:12,13
329:3 333:10
352:14
357:21
403:11
405:24
417:24
420:21
425:13 427:2
447:9,11
500:24
**notes**
15:4 21:7
23:17 24:3,
7,10 66:13
319:17 429:5
**notice**
23:3,11,14
189:11
334:25
424:2,15
**noting**
197:15
258:21 331:8
340:22
**NTP**
100:2,7
**num-**
479:18
**number**
6:11 26:16
27:7 33:25
40:16 66:22
80:13 141:1
143:16
157:22
158:2,22
160:13
162:14
163:15,17
164:7 165:4,
8,10,18
166:6,16
167:6,7,8
168:24 208:2
223:3 263:11
316:11
330:25
355:23
356:23 359:4
374:16,17
403:8 424:24
429:24 431:1
432:15,18
433:4,11,17
434:7,9,12,
16,17,19
441:12
451:20
453:23
459:18,24
475:14
491:22
492:16 496:1
**numbers**
61:5 123:16
160:16,20,25
161:23
162:16 163:2
169:17 296:9
390:21 408:1
423:20
424:16
426:9,15
429:4 431:7,
20 436:1,9
481:9
**numeric**
479:18
**numerically**
498:3
**numerous**
23:18 52:1
113:5 199:3
398:24
409:22 410:6
431:22

**O**

**oath**
10:1 76:7
362:10
**object**
166:24
346:7,8
**objection**
10:7 16:10,
12 26:22
27:11 28:10,
19 33:20
37:19 39:17
40:6 42:9,23
43:10,15,22
44:19 45:8,
20 46:12,25
47:9 48:12
50:1 51:4
52:18 54:16
55:6,13 57:3
58:4,5,7
59:18 61:3,7
62:9 64:7,
16,23 65:7,
21 68:1,17
70:12,17
71:4 72:3
78:21 80:11
81:13,20
84:23 86:1,
16 87:24
88:4,9 89:6,
13,24,25
91:7,14,23
92:21 93:12,
20 94:22
95:15,23
97:4,22
98:8,19
99:7,9,18
100:5,18
101:4,15
102:22
103:8,20

104:13,22
105:6,22
106:10
107:23
108:5,15
109:7,23
110:3,12,19
113:18
114:8,14
115:14
116:3,16,21
118:22
119:10
120:7,16,23
122:17 123:8
124:3 126:19
127:8 128:11
130:7,16
131:14
132:13
135:2,17,21
136:3,11
137:5,17
138:6,11,16,
22 139:2,15
141:19
143:11,25
144:18,25
145:6,18
146:6,13
147:12
148:1,18
150:12,17
151:20,24
152:7,21
153:24
154:16
155:10,13
156:7,17
157:25
158:19 159:7
160:17
161:19
162:12,23
163:13,22
164:4 166:23
168:14
169:14
176:20
177:6,18
178:7,19
180:5 182:9,
20 184:24
186:19 187:1
191:17
192:12 193:2
194:6 196:1,
21 197:11
198:10 199:6
200:1 202:15
204:25 208:8
209:2 210:5
211:24
212:20
215:19
216:17
217:21
218:16
219:14
220:23 221:7
222:9,21
223:10
225:6,18
226:20
228:23 229:4
230:2,21
232:5,12
233:2 234:4,
13 236:13
237:6 238:9,
21,24,25
240:6,22
242:7 243:4
244:8 245:2,
11,16
247:15,22
249:2,17
250:19 251:9
253:8,9
256:24,25
258:25
259:25 260:2
261:11,22,23
264:22
266:19
267:17
270:2,15,25
271:23
273:6,19
274:2,19
275:21
277:13,21
283:11 284:3
286:17
287:17 288:3
293:13 294:3
296:6 298:19
300:8 302:4,
9 306:10,23
307:4,9
308:11 309:1
310:18 311:2
312:11
315:7,20
316:1,17,21
317:12,25
320:11
321:17 322:5
324:8
325:11,23
327:19
328:12
331:11 332:4
335:6,20
337:21
338:4,20
340:25
341:18
342:3,21
347:12
350:15
358:1,17
360:20
361:11
363:19
364:17,25
366:8 367:17
368:8 370:9
371:12,22
374:1,25
380:23
382:9,20
383:13 384:9
385:18
393:22
394:14
397:9,10,11
400:3,14
401:7 402:2,
3,24 406:4
407:3,23
408:13
409:25
414:10
415:13 416:1
417:7 418:2,
24 419:9,18
422:5 424:22
425:3 426:7
427:8 428:3
430:1,2
431:18
432:4,7
435:4,14,16
436:13,23
438:1,8,9,13
439:1,8,16
441:11 443:5
444:19
445:11
447:20 448:2
449:2 450:9
452:8 453:19
454:3,25
456:16,24
458:25
464:11
465:23
466:4,11
467:3,14
468:3,18,25
469:16
472:13
473:3,8
474:1,17
476:5 477:23
479:4
480:17,21
481:19
482:2,8,17
483:17
484:6,16,23
486:14
487:3,10
488:2,14
489:1,10,25

490:19 491:2 494:1,19 495:4 496:8, 18 497:2,14, 18 498:6,17, 19 499:8
**objections** 10:9
**objective** 364:11 365:21
**objectively** 365:13
**observation** 338:22
**observations** 393:25 397:21
**observed** 158:11 233:23 301:14 321:22 327:3,6 328:25 329:1,6 330:9 336:23 337:5,12
**observer** 49:11,13
**obtain** 321:4
**obtained** 185:11 441:21
**obvious** 66:5 324:23
**obviously** 11:5,13 55:14 64:8 66:20 73:11 90:25 95:17 106:11 141:20 155:4 180:17 246:14 280:10
284:19 419:11 447:22 480:23
**occur** 118:14,20 229:3 288:1 337:12 398:5
**occurred** 341:20
**occurring** 257:15 258:16 284:20 301:16
**occurs** 139:22 381:22 461:14 463:1
**October** 319:1 341:6 342:15 345:25 348:12 354:10 358:15
**odor** 197:9,17,22, 24 198:1,3, 6,19 199:4 211:12 214:25 307:18,22,24 308:8,13,14, 17,22,24 309:3,5 465:20 466:10,14, 15,16,18
**odorless** 198:2 466:13,21
**odors** 308:3,5
**offer** 64:5,22 213:2 240:11 307:15 309:8
491:24 492:2
**offered** 53:9,14,17 59:9 220:3 309:10 491:21
**offering** 53:21 54:12 72:6 202:21 469:7
**offhand** 162:8 164:20,24 228:4
**office** 372:16,17 381:11
**offset** 64:3
**oily** 181:16
**okay** 12:9,25 13:1 14:10 15:3 16:2 18:8,23 21:6,9 22:14,24,25 24:12,23 25:2 26:6 29:1,17,25 30:4 31:1,20 33:24 38:21 60:13 70:3 75:22 90:21 102:7 103:18 105:7,12 116:23 117:8,13 121:2,17,18 126:22 130:3,23 131:23 132:19 137:9 141:16 142:23 143:20 149:4,21 152:3 153:3,
7,23 154:7, 13 158:4,21 159:4,10,14 160:6 163:20 166:13 168:1,3 169:6,19 178:4 183:20,24 185:3 186:24 187:7 188:1 189:3,14 190:23 195:22 196:5 198:11 199:21 200:3 203:10 204:2 205:22 206:15,24 207:2 209:3 213:4,11 215:15,23 216:2 220:17 230:24 232:8 236:6,15 254:25 255:6,12 257:3 262:5, 21 263:1 264:4 265:14 266:20,21 272:21 279:23 281:23 282:8,21 283:14,15, 16,18,19,20 288:12,25 289:1,6,19 296:19 297:17 298:23 300:5,22 301:18 303:20 304:10,24 305:8,21 306:2 309:22 311:10

312:4,13
313:10
314:23 315:4
316:3 317:9
318:17,23
319:5
322:12,16
323:1,6,17
324:18 325:8
326:9
327:15,21
328:6 329:10
330:2 332:6,
8,18 333:20
335:10,25
336:13
338:11 341:2
348:10
349:4,15,20
350:7,19
351:1,2,13,
17 352:1,2,
12 354:13,24
357:7,23
361:20,25
369:17
371:25
372:14
383:12,18
385:8,11
391:4,11,12,
15,19 392:18
394:11,17
396:24
397:13 400:9
401:17,22
402:9 403:7,
16,18 404:9
405:20,23
408:22
409:11,20
410:3 416:12
420:13
422:11,14,19
423:4,11
426:16
428:14,16
429:12
430:12,17,25
432:24,25
433:21
436:25 443:1
444:24
445:23
450:20
451:13
452:12 457:3
458:17,18
459:12,21
469:10
472:22
473:22
480:13
497:16
500:20

**older**
190:17

**once**
116:8 140:14
152:8
163:17,18
173:15 233:6
247:17 276:2
331:10
379:10 381:1
385:3 391:10
415:11 439:9

**oncologist**
71:11

**oncology**
35:22 36:13

**one**
13:9 14:14
17:6 20:8
26:8 29:2
30:13 38:19
42:1 43:3
49:4 50:3
51:11,12
53:2 61:9,10
63:17 78:17
79:8,9,25
80:19,22
82:9 95:7
97:8 99:19
101:11
117:10
130:20 134:4
136:18
149:18
152:17
153:11,12
164:7 165:7,
17 172:22
179:25
180:11 184:2
188:17 193:6
198:23
199:22
200:21
206:17
207:16
214:22
217:25 221:9
222:16 223:6
228:9,13
236:21
243:12,13,
15,17 252:3,
10 253:5,21
254:21 259:1
260:4,13
264:24
265:2,23
272:24 273:1
281:5 283:17
287:18
291:22,23
292:15 307:5
311:22
312:25
314:16
323:12
349:18
352:11
353:21
365:4,7,13
368:20
371:16
374:12
380:10 391:8
402:9 405:22
406:1,9,10
408:2,17
410:3 412:4
426:22 429:4
434:13 443:6
447:24
451:14
462:10,21
470:22
475:11,21
479:19
480:24 486:5
490:8
493:22,23
494:5

**one's**
257:25
260:12

**one-page**
281:7

**one-to-one**
221:21 222:6

**ones**
19:6 28:14
65:25 66:1,9
68:11 141:3
149:2 152:12
182:12
258:13
274:17
275:22
335:12
406:10 414:3

**ongoing**
31:11

**open**
13:15 14:17,
19,23,25
15:1 168:10
445:13,16

**opened**
445:14

**opening**
445:9

**operator**
470:17
471:21

**operator-determined**
389:18

**opine**

447:24 465:11,14
**opined**
91:9 458:21
**opining**
273:24 310:2 341:21
**opinion**
53:10,17 72:6 80:8 148:9 154:21 196:2 218:22 234:3 243:22,24 245:14,18 246:20 249:23 273:11 280:12 364:7 378:8 381:25 395:5 438:11 439:14 440:22 454:23 468:1 472:6 473:9, 15 475:11 482:13
**opinions**
53:14,21 54:9,12 55:1,3 60:2, 3 64:5,9,12, 19,22 69:4, 15 114:22 117:25 137:20 138:5 150:15 175:7 176:6 178:11 191:7,18 192:1 194:17 202:22 209:8 213:3 220:3 240:11 280:16 295:22 307:15,17 309:8,10 439:19

449:11 452:21 454:15,18 456:14 459:13 460:13 469:7
**opportunity**
59:9 151:8 472:23
**opposed**
59:8
**opposite**
135:19
**OPQ**
372:17
**optimize**
80:19
**option**
187:11
**options**
80:21 445:9
**oral**
255:19 257:16
**orally**
228:19
**orange/beige**
328:2
**oranges**
348:9
**Orbitraps**
74:1
**order**
19:14 44:4 45:3 124:23 175:17 221:15 290:5 473:5
**orders**
66:25
**organ**
97:8 174:8 463:4
**organic**
79:16 81:1 96:16 97:11 267:3 268:13

342:25 343:9 344:6,7,12, 18 346:23 347:2,24
**organization**
120:11 369:7
**organizations**
50:19
**Organometalli c**
72:14,16
**original**
22:5 59:25 337:2
**originally**
58:11 99:6, 10
**ORPD**
106:13 140:4 151:11
**OTC**
337:9
**other's**
227:17
**others'**
325:19
**outcome**
9:13
**outlet**
57:20
**outlier**
479:24 490:5,11 494:4
**outliers**
479:25
**outlined**
459:12
**output**
44:10 83:8
**outshadows**
44:13
**outside**
8:10 67:21 110:21 151:5 167:16 175:6 192:7 202:23

309:12 328:23 366:15 392:15
**oven**
404:16,23 405:3,6,12
**overcome**
80:9 290:22
**overlap**
401:16
**overlapping**
79:14 80:7
**overriding**
96:6
**overseas**
87:12
**oversee**
371:24
**overseen**
371:21
**oversight**
136:12
**overview**
325:25
**overwhelming**
122:1
**overwriting**
320:19
**oxidation**
260:6,8 331:2
**oxidative**
256:20 258:15 259:12 260:5 468:9
**oxygen**
196:16 207:14

**P**

**p.m.**
9:5 21:17,22 75:23 76:3 156:25 157:5

214:13,17 299:6,11 362:3,7 392:2,6 457:11,16 458:2 500:24
**packaging**
475:5
**page**
6:4,11,23 102:7,18 105:7 111:10,15,23 117:9,10,11 121:16,17 128:23 131:25 132:21 158:6 185:5,16,18, 21 187:17 188:1,3,15 189:15 196:10 204:4 205:24 231:15,16 235:4 254:21 255:14,15 262:15 263:18 264:3,6 281:2,4,9 282:23 289:12 309:15 312:9,24 313:11 317:4 319:7,8 332:21,23 334:10,23 336:13,14 350:2,3,25 351:1 355:13 357:7 372:14 395:12 401:14 402:18,19, 20,22 403:3, 4 405:22 406:13,18,21 408:15 409:9,10 410:20 422:13,18 423:12 428:15 440:3 451:5,15 459:23 460:3,4 476:23 480:9 481:9
**pages**
204:5 280:14 362:14 395:25 406:16,19 407:12 410:22 411:5,12 412:3,9,19 450:13,15,18 453:2,6 481:2
**paid**
20:14,18 370:4
**pale**
466:13,21 467:5
**pancreatic**
86:22
**paper**
18:22 106:13 126:2 139:3 140:4 141:7, 10 142:2,11, 14 143:6,14, 16 199:18 200:2 206:9 213:13,17 215:21 226:21 227:23 228:8 233:4 262:19 265:24,25 277:2 280:24 281:10 283:14 286:25 287:19 288:23 289:7,12 291:22,25 293:22,25 311:25 350:17,22,24 394:21,22 422:24 435:19 436:2 437:2 438:12 439:15 440:23 478:15 486:16 487:12,19 488:4,16 489:5,11 493:6
**papers**
66:6 68:10 95:24 141:1, 24 170:20 171:4 193:12 199:22 227:21 228:2 248:11 265:7,11,15 272:9 274:9, 12 276:20 278:11,14, 19,22 280:11,12 295:15 296:22,24 353:14 370:23 443:13,15
**paragraph**
98:23 102:9 105:8 111:24 118:6 121:20 128:24 129:1 130:3,9 131:24 132:5 133:2 136:14 185:8,24 186:2,4 188:3 190:5 204:20 205:11 206:2 207:6 220:4 231:19 289:14,17 290:14 291:23 309:17 312:14 313:12,25 316:4 319:23 320:18 326:21 330:3,16,17 332:24 335:8 336:15,16 355:14 382:4 410:21 437:3,4,8 451:22 477:3
**paragraphs**
319:11
**Paralegal**
5:21
**parameter**
425:25 428:8
**parameters**
80:19 106:9 107:6,18 172:4 242:25 371:4 384:16 405:16
**parent**
79:3 82:25 84:6,17 173:3 258:7 307:22 309:5 321:11 348:6 466:14
**parenthetical**
133:22 134:8
**parenthetical s**
130:5

**parents** 173:22
**Park** 399:9
**Parke-davis** 34:3
**Parkinson's** 36:16,25
**parse** 276:15
**part** 8:23 44:24 50:19 53:22 55:3 63:6 99:13 130:21 147:4 174:16 175:23 178:16 206:9,21 233:4 263:23 279:16 324:3 387:23 456:18
**partial** 324:25
**participant** 262:2
**participants** 8:3,19 256:11 497:12,16
**participating** 9:20
**particular** 79:4 80:20 217:2,25 227:8 228:10 252:15 265:2 376:13 417:8 445:3 460:15
**parties** 10:5
**partner** 39:20 40:3 44:5 45:2,10
**partnered** 38:14 39:7, 24
**Partners** 57:22
**partnerships** 46:17 47:7, 15,16 63:2
**parts** 250:17
**party** 9:12 450:11
**pass** 176:9 482:25
**past** 39:11 40:5 51:10,19 57:21 63:4, 21 204:10
**paste** 136:7 397:25
**patent** 12:16 37:14 51:25 53:6, 7,13 478:17, 23
**patents** 37:8,14 54:3
**Patheon** 98:22 99:14 110:8 415:5
**pathologist** 71:15
**pathway** 206:6,14,17 208:7 257:9 337:1
**pathways** 209:14
**patient** 475:17 479:21 486:17 487:20 490:6,10 494:12 498:10
**patients** 39:6,22 40:8 44:4 45:13 70:25 93:25 94:5 285:3 290:19 378:3 462:7 479:25 490:5,11 494:4,8 497:6 498:11
**patterns** 82:24 83:1,4 472:4
**Paul** 91:1
**pause** 456:7
**pay** 41:24
**payment** 24:15
**PDFS** 414:18 450:7,10 469:19
**peak** 321:7 389:10,18 455:10 469:25 470:1,12,23 471:13,15,20 473:14
**peaks** 79:10,11,14 80:6,7 210:17 320:24 321:1 323:20 324:21 326:2 335:15 389:8 455:21
**peer** 142:12 150:25 151:3,14 205:8 394:19 395:3 418:10,22 421:21 444:1
**peer-review** 418:12 443:4
**peer-reviewed** 150:19
**penalty** 10:4
**pendent** 461:3
**pending** 176:15
**Penner** 16:4 17:13 65:3
**Pennsylvania** 5:4,16
**people** 57:17 58:16, 25 59:4,5 83:16,25 89:20 90:2 135:7 152:15 171:16 179:4 219:7 239:5 244:2 246:13 247:18 272:6 298:17 323:16 324:6 325:14 376:20 377:15 379:12 380:6 398:10 399:14 441:21 464:22
**percent** 36:14 40:19 41:3,4,21 42:5 43:3 46:1,2 55:19 56:21,24 57:9 58:23 63:7,8 106:19,20 107:7,19 170:23 172:20,21 179:6 188:18

222:11,19 235:14 236:8,10,12 239:24 240:1,17 242:3,24 256:16 301:13 302:3 313:1,16,18 314:2,4 315:19 316:7 327:5,7,8 328:21 331:7 333:13 339:8,19,23 371:6 434:25 461:15 465:1,7 472:14

**percentage**
40:12 45:17, 23 46:9 55:8 56:19 146:4, 11 339:7 356:3 453:5, 17,21 454:1, 5

**percentages**
226:17 338:24

**perfect**
102:9 117:15 204:5 231:17 236:18 256:3 289:15 422:20 428:20

**perfectly**
353:3 487:21

**perform**
50:5

**performed**
75:4 76:11 211:14 360:12,13 388:13 395:25 402:6 412:23,24

454:16 464:21 472:11

**period**
29:5 30:6 115:18 187:14 293:8 326:25 327:25 464:18

**periods**
149:10 314:1

**peripheral**
37:15

**perjury**
10:4

**permeate**
377:15

**permissible**
340:1

**permitted**
13:14

**person**
10:2 18:6 262:2 363:22 365:7

**person's**
368:20

**personally**
78:5,13 85:9 296:18

**pertinent**
18:17,19

**petition**
102:1 188:4 248:1 391:7

**Pfizer**
58:14 61:11, 15 98:22 99:14 336:7 340:22

**ph**
171:19,20,23 233:5,6 234:6,7 290:3 375:23 384:18 385:7

386:23,25 387:7 388:25 461:9,18,23, 25 462:2,4,6

**Ph.d.**
9:2 72:11,13 241:18 247:5

**Ph.d.s**
57:11

**Pharm**
208:12

**pharma**
41:7 55:11, 12 57:6,22 72:19 102:1 399:12 400:20 454:16

**pharma-**
48:4

**pharmaceutical**
34:1,9,17 37:18 38:14, 23 39:12,14 40:4,9,14 42:7 43:9,20 44:14,17 45:2,7,11, 19,24 46:11 48:2 51:2,6 52:20,22,23 55:22 56:8 63:2,24 75:1 77:20 148:24 181:25 226:5 244:13 250:5 268:15,18 269:10,14 271:10 352:25 372:18 392:16,21 443:11 444:5

**pharmaceuticals**
5:1,13 34:4 48:7,8

152:11 201:19 268:13

**pharmacies**
364:9

**pharmacokinetic**
73:10

**pharmacokinetics**
173:23

**pharmacologist**
57:15

**pharmacologists**
35:20

**pharmacology**
50:12,13 58:13 96:8 173:12,13 278:7,10

**pharmacy**
303:17 475:6

**phase**
38:19 39:1, 12 40:5 50:22,24 90:23 344:9 352:18 353:21 497:20

**phenomenon**
126:10 184:18 320:21

**Phil**
440:17

**Philadelphia**
5:4

**philanthropy**
62:22,23

**phone**
13:21,24 14:6

**phonetic**
12:13,15

77:7 281:12
**phosphate**
344:13
**photo**
199:14 211:7
215:6
**photographs**
26:19 27:4,
22 28:22
**photos**
414:18
**phrase**
244:10
**phs**
171:21
221:23
375:22,25
386:22 387:2
460:19 462:9
463:3 464:1
**physical**
174:15,18,19
175:23,25
176:18
178:15,21,24
216:14 336:8
**physically**
9:21 150:5
445:21
**physiological**
171:21
223:13
224:4,11
233:9 234:15
246:1,5
251:15
275:23 286:1
345:19
377:19
388:14
**physiological ly**
224:6,9
228:17
232:17,20
233:10
239:16,18
245:19 276:2
**PI**
61:20 443:22
**pick**
267:23
389:24
455:17
471:3,5
**picked**
366:18
**picking**
389:18
471:16,20
**picture**
141:7 436:11
**piece**
195:16 273:2
317:21
337:17,24
399:21
**pieces**
449:21
**Piedmont**
5:7
**PIETRAGALLO**
5:14
**pill**
153:9 154:5
159:6 168:21
169:2,10
181:19
184:13
249:13
339:19,24
388:2,10
462:5 475:25
**pills**
144:16,23
145:4,22
146:19 147:7
150:7 152:24
164:3 168:5,
9 184:4,11
221:4 246:25
247:8
364:14,20
378:12
464:23
**Pittsburgh**
5:16
**PK**
82:18 173:25
**place**
92:6 278:22
316:9 323:11
484:4
**placebo**
377:25
476:14
479:15 480:2
485:24
486:2,7,24
487:7,25
488:12
489:21
493:24
494:18
496:25 498:5
499:6
**plain**
360:15
**plaintiff**
9:3 53:1,3
458:17
**plaintiff's**
480:24
**plaintiffs**
10:22 11:24
391:11
459:18
465:17,24
469:6 473:16
476:25
**plaintiffs'**
18:15 19:4
86:18 459:9
**Plan**
304:21
**plasma**
257:23 258:5
260:11
377:23
461:24
476:12
479:13
486:6,9,11,
12,20,22,23
487:5,23
488:8,9,25
489:16,20
490:16
491:1,15
493:19,24
494:12,14,
16,24 495:2
496:6,15,24
497:8,22,23
498:3,14
499:4
**platform**
38:6
**play**
80:1 152:18
207:11
379:21
**please**
9:16 12:1,24
13:6 25:17
49:23 118:3
128:25
185:17,20,25
190:4 196:6
207:8 225:11
241:3 262:15
267:20
283:13,17
287:2 289:16
299:13
304:14
309:14,18
323:7 351:1
352:16 361:7
372:20,21
386:10
442:15,19,22
451:15
487:12 489:4
495:8
**plot**
497:5
**plots**
479:21
486:17
487:20 490:6

494:8,11 498:10
**plotting** 490:10
**point** 16:5 24:17 26:25 47:22 49:16,18,19 51:11,13 53:2 60:24 64:2 96:1 127:15 141:2 171:8 196:8 213:18 222:16 244:10 270:5 271:5 285:16 293:20 300:13,15 314:16 318:13 330:22 331:5 342:7,23 346:21 352:11 358:20 363:7 365:9 369:9 390:11 439:12 448:18 455:1 460:20 469:17 478:19 479:7 483:22 499:11
**pointed** 257:4
**points** 28:1 211:25 324:19 369:5 371:3 390:8 400:24 427:24
**polar** 79:2
**Policies** 401:11 409:1
**polish** 262:16 263:2
**pop** 434:7
**Popkin** 323:6
**population** 92:14
**port** 193:14 268:23 343:10 358:6
**portal** 257:19 462:25
**portfolio** 41:20
**portion** 361:9 386:11
**posing** 385:13
**position** 93:15
**positions** 73:16
**positive** 287:10
**possession** 168:7 445:17,22
**possibilities** 307:5
**possibility** 228:25 230:4 260:4 313:9 369:9 370:10
**possible** 47:5 77:10 89:14 96:12,13 110:18 111:7 112:11 115:13,19 116:13 117:22 131:20 139:5 141:11,14 220:24 243:6,19,21 244:14 247:3,18 259:8 283:7 287:11,15,25 288:8 289:25 292:14,21 306:25 307:1 320:23 335:11 357:5 371:13 378:23 384:2 422:15 425:21 446:20,24 447:21
**possibly** 89:17 255:15
**post** 32:18 33:1 59:1,7 212:25 263:5
**post-ranitidine** 271:21
**poster** 444:7 478:15
**potable** 87:12
**potency** 133:10
**potential** 39:4 91:12 173:11 204:14,21 225:22 230:1,9,11,12,19 275:19 292:17 310:6 355:7,23 356:24 459:3 468:2
**potentially** 39:9 124:13 127:3 149:10 209:1 221:16 238:20 272:23 294:1 323:21 367:2 381:4,5 475:20 478:17
**power** 80:5 243:11 291:9 441:2 442:8
**Powerpoint** 324:4
**PPM** 148:25 321:2
**practical** 100:16 101:13 102:15 103:1,6,14 104:4,7 147:23 321:6
**practice** 152:17 393:3
**practices** 152:18 397:15
**PRD** 313:15
**pre-2019** 195:18,24 199:24 208:21,25 269:16 270:13
**pre-clinical** 173:16
**pre-litigation** 391:7
**precise** 148:11
**precision** 253:1 441:1
**preclinical** 77:4 90:25 96:13 173:8 297:7 392:25
**precluded** 437:16

440:12
**predicted** 467:12
**predictive** 373:11 375:6,15 382:6
**predominance** 37:3
**predominant** 329:17,25
**preferred** 72:18
**pregnant** 249:14
**preliminary** 186:9 188:12 311:15
**premarked** 22:15 23:2 25:5 111:22 116:25 121:3 131:17 157:8 195:7 200:6 203:13 254:10 280:21
**premise** 96:10
**prep** 33:2
**prepare** 17:4 18:12 19:14,25 20:6,11
**prepared** 15:3 65:2 201:23
**preparing** 18:8 19:22
**prescribed** 298:8
**presence** 8:10 183:13, 18 188:20 231:23 313:20 442:5
467:10 468:2
**present** 5:18 9:22 17:24 77:4 171:6 256:7 257:24 258:9 266:4 301:21 321:1 331:6 332:15 335:14 378:10,11 470:6
**presentation** 5:23 446:18
**presented** 92:13 142:10 264:9 379:11 386:14 469:23 482:10,21
**presents** 202:13
**presumable** 284:20
**presume** 108:12 177:2 222:3
**pretty** 66:5 350:18
**prevailing** 96:7
**previous** 121:14 283:2 327:10
**previously** 6:13,15,18, 19,20,21 7:3,4,7,10, 11 12:4 20:2 23:11,20 94:12 98:10 101:20,21 102:2 111:13,22 117:6 157:15 159:11 163:4 168:5 195:14 198:12
199:17 247:1,14 253:4 254:11,12 262:8,9 277:18 280:21 282:2,6 288:15 296:1 299:19,20,24 301:7 304:15,17 311:11,14,20 313:14 316:15 318:18,20 319:3 322:17,19 326:13,19 332:9 336:3, 11 340:15 347:7 348:18 349:2 351:6 352:2,4 354:15,17 359:5 372:3 391:2 402:15 409:2 418:20 421:1,2 429:4 430:19,23 439:24 451:3,16 453:16 454:15 456:10 485:14 486:20 492:4 495:23
**primarily** 36:9 139:22 171:10 179:20
**primary** 66:19 68:2 98:21 137:25 143:18 216:21
220:11 253:21 260:10 282:18 284:7 285:19 355:15,17,20 458:21
**primate** 173:2
**primates** 96:22
**principal** 115:8 338:25 339:7
**print** 150:20 325:3 450:7
**printed** 469:20
**prior** 12:17 16:16, 20 24:4 52:14 86:6, 14 87:22 88:2,7 90:7, 12 209:16 212:1,3 216:6 218:22 220:6 229:10 266:9,20 267:7 271:8 277:19 278:22 303:14,21 309:19 318:6 332:19 346:4 348:11 358:13 360:1,4 403:4 414:25 418:17 420:10 421:13 429:13 467:13
**priori** 376:10

**priority**
165:20
**Private**
8:8
**privy**
191:21
219:16
307:10
**probability**
91:17 356:12
**probable**
95:16,18
97:2,16
100:12,19,25
101:8,17
104:2 113:7
189:16,24
250:13
286:7,13
289:22
297:15
298:17 357:5
358:3 360:2
**probably**
16:24,25
24:25 31:19
32:15 33:22
36:14 42:12,
19 48:23
56:22 58:23
60:23 63:7,
8,25 66:24
135:9 163:20
167:24
199:11 272:4
298:5 303:8
354:6 401:25
404:5
**problem**
112:19
113:11
202:14
294:20
306:15 387:4
489:22
492:25
**problematic**
438:23 439:6
**problems**
34:24 35:10
378:17
**procedure**
187:19
282:15
341:12
**procedures**
369:21
**proceeding**
8:4
**proceedings**
9:17
**process**
77:10 84:22
87:10 88:14,
19 115:15,17
116:1 172:12
276:6
305:14,15
347:25
362:13,15
418:13
423:24,25
424:9,13
425:1,7
442:6 443:4
444:4 448:9
**processed**
115:20
396:10
**processes**
423:8
**processing**
78:24
**produce**
245:13
381:12
**produced**
24:12 25:3
27:1,19,25
108:19 109:1
125:14 184:5
195:12
197:23
209:23
212:10,12,
14,19 222:8
223:9
226:11,15
227:5
233:11,18,25
234:23 236:3
237:23
238:17
246:22 309:4
312:19 381:8
390:6 414:14
415:4 453:2
464:14 473:5
480:14
481:15
**produces**
179:19 197:9
**producing**
170:16
196:17 198:4
222:4 246:10
389:22
**product**
68:20 109:3
140:8,13
141:4
145:10,13
146:24 176:1
179:2 180:19
181:15 182:3
183:5,12
184:19
186:12
187:20
188:20
190:14,17
191:1,14
196:7,11
199:2 203:20
204:12
207:17
210:11
212:2,23
242:13
244:1,23
246:16
252:15
259:14
268:25 269:5
291:2 310:7
337:13 355:2
358:12
362:18
378:17
380:21 414:1
437:17
440:13 479:3
484:19
**production**
94:13 220:1
377:18 378:1
435:8 479:12
**products**
9:7 28:22
49:17,19
54:4 91:11
92:1 95:14
108:17,22
109:11,13,
14,18 182:14
186:8 188:7,
12 189:11
190:21 191:6
197:4 199:14
209:18 210:3
211:7,10,21
212:5 215:6
216:8 220:8,
19 240:19
242:5 244:3,
24 268:15,18
309:21
310:1,10
312:18 338:8
341:9,11
376:1,4,25
428:24 431:1
459:8 461:5
464:25
474:15,21
484:18,25
**profile**
77:12 171:16
172:25
**profiling**
228:12

**profit** 49:15,21
**profitable** 49:17
**program** 35:18 401:13
**programs** 35:13,21 37:2 38:14 39:23 41:13 44:2 47:18 50:23 60:23 61:9 278:4
**projects** 36:10 40:4 41:13 473:11
**prolonged** 187:13 314:1
**promiscuously** 253:24
**prompted** 190:8
**propensity** 221:15
**proper** 147:17 382:3 400:7 481:12
**properly** 272:11
**property** 41:15 312:20 343:8 444:23 478:19
**proportion** 248:9 349:8
**proposing** 381:18
**proposition** 131:2 211:1
**propriety** 341:22
**protected** 69:19 478:17
**protection** 478:23
**protections** 68:21
**protocol** 77:15 303:19 393:25 397:25
**protocols** 77:14 90:24 92:9 106:25 265:22 266:9 267:7 364:1 369:20
**protonated** 462:12
**proverb** 178:24
**provide** 37:24 38:10 67:7,15 112:3 151:8 160:25 182:1 187:19 188:5 219:20 249:22 250:1 279:25 280:2 368:23 409:22 410:18,25 411:14 412:15 452:21 464:2 491:10 495:19
**provided** 11:7,9 23:13,22,25 33:12 60:13 67:9,11,14, 19,22 68:11 69:8,14,19 108:2 111:4, 5 159:18 161:10 163:9 238:18 242:25 303:16 383:8 410:12,14 412:1 414:5 417:4 422:24 423:20 424:18,19,25 446:6 449:5 499:24
**provides** 30:5 349:21 350:4
**providing** 30:5 114:6 117:24 158:17 176:6 218:21 495:15
**Prozac** 258:13
**prudent** 210:2
**public** 10:13 44:10 188:5,22 200:14 202:3,7,9 203:8 380:13 401:9
**publication** 54:2 128:16 140:20 151:10,14 418:15 421:6,12 424:4,9,20 426:5,11,17 427:6,25 434:3,22 436:6 444:8 447:9 478:15 482:14,19 483:5,12,16, 21 484:2,4, 10,22
**publications** 37:7,13 40:1 44:11 68:3, 13 478:6,11
**publish** 51:1 86:7,10
**published** 37:13 82:12 87:22 88:2,7 174:13 211:15 219:8 279:13,18,21 351:13 375:19,20 394:18 418:11,22 425:23 443:13,14 455:7 460:17
**publishing** 54:20 277:8
**pull** 23:1 25:17 77:9 80:6 92:25 101:19 108:1,10 111:14,16 116:24 121:2 131:16,18,23 157:7 159:21 185:4 203:12 205:13 208:11,15 218:1 224:16 225:8 228:4, 8 229:18 231:2 246:15 254:9 280:19,20 299:13 304:14 315:2 332:8 348:16 354:15 358:24 359:2 372:1 402:11 408:23 411:3,13,16 415:8 416:25 420:25 439:21 449:14 451:2 476:22 486:16 487:12 488:16 489:4
**pulled** 32:3 131:8

149:6,15,17 187:2,3 303:18,24 364:9 450:11 475:3,7 480:24
**pulling** 174:6
**pulls** 248:7
**purchased** 413:21
**pure** 170:23 172:20 179:6 257:13 297:19 298:15 308:14 338:16 465:1,7
**purely** 228:19 233:9
**purity** 73:4 76:15 170:22 171:2 172:9 179:8, 11,15,25 180:11 181:6 338:15,25 345:11,20
**purport** 435:21
**purpose** 8:12 201:12 224:13 275:18 286:8 343:14,15 345:22 354:25 355:2 396:3 405:23
**purposes** 96:2 100:16 101:13 102:15 103:2,6,14 104:4,7 147:23
**pursuant** 179:12 226:11 268:21 465:4
**purview** 191:25 368:1
**push** 97:10 120:11 291:9
**put** 10:19 13:24 21:2 128:21 130:11 148:20 149:10 162:14 180:18 189:4 195:6 200:6 215:2 228:15 242:17 252:12 262:7 274:12,15 313:5 319:12 322:14 326:11 336:2 345:6 351:19 353:15 354:7,11 404:20 406:20 412:6 434:13 457:4 470:18
**putting** 43:1 131:11 251:12 344:4
**Python** 370:14

**Q**

**Q1** 83:5
**Q2** 83:9
**Q3** 83:11
**quad** 73:7,24 75:17 76:23 82:22 243:8, 10
**quadrupoles** 73:25 82:21
**qual-** 124:19 155:1
**qualified** 123:25 125:11 148:11 161:1
**qualifier** 291:4
**qualifiers** 126:7 127:14 128:1,6,17 292:2
**qualify** 123:19 194:3 343:2 345:10
**qualifying** 103:3 122:13 126:2 148:5
**qualitatively** 124:9,19 125:8,11,13 126:13,25 297:5
**quality** 87:17 182:2 336:7
**quantifiable** 123:11 163:2
**quantification** 85:8 153:19 154:23 222:13 260:24 456:4
**quantified** 75:5 82:18 126:4 163:10 166:13 194:21 223:4 227:11 242:6 247:8 260:14 261:15 262:3 302:12,16 334:3 429:20 430:8 431:11
**quantify** 73:6 75:9 123:24 153:6,18,22 154:24 161:2 164:18 165:19 193:5,24 210:18 244:21 265:3 268:6 269:13 272:16 291:1 320:23 333:23 345:1,8 348:5 353:17 357:15 376:13 377:23 389:7 448:16 471:9 472:5 474:23 476:12 483:15
**quantifying** 76:19 166:18 225:3,15 257:7 360:5 455:16
**quantitate** 436:20
**quantitated** 455:5
**quantitation** 73:9 77:9 79:13 80:20 118:11 122:9 127:14 160:10,24 165:12 167:16 250:11 334:2 343:15 353:18 390:4

432:11 434:6 435:21 436:18 453:12
**quantitative**
123:15 148:6 297:8 476:8
**quantitatively**
124:20 125:16 127:19 499:3
**quantities**
96:3 161:8 163:5 164:8 170:16 294:24 297:20,22 419:22 429:15 467:5 472:18
**quantity**
74:20 153:4 155:1 236:2 237:10 298:6 316:11 343:3 471:2
**quarterly**
24:20
**question**
12:24 13:2, 3,7 24:16 27:15 28:3,6 31:15 32:24 43:23 46:6 81:9 103:25 106:7 168:25 175:22 176:15 178:14 180:7 203:5 214:3 216:12 217:19 225:9 229:24 233:13,19 234:1,24 235:3 241:8 242:10,19 243:18 247:10 250:4,14 261:1,16,17 270:8,9,17 275:7 283:20 287:24 298:22 300:7 308:21 337:23 339:4,13 346:3 361:2, 5,8 363:20 375:11,13 383:17 385:13 386:10 395:1 397:4 398:15 399:25 400:16 433:25 434:16 438:22 453:25 473:15 481:17 482:5 483:14 486:22 489:14,15 491:6 492:15,18,24 494:13 495:14,15 496:14 497:25 499:1,14 500:8
**questioning**
123:1 202:25
**questions**
11:24 12:23 97:17 201:23 298:13 309:6 310:4 340:6 391:15 415:7 429:14 457:22 458:15,16 459:18 465:18 469:5 473:17 480:9 482:24 491:8,14,16 493:7 495:22 500:11,14
**quick**
213:10 223:1 311:22
**quickly**
14:2 278:13 469:22
**quite**
31:6,7 32:7 62:16 64:2 80:1 83:22, 25 171:9,17 172:1 174:9 217:23 218:8 252:10 290:20 325:1 353:18,19 387:6 389:23 410:13 432:9 442:9 456:19 462:18
**quote**
57:25 112:8, 17,18 143:15 211:5 222:10 229:14 284:17,22 367:5 370:12
**quote/unquote**
464:9
**quoting**
169:17

**R**

**R01's**
40:22
**Radioisotope**
254:16
**radiolabel**
250:25 252:12 253:23
**radiolabeled**
251:4 252:8 253:5
**radiolabeling**
251:7 252:18 254:4
**rage**
302:23
**raise**
61:24 62:4,7 190:20 307:13
**raised**
214:4
**raising**
54:24
**rampant**
472:21
**ran**
196:17 220:19 240:16 378:22 387:25 411:10 425:22 476:11
**random**
315:9 367:2 374:10,15 378:20 389:16,23 455:4,14 456:19 471:8 475:16
**range**
62:18 92:5 152:24 155:17,24 156:2 158:11,17 166:9 169:9, 11,18 180:22 246:15,17 302:23 303:4,8

350:4 356:24 366:23 376:18 377:9 420:4,5 428:20,22 429:7 435:7, 10 441:13, 14,16 443:20 461:18 464:1,6 472:21 490:4 494:3

**ranges**
153:1 166:8 169:8 171:19 256:13 375:24 479:20

**ranging**
350:9

**ranitidine**
9:7 16:8,17 52:14 68:5, 16 83:20 84:10,12,20 85:4,12,13, 23 86:8,14, 20 93:24,25 94:5 95:11 105:14 106:24 107:15,21 108:18 109:5 110:1,11 125:3 137:12,24 139:20 141:12 142:16 143:8 146:5 148:12,15 149:13 153:21 154:25 155:18,25 156:10 157:10 159:25 161:17 162:4 163:10 164:2,10 169:25 170:4 174:14,20 175:11,20 176:7,19 177:12,15,21 178:6,18 179:5 180:3, 8,10,12 183:11 184:19 185:13 186:8,12,16, 24 187:23 188:7,12 189:10 190:10,17, 20,24 191:12 192:10,23,25 193:8 194:1, 2,20 195:2, 19 196:13, 20,24 197:5, 8,16 198:19 199:5,15 206:5,13,19 207:11,15 208:4,21,25 209:14,18 211:8,12,15, 22 212:24 214:25 215:7,18 216:8,16 217:10 219:22 220:8 221:24 222:4,7 223:7,16 225:1,4,16 226:10,16 227:4,14 228:10 231:10,20 233:6 235:11,15 236:21 238:15 240:15 248:24 254:4,18 255:2,20 256:4,7,18 257:9 258:15,23 260:9 262:18 263:4 264:14 265:6 266:18,24 267:14 269:18,19 270:13 273:3,15 275:6,12 279:20 282:16 284:11,20 285:12 287:1,10,12, 15 288:1,8 289:25 290:5,17,20 291:5 292:22,24 293:1 294:1, 6,8 295:21 300:2 301:22 302:18 303:13,14 304:12 305:17,24 306:6 307:21 308:9,16,18, 24 309:12, 21,25 310:8, 10 311:17 312:2,5,21 313:13 314:4,11,13 315:23 316:6,18 317:10,17,22 318:25 319:19 321:10 324:15,23 325:19 327:17 328:11,18 336:25 337:1,18 338:1 339:19 340:2,16 341:8,11,17 342:17,19 343:22 344:2 345:11,21,23 346:2,5,19 347:7,11 348:14 353:6,12,22 358:7 359:13,15,19 360:17 361:17 362:13,17 363:1,11,15, 18 367:14,23 368:7 369:6 370:6,7 371:8,11 373:20,25 374:3 375:8, 16,18 376:9, 15 377:18 378:11 381:14 383:10,20,24 384:7,17,25 385:6,15 386:4,24 387:12,13 415:22 416:16 437:12 438:19 442:6 459:2,6,8,19 460:6,11 461:10 462:1 464:9 465:15,21 466:10,15,25 467:2,11,21 468:11,16,20 469:14

474:15
475:24 476:4
479:2 480:7
485:22
486:6,24
487:6,8,23
488:1,10,24
489:18
493:21,23
494:17
496:25 498:4
499:5

**ranitidine's**
175:23 176:8
184:23
195:25
199:24 208:6
275:19

**ranitidine-colored**
323:18

**ranitidine-containing**
354:5

**rank**
221:14 226:6
227:23
228:20

**ranks**
226:10 227:1

**rapid**
463:5,10

**rapidly**
312:6 387:16

**rarely**
268:12

**RASPANTI**
5:14

**rat**
113:23
125:15
173:1,23

**rate**
20:19 285:1
461:15

**ratio**
46:18 83:14,
19 84:7,10
221:21
222:6,7
223:6 284:19
294:8

**ration**
223:6

**rationale**
52:8 220:25
251:17 378:7
483:23

**ratios**
41:16

**rats**
96:22 99:24
292:23
349:12

**raw**
73:15 267:9
274:23
393:18 394:4
396:10,20
398:9
446:11,19
447:16 448:9
449:8 452:3

**ray**
74:2

**RCA**
144:7 482:22

**re-crystallization**
423:17

**reach**
138:20
151:22 170:8
315:18

**reached**
304:4 315:6
366:1 482:6

**reaching**
150:15 414:6

**react**
258:2

**reaction**
73:5 76:15
139:21
224:25
231:10
238:15 290:6

**reactive**
179:13,16,24
230:14

**reactivity**
184:13

**read**
64:9 101:11
102:3 118:3,
7 119:22
129:18
140:3,4
152:15
185:7,25
186:5 190:4
196:6 200:2,
21,22 205:11
207:8 211:4
229:12,15
261:13
272:1,3
276:14
278:14
280:10
282:25
283:22 287:2
289:16
291:21 294:5
295:14
300:20,25
305:4,12
309:18
314:16,17
316:4 320:17
323:7,13
324:19
329:3,8
330:15
333:4,17
335:10
336:17 349:4
352:16
355:10,14
361:7,10
372:15,20,21
381:20 382:1
386:9,12
393:7,12
396:2 437:10
477:17

**reading**
65:24 109:24
135:24
204:18
276:25
356:6,18
382:4

**readouts**
50:10

**ready**
73:11

**real**
92:14 162:17
174:25 196:2
213:9 223:1,
19 239:10
249:6,18
291:25
303:17,19
304:1 311:22
342:23
363:16,21
364:1,4,23
365:3,7,10
366:21
367:5,8,12,
19,22 368:6,
13,19,21
370:12,21
372:24
373:19
378:19,24
381:24 388:1
425:14 470:6
475:10,12,15

**realistic**
239:10

**reason**
94:23 103:4,
18,23 122:4
124:1,15
137:16
186:21

189:1,19 190:1 205:3 222:3 247:3 251:11 356:16 357:1 371:23 376:7,10 436:21 442:11 447:25 448:22 476:6,18
**reasonable** 178:13 221:1 244:6 249:11 411:8 425:18 442:3
**reasoning** 188:22
**reasons** 39:23
**recall** 15:21 24:24 26:24 27:3 84:14 108:4 110:4,6,13, 24 111:8 130:21 131:8 143:3,12 144:9 152:23 158:1 160:2, 3,14 161:7, 11 162:8 164:13,22,24 165:20 168:16 170:2 178:8,20 195:20 196:3 198:20 199:16,18 209:4,21 215:25 222:8 228:9 289:9 308:9 311:24 314:17,21,23 341:13 383:3 406:3,12 412:16 413:8,15,23 415:14 416:3,11,19 417:20,22 429:18 430:5 432:18 433:3,10 445:5 449:17 450:21,24 452:24 454:20 459:19 465:21 468:23 469:2 473:20 477:3 480:11 487:16,22 488:8,22 489:8,18 490:24 493:19,24 496:5 497:7, 11,21,23 498:13
**recalled** 149:12 187:16
**recalling** 92:3 108:23 178:3
**recalls** 203:20 204:12 323:10 499:18
**recapitulate** 295:1
**receipt** 416:22
**receive** 59:15 91:4 92:19 94:4 445:23
**received** 10:20 11:11 16:6 27:7 28:4,8,15 32:1 90:17 168:23 240:4 255:2 413:17,20,24 415:11 487:25 493:22,23
**recently** 201:18 298:15 316:24 342:15 445:25 446:5 452:12
**receptor** 50:9 438:16
**recess** 21:19 75:25 157:2 214:14 299:8 362:4 392:3 457:13 458:3
**recognize** 158:3
**recollection** 153:13 166:5 269:23 452:1 493:6 495:21 496:1
**recommended** 282:15
**record** 8:2,7 9:18 10:20 13:10 21:15,17,22 75:21,23 76:3 156:25 157:5 213:12,16 214:1,12,17 237:21 299:4,6,11 315:1 361:9 362:2,7 386:11 391:25 392:2,6 396:21 397:20 409:24 410:1 457:9,11,16, 24 458:1,5 500:18,22
**record's** 48:18
**recorded** 8:4,6 327:1 396:11,13 398:6 409:14
**recording** 8:13 410:4
**recordkeeping** 399:4
**records** 23:18
**recovered** 85:15 236:11 240:1
**recovery** 236:8
**recruited** 59:6
**red** 293:25 328:2 330:24 440:4
**Reddy's** 423:19
**redo** 266:10
**reduce** 95:19
**reduced** 35:24 110:18 111:6 112:10 115:12 116:12 117:21
**reevaluated** 101:3
**reference** 112:17 208:10 320:24 400:9 415:16,21 446:10

**referenced** 266:13 396:14,15
**references** 199:8,10 208:1 287:7 364:2 394:3
**referencing** 155:7 215:3, 4,12
**referred** 48:15 361:9 386:11 393:5 406:2
**referring** 26:20 131:12 217:2 226:22 411:1,12 412:17,18 416:6 449:4
**refers** 382:11
**reflect** 37:15 366:19 482:14
**reflected** 30:17 278:16
**reflecting** 58:9
**reflects** 30:19 482:21
**reflux** 460:20 461:12,17
**refluxing** 463:7
**refresh** 451:25
**refrigerated** 146:25 416:9
**refrigerating** 416:15
**refrigeration** 416:13
**refuse** 491:5 492:9 495:19
**regard** 407:1
**regarded** 100:16 101:13 102:14 103:6,13 104:4
**regarding** 16:8 188:6 306:6 413:7 473:23
**regional** 57:13
**registered** 49:20
**regulating** 388:25
**regulation** 187:19
**regulations** 71:18 175:2
**regulator** 147:21 362:20
**regulators** 204:10
**regulatory** 71:17 92:7 112:2 129:5 130:10 132:6 136:19 137:1 147:14 158:8 240:7,11 302:22 365:15 377:4 474:19,25
**reject** 276:24
**relate** 295:18
**related** 9:11 37:8 147:15 191:8 269:23 278:6 324:23 340:10,13,23 397:18 420:20 439:12
**relates** 355:18,21
**relating** 273:23 438:15 465:18
**relation** 157:9 420:12 459:3,10
**relationship** 68:22
**relationships** 51:15
**relative** 106:19,21 107:7,19 145:25 146:4 228:20 240:18 242:3,24 251:14 278:22 301:5,12 313:1,16,18 314:3,4 327:7,9 328:21 333:13 355:22 371:6
**release** 444:14
**released** 158:2 199:14 211:7 215:6 230:23 256:20 257:20 258:24 259:2,5,19 260:13,20,23 261:4,6,9, 14,20
**releases** 149:19
**relevant** 65:23 109:16 110:6 224:6, 9 228:17 232:9,17,21, 23 233:10 234:7,9 239:16,18 245:20 272:23 274:11,16 276:2,3,7, 14,16 279:25 286:1 291:11,14 292:9,13 316:7 327:5 364:11 367:8 381:5 387:22 394:24 412:22 500:9
**reliability** 147:20 250:10 291:18 294:21 295:12 380:12 418:12 428:7 438:12 439:14 440:22 456:8 469:12,21 473:6 485:15
**reliable** 142:9,12 152:20 167:8 265:5 273:11,15 274:11,14,16 276:22 293:10,16 295:18 367:20 368:23 379:7 395:16 397:2 406:3,7,11 409:24 420:1

421:22 432:14 434:9,12,16 454:17 471:18 474:16
**relied** 69:3,15 130:20 143:14,22 417:1,3 419:7,19 450:6
**relief** 11:1
**rely** 142:4,15 145:3 147:11 152:5 276:17 370:24 386:13 433:21
**relying** 127:11 150:15 161:14 381:7 393:21 419:17
**remain** 182:6 186:13 437:25 438:25
**remainder** 457:20
**remains** 173:3 290:16 461:19
**remember** 111:10 200:23 217:24 224:23 228:3 308:6 311:25 414:2 416:23 446:7 488:21
**reminds** 370:14
**reminiscent** 462:13 463:3
**remote** 8:11,25 9:1, 10,17
**remotely** 9:24
**removal** 187:20 189:10
**remove** 8:17 267:7 353:16,22
**removed** 109:18 257:22 405:3,12
**removes** 295:11
**removing** 437:24 438:24 440:15
**renal** 36:12
**renewal** 43:1
**repair** 282:17 283:5
**repeat** 20:8 47:1 74:9 225:11 233:16 396:22,23 397:16,20 476:18 481:20
**repeated** 266:8
**repeating** 398:14
**rephrase** 12:25 156:8
**replicate** 393:14 476:9
**report** 18:13 21:3, 7,11 22:6,7, 16,17,23 26:14,16 27:7 28:4,17 29:18,23 31:4,13,14, 17,18,21,24 32:6,7,9 33:15 54:1,6 60:3,8 64:24 67:23 69:16 84:13 91:9 97:23,25 98:24 99:1, 20 110:25 111:4,9,15, 18,20 112:7, 18 114:12 115:1 117:17 119:8 120:4 128:22 130:22 131:11,25 132:5 134:6 136:10,15,16 138:5,21 139:1,11,14, 18 140:6 151:23 153:4 155:8 167:10 169:24 175:6,15 178:12 191:5 192:19 197:22 198:12,16 203:4 209:16 216:5,23 218:6 220:2, 4 222:17 226:13 271:16 272:19 273:4,17,21 274:12,15 275:11,14 276:5 277:5, 12 279:24 280:13 283:10,23 290:12 291:23 293:12,23 306:4 309:15 310:12 325:6 327:1 342:9 346:12 353:15 362:12 366:12 385:24 387:2 389:23 391:20 392:10 393:5 395:11,12,20 401:11 402:7 405:15 406:3,12,21 407:4,22 409:7 410:19,21 411:7 412:2 413:6 414:7, 8,9 415:1, 17,22 417:4 433:12,14,22 434:20 435:9,19,23 436:1,10 437:19 443:18 445:2 446:10,18 448:6,13,17 449:6,15,20, 23 450:22 451:1 452:2, 7,10,13 454:19 455:8,22 456:14 457:5 458:22 459:23 460:2,3,4 463:11,16 470:18 472:17 474:3 476:23 483:6

**reported**
118:16 167:13 206:4,12 211:18 220:10,11 243:10 275:9 280:7 337:2 378:7 413:14 435:6,7 436:19 469:13 471:24 473:7,18,19, 24,25 474:4 498:15
**reporter**
9:14,19 12:14 13:23 21:13 25:9 32:20 35:3,4 37:9 50:16 59:3,22 62:2 70:18 72:15 74:7,8,14 75:20 84:2 120:18 124:22 129:21 173:19 253:11 259:9 265:12 284:24 294:10 328:16 335:22 344:25 361:10 386:12 404:3 407:6 462:3 463:12 465:6
**reporting**
9:23 10:8 280:5 473:11
**reports**
10:21,23 11:6,13 17:2 18:14,15 19:4,15 21:9 22:2,3 64:4, 10,15,21,24 65:2,10,14 66:16 67:4,8 104:21 137:21 141:21 152:6 192:19 211:13 219:5 227:9 337:10 359:9 390:20 459:14
**repository**
146:22
**represent**
25:2 27:6 43:5 154:12 166:16 169:4,9 233:17 290:18 304:1 333:7 383:6 413:2 415:20
**representation**
255:10
**representative**
108:24 357:19 365:6,10 370:20 453:9 454:7
**represented**
28:4 57:20, 24 144:15,22
**representing**
13:16 458:13
**represents**
474:15
**request**
8:6 105:9 109:4 188:4, 8 237:13
**requested**
175:7 191:8 219:25 491:4
**requesting**
27:24 107:14
**require**
66:1,7 277:2
**required**
170:21 175:18 176:9,22 177:23 181:25 217:15 321:4 371:7 399:8
**requirements**
170:18 407:17,20
**requiring**
108:14
**reread**
18:14,15,20, 21 19:1
**res**
73:5 334:18
**research**
11:17 16:17, 19 37:25 40:25 41:22 42:18 43:8, 19 44:3,16 46:4 55:21 56:7,8,10,22 81:3 94:25 95:21 201:25 209:8 372:17 392:14,15,20 394:12 401:12,13 409:1
**researching**
94:16
**reserve**
10:25 64:11 457:20
**reserves**
50:9
**residual**
343:19,20,22 344:21,24 345:2,5,13 347:6,10,23
**resistant**
462:11
**resolution**
79:21 243:11 441:2 442:8
**resolving**
80:5 291:8
**resources**
35:2
**respect**
68:21 91:12 475:25 476:1
**respond**
11:4,18 219:17 405:18
**responded**
192:18
**responding**
11:7
**response**
43:20 44:24 101:25 114:10 119:20 129:9 219:2 233:12,19,25 234:22,24 235:3 280:11 281:17 442:24 458:15 469:5
**responsible**
211:11 320:9
**responsive**
23:14
**rest**
41:21 58:25 205:11
**result**
124:11 127:2,21 139:20 222:2 273:3 302:13,17

308:8,17
312:20 461:6
**resultant**
314:8
**resulted**
211:21
**resulting**
266:18
**results**
68:13 147:11
158:17
177:22
185:9,10
186:9 217:5,
18 218:11
219:21 221:4
222:15
226:18
227:24 240:5
264:9 267:12
273:10 292:1
311:16 354:9
376:1 393:15
418:5 420:9
431:7
**retained**
15:17,22
16:1 51:5,
18,22,23
52:5,20
59:7,21,24
86:3,6,14
87:22 88:2,7
90:7,12
98:13 136:13
391:11
**retention**
59:25 455:11
**retracted**
248:12
265:24
**retractions**
273:13
358:21
**review**
19:10 20:5,
10 25:12
26:12 27:9
28:7,9,17
33:15 52:13
54:19 56:16
67:16,23
68:11 102:5,
10 105:10,11
128:25 129:2
138:8,13,19,
24 140:25
142:12
150:25
151:4,14,17
170:9 175:18
177:16
178:4,15,16
185:20,22
194:5 196:23
198:15 201:8
205:8 207:23
208:18,22
215:15,21,23
216:13,20,24
217:4 218:2,
6,9,14 255:7
262:24,25
263:25
273:22
277:16
278:20
307:15
310:14,15
311:19 325:5
333:3,4
336:7 340:7
349:20
350:22
382:21,23
394:19 395:3
400:23 402:9
407:10
410:11
411:18 414:5
415:3 417:16
418:1,22
419:3
420:14,23
422:7 426:10
428:5 430:13
444:9 445:4
452:17,22
453:6,18
454:9,11,13,
23 456:15,22
459:9 468:21
472:24
478:25
480:13
481:15,23,24
482:3,20
**reviewed**
19:3,15
23:20 26:17,
24 28:24
65:16,19
66:10,16,24
67:2 69:12
97:19 105:3
107:24
113:13,19
114:5 155:16
170:10,20
176:12
177:3,14
184:17
195:23
198:13
199:22
215:10
216:10
217:20,22
219:11,12
220:12,13
227:21,23
229:22 235:6
246:11
259:22
262:12
270:10
272:22
273:25 274:4
299:23 308:7
309:7,13
310:22
316:15
349:9,17
370:23
375:17
414:24
418:10
421:21 422:9
427:9 428:11
451:20 454:2
456:11
460:12 464:8
469:12 478:6
485:7,20
**reviewer**
276:25
437:23
438:23
440:15
**reviewers**
150:21 151:9
276:24
**reviewing**
17:1 31:10
32:14 49:2
65:23 91:3
199:16
276:20
293:21
393:21
417:22
448:8,25
453:15
475:24
478:10,18
485:5
**reviews**
356:23
**revisions**
277:2
**rewritten**
403:9
**RH**
314:7
**rich**
290:1
**riddled**
127:14
**right**
8:24 20:24,
25 26:8
45:10 59:6
64:11,18
92:6 93:19

98:21 102:9 103:17 111:4,24 116:8 117:11,13,15 121:19,20 130:10,21 131:7,25 132:23 134:1,6,9 147:25 150:22,23 155:12 159:19 161:4 164:20,24 165:6,19 168:13 169:3 176:7 178:3 199:11 204:5,6,20 205:24 206:12,25 207:6 210:9 214:11 222:13 231:17 235:21 236:7,12,17 239:25 244:9,10 246:16 249:1 251:23 264:5,6,8 267:23,24 268:1 269:22 275:20 281:20 287:6,20 289:12,13,17 298:7 299:3 304:7 307:3,7 314:18 315:25 317:11 319:8 322:6 331:19 334:24 336:15 342:11 347:11 350:10 351:21,25 362:1 371:7 372:25 373:5,25 380:22 384:1 388:4 391:7,18 393:17 402:14 411:11 417:20 422:19 424:4,13 428:1,17 430:5 431:3,8,12 433:5,24 438:17 447:4 451:14 452:14 453:25 475:3 486:4 493:1,22 497:11 500:21

**right-hand**
281:8

**rights**
10:24,25 11:18

**rigor**
474:24

**rises**
462:6

**risk**
91:13,16 92:14 118:12 200:13 221:18 228:18 239:22 253:19 290:18 292:6 332:14 359:9 377:17 464:3

**Road**
5:7

**rocket**
94:13

**rodent**
113:22 119:12 133:9 291:14 295:2 297:4

**rodents**
125:4,17 127:21 291:14

**role**
51:9 83:5,9,11 207:11 478:9

**roles**
82:21

**room**
9:22 13:20,25 14:7,17 15:10,11 17:8 18:5 172:15,17 194:12 460:19 461:11

**rooms**
146:25

**Roopal**
11:23 68:19 83:21 156:20 214:8 225:6 227:15 240:25 288:19 442:16,19 492:1,15 493:16 495:12 499:23

**root**
18:20,23,25 106:12 140:3,16 142:1 143:21 144:10,14 145:3 149:23,25 150:8,16,25 151:3,18,22 169:12 251:5 252:17 253:21 299:15,23 304:4 323:3 325:9 402:5 407:8 416:8 417:1,11,18 418:9 420:15 421:8 422:1,22 423:6 424:3,7,18 426:4,12 427:4,10 432:16 433:2,16,23 434:19 436:5,9 441:18 447:3 480:15,20 481:16,25 482:6,10,16,20

**roster**
77:7

**rotate**
256:3

**ROTD**
18:21

**rough**
453:14

**Roughly**
74:24

**round**
425:16

**route**
72:19 77:10 348:1

**routine**
239:15 398:3

**row**
431:12

**RUBENSTEIN**
5:4

**rubenstein@gtlaw.com**
5:5

**Rule**
11:10 22:5
**rules**
11:13 12:22 69:20
**run**
12:21 79:11 129:4 164:15 234:14 240:19 241:20,25 242:5,22,25 243:2 295:16 313:6 374:18 376:22 397:23 398:2,9 425:24 457:1,3
**running**
247:13 379:4,6 396:5 412:10
**runs**
453:10 455:6,15 456:1

**S**

**S--------------**
6:9
**S-OXIDE**
171:13 256:6
**SAB**
48:3,16,21 49:1 51:9
**sad**
39:1 298:3 497:20
**safe**
91:11,21 96:21
**safety**
38:19 39:3 96:14 123:13 173:17,24 202:1,6,9,13 203:8
**salt**
84:16 181:11 183:5 267:3 292:12 343:1 344:13,15 347:3
**salts**
268:14 344:11
**sample**
314:10 353:6,12 354:1 358:4,5,12 446:11 464:25 471:2,5,14
**samples**
33:10 108:24 110:6 141:3 144:9 159:15 160:3 164:15,21 165:5,21,24 166:3,7 168:17,23 179:4 185:11 190:12 255:3 300:17 301:14,23 302:24 303:6,19,21,25 313:1 315:15 337:6 350:8 353:23 354:5 359:23 364:9 369:13,14 377:3,5 389:8,13,21 390:5 413:8,12,18,20,24,25 414:3 415:11,23 416:9,14,21 417:5,8,10,13 418:8,16 419:6 420:9 421:13,17 422:3 429:19,23 430:7 431:23,25 434:1,24,25 441:19 455:25 469:24 470:2 471:10,15,25 472:8,20,21 473:12 474:4,9,23 479:23
**SARA**
5:9
**Saraca**
150:3 423:23 424:8,12,17 425:8 447:5
**sartans**
353:7 438:15
**saying**
22:1 26:2 74:15 93:14 103:12 104:3 106:4,5 115:25 118:19 122:14 123:6,9 126:4 128:2 135:20 145:21 153:20 162:21 165:16 178:8 195:20 213:23 214:2 219:10 228:13 242:19 249:4 267:13 286:6 291:5,11,15,25 307:24 309:24 331:9 357:24 367:18 380:1 381:12 396:9 400:19 403:3 414:21 432:14 490:23 496:14
**says**
26:10 29:3,9 68:4 103:17 105:9 112:19 114:12 117:12,19 123:18 133:22 134:14 135:14 137:2 146:1 147:22 158:7 167:19 186:20 187:8 188:3 189:15 194:8 196:22 197:3,12 199:12 204:7 205:2 206:11 220:5 223:21,23 231:19 236:14 256:1 264:8 282:13 287:3 288:5 290:15 300:15 301:19 306:1 312:17,25 313:25 315:3 324:21 325:13 326:22 327:20,24 328:18 329:14 330:3 332:24 333:24 334:14 335:10 337:8 338:6 348:22 352:21 355:6

357:9,18 361:19 370:16 372:22 402:18,20 403:19 404:15 407:4 429:2
**scale** 170:14 179:8
**scales** 464:16
**scare** 323:16 324:7 325:8,13
**scared** 325:14
**scattering** 74:21
**scavenging** 125:18
**scenario** 239:9 249:7 388:2
**scenarios** 333:7 366:7,21 367:5,20,22 370:6,12,21 378:20,23 379:5 381:15 475:12,14
**schedule** 290:2
**schizophrenia** 36:15
**schizophrenic** 36:23
**SCHMITZER** 5:23
**Scholar** 139:7
**school** 55:25 86:25 87:1 351:8
**schools** 57:13
**Schreiber** 17:15
**science** 56:9 58:18 123:10,11,15 153:20 274:13 276:22,23 277:25 278:11,15,21 393:10 478:14 498:18
**scientific** 5:19 48:16 49:1 52:8 54:8,9,25 55:1 126:14 127:15 128:14,15 178:13 273:23 277:7 280:16 291:22 395:17 397:3 411:9 435:19 436:2 469:17 471:19 478:11 482:5
**scientifically** 127:25 142:8 342:11 346:14,17 409:23 435:25 500:9
**scientist** 57:16 72:21 90:25 125:25 167:14 396:1,7 403:12
**scientists** 57:12 59:8 126:15 179:10 267:5 269:10 270:7,21
271:11 418:14 478:13
**scope** 97:23,25 104:14 110:20
**scratch** 192:23
**scratched** 403:9
**screen** 8:23 23:8 131:19 133:13 206:21 323:25 412:7 422:15
**screening** 224:5,14 228:21 242:21 357:11,12
**screens** 8:15 50:6,7
**scroll** 23:15 25:22 26:6,7 102:7,17,23 117:12,13,14 121:15 132:20 157:17 158:5 185:18,19 188:1 189:14 200:18 206:10 207:3,24 208:1 213:8 254:20 262:21 263:15 282:9,23 283:14 287:5 300:11 301:20 311:21,22 313:24
334:7,9,10 349:16 351:20,23 359:3 402:13 431:2,6 451:5,15
**scrolled** 481:2
**scrolling** 282:10
**seal** 364:20
**sealed** 142:21 378:16 405:9
**search** 67:13 68:6 69:13 276:13 296:21 366:6
**searches** 139:6,7 278:6
**Searle** 19:17 323:2 422:2
**Searle's** 422:7
**seat** 366:14
**second** 31:21,23 83:23 89:23 117:11 118:4 185:23 186:2,4 190:5 204:19 231:19 253:16 257:10 258:15 281:5,9 319:7,23 324:17 329:14,21 349:18 350:7 396:1 404:15 446:10 449:15,19

456:13 468:9
**secondary**
27:24
305:14,15
451:1
**secret**
478:18
**secreting**
462:15
**section**
23:16 275:10
283:10
301:19
305:3,12
314:8 333:11
391:23 460:5
**sections**
200:24
**see**
23:7 25:25
26:9 34:25
37:6,7,11
51:23 65:25
75:12 76:21,
24 80:5
82:23,25
83:25 84:6,
16 85:3,13,
20,23 90:2
95:4,24
96:14 102:10
106:4 111:25
117:7,18
119:19 121:5
122:11
125:13
126:10
129:14
132:7,9
133:4,12,21
134:11,14,23
135:5,12,16
144:4 145:3
146:14 151:6
157:17
158:10,13,
15,21,24
166:3 169:15
177:7 180:25
181:3 184:3
188:24
189:15
196:19
197:2,3
199:7 200:18
201:11,20
202:4 204:6
206:1,7,19,
25 207:19
208:16
212:22
215:13
216:19
218:1,12
226:10,15,25
227:3 231:18
232:1 237:1
239:19
243:25
246:3,4
247:3 253:6
255:8 256:4,
10 263:21,23
264:7,15
271:12
274:11 279:6
282:12,19
284:11
285:15,22,23
296:9 304:6
312:16,22
313:22 315:3
317:6,8
319:16,20,22
320:3,4,13
323:22 324:1
325:3,7
326:21
327:13 328:4
329:7,13
330:1,13
331:3 332:23
333:15,21
334:7,9
340:24
348:24
349:21
350:6,11,24
352:12
354:22 355:4
357:9,16,21
359:11,16,17
360:14
376:10
380:19
382:8,10,24
384:24
387:24
389:11,16
394:6 401:20
402:17
403:8,20
405:15,22
409:12
423:4,9,11,
16,19,22
424:6,21,24
425:15
427:20
430:7,25
431:3,7,13,
16,19,20
433:13,17
437:6 438:20
440:6,18
442:10 447:6
453:12 456:2
460:7 461:4
463:5 464:21
466:8 467:4
470:21
471:12,13,14
472:2 473:10
477:8
479:20,22
481:14,21
482:3 486:17
487:4,20
490:14,21
491:4 492:9
494:9 495:18
499:25
**seeing**
110:4,6
169:8,12
178:20
195:20 196:3
202:5 206:8,
21,22 209:4
215:25
239:19
258:14 281:8
289:9 295:1
307:2
311:24,25
313:7 326:4
329:19 340:5
359:21
360:11
416:19
**seek**
10:25 120:11
**sees**
386:22
**select**
76:18
**selected**
470:1
**selecting**
167:3 470:3
471:9,22
**selection**
275:12
456:20
**selections**
277:4
**selectively**
38:1
**selectivity**
38:2
**SEM**
26:18
**semester**
56:6
**senior**
58:9,15
399:14
**sense**
90:4
**sensitive**
77:8 113:23
313:20
376:14

377:13,22 440:10 479:14
**sensitivity** 73:8 97:20 250:7,10 252:23 253:1 290:22 291:8 296:15,16 337:3 437:14
**sentence** 109:24 117:19 118:4,6 126:7 127:13 128:7 129:14 134:4,6 185:8 186:1, 3,4 205:1,7, 10,14 207:5 231:18 264:7 282:13 286:25 287:4,6,18 288:5 289:17 290:14 291:23 292:4 294:6 301:1, 18 305:4,13 329:14,21 330:15 336:18 338:5 407:4 409:17 437:5,8 438:14 440:4,6
**sentences** 118:7 134:3, 12 301:10 336:19 349:5
**separate** 210:17 241:8 243:16 405:4
**separated** 84:21 404:25 405:1
**separation** 80:20
**September** 112:7 116:20 359:15,20 360:19 361:17
**Septerna** 49:5
**sequence** 396:5
**series** 74:5
**serious** 54:23 202:19 203:8
**seriously** 495:12
**serve** 45:6,9,13
**served** 10:23
**service** 44:11
**serving** 43:9,19 44:16
**set** 18:6 113:21, 25 313:14 321:25 338:11 364:3 382:16 383:1 455:13 456:6 498:18
**setting** 8:17 367:12 371:4 414:4 498:1,15 499:2,16
**sev-** 230:22
**seven** 34:18 406:19
**seventh** 491:3
**several** 42:15 44:25 196:12 204:12 318:9 335:1 430:6 445:8 490:20
**severe** 239:8
**shape** 258:1
**share** 188:22 323:15 324:6
**shared** 293:3
**sharp** 389:8,9,10 455:10 469:25 470:12 471:13
**Sheehan** 6:6 11:3,21 14:1 15:14 16:10 26:22 27:11 28:10, 19 33:20 37:19 39:15 40:6 42:9,23 43:10,15,22 44:18 45:8, 20 46:12,25 47:9 48:12 50:1 51:4 52:18 54:16 55:6,13 57:3 58:4 59:18 61:3,7 62:9 64:7,16,23 65:7,21 68:1,17 69:7,17 70:12,17 71:4 72:3 78:21 80:11 81:13,20 83:21 84:23 86:1,16 87:24 88:4,9 89:6,13,21 90:18,21 91:7,14,23 92:21 93:12, 20 94:22 95:6,15,23 97:4,22 98:8,19 99:7,18 100:5,18 101:4,15 102:22 103:8,20 104:13,22 105:6,22 106:10 107:23 108:5,15 109:7,23 110:3,12,19 113:18 114:8,14 115:14 116:3,16,21 118:22 119:10 120:7,16,23 122:17 123:8 124:3 126:19 127:8 128:11 130:7,16 131:14 132:13 135:2,8,17, 21 136:3,11 137:5,17 138:6,11,16, 22 139:2,15 141:19 142:25 143:11,25 144:18,24 145:6,18 146:6,13 147:12 148:1,18 150:12,17 151:20,24 152:7,21 153:24 154:16

155:10,13 156:7,17 157:25 158:19 159:7 160:17 161:19 162:12,23 163:13,22 164:4 166:22 168:14 169:14 176:14,20 177:6,18 178:7,19 180:5 182:9, 20 183:21 184:24 186:19 187:1 191:17 192:12 193:2 194:6 196:1, 21 197:11 198:10 199:6 200:1 202:15 204:25 208:8 209:2 210:5 211:24 212:20 214:8 215:19 216:17 217:21 218:16 219:14 220:23 221:7 222:9,21 223:10 225:6,18 226:20 227:15 228:23 229:4 230:2,21 232:5,12 233:2 234:4, 13 236:13 237:6 238:9, 21,23 240:6, 22 242:7 243:4 244:8 245:2,11,16 247:15,22 249:2,17 250:19 251:9 253:8,13 255:24 256:24 258:25 259:25 261:11,22,25 263:11,14 264:22 266:19 267:17 270:2,14,24 271:23 272:1 273:6,19 274:1,19 275:21 277:13,21 281:11,16 283:11 284:3,25 286:17 287:17 288:3,19 289:1 293:13 294:3,11 296:6 298:19 299:1,3 300:6 302:4, 9 306:10,23 307:4,9 308:11 309:1 310:18 311:2 312:11 315:7,20 316:1,17,21 317:12,25 318:2 320:11 321:16 322:5 324:8 325:11,23 327:19 328:12 331:11 332:4 333:18 335:6,20 337:21 338:4,20 340:25 341:18 342:3,21 346:7 347:12 350:15,20 358:1,17 360:20 361:11,25 363:19 364:17,25 366:8 367:17 368:8 369:7 370:9 371:12,22 374:1,25 380:23 382:9,20 383:13,16 384:9 385:18 393:22 394:14 397:9 400:3,14 401:6 402:1, 24 406:4 407:3,23 408:13 409:25 411:20 412:4 414:10 415:13 416:1 417:7 418:2, 24 419:9,18 422:5 424:22 425:3 426:7 427:8 428:3 430:1 431:18 432:4 435:4, 14 436:13,23 438:1,8,13 439:1,8,16 441:11 442:15,18 443:5 444:19 445:11 447:20 448:2 449:2 450:9 452:8 453:19 454:3,25 456:16,24 457:23 458:8,13 459:22 460:1 476:22 482:23 483:17 484:6,16,23 486:14 487:3,10 488:2,14,20 489:1,10,23 490:19 491:2,17,21 492:1,8,14, 20,23 493:3, 9,14 494:1, 19 495:4,11, 17,25 496:8, 18 497:2,14, 18 498:6,17 499:8,19 500:7,12

**sheet**
159:22 352:8,20

**sheets**
164:18

**shelf**
182:7,17 373:7 377:6 464:23 465:1 475:6

**shelves**
93:1 109:19 149:7,16 187:3 246:16 248:7 303:17,25 475:3

**shipping**
71:21 475:5

**short**
31:25 51:25 294:13 303:15 421:6

**shot**
85:6

**should've**
30:17 109:21
240:4
248:19,21
403:14
**show**
149:8 187:9,
12 214:22
215:11 226:7
228:18 239:9
245:22
260:13,22
269:16 270:9
412:10
465:24 468:8
487:13,19
488:5,17
489:5,11
490:11,21
491:5,22
492:10,12
500:1
**showed**
165:23 172:1
184:6 185:12
190:16 238:6
318:10 330:7
377:17
415:10,22
416:20
**showing**
174:4 198:18
206:15
214:24
258:22
271:19 273:2
277:4 323:20
334:13
360:25
428:20,22
**shown**
113:4 118:2
171:3 179:18
183:7,19
246:13 259:1
261:6 301:22
313:14,19
353:8 356:10
441:13,15
467:24
487:14
**shows**
47:13 223:24
228:25
239:20
261:14 314:6
447:16
455:21 480:6
**sic**
319:19
349:22
**side**
13:25 14:6
36:20
169:15,16
471:4
**sign**
96:15 308:25
328:7,10
**sign/ countersign**
481:8
**signal**
223:14
236:25 237:4
292:8 389:11
**signaling**
50:9
**signed**
152:14 317:6
393:6 395:25
403:14
406:23
407:13
411:25
412:11,20
413:3 422:22
427:4 481:10
**significance**
499:2,16
**significant**
190:24
191:12
256:19
264:10,18
271:20
290:18
307:11
355:23 390:8
401:16
425:16
435:20
456:18 471:7
**significantly**
79:22 114:2
171:11,24
190:12
437:14
440:10
**signing**
399:15
**silos**
58:19
**silver**
374:11
**similar**
54:4 79:1
124:10 125:9
127:1,20
212:8 237:7
239:19
273:12
298:12
337:10
356:11 363:5
399:9,21
437:19
474:25
486:21 487:1
**similarly**
486:21
**simple**
289:24
292:20 301:5
498:25
**simulate**
191:6 192:5
364:1 366:24
388:21
**simulated**
193:18
232:10,24
233:15,20
234:10
235:10
240:24
384:14,23
385:5,14
386:14
472:12
**simulating**
234:15
**single**
108:8 153:11
205:10,13
366:18
401:23
420:5,18
473:4
**singular**
387:5
**sister**
92:8
**sit**
48:1 130:17
131:7
**sit-**
487:15
**site**
139:6 215:8,
9 400:1
**sites**
352:24
**sits**
268:25 269:2
**sitting**
21:11 108:3
143:12 144:3
151:12
164:14 165:5
180:3 222:23
229:11
314:23 400:1
412:14
413:23
429:18
449:17 475:6
485:1 486:10
487:16
488:22 489:8
490:24 496:4

**situation**
221:13 276:4 290:19 367:9 475:15
**situations**
364:2,5 392:11 475:19
**size**
497:19
**SK**
212:8
**SKF**
212:8 221:5
**Skyline**
445:10
**slide**
324:4
**slight**
306:16 398:4 426:8
**slightly**
92:2 426:19 477:25
**slope**
389:16,24 455:14,15 470:10 471:22
**slopes**
448:15 474:12
**slow**
14:4 89:23 139:21 142:25 253:12 265:13 284:25 294:11 337:4 460:25 461:14,19 463:13 470:20
**slowly**
313:18 388:5
**small**
36:7 96:16 139:19 141:18 153:3,6 154:14 155:2,7 156:3,4,13 161:16 194:3 252:24 323:23 325:2 385:24 441:3 455:10 497:11,15,17
**smaller**
471:5
**Smith**
53:3
**smoking**
243:25 244:5
**snapshot**
370:19
**Society**
54:18
**sodium**
222:7 223:7 225:1,5,16 231:11 235:12 236:20 237:15 238:16 248:24 285:13 294:18 295:3
**soft**
41:23 75:15 369:21
**software**
445:3,13 448:23 450:12 455:18
**sold**
92:10
**sole**
88:23
**solely**
306:16
**solid**
139:22 140:14 197:5 199:15 211:8 278:15 301:23 352:17 353:20
**soliloquy**
166:24
**solution**
313:6 320:2 367:10 388:3,11
**solutions**
278:8 461:2
**solvent**
79:17 268:24 343:19,20,22 345:14 347:6,25 348:8 423:11 424:16,25 425:6,9,20
**solvents**
344:21,24 345:2,6 347:11 460:20
**solving**
34:23
**someone's**
393:11
**sophisticated**
250:12 369:11 476:17
**SOPS**
147:2
**sound**
52:9 100:9
**sounded**
303:16
**sounds**
214:10 299:2
**souped-up**
223:17
**source**
83:15,18 85:19 307:7 466:10
**sources**
88:20 139:8 366:12 413:22 441:22
**sourcing**
63:23
**south**
469:22
**southern**
373:5
**southwest**
379:17
**space**
345:3
**SPALDING**
5:20
**spanning**
35:21
**sparked**
248:4
**spatial**
79:21
**spatially**
85:15
**speak**
14:2 92:22
**speaker**
8:15
**speaking**
89:10 162:9
**speaks**
142:5 288:4 290:24 362:24
**spec**
73:5 75:11, 14,17 76:11, 21 77:15 78:14 80:16, 23 84:5 85:6

243:10 334:19 344:22 345:7 446:4 448:14 470:8
**spec-**
495:10
**special**
81:7,11,16
**Specialist**
5:19,23
**specialized**
35:19
**species**
73:6 75:13 76:25 77:2,4 81:2 83:3 90:6 96:14 98:4 113:23 121:24 125:4,15 173:1,8,17, 24 252:8 285:21 297:7 321:24 324:22 343:4 463:18
**specific**
35:15 67:17 133:8 146:8 161:7 204:9 217:11 292:25 298:12 332:1 357:19 398:17 400:2,10,11, 18,22 414:13 415:7 433:6 480:9 495:14,18
**specifically**
46:7 59:19 61:24 82:5 108:2 125:21 139:16 142:6 143:6 166:18 178:2 191:19 192:13 194:16 210:10,17 218:5 284:1 292:19 321:10,12 359:15 381:18 406:18 409:22 417:15 485:3
**specification**
218:10
**specifications**
338:16,18
**specs**
73:7,25 76:23 243:9 252:23
**spectrometer**
82:22
**spectrometry**
74:25 75:3 77:19 437:13 440:9
**speculate**
443:9
**speculating**
269:25
**speculation**
241:9 242:8 243:5 247:9 257:13 259:8,10 324:9 325:17 425:14 426:1,24 439:9,19
**speculative**
242:10 243:19 247:2 248:18 381:6
**speech**
346:8 383:14
**speed**
278:13
**spelled**
146:14 277:9 399:3,5 483:13
**spend**
18:8 31:3, 16,21 32:13 65:25 119:24 252:10 307:15 369:23
**spending**
191:9
**spent**
16:23 31:9, 25 32:9 33:14,18,22 55:21 56:6 274:8 278:24 279:4 450:17 453:15
**split**
131:19 422:15
**spoken**
20:2
**sponsored**
40:25 41:22 42:17
**spontaneously**
179:13
**spotlight**
8:17
**spotlighted**
8:14
**spots**
75:15
**spreadsheet**
153:14 160:15 161:5,7 163:9 166:17 427:10,14,18 428:6,9,12 429:15 430:14,18,23 446:17 447:11,18
**spreadsheets**
152:25 159:18 393:19 410:6 446:13
**spring**
56:4
**spun**
48:9
**square**
285:2
**stability**
92:6 105:15 106:6,8,16 107:3,7,17 109:5 110:1, 10 169:23 172:4,6 174:10,16,20 175:19,24 176:8,9,12, 19 177:3,15, 17,21,22 178:5,15,18, 21 180:1,10, 12,15,19 181:5 182:1 186:10,17 188:13 196:12 216:13,15 217:3,8,15, 17,19 218:19 219:21 240:16 242:1,14,22, 25 268:21 320:1 326:16 333:1 337:7 338:14 340:14,17,20 371:7,9 373:11,17 375:7,16,18, 21 382:7 416:14 459:2,19

460:23
463:25
**stable**
170:5 171:2, 10,17,20,22 172:2 175:11 176:11 177:2,13 179:12,19,23 180:9 182:6 186:13,17 196:25 375:23,25 461:4,11,13 462:18,22 464:14 465:8
**staff**
57:10 58:21 59:8
**stand**
402:23,25 408:12
**stand-alone**
297:2,9
**standard**
35:12 56:4 107:2 115:24,25 152:17 159:21 160:11,24 162:15 165:9,13 167:4,9 271:16 369:20 373:16 389:12 393:2 399:18,19 400:20 430:11
**standards**
107:2 152:18 383:7 384:5 399:1
**standing**
225:10
**standpoint**
174:11,12
**stands**
48:16
**star**
470:18
**start**
65:24 73:11 77:15 118:5 122:24 126:10 155:22 171:23 181:18,20 281:9 291:15 295:13 344:17 380:11 391:23 455:3 463:5
**started**
10:19 68:14 98:12,22 193:11,16 389:17
**starting**
121:20 190:5 207:7 227:17 283:1 355:15
**starts**
185:24 205:12 289:19 330:17 406:19
**startup**
48:8
**state**
12:2 28:16 61:24 112:12 129:11 133:16 135:13 139:16,18,22 140:14 153:3 180:16 194:25 197:6 199:15 204:13 210:14 211:8 218:23 272:19 392:10 407:17 445:2 452:16
**state-of-the-art**
241:21 247:13 369:2
**stated**
26:17 104:9 144:1 181:6 211:3 364:1 456:13
**statement**
9:17 102:21, 24,25 103:3, 17,22,24 112:1,14 113:11 115:5 116:15,18 119:7 121:1 122:6,12,16, 23 124:2,4, 5,16 126:5,6 127:7,12,13, 25 128:2,10 130:15,24 137:7 147:24 186:23 189:23 195:11 196:7,9 197:12 206:11 209:21 215:9,24 216:1 229:6 230:17 232:19 237:19 274:21 282:24 309:23 312:16 319:20,22 329:2 344:5 382:10 410:18 411:2,7,24 412:15 437:24 438:24 440:24 441:4 448:3 467:16
**statements**
53:25 111:5 122:5 126:3 128:14 148:5,7 203:3 280:8 356:17 439:5 442:14 459:10
**states**
29:9 30:10 112:1,8 116:10 120:6 135:1 136:20 149:14 197:8 206:3 207:9 302:3,6 354:25 360:16 361:14 409:13 428:19 438:19 440:14 477:21
**static**
318:14
**stating**
103:11 136:24 169:25 188:7 259:21 333:6 342:11 343:24 345:25 346:14 359:11 382:5 401:3 410:16 454:20

**statistical** 493:9 496:11 498:1 499:2, 15
**statistically** 264:10,17 271:20 496:20 497:4,10 498:16,23
**statistics** 494:21 496:11 498:8
**stay** 59:10 184:8
**steep** 277:24
**steering** 342:22
**step** 223:12 276:9 403:19,22 404:1 458:19
**steps** 276:6 363:10
**Sterile** 318:25
**stomach** 284:21 384:17 386:24 388:18,19
**stop** 88:18 244:11,18 309:22 416:16 495:8
**stopped** 108:18
**stops** 41:15
**storage** 144:6 145:11 190:11 207:7,10 301:1,3 413:7,12 418:7 419:14,15 420:3,12
**store** 145:9 146:5, 11,18 194:2, 8,9 363:17 373:24
**stored** 144:5,8,11, 23 145:4 146:16,25 147:6 190:12,25 191:13 194:10,12 303:21 315:16 327:3,6 415:11 416:21 417:6,13 418:16 419:5 420:10 421:13
**storing** 145:13
**story** 294:12
**STOY** 5:16
**straightforward** 251:20,21 252:3 277:25
**strange** 390:14
**strategic** 41:12
**strategies** 37:22 49:3
**Street** 5:3,15
**strengths** 331:4
**stressed** 300:18
**strictest** 90:4
**strictly** 478:19
**strike** 380:14
**strong** 14:5 52:8 74:4 100:23 127:24 148:9 248:20 249:18 322:10
**strongly** 461:2,3 462:14
**structure** 334:16
**structures** 324:24 463:24
**studied** 86:13 355:8 356:4
**studies** 39:1 50:18, 22 73:10,17 77:6 79:18 82:17 90:9, 13,17 95:22 96:11 99:22, 23,24 106:14 108:24 109:16 112:23 113:2,8,22 118:1 119:12 121:23 125:22 138:1 141:5 167:12 170:9,22 171:19 173:15,21 193:19,20 196:12 206:2,4,12 211:16 216:10 236:1 244:18 245:22 246:8 253:4 260:18,21,22 261:3,8,18, 19 265:1 274:15 275:11,13, 16,18,25 276:8 277:16 279:24 280:1,6,17, 20 291:14,19 294:18,21 295:2,15,25 297:1,4,11 298:15,16 315:11 318:8,11 327:10 355:24 356:5,8 360:12,13 366:18 368:2 370:1 376:22 377:12 379:2 383:24 384:15,19,23 385:1 387:5, 25 388:13,15 389:2,5 393:4 395:24 412:23,24 464:21,23 466:6 467:22,23 476:7
**study** 93:24 94:4 99:17 108:9 143:17 212:7,8 221:5 222:1, 2 227:8,10 228:5 231:7 232:9,23 233:12,18,25 234:8,9 235:5,6,10

238:6,13
243:23
245:1,13,24
248:22
254:16,19
255:1,10
259:15
260:12,19,25
261:3,5,13,
21 262:1,13,
16 263:2
264:9,19,23
266:7,11,13
267:6
271:19,24
272:2,13,18
273:1,4,7
275:1 280:1
282:1 284:6
285:8 291:18
292:3,19
294:14,17
295:18
298:3,7
315:14,15
316:15
320:20
321:21
326:16
327:16 330:8
333:1
347:14,18
359:25 360:2
375:19
377:17,20
385:4,8,11,
15,21 393:14
394:2 398:2,
12 405:16
416:14
436:14,15
460:16
463:19,22,25
464:24
467:20
468:21 480:4
485:19
487:11
488:15 489:2
490:1,13,17
491:9 495:1,
19,21,23
496:7,23
497:11,17,
20,25 498:15
499:20 500:1

**stuff**
251:23

**subjected**
300:17
301:23 312:6

**subjective**
122:10
363:22 365:5

**subjects**
255:2,18

**submicrogram**
321:7

**submit**
73:14 91:1
172:19,22,23
395:3

**submitted**
22:10 24:15,
18,20,24
25:13 26:2,
5,15 29:19
32:23 60:8
64:15 66:21
82:14,20
84:4 90:24
91:4 105:25
128:16
136:10 140:5
150:25
151:3,13
174:25 176:5
213:14,17,22
235:3
244:24,25
245:7 278:19
394:19,25
414:8,20
418:21 419:1
426:5 440:2
448:5,19,24
449:10
450:21
451:21
452:1,13
459:14

**submitting**
136:16
414:25 436:5

**subsequent**
26:3

**subsequently**
98:14

**substance**
53:10,15
66:2,6
158:3,22
159:25 161:9
162:4,20
163:11 164:8
165:3
166:15,19
182:2 183:16
189:17,21,24
301:22 423:8
429:5,16,21
447:10

**substances**
186:9 428:24

**substantiate**
436:3 464:8

**substantiated**
465:25

**substantiates**
479:1

**success**
276:18

**successful**
35:23 37:21

**successive**
290:4

**sued**
444:2

**sufficient**
102:11
112:5,20
113:10
397:15,19

**sufficiently**
290:3 395:16
397:2

**sugar**
269:6,7

**suggest**
179:23 244:1
380:7 466:18

**suggested**
437:23
438:24

**suggesting**
69:18 185:1
237:22
258:18
259:3,11
292:14

**suggests**
251:13
440:15

**suitable**
50:18 270:6

**Suite**
5:3,8

**sulfate**
344:14

**sulfur**
197:25

**summary**
254:25 255:4
282:10

**summer**
373:5

**sun**
374:10

**super**
239:8 246:1
294:23

**superficial**
111:1

**supplement**
43:2

**supplemental**
11:12 18:14
22:7 29:23
31:14,17,21,
24 64:24

142:11 151:7 391:20 392:9 395:12 402:7 406:11 407:21 409:6 413:5 414:7, 25 419:2 445:1 446:10 448:6 449:6, 20 450:22 452:13 456:14

**supplements** 53:24

**supplier** 303:6 423:24,25 424:9,13 425:1,7 447:5

**supplies** 362:23

**support** 9:11,16 40:23 41:3 62:5 73:15 280:8 395:16 397:3 454:14,17

**supported** 274:17

**supporting** 100:22

**supports** 122:11 394:22

**supposed** 219:17 387:13

**sure** 13:6 22:5 27:17 33:5 40:2 42:3 60:22 69:7 80:6 97:12 98:20 102:3 103:1 107:13 108:3,11,21 109:2 111:12 128:8,20 130:20 138:17 140:2 156:23 157:16,21 161:18,24 165:1 169:16 173:7 175:10 180:7 192:22 198:22 200:20,21,25 203:1 205:16 206:10,22 208:11 213:20 219:19 222:16 223:4 227:10 230:15 237:9 249:8 272:14 277:11 279:10,12 280:18 281:3 284:16 302:5 306:20 307:6 308:6,15,24 318:11,15 329:2,21 334:3,22 336:22 338:24 346:21 349:19 350:22 351:10 353:1 354:2 358:23 360:14 362:25 365:23 369:25 371:2,18 382:2,11,22 387:21 390:25 393:16 399:16,23 415:6 425:20 427:1 429:3 431:10 432:21 433:8 434:18 435:9 443:24 448:18 449:17,23 451:2 456:21 458:24 459:1 460:15 472:15 478:12 486:19 487:15 494:10

**surface** 140:11 181:14,17 184:10,18 336:24

**surprise** 57:19 58:1 60:25 61:6,8 431:24

**surprised** 46:21 47:2 96:15 128:5

**surprising** 315:17

**susceptible** 207:12

**suspect** 267:12 475:19

**swaying** 202:23

**swear** 10:10

**switch** 476:19

**sworn** 10:13

**synthesis** 72:17

**synthetic** 72:16 351:9 390:15

**system** 36:4 80:15 284:9 291:2, 9,16 295:10 344:22 455:23

**systematic** 138:8,13

**systemic** 257:21 258:4

**systems** 368:18 377:22 390:3,15

**SZUMLA** 5:21

**T**

**table** 157:22 158:2,10 165:23 228:5,9 255:14 281:2 283:18 287:22 330:10 335:13 338:13 350:3 422:12,16,18 423:5,6 425:1,7 428:16,19,22 429:1

**tables** 164:13 166:2 228:15 390:21 472:17 479:18

**tablet** 290:5 306:13 327:24 467:2,7

**tablets** 140:11

143:23 167:19 232:10,24 233:14,20 234:10 305:6,16 326:16,24 327:3 328:20,22 329:4 332:16 333:7,11 336:8,24 337:11 429:6 472:11

**tabs**
423:16

**tactics**
49:3

**tad**
479:15

**take**
8:22 24:2,6, 9 25:4 30:1 31:1 38:8 58:6 66:13 110:14 111:12 128:20 131:22 132:25 137:10 156:22 167:18 169:20,24 194:11 195:5 200:4 203:10 213:5,8 214:6 216:3 230:25 233:6 235:23 241:3 254:25 255:4,25 257:16 262:5,23 264:2 275:13 281:19 288:13,21,24 290:6 292:11,25 298:24 299:1 304:10 306:3,4 309:14 311:13 322:13 323:11 326:10 329:11 332:7,22 333:18 336:1 341:3 348:10 349:16 350:20 351:18 352:1 354:14 361:21,23 369:18 370:2 378:12,13 379:8 387:13 388:2 408:19 410:9 430:16 443:17 444:24 457:8 462:5 464:23 491:23 492:1

**take-home**
478:1

**taken**
9:3 21:20 38:15 56:13 73:12 76:1 81:12 157:3 214:15 255:3 299:9 333:9 362:5 387:12 392:4 457:14 458:3

**takes**
57:23 291:17 316:9 363:24 386:20

**taking**
112:18 141:11 205:9,10 289:21 290:19 292:24

**talk**
13:9 19:24 126:15 169:22 174:25 217:25 225:7 228:8 229:17 240:9 443:19 458:10

**talked**
19:21 45:21 54:1 153:18 179:3 208:10 297:19 335:9 342:23 367:24 370:22 375:19 440:25 465:2

**talking**
48:19 65:9 82:5 95:7 99:20 127:17 155:20 161:3 176:1,24 177:11,20 182:22,25 183:1,4 198:21 205:12,16 217:12 227:8 231:1 242:15,16 271:7,8 286:11 292:22,23 308:3 319:23 339:6 340:14 353:11 365:24 375:2 397:14 401:15 417:9 438:17 441:5,6 444:3 449:24 450:3 488:17 491:18,23 494:11

**talks**
133:2 197:22

**Tanner**
212:7,14,19 221:5,21 222:2 223:24 224:19,20 226:14,16 231:1,7 232:9 233:12,18,25 234:8 238:6 245:1,7,12 267:6 359:25

**target**
35:18 62:1, 3,16 173:12

**targeting**
37:2

**targets**
37:20 38:2,9 50:6 278:4

**task**
98:7,10,18 99:5

**tasked**
279:2

**taught**
72:20

**TD50**
129:12,15, 19,23 131:3 133:2,10,17, 23 134:15 477:11

**teach**
56:1,2 57:14

**teaching**
55:21 56:21

**team**
57:23 58:18 59:11 88:24 445:14

**teams**
50:20

**technical**
336:7 352:8
**technically**
51:8 109:17
**technician**
9:10 111:18
131:21
281:21
299:16
319:13
451:6,11
**technicians**
389:7
**technique**
265:16
267:1,4,24
272:6,10,17
343:2,7
344:18
**techniques**
243:15
250:8,12
266:22
274:10 291:8
353:21 442:7
**technology**
34:23 35:9
210:15
243:11
437:13
440:8,25
**techs**
84:5
**tell**
18:11 122:24
139:25
142:15
146:10,20
159:19
165:17 172:7
234:18
240:13 251:3
269:7 297:23
326:7
403:22,25
404:9 405:2
411:11
421:12,16
434:15
443:10,11,18
458:20
**telling**
88:16 292:4
340:15
487:18
**temperature**
84:25 85:20
180:20
182:5,16
188:6,10
194:8,13
207:13
211:22
300:18
301:24
305:18
315:13
316:12
329:16,24
337:3 365:25
366:10,16,19
374:13
379:16
403:25
460:19
461:12
**temperatures**
107:11
142:22
188:19
190:13,14
191:1,14
196:15 301:4
312:7 315:5
316:8 341:9,
10 366:13,24
367:1 375:22
463:7
**templates**
389:4
**ten**
31:19 56:21
288:21 299:1
387:10
492:24
**ten-minute**
361:23
**tendency**
14:2
**Tennessee**
15:8,10
**terabytes**
450:2
**term**
45:14
**terminate**
41:12
**terminated**
51:16 61:10
**terms**
22:22 44:11
46:8 60:2
62:25 69:11
70:5 73:16
81:14 84:16
90:2 107:17
120:8 123:13
126:14 132:5
137:22 138:4
139:11
141:25
146:12,18
150:6 153:15
154:22 156:3
168:19
172:24
173:10,22
174:22
178:16,24
180:9 193:18
197:4 203:2
226:11 227:4
235:25
241:23
249:21,25
296:15
297:22
301:19
315:12 333:8
339:6,20
345:21
352:21,24
365:23
398:14
410:24 419:2
420:6 428:8,
10 450:2,4
478:1 485:5,
19,20 486:20
488:25
490:15
496:15,24
498:3 499:4
**Terry**
370:16
**tertiary**
225:21,25
229:25
230:8,13,18
232:2 256:21
258:12
**test**
80:3 91:5,6
107:20 109:4
150:8 158:17
185:9,10
188:9 212:9
218:11
221:9,12
223:21,23
224:1,3,5,
10,14 226:5,
12,16,18
227:2,5,24
228:21 229:8
232:16,20
236:4 239:4,
6,7 240:5,
14,20 241:6,
24 242:11,
17,21 243:1,
2,3 249:5
313:5 317:24
341:8,12
342:16 344:2
363:15
367:10,12,22
368:6 370:7
371:3,5,8
383:2 416:14
418:5 420:8

**test-**
111:4
**testified**
10:14 23:19 33:13 43:13 80:10 98:11 114:4 119:4 126:16 143:24 144:5,10,12, 23 145:5 146:19 147:7 149:24 150:4 152:24 155:19,21,23 157:24 158:11,16 163:6 168:5, 6 185:11 194:18 211:20 221:3 226:25 233:14,20 234:10 246:25 247:7 277:17 316:14 338:8 362:16,17,25 363:12 369:5 384:7 408:11 413:8 418:17,20 420:14 421:11,17 422:2,4 428:24 429:7,17 431:2 434:25 435:1 453:1 469:4 472:23 478:5 483:4
**testify**
113:16 119:8 229:11
**testifying**
76:10 97:14 109:20 486:25
493:13 497:9
**testimonies**
422:10
**testimony**
10:3 30:21 64:20 72:9 92:16 97:1 104:20 114:6 183:15 212:13 233:3 238:12 249:3 250:2 252:16 267:18 270:3,16 271:1 274:20 277:22 343:24 358:18 367:15 380:25 397:12 417:4 419:10 422:8 436:15 467:9 483:25 484:7,20 486:10,19 488:19 489:7 490:24
**testing**
81:23 82:6 86:4 105:16, 20 106:6,8, 16 107:3,8, 18 108:4 110:1,9 142:16 144:17 174:17,21 175:19,24 176:8,9,19 177:3,15,17, 21,22 178:5, 15 180:1,10, 12,15 181:5 182:1 186:7, 10,17 190:6, 7,16 216:13, 15,25 217:3,
4,5,6,8,15, 17,19 219:21 220:19 232:1,10,23 240:16 242:1,23 249:21 256:5 303:14,21 340:14,17,21 341:7 343:19,22 345:21 347:6 351:14 362:13 365:15 369:10 370:5 371:7,20 372:17 374:2,4 376:18 379:5 380:19 381:13 383:1,20 384:5,15 391:2,5,6, 10,14 405:16 417:2,14,19 418:8 419:8 420:10 421:13 432:22 435:6 454:16 469:6 472:10,25 474:14 475:24 476:2
**tests**
107:2,5,20 188:13 240:13 244:17 250:1 254:6 386:3
**tetrahydropip erine**
344:23
**Teva**
5:1
**text**
323:7 360:15
418:18
**texts**
284:16
**thank**
156:19 214:4 263:14 267:21 305:8 428:20 457:18 476:24 500:12,15
**thanks**
458:9
**That'll**
443:19
**thee**
246:8
**theme**
345:4
**theory**
96:7
**therapeutic**
123:14 147:15 294:6
**thermal**
265:8,20 266:17 267:15 311:17
**thermally**
341:17 342:2,19
**THF**
348:1
**thing**
46:5,15 78:22 160:19 170:12 172:22 173:14 178:22 184:2 191:4 212:6 239:10 243:7 248:9 251:20 272:8 363:8 479:19

**things**
23:18 27:5, 22 36:16 47:18 53:7 66:23 73:19 74:19 76:14, 17,19 79:3, 25 80:13 94:8 96:19 97:10 104:1 105:1 122:8 139:9 141:15 172:18,19 178:20 179:3,14,22 180:23,25 181:2,8,21 184:2,16 193:6 219:9, 18 221:9 243:16,19,21 248:16,19 250:4,13 251:22 253:25 260:7 271:4,14 276:1,13,15 277:4 278:12 279:2 284:5, 12 285:14 291:17 292:15 295:4 296:23 303:16,24 307:12 311:3 318:9 326:4 339:14 347:4 373:3 376:21 380:7 388:7 393:19 394:1 396:25 397:6,14 398:16 400:2,6 401:2,15,20 407:25 416:5 420:20 425:15 429:6 443:17,20 444:9,13 447:4,9 449:3 455:9 460:22

**think**
20:24 27:2 43:11 44:1 45:9 47:11, 23 48:15 52:1 54:23 59:25 64:8,9 65:8,22 66:4 68:19 73:19 74:21 84:11, 12,24 85:5, 18 89:19 90:3 91:24, 25 92:23,24 93:23 94:3 96:6 98:16 101:16 104:25 106:13 109:15 113:12 115:15 122:19 125:22 135:8 146:8,16 147:18 148:23 149:25 150:4 153:11 154:1 159:8 160:21 168:15 175:5 181:9 182:22,24 183:4,24 187:10 199:19 209:22 210:6,20 218:17 228:6,12 229:6 242:10 246:13 247:24 248:18 249:18 251:13,17,25 252:20 255:15 257:12 258:10 259:7 264:24,25 265:7 266:21 267:11 269:21 276:3 277:23 279:5 281:6,7,12, 16 290:24 292:5,16 293:9 297:10,12, 18,21 303:25 312:2 315:8 324:5 325:14 328:13 335:12 338:12 352:10 355:19 362:14,23 364:10,18,22 365:2,19 368:22,23 370:23 371:14 372:23 373:2 376:16 378:15 379:23 380:10 385:1 386:13 406:15 407:25 408:7 419:19 422:19 436:16 446:1 453:20 454:4 461:22 470:18 472:22 474:6,10,21 475:9,10,11, 18,21 479:5, 22 483:23 492:5 500:19

**thinking**
84:15 244:14 295:6

**thioether**
307:23

**third**
121:19 313:24 450:11

**third-party**
32:2 33:6 190:8 341:7 342:10 346:13

**THOMPSON**
5:9

**thompsons@ gtlaw.com**
5:10

**thorough**
476:8

**thoroughly**
209:17 216:7 218:24 220:7 309:20,24 310:9

**thought**
18:16,19 51:14 60:10 83:7 168:16 274:7 304:7, 8 327:10 378:5 406:5 442:20

**thoughts**
68:12 365:14

**thousand**
266:21 387:9,10

**thousands**
184:15 369:23 420:6 441:7,17

**three**
12:8 17:11 56:5 152:10 204:11

314:2,19,24 331:4 336:18 339:25
**threshold** 75:9 113:25 130:2 131:6 134:19,22 135:14,15 136:20,21, 22,25 137:3 164:16 172:13 335:16 477:15 478:4
**thresholds** 244:19
**throughput** 50:5
**throws** 473:14
**tics** 446:4 448:14
**tight** 419:23 455:11
**tighten** 425:22
**till** 336:20
**time** 9:5,14 12:9, 11 16:8,14 18:8 20:9, 15,21,22 21:17,18,22, 23 23:18 24:21 26:10 28:1 29:5,17 30:6,10 31:3,5,6,16, 20,25 32:5, 11,18,25 33:17 35:24 38:11 42:24 46:3 47:23 51:11 55:20 56:6 63:17 65:22 66:1, 2,7 69:1 73:3 74:1 75:23,24 76:3,4 85:7 87:18 89:1 96:5 99:12 119:24 130:22 139:20 140:8 149:10 150:3 156:25 157:1,5,6 167:11 177:15 182:3,16 184:7,21 187:14 188:10 190:18 191:10 210:15 211:22,25 212:1 213:25 214:13,17,18 217:9 234:17 235:23 241:11,12 250:7 252:11 268:8 274:8 278:24 291:1,7,21 293:7 299:6, 7,11,12 300:16 307:15 316:13 318:15 321:8,13 323:9 325:25 326:5 329:20 330:22 331:5 333:18 334:14 340:5 342:7 343:17 346:2 350:21 356:19 360:10 362:3,7 369:19 370:2,19 375:10,13 376:21 378:6 379:9 382:1 390:7,11,12 391:22 392:2,6,7 396:18 397:23 398:2 412:10 442:11 449:8 450:24 454:6,10 455:11 456:2 457:11,12, 16,17,19,20 458:1,2,5,6 472:15 473:11 475:7 482:24 483:22 485:7,10 491:3 495:5 500:13,16, 22,23,24
**timelines** 53:7
**times** 12:7,18 17:3 27:2 41:2,4, 9 51:21,24 52:1,19 63:4,9 82:24 120:13,14 163:21,24 250:1 294:7 447:15 448:12 455:12 490:20 491:22 492:16,24 494:20 495:11,12 496:1 498:20 500:2
**Tired** 57:21
**tissue** 174:8 463:5
**tissues** 174:6 356:12
**title** 224:21 225:2,14,19 429:1
**titled** 57:21 231:8 238:13 254:16 275:11 332:13 336:6
**TK** 82:18
**today** 9:4 11:24 12:23 15:4,7 17:5 18:12 20:7,12,15 96:20 97:15, 17 98:18 108:3 114:23 143:13 144:3 151:13 180:4 222:23 229:11 243:12 251:21 253:2 278:17 323:15 400:2 412:14 413:23 417:4 429:18 465:3 485:2 486:11 487:16 489:8 490:24 496:4
**told** 176:13 194:11,12 234:5 274:22 323:15 324:6 399:7 426:23 494:3
**tolerability** 39:3

**tolerate**
239:12
**Tom**
14:18 15:14 17:7,21 18:4 225:10 458:12
**tomorrow**
393:11
**tons**
184:15,16,25
**tool**
37:24 38:9 39:25 267:2 268:5,6 269:10,13 357:12
**top**
84:14 130:5, 9 169:3 189:15 213:9 215:9 283:13 304:8 319:11 322:6 323:8, 13 329:13,14 357:9 402:18 409:12 426:14 433:5
**topic**
87:2 114:6
**topics**
273:24 276:13,21 278:12 458:21 459:11 476:19
**total**
20:17,20,21 32:9 40:15 47:4,13 63:18 64:1 72:17 83:7 156:6 331:5 339:8 424:25 425:6,9,20
**totality**
138:9,14,19, 23 141:22 291:24 310:16
**totally**
348:8
**touch**
463:14
**tox**
75:8 77:17 123:13
**toxic**
96:9,15 97:6 124:21,23 284:12,14 285:17 286:4
**toxicity**
96:14 99:25 110:23 285:22 286:10,16, 19,22
**toxicological**
332:14 355:16,17,20 356:8,9
**toxicology**
38:17 70:11, 14 82:17 201:17 356:4
**toxin**
97:13
**trace**
172:20 253:25 349:13 403:12 437:15 440:11 441:3,6,9 467:5
**traces**
446:3
**tracked**
327:1
**Trackwise**
218:9
**trade**
478:18
**train**
57:14
**trained**
59:1
**training**
58:24 70:6 72:18 247:13
**transcript**
372:10,12 381:10
**transcripts**
19:11,13,16 201:8
**transition**
85:14
**transitions**
85:25
**translated**
221:12
**translates**
124:7
**translational**
44:3 45:1,12 56:9 278:11
**transport**
71:21 304:2
**transposed**
390:22
**TRAURIG**
5:2,7
**travel**
343:12
**treated**
104:10 263:3 285:4
**treating**
252:1
**treatment**
263:5 264:14
**treatments**
40:8
**treats**
70:24
**tremendous**
441:15
**trend**
218:10,11
**trial**
5:23 18:22 38:19 90:23 193:19 246:7 476:11 479:6
**trials**
39:5,6,10,11 301:6
**trigger**
330:12
**triggers**
207:14
**trim**
73:7
**triple**
73:24 75:17 76:23 82:22 243:8,9
**trouble**
21:14
**troubling**
443:2
**truck**
373:4
**true**
152:9 237:19 274:21 439:13 440:24 441:4 446:15,16 448:3 449:7 473:14
**try**
13:15 41:18, 20 62:3 76:24 77:11 96:11,12 167:6 174:1 192:2 317:17 368:1 373:10 382:5 387:21 398:10 434:15 476:18

**trying**
49:17 87:16 114:9 141:5, 12 154:22 164:6 172:19 176:11 177:13 180:9 181:4 183:2 187:10 191:6 192:5 204:17 227:20,22 229:21 268:3 296:21 315:15 319:12 350:7 378:19 380:6 387:24 398:8 445:25 476:8 488:20 499:13

**Tuesday**
9:4

**tumor**
112:5,21 113:10

**tumors**
117:25 118:14,20 121:24 286:8 296:4

**turn**
105:7 111:23 117:9,11 121:17 128:23 157:19 179:5 185:15,17 187:17 204:3 205:23 231:15 235:4 255:13,22 263:7 304:25 312:23 320:5,16 327:22 332:21 355:12 357:7 372:14 409:9,10 422:18 440:3 451:5

**turned**
13:21 14:7 469:21

**twisting**
344:3

**two**
12:18 16:25 20:25 24:21 25:11 26:15 55:18 61:9 68:13 118:7 134:3,11 153:12 173:24 183:25 198:23 201:22 204:5,10 266:20 278:25 279:8 301:10 319:11 330:18,21 331:16,17 333:6 349:5 357:10 361:15 391:5 414:8 423:15 461:16 476:13 486:5,12 489:16 490:18 491:1 493:20 495:3 496:6,12,17

**two-day**
372:8

**two-dozen**
80:3

**two-thirds**
477:6

**type**
88:21 205:6 405:7

**types**
51:17 419:4

**typically**
118:16 148:10 153:25 172:18 173:17 174:2 268:14 296:14 328:3

**typo**
29:13

**typographical**
29:12 30:12

**U**

**U.S.**
373:5

**Uh-huh**
289:4 402:21

**Uhm**
136:23 405:17

**ultimate**
280:8 474:19,20

**ultimately**
333:9

**umbrella**
50:4

**unable**
445:4 452:16

**unacceptable**
202:18 203:6

**unaware**
209:24 220:21 293:6 318:10 358:19

**unchanged**
171:10 179:21

**unclear**
484:13

**uncovered**
404:13

**undergraduates**
56:3

**underline**
407:8

**underlying**
151:2 198:15 393:17

**understand**
12:23 13:14, 17 14:10 28:2 58:17 64:13 75:15 76:6,25 77:3 86:18 119:20,21 122:8 126:8 127:16 154:22 164:6 167:15 174:1 176:11,12 177:14 180:9 181:24 198:24 227:21,22 229:21,22 266:22 286:23 287:20 362:9 364:12 381:9,16 398:20 399:23 400:19 492:6 494:10 496:13 497:9

**understanding**
64:19 108:25 276:21

**understands**
397:21

**understood**
11:19 13:3, 11 152:16 165:1 167:17 347:15 393:8 396:2

**undertaking** 62:7
**undertook** 138:4
**underway** 88:19
**Undesirable** 197:2
**Undoubtedly** 290:19
**unethical** 54:22 298:5, 17
**unexpired** 168:21 169:1
**unfamiliar** 174:23 175:2 278:12
**unidentified** 312:18
**uniform** 370:25 441:12
**unimportant** 95:8 164:3 165:15 419:16
**unique** 82:4 83:3
**United** 149:14 302:3,6
**units** 147:1
**Universities** 45:5
**university** 36:8 44:1,7, 8,25 45:1 56:2 61:18, 22 399:2
**unknown** 331:6,22
**unlike** 58:18
**unmet** 45:13
**unpleasant** 197:9
**unpredictable** 46:5 62:19
**unqualified** 89:9 324:13
**unquote** 57:25
**unrealistic** 295:5 370:11
**unrelated** 59:17 60:14 61:13
**unreliable** 54:15 248:1 252:9 266:6 272:15 274:25 275:1 276:16 293:21,22 472:4,6 475:20
**unsealed** 168:11 405:9
**unsophisticated** 291:7
**unstable** 170:1,15,16 182:19,23,25 183:3,12,14, 16,18 185:2 196:14,20 464:10 465:9
**untimeliness** 11:15
**untimely** 10:21,23 11:6
**unusual** 139:21
**upcoming** 452:23
**update** 101:7 341:6 354:11 358:16
**updated** 24:1 47:17
**upheld** 54:10 55:2
**upper** 8:24 165:13 436:18
**upwards** 57:9
**urine** 171:11 255:3 256:8,11 257:24 258:6,23 259:6,20 260:11 263:5 264:12 377:24 461:24 476:12 479:13
**UTC** 9:5 21:17,22 75:24 76:3 156:25 157:5 214:13,17 299:6,11 362:3,8 392:2,7 457:12,17 458:2,6 500:22
**utilized** 347:10 348:13 393:17 446:12
**UV** 74:13,17

**V**

**vague** 120:8 274:2
**vaguely** 254:23
**valid** 127:25 142:8
**validated** 81:23 82:7, 15,16,19 250:16 359:13 360:8,17
**validating** 77:24 78:2,7
**validation** 396:4
**validity** 481:17 482:5
**Valisure** 248:1,8 341:8 376:16
**Valsartan** 79:16
**value** 129:12,16, 20,23 131:3 133:18,24 134:16 167:11 238:10 293:22 368:22 477:11
**values** 133:3,11 167:12 235:25 302:24 425:24 426:3 435:1 436:3, 19 490:15 496:22
**Vanderbilt** 36:1,5,7,18 38:5,20,25 40:3,10,13, 15 42:7 43:7,8,18,25 44:7,8,15,24 45:18 47:13 48:9 51:13 55:11 57:1,

11,23 59:13, 15 60:14 61:12,16 90:24 399:20,22
**vapor** 344:9
**variability** 498:10
**variables** 367:19 374:17 475:18
**variations** 106:18,21 303:9 345:4 374:13 398:5
**varied** 56:15
**varies** 41:5 46:20 55:14 63:3 182:3 462:7
**variety** 63:17 80:18 152:12 179:17 182:4 275:15 363:16 373:12 374:5 375:7 381:13 382:7 471:14
**various** 28:23 39:23 50:6 73:1 82:23 106:24 170:22,25 171:19 324:24 353:20 357:5 366:25 377:6 381:15 384:15 386:3 389:21 431:20 459:7 465:18
**vary** 365:17 366:13
**varying** 192:3 302:14,18 365:24 366:3 383:7 384:23 385:7,16 390:6
**vast** 166:6 268:19
**vaster** 362:20
**vehicle** 222:1
**vein** 257:19 462:25
**vendor** 450:6
**vendors'** 170:25
**verbally** 10:2
**verses** 424:19 447:10
**version** 171:14 174:3 262:20 263:10
**versus** 35:12 55:11, 17,21,22 69:14 97:20 250:9 296:16 367:11 389:18 424:12 425:17 446:18 485:23 487:6 489:21 494:17 498:4 499:6
**vet** 390:24
**vetted** 150:21 364:6 421:23
**vials** 142:21
**video** 8:13,15,20, 22 9:10 214:12 362:2 500:18,21
**video-recorded** 9:1
**VIDEOGRAPHER** 5:22 8:1 21:16,21 75:22 76:2 156:24 157:4 214:11,16 281:3 299:5, 10 362:1,6 392:1,5 457:10,15,25 458:4 500:17,20
**view** 8:16,24 127:16 274:13 285:16 360:15 368:20 469:18 478:20
**viewed** 54:22
**vitro** 90:8,9 138:1 170:5 175:11 196:25 240:24
**vivo** 90:13,16 93:24 94:4 138:2 170:6 171:9 173:15,25 175:12 179:19 193:20 196:25 221:24 223:18 233:8 249:7 271:19 276:4
**volatile** 78:23 81:1 199:13 211:6 215:5 266:24 268:15,17,23 343:8,9 344:8 345:2, 12,13 348:3, 23 349:13,23 353:10
**volatilize** 268:22 343:11 344:16
**voltage** 80:16 85:1
**volume** 388:19 424:25 425:6,9,20
**volumes** 280:14
**voluminous** 427:17
**volunteers** 39:2 377:21

**W**

**wait** 13:6 336:20 387:14
**waive** 10:6
**waiving** 10:24
**walk** 164:17 218:2 411:4 412:7 488:5 489:6,

12 491:19
**wanes**
41:1
**want**
8:21 10:19 22:17 69:23, 24 88:13,15 92:4 95:18 98:20 102:8 120:10 143:15 155:4 156:22 158:9 169:15 175:3 176:4,17 180:24 185:23 205:7 216:9 217:25 225:7 229:5, 17 236:2 263:19 264:2 285:18,19 292:15 300:12 305:2,19 314:25 325:15 356:1 359:7 391:13 392:18 398:17 412:9 422:16,17 428:16 442:23 443:8 476:19 478:13 488:19 489:7 490:23 493:16 498:18
**wanted**
49:8 53:5 214:22 215:11 263:23 311:4 369:4
**WAR/84**
317:3
**warn**
288:7
**warnings**
41:10 293:4
**wash**
378:2
**waste**
412:10
**water**
87:13,17 88:13,20 181:13,16 183:6,19 184:4,11 352:23,24 387:14 388:3
**wavelength**
320:25 321:25 322:3
**waxes**
41:1
**way**
43:3 44:1 50:21 63:9 66:11 85:17 109:10 128:6 132:22 164:24 178:23 210:20 221:14,17 228:20 234:14 242:9 248:9 256:2 258:1,17 261:15 268:20 274:9 291:10 295:16 303:4 309:12 345:3,10,19 363:3 364:11 365:17 369:11 376:23 379:6 408:17 426:22 430:17 436:24 440:22 445:14 447:17,24 448:15 453:12 455:18 467:4 469:24 471:20 474:11,22 477:7,20 480:4 481:22 500:8
**ways**
80:9,12 209:10 252:24 330:19,21 331:16,17 409:22 410:7
**wealth**
245:24
**website**
48:22
**week**
17:6,9 56:5 326:15
**weeks**
96:5 240:18 242:4 243:1 329:5 333:12 446:1
**weigh**
78:19 418:5
**weighing**
419:16
**weight**
78:8,11,23 79:1 82:11 84:14 268:17 270:5 285:9 294:7 321:23 413:13 418:6
**weights**
85:25 345:7
**well-controlled**
377:16
**went**
18:13 38:11 54:12 82:17 160:7 162:7 194:7 210:9 277:3 383:4 390:21 412:18 420:3 425:19 456:18
**West**
15:12
**whatsoever**
383:24 467:1
**wheelhouse**
202:24
**whereabouts**
15:9
**white**
330:22
**whopping**
285:14
**wide**
155:17,24 156:1 470:13,14,15 472:21
**wiggle**
172:15,17
**William**
12:3
**wise**
289:23 292:20
**withdraw**
43:6 81:7,9 109:11
**withdrawal**
187:21
**withdrawing**
92:3 105:14
**withdrawn**
149:5,14 187:4,5,23 212:2
**withheld**
245:12,15

**witness**
6:3 8:13,14, 16,20 10:2, 10,12 27:17 55:17 56:12, 23 68:24 121:5 135:11 143:2 213:7 253:15 254:20 261:24 262:14 263:15,21 265:13 281:6 283:12 289:4 321:19 350:23 365:1 383:18 396:2 482:25 490:2 495:9,10 499:10,13

**witness's**
8:22

**witnessed**
152:14 410:23

**witnesses**
410:17

**witnessing**
399:15

**women**
249:15

**wonder**
105:1

**wondering**
386:1

**Woodcock**
149:18

**word**
45:10 65:19 184:1

**worded**
477:25

**wording**
187:10

**words**
227:17 292:18 344:4

**work**
16:16,20 20:22 24:19 29:14,21 30:22 32:25 33:4 35:18 36:14 37:7, 12,15,20 44:13 45:5, 17,23 46:1, 9,10 49:24 55:10,11,17, 21,23 56:12, 23 58:16,18, 19 68:20 73:2 74:16 79:16 82:3 90:23 98:15 101:18 108:9 115:9 124:16 127:6 128:9, 13 150:18, 20,23 152:8 163:23 174:9 193:15,16 211:11,18 230:13 234:17 240:11 279:1,9 289:3 293:20 302:21 312:1 363:25 364:5,8 369:22,25 378:9 379:22 385:10 388:17 392:15,24 393:5 396:23 397:16,18,20 398:14 402:5,6 443:10 444:5

**workaround**
347:9

**worked**
24:22 33:25 34:3,6,10, 13,16 35:25 36:10 38:4 59:2 73:23 74:25 85:11 152:9,10,11 278:2 400:21 443:12

**worked-up**
396:20

**working**
16:23 17:14 31:6 72:23 77:23 81:15 99:12

**works**
272:10 351:9 455:19

**workshop**
200:14 201:1,9,13 372:7,9 381:17

**workups**
481:6

**world**
239:10 249:6 304:1 363:16,21 364:2,4,23 365:3,7,10 366:21 367:5,8,13, 20,22 368:6, 13,20,21 370:12,21 372:24 373:19 378:19,24 388:2 475:11,12,15

**worst**
239:9

**worth**
279:8

**would've**
109:21 127:24 247:4 252:20 376:10 425:24 481:2

**write**
64:10 65:10 280:13

**writing**
17:1 54:3,21 111:8 130:19 428:18

**written**
99:1 109:10 388:9 393:3 395:23 405:21 406:8 408:5 448:13 477:19 481:4

**wrong**
126:5 128:3 179:1 245:20 248:2 272:6, 10 281:23 344:4

**wrote**
103:1 110:25 128:2,3 135:6,25 174:24 477:10

**Wyeth**
12:12

**X**

**X------------------**
6:2

**X-RAY**
463:24

**XCMS**
445:10

**Y**

**yeah**
26:23 36:6 42:18 44:22 62:10 104:15 111:1 113:5, 19 118:24 135:11,24 136:4,7 152:22 154:20 159:8 160:18 164:12 183:20,24 212:16,17 213:11 215:20 216:19 224:21 225:19 228:24 230:12 231:17 232:14 236:17 242:9 255:14 261:21 270:4 272:3 281:14,18 319:9,13 322:16 324:10 327:20 331:13 333:16 335:21 341:1 351:20,24 352:10 358:2 369:8 372:23 382:10 393:23 394:15 400:16 403:21 406:5,14 414:16 426:13 428:11 431:9 432:3 433:20 435:5 439:18,22 450:4 451:9, 13 469:1,3 486:15 495:7

**year**
31:5 34:7,14 47:25 48:21, 23 55:15 63:12,16,17, 21 87:4,7

**yearly**
55:9

**years**
16:25 20:25 24:21 25:11 34:18 40:18 41:6 42:4, 13,22 45:22, 25 54:19 55:18 57:6 60:20 63:19 74:24 91:16 177:1,2 178:6 204:11 216:16 219:22 247:5,8 276:11,17,19 278:2,25 279:8 349:10 355:9 380:21 461:16

**yellow**
318:24 319:19 320:2,7,20 323:21 466:13,21 467:5

**yesterday**
17:7,19 18:4

**yield**
226:11,15 227:1,4 235:14 239:25 285:4

**yields**
282:16

**Yokoo**
141:10 142:14 143:14 464:24

**Z**

**Zantac**
9:6 86:8 92:10 109:1 120:1 170:21 220:2 232:10,24 233:14,20 234:9 239:20 244:4 245:25 246:9,17,22 248:5 253:22 260:15 262:4 265:17 266:9 268:5,7 271:8,10 274:24 275:24 311:6 326:16 332:16 336:8 337:9 343:5, 13 346:25 458:14 462:5 464:22 466:15 467:6

**Zantac's**
304:21

**Zeng**
68:10 193:12 248:11 265:11,23 272:9 273:12 358:21

**zero**
390:9 490:8 494:5

**zone**
382:17,18 383:1,9

**zones**
382:18 383:7 384:6

**zoom**
14:23 15:2 17:6,9 289:14 312:13 319:10